# EXHIBIT "4"

 **THE BOND MARKET ASSOCIATION**

# Master Repurchase Agreement

September 1996 Version

Dated as of   August 22, 2008

Between:      Fenway Capital, LLC (the "Buyer")

and           Lehman Commercial Printing Inc. (the "Seller")

## 1.  Applicability

From time to time the parties hereto may enter into transactions in which one party ("Seller") -- agrees to transfer to the other ("Buyer") securities or other assets ("Securities") against the transfer of funds by Buyer, with a simultaneous agreement by Buyer to transfer to Seller such Securities at a date certain or on demand, against the transfer of funds by Seller. Each such transaction shall be referred to herein as a "Transaction" and, unless otherwise agreed in writing, shall be governed by this Agreement, including any supplemental terms or conditions contained in Annex I hereto and in any other annexes identified herein or therein as applicable hereunder.

## 2.  Definitions

(a) "Act of Insolvency", with respect to any party, (i) the commencement by such party as debtor of any case or proceeding under any bankruptcy, insolvency, reorganization, liquidation, moratorium, dissolution, delinquency or similar law, or such party seeking the appointment or election of a receiver, conservator, trustee, custodian or similar official for such party or any substantial part of its property, or the convening of any meeting of creditors for purposes of commencing any such case or proceeding or seeking such an appointment or election, (ii) the commencement of any such case or proceeding against such party, or another seeking such an appointment or election, or the filing against a party of an application for a protective decree under the provisions of the Securities Investor Protection Act of 1970, which (A) is consented to or not timely contested by such party, (B) results in the entry of an order for relief, such an appointment or election, the issuance of such a protective decree or the entry of an order having a similar effect, or (C) is not dismissed within 15 days, (iii) the making by such party of a general assignment for the benefit of creditors, or (iv) the admission in writing by such party of such party's inability to pay such party's debts as they become due;

(b) "Additional Purchased Securities", Securities provided by Seller to Buyer pursuant to Paragraph 4 (a) hereof;

17530520 07150725

JPM-PALMDALE00000388
WC000009

**Exhibit 4, Page 38**

(c) "Buyer's Margin Amount", with respect to any Transaction as of any date, the amount obtained by application of the Buyer's Margin Percentage to the Repurchase Price for such Transaction as of such date;

(d) "Buyer's Margin Percentage", with respect to any Transaction as of any date, a percentage (which may be equal to the Seller's Margin Percentage) agreed to by Buyer and Seller or, in the absence of any such agreement, the percentage obtained by dividing the Market Value of the Purchased Securities on the Purchase Date by the Purchase Price on the Purchase Date for such Transaction;

(e) "Confirmation", the meaning specified in Paragraph 3(b) hereof;

(f) "Income", with respect to any Security at any time, any principal thereof and all interest, dividends or other distributions thereon;

(g) "Margin Deficit", the meaning specified in Paragraph 4(a) hereof;

(h) "Margin Excess", the meaning specified in Paragraph 4(b) hereof;

(i) "Margin Notice Deadline", the time agreed to by the parties in the relevant Confirmation, Annex I hereto or otherwise as the deadline for giving notice requiring same-day satisfaction of margin maintenance obligations as provided in Paragraph 4 hereof (or, in the absence of any such agreement, the deadline for such purposes established in accordance with market practice);

(j) "Market Value", with respect to any Securities as of any date, the price for such Securities on such date obtained from a generally recognized source agreed to by the parties or the most recent closing bid quotation from such a source, plus accrued Income to the extent not included therein (other than any Income credited or transferred to, or applied to the obligations of, Seller pursuant to Paragraph 5 hereof) as of such date (unless contrary to market practice for such Securities);

(k) "Price Differential", with respect to any Transaction as of any date, the aggregate amount obtained by daily application of the Pricing Rate for such Transaction to the Purchase Price for such Transaction on a 360 day per year basis for the actual number of days during the period commencing on (and including) the Purchase Date for such Transaction and ending on (but excluding) the date of determination (reduced by any amount of such Price Differential previously paid by Seller to Buyer with respect to such Transaction);

(l) "Pricing Rate", the per annum percentage rate for determination of the Price Differential;

(m) "Prime Rate", the prime rate of U.S. commercial banks as published in The Wall Street Journal (or, if more than one such rate is published, the average of such rates);

(n) "Purchase Date", the date on which Purchased Securities are to be transferred by Seller to Buyer;

17530520 07150725

2 · September 1996 · Master Repurchase Agreement

JPM-PALMDALE00000389

WC000010

(o) "Purchase Price", (i) on the Purchase Date, the price at which Purchased Securities are transferred by Seller to Buyer, and (ii) thereafter, except where Buyer and Seller agree otherwise, such price increased by the amount of any cash transferred by Buyer to Seller pursuant to Paragraph 4(b) hereof and decreased by the amount of any cash transferred by Seller to Buyer pursuant to Paragraph 4 (a) hereof or applied to reduce Seller's obligations under clause (ii) of Paragraph 5 hereof;

(p) "Purchased Securities", the Securities transferred by Seller to Buyer in a Transaction hereunder, and any Securities substituted therefor in accordance with Paragraph 9 hereof. The term "Purchased Securities" with respect to any Transaction at any time also shall include Additional Purchased Securities delivered pursuant to Paragraph 4(a) hereof and shall exclude Securities returned pursuant to Paragraph 4 (b) hereof;

(q) "Repurchase Date", the date on which Seller is to repurchase the Purchased Securities from Buyer, including any date determined by application of the provisions of Paragraph 3 (c) or 11 hereof;

(r) "Repurchase Price", the price at which Purchased Securities are to be transferred from Buyer to Seller upon termination of a Transaction, which will be determined in each case (including Transactions terminable upon demand) as the sum of the Purchase Price and the Price Differential as of the date of such determination;

(s) "Seller's Margin Amount", with respect to any Transaction as of any date, the amount obtained by application of the Seller's Margin Percentage to the Repurchase Price for such Transaction as of such date;

(t) "Seller's Margin Percentage", with respect to any Transaction as of any date, a percentage (which may be equal to the Buyer's Margin Percentage) agreed to by Buyer and Seller or, in the absence of any such agreement, the percentage obtained by dividing the Market Value of the Purchased Securities on the Purchase Date by the Purchase Price on the Purchase Date for such Transaction.

3. **Initiation; Confirmation; Termination**

(a) An agreement to enter into a Transaction may be made orally or in writing at the initiation of either Buyer or Seller. On the Purchase Date for the Transaction, the Purchased Securities shall be transferred to Buyer or its agent against the transfer of the Purchase Price to an account of Seller.

(b) Upon agreeing to enter into a Transaction hereunder, Buyer or Seller (or both), as shall be agreed, shall promptly deliver to the other party a written confirmation of each Transaction (a "Confirmation"). The Confirmation shall describe the Purchased Securities (including CUSIP number, if any), identify Buyer and Seller and set forth (i) the Purchase Date, (ii) the Purchase Price, (iii) the Repurchase Date, unless the Transaction is to be terminable on demand, (iv) the Pricing Rate or Repurchase Price applicable to the Transaction, and (v) any additional terms or conditions of the Transaction not inconsistent with this Agreement. The Confirmation, together with this Agreement, shall constitute conclusive evidence of the terms agreed between Buyer and Seller with respect to the Transaction to which the Confirmation relates, unless with respect to the Confirmation specific objection is made promptly after receipt thereof. In

17530520 07150725                                 3 • September 1996 • Master Repurchase Agreement

JPM-PALMDALE00000390
WC000011

**Exhibit 4, Page 40**

the event of any conflict between the terms of such Confirmation and this Agreement, this Agreement shall prevail.

(c) In the case of Transactions terminable upon demand, such demand shall be made by Buyer or Seller, no later than such time as is customary in accordance with market practice, by telephone or otherwise on or prior to the business day on which such termination will be effective. On the date specified in such demand, or on the date fixed for termination in the case of Transactions having a fixed term, termination of the Transaction will be effected by transfer to Seller or its agent of the Purchased Securities and any Income in respect thereof received by Buyer (and not previously credited or transferred to, or applied to the obligations of, Seller pursuant to Paragraph 5 hereof) against the transfer of the Repurchase Price to an account of Buyer.

### 4. Margin Maintenance

(a) If at any time the aggregate Market Value of all Purchased Securities subject to all Transactions in which a particular party hereto is acting as Buyer is less than the aggregate Buyer's Margin Amount for all such Transactions (a "Margin Deficit"), then Buyer may by notice to Seller require Seller in such Transactions, at Seller's option, to transfer to Buyer cash or additional Securities reasonably acceptable to Buyer ("Additional Purchased Securities"), so that the cash and aggregate Market Value of the Purchased Securities, including any such Additional Purchased Securities, will thereupon equal or exceed such aggregate Buyer's Margin Amount (decreased by the amount of any Margin Deficit as of such date arising from any Transactions in which such Buyer is acting as Seller).

(b) If at any time the aggregate Market Value of all Purchased Securities subject to all Transactions in which a particular party hereto is acting as Seller exceeds the aggregate Seller's Margin Amount for all such Transactions at such time (a "Margin Excess"), then Seller may by notice to Buyer require Buyer in such Transactions, at Buyer's option, to transfer cash or Purchased Securities to Seller, so that the aggregate Market Value of the Purchased Securities, after deduction of any such cash or any Purchased Securities so transferred, will thereupon not exceed such aggregate Seller's Margin Amount (increased by the amount of any Margin Excess as of such date arising from any Transactions in which such Seller is acting as Buyer).

(c) If any notice is given by Buyer or Seller under subparagraph (a) or (b) of this Paragraph at or before the Margin Notice Deadline on any business day, the party receiving such notice shall transfer cash or Additional Purchased Securities as provided in such subparagraph no later than the close of business in the relevant market on such day. If any such notice is given after the Margin Notice Deadline, the party receiving such notice shall transfer such cash or Securities no later than the close of business in the relevant market on the next business day following such notice.

(d) Any cash transferred pursuant to this Paragraph shall be attributed to such Transactions as shall be agreed upon by Buyer and Seller.

(e) Seller and Buyer may agree, with respect to any or all Transactions hereunder, that the respective rights of Buyer or Seller (or both) under subparagraphs (a) and (b) of this Paragraph may be exercised only where a Margin Deficit or Margin Excess, as the case

17530520 07130725

4 • September 1996 • Master Repurchase Agreement

JPM-PALMDALE00000391
WC000012

may be, exceeds a specified dollar amount or a specified percentage of the Repurchase Prices for such Transactions (which amount or percentage shall be agreed to by Buyer and Seller prior to entering into any such Transactions).

(f) Seller and Buyer may agree, with respect to any or all Transactions hereunder, that the respective rights of Buyer and Seller under subparagraphs (a) and (b) of this Paragraph to require the elimination of a Margin Deficit or a Margin Excess, as the case may be, may be exercised whenever such a Margin Deficit or Margin Excess exists with respect to any single Transaction hereunder (calculated without regard to any other Transaction outstanding under this Agreement).

## 5. Income Payments

Seller shall be entitled to receive an amount equal to all Income paid or distributed on or in respect of the Securities that is not otherwise received by Seller, to the full extent it would be so entitled if the Securities had not been sold to Buyer. Buyer shall, as the parties may agree with respect to any Transaction (or, in the absence of any such agreement, as Buyer shall reasonably determine in its discretion), on the date such Income is paid or distributed either (i) transfer to or credit to the account of Seller such Income with respect to any Purchased Securities subject to such Transaction or (ii) with respect to Income paid in cash, apply the Income payment or payments to reduce the amount, if any, to be transferred to Buyer by Seller upon termination of such Transaction. Buyer shall not be obligated to take any action pursuant to the preceding sentence (A) to the extent that such action would result in the creation of a Margin Deficit, unless prior thereto or simultaneously therewith Seller transfers to Buyer cash or Additional Purchased Securities sufficient to eliminate such Margin Deficit, or (B) if an Event of Default with respect to Seller has occurred and is then continuing at the time such Income is paid or distributed.

## 6. Security Interest

Although the parties intend that all Transactions hereunder be sales and purchases and not loans, in the event any such Transactions are deemed to be loans, Seller shall be deemed to have pledged to Buyer as security for the performance by Seller of its obligations under each such Transaction, and shall be deemed to have granted to Buyer a security interest in, all of the Purchased Securities with respect to all Transactions hereunder and all Income thereon and other proceeds thereof.

## 7. Payment and Transfer

Unless otherwise mutually agreed, all transfers of funds hereunder shall be in immediately available funds. All Securities transferred by one party hereto to the other party (i) shall be in suitable form for transfer or shall be accompanied by duly executed instruments of transfer or assignment in blank and such other documentation as the party receiving possession may reasonably request, (ii) shall be transferred on the book-entry system of a Federal Reserve Bank, or (iii) shall be transferred by any other method mutually acceptable to Seller and Buyer.

17530520 07150725                    5 • September 1996 • Master Repurchase Agreement

**Exhibit 4, Page 42**

JPM-PALMDALE00000392
WC000013

8. **Segregation of Purchased Securities**

To the extent required by applicable law, all Purchased Securities in the possession of Seller shall be segregated from other securities in its possession and shall be identified as subject to this Agreement. Segregation may be accomplished by appropriate identification on the books and records of the holder, including a financial or securities intermediary or a clearing corporation. All of Seller's interest in the Purchased Securities shall pass to Buyer on the Purchase Date and, unless otherwise agreed by Buyer and Seller, nothing in this Agreement shall preclude Buyer from engaging in repurchase transactions with the Purchased Securities or otherwise selling, transferring, pledging or hypothecating the Purchased Securities, but no such transaction shall relieve Buyer of its obligations to transfer Purchased Securities to Seller pursuant to Paragraph 3, 4 or 11 hereof, or of Buyer's obligation to credit or pay Income to, or apply Income to the obligations of, Seller pursuant to Paragraph 5 hereof.

---

**Required Disclosure for Transactions in Which the Seller Retains Custody of the Purchased Securities**

Seller is not permitted to substitute other securities for those subject to this Agreement and therefore must keep Buyer's securities segregated at all times, unless in this Agreement Buyer grants Seller the right to substitute other securities. If Buyer grants the right to substitute, this means that Buyer's securities will likely be commingled with Seller's own securities during the trading day. Buyer is advised that, during any trading day that Buyer's securities are commingled with Seller's securities, they [will] * [may] ** be subject to liens granted by Seller to [its clearing bank] * [third parties] ** and may be used by Seller for deliveries on other securities transactions. Whenever the securities are commingled, Seller's ability to resegregate substitute securities for Buyer will be subject to Seller's ability to satisfy [the clearing] * [any] ** lien or to obtain substitute securities.

* Language to be used under 17 C.F.R. 13403.4(e) if Seller is a government securities broker or dealer other than a financial institution.
** Language to be used under 17 C.F.R. 13403.5(d) if Seller is a financial institution.

---

9. **Substitution**

(a) Seller may, subject to agreement with and acceptance by Buyer, substitute other Securities for any Purchased Securities. Such substitution shall be made by transfer to Buyer of such other Securities and transfer to Seller of such Purchased Securities. After substitution, the substituted Securities shall be deemed to be Purchased Securities.

(b) In Transactions in which Seller retains custody of Purchased Securities, the parties expressly agree that Buyer shall be deemed, for purposes of subparagraph (a) of this Paragraph, to have agreed to and accepted in this Agreement substitution by Seller of other Securities for Purchased Securities; provided, however, that such other Securities shall have a Market Value at least equal to the Market Value of the Purchased Securities for which they are substituted.

17530520 07150725

6 • September 1996 • Master Repurchase Agreement

JPM-PALMDALE00000393
WC000014

## 10. Representations

Each of Buyer and Seller represents and warrants to the other that (i) it is duly authorized to execute and deliver this Agreement, to enter into Transactions contemplated hereunder and to perform its obligations hereunder and has taken all necessary action to authorize such execution, delivery and performance, (ii) it will engage in such Transactions as principal (or, if agreed in writing, in the form of an annex hereto or otherwise, in advance of any Transaction by the other party hereto, as agent for a disclosed principal), (iii) the person signing this Agreement on its behalf is duly authorized to do so on its behalf (or on behalf of any such disclosed principal), (iv) it has obtained all authorizations of any governmental body required in connection with this Agreement and the Transactions hereunder and such authorizations are in full force and effect and (v) the execution, delivery and performance of this Agreement and the Transactions hereunder will not violate any law, ordinance, charter, bylaw or rule applicable to it or any agreement by which it is bound or by which any of its assets are affected. On the Purchase Date for any Transaction Buyer and Seller shall each be deemed to repeat all the foregoing representations made by it.

## 11. Events of Default

In the event that (i) Seller fails to transfer or Buyer fails to purchase Purchased Securities upon the applicable Purchase Date, (ii) Seller fails to repurchase or Buyer fails to transfer Purchased Securities upon the applicable Repurchase Date, (iii) Seller or Buyer fails to comply with Paragraph 4 hereof, (iv) Buyer fails, after one business day's notice, to comply with Paragraph 5 hereof, (v) an Act of Insolvency occurs with respect to Seller or Buyer, (vi) any representation made by Seller or Buyer shall have been incorrect or untrue in any material respect when made or repeated or deemed to have been made or repeated, or (vii) Seller or Buyer shall admit to the other its inability to, or its intention not to, perform any of its obligations hereunder (each an "Event of Default"):

(a) The nondefaulting party may, at its option (which option shall be deemed to have been exercised immediately upon the occurrence of an Act of Insolvency), declare an Event of Default to have occurred hereunder and, upon the exercise or deemed exercise of such option, the Repurchase Date for each Transaction hereunder shall, if it has not already occurred, be deemed immediately to occur (except that, in the event that the Purchase Date for any Transaction has not yet occurred as of the date of such exercise or deemed exercise, such Transaction shall be deemed immediately canceled). The nondefaulting party shall (except upon the occurrence of an Act of Insolvency) give notice to the defaulting party of the exercise of such option as promptly as practicable.

(b) In all Transactions in which the defaulting party is acting as Seller, if the nondefaulting party exercises or is deemed to have exercised the option referred to in subparagraph (a) of this Paragraph, (i) the defaulting party's obligations in such Transactions to repurchase all Purchased Securities, at the Repurchase Price therefor on the Repurchase Date determined in accordance with subparagraph (a) of this Paragraph, shall thereupon become immediately due and payable, (ii) all Income paid after such exercise or deemed exercise shall be retained by the nondefaulting party and applied to the aggregate unpaid Repurchase Prices and any other amounts owing by the defaulting party hereunder, and (iii) the defaulting party shall immediately deliver to the nondefaulting party any Purchased Securities subject to such Transactions then in the defaulting party's possession or control.

17530520 07150725                                7 · September 1996 · Master Repurchase Agreement

JPM-PALMDALE00000394
WC000015

(c) In all Transactions in which the defaulting party is acting as Buyer, upon tender by the nondefaulting party of payment of the aggregate Repurchase Prices for all such Transactions, all right, title and interest in and entitlement to all Purchased Securities subject to such Transactions shall be deemed transferred to the nondefaulting party, and the defaulting party shall deliver all such Purchased Securities to the nondefaulting party.

(d) If the nondefaulting party exercises or is deemed to have exercised the option referred to in subparagraph (a) of this Paragraph, the nondefaulting party, without prior notice to the defaulting party, may:

(i) as to Transactions in which the defaulting party is acting as Seller, (A) immediately sell, in a recognized market (or otherwise in a commercially reasonable manner) at such price or prices as the nondefaulting party may reasonably deem satisfactory, any or all Purchased Securities subject to such Transactions and apply the proceeds thereof to the aggregate unpaid Repurchase Prices and any other amounts owing by the defaulting party hereunder or (B) in its sole discretion elect, in lieu of selling all or a portion of such Purchased Securities, to give the defaulting party credit for such Purchased Securities in an amount equal to the price therefor on such date, obtained from a generally recognized source or the most recent closing bid quotation from such a source, against the aggregate unpaid Repurchase Prices and any other amounts owing by the defaulting party hereunder; and

(ii) as to Transactions in which the defaulting party is acting as Buyer, (A) immediately purchase, in a recognized market (or otherwise in a commercially reasonable manner) at such price or prices as the nondefaulting party may reasonably deem satisfactory, securities ("Replacement Securities") of the same class and amount as any Purchased Securities that are not delivered by the defaulting party to the nondefaulting party as required hereunder or (B) in its sole discretion elect, in lieu of purchasing Replacement Securities, to be deemed to have purchased Replacement Securities at the price therefor on such date, obtained from a generally recognized source or the most recent closing offer quotation from such a source.

Unless otherwise provided in Annex I, the parties acknowledge and agree that (1) the Securities subject to any Transaction hereunder are instruments traded in a recognized market, (2) in the absence of a generally recognized source for prices or bid or offer quotations for any Security, the nondefaulting party may establish the source therefor in its sole discretion and (3) all prices, bids and offers shall be determined together with accrued Income (except to the extent contrary to market practice with respect to the relevant Securities).

(e) As to Transactions in which the defaulting party is acting as Buyer, the defaulting party shall be liable to the nondefaulting party for any excess of the price paid (or deemed paid) by the nondefaulting party for Replacement Securities over the Repurchase Price for the Purchased Securities replaced thereby and for any amounts payable by the defaulting party under Paragraph 5 hereof or otherwise hereunder.

(f) For purposes of this Paragraph 11, the Repurchase Price for each Transaction hereunder in respect of which the defaulting party is acting as Buyer shall not increase above the

17530520 07150723                                8 • September 1996 • Master Repurchase Agreement

**Exhibit 4, Page 45**

JPM-PALMDALE00000395

WC000016

amount of such Repurchase Price for such Transaction determined as of the date of the exercise or deemed exercise by the nondefaulting party of the option referred to in subparagraph (a) of this Paragraph.

(g) The defaulting party shall be liable to the nondefaulting party for (i) the amount of all reasonable legal or other expenses incurred by the nondefaulting party in connection with or as a result of an Event of Default, (ii) damages in an amount equal to the cost (including all fees, expenses and commissions) of entering into replacement transactions and entering into or terminating hedge transactions in connection with or as a result of an Event of Default, and (iii) any other loss, damage, cost or expense directly arising or resulting from the occurrence of an Event of Default in respect of a Transaction.

(h) To the extent permitted by applicable law, the defaulting party shall be liable to the nondefaulting party for interest on any amounts owing by the defaulting party hereunder, from the date the defaulting party becomes liable for such amounts hereunder until such amounts are (i) paid in full by the defaulting party or (ii) satisfied in full by the exercise of the nondefaulting party's rights hereunder. Interest on any sum payable by the defaulting party to the nondefaulting party under this Paragraph 11(h) shall be at a rate equal to the greater of the Pricing Rate for the relevant Transaction or the Prime Rate.

(i) The nondefaulting party shall have, in addition to its rights hereunder, any rights otherwise available to it under any other agreement or applicable law.

## 12. Single Agreement

Buyer and Seller acknowledge that, and have entered hereinto and will enter into each Transaction hereunder in consideration of and in reliance upon the fact that, all Transactions hereunder constitute a single business and contractual relationship and have been made in consideration of each other. Accordingly, each of Buyer and Seller agrees (i) to perform all of its obligations in respect of each Transaction hereunder, and that a default in the performance of any such obligations shall constitute a default by it in respect of all Transactions hereunder, (ii) that each of them shall be entitled to set off claims and apply property held by them in respect of any Transaction against obligations owing to them in respect of any other Transactions hereunder and (iii) that payments, deliveries and other transfers made by either of them in respect of any Transaction shall be deemed to have been made in consideration of payments, deliveries and other transfers in respect of any other Transactions hereunder, and the obligations to make any such payments, deliveries and other transfers may be applied against each other and netted.

## 13. Notices and Other Communications

Any and all notices, statements, demands or other communications hereunder may be given by a party to the other by mail, facsimile, telegraph, messenger or otherwise to the address specified in Annex II hereto, or so sent to such party at any other place specified in a notice of change of address hereafter received by the other. All notices, demands and requests hereunder may be made orally, to be confirmed promptly in writing, or by other communication as specified in the preceding sentence.

17530520 07150725

9 • September 1996 • Master Repurchase Agreement

JPM-PALMDALE00000396
WC000017

### 14. Entire Agreement; Severability

This Agreement shall supersede any existing agreements between the parties containing general terms and conditions for repurchase transactions. Each provision and agreement herein shall be treated as separate and independent from any other provision or agreement herein and shall be enforceable notwithstanding the unenforceability of any such other provision or agreement.

### 15. Non-assignability; Termination

(a) The rights and obligations of the parties under this Agreement and under any Transaction shall not be assigned by either party without the prior written consent of the other party, and any such assignment without the prior written consent of the other party shall be null and void. Subject to the foregoing, this Agreement and any Transactions shall be binding upon and shall inure to the benefit of the parties and their respective successors and assigns. This Agreement may be terminated by either party upon giving written notice to the other, except that this Agreement shall, notwithstanding such notice, remain applicable to any Transactions then outstanding.

(b) Subparagraph (a) of this Paragraph 15 shall not preclude a party from assigning, charging or otherwise dealing with all or any part of its interest in any sum payable to it under Paragraph 11 hereof.

### 16. Governing Law

This Agreement shall be governed by the laws of the State of New York without giving effect to the conflict of law principles thereof.

### 17. No Waivers, Etc.

No express or implied waiver of any Event of Default by either party shall constitute a waiver of any other Event of Default and no exercise of any remedy hereunder by any party shall constitute a waiver of its right to exercise any other remedy hereunder. No modification or waiver of any provision of this Agreement and no consent by any party to a departure herefrom shall be effective unless and until such shall be in writing and duly executed by both of the parties hereto. Without limitation on any of the foregoing, the failure to give a notice pursuant to Paragraph 4(a) or 4(b) hereof will not constitute a waiver of any right to do so at a later date.

### 18. Use of Employee Plan Assets

(a) If assets of an employee benefit plan subject to any provision of the Employee Retirement Income Security Act of 1974 ("ERISA") are intended to be used by either party hereto (the "Plan Party") in a Transaction, the Plan Party shall so notify the other party prior to the Transaction. The Plan Party shall represent in writing to the other party that the Transaction does not constitute a prohibited transaction under ERISA or is otherwise exempt therefrom, and the other party may proceed in reliance thereon but shall not be required so to proceed.

17530520 07150725

10 • September 1996 • Master Repurchase Agreement

**Exhibit 4, Page 47**

JPM-PALMDALE00000397
WC000018

(b) Subject to the last sentence of subparagraph (a) of this Paragraph, any such Transaction shall proceed only if Seller furnishes or has furnished to Buyer its most recent available audited statement of its financial condition and its most recent subsequent unaudited statement of its financial condition.

(c) By entering into a Transaction pursuant to this Paragraph, Seller shall be deemed (i) to represent to Buyer that since the date of Seller's latest such financial statements, there has been no material adverse change in Seller's financial condition which Seller has not disclosed to Buyer, and (ii) to agree to provide Buyer with future audited and unaudited statements of its financial condition as they are issued, so long as it is a Seller in any outstanding Transaction involving a Plan Party.

### 19. Intent

(a) The parties recognize that each Transaction is a "repurchase agreement" as that term is defined in Section 101 of Title 11 of the United States Code, as amended (except insofar as the type of Securities subject to such Transaction or the term of such Transaction would render such definition inapplicable), and a "securities contract" as that term is defined in Section 741 of Title 11 of the United States Code, as amended (except insofar as the type of assets subject to such Transaction would render such definition inapplicable).

(b) It is understood that either party's right to liquidate Securities delivered to it in connection with Transactions hereunder or to exercise any other remedies pursuant to Paragraph 11 hereof is a contractual right to liquidate such Transaction as described in Sections 555 and 559 of Title 11 of the United States Code, as amended.

(c) The parties agree and acknowledge that if a party hereto is an "insured depository institution," as such term is defined in the Federal Deposit Insurance Act, as amended ("FDIA"), then each Transaction hereunder is a "qualified financial contract," as that term is defined in FDIA and any rules, orders or policy statements thereunder (except insofar as the type of assets subject to such Transaction would render such definition inapplicable).

(d) It is understood that this Agreement constitutes a "netting contract" as defined in and subject to Title IV of the Federal Deposit Insurance Corporation Improvement Act of 1991 ("FDICIA") and each payment entitlement and payment obligation under any Transaction hereunder shall constitute a "covered contractual payment entitlement" or "covered contractual payment obligation", respectively, as defined in and subject to FDICIA (except insofar as one or both of the parties is not a "financial institution" as that term is defined in FDICIA).

### 20. Disclosure Relating to Certain Federal Protections

The parties acknowledge that they have been advised that:

(a) in the case of Transactions in which one of the parties is a broker or dealer registered with the Securities and Exchange Commission ("SEC") under Section 15 of the Securities Exchange Act of 1934 ("1934 Act"), the Securities Investor Protection Corporation has taken the position that the provisions of the Securities Investor

JPM-PALMDALE00000398

WC000019

Protection Act of 1970 ("SIPA") do not protect the other party with respect to any Transaction hereunder;

(b) in the case of Transactions in which one of the parties is a government securities broker or a government securities dealer registered with the SEC under Section 15C of the 1934 Act, SIPA will not provide protection to the other party with respect to any Transaction hereunder; and

(c) in the case of Transactions in which one of the parties is a financial institution, funds held by the financial institution pursuant to a Transaction hereunder are not a deposit and therefore are not insured by the Federal Deposit Insurance Corporation or the National Credit Union Share Insurance Fund, as applicable.

**Exhibit 4, Page 49**

JPM-PALMDALE00000399
WC000020

FENWAY CAPITAL, LLC, as Buyer

LEHMAN COMMERCIAL PAPER INC.,
as Seller

By: GLOBAL SECURITIZATION
SERVICES, LLC, its Manager

By: _____

Name: Bernard J. Angelo
Title:  Senior Vice President

By: _____

Name: _____
Title: _____

S-1        September 1996 • Master Repurchase Agreement

**Exhibit 4, Page 50**

\

FENWAY CAPITAL, LLC, as Buyer

By: GLOBAL SECURITIZATION
SERVICES, LLC, its Manager

By: _____
Name:
Title:

LEHMAN COMMERCIAL PAPER INC.,
as Seller

By: _____
Name: Paolo Tonucci
Title: Global Treasurer

S-1          September 1996 · Master Repurchase Agreement

**Exhibit 4, Page 51**

JPM-PALMDALE00000401
WC000022

EXECUTION COPY

ANNEX I

Supplemental Terms and Conditions

This Annex I, dated as of August 22, 2008, forms a part of the Master Repurchase Agreement dated as of August 22, 2008 (the "Agreement") between Lehman Commercial Paper Inc. and Fenway Capital, LLC. Capitalized terms used but not defined in this Annex I shall have the meanings ascribed to them in the Agreement.

1.     Other Applicable Annexes    In addition to this Annex I and Annex II, the following Annexes and any Schedules thereto shall form a part of the Agreement and shall be applicable thereunder:

Annex III     Hold-in-Custody Transactions
Addendum     Whole Loan Addendum

2.     The following Supplemental Terms and Conditions shall apply:

(a)     **Definitions.**

(i)     Section 2 shall be amended by replacing each indicated term with the following definitions:

"Margin Deficit" has (x) the meaning specified in Paragraph 4(a) of the Agreement or (y) with respect to any Securities held pursuant to a Tri-Party Custody Agreement, the meaning specified in such Tri-Party Custody Agreement.

"Margin Excess" has (x) the meaning specified in Paragraph 4(b) of the Agreement or (y) with respect to any Securities held pursuant to a Tri-Party Custody Agreement, the meaning specified in such Tri-Party Custody Agreement.

"Pricing Rate" means Buyer's Cost of Funds plus 0.22%, or such other rate as is otherwise agreed by Buyer and Seller from time to time.

(ii)     Section 2 shall be amended by adding in the proper alphabetical order the definitions indicated in Part 2 to this Annex I.

(b)     **Confirmation.** Section 3(a) and Section 3(b). Seller shall deliver to Buyer each Confirmation referred to in Paragraph 3(b) of the Agreement.

(c)     **Margin.** Section 4(a) and (b) shall be amended by adding the word "written" before the word "notice". As regards Transactions which are processed through Euroclear or where the Purchased Securities are held-in-custody with Seller, all calculations of Market Value shall be performed by Seller.

17528925 07150725

JPM-PALMDALE00000402
WC000023

(d)    **Substitution.**  The parties hereto hereby agree to amend Section 9 of this Agreement by

(i)    deleting and replacing Section 9(b) with the following:

In Transactions in which Seller retains custody of Purchased Securities, the parties expressly agree that Buyer shall be deemed, for purposes of subparagraph (a) of this Paragraph, to have agreed to and accepted in this Agreement substitution by Seller of other Securities for Purchased Securities; *provided, however,* that such other Securities shall have a Market Value at least equal to the Market Value of the Purchased Securities for which they are substituted.

(ii)    adding at the end thereto the following paragraphs (c) and (d):

"(c)    In the case of any Transaction for which the Repurchase Date is other than the business day immediately following the Purchase Date and with respect to which Seller does not have any existing right to substitute substantially the same Securities for the Purchased Securities, Seller shall have the right, subject to the proviso to this sentence, with notice to Buyer, which notice shall be given at or prior to 11:00 a.m.  (New York time) on the business day immediately following Seller's transfer to Buyer of substantially the same Securities for any Purchased Securities; *provided, however,* that Buyer may elect, by the close of business on the business day notice is received, or by the close of the next business day if notice is given after 11:00 a.m.  (New York time) on such day, not to accept such substitution.  In the event such substitution is accepted by Buyer, such substitution shall be completed by Buyer's transfer to Seller of such Purchased Securities, and after substitution, the substituted Securities shall be deemed to be Purchased Securities.  In the event Buyer elects not to accept such substitution, Buyer shall offer Seller the right to terminate the Transaction, in which case Seller shall pay any related Breakage.

"(d)    In the event Seller exercises its right to substitute or terminate under sub-paragraph (c), Seller shall be obligated to pay to Buyer, by the close of the business day of such substitution or termination, as the case may be, an amount equal to (A) Buyer's actual cost (including all fees, expenses and commissions) of (i) entering into replacement transactions; (ii) entering into or terminating hedge transactions; and/or (iii) terminating transactions or substituting securities in like transactions with third parties in connection with or as a result of such substitution or termination, (B) to the extent Buyer determines not to enter into replacement transactions, the loss incurred by Buyer directly arising or resulting from such substitution or termination and (C) any Breakage.  The foregoing amounts shall be solely determined and calculated by Buyer in good faith."

17528925 07150725

**Exhibit 4, Page 53**

JPM-PALMDALE00000403

WC000024

(c)    **Events of Default.**

(i)    The first paragraph in Section 11 shall be deleted and replaced with the following:

"In the event that (i) Seller fails to transfer Purchased Securities upon the applicable Purchase Date, (ii) Buyer fails to pay the Purchase Price on the Purchase Date (subject to Buyer's ability to issue Commercial Paper Notes on such Purchase Date), (iii) Seller fails to pay any Price Differential on the related Price Differential Payment Date, or to pay the Repurchase Price on the Repurchase Date, (iv) Seller fails to pay any Breakage or other amounts owing under this Agreement when due, (v) Seller or Buyer fails to comply with Paragraph 4 hereof, (vi) an Act of Insolvency occurs with respect to Seller, the Guarantor or Buyer, (vii) any representation made by Seller, the Guarantor or Buyer shall have been incorrect or untrue in any material respect when made or repeated or deemed to have been made or repeated, (viii) Seller fails to comply with any other covenant or agreement on its part under this Agreement and such failure continues for one business day after Seller obtains knowledge of such failure, (ix) Seller, the Guarantor or Buyer shall admit to the other its inability to, or its intention not to, perform any of its obligations hereunder, or (x) the Guarantee shall cease to be in full force and effect (each an "Event of Default"):"

(ii)    Paragraph 11(a) is amended by (i) deleting the parenthetical in the first sentence and replacing it with the following: ", after written notice (provided that no such notice shall be required in regards to an Act of Insolvency and an Event of Default shall automatically be deemed to have occurred in such event)" and (ii) inserting after the words "have occurred hereunder" the following: "(unless the defaulting party has cured or remedied such Event of Default)".

(iii)    Section 11(b) shall be deleted and replaced with the following:

"(b)    In all Transactions in which the defaulting party is acting as Seller, if the nondefaulting party exercises or is deemed to have exercised the option referred to in subparagraph (a) of this Paragraph, (i) the defaulting party's obligations in such Transactions to repurchase all Purchased Securities, at the Repurchase Price therefor on the Repurchase Date determined in accordance with subparagraph (a) of this Paragraph plus Breakage thereon and other amounts owing hereunder, shall thereupon become immediately due and payable, and the nondefaulting party may exercise any and all other rights available to it at law or in equity, (ii) all Income paid after such exercise or deemed exercise shall be retained by the nondefaulting party and applied to the aggregate unpaid Repurchase Prices and any other amounts owing by the defaulting party hereunder, and (iii) the defaulting party shall immediately deliver to the nondefaulting

17528925 07150725

3

JPM-PALMDALE00000404
WC000025

**Exhibit 4, Page 54**

party any Purchased Securities subject to such Transactions then in the defaulting party's possession or control."

(iv)    Section 11(d)(i) shall be deleted and replaced with the following:

"(i)    as to Transactions in which the defaulting party is acting as Seller, the Buyer may instruct the MI Administrator and any custodian with respect to the Purchased Securities and without limiting the scope of the Buyer's rights thereunder, the Buyer, in its sole good faith discretion, may immediately sell, in a public or private sale, or in any other manner, any or all Purchased Securities subject to such Transactions and apply the proceeds thereof (after deducting all of the Buyer's and/or the MI Administrator's costs and expenses of disposition) to the aggregate unpaid Repurchase Prices, any Breakage and any other amounts owing by the defaulting party hereunder. If a surplus of such proceeds remains after payment in full of the Seller's outstanding obligations (net of any costs, expenses and taxes), the Buyer shall with reasonable promptness pay such proceeds to the Seller or its successors. Seller may, but shall have no obligation to bid in any such sale; and"

(v)    A new Section 11(d)(iii) is hereby created, which reads:

"The nondefaulting party shall act in good faith and in a commercially reasonable manner in connection with the exercise of any remedies pursuant to Paragraph 11 of the Agreement."

(vi)    Section 11(j). A new Section 11(j) shall be inserted as follows:

"Upon the occurrence of an Event of Default in respect of the Seller in addition to all its other rights and obligations under the Agreement, at law and in equity, the Buyer shall have the rights and obligations of a secured party under the Uniform Commercial Code of the State of New York in respect of a debt equal to all amounts owing under this Agreement."

(f)    Remedies for Purchased Securities Delivery Failure. Notwithstanding clauses (i), (ii) and (iii) of the introductory paragraph to Paragraph 11 of the Agreement, it will not be an Event of Default:

(A)    if Seller fails to transfer all or any portion of the Purchased Securities on the applicable Purchase Date for a Transaction, but Buyer may, by written notice to Seller,

(1)    if Buyer has paid to Seller the Purchase Price relating to any of such undelivered Securities, require Seller to immediately repay the sum so paid together with all related Breakage;

(2)    if there exists a Margin Deficit in respect of such Transaction require Seller to pay (in accordance with the notice and delivery requirements

4

17528923 07150723

**Exhibit 4, Page 55**

JPM-PALMDALE00000405

WC000026

of Paragraph 4 of the Agreement) margin in an amount equal to such Margin Deficit; and

     (3)  at any time while such failure continues, terminate such Transaction (but only such Transaction) ("**Buyer Mini Close-out**")

and upon such termination, the provisions of Paragraph 11 of the Agreement shall apply with respect to the terminated Transaction (but only such Transaction).

(B)  if Buyer fails to transfer Purchased Securities on the applicable Repurchase Date for a Transaction, but Seller may, by written notice to Buyer,

     (1)  if Seller has paid the Repurchase Price to Buyer, require Buyer to immediately repay the sum so paid;

     (2)  if there exists a Margin Excess in respect of such Transaction under the Agreement including the relevant Transaction, require Buyer to pay (in accordance with the notice and delivery requirements of Paragraph 4 of the Agreement and subject to paragraph 2(m) below) margin in an amount equal to such Margin Excess; and

     (3)  at any time while such failure continues, terminate such Transaction (but only such Transaction) ("Seller Mini Close-out", and together with Buyer Mini Close-out, "Mini Close-out")

and upon such termination, the provisions of Paragraph 11 of the Agreement (as amended) shall apply with respect to the terminated Transaction (but only such Transaction).

Any repayment of the Purchase Price or Repurchase Price pursuant to Clauses (A)(1) or (B)(1) above, any transfer of margin pursuant to Clauses (A)(2) or (B)(2) above and any payment due pursuant to Clauses (A)(3) or (B)(3) above, shall be due and payable within the time period specified in Paragraph 4(c) of the Agreement (as if such notice from Buyer or Seller, as the case may be, were a notice requesting the delivery of margin). For the avoidance of doubt, Paragraph 5 (Income Payments) shall apply in the event Buyer fails to deliver Purchased Securities on the Repurchase Date and Seller elects not to terminate the Transaction.

(g)  **Paragraph 12 of the Repurchase Agreement is hereby amended by deleting the second sentence in its entirety and inserting the following in lieu thereof:**

"Accordingly, each of Buyer and Seller agrees (i) to perform all of its obligations in respect of each Transaction hereunder and that a default in the performance of any such obligations shall constitute a default by it in respect of all Transactions hereunder and (ii) that, other than with respect to sections (vii) and (ix) of the introductory paragraph to Paragraph 11, (a) each of them shall be entitled to set

17528925 07150725

5

JPM-PALMDALE00000406
WC000027

off claims and apply property held by them in respect of any Transaction against obligations owing to them in respect of any other Transactions hereunder and (b) payments, deliveries and other transfers made by either of them in respect of any Transaction shall be deemed to have been made in consideration of payments, deliveries and other transfers in respect of any other Transactions hereunder, and the obligations to make any such payments, deliveries and other transfers may be applied against each other and netted."

(h)    **Payments by Seller to Buyer.**

Notwithstanding anything in this Agreement to the contrary,

(i)    Payment by Seller of Price Differential.  The Seller or the Guarantor (to the extent Seller fails to pay) shall pay to the Buyer on each Price Differential Payment Date an amount equal to the accrued unpaid Price Differential.

(ii)   Breakage.  In the event that Seller or the Guarantor pays the Repurchase Price or any portion thereof prior to the originally scheduled Repurchase Date (including without limitation pursuant to Paragraph 2(i) of this Annex I, Paragraph 9 or Paragraph 11 and regardless of which party is the defaulting party), it or the Guarantor (to the extent Seller fails to pay) shall pay in addition the related Breakage.

(iii)  Time of Payment.  Seller shall pay all amounts due from it under this Agreement to Buyer by 12:00 p.m. New York time on the date due.

(iv)   Guarantee.  In the event of Seller's failure to pay by 12:00 p.m. (New York time) amounts owing under clause (i) or (ii) above on the date such amounts are due, the Guarantor shall make such payments by 2:30 p.m. (New York time) on such date.

(i)    **Accelerated Repurchase Date.**

Buyer or Seller may declare the aggregate Repurchase Price of all Transactions then outstanding under this Agreement immediately due and payable by providing notice to the other party by 10:00 a.m. (New York City time) on any day upon which such declaration is to occur.

(j)    **Term.**

At any time after the first anniversary of the date of this Agreement, either party may terminate this Agreement by written notice to the other; provided that such termination shall not occur until the 270th day after the date of such notice or, if such 270th day is not a Business Day, the first Business Day thereafter (such 270th day (or succeeding Business Day, as applicable, the "Termination Date").

6

JPM-PALMDALE00000407
WC000028

**Exhibit 4, Page 57**

(k)    **Eligible Assets.**

The Seller covenants that all Purchased Assets offered for sale hereunder shall be Eligible Assets.

(l)    **Other Documents.**

Each party shall deliver to the other, upon request, other documents such as tax forms, financial statements, articles of incorporation, corporate resolutions, or other evidence of capacity, authority, incumbency and specimen signatures and any other relevant documents that are required by law or are reasonably requested. Without limitation of the foregoing Seller shall deliver to the Buyer an opinion as to the enforceability of this Agreement and the Guarantee, the perfection of the security interest granted hereunder and related matters satisfactory to the Buyer, which opinion may be an opinion of Seller's in-house counsel.

(m)    **Indemnification.**

The Seller hereby agrees to indemnify, defend and hold the Buyer and the Program Manager and each of their respective affiliates and their respective officers, managers, members or shareholders (and the direct and indirect owners of such members or shareholders), employees, representatives and agents (the "Indemnified Parties") harmless from and against any and all losses, claims, damages, causes of action, suits, liabilities, costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) or judgments of whatever kind and nature (collectively, "Losses"), imposed upon, incurred by or asserted against any Indemnified Party arising out of or based upon this Agreement, any Confirmation, any custodial arrangement or the transactions contemplated thereby or hereby except to the extent resulting from the gross negligence or willful misconduct of the Buyer or, to the extent the MI Administrator is obligated to indemnify the Buyer for such Losses, the gross negligence or willful misconduct of the MI Administrator.

(n)    **Limited Recourse.**

Except as expressly set forth herein, the obligations of the Buyer under this Agreement, any Confirmations and any Transaction are solely the limited liability company obligations of the Buyer.  Except as expressly set forth herein, no recourse shall be had for the payment of any amount owing by the Buyer under the Agreement or for the payment by the Buyer of any fee or any other obligation or claim of or against the Buyer arising out of or based upon the Agreement, against any employee, officer, director, incorporator or the manager or other affiliate of the Buyer; provided, however, that the foregoing shall not in the event of any fraud or willful misconduct, stop the Seller from instituting or prosecuting legal proceedings against the person or persons committing such fraud or willful misconduct.  The Seller acknowledges that the Buyer shall be liable for any

7

17528925 07150723

JPM-PALMDALE00000408
WC000029

claims that it or any party may have against the Buyer only to the extent funds are or become available to pay such claims pursuant to the Base Indenture and the Buyer's other conduit program documents. The provisions of this paragraph shall survive termination of this Agreement.

(o)    **Non-Petition.**

The Seller hereby agrees that it shall not, prior to the date which is one year and one day (or if longer, the applicable preference period then if effect) after the payment in full of the latest maturing note issued by the Buyer under the Base Indenture, acquiesce, petition or otherwise, directly or indirectly, invoke or cause the Buyer to invoke the process of any governmental authority for the purpose of commencing or sustaining a case against the Buyer under any federal or state bankruptcy, insolvency or similar law or appointing a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar official of the Buyer or any substantial part of its property or ordering the winding up or liquidation of the affairs of the Buyer. The provisions of this paragraph shall survive the termination of this Agreement.

(p)    **Amendment.**

The Buyer and the Seller may agree to an increase or decrease in the Maximum Purchase Amount by any method of writing agreed between them, including without limitation, exchange of emails or facsimiles, *provided, however,* that (x) no such proposed increase shall be effective without written confirmation from each Rating Agency that rates the Commercial Paper Notes that such increase will not result in a reduction, qualification or withdrawal of its then-current ratings of such obligations (such written confirmation being delivered, if so agreed by the Buyer, Seller, and applicable Rating Agency, using the same form of writing as that employed by the Buyer and Seller), and (y) each Rating Agency shall be notified in writing by the Seller regarding such proposed decrease no later than the Business Day prior to such decrease becoming effective. Except as provided in the foregoing sentence, notwithstanding any other provision in the Repurchase Agreement to the contrary, no amendment to or waiver of any provision of this Repurchase Agreement shall be effective unless the same shall be in writing and signed by the parties hereto; provided, that no amendment or waiver shall be effective without written confirmation from each Rating Agency that rates the Commercial Paper Notes that such amendment or waiver will not result in a reduction, qualification or withdrawal of its then-current ratings of such obligations, unless such amendment or waiver is made for one of the following purposes (in each such case, Buyer shall promptly notify each Rating Agency of such amendment or waiver): (i) to cure any mistake, ambiguity, defect, or inconsistency or to correct or supplement any provision contained herein, (ii) to correct or supplement any provision herein which may be inconsistent with any other provision herein or to make any other provisions with respect to matters or questions arising under this Repurchase Agreement, or (iii) to add such provisions

8

17528925 07150725

JPM-PALMDALE00000409

WC000030

**Exhibit 4, Page 59**

with respect to matters or questions arising hereunder as may be necessary or desirable and not inconsistent with the Repurchase Agreement.

(q)   **Perfection.**

The Seller hereby covenants and agrees that it will take such action as the Buyer may reasonably request to maintain and perfect the Buyer's ownership or security interest in the Purchased Securities, including filing Uniform Commercial Code financing statements.

(r)   **Reporting.**

(i)   Seller will provide reports as to the Market Values of the Purchased Securities and Margin amounts and such other information as the Buyer shall reasonably request and as is customary which shall be in a form reasonably satisfactory to the Buyer.

(ii)   Upon request from the Seller, the Buyer shall provide to the Seller documentation supporting its calculation of the Buyer's Cost of Funds.

(s)   **Notice to Rating Agencies.**

The Program Manger shall, to the extent it has actual knowledge thereof, notify, as soon as practicable, each Rating Agency that is rating the Commercial Paper Notes of any downgrade in the ratings assigned to the Guarantor by Moody's and/or S&P.

(t)   **Demands.**

In any case where a payment shall become due on the Guarantee, Buyer shall endeavor to make a demand (which demand may be made by e-mail to Guarantor at address set forth in Annex II to the Agreement) therefor at least one hour prior to the time that such payment is due, but failure to do so shall not excuse the Guarantor from its obligation to pay timely.

(u)   **Purchased Securities.**

Each of the terms "Purchased Securities" and "Purchased Assets" (as used in the Confirmation and the Guarantee) shall include the other.

(v)   **Minimum Transfer Amount.**   Seller and Buyer agree, with respect to all Transactions hereunder (but not less than all Transactions), that unless an Event of Default has occurred and is continuing, the respective rights of Buyer and Seller under subparagraphs (a) and (b) of Paragraph 4 of the Agreement may be exercised only where a Margin Deficit or Margin Excess, as the case may be, exceeds $500,000.

9

17528925 07150725

**Exhibit 4, Page 60**

JPM-PALMDALE00000410

WC000031

(w) **Custodian Failures.** Buyer shall not be responsible for the delivery of Purchased Securities held by a custodian (including, without limitation, Seller) on any Repurchase Date or for the remittance of Income received by a custodian, and Seller shall look solely to the custodian for the same; defaults by a custodian shall not be attributed to Buyer and shall not excuse timely performance by Seller of any obligation under the Agreement.

(x) **Governing Law.** Paragraph 16 of the Agreement shall be amended by:

    (i)    adding to the end of the title thereof ", Jurisdiction and Venue",

    (ii)    adding to the end thereof the following:

    "that would result in the application of the law of any other jurisdiction. With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably submits to the exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City and waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party."

(y) **Series 2008-2 Designations.** For purposes of the Series 2008-2 Supplement, the "Interest Collections" under this Agreement shall be the Price Differential, this Agreement shall be designated a "Group III Customer Agreement" and the Guarantee shall be designated a "Group III Customer Liquidity Agreement".

(z) **Buyer Grant of Security Interest.** The parties acknowledge that Buyer has granted a granted to Deutsche Bank Trust Company Americas, as trustee for the benefit of certain secured parties, a security interest in Buyer's rights under the Repurchase Agreement and all payments due to Buyer thereunder.

(aa) **Amendments to Tri-Party Sub-Custodial Agreements.** Seller shall not without Buyer's written consent, agree to any amendment, waiver or other modification of or under a Tri-Party Sub-Custodial Agreement (as defined in a Tri-Party Custody Agreement) that would reasonably be expected to have a material adverse effect on Buyer.

(bb) **Tax Treatment.** Each party to this Agreement acknowledges that it is its intent for purposes of U.S. federal state and local income and franchise taxes to treat each Transaction as indebtedness of the Seller that is secured by the Purchased Assets and that the Purchased Assets are owned by the Seller in the absence of an Event of Default by the Seller. All parties to this Repurchase Agreement agree to such treatment and agree to take no action inconsistent with this treatment, unless required by law.

10

17528925 07150725

JPM-PALMDALE00000411
WC000032

(cc)   **Expenses.**  Seller shall pay to Buyer the costs and expenses of the CP Issuer in connection with any amendment or modification of this Agreement, including but not limited to the legal fees and out-of-pocket expenses of counsel, fees of the rating agencies rating the Commercial Paper Notes, and fees and expenses of the owner of the CP Issuer and Buyer. Buyer shall provide to Seller reasonable supporting documentation detailing such costs, expenses and/or fees, and Seller shall pay such amounts within 30 calendar days from the date of its receipt of such documentation.

(dd)   **Usage of Mortgage Asset Principal and Interest Payments.**  Seller agrees that if, on any date, more than 50 percent of the Purchased Assets consisting of debt obligations are comprised of real estate mortgages, within the meaning of Code section 7701(i) and Treasury Regulation section 1.7701(i)-1, then none of the Price Differential or the Repurchase Price on all or any liability of Seller issued or outstanding on or after such date shall be paid with monies attributable to, or derived from or measured by, directly or indirectly, principal or income collections on the Purchased Assets (it being understood that this section shall in no way limit Seller's payment obligations under this Agreement).

[SIGNATURES FOLLOW]

17528925 07150725

11

JPM-PALMDALE00000412

WC000033

**Exhibit 4, Page 62**

Lehman Commercial Paper Inc.

By: _____

Name: __Paolo Tonucci__

Title: __Global Treasurer__

Fenway Capital, LLC

By: Global Securitization Services, LLC,
    its Manager

By: _____

Name: _____

Title: _____

12

**Exhibit 4, Page 63**

JPM-PALMDALE00000413

WC000034

Lehman Commercial Paper Inc.

By:_____

Name:_____

Title:_____

Fenway Capital, LLC

By: Global Securitization Services, LLC,
     Its Manager

By:_____

Name:___Bernard J. Angelo_____

Title:___Senior Vice President___

12

**Exhibit 4, Page 64**

JPM-PALMDALE00000414
WC000035

ANNEX I, PART 2

### List of Additional Defined Terms

"*Base Indenture*": that certain Amended and Restated Base Indenture, dated as of November 29, 2001 (as amended, restated or modified from time to time), among the Buyer, the Indenture Trustee and the MI Administrator;

"*Breakage*": with respect to a payment of the Repurchase Price for a Transaction prior to the originally scheduled Repurchase Date for any reason (including, without limitation, as a result of a Buyer Mini Close-out or an Event of Default by either party), the amount determined by the Buyer as necessary to compensate the Buyer (if the income obtained by the Buyer upon the redeployment of an amount of funds equal to the amount of such prepayment is less than the interest applicable to the Commercial Paper Notes allocated by the Program Manager, in its sole discretion, to funding or maintaining such Transaction) for any loss, cost or expense incurred by the Buyer as a consequence of such prepayment (including the interest to accrue on such Commercial Paper Notes through their Final Maturity Date), such compensation to be limited to an amount equal to any actual loss or expense suffered by the Buyer during the period from the date of receipt of such prepayment to (but excluding) the scheduled Repurchase Date;

"*Business Day*": means any day other than a Saturday, Sunday or other day on which banks are authorized or required by law to be closed in New York City, New York;

"*Buyer's Cost of Funds*": with respect to any period, the weighted average cost of or related to the CP Issuer's issuance of Commercial Paper Notes (including the interest accrued on Commercial Paper Notes) allocated by the Program Manager to fund or maintain the Transactions entered into under this Agreement (expressed as a per annum percentage rate and as determined by the Program Manager (in its reasonable sole discretion)), which shall include (i) the fees and commissions of placement agents and dealers and incremental carrying costs incurred with respect to Commercial Paper Notes paid on dates other than those on which corresponding funds are received by the Buyer (for instance, in cases where funds are received by the Buyer too late to be applied to pay the Commercial Paper Notes on the date received) and (ii) costs, liabilities, losses, suits or expenses of any kind in any way related to the Agreement incurred by the Buyer or its officers, managers, members (and the direct and indirect owners of such members), employees, representatives and agents;

"*Commercial Paper Notes*": the Commercial Paper Notes issued by the CP Issuer pursuant to the terms of the CP Issuing and Paying Agency Agreement;

"*CP Issuer*": Fenway Funding, LLC;

"*CP Issuing and Paying Agency Agreement*": that certain Commercial Paper Note Issuing and Paying Agency Agreement dated as of August 22, 2008, between the CP Issuing and Paying Agent and the CP Issuer, as amended, restated, supplemented or otherwise modified from time to time;

"*CP Issuing and Paying Agent*": Deutsche Bank Trust Company Americas, a New York banking corporation;

17528925 07150725

JPM-PALMDALE00000415
WC000036

*"Eligible Assets*:  means (i) whole mortgage loans (commercial and residential), (ii) trust receipts evidencing ownership of whole mortgage loans, (iii) corporate loans, (iv) securities and (v) any other assets approved by Buyer;

*"Final Maturity Date"*:  the maturity date of such Commercial Paper Note which shall not be more than 270 days from the date of issuance of such Commercial Paper Note;

*"Guarantee"*:  The Guarantee dated August 22, 2008 issued by the Guarantor;

*"Guarantor"*:  Lehman Brothers Holdings, Inc., which shall have a short term unsecured credit rating of at least A-1 by S&P and Prime-1 by Moody's as of the date hereof;

*"Indenture Trustee"*:  Deutsche Bank Trust Company Americas, a New York banking corporation;

*"Maximum Purchase Amount"*:  $5,000,000,000, as increased or reduced, from time to time, with a written agreement of the parties;

*"MI Administrator"*:  Deutsche Bank Trust Company Americas, a New York banking corporation;

*"Moody's"*:  Moody's Investors Service, Inc.;

*"Price Differential Payment Date"*:  means with respect to any Transaction (i) each interest payment date of the Commercial Paper Notes allocated by the Program Manager to fund or maintain such Transaction (as determined by the Program Manager, in its sole discretion), as specified in the applicable Confirmation, and (ii) each date on which the Seller is required to pay any Repurchase Price with respect to such Transaction pursuant to the Agreement;

*"Program Manager"*:  Hudson Castle Group Inc., a Delaware corporation;

*"Rating Agencies"*:  collectively, Moody's and S&P;

*"Repurchase Date"*:  with respect to any outstanding Transaction, the earliest of (i) Final Maturity Date of the Commercial Paper Notes allocated by the Program Manager to fund or maintain such Transaction (as determined by the Program Manager, in its sole discretion), (ii) the accelerated Repurchase Date as designated by either party pursuant to Paragraph 2(i) of this Annex and (iii) the occurrence of an Event of Default pursuant to Section 11 of this Agreement;

*"Repurchase Price"*:  (i) the price at which Purchased Securities are to be repurchased from the Buyer by the Seller, which price will be determined in each case (including Transactions terminable upon demand) as the sum of the Purchase Price, the accrued unpaid Price Differential as of the date of such determination, plus any related Breakage; and (ii) after the occurrence of an Event of Default, such amount decreased by (x) any Income (if received in, or converted to or exchanged for, United States dollars) applied by Buyer to reduce Seller's obligations under clause ii of Paragraph 5 of the Agreement and (y) any proceeds actually received by the Buyer upon liquidation of Purchased Securities in connection with the Buyer's

14

17528925 07150725

JPM-PALMDALE00000416

WC000037

*exercise of its rights under Paragraph 11 of the Agreement and applied by the Buyer to pay the Commercial Paper Notes;*

*"S&P": Standard and Poor's Ratings Services;*

*"Series 2008-2 Supplement" means the Series 2008-2 Supplement dated as of August 22, 2008, among the MT Administrator, Fenway Capital, LLC and the Indenture Trustee;*

*"Supplement": the Supplemental Terms and Conditions, of even date herewith, attached hereto as Annex I and made a part hereof;*

*"Termination Date" has the meaning specified in paragraph 2(j) of Annex I, Part 1;*

*"Tri-Party Custody Agreement" has the meaning specified in Annex III to the Agreement.*

15

17528/23 07150725

**Exhibit 4, Page 67**

JPM-PALMDALE00000417
WC000038

## ANNEX II

### Names and Addresses for Communication between Parties

**LEHMAN COMMERCIAL PAPER INC.**
745 Seventh Avenue, 19th Floor
New York, New York 10019
Attn.: [_____]
Tel: [_____]
Fax: [_____]
Email: [_____]

**LEHMAN BROTHERS HOLDINGS, INC.**
745 Seventh Avenue, 19th Floor
New York, New York 10019
Attn.: [_____]
Tel: [_____]
Fax: [_____]
Email: [_____]

**FENWAY CAPITAL, LLC**
c/o Hudson Castle Group
810 Seventh Avenue, 11th Floor
New York, NY 10019
Attn: John Heslin
Tel: (646) 624-2670
Fax: (646) 624-2621
Email: cmg@hudsoncastle.com

17528925 07150725

**Exhibit 4, Page 68**

JPM-PALMDALE00000418

WC000039

**Annex III**

**Hold-in-Custody Transaction Annex**

This Annex III (the "HIC Annex") forms a part of the Master Repurchase Agreement dated as of August 22, 2008 (the "Agreement") between **Lehman Commercial Paper Inc.** and **Fenway Capital, LLC.** Capitalized terms used but not defined in this Annex III shall have the meanings ascribed to them in the Agreement.

1.  Lehman Brothers Commercial Paper Inc. as hold-in-custody agent (in such capacity, "Agent") for the Purchased Securities and Additional Purchased Securities. In the event Seller does not make delivery of the Purchased Securities and Additional Purchased Securities:

    (a)  Agent shall maintain the Purchased Securities and Additional Purchased Securities in a segregated account to the order of Buyer. Agent shall not lend the Purchased Securities and Additional Purchased Securities or any interest therein either to itself or to others.

    (b)  Agent shall not subject the Purchased Securities or Additional Purchased Securities to any other right, charge, security interest, lien, claim or encumbrance in favor of any party or any person claiming through Agent.

    (c)  Agent may not release the Purchased Securities or Additional Purchased Securities to the Seller without the prior written consent of Buyer, except (i) in accordance with the terms of the Agreement to the extent of Seller's right of substitution under the Agreement and (ii) to the extent otherwise permitted under the Agreement after an Event of Default as to Buyer.

    (d)  Following the occurrence of an Event of Default in respect of the Seller, or, if the Guarantor's rating is put on watch for possible downgrade by S&P or by Moody's or is withdrawn or reduced below A-1 by S&P or P-1 by Moody's, Agent will upon demand of the Buyer, deliver by 4:00 p.m. (New York time) on the date of such demand (or if such demand is made after 10:00 am (New York time) then on the next Business Day) all Purchased Securities and Additional Purchased Securities to JPMorgan Chase Bank, N.A. or The Bank of New York, as appropriate, as custodian under the Tri-Party Custody Agreement, or if the custodian appointed by such Tri-Party Custody Agreement is unwilling or unable to serve, to Buyer or another custodian acceptable to Buyer. As used herein, "Tri-Party Custody Agreement" means an agreement in substantially the form attached hereto as Exhibit A, or in such other form as Seller and Buyer may approve.

    (e)  This HIC Annex shall constitute a securities control agreement for purposes of the UCC and shall create a securities entitlement in favor of the Buyer. Agent shall not take any action (aside from actions in accordance with instructions from Buyer) in respect of the Purchased Securities or Additional Purchased Securities, except (i) to the extent otherwise provided in the Agreement in connection with

17528925 07150725

**Exhibit 4, Page 69**

JPM-PALMDALE00000419

WC000040

Seller's right of substitution and (ii) to the extent otherwise permitted under the Agreement after an Event of Default as to Buyer.

2.    Appointment of Agent.  The Buyer appoints Agent to act as its hold-in-custody agent as described in this HIC Annex.

3.    Acknowledgment of Agent's Appointment.    Agent acknowledges and agrees to its appointment as hold-in-custody agent as described in this HIC Annex.

4.    Buyer's Margin Percentage.  Unless otherwise agreed in writing by Seller and Buyer in respect of any Transaction to which this HIC Annex applies, the Buyer's Margin Percentage shall be 102%.

5.    Governing Law.  This HIC Annex shall be governed by and construed in accordance with the laws of the State of New York, without giving effect to choice or conflict of law doctrine.

6.    Counterparts.  This HIC Annex may be executed in counterparts, each of which shall be deemed an original.

7.    Conflicts.  If there is any conflict between the terms of this HIC Annex and the Agreement, the terms of this HIC Annex shall govern.


LEHMAN COMMERCIAL PAPER INC.,          FENWAY CAPITAL, LLC
for itself and as Agent pursuant to this
Annex III                                               By:   GLOBAL SECURITIZATION
                                                                  SERVICES, LLC, its Manager

By: _____          By: _____
Name: _____          Name: _____
Title: _____          Title: _____

JPM-PALMDALE00000420

WC000041

Seller's right of substitution and (ii) to the extent otherwise permitted under the Agreement after an Event of Default as to Buyer.

2. <u>Appointment of Agent</u>. The Buyer appoints Agent to act as its hold-in-custody agent as described in this HIC Annex.

3. <u>Acknowledgment of Agent's Appointment</u>. Agent acknowledges and agrees to its appointment as hold-in-custody agent as described in this HIC Annex.

4. <u>Buyer's Margin Percentage</u>. Unless otherwise agreed in writing by Seller and Buyer in respect of any Transaction to which this HIC Annex applies, the Buyer's Margin Percentage shall be 102%.

5. <u>Governing Law</u>. This HIC Annex shall be governed by and construed in accordance with the laws of the State of New York, without giving effect to choice or conflict of law doctrine.

6. <u>Counterparts</u>. This HIC Annex may be executed in counterparts, each of which shall be deemed an original.

7. <u>Conflicts</u>. If there is any conflict between the terms of this HIC Annex and the Agreement, the terms of this HIC Annex shall govern.

**LEHMAN COMMERCIAL PAPER  INC.,**
for itself and as Agent pursuant to this
Annex III

By: _____
Name: _____
Title: _____

**FENWAY CAPITAL, LLC**

By:  GLOBAL SECURITIZATION
     SERVICES, LLC, its Manager

By: _____
Name:   Bernard J. Angelo
Title:   Senior Vice President

JPM-PALMDALE00000421

WC000042

# EXHIBIT "5"

----- Original Message -----
From: Waisman, Shai <Shai.Waisman@weil.com>
To: Paul Couchot
Cc: 'Afriedman@irell.com' <Afriedman@irell.com>; Rothman, Richard
<richard.rothman@weil.com>; Bond, Michael <michael.bond@weil.com>;
Soto, Edward <edward.soto@weil.com>; 'rpachulski@pszjlaw.com'
<rpachulski@pszjlaw.com>
Sent: Sun Mar 08 13:27:51 2009
Subject: Re: In re Lehman Brothers Holdings Inc.  -- Automatic Stay

Paul,

To clarify, the deadline is tomorrow, March 9, 2009, at 1:00 PM
(Eastern Time).

Thank you.



Shai Waisman
Business, Finance & Restructuring
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 100153
p.  212.310.8274
f.  212.310.8007
e.  shai.waisman@weil.com

_____

From: Waisman, Shai
To: Paul Couchot
Cc: Afriedman@irell.com ; Rothman, Richard; Bond, Michael; Soto,
Edward; Richard Pachulski
Sent: Sun Mar 08 16:20:18 2009
Subject: In re Lehman Brothers Holdings Inc. -- Automatic Stay

Paul,

I am writing in reference to the SunCal motion for bidding procedures
and the SunCal Second Amended Complaint.

As you will certainly recall, Judge Peck has repeatedly advised you
that any act or effort to affect property of the estate in the chapter
11 cases pending before him of Lehman Brothers Holdings Inc. and its
affiliated Debtors (the "Lehman Debtors" and, together with their non-
debtor affiliates, "Lehman") can only be accomplished in two ways.
Either the SunCal Debtors were to return to Judge Peck with
specifically tailored requests for relief from the automatic stay prior
to any such act or effort or the parties were to reach agreement as to
a consensual modification from stay. To date, the SunCal Debtors have
not moved before Judge Peck to modify the automatic stay nor do the
Lehman Debtors consent to such modification.

Since the last hearing before Judge Peck, the SunCal Debtors have accused the Lehman Debtors of engaging in inequitable conduct along with several other Lehman entities — conduct that they believe entitles them to subordinate the claims of the non-bankruptcy Lehman entities to all other creditors and to transfer the liens of the non-bankruptcy Lehman entities to the SunCal estates. For example, the Second Amended Complaint makes clear that the SunCal Debtors believe that each of Lehman entities that extended loans to the SunCal entities (the "Lehman Lenders") all are the alter-ego of the Lehman Debtors. Indeed, the Second Amended Complaint contains paragraph upon paragraph of such alter-ego allegations. Given that the SunCal Debtors clearly contend that the Lehman Lenders are alter-egos of the Lehman Debtors, should SunCal prevail in the allegations set forth in the complaint, any act to affect the property of the Lehman Lenders is an act that seeks to affect the property of the Lehman Debtors. As such, the SunCal Debtors' motion to establish bidding procedures, including the request to preclude Lehman's rights to exercise its Bankruptcy Code mandated right to credit bid on account of its secured claims, is a violation of the automatic stay. Separately and taken together, SunCal's actions are continuing violations of the automatic stay. In addition, your proposed amended complaint would assert a claim directly against LCPI, and further seeks damages against other Lehman entities for which LCPI or LBHI may have contribution or indemnity obligations. More generally, a review of your entire strategy and the totality of your clients' conduct -- as framed by the plan you have now filed, your proposed order on our lift stay motion, as well as your First and Second Amended Complaints -- leaves no doubt that your strategy is predicated on a wholesale attack on the Lehman Debtors in flagrant violation of the Automatic Stay, Judge Peck's prior order and admonitions to you.

Under these circumstances, the purpose of this email is to (i) inform you that we will not consent to the filing of the second amended complaint and (ii) give you the courtesy of informing you that in light of the myriad actions taken by the SunCal Debtors since the January 30, 2009 telephonic hearing before Judge Peck, Lehman will be asking Judge Peck, once again, to enforce the automatic stay. Please be advised that, consistent with Judge Peck's comments on January 30, 2009, we will be asking for sanctions in the form attorneys fees and costs.

In light of the foregoing, please confirm to me by no later than tomorrow, March 9, 2009, at 1:00 PM (Eastern Time) that you will proceed no further with the attacks that could improperly prejudice the interests of the Lehman Debtors unless you apply to Judge Peck for relief from stay, including that you have withdrawn the Credit Bid Motion. Absent withdrawal of the Credit Bid Motion and your clear assurance as to all of the foregoing by 11am (Eastern Time) tomorrow we will request a hearing later during the day before Judge Peck.

I look forward to your prompt response.

Shai Waisman

Business, Finance & Restructuring

Weil, Gotshal & Manges LLP

767 Fifth Avenue

New York, New York 10153

p.   212.310.8274

f.   212.310.8007

e.   shai.waisman@weil.com

---

The information contained in this email message is intended only for
use of the individual or entity named above. If the reader of this
message is not the intended recipient, or the employee or agent
responsible to deliver it to the intended recipient, you are hereby
notified that any dissemination, distribution or copying of this
communication is strictly prohibited. If you have received this
communication in error, please immediately notify us by email
(postmaster@weil.com), and destroy the original message. Thank you

# EXHIBIT "6"

# WEIL, GOTSHAL & MANGES LLP

767 FIFTH AVENUE

NEW YORK, NY 10153

(212) 310-8000

FAX: (212) 310-8007

AUSTIN
BOSTON
BUDAPEST
DALLAS
FRANKFURT
HONG KONG
HOUSTON
LONDON
MIAMI
MUNICH
PARIS
PRAGUE
PROVIDENCE
SHANGHAI
SILICON VALLEY
WARSAW
WASHINGTON, D.C.

March 9, 2009

SHAI Y. WAISMAN
DIRECT LINE (212) 310-8274
E-MAIL: shai.waisman@weil.com

**BY EMAIL**

Honorable James M. Peck
United States Bankruptcy Court – Southern District of New York
Courtroom 601
One Bowling Green
New York, NY 10004-1408

Honorable Erithe Smith
United States Bankruptcy Court - Central District of California
Ronald Reagan Federal Building and United States Courthouse
411 West Fourth Street, Suite 5041
Santa Ana, CA 92701-4593

**Re:**    *In re Lehman Brothers Holdings, Inc., et al.* Case No. 08-13555
*In re Palmdale Hills Property, LLC, et al.,* Case No. 08-17206
*In re SunCal Heartland, LLC,* Case No. 8:08-17407-ES
*In re LB-L-SunCal Northlake, LLC,* Case No. 8:08-17408-ES
*In re SunCal Marblehead, LLC,* Case No. 8:08-17409-ES
*In re SunCal Century City, LLC,* Case No. 8:08-17458-ES
*In re SunCal PSV, LLC,* Case No. 8:08-17465-ES
*In re Delta Coves Venture, LLC,* Case No. 8:08-17470-ES
*In re SunCal Torrance, LLC,* Case No. 8:08-17472-ES
*In re LB-L SunCal Oak Valley LLC,* Case No. 8:08-17404-ES
*In re SunCal Oak Knoll, LLC,* Case No. 8:08-17588-ES

To the Honorable Judges Peck and Smith:

We represent Lehman Brothers Holdings Inc. ("LBHI") and Lehman Commercial Paper Inc. ("LCPI"), a debtors and debtors in possession in the Chapter 11 Case No. 08-13555 (JMP) pending in the United States Bankruptcy Court for the Southern District of New York, as well as Lehman ALI, Inc. ("ALI"), Northlake Holdings, LLC ("Northlake Holdings"), and OVC Holdings, LLC ("OVC Holdings" and collectively, with ALI, Northlake Holdings, and LCPI, the "Lehman Lenders" together with LBHI and their debtor affiliates, the "Lehman Debtors").

MII 2:6519.03.4PCNG3:DOC 58399.0003

**Exhibit 6, Page 75**

WEIL, GOTSHAL & MANGES LLP

Honorable James M. Peck
Honorable Erithe Smith
Page 2

As Your Honors are aware, the Lehman Lenders are lenders to various SunCal affiliated debtors (collectively, the "SunCal Debtors") whose chapter 11 cases (collectively, the "SunCal Bankruptcy Cases") are currently pending in the United States Bankruptcy Court for the Central District of California.

We are writing to express our concern for the continuing actions by the SunCal Debtors against the Lehman Lenders, which actions collectively threaten LCPI's property interests as well as that of the other Lehman Debtors.

The SunCal Debtors:

- are currently pursuing equitable subordination litigation against ALI, Northlake Holdings, and OVC Holdings that wholly is premised on the alleged "bad acts" of the Lehman Debtors and contains paragraph after paragraph (as set forth in pages 8-9 of the annexed Motion) (including as alleged in paragraph 72 of their proposed second amended complaint), that ALI and LCPI are alter egos of each other and their parent, LBHI, which, if true, would directly implicate the interests of all the Lehman Debtors, and the SunCal Debtors intend to amend their complaint to (i) include claims against LCPI on essentially the same bases and (ii) seek to transfer the liens of the Lehman Lenders (which constitute collateral for their loans to the SunCal Debtors) to the SunCal Debtors' estates;

- have filed a joint plan of reorganization that is premised on, among other things, equitably subordinating the Lehman Lenders' claims to those of all of the SunCal Debtors' unsecured creditors and transferring the liens securing those claims to the SunCal Debtors' estates; and

- are pursuing a motion to eviscerate the statutorily mandated credit bid rights of ALI, Northlake Holdings, and OVC Holdings (i.e., prevent ALI, Northlake Holdings, and OVC Holdings from credit bidding over $1 billion in claims (comprised of outstanding principal alone) on the sale of properties that constitute these lenders' collateral, which motion, at its core, is also premised on the alleged "bad acts" of the Lehman Debtors.

MI1 269519 03 4FC N03! DOC 54399 6003

WEIL, GOTSHAL & MANGES LLP

Honorable James M. Peck
Honorable Erithe Smith
Page 3

All of these actions, individually, and certainly together, threaten the Lehman Debtors' property interests.

In light of the foregoing, LCPI and LBHI are prepared to file a motion seeking, among other things, (a) to enforce the automatic stay as it relates to LCPI and any of its affiliated-debtor entities and (b) to enjoin the SunCal Debtors and/or their non-debtor affiliates from taking any actions that would implicate or impact the rights and property of the Lehman Debtors' estates. A copy of the proposed motion ("Motion") is enclosed herewith. Although we do not attach copies of the exhibits cited in the Motion or the accompanying complaint, these, too, can be made available to the Courts.

Notwithstanding the foregoing, the Lehman Debtors believe it would behoove all parties to resolve the issues between and among them consensually. To that end, the Lehman Lenders propose a joint conference involving the SunCal Debtors, the Lehman Lenders, and each of the Courts to discuss and determine a process that can protect the interests of *all* of the debtors in the above-referenced bankruptcy cases. Should the Courts be inclined to agree, they may want to consider staying any hearing on the proposed Motion noted above as well as any hearings in the SunCal Bankruptcy Cases that affect any of the Lehman Lenders' interests pending a joint status conference on the above-noted matters.

I am, as always, available to answer any questions the Courts may have.

Respectfully submitted,

Shai Y. Waisman

Encl.

cc:    Paul Couchot, Esq.
       Mr. Steven M. Speier
       Dennis O'Donnell, Esq.
       Evan Fleck, Esq.
       Alan Friedman, Esq.
       Richard Pachulski, Esq.
       Dean Ziehl, Esq.
       Michael Bond, Esq.
       Edward Soto, Esq.
       Christopher Pace, Esq.

MH: 206519 03:4FC N03' DOC 58399 0003

**Exhibit 6, Page 77**

# EXHIBIT "7"

**Attachments:**          Mar10Let.PDF



Mar10Let.PDF (2
MB)

```
----- Original Message -----
From: Waisman, Shai <Shai.Waisman@weil.com>
To: jmp.chambers@nysb.uscourts.gov <jmp.chambers@nysb.uscourts.gov>
Cc: Paul Couchot; dodonell@milbank.com <dodonell@milbank.com>; efleck@milbank.com
<efleck@milbank.com>; afriedman@irell.com <afriedman@irell.com>; rpachulski@pszjlaw.com
<rpachulski@pszjlaw.com>; dziehl@pszjlaw.com <dziehl@pszjlaw.com>; sspeier@squarmilner.com
<sspeier@squarmilner.com>; Bond, Michael <michael.bond@weil.com>; Soto, Edward
<edward.soto@weil.com>; Pace, Christopher <Christopher.Pace@weil.com>; Rothman, Richard
<richard.rothman@weil.com>; Lemmer, Elisa R <elisa.lemmer@weil.com>
Sent: Tue Mar 10 07:17:11 2009
Subject: In re Lehman Brothers Holdings Inc. et al. (SunCal)

To The Honorable Judge Peck,

Further to our letter yesterday afternoon, attached please find an update regarding these
matters.

I am, as always, available to answer any questions the Court may have.


Shai Waisman
Business, Finance & Restructuring
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
p.   212.310.8274
f.   212.310.8007
e.   shai.waisman@weil.com
```

The information contained in this email message is intended only for use of the individual
or entity named above. If the reader of this message is not the intended recipient, or the
employee or agent responsible to deliver it to the intended recipient, you are hereby
notified that any dissemination, distribution or copying of this communication is strictly
prohibited. If you have received this communication in error, please immediately notify us
by email (postmaster@weil.com), and destroy the original message. Thank you

1

WEIL, GOTSHAL & MANGES LLP

767 FIFTH AVENUE
NEW YORK, NY 10153

(212) 310-8000
FAX: (212) 310-8007

AUSTIN
BOSTON
BUDAPEST
DALLAS
FRANKFURT
HONG KONG
HOUSTON
LONDON
MIAMI
MUNICH
PARIS
PRAGUE
PROVIDENCE
SHANGHAI
SILICON VALLEY
WARSAW
WASHINGTON, D C

SHAI Y. WAISMAN
DIRECT LINE (212) 310-8374
E-MAIL shai.waisman@weil.com

March 10, 2009

## VIA ELECTRONIC MAIL

Honorable James M. Peck
United States Bankruptcy Court
Southern District of New York
1 Bowling Green
New York, New York 10004

Dear Judge Peck:

        Yesterday afternoon, after sending our letter to you and Judge Smith, we were served with the attached Emergency Motion For Order Confirming That Automatic Stay Does Not Apply to Pending Sale Procedures Motion and Ruling Thereon and Declaration of Paul Couchot in Support Thereof.

        By this Motion, despite your Honor's direct admonition, SunCal, yet again, seeks to have the California Bankruptcy Court, rather than Your Honor, make determinations regarding the automatic stay in force in the Lehman Chapter 11 cases over which Your Honor has exclusive jurisdiction. As you will see, SunCal's Motion and the declaration of Mr. Couchot, which purport to provide Judge Smith with an account of the prior hearings regarding SunCal's disregard for the automatic stay extent in Lehman's Chapter 11 cases, are seriously incomplete and misleading.

        Mr. Couchot has obtained a hearing on the attached **Motion today at 10:30 a.m. (Pacific Time)**. In light of these events, we are hereby proceeding with the filing of the motion we provided to both Your Honor and Judge Smith yesterday afternoon, and would request that a hearing be scheduled.

NY2 1975148 01 16C1801 DOC 58399 0003

**Exhibit 7, Page 79**

**Exhibit 1, Page 4**

WEIL, GOTSHAL & MANGES LLP

March 10, 2009
Page 2

We respectfully submit that the filing of SunCal's Motion underscores the need for the coordination between the Lehman and SunCal proceedings that we recommended in our letter to Your Honor and Judge Smith yesterday.

Respectfully submitted,

Shai Y. Waisman

cc:     Judge Smith
        Paul Couchot, Esq.
        Mr. Steven M. Speier
        Dennis O'Donnell, Esq.
        Evan Fleck, Esq.
        Alan Friedman, Esq.
        Richard Pachulski, Esq.
        Dean Ziehl, Esq.
        Michael Bond, Esq.
        Edward Soto, Esq.
        Christopher Pace, Esq.

Exhibit 7, Page 80                    Exhibit 1, Page 5

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I.
Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 660 Newport Center Drive., 4th Fl., Newport Beach, CA 92660.

A true and correct copy of the foregoing document described as **SUPPLEMENTAL DECLARATION OF PAUL COUCHOT IN SUPPORT OF REPLY RE SUPPLEMENT TO DEBTORS' MOTION FOR ORDER: (1) APPROVING OVERBID PROCEDURES IN CONNECTION WITH PROPOSED SALE OF SUBSTANTIALLY ALL ASSETS OF THE DEBTORS' ESTATES; (2) APPROVING BREAK-UP FEE; (3) DISALLOWING CREDIT BIDS RIGHTS OF DISPUTED SECURED CREDITORS, LEHMAN ALI, INC., NORTHLAKE HOLDINGS AND OVC HOLDINGS; AND (4) SETTING HEARING ON APPROVAL OF SALE OF ASSETS** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

**I.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On July 21, 2009, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

☒  Service information continued on attached page

**II.  SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served):
On _____ I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐  Service information continued on attached page

**III.  SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on July 21, 2009 I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.

☒  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| | | |
|---|---|---|
| July 21, 2009 | Susan Connor | |
| *Date* | *Type Name* | *Signature* |

NEF SERVICE LIST

- Joseph M Adams     jadams@sycr.com
- Raymond H Aver     ray@averlaw.com
- James C Bastian     jbastian@shbllp.com
- John A Boyd     fednotice@tclaw.net
- Brendt C Butler     BButler@rutan.com
- Dan E Chambers     dchambers@jmbm.com
- Shirley Cho     scho@pszjlaw.com
- Vonn Christenson     vrc@paynefears.com
- Vincent M Coscino     emurdoch@allenmatkins.com
- Paul J Couchot     pcouchot@winthropcouchot.com, pj@winthropcouchot.com
- Jonathan S Dabbieri     dabbieri@shlaw.com
- Ana Damonte     ana.damonte@pillsburylaw.com
- Melissa Davis     mdavis@shbllp.com
- Daniel Denny     ddenny@gibsondunn.com
- Caroline Djang     crd@jmbm.com
- Donald T Dunning     ddunning@dunningLaw.com
- Joseph A Eisenberg     jae@jmbm.com
- Lei Lei Wang Ekvall     lekvall@wgllp.com
- Richard W Esterkin     resterkin@morganlewis.com
- Marc C Forsythe     kmurphy@goeforlaw.com
- Alan J Friedman     afriedman@irell.com
- Robert P Goe     kmurphy@goeforlaw.com
- Eric D Goldberg     egoldberg@stutman.com
- Kelly C Griffith     bkemail@harrisbeach.com
- Asa S Hami     ahami@morganlewis.com
- Michael J Hauser     michael.hauser@usdoj.gov
- D Edward Hays     ehays@marshackhays.com
- Michelle Hribar     mhribar@rutan.com
- Lawrence A Jacobson     laj@cohenandjacobson.com
- Stephen M Judson     sjudson@fablaw.com
- David I Katzen     katzen@ksfirm.com
- Christopher W Keegan     ckeegan@kirkland.com,
  emilee@kirkland.com;alevin@kirkland.com
- Irene L Kiet     ikiet@hkclaw.com
- Mark J Krone     mk@amclaw.com
- Leib M Lerner     leib.lerner@alston.com
- Peter W Lianides     pj@winthropcouchot.com
- Charles Liu     cliu@winthropcouchot.com
- Kerri A Lyman     klyman@irell.com
- Mariam S Marshall     mmarshall@marshallramoslaw.com
- Robert C Martinez     rmartinez@mclex.com
- Hutchison B Meltzer     hmeltzer@wgllp.com
- Joel S. Miliband     jmiliband@rusmiliband.com
- James M Miller     jmiller@millerbarondess.com
- Louis R Miller     smiller@millerbarondess.com

- Douglas M Neistat    twilliams@greenbass.com
- Mike D Neue    mneue@thelobelfirm.com, csolorzano@thelobelfirm.com
- Robert Nida    Rnida@castlelawoffice.com
- Penelope Parmes    pparmes@rutan.com
- Ronald B Pierce    ronald.pierce@sdma.com
- Raymond A Policar    hausermouzes@sbcglobal.net
- Cassandra J Richey    cmartin@pprlaw.net
- Debra Riley    driley@allenmatkins.com
- Martha E Romero    Romero@mromerolawfirm.com
- William D Schuster    bills@allieschuster.org
- Steven M Speier    Sspeier@Squarmilner.com, ca85@ecfcbis.com
- Michael St James    ecf@stjames-law.com
- Todd L Turoci    tturoci@aol.com
- United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov
- Jason Wallach    jwallach@bergerkahn.com
- Christopher T Williams    ctwilliams@venable.com
- David M Wiseblood    dwiseblood@seyfarth.com
- Arnold H Wuhrman    Wuhrman@serenitylls.com
- Dean A Ziehl    dziehl@pszjlaw.com, dziehl@pszjlaw.com

## SERVICE VIA E-MAIL

Wayne Abb, Esq. - wayneabb@gmail.com
Atty for P. Volkerts –cmartin@pprlaw.net
Atty for Bond Safeguard & Lexon – Mark E. Aronson, Esq.mea@amclaw.com;
Counsel to Fenway – Dewey & LeBoeuf - igoldstein@DeweyLeBoeuf.com

| | |
|---|---|
| Lehman Ali, Inc. and Lehman Commercial, OVC Holdings<br>c/o Weil, Gotshal & Manges LLP<br>elisa.lemmer@weil.com<br>Edward.soto@weil.com<br>Nellie.camerik@weil.com<br>Shai.waisman@weil.com<br>michael.bond@weil.com) | Danske Bank A/S, London Branch<br>c/o Venable LLP<br>ccallari@Venable.com<br>Timothy J. Gorry - tgorry@Venable.com |
| Lehman Ali, Inc. etc.<br>Richard Pachulski -rpachulski@pszjlaw.com | JP Morgan Chase Bank NA<br>JP Morgan Securities<br>c/o Wachtell Lipton Rosen & Katz<br>Amy Wolfe, Esq. - ARWolf@WLRK.com |
| sspeier@squarmilner.com<br>Steven N. Speier, Ch 11 Trustee | John.sieger@kattenlaw.com |

MAINDOCS-#131916-v1-SCC Sup Dec Couchot Supp Sale Proc.DOC