1   PAUL J. COUCHOT - State Bar No. 131934
**WINTHROP COUCHOT**
2   **PROFESSIONAL CORPORATION**
660 Newport Center Drive, Fourth Floor
3   Newport Beach, CA 92660
pcouchot@winthropcouchot.com
Telephone: (949) 720-4165
4   Facsimile: (949) 720-4111
5   General Insolvency Counsel for Administratively Consolidated
Debtors-in-Possession and SCC Acquisitions, Inc.

6   LOUIS R. MILLER, State Bar No. 54141
smiller@millerbarondess.com
7   MARTIN PRITIKIN, State Bar. No. 210845
mpritikin@millerbarondess.com
8   BRIAN PROCEL, State Bar No. 218657
bprocel@millerbarondess.com
9   **MILLER BARONDESS, LLP**
1999 Avenue of the Stars, Suite 1000
10  Los Angeles, California 90067
Telephone:   (310) 552-4400
11  Facsimile:   (310) 552-8400

12  Special Litigation Counsel for
Jointly Administered Debtors in Possession and Chapter 11 Trustee

13          **UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
14              **SANTA ANA DIVISION**

| | |
|---|---|
| In re | Case No. 8:08-bk-17206-ES |
| PALMDALE HILLS PROPERTY, LLC, AND ITS RELATED DEBTORS, | Jointly Administered With Case Nos. 8:08-17209-ES; 8:08-17240-ES; 8:08-17224-ES; 8:08-17242-ES; 8:08-17225-ES; 8:08-17245-ES; 8:08-17227-ES; 8:08-17246-ES; 8:08-17230-ES; 8:08-17231-ES; 8:08-17236-ES; 8:08-17248-ES; 8:08-17249-ES; 8:08-17573-ES; 8:08-17574-ES; 8:08-17575-ES; 8:08-17404-ES; 8:08-17407-ES; 8:08-17408-ES; 8:08-17409-ES; 8:08-17458-ES; 8:08-17465-ES; 8:08-17470-ES; 8:08-17472-ES; and 8:08-17588-ES |
| Jointly Administered Debtors and Debtors-in-Possession | |

15
16
17

18  Affects:
☐ All Debtors
19  ☐ Palmdale Hills Property, LLC,
☐ SunCal Beaumont Heights, LLC
20  ☐ SCC/Palmdale,
☐ SunCal Johannson Ranch, LLC
21  ☐ SunCal Summit Valley, LLC
☐ SunCal Emerald Meadows LLC
22  ☐ SunCal Bickford Ranch, LLC
☐ Acton Estates, LLC
23  ☐ Seven Brothers LLC
☐ SJD Partners, Ltd.
24  ☐ SJD Development Corp.
25  ☐ Kirby Estates, LLC
☐ SunCal Communities I, LLC
26  ☐ SunCal Communities III, LLC
☐ SCC Communities LLC
27  ☐ North Orange Del Rio Land, LLC
28  *Caption Continued on Next Page*

Chapter 11 Proceedings

**DECLARATION OF BRUCE ELIEFF IN
SUPPORT OF REPLY RE SUPPLEMENT TO
DEBTORS' MOTION FOR ORDER:
(1) APPROVING OVERBID PROCEDURES IN
CONNECTION WITH PROPOSED SALE OF
SUBSTANTIALLY ALL ASSETS OF THE
DEBTORS' ESTATES; (2) APPROVING
BREAK-UP FEE; (3) DISALLOWING CREDIT
BIDS RIGHTS OF DISPUTED SECURED
CREDITORS, LEHMAN ALI, INC.,
NORTHLAKE HOLDINGS AND OVC
HOLDINGS; AND (4) SETTING HEARING ON
APPROVAL OF SALE OF ASSETS**

Date:      July 28, 2009
Time:     10:00 a.m.
Place:    Courtroom 5A

35457.2

*Continued from Previous Page*

☒ LBL-SunCal Oak Valley, LLC
☒ SunCal Heartland, LLC
☒ LBL-SunCal Northlake, LLC
☒ SunCal Marblehead, LLC
☒ SunCal Century City, LLC
☒ SunCal PSV, LLC
☒ Delta Coves Venture, LLC
☒ SunCal Torrance, LLC
☒ SunCal Oak Knoll, LLC

I, Bruce Elieff, hereby declare and state as follows:

1.    I submit this declaration in support of the REPLY RE SUPPLEMENT TO DEBTOR'S MOTION FOR ORDER: (1) APPROVING OVERBID PROCEDURES IN CONNECTION WITH PROPOSED SALE OF SUBSTANTIALLY ALL ASSETS OF THE DEBTORS' ESTATES; (2) APPROVING BREAK-UP FEE; (3) DISALLOWING CREDIT BID RIGHTS OF DISPUTED SECURED CREDITORS, LEHMAN ALI, INC., NORTHLAKE HOLDINGS, AND OVC HOLDINGS; AND (4) SETTING HEARING HEREON APPROVAL OF SALE OF ASSETS (the "Reply"). I have personal knowledge of the following facts and, if called as a witness, I could and would competently testify thereto.

2.    I am the CEO of SCC Acquisitions, Inc. or "SCC." SCC is the parent entity in an integrated network of companies that operate under the common dba "the SunCal Companies" or "SunCal," and is a direct or indirect owner of all of the twenty-six administratively-consolidated Debtors.[1]

3.    I have knowledge of the Debtors' books and records, and I am familiar with the Debtors' projects and their operational affairs. As to the following facts, I know them to be true of

---

[1] They are: (i) Acton Estates LLC ("SunCal Acton"), SunCal Bickford Ranch LLC ("SunCal Bickford"), SunCal Emerald Meadows LLC ("SunCal Emerald"), SCC Palmdale LLC ("SCC Palmdale"), Palmdale Hills Property LLC ("Palmdale Hills"), SJD Partners, Ltd. ("SJD Partners"), SJD Development Corp. ("SJD Development"), SunCal Summit Valley LLC ("SunCal Summit"), SCC Communities LLC ("SCC Communities"), SunCal Communities I LLC ("SunCal I"), SunCal Communities III LLC ("SunCal III"), North Orange Del Rio Land LLC ("SunCal Del Rio"), and Tesoro SF LLC ("SunCal Tesoro") (collectively, the "Voluntary Debtors"); and (ii) LB/L-SunCal Oak Valley LLC ("SunCal Oak Valley"), LB/L-SunCal Northlake LLC ("SunCal Northlake"), SunCal Heartland LLC ("SunCal Heartland"), SunCal Marblehead LLC ("SunCal Marblehead"), SunCal Century City LLC ("SunCal Century City"), SunCal PSV LLC ("SunCal PSV"), Delta Coves Venture LLC ("SunCal Delta Coves"), SunCal Torrance LLC ("SunCal Torrance"), and SunCal Oak Knoll LLC ("SunCal Oak Knoll") (collectively, the "Trustee Debtors").

35457.2

1    my own knowledge, and, if called as a witness, I could and would competently testify thereto; or I

2    have gained such knowledge from the business records of the Debtors which were made at or near

3    the time of the acts, conditions or events to which they relate. Any such document or record was

4    prepared in the ordinary course of business by a person who had personal knowledge of the event

5    being recorded and had a business duty to accurately record such event.

6          4.     SunCal is a family-owned and -operated California real estate business, and is the

7    direct or indirect parent of each of the Debtors. SunCal is a highly-experienced and successful

8    developer. SunCal and its related parties and affiliates have been in business for over 70 years. It

9    manages virtually all aspects of real estate development, from acquiring properties and obtaining

10   governmental entitlements to construction and build-out, culminating in the sale of lots to merchant

11   builders. SunCal has gained an expertise in these matters, and has formed relationships with many

12   governmental entities and businesses throughout California.

13         5.     The land development process is inherently capital intensive due to the size and costs

14   of the assets being acquired, the front-loaded capital requirements, and the length of time between

15   the initial acquisition and the ultimate realization of profits.

16         6.     The acquisition and development of SunCal projects are typically financed through

17   some combination of debt, mezzanine or "mezz" debt (secured by an equity ownership interest in the

18   entity that owns the property), and/or equity contributions.

19         7.     SunCal historically financed its projects with loans and/or equity from a number of

20   different sources. However, beginning over a decade ago, an increasing number of SunCal's

21   projects were financed by Lehman.[2] This happened when Mark Walsh ("Walsh"), the head of the

22   Global Real Estate Group at LBHI, and I began cultivating a business relationship between our

23   firms.

24         8.     In 1997, Lehman made its first investment with SunCal via a $20 million mezzanine

25   loan to Plaintiff Debtor SJD Partners on the Pacific Point Project. As Lehman worked with SunCal

---

[2] The term "Lehman" herein refers to the Global Real Estate Group within Lehman Brothers Holdings, Inc. ("LBHI"),
through various affiliates that it wholly-owned and/or controlled. These affiliates included Lehman ALI, Inc. ("Lehman
ALI") and Lehman Commercial Paper, Inc. ("LCPI"), as well as Lehman ALI's purported successors OVC Holdings
LLC ("OVC") and Northlake Holdings LLC ("Northlake Holdings"), as well as Lehman equity members in the Trustee
Debtors.

1    on additional projects, a pattern emerged:  Lehman's investments were structured with some type of

2    participation by Lehman in the profitability of the projects, either as an equity partner, pursuant to a

3    contingent interest loan that contains a profit participation component, or through a mezz loan with

4    significant return.

5        9.       Lehman also provided debt financing on a number of SunCal projects, but typically

6    only when Lehman was also a participant in the profitability of the project.

7        10.      When Lehman participated as a lender on SunCal projects, it was, with rare

8    exceptions, always through Lehman ALI and/or LCPI.

9        11.      Soon after its initial investment, Lehman invested in several more projects with

10   SunCal.  Each of these early SunCal-Lehman projects proved to be highly profitable for Lehman,

11   with some projects yielding a return on investment of over a hundred percent.

12       12.      Based on these results, Lehman accelerated its debt and equity participation in

13   SunCal projects.  By 2003, Lehman had partnered with SunCal on approximately fifteen projects.

14   By 2007, that number had grown to over forty.

15       13.      By 2006, Lehman's distributions on its mezzanine and equity investments with

16   SunCal exceeded its contributions by over a hundred million dollars.

17       14.      Lehman generated quarterly projections regarding the profitability of its investments

18   with SunCal extending out through the year 2015.  Lehman anticipated earning at least $2 billion in

19   profits on $4 billion in debt and equity investments over the course of its relationship with SunCal.

20   Lehman accelerated its debt participation further.  Between 2005 and 2007, Lehman ALI and/or

21   LCPI lent or contributed over $2 billion to the Debtors.

22       15.      Given Lehman's past and projected profitability, Lehman continued to seek an even

23   closer and more exclusive relationship with SunCal.  And SunCal acquiesced, allowing Lehman to

24   take an increasing role in its Projects and finance an increased share of SunCal's business.

25       16.      For example, in or about 2005, SunCal allowed Lehman—at Lehman's urging—to

26   participate in $50 million in gains realized from sales in connection with the "Heritage Fields"

27   project.  This generated in excess of $22 million to Lehman, without Lehman having to make any

28

35457.2                                            4

1    capital investment.  SunCal did so without any kind of agreement with Lehman, purely for

2    relationship purposes.

3        17.    There were other instances, such as the College Park and Summerwind projects,

4    where SunCal allowed Lehman to participate—even though others were offering more favorable

5    terms—for the sake of maintaining and building its relationship with Lehman.  (LCPI financed the

6    Summerwind project.)  Lehman pressured SunCal not to go with DE Shaw on the Century City

7    Project known as 10000 Santa Monica, even though Shaw was offering better financial terms.

8    Similarly, Lehman pressed SunCal not to use Goldman Sachs on the Marblehead Project.  (Both the

9    Century City and Marblehead Projects were financed by Lehman ALI, and both are at issue in this

10    action.)

11        18.    It was not just SunCal that brought Lehman in on projects; the partnership went both

12    ways.  Lehman brought SunCal in to develop and manage (and effectively rescue) two large projects

13    that Lehman was already involved in: Terra Lago and Delta Coves (the latter of which is at issue in

14    this suit, and was financed by debt from Lehman ALI.).

15        19.    So close was the SunCal-Lehman relationship that in 2007, Lehman even financed an

16    approximately $40 million unsecured option purchase in connection with the Delta Shores Project—

17    something that would be unheard of from a mere arm's length "lender."

18        20.    In furtherance of Lehman's desire for greater exclusivity, in August 2006, SunCal,

19    through its subsidiary SunCal Communities II, LLC ("SunCal II"), and Lehman, through its wholly-

20    owned and controlled subsidiary, LBREP II/SCLFM, entered into the Operating Agreement of the

21    Lehman SunCal Real Estate Fund LLC (the "Lehman SunCal Fund").  Lehman SunCal Fund is the

22    parent of Plaintiff Debtors SunCal Century City, SunCal Oak Knoll, SunCal Del Amo and SunCal

23    PSV, which own, respectively, the Century City, Oak Knoll, Del Amo and Palm Springs Village

24    Projects at issue in this suit.

25        21.    The purpose of the Lehman SunCal Fund agreement was to make Lehman, with

26    limited exceptions, the exclusive provider of financing for SunCal projects.  Under that agreement,

27    "SunCal and its Affiliates shall make available for purchase by the Company (i.e., the Lehman

28    SunCal Fund), and the Company shall have the right of first refusal to purchase . . . all Proposed

1  Properties . . . which are sourced by or brought to SunCal . . . ."    Thus, with limited exceptions,

2  SunCal and its affiliates were prohibited from making any investments in real property not in

3  compliance with the provisions of the Fund.  Because the Operating Agreement is voluminous,

4  attached hereto as Exhibit 1 is a true and correct copy of the cover page and the pages that contain

5  the relevant provisions cited above.

6       22.    By 2007, Lehman was by far SunCal's biggest source of funding.  Sixty percent of

7  SunCal's total financing came from Lehman.  Two out of every three SunCal projects were financed

8  by Lehman.  Seventy percent of SunCal's debt financing came from loans from Lehman ALI or

9  LCPI.

10       23.    Whenever Lehman ALI or LCPI provided financing for SunCal projects, the

11  respective lending entities obtained liens on each property as security for their loans, and/or obtained

12  pledges of equity interests in the SunCal-affiliated entities owning such properties.

13       24.    For years prior to 2007, the SunCal-Lehman partnership thrived, and the parties

14  prospered in their venture together.  As of the start of 2007, Lehman projected making billions in

15  profits over the ensuing years from its relationship with SunCal.  However, in or about 2007, the real

16  estate market experienced a downturn, and many of the Projects declined significantly in value.

17       25.    Beginning in or about the summer of 2007, I, along with SunCal's President, Stephan

18  Elieff, had high-level discussions with Lehman representatives—including Walsh as well as Paul

19  Hughson ("Hughson") and Frank Gilhool ("Gilhool"), Managing Directors of Global Real Estate—

20  to address these developments.

21       26.    I understood based on their representations and conduct that each of these individuals

22  at Lehman had authority to act and make representations on behalf of both Lehman ALI, in its

23  capacity as lender to the nine Trustee Debtors and Plaintiffs SunCal Bickford, SJD Partners, SJD

24  Development, SunCal Del Rio, SCC Communities, and SunCal Tesoro; and LCPI, in its capacity as

25  the lender to SunCal Bickford and the remaining Voluntary Debtor Plaintiffs.

26       27.    In their dealings with me, Walsh and the other Lehman executives generally made no

27  distinction between the debt and equity interests, or between Projects financed by Lehman ALI debt

28  and Projects financed by LCPI debt.  As the financing partner in the parties' venture, Lehman would

1  determine which Lehman entity would provide funding on which Projects, and would dictate the

2  form that the funding would take, according to whatever suited Lehman's needs.

3      28.    I expressed to the Lehman executives that loans on the Projects were out of balance,

4  and that SunCal would not be able to finance its operations or manage the Projects without

5  assistance.  I suggested shutting down or at least slowing development of the Projects.

6  Walsh instructed me not to have SunCal slow down or stop work.  He advised me that Lehman's

7  goal was to do a complete recapitalization of the Projects, that Lehman was taking the lead on the

8  restructuring and recapitalization of the Projects in anticipation of going out to the market, and that it

9  did not want the Projects to appear to be in a distressed situation.

10      29.    He assured me that Lehman ALI and LCPI would provide the necessary funding to

11  pay vendors and keep development of their Projects moving forward, and that they would restructure

12  the Debtors' Loans.

13      30.    In reliance on these representations, SunCal and the Debtors continued to move

14  forward with the Projects and incurred substantial expenses in hiring contractors to maintain and/or

15  develop them and to deal with public health and safety issues.

16      31.    SunCal and the Debtors continued to work with the contractors and develop the

17  Projects in reliance on a promised overall "work out" or restructuring of the Projects and of the

18  Loans and/or liens held by Lehman ALI and LCPI, as well as an assumption of SCC's and my own

19  indemnity liability on surety bonds covering work that had been done and was being done on the

20  Projects. (SCC and I had agreed to be indemnitors on the bonds in reliance on the relationship with

21  Lehman and on the parties' mutual understanding that, although the Debtors were technically the

22  primary obligors on the bonds, Lehman ALI and LCPI were, in effect, the primary financial

23  obligors, were well aware of the work that was required by the Projects' respective municipalities to

24  be performed and bonded in order for development to proceed, and agreed to be responsible for

25  payment of that work.)

26      32.    It was contemplated as of the October 2007 Interim Loan that a restructuring

27  agreement would be entered into shortly, by no later than January or February of 2008.  However,

28  implementation was again dragged out due in large part to Lehman's extensive documentation.

33.     In the meantime, until a restructuring agreement was entered into, Lehman ALI and LCPI stopped paying vendor payables, nor would they pay any management fees of SunCal Management LLC, which was managing each of the Debtors' Projects.

34.     As the restructuring was pushed further and further out and Lehman ALI and LCPI continued to refuse to provide funding—despite their prior assurances—SunCal was effectively drained of liquidity, and so the Debtors became even more desperate and more dependent on Lehman ALI and LCPI financing.

35.     Lehman ALI and LCPI used the Debtors' vulnerability to their advantage in negotiating a restructuring agreement that was tipped heavily in Lehman's favor. (They also specifically exploited the fact that SCC and I were indemnitors on millions of dollars worth of surety bonds that covered work being done on the Debtors' Projects, including work that Lehman ALI and LCPI had specifically authorized and agreed to pay for. If Lehman ALI and LCPI did not pay for this work as promised, SCC, and I personally, would be exposed to massive bond liability. Hughson directly threatened me that if SunCal did not agree to what the Lehman parties wanted, they would foreclose and leave me "hung out on the bonds.")

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 21st day of July 2009, at Irvine, California.

/s/ _____

Bruce Elieff

# EXHIBIT 1

**LIMITED LIABILITY COMPANY OPERATING AGREEMENT**

**OF**

**LEHMAN SUNCAL REAL ESTATE FUND LLC**

**Dated as of August 8, 2006**

THE MEMBERSHIP INTERESTS IN LEHMAN SUNCAL REAL ESTATE FUND LLC (THE "INTERESTS") ARE SUBJECT TO THE RESTRICTIONS ON TRANSFER SET FORTH IN ARTICLE VIII OF THIS AGREEMENT AND THE OTHER TERMS AND CONDITIONS OF THIS AGREEMENT. THE INTERESTS HAVE BEEN ACQUIRED FOR INVESTMENT AND HAVE NOT BEEN REGISTERED (I) UNDER ANY STATE SECURITIES LAWS OR (II) UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "FEDERAL SECURITIES ACT"). NEITHER THE INTERESTS NOR ANY PART THEREOF MAY BE OFFERED FOR SALE, PLEDGED, HYPOTHECATED, SOLD, ASSIGNED OR TRANSFERRED AT ANY TIME EXCEPT IN COMPLIANCE WITH THE TERMS AND CONDITIONS OF ARTICLE VIII OF THIS AGREEMENT AND (1) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER ANY APPLICABLE STATE SECURITIES LAWS OR IN A TRANSACTION WHICH IS EXEMPT FROM REGISTRATION UNDER SUCH SECURITIES LAWS OR WHICH IS OTHERWISE IN COMPLIANCE WITH SUCH SECURITIES LAWS AND (2) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE FEDERAL SECURITIES ACT OR IN A TRANSACTION WHICH IS EXEMPT FROM REGISTRATION UNDER THE FEDERAL SECURITIES ACT OR WHICH IS OTHERWISE IN COMPLIANCE WITH THE FEDERAL SECURITIES ACT.

## LIMITED LIABILITY COMPANY OPERATING AGREEMENT OF
## LEHMAN SUNCAL REAL ESTATE FUND LLC

This **LIMITED LIABILITY COMPANY OPERATING AGREEMENT** (as same may be amended, modified "**Agreement**") for **Lehman SunCal Real Estate Fund LLC**, a Delaware limited liability company (the "**Company**"), is made and entered into as of the 8th day of August, 2006 by and between **LBREP II/SunCal Land Fund Member LLC**, a Delaware limited liability company ("**Fund**") and **SunCal Communities II, LLC**, a Delaware limited liability company ("**SunCal**"). Fund and SunCal are sometimes each individually referred to herein as a "**Member**" and collectively referred to herein as the "**Members**".

In consideration of the mutual covenants and agreements herein contained, and intending to be legally bound, the Members hereby agree as follows:

## ARTICLE I.
## DEFINITIONS

**Section 1.1    Definitions.**  For the purposes of this Agreement, capitalized terms used herein shall have the following meanings:

"**Acquisition Activities**" is defined in Section 3.6(a) hereof.

"**Acquisition Activities Reserve**" is defined in Section 3.6(a) hereof.

"**Acquisition Costs**" is defined in Section 3.6(a) hereof.

"**Act**" means the Delaware Limited Liability Company Act, codified in the Delaware Code Annotated, Title 6, Sections 18-101 to 18-1109, as the same may be amended from time to time.

"**Actual Development Fee**" is defined in Section 3.10(c)(iii) hereof.

"**Adjusted Capital Account Deficit**" means the deficit balance, if any, in a Member's Capital Account at the end of any fiscal year, with the following adjustments: (i) credit to such Capital Account any amount that such Member is obligated or deemed obligated to restore under Regulations Section 1.704-1(b)(2)(ii)(c), as well as any additions thereto pursuant to the next to last sentences of Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), after taking into account thereunder any changes during such year in Partnership Minimum Gain and in the minimum gain attributable to any Partner Nonrecourse Debt; and (ii) debit to such Capital Account the items described in Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6). The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted in a manner consistent with such intent.

"**Affiliate**" when used with respect to any particular Person, means (a) any Person or group of Persons acting in concert that directly or indirectly through one or more intermediaries Controls or is Controlled by or is under common Control with such

extended, acknowledged and/or verified such other documents and/or instruments as may be necessary and/or appropriate in order to form the Company or any Subsidiary under the Act and/or to continue its or their existence in accordance with the provisions of the Act.

**Section 2.2** **Name; Registered Agent and Registered Office**. The name of the Company and the name under which the business of the Company shall be conducted shall be Lehman SunCal Real Estate Fund LLC and such name shall only be changed upon approval by the Members. The registered agent of the Company shall be National Registered Agents, Inc., and the registered office of the Company shall be at 160 Greentree Drive, Suite 101, Dover, Delaware 19904. Upon consent of the Members, the Manager may select another such registered agent or registered office from time to time.

**Section 2.3** **Principal Office**. The principal place of business and office of the Company and the Subsidiaries shall be located c/o SunCal Companies, 2392 Morse Avenue, Irvine, CA 92614, or at such other place as the Members may unanimously determine from time to time. The business of the Company may also be conducted at such additional place or places as the Members may unanimously determine.

**Section 2.4** **Purposes and Business; Ownership Structure**.

(a) The purpose of the Company shall be to (i) acquire, obtain entitlements with respect to, improve and develop land for residential and commercial purposes in the Western United States, provided, however, that not more than twenty percent (20%) of the Company's funds will be invested in Properties located outside of California, at locations as the Members determine in accordance with the terms of this Agreement, (ii) use, sell, exchange, finance and refinance and otherwise dispose of each Property, all in accordance with the Annual Plan and Annual Budget, for profit and (iii) to engage in all activities related thereto. The purpose of the Company shall not limit its powers and privileges, and the Company shall possess and may exercise all the powers and privileges granted by the Act or by any other law or by this Agreement, together with all powers incidental thereto.

(b) Except with the unanimous approval of the Members, the Company and its Subsidiaries shall not engage in any other business or activity, including the loaning of any funds or money, extending credit or otherwise providing financial accommodations to any Person, other than a Subsidiary.

(c) The Company intends to form wholly-owned Subsidiaries, each of which will own a single Property and will conduct part of the Company's business, it being understood that the Members may, unanimously, decide that one or more Subsidiaries may own multiple Properties. Each such Property-owning Subsidiary will be a single purpose limited liability company in which the Company or another Subsidiary will be the sole member; provided, however, that the Members may approve alternate Property-owning structures as part of an Acquisition Memorandum. The organizational documents relating to the formation of any Subsidiary will be in the form annexed hereto as Schedule K hereto.

(d) Notwithstanding anything to the contrary contained in the organizational documents of any Subsidiary, no action shall be taken, sum expended, decision made or

14

obligation incurred by any Subsidiary with respect to a matter within the scope of any of the Major Decisions or otherwise requiring approval of the Members as set forth in this Agreement, unless such matter has been expressly approved by the Members or unless express provision therefor has been made a part of the Annual Plan or the Annual Budget or an Acquisition Memorandum, in each instance as approved by the Members. The Manager shall take all reasonable steps necessary to ensure compliance with the limitations of this Section 2.4 by the Company, each Subsidiary and its managing member, general partner and board of directors or similar governing body, as may be applicable.

Section 2.5    Term. The term of the Company shall commence on the date of the filing of the Certificate and shall continue until December 23, 2013, unless the Company is sooner terminated and dissolved pursuant to the terms hereof; provided, however, that Fund may, in its sole discretion, extend the term of the Company for two one-year periods.

Section 2.6    Other Qualifications. The Manager shall cause the Company and each Subsidiary shall file or record such documents and take such other actions under the laws of any jurisdiction in which the Company or the applicable Subsidiary does business pursuant to the Requirement of a Governmental Authority or as may be desirable to permit the Company and each Subsidiary to do business in any such jurisdiction and to promote the limitation of liability for the Members in any such jurisdiction.

Section 2.7    Limitation on the Rights of Members. Except as otherwise specifically provided in this Agreement, (a) no Member shall have the right to withdraw or retire as a Member, or withdraw or reduce its Capital Commitment or Capital Contributions, (b) no Member shall have the right to demand or receive property other than cash in return for its Capital Contributions and (c) no Member shall have priority over any other Member either as to the return of its Capital Contributions or as to profits or distributions.

Section 2.8    Negotiation Expenses and Internal Expenses.

(a)    Intentionally Omitted.

(b)    Internal Expenses. Except as provided in this Agreement and except to the extent the same are approved by the Members for incurrence or payment by or on behalf of the Company or are paid to the Manager pursuant to Section 3.10(c) hereof, each Member shall be responsible for the salaries of its respective officers and employees, including all employment expenses related thereto, and all of its own general administrative overhead and other internal costs or expenses and the Company shall not be liable or responsible for reimbursing any Member for any such costs and expenses.

Section 2.9    Publicity. The Members shall mutually agree on appropriate press releases, advertisements and other promotional materials describing in general terms or in detail the formation of the Company and the Subsidiaries, the Members' participation in the Company and the business of the Company; provided, however, that if any Member or its Affiliates is required by law or the rules of an applicable stock exchange or securities market by which such Member or Affiliate is bound to make such disclosures regarding the transactions that are the subject of this Agreement, then such Member or Affiliate may make such disclosures after the

15

(e)    Disapproved Properties. Notwithstanding the provisions of Section 3.9 hereof, if Fund, at any time prior to the acquisition of a Proposed Property, disapproves of acquisition of any Proposed Property or any phase thereof, then the Manager shall not cause or permit the Company or any Subsidiary to acquire such Proposed Property, or Approved Property, and SunCal or its Affiliates shall thereafter have the right to acquire such Proposed Property or Approved Property for its own account or with or in connection with any other Person. If SunCal or any Affiliate of SunCal chooses to pursue the acquisition of any Proposed Property that is disapproved as described herein, SunCal or the Affiliate pursuing the acquisition, shall, within ninety (90) days of its acquisition of such Proposed Property by SunCal or any Affiliate of SunCal, reimburse the Company for any and all Acquisition Costs incurred by the Company in connection with such Proposed Property. SCC Acquisitions, Inc. agrees to guaranty the prompt payment of any such reimbursement and Fund may act on behalf of the Company in the enforcement of said guaranty without any need for consent from the Manager.    SCC Acquisitions, Inc., in connection with such guaranty, is required to maintain a net worth of $50,000,000 and liquidity of $10,000,000, as determined in accordance with generally accepted accounting principals, consistently applied. In addition, if the reimbursement payments are not made to the Company as required pursuant to the terms hereof, the Company may retain such amounts from any amounts that would otherwise be distributed to the Manager pursuant to the terms of this Agreement.

### Section 3.7    Sale of Properties; Right of First Refusal.

(a)    Authority to Sell. Except as otherwise contemplated in the Annual Plan or any applicable Annual Budget, the Manager shall not have the authority to sell, and shall not have the right to initiate the sale of, any Property without the prior written approval of Fund.

(b)    Right to Sell Properties; Right of First Refusal.

(i)    After the expiration of the applicable lock-out period provided in the Annual Plan or Annual Budget of a particular Property, Fund and SunCal shall each have the right, to require the Company or the applicable Subsidiary to sell to a third party or parties, in each instance by written notice (a "**Sale Notice**") to the other Member, the applicable Property or Properties; provided, however, that SunCal's or Fund's right to require a sale under this Section 3.7(b)(i) is subject to and limited by the other Member's ability to exercise its Right of First Refusal set forth below. Upon receipt of any Sale Notice, the Manager shall promptly market and sell to third parties on behalf of the Company such Property or Properties specified in the Sale Notice or, at the election of the Sale Member (as defined below), the Sale Member may cause the Company to engage a broker selected by the Sale Member (at a market fee and on other market terms) to market the applicable Property or Properties at the Company's reasonable expense and control the marketing process with the full cooperation of the Manager.

(ii)    If the Company receives a Bona Fide Offer (as defined below), the Manager shall deliver a copy of the same to Fund and shall notify Fund in writing of the Member that delivered the Sale Notice (or, in the event both Members have delivered Sale Notices, the Member who delivered a Sale Notice to the other Member first in conformance with Section 12.2 hereof) (such Member, the "**Sale Member**"). The Sale

32

Member shall respond in writing as to whether it will accept or reject such Bona Fide Offer within ten (10) Business Days of receipt of such notification from the Manager. If the Sale Member fails to respond in writing within such 10-Business Day period, the Sale Member shall be deemed to have rejected such Bona Fide Offer.

(iii)    If the Sale Member has accepted such Bona Fide Offer, the other Member (the "**Non-Sale Member**"), or an Affiliate of the Non-Sale Member, shall have the absolute right to purchase all of (but not part of) such Property or Properties that are the subject of the Bona Fide Offer, as applicable, upon the same terms and conditions as set forth in such Bona Fide Offer for cash or its equivalent (such right, the "**Right of First Refusal**"). At the closing of the purchase of the Property or Properties by the Non-Sale Member (i) the brokerage commission, if any, but only to the extent due and owing to the broker in connection with such sale to the Non-Sale Member, (ii) any real property transfer taxes, but only to the extent due and payable in connection with the sale of the Property or Properties to the Non-Sale Member and (iii) any loan prepayment or transfer fee, but only to the extent due and payable in connection with the sale of the Property or Properties shall be paid by (i) the Company (or the applicable Subsidiary) if, in each case, payable by the Company or the Subsidiary under the terms of the Bona Fide Offer, or (ii) the Non-Sale Member if, in each case, payable by the third-party purchaser under the Bona Fide Offer. It is understood and agreed that the funds required by either Fund or SunCal to exercise a Right of First Refusal hereunder and close the purchase of the Property or Properties relating thereto may be raised, subject to compliance with Patriot Act Compliance Procedures, from Affiliates of, respectively, Fund and SunCal, or any other Person.

(iv)    The Non-Sale Member shall, within ten (10) Business Days after the Sale Member's decision to accept such Bona Fide Offer, indicate in writing to the Sale Member whether or not the Non-Sale Member has elected to exercise its Right of First Refusal. Failure to send such notification within such 10-Business Day period shall constitute a waiver by the Non-Sale Member of its Right of First Refusal with respect to the applicable Property or Properties and the Company shall sell the Property or Properties to the third party making the Bona Fide Offer, but only (x) upon substantially the same terms and conditions contained in, and to the purchaser identified in, such Bona Fide Offer and (y) within one hundred fifty (150) days after the Non-Sale Member waived its Right of First Refusal; provided, however, that in the event that the Company agrees to sell the applicable Property within such 150-day period to such third party at an aggregate cash purchase price for all of the Properties included in the Bona Fide Offer which is ninety-five percent (95%) or less than the aggregate purchase price contained in the Bona Fide Offer for all of the Properties included in the Bona Fide Offer (the "**Reduced Price**"), then the Manager shall notify the Non-Sale Member of such an occurrence prior to the sale, whereupon the Non-Sale Member shall have a renewed right ("**Renewed ROFR**"), exercisable within ten (10) Business Days of notification from the Manager, to exercise its Renewed ROFR in accordance with the terms of this Section 3.7(b)(iv). If the Non-Sale Member exercises its Right of First Refusal, the Sale Member shall consent to the sale of the Property or Properties to the Non-Sale Member on substantially the same terms and conditions contained in the Bona Fide Offer, including (if applicable) the Reduced Price. In addition, if requested by the Non-Sale

33

Member, such sale of the Property or Properties to the Non-Sale Member shall be effectuated by a distribution and/or transfer of the equity interests in the Subsidiary owning such Property or Properties. If the Non-Sale Member fails to exercise its Renewed ROFR, then the Company may sell the applicable Property or Properties to the purchaser under the Bona Fide Offer at the Reduced Price within one hundred fifty (150) days after the Non-Sale Member failed to exercise its initial Right of First Refusal. If the Company is unable to close such sale within such one hundred fifty (150) day period, then the Non-Sale Member shall have a renewed Right of First Refusal in the event the Company attempts to sell the applicable Property or Properties to any third party at any price.

(v)    In the event that the Sale Member rejects the Bona Fide Offer, then the Non-Sale Member shall have the right, by giving notice to the Sale Member within five (5) Business Days of its receipt of notice that the Bona Fide Offer was rejected, to accept the Bona Fide Offer on behalf of the Company, whereupon such Non-Sale Member shall thereafter be treated as the Sale Member for purposes of this Section 3.7(b) and the Sale Member shall thereafter be treated as the Non-Sale Member (with a Right of First Refusal) for purposes of this Section 3.7(b).

(vi)    If the Non-Sale Member (A) elects not to exercise or waives its Right of First Refusal or (B) defaults in its obligation to purchase the applicable Property or Properties upon the exercise of its Right of First Refusal (the Members agreeing that, except as may otherwise be agreed to by the Members at such time, a default with respect to one or more of the Properties to be acquired shall constitute a default with respect to all of the Properties to be acquired), then, without any further action, the Non-Sale Member shall be deemed to have granted to the Sale Member an irrevocable limited power-of-attorney to execute, enter into and perform on the Non-Sale Member's behalf such agreements and other documents as are necessary to effectuate the sale and transfer of the applicable Property to the third party who made the Bona Fide Offer or to any other third party at any time.

(vii)    A **"Bona Fide Offer"** shall mean, with respect to the Property or Properties described in the Sale Notice, a written offer (in the form of a letter of intent or term sheet) made in good faith by a financially responsible and stable third party having adequate financial worth and/or access to financing, which third party or the individuals Controlling such third party (A) is not included on any Government List, (B) has not previously been indicted for or convicted of any felony, (C) is not, to the knowledge of Fund or SunCal, currently under investigation by any Governmental Authority for alleged criminal activity, (D) does not, to the knowledge of Fund or SunCal, have a reputation in the community for criminal or unethical behavior or (E) is disqualified as a valid buyer in accordance with the AMLP. At any time, any Member may request that the Company (at the Company's expense) conduct all reasonable due diligence necessary regarding such third party to ensure that none of the conditions contained in clauses (A)-(E) above regarding such third party exist.

(ii) Fund's cooperation with, or failure to oppose, Lehman Ali, Inc. in connection with Lehman Ali, Inc.'s exercise of its rights or remedies under any documents executed in connection with any such financing.

      **Section 12.17 <u>Right to Invest in Long Term Investments</u>.**  Notwithstanding anything to the contrary contained herein, SunCal, the Key Principals and any and all Affiliates of SunCal (it being acknowledged that the excution of this Agreement by SunCal makes this provision binding on all said parties) shall present to Lehman Brothers Holdings, Inc., Lehman Brothers Real Estate Partners II, L.P. and any real estate investment fund subsequent to Lehman Brothers Real Estate Partners II, L.P. that is affiliated with Lehman Brothers Holdings, Inc. the opportunity to invest in any and all long term real estate projects pursued by SunCal, the Key Principals or any and all Affiliates of SunCal that are projects that are not reasonably anticipated to generate 50% of their projected revenues on or before December 31, 2013.  Any and all such investment opportunities shall be presented in a manner consistent with how Proposed Properties are presented to Fund pursuant to the terms of this Agreement.

**[Signature Page Follows]**

IN WITNESS WHEREOF, the Members have executed this Agreement effective as of the date first set forth above.

SUNCAL COMMUNITIES II, LLC,
a Delaware limited liability company,

By: _____
    Name: _Bruce V. Cook_
    Title: _General Counsel_


LBREP II/SUNCAL LAND FUND MEMBER LLC,
a Delaware limited liability company

By: _____
    Name:
    Title:

IN WITNESS WHEREOF, the Members have executed this Agreement effective as of the date first set forth above.

SUNCAL COMMUNITIES II, LLC,
a Delaware limited liability company,

By: _____
     Name:
     Title:

LBREP II/SUNCAL LAND FUND MEMBER LLC,
a Delaware limited liability company

By: _____
     Name:  Randolpho Amboss
     Title:  Authorized Signatory

## JOINDER

By its signature below, the undersigned, SCC Acquisitions, Inc., a California corporation, agrees to be bound by Sections 3.6, 3.8, 3.10 and 7.1 of this Agreement and to fulfill its obligations thereunder. The undersigned hereby waives all suretyship and guarantor rights and defenses that would otherwise be available to the undersigned with respect to the payment of its obligations hereunder, and agrees that this Agreement may be modified by the parties at any time without the undersigned's consent.

**SCC ACQUISITIONS, INC., a**
California corporation

By: _____

Name: _____

Title: _____

2

## SCHEDULE A

### Names, Capital Commitments
### and Percentage Interests of the Members

| Member | Capital Commitment | Percentage Interest |
|---|---|---|
| SunCal Communities II, LLC | $66.6 million | 10% |
| LBREP II/SunCal Land Fund Member LLC | $600 million | 90% |

| In re: | CHAPTER 11 |
| Palmdale Hills Property, LLC | |
| Debtor(s). | CASE NUMBER 8:08-bk-17206-ES |

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 1999 Avenue of the Stars, Suite 1000, Los Angeles, CA 90067.

The foregoing document described as: DECLARATION OF BRUCE ELIEFF IN SUPPORT OF REPLY RE SUPPLEMENT TO DEBTORS' MOTION FOR ORDER: (1) APPROVING OVERBID PROCEDURES IN CONNECTION WITH PROPOSED SALE OF SUBSTANTIALLY ALL ASSETS OF THE DEBTORS' ESTATES; (2) APPROVING BREAK-UP FEE; (3) DISALLOWING CREDIT BIDS RIGHTS OF DISPUTED SECURED CREDITORS, LEHMAN ALI, INC., NORTHLAKE HOLDINGS AND OVC HOLDINGS; AND (4) SETTING HEARING ON APPROVAL OF SALE OF ASSETS will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

**I.   TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On July 21, 2009, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

☒  Service information continued on attached page

**II.   SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served):
On _____, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. *Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.*

☐  Service information continued on attached page

**III.   SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on July 21, 2009 I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. *Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.*

☒  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| July 21, 2009 | Carole Conklin | *Carole Conklin* (signature) |
| Date | Type Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*                                                                                         **F 9013-3.1**

| In re:<br>Palmdale Hills Property, LLC<br><br>Debtor(s). | CHAPTER  11<br><br>CASE NUMBER 8:08-bk-17206-ES |
|---|---|

## SERVICE LISTS

### I.    Served by NEF

- Joseph M Adams    jadams@sycr.com
- Raymond H Aver    ray@averlaw.com
- James C Bastian    jbastian@shbllp.com
- John A Boyd    fednotice@tclaw.net
- Brendt C Butler    BButler@rutan.com
- Dan E Chambers    dchambers@jmbm.com
- Shirley Cho    scho@pszjlaw.com
- Vonn Christenson    vrc@paynefears.com
- Vincent M Coscino    emurdoch@allenmatkins.com
- Paul J Couchot    pcouchot@winthropcouchot.com, pj@winthropcouchot.com
- Jonathan S Dabbieri    dabbieri@shlaw.com
- Ana Damonte    ana.damonte@pillsburylaw.com
- Melissa Davis    mdavis@shbllp.com
- Daniel Denny    ddenny@gibsondunn.com
- Caroline Djang    crd@jmbm.com
- Donald T Dunning    ddunning@dunningLaw.com
- Joseph A Eisenberg    jae@jmbm.com
- Lei Lei Wang Ekvall    lekvall@wgllp.com
- Richard W Esterkin    resterkin@morganlewis.com
- Marc C Forsythe    kmurphy@goeforlaw.com
- Alan J Friedman    afriedman@irell.com
- Robert P Goe    kmurphy@goeforlaw.com
- Eric D Goldberg    egoldberg@stutman.com
- Kelly C Griffith    bkemail@harrisbeach.com
- Asa S Hami    ahami@morganlewis.com
- Michael J Hauser    michael.hauser@usdoj.gov
- D Edward Hays    ehays@marshackhays.com
- Michelle Hribar    mhribar@rutan.com
- Lawrence A Jacobson    laj@cohenandjacobson.com
- Stephen M Judson    sjudson@fablaw.com
- David I Katzen    katzen@ksfirm.com
- Christopher W Keegan    ckeegan@kirkland.com, emilee@kirkland.com;alevin@kirkland.com
- Irene L Kiet    ikiet@hkclaw.com
- Mark J Krone    mk@amclaw.com
- Leib M Lerner    leib.lerner@alston.com
- Peter W Lianides    pj@winthropcouchot.com
- Charles Liu    cliu@winthropcouchot.com
- Kerri A Lyman    klyman@irell.com
- Mariam S Marshall    mmarshall@marshallramoslaw.com
- Robert C Martinez    rmartinez@mclex.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

January 2009                                                                                                     F 9013-3.1

| In re:<br>Palmdale Hills Property, LLC | CHAPTER 11 |
|---|---|
| Debtor(s). | CASE NUMBER 8:08-bk-17206-ES |

- Hutchison B Meltzer    hmeltzer@wgllp.com
- Joel S. Miliband    jmiliband@rusmiliband.com
- James M Miller    jmiller@millerbarondess.com
- Louis R Miller    smiller@millerbarondess.com
- Douglas M Neistat    twilliams@greenbass.com
- Mike D Neue    mneue@thelobelfirm.com, csolorzano@thelobelfirm.com
- Robert Nida    Rnida@castlelawoffice.com
- Penelope Parmes    pparmes@rutan.com
- Ronald B Pierce    ronald.pierce@sdma.com
- Raymond A Policar    hausermouzes@sbcglobal.net
- Cassandra J Richey    cmartin@pprlaw.net
- Debra Riley    driley@allenmatkins.com
- Martha E Romero    Romero@mromerolawfirm.com
- William D Schuster    bills@allieschuster.org
- Steven M Speier    Sspeier@Squarmilner.com, ca85@ecfcbis.com
- Michael St James    ecf@stjames-law.com
- Todd L Turoci    tturoci@aol.com
- United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov
- Jason Wallach    jwallach@bergerkahn.com
- Christopher T Williams    ctwilliams@venable.com
- David M Wiseblood    dwiseblood@seyfarth.com
- Arnold H Wuhrman    Wuhrman@serenitylls.com
- Dean A Ziehl    dziehl@pszjlaw.com, dziehl@pszjlaw.com

## III.    Served by Personal Delivery, Facsimile Transmission or Email

### BY EMAIL

Wayne Abb, Esq. - wayneabb@gmail.com
Atty for P. Volkerts – cmartin@pprlaw.net
Atty for Bond Safeguard & Lexon – mea@amclaw.com;

Lehman Ali, Inc. and Lehman Commercial
c/o Weil, Gotshal & Manges LLP
elisa.lemmer@weil.com
Edward.soto@weil.com
Nellie.camerik@weil.com
Shai.waisman@weil.com
michael.bond@weil.com)

Danske Bank A/S, London Branch
c/o Venable LLP
ccallari@Venable.com
Timothy J. Gorry - tgorry@Venable.com

Richard Pachulski -rpachulski@pszjlaw.com

John.sieger@kattenlaw.com

sspeier@squarmilner.com
Steven N. Speier, Ch 11 Trustee
c/o Squar Milner

Atty. for Fenway Capital LLC –
igoldstein@DeweyLeBoeuf.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

January 2009                                                                                            F 9013-3.1

| In re:<br>Palmdale Hills Property, LLC | CHAPTER 11 |
|---|---|
| Debtor(s). | CASE NUMBER 8:08-bk-17206-ES |

Atty. for JP Morgan Chase Bank NA –
ARWolf@WLRK.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*                                                                          **F 9013-3.1**