1  PAUL J. COUCHOT - State Bar No. 131934
   PETER W. LIANIDES - State Bar No. 160517
2  PAYAM KHODADADI - State Bar No. 239906
   **WINTHROP COUCHOT**
3  **PROFESSIONAL CORPORATION**
   660 Newport Center Drive, Fourth Floor
4  Newport Beach, CA 92660
   pcouchot@winthropcouchot.com
5  plianides@winthropcouchot.com
   pkhodadadi@winthropcouchot.com
6  Telephone: (949) 720-4165
   Facsimile: (949) 720-4111
7  General Insolvency Counsel for Administratively
   Consolidated Debtors-in-Possession and
8  Counsel for SCC Acquisitions, Inc.

9           **UNITED STATES BANKRUPTCY COURT**
            **CENTRAL DISTRICT OF CALIFORNIA**
10               **SANTA ANA DIVISION**

11  In re                                    Case No. 8:08-bk-17206-ES
    PALMDALE HILLS PROPERTY, AND ITS
12  RELATED DEBTORS,                         Jointly Administered With Case Nos.
                                             8:08-bk-17209-ES; 8:08-bk-17240-ES;
13           Joint Administered Debtors and  8:08-bk-17224-ES; 8:08-bk-17242-ES;
             Debtors-in-Possession           8:08-bk-17225-ES; 8:08-bk-17245-ES;
14                                           8:08-bk-17227-ES; 8:08-bk-17246-ES;
                                             8:08-bk-17230-ES; 8:08-bk-17231-ES;
15  Affects:                                 8:08-bk-17236-ES; 8:08-bk-17248-ES;
    ☒ All Debtors                            8:08-bk-17249-ES; 8:08-bk-17573-ES;
16  ☐ Palmdale Hills Property, LLC           8:08-bk-17574 ES; 8:08-bk-17575-ES;
                                             8:08-bk-17404-ES; 8:08-bk-17407-ES;
17  ☐ SunCal Beaumont Heights, LLC           8:08-bk-17408-ES; 8:08-bk-17409-ES;
    ☐ SCC/Palmdale, LLC                      8:08-bk-17458-ES; 8:08-bk-17465-ES;
18  ☐ SunCal Johannson Ranch, LLC            8:08-bk-17470-ES; 8:08-bk-17472-ES;
                                             and 8:08-bk-17588-ES
19  ☐ SunCal Summit Valley, LLC
    ☐ SunCal Emerald Meadows LLC             Chapter 11 Proceedings
20  ☐ SunCal Bickford Ranch, LLC
                                             **DEBTORS' THIRD AMENDED JOINT**
21  ☐ Acton Estates, LLC                     **DISCLOSURE STATEMENT**
    ☐ Seven Brothers LLC                     **DESCRIBING DEBTORS' THIRD**
22  ☐ SJD Partners, Ltd.                     **AMENDED JOINT CHAPTER 11 PLAN**

23  ☐ SJD Development Corp.                  Date:    October 15, 2009
    ☐ Kirby Estates, LLC                     Time:    10:00 a.m.
24  ☐ SunCal Communities I, LLC              Place:   Courtroom 5A
25  ☐ SunCal Communities III, LLC
26  ☐ SCC Communities LLC
    ☐ North Orange Del Rio Land, LLC
27  ☐ Tesoro SF LLC
28      *Caption Continued on Next Page*

*Continued from Previous Page*

- ☐ LBL-SunCal Oak Valley, LLC
- ☐ SunCal Heartland, LLC
- ☐ LBL-SunCal Northlake, LLC
- ☐ SunCal Marblehead, LLC
- ☐ SunCal Century City, LLC
- ☐ SunCal PSV, LLC
- ☐ Delta Coves Venture, LLC
- ☐ SunCal Torrance, LLC
- ☐ SunCal Oak Knoll, LLC

# TABLE OF CONTENTS

**PAGE**

I. INTRODUCTION ...................................................................... 2

II. DEFINITIONS AND RULES OF INTERPRETATION ..................... 3
    2.1 Definitions .................................................................. 3
    2.2 Rules of Construction .................................................. 26
    2.3 Exhibits ...................................................................... 27

III. PLAN CONFIRMATION DEADLINES ..................................... 27
    3.1 Time and Place of the Confirmation Hearing ................ 27
    3.2 Deadline for Voting for or Against the Plan .................. 27
    3.3 Deadline for Objecting to the Confirmation of the Plan .... 28
    3.4 Identity of Person to Contact for More Information
        Regarding the Plan ....................................................... 28
    3.5 Disclaimer .................................................................. 28

IV. FACTUAL BACKGROUND OF THE DEBTORS ......................... 29
    4.1 The Formation of the Debtors and the Projects ............ 29
        (a) Overview of the Debtors and Their Projects ............ 29
        (b) The Debtors' Primary Secured Creditors and Their
            Disputed Claims ................................................... 30
        (c) The Lehman Loans and the Lehman Disputed Claims
            and Lehman's Disputed Liens ............................... 31
        (d) A Summary of All of the Alleged Claims Against
            the Debtors .......................................................... 32
    4.2 Factual Circumstances Leading to the Filing of the Debtors'
        Chapter 11 Cases ......................................................... 32
        (a) Background on the SunCal Companies .................... 32
        (b) The Origins of the SunCal/Lehman Joint Venture ...... 33
        (c) Lehman's Effective Control over the Management of
            the Debtors and Promises of Ongoing Funding .......... 33
        (d) The 2008 Restructuring Agreement ....................... 35
        (e) The Lehman Lenders Hire Radco ........................... 36
        (f) The Lehman Lenders' Failure to Close on the
            Settlement Agreement ........................................... 36
        (g) The Lehman Lenders' Undisclosed Sale of Most
            of the Debtors' Loans ............................................ 37
        (h) Lehman's Foreclosure Sale and Purchase of the
            Pacific Point Project ............................................. 38
        (i) Alvarez and Marsal's Take Over Control of the Lehman
            Entities After the Chapter 11 Filings of LBHI and
            Lehman Commercial .............................................. 39
    4.3 The Debtors' Potential Preferential Transfers ................ 40

V.  SIGNIFICANT EVENTS IN THE DEBTORS' CHAPTER 11 CASES ................. 41
5.1  Voluntary Debtors ...................................................................... 41
5.2  Trustee Debtors ......................................................................... 41
5.3  The Debtors' Various Motions to Preserve and Maintain
the Projects ............................................................................... 41
(a)  The Debtors' Motion for Relief from Stay in the Lehman
Commercial Chapter 11 Proceedings .................................. 41
(b)  Certain of the Debtors' Initial Motion for Surcharge and
Use of Cash Collateral ....................................................... 42
(c)  The Lehman Administrative Loans ...................................... 43
(d)  Certain Debtors' Second Motion for Use of Cash
Collateral ........................................................................... 43
5.4  Lehman Commercial's Motions for Relief from the Automatic
Stay Against Certain of the Voluntary Debtors' Projects ............... 44
5.5  The Lehman Adversary Proceeding ............................................. 44
(a)  A Summary of the Equitable Subordination Causes
of Action ........................................................................... 45
(1)  The Debtors Assert that the Lehman Lenders
Engaged in Inequitable Conduct ............................ 46
(i)  The Debtors Assert that the Lehman
Lenders Are Insiders ................................. 46
(ii)  As Non-Insiders ....................................... 46
(2)  The Lehman Entities' Inequitable Conduct
Harmed the Creditors ........................................... 46
(3)  Equitable Subordination Is Consistent with
Bankruptcy Code Principles ................................. 47
(b)  The Fraudulent Conveyance Claims .................................... 47
(c)  The Preference Claims ....................................................... 49
(d)  The Lien Avoidance Claims Under Section 506(d) in
Both the Third Amended Complaint and the Debtors'
Motion Pursuant to Section 506(d) ..................................... 49
5.6  The Trustee Debtors' Sales Procedures Motion ............................ 50
5.7  The Debtors' Motion to Strike the Claims and Pleadings
Arising from the Sold Loans to Fenway Capital ........................... 51
5.8  The Debtors' Substantive Consolidation Motion ........................... 51
5.9  The Debtors' Motion to Approve the Acquisitions
Administrative Loan ................................................................... 53
5.10 The Debtors' Other Litigation with Non-Lehman Related Parties ...... 55
(a)  The Debtors' Failed Preliminary Injunction Motion
Against the Holders of Bond Claims ................................... 55

# TABLE OF CONTENTS

## (Continued)

(b) The Contractors' Successful Motions for Relief from Stay to Pursue the Bond Claims.............................................. 55

(c) The Non-Lehman Related Primary Secured Lenders' Successful Motions for Relief from Stay........................................ 56

(d) The Rubidoux 60 Litigation............................................... 56

(e) Church Litigation ............................................................. 57

VI. TREATMENT OF UNCLASSIFIED CLAIMS ............................................. 58

    6.1 Treatment of Allowed Administrative Claims................................ 58

    (a) Treatment and Repayment of the Lehman Administrative Loan(s) ................................................................. 59

    (b) Repayment of Allowed Administrative Claims Other than Repayment of the Lehman Administrative Loans..................... 59

    (c) Administrative Claims Bar Date.......................................... 60

      (i) General Administrative Claims Bar Date ............................ 60

      (ii) Administrative Tax Claims Bar Date..................................... 60

    6.2 Treatment of Priority Unsecured Tax Claims ............................... 61

VII. CLASSIFICATION OF CLAIMS AND INTERESTS............................................. 61

VIII. THE PLAN'S TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS.................................................................... 82

    8.1 The Plan's Treatment of Holders of Allowed Secured Real Property Tax Claims on Real Properties Subject to Deeds of Trust Arising from Lehman's Disputed Secured Claims and Disputed Liens (Classes 1.1 Through 1.14)................ 82

    8.2 The Plan's Treatment of Holders of Allowed Secured Real Property Tax Claims Against Real Properties Not Subject to Deeds of Trust Arising from Lehman's Disputed Claims (Classes 2.1 Through 2.5)........................................ 83

    8.3 The Plan's Treatment of Lehman's Disputed Claim(s) and Disputed Lien(s) (Classes 3.1 Through 3.14) .......................... 83

    8.4 The Plan's Treatment of Holders of Secured Claims of Primary Secured Creditors Other than the Holders of Lehman's Disputed Claims (Classes 4.1 Through 4.15) .............. 84

    8.5 The Plan's Treatment of Holders of Asserted Mechanic Lien Claims Against the Debtors' Projects Subject to Lehman's Disputed Claims (Classes 5.1 Through 5.55) .............. 84

    8.6 The Plan's Treatment of Asserted Mechanic Lien Claims Against Projects Not Subject to Lehman's Disputed Claims (Class 6.1).................... 85

8.7     The Plan's Treatment of Holders of Priority Claims
        (Classes 7.1 Through 7.4) ................................................................ 85
8.8     The Plan's Treatment of Holders of Allowed General
        Unsecured Claims Against Debtors with Assets that Are Not
        Subject to the Lehman's Disputed Claims and Disputed
        Liens (Classes 8.1 Through 8.5) (SunCal Beaumont, SunCal Johannson,
        Seven Brothers and Kirby Estates) ................................................ 86
8.9     The Plan's Treatment of Holders of General Unsecured Claims
        that Become the Beneficiary of any Equitable Subordination
        Judgment Against Lehman's Disputed Claims and Disputed
        Liens (Classes 9.1 Through 9.20) ................................................ 86
8.10    The Plan's Treatment of Holders of Allowed General Unsecured
        Claims that Do Not Become the Beneficiary of an Equitable
        Subordination Judgment Against Lehman's Disputed Claims
        (Classes 10.1 Through 10.20) ...................................................... 87
8.11    The Plan's Treatment of Holders of Allowed Interests ................. 87

IX.   ACCEPTANCE OR REJECTION OF THE PLAN ................................. 88
      9.1     Introduction ............................................................................... 88
      9.2     Who May Object to Confirmation of the Plan ........................... 88
      9.3     Who May Vote to Accept/Reject the Plan ................................. 88
      9.4     What Is an Allowed Claim/Interest ........................................... 88
      9.5     What Is an Impaired Class ........................................................ 88
      9.6     Who Is Not Entitled to Vote ..................................................... 89
      9.7     Who Can Vote in More than One Class ..................................... 89
      9.8     Votes Necessary for a Class to Accept the Plan ...................... 89
      9.9     Treatment of Nonaccepting Classes ........................................ 90
      9.10    Request for Confirmation Despite Nonacceptance by
              Impaired Class(as) .................................................................. 90

X.    MEANS OF EXECUTION AND IMPLEMENTATION OF THE PLAN .............. 90
      10.1    Introduction ............................................................................... 90
      10.2    The Plan Sponsor ...................................................................... 90
      10.3    Acquisitions' Funding Obligations Pursuant to the Acquisitions
              Administrative Loan .................................................................. 90
      10.4    Transfer of the Debtors' Assets to the Plan Trust and Removal
              of the Chapter 11 Trustee ........................................................ 91
      10.5    Management of the Plan Trust Assets After Effective Date ......... 91
      10.6    The Committee(s) ...................................................................... 91
              (a)     Duties and Powers ........................................................ 91
              (b)     Dissolution of Committee(s) .......................................... 92

| | | | |
|---|---|---|---|
| 10.7 | Litigation Claims | ............................................................................... | 92 |
| 10.8 | Collection of Litigation Recoveries | .................................................. | 92 |
| 10.9 | Payment of Post-Confirmation Expenses | ........................................... | 93 |

| | | | |
|---|---|---|---|
| XI. | DISTRIBUTIONS | ................................................................................... | 93 |
| 11.1 | Distribution Agent | ........................................................................... | 93 |
| 11.2 | Distributions | ..................................................................................... | 93 |
| | (a) | Dates of Distributions | ........................................... | 93 |
| | (b) | Limitation on Liability | .......................................... | 93 |
| 11.3 | Old Instruments and Securities | ......................................................... | 94 |
| | (a) | Surrender and Cancellation of Instruments and Securities | | 94 |
| | (b) | Cancellation of Liens | .............................................. | 94 |
| 11.4 | De Minimis Distributions and Fractional Shares | ............................. | 94 |
| 11.5 | Delivery of Distributions | ................................................................. | 94 |
| 11.6 | Undeliverable Distributions | .............................................................. | 95 |
| 11.7 | Disposition of Unclaimed Property | ................................................... | 95 |

| | | | |
|---|---|---|---|
| XII. | OBJECTION TO CLAIMS AND DISPUTE CLAIMS | ............................ | 96 |
| 12.1 | Standing for Objections to Claims | .................................................... | 96 |
| 12.2 | Treatment of Disputed Claims and Disputed Liens | ......................... | 96 |
| | (a) | No Distribution Pending Allowance | ....................... | 96 |
| | (b) | Distribution After Allowance | .................................. | 96 |

| | | | |
|---|---|---|---|
| XIII. | EXECUTORY CONTRACTS AND UNEXPIRED LEASES | ................... | 96 |
| 13.1 | Executory Contracts Potentially Being Assumed | ............................ | 96 |
| 13.2 | Executory Contracts Being Rejected | ................................................ | 97 |
| 13.3 | Bar Date for Rejection Damages | ...................................................... | 97 |
| 13.4 | Changes in Rates Subject to Regulatory Commission Approval | ...... | 97 |

| | | | |
|---|---|---|---|
| XIV. | BEST INTEREST OF CREDITORS TEST AND PLAN FEASIBILITY | ...... | 97 |
| | (a) | Holders of Allowed Classes 8.1 Through 8.5 Claims | ....... | 98 |
| | (b) | Holders of Allowed Classes 9.1 Through 9.20 Claims | ...... | 98 |
| | (c) | Holders of Allowed Classes 10.1 Through 10.20 | .......... | 99 |

| | | | |
|---|---|---|---|
| XV. | LIMITATION OF LIABILITY | ............................................................. | 99 |
| 15.1 | No Liability for Solicitation or Participation | ................................. | 99 |
| 15.2 | Limitation of Liability | ...................................................................... | 99 |

XVI. CONDITIONS TO CONFIRMATION AND EFFECTIVENESS
OF THE PLAN .................................................................... 100
  16.1 Conditions Precedent to Plan Confirmation ...................... 100
  16.2 Conditions Precedent to Plan Effectiveness ...................... 100

XVII. RETENTION OF JURISDICTION ...................................... 100

XVIII. MODIFICATION OR WITHDRAWAL OF THE PLAN ........... 100
  18.1 Modification of Plan ................................................... 100
  18.2 Nonconsensual Confirmation........................................ 101

XIX. MISCELLANEOUS ........................................................ 101
  19.1 Payment of Statutory Fees ........................................... 101
  19.2 Payment Dates.......................................................... 101
  19.3 Headings ................................................................ 101
  19.4 Other Documents and Actions....................................... 101
  19.5 Notices .................................................................. 102
  19.6 Governing Law ......................................................... 102
  19.7 Binding Effect ......................................................... 102
  19.8 Successors and Assigns............................................... 103
  19.9 Severability of Plan Provisions ..................................... 103
  19.10 No Waiver .............................................................. 103
  19.11 Inconsistencies ........................................................ 103
  19.12 Exemption from Certain Transfer Taxes and Recording Fees...... 103
  19.13 Post-Confirmation Status Report ................................... 104
  19.14 Post-Confirmation Conversion/Dismissal ......................... 104
  19.15 Final Decree ........................................................... 104

# I.

## INTRODUCTION

This Disclosure Statement[1] is filed by the Plan Proponents, the Voluntary Debtors and Acquisitions on behalf of the Debtors. The Debtors are all Affiliates of each other, Acquisitions, and SCC LLC.

The Voluntary Debtors are the Plan Proponents in each of their respective Chapter 11 Cases and Acquisitions is the Plan Proponent in the Trustee Debtors' Chapter 11 Cases. Acquisitions is also the Plan Sponsor, the Plan Trustee and the Distribution Agent for all of the Debtors.

Chapter 11 allows debtors-in-possession, Chapter 11 trustees, and under some circumstances, creditors, interest holders and others parties in interest, to propose a Chapter 11 plan. As stated, the Voluntary Debtors and Acquisitions are the Plan Proponents of the Plan sent to you in the same envelope as this Disclosure Statement. THE DOCUMENT YOU ARE READING IS THE DISCLOSURE STATEMENT FOR THE ENCLOSED PLAN. This Disclosure Statement summarizes the contents of the Plan, certain information relating to the Plan and the process the Bankruptcy Court follows in determining whether or not to confirm the Plan.

The Plan provides for the sale and liquidation of the Debtors' Assets, the prosecution and liquidation of the Debtors' Litigation Claims, and the distribution of the Net Sale Proceeds, Net Litigation Recoveries and Available Cash to the Holders of Allowed Claims against the Debtors in accordance with the priorities and other rights set forth in the Bankruptcy Code and the resolution of the Litigation Claims.

**READ THIS DISCLOSURE STATEMENT CAREFULLY IF YOU WANT TO KNOW ABOUT:**

➢ **WHO CAN VOTE OR OBJECT TO THE PLAN;**

➢ **HOW YOUR CLAIM IS TREATED;**

➢ **HOW THIS TREATMENT COMPARES TO WHAT YOUR CLAIM WOULD RECEIVE IN LIQUIDATION;**

---

[1] All capitalized terms are defined terms set forth in Article II of this Disclosure Statement.

MAINDOCS-#132904-v6-SCC_3d_Amd_DS_Sub_Consolidated.DOC

> **A BRIEF HISTORY OF THE DEBTORS AND SIGNIFICANT EVENTS DURING THEIR CHAPTER 11 BANKRUPTCY PROCEEDING;**

> **WHAT FACTORS THE BANKRUPTCY COURT WILL CONSIDER TO DECIDE WHETHER OR NOT TO CONFIRM THE PLAN;**

> **WHAT IS THE EFFECT OF CONFIRMATION; AND**

> **WHETHER THE PLAN IS FEASIBLE.**

This Disclosure Statement cannot tell you everything about your rights. You should consider consulting your own attorney to obtain more specific advice on how the Plan will affect you and your best course of action.

Be sure to read the Plan as well as this Disclosure Statement. If there are any inconsistencies between the Plan and this Disclosure Statement, the Plan provisions will govern.

The Bankruptcy Code requires a Disclosure Statement to contain "adequate information" concerning the Plan. On _____, 2009, the Bankruptcy Court entered an order approving this Disclosure Statement, based upon a finding that this document contained "adequate information" to enable parties affected by the Plan to make an informed judgment regarding the Plan. Any party can now solicit votes for or against the Plan.

## II.

## DEFINITIONS AND RULES OF INTERPRETATION

### 2.1     Definitions.

The following defined terms are used in this Disclosure Statement. Any capitalized term that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term in the Bankruptcy Code or Bankruptcy Rules.

2.1.1     10,000 Santa Monica Project. The Project owned by SunCal Century City, located in Century City, California, as more particularly described herein.

2.1.2     Acquisitions. SCC Acquisitions, Inc., a California corporation, an indirect parent company of all of the Debtors, a purported obligor on the Bond Claims, a Creditor of all of the Debtors, a Plan Proponent for the Trustee Debtors, the Plan Sponsor, and the proposed Plan Trustee.

MAINDOCS-#132904-v6-SCC_3d_Amd_DS_Sub_Consolidated.DOC

2.1.3   Acquisitions Administrative Loan. The Allowed Administrative Claim of Acquisitions, or of such Affiliate that provides such funding, equal to all amounts caused to be funded by Acquisitions or such Affiliate in connection with the Debtors' Chapter 11 Cases and the consummation of the Plan.

2.1.4   Acton Estates. Acton Estates, LLC, a Delaware limited liability, a Voluntary Debtor herein, and the owner of the Acton Project.

2.1.5   Acton Project. The Project owned by Acton Estates, located in Los Angeles County, California, as more particularly described herein.

2.1.6   Administrative Claim(s). Any Claim incurred after the Petition Date but before the Confirmation Dates for any cost or expense of administration of the Cases allowable under Section 330, 331, 503(b), or 507(a)(1) of the Bankruptcy Code, including, without limitation, any actual and necessary post-petition expenses of preserving the Estates of the Debtors, any actual and necessary post-petition expenses of operating the business of the Debtors in Possession, all compensation or reimbursement of expenses to the extent allowed by the Bankruptcy Court under Section 330, 331, or 503 of the Bankruptcy Code and any fees or charges assessed against the Estates of the Debtors under Section 1930 of title 28 of the United States Code.

2.1.7   Administrative Claims Bar Date. The last date fixed by the Plan for the filing of Proof of Claims or requests for payment of Administrative Claims. Under the Plan, the Administrative Claims Bar Date shall be the first business day after the sixtieth (60th) day after the Confirmation Date.

2.1.8   Affiliate. The term shall have the meaning set forth under Section 101(2), including, but not limited to, as to any Person, any other Person that directly or indirectly owns or controls, is owned or controlled by, or is under common ownership or control with, such Person. The term "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as applied to any Person, means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of such

Person, whether through the ownership of voting securities or other equity ownership interest, by contract or otherwise.

2.1.9    Allowed.    When used to describe Claim(s) or Interest(s), such Claim(s) or Interest(s), to the extent that it or they are "Allowed Claim(s)" or "Allowed Interest(s)."

2.1.10    Allowed Amount shall mean:

A.    With respect to any Administrative Claim (i) if the Claim is based upon a Fee Application, the amount of such Fee Application that has been approved by a Final Order of the Bankruptcy Court; (ii) if the Claim is based upon any indebtedness or obligation incurred in the ordinary course of business of the Debtors and is not otherwise subject to an Administrative Claim Bar Date, the amount of such Claim that has been agreed to by the Debtors and such creditor, failing which, the amount thereof as fixed by a Final Order of the Bankruptcy Court; or (iii) if the Holder of such Claim was required to file and has filed proof thereof with the Bankruptcy Court prior to an Administrative Claim Bar Date, (1) the amount stated in such proof if no objection to such Proof of Claim is interposed within the applicable period of time fixed by the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court, or (2) the amount thereof as fixed by Final Order of the Bankruptcy Court if an objection to such proof was interposed within the applicable period of time fixed by the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court.    The Allowed Amount of any Administrative Claim which is subject to an Administrative Claims Bar Date and not filed by the applicable Administrative Claims Bar Date shall be zero, and no distribution shall be made on account of any such Administrative Claim;

B.    with respect to any Claim which is not an Administrative Claim (the "Other Claim"): (i) if the Holder of such Other Claim did not file proof thereof with the Bankruptcy Court on or before the Claims Bar Date, the amount of such Claim as listed in the Debtors'' Schedules as neither disputed, contingent nor unliquidated; or (ii) if the Holder of such Claim has filed proof thereof with the Bankruptcy Court on or before the Claims Bar Date, (a) the amount stated in such proof if no objection to such Proof of Claim was interposed within the applicable period of time fixed by the Bankruptcy Code, the Bankruptcy Rules, the Plan or the Bankruptcy Court, or (b) the amount thereof as fixed by Final Order of the Bankruptcy Court if an

objection to such proof was interposed within the applicable period of time fixed by the Bankruptcy Code, the Bankruptcy Rules, the Plan or the Bankruptcy Court. The Allowed Amount of any Other Claim which is not Filed by the applicable Claims Bar Date, is not listed on the Debtors' Schedules or is listed as disputed, unliquidated, contingent or unknown, and is not allowed under the terms of this Plan shall be zero, and no distribution shall be made on account of any such Claim; and

C.      with respect to any Interest, (i) the amount provided by or established in the records of the Debtors at the Confirmation Date, provided, however, that a timely filed proof of Interest shall supersede any listing of such Interest on the records of the Debtors; or (ii) the amount stated in a proof of Interest Filed prior to the Confirmation Date if no objection to such Interest was filed prior to the Confirmation Date or such later date as the Bankruptcy Court allows; or (iii) the amount of such Interest as fixed by a Final Order of the Bankruptcy Court.

2.1.11      Allowed Claim. Except as otherwise provided in the Plan (including with respect to those Classes for which the amount of the Allowed Claims is specified by the Plan), a Claim to the extent (and only to the extent) of the Allowed Amount of such Claim.

2.1.12      Allowed Interest. Any Interest to the extent, and only to the extent, of the Allowed Amount of such Interest.

2.1.13      Allowed Secured Claims. An asserted Secured Claim that is not either a Disputed Claim or a Disputed Lien.

2.1.14      Assets. All assets that are property of the Debtor(s) pursuant to Bankruptcy Code Section 541.

2.1.15      Arch. Arch Insurance Company, a Bond Issuer.

2.1.16      Available Cash. The Cash deposited into the Distribution Account(s) on or after the Effective Date that is available for making Distributions under the Plan to Holders of Allowed Administrative, Priority, and General Unsecured Claims.

2.1.17    Avoidance Actions.  All Claims and defenses to Claims accruing to the Debtors and their Estates under Bankruptcy Code Sections 506(d), 510(c), 541, 544, 545, 547, 548, 549, 550, or 551.

2.1.18    Bankruptcy Code.  The Bankruptcy Reform Act of 1978, as amended, as set forth in Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq., as applicable to the Cases.

2.1.19    Bankruptcy Court.  The United States Bankruptcy Court for the Central District of California, having jurisdiction over the Cases and, to the extent of any withdrawal of the reference made pursuant to Section 157 of title 28 of the United States Code, the United States District Court for the Central District of California; or, in the event such courts cease to exercise jurisdiction over the Cases, such court or unit thereof that exercises jurisdiction over the Cases in lieu thereof.

2.1.20    Bankruptcy Rules.  Collectively, as now in effect or hereafter amended and as applicable to the Cases, (i) the Federal Rules of Bankruptcy Procedure, and (ii) the Local Bankruptcy Rules and General Orders applicable to cases pending before the Bankruptcy Court.

2.1.21    Beaumont Heights Project.  The Project owned by SunCal Beaumont, located in the City of Beaumont, California, as more particularly described herein.

2.1.22    Bickford Ranch Project.  The Project owned by SunCal Bickford, located in the City of Penryn, California, as more particularly described herein.

2.1.23    Bickford Second Loan Agreement.  That certain promissory note secured by a deed of trust, dated as of May 25, 2005, in the maximum aggregate principal amount of approximately $30,000,000 executed by SunCal Bickford, as borrower, and payable to the order of Lehman ALI.  The Bickford Second Lien Loan Agreement is allegedly secured by a second priority deed of trust on the Bickford Ranch Project.  The Bickford Second Loan Agreement has an asserted balance due of $56,494,059.38 as of March 30, 2009.

2.1.24    Bond Claim(s).  Any Claim against the Debtor(s) and a Bond Issuer under various payment or performance bonds, and/or any claims of Bond Issuer(s) against the Debtor(s) under various payment or performance bonds.

2.1.25    Bond Claimant.  Holder(s) of a Bond Claim.

2.1.26    Bond Indemnification Claim.  All Claims by Bond Safeguard, Lexon, and Arch for indemnification for payment by Bond Safeguard, Lexon and Arch of Bond Claims with respect to the Debtors' Projects.

2.1.27    Bond Indemnitors.  The individuals and entities that are allegedly liable on the Bond Indemnification Claims, including, allegedly, all of the Debtors, Acquisitions, all Affiliates of Acquisitions, and Elieff.

2.1.28    Bond Issuer(s).  Bond Safeguard, Lexon and Arch in their capacities as issuers and sureties for payment and performance bonds for the benefit of certain of the Debtors.

2.1.29    Bond Safeguard.  Bond Safeguard Insurance Company, a Bond Issuer.

2.1.30    Business Day.  Any day, other than a Saturday, a Sunday or a "legal holiday," as defined in Bankruptcy Rule 9006(a).

2.1.31    Cases.  The Chapter 11 cases of the Debtors pending before the Bankruptcy Court.

2.1.32    Cash.  Currency of the United States of America and cash equivalents, including, but not limited to, bank deposits, immediately available or cleared checks, drafts, wire transfers and other similar forms of payment.

2.1.33    CFD Bonds.  Community facilities district bonds issued by a governmental entity.

2.1.34    Chapter 11 Trustee.  Steven M. Speier, the duly appointed trustee of the Trustee Debtors in their pending Chapter 11 Cases.

2.1.35    Claim.  This term shall have the broadest possible meaning under Section 101(5) of the Bankruptcy Code, and shall include (a) any right to payment from any of the Debtors, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, or (b) any right to an equitable remedy for breach of performance if such breach gives rise to a right of payment from any of the Debtors, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

2.1.36    Claims Bar Date.  For any Claim other than an Administrative Claim, March 31, 2009, which was established by the Bankruptcy Court as the last date for creditors to file Proof of Claims with the Bankruptcy Court in all of the Debtors' cases.

2.1.37    Claims Objection Deadline.  The later of (i) the first business day following the one hundred and eightieth (180th) day after the Effective Date, or (ii) such greater period of limitation as may be fixed or extended by the Bankruptcy Court or by agreement between the Plan Trustee and the Holder of the Claim.

2.1.38    Class.  Each group of Claims or Interests classified in Article V of the Plan pursuant to Sections 1122 and 1123 of the Bankruptcy Code.

2.1.39    Committees.  Collectively, the Voluntary Debtors' Committee and the Trustee Debtors' Committee, both before and after the Confirmation Date.

2.1.40    Confirmation Date.  The date on which the Confirmation Order is entered in the Bankruptcy Court's docket.

2.1.41    Confirmation Order.  The order entered by the Bankruptcy Court confirming the Plan in accordance with the provisions of Chapter 11 of the Bankruptcy Code.

2.1.42    Contingent Bond Claims.  Unmatured Bond Claims.

2.1.43    Creditor.  Any Person who is the Holder of a Claim against any Debtor that arose or accrued or is deemed to have arisen or accrued or to have matured, or otherwise become due, owing, and payable on or before the Petition Date, including, without limitation, Claims of the kind specified in Sections 502(g), 502(h) or 502(i) of the Bankruptcy Code.

2.1.44    Danske Bank.  Danske Bank A/S London Branch, a Lehman Successor in their asserted capacity as the Holder of Lehman's Disputed Claim and Disputed Liens arising from the SunCal Century City Loan Agreement.

2.1.45    Debtor(s).  Individually or collectively, the Voluntary Debtors and the Trustee Debtors.  In the event that the Court orders substantive consolidation of two or more Debtor's Estates, then the term "Debtor" shall refer to the consolidated Debtor under the Plan.

2.1.46    Debtor(s)-in-Possession.  The Voluntary Debtor(s) when acting in their capacity as representatives of their respective Estates in their respective Chapter 11 Cases.

2.1.47    Del Amo Project. The Project owned by SunCal Torrance, located in the City of Torrance, California, as more particularly described herein.

2.1.48    Del Rio. North Orange Del Rio Land, LLC, a limited liability company, a Voluntary Debtor herein, and the owner of the Del Rio CFD Bond Proceeds.

2.1.49    Del Rio CFD Bond Proceeds. Certain net proceeds of CFD Bonds that may be issued by the City of Orange.

2.1.50    Delta Coves. Delta Coves Ventures, LLC, a limited liability company, a Trustee Debtor herein, and the owner of the Delta Coves Project.

2.1.51    Delta Coves Loan Agreement. That certain Amended and Restated Loan Agreement, dated as of April 20, 2007, by and between Delta Coves, as borrower, and Lehman ALI, lender, pursuant to which Lehman ALI made a loan in the maximum aggregate principal amount of approximately $236 million. The Delta Coves Loan Agreement is allegedly secured by a first-priority deed of trust on the Delta Coves Project. The Delta Coves Loan Agreement has an asserted balance due of $206,023,142.48 as of March 30, 2009.

2.1.52    Delta Coves Project. The Project owned by Delta Coves, located in Bethel Island located in Contra Costa County, California, as more particularly described herein.

2.1.53    Disclosure Statement. This Debtors' Third Amended Joint Disclosure Statement Describing the Debtors' Third Amended Joint Chapter 11 Plan.

2.1.54    Disputed Claim(s). All or any part of a Claim other than any Allowed Amount thereof as to which any one of the following applies: (i) no Proof of Claim has been filed with respect to such Claim, and either (a) the Claim is not listed in the Schedules; or (b) the Claim is listed in the Schedules as unliquidated, disputed, contingent, unknown or in a zero amount, (ii) the Claim is the subject of (a) a Litigation Claim; (b) the Claim is subject to offset by a Litigation Claim; (c) a timely objection that has not been resolved by a Final Order; or (d) a request for estimation in accordance with the Bankruptcy Code, the Bankruptcy Rules, any applicable order of the Bankruptcy Court, or the Plan which is Filed on or before the Claims Objection Deadline, which Adversary Proceeding, objection, or request for estimation has not been

dismissed, withdrawn or determined by a Final Order; or (iii) the Claim is otherwise treated as a "Disputed Claim" pursuant to the Plan.

2.1.55   Disputed Lien(s). An asserted lien(s) against Assets of the Debtor(s) that is either subject to a Disputed Secured Claim, not duly perfected, subject to an Avoidance Action, or subject to an action pursuant to Bankruptcy Code Sections 510(c)(2) and/or 506(d).

2.1.56   Distribution(s). Payments to Holders of Allowed Claims provided for under the Plan.

2.1.57   Distribution Agent. The entity that is responsible for making Distributions under the Plan, which shall be Acquisitions.

2.1.58   Distribution Account(s). Separate account(s) to be established by the Plan Trustee at an FDIC insured bank into which each Debtors' Available Cash shall be deposited and all Available Cash received by the Plan Trust after the Confirmation Date that would have belonged to such Debtor shall be deposited, other than Net Sales Proceeds that are subject to Disputed Claims and Disputed Liens. In the event that the Court orders substantive consolidation of two or more of the Debtors, then there will be only one Distribution Account for such Debtors, as consolidated.

2.1.59   Distribution Date. With respect to any Allowed Claim or Allowed Interest, the date on which a Distribution is required to be made under the Plan.

2.1.60   Effective Date. A date selected by the Plan Trustee, but in no event later than the sixtieth (60th) day after the Confirmation Date.

2.1.61   Elieff. Bruce Elieff, the president of Acquisitions, a purported obligor on the Bond Claims with corresponding indemnity Claims against the Debtors.

2.1.62   Emerald Meadows Project. The Project owned by SunCal Emerald, located in the City of Rubidoux, California, as more particularly described herein.

2.1.63   EMR. EMR Residential Properties LLC, a Nevada limited liability company.

2.1.64   Estates. The bankruptcy estates of the Debtors created pursuant to Section 541 of the Bankruptcy Code.

2.1.65    <u>Fee Applications</u>.  Applications of Professional Persons under Sections 330, 331 or 503 of the Bankruptcy Code for allowance of compensation and reimbursement of expenses in the Cases.

2.1.66    <u>Fee Claim</u>.  A Claim under Sections 330 or 503 of the Bankruptcy Code for allowance of compensation and reimbursement of expenses in the Cases.

2.1.67    <u>Fenway Capital</u>.  Fenway Capital Funding LLC, a Lehman Successor to Lehman's Disputed Claims and Lehman's Disputed Liens arising from (i) SunCal Communities I Loan Agreement, (ii) Ritter Ranch Loan Agreement, (iii) Bickford Second Loan Agreement, (iv) SunCal PSV Loan Agreement, (v) SunCal Marblehead/SunCal Heartland Loan Agreement, (vi) Delta Coves Loan Agreement (vii) SunCal Northlake Loan Agreement, and (viii) SunCal Oak Valley Loan Agreement.

2.1.68    <u>Filed</u>.  Delivered to, received by and entered upon the legal docket by the Clerk of the Bankruptcy Court.  "File" shall have a correlative meaning.

2.1.69    <u>Final Order</u>.  A judgment, order, ruling or other decree issued and entered by the Bankruptcy Court.

2.1.70    <u>General Unsecured Claim</u>.  A Claim against a Debtor that is not (a) a Secured Claim, (b) an Administrative Claim, (c) a Tax Claim or (d) a Priority Claim.

2.1.71    <u>Heartland Project</u>.  The Project being developed by SunCal Heartland, located in Riverside County, California, as more particularly described herein.

2.1.72    <u>Holder</u>.  The beneficial owner of any Claim or Interest.

2.1.73    <u>Insider</u>.  The term shall have the broadest meaning possible under Section 101(31), including, but not limited to, a person in control of the Debtor, Affiliates and Insiders of such Affiliates.

2.1.74    <u>Interest</u>.  Any equity security interest in any Debtor within the meaning, of Section 101(16) of the Bankruptcy Code, including, without limitation, any equity ownership interest in any of the Debtors, whether in the form of common or preferred stock, stock options, warrants, partnership interests, or membership interests.

-12-

2.1.75    Interim Loan Agreement. That certain Loan Agreement, dated as of October 31, 2007, by and between SCC LLC, as borrower and Lehman ALI, as lender, pursuant to which Lehman ALI made a loan in the maximum aggregate amount of approximately $20 million. The Interim Loan Agreement has an alleged balance due of $23,795,012.59 as of March 30, 2009. The alleged obligation under the Interim Loan Agreement is allegedly secured by (a) an alleged first-priority deed of trust on the Joshua Ridge Project; (b) an alleged first-priority deed of trust on the Tesoro Project; and (c) an alleged first-priority lien on the Del Rio CFD Bond Proceeds.

2.1.76    Johannson Ranch Project. The Project owned by SunCal Johannson, located in the City of Modesto, California, as more particularly described herein.

2.1.77    Joshua Ridge Project. The Project owned by SCC Communities, located in the City of Victorville, California, as more particularly described herein.

2.1.78    Kirby Estates. Kirby Estates, LLC, a Delaware limited liability company, a Voluntary Debtor herein, and the owner of a portion of the Summit Valley Project not owned by SunCal Summit Valley and Seven Brothers.

2.1.79    LBHI. Lehman Brothers Holdings, Inc., a Lehman Entity.

2.1.80    Legal Rate. The rate of interest payable on judgments obtained in the United States District Courts as set forth in 28 U.S.C. § 1961. The rate applicable under the Plan is 1.44% per annum, representing the applicable rate on November 6, 2008.

2.1.81    Lehman Adversary Proceeding. The Debtors' pending adversary proceeding against the Lehman Lenders and/or the Lehman Successors asserting various causes of action including equitable subordination, fraudulent conveyances, preferential transfers and lien avoidance.

2.1.82    Lehman ALI. Lehman ALI, Inc.

2.1.83    Lehman Administrative Loans. The post-petition financing provided by Lehman ALI to Palmdale Hills, SunCal Emerald, SunCal Bickford, Acton Estates, SunCal Oak Valley, SunCal Heartland, SunCal Northlake, SunCal Marblehead, SunCal Century City, SunCal PSV, Delta Coves, and SunCal Oak Knoll, which grants priming liens on all borrower Debtors' assets (with the exception of SunCal Century City in which the liens are junior priority), and

-13-

provides for super-priority administrative status to Lehman ALI and modifies the automatic stay to the extent necessary to implement the financing. The aggregate amount of the Lehman Administrative Loans to all of the borrower Debtors is $1,790,572.

2.1.84 <u>Lehman Commercial</u>. Lehman Commercial Paper, Inc.

2.1.85 <u>Lehman Entities</u>. The Lehman Lenders, the Lehman Equity Members and LBHI.

2.1.86 <u>Lehman Equity Members</u>. Lehman Entities that owned direct or indirect membership Interests in one or more of the Trustee Debtors.

2.1.87 <u>Lehman Lenders</u>. Lehman ALI, Lehman Commercial, Northlake Holdings, and OVC Holdings.

2.1.88 <u>Lehman Loans</u>. Collectively the following loans that are the purported basis for the Lehman's Disputed Claims: (a) SunCal Communities I Loan Agreement; (b) Bickford Second Loan Agreement; (c) Ritter Ranch Loan Agreement; (d) SCC Palmdale Loan; (e) Interim Loan Agreement; (f) SunCal Oak Knoll/SunCal Torrance Loan Agreement; (g) SunCal Century City Loan Agreement; (h) SunCal PSV Loan Agreement; (i) SunCal Delta Coves Loan Agreement; (j) SunCal Marblehead/SunCal Heartland Loan Agreement; (k) Sun Cal Oak Valley Loan Agreement; (l) SunCal Northlake Loan Agreement; (m) Pacific Point First Loan Agreement; and (n) Pacific Point Second Loan Agreement.

2.1.89 <u>Lehman Re</u>. Lehman Re LTD., an Affiliate of the Lehman Entities and a Lehman Successor to Lehman's Disputed Claim and Disputed Liens arising from the Pacific Point First Loan Agreement.

2.1.90 <u>Lehman Representatives</u>. The individuals that controlled the Lehman Entities.

2.1.91 <u>Lehman Successor(s)</u>. Entities other than the Lehman Lenders that either assert to be or are determined by the Bankruptcy Court to be the beneficial owner(s) of the Lehman Loan(s), including, but not limited to Fenway Capital, Lehman Re and Danske Bank.

2.1.92    <u>Lehman's Disputed Claim(s)</u>. All of the Proofs of Secured Claims filed by a Lehman Lender or a Lehman Successor in the Debtors' Chapter 11 Cases arising from the Lehman Loans.

2.1.93    <u>Lehman's Disputed Lien(s)</u>. All of the alleged liens relating to Proofs of Secured Claims filed by a Lehman Lender or a Lehman Successor in the Debtor's Chapter 11 Cases arising form the Lehman Loans.

2.1.94    <u>Lexon</u>. Lexon Insurance Co.

2.1.95    <u>Litigation Claims</u>. Any and all interests of the Debtors in any and all Claims, rights, causes of action, and objections or defenses to Claims, liens, rights, or causes of action which have been or may be commenced by the Debtor(s), the Chapter 11 Trustee, or the Committee(s), as the case may be, including, but not limited to, any (i) Avoidance Actions; (ii) for turnover of property to the Debtors' Estates and/or the Plan Trust; (iii) for the recovery of property or payment of money that belongs to the Debtors' Estates or the Plan Trust; (iv) the right to compensation in the form of damages, recoupment or setoff of the Debtors' Estates and/or the Plan Trust; (v) the Lehman Adversary Proceeding; and (vi) any and all other Claims against Lehman's Disputed Claims and/or Disputed Liens referenced in the Plan or the Disclosure Statement.

2.1.96    <u>Litigation Recoveries</u>. Any Cash or other property received by the Chapter 11 Trustee, the Debtors, the Committees and/or the Plan Trust, as the case may be, from all or any portion of a Litigation Claim(s), including, but not limited to, awards of damages, attorneys' fees and expenses, interest and punitive damages, whether recovered by way of settlement, execution on judgment or otherwise.

2.1.97    <u>LV Pacific Point</u>. LV Pacific Point, LLC, a Delaware limited liability company, a Lehman Entity that is the disputed owner of the Pacific Point Project.

2.1.98    <u>Marblehead Project</u>. The Project owned by SunCal Marblehead, located in the City of San Clemente, California, as more particularly described herein.

2.1.99    <u>Maximum Distributions</u>. A Distribution to a Holder of an Allowed General Unsecured Claim against a Debtor equal to one hundred percent (100%) of the amount of

the Holder's Allowed General Unsecured Claim plus interest at the Legal Rate from and as of the applicable Debtor's Petition Date.

2.1.100 <u>Mechanic Lien Claims</u>. Mechanic Lien Claims arising pursuant to California Civil Code §3110, et seq. that were either allegedly perfected prepetition or otherwise allegedly satisfy the requirements of Bankruptcy Code 546(b).

2.1.101 <u>Net Litigation Recoveries</u>. Litigation Recoveries less associated Administrative Claims and Post-Confirmation Expenses incurred in connection with such Litigation Recoveries.

2.1.102 <u>Net Sales Proceeds</u>. The Cash generated from the sale(s) or liquidation of the Debtor(s)' Assets or the Plan Trust's Assets, less payment of selling expenses, taxes, Chapter 11 Trustee fees, and any associated Post-Confirmation Expenses and Administrative Claims incurred in furtherance of such sales or liquidation of such Assets.

2.1.103 <u>Net Sales Proceeds Account(s)</u>. Separate account(s) to be established by the Plan Trustee at an FDIC insured bank into which all Net Sale Proceeds shall be deposited from the sale of Assets that were allegedly encumbered by a Disputed Secured Claim(s) and/or a Disputed Lien(s). Regardless of whether the Court orders substantive consolidation of two or more of the Debtors' Estates, there shall be separate Net Sales Proceeds Accounts for Net Sale Proceeds allegedly subject to Disputed Secured Claim(s) and/or Disputed Lien(s). The Disputed Secured Claim(s) and/or Disputed Lien(s) shall attach to the corresponding Net Sales Proceeds Account(s) pending any Final Order(s) of the Bankruptcy Court resolving the applicable Disputed Secured Claim(s) and/or applicable Disputed Lien(s). To the extent that a particular Disputed Claim is disallowed or subordinated and/or a particular Disputed Lien is avoided or otherwise invalidated, such Net Sales Proceeds allegedly subject thereto shall become Available Cash and shall be transferred to the applicable Distribution Account(s).

2.1.104 <u>Northlake Holdings</u>. Northlake Holdings LLC, a California limited liability company, that is a Lehman Lender and the asserted Holder of the beneficial interest in the Disputed Secured Claim against the Northlake Project.

2.1.105   Northlake Project.  The Project owned by SunCal Northlake, located in the City of Castaic California, as more particularly described herein.

2.1.106   Oak Knoll Project.  The Project owned by SunCal Oak Knoll, located in the City of Oakland, California, as more particularly described herein.

2.1.107   Oak Valley Project.  The Project owned by SunCal Oak Valley, located in Riverside County, California, as more particularly described herein.

2.1.108   Orders for Relief Date.  The following are dates that orders for relief were entered for each of the Trustee Debtors:

| SunCal Oak Valley | January 6, 2009 |
| SunCal Heartland | January 6, 2009 |
| SunCal Northlake | January 6, 2009 |
| SunCal Marblehead | January 6, 2009 |
| SunCal Century City | January 6, 2009 |
| SunCal PSV | January 6, 2009 |
| Delta Coves | January 6, 2009 |
| SunCal Torrance | January 6, 2009 |
| SunCal Oak Knoll | January 6, 2009 |

2.1.109   OVC Holdings.  OVC Holdings LLC, a California limited liability company, that is a Lehman Lender and the asserted Holder of the beneficial interest in the Disputed Secured Claim against the Oak Valley Project.

2.1.110   Pacific Point First Loan Agreement.  That certain loan agreement, dated February 16, 2006, by and among Lehman ALI, SJD Development and SJD Partners, pursuant to which Lehman ALI made a loan in the maximum aggregate principal amount of approximately $125,000,000. The Pacific Point First Loan Agreement is allegedly secured by a first-priority deed of trust on the Pacific Point Project.  The Pacific Point First Loan Agreement had an asserted balance due of $120,110,237 as of March 30, 2009.

2.1.111   Pacific Point Second Loan Agreement.  That certain loan agreement, dated May 1997, by and between Lehman ALI and SJD Partners, pursuant to which Lehman ALI initially made a loan in the maximum aggregate principal amount of approximately $20,000,000. The Pacific Point Second Loan Agreement was secured by a second-priority deed of trust on the

Pacific Point Project, which was foreclosed upon on August 28, 2008 by LV Pacific Point, as assignee of Lehman ALI.

2.1.112   Pacific Point Project.  The Project formerly owned by SJD Partners, which was non-judicially foreclosed upon on August 28, 2008, by LV Pacific Point, as assignee of Lehman ALI.  The Pacific Point Project is a 200 plus acre development overlooking the Pacific Ocean in San Juan Capistrano, California.

2.1.113   Palmdale Hills.  Palmdale Hills Property, a Delaware limited liability company, a Voluntary Debtor herein, and the owner of the Ritter Ranch Project

2.1.114   Palmdale Hills CFD Bonds.  Certain CFD bonds issued by the City of Palmdale, in the amount of approximately $33 million that are owned by Palmdale Hills.

2.1.115   Palm Springs Village Project.  The Project owned by SunCal PSV, located in the City of Palm Springs, California, as more particularly described herein.

2.1.116   Person.  An individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, governmental authority, governmental unit, committee or other entity of whatever nature.

2.1.117   Petition Dates.  The following are dates that each of the Voluntary Debtors filed their Voluntary Chapter 11 petitions or Creditors filed involuntary Chapter 11 petitions against the Trustee Debtors:

| Palmdale Hills | November 6, 2008 |
| SunCal Beaumont | November 6, 2008 |
| SCC Palmdale | November 7, 2008 |
| SunCal Johannson | November 7, 2008 |
| SunCal Summit Valley | November 7, 2008 |
| SunCal Emerald | November 7, 2008 |
| SunCal Bickford | November 7, 2008 |
| Acton Estates | November 7, 2008 |
| Seven Brothers | November 7, 2008 |
| SJD Partners. | November 7, 2008 |
| SJD Development | November 7, 2008 |
| Kirby Estates | November 7, 2008 |
| SunCal I | November 7, 2008 |
| SunCal III | November 7, 2008 |
| SCC Communities | November 19, 2008 |
| Del Rio | November 19, 2008 |
| Tesoro | November 19, 2008 |

| Delta Coves Ventures, LLC | November 14, 2008 |
| SunCal Heartland, LLC | November 12, 2008 |
| SunCal Marblehead, LLC | November 12, 2008 |
| LB-L-SunCal Northlake, LLC | November 12, 2008 |
| LB-L-SunCal Oak Valley, LLC | November 12, 2008 |
| SunCal Century City, LLC | November 14, 2008 |
| SunCal PSV, LLC | November 14, 2008 |
| SunCal Torrance Properties, LLC | November 14, 2008 |
| SunCal Oak Knoll, LLC | November 19, 2008 |

2.1.118    Plan. The Debtors' Third Amended Joint Chapter 11 Plan, together with the Exhibits thereto, as the same may be amended or modified from time to time in accordance with the Plan.

2.1.119    Plan Proponent(s). The parties-in-interest that are proposing the Plan. In the case of the Voluntary Debtors, each Voluntary Debtor is their own Plan Proponent. In the case of the Trustee Debtors, Acquisitions is the Plan Proponent.

2.1.120    Plan Sponsor. The entity that has committed to cause the funding of certain specified obligations under the Plan on or after the Effective Date. The Plan Sponsor is Acquisitions.

2.1.121    Plan Trust. A trust to be established as of the Effective Date, with Acquisitions as the Plan Trustee and the Holders of Allowed Claims against the Debtors as the beneficiaries. The purpose of the Plan Trust will be to liquidate the Debtors' Assets and to otherwise consummate the Plan.

2.1.122    Plan Trustee. Acquisitions, as the Plan Trustee, under the Plan Trust.

2.1.123    Post-Confirmation Expenses. The fees and expenses incurred by the Plan Sponsor, the Plan Trustee and the Committee(s) and their professionals following the Confirmation Date (including the fees and costs of Professionals) for the purpose of (i) prosecuting and liquidating the Litigation Claims; (ii) objecting to and resolving Disputed Claims and Disputed Liens; (iii) selling or otherwise liquidating the Plan Trust's Assets; (iv) effectuating Distributions under the Plan; and (v) otherwise consummating the Plan and closing the Debtors' Chapter 11 Cases.

2.1.124    Priority Claim. Any Claim, other than an Administrative Claim or a Tax Claim, to the extent entitled to priority under Section 507(a) of the Bankruptcy Code.

-19-

2.1.125    Pro Rata.  Proportionately, so that with respect to any distribution in respect of any Allowed Claim, the ratio of (a)(i) the amount of property distributed on account of such Allowed Claim to (ii) the amount of such Allowed Claim, is the same as the ratio of (b)(i) the amount of property distributed on account of all Allowed Claims of the Class or Classes sharing in such distribution to (ii) the amount of all Allowed Claims in such Class or Classes.

2.1.126    Professional.  A Person or Entity (a) employed by the Debtors, the Committees pursuant to a Final Order in accordance with Sections 327 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to the Effective Date, pursuant to Sections 327, 328, 329 1330 and 331 of the Bankruptcy Code, or (b) for which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to Section 503(b) of the Bankruptcy Code.

2.1.127    Professional Fees.  All Allowed Claims for compensation and for reimbursement of expenses under Sections 328, 330 and/or 503(b) of the Bankruptcy Code

2.1.128    Projects.  The Debtors' residential real estate development projects as separately defined herein and described in Exhibit "1" to this Disclosure Statement.

2.1.129    Ritter Ranch Loan Agreement.  That certain Credit Agreement, dated as of February 8, 2007, by and among Palmdale Hills, as borrower, Lehman Commercial, as administrative agent and lender, pursuant to which Lehman Commercial made a loan in the maximum aggregate principal amount of approximately $264,000,000.  The Ritter Ranch Loan Agreement is allegedly secured by a first-priority deed of trust on all real and personal property owned by Palmdale Hills.  The Ritter Ranch Loan Agreement has an asserted balance due of $287,252,096.31 as of March 30, 2009.

2.1.130    Ritter Ranch Project.  The Project owned by Palmdale Hills, located in the City of Palmdale, California, as more particularly described herein.

2.1.131    Rubidoux.  Rubidoux 60 LLC, a Nevada limited liability company.

2.1.132    Sales Period.  The Sales Period is the time period that the Plan Trustee is provided under the Plan to consummate a sale or liquidation of the Plan Trust's Assets subject to the Lehman Disputed Claims(s) and/or the Lehman Disputed Lien(s).  The Sales Period shall

commence on the Effective Date and shall expire on the first calendar date after the one hundred and eightieth (180th) day following the date that the Bankruptcy Court enters a Final Order(s) resolving all of the Lehman's Disputed Claim(s) and/or the Lehman Disputed Lien(s) against the applicable Plan Trust's Assets. To the extent that the Plan Trust is stayed for any reason from selling and/or liquidating such Assets, then the Sales Period for the Plan Trust shall be tolled for a time period equal to the duration of such stay.

2.1.133 <u>SCC Communities</u>. SCC Communities, LLC, a limited liability company, a Voluntary Debtor herein, and the owner of the Joshua Ridge Project.

2.1.134 <u>SCC JV</u>. SCC JV Ventures, LLC, a Delaware limited liability company, that is an Affiliate of Acquisitions and the Debtors.

2.1.135 <u>SCC LLC</u>. SCC Acquisitions LLC, a limited liability company, a subsidiary of Acquisitions and an indirect and/or a direct parent company of all of the Debtors.

2.1.136 <u>SCC Palmdale</u>. SCC Palmdale, LLC, a Delaware limited liability company, a Voluntary Debtor herein, and the Holder of the Allowed Interest in Palmdale Hills.

2.1.137 <u>SCC Palmdale Loan</u>. Mezzanine Credit Agreement, between SCC Palmdale as borrower and Lehman Commercial as lender. The SCC Palmdale Loan is allegedly secured by a pledge of SCC Palmdale's Allowed Interest in Palmdale Hills. The SCC Palmdale Loan has an alleged balance due of $119,664,305.25 as of March 30, 2009.

2.1.138 <u>Schedules</u>. The schedules of assets and liabilities and list of equity security holders Filed by the Debtors, as required by Section 521(1) of the Bankruptcy Code, Bankruptcy Rules 1007(a)(3) and (b)(1), and Official Bankruptcy Form No. 6, as amended from time to time.

2.1.139 <u>Secured Claim</u>. Any Claim, including interest, fees, costs, and charges to the extent allowable pursuant to Bankruptcy Code Section 506, that is secured by a valid and unavoidable Lien on the Debtor(s)' Assets.

2.1.140 <u>Secured Real Property Tax Claims</u>. Secured Claims held by various government entities secured by liens on the underlying real properties owned by the Debtors but that are non-recourse to the Debtors.

2.1.141    Seven Brothers. Seven Brothers, LLC, a Delaware limited liability company, a Voluntary Debtor herein, and the owner of the portion of the Summit Valley Project not owned by Kirby Estates and SunCal Summit Valley.

2.1.142    SJD Development. SJD Development Corp., a California corporation, a Voluntary Debtor herein, and the Holder of the Allowed Interest in SJD Partners.

2.1.143    SJD Partners. SJD Partners, Ltd., a California limited partnership, a Voluntary Debtor herein, and the prior owner of the Pacific Point Project.

2.1.144    Summit Valley Project. The Project owned in part by SunCal Summit Valley, Seven Brothers and Kirby Estates, located in the City of Hesperia, California, as more particularly described herein.

2.1.145    SunCal. The SunCal Companies, a trade name for Acquisitions and its Affiliates.

2.1.146    SunCal I. SunCal Communities I, LLC, a Delaware limited liability company, a Voluntary Debtor herein, and the owner of the equity membership interests in Acton Estates, SunCal Bickford, SunCal Beaumont, SunCal Summit Valley, SunCal Johannson and SunCal Emerald.

2.1.147    SunCal III. SunCal Communities III, LLC, a Delaware limited liability company, a Voluntary Debtor herein.

2.1.148    SunCal Beaumont. SunCal Beaumont, LLC, a limited liability company, a Voluntary Debtor herein, and the owner of the Beaumont Heights Project.

2.1.149    SunCal Bickford. SunCal Bickford Ranch, LLC, a Delaware limited liability company, a Voluntary Debtor herein, and the owner of the Bickford Ranch Project.

2.1.150    SunCal Century City. SunCal Century City, LLC, a Delaware limited liability company, a Trustee Debtor herein, and the owner of the 10,000 Santa Monica Project.

2.1.151    SunCal Century City Loan Agreement. That certain Loan Agreement by and between SunCal Century City, as borrower and Lehman ALI, as agent and sole lender pursuant to which Lehman ALI made a loan in the aggregate maximum principal amount of approximately $120,000,000. The SunCal Century City Loan Agreement is allegedly secured by a first-priority

deed of trust on the 10,000 Santa Monica Project. The SunCal Century City Loan Agreement has an alleged balance due of $120,000,000.00 as of April 1, 2009. Danske Bank is the current Holder of the Century City Loan Agreement and related deed of trust.

2.1.152 <u>SunCal Communities I Loan Agreement</u>. The loan agreement by and among (i) SunCal I and SunCal III, as borrowers and (ii) Lehman Commercial, as administrative agent and lender, pursuant to which Lehman Commercial made a loan to SunCal I and SunCal III, as borrowers in the maximum aggregate principal amount of approximately $395,313,713.37. The loan agreement is allegedly secured by (a) alleged first-priority deeds of trust on the SunCal Bickford, the Acton Estates, and the SunCal Emerald Projects, (b) an alleged pledge of SunCal I's Allowed Interest in Acton Estates, SunCal Summit, SunCal Beaumont, SunCal Johannson, SunCal Emerald, and SunCal Bickford; and (c) an alleged pledge of SunCal Summit's Allowed Interest in Seven Brothers and Kirby. The SunCal Communities I Loan Agreement has an alleged balance due of $343,221,391.06 as of March 30, 2009.

2.1.153 <u>SunCal Emerald</u>. SunCal Emerald Meadows, LLC, a Delaware limited liability company, a Voluntary Debtor herein, and the owner of the Emerald Meadows Project.

2.1.154 <u>SunCal Heartland</u>. SunCal Heartland, LLC, a Delaware limited liability company, a Trustee Debtor herein, and the owner of the Heartland Project

2.1.155 <u>SunCal Johansson</u>. SunCal Johansson Ranch, LLC, a Delaware limited liability company, a Voluntary Debtor herein, and the owner of the Johansson Ranch Project.

2.1.156 <u>SunCal Management</u>. SunCal Management, LLC, a Delaware limited liability company, and the property manager for the Projects.

2.1.157 <u>SunCal Marblehead</u>. SunCal Marblehead, LLC, a Delaware limited liability company, a Trustee Debtor herein, and the owner of the Marblehead Project.

2.1.158 <u>SunCal Marblehead/SunCal Heartland Loan Agreement</u>. That certain Second Amended and Restated Term Loan and Revolving Line of Credit Loan Agreement, dated as of October 3, 2007, by and among SunCal Marblehead Heartland Master LLC, SunCal Marblehead, and SunCal Heartland, as borrowers, and Lehman ALI, as agent and sole lender, pursuant to which Lehman ALI made a loan in the maximum aggregate principal mount of

approximately $316,061,300. The SunCal Marblehead/SunCal Heartland Loan Agreement is allegedly secured by first-priority deeds of trust on the Marblehead and the Heartland Projects. The SunCal Marblehead/SunCal Heartland Loan Agreement has an alleged balance due of $354,325,126.15 as of March 30, 2009.

2.1.159 SunCal Northlake. LB-L-SunCal Northlake, LLC, a Delaware limited liability company, a Trustee Debtor herein, and the owner of the Northlake Project.

2.1.160 SunCal Northlake Loan Agreement. That certain Term Loan and Revolving Line of Credit Loan Agreement, dated as of September 5, 2009, between SunCal Northlake, as borrower, and Northlake Holdings, as successor agent and sole lender, pursuant to which Northlake Holdings' predecessor (Lehman ALI) made a loan in the maximum aggregate principal mount of approximately $100,000,000. The SunCal Northlake Loan Agreement is allegedly secured by a first-priority deed of trust on the Northlake Project. The SunCal Northlake Loan Agreement has an alleged balance due of $123,654,776.88 as of March 30, 2009.

2.1.161 SunCal Oak Knoll. SunCal Oak Knoll, LLC, a Delaware limited liability company, a Trustee Debtor herein, and the owner of the Oak Knoll Project.

2.1.162 SunCal Oak Knoll/SunCal Torrance Loan Agreement. That certain Loan Agreement, dated as of November 30, 2006, between SunCal Torrance and SunCal Oak Knoll, as borrowers, and Lehman ALI, as agent and sole lender, pursuant to which Lehman ALI made a loan in the maximum aggregate principal amount of approximately $167.7 million. The SunCal Oak Knoll/SunCal Torrance Loan Agreement is allegedly secured by first-priority deeds of trust on the Oak Knoll and the Del Amo Projects. The SunCal Oak Knoll/SunCal Torrance Loan Agreement has an alleged balance due of $158,141,364.64 as of March 30, 2009.

2.1.163 SunCal Oak Valley. LB-L-SunCal Oak Valley, LLC, a Delaware limited liability company, a Trustee Debtor herein, and the owner of the Oak Valley Project.

2.1.164 SunCal Oak Valley Loan Agreement. That certain Term Loan and Revolving Line of Credit Loan Agreement, dated as of May 23, 2006, by and between SunCal Oak Valley, as borrower, and OVC Holdings, as successor agent and sole lender, pursuant to which OVC Holdings' predecessor (Lehman ALI) made a loan in the maximum aggregate principal

mount of approximately $120,000,000. The SunCal Oak Valley Loan Agreement is allegedly secured by a first-priority deed of trust on the Oak Valley Project. The SunCal Oak Valley Loan Agreement has an alleged balance due of $141,630,091.63 as of March 30, 2009.

2.1.165    SunCal PSV. SunCal PSV, LLC, a Delaware limited liability company, a Trustee Debtor herein, and the owner of the Palm Springs Village Project.

2.1.166    SunCal PSV Loan Agreement. That certain Term Loan and Revolving Line of Credit Loan Agreement, dated as of February 12, 2007, between SunCal PSV, as borrower, and Lehman ALI, as agent and sole lender, pursuant to which Lehman ALI made a loan in the maximum aggregate principal amount of approximately $90 million. The SunCal PSV Loan Agreement is allegedly secured by a first-priority deed of trust on the Palm Springs Village Project. The SunCal PSV Loan Agreement has an alleged balance due of $88,257,340.20 as of March 30, 2009.

2.1.167    SunCal Summit Valley. SunCal Summit Valley, LLC, a Delaware limited liability company, a Voluntary Debtor herein, the owner of a portion of the Summit Valley Project not owned by Kirby Estates and Seven Brothers, and the holder of Allowed Interests in Kirby Estates and Seven Brothers.

2.1.168    SunCal Torrance. SunCal Torrance Properties, LLC, a Delaware limited liability company, a Trustee Debtor herein, and the owner of the Del Amo Project.

2.1.169    Tax. Any tax, charge, fee, levy, impost or other assessment by any federal, state, local or foreign taxing authority, including, without limitation, income, excise, property, sales, transfer, employment, payroll, franchise, profits, license, use, ad valorem, estimated, severance, stamp, occupation and withholding tax. "Tax" shall include any interest or additions attributable to, or imposed on or with respect to such assessments.

2.1.170    Tax Claim. Any Claim for any Tax to the extent that it is entitled to priority in payment under Section 507(a)(8) of the Bankruptcy Code.

2.1.171    Tesoro. Tesoro SF, LLC, a Delaware limited liability company, a Voluntary Debtor herein, and the owner of the Tesoro Project.

2.1.172    Tesoro Project.  The Project owned by Tesoro located in the City of Santa Clarita, California, as more particularly described herein.

2.1.173    Trustee Debtor(s). The following Debtors, individually or collectively, that are represented by the Chapter 11 Trustee: Delta Coves, SunCal Heartland, SunCal Marblehead, SunCal Northlake, SunCal Oak Valley , SunCal Century City, SunCal PSV, SunCal Torrance, and SunCal Oak Knoll.

2.1.174    Trustee Debtors' Committee.  The Official Committee of Unsecured Creditors of the Trustee Debtors appointed in the Cases pursuant to Section 1102 of the Bankruptcy Code.

2.1.175    Voluntary Debtor(s).  The following  Chapter 11 debtors and debtors-in-possession, individually or collectively, Palmdale Hills, SunCal I, SunCal III, SCC Palmdale, Acton Estates, SunCal Beaumont, SunCal Emerald, SunCal Johansson, SunCal Bickford, SunCal Summit, Seven Brothers, Kirby Estates, SJD Partners, SJD Development, SCC Communities, Del Rio and Tesoro.

2.1.176    Voluntary Debtors' Committee.  The Official Committee of Unsecured Creditors of the Voluntary Debtors appointed in the Cases pursuant to Section 1102 of the Bankruptcy Code.

**2.2     Rules of Construction.**

For purposes of the Plan and this Disclosure Statement, unless otherwise provided herein or in the Plan, (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural; (b) each pronoun stated in the masculine, feminine or neuter includes the masculine, feminine and neuter; (c) any reference in the Plan or this Disclosure Statement to an existing document or schedule filed or to be filed means such document or schedule, as it may have been or may be amended, modified or supplemented pursuant to the Plan; (d) any reference to an entity as a Holder of a Claim or Interest includes that entity's successors and assigns; (e) except as otherwise indicated herein all references in the Plan or this Disclosure Statement to Sections, Articles and Exhibits are references to Sections, Articles and Exhibits of or to the Plan; (f) the words "therein," "thereunder" and "thereto" refer to the Plan

in its entirety rather than to a particular portion of the Plan; and (g) unless otherwise provided in the Plan or this Disclosure Statement, any reference in the Plan or this Disclosure Statement to a contract, instrument, release, indenture, agreement, or other document being in a particular form or on particular terms and conditions means that such document shall be substantially and materially in such form or substantially and materially on such terms and conditions; (h) any reference in the Plan or this Disclosure Statement to a document, schedule, or exhibit to the Plan or Disclosure Statement Filed or to be Filed means such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; and (i) the rules of construction set forth in Section 102 of the Bankruptcy Code shall apply to the extent such rules are not inconsistent with the express terms of the Plan or this Disclosure Statement or any other provision in this Section 3.2.

**2.3  Exhibits.**

All Exhibits to the Plan are incorporated into and are a part of the Plan as if set forth in full therein.

## III.

## PLAN CONFIRMATION DEADLINES

The Bankruptcy Court has not confirmed the Plan described in this Disclosure Statement. Accordingly, the terms of the Plan are not binding on anyone. However, if the Bankruptcy Court confirms the Plan, then the Plan will be binding on the Debtor(s) and on all Creditors and Interest Holders in these Cases.

**3.1  Time and Place of the Confirmation Hearing.**

The hearing where the Bankruptcy Court will determine whether or not to confirm the Plan will take place at 411 West Fourth Street, Santa Ana, CA 92701-4593 at ____ .m. in Courtroom 5A.

**3.2  Deadline for Voting for or Against the Plan.**

If you are entitled to vote, it is in your best interest to timely vote on the enclosed ballot and return the ballot to:

> Winthrop Couchot Professional Corporation
> 660 Newport Center Drive, Suite 400
> Newport Beach, CA 92660
> Facsimile: (949) 720-4111
> Attn: P.J. Marksbury

MAINDOCS-#132904-v6-SCC_3d_Amd_DS_Sub_Consolidated.DOC

Your ballot must be **received by** _____, 2009, or it will not be counted.

### 3.3    Deadline for Objecting to the Confirmation of the Plan.

Objections to the confirmation of the Plan must be filed with the Bankruptcy Court, and served upon the following parties so that they are received by _____, 2009:

| | |
|---|---|
| **Counsel to the Voluntary Debtors and Acquisitions** | Paul J. Couchot<br>Winthrop Couchot Professional Corporation<br>660 Newport Center Drive, Suite 400,<br>Newport Beach, CA 92660 |
| **Authorized Agent for Voluntary Debtors and Acquisitions** | Bruce V. Cook<br>General Counsel<br>2392 Morse Ave<br>Irvine, CA 92614-6234 |

### 3.4    Identity of Person to Contact for More Information Regarding the Plan.

Any interested party desiring further information about the Plan should contact the Debtors' and Acquisitions' counsel, Winthrop Couchot Professional Corporation, 660 Newport Center Drive, Suite 400, Newport Beach, CA 92660, Attn:  Paul J. Couchot, (949) 720-4100; Peter W. Lianides, (949) 720-4155; Payam Khodadadi, (949) 720-4160.

### 3.5    Disclaimer.

The information contained in this Disclosure Statement is provided by the Debtors.  The Debtors represent that everything stated in this Disclosure Statement is true to the best of the Debtors' knowledge.  The Bankruptcy Court has not yet determined whether or not the Plan is confirmable and makes no recommendation as to whether or not you should support or oppose the Plan.

The discussion in this Disclosure Statement regarding the Debtors may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995.  Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate," or "continue," or the negative thereof or other variations thereon or comparable terminology.  The reader is cautioned that all forward looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to

1  differ materially from those referred to in such forward looking statements.  The liquidation

2  analyses, distribution projections, projections of financial results and other information are

3  estimates only, and the timing, amount and value of actual distributions to Creditors may be

4  affected by many factors that cannot be predicted.  Therefore, any analyses, estimates, or

5  projections may or may not turn out to be accurate.

6        The Debtors and their professionals have made a diligent effort to identify in this Disclosure

7  Statement all Litigation Claims, including claims for relief, counterclaims, and objections to claims.

8  However, no reliance should be placed on the fact that a particular Litigation Claim is or is not

9  identified in this Disclosure Statement.  The Debtors or other parties in interest may seek to

10  investigate, file and prosecute Litigation Claims after the Confirmation Date or Effective Date of

11  the Plan whether or not the Litigation Claims are identified in this Disclosure Statement.

12  **IV.**

13  **FACTUAL BACKGROUND OF THE DEBTORS**

14      **4.1**    **The Formation of the Debtors and the Projects.**

15        **(a)**    **Overview of the Debtors and their Projects.**

16        The Debtors are twenty-six (26) entities formed to develop the Projects throughout

17  California as part of a larger overall joint venture between Affiliates of the SunCal Companies

18  ("SunCal") controlled by Acquisitions and the Lehman Entities, which were controlled by LBHI's

19  Global Real Estate Group (the "SunCal/Lehman Joint Venture").  At inception, the SunCal/Lehman

20  Joint Venture contemplated that SunCal would be the developer/manager of the Projects and that

21  the Lehman Entities would be the financial partner.  Attached hereto as Exhibit "1" is a general

22  description of the Debtors' Projects and the Debtors other primary Assets other than Litigation

23  Claims.

24        All of the Debtors are Affiliates of Acquisitions and SCC LLC.  Some of the Debtors

25  directly own the Projects and others serve as holding companies, owning Allowed Interests in the

26  Debtors that hold title to the Projects.  SunCal Management, LLC, a SunCal Affiliate, has

27  management contracts with respect to all of the Projects.

28

In the case of the seventeen Voluntary Debtors, SunCal Affiliates are the owners of one hundred percent (100%) of the equity and SunCal Affiliates have full corporate governance authority over the Voluntary Debtors. Of the Voluntary Debtors, there are eleven (11) Projects.

In the case of the nine Trustee Debtors, SunCal Affiliates and Lehman Affiliates each own fifty percent (50%) of the equity. Recently, SunCal Affiliates became the owner of hundred percent (100%) of the equity in SunCal Heartland and SunCal Marblehead. Of the Trustee Debtors, there are nine (9) Projects.

Attached hereto as Exhibit "2" is a chart that sets forth the appraised value of most of the Debtors' Projects provided by the Lehman Lenders during the pendency of the Debtors' Chapter 11 proceedings, as well as SunCal's valuation opinions of all of the Projects and the Del Rio CFD Bond Proceeds. As the chart indicates, the Lehman Lenders' aggregate valuation for the Debtors' Projects is approximately $536,350,000, while the Debtors' valuation of the Projects is approximately $308,525,000.

      **(b)**      **The Debtors' Primary Secured Creditors and Their Disputed Claims.**

Lehman Commercial was the original ender with respect to four (4) of the Voluntary Debtors' Projects by virtue of alleged first-priority deeds of trust on the Ritter Ranch, Acton Estates, Emerald Meadows, and Bickford Ranch Projects.

Lehman ALI was the original lender with respect to two (2) of the Voluntary Debtors' Projects (the Joshua Ridge and Tesoro Projects). Lehman ALI was also the original lender of SJD Partners' Pacific Point Project prior to a non-judicial foreclosure sale of the Pacific Point Project in August of 2008. Finally, Lehman ALI also had a loan secured by a second priority deed of trust on the Bickford Ranch Project.

Various unrelated third parties are the primary secured creditors with respect to certain portions of two (2) of the Voluntary Debtors' Projects (SunCal Beaumont and SunCal Summit Valley – including portions of Seven Brothers).

Finally, the SunCal Johannson Project and the portions of Summit Valley owned by Kirby Estates have no primary secured creditors, as well as portions of the Beaumont and Summit Valley Projects, including portions of Seven Brothers.

-30-

As to the nine Trustee Debtors, there are currently nine Projects (the Delta Coves, the Heartland, the Marblehead, the Northlake, the Oak Valley, the Oak Knoll, the 10,000 Santa Monica, the Palm Springs Village, and Del Amo Projects). Lehman Entities allege to be the primary secured creditors with respect to all of the Trustee Debtor Projects except for the 10,000 Santa Monica Project, with respect to which Danske Bank alleges to be the primary secured creditor.

(c)    **The Lehman Loans and the Lehman Disputed Claims and Lehman's Disputed Liens.**

As discussed in detail herein, during the course of the Debtors Chapter 11 Cases, the Debtors have initiated litigation against Lehman's Disputed Secured Claims and Lehman's Disputed Liens. Such litigation includes various contested matters and the Lehman Adversary Proceeding.

Unbeknownst to SunCal and the Debtors until March of 2009, on August 22, 2008, Lehman ALI apparently transferred a number of the Lehman Loans and liens on the Projects to LCPI. OVC and Northlake apparently likewise transferred the Oak Valley and Northlake Loans and associated liens, respectively, to LCPI. LCPI immediately turned around and sold all of its interest in those Loans and liens to Fenway Capital pursuant to a Master Repurchase Agreement ("MRA").

In addition, unbeknownst to the Debtors until March of 2009, Danske Bank had been the real party in interest as lender under an MRA with respect to the SunCal Century City Loan Agreement.

Finally, unbeknownst to the Debtors until March of 2009, in early September 2008, Lehman ALI transferred much or all of its interest in the Pacific Point First Loan Agreement to a separate Lehman-affiliated entity, Lehman Re. Lehman Re claims it did not file a proof of claim against the SJD Partners Estate.

The four (4) other Disputed Secured Claims alleged by the Lehman Lenders that the Lehman Lenders appear to have not sold are the SCC Palmdale Loan, the SunCal Oak Knoll /

SunCal Torrance Loan Agreement, the Bickford Second Loan Agreement and the Interim Loan Agreement.

Attached hereto as Exhibit "3" is a chart that sets forth Lehman's Disputed Secured Claims, the alleged Holders of the Lehman Disputed Secured Claims, the collateral encumbered by the Lehman Disputed Liens, and the alleged outstanding amount based on the filed Proofs of Claim. As the chart indicates, the total of Lehman's Disputed Secured Claims is approximately $2,142,568,943.

**(d)    A Summary of All of the Alleged Claims Against the Debtors.**

Attached hereto as Exhibit "4" is a chart that sets forth all of the asserted prepetition Claims against each of the Debtors. In summary, the asserted Claims consist of the following: unpaid Real Property Tax Claims ($13,501,914), primary Secured Claims ($2,153,326,418), Mechanic Lien Claims ($19,021,014), Priority and Administrative Claims ($6,231,797) and General Unsecured Claims ($346,565,678).

**4.2    Factual Circumstances Leading to the Filing of the Debtors' Chapter 11 Cases.**

**(a)    Background on the SunCal Companies.**

SunCal is a family-owned and -operated California real estate business. SunCal is a highly-experienced and successful developer that has been in business for over 70 years. SunCal manages virtually all aspects of real estate development, from acquiring properties and obtaining governmental entitlements to construction and build-out, culminating in the sale of lots to merchant builders. SunCal has gained an expertise in these matters, and has formed relationships with many governmental entities and real estate businesses throughout California.

SunCal's business focuses upon the "development" of residential land. A typical SunCal development begins with the acquisition of one or more parcels of raw land. Thereafter, the SunCal team develops a master plan for the acreage that incorporates streets, homes, parks, schools and commercial areas, and then it works with the applicable municipal planning authorities (the city, county, state and federal) to secure the necessary approvals or "entitlements" to achieve this plan. This process, which requires the assistance of land planners, civil engineers, architects, lawyers, and other land specialists, takes a period of years. Once the master plan is approved, SunCal

| | |
|---|---|
| 1 | provides for the grading of the project and the installation of the foundational infrastructure (streets, |
| 2 | utilities, etc.) and then sells the lots or parcels within the project to merchant builders. |

<b>(b)</b>    <b><u>The Origins of the SunCal/Lehman Joint Venture</u></b>.

4.    SunCal historically financed its projects with loans and/or equity from a number of different sources. However, beginning in 1997, an increasing number of SunCal's projects were financed by the Lehman Entities, as Mark Walsh ("Walsh"), the head of LBHI's Global Real Estate Group, began cultivating a business relationship with SunCal's principals.

By 2003, the Lehman Entities had partnered with SunCal on approximately fifteen projects. By 2007, that number had grown to over forty and the Lehman Entities had become, with limited exceptions, the exclusive provider of financing for the SunCal Projects pursuant to a written agreement executed in 2006. The Lehman Entities also consisted of the Lehman Equity Members that either directly or indirectly owned a fifty percent (50%) equity interest in all nine of the Trustee Debtors.

In their dealings with SunCal, the Lehman Representatives made no distinction between Projects financed by Lehman ALI and Projects financed by Lehman Commercial or any distinctions between the Debtors in which Lehman Equity Members held 50% equity memberships or the Debtors in which the Lehman Entities held no equity membership interest. As the financial partner in the parties' joint venture, the Lehman Representatives would determine which Lehman Entity would provide financing on which Projects, and would dictate the structure that the financing would take, according to whatever suited the Lehman Entities' needs.

<b>(c)</b>    <b><u>Lehman's Effective Control over the Management of the Debtors and Promises of Ongoing Funding</u></b>.

Prior to the market downturn in the middle of 2007, the Lehman Representatives afforded SunCal substantial discretion to use its expertise to manage development of the Projects. SunCal, primarily via the Debtors, would contract with third-party vendors to perform grading, health and safety compliance, construction, landscaping, and other necessary services on the Project sites, and would coordinate with municipalities for easements, entitlements and other requirements to proceed with development. SunCal and the Debtors would conduct periodic budget meetings with

1  the Lehman Representatives to discuss anticipated expenses over the next quarter; SunCal and the

2  Debtors would submit documentation of expenses incurred on a monthly basis to the Lehman

3  Representatives; and the Lehman Representatives, in the regular course, would remit payment to

4  SunCal and the Debtors so that the third-party vendors could be paid.

5          However, in or about the summer of 2007, the real estate market experienced a sudden

6  downturn, and many of the Projects almost immediately declined significantly in value. At this

7  time, SunCal's representatives had high-level discussions with the Lehman Representatives --

8  including Walsh, as well as Paul Hughson ("Hughson") and Frank Gilhool ("Gilhool"), the

9  Managing Directors of Lehman's Global Real Estate Group -- to address these developments. In

10  these discussions, the SunCal representatives, on behalf of the Debtors, expressed to the Lehman

11  Representatives that the loans on the Projects were out of balance, and SunCal suggested shutting

12  down or at least slowing development of the Projects, however, Walsh specifically instructed

13  SunCal not to slow down or stop work. Walsh assured SunCal that the Lehman Entities would

14  provide the necessary funding to pay vendors and keep the development of the Projects moving

15  forward.

16          Similarly, in numerous telephone conversations between Gilhool and SunCal's COO, Frank

17  Faye ("Faye"), and/or SunCal's General Counsel, Bruce Cook ("Cook") that took place during

18  2007 and 2008, Gilhool assured SunCal that the Lehman Entities were committed to funding the

19  debts and obligations of the Projects and the work they directed to be performed; that funding

20  would be forthcoming; and that SunCal and the Debtors should continue to have contractors

21  undertake work to develop and preserve the value of the Projects.

22          At this same time, however, the Lehman Representatives became much more "hands on" in

23  scrutinizing—and approving—budgets and expenses. SunCal would submit budgets on a weekly

24  basis. On periodic conference calls, SunCal would explain what Project payables had to paid and

25  what work had to be performed on the Projects, and the Lehman Representatives would have to

26  give pre-authorization before any work could occur or expenses be incurred. The Lehman

27  Representatives would unilaterally dictate what future work would proceed, and also decided what

28  payables were "urgent" and what other payables could be deferred.

(d)    **The 2008 Restructuring Agreement.**

By the fall of 2007, it was contemplated by both SunCal and the Lehman Representatives that a restructuring agreement would be entered into shortly, by no later than January or February of 2008. However, implementation was dragged out due in large part to the Lehman Entities' extensive documentation.

Finally, on May 23, 2008, SunCal and most of the Debtors entered into an omnibus "Restructuring Agreement" with LBHI, Lehman ALI and other Lehman Entities. The same Lehman Representative signed the Restructuring Agreement on behalf of all of the Lehman Entities.

Pursuant to the Restructuring Agreement, Lehman ALI, "as the Lender with respect to each Loan," committed, among other things, to: (1) make advances under existing loans to fund the continuing costs necessary to preserve the value of the Projects; (2) move forward to resolve the accrued outstanding subcontractor payables, i.e., to make sure that the Projects' creditors were paid for their work; and (3) to close the transaction, whereby newly-created Lehman Entities would assume the debt and obligations of the Projects.

As originally executed in May 2008, the Restructuring Agreement applied to twelve of the twenty Projects (as well as several other projects not at issue in this lawsuit): (1) Acton Estates; (2) Beaumont Heights; (3) Bickford Ranch; (4) Emerald Meadows; (5) Heartland; (6) Johannson Ranch; (7) Marblehead; (8) Northlake; (9) Oak Valley; (10) Pacific Point; (11) Ritter Ranch; and (12) Summit Valley. The Debtors that owned and/or held equity interests in the owners of these Projects were signatories to the May 2008 agreement.[2]

Between May and August 2008, four additional projects were added to the Restructuring Agreement by agreement of the parties: (1) Del Rio; (2) Joshua Ridge; (3) Palm Springs Village;

---

[2] Specifically, the Restructuring Agreement was entered into by, among others, the "Borrowers," "Grantors" and "Pledgors," as defined in Annex 1 thereto. The "Borrowers" included Plaintiffs SunCal Marblehead, SunCal Heartland, SunCal Northlake, SunCal Oak Valley, SJD Partners, Palmdale Hills, SCC Palmdale, SunCal I, SunCal III, and SunCal Bickford.

The "Grantors" included Plaintiffs SunCal Marblehead, SunCal Heartland, SunCal Northlake, SunCal Oak Valley, SJD Partners, Palmdale Hills, SunCal Bickford, SunCal Acton, SunCal Summit and SunCal Emerald, and Debtors SunCal Beaumont and SunCal Johannson.

The "Pledgors" included Plaintiffs SCC Palmdale, SunCal I, SunCal Summit and SJD Development.

MAINDOCS-#132904-v6-SCC_3d_Amd_DS_Sub_Consolidated.DOC

and (4) Tesoro Burnham. Accordingly, the Debtors associated with these Projects—SunCal Del Rio, SCC Communities, SunCal PSV, and SunCal Tesoro—became parties to the Restructuring Agreement as amended.

Thus, only four Projects were not formally added to the Restructuring Agreement—Century City, Delta Coves, Oak Knoll and Del Amo; and the four Debtors associated with these Projects— SunCal Century City, SunCal Delta Coves, SunCal Oak Knoll and SunCal Torrance. Lehman ALI was the lender on each of these Projects. However, even as to these four Projects, Lehman ALI engaged in the same course of conduct that it had regarding the other Projects. The same Lehman Representatives encouraged SunCal and these four Debtors to continue developing these four Projects, approved all expenses, and made assurances of payment.

### (e) **The Lehman Lenders Hire Radco.**

Subsequent to the execution of the Restructuring Agreement, Lehman ALI arranged for a third party, Radco, as its agent to directly settle outstanding contractor payables. Radco was provided some limited funding and authority to negotiate settlements, and did in fact do so with some creditors. Funding for settlements on Lehman ALI and Lehman Commercial funded Projects came from the same source. Lehman ALI and Lehman Commercial also provided approval for new work on the Projects, and Lehman ALI provided payment for some of it. But this funding was minimal and soon stopped.

Unfortunately, in August 2008, Lehman ALI withdrew funding and settlement authority from Radco, and so halted the process of resolving millions of dollars of outstanding contractor payables on the Projects subject to the Restructuring Agreement. The halting of Radco's efforts further impeded development of the Projects and also impeded Debtors' ability to deal with public health and safety issues. Radco ultimately ended up resolving only a fraction of the total outstanding payables.

### (f) **The Lehman Lenders' Failure to Close on the Settlement Agreement.**

The Restructuring Agreement was designed to culminate in a closing with the parties entering into a Settlement Agreement, the form of which was attached to the Restructuring Agreement. Under the Settlement Agreement, newly-created Lehman-controlled entities (each

with "SCLV" in its name, for "SunCal-Lehman Venture") were to take title to the properties, assume the Debtors' debt obligations to the Lehman Lenders, assume the Debtors' bond obligations, and provide indemnifications to SunCal and the Debtors. The Settlement Agreement was signed by the SunCal and by Gilhool on behalf of the applicable Lehman Lenders and Lehman Equity Members as parties on August 25, 2008. But as explained below, despite the fulfillment of all material conditions precedent, the Lehman Representatives refused to close the Settlement Agreement.

At an August 25, 2008 meeting to sign closing documents for the Settlement Agreement held in Los Angeles—just days after most of the loans and associated liens had secretly been sold to Fenway Capital -- the Lehman Representatives announced that they wanted to push the closing date out another month to September 30, 2008, ostensibly in order to obtain a few additional (and easily obtainable) third party consents. SunCal, still believing that the Lehman Lenders owned the Loans and were acting in good faith, agreed to the extension to September 30, 2008.

Cook, on behalf of SunCal and the Debtors, and Gilhool, on behalf of the applicable Lehman Entities, signed hundreds of pages of settlement documents at the August 25 meeting, including the Settlement Agreement itself.

The additional third-party consents required for the closing of the Settlement Agreement had been obtained (or could have been but for Lehman's refusal to pursue them in good faith) by the first week of September 2008, and thus all conditions precedent to closing had been met. Yet, inexplicably at the time, Lehman took no steps to proceed with the closing.

**(g)     The Lehman Lenders' Undisclosed Sale of Most of the Debtors' Loans.**

As previously stated, unbeknownst to SunCal or the Debtors, on or just prior to August 22, 2008—days before the Lehman Entities signed the Settlement Agreement and related documents that were to culminate in the closing—Lehman ALI apparently transferred a number of its Loans and liens on the Projects to LCPI. OVC and Northlake apparently likewise transferred the Oak Valley and Northlake Loans and associated liens, respectively, to LCPI.

LCPI immediately turned around and sold all of its interest in those Loans and liens to Fenway Capital pursuant to the Fenway Repurchase agreement. The Lehman Representatives did

1   not disclose to SunCal or the Debtors that they were selling to third parties the very obligations

2   they were supposedly about to assume and restructure.

3   Also as previously stated, unbeknownst to the Debtors until March of 2009, in early

4   September 2008, Lehman ALI transferred much or all of its interest in the Pacific Point First Loan

5   Agreement to a separate Lehman-affiliated entity, Lehman Re. Lehman ALI purports to have filed

6   a proof of claim in the capacity of an agent, however, Lehman Re asserts that it did not file nor

7   authorize the filing of a proof of claim against the SJD Partners Estate.

8   **(h)    Lehman's Foreclosure Sale and Purchase of the Pacific Point Project.**

9   At the time of the Restructuring Agreement and the Settlement Agreement, the Pacific

10  Point Project was still owned by SJD Partners and the Pacific Point Project was among the Projects

11  included in the Restructuring Agreement and the Settlement Agreement.

12  Pursuant to the Restructuring Agreement, and as detailed in the Settlement Agreement

13  incorporated thereto, SunCal, SJD Partners and its parent company, SJD Development, all agreed

14  not to interfere with Lehman ALI's (or its designee's) foreclosure on the Pacific Point Project, and

15  the new Lehman entity, LV Pacific Point, would purchase the Pacific Point Project upon

16  foreclosure. In consideration for this, Lehman ALI and LV Pacific Point agreed to (a) assume SJD

17  Partners' and SJD Development's outstanding accounts payable for Pacific Point third-party

18  vendors, (b) assume SJD Partners', SJD Developments' and others' bond liability in connection

19  with the Pacific Point Project, and (c) pay for millions of dollars worth of work that Lehman ALI

20  representatives had authorized.

21  As previously stated, the Settlement Agreement was signed on August 25, 2008 by the

22  SunCal parties, including SJD Partners and SJD Development. It was also signed by Gilhool as

23  authorized signatory on behalf of both Lehman ALI and LV Pacific Point. As a signatory to the

24  Settlement Agreement, LV Pacific Point was supposed to and agreed to purchase the Pacific Point

25  Project at the foreclosure sale subject to the above obligations.

26  The City of San Juan Capistrano even executed an estoppel certificate for the benefit of

27  SJD Partners and Lehman ALI—at Lehman ALI's request—on August 26, 2008, two days before

28  the foreclosure. That certificate stated, among other things, that the "Acquiring Entity [LV Pacific

Point] shall by operation of law become the legal successor-in-interest to Developer [SJD Partners]" under SJD Partners' agreements with the City. That certificate further provided that there existed no breaches, defaults, or claims under SJD Partners' agreements with the City.

On August 28, 2008, Lehman ALI foreclosed on the Pacific Point Project, and title was transferred to LV Pacific Point at the foreclosure sale.

However, neither Lehman ALI nor LV Pacific Point has honored the agreement to assume the liabilities and obligations. As a result of LV Pacific Point's foreclosure and Lehman ALI's and LV Pacific Point's failure to fulfill their payment obligations, SJD Partners no longer owns any real property, but has unsecured claims of approximately $50 million, including bond claims of approximately $34 million. Moreover, due to the deterioration of construction at the Pacific Point Project, unpaid taxes, fines, and penalties resulting from Lehman ALI and LV Pacific Point's conduct, this exposure continues to grow.

Had SunCal, SJD Partners and SJD Development known that Lehman ALI and LV Pacific Point had no intent to honor their promised obligations, they never would have agreed to cooperate with a foreclosure. Instead, SJD Partners could have filed for bankruptcy earlier, thereby preventing the foreclosure and thereby including the Pacific Point Project in these Chapter 11 cases.

(i)     **Alvarez and Marsal's Take Over Control of the Lehman Entities After the Chapter 11 Filings of LBHI and Lehman Commercial.**

LBHI filed for bankruptcy in September 2008 and Lehman Commercial filed for bankruptcy in October 2008. After filing bankruptcy, LBHI's leadership was taken over by its "restructuring consultants," Alvarez & Marsal ("A&M"). A&M is in control not only of the bankrupt Lehman Entities, such as LBHI and LCPI, but also the non-bankrupt Lehman Lenders (Lehman ALI, OVC, and Northlake Holdings) as well as the non-bankrupt Lehman Equity Members.

In the meantime, the Projects required work. Even if no new construction or development was to be undertaken, significant sums had to be spent on site security, erosion prevention, property taxes and other measures in order to prevent the Projects from becoming a public safety

1    hazard, and in order to prevent losing valuable entitlements, accruing penalties and fines, and other

2    losses to the Projects.

3         SunCal and the Debtors repeatedly requested that the Lehman Entities pay for critical

4    health and safety and value preservation measures on the Projects.  Between October 9 and

5    November 4, 2008, SunCal's general counsel Cook sent Robert Brusco, an authorized agent of the

6    Lehman Entities, nearly two dozen letters pleading for the Lehman Lenders to provide the

7    promised funding to address critical needs on the Projects as promised.

8         Finally, in November 2008, Brusco purportedly, on behalf of the Lehman Lenders,

9    delivered the message that the Lehman Lenders were unwilling to fund the Projects and that,

10   instead, they intended to foreclose on all of the Projects.

11        As a result, as set forth in Exhibit "4", there are now over 240 vendors, municipalities,

12   counties and bonding companies claiming over $370 million in work, improvements and property

13   tax claims against the Projects.  Substantially all of these sums are due to work performed or

14   bonded at Lehman's request based on promises of payment.

15   **4.3    The Debtors' Potential Preferential Transfers**.

16        Attached hereto as Exhibit "5" are charts setting forth potential preference payments made

17   to third parties as well as potential preference payments made to the Lehman Entities and to

18   SunCal Affiliates.  As the charts in Exhibit 5" indicate, there were approximately $13,769,833.86

19   of potential preferential payments made to Debtors' non-insiders within the 90 days preceding the

20   Petition Date for each Debtor, approximately $11,805,704.45 of potential preferential payments

21   made to SunCal Affiliates within one year preceding the Petition Date for each Debtor and

22   approximately $17,113,087.31 of potential preferential payments made to the Lehman Entities

23   within both the ninety-day and one-year time periods preceding the Petition Date for each Debtor. [3]

24

25

26

27

28

---

[3] Pending Fraudulent Conveyance and Preference Actions against the Lehman Entities and a discussion of
intercompany Claims between the Debtors' Estates are discussed in detail in Section V of this Disclosure Statement.

MAINDOCS-#132904-v6-SCC_3d_Amd_DS_Sub_Consolidated.DOC

## V.

## SIGNIFICANT EVENTS IN THE DEBTORS' CHAPTER 11 CASES

### 5.1.  Voluntary Debtors.

Since the Petition Dates beginning in November 6, 2008, the seventeen (17) Voluntary Debtors have continued to operate as "debtors-in-possession" subject to the supervision of the Bankruptcy Court and in accordance with the Bankruptcy Code.  The Voluntary Debtors are authorized to operate their businesses in the ordinary course during the Chapter 11 proceedings. Transactions outside the ordinary course of business must be approved by the Bankruptcy Court.

The Voluntary Debtors' Cases are jointly administered with each other pursuant to orders entered on November 10, 2008 and November 26, 2008.  The Voluntary Debtors' Cases are jointly administered with the Trustee Debtors' cases pursuant to an order entered on March 11, 2009.

The Voluntary Debtors have employed Winthrop Couchot Professional Corporation as their general insolvency counsel, Morgan Lewis & Bockius LLP as their special litigation counsel for the Southern District of New York and Miller Barondess, LLP as their special litigation counsel.

The Voluntary Debtors' Committee has employed Irell & Manella LLP as its counsel pursuant to an order entered on February 13, 2009.

### 5.2.  Trustee Debtors.

Orders for Relief were entered in the involuntary cases beginning on January 6, 2009.  The Trustee Debtors are represented by their duly-appointed Chapter 11 Trustee, Mr. Steven M. Speier pursuant to orders of the Bankruptcy Court entered on January 15, 2009.

The Chapter 11 Trustee has employed the Lobel Firm as the Chapter 11 Trustee's general insolvency counsel and Miller Baroness LLP as special litigation counsel.

### 5.3.  The Debtors' Various Motions to Preserve and Maintain the Projects.

#### (a)  The Debtors' Motion for Relief from Stay in the Lehman Commercial Chapter 11 Proceedings.

On November 10, 2008, the Debtors filed a motion for an order modifying the automatic stay in the Lehman Commercial Chapter 11 proceeding to allow the Debtors to administer their own Chapter 11 cases to the extent that such cases, and the relief requested by such debtors therein,

may affect the rights of Lehman Commercial.  The Debtors also specifically requested the court to allow the Debtors to proceed to obtain post-petition debtor-in-possession financing on a priming lien basis that would subordinate Lehman Commercial's Disputed Claims arising from the Ritter Ranch Loan Agreement and the SunCal Communities I Loan Agreement to those of a proposed debtor-in-possession lender.  Lehman Commercial opposed the motion.  The motion was denied, without prejudice, by the Presiding Judge in the Lehman Commercial's Chapter 11 case pursuant to an order entered on November 21, 2008.

Based on the pre-petition Fenway Repurchase Agreement, which the Debtors were not made aware at such time, the Debtors now believe that Lehman Commercial's automatic stay did not apply to the Ritter Ranch Loan Agreement and the SunCal Communities I Loan Agreement.

**(b)**     **<u>Certain of the Debtors' Initial Motion for Surcharge and Use of Cash Collateral.</u>**

On January 16, 2009, seven of the Debtors filed a motion authorizing Palmdale Hills to use and surcharge, pursuant to 11 U.S.C. § 506(c), and/or use the purported cash collateral of Lehman Commercial arising from the Ritter Ranch Loan Agreement, pursuant to 11 U.S.C. § 363(c)(2), in order to pay for the reasonable and necessary maintenance expenses required to preserve the value of such Debtors' Projects that are subject to deeds of trust and other security held by Lehman Commercial.

Lehman Commercial objected to the motion and subsequently filed a motion in its own Chapter 11 proceeding in the Southern District of New York requesting the Court to enforce its stay as to the Motion.  Although the Debtors believe that Lehman Commercial's stay was not violated in any way by the Motion, the Motion was taken off calendar prior to any ruling by the New York Bankruptcy Court at the threat of sanctions to Debtors' counsel by the presiding judge.

As stated, the Debtors now believe that Lehman Commercial does not own a beneficial interest in the Ritter Ranch Loan Agreement.  The Ritter Ranch Loan Agreement, which was the subject of the cash collateral motion, had already been sold pursuant to the Fenway Repurchase Agreement.

-42-

(c)     **The Lehman Administrative Loans.**

At a hearing on March 20, 2009, the Bankruptcy Court approved a stipulation among Lehman ALI, Palmdale Hills, SunCal Emerald, SunCal Bickford, Acton Estates, SunCal Oak Valley, SunCal Heartland, SunCal Northlake, SunCal Marblehead, SunCal Century City, SunCal PSV, Delta Coves, and SunCal Oak Knoll, pursuant to which each of the foregoing borrower Debtor entities is authorized to borrow from Lehman ALI individual loans in an aggregate amount equal to $1,790,572 for the purposes of paying the costs and expenses provided in their 30-day budgets and for paying up to $250,000 of certain professional expenses limited to settlement efforts. The loan proceeds were used to pay for the most urgent and critical public health and safety issues on the Projects. The loans provide for superpriority administrative status in each of the Debtor borrowers' estates. The loan also has priming lien status on all of the borrowing Debtors' assets with the exception of SunCal Century City in which the loan has junior priority. The following is a breakdown of each Debtors' loans:

| DEBTOR NAME | 1-MONTH TOTAL |
|---|---|
| SunCal Century City | $3,166 |
| Acton Estates | $37,059 |
| SunCal Bickford | $83,454 |
| Delta Coves | $302,307 |
| SunCal Emerald | $70,259 |
| SunCal Heartland | $163,231 |
| Marblehead | $455,009 |
| SunCal Northlake | $46,909 |
| SunCal Oak Knoll | $250,876 |
| Oak Valley | $249,534 |
| SunCal PSV | $48,809 |
| Palmdale Hills | $79,959 |
| **Total** | $1,790,572 |

(d)     **Certain Debtors' Second Motion for Use of Cash Collateral.**

On September 1, 2009, fourteen of the Debtors filed a motion authorizing surcharge pursuant to 11 U.S.C. § 506(c), and/or use of the purported cash collateral for the purpose of addressing critical public health and safety issues and other value preservation with respect to the Debtors Projects. In the motion, the Debtors propose a 120-day budget totaling $6,483,316.

-43-

At the hearing held on September 22, 2009, the Court ruled as follows:

_____.

### 5.4. **Lehman Commercial's Motions for Relief from the Automatic Stay Against Certain of the Voluntary Debtors' Projects.**

On January 23, 2009, Lehman Commercial and Lehman ALI filed various motions for relief from the automatic stay against Palmdale Hills, SCC Palmdale, SunCal Beaumont, SunCal Summit Valley, SunCal Emerald, SunCal Bickford, Acton Estates, SunCal Johannson, and SCC Communities I (the "Lehman Entities' Stay Motions"). The Debtors originally opposed the Lehman Entities' Stay Motions.

On March 10, 2009, the Court entered orders denying the Lehman Entities' Stay Motions without prejudice.

Lehman Commercial has appealed the Court's order with respect to the ruling on the applicability of Lehman Commercial's automatic stay. All briefs have been filed, and oral arguments are currently set for September 25, 2009.

### 5.5. **The Lehman Adversary Proceeding.**

On January 6, 2009, the Voluntary Debtors initiated the Lehman Adversary Proceeding by filing their initial complaint against Lehman ALI for equitable subordination of Lehman ALI's Disputed Claims and avoidance of its Disputed Liens pursuant to Bankruptcy Code Section 510(c). On February 3, 2009, the Debtors filed a First Amended Complaint adding the Trustee Debtors as plaintiffs to the various causes of action.

On March 11, 2009, the Debtors filed a motion for leave to file a second amended complaint to add Lehman Commercial as a defendant in the Adversary Proceeding based on a ruling by the Bankruptcy Court that Lehman Commercial's automatic stay did not prevent its inclusion as a defendant in the Adversary Proceeding. On March 24, 2009, the Court granted this request and deemed the Second Amended Complaint to be filed. On March 26, 2009, the Lehman Entities filed an appeal of this Order, which was dismissed by the Bankruptcy Appellate Panel on June 25, 2009 because the Order was interlocutory.

On April 27, 2009, the Lehman Entities filed a motion to dismiss the Second Amended Complaint, alleging that the Debtors requested relief is not available as a matter of law and that the Debtors are seeking to circumvent legal restrictions by substantive consolidation. On May 11, 2009, the Debtors filed an Opposition to the Motion to Dismiss Second Amended Complaint. At a hearing held on June 11, 2009, the Bankruptcy Court dismissed the Equitable Subordination with leave to amend.

On July 10, 2009, the Debtors filed their Third Amended Complaint. The Third Amended Complaint addresses the concerns raised by the Bankruptcy Court and also includes various Avoidance Actions and other causes of action against the Lehman Lenders and the Lehman Successors.

The following is a summary of the causes of action set forth in the Third Amended Complaint:

      **(a)**      <u>**A Summary of the Equitable Subordination Causes of Action**</u>.

Bankruptcy Code Section 510(c) authorizes the court to equitably subordinate claims to other claims and to transfer liens of a secured creditor to a debtor's estate. Equitable subordination requires the three following findings: (1) that the claimant engaged in some type of inequitable conduct; (2) that the misconduct injured creditors or conferred unfair advantage on the claimant; and (3) that the subordination would not be inconsistent with the Bankruptcy Code. Further, where the claimant is an insider, the party requesting equitable subordination is subject to a lesser burden of proof and pleading. Bankruptcy Code Section 101(31) lists certain specific categories of insiders, but the list is not exclusive. Bankruptcy law recognizes two types of insiders: those specifically identified in § 101(31), commonly referred to as 'per se' insiders, and those not so identified but who have a sufficiently close relationship with the debtor to be insiders, commonly referred to as "non-statutory" insiders.

/ / /

**(1)** **The Debtors Assert that the Lehman Lenders Engaged in Inequitable Conduct.**

**(i)** **The Debtors Assert that the Lehman Lenders Are Insiders.**

For the following reasons, the Debtors believe and have pleaded that the Lehman Lenders are insiders of the Debtors and that their conduct is subject to a lesser burden of proof:

First, all of the Trustee Debtors have a Lehman Equity Member. LBHI directly or indirectly has at least a 50% ownership interest in each of the Lehman Equity Members, and LBHI also wholly owns Lehman ALI, OVC Holdings and Northlake Holdings, the lenders (or successor lenders) on each of the Trustee Debtors' Projects. Thus, the Debtors assert that the Lehman Lenders are "affiliates" of the Lehman Equity Members, and are thus "statutory insiders" under 11 U.S.C. § 101(31); and

Second, even as to the Debtors who are not owned partially by a Lehman Equity Member, the Debtors assert that the Lehman Lenders are "non-statutory" insiders due to the Lehman Entities' domination and control over the Debtors since at least the middle of 2007 as outlined in detail in Section 4.2.

**(ii)** **As Non-Insiders.**

Even where the defendant is not an insider, equitable subordination may still be premised on "gross misconduct" to the detriment of others. Thus, even assuming, *arguendo*, that the Lehman Lenders were not found to be insiders, the Debtors assert that the egregious conduct that the Lehman Lenders engaged in as outlined in Section 4.2 is more than sufficient to warrant subordination of their claims.

**(2)** **The Lehman Entities' Inequitable Conduct Harmed the Creditors.**

The harm to the Debtors' Creditors caused by the Lehman Lenders' inequitable conduct is obvious. The Debtors assert that the Lehman Lenders promised that they would provide funding, induced hundreds of creditors to provide hundreds of millions of dollars in work and improvements, then refused to pay them, and eventually repudiated their obligations. The Debtors

believe that all but approximately $68,746,895.07 of its alleged unsecured claims (held by entities other than the Lehman Entities and Lehman Successors) were harmed by the Lehman Lenders' conduct.

| Creditor | Debtor | Alleged Claim |
|---|---|---|
| Warmington Group | Ritter Ranch | 1,771,232.00 |
| Cadwaladar | Ritter Ranch | 16,064.00 |
| Bethel Island Municipal Improvement District | Delta Coves | 2,000,000.00 |
| Life Church of God | Emerald Meadows | 6,055,000.00 |
| David Sandoval | Emerald Meadows | 500,000.00 |
| Moses Green | Emerald Meadows | 500,000.00 |
| Rubidoux 60 | Emerald Meadows | Not Stated – Pending State Court Action |
| Centex Homes | Pacific Point | 3,771,678.07 |
| Serrano Heights East | Pacific Point | 50,000.00 |
| UCP, Inc. | Pacific Point | 878,084.00 |
| Villa San Clemente | Marblehead | 13,233,103.00 |
| City of San Clemente | Marblehead | 39,971,734.00 |
| Total | | $68,746,895.07 |

Claims that were not harmed by the Lehman Lenders' conduct also include any alleged unsecured deficiency claims of the Lehman Lenders and the Lehman Successors.

Under the Plan, these unsecured creditors are classified separately from those Creditors that the Debtors do not believe have claims that arose as a result of the Lehman Lenders' conduct.

### (3) Equitable Subordination Is Consistent with Bankruptcy Code Principles.

Furthermore, the Debtors do not believe that the application of equitable subordination to the Lehman's Disputed Claims and Disputed Liens would run counter to the principles and requirements of the Bankruptcy Code.

### (b) The Fraudulent Conveyance Claims.

The Debtors assert and have pled that the Lehman Lenders' cross-collateralization of several of the Debtors' Projects with one another on several of the Lehman Loans rendered these Debtors insolvent and gives rise to fraudulent conveyance actions under Sections 544 and/or 548 that should result in the disallowance of several of the Lehman Disputed Claims and avoidance of Lehman's Disputed Liens pursuant to Bankruptcy Code Sections 502(d) and Section 551. See

Third Amended Complaint filed on July 10, 2009 in the Lehman Adversary Proceeding. These fraudulent conveyance claims set forth in the Third Amended Complaint include the following:

(i)     Acton Estates asserts a fraudulent conveyance claim against Lehman Commercial in the amount of $342,841,322.

(ii)     SunCal Emerald asserts a fraudulent conveyance claim against Lehman Commercial in the amount of $298,457,533.

(iii)     SunCal Bickford asserts a fraudulent conveyance claim against Lehman Commercial in the amount of $168,651,104.

(iv)     SunCal Summit asserts a fraudulent conveyance claim against Lehman Commercial in the amount of $333,296,018.

(v)     SunCal I asserts a fraudulent conveyance claim against Lehman Commercial in the amount of $343,221,391.

(vi)     SunCal III asserts a fraudulent conveyance claim against Lehman Commercial in the amount of $343,221,391.

(vii)     SCC Palmdale asserts a fraudulent conveyance claim against Lehman Commercial in the amount of $120 million.

(viii)     SunCal Oak Knoll asserts a fraudulent conveyance claim against Lehman ALI in the amount of $54,565,939.

(ix)     SunCal Torrance asserts a fraudulent conveyance claim against Lehman ALI in the amount of $112,956,015.

(x)     SunCal Marblehead asserts a fraudulent conveyance claim against Lehman ALI in the amount of $95,481,774.

(xi)     SunCal Heartland asserts a fraudulent conveyance claim against Lehman ALI in the amount of $304,730,278.

(xii)     SCC Communities asserts a fraudulent conveyance claim against Lehman ALI in the amount of $23,795,013.

(xiii)     Tesoro asserts a fraudulent conveyance claim against Lehman ALI in the amount of $23,795,013.

(xiv)   Del Rio asserts a fraudulent conveyance claim against Lehman ALI in the amount of $23,795,013.

### (c)   The Preference Claims.

The preferential claims set forth in the Third Amended Complaint include the following transfers to a Lehman Entity in the cases where a Lehman Equity Member was a 50% Interest Holder in the particular Debtor that was in control of the Debtors at the time of the transfer. Furthermore, according to the Lehman Lenders' appraisals submitted on the Projects of these Debtors, all of the loans were vastly undersecured at the time of the transfers.

(i)   Delta Coves asserts a preference claim against Lehman ALI in the amount of $6,195,440.46.

(ii)   SunCal Century City asserts a preference claim against Lehman ALI / Danske Bank in the amount of $10,628,819.87.

(iii)   SunCal Marblehead asserts a preference claim against Lehman ALI in the amount of $3,390,280.37.

(iv)   SunCal Heartland asserts a preference claim against Lehman ALI in the amount of $3,390,280.37.

(v)   SJD Partners asserts a preference action claim against LV Pacific Point and Lehman ALI to recover the Pacific Point Project based on a foreclosure sale by a lender during the 90 days preceding the Chapter 11 filing.

### (d)   The Lien Avoidance Claims Under Section 506(d) in Both the Third Amended Complaint and the Debtors' Motion Pursuant to Section 506(d).

Bankruptcy Code Section 506(a) provides that an asserted Secured Claim is only an Allowed Secured Claim to the extent of the value of such Creditor's interest in the Estate's interest in such property. Bankruptcy Code Section 506(d) then provides that liens against the Debtor's Assets that have no such value to the Alleged Secured Creditor are void. Finally, Bankruptcy Code Section 551 provides that such liens that are void under Section 506(d) are preserved for the benefit of the applicable Debtor's Estate.

The Third Amended Complaint sets forth causes of action that are based on the Lehman Entities' own appraisals and the Lehman Entities' filed Proofs of Secured Claims that prove there is no value to the collateral supporting the Lehman Entities' second deed of trust on Bickford Ranch, the Lehman Entities' alleged lien on of SCC Palmdale's Allowed Interest in Palmdale Hills, or the Lehman Entities' alleged liens on SunCal I's Allowed Interests in Acton Estates, SunCal Summit Valley, SunCal Bickford, and SunCal Emerald.

On May 29, 2009 and June 9, 2009, the Debtors also filed a motion seeking orders (i) valuing the above collateral at zero dollars, (ii) voiding the corresponding liens, pursuant to 11 U.S.C. § 506(d), and (iii) preserving such voided liens for the benefit of the respective bankruptcy estates. The motion raised substantially the same issues as the Third Amended Complaint. The Motion has been set for status conference on September 22, 2009.

### 5.6. The Trustee Debtors' Sales Procedures Motion.

On February 18, 2009, the Chapter 11 Trustee, SCC Communities, Del Rio, and Tesoro filed a sales procedures motion seeking the approval of overbid procedures pursuant to a purchase offer from D.E. Shaw for $200,000,000. As part of the Trustee Debtors' Sales Procedures Motion, the Debtors conditioned the sale on the disallowance of Lehman ALI's credit bid rights. Both Lehman ALI and Danske Bank filed oppositions to this motion.

On June 9, 2009, the Trustee Debtors' Sales Procedures Motion was thereafter modified to include a purchase of the Assets of only the Trustee Debtors and the proposed purchase price was reduced from $200 million to $195 million. The modification to the Trustee Debtors' Sales Procedures Motion also contains additional support for disallowing the Lehman Lenders' credit bid rights on the Trustee Debtors Projects.

Attached hereto as Exhibit "6" is a Sales Analysis Chart that shows the projected distribution to the Holders of all Claims (other than the Lehman Entities and their successors' Disputed Secured Claims) against the Debtors that are parties to the proposed sale if the proposed sale is consummated and assuming that these Debtors prevail in equitably subordinating Lehman's Disputed Claims in the Lehman Adversary Proceeding to such unsecured claims. In the event the Court grants substantive consolidation, such Holders are expected to receive a 100% Distribution.

After several continuances of the Motion, a hearing was held on September 22, 2009.  At the conclusion of the hearing, the Court ruled as follows: _____.

### 5.7.    The Debtors' Motions to Strike the Claims and Pleadings Arising from the Sold Loans to Fenway Capital.

On May 29, 2009 and June 6, 2009, the Debtors filed motions seeking an order striking certain claims and pleadings filed by the Lehman Lenders to the extent that they are premised on the Lehman Lenders' ownership of the loans sold to Fenway Capital pursuant to the Fenway Repurchase Agreement (the "Fenway Sold Loans").  The Fenway Sold Loans included the SunCal Communities I Loan Agreement, the Ritter Ranch Loan Agreement, the SunCal PSV Loan Agreement, the SunCal Marblehead/SunCal Heartland Loan Agreement, the Delta Coves Loan Agreement, the SunCal Northlake Loan Agreement and SunCal Oak Valley Loan Agreement.  See Exhibit "3".

At the initial hearing on the Debtors' motion to strike the Claims held on June 30, 2009, the Court held that the transfer of the Fenway Sold Loans pursuant to the MRA was a true purchase and sale transaction and that accordingly, the Lehman Lenders retained no right to file the Proofs of claim on this basis, under Federal Rule of Bankruptcy Procedure 3001(e)(1).

The Lehman Lenders also contended that they were entitled to file the Proofs of Claim as the "Fenway's authorized agent" under Federal Rule of Bankruptcy Procedure 3001(b).  A continued hearing on the "agency issue" was set for September 22, 2009.

At the September 22, 2009 hearing, the Court ruled the following: _____.

### 5.8.    The Debtors' Substantive Consolidation Motion.

On September 24, 2009, the Debtors filed a motion for substantive consolidation of substantially all of the Debtors' assets and liabilities, as well as non-debtor LV Pacific Point.  The substantive consolidation motion does not include Seven Brothers, Kirby Estates, SunCal Beaumont, SunCal Johannson and SCC Palmdale because such Debtors do not have a Lehman Lender or Lehman Successor as their primary Secured Creditor, do not have any Assets of value or unsecured creditors.

Substantive consolidation contemplates the Bankruptcy Courts power to combine the assets of, and the claims against, two or more separate and distinct -- but related -- entities into a single pool for the purpose of ensuring the equitable treatment of all creditors where there is either a substantial identity and or substantial entanglement between the entities.

The prospects of equal treatment amongst all of the Debtors' Creditors that were harmed by the Lehman Entities' inequitable conduct will be greatly enhanced by substantive consolidation of the Debtors. If the Debtors prevail on the equitable subordination causes of action in the Lehman Adversary Proceeding, there will be a dramatic difference between the percentage Distributions to the various creditors that the Debtors assert should be the beneficiaries of an equitable subordination judgment against the Lehman Lenders and Lehman Successors. Without substantive consolidation, these distributions will range between 0% and 100%. Conversely, if the Debtors prevail on the equitable subordination causes of action of the Lehman Adversary Proceeding and the Debtors' motion for substantive consolidation is granted, there should be a 100% distribution to all of these creditors. See Exhibit "7" attached hereto.

The Debtors assert that substantive consolidation is appropriate as there are substantial identity and entanglements among the Debtors:

(1)     All of the Debtors are part of the overall SunCal/Lehman Joint Venture;

(2)     Virtually all of the Debtors and Projects have the phrase "SunCal" in their title;

(3)     All of the Debtors are Affiliates of each other and Affiliates of Acquisitions;

(4)     All of the Debtors interfaced with their creditor body through SunCal Management and later Lehman's direct agent, Radco.

(5)     All of the Lehman Equity Members and Lehman Lenders are insiders of all of the Debtors by virtue of the fact they were all controlled by the same small group of Lehman Representatives and are all Affiliates of LBHI.

(6)     The Lehman Lenders' use of cross-collateralization, upstream, cross-stream and down-stream guarantees, and equity pledges in their lending arrangements entangled the Debtors. This lending strategy gave rise to approximately $1 billion of fraudulent conveyance actions and approximately $1 billion of corresponding intercompany debt;

(7)     Since March of 2007, the Lehman Entities effectively acted as the Debtors collective "general partner" by exercising managerial control over the Debtors and, through its third party agent, Radco, induced scores of creditors to perform work based upon the Lehman Entities' unfulfilled promise of payment;

(8)     The May 2008 Restructuring Agreement formally bound most of the Debtors together, and informally bound the rest of the Debtors together under a single master agreement with Lehman ALI as their sole Lender . Pursuant to this agreement the Debtors were bound to transfer their assets to the newly-created Lehman Affiliates such as  the transfer of the Pacific Point Project into LV Pacific Point. Although this occurred in the case of the Pacific Point Project, Lehman ALI and LV Pacific Point failed to honor their obligation to assume the existing debts, which was the only reason why the Debtors agreed to enter into this arrangement in the first place; and

(9)     The Bond Companies assert that their claims of approximately $225 million are joint and several against all of the Debtors.

### 5.9.    The Debtors' Motion to Approve the Acquisitions Administrative Loan.

On September 4, 2009, the Debtors filed a motion seeking approval of the Acquisitions Administrative Loan requesting an unsecured administrative priority pursuant to Section 364(b) of the Bankruptcy Code in the minimum amount of $2 million for the purpose of funding the Debtors' professional fees and expenses.  Certain of the material terms of the financing are the following:

> Acquisitions' Funding Obligations for Payment of Professional Fees and Costs
> Acquisitions commits to pay or cause to be paid the following amounts for professional fees and costs conditioned upon a Bankruptcy Court order granting Acquisitions or its applicable Affiliate providing such funding an Allowed Administrative Claim for all of the professional fees that the SC Insiders have caused to be paid to the professionals for the Debtors' Chapter 11 cases, including special litigation counsel, to date (subject to verification) and all future amounts paid to such professionals.
>
> - The Lehman Adversary Proceeding.  Unless there are orders either granting relief from stay of substantially all of the Voluntary Debtors and/or Trustee Debtors' Properties, and/or there are orders converting or dismissing substantially all of the Voluntary Debtors and/or the Trustee

-53-

Debtors' Chapter 11 cases, Acquisitions shall make or cause to be made a deposit with Winthrop Couchot of $1 million and continue funding the professional fees of special litigation counsel in the Adversary Proceeding against the Lehman Entities and their successors through (i) a final resolution (including all appeals); or (ii) a decision by Acquisitions to cease the ongoing funding, in which case Winthrop Couchot shall transfer the $1 million deposit in an account designated by the Trustee (or the applicable Committee Counsel in the event that substantive consolidation is granted). The $1 million deposit shall be deposited within 5 business days of the entry of the order referenced in paragraph 2 above. In the event of a decision by Acquisitions to cease funding the Lehman Adversary Proceeding, the Trustee and the Committees may terminate existing counsel, retain new counsel to represent the Plaintiffs in the Lehman Adversary Proceeding, draw upon the $1 million deposit to continue to fund the Lehman Adversary Proceeding, and/or pay other professional fees (pro rata) in the Trustee and Committees' discretion.

- <u>Bankruptcy Professional Fees</u>. Acquisitions shall fund or cause to be funded the professional fees and costs of the Trustee Debtors, the Voluntary Debtors, and their respective Committees on an ongoing basis with a reservation of rights on objections to such fees. Acquisitions shall make an initial payment of $1 million over and above the $1 million deposit referenced in subparagraph (a) above. The allocation of the $1 million shall be $250,000 to the Trustee's General Insolvency Counsel, $250,000 to the Voluntary Debtors' General Insolvency Counsel, and $250,000 to both the Voluntary Debtors' and Trustee Debtors' Committee Counsel. In the event that a Chapter 11 plan proposed by the SC Insiders is confirmed as part of its Allowed Administrative Claim, Acquisitions shall fund or cause to be funded the amounts due and owing for all of the professional fees on the Plan's Effective Date after first exhausting any existing cash or other assets of the estates. The $1 million referenced herein shall be paid within 5 business days of the entry of the order referenced in the paragraph supra.

- <u>Default on the $2 Million Payment</u>. Provided the Trustee and the Committees have not defaulted under this Agreement, in the event that Acquisitions fails to make the initial $2 million payment to Winthrop Couchot, Acquisitions will lose its administrative status for any of the above payments and all of the SC Insiders' claims shall be subordinated to other unsecured creditors.

- <u>Dollar for Dollar Claim Release and Full Releases in the Event of Confirmation of SC Insiders Plan</u>. In the event that Acquisitions makes the initial $2 million deposit of funds, the SC Insiders shall be released dollar for dollar from all potential liability claims by all of the Debtors' estates for all monies previously funded toward the Chapter 11 professional fees and all future amounts paid on professional fees, including the $2 million deposit. The SC Insiders shall receive a full

-54-

release on any and all potential claims in the event of confirmation of a Chapter 11 plan in the Debtors Chapter 11 cases proposed by the SC Insiders.

Support. The Committees and the Trustee shall affirmatively support the above referenced motion(s) for use of cash collateral, approval of DIP Loan, the Administrative Loan, and the Administrative Claim, on the terms specified herein.

The hearing on the motion was held on September __, 2009. At the hearing, the Court ruled as follows: _____.

### 5.10.   The Debtors' Other Litigation with Non-Lehman Related Parties.

#### (a)   The Debtors' Failed Preliminary Injunction Motion Against the Holders of Bond Claims.

On February 20, 2009, the Debtors filed a complaint and a Motion for Preliminary Injunction, pursuant to which the Debtors sought a Motion for Preliminary Injunction against the Holders of Bond Claims from pursuing such Claims.

On February 23, 2009, the Court denied the Debtors' request for the TRO and granted the Debtors' request to require the defendants to show cause why the Motion for Preliminary Injunction should not be issued.

On March 2, 2009, several Holders of Bond Claims objected to the Motion for the Preliminary Injunction. The objections generally alleged that the Debtors failed to show that the balancing of the equities favored granting the Preliminary Injunction versus the harm to the Holders of the Bond Claims.

At a hearing held on March 4, 2009, the Court denied the Preliminary Injunction Motion and the underlying complaint has subsequently voluntarily been dismissed without prejudice.

#### (b)   The Contractors' Successful Motions for Relief from Stay to Pursue the Bond Claims.

Various contractors of the Debtors that were hired to perform work on some of the Projects have filed motions for relief from stay with the Bankruptcy Court to pursue their purported Bond Claims. These creditors have requested the Bankruptcy Court relief from the automatic stay to allow such creditors to enforce certain Claims that such creditors allege to have against some of the Debtors, including certain surety bonds that are alleged to have been issued in favor of such

creditors. The Debtors opposed the motions on the grounds that the various Debtors are indispensible parties. The Court conditionally granted the motions provided that the Bond Claimants are able to sever the Debtors from their proceedings on the Bonds.

**(c)** **The Non-Lehman Related Primary Secured Lenders' Successful Motions for Relief from Stay.**

Various secured creditors, including Philip C. Dowse, successor trustee of the Philip C. Dowse revocable trust and Patricia I Volkerts, as trustee, have filed motions for relief from stay with respect to portions of the properties owned by Seven Brothers and SunCal Beaumont. Such secured creditors are not defendants in the Adversary Proceeding and the applicable Debtors have not opposed the requested relief. There are other similarly situated secured parties in the real properties owned by Seven Brothers, SunCal Beaumont, and SunCal Summit, which may result in foreclosure of such real property.

**(d)** **The Rubidoux 60 Litigation.**

On December 17, 2008, Rubidoux and EMR filed a complaint to remove a prior action (the "Rubidoux Action") filed with the Superior Court of the State of California, County of Riverside (the "Superior Court") to the Bankruptcy Court. The Rubidoux Action filed with the Superior Court is against SunCal Emerald for breach of contract, breach of implied covenant of good faith and fair dealings, and declaratory relief.

Rubidoux and EMR make the allegations that (i) certain real property over which SunCal Emerald holds legal title is actually being held in constructive trust for Rubidoux and EMR, (ii) said property therefore should not be considered part of SunCal Emerald's bankruptcy estate, and (iii) that certain funds currently held in an escrow account that SunCal Emerald refuses to allow to be released to Rubidoux and EMR should also not be considered part of SunCal Emerald' bankruptcy estate because such funds belong to Rubidoux and EMR.

According to Rubidoux and EMR, these allegations are based on various prepetition agreements between EMR, Rubidoux and SunCal Emerald, pursuant to which SunCal Emerald allegedly holds title to portions of the Emerald Meadows Project in constructive trust for EMR and Rubidoux. Rubidoux and EMR allege that portions of the Emerald Meadows Project were

-56-

1 temporarily transferred to SunCal Emerald, without any consideration and that SunCal Emerald is

2 required to transfer such property back to EMR and Rubidoux when certain parcel maps are

3 recorded.

4       Rubidoux and EMR also allege that approximately $500,000 that is currently held in a

5 certain escrow account by SunCal Emerald should be paid to Rubidoux and EMR.

6       On March 10, 2009, SunCal Emerald filed a motion to remand the Rubidoux Action to the

7 Superior Court on the grounds that (i) the Rubidoux Action raises exclusively issues of state law

8 and invokes no substantive right created by the Bankruptcy Code; (ii) the Rubidoux Action is a

9 non-core proceeding and the parties have duly made a demand for a jury trial with the Superior

10 Court; (iii) SunCal Emerald does not consent to the Bankruptcy Court's conducting a jury trial of,

11 or entry of a final order with respect to, the Rubidoux Action; and (iv) SunCal Emerald will suffer

12 prejudice if the Court does not remand the Rubidoux Action.

13       On April 16, 2009, Rubidoux and EMR filed a first amended complaint and sought to add

14 three additional claims against SunCal Emerald as described below.

15       On April 23, 2009, SunCal Emerald filed an opposition to the filing of the first amended

16 complaint based on the grounds that Rubidoux and EMR's proposed amendment seeks to (i)

17 address a controversy that does not exist and (ii) to prevent a potential outcome that is not possible

18 under the law.  On April 23, 2009, Rubidoux and EMR filed an opposition to SunCal's Emerald's

19 motion to remand the Rubidoux Action to the Superior Court.

20       On May 7, 2009, the Bankruptcy Court granted SunCal Emerald's motion to remand the

21 Rubidoux Action to the Superior Court.

22       On July 14, 2009, the Bankruptcy Court granted the motion for relief from stay and

23 remanded the Rubidoux Action to the Superior Court.

24       **(e)**    **Church Litigation.**

25       On March 30, 2009, Life Church of God in Christ (the "Church") filed an adversary

26 complaint (the "Church Litigation") against SunCal Emerald for breach of contract, breach of

27 implied covenant of good faith and fair dealings and declaratory relief.

28

1    The Church alleges that SunCal Emerald has not used its best efforts as required by certain

2    agreements to record various maps to entitle the property owned by SunCal Emerald and such

3    failure has caused its inability to transfer certain portions of the property owned by SunCal

4    Emerald to the Church.  The Church further alleges that SunCal Emerald is obligated to make

5    certain improvements to described property but has failed to do so.  The Church also alleges that

6    SunCal Emerald has failed to keep the property free and clear of liens and encumbrances as

7    required by certain agreements.

8        On April 1, 2009, SunCal Emerald filed its response to the Church Complaint generally

9    denying various elements of the causes of action asserted against it and asserting various

10   affirmative defenses.

11                                    **VI.**

12                    **TREATMENT OF UNCLASSIFIED CLAIMS**

13       As required by the Bankruptcy Code, the Plan places Claims and Interests into various

14   Classes according to their right to priority.  However, certain types of Claims are not classified in

15   any Classes under the Plan.  These Claims are deemed "unclassified" under the provisions of the

16   Code.  They are not considered impaired and they do not vote on the Plan, because they are

17   automatically entitled to specific treatment provided for them in the Code.  As such, the Plan

18   Proponents have not placed the following Claims in a Class.  The treatment of these unclassified

19   Claims is as provided below.

20       **6.1.    Treatment of Allowed Administrative Claims.**

21       The Code requires that all Allowed Administrative Claims be paid on the Effective Date of

22   the Plan, unless a particular Holder agrees to a different treatment.  The treatment of Allowed

23   Administrative Claims is as described below.  However, such Administrative Claims are

24   continuing to be incurred.  The Allowed Administrative Claims shall be paid from the applicable

25   Distribution Account(s) pursuant to the Acquisitions Administrative Loan.  In the event that the

26   Court grants substantive consolidation, Holders of Allowed Administrative Claims shall be paid

27   from a single Distribution Account.

28

(a) **Treatment and Repayment of the Lehman's Administrative Loan(s).**

Subject to any potential post-petition setoff and/or recoupment rights, the Lehman's Administrative Loans shall continue to have a first priority lien against the respective Assets securing such loans and the applicable Net Sale Proceeds Account with the exception of the lien for the amounts due under the Lehman Administrative Loan secured by the 10,000 Santa Monica Project, which is and shall remain be subordinate to Holders of the Lehman's Disputed Claims arising from the SunCal Century City Loan Agreement. The Lehman Administrative Loans shall be payable from the applicable Net Sales Proceeds Accounts and from the Distribution Accounts of the Debtors that were the borrowers under the Lehman Administrative Loan(s) to the extent and amount that such borrower received loan proceeds. In the event that the Plan Trust has not repaid such loan(s) by the expiration of the Sales Period, the Holders of the Lehman Administrative Loan(s) shall be free to pursue their rights and remedies against the Assets securing the Lehman Administrative Loans under applicable law.

(b) **Repayment of Allowed Administrative Claims Other than Repayment of the Lehman Administrative Loans.**

Except to the extent that the Holder of an Allowed Administrative Claim agrees to a different treatment and subject to the Administrative Claims Bar Date set forth herein, the Distribution Agent shall pay each Allowed Administrative Claim in full, in Cash, on the later of (i) the Effective Date, (ii) within ten (10) Business Days after the date such Administrative Claim becomes an Allowed Administrative Claim, or (iii) the date such Allowed Administrative Claim becomes due according to its terms. Notwithstanding the foregoing, any Allowed Administrative Claim representing obligations incurred in the ordinary course of post-petition business by the Debtors in Possession (including without limitation post-petition trade obligations and routine post-petition payroll obligations) shall be paid in full or performed by the Plan Trustee in the ordinary course of business, in accordance with the terms of the particular obligation.

**(c)** **Administrative Claims Bar Date.**

**(i)** **General Administrative Claims Bar Date.**

All applications for final compensation of Professionals for services rendered and for reimbursement of expenses incurred on or before the Effective Date and all other requests for payment of Administrative Claims incurred before the Effective Date under Sections 507(a)(2) or 507(b) of the Bankruptcy Code (except only for (i) post-petition, ordinary course trade obligations and routine post-petition payroll obligations incurred in the ordinary course of the Debtors' post-petition business, for which no bar date shall apply, and (ii) post-petition tax obligations, for which the bar date described in the following Section shall apply) shall be Filed with the Bankruptcy Court and served upon the Plan Trustee no later than the General Administrative Claims Bar Date, unless such date is extended by the Bankruptcy Court after notice to the Plan Trustee. Any such request for payment of an Administrative Claim that is subject to the General Administrative Claims Bar Date and that is not Filed and served on or before the General Administrative Claims Bar Date shall be forever barred; any party that seeks payment of Administrative Claims that (i) is required to file a request for payment of such Administrative Claims and (ii) does not file such a request by the deadline established herein shall be forever barred from asserting such Administrative Claims against the Debtors, the Plan Trust, their estates, or any of their property.

**(ii)** **Administrative Tax Claims Bar Date.**

All requests for payment of Administrative Claims by a governmental unit for Taxes (and for interest and/or penalties related to such Taxes) for any tax year or period, all or any portion of which occurs or falls within the period from and including the Petition Date through and including the Effective Date ("Tax Administrative Claims") and for which no bar date has otherwise previously been established, must be filed and served on the Plan Trustee on or before the later of (i) sixty (60) days following the Effective Date; and (ii) 180 days following the filing of the tax return for such taxes for such tax year or period with the applicable governmental unit. Any Holder of any Tax Administrative Claims that is required to file a request for payment of such

taxes and does not file and properly serve such a request by the applicable bar date shall be forever barred from asserting any such Tax Administrative Claims against the Debtors or the Plan Trust.

### 6.2.  Treatment of Priority Unsecured Tax Claims.

Priority Tax Claims are certain unsecured income, employment and other taxes described by Code Section 507(a)(8).  The Code requires that each holder of such a Section 507(a)(8) priority tax claim receive the present value of such Claim in deferred cash payments, over a period not exceeding five (5) years from the petition date and that such treatment not be less favorable than the treatment accorded to non priority unsecured creditors.

At the election of the Plan Trustee, the Holder of each Allowed Priority Tax Claim shall be entitled to receive, on account of such Claim, (i) equal cash payments on the last Business Day of each three-month period following the Effective Date, during a period not to exceed five years after November 6, 2008, totaling the principal amount of such Claim plus simple interest on any unpaid balance from the Effective Date, calculated at the interest rate available on ninety (90) day United States Treasuries on the Effective Date, (ii) such other treatment agreed to by the Holder of the Allowed Priority Tax Claim and the Plan Trustee, provided such treatment is on more favorable terms to the Debtors (or the Plan Trust after the Effective Date) than the treatment set forth in clause (i) hereof, or (iii) payment of the full Allowed Priority Tax Claim in Cash.

## VII.

## CLASSIFICATION OF CLAIMS AND INTERESTS

As required by the Code, the Plan places Claims and Interests into various Classes according to their right to priority and other relative rights.  The Plan specifies whether each Class of Claims or Interests is impaired or unimpaired, and the Plan sets forth the treatment each Class will receive.  The table below lists the Classes of Claims established under the Plan and states whether each particular Class is impaired or left unimpaired by the Plan.  A Class is "unimpaired" if the Plan leaves unaltered the legal, equitable and contractual rights to which the Holders of Claims or Interests in the Class are entitled, with certain exceptions specified in the Bankruptcy Code.

The Debtors have not yet completed their investigation on whether or not the Claims and Interests are Allowed and their listing herein should not be construed as providing for Allowance under the Plan. However, certain Disputed Claims and Disputed Liens are noted below.

| CLASSIFICATION OF HOLDERS OF SECURED PROPERTY TAX CLAIMS ON REAL PROPERTY SUBJECT TO DEEDS OF TRUST ARISING FROM LEHMAN'S DISPUTED CLAIMS | | |
|---|---|---|
| Class | Claimant | Claim Nos. |
| Class 1.1 | Los Angeles County as the Holder of a Secured Real Property Tax Claim against the Ritter Ranch Project in the amount of $1,037,377. | Palmdale Hills 12 |
| Class 1.2 | Los Angeles County as the Holder of a Secured Real Property Tax Claim against the Acton Project in the amount of $200,454. | Acton Estates 1 |
| Class 1.3 | Riverside County as the Holder of a Secured Real Property Tax Claim against the Emerald Meadows Project in the amount of $284,974. | Emerald Meadows 9 |
| Class 1.4 | Placer County as the Holder of a Secured Real Property Tax Claim against the Bickford Ranch Project in the amount of $2,887,678. | Scheduled Amount |
| Class 1.5 | Contra Costa County as the Holder of a Secured Real Property Tax Claim against the Delta Coves Project in the amount of $609,221. | Delta Coves 16 |
| Class 1.6 | Riverside County as the Holder of a Secured Real Property Tax Claim against the Heartland Project in the amount of $559,022. | SunCal Heartland 5 |
| Class 1.7 | Orange County as the Holder of a Secured Real Property Tax Claim against the Marblehead Project in the amount of $379,156. | SunCal Marblehead 49 and 57 |
| Class 1.8 | Los Angeles County as the Holder of a Secured Real Property Tax Claim against the Northlake Project in the amount of $1,189,919. | Scheduled Amount |

| CLASSIFICATION OF HOLDERS OF SECURED PROPERTY TAX CLAIMS ON REAL PROPERTY SUBJECT TO DEEDS OF TRUST ARISING FROM LEHMAN'S DISPUTED CLAIMS | | |
|---|---|---|
| **Class** | **Claimant** | **Claim Nos.** |
| **Class 1.9** | Riverside as the Holder of a Secured Real Property Tax Claim against the Oak Valley Project in the amount of $280,280. | SunCal Oak Valley 9 |
| **Class 1.10** | Los Angeles County as the Holder of a Secured Real Property Tax Claim against the 10,000 Santa Monica Project in the amount of $1,407,212. | SunCal Century City 4 |
| **Class 1.11** | San Bernardino County as the Holder of a Secured Real Property Tax Claim against the Palm Springs Village Project in the amount of $589,367. | SunCal PSV 22 |
| **Class 1.12** | Alameda County as the Holder of a disputed Secured Real Property Tax Claim against the Oak Knoll Project in the amount of $2,356,035. | SunCal Oak Knoll 22, 23 and 24 |
| **Class 1.13** | Los Angeles County as the Holder of a Secured Real Property Tax Claim against the Tesoro Project in the amount of $70,239. | Tesoro 2 |
| **Class 1.14** | San Bernardino County as the Holder of a Secured Real Property Tax Claim against the Joshua Ridge Project in the amount of $5,900. | Scheduled Amount |
| **Class 1.15** | Placer County as the Holder of a Secured Real Property Tax Claim against the Summit Valley Project in the amount of $ 504,245. | Palmdale Hills 97 |

| CLASSIFICATION OF HOLDERS OF SECURED PROPERTY TAX CLAIMS ON REAL PROPERTY NOT SUBJECT TO DEEDS OF TRUST ARISING FROM THE LEHMAN'S DISPUTED CLAIMS | | |
|---|---|---|
| **Class** | **Claimant** | **Claim Nos.** |
| **Class 2.1** | San Bernardino County as the Holder of a Secured Real Property Tax Claim against the Summit Valley Project in the amount of $69,530. | Scheduled Amount |