1  D. EDWARD HAYS, #162507
   ehays@marshackhays.com
2  SEAN A. KADING, #211540
   skading@marshackhays.com
3  **MARSHACK HAYS LLP**
   5410 Trabuco Road, Suite 130
4  Irvine, California 92620-5749
   Telephone:  (949) 333-7777
5  Facsimile:  (949) 333-7778

6  Attorneys for Movant,
   VILLA SAN CLEMENTE, LLC

7

8              UNITED STATES BANKRUPTCY COURT

9       CENTRAL DISTRICT OF CALIFORNIA - SANTA ANA DIVISION

10

11 | In re: | Case No.: 8:08-bk-17206-ES |
   PALMDALE HILLS PROPERTY, LLC, and Its | Jointly Administered With Case Nos.:
12 Related Debtors, | 8:08-bk-17209-ES; 8:08-bk-17140-ES;
            Jointly Administered Debtors and | 8:08-bk-17224-ES; 8:08-bk-17242-ES;
13          Debtors-In-Possession. | 8:08-bk-17225-ES; 8:08-bk-17245-ES;
   | 8:08-bk-17227-ES; 8:08-bk-17246-ES;
   Affects: | 8:08-bk-17230-ES; 8:08-bk-17231-ES;
14 ☐ All Debtors | 8:08-bk-17236-ES; 8:08-bk-17248-ES;
   ☐ Palmdale Hills Property, LLC | 8:08-bk-17249-ES; 8:08-bk-17573-ES;
15 ☐ SunCal Beaumont Heights, LLC | 8:08-bk-17574-ES; 8:08-bk-17575-ES;
   ☐ SCC/Palmdale, LLC | 8:08-bk-17404-ES; 8:08-bk-17407-ES;
16 ☐ SunCal Johannson Ranch, LLC | 8:08-bk-17408-ES; 8:08-bk-17409-ES;
   ☐ SunCal Summit Valley, LLC | 8:08-bk-17458-ES; 8:08-bk-17465-ES;
17 ☐ SunCal Emerald Meadows, LLC | 8:08-bk-17470-ES; 8:08-bk-17472-ES;
   ☐ SunCal Bickford Ranch, LLC | and 8:08-bk-17588-ES
18 ☐ Action Estates, LLC |
   ☐ Seven Brothers, LLC |
19 ☐ SJD Partners, Ltd. | Chapter 11
   ☐ SJD Development Corp. |
20 ☐ Kirby Estates, LLC | MOTION FOR ORDER DETERMINING
   ☐ SunCal Communities I, LLC | THAT ESCROW FUNDS ARE NOT
21 ☐ SunCal Communitities III, LLC | PROPERTY OF THE ESTATE AND/OR TO
   ☐ SCC Communities, LLC | COMPEL THE TRUSTEE TO ASSUME OR
22 ☐ North Orange Del Rio Land, LLC | REJECT EXECUTORY CONTRACT;
   ☐ Tesoro SF, LLC | MEMORANDUM OF POINTS AND
23 ☐ LB-1 SunCal Oak Valley, LLC | AUTHORITIES; DECLARATION OF
   ☐ SunCal Heartland, LLC | DAVID SANNER IN SUPPORT
24 ☐ LB-L-SunCal Northlake, LLC |
   ☒ SunCal Marblehead, LLC | Date:      May 18, 2010
25 ☐ Sun Cal Century City, LLC | Time:      10:30 a.m.
   ☐ SunCal PSV, LLC | Ctrm:      5A
26 ☐ Delta Coves Venture, LLC |
   ☐ SunCal Torrance, LLC |
27 ☐ SunCal Oak Knoll, LLC |

28

18510v1/1079-001

1    TO THE HONORABLE ERITHE A. SMITH UNITED STATES BANKRUPTCY COURT

2    JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE AND ALL INTERESTED

3    PARTIES:

4          Movant, Villa San Clemente, LLC ("Movant" or "VSC") hereby moves this Court for

5    an Order determining that certain funds held in escrow are not property of the estate or to compel the

6    Trustee for the Bankruptcy Estate of Sun Cal Marblehead, LLC ("Debtor" or "SunCal") to assume or

7    reject an executory contract and to release certain escrowed funds to VSC, as follows:

8                    **MEMORANDUM OF POINTS AND AUTHORITIES**

9

10   1.    <u>INTRODUCTION</u>

11          Prior to bankruptcy, the Debtor's predecessor entered into an agreement to sell certain

12   real property to Villa San Clemente, LLC ("VSC") for the purpose of developing retail and

13   commercial portions of the Marblehead Coastal Project in San Clemente, California.  As successor,

14   the Debtor assumed the obligations under the purchase and sale agreement.  Escrow closed several

15   years before the Debtor filed bankruptcy.

16          The purchase and sale agreement ("Agreement") required that a portion of the

17   purchase price be placed into an escrow account and used to complete certain on-site and off-site

18   development work (the "Escrow Account").  In the event the Debtor failed to complete the

19   development work, VSC was entitled to assume the construction of any remaining development

20   work and receive payment for the cost of such construction from the funds held in the Escrow

21   Account.  This was the same procedure pursuant to which the Debtor was to receive payment if it

22   had completed the required construction.  *See*, First Amendment, page 6 – 7, paragraph 11.1.3.  The

23   Debtor's interest in the funds held in the Escrow Account is contingent on, and only vested if, at all,

24   upon completion of the development work.

25          Prior to bankruptcy, the Debtor defaulted and failed to complete the development

26   work.  VSC's efforts to access the funds held in the Escrow Account to complete the development

27   work have been stayed.

28   / / /

18510v1/1079-001

1    Because the Agreement requires both parties to perform certain duties, the Agreement

2    is executory and must be either assumed or rejected by the Trustee.  Because the Debtor is no longer

3    operating, VSC believes the Trustee is unable to complete the development work and should be

4    required to reject the Contract.  Upon rejection, the Debtor will be deemed to have breached the

5    Agreement and VSC shall be permitted to complete the construction of the remaining development

6    work from the Escrowed Funds.

7    2.    BACKGROUND FACTS

8    On June 29, 1999, VSC and SunCal's predecessor-in-interest MT NO. 1, LLC entered

9    into an Amended and Restated Purchase and Sale Agreement and Joint Escrow Instructions (the

10    "Original Agreement") whereby VSC agreed to purchase certain unimproved real property in the

11    City of San Clemente for the purpose of building an outlet shopping center with retail stores,

12    theaters, restaurants, and a hotel (the "Commercial Property") as part of the Marblehead Coastal

13    Project in San Clemente, California.  A true and correct copy of the Original Agreement is attached

14    to the Declaration of David Sanner as Exhibit "1."

15    The Original Agreement subsequently was amended and SunCal assumed the

16    obligations of its predecessor.  True and correct copies of the First Amendment, the Fourth

17    Amendment, and the Sixth Amendment are collectively attached to the Declaration of David Sanner

18    as Exhibit 2.  The Original Agreement and the Amendments are referred to as the "Agreement."

19    On May 11, 2006, escrow closed and VSC acquired title to the Commercial Property

20    from SunCal for $22,500,000.  Pursuant to the terms of the Agreement, the parties agreed that $9

21    million of the purchase price paid by VSC would be deposited into a "Cash Withhold Account" for

22    the purpose of providing the funding source necessary to complete certain on-site and off-site

23    improvements, as described in the Fourth Amendment, at page 9, paragraph 12 (the "Development

24    Work").  In May 2006, the funds were tendered to Chicago Title Insurance Company as disbursing

25    agent, creating account No. 6016409.  *See* Sanner Declaration, ¶ 3.

26    All Development Work was to be completed by SunCal no later than August 11,

27    2007.  In September 2007, SunCal ceased performing the on-site Development Work for VSC due to

28    its financial difficulties.  By SunCal's own estimate, the Development Work is 68.23% complete and

18510v1/1079-001

1    the cost of completion was $5,508,851.52 as of March 19, 2008.  *See*, SunCal's Draw Request No.

2    10, Exhibit 3.  VSC believes that the cost of completion has increased due to degradation of the site

3    and additional costs that will be incurred when work is resumed.  *See,* Sanner Declaration, ¶ 4.

4    Pursuant to paragraph 11.1.3(A) of the First Amendment, VSC is entitled to draw

5    funds from the Cash Withhold Account if it elects to take over any or all of the unfinished

6    Development Work upon SunCal's default.  Prior to the petition date, VSC commenced an action in

7    the Superior Court for the State of California, County of Orange seeking to recover, *inter alia*, the

8    substantial delay damages it has incurred as a result of being prevented from commencing

9    construction for over two years (the "State Court Action").  Before the State Court Action could

10    proceed to trial, this bankruptcy was filed.  *See* Sanner Declaration, ¶ 5.

11    On November 12, 2008, the Debtor filed a voluntary petition under Chapter 11 of

12    Title 11 of the United States Code.  Steven M. Speier is the duly appointed and acting Chapter 11

13    Trustee (the "Trustee").

14    The Debtor's Schedule B lists a balance of $1,075,393 as being held at Chicago Title

15    in Escrow Account No. 6016409.  The current balance including interest is approximately $1.2

16    million.  As set forth above, the funds contained in the Cash Withhold Account specifically were set

17    aside in escrow for the benefit of VSC in order to guaranty completion of the Development Work on

18    the Commercial Property.  Given that the Debtor failed to complete the Development Work required

19    by the Agreement and is no longer operating and able to complete the work of improvement, and

20    because the Debtor has not acquired an actual interest in the funds, VSC respectfully requests that te

21    Court enter an Order compelling the Trustee to reject the Agreement so that all remaining funds on

22    deposit with Chicago Title in the Cash Withhold Account can be released to VSC.

23    Rejection of the Agreement is a breach by the Debtor entitling VSC to assume and

24    complete the Development Work and to obtain payment from the Escrow Account.  The cost to

25    complete the Development Work is well in excess of the amount contained in the Escrow Account.

26    / / /

27    / / /

28    / / /

18510v1/1079-001

3.    <u>LEGAL AUTHORITIES</u>

A.    <u>The Funds Held in Escrow Are Not Property of the Estate</u>

The Bankruptcy Code is clear that property of the estate does not include property in which the Debtor holds bare legal title.  11 U.S.C. § 541(d).  In this case, the Agreement provides that the Debtor is entitled to the funds in the Escrow Account only if it successfully and timely completes construction.

The Agreement provides that the Debtor's interest in the Escrow Account is subject to completion of construction:

> The "monies constituting the Cash Withhold and the interest earned thereon, shall belong to [the Debtor] **subject to** [the Debtor's] lien-free completion of the Development Work in accordance with Section 11.1 below."

*See*, Agreement, Section 3.3.2 (emphasis added.)

In other words, the Debtor's interest in the funds was contingent and entirely dependent upon completion of the Development Work.  Because the Debtor failed to complete the Development Work, the Debtor has not acquired legal title to the funds.  Moreover, Paragraph 11.1.3(A) of the First Amendment, entitles VSC to draw funds from the Cash Withhold Account and to take over the unfinished Development Work upon SunCal's default.

The United States Supreme Court has ruled that estate property does not include "property of others held by the debtor in trust at the time of the filing of the petition." *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 205 n. 10 (1983).  The Ninth Circuit courts have regularly held that, where the debtor holds only a reversionary or other contingent interest in escrowed funds, such funds are not property of the bankruptcy estate. *See, e.g., Elsaesser v. Trefz (In re Taylor)* 1995 WL 577361 (Bankr. D. Idaho) (holding that because the debtors failed to satisfy certain conditions precedent, debtors never obtained control of the escrowed funds and funds were not property of the estate).

It is anticipated that the Trustee will rely on the often distinguished New York decision of *In re Rosenshein*, 136 B.R. 368 (Bankr. S.D.N.Y. 1992).  Unlike the case at bar, in

1  *Rosenshein* the debtor deposited certain funds for the purpose of making the debtor's mortgage loan

2  payments.  There, the debtor had deposited and retained a beneficial interest in the funds.  In fact, the

3  court in *Rosenshein* noted that: "Where state law bars a debtor from having an interest in an escrow

4  fund, and instead, requires the imposition of a constructive trust on the debtor's reversionary interest

5  because of the debtor's inequitable conduct, such minimal or bare legal interest, will not support a

6  broad application of the bankruptcy concept of property of the estate with respect to the escrow

7  fund." *Rosenshein, supra*, at 372 (*citing Garrott*, 772 F.2d at 467).

8         Section 541 of the Bankruptcy Code does not expand the Debtor's property rights.  In

9  fact, most courts have held that escrowed funds are not property of the estate, even where the debtor

10  may have certain rights under the escrow agreement.  *See Collier on Bankruptcy* ¶ 541.09A[2], at

11  541-55 ("These courts tend to hold that only the debtor's contingent rights to the possible return of

12  some or all of the escrowed assets are property of the estate."); *see also, Noble v. Federal Insurance*

13  *Co. (In re Jazzland, Inc.)* 322 B.R. 610 (Bankr. E.D.LA 2005) (distinguishing *Rosenshein* from the

14  majority of decisions).  Whether the escrowed funds constitute property of the estate depends on a

15  number of factors, including: (1) whether the debtor initiated and/or agreed to the creation of the

16  escrow; (2) what control the debtor exercises over it (if any); (3) the incipient source of it; (4) the

17  nature of the funds; (5) the remainderman (if any); (6) the target of its benefits, and; (7) the purpose

18  for its creation.  *See, Elsaesser, supra, (citing In re World Communications, Inc.* 72 B.R. 498, 500-

19  01 (D.Utah 1987); *In re Sun*, 116 B.R. 767, 771-72 (Bankr. D. Haw. 1990)).

20         Here, the parties agreed that the funds were to be placed into escrow for the benefit of

21  VSC to fund certain Development Work for the benefit of VSC.  The escrowed funds would revert

22  to the Debtor, if at all, only upon the lien-free completion of the Development Work.  Because the

23  Development Work was not completed, the escrowed funds are not property of the estate.  Even

24  where escrow funds are purportedly held for the debtor, those funds are not property of the estate

25  where the condition precedent to the debtor's interest has not been satisfied.

26         Allowing the Debtor to retain the funds without completing the Development Work

27  would result in the same unjust enrichment avoided by the court in *Garrott, supra*, (wherein the

28  court held that the imposition of a constructive trust upon the subject property would avoid unjust

18510v1/1079-001

1    enrichment and confer on the true owner of the property an equitable interest superior to that of the

2    trustee or debtors-in-possession).

3        Because the Debtor failed to complete construction, the funds held in the Escrow

4    Account should be determined not to be property of the estate so that VSC may draw down upon

5    such funds in order to complete construction pursuant to the terms of the Agreement.

6    B.    The Trustee Should Be Compelled To Assume or Reject the Executory Contract

7        If the Court determines that the funds in the Escrow Account constitute estate

8    property, the Court should compel the Trustee to assume or reject the Agreement.

9        ". . . the trustee, subject to the court's approval, may assume or reject

10       any executory contract or unexpired lease of the debtor."

11   11 U.S.C. § 365(a). *See also*, 11 U.S.C. § 365(d)(2) which allows a Court to Order

12   the Trustee to assume or reject within a specified time.

13       A contract is executory where performance is still required by each party thereto.

14   *See, e.g. In re Zenith Laboratories, Inc.*, 104 B.R. 667 (Bankr. D.N.J. 1989) [To constitute an

15   "executory contract" there must be some further performance to be rendered by each party so that

16   such remaining obligations are bilateral in nature]. The crucial factor which establishes the

17   executory nature of a contract is the existence of unperformed mutual obligations at time of the filing

18   of the bankruptcy petition. *See, In re California Steel Co.*, 24 B.R. 185 (Bankr. N.D.Ill. 1982).

19       As set forth in the attached Declaration of David Sanner, both the Debtor and VSC

20   remain obligated to perform under the Agreement. Among other things, the Debtor was obligated to

21   complete the Development Work on the Commercial Property. In the event the Debtor failed to

22   perform, as it did, VSC had the specific authority under the Agreement to step in and complete the

23   Development Work.

24       VSC also had ongoing duties under the Agreement. VSC was obligated to cooperate

25   and allow SunCal and its contractors a temporary right to access the Commercial Property for

26   purposes of completing the Development Work. (See Paragraph 11.10, of Exhibit 2). Paragraph 13

27   required VSC to complete, at its own expense, berming and other screening, if required, to produce

28   or reduce the visual site impacts from the Retail Site. VSC was further obligated to execute and

1  cooperate with the recordation of pending easements.  VSC also was obligated to pay certain

2  entitlement fees pursuant to Paragraph 11 of the Fourth Amendment.  *See*, Sanner Declaration,

3  Paragraph 6.

4  As set forth herein, because the Debtor is no longer operating and is unable to

5  complete the Development Work or to otherwise perform as required by the parties' Agreement, the

6  Trustee must be compelled to either assume and assign the Agreement to a third party to complete

7  construction or, in the alternative, reject the Agreement.  Either way, VSC is entitled to have the

8  construction completed pursuant to the Agreement.

9  C.    Rejection Is Deemed A Breach Entitling VSC To Assume And Complete The

10  Development And to Receive Payment From The Escrow Account

11  The determination of property rights is determined by state law.  *See, e.g., Butner v.*

12  *United States,* 440 U.S. 48 (1979).  Pursuant to *Butner,* a party should not receive a windfall through

13  the mere happenstance of a bankruptcy case.  In this case, the Agreement clearly permitted VSC to

14  complete construction through use of the funds held in the Escrow Account.  The result should be no

15  different simply because the Debtor filed bankruptcy.

16  Upon rejection, the Agreement is deemed breached and the non-breaching party is

17  entitled to pursue its contractual remedies.  *See*, 11 U.S.C. Section 365(g).  Pursuant to the terms of

18  the Agreement, VSC is entitled to assume completion of the Development Work and to draw upon

19  the funds in the Escrow Account to complete the construction.  *See*, paragraph 11.1.3(A) of the First

20  Amendment.

21  4.    CONCLUSION

22  For all of the foregoing reasons, VSC respectfully requests that the Court enter an

23  order compelling the Trustee to reject the executory contract, release the Escrow Funds to VSC, and

24  for such other and further relief as the Court deems necessary and appropriate.

25  DATED:  April 8, 2010                Respectfully submitted,
                                         **MARSHACK HAYS LLP**

26                                       By: _/s/ Sean A. Kading_

27                                       SEAN A. KADING
                                         Attorneys for Movant VILLA SAN

28                                       CLEMENTE. LLC

18510v1/1079-001

## DECLARATION OF DAVID SANNER

I, DAVID SANNER, declare as follows:

I am an individual over eighteen years of age and General Counsel to Villa San Clemente, LLC ("VSC") in the above-entitled action.   I make this declaration in support of Motion For Order Determining That Escrow Funds Are Not Property Of The Estate And/Or To Compel The Trustee To Assume Or Reject Executory Contract ("Motion").  The facts set forth herein are true of my own personal knowledge, and if called upon to testify thereto, I could and would competently testify thereto.

1.    On June 29, 1999, VSC and SunCal's predecessor-in-interest MT NO. 1, LLC entered into an Amended and Restated Purchase and Sale Agreement and Joint Escrow Instructions (the "Original Agreement") whereby VSC agreed to purchase certain unimproved real property in the City of San Clemente for the purpose of building an outlet shopping center with retail stores, theaters, restaurants, and a hotel (the "Commercial Property") as part of the Marblehead Coastal Project.  A true and correct copy of the Original Agreement is attached as Exhibit 1.

2.    The Original Agreement subsequently was amended and SunCal assumed the obligations of its predecessor.  True and correct copies of the First Amendment, the Fourth Amendment, and the Sixth Amendment are collectively attached as Exhibit 2.  The Original Agreement and the Amendments will be referred to as the "Agreement."

3.    On May 11, 2006, escrow closed and VSC acquired the Commercial Property from SunCal for $22,500,000.  Pursuant to the terms of the Agreement, the parties agreed that $9 million of the purchase price paid by VSC would be deposited into a "Cash Withhold Account" for the purpose of providing the funding source necessary to complete certain on-site and off-site improvements (the "Development Work") which SunCal is obligated to perform under the Agreement.  In May 2006, the funds were tendered to Chicago Title Insurance Company as disbursing agent, creating account No. 6016409.

4.    Under the Agreement, SunCal was required to complete all Development Work by August 11, 2007.  SunCal began its Development Work in October 2005. After

1    encountering severe economic difficulties, SunCal walked off the job in September 2007. SunCal

2    has made a total of ten draw requests on the Cash Withhold Account totaling $7,931,564.09. The

3    remaining balance in the Account, including interest, is approximately $1.2 million. SunCal's tenth

4    draw request was made on March 21, 2008 and is for the period ending March 18, 2008. A true copy

5    of a portion of the tenth draw request is attached hereto as Exhibit 3. The tenth draw request

6    prepared by SunCal discloses the following:

- The total cost for performing all Development Work required to be performed under the Agreement with VSC is $13,440,415.61.

- The Development Work is now 68.23% complete.

- <u>The remaining cost to complete the Development Work is $5,508,851.52.</u>

11    5.    Pursuant to paragraph 11.1.3(A) of the First Amendment, VSC is entitled to

12    draw funds from the Cash Withhold Account if it elects to take over any or all of the unfinished

13    Development Work upon SunCal's default.  VSC is required to follow the same request procedures

14    and submit documentation to the escrow holder for payment.  Prior to the petition date, VSC

15    commenced an action in the Superior Court for the State of California, County of Orange seeking to

16    recover, *inter alia*, the substantial delay damages it has incurred as a result of being prevented from

17    commencing construction for over two years (the "State Court Action").  Before the State Court

18    Action could proceed to trial, this bankruptcy was filed.

19    6.    Both the Debtor and VSC remain obligated to perform under the Agreement.

20    Among other things, the Debtor is obligated to complete the Development Work on the Commercial

21    Property.  In the event the Debtor fails to perform, as it did, VSC has the authority under the

22    Agreement to step in and complete the Development Work.  In addition, VSC is obligated to

23    cooperate and allow SunCal and its contractors a temporary right to access the Commercial Property

24    for purposes of completing the Development Work (*See* Paragraph 11.10, of Exhibit 2).  Paragraph

25    / / /

26    / / /

27    / / /

28    / / /

18510v1/1079-001

1   13 of the Fourth Amendment requires VSC to complete, at its own expense, berming and other

2   screening, if required, to reduce the visual site impacts from the Retail Site.  I am informed and

3   believe and thereon allege that the City of San Clemente is requiring VSC to complete certain

4   screening as follows:  (i) screening walls that screen the service area for the parking structure; (ii)

5   screening walls around all trash enclosures; (iii) screening walls around the array of onsite San

6   Diego Gas and Electric equipment; and (iv) low level screening walls along Avenida Vista Hermosa

7   to block views from the street to the service doors on VSC's building. To date, none of the screening

8   walls have been constructed. They are expected to cost several hundred thousand dollars. VSC is

9   further obligated to execute and cooperate with the recordation of pending easements. VSC is also

10  obligated to pay certain entitlement fees pursuant to Paragraph 11 of the Fourth Amendment.

11          I declare under penalty of perjury under the laws of the United States of America that

12  the foregoing is true and correct, and that this declaration is executed on March 26, 2010, at Newport

13  Beach, California.

14

15                                                           DAVID SANNER

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit "1"

## AMENDED AND RESTATED PURCHASE AND SALE
## AGREEMENT AND JOINT ESCROW INSTRUCTIONS

This **AMENDED AND RESTATED PURCHASE AND SALE AGREEMENT AND JOINT ESCROW INSTRUCTIONS** ("Agreement") dated ~~June 29~~, 1999, effective as of the 5th day of February, 1999 ("Effective Date"), is made by and between MT NO. 1, LLC, a California limited liability company ("Seller"), and VILLA SAN CLEMENTE, LLC, a California limited liability company ("Buyer"). Buyer and Seller are sometimes referred to herein collectively as the "Parties."

### RECITALS

**WHEREAS**, Seller is the owner of certain unimproved land comprising approximately two hundred fifty (250) acres, located in the City of San Clemente, County of Orange, State of California, legally described in **Exhibit "A"** attached hereto ("Marblehead Coastal Project").

**WHEREAS**, a portion of the Marblehead Coastal Project consists of approximately 74.529 gross acres of unimproved land containing approximately sixty (60) Net Usable acres, or Two Million Six Hundred Thirteen Thousand (2,613,600) Net Useable square feet ("Retail Site"), and is legally described as follows:

Parcel 1 of Lot Line Adjustment LL 98-103, recorded on December 16, 1998, as Instrument Number 19980869560 of the Official Records of Orange County, California.

The balance of the Marblehead Coastal Project (approximately one hundred seventy-five [175] gross acres) is hereinafter referred to as the "Residential Site."

**WHEREAS**, Seller, SDC Partners, Ltd., a California corporation ("SDC"), and Dayton Hudson Corporation, a Minnesota corporation ("Dayton") have entered into that certain written Purchase and Sale Agreement and Joint Escrow Instructions dated February 5, 1996 ("Prior Purchase Agreement") and in connection therewith, have opened an escrow at Chicago Title Company, 16969 Von Karman, Irvine, California 92606 ("Escrow Holder"); Escrow Number 006016409M23 ("Escrow").

**WHEREAS**, Dayton has withdrawn from the Prior Purchase Agreement pursuant to that certain written Termination Agreement and General Release dated June 16, 1999 executed by Seller and Dayton and consented to by SDC ("Dayton Termination Agreement"), the terms of which are incorporated herein by this reference.

**WHEREAS**, concurrently herewith, SDC has assigned all of its right, title and interest in and to the Retail Site, the Prior Purchase Agreement, and the Escrow to Buyer by written assignment dated as of February 5, 1999.

**WHEREAS**, Seller desires to sell the Retail Site to Buyer, and Buyer desires to purchase the Retail Site from Seller, on the terms and conditions set forth in this Agreement.

**NOW THEREFORE**, in consideration of the covenants and agreements contained herein, the Parties hereto agree as follows:

161857.7

-1-

## TERMS AND CONDITIONS

### 1. AMENDMENT AND COMPLETE RESTATEMENT OF PRIOR PURCHASE AGREEMENT

This Agreement amends, and completely restates the Prior Purchase Agreement in its entirety. From and after the Effective Date, the sale and purchase of the Retail Site by Seller and Buyer, as well as the Escrow shall be governed solely by this Agreement and the Prior Purchase Agreement shall be completely superceded hereby and of no further force or effect.

### 2. PURCHASE AND SALE

Seller agrees to sell the Retail Site to Buyer, and Buyer agrees to purchase the Retail Site from Seller, on the terms and conditions, and subject to the contingencies, set forth in this Agreement.

### 3. PURCHASE PRICE

3.1    Purchase Price.  Subject to adjustment pursuant to Section 3.2 below, the total purchase price for the Retail Site shall be Twenty-Seven Million Four Hundred Forty-Two Thousand Eight Hundred And 00/100 Dollars ($27,442,800.00) plus Two Hundred Thousand And 00/100 Dollars ($200,000.00) for a total of Twenty-Seven Million Six Hundred Forty-Two Thousand Eight Hundred And 00/100 Dollars ($27,642,800.00) ("Purchase Price").

3.2    Adjustment of Purchase Price.  If the Net Useable Area (defined and determined in accordance with Section 7.2 below) is more or less than Two Million Six Hundred Thirteen Thousand Six Hundred (2,613,600) square feet, then the Purchase Price shall be adjusted by multiplying such difference by the amount of Ten Dollars And Fifty Cents ($10.50) for each square foot that the Net Useable Area differs from 2,613,600 square feet and the product shall be added or subtracted from the Purchase Price set forth in Subsection 3.1 above so that the Purchase Price is based upon the product of $10.50 multiplied by the square footage of the Net Usable Area, plus Two Hundred Thousand And 00/100 Dollars ($200,000.00).

3.3    Terms of Payment.

3.3.1    Buyer shall deposit with Escrow Holder at least 24 hours prior to the close of Escrow, the entire Purchase Price which, subject to the Cash Withhold described in Subsection 3.3.2, below, shall be paid to Seller at the Closing (as defined in Section 12.2).

3.3.2    Buyer's and Seller's Completion Estimate: Cash Withhold.  By no later than twenty (20) days prior to the Closing, Seller shall prepare, deliver to Buyer and deposit into Escrow a written estimate of the total cost to complete the Development Work required to be completed by Seller pursuant to Section 11.1 below ("Completion Estimate").  The Completion Estimate shall contain in reasonable detail (i) separate line items for each category of work required under Section 11.1 that has not then been completed by Seller, and (ii) a dollar estimate of the total cost to complete each such line item.  If Buyer does not, within said ten (10) day period, object in writing to any particular line items, Seller's Completion Estimate as to those line items to which Buyer has not objected shall be deemed approved.   If Buyer objects to

161857.7

Seller's estimate of the cost of any line items, Buyer shall also, within said ten (10) day period, state in writing the basis for Buyer's objection to specific line items and Buyer's proposed estimated amount to be applicable to such line items.. Such statement shall be signed by both a member of Seller and a California licensed civil engineer. If there is a disagreement between Seller and Buyer as to the cost estimate of any particular line item, the amount to be retained in Escrow in respect of such line item shall be an amount equal to the lesser of (i) the average of (a) Buyer's estimated cost for such line item and (b) Seller's estimated cost for such line item; or (ii) an amount equal to 110% of Seller's estimated cost for such line item. Subject to the foregoing in this Section 3.3.2, Escrow Holder shall deposit with the "Disbursing Agent" (defined below) in Escrow at the Closing an amount equal to the cost to complete the Development Work based on the Completion Estimate, but in no event to exceed Nine Million And 00/100 Dollars ($9,000,000.00) ("Cash Withhold"). The remainder of the Purchase Price shall be disbursed to Seller at Closing. The Cash Withhold shall be held in an interest-bearing account at a Disbursing Agent, with all interest payable to remain in the account. Buyer shall have no right, title or interest in the Cash Withhold or the interest earned thereon, and all monies constituting the Cash Withhold and the interest earned thereon, shall belong to Seller subject to Seller's lien-free completion of the Development Work in accordance with Section 11.1 below. The term "Disbursing Agent" shall mean the Bank of America, or any other independent, third party lender or construction disbursement company mutually satisfactory to both Seller and Buyer.

The Cash Withhold shall be disbursed monthly by the Disbursing Agent directly to the applicable contractors or subcontractors, to pay the actual cost of the Development Work as incurred in accordance with the Completion Estimate, by Seller's written demand for such funds to Disbursing Agent within ten (10) days following the end of each month, with a copy to Buyer, which demand shall include copies of the invoices/billings received during the previous month for which payment is sought, and the amounts due ("Monthly Draw Request"). Each Monthly Draw Request shall be certified by Seller's civil and/or soil engineer (for the benefit of Seller and Buyer) that the work being paid for in respect of the subject Monthly Draw Request has been completed pursuant to the plans and specifications for such work in accordance with the specifications prepared by Seller's soils engineer; and such certification shall also state the approximate percentage of work completed to the date of such Monthly Draw Request. Buyer shall be provided with a copy of each Monthly Draw Request. The Monthly Draw Request will include only those payments for which applicable conditional lien releases have been furnished. Seller shall inform Buyer in writing of any changes in the contract price of the contracts entered into by Seller pursuant to Section 11.1 of this Agreement.

Within two (2) business days following its receipt of each Monthly Draw Request from Seller, the Disbursing Agent shall disburse the amount requested to Seller's contractors and subcontractors. Each Monthly Draw Request shall pay for the Development Work in accordance with the line items on the Completion Estimate; provided, however, that any savings by Seller in any line item may be applied on a dollar-by-dollar basis, to increasing the amount estimated for any other line item. (All such savings shall be allocated to increasing the estimated amount of other line items in Seller's sole and absolute discretion.) Any monies allocable to a line item labeled "contingency" (or comparable designation) may be used for any other line item in Seller's sole and absolute discretion. If any line item in a Monthly Draw Request exceeds the amount set forth in the Completion Estimate (as such line item may be increased by reason of any savings in any other line item, as provided aforesaid), the Disbursing Agent shall disburse

the amount set forth in the Completion Estimate (as it may be adjusted as provided aforesaid) and Seller shall pay (outside of Escrow) any such excess in respect of such line item. However, the Disbursing Agent shall not withhold payment of the amount allocated in the Completion Estimate (as it may be adjusted as provided aforesaid) as a result of such increased cost. Disbursing Agent is not to be concerned with application of each Monthly Draw Request to the line items shown in the Completion Estimate but only that the cumulative total of the Monthly Draw Requests does not exceed the amount of the Cash Withhold, exclusive of interest earned thereon. Each Monthly Draw Request will show the percentage of Development Work (defined in Section 11 this Agreement) which has been completed to the date of such Monthly Draw Request. Buyer shall have no right to approve or disapprove of any Monthly Draw Request and the Disbursing Agent shall not be required, nor shall the Disbursing Agent seek, to obtain Buyer's consent to any Monthly Draw Request, or the disbursement of monies therefor. Immediately after Seller's completion of the Development Work under Section 11.1 hereof, the entire remaining balance of the Cash Withhold, if any, and the interest earned thereon, shall be disbursed to Seller upon the Disbursing Agent's receipt of Seller's written request for same, which request has also been approved by Buyer in writing.

3.4   Deposit.  Upon the full execution of this Agreement, Buyer shall deposit with Escrow Holder the sum of Fifty Thousand And 00/100 Dollars ($50,000.00), to be placed in a separate interest bearing account, with all interest accruing to the benefit of Buyer ("Deposit"). The Deposit shall be fully refundable until such time as Buyer's "Contingencies" as set forth in Article 5 have been either satisfied or waived by the deadline for satisfaction or waiver of such Contingencies, at which time the Deposit, plus all accrued interest thereon, shall be non-refundable and released to Seller. The Deposit, plus all accrued interest thereon, shall be applied to the Purchase Price at the Close of Escrow.

3.5   Rebate of Portion of Purchase Price.  Buyer shall be entitled to a rebate of a portion of the Purchase Price in an amount not to exceed Three Hundred Seventy Five Thousand And 00/100 Dollars ($375,000.00) if, and to the extent, provided in this Section 3.5. If (i) Buyer is required, by a Governing Agency (defined in Section 5.1.1, below) to develop (or caused to be developed) a hotel or separate community center on the Retail Site as a condition to any Governing Agency's approval of Buyer's Site Plan for the Retail Site; and (ii) if a hotel, Buyer enters into a binding written agreement with a hotel owner to own and operate a hotel on the Retail Site within thirty-six (36) months after the Closing; or, if a separate community center, Buyer has entered into a binding written commitment to build a community center within thirty-six (36) months after the Closing;  Buyer shall be entitled to a rebate of a portion of the Purchase Price ("Rebate") in an amount determined by the following calculation: (a) the number of acres covered by the Hotel or Community Area (defined below); multiplied by (b) $125,000.00 per acre (prorated for any portion of an acre).  The term "Hotel or Community Area" as used in this Section 3.5 shall mean the area on which the hotel (or community center) is located, including parking which is legally required and dedicated solely therefore.  Notwithstanding anything above in this Agreement, the Rebate shall not, under any circumstance, exceed $375,000.00. The parties good faith estimate of the Rebate shall remain in escrow until thirty-six (36) months after the Closing, at which time the Rebate will thereupon either (1) be disbursed to Buyer (if Buyer is thereupon entitled to any Rebate pursuant to this Section 3.5); or (2) immediately thereupon returned to Seller (if Buyer is not entitled to a Rebate pursuant to this Section 3.5).  To the extent the estimated Rebate held in escrow exceeds the actual Rebate to which Buyer is

entitled, the excess shall, at the end of the thirty-six (36) month after the Closing, be returned to Seller.

## 4.    CONDITION OF TITLE TO RETAIL SITE

4.1    <u>Conveyance of Retail Site</u>.  Title to the Retail Site shall be conveyed to Buyer at the Closing.

4.2    <u>Permitted Exceptions</u>.  Title to the Retail Site shall be conveyed to Buyer by Grant Deed in the form attached hereto as **Exhibit "B"** free and clear of all liens except: (A) liens securing real property taxes and assessments (which are not delinquent); and (B) such other exceptions and reservations (other than the deed of trust reflected as Item No. 16 in Schedule B) shown on the preliminary title report dated December 18, 1998 (Order Number 6016409A-U54) ("Title Report") issued by Chicago Title Company ("Title Company") a copy of which is attached hereto as **Exhibit "C"** and incorporated herein by this reference, and such additional exceptions as are approved in writing by Buyer. All exceptions to title set forth in the Title Report together with those Additional Exceptions approved in writing by Buyer (as provided in Section 4.2.1, below) are hereinafter collectively referred to as the "Permitted Exceptions."

4.2.1    Seller has furnished Buyer with a current preliminary title report, together with copies of all recorded exceptions to title and the plotted easements. An ALTA survey of the Retail Site ("ALTA Survey") has been approved by Buyer and has been deposited with the Title Company.  Buyer and Seller acknowledge and agree that, during the course of Seller's development and pre-development activities prior to Closing, certain additional title exceptions ("Additional Exceptions") may be recorded against the Retail Site, which Additional Exceptions shall be subject to Buyer's approval as follows:

(a)    Seller shall give Buyer written notice of such Additional Exception(s), which notice shall include a statement that Buyer shall have ten (10) days following receipt of such notice to notify Seller in writing that Buyer has reasonably determined that such Additional Exception(s) have (i) caused the creation of an additional financial obligation other than as provided herein, including, but not limited to Mello-Roos districts, or (ii) caused the Net Useable Area (determined pursuant to Section 7.2) to decrease below 2,613,600 square feet, or (iii) caused the total square footage of the improvements permitted to be built within the Retail Site to decrease below 700,000 square feet ("Buildable Area"), or (iv) resulted in a material change to Buyer's proposed development of the Retail Site (and the reasons therefor). If Buyer does not notify Seller of its disapproval within said ten (10) day period, then such Additional Exceptions shall be deemed to be Permitted Exceptions.

(b)    In the event Buyer gives Seller timely written notice of its disapproval of any Additional Exceptions ("Buyer's Notice Of Additional Exceptions"), Seller shall have ten (10) days following receipt of Buyer's Notice of Additional Exception to agree, (by giving written notice to Buyer), to cure or remove such Additional Exception prior to the Closing. Failure by Seller to give the aforesaid notice to Buyer within said ten (10) day period shall constitute Seller's election to cure or remove such Additional Exceptions. The removal or cure of any such objection which effects title shall be evidenced by Seller providing, or causing

to be provided, to Buyer an updated Preliminary Title Report showing the deletion of the Additional Exception disapproved by Buyer and/or a revised ALTA Survey.

(c)    If any of Buyer's objections to Additional Exceptions are not cured or removed as provided herein and the item objected to is a monetary lien, Buyer may elect to (i) accept title to the Retail Site as it is, or (ii) terminate this Agreement.    Notwithstanding anything set forth above in this Section 4.2 or elsewhere in this Agreement, Seller shall pay (or otherwise cause to be removed from the Title Policy) at Closing, all monetary liens encumbering the Retail Site which arose by reason of either (1) judgment liens or mechanic's liens; or (2) liens secured by a mortgage or deed of trust.    However, any Additional Exception which constitutes a property tax or assessment against the Retail Site shall be prorated at closing pursuant to Section 13, below.    If any of Buyer's objections to Additional Exceptions are not cured or removed as provided herein and the item objected to is a non-monetary lien, Buyer may elect either to (i) accept title to the Retail Site as it is, or (ii) terminate this Agreement.

In the event this Agreement is terminated as provided herein, each party shall be released from all duties or obligations contained herein and all sums, less disbursements authorized by this Agreement, and documents deposited in Escrow shall be returned to the Parties who respectively deposited the same, and Seller shall pay the Escrow costs.

4.3    Form of Policy.    Title to the Retail Site shall be evidenced by Title Company's issuance at Closing of an American Land Title Association Extended Coverage Policy of Title Insurance ("Extended Coverage Policy"), with liability in the amount of the Purchase Price showing title to the Retail Site vested in Buyer subject only to the Permitted Exceptions.    If Buyer so desires, Buyer may obtain any title insurance endorsements provided that Buyer shall pay all additional costs associated with any endorsements desired by Buyer together with the increased cost of an Extended Coverage Policy over the cost of a CLTA policy of title insurance ("Standard Coverage Policy").    The title policy to be issued to Buyer, as provided above, shall be referred to as the "Title Policy".    Notwithstanding the foregoing, any title insurance endorsements desired by Buyer shall, under no circumstance, delay or extend the date for the Closing, as provided in this Agreement.

## 5.    BUYER'S CONTINGENCIES

Buyer's obligations under this Agreement are contingent upon the satisfaction or waiver of the contingencies described in Sections 5.1 through 5.3 below (individually, a "Contingency" and collectively, the "Contingencies").

5.1    Approvals for Retail Site.

5.1.1    Buyer's obligations under this Agreement and its obligations to close Escrow are contingent upon Seller obtaining, on or before November 30, 2000, the necessary, discretionary governmental zoning and land use entitlements from the governing authorities having jurisdiction over the Retail Site (collectively, "Governing Agencies" and, individually, "Governing Agency") including, but not limited to the City of San Clemente, the California Coastal Commission, the Army Corps of Engineers, the U.S. Fish and Wildlife Service and the California Department of Fish and Game, for a retail/commercial project on the Retail Site

consistent with the site plan SPP99-16, the Conditional Use Permit application numbered CUP99-17 and the Sign Exception Permit numbered SEP99-18 (all more particularly described in Section 6.1, below), satisfying the following: (i) the Net Useable Area of the Retail Site (as determined pursuant to Section 7.2, below) containing a minimum of 2,613,600 square feet; (ii) the building-to-land ratio (calculated by dividing the Buildable Area by the Net Useable Area) is no less than twenty-six percent (26%); and (iii) the Buildable Area is not less than 700,000 square feet. No representation, whether express or implied, is made by Seller as to Seller's ability to obtain the said necessary discretionary governmental zoning and land use entitlements from any Governing Agency.

5.1.2   If, at any time, any Governing Agency conditions or reduces (i) the Net Useable Area of the Retail Site to less than 2,613,600 square feet; (ii) the building-to-land ratio to less than 26%; or (iii) the Buildable Area to less than 700,000 square feet, then, within ten (10) days thereafter, Buyer must elect, by giving written notice to Seller, to either (a) accept such conditions or reductions and continue to proceed with seeking approvals from other Governing Agencies for zoning and land use entitlements; or (b) terminate this Agreement. If Buyer elects (a), aforesaid (that is, to accept such conditions or reductions and continue to proceed with seeking approvals from other Governing Agencies), Buyer shall not thereafter have the right to terminate this Agreement unless, thereafter, a Governing Agency further conditions or reduces the Net Useable Area of the Retail Site, the building-to-land ratio or the Buildable Area. If a Governing Agency subsequently further conditions or reduces the Net Useable Area of the Retail Site, the building-to-land ratio or the Buildable Area, Buyer must elect, by giving written notice to Seller within ten (10) days thereafter, either (a) or (b), aforesaid, in this Section 5.1.2

5.1.3   If a government moratorium results in the inability of Buyer to develop the Retail Site as contemplated by this Agreement, Buyer shall have the right, to be exercised by written notice to Seller within thirty (30) days after such action to either (i) waive the Contingency in this Section 5.1.3; or (ii) elect to terminate this Agreement. In addition, and notwithstanding the provisions of Section 5.4, below, if, at the time the aforesaid moratorium occurs, all other Contingencies have been satisfied or waived pursuant to this Agreement (other than the Contingency provided in Section 5.4. below), then the deadline for the satisfaction (or waiver) of the Contingency set forth in Section 5.4, below, (that is, Seller obtaining a bulk grading permit for the Retail Site and Residential Site) shall be advanced from November 30, 2000, to the deadline for the satisfaction (or waiver) of the Contingency set forth in this Section 5.1.3 (to wit; thirty (30) days after the moratorium occurs). It is therefore the intent of the Parties that if a moratorium precludes the issuance of a bulk grading permit (and if at such time all other Contingencies have then been satisfied or waived pursuant to this Agreement), the Contingency regarding Seller's obtaining a bulk grading permit shall, notwithstanding the provisions of Section 5.4, expire thirty (30) days after the moratorium.

5.1.4   If any lawsuit is filed which results in the issuance of an injunction enjoining the development of the Retail Site as contemplated by this Agreement, Buyer shall have until the earlier to occur of (a) the lifting of such injunction or (b) November 30, 2000 (or, if Buyer has elected to extend the Closing pursuant to Section 12.2.2, Buyer shall have until November 30, 2001) to elect, by giving Seller written notice prior to such time, to either (i) waive the Contingency in this Section 5.1.4 or (ii) elect to terminate this Agreement. However, if Buyer elects to waive the Contingency and close the purchase and sale contemplated

Exhibit "1"
Page 18

by this Agreement notwithstanding any such injunction, Seller shall not be deemed to be in breach of this Agreement if it is unable to perform the Development Work (defined below), provided that Seller opposes the continuation of such injunction.

     5.1.5    Notwithstanding anything set forth above in this Section 5.1 or elsewhere in this Agreement, the date for the Closing shall be no later than the Outside Closing Date (defined in Section 12.2.1, below), subject to extension as provided in Section 12.2.1 and 12.2.2, below.

    5.2    <u>Entitlement Fees.</u>

     5.2.1    Following the Close of Escrow, Buyer agrees to pay the fees attributable to its development of the Retail Site including, without limitation, those fees described in that certain Memorandum dated February 24, 1994 to Cliff Russell from Mike Burke attached hereto as **Exhibit "D"** (collectively the "Buyer's Entitlement Fees"). Buyer reserves the right, but shall not be obligated, to reduce any of Buyer's Entitlement Fees through negotiations with the City of San Clemente. Notwithstanding the foregoing, Buyer's obligations under this Agreement are not contingent upon such reduction and shall not, under any circumstance, delay the date for the Closing as otherwise contemplated in this Agreement.

    (i)    Buyer agrees to pay all fees, charges and payments applicable to the "Commercial Area" as contained in that certain written Development Agreement for Marblehead Coastal Property dated October 2, 1998 and recorded on October 2, 1998 as Instrument No. 19980667761 of the Official Records ("Development Agreement") except those obligations set forth in Sections 3.5, 3.6, 4.2, 4.3, 4.4, 4.5, and 4.7 of the Development Agreement and except for fees for the Development Work to be completed by Seller pursuant to Paragraph 11, below, in this Agreement.

    (ii)    Buyer's Entitlement Fees shall not include fees, charges and payments for the design, planning, approval and construction of the Avenida Vista Hermosa Interchange as described in Section 11, below.

     5.2.2    In the event the City San Clemente and/or any other Governing Agency shall adopt further entitlement fees following the Effective Date ("Further Entitlement Fees"), and upon Seller receiving written notice thereof, Seller shall give prompt written notice thereof to Buyer, Buyer shall have twenty (20) days from receipt from Seller of notice of such Further Entitlement Fees to review and approve, or waive any objection to, such Further Entitlement Fees. Failure of Buyer to provide Seller with notice in writing of Buyer's disapproval of any such Further Entitlement Fees ("Buyer's Disapproval Notice of Further Entitlement Fees") within such twenty (20) day time period shall be deemed approval of the Further Entitlement Fees and, therefore, the waiver by Buyer of the Contingency in this Section 5.2.2 as to any such Further Entitlement Fees. If Buyer disapproves in writing any of the Further Entitlement Fees Seller shall, within ten (10) days of receipt of Buyer's Disapproval Notice of Further Entitlement Fees, notify Buyer in writing, of any action Seller is willing to undertake, if any, to cause Buyer to waive Buyer's disapproval of such Further Entitlement Fees. In the event Seller fails to so notify Buyer of Seller's decision in this matter within ten (10) days after receipt of Buyer's disapproval of such Further Entitlement Fees, or Seller declines to take action to remedy Buyer's

disapproval within said ten (10) day period, Buyer must elect, in its absolute discretion within five (5) days after expiration of the aforesaid ten (10) day period, to either (i) waive the Contingency set forth in this Section 5.2.2 or (ii) terminate this Agreement by giving written notice to Seller and Escrow Holder, in which case all sums, less disbursements authorized by this Agreement, and documents deposited in Escrow shall be returned to the Parties who respectively deposited the same, and Seller shall pay the Escrow costs. If Buyer fails to make its election within five (5) days after the expiration of the aforesaid ten (10) day period, Buyer shall be deemed to have elected to waive the contingency set forth in this Section 5.2.2. No representation or warranty, whether express or implied, is made by Seller as to whether or not there will, or will not, be Further Entitlement Fees.

 5.3 <u>Approvals, Funding and Completion of Avenida Vista Hermosa Interchange.</u>

  5.3.1 Buyer's obligations under this Agreement and its obligation to close Escrow are contingent upon: (A) the governmental approvals and funding (as defined below) for the completion of the Avenida Vista Hermosa Interchange being in place by no later than November 30, 2000; (B) construction of the Avenida Vista Hermosa Interchange having commenced no later than November 30, 2000; and (C) Buyer having determined, in Buyer's reasonable discretion, by the earlier to occur of (i) thirty (30) days after construction of the Avenida Vista Hermosa Interchange has commenced; or (ii) November 30, 2000; that completion of the northbound and southbound on and off ramps for the Avenida Vista Hermosa Interchange will occur (a) in the case of (i), aforesaid, within twelve (12) months after commencement of construction of the Avenida Vista Hermosa Interchange; or, (b) in the case of (ii), aforesaid, by November 30, 2001. By no later than the respective deadlines provided in (A), (B) and (C), aforesaid, Buyer shall give Seller written notice of its election to either (i) waive the Contingencies set forth in (A), (B) and (C) aforesaid, respectively, or (ii) elect to terminate this Agreement by reason by failure of any of such Contingencies. Failure by Buyer to give Seller written notice by the deadlines as aforesaid shall be deemed to be an election by Buyer to waive the Contingencies in this Section 5.3.1. No representation or warranty, whether express or implied, is made by Seller as to whether (A), (B) or (C), aforesaid can be satisfied. For the purpose of this Section 5.3, the term "funding" shall mean that commitment(s) have been obtained from a financial institution, and/or a governmental agency, and/or a third party that will provide reasonably sufficient capital for completion of the Avenida Vista Hermosa Interchange, or alternatively, that evidence reasonably satisfactory to Buyer exists to establish that funds will be available to finance such project from other sources. In addition, for the purpose of this Section 5.3 only, the term "commencement" shall mean the beginning of any physical construction, grading or other physical work with respect to the Avenida Vista Hermosa Interchange, under a contract issued by the appropriate authority for the completion of the Avenida Vista Hermosa Interchange.

 5.4 <u>Bulk Grading Permit</u>. Subject to the provisions of Section 5.3.1, above, Buyer's obligations under this Agreement and its obligation to close Escrow are contingent upon Seller obtaining, on or before November 30, 2000, a bulk grading permit for the Retail Site and Residential Site. If, by November 30, 2000, Seller has not obtained the aforesaid bulk grading permit, Buyer must elect, in its absolute discretion by no later than November 30, 2000, to either (i) waive the Contingency set forth in this Section 5.4; or (ii) terminate this Agreement by giving written notice to Seller and Escrow Holder, in which case, all sums, less disbursements

161857.7

-9-

authorized by this Agreement, and documents deposited in Escrow shall be returned to the Parties who respectively deposited the same, and Seller shall pay the Escrow Costs. No representations or warranty, whether express or implied, is made by Seller as to whether a bulk grading permit will or will not be obtained.

     5.5    <u>Remedy For Failure of Contingencies</u>.  If Buyer fails to elect to terminate this Agreement by reason of the failure of any Contingency by the applicable deadline therefor, Buyer shall be deemed to have elected to waive the subject Contingency.  In the event of the failure of any of the Contingencies set forth in this Article 5 and provided Seller is not in default under the terms of this Article 5, the sole remedy of Buyer shall be to terminate this Agreement, whereupon all sums, less disbursements authorized by this Agreement, and documents deposited in Escrow shall be returned to the Parties who respectively deposited the same, Seller shall pay the Escrow costs, and neither Party shall have any further obligations under this Agreement.

## 6.    BUYER'S SPECIFIC SITE PLANS

     6.1    Buyer has prepared a site plan with elevations for the Retail Site, which was submitted to the City of San Clemente for approval on February 8, 1999, and is identified as SPP99-16.  In response to comments by the staff of the City of San Clemente, Buyer has revised the site plan.  (The site plan for the Retail Site, together with the accompanying exhibits thereto, are hereinafter referred to as "Buyer's Specific Site Plans.").  Buyer also prepared a Conditional Use Permit application, numbered CUP99-17 and a Sign Exception Permit numbered SEP99-18.  The CUP application and the Sign Exception Permit application were both submitted to the City of San Clemente on March 4, 1999.  These applications are being processed by the Buyer.  Seller acknowledges receiving and approving Buyer's Specific Site Plans.  Buyer's Specific Site Plans includes the following:

     (A)    the proposed configuration of Buyer's improvements to the Retail Site;

     (B)    the proposed vehicular access points to and from the Retail Site from the adjoining public streets;

     (C)    the proposed specific layout of the access between the Retail Site and the Avenida Vista Hermosa ramp/interchange to the I-5 Freeway ("Avenida Vista Hermosa Interchange") to be constructed adjacent to the Retail Site.

     6.2    Buyer has previously provided Seller with grading information, elevations and the location of utilities for the Retail Site on plans prepared in conjunction with Tentative Tract Map #8817, which Tentative Tract Map was approved by the City of San Clemente on August 5, 1998.  The aforesaid plans which specify the grading information, elevations and location of utilities for the Retail Site which are attached hereto as **Exhibit "H."**  If, upon final approval by the Governing Agencies of Buyer's Site Plan SPP99-16 (or any subsequent Site Plan for the Retail Site), there is additional work required for the Retail Site which is otherwise not consistent with the work to be performed pursuant to Exhibit "H," then the net increase in costs shall be paid by Buyer.  In addition, Buyer shall pay for any and all costs incurred as a result of berming or other screening (if any) required to reduce visual site impacts from the Retail Site.  As soon as practicable after the Closing, Seller shall prepare its good faith written estimate ("Estimate") of

the additional costs to be paid by Buyer pursuant to this Section 6.2 and shall provide Buyer with the Estimate. Buyer shall have two (2) business days to review the Estimate to determine whether the Estimate is consistent with the additional work to be paid for by Buyer pursuant to this Section 6.2. Within five (5) business days after Seller's delivery to Buyer of the Estimate, Buyer shall deposit with the Disbursing Agent funds sufficient to pay for the additional work contemplated by this Section 6.2. After completion of all work contemplated by the Estimate, Seller shall prepare and deliver to Buyer a final written accounting and, if the Estimate was less than the actual costs, Buyer shall thereupon forthwith pay the excess to Seller or, if the Estimate was greater than the actual costs, Disbursing Agent shall refund the excess to Buyer.

6.3    Buyer will cause its civil engineer to timely and expeditiously (but in no event later than ten (10) days after Seller has procured the approvals from the Governing Agencies as contemplated in Section 5.1, above) provide Seller with grading information, elevations, locations and capacities of utilities, proposed vehicular access points and other information necessary for Seller to prepare a grading plan for bulk grading, utility plan and off-site improvement plan for the Retail Site. Seller will incorporate such information provided by Buyer's civil engineer into Seller's grading plan for bulk grading, utility plan and off-site improvement plan. After Seller has incorporated such information provided by Buyer's civil engineer into Seller's grading plan for bulk grading, utility plan and off-site improvement plan, Buyer shall have a maximum of five (5) days to review such plans before Seller submits such plans for final governmental approval; provided, however, that (i) Buyer's right of approval shall be solely for the limited right of confirming that Seller's plans are consistent with the information provided by Buyer's civil engineer; and (ii) notwithstanding the aforesaid maximum five (5) day period, Buyer will review Seller's completed bulk grading, utility and off-site improvement plans as quickly as possible. Seller shall thereafter submit such plans to the applicable governmental authority, and diligently pursue the issuance of the applicable permits to completion.

## 7.    FINALIZING DESCRIPTION OF RETAIL SITE

7.1    Selection of Surveyor. Seller has selected Robert Bein, William Frost & Associates, a certified and licensed civil engineer ("RBF"), who has prepared a survey of the Retail Site dated September 16, 1996 ("Survey"). Buyer and Seller have approved the Survey and agree that the boundaries of the Retail Site as depicted in the Survey constitutes the final boundaries for the Retail Site.

7.2    Determination of "Net Useable Area". For the purpose of this Agreement, the term "Net Useable Area" shall mean the total square footage land area within the Retail Site excluding only: (A) perimeter street dedications (but not streets or roads to be developed by Buyer on the interior of the Retail Site); (B) non-buildable slope areas; and (C) other land that is not useable for the operation of a retail commercial property based on common standards consistent with other retail commercial properties located within the area of Orange County, California. Huitt-Zollars ("HZ") has previously calculated the Net Useable Area, RBF has confirmed the calculation by HZ, and the parties agree that the Net Useable Area of the Retail Site is presently 60.41 acres. By no later than twenty (20) days prior to the Closing, HZ and RBF will make a final calculation of the Net Useable Area of the Retail Site based on the final entitled Retail Site Plan, using the same criteria as they previously used to calculate the Net

Useable Area of the Retail Site and such calculation and such final calculation by MGA and RBF shall be binding upon Buyer and Seller for purposes of this Agreement.

## 8.    REPRESENTATIONS AND WARRANTIES BY SELLER

8.1    Due Authority.    Seller represents and warrants that it is a California limited liability company, duly organized, validly existing and in good standing under the laws of the State of California. Seller represents and warrants that it has the power and authority to enter into this Agreement and to consummate the transactions contemplated hereby. Seller represents and warrants that the persons signing this Agreement on behalf of Seller have the full legal power, authority and right to execute and deliver this Agreement.

8.2    No Violations of Other Agreements.    Seller represents and warrants that neither the entering into this Agreement, nor the performance of any of Seller's obligations under this Agreement, will violate the terms of any contract, agreement or instrument to which Seller is a party.

8.3    No Brokers.    Seller represents and warrants that Seller has neither engaged nor dealt with any broker or finder in connection with the sale contemplated by this Agreement except that Seller understands that Buyer was made aware of the Retail Site by The Joseph Company. Seller agrees to defend, protect, indemnify and hold Buyer harmless in connection with any commission or finder's fee payable to anyone claiming to represent Seller in this transaction, including The Joseph Company. The extent any commission is owed The Joseph Company, Seller shall pay such commission to The Joseph Company. However, The Joseph Company shall not be a third party beneficiary of this Agreement.

8.4    Additional Representations and Warranties.    Seller further warrants and represents to Buyer that the following statements are now, and will on the date of Closing be, true and accurate:

8.4.1    So long as this Agreement remains in force, Seller shall not lease, sell or transfer all or any part of the Retail Site except subject to and burdened by this Agreement. Any transferee of the Retail Site, or any portion thereof, shall as a condition to the transfer, acknowledge its recognition of its obligation to (i) sell the Retail Site to Buyer, and (ii) perform all the Development Work set forth in Article 11, under the terms set forth in this Agreement. Upon the assignment by Seller of this Agreement of its rights and obligations under this Agreement, or upon the sale of the Retail Site by Seller to a third party (which assignment or sale to a third party shall be subject to and burdened by this Agreement, as contemplated aforesaid), Seller shall, upon any such assignment or transfer, be automatically released from any and all obligations and liabilities under this Agreement. However, if Seller sells or transfers all or any part of the Retail Site and/or all of the Residential Site prior to the time "funding" for completion of the Avenida Vista Hermosa Interchange is in place (as the term "funding" is defined in Section 5.3.1), then the purchaser of the Retail Site (but not the Buyer herein) shall place Five Million And 00/100 Dollars ($5,000,000.00) in cash with Escrow Holder, which amount shall be used toward funding the Avenida Vista Hermosa Interchange if, at the Closing, funding for the Avenida Vista Hermosa Interchange is not then in place. However, such $5,000,000.00 shall be

released to the purchaser as soon as funding for the Avenida Vista Hermosa Interchange is in place.

       8.4.2   Seller is not a "foreign person" as contemplated by Section 1445 of the Internal Revenue Code.

       8.4.3   This Agreement and all documents to be executed pursuant hereto by Seller are and shall be binding upon and enforceable against Seller, its successors and assigns, in accordance with their respective terms, and the transaction contemplated hereby will not result in a breach of, or constitute a default or permit acceleration and maturity under, any indenture, mortgage, deed of trust, loan agreement or other agreement to which Seller or the Retail Site are subject or by which Seller or the Retail Site are bound.

       8.4.4   Seller has not (i) made a general assignment for the benefit of creditors, (ii) filed any voluntary petition in bankruptcy or suffered the filing of any involuntary petition by Seller's creditors, (iii) suffered the appointment of a receiver to take possession of all or substantially all of Seller's assets, (iv) suffered the attachment or other judicial seizure of all, or substantially all, of Seller's assets, (v) admitted in writing its inability to pay its debts as they come due, or (vi) made an offer of settlement, extension or composition to its creditors generally.

     8.5   <u>Limits on Liability of Buyer</u>.  Seller confirms that no officer, director, employee or representative of Buyer (whether or not such individual has signed this Agreement on behalf of Buyer) makes any express or implied representation or warranty of any kind or nature whatsoever.  Seller further acknowledges, confirms and agrees that any liability with respect of this Agreement and the transactions contemplated herein shall result in the liability of Buyer only and not any individual officer, director, employee or representative of Buyer.  Seller therefore confirms, acknowledges and agrees that Seller may seek recourse only against Buyer for any liability arising out of or in connection with this Agreement and the transactions contemplated hereby.

     8.6   <u>Republication Of Representations and Warranties</u>.  The representations and warranties made under this Article 8 shall be deemed to have been remade by Seller as of Closing, as if made on and as of such date, except for any matters arising subsequent to the Effective Date of this Agreement, which shall be set forth in a certificate stating the manner in which the representations and warranties of Seller are no longer correct, which certificate shall be delivered to Buyer and Escrow Holder prior to the Closing.  All of the representations, warranties and indemnity obligations set forth in Article 8 shall survive the Closing and recordation of the Grant Deed in favor of Buyer.

## 9.    REPRESENTATIONS AND WARRANTIES BY BUYER

     9.1   <u>Purchase In "As Is" Condition</u>.

       9.1.1   Except as expressly provided in this Agreement, Buyer acknowledges that (A) Seller is not making and has not made any warranties or representations, express or implied, as to the Retail Site's legal, physical and/or financial condition now or in the future, and (B) Buyer is buying the Retail Site in an "as-is" condition based solely on Buyer's own studies and

investigations subject to Seller's obligation to complete the Development Work as described in Section 11.1 hereof.

9.1.2  Buyer acknowledges that, subject to and conditioned upon the truthfulness of Seller's representations and warranties in Section 7, Seller shall have no liability for any latent or patent defects discovered upon the Retail Site following Closing except defects related to Seller's or its contractor's performance of the Development Work under Section 11.1.

9.1.3  Buyer confirms, acknowledges and agrees that no officer, director, employee or representative of Seller or Seller's members (whether or not such individual has signed this Agreement on behalf of Seller) makes any express or implied representation or warranty of any kind or nature whatsoever.  Buyer further acknowledges, confirms and agrees that any liability with respect of this Agreement and the transactions contemplated herein shall result in the liability of Seller only and not any individual officer, director, employee or representative of Seller or Seller's members.  Buyer therefore confirms, acknowledges and agrees that Buyer may seek recourse only against Seller for any liability arising out of or in connection with this Agreement and the transactions contemplated hereby.

9.2  Information Provided By Buyer.  Any financial statement delivered by Buyer to Seller is true and correct.

9.3  Due Authority.  Buyer is a limited liability company duly organized, validly existing and in good standing under the laws of the state of its incorporation and is qualified to do business in the State of California.  Buyer has the power and authority to enter into this Agreement and to consummate the transactions contemplated hereby.  Buyer represents and warrants that the persons signing this Agreement on behalf of Buyer have the full legal power, authority and right to execute and deliver this Agreement.

9.4  No Brokers.  Buyer has neither engaged nor dealt with any broker or finder in connection with the sale contemplated by this Agreement, except for The Joseph Company.  Buyer agrees to defend, protect, indemnify and hold Seller harmless in connection with any commission or finder's fee payable to anyone other than the Joseph Company claiming to represent Buyer in this transaction.

9.5  Independent Investigation.  Buyer has or will make its own investigation concerning the physical condition of the Retail Site, condition of title of the Retail Site, or any other matter pertaining to the Retail Site and this Agreement.  Other than the specific representations and warranties made by Seller in this Agreement, Buyer is not relying on any representations, warranties or inducements of Seller or any agent or representative of Seller with respect to the physical condition of the Retail Site, condition of title to the Retail Site, or any other matter pertaining to the Retail Site or this Agreement.  Accordingly, except for those specific representations and warranties of Seller set forth in this Agreement, Buyer is purchasing the Retail Site and each and every aspect thereof in an "as-is" condition.

10.  **INDEMNIFICATION**

10.1  Indemnity.  Subject to any other provisions of this Agreement to the contrary, each party ("Indemnitor") agrees to indemnify, defend and hold the other party ("Indemnitee")

harmless from and against any action, claim, damage, lien, liability, cost and/or expense including, without limitation, any reasonable attorneys' fees (including attorneys' fees on appeal), asserted against or suffered by the Indemnitee resulting from:

(A)    Any default by the Indemnitor of this Agreement; or

(B)    The inaccuracy or breach of any of the representations, warranties or covenants made by the Indemnitor set forth in this Agreement.

10.2    Claims.  The Indemnitee shall submit any claim for indemnification under this Agreement to the Indemnitor in writing within thirty (30) days after Indemnitee determines that an event has occurred which has given rise to a right of indemnification under this Article 9 and shall give Indemnitor a period of not less than thirty (30) days to investigate and cure any default of Indemnitor under this Agreement and to eliminate or remove any claim by a third party. Notwithstanding the foregoing, if the nature of Indemnitor's default or the third party claim is such that it would be impractical or unreasonable to give Indemnitor an opportunity to investigate and cure such default and remove such claim, Indemnitee need not give Indemnitor such opportunity.

10.3    Defense of Claims.  If any such claim for indemnification relates to a claim or demand presented in writing by a third party against Indemnitee, Indemnitor shall have the right to employ counsel reasonably acceptable to Indemnitee to defend any such claim or demand, and Indemnitee shall make available to Indemnitor, or its representatives, all records and other materials in its possession or under its control reasonably required by Indemnitor for its use in contesting such liability.  If Indemnitor does not elect to defend any such claim or demand, Indemnitee may do so at its option, but shall not have any obligation to do so.

## 11.    DEVELOPMENT WORK AND CERTAIN OTHER MATTERS

11.1    Seller's Construction Obligations.

11.1.1 Seller hereby covenants and agrees to timely commence, diligently perform, and timely complete the following work (collectively "Development Work") and pay the governmentally required fees to complete the Development Work:

(A)    Mass grading of the Retail Site, bringing utilities to the Retail Site and vehicular access points (all pursuant to the information provided by Buyer's civil engineer and the approved bulk grading plan);

(B)    Demolition of all structures above and below ground within the Retail Site and removal and disposal pursuant to the recommendations of Seller's soils engineer;

(C)    Grubbing, removal and disposal of all trees and other organic materials within the Retail Site pursuant to the recommendations of Seller's soils engineer;

(D)    Filling and lawful abandonment of all wells, holes and depressions within the Retail Site pursuant to the recommendations of Seller's soils engineer;

(E)    Installation of all subsurface drains, vents and other equipment and facilities required by the grading plan for the bulk grading;

(F)    Installation of any perimeter retaining walls and other soils/slope engineering facilities for the Retail Site shown on the grading plan for bulk grading;

(G)    Cut and fill grading of the Retail Site to the rough grades established in the grading plan for bulk grading;

(H)    Over excavation and compaction of the subsurface soils within and adjacent to the Retail Site in accordance with the recommendations of the Seller's soils engineer;

(I)    Installation of all utility mains to the boundary of the Retail Site to the locations and having the capacities set forth in the utility plan;

(J)    Installation of the public streets, street lights, medians, sidewalks and curb cuts surrounding the Retail Site, and all other off-site work required by the City of San Clemente as a condition to the development of the Retail Site; and

(K)    Relocation of existing utility lines within the Retail Site, pursuant to information provided by Buyer's civil engineer.

11.1.2  If Seller does not act as general contractor for the Development Work, the Development Work shall be performed by a licensed and bondable general contractor mutually approved by Buyer and Seller; provided, however, that Buyer shall approve or disapprove of Seller's proposed general contractor within five (5) days after notice by Seller of Seller's proposed contractor, and provided further that Buyer's approval shall not be unreasonably withheld.  If Buyer fails to disapprove of Seller's proposed general contractor within said five (5) day period, Seller's proposed general contractor shall be deemed approved by Buyer.

11.1.3  Subject to the inability of Seller to do so by reason of any action by a Governing Agency or a court order, (i) Seller shall provide, with nine (9) months after the Closing, temporary water and electrical service sufficient to allow Buyer to commence Buyer's construction of improvements on Retail Site; (ii) Seller shall complete all bulk grading on the Retail Site within nine (9) months after the Closing; and (iii) Seller shall complete all other Development Work within twelve (12) months after the Closing.

11.1.4  Buyer shall be permitted to employ its own geotechnical engineer, at Buyer's sole cost and expense, to observe the grading, compaction and subsurface soils preparation of the Retail Site by the grading contractor.  Seller shall cause the grading, compaction and subsurface soils preparation of the Retail Site to be supervised by a licensed soils engineer to insure that such work is performed in accordance with the grading plan for bulk grading.

11.2  Prior to commencing the Development Work, Seller shall require each party providing services or performing work on the Retail Site to obtain and thereafter maintain so long as any construction activity is occurring in connection with the Development Work on the Retail Site, at least the minimum insurance coverage set forth below:

Exhibit "1"
Page 27

(a)    <u>Workers' Compensation And Employer's Liability Insurance</u>:

    1.    Worker's compensation insurance as required by any applicable law or regulation; and

    2.    Employer's liability insurance in the amount of One Million And 00/100 Dollars ($1,000,000.00) each accident for bodily injury, One Million And 00/100 Dollars ($1,000,000.00) policy limit for bodily injury by disease and One Million And 00/100 Dollars ($1,000,000.00) each employee for bodily injury by disease.

(b)    <u>General Liability Insurance</u>: Comprehensive General Liability or Commercial General Liability insurance covering all operations by or on behalf of Seller's general contractor, if any, which shall include the following minimum limits of liability and coverages:

    1.    <u>Required coverage</u>:

    (a)    Premises and Operations;

    (b)    Productions and Completed Operations;

    (c)    Contractual Liability, Insuring the indemnity obligations assumed by Seller's contractor under the Contract Documents;

    (d)    Broad Form Property Damage (including Completed Operations);

    (e)    Explosion, Collapse and Underground Hazards; and

    (f)    Personal Injury Liability.

    2.    <u>Minimum limits of liability</u>:

    (a)    If Seller's contractor carries Comprehensive General Liability, the limits of liability shall not be less than a Combined Single Limit for bodily injury, property damage and Personal Injury Liability of

    (i)    One Million Dollars ($1,000,000) each occurrence; and

    (ii)    Two Million Dollars ($2,000,000) aggregate for Products and Completed Operations (which shall be maintained for a three [3] year period following final completion of the Work).

    (b)    If Seller's contractor carries Commercial General Liability, the limits of liability shall not be less than:

161857.7

-17-

(i)    One Million Dollars ($1,000,000) each occurrence (for bodily injury and property damage);

(ii)    One Million Dollars ($1,000,000) for Personal Injury Liability;

(iii)    Two Million Dollars ($2,000,000) aggregate for Products and Completed Operations (which shall be maintained for a three (3) year period following final completion of the Work); and

(iv)    Two Million Dollars ($2,000,000) general aggregate applying separately to this Project.

(c)    Automobile Liability Insurance:  Automobile liability insurance (bodily injury and property damage liability) including coverage for owned, hired, and non-owned automobiles.  The limits of liability shall not be less than One Million And 00/100 Dollars ($1,000,000.00) combined single limit each accident for bodily injury and property damage combined.  If the contractor's general liability insurance is provided by the Commercial General Liability policy, then the contractor shall require each of its Subcontractors to include in its liability insurance policies coverage for Automobile Contractual Liability.

(d)    Umbrella/Excess Liability Insurance:  The contractor shall also carry umbrella/excess liability insurance in the amount of Four Million And 00/100 Dollars ($4,000,000.00).  If there is no per project aggregate under the Commercial General Liability policy, the limit shall be Ten Million And 00/100 Dollars ($10,000,000.00).

Seller shall name Buyer as additional insureds and such insurance shall provide that the same shall not be canceled, or reduced in amount or coverage below the requirements set forth herein, without at least thirty (30) days prior written notice to each additional insured.

11.3    Seller shall timely apply for and procure all necessary permits and other approvals sufficient to complete the Development Work.

11.4    Seller shall defend, indemnify and hold harmless Buyer and its members from any and all judgments, actions, liens, loss, damages, penalties, fines, liabilities, expenses (including reasonable attorneys' fees) and claims in connection with any construction activity performed under this Agreement by or at the direction of Seller which arises from the negligence or willful misconduct of Seller, its contractors, subcontractors, agents or employees.  Buyer shall defend, indemnify and hold harmless Seller from any and all judgments, actions, liens, loss, damages, penalties, fines, liabilities, expenses (including reasonable attorney's fees) and claims in connection with any construction activity performed under this Agreement by or at the direction of Buyer which arises from the negligence or willful misconduct of Buyer, its contractors, subcontractors, agents or employees.

11.5    Seller shall complete all Development Work lien-free (or, at Seller's election, provide a bond sufficient to pay the amount of any lien) and in compliance with all applicable law.

161857.7                    -18-

11.6    Buyer's Cooperation.  Buyer agrees to provide to Seller, at Buyer's expense, all items necessary to assist Seller in processing the approvals in connection with the Retail Site. Without limiting the foregoing, both before and after the Closing, in accordance with Buyer's approval rights as provided for herein, Buyer shall execute in a timely manner all documents requested by Seller, including easements, rights of way and other title instruments, which are necessary for Seller to complete its development obligations set forth above, and otherwise to develop the Marblehead Coastal Project on condition that no such documents will impair Buyer's ability to develop the Retail Site.

11.7    Avenida Vista Hermosa Interchange.  Except for the use of sales tax revenue, which may be generated from the Retail Site, all costs and expenses associated with the planning and construction of the Avenida Vista Hermosa Interchange shall not be charged, assessed or levied against the Retail Site.  Neither Buyer, nor tenants, users or subsequent purchasers of the Retail Site, shall be charged, assessed or levied with any special assessments, bond-type financing assessments, special sales taxes or any other tax or assessment, which will in any way increase the cost of ownership and operation of the Retail Site arising from the Avenida Vista Hermosa Interchange.  Notwithstanding the foregoing, Buyer shall be responsible for all real property taxes, including ad valorem real property taxes, any assessments not related to the Avenida Vista Hermosa Interchange, and any other Permitted Exceptions described in Section 4.2, above, and nothing contained herein shall affect Buyer's obligations under Section 11.6 above.  Further, if there are any fee credits in connection with the planning and construction of the Avenida Vista Hermosa Interchange, even if the same are attributable to the Retail Site (or the land located therein), such fee credits shall belong to Seller exclusively, and Buyer shall immediately assign the same to Seller.

11.8    Buyer's Obligation for Development of Retail Site.  Except as otherwise specifically provided for in this Agreement Buyer shall be responsible for all governmental costs and fees associated with Buyer's development of the Retail Site as a commercial retail project, including all fees and costs associated with the construction of the Retail Site.  Buyer further agrees to process the approvals in connection with the Retail Site (i) simultaneously with Seller's efforts to obtain permits and approvals for the Development Work; and (ii) in an expeditious manner so as not delay the processing by Seller of any applications or plans to any governmental entity.

11.9    Seller Not Bound to Any Agreements Between Buyer and Third Parties.  If Buyer enters into any agreements with third parties, whether such agreements constitute leases or other contracts or obligations, Seller shall not be bound to any such agreement, contract or obligation and, with respect to any leases executed by Buyer prior to the Closing, each such lease shall expressly state that Seller is not a party thereto and has no obligation thereunder.

11.10    Seller's Right to Enter.  Effective as of the Closing, Buyer hereby grants to Seller, its contractors, agents and employees, a temporary right to enter upon the Retail Site for the purpose of performing all or any part of such Development Work.  Seller shall have the same obligations and conditions with respect to the license granted herein as are imposed on Buyer in connection with the license provided for in Section 17.16.

Exhibit "1"
Page 30

11.11  <u>Additional Work to be Completed by Seller</u>.  Although not included within the definition of Development Work for purposes of this Agreement, Seller shall complete such work as may be necessary to satisfy those conditions for off-site improvements and bonding imposed by the City of San Clemente in accordance with the approval of Tentative Tract Map #8817 (as approved on August 5, 1998) for the Retail Site, to the extent necessary to allow Buyer to file Tentative Tract Map #8817 over the Retail Site concurrently with the Closing, and to timely procure certificates of occupancy for those improvements built by Buyer which comprise Phase I of Buyer's development of the Retail Site.

11.12  <u>Survival of Obligations</u>.  All obligations of the Parties in this Article 11 shall survive Closing and the recordation of the Grant Deed in favor of Buyer.

## 12.  ESCROW AND CLOSING

12.1  <u>Opening of Escrow</u>.  Buyer and Seller have opened the Escrow with Escrow Holder.  As soon as possible after full execution of this Agreement, Buyer and Seller shall deposit with Escrow Holder a copy of their respective signed copy of this Agreement.  Seller and Buyer shall, promptly upon request by Escrow Holder, execute such additional escrow instructions as may be reasonably required by Escrow Holder; provided, however, that if there is any conflict between the provisions of this Agreement and the provisions of any such additional instructions, the provisions of this Agreement shall prevail.

12.2  <u>Closing</u>.

12.2.1  The "Closing" of the Escrow shall be deemed to be the date the Grant Deed in favor of Buyer shall be recorded in the Office of the County Recorder of Orange County, California, and shall occur on or before thirty (30) days following satisfaction all of the Contingencies set forth in Sections 5.1, 5.2.2 and 5.4, above.  Notwithstanding the foregoing, but subject to Section 12.2.2, below, this Agreement shall automatically terminate if Closing has not occurred on or before December 31, 2000 ("Outside Closing Date").

12.2.2  If, and only if, (i) the Contingency in Section 5.1 has not been satisfied by November 30, 2000; and (ii) Buyer requires additional time to redesign its proposed development of the Retail Site in an effort to obtain approval from the Governing Agencies as contemplated in Section 5.1, Buyer may, by providing written notice to Seller on or before November 30, 2000, elect to extend the date for the Closing in accordance with this Section 12.2.2.  If Buyer elects to extend the date for the Closing as aforesaid, the Closing shall occur thirty (30) days following the satisfaction of all of the Contingencies set forth in Section 5.1 and 5.4, above (or, if Section 5.1.4 is then applicable, the Closing shall occur on December 31, 2001), but in no event shall the Closing occur later than December 31, 2001.  During the extension of the date for the Closing as provided in this Section 12.2.2, the Contingencies in Sections 5.1, 5.3.1 and 5.4 shall continue to exist, but no other Contingencies (including but not limited to the Contingencies provided in Sections 5.2.2) shall continue or be effective; provided, however, once the Contingency in Section 5.1 is satisfied (or waived), Buyer shall have only two (2) business days thereafter to determine whether all Contingencies in Section 5.3.1 are satisfied (or, if not satisfied, to elect to waive such Contingencies), and the Contingencies in Section 5.3.1 shall therefore expire at 5:00 p.m. pacific time on said second (2nd) business day.  However,

under no circumstance shall the Closing occur later than December 31, 2001. If the date for the Closing is extended by Buyer pursuant to this Section 12.2.2, the Purchase Price shall be increased to an amount equal to (a) the Purchase Price to paid pursuant to Section 3.1 plus (ii) an amount equal to One And 00/100 Dollar ($1.00) for each square foot of Net Usable Area of the Retail Site. During any extension of the date for the Closing pursuant to this Section 12.2.2, Buyer covenants and agrees to promptly and diligently prepare and submit to the applicable Governing Agencies a redesign of its proposed development for the Retail Site and promptly and diligently pursue final approval by all Governing Agencies of its intended development of the Retail Site.

12.3    Seller's Deposits Into Escrow.  Within the time set forth below, or if none is specified, at least one (1) business day prior to the Closing, Seller shall deposit into Escrow Holder the following:

12.3.1 Grant Deed. The duly executed and acknowledged Grant Deed in favor of Buyer as provided herein.

12.3.2 Assignment of Entitlements. An executed and notarially acknowledged Assignment in the form attached hereto as **Exhibit "F"**, assigning to Buyer any intangible development rights and entitlements obtained by Seller, along with originals of all permits, licenses, and other governmental approvals obtained by Seller in connection with the Retail Site, and executed originals of any documents that may reasonably be required by governmental authorities to so transfer such permits, licenses and other governmental approvals. Escrow Holder is instructed to deliver to Buyer at Closing all such originals received from Seller pursuant to this Subsection 12.3.2.  The execution and delivery of the Assignment as contemplated aforesaid in this Subsection 12.3.2 shall not be deemed to alter or diminish Seller's obligations under this Agreement to complete the Development Work.

12.3.3 Non-Foreign Person Certification.  At Closing, Seller shall have completed, executed and delivered to Escrow Holder for transmission to Buyer at Closing, the Non-Foreign Person Certification substantially in the form attached hereto as **Exhibit "G"**, together with any such certifications, declarations or other documents required by law pertaining to foreign or out-of-state sellers and/or as may be required under California Revenue and Tax Code § 18662.

12.4    Buyer's Deposits Into Escrow.  Buyer shall deposit with Escrow Holder prior to the Closing the Purchase Price set forth in Section 3 above, as adjusted pursuant to this Agreement, less the Deposit, plus an additional sum sufficient to cover Buyer's closing costs as set forth in Section 12.7 below.

12.5    Escrow Holder's Closing Responsibilities.  At Closing, Escrow Holder shall (A) record the Grant Deed in favor of Buyer; and (B) deliver the Purchase Price less the Cash Withhold to Seller and deliver the other monies and instruments to which each party is entitled pursuant to this Agreement, only when the Title Company is in a position to issue the Title Policy described in Section 4.3 above). The Cash Withheld shall be delivered by Escrow Holder to the Disbursing Agent.