1  PAUL J. COUCHOT - State Bar No. 131934
   SEAN A. O'KEEFE -- State Bar No. 122417
2  PETER W. LIANIDES - State Bar No. 160517
   PAYAM KHODADADI - State Bar No. 239906
3  **WINTHROP COUCHOT**
   **PROFESSIONAL CORPORATION**
4  660 Newport Center Drive, Fourth Floor
   Newport Beach, CA 92660
5  pcouchot@winthropcouchot.com
   sokeefe@winthropcouchot.com
6  plianides@winthropcouchot.com
   pkhodadadi@winthropcouchot.com
7  Telephone: (949) 720-4165
   Facsimile: (949) 720-4111
8  General Insolvency Counsel for Administratively
   Consolidated Debtors-in-Possession and
9  Counsel for SCC Acquisitions, Inc.

10              **UNITED STATES BANKRUPTCY COURT**
                **CENTRAL DISTRICT OF CALIFORNIA**
11                     **SANTA ANA DIVISION**

12  In re                                    Case No. 8:08-bk-17206-ES

    PALMDALE HILLS PROPERTY, AND ITS         Jointly Administered With Case Nos.
13  RELATED DEBTORS,                         8:08-bk-17209-ES; 8:08-bk-17240-ES;
                                             8:08-bk-17224-ES; 8:08-bk-17242-ES;
14        Joint Administered Debtors and     8:08-bk-17225-ES; 8:08-bk-17245-ES;
          Debtors-in-Possession             8:08-bk-17227-ES; 8:08-bk-17246-ES;
15                                           8:08-bk-17230-ES; 8:08-bk-17231-ES;
    ─────────────────────────────────       8:08-bk-17236-ES; 8:08-bk-17248-ES;
16  Affects:                                 8:08-bk-17249-ES; 8:08-bk-17573-ES;
    ☒ All Debtors                            8:08-bk-17574 ES; 8:08-bk-17575-ES;
17  ☐ Palmdale Hills Property, LLC           8:08-bk-17404-ES; 8:08-bk-17407-ES;
                                             8:08-bk-17408-ES; 8:08-bk-17409-ES;
18  ☐ SunCal Beaumont Heights, LLC           8:08-bk-17458-ES; 8:08-bk-17465-ES;
    ☐ SCC/Palmdale, LLC                      8:08-bk-17470-ES; 8:08-bk-17472-ES;
19  ☐ SunCal Johannson Ranch, LLC            and 8:08-bk-17588-ES
    ☐ SunCal Summit Valley, LLC
20  ☐ SunCal Emerald Meadows LLC             Chapter 11 Proceedings
21  ☐ SunCal Bickford Ranch, LLC             **DEBTORS' FOURTH AMENDED JOINT**
    ☐ Acton Estates, LLC                     **DISCLOSURE STATEMENT**
22  ☐ Seven Brothers LLC                     **DESCRIBING DEBTORS' FOURTH**
                                             **AMENDED JOINT CHAPTER 11 PLAN**
23  ☐ SJD Partners, Ltd.
    ☐ SJD Development Corp.                  Date:      November 5, 2010
24  ☐ Kirby Estates, LLC                     Time:      10:00 a.m.
                                             Place:     Courtroom 5A
25  ☐ SunCal Communities I, LLC
    ☐ SunCal Communities III, LLC
26  ☐ SCC Communities LLC
27  ☐ North Orange Del Rio Land, LLC
    ☐ Tesoro SF LLC
28       *Caption Continued on Next Page*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Continued from Previous Page*

☐ LBL-SunCal Oak Valley, LLC
☐ SunCal Heartland, LLC
☐ LBL-SunCal Northlake, LLC
☐ SunCal Marblehead, LLC
☐ SunCal Century City, LLC
☐ SunCal PSV, LLC
☐ Delta Coves Venture, LLC
☐ SunCal Torrance, LLC
☐ SunCal Oak Knoll, LLC

# TABLE OF CONTENTS

**PAGE**

I.      INTRODUCTION ........................................................................................    2

II.     DEFINITIONS AND RULES OF INTERPRETATION ..........................    3
        2.1    Definitions ..................................................................................    3
        2.2    Rules of Construction .................................................................   28
        2.3    Exhibits .....................................................................................   29

III.    PLAN CONFIRMATION DEADLINES .................................................   29
        3.1    Time and Place of the Confirmation Hearing .............................   29
        3.2    Deadline for Voting for or Against the Plan...............................   29
        3.3    Deadline for Objecting to the Confirmation of the Plan..............   29
        3.4    Identity of Person to Contact for More Information
               Regarding the Plan.....................................................................   30
        3.5    Disclaimer ..................................................................................   30

IV.     FACTUAL BACKGROUND OF THE DEBTORS ..................................   31
        4.1    The Formation of the Debtors and the Projects ..........................   31
               (a)    Overview of the Debtors and Their Projects ....................   31
               (b)    The Debtors' Primary Secured Creditors and
                      Their Disputed Claims ....................................................   32
               (c)    The Lehman Disputed Claims and Liens...........................   33
               (d)    A Summary of All of the Alleged Claims
                      Against the Debtors .........................................................   34
               (e)    Summary of the Debtors Cash .........................................   34
        4.2    Factual Circumstances Leading to the Filing of the
               Debtors' Chapter 11 Cases .........................................................   35
               (a)    Background on the SunCal Companies .............................   35
               (b)    The Origins of the SunCal/Lehman Joint Venture ...........   36
               (c)    Lehman's Effective Control over the Management
                      of the Debtors and Promises of Ongoing Funding............   37
               (d)    The 2008 Restructuring Agreement..................................   38
               (e)    The Lehman Lenders Hire Radco......................................   39
               (f)    The Lehman Lenders' Failure to Close on the
                      Settlement Agreement......................................................   40
               (g)    The Lehman Lenders' Undisclosed Sale of Most
                      of the Debtors' Loans ......................................................   41
               (h)    Lehman's Foreclosure Sale and Purchase of the
                      Pacific Point Project........................................................   41
               (i)    Alvarez and Marsal Take Over Control of the
                      Lehman Entities After the Chapter 11 Filing of
                      LBHI and LCPI................................................................   43
        4.3    The Debtors' Potential Preferential Transfers ..............................   44

MAINDOCS-#149764-v6-SunCal_Fourth_Amended_Disclosure_Statement.DOC

# TABLE OF CONTENTS

## (Continued)

|  |  | PAGE |
|---|---|---|
| V. | SIGNIFICANT EVENTS IN THE DEBTORS' CHAPTER 11 CASES | 44 |
| 5.1 | Voluntary Debtors | 44 |
| (a) | Joint Administration of the Voluntary Debtors and the Trustee Debtors | 44 |
| (b) | The Voluntary Debtors Court Employed Professionals | 45 |
| (c) | LCPI's Motions for Relief from the Automatic Stay Against Certain of the Voluntary Debtors' Projects and Related Appeals | 46 |
| 5.2 | The Trustee Debtors and Their Professionals | 47 |
| 5.3 | The Trustee Debtors' Sales Procedures Motion | 47 |
| 5.4 | The Debtors' Various Motions Relating to Financing for the Projects and to Pay Professional Fees | 48 |
| (a) | The Debtors' Motion for Relief from Stay in the LCPI Chapter 11 Proceedings | 48 |
| (b) | The Voluntary Debtors' Initial Motion for Surcharge and Use of Cash Collateral | 48 |
| (c) | The Lehman Administrative Loans | 49 |
| (d) | The Voluntary Debtors' Agreements with the Lehman Entities for Use of Alleged Cash Collateral to Maintain the Properties and to Pay Professional Fees | 49 |
| 5.5 | The Debtors' Disputes and Claims Against the Lehman Entities | 50 |
| (a) | The Lehman Adversary Proceeding | 50 |
| (i) | Equitable Subordination | 51 |
| (ii) | The Fraudulent Transfer Claims | 51 |
| (iii) | The Preference Claims | 52 |
| (b) | The Debtors' Motions to Strike the Claims and Pleadings Arising from the Sold Loans to Fenway Capital and Related Appeals | 53 |
| (c) | The Debtors' Motion Pursuant to Section 506(d) and the 506(d) Valuation Stipulation | 54 |
| (d) | The Debtors' 502(d) Objections | 54 |
| (e) | The Debtors' Recoupment/Set-Off Claims | 55 |
| (f) | The Debtors' Potential Post-Petition Claims Against Lehman and Their Agents | 57 |
| 5.6 | The Lehman Fenway Claims Transaction, Compromise Motion Filed By the Lehman Entities, and the Debtor's Motion for Relief from Stay | 58 |
| (a) | Lehman Entities' and Fenway's Proposed Claims Transaction | 58 |
| (b) | The Debtors' Opposition and the Debtors' Second Relief from Stay Motion Filed in Response to Lehman's Compromise Motion | 59 |

# TABLE OF CONTENTS

## (Continued)

**PAGE**

| | | | |
|---|---|---|---|
| | | (c) | The Voluntary Debtors' Appeals of the Compromise Order and RFS Order to the Second Circuit ..................................... 59 |
| | 5.7 | | The Debtors' Motion for a Stay to Suspend Certain Lehman Actions.................................................................................. 59 |
| | 5.8 | | The Debtors' Other Litigation with Non-Lehman Related Parties............... 60 |
| | | (a) | The Debtors' Failed Preliminary Injunction Motion Against the Holders of Bond Claims ................................. 60 |
| | | (b) | The Contractors' Successful Motions for Relief from Stay to Pursue the Bond Claims ............................... 60 |
| | | (c) | The Non-Lehman Related Primary Secured Lenders' Successful Motions for Relief from Stay........................... 60 |
| | | (d) | The Rubidoux 60 Litigation................................................. 61 |
| | | (e) | Church Litigation ............................................................... 62 |
| | | (f) | Hillcrest's Successful Motion for Relief from Stay........................... 63 |
| | | (g) | Arch's Motion for Relief from Stay..................................... 63 |
| | | (h) | Shea's Successful Motion for Relief from Stay............................... 64 |
| | | (i) | Bond Safeguard Motion ...................................................... 64 |
| VI. | | | TREATMENT OF UNCLASSIFIED CLAIMS............................................. 64 |
| | 6.1 | | Treatment of Allowed Administrative Claims............................................. 64 |
| | | (a) | Treatment and Repayment of the Lehman Administrative Loan(s) ................................................................ 64 |
| | | (b) | Repayment of Alleged Administrative Claims Other than the Lehman Administrative Loans.................................. 65 |
| | | (c) | Administrative Claims Bar Date............................................ 65 |
| | | | (i)    Administrative Claims Bar Date .......................... 65 |
| | | | (ii)   Administrative Tax Claims Bar Date.................... 66 |
| | 6.2 | | Treatment of Priority Unsecured Tax Claims............................................. 66 |
| VII. | | | CLASSIFICATION OF CLAIMS AND INTERESTS ........................................... 67 |
| VIII. | | | THE PLAN'S TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS........................................................................ 87 |
| | 8.1 | | The Plan's Treatment of Holders of Allowed Unpaid Secured Real Property Tax Claims on Real Properties Subject to Deeds of Trust Arising from Lehman Disputed Secured Claims and Disputed Liens (Classes 1.1 Through 1.14)................................ 87 |
| | 8.2 | | The Plan's Treatment of Holders of Allowed Unpaid Secured Real Property Tax Claims Against Real Properties Not Subject to Deeds of Trust Arising from Lehman's Disputed Claims) (Classes 2.1 Through 2.3) ................................. 87 |

# TABLE OF CONTENTS

### (Continued)

|  |  | PAGE |
|---|---|---:|
| 8.3 | The Plan's Treatment of Lehman's Disputed Claim(s) and Disputed Lien(s) (Classes 3.1 Through 3.13) | 88 |
| 8.4 | The Plan's Treatment of Holders of Secured Claims of Primary Secured Creditors Other than the Holders of Lehman's Disputed Claims (Classes 4.1 Through 4.11) | 91 |
| 8.5 | The Plan's Treatment of Holders of Asserted Mechanic Lien Claims Against the Debtors' Projects Subject to Lehman's Disputed Claims (Classes 5.1 Through 5.55) | 91 |
| 8.6 | The Plan's Treatment of Asserted Mechanic Lien Claims Against Projects Not Subject to Lehman Disputed Claims (Classes 6.1 and 6.2) | 92 |
| 8.7 | The Plan's Treatment of Holders of Priority Claims (Classes 7.1 Through 7.4) | 92 |
| 8.8 | The Plan's Treatment of Holders of Allowed General Unsecured Claims Against Debtors with Assets that Are Not Subject to the Lehman's Disputed Claims and Disputed Liens (Classes 8.1 Through 8.6) (SunCal Beaumont, SunCal Johannson, Seven Brothers and Kirby Estates) | 93 |
| 8.9 | The Plan's Treatment of Holders of General Unsecured Claims that Are the Intended Beneficiaries of any Equitable Subordination Judgment Against Lehman's Disputed Claims and Disputed Liens (Classes 9.1 Through 9.18) | 93 |
| 8.10 | The Plan's Treatment of Holders of Allowed General Unsecured Claims that Are Not Intended to Be the Beneficiaries of an Equitable Subordination Judgment Against Lehman's Disputed Claims (Classes 10.1 Through 10.19) | 94 |
| 8.11 | The Plan's Treatment of Holders of Allowed Interests | 94 |
| **IX.** | **ACCEPTANCE OR REJECTION OF THE PLAN** | 95 |
| 9.1 | Introduction | 95 |
| 9.2 | Who May Object to Confirmation of the Plan | 95 |
| 9.3 | Who May Vote to Accept/Reject the Plan | 95 |
| 9.4 | What Is an Allowed Claim/Interest | 95 |
| 9.5 | What Is an Impaired Class | 95 |
| 9.6 | Who Is Not Entitled to Vote | 96 |
| 9.7 | Who Can Vote in More than One Class | 96 |
| 9.8 | Votes Necessary for a Class to Accept the Plan | 96 |
| 9.9 | Treatment of Nonaccepting Classes | 97 |
| 9.10 | Request for Confirmation Despite Nonacceptance by Impaired Class(as) | 97 |

MAINDOCS-#149764-v6-SunCal_Fourth_Amended_Disclosure_Statement.DOC

1

## TABLE OF CONTENTS

2

### (Continued)

3
                                                                                      **PAGE**

4    X.     MEANS OF EXECUTION AND IMPLEMENTATION OF THE PLAN ............... 97
            10.1    Introduction.................................................................. 97
5           10.2    The Plan Sponsor ......................................................... 98
            10.3    Acquisitions' Funding Obligations Pursuant to the Acquisitions
6                   Administrative Loan ...................................................... 98
7           10.4    Transfer of the Debtors' Assets to the Plan Trust and Removal
                    of the Chapter 11 Trustee............................................. 99
8           10.5    Management of the Plan Trust Assets After Effective Date..... 99
            10.6    The Committee(s) .......................................................... 99
9                   (a)    Duties and Powers ............................................ 99
                    (b)    Dissolution of Committees ................................ 100
10          10.7    Litigation Claims ........................................................ 100
            10.8    Collection of Litigation Recoveries................................ 100
11          10.9    Payment of Post-Confirmation Expenses ..................... 100

12
     XI.    DISTRIBUTIONS ....................................................................... 101
13          11.1    Distribution Agent ...................................................... 101
            11.2    Distributions............................................................... 101
14                  (a)    Dates of Distributions .................................... 101
15                  (b)    Limitation on Liability..................................... 101
            11.3    Old Instruments and Securities .................................... 101
16                  (a)    Surrender and Cancellation of Instruments and
                           Securities...................................................... 101
17                  (b)    Cancellation of Liens ..................................... 102
18          11.4    De Minimis Distributions and Fractional Shares............... 102
            11.5    Delivery of Distributions ............................................. 102
19          11.6    Undeliverable Distributions.......................................... 103
            11.7    Disposition of Unclaimed Property .............................. 103
20
21   XII.   OBJECTION TO CLAIMS AND DISPUTE CLAIMS ......................... 103
            12.1    Standing for Objections to Claims................................ 103
22          12.2    Treatment of Disputed Claims and Disputed Liens........... 104
                    (a)    No Distribution Pending Allowance.................... 104
23                  (b)    Distribution After Allowance .......................... 104

24   XIII.  EXECUTORY CONTRACTS AND UNEXPIRED LEASES.................... 104
25          13.1    Executory Contracts Being Assumed ............................ 104
            13.2    Executory Contracts Being Rejected ............................ 104
26          13.3    Bar Date for Rejection Damages .................................. 105
            13.4    Changes in Rates Subject to Regulatory Commission Approval ... 105
27

28

1

## **TABLE OF CONTENTS**

2

### **(Continued)**

3

**PAGE**

4

XIV.    BEST INTEREST OF CREDITORS TEST AND PLAN FEASIBILITY ............... 105
        (a)    Holders of Allowed Classes 8.1 Through 8.6 Claims.................................... 106

5

        (b)    Holders of Allowed Classes 9.1 Through 9.18 Claims.................................. 106

6

XV.    LIMITATION OF LIABILITY ........................................................................ 107

7

        15.1    No Liability for Solicitation or Participation .................................................. 107

8

XVI.    CONDITIONS TO CONFIRMATION AND EFFECTIVENESS
        OF THE PLAN ................................................................................................. 107

9

        16.1    Conditions Precedent to Plan Confirmation .................................................. 107
        16.2    Conditions Precedent to Plan Effectiveness .................................................. 107

10

11

XVII.    RETENTION OF JURISDICTION ................................................................ 108

12

XVIII. MODIFICATION OR WITHDRAWAL OF THE PLAN........................................ 108
        18.1    Modification of Plan ................................................................................... 108

13

        18.2    Nonconsensual Confirmation........................................................................ 108

14

XIX.    MISCELLANEOUS ......................................................................................... 108

15

        19.1    Payment of Statutory Fees ........................................................................... 108
        19.2    Payment Dates ............................................................................................. 109

16

        19.3    Headings ...................................................................................................... 109
        19.4    Other Documents and Actions ..................................................................... 109

17

        19.5    Notices ......................................................................................................... 109

18

        19.6    Governing Law ............................................................................................. 110
        19.7    Binding Effect .............................................................................................. 110

19

        19.8    Successors and Assigns ................................................................................ 110
        19.9    Severability of Plan Provisions..................................................................... 110

20

        19.10   No Waiver.................................................................................................... 111

21

        19.11   Inconsistencies ............................................................................................. 111
        19.12   Exemption from Certain Transfer Taxes and Recording Fees....................... 111

22

        19.13   Post-Confirmation Status Report ................................................................. 111
        19.14   Post-Confirmation Conversion/Dismissal .................................................... 111

23

        19.15   Final Decree ................................................................................................ 112

24

25

26

27

28

# I.

## __INTRODUCTION__

This DISCLOSURE STATEMENT[1] is filed by the Voluntary Debtors and Acquisitions as the SunCal Plan Proponents. Acquisitions is also the Plan Sponsor, and will serve as the Plan Trustee and the Distribution Agent for all of the Debtors if the Plan is confirmed.

Chapter 11 allows debtors-in-possession, Chapter 11 trustees, and under some circumstances, creditors, interest holders and others parties in interest, to propose a Chapter 11 plan.  As stated, the SunCal Plan Proponents are the proponents of the Plan sent to you in the same envelope as this Disclosure Statement.  This document summarizes the contents of the Plan, certain information relating to the Plan and the process the Bankruptcy Court follows in determining whether or not to confirm the Plan.

The SunCal Proponents' Plan provides for (i) the sale of the Projects owned by all of the Debtors' free and clear of the disputed credit bid rights of the Holders of Lehman Disputed Secured Claims and Disputed Liens, on commercially reasonable terms; (ii)  the replacement or assumption of  the Bond Claims relating to the Debtors' Projects; (ii) the prosecution and liquidation of the Debtors' Litigation Claims[2]; and (iii) the distribution of the Net Sale Proceeds, Net Litigation Recoveries and Available Cash to the Holders of Allowed Claims against the Debtors in accordance with the priorities and other rights set forth in the Bankruptcy Code.

READ THIS DISCLOSURE STATEMENT CAREFULLY IF YOU WANT TO KNOW ABOUT:

> **WHO CAN VOTE OR OBJECT TO THE PLAN;**

> **HOW YOUR CLAIM IS TREATED;**

---

[1] All defined terms used herein have the same meanings as set forth in Article II herein.

[2] As more fully explained herein and as provided in the Plan, to the extent that any of the provisions of the Plan would violate any automatic stay applicable in the concurrently pending bankruptcy proceedings of the Lehman Entities, although the SunCal Proponents do not believe any of the Plan provisions will have this legal effect, then either the Effective Date, the Plan, or the implementation of the applicable provision impacted by any such stay, shall be delayed until the stay is lifted or otherwise deemed inapplicable. During this time frame, the automatic stay in the instant case will bar the Lehman Entities from foreclosing upon the properties and other assets that they claim as collateral.

1    ➢    **HOW THIS TREATMENT COMPARES TO WHAT YOUR CLAIM WOULD**

2    **RECEIVE IN LIQUIDATION;**

3    ➢    **A BRIEF HISTORY OF THE DEBTORS AND SIGNIFICANT EVENTS**

4    **DURING THEIR CHAPTER 11 BANKRUPTCY PROCEEDING;**

5    ➢    **WHAT FACTORS THE BANKRUPTCY COURT WILL CONSIDER TO**

6    **DECIDE WHETHER OR NOT TO CONFIRM THE PLAN;**

7    ➢    **WHAT IS THE EFFECT OF CONFIRMATION; AND**

8    ➢    **WHETHER THE PLAN IS FEASIBLE.**

9    This Disclosure Statement cannot tell you everything about your rights.  You should

10    consider consulting your own attorney to obtain more specific advice on how the Plan will affect

11    you and your best course of action.

12    Be sure to read the Plan as well as this Disclosure Statement.  If there are any

13    inconsistencies between the Plan and this Disclosure Statement, the Plan provisions will govern.

14    The Bankruptcy Code requires a Disclosure Statement to contain "adequate information"

15    concerning the Plan.  On _____, 2010, the Bankruptcy Court entered an order approving this

16    Disclosure Statement, based upon a finding that this document contained "adequate information"

17    to enable parties affected by the Plan to make an informed judgment regarding the Plan.  Any

18    party can now solicit votes for or against the Plan.

19    **II.**

20    **DEFINITIONS AND RULES OF INTERPRETATION**

21    **2.1**    **Definitions.**

22    The following defined terms are used in this Disclosure Statement.  Any capitalized term

23    that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall

24    have the meaning ascribed to that term in the Bankruptcy Code or Bankruptcy Rules.

25    2.1.1    10,000 Santa Monica Project.  The Project formerly owned by SunCal

26    Century City, located in Century City, California, as more particularly described herein.

27

28

2.1.2    Acquisitions.  SCC Acquisitions, Inc., a California corporation, an indirect parent company of all of the Debtors, a purported obligor on the Bond Claims, a Creditor of all of the Debtors, a SunCal Plan Proponent, the Plan Sponsor, and the proposed Plan Trustee.

2.1.3    Acquisitions Administrative Loan.  The Allowed Administrative Claim of Acquisitions, or of such Affiliate that provides such funding, equal to all amounts caused to be funded by Acquisitions or such Affiliate in connection with the Debtors' Cases and the consummation of the Plan, including, but not limited to, the reimbursement of all payments made to Professionals that provided services to the Debtors in connection with the Cases.

2.1.4    Acton Estates.  Acton Estates, LLC, a Delaware limited liability, a Voluntary Debtor herein, and the owner of the Acton Project.

2.1.5    Acton Project. The Project owned by Acton Estates, located in Los Angeles County, California, as more particularly described herein.

2.1.6    Administrative Claim(s).  Any Claim incurred after the Petition Date but before the Confirmation Dates for any cost or expense of administration of the Cases allowable under Section 330, 331, 503(b), or 507(a)(1) of the Bankruptcy Code, including, without limitation, any actual and necessary post-petition expenses of preserving the Estates of the Debtors, any actual and necessary post-petition expenses of operating the business of the Debtors in Possession, all compensation or reimbursement of expenses to the extent allowed by the Bankruptcy Court under Section 330, 331, or 503 of the Bankruptcy Code and any fees or charges assessed against the Estates of the Debtors under Section 1930 of title 28 of the United States Code.

2.1.7    Administrative Claims Bar Date.  The last date fixed by the Plan for the filing of Proof of Claims or requests for payment of Administrative Claims.  Under the Plan, the Administrative Claims Bar Date shall be the first business day after the sixtieth (60th) day after the Confirmation Date.

2.1.8    Affiliate.  The term shall have the meaning set forth under Section 101(2), including, but not limited to, as to any Person, any other Person that directly or indirectly owns or controls, is owned or controlled by, or is under common ownership or control

1    with, such Person.  The term "control" (including, with correlative meanings, the terms "controlled

2    by" and "under common control with"), as applied to any Person, means the possession, direct or

3    indirect, of the power to direct or cause the direction of the management and policies of such

4    Person, whether through the ownership of voting securities or other equity ownership interest, by

5    contract or otherwise.

6           2.1.9    Allowed.  When used to describe Claim(s) or Interest(s), such Claim(s)

7    or Interest(s), to the extent that it or they are "Allowed Claim(s)" or "Allowed Interest(s)."

8           2.1.10    Allowed Amount shall mean:

9                 A.    With respect to any Administrative Claim (i) if the Claim is based

10   upon a Fee Application, the amount of such Fee Application that has been approved by a Final

11   Order of the Bankruptcy Court; (ii) if the Claim is based upon any indebtedness or obligation

12   incurred in the ordinary course of business of the Debtors and is not otherwise subject to an

13   Administrative Claim Bar Date, the amount of such Claim that has been agreed to by the Debtors

14   and such creditor, failing which, the amount thereof as fixed by a Final Order of the Bankruptcy

15   Court; or (iii) if the Holder of such Claim was required to file and has filed proof thereof with the

16   Bankruptcy Court prior to an Administrative Claim Bar Date, (1) the amount stated in such proof

17   if no objection to such Proof of Claim is interposed within the applicable period of time fixed by

18   the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court, or (2) the amount thereof as

19   fixed by Final Order of the Bankruptcy Court if an objection to such proof was interposed within

20   the applicable period of time fixed by the Bankruptcy Code, the Bankruptcy Rules or the

21   Bankruptcy Court.  The Allowed Amount of any Administrative Claim which is subject to an

22   Administrative Claims Bar Date and not filed by the applicable Administrative Claims Bar Date

23   shall be zero, and no distribution shall be made on account of any such Administrative Claim;

24                 B.    with respect to any Claim which is not an Administrative Claim

25   (the "Other Claim"):  (i) if the Holder of such Other Claim did not file proof thereof with the

26   Bankruptcy Court on or before the Claims Bar Date, the amount of such Claim as listed in the

27   Debtors'' Schedules as neither disputed, contingent nor unliquidated; or (ii) if the Holder of such

28   Claim has filed proof thereof with the Bankruptcy Court on or before the Claims Bar Date, (a) the

amount stated in such proof if no objection to such Proof of Claim was interposed within the applicable period of time fixed by the Bankruptcy Code, the Bankruptcy Rules, the Plan or the Bankruptcy Court, or (b) the amount thereof as fixed by Final Order of the Bankruptcy Court if an objection to such proof was interposed within the applicable period of time fixed by the Bankruptcy Code, the Bankruptcy Rules, the Plan or the Bankruptcy Court.  The Allowed Amount of any Other Claim which is not Filed by the applicable Claims Bar Date, is not listed on the Debtors' Schedules or is listed as disputed, unliquidated, contingent or unknown, and is not allowed under the terms of this Plan shall be zero, and no distribution shall be made on account of any such Claim; and

C.    with respect to any Interest, (i) the amount provided by or established in the records of the Debtors at the Confirmation Date, provided, however, that a timely filed proof of Interest shall supersede any listing of such Interest on the records of the Debtors; or (ii) the amount stated in a proof of Interest Filed prior to the Confirmation Date if no objection to such Interest was filed prior to the Confirmation Date or such later date as the Bankruptcy Court allows; or (iii) the amount of such Interest as fixed by a Final Order of the Bankruptcy Court.

2.1.11    Allowed Claim.  Except as otherwise provided in the Plan (including with respect to those Classes for which the amount of the Allowed Claims is specified by the Plan), a Claim to the extent (and only to the extent) of the Allowed Amount of such Claim.

2.1.12    Allowed Interest.  Any Interest to the extent, and only to the extent, of the Allowed Amount of such Interest.

2.1.13    Allowed Secured Claims.  An asserted Secured Claim that is not either a Disputed Claim or a Disputed Lien.

2.1.14    Assets.  All assets that are property of the Debtor(s) pursuant to Bankruptcy Code Section 541.

2.1.15    Arch.  Arch Insurance Company, a Bond Issuer.

2.1.16    Available Cash.  Each Debtors' Cash deposited into the applicable Distribution Account(s) on or after the Effective Date that is available for making Distributions

1    under the Plan to Holders of Allowed Administrative, Priority, and General Unsecured Claims.

2    The Available Cash shall consist of the respective Debtors' cash on hand as of the Effective Date

3    that is not subject to a Disputed Lien, proceeds of Net Litigation Recoveries that are not subject to

4    a Disputed Lien, Net Sales Proceeds that become Available Cash upon the disallowance of a

5    Disputed Claim or avoidance of a Disputed Lien purportedly encumbering such Cash, or proceeds

6    from the Acquisitions Administrative Loan.  All Available Cash shall be deposited into the

7    applicable Distribution Account(s).  Available Cash shall not include Net Sale Proceeds in the Net

8    Sales Proceeds Account where the Disputed Secured Claims are Allowed but subject to an

9    equitable subordination judgment.

10    2.1.17    Avoidance Actions.  All Claims and defenses to Claims accruing to the

11    Debtors and their Estates under Bankruptcy Code Sections 506(d), 510(c), 541, 544, 545, 547,

12    548, 549, 550, or 551.

13    2.1.18    Bankruptcy Code.  The Bankruptcy Reform Act of 1978, as amended, as

14    set forth in Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq., as applicable to the Cases.

15    2.1.19    Bankruptcy Court.  The United States Bankruptcy Court for the Central

16    District of California, having jurisdiction over the Cases and, to the extent of any withdrawal of

17    the reference made pursuant to Section 157 of title 28 of the United States Code, the United States

18    District Court for the Central District of California; or, in the event such courts cease to exercise

19    jurisdiction over the Cases, such court or unit thereof that exercises jurisdiction over the Cases in

20    lieu thereof.

21    2.1.20    Bankruptcy Rules.  Collectively, as now in effect or hereafter amended

22    and as applicable to the Cases, (i) the Federal Rules of Bankruptcy Procedure, and (ii) the Local

23    Bankruptcy Rules and General Orders applicable to cases pending before the Bankruptcy Court.

24    2.1.21    Beaumont Heights Project.  The Project owned by SunCal Beaumont,

25    located in the City of Beaumont, California, as more particularly described herein.

26    2.1.22    Bickford Ranch Project.  The Project owned by SunCal Bickford, located

27    in the City of Penryn, California, as more particularly described herein.

28

MAINDOCS-#149764-v6-SunCal_Fourth_Amended_Disclosure_Statement.DOC

1          2.1.23     Bickford Second Loan Agreement.  That certain promissory note secured

2 by a deed of trust, dated as of May 25, 2005, in the maximum aggregate principal amount of

3 approximately $30,000,000 executed by SunCal Bickford, as borrower, and payable to the order of

4 Lehman ALI.  The Bickford Second Lien Loan Agreement is allegedly secured by a second

5 priority deed of trust on the Bickford Ranch Project.  The Bickford Second Loan Agreement has

6 an asserted balance due of $56,494,059.38 as of March 30, 2009.

7          2.1.24     Bond Claim(s).  Any Claim against the Debtor(s) and a Bond Issuer

8 under various payment or performance bonds, and/or any claims of Bond Issuer(s) against the

9 Debtor(s) under various payment or performance bonds.

10         2.1.25     Bond Claimant.  Holder(s) of a Bond Claim.

11         2.1.26     Bond Indemnification Claim.  All Claims by Bond Safeguard, Lexon, and

12 Arch for indemnification for payment by Bond Safeguard, Lexon and Arch of Bond Claims with

13 respect to the Debtors' Projects.

14         2.1.27     Bond Indemnitors.  The individuals and entities that are allegedly liable

15 on the Bond Indemnification Claims, including, allegedly, all of the Debtors, Acquisitions, all

16 Affiliates of Acquisitions, and Elieff.

17         2.1.28     Bond Issuer(s).  Bond Safeguard, Lexon and Arch in their capacities as

18 issuers and sureties for payment and performance bonds for the benefit of certain of the Debtors.

19         2.1.29     Bond Safeguard.  Bond Safeguard Insurance Company, a Bond Issuer.

20         2.1.30     Break-Up Fee.  Break-Up Fee means a fee granted to a Stalking Horse

21 Bidder of up to three percent (3%) of the Opening Bid for a Project and of up to five percent (5%)

22 of the Opening Bid for other Plan Trust Assets.

23         2.1.31     Business Day.  Any day, other than a Saturday, a Sunday or a "legal

24 holiday," as defined in Bankruptcy Rule 9006(a).

25         2.1.32     Cases.  The Chapter 11 cases of the Debtors pending before the

26 Bankruptcy Court.

27

28

MAINDOCS-#149764-v6-SunCal_Fourth_Amended_Disclosure_Statement.DOC

2.1.33    <u>Cash</u>.  Currency of the United States of America and cash equivalents, including, but not limited to, bank deposits, immediately available or cleared checks, drafts, wire transfers and other similar forms of payment.

2.1.34    <u>CFD Bonds</u>.  Community facilities district bonds issued by a governmental entity.

2.1.35    <u>Chapter 11 Trustee</u>.  Steven M. Speier, the duly appointed trustee of the Trustee Debtors in their pending Chapter 11 Cases.

2.1.36    <u>Claim</u>.  This term shall have the broadest possible meaning under Section 101(5) of the Bankruptcy Code, and shall include (a) any right to payment from any of the Debtors, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, or (b) any right to an equitable remedy for breach of performance if such breach gives rise to a right of payment from any of the Debtors, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

2.1.37    <u>Claims Bar Date</u>.  For any Claim other than an Administrative Claim, March 31, 2009, which was established by the Bankruptcy Court as the last date for creditors to file Proof of Claims with the Bankruptcy Court in all of the Debtors' cases.

2.1.38    <u>Claims Objection Deadline</u>.  The later of (i) the first business day following the one hundred and eightieth (180th) day after the Effective Date, or (ii) such greater period of limitation as may be fixed or extended by the Bankruptcy Court or by agreement between the Plan Trustee and the Holder of the Claim.

2.1.39    <u>Class</u>.  Each group of Claims or Interests classified in Article V of the Plan pursuant to Sections 1122 and 1123 of the Bankruptcy Code.

2.1.40    <u>Committees</u>.  Collectively, the Voluntary Debtors' Committee and the Trustee Debtors' Committee, both before and after the Confirmation Date.

2.1.41    <u>Confirmation Date</u>.  The date on which the Confirmation Order is entered in the Bankruptcy Court's docket.

1          2.1.42    Confirmation Order.  The order entered by the Bankruptcy Court

2    confirming the Plan in accordance with the provisions of Chapter 11 of the Bankruptcy Code.

3          2.1.43    Contingent Bond Claims.  Unmatured Bond Claims.

4          2.1.44    Creditor.  Any Person who is the Holder of a Claim against any Debtor

5    that arose or accrued or is deemed to have arisen or accrued or to have matured, or otherwise

6    become due, owing, and payable on or before the Petition Date, including, without limitation,

7    Claims of the kind specified in Sections 502(g), 502(h) or 502(i) of the Bankruptcy Code.

8          2.1.45    Danske Bank.  Danske Bank A/S London Branch, a Lehman Successor in

9    its asserted capacity as the former Holder of Lehman's Disputed Claim and Disputed Liens arising

10   from the SunCal Century City Loan Agreement and the purchaser of the 10,000 Santa Monica

11   Project.

12         2.1.46    Debtor(s).  Individually or collectively, the Voluntary Debtors and the

13   Trustee Debtors.

14         2.1.47    Debtor(s)-in-Possession.  The Voluntary Debtor(s) when acting in their

15   capacity as representatives of their respective Estates in their respective Chapter 11 Cases.

16         2.1.48    Del Amo Project.  The Project owned by SunCal Torrance, located in the

17   City of Torrance, California, as more particularly described herein.

18         2.1.49    Del Rio.  North Orange Del Rio Land, LLC, a limited liability company,

19   a Voluntary Debtor herein, and the owner of the Del Rio CFD Bond Proceeds.

20         2.1.50    Del Rio CFD Bond Proceeds.  Proceeds of CFD Bonds that are in the

21   process of being issued by the City of Orange, authorized by the Order of the Bankruptcy Court on

22   March 16, 2010.

23         2.1.51    Delta Coves.  Delta Coves Ventures, LLC, a limited liability company, a

24   Trustee Debtor herein, and the owner of the Delta Coves Project.

25         2.1.52    Delta Coves Loan Agreement.  That certain Amended and Restated Loan

26   Agreement, dated as of April 20, 2007, by and between Delta Coves, as borrower, and Lehman

27   ALI as lender, pursuant to which Lehman ALI made a loan in the maximum aggregate principal

28   amount of approximately $236 million.  The Delta Coves Loan Agreement is allegedly secured by

a first-priority deed of trust on the Delta Coves Project.  The Delta Coves Loan Agreement has an asserted balance due of $206,023,142.48 as of March 30, 2009.

        2.1.53      Delta Coves Project.  The Project owned by Delta Coves, located in Bethel Island, Contra Costa County, California, as more particularly described herein.

        2.1.54      Disclosure Statement.  This document, which is entitled "Debtors' Fourth Amended Joint Disclosure Statement Describing the Debtors' Fourth Amended Joint Chapter 11 Plan," as amended and with all accompanying exhibits.

        2.1.55      Disputed Claim(s).  All or any part of a Claim other than any Allowed Amount thereof as to which any one of the following applies: (i) no Proof of Claim has been filed with respect to such Claim, and either (a) the Claim is not listed in the Schedules; or (b) the Claim is listed in the Schedules as unliquidated, disputed, contingent, unknown or in a zero amount, (ii) the Claim is the subject of (a) a Litigation Claim; (b) the Claim is subject to offset by a Litigation Claim; (c) a timely objection that has not been resolved by a Final Order; or (d) a request for estimation in accordance with the Bankruptcy Code, the Bankruptcy Rules, any applicable order of the Bankruptcy Court, or the Plan which is Filed on or before the Claims Objection Deadline, which Adversary Proceeding, objection, or request for estimation has not been dismissed, withdrawn or determined by a Final Order; or (iii) the Claim is otherwise treated as a "Disputed Claim" pursuant to the Plan.

        2.1.56      Disputed Lien(s).  An asserted lien(s) against Assets of the Debtor(s) that is either subject to a Disputed Secured Claim, not duly perfected, subject to an Avoidance Action, or subject to an action pursuant to Bankruptcy Code Sections 510(c)(2) and/or 506(d).

        2.1.57      Distribution(s).  Payments to Holders of Allowed Claims provided for under the Plan.

        2.1.58      Distribution Agent.  The entity that is responsible for making Distributions under the Plan, which shall be Acquisitions.

        2.1.59      Distribution Account(s).  Separate account(s) to be established by the Plan Trustee at an FDIC insured bank into which each Debtors' Available Cash shall be deposited and all Available Cash received by the Plan Trust after the Confirmation Date that would have

1    belonged to such Debtor shall be deposited, other than Net Sales Proceeds that are subject to

2    Disputed Claims and Disputed Liens.

3          2.1.60    Distribution Date.  With respect to any Allowed Claim or Allowed

4    Interest, the date on which a Distribution is required to be made under the Plan.

5          2.1.61    Effective Date.  The one hundred and fiftieth (150th) calendar day after

6    the Confirmation Date. However, in any case where the actions provided for in the Plan would be

7    delayed by the automatic stay applicable in the case of any Lehman Entity operating under the

8    protection of Chapter 11 or Chapter 7, then the Effective Date shall the one hundred and fiftieth

9    (150th) calendar day after the later of (i) the Confirmation Date,  or (ii) the date any stay barring

10   the implementation of the Plan arising from the Lehman Entities' cases is no longer applicable or

11   has been deemed inapplicable or lifted by a Court of competent jurisdiction.

12         2.1.62    Elieff.  Bruce Elieff, the president of Acquisitions, a purported obligor on

13   the Bond Claims with corresponding indemnity Claims against the Debtors.

14         2.1.63    Emerald Meadows Project.  The Project owned by SunCal Emerald,

15   located in the City of Rubidoux, California, as more particularly described herein.

16         2.1.64    EMR.  EMR Residential Properties LLC, a Nevada limited liability

17   company.

18         2.1.65    Estates.  The bankruptcy estates of the Debtors created pursuant to

19   Section 541 of the Bankruptcy Code.

20         2.1.66    Fee Applications.  Applications of Professional Persons under Sections

21   330, 331 or 503 of the Bankruptcy Code for allowance of compensation and reimbursement of

22   expenses in the Cases.

23         2.1.67    Fee Claim.  A Claim under Sections 330 or 503 of the Bankruptcy Code

24   for allowance of compensation and reimbursement of expenses in the Cases.

25         2.1.68    Fenway Capital.  Fenway Capital Funding LLC, a Lehman Successor to

26   Lehman's Disputed Claims and Lehman's Disputed Liens arising from (i) SunCal Communities I

27   Loan Agreement, (ii) Ritter Ranch Loan Agreement, (iii) Bickford Second Loan Agreement,

28   (iv) SunCal PSV Loan Agreement, (v) SunCal Marblehead/SunCal Heartland Loan Agreement,

1  (vi) Delta Coves Loan Agreement (vii) SunCal Northlake Loan Agreement, and (viii) SunCal Oak

2  Valley Loan Agreement.  Such Disputed Claims and Disputed Liens were transferred back to

3  LCPI pursuant to a compromise approved by the New York Bankruptcy Court on May 12, 2010,

4  which is subject to a pending appeal before the Second Circuit.

5  2.1.69    Filed.  Delivered to, received by and entered upon the legal docket by the

6  Clerk of the Bankruptcy Court.  "File" shall have a correlative meaning.

7  2.1.70    Final Order.  A judgment, order, ruling or other decree issued and entered

8  by the Bankruptcy Court.

9  2.1.71    General Unsecured Claim.  A Claim against a Debtor that is not (a) a

10  Secured Claim, (b) an Administrative Claim, (c) a Tax Claim or (d) a Priority Claim.

11  2.1.72    Heartland Project.  The Project being developed by SunCal Heartland,

12  located in Riverside County, California, as more particularly described herein.

13  2.1.73    Holder.  The beneficial owner of any Claim or Interest.

14  2.1.74    Insider.  The term shall have the broadest meaning possible under

15  Section 101(31), including, but not limited to, a person in control of the Debtor, Affiliates and

16  Insiders of such Affiliates.

17  2.1.75    Interest.  Any equity security interest in any Debtor within the meaning,

18  of Section 101(16) of the Bankruptcy Code, including, without limitation, any equity ownership

19  interest in any of the Debtors, whether in the form of common or preferred stock, stock options,

20  warrants, partnership interests, or membership interests.

21  2.1.76    Interim Loan Agreement.  That certain Loan Agreement, dated as of

22  October 31, 2007, by and between SCC LLC, as borrower and Lehman ALI, as lender, pursuant to

23  which Lehman ALI made a loan in the maximum aggregate amount of approximately $20 million.

24  The Interim Loan Agreement has an alleged balance due of $23,795,012.59 as of March 30, 2009.

25  The alleged obligation under the Interim Loan Agreement is allegedly secured by (a) an alleged

26  first-priority deed of trust on the Joshua Ridge Project; (b) an alleged first-priority deed of trust on

27  the Tesoro Project; and (c) an alleged first-priority lien on the Del Rio CFD Bond Proceeds.

28

1    2.1.77    Johannson Ranch Project.  The Project owned by SunCal Johannson,

2   located in the City of Modesto, California, as more particularly described herein.

3    2.1.78    Joshua Ridge Project.  The Project owned by SCC Communities, located

4   in the City of Victorville, California, as more particularly described herein.

5    2.1.79    Kirby Estates.  Kirby Estates, LLC, a Delaware limited liability

6   company, a Voluntary Debtor herein, and the owner of a portion of the Summit Valley Project not

7   owned by SunCal Summit Valley and Seven Brothers.

8    2.1.80    LBHI.  Lehman Brothers Holdings, Inc., a Lehman Entity, the parent

9   company of Lehman ALI and LCPI, and a Chapter 11 debtor in a bankruptcy proceeding pending

10   in the Bankruptcy Court for the Southern District of New York.

11    2.1.81    LCPI.  Lehman Commercial Paper, Inc, a Chapter 11 debtor in a

12   bankruptcy proceeding pending in the Bankruptcy Court for the Southern District of New York.

13    2.1.82    Legal Rate.  The rate of interest payable on judgments obtained in the

14   United States District Courts as set forth in 28 U.S.C. § 1961.  The rate applicable under the Plan

15   is 1.44% per annum, representing the applicable rate on November 6, 2008.

16    2.1.83    Lehman Adversary Proceeding.  The Debtors' pending adversary

17   proceeding against the Lehman Lenders and/or the Lehman Successors asserting various causes of

18   action including equitable subordination, fraudulent conveyances and preferential transfers.

19    2.1.84    Lehman ALI.  Lehman ALI, Inc.

20    2.1.85    Lehman Administrative Loans.  The post-petition financing provided by

21   Lehman ALI to Palmdale Hills, SunCal Emerald, SunCal Bickford, Acton Estates, SunCal Oak

22   Valley, SunCal Heartland, SunCal Northlake, SunCal Marblehead, SunCal Century City, SunCal

23   PSV, Delta Coves, and SunCal Oak Knoll, which grants priming liens on all borrower Debtors'

24   assets, and for super-priority administrative status to Lehman ALI.  The Voluntary Debtors have

25   repaid to Lehman ALI the full amount of $270,731 loaned to the Voluntary Debtors.  The

26   aggregate amount of the Lehman Administrative Loans to all of the Trustee Debtors is

27   approximately $14,075,230, as of September 1, 2010 and continuing to increase.

28

1        2.1.86    Lehman Entities.  The Lehman Lenders, the Lehman Equity Members

2  and LBHI.

3        2.1.87    Lehman Equity Members.  Lehman Entities that owned direct or indirect

4  membership Interests in one or more of the Trustee Debtors.

5        2.1.88    Lehman Lenders.  Lehman ALI, LCPI, Northlake Holdings, and OVC

6  Holdings.

7        2.1.89    Lehman Disputed Loans.  Collectively the following loans that are the

8  purported basis for the Lehman's Disputed Claims:  (a) SunCal Communities I Loan Agreement;

9  (b) Bickford Second Loan Agreement; (c) Ritter Ranch Loan Agreement; (d) SCC Palmdale Loan;

10  (e) Interim Loan Agreement; (f) SunCal Oak Knoll/SunCal Torrance Loan Agreement; (g) SunCal

11  Century City Loan Agreement; (h) SunCal PSV Loan Agreement; (i) SunCal Delta Coves Loan

12  Agreement; (j) SunCal Marblehead/SunCal Heartland Loan Agreement; (k) Sun Cal Oak Valley

13  Loan Agreement; (l) SunCal Northlake Loan Agreement; (m) Pacific Point First Loan Agreement;

14  and (n) Pacific Point Second Loan Agreement.

15        2.1.90    Lehman Re.  Lehman Re LTD., an Affiliate of the Lehman Entities and a

16  Lehman Successor to Lehman's Disputed Claim and Disputed Liens arising from the Pacific Point

17  First Loan Agreement.

18        2.1.91    Lehman Representatives.  The individuals that controlled the Lehman

19  Entities.

20        2.1.92    Lehman Successor(s).  Entities other than the Lehman Lenders that either

21  assert to be or are determined by the Bankruptcy Court to be the beneficial owner(s) of the

22  Lehman Disputed Loan(s), including, but not limited to Fenway Capital, Lehman Re and Danske

23  Bank.

24        2.1.93    Lehman's Disputed Claim(s).  All of the Proofs of Secured Claims filed

25  by a Lehman Lender or a Lehman Successor in the Debtors' Chapter 11 Cases arising from the

26  Lehman Disputed Loans.

27

28

-15-

1                 2.1.94     <u>Lehman's Disputed Lien(s)</u>.  All of the alleged liens relating to Proofs of

2   Secured Claims filed by a Lehman Lender or a Lehman Successor in the Debtor's Chapter 11

3   Cases arising from the Lehman Disputed Loans.

4                 2.1.95     <u>Lexon</u>.  Lexon Insurance Co.

5                 2.1.96     <u>Litigation Claims</u>.   Any and all interests of the Debtors in any and all

6   Claims, rights, causes of action, and objections or defenses to Claims, liens, rights, or causes of

7   action which have been or may be commenced by the Debtor(s), the Chapter 11 Trustee, or the

8   Committee(s), as the case may be, including, but not limited to, any (i) Avoidance Actions; (ii) for

9   turnover of property to the Debtors' Estates and/or the Plan Trust; (iii) for the recovery of property

10   or payment of money that belongs to the Debtors' Estates or the Plan Trust; (iv) the right to

11   compensation in the form of damages, recoupment or setoff of the Debtors' Estates and/or the Plan

12   Trust; (v) the Lehman Adversary Proceeding; and (vi) any and all other Claims against Lehman's

13   Disputed Claims and/or Disputed Liens referenced in the Plan or the Disclosure Statement.

14                 2.1.97     <u>Litigation Recoveries</u>.  Any Cash or other property received by the

15   Chapter 11 Trustee, the Debtors, the Committees and/or the Plan Trust, as the case may be, from

16   all or any portion of a Litigation Claim(s), including, but not limited to, awards of damages,

17   attorneys' fees and expenses, interest and punitive damages, whether recovered by way of

18   settlement, execution on judgment or otherwise.

19                 2.1.98     <u>LV Pacific Point</u>.  LV Pacific Point, LLC, a Delaware limited liability

20   company, a Lehman Entity that is the disputed owner of the Pacific Point Project.

21                 2.1.99     <u>Marblehead Project</u>.  The Project owned by SunCal Marblehead, located

22   in the City of San Clemente, California, as more particularly described herein.

23                 2.1.100    <u>Maximum Distributions</u>.  A Distribution to a Holder of an Allowed

24   General Unsecured Claim against a Debtor equal to one hundred percent (100%) of the amount of

25   the Holder's Allowed General Unsecured Claim plus interest at the Legal Rate from and as of the

26   applicable Debtor's Petition Date.

27                 2.1.101    <u>MB Firm</u>.  Miller Barondess, LLP.

28

1    2.1.102    <u>Mechanic Lien Claims</u>.  Mechanic Lien Claims arising pursuant to

2    California Civil Code §3110, et seq. that were either allegedly perfected prepetition or otherwise

3    allegedly satisfy the requirements of Bankruptcy Code 546(b).

4    2.1.103    <u>Minimum Increment</u>.  Minimum Increment means the following: a) <u>For

5    Sales of Projects</u>: One hundred percent of the preceding Qualifying Bid, plus any applicable

6    Break-Up Fee, plus two hundred and fifty-thousand dollars ($250,000); and b) For Sales of Other

7    Plan Trust Assets: One hundred percent (100%) of the preceding Qualifying Bid, plus any

8    applicable Break-Up Fee, plus five percent (5%) of the preceding Qualifying Bid.

9    2.1.104    <u>Net Litigation Recoveries</u>.  Litigation Recoveries less associated

10    Administrative Claims and Post-Confirmation Expenses incurred in connection with such

11    Litigation Recoveries.

12    2.1.105    <u>Net Sales Proceeds</u>.  The Cash generated from the sale(s) or liquidation

13    of the Debtor(s)' Assets or the Plan Trust's Assets, less payment of selling expenses, taxes,

14    Chapter 11 Trustee fees, and any associated Post-Confirmation Expenses and Administrative

15    Claims incurred in furtherance of such sales or liquidation of such Assets.

16    2.1.106    <u>Net Sales Proceeds Account(s)</u>.  Separate account(s) that will be

17    established by the Plan Trustee at an FDIC insured bank into which all Net Sale Proceeds shall be

18    deposited from the sale of Assets that were allegedly encumbered by a Disputed Secured Claim(s)

19    and/or a Disputed Lien(s).  There shall be a separate Net Sales Proceeds Account for the Net Sale

20    Proceeds allegedly subject to each Disputed Secured Claim(s) and/or Disputed Lien(s), except

21    where there are two Disputed Liens on a single Project, in which case, there shall be a single

22    account for the proceeds generated from that Project.  The Disputed Secured Claim(s) and/or

23    Disputed Lien(s) shall attach to the corresponding Net Sales Proceeds Account(s) pending any

24    Final Order(s) of the Bankruptcy Court resolving the applicable Disputed Secured Claim(s) and/or

25    applicable Disputed Lien(s).  To the extent that a particular Disputed Claim is disallowed or a

26    particular Disputed Lien is avoided (other than transferred to the Estates pursuant to Bankruptcy

27    Code Section 510(c)(2)) or otherwise invalidated, such Net Sales Proceeds allegedly subject

28    thereto shall become Available Cash and shall be transferred to the applicable Distribution

1    Account(s).  To the extent that a particular Disputed Secured Claim and a Disputed Lien are

2    allowed and deemed valid but subject to the equitable subordination causes of action in the

3    Lehman Adversary Proceeding, the funds shall remain in the Net Sales Accounts pending a Final

4    Order on the equitable subordination causes of action in the Lehman Adversary Proceeding.

5                    2.1.107    Northlake Holdings.  Northlake Holdings LLC, a California limited

6    liability company, that is a Lehman Lender and the asserted Holder of the beneficial interest in the

7    Disputed Secured Claim against the Northlake Project.

8                    2.1.108    Northlake Project.  The Project owned by SunCal Northlake, located in

9    the City of Castaic California, as more particularly described herein.

10                   2.1.109    Oak Knoll Project.  The Project owned by SunCal Oak Knoll, located in

11   the City of Oakland, California, as more particularly described herein.

12                   2.1.110    Oak Valley Project.  The Project owned by SunCal Oak Valley, located

13   in Riverside County, California, as more particularly described herein.

14                   2.1.111    Opening Bid.  Opening Bid means the first Qualifying Bid accepted by

15   the Debtor for any of the Plan Trust's Assets.

16                   2.1.112    Orders for Relief Date.  The following are dates that orders for relief

17   were entered for each of the Trustee Debtors:

| SunCal Oak Valley | January 6, 2009 |
| SunCal Heartland | January 6, 2009 |
| SunCal Northlake | January 6, 2009 |
| SunCal Marblehead | January 6, 2009 |
| SunCal Century City | January 6, 2009 |
| SunCal PSV | January 6, 2009 |
| Delta Coves | January 6, 2009 |
| SunCal Torrance | January 6, 2009 |
| SunCal Oak Knoll | January 6, 2009 |

24                   2.1.113    OVC Holdings.  OVC Holdings LLC, a California limited liability

25   company, that is a Lehman Lender and the asserted Holder of the beneficial interest in the

26   Disputed Secured Claim against the Oak Valley Project.

27                   2.1.114    Pacific Point First Loan Agreement.  That certain loan agreement, dated

28   February 16, 2006, by and among Lehman ALI, SJD Development and SJD Partners, pursuant to

which Lehman ALI made a loan in the maximum aggregate principal amount of approximately $125,000,000. The Pacific Point First Loan Agreement is allegedly secured by a first-priority deed of trust on the Pacific Point Project.  The Pacific Point First Loan Agreement had an asserted balance due of $120,110,237 as of March 30, 2009, and ownership of this loan is now held by Lehman Re, a Bermuda business entity.

2.1.115    Pacific Point Second Loan Agreement.  That certain loan agreement, dated May 1997, by and between Lehman ALI and SJD Partners, pursuant to which Lehman ALI initially made a loan in the maximum aggregate principal amount of approximately $20,000,000. The Pacific Point Second Loan Agreement was secured by a second-priority deed of trust on the Pacific Point Project, which was foreclosed upon on August 28, 2008 by LV Pacific Point, as assignee of Lehman ALI.

2.1.116    Pacific Point Project.  The Project formerly owned by SJD Partners, which was non-judicially foreclosed upon on August 28, 2008, by LV Pacific Point, as assignee of Lehman ALI.  The Pacific Point Project is a 200 plus acre development overlooking the Pacific Ocean in San Juan Capistrano, California.

2.1.117    Palmdale Hills.  Palmdale Hills Property, a Delaware limited liability company, a Voluntary Debtor herein, and the owner of the Ritter Ranch Project

2.1.118    Palmdale Hills CFD Bonds.  Certain CFD bonds issued by the City of Palmdale, in the amount of approximately $33 million that are owned by Palmdale Hills.

2.1.119    Palm Springs Village Project.  The Project owned by SunCal PSV, located in the City of Palm Springs, California, as more particularly described herein.

2.1.120    Person.  An individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, governmental authority, governmental unit, committee or other entity of whatever nature.

2.1.121    Petition Dates.  The following are dates that each of the Voluntary Debtors filed their Voluntary Chapter 11 petitions or Creditors filed involuntary Chapter 11 petitions against the Trustee Debtors:

///

| Palmdale Hills | November 6, 2008 |
|---|---|
| SunCal Beaumont | November 6, 2008 |
| SCC Palmdale | November 7, 2008 |
| SunCal Johannson | November 7, 2008 |
| SunCal Summit Valley | November 7, 2008 |
| SunCal Emerald | November 7, 2008 |
| SunCal Bickford | November 7, 2008 |
| Acton Estates | November 7, 2008 |
| Seven Brothers | November 7, 2008 |
| SJD Partners. | November 7, 2008 |
| SJD Development | November 7, 2008 |
| Kirby Estates | November 7, 2008 |
| SunCal I | November 7, 2008 |
| SunCal III | November 7, 2008 |
| SCC Communities | November 19, 2008 |
| Del Rio | November 19, 2008 |
| Tesoro | November 19, 2008 |
| Delta Coves Ventures, LLC | November 14, 2008 |
| SunCal Heartland, LLC | November 12, 2008 |
| SunCal Marblehead, LLC | November 12, 2008 |
| LB-L-SunCal Northlake, LLC | November 12, 2008 |
| LB-L-SunCal Oak Valley, LLC | November 12, 2008 |
| SunCal Century City, LLC | November 14, 2008 |
| SunCal PSV, LLC | November 14, 2008 |
| SunCal Torrance Properties, LLC | November 14, 2008 |
| SunCal Oak Knoll, LLC | November 19, 2008 |

2.1.122    Plan.  The Debtors' Fourth Amended Joint Chapter 11 Plan, together with the Exhibits thereto, as the same may be amended or modified from time to time in accordance with the Plan.

2.1.123    Plan Sponsor.  The entity that has committed to cause the funding of certain specified obligations under the Plan on or after the Effective Date.  The Plan Sponsor is Acquisitions.

2.1.124    Plan Trust.  A trust to be established as of the Effective Date, with Acquisitions as the Plan Trustee and the Holders of Allowed Claims against the Debtors as the beneficiaries.  The purpose of the Plan Trust will be to liquidate the Debtors' Assets and to otherwise consummate the Plan.

2.1.125    Plan Trustee.  Acquisitions, as the Plan Trustee, under the Plan Trust.

-20-

2.1.126    <u>Post-Confirmation Expenses</u>.  The fees and expenses incurred by the Plan Sponsor, the Plan Trustee and the Committee(s) and their professionals following the Confirmation Date (including the fees and costs of Professionals) for the purpose of (i) prosecuting and liquidating the Litigation Claims; (ii) objecting to and resolving Disputed Claims and Disputed Liens; (iii) selling or otherwise liquidating the Plan Trust's Assets; (iv) effectuating Distributions under the Plan; and (v) otherwise consummating the Plan and closing the Debtors' Chapter 11 Cases.

2.1.127    <u>Priority Claim</u>.  Any Claim, other than an Administrative Claim or a Tax Claim, to the extent entitled to priority under Section 507(a) of the Bankruptcy Code.

2.1.128    <u>Pro Rata</u>.  Proportionately, so that with respect to any distribution in respect of any Allowed Claim, the ratio of (a)(i) the amount of property distributed on account of such Allowed Claim to (ii) the amount of such Allowed Claim, is the same as the ratio of (b)(i) the amount of property distributed on account of all Allowed Claims of the Class or Classes sharing in such distribution to (ii) the amount of all Allowed Claims in such Class or Classes.

2.1.129    <u>Professional</u>.  A Person or Entity (a) employed by the Debtors, the Committees pursuant to a Final Order in accordance with Sections 327 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to the Effective Date, pursuant to Sections 327, 328, 3291 330 and 331 of the Bankruptcy Code, or (b) for which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to Section 503(b) of the Bankruptcy Code.

2.1.130    <u>Professional Fees</u>.  All Allowed Claims for compensation and for reimbursement of expenses under Sections 328, 330 and/or 503(b) of the Bankruptcy Code

2.1.131    <u>Projects</u>.  The Debtors' residential real estate development projects as separately defined herein and described in Exhibit "1" to this Disclosure Statement.

2.1.132    <u>Qualifying Bid</u>.  Qualifying Bid means, with respect to a bid on a Project, a bid made by Qualifying Bidder that exceeds the immediately preceding Qualifying Bid by the Minimum Increment.

1      2.1.133   <u>Qualifying Bidder</u>.  Qualifying Bidder means a bidder who has provided

2 the Plan Trustee, in the case of a bid for a Project, a deposit equal to two hundred and fifty

3 thousand dollars ($250,000) and who has provided the Plan Trustee evidence confirming that the

4 bidder has the financial means to acquire the Plan Trust Asset being offered for sale. In the case of

5 a bid for another Asset owned by the Plan Trust, means a bidder who provides cash deposit equal

6 to ten percent of the value of the Assets being offered for sale and evidence confirming the

7 bidder's ability to timely pay the remainder of the purchase price.

8      2.1.134   <u>Ritter Ranch Loan Agreement</u>.  That certain Credit Agreement, dated as

9 of February 8, 2007, by and among Palmdale Hills, as borrower, LCPI, as administrative agent and

10 lender, pursuant to which LCPI made a loan in the maximum aggregate principal amount of

11 approximately $264,000,000.  The Ritter Ranch Loan Agreement is allegedly secured by a first-

12 priority deed of trust on all real and personal property owned by Palmdale Hills.  The Ritter Ranch

13 Loan Agreement has an asserted balance due of $287,252,096.31 as of March 30, 2009.

14      2.1.135   <u>Ritter Ranch Project</u>.  The Project owned by Palmdale Hills, located in

15 the City of Palmdale, California, as more particularly described herein.

16      2.1.136   <u>Rubidoux</u>.  Rubidoux 60 LLC, a Nevada limited liability company.

17      2.1.137   <u>Sales Period</u>.  The Sales Period is the time period that the Plan Trustee is

18 provided under the Plan to consummate a sale or liquidation of the Plan Trust's Assets subject to

19 the Lehman Disputed Claims(s) and/or the Lehman Disputed Lien(s).  The Sales Period shall

20 commence on the Confirmation Date and shall expire on the Effective Date.

21      2.1.138   <u>SCC Communities</u>.  SCC Communities, LLC, a limited liability

22 company, a Voluntary Debtor herein, and the owner of the Joshua Ridge Project.

23      2.1.139   <u>SCC JV</u>.  SCC JV Ventures, LLC, a Delaware limited liability company,

24 that is an Affiliate of Acquisitions and the Debtors.

25      2.1.140   <u>SCC LLC</u>.  SCC Acquisitions LLC, a limited liability company, a

26 subsidiary of Acquisitions and an indirect and/or a direct parent company of all of the Debtors.

27      2.1.141   <u>SCC Palmdale</u>.  SCC Palmdale, LLC, a Delaware limited liability

28 company, a Voluntary Debtor herein, and the Holder of the Allowed Interest in Palmdale Hills.

MAINDOCS-#149764-v6-SunCal_Fourth_Amended_Disclosure_Statement.DOC

1          2.1.142    <u>SCC Palmdale Loan</u>.  Mezzanine Credit Agreement, between SCC

2    Palmdale as borrower and LCPI as lender.  The SCC Palmdale Loan is allegedly secured by a

3    pledge of SCC Palmdale's Allowed Interest in Palmdale Hills.  The SCC Palmdale Loan has an

4    alleged balance due of $119,664,305.25 as of March 30, 2009.

5          2.1.143    <u>Schedules</u>.  The schedules of assets and liabilities and list of equity

6    security holders Filed by the Debtors, as required by Section 521(1) of the Bankruptcy Code,

7    Bankruptcy Rules 1007(a)(3) and (b)(1), and Official Bankruptcy Form No. 6, as amended from

8    time to time.

9          2.1.144    <u>Secured Claim</u>.  Any Claim, including interest, fees, costs, and charges to

10    the extent allowable pursuant to Bankruptcy Code Section 506, that is secured by a valid and

11    unavoidable Lien on the Debtor(s)' Assets.

12          2.1.145    <u>Seven Brothers</u>. Seven Brothers, LLC, a Delaware limited liability

13    company, a Voluntary Debtor herein, and the owner of the portion of the Summit Valley Project

14    not owned by Kirby Estates and SunCal Summit Valley.

15          2.1.146    <u>SJD Development</u>. SJD Development Corp., a California corporation, a

16    Voluntary Debtor herein, and the Holder of the Allowed Interest in SJD Partners.

17          2.1.147    <u>SJD Partners</u>. SJD Partners, Ltd., a California limited partnership, a

18    Voluntary Debtor herein, and the prior owner of the Pacific Point Project.

19          2.1.148    <u>Summit Valley Project</u>.  The Project owned in part by SunCal Summit

20    Valley, Seven Brothers and Kirby Estates, located in the City of Hesperia, California, as more

21    particularly described herein.

22          2.1.149    <u>Stalking Horse Bidder</u>.  Stalking Horse Bidder means the Qualifying

23    Bidder who submits the Opening Bid for any of the Plan Trust's Assets.

24          2.1.150    <u>SunCal</u>.  The SunCal Companies, a trade name for Acquisitions and its

25    Affiliates.

26          2.1.151    <u>SunCal I</u>. SunCal Communities I, LLC, a Delaware limited liability

27    company, a Voluntary Debtor herein, and the owner of the equity membership interests in Acton

28

1    Estates, SunCal Bickford, SunCal Beaumont, SunCal Summit Valley, SunCal Johannson and

2    SunCal Emerald.

3            2.1.152    SunCal III. SunCal Communities III, LLC, a Delaware limited liability

4    company, a Voluntary Debtor herein.

5            2.1.153    SunCal Beaumont.  SunCal Beaumont, LLC, a limited liability company,

6    a Voluntary Debtor herein, and the owner of the Beaumont Heights Project.

7            2.1.154    SunCal Bickford.  SunCal Bickford Ranch, LLC, a Delaware limited

8    liability company, a Voluntary Debtor herein, and the owner of the Bickford Ranch Project.

9            2.1.155    SunCal Century City. SunCal Century City, LLC, a Delaware limited

10   liability company, a Trustee Debtor herein, and the former owner of the 10,000 Santa Monica

11   Project.

12           2.1.156    SunCal Century City Loan Agreement.  That certain Loan Agreement by

13   and between SunCal Century City, as borrower and Lehman ALI, as agent and sole lender

14   pursuant to which Lehman ALI made a loan in the aggregate maximum principal amount of

15   approximately $120,000,000.  The SunCal Century City Loan Agreement was allegedly secured

16   by a first-priority deed of trust on the 10,000 Santa Monica Project.  The SunCal Century City

17   Loan Agreement had an alleged balance due of $120,000,000.00 as of April 1, 2009.  Danske

18   Bank was formerly the Holder of the Century City Loan Agreement and related deed of trust,

19   which has been satisfied in full pursuant to Danske Bank's purchase of the 10,000 Santa Monica

20   Project for $5.3 million, less payment of an Unpaid Real Property Tax Claim of $1.6 million.

21           2.1.157    SunCal Communities I Loan Agreement.  The loan agreement by and

22   among (i) SunCal I and SunCal III, as borrowers and (ii) LCPI, as administrative agent and lender,

23   pursuant to which LCPI made a loan to SunCal I and SunCal III, as borrowers in the maximum

24   aggregate principal amount of approximately $395,313,713.37.  The loan agreement is allegedly

25   secured by (a) alleged first-priority deeds of trust on the SunCal Bickford, the Acton Estates, and

26   the SunCal Emerald Projects, (b) an alleged pledge of SunCal I's Allowed Interest in Acton

27   Estates, SunCal Summit, SunCal Beaumont, SunCal Johannson, SunCal Emerald, and SunCal

28   Bickford; and (c) an alleged pledge of SunCal Summit's Allowed Interest in Seven Brothers and

1   Kirby.  The SunCal Communities I Loan Agreement has an alleged balance due of

2   $343,221,391.06 as of March 30, 2009.

3               2.1.158    SunCal Emerald. SunCal Emerald Meadows, LLC, a Delaware limited

4   liability company, a Voluntary Debtor herein, and the owner of the Emerald Meadows Project.

5               2.1.159    SunCal Heartland. SunCal Heartland, LLC, a Delaware limited liability

6   company, a Trustee Debtor herein, and the owner of the Heartland Project

7               2.1.160    SunCal Johansson. SunCal Johansson Ranch, LLC, a Delaware limited

8   liability company, a Voluntary Debtor herein, and the owner of the Johansson Ranch Project.

9               2.1.161    SunCal Management.  SunCal Management, LLC, a Delaware limited

10  liability company, and the property manager for the Projects.

11              2.1.162    SunCal Marblehead. SunCal Marblehead, LLC, a Delaware limited

12  liability company, a Trustee Debtor herein, and the owner of the Marblehead Project.

13              2.1.163    SunCal Marblehead/SunCal Heartland Loan Agreement.  That certain

14  Second Amended and Restated Term Loan and Revolving Line of Credit Loan Agreement, dated

15  as of October 3, 2007, by and among SunCal Marblehead Heartland Master LLC, SunCal

16  Marblehead, and SunCal Heartland, as borrowers, and Lehman ALI, as agent and sole lender,

17  pursuant to which Lehman ALI made a loan in the maximum aggregate principal amount of

18  approximately $316,061,300.  The SunCal Marblehead/SunCal Heartland Loan Agreement is

19  allegedly secured by first-priority deeds of trust on the Marblehead and the Heartland Projects.

20  The SunCal Marblehead/SunCal Heartland Loan Agreement has an alleged balance due of

21  $354,325,126.15 as of March 30, 2009.

22              2.1.164    SunCal Northlake.  LB-L-SunCal Northlake, LLC, a Delaware limited

23  liability company, a Trustee Debtor herein, and the owner of the Northlake Project.

24              2.1.165    SunCal Northlake Loan Agreement.  That certain Term Loan and

25  Revolving Line of Credit Loan Agreement, dated as of September 5, 2009, between SunCal

26  Northlake, as borrower, and Northlake Holdings, as successor agent and sole lender, pursuant to

27  which Northlake Holdings' predecessor (Lehman ALI) made a loan in the maximum aggregate

28  principal amount of approximately $100,000,000.  The SunCal Northlake Loan Agreement is

1   allegedly secured by a first-priority deed of trust on the Northlake Project.  The SunCal Northlake

2   Loan Agreement has an alleged balance due of $123,654,776.88 as of March 30, 2009.

3           2.1.166    SunCal Oak Knoll. SunCal Oak Knoll, LLC, a Delaware limited liability

4   company, a Trustee Debtor herein, and the owner of the Oak Knoll Project.

5           2.1.167    SunCal Oak Knoll/SunCal Torrance Loan Agreement.  That certain Loan

6   Agreement, dated as of November 30, 2006, between SunCal Torrance and SunCal Oak Knoll, as

7   borrowers, and Lehman ALI, as agent and sole lender, pursuant to which Lehman ALI made a loan

8   in the maximum aggregate principal amount of approximately $167.7 million.  The SunCal Oak

9   Knoll/SunCal Torrance Loan Agreement is allegedly secured by first-priority deeds of trust on the

10  Oak Knoll and the Del Amo Projects.  The SunCal Oak Knoll/SunCal Torrance Loan Agreement

11  has an alleged balance due of $158,141,364.64 as of March 30, 2009.

12          2.1.168    SunCal Oak Valley. LB-L-SunCal Oak Valley, LLC, a Delaware limited

13  liability company, a Trustee Debtor herein, and the owner of the Oak Valley Project.

14          2.1.169    SunCal Oak Valley Loan Agreement.  That certain Term Loan and

15  Revolving Line of Credit Loan Agreement, dated as of May 23, 2006, by and between SunCal Oak

16  Valley, as borrower, and OVC Holdings, as successor agent and sole lender, pursuant to which

17  OVC Holdings' predecessor (Lehman ALI) made a loan in the maximum aggregate principal

18  amount of approximately $120,000,000.  The SunCal Oak Valley Loan Agreement is allegedly

19  secured by a first-priority deed of trust on the Oak Valley Project.  The SunCal Oak Valley Loan

20  Agreement has an alleged balance due of $141,630,091.63 as of March 30, 2009.

21          2.1.170    SunCal Plan Proponent(s).  The Voluntary Debtors and Acquisitions as

22  the parties-in-interest that are proposing the Plan.

23          2.1.171    SunCal PSV. SunCal PSV, LLC, a Delaware limited liability company, a

24  Trustee Debtor herein, and the owner of the Palm Springs Village Project.

25          2.1.172    SunCal PSV Loan Agreement.  That certain Term Loan and Revolving

26  Line of Credit Loan Agreement, dated as of February 12, 2007, between SunCal PSV, as

27  borrower, and Lehman ALI, as agent and sole lender, pursuant to which Lehman ALI made a loan

28  in the maximum aggregate principal amount of approximately $90 million.  The SunCal PSV Loan

1    Agreement is allegedly secured by a first-priority deed of trust on the Palm Springs Village

2    Project.  The SunCal PSV Loan Agreement has an alleged balance due of $88,257,340.20 as of

3    March 30, 2009.

4              2.1.173    SunCal Summit Valley. SunCal Summit Valley, LLC, a Delaware limited

5    liability company, a Voluntary Debtor herein, the owner of a portion of the Summit Valley Project

6    not owned by Kirby Estates and Seven Brothers, and the holder of Allowed Interests in Kirby

7    Estates and Seven Brothers.

8              2.1.174    SunCal Torrance. SunCal Torrance Properties, LLC, a Delaware limited

9    liability company, a Trustee Debtor herein, and the owner of the Del Amo Project.

10             2.1.175    Tax.  Any tax, charge, fee, levy, impost or other assessment by any

11   federal, state, local or foreign taxing authority, including, without limitation, income, excise,

12   property, sales, transfer, employment, payroll, franchise, profits, license, use, ad valorem,

13   estimated, severance, stamp, occupation and withholding tax.  "Tax" shall include any interest or

14   additions attributable to, or imposed on or with respect to such assessments.

15             2.1.176    Tax Claim.  Any Claim for any Tax to the extent that it is entitled to

16   priority in payment under Section 507(a)(8) of the Bankruptcy Code.

17             2.1.177    Tesoro.  Tesoro SF, LLC, a Delaware limited liability company, a

18   Voluntary Debtor herein, and the owner of the Tesoro Project.

19             2.1.178    Tesoro Project.  The Project owned by Tesoro located in the City of

20   Santa Clarita, California, as more particularly described herein.

21             2.1.179    Trustee Debtor(s). The following Debtors, individually or collectively,

22   that are represented by the Chapter 11 Trustee: Delta Coves, SunCal Heartland, SunCal

23   Marblehead, SunCal Northlake, SunCal Oak Valley , SunCal Century City, SunCal PSV, SunCal

24   Torrance, and SunCal Oak Knoll.

25             2.1.180    Trustee Debtors' Committee.  The Official Committee of Unsecured

26   Creditors of the Trustee Debtors appointed in the Cases pursuant to Section 1102 of the

27   Bankruptcy Code.

28

1              2.1.181    <u>Unpaid Secured Real Property Tax Claims</u>.  Secured Claims held by

2 various government entities secured by liens on the underlying real properties owned by the

3 Debtors but that are non-recourse to the Debtors.

4              2.1.182    <u>Voluntary Debtor(s)</u>.  The following  Chapter 11 debtors and debtors-in-

5 possession, individually or collectively, Palmdale Hills, SunCal I, SunCal III, SCC Palmdale,

6 Acton Estates, SunCal Beaumont, SunCal Emerald, SunCal Johansson, SunCal Bickford, SunCal

7 Summit, Seven Brothers, Kirby Estates, SJD Partners, SJD Development, SCC Communities, Del

8 Rio and Tesoro.

9              2.1.183    <u>Voluntary Debtors' Committee</u>.  The Official Committee of Unsecured

10 Creditors of the Voluntary Debtors appointed in the Cases pursuant to Section 1102 of the

11 Bankruptcy Code.

12       **2.2**       **<u>Rules of Construction</u>.**

13          For purposes of the Plan and this Disclosure Statement, unless otherwise provided herein

14 or in the Plan, (a) whenever from the context it is appropriate, each term, whether stated in the

15 singular or the plural, will include both the singular and the plural; (b) each pronoun stated in the

16 masculine, feminine or neuter includes the masculine, feminine and neuter; (c) any reference in the

17 Plan or this Disclosure Statement to an existing document or schedule filed or to be filed means

18 such document or schedule, as it may have been or may be amended, modified or supplemented

19 pursuant to the Plan; (d) any reference to an entity as a Holder of a Claim or Interest includes that

20 entity's successors and assigns; (e) except as otherwise indicated herein all references in the Plan

21 or this Disclosure Statement to Sections, Articles and Exhibits are references to Sections, Articles

22 and Exhibits of or to the Plan; (f) the words "therein," "thereunder" and "thereto" refer to the Plan

23 in its entirety rather than to a particular portion of the Plan; and (g) unless otherwise provided in

24 the Plan or this Disclosure Statement, any reference in the Plan or this Disclosure Statement to a

25 contract, instrument, release, indenture, agreement, or other document being in a particular form or

26 on particular terms and conditions means that such document shall be substantially and materially

27 in such form or substantially and materially on such terms and conditions; (h) any reference in the

28 Plan or this Disclosure Statement to a document, schedule, or exhibit to the Plan or Disclosure

1    Statement Filed or to be Filed means such document, schedule, or exhibit, as it may have been or

2    may be amended, modified, or supplemented; and (i) the rules of construction set forth in Section

3    102 of the Bankruptcy Code shall apply to the extent such rules are not inconsistent with the

4    express terms of the Plan or this Disclosure Statement or any other provision in this Section 3.2.

5          **2.3**    **Exhibits.**

6          All Exhibits to the Plan are incorporated into and are a part of the Plan as if set forth in full

7    therein.

8                                 **III.**

9            **PLAN CONFIRMATION DEADLINES**

10          The Bankruptcy Court has not confirmed the Plan described in this Disclosure Statement.

11    Accordingly, the terms of the Plan are not binding on anyone.  However, if the Bankruptcy Court

12    confirms the Plan, then the Plan will be binding on the Debtor(s), the Plan Trustee, and on all

13    Creditors and Interest Holders in such Cases.

14          **3.1**    **Time and Place of the Confirmation Hearing.**

15          The hearing where the Bankruptcy Court will determine whether or not to confirm the Plan

16    will take place at 411 West Fourth Street, Santa Ana, CA 92701-4593 on _____, 2010, at ___

17    _.m. in Courtroom 5A.

18          **3.2**    **Deadline for Voting for or Against the Plan.**

19          If you are entitled to vote, it is in your best interest to timely vote on the enclosed ballot and

20    return the ballot to:

21
22                  Winthrop Couchot Professional Corporation
              660 Newport Center Drive, Suite 400
              Newport Beach, CA 92660
23                  Facsimile:  (949) 720-4111
              Attn:  P.J. Marksbury
24
      Your ballot must be **received by**   _____, 2010**,** or it will not be counted.
25
      **3.3**    **Deadline for Objecting to the Confirmation of the Plan.**
26
      Objections to the confirmation of the Plan must be filed with the Bankruptcy Court, and
27
served upon the following parties so that they are received by _____, 2010:
28

        **Counsel to the**            Paul J. Couchot

MAINDOCS-#149764-v6-SunCal_Fourth_Amended_Disclosure_Statement.DOC

| | |
|---|---|
| **Voluntary Debtors and Acquisitions** | Winthrop Couchot Professional Corporation 660 Newport Center Drive, Suite 400, Newport Beach, CA 92660 |
| **Authorized Agent for Voluntary Debtors and Acquisitions** | Bruce V. Cook General Counsel 2392 Morse Ave Irvine, CA 92614-6234 |

**3.4    Identity of Person to Contact for More Information Regarding the Plan.**

Any interested party desiring further information about the Plan should contact the Debtors' and Acquisitions' counsel, Winthrop Couchot Professional Corporation, 660 Newport Center Drive, Suite 400, Newport Beach, CA 92660, Attn:  Paul J. Couchot, (949) 720-4100; Peter W. Lianides, (949) 720-4155; Payam Khodadadi, (949) 720-4160.

**3.5    Disclaimer.**

The information contained in this Disclosure Statement is provided by the SunCal Plan Proponents.  The SunCal Plan Proponents represent that everything stated in this Disclosure Statement is true to the best of their knowledge.  The Bankruptcy Court has not yet determined whether or not the Plan is confirmable and makes no recommendation as to whether or not you should support or oppose the Plan.

The discussion in this Disclosure Statement regarding the Debtors may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate," or "continue," or the negative thereof or other variations thereon or comparable terminology.  The reader is cautioned that all forward looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements.  The liquidation analyses, distribution projections, projections of financial results and other information are estimates only, and the timing, amount and value of actual distributions to Creditors may be affected by many factors that cannot be predicted.  Therefore, any analyses, estimates, or projections may or may not turn out to be accurate.

1    The SunCal Plan Proponents and their professionals have made a diligent effort to identify

2    in this Disclosure Statement all Litigation Claims, including claims for relief, counterclaims, and

3    objections to claims.  However, no reliance should be placed on the fact that a particular Litigation

4    Claim is or is not identified in this Disclosure Statement.  The Debtors or other parties in interest

5    may seek to investigate, file and prosecute Litigation Claims after the Confirmation Date or

6    Effective Date of the Plan whether or not the Litigation Claims are identified in this Disclosure

7    Statement.

8                                    **IV.**

9                    **FACTUAL BACKGROUND OF THE DEBTORS**

10    **4.1**    **The Formation of the Debtors and the Projects.**

11         **(a)**    **Overview of the Debtors and their Projects.**

12    The Debtors are twenty-six (26) entities formed to develop the Projects throughout

13    California as part of a larger overall joint venture between Affiliates of the SunCal Companies

14    ("SunCal"), which were controlled by Acquisitions, and the Lehman Entities, which were

15    controlled by LBHI's Global Real Estate Group (the "SunCal/Lehman Joint Venture").  At

16    inception, the SunCal/Lehman Joint Venture contemplated that SunCal would be the

17    developer/manager of the Projects and that the Lehman Entities would be the financial partner.

18    Attached hereto as Exhibit "1" is a general description of the Debtors' Projects and the Debtors'

19    other primary Assets, excluding Cash and the Litigation Claims.

20    All of the Debtors are Affiliates of Acquisitions and SCC LLC.  Some of the Debtors

21    directly own the Projects, while others serve as holding companies, owning Allowed Interests in

22    the Debtors that hold title to the Projects.  SunCal Management, LLC, a SunCal Affiliate, has

23    management contracts with respect to all of the Projects.

24    In the case of the seventeen Voluntary Debtors, SunCal Affiliates are the owners of one

25    hundred percent (100%) of the equity of, and SunCal Affiliates have full corporate governance

26    authority over, the Voluntary Debtors.  Among the Voluntary Debtors, there are eleven (11)

27    Projects.

28

MAINDOCS-#149764-v6-SunCal_Fourth_Amended_Disclosure_Statement.DOC

1    In the case of the nine Trustee Debtors, SunCal Affiliates and Lehman Affiliates each own

2  fifty percent (50%) of the equity in these entities.  Following the Petition Date, SunCal Affiliates

3  became the owner of hundred percent (100%) of the equity in SunCal Heartland and SunCal

4  Marblehead.  The Trustee Debtors own nine (9) Projects.

5    Attached hereto as Exhibit "2" is a chart that sets forth the appraised value of most of the

6  Debtors' Projects, as provided by the Lehman Lenders during the pendency of the Debtors'

7  Chapter 11 proceedings, as well as SunCal's valuation opinions of all of the Projects and the Del

8  Rio CFD Bond Proceeds.  SunCal's valuations were prepared by SunCal's internal underwriting

9  team using the same criteria that SunCal employees when valuing prospective  acquisitions.  As

10  the chart indicates, the Lehman Lenders' valuation for the Debtors' Projects, in the aggregate, is

11  approximately $461,450,000 (consisting of $110,150,000 for the Voluntary Debtors and

12  $351,450,000 for the Trustee Debtors), while the Debtors' valuation of the Projects ,in the

13  aggregate, is approximately $245,525,000 (consisting of $70,525,000 for the Voluntary Debtors

14  and $175,000,000 for the Trustee Debtors).[3]

15    The Plan eliminates any potential value disputes by providing for the sale of the Projects

16  through a sale procedure that is designed to yield the highest market price for these assets.

17  Accordingly, to the extent the Lehman Entities believe the Projects have a greater value than the

18  Opening Bid offered by another Qualifying Bidder, they will have the opportunity to submit a

19  Qualifying Bid (but not a credit-bid) that exceeds the Opening Bid and, if they so desire, to

20  become the prevailing bidder by offering the highest Qualifying Bid. This market sale process will

21  insure that the rights of all stakeholders are protected.

22    **(b)    The Debtors' Primary Secured Creditors and Their Disputed Claims**.

23    LCPI was the original lender with respect to four (4) of the Voluntary Debtors' Projects.

24  This financing was secured by  the recording of deeds of trust against the Ritter Ranch, Acton

25  Estates, Emerald Meadows and Bickford Ranch Projects.

26    Lehman ALI was the original lender with respect to two (2) of the Voluntary Debtors'

27  Projects (the Joshua Ridge and Tesoro Projects).  Lehman ALI was also the original lender of SJD

28

---

[3] Values may have changed since these analyses were prepared.

1   Partners' Pacific Point Project prior to a non-judicial foreclosure sale of the Pacific Point Project

2   in August of 2008.  Finally, Lehman ALI also had a loan secured by a second priority deed of trust

3   on the Bickford Ranch Project.

4   　　　　Various unrelated third parties are the primary secured creditors with respect to certain

5   portions of two (2) of the Voluntary Debtors' Projects (SunCal Beaumont and SunCal Summit

6   Valley – including portions of Seven Brothers).

7   　　　　Finally, the SunCal Johannson Project and the portions of Summit Valley owned by Kirby

8   Estates have no primary secured creditors, as well as portions of the Beaumont and Summit Valley

9   Projects, including portions of Seven Brothers.

10   　　　　As to the Trustee Debtors, they currently own eight Projects ( Delta Coves, the Heartland,

11   the Marblehead, the Northlake, the Oak Valley, the Oak Knoll, the Palm Springs Village, and Del

12   Amo Projects).  The Lehman Entities contend they are the primary secured claimants with respect

13   to all of the Trustee Debtor Projects, except for the 10,000 Santa Monica Project  As of the

14   Petition Date, SunCal Century City owned the 10,000 Santa Monica Project and Danske Bank held

15   an alleged first priority deed of trust on the 10,000 Santa Monica Project pursuant to the SunCal

16   Century City Loan Agreement.  However, the 10,000 Santa Monica Project was sold to Danske

17   Bank pursuant to a settlement agreement in full satisfaction of the amounts owed under the SunCal

18   Century City Loan Agreement and payment by Danske Bank of $5.3 million.  The settlement

19   agreement provides that SunCal Century City retains the right to pursue an approximate

20   $11 million Avoidance Action against the Lehman Lenders with respect to the 10,000 Santa

21   Monica Project and SunCal Century City.

22   　　　　　**(c)**　　　　**The Lehman Disputed Claims and Liens.**

23   　　　　As discussed in detail herein, during the course of the Debtors' Cases, the Debtors initiated

24   litigation disputing the validity of Lehman's Disputed Secured Claims and the validity, priority and

25   extent of Lehman's Disputed Liens.  This litigation is being pursued in the Lehman Adversary

26   Proceeding, various contested matters, and in potential lawsuits based on the post-petition conduct

27   of the Lehman Entities and/or their agents.

28

1    Attached hereto as Exhibit "3" is a chart that sets forth Lehman's Disputed Secured Claims,

2    the alleged Holders of the Lehman Disputed Secured Claims, the collateral encumbered by the

3    Lehman Disputed Liens, and the alleged outstanding amount based on the filed Proofs of Claim.

4    As the chart indicates, the total of Lehman's Disputed Secured Claims pursuant to Lehman's

5    Disputed Secured Claims filed in the Debtor's bankruptcy cases (excluding SunCal Century City)

6    is approximately $1,942,568,943.

7    **(d)    A Summary of All of the Alleged Claims Against the Debtors.**

8    Attached hereto as Exhibit "4" is a chart that sets forth the prepetition Claims asserted

9    against all of the Debtors.  In summary, the asserted Claims consist of the following: Unpaid

10    Secured Real Property Tax Claims ($18,806,157, consisting of $10,251,376 for the Voluntary

11    Debtors and $8,554,781 for the Trustee Debtors); primary Secured Claims ($1,569,915,985,

12    consisting of $497,884,116 for the Voluntary Debtors and $1,072,031,842 for the Trustee Debtors);

13    Mechanic Lien Claims ($19,475,457, consisting of $7,370,651 for the Voluntary Debtors and

14    $12,104,806 for the Trustee Debtors); Priority and Administrative Claims ($29,631,527, consisting

15    of $8,400,026 for the Voluntary Debtors and $21,231,501 for the Trustee Debtors); and General

16    Unsecured Claims ($347,572,164, consisting of $113,862,603 for the Voluntary Debtors and

17    $233,709,561  for the Trustee Debtors).

18    **(e)    Summary of the Debtors Cash.**

19    The following chart sets forth the Debtors' cash on hand as of August 31, 2010 . Some of

20    this cash may be encumbered by  liens asserted by the Lehman Lenders. Based upon a preliminary

21    review of the applicable documents, the Voluntary Debtors believe that the only accounts that may

22    be subject to valid perfected liens are the Palmdale Hills accounts, with balances of $369,099.34

23    and $16,648,815.26.  To the extent the liens on these accounts are valid, the ultimate priority of

24    these liens will depend on the results of the equitable subordination causes of action in the Lehman

25    Adversary Proceeding and the results of claim objections.

26    / / /

27

28

| *Debtors* | *Amount* |
|---|---|
| Palmdale Hills - ELR Escrow | 369,166.99 |
| Palmdale Hills | 16,373,291.83 |
| Palmdale Hills | 994,372.28 |
| Palmdale Hills | 2,715,956.52 |
| Palmdale Hills | 343,000.00 |
| SunCal Emerald | 0.00 |
| SunCal Bickford | 1,800,518.54 |
| SunCal Bickford | 0.00 |
| Acton Estates | 0.00 |
| Tesoro | 71.07 |
| Del Rio | 399,990.79 |
| Kirby Estates | 10.45 |
| SCC Communities | 3,409.42 |
| SCC Palmdale | 7.09 |
| SJD Development | 205.99 |
| SJD Partners | 36,188.00 |
| Seven Brothers | 173.58 |
| SunCal Beaumont Heights | 11.11 |
| SunCal Communities I | 25.82 |
| SunCal Communities III | 29.27 |
| SunCal Johannson Ranch | 90,218.00 |
| SunCal Summit Valley | 34,709.14 |
| **Voluntary Debtors' Total** | **$23,161,355.89** |
| | |
| SunCal Oak Knoll | 188.523.09 |
| SunCal Northlake | 1,349,609.88 |
| SunCal Oak Valley | 432,292.36 |
| SunCal Heartland | 55,723.51 |
| SunCal Marblehead | 1,742,163.58 |
| SunCal PSV | 3,516.53 |
| SunCal Torrance | 93,010.65 |
| Delta Coves | 1,164,659.07 |
| SunCal Century City | 3,689,281.67 |
| **Trustee Debtors' Total** | **$ 8,530,257.25** |
| | |
| **Total** | **$31,691,613.14** |

## 4.2   Factual Circumstances Leading to the Filing of the Debtors' Chapter 11 Cases.

### (a)   Background on the SunCal Companies.

SunCal is a family-owned and operated real estate business that has been successfully developing properties throughout the western United States for over 70 years.

MAINDOCS-#149764-v6-SunCal_Fourth_Amended_Disclosure_Statement.DOC

1    SunCal's business focuses upon the "development" of residential land. A typical SunCal

2    development begins with the acquisition of one or more parcels of raw land. Thereafter, the SunCal

3    team develops a master plan for the acreage that incorporates streets, homes, parks, schools and

4    commercial areas, and then it works with the applicable municipal planning authorities (the city,

5    county, state and federal) to secure the necessary approvals or "entitlements" to gain approval of

6    this plan. This process, which requires the assistance of land planners, civil engineers, architects,

7    lawyers, and other land specialists, takes a period of years. Once the master plan is approved,

8    SunCal provides for the grading of the project and the installation of the foundational infrastructure

9    (streets, utilities, etc.) and then sells the lots or parcels within the project to merchant builders.

10    **(b)    The Origins of the SunCal/Lehman Joint Venture.**

11    SunCal historically financed its projects with loans and/or equity from a number of

12    different sources.  However, beginning in 1997, an increasing number of SunCal's projects were

13    financed by the Lehman Entities, as Mark Walsh ("Walsh"), the head of LBHI's Global Real

14    Estate Group, began cultivating a business relationship with SunCal's principals.

15    By 2003, the Lehman Entities and SunCal had entered into joint ventures involving

16    approximately fifteen projects.  By 2007, that number had grown to over forty, and the Lehman

17    Entities had become, with limited exceptions, the exclusive provider of financing for the SunCal

18    Projects pursuant to a written agreement executed in 2006.  The Lehman Entities also consisted of

19    the Lehman Equity Members that either directly or indirectly owned a fifty percent (50%) equity

20    interest in all nine of the Trustee Debtors.

21    In their dealings with SunCal, the Lehman Representatives made no distinction between

22    Projects financed by Lehman ALI and Projects financed by LCPI, nor between the Debtors in

23    which Lehman Equity Members held 50% equity memberships or the Debtors in which the

24    Lehman Entities held no equity membership interest.  As agents of the financial partner in the

25    parties' joint venture, the Lehman Representatives would determine which Lehman Entity would

26    provide financing on which Projects, and would dictate the structure that the financing would take,

27    according to whatever suited the Lehman Entities' needs.

28

1    **(c)      Lehman's Effective Control over the Management of the Debtors and**

2    **Promises of Ongoing Funding.**

3         Prior to the market downturn in the middle of 2007, the Lehman Representatives afforded

4    SunCal substantial discretion in the management and development of the Projects.  The Debtors

5    would contract with third-party vendors to perform grading, health and safety compliance,

6    construction, landscaping, and other necessary services on the Project sites, and they would work

7    with the local municipalities to obtain the necessary entitlements and other authorizations

8    necessary  to proceed with development.  The Lehman Representatives, SunCal and the Debtors

9    would discuss anticipated quarterly expenditures at periodic budget meetings . As expenses were

10   incurred each month, SunCal and the Debtors would submit requests for payment to the Lehman

11   Representatives, supported by the necessary documentation, and   the Lehman Representatives

12   would then provide the funding necessary to pay these expenses..

13        During the third quarter of 2007, the foregoing management and payment dichotomy

14   changed, after , the real estate market experienced a sudden downturn, and many of the Projects

15   significantly declined in value.  In response to this dramatic economic change, a series of high

16   level discussions occurred between SunCal's representatives and the Lehman Representatives --

17   including Walsh, Paul Hughson ("Hughson") and Frank Gilhool ("Gilhool"), the Managing

18   Directors of Lehman's Global Real Estate.  In these discussions, SunCal's representatives, acting

19   on behalf of the Debtors, expressed their concern about the loans on the Projects being out of

20   balance, and suggested  shutting down the Projects, or at least slowing  the pace of development.

21   However, Walsh specifically instructed SunCal not to slow down or stop work.  He assured

22   SunCal that the Lehman Entities would provide the necessary funding to pay vendors and to keep

23   the development of the Projects moving forward.

24        The foregoing assurances of payments were confirmed in numerous telephone

25   conversations between Gilhool and SunCal's COO, Frank Faye ("Faye"), and/or SunCal's General

26   Counsel, Bruce Cook ("Cook") that took place during 2007 and 2008. In each exchange, Gilhool

27   assured SunCal that the Lehman Entities were committed to funding the debts and obligations

28   being incurred at the Projects and they continued to insist that work proceed..

1      During this time frame, the Lehman Representatives became much more "hands on,"

2  scrutinizing and approving all budgets and expenses through a new control and approval structure.

3  Under the new structure, SunCal would submit budgets to the Lehman Representatives on a

4  weekly basis and explain, during period conference calls, what Project payables they believe had

5  to be paid and what work had to be performed on the Projects.  The Lehman Representatives

6  would then unilaterally decide what future work would proceed, the Lehman Representatives

7  would authorize the work and the Lehman Representatives  would decide what payables would be

8  paid timely by designating them as "urgent," and what other payables  were not urgent and hence

9  would not be paid on a timely basis.  However, even under this new Lehman controlled

10  management and payment regime, the Lehman Representatives made it clear that all payables

11  being incurred would be funded.

12              **(d)      The 2008 Restructuring Agreement.**

13      By the fall of 2007, both SunCal and the Lehman Representatives contemplated entering

14  into restructuring agreement in the near term, with a closing to occur no later than January or

15  February of 2008.  However, this transaction was delayed by the Lehman Entities' extensive

16  documentation demands until May 23, 2008,, On this date, SunCal and most of the Debtors finally

17  entered into an omnibus "Restructuring Agreement" with LBHI, Lehman ALI and the other

18  Lehman Entities.  The same Lehman Representative signed the Restructuring Agreement on behalf

19  of all of the Lehman Entities.

20      Pursuant to the Restructuring Agreement, Lehman ALI, "as the Lender with respect to each

21  Loan," committed, among other things, to: (1) make advances under existing loans to fund the

22  continuing costs necessary to preserve the value of the Projects; (2) move forward to resolve the

23  accrued outstanding subcontractor payables, i.e., to make sure that the Projects' creditors were

24  paid for their work; and (3) to close the transaction, whereby newly-created Lehman Entities

25  would assume the debt and obligations of the Projects.

26      As originally executed in May 2008, the Restructuring Agreement applied to twelve of the

27  twenty Projects (as well as several other projects not at issue in the Lehman Adversary

28  Proceeding):  (1) Acton Estates; (2) Beaumont Heights; (3) Bickford Ranch; (4) Emerald

MAINDOCS-#149764-v6-SunCal_Fourth_Amended_Disclosure_Statement.DOC

1   Meadows; (5) Heartland; (6) Johannson Ranch; (7) Marblehead; (8) Northlake; (9) Oak Valley;

2   (10) Pacific Point; (11) Ritter Ranch; and (12) Summit Valley.  The Debtors that owned and/or

3   held equity interests in the entities that owned  these Projects were signatories to the May 2008

4   agreement.[4]

5          Between May and August 2008, the parties agreed to add four additional projects to the

6   Restructuring Agreement by agreement: (1) Del Rio; (2) Joshua Ridge; (3) Palm Springs Village;

7   and (4) Tesoro Burnham, and the four Debtors associated with these Projects—SunCal Del Rio,

8   SCC Communities, SunCal PSV, and SunCal Tesoro.  Only four Projects were  not included in the

9   Restructuring Agreement—Century City, Delta Coves, Oak Knoll and Del Amo. Accordingly, the

10  four Debtors associated with these Projects—SunCal Century City, Delta Coves, SunCal Oak

11  Knoll and SunCal Torrance—were not signatories thereto.  Lehman ALI was the lender on each of

12  these Projects and , and, as with the other Projects, this lender continued to insist that these four

13  debtors  proceed with the development of the four Projects, it approved all expenses, and it

14  continually provided assurances of payment.

15                      **(e)        <u>The Lehman Lenders Hire Radco.</u>**

16         Subsequent to the execution of the Restructuring Agreement, Lehman ALI arranged for a

17  third party, Radco, to directly settle outstanding contractor payables, as its agent.  Radco was

18  provided some limited funding and authority to negotiate settlements, and did in fact reach

19  settlement with a number of creditors.  The funding for these settlements, whether the debts related

20  to Lehman ALI or LCPI funded Projects, came from the same source.  Lehman ALI and LCPI also

21  provided approval for new work on the Projects, and Lehman ALI paid for some of this work.

22  However, this funding was minimal and it soon stopped.

23

24

25  _____

[4] Specifically, the Restructuring Agreement was entered into by, among others, the "Borrowers," "Grantors" and
26  "Pledgors," as defined in Annex 1 thereto.  The "Borrowers" included SunCal Marblehead, SunCal Heartland, SunCal
    Northlake, SunCal Oak Valley, SJD Partners, Palmdale Hills, SCC Palmdale, SunCal I, SunCal III, and SunCal
27  Bickford.
    The "Grantors" included SunCal Marblehead, SunCal Heartland, SunCal Northlake, SunCal Oak Valley, SJD
28  Partners, Palmdale Hills, SunCal Bickford, SunCal Acton, SunCal Summit and SunCal Emerald, and Debtors SunCal
    Beaumont and SunCal Johannson.
    The "Pledgors" included SCC Palmdale, SunCal I, SunCal Summit and SJD Development.

MAINDOCS-#149764-v6-SunCal_Fourth_Amended_Disclosure_Statement.DOC

1    In August 2008, Lehman ALI withdrew funding and settlement authority from Radco,

2  leaving millions of dollars in outstanding contractor payables unresolved, notwithstanding the

3  contrary provisions in the Restructuring Agreement.  Leman Ali's actions also impaired the

4  Debtors' ability to resolve ongoing public health and safety issues arising at the Projects.

5  Ultimately,  only a fraction of the total outstanding payables were resolved, contrary to the  past

6  promises made by Lehman Representatives.

7                    **(f)**        **The Lehman Lenders' Failure to Close on the Settlement Agreement.**

8    Pursuant to the terms of the Restructuring Agreement,  the parties agreed to enter into a

9  Settlement Agreement, the form of which was attached to the Restructuring Agreement.  The

10  Settlement Agreement provided for the transfer of the Projects included within the Restructuring

11  Agreement to a series of  newly formed Lehman-controlled entities (each with "SCLV" in its

12  name, for "SunCal-Lehman Venture"). The agreement further provided that the entity taking title

13  to the Project would assume the  Lehman Lender debt obligations associated with the Projects,

14  assume certain bond obligations associated with the Projects, and provide indemnifications to

15  SunCal and the Debtors for unpaid claims.  The Settlement Agreement was signed by the SunCal

16  and by Gilhool on behalf of the applicable Lehman Lenders and Lehman Equity Members, as

17  parties, on August 25, 2008.  As explained below, although all material conditions precedent to

18  closing were satisfied, the Lehman Representatives refused to close the Settlement Agreement.

19    On August 25, 2008, a meeting was held in Los Angeles to sign the closing documents

20  referenced in an associated with the Settlement Agreement.  Cook, acting on behalf of SunCal and

21  the Debtors, and Gilhool, on behalf of the applicable Lehman Entities, signed hundreds of pages of

22  settlement documents at this meeting, including the Settlement Agreement itself.

23    As more fully detailed herein, the Debtors later discovered that the Lehman Entities signed

24  the Settlement Agreement that purported to restructure the rights of the parties relating to seven

25  loans that had been secretly been sold to Fenway Capital, three days earlier. Instead of disclosing

26  this fact, the Lehman Representatives announced at the August 25, 2008 meeting that they wanted

27  to push the closing date out another month to September 30, 2008, ostensibly in order to obtain a

28

1   few additional third party consents that were readily obtainable.  SunCal, still believing that the

2   Lehman Lenders owned the Loans and were acting in good faith, agreed to this extension.

3        The additional third-party consents that the Lehman Entities cited as a predicate for

4   delaying the closing of the Settlement Agreement were obtained (or could have been obtained, but

5   for Lehman's refusal to pursue them in good faith) by the first week of September 2008.

6   Accordingly, at this point in time all conditions precedent to the closing of the transaction had

7   been met.  Yet, inexplicably, Lehman did not proceed with the closing.

8        **(g)    The Lehman Lenders' Undisclosed Sale of Most of the Debtors' Loans.**

9        As discussed herein, on or just prior to August 22, 2008, Lehman ALI, OVC and Northlake

10  transferred seven of the Lehman Disputed Loans to LCPI and LCPI immediately turned around and

11  sold all of its interest in those Loans and liens to Fenway Capital pursuant to the Fenway

12  Repurchase agreement.  When the closing occurred on August 25, 2008, three days later, the

13  Lehman Representatives did not disclose to SunCal or the Debtors (and SunCal and the Debtors

14  were unaware) that they had already sold the very obligations they were agreeing to assume and

15  restructure.  The Lehman Representatives also did not disclose the sale of the Pacific Point First

16  Loan to Lehman Re, approximately a week later, even though this loan was also subject to  the

17  Settlement Agreement. To the contrary, the Lehman Representatives affirmatively concealed these

18  facts from SunCal and the Debtors by asserting that ownership still existed in the case of seven of

19  the eight loans.

20       **(h)    Lehman's Foreclosure Sale and Purchase of the Pacific Point Project.**

21       At the time of the Restructuring Agreement and the Settlement Agreement were signed, the

22  Pacific Point Project, which was still owned by SJD Partners, was among the Projects included in

23  the Restructuring Agreement and the Settlement Agreement.  Pursuant to the Restructuring

24  Agreement, and as detailed in the Settlement Agreement attached thereto, SunCal, SJD Partners,

25  and its parent company, SJD Development, all agreed that they would not interfere with Lehman

26  ALI's (or its designee's) foreclosure on the Pacific Point Project. They further agreed that a new

27  Lehman entity, LV Pacific Point, would purchase the Pacific Point Project upon foreclosure and

28  that Lehman ALI and LV Pacific Point would (a) assume SJD Partners' and SJD Development's

1    outstanding accounts payable for Pacific Point third-party vendors, (b) assume the bond liability

2    associated with the Pacific Point Project, and (c) pay for the millions of dollars worth of work that

3    Lehman ALI representatives had authorized.

4        As previously stated, the Settlement Agreement was signed on August 25, 2008 by the

5    SunCal parties, including SJD Partners and SJD Development.  It was also signed by Gilhool as

6    authorized signatory on behalf of both Lehman ALI and LV Pacific Point.  As a signatory to the

7    Settlement Agreement, LV Pacific Point was required to purchase the Pacific Point Project at the

8    foreclosure sale subject to the above obligations. Consistent with this agreement, the City of San

9    Juan Capistrano executed an estoppel certificate for the benefit of SJD Partners and Lehman

10   ALI—at Lehman ALI's request—on August 26, 2008, two days before the foreclosure sale.  This

11   certificate stated, among other things, that the "Acquiring Entity [LV Pacific Point] shall by

12   operation of law become the legal successor-in-interest to Developer [SJD Partners]" under SJD

13   Partners' agreements with the City. That certificate further provided that there existed no breaches,

14   defaults, or claims under SJD Partners' agreements with the City.

15       On August 28, 2008, Lehman ALI foreclosed on the Pacific Point Project, and title was

16   transferred to LV Pacific Point at the foreclosure sale.  However, Lehman ALI and LV Pacific

17   Point failed to assume the liabilities and obligations associated with this Project as agreed.   This

18   breach of the parties' agreement, left SJD Partners without title to the Pacific Point Project, but

19   with the potential liability for the $50 million in unsecured claims relating to the Project, including

20   bond claims of approximately $34 million,.  Moreover, since Lehman Ali and LV Pacific Point

21   have continued to ignore their obligations under the above agreement, unpaid taxes, fines, and

22   penalties have continued to accrue to the detriment of the Project and these claims are being

23   asserted against SJD Partners..

24       Had SunCal, SJD Partners and SJD Development known that Lehman ALI and LV Pacific

25   Point had no intention of honoring their obligations under the foregoing agreement, they never

26   would have agreed to cooperate with the foreclosure.  Instead, SJD Partners would have filed for

27   bankruptcy earlier, thereby mitigating the damages from Lehman Ali's breach, by allowing

28   creditors recourse to the value of the Project.

(i)    **Alvarez and Marsal Take Over Control of the Lehman Entities After the Chapter 11 Filings of LBHI and LCPI.**

LBHI filed for bankruptcy in September 2008 and LCPI filed for bankruptcy in October 2008.  After LBHI's filing, Bryan Marsal ("Marsal") of Alvarez & Marsal ("A&M"). who are "restructuring consultants," was appointed to serve as LBHI's   Chief Restructuring Officer. Marsal and A&M are in charge of liquidating the now defunct Lehman Entities, including Chapter 11 debtors LBHI and LCPI, and the non-bankrupt Lehman Lenders (Lehman ALI, OVC, and Northlake Holdings, as well as the non-bankrupt Lehman Equity Members.

LBHI's bankruptcy filing and the Lehman Lenders refusal to close the transactions provided for under the Settlement Agreement as agreed further exacerbated the Debtors' problems. Although  the Debtors were not proceeding with any new construction or development, the Debtors had to expend significant sums on site security, erosion control, property taxes and other measures in order to prevent the Projects from becoming a public safety hazard, and in order to avoid the loss of valuable entitlements, and to mitigate penalties and fines being incurred by the Projects.

SunCal and the Debtors repeatedly requested that the Lehman Entities pay for critical health and safety and value preservation measures on the Projects.  Between October 9 and November 4, 2008, SunCal's general counsel Cook sent Robert Brusco, an authorized agent of the Lehman Entities, nearly two dozen letters requesting that the Lehman Lenders provide the funding necessary to address critical needs on the Projects as promised.  A summary of these health and safety notices are attached hereto as Exhibit "5".  The Lehman Entities ignored these requests until November 2008, when Brusco, purportedly on behalf of the Lehman Lenders, delivered the message that the Lehman Lenders were unwilling to fund the Projects and that, instead, they intended to foreclose on all of the Projects.

As a result, as set forth in Exhibit "4," there are now over 240 vendors, municipalities, counties and bonding companies claiming over $400 million in work, improvements and property tax claims against the Projects.  Substantially all of these sums are due to work performed or bonded at Lehman's request based upon Lehman's promises of payment.

**4.3    The Debtors' Potential Preferential Transfers**.

Attached hereto as Exhibit "6" are charts setting forth payments made to third parties during the ninety (90) day time period preceding the filing of the Debtors' Chapter 11 Cases as well as payments made to the Lehman Entities and to SunCal Affiliates during the one-year time period preceding the filing of the Debtors' Chapter 11 Cases.  As the charts in Exhibit 6" indicate, approximately $13,769,833.86 (consisting of $7,193,563.90 for the Voluntary Debtors and $6,576,269.96 for the Trustee Debtors) in payments were made to non-insiders within the 90 day period preceding the Petition Dates for each Debtor, and approximately $11,805,704.45 (consisting of $3,388,667.74 for the Voluntary Debtors and $8,417,036.71 for the Trustee Debtors) in payments were made to SunCal Affiliates within the one year period preceding the Petition Dates.  Approximately $16,824,260.33 in payments were made to the Lehman Entities by the Trustee Debtors within the one-year time period preceding the Petition Date for each Debtor.[5] The Trustee and the Debtors are still in the process of investigating the amount of potential preference claims that may exist in favor of the estates.

The Debtors have filed their pending Fourth Amended Complaint against the Lehman Entities. This complaint includes causes of action for, among other things, the recovery of the preferential payments made to the Lehman Entities referenced above.  As to SunCal Affiliates, Acquisitions believes, and counsel to the Trustee has preliminarily opined, that such entities either have ordinary course or new value defenses for all payments received during the one-year time period preceding the Petition Dates.

## V.

## SIGNIFICANT EVENTS IN THE DEBTORS' CHAPTER 11 CASES

**5.1.    Voluntary Debtors**.

**(a)    Joint Administration of the Voluntary Debtors and the Trustee Debtors**.

Since their respective Petition Dates, the seventeen (17) Voluntary Debtors have continued to operate as "debtors-in-possession," subject to the supervision of the Bankruptcy Court and in

---

[5] Pending Fraudulent Conveyance and Preference Actions against the Lehman Entities and a discussion of intercompany Claims between the Debtors' Estates are discussed in detail in Section V of this Disclosure Statement.

1    accordance with the Bankruptcy Code.  The Voluntary Debtors are authorized to operate their

2    businesses in the ordinary course during the Chapter 11 proceedings.  Transactions outside the

3    ordinary course of business must be approved by the Bankruptcy Court.

4         The Voluntary Debtors' Cases are being jointly administered pursuant to orders entered on

5    November 10, 2008 and November 26, 2008.  The Voluntary Debtors' Cases are being jointly

6    administered with the Trustee Debtors' cases pursuant to an order entered on March 11, 2009.

7         The Voluntary Debtors have employed Winthrop Couchot Professional Corporation as

8    their general insolvency counsel, Morgan Lewis & Bockius LLP as their special litigation counsel

9    for the Southern District of New York and the MB Firm as their special litigation counsel.

10              **(b)    The Voluntary Debtors Court Employed Professionals.**

11        The Voluntary Debtors' Committee has employed Irell & Manella LLP as its counsel

12   pursuant to an order entered on February 13, 2009.

13        Pursuant to the Court's Order regarding joint administration of the Voluntary Debtors, the

14   Voluntary Debtors' liability for professional fees is joint and several among the Voluntary

15   Debtors' Estates for fees incurred related to services for the benefit of all of the Voluntary

16   Debtors.  The Trustee Debtors' liability for professional fees is not joint and several.

17        Pursuant to the initial MB Firm employment application, Acquisitions was responsible for

18   the payment of their fees until December 31, 2009.  The MB Firm's application also allows for

19   payments from the Bond Companies.  The initial MB Firm employment application reserved the

20   right, should the Lehman Adversary Proceeding result in a benefit accruing to a particular

21   Debtors' Estates, to request that its fees and expenses be reimbursed by the Debtors' Estates.  The

22   Bond Companies have also agreed to jointly fund a portion of the professional fees and expenses

23   of the MB Firm with respect to the Lehman Adversary Proceeding.  The Bond Companies'

24   funding commitment can be terminated and after such a termination they will only be required to

25   cover fees and costs incurred during the period of their prior commitments.

26        The MB Firm employment application was subsequently amended.  Pursuant to an order

27   entered on April 14, 2010, (1) the Voluntary Debtors will pay up to one-half of the fees and

28   expenses incurred by the MB Firm from and after February 1, 2010 onward; and (2) the Trustee

1   Debtors do not have an obligation to pay any of the MB Firm's fees pertaining to the Trustee

2   Debtors' estates, unless and until a loan by the Voluntary Debtors to the Trustee Debtors is agreed

3   to by the Trustee and approved by the Court, or in accordance with the terms of the original

4   employment applications to the extent not superseded or modified by the amended employment

5   application.  The order does not affect the MB Firm's right to seek payment from the Bond

6   Companies without the need for an additional order of the Court.

7       The MB Firm recently filed an application seeking to further amend their employment to

8   include the right to pursue certain claims against the Lehman Entities and certain employees and

9   agents of these entities on behalf of the Voluntary Debtors.  The claims encompassed by this

10  amendment include claims that are based upon both prepetition and post-post petition actionable

11  conduct under both state law and federal law against the Lehman Entities and/or their agents.

12      **(c)**     **LCPI's Motions for Relief from the Automatic Stay Against Certain of**

13              **the Voluntary Debtors' Projects and Related Appeals.**

14      On January 23, 2009, LCPI and Lehman ALI filed various motions for relief from the

15  automatic stay against Palmdale Hills, SCC Palmdale, SunCal Beaumont, SunCal Summit Valley,

16  SunCal Emerald, SunCal Bickford, Acton Estates, SunCal Johannson, and SCC Communities I

17  (the "Lehman Entities' Stay Motions").  The Debtors opposed the Lehman Entities' Stay Motions.

18  On March 10, 2009, the Court entered orders denying the Lehman Entities' Stay Motions without

19  prejudice.  This order included a finding that the continued pursuit of the claims alleged in the

20  Lehman Adversary Proceeding would not constitute a violation of LCPI's automatic stay (the

21  "Stay Finding").

22      LCPI did not appeal the denial of the motions for relief from stay, but instead appealed just

23  the Stay Finding. This appeal was initially successful, with the bankruptcy appellate panel

24  reversing this finding.  The Debtors appealed this ruling to the Ninth Circuit. The matter is now

25  fully briefed and awaiting oral argument, to the extent the Ninth Circuit considers it necessary.

26  / / /

27

28

### 5.2.    The Trustee Debtors and Their Professionals.

Orders for Relief were entered in the involuntary cases beginning on January 6, 2009. The Trustee Debtors are represented by their duly-appointed Chapter 11 Trustee, Mr. Steven M. Speier pursuant to orders of the Bankruptcy Court entered on January 15, 2009.

The Chapter 11 Trustee has employed the Lobel Firm as the Chapter 11 Trustee's general insolvency counsel and the MB Firm, as special litigation counsel and Squar Miller, LLP as its accountants.

The Trustee Debtors' Committee has employed Weiland, Golden, Smiley, Wang Ekvall & Strok as its general insolvency counsel.

### 5.3.    The Trustee Debtors' Sales Procedures Motion.

On February 18, 2009, the Chapter 11 Trustee, SCC Communities, Del Rio, and Tesoro filed a sales procedures motion pursuant to Section 363 of the Bankruptcy Code. This motion sought the approval of overbid procedures pursuant to a purchase offer from D.E. Shaw for $200 million. As part of the Trustee Debtors' Sales Procedures Motion, the Debtors conditioned the sale on the disallowance of Lehman ALI's credit bid rights. Both Lehman ALI and Danske Bank filed oppositions to the motion.

The Trustee Debtors' Sales Procedures Motion was subsequently modified to include a purchase of the Assets of only eight of the Trustee Debtors for a purchase price of $150 million.

Attached hereto as Exhibit "7" is a Sales Analysis Chart that shows the projected distribution to the Holders of all Claims (other than the Lehman Entities and their successors' Disputed Secured Claims) against the Trustee Debtors that are parties to the proposed sale, if the proposed sale had been consummated and assuming that the Trustee Debtors prevail in equitably subordinating Lehman's Disputed Claims in the Lehman Adversary Proceeding to such unsecured claims.

After several continuances of the Motion, the Trustee entered into a settlement with the Lehman Entities agreeing to defer the sale of the Assets to after the Confirmation Hearing in exchange for certain financing guarantees under Lehman's competing plan to be proposed by the Lehman Entities.

**5.4.**     **The Debtors' Various Motions Relating to Financing for the Projects and to Pay Professional Fees.**

**(a)**     **The Debtors' Motion for Relief from Stay in the LCPI Chapter 11 Proceedings.**

On November 10, 2008, the Debtors filed a motion for an order modifying the automatic stay in the LCPI Chapter 11 proceeding to allow the Debtors to administer their own Chapter 11 cases to the extent that such cases, and the relief requested by such debtors therein, may affect the rights of LCPI.  The motion was denied, without prejudice, by the presiding judge in the LCPI's Chapter 11 case pursuant to an order entered on November 21, 2008.

Based on the pre-petition Fenway Repurchase Agreement, of which the Debtors were not made aware at such time, the Debtors now believe that LCPI's automatic stay did not apply to the Ritter Ranch Loan Agreement and the SunCal Communities I Loan Agreement. Accordingly, the filing of the motion was unnecessary, since no stay existed.

**(b)**     **The Voluntary Debtors' Initial Motion for Surcharge and Use of Cash Collateral.**

On January 16, 2009, seven of the Debtors filed a motion authorizing Palmdale Hills to use and surcharge, pursuant to 11 U.S.C. § 506(c), and/or use the purported cash collateral of LCPI arising from the Ritter Ranch Loan Agreement, pursuant to 11 U.S.C. § 363(c)(2), in order to pay for the reasonable and necessary maintenance expenses required to preserve the value of such Debtors' Projects subject to deeds of trust and other security interests held by LCPI.

LCPI objected to the motion and subsequently filed a motion in its own Chapter 11 proceeding in the Southern District of New York seeking an order barring the motion as a violation of the automatic stay.  Although the Debtors believe that LCPI's stay was not violated in any way by the Motion, the Motion was taken off calendar prior to any ruling by the New York Bankruptcy Court, based upon the threat of sanctions made against Debtors' counsel by the presiding judge in LCPI's case.

As explained above, LCPI did not own any beneficial interest in the Ritter Ranch Loan Agreement when this party asserted the automatic stay, since the Ritter Ranch Loan Agreement,

-48-

1    which was the subject of the cash collateral motion, had already been sold pursuant to the Fenway

2    Repurchase Agreement.

3        **(c)**   **The Lehman Administrative Loans.**

4       At a hearing on March 20, 2009, the Bankruptcy Court approved a stipulation among

5    Lehman ALI, Palmdale Hills, SunCal Emerald, SunCal Bickford, Acton Estates, SunCal Oak

6    Valley, SunCal Heartland, SunCal Northlake, SunCal Marblehead, SunCal Century City, SunCal

7    PSV, Delta Coves, and SunCal Oak Knoll, pursuant to which each of the foregoing Debtors was

8    authorized to borrow from Lehman ALI, through individual loans, up to the  aggregate sum of

9    $1,790,572, for the purposes of  paying the costs and expenses provided in their 30-day budgets

10    and for paying up to $250,000 of certain professional expenses limited to settlement efforts.  The

11    proceeds from the above loans were used to pay for the most urgent and critical public health and

12    safety issues on the Projects.  The loans were also granted superpriority administrative status in

13    each of the Debtor borrowers' estates.  The loan also has priming lien status on all of the

14    borrowing Debtors' assets, with the exception of SunCal Century City, where such loans were

15    granted a junior priority.  The Voluntary Debtors have repaid Lehman ALI the sum of $270,731

16    that was loaned to the Voluntary Debtors.

17       Subsequently, the Trustee has entered into several other stipulations with Lehman ALI for

18    additional financing, on similar terms under the caveat that such professionals would not be paid

19    for services against the Lehman Entities.  The Trustee, in return, as previously agreed withdrew

20    the Sales Procedure Motion and the potential sale for $150 million.  The Trustee now has incurred

21    the sum of $14,075,230 from Lehman ALI as of September 1, 2010 for the purpose of maintaining

22    the Projects and paying the Trustee's professional fees.

23        **(d)**   **The Voluntary Debtors' Agreements with the Lehman Entities for Use**

24             **of Alleged Cash Collateral to Maintain the Properties and to Pay**

25             **Professional Fees.**

26       On September 1, 2009, with the consent of the Lehman Entities, fourteen of the Voluntary

27    Debtors filed a motion authorizing surcharge pursuant to 11 U.S.C. § 506(c), and/or use of the

28    purported cash collateral for the purpose of addressing critical public health and safety issues and

1    other value preservation with respect to the Debtors Projects.  In the motion, the Voluntary

2    Debtors proposed a 120-day budget with expenses totaling $6,483,316.  At the hearing on the

3    motion held on September 22, 2009, the attorneys for the Lehman Lenders informed the Court of

4    an agreement subject to documentation.  The proposed agreement provides for a 120-day budget

5    with expenses totaling approximately $5 million, pursuant to which any Cash in the Estates is used

6    first and then money borrowed from the Palmdale Hills Estate is used thereafter on an

7    administrative basis.  The agreement also permitted the Voluntary Debtors to use their alleged

8    unencumbered cash to pay its professional fees.  This agreement has been renewed on several

9    occasions.

10        **5.5.    The Debtors' Disputes and Claims Against the Lehman Entities.**

11            **(a)    The Lehman Adversary Proceeding.**

12            On January 6, 2009, the Voluntary Debtors initiated the Lehman Adversary Proceeding by

13    filing their initial complaint against Lehman ALI for equitable subordination of Lehman ALI's

14    Disputed Claims and avoidance of its Disputed Liens pursuant to Bankruptcy Code Section 510(c).

15    On February 3, 2009, the Debtors filed a First Amended Complaint, which added the Trustee

16    Debtors as co-plaintiffs and added various other causes of action.  The First Amended Complaint

17    also named OVC Holdings, Northlake Holdings and various other entities as defendants.

18            Pursuant to a hearing on a motion to dismiss held on June 11, 2009, the Bankruptcy Court

19    granted the Debtors leave to amend the second amended complaint.  Thus, on July 10, 2009, the

20    Debtors filed their Third Amended Complaint.  The Third Amended Complaint addressed many of

21    the concerns raised by the Bankruptcy Court and also included various Avoidance Actions and

22    other causes of action against the Lehman Lenders and the Lehman Successors.  The Third

23    Amended Complaint also added Fenway Capital as a defendant based upon, the discovery of the

24    facts relating to the sale of the loans Fenway Capital and based upon the Court ruling that the Repo

25    was a true sale.

26            On September 30, 2009, the Lehman Entities filed a motion to dismiss the Third Amended

27    Complaint (which motion was amended on October 7, 2009 and October 22, 2009), alleging that

28    the relief requested by certain Debtors was not available as a matter of law.  On September 30,

1    2009, Fenway also filed a motion to dismiss the Third Amended Complaint.  On January 26, 2010

2    and January 28, 2010, the Debtors filed oppositions to the motions to dismiss the Third Amended

3    Complaint filed by the Lehman Entities and Fenway, respectively.  On February 4, 2010, the

4    Lehman Entities and Fenway filed their respective replies.  The Court entered an order granting in

5    part and denying in part the relief requested in the motions to dismiss. Most notably, the Court

6    denied  the defendants request for the dismissal of  the equitable subordination claims and the

7    Court permitted the Debtors to file an amended complaint.  LCPI was dismissed as a defendant at

8    this hearing, due to the fact that it did not own any interest in the loans at issue and due to potential

9    impact of the case upon LCPI's automatic stay.  On March 26, 2010, the Debtors filed their Fourth

10   Amended Complaint. The following is a summary of the causes of action set forth in the Fourth

11   Amended Complaint:

12                          **(i)    Equitable Subordination.**

13        Based on the pre-petition inequitable conduct of the Lehman Entities, summarized in

14   Section 4.2, the Debtors have sought to subordinate the claims and avoid the liens of the Holders

15   of the Lehman Disputed Loans to the extent necessary to pay the Claims of unpaid Creditors that

16   were damaged by the inequitable conduct.

17                          **(ii)    The Fraudulent Transfer Claims.**

18        The fraudulent conveyance claims set forth in the Fourth Amended Complaint include the

19   following:

20        (i)    Acton Estates asserts a fraudulent conveyance claim against Fenway (as a non-

21   debtor success to LCPI) in order to avoid a lien in the amount of $342,841,322.

22        (ii)    SunCal Emerald asserts a fraudulent conveyance claim against Fenway (as a non-

23   debtor success to LCPI) in order to avoid a lien in the amount of $298,457,533.

24        (iii)    SunCal Bickford asserts a fraudulent conveyance claim against Fenway (as a non-

25   debtor success to LCPI) in order to avoid a lien in the amount of $168,651,104.

26        (iv)    SunCal Summit asserts a fraudulent conveyance claim against Fenway (as a non-

27   debtor success to LCPI) in order to avoid a lien in the amount of $333,296,018.

28

1      (v)     SunCal I asserts a fraudulent conveyance claim against Fenway (as a non-debtor

2  success to LCPI) in order to avoid a lien in the amount of $343,221,391.

3      (vi)    SunCal III asserts a fraudulent conveyance claim against Fenway (as a non-debtor

4  success to LCPI) in order to avoid a lien in the amount of $343,221,391.

5      (vii)   SunCal Oak Knoll asserts a fraudulent conveyance claim against Lehman ALI in

6  order to avoid a lien in the amount of $54,565,939.

7      (viii)  SunCal Torrance asserts a fraudulent conveyance claim against Lehman ALI in

8  order to avoid a lien in the amount of $112,956,015.

9      (ix)    SunCal Marblehead asserts a fraudulent conveyance claim against Lehman ALI in

10  order to avoid a lien in the amount of $95,481,774.

11      (x)     SunCal Heartland asserts a fraudulent conveyance claim against Lehman ALI in

12  order to avoid a lien in the amount of $304,730,278.

13      (xi)    SCC Communities asserts a fraudulent conveyance claim against Lehman ALI in

14  order to avoid a lien in the amount of $23,795,013.

15      (xii)   Tesoro asserts a fraudulent conveyance claim against Lehman ALI in order to avoid

16  a lien in the amount of $23,795,013.

17      (xiii)  Del Rio asserts a fraudulent conveyance claim against Lehman ALI in order to

18  avoid a lien in the amount of $23,795,013.

19                **(iii)**     **The Preference Claims.**

20      The preference claims set forth in the Fourth Amended Complaint include the following:

21  Transfers made to a Lehman Entity by a Debtor, where such Debtor was either owned by a Lehman

22  Equity Member (50%) or where a Lehman Equity Member of Lehman Entity controlled such

23  Debtor at the time of the transfer.  Furthermore, according to the Lehman Lenders' appraisals

24  submitted on the Projects of these Debtors, all of the loans were vastly undersecured at the time of

25  the transfers.

26      (i)     Delta Coves asserts a preference claim against Lehman ALI in the amount of

27  $6,195,440.46.

28

1      (ii)      SunCal Century City asserts a preference claim against Lehman ALI in the amount

2   of $10,628,819.87.

3          On April 12, 2010, the Lehman Entities filed a motion to dismiss the Fourth Amended

4   Complaint (as well as a related motion to strike portions of the same).  On that same date, the

5   Lehman Entities and Fenway, respectively, also filed answers to the Complaint denying the causes

6   of actions set forth in the Fourth Amended Complaint and alleging certain affirmative defenses.

7   Furthermore, as discussed herein, the New York Bankruptcy Court has approved Fenway's sale of

8   all Sold Loans to LCPI, which is subject to an appeal in the Second Circuit.  Consequently, the

9   filing of a fifth amended complaint may be necessary.

10          **(b)      The Debtors' Motions to Strike the Claims and Pleadings Arising from**

11          **the Sold Loans to Fenway Capital and Related Appeals.**

12          On May 29, 2009 and June 6, 2009, the Debtors filed motions seeking an order striking

13   certain claims and pleadings filed by the Lehman Lenders to the extent that they are premised on

14   the Lehman Lenders' ownership of the loans sold to Fenway Capital pursuant to the Fenway

15   Repurchase Agreement (the "Fenway Sold Loans").  The Fenway Sold Loans included the SunCal

16   Communities I Loan Agreement, the Ritter Ranch Loan Agreement, the SunCal PSV Loan

17   Agreement, the SunCal Marblehead/SunCal Heartland Loan Agreement, the Delta Coves Loan

18   Agreement, the SunCal Northlake Loan Agreement and SunCal Oak Valley Loan Agreement.  See

19   Exhibit "3."

20          At the initial hearing on the Debtors' motion to strike the Claims held on June 30, 2009, the

21   Court held that the transfer of the Fenway Sold Loans pursuant to the MRA was a true purchase and

22   sale transaction (the "Ownership Issue") and, accordingly, the Lehman Lenders retained no right to

23   file the Proofs of claim on this basis, under Federal Rule of Bankruptcy Procedure 3001(e)(1).  The

24   Court entered an order regarding the Ownership Issue on October 2, 2009.

25          The Lehman Lenders also contended that they were entitled to file the Proofs of Claim as

26   the "Fenway's authorized agent" under Federal Rule of Bankruptcy Procedure 3001(b) (the

27   "Agency Issue").  A continued hearing on the Agency Issue was set for September 22, 2009 and the

28   Court ruled that the Lehman Lenders could file the Proofs of Claim an authorized agents.

1   The Lehman Entities appealed the Ownership Issue and the Debtors appealed the Agency Issue to

2   the Bankruptcy Appellate Panel.  The Bankruptcy Appellate Panel has consolidated these two

3   appeals.  The appeals are fully briefed and awaiting the scheduling of oral arguments.

4           **(c)       The Debtors' Motion Pursuant to Section 506(d) and the 506(d)**

5                       **Valuation Stipulation.**

6           Bankruptcy Code Section 506(a) provides that an asserted Secured Claim is only an

7   Allowed Secured Claim to the extent of the value of such Creditor's interest in the Estate's interest

8   in such property.  Bankruptcy Code Section 506(d) then provides that liens against the Debtor's

9   Assets that have no such value to the Alleged Secured Creditor are void.  Finally, Bankruptcy

10  Code Section 551 provides that such liens that are void under Section 506(d) are preserved for the

11  benefit of the applicable Debtor's Estate.

12          On May 29, 2009 and June 9, 2009, the Debtors filed a motion seeking orders (i) valuing

13  certain collateral at zero dollars, (ii) voiding the corresponding liens, pursuant to 11 U.S.C. §

14  506(d), and (iii) preserving such voided liens for the benefit of the respective bankruptcy estates.

15          The Debtors and the Lehman Entities subsequently entered into a stipulation to resolve the

16  valuation of such Liens. This stipulation provided that these liens would be valued at zero for all

17  purposes, with the exception of potential equity distributions. Although the Lehman Entities

18  acknowledged the stipulation on the record before the bankruptcy court, and promised to file the

19  executed stipulation that day, counsel for the Lehman Entities subsequently refused to file the

20  document disclosed to the Court on the record, and the parties have subsequently entered into a

21  modified stipulation on substantially similar terms that have been filed with both the New York

22  and California Bankruptcy Courts.

23          **(d)       The Debtors' 502(d) Objections.**

24          The Voluntary Debtors and other parties-in-interest are preparing a motion to disallow,

25  pursuant to 11 U.S.C. § 502(d), the following Disputed Claims filed by Lehman ALI and LCPI

26  based on the various causes of action set forth in the Lehman Adversary Proceeding, as well as

27  other potential defenses to the Lehman Entities Disputed Claims, including but not limited to the

28  following:

| Disputed Proof of Claim No. | Debtor | Claim Holder | Claim Amount |
|---|---|---|---|
| 6 | Acton Estates | LCPI | $343,221,391 |
| 6 | SunCal Emerald | LCPI | $343,221,391 |
| 16 | SunCal Bickford | LCPI | $343,221,391 |
| 12 | SunCal Summit | LCPI | $343,221,391 |
| 1 | SunCal I | LCPI | $343,221,391 |
| 2 | SunCal III | LCPI | $343,221,391 |
| 1 | SCC Palmdale | LCPI | $119,664,305 |
| 12 | SunCal Oak Knoll | Lehman ALI | $158,141,365 |
| 4 | SunCal Torrance | Lehman ALI | $158,141,365 |
| 9 | SunCal Heartland | Lehman ALI | $354,325,126 |
| 21 | SunCal Marblehead | Lehman ALI | $354,325,126 |
| 9 | SCC Communities | Lehman ALI | $ 23,795,013 |
| 7 | Tesoro | Lehman ALI | $ 23,795,013 |
| 14 | Del Rio | Lehman ALI | $ 23,795,013 |
| 21 | Delta Coves | Lehman ALI | $ 2,060,231 |

The Debtors have been informed that the earliest the Court can hear this motion is in February 2011.

**(e)    The Debtors' Recoupment/Set-Off Claims.**

Pursuant to the terms of the joint ventures entered into by and among the Debtors and the Lehman Entities, the Lehman Entities were responsible for paying the costs incurred in the development of the Projects. These costs include the claims of vendors who provided goods and services to the Projects and the claims asserted by the Bond Claimants. Although the Lehman Entities contend that they were merely "lenders," and that they did not assume any liability for these claims, as the above facts and those that will be adduced prior to and at the confirmation of the Plan will demonstrate, the Lehman Entities are in fact obligated to pay these claims.

The Debtors' contend that direct liability can be imposed on the Lehman Entities on various grounds, including the following. First, the Lehman Entities were either in a joint venture relationship with the Debtors from the outset, or this relationship developed and became a legal fixture through the Lehman Entities' course of conduct. Pursuant to this relationship, and the promises and representations made therein, the Lehman Entities agreed to be responsible for all vendor and Bond Claims incurred at or in connection with the Projects. The role of each of the Debtors, by mutual agreement, was to provide development expertise and project management

1   services. The Lehman Entities were required to provide the capital necessary to fund the Projects.

2   Second, during the last eighteen months of the relationship between the parties, the Lehman

3   Entities assumed direct responsibility for all claims incurred during this period, by insisting that

4   work continue on the Projects and by repeatedly promising to pay for this work. Since the Lehman

5   Entities ordered this work, and promised to pay for the same, they bear this financial

6   responsibility.

7           The Lehman Entities failure to pay the vendor and Bond Claims associated with the

8   Projects as agreed, and as was their obligation under the terms of the joint ventures, has unjustly

9   shifted responsibility for these liabilities to the Debtors in breach of the joint venture terms. Under

10  these circumstances, the Debtors believe they have the right to assert "recoupment" claims against

11  the Secured Claims that the Lehman Entities are asserting against the Projects. The recoupment

12  claims held by each estate would be equal to the amount of the allowed claims asserted in the

13  applicable Debtor's estate by claimants who performed work or services on the applicable Project,

14  but that was not paid for the same by the Lehman Entities as promise, and the applicable Bond

15  Claims asserted with respect to such Debtor's Project. These claims arise out of the "same

16  transaction and occurrence" as the secured claims – the joint ventures entered into, or arising by

17  and among the applicable Debtors and the applicable Lehman Entities, with respect to one or more

18  of the Projects.

19          These recoupment claims will be pursued through claim objections. Each objection will

20  seek to recoup or offset the amount of the applicable Debtor's estate's qualifying recoupment

21  claims against the secured claim asserted by the Lehman Entities. Once the amount of the

22  recoupment is fixed by the Court, this sum will be allocated to the applicable Debtor's estate

23  through its Distribution Account, upon the sale of the underlying Project. Alternatively, in those

24  cases where the Project does not sell, a lien will be imposed under the Plan, as of the Effective

25  Date, on the Project that will be senior to the Secured Claim and lien of the affected Lehman

26  Entity.

27          To the extent that the Court concludes that recoupment does not apply on the facts, then the

28  Debtors will seek the same relief under a "setoff" theory. Setoff allows Party A to offset a claim

1    held by Party "A" against a claim asserted against Party A by Party B. However, setoff is a broader

2    right than recoupment.  Unlike recoupment, setoff claims do not have to arise from the same

3    transaction and occurrence. They can arise from different transactions.

4        Recoupment is not subject to the automatic stay. *In re McMahon*, 129 F.3d 93, 95 (2nd Cir.

5    1997); *Newbery Corp. v. Fireman's Fund Ins. Co.*, 95 F.3d 1392, 1398 (9th Cir. 1996).  Although

6    "setoff" is subject to the automatic stay, the stay does not apply to claim objections. *Wheatfield*

7    *Business Park*, 308 B.R. 463 (9th Cir. BAP 2004).  Accordingly, the Debtors' recoupment and

8    setoff rights will be pursued through the claims objection procedure in order to eliminate the

9    LCPI's ongoing effort to use its stay as a sword to prevent the resolution of the claims that it has

10    filed against the Debtors.

11        **(f)**    **The Debtors' Potential Post-Petition Claims Against Lehman and Their**

12            **Agents.**

13        The Voluntary Debtors believe that the Lehman Entities and certain agents of the Lehman

14    Entities (the "Culpable Agents") engaged in a post-petition course of conduct that severely

15    damaged the Voluntary Debtors, their estates and the recovery rights of creditors. In summary, the

16    actions taken by the Lehman Entities and the Culpable Agents included, among other things, the

17    following:

18        a.    Actively concealing the prepetition sale of the Lehman Disputed

19            Loans to Fenway Capital and misrepresenting themselves as the

20            owners of these loans during the post-petition period; and

21        b.    Improperly asserting that LCPI's automatic stay barred actions in

22            the Voluntary Debtors' Chapter 11 Cases relating to two of the

23            Lehman Disputed Loans, when in fact LCPI did not own any

24            interest in such loans and hence the stay could not apply.

25        The foregoing course of conduct inflicted millions of dollars in damages upon the

26    Voluntary Debtors in the form of additional fees and costs, and it materially delayed the progress of

27    the Voluntary Debtors' reorganization effort.

28

MAINDOCS-#149764-v6-SunCal_Fourth_Amended_Disclosure_Statement.DOC

1    A number of the Culpable Agents may fall within the reach of what is referred to as the

2    "Barton Doctrine." In summary, this doctrine requires a party seeking to file a complaint against

3    certain court-appointed professionals representing a debtor to first seek the consent of the

4    appointing court. The Voluntary Debtors will file the requisite "Barton" motion in the Lehman

5    Entities' cases prior to filing a complaint against the Culpable Agents.

6    **5.6.    The Lehman Fenway Claims Transaction, Compromise Motion Filed By the**

7    **Lehman Entities, and the Debtor's Motion for Relief from Stay.**

8    **(a)    Lehman Entities' and Fenway's Proposed Claims Transaction.**

9    In April of 2010, LCPI and LBHI filed that certain *Motion Pursuant To Bankruptcy Rule*

10   *9019 For Authority To Compromise Controversy In Connection With A Repurchase Transaction*

11   *With Fenway Capital, LLC And A Commercial Paper Program With Fenway Funding, LLC* (the

12   "Compromise Motion.").  In the motion, LCPI and LBHI represented that they were

13   "compromising" various issues and relationships arising out of the repurchase transaction

14   described in the LCPI – Fenway MRA (the "Repo"). However, a careful review of the transaction

15   described therein indicated that the motion was designed to accomplish the following objectives:

16   a.    To transfer title to the Lehman Disputed Loans at issue in the Lehman

17         Adversary Proceeding from Fenway Capital to LCPI, an entity that had no

18         interest in five of the seven loans prepetition;

19   b.    To allow LCPI, as the new owner of the Lehman Disputed Loans, to re-

20         join the Lehman Adversary Proceeding as a defendant, and once there to

21         use its automatic stay as a "sword" to stay this action;

22   c.    To enable the Lehman Entities to thwart the pursuit of the SunCal Plan

23         Proponents' Plan;

24   d.    To bestow upon the Lehman Entities' purported competing plan an unfair

25         advantage in the plan confirmation contest by delaying the effectiveness

26         of critical provisions in the SunCal Plan Proponents' Plan; and

27   e.    To shield Fenway Capital and its principals from liability and

28         investigation through discovery.

-58-

1       At the hearing on the Compromise Motion, the bankruptcy court in New York approved

2  the Compromise Motion, and stated, consistent with the objectives of the Lehman Entities, that the

3  continued pursuit of the Lehman Adversary Proceeding would be stayed, once LCPI obtained title

4  to the Lehman Disputed Loans. The order reflecting this relief was entered on May 13, 2010 (the

5  "Compromise Order").

6       **(b)**     **The Debtors' Opposition and the Debtors' Second Relief From Stay**

7                   **Motion Filed in Response to Lehman's Compromise Motion.**

8       In the face of the Lehman Entities' attempt, through the Compromise Motion, to drag the

9  Lehman Disputed Loans within the protection of LCPI's automatic stay (again, in order to thwart

10  the Lehman Adversary Proceeding), the Debtors filed a motion in the LCPI's and LBHI's

11  bankruptcy cases seeking an order confirming that the stay did not apply to this action, or in the

12  alternative, granting relief from stay.  Shortly prior to the hearing, the Trustee Debtors filed a

13  withdrawal of their portion of the motion, based on a purported settlement with LCPI, the terms of

14  which have not been disclosed.  The bankruptcy court in New York denied this motion, in part,

15  based on the Trustee's purported settlement.  The order denying this motion was entered on May

16  17, 2010 (the "RFS Order").

17       **(c)**     **The Voluntary Debtors' Appeals of the Compromise Order and RFS**

18                   **Order to the Second Circuit.**

19       The Voluntary Debtors appealed both the Compromise Order and the RFS Order to the

20  District Court. On August 27, 2010, the District Court in New York declined to grant the Debtors

21  any relief. Accordingly, they are proceeding with an appeal to the Second Circuit Court of

22  Appeals.

23       **5.7.**    **The Debtors' Motion for a Stay to Suspend Certain Lehman Actions.**

24       On September 21, 2010, the Voluntary Debtors, Acquisitions, and SunCal Management

25  filed a motion requesting, among other relief, for the Court to suspend the Lehman Entities

26  competing plan and disclosure statement unless and until the Lehman Entities agree to provide the

27  Debtors with relief from their automatic stay in the Debtors' Chapter 11 Cases (the "Suspension

28

1    Motion").  The Suspension Motion also requests the Court to extend the two-year statute of

2    limitations for avoidance actions against the Lehman Entities and certain other entities as well.

3        **5.8.**    <u>**The Debtors' Other Litigation with Non-Lehman Related Parties**</u>.

4        **(a)**    <u>**The Debtors' Failed Preliminary Injunction Motion Against the**</u>

5        <u>**Holders of Bond Claims**</u>.

6    On February 20, 2009, the Debtors filed a complaint and a Motion for Preliminary

7    Injunction, pursuant to which the Debtors sought a Motion for Preliminary Injunction against the

8    Holders of Bond Claims from pursuing such Claims. On February 23, 2009, the Court denied the

9    Debtors' request for the TRO and granted the Debtors' request to require the defendants to show

10    cause why the Motion for Preliminary Injunction should not be issued.

11    On March 2, 2009, several Holders of Bond Claims objected to the Motion for the

12    Preliminary Injunction.  The objections generally alleged that the Debtors failed to show that the

13    balancing of the equities favored granting the Preliminary Injunction versus the harm to the

14    Holders of the Bond Claims.  At a hearing held on March 4, 2009, the Court denied the

15    Preliminary Injunction Motion and the underlying complaint has subsequently voluntarily been

16    dismissed without prejudice.

17        **(b)**    <u>**The Contractors' Successful Motions for Relief from Stay to Pursue the**</u>

18        <u>**Bond Claims**</u>.

19    Various contractors that were hired to perform work on some of the Projects have filed

20    motions for relief from stay with the Bankruptcy Court to pursue their purported Bond Claims.

21    These creditors have requested that the Bankruptcy Court grant these creditors relief from the

22    automatic stay to allow such creditors to enforce certain Claims that such creditors allege to have

23    against some of the Debtors, including certain surety bonds that are alleged to have been issued in

24    favor of such creditors.  The Debtors opposed the motions on the grounds that the various Debtors

25    are indispensible parties.  The Court conditionally granted the motions provided that the Bond

26    Claimants are able to sever the Debtors from their proceedings on the Bonds.

27        **(c)**    <u>**The Non-Lehman Related Primary Secured Lenders' Successful**</u>

28        <u>**Motions for Relief from Stay**</u>.

1    Various secured creditors have filed motions for relief from stay with respect to portions of

2    the properties owned by Seven Brothers, SunCal Summit and SunCal Beaumont.  Such secured

3    creditors are not defendants in the Adversary Proceeding and the applicable Debtors have not

4    opposed the requested relief.  A number of foreclosures have since been completed relating to the

5    parcels previously owned by Seven Brothers, SunCal Beaumont, and SunCal Summit, thereby

6    reducing the parcels owned by the Debtors in these Projects.

7           **(d)**        **The Rubidoux 60 Litigation.**

8    On December 17, 2008, Rubidoux and EMR filed a complaint to remove a prior action (the

9    "Rubidoux Action") filed with the Superior Court of the State of California, County of Riverside

10    (the "Superior Court") to the Bankruptcy Court.  The Rubidoux Action filed with the Superior

11    Court is against SunCal Emerald for breach of contract, breach of implied covenant of good faith

12    and fair dealings, and declaratory relief.

13    Rubidoux and EMR make the allegations that (i)  certain real property over which SunCal

14    Emerald holds legal title is actually being held in constructive trust for Rubidoux and EMR, (ii)

15    said property therefore should not be considered part of SunCal Emerald's bankruptcy estate, and

16    (iii) that certain funds currently held in an escrow account that SunCal Emerald refuses to allow to

17    be released to Rubidoux and EMR should also not be considered part of SunCal Emerald'

18    bankruptcy estate because such funds belong to Rubidoux and EMR or the "Church" (see (e)

19    below)

20    According to Rubidoux and EMR, these allegations are based on various prepetition

21    agreements between EMR, Rubidoux and SunCal Emerald, pursuant to which SunCal Emerald

22    allegedly holds title to portions of the Emerald Meadows Project in constructive trust for EMR and

23    Rubidoux.  Rubidoux and EMR allege that portions of the Emerald Meadows Project were

24    temporarily transferred to SunCal Emerald, without any consideration and that SunCal Emerald is

25    required to transfer such property back to EMR and Rubidoux when certain parcel maps are

26    recorded.

27

28

1    Rubidoux and EMR also contend that that sum of approximately $600,000, which is

2    currently held in a certain escrow account by SunCal Emerald, should be paid to Rubidoux and

3    EMR or the Church.

4    On March 10, 2009, SunCal Emerald filed a motion to remand the Rubidoux Action to the

5    Superior Court on the grounds that (i) the Rubidoux Action raises exclusively issues of state law

6    and invokes no substantive right created by the Bankruptcy Code; (ii) the Rubidoux Action is a

7    non-core proceeding and the parties have duly made a demand for a jury trial with the Superior

8    Court; (iii) SunCal Emerald does not consent to the Bankruptcy Court's conducting a jury trial of,

9    or entry of a final order with respect to, the Rubidoux Action; and (iv) SunCal Emerald will suffer

10    prejudice if the Court does not remand the Rubidoux Action.

11    On April 16, 2009, Rubidoux and EMR filed a first amended complaint and sought to add

12    three additional claims against SunCal Emerald as described below.

13    On April 23, 2009, SunCal Emerald filed an opposition to the filing of the first amended

14    complaint based on the grounds that Rubidoux and EMR's proposed amendment seeks to (i)

15    address a controversy that does not exist and (ii) to prevent a potential outcome that is not possible

16    under the law.  On April 23, 2009, Rubidoux and EMR filed an opposition to SunCal's Emerald's

17    motion to remand the Rubidoux Action to the Superior Court.

18    On May 7, 2009, the Bankruptcy Court granted SunCal Emerald's motion to remand the

19    Rubidoux Action to the Superior Court.

20    On July 14, 2009, the Bankruptcy Court granted the motion for relief from stay and

21    remanded the Rubidoux Action to the Superior Court.

22    **(e)    Church Litigation.**

23    On March 30, 2009, Life Church of God in Christ (the "Church") filed an adversary

24    complaint (the "Church Litigation") against SunCal Emerald for breach of contract, breach of

25    implied covenant of good faith and fair dealings and declaratory relief.

26    The Church alleges that SunCal Emerald has not used its best efforts, as required by certain

27    agreements, to record various maps to entitle the property owned by SunCal Emerald and that such

28    failure has caused its inability to transfer certain portions of the property owned by SunCal

1    Emerald to the Church.  The Church further alleges that SunCal Emerald is obligated to make

2    certain improvements to described property but has failed to do so.  The Church also alleges that

3    SunCal Emerald has failed to keep the property free and clear of liens and encumbrances as

4    required by certain agreements.

5          On April 1, 2009, SunCal Emerald filed its response to the Church Complaint generally

6    denying various elements of the causes of action asserted against it and asserting various

7    affirmative defenses.

8              **(f)**      **Hillcrest's Successful Motion for Relief from Stay.**

9          On October 1, 2009, Hillcrest Contracting, Inc. filed a motion for relief from stay to

10   continue its litigation against SunCal Oak Valley in state court for amounts allegedly owed to it for

11   work performed on a private work of improvement described as Fairway Canyon (Oak Valley

12   Champions).  On November 18, 2009, the Trustee filed a notice of non-opposition.  On

13   December 3, 2009, the Court granted this motion.

14             **(g)**      **Arch's Motion for Relief from Stay.**

15         On March 10, 2010, Arch and the City of San Clemente jointly filed a motion for relief

16   from stay.  The motion requested an order granting the following relief: (1) allowing such parties

17   to obtain authorization from the Trustee for a right of entry to allow Arch, as subdivision

18   performance bond surety for debtor-in-possession SunCal Marblehead, and the City (and their

19   respective contractors and consultants) to enter onto land located entirely, or in part, on the

20   Property owned by SunCal Marblehead to complete works of improvement which, if left

21   unfinished, pose a health and safety risk to the general public; (2) to the extent such improvements

22   are located entirely, or in part, on the Project owned by SunCal Marblehead authorizing the City to

23   accept SunCal Marblehead's offer of dedication for such improvements and the rights-of-way

24   pertaining thereto upon completion; and (3) to the extent SunCal Marblehead may have custody of

25   any equipment, materials, and supplies that are needed to complete the works of improvement,

26   Arch and City request that such equipment, materials, and supplies be released to Arch and its

27   completion contractors so that the applicable portion(s) of the Project can timely proceed.  There

28   has been no opposition to this motion.  On April 6, 2010, the Court granted this motion.

**(h)    Shea's Successful Motion for Relief from Stay.**

On April 7, 2010, Shea Construction, Inc. filed a motion for relief from stay to pursue a state court for foreclosure of liens on property previously owned by the Debtors and no longer property of the Debtors' estate.  On May 14, 2010, the Court granted this motion.

**(ii)    Bond Safeguard Motion.**

Bond Safeguard, a surety that issued bonds to secure the performance of work on certain projects, filed a motion seeking authority to file  claims relating to these bond claims after the bar date. The Debtors opposed this motion. A hearing on the matter had not yet been held.

# VI.

## TREATMENT OF UNCLASSIFIED CLAIMS

As required by the Bankruptcy Code, the Plan places Claims and Interests into various Classes according to their right to priority.  However, certain types of Claims are not classified in any Classes under the Plan.  These Claims are deemed "unclassified" under the provisions of the Code.  They are not considered impaired and they do not vote on the Plan, because they are automatically entitled to specific treatment provided for them in the Code.  As such, the SunCal Plan Proponents have not placed the following Claims in a Class.  The treatment of these unclassified Claims is as provided below.

### 6.1.    Treatment of Allowed Administrative Claims.

The Code requires that all Allowed Administrative Claims be paid on the Effective Date of the Plan, unless a particular Holder agrees to a different treatment.  The treatment of Allowed Administrative Claims is as described below.  However, such Administrative Claims are continuing to be incurred.  The Allowed Administrative Claims shall be paid from the applicable Distribution Account(s) pursuant to the Acquisitions Administrative Loan.

**(a)    Treatment and Repayment of the Lehman's Administrative Loan(s).**

Subject to any potential post-petition setoff and/or recoupment rights approved by the Court, the Lehman's Administrative Loans shall continue to have a first priority lien against the respective Assets securing such loans and the applicable Net Sale Proceeds Account.  The Lehman Administrative Loans shall be payable from the applicable Net Sales Proceeds Accounts and from

1    the Distribution Accounts of the Debtors that were the borrowers under the Lehman

2    Administrative Loan(s) to the extent and amount that such borrower received loan proceeds.  In

3    the event that the Plan Trust has not repaid such loan(s) by the expiration of the Sales Period, the

4    Holders of the Lehman Administrative Loan(s) shall be free to pursue their rights and remedies

5    against the Assets securing the Lehman Administrative Loans under applicable law.

6              **(b)      Repayment of Allowed Administrative Claims Other than the Lehman**

7                         **Administrative Loans.**

8              Except to the extent that the Holder of an Allowed Administrative Claim agrees to a

9    different treatment and subject to the Administrative Claims Bar Date set forth herein, the

10   Distribution Agent shall pay each Allowed Administrative Claim in full, in Cash, on the later of

11   (i) the Effective Date, (ii) within ten (10) Business Days after the date such Administrative Claim

12   becomes an Allowed Administrative Claim, or (iii) the date such Allowed Administrative Claim

13   becomes due according to its terms. Notwithstanding the foregoing, any Allowed Administrative

14   Claim representing obligations incurred in the ordinary course of post-petition business by the

15   Debtors in Possession (including without limitation post-petition trade obligations and routine

16   post-petition payroll obligations) shall be paid in full or performed by the Plan Trustee in the

17   ordinary course of business, in accordance with the terms of the particular obligation.

18             **(c)      Administrative Claims Bar Date.**

19                        **(i)      Administrative Claims Bar Date.**

20             All applications for final compensation of Professionals for services rendered and for

21   reimbursement of expenses incurred on or before the Effective Date and all other requests for

22   payment of Administrative Claims incurred before the Effective Date under Sections 507(a)(2)

23   or 507(b) of the Bankruptcy Code (except only for (i) post-petition, ordinary course trade

24   obligations and routine post-petition payroll obligations incurred in the ordinary course of the

25   Debtors' post-petition business, for which no bar date shall apply, and (ii) post-petition tax

26   obligations, for which the bar date described in the following Section shall apply) shall be Filed

27   with the Bankruptcy Court and served upon the Plan Trustee no later than the General

28   Administrative Claims Bar Date, unless such date is extended by the Bankruptcy Court after notice

1    to the Plan Trustee.  Any such request for payment of an Administrative Claim that is subject to

2    the General Administrative Claims Bar Date and that is not Filed and served on or before the

3    Administrative Claims Bar Date shall be forever barred; any party that seeks payment of

4    Administrative Claims that (i) is required to file a request for payment of such Administrative

5    Claims and (ii) does not file such a request by the deadline established herein shall be forever

6    barred from asserting such Administrative Claims against the Debtors, the Plan Trust, their estates,

7    or any of their property.

8                  **(ii)    Administrative Tax Claims Bar Date.**

9            All requests for payment of Administrative Claims by a governmental unit for Taxes (and

10   for interest and/or penalties related to such Taxes) for any tax year or period, all or any portion of

11   which occurs or falls within the period from and including the Petition Date through and including

12   the Effective Date ("Tax Administrative Claims") and for which no bar date has otherwise

13   previously been established, must be filed and served on the Plan Trustee on or before the later of

14   (i) sixty (60) days following the Effective Date; and (ii) 180 days following the filing of the tax

15   return for such taxes for such tax year or period with the applicable governmental unit.  Any

16   Holder of any Tax Administrative Claims that is required to file a request for payment of such

17   taxes and does not file and properly serve such a request by the applicable bar date shall be forever

18   barred from asserting any such Tax Administrative Claims against the Debtors or the Plan Trust.

19           **6.2.    Treatment of Priority Unsecured Tax Claims.**

20           Priority Tax Claims are certain unsecured income, employment and other taxes described

21   by Code Section 507(a)(8).  The Code requires that each holder of such a Section 507(a)(8)

22   priority tax claim receive the present value of such Claim in deferred cash payments, over a period

23   not exceeding five (5) years from the petition date and that such treatment not be less favorable

24   than the treatment accorded to non priority unsecured creditors.

25           At the election of the Plan Trustee, the Holder of each Allowed Priority Tax Claim shall be

26   entitled to receive, on account of such Claim, (i) equal cash payments on the last Business Day of

27   each three-month period following the Effective Date, during a period not to exceed five years

28   after November 6, 2008, totaling the principal amount of such Claim plus simple interest on any

1  unpaid balance from the Effective Date, calculated at the interest rate available on ninety (90) day

2  United States Treasuries on the Effective Date, (ii) such other treatment agreed to by the Holder of

3  the Allowed Priority Tax Claim and the Plan Trustee, provided such treatment is on more

4  favorable terms to the Debtors (or the Plan Trust after the Effective Date) than the treatment set

5  forth in clause (i) hereof, or (iii) payment of the full Allowed Priority Tax Claim in Cash.

6                                         **VII**.

7                    **CLASSIFICATION OF CLAIMS AND INTERESTS**

8            As required by the Code, the Plan places Claims and Interests into various Classes

9  according to their right to priority and other relative rights.  The Plan specifies whether each Class

10  of Claims or Interests is impaired or unimpaired, and the Plan sets forth the treatment each Class

11  will receive.  The table below lists the Classes of Claims established under the Plan and states

12  whether each particular Class is impaired or left unimpaired by the Plan.  A Class is "unimpaired"

13  if the Plan leaves unaltered the legal, equitable and contractual rights to which the Holders of

14  Claims or Interests in the Class are entitled, with certain exceptions specified in the Bankruptcy

15  Code.

16          The Debtors have not yet completed their investigation on whether or not the Claims and

17  Interests are Allowed and their listing herein should not be construed as providing for Allowance

18  under the Plan.  However, certain Disputed Claims and Disputed Liens are noted below.

| CLASSIFICATION OF HOLDERS OF UNPAID SECURED REAL PROPERTY TAX CLAIMS ON REAL PROPERTY SUBJECT TO DEEDS OF TRUST ARISING FROM LEHMAN'S DISPUTED CLAIMS | | |
|---|---|---|
| **Class** | **Claimant** | **Claim Nos.**[6] |
| **Class 1.1** | Los Angeles County as the Holder of an Unpaid Secured Real Property Tax Claim against the Ritter Ranch Project in the amount of $2,108,683. | Palmdale Hills 12 |
| **Class 1.2** | Los Angeles County as the Holder of an Unpaid Secured Real Property Tax Claim against the Acton Project in the amount of $370,137 | Acton Estates 1 |

---

[6] These Real Property Tax Claims have been updated to include amounts for which proofs of claim have not yet been filed.

| | CLASSIFICATION OF HOLDERS OF UNPAID SECURED REAL PROPERTY TAX CLAIMS ON REAL PROPERTY SUBJECT TO DEEDS OF TRUST ARISING FROM LEHMAN'S DISPUTED CLAIMS | |
|---|---|---|
| **Class** | **Claimant** | **Claim Nos.[6]** |
| **Class 1.3** | Riverside County as the Holder of an Unpaid Secured Real Property Tax Claim against the Emerald Meadows Project in the amount of $673,353. | Emerald Meadows 9 |
| **Class 1.4** | Placer County as the Holder of an Unpaid Secured Real Property Tax Claim against the Bickford Ranch Project in the amount of $5,952,002. | Scheduled Amount |
| **Class 1.5** | Los Angeles County as the Holder of an Unpaid Secured Real Property Tax Claim against the Tesoro Project in the amount of $72,771. | Tesoro 2 |
| **Class 1.6** | Placer County as the Holder of an Unpaid Secured Real Property Tax Claim against the Summit Valley Project in the amount of $238,494. | Palmdale Hills 97 |
| **Class 1.7** | Contra Costa County as the Holder of an Unpaid Secured Real Property Tax Claim against the Delta Coves Project in the amount of $609,221. | Delta Coves 16 |
| **Class 1.8** | Riverside County as the Holder of an Unpaid Secured Real Property Tax Claim against the Heartland Project in the amount of $559,022. | SunCal Heartland 5 |
| **Class 1.9** | Orange County as the Holder of an Unpaid Secured Real Property Tax Claim against the Marblehead Project in the amount of $757,712. | SunCal Marblehead 49 and 57 |
| **Class 1.10** | Los Angeles County as the Holder of an Unpaid Secured Real Property Tax Claim against the Northlake Project in the amount of $2,767,794. | Scheduled Amount |
| **Class 1.11** | Riverside as the Holder of an Unpaid Secured Real Property Tax Claim against the Oak Valley Project in the amount of $280,280. | SunCal Oak Valley 9 |
| **Class 1.12** | San Bernardino County as the Holder of an Unpaid Secured Real Property Tax Claim against the Palm Springs Village Project in the amount of $589,367. | SunCal PSV 22 |

| CLASSIFICATION OF HOLDERS OF UNPAID SECURED REAL PROPERTY TAX CLAIMS ON REAL PROPERTY SUBJECT TO DEEDS OF TRUST ARISING FROM LEHMAN'S DISPUTED CLAIMS | | |
|---|---|---|
| **Class** | **Claimant** | **Claim Nos.[6]** |
| **Class 1.13** | Alameda County as the Holder of an Unpaid Secured Real Property Tax Claim against the Oak Knoll Project in the amount of $2,356,035. | SunCal Oak Knoll 22, 23 and 24 |
| **Class 1.14** | Los Angeles County as the Holder of an Unpaid Secured Real Property Tax Claim against the Torrance Project in the amount of $635,349. | SunCal Torrance 10 |

| CLASSIFICATION OF HOLDERS OF UNPAID SECURED REAL PROPERTY TAX CLAIMS ON REAL PROPERTY NOT SUBJECT TO DEEDS OF TRUST ARISING FROM THE LEHMAN'S DISPUTED CLAIMS | | |
|---|---|---|
| **Class** | **Claimant** | **Claim Nos.** |
| **Class 2.1** | San Bernardino County as the Holder of an Unpaid Secured Real Property Tax Claim against the Summit Valley Project in the amount of $258,705. | Scheduled Amount |
| **Class 2.2** | Riverside County as the Holder of an Unpaid Secured Real Property Tax Claim against the Beaumont Project in the amount of $306,003. | SunCal Beaumont 9 |
| **Class 2.3** | Stanislaus County as the Holder of an Unpaid Secured Real Property Tax Claim against the Johannson Ranch Project in the amount of $271,228. | Scheduled Amount |

| CLASSIFICATION OF LEHMAN'S DISPUTED CLAIMS | | |
|---|---|---|
| **Class** | **Claims** | **Claim Nos.** |
| **Class 3.1** | The Holders of Lehman's Disputed Claims filed by LCPI against SunCal I, SunCal III, Acton Estates, SunCal Emerald, SunCal Bickford, SunCal Summit Valley arising from the SunCal Communities I Loan Agreement in the asserted amount of $343,221,391. | SunCal I:  1 SunCal III:  2 Acton Estates:  6 SunCal Emerald: 7 SunCal Bickford: 16 SunCal Summit: 12 |

MAINDOCS-#149764-v6-SunCal_Fourth_Amended_Disclosure_Statement.DOC

| **CLASSIFICATION OF LEHMAN'S DISPUTED CLAIMS** | | |
|---|---|---|
| **Class** | **Claims** | **Claim Nos.** |
| **Class 3.2** | The Holder of Lehman's Disputed Claims filed by LCPI against Palmdale Hills arising from the Ritter Ranch Loan Agreement in the asserted amount of $287,252,096. | Palmdale Hills 65 |
| **Class 3.3** | The Holder of Lehman's Disputed Claims filed by LCPI against SCC Palmdale arising from the SCC Palmdale Loan Agreement in the asserted amount of $119,664,305. | SCC Palmdale 1 |
| **Class 3.4** | The Holder of Lehman's Disputed Claims filed by Lehman ALI against SunCal Bickford arising from the Bickford Second Loan Agreement in the asserted amount of $56,494,059. | SunCal Bickford 17 |
| **Class 3.5** | The Holder of Lehman's Disputed Claims filed by Lehman ALI against SCC Communities, Tesoro and Del Rio arising from the Interim Loan Agreement in the asserted amount of $23,795,012. | SCC Communities: 9<br>Del Rio: 14<br>Tesoro: 7 |
| **Class 3.6** | The Holder of Lehman's Disputed Claims filed by Lehman ALI against SunCal Oak Knoll and SunCal Torrance arising from the SunCal Oak Knoll/SunCal Torrance Loan Agreement in the asserted amount of $158,141,364. | SunCal Oak Knoll: 12<br>SunCal Torrance: 4 |
| **Class 3.7** | The Holder of Lehman's Disputed Claims filed by Lehman ALI against Delta Coves arising from the Delta Coves Loan Agreement in the asserted amount of $206,023,142. | Delta Coves 21 |
| **Class 3.8** | The Holder of Lehman's Disputed Claims filed by Lehman ALI against SunCal Marblehead and SunCal Heartland arising from the SunCal Marblehead/SunCal Heartland Loan Agreement in the asserted amount of $354,325,126. | SunCal Heartland: 9<br>SunCal Marblehead: 21 |
| **Class 3.9** | The Holder of Lehman's Disputed Claims filed by OVC Holdings against SunCal Oak Valley arising from the SunCal Oak Valley Loan Agreement in the asserted amount of $141,630,091. | SunCal Oak Valley 16 |
| **Class 3.10** | The Holder of Lehman's Disputed Claims filed by of Northlake Holdings against SunCal Northlake arising from the Northlake Loan Agreement in the asserted amount of $123,654,776. | SunCal Northlake 6 |

MAINDOCS-#149764-v6-SunCal_Fourth_Amended_Disclosure_Statement.DOC

| CLASSIFICATION OF LEHMAN'S DISPUTED CLAIMS | | |
|---|---|---|
| Class | Claims | Claim Nos. |
| Class 3.11 | The Holder of Lehman's Disputed Claim filed by Lehman ALI against SunCal PSV arising from the SunCal PSV Loan Agreement in the asserted amount of $88,257,340. | SunCal PSV 12 |
| Class 3.12 | The Holder of Lehman's Disputed Claim filed by Lehman ALI against SJD Development arising from the Pacific Point First Loan Agreement in the asserted amount of $120,110,237. | SJD Development 2 |
| Class 3.13 | The Holder of Lehman's Disputed Claim filed by Lehman ALI against SJD Partners arising from the Pacific Point First Loan Agreement in the asserted amount of $120,110,237. | SJD Partners 23 |

| CLASSIFICATION OF FILED SECURED CLAIMS OF PRIMARY SECURED CREDITORS OTHER THAN THE LEHMAN ENTITIES AND LEHMAN SUCCESSORS | | |
|---|---|---|
| Class | Claimant | Claim Nos. |
| Class 4.1 | The Holder of the filed Secured Claim of Cheryl M. Mims pursuant to a first-priority deed of trust against certain portions of the Beaumont Heights Project in the amount of $136,229. | Palmdale Hills: 101 |
| Class 4.2 | The Holder of the filed Secured Claim of William L & Kathleen Ward pursuant to a first-priority deed of trust against certain portions of the Beaumont Heights Project in the amount of $130,000. | Scheduled Amount |
| Class 4.3 | The Holder of the filed Secured Claim of Wayne & Francis Lee pursuant to a first-priority deed of trust against certain portions of the Beaumont Heights Project in the amount of $650,000. | Scheduled Amount |
| Class 4.4 | The Holder of the filed Secured Claim of Marie B. Stanford pursuant to a first-priority deed of trust against certain portions of Beaumont Heights Project in the amount of $154,742. | SunCal Beaumont 6 |
| Class 4.5 | The Holder of the filed Secured Claim of Arleen Logan pursuant to a first-priority deed of trust against certain portions of the Summit Valley Project in the amount of $668,250. | SunCal Summit 5 |

| CLASSIFICATION OF FILED SECURED CLAIMS OF PRIMARY SECURED CREDITORS OTHER THAN THE LEHMAN ENTITIES AND LEHMAN SUCCESSORS | | |
|---|---|---|
| **Class** | **Claimant** | **Claim Nos.** |
| **Class 4.6** | The Holder of the filed Secured Claim of K Square pursuant to a first-priority deed of trust Properties Inc. against certain portions of the Summit Valley Project in the amount of $200,000. | Scheduled Amount |
| **Class 4.7** | The Holder of the filed Secured Claim of Leslie Quigg & Betty Quigg pursuant to a first-priority deed of trust against certain portions of the Summit Valley Project in the amount of $1,246,500. | Scheduled Amount |
| **Class 4.8** | The Holder of the filed Secured Claim of Cheltimalie Enterprises pursuant to a first-priority deed of trust against certain portions of the Summit Valley Project owned by Seven Brothers in the amount of $1,388,156. | SunCal Summit 17 |
| **Class 4.9** | The Holder of the filed Secured Claim of Philip C Dowse and Vera G. Dowse pursuant to a first-priority deed of trust against certain portions of the Summit Valley Project owned by Seven Brothers in the amount of $296,910. | Scheduled Amount |
| **Class 4.10** | The Holder of the filed Secured Claim of Philip C. Dowse pursuant to a first-priority deed of trust against certain portions of the Summit Valley Project owned by Seven Brothers in the amount of $880,000. | Scheduled Amount |
| **Class 4.11** | The Holder of the filed Secured Claim of Desert Wind, LLC pursuant to a first-priority deed of trust against certain portions of the Summit Valley Project owned by Seven Brothers in the amount of $862,000. | Scheduled Amount |

| CLASSIFICATION OF ASSERTED MECHANIC LIEN CLAIMS ON THE DEBTORS' PROJECTS SUBJECT TO DEEDS OF TRUST ARISING FROM LEHMAN'S DISPUTED CLAIMS | | |
|---|---|---|
| **Class** | **Claimant** | **Claim Nos.** |
| **Class 5.1** | The Holder of the asserted Mechanic Lien Claim held by Asphalt Professionals against the Ritter Ranch Project owned by Palmdale Hills in the amount of $38,249. | Palmdale Hills 1 and 46 |

MAINDOCS-#149764-v6-SunCal_Fourth_Amended_Disclosure_Statement.DOC

| CLASSIFICATION OF ASSERTED MECHANIC LIEN CLAIMS ON THE DEBTORS' PROJECTS SUBJECT TO DEEDS OF TRUST ARISING FROM LEHMAN'S DISPUTED CLAIMS | | |
|---|---|---|
| **Class** | **Claimant** | **Claim Nos.** |
| **Class 5.2** | The Holder of the asserted Mechanic Lien Claim held by Sierra Cascade Construction against the Ritter Ranch Project owned by Palmdale Hills in the amount of $550,677. | Palmdale Hills 33 |
| **Class 5.3** | The Holder of the asserted Mechanic Lien Claim held by Staats Construction. Inc. against the Ritter Ranch Project owned by Palmdale Hills in the amount of $166,105. | Palmdale Hills 51 |
| **Class 5.4** | The Holder of the asserted Mechanic Lien Claim held by Southland Farmers, Inc. against the Ritter Ranch Project owned by Palmdale Hills in the amount of $177,801. | Palmdale Hills 55, 67 and 68 |
| **Class 5.5** | The Holder of the asserted Mechanic Lien Claim held by Chamelon Design Inc. against the Ritter Ranch Project owned by Palmdale Hills in the amount of $73,600. | Palmdale Hills 93, 99 |
| **Class 5.6** | The Holder of the asserted Mechanic Lien Claim held by Hall & Foreman, Inc. against the Emerald Meadows Project in the amount of $287,727. | SunCal Emerald 13 |
| **Class 5.7** | The Holder of the asserted Mechanic Lien Claim held by Proactive Engineering against the Emerald Meadows Project in the amount of $991,315. | SunCal Emerald 15 and 16 |
| **Class 5.8** | The Holder of the asserted Mechanic Lien Claim held by HD Supply Construction against the Emerald Meadows Project owned by SunCal Emerald in the amount of $14,893. | Palmdale Hills 15 |
| **Class 5.9** | The Holder of the asserted Mechanic Lien Claim held by MHM Engineers against the Bickford Ranch Project in the amount of $8,916. | SunCal Bickford 5 |
| **Class 5.10** | The Holder of the asserted Mechanic Lien Claim held by Land Architecture against the Bickford Ranch Project in the amount of $100,245. | SunCal Bickford 6 |

MAINDOCS-#149764-v6-SunCal_Fourth_Amended_Disclosure_Statement.DOC

| CLASSIFICATION OF ASSERTED MECHANIC LIEN CLAIMS ON THE DEBTORS' PROJECTS SUBJECT TO DEEDS OF TRUST ARISING FROM LEHMAN'S DISPUTED CLAIMS | | |
|---|---|---|
| **Class** | **Claimant** | **Claim Nos.** |
| **Class 5.11** | The Holder of the asserted Mechanic Lien Claim held by Kiewit Pacific Co. against the Bickford Ranch Project in the amount of $1,868,357. | SunCal Bickford 10 |
| **Class 5.12** | The Holder of the asserted Mechanic Lien Claim held by ARB, Inc. against the Bickford Ranch Project in the amount of $1,052,272. | SunCal Bickford 15 |
| **Class 5.13** | The Holder of the asserted Mechanic Lien Claim held by Independent Construction against the Bickford Ranch Project in the amount of $117,209. | SunCal Bickford 28 |
| **Class 5.14** | The Holder of the asserted Mechanic Lien Claim held by Marques Pipeline, Inc. against the Bickford Ranch Project in the amount of $330,118. | SunCal Bickford 29 and 30 |
| **Class 5.15** | The Holder of the asserted Mechanic Lien Claim held by Pacific Soils Engineering against the portion of the Summit Valley Project owned by Summit Valley in the amount of $16,827. | SunCal Summit 9 |
| **Class 5.16** | The Holder of the disputed asserted Mechanic Lien Claim held by Hertz Equipment Rental Corporation against the Delta Coves Project in the amount of $25,444. | Delta Coves 2 |
| **Class 5.17** | The Holder of the asserted Mechanic Lien Claim held by MBH Architects against the Delta Coves Project in the amount of $97,091. | Delta Coves 8 |
| **Class 5.18** | The Holder of the asserted Mechanic Lien Claim held by Top Grade Construction, Inc. against the Delta Coves Project in the amount of $250,000. | Delta Coves 3 |
| **Class 5.19** | The Holder of the asserted Mechanic Lien Claim held by HD Supply Construction against the Heartland Project in the amount of $47,675. | SunCal Heartland 2 |

| | CLASSIFICATION OF ASSERTED MECHANIC LIEN CLAIMS ON THE DEBTORS' PROJECTS SUBJECT TO DEEDS OF TRUST ARISING FROM LEHMAN'S DISPUTED CLAIMS | |
|---|---|---|
| **Class** | **Claimant** | **Claim Nos.** |
| **Class 5.20** | The Holder of the asserted Mechanic Lien Claim held by Pinnik, Inc. against the Heartland Project in the amount of $563,159. | SunCal Heartland 8 |
| **Class 5.21** | The Holder of the asserted Mechanic Lien Claim held by Dennis M. McCoy & Sons against the Heartland Project in the amount of $941,960. | SunCal Heartland 16 |
| **Class 5.22** | The Holder of the asserted Mechanic Lien Claim held by Trimax Systems, Inc. against the Marblehead Project in the amount of $75,286. | SunCal Marblehead 3 |
| **Class 5.23** | The Holder of the asserted Mechanic Lien Claim held by Butsko Utility Design, Inc. against the Marblehead Project in the amount of $6,250. | SunCal Marblehead 4 |
| **Class 5.24** | The Holder of the asserted Mechanic Lien Claim held by Dennis RMF Contracting, Inc. against the Marblehead Project in the amount of $264,749. | SunCal Marblehead 28 |
| **Class 5.25** | The Holder of the asserted Mechanic Lien Claim held by The Jasper Companies against the Marblehead Project in the amount of $165,260. | SunCal Marblehead 29 |
| **Class 5.26** | The Holder of the asserted Mechanic Lien Claim held by Kirk Negrete, Inc. dba United Steel Placers against the Marblehead Project in the amount of $270,056. | SunCal Marblehead 38 |
| **Class 5.27** | The Holder of the asserted Mechanic Lien Claim held by RBF Consulting against the Marblehead Project in the amount of $125,093. | SunCal Marblehead 39 |
| **Class 5.28** | The Holder of the asserted Mechanic Lien Claim held by RJ Noble Co. against the Marblehead Project in the amount of $175,030. | SunCal Marblehead 42, 50 and 58 |
| **Class 5.29** | The Holder of the asserted Mechanic Lien Claim held by Orange County Stripping Services against the Marblehead Project in the amount of $4,400. | SunCal Marblehead 46 and 54 |

| CLASSIFICATION OF ASSERTED MECHANIC LIEN CLAIMS ON THE DEBTORS' PROJECTS SUBJECT TO DEEDS OF TRUST ARISING FROM LEHMAN'S DISPUTED CLAIMS | | |
|---|---|---|
| **Class** | **Claimant** | **Claim Nos.** |
| **Class 5.30** | The Holder of the asserted Mechanic Lien Claim held by Savala Equipment Co. Inc. against the Marblehead Project in the amount of $34,440. | SunCal Marblehead 48 and 56 |
| **Class 5.31** | The Holder of the asserted Mechanic Lien Claim held by Rockey Murata Landscaping against the Marblehead Project in the amount of $285,643. | SunCal Marblehead 60 |
| **Class 5.32** | The Holder of the asserted Mechanic Lien Claim held by HD Supply Construction against the Oak Valley Project in the amount of $52,806. | SunCal Oak Valley 3 |
| **Class 5.33** | The Holder of the asserted Mechanic Lien Claim held by Pinnik Inc. against the Oak Valley Project in the amount of $966,987. | SunCal Oak Valley 12 and 14 |
| **Class 5.34** | The Holder of the asserted Mechanic Lien Claim held by Hillcrest Contracting Inc. against the Oak Valley Project in the amount of $136,567. | SunCal Oak Valley 23 |
| **Class 5.35** | The Holder of the asserted Mechanic Lien Claim held by MacKenzie Landscape against the Oak Valley Project in the amount of $121,297. | SunCal Oak Valley 25 |
| **Class 5.36** | The Holder of the asserted Mechanic Lien Claim held by All American Asphalt against the Oak Valley Project in the amount of $60,355. | SunCal Oak Valley 26 |
| **Class 5.37** | The Holder of the asserted Mechanic Lien Claim held by Los Angeles Times against the Oak Valley Project in the amount of $43,610. | SunCal Oak Valley 31 and 32 |
| **Class 5.38** | The Holder of the asserted Mechanic Lien Claim held by Proactive Engineering against the Oak Valley Project in the amount of $280,685. | SunCal Oak Valley 35 and 36 |
| **Class 5.39** | The Holder of the asserted Mechanic Lien Claim held by Ateliers Jean Nouvel against the 10,000 Santa Monica Project in the amount of $1,110,000. | SunCal Century City 15 |

| CLASSIFICATION OF ASSERTED MECHANIC LIEN CLAIMS ON THE DEBTORS' PROJECTS SUBJECT TO DEEDS OF TRUST ARISING FROM LEHMAN'S DISPUTED CLAIMS | | |
|---|---|---|
| **Class** | **Claimant** | **Claim Nos.** |
| **Class 5.40** | The Holder of the asserted Mechanic Lien Claim held by Englekirk & Sabol Construction Structure Engineering against the 10,000 Santa Monica Project in the amount of $324,520. | SunCal Century City 12 |
| **Class 5.41** | The Holder of the asserted Mechanic Lien Claim held by Brudvik Inc. against the Palm Springs Village Project in the amount of $43,365. | SunCal PSV 4 |
| **Class 5.42** | The Holder of the asserted Mechanic Lien Claim held by Larry Jacinto Construction Inc. against the Palm Springs Village Project in the amount of $212,663. | SunCal PSV 5 and 24 |
| **Class 5.43** | The Holder of the asserted Mechanic Lien Claim held by William + Paddon Architects + Planners Inc. against the Palm Springs Village Project in the amount of $73,798. | SunCal PSV 9 and 10 |
| **Class 5.44** | The Holder of the asserted Mechanic Lien Claim held by Southern California Edison against the Palm Springs Village Project in the amount of $23,861. | SunCal PSV 26 |
| **Class 5.45** | The Holder of the asserted Mechanic Lien Claim held by Pacific Masonry Walls, Inc. against the Palm Springs Village Project in the amount of $314,061. | SunCal PSV 33 and 39 |
| **Class 5.46** | The Holder of the asserted Mechanic Lien Claim held by J.R. Simplot Company against the Palm Springs Village Project in the amount of $3,467. | SunCal PSV 34 and 40 |
| **Class 5.47** | The Holder of the asserted Mechanic Lien Claim held by Desert Pipeline Inc. against the Palm Springs Village Project in the amount of $469,784. | SunCal PSV 36, 42 and 47 |
| **Class 5.48** | The Holder of the asserted Mechanic Lien Claim held by MSA Consulting against the Palm Springs Village Project in the amount of $666,897. | SunCal PSV 43 |

-77-

| | CLASSIFICATION OF ASSERTED MECHANIC LIEN CLAIMS ON THE DEBTORS' PROJECTS SUBJECT TO DEEDS OF TRUST ARISING FROM LEHMAN'S DISPUTED CLAIMS | |
|---|---|---|
| **Class** | **Claimant** | **Claim Nos.** |
| **Class 5.49** | The Holder of the asserted Mechanic Lien Claim held by Jackson DeMarco against the Palm Springs Village Project in the amount of $52,234. | SunCal PSV 45 |
| **Class 5.50** | The Holder of the asserted Mechanic Lien Claim held by Oliphant Golf, Inc. against the Oak Knoll Project in the amount of $456,476. | SunCal Oak Knoll 46 |
| **Class 5.51** | The Holder of the asserted Mechanic Lien Claim held by RGA Environmental, Inc. against the Oak Knoll Project in the amount of $75,617. | SunCal Oak Knoll 1 |
| **Class 5.52** | The Holder of the asserted Mechanic Lien Claim held by BKF Engineers against the Oak Knoll Project in the amount of $308,817. | SunCal Oak Knoll 2 and 19 |
| **Class 5.53** | The Holder of the asserted Mechanic Lien Claim held by CST Environmental Inc. against the Oak Knoll Project in the amount of $4,316,169. | SunCal Oak Knoll 4 and 9 |
| **Class 5.54** | The Holder of the asserted Mechanic Lien Claim held by The Professional Tree Care Co. against the Oak Knoll Project in the amount of $93,925.01. | SunCal Oak Knoll 3 |
| **Class 5.55** | The Holder of the asserted Mechanic Lien Claim held by Park West Landscape Inc. against the Ritter Ranch Project in the amount of $ 27,624.70. | Palmdale Hills 109 |

/ / /

-78-

| CLASSIFICATION OF ASSERTED MECHANIC LIEN CLAIMS ON THE PROJECTS NOT SUBJECT TO DEEDS OF TRUST ARISING FROM LEHMAN'S DISPUTED CLAIMS | | |
|---|---|---|
| Class | Claimant | Claim Nos. |
| Class 6.1 | The Holder of the asserted Mechanic Lien Claim held by Proactive Engineering against the Beaumont Heights Project in the amount of $46,188. | SunCal Beaumont 11 and 12 |
| Class 6.2 | The Holder of the asserted Mechanic Lien Claim held by Pinnick, Inc. against the Beaumont Heights Project owned by SunCal Beaumont in the amount of $1,530,146. | Palmdale Hills 62, 63 and 64 |

| CLASSIFICATION OF PRIORITY UNSECURED CLAIMS | | |
|---|---|---|
| Class 7 | Claimant | Claim Nos. |
| Class 7.1 | The Holder of Priority Claims that fall within Code Sections 507(a)(2), (4), (5), (6), and (7) in the asserted amount of $10,950 against SunCal Marblehead. | Scheduled Amount and SunCal Marblehead 45 |
| Class 7.2 | The Holder of Priority Claims that fall within Code Sections 507(a)(2), (4), (5), (6), and (7) in the asserted amount of $235 against SunCal Oak Knoll. | SunCal Oak Knoll 26 |
| Class 7.3 | The Holder of Priority Claims that fall within Code Sections 507(a)(4), (5), (6), and (7) in the asserted amount of $10,950 against Palmdale Hills. | Palmdale Hills 70 |
| Class 7.4 | The Holder of Priority Claims that fall within Code Sections 507(a)(4), (5), (6), and (7) in the asserted amount of $4,188 against SJD Partners. | Schedule Amount and SJD Partners 12 |

| CLASSIFICATION OF GENERAL UNSECURED CLAIMS NOT SUBJECT TO THE LEHMAN'S DISPUTED CLAIMS | | |
|---|---|---|
| Class | Claimant | Claim Nos. |
| Class 8.1 | The Holder of General Unsecured Claims filed against SunCal Beaumont in the in the estimated amount of $183,731. | Various Filed and Scheduled |

| CLASSIFICATION OF GENERAL UNSECURED CLAIMS NOT SUBJECT TO THE LEHMAN'S DISPUTED CLAIMS | | |
|---|---|---|
| **Class** | **Claimant** | **Claim Nos.** |
| **Class 8.2** | The Holder of General Unsecured Claims filed against SunCal Johannson in the estimated amount of $41,181. | Various Filed and Scheduled |
| **Class 8.3** | The Holder of General Unsecured Claims filed against Seven Brothers. | Contingent Bond Claims |
| **Class 8.4** | The Holder of General Unsecured Claims filed against Kirby Estates. | Contingent Bond Claims |
| **Class 8.5** | The Holder of General Unsecured Claims filed against SCC Palmdale. | Contingent Bond Claims |
| **Class 8.6** | The Holder of General Unsecured Claims filed against SunCal Century City. | Contingent Bond Claims |

| CLASSIFICATION OF GENERAL UNSECURED CLAIMS THAT ARE THE INTENDED BENEFICIARIES OF AN EQUITABLE SUBORDINATION JUDGMENT AGAINST LEHMAN'S DISPUTED CLAIMS | | |
|---|---|---|
| **Class 9** | **Claimant** | **Claim Nos.** |
| **Class 9.1** | The Holder of General Unsecured Claims that are the intended beneficiaries of an equitable subordination judgment filed against Palmdale. | Various Filed and Scheduled |
| **Class 9.2** | The Holder of General Unsecured Claims that are the intended beneficiaries of an equitable subordination judgment filed against SunCal. | Various Filed and Scheduled |
| **Class 9.3** | The Holder of General Unsecured Claims that are the intended beneficiaries of an equitable subordination judgment filed against SunCal Summit. | Various Filed and Scheduled |
| **Class 9.4** | The Holder of General Unsecured Claims that are the intended beneficiaries of an equitable subordination judgment filed against Acton Estates. | Various Filed and Scheduled |
| **Class 9.5** | The Holder of General Unsecured Claims that are the intended beneficiaries of an equitable subordination judgment filed against Delta Coves. | Various Filed and Scheduled |

| CLASSIFICATION OF GENERAL UNSECURED CLAIMS THAT ARE THE INTENDED BENEFICIARIES OF AN EQUITABLE SUBORDINATION JUDGMENT AGAINST LEHMAN'S DISPUTED CLAIMS | | |
|---|---|---|
| **Class 9** | **Claimant** | **Claim Nos.** |
| **Class 9.6** | The Holder of General Unsecured Claims that are the intended beneficiaries of an equitable subordination judgment filed against SunCal Heartland. | Various Filed and Scheduled |
| **Class 9.7** | The Holder of General Unsecured Claims that are the intended beneficiaries of an equitable subordination judgment filed against SunCal Marblehead. | Various Filed and Scheduled |
| **Class 9.8** | The Holder of General Unsecured Claims that are the intended beneficiaries of an equitable subordination judgment filed against SJD Development. | Various Filed and Scheduled |
| **Class 9.9** | The Holder of General Unsecured Claims that are the intended beneficiaries of an equitable subordination judgment filed against SJD Partners. | Various Filed and Scheduled |
| **Class 9.10** | The Holder of General Unsecured Claims that are the intended beneficiaries of an equitable subordination judgment filed against SunCal Northlake. | Various Filed and Scheduled |
| **Class 9.11** | The Holder of General Unsecured Claims that are the intended beneficiaries of an equitable subordination judgment filed against SunCal Oak Knoll. | Various Filed and Scheduled |
| **Class 9.12** | The Holder of General Unsecured Claims that are the intended beneficiaries of an equitable subordination judgment filed against SunCal Oak Valley. | Various Filed and Scheduled |
| **Class 9.13** | The Holder of General Unsecured Claims that are the intended beneficiaries of an equitable subordination judgment filed against SunCal PSV. | Various Filed and Scheduled |
| **Class 9.14** | The Holder of General Unsecured Claims that are the intended beneficiaries of an equitable subordination judgment filed against SunCal Torrance. | Various Filed and Scheduled |
| **Class 9.15** | The Holder of General Unsecured Claims that are the intended beneficiaries of an equitable subordination judgment filed against SCC Communities. | Various Filed and Scheduled |

| CLASSIFICATION OF GENERAL UNSECURED CLAIMS THAT ARE THE INTENDED BENEFICIARIES OF AN EQUITABLE SUBORDINATION JUDGMENT AGAINST LEHMAN'S DISPUTED CLAIMS | | |
|---|---|---|
| **Class 9** | **Claimant** | **Claim Nos.** |
| **Class 9.16** | The Holder of General Unsecured Claims that are the intended beneficiaries of an equitable subordination judgment filed against Tesoro. | Various Filed and Scheduled |
| **Class 9.17** | The Holder of General Unsecured Claims that are the intended beneficiaries of an equitable subordination judgment filed against SunCal Bickford. | Various Filed and Scheduled |
| **Class 9.18** | The Holder of General Unsecured Claims that are the intended beneficiaries of an equitable subordination judgment filed against SunCal III. | Various Filed and Scheduled |

| CLASSIFICATION OF GENERAL UNSECURED CLAIMS THAT ARE NOT THE INTENDED THE BENEFICIARIES OF AN EQUITABLE SUBORDINATION JUDGMENT AGAINST LEHMAN'S DISPUTED CLAIMS | | |
|---|---|---|
| **Class 10** | **Claimant** | **Claim Nos.** |
| **Class 10.1** | The Holder of General Unsecured Claims that are not the intended beneficiaries of an equitable subordination judgment filed against Palmdale Hills. | Various Filed and Scheduled |
| **Class 10.2** | The Holder of General Unsecured Claims that are not the intended beneficiaries of an equitable subordination judgment filed against Del Rio. | Various Filed and Scheduled |
| **Class 10.3** | The Holder of General Unsecured Claims that are not the intended beneficiaries of an equitable subordination judgment filed against SunCal Emerald. | Various Filed and Scheduled |
| **Class 10.4** | The Holder of General Unsecured Claims that are not the intended beneficiaries of an equitable subordination judgment filed against SunCal Summit Valley. | Various Filed and Scheduled |
| **Class 10.5** | The Holder of General Unsecured Claims that are not the intended beneficiaries of an equitable subordination judgment filed against Acton Estates. | Various Filed and Scheduled |

| CLASSIFICATION OF GENERAL UNSECURED CLAIMS THAT ARE NOT THE INTENDED THE BENEFICIARIES OF AN EQUITABLE SUBORDINATION JUDGMENT AGAINST LEHMAN'S DISPUTED CLAIMS | | |
|---|---|---|
| **Class 10** | **Claimant** | **Claim Nos.** |
| **Class 10.6** | The Holder of General Unsecured Claims that are not the intended beneficiaries of an equitable subordination judgment filed against Delta Coves. | Various Filed and Scheduled |
| **Class 10.7** | The Holder of General Unsecured Claims that are not the intended beneficiaries of an equitable subordination judgment filed against SunCal Heartland. | Various Filed and Scheduled |
| **Class 10.8** | The Holder of General Unsecured Claims that are not the intended beneficiaries of an equitable subordination judgment filed against SunCal Marblehead. | Various Filed and Scheduled |
| **Class 10.9** | The Holder of General Unsecured Claims that are not the intended beneficiaries of an equitable subordination judgment filed against SJD Development. | Various Filed and Scheduled |
| **Class 10.10** | The Holder of General Unsecured Claims that are not the intended beneficiaries of an equitable subordination judgment filed against SJD Partners. | Various Filed and Scheduled |
| **Class 10.11** | The Holder of General Unsecured Claims that are not the intended beneficiaries of an equitable subordination judgment filed against SunCal Northlake. | Various Filed and Scheduled |
| **Class 10.12** | The Holder of General Unsecured Claims that are not the intended beneficiaries of an equitable subordination judgment filed against SunCal Oak Knoll. | Various Filed and Scheduled |
| **Class 10.13** | The Holder of General Unsecured Claims that are not the intended beneficiaries of an equitable subordination judgment filed against SunCal Oak Valley. | Various Filed and Scheduled |

MAINDOCS-#149764-v6-SunCal_Fourth_Amended_Disclosure_Statement.DOC

| CLASSIFICATION OF GENERAL UNSECURED CLAIMS THAT ARE NOT THE INTENDED THE BENEFICIARIES OF AN EQUITABLE SUBORDINATION JUDGMENT AGAINST LEHMAN'S DISPUTED CLAIMS | | |
|---|---|---|
| **Class 10** | **Claimant** | **Claim Nos.** |
| **Class 10.14** | The Holder of General Unsecured Claims that are not the intended beneficiaries of an equitable subordination judgment filed against SunCal PSV. | Various Filed and Scheduled |
| **Class 10.15** | The Holder of General Unsecured Claims that are not the intended beneficiaries of an equitable subordination judgment filed against SunCal Torrance. | Various Filed and Scheduled |
| **Class 10.16** | The Holder of General Unsecured Claims that are not the intended beneficiaries of an equitable subordination judgment filed against SCC Communities. | Various Filed and Scheduled |
| **Class 10.17** | The Holder of General Unsecured Claims that are not the intended beneficiaries of an equitable subordination judgment filed against Tesoro. | Various Filed and Scheduled |
| **Class 10.18** | The Holder of General Unsecured Claims that are not the intended beneficiaries of an equitable subordination judgment filed against SunCal Bickford. | Various Filed and Scheduled |
| **Class 10.19** | The Holder of General Unsecured Claims that are not the intended beneficiaries of an equitable subordination judgment filed against SunCal III. | Various Filed and Scheduled |

MAINDOCS-#149764-v6-SunCal_Fourth_Amended_Disclosure_Statement.DOC

| CLASSIFICATION OF INTEREST HOLDERS | | |
|---|---|---|
| **Class 11** | **Claimant** | **Scheduled** |
| **Class 11.1** | Allowed Interests in Palmdale Hills held by SCC Palmdale. | Scheduled Amount |
| **Class 11.2** | Allowed Interests in Del Rio held by SCC LLC. | Scheduled Amount |
| **Class 11.3** | Allowed Interests in SunCal Beaumont held by SunCal I. | Scheduled Amount |
| **Class 11.4** | Allowed Interests in SunCal Emerald held by SunCal I. | Scheduled Amount |
| **Class 11.5** | Allowed Interests in SunCal Johannson held by SunCal I. | Scheduled Amount |
| **Class 11.6** | Allowed Interests in SunCal Summit Valley held by SunCal I. | Scheduled Amount |
| **Class 11.7** | Allowed Interests in Acton Estates held by SunCal I. | Scheduled Amount |
| **Class 11.8** | Allowed Interests in Delta Coves held by Delta Coves Master JV LLC and LB/L-DUC III Master LLC. | Scheduled Amount |
| **Class 11.9** | Allowed Interests in SunCal Heartland held by SunCal Marblehead Heartland Master LLC. | Scheduled Amount |
| **Class 11.10** | Allowed Interests in SunCal Marblehead held by SunCal Marblehead Heartland Master LLC. | Scheduled Amount |
| **Class 11.11** | Allowed Interests in SJD Development held by Elieff. | Scheduled Amount |
| **Class 11.12** | Allowed Interests in SJD Partners held by SJD Development. | Scheduled Amount |
| **Class 11.13** | Allowed Interests in Sun Cal Century City held by Lehman SunCal Real Estate Fund LLC and LBREP II/SunCal Land Fund Member LLC. | Scheduled Amount |
| **Class 11.14** | Allowed Interests in SunCal Northlake held by SCLV Northlake, LLC and SCC/Northlake, LLC. | Scheduled Amount |

| CLASSIFICATION OF INTEREST HOLDERS | | |
|---|---|---|
| **Class 11** | **Claimant** | **Scheduled** |
| **Class 11.15** | Allowed Interests in SunCal Oak Knoll held by Lehman SunCal Real Estate Fund LLC and LBREP II/SunCal Land Fund Member LLC. | Scheduled Amount |
| **Class 11.16** | Allowed Interests in SunCal Oak Valley held by SCLV Oak Valley, LLC and SCC/Oak Valley, LLC. | Scheduled Amount |
| **Class 11.17** | Allowed Interests in SunCal PSV held by Lehman SunCal Real Estate Fund LLC and LBREP II/SunCal Land Fund Member LLC. | Scheduled Amount |
| **Class 11.18** | Allowed Interests in SunCal Torrance held by Lehman SunCal Real Estate Fund LLC and LBREP II/SunCal Land Fund Member LLC. | Scheduled Amount |
| **Class 11.19** | Allowed Interests in SCC Communities held by SCC LLC. | Scheduled Amount |
| **Class 11.20** | Allowed Interests in Tesoro held by SCC LLC. | Scheduled Amount |
| **Class 11.21** | Allowed Interests in SunCal Bickford held by SunCal I. | Scheduled Amount |
| **Class 11.22** | Allowed Interests in SunCal I held by SCC LLC. | Scheduled Amount |
| **Class 11.23** | Allowed Interests in SunCal III held by SCC LLC. | Scheduled Amount |
| **Class 11.24** | Allowed Interests in Seven Brothers held by SunCal Summit Valley. | Scheduled Amount |
| **Class 11.25** | Allowed Interests in Kirby Estates held by SunCal Summit Valley. | Scheduled Amount |
| **Class 11.26** | Allowed Interests in SCC Palmdale held by SCC LLC. | Scheduled Amount |

/ / /

# VIII.

## THE PLAN'S TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS

**8.1.** **The Plan's Treatment of Holders of Allowed Unpaid Secured Real Property Tax Claims on Real Properties Subject to Deeds of Trust Arising from Lehman's Disputed Secured Claims and Disputed Liens (Classes 1.1 Through 1.14).**

The treatment of Holders of Allowed Secured Claims in Classes 1.1 through 1.14 under the Plan is as follows:

      (a)    The Holder(s)' rights are impaired under the Plan;

      (b)    The Holder(s) shall retain their underlying first priority liens on the applicable real property collateral but shall forebear from pursuing their rights and remedies until the expiration of the applicable Sales Period;

      (c)    If the Plan Trustee is able to consummate a sale of the applicable underlying real property collateral during the applicable Sales Period, such Holder(s) shall receive a distribution to the extent of available Net Sale Proceeds from its underlying real property collateral in accordance with the priorities set forth in the Bankruptcy Code and under applicable California law; such distribution shall include accrued interest on such Allowed Claims pursuant to Sections 506 and 511 of the Bankruptcy Code; and

      (d)    If the Plan Trustee is unable to consummate a sale of the applicable underlying real property collateral during the applicable Sales Period, the Holder(s) shall be free to pursue their respective rights and remedies against the underlying real property collateral under applicable California law, but shall have no recourse against the Plan Trust or Plan Trustee.

**8.2.** **The Plan's Treatment of Holders of Allowed Unpaid Secured Real Property Tax Claims Against Real Properties Not Subject to Deeds of Trust Arising from Lehman's Disputed Claims (Classes 2.1 Through 2.3).**

The treatment of Holders of Class 2.1 through 2.3 Allowed Secured Claims under the Plan is as follows:

      (a)    The Holder(s)' rights are unimpaired under the Plan;

MAINDOCS-#149764-v6-SunCal_Fourth_Amended_Disclosure_Statement.DOC

(b)    The Holder(s) shall retain their underlying first priority liens on the applicable real property collateral and shall be fully paid from any conveyance thereof, including payment of accrued interest on such Allowed Claims; such distribution shall include accrued interest on such Allowed Claims pursuant to Sections 506 and 511 of the Bankruptcy Code; and

(c)    On the Effective Date, the Holder(s) shall be free to pursue their respective rights and remedies against the underlying real property collateral under applicable California law, but shall have no recourse against the Plan Trust.

**8.3.    The Plan's Treatment of Lehman's Disputed Claim(s) and Disputed Lien(s) (Classes 3.1 Through 3.13).**

The Holder(s) of claims within Classes 3.1 through 3.13 (Lehman's Disputed Secured Claim(s) and Disputed Lien(s)) shall receive the indubitable equivalent of their claims, pursuant to 11 U.S.C. § 1129(b)(2)(A) (iii), through the following treatment:

(a)    Treatment of Claims Secured By Assets That Are Sold On Effective Date. The Plan Trustee shall proceed with sale of the Projects and the other Assets under the following terms and conditions after the Confirmation Date. If this sale effort is successful and Qualified Bids are received that will result in a closing on the Effective Date, then the following treatment shall apply to Classes 3.1 through 3.13:

1.    The Holder(s) shall retain their interest in their Disputed Lien(s) on the applicable Plan Trust's Assets pending a Final Order(s) resolving the Allowance of the applicable Disputed Claim(s) and determining the validity, priority and extent of the applicable Disputed Lien(s) against the applicable Plan Trust's Assets;

2.    The Holder(s) shall be barred from pursuing their rights and remedies against the Plan Trust's Assets until the expiration of the Sales Period;

3.    The Plan Trustee shall sell the Projects subject to the Holder(s)' Disputed Secured Claims and Disputed Liens, free and clear of such claims and liens, through a sale that satisfies the following conditions:

3.1    The Projects will be sold through a public auction after a commercially reasonable marketing and advertising effort of at least sixty (60) days duration;

3.2     The Debtor shall have the right to provisionally accept an Opening Bid from a Stalking Horse Bidder prior to the public auction and to grant this bidder a Break-Up Fee;

3.3     Other Qualified Bidders shall have the right to overbid the Opening Bid by submitting a Qualifying Bid that is equal to or in excess of the Minimum Increment;

3.4     The Qualified Bidder that submits the highest Qualifying Bid shall obtain title to the Project being sold, free and clear of all applicable Disputed Liens and Disputed Claims; and

3.5     No bidder may submit or demand the acceptance of a "credit bid" based upon an existing claim or lien.

4.     The Plan Trustee shall sell all other Plan Trust Assets subject to the Holder(s)' Disputed Secured Claims and Disputed Liens, free and clear of such claims and liens, through a sale that satisfies the following conditions:

4.1     All other Plan Trust Assets will be sold through a public auction after a commercially reasonable marketing and advertising effort of at least thirty (30) days duration;

4.2     The Debtor shall have the right to provisionally accept an Opening Bid from a Stalking Horse Bidder prior to the public auction and to grant this bidder a Break-Up Fee;

4.3     Other Qualified Bidders shall have the right to overbid the Opening Bid by submitting a Qualifying Bid that is equal to or in excess of the Minimum Increment;

4.4     The Qualified Bidder that submits the highest Qualifying Bid shall obtain title to the Project being sold, free and clear of all applicable Disputed Liens and Disputed Claims; and

4.5     No bidder may submit or demand the acceptance of a "credit bid" based upon an existing claim or lien.

4.6    All Net Sale Proceeds generated from such sales shall be deposited into the applicable Net Sales Proceeds Account with all Disputed Claims and Disputed Liens attached thereto;

5.    If the Plan Trustee consummates a sale or otherwise liquidates the particular Asset(s) subject to a Disputed Claim(s) and/or Disputed Lien(s) during the Sales Period, as provided for above, the Holder(s) of such Disputed Claim shall receive a distribution to the extent of available funds from the applicable Net Sale Proceeds Account(s) to the extent required by a Final Order determining the allowance and priority of the Disputed Claims and the validity, priority and extent of the Disputed Liens in, including but not limited to, the Lehman Adversary Proceeding; and

(b) Treatment of Claims Secured By Assets That Are Not Sold Prior To Effective Date>  If the Plan Trustee is unable to consummate a sale or otherwise liquidate the particular Asset(s) subject to a Lehman Disputed Claim during the Sales Period, then the following treatment shall apply in the case of unsold Projects:

1.    The Plan Trust shall be granted a lien against any Project that is senior to any Disputed Lien held by any of the Lehman Entities. This lien shall secure any recoupment or offset amount allowed by the Court in favor of the Debtor that owned such Project, pursuant to a claim objection filed by such Debtor;

2.    The foregoing lien shall only be imposed after the Effective Date, which by definition only occurs after any applicable stay protecting the Lehman Entities is lifted or deemed applicable;

3.    The foregoing lien may be enforced after the Effective Date like any other judgment under the laws of the State of California.

All other unsold Asset(s) shall be deemed abandoned by the Plan Trust, no payment shall be made to such Holder(s), and such Holder(s) shall be allowed to pursue their respective rights and remedies against the underlying collateral under applicable law subject to a Final Order determining the allowance and priority of the Disputed Claims and the validity of the Disputed Liens in, including but not limited to, the Lehman Adversary Proceeding.

**8.4.    The Plan's Treatment of Holders of Secured Claims of Primary Secured Creditors Other than the Holders of Lehman's Disputed Claims (Classes 4.1 Through 4.11).**

The treatment of the Holders of Allowed Classes 4.1 through 4.11 under the Plan shall be as follows:

(a)    The Holder(s)' rights are impaired under the Plan;

(b)    The Holder(s) shall retain their respective underlying liens on the applicable real property collateral;

(c)    On the Effective Date, the Holder(s) shall be allowed to pursue their rights against the subject real property collateral under applicable California law, but shall have no recourse against the Plan Trust.

**8.5.    The Plan's Treatment of Holders of Asserted Mechanic Lien Claims Against the Debtors' Projects Subject to Lehman's Disputed Claims (Classes 5.1 Through 5.55).**

The treatment of the Holders of Allowed Classes 5.1 through 5.55 Secured Claims under the Plan shall be as follows:

(a)    The Holder(s)' rights are impaired under the Plan;

(b)    The Holder(s) shall retain their respective underlying liens on the applicable Projects, but shall forebear from pursuing their rights and remedies until the expiration of the Sales Period;

(c)    If the Plan Trustee is able to consummate a sale of the Projects subject to the liens asserted by the Holders of Class 5.1 through 5.6 claims  during the Sales Period, such Holders shall receive a distribution, to the extent of available, Net Sale Proceeds in accordance with the priorities set forth under the Bankruptcy Code, subject to a Final Order(s) resolving the allowance and priority of the applicable Lehman's Disputed Claim(s) and the validity of the applicable Lehman Disputed Lien(s) in, including but not limited to, the Lehman Adversary Proceeding; and

1             (d)     If the Plan Trustee is unable to consummate a sale of the applicable

2    underlying real property collateral during the Sales Period, such real property collateral shall be

3    deemed abandoned by the Plan Trustee, no payment shall be made to such Holder(s), and such

4    Holder(s) shall be allowed to pursue their respective rights against the real property collateral

5    under applicable California law, subject to a Final Order(s) resolving the allowance and priority of

6    the applicable Lehman's Disputed Claim(s) and applicable Lehman Disputed Lien(s), without

7    recourse to the Debtor (s).

8           **8.6.**     **The Plan's Treatment of Asserted Mechanic Lien Claims Against Projects Not**

9                        **Subject to Lehman's Disputed Claims (Classes 6.1 and 6.2).**

10        The treatment of the Holder of Allowed Classes 6.1 and 6.2 under the Plan shall be as

11   follows:

12            (a)     The Holder(s)' rights are unimpaired under the Plan;

13            (b)     The Holder(s) shall retain their respective underlying lien on the subject real

14   property; and

15            (c)     On the Effective Date, the Holder(s) shall be free to pursue their respective

16   rights and remedies against real property collateral under California law, but shall have no

17   recourse against the Plan Trust.

18          **8.7.**     **The Plan's Treatment of Holders of Priority Claims (Classes 7.1 Through 7.4)**.

19        The treatment of the Holders of Allowed Priority Claims under the Plan shall be as

20   follows**:**

21            (a)     The Holder(s) are unimpaired under the Plan; and

22            (b)     The Holder(s) shall be paid either the applicable Distribution Account(s) (i)

23   the full amount of such Allowed Priority Claim in Cash on the later of (x) the Effective Date, (y)

24   the date such Claim becomes an Allowed Priority Claim or (z) the date such Allowed Priority

25   Claim becomes payable in accordance with the terms governing such Allowed Priority Claim, or

26   (ii) upon such other less favorable terms as may be agreed to by such Holder and the Plan Trustee.

27   / / /

28

1    **8.8.    The Plan's Treatment of Holders of Allowed General Unsecured Claims**

2    **Against Debtors with Assets that Are Not Subject to the Lehman's Disputed**

3    **Claims and Disputed Liens (Classes 8.1 Through 8.6).**

4    The treatment of the Holders of Allowed Classes 8.1 through 8.6 Claims under the Plan

5    shall be as follows:

6        (a)    The Holders' rights are impaired under the Plan; and

7        (b)    After payment in full of all Allowed Secured Claims, all Post Confirmation

8    Expenses, Allowed Administrative Claims, and Allowed Priority Claims of the Debtors, the

9    Holders of Allowed Classes 8.1 through 8.6 Claims shall receive Distribution(s) of their pro-rata

10    share of the funds remaining in the applicable Distribution Account(s).

11    **8.9.    The Plan's Treatment of Holders of General Unsecured Claims that Are the**

12    **Intended Beneficiaries of any Equitable Subordination Judgment Against**

13    **Lehman's Disputed Claims and Disputed Liens (Classes 9.1 Through 9.18).**

14    The treatment of the Holders of Allowed Classes 9.1 through 9.18 Claims under the Plan

15    shall be as follows:

16        (a)    The Holders' rights are impaired under the Plan;

17        (b)    After payment in full of all Post Confirmation Expenses, Allowed

18    Administrative Claims, and Allowed Priority Claims, the Holders of Allowed Classes 9.1 through

19    9.18 Claims shall receive Distribution(s) of their pro-rata share from the applicable Distribution

20    Account(s);

21        (c)    In the event that such Holder(s) become the beneficiary of an equitable

22    subordination judgment, such Holders shall receive their pro-rata share of the funds available in

23    the applicable Net Sales Proceeds Account to the extent provided for in the equitable

24    subordination judgment; and

25        (d)    In the event that such Holder provides a written election to sell its Allowed

26    Claim to Acquisitions or an Affiliate of Acquisitions by no later than thirty days after receipt of an

27    Effective Date Notice, Acquisitions or its Affiliates shall purchase or cause to be purchase such

28    Allowed Claim, including any Claims against third party obligors arising from such Claim, for an

1    amount equal to _____ percent (___%) of the Allowed Amount within sixty days after receipt of

2    such written election, or within sixty (60) days of the determination that the claim is an Allowed

3    Claim, whichever is later.

4    **8.10.    The Plan's Treatment of Holders of Allowed General Unsecured Claims that**

5    **Are Not Intended to Be the Beneficiaries of an Equitable Subordination**

6    **Judgment Against Lehman's Disputed Claims (Classes 10.1 Through 10.19).**

7    The treatment of the Holders of Allowed Classes 10.1 through 10.19 Claims under the Plan

8    shall be as follows:

9           (a)    The Holders' rights are impaired under the Plan; and

10          (b)    After payment in full of Post Confirmation Expenses, Allowed

11   Administrative Claims, Allowed Priority Claims, and Holders of Allowed Classes 9.1 through 9.18

12   Claims, the Holders of Allowed Classes 10.1 through 10.19 Claims shall receive their pro-rata

13   share of funds remaining in the applicable Distribution Account(s).

14   **8.11.    The Plan's Treatment of Holders of Allowed Interests.**

15   The treatment of the Holders of Allowed Classes 11.1 to 11.26 Interest(s) under the Plan

16   shall be as follows:

17          (a)    The Holders of Allowed Classes 11.1 to 11.26 Interest(s) are impaired under

18   the Plan;

19          (b)    On the Effective Date, all such Allowed Interest shall be cancelled and will

20   not receive any distribution on account of such Interest(s); and

21          (c)    To the extent that there is a potential Distribution on the Allowed Interests

22   of SunCal Beaumont, SunCal Johannson, Seven Brothers and Kirby Estates, such Distributions

23   shall be made to the Distribution Accounts established for the Debtors that owned such Allowed

24   Interest.

25   ///

26

27

28

MAINDOCS-#149764-v6-SunCal_Fourth_Amended_Disclosure_Statement.DOC

**IX.**

**ACCEPTANCE OR REJECTION OF THE PLAN**

**9.1.    Introduction.**

PERSONS OR ENTITIES CONCERNED WITH CONFIRMATION OF THE PLAN SHOULD CONSULT WITH THEIR OWN ATTORNEYS BECAUSE THE LAW ON CONFIRMING A PLAN OF REORGANIZATION IS VERY COMPLEX.  The following discussion is intended solely for the purpose of alerting readers about basic confirmation issues, which they may wish to consider, as well as certain deadlines for filing Claims.  The Debtors cannot represent that the discussion contained below is a complete summary of the law on this topic.

Many requirements must be met before the Court can confirm the Plan.  Some of the requirements include that the Plan must be proposed in good faith, acceptance of the Plan, whether the Plan pays creditors at least as much as creditors would receive in a Chapter 7 liquidation, and whether the Plan is feasible.  The requirements described herein are <u>not</u> the only requirements for confirmation.

**9.2.    Who May Object to Confirmation of the Plan.**

Any party in interest may object to the confirmation of the Plan, but as explained below not everyone is entitled to vote to accept or reject the Plan.

**9.3.    Who May Vote to Accept/Reject the Plan.**

A Holder of a Claim or Interest has a right to vote for or against the Plan if that Holder of the Claim or Interest has a Claim which is both (1) Allowed or Allowed for voting purposes and (2) Classified in an impaired Class.  The votes will be tabulated on a Debtor by Debtor basis.

**9.4.    What Is an Allowed Claim/Interest.**

As noted above, a Holder of Claim or Interest must first have an Allowed Claim or Allowed Interest to vote.

**9.5.    What Is an Impaired Class.**

A Class is impaired if the Plan alters the legal, equitable, or contractual rights of the Claims or Interests in that Class, other than the right to accelerate the Claim upon certain kinds of defaults.

1  In this case, the Debtors believe that all Classes, except for Classes 2.1 through 2.3, Classes 6.1

2  and 6.2, and Classes 7.1 through 7.4 are impaired.

3  **9.6.    Who Is Not Entitled to Vote.**

4  The following four types of Claims are _not_ entitled to vote: (1) Claims that have been

5  disallowed; (2) Claims in unimpaired Classes; (3) Claims entitled to priority pursuant to

6  Bankruptcy Code Sections 507(a)(2) or (a)(3) and Claims in Classes that do not receive or retain

7  any value under the Plan.  Claims in unimpaired Classes are not entitled to vote because such

8  Classes are deemed to have accepted the Plan.  Claims entitled to priority pursuant to Bankruptcy

9  Code Section 507(a)(8) are not entitled to vote because such Claims are not placed in Classes and

10  they are required to receive certain treatment specified by the Bankruptcy Code.  Claims in Classes

11  that do not receive or retain any property under the Plan do not vote because such Classes are

12  deemed to have rejected the Plan.  The Debtors believe that all Classes are entitled to vote except

13  Classes 2.1 through 2.3, Classes 6.1 and 6.2, and Classes 7.1 through 7.4 are unimpaired under the

14  Plan and consequently are not entitled to vote, because they are conclusively deemed to have

15  accepted the Plan.  Classes 11.1 to 11.26 Interests are being cancelled under the Plan; accordingly

16  these Interest Holders are deemed to have voted to reject the Plan.

17  EVEN IF YOUR CLAIM IS OF THE TYPE DESCRIBED ABOVE, YOU MAY STILL

18  HAVE A RIGHT TO OBJECT TO THE CONFIRMATION OF THE PLAN.

19  **9.7.    Who Can Vote in More than One Class.**

20  A creditor whose Claim has been Allowed in part as a Secured Claim and in part as an

21  Unsecured Claim is entitled to accept or reject a Plan in both capacities by casting one ballot for

22  the secured part of the Claim and another ballot for the Unsecured Claim.  Also, a Creditor may

23  otherwise hold Claims in more than one Class (such as a Holder of Senior Secured Claims and

24  Subordinated Note Claims), and may vote the Claims held in each Class.

25  **9.8.    Votes Necessary for a Class to Accept the Plan.**

26  A Class of Claims is deemed to have accepted the Plan when more than one-half (1/2) in

27  number and at least two-thirds (2/3) in dollar amount of the Claims _that actually voted_, vote to

28  accept the Plan.  A Class of interests is deemed to have accepted the Plan when Holders of at least

1  two-thirds (2/3) in amount of the interest-Holders of such Class which actually vote, vote to accept

2  the Plan.

3       **9.9.**     **Treatment of Nonaccepting Classes.**

4       As noted above, even if there are impaired Classes that do not accept the proposed Plan,

5  the Court may nonetheless confirm the Plan if the nonaccepting Classes are treated in the manner

6  required by the Code and at least one impaired Class of Claims accepts the Plan.  The process by

7  which a plan may be confirmed and become binding on non-accepting Classes is commonly

8  referred to as "cramdown."  The Bankruptcy Code allows the Plan to be "crammed down" on

9  nonaccepting Classes of Claims or interests if it meets all statutory requirements except the voting

10  requirements of 1129(a)(8) and if the Plan does not "discriminate unfairly" and is "fair and

11  equitable" with respect to each impaired Class that has not voted to accept the Plan, as set forth in

12  11 U.S.C. § 1129(b) and applicable case law.

13       **9.10.**     **Request for Confirmation Despite Nonacceptance by Impaired Class(es).**

14       The SunCal Plan Proponent will ask the Court to confirm the Plan by cramdown on any

15  impaired Class if such Class does not vote to accept the Plan.

16                                          **X.**

17       **MEANS OF EXECUTION AND IMPLEMENTATION OF THE PLAN**

18       **10.1.**     **Introduction.**  This section is intended to address how the SunCal Plan Proponents

19  intend to fund and to implement the obligations to Creditors under the Plan.  It thus provides

20  information regarding funding sources for the Plan obligations and other material issues bearing

21  upon the performance of the Plan.

22       Throughout the Debtors' Chapter 11 cases, LCPI has attempted to use its automatic stay as

23  a sword to impair or bar the Debtors' reorganization efforts. These efforts have resulted in two

24  pending appeals in the Ninth and Second Circuits.  The Debtors are hopeful that these appeals will

25  lay to rest this inappropriate strategy and allow both the Debtors' cases and the Lehman Entities

26  bankruptcy cases to proceed in the ordinary course, as contemplated by the jurisdictional system.

27  However, in anticipation of future efforts by the Lehman Entities to characterize any action in the

28  Debtors' cases as somehow in violation of their automatic stay, again to achieve a tactical

1    litigation advantage, this Plan defers any action that could be deemed in violation of the Lehman

2    Entities automatic stay (and the Debtors do not believe the stay applies to anything provided for in

3    the Plan) until the "Effective Date" of the Plan. The term Effective Date is defined as the date on

4    which the following two conditions are satisfied: The Confirmation Order is entered, and the date

5    on which any automatic stay barring any material aspect of the Plan is either lifted, or deemed no

6    longer applicable. In sum, by definition, the Plan terms cannot and will not violate any applicable

7    stay.

8        In order to insure fairness and parity, the automatic stay in the Debtors' cases shall remain

9    in effect until the Effective Date. Thereafter, the Plan injunction in 11 U.S.C. § 1141 shall be

10   effective.

11       **10.2.    The Plan Sponsor.**

12       The Plan Sponsor shall be Acquisitions.

13       **10.3.    Acquisitions' Funding Obligations Pursuant to the Acquisitions**

14              **Administrative Loan.**

15       As part of its obligations as the Plan Sponsor, Acquisitions has agreed to cause the funding

16   of the payment of the following amounts required under the Plan to the extent necessary after all

17   Available Cash has been exhausted:

18              (a)    All Allowed Administrative Claims;

19              (b)    Allowed Priority Claims; and

20              (c)    Continuing Professional fees for the prosecution of the Litigation Claims

21   and other post-confirmation expenses

22       In exchange for the above referenced funding commitments, Acquisitions, and all of its

23   Affiliates shall receive (i) a complete release from all of the Debtors, the Estates, and the Plan

24   Trust of any potential Litigation Claims, and (ii) Allowance of the Acquisitions Administrative

25   Loan in an amount equal to all Chapter 11 and post-confirmation funding caused by Acquisitions

26   to the extent that the same has not already been approved by the Court.

27   / / /

28

1    **10.4.    Transfer of the Debtors' Assets to the Plan Trust and Removal of the**

2    **Chapter 11 Trustee.**

3         On the Confirmation Date, the Chapter 11 Trustee shall be removed and replaced by

4    Acquisitions in its capacity as the Plan Trustee.

5         On the Effective Date, the Debtors' Assets shall be transferred to the Plan Trust, free and

6    clear of all Claims, Liens, charges, encumbrances, rights and Interests of Creditors and equity

7    security holders, except for the Claims, Liens and Interests specifically retained under the Plan.

8    **10.5.    Management of the Plan Trust Assets After Effective Date.**

9         On the Effective Date, the operation of the Plan Trust's Assets shall be the responsibility of

10   Acquisitions as the Plan Trustee.  Acquisitions shall be entitled to retain, employ and compensate

11   Professionals, in order to assist with the Plan Trust's obligations and rights under the terms of the

12   Plan.  Acquisitions may also employ or contract with other persons or entities to perform the

13   obligations created under the Plan.

14   **10.6.    The Committee(s).**

15        On the Effective Date, the Committee(s) shall continue to serve their applicable Debtors as

16   Committees to the applicable reorganized Debtors, subject to the following:

17        **(a)    Duties and Powers.**

18        The duties of the Committees after the Effective Date shall be limited to investigating and

19   prosecuting potential claims objections against Acquisitions and its Affiliates, and monitoring the

20   Plan's implementation, joint decision-making authority on a settlement of the Lehman Adversary

21   Proceeding, and standing to object to any settlement of any Litigation Claim in excess of $100,000

22   and standing to object to any proposed sales procedures on sale of the Debtors' Projects.

23        The Committees shall be entitled to retain, employ and compensate Professionals, in order

24   to assist with the obligations and rights of the Committees under the terms of the Plan.  Such

25   compensation shall be from the applicable Distribution Account(s).

26        The Committee(s) shall receive notice of and the right to review all payments and

27   Distributions.  In addition, each Committee shall have 25% decision-making authority with respect

28   to settlement of the Lehman Adversary Proceeding along with Acquisitions, which shall have 50%

1    decision making authority.  The Bankruptcy Court shall resolve any impasse with respect to a

2    proposed settlement.

3                    **(b)      Dissolution of Committees.**

4           The Committees shall be dissolved upon the entry of an order converting, closing or

5    dismissing the Chapter 11 Cases or entry of a final decree in the Chapter 11 Cases.  On

6    dissolution, the Confirmation Committees shall have no other or further obligations or

7    responsibilities on behalf of the Plan Trust.

8           **10.7.    Litigation Claims.**

9           Pursuant to Section 1123(b)(3) of the Bankruptcy Code, the Plan Trust shall retain all

10   Litigation Claims whether or not pending on the Effective Date.  Unless a Litigation Claim is

11   expressly waived, relinquished, released, compromised or settled in the Plan or in a Final Order,

12   all rights with respect to such Litigation Claims are reserved and the Plan Trustee and the

13   Committees  (in the case of Avoidance Actions) may pursue such Litigation Claims.

14   Notwithstanding the foregoing, the Plan Trustee and the Committees shall not settle or abandon a

15   Litigation Claim valued at greater than $100,000 except upon ten (10) days' prior written notice

16   and opportunity to object to one or another.  Any disputes concerning the settlement or

17   abandonment of a Litigation Claim shall be submitted to the Bankruptcy Court for resolution on no

18   less than ten (10) days' notice to the objecting party.

19          **10.8.    Collection of Litigation Recoveries.**

20          All Litigation Recoveries realized or obtained by the Plan Trustee and/or the Committee(s)

21   shall be promptly deposited into the applicable Distribution Account(s).  Except as otherwise

22   provided in the Plan and the Confirmation Order, the Litigation Recoveries shall be free and clear

23   of all Claims and Liens and shall only be expended in accordance with the provisions of the Plan.

24          **10.9.    Payment of Post-Confirmation Expenses.**

25          All Post-Confirmation Expenses may be paid by the Plan Trustee from the Distribution

26   Account(s) upon ten (10) days' prior written notice and opportunity to object provided to the

27   Committee(s), the Holders of the Lehman's Disputed Claim(s), and the Office of the United States

28   Trustee, but without further notice to other Creditors or Holders of Interests, or approval of the

Bankruptcy Court.  Any disputes concerning the payment of the Post-Confirmation Expenses shall be submitted to the Bankruptcy Court for resolution.

**XI.**

**DISTRIBUTIONS**

**11.1.    Distribution Agent.**

Acquisitions shall serve as the Distribution Agent for distributions due under the Plan.  The Distribution Agent may employ one or more sub agents on such terms and conditions as it may agree in its discretion and pay such sub agent as a Post Confirmation Expense from the Distribution Accounts.  The Distribution Agent shall not be required to provide any bond in connection with the making of any Distributions pursuant to the Plan.

**11.2.    Distributions.**

**(a)    Dates of Distributions.**

Any distribution required to be made on the Effective Date shall be deemed timely if made as soon as practicable after such date and, in any event, within thirty (30) days after such date.  Any distribution required to be made upon a Disputed Claim becoming an Allowed Claim and no longer being a Disputed Claim shall be deemed timely if made as soon as practicable thereafter.

**(b)    Limitation on Liability.**

Neither the Plan Sponsor, the Plan Trustee, the Distribution Agent, their Affiliates, nor any of their employees, members, officers, directors, agents, or professionals or Affiliates shall be liable for (i) any acts or omissions (except for gross negligence or willful misconduct) in connection with implementing the Distribution provisions of the Plan and the making or withholding of Distributions pursuant to the Plan, or (ii) any change in the value of distributions made pursuant to the Plan resulting from any delays in making such distributions in accordance with the Plan's terms (including but not limited to any delays caused by the resolution of Disputed Claims).

**11.3.    Old Instruments and Securities.**

**(a)    Surrender and Cancellation of Instruments and Securities.**

As a condition to receiving any distribution pursuant to the Plan, each Person holding any note or other instrument or security (collectively "Instruments or Securities" and individually an

"Instrument or Security") evidencing, an existing Claim(s) against the Debtor(s) must surrender
such Instrument or Security to the Distribution Agent.

**(b)**        **Cancellation of Liens.**

Except as otherwise provided in the Plan, any Lien securing any Secured Claim shall be
deemed released and discharged, and the Person holding such Secured Claim shall be authorized
and directed to release any collateral or other property of the Debtors (including, without
limitation, any cash collateral) held by such Person and to take such actions as may be requested
by the Plan Trustee to evidence the release of such Lien, including, without limitation, the
execution, delivery and Filing or recording of such releases as may be requested by the Plan
Trustee.

**11.4.    De Minimis Distributions and Fractional Shares.**

No Cash payment of less than ten dollars ($10) shall be made by the Plan Trust to any
Holder of Claims unless a request therefore is made in writing to the Plan Trust.  Whenever
payment of a fraction of a cent would otherwise be called for, the actual payment shall reflect a
rounding down of such fraction to the nearest whole cent.  Any Cash or other property that is not
distributed as a consequence of this section shall, after the last distribution on account of Allowed
Claims in the applicable Class, be treated as "Unclaimed Property" under the Plan.

**11.5.    Delivery of Distributions.**

Except as provided in the Plan with respect to Unclaimed Property, distributions to Holders
of Allowed Claims and Allowed Administrative Claims shall be distributed by mail as follows:
(1) with respect to each Holder of an Allowed Claim that has filed a Proof of Claim, at the address
for such Holder as maintained by the official claims agent for the Debtors; (2) with respect to each
Holder of an Allowed Claim that has not filed a Proof of Claim, at the address reflected on the
Schedules filed by the Debtors, provided, however, that if the Debtors or the Plan Trust has
received a written notice of a change of address for such Holder, the address set forth in such
notice shall be used; or (3) with respect to each Holder of an Allowed Administrative Claim, at
such address as the Holder may specify in writing.

**11.6.  Undeliverable Distributions.**

If the Distribution of Cash to the Holder of any Allowed Claim is returned to the Plan Trustee as undeliverable or the Distribution check is not negotiated within 90 days of mailing (any such distribution being hereinafter referred to as "Unclaimed Property"), no further distribution shall be made to such Holder unless and until the Plan Trustee is notified in writing of such Holder's then current address.  Subject to the remainder of this Section and the following section, Unclaimed Property shall remain in the possession of the Plan Trustee pursuant to this Section, and shall be set aside and (in the case of Cash) held in a segregated interest bearing account (as to Cash Unclaimed Property) to be maintained by the Distribution Agent until such time as the subject Distribution becomes deliverable.  Nothing contained in the Plan shall require the Plan Trustee or any other Person to attempt to locate such Person.

**11.7.  Disposition of Unclaimed Property.**

If the Person entitled thereto notifies the Plan Trustee of such Person's Claim to a Distribution of Unclaimed Property within ninety (90) days following such Person's initial Distribution Date, Effective Date, the Unclaimed Property distributable to such Person, together with any interest or dividends earned thereon, shall be paid or distributed to such Person as soon as practicable.  Any Holder of an Allowed Claim that does not assert a Claim in writing for Unclaimed Property held by the Plan Trustee within ninety (90) days after the Holder's initial Distribution Date shall no longer have any Claim to or Interest in such Unclaimed Property, and shall be forever barred from receiving any distributions under the Plan or otherwise from the Plan Trustee.  In such cases, any property held for Distribution on account of such Claims shall become Available Cash and deposited into the Distribution Account.

<h1 style="text-align:center">XII.</h1>

<h1 style="text-align:center">OBJECTIONS TO CLAIMS AND DISPUTED CLAIMS</h1>

**12.1.  Standing for Objections to Claims.**

The Plan Trustee shall have the sole and exclusive right to file, prosecute and resolve objections to Claims other than to the right to object to the claims of SunCal Affiliates, which shall be vested with the applicable Committee.  The applicable Committee shall have standing to object

MAINDOCS-#149764-v6-SunCal_Fourth_Amended_Disclosure_Statement.DOC

1   to any settlement of any Litigation Claim in excess of $100,000 and standing to object to any

2   proposed sales procedures and sale of the Debtors' Projects.

3       Any objection to a Claim shall be Filed with the Bankruptcy Court and served on the

4   Person holding such Claim on or before the applicable Claims Objection Deadline.  The Plan

5   Trustee shall have the right to petition the Bankruptcy Court, without notice or a hearing, for an

6   extension of the Claims Objection Deadline if a complete review of all Claims cannot be

7   completed by such date.

8       **12.2.    Treatment of Disputed Claims and Disputed Liens.**

9           **(a)    No Distribution Pending Allowance.**

10      If any portion of a Claim or Lien is a Disputed Claim or Disputed Lien, no payment

11  or distribution provided for under the Plan shall be made on account of such Claim or Lien unless

12  and until such Claim or Lien becomes an Allowed Claim and/or Allowed Lien.

13          **(b)    Distribution After Allowance.**

14      On the next Distribution Date following the date on which a Disputed Claim

15  becomes an Allowed Claim and is no longer a Disputed Claim, the Distribution Agent shall

16  distribute to the Person holding such Claim any Cash that would have been distributable to such

17  Person if on the initial Distribution Date such Claim had been an Allowed Claim and not a

18  Disputed Claim.

19                  **XIII.**

20          **EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

21      **13.1.    Executory Contracts Potentially Being Assumed.**

22      The Plan Trustee shall have until the expiration of the Sales Period to assume or reject any

23  of the executory contracts and unexpired leases attached to the Plan as Exhibit "1" to the Plan.

24  The SunCal Plan Proponents may add any executory contract or unexpired leases to these exhibits,

25  or delete any contract or lease therefrom up to and including the Confirmation Date.  All contracts

26  or leases not assumed by the expiration of the Sales Period shall be deemed rejected.

27      **13.2.    Executory Contracts Being Rejected.**

28

MAINDOCS-#149764-v6-SunCal_Fourth_Amended_Disclosure_Statement.DOC

1    The Debtors hereby reject all of the executory contracts and unexpired leases set forth in

2    the Debtors' Schedules attached to the Plan as Exhibit "2."  The SunCal Plan Proponents reserve

3    the right to amend Exhibit "2" to the Plan to include additional leases and contracts on this exhibit,

4    or to delete leases and contracts from this exhibit, up to and including the Confirmation Date.

5        **13.3.    Bar Date for Rejection Damages.**

6    Any Claim arising out of the rejection of an executory contract or unexpired lease shall be

7    forever barred and shall not be enforceable against the Debtors, the Plan Trust, their Affiliates,

8    their successors, or their properties, and shall not be entitled to any distribution under the Plan,

9    unless a Proof of Claim for such Claim is filed and served on the Debtors, or the Plan Trust within

10   thirty (30) days after the receipt of a notice of the rejection of any contract or lease.

11       **13.4.    Changes in Rates Subject to Regulatory Commission Approval.**

12   The Debtors are not subject to governmental regulatory commission approval of their rates**.**

13                               **XIV.**

14       **BEST INTEREST OF CREDITORS TEST AND PLAN FEASIBILITY**

15   Pursuant to Section 1129(a)(7) of the Bankruptcy Code, a Plan cannot be confirmed unless

16   the Bankruptcy Court determines that Distributions under the Plan to all Holders of Claims and

17   Interests who have not accepted the plan and whose Claims are classified in Classes that are

18   impaired under the plan, are not less than those which they would receive in a liquidation under

19   Chapter 7 of the Bankruptcy Code.

20   The Best Interest of Creditors Test must be satisfied even if the Plan is accepted by each

21   impaired Class of Claims and if any Holder of an Allowed Claim objects to the Plan on such basis.

22   The Best Interests Test requires the Bankruptcy Court to find either that either (i) all Holders of

23   Claims in an impaired Class of Claims have accepted the Plan or (ii) the Plan provides each

24   Holder of Allowed Claims of an impaired Class who has not accepted the Plan with a recovery of

25   property of a value, as of the effective date of the Plan, that is not less than the amount that such

26   Holder would receive if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code.  As

27   set forth below, the Debtors' Creditors will clearly receive a distribution under the Plan equal to or

28   greater than they would receive in a hypothetical Chapter 7.

1       In addition, in order to confirm the Plan, the Bankruptcy Court must find that confirmation

2   of the Plan is not likely to be followed by the liquidation or the need for further financial

3   reorganization of the Debtor(s).  This requirement is imposed by Section 1129(a)(11) of the

4   Bankruptcy Code and is generally referred to as the "feasibility" requirement.

5       Each of the Holders of Allowed Classes 9.1 through 9.18 and Allowed Classes 10.1

6   through 10.19 shall receive their pro-rata share of the funds that become Available Cash from the

7   applicable Distribution Account(s).  The Holders of Allowed Classes 9.1 through 9.18 Claims that

8   become beneficiaries of the equitable subordination judgment shall also receive their pro-rata

9   share from the applicable Net Sales Proceeds Account(s) to the extent provided for in the equitable

10  subordination judgment.

11      Attached hereto as Exhibit "8" are two charts that show the Distribution to the Holders of

12  Allowed Classes 8.1 through 8.6 and Classes 9.1 through 9.18 Claims if sales are consummated of

13  the Debtors' Assets at the Lehman Entities appraised values for the Projects with respect to which

14  the Lehman Entities have provided appraisals, and supplemented by the SunCal values for the

15  Projects with respect to which the Lehman Entities did not provide an appraisal, and assuming that

16  the Plan Trustee prevails in the equitable subordination causes of action in the Lehman Adversary

17  Proceeding.

18              **(a)        Holders of Allowed Classes 8.1 Through 8.6 Claims.**

19      As demonstrated in the attached charts, the Holders of Allowed Classes 8.1 through 8.6

20  Claims are expected to receive a 100% Distribution regardless of the outcomes of the Lehman

21  Adversary Proceeding since the Assets are not subject to Lehman's Disputed Secured Claims and

22  Lehman's Disputed Liens and the Debtors believe that there is sufficient value to pay all of the

23  Holders of Allowed Classes 8.1 through 8.6 Claims a Maximum Distribution.

24              **(b)        Holders of Allowed Classes 9.1 Through 9.18 Claims.**

25      As demonstrated in the attached charts, the Holders of Allowed Classes 9.1 through 9.18

26  Claims for all Debtors shall range between 64% and 100%, assuming that the Debtors prevail in

27  the Lehman Adversary Proceeding.

28

If the Debtors do not prevail in the Lehman Adversary Proceeding, the Holders of Allowed Classes 9.1 through 9.18 Claims will likely not receive a Distribution under the Plan other than their pro rata share of any recovery on Avoidance Actions after payment in full of all Allowed Administrative and Priority Claims.

## XV.

## LIMITATION OF LIABILITY

### 15.1    No Liability for Solicitation or Participation.

As specified in Section 1125(e) of the Bankruptcy Code, entities that solicit acceptances or rejections of the Plan and/or that participate in the offer, issuance, sale, or purchase of securities offered or sold under the Plan, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, shall not be liable, on account of such solicitation or participation, for violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer, issuance, sale, or purchase of securities.

## XVI.

## CONDITIONS TO CONFIRMATION AND

## EFFECTIVENESS OF THE PLAN

### 16.1    Conditions Precedent to Plan Confirmation.

The only condition precedent to confirmation of the Plan is that the Bankruptcy Court shall have entered a Confirmation Order in form and substance reasonably acceptable to the SunCal Plan Proponents.

### 16.2    Conditions Precedent to Plan Effectiveness.

The conditions precedent to the effectiveness of the Plan and the occurrence of the Effective Date is that the Confirmation Order shall be a Final Order in form and substance reasonably satisfactory to the SunCal Plan Proponents, and the resolutions of any material impairment of the Plan terms caused by the automatic stays applicable in the Lehman Entities cases. The automatic stay in the Debtors cases shall continue to be applicable until the Effective Date.

/ / /

**XVII.**

**RETENTION OF JURISDICTION**

Notwithstanding the entry of the Confirmation Order or the occurrence of the Effective Date, the Bankruptcy Court shall not be limited under the Plan and the Bankruptcy Court's jurisdiction shall apply to the fullest extent possible under applicable law.

**XVIII.**

**MODIFICATION OR WITHDRAWAL OF THE PLAN**

**18.1    Modification of Plan.**

At any time prior to confirmation of the Plan, the former Debtor(s) may supplement, amend or modify the Plan.  After confirmation of the Plan,  the Debtors or Plan Trustee may (x) apply to the Bankruptcy Court, pursuant to Section 1127 of the Bankruptcy Code, to modify the Plan; and (y) apply to the Bankruptcy Court to remedy defects or omissions in the Plan or to reconcile inconsistencies in the Plan.

**18.2    Nonconsensual Confirmation.**

In the event that any impaired Class of Claims or Interests shall fail to accept the Plan in accordance with Section 1129(a)(8) of the Bankruptcy Code, SunCal Plan Proponents (i) may request that the Bankruptcy Court confirm the Plan in accordance with Section 1129(b) of the Bankruptcy Code, and (ii) in accordance with Section 16.1 of the Plan, and may modify the Plan in accordance with Section 1127(a) of the Bankruptcy Code.

**XIX.**

**MISCELLANEOUS**

**19.1    Payment of Statutory Fees.**

All quarterly fees due and payable to the Office of the United States Trustee pursuant to Section 1930(a)(6) of title 28 of the United States Code shall be paid in full on or before the Effective Date, or, to the extent such quarterly fees are disputed, an adequate reserve shall have been established and set aside for payment in full thereof, as required by Section 1129(a)(12) of the Bankruptcy Code.  The Plan Trustee shall remain responsible for timely payment of quarterly

MAINDOCS-#149764-v6-SunCal_Fourth_Amended_Disclosure_Statement.DOC

fees due and payable after the Effective Date and until the Debtors' Cases are closed, to the extent required by Section 1930(a)(6) of title 28 of the United States Code.

**19.2    Payment Dates.**

Whenever any payment or distribution to be made under the Plan shall be due on a day other than a Business Day, such payment or distribution shall instead be made, without interest, on the immediately following Business Day.

**19.3    Headings.**

The headings used in this Disclosure Statement and in the Plan are inserted for convenience only and neither constitutes a portion of this Disclosure Statement or the Plan nor in any manner affect the construction of the provisions of this Disclosure Statement or the Plan.

**19.4    Other Documents and Actions.**

The Plan Trustee may execute such other documents and take such other actions as may be necessary or appropriate to effectuate the transactions contemplated under the Plan.

**19.5    Notices.**

All notices and requests in connection with this Disclosure Statement and the Plan shall be in writing and shall be hand delivered or sent by mail addressed to:

> **To the SunCal Plan Proponents**:
> Bruce V. Cook
> General Counsel
> Authorized Agent of the SunCal Plan Proponents
> 2392 Morse Ave
> Irvine, CA 92614-6234
>
> **With copies to:**
> Paul J. Couchot
> Winthrop & Couchot, Professional Corporation
> 660 Newport Center Drive, Suite 400
> Newport Beach, CA 92660

All notices and requests to any Person holding of record any Claim or Interest shall be sent to them at their last known address or to the last known address of their attorney of record.  Any such Person may designate in writing any other address for purposes of this Section 21.5, which designation will be effective on receipt.

**19.6    Governing Law.**

1    Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy

2    Code and Bankruptcy Rules), the laws of the State of California (without reference to its conflict

3    of law rules) shall govern the construction and implementation of the Plan and any agreements,

4    documents, and instruments executed in connection with the Plan, unless otherwise specifically

5    provided in such agreements, documents, or instruments.

6    **19.7    Binding Effect.**

7    The Plan and all rights, duties and obligations thereunder shall be binding upon and inure

8    to the benefit of the Plan Sponsor Debtors, the Plan Trustee, Holders of Claims, Holders of

9    Interests, and their respective successors and assigns.

10    **19.8    Successors and Assigns.**

11    The rights, benefits, and obligations of any entity named or referred to in the Plan shall be

12    binding on, and shall inure to the benefit of, the heirs, executors, administrators, successors, and

13    assigns of such entity.

14    **19.9    Severability of Plan Provisions.**

15    If, prior to the Confirmation Date, any term or provision of the Plan is held by the

16    Bankruptcy Court to be illegal, impermissible, invalid, void or unenforceable, or otherwise to

17    constitute grounds for denying confirmation of the Plan, the Bankruptcy Court shall, with the

18    consent of the Debtors, have the power to interpret, modify or delete such term or provision (or

19    portions thereof) to make it valid or enforceable to the maximum extent practicable, consistent

20    with the original purpose of the term or provision held to be invalid, void or unenforceable, and

21    such term or provision shall then be operative as interpreted, modified or deleted.

22    Notwithstanding any such interpretation, modification or deletion, the remainder of the terms and

23    provisions of the Plan shall in no way be affected, impaired or invalidated by such interpretation,

24    modification or deletion.

25    / / /

26

27

28

**19.10    No Waiver.**

The failure of the Debtors or any other Person to object to any Claim for purposes of voting shall not be deemed a waiver of the Committee(s)', the Debtors' or the Plan Trustee's right to object to or examine such Claim, in whole or in part.

**19.11    Inconsistencies.**

In the event the terms or provisions of this Disclosure Statement are inconsistent with the terms and provisions of the Plan or documents executed in connection with the Plan, the terms of the Plan shall control.

**19.12    Exemption from Certain Transfer Taxes and Recording Fees.**

Pursuant to Section 1146(c) of the Bankruptcy Code, any transfers from a Debtor to the Plan Trust or to any other Person or entity pursuant to the Plan, or any agreement regarding the transfer of title to or ownership of any of the Debtors' real or personal property or of any other interest in such property (including, without limitation, a security interest) will not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, and the Confirmation Order will direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**19.13    Post-Confirmation Status Report.**

Within 180 days following the entry of the Confirmation Order, the Plan Trustee shall file a status report with the Court explaining what progress has been made toward consummation of the confirmed Plan.  The status report shall be served on the United States Trustee, the twenty largest unsecured creditors, and those parties who have requested special notice.  Unless otherwise ordered, further status reports shall be filed every 180 days and served on the same entities.

**19.14    Post-Confirmation Conversion/Dismissal.**

A creditor or party in interest may bring a motion to convert or dismiss the case under § 1112(b), after the Plan is confirmed, if there is a default in performing the Plan.  The Plan

1  Trustee reserves the right to object to any motion for conversion or dismissal. If the Court orders

2  any of the Cases converted to Chapter 7 after the Plan is confirmed, then all property that had been

3  property of the Chapter 11 Estate, and that has not been disbursed pursuant to the Plan, will revest

4  in the Chapter 7 estate. The automatic stay will be reimposed upon the revested property, but only

5  to the extent that relief from stay was not previously authorized by the Court during this case.

6        **19.15  Final Decree.**

7        Once an Estate has been fully administered, as referred to in Bankruptcy Rule 3022, the

8  Plan Trustee, or other party as the Court shall designate in the Confirmation Order, shall file a

9  motion with the Court to obtain a final decree to close the Case of such Debtor.

10  Date: September 30, 2010

11

12                                    By: _____

13                                            Bruce Cook
                                            Authorized Agent for the Voluntary Debtors and
                                            Acquisitions

14  *[Signatures Continued on Next Page]*

15  **Submitted By:**

16  **WINTHROP COUCHOT
PROFESSIONAL CORPORATION**

17

18  By: */s/ Paul J. Couchot*

19        Paul J. Couchot,
        General Insolvency Counsel for
20        the Voluntary Debtors and Acquisitions

21

22

23

24

25

26

27

28

MAINDOCS-#149764-v5-SunCal_Fourth_Amended_Disclosure_Statement.DOC

# EXHIBIT "1"

<u>**EXHIBIT 1**</u>

<u>**THE DEBTORS' PROJECTS AND OTHER PRIMARY ASSETS**
**(EXCLUDING CASH AND LITIGATION CLAIMS DISCUSSED INFRA)**</u>

<u>**NAME OF DEBTOR**</u>                       <u>**ASSET DESCRIPTION**</u>

***Voluntary Debtors***

| | |
|---|---|
| Palmdale Hills | Palmdale Hills owns the Ritter Ranch Project.  The Ritter Ranch Project consists of a 10,625 acre site situated in the City of Palmdale, in Los Angeles County, California.  Grading of the first phase is complete with master infrastructure nearly 90% complete.  The specific plan and the development agreement were approved in 1992 and allow for the development of up to 7,200 residential units.  A vesting tentative parcel map consisting of 42 parcels has been processed and was recorded in 1995.  Additionally, six vesting tentative tract maps totaling 553 lots were approved by the city in December 1995.  All regulatory permits have been received. |
| SCC Palmdale | SCC Palmdale does not own any real property.  SCC Palmdale is the Holder of the Allowed Interest in Palmdale Hills. |
| Acton Estates | Action Estates owns the Acton Project consisting of a 175-acre site situated in Los Angeles County, California.  The Acton Project is surrounded by mostly equestrian properties and light agricultural vacant land.  The Acton Project is expected to consist of 136 units. |
| SunCal Beaumont | SunCal Beaumont owns the Beaumont Heights Project, that originally consisted of a 1,191-acre site situated in the City of Beaumont, in Riverside County, California.  None of the 1,191 acres are subject to any option contracts.  The property is currently designated as low density residential use - rural residential use.  The City of Beaumont is in the process of amending the general plan, preparing an environmental impact report and annexing the assemblage.  The specific plan and tentative tract map are in the drafting stage.  The Beaumont Heights Project was expected to consist of 1,203 units.  Portions of the Beaumont Heights Project have been lost through foreclosure sales completed prior to the Petition Date, and post-petition pursuant to orders granting certain undisputed secured creditors relief from the automatic stay. |

| **NAME OF DEBTOR** | **ASSET DESCRIPTION** |
|---|---|
| SunCal Bickford | SunCal Bickford owns the Bickford Ranch Project, consisting of a 1,940-acre site situated in the City of Penryn, in Placer County, California.  The Bickford Ranch Project is fully entitled with an approved large lot tentative map, small lot tentative map, specific plan, design guidelines, development standards, and a development agreement.  The offsite water and sewer improvements are mostly complete.  Improvement plans for major roads and in-tract improvements were in process of being completed and a memorandum of understanding between the City and County for the regional sewer pipeline was in process.  The Bickford Ranch Project is expected to consist of 2,105 units. |
| SunCal Emerald | SunCal Emerald owns the Emerald Meadows Project, consisting of a 178-acre site situated in the City of Rubidoux, in Riverside County, California.  The specific plan, general plan and the environmental impact report were approved in October 2005.  The tentative tract map & final map were in process.  The Emerald Meadows Project is expected to consist of 1,002 units. |
| SunCal Johannson | SunCal Johannson owns the Johannson Ranch Project, consisting of a 501-acre site in the City of Modesto, in Stanislaus County, California.  Tentative maps were in the process of being prepared.  Engineering plans and preparation of the draft specific plan were commenced.  The SunCal Johansson Project is expected to consist of 921 units. |
| SJD Partners | SJD Partners currently owns no real property.  SJD Partners formerly owned a project located in San Juan Capistrano known as the "Pacific Point Project".  The Pacific Point Project was lost through a non-judicial foreclosure sale by Lehman ALI, which caused a Lehman Affiliate, LV Pacific Point LLC ("LV PacPoint"), a Delaware Limited Liability Company, to purchase the Pacific Point Project at a foreclosure sale conducted on August 28, 2008.  SJD Partners has a pending fraudulent inducement action against the Lehman Entity Affiliates. |
| SJD Development | SJD Development does not own any real property.  SJD Development is the Holder of the Allowed Interest in SJD Partners. |

| **NAME OF DEBTOR** | **ASSET DESCRIPTION** |
|---|---|
| SunCal Summit Valley | SunCal Summit Valley owns most of the Summit Valley Project that originally consisted of a 2,500-acre site situated in the City of Hesperia, in San Bernardino County, California.  The City of Hesperia's general plan allows for low density residential development.  SunCal Summit Valley anticipated approximately 2.5 lots per acre over the entire assemblage.  Most of the technical studies for the environmental impact report were completed.  The Summit Valley Project was previously expected to consist of 6,023 units.  A part of the Summit Valley Project has been lost through foreclosure proceedings completed prior to the Petition Date.. |
| | SunCal Summit Valley is also the Holder of the Allowed Interests in Seven Brothers and Kirby Estates. |
| Seven Brothers | Seven Brothers owned 900 acres of the Summit Valley Project, a portion of which has been lost through foreclosure proceedings completed prior to the Petition Date. |
| Kirby Estates | Kirby Estates owns 27 acres of the Summit Valley Project. |
| SCC Communities | SCC Communities owns the Joshua Ridge Project, consisting of an 80-acre site situated in the City of Victorville in San Bernardino County, California.  The Joshua Ridge Project was slated to be sold to the city and the city was scheduled to use the land to build a park or a school. |
| Tesoro | Tesoro owns the Tesoro Project consisting of a 185-acre site situated in the City of Santa Clarita in Los Angeles County, California.  The existing entitlements include a tentative tract map approved by the planning commission, which allows for 45 lots. |

| **NAME OF DEBTOR** | **ASSET DESCRIPTION** |
|---|---|

Del Rio

Del Rio does not own any real property.  Del Rio Estate owns the net proceeds of the Del Rio CFD Bonds after use and application as provided in an Acquisition Agreement, including the payment of certain undisputed creditors.   The Plan Proponents believe that the value of the Del Rio Estate's interest in the net proceeds of the Del Rio CFD Bonds will be between $5 million and $9 million.

The Acquisition Agreement sets forth certain terms for the acquisition of various facilities by the City of Orange from Del Rio, the issuance of the Del Rio CFD Bonds and the use and application of a portion of the proceeds of the Del Rio Bonds for the construction of certain improvements and other applications, and with the remaining proceeds to go to Del Rio.  The Acquisition Agreement provides for a maximum bond authorization in the amount of up to $25 million.  The Court has entered an order approving the Acquisition Agreement, the sale of the Del Rio CFD Bonds, and creditor payments.  The Acquisition Agreement has recently closed and the net proceeds of the Del Rio CFD Bonds are expected to be received in approximately one year.

SunCal I

SunCal I does not own any real property.  SunCal I is the Holder of Allowed Interests in Acton Estates, SunCal Bickford, SunCal Beaumont, SunCal Summit Valley, SunCal Johannson and SunCal Emerald.

SunCal III Debtor)

SunCal III owns no real or personal property.

**Trustee Debtors**

Delta Coves

Delta Coves owns the Delta Coves Project consisting of a 310-acre site which is located on Bethel Island within Contra Costa County. The Delta Coves Project is expected to consist of 494 waterfront residential lots, some of which will be condominiums/townhomes and some of which will contain private boat docks.  The Delta Coves Project is expected to include an interior lagoon that will provide direct boating access to San Joaquin River Delta.

SunCal Heartland

SunCal Heartland owns the Heartland Project consisting of a 417 acre site located in Riverside County, California.  The Heartland Project is expected to consist of 983 units.

| **NAME OF DEBTOR** | **ASSET DESCRIPTION** |
|---|---|
| SunCal Marblehead | SunCal Marblehead owns the Marblehead Project, consisting of a 247-acre site and is expected to consist of 308 units in San Clemente, California.  The development is expected to offer canyon and ocean views from a number of lots throughout the Marblehead Project. |
| SunCal Northlake | SunCal Northlake owns the Northlake Project, consisting of a 1,564-acre site which is located in Castaic, California, north of Valencia, approximately 45 miles north of downtown Los Angeles and 10 miles north of the San Fernando Valley.  The Northlake Project is expected to consist of 3,417 units. |
| SunCal Oak Valley | SunCal Oak Valley owns the Oak Valley Project consisting of a 985-acre site which is located in Riverside County, California. The Oak Valley Project consists primarily of residential property and is expected to also include two commercial sites, one school site and several parks.  The Oak Valley Project is expected to consist of 3,417 units. |
| SunCal PSV | SunCal PSV owns the Palm Springs Village Project, consisting of a 309-acre site which is located in the City of Palm Springs, California.  The current proposed development consists of 752 single family units, 398 multi-family units, an 18-hole executive golf course, a driving range, a golf clubhouse and recreational facilities. |
| SunCal Torrance | SunCal Torrance owns the Del Amo Project, consisting of a 14-acre site which is located in the City of Torrance in Los Angeles County, California.  The site is currently a section of the Del Amo Fashion Center complex, a 3 million square feet retail mall.  The Del Amo Project is expected to consist of 365 units. |
| SunCal Oak Knoll | SunCal Oak Knoll owns the Oak Knoll Project, consisting of a 172.5-acre site which is located in the City of Oakland, California. The Oak Knoll Project is expected to be a diverse master planned community that includes 960 residential units, including single family homes, town homes and apartments.  The Oak Knoll Project is also expected to consist of six restaurant spaces, along with a grocery anchor. |

| **NAME OF DEBTOR** | **ASSET DESCRIPTION** |
|---|---|
| SunCal Century City | SunCal Century City owned the 10,000 Santa Monica Project. Pursuant to a settlement agreement, the Trustee has conveyed the 10,000 Santa Monica Project to Danske Bank in exchange for the full satisfaction of the SunCal Century City Loan Agreement and $5.3 million. |

# EXHIBIT "2"

# EXHIBIT 2

## THE LEHMAN LENDERS' APPRAISALS OF THE PROJECTS

## AND SUNCAL'S VALUATION OPINIONS.

| NAME OF DEBTOR | THE LEHMAN LENDERS' APPRAISLAS[1] | SUNCAL'S VALUATION OPINIONS[2] |
|---|---|---|
| *Voluntary Debtors* | | |
| Palmdale Hills | $42,900,000 | $27,000,000 |
| SunCal Beaumont | $1,200,000 (SunCal) | $1,200,000 |
| Acton Estates | $6,800,000 | $3,400,000 |
| SunCal Johannson | $4,000,000 | $2,100,000 |
| SunCal Summit Valley | $2,200,000 | $750,000 |
| Kirby Estates | $2,800,000 | 1,000,000 |
| Seven Brothers | $200,000 | $75,000 |
| Del Rio | $5,500,000 (SunCal) | $5,500,000 |
| SunCal Bickford | $29,500,000 | $21,000,000 |
| SunCal Emerald | $12,000,000 | $6,000,000 |
| Tesoro | $1,850,000 | $1,500,000 |
| SCC Communities | $1,200,000 | $1,000,000 |
| Total | $110,150,000 | $70,525,000 |
| *Truste Debtors* | | |
| SunCal Marblehead | $187,500,000 | $74,000,000 |
| SunCal Heartland | $7,900,000 | $5,000,000 |
| OVC Holdings | $20,900,000 | $12,000,000 |
| Northlake Holdings | $23,000,000 | $4,000,000 |
| SunCal Oak Knoll | $48,000,000 | $32,000,000 |
| SunCal PSV | $13,800,000 | $10,000,000 |
| SunCal Torrance | $25,000,000 | $16,000,000 |
| Delta Coves | $25,200,000 | $22,000,000 |
| **Total** | $351,300,000 | $175,000,000 |
| **TOTAL** | $461,450,000 | $245,525,000 |

---

[1] The appraisals provided by the Lehman Entities were conducted shortly after the filing of these Cases.
[2] SunCal's valuations reflect SunCal's opinions as to the fair market values shortly after the filing of these Cases.

- The Lehman Lenders' appraised value of the Summit Valley Project includes the portions of the Summit Valley Project owned by Seven Brothers and Kirby Estates. Furthermore, the appraisal values the property that is owned outright by SunCal Summit, Seven Brothers and Kirby Estates, and not subject to other third-party seller financing lienholders.

- The Lehman Lenders have not provided an appraisal of the Project belonging to SunCal Beaumont presumably because they do not have a deed of trust on such Project. However, the Lehman Lenders have a Disputed Lien on SunCal I's Allowed Interest in SunCal Beaumont. SunCal believes that the value of the Beaumont Heights Project is $1,200,000, net of portions of the Project that are expected to be lost through foreclosure sales conducted by third-party seller financing lienholders.

- The Lehman Lenders did not provide an appraisal for the Del Rio CFD Bond Proceeds. The Plan Proponents believe that the net proceeds in the Del Rio CFD Bonds subject to Lehman's Disputed Liens are worth approximately $5 million to $9 million to the Del Rio Estate, net of funds to be used in resolving claims pursuant to the terms of the Acquisition Agreement. Consequently, a value of $5.5 million is attributed to the Del Rio CFD Bond Proceeds.

**EXHIBIT "3"**

**EXHIBIT 3**

**A SUMMARY OF THE LEHMAN LENDERS' AND**

**LEHMAN SUCCESSORS' DISPUTED SECURED CLAIMS AND DISPUTED**

**LIENS**

| LEHMAN LOAN(S) | ALLEGED HOLDER | DEBTOR(S) | ALLEGED SECURITY | ALLEGED OUTSTANDING AMOUNT UNDER DISPUTED PROOFS OF SECURED CLAIMS |
|---|---|---|---|---|
| | | ***Voluntary Debtors*** | | |
| SunCal Communities I Loan Agreement | Lehman Commercial | SunCal I, SunCal III, Acton Estates, SunCal Emerald, SunCal Bickford, SunCal Summit Valley, SunCal Beaumont and SunCal Johannson | (a) Alleged first-priority deeds of trust on the SunCal Bickford, the Acton Estates and the SunCal Emerald Projects, (b) Alleged pledges of SunCal I's Allowed Interests in Acton Estates, SunCal Summit, SunCal Beaumont, SunCal Johannson, SunCal Emerald, and SunCal Bickford and (c) Alleged pledges of SunCal Summit Valley's Allowed Interests in Seven Brothers and Kirby. | Identical $343,221,391 Proof of Secured Claim No. 1 Asserted by Lehman Commercial Against SunCal I; Proof of Secured Claim No. 2 Asserted Against SunCal III; Proof of Secured Claim No. 6 Asserted Against Acton Estates; Proof of Secured Claim No. 7 Asserted Against SunCal Emerald; Proof of Secured Claim No. 16 Asserted Against SunCal Bickford; and Proof of Secured Claim No. 12 Asserted Against SunCal Summit |

| LEHMAN LOAN(S) | ALLEGED HOLDER | DEBTOR(S) | ALLEGED SECURITY | ALLEGED OUTSTANDING AMOUNT UNDER DISPUTED PROOFS OF SECURED CLAIMS |
|---|---|---|---|---|
| Ritter Ranch Loan Agreement | Lehman Commercial | Palmdale Hills | An alleged first-priority deed of trust on all real and an alleged first priority lien on all personal property owned by Palmdale Hills. | $287,252,096 Proof of Secured Claim No. 65 Asserted by Lehman Commercial Against Palmdale Hills |
| Pacific Point First Loan Agreement | Lehman Re (Lehman ALI Successor)[1] | SJD Development; SJD Partners | Alleged first priority deed of trust on the Pacific Point Project | Identical $120,110,237 Proof of Secured Claim No. 2 Asserted by Lehman ALI against SJD Development; $120,110,237 Proof of Secured Claim No. 23 Asserted by Lehman ALI against SJD Partners |
| SCC Palmdale Loan | Lehman Commercial | SCC Palmdale | An alleged pledge of SCC Palmdale's Allowed Interest in Palmdale Hills. | $119,664,305 Proof of Secured Claim No.: 1 Asserted by Lehman Commercial Against SCC Palmdale |
| Bickford Second Loan Agreement | Lehman ALI | SunCal Bickford | An alleged second priority deed of trust on the Bickford Ranch Project. | $56,494,059 Proof of Secured Claim No. 17 Asserted by Lehman ALI Against Bickford Ranch |

---

[1] Lehman ALI has also asserted an unliquidated contingent claim against SJD Partners based on the Pacific Point Second Loan Agreement.

| LEHMAN LOAN(S) | ALLEGED HOLDER | DEBTOR(S) | ALLEGED SECURITY | ALLEGED OUTSTANDING AMOUNT UNDER DISPUTED PROOFS OF SECURED CLAIMS |
|---|---|---|---|---|
| Interim Loan Agreement | Lehman ALI | SCC Communities, Tesoro and Del Rio | Alleged first-priority deeds of trust on the Joshua Ridge and the Tesoro Projects, and an alleged first-priority lien on the net proceeds of the Del Rio CFD Bonds. | Identical $23,795,013 Proof of Secured Claim No. 9 Asserted by Lehman Commercial Against SCC Communities Proof of Secured Claim No. 14 Asserted Against Del Rio; Proof of Secured Claim No. 7 Asserted Against Tesoro |
| | | ***Trustee Debtors*** | | |
| SunCal PSV Loan Agreement | Lehman Commercial | SunCal PSV | An alleged first-priority deed of trust on the Palm Springs Village Project. | $88,257,340 Proof of Secured Claim No. 12 Asserted by Lehman ALI Against SunCal PSV |
| SunCal Delta Coves Loan Agreement | Lehman Commercial | Delta Coves | An alleged first-priority deed of trust on the Delta Coves Project. | $206,023,142 Proof of Secured Claim No. 21 Asserted by Lehman ALI Against Delta Coves 21 |
| SunCal Marblehead/ SunCal Heartland Loan Agreement | Lehman Commercial | SunCal Marblehead; SunCal Heartland | Alleged first-priority deeds of trust on the Marblehead and the Heartland Projects. | Identical $354,325,126 Proof of Secured Claim No. 9 Asserted by Lehman ALI Against SunCal Heartland; Proof of Secured Claim No. 21 Asserted Against SunCal Marblehead |

| LEHMAN LOAN(S) | ALLEGED HOLDER | DEBTOR(S) | ALLEGED SECURITY | ALLEGED OUTSTANDING AMOUNT UNDER DISPUTED PROOFS OF SECURED CLAIMS |
|---|---|---|---|---|
| Sun Cal Oak Valley Loan Agreement | Lehman Commercial | SunCal Oak Valley | An alleged first-priority deed of trust on the Oak Valley Project. | $141,630,092 Proof of Secured Claim No. 16 Asserted by OVC Holdings Against SunCal Oak Valley |
| SunCal Northlake Loan Agreement | Lehman Commercial | SunCal Northlake | An alleged first-priority deed of trust on the Northlake Project. | $123,654,777 Proof of Secured Claim No. 6 Asserted by Northlake Holdings Against SunCal Northlake |
| SunCal Oak Knoll/SunCal Torrance Loan Agreement | Lehman ALI | SunCal Oak Knoll and SunCal Torrance | Alleged first-priority deeds of trust on the Oak Knoll Project and the Del Amo Project. | Identical $158,141,365 Proof of Secured Claim No. 12 Asserted by Lehman ALI against SunCal Oak Knoll; Proof of Secured Claim No. 4 Asserted Against SunCal Torrance |
| TOTAL | | | | $1,942,568,943 |

- All loans allegedly held by Lehman Commercial, with the exception of SCC Palmdale, were sold by Fenway Capital to Lehman Commercial post-petition pursuant to an order of the Bankruptcy Court in New York, which orders are currently on appeal in the Second Circuit.   The Fenway Sold Loans include the SunCal Communities I Loan Agreement, the Ritter Ranch Loan Agreement, the SunCal PSV Loan Agreement, the SunCal Marblehead/SunCal Heartland Loan Agreement, the Delta Coves Loan Agreement, the SunCal Northlake Loan Agreement and SunCal Oak Valley Loan Agreement.

# EXHIBIT "4"

## EXHIBIT 4

## SUMMARY OF ALL OF THE ALLEGED CLAIMS AGAINST THE DEBTORS

| DEBTOR | REAL PROPERTY TAX CLAIMS | ALLEGED SECURED CLAIMS | ALLEGED MECHANIC LIEN CLAIMS | PRIORITY AND ADMINISTRATIVE CLAIMS | GENERAL UNSECURED CLAIMS |
|---|---|---|---|---|---|
| **Voluntary Debtors** | | | | | |
| Palmdale Hills | $2,108,683 | $287,252,096 | $1,006,435 | $3,932,703 | $33,027,677 |
| SCC Palmdale | $0 | $119,664,305 | $0 | $846 | $0 |
| SunCal Beaumont | $306,003 | $4,825,659 | $1,576,334 | $105,462 | $183,731 |
| SCC Communities | $0 | $23,795,013 | $0 | $88,830 | $32,813 |
| Del Rio | $0 | (Same as SCC Communities) | $0 | $699,720 | $8,242,033 |
| Tesoro | $72,771 | (Same as SCC Communities) | $0 | $386,044 | $170,969 |
| SunCal Bickford | $5,952,002 | $343,221,391 (Bickford 1st) | $3,477,120 | $1,391,865 | $10,146,825 |
| | | $56,494,059 (Bickford 2nd) | | $0 | |
| SunCal Emerald | $673,353 | (Same as Bickford 1st) | $1,293,935 | $744,587 | $7,878,901 |
| Acton Estates | $370,137 | (Same as Bickford 1st) | $0 | $242,560 | $1,428,250 |
| SunCal I | $0 | (Same as Bickford 1st) | $0 | $846 | $0 |
| Summit Valley | $497,199 | (Same as Bickford 1st) | $16,827 | $138,766 | $1,076,053 |
| | | $2,504,750 | | | |
| SunCal III | $0 | (Same as Bickford 1st) | $0 | $846 | $459 |
| Seven Brothers | See SunCal Summit | $3,427,066 | $0 | $846 | $0 |
| Kirby Estates | See SunCal Summit | $0 | $0 | $846 | $0 |
| SunCal Johannson | $271,228 | $0 | $0 | $110,997 | $41,181 |
| SJD Development | $0 | $120,110,237 | $0 | $837 | $368,362 |
| SJD Partners | $0 | (Same as SJD Development) | $0 | $553,425 | $51,265,349 |
| **Voluntary Debtors Total** | $10,251,376 | $497,884,116 | $7,370,651 | $8,400,026 | $113,862,603 |
| | | | | | |
| **Trustee Debtors** | | | | | |
| SunCal Heartland | $559,022 | $354,325,126 | $1,552,794 | $1,231,493 | $30,774,591 |
| SunCal Marblehead | $757,712 | (Same as SunCal Heartland) | $1,406,209 | $3,220,120 | $109,697,964 |
| SunCal Oak Knoll | $2,356,036 | $158,141,365 | $4,794,529 | $7,901,843 | $1,041,373 |
| SunCal Torrance | $635,349 | (Same as SunCal Oak Knoll) | $0 | $435,249 | $203,838 |
| Delta Coves | $609,221 | $206,023,142 | $372,535 | $1,797,517 | $35,192,631 |
| Sun Cal Century City | $0 | $0 | $0 | $2,511,672 | $4,390,043 |
| SunCal Northlake | $2,767,794 | $123,654,777 | $0 | $1,667,356 | $911,296 |
| SunCal Oak Valley | $280,280 | $141,630,092 | $1,662,309 | $1,267,106 | $29,605,482 |
| SunCal PSV | $589,367 | $88,257,340 | $2,316,430 | $1,199,145 | $21,892,343 |
| **Trustee Debtors Total** | $8,554,781 | $1,072,031,842 | $12,104,806 | $21,231,501 | $233,709,561 |
| | | | | | |
| **Total** | $18,806,157 | $1,569,915,958 | $19,475,457 | $29,631,527 | $347,572,164 |

- The Debtors have not yet completed their investigation on what Claims are Allowed Claims and their listing herein should not be construed as providing for Allowance under the Plan.

- Certain Disputed Claims, such as duplicative Claims, have been deducted from the figures above.

- Certainly recently excluded claims pursuant to Court Orders have not been taken into account.

- Administrative Claims are ongoing.

- $275,918 of Mechanic Lien Claims asserted against Del Rio and $1,996,537 of Mechanic Lien Claims asserted against SJD Partners have been classified as General Unsecured Claims since neither Del Rio nor SJD Partners own any underlying real property.

- The chart reflects both matured and un-matured Bond Claims according to the Bonds associated with the particular Debtors' Projects.  The Bond Issuers assert that their Bond Obligor Claims are joint and several against all of the Debtors, which the Debtors dispute as lacking in consideration and constituting fraudulent conveyances.

- Lehman ALI has also filed a contingent claim against SJD Partners based on the Pacific Point Second Loan Agreement, which was the basis of the non-judicial foreclosure of the Pacific Point Project.

- Unpaid Real Property Tax Claims include post-petition unpaid property tax claims filed by government entities.

- The chart includes the Lehman Entities' alleged administrative claims in the approximate amount of $14 million against the Trustee Debtors.  The amount of $337,500 has been appropriated to each Trustee Debtor, other than SunCal Century City. for payment of professional fees.

**EXHIBIT "5"**

**EXHIBIT 5**

**SUMMARY OF HEALTH AND SAFETY NOTICES**

| Ex. No. | Citation | Date | Issuing Agency | Applicable Project |
|---|---|---|---|---|
| | *Voluntary Debtors* | | | |
| 1. | Letter from City of Palmdale | March 10, 2009 | City of Palmdale | Palmdale Hills |
| 2. | Request for Supplemental Deposit | February 19, 2009 | Los Angeles County Department of Regional Planning | Tesoro Project |
| | *Trustee Debtors* | | | |
| 3. | Notice of Violation of the California Coastal Act[4] | June 4, 2009 | California Coastal Commission | Marblehead Project |
| 4. | Order to Abate – Habitability Hazards | June 12, 2009 | City of Oakland | Oak Knoll Project |
| 5. | Notice of Violation | April 1, 2009 | City of Palm Springs Department of Building & Safety | Palm Springs Village Project |
| 6. | Notice of Violation, Construction Storm Water General Permit No. CAS000002, Delta Coves Venture LLC SunCal Company, WDID No. 5S07C344548, Contra Costa County | October 17, 2008 | California Regional Water Quality Control Board | Delta Coves Project |
| 7. | Administrative Citation for Violations of the City of San Clemente Municipal Code (SCMC): Storm Water Runoff Control (Chapter 13.40) and Excavations & Grading | October 15, 2008 | City of San Clemente, Engineering Division | Marblehead Project |
| 8. | Notice to Comply | October 14, 2008 | Contra Costa County – Building Inspection Department | Delta Coves Project |
| 9. | Notice of Violation No. A49456 | October 9, 2008 | Bay Area Air Quality Management District | Delta Coves Project |
| 11. | Notice of Violation No. A 49457 | October 10, 2008 | Bay Area Air Quality Management District | Delta Coves Project |
| 12. | Contra Costa County Stormwater Pollution Prevention Plan Notice of Correction | October 7, 2008 | Contra Costa County | Delta Coves Project |
| 13. | Letter from City of Palmdale | March 10, 2009 | City of Palmdale | Palmdale Hills |

---

[4] The potential penalties range from $254,000 to $3.8 million.

# EXHIBIT "6"

## EXHIBIT 6

## POTENTIAL PREFERENTIAL PAYMENTS

Below is a summary of the total payments made by each Debtor to non-insiders within

the 90 days preceding the Petition Date for each Debtor.

| NAME OF DEBTOR | AMOUNT TRANSFERRED |
| --- | --- |
| *Voluntary Debtors* | |
| Acton Estates | $1,300.00 |
| SunCal Beaumont | $25,244.97 |
| SunCal Bickford | $133,669.98 |
| SunCal I | $0.00 |
| SunCal III | $0.00 |
| SunCal Emerald | $128,287.10 |
| SunCal Johansson | $26,187.00 |
| Kirby Estates | $0.00 |
| Del Rio | $86,622.93 |
| SCC Palmdale | $0.00 |
| Palmdale Hills | $6,002,491.87 |
| SCC Communities | $500.00 |
| Seven Brothers | $0.00 |
| SJD Development | $25.00 |
| SJD Partners | $748,926.28 |
| SunCal Summit Valley | $39,649.77 |
| Tesoro | $659.00 |
| **Total** | $7,193,563.90 |
| | |
| *Trustee Debtors* | |
| SunCal Century City | $190,087.05 |
| Delta Coves | $597,961.92 |
| SunCal Heartland | $48,896.50 |
| SunCal Marblehead | $1,798,895.67 |
| SunCal Northlake | $833,921.81 |
| SunCal Oak Knoll | $2,324,630.92 |
| SunCal Oak Valley | $316,534.90 |
| SunCal PSV | $446,722.69 |
| SunCal Torrance | $18,618.50 |
| **Total** | $6,576,269.96 |
| | |
| **TOTAL** | $13,769,833.86 |

Below is a summary of the total payments made by each Debtor to SunCal Affiliates within one year preceding the Petition Date for each Debtor.

| NAME OF DEBTOR | AMOUNT TRANSFERRED | RECIPIENT |
|---|---|---|
| *Voluntary Debtors* | | |
| Acton Estates | $7,885.12 | SunCal Management |
| SunCal Beaumont | $15,602.83 | SunCal Management |
| SunCal Bickford | $492,802.57 | SunCal Management & Acquisitions |
| SunCal I | $20,449.52 | SunCal Bickford |
| SunCal III | $0.00 | N/A |
| SunCal Emerald | $884,890.80 | SunCal Management & Acquisitions |
| SunCal Johansson | $8,046.53 | SunCal Management & Acquisitions |
| Kirby Estates | $500.00 | SunCal Management |
| Del Rio | $50,721.00 | SunCal Management & Acquisitions |
| SCC Palmdale | $238,352.34 | N/A |
| Palmdale Hills | $1,149,348.04 | SunCal Management & Acquisitions |
| SCC Communities | 0.00 | |
| Seven Brothers | $0.00 | N/A |
| SJD Development | $0.00 | N/A |
| SJD Partners | $498,351.39 | SunCal Management |
| SunCal Summit Valley | $16,717.60 | Acquisitions & SC Master Marketing LLC |
| Tesoro | $5,000.00 | Acquisitions |
| **Total** | $3,388,667.74 | |
| | | |
| *Trustee Debtors* | | |
| SunCal Century City | $747,727.13 | SunCal Management & Acquisitions |
| Delta Coves | $2,305,572.58 | SunCal Management & Acquisitions |
| SunCal Heartland | $282,628.75 | SunCal Management; SunCal Marblehead Heartland Master LLC |
| SunCal Marblehead | $945,435.28 | SunCal Management; Acquisitions; and SunCal Marblehead Heartland Master LLC |
| SunCal Northlake | $819,207.14 | SunCal Management; Acquisitions; SCC College Park LLC |
| SunCal Oak Knoll | $2,914,645.70 | SunCal Management and Acquisitions |
| SunCal Oak Valley | $87,293.65 | SunCal Management and Acquisitions |
| SunCal PSV | $4,345.05 | SunCal Management; Lehman SunCal Real Estate Fund |
| SunCal Torrance | $310,181.43 | SunCal Management; Acquisitions; SunCal PSV; and Lehman SunCal Real Estate Holdings |
| **Total** | $8,417,036.71 | |
| | | |
| **TOTAL** | $11,805,704.45 | |

Below is a summary of the total payments made by each Debtor to the Lehman Entities within ninety days and one year preceding the Petition Date for each Debtor.

| NAME OF DEBTOR | AMOUNT TRANSFERRED WITHIN NINETY DAYS PRECEDING THE PETITION DATE | AMOUNT TRANSFERRED WITHIN ONE YEAR PRECEDING THE PETITION DATE | RECIPIENT |
|---|---|---|---|
| Delta Coves | $0.00 | $6,195,440.46 | Lehman ALI |
| SunCal Century City | $1,202,641.26 | $10,628,819.87 | Lehman ALI |
| **Total** | $1,202,641.26 | $16,824,260.33 | |

# EXHIBIT "7"

**EXHIBIT 7**

**TRUSTEE DEBTORS' SALES ANALYSIS CHART**

| Case Name | Proposed Purchase Price Allocated Based on D.E. Shaw Purchase Price | Estimate of Allowed Claims | Bond Claimant Claims Resolved By Sale to D.E. Shaw | Available Distribution Assuming Sale to D.E. Shaw | Percentage Distribution to Non-Lehman Creditors Assuming Sale to D.E. Shaw and Resolution of Bond Claimant Claims |
|---|---|---|---|---|---|
| SunCal Oak Valley | $7,437,092 | $32,197,397 | $26,167,563 | $7,437,092 | 100.00% |
| SunCal Heartland | $2,811,149 | $33,221,378 | $28,947,440 | $2,811,149 | 65.77% |
| SunCal Northlake | $8,184,360 | $2,241,152 | $0 | $8,184,360 | 100.00% |
| SunCal Marblehead | $66,713,122 | $113,986,793 | $56,510,018 | $66,713,122 | 100.00% |
| SunCal PSV | $4,910,615 | $25,070,418 | $18,405,548 | $4,910,615 | 73.68% |
| Delta Coves Venture | $8,967,212 | $37,025,183 | $27,755,885 | $8,967,212 | 96.74% |
| SunCal Torrance | $8,896,044 | $301,587 | $0 | $8,896,044 | 100.00% |
| SunCal Oak Knoll | $17,080,406 | $13,400,245 | $0 | $17,080,406 | 100.00% |

- The purchase price allocation for the D.E. Shaw sale is calculated by taking the total Lehman appraised value provided by the Lehman Entities and allocating such appraised values provided by Lehman pro rata to the sale amount to D.E. Shaw.

- The estimate of Allowed Claims are based on undisputed scheduled claims in which no Proof of Claim was filed and filed Proofs of Claims, after deducting certain disputed and duplicative claims.

- The Bond Issuers have asserted various Bond Obligor Claims against the Debtors in the approximate amount of $230 million ($155 million by Arch and $75 million by Bond Safeguard). The Bond Issuers assert that their Bond Obligor Claims are joint and several against all of the Debtors, which the Debtors dispute as lacking consideration and/or constituting fraudulent conveyances to the extent that such Bond Claims do not arise from the Project of the particular Debtor. For purposes of the Sales Chart, the Debtors have assumed Bond Claims relating to their respective Projects.

- Claims subject to bonds are duplicative of the Bond Issuer Claims.  These amounts have been subtracted from the Bond Issuer Claims for each estate, where applicable.

- Approximately $18 million of the mature Bond Claims, approximately $139 million of the unmatured Bond Claims and approximately $8.6 million of property taxes would've be paid or otherwise resolved by the consummation of the sale to D.E. Shaw.

**EXHIBIT "8"**

# EXHIBIT 8

## BEST INTEREST OF CREDITORS ASSUMING

## THE DEBTORS PREVAIL IN EQUITABLE SUBORDINATION

## (LEHMAN VALUES SUPPLEMENTED BY SUNCAL VALUES)

| Case Name | Estimated Values | Estimate of Allowed Non-Lehman Entities' Claims | Bond Claimant Claims Resolved By Sale | Available Distribution Assuming Sale | Percentage Distribution to Classes 8 and 9 Claimants |
|---|---|---|---|---|---|
| SCC Communities | $1,200,000 | $121,643 | $0 | $1,200,000 | 100.00% |
| Del Rio | $5,500,000 | $8,941,753 | $3,159,945 | $5,500,000 | 95.13% |
| Tesoro | $1,850,000 | $557,013 | $0 | $1,850,000 | 100.00% |
| SJD Partners / SJD Development | $16,000,000 | $52,187,973 | $37,472,869 | $16,000,000 | 100.00% |
| Acton Estates | $6,800,000 | $1,670,810 | $1,290,000 | $6,800,000 | 100.00% |
| Palmdale Hills | $69,900,000 | $37,966,815 | $27,991,947 | $69,900,000 | 100.00% |
| SunCal Bickford | $29,500,000 | $15,015,810 | $2,827,548 | $29,500,000 | 100.00% |
| SunCal Emerald | $12,000,000 | $9,917,423 | $0 | $12,000,000 | 100.00% |
| SunCal Johannson | $4,000,000 | $152,178 | $0 | $4,000,000 | 100.00% |
| SunCal Beaumont | $1,200,000 | $1,865,527 | $0 | $1,200,000 | 64.32% |
| SunCal Summit | $2,200,000 | $2,119,893 | $0 | $2,200,000 | 100.00% |
| Seven Brothers | $200,000 | $60,828 | $0 | $200,000 | 100.00% |
| Kirby Estates | $2,800,000 | $1,744 | $0 | $2,800,000 | 100.00% |
| SunCal Oak Valley | $20,900,000 | $32,197,397 | $26,167,563 | $20,900,000 | 100.00% |
| SunCal Heartland | $7,900,000 | $33,221,378 | $28,947,440 | $7,900,000 | 100.00% |
| SunCal Northlake | $23,000,000 | $2,241,152 | $0 | $23,000,000 | 100.00% |
| SunCal Marblehead | $187,500,000 | $113,986,793 | $56,510,018 | $187,500,000 | 100.00% |
| SunCal PSV | $13,800,000 | $25,070,418 | $18,405,548 | $13,800,000 | 100.00% |
| Delta Coves Venture | $25,200,000 | $37,025,183 | $27,755,885 | $25,200,000 | 100.00% |
| SunCal Torrance | $25,000,000 | $301,587 | $0 | $25,000,000 | 100.00% |
| SunCal Oak Knoll | $48,000,000 | $13,400,245 | $0 | $48,000,000 | 100.00% |
| SunCal Century City | $14,200,000 | $6,901,715 | $0 | $14,200,000 | 100.00% |
| **Total** | $504,450,000 | $394,925,278 | $230,528,763 | $504,450,000 | |

- Estimate of Allowed Claims are based on filed Proofs of Claims and undisputed, noncontingent and unliquidated scheduled claims in which no Proof of Claim was filed on Claims classified in Classes 8 and 9, less duplicative claims.

- The chart excludes certain Administrative Claims and recovery on potential preference actions, except for the preference actions recoveries by SunCal Century City and Palmdale Hills.

- Various Bond Claims are duplicative of the Bond Issuer Claims. The existing claim amounts have been subtracted from the Bond Issuer Claims for each estate, where applicable.

- Approximately $18.8 million of Unpaid Real Property Taxes that would be paid or otherwise resolved by the consummation of the sale to a third party buyer have been excluded from the chart.

- The chart assumes that there will be a recovery of approximately $16,000,000 for the fraudulent inducement claims against Lehman ALI and LV Pacific Point.

- The asset valuations are based on the total of the Lehman Lenders appraised values or SunCal valuation opinions where the Lehman Lenders have not provided appraisals for the assets. However, Palmdale Hills' cash of approximately $21 million has been added to the Ritter Ranch Project's appraised value of $42,900,000.

- The Lehman Lenders did not provide an appraisal for the Del Rio CFD Bond Proceeds. The Plan Proponents believe that the net proceeds in the Del Rio CFD Bonds subject to Lehman's Disputed Liens are worth approximately $5 million to $9 million to the Del Rio Estate, net of funds to be used in resolving claims pursuant to the terms of the Acquisition Agreement. Consequently, a value of $5.5 million is attributed to the Del Rio CFD Bond Proceeds.

- The estimated values for SunCal Beaumont, SunCal Summit and Seven Brothers is net of the anticipated portions expected to be lost through non-judicial foreclosure sale of

various undisputed secured creditors pursuant to orders of the Court granting them relief from the automatic stay.

- Estimate of Allowed Non-Lehman Entities' Claim includes certain claims that the Debtor does not believe will be beneficiaries of an equitable subordination judgment, such claims are identified in the Debtor's Disclosure Statement.

- SJD Development is the parent company of SJD Partners.  Approximately $369,199 of General Unsecured Claims were filed against SJD Development, which presumably should have been filed against SJD Partners and are therefore included in the SJD Partners' row of the chart.  The chart also assumes that SJD Partners will be successful in its fraudulent inducement against certain Lehman Entities that seeks rescission of the non-judicial foreclosure sale and that the Pacific Point Project will thereafter be sold to a buyer that will assume the un-matured bond liabilities.

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I.
Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

**PROOF OF SERVICE OF DOCUMENT**

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 660 Newport Center Drive, 4th Fl., Newport Beach, CA 92660.

A true and correct copy of the foregoing document described as **DEBTORS' FOURTH AMENDED JOINT DISCLOSURE STATEMENT DESCRIBING DEBTORS' FOURTH AMENDED JOINT CHAPTER 11 PLAN** will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner indicated below:

I. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On September 30, 2010, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

☒  Service information continued on attached page

II. **SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served)**:**
On September 30, 2010 I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☒  Service information continued on attached page

III. **SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on September 30, 2010 I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.

rrus@rusmiliband.com; jmiliband@rusmiliband.com; michael.bond@weil.com; bcook@suncal.com; rpachulski@pszjlaw.com; Edward.soto@weil.com; wayneabb@gmail.com; c.martin@pprlaw.net; mea@amclaw.com

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| September 30, 2010 | Susan Connor | /s/ Susan Connor |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

# SERVICE LIST

## NEF LIST

- Selia M Acevedo    sacevedo@millerbarondess.com,
  mpritikin@millerbarondess.com;bprocel@millerbarondess.com
- Joseph M Adams    jadams@sycr.com
- Raymond H Aver    ray@averlaw.com
- James C Bastian    jbastian@shbllp.com
- John A Boyd    fednotice@tclaw.net
- Mark Bradshaw    mbradshaw@shbllp.com
- Jeffrey W Broker    jbroker@brokerlaw.biz
- Brendt C Butler    BButler@rutan.com
- Andrew W Caine    acaine@pszyjw.com
- Carollynn Callari    ccallari@venable.com
- Dan E Chambers    dchambers@jmbm.com
- Shirley Cho    scho@pszjlaw.com
- Vonn Christenson    vrc@paynefears.com
- Brendan P Collins    bpcollins@bhfs.com
- Vincent M Coscino    vcoscino@allenmatkins.com, emurdoch@allenmatkins.com
- Paul J Couchot    pcouchot@winthropcouchot.com,
  pj@winthropcouchot.com;sconnor@winthropcouchot.com
- Jonathan S Dabbieri    dabbieri@shlaw.com
- Ana Damonte    ana.damonte@pillsburylaw.com
- Vanessa S Davila    vsd@amclaw.com
- Melissa Davis    mdavis@shbllp.com
- Daniel Denny    ddenny@gibsondunn.com
- Caroline Djang    crd@jmbm.com
- Donald T Dunning    ddunning@dunningLaw.com
- Joseph A Eisenberg    jae@jmbm.com
- Lei Lei Wang Ekvall    lekvall@wgllp.com
- Richard W Esterkin    resterkin@morganlewis.com
- Marc C Forsythe    kmurphy@goeforlaw.com
- Alan J Friedman    afriedman@irell.com
- Steven M Garber    steve@smgarberlaw.com
- Christian J Gascou    cgascou@gascouhopkins.com
- Barry S Glaser    bglaser@swjlaw.com
- Robert P Goe    kmurphy@goeforlaw.com,
  rgoe@goeforlaw.com;mforsythe@goeforlaw.com
- Eric D Goldberg    egoldberg@stutman.com
- Richard H Golubow    rgolubow@winthropcouchot.com, pj@winthropcouchot.com
- Kelly C Griffith    bkemail@harrisbeach.com
- Matthew Grimshaw    mgrimshaw@rutan.com
- Asa S Hami    ahami@morganlewis.com
- Michael J Hauser    michael.hauser@usdoj.gov
- D Edward Hays    ehays@marshackhays.com
- Michael C Heinrichs    mheinrichs@omm.com
- Harry D. Hochman    hhochman@pszjlaw.com, hhochman@pszjlaw.com
- Jonathan M Hoff    jonathan.hoff@cwt.com

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

- Nancy Hotchkiss    nhotchkiss@trainorfairbrook.com
- Michelle Hribar    mhribar@rutan.com
- John J Immordino    john.immordino@wilsonelser.com, raquel.burgess@wilsonelser.com
- Lawrence A Jacobson    laj@cohenandjacobson.com
- Michael J Joyce    mjoyce@crosslaw.com
- Stephen M Judson    sjudson@fablaw.com
- David I Katzen    katzen@ksfirm.com
- Christopher W Keegan    ckeegan@kirkland.com, emilee@kirkland.com;alevin@kirkland.com
- Payam Khodadadi    pkhodadadi@winthropcouchot.com, pj@winthropcouchot.com
- Irene L Kiet    ikiet@hkclaw.com
- Mark J Krone    mk@amclaw.com, crs@amclaw.com;amc@amclaw.com
- Leib M Lerner    leib.lerner@alston.com
- Peter W Lianides    plianides@winthropcouchot.com, pj@winthropcouchot.com
- Charles Liu    cliu@winthropcouchot.com
- Kerri A Lyman    klyman@irell.com
- Mariam S Marshall    mmarshall@marshallramoslaw.com
- Robert C Martinez    rmartinez@mclex.com
- Michael D May    mdmayesq@verizon.net
- Hutchison B Meltzer    hmeltzer@wgllp.com
- Krikor J Meshefejian    kjm@lnbrb.com
- Joel S. Miliband    jmiliband@rusmiliband.com
- James M Miller    jmiller@millerbarondess.com
- Louis R Miller    smiller@millerbarondess.com
- Mike D Neue    mneue@thelobelfirm.com, jmattiace@thelobelfirm.com;pnelson@thelobelfirm.com
- Robert Nida    Rnida@castlelawoffice.com
- Henry H Oh    henry.oh@dlapiper.com, janet.curley@dlapiper.com
- Sean A Okeefe    sokeefe@okeefelc.com
- Robert B Orgel    rorgel@pszjlaw.com, rorgel@pszjlaw.com
- Malhar S Pagay    mpagay@pszjlaw.com, mpagay@pszjlaw.com
- Penelope Parmes    pparmes@rutan.com
- Ronald B Pierce    ronald.pierce@sdma.com
- Cassandra J Richey    cmartin@pprlaw.net
- Debra Riley    driley@allenmatkins.com
- James S Riley    tgarza@sierrafunds.com
- Todd C. Ringstad    becky@ringstadlaw.com
- Martha E Romero    Romero@mromerolawfirm.com
- John P Schafer    jps@mandersonllp.com
- John E Schreiber    jschreiber@dl.com
- William D Schuster    bills@allieschuster.org
- Christopher P Simon    csimon@crosslaw.com
- Wendy W Smith    wendy@bindermalter.com
- Steven M Speier    Sspeier@Squarmilner.com, ca85@ecfcbis.com
- Michael St James    ecf@stjames-law.com
- James E Till    jtill@thelobelfirm.com, jmattiace@thelobelfirm.com;pnelson@thelobelfirm.com
- United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov

- Carol G Unruh    cgunruh@sbcglobal.net
- Jason Wallach    jwallach@gladstonemichel.com
- Joshua D Wayser    , kim.johnson@kattenlaw.com
- Christopher T Williams    ctwilliams@venable.com, jcontreras@venable.com
- Marc J Winthrop    mwinthrop@winthropcouchot.com, pj@winthropcouchot.com
- David M Wiseblood    dwiseblood@seyfarth.com
- Brett K Wiseman    bwiseman@aalaws.com
- Arnold H Wuhrman    Wuhrman@serenitylls.com
- Dean A Ziehl    dziehl@pszjlaw.com, dziehl@pszjlaw.com