1   Richard M. Pachulski (CA Bar No. 90073)
    Dean A. Ziehl (CA Bar No. 84529)
2   Robert B. Orgel (CA Bar No. 101875)
    PACHULSKI STANG ZIEHL & JONES LLP
3   10100 Santa Monica Blvd., 11th Floor
    Los Angeles, California  90067-4100
4   Telephone: 310/277-6910; Facsimile:  310/201-0760

5   Edward Soto (admitted *pro hac vice*)
    Shai Y. Waisman (admitted *pro hac vice*)
6   WEIL, GOTSHAL & MANGES LLP
    767 Fifth Avenue
7   New York, NY  10153-0119
    Telephone:  (212) 310-8000; Facsimile:  (212) 310-8007
8
9   Attorneys for Lehman Commercial Paper Inc. and Lehman
    ALI, Inc.

10              **UNITED STATES BANKRUPTCY COURT**
                **CENTRAL DISTRICT OF CALIFORNIA**
11                   **SANTA ANA DIVISION**

12  In re:                                              Case No.: 8:08-bk-17206-ES
    Palmdale Hills Property, LLC, and its Related Debtors,   Chapter 11
            Jointly Administered Debtors and
13          Debtors-In-Possession                        Jointly Administered Case Nos.
                                                         8:08-bk-17209-ES; 8:08-bk-17240-ES;
14  Affects:                                             8:08-bk-17224-ES; 8:08-bk-17242-ES;
    ☐  All Debtors                                       8:08-bk-17225-ES; 8:08-bk-17245-ES;
15  ☑  Palmdale Hills Property, LLC                      8:08-bk-17227-ES; 8:08-bk-17246-ES;
    ☑  SunCal Beaumont Heights, LLC                      8:08-bk-17230-ES; 8:08-bk-17231-ES;
16  ☐  SCC/Palmdale, LLC                                 8:08-bk-17236-ES; 8:08-bk-17248-ES;
    ☑  SunCal Johannson Ranch, LLC                       8:08-bk-17249-ES; 8:08-bk-17573-ES;
17  ☑  SunCal Summit Valley, LLC                         8:08-bk-17574-ES; 8:08-bk-17575-ES;
    ☐  SunCal Emerald Meadows, LLC                       8:08-bk-17404-ES; 8:08-bk-17407-ES;
18  ☑  SunCal Bickford Ranch, LLC                        8:08-bk-17408-ES; 8:08-bk-17409-ES;
    ☑  Acton Estates, LLC                                8:08-bk-17458-ES; 8:08-bk-17465-ES;
19  ☑  Seven Brothers, LLC                               8:08-bk-17470-ES; 8:08-bk-17472-ES;
    ☐  SJD Partners, Ltd.                                and 8:08-bk-17588-ES
20  ☐  SJD Development Corp.
    ☑  Kirby Estates, LLC                                **DISCLOSURE STATEMENT WITH**
21  ☑  SunCal Communities I, LLC                         **RESPECT TO** *FIRST AMENDED*
    ☑  SCC Communities LLC                               **JOINT CHAPTER 11 PLAN FOR**
22  ☐  SunCal Communities III, LLC                       **ELEVEN VOLUNTARY DEBTORS**
    ☐  North Orange Del Rio Land, LLC                    **PROPOSED BY THE LEHMAN VD**
23  ☑  Tesoro SF, LLC                                    **LENDERS**
            *Caption Continued on Next Page*
24

25

26

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

☐ LB/L-SunCal Oak Valley, LLC
☐ SunCal Heartland, LLC
☐ LB/L-SunCal Northlake, LLC
☐ SunCal Marblehead, LLC
☐ SunCal Century City, LLC
☐ SunCal PSV, LLC
☐ Delta Coves Venture, LLC
☐ SunCal Torrance Properties, LLC
☐ SunCal Oak Knoll, LLC

**Hearing:**
Date:       May 13, 2011
Time:       9:30 a.m.
Place:      Courtroom 5A
            411 West Fourth Street
            Santa Ana, CA  92701

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

[THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE

*FIRST AMENDED* JOINT VD PLAN.  ACCEPTANCES OR REJECTIONS MAY NOT BE

SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE

BANKRUPTCY COURT.  THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR

APPROVAL BUT HAS NOT BEEN APPROVED BY THE COURT]

| | SUMMARY INFORMATION[1] |
|---|---|
| **VD Plan Debtors:** | **Group I Debtors:** Acton Estates, LLC; Palmdale Hills Property, LLC; SCC Communities LLC; SunCal Communities I, LLC; SunCal Bickford Ranch, LLC; SunCal Summit Valley, LLC; and Tesoro SF, LLC |
| | **Group II Debtors:** Seven Brothers, LLC; Kirby Estates, LLC; SunCal Beaumont Heights, LLC; SunCal Johannson Ranch, LLC |
| **Recommendation:** | The Lehman VD Lenders recommend that you vote in favor of the Plan. |
| **Plan Summary** | To obtain conveyance of Plan Projects free and clear of most Encumbrances, under the Plan, the Lehman VD Lenders will provide the Lehman Plan Funding. The Lehman Plan Funding consists of the Lehman Post-Confirmation Expense Funding (*i.e.*, to fund up to $500,000 of Post-Confirmation Expenses incurred during the 2 years following the Plan's Effective Date) and the Lehman Creditor Distribution Funding. |
| | The Lehman VD Lenders' Lehman Creditor Distribution Funding will fund, among others, the following payments to Creditors: |
| | (a) amounts payable under the Plan for Senior Claims and for Allowed General Unsecured Claims in Class 8; and, also |
| | (b) amounts payable under the Plan for each Holder of a Reliance Claim or General Unsecured Claim against any Group I Debtor, consisting of: (i) the Lehman Guaranteed Minimum Distribution (of 1% of an Allowed Claim); and (ii) the Lehman Distribution Enhancement. |
| | The Lehman Distribution Enhancement is a payment to an accepting Creditor of a Group I Debtor for its execution and delivery of the Creditor's Assignment / Release for Lehman. The offer to each Holder of an Allowed General Unsecured Claim against a Group I Debtor is to increase the payment to such Creditor to 5% of its Allowed Claim, despite such Claim lacking what the Lehman VD Lenders view as the threshold characteristics for their potential exposure. Because Allowed Reliance Claims, as defined, meet what the Lehman VD Lenders view as the threshold characteristics for at least their potential exposure, the offer to each Holder thereof, as more fully set forth below, is to increase the payment to such Holder up to 50% of its Allowed Claim. |
| | The Lehman VD Lenders also will arrange for reimbursements due under a Settling Bond Issuer Agreement to a Settling Bond Issuer as the Holder of a Settling Bond Issuer-Incurred Future Work Obligation |
| | Other Assets of the Plan Debtors will be liquidated by a Liquidating Trustee and the resulting Residual Cash will be distributed to Holders of Allowed General Unsecured Claims and Allowed Reliance Claims. Holders of Interests in the Plan Debtors receive nothing. |
| | The Plan and the extent of certain Distributions are dependent upon certain identified Claim or Distribution thresholds (or the Lehman VD |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

---

[1] All capitalized terms have the meanings set forth in Article II and Exhibit "C" of the Plan.

| | | Lenders' good faith estimate thereof) not being exceeded. |
|---|---|---|
| | **Vote Required to Accept the Plan:** | Acceptance of the Plan requires the affirmative vote of two-thirds in amount and a majority in number of the Allowed Claims actually voted in each Class (or subclass) of Impaired Classes entitled to vote.  Only Entities holding Claims in Classes 2, 6, 7, 8 and 9 are entitled to vote.  If any of these Classes as to any particular VD Plan Debtor rejects the Plan, the Bankruptcy Court nevertheless may confirm the Plan as to such VD Plan Debtor if the "cramdown" requirements of Bankruptcy Code § 1129(b) are satisfied with respect to such Class or subclass. |
| | **Voting / Balloting Information Generally:** | If you are entitled to vote, you should have received a Ballot with this Disclosure Statement.  After completing and signing your Ballot, you should return it to: |
| | | Pachulski Stang Ziehl & Jones LLP 10100 Santa Monica Blvd., 11th Floor Los Angeles, California  90067-4100 Attention: Michael Matteo |
| | | For your ballot to be counted, Pachulski Stang Ziehl & Jones LLP must receive it no later than 5:00 p.m. Pacific Time on _____ __, 2011. |
| | *Special Voting Procedures: Holders of Reliance Claims & General Unsecured Claims against Group I Debtors (**Classes 6 & 7**)* | **Whether you have an Allowed Reliance Claim in Class 6 or an Allowed General Unsecured Claim in Class 7, you only receive 1% on your Claim (plus a proportional share of Residual Cash) <u>unless</u> you properly and timely elect to receive the Lehman Distribution Enhancement and afford the Lehman Released Parties the Creditor's Assignment / Release for Lehman.**  Ballots for each Holder of a General Unsecured Claim or Reliance Claim will afford the Holder the opportunity to elect that, if its Claim is Allowed, it would receive the Lehman Distribution Enhancement (up to a 5% Distribution for Holders of Allowed General Unsecured Claims and up to a 40% or 50% Distribution for Holders of Allowed Reliance Claims).  By such election and execution and delivery of the Ballot, as the Ballot reflects, the Holder also is executing and delivering the Creditor's Assignment / Release for Lehman set forth in the Plan for the benefit of the Lehman Released Parties. |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| | |
|---|---|
| *Special Voting Procedures: Holders of Alleged **Mechanic's Lien Claims Against Group I Debtors*** | **The Lehman Proponents dispute that any Mechanic's Lien Claims Against Group I Debtors (Other than SunCal Summit Valley) could be Allowed as Sr. Secured Mechanic's Lien Claims** because they believe that, with respect to Plan Projects of such Debtors, the Lehman VD Lenders' Liens are senior Encumbrances and there is no value in the junior Liens of the Holders of such Mechanic's Lien Claims.  For each Holder identified in advance as having alleged to hold a Mechanic's Lien Claim, **the Ballot will afford an opportunity to waive any contention that the Holder has a Secured Claim senior to the Secured Claim of the applicable Lehman VD Lender(s) on the applicable Plan Project** and to assert, instead, that its Claim is a General Unsecured Claim or Reliance Claim, **thereby affording the Creditor**, as more fully set forth below, **the opportunity to elect to receive the <u>Lehman Distribution Enhancement</u> if its Claim is Allowed. If the Creditor holding a Mechanic's Lien Claim against a Group I Debtor instead waits to see whether its Claim later is deemed to be entitled to "secured" status and it is unsuccessful in such effort, even if its Claim is Allowed as a Reliance Claim or General Unsecured Claim, it will only receive 1% on its Claim plus a proportional share of Residual Cash and it will not have the opportunity to elect to receive the Lehman Distribution Enhancement.** |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| *"Reliance Claim" Status Must Be Asserted on a Ballot* | For any Creditor to vote its Claim as a Reliance Claim (Class 6), and have offered to it the higher Distributions available therefor with respect to the Lehman Distribution Enhancement, the Creditor must mark its Ballot to indicate that it contends it holds a Reliance Claim.  The features distinguishing General Unsecured Claims from Reliance Claims, as more fully reflected in the definitions of each, are essentially that a Reliance Claim is a Claim (a) for "new value," (b) voluntarily extended after the August 1, 2007 Reliance Date and prior to the applicable November, 2008 Petition Date(s), and (c) timely of record as follows: either (1) Filed by the Primary Claims Bar Date or (2) Filed late, but by March 25, 2011 in accordance with a Final Order or (3) listed on the Filed Schedules by March 25, 2011 as (undisputed, non-contingent, liquidated) Scheduled Claims; but Reliance Claims exclude Insider Claims and Lehman Creditor Claims (other than Lehman-Owned Settling Bond Issuer-Related Claims).  The same Ballot will be provided to those Creditors believed by the Proponents to hold General Unsecured Claims or Reliance Claims in Classes 6 or 7. |
| **Confirmation Hearing:** | The hearing on Confirmation will be held on **[_____ __, 2011 at __:__ __.]**m. Pacific Time in Courtroom 5A, 411 West Fourth Street, Santa Ana, CA 92701.  The hearing on Confirmation may be continued from time to time without notice. |
| **Plan Effective Date:** | The Plan's Effective Date for a VD Plan Debtor as to which the Plan is confirmed by the Bankruptcy Court will be a date selected by the Lehman VD Lenders, but in no event later than the sixtieth (60th) day after the Confirmation Date. |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| Questions: | All inquiries about the Plan and Disclosure Statement should be in writing and should be sent to:<br><br>Pachulski Stang Ziehl & Jones LLP<br>10100 Santa Monica Blvd., 11th Floor<br>Los Angeles, California  90067-4100<br>Attention: Richard M. Pachulski, Esq. &<br>Robert B. Orgel, Esq. |
| NOTICE: | THE PLAN, DISCLOSURE STATEMENT AND BALLOTS CONTAIN IMPORTANT INFORMATION THAT IS NOT INCLUDED IN THIS SUMMARY. THAT INFORMATION COULD MATERIALLY AFFECT YOUR RIGHTS. YOU SHOULD THEREFORE READ THE PLAN, DISCLOSURE STATEMENT, AND BALLOTS IN THEIR ENTIRETY. YOU ALSO SHOULD CONSULT WITH YOUR LEGAL AND FINANCIAL ADVISORS BEFORE VOTING ON THE PLAN. |

**SUMMARY OF CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS**

| CLASS AND/OR CLAIM TYPE | TREATMENT | IMPAIRED STATUS/ VOTING STATUS |
|---|---|---|
| **Unclassified Claims** | | |
| Allowed Ordinary Course Administrative Claims | To be paid in full or performed by the Liquidating Trustee in the ordinary course of business, in accordance with the terms of the particular obligation. | Not Entitled to Vote |
| Lehman Administrative Loans | To be paid in Cash in full from the Lehman Creditor Distribution Funding on the Effective Date or at such later time and on such other terms as the Lehman VD Lenders may agree. | Not Entitled to Vote |
| Other Allowed Administrative Claims | To be paid by the Liquidating Trustee in full, in Cash, by the later of (i) the Effective Date, (ii) within ten (10) Business Days after the date such Administrative Claim becomes an Allowed Administrative Claim, or (iii) the date such Allowed Administrative Claim becomes due according to its terms. Administrative Tax Claims must be Filed and served on the Liquidating Trustee on or before the later of: (1) sixty (60) days following the Effective Date; or (2) 180 days following the date that the tax return for such tax year or period to which such Taxes relate is required to be filed with the applicable governmental unit. Other Administrative Claims, including for Professional Fees must be Filed by the General Administrative Claim Bar Date (first Business Day following the sixtieth (60th) day after the | Not Entitled to Vote |

| SUMMARY OF CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS | | |
|---|---|---|
| **CLASS AND/OR CLAIM TYPE** | **TREATMENT** | **IMPAIRED STATUS/ VOTING STATUS** |
| | Confirmation Date). | |
| Allowed Priority Tax Claims | To receive equal quarterly Cash payments payable until November 6, 2013, with all such payments totaling 100% of the principal amount of such Claim, plus interest on any unpaid balance from the Effective Date, calculated at the nonbankruptcy interest rate applicable on the Effective Date, if any. | Not Entitled to Vote |
| **Secured Claims** | | |
| Class 1 Allowed Secured Real Property Tax Claims | To receive either: (a) a lump sum payment on the Effective Date in the full amount owing when last due before default or maturity, plus any fees incurred in reasonable reliance on timely receipt of the tax, but without any penalty amounts at any time incurred or charged; (b) quarterly Cash payments until November 6, 2013, totaling the Allowed Amount of the Claim, with interest at the rate applicable under non-bankruptcy law; or (c) Simple Unimpairment (*e.g.*, to have left unaltered Creditor's legal, equitable and contractual rights, and Creditor to be free to pursue its rights and remedies under applicable nonbankruptcy law.  The first treatment will be applicable by default unless the Bankruptcy Court rules that, despite cure and reinstatement, any penalty amounts are owing, or unless a Lehman VD Lender selects to make the second or third treatment applicable. | Not Entitled to Vote |
| Class 2 Allowed Lehman Secured Claims | Plan Projects to be conveyed free and clear to Lehman Nominees, as designated by the Lehman VD Lender(s); Collateral for the Lehman Secured Claims or its Net Cash Proceeds to be paid to the applicable Lehman VD Lender, unless the applicable Lehman VD Lender(s) otherwise directs. | Impaired Entitled to Vote |
| Class 3 Allowed Sr. Secured Mechanic's Lien Claims | To receive either: (a) a cure and payment of the full amount owing and reinstatement of the terms applicable when last due before default or maturity, only with interest if not penalty interest, plus any fees incurred in reasonable reliance on timely receipt of payment, but without any penalty amounts at any time incurred or charged (if the original maturity date has passed as of the Effective Date, cure to be paid in a lump sum); or (b) the Holder of the Claim will have left unaltered its legal, | Not Entitled to Vote |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| SUMMARY OF CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS | | |
|---|---|---|
| **CLASS AND/OR CLAIM TYPE** | **TREATMENT** | **IMPAIRED STATUS/ VOTING STATUS** |
| | equitable and contractual rights as a Holder of such Claim and will be free to pursue its rights and remedies, if any, against the underlying collateral under applicable nonbankruptcy law.  The first treatment will be (i) applicable to all Settling Bond Issuer-Backed Non-Future Work Claims and (ii) also applicable to other Class 3 Claims unless the applicable Lehman VD Lender or Lehman Nominee selects and notifies the applicable Creditor or Creditors of its selection of the second alternative treatment.  Lehman VD Lenders and Settling Bond Issuers holding Class 3 Claims have agreed to less favorable treatment. | |
| Class 4<br><br>Allowed Other Secured Claims | To receive either: (a)  Simple Unimpairment (e.g., to have left unaltered Creditor's legal, equitable and contractual rights and Creditor to be free to pursue its rights and remedies, if any, against the underlying collateral under applicable nonbankruptcy law); or (b) Unimpairment With Surrender or Abandonment (e.g., the Liquidating Trustee to abandon or surrender to the Creditor the property securing such Allowed Claim and turn over possession as soon as practicable thereafter); or (c) the applicable Allowed Claim to be cured and reinstated as of the first date when last payable without interest, fees or penalties, plus any non-penalty interest thereafter, plus fees incurred in reasonable reliance on timely receipt of timely payment, but exclusive of any penalty amounts thereof at any time incurred or charged (if the original maturity date has passed as of the Effective Date, cure to be paid in a lump sum). | Not Entitled to Vote |
| **Priority Unsecured Claims** | | |
| Class 5<br><br>Allowed Priority Claims | To receive the full amount of such Claim in Cash by the later of (i) the Effective Date, and (ii) the date such Claim becomes payable in accordance with its terms. | Not Entitled to Vote |
| **Non-Priority Unsecured Claims** | | |
| Class 6<br><br>Allowed Reliance Claims against Group I Debtors | If the Creditor elects to receive the **Lehman Distribution Enhancement**, which it can do by electing on its Ballot to provide the Lehman Released Parties a Creditor's Assignment / Release for Lehman, it will receive a Cash Distribution of *40% of the Allowed Claim* against the applicable Group I Debtor.  The Distribution | Impaired<br><br>Entitled to Vote |

| SUMMARY OF CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS | | |
|---|---|---|
| **CLASS AND/OR CLAIM TYPE** | **TREATMENT** | **IMPAIRED STATUS/ VOTING STATUS** |
| | *will be increased to 50% through the Projected Distribution Bump Up* if the Classes 6/7 Distribution Amount for a Group I Debtor does not exceed its Bump Up Threshold (all of which thresholds aggregate to $2.5 million). But, *if the aggregate Distributions* for Allowed Class 6 and Class 7 Claims and for Senior Claims against the Group I Debtors otherwise *would exceed $20.5 million, there shall be an On Proportion Distribution Reduction* of the Lehman Distribution Enhancement, *reducing Distributions by such excess over $20.5 million.* | |
| | If the Creditor does not elect to receive the Lehman Enhanced Distribution, it will receive an unconditional, guaranteed Cash Distribution equal to 1% of its Allowed Claim. | |
| | Creditors will also receive a pro rata share of any Residual Cash, if any. | |
| | Payment will be made after the Effective Date within a short time after a Claim is determined to be Allowed (and, if such Claim is a Future Obligation, after it is no longer a Future Obligation). | |
| Class 7<br><br>Allowed General Unsecured Claims against Group I Debtors | If the Creditor elects to receive the **Lehman Distribution Enhancement**, which it can do by electing on its Ballot to provide the Lehman Released Parties a Creditor's Assignment / Release for Lehman, it will receive a Cash Distribution of *5% of the Allowed Claim* against the applicable Group I Debtor. But, *if the aggregate Distributions* for Allowed Class 6 and Class 7 Claims and for Senior Claims against the Group I Debtors otherwise *would exceed $20.5 million, there shall be an On Proportion Distribution Reduction* of the Lehman Distribution Enhancement, *reducing Distributions by such excess over $20.5 million.* | Impaired<br><br>Entitled to Vote |
| | If the Creditor does not elect to receive the Lehman Enhanced Distribution, it will receive an unconditional, guaranteed Cash Distribution equal to 1% of its Allowed Claim. | |
| | Creditors will also receive a pro rata share of any Residual Cash, if any. | |
| | Payment will be made after the Effective Date within a short time after a Claim is determined to be Allowed | |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| SUMMARY OF CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS | | |
|---|---|---|
| **CLASS AND/OR CLAIM TYPE** | **TREATMENT** | **IMPAIRED STATUS/ VOTING STATUS** |
| | (and, if such Claim is a Future Obligation, after it is no longer a Future Obligation). | |
| Class 8 Allowed General Unsecured Claims against Group II Debtors | To receive a Cash Distribution equal to 100% of each Claim plus post-petition interest at the Federal Judgment Rate applicable on the applicable Petition Date unless the Allowed Class 8 Claims exceed the Project Value less the Allowed Senior Claims against the applicable Group II Debtor.  In such event, each Holder is to receive, instead, a Pro Rata distribution of: (1) any positive sum resulting from subtracting the Allowed Senior Claims against the applicable Group II Debtor from the Project Value for the applicable Group II Debtor's Plan Project; and (2) Residual Cash, if any, of the Estate of the applicable Group II Debtor; provided that such Pro Rata Distribution shall not be less than 1% of each Allowed Claim. Payment will be made after the Effective Date within a short time after a Claim is determined to be Allowed (and, if such Claim is a Future Obligation, after it is no longer a Future Obligation). | Impaired Entitled to Vote |
| Class 9 Allowed Settling Bond Issuer-Related Future Work Bond Claims | To receive performance of the Future Work obligations with respect to each Allowed Claim, without penalties, and with the obligation reinstated as to any maturity applicable prior to the applicable Petition Date, provided that: (a) the initial payment for the performance of the Future Work obligations will be the obligation of the applicable Settling Bond Issuer that issued a Future Work Bond with respect to the subject Claim and will not be an obligation of the Liquidating Trustee or a VD Plan Debtor's Estate; (b) the Lehman Nominee that takes title to the Plan Project to which the subject Claim relates is to cooperate in connection with the performance of such Future Work obligations, contingent upon such payment by the applicable Settling Bond Issuer; and (c) as and to the extent provided in the applicable Settling Bond Issuer Agreement: (i) the Lehman Nominee that takes title to the Plan Project to which a subject Claim relates is to take an assignment from the applicable Settling Bond Issuer of certain of such Settling Bond Issuer's Claims against the applicable VD Plan Debtor and third parties; and (ii) in exchange therefor, such Lehman Nominee is to reimburse such Settling Bond Issuer agreed amounts for payments made by such | Impaired Entitled to Vote |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| SUMMARY OF CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS | | |
|---|---|---|
| **CLASS AND/OR CLAIM TYPE** | **TREATMENT** | **IMPAIRED STATUS/ VOTING STATUS** |
| | Settling Bond Issuer under the applicable Future Work Bonds. | |
| **Equity Interests** | | |
| Group 10 Interests | To receive nothing. | Not Entitled to Vote |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

# TABLE OF CONTENTS

**Page**

I PRELIMINARY MATTERS ................................................................................................. 1
 1.1    Introduction .......................................................................................................... 1
 1.2    Definitions and Rules of Contstruction .............................................................. 2
 1.3    Summary of The Plan Process – Disclosure, Voting, and Treatment of Claims and
        Interests ............................................................................................................... 2
        (a)    Disclosure ................................................................................................ 2
        (b)    Voting ..................................................................................................... 3
        (c)    Treatment of Claims and Interests Under the Plan ................................ 4
 1.4    Background to the Joint VD Plan ....................................................................... 5
    1.4.1    Generally ............................................................................................... 5
    1.4.2    Prior and Competing Plans ................................................................... 6
    1.4.3    Plan Stay and Mediation ..................................................................... 11
 1.5    Purpose of This Document ............................................................................... 11
 1.6    Court Approval of this Document ..................................................................... 12
 1.7    Plan Overview ................................................................................................. 13
 1.8    Summary of the Joint VD Plan ........................................................................ 14
    1.8.1    Groupings of Debtors .......................................................................... 15
        (a)    Group I Debtors: ................................................................................... 15
        (b)    Group II Debtors: ................................................................................. 15
    1.8.2    Overview of Treatment of Claims and Relevant Agreements ............ 15
        (a)    Lehman Plan Funding ........................................................................... 16
        (b)    Bond-Backed Claims and Bond Issuer Settlement(s) ......................... 16
        (c)    Treatment of Non-Priority Unsecured Claims and Interests ............... 17
 1.9    Voting Recommendations ................................................................................ 24
II PLAN CONFIRMATION DEADLINES ......................................................................... 24
 2.1    Time and Place of the Confirmation Hearing .................................................. 24
 2.2    Deadline for Voting for or Against the Joint VD Plan ..................................... 25
 2.3    Deadline for Objecting to the Confirmation of the Joint VD Plan .................. 25
 2.4    Identity of Person to Contact for More Information Regarding the Joint VD Plan ........... 25
 2.5    Disclaimer ....................................................................................................... 26
III ACCEPTANCE OR REJECTION OF THE JOINT VD PLAN ..................................... 26
 3.1    Who May Object to Confirmation of the Joint VD Plan .................................. 26
 3.2    Who May Vote to Accept/Reject the Joint VD Plan ........................................ 27
 3.3    What Is an Allowed Claim/Interest .................................................................. 27
 3.4    What Is an Impaired Class ............................................................................... 28
 3.5    Who Is Not Entitled to Vote ............................................................................ 28
 3.6    Who Can Vote in More than One Class ........................................................... 29
 3.7    Votes Necessary for a Class to Accept the Joint VD Plan ............................... 29
 3.8    Special Provisions for Listed Holders of Mechanic's Lien Claims .................. 29
 3.9    Special Provisions for Allowed General Unsecured Claims in Class 7 and Allowed
        Reliance Claims in Class 6 ............................................................................... 30
    3.9.1    Voting Permitted Regardless of Election to Receive the Lehman Distribution
             Enhancement ....................................................................................... 30
    3.9.2    "Reliance Claim" Status Must Be Asserted on a Ballot ....................... 30
 3.10   Receipt of No or Incorrect Ballots .................................................................. 31
 3.11   Acceptance of the Plan Contrasted With Confirmation ................................... 31
IV BACKGROUND OF THE VD PLAN DEBTORS, THEIR BUSINESS AND THE CASES ..... 32
 4.1    The SunCal Companies and the Debtors .......................................................... 32
 4.2    Financial Information: Assets and Liabilities ................................................... 33
    4.2.1    The VD Plan Debtors' Primary Assets ................................................ 33
    4.2.2    Values for Plan Projects ...................................................................... 36
    4.2.3    Remaining Other Assets ...................................................................... 38

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

(a)    VD Plan Debtors' Cash.................................................................38
(b)    Net Cash Litigation Recoveries ..................................................39
4.2.4  Debt and Capital Structure..............................................................39
(a)    A Summary of the Lehman VD Lenders' Loans. ..........................39
(b)    Other Debts against the VD Plan Debtors and Plan Projects........41
(c)    Mechanic's Lien Claims. ...........................................................44
4.2.5  Alleged Litigation Claims And Challenges Against The Lehman Creditors Asserted
       Currently By The Voluntary Debtors And Formerly By The Trustee.....................46
(a)    Introduction..............................................................................46
(b)    The Equitable Subordination Claims Relating to the Lehman Creditors' Claims......47
(c)    The Voluntary Debtors' Assertions regarding Fraudulent Transfer Actions Against
       the Lehman Creditors Arising under Various Cross-Collateralized Lehman Loans..50
(d)    Alleged Preference Claims Against the Lehman Creditors. ................52
(e)    Alleged Fraud, Breach of Fiduciary Duty and Other Potential Litigation Claims
       Against the Lehman Creditors. ....................................................54
(f)    Challenge to Proofs of Claim with Respect to the Claims of the Lehman Creditors. 54
(g)    The Debtors' Disputes Relating to the Allowed Secured Claims of Fenway Capital
       Pursuant to Bankruptcy Code Section 506. ...................................56
4.3    Significant Events In The Debtors' Chapter 11 Cases. ..................................56
4.3.1  Voluntary Debtors........................................................................56
4.3.2  Trustee Debtors...........................................................................57
4.3.3  The Debtors' Motions for Relief from Stay in the Lehman Commercial Chapter 11
       Proceedings. ..............................................................................57
4.3.4  Certain of the Voluntary Debtors' Motion for Surcharge and Use of Cash Collateral....58
4.3.5  Lehman Commercial's Motions for Relief from the Automatic Stay Against Certain of
       the Voluntary Debtors' Projects....................................................59
4.3.6  The Debtors' Filing of the ES Action Against the Lehman Creditors...................59
4.3.7  Certain Debtors' Filing of the Sales Procedures Motion. ...............................59
(a)    Lehman Commercial's Stay Assertion and the Sales Procedure Motion. .............60
(b)    Danske Bank's Intervention into the Sales Procedures Motion.........................60
(c)    Lehman's Disclosure of the Repurchase Agreement Involving Certain Loans with the
       Debtors. ...................................................................................61
(d)    The Modifications to the Sales Procedure Motion. ........................................61
(e)    The Continuance of the Sales Procedure Motion. .........................................61
4.3.8  The Lehman Administrative Loans.......................................................62
(a)    The Initial Stipulation. .................................................................62
(b)    The Subsequent Stipulations Regarding Use of Lehman Creditors' Cash Collateral
       and/or Provision by the Lehman Creditors of Secured or Administrative Loans.......62
(c)    Voluntary Debtors' Surcharging and Financing Motions...................................72
4.3.9  The Contractors' Successful Motions for Relief from Stay to Pursue the Bond Claims.73
4.3.10 The Voluntary Debtors' Motion Pursuant to Bankruptcy Code Section 506(d)............73
4.3.11 The Debtors' Motions to Strike the Claims and Pleadings Arising from the Repurchase
       Lehman Loans. ...........................................................................73
4.3.12 The Debtors' Denied Preliminary Injunction Motion Against the Holders of Bond
       Claims. .....................................................................................73
4.3.13 The Debtors' Potential Preferential Transfers. ..........................................74
4.3.14 The Voluntary Debtors' Substantive Consolidation Motion .............................75
4.3.15 Villa San Clemente Turnover Motion against SunCal Marblehead .......................75
V LEHMAN VD LENDERS' PLAN ..................................................................75
5.1    Treatment of Unclassified Claims. ....................................................75
5.1.1  Treatment of Allowed Administrative Claims. ..........................................76
(a)    Treatment and Repayment of the Lehman Administrative Loan(s). ....................76
(b)    Administrative Claim Bar Date. ......................................................77
5.1.2  Treatment of Priority Tax Claims. .....................................................78
5.2    Classification of Claims and Interests...................................................79

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

5.3      Treatment Of Classified Claims And Interests .................................................. 94
    5.3.1    Treatment of Allowed Secured Real Property Tax Claims (Class 1). ........................... 94
        (a)      A Voting and Impairment. ................................................. 94
        (b)      Liens. ................................................................ 95
        (c)      Distributions and Distribution Dates. .................................... 95
    5.3.2    Treatment of Lehman Secured Claims (Class 2). ................................ 97
        (a)      Voting. .............................................................. 97
        (b)      Liens. ................................................................ 97
        (c)      Claims. .............................................................. 97
        (d)      Disposition of Collateral ............................................ 97
    5.3.3    Treatment of Allowed Sr. Secured Mechanic's Lien Claims (Class 3). ............ 98
        (a)      Voting and Impairment. ................................................ 98
        (b)      Liens. ................................................................ 99
        (c)      Distributions and Distribution Dates. .................................... 99
        (d)      Less Favorable Treatment for Lehman VD Lenders and Settling Bond Issuer(s) by
                 Consent. ............................................................. 100
        (e)      Unsecured Deficiency Claims. ........................................ 101
    5.3.4    Treatment of Allowed Other Secured Claims (Class 4). ........................ 101
        (a)      Voting and Impairment. ............................................... 101
        (b)      Liens. ............................................................... 101
        (c)      Distributions and Distribution Dates. ................................... 102
    5.3.5    Treatment of Allowed Priority Claims (Class 5). ............................. 103
        (a)      Voting and Impairment. ............................................... 103
        (b)      Distributions and Distribution Dates. ................................... 103
    5.3.6    Treatment of Allowed Reliance Claims Against Group I Debtors (Class 6)............... 104
        (a)      Voting and Impairment. ............................................... 104
        (b)      Distributions. ....................................................... 104
        (c)      Distribution Dates. .................................................. 106
        (d)      Less Favorable Treatment for Lehman VD Lenders and Settling Bond Issuer(s) by
                 Consent. ............................................................. 107
    5.3.7    Treatment of Allowed General Unsecured Claims Against Group I Debtors (Class 7).
             108
        (a)      Voting and Impairment. ............................................... 108
        (b)      Distributions. ....................................................... 108
        (c)      Distributions for Allowed Bond-Backed Non-Future Work Claims in Class 7. ...... 109
        (d)      Distribution Dates. .................................................. 109
        (e)      Less Favorable Treatment for Lehman VD Lenders and Settling Bond Issuer(s) by
                 Consent. ............................................................. 111
    5.3.8    Treatment of Allowed General Unsecured Claims Against Group II Debtors (Class 8).
             111
        (a)      Voting and Impairment. ............................................... 112
        (b)      Distributions:  Lehman Creditor Distribution Funding. ..................... 112
        (c)      Distribution Dates. .................................................. 112
    5.3.9    Treatment of Allowed Settling Bond Issuer-Related Future Work Claims (Class 9)... 113
        (a)      Voting and Impairment. ............................................... 113
        (b)      Distributions and Distribution Dates. .................................... 113
    5.3.10   Treatment of Allowed Interests (Class 10). ................................ 114
5.4      Means of Execution and Implementation of the Joint VD Plan. ........................ 114
    5.4.1    Introduction. ............................................................ 114
    5.4.2    The Liquidating Trustee. ................................................ 115
    5.4.3    Conditions to Confirmation and Plan Effectiveness. .......................... 115
    5.4.4    Lehman Plan Funding. ................................................... 116
        (a)      Lehman Creditor Distribution Funding. ................................. 117
        (b)      Lehman Post-Confirmation Expense Funding.............................. 119
        (c)      Funding with Cash Collateral of a Lehman VD Lender. ..................... 120

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

(d)     Funding with New Cash Payments from a Lehman Related Party........................ 120
(e)     Plan Reserve.................................................................................................... 120
(f)     Terms and Documentation of Lehman Plan Funding. ...................................... 121
5.4.5     Post-Confirmation Expenses and Intercompany Loans. .......................................... 121
5.4.6     Vesting of Assets in Estates of VD Plan Debtors Managed by Liquidating Trustee. .. 122
5.4.7     Disposition and Value of Assets .............................................................................. 123
(a)     Disposition and Value of the Plan Projects...................................................... 123
(b)     Remaining Litigation Claims, Net Cash Litigation Recoveries and Remaining Other
Assets. ............................................................................................................. 125
5.4.8     Bond Claims and the Settling Bond Issuer Agreements. .......................................... 126
(a)     Background. ..................................................................................................... 126
(b)     Settling Bond Issuer Agreement. ..................................................................... 127
(c)     Bond Modification Discussions. ...................................................................... 129
5.4.9     Releases for Lehman Released Parties...................................................................... 130
(a)     Creditors' Assignments / Releases for Lehman. ............................................... 130
(b)     Settling Bond Issuer Releases for Lehman Released Parties............................. 134
(c)     Plan Release for Lehman. ................................................................................ 137
(d)     Dismissal of Pending Litigation. ..................................................................... 137
(e)     Process for Execution and Delivery of Creditor's Assignments / Releases for Lehman.
......................................................................................................................... 138
5.4.10     Entry of Final Decrees. ......................................................................................... 140
5.4.11     Dissolution of Voluntary Debtors' Committee and Discharge of Liquidating Trustee. 140
5.5     Distributions................................................................................................................... 140
5.5.1     Distribution Agent. ................................................................................................. 140
5.5.2     Distributions. .......................................................................................................... 140
(a)     Dates of Distributions. .................................................................................... 140
(b)     Limitation on Liability. .................................................................................... 141
5.5.3     Old Instruments and Securities. .............................................................................. 141
(a)     Surrender and Cancellation of Instruments and Securities. .............................. 141
(b)     Cancellation of Liens. ..................................................................................... 141
5.5.4     De Minimis Distributions and Fractional Shares. .................................................... 142
5.5.5     Delivery of Distributions. ....................................................................................... 142
5.5.6     Unclaimed Property. ............................................................................................... 142
5.5.7     Disposition of Unclaimed Property. ........................................................................ 143
5.6     Objections to Claims and Disputed Claims. .................................................................... 143
5.6.1     Standing for Objections to Claims. ......................................................................... 143
5.6.2     Treatment of Disputed Claims. ............................................................................... 144
(a)     No Distribution Pending Allowance.................................................................. 144
(b)     Distribution After Allowance. .......................................................................... 144
(c)     Reserves for Disputed Claims. ......................................................................... 145
5.7     Executory Contracts And Unexpired Leases. ................................................................... 145
5.7.1     Identification of Executory Contracts and Unexpired Leases. .................................. 145
5.7.2     Executory Contracts Being Assumed or Assumed and Assigned............................... 145
5.7.3     Cure Rights. ........................................................................................................... 146
5.7.4     Executory Contracts Being Rejected. ...................................................................... 147
5.7.5     Retention of Property Rights by Lehman Nominees or Liquidating Trustee. ............ 147
5.7.6     Continuing Obligations. .......................................................................................... 147
5.7.7     Bar Date for Rejection Damages. ............................................................................ 148
5.8     Effect Of Confirmation Of The Joint VD Plan. ............................................................... 148
5.9     Other Plan Provisions. ................................................................................................... 150
5.9.1     Limitation Of Liability. ........................................................................................... 150
(a)     No Liability for Solicitation or Participation. ................................................... 150
(b)     Limitation of Liability...................................................................................... 150
5.9.2     Conditions To Confirmation And Effectiveness Of The Joint VD Plan...................... 151
(a)     Conditions Precedent to Entry of the Confirmation Order. ............................... 151

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

(b)      Conditions Precedent to Plan Effectiveness. ........................................ 151
5.9.3   Retention Of Jurisdiction. ................................................................. 152
5.9.4   Modification Or Withdrawal Of Plan. ................................................ 152
(a)      Modification of Plan. ......................................................... 152
(b)      Nonconsensual Confirmation. ............................................ 152
5.9.5   Miscellaneous. .................................................................................. 152
(a)      Changes in Rates Subject to Regulatory Commission Approval. ............................ 152
(b)      Payment of Statutory Fees. ................................................ 153
(c)      Payment Dates. ................................................................. 153
(d)      Headings. .......................................................................... 153
(e)      Other Documents and Actions. ........................................... 153
(f)      Notices. ............................................................................. 153
(g)      Governing Law. ................................................................. 154
(h)      Binding Effect. .................................................................. 154
(i)      Successors and Assigns. .................................................... 154
(j)      Severability of Plan Provisions. ......................................... 155
(k)      No Waiver. ......................................................................... 155
(l)      Inconsistencies. ................................................................. 155
(m)      Exemption from Certain Transfer Taxes and Recording Fees. ................................ 155
(n)      Post-Confirmation Status Report. ....................................... 156
(o)      Post-Confirmation Conversion/Dismissal. .......................... 156
(p)      Final Decree. ..................................................................... 156
VI BEST INTERESTS OF CREDITORS TEST ...................................................... 157
VII PLAN FEASIBILITY .......................................................................................... 162
VIII RISK FACTORS ............................................................................................... 163
IX CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE JOINT
     VD PLAN ........................................................................................................ 165
9.1   Consequences to Holders of Lehman Secured Claims ............................. 166
9.2   Consequences to Holders of General Unsecured Claims. ........................ 167
9.3   Consequences to Holders of Settling Bond Issuer-Related Future Work Claims. .......... 168
9.4   Distributions in Discharge of Accrued but Unpaid Interest. .................... 169
9.5   Character of Gain or Loss ...................................................................... 170
9.6   Information Reporting and Withholding ................................................. 170
X ALTERNATIVES, CONCLUSION AND RECOMMENDATION ......................... 171

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1

EXHIBIT LIST

2

EXHIBIT "1" -        Summary of Health and Safety Notices

3

EXHIBIT "2" -        Lehman VD Lenders' Claims

4

EXHIBIT "3" -        Additional Definitions

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    THE DOCUMENT YOU ARE READING IS THE DISCLOSURE STATEMENT

2  FOR THE JOINT VD PLAN.

3    This Disclosure Statement With Respect to *First Amended* Joint Chapter 11 Plan for

4  Eleven Voluntary Debtors Proposed by the Lehman VD Lenders is being sent to you as an

5  accompaniment to the *First Amended* Joint Chapter 11 Plan for Eleven Voluntary Debtors Proposed

6  By the Lehman VD Lenders, which is being provided to you either in the same envelope as this

7  Disclosure Statement or under separate cover.

8                                       **I**

9                          **PRELIMINARY MATTERS**

10      **1.1    Introduction.**

11      The Lehman VD Lenders are pleased to be able to propose their Joint VD Plan.  The

12  Plan is a chapter 11 plan for eleven Voluntary Debtors (as marked on the cover page(s) of this

13  Disclosure Statement).

14      While good faith efforts have been made to make the Plan and Disclosure Statement

15  consistent in all respects, if there are any discrepancies between the Plan and the Disclosure

16  Statement, the Plan controls, and if there are any discrepancies between (a) the summaries provided

17  in the table above or in Disclosure Statement section 1.8 and (b) the other provisions of this

18  Disclosure Statement, the other provisions will control.

19      It is anticipated that besides the solicitation of votes on the Joint VD Plan by the

20  Lehman VD Lenders for the affected eleven Voluntary Debtors, the Lehman Creditors (*i.e.,* the

21  Lehman VD Lenders, Northlake Holdings and OVC Holdings) simultaneously will be soliciting

22  acceptances for a plan for eight Trustee Debtors (the "Joint TD Plan"), jointly proposed by the

23  Lehman Creditors and the Trustee.  There is no overlap between the two plans for which the Lehman

24  VD Lenders or Lehman Creditors are proponents or co-proponents (the Joint VD Plan and the Joint

25  TD Plan) and votes will be solicited separately as to each such plan from the appropriate creditors.

26  Because there is no overlap, both such plans may be confirmed by the Court.  At the same time,

27  however, the Voluntary Debtors, Acquisitions and/or other Persons simultaneously may be soliciting

28  acceptances for a plan or plans (each an "Alternative Plan") affecting all or some of the same

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Debtors and Estates as the Joint VD Plan and Joint TD Plan.  After voting, if only one plan affecting a Debtor receives sufficient accepting votes and otherwise qualifies for confirmation by law and according to its terms, it will be confirmed by the Bankruptcy Court and become effective as to such Debtor.  If both an Alternative Plan and either the Joint VD Plan and/or Joint TD Plan receive sufficient votes and otherwise qualify for confirmation as to a particular Debtor, the Bankruptcy Court "will consider the preferences of creditors and equity security holders in determining which plan to confirm" in accordance with section 1129(c) of the Bankruptcy Code.

### 1.2    Definitions and Rules of Contstruction.

The rules of construction set forth in the Plan will be applicable to the Disclosure Statement.  The defined terms set forth in **Exhibit "C"** to the Plan and **Exhibit "3"** to the Disclosure Statement are incorporated into the Disclosure Statement by this reference and will apply to capitalized terms used in the Disclosure Statement, provided that any capitalized term that is not defined in the Plan or Disclosure Statement, but is defined in the Bankruptcy Code or the Bankruptcy Rules, will have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules.

### 1.3    Summary of The Plan Process – Disclosure, Voting, and Treatment of Claims and Interests.

Votes of Creditors are being solicited for the Plan.  The Joint VD Plan is essentially a blueprint of how the VD Plan Debtors will be structured or liquidated after or as a result of bankruptcy – whether they will survive, the forms of entities they will be, who will own them, and what distributions will be made or required.  Among other things, the Plan designates Classes of Claims and Classes of Interests, identifies Unimpaired and Impaired Classes, sets forth a proposal for the satisfaction of all Claims against, and Interests in, the VD Plan Debtors, and provides adequate means for the implementation of the Joint VD Plan.  If the Plan receives sufficient votes and meets certain other criteria described in this Disclosure Statement, it will be confirmed by the Bankruptcy Court.

**(a)    Disclosure.**

The Disclosure Statement is intended to provide Creditors with information sufficient

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

to enable Creditors to vote on the Plan [and has been approved by the Bankruptcy Court as containing sufficient information for that purpose][2].  The Disclosure Statement includes a summary of the VD Plan Debtors' assets and liabilities, a summary of what Holders of Allowed Claims and Interests will receive under the Joint VD Plan, references to certain alternatives to the Plan, and a summary of the procedures and voting requirements necessary for confirmation of the Plan.  Each Creditor should thoroughly review both the Joint VD Plan and Joint VD Disclosure Statement before deciding whether the Creditor will accept or reject the Plan.  No solicitation materials, other than the Disclosure Statement and related materials transmitted therewith and approved for solicitation purposes by the Bankruptcy Court, have been authorized for use in soliciting acceptances or rejections of the Plan.

<b>(b)</b>     <b>Voting.</b>

The Lehman VD Lenders recommend approval of the Joint VD Plan. Holders of Claims and Interests entitled to vote on the Plan will receive with the Plan a Ballot, for voting on the Plan.

(i)     <u>Special Voting / Election Procedures</u>

(1)     Voting - General Unsecured Claims or Reliance Claims Against Any Group I Debtor.

Ballots for each Holder of a General Unsecured Claim or Reliance Claim against any Group I Debtor also will afford the Holder the opportunity to elect that, if its Claim is Allowed, it would receive the Lehman Distribution Enhancement.  *By such election and execution and delivery of the Ballot, as the Ballot reflects, the Holder also is executing and delivering the Creditor's Assignment / Release for Lehman set forth in the Plan for the benefit of the Lehman Released Parties.*

(2)     Voting / Election - Alleged Mechanic's Lien Claims Against Any Group I Debtor.

For each Holder identified in advance as having alleged to hold a Mechanic's Lien Claim against any Group I Debtor, the Ballot will afford an opportunity to waive any contention that

---

[2] THIS STATEMENT IS NOT YET TRUE. Brackets to be removed after Disclosure Statement approved.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

the Holder has a Secured Claim senior to the Secured Claim of the applicable Lehman VD Lender(s) on the applicable Plan Project and to assert, instead, that its Claim is a General Unsecured Claim or Reliance Claim, thereby affording the Creditor the opportunity to elect to receive the Lehman Distribution Enhancement if its Claim is Allowed.

(c)      <strong>Treatment of Claims and Interests Under the Plan.</strong>

Upon confirmation by the Bankruptcy Court of the Joint VD Plan, the Lehman VD Lenders will pay substantial sums for the benefit of other Creditors through the Lehman Plan Funding to enable Distributions as described below and the VD Plan Debtors will convey ownership of the Plan Projects to the designees of the Lehman VD Lenders (the Lehman Nominees) in satisfaction of the Lehman VD Lenders' Secured Claims (Class 2) or, in the case of the Plan Projects of the Group II Debtors, in exchange for the consideration to be provided by the Lehman VD Lenders, as applicable.

As a result of the Lehman Plan Funding, under the Plan, (i) Creditors with Allowed Claims in Classes 6 and 7 against the Group I Debtors, which Creditors execute the Creditor's Assignment / Release for Lehman, will receive enhanced recoveries (1) of up to 4% of each Allowed General Unsecured Claim in Class 7, and (2) of up to 49% of each Allowed Reliance Claim in Class 6, provided that the exact percentage(s) of enhanced recovery will be subject to the Plan; and (ii) Creditors with Allowed Claims in Class 8 will receive up to 100% of their Allowed Claims, capped at the Pro Rata portion of the remainder after deducting Senior Claims and Secured Claims from the value of their Debtor's Project.  Holders of Allowed Reliance Claims and Allowed General Unsecured Claims also will share in Residual Cash, if any, such as from any Net Litigation Recoveries (unless, for a Class 8 Claim Holder, it otherwise already has been paid in full).  Reliance Claims, as more fully defined below, are those Claims that were incurred to non-insiders who provided new value to a VD Plan Debtor after August 1, 2007 and either were (1) Filed by the Primary Claims Bar Date or (2) Filed late, but by March 25, 2011 in accordance with a Final Order or (3) listed on the Filed Schedules by March 25, 2011 as Scheduled Claims.

For priority and secured claims, under the Plan, Holders of Allowed Secured, Priority, Priority Tax and Administrative Claims are paid in full through the Plan; Holders of Interests receive

nothing.  Additionally, the Plan treats separately certain Claims arising in connection with Future

Work Bonds.  For Creditors (*e.g.*, municipalities) holding Settling Bond Issuer-Backed Future Work

Claims in Class 9, the Settling Bond Issuer has recommitted to perform under its Project Bonds with

respect to such Claims, if Allowed, and the related Future Work obligations, but without penalties,

and with the obligation reinstated as to any maturity applicable prior to the applicable Petition Date.

The Lehman Nominee that takes title to the Plan Project to which the Settling Bond Issuer-Backed

Future Work Claim relates is to cooperate in connection with the performance of such Future Work

obligations, is to take an assignment from the Settling Bond Issuer of certain of such Settling Bond

Issuer's Claims against the applicable VD Plan Debtors (although no Distribution is made to such

Lehman Nominee therefor under the Plan) and against third parties, and is to reimburse such Settling

Bond Issuer agreed amounts for the payments made by such Settling Bond Issuer under the

applicable Future Work Bonds, creating such Settling Bond Issuer's Allowed Class 9 Claims.

**1.4**    **Background to the Joint VD Plan.**

**1.4.1    Generally.**

In the Bankruptcy Court, under case number 8:08-bk-17206-ES, the chapter 11

bankruptcy cases (the "Cases") of twenty-six affiliated debtors (the "Debtors") are being jointly

administered.  The Debtors include seventeen debtors who continue to manage, and remain in

possession of, their assets as debtors and debtors in possession (the "Voluntary Debtors") and nine

debtors for whom Steven M. Speier was duly appointed as the chapter 11 trustee (the "Trustee

Debtors").

The Plan is a chapter 11 plan for the following eleven Voluntary Debtors (each a "VD

Plan Debtor"):  Palmdale Hills, SunCal I, Acton Estates, SunCal Beaumont, SunCal Johannson,

SunCal Bickford, SunCal Summit Valley, Seven Brothers, Kirby Estates, SCC Communities, and

Tesoro.   The proponents of the Plan are the Lehman VD Lenders: (a) Lehman ALI, Inc. and (b)

Lehman Commercial, each in its capacity as a lender in its own right and/or as agent for themselves,

with respect to the applicable Lehman Loans.  The Lehman VD Lenders are referred to in the Plan as

both the "Lehman Proponents," with reference to their role as proponents of the Plan, and as the

Lehman VD Lenders, with reference to their other capacities.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Each of the Group I Debtors are insolvent.  Plan Projects are the primary Assets of the Estates of the VD Plan Debtors (other than SunCal I, which owns Interests in other VD Plan Debtors that own Plan Projects). The Lehman VD Lenders hold Claims against Group I Debtors aggregating to approximately $711 million, which Claims are secured by deeds of trust on such Debtors' Plan Projects, and secured by their Cash Collateral and certain other Assets.  Approximately $343 million of such amount is owed by SunCal Summit Valley, secured by a pledge of its Interests in Group II Debtors Kirby Estates and Seven Brothers, and owed by SunCal I, secured by, *inter alia,* a pledge of its Interests in Group II Debtors SunCal Beaumont and SunCal Johannson.  The Lehman VD Lenders' collateral, including the Plan Projects of the Group I Debtors (other than SunCal Summit Valley) and the equity interests in SunCal Summit Valley and the Group II Debtors, collectively, is worth substantially less than the total amount of the Lehman Secured Claims.

Moreover, the VD Plan Debtors are generating no or virtually no current revenue.  Yet, these Cases have been pending for over 28 months and have been highly litigious and, thus, costly to the VD Plan Debtors' Estates and the Lehman Creditors in terms of out of pocket expenses, time and delay.  Prepetition, Lehman Related Parties provided debt and equity funding to the Debtors. During the Cases, challenges have been asserted to the Claims of the Lehman Creditors - based on the debt and equity funding - and actions have been asserted to subordinate or set aside certain of their Claims or Liens.  The nature of these claims and the Lehman Creditors' analysis of their merits and likely value is discussed in Disclosure Statement Section 4.2.5 below.

The Joint VD Plan for the eleven VD Plan Debtors will not affect the status of the other Debtors in their Cases or preclude plans being promulgated for those other Debtors or preclude the Filing of competing plans.  As to each other such Debtor, its Case will remain pending until either a plan for such Debtor is confirmed or its Case is dismissed or converted to a liquidating case under chapter 7 of the Bankruptcy Code.

### 1.4.2    Prior and Competing Plans.

Previously, during the Cases, prior to the Filing of any plans for which a solicitation process is underway, competing plans and accompanying disclosure statements were Filed for all of

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

the Debtors.  On the one hand, the most recent version of both a plan and disclosure statement (third amended) Filed for all Debtors by the Voluntary Debtors and Acquisitions (the indirect parent company of the Debtors managed by Bruce Elieff) were Filed September 9, 2009 (the "2009 SunCal Plan" and "2009 SunCal Disclosure Statement," respectively). The 2009 SunCal Plan appeared to the Lehman Creditors to offer no meaningful recovery to general unsecured Creditors of most Debtors unless the Trustee and Voluntary Debtors or their successors were to obtain a successful result in the ES Action (and in particular the cornerstone of that proceeding, the hotly disputed equitable subordination claims).

Whereas the Joint VD Plan offers Holders of Reliance Claims against Group I Debtors 40% to 50% on their Claims as provided below, the 2009 SunCal Plan purported to include an offer of Elieff and Acquisitions to purchase Claims entitled to the benefits of a judgment for equitable subordination at ten cents on the dollar.  The offer of the Voluntary Debtors and Acquisitions not only was much lower than the current amount offered for Reliance Claims, it also appeared to the Lehman Creditors to be illusory and/or unfunded.  (Additionally, the up to 100% payout to General Unsecured Claims against Group II Debtors also is significantly higher than the ten percent offer of Elieff and Acquisitions.) Moreover, for this "lottery ticket" litigation to have benefitted a broad group of the Debtors' Creditors, besides the plaintiffs having to first prove inequitable conduct by the Lehman Creditors, it appeared to the Lehman Creditors that Acquisitions and Elieff would have to be successful also in arguing that the Estates of the various Debtors should be merged (*e.g.*, substantively consolidated) so that values payable, absent subordination, to the Lehman Creditors in their capacity as Creditors of one particular Debtor could be used instead to pay Creditors of another Debtor.  This "substantive consolidation" required the Trustee and Voluntary Debtors to meet high evidentiary hurdles before the Bankruptcy Court that the Lehman Creditors believed they appeared unlikely to meet.

In fact, the Lehman Related Parties believed that the 2009 SunCal Plan and its "lottery ticket" litigation strategy were just a smokescreen for a course of action by Acquisitions and Elieff designed primarily to provide Elieff, despite his equity interests being out of the money, the personal benefits of reducing or eliminating his personal liability with respect to his guarantee to

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Bond Issuers and securing him or his development company Cash or new business going forward.

The 2009 SunCal Plan was centered upon a sale (that Acquisitions and Elieff arranged and proposed) of certain Projects to D.E. Shaw or another bidder at an under-market price, but on terms that required all of the likely liability for the Elieff guaranteed debt to Bond Issuers to be assumed and satisfied by the buyer, whether or not any other Holder of an unsecured, non-priority Claim got paid anything at all. (According to the Voluntary Debtors' Third Amended Disclosure Statement - Exhibit 6, notes – obligations under bonds of $157 million were to be paid or resolved by the proposed sale to D.E. Shaw.) In any event, even if the Voluntary Debtors were able to overcome the legal obstacles they faced in confirming the 2009 SunCal Plan, the Lehman Creditors view the litigation attendant to the cornerstones of the 2009 SunCal Plan as taking years to resolve – thus depriving the Debtors' Creditors from access to any payment on account of their Allowed Claims until resolution of such litigation and, all the while, forcing the Creditors to bear the risk of the inevitable protracted litigation.

On October 13, 2009, the Lehman Creditors Filed their second amended versions of a competing plan and disclosure statement (such plan being referred to hereafter as the "2009 Lehman Plan") to the 2009 SunCal Plan and 2009 SunCal Disclosure Statement. Under the 2009 Lehman Plan, the Lehman Creditors agreed to fund $10 million on the 2009 Lehman Plan's Effective Date, to provide plan implementation funding that included up to $5 million of new money plus the use of over $18 million of existing Cash Collateral, to provide limited funding and litigation concessions to permit all litigation by the Trustee and Voluntary Debtors to continue (including against the Lehman Creditors) and to offer certain Creditors that it believed may hold Allowed Claims that arguably would benefit from any judgment with respect to the ES Action as to the equitable subordination claims therein a guaranteed payment in exchange for a release. Based on then available information and, thus, assuming a large pool of eligible claims, the guaranteed payment for such likely beneficiaries of the equitable subordination claims was estimated to approximate 6.6% on their Claims. The current offer of up to 40% or 50% for Holders of Allowed Reliance Claims of the Group I Debtors and up to 5% for Holders of Allowed General Unsecured Claims of the Group I Debtors is a substantial improvement for these Creditors.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Votes were not solicited for the 2009 Lehman Plan or 2009 SunCal Plan.  The Filing of a plan and disclosure statement is just part of the process leading to plan confirmation.  Before votes could be solicited, the disclosure statement with respect to each plan had to have been approved by the court.  The Lehman Creditors, Voluntary Debtors and Acquisitions abandoned efforts to move forward the process for obtaining confirmation of the 2009 Lehman Plan or the 2009 SunCal Plan and no disclosure statements with respect thereto were approved (and no votes solicited).

In the summer of 2010, the Lehman Creditors reached agreement with the Trustee and the official committee in the Trustee Debtors' Cases regarding the terms of a plan in the Trustee Debtors' Cases.  Because SunCal was not part of this agreement, prior to the Filing by the Lehman Creditors and Trustee of their consensual plan for the Trustee Debtors and the Filing by certain of the Lehman Creditors of a separate plan for other Debtors, the Bankruptcy Court and Voluntary Debtors were made aware of this intention of the Lehman Creditors and Trustee.  To give sufficient time for the Voluntary Debtors to also File a plan and disclosure statement or amend their prior plan and disclosure statement and to enable the Voluntary Debtors to also have a disclosure statement considered for approval at the same time, the date for such disclosure statement hearing was postponed to November 5, 2010.  The November 5, 2010 date meant that September 30, 2010 would be the deadline for the Filing of any disclosure statements or amended disclosure statement for consideration on November 5, 2010.

Just before the September 30, 2010 deadline for filing further plans and disclosure statements to move these Cases forward, on September 21, 2010, the Voluntary Debtors Filed a motion with the Bankruptcy Court seeking, *inter alia*, to "stay[] all pending . . . plan and disclosure statement proceedings . . . filed by . . . the 'Lehman Entities'" (the "SunCal Plan Stay Motion").  The SunCal Plan Stay Motion was not heard until October 29, 2010.  In the meantime, the Trustee and Lehman Creditors determined to proceed on September 30, 2010 to File further plans and disclosure statements and filed versions thereof as to which the Joint TD Plan, Joint TD Disclosure Statement, Joint VD Plan and Joint VD Disclosure Statement are amended versions. At the same time, the Voluntary Debtors and Acquisitions filed their amended disclosure statement (the "SunCal Fourth

1    Disclosure Statement"), which described an amended plan (the "SunCal Fourth Plan").

2              The SunCal Fourth Disclosure Statement and the SunCal Fourth Plan it purports to

3    describe, appear to represent little more than a half-hearted effort by SunCal to keep a toe-hold in the

4    plan process as a back-up strategy to its then primary focus on prosecution of the SunCal Plan Stay

5    Motion.  The SunCal Fourth Plan is similar in many respect to the same parties' 2009 SunCal Plan–

6    *e.g.*, a continuation of all litigation against the Lehman Creditors, a sale of the Projects (now at an

7    auction, with no buyer currently identified), and an offer to buy claims that would be benefited by

8    the equitable subordination litigation (with the percentage purchase price not disclosed).  As in the

9    case of the prior iterations, the SunCal Fourth Plan is ambiguous, incomplete and unconfirmable on

10   its face.

11              Lip service is paid in the SunCal Fourth Plan to cashing out creditors, but the so-

12   called offer appears illusory – both being unfunded and applicable only once the speculative victory

13   in the ES Action actually is won (which is the first point at which the "intended beneficiaries" of the

14   equitable subordination claims, to whom the offer was made, could be identified). Moreover, the

15   SunCal Fourth Plan was defective. Many of its terms were to take effect shortly after the plan's

16   confirmation, but, at the same time, it provided for a lengthy, impermissible delay of the actual plan

17   effective date when payments would first be made to priority creditors so that funds could be raised

18   through selling Projects. SunCal explained this structure as being necessitated by the stay emanating

19   from the New York bankruptcy case of Lehman Commercial and various other related entities. But

20   SunCal's problem was not the stay in the Lehman Commercial case, it is SunCal's lack of money to

21   pay a plan's effective date obligations and that its plan is not winnable.

22              The former problem is reflected by an unsatisfied writ of attachment for $7.9 million

23   against Elieff and Acquisitions.  The latter problem is inherent:  SunCal is offering creditors the

24   possibility of receiving net proceeds from highly speculative litigation that would take years to

25   resolve even with immediate relief from stay, while the Lehman Creditors (and the duly appointed

26   chapter 11 trustee, Steven M. Speier (the "Trustee") for the Trustee Debtors) are proposing under the

27   plans sponsored in whole or part by Lehman Creditors immediate payment of 40-50 cents on the

28   dollar to accepting creditors that are beneficiaries of the equitable subordination claims.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Before the hearing on the SunCal Plan Stay Motion, objections already had been filed to the September 30, 2010 plans and disclosure statements. Although the result of the hearing on the SunCal Plan Stay Motion obviated the need of the Lehman Creditors to formally reply to the objections, some of the changes reflected in the current Joint VD Plan, Joint TD Plan and their accompanying disclosure statements are responsive to aspects of those objections.

The Voluntary Debtors and Acquisitions have and are believed to continue to dispute certain characterizations and descriptions of their proposed plans and positions as set forth in this Disclosure Statement.

### 1.4.3    Plan Stay and Mediation.

On October 29, 2010, the hearing took place with respect to the SunCal Plan Stay Motion.  The Bankruptcy Court granted the motion imposing a temporary stay through February 18, 2011, tolling the time to file certain claims and ordering to mediation the Voluntary Debtors, the Trustee, the official committees in the Cases, Elieff, Acquisitions, SunCal Management, LLC, the Lehman Creditors, the Bond Issuers, and others.  The mediation, which took place before the Honorable Daniel Weinstein (Ret.) of J.A.M.S. Resolution Experts, was mostly successful in that certain of the parties to it reached further or actual agreements or agreements in principle, the terms of which are reflected in the Joint VD Plan and Joint VD Disclosure Statement and in the Joint TD Plan and Joint TD Disclosure Statement.  No agreement, however, was reached between the Lehman Creditors and SunCal or Elieff.  At a further hearing on the SunCal Plan Stay Motion on February 18, 2011, the Bankruptcy Court continued the tolling of time to file certain lawsuits but let the temporary stay expire by its own terms and did not stay further any party's efforts to confirm a plan.

### 1.5    Purpose of This Document.

The Disclosure Statement is submitted in accordance with 11 U.S.C. § 1125 and contains information regarding the Joint VD Plan, a copy of which accompanies this Disclosure Statement.  The Disclosure Statement is being distributed to you for the purpose of enabling you to make an informed judgment about the Joint VD Plan.  The Joint VD Disclosure Statement describes the Joint VD Plan and contains information concerning, among other matters:  (1) the history, business, results of operations, assets and liabilities of the Debtors, (2) the business plan (*e.g.*, to

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

liquidate) that is to be implemented following confirmation of the Joint VD Plan, (3) risk factors to be considered in voting on the Joint VD Plan, and (4) certain tax considerations of the Joint VD Plan.

The Lehman VD Lenders strongly urge you to review carefully the contents of this Joint VD Disclosure Statement and the Joint VD Plan (including the exhibits to each) before making a decision to accept or reject the Joint VD Plan.  Particular attention should be paid to the provisions affecting or impairing your rights as a Holder of a Claim or Interest.

This Disclosure Statement cannot tell you everything about your rights. You should consider consulting your own lawyer to obtain more specific advice on how the Joint VD Plan will affect you and your best course of action.

**READ THIS DISCLOSURE STATEMENT CAREFULLY IF YOU WANT TO KNOW ABOUT:**

➢  **WHO CAN VOTE OR OBJECT TO THE JOINT VD PLAN;**

➢  **HOW YOUR CLAIM OR INTEREST IS TREATED;**

➢  **HOW THIS TREATMENT COMPARES TO WHAT YOU WOULD RECEIVE ON ACCOUNT OF YOUR CLAIM OR INTEREST IN LIQUIDATION;**

➢  **A BRIEF HISTORY OF THE DEBTORS AND SIGNIFICANT EVENTS DURING THEIR CHAPTER 11 BANKRUPTCY PROCEEDINGS;**

➢  **WHAT FACTORS THE BANKRUPTCY COURT WILL CONSIDER TO DECIDE WHETHER OR NOT TO CONFIRM THE JOINT VD PLAN;**

➢  **WHAT IS THE EFFECT OF CONFIRMATION; AND**

➢  **WHETHER THE JOINT VD PLAN IS FEASIBLE.**

**1.6**    **Court Approval of this Document.**

The Bankruptcy Court approved the Joint VD Disclosure Statement as containing sufficient information to enable a hypothetical reasonable investor, typical of Holders of Claims or Interests receiving the Joint VD Disclosure Statement, to make an informed judgment about the Joint VD Plan.[3]  This approval enabled the Lehman VD Lenders to send you this Disclosure Statement

---

[3] **THIS STATEMENT IS NOT YET TRUE.**

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    and solicit your acceptance of the Joint VD Plan.  The Bankruptcy Court has not, however, ruled on

2    the Joint VD Plan itself, nor conducted a detailed investigation into the contents of this Disclosure

3    Statement.

4        **1.7    Plan Overview.**

5            The Joint VD Plan is designed to enable a reasonable resolution of the financial

6    distress of the VD Plan Debtors and of the delay and cost attendant to the continuation of the VD

7    Plan Debtors' Cases absent confirmation of a plan.  In all, under the Plan, the Lehman VD Lenders

8    believe that Creditors will receive as much or more than they would if the VD Plan Debtors' Cases

9    were converted to cases under chapter 7 of the Bankruptcy Code.  As importantly, however, the Plan

10   Proponents believe that, under the Plan, Creditors will receive payment much sooner than if no

11   consensual plan with the Lehman VD Lenders occurred.

12           Because the Lehman VD Lenders appreciate that, for the foreseeable future, the VD

13   Plan Debtors have and will have no ability to pay the full amount of the debt owed to the Lehman

14   VD Lenders giving rise to the Lehman Secured Claims or, without additional funding, to develop the

15   Plan Projects, the Lehman VD Lenders want ownership of all Plan Projects.  Thus, upon

16   confirmation of the Plan, as more fully set forth below, among other things, the VD Plan Debtors

17   will convey ownership of the Plan Projects to the designees of the Lehman VD Lenders (the Lehman

18   Nominees).  In exchange, the Lehman VD Lenders will pay substantial sums for the benefit of other

19   Creditors through the Lehman Plan Funding, as and to the extent provided under the Plan.

20           The Joint VD Plan with respect to which this Disclosure Statement is being Filed

21   requires consummation of a settlement between the Lehman VD Lenders and the Bond Issuers.[4]

22   Bond Claims are complicated.  The Bond Issuers issued Project Bonds and bonding obligations of

23   certain of the Debtors to certain Creditors in exchange for premiums and reimbursement obligations

24   from each respective Debtor.  The Creditors holding Claims benefited by the Bonds (Bond-Backed

25   Claims) include, by example, subcontractors who may be beneficiaries of Payment Bonds and

26   municipalities who may be beneficiaries of Performance Bonds (including Future Work Bonds).  For

27

28   [4] The Bond Issuers are Arch and Bond Safeguard.  Settlements with Arch and Bond Safeguard are under discussion, but, as of the preparation of the Disclosure Statement, have not been fully or finally documented.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Bond Backed Claims that are Allowed Sr. Secured Mechanic's Lien Claims (Class 3), Allowed Reliance Claims (Class 6) or Allowed General Unsecured Claims (Class 7 or 8), under the Plan, the *Bond-Backed Claims get treated under the Plan the same as Class 3, Class 6, Class 7, or Class 8 Claims, as applicable, but the Holders of Bond-Backed Claims retain any and all of their rights against the applicable Bond Issuer*.  Still, as noted above, *for Holders of Class 9 Settling Bond Issuer-Backed Future Work Claims, the Lehman VD Lenders are obtaining a recommitment from the Settling Bond Issuers to perform under their Future Work Bonds with respect to such Class 9 Claims*.

The Bond Issuers appear to be contending that they are owed, collectively, by the Debtors tens of millions of dollars in respect of Project Bonds issued in connection with the development of the Projects.  Yet, based largely on the contingent nature of the Future Work Claims arising under the Future Work Bonds, the Proponents believe that through a settlement that enables parties to wait until these contingencies come to pass, these Claims, even if Allowed, might drop substantially.  Yet, *absent the settlement with the Bond Issuers reflected in the Plan*, there could be no assurance that their Claims would not be estimated by the Bankruptcy Court at so high an amount that, for the Lehman VD Lenders to go forward with the Plan at the same offered level of Lehman Plan Funding, the Distributions from the Lehman Plan Funding for other Creditors would be substantially diluted (and, thus, their percentage returns much lower). The settlements offered by the Lehman VD Lenders to the Bond Issuers in connection with the Plan thus facilitates the settlement offer made by certain of the Lehman VD Lenders through the Joint VD Plan.  The settlements with the Bond Issuers accomplish this by having them, as the Settling Bond Issuers, agree, in essence, that (a) as to amounts each Settling Bond Issuer actually incurs under its Future Work Bonds, the Settling Bond Issuer will wait to accept reimbursement after its incurrence, which, if after Confirmation, would be paid by the applicable Lehman Nominee and (b) the Bond Issuers will forego certain Distributions under the Plan on their other Claims.

The Lehman VD Lenders are pleased to be able to present the Joint VD Plan.

**1.8    Summary of the Joint VD Plan.**

The summary of the Joint VD Plan that follows in this Section 1.8 is not intended to

substitute for the more specific terms set forth in the Joint VD Plan.  If there are any discrepancies between the summary provided in this Section 1.8 and the Joint VD Plan, the provisions of the Joint VD Plan will control.  Additionally, the Cases of the VD Plan Debtors have been jointly administered, but not substantively consolidated.  Accordingly, the Joint VD Plan provides separate treatment for Holders of Claims and Interests against each VD Plan Debtor.  Under the Plan, Holders of Interests receive nothing.  The following is a general outline of the Joint VD Plan.

### 1.8.1    Groupings of Debtors.

The Joint VD Plan divides the VD Plan Debtors into two groups:

#### (a)    Group I Debtors:

The Group I Debtors consist of:

(i)    Acton Estates, LLC;

(ii)    Palmdale Hills Property, LLC;

(iii)    SCC Communities, LLC;

(iv)    SunCal Bickford Ranch, LLC; and

(v)    SunCal Communities I, LLC;

(vi)    SunCal Summit Valley, LLC; and

(vii)    Tesoro SF, LLC;

#### (b)    Group II Debtors:

The Group II Debtors consist of:

(i)    Kirby Estates, LLC;

(ii)    Seven Brothers, LLC;

(iii)    SunCal Beaumont Heights, LLC; and

(iv)    SunCal Johannson Ranch, LLC.

### 1.8.2    Overview of Treatment of Claims and Relevant Agreements.

Essential features of the Plan are summarized in this section, subject to the Plan itself. Because the Cases of the VD Plan Debtors have been jointly administered, but not substantively consolidated, the Plan provides separate treatment for Holders of Claims and Interests against each VD Plan Debtor.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

(a)     **Lehman Plan Funding.**

Under the Plan, the Lehman VD Lenders, for the benefit of other Creditors, will provide the Lehman Plan Funding consisting of the Lehman Creditor Distribution Funding for direct payment to Creditors holding Allowed Claims and the Lehman Post-Confirmation Expense Funding for payment of Post-Confirmation Expenses.

(b)     **Bond-Backed Claims and Bond Issuer Settlement(s).**

Many of the Claims against the VD Plan Debtors, or portions thereof, are, or were at some point in time, secured by Project Bonds (the "Bond-Backed Claims") issued by Arch Insurance Company ("Arch") or Bond Safeguard Insurance Company or its Affiliate, Lexon Insurance Company (collectively, "Bond Safeguard" and together with Arch, the "Bond Issuers"). The Bond Issuers have made and may continue to make payments to certain Creditors who are beneficiaries of Project Bonds based on the Bond Issuer's own obligations, which payments and treatment from the Bond Issuers may be different than, and may or may not be in addition to, payments provided under the Plan. Nonetheless, to facilitate the Plan, unless waived by the Lehman VD Lenders in their sole and absolute discretion, as a condition to entry of the Confirmation Order and prior to the Effective Date, certain Lehman Related Parties must have entered into a Settling Bond Issuer Agreement with each Bond Issuer. In the event the Lehman VD Lenders do waive the requirement for entry into such a settlement with either or both Bond Issuers and waive attendant rights to withdraw the Plan, the treatment of Claims in the Plan accounts for the possibility of settlements or of no settlements with one or both of the Bond Issuers. For each Settling Bond Issuer Agreement entered into as required under the Plan, as more fully set forth in the Plan, pursuant thereto and subject to the specific terms thereof: (a) the applicable Settling Bond Issuer will agree to perform under its Future Work Bonds if a demand is made for such performance, upon request by the applicable Lehman Nominee, (b) to the extent that there is or may be an Allowed Claim for the obligation to perform the relevant Future Work covered by a Future Work Bond of the applicable Settling Bond Issuer, the Lehman Nominee taking title to an applicable Plan Project will cooperate in the performance of such Future Work and will agree to reimburse the Settling Bond Issuer for certain amounts with respect to payments made by the Settling Bond Issuer under Future Work Bonds, (c) the Settling Bond Issuer

will waive all or part of the payment under the Plan with respect to certain Claims and (d) the

Settling Bond Issuer will assign to a Lehman Related Party(ies) all or part of its Claims against each

of the VD Plan Debtors and its related claims against any Bond Obligors.

(c)    <strong>Treatment of Non-Priority Unsecured Claims and Interests.</strong>

(i)    <u>Amounts Payable for Class 6 Allowed Reliance Claims against Group I Debtors.</u>

Each of these Claims must be an Allowed Claim against any Group I Debtor for "new

value," arising after August 1, 2007 and timely of record as follows: either (1) Filed by the Primary

Claims Bar Date or (2) Filed late, but by March 25, 2011 in accordance with a Final Order or (3)

listed on the Filed Schedules by March 25, 2011 as a Scheduled Claim.  Class 6 Claims are

Impaired.  Under the Plan, each Holder of an Allowed Class 6 Claim receives the following

Distributions:

- o  <u>The Lehman Guaranteed Minimum Distribution</u>:  An unconditional, guaranteed Cash Distribution equal to 1% of its Allowed Reliance Claim – part of the Lehman Creditor Distribution Funding is to be paid to each Holder of an Allowed Class 6 Claim; and

- o  <u>The Lehman Distribution Enhancement</u>:  An <u>additional</u> Cash Distribution is available to Holders of Allowed Class 6 Claims that increases a Holder's Distributions to 50% of its Allowed Reliance Claim if the *Projected Distribution Bump Up* is applicable and otherwise up to 40%; provided, that such additional Cash Distribution to each such Holder shall be subject to reduction in the amount of the On Proportion Distribution Reduction, if that reduction is applicable as more particularly described below.  The Lehman Distribution Enhancement is a part of the Lehman Creditor Distribution Funding and only is being made available to a Holder of an Allowed Class 6 Claim who completes its Ballot so as to deliver, or otherwise executes and delivers, a Creditor's Assignment / Release for Lehman for the benefit of the Lehman Released Parties.  The Projected Distribution Bump Up is applicable only if the aggregate amount of Distributions made under the Plan in respect of all Allowed Reliance Claims and Allowed General Unsecured Claims against the particular,

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

applicable Group I Debtor, excluding certain specified Claims, as described herein, is no greater than such Group I Debtor's specified Bump Up Threshold, which thresholds for all Group I Debtors aggregate to $2.5 million, as more fully set forth in the Plan.  The amount of the additional Cash Distribution available as a Lehman Distribution Enhancement is subject to reduction by the On Proportion Distribution Reduction, if applicable, as follows:

- ▪ <u>On Proportion Distribution Reduction</u>:  There is a $20.5 million Distribution threshold applicable to Distributions to Holders of Allowed Class 6 Claims, Allowed Class 7 Claims and Allowed Senior Claims. If the Distribution threshold otherwise would be exceeded, there will be an On Proportion Distribution Reduction, reducing the aggregate amount of the Lehman Distribution Enhancement for Allowed Class 6 Claims and Allowed Class 7 Claims by the excess over $20.5 million (with such reduction allocated ratably among Holders of such Claims, as described below); and

- o <u>Residual Cash</u>:  Each Holder of an Allowed Class 6 Claim also will receive a share of any Residual Cash of the applicable Group I Debtor to be shared Pro Rata among other Holders of Allowed Claims against the applicable Group I Debtor that are any of the following: (1) Sr. Secured Mechanics' Lien Claims (Class 3) that are Allowed Lehman-Owned Settling Bond Issuer-Related Claims, (2) Allowed Reliance Claims (Class 6), and (3) Allowed General Unsecured Claims (Class 7).  Allowed Lehman-Owned Settling Bond Issuer-Related Claims that are Class 6 or Class 7 Allowed Claims will participate in the sharing of the Residual Cash.

(ii)    <u>Amounts Payable for Class 7 Allowed General Unsecured Claims against Group I Debtors.</u>

These Claims consist of Allowed Claims against any Group I Debtor that have no priority or security and do not fit within the definitions of Reliance Claims (Class 6) or Settling Bond Issuer-Related Future Work Claims (Class 9).  Class 7 Claims are Impaired.  Under the Plan, each Holder of an Allowed Class 7 Claim receives the following Distributions:

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

o    The Lehman Guaranteed Minimum Distribution:  An unconditional, guaranteed Cash Distribution equal to 1% of its Allowed General Unsecured Claim – part of the Lehman Creditor Distribution Funding is to be paid to each Holder of an Allowed Class 7 Claim; and

o    The Lehman Distribution Enhancement:  An additional Cash Distribution is available to Holders of Allowed Class 7 Claims that increases a Holder's Distributions to 5% of its Allowed General Unsecured Claim; provided, that such additional Cash Distribution to each such Holder shall be subject to reduction in the amount of the On Proportion Distribution Reduction, if that reduction is applicable as more particularly described below.  The Lehman Distribution Enhancement is a part of the Lehman Creditor Distribution Funding and only is being made available to a Holder of a Class 7 Claim who completes its Ballot so as to deliver, or otherwise executes and delivers, a Creditor's Assignment / Release for Lehman for the benefit of the Lehman Released Parties.  The amount of the additional Cash Distribution available as a Lehman Distribution Enhancement is subject to reduction by the On Proportion Distribution Reduction, if applicable, as follows:

▪    On Proportion Distribution Reduction:  There is a $20.5 million Distribution threshold applicable to Distributions to Holders of Allowed Class 6 Claims, Allowed Class 7 Claims and Allowed Senior Claims. If the Distribution threshold otherwise would be exceeded, there will be an On Proportion Distribution Reduction, reducing the aggregate amount of the Lehman Distribution Enhancement for Allowed Class 6 Claims and Allowed Class 7 Claims by the excess over $20.5 million (with such reduction allocated ratably among Holders of such Claims, as described below); and

o    Residual Cash:  Each Holder of an Allowed Class 7 Claim also will receive a share of any Residual Cash of the applicable VD Plan Debtor to be shared Pro Rata among other Holders of Allowed Claims against the applicable VD Plan Debtor that are any of the following: (1) Sr. Secured Mechanics' Lien Claims (Class 3) that are Allowed

1   Lehman-Owned Settling Bond Issuer-Related Claims, (2) Allowed Reliance Claims

2   (Class 6), and (3) Allowed General Unsecured Claims (Class 7).  Allowed Lehman-

3   Owned Settling Bond Issuer-Related Claims that are Class 6 or Class 7 Allowed

4   Claims will participate in the sharing of the Residual Cash.

5                    (iii)    <u>Timing of Payments after the Effective Date for Allowed Class</u>

6   <u>6 Claims and Allowed Class 7 Claims against Group I Debtors.</u>

7                    For each or the portion of each Allowed Class 6 Claim or Allowed Class 7 Claim that

8   is not a Future Obligation (see description below), the payments due from the Lehman Creditor

9   Distribution Funding are payable as follows:

10    o   After the Effective Date, within a short time after a Claim is determined to be

11        Allowed, *i.e.*, generally within thirty (30) days following such Claim's Allowance

12        Determination Date, payment is to be made of:

13            ▪   the Lehman Guaranteed Minimum Distribution (the first 1% of the Allowed

14                Claim); and

15            ▪   a payment of or towards the Lehman Distribution Enhancement, if the

16                applicable Claimant executes the Creditor's Assignment / Release for

17                Lehman, in the following amounts:

18                    •   for Reliance Claims in Class 6, up to the first 39% of the Allowed

19                        Claim; and

20                    •   for General Unsecured Claims in Class 7, up to 4% of the Allowed

21                        Claim, provided that:

22                            o   in each case, all Disputed Claims are to be treated as Allowed

23                                Claims for purposes of calculations; and

24    o   If the amount payable for Allowed Class 6 or Allowed Class 7 Claims is not the

25        maximum amount that might be payable upon resolution of all Disputed Claims

26        (which resolution would enable, *inter alia*, a determination of whether the Projected

27        Distribution Bump Up is available and/or whether the On Proportion Distribution

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    Reduction is applicable), then, the Liquidating Trustee shall make Interim Capped

2    Distributions pending such final resolution of Disputed Claims.

3    As to payments due from Residual Cash, if any, with respect to any Allowed Class 6 Claim

4    or Allowed Class 7 Claim or portion thereof that is not a Future Obligation, such payment is to occur

5    after the payment from the Lehman Creditor Distribution Funding in respect of such Claim or

6    portion of Claim and, if and as the Liquidating Trustee determines it is available.

7    For each or the portion of each Allowed Class 6 Claim or Allowed Class 7 Claim that is a

8    Future Obligation, payment from the Lehman Creditor Distribution Funding is to occur by the later

9    of (a) the date due for other Allowed Class 6 Claims or Allowed Class 7 Claims, respectively, and

10   (b) thirty (30) days following the date that the Claim or portion thereof is not a Future Obligation

11   (*e.g.*, the obligation becomes due, liquidated and non-contingent) and the Creditor holding such

12   Claim sends a notice of such change in status of such Claim or portion thereof to the Lehman

13   Proponents at the address set forth in the Plan.

14   (iv)    Amounts Payable for Class 8 Allowed General Unsecured

15   Claims against Group II Debtors.

16   Under the Plan, after the Effective Date, each Holder of an Allowed Class 8 General

17   Unsecured Claim against a Group II Debtor shall receive as to each such Claim or portion thereof

18   that is not a Future Obligation within a short time after such Claim is determined to be Allowed, *i.e.*,

19   generally within thirty (30) days following such Claim's Allowance Determination Date, a

20   Distribution in Cash equal to the lesser of:

21   o    100% of the Allowed Amount of such Claim, plus post-petition interest at the Federal

22   Judgment Rate applicable on the applicable Petition Date; and

23   o    a Pro Rata distribution of: (i) any positive sum resulting from subtracting the Allowed

24   Senior Claims against the applicable Group II Debtor from the Project Value for the

25   applicable Group II Debtor's Plan Project; and (ii) Residual Cash of the Estate of the

26   applicable Group II Debtor, provided that:

27   o    such Pro Rata Distribution shall not be less than 1% of the Allowed Claim;

28   and

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

o  If the amount payable for Allowed Class 8 Claims is not the maximum

amount that might be payable upon resolution of all Disputed Claims, then:

▪  the Liquidating Trustee shall make Interim Capped Distributions

pending such final resolution of Disputed Claims; and

▪  Payments are to be made from Residual Cash, if any, with respect to

any Allowed Class 8 Claim or portion thereof that is not a Future

Obligation, if and as the Liquidating Trustee determines it is available.

For each or the portion of each Allowed Class 8 Claim that is a Future Obligation,

payment from the Lehman Creditor Distribution Funding is to occur by the later of (a) the date due

for other Allowed Class 8 Claims, and (b) thirty (30) days following the date that the Claim or

portion thereof is not a Future Obligation (*e.g.*, the obligation becomes due, liquidated and non-

contingent) and the Creditor holding such Claim sends a notice of such change in status of such

Claim or portion thereof to the Lehman Proponents at the address set forth in the Plan.

(v)    Class 9 Settling Bond Issuer-Related Claims.

Settling Bond Issuer-Related Claims include Settling Bond Issuer-Backed Claims and

Settling Bond Issuer-Owned Claims.  If a Bond Issuer and the applicable Lehman Related Party(ies)

have entered into a Settling Bond Issuer Agreement, the Settling Bond Issuer-Backed Claims will be

certain Claims against VD Plan Debtors that are Bond-Backed Claims secured by Project Bonds

issued by such Settling Bond Issuer.  Settling Bond Issuer-Owned Claims will be those certain

Claims against the VD Plan Debtors owned and held by such Settling Bond Issuer.  Settling Bond

Issuer-Owned Claims will receive treatment under the Plan consistent with the applicable Settling

Bond Issuer Agreement.  (*See* Plan Section 5.4.8.)  Under the Plan, Allowed Settling Bond Issuer-

Backed Claims receive the following treatment:

o  *Settling Bond Issuer-Backed Claims which are Sr. Secured Mechanic's Lien Claims*

*(Class 3):*  Each of these Secured Claims of Bond-Backed Claimants, if and once

Allowed, would receive payment from the Lehman Creditor Distribution Funding of

the full amount of the Claim, exclusive of any penalty or similar amounts, payable as

a lump sum on the Effective Date if the original maturity date has passed or,

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1   otherwise, payable by curing any defaults and paying any fees on the Effective Date

2   and making further payments as required under the applicable contract or statute

3   under the applicable contract or statute after reinstatement (Section 1124(2)

4   Unimpairment).

5   o   *Settling Bond Issuer-Backed Claims which are Reliance Claims or General*

6       *Unsecured Claims (Classes 6, 7, and 8):*  If Allowed, each such Claim of a Bond-

7       Backed Claimant is to receive the applicable treatment in Class 6, Class 7, or Class 8,

8       depending on whether such Claims fits the definition of a Reliance Claim or General

9       Unsecured Claim and depending on which VD Plan Debtor the Claim is against.  The

10      Bond Issuer also may have separate obligations to the Bond-Backed Claimants in

11      respect of these Claims such that these Claims may be paid or settled by the Bond

12      Issuer (and possibly acquired by the Bond Issuer as part of any such payment or

13      settlement).

14  o   *Settling Bond Issuer-Backed Future Work Claims (Class 9):*  The Settling Bond

15      Issuer is to perform and/or pay in full for the performance of the Future Work

16      obligations with respect to each Settling Bond Issuer-Backed Future Work Claim, if

17      Allowed, without penalties, and with the obligation reinstated as to any maturity

18      applicable prior to the applicable Petition Date. The Lehman Nominee that takes title

19      to the Plan Project to which the Claim relates will (a) be required to cooperate in

20      connection with the performance of such Future Work obligations, (b) take an

21      assignment from the Settling Bond Issuer of certain of such Settling Bond Issuer's

22      Claims against the applicable VD Plan Debtors and Bond Obligors, and (c) reimburse

23      such Settling Bond Issuer agreed amounts for payments made by such Settling Bond

24      Issuer under the applicable Future Work Bonds. Nonetheless, the applicable Creditor

25      holding a Settling Bond Issuer-Backed Future Work Claim may agree to forego

26      performance or payment for certain Future Work directly or through release of the

27      applicable Future Work Bond;

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1         (vi)     Class 10 Interests.

2 Class 10 Interests are the ownership interests in each of the VD Plan Debtors.  Class 10 is Impaired.

3 Under the Plan, Holders of the Class 10 Interests get nothing and retain nothing.

4     **1.9**    **Voting Recommendations.**

5     Your vote on the Joint VD Plan is important.  The Lehman VD Lenders urge you to

6 vote to accept the Joint VD Plan by completing and returning the enclosed ballot(s) no later than the

7 Voting Deadline (defined below).   Additionally, the Lehman VD Lenders suggest all Holders of

8 Reliance Claims in Class 6 and of General Unsecured Claims in Class 7 seriously consider the offer

9 that such Creditors may elect to receive the Lehman Distribution Enhancement, understanding that,

10 by such election, such Creditors would afford the Lehman Released Parties the Creditor's

11 Assignment / Release for Lehman.  The Lehman VD Lenders further urge Holders of Mechanic's

12 Lien Claims to seriously consider waiving any Secured Claim and agreeing that their Claim, instead,

13 is a Reliance Claim or General Unsecured Claim, as applicable, in order that such Holder of a

14 Mechanic's Lien Claim too can elect to receive the Lehman Distribution Enhancement (thereby

15 affording the Lehman Released Parties the Creditor's Assignment / Release for Lehman).

16     The Voting Deadline is set forth in a notice or order, which is being sent as an

17 accompaniment to the Disclosure Statement and Plan.

18           **II**

19     **PLAN CONFIRMATION DEADLINES**

20     The Bankruptcy Court has not confirmed the Joint VD Plan described in this Joint

21 VD Disclosure Statement.  Accordingly, the terms of the Joint VD Plan are not binding on anyone.

22 However, if the Bankruptcy Court confirms the Joint VD Plan, then the Joint VD Plan will be

23 binding on all Persons with respect to the matters set forth in the Plan.

24     **2.1**    **Time and Place of the Confirmation Hearing.**

25     The hearing where the Bankruptcy Court will determine whether or not to confirm the Joint

26 VD Plan will take place before Judge Erithe Smith, in Courtroom 5A, 411 West Fourth Street, Santa

27 Ana, California 92701-4593, at _.m. on _____, __, 2011.

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**2.2    Deadline for Voting for or Against the Joint VD Plan.**

If you are entitled to vote, it is in your best interest to timely vote on the enclosed

ballot and return the ballot with any applicable election to:

Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 11th Floor
Los Angeles, California  90067-4100
Attention: Michael Matteo

Your ballot must be **received by** _____, 2011 (the "Voting Deadline"), or it will not be

counted.

**2.3    Deadline for Objecting to the Confirmation of the Joint VD Plan.**

Objections to the confirmation of the Joint VD Plan must be Filed with the

Bankruptcy Court, and served upon the following parties so that they are received by

_____, 2011:

|   |   |
|---|---|
| Counsel for Lehman VD Lenders: | Richard M. Pachulski<br>Dean A. Ziehl<br>Robert B. Orgel<br>Jeremy V. Richards<br>PACHULSKI STANG ZIEHL & JONES LLP<br>10100 Santa Monica Blvd., 11th Floor<br>Los Angeles, California  90067-4100 |
|   | Edward Soto<br>Shai Waisman<br>Nellie P. Camerik<br>WEIL, GOTSHAL & MANGES LLP<br>767 Fifth Avenue<br>New York, NY  10153-0119 |

**2.4    Identity of Person to Contact for More Information Regarding the Joint VD**

**Plan.**

Any interested party desiring further information about the Joint VD Plan should

contact the Lehman VD Lenders' counsel, Pachulski Stang Ziehl & Jones LLP, 10100 Santa Monica

Boulevard, 11th Floor, Los Angeles, California 90067, (310) 277-6910, attention:  Richard M.

Pachulski and Robert B. Orgel.

**2.5    Disclaimer.**

Certain information contained in this Joint VD Disclosure Statement (general information in Section 4.1, Project descriptions in Section 4.2.1, SunCal's stated opinions of value in Section 4.2.2, various information regarding Claims used to develop the summary in Section 4.2.4 hereof) is either provided by the Voluntary Debtors or is contained in the 2009 SunCal Disclosure Statement.  Additionally, this Disclosure Statement from time to time notes within the text when the Proponents are specifically relying upon information provided or disclosed or believed by either the Voluntary Debtors or Elieff.  The Lehman Proponents represent that they are unaware of any material inaccuracies in the information set forth herein.

The Bankruptcy Court has not yet determined whether or not the Joint VD Plan is confirmable and makes no recommendation as to whether or not you should support or oppose the Joint VD Plan.

The discussion in this Joint VD Disclosure Statement regarding the VD Plan Debtors may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995.  Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate," or "continue," or the negative thereof or other variations thereon or comparable terminology.  The reader is cautioned that all forward looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements.  The liquidation analyses, distribution projections, projections of financial results and other information are estimates only, and the timing, amount and value of actual distributions to Creditors may be affected by many factors that cannot be predicted.  Therefore, any analyses, estimates, or projections mayor may not turn out to be accurate.

**III**

**ACCEPTANCE OR REJECTION OF THE JOINT VD PLAN**

**3.1    Who May Object to Confirmation of the Joint VD Plan.**

Any party in interest may object to the confirmation of the Joint VD Plan, but as

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

explained below not everyone is entitled to vote to accept or reject the Joint VD Plan.

**3.2**    **Who May Vote to Accept/Reject the Joint VD Plan.**

Subject to the following, a Holder of a Claim or Interest has a right to vote for or against the Plan if that Holder of the Claim or Interest has a Claim, which is (1) Allowed or Allowed for voting purposes, (2) classified in an Impaired Class and (3) receives something under the Plan.

Allowed Claims in Classes 2, 6, 7, 8 and 9 are classified as Impaired and receive or retain property or rights under the Plan and, thus, Holders of Claims in such Classes are entitled to vote to accept or reject the Plan.

**3.3**    **What Is an Allowed Claim/Interest.**

As noted above, a Holder of Claim or Interest must first have an Allowed Claim or Allowed Interest to vote.  As more fully defined in the Plan, a Claim (other than an Administrative Claim) is "Allowed:" (1) if it is a Scheduled Claim and the Holder of such Claim did not File proof thereof with the Bankruptcy Court on or before the Claims Bar Date, in the amount thereof, with the status as secured or unsecured thereof and with the statutory priority thereof if no objection to such Claim was interposed by the Claims Objection Deadline; or (2) if the Holder of such Claim has Filed a Proof of Claim therefor with the Bankruptcy Court on or before the Claims Bar Date, in the amount and with the status as secured or unsecured and in the statutory priority as stated in such Proofs of Claim if no objection to such Claim was interposed by the Claims Objection Deadline; or (3) if an objection to such Claim was interposed by the Claims Objection Deadline, in the amount and with the status as secured or unsecured and in the statutory priority thereof as fixed by Final Order of the Bankruptcy Court; and (4) with respect to a Claim's status as a Reliance Claim, (a) with such status if it is alleged on the Holder's Ballot in the manner provided therefor and if no objection thereto is interposed by the Claims Objection Deadline, (b) with such status if it is alleged by the Liquidating Trustee and either (i) the Lehman VD Lenders consent or (ii) no objection thereto is Filed by the later of the Claims Objection Deadline or seventy-five (75) days after notice thereof to the Voluntary Debtors' Committee, if surviving, and the Lehman Creditors or (c) as fixed by Final Order of the Bankruptcy Court.  An Interest is "Allowed" (1) if no objection to such Interest was interposed within the applicable period of time fixed by the Bankruptcy Code, the Bankruptcy Rules,

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

the Plan or the Bankruptcy Court, (i) if the Holder of such Interest did not File proof thereof with the Bankruptcy Court within the applicable period of time fixed by the Bankruptcy Code, the Bankruptcy Rules, the Plan or the Bankruptcy Court, in the number, amount or percentage of such Interest and with the nature thereof as listed in the VD Plan Debtors' Schedules if listed as neither disputed, contingent or unliquidated and (ii) if the Holder of such Interest has Filed a Proof of Interest therefor with the Bankruptcy Court within the applicable period of time fixed by the Bankruptcy Code, the Bankruptcy Rules, the Plan or the Bankruptcy Court, in the number, amount or percentage of such Interest and with the nature thereof as stated in such Proof of Interest, or (2) if an objection to such proof was interposed within the applicable period of time fixed by the Bankruptcy Code, the Bankruptcy Rules, the Plan or the Bankruptcy Court, in the number, amount or percentage of such Interest and nature thereof as fixed by Final Order of the Bankruptcy Court.

### 3.4    What Is an Impaired Class.

A Class is impaired if the Joint VD Plan alters the legal, equitable, or contractual rights of the Claims or Interests in that Class, other than the right to accelerate the Claim upon certain kinds of defaults. Under the Joint VD Plan, Classes 1, 3, 4, and 5 are Unimpaired and Classes 2, 6, 7, 8, 9 and 10 are Impaired.

### 3.5    Who Is Not Entitled to Vote.

The following four types of Claims are not entitled to vote: (1) Claims that have not been Allowed; (2) Claims that, pursuant to Bankruptcy Code sections 507(a)(2), (a)(3) or (a)(8), are entitled to priority; (3) Claims in Unimpaired Classes; and (4) Claims in Classes that do not receive or retain any value under the Plan:

(a)    Claims in Unimpaired Classes are not entitled to vote because such Classes are deemed to have accepted the Plan.

Classes 1, 3, 4, and 5 are Unimpaired and thus Holders of Allowed Claims in those Classes are not entitled to vote because they are deemed to have accepted the Plan under Bankruptcy Code § 1126(f).

(b)    Claims entitled to priority pursuant to Bankruptcy Code section 507(a)(2), (3) or (8) are not entitled to vote because voting is to determine class acceptance of a Plan

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1  under Bankruptcy Code § 1129(a)(8) and such Claims are not to be placed in Classes (and, thus, are

2  unclassified) pursuant to Bankruptcy Code § 1123(a)(1).  Instead, such Claims are required to

3  receive certain treatment specified under Bankruptcy Code §§ 1129(a)(9)(A) & (C).

4  Allowed Administrative Claims and Allowed Priority Tax Claims are unclassified

5  Claims the Holders of which are not entitled to vote.

6  (c)  Claims in Classes that do not receive or retain any property under the

7  Plan do not vote because such Classes are deemed to have rejected the Plan.

8  Class 10 Interests are Impaired but Holders of such Interests receive and retain

9  nothing under the Plan in respect of such Interests and, accordingly, these Holders are not entitled to

10  vote because they are deemed to have voted to reject the Plan under Bankruptcy Code § 1126(f).

11  EVEN IF A CLAIM IS OF THE TYPE DESCRIBED ABOVE, A CREDITOR MAY

12  STILL HAVE A RIGHT TO OBJECT TO THE CONFIRMATION OF THE PLAN.

13  **3.6**    **Who Can Vote in More than One Class.**

14  A Creditor whose Claim has been Allowed in part as a Secured Claim and in part as

15  an Unsecured Claim is entitled to accept or reject the Plan in both capacities by casting one Ballot

16  for the secured part of the Claim and another Ballot for the Unsecured Claim.  Also, a Creditor may

17  otherwise hold Claims in more than one Class (such as a Holder of General Unsecured Claims (Class

18  7) and Reliance Claims (Class 6)), and may vote the Allowed Claims held in each Class.

19  **3.7**    **Votes Necessary for a Class to Accept the Joint VD Plan.**

20  A Class of Claims is deemed to have accepted the Plan when more than one-half (1/2)

21  in number and at least two-thirds (2/3) in dollar amount of the Claims *that actually voted*, vote to

22  accept the Plan. A Class of interests is deemed to have accepted the Plan when Holders of at least

23  two-thirds (2/3) in amount of the interest-Holders of such Class which actually vote, vote to accept

24  the Plan.

25  **3.8**    **Special Provisions for Listed Holders of Mechanic's Lien Claims.**

26  Although the subclasses of Class 3 are Unimpaired and any Holders of <u>Allowed</u> Sr.

27  Secured Mechanic's Lien Claims are deemed to accept the Plan, the Lehman Proponents dispute the

28  "secured" status of any such Claim against any Group I Debtor (other than SunCal Summit Valley)

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

because the Lehman Proponents assert that the aggregate amount of the applicable Lehman Loans

secured by Lehman Claim Liens on each applicable Plan Project exceeds the value of such Plan

Project, such that there is no value in the junior Liens of the Holders of Mechanic's Lien Claims.

Thus, <u>each listed Holder of a Mechanic's Lien Claim against any Group I Debtor will be provided a</u>

<u>Ballot on which such Holder may elect to vote its Claims as a General Unsecured Claim or Reliance</u>

<u>Claim, as applicable, in which event the Holder will be waiving contentions that its interest in the</u>

<u>collateral securing its Claim has any value and thus will be waiving contentions that it holds a</u>

<u>Secured Claim against the applicable Plan Project.  By holding a General Unsecured Claim or</u>

<u>Reliance Claim at the time of voting, the Creditor will have the opportunity, as more fully set forth</u>

<u>herein, to elect to receive the Lehman Distribution Enhancement.</u>

> **3.9**     **Special Provisions for Allowed General Unsecured Claims in Class 7 and**
>
> **Allowed Reliance Claims in Class 6.**

>> **3.9.1    Voting Permitted Regardless of Election to Receive the Lehman**
>>
>> **Distribution Enhancement.**

Creditors voting a General Unsecured Claim in Class 7 or a Reliance Claim in Class 6

may vote for or against the Plan whether or not the Creditor elects to execute and deliver the

Creditor's Assignment / Release for Lehman and receive the benefits of the Lehman Distribution

Enhancement (applicable only if the Claim is Allowed, Plan is Confirmed and Effective Date

occurs).

>> **3.9.2    "Reliance Claim" Status Must Be Asserted on a Ballot.**

For any Creditor to vote its Claim as a Reliance Claim in Class 6, and have offered to

it the higher Distributions available therefor with respect to the Lehman Distribution Enhancement,

the Creditor must mark its Ballot to indicate that it contends it holds a Reliance Claim.  The features

distinguishing General Unsecured Claims from Reliance Claims, as more fully reflected in the

definitions of each, are essentially that a Reliance Claim is a Claim (a) for "new value," (b)

voluntarily extended after the August 1, 2007 Reliance Date and prior to the applicable November,

2008 Petition Date(s), and (c) timely of record as follows: either (1) Filed by the Primary Claims Bar

Date or (2) Filed late, but by March 25, 2011 in accordance with a Final Order or (3) listed on the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Filed Schedules by March 25, 2011 as Scheduled Claims, <u>excluding</u> (d) Insider Claims and Lehman VD Lender Claims (other than Lehman-Owned Settling Bond Issuer-Related Claims).  The same Ballot will be provided to those Creditors believed by the Proponents to hold General Unsecured Claims or Reliance Claims in Classes 6 or 7.

### 3.10    Receipt of No or Incorrect Ballots.

If a Creditor does not receive a Ballot or receives an incorrect Ballot, it may contact the Proponents to receive the correct Ballot.

### 3.11    Acceptance of the Plan Contrasted With Confirmation.

Many requirements must be met before the Bankruptcy Court can confirm the Plan.  Some of the requirements include that the Plan must (a) be proposed in good faith, (b) be accepted in accordance with the provisions of the Bankruptcy Code, (c) pay creditors at least as much as creditors would receive in a Chapter 7 liquidation and (d) be feasible. Creditor acceptance of the Plan is only a factor relating to confirmation.  Even if there are Impaired Classes that do not accept the proposed Plan, the Court may nonetheless confirm the Plan if the non-accepting Classes are treated in the manner required by the Bankruptcy Code and at least one Impaired Class of Claims accepts the Plan.  The process by which a plan may be confirmed and become binding on non-accepting classes is commonly referred to as "cramdown."  The Bankruptcy Code allows the Plan to be "crammed down" on non-accepting Classes of Claims or Interests if it meets all statutory requirements except the voting requirements of Bankruptcy Code § 1129(a)(8) and if the Plan does not "discriminate unfairly" and is "fair and equitable" with respect to each Impaired Class that has not voted to accept the Plan, as set forth in 11 U.S.C. § 1129(b) and applicable case law.  The confirmed Plan binds the non-accepting Classes.  The Proponents will ask the Bankruptcy Court to confirm the Plan by cramdown on any Impaired Class if such Class does not vote to accept the Plan.

The requirements described in the Plan may not be the only requirements for confirmation. PERSONS OR ENTITIES CONCERNED WITH CONFIRMATION OF THE PLAN SHOULD CONSULT WITH THEIR OWN ATTORNEYS BECAUSE THE LAW ON CONFIRMING A PLAN OF REORGANIZATION IS VERY COMPLEX.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**IV**

**BACKGROUND OF THE VD PLAN DEBTORS, THEIR BUSINESS AND THE CASES**

**4.1    The SunCal Companies and the Debtors.**[5]

SunCal's business focused upon the acquisition and development of residential land. A typical SunCal project began with the acquisition of one or more parcels of raw land. Thereafter, the SunCal team developed a master plan for the acreage that incorporated streets, homes, parks, schools and commercial areas, and then it worked with the applicable municipal planning authorities (the city, county, state and federal) to secure the necessary approvals or "entitlements" to achieve such plan. This process, which required the assistance of land planners, civil engineers, architects, lawyers, and other land specialists, took a period of years. Once a master plan had been approved, SunCal provided for the grading of the project and the installation of the foundational infrastructure (streets, utilities, *etc*.) and then sold the lots or parcels within the project to merchant builders.

The land development process is inherently capital intensive due to size and costs of the assets being acquired, the front-loaded capital requirements, and the length of time between the initial acquisition and the ultimate realization of profits. A typical SunCal project was financed through an equity contribution coupled with a land or acquisition loan. Thereafter one or more development and entitlement credit facilities would either be incorporated into the acquisition loan, or an entirely new facility would be obtained to fund the development. In some cases a layer of mezzanine debt (secured by an equity ownership interest in the entity that owns the project) was employed to provide additional funding.

The Debtors are twenty-six (26) entities formed to develop the Projects throughout California. Some of the Debtors directly own the Projects and others serve as holding companies, owning Allowed Interests directly or indirectly in the Debtors that hold title to the Projects. SunCal Management, a non-debtor entity, owned and controlled by Elieff, managed all of the Projects.

Attached hereto as **Exhibit "1"** is a list and general description of various notices of potential health and safety issues asserted by various government agencies with respect to the Plan

---

[5] The information set forth in this Disclosure Statement Section 4.1 is largely obtained from the previously Filed 2009 SunCal Disclosure Statement, although certain amounts have been updated as more recent data became available. This information is designed to provide to the reader with a general background understanding of the Debtors and their operations.

Projects, which information was derived from information from the Voluntary Debtors.

The Assets, debt and capital structure of the VD Plan Debtors are set forth in the subsections below. As to the related eight Trustee Debtors, they each own a Project, with approximate collective values of $175 million to $352.2 million. (The derivation for these Plan Project Values are set forth in Disclosure Statement Section4.2.2; the Debtors' valuations represent the lower sums and actual vales are expected to be less than the upper range figures). As to the Trustee Debtors, the Lehman Creditors who are creditors of the Trustee Debtors (the Lehman TD Lenders) assert that they hold first priority, voluntary liens against the Projects of the Trustee Debtors securing an aggregate, non-duplicative debt to such the Lehman TD Lenders of approximately $1.1 billion.

**4.2    Financial Information: Assets and Liabilities.**

**4.2.1    The VD Plan Debtors' Primary Assets.**

The following is a general description of the VD Plan Debtors and their primary Assets (other than the Litigation Claims) as of their respective Petition Dates, based solely upon the Voluntary Debtors' disclosures in the 2009 SunCal Disclosure Statement:

| DEBTOR | ASSET DESCRIPTION |
|---|---|
| Palmdale Hills | Palmdale Hills owns the Ritter Ranch Project. The Ritter Ranch Project consists of a 10,625 acre site situated in the City of Palmdale, in Los Angeles County, California. Grading of the first phase is complete with master infrastructure nearly 90% complete. The specific plan and the development agreement were approved in 1992 and allow for the development of up to 7,200 residential units. A vesting tentative parcel map consisting of 42 parcels has been processed and was recorded in 1995. Additionally, six vesting tentative tract maps totaling 553 lots were approved by the city in December 1995. All regulatory permits have been received.<br><br>Palmdale Hills also owns personal property in the form of cash and the Palmdale Hills CFD Bonds. |
| Acton Estates | Action Estates owns the Acton Project consisting of a 175-acre site situated in Los Angeles County, California. The Acton Project is surrounded by mostly equestrian properties and light agricultural vacant land. The Acton Project is expected to consist of 136 units. |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| **DEBTOR** | **ASSET DESCRIPTION** |
|---|---|
| SunCal Beaumont | SunCal Beaumont owns the Beaumont Heights Project, that originally consisted of a 1,191-acre site situated in the City of Beaumont, in Riverside County, California. The property is currently designated as low density residential use -rural residential use. The City of Beaumont is in the process of amending the general plan, preparing an environmental impact report and annexing the assemblage. The specific plan and tentative tract map are in the drafting stage. The Beaumont Heights Project was expected to consist of 1,203 units. A portion of the Beaumont Heights Project has been lost through foreclosure sales completed prior to the Petition Date. |
| SunCal Bickford | SunCal Bickford owns the Bickford Ranch Project, consisting of a 1,940-acre site situated in the City of Penryn, in Placer County, California. The Bickford Ranch Project is fully entitled with an approved large lot tentative map, small lot tentative map, specific plan, design guidelines, development standards, and a development agreement. The offsite water and sewer improvements are mostly complete. Improvement plans for major roads and in-tract improvements were in process of being completed and a memorandum of understanding between the City and County for the regional sewer pipeline was in process. The Bickford Ranch Project is expected to consist of 2,105 units.<br><br>SunCal Bickford owns personal property in the form of cash. |
| SunCal Johannson | SunCal Johannson owns the Johannson Ranch Project, consisting of a 501-acre site in the City of Modesto, in Stanislaus County, California. Tentative maps were in the process of being prepared. Engineering plans and preparation of the draft specific plan were commenced prior to the filing of the Debtors' Cases. The SunCal Johannson Project is expected to consist of 921 units.<br><br>SunCal Johannson also owns personal property in the form of cash. |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| DEBTOR | ASSET DESCRIPTION |
|---|---|
| SunCal Summit Valley | SunCal Summit Valley, Kirby Estates and Seven Brothers each own portions of the Summit Valley Project that originally consisted of a 2,500-acre site situated in the City of Hesperia, in San Bernardino County, California. The City of Hesperia's general plan allows for low density residential development. SunCal Summit Valley anticipated approximately 2.5 lots per acre over the entire assemblage. Most of the technical studies for the environmental impact report were completed. The Summit Valley Project was previously expected to consist of 6,023 units. A part of the Summit Valley Project has been lost through foreclosure proceedings completed prior to the Petition Date.  SunCal Summit Valley is the Holder of the Allowed Interests in Seven Brothers and Kirby Estates. <br><br>SunCal Summit Valley also owns personal property in the form of cash. |
| Kirby Estates | SunCal Summit Valley, Kirby Estates and Seven Brothers each own portions of the Summit Valley Project that originally consisted of a 2,500-acre site situated in the City of Hesperia, in San Bernardino County, California. The City of Hesperia's general plan allows for low density residential development. SunCal Summit Valley anticipated approximately 2.5 lots per acre over the entire assemblage. Most of the technical studies for the environmental impact report were completed. The Summit Valley Project was previously expected to consist of 6,023 units. A part of the Summit Valley Project has been lost through foreclosure proceedings completed prior to the Petition Date.  Kirby Estates owns 27 acres of the Summit Valley Project. (SunCal Summit Valley is the Holder of the Allowed Interests in Seven Brothers and Kirby Estates.) |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| **DEBTOR** | **ASSET DESCRIPTION** |
|---|---|
| Seven Brothers | SunCal Summit Valley, Kirby Estates and Seven Brothers each own portions of the Summit Valley Project that originally consisted of a 2,500-acre site situated in the City of Hesperia, in San Bernardino County, California. The City of Hesperia's general plan allows for low density residential development. SunCal Summit Valley anticipated approximately 2.5 lots per acre over the entire assemblage. Most of the technical studies for the environmental impact report were completed. The Summit Valley Project was previously expected to consist of 6,023 units. A part of the Summit Valley Project has been lost through foreclosure proceedings completed prior to the Petition Date.  Seven Brothers owned 900 acres of the Summit Valley Project, a portion of which has been lost through foreclosure proceedings completed prior to the Petition Date.  (SunCal Summit Valley is the Holder of the Allowed Interests in Seven Brothers and Kirby Estates.) |
| SCC Communities | SCC Communities owns the Joshua Ridge Project, consisting of an 80-acre site situated in the City of Victorville in San Bernardino County, California. The Joshua Ridge Project was slated to be sold to the city and the city was scheduled to use the land to build a park or a school. |
| Tesoro | Tesoro owns the Tesoro Project consisting of a 185-acre site situated in the City of Santa Clarita in Los Angeles County, California. The existing entitlements include a tentative tract map approved by the planning commission, which allows for 45 lots. |
| SunCal I | SunCal I does not own any real property. SunCal I is the Holder of Allowed Interests in Acton Estates, SunCal Bickford, SunCal Beaumont, SunCal Summit Valley, SunCal Johannson and SunCal Emerald. |

### 4.2.2   Values for Plan Projects.

The below chart sets forth the appraised value of the VD Plan Debtors' Projects based upon appraisals prepared for the Lehman Creditors during the pendency of the Bankruptcy Cases, and SunCal's stated valuation opinions for the Projects.

| NAME OF DEBTOR | APPRAISED VALUE OF DEBTORS' PROJECTS BASED UPON APPRAISALS PREPARED FOR LEHMAN CREDITORS DURING THE PENDENCY OF THE DEBTORS' CHAPTER 11 PROCEEDING[6] | SUNCAL'S STATED VALUATION OPINIONS[7] |
|---|---|---|
| SunCal Bickford | $29,500,000 | $21,000,000 |
| Palmdale Hills | $42,900,000 | $27,000,000 |
| Tesoro | $1,850,000 | $1,500,000 |
| SCC Communities | $1,200,000 | $1,000,000 |
| SunCal Beaumont | $1,400,000 | $1,200,000 |
| Acton Estates | $6,800,000 | $3,400,000 |
| SunCal Johannson | $4,000,000 | $2,100,000 |
| SunCal Summit Valley | $2,200,000 | $750,000 |
| Kirby Estates | $2,800,000 | $1,000,000 |
| Seven Brothers | $200,000 | $75,000 |
| **TOTAL** | **$92,850,000.00** | **$59,025,000.00** |

• The Lehman Creditors' appraised value of the Summit Valley Project includes the portions of the Summit Valley Project owned by Seven Brothers and Kirby Estates. The appraisal values the property that is owned outright by SunCal Summit, Seven Brothers and Kirby Estates, and not subject to Seller Financing Secured Claims.

As to the net values estimated to be available for the Lehman Secured Claims against SunCal I and SunCal Summit Valley based on the value of their Interests in Kirby Estates, Seven Brothers, SunCal Beaumont, and SunCal Johanson, the following estimate is applicable:

---

[6] The Lehman VD Lenders believe the Plan Projects are worth no more than and some may be worth substantially less than these appraised values.

[7] SunCal represented that the valuations identified as its "Stated Valuation Opinions" were prepared by its internal underwriting team using criteria consistent with the team's acquisition of real properties. The Lehman Proponents have not verified, nor do they vouch for the valuation techniques adopted by the Debtors.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| DEBTOR | Project Values | Cash | Aggregate Asset Values | Total Non-Lehman Creditor Claims[8] | Available for Lehman Secured Claim |
|---|---|---|---|---|---|
| Kirby Estates | $2,800,000 | $10 | $2,800,010 | $9,952 | $2,790,058 |
| Seven Brothers | $200,000 | $174 | $200,174 | $258,825 | ($58,651) |
| SunCal Beaumont | $1,400,000 | $11 | $1,400,011 | $1,389,132 | $10,879 |
| SunCal Johannson | $4,000,000 | $106,412 | $4,106,412 | $385,347 | $3,721065 |
| Total | $8,400,000 | $106,607.00 | $8,490,413 | $2,043,256 | $6,447,157 |

### 4.2.3    Remaining Other Assets

Besides the Plan Projects and any associated personal property, the only significant Remaining Other Assets are the VD Plan Debtors' Cash and any potential Net Cash Litigation Recoveries.

### (a)    VD Plan Debtors' Cash

The following chart sets forth the VD Plan Debtors' cash on hand as of January 31, 2011 (based on information in January 2011 Filings by the Voluntary Debtors of Monthly Operating Reports and pleadings).  The Lehman Creditors contend that some or all of the following amounts are subject to its Liens and therefore constitute their "Cash Collateral."

| Debtor | Undisputed Cash Collateral | Disputed Cash Collateral | Other Restricted Cash | Unrestricted Cash |
|---|---|---|---|---|
| **Group I Debtors** | | | | |
| Acton Estates | | | | |
| Palmdale Hills | $17,314,703 | $3,060,151 | $201,806 | |

---

[8] Seller Financing Secured Claims are excluded from the above chart. The Lehman Creditors are aware of Seller Financing Secured Claims of approximately $2.9 million against SunCal Summit Valley, $3.4 million against Seven Brothers, and $1.1 million against SunCal Beaumont.  The Plan provides that the Holders of such Claims, absent settlement, either are to be left to their state law rights, to be paid in full, or to receive back their collateral. To the extent their Claims are thereby satisfied, there should be no impact on other Creditors.  In the event any Holder of a Seller Financing Secured Claim successfully asserts an Unsecured Deficiency Claim that becomes Allowed or the prospect thereof becomes reasonably likely, such as might occur if the Holder is left unimpaired, is undersecured and elects to judicially foreclose, such Claims or their prospect could dilute recoveries or cause a Plan contingency to be unsatisfied.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| Debtor | Undisputed Cash Collateral | Disputed Cash Collateral | Other Restricted Cash | Unrestricted Cash |
|---|---|---|---|---|
| SCC Communities | | $ 2,669 | | |
| SunCal Bickford | | $1,105,004 | | |
| SunCal I | | $ 26 | | |
| SunCal Summit Valley | | $28,596 | | |
| Tesoro | | $ 71 | | |
| **Total** | **$17,314,703.00** | **$4,196,517.00** | **$201,806.00** | **0** |
| **Aggregate Total:** | **$21,713,026** | | | |

| Debtor | Undisputed Cash Collateral | Disputed Cash Collateral | Other Restricted Cash | Unrestricted Cash |
|---|---|---|---|---|
| **Group II Debtors** | | | | |
| Kirby Estates | | | | $ 10 |
| Seven Brothers | | | | $ 174 |
| SunCal Beaumont | | | | $ 11 |
| SunCal Johannson | | | | $106,412 |
| **Total** | | | | **$106,607.00** |

**(b)    Net Cash Litigation Recoveries**

The Proponents have not completed their investigation of potential Litigation Claims as to matters not resolved under the Plan and are not aware of any material matters of this type.  Yet, the Plan preserves the ability of the Liquidating Trustee to pursue Remaining Litigation Claims and affords non-priority, unsecured creditors (*e.g.*, Holders of Allowed Reliance Claims and Allowed General Unsecured Claims), a proportional share of any Net Litigation Recoveries.

**4.2.4    Debt and Capital Structure.**

The VD Plan Debtors' ownership is reflected in the classification tables.  The following summarizes the debt of the VD Plan Debtors.

**(a)    A Summary of the Lehman VD Lenders' Loans.**

As to the eleven (11) VD Plan Debtors, there are currently eight (8) Plan Projects, as follows:

**Group I Debtors**
1.    Acton Project

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**Group I Debtors**
2.    Ritter Ranch Project
3.    Joshua Ridge Project
4.    Bickford Ranch Project
5.    Summit Valley Project
6.    Tesoro Project
**Group II Debtors**
7.    Beaumont Heights Project
8.    Johannson Ranch Project

As of the applicable Petition Dates, there were first priority, voluntary liens and security interests against each Plan Project of the Group I Debtors other than SunCal Summit Valley, that now are held by the Lehman VD Lenders, each as owner of all of the subject loan or of the term or revolver component thereof, as more fully set forth in **Exhibit "2"** to the Disclosure Statement. The amount owing, collectively, by the VD Plan Debtors under the Lehman Loans, without duplication, totals approximately $711 million.

More specifically:

(a)    Three (3) Projects – Ritter Ranch Project, Acton Estates Project, and Bickford Ranch Project – are owned, respectively, by Palmdale Hills, Acton Estates, and SunCal Bickford. Lehman Commercial asserts a first priority lien by virtue of first-priority deeds of trust on each of these three Projects. Additionally, besides holding a first priority Lien directly on the Ritter Ranch Project, Lehman Commercial holds a first priority pledge of the membership interests in Palmdale Hills, which is the owner of the Ritter Ranch Project.

(b)    Two (2) Projects – the Joshua Ridge and Tesoro Projects – are owned, respectively, by SCC Communities and Tesoro. Lehman ALI is the primary secured creditor on each of these two additional Projects.

(c)    Two (2) Projects – the Johannson Ranch Project and Beaumont Heights Project – are owned, respectively, by SunCal Johannson and SunCal Beaumont. Lehman Commercial holds a first priority pledge of SunCal I's membership interests in SunCal Johannson and SunCal Beaumont.

(d)    One (1) Project – SunCal Summit Valley – is owned by three Debtors: SunCal Summit Valley, Kirby Estates and Seven Brothers, which each own a portion of the Project.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Lehman Commercial holds a first priority pledge of SunCal I's membership interests in SunCal Summit Valley and in SunCal Summit Valley's membership interests in Kirby Estates and Seven Brothers.

The Lehman VD Lenders also hold a substantially undisputed Lien on a major part (and undisputed or disputed Liens on substantially all) of the VD Plan Debtors' cash balances (Cash Collateral) and receivables and other rights relating to the Projects in which they assert Liens.

The various Lehman Loans, the entities against which they are asserted and the Allowed Amount of each Lehman Loan as of the Petition Date for the purposes of the Joint VD Plan are all set forth in the classification tables that are set forth herein below and in the Plan.

The Plan Projects are being conveyed to the Lehman Nominees pursuant to the Plan, as permitted by Bankruptcy Code § 1123(a), and the value of such conveyance is set under the Plan based on the appraisals and amounts described therein.  All of the Lehman Loans are recourse loans as to the respective borrowers' assets.  Accordingly, for each Lehman Loan, each applicable Lehman VD Lender is afforded a Lehman Creditor Deficiency Claim against each VD Plan Debtor liable for the subject Lehman Loan equal to the balance of the applicable Lehman Loan not satisfied by the conveyance of Plan Projects to the Lehman Nominee for such Lehman VD Lender, provided that, under the Plan, no Lender Creditor Deficiency Claim is afforded against SCC Communities or Tesoro and, under the Plan and to the benefit of other Creditors, the Lehman VD Lenders are agreeing to receive no part of the Residual Cash for these Lehman Creditor Deficiency Claims.

**(b)    Other Debts against the VD Plan Debtors and Plan Projects.**

In addition to the Secured Claims of the Lehman VD Lenders against certain Plan Projects, there are miscellaneous Real Property Tax Claims, Mechanic's Lien Claims and possibly Other Secured Claims, alleged to be Allowed Secured Claims against the Plan Projects, and other Priority Claims, Administrative Claims, General Unsecured Claims or Reliance Claims asserted against each of the VD Plan Debtors, summarized in the chart below.

| ESTIMATED CLAIMS (OTHER THAN LEHMAN CREDITOR CLAIMS) |
| --- |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| ESTIMATED CLAIMS (OTHER THAN LEHMAN CREDITOR CLAIMS) | | | | | | |
|---|---|---|---|---|---|---|
| DEBTOR | ADMIN-ISTRATIVE, PRIORITY TAX, PRIORITY (CLASS 5) & OTHER SECURED (CLASS 4) CLAIMS | PRE-PETITION REAL PROPERTY TAX CLAIMS (CLASS 1) | POST PETITION REAL PRO-PERTY TAX CLAIMS (1) | MECHAN-IC'S LIEN CLAIMS+ | RE-LIANCE CLAIMS (CLASS 6) | GENERAL UN-SECURED CLAIMS (CLASSES 7 or 8)++ | SETTLING BOND ISSUER RELATED FUTURE WORK CLAIMS (CLASS 8) |
| Palmdale Hills Property LLC | $465,680 | $1,037,377 | $1,905,563 | $1,207,235 | $1,139,875 | $1,542,339 | $21,388,095 |
| SunCal Bickford Ranch, LLC | $494,252 | $2,887,678 | $4,924,891 | $1,608,763 | $460,255 | $324,103 | $2,581,887 |
| Acton Estates, LLC | $49,280 | $200,454 | $411,564 | $0 | $84,811 | $60,506 | $1,290,000 |
| SCC Communities LLC | $22,842 | $5,900 | $26,027 | $0 | $2,958 | $29,855 | $20,000 |
| SunCal Summit Valley, LLC | $32,982 | $176,005 | $295,662 | $16,827 | $269,062 | $12,254 | $0 |
| Tesoro SF, LLC | $105,705 | $33,205 | $69,441 | $0 | $28,095 | $134,314 | $422,000 |
| Kirby Estates, LLC | $846 | $1,744 | $7,362 | $0 | $0 | $0 | $0 |
| Seven Brothers, LLC | $1,691 | $60,828 | $196,305 | $0 | $0 | $0 | $0 |
| SunCal Beaumont Heights, LLC | $26,485 | $365,955 | $769,704 | $43,355 | $136,612 | $47,021 | $0 |
| SunCal Johannson Ranch, LLC | $28,383 | $75,107 | $240,676 | $0 | $265 | $40,916 | $0 |
| SunCal Communities I, LLC | $846 | $0 | $0 | $0 | $0 | $0 | $0 |
| **Total** | **$1,228,992** | **$4,844,254** | **$8,847,195** | **$2,876,180** | **$2,121,933** | **$2,191,307** | **$25,701,982** |

As to the above chart:

•       These estimates are the result of the initial, first level Claims analysis.  The Claims analysis is continuing and incomplete and late Filed Claims and many amendments have not been included in arriving at the numbers set forth above.

•       The chart takes into account information compiled by the Lehman Proponents after having received input from SunCal Management in late 2009 as to Claims likely subject to disallowance.

•       Settling Bond Issuer-Related Future Work Claims in the above chart involve numerous assumptions.  Efforts were made to avoid duplication in that the Proponents believe certain Bond Issuer Claims will be subject to disallowance under Bankruptcy Code section 502(e) to the extent the corresponding Bond-Backed Claim is Allowed.  Although Arch asserted that these

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

alleged Claims (and similar Claims against the Trustee Debtors) are joint and several obligations of all the Debtors, such contentions are disputed and are not taken into account in the chart above (and are irrelevant if there is consensual treatment of the Bond Issuer Claims under the Plan).

    •    This first level estimation of what Claims may become Allowed Claims and the status of their listing herein or in the Joint VD Plan should not be construed as providing or admitting that any Claim is Allowed or is to be Allowed under the Joint VD Plan unless expressly so provided in the Plan.

    •    Administrative Claims are ongoing and the amounts included are estimates as of July, 2010.

    •    Seller Financing Secured Claims are excluded from the above chart. The Lehman Creditors are aware of Seller Financing Secured Claims of approximately $2.9 million against SunCal Summit Valley, $3.4 million against Seven Brothers, and $1.1 million against SunCal Beaumont.  The Plan provides that the Holders of such Claims, absent settlement, either are to be left to their state law rights, to be paid in full, or to receive back their collateral. To the extent their Claims are thereby satisfied, there should be no impact on other Creditors.  In the event any Holder of a Seller Financing Secured Claim successfully asserts an Unsecured Deficiency Claim that becomes Allowed or the prospect thereof becomes reasonably likely, such as might occur if the Holder is left unimpaired, is undersecured and elects to judicially foreclose, such Claims or their prospect could dilute recoveries or cause a Plan contingency to be unsatisfied.

    Totals from the chart above are as follows:

| DEBTOR | TOTAL NON-LEHMAN CREDITOR CLAIMS |
|---|---|
| Palmdale Hills | $28,686,163 |
| SunCal Bickford | $13,281,828 |
| Acton Estates | $2,096,616 |
| SCC Communities | $107,582 |
| SunCal Summit Valley | $802,792 |
| Tesoro | $792,760 |
| Kirby Estates | $9,952 |
| Seven Brothers | $258,825 |
| SunCal Beaumont | $1,389,132 |
| SunCal Johannson | $385,347 |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| DEBTOR | TOTAL NON-LEHMAN CREDITOR CLAIMS |
|--------|----------------------------------|
| SunCal I | $846 |
| **Total** | **$47,811,843** |

### (c)    Mechanic's Lien Claims.

Mechanic's Lien Claims constitute Claims arising pursuant to California Civil Code §3110 *et seq.* that were either perfected prepetition or otherwise satisfy the requirements of Bankruptcy Code 546(b).  There are estimated to have been asserted approximately $4.74 million of asserted Mechanic's Lien Claims against various of the Plan Projects.  The Lehman VD Lenders contend that the Lehman Claim Liens are first priority, voluntary Liens on the Plan Projects of the Group I Debtors (other than SunCal Summit Valley), senior to the alleged Mechanic's Lien Claims. Because the Lehman Claims Liens are senior Encumbrances to such Mechanic's Lien Claims and because the Plan Projects of the Group I Debtors (other than SunCal Summit Valley) are worth less than the aggregate outstanding amount of the Lehman Loans that are secured by the Lehman Claims Liens, the Lehman Proponents assert that there is no value in said Plan Projects to which the junior Liens of the Holders of Mechanic's Lien Claims could attach.

The Lehman VD Lenders believe that, generally, the Mechanic's Lien Claims are General Unsecured Claims or Reliance Claims (to be treated in Class 6, Class 7 or Class 8, if Allowed).  The Lehman VD Lenders contend that the lien of a secured lender or construction lender is senior to mechanic's liens under Cal. Civil Code sections 3134 & 3136 (taken together and viewed in light of existing case law) so long as the lender recorded its trust deed prior to the commencement of work on the Project.[9]  Based upon the foregoing, the Lehman VD Lenders believe that Holders of Mechanic's Lien Claims against Group I Debtors (other than SunCal Summit Valley) face

---

[9] The Lehman VD Lenders are substantially undersecured and, although no analysis was undertaken, have some confidence that Project values are unlikely to exceed original loan amounts. If they do, there is a possibility that mechanic's lien holders could establish priority as to such excess value if the subsequent advances were not required under the construction loan and were not made to fund construction. The dates of the recording of the Lehman VD Lenders' trust deeds for the Projects are as follows: Palmdale Hills:  February 12, 2007, Instrument No. 2007-0299922; SunCal Bickford:  August 25, 2006, Instrument No. 2006-0091555, amended March 14, 2007, Instrument No. 2007-0025661-00; SunCal Emerald:  July 19, 2007, Instrument No. 2007-0471396, amended September 4, 2008, Instrument No. 2008-0485910; Acton Estates:  January 16, 2007, Instrument No. 20070078774; SCC Communities:  November 2, 2007, Instrument No. 2007-0612667, amended July 1, 2008, Instrument No. 2008-0297987; Tesoro: November 2, 2007, Instrument No. 20072474180, amended July 1, 2008, Instrument No. 20081168418.

significant hurdles in establishing that their Claims are Sr. Secured Mechanic's Lien Claims, entitled to priority over the Encumbrances of the Lehman VD Lenders, such that such Holders of Mechanic's Lien Claims against Group I Debtors (other than SunCal Summit Valley) should consider (i) waiving any contention of holding a Secured Claim and (ii) electing the Lehman Distribution Enhancement as a Holder of either a Class 6 Reliance Claim or Class 7 General Unsecured Claim.

If a Creditor with a Mechanic's Lien Claim, that it contends is a Secured Claim (which means such Claim must be senior to the Secured Claim against the applicable Plan Project of the applicable Lehman VD Lender) waits to find out after an objection to such Claim whether its Claim will be Allowed as having the status of a Sr. Secured Mechanic's Lien Claim, General Unsecured Claim or Reliance Claim, then, the Plan offers no opportunity at such later point for the Creditor to avail itself of the Lehman Distribution Enhancement, which, as provided in the Plan, essentially offers Creditors an opportunity on their Ballots to elect to receive an enhanced recovery of (as applicable) up to 49% for Allowed Reliance Claims against Group I Debtors, and up to 4% for Allowed General Unsecured Claims against Group I Debtors.

Thus, each listed Holder of a Mechanic's Lien Claim relating to the Plan Projects of Group I Debtors will be provided a Ballot on which such Holder may elect to vote its Claim as a General Unsecured Claim or a Reliance Claim, as applicable, and will have the opportunity to elect to receive the Lehman Distribution Enhancement in respect of its Allowed Claim (in exchange for the Creditor's Assignment / Release for Lehman). To elect this option, the Creditor must and would waive all contentions that its Claim is a Secured Claim against the applicable Plan Project. If such Holder does not elect to vote its Claims as General Unsecured Claims or Reliance Claims, thereby electing to proceed as a Holder of Mechanic's Lien Claims, then if it is subsequently determined that such Claims are not Sr. Secured Mechanic's Lien Claims, such Holder will not be eligible to receive the Lehman Distribution Enhancement.

Some of the Mechanic's Lien Claims are Bond-Backed Claims and may be paid or otherwise settled by the applicable Bond Issuer.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

### 4.2.5    Alleged Litigation Claims And Challenges Against The Lehman Creditors Asserted Currently By The Voluntary Debtors And Formerly By The Trustee.

#### (a)    Introduction.

The Voluntary Debtors contend and the Trustee, prior to the Plan, contended that the Debtors' Estates or certain of the Debtors' Creditors have substantial causes of action and challenges against the Lehman Creditors with respect to the loans and Claims of the Lehman Creditors that would result either in the subordination of the Claims of the Lehman Creditors against the Debtors to payment in full of all, or a substantial portion of the Debtors' Creditors, the avoidance or setting aside of various Claims and Liens that the Lehman Creditors assert against certain Debtors and/or recovery of substantial monies by one or more of the Debtors' Estates from the Lehman Creditors. Those claims and challenges fall into five general categories:  (i) the Equitable Subordination Claims; (ii) the Fraudulent Transfer Claims; (iii) the Preference Claims; (iv) the Breach of Fiduciary Duty Claims; (iv) the Section 506(d) Claims; and (v) the Challenge to the Lehman Creditors' Proofs of Claims.  The nature of these claims and the Lehman Creditors' analysis of their merits and likely value is discussed in this Disclosure Statement Section 4.2.5.

Additionally, the Voluntary Debtors have asserted (1) that they and certain creditors of the Trustee Debtors intend to file a motion to disallow certain claims of Lehman Commercial and Lehman ALI pursuant to Bankruptcy Code § 502(d) of the Bankruptcy Code; (2) that the Estates have recoupment and setoff rights against the Lehman Creditors that they assert may be exercised without relief from the automatic stay from the New York Bankruptcy Court and contend are based upon the alleged pre-petition assumption by the Lehman Creditors of various liabilities incurred in the development of the Projects; and (3) that certain Lehman Related Parties (i) during the post-petition period, concealed the prepetition sale of certain loans to Fenway Capital and made misrepresentations with respect thereto, and (ii) improperly asserted that Lehman Commercial's automatic stay barred actions in the Voluntary Debtors' chapter 11 cases relating to two of such loans (because the Voluntary Debtors contend that Lehman Commercial did not own any interest therein and thus, the stay was inapplicable).  The Lehman Creditors dispute all such allegations and are or will vigorously contest their assertion.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**(b)    The Equitable Subordination Claims Relating to the Lehman Creditors' Claims.**

The previously Filed 2009 SunCal Disclosure Statement sets forth the basis upon which the Elieff Proponents believe that the Lehman Creditors' Claims could be "equitably subordinated" to the claims of all other unsecured creditors, such that distributions that would otherwise be made by the Trustee or Voluntary Debtors to the Lehman Creditors would instead be redistributed to junior, unsecured creditors of the Debtors.

As the primary basis for equitable subordination, the Debtors allege that, beginning in or about August of 2007, the Lehman Creditors took over effective control of all of the material aspects of the operations of the Debtors' projects, without regard as to whether a Lehman Related Party was the lender or whether a Lehman Related Party was an equity member.  The Lehman Creditors, they allege further, imposed a "new control and approval structure" for payments pursuant to which they scrutinized the budget, met weekly and decided what would be paid and what would not.  At the same time, however, the Debtors allege that even though payables were being scrutinized on a line item basis, representatives of the Lehman Creditors were urging the Debtors not to slow down work, and were promising that all vendors would be paid in order to keep the projects moving forward; this naturally caused the Debtors to incur substantial unsecured vendor claims, which went unpaid when the Lehman Creditors broke their purported promise to pay all payables. The Debtors further allege that the Lehman Creditors acted in bad faith when, after signing a Restructuring Agreement in mid-2008 that contemplated a further settlement agreement, they declined to consummate that settlement in August-September 2008 (the month that Lehman Commercial and LBHI filed the largest bankruptcy cases in history).

These allegations form the basis of the action commenced by the Voluntary Debtors on January 6, 2009 (the "ES Action").  On February 3, 2009, the Debtors filed a First Amended Complaint, which added the Trustee Debtors as co-plaintiffs and named OVC Holdings, Northlake Holdings and various other entities as additional defendants (collectively with ALI, the "ES Defendants").  Lehman Commercial was added as a defendant in the Second Amended Complaint, filed March 26, 2009.

The Lehman Creditors believe that the equitable subordination claims have no merit,

and that they face legal, factual and practical hurdles that the Debtors are unlikely to surmount and that the Elieff Proponents have failed to disclose, which render improbable any meaningful benefit to creditors from the prosecution of such claims.

First, generally, equitable subordination as a matter of law is a rare and limited remedy. Courts refer to equitable subordination as an "extraordinary remedy" that must be applied sparingly. As a basic rule, as the Elieff Proponents acknowledge, equitable subordination requires findings that (a) the claimant whose claim is sought to be equitably subordinated engaged in some type of inequitable conduct, (b) the conduct injured creditors, or conferred an unfair advantage on the claimant, and (c) subordination would not be inconsistent with the Bankruptcy Code. A plaintiff carries the burden of proof with respect to each of these elements. The Debtors hope that all of the Lehman Creditors will be deemed "insiders," for otherwise they must prove "gross and egregious misconduct." The Lehman Creditors believe that the Debtors would not be able to meet their burden of proving that the Lehman Creditors were insiders.

Second, factually, the Lehman Creditors believe that the Debtors will not be able to prove misconduct of any kind, much less gross and egregious misconduct. The Debtors' own allegations signal their dilemma. They allege that the Lehman Creditors imposed a strict new structure for the control and approval of payables (thereby taking control from the Debtors), while at the same time alleging that the Lehman Creditors were urging work to continue and making  blanket promises of payment. Instead, the evidence will show that each payable of the Debtors that the Lehman Creditors were willing to fund was documented in a Protective Advance Notice that (a) specified the payable, (b) stated that the Lehman Creditors were advancing funds to pay it solely to protect their collateral, and (c) stated clearly that by doing so, the Lehman Creditors were not agreeing to advance funds for any other obligations. Such facts will not support equitable subordination.

Third, as a matter of law, equitable subordination is a creditor specific remedy, as the Debtors originally represented (and which the Elieff Proponents still imply). Equitable subordination can only be determined on a creditor-by-creditor basis, based on specific conduct by a specific Lehman Creditor that caused a specific injury to a specific creditor. Thus although the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Elieff Proponents originally posited that the Lehman Creditors' Claims would be subordinated to the Claims of all other unsecured creditors, such blanket subordination was legally impossible. Accordingly, the Court dismissed the equitable subordination claim in the Second Amended Complaint on June 11, 2009, on the basis that the complaint "fail[ed] to either a) tie specific defendants to particular inequitable conduct or b) state sufficiently the basis for imputing the conduct of the nonparty Lehman to the defendants" and also "fail[ed] to sufficiently identify the alleged injured creditors, at least by category/class."  However, there are 26 separate Debtors, representing 19 development projects scattered throughout California.  Contractors in San Clemente could not rely on alleged promises made to contractors in Oakland.  Indeed, no individual contractor could reasonably rely on promises made to any other contractor.  Further, although the alleged false funding promises are vaguely said to relate back to the Restructuring Agreement, not all of those projects, Debtors or Lehman Creditors were even part of that agreement.

Fourth, the equitable subordination claims are not bolstered by the allegations of post-petition misconduct by the Lehman Creditors added by the Debtors to their Third Amended Complaint, filed July 10, 2009 and partially dismissed by the Court, and Fourth Amended Complaint, filed March 26, 2010.  The Debtors allege that Lehman Commercial engaged in inequitable conduct that injured creditors, post-petition, by "falsely" invoking its automatic stay between the Petition Date and June 30, 2009, when the Court issued a tentative ruling that Fenway Capital held certain of the Lehman Creditors' Claims (subject to a repurchase right, as described in subsection (f) below).  That order was eventually entered on October 2, 2009 and is now on appeal.

The Lehman Creditors contend that the Debtors' position is frivolous for numerous reasons, including:  (a) the Bankruptcy Appellate Panel ruled on December 15, 2009 that the equitable subordination claims violated the Lehman Commercial automatic stay, and this Court dismissed Lehman Commercial from the Third Amended Complaint on such basis; (b) there was never a time when Lehman Commercial did not still hold Claims protected by its automatic stay; (c) in any event, the post-petition representations that the Lehman Creditors owned all of their Claims were correct and well-justified when made; (d) the Lehman Creditors' representations were based on a good faith belief that they were, and continue to be, consistent with existing law and facts; and

moreover (e) the Debtors' argument cannot support equitable subordination even conceptually, since post-petition conduct is legally irrelevant to the subordination of some prepetition claims to other prepetition claims. On April 12, 2010, the Lehman Creditors filed a partial motion to dismiss the Fourth Amended Complaint (as well as a motion to strike portions of the same). Those motions are pending.

Sixth, prosecution of the ES Action is costly and time-consuming. The Debtors previously estimated that the ES Action will cost between $3 and $4 million to prosecute. It is not clear how the Debtors' Estates could fund the anticipated costs and expenses. Further, even if the ES Action were not stayed against Lehman Commercial, prosecuting the claims to finality would require years of litigation and appeals, even if the Debtors were to overcome all of the legal and factual hurdles described herein.

Although the Lehman Creditors believe that the pending challenges to their Claims are without merit, they also are aware that, despite their holding Liens securing obligations that substantially exceed the value of the Plan Projects, the Debtors have no ability to pay in any foreseeable time the full amount of the debt owed under the Lehman Loans. Thus, the Lehman Creditors want immediate ownership of their collateral. As discussed herein, the Plan would result in the conveyance of the Plan Projects to the Lehman Nominees and a release from the Plan Debtors' Estates for the Lehman Released Parties, while permitting individual creditors to elect between preserving their whatever claims they themselves have against the Lehman Released Parties or receiving payments in exchange for a release of such claims.

**(c)    The Voluntary Debtors' Assertions regarding Fraudulent Transfer Actions Against the Lehman Creditors Arising under Various Cross-Collateralized Lehman Loans.**

The Voluntary Debtors contend (and the Trustee had contended) that certain Claims and Liens of the Lehman Creditors can be set aside and avoided pursuant to Bankruptcy Code sections 544, 548, 502(d) and 551 on the theory that at least part of the Claims and Liens identified therein relate to monies received by a Debtor other than the Debtor with a secured obligation to repay those monies. The Elieff Proponents contend the Lehman Creditors may only assert a Claim and Lien against a particular Debtor to the extent that particular Debtor actually received monies on

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

account of the subject Claim (rather than to the extent the Debtor guaranteed and secured repayment of monies received by an Affiliate).

There are numerous problems with this theory of recovery, not the least of which is that a guarantee or co-obligor obligation (and the lien securing such obligation) based upon monies advanced to an Affiliate can only be set aside if the Debtor incurring such obligation or granting such lien was insolvent, or was rendered insolvent (as insolvency is defined in section 544 and applicable state law or section 548) by virtue of incurring the secured obligation at the time the obligation and lien were incurred.  The 2009 SunCal Disclosure Statement does not allege that the subject cross-collateralization identified therein was incurred by any Debtor at a time when the Debtor was, or was thereby rendered, insolvent.  The Lehman Creditors believe that in all, or substantially all instances of cross-collateralization identified by the Elieff Proponents, the Debtor incurring the secured obligation was not insolvent, nor was it rendered insolvent (as such term is defined by applicable law) at the time the Lien and obligation were incurred.

Furthermore, the Elieff Proponents concede that the Liens and Claims of Lehman Creditors cannot be set aside to the extent that funds were actually received by the obligor/pledgor. Taking the amount of funds that the Elieff Proponents concede each of the relevant Debtors received and comparing that number with the Debtors' estimate of the value of the related collateral pledged in favor of the Lehman Creditors, it is clear that in only one instance involving a Voluntary Debtor's Project (the Acton Project) is the amount of funds allegedly received ($380,000) less than the value of the pledged collateral (in this case, $3.4 million).  Thus, even if the Fraudulent Transfer Claims are valid, they would at best generate a recovery of approximately $3.02 million and then only for the benefit of Creditors of the Acton Estate.  However, as Bankruptcy Code section 550 limits recovery "for the benefit of the estate" and the Lehman Creditors contend that fraudulent transfer claims cannot be prosecuted for the benefit of equity holders, the potential recovery on account of the foregoing Fraudulent Transfer Claims would be capped at no more than approximately $1.4 million, the unsecured claims asserted against the Acton estate according to the 2009 SunCal Disclosure Statement.

Even if the fraudulent conveyance alleged with respect to the cross-collateralization

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

of the SCC Palmdale Loan had merit, the value to the estate of SCC Palmdale is zero, as noted by the Elieff Proponents.  The collateral, SCC Palmdale's Allowed Interest in Palmdale Hills, therefore is worthless.

Likewise, even if other theories alleged against the Lehman Creditors (described in Article 4.5(c) and (d) of the 2009 SunCal Disclosure Statement) were valid and the requisite insolvency could be proven, the Elieff Proponents have conceded that the Claims and Liens of the Lehman Creditors are valid at least to the extent of proceeds received by the obligor/pledgor.  As the proceeds received by TD Plan Debtors SunCal Oak Knoll and SunCal Torrance ($103.5 million and $45 million, respectively) exceed the estimate from SunCal of the value of the underlying pledged collateral ($48 million and $25 million, respectively), the Fraudulent Transfer Claims identified in Articles 4.5(c) and (d) of the 2009 SunCal Disclosure Statement are without merit.

Finally, with respect to the claims identified in the SunCal Disclosure Statement relating to the Interim Loan Agreement, assuming insolvency as of the date such obligations were incurred can be proved, the maximum potential liability of the Lehman Creditors would be approximately $1.5 million as to the Tesoro Estate and $4.5 million as to the Del Rio Estate.  However, based on the Elieff Proponents' own numbers, the unsecured claims at those estates total approximately $290,000 and $270,000, respectively, therefore capping the maximum potential recovery on account of such alleged Fraudulent Transfer Claims at approximately $560,000.

While the Lehman Creditors believe that the Fraudulent Transfer Claims outlined in the SunCal Disclosure Statement are without merit, making assumptions most favorable to the Debtors, the maximum aggregate exposure of Lehman Creditors to such Fraudulent Transfer Claims is no more than approximately $2 million, and the probable value of litigation on such claims significantly less.

**(d)      Alleged Preference Claims Against the Lehman Creditors.**

The Elieff Proponents assert that Delta Coves, SunCal Century City and SunCal Marblehead Heartland Master LLC made prepetition transfers in the one year preceding the Petition Date to Lehman Creditors in the sums of approximately $6.5 million, $10.6 million, and $3.4 million, respectively.  The 2009 SunCal Disclosure Statement asserts, without any further support,

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

that these payments are recoverable as preferences.  However, the Lehman Creditors contend that

there is absolutely no factual support in the 2009 SunCal Disclosure Statement to support these

contentions.  In particular, it would be necessary for the plaintiff to establish balance sheet

insolvency (as required by Bankruptcy Code section 547) in order to be able to maintain a preference

recovery.  Furthermore, and perhaps more importantly, the Lehman Creditors assert (or in the case of

SunCal Century City, at all relevant times asserted) validly perfected first priority security interests

and deeds of trust in and to all of the material assets of the Debtors that the Elieff Proponents

contend may have made alleged preferential transfers.  Under such circumstances, a transfer of some

or all of the collateral of a validly perfected secured creditor (even an undersecured creditor) cannot

constitute a recoverable preferential transfer as it does not have the effect of depleting assets

otherwise available to pay unsecured creditors.  Furthermore, as noted above, the Lehman Creditors

contend that pursuant to Bankruptcy Code section 550, preferences can only be recovered for the

benefit of unsecured creditors of the transferor.  The Lehman Creditors believe that for these, and

other reasons that will be asserted at the appropriate time, the preference claims that have been

alleged against them are wholly, or largely, without merit and are unlikely to result in Creditors

receiving a meaningful recovery.

Finally, the status of any preference claim against Lehman Commercial (which is

itself a debtor in a chapter 11 proceeding before the United States Bankruptcy Court for the Southern

District of New York) is subject to the treatment in that chapter 11 case.  Specifically, there is a

distinct possibility that such a claim may be treated as a general unsecured claim in Lehman

Commercial's bankruptcy, which claim is subject to an uncertain recovery.

The Elieff Proponents also contend that the foreclosure by Lehman ALI on its second

priority deed of trust against the Pacific Point Project in August 2008 constituted a preferential

transfer because there was no equity value supporting the second priority deed of trust.

"Specifically, the fair market value of the Pacific Point Project was and remains approximately $25

million and the alleged obligations securing the first deed of trust was approximately $100 million."

However, based upon the Elieff Proponents' own assertions, it is clear that the bankruptcy estate of

SJD Partners (and in turn, the unsecured creditors of that Estate) were not deprived of any value by

virtue of the alleged foreclosure.  Indeed, based upon the 2009 SunCal Disclosure Statement,

Lehman ALI, as the beneficiary under the first deed of trust, is undersecured by more than $75

million.  Under these circumstances, no valid preference claims can be asserted against the Lehman

Creditors based on the foregoing transactions.

     **(e)**  **Alleged Fraud, Breach of Fiduciary Duty and Other Potential
Litigation Claims Against the Lehman Creditors.**

     Article 4.7 of the 2009 SunCal Disclosure Statement purports to set forth further

claims against the Lehman Creditors, based upon the Interim Loan Agreement, the Restructuring

Agreement of May 2008, and the Pacific Point Foreclosure.  However, the narrative contained in the

2009 SunCal Disclosure Statement does not state any claim for relief or theory of recovery against

the Lehman Creditors based upon the alleged facts and, in reality, asserts nothing different from the

material allegations set forth in the Equitable Subordination Claims (more fully discussed in

Article 4.5).

     **(f)**  **Challenge to Proofs of Claim with Respect to the Claims of the
Lehman Creditors.**

     On or before the bar date for filing Proofs of Claim, the Lehman Creditors Filed

Proofs of Claim on account of all of the Lehman Loans.  All or portions of seven of the outstanding

loans to the Lehman Creditors (the "Repurchase Lehman Loans") were subject to repurchase

agreements with Fenway Capital.  The obligations under the subject repurchase agreements with

Fenway Capital had been guaranteed by the ultimate parent and Affiliate of the Lehman Creditors,

Lehman Brothers Holdings Inc. ("LBHI").  In connection with the bankruptcy cases of LBHI and

Lehman Creditor, Lehman Commercial, the subject repurchase agreement was unwound pursuant to

an agreement to which Fenway Capital and LBHI also were parties.  As a result, Lehman

Commercial presently holds whatever interests in the subject loans formerly were held by Fenway

Capital, subject to certain claims and interest of LBHI.

     Based upon the original repurchase transactions, the Debtors moved to strike certain

of the Proofs of Claim Filed by the Lehman Creditors on the basis that they allegedly did not own

the Repurchase Lehman Loans when the Proofs of Claim were Filed.  The Lehman Creditors

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

opposed the motion, asserting that they did then own the Repurchase Lehman Loans because the repurchase agreements with Fenway Capital were transfers for security only, and that they had the power and authority to File the related Proofs of Claim.

The Bankruptcy Court held a hearing on the foregoing motion to strike on June 30, 2009.  At that hearing, the Bankruptcy Court determined, over the objection of the Lehman Creditors, that the Repurchase Lehman Loans had actually been "sold" to Fenway Capital (rather than having been pledged to Fenway Capital as collateral for a loan, as asserted by the Lehman Creditors).  The Court entered an order on the foregoing issue on October 2, 2009 and the Lehman Creditors appealed such Order.  A hearing on whether the Lehman Creditors were authorized to File Proofs of Claim as agent for Fenway Capital was held on September 22, 2009 and, on December 21, 2009, the Court issued its Order Regarding Lehman Creditors' Authority To File Proofs Of Claim As Agents Of Fenway Capital, LLC (the "Authority Order"), pursuant to which the Court held, *inter alia*, that "the Lehman Creditors had the requisite authority to file the Proofs of Claim on behalf of Fenway [Capital] as Fenway [Capital]'s Agents pursuant to Rule 3001(b) of the Federal Rules of Bankruptcy Procedure."  The Debtors have appealed.

At the same time, the Lehman Creditors believe, and the Voluntary Debtors continue to dispute, that the Bankruptcy Court, in all events, recognized that not all of the relevant loans ever were Repurchase Lehman Loans.

Even were the appeals all decided adversely to the Lehman Creditors, the Lehman Creditors contend that the only effect would be that the Lehman Creditors would be unable to assert the Lehman Creditor Deficiency Claims against the TD Plan Debtors' Estates.  The Lehman Creditors believe that it is well established and accepted that Creditors need not File Proofs of Claim to preserve their Liens such that even if there were adverse determinations on appeal (such that if it were determined that Fenway Capital owned all equitable interests in the subject Claims and failed to File any timely Claims), such circumstance would not in any way invalidate or impair the subject Liens or any of the rights and remedies relating to such Liens other than the ability to obtain an unsecured deficiency claim.

(g)    **The Debtors' Disputes Relating to the Allowed Secured Claims of Fenway Capital Pursuant to Bankruptcy Code Section 506.**

Bankruptcy Code section 506(a) provides that an asserted secured claim is only an Allowed Secured Claim to the extent of the value of such Creditors' interest in the Estate's interest in such property.  Bankruptcy Code section 506(d) provides that to the extent a lien secures a claim against a debtor that is not an allowed secured claim, such lien is void subject to certain exceptions. (One such exception where the lien is not voided is where the underlying claim is not Filed, as was alleged as to the Repurchase Lehman Loans).  Finally, Bankruptcy Code section 551 provides that any liens that are void under section 506(d) are preserved for the benefit of the applicable debtor's estate.

The Voluntary Debtors contend that based upon the Lehman Creditors' appraised values of certain Voluntary Debtors' Projects, there is no value to the collateral supporting certain of the Lehman Creditors' Liens against SunCal I, SunCal III, SunCal Bickford and SCC/Palmdale (all Voluntary Debtors).  SunCal I, SunCal III, SunCal Bickford and SCC/Palmdale, on the one hand, and Lehman ALI and Lehman Commercial, on the other hand, entered into a stipulation resolving the valuation of such Liens, which, as of September 10, 2010, was approved both by the Bankruptcy Court in these Cases and by the New York Bankruptcy Court in the New York Bankruptcy Cases. Although collateral values being less than these liens is unfortunate for all Creditors, (a) as to SunCal Bickford, Lehman VD Lenders hold other more senior Liens on the same collateral that already are in excess of such collateral's value, (b) as to SCC/Palmdale's interest in Palmdale Hills, Lehman VD Lenders hold other senior Liens on the Project of Palmdale Hills, exhausting its value, (c) as to SunCal I, the Lehman VD Lenders are owed over $343 million and likely would dilute the Distributions due to any other Creditors, and (d) SunCal III is not believed to hold any real or personal property from which to obtain a Distribution for any Creditor.

**4.3**    **Significant Events In The Debtors' Chapter 11 Cases.**

**4.3.1    Voluntary Debtors.**

Since the Petition Dates, beginning in November 6, 2008, the seventeen (17) Voluntary Debtors have continued to operate as a "debtors-in-possession" subject to the supervision of the Bankruptcy Court.  The Voluntary Debtors are authorized to operate their businesses in the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

ordinary course during the Chapter 11 proceedings. Transactions outside the ordinary course of business must be approved by the Bankruptcy Court.

The Voluntary Debtors' Cases are jointly administered with each other pursuant to orders entered on November 10, 2008 and November 26, 2008.  The Voluntary Debtors' Cases are being jointly administered with the Trustee Debtors' Chapter 11 Cases pursuant to an order entered on March 11, 2009.

The Voluntary Debtors have employed Winthrop Couchot Professional Corporation as their general insolvency counsel, Morgan Lewis & Bockius LLP as their special litigation counsel for the Southern District of New York and Miller Barondess, LLP as their special litigation counsel.

The Voluntary Debtors' Committee has employed Irell & Manella LLP as its counsel pursuant to an order entered on February 13, 2009.

### 4.3.2   Trustee Debtors.

Orders for Relief were entered in the involuntary cases beginning on January 6, 2009. The Trustee Debtors are represented by their duly-appointed Chapter 11 trustee, Steven M. Speier, pursuant to orders of the Bankruptcy Court entered on January 15, 2009.

The Trustee has employed the Lobel Firm as the Trustee's general insolvency counsel and Miller Baroness LLP as special litigation counsel.

The official committee in the Trustee Debtors' Cases has employed Weiland, Golden, Smiley, Wang, Ekvall & Strok, LLP as its counsel.

### 4.3.3   The Debtors' Motions for Relief from Stay in the Lehman Commercial Chapter 11 Proceedings.

On November 10, 2008, the Debtors Filed a motion for an order modifying the automatic stay in the Lehman Commercial Bankruptcy Proceeding to allow the Voluntary Debtors to administer their own Cases to the extent that such Cases, and the relief requested by such Debtors therein, may affect the rights of Lehman Commercial. The Voluntary Debtors also requested the court to allow the Voluntary Debtors to proceed to obtain post-petition debtor-in-possession financing on a priming lien basis that would subordinate Lehman Commercial's Claims and Liens arising from the Ritter Ranch Loan Agreement and the SunCal Communities I Loan Agreement to

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

those of a proposed debtor-in-possession lender. Lehman Commercial opposed the motion on November 18, 2008 and the objection was joined by the Lehman Commercial Official Creditors' Committee. The motion was denied, without prejudice, by the New York Bankruptcy Court pursuant to an order entered on November 21, 2008.

On April 21, 2010, the Debtors filed a motion in the New York Bankruptcy Court seeking relief from Lehman Commercial's automatic stay to, *inter alia*, pursue the ES Action against Lehman Commercial and to prosecute a plan seeking to, *inter alia*, equitably subordinate Lehman Commercial's Claims.  The Trustee subsequently withdrew from the motion.  The Voluntary Debtors further sought a ruling that LBHI's automatic stay does not apply to the foregoing efforts, but if it did, relief from stay should be granted.  The Voluntary Debtors' motion was denied, without prejudice, on May 12, 2010.  On May 28, 2010, the Voluntary Debtors filed a motion in the New York Bankruptcy Court, seeking a stay of that Court's ruling pending appeal.  On June 16, 2010, the Voluntary Debtors' motion was denied.  On June 17, 2010, the Voluntary Debtors filed a motion in the United States District Court for the Southern District of New York, again seeking a stay pending appeal.  On June 21, 2010, the motion was denied.  On August 27, 2010, the United States District Court for the Southern District of New York affirmed the New York Bankruptcy Court's May 12, 2010 ruling, which thereafter was affirmed on December 7, 2010 by the United States Court of Appeals for the Second Circuit.

### 4.3.4    Certain of the Voluntary Debtors' Motion for Surcharge and Use of Cash Collateral.

On January 16, 2009, seven of the Voluntary Debtors Filed a motion seeking an order authorizing Palmdale Hills to use and surcharge, pursuant to 11 U.S.C. § 506(c), and/or use the purported cash collateral of Lehman Commercial arising from the Ritter Ranch Loan Agreement, pursuant to 11 U.S.C. § 363(c)(2), in order to pay for the reasonable and necessary maintenance expenses required to preserve the value of such Voluntary Debtors' Projects that are subject to deeds of trust and other security held by Lehman Commercial.

Lehman Commercial objected to the motion and subsequently Filed a motion in the New York Bankruptcy Court requesting the New York Bankruptcy Court to enforce its automatic

1  stay as to the motion. The motion was taken off calendar prior to any ruling by the New York

2  Bankruptcy Court.

3  **4.3.5    Lehman Commercial's Motions for Relief from the Automatic Stay**

4  **Against Certain of the Voluntary Debtors' Projects.**

5  On January 23, 2009, Lehman Commercial and Lehman ALI Filed in the Bankruptcy

6  Court various motions for relief from the automatic stay against Palmdale Hills, SCC/Palmdale,

7  SunCal Beaumont, SunCal Summit Valley, SunCal Emerald, SunCal Bickford, Acton Estates,

8  SunCal Johannson, and SCC Communities I (the "Lehman Creditors' Stay Motions") pursuant to

9  which Lehman Commercial and Lehman ALI sought to foreclose on, *inter alia,* their deeds of trust

10  encumbering certain of the Debtors' Projects.

11  On February 4, 2009, the Voluntary Debtors Filed an opposition to Lehman

12  Commercial and Lehman ALI's requests for relief from stay.  On February 13, 2009, Lehman

13  Commercial and Lehman ALI Filed a reply to the Voluntary Debtors' opposition primarily asserting

14  that the ES Action would violate the automatic stay in the bankruptcy cases of Lehman Commercial

15  and LBHI.

16  On March 10, 2009, the Bankruptcy Court entered an order denying the Lehman

17  Creditors' Stay Motion without prejudice. Lehman Commercial appealed the Bankruptcy Court's

18  order.

19  On December 15, 2009, the Bankruptcy Appellate Panel ruled that the ES Action may

20  not proceed unless prosecuted in the bankruptcy cases of Lehman Commercial and LBHI or until

21  stay relief is granted in the bankruptcy cases of Lehman Commercial and LBHI.  The Voluntary

22  Debtors have appealed.  Confirmation of the Plan would moot the appeal as to the VD Plan Debtors.

23  **4.3.6    The Debtors' Filing of the ES Action Against the Lehman Creditors.**

24  (*See* Disclosure Statement Section 4.2.5(b) above.)

25  **4.3.7    Certain Debtors' Filing of the Sales Procedures Motion.**

26  On February 18, 2009, the Trustee for the Trustee Debtors and certain Voluntary

27  Debtors Filed a motion (the "Sale Procedures Motion") seeking approval of overbid procedures for a

28  purchase by D.E. Shaw of a significant portion of the Debtors' assets for $200 million and its

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

purported assumption of certain related bond liabilities personally guaranteed by Elieff.  Although the Sale Procedures Motion indicated that D.E. Shaw would assume the bond liabilities as part of its purchase of the properties, there was no such commitment in D.E. Shaw's commitment letter.  The commitment letter provided that $175 million of the purchase price would be paid in cash and the remaining $25 million would be in the form of an assumption of some of the Debtors' contractual and other obligations.  As part of the Sale Procedures Motion, the Trustee and Debtors seeking relief conditioned the sale on the disallowance of the Lehman Creditors' credit bid rights and the transfer of their Liens to the Debtors.

On March 10, 2009, the Bankruptcy Court commenced a hearing on the Sale Procedures Motion.  At that hearing, the Bankruptcy Court held that the automatic stay in the Lehman Commercial Bankruptcy Proceeding did not apply to the Sales Procedures Motion and continued the Sales Procedures Motion to March 20, 2009.

At the March 20, 2009 hearing, the parties agreed to continue the Sale Procedures Motion to allow settlement discussions to take place.  The Sale Procedures Motion was continued from time to time.

> **(a)    Lehman Commercial's Stay Assertion and the Sales Procedure Motion.**

On March 9, 2009, the Trustee, SCC Communities, Del Rio, and Tesoro Filed emergency motions for an order that the automatic stay in the Lehman Commercial Bankruptcy Proceeding does not apply to the Sales Procedures Motion.

On March 10, 2009, Lehman Commercial, Lehman ALI, Northlake Holdings and OVC Holdings Filed responses to the emergency motions, asserting that Lehman Commercial's automatic stay prevented the Bankruptcy Court from hearing the Sales Procedures Motion.

On March 10, 2009, the Bankruptcy Court held that the automatic stay in the Lehman Commercial Bankruptcy Case does not apply to the Sales Procedures Motion.

> **(b)    Danske Bank's Intervention into the Sales Procedures Motion.**

On March 25, 2009, Danske Bank Filed a supplemental response to the Sales Procedures Motion. Danske Bank's supplemental response asserts various allegations, including the allegations that Danske Bank has a first-priority deed of trust on the 10000 Santa Monica Project by

the virtue of the SunCal Century City Loan Agreement and related loan documents and that the

Secured Claim and Lien arising from the SunCal Century City Loan Agreement and related loan

documents are not subject to a bona fide dispute because there has been no allegation of wrongdoing

by Danske Bank and that Danske Bank is a holder in due course that effectively cuts off any

defenses to the loan based on the Lehman Creditors' alleged inequitable conduct.

On April 1, 2009, the Debtors Filed a reply to Danske Bank's supplemental response

asserting that Danske is not a holder in due course and that Danske Bank took the assignment of the

disputed loan subject to all defenses thereto, including the defense of equitable subordination

described below.

In August 2009, the Sales Procedures Motion was modified to exclude the 10000

Santa Monica Project owned by SunCal Century City and to reduce the purchase price to $150

million pursuant to a tentative settlement agreement between Danske Bank and the Trustee.  Based

upon disclosures made by the Trustee, pursuant to that settlement agreement, the Trustee will convey

the 10000 Santa Monica Project to Danske Bank in exchange for $5.3 million.  The Trustee has

further disclosed that the settlement agreement provides that SunCal Century City will retain any

right it has, or may have, to pursue any Avoidance Actions against the Lehman Creditors with

respect to the 10000 Santa Monica Project and SunCal Century City.

**(c)    Lehman's Disclosure of the Repurchase Agreement Involving Certain Loans with the Debtors.**

On or about April 15, 2009, the Lehman Creditors provided a letter to the Debtors

disclosing the Repurchase Lehman Loans.

**(d)    The Modifications to the Sales Procedure Motion.**

The Sales Procedures Motion was thereafter modified to include a purchase of the

Assets of only the Trustee Debtors and the D.E. Shaw proposed aggregate purchase price was

reduced from $200 million to $195 million.

**(e)    The Continuance of the Sales Procedure Motion.**

As described more fully below in Disclosure Statement Section 4.3.8(b), on

December 10, 2009, the Lehman Creditors filed the Stipulation Authorizing Use of Cash Collateral

and Approving Financing For Covered Professional Expenses and Granting Administrative Expense Claims by and among Lehman ALI, Northlake Holdings, and OVC Holdings, on the one hand, and the Trustee, and a joint motion to approve such stipulation. Pursuant to such stipulation, the Lehman Creditors and the Trustee agreed, among other things, to continue the Sale Procedures Motion. Pursuant to the order entered by the Bankruptcy Court on December 17, 2009, the Court ordered that the Sale Procedures Motion will be continued to a date following the conclusion of the confirmation hearing(s) in connection with any plan of reorganization or liquidation in these Cases.

### 4.3.8    The Lehman Administrative Loans.

#### (a)    The Initial Stipulation.

At a hearing on March 20, 2009, the Bankruptcy Court approved a stipulation (the "April 2009 Financing Stipulation") among Lehman ALI, Palmdale Hills, SunCal Emerald, SunCal Bickford, Acton Estates, SunCal Oak Valley, SunCal Heartland, SunCal Northlake, SunCal Marblehead, SunCal Century City, SunCal PSV, Delta Coves, and SunCal Oak Knoll, pursuant to which each of the foregoing Debtors was authorized to borrow from Lehman ALI and Lehman ALI agreed to make individual loans in an aggregate amount equal to $1,790,572 for the purposes of paying the costs and expenses provided in their 30-day budgets and for paying up to $250,000 of certain professional expenses limited to settlement efforts. The order approving such stipulation was entered on April 17, 2009. The loan proceeds were used to pay for the most urgent and critical public health and safety issues on certain of the Projects. The April 2009 Financing Stipulation provided Lehman ALI superpriority administrative status in each of the Debtor borrowers' Estates on account of such loans, and such loans also have priming lien status on all of the borrowing Debtors' Assets with the exception of SunCal Century City in which such loans have junior priority.

#### (b)    The Subsequent Stipulations Regarding Use of Lehman Creditors' Cash Collateral and/or Provision by the Lehman Creditors of Secured or Administrative Loans.

The Lehman Creditors, the Trustee, and the Voluntary Debtors, as applicable, subsequently have entered into additional stipulations providing for financing by the Lehman Creditors and/or consent to the use of the Lehman Creditors' cash collateral.

The following is a breakdown of the VD Plan Debtors' loans (approximate, unpaid

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

net amount as of March 28, 2011) from the Lehman Creditors under the applicable financing stipulations and the sum of the Lehman Creditors' Administrative Claim for monies advanced after the Petition Dates:

| LEHMAN DIP LOAN SUMMARY | |
| --- | --- |
| **VD PLAN DEBTOR NAME** | **LEHMAN ADMINISTRATIVE LOAN TOTAL** |
| Acton Estates | $5,315 |
| SunCal Bickford | $12,754 |
| Palmdale Hills | $45,930 |
| **Total** | **$74,222** |

The following summarizes the various stipulations (including those affecting the Trustee Debtors):

(i)     *Amended Stipulation Pursuant to 11 U.S.C. §§362, 363, 364, and 507: (1) Approving Senior Secured Superpriority Postpetition Financing; (2) Granting Liens and Providing Superpriority Administrative Expense Status; and (3) Modifying the Automatic Stay to the Extent Necessary* (the "December 2009 Trustee Debtor Financing Stipulation"), by and between Lehman ALI, on the one hand, and the Trustee on behalf of certain of the Trustee Debtors as borrowers thereunder, on the other hand, dated December 8, 2009.  Pursuant to the December 2009 Trustee Debtor Financing Stipulation, each of the Trustee Debtor borrowers was authorized to borrow from Lehman ALI and Lehman ALI agreed to make individual loans in an aggregate amount equal to $2,124,937.00 for the purposes of paying the health and safety costs and expenses provided in their 120-day budgets.  The borrowers' obligations under such stipulation are secured by first priority security interests and liens and superpriority claims (junior only to the claims specified under the December 2009 Trustee Debtor Financing Stipulation), and will be treated as administrative expense claims owed to Lehman ALI.  The December 2009 Trustee Debtor Financing Stipulation was approved by the Bankruptcy Court on an interim basis by the entry of an interim order on November 20, 2009 and on a final basis by the entry of a final order on December 17, 2009.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

(ii)     *Stipulation Authorizing Use of Cash Collateral and Approving Financing For Covered Professional Expenses and Granting Administrative Expense Claims* (the "Initial Professional Fees Funding Stipulation"), by and among Lehman ALI, Northlake Holdings, and OVC Holdings, on the one hand, and the Trustee on behalf of the borrowers thereunder, on the other hand, dated December 8, 2009.  Pursuant to the Initial Professional Fee Funding Stipulation, the Lehman Creditors consented to the use of their cash collateral and Lehman ALI agreed to make administrative loans in the maximum total amount of $2,700,000.00 (the "Initial Professional Fees Funding Amount") to pay certain professional fees and expenses described therein.  Pursuant to the Initial Professional Fee Funding Stipulation, the portions of the Initial Professional Fee Funding Amount used pursuant to the terms of the stipulation will be treated as administrative expense claims owed to the Lehman Creditors, as applicable.  The Initial Professional Fee Funding Stipulation was approved by the Bankruptcy Court by the entry of an order on December 17, 2009.

(iii)     *Stipulation By and Between Lehman ALI, Inc. and Chapter 11 Trustee Pursuant to 11 U.S.C. §§ 362, 363, 364, and 507: (1) Approving Senior Secured Superpriority Postpetition Financing; (2) Granting Liens and Providing Superpriority Administrative Expense Status; and (3) Modifying Automatic Stay to the Extent Necessary* (the "Initial SunCal Oak Knoll Financing Stipulation") by and between Lehman ALI, Inc. and the Trustee on behalf of SunCal Oak Knoll, dated December 7, 2010.  Pursuant to the SunCal Oak Knoll Financing Stipulation, Lehman ALI made a secured loan to SunCal Oak Knoll in an aggregate amount not to exceed $4,400,000.00, (i) $3,701,700.00 of which was and is to be used by the Trustee solely for the purpose of paying the costs and expenses related to the abatement, demolition and securing of the hospital structure and of certain outbuildings and related structures located at the SunCal Oak Knoll Project to be performed by CST Environmental, Inc. ("CST Environmental") and (ii) $698,300.00 of which was and is to be used by SunCal Oak Knoll for the purpose of paying CST Environmental as a critical vendor with respect to prepetition services relating to the SunCal Oak Knoll Project performed by CST Environmental.  The obligations under the SunCal Oak Knoll Financing Stipulation are secured by first priority security interests and liens and superpriority claims, and will be treated as administrative expense claims under the Bankruptcy Code.  The SunCal Oak Knoll Financing

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Stipulation was approved by the entry of an order on January 5, 2010.

(iv)    *Stipulation Pursuant to 11 U.S.C. §§362, 363, and 364: (1) Authorizing the Use of Cash Collateral and Alleged Unencumbered Cash; (2) Approving Postpetition Financing; (3) Providing Administrative Expense Status; and (4) Modifying the Automatic Stay to the Extent Necessary* (the "December 2009 Voluntary Debtor Financing Stipulation") by and between Lehman Commercial, Lehman ALI, Northlake Holdings, OVC Holdings, on the one hand, and certain of the Voluntary Debtors as borrowers thereunder, on the other hand, dated December 8, 2009.  The December 2009 Voluntary Debtor Financing Stipulation was approved by the entry of an order by the Bankruptcy Court on December 17, 2009, and Lehman Commercial's entry into the December 2009 Voluntary Debtors' Stipulation was approved by the New York Bankruptcy Court on December 17, 2009.

Pursuant to the December 2009 Voluntary Debtor Stipulation, the parties agreed to the following financing provisions:

(1)    Use of Cash Collateral Held in Ritter Accounts

Lehman Commercial consented to the use by Palmdale Hills of cash collateral held in a certain escrow account in an amount not to exceed $2,191,008.89 solely for the purpose of (i) paying the costs and expenses attributable to the completion of the construction of certain improvements relating to Elizabeth Lake Road located at the Ritter Ranch Project and (ii) reimbursing Palmdale Hills in the amount of $148,560.63 of "Alleged Unencumbered Cash"[10] used to pay such costs and expenses.  In the event a party other than a Lehman Creditor (or a nominee and/or successor thereof) purchases the Ritter Ranch Project pursuant to a sale of the Ritter Ranch Project under section 363 of the Bankruptcy Code or otherwise, such purchaser is required to repay such portion of the funds used from the subject escrow account as provided for in the stipulation, in

---

[10] Certain of the Voluntary Debtors maintain bank accounts containing cash or cash equivalents, which the Lehman Creditors assert are subject to perfected liens and therefore constitute the Lehman Creditors' "cash collateral" under section 363 of the Bankruptcy Code.  The Voluntary Debtors dispute such contention, and assert that such cash and cash equivalents are not subject to perfected liens of the Lehman Creditors and therefore do not constitute "cash collateral" under section 363 of the Bankruptcy Code.  The cash and cash equivalents held by the Voluntary Debtors, excluding the cash and cash equivalents (i) held by Fidelity National Title Insurance Company ("Fidelity") in the escrow account (the "ELR Escrow Account") pursuant to that certain escrow agreement (as amended and/or supplemented), dated June 25, 2008, by and among Palmdale Hills, Lehman Commercial and Fidelity and (ii) held by California Bank & Trust in account no. 3090340741 (the "Ritter Pledged Account" and, collectively with the ELR Escrow Account, the "Ritter Accounts"), are referred to in the December 2009 Voluntary Debtors' Stipulation as the "Alleged Unencumbered Cash."

1  cash, by depositing such amount in such escrow account upon the closing of the sale of the Ritter

2  Ranch Project.

3     Lehman Commercial also consented to the use by Palmdale Hills of cash collateral

4  held in the Ritter Pledged Account for the health and safety costs set forth in the 120-day budget.

5  Such amounts will be treated as administrative expense claims.

6     Lastly, Lehman Commercial consented to, and Palmdale Hills was authorized to

7  make, individual loans to the respective borrowers (with the exception of Palmdale Hills) from the

8  Ritter Pledged Account, the proceeds of which will be used by the respective borrowers for the

9  purpose of paying the health and safety costs and expenses attributable to each such borrower as set

10  forth in the 120-day budgets.  All amounts borrowed from the Ritter Pledged Account will be treated

11  as administrative expense claims.

12     (2)  Use of Alleged Unencumbered Cash

13     The Lehman Creditors also consented to the use by the borrowers of the Alleged

14  Unencumbered Cash for the purpose of paying the reasonable fees and expenses incurred by

15  professionals retained in the Voluntary Debtors' cases and, at the Voluntary Debtors' option, to

16  make loans to the Trustee Debtors for the purpose of paying the professionals retained in the Trustee

17  Debtors' cases.  In addition, the Lehman Creditors consented to the use by each Voluntary Debtor of

18  Alleged Unencumbered Cash held by such Voluntary Debtor in an amount equal to 10% in excess of

19  the amount allocable to each such Voluntary Debtor in the 120-day budgets.  Further, Lehman

20  Commercial consented to the use by Palmdale Hills of Alleged Unencumbered Cash held by

21  Palmdale Hills in an amount equal to 10% in excess of the aggregate amount of the 120-day budget

22  allocable to Palmdale Hills.  Lastly, Lehman Commercial consented to, and Palmdale Hills was

23  authorized to make, from Alleged Unencumbered Cash held by Palmdale Hills, individual loans to

24  each of the other borrowers in amounts equal to 10% in excess of the amounts allocable to each such

25  borrower in the 120-day budgets.  The amounts used by the borrowers under the December 2009

26  Voluntary Debtor Financing Stipulation will be treated as administrative expense claims provided

27  that the conditions set forth in such stipulation have been satisfied.

28     (v)  *Stipulation to Enable Timely Payment of Post-Petition Real Property Taxes*

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

*By and Between Lehman ALI, Inc. and Chapter 11 Trustee Pursuant To 11 U.S.C. §§ 362, 363, 364, and 507: (1) Approving Senior Secured Superpriority Postpetition Financing; (2) Granting Liens and Providing Superpriority Administrative Expense Status; and (3) Modifying Automatic Stay to the Extent Necessary* (the "Initial Real Property Tax Financing Stipulation"), by and between Lehman ALI, on the one hand, and the Trustee on behalf of certain of the Trustee Debtors as borrowers thereunder, on the other hand, dated April 7, 2010.  Pursuant to the Initial Real Property Tax Financing Stipulation, Lehman ALI agreed, conditioned as set forth in the stipulation, to make available to each of the borrowers thereunder, individual loans in an aggregate amount not to exceed $8.7 million, the proceeds of which will be used by the respective borrowers solely for purposes of paying sufficient amounts to enable them to avoid incurring the 10% penalty for failing to pay the certain post-petition real property taxes by April 12, 2010.  The obligations under the Initial Real Property Tax Financing Stipulation are secured by first priority security interests and liens and superpriority claims (junior only to the claims specified in the Initial Real Property Tax Financing Stipulation), and will be treated as administrative expense claims under the Bankruptcy Code.  The Initial Real Property Tax Financing Stipulation was approved by the Bankruptcy Court on an interim basis by the entry of an order on April 8, 2010 and on a final basis by the entry of an order on April 27, 2010.

(vi)    *Stipulation By and Between Lehman ALI, Inc. and Chapter 11 Trustee Pursuant to 11 U.S.C. §§ 362, 363, 364, and 507: (1) Approving Senior Secured Superpriority Postpetition Financing; (2) Granting Liens and Providing Superpriority Administrative Expense Status; and (3) Modifying Automatic Stay to the Extent Necessary* (the "April 2010 Trustee Debtor Financing Stipulation") by and between Lehman ALI, on the one hand, and the Trustee on behalf of certain of the Trustee Debtors as borrowers thereunder, on the other hand, dated April 22, 2010.  Pursuant to the April 2010 Trustee Debtor Financing Stipulation, Lehman ALI agreed to make available to each borrower thereunder individual loans in an aggregate amount not to exceed $2,185,972.00, the proceeds of which will be used by the respective borrowers solely for purposes of paying the health and safety costs and expenses attributable to each such borrower's project as set forth in the 120-day budgets.  Repayment of such loans is secured by first priority security interests

and liens and superpriority claims (junior only to the claims specified in the April 2010 Trustee

Debtor Financing Stipulation), and will be treated as administrative expense claims.  In addition,

Lehman ALI agreed to pay directly to the applicable insurers the insurance premiums in connection

with the provision of insurance coverage for the borrowers' Projects up to the aggregate amount of

$219,157.00.  The insurance amounts paid by Lehman ALI will be treated as an administrative

expense claims.  The April 2010 Trustee Debtor Financing Stipulation was approved by the

Bankruptcy Court on a final basis by the entry of an order on June 11, 2010.

(vii)    *Stipulation Pursuant to 11 U.S.C. §§ 362, 363, 364, and 507: (1) Authorizing*

*the Use of Alleged Unencumbered Cash; (2) Granting Administrative Expense Claims; and (3)*

*Modifying Automatic Stay to the Extent Necessary* (the "June 2010 Voluntary Debtor Financing

Stipulation") by and between Lehman ALI, Northlake Holdings, OVC Holdings, on the one hand,

and certain of the Voluntary Debtors as borrowers thereunder, dated June 4, 2010.  Pursuant to the

June 2010 Voluntary Debtor Financing Stipulation, the Lehman Creditors agreed to the borrowers'

use of "Alleged Unencumbered Cash"[11] (i) in the amount of $423,172.00 to pay necessary expenses

to maintain the borrowers' Projects pursuant to 120-day budgets and (ii) amounts necessary to pay

the reasonable fees and expenses incurred by professionals retained in the Voluntary Debtors' cases

(subject to the conditions set forth in such stipulation).  In addition, Lehman Commercial consented

to and Palmdale Hills was authorized to make, from Alleged Unencumbered Cash held by Palmdale

Hills, individual loans:  (a) to each of the other borrowers solely for the purpose of paying (i) the

costs and expenses attributable to each such borrower as set forth in the budgets attached to the

stipulation and (ii) the reasonable fees and expenses incurred by professionals retained in the

Voluntary Debtors' cases, including Miller Barondess, LLP (the "Miller Firm"); and (b) by separate

Bankruptcy Court approval, to the Trustee Debtors for the purpose of paying the reasonable fees and

expenses incurred by professionals retained in the Trustee Debtors' cases, including the Miller Firm;

provided, however, that: (a) Palmdale Hills is permitted to make individual loans from Alleged

Unencumbered Cash held by Palmdale Hills only to borrowers or Trustee Debtors that have used,

and accordingly no longer hold, any Alleged Unencumbered Cash; and (b) the use of any Alleged

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

---

[11]   See footnote 10.

Unencumbered Cash for payments to the Miller Firm will be subject to the terms and conditions set forth in the *Order Granting Amended Joint Application for Authority to Employ Miller Barondess, LLP as Special Litigation Counsel* [D.E. 1061].  The amounts used by the borrowers under the June 2010 Voluntary Debtor Financing Stipulation will be treated as administrative expense claims provided that the conditions set forth in such stipulation have been satisfied.  In addition, Lehman ALI agreed to pay directly to the applicable insurers the insurance premiums in connection with the provision of insurance coverage for the borrowers' Projects up to the aggregate amount of $42,218.00.  The insurance amounts paid by Lehman ALI will be treated as administrative expense claims.  The June 2010 Voluntary Debtor Financing Stipulation was approved by the Bankruptcy Court on a final basis by the entry of an order on July 9, 2010.

(viii) *Stipulation By and Between Lehman ALI, Inc. and Chapter 11 Trustee, Pursuant to 11 U.S.C. §§ 362, 363, 364, and 507, (1) Approving Senior Secured Superpriority Postpetition Financing, (2) Granting Liens and Providing Superpriority Administrative Expense Status, and (3) Modifying Automatic Stay to the Extent Necessary* by and between Lehman ALI, on the one hand, and the Trustee on behalf of certain of the Trustee Debtors as borrowers thereunder, on the other hand, dated October 6, 2010 (the "August 2010 Trustee Debtor Financing Stipulation").  Pursuant to the August 2010 Trustee Debtor Financing Stipulation, Lehman ALI agreed to make available to each borrower thereunder individual loans in an aggregate amount not to exceed $2,563,904.00, the proceeds of which shall be used by the respective borrowers solely for purposes of paying the health and safety costs and expenses attributable to each such borrower's project as set forth in the 120-day budgets.  Repayment of such loans is secured by first priority security interests and liens and superpriority claims (junior only to the claims specified in the August 2010 Trustee Debtor Financing Stipulation), and shall be treated as administrative expense claims.  The August 2010 Trustee Debtor Financing Stipulation was approved by the Bankruptcy Court on an interim basis by the entry of an order on October 29, 2010 and on a final basis by the entry of an order on January 5, 2011.

(ix) *Second Stipulation By and Between Lehman ALI, Inc. and Chapter 11 Trustee Pursuant to 11 U.S.C. §§ 362, 363, 364, and 507: (1) Approving Senior Secured Superpriority*

*Postpetition Financing; (2) Granting Liens and Providing Superpriority Administrative Expense*

*Status; and (3) Modifying Automatic Stay to the Extent Necessary (SunCal Oak Knoll, LLC Only)*

(the "Second SunCal Oak Knoll Financing Stipulation") by and between Lehman ALI and the

Trustee on behalf of SunCal Oak Knoll, dated October 6, 2010.  Pursuant to the Second SunCal Oak

Knoll Financing Stipulation, Lehman ALI made a secured loan to SunCal Oak Knoll in an aggregate

amount not to exceed $2,169,800.00 for the purpose of paying the costs and expenses related to the

completion of the remaining demolition and clean-up work to be performed by CST Environmental

on the SunCal Oak Knoll Project..  The obligations under the Second SunCal Oak Knoll Financing

Stipulation are secured by first priority security interests and liens and superpriority claims, and shall

be treated as administrative expense claims under the Bankruptcy Code.  The Second SunCal Oak

Knoll Financing Stipulation was approved on an interim basis by the entry of an order on October

29, 2010 and on a final basis by the entry of an order on January 5, 2011.

(x)      *Second Stipulation to Enable Timely Payment of Post-Petition Real Property*

*Taxes By and Between Lehman ALI, Inc. and Chapter 11 Trustee Pursuant To 11 U.S.C. §§ 362,*

*363, 364, and 507: (1) Approving Senior Secured Superpriority Postpetition Financing; (2)*

*Granting Liens and Providing Superpriority Administrative Expense Status; and (3) Modifying*

*Automatic Stay to the Extent Necessary*, by and between Lehman ALI and the Trustee on behalf of

certain of the Subject Borrowers' Estates as borrowers thereunder, dated November 12, 2010

("Second Real Property Tax Financing Stipulation").  Pursuant to the Second Real Property Tax

Financing Stipulation, Lehman ALI agreed, conditioned as set forth in the stipulation, to make

available to each of the borrowers thereunder, individual loans in an aggregate amount not to exceed

$7.2 million, the proceeds of which shall be used by the respective borrowers solely for purposes of

paying sufficient amounts to enable them to avoid incurring the 10% penalty for failing to pay the

first installment of real property taxes for the year 2010-2011 by December 10, 2010 and the second

installment of real property taxes for the year 2010-2011 by April 10, 2011.  The obligations under

the Second Real Property Tax Financing Stipulation are secured by first priority security interests

and liens and superpriority claims (junior only to the claims specified in the Second Real Property

Tax Financing Stipulation), and shall be treated as administrative expense claims under the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1  Bankruptcy Code.  The Second Real Property Tax Financing Stipulation was approved on a final

2  basis by the entry of an order on December 9, 2010.

3           (xi)    *Stipulation of December 2010 by and Between Lehman ALI, Inc. and Chapter*

4  *11 Trustee, Pursuant to 11 U.S.C. §§362, 363, 364, and 507, (1) Approving Senior Secured*

5  *Superpriority Postpetition Financing, (2) Granting Liens and Providing Superpriority*

6  *Administrative Expense Status, and (3) Modifying the Automatic Stay to the Extent Necessary*, by

7  and between Lehman ALI and the Trustee on behalf of certain of the Subject Borrowers' Estates as

8  borrowers thereunder, dated December 30, 2010 (the "December 2010 Trustee Debtor Financing

9  Stipulation").  Pursuant to the December 2010 Trustee Debtor Financing Stipulation, Lehman ALI

10  may make available, in its sole and absolute discretion, to each borrower thereunder individual loans

11  in an aggregate amount not to exceed $5,200,000.00, the proceeds of which shall be used to pay the

12  costs and expenses attributable to the Estate of each such borrower for the period from December 15,

13  2010 through August 15, 2011 as set forth in periodic budgets to be provided by the Trustee to

14  Lehman ALI and approved by Lehman ALI in its sole and absolute discretion.  Repayment of such

15  loans is secured by first priority security interests and liens and superpriority claims (junior only to

16  the claims specified in the December 2010 Trustee Debtor Financing Stipulation), and shall be

17  treated as administrative expense claims.  The December 2010 Trustee Debtor Financing Stipulation

18  was approved on a final basis by the entry of an order on February 24, 2011.

19           (xii) *Amended Stipulation of February 2011 by and Between Lehman ALI, Inc. and*

20  *the Chapter 11 Trustee Authorizing (I) Financing for Chapter 11 Trustee Professional Fees and*

21  *Expenses of Trustee Debtors and Chapter 11 Trustee and (II) Granting Administrative Expense*

22  *Claims*, by and between Lehman ALI and the Trustee on behalf of the borrowers thereunder, dated

23  March 14, 2011 (the "Second Professional Fee Funding Stipulation"). Pursuant to the Second

24  Professional Fee Funding Stipulation, Lehman ALI agreed to make available, in its sole and absolute

25  discretion, administrative loans in the maximum total amount of $1,000,000.00 (the "Second

26  Professional Fee Funding Amount") to pay certain professional fees and expenses incurred in the

27  Trustee Debtors' cases as described therein, provided that, among other things, such loans shall be

28  made only to borrowers that have used, and accordingly no longer hold, unencumbered cash to pay

the fees and expenses set forth in such stipulation.  Pursuant to the Second Professional Fee Funding

Stipulation, the portions of the Second Professional Fee Funding Amount used pursuant to the terms

of the stipulation shall be treated as administrative expense claims owed to Lehman ALI.  The

Second Professional Fee Financing Stipulation was approved on a final basis by the entry of an order

on March 23, 2011.

(c)    <strong>Voluntary Debtors' Surcharging and Financing Motions</strong>

On September 1, 2009, five of the Voluntary Debtors and the Trustee for eight of the

Trustee Debtors filed the *Voluntary Debtors' and Trustee's Motion for Order (1) Authorizing*

*Surcharge Under 11 U.S.C. Section 506(c), or, In the Alternative, Use of Cash Collateral, and (2)*

*Compelling Release and Turnover of Undrawn Pledged Accounts* (the "Surcharge/Cash Collateral

Motion") seeking authority to surcharge collateral pursuant to Bankruptcy Code § 506(c) or use the

alleged "cash collateral" of the Lehman Creditors for the purpose of addressing public health, safety

and other issues relating to the moving Trustee Debtors' and Voluntary Debtors' Projects.  In the

motion, the Trustee for the moving Trustee Debtors and moving Voluntary Debtors proposed a 120-

day budget with expenses totaling $6,483,316.  The Lehman Creditors objected to the

Surcharge/Cash Collateral Motion.

On October 15, 2009, the Voluntary Debtors filed the *Voluntary Debtors' Motion For*

*Order (1) Approving Acquisition's Proposal, (2) Authorizing Disposition Of Certain Depository*

*Accounts, (3) Rejecting Cost Sharing Agreement With Anaverde LLC, And (4) Turnover Of Funds*

(the "Acquisitions Financing Proposal Motion"), which sought authority to use the Lehman

Creditors' cash collateral for certain expenses and to authorize loans on an administrative expense

basis from SCC Acquisitions to pay professional fees and expenses, up to a cap of $2.7 million.  The

Lehman Creditors opposed the motion.

After extensive negotiations, the Lehman Creditors, the Voluntary Debtors and the

Trustee entered into the December 2009 Voluntary Debtor Financing Stipulation, pursuant to which

the Voluntary Debtors and the Trustee agreed that the Surcharge/Cash Collateral Motion and the

Acquisitions Financing Proposal Motion were resolved effective as of December 17, 2009.  The

December 2009 Voluntary Debtor Financing Stipulation also provided that the Voluntary Debtors'

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1  *Motion for Reconsideration of DIP Order Entered on April 17, 2009* (the "Reconsideration Motion")

2  was deemed withdrawn.  Under the Reconsideration Motion, which was opposed by the Lehman

3  Creditors, the Voluntary Debtors sought reconsideration by the Bankruptcy Court of the April 2009

4  Financing Stipulation.

5  **4.3.9    The Contractors' Successful Motions for Relief from Stay to Pursue the**

6  **Bond Claims.**

7  Various contractors of the Debtors that were hired to perform work on some of the

8  Projects have Filed motions for relief from stay with the Bankruptcy Court to pursue their purported

9  Bond Claims against the Bond Issuers.  These creditors have requested the Bankruptcy Court relief

10  from the automatic stay to allow such creditors to enforce certain Claims that such creditors allege to

11  have against some of the Debtors, including rights to payment under certain surety bonds that are

12  alleged to have been issued in favor of such creditors. The Debtors opposed the motions on the

13  grounds that the various Debtors are indispensible parties. The Court conditionally granted the

14  motions provided that the Bond Claimants are able to sever the Debtors from their proceedings on

15  the surety bonds against the Bond Issuers.

16  **4.3.10   The Voluntary Debtors' Motion Pursuant to Bankruptcy Code Section**

17  **506(d).**

18  (*See* Disclosure Statement Section 4.2.5(g) above.)

19  **4.3.11   The Debtors' Motions to Strike the Claims and Pleadings Arising from**

20  **the Repurchase Lehman Loans**

21  (*See* Disclosure Statement Section 4.2.5(f) above.)

22  **4.3.12   The Debtors' Denied Preliminary Injunction Motion Against the Holders**

23  **of Bond Claims.**

24  On February 20, 2009, the Debtors Filed a complaint and a motion for preliminary

25  injunction, pursuant to which the Debtors sought a preliminary injunction against the Holders of

26  Bond Claims from pursuing such Claims.

27  On February 23, 2009, the Bankruptcy Court denied the Debtors' request for a

28  temporary restraining order and granted the Debtors' request to require the defendants thereon to

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    show cause why the motion for preliminary injunction should not be granted.

2    On March 2, 2009, several Bond Claimants objected to the motion for the preliminary

3    injunction. The objections generally alleged that the Debtors failed to show that the balancing of the

4    equities favored granting the preliminary injunction versus the harm to the Bond Claimants.

5    At a hearing held on March 4, 2009, the Court denied the motion for preliminary

6    injunction and the underlying complaint has subsequently voluntarily been dismissed without

7    prejudice.

8    **4.3.13  The Debtors' Potential Preferential Transfers.**

9    The Debtors' Schedules and Statement of Financial Affairs, which are on file with the

10    Bankruptcy Court and available for viewing, provide a list of all payments made to creditors, other

11    than Insiders, for the 90 days preceding the respective Petition Dates, and all payments made to

12    insiders during the one year preceding the respective Petition Dates.

13    Below is a summary showing the total payments by each VD Plan Debtor to non-

14    insiders within the 90 days preceding the Petition Date for each VD Plan Debtor, as disclosed in the

15    Schedules and Statement of Financial Affairs.

| NAME OF DEBTOR | AMOUNT TRANSFERRED |
|---|---|
| Acton Estates | $1,300.00 |
| SunCal Beaumont | $25,244.97 |
| SunCal Bickford | $133,669.98 |
| SunCal I | $0.00 |
| SunCal Johansson | $26,187.00 |
| Kirby Estates | $0.00 |
| Palmdale Hills | $6,002,491.87 |
| SCC Communities | $500.00 |
| Seven Brothers | $0.00 |
| SunCal Summit Valley | $39,649.77 |
| Tesoro | $659.00 |
| Total | **$6,229,702.59** |

To the extent these Litigation Claims would be against the Lehman Creditors, they

believe they have substantial defenses.  In any event, such Litigation Claims against all Lehman

Related Parties are waived under the Plan.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

### 4.3.14  The Voluntary Debtors' Substantive Consolidation Motion

On September 24, 2009, the Voluntary Debtors filed a motion for substantive consolidation of some, but not all, of the Debtors' assets and liabilities, as well as non-debtor LV Pacific Point LLC.  The substantive consolidation motion did not include the Estates of Seven Brothers, Kirby Estates, SunCal Beaumont or SunCal Johannson, ostensibly for the reason that "such Debtors do not have a Lehman Creditor as their primary Secured Creditor, do not have any Assets or value, or do not have unsecured creditors".  The Lehman Creditors did not believe that the substantive consolidation motion had any merit.  The motion was withdrawn, without prejudice to its renewal.

### 4.3.15  Villa San Clemente Turnover Motion against SunCal Marblehead

On April 8, 2010, Villa San Clemente, LLC ("VSC") filed a motion (the "VSC Turnover Motion") for an order determining that certain funds in the approximate amount of $1.2 million held in an escrow account were not property of SunCal Marblehead's estate and/or to compel the Trustee to assume or reject a real property purchase and sale agreement (the "VSC APA") related to the escrowed funds and described by VSC as an "executory contract."  The Trustee subsequently filed an opposition to such motion.  On May 27, 2010, the Bankruptcy Court entered an order denying the VSC Turnover Motion in its entirety.

On June 10, 2010, VSC filed a motion to reconsider such order (the "VSC Reconsideration Motion"), and the Trustee subsequently filed an opposition to such motion.  On August 2, 2010, the Bankruptcy Court entered an order partially granting the VSC Reconsideration Motion solely to the extent that it sought clarification that, in denying the VSC Turnover Motion, the Bankruptcy Court did not make any ruling whether the VSC APA was an executory contract.

### V

### LEHMAN VD LENDERS' PLAN

### 5.1    Treatment of Unclassified Claims.

As required by the Bankruptcy Code, the Plan places Claims and Interests into various Classes according to their right to priority.  However, in accordance with Bankruptcy Code § 1123(a)(1), certain types of Claims are not classified in any Classes under the Plan and the

Proponents have not placed such Claims in a Class.  These Claims are "unclassified."  As to Allowed Administrative Claims and Allowed Priority Tax Claims, these Claims are not considered Impaired, and they do not vote on the Plan because they are automatically entitled to specific treatment provided for them in the Bankruptcy Code.  The treatment of these unclassified Claims is as provided below.

### 5.1.1    Treatment of Allowed Administrative Claims.

Except to the extent that the Holder of an Allowed Administrative Claim agrees to a different treatment, and subject to the Administrative Claim Bar Date set forth in the Plan, the Liquidating Trustee shall pay each Allowed Administrative Claim in full, in Cash, by the later of (i) the Effective Date, (ii) within ten (10) Business Days after the date such Administrative Claim becomes an Allowed Administrative Claim, or (iii) the date such Allowed Administrative Claim becomes due according to its terms. Notwithstanding the foregoing, any Allowed Administrative Claim representing obligations incurred prior to the Effective Date in the ordinary course of post-petition business by the VD Plan Debtors (including, without limitation, post-petition trade obligations and routine post-petition payroll obligations) shall be paid in full or performed by the Liquidating Trustee in the ordinary course of business, in accordance with the terms of the particular obligation.

### (a)    Treatment and Repayment of the Lehman Administrative Loan(s).

The Lehman Administrative Loans (certain post-petition and pre-Confirmation financing provided by Lehman ALI and/or other Lehman Related Parties pursuant to order(s) of the Bankruptcy Court, as more fully defined above) are Allowed in the amount loaned or advanced by Lehman ALI and/or other applicable Lehman Related Parties after the commencement of the Cases net of any repayment thereof, shall be paid in Cash in full on the Effective Date from the Lehman Creditor Distribution Funding or shall be payable from the Lehman Creditor Distribution Funding at such later time and on such other terms as the Lehman VD Lenders may agree.  Pending any such payment or during a period of voluntary deferral by Lehman ALI and/or Lehman Related Parties, the Lehman Administrative Loans shall continue to have a first priority Lien against the respective Assets securing such loans as of the moment prior to the Effective Date, including any Cash of the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

VD Plan Debtors, such as may be deposited in the Plan Reserve or Post-Confirmation Accounts, and any proceeds thereof.

### (b)    Administrative Claim Bar Date.

Any Administrative Claim that is subject to an Administrative Claim Bar Date and not Filed by the applicable Administrative Claim Bar Date shall not be Allowed, and no Distribution shall be made on account of any such Administrative Claim.

### (i)    General Administrative Claim Bar Date.

All applications of Professionals for final Professional Fees for services rendered and for reimbursement of expenses incurred on or before the Effective Date and all other requests for payment of Administrative Claims incurred before the Effective Date under sections 507(a)(2) or 507(b) of the Bankruptcy Code (except only for (i) post-petition, ordinary course trade obligations and routine post-petition payroll obligations incurred in the ordinary course of the VD Plan Debtors' postpetition business, for which no bar date shall apply, and (ii) post-petition tax obligations, for which the bar date described in the following section shall apply) shall be Filed with the Bankruptcy Court and served upon the Liquidating Trustee no later than the General Administrative Claim Bar Date (the first Business Day following the sixtieth (60th) day after the Confirmation Date), unless such date is extended by the Bankruptcy Court after notice to the Liquidating Trustee.  Any such request for payment of an Administrative Claim that is subject to the General Administrative Claim Bar Date and that is not Filed and served on or before the General Administrative Claim Bar Date shall be forever barred; any party that seeks payment of Administrative Claims that is required to File a request for payment of such Administrative Claims and does not File such a request by the deadline established in the Plan, shall be forever barred from asserting such Administrative Claims against the VD Plan Debtors, their properties or assets or the successors thereto, including, without limitation, the Liquidating Trustee, Lehman Nominees and the VD Plan Debtors' Estates.

### (ii)    Administrative Tax Claim Bar Date.

All requests for payment of Administrative Claims by a governmental unit for Taxes (and for interest and/or penalties related to such Taxes) for any tax year or period, all or any portion of which occurs or falls within the period from and including the applicable Petition Date through

and including the Effective Date ("Administrative Tax Claims") and for which no bar date has

otherwise previously been established, must be Filed and served on the Liquidating Trustee on or

before the later of: (1) sixty (60) days following the Effective Date; or (2) 180 days following the

date that the tax return for such tax year or period to which such Taxes relate is required to be filed

with the applicable governmental unit. Any Holder of an Administrative Tax Claim that is required

to File a request for payment of such Taxes and does not File and properly serve such a request by

the applicable bar date shall be forever barred from asserting any such Administrative Tax Claims

against the VD Plan Debtors, their properties or assets or the successors thereto, including, without

limitation, the Liquidating Trustee, Lehman Nominees and the VD Plan Debtors' Estates.

### 5.1.2    Treatment of Priority Tax Claims.

Priority Tax Claims are certain unsecured income, employment and other Taxes

described by Bankruptcy Code section 507(a)(8).  The Bankruptcy Code requires that each Holder of

such a Priority Tax Claim receive the present value of such Claim in deferred Cash payments over a

period not exceeding five (5) years from the applicable Petition Date and that such treatment not be

less favorable than the treatment accorded to non-priority unsecured creditors.

Allowed Priority Tax Claims, if any, shall receive from the Liquidating Trustee (i)

equal Cash payments to be made on the last Business Day of each third full-calendar month

following the Effective Date, *provided that* the first payment need not be made any sooner than

thirty (30) days following the Effective Date and *provided that* such periodic payments are to be

payable until November 6, 2013, on which date the final payment shall be due, with all such

payments totaling 100% of the principal amount of such Claim, plus interest on any unpaid balance

from the Effective Date, calculated at the nonbankruptcy interest rate applicable on the Effective

Date, if any, or (ii) such other treatment agreed to by the Holder of the Allowed Priority Tax Claim

and the Liquidating Trustee, provided such treatment is on more favorable terms to the applicable

VD Plan Debtor's Estate than the treatment set forth in clause (i) hereof; provided that, prepayments

shall be made and permitted with the consent or at the direction of a Lehman VD Lender, including

payment in full any time on or after the Effective Date.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

### 5.2    Classification of Claims and Interests.

As required by the Bankruptcy Code, the Plan places Claims and Interests into various Classes according to their right to priority and other relative rights. The Plan specifies whether each Class of Claims or Interests is Impaired or Unimpaired, and the Plan sets forth the treatment each Class will receive. The table below lists the Classes of Claims established under the Plan and states whether each particular Class is Impaired or left Unimpaired by the Plan. A Class is "Unimpaired" if the Plan leaves unaltered the legal, equitable and contractual rights to which the Holders of Claims or Interests in the Class are entitled, with certain exceptions specified in the Bankruptcy Code.

For voting purposes and to comply with Bankruptcy Code section 1122(a), each Allowed Secured Claim shall be deemed to be in its own subclass even if not expressly designated as such. Further, in the event that any alleged Secured Claim is not, or only is partially, Allowed as a Secured Claim, the deficiency amount (Unsecured Deficiency Claim) if Allowed and, where applicable, Filed by the Unsecured Deficiency Claim Bar Date, will constitute a Class 7 or Class 8 Claim against the applicable VD Plan Debtor, as more fully set forth below, and will receive the same treatment as provided to other Claims in Class 7 or Class 8 of such VD Plan Debtor, as appropriate. The deficiency amounts with respect to the Claims of Lehman VD Lenders (Lehman Creditor Deficiency Claims) are Allowed General Unsecured Claims in Class 7, provided that, under the Plan, no Lehman Creditor Deficiency Claim is afforded against SCC Communities or Tesoro.

The Plan does not intend to and does not provide for substantive consolidation of any of the VD Plan Debtors for any purpose, *e.g.*, for voting, for classification, for the testing of compliance of the Plan with applicable provisions of the Bankruptcy Code, for treatment of Claims and Interests, including calculations of Distributions among creditors, or for the obligations created under the Plan with respect to Distributions for Creditors. Thus, each Allowed Claim in a Class will be deemed to be in one or more subclasses of the applicable VD Plan Debtor as the classification tables herein reflect. If at the hearing on Confirmation, the Proponents establish a reasonable good faith belief that a particular Class or subclass contains no Allowed Claims, such Class or subclass will be disregarded thereat.

1    THE INVESTIGATION OF CLAIMS AND INTERESTS IS NOT YET

2 COMPLETE, AND THEIR LISTING IN THE PLAN OR IN THE TABLES BELOW SHOULD

3 NOT BE CONSTRUED AS INDICATING OR PROVIDING THAT SUCH CLAIMS ARE

4 ALLOWED UNDER THE PLAN IN ANY RESPECT (WHETHER AS TO AMOUNT OR AS TO

5 STATUS, E.G., AS A SECURED CLAIM, SECURED REAL PROPERTY TAX CLAIM OR SR.

6 SECURED MECHANIC'S LIEN CLAM), EXCEPT AS EXPRESSLY SET FORTH FOR THE

7 PARTICULAR CLAIM.

8    **ADDITIONALLY, ALTHOUGH THE LISTED *POTENTIAL* CLASS 3 SR.**

9 **SECURED MECHANIC'S LIEN CLAIMS ARE CLAIMS AS TO WHICH A MECHANIC'S**

10 **LIEN MAY HAVE BEEN FILED, SOME OF THE IDENTIFIED CLAIMS AGAINST**

11 **GROUP I DEBTORS OTHER THAN SUNCAL SUMMIT VALLEY ARE BELIEVED TO**

12 **BE JUNIOR TO THE LEHMAN SECURED CLAIMS AGAINST THE APPLICABLE PLAN**

13 **PROJECT AND, THUS, ARE NOT BELIEVED TO BE ENTITLED TO THE TREATMENT**

14 **AFFORDED IN CLASS 3 FOR ALLOWED SR. SECURED MECHANIC'S LIEN CLAIMS,**

15 **BUT, INSTEAD, IF ALLOWED, ENTITLED TO CLASS 6, 7 OR 8 TREATMENT, AS**

16 **APPLICABLE.**

17    The Lehman Secured Claims and Lehman Creditor Deficiency Claims set forth in the

18 tables below are calculated using, *inter alia,* the applicable Project Value for the applicable Plan

19 Project and estimates of Cash Collateral from recent monthly operating reports Filed by the

20 Voluntary Debtors.

21

22

23

24

25

26

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| CLASS 1:  CLASSIFICATION OF SECURED REAL PROPERTY TAX CLAIMS, **IF SO ALLOWED** | | **Class 1 is Unimpaired** | **Class 1 Claim Holders are Not Entitled to Vote** |
|---|---|---|---|
| Class | Claims | | VD Plan Debtor and Basis for Claim (*i.e.*, Scheduled Amount or Case in Which Proof Filed and Number) |
| | | | **Group I Debtors** |
| Class 1.1 | Secured Real Property Tax Claim of Los Angeles County against the Ritter Ranch Project | | Palmdale Hills; Palmdale Hills 12 |
| Class 1.2 | Secured Real Property Tax Claim of Placer County against the Bickford Ranch Project | | SunCal Bickford; SunCal Bickford Scheduled Amount |
| Class 1.3 | Secured Real Property Tax Claim of Los Angeles County against the Acton Project | | Acton Estates; Acton Estates 1 |
| Class 1.4 | Secured Real Property Tax Claim of San Bernardino County against the Joshua Ridge Project. | | SCC Communities; SCC Communities Scheduled Amount |
| Class 1.5 | None; Class Number Reserved. | | |
| Class 1.6.1 | Secured Real Property Tax Claim of Placer County against the Summit Valley Project, exclusive of Seller Financing Encumbered Parcels. | | SunCal Summit Valley; Palmdale Hills 97 |
| Class 1.6.2 | Secured Real Property Tax Claim of San Bernardino County against the Summit Valley Project, exclusive of Seller Financing Encumbered Parcels. | | SunCal Summit Valley |
| Class 1.6.3 | Secured Real Property Tax Claim against Seller Financing Encumbered Parcel Affected by Seller Financing Secured Claim of, or formerly of, Arthur Riggs pursuant to a first-priority deed of trust against certain portions of the Summit Valley Project. | | SunCal Summit Valley |
| Class 1.6.4 | Secured Real Property Tax Claim against Seller Financing Encumbered Parcel Affected by Seller Financing Secured Claim of, or formerly of, Arleen Logan pursuant to a first-priority deed of trust against certain portions of the Summit Valley Project. | | SunCal Summit Valley |
| Class 1.6.5 | Secured Real Property Tax Claim against Seller Financing Encumbered Parcel Affected by Seller Financing Secured Claim of, or formerly of, K Square pursuant to a first-priority deed of trust Properties Inc. against certain portions of the Summit Valley Project. | | SunCal Summit Valley |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| Class 1.6.6 | Secured Real Property Tax Claim against Seller Financing Encumbered Parcel Affected by Seller Financing Secured Claim of, or formerly of, Leslie Quigg & Betty Quigg pursuant to a first-priority deed of trust against certain portions of the Summit Valley Project. | SunCal Summit Valley; SunCal Summit Valley Scheduled Amount |
|---|---|---|
| Class 1.7 | Secured Real Property Tax Claim of Los Angeles County against the Tesoro Project. | Tesoro; Tesoro 2 |
| | | **Group II Debtors** |
| Class 1.8 | Secured Real Property Tax Claim of San Bernardino County against the property Kirby Estates' property. | Kirby Estates; Kirby Estates Scheduled Amount |
| Class 1.9.1 | Secured Real Property Tax Claim of San Bernardino County against Seven Brothers' property, exclusive of Seller Financing Encumbered Parcels. | Seven Brothers |
| Class 1.9.2 | Secured Real Property Tax Claim against Seller Financing Encumbered Parcel Affected by Seller Financing Secured Claim of, or formerly of, Cheltimalie Enterprises pursuant to a first-priority deed of trust against certain portions of the Summit Valley Project owned by Seven Brothers. | Seven Brothers |
| Class 1.9.3 | Secured Real Property Tax Claim against Seller Financing Encumbered Parcel Affected by Seller Financing Secured Claim of, or formerly of, Philip C. Dowse and Vera G. Dowse pursuant to a first-priority deed of trust against certain portions of the Summit Valley Project owned by Seven Brothers. | Seven Brothers |
| Class 1.9.4 | Secured Real Property Tax Claim against Seller Financing Encumbered Parcel Affected by Seller Financing Secured Claim of, or formerly of, Philip C. Dowse pursuant to a first-priority deed of trust against certain portions of the Summit Valley Project owned by Seven Brothers. | Seven Brothers |
| Class 1.9.5 | Secured Real Property Tax Claim against Seller Financing Encumbered Parcel Affected by Seller Financing Secured Claim of, or formerly of, Desert Wind, LLC pursuant to a first-priority deed of trust against certain portions of the Summit Valley Project owned by Seven Brothers. | Seven Brothers |
| Class 1.10.1 | Secured Real Property Tax Claim of Riverside County against the Beaumont Project, exclusive of Seller Financing Encumbered Parcels. | SunCal Beaumont; SunCal Beaumont 9 |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| Class 1.10.2 | Secured Real Property Tax Claim against Seller Financing Encumbered Parcel Affected by Seller Financing Secured Claim of, or formerly of, Cheryl M. Mims pursuant to a first-priority deed of trust against certain portions of the Beaumont Heights Project. | SunCal Beaumont |
| Class 1.10.3 | Secured Real Property Tax Claim against Seller Financing Encumbered Parcel Affected by Seller Financing Secured Claim of, or formerly of, William L & Kathleen Ward pursuant to a first-priority deed of trust against certain portions of the Beaumont Heights Project. | SunCal Beaumont |
| Class 1.10.4 | Secured Real Property Tax Claim against Seller Financing Encumbered Parcel Affected by Seller Financing Secured Claim of, or formerly of, Marie B. Stanford pursuant to a first-priority deed of trust against certain portions of Beaumont Heights Project. | SunCal Beaumont |
| Class 1.11 | Secured Real Property Tax Claim of Stanislaus County against the Johannson Ranch Project. | SunCal Johannson; SunCal Johannson Scheduled Amount |

| CLASS 2: CLASSIFICATION OF LEHMAN SECURED CLAIMS | | Class 2 is Impaired | Class 2 Claim Holders are Entitled to Vote |
|---|---|---|---|
| Class | Claims | VD Plan Debtor and Basis for Claim (*i.e.*, Scheduled Amount or Case in Which Proof Filed and Number). | |
| | | Group I Debtors | |
| Class 2.1 | **Ritter Ranch Loan Agreement** Allowed Claim of Lehman Commercial or its assignee or successor against Palmdale Hills arising form the Ritter Ranch Loan Agreement in the Allowed Amount of $287,252,096.31 and as an Allowed Secured Claim against the Ritter Ranch Project, all Cash Collateral and PH CFD Bonds in the amount of $98.5 million. | Palmdale Hills; Palmdale Hills: 65 | |
| Class 2.2 | **SunCal Communities I Loan Agreement** Allowed Claim of Lehman Commercial or its assignee or successor against SunCal Bickford arising from the SunCal Communities I Loan Agreement in the Allowed Amount of $343,221,391.06 and as an Allowed Secured Claim against the Bickford Ranch Project and all Cash Collateral in the amount of $30.1 million. | SunCal Bickford; SunCal Bickford: 16 | |

| CLASS 2: CLASSIFICATION OF LEHMAN SECURED CLAIMS | | Class 2 is Impaired | Class 2 Claim Holders are Entitled to Vote |
|---|---|---|---|
| <u>Class</u> | <u>Claims</u> | | <u>VD Plan Debtor and Basis for Claim</u> (*i.e.*, Scheduled Amount or Case in Which Proof Filed and Number). |
| Class 2.3 | **SunCal Communities I Loan Agreement** Allowed Claim of Lehman Commercial or its assignee or successor against Acton Estates arising from the SunCal Communities I Loan Agreement in the Allowed Amount of $343,221,391.06 and as an Allowed Secured Claim against the Acton Project and all Cash Collateral in the amount of $6.8 million. | | Acton Estates; Acton Estates: 6 |
| Class 2.4 | **Interim Loan Agreement** Allowed Claim of Lehman ALI or its assignee or successor against SCC Communities, arising from the Interim Loan Agreement in the Allowed Amount of $23,795,012.59 and as an Allowed Secured Claim against the Joshua Ridge Project and all Cash Collateral in the amount of $1.2 million. | | SCC Communities; SCC Communities: 9 |
| Class 2.5 | **SunCal Communities I Loan Agreement** Allowed Claim of Lehman Commercial or its assignee or successor against SunCal I arising from the SunCal Communities I Loan Agreement in the Allowed Amount of $343,221,391.06 and as an Allowed Secured Claim against the Interests in SunCal Johannson and SunCal Beaumont and all Cash Collateral in the amount of $3.6 million. | | SunCal I; SunCal I: 1 |
| Class 2.6 | **SunCal Communities I Loan Agreement** Allowed Claim of Lehman Commercial or its assignee or successor against SunCal Summit Valley arising from SunCal Communities I Loan Agreement in the Allowed Amount of $343,221,391.06 and as an Allowed Secured Claim against SunCal Summit Valley's portions of the Summit Valley Project, the Interests in Kirby Estates and Seven Brothers, and all Cash Collateral in the amount of $4.9 million. | | SunCal Summit Valley; SunCal Summit Valley: 12 |
| Class 2.7 | **Interim Loan Agreement** Allowed Claim of Lehman ALI or its assignee or successor against Tesoro rising from the Interim Loan in the Allowed Amount of $23,795,012.59 and as an Allowed Secured Claim against the Tesoro Project and all Cash Collateral in the amount of $1.9 million. | | Tesoro; Tesoro: 7 |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| CLASS 3: CLASSIFICATION OF SR. SECURED MECHANIC'S LIEN CLAIMS, **IF SO ALLOWED** | | Class 3 is Unimpaired | Class 3 Claim Holders are Not Entitled to Vote |
|---|---|---|---|
| Class | Claims | | VD Plan Debtor and Basis for Claim (*i.e.*, Scheduled Amount or Case in Which Proof Filed and Number) |
| | | | **Group I Debtors** |
| Class 3.1.1 | Mechanic's Lien Claim of Asphalt Professionals or its assignee or successor against the Ritter Ranch Project owned by Palmdale Hills in the amount of $38,249. | | Palmdale Hills; Palmdale Hills 1 and 46 |
| Class 3.1.2 | Mechanic's Lien Claim of Sierra Cascade Construction or its assignee or successor against the Ritter Ranch Project owned by Palmdale Hills in the amount of $550,677. | | Palmdale Hills; Palmdale Hills 33 |
| Class 3.1.3 | Mechanic's Lien Claim of Staats Construction. Inc. or its assignee or successor against the Ritter Ranch Project owned by Palmdale Hills in the amount of $166,105. | | Palmdale Hills; Palmdale Hills 51 |
| Class 3.1.4 | Mechanic's Lien Claim of Southland Farmers, Inc. or its assignee or successor against the Ritter Ranch Project owned by Palmdale Hills in the amount of $177,801. | | Palmdale Hills; Palmdale Hills 55, 67 and 68 |
| Class 3.1.5 | Mechanic's Lien Claim of Pinnick, Inc. or its assignee or successor against the Ritter Ranch Project owned by Palmdale Hills in the amount of $1,530,146 (Alleged Project Collateral for this alleged Lien may not be Collateral for Lehman Secured Claims). | | Palmdale Hills; Palmdale Hills 62, 63 and 64 |
| Class 3.1.6 | Mechanic's Lien Claim of Chameleon Design Inc. or its assignee or successor against the Ritter Ranch Project owned by Palmdale Hills in the amount of $73,600. | | Palmdale Hills; Palmdale Hills 93, 99 |
| Class 3.1.7 | Mechanic's Lien Claim of HD Supply Construction or its assignee or successor against the Ritter Ranch Project owned by Palmdale Hills in the amount of $14,893. | | Palmdale Hills; Palmdale Hills 15 |
| Class 3.1.8 | Mechanic's Lien Claim of Park West Landscape or its assignee or successor against the Ritter Ranch Project in the amount of $27,624.70. | | Palmdale Hills; Palmdale Hills 109 |
| Class 3.2.1 | Mechanic's Lien Claim of MHM Engineers or its assignee or successor against the Bickford Ranch Project in the amount of $8,916. | | SunCal Bickford; SunCal Bickford 5 |
| Class 3.2.2 | Mechanic's Lien Claim of Land Architecture or its assignee or successor against the Bickford Ranch Project in the amount of $100,245. | | SunCal Bickford; SunCal Bickford 6 |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| CLASS 3:  CLASSIFICATION OF SR. SECURED MECHANIC'S LIEN CLAIMS, **IF SO ALLOWED** | | Class 3 is Unimpaired | **Class 3 Claim Holders are Not Entitled to Vote** |
|---|---|---|---|
| Class | Claims | | VD Plan Debtor and Basis for Claim (*i.e.*, Scheduled Amount or Case in Which Proof Filed and Number) |
| Class 3.2.3 | Mechanic's Lien Claim of Kiewit Pacific Co. or its assignee or successor against the Bickford Ranch Project in the amount of $1,868,357. | | SunCal Bickford; SunCal Bickford 10 |
| Class 3.2.4 | Mechanic's Lien Claim of ARB, Inc. or its assignee or successor against the Bickford Ranch Project in the amount of $1,052,272. | | SunCal Bickford; SunCal Bickford 15 |
| Class 3.2.5 | Mechanic's Lien Claim of Independent Construction or its assignee or successor against the Bickford Ranch Project in the amount of $117,209. | | SunCal Bickford; SunCal Bickford 28 |
| Class 3.2.6 | Mechanic's Lien Claim of Marques Pipeline, Inc. or its assignee or successor against the Bickford Ranch Project in the amount of $330,118. | | SunCal Bickford; SunCal Bickford 29 and 30 |
| Classes 3.3 – 3.5 | None; Claim Numbers Reserved. | | |
| Class 3.6 | Mechanic's Lien Claim of Pacific Soils Engineering or its assignee or successor against the portion of the Summit Valley Project owned by Summit Valley in the amount of $16,827. | | SunCal Summit Valley; SunCal Summit Valley 9 |
| | | | **Group II Debtors** |
| Classes 3.7 – 3.9 | None; Claim Numbers Reserved. | | |
| Class 3.10 | Mechanic's Lien Claim of Proactive Engineering or its assignee or successor against the Beaumont Heights Project in the amount of $46,188. (Alleged Project Collateral for this alleged Lien may not be Collateral for Lehman Secured Claims). | | SunCal Beaumont; SunCal Beaumont 11 and 12 |

| CLASS 4:  CLASSIFICATION OF OTHER SECURED CLAIMS, **IF SO ALLOWED** | | Class 4 is Unimpaired | **Class 4 Claim Holders are Not Entitled to Vote** |
|---|---|---|---|
| Class | Claims | | VD Plan Debtor |
| | | | **Group I Debtors** |
| Class 4.1 | Allowed Other Secured Claims against Palmdale Hills | | Palmdale Hills |
| Class 4.2 | Allowed Other Secured Claims against SunCal Bickford | | SunCal Bickford |
| Class 4.3 | Allowed Other Secured Claims against Acton Estates | | Acton Estates |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| CLASS 4:  CLASSIFICATION OF OTHER SECURED CLAIMS, <u>IF SO ALLOWED</u> | | Class 4 is Unimpaired | Class 4 Claim Holders are Not Entitled to Vote |
|---|---|---|---|
| <u>Class</u> | <u>Claims</u> | | <u>VD Plan Debtor</u> |
| Class 4.4 | Allowed Other Secured Claims against SCC Communities | | SCC Communities |
| Class 4.5 | Allowed Other Secured Claims against SunCal I | | SunCal I |
| Class 4.6.1 | Other Secured Claims against SunCal Summit Valley, consisting of the Seller Financing Secured Claim of, or formerly of, Arthur Riggs, pursuant to a first-priority deed of trust against certain portions of the Summit Valley Project in the amount of $801,900. | | SunCal Summit Valley; SunCal Summit Valley 4 |
| Class 4.6.2 | Other Secured Claims against SunCal Summit Valley, consisting of the Seller Financing Secured Claim of, or formerly of, Arleen Logan pursuant to a first-priority deed of trust against certain portions of the Summit Valley Project in the amount of $668,250. | | SunCal Summit Valley; SunCal Summit Valley 5 |
| Class 4.6.3 | Other Secured Claims against SunCal Summit Valley, consisting of the Seller Financing Secured Claim of, or formerly of, K Square pursuant to a first-priority deed of trust Properties Inc. against certain portions of the Summit Valley Project in the amount of $200,000. | | SunCal Summit Valley; SunCal Summit Valley Scheduled Amount |
| Class 4.6.4 | Other Secured Claims against SunCal Summit Valley, consisting of the Seller Financing Secured Claim of, or formerly of, Leslie Quigg & Betty Quigg pursuant to a first-priority deed of trust against certain portions of the Summit Valley Project in the amount of $1,246,500. | | SunCal Summit Valley; SunCal Summit Valley Scheduled Amount |
| Class 4.6.4 | Allowed Other Secured Claims against SunCal Summit Valley | | SunCal Summit Valley |
| Class 4.7 | Allowed Other Secured Claims against Tesoro | | Tesoro |
| | | | **Group II Debtors** |
| Class 4.8 | Allowed Other Secured Claims against Kirby Estates | | Kirby Estates |
| Class 4.9.1 | Other Secured Claims against Seven Brother, consisting of the Seller Financing Secured Claim of, or formerly of, Cheltimalie Enterprises pursuant to a first-priority deed of trust against certain portions of the Summit Valley Project owned by Seven Brothers in the amount of $1,388,156. | | Seven Brothers; SunCal Summit 17 |
| Class 4.9.2 | Other Secured Claims against Seven Brother, consisting of the Seller Financing Secured Claim of, or formerly of, Philip C. Dowse and Vera G. Dowse pursuant to a first-priority deed of trust against certain portions of the Summit Valley Project owned by | | Seven Brothers; Seven Brothers Scheduled Amount |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| CLASS 4:  CLASSIFICATION OF OTHER SECURED CLAIMS, IF SO ALLOWED | | Class 4 is Unimpaired | Class 4 Claim Holders are Not Entitled to Vote |
|---|---|---|---|
| Class | Claims | | VD Plan Debtor |
| | Seven Brothers in the amount of $296,910. | | |
| Class 4.9.3 | Other Secured Claims against Seven Brother, consisting of the Seller Financing Secured Claim of, or formerly of, Philip C. Dowse pursuant to a first-priority deed of trust against certain portions of the Summit Valley Project owned by Seven Brothers in the amount of $880,000. | | Seven Brothers; Seven Brothers Scheduled Amount |
| Class 4.9.4 | Other Secured Claims against Seven Brother, consisting of the Seller Financing Secured Claim of, or formerly of, Desert Wind, LLC pursuant to a first-priority deed of trust against certain portions of the Summit Valley Project owned by Seven Brothers in the amount of $862,000. | | Seven Brothers; Seven Brothers Scheduled Amount |
| Class 4.9.5 | Allowed Other Secured Claims against Seven Brother | | Seven Brothers |
| Class 4.10.1 | Other Secured Claims against SunCal Beaumont, consisting of the Seller Financing Secured Claim of, or formerly of, Cheryl M. Mims pursuant to a first-priority deed of trust against certain portions of the Beaumont Heights Project in the amount of $136,229. | | SunCal Beaumont; Palmdale Hills 101 |
| Class 4.10.2 | Other Secured Claims against SunCal Beaumont, consisting of the Seller Financing Secured Claim of, or formerly of, William L & Kathleen Ward pursuant to a first-priority deed of trust against certain portions of the Beaumont Heights Project in the amount of $130,000. | | SunCal Beaumont; SunCal Beaumont Scheduled Amount |
| Class 4.10.3 | Other Secured Claims against SunCal Beaumont, consisting of the Seller Financing Secured Claim of, or formerly of, Wayne & Francis Lee pursuant to a first-priority deed of trust against certain portions of the Beaumont Heights Project in the amount of $650,000. | | SunCal Beaumont; SunCal Beaumont Scheduled Amount |
| Class 4.10.4 | Other Secured Claims against SunCal Beaumont, consisting of the Seller Financing Secured Claim of, or formerly of, Marie B. Stanford pursuant to a first-priority deed of trust against certain portions of Beaumont Heights Project in the amount of $154,742. | | SunCal Beaumont; SunCal Beaumont 6 |
| Class 4.10.5 | Allowed Other Secured Claims against SunCal Beaumont | | SunCal Beaumont |
| Class 4.11 | Allowed Other Secured Claims against SunCal Johannson | | SunCal Johannson |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| CLASS 5: CLASSIFICATION OF PRIORITY CLAIMS, IF SO ALLOWED | | Class 5 is Unimpaired | Class 5 Claim Holders are Not Entitled to Vote |
|---|---|---|---|
| Class | Claims | | VD Plan Debtor and Basis for Claim (*i.e.*, Scheduled Amount or Case in Which Proof Filed and Number) |
| | | | **Group I Debtors** |
| Class 5.1 | Priority Claims (alleged amount - $10,950). | | Palmdale Hills; Palmdale Hills 70 |
| Class 5.2 | Priority Claims (none alleged) | | SunCal Bickford |
| Class 5.3 | Priority Claims (none alleged) | | Acton Estates |
| Class 5.4 | Priority Claims (none alleged) | | SCC Communities |
| Class 5.5 | Priority Claims (none alleged) | | SunCal I |
| Class 5.6 | Priority Claims (none alleged) | | SunCal Summit Valley |
| Class 5.7 | Priority Claims (none alleged) | | Tesoro |
| | | | **Group II Debtors** |
| Class 5.8 | Priority Claims (none alleged) | | Kirby Estates |
| Class 5.9 | Priority Claims (none alleged) | | Seven Brothers |
| Class 5.10 | Priority Claims (none alleged) | | SunCal Beaumont |
| Class 5.11 | Priority Claims (none alleged) | | SunCal Johannson |

| CLASS 6: CLASSIFICATION OF RELIANCE CLAIMS, IF SO ALLOWED, AGAINST GROUP I DEBTORS | | Class 6 is Impaired | Class 6 Claim Holders are Entitled to Vote |
|---|---|---|---|
| Class | Claims | | VD Plan Debtor and Basis for Claims |
| Class 6.1 | Reliance Claims against Palmdale Hills | | Palmdale Hills - Various Filed and Scheduled |
| Class 6.2 | Reliance Claims against SunCal Bickford | | SunCal Bickford - Various Filed and Scheduled |
| Class 6.3 | Reliance Claims against Acton Estates | | Acton Estates - Various Filed and Scheduled |
| Class 6.4 | Reliance Claims against SCC Communities | | SCC Communities - Various Filed and Scheduled |
| Class 6.5 | Reliance Claims against SunCal I | | SunCal I - Various Filed and Scheduled |

| CLASS 6: CLASSIFICATION OF RELIANCE CLAIMS, **IF SO ALLOWED**, AGAINST **GROUP I DEBTORS** | Class 6 is Impaired | Class 6 Claim Holders are Entitled to Vote |
|---|---|---|
| Class | Claims | VD Plan Debtor and Basis for Claims |
| Class 6.6 | Reliance Claims against SunCal Summit Valley | SunCal Summit Valley - Various Filed and Scheduled |
| Class 6.7 | Reliance Claims against Tesoro | Tesoro - Various Filed and Scheduled |

| CLASS 7: CLASSIFICATION OF GENERAL UNSECURED CLAIMS, **IF SO ALLOWED**, AGAINST GROUP I DEBTORS[12] | Class 7 is Impaired | Class 7 Claim Holders are Entitled to Vote |
|---|---|---|
| Class | Claims | VD Plan Debtor |
| Class 7.1 | General Unsecured Claims (including the Allowed Lehman Creditor Deficiency Claim of Lehman Commercial or its assignee or successor arising from the Ritter Ranch Loan Agreement in the Allowed Amount of $188,777,242) | Palmdale Hills |
| Class 7.2 | General Unsecured Claims (including the Allowed Lehman Creditor Deficiency Claim of: (a) Lehman Commercial or its assignee or successor arising from the SunCal Communities I Loan Agreement in the Allowed Amount of $312,616,387 and (b) Lehman ALI or its assignee or successor arising from the Bickford Second Lien Loan Agreement in the Allowed Amount of $56,494,059) | SunCal Bickford |
| Class 7.3 | General Unsecured Claims (including the Allowed Lehman Creditor Deficiency Claim of Lehman Commercial or its assignee or successor arising from the SunCal Communities I Loan Agreement in the Allowed Amount of $336,421,391) | Acton Estates |
| Class 7.4 | General Unsecured Claims | SCC Communities |
| Class 7.5 | General Unsecured Claims (including the Allowed General Unsecured Claim of Lehman Commercial or its assignee or successor arising from the SunCal Communities I Loan Agreement in the Allowed Amount of $339,595,844) | SunCal I |

[12] The General Unsecured Claims of the Lehman Creditors indicated below are calculated for Lehman Creditor with recourse Secured Claims against a Plan Debtor's Project by deducting the applicable Project Value and Cash Collateral from the total Allowed Claim arising under the subject Lehman Loan, first against the more senior debt. For a Lehman Creditor of an entity that pledged as collateral to the Lehman Creditor interests in another Plan Debtor that owns a Plan Project, such General Unsecured Claims are calculated by deducting from the total Allowed Amount of the subject Lehman Loan, Cash Collateral of the obligor Debtor and the remainders after deducting Allowed Claims against each subsidiary Plan Debtor that owns a Project from the Project Value and its Cash Collateral.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| **CLASS 7:  CLASSIFICATION OF GENERAL UNSECURED CLAIMS, IF SO ALLOWED, AGAINST GROUP I DEBTORS**[12] | | **Class 7 is Impaired** | **Class 7 Claim Holders are Entitled to Vote** |
|---|---|---|---|
| <u>Class</u> | <u>Claims</u> | | <u>VD Plan Debtor</u> |
| | | | |
| Class 7.6 | General Unsecured Claims (including the Allowed General Unsecured Claim of Lehman Commercial or its assignee or successor arising from the SunCal Communities I Loan Agreement in the Allowed Amount of $338,296,030) | | SunCal Summit Valley |
| Class 7.7 | General Unsecured Claims | | Tesoro |

| **CLASS 8:  CLASSIFICATION OF GENERAL UNSECURED CLAIMS, IF SO ALLOWED, AGAINST GROUP II DEBTORS** | | **Class 8 is Impaired** | **Class 8 Claim Holders are Entitled to Vote** |
|---|---|---|---|
| <u>Class</u> | <u>Claims</u> | | <u>VD Plan Debtor</u> |
| Classes 8.1 – 8.7 | None; Claim Numbers Reserved. | | |
| Class 8.8 | General Unsecured Claims | | Kirby Estates |
| Class 8.9 | General Unsecured Claims | | Seven Brothers |
| Class 8.10 | General Unsecured Claims | | SunCal Beaumont |
| Class 8.11 | General Unsecured Claims | | SunCal Johannson |

| **CLASS 9:  CLASSIFICATION OF SETTLING BOND ISSUER-RELATED FUTURE WORK CLAIMS, IF ALLOWED** | | **Class 9 is Impaired** | **Class 9 Claim Holders are Entitled to Vote** |
|---|---|---|---|
| <u>Class</u> | <u>Claims</u> | | <u>VD Plan Debtor and Basis for Claims</u> |
| | | | **Group I Debtors** |
| Class 9.1 | Settling Bond Issuer-Related Future Work Claims against Palmdale Hills (including, to the extent arising from a Future Work Bond of a VD Plan Debtor, (a) the Claim of Bond Safeguard, if Allowed, for which Proof of Claim No. 107 was filed in the aggregate penal amount of $24,859,950, and (b) the Claim of Arch, if Allowed, for which Proof of Claim No. 54 was filed in the contingent amount of $155,426,657) | | Palmdale Hills – Various Filed and Scheduled |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| CLASS 9: CLASSIFICATION OF SETTLING BOND ISSUER-RELATED FUTURE WORK CLAIMS, IF ALLOWED | | Class 9 is Impaired | Class 9 Claim Holders are Entitled to Vote |
|---|---|---|---|
| Class | Claims | | VD Plan Debtor and Basis for Claims |
| Class 9.2 | Settling Bond Issuer-Related Future Work Claims against SunCal Bickford (including, to the extent arising from a Future Work Bond of a VD Plan Debtor, (a) the Claim of Bond Safeguard, if Allowed, for which Proof of Claim No. 24 was filed in the amount of $2,827,548) (unliquidated) and (b) the Claim of Arch, if Allowed, for which Proof of Claim No. 22 was filed in the contingent amount of $155,426,657) | | SunCal Bickford – Various Filed and Scheduled |
| Class 9.3 | Settling Bond Issuer-Related Future Work Claims against Acton Estates (including, to the extent arising from a Future Work Bond of a VD Plan Debtor, (a) the Claim of Bond Safeguard, if Allowed, for which Proof of Claim No. 7 was filed in the amount of $1,290,000 (unliquidated), and (b) the Claim of Arch, if Allowed, for which Proof of Claim No. 10 was filed in the contingent amount of $155,426,657) | | Acton Estates – Various Filed and Scheduled |
| Class 9.4 | Settling Bond Issuer-Related Future Work Claims against SCC Communities (including, to the extent arising from a Future Work Bond of a VD Plan Debtor, (a) the Claim of Bond Safeguard, if Allowed, for which Proof of Claim No. 4 was filed in the amount of $25,000, and (b) the Claim of Arch, if Allowed, for which Proof of Claim No. 10 was filed in the contingent amount of $155,426,657) | | SCC Communities – Various Filed and Scheduled |
| Class 9.5 | Settling Bond Issuer-Related Future Work Claims against SunCal I (including, to the extent arising from a Future Work Bond of a VD Plan Debtor, the Claim of Arch, if Allowed, for which Proof of Claim No. 2 was filed in the contingent amount of $155,426,657) | | SunCal I – Various Filed and Scheduled |
| Class 9.6 | Settling Bond Issuer-Related Future Work Claims against SunCal Summit Valley (including, to the extent arising from a Future Work Bond of a VD Plan Debtor, the Claim of Arch, if Allowed, for which Proof of Claim No. 15 was filed in the contingent amount of $155,426,657) | | SunCal Summit Valley – Various Filed and Scheduled |
| Class 9.7 | Settling Bond Issuer-Related Future Work Claims against Tesoro (including, to the extent arising from a Future Work Bond of a VD Plan | | Tesoro – Various Filed and Scheduled |

| CLASS 9:  CLASSIFICATION OF SETTLING BOND ISSUER-RELATED FUTURE WORK CLAIMS, IF ALLOWED | | Class 9 is Impaired | Class 9 Claim Holders are Entitled to Vote |
|---|---|---|---|
| Class | Claims | | VD Plan Debtor and Basis for Claims |
| | Debtor, the Claim of Arch, if Allowed, for which Proof of Claim No. 8 was filed in the contingent amount of $155,426,657) | | |
| | | | **Group II Debtors** |
| Class 9.8 | Settling Bond Issuer-Related Future Work Claims against Kirby Estates (including, to the extent arising from a Future Work Bond of a VD Plan Debtor, the Claim of Arch, if Allowed, for which Proof of Claim No. 2 was filed in the contingent amount of $155,426,657) | | Kirby Estates – Various Filed and Scheduled |
| Class 9.9 | Settling Bond Issuer-Related Future Work Claims against Seven Brothers (including, to the extent arising from a Future Work Bond of a VD Plan Debtor, the Claim of Arch, if Allowed, for which Proof of Claim No. 1 was filed in the contingent amount of $155,426,657) | | Seven Brothers – Various Filed and Scheduled |
| Class 9.10 | Settling Bond Issuer-Related Future Work Claims against SunCal Beaumont (including, to the extent arising from a Future Work Bond of a VD Plan Debtor, the Claim of Arch, if Allowed, for which Proof of Claim No. 10 was filed in the contingent amount of $155,426,657) | | Suncal Beaumont – Various Filed And Scheduled |
| Class 9.11 | Settling Bond Issuer-Related Future Work Claims against SunCal Johannson (including, to the extent arising from a Future Work Bond of a VD Plan Debtor, the Claim of Arch, if Allowed, for which Proof of Claim No. 5 was filed in the contingent amount of $155,426,657) | | SunCal Johannson – Various Filed and Scheduled |

| CLASS 10:  CLASSIFICATION OF INTERESTS, IF ALLOWED | | Class 10 is Impaired | Class 10 Interest Holders are Deemed to Reject the Plan and are Not Entitled to Vote |
|---|---|---|---|
| Class | Interests (and alleged Holders) | | VD Plan Debtor and Basis for Interests |
| Class 10.1 | Interests in Palmdale Hills (of SCC Palmdale). | | Palmdale Hills Scheduled |
| Class 10.2 | Interests in SunCal Bickford (of SunCal I). | | SunCal Bickford Scheduled |
| Class 10.3 | Interests in Acton Estates (of SunCal I). | | Acton Estates Scheduled |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| CLASS 10:  CLASSIFICATION OF INTERESTS, IF ALLOWED | | Class 10 is Impaired | Class 10 Interest Holders are Deemed to Reject the Plan and are Not Entitled to Vote |
|---|---|---|---|
| Class | Interests (and alleged Holders) | | VD Plan Debtor and Basis for Interests |
| Class 10.4 | Interests in SCC Communities (of SCC LLC). | | SCC Communities Scheduled |
| Class 10.5 | Interests in SunCal I (of SCC LLC). | | SunCal I Scheduled |
| Class 10.6 | Interests in SunCal Summit Valley (of SunCal I). | | SunCal Summit Valley Scheduled |
| Class 10.7 | Interests in Tesoro (of SCC LLC). | | Tesoro Scheduled |
| Class 10.8 | Interests in Kirby Estates (of SunCal Summit Valley). | | Kirby Estates Scheduled |
| Class 10.9 | Interests in Seven Brothers (of SunCal Summit Valley). | | Seven Brothers Scheduled |
| Class 10.10 | Interests in SunCal Beaumont (of SunCal I). | | SunCal Beaumont Scheduled |
| Class 10.11 | Interests in SunCal Johannson (of SunCal I). | | SunCal Johannson Scheduled |

### 5.3    Treatment Of Classified Claims And Interests

Any references in the Plan to Classes 1 through 10 are summary references made for convenience only to the group of subclasses of each such Class.  Voting and treatment for each subclass are to remain distinct. Regardless of the treatment provided in the Plan for any Holder of a Claim, the Holder may agree to accept less favorable treatment and no Creditor will receive more than 100% of its Allowed Claim (plus any interest, fees or other cost or expenses payable under the Plan).  Provisions for treatment below for Holders of Allowed Claims are not an indication that any particular Claim is Allowed unless expressly provided.

### 5.3.1    Treatment of Allowed Secured Real Property Tax Claims (Class 1).

The treatment of any Allowed Secured Real Property Tax Claims (Class 1) under the Plan is as follows:

#### (a)    A Voting and Impairment.

Class 1 is Unimpaired under the Plan, and each Holder of an Allowed Secured Real

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Property Tax Claim is <u>not entitled to vote</u> on the Plan.

**(b)**     **Liens.**

As of the Effective Date, each Holder of an Allowed Secured Real Property Tax Claim, on account of such Claim, <u>will retain its underlying Liens</u> on the applicable real property collateral pending full payment in accordance with the Plan.

**(c)**     **Distributions and Distribution Dates.**

Each Allowed Secured Real Property Tax Claim will receive, on account of such Claim, one of the three following alternative treatments identified immediately below, performance of which, when due, will be undertaken by the owner of the Plan Project serving as collateral for the subject Claim as its own obligation and that of the Liquidating Trustee, in full and final satisfaction of each such Allowed Secured Real Property Tax Claim.

(i)     <u>Section 1124(2) Unimpairment.</u>

On the Effective Date, the applicable Allowed Secured Real Property Tax Claim will be cured and reinstated as of the first date when last payable without interest, fees or penalties, and, as so cured and reinstated, will receive a lump sum payment in full on the Effective Date. Under this treatment, the Holder of an Allowed Secured Real Property Tax Claim will be paid Cash on the Effective Date equal to the amount of such Allowed Secured Real Property Tax Claim due as of the first date when last payable without interest, fees or penalty, plus any interest thereupon from such date until payment at the rate of interest, if any, determined under the applicable nonbankruptcy law, plus any fees incurred in reasonable reliance on timely receipt of the tax, but exclusive of any penalty amounts thereof at any time incurred or charged (*see* Bankruptcy Code §§ 365(b)(2)(D), 1123(a)(5)(G) & 1124(2)); or

(ii)     <u>Quarterly Payments.</u>

As permitted by Bankruptcy Code § 1129(a)(9)(D), each Holder of an Allowed Secured Real Property Tax Claim will receive value as of the Effective Date equal to 100% of its Allowed Secured Real Property Tax Claim through equal Cash payments totaling the Allowed Amount of the Claim, with interest at the rate applicable under non-bankruptcy law, if any, or, if none, the federal judgment rate applicable as of the Effective Date, with each payment to be made on

the last Business Day of each third full-calendar month following the Effective Date (*provided that* the first payment need not be made any sooner than thirty (30) days following the Effective Date). Such periodic payments will continue until November 6, 2013, on which date (within the five-year payment period mandated under section 1129(a)(9)(D)) the final payment will be due. Prepayments are permitted any time on or after the Effective Date, including payment in full of the Allowed Amount of the Claim, plus accrued interest as provided in this paragraph, but only with the consent of (and will be made if at the direction of) a Lehman VD Lender; or

(iii)    <u>Simple Unimpairment.</u>

As of the Effective Date, the Holder of any Allowed Secured Real Property Tax Claim, on account of such Claim, will have left unaltered its legal, equitable and/or contractual rights as a Holder of such Allowed Secured Real Property Tax Claim and will be free to pursue its rights and remedies, if any, against the underlying collateral under applicable nonbankruptcy law; and

(iv)    <u>Determination of Applicable Treatment.</u>

For subclasses as to which the taxes do <u>not</u> relate to Seller Financing Encumbered Parcels, the first alternative treatment will be applicable unless the applicable Lehman VD Lender selects and notifies the subject Creditor prior to the Effective Date of its selection of the second or third alternative treatments; provided that, notwithstanding, the foregoing, the second alternative treatment will be applicable if the Lehman VD Lenders do not waive the application of the following condition and the Bankruptcy Court rules as to the subject Claim (each of which is its own subclass) that despite cure and reinstatement in accordance with the Plan any of the following amounts remain payable:  (a) 10% of a tax, added upon non-payment of the tax by any deadline occurring prior to the applicable Petition Date for timely payment thereof or (b) 1.5% of the tax, added monthly from the first July 1 following the first missed timely payment deadline occurring prior to the Petition Date until payment.

For subclasses as to which the taxes relate to Seller Financing Encumbered Parcels, the third alternative treatment will be applicable unless the applicable Lehman VD Lender selects and notifies the subject Creditor prior to the Effective Date of its selection of the first or second alternative treatments.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

### 5.3.2    Treatment of Lehman Secured Claims (Class 2).

The treatment of Lehman Secured Claims (Class 2) under the Plan will be as follows:

#### (a)    Voting.

Class 2 is <u>Impaired</u> under the Plan, and each Holder of a Lehman Secured Claim is <u>entitled to vote</u> on the Plan.

#### (b)    Liens.

As of the Effective Date, each Holder of a Lehman Secured Claim, on account of such Claim, will <u>retain its Lehman Claim Liens</u> pending full payment in Cash of both the secured and unsecured portions of its Claim.

#### (c)    Claims.

Each Claim of a Lehman VD Lender will be Allowed for voting and all other purposes of the Plan in the amount and with the status as a Secured Claim or General Unsecured Claim as set forth in the Plan's classification tables.

#### (d)    Disposition of Collateral

(i)    On the Effective Date, the Plan Projects (other than any Seller Financing Encumbered Parcel designated by a Lehman VD Lender for conveyance in a Filed notice) will be conveyed free and clear of Encumbrances other than the Lehman Claim Liens and other Permitted Liens to one or more Lehman Nominees, as designated by the Lehman VD Lender(s) with a Secured Claim against the applicable Plan Project; and

(ii)    On the Effective Date, the Liquidating Trustee will pay all Cash Collateral for a Lehman Secured Claim to the applicable Lehman VD Lender or, may, at the direction of the Lehman VD Lenders, use all or a portion thereof to pay the Lehman Creditor Distribution Funding (in the order set forth in the definition thereof, unless the applicable Lehman VD Lender(s) otherwise directs), with the balance, if any, payable to the applicable Lehman VD Lender; and

(iii)    Any other remaining collateral for a Lehman Secured Claim may be retained and liquidated or sold by the Liquidating Trustee with the Net Cash Proceeds therefrom to be paid to the applicable Lehman VD Lender, *provided that:*

(a)    the Liquidating Trustee and Lehman VD Lenders may agree to any

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

alternative disposition of such collateral, including transfer of the collateral to the applicable Lehman

VD Lender or abandonment to the applicable VD Plan Debtor, which abandonment will be deemed

to occur on notice from the Liquidating Trustee;

(b)      the Lehman VD Lender, on reasonable notice to the Liquidating

Trustee, may require turnover to it of such collateral, including the PH CFD Bonds; and

(c)      if no disposition of such collateral occurs within six (6) months after

the Effective Date, the Liquidating Trustee will give the Lehman VD Lenders thirty (30) days'

notice indicating the Liquidating Trustee's intention to turn over the collateral to a particular

Lehman VD Lender and describing the collateral and:

(1)      If before the expiration of the notice period, the Lehman VD

Lender rejects such turn over, the Liquidating Trustee will abandon such collateral to the applicable

VD Plan Debtor, which abandonment will be deemed to occur on subsequent notice from the

Liquidating Trustee to the VD Plan Debtor and applicable Lehman VD Lenders; and

(2)      If the Lehman VD Lender does not reject such turn over, upon

expiration of the notice period, the Liquidating Trustee will turn over such collateral to the

applicable Lehman VD Lenders.

### 5.3.3    Treatment of Allowed Sr. Secured Mechanic's Lien Claims (Class 3).

The treatment of any Allowed Sr. Secured Mechanic's Lien Claims (Class 3) under

the Plan will be as follows:

(a)      **Voting and Impairment.**

Class 3 is Unimpaired under the Plan, and each Holder of an Allowed Sr. Secured

Mechanic's Lien Claim in Class 3, if any, is not entitled to vote on the Plan.

The Lehman Proponents dispute that any Mechanic's Lien Claims against any Group

I Debtor (other than SunCal Summit Valley) could be Allowed as Sr. Secured Mechanic's Lien

Claims because they believe that the Lehman VD Lenders' Liens are senior Encumbrances and there

is no value in the junior Liens of the Holders of such Mechanic's Lien Claims against any Group I

Debtor.  For each Holder identified in advance as having alleged to hold a Mechanic's Lien Claim

against any Group I Debtor, the Ballot will afford an opportunity to waive any contention that the

Holder has a Secured Claim senior to the Secured Claim of the applicable Lehman VD Lender(s) on the applicable Plan Project and to assert, instead, that its Claim is a General Unsecured Claim or Reliance Claim, thereby affording the Creditor, as more fully set forth below, the opportunity to elect to receive the Lehman Distribution Enhancement if its Claim is Allowed. **If the Creditor holding a Mechanic's Lien Claim against any Group I Debtor instead waits to see whether its Claim later is deemed to be entitled to "secured" status and it is unsuccessful in such effort, even if its Claim is Allowed as a Reliance Claim or General Unsecured Claim, it will only receive 1% on its Claim plus a proportional share of Residual Cash and it will not have the opportunity to elect to receive the Lehman Distribution Enhancement.**

(b)    Liens.

As of the Effective Date, each Holder of an Allowed Sr. Secured Mechanic's Lien Claim in Class 3, if any, on account of such Claim, will retain its underlying Liens on the applicable collateral pending full payment;

(c)    **Distributions and Distribution Dates.**

Each Allowed Sr. Secured Mechanic's Lien Claim, if any, will receive, on account of such Claim, one of the two following alternative treatments identified immediately below in full and final satisfaction of any such Allowed Sr. Secured Mechanic's Lien Claim:

(i)    Section 1124(2) Unimpairment.

On the Effective Date, the applicable Allowed Sr. Secured Mechanic's Lien Claim will be cured and reinstated as of the first date when last payable without interest, fees or penalties. The Holder of such Claim will receive from the owner of the Plan Project serving as collateral for the subject Claim (or from the applicable Settling Bond Issuer for Allowed Sr. Secured Mechanic's Lien Claims that also are Settling Bond Issuer-Backed Non-Future Work Claims ), as an obligation of such owner of the Plan Project and the Liquidating Trustee for the applicable Estate, payment in full equal to the amount of such Allowed Sr. Secured Mechanic's Lien Claim due as of the first date when last payable without interest, fees or penalty, plus any interest thereupon from such date until payment at the rate of interest, if any, determined under the applicable nonbankruptcy law, plus any fees incurred in reasonable reliance on timely receipt of timely payment, but exclusive of any

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

penalty amounts thereof at any time incurred or charged.  Such amounts will be payable in Cash as a lump sum on the Effective Date if the original maturity date has passed as of the Effective Date or, otherwise, will be payable by curing any defaults and paying any fees in Cash on the Effective Date and making further payments in Cash as required under the applicable contract after reinstatement (*see* Bankruptcy Code §§ 365(b)(2)(D), 1123(a)(5)(G) & 1124(2)); or

(ii)    Simple Unimpairment.

As of the Effective Date, the Holder of any such Allowed Sr. Secured Mechanic's Lien Claim, on account of such Claim, will have left unaltered its legal, equitable and contractual rights as a Holder of such Allowed Sr. Secured Mechanic's Lien Claim and will be free to pursue its rights and remedies, if any, against the underlying collateral under applicable nonbankruptcy law; and

(iii)    Determination of Applicable Treatment.

The first treatment indicated above will be applicable to each subclass <u>unless</u>, as to such subclass either the Lehman VD Lender with a Secured Claim against the applicable Plan Project or the Lehman Nominee, if any, taking title to such Plan Project selects and, prior to payment, notifies the applicable Creditor or Creditors of its selection of, the second alternative treatment, in which case the second alternative treatment will be applicable; provided that only the first treatment will be applicable for Allowed Sr. Secured Mechanic's Lien Claims that are Settling Bond Issuer-Backed Non-Future Work Claims; and

**(d)    Less Favorable Treatment for Lehman VD Lenders and Settling Bond Issuer(s) by Consent.**

(i)    The Lehman VD Lenders have consented that, in lieu of the treatment provided for other Allowed Claims in Class 3, each Holder of an Allowed Lehman-Owned Settling Bond Issuer-Related Claim in Class 3, on account of such Claim, only will be entitled under the Plan to receive from the applicable VD Plan Debtor the Residual Cash of the applicable VD Plan Debtor's Estate Pro Rata with Holders of other Allowed Claims in the following subclasses for such VD Plan Debtor:  (i) other Allowed Sr. Secured Mechanic's Lien Claims that are Lehman-Owned Settling Bond Issuer-Related Claims, (ii) Allowed Reliance Claims against Group I Debtors (Class 6), and (iii) Allowed General Unsecured Claims against Group I Debtors (Class 7).

(ii)     Based on its consent, each Settling Bond Issuer, in lieu of the treatment provided for other Allowed Claims in Class 3, will forego certain payments from the VD Plan Debtors' Estates for Allowed Sr. Secured Mechanic's Lien Claims that also are Settling Bond Issuer-Owned Non-Future Work Claims, held by the applicable Settling Bond Issuer immediately prior to the Effective Date or may waive contentions that such Claim is a Secured Claim.  Based on its ongoing liability under Future Work Bonds, a Settling Bond Issuer will be a beneficiary of the treatment of Settling Bond Issuer-Related Future Work Claims in Class 9.

### (e)     Unsecured Deficiency Claims.

If a Holder of an Allowed Sr. Secured Mechanic's Lien Claim contends it holds or wishes to assert an Unsecured Deficiency Claim related to its Allowed Sr. Secured Mechanic's Lien Claim then, by the Unsecured Deficiency Claims Bar Date (which is no later than the first Business Day that is at least thirty (30) days following the Effective Date) and regardless of any prior Filing of one or more Proofs of Claim by such Holder, such Holder must File (and serve upon the Liquidating Trustee and the Lehman VD Lenders) an amended Proof of Claim (in compliance with Bankruptcy Rule 3001) asserting, inter alia, the amount of such Unsecured Deficiency Claim.  Any such Unsecured Deficiency Claim, if Allowed, shall be treated as a General Unsecured Claim in Class 7 or Class 8, as applicable.  (With respect to Class 7 treatment, the exchange of a Creditors' Assignment / Release for Lehman for the Lehman Distribution Enhancement is a settlement offer under the Plan to be effectuated through the voting / balloting process for the Plan and is not available thereafter and thus is not available to Claims asserted in accordance with this provision.)

### 5.3.4    Treatment of Allowed Other Secured Claims (Class 4).

The treatment of any Allowed Other Secured Claims in Class 4 under the Plan will be as follows:

### (a)     Voting and Impairment.

Class 4 is Unimpaired under the Plan, and each Holder of an Allowed Secured Claim in Class 4, if any, is not entitled to vote on the Plan.

### (b)     Liens.

As of the Effective Date, each Holder of an Allowed Other Secured Claim in Class 4,

1  if any, on account of such Claim, will <u>retain its underlying Liens</u> on the applicable collateral pending

2  full payment.

3  **(c)    Distributions and Distribution Dates.**

4  Unless agreed otherwise with the applicable Creditor, each Allowed Other Secured

5  Claim, including, without limitation, any Seller Financing Secured Claim, will receive, in full and

6  final satisfaction of any such Allowed Other Secured Claim, the first following treatment identified

7  immediately below <u>unless</u> the Lehman Proponents or any of them selects the second or third

8  following alternative treatment identified below, in which case the selected alternative treatment will

9  be applicable:

10  (i)    <u>Simple Unimpairment.</u>

11  As of the Effective Date, the Holder of any such Allowed Other Secured Claim in

12  Class 4, on account of such Claim, will have left unaltered its legal, equitable and contractual rights

13  as a Holder of such Allowed Other Secured Claim in Class 4 and will be free to pursue its rights and

14  remedies, if any, against the underlying collateral under applicable nonbankruptcy law; or

15  (ii)    <u>Unimpairment With Surrender or Abandonment.</u>The

16  Liquidating Trustee will abandon or surrender to the Holder of any such Allowed Other Secured

17  Claim in Class 4 the property securing such Allowed Other Secured Claim in Class 4 and will turn

18  over possession of such collateral to the Holder of such Allowed Other Secured Claim upon the

19  Filing, prior to the closing of the Case, of a notice so providing therefor either by: (a) any Lehman

20  VD Lender or (b) the Liquidating Trustee, either with the consent of a Lehman VD Lender or upon

21  order of the Court after the refusal of the Lehman VD Lenders to provide reasonable financial

22  support for the maintenance of such property; or

23  (iii)    <u>Section 1124(2) Unimpairment.</u>

24  On the Effective Date, the applicable Allowed Other Secured Claim will be cured and

25  reinstated as of the first date when last payable without interest, fees or penalties.  The Holder of

26  such Claim will receive, as an obligation of the Liquidating Trustee for the applicable Estate,

27  payment in full equal to the amount of such Allowed Other Secured Claim in Class 4 due as of the

28  first date when last payable without interest, fees or penalty, plus any interest thereupon from such

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

date until payment at the rate of interest, if any, determined under the applicable nonbankruptcy law, plus any fees incurred in reasonable reliance on timely receipt of timely payment, but exclusive of any penalty amounts thereof at any time incurred or charged.  Such amounts will be payable in Cash as a lump sum on the Effective Date if the original maturity date has passed as of the Effective Date or, otherwise, will be payable by curing any defaults and paying any fees in Cash on the Effective Date and making further payments in Cash as required under the applicable contract or statute after reinstatement (*see* Bankruptcy Code §§ 365(b)(2)(D), 1123(a)(5)(G) & 1124(2)).

(iv)      Unsecured Deficiency Claims.

If a Holder of an Allowed Other Secured Claim contends it holds or wishes to assert an Unsecured Deficiency Claim related to its Allowed Other Secured Claim then, by the Unsecured Deficiency Claims Bar Date (which is no later than the first Business Day that is at least thirty (30) days following the Effective Date) and regardless of any prior Filing of one or more Proofs of Claim by such Holder, such Holder must File (and serve upon the Liquidating Trustee and the Lehman VD Lenders) an amended Proof of Claim (in compliance with Bankruptcy Rule 3001) asserting, inter alia, the amount of such Unsecured Deficiency Claim.  Any such Unsecured Deficiency Claim, if Allowed, shall be treated as a General Unsecured Claim in Class 7 or Class 8, as applicable.  (With respect to Class 7 treatment, the exchange of a Creditors' Assignment / Release for Lehman for the Lehman Distribution Enhancement is a settlement offer under the Plan to be effectuated through the voting / balloting process for the Plan and is not available thereafter and thus is not available to Claims asserted in accordance with this provision.)

**5.3.5    Treatment of Allowed Priority Claims (Class 5).**

The treatment of any Allowed Priority Claims in Class 5 under the Plan will be as follows:

**(a)      Voting and Impairment.**

Class 5 is Unimpaired under the Plan, and each Holder of an Allowed Priority Claim in Class 5 is not entitled to vote on the Plan.

**(b)      Distributions and Distribution Dates.**

Each Holder of an Allowed Priority Claim in Class 5 will be paid, on account of such

Claim as an obligation of the Liquidating Trustee for the applicable Estate, the full amount of such Allowed Priority Claim in Cash by the later of (i) the Effective Date, and (ii) the date such Allowed Priority Claim becomes payable in accordance with the terms governing such Allowed Priority Claim.

### 5.3.6 Treatment of Allowed Reliance Claims Against Group I Debtors (Class 6).

The treatment of any Allowed Reliance Claims in Class 6 under the Plan will be as follows:

**(a)  Voting and Impairment.**

Class 6 is <u>Impaired</u> under the Plan, and each Holder of an Allowed Reliance Claim against a Group I Debtor is <u>entitled to vote</u> on the Plan.  The same Ballot will be provided to those Creditors believed by the Proponents to hold General Unsecured Claims or Reliance Claims.  For any Creditor to vote its Claim as a Reliance Claim, the Creditor must mark its Ballot to indicate that it contends it holds a Reliance Claim.

**(b)  Distributions.**

(i)  <u>Lehman Creditor Distribution Funding.</u>

(1)  Lehman Guaranteed Minimum Distribution.

Each Holder of an Allowed Reliance Claim in Class 6 (against a Group I Debtor) will receive, on account of such Claim, one percent (1%) of the Allowed Amount of such Claim, which amount is part of the Lehman Guaranteed Minimum Distribution, arranged or provided by the Lehman VD Lenders.

(2)  Lehman Distribution Enhancement.

A Holder of an Allowed Reliance Claim in Class 6 (against a Group I Debtor) will only receive the Lehman Guaranteed Minimum Distribution (one percent (1%) of the Allowed Amount of such Claim) plus the Distribution of certain Residual Cash (described below) <u>unless</u> such Creditor properly and timely elects to receive the Lehman Distribution Enhancement and to afford the Lehman Released Parties the Creditor's Assignment / Release for Lehman.

On the other hand, each Holder of a Reliance Claim in Class 6 (against a Group I

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Debtor), who elects to receive the Lehman Distribution Enhancement and executes and delivers, in

accordance with the Plan, a Creditor's Assignment / Release for Lehman for the benefit of the

Lehman Released Parties, as consideration for such Creditor's Assignment / Release for Lehman,

will, to the extent its Reliance Claim in Class 6 is Allowed, have reserved the right to the following

and thereby will receive, on account of such Allowed Claim, the following additional amount in

Cash, which amount is part of the Lehman Distribution Enhancement, arranged or provided by the

Lehman VD Lenders:

(1)     *Additional 39% Recovery (Increasing Recovery to 40%)*:  The Liquidating
Trustee, in addition to the Guaranteed Minimum Distribution, shall pay an additional thirty-
nine percent (39%) of the Allowed Amount of the Allowed Class 6 Reliance Claim against
the applicable Group I Debtor (subject to the provisions for an On Proportion Distribution
Reduction below); and

(2)     *Projected Distribution Bump Up to 50% Recovery:* If the Classes 6/7
Distribution Amount as to a particular Group I Debtor does not exceed the Bump Up
Threshold for that Group I Debtor (which Bump Up Thresholds, in the aggregate, total $2.5
million), then, the Projected Distribution Bump Up shall apply and the Liquidating Trustee, in
addition to the Guaranteed Minimum Distribution, instead, shall pay an additional forty-
nine percent (49%) of the Allowed Amount of the Allowed Class 6 Reliance Claim against
the applicable Group I Debtor (subject to the provisions for an On Proportion Distribution
Reduction below); and

(3)     *On Proportion Distribution Reduction:*  If the Distributions for
Allowed Class 6 Claims and Allowed Class 7 Claims and for Allowed Senior Claims against
the Group I Debtors otherwise would exceed $20.5 million, there shall be an On Proportion
Distribution Reduction for the Allowed Class 6 Claims and Allowed Class 7 Claims,
reducing their Lehman Distribution Enhancement by such excess over $20.5 million.

(ii)     <u>Distribution of Residual Cash.</u>

Each Holder of an Allowed Reliance Claim against a Group I Debtor, will receive, on

account of such Claim, any Residual Cash in the applicable Estate, to be shared Pro Rata with

Holders of other Allowed Claims in the following subclasses for such VD Plan Debtor:  (i) Allowed

Sr. Secured Mechanic's Lien Claims (Class 3) that are Lehman-Owned Settling Bond Issuer-Related

Claims, (ii) other Allowed Reliance Claims in Class 6, and (iii) Allowed General Unsecured Claims

in Class 8.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

(iii)    Distributions for Allowed Bond-Backed Non-Future Work Claims in Class 6.

A Bond Issuer may have separate obligations, not arising under the Plan, to Bond-Backed Claimants in respect of Allowed Reliance Claims that are Bond-Backed Claims, which, thus, may be paid or settled by the applicable Settling Bond Issuer (and may be acquired by such Settling Bond Issuer as part of any such payment or settlement).

**(c)    Distribution Dates.**

Distributions in the amounts provided under the Plan are payable to Holders of Allowed Reliance Claims in Class 6 after the Effective Date as follows:

(i)    Lehman Creditor Distribution Funding.

(1)    Lehman Guaranteed Minimum Distribution.

Any Lehman Guaranteed Minimum Distribution due as to an Allowed Reliance Claim in Class 6 or portion thereof that is not a Future Obligation shall be payable within thirty (30) days following such Claim's Allowance Determination Date;

(2)    Lehman Distribution Enhancement.

For each Allowed Reliance Claim in Class 6 or portion thereof entitled to the Lehman Distribution Enhancement that is not a Future Obligation, the applicable Lehman Distribution Enhancement shall be payable by the later of (a) thirty (30) days following such Claim's Allowance Determination Date and (b) forty-five days following the Effective Date; provided that if the amount payable therefor is not the maximum amount that might be payable upon resolution of all Disputed Claims (which resolution would enable, *inter alia*, a determination of whether the Projected Distribution Bump Up is available and/or whether the On Proportion Distribution Reduction is applicable), then, the Liquidating Trustee shall make Interim Capped Distributions pending such final resolution of Disputed Claims.

(ii)    Residual Cash.

Any Distribution of Residual Cash for an Allowed Class 6 Claim or portion thereof that is not a Future Obligation shall be payable after the payment from the Lehman Creditor Distribution Funding at such times as determined in the sole discretion of the Liquidating Trustee,

considering, inter alia, the amount of sums available for Distribution and the progress in the claims allowance process.

(iii)      Distributions as to a Future Obligation.

For an Allowed Class 6 Claim or portion thereof that is a Future Obligation, each Distribution due under the Plan is payable by the later of: (a) the date determined as set forth otherwise in the Plan for an Allowed Class 6 Claim or portion thereof that is not a Future Obligation; and (b) thirty (30) days following the date that (i) the Claim or portion thereof is not a Future Obligation (e.g., the obligation becomes due, liquidated and non-contingent) and (ii) the Creditor holding such Claim sends a notice of such change in status of such Claim or portion thereof to the Lehman Proponents at the address set forth in the Plan.

**(d)      Less Favorable Treatment for Lehman VD Lenders and Settling Bond Issuer(s) by Consent.**

(i)      The Lehman VD Lenders have consented that, in lieu of the treatment provided for other Allowed Claims in Class 6, for Allowed Reliance Claims of the Lehman VD Lenders against Group I Debtors, if any:

(1)      the Lehman VD Lenders, as the Holders thereof, will forego any payment from the VD Plan Debtors' Estates on account of such Claims, except as follows in the next paragraph; and

(2)      to the extent such Claims are Lehman-Owned Settling Bond Issuer-Related Claims, each Lehman VD Lender holding such a Claim, on account of such Claim, only will be entitled under the Plan to receive from the applicable VD Plan Debtor the Residual Cash of the applicable VD Plan Debtor's Estate Pro Rata with Holders of other Allowed Claims in the following subclasses for such VD Plan Debtor:  (i) Allowed Sr. Secured Mechanic's Lien Claims that are Lehman-Owned Settling Bond Issuer-Related Claims, (ii) other Allowed Reliance Claims in Class 6, and (iii) Allowed General Unsecured Claims in Class 8.

(ii)      Based on its consent, each Settling Bond Issuer, in lieu of the treatment provided for other Allowed Claims in Class 6, will forego certain payments from the VD Plan Debtors' Estates for any Allowed Reliance Claims in Class 6 that also are Settling Bond Issuer-Owned Non-Future Work Claims, held by the applicable Settling Bond Issuer immediately prior to

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

the Effective Date.  Based on its ongoing liability under Future Work Bonds, a Settling Bond Issuer

will be a beneficiary of the treatment of Settling Bond Issuer-Related Future Work Claims in Class

9.

### 5.3.7    Treatment of Allowed General Unsecured Claims Against Group I Debtors (Class 7).

The treatment of any Allowed General Unsecured Claims in Class 7 under the Plan

will be as follows:

**(a)    Voting and Impairment.**

Class 7 is <u>Impaired</u> under the Plan, and each Holder of an Allowed General

Unsecured Claim against a Group I Debtor is <u>entitled to vote</u> on the Plan.  The same Ballot will be

provided to those Creditors believed by the Proponents to hold General Unsecured Claims or

Reliance Claims.  A Creditor can vote its Claim as a General Unsecured Claim or, if eligible, may

mark its Ballot to indicate that it contends it holds a Reliance Claim.

**(b)    Distributions.**

(i)    <u>Lehman Creditor Distribution Funding.</u>

(1)    Lehman Guaranteed Minimum Distribution.

Each Holder of an Allowed General Unsecured Claim in Class 7 will receive, on

account of such Claim, one percent (1%) of the Allowed Amount of such Claim, which amount is

part of the Lehman Guaranteed Minimum Distribution, arranged or provided by the Lehman VD

Lenders.

(2)    Lehman Distribution Enhancement.

A Holder of an Allowed General Unsecured Claim in Class 7 (against a Group I

Debtor)  will only receive the Lehman Guaranteed Minimum Distribution (one percent (1%) of the

Allowed Amount of such Claim) plus the Distribution of certain Residual Cash (described below)

<u>unless</u> such Creditor properly and timely elects to receive the Lehman Distribution Enhancement and

to afford the Lehman Released Parties the Creditor's Assignment / Release for Lehman.

On the other hand, each Holder of a General Unsecured Claim in Class 7, who elects

to receive the Lehman Distribution Enhancement and executes and delivers, in accordance with the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Plan, a Creditor's Assignment / Release for Lehman for the benefit of the Lehman Released Parties, as consideration for such Creditor's Assignment / Release for Lehman, will, to the extent its General Unsecured Claim in Class 8 is Allowed, have reserved the right to the following and thereby will receive, on account of such Allowed Claim, the following additional amount in Cash, which amount is part of the Lehman Distribution Enhancement, arranged or provided by the Lehman VD Lenders:

> (1)    Increase to 5% Recovery:  The Liquidating Trustee, in addition to the Guaranteed Minimum Distribution, shall pay an additional four percent (4%) of the Allowed Amount of the Allowed Class 7 General Unsecured Claim against the applicable Group I Debtor (subject to the provisions for an On Proportion Distribution Reduction below); and

> (2)    On Proportion Distribution Reduction:  If the Distributions for Allowed Class 6 Claims and Allowed Class 7 Claims and for Allowed Senior Claims against the Group I Debtors otherwise would exceed $20.5 million, there shall be an On Proportion Distribution Reduction for the Allowed Class 6 Claims and Allowed Class 7 Claims, reducing their Lehman Distribution Enhancement by such excess over $20.5 million.

> (ii)    <u>Distribution of Residual Cash.</u>

Each Holder of an Allowed General Unsecured Claim in Class 7, will receive, on account of such Claim, any Residual Cash in the applicable Estate, to be shared Pro Rata with Holders of other Allowed Claims in the following subclasses for such VD Plan Debtor:  (i) Allowed Sr. Secured Mechanic's Lien Claims (Class 3) that are Lehman-Owned Settling Bond Issuer-Related Claims, (ii) Allowed Reliance Claims in Class 6, and (iii) other Allowed General Unsecured Claims in Class 7.

**(c)    Distributions for Allowed Bond-Backed Non-Future Work Claims in Class 7.**

A Bond Issuer may have separate obligations, not arising under the Plan, to Bond-Backed Claimants in respect of Allowed General Unsecured Claims that are Bond-Backed Claims, which, thus, may be paid or settled by the applicable Settling Bond Issuer (and may be acquired as part of any such payment or settlement).

**(d)    Distribution Dates.**

Distributions in the amounts provided under the Plan are payable to Holders of Allowed General Unsecured Claims in Class 7 after the Effective Date as follows:

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

(i)       <u>Lehman Creditor Distribution Funding.</u>

(1)       Lehman Guaranteed Minimum Distribution.

Any Lehman Guaranteed Minimum Distribution due as to an Allowed General Unsecured Claim in Class 7 or portion thereof that is not a Future Obligation shall be payable within thirty (30) days following such Claim's Allowance Determination Date;

(2)       Lehman Distribution Enhancement.

For each Allowed General Unsecured Claim in Class 7 or portion thereof entitled to the Lehman Distribution Enhancement that is not a Future Obligation, the applicable Lehman Distribution Enhancement shall be payable by the later of (a) thirty (30) days following such Claim's Allowance Determination Date and (b) forty-five days following the Effective Date; provided that if the amount payable therefor is not the maximum amount that might be payable upon resolution of all Disputed Claims (which resolution would enable, *inter alia*, a determination of whether the Projected Distribution Bump Up is available and/or whether the On Proportion Distribution Reduction is applicable), then, the Liquidating Trustee shall make Interim Capped Distributions pending such final resolution of Disputed Claims.

(ii)       <u>Residual Cash.</u>

Any Distribution of Residual Cash for an Allowed Class 7 Claim or portion thereof that is not a Future Obligation shall be payable after the payment from the Lehman Creditor Distribution Funding at such times as determined in the sole discretion of the Liquidating Trustee, considering, *inter alia*, the amount of sums available for Distribution and the progress in the claims allowance process.

(iii)       <u>Distributions as to a Future Obligation.</u>

For an Allowed Class 7 Claim or portion thereof that is a Future Obligation, each Distribution due under the Plan is payable by the later of: (a) the date determined as set forth otherwise in the Plan for an Allowed Class 7 Claim or portion thereof that is not a Future Obligation; and (b) thirty (30) days following the date that (i) the Claim or portion thereof is not a Future Obligation (e.g., the obligation is due, liquidated and non-contingent) and (ii) the Creditor holding such Claim sends a notice of such change in status of such Claim or portion thereof to the Lehman

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Proponents at the address set forth in the Plan.

          **(e)    Less Favorable Treatment for Lehman VD Lenders and Settling Bond Issuer(s) by Consent.**

          (i)    The Lehman VD Lenders have consented that, in lieu of the treatment provided for other Allowed Claims in Class 7, for Allowed General Unsecured Claims in Class 7 of the Lehman VD Lenders:

          (1)    the Lehman VD Lenders, as the Holders thereof, will forego any payment from the VD Plan Debtors' Estates on account of such Claims, except as follows in the next paragraph; and

          (2)    to the extent such Claims are Lehman-Owned Settling Bond Issuer-Related Claims, each Lehman VD Lender holding such a Claim, on account of such Claim, only will be entitled under the Plan to receive from the applicable VD Plan Debtor the Residual Cash of the applicable VD Plan Debtor's Estate Pro Rata with Holders of other Allowed Claims in the following subclasses for such VD Plan Debtor:  (i) Allowed Sr. Secured Mechanic's Lien Claims that are Lehman-Owned Settling Bond Issuer-Related Claims, (ii) Allowed Reliance Claims in Class 6, and (iii) other Allowed General Unsecured Claims in Class 7.

          (ii)    Based on its consent, each Settling Bond Issuer, in lieu of the treatment provided for other Allowed Claims in Class 7, shall forego certain payments from the VD Plan Debtors' Estates for Allowed General Unsecured Claims in Class 7 that also are Settling Bond Issuer-Owned Non-Future Work Claims, held by the applicable Settling Bond Issuer immediately prior to the Effective Date.  Based on its ongoing liability under Future Work Bonds, a Settling Bond Issuer will be a beneficiary of the treatment of Settling Bond Issuer-Related Future Work Claims in Class 9.

        **5.3.8    Treatment of Allowed General Unsecured Claims Against Group II Debtors (Class 8).**

          The treatment of any Allowed General Unsecured Claims in Class 8 under the Plan will be as follows:

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

(a)      **Voting and Impairment.**

Class 8 is <u>Impaired</u> under the Plan, and each Holder of an Allowed General Unsecured Claim against a Group II Debtor is <u>entitled to vote</u> on the Plan.

(b)      **Distributions:  Lehman Creditor Distribution Funding.**

Each Holder of an Allowed General Unsecured Claim in Class 8 will receive, on account of such Claim, a Distribution in Cash equal to the lesser of:

(i)      100% of the Allowed Amount of such Claim, plus post-petition interest at the Federal Judgment Rate applicable on the applicable Petition Date; and

(ii)      a Pro Rata distribution of:

(1)      any positive sum resulting from subtracting the Allowed Senior Claims against the applicable VD Plan Debtor from the Project Value for the applicable VD Plan Debtor's Plan Project; and

(2)      any Residual Cash of the Estate of the applicable VD Plan Debtor; provided that such Pro Rata Distribution shall not be less than 1% of each Allowed Claim.

(c)      **Distribution Dates.**

Distributions in the amounts provided under the Plan are payable to Holders of Allowed General Unsecured Claims in Class 8 after the Effective Date as follows:

(i)      <u>Lehman Creditor Distribution Funding.</u>

For each Allowed General Unsecured Claim in Class 8 or portion thereof that is not a Future Obligation, Distributions shall be payable by the later of (a) thirty (30) days following such Claim's Allowance Determination Date and (b) forty-five days following the Effective Date; <u>provided that</u> if the amount payable therefor is not the maximum amount that might be payable upon resolution of all Disputed Claims, then, the Liquidating Trustee shall make Interim Capped Distributions pending such final resolution of Disputed Claims.

(ii)      <u>Residual Cash.</u>

Any Distribution of Residual Cash for an Allowed Class 8 Claim or portion thereof that is not a Future Obligation shall be payable after the payment from the Lehman Creditor Distribution Funding at such times as determined in the sole discretion of the Liquidating Trustee,

1    considering, *inter alia*, the amount of sums available for Distribution and the progress in the claims

2    allowance process.

3                        (iii)    Distributions as to a Future Obligation.

4                For an Allowed Class 8 Claim or portion thereof that is a Future Obligation, each

5    Distribution due under the Plan is payable the later of: (a) the date determined as set forth otherwise

6    in the Plan for an Allowed Class 8 Claim or portion thereof that is not a Future Obligation; and (b)

7    thirty (30) days following the date that (i) the Claim or portion thereof is not a Future Obligation

8    (e.g., the obligation is due, liquidated and non-contingent) and (ii) the Creditor holding such Claim

9    sends a notice of such change in status of such Claim or portion thereof to the Lehman Proponents at

10    the address set forth in the Plan.

11                **5.3.9    Treatment of Allowed Settling Bond Issuer-Related Future Work Claims**

12    **(Class 9).**

13                The treatment of any Allowed Settling Bond Issuer-Related Future Work Claims in

14    Class 9 under the Plan will be as follows:

15                        **(a)    Voting and Impairment.**

16                Class 9 is Impaired under the Plan, and the Holders of the Allowed Settling Bond

17    Issuer-Related Future Work Claims are entitled to vote on the Plan.

18                        **(b)    Distributions and Distribution Dates.**

19                Allowed Settling Bond Issuer-Related Future Work Claims consist of Allowed

20    Settling Bond Issuer-Backed Future Work Claims and Allowed Settling Bond Issuer-Owned Future

21    Work Claims.  Each Holder of an Allowed Settling Bond Issuer-Related Future Work Claim will

22    receive the following on account of its Claim:

23                        (i)    The related Future Work obligations will be performed, with

24    no penalties to be applicable (and, to the extent applicable, with the obligation reinstated as to any

25    maturity applicable prior to the applicable Petition Date);

26                        (ii)    The initial payment for the performance of the Future Work

27    obligations will be the obligation of the applicable Settling Bond Issuer that issued a Future Work

28    Bond with respect to the subject Claim and will not be an obligation of the Liquidating Trustee,

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Lehman Nominee or any VD Plan Debtor's Estate;

(iii)    The Lehman Nominee that takes title to the Plan Project to which the subject Claim relates will cooperate in connection with the performance of such Future Work obligations, contingent upon such payment by the applicable Settling Bond Issuer;

(iv)    As and to the extent provided in the applicable Settling Bond Issuer Agreement:

(1)    A Lehman Related Party(ies) will take an assignment from the applicable Settling Bond Issuer of certain of such Settling Bond Issuer's Claims against the applicable VD Plan Debtor and Bond Obligors; and

(2)    In exchange therefor, the Lehman Nominee that takes title to the Plan Project to which the subject Claim relates is to reimburse such Settling Bond Issuer agreed amounts for payments made by such Settling Bond Issuer under the applicable Future Work Bonds; and

(v)    Nonetheless, pursuant to the Bond Modification Discussions or otherwise, the Holder of an Allowed Settling Bond Issuer-Backed Future Work Claim may agree to forego performance or payment for certain Future Work, such as may occur specifically as to such performance or payment of Future Work or through release of the applicable Future Work Bond.

**5.3.10  Treatment of Allowed Interests (Class 10).**

The treatment of any Allowed Interests in Class 10 under the Plan will be as follows:

(a)    Class 10 is Impaired under the Plan, and each Holder of an Allowed Interest is deemed to reject the Plan and is not entitled to vote; and

(b)    On the Effective Date, all such Allowed Interests will be cancelled and each Holder thereof will not be entitled to, and will not, retain or receive any property or interest in property on account of its Interest.

**5.4    Means of Execution and Implementation of the Joint VD Plan.**

**5.4.1    Introduction.**

This section is intended to address how the Proponents intend to fund and to have implemented the obligations to Creditors under the Plan.  It thus provides information regarding

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

funding sources and mechanisms for the Plan obligations, management of the VD Plan Debtors' Estates after the Effective Date and other material issues bearing upon the performance of the Plan.

### 5.4.2 The Liquidating Trustee.

The Estate of each VD Plan Debtor will be managed after the Effective Date by the Liquidating Trustee, who, except as otherwise provided in the Plan, will oversee and effectuate the Distributions to Creditors under the Plan, the liquidation of the Remaining Other Assets, and the sale and transfer of the Plan Projects to the Lehman Nominees, and otherwise will implement the Plan. [_____] will be the Liquidating Trustee or, if such Person declines to serve, another Person selected by the Lehman Proponents and approved by the Court shall be the Liquidating Trustee. The person who becomes the Liquidating Trustee, while serving in his capacity as the Liquidating Trustee, will be an agent of each Estate and not a separate taxable entity therefrom. Compensation of the Liquidating Trustee will be reasonable compensation payable from the VD Plan Debtors' Estates after prior notice to, *inter alia*, the Lehman Creditors, Voluntary Debtors' Committee members, and U.S. Trustee and after order of the Bankruptcy Court.  The Bankruptcy Court may, by order, replace the Liquidating Trustee in its reasonable discretion.  After the Effective Date, the Liquidating Trustee, *inter alia*, will cooperate in granting, perfecting or reflecting perfection of any Liens acknowledged or created or provided for under the Plan, will cooperate with the Lehman Proponents in the claims process and prosecution, resolution or abandonment of any objections to Claims, and will resolve or dismiss any Remaining Litigation Claims, all in accordance with the Plan.

### 5.4.3 Conditions to Confirmation and Plan Effectiveness.

Under the Plan, as more fully set forth herein, the Lehman VD Lenders are to be conveyed the Plan Projects (through the Lehman Nominees) and receive releases, as more fully set forth below, and the Liquidating Trustee is to cooperate with any Lehman Related Party in connection with Bond Modification Discussions that any Lehman Related Party desires to initiate. As discussed more fully below, unless waived by the Lehman VD Lenders in their sole and absolute discretion, conditions precedent to entry of the Confirmation Order for the Plan, which Confirmation Order will reflect the approval of the Plan by the Bankruptcy Court having jurisdiction over the

Cases after consideration of all applicable provisions of the Bankruptcy Code, are: (a) first,

execution of a Settling Bond Issuer Agreement by certain of the Lehman Related Parties and each

Bond Issuer; (b) second, approval of the role and obligations under the Plan of certain of the Lehman

VD Lenders and of each Settling Bond Issuer Agreement (or the material terms thereof) by the New

York Bankruptcy Court, due to its having jurisdiction over the New York Bankruptcy Cases of

Lehman Commercial, a Lehman VD Lender, and LBHI, which may be a party to the applicable

Settling Bond Issuer Agreement (as a guarantor of one or more applicable Lehman Nominee's

reimbursement obligations thereunder) and may be a source of funding of the Lehman Plan Funding;

(c) third, as to the Group I Debtors, that the Lehman VD Lenders good faith estimate of all such

Debtors' Allowed Senior Claims does not exceed $17 million, and, as to the Group II Debtors, that

the Lehman VD Lenders good faith estimate of all such Debtors' Allowed Senior Claims does not

exceed $3 million; and (d) fourth, unless waived by the Lehman VD Lenders as to one or more VD

Plan Debtors, confirmation of the Plan as to all of the VD Plan Debtors.  Conditions to the Plan's

effectiveness and occurrence of the Effective Date are: (i) the Confirmation Order must be a Final

Order in form and substance reasonably satisfactory to the Lehman VD Lenders; (ii) unless waived

by the Lehman VD Lenders, all agreements and instruments contemplated by the Plan have been

executed and delivered and all conditions to their effectiveness satisfied or waived; and (iii) unless

waived by the Lehman VD Lenders as to one or more VD Plan Debtors, the simultaneous

occurrence of the Effective Date for all of the VD Plan Debtors.

### 5.4.4    Lehman Plan Funding.

Under the Plan, the Lehman VD Lenders have agreed to pay the Lehman Post-

Confirmation Expense Funding and the Lehman Creditor Distribution Funding. Additionally, except

as expressly provided otherwise in the Plan, Cash that is not Cash Collateral will first be used to pay

all Allowed Administrative Claims, and then Allowed Priority Claims, and then Allowed Secured

Real Property Tax Claims, and any excess thereof may be held as a reserve by the Liquidating

Trustee for Post-Confirmation Expenses in lieu or prior to becoming Residual Cash.  Although one

of the Lehman Creditors, Lehman Commercial, is a debtor in a chapter 11 case (administratively

consolidated with other cases including that of its indirect parent, LBHI) in which there is substantial

prepetition debt,[13] the Lehman Creditors have ample Cash to fulfill their obligations under the Joint

TD Plan and Joint VD Plan.  In fact, the February 2011 monthly operating report filed on March 18,

2011 in the New York Bankruptcy Court [Docket No. 15194] reflects ending unrestricted cash and

investments that includes cash in demand-deposit accounts, money-market funds, treasury bills and

other investments held by Lehman Commercial of approximately $2.726 billion and, together with

LBHI, a combined total of $3.669 billion.[14]

### (a)    Lehman Creditor Distribution Funding.

The Lehman Creditors have agreed under the Plan to fund, to the extent not paid from

other designated sources, through permitting use of Cash Collateral or through new transfers of Cash

or through other arrangements, the Distributions that Plan Articles IV and VI mandate for the

following (i) Allowed Secured Real Property Tax Claims (Class 1), (ii) Allowed Administrative

Claims, (iii) Allowed Priority Tax Claims, (iv) Allowed Priority Claims (Class 5), (v) Allowed Sr.

Secured Mechanic's Lien Claims (Class 3), (vi) Allowed Other Secured Claims (Class 4) (only to

the extent that the third alternative treatment set forth in the Plan is selected), (viii) the Lehman

Guaranteed Minimum Distribution, and (ix) as applicable, the Lehman Distribution Enhancement for

Holders of Allowed General Unsecured Claims in Class 7 and Allowed Reliance Claims in Class 6.

(In addition to providing the Lehman Plan Funding, the Lehman VD Lenders also have agreed under

this Plan to arrange for the applicable Lehman Nominees to cooperate in the performance of Future

Work that is the subject of an Allowed Settling Bond Issuer- Backed Future Work Claim and to

reimburse the agreed upon amount to the applicable Settling Bond Issuer for the Settling Bond

Issuer-Incurred Future Work Obligations arising under any Future Work Bond.)

---

[13]  The *Debtors' Disclosure Statement for First Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors Pursuant to Section 1125 of the Bankruptcy Code,* Dated January 25, 2011, filed on January 25, 2011 in the New York Bankruptcy Court [Docket No. 14151], attached as an exhibit to a Request for Judicial Notice being Filed by the Lehman Creditors with the Bankruptcy Court simultaneously with the initial Filing of this disclosure statement, reflects approximately $623.781 billion in claims have been filed against Lehman Commercial and its parent LBHI.  (The validity of some of such claims has been or will be challenged.)

[14]  The *Final Order Pursuant . . . (A) Authorizing Debtors to (I) Continue to Use Existing Cash Management System, as Modified . . .*, entered by the New York Bankruptcy Court on November 6, 2008 [Docket No. 1416], attached as an exhibit to a Request for Judicial Notice, being Filed by the Lehman Creditors with the Bankruptcy Court simultaneously with the initial Filing of this disclosure statement, authorizes LBHI, Lehman Commercial and other affiliated debtors to make transfers of cash to debtor or non-debtor affiliates, as applicable in exchange for liens or notes with respect to the amounts transferred.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

(i)      Lehman Guaranteed Minimum Distribution.

The Lehman VD Lenders have agreed to fund guaranteed, minimum recoveries, of one percent (1%) of each Allowed General Unsecured Claim in Class 8 and Class 9 and one percent (1%) of each Allowed Reliance Claim in Class 6 and Class 7, regardless of whether the individual Creditor holding such Claim executes and delivers for the benefit of the Lehman Released Parties the applicable Creditor's Assignment / Release for Lehman.

(ii)      Lehman Distribution Enhancement.

For Creditors holding Allowed General Unsecured Claims in Class 7 and Allowed Reliance Claims in Class 6 who do execute and deliver for the benefit of the Lehman Released Parties the applicable Creditor's Assignment / Release for Lehman, the Lehman VD Lenders are increasing recoveries for such Allowed Class 6 and 7 Claims (a) by up to four percent (4%) of each Allowed General Unsecured Claim in Class 7 (for a total recovery of up to five percent (5%) of such Claims) and (b) by up to forty-nine percent (49%) of each Allowed Reliance Claim in Class 6 (for a total recovery of up to fifty percent (50%) of such Claims), provided that the exact percentage(s) of enhanced recovery shall be subject to the Plan subject to the On Proportion Distribution Reduction, if applicable, as set forth in the Plan.

(1)      The On Proportion Distribution Reduction.

The On Proportion Distribution Reduction is a reduction in the Distribution for a Creditor holding an Allowed Reliance Claim or an Allowed General Unsecured Claim against a Group I Debtor applicable only if the following items (A) through (C), in aggregate, exceed $20.5 million and the excess of such items over $20.5 million hereafter is referred to as the "Excess":

(A)      The amount of the Lehman Distribution Enhancement for any Holder of an Allowed Reliance Claim or an Allowed General Unsecured Claim against any of the Group I Debtors, calculated without regard to this reduction and including the Projected Distribution Bump Up, if applicable, e.g., unless it is finally determined to be unavailable (hereafter, the "Regular, Individual Lehman Distribution Enhancement") aggregated with the amounts of all other Regular, Individual Lehman Distribution Enhancements of all Holders of Allowed Reliance Claims and Allowed General Unsecured Claims against Group I Debtors (such

1     aggregate amount hereafter referred to as the "Regular Lehman Distribution Enhancement

2     Total"); plus

3   (B)    The amount of the aggregate Lehman Guaranteed Minimum Distributions for all Allowed

4     Reliance Claims and Allowed General Unsecured Claims against Group I Debtors (*i.e.*, 1%

5     of such Allowed Claims), plus

6   (C)    The aggregate Distributions for all Allowed Senior Claims for all Group I Debtors.

7         If this reduction applies, then, the Lehman Distribution Enhancement payable

8   to all Holders of Allowed Class 6 Claims and Allowed Class 7 Claims shall be reduced by the

9   Excess, with such reduction applied ratably among such Holders.  More specifically, if this reduction

10   applies, then, the Lehman Distribution Enhancement payable to each Holder of an Allowed Class 6

11   Claim or Allowed Class 7 Claim shall be reduced by a percentage of the Excess equal to the

12   percentage of the Regular Lehman Distribution Enhancement Total that is represented by such

13   Holder's Regular, Individual Lehman Distribution Enhancement.

14         By example, assume that, absent this reduction, a particular Holder of an

15   Allowed Reliance Claim or Allowed General Unsecured Claim against a Group I Debtor would be

16   entitled to receive under the Plan in respect of such Claim $200,000 (*e.g.*, the Regular, Individual

17   Lehman Distribution Enhancement) and that, absent this reduction, all such Holders of Allowed

18   Reliance Claims and Allowed General Unsecured Claims would be entitled to receive $2 million

19   (*e.g.,* the Regular Lehman Distribution Enhancement Total).  Assume also that there is an Excess

20   over $20.5 million of $100,000.  For the particular Holder, because its Regular, Individual Lehman

21   Distribution Enhancement ($200,000) is 10% of the Regular Lehman Distribution Enhancement

22   Total ($2 million), the reduction from such $200,000 Distribution otherwise payable to such Holder

23   would be 10% of the Excess or $10,000, resulting in the Distribution for such Holder being reduced

24   from $200,000 to $190,000.

25           **(b)**     **Lehman Post-Confirmation Expense Funding.**

26         Under the Plan, the Lehman VD Lenders have agreed to pay an amount (with such

27   amount not to exceed $500,000 and which shall not be payable for expenses to be incurred or

28   payable or for services to be rendered from or after two (2) years following the Effective Date) for

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Post-Confirmation Expenses in the form of new Cash transfers or by a Lehman VD Lender permitting the use of Cash Collateral of a Lehman VD Lender, each as loans payable by each benefitted VD Plan Debtor's Estate, provided that the recourse for such loans shall be limited to the applicable Estate's Net Cash Proceeds from Remaining Other Assets.

**(c)      Funding with Cash Collateral of a Lehman VD Lender.**

If permitted by the applicable Lehman VD Lender, on the Effective Date, the Liquidating Trustee will use Cash Collateral for a Lehman Secured Claim to pay the Lehman Creditor Distribution Funding (in the order set forth in the definition thereof, unless otherwise specified by the applicable Lehman VD Lender) and then to pay the applicable Lehman VD Lender, unless it agrees that the Liquidating Trustee, instead, may hold such Cash Collateral in the Plan Reserve for potential use for payment of Post-Confirmation Expenses.

**(d)      Funding with New Cash Payments from a Lehman Related Party.**

On the Effective Date, the Lehman VD Lenders will cause to be paid to the Liquidating Trustee from new Cash transfers sufficient amounts such that, when combined with other available and designated sources and Cash Collateral for Lehman Secured Claims and Lehman Administrative Loans, the Liquidating Trustee is holding sufficient funds to make the payments required under the Plan to be paid on the Effective Date from Lehman Plan Funding.  Thereafter, the Lehman VD Lenders will pay the Liquidating Trustee further amounts at such times as the VD Plan Debtors and the Liquidating Trustee, as applicable, and the Lehman VD Lenders reasonably determine are necessary to enable the Liquidating Trustee to make timely payments due under the Plan as Lehman Plan Funding.

**(e)      Plan Reserve.**

All Lehman Plan Funding provided by a Lehman Related Party will be deposited in or held in the Plan Reserve until utilized in accordance with the Plan. The applicable Lehman VD Lender will report the Cash Collateral, while held in the Plan Reserve, as being owned by it for all applicable federal, state and local income tax purposes.  To enable the applicable Lehman VD Lender to pay its applicable federal, state and local income tax with respect to amounts in the Plan Reserve, the Liquidating Trustee will distribute to the applicable Lehman VD Lender, or cause to be

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

distributed, forty five percent (45%) of all income and gain earned with respect to amounts in the Plan Reserve no less than annually and prior to any such amounts being otherwise distributed pursuant to the Plan.

**(f)    Terms and Documentation of Lehman Plan Funding.**

The Liquidating Trustee will be obligated to repay to the applicable Lehman Related Party any Lehman Plan Funding not utilized in accordance with the Plan.  The Liquidating Trustee also will be obligated to repay all of the Lehman Post-Confirmation Expense Funding to the extent of Net Cash Proceeds from Remaining Other Assets, based on such funding being a non-recourse loan against Remaining Other Assets and their Net Cash Proceeds as indicated above.  Repayments will be due immediately upon funds therefor becoming available.  Repayment obligations will be secured by a Lien (or replacement Liens as to use of Cash Collateral) (1) of first priority in all funds in the Plan Reserve and in any Post-Confirmation Account(s) until such funds have been utilized in accordance with the Plan and (2) a Lien on any Remaining Other Assets, junior only to any other valid and indefeasible Liens in the Remaining Other Assets.  The Liquidating Trustee will reasonably execute all documents reasonably requested by a Lehman VD Lender to evidence a loan or use of Cash Collateral constituting Lehman Post-Confirmation Expense Funding and to evidence any Liens or replacement Liens for the use of Cash Collateral, securing the Liquidating Trustee's repayment obligations, on terms and in a form reasonably requested by such Lehman VD Lender, with customary and reasonable provisions for interest, fees and expenses upon the loan(s).

**5.4.5    Post-Confirmation Expenses and Intercompany Loans.**

Limited functions are required to implement the Plan after the Effective Date.  The Liquidating Trustee will need to distribute Cash to Creditors (most of which is being provided by the Lehman VD Lenders), convey the Plan Projects to the Lehman Nominees, participate and cooperate with the Lehman VD Lenders in the claim reconciliation and objection processes, and liquidate the limited Remaining Other Assets.  Post-Confirmation Expenses expected to be incurred include:

(a)    Compensation for the Liquidating Trustee for the period following the Effective Date;

(b)    Expenses for fees of the professionals retained by the Liquidating Trustee

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

following the Effective Date;

        (c)      Quarterly U.S. Trustee fees for this government agency with responsibilities in respect to bankruptcy cases following the Effective Date; and

        (d)      Additional obligations of the Liquidating Trustee (in such capacity) that arise on or after the Effective Date consistent with the Plan.

All Post-Confirmation Expenses may be paid by the Liquidating Trustee from the Post-Confirmation Account(s) upon ten (10) days' prior written notice and opportunity to object provided to the Lehman Creditors, but without further notice to any others, including Creditors or Holders of Interests, or approval of the Bankruptcy Court.  Any disputes concerning the payment of Post-Confirmation Expenses will be submitted to the Bankruptcy Court for resolution.  To the extent readily determinable, Post-Confirmation Expenses attributable to a particular VD Plan Debtor will be paid from that VD Plan Debtor's Assets consistent with the provisions of the Plan.  To the extent of available Assets from each VD Plan Debtor, other Post-Confirmation Expenses will be payable by each VD Plan Debtor Pro Rata consistent with the Plan, provided that after a VD Plan Debtor's Available Cash or Assets are exhausted, the other VD Plan Debtors will absorb such VD Plan Debtor's share of unpaid Post-Confirmation Expenses as provided in the Plan, which will be Pro Rata to the extent reasonably possible.  To the extent one VD Plan Debtor advances funds on behalf of another, the Liquidating Trustee will book a receivable for the advancing VD Plan Debtor and a payable for the borrowing VD Plan Debtor.  Payments of intercompany loans between the VD Plan Debtors made prior to the Confirmation Date will not be funded by the Lehman VD Lenders and are waived except to the extent of Remaining Other Assets.

### 5.4.6 Vesting of Assets in Estates of VD Plan Debtors Managed by Liquidating Trustee.

Except as otherwise provided in the Plan or any agreement, instrument or other document relating to the Plan, on and after the Effective Date, all property of each VD Plan Debtor's Estate will vest in each respective Estate, free and clear of all Liens.  Except as may be provided in the Plan, on and after the Effective Date, the Liquidating Trustee may operate the business of each Estate and may use, acquire or dispose of property and compromise or settle any Claims or Interests

without supervision or approval by the Bankruptcy Court and free of any restrictions of the

Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan

and the Confirmation Order.  On motion to the Bankruptcy Court and consent of the Lehman VD

Lenders, the Liquidating Trustee may elect hereafter to abandon to the VD Plan Debtors' Assets of

inconsequential value.

### 5.4.7    Disposition and Value of Assets

The Assets of the Estates of the VD Plan Debtors consist primarily of certain Projects

(the Plan Projects).  There also may be some Cash, some of which is Cash Collateral for Lehman

Secured Claims and/or Lehman Administrative Loans, and certain Remaining Other Assets,

including Remaining Litigation Claims.  (Remaining Litigation Claims possibly could result in

affirmative recoveries for the Estates or possibly could reduce the size of the Creditor Claims to

share in Available Cash for Distribution.)

### (a)    Disposition and Value of the Plan Projects.

a.    Pursuant to Bankruptcy Code section 1123(a) and the Plan, each Plan Project

and all easements and appurtenances thereto and all associated personal property and rights,

including the applicable VD Plan Debtor's Estate's right, title and interest in, to and under any

development agreements, plans, engineering reports, permits and community facilities district bonds,

but excluding subdivision improvement and monumentation agreements, will be sold and conveyed

by virtue of the Confirmation Order to the applicable Lehman Nominee (to be identified for each

Plan Project by the Lehman VD Lenders by Filing a statement providing such identification) free

and clear of any Encumbrances (other than the Lehman Claim Liens and other Permitted Liens) with

such Encumbrances (other than the Lehman Claim Liens and other Permitted Liens) not paid in

connection with the transaction to attach to the Lehman Creditor Distribution Funding to the extent

payment is due therefor under the Plan. in the same priority and subject to the same defenses and

avoidability, if any, as before the closing of the transaction.  After conveyance of a Plan Project to a

Lehman Nominee, the Lehman Nominee will report the subject Plan Project and related Assets as

being owned by it for all applicable federal, state and local income tax purposes.

b.    To facilitate further conveyances of the Plan Projects, the recording of

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

evidence of the conveyances and the identification of specific Encumbrances from which a Plan

Project is being sold free and clear or specific Permitted Liens:

(1)    Separate orders, consistent with the Plan, authorizing such

conveyances will be issued by the Bankruptcy Court as reasonably requested by the Lehman VD

Lenders or applicable Lehman Nominee, which orders will reflect the conveyance of the Plan

Projects free and clear of all Encumbrances (other than Lehman Claim Liens and other Permitted

Liens) in accordance with the Plan; and

(2)    Entry of the Confirmation Order, without more and thus

automatically, will retroactively and prospectively authorize the VD Plan Debtors and the

Liquidating Trustee to take all actions that a Lehman VD Lender or Lehman Nominee believes in

good faith to be necessary or appropriate to consummate the transactions contemplated by the Plan,

which actions would include execution of the grant deeds, assignments and other documents set

forth in a supplemental exhibit to the Plan (Plan Supplement) to be filed by the Lehman Proponents

no later than ten (10) days prior to the last day of the hearing on Confirmation and which

transactions would include conveyance of the Plan Projects to the Lehman VD Lenders or Lehman

Nominees as provided in the Plan; and

(3)    At no material cost to the VD Plan Debtors or Liquidating

Trustee, upon the reasonable request of a Lehman VD Lender or Lehman Nominee at any time and

from time to time on or after the Effective Date and through the closing of the VD Plan Debtors'

Cases, and notwithstanding any prior knowledge of a Lehman Creditor or Lehman Nominee, the VD

Plan Debtors, prior to the Effective Date, and the Liquidating Trustee, from and after the Effective

Date, will, do, execute, acknowledge and deliver, and cause to be done, executed, acknowledged and

delivered, all such further reasonable acts, deeds, transfers, conveyances, assignments, powers of

attorney or assurances as may be required (i) to transfer, assign, convey and grant all of the Plan

Projects to the applicable Lehman Nominees in accordance with the terms of the Plan, (ii) for the

acquiring Lehman Nominees to record such transfers, assignments and conveyances of the Plan

Projects in the applicable filing offices of the applicable governmental entity or (iii) to otherwise

implement the Plan.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    c.    The conveyances, free and clear of Encumbrances (other than Lehman Claim

2    Liens and other Permitted Liens), of the Plan Projects of the Group I Debtors to the Lehman VD

3    Lenders or Lehman Nominees under the Plan, result in a deficiency owed to the Lehman VD

4    Lenders under the applicable Lehman Loans (the "Lehman Creditor Deficiency Claims"), provided

5    that, under the Plan, no Lender Creditor Deficiency Claim is afforded against SCC Communities or

6    Tesoro.  The Allowed General Unsecured Claims of the Lehman VD Lenders and the Allowed

7    Amount thereof with respect to such Lehman Creditor Deficiency Claims shall be fixed for all

8    purposes relevant to the Plan and Disclosure Statement as to all VD Plan Debtors and Creditors at

9    the amounts set forth in Plan Article V, which determination is based, in part, on the Project Values.

10    d.    Pursuant to the Plan, the Plan Projects of the Group II Debtors shall also be

11    conveyed to the Lehman VD Lenders or Lehman Nominees, free and clear of Encumbrances (other

12    than any Lehman Claim Liens and other Permitted Liens), in exchange for the consideration to be

13    provided to Creditors of the Group II Debtors as set forth in Article VI hereof and based on the

14    Lehman Secured Claims against the Holders of Interests in the Group II Debtors (SunCal I and

15    SunCal Summit Valley) and the applicable Project Values less Allowed Senior Claims.

16    **(b)    Remaining Litigation Claims, Net Cash Litigation Recoveries and**

17    **Remaining Other Assets.**

18    The Remaining Other Assets (other than Cash) will be liquidated by the Liquidating

19    Trustee, and the Net Cash Proceeds therefrom will be available for payment of Claims and Creditors

20    in accordance with the Plan.  Pursuant to section 1123(b)(3) of the Bankruptcy Code and subject to

21    the compromises, waivers and releases provided in the Plan, the Liquidating Trustee will retain all

22    Remaining Litigation Claims whether or not pending on the Effective Date. Unless a Litigation

23    Claim is expressly waived, relinquished, released, compromised or settled in the Plan or prior to the

24    Plan's Effective Date in a Final Order, all rights with respect to such Litigation Claims are reserved

25    and the Liquidating Trustee may pursue such Remaining Litigation Claims.  The Liquidating Trustee

26    will not settle or abandon a Remaining Litigation Claim valued at greater than $100,000, if any,

27    without a Lehman VD Lender's consent; and the Lehman VD Lenders may pursue any Remaining

28    Litigation Claim for the applicable Estate or Estates that, upon request, the Liquidating Trustee does

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

not agree to pursue.  Any disputes concerning the settlement or abandonment of a Remaining

Litigation Claim will be submitted to the Bankruptcy Court for resolution on no less than ten (10)

days' notice to the objecting party.  All Net Cash Litigation Recoveries realized or obtained in

respect of Remaining Litigation Claims of the Estates will be promptly deposited into the Post-

Confirmation Account(s) or Plan Reserve, as appropriate. Except as otherwise provided in the Plan

and the Confirmation Order, the Net Cash Litigation Recoveries will be free and clear of all

Encumbrances and will only be expended in accordance with the provisions of the Plan.

### 5.4.8    Bond Claims and the Settling Bond Issuer Agreements.

#### (a)    Background.

Prior to the Petition Dates for the VD Plan Debtors, the Bond Issuers, at the request of

certain VD Plan Debtors, issued certain Project Bonds in connection with the development of the

Plan Projects owned by such VD Plan Debtors.  These Project Bonds issued by the Bond Issuers for

the benefit of the VD Plan Debtors consist of either Payment Bonds or Performance Bonds (certain

of which Payment Bonds and Performance Bonds constitute Future Work Bonds), securing payment

to the applicable third party for work performed by such third party for or with respect to the

applicable Plan Project and/or for the performance of certain work by the applicable VD Plan

Debtor.  Although the definitions herein are controlling, the Payment Bonds might typically secure

payment to contractors and others who undertook construction work and Performance Bonds might

typically guarantee the performance of Bonded Work such as infrastructure improvements to a

municipality who has jurisdiction over the development of the applicable Plan Project and who may

have executed a development agreement providing for entitlements relating to such Plan Project.

Reimbursement to the Bond Issuer for any payments made under or any liabilities or obligations

incurred by such Bond Issuer with respect to the Project Bonds were guaranteed or indemnified by

the Bond Obligors.

Prepetition, Bond Issuers are believed to have paid and/or settled with some of the

third party beneficiaries of Project Bonds (and, in certain instances, received an assignment of the

Claims held by such third parties upon such payment or settlement).  As a result, the Claims, if any,

of a Bond Issuer against the applicable VD Plan Debtor and relating to such Project Bonds would be

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    non-contingent.

2    As of the applicable Petition Dates, various other third parties with Bond-Backed

3    Claims allege that they held unpaid or unsatisfied Claims secured by Project Bonds of the Bond

4    Issuers.  The Claims, if any, of a Bond Issuer relating thereto would have been contingent.

5    After the Petition Dates, Bond Issuers are believed to have continued paying and/or

6    settling with Bond-Backed Claimants secured by Project Bonds.  To the extent such occurred, any

7    Claim of a Bond Issuer relating thereto may have become non-contingent.  Still, there remain Bond-

8    Backed Claimants holding Bond-Backed Claims secured by Project Bonds (including Future Work

9    Bonds) that remain unpaid or unsatisfied.  The Claims, if any, of a Bond Issuer relating thereto are

10    contingent.

11    **(b)    Settling Bond Issuer Agreement.**

12    Absent a settlement with each of the Bond Issuers, each Allowed Bond Claim related

13    to a Future Work Bond[15] will be classified and treated under the Plan as either a Reliance Claim in

14    Class 6 or a General Unsecured Claim in Class 7 or Class 8, depending on which definition the

15    Claim fits within.  Yet, one or both Bond Issuers have contended that: (i) should a Bond Issuer be

16    required to pay or perform under a Project Bond because of a demand from a municipality that is the

17    beneficiary of the Project Bond, the costs for improving the subject Plan Project can be recovered

18    upon sale or transfer of the Plan Project from its subsequent owner; and (ii) absent consent of the

19    applicable Bond Issuer, the Project Bonds must be replaced on sale or transfer of each applicable

20    Plan Project.  Although the Lehman Creditors dispute these contentions, to facilitate confirmation of

21    the Plan, certain of the Lehman Related Parties (including the Lehman Nominees taking title to Plan

22    Projects as to which there are related Bond-Backed Claims secured by Future Work Bonds) are

23    prepared to enter into agreements with respect to certain matters relating to the Allowed Bond-

24    Backed Claims secured by Future Work Bonds.

25    Under each Settling Bond Issuer Agreement and as part of the Lehman Creditor

26    Distribution Funding, the Lehman Nominee that takes title to a Plan Project for which Future Work

27    

28    _____

[15] Such Allowed Bond Claim would be "related" to a Future Work Bond either because such Claim is a Bond-Backed Claim relating to the payment or performance of Future Work secured by a Future Work Bond or because such Claim is a Bond Issuer Claim arising from the exposure and liability of the Bond Issuer under a Future Work Bond.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    Bonds were issued and remain outstanding as of the Effective Date, in consideration for an

2    assignment of certain Allowed Claims from the applicable Settling Bond Issuer as described below,

3    will reimburse and or commit to reimburse such Settling Bond Issuer for all or a portion of the

4    Settling Bond Issuer-Incurred Future Work Obligations arising in connection with the satisfaction of

5    such Settling Bond Issuer's obligations to Bond-Backed Claimants under Future Work Bonds issued

6    by such Settling Bond Issuer and related to such Allowed Claims provided that each Lehman

7    Nominee will have first requested such performance.  Such reimbursement obligations of each

8    applicable Lehman Nominee will be collateralized or credit enhanced in one (and only one) of the

9    following two manners (subject to further terms and provisions as may be agreed upon by the parties

10   to a Settling Bond Issuer Agreement), as determined by the Lehman VD Lenders in their sole and

11   absolute discretion (the applicable type of collateral or credit enhancement being provided by any

12   particular Lehman Nominee being referred to herein as the "Future Work Obligation Collateral"):

13   (a) a first Lien deed of trust encumbering the applicable Plan Project owned by such Lehman

14   Nominee and securing the reimbursement obligations of such Lehman Nominee to the applicable

15   Settling Bond Issuer, or (b) a guarantee of such Lehman Nominee's reimbursement obligations

16   provided by LBHI, which guarantee obligation of LBHI will be an administrative claim in the New

17   York Bankruptcy Cases.  In turn, the applicable Settling Bond Issuer will agree that such Settling

18   Bond Issuer, itself, will not receive the full amount otherwise due under the Plan from the VD Plan

19   Debtors' Estates with respect to the Settling Bond Issuer-Owned Claims or any other Claims it may

20   have (provided that, with respect to Settling Bond  Issuer-Owned Future Work Claims, it will

21   receive the applicable cooperation and reimbursement from the applicable Lehman Nominees and

22   the applicable Future Work Obligation Collateral as described above).  Further, under each Settling

23   Bond Issuer Agreement, the applicable Settling Bond Issuer would agree to cooperate with and

24   assist, if and to the extent agreed to by the parties under the applicable Settling Bond Issuer

25   Agreement, the Lehman Related Parties in connection with the Bond Modification Discussions.

26          Moreover, under each Settling Bond Issuer Agreement, as reflected in the Plan, the

27   applicable Settling Bond Issuer will agree to assign to the Lehman VD Lenders or another Lehman

28   Related Party (as determined by the Lehman VD Lenders) (and release to the extent such assignment

is ineffective), effective as of the Effective Date, certain Settling Bond Issuer-Owned Claims held by the applicable Settling Bond Issuer as of the Effective Date and certain Claims acquired by such Settling Bond Issuer thereafter, as well as certain rights and claims that the Settling Bond Issuer may have against the Bond Obligors. Upon assignment by the applicable Settling Bond Issuer of Settling Bond Issuer-Owned Non-Future Work Claims to a Lehman VD Lender or other Lehman Related Party under the Plan, such Lehman VD Lender or other Lehman Related Party will be entitled to the proportional share of the Residual Cash attributable to such Allowed Claim, as more fully set forth in the Plan.  To the extent that on or after the Effective Date, the applicable Settling Bond Issuer acquires claims that were to be assigned or released if acquired on or before the Effective Date by the Settling Bond Issuer Release for Lehman Released Parties, promptly thereafter, the applicable Settling Bond Issuer shall execute an assignment / release in substantially the form of the Settling Bond Issuer Release for Lehman Released Parties for the benefit of the Liquidating Trustee and Lehman Released Parties.

Thus, whereas other Creditors are to receive the Lehman Distribution Enhancement with respect to each Allowed General Unsecured Claim or Allowed Reliance Claim that they hold if they execute and deliver the Creditor Assignment / Release for Lehman, under a Settling Bond Issuer Agreement, the applicable Settling Bond Issuer is to receive treatment under the Plan providing less for its Settling Bond Issuer-Owned Non-Future Work Claims and is to receive an agreed-upon reimbursement essentially for all or a portion of the Settling Bond Issuer-Incurred Future Work Obligations arising from Future Work Bonds relating to the Allowed Settling Bond Issuer-Related Future Work Claims with such Settling Bond Issuer agreeing to waive payment for any obligations which are not required to be reimbursed pursuant to the terms of the applicable Settling Bond Issuer Agreement.

### (c)  Bond Modification Discussions.

There may be discussions and efforts to approach and initiate discussions by Lehman Related Parties, with various municipalities, utilities and governmental, quasi-governmental and other entities that the Lehman VD Lenders or Lehman Nominees believe, in good faith, are beneficiaries under certain of the Future Work Bonds (including Holders of Class 9 Settling Bond

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Issuer-Backed Future Work Claims), regarding the development rights and entitlements relating to

the Plan Projects including (a) the implementation of any modifications to such development rights

and entitlements and/or to any development agreements, subdivision agreements, permits, approvals,

consents or other documents, instruments and agreements evidencing, effectuating or providing for

such development rights and entitlements, and (b) the reduction, release and/or substitution of any

Future Work Bonds issued for the benefit of any Plan Project and currently outstanding ("Bond

Modification Discussions").  Pursuant thereto or otherwise, agreement may be reached by all

applicable parties either (a) as to the timing, scope or other matters with respect to certain Future

Work or its performance or (b) to forego performance or payment for certain Future Work directly or

through release of the applicable Future Work Bond.

**5.4.9    Releases for Lehman Released Parties.**

In exchange for, *inter alia*, the Lehman Plan Funding, various releases are to be

afforded for the benefit of the Lehman Released Parties.

**(a)    Creditors' Assignments / Releases for Lehman.**

In exchange for the Lehman Distribution Enhancement, each Creditor who holds a

Reliance Claim or General Unsecured Claim against a Group I Debtor and checks the appropriate

box on its Ballot and/or timely executes and delivers a separate, written assignment or assignment

and release in accordance with this Plan, whether or not the Creditor votes in favor of the Plan,

automatically upon the occurrence of the Effective Date, assigns to the applicable Lehman VD

Lender (or if multiple applicable Lehman VD Lenders, to the Lehman VD Lender holding the most

senior Lien against the applicable Plan Project) all rights, benefits and interests of the assigning

Holder, including, without limitation, Proofs of Claim and Encumbrances (each a "Claim Right"

and, collectively, the "Claim Rights") with respect to each of such Holder's Reliance Claims,

General Unsecured Claims, and, if any, Lehman Released Claims held as of the Disclosure Hearing

Date and as might arise after the Disclosure Hearing Date as a result of an avoided transfer, with

such assignment to be effective immediately upon the Effective Date. Such assignments are to be

effective to the greatest extent permitted by applicable law and shall not require anything or any

action for their effectiveness except as expressly provided herein. To the extent any such assignment

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

is not effective to assign all of any such Reliance Claim, General Unsecured Claim or Lehman Released Claim or all of any such Claim Rights, <u>each Holder of the applicable Reliance Claim or General Unsecured Claim who</u>, in exchange for the Lehman Distribution Enhancement, <u>checks the appropriate box on its Ballot and/or timely executes and delivers a separate, written release or assignment and release</u> in accordance with this Plan, automatically upon the occurrence of the Effective Date, <u>unconditionally, irrevocably and generally releases, acquits and forever discharges, waives and relinquishes</u> the Holder's General Unsecured Claims, Reliance Claims and Lehman Released Claims (including such Claims as might arise after the Disclosure Hearing Date as a result of an avoided transfer) and Claim Rights with respect thereto from and against the VD Plan Debtors and all Lehman Released Parties, including, without limitation, the Lehman Nominees, with such release to be effective immediately after the moment that the assignment was to become effective. Such releases are to be effective to the greatest extent permitted by applicable law and shall not require anything or any action for their effectiveness except as expressly provided herein. **SUCH RELEASES INCLUDE AN EXPRESS, INFORMED, KNOWING AND VOLUNTARY WAIVER AND RELINQUISHMENT TO THE FULLEST EXTENT PERMITTED BY LAW OF RIGHTS UNDER SECTION 1542 OF THE CALIFORNIA CIVIL CODE, WHICH READS AS FOLLOWS, AND UNDER ANY SIMILAR OR COMPARABLE LAWS ANYWHERE IN THE WORLD:**

> **A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor.**

Each releasing Creditor, by the release, waives and relinquishes any right or benefit that such Creditor has or may have under section 1542 of the California Civil Code or any similar provision of statutory or non-statutory law of California or any other jurisdiction to the fullest extent that such releasing Creditor may lawfully waive such rights and benefits pertaining to the subject matter of the release set forth above. In that regard, each such releasing Creditor, by the release, further acknowledges that such Creditor is aware that such Creditor or the attorneys of such Creditor may hereafter discover claims or facts in addition to or different from those which such Creditor or

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

such attorneys now know or believe to exist with respect to the subject matter of the release, and that

it is each such releasing Creditor's intention fully, finally, and forever to settle and release the

Holder's General Unsecured Claims, Reliance Claims, Lehman Released Claims (including such

Claims as might arise after the Disclosure Hearing Date as a result of an avoided transfer) and Claim

Rights with respect thereto from and against the VD Plan Debtors and all Lehman Released Parties,

including, without limitation, the Lehman Nominees. Through the release, each such releasing

Creditor is expressly acknowledging that it understands that, notwithstanding the discovery or

existence of any such additional or different claims or facts, the release shall be and remain in full

force and effect as a full and complete general release with respect to the Holder's General

Unsecured Claims, Reliance Claims, Lehman Released Claims (including such Claims as might arise

after the Disclosure Hearing Date as a result of an avoided transfer) and Claim Rights with respect

thereto from and against the VD Plan Debtors and all Lehman Released Parties, including, without

limitation, the Lehman Nominees. Through the release, each such releasing Creditor further

acknowledges that no released Person has made any representation of any kind or character

whatsoever in order to induce the execution of the release other than the Disclosure Statement for

which certain released Persons are Proponents, subject to its disclaimers.

In each case, neither the assignment nor the release shall include for General

Unsecured Claims or Reliance Claims (including such Claims as might arise after the Disclosure

Hearing Date as a result of an avoided transfer) (1) a Creditor's rights under this Plan to the Lehman

Creditor Distribution Funding and (2) the proportional share of Residual Cash attributable under the

Plan to the Claims so assigned or released.  Moreover, for clarity, (A) neither the assignment nor the

release shall preclude a Creditor holding an assigned or released Claim from opposing or responding

defensively to the Filing of an objection to such Claim or request for determination of such Claim's

status as a Reliance Claim (nor preclude such Filing of an objection to the Claim or request for

determination of such Claim's status as a Reliance Claim); (B) neither the assignment nor the release

includes any claim of a Creditor against a Bond Issuer arising under a Project Bond to the extent

such claim is severable from any and all of such Creditor's General Unsecured Claims, Reliance

Claims, Lehman Released Claims and Claim Rights; and (C) neither the assignment nor the release

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

shall preclude a Creditor against which the Liquidating Trustee asserts a Remaining Litigation Claim from opposing or responding defensively to such Remaining Litigation Claim, including assertion of its Claims for offset, recoupment or setoff purposes (nor preclude the Liquidating Trustee from asserting any Remaining Litigation Claims against such Creditor).

On or as soon as practicable after the Effective Date, the assigning and/or releasing Creditor shall dismiss (with prejudice) all litigation pending against a Lehman Released Party with respect to a Lehman Released Claim, with all parties to bear their own costs and professional fees. The assigning and/or releasing Creditor also shall take all appropriate steps to withdraw, dismiss or release any Encumbrances it may hold or have asserted against any of the Plan Projects or other Assets of the VD Plan Debtors as a condition of receipt of its Distributions under the Plan.

If the Ballot is appropriately marked to indicate the Creditor's election to receive the Lehman Distribution Enhancement in exchange for the Creditor's Assignment / Release for Lehman, the Confirmation Order, without more, shall effectuate the assignment and/or release, waiver and relinquishment described or referenced in this section for the Lehman Released Parties, in accordance herewith. Nonetheless, and regardless of whether the Ballot is appropriately marked: (a) the Lehman VD Lenders may require the Creditor electing to receive the Lehman Distribution Enhancement to execute and deliver to the VD Plan Debtors, the Liquidating Trustee or a Lehman Released Party, a separate Creditor's Assignment / Release for Lehman in a form determined by the Lehman Released Party and reasonably consistent herewith; and (b) a condition subsequent to the assignment and release shall be the disallowance of all Claims of the Creditor electing to receive the Lehman Distribution Enhancement prior to the Creditor receiving any of the Lehman Distribution Enhancement.

If such condition subsequent to a particular Creditor's Assignment / Release for Lehman shall occur: (i) the applicable Creditor's Assignment / Release for Lehman shall be void and (ii) if such Creditor dismissed any litigation pending against a Lehman Released Party with respect to a Lehman Released Claim with the dismissal reciting it was based on this Plan's assignment and release for such Lehman Released Party, then such the Lehman Released Party shall stipulate to reinstatement of such litigation (subject to all applicable defenses, objections and other rights of the

applicable Lehman Released Party); provided that such voidance of the applicable Creditor's

Assignment / Release for Lehman shall not limit or affect any other provision or effect of the Plan,

including, without limitation, such voidance of an applicable Creditor's Assignment / Release for

Lehman shall not preserve or restore any Encumbrances from which a Plan Project is conveyed free

and clear under the Plan.

(b)     **Settling Bond Issuer Releases for Lehman Released Parties.**

Consistent with each Settling Bond Issuer Agreement, each Settling Bond Issuer,

automatically upon the occurrence of the Effective Date, will assign to the applicable Lehman VD

Lender (or if multiple applicable Lehman VD Lenders, to the Lehman VD Lender holding the most

senior Lien against the applicable Plan Project or its designee) or to another Lehman Related Party

(as determined by the applicable Lehman VD Lender) all rights, benefits and interests of the

applicable Settling Bond Issuer, including, without limitation, Proofs of Claim and Encumbrances

(each a "Claim Right" and, collectively, the "Claim Rights") with respect to (1) certain Settling

Bond Issuer-Owned Claims (as agreed in the applicable Settling Bond Issuer Agreement), and all, if

any, Lehman Released Claims, including, without limitation, the applicable Settling Bond Issuer's

rights under the Plan, on account of certain assigned Settling Bond Issuer-Owned Non-Future Work

Claims that are not Secured Claims, to a proportional share of Residual Cash attributable under the

Plan to such Claims so assigned to a Lehman VD Lender or other Lehman Related Party, and (2) all

such Settling Bond Issuer's rights and claims against all Bond Obligors, with such assignment to be

effective immediately upon the Effective Date.  Such assignments are to be effective to the greatest

extent permitted by applicable law.  Except to the extent expressly agreed otherwise in the applicable

Settling Bond Issuer Agreement, to the extent such assignments are not effective to assign all of any

such Settling Bond Issuer-Owned Claims and Claim Rights (subject to the express exceptions

above), the applicable Settling Bond Issuer, unconditionally, irrevocably and generally releases,

acquits and forever discharges, waives and relinquishes (a) the Lehman Released Claims, (b) the

Settling Bond Issuer-Owned Claims, (c) each other Claim owned by the applicable Settling Bond

Issuer against any of the VD Plan Debtors (other than any Class 9 Allowed Claim it may hold arising

from a Project Bond issued for the Plan Project of the VD Plan Debtor against which the Class 9

Claim is asserted), and (d) Claim Rights with respect thereto, to the extent that any of such Claims or Claim Rights are owned by the applicable Settling Bond Issuer as of the moment prior to the Effective Date, from and against all Lehman Released Parties, including, without limitation, the Lehman Nominees, with such release to be effective immediately after the moment that the assignment was to become effective. **SUCH RELEASES INCLUDE AN EXPRESS, INFORMED, KNOWING AND VOLUNTARY WAIVER AND RELINQUISHMENT TO THE FULLEST EXTENT PERMITTED BY LAW OF RIGHTS UNDER SECTION 1542 OF THE CALIFORNIA CIVIL CODE, WHICH READS AS FOLLOWS, AND UNDER ANY SIMILAR OR COMPARABLE LAWS ANYWHERE IN THE WORLD:**

> **A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor.**

Each releasing Settling Bond Issuer, by the release, waives and relinquishes any right or benefit that such Settling Bond Issuer has or may have under section 1542 of the California Civil Code or any similar provision of statutory or non-statutory law of California or any other jurisdiction to the fullest extent that such releasing Settling Bond Issuer may lawfully waive such rights and benefits pertaining to the subject matter of the release set forth above. In that regard, each such releasing Settling Bond Issuer, by the release, further acknowledges that such Settling Bond Issuer is aware that such Settling Bond Issuer or its attorneys may hereafter discover claims or facts in addition to or different from those which such Settling Bond Issuer or such attorneys now know or believe to exist with respect to the subject matter of the release, and that, except to the extent expressly agreed otherwise in the applicable Settling Bond Issuer Agreement, it is each such releasing Settling Bond Issuer's intention fully, finally, and forever to settle and release (a) the Lehman Released Claims, (b) the Settling Bond Issuer-Owned Claims, (c) each other Claim owned by the applicable Settling Bond Issuer against any of the VD Plan Debtors (other than any Class 9 Allowed Claim it may hold arising from a Project Bond issued for the Plan Project of the VD Plan Debtor against which the Class 9 Claim is asserted), and (d) Claim Rights with respect thereto, to the extent that any of such Claims or Claim Rights are owned by the applicable Settling Bond Issuer as of the moment prior to the Effective Date, from and against the VD Plan Debtors and all Lehman

Released Parties, including, without limitation, the Lehman Nominees. Through the release, each such releasing Settling Bond Issuer is expressly acknowledging that it understands that, notwithstanding the discovery or existence of any such additional or different claims or facts, the release shall be and remain in full force and effect as a full and complete general release with respect to (a) the Lehman Released Claims, (b) the Settling Bond Issuer-Owned Claims, (c) each other Claim owned by the applicable Settling Bond Issuer against any of the VD Plan Debtors (other than any Class 9 Allowed Claim it may hold arising from a Project Bond issued for the Plan Project of the VD Plan Debtor against which the Class 9 Claim is asserted), and (d) Claim Rights with respect thereto, to the extent that any of such Claims or Claim Rights are owned by the applicable Settling Bond Issuer as of the moment prior to the Effective Date, from and against the VD Plan Debtors and all Lehman Released Parties, including, without limitation, the Lehman Nominees, except to the extent expressly agreed otherwise in the applicable Settling Bond Issuer Agreement. Through the release, each such releasing Settling Bond Issuer further acknowledges that no released Person has made any representation of any kind or character whatsoever in order to induce the execution of the release.

In each case, neither the assignment nor the release shall include for Allowed Settling Bond Issuer-Related Future Work Claims the obligation of the Lehman Nominee that takes title to a Plan Project to reimburse the applicable Settling Bond Issuer, pursuant to the terms of the applicable Settling Bond Issuer Agreement, for all or a portion of the Settling Bond Issuer-Incurred Future Work Obligations arising from each Allowed Settling Bond Issuer-Related Future Work Claim, incurred with respect to such Plan Project.

On or as soon as practicable after the Effective Date, the assigning and/or releasing Bond Issuer shall dismiss (with prejudice), all litigation pending against a Lehman Released Party with respect to a Lehman Released Claim, with all parties to bear their own costs and professional fees. The Settling Bond Issuer also shall take all appropriate steps to withdraw, dismiss or release any Encumbrances it may hold or have asserted against any of the Plan Projects or other Assets of the VD Plan Debtors.

The Confirmation Order, without more, shall effectuate the release, waiver and

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

relinquishment described or referenced in this section for the Lehman Released Parties in accordance

herewith.

                    (c)    **Plan Release for Lehman.**

             In exchange for the consideration represented by, *inter alia*, the Lehman Plan

Funding, as of the Effective Date, the Estate of each VD Plan Debtor, on behalf of itself and its

Affiliates exclusive of other Debtors in these Cases, automatically upon the occurrence of the

Effective Date, will be deemed to unconditionally, irrevocably and generally release, acquit and

forever discharge, waive and relinquish any and all Lehman Released Claims against each and every

Lehman Released Party.

             **THE RELEASE GIVEN ABOVE INCLUDES AN EXPRESS, INFORMED,**

**KNOWING AND VOLUNTARY WAIVER AND RELINQUISHMENT TO THE FULLEST**

**EXTENT PERMITTED BY LAW OF RIGHTS UNDER SECTION 1542 OF THE**

**CALIFORNIA CIVIL CODE, WHICH READS AS FOLLOWS, AND UNDER ANY**

**SIMILAR OR COMPARABLE LAWS ANYWHERE IN THE WORLD:**

> **A general release does not extend to claims which the creditor does not know or
> suspect to exist in his favor at the time of executing the release, which if known
> by him must have materially affected his settlement with the debtor.**

             Each such releasing Person, by the release, waives and relinquishes any right or

benefit that such Person has or may have under section 1542 of the California Civil Code or any

similar provision of statutory or non-statutory law of California or any other jurisdiction to the

fullest extent that such releasing Person may lawfully waive such rights and benefits pertaining to

the subject matter of the release set forth above. In that regard, each such releasing Person, by the

release, further acknowledges that such Person is aware that such Person or the attorneys of such

Person may hereafter discover claims or facts in addition to or different from those which such

Person or such attorneys now know or believe to exist with respect to the subject matter of the

release, and that it is each such releasing Person's intention fully, finally, and forever to settle and

release any and all Lehman Released Claims against each and every Lehman Released Party.

Through the release, each such releasing Person is expressly acknowledging that it understands that,

notwithstanding the discovery or existence of any such additional or different claims or facts, the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1   release shall be and remain in full force and effect as a full and complete general release with respect

2   to any and all Lehman Released Claims against each and every Lehman Released Party. Through the

3   release, each such releasing Person further acknowledges that no released Person has made any

4   representation of any kind or character whatsoever in order to induce the execution of the release.

5       The Confirmation Order, without more, will effectuate the release, waiver and

6   relinquishment described or referenced in this section for the Lehman Released Parties in accordance

7   herewith.  Nonetheless, the Lehman Released Parties also will be entitled to issuance of a separate

8   written release, waiver and relinquishment by the Liquidating Trustee in a form acceptable to the

9   Lehman VD Lenders and Liquidating Trustee or as reasonably proposed by the Lehman VD Lenders

10  and approved by the Bankruptcy Court at or after the hearing on Confirmation of the Plan.

11          **(d)        Dismissal of Pending Litigation**

12      On or as soon as practicable after the Effective Date, the Liquidating Trustee will

13  dismiss (with prejudice), as to the Estates of all VD Plan Debtors, all litigation pending against a

14  Lehman Released Party on behalf of any VD Plan Debtor's Estate, including, without limitation, (a)

15  the Liquidating Trustee will dismiss any action seeking equitable subordination, avoidance of

16  fraudulent transfers or other relief against any Lehman Released Party, specifically the ES Action,

17  (b) the Liquidating Trustee will dismiss any appeals adverse to a Lehman Related Party, including,

18  without limitation, appeals seeking findings relating to the validity or allowance of Proofs of Claim

19  filed by any of the Lehman Related Parties, and (c) the Liquidating Trustee will withdraw any

20  opposition to any appeals by Lehman Related Parties, with all parties to bear their own costs and

21  professional fees (except as expressly provided in the Plan for the Lehman Post-Confirmation

22  Expense Funding).

23          **(e)        Process for Execution and Delivery of Creditor's Assignments /**
24  **Releases for Lehman.**

25      The releases contained in the Plan will become effective on the Effective Date

26  without further notice or action of any Person or party.  Although execution and delivery of a

27  separate writing reflecting releases contained herein may be required by the Lehman VD Lenders as

28  more fully set forth in the Plan, such requirement will not affect or diminish the effectiveness of the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

releases contained herein.  As to a Holder of a General Unsecured Claim or Reliance Claim, its execution and delivery of the Creditor Assignment / Release for Lehman herein will occur and be deemed to occur upon the delivery to the Liquidating Trustee or any of the Lehman Related Parties of an original, facsimile, electronic formatted or other written Ballot of such Holder marking the appropriate box thereupon signifying its intent to accept the benefits of the Lehman Distribution Enhancement and afford the Lehman Released Parties the benefit of the Creditor Assignment / Release for Lehman herein.  Disallowance in whole of such Creditor's Claim(s) prior to receipt of any Lehman Distribution Enhancement will be a condition subsequent voiding such release.

The Liquidating Trustee will be entitled to utilize the following procedure to determine which Creditors have appropriately marked their Ballots or otherwise provided the Creditor's Assignment / Release for Lehman entitling it to the Lehman Distribution Enhancement. The procedure may be modified by the Liquidating Trustee with the consent of the Lehman VD Lenders, which they may grant or withhold in their sole and absolute discretion:

(1)      Within two (2) Business Days after the voting deadline, the VD Plan Debtors (or their designated agent, if any) will deliver to the appropriate Lehman VD Lenders or as they direct the duly executed original of each Ballot received by the VD Plan Debtors (or their agent) by the voting deadline and each separately executed Creditor's Assignment / Release for Lehman;

(2)      Within fifteen (15) Business Days after receipt of all such Ballots and Creditors' Assignments / Releases for Lehman, the Lehman VD Lenders will advise the VD Plan Debtors or Liquidating Trustee, as then in place, of any issues with respect to the form or propriety of the execution or delivery of any such Ballots, the marking thereupon of the election to receive the Lehman Distribution Enhancement in exchange for the Creditor's Assignment / Release for Lehman, or any actual Creditors' Assignments / Releases for Lehman;

(3)      Within ten (10) days after expiration of the time for the Lehman VD Lenders to advise the VD Plan Debtors or Liquidating Trustee of issues with respect to the form or propriety of the execution and delivery of such items, if no issues are so raised, the form and propriety of such items will be deemed adequate to entitle the applicable Creditor to the applicable

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Lehman Distribution Enhancement, as and to the extent set forth in the Plan and if and to the extent such Creditor holds an Allowed Claim.

### 5.4.10  Entry of Final Decrees.

The Liquidating Trustee will cause the entry of a final decree in the Case of each Estate of a VD Plan Debtor at the earliest reasonable opportunity therefor.  Such final decrees may be sought and entered individually for each Case.

### 5.4.11  Dissolution of Voluntary Debtors' Committee and Discharge of Liquidating Trustee.

The Voluntary Debtors' Committee will dissolve and its members will be released and discharged from all duties and obligations arising from or related to the Cases thirty days following the Effective Date unless the Bankruptcy Court, for good cause shown, extends such date. Except as may be necessary to File applications pursuant to the Plan, the Professionals retained by the Voluntary Debtors' Committee will not be entitled to compensation or reimbursement of expenses for any services rendered after the dissolution of the Voluntary Debtors' Committee.  (The Liquidating Trustee may employ Professionals after the Effective Date.)  The Liquidating Trustee will be discharged upon consummation of the Plan and the entry of a final decree in each Case or as otherwise ordered by the Bankruptcy Court.

### 5.5    Distributions.

### 5.5.1   Distribution Agent.

The Liquidating Trustee will serve as the Distribution Agent for Distributions due under the Plan. The Distribution Agent may employ one or more subagents on such terms and conditions as it may agree in his discretion and pay such subagent as a Post-Confirmation Expense from the Post-Confirmation Account(s). The Distribution Agent will not be required to provide any bond in connection with the making of any Distributions pursuant to the Plan.

### 5.5.2   Distributions.

#### (a)    Dates of Distributions.

Any Distribution required to be made on the Effective Date will be deemed timely if made as soon as practicable after such date and, in any event, within thirty (30) days after such date.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Any Distribution required to be made upon a Disputed Claim becoming an Allowed Claim and no longer being a Disputed Claim will be deemed timely if made as soon as practicable thereafter. To minimize the need to estimate certain contingent or unliquidated Claims and the expense thereof, the treatment sections of the Plan provide as to certain Claims that Distributions as to Future Obligations first are to be made only after the Claim or portion of the Claim is no longer a Future Obligation.

**(b)    Limitation on Liability.**

Notwithstanding contrary provisions of non-bankruptcy law, except as expressly set forth otherwise in the Plan, neither the Lehman Related Parties, the Lehman Nominees, the Liquidating Trustee, the Voluntary Debtors' Committee, their Affiliates, nor any of their employees, members, officers, directors, agents, attorneys, representatives, consultants, asset managers or other professionals will be liable for:  (i) any debts arising under the Plan; (ii) any acts or omissions or the damages therefrom (except for damages proximately caused by gross negligence or intentional misconduct of such Person) in connection with implementing the Distribution provisions of the Plan and the making or withholding of Distributions pursuant to the Plan, including, without limitation, such Person will not be liable as to the order of payment of any such Distributions which order of payment is not expressly set forth in the Plan; or (iii) any change in the value of Distributions made pursuant to the Plan resulting from any delays in making such Distributions in accordance with the Plan's terms (including but not limited to any delays caused by the resolution of Disputed Claims).

**5.5.3    Old Instruments and Securities.**

**(a)    Surrender and Cancellation of Instruments and Securities.**

As a condition to receiving any Distribution pursuant to the Plan in respect of a Claim, each Person holding any note or other instrument or security evidencing such Claim must surrender such instrument or security to the Distribution Agent, if requested.

**(b)    Cancellation of Liens.**

Except as otherwise provided in the Plan, any Lien against any Assets of any VD Plan Debtors, including any Plan Project, will be deemed released and discharged, and the Person holding such Lien will be authorized and directed to release any collateral or other property secured or allegedly secured by such Lien (including, without limitation, any Cash Collateral) held by such

1  Person and to take such actions as may be requested by the Liquidating Trustee (or applicable

2  Lehman Nominee as to a Plan Project) to evidence the release of such Lien, including, without

3  limitation, the execution, delivery and Filing or recording of such releases as may be requested by

4  the Liquidating Trustee (or applicable Lehman Nominee as to a Plan Project).

5        **5.5.4** *De Minimis* **Distributions and Fractional Shares.**

6        No Cash payment of less than ten dollars ($10) will be made by the Liquidating

7  Trustee to any Holder of Claims unless a request therefor is made in writing to the Liquidating

8  Trustee.  Whenever payment of a fraction of a cent would otherwise be called for, the actual

9  payment will reflect a rounding down of such fraction to the nearest whole cent. Any Cash or other

10  property that is not distributed as a consequence of this section will, after the last Distribution on

11  account of Allowed Claims in the applicable Class, be treated as "Unclaimed Property" under the

12  Plan.

13        **5.5.5    Delivery of Distributions.**

14        Except as provided in the Plan with respect to Unclaimed Property, Distributions to

15  Holders of Allowed Claims and Allowed Administrative Claims will be distributed by mail as

16  follows: (1) with respect to each Holder of an Allowed Claim that has Filed a Proof of Claim, at the

17  address for such Holder as maintained by the Liquidating Trustee; (2) with respect to each Holder of

18  an Allowed Claim that has not Filed a Proof of Claim, at the address reflected on the Schedules Filed

19  by the VD Plan Debtors, provided, however, that if the VD Plan Debtors or the Liquidating Trustee

20  has received a written notice of a change of address for such Holder, the address set forth in such

21  notice will be used; or (3) with respect to each Holder of an Allowed Administrative Claim, at such

22  address as the Holder may specify in writing.

23        **5.5.6    Unclaimed Property.**

24        If either (1) the Distribution of Cash to the Holder of any Allowed Claim is returned

25  to the Liquidating Trustee (*e.g.,* as undeliverable) and the check or other similar instrument or

26  Distribution remains unclaimed for one hundred twenty (120) days from sending or (2) the check or

27  other similar instrument used for the Distribution to the Holder of any Allowed Claim remains

28  uncashed for one hundred twenty (120) days from sending; or (3) the Liquidating Trustee does not

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

have an address for a Holder of any Allowed Claim on the date such Distribution first could have

been made under the Plan and for one hundred twenty (120) days thereafter, then such applicable

Distribution will be Unclaimed Property under the Plan and the Liquidating Trustee will be relieved

of making such Distribution or any further Distribution to such Holder of such Allowed Claim

unless and until the Liquidating Trustee is notified in writing of the then current address of such

Holder of an Allowed Claim.  Subject to the remainder of this section and the following section,

Unclaimed Property will remain in the possession of the Liquidating Trustee pursuant to this section,

and will be set aside and (in the case of Cash) held in a segregated, interest bearing account to be

maintained by the Distribution Agent until such time as the subject Distribution becomes

deliverable.  Nothing contained in the Plan will require the Liquidating Trustee or any other Person

to attempt to locate the Holder of an Allowed Claim as to which there is Unclaimed Property.

### 5.5.7    Disposition of Unclaimed Property.

If the Person entitled thereto notifies the Liquidating Trustee of such Person's Claim

to a Distribution of Unclaimed Property within ninety (90) days following such Person's initial

Distribution Date, the Unclaimed Property distributable to such Person, together with any interest or

dividends earned thereon, will be paid or distributed to such Person as soon as practicable. Any

Holder of an Allowed Claim that does not assert a Claim in writing for Unclaimed Property held by

the Liquidating Trustee within ninety (90) days after the Holders' initial Distribution Date will no

longer have any Claim to or Interest in such Unclaimed Property, and will be forever barred from

receiving any Distributions under the Plan or otherwise from the Liquidating Trustee.  In such cases,

any property held for Distribution on account of such Claims will become Available Cash and

deposited into the Post-Confirmation Account of the VD Plan Debtor's Estate against which the

applicable Allowed Claim was asserted.

### 5.6    Objections to Claims and Disputed Claims.

### 5.6.1    Standing for Objections to Claims.

The Liquidating Trustee and Lehman Creditors may File and resolve for the Estates

objections to Claims and requests for the determination of Claims' status as Reliance Claims, may

do so jointly or separately, and will have the exclusive right to do so, except that only the

Liquidating Trustee will have such rights as to any particular Claim for which a disabling conflict exists that precludes all of the Lehman Creditors from performing such functions as determined either by the Lehman Creditors or by the Bankruptcy Court.  The Liquidating Trustee will cooperate in Filing objections and taking action with respect to Claims identified for objection or action by the Lehman Creditors in good faith, except that the Liquidating Trustee need not object to a Claim or to a Claim's asserted status as a Reliance Claim that he reasonably believes is valid. Any objection to a Claim or any objection to a Claim's status as a Reliance Claim, will be Filed with the Bankruptcy Court and served on the Person holding such Claim on or before the applicable Claims Objection Deadline, expect as provided in the Plan.

### 5.6.2 Treatment of Disputed Claims.

#### (a) No Distribution Pending Allowance.

If any portion of a Claim is a Disputed Claim or has no Allowed Amount, no payment or Distribution provided for under the Plan shall be made on account of such Claim unless expressly provided hereunder or unless and until such Claim becomes an Allowed Claim and has an Allowed Amount.  Except as expressly provided in the Plan, Holders of Disputed Claims, pending their allowance, shall forbear from enforcement of the rights entitled to them under the Plan for their Claims were they Allowed Claims; provided that if the Claim is a Secured Claim, the Creditor may seek adequate protection for its Claim from the Bankruptcy Court.  A Claim that has not been Allowed by a Final Order of the Bankruptcy Court and as to which the objection deadline has not passed, including as to its status as a Reliance Claim, may be treated by the Liquidating Trustee as a Disputed Claim and, absent the agreement of the Lehman VD Lenders, the Liquidating Trustee shall so treat any such Secured Claim not expressly Allowed under the Plan and any Reliance Claim to which a payment otherwise would be due from Lehman Creditor Distribution Funding.

#### (b) Distribution After Allowance.

On the next Distribution Date following the date on which a Disputed Claim becomes an Allowed Claim and is no longer a Disputed Claim, the Distribution Agent will distribute to the Person holding such Claim any Cash that would have been distributable to such Person if on the initial Distribution Date such Claim had been an Allowed Claim and not a Disputed Claim.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

(c)      **Reserves for Disputed Claims.**

In the event that Disputed Claims are pending, the Liquidating Trustee will establish reasonable reserves, including the Plan Reserve for such Disputed Claims. The Distribution Agent may move the Bankruptcy Court for approval of its determination to reserve certain amounts.

**5.7**      **Executory Contracts And Unexpired Leases.**

**5.7.1      Identification of Executory Contracts and Unexpired Leases.**

The Lehman Proponents may File and/or amend or modify on or prior to the Confirmation Date an **Exhibit "A"** to the Plan containing, *inter alia*, a list of contracts and leases. The Liquidating Trustee will assume, assume and assign or reject the executory contracts and unexpired leases on **Exhibit "A"** to the Plan as requested by the Lehman Proponents no later than forty-five (45) days after the Effective Date.  The Lehman Proponents may add any executory contract or unexpired leases to this exhibit or delete any contract or lease therefrom up to and including the Confirmation Date.

**5.7.2      Executory Contracts Being Assumed or Assumed and Assigned.**

In accordance with the provisions and requirements of Sections 365 and 1123 of the Bankruptcy Code, any executory contracts and unexpired leases of the VD Plan Debtors' Estates listed on **Exhibit "A"** to the Plan, as is or as amended prior to the Confirmation Date, in a manner that expressly indicates that such contract or lease is to be assumed or assumed and assigned will be so assumed or assumed and assigned automatically as of the Effective Date, and the cure amount therefor will be paid promptly thereafter as an Administrative Claim under the Plan. (Such assumption or assumption and assignment will be in addition to all executory contracts and unexpired leases that have been previously assumed by the VD Plan Debtors by order of the Bankruptcy Court.)

The Proponents will provide notice of any amendments to **Exhibit "A"** to any party with a lease or contract to be assumed under the Plan and to the Voluntary Debtors' Committee.

To the extent applicable, all executory contracts or unexpired leases of VD Plan Debtors or their Estates assumed or assumed and assigned pursuant to the Plan shall be deemed modified such that the transactions contemplated by the Plan shall not be a "sale", "transfer",

"conveyance", "assignment", "change of control" or words of similar meaning (collectively, a "transfer"), however such transfer may be defined in the relevant executory contract or unexpired lease, and any precondition to a transfer (including without limitation any notice or required consent) under any such contract or lease shall be deemed satisfied by Confirmation of the Plan.

Each executory contract and unexpired lease assumed or assumed and assigned pursuant the Plan (or pursuant to other Bankruptcy Court order) will remain in full force and effect and be fully enforceable by the applicable VD Plan Debtors' Estate or assignee in accordance with its terms, except as modified by the provisions of the Plan, or any order of the Bankruptcy Court authorizing and providing for its assumption or applicable law.

### 5.7.3   Cure Rights.

Any monetary cure amounts by which each executory contract and unexpired lease to be assumed pursuant to the Plan is in default will be satisfied, pursuant to Section 365(b)(1) of the Bankruptcy Code, by payment of the cure amount in Cash by the later of (a) the Effective Date (or as soon as practicable thereafter), (b) as due in the ordinary course of business or (c) on such other terms as the parties to such executory contracts or unexpired leases may otherwise agree.  In the event of a dispute regarding: (i) the amount of any cure payments, (ii) the ability of any assignee to provide "adequate assurance of future performance" (within the meaning of Section 365 of the Bankruptcy Code) under the contract or lease to be assumed or assigned, or (iii) any other matter pertaining to assumption, the cure payments required by Section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order resolving the dispute and approving the assumption.  The Proponents may list cure amounts for executory contracts and unexpired leases on **Exhibit "A."**  The failure of any non-Debtor party to an executory contract or unexpired lease to File and serve an objection to the cure amount listed on **Exhibit "A"** for such party's contract or lease by the deadline for objecting to the Plan will be deemed consent to such cure amount; provided, however, that prior to entry of a Final Order approving the assumption of an executory contract or unexpired lease, the VD Plan Debtors will be authorized to reject any executory contract or unexpired lease to the extent the Lehman Proponents conclude that the amount of the cure obligation as determined by the Bankruptcy Court renders assumption of such executory contract or

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1  unexpired lease unfavorable.

2  ### 5.7.4    Executory Contracts Being Rejected.

3  Any executory contracts and unexpired leases of the VD Plan Debtors' Estates listed

4  on **Exhibit "A"** to the Plan, as is or as amended prior to the Confirmation Date, in a manner that

5  indicates such contract or lease is to be rejected will be so rejected as of the Confirmation Date.

6  Additionally, there will be rejected as of the Confirmation Date all executory contracts and

7  unexpired leases of the VD Plan Debtors' Estates not listed on **Exhibit "A"** to the Plan, as is or as

8  amended prior to the Confirmation Date, provided that such contracts or leases: (a) have not

9  previously expired or terminated pursuant to their own terms, (b) were not previously rejected, and

10  (c) are not the subject of any pending motion, including to assume, to assume on modified terms, to

11  reject or to make any other disposition filed by the VD Plan Debtors on or before the Confirmation

12  Date.  Further, all executory contracts and unexpired leases of the VD Plan Debtors' Estates that are

13  listed on **Exhibit "A"** to the Plan that are not assumed or assumed and assigned within the deadlines

14  set forth in the Plan are automatically rejected after such deadline has expired.

15  ### 5.7.5    Retention of Property Rights by Lehman Nominees or Liquidating

16  **Trustee.**

17  To the extent that a matter that provides the VD Plan Debtors or their Estates with

18  property rights does not constitute an executory contract or unexpired lease, or the VD Plan Debtors

19  have obtained property rights under the executed portion of an executory contract or unexpired lease,

20  rejection will not constitute an abandonment by the VD Plan Debtors, the Lehman Nominees or the

21  Liquidating Trustee of any such property rights.

22  ### 5.7.6    Continuing Obligations.

23  Continuing obligations of third parties to the VD Plan Debtors under insurance

24  policies, contracts, or leases that have otherwise ceased to be executory or have otherwise expired on

25  or prior to the Effective Date, including, without limitation, continuing obligations to pay insured

26  claims, to defend against and process claims, to refund premiums or overpayments, to provide

27  indemnification, contribution or reimbursement, to grant rights of first refusal, to maintain

28  confidentiality, or to honor releases, will continue and will be binding on such third parties

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1   notwithstanding any provision to the contrary in the Plan to the extent no obligations to such third

2   party must be cured or assumed as a condition thereto by the VD Plan Debtors, their Estates or their

3   assignees under or pursuant to the Plan, unless otherwise specifically terminated by the VD Plan

4   Debtors or by order of Bankruptcy Court.  The deemed rejection provided by the Plan is of

5   executory contracts and unexpired leases and thus will not apply to any such continuing obligations.

6   <h3>5.7.7    Bar Date for Rejection Damages.</h3>

7   Any Claim arising out of the rejection of an executory contract or unexpired lease

8   will be forever barred and will not be enforceable against the VD Plan Debtors, their Estates, the

9   Liquidating Trustee, their Affiliates, their successors, or their properties, and will not be entitled to

10  any Distribution under the Plan, unless a Proof of Claim for such Claim is timely Filed and served.

11  For rejections occurring prior to Confirmation, such Claims must have been Filed by the later of

12  March 31, 2009 or thirty (30) days following the date of entry of the order of the Bankruptcy Court

13  approving rejection.  For Claims related to executory contracts or unexpired leases not listed on

14  **Exhibit "A"** to the Plan that are rejected under the Plan, such Claim must have been Filed and

15  served on the VD Plan Debtors (if before the Effective Date) or the Liquidating Trustee and Lehman

16  VD Lenders (if after the Effective Date) within thirty (30) days after the Confirmation Date.  For

17  Claims related to executory contracts or unexpired leases listed on **Exhibit "A"** to the Plan that are

18  rejected under or in accordance with the Plan, such Claim must have been Filed and served on the

19  Liquidating Trustee and Lehman VD Lenders within the later of:  (a) thirty (30) days after service

20  upon the non-debtor party to the contract or lease of any notice of the rejection of the contract or

21  lease, including service of the Plan and its **Exhibit "A"** if the contract or lease is listed for rejection

22  thereupon; and (b) thirty (30) days after the Confirmation Date.

23  **5.8    Effect Of Confirmation Of The Joint VD Plan.**

24  Following Confirmation, the VD Plan Debtors shall reasonably cooperate with, and

25  take all actions reasonably requested by, the Lehman VD Lenders in preparing for the Effective Date

26  and the matters to occur and actions required to be taken in connection therewith.

27  Except as otherwise expressly provided in the Plan, the documents executed pursuant

28  to the Plan, or the Confirmation Order, on and after the Effective Date, all Persons who have held,

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

currently hold, or may hold a debt, Claim, or Interest against a VD Plan Debtor (including but not limited to States and other governmental units, and any State official, employee, or other entity acting in an individual or official capacity on behalf of any State or other governmental units, other than as to matters excepted from the automatic stay by Bankruptcy Code § 362(b)(4), including, without limitation, the commencement or continuation of an action or proceeding by a governmental unit to enforce such governmental unit's police and regulatory power, including the enforcement of a judgment other than a monetary judgment, obtained in an action or proceeding by the governmental unit to enforce such governmental unit's police or regulatory power) shall be permanently enjoined from:

(a)      taking any of the following actions *on account of any such debt, Claim, or Interest*:[16]

(1)      commencing or continuing in any manner any action or other proceeding against the Liquidating Trustee or the Lehman Released Parties (or the successors or property of either of them);

(2)      enforcing, attaching, executing, collecting, or recovering in any manner any judgment, award, decree, or order against the Liquidating Trustee or the Lehman Released Parties (or the successors or property of either of them);

(3)      creating, perfecting, or enforcing any Lien or encumbrance against the Liquidating Trustee or the Lehman Released Parties (or the successors or property of either of them); and

(4)      asserting any set off, right of subrogation, or recoupment of any kind against any obligation due to the Liquidating Trustee or the Lehman Released Parties (or the successors or property of either of them); and

(b)      challenging the Distributions to be effected by the Plan or the classification of Claims or Interests set forth in the Plan, except as expressly provided in and permitted by the Plan.

---

[16] An action on "account of any such debt, Claim or Interest" does not include an action against the Liquidating Trustee or Lehman Released Parties (or the successors or property of either of them) (a "Target") based upon an independent obligation of such Target (such as, by example, a written guaranty of such Target or an obligation of such Target arising under law based on the Target's current ownership of real property) so long as the obligation is not alleged to arise from upon the Target's post-petition involvement in these Cases or with the Plan.

DOCS_LA:225339.12                                                   149

1   Any Person injured by any willful violation of such injunction will recover actual

2   damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover

3   punitive damages from the willful violator.

4   **5.9     Other Plan Provisions.**

5   **5.9.1   Limitation Of Liability.**

6   **(a)     No Liability for Solicitation or Participation.**

7   As specified in section 1125(e) of the Bankruptcy Code, entities that solicit

8   acceptances or rejections of the Plan and/or that participate in the offer, issuance, sale, or purchase of

9   securities offered or sold under the Plan, in good faith and in compliance with the applicable

10  provisions of the Bankruptcy Code, will not be liable, on account of such solicitation or

11  participation, for violation of any applicable law, rule, or regulation governing the solicitation of

12  acceptances or rejections of the Plan or the offer, issuance, sale, or purchase of securities.

13  **(b)     Limitation of Liability.**

14  Notwithstanding contrary provisions of non-bankruptcy law, except as expressly set

15  forth otherwise in the Plan, neither the Lehman Related Parties, the Lehman Nominees, the

16  Liquidating Trustee, the Voluntary Debtors' Committee, their respective Affiliates, nor any of their

17  employees, Professionals, staff, members, officers, directors, agents, attorneys, representatives,

18  consultants, asset managers or other professionals will have any liability to any Holder of any Claim

19  or Interest or any other Person for any act or omission in connection with or arising out of the

20  negotiation, preparation and pursuit of confirmation of the Plan, the Disclosure Statement, the

21  consummation of the Plan, the administration of the Plan, the Cases or the property to be distributed

22  under the Plan, or any contract, instrument, document or other agreement entered into pursuant

23  thereto through and including the Effective Date, except: (a) the Liquidating Trustee, in such

24  capacity, will be liable contractually for the performance of obligations assumed or imposed under

25  or by the Plan; (b) for liability for damages proximately caused by (i) intentional misconduct as

26  finally determined by a Final Order of the Bankruptcy Court and (ii) gross negligence in connection

27  with implementing the Distribution provisions of the Plan and the making or withholding of

28  Distributions pursuant to the Plan, other than liability resulting from the order of payment of any

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

such Distributions which order of payment is not expressly set forth in the Plan. Each of the

Liquidating Trustee, his Professionals and staff, and Lehman Related Parties will be entitled to rely,

in every respect, upon the advice of counsel with respect to their duties and responsibilities under or

with respect to the Plan.

### 5.9.2   Conditions To Confirmation And Effectiveness Of The Joint VD Plan.

#### (a)    Conditions Precedent to Entry of the Confirmation Order.

Unless waived by the Lehman VD Lenders in their sole and absolute discretion,

conditions precedent to entry of the Confirmation Order, which will reflect the approval of the Plan

by the Bankruptcy Court having jurisdiction over the Cases after consideration of all applicable

provisions of the Bankruptcy Code, are:  (i) first, execution of a Settling Bond Issuer Agreement by

certain of the Lehman Related Parties and each Bond Issuer; (ii) second, approval of the role and

obligations under the Plan of certain of the Lehman VD Lenders and each Settling Bond Issuer

Agreement (or the material terms thereof) by the New York Bankruptcy Court, due to its having

jurisdiction over the New York Bankruptcy Cases of Lehman Commercial, a Lehman VD Lender,

and LBHI, which may be a party to the Settling Bond Issuer Agreements and may be a source of

funding of the Lehman Plan Funding; (iii) third, as to the Group I Debtors, that the Lehman VD

Lenders good faith estimate of all such Debtors' Allowed Senior Claims does not exceed $17

million, and, as to the Group II Debtors, that the Lehman VD Lenders good faith estimate of all such

Debtors' Allowed Senior Claims does not exceed $3 million; and (iv) fourth, unless waived by the

Lehman VD Lenders as to one or more VD Plan Debtors, confirmation of the Plan as to all of the

VD Plan Debtors.

#### (b)    Conditions Precedent to Plan Effectiveness.

The following will be conditions precedent to the effectiveness of the Plan and the

occurrence of the Effective Date.

(i)    The Confirmation Order will be a Final Order in form and substance

reasonably satisfactory to the Lehman VD Lenders;

(ii)    Unless waived by the Lehman VD Lenders, all agreements and instruments

contemplated by, or to be entered into pursuant to, the Plan, including, without limitation, each of

the documents necessary for consummation of the Plan, will have been duly and validly executed

and delivered by the parties thereto and all conditions to their effectiveness will have been satisfied

or waived other than the occurrence of the Effective Date; and

(iii)    Unless waived by the Lehman VD Lenders as to one or more VD Plan

Debtors, the ability to have the Effective Date occur for all of the VD Plan Debtors.

### 5.9.3    Retention Of Jurisdiction.

Notwithstanding the entry of the Confirmation Order or the occurrence of the

Effective Date, the Bankruptcy Court will not be limited under the Plan and the Bankruptcy Court

will retain jurisdiction over the Cases of the VD Plan Debtors and any of the proceedings related to

the Cases of the VD Plan Debtors pursuant to Bankruptcy Code § 1142 and 28 U.S.C. § 1334 to the

fullest extent permitted by the Bankruptcy Code and other applicable law.

### 5.9.4    Modification Or Withdrawal Of Plan.

#### (a)    Modification of Plan.

At any time prior to confirmation of the Plan, the Lehman VD Lenders may

supplement, amend, modify or restate the Plan or withdraw it as to any VD Plan Debtor.  After

confirmation of the Plan, the Lehman VD Lenders or Liquidating Trustee with the consent of the

Lehman VD Lenders may (x) apply to the Bankruptcy Court, pursuant to section 1127 of the

Bankruptcy Code, to modify the Plan; and (y) apply to the Bankruptcy Court to remedy defects or

omissions in the Plan or to reconcile inconsistencies in the Plan.

#### (b)    Nonconsensual Confirmation.

In the event that any Impaired Class of Claims or Interests will fail to accept the Plan

in accordance with section 1129(a)(8) of the Bankruptcy Code, Lehman VD Lenders (i) may request

that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy

Code, and in accordance with the Plan, and (ii) may modify the Plan in accordance with section

1127(a) of the Bankruptcy Code.

### 5.9.5    Miscellaneous.

#### (a)    Changes in Rates Subject to Regulatory Commission Approval.

The VD Plan Debtors are not subject to governmental regulatory commission

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    approval of their rates.

2                          **(b)    Payment of Statutory Fees.**

3                All quarterly fees due and payable to the Office of the United States Trustee pursuant

4    to section 1930(a)(6) of Title 28 of the United States Code with respect to the VD Plan Debtors will

5    be paid in full on or before the Effective Date, or, to the extent such quarterly fees are disputed, an

6    adequate reserve will have been established and set aside for payment in full thereof, as required by

7    section 1129(a)(l2) of the Bankruptcy Code.  The Liquidating Trustee will remain responsible for

8    timely payment of quarterly fees due and payable after the Effective Date with respect to the VD

9    Plan Debtors until each applicable VD Plan Debtor's Case is closed, to the extent required by section

10   1930(a)(6) of Title 28 of the United States Code.

11                          **(c)    Payment Dates.**

12               Whenever any payment or Distribution to be made under the Plan will be due on a

13   day other than a Business Day, such payment or Distribution will instead be made, without interest,

14   on the immediately following Business Day.

15                          **(d)    Headings.**

16               The headings used in this Disclosure Statement and in the Plan are inserted for

17   convenience only and neither constitutes a portion of the Joint VD Disclosure Statement or the Joint

18   VD Plan nor in any manner affect the construction of the provisions of the Joint VD Disclosure

19   Statement or the Joint VD Plan.

20                          **(e)    Other Documents and Actions.**

21               The VD Plan Debtors and Liquidating Trustee may execute such other documents and

22   take such other actions as may be necessary or appropriate to effectuate the transactions

23   contemplated under the Plan.

24                          **(f)    Notices.**

25               All notices and requests in connection with the Joint VD Disclosure Statement and

26   the Plan will be in writing and will be hand delivered or sent by mail addressed to:

27          Edward Soto, Esq.
            Nellie P. Camerik, Esq.
28          Weil, Gotshal & Manges LLP
            1395 Brickell Avenue

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Suite 1200
Miami, FL 33131

and

Shai Y. Waisman, Esq.
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY  10153-0119

With copies to:

Dean A. Ziehl, Esq.
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 11th Fl.
Los Angeles, CA  90067

All notices and requests to any Person holding of record any Claim or Interest will be sent to them at their last known address or to the last known address of their attorney of record. Any such Person may designate in writing any other address for purposes of this section, which designation will be effective on receipt.

**(g)    Governing Law.**

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), the laws of the State of New York (without reference to its conflict of law rules) will govern the construction and implementation of the Plan and any agreements, documents, and instruments executed in connection with the Plan, unless otherwise specifically provided in such agreements, documents, or instruments.

**(h)    Binding Effect.**

The Joint VD Plan and all rights, duties and obligations thereunder will be binding upon and inure to the benefit of the Lehman Creditors, the VD Plan Debtors, the Liquidating Trustee, Holders of Claims, Holders of Interests, and their respective successors and assigns.

**(i)    Successors and Assigns.**

The rights, benefits, and obligations of any Person named or referred to in the Plan will be binding on, and will inure to the benefit of, the heirs, executors, administrators, successors, and assigns of such Person.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**(j)**      **Severability of Plan Provisions.**

If, prior to the Confirmation Date, any term or provision of the Plan is held by the Bankruptcy Court to be illegal, impermissible, invalid, void or unenforceable, or otherwise to constitute grounds for denying confirmation of the Plan, the Bankruptcy Court will, with the consent of the Lehman Proponents, have the power to interpret, modify or delete such term or provision (or portions thereof) to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision will then be operative as interpreted, modified or deleted. Notwithstanding any such interpretation, modification or deletion, the remainder of the terms and provisions of the Plan will in no way be affected, impaired or invalidated by such interpretation, modification or deletion.

**(k)**      **No Waiver.**

The failure of the VD Plan Debtors, Liquidating Trustee, Voluntary Debtors' Committee or Lehman Creditors or any other Person to object to any Claim for purposes of voting will not be deemed a waiver of the Voluntary Debtors' Committee's, the VD Plan Debtors', the Liquidating Trustee's or the Lehman VD Lenders' right to object to or examine such Claim, in whole or in part.

**(l)**      **Inconsistencies.**

In the event the terms or provisions of this Disclosure Statement are inconsistent with the terms and provisions of the Plan or documents executed in connection with the Plan, the terms of the Plan will control.

**(m)**      **Exemption from Certain Transfer Taxes and Recording Fees.**

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers from a VD Plan Debtor or its Estate to the Liquidating Trustee, the Lehman Nominees or to any other Person pursuant to the Plan, or any agreement regarding the transfer of title to or ownership of any of the VD Plan Debtors' real or personal property or of any other interest in such property (including, without limitation, a security interest), including, without limitation, transfers or sales pursuant to the Confirmation Order or any Sale Order will not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage

recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or

governmental assessment, and the Confirmation Order will direct the appropriate state or local

governmental officials or agents to forego the collection of any such tax or governmental assessment

and to accept for filing and recordation any of the foregoing instruments or other documents without

the payment of any such tax or governmental assessment.

**(n)    Post-Confirmation Status Report.**

By the earlier of 180 days following the entry of the Confirmation Order a status

report will be Filed with the Court explaining what progress has been made toward consummation of

the confirmed Plan, which report will be Filed by the Liquidating Trustee, if the Effective Date

occurs within 120 days following the entry of the Confirmation Order and, otherwise, by the

Lehman Creditors.  The status report will be served on the United States Trustee, the list of twenty

largest unsecured creditors Filed by the VD Plan Debtors for the jointly administered Cases of the

Debtors, the Lehman Creditors, the Liquidating Trustee and those parties who have requested special

notice. Unless otherwise ordered, further status reports will be Filed every 180 days and served on

the same entities.

**(o)    Post-Confirmation Conversion/Dismissal.**

A creditor or party in interest may bring a motion to convert or dismiss any Case of a

VD Plan Debtor under § 1112(b), after the Plan is confirmed, if there is a default in performing the

Plan, subject to the right of any party in interest to object to such motion.  If the Court orders any of

the Cases converted to Chapter 7 after the Plan is confirmed, then all property that had been property

of the Chapter 11 Estate, and that has not been disbursed pursuant to the Plan, will revest in the

Chapter 7 estate.  The automatic stay will be reimposed upon the revested property, but only to the

extent that relief from stay was not previously authorized by the Court during this Case.

**(p)    Final Decree.**

Once a VD Plan Debtor's Estate has been fully administered, as referred to in

Bankruptcy Rule 3022, the Liquidating Trustee, or other party as the Bankruptcy Court will

designate in the Confirmation Order, will File a motion with the Bankruptcy Court to obtain a final

decree to close the Case of such VD Plan Debtor.

## VI

## BEST INTERESTS OF CREDITORS TEST

Pursuant to Section 1129(a)(7) of the Bankruptcy Code, if any creditor or interest holder who holds a claim or interest in an impaired class under a plan does not vote to accept the plan, the plan for that debtor cannot be confirmed unless the Bankruptcy Court determines that the distributions under the plan for such creditor or interest holder are not less than those which the creditor or interest holder would receive in a liquidation under chapter 7 of the Bankruptcy Code (referenced herein as the "Best Interests Test").

The Best Interests Test must be satisfied even if the Joint VD Plan is accepted by each impaired Class of Claims and Interests if any Holder of an Allowed Claim or Allowed Interest objects to the Joint VD Plan on such basis. The Best Interests Test requires the Bankruptcy Court to find either that (i) all Holders of Claims and Interests in an Impaired Class for a particular VD Plan Debtor have accepted the Joint VD Plan, or (ii) the Joint VD Plan for such VD Plan Debtor provides each Holder of Allowed Claim or Interest in an Impaired Class who has not accepted the Joint VD Plan with a recovery of property of a value, as of the effective date of the Joint VD Plan, that is not less than the amount that such Holder would receive if the applicable VD Plan Debtor were liquidated under chapter 7 of the Bankruptcy Code.  Excluding the Secured Claims of the Lehman VD Lenders (who, as Plan Proponents, will vote in favor of the Plan) and ignoring the Claims of Settling Bond Issuers based on the settlement embodied in the applicable Settling Bond Issuer Agreement, Allowed Claims and Interests classified as Impaired include:

(1)   the Allowed Reliance Claims against Group I Debtors in Class 6;

(2)   the Allowed General Unsecured Claims against Group I Debtors in Class 7;

(3)   the Allowed General Unsecured Claims against Group II Debtors in Class 8;

(4)   the Allowed Settling Bond Issuer-Related Future Work Claims in Class 9; and

(5)   the Allowed Interests in Group 10.

Because each of the Plan Projects of the Group I Debtors (other than SunCal Summit Valley) is subject to a Lehman Claim Lien and the amount owed under the applicable Lehman Loan exceeds the value of the applicable Plan Project, unless the equitable subordination claims were

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

successful, Claims in Impaired Classes 6 and 7 would receive no recovery in chapter 7 liquidation

Cases from the Plan Projects.  The Lehman VD Lenders contend that the equitable subordination

claims asserted in the ES Action are without merit.  If, however, the litigation with respect to

equitable subordination could be adequately funded in a chapter 7 liquidation (or under an

alternative plan), and were successful, holders of claims determined to be beneficiaries of equitable

subordination and as to which creditor specific injury was shown could be paid in full or in part and,

thus, may be paid more than is proposed under the Plan. Further, there is no basis for a present

estimate of any value for the other Litigation Claims, primarily consisting of Avoidance Actions.

The Lehman Proponents estimate the outcome as follows if all of the VD Plan

Debtors' Cases were converted to Cases under chapter 7 of the Bankruptcy Code: [17]

| **LEHMAN PROPONENTS' ESTIMATED DISTRIBUTIONS UNDER CHAPTER 7 CASES FOR CREDITORS OTHER THAN LEHMAN VD LENDERS** |
|:---:|

| **GROUP I DEBTORS** | | | | | | |
|---|---|---|---|---|---|---|
| **DEBTOR** | **ADMIN-ISTRATIVE, PRIORITY TAX, PRIORITY (CLASS 5) & OTHER SECURED (CLASS 4) CLAIMS** | **SECURED REAL PROPERTY TAX CLAIMS (CLASS 1)** | **ALLOWED SR. SECURED MECHANIC'S LIEN CLAIMS (CLASS 3) IF ANY** | **RELIANCE CLAIMS (CLASS 6)** | **GENERAL UNSECURED CLAIMS (CLASS 7)** | **SETTLING BOND ISSUER RELATED FUTURE WORK CLAIMS - CLASS 9** |
| Acton Estates | Unknown | 100% | 100% | 0% | 0% | 0% |
| Palmdale Hills | Unknown | 100% | 100% | 0% | 0% | 0% |
| SunCal Bickford | Unknown | 100% | 100% | 0% | 0% | 0% |
| SCC Communities | Unknown | 100% | 100% | 0% | 0% | 0% |

---

[17] In any event, for net recoveries from Litigation Claims to result in distributions to Holders of Claims in Classes 6, 7 and 8 (a) the Litigation Claims or their proceeds would have to be unencumbered by any Liens and (b) the net recoveries would need to exceed the amount of, at a minimum, Administrative Claims (including postpetition real property taxes), Secured Real Property Tax Claims and Priority Claims, which are estimated to aggregate approximately $15 million presently and are likely to increase pending final conclusion of pursuit of the Litigation Claims.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

## GROUP I DEBTORS

| DEBTOR | ADMIN-ISTRATIVE, PRIORITY TAX, PRIORITY (CLASS 5) & OTHER SECURED (CLASS 4) CLAIMS | SECURED REAL PROPERTY TAX CLAIMS (CLASS 1) | ALLOWED SR. SECURED MECHANIC'S LIEN CLAIMS (CLASS 3) IF ANY | RELIANCE CLAIMS (CLASS 6) | GENERAL UNSECURED CLAIMS (CLASS 7) | SETTLING BOND ISSUER RELATED FUTURE WORK CLAIMS - CLASS 9 |
|---|---|---|---|---|---|---|
| SunCal I | Unknown | 100% | 100% | 0% | 0% | 0% |
| SunCal Summit Valley | Unknown | 100% | 100% | 0% | 0% | 0% |
| Tesoro | Unknown | 100% | 100% | 0% | 0% | 0% |

## GROUP II DEBTORS

| DEBTOR | ADMIN-ISTRATIVE, PRIORITY TAX, PRIORITY (CLASS 5) & OTHER SECURED (CLASS 4) CLAIMS | SECURED REAL PROPERTY TAX CLAIMS (CLASS 1) | ALLOWED SR. SECURED MECHANIC'S LIEN CLAIMS (CLASS 3) IF ANY | GENERAL UNSECURED CLAIMS (CLASS 8) | SETTLING BOND ISSUER RELATED FUTURE WORK CLAIMS - CLASS 9 |
|---|---|---|---|---|---|
| Kirby Estates | 100% | 100% | Not applicable | Not applicable | Not applicable |
| Seven Brothers | 0% | 100% | Not applicable | Not applicable | Not applicable |
| SunCal Beaumont | 100% | 100% | 100% | 100% | Not applicable |
| SunCal Johannson | 100% | 100% | Not applicable | 100% | Not applicable |

In contrast, under the Plan, Holders of Allowed Claims in Classes 6, 7 and 8 all

receive Distributions or performance (and the Lehman Proponents believe that any Distribution with

respect to Class 6 or Class 7 Claims under the Plan would be more than a Creditor would receive

through a chapter 7 liquidation by depending on success with respect to the ES Action).

Under the Plan, Distributions and performance proposed for Creditors other than the Lehman Creditors and other than the Settling Bond Issuers are as follows, *based on the Lehman VD Lenders' estimates of Claims set forth in the Disclosure Statement* (with shaded boxes reflecting projected improved treatment from that projected in a chapter 7 case and unshaded boxes reflecting the same projected treatment):

## DISTRIBUTIONS UNDER THE PLAN – GROUP I DEBTORS

| DEBTOR | ADMIN-ISTRATIVE, PRIORITY TAX, PRIORITY (CLASS 5) & OTHER SECURED (CLASS 4) CLAIMS | SECURED REAL PROPERTY TAX CLAIMS (CLASS 1) | ALLOWED SR. SECURED MECHANIC'S LIEN CLAIMS (CLASS 3) IF ANY | RELIANCE CLAIMS (CLASS 6) (Sign Creditor's Assignment/ Release for Lehman? % if Yes / % if No) | GENERAL UNSECURED CLAIMS (CLASS 7) (Sign Creditor's Assignment/ Release for Lehman? % if Yes / % if No) | SETTLING BOND ISSUER-BACKED FUTURE WORK CLAIMS - CLASS 9 |
|---|---|---|---|---|---|---|
| Acton Estates | 100% | 100% | 100% | 40%-50% / 1% | 5% / 1% | 100% |
| Palmdale Hills | 100% | 100% | 100% | 40%-50% / 1% | 5% / 1% | 100% |
| SCC Communities | 100% | 100% | 100% | 40%-50% / 1% | 5% / 1% | 100% |
| SunCal Bickford | 100% | 100% | 100% | 40%-50% / 1% | 5% / 1% | 100% |
| SunCal I | 100% | 100% | 100% | 40%-50% / 1% | 5% / 1% | 100% |
| SunCal Summit Valley | 100% | 100% | 100% | 40%-50% / 1% | 5% / 1% | 100% |
| Tesoro | 100% | 100% | 100% | 40%-50% / 1% | 5% / 1% | 100% |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

## DISTRIBUTIONS UNDER THE PLAN – GROUP II DEBTORS

| DEBTOR | ADMIN-ISTRATIVE, PRIORITY TAX, PRIORITY (CLASS 5) & OTHER SECURED (CLASS 4) CLAIMS | SECURED REAL PROPERTY TAX CLAIMS (CLASS 1) | ALLOWED SR. SECURED MECHANIC'S LIEN CLAIMS (CLASS 3) IF ANY | GENERAL UNSECURED CLAIMS (CLASS 8) | SETTLING BOND ISSUER-BACKED FUTURE WORK CLAIMS - CLASS 9 |
|---|---|---|---|---|---|
| Kirby Estates | 100% | 100% | Not applicable | Not applicable | Not applicable |
| Seven Brothers | 100% | 100% | Not applicable | Not applicable | Not applicable |
| SunCal Beaumont | 100% | 100% | 100% | 100% | Not applicable |
| SunCal Johannson | 100% | 100% | Not applicable | 100% | Not applicable |

For Holders of Allowed Class 6 Reliance Claims, they receive not only their proportional share of Residual Cash, but also:  (a) the Guaranteed Minimum Distribution of 1% of the Allowed Claims; and (b) if they elect it, the Lehman Distribution Enhancement, which increases a Holder's recovery to 40% or 50% of its Allowed Claim against a Group I Debtor (depending on whether the Projected Distribution Bump Up is applicable), subject to reduction if the On Proportion Distribution Reduction is applicable. As to the fairness of the Distributions for Allowed Reliance Claims with respect to the equitable subordination claims, the Lehman VD Lenders believe the Lehman Plan Funding results in fair value for the VD Plan Debtors' Assets based on the complexities of the ES Action with respect to the equitable subordination claims, the lack of definitive funding for the prosecution thereof and for the maintenance of the Plan Projects and VD Plan Debtors' Estates pending resolution of the ES Action, the delay attendant to prosecution of the ES Action as to at least Lehman Commercial due to the automatic stay in its bankruptcy case and the high evidentiary hurdles for either recovery for an individual Creditor or to substantively consolidate multiple VD Plan Debtors to enable recoveries for a broader group of Creditors.

For Holders of Allowed Class 7 General Unsecured Claims, they receive not only

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

their proportional share of Residual Cash, but also the Guaranteed Minimum Distribution of 1% of their Allowed Claims and, if they elect it, the Lehman Distribution Enhancement of up to another 4% of their Allowed Claims, subject to reduction for the On Proportion Distribution Reduction.

For Holders of Allowed Class 8 General Unsecured Claims, they receive 100% of their Claims unless Residual Cash and Project Values are insufficient to pay all Claims. In that event, Holders of Allowed Class 8 General Unsecured Claims receive their Pro Rata share of Project Values and Residual Cash after payment of Allowed Senior Claims, but no less than 1% of each Allowed Class 8 Claim.

For Holders of Allowed Class 9 Settling Bond Issuer-Backed Future Work Claims, based on the recommitment from the Settling Bond Issuers, they are to receive essentially the full benefit of their bargains.  As described in the Plan and Disclosure Statement, however, Settling Bond Issuers are waiving payment on all or some of their Allowed Claims in Classes 3, 6 and 7.

For Holders of Allowed Group 10 Interests, because (i) all of the Group I Debtors are insolvent and (ii) in the case of the Group II Debtors, Lehman VD Lenders hold Secured Claims in the Interests in the Group II Debtors (entitling them to any Distributions therefor in a chapter 7 liquidation), nothing would be available for Holders of Interests and nothing is payable to them under the Plan.  Thus, they do no worse.

## VII

## PLAN FEASIBILITY

In order to confirm the Joint VD Plan as to a particular VD Plan Debtor, the Bankruptcy Court must find that confirmation of the Joint VD Plan is not likely to be followed by the liquidation or the need for further financial reorganization of such VD Plan Debtor, unless provided in the Plan.  This requirement is imposed by Section 1129(a)(11) of the Bankruptcy Code and is generally referred to as the "feasibility" requirement.

Under the Plan, the Lehman VD Lenders have agreed to provide the Lehman Plan Funding, being the Lehman Post-Confirmation Expense Funding and the Lehman Creditor Distribution Funding.  For the Lehman Creditor Distribution Funding, the Lehman VD Lenders have agreed to fund, through permitting use of Cash Collateral or through new transfers of Cash or

1  through other arrangements, the Distributions for the following (i) Allowed Secured Real Property

2  Tax Claims (Class 1), (ii) Allowed Administrative Claims, (iii) Allowed Priority Tax Claims, (iv)

3  Allowed Priority Claims (Class 5), (v) Allowed Sr. Secured Mechanic's Lien Claims (Class 3), (vi)

4  Allowed Other Secured Claims (Class 4) (only to the extent that the third alternative treatment set

5  forth in the Plan is selected), (vii) the Lehman Guaranteed Minimum Distribution, (viii) the Lehman

6  Distribution Enhancement for Holders of Allowed General Unsecured Claims in Class 7 and

7  Allowed Reliance Claims in Class 6, and (ix) Allowed General Unsecured Claims in Class 8.  The

8  Lehman VD Lenders also have agreed under the Joint VD Plan to arrange, as provided in Plan

9  Article VI, for the applicable Lehman Nominees to cooperate in the performance of Future Work

10  that is the subject of an Allowed Settling Bond Issuer-Backed Future Work Claim and to reimburse

11  the applicable Settling Bond Issuer the agreed amount for the Settling Bond Issuer-Incurred Future

12  Work Obligations arising under any Future Work Bond.

13  　　　　　For the Lehman Post-Confirmation Expense Funding, the Lehman VD Lenders have

14  agreed to pay an amount (with such amount not to exceed $500,000 and which will not be payable

15  for expenses to be incurred or payable or for services to be rendered from or after two (2) years

16  following the Effective Date) for Post-Confirmation Expenses in the form of new Cash transfers or

17  by a Lehman VD Lender permitting the use of Cash Collateral of a Lehman VD Lender, each as

18  loans payable by each benefitted VD Plan Debtor's Estate, provided that the recourse for such loans

19  will be limited to the applicable Estate's Net Cash Proceeds from Remaining Other Assets.

20  **VIII**

21  **<u>RISK FACTORS</u>**

22  　　　　　The Plan essentially provides for (a) payments to Creditors by the Liquidating Trustee

23  from the Lehman Plan Funding, (b) payments to Creditors of Residual Cash by the Liquidating

24  Trustee, (c) conveyance to Lehman Nominees of the Plan Projects, and (d) payments and

25  reimbursements by Lehman Nominees to Bond Issuers and Holders of Secured Real Property Tax

26  Claims.  The following discussion summarizes some of the material risks associated with the Plan

27  and its implementation:

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1.     The Plan includes in its Article XIV express conditions to its Confirmation and the Effective Date occurring, in addition to the statutory conditions for Confirmation set forth in Bankruptcy Code § 1129.  That such conditions would not be met is a risk that the Plan would not become effective, but these are <u>not</u> risks that the Plan, once effective, would fail.

2.     Most of the Distributions from the Lehman Plan Funding and the conveyance of the Plan Projects to the Lehman Nominees are to be made by the Liquidating Trustee.  The Liquidating Trustee will be a Person selected by the Lehman VD Lenders, whose identity will be disclosed prior to the hearing on Confirmation.  Should there be any issues as to the Liquidating Trustee, whether as to his or her performance, health or other issues, the Bankruptcy Court may, by order, replace the Liquidating Trustee in its reasonable discretion.

3.     The Liquidating Trustee requires the Lehman Plan Funding to make a substantial part of the Distributions required under the Plan and such is thereby a risk of the Plan.  Article VIII of the Plan requires that, on the Effective Date, the Lehman VD Lenders will cause to be paid to the Liquidating Trustee from new Cash transfers sufficient amounts such that, when combined with Cash Collateral for Lehman Secured Claims, the Liquidating Trustee is holding sufficient funds to make the payments required under the Plan to be paid on the Effective Date from Lehman Plan Funding.  Thereafter, the Lehman VD Lenders will pay the Liquidating Trustee further amounts at such times as the Lehman VD Lenders reasonably determine are necessary to enable the Liquidating Trustee to make timely payments due under the Plan as Lehman Plan Funding, provided that the Post-Confirmation Expense Funding is not to exceed $500,000 nor  to be payable for expenses to be incurred or payable or for services to be rendered from or after two (2) years following the Effective Date.

4.     The existence of any Residual Cash for Distribution for a VD Plan Debtor's Estate is dependent, first, on revenue from the liquidation by the Liquidating Trustee of any Remaining Other Assets of such Estate, including any applicable Net Cash Litigation Recoveries in which such Estate has an interest.  That any such revenues will materialize is uncertain.

5.     Moreover, the existence of Residual Cash also is dependent on whether any revenue from Remaining Other Assets of an Estate will remain after Distributions for Secured

164

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Claims with respect thereto and payment or reserve for the Post-Confirmation Expenses, including post-Confirmation Date intercompany payables and reimbursements for Lehman Post-Confirmation Expense Funding.  Such deductions or applications of such revenue also are uncertain.

6. Under the Plan, the Lehman Nominees are to perform the following functions and their performance is a risk of the Plan: (a) to cooperate in the performance of Future Work that is the subject of an Allowed Settling Bond Issuer-Backed Future Work Claim and to reimburse the agreed upon amount to the applicable Settling Bond Issuer for the Settling Bond Issuer-Incurred Future Work Obligations arising under any Future Work Bond; and (b) as owners of the Plan Projects, to pay the Allowed Secured Real Property Tax Claims.

## IX

## CERTAIN UNITED STATES FEDERAL INCOME TAX
## CONSEQUENCES OF THE JOINT VD PLAN

The following discussion summarizes certain United States federal income tax consequences of the implementation of the Joint VD Plan to certain Holders of Claims.  The following summary does not address the United States federal income tax consequences to Holders of Claims that are not entitled to vote, such as (i) Holders of Claims who are unimpaired or otherwise entitled to payment in full in Cash under the Joint VD Plan or (ii) Holders of Interests as they are deemed to reject the Plan.

The following summary is based on the Internal Revenue Code of 1986 and all rules and treasury regulations promulgated thereunder ("Tax Code"), judicial decisions, and published administrative rules and pronouncements of the Internal Revenue Service ("IRS"), all as in effect on the date hereof.  Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the United States federal income tax consequences described below.

The United States federal income tax consequences of the Joint VD Plan are complex and are subject to significant uncertainties.  The Lehman Proponents have not requested a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Joint VD Plan.  Thus, no assurance can be given as to whether the IRS will successfully assert alternative positions from those set forth herein or the interpretation that the IRS will adopt.  In addition, this summary

generally does not address foreign, state or local tax consequences of the Joint VD Plan, nor does it address the United States federal alternative minimum or federal income tax consequences of the Joint VD Plan to special classes of taxpayers (such as foreign taxpayers, broker-dealers, banks, mutual funds, insurance companies, other financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations (including, without limitation, certain pension funds), persons holding a Claim as part of a constructive sale, straddle or other integrated transaction, and investors in pass-through entities, including partnerships).  If a partnership (or other Person taxed as a partnership) holds a Claim, the tax treatment of a partner in the partnership will generally depend upon the status of the partner and upon the activities of the partnership.

Accordingly, the following summary of certain United States federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon the individual circumstances pertaining to a Holder of a Claim.

IRS Circular 230 Notice:  To ensure compliance with IRS Circular 230, Holders of Claims are hereby notified that:  (a) any discussion of United States federal tax issues contained or referred to in this Disclosure Statement is not intended or written to be used, and cannot be used, by Holders of Claims for the purpose of avoiding penalties that may be imposed on them under the Tax Code; (b) such discussion is written in connection with the promotion or marketing by the Lehman Proponents of the transactions or matters addressed herein; and (c) Holders of Claims should seek advice based on their particular circumstances from their tax advisors.

### 9.1 Consequences to Holders of Lehman Secured Claims

Pursuant to the Joint VD Plan, the Holders of Lehman Secured Claims will receive property (including Plan Projects), conveyed to the Holders of such Claims or one or more Lehman Nominees) in satisfaction of their Claims.

In general, each Holder of such a Claim should recognize gain or loss in an amount equal to the difference between (x) the amount of cash and the fair market value of other property received by the Holder in satisfaction of its Claim (other than any Claim for accrued but unpaid interest and other than any amount treated as imputed interest as further discussed below) and (y) the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Holder's adjusted tax basis in its Claim (other than any basis attributable to accrued but unpaid interest but including any basis such Holder has as a result of a transfer by a Lehman Related Party of new Cash to fund a Lehman Post-Confirmation Loan).

Distributions to such Holders may be made subsequent to the Effective Date.  Under the Tax Code, a portion of each distribution to such Holders may be treated as imputed interest.  In addition, it is possible that any loss and a portion of any gain realized by such Holder may be deferred until such time as such Holder has received its final distribution.  All Holders of such Claims should consult their tax advisors as to tax consequences of distributions subsequent to the Effective Date.

A Holder's initial tax basis in any Plan Projects conveyed should equal the fair market value thereof.  Gain or loss recognized by a Holder on the sale, exchange or other disposition of the Plan Projects will equal the difference, if any, between the amount realized by the Holder and the Holder's adjusted tax basis in the Plan Projects immediately before the sale, exchange or other disposition.  Any such gain or loss will be long-term if the Holder's holding period for the Plan Project is more than one year at that time.  A Holder's holding period for any conveyed Plan Projects generally should begin the day following the day that it is conveyed to the Holder.  Depending upon the facts at the time, such gain or loss may be capital or may be "Section 1231 Gain" or "Section 1231 Loss."  The discussion in this paragraph is premised upon the Holder being considered the owner of a Plan Project for federal income tax purposes.

**9.2**      **Consequences to Holders of General Unsecured Claims.**

Pursuant to the Joint VD Plan, the Liquidating Trustee will distribute to the Holders of Allowed General Unsecured Claims in Classes 8 and 9 and Allowed Reliance Claims the Guaranteed Minimum Distribution (1% of their Claims) and, Residual Cash, if any, Pro Rata.  In addition, each such Holder of an Allowed General Unsecured Claim or Allowed Reliance Claim that executes and delivers the Creditor's Assignment / Release for Lehman will assign its Claims to the applicable Lehman VD Lender(s) and receive the applicable, additional Lehman Distribution Enhancement.  Holders of Allowed General Unsecured Claims in Class 8 will receive a 100% recovery with post-petition interest, capped by, in effect, their respective pro rata share of the

1   residual value of the applicable Plan Project and Estate's Residual Cash, after application thereof to

2   the Allowed Senior Claims.

3          In general, each Holder of such a Claim should recognize gain or loss in an amount

4   equal to the difference between (x) the amount of Cash received by the Holder in satisfaction of its

5   Claim (other than any Claim for accrued but unpaid interest and other than any amount treated as

6   imputed interest as further discussed below), and (y) the Holder's adjusted tax basis in its Claim

7   (other than any basis attributable to accrued but unpaid interest).

8          Distributions to such Holders will be made subsequent to the Effective Date.  Under

9   the Tax Code, a portion of each distribution to such Holders may be treated as imputed interest.  In

10  addition, it is possible that any loss and a portion of any gain realized by such Holder may be

11  deferred until such time as such Holder has received its final distribution.  All Holders of such

12  Claims should consult their tax advisors as to tax consequences of distributions subsequent to the

13  Effective Date.

14          **9.3    Consequences to Holders of Settling Bond Issuer-Related Future Work Claims.**

15          Settling Bond Issuer-Related Future Work Claims consist of Settling Bond Issuer-

16  Backed Future Work Claims and Settling Bond Issuer-Owned Future Work Claims. Pursuant to the

17  Joint VD Plan, (a) each Holder of an Allowed Settling Bond Issuer-Backed Future Work Claim is to

18  receive performance of the Future Work obligations with respect to such Allowed Claim, without

19  penalties, and with the obligation reinstated as to any maturity applicable prior to the applicable

20  Petition Date, as more fully set forth in the Plan and (b) each Holder of an Allowed Settling Bond

21  Issuer-Owned Future Work Claim is (i) to receive the cooperation of the Lehman Nominee that takes

22  title to the Plan Project to which the subject Allowed Claim relates in connection with the

23  performance of such Future Work obligations, contingent upon such payment by the applicable

24  Settling Bond Issuer and (ii) as and to the extent provided in the applicable Settling Bond Issuer

25  Agreement: (1) the Lehman Nominee that takes title to the Plan Project to which a subject Claim

26  relates is to take an assignment from the applicable Settling Bond Issuer of certain of such Settling

27  Bond Issuer's Claims against the applicable VD Plan Debtor and third parties; and (2) in exchange

28  therefor, such Lehman Nominee is to reimburse such Settling Bond Issuer agreed amounts for

payments made by such Settling Bond Issuer under the applicable Future Work Bonds.

In general, each Holder of such a Claim should recognize gain or loss in an amount equal to the difference between (x) the amount of Cash received by the Holder in satisfaction of its Claim (other than any Claim for accrued but unpaid interest and other than any amount treated as imputed interest as further discussed below), and (y) the Holder's adjusted tax basis in its Claim (other than any basis attributable to accrued but unpaid interest).

Distributions to such Holders will be made subsequent to the Effective Date.  Under the Tax Code, a portion of each distribution to such Holders may be treated as imputed interest.  In addition, it is possible that any loss and a portion of any gain realized by such Holder may be deferred until such time as such Holder has received its final distribution.  All Holders of such Claims should consult their tax advisors as to tax consequences of distributions subsequent to the Effective Date.

**9.4**    **Distributions in Discharge of Accrued but Unpaid Interest.**

Pursuant to the Joint VD Plan, distributions to any Holder of Allowed Claims will be allocated first to the principal amount of such Claims, as determined for federal income tax purposes, and thereafter, to the portion of such Claim, if any, representing accrued but unpaid interest or original issue discount ("OID").  However, there is no assurance that the IRS would respect such allocation for federal income tax purposes.

In general, to the extent that any consideration received pursuant to the Joint VD Plan by a Holder of an Allowed Claim is received in satisfaction of accrued interest or OID during its holding period, such amount will be taxable to the Holder as interest income (if not previously included in the Holder's gross income).  Conversely, a Holder generally recognizes a deductible loss to the extent any accrued interest claimed or amortized OID was previously included in its gross income and is not paid in full.  However, the IRS has privately ruled that a holder of a security of a corporate issuer, in an otherwise tax-free exchange, could not claim a current deduction with respect to any unpaid OID.  Accordingly it is also unclear whether, by analogy, a Holder of a Claim of a non-corporate issuer would be required to recognize a capital loss, rather than an ordinary loss, with respect to previously included OID that is not paid in full.

1    Each Holder of a Claim is urged to consult its tax advisor regarding the allocation of

2    consideration and the deductibility of accrued but unpaid interest for federal income tax purposes.

3    **9.5    Character of Gain or Loss**

4    Where gain or loss is recognized by a Holder of such a Claim, the character of such

5    gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be

6    determined by a number of factors, including, among others, the tax status of the Holder (including

7    method of accounting), whether the Claim constitutes a capital asset in the hands of the Holder,

8    whether the Claim arose in connection with the provision of services by the Holder and how long it

9    has been held, whether the Claim was acquired at a market discount, and whether and to what extent

10    the Holder previously had claimed a bad debt deduction.

11    **9.6    Information Reporting and Withholding**

12    All distributions to Holders of Allowed Claims under the Joint VD Plan are subject to

13    any applicable tax withholding.  Under United States federal income tax law, interest, dividends, and

14    other reportable payments may, under certain circumstances, be subject to "backup withholding" at

15    the then applicable withholding rate (currently 28% and scheduled to increase to 31% beginning in

16    2011).  Backup withholding generally applies if the Holder (a) fails to furnish its social security

17    number or other taxpayer identification number ("TIN"), (b) furnishes an incorrect TIN, (c) fails

18    properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified

19    statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is a

20    United States person that is not subject to backup withholding.  Backup withholding is not an

21    additional tax but merely an advance payment, which may be refunded by the IRS to the extent it

22    results in an overpayment of tax and the appropriate information is timely supplied to the IRS.

23    Certain persons are exempt from backup withholding, including, in certain circumstances,

24    corporations and financial institutions.

25    In addition, from an information reporting perspective, Treasury Regulations

26    generally require disclosure by a taxpayer on its United States federal income tax return of certain

27    types of transactions in which the taxpayer participated, including, among other types of

28    transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1  thresholds.  Holders are urged to consult their tax advisors regarding these regulations and whether

2  the transactions contemplated by the Plan would be subject to these regulations and require

3  disclosure on the Holders' tax returns.

4          The foregoing summary has been provided for informational purposes only.  All

5  Holders of Claims receiving a distribution under the Plan are urged to consult their tax advisors

6  concerning the United States federal, state and local and foreign tax consequences applicable under

7  the Plan.

8                                    **X**

9          **ALTERNATIVES, CONCLUSION AND RECOMMENDATION**

10         The Joint VD Plan provides for prompt Distributions to Creditors in amounts believed

11  by the Lehman VD Lenders to represent fair value for the Assets of the VD Plan Debtors, including

12  all Litigation Claims.  Although no current alternative to the Plan is contemplated by Lehman

13  Creditors, possible alternatives would be (a) another plan under which someone provided funding to

14  enable continued operation of the VD Plan Debtors pending sale of the Plan Projects and resolution

15  of all Litigation Claims, including those against the Lehman Creditors (the Lehman Proponents

16  believe that the Voluntary Debtors and/or Acquisitions may be proposing an alternative Plan) or (b)

17  conversion of the VD Plan Debtors' Cases to Cases under chapter 7 in which, again, someone would

18  need to provide funding to enable continued operation of the VD Plan Debtors pending sale of the

19  Plan Projects and resolution of all Litigation Claims.  Because the Lehman VD Lenders believe that

20  the current Plan offers fair value for the VD Plan Debtors' Assets, and the foregoing alternatives

21  would involve substantial delay before Distributions would be likely for Holders of unsecured, non-

22  priority Claims, the Lehman VD Lenders recommend that eligible Creditors vote for the Plan.

23

24

25

26

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Dated:  March 28, 2011                      PACHULSKI STANG ZIEHL & JONES LLP

                                   By      /s/Robert B. Orgel
                                           Richard M. Pachulski (CA Bar No. 90073)
                                           E-mail: rpachulski@pszjlaw.com
                                           Dean A. Ziehl (CA Bar No. 84529)
                                           E-mail: dziehl@pszjlaw.com
                                           Robert B. Orgel (CA Bar No. 101875)
                                           E-mail: rorgel@pszjlaw.com

                                           Attorneys for Lehman Commercial Paper
                                           Inc. and Lehman ALI, Inc.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

# EXHIBIT "1"

## Summary of Health and Safety Notices

| Ex. No | Citation | Date | Issuing Agency | Applicable Projects |
|---|---|---|---|---|
| 1 | Request for Supplemental Deposit | February 19,2009 | Los Angeles County Department of Regional Planning | Tesoro Project |
| 2 | Letter from City of Palmdale | March 10, 2009 | City of Palmdale | Palmdale Hills |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**<u>EXHIBIT "2"</u>**


**<u>Lehman VD Lenders' Claims</u>**

**JOINT VD DISCLOSURE STATEMENT: EXHIBIT "2"**

**Prepetition Lehman VD Lender Claims:  Lehman Secured Claims and Lehman Creditor Deficiency Claims**

| | Class | Prepetition Loan | Loan Amouts Per Loan | Plan Debtors;   Claim # | Loan Amounts Per Plan Debtor | Plan Debtors' Projects' Values* | Cash Collateral & Other Collateral** | Lehman Creditor Secured Claims*** | Lehman Creditor Deficiency Claims | Combined Secured Claims & Deficiency Claims by Lehman Creditor | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | Lehman ALI | Lehman Commercial |
| 1 | | **Ritter Ranch Loan Agreement** Claim Filed by Lehman Commercial: $287,252,096.31 | $287,252,096 | **Group I Debtors:** | | | | | | | |
| | 2.1 | | | Palmdale Hills #65 | $287,252,096 | $42,900,000 | $55,574,854 | $98,474,854 | $188,777,242 | | $287,252,096 |
| 2 | | **SunCal Communities I Loan Agreement** Claim Filed by Lehman Commercial: $343,221,391.06 | $343,221,391 | **Group I Debtors:** | | | | | | | |
| | 2.2 | | | SunCal Bickford #16 | $343,221,391 | $29,500,000 | $1,105,004 | $30,605,004 | $312,616,387 | | $343,221,391 |
| | 2.3 | | | Acton Estates #6 | $343,221,391 | $6,800,000 | $0 | $6,800,000 | $336,421,391 | | $343,221,391 |
| | 2.4 | | | SunCal I #[__] | $343,221,391 | $0 | $3,625,547 | $3,625,547 | $339,595,844 | | $343,221,391 |
| | 2.6 | | | SunCal Summit Valley #12 | $343,221,391 | $2,200,000 | $2,725,361 | $4,925,361 | $338,296,030 | | $343,221,391 |
| | 2.7 | | | **Additional Loan Obligor: Not a Plan Debtor:** | | | | | | | |
| | | | | SunCal Emerald #7 | $343,221,391 | $12,000,000 | $0 | $12,000,000 | $331,221,391 | | $343,221,391 |
| 3 | 8.3 | **SunCal Bickford 2nd Lien Loan Agreement** Claim Filed by Lehman Ali: $56,494,059.38 | $56,494,059 | **Group I Debtors:** | | | | | | | |
| | | | | SunCal Bickford #17 | $56,494,059 | $0 | $0 | $0 | $56,494,059 | $56,494,059 | |
| 6 | 2.5 | **Interim Loan Agreement** Claim Filed by Lehman ALI: $23,795,012.59 | $23,795,013 | **Group I Debtors:** | | | | | | | |
| | | | | SCC Communities #9 | $23,795,013 | $1,200,000 | $2,669 | $1,202,669 | | $1,202,669 | |
| | 2.8 | | | Tesoro #7 | $23,795,013 | $1,850,000 | $71 | $1,850,071 | | $1,850,071 | |
| | | **Totals for Plan Debtors:** | $710,762,559 | | | $1,764,221,745 | $84,450,000 | $63,033,506 | $147,483,506 | $1,572,200,954 | $59,546,799 | $1,660,137,661 |
| | | **Each Lehman VD Lender's Percentage of Total Loan Amounts For VD Plan Debtors** | | | | | | | | | 3% | 97% |
| | | **Total, collectively, for all Lehman VD Lenders:** | | | | | | | | $1,719,684,460 | | |

*For the Plan Debtors' Project Values, the values used are from the Lehman Creditors' appraisals undertaken during these Chapter 11 Cases. Becaue the Bickford Ranch Project's value is less than the amount of the senior lien, no value is shown for the Project with respect to the 2nd Lien loan of Lehman ALI.

**Cash amounts include both Undisputed Cash Collateral and Disputed Cash Collateral. The numbers were derived from January 2011 Filings by the Voluntary Debtors of pleadings and Monthly Operating Reports. Also, Palmdale Hills apparently owns approximately $35.2 million of CFD Bonds.  Additionally, the Lehman VD Lenders' collateral includes the Interests of SunCal Summit Valley in Seven Brothers and Kirby Estates (estimated to be worth $2.7 million) and the Interests of SunCal I in SunCal Beaumont and SunCal Johannson (estimated to be worth $3.6 million, in each case net of the respective Project owners' Allowed Claims).

***Lehman Creditor Deficiency Claims are calculated for Lehman Creditor with recourse Secured Claims against a Plan Debtor's Project by deducting the applicable Project Value and Cash Collateral from the total Allowed Claim arising under the subject Lehman Loan, first against the more senior debt.  For SunCal I, which pledged its interests in SunCal Beamont and SunCal Johannson as collateral to the Lehman Creditor, the Lehman Creditor Deficiency Claim is calculated by deducting from the amount owed on the applicable Lehman Loan both SunCal I's Cash Collateral and the remainder from the value of the Projects of SunCal Beamont and SunCal Johannson after payment of their Allowed Claims.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

## EXHIBIT "3"

### Additional Definitions

1.    **Acquisitions**. SCC Acquisitions, Inc., a California corporation, an indirect parent company of all of the Debtors.

2.    **Danske Bank**. Danske Bank A/S London Branch.

3.    **Fenway Capital**.  Fenway Capital Funding LLC, which previously owned or held a legal or equitable interest in all or a portion of the Lehman Loans made pursuant to and/or evidenced by the following loan agreements, but for which a Lehman Creditor nonetheless continued as agent:  (a) SunCal Communities I Loan Agreement; (b) Ritter Ranch Loan Agreement; (c) SunCal PSV Loan Agreement; (d) Delta Coves Loan Agreement; (e) SunCal Marblehead / SunCal Heartland Loan Agreement; (f) SunCal Oak Valley Loan Agreement; and (g) SunCal Northlake Loan Agreement.

4.    **Joint TD Plan.**    A plan for eight Trustee Debtors, jointly proposed by the Lehman Creditors and the Trustee for which acceptances may be solicited simultaneously with the soliciting of acceptances for the Joint VD Plan, and prior versions thereof.

5.    **NY Bankruptcy Court.**  United States Bankruptcy Court for the Southern District of New York, which court has jurisdiction over the case of Lehman Commercial under the Bankruptcy Code (jointly administered under case no. 08-13555)

6.    **SunCal Management**. SunCal Management, LLC, a Delaware limited liability company, and the property manager for the Projects.

In re:
PALMDALE HILLS PROPERTY, LLC. AND ITS RELATED DEBTORS,

CHAPTER 11

CASE NUMBER 08-17206-ES

Debtor(s).

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
**10100 Santa Monica Blvd., 11th Floor, Los Angeles, CA 90067**

A true and correct copy of the foregoing document described as *DISCLOSURE STATEMENT WITH RESPECT TO FIRST AMENDED JOINT CHAPTER 11 PLAN FOR ELEVEN VOLUNTARY DEBTORS PROPOSED BY THE LEHMAN VD LENDERS* will be served or was served **(a)** on the **judge in chambers** in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

**I.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On ____March 28, 2011____ I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

☒  Service information continued on attached page

**II.  SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served)**:**
On _____March 28, 2011_____  I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows.  *Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.*
**JUDGE'S COPY [Overnight Delivery]**
The Honorable Erithe A. Smith
United States Bankruptcy Court - Central District of California
411 West Fourth Street, Suite 5041
Santa Ana, CA 92701-4593

☒  Service information continued on attached page

**III.  SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on _____March 28, 2011_____  I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  *Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.*

(1) Gen'l Counsel for Voluntary Debtors:
    Paul Couchot - pcouchot@winthropcouchot.com
    Marc J Winthrop - pj@winthropcouchot.com
    Paul Lianides - plianides@winthropcouchot.com
(2) Debtors (Palmdale Hills Property, LLC and related entities):
    bcook@suncal.com
(3) Counsel for SunCal Management:
    Ronald Rus – rrus@rusmiliband.com
(4) Special Counsel for Jt. Admin. Debtors & Trustee Speier:
    Louis Miller - smiller@millerbarondess.com
    Martin Pritikin - mpritikin@millerbarondess.com
(5) Gen'l Counsel for Ch. 11 Trustee (Speier):
    William Lobel - wlobel@thelobelfirm.com
    Mike Neue – mneue@thelobelfirm.com
(6) Ch. 11 Trustee (c/o Squar Milner):
    Steven N. Speier - sspeier@squarmilner.com; ca85@ecfcbis.com
(7) Office of the United States Trustee:
    Michael Hauser - michael.hauser@usdoj.gov

(8) Counsel for Voluntary Debtors' Committee:
    Alan Friedman - afriedman@irell.com
    Kerri A Lyman - klyman@irell.com
(9) Counsel for Trustee Debtors' Committee:
    Lei Lei Wang Ekvall - lekvall@wgllp.com
    Hutchison B Meltzer - hmeltzer@wgllp.com

Edward Soto - Edward.soto@weil.com; odalys.smith@weil.com; lori.seavey@weil.com
Allen Blaustein - Allen.Blaustein@weil.com
Clay Roesch - clay.roesch@weil.com
Chauncey Cole – chauncey.cole@cwt.com
Betty Shumener - bshumener@dlapiper.com
John E. Schreiber - jschreiber@dl.com; rreinthaler@dl.com
Joseph A Eisenberg - jae@jmbm.com
Mark McKane - mark.mckane@kirkland.com
Atty for Bond Safeguard & Lexon - mea@amclaw.com

☒  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| March 28, 2011 | Myra Kulick | /s/ Myra Kulick |
|---|---|---|
| Date | Type Name | Signature |

This form is mandatory.  It has been approved for use for the United States Bankruptcy Court for the Central District of California.

August 2010    **F 9013-3.1.PROOF.SERVICE**

In re:
PALMDALE HILLS PROPERTY, LLC. AND ITS RELATED DEBTORS,

CHAPTER 11

CASE NUMBER 08-17206-ES

Debtor(s).

## I.  SERVED BY NEF

**8:08-bk-17206-ES Notice will be electronically mailed to:**

(1)  *Selia M Acevedo for Atty Miller Barondess LLP*
sacevedo@millerbarondess.com,
mpritikin@millerbarondess.com;bprocel@millerbarondess.com

(2)  *Joseph M Adams for Def The City of San Juan Capistrano*
jadams@sycr.com

(3)  *Raymond H Aver for Debtor Palmdale Hills Property, LLC*
ray@averlaw.com

(4)  *James C Bastian for Cred ARB, Inc.*
jbastian@shbllp.com

(5)  *Thomas Scott Belden for Def Zim Ind, Inc. dba Bakersfield Well & Pump*
sbelden@kleinlaw.com, ecf@kleinlaw.com

(6)  *John A Boyd for Int Pty Oliphant Golf Inc*
fednotice@tclaw.net

(7)  *Mark Bradshaw for Int Pty Courtesy NEF*
mbradshaw@shbllp.com

(8)  *Gustavo E Bravo for Cred Oliphant Golf, Inc.*
gbravo@smaha.com

(9)  *Jeffrey W Broker for Cred Bond Safe Ins Co*
jbroker@brokerlaw.biz

(10)  *Brendt C Butler for Cred EMR Residential Properties LLC*
BButler@rutan.com

(11)  *Andrew W Caine for Cred Lehman ALI, Inc.*
acaine@pszyjw.com

(12)  *Carollynn Callari for Cred Danske Bank A/S London Branch*
ccallari@mmk.com

(13)  *Dan E Chambers for Cred EMR Residential Properties LLC*
dchambers@jmbm.com

(14)  *Shirley Cho for Cred Lehman ALI, Inc.*
scho@pszjlaw.com

(15)  *Vonn Christenson for Int Pty Courtesy NEF*
vrc@paynefears.com

(16)  *Brendan P Collins for Cred Gray1 CPB, LLC*
bpcollins@bhfs.com

(17)  *Vincent M Coscino for Petitioning Cred CST Environmental Inc*
vcoscino@allenmatkins.com, emurdoch@allenmatkins.com

(18)  *Paul J Couchot for Cred SCC Acquisitions, Inc.*
pcouchot@winthropcouchot.com,
pj@winthropcouchot;sconnor@winthropcouchot.com

(19)  *Jonathan S Dabbieri for Int Pty Courtesy NEF*
dabbieri@sullivan.com,
hill@sullivanhill.com;mcallister@sullivanhill.com;
stein@sullivanhill.com;vidovich@sullivanhill.com

(20)  *Ana Damonte for Cred Top Grade Construction, Inc.*
ana.damonte@pillsburylaw.com

(21)  *Vanessa S Davila for Cred Bond Safe Ins Co*
vsd@amclaw.com

(22)  *Melissa Davis for Cred City of Orange*
mdavis@shbllp.com

(23)  *Daniel Denny for Int Pty Courtesy NEF*
ddenny@gibsondunn.com

(24)  *Caroline Djang for Cred Lehman ALI, Inc.*
crd@jmbm.com

(25)  *Donald T Dunning for Cred Hertz Equipment Rental Corp*
ddunning@dunningLaw.com

(26)  *Joseph A Eisenberg for Cred Lehman ALI, Inc.*
jae@jmbm.com

(27)  *Lei Lei Wang Ekvall for Atty Weiland Golden*
lekvall@wgllp.com

(28)  *Richard W Esterkin for Debtor Palmdale Hills Property, LLC*
resterkin@morganlewis.com

(29)  *Marc C Forsythe for Atty Robert Goe*
kmurphy@goeforlaw.com

(30)  *Alan J Friedman for Atty Irell & Manella LLP*
afriedman@irell.com

(31)  *Steven M Garber for Cred Park West Landscape, Inc*
steve@smgarberlaw.com

(32)  *Christian J Gascou for 3rd Party Pltf Arch Insurance Co*
cgascou@gascouhopkins.com

(33)  *Barry S Glaser for Cred County of Los Angeles*
bglaser@swjlaw.com

(34)  *Robert P Goe for Atty Robert Goe*
kmurphy@goeforlaw.com,
rgoe@goeforlaw.com;mforsythe@goeforlaw.com

(35)  *Eric D Goldberg for Int Pty Courtesy NEF*
egoldberg@stutman.com

(36)  *Richard H Golubow for Debtor Palmdale Hills Property, LLC*
rgolubow@winthropcouchot.com, pj@winthropcouchot.com

(37)  *Michael J Gomez for Int Pty Central Pacific Bank*
mgomez@frandzel.com, efiling@frandzel.com;sking@frandzel.com

(38)  *Kelly C Griffith for Cred Bond Safe Ins Co*
bkemail@harrisbeach.com

(39)  *Matthew Grimshaw for Int Pty City Of Torrance*
mgrimshaw@rutan.com

(40)  *Kavita Gupta for Debtor Palmdale Hills Property, LLC*
kgupta@winthropcouchot.com

(41)  *Asa S Hami for Debtor Palmdale Hills Property, LLC*
ahami@morganlewis.com

(42)  *Michael J Hauser for UST(SA)*
michael.hauser@usdoj.gov

(43)  *D Edward Hays for Cred Villa San Clemente, LLC*
ehays@marshackhays.com

(44)  *Michael C Heinrichs for Int Pty Courtesy NEF*
mheinrichs@omm.com

(45)  *Harry D. Hochman for Cred Lehman ALI, Inc.*
hhochman@pszjlaw.com, hhochman@pszjlaw.com

(46)  *Jonathan M Hoff for 3rd Party Pltf Jt Prov Liqs of Lehman RE Ltd*
jonathan.hoff@cwt.com

(47)  *Nancy Hotchkiss for Cred Murray Smith & Associates Engineering*
nhotchkiss@trainorfairbrook.com

(48)  *Michelle Hribar for Pltf EMR Residential Properties LLC*
mhribar@rutan.com

(49)  *John J Immordino for Cred Arch Insurance Co.*
john.immordino@wilsonelser.com,
raquel.burgess@wilsonelser.com

(50)  *Lawrence A Jacobson for Cred BKF Engineers*
laj@cohenandjacobson.com

(51)  *Michael J Joyce for Int Pty Courtesy NEF*
mjoyce@crosslaw.com

(52)  *Stephen M Judson for Petitioning Cred The Prof Tree Care Co*
sjudson@fablaw.com

(53)  *Kaleb L Judy for Def Zim Ind, Inc. dba Bakersfield Well & Pump*
ecf@kleinlaw.com, kjudy@kleinlaw.com

(54)  *Sheri Kanesaka for Cred California Bank & Trust*
sheri.kanesaka@bryancave.com

(55)  *David I Katzen for Int Pty Bethel Island Muni Impr Dist*
katzen@ksfirm.com

(56)  *Christopher W Keegan for Cred SC Master Holdings II LLC*
ckeegan@kirkland.com,
gdupre@kirkland.com;alevin@kirkland.com

(57)  *Payam Khodadadi for Debtor Palmdale Hills Property, LLC*
pkhodadadi@winthropcouchot.com, pj@winthropcouchot.com

(58)  *Irene L Kiet for Cred BNB Engineering, Inc.*
ikiet@hkclaw.com

(59)  *Mark J Krone for Cred Bond Safe Ins Co*
mk@amclaw.com, crs@amclaw.com;amc@amclaw.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

August 2010                                                                                      F 9013-3.1.PROOF.SERVICE

In re:
PALMDALE HILLS PROPERTY, LLC. AND ITS RELATED DEBTORS,

Debtor(s).

CHAPTER 11

CASE NUMBER 08-17206-ES

(60) David B Lally for Def Contracting Engineers, Inc.
davidlallylaw@gmail.com

(61) Leib M Lerner for Cred Steiny and Co, Inc.
leib.lerner@alston.com

(62) Peter W Lianides for Debtor Palmdale Hills Property, LLC
plianides@winthropcouchot.com, pj@winthropcouchot.com

(63) Charles Liu for Debtor Palmdale Hills Property, LLC
cliu@winthropcouchot.com

(64) Kerri A Lyman for Atty Irell & Manella LLP
klyman@irell.com

(65) Mariam S Marshall for Cred RGA Environmental, Inc.
mmarshall@marshallramoslaw.com

(66) Robert C Martinez for Cred TC Construction Co, Inc
rmartinez@mclex.com

(67) Michael D May for Cred R.J. Noble Co.
mdmayesq@verizon.net

(68) Hutchison B Meltzer for Jt Cred Com
hmeltzer@wgllp.com

(69) Krikor J Meshefejian for Int Pty Courtesy NEF
kjm@lnbrb.com

(70) Joel S. Miliband for Cred RBF CONSULTING
jmiliband@rusmiliband.com

(71) James M Miller for Atty Miller Barondess LLP
jmiller@millerbarondess.com

(72) Louis R Miller for Pltf Palmdale Hills Property, LLC
smiller@millerbarondess.com

(73) Randall P Mroczynski for Def Bob McGrann Construction, Inc.
randym@cookseylaw.com

(74) Mike D Neue for Atty The Lobel Firm, LLP
mneue@thelobelfirm.com,
jmattiace@thelobelfirm.com;pnelson@thelobelfirm.com

(75) Robert Nida for Cred Kirk Negrete, Inc
Rnida@castlelawoffice.com

(76) Henry H Oh for 3rd Party Pltf Jt Prov Liqs of Lehman RE Ltd
henry.oh@dlapiper.com, janet.curley@dlapiper.com

(77) Sean A Okeefe for Debtor Palmdale Hills Property, LLC
sokeefe@okeefelc.com

(78) Robert B Orgel for Cred Lehman ALI, Inc.
rorgel@pszjlaw.com, rorgel@pszjlaw.com

(79) Malhar S Pagay for Cred Lehman ALI, Inc.
mpagay@pszjlaw.com, mpagay@pszjlaw.com

(80) Penelope Parmes for Cred EMR Residential Properties LLC
pparmes@rutan.com

(81) Ronald B Pierce for Cred Griffith Co
ronald.pierce@sdma.com

(82) Katherine C Piper for Int Pty New Anaverde LLC
kpiper@steptoe.com

(83) Cassandra J Richey for Cred Patricia I Volkerts, as Trustee, et al
cmartin@pprlaw.net

(84) James S Riley for Cred Sierra Liquidity Fund, LLC
tgarza@sierrafunds.com

(85) Debra Riley for Int Pty City of Palmdale
driley@allenmatkins.com

(86) Todd C. Ringstad for Int Pty Courtesy NEF
becky@ringstadlaw.com

(87) R Grace Rodriguez for Def O&B Equipment, Inc.
ecf@lorgr.com

(88) Martha E Romero for Cred San Bernardino County Tax Collector
Romero@mromerolawfirm.com

(89) Ronald Rus for Cred SunCal Management, LLC
rrus@rusmiliband.com

(90) John P Schafer for Cred LB/L-DUC III Bethel Island, LLC
jps@mandersonllp.com

(91) John E Schreiber for Def Fenway Capital, LLC
jschreiber@dl.com

(92) William D Schuster for Cred HD Supply Construction Supply LTD
bills@allieschuster.org

(93) Christopher P Simon for Int Pty Courtesy NEF
csimon@crosslaw.com

(94) Wendy W Smith for Cred Castaic Union School District
wendy@bindermalter.com

(95) Steven M Speier (TR)
Sspeier@asrmanagement.com, ca85@ecfcbis.com

(96) Steven M Speier for Trustee Steven Speier (TR)
Sspeier@Squarmilner.com, ca85@ecfcbis.com

(97) Michael St James for Cred MBH Architects, Inc.
ecf@stjames-law.com

(98) Michael K Sugar for Unsecured Cred Com
msugar@irell.com

(99) Cathy Ta for Def Hi-Grade Material Co.
cathy.ta@bbklaw.com,
Arthur.Johnston@bbklaw.com;Kenneth.Burgess@bbklaw.com

(100) David A Tilem for Def Southland Pipe Corp
davidtilem@tilemlaw.com,
malissamurguia@tilemlaw.com;dianachau@tilemlaw.com;
kmishigian@tilemlaw.com

(101) James E Till for Trustee Steven Speier (TR)
jtill@thelobelfirm.com,
jmattiace@thelobelfirm.com;pnelson@thelobelfirm.com

(102) United States Trustee (SA)
ustpregion16.sa.ecf@usdoj.gov

(103) Carol G Unruh for Cred Scott E. McDaniel
cgunruh@sbcglobal.net

(104) Annie Verdries for Def WEC Corp
verdries@lbbslaw.com

(105) Jason Wallach for Def Prof Pipeline Contractors, Inc.
jwallach@gladstonemichel.com

(106) Joshua D Wayser for Other Prof D. E. Shaw & Co., L.P.
, kim.johnson@kattenlaw.com

(107) Christopher T Williams for Cred Danske Bank A/S London Branch
ctwilliams@venable.com, jcontreras@venable.com

(108) Marc J Winthrop for Debtor Palmdale Hills Property, LLC
mwinthrop@winthropcouchot.com, pj@winthropcouchot.com

(109) David M Wiseblood for Cred Bethel Island Muni Impr Dist
dwiseblood@seyfarth.com

(110) Brett K Wiseman for Cred JF Shea Construction Inc
bwiseman@aalaws.com

(111) Dean A Ziehl for Counter-Def LV Pacific Point LLC
dziehl@pszjlaw.com, dziehl@pszjlaw.com

(112) Marc A. Zimmerman for Cred Life Church of God in Christ
joshuasdaddy@att.net

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

August 2010

F 9013-3.1.PROOF.SERVICE

In re:
PALMDALE HILLS PROPERTY, LLC. AND ITS RELATED DEBTORS,
                                                    Debtor(s).

CHAPTER 11

CASE NUMBER 08-17206-ES

II
.  **SERVED BY U.S. MAIL**

*Please see attached Service Lists*

III.  **SERVED BY EMAIL**

Ken Goddard, Operations Officer
Roddan Paolucci Roddan
kgoddard@roddanpaolucci.com

*John Gentillon,* C.E.O.
john@thelandstewards.com

*Deborah L. Lemanski*
Assistant to Frederick A. Berg, Esq. and
Barry J. Jensen, Esq.
*Kotz, Sangster, Wysocki and Berg, P.C.*
dlemanski@kotzsangster.com
bjensen@kotzsangster.com

Virginia Zareba, Sec'y to Darren G. Burge
Darren G. Burge
Cohen & Burge, LLP
vzareba@cohenburgelaw.com
dburge@cohenburgelaw.com

Brian Cartmell
Independent Construction Co.
bcartmell@indycc.com

Richard Rudolph
Law Offices of Richard B. Rudolph
RRudolph@Rudolph-Law.com

Michele Stubbs
Assistant to Arnold L. Veldkamp
*Superior Ready Mix Concrete, L.P.*
mstubbs@superiorrm.com

David Sanner
General Counsel-Litigation
Craig Realty Group
dsanner@craigrealtygroup.com

Attorney for Villa San Clemente, LLC
(a creditor of SunCal Marblehead, LLC)
David Sanner**,** General Counsel-Litigation
Craig Realty Group
dsanner@craigrealtygroup.com

Counsel to Kevin L. Crook Architect, Inc.; Halladay & Mim
Mack, Inc.
Crystal N Le, Clerk Supervisor
Murtaugh Meyer Nelson & Treglia, LLP
Crystal N. Le – cle@mmnt.com
Michelle R. Generaux – mgeneraux@mmnt.com

Counsel to Southern California Soil and Testing, Inc.
Justin G. Reden, Esq.
Reden & Reden
jreden@redenandreden.com
greden@redenandreden.com

Sharon Dyer
sdyer@5thgearadv.com

Interested Party In Oak Knoll
Ken Berrick, President / CEO
Seneca Center
ken@senecacenter.org
ken_berrick@senecacenter.org

Michael D. May
Attorney for R.J. Noble Co.
mdmayesq@verizon.net

Attorney for Oak Valley Partners
John Ohanian
Oak Valley Partners
johanian@ovplp.com

Counsel to Palm Springs Village-309, LLC
Ira Glasky, Vice President/General Counsel
Far West Industries
iglasky@farwestindustries.com

Represents Union Pacific
Mary Ann Kilgore
Email:  MKILGORE@up.com

Paul C. Guerin, Principal Engineer
ENGEO Incorporated
Email:  pguerin@engeo.com

Attorneys for Schilling Corporation, Andersen Concrete,
Butsko Utility Design and Trimax Systems
Scott A. Schaelen
Walters, Townsend & Schaelen, A PLC
Email:  sas@wts-lawcom

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*August 2010*                                                                                                    **F 9013-3.1.PROOF.SERVICE**

Mr. C.F. Raysbrook
California Department of Fish and Game
Streambed Alteration Team
4949 Viewridge Avenue
San Diego, CA  92123

California Regional Water Quality
Control Board
Los Angeles Region
320 West 4th Street, Suite 200
Los Angeles, CA  90013

Dr. Aaron Allen
U.S. Army Corps of Engineers
2151 Alessandro Drive, Suite 110
Ventura, CA  93301

Bob Hosea
California Department of Fish and Game,
Region 2
Attn.: Streambed Alteration Agreement
Program
1701 Nimbus Road
Rancho Cordova, CA  95670

Ms. Leslie Gault
Placer County Water Agency
144 Ferguson Road
Auburn, CA  95604

Riverside County Flood Control and Water
Conservation District
1995 Market St.
Riverside, CA  92501
Attn.:  Warren D. Williams
            General Manager & Chief Engineer

County of Riverside Transportation and Land
Management Agency
4080 Lemon Street, 8th Floor
Riverside, CA  92501
Attn.:  Juan C. Perez, P.E., T.E.
            Director of Transportation

County of Riverside
P.O. Box 1090
Riverside, CA  92502-1090
Attn.:  George Johnson

Jurupa Area Recreation & Park District
4810 Pedley Rd.
Riverside, CA  92502
Attn.: Dan Rodriguez, General Manager

Mitchell Ogron
14 Old Lake Circle
Henderson, NV  89074

Church of God in Jesus Christ
3349 Rubidoux Blvd.
Riverside, CA  92509
Attn.:  Cecilia A. Bennett

Marjorie Ina and Jerry Ray Engelauf
5037 Riverside Drive
Riverside, CA  92509-6427

Rte 60, LLC
14 Old Lake Circle
Henderson, NV  89074
Attn: Jim Stockhausen

Riverside County Economic Development
Agency
1153 Spruce Street, Suite B
Riverside, CA  92507
Attn.:  Tina English,  Deputy Executive Director

David R. Brunner, Executive Director
Center for Natural Lands Management
425 E. Alvarado St., Ste. H
Fallbrook, CA  92028-2960

Lee Ann Carranza, Preserve Manager
Center for Natural Lands Management
P.O. Box 2162
Capistrano Beach, CA  92624

U.S. Army Corps of Engineers
Los Angeles District
P.O. Box 532711
Los Angeles, CA  90053-2325
Attn.:  District Counsel

California Department of Fish and Game
4949 Viewridge Avenue
San Diego, CA  92123
Attn.:  Regional Manager

U.S. Fish and Wildlife Service
Carlsbad Fish and Wildlife Office
6010 Hidden Valley Road
Carlsbad, CA  92009
Attn.: Field Supervisor

City of San Clemente
City Hall
100 Avenida Presidio
San Clemente, CA  92672
Attn.:  George Scarborough, City Manager

Ron Lebs, Deputy Superintendent
Capistrano Unified School District
Business and Support Services
33122 Valle Road
San Juan Capistrano, CA  92675

Denise H. Hering, Esq.
Stradling, Yocca, Carlson & Rauth
660 Newport Center Drive, Suite 1600
Newport Beach, CA  92660

Mr. Sam Wyngaarden
Southern California Gas Company
One Liberty
Aliso Viejo, CA  92656-3830

Ms. Pinky Oliver
San Diego Gas & Electric
8330 Century Park Court, Room 31-C
San Diego, CA  92123

Stephen L. Millham
Anaverde LLC
c/o Empire Partners, Inc.
3536 Concours Street, Suite 300
Ontario, CA  91764

Mr. Brian Veit
Farallon Capital Management, LLC
One Maritime Plaza, Suite 2100
San Francisco, CA  94111

Mr. Justin Bowman, OSP Planning Mgr.
AT&T
739 E. Santa Clara St., Room 312A
Ventura, CA  93001

Ms. Deborah Schwenk
AT&T
6930 Van Nuys Blvd., Room 110
Van Nuys, CA  91405

Elma Watson, Assistant Planner
City of Lancaster
44933 Fern Avenue
Lancaster, CA  93534

Ms. Laurie Lile
City of Palmdale
38250 N. Sierra Highway
Palmdale, CA  93550-4798

Stephen H. Williams, City Manager
City of Palmdale
38300 N. Sierra Hwy.
Palmdale, CA  93550-4798

Mr. Michael Mischel
City of Palmdale Engineering Department
38250 N. Sierra Highway
Palmdale, CA  93550-4798

Matthew Ditzhazy, City Attorney
Noel James Dorean, Deputy City Attorney
City of Palmdale
38300 N. Sierra Hwy.
Palmdale, CA  93550-4798

Tobi Tyler
California Regional Water Quality Control
Board
Lahontan Region
2501 Lake Tahoe Bouelvard
South Lake Tahoe, CA  96150

Ronnie Burtner
Los Angeles County Sanitation District
P.O. Box 4998
Whittier, CA  90607

Adam Ariki
Los Angeles County Waterworks District No.
40, Antelope Valley
P.O. Box 1460
Alhambra, CA  91802-1406

Mr. Jay R. Olson
Southern California Edison
10180 Telegraph Road
Ventura, CA  93004

Bertram E. Williams
Southern California Edison
26100 Menifee Road
Romoland, CA  92585

City of Torrance
City Hall
3031 Torrance Blvd.
Torrance, CA  90503-2970
Attn.:  Jeffery W. Gibson,
             Community Development Director

City of Torrance
City Attorney's Office
3031 Torrance Blvd.
Torrance, CA 90503
Attn.:  John Fellows, City Attorney

Rutan & Tucker, LLP
611 Anton Blvd., Ste. 1400
Costa Mesa, CA 92626-1931
Attn.:  Jeffrey M. Oderman, Esq.

City of Beaumont
Attn.:  Ernest Egger, Director of Planning
550 E. Sixth St.
Beaumont, CA  92223-0158

City of San Clemente
City Hall
100 Avenida Presidio
San Clemente, CA  92672
Attn.:  George Scarborough, City Manager

Rutan & Tucker, LLP
611 Anton Blvd., Ste. 1400
Costa Mesa, CA 92626-1931
Attn.:  Jeffrey M. Oderman, Esq.

City of Beaumont
Attn.:  Ernest Egger, Director of Planning
550 E. Sixth St.
Beaumont, CA  92223-0158

City of Palmdale
Attn.:  Steve Williams, City Manager
            Matthew Ditzhazy, City Attorney
38300 N. Sierra Hwy.
Palmdale, CA  93550

John Sanabria
Acting Director of Dept. of Regional Planning
County of Los Angeles Dept. of Regional
Planning
1390 Hall of Records
320 West Temple Street
Los Angeles, CA  90012

**Palmdale Hills Property**
**8:08-bk-17206-ES**
**Service List for Parties not being served electronically**

Richard B Andrade
Andrade & Associates
27101 Puerta Real Ste 120
Mission Viejo, CA 92691-8518

Tab L K Artis
301 N Lake Ave 7th Fl
Pasadena, CA 91101

Sharon A Bangs
Crawford & Bangs
1290 E Center Ct Dr
Covina, CA 91724

Miller Barondess LLP
,

William Bissell
110 Newport Center Dr Ste 200
Newport Beach, CA 92660

William G Bissell
110 Newport Ctr Dr Ste 200
Newport Beach, CA 92660

Brian Construction Co Inc
,

John W Busby
251 Lafayette Circle Ste 350
Lafayette, CA 94549

CRG Partners Group, LLC
,

Wayne W Call
Call & Jensen
610 Newport Ctr Dr Ste 700
Newport Beach, CA 92660

Central Pacific Bank
Frandzel Robins Bloom & Csato, L.C.
6500 Wilshire Boulevard
17th Floor
Los Angeles, CA 90048-4920

Brent S Clemmer
Slovak Baron & Empey LLP
1800 E Tahquitz Cyn Wy
Palm Springs, CA 92262

Adrianna M Corrado
Lanak & Hanna
400 N Tustin Ave Ste 120
Santa Ana, CA 92705-3815

Delta Coves Venture LLC
2392 Morse
Irvine, CA 92614

Donald B Devirian
Devirian & Shinmoto
11400 W Olympic Blvd Ste 200
Los Angeles, CA 90064

Francis T Donohue
Voss, Cook & Thel LLP
895 Dove Street Suite 450
Newport Beach, CA 92660

Norman A. Filer
500 N. State College Bl., #1270
Orange, CA 92868

Stanley Haren
Gill & Baldwin
130 N Baldwin Blvd #405
Glendale, CA 91203

William R Hart
Hart King & Coldren
200 Sandpointe Fourth Fl
Santa Ana, CA 92707

Andrew C Kienle
200 Sandpointe, 4th Fl
Santa Ana, CA 92707

LB/L SunCal Northlake LLC
,

LB/L SunCal Oak Valley LLC
,

Vivian Le
Gary R King & Associates
30950 Rancho Viejo Rd Ste 155
San Juan Capistrano, CA 92675

Mark E McKane
Kirkland & Ellis LLP
555 California St
San Francisco, CA 94104

Louis R Miller
1999 Ave of The Star Ste 1000
Los Angeles, CA 90067

Louis R Miller
Miller Barondess LLP
1999 Avenue of the Stars
Ste 1000
Los Angeles, CA 90067

Louis R Miller
Miller Barondess, LLP
1999 Avenue of the Stars, Ste 1000
Los Angeles, CA 90067

Gerald W Mouzis
The Mouzis Law Firm APC
13681 Newport Ave Ste 8-605
Tustin, CA 92680

Howard S Nevins
2150 River Plaza Dr Ste 450
Sacramento, CA 95833

New Anaverde LLC
,

Richard Pachulski
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Bl Ste 1100
Los Angeles, CA 90067-4003

Martin Pritikin
Miller Barondess, LLP
1999 Avenue of the Stars, Ste 1000
Los Angeles, CA 90067

J Patrick Ragan
1881 S Business Center Dr Suite 7b
San Bernardino, CA 92408

Regal Development LLC
c/o Benjamin M Weiss
12770 High Bluff Dr
Ste 160
San Diego, CA 92130

SQUAR, MILNER, MIRANDA &
WILLIAMSON, LLP
4100 Newport Place, Third Floor
Newport Beach, CA 92660

Raymond D Scott
1835 W Orangewood Ave Ste 255
Orange, CA 92868

Laurie A Shade
333 W Santa Ana Blvd Ste 407
PO Box 1379
Santa Ana, CA 92702-1379

Kimberly A Soyer
251 Lafayette Cir, Ste 350
Lafayette, CA 94549

Joseph L Strohman
Ferguson Case Orr Paterson LLP
1050 S Kimball Rd
Ventura, CA 93004

SunCal Century City LLC
2392 Morse
Irvine, CA 92614

SunCal Heartland LLC
2392 Morse
Irvine, CA 92614

SunCal Marblehead LLC
2392 Morse
Irvine, CA 92614

SunCal Oak Knoll LLC
,

SunCal PSV LLC
2392 Morse
Irvine, CA 92614

SunCal Torrance Properties LLC
2392 Morse
Irvine, CA 92614

Dina Tasini
Tasini and Associates
2126 Grant St
Berkeley, CA 94703

Theresa C Tate
Crawford & Bangs LLP
1290 E Center Crt Dr
Covina, CA 91724

Robert S Throckmorton
Throckmorton, Beckstrom & Tomassian,
LLP
2 Corporate Park, Ste 210
Irvine, CA 92606-5115

Elizabeth A Walters
3365 Seventh Ave
San Diego, CA 92103

Douglas F Welebir
Welebir Tierney & Weck
2068 Orange Tree Ln Ste 215
Redlands, CA 92374