1  PAUL J. COUCHOT -- State Bar No. 131934
   WINTHROP COUCHOT, P.C.
2  660 Newport Center Drive, Fourth Floor
   Newport Beach, CA 92660
3  Telephone: (949) 720-4100
   Facsimile: (949) 720-4111

4  General Insolvency Counsel for Palmdale Hills
   Property, LLC et. al. (the "Voluntary Debtors")

5

6  RONALD RUS - State Bar No. 67369
   JOEL S. MILIBAND - State Bar No. 77438
7  RUS MILIBAND & SMITH P.C.
   2211 Michelson Drive, Seventh Floor
8  Irvine, California 92612
   Telephone: (949) 752-7100
   Facsimile:  (949) 252-1514
9
   Counsel for SunCal Management LLC and
10 SCC Acquisitions Inc.

11                    **UNITED STATES BANKRUPTCY COURT**
                      **CENTRAL DISTRICT OF CALIFORNIA**
                              **Santa Ana Division**

12 In re                                    Case No. 8:08-bk-17206-ES

13 PALMDALE HILLS PROPERTY, AND ITS         Jointly Administered With Case Nos.
   RELATED DEBTORS,                         8:08-bk-17209-ES; 8:08-bk-17240-ES;
14                                          8:08-bk-17224-ES; 8:08-bk-17242-ES;
          Joint Administered Debtors and    8:08-bk-17225-ES; 8:08-bk-17245-ES;
15        Debtors-in-Possession             8:08-bk-17227-ES; 8:08-bk-17246-ES;
                                            8:08-bk-17230-ES; 8:08-bk-17231-ES;
16 Affects:                                 8:08-bk-17236-ES; 8:08-bk-17248-ES;
                                            8:08-bk-17249-ES; 8:08-bk-17573-ES;
17 ☐ All Debtors                            8:08-bk-17574 ES; 8:08-bk-17575-ES;
   ☒ Palmdale Hills Property, LLC           8:08-bk-17404-ES; 8:08-bk-17407-ES;
18 ☐ SunCal Beaumont Heights, LLC           8:08-bk-17408-ES; 8:08-bk-17409-ES;
                                            8:08-bk-17458-ES; 8:08-bk-17465-ES;
19 ☐ SCC/Palmdale, LLC                      8:08-bk-17470-ES; 8:08-bk-17472-ES;
   ☐ SunCal Johannson Ranch, LLC            and 8:08-bk-17588-ES
20 ☐ SunCal Summit Valley, LLC
   ☐ SunCal Emerald Meadows LLC             Chapter 11 Proceedings
21 ☒ SunCal Bickford Ranch, LLC
                                            **DISCLOSURE STATEMENT
22 ☐ Acton Estates, LLC                     DESCRIBING CHAPTER 11 PLAN FILED
   ☐ Seven Brothers LLC                     BY SUNCAL PLAN PROPONENTS IN
23 ☐ SJD Partners, Ltd.                     THE CHAPTER 11 CASES OF
                                            PALMDALE HILLS PROPERTY, LLC,
24 ☐ SJD Development Corp.                   SUNCAL BICKFORD RANCH, LLC,
   ☐ Kirby Estates, LLC                     SUNCAL MARBLEHEAD, LLC AND
25 ☐ SunCal Communities I, LLC               SUNCAL PSV, LLC [GROUP I DEBTORS]**
26 ☐ SunCal Communities III, LLC
   ☐ SCC Communities LLC                    Date:      May 13, 2011
27 ☐ North Orange Del Rio Land, LLC          Time:      9:30 a.m.
28 ☐ Tesoro SF LLC                           Place:     Courtroom 5A

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Continued from Previous Page*

☐ LBL-SunCal Oak Valley, LLC
☐ SunCal Heartland, LLC
☐ LBL-SunCal Northlake, LLC
☒ SunCal Marblehead, LLC
☐ SunCal Century City, LLC
☒ SunCal PSV, LLC
☐ Delta Coves Venture, LLC
☐ SunCal Torrance, LLC
☐ SunCal Oak Knoll, LLC

# TABLE OF CONTENTS

**PAGE**

I.      INTRODUCTION .................................................................................................    2

II.     DEFINITIONS AND RULES OF INTERPRETATION ......................................    4
        2.1     Definitions ................................................................................................    4
        2.2     Rules of Construction ...............................................................................    24
        2.3     Exhibits .....................................................................................................    25

III.    PLAN CONFIRMATION DEADLINES ..............................................................    25
        3.1     Time and Place of the Confirmation Hearing ............................................    25
        3.2     Deadline for Voting for or Against the Plan ..............................................    25
        3.3     Deadline for Objecting to the Confirmation of the Plan.............................    26
        3.4     Identity of Person to Contact for More Information
                Regarding the Plan.....................................................................................    26
        3.5     Disclaimer .................................................................................................    27

IV.     FACTUAL BACKGROUND OF THE DEBTORS ................................................    28
        4.1     The Formation of the Debtors and the Projects .........................................    28
                4.1.1   Overview of the Debtors and Their Projects ...................................    29
                4.1.2   The Debtors' Primary Secured Creditors and
                        Their Disputed Claims ....................................................................    30
                4.1.3   The Lehman Disputed Claims and Liens..........................................    30
                4.1.4   A Summary of All of the Alleged Claims
                        Against the Debtors ........................................................................    30
                4.1.5   Summary of the Group I Debtors Cash.............................................    31
        4.2     Factual Circumstances Leading to the Filing of the
                Debtors' Chapter 11 Cases........................................................................    31
                4.2.1   Introduction.....................................................................................    31
                4.2.2   Background on the SunCal Companies .............................................    32
                4.2.3   The Origins of the SunCal/Lehman Joint Venture ...........................    32
                4.2.4   Lehman's Effective Control over the Management
                        of the Debtors and Promises of Ongoing Funding............................    33
                4.2.5   The 2008 Restructuring Agreement...................................................    34
                4.2.6   The Lehman Lenders Hire Radco ....................................................    36
                4.2.7   The Lehman Lenders' Failure to Close on the
                        Settlement Agreement......................................................................    36
                4.2.8   The Lehman Lenders' Undisclosed Sale of Most
                        of the Debtors' Loans .....................................................................    37
                4.2.9   Lehman's Foreclosure Sale and Purchase of the
                        Pacific Point Project........................................................................    38
                4.2.10  Alvarez and Marsal Take Over Control of the
                        Lehman Entities After the Chapter 11 Filing of
                        LBHI and LCPI................................................................................    39
        4.3     The Debtors' Potential Preferential Transfers.............................................    40

MAINDOCS-#160298-v1-Disclosure_Statement_Group_I.DOC

# TABLE OF CONTENTS

### (Continued)

|  | PAGE |
|---|---|
| V. SIGNIFICANT EVENTS IN THE DEBTORS' CHAPTER 11 CASES | 41 |
| 5.1 Voluntary Debtors | 41 |
| 5.1.1 Joint Administration of the Voluntary Debtors and the Trustee Debtors | 42 |
| 5.1.2 The Voluntary Debtors Court Employed Professionals | 43 |
| 5.1.3 LCPI's Motions for Relief from the Automatic Stay Against Certain of the Voluntary Debtors' Projects and Related Appeals | 43 |
| 5.2 The Trustee Debtors and Their Professionals | 43 |
| 5.3 The Debtors' Various Motions Relating to Financing for the Projects and to Pay Professional Fees | 44 |
| 5.3.1 The Voluntary Debtors' Initial Motion for Surcharge and Use of Cash Collateral | 44 |
| 5.3.2 The Lehman Administrative Loans | 45 |
| 5.3.3 The Voluntary Debtors' Agreements with the Lehman Entities for Use of Alleged Cash Collateral to Maintain the Properties and to Pay Professional Fees | 45 |
| 5.4 The Debtors' Disputes and Claims Against the Lehman Entities | 46 |
| 5.4.1 The Lehman Adversary Proceeding | 46 |
| 5.4.1.1 Equitable Subordination | 47 |
| 5.4.1.2 The Fraudulent Transfer Claims | 47 |
| 5.4.1.3 The Preference Claims | 48 |
| 5.4.1.4 The Debtors' Motions to Strike the Claims and Pleadings Arising from the Sold Loans to Fenway Capital and Related Appeals | 49 |
| 5.4.1.5 The Debtors' Motion Pursuant to Section 506(d) and the 506(d) Valuation Stipulation | 50 |
| 5.4.1.6 The Debtors' 502(d) Objections | 50 |
| 5.4.1.7 The Lehman Claim Objections. | 51 |
| 5.4.1.8 The Debtors' Potential Post-Petition Claims Against Lehman and Their Agents | 52 |
| 5.5 The Lehman Fenway Claims Transaction, Compromise Motion Filed By the Lehman Entities | 53 |
| 5.5.1 Lehman Entities' and Fenway's Proposed Claims Transaction | 53 |

MAINDOCS-#160298-v1-Disclosure_Statement_Group_I.DOC

# TABLE OF CONTENTS

## (Continued)

**PAGE**

5.6   The Debtors' Motion for a Stay to Suspend Certain
Lehman Actions ........................................................................................ 54

5.7   The Debtors' Other Litigation with Non-Lehman Related Parties .............. 54

    5.7.1   The Debtors' Failed Preliminary Injunction Motion
Against the Holders of Bond Claims .................................................. 54

    5.7.2   The Contractors' Successful Motions for Relief from
Stay to Pursue the Bond Claims ........................................................ 55

    5.7.3   The Non-Lehman Related Primary Secured Lenders'
Successful Motions for Relief from Stay ............................................ 55

    5.7.4   Arch's Motion for Relief from Stay ................................................... 56

    5.7.4   Shea's Successful Motion for Relief from Stay ................................. 56

    5.7.6   Bond Safeguard Motion ...................................................................... 56

VI.   TREATMENT OF UNCLASSIFIED CLAIMS ................................................ 56

6.1   Introductions ........................................................................................ 56

6.2   Treatment of Allowed Administrative Claims .............................................. 57

6.3   Treatment and Repayment of the Lehman Administrative Loan(s) .............. 57

6.4   Repayment of Alleged Administrative Claims
Other than the Lehman Administrative Loans ............................................. 57

6.5   Administrative Claims Bar Date .................................................................. 58

6.6   Treatment of Priority Unsecured Tax Claims .............................................. 58

VII.   CLASSIFICATION OF CLAIMS AND INTERESTS ..................................... 59

VIII.   THE PLAN'S TREATMENT OF CLASSIFIED CLAIMS
AND INTERESTS ......................................................................................... 65

8.1   The Plan's Treatment of Holders of Allowed Secured
Real Property Tax Claims on Real Properties Subject to
Deeds of Trust Arising from Lehman's Disputed Secured
Claims and Disputed Liens (Classes 1.1 Through 1.14) .............................. 65

8.2   The Plan's Treatment of Holders of Lehman's Disputed
Claim(s) and Disputed Lien(s) (Classes 2.1 Through 2.4) ........................... 66

# TABLE OF CONTENTS

## (Continued)

| | | PAGE |
|---|---|---|
| 8.3 | The Plan's Treatment of Holders of Asserted Mechanic Lien Claims Against the Debtors' Projects Subject to Lehman's Disputed Claims (Classes 3.1 Through 3.29) | 69 |
| 8.4 | The Plan's Treatment of Holders of Priority Claims (Classes 4.1 Through 4.2) | 69 |
| 8.5 | The Plan's Treatment of Holders of General Unsecured Claims that Are Reliance Claims (Classes 5.1 Through 8.4) | 70 |
| 8.6 | The Plan's Treatment of Holders of Allowed General Unsecured Claims that Are Not Reliance Claims (Classes 6.1 Through 6.4) | 70 |
| 8.7 | The Plan's Treatment of Holders of Allowed Interests | 71 |
| IX. | ACCEPTANCE OR REJECTION OF THE PLAN | 71 |
| 9.1 | Introduction | 71 |
| 9.2 | Who May Object to Confirmation of the Plan | 72 |
| 9.3 | Who May Vote to Accept/Reject the Plan | 72 |
| 9.4 | What Is an Allowed Claim/Interest | 72 |
| 9.5 | What Is an Impaired Class | 72 |
| 9.6 | Who Is Not Entitled to Vote | 72 |
| 9.7 | Who Can Vote in More than One Class | 73 |
| 9.8 | Votes Necessary for a Class to Accept the Plan | 73 |
| 9.9 | Treatment of Nonaccepting Classes | 73 |
| 9.10 | Request for Confirmation Despite Nonacceptance by Impaired Class(es) | 73 |
| X. | MEANS OF EXECUTION AND IMPLEMENTATION OF THE PLAN | 74 |
| 10.1 | Introduction | 74 |
| 10.2 | Removal of Trustee | 74 |
| 10.3 | Transfer of Property To The Plan Trust | 74 |
| 10.5 | Purpose of the Plan Trust Assets After Effective Date | 75 |
| 10.6 | Operations of the Plan Trust | 75 |
| 10.7 | The Plan Trustee | 75 |
| 10.8 | Payment of Trust Expenses | 75 |
| 10.9 | Plan Distribution System | 75 |
| 10.10 | Claims Estimation Rights | 76 |
| 10.11 | No Payment of Transfer-Related Fees to the United States Trustee | 76 |
| 10.12 | NO PAYMENT OF TRANSFER-RELATED FEES TO THE TRUSTEE | 76 |
| 10.13 | BOOKS AND RECORDS OF TRUST | 76 |
| 10.14 | LIMITATIONS ON LIABILITY | 77 |
| 10.15 | FEDERAL INCOME TAX TREATMENT OF THE HOLDERS OF PLAN TRUST BENEFICIAL INTERESTS | 77 |
| 10.16 | TERMINATION OF THE TRUST | 78 |
| 10.17 | EXEMPTION FROM CERTAIN TRANSFER TAXES | 79 |
| 10.18 | TAX CONSEQUENCE OF THE PLAN | 79 |

MAINDOCS-#160298-v1-Disclosure_Statement_Group_I.DOC

|        |        |                                                                           |     |
|--------|--------|---------------------------------------------------------------------------|-----|
|        | 10.19  | THE PLAN SPONSOR                                                           | 79  |
|        | 10.20  | ACQUISITIONS' FUNDING OBLIGATIONS PURSUANT TO THE                         |     |
|        |        | ACQUISITIONS ADMINISTRATIVE LOAN                                           | 79  |
|        | 10.21  | THE COMMITTEE(S).                                                         | 80  |
|        |        | 10.21.1    DUTIES AND POWERS.                                             | 80  |
|        |        | 10.21.2    DISSOLUTION OF COMMITTEES                                      | 80  |
|        | 10.22  | LITIGATION CLAIMS                                                          | 80  |
|        | 10.23  | Collection of Litigation Recoveries                                        | 81  |
| XI.    | DISTRIBUTIONS                                                                       || 81  |
|        | 11.1   | Distribution Agent                                                         | 81  |
|        | 11.2   | Distributions                                                              | 81  |
|        |        | 11.2.1  Dates of Distributions                                            | 81  |
|        |        | 11.2.2  Limitation on Liability                                           | 82  |
|        | 11.3   | Old Instruments and Securities                                            | 82  |
|        |        | 11.3.1  Surrender and Cancellation of Instruments and Securities          | 82  |
|        |        | 11.3.2) Cancellation of Liens                                             | 82  |
|        | 11.4   | De Minimis Distributions and Fractional Shares                            | 82  |
|        | 11.5   | Delivery of Distributions                                                  | 83  |
|        | 11.6   | Undeliverable Distributions                                               | 83  |
|        | 11.7   | Disposition of Unclaimed Property                                          | 83  |
| XII.   | OBJECTION TO CLAIMS AND DISPUTE CLAIMS                                              || 84  |
|        | 12.1   | Standing for Objections to Claims                                         | 84  |
|        | 12.2   | Treatment of Disputed Claims and Disputed Liens                           | 84  |
|        |        | 12.2.1    No Distribution Pending Allowance                               | 84  |
|        |        | 12.2.2    Distribution After Allowance                                    | 84  |
| XIII.  | EXECUTORY CONTRACTS AND UNEXPIRED LEASES                                            || 85  |
|        | 13.1   | Executory Contracts Being Assumed                                         | 85  |
|        | 13.2   | Executory Contracts Being Rejected                                        | 85  |
|        | 13.3   | Bar Date for Rejection Damages                                            | 85  |
|        | 13.4   | Changes in Rates Subject to Regulatory Commission Approval                | 85  |
| XIV.   | BEST INTEREST OF CREDITORS TEST AND PLAN FEASIBILITY                                || 85  |
|        | 14.1   | Best Interest Test                                                        | 85  |
|        | 14.2   | Feasibility                                                               | 85  |
| XV.    | LIMITATION OF LIABILITY                                                             || 88  |
|        | 15.1   | No Liability for Solicitation or Participation                            | 88  |
| XVI.   | CONDITIONS TO CONFIRMATION AND EFFECTIVENESS                                        |     |
|        | OF THE PLAN                                                                         || 88  |
|        | 16.1   | Conditions Precedent to Plan Confirmation                                 | 88  |
|        | 16.2   | Conditions Precedent to Plan Effectiveness                               | 88  |
| XVII.  | RETENTION OF JURISDICTION                                                           || 88  |

1

**TABLE OF CONTENTS**

2

**(Continued)**

| | | **PAGE** |
|---|---|---|
| XVIII. MODIFICATION OR WITHDRAWAL OF THE PLAN | | 89 |
| 18.1 | Modification of Plan | 89 |
| 18.2 | Nonconsensual Confirmation | 89 |
| XIX. MISCELLANEOUS | | 89 |
| 19.1 | Payment of Statutory Fees | 89 |
| 19.2 | Payment Dates | 90 |
| 19.3 | Headings | 90 |
| 19.4 | Other Documents and Actions | 90 |
| 19.5 | Notices | 90 |
| 19.6 | Governing Law | 91 |
| 19.7 | Binding Effect | 91 |
| 19.8 | Successors and Assigns | 91 |
| 19.9 | Severability of Plan Provisions | 91 |
| 19.10 | No Waiver | 92 |
| 19.11 | Inconsistencies | 92 |
| 19.12 | Exemption from Certain Transfer Taxes and Recording Fees | 92 |
| 19.13 | Post-Confirmation Status Report | 93 |
| 19.14 | Post-Confirmation Conversion/Dismissal | 93 |
| 19.15 | Final Decree | 93 |

# I.

## __INTRODUCTION__

This DISCLOSURE STATEMENT[1] is filed by the Voluntary Debtors and Acquisitions, as the SunCal Plan Proponents, in the Chapter 11 Cases of the following Debtors:

> Palmdale Hills Property, LLC
> SunCal PSV, LLC
> SunCal Marblehead, LLC
> SunCal Bickford, LLC

(the "Group I Debtors"). In addition to being one of the proponents of the Plan, Acquisitions is the Plan Sponsor, it will also serve as the Plan Trustee of the Plan Trust and as the Distribution Agent, if the Plan is confirmed.

Chapter 11 allows debtors-in-possession, Chapter 11 trustees, and under some circumstances, creditors, interest holders and others parties in interest, to propose a Chapter 11 plan.  As stated, the SunCal Plan Proponents are the proponents of the Plan sent to you in the same envelope as this Disclosure Statement.  This document summarizes the contents of the Plan, certain information relating to the Plan and the process the Bankruptcy Court follows in determining whether or not to confirm the Plan.

In summary, the Plan provides for sale of the following four real estate Projects owned by the Group I Debtors: Ritter Ranch, the Palms Springs Village Project, Bickford Ranch and the Marblehead Project (the "Group I Projects"), and for the liquidation of all other assets of the Group I Debtors. The Net Proceeds from these sales will then be distributed to Creditors holding Allowed Claims in accordance with their rights and priorities under the bankruptcy code and under other applicable law.

**The Plan also offers the holders of a certain category of general unsecured claims, which are defined herein as Reliance Claims, the right to sell these claims, and any Litigation Rights held by the holders of such claims against the Lehman Entities, to LitCo, for the sum of fifty-five cents ($0.55) per dollar of claim.  The purchase offer is conditioned upon**

---

[1] All defined terms used herein have the same meanings as set forth in Article II herein and Exhibit "1" attached hereto.

1  confirmation of the applicable Plan and the lack of any stay pending an appeal of the

2  Confirmation Order.  However, this purchase offer is not contingent upon the sale of the

3  Group I Projects or a determination regarding any alleged automatic stay claim by LCPI

4  arising from LCPI's pending Chapter 11 proceeding.

5  **EXCEPT AS PROVIDED IN THE PURCHASE OFFER TO HOLDERS OF**

6  **RELIANCE CLAIMS REFERENCED ABOVE, AS EXPLAINED IN THE DEFINITION**

7  **OF THE TERM "EFFECTIVE DATE," WHICH IS THE DATE ON WHICH THIS PLAN**

8  **BECOMES EFFECTIVE, NO ACTION PROVIDED FOR IN THIS PLAN SHALL BE**

9  **TAKEN AGAINST EITHER LEHMAN COMMERCIAL PAPER, INC. ("LCPI") OR**

10  **LEHMAN BROTHERS HOLDINGS, INC. ("LBHI") THAT WOULD HAVE THE**

11  **EFFECT OF VIOLATING ANY APPLICABLE AUTOMATIC STAY THAT MAY EXIST**

12  **IN THEIR CHAPTER 11 CASES. ANY SUCH ACTION WILL ONLY PROCEED AFTER**

13  **ANY APPLICABLE STAY IS EITHER LIFTED OR DEEMED INAPPLICABLE.**

14  Although the same Plan is being filed in the Cases of all four Group I Debtors, each Plan is

15  independent of the others. The Creditors in each Case will determine, subject to Court approval,

16  whether the Plan will be approved in their Case. Accordingly, the Plan may be confirmed in the

17  Cases of all of the Group I Debtors, but not in others.

18  The Lehman Lenders have filed a competing and alternative plan of reorganization in the

19  Cases. Accordingly, the creditors holding claims against the Debtors will have the opportunity to

20  choose between one of the two Plans. The Debtors believe that the aggregate benefits offered

21  under their Plan are superior to what is being offered to Creditors under the Lehman Lenders'

22  competing Plan.

23  **READ THIS DISCLOSURE STATEMENT CAREFULLY IF YOU WANT TO**

24  **KNOW ABOUT**:

25  ➢  **WHO CAN VOTE OR OBJECT TO THE PLAN;**

26  ➢  **HOW YOUR CLAIM IS TREATED;**

27  ➢  **HOW THIS TREATMENT COMPARES TO WHAT YOUR CLAIM WOULD**

28  **RECEIVE IN LIQUIDATION;**

1     ➢   **A BRIEF HISTORY OF THE DEBTORS AND SIGNIFICANT EVENTS**

2       **DURING THEIR CHAPTER 11 BANKRUPTCY PROCEEDING;**

3     ➢   **WHAT FACTORS THE BANKRUPTCY COURT WILL CONSIDER TO**

4       **DECIDE WHETHER OR NOT TO CONFIRM THE PLAN;**

5     ➢   **WHAT IS THE EFFECT OF CONFIRMATION; AND**

6     ➢   **WHETHER THE PLAN IS FEASIBLE.**

7     This Disclosure Statement cannot tell you everything about your rights. You should

8   consider consulting your own attorney to obtain more specific advice on how the Plan will affect

9   you and your best course of action.

10     Be sure to read the Plan as well as this Disclosure Statement. If there are any

11   inconsistencies between the Plan and this Disclosure Statement, the Plan provisions will govern.

12     The Bankruptcy Code requires a Disclosure Statement to contain "adequate information"

13   concerning the Plan. On _____, 2011, the Bankruptcy Court entered an order approving this

14   Disclosure Statement, based upon a finding that this document contained "adequate information"

15   to enable parties affected by the Plan to make an informed judgment regarding the Plan. Any

16   party can now solicit votes for or against the Plan.

17         **II.**

18       **DEFINITIONS AND RULES OF INTERPRETATION**

19     **2.1**   **Definitions.**

20     The following defined terms are used in this Disclosure Statement. Any capitalized term

21   that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall

22   have the meaning ascribed to that term in the Bankruptcy Code or Bankruptcy Rules.

23       2.1.1   Acquisitions. SCC Acquisitions, Inc., a California corporation, an indirect

24   parent company of all of the Debtors, a purported obligor on the Bond Claims, a Creditor of all of

25   the Debtors, a SunCal Plan Proponent, the Plan Sponsor and the proposed Plan Trustee.

26       2.1.2   Acquisitions Administrative Loan. The Allowed Administrative Claim of

27   Acquisitions, or of such Affiliate that provides such funding, which will comprised of all amounts

28   caused to be funded by Acquisitions, or such Affiliate, in connection with the Group I Debtors'

1  Cases and the consummation of the Plan, including, but not limited to, the reimbursement of all

2  payments made to Professionals that provided services to the Group I Debtors in connection with

3  the Cases.

4          2.1.3    <u>Administrative Claim(s)</u>.  Any Claim incurred after the Petition Date but

5  before the Confirmation Dates for any cost or expense of administration of the Cases allowable

6  under Section 330, 331, 503(b), or 507(a)(1) of the Bankruptcy Code, including, without

7  limitation, any actual and necessary post-petition expenses of preserving the Estates of the Group I

8  Debtors, any actual and necessary post-petition expenses of operating the business of the Group I

9  Debtors in Possession, all compensation or reimbursement of expenses to the extent allowed by

10  the Bankruptcy Court under Section 330, 331, or 503 of the Bankruptcy Code and any fees or

11  charges assessed against the Estates of the Group I Debtors under Section 1930 of title 28 of the

12  United States Code.

13          2.1.4    <u>Administrative Claims Bar Date</u>.  The last date fixed by the Plan for the

14  filing of Proof of Claims or requests for payment of Administrative Claims.  Under the Plan, the

15  Administrative Claims Bar Date shall be the first business day after the sixtieth (60th) day after the

16  Confirmation Date.

17          2.1.5    <u>Affiliate</u>.  The term shall have the meaning set forth under Section 101(2),

18  including, but not limited to, as to any Person, any other Person that directly or indirectly owns or

19  controls, is owned or controlled by, or is under common ownership or control with, such Person.

20  The term "control" (including, with correlative meanings, the terms "controlled by" and "under

21  common control with"), as applied to any Person, means the possession, direct or indirect, of the

22  power to direct or cause the direction of the management and policies of such Person, whether

23  through the ownership of voting securities or other equity ownership interest, by contract or

24  otherwise.

25          2.1.6    <u>Allowed</u>.  When used to describe Claim(s) or Interest(s), such Claim(s) or

26  Interest(s), to the extent that it or they are "Allowed Claim(s)" or "Allowed Interest(s)."

27          2.1.7    <u>Allowed Amount</u> shall mean:

28

MAINDOCS-#160298-v1-Disclosure_Statement_Group_I.DOC

1    A.    With respect to any Administrative Claim (i) if the Claim is based

2 upon a Fee Application, the amount of such Fee Application that has been approved by a Final

3 Order of the Bankruptcy Court; (ii) if the Claim is based upon any indebtedness or obligation

4 incurred in the ordinary course of business of the Group I Debtors and is not otherwise subject to

5 an Administrative Claim Bar Date, the amount of such Claim that has been agreed to by the Group

6 I Debtors and such creditor, failing which, the amount thereof as fixed by a Final Order of the

7 Bankruptcy Court; or (iii) if the Holder of such Claim was required to file and has filed proof

8 thereof with the Bankruptcy Court prior to an Administrative Claim Bar Date, (1) the amount

9 stated in such proof if no objection to such Proof of Claim is interposed within the applicable

10 period of time fixed by the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court, or

11 (2) the amount thereof as fixed by Final Order of the Bankruptcy Court if an objection to such

12 proof was interposed within the applicable period of time fixed by the Bankruptcy Code, the

13 Bankruptcy Rules or the Bankruptcy Court.  The Allowed Amount of any Administrative Claim

14 which is subject to an Administrative Claims Bar Date and not filed by the applicable

15 Administrative Claims Bar Date shall be zero, and no distribution shall be made on account of any

16 such Administrative Claim;

17    B.    with respect to any Claim which is not an Administrative Claim

18 (the "Other Claim"):  (i) if the Holder of such Other Claim did not file proof thereof with the

19 Bankruptcy Court on or before the Claims Bar Date, the amount of such Claim as listed in the

20 Group I Debtors' ' Schedules as neither disputed, contingent nor unliquidated; or (ii) if the Holder

21 of such Claim has filed proof thereof with the Bankruptcy Court on or before the Claims Bar Date,

22 (a) the amount stated in such proof if no objection to such Proof of Claim was interposed within

23 the applicable period of time fixed by the Bankruptcy Code, the Bankruptcy Rules, the Plan or the

24 Bankruptcy Court, or (b) the amount thereof as fixed by Final Order of the Bankruptcy Court if an

25 objection to such proof was interposed within the applicable period of time fixed by the

26 Bankruptcy Code, the Bankruptcy Rules, the Plan or the Bankruptcy Court.  The Allowed Amount

27 of any Other Claim which is not Filed by the applicable Claims Bar Date, is not listed on the

28 Group I Debtors' Schedules or is listed as disputed, unliquidated, contingent or unknown, and is

not allowed under the terms of this Plan shall be zero, and no distribution shall be made on account of any such Claim; and

                             C.     with respect to any Interest, (i) the amount provided by or established in the records of the Group I Debtors at the Confirmation Date, provided, however, that a timely filed proof of Interest shall supersede any listing of such Interest on the records of the Group I Debtors; or (ii) the amount stated in a proof of Interest Filed prior to the Confirmation Date if no objection to such Interest was filed prior to the Confirmation Date or such later date as the Bankruptcy Court allows; or (iii) the amount of such Interest as fixed by a Final Order of the Bankruptcy Court.

         2.1.8     <u>Allowed Claim</u>.  Except as otherwise provided in the Plan (including with respect to those Classes for which the amount of the Allowed Claims is specified by the Plan), a Claim to the extent (and only to the extent) of the Allowed Amount of such Claim.

         2.1.9     <u>Allowed Interest</u>.  Any Interest to the extent, and only to the extent, of the Allowed Amount of such Interest.

         2.1.10     <u>Allowed Secured Claims</u>.  An asserted Secured Claim that is not either a Disputed Claim or a Disputed Lien.

         2.1.11     <u>Assets</u>.  All assets that are property of the Debtor(s) pursuant to Bankruptcy Code Section 541.

         2.1.12     <u>Arch</u>.  Arch Insurance Company, a Bond Issuer.

         2.1.13     <u>Available Cash</u>.  Each Group I Debtors' Cash deposited into the applicable Distribution Account(s) on or after the Effective Date that is available for making Distributions under the Plan to Holders of Allowed Administrative, Priority, and General Unsecured Claims.  The Available Cash shall consist of the respective Group I Debtors' cash on hand as of the Effective Date that is not subject to a Disputed Lien, proceeds of Net Litigation Recoveries that are not subject to a Disputed Lien, Net Sales Proceeds that become Available Cash upon the disallowance of a Disputed Claim or avoidance of a Disputed Lien purportedly encumbering such Cash, or proceeds from the Acquisitions Administrative Loan.  All Available Cash shall be deposited into the applicable Distribution Account(s).  Available Cash shall not

include Net Sale Proceeds in the Net Sales Proceeds Account where the Disputed Secured Claims are Allowed but subject to an equitable subordination judgment.

2.1.14    <u>Avoidance Actions</u>.  All Claims and defenses to Claims accruing to the Group I Debtors and their Estates under Bankruptcy Code Sections 506(d), 510(c), 541, 544, 545, 547, 548, 549, 550, or 551.

2.1.15    <u>Bankruptcy Code</u>.  The United States Bankruptcy Code.

2.1.16    <u>Bankruptcy Court</u>.  The United States Bankruptcy Court for the Central District of California, having jurisdiction over the Cases and, to the extent of any withdrawal of the reference made pursuant to Section 157 of title 28 of the United States Code, the United States District Court for the Central District of California; or, in the event such courts cease to exercise jurisdiction over the Cases, such court or unit thereof that exercises jurisdiction over the Cases in lieu thereof.

2.1.17    <u>Bankruptcy Rules</u>.  Collectively, as now in effect or hereafter amended and as applicable to the Cases, (i) the Federal Rules of Bankruptcy Procedure, and (ii) the Local Bankruptcy Rules and General Orders applicable to cases pending before the Bankruptcy Court.

2.1.18    <u>Beneficial Interests</u>. means, collectively, the interests of the holders of Allowed Unsecured Claims in the Plan Trust and in all distributions to be made by the Plan Trust on account of Allowed Unsecured Claims. The Beneficial Interests (a) shall be noted in the books and records of the Plan Trust, (b) shall not be evidenced by a writing, and (c) may not be transferred, sold, assigned or transferred by will, intestate succession or operation of law.

2.1.19    <u>Bickford Ranch Project</u>.  The Project owned by SunCal Bickford, located in the City of Penryn, California, as more particularly described herein.

2.1.20    <u>Bickford Second Loan Agreement</u>.  That certain promissory note secured by a deed of trust, dated as of May 25, 2005, in the maximum aggregate principal amount of approximately $30,000,000 executed by SunCal Bickford, as borrower, and payable to the order of Lehman ALI.  The Bickford Second Lien Loan Agreement is allegedly secured by a second priority deed of trust on the Bickford Ranch Project.  The Bickford Second Loan Agreement has an asserted balance due of $56,494,059.38 as of March 30, 2009.

2.1.21    <u>Bond Claim(s)</u>.  Any Claim against the Debtor(s) and a Bond Issuer under various payment or performance bonds, and/or any claims of Bond Issuer(s) against the Debtor(s) under various payment or performance bonds.

2.1.22    <u>Bond Claimant</u>.  Holder(s) of a Bond Claim.

2.1.23    <u>Bond Indemnification Claim</u>.  All Claims by Bond Safeguard, Lexon, and Arch for indemnification for payment by Bond Safeguard, Lexon and Arch of Bond Claims with respect to the Group I Debtors' Projects.

2.1.24    <u>Bond Indemnitors</u>.  The individuals and entities that are allegedly liable on the Bond Indemnification Claims, including, allegedly, all of the Debtors, Acquisitions, all Affiliates of Acquisitions, and Elieff.

2.1.25    <u>Bond Issuer(s)</u>.  Bond Safeguard, Lexon and Arch in their capacities as issuers and sureties for payment and performance bonds for the benefit of certain of the Debtors.

2.1.26    <u>Bond Safeguard</u>.  Bond Safeguard Insurance Company, a Bond Issuer.

2.1.27    <u>Break-Up Fee</u>.  Break-Up Fee means a fee granted to a Stalking Horse Bidder of up to three percent (3%) of the Opening Bid for a Project and of up to five percent (5%) of the Opening Bid for other Plan Trust Assets.

2.1.28    <u>Business Day</u>.  Any day, other than a Saturday, a Sunday or a "legal holiday," as defined in Bankruptcy Rule 9006(a).

2.1.29    <u>Cases</u>.  The Chapter 11 cases of the Group I Debtors pending before the Bankruptcy Court.

2.1.30    <u>Cash</u>.  Currency of the United States of America and cash equivalents, including, but not limited to, bank deposits, immediately available or cleared checks, drafts, wire transfers and other similar forms of payment.

2.1.31    <u>CFD Bonds</u>.  Community facilities district bonds issued by a governmental entity.

2.1.32    <u>Chapter 11 Trustee</u>.  Steven M. Speier, the duly appointed trustee of the Trustee Debtors in their pending Chapter 11 Cases.

2.1.33    Claim.  This term shall have the broadest possible meaning under Section 101(5) of the Bankruptcy Code, and shall include (a) any right to payment from any of the Group I Debtors, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, or (b) any right to an equitable remedy for breach of performance if such breach gives rise to a right of payment from any of the Group I Debtors, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

2.1.34    Claims Bar Date.  For any Claim other than an Administrative Claim, March 31, 2009, which was established by the Bankruptcy Court as the last date for creditors to file Proof of Claims with the Bankruptcy Court in all of the Group I Debtors' cases.

2.1.35    Claims Objection Deadline.  The later of (i) the first business day following the one hundred and eightieth (180th) day after the Effective Date, or (ii) such greater period of limitation as may be fixed or extended by the Bankruptcy Court or by agreement between the Plan Trustee and the Holder of the Claim.

2.1.36    Claim Objection Reduction Amount.  The amount of Net Sales Proceeds that is made available to the holders of Allowed Unsecured Claims due to the entry of a judgment or order on a Lehman Claim Objection that disallows, reduces, or otherwise adversely modifies the secured claims filed by the Lehman Lenders.

2.1.37    Class.  Each group of Claims or Interests classified in Article V of the Plan pursuant to Sections 1122 and 1123 of the Bankruptcy Code.

2.1.38    Committees.  Collectively, the Voluntary Debtors' Committee and the Trustee Debtors' Committee, both before and after the Confirmation Date.

2.1.39    Confirmation Date.  The date on which the Confirmation Order is entered in the Bankruptcy Court's docket.

2.1.40    Confirmation Order.  The order entered by the Bankruptcy Court confirming the Plan in accordance with the provisions of Chapter 11 of the Bankruptcy Code.

2.1.41    Contingent Bond Claims.  Unmatured Bond Claims.

1        2.1.42    <u>Creditor</u>.  Any Person who is the Holder of a Claim against any Debtor

2 that arose or accrued or is deemed to have arisen or accrued or to have matured, or otherwise

3 become due, owing, and payable on or before the Petition Date, including, without limitation,

4 Claims of the kind specified in Sections 502(g), 502(h) or 502(i) of the Bankruptcy Code.

5        2.1.43    <u>Debtor(s)</u>.  Individually or collectively, the Voluntary Debtors and the

6 Trustee Debtors, as specifically defined in Exhibit "1" attached hereto.

7        2.1.44    <u>Debtor(s)-in-Possession</u>.  The Voluntary Debtor(s) when acting in their

8 capacity as representatives of their respective Estates in their respective Chapter 11 Cases.

9        2.1.45    <u>Disclosure Statement</u>.  The document accompanying the Plan that is

10 entitled "Disclosure Statement Describing Chapter 11 Plan Filed by SunCal Plan Proponents In

11 The Chapter 11 Cases Of Palmdale Hills Property, LLC, SunCal Bickford Ranch, LLC, SunCal

12 Marblehead, LLC, SunCal PSV, LLC," as amended and with all accompanying exhibits.

13        2.1.46    <u>Disputed Claim(s)</u>.  All or any part of a Claim other than any Allowed

14 Amount thereof as to which any one of the following applies: (i) no Proof of Claim has been filed

15 with respect to such Claim, and either (a) the Claim is not listed in the Schedules; or (b) the Claim

16 is listed in the Schedules as unliquidated, disputed, contingent, unknown or in a zero amount,

17 (ii) the Claim is the subject of (a) a Litigation Claim; (b) the Claim is subject to offset by a

18 Litigation Claim; (c) a timely objection that has not been resolved by a Final Order; or (d) a

19 request for estimation in accordance with the Bankruptcy Code, the Bankruptcy Rules, any

20 applicable order of the Bankruptcy Court, or the Plan which is Filed on or before the Claims

21 Objection Deadline, which Adversary Proceeding, objection, or request for estimation has not

22 been dismissed, withdrawn or determined by a Final Order; or (iii) the Claim is otherwise treated

23 as a "Disputed Claim" pursuant to the Plan.

24        2.1.47    <u>Disputed Lien(s)</u>.  An asserted lien(s) against Assets of the Debtor(s) that

25 is either subject to a Disputed Secured Claim, not duly perfected, subject to an Avoidance Action,

26 or subject to an action pursuant to Bankruptcy Code Sections 510(c)(2) and/or 506(d).

27        2.1.48    <u>Distribution(s)</u>.  Payments to Holders of Allowed Claims provided for

28 under the Plan.

1            2.1.49     <u>Distribution Agent</u>.  The entity that is responsible for making

2 Distributions under the Plan, which shall be Acquisitions.

3            2.1.50     <u>Distribution Account(s)</u>.  Separate account(s) to be established by the Plan

4 Trustee at an FDIC insured bank into which each Group I Debtors' Available Cash shall be

5 deposited and all Available Cash received by the Plan Trust after the Confirmation Date that

6 would have belonged to such Group I Debtor shall be deposited, other than Net Sales Proceeds

7 that are subject to Disputed Claims and Disputed Liens.

8            2.1.51     <u>Distribution Date</u>.  With respect to any Allowed Claim or Allowed

9 Interest, the date on which a Distribution is required to be made under the Plan.

10            2.1.52     <u>Effective Date</u>. A date selected by the SunCal Plan Proponents that is not

11 later than 1) the one hundred and twentieth (120th) calendar day after the Confirmation Date.

12 However, in any case where the actions provided for in the Plan would be delayed by the

13 automatic stay applicable in the case of any Lehman Entity operating under the protection of

14 Chapter 11 or Chapter 7, then the Effective Date shall the one hundred and twentieth (120th)

15 calendar day after the later of (i) the Confirmation Date, or (ii) the date any stay barring the

16 implementation of the Plan arising from the Lehman Entities' cases is no longer applicable, has

17 been deemed inapplicable, or has been lifted by a Court of competent jurisdiction.

18            2.1.53     <u>Elieff</u>.  Bruce Elieff, the president of Acquisitions, a purported obligor on

19 the Bond Claims with corresponding indemnity Claims against the Debtors.

20            2.1.54     <u>Estates</u>.  The bankruptcy estates of the Group I Debtors created pursuant

21 to Section 541 of the Bankruptcy Code.

22            2.1.55     <u>Fee Applications</u>.  Applications of Professional Persons under Sections

23 330, 331 or 503 of the Bankruptcy Code for allowance of compensation and reimbursement of

24 expenses in the Cases.

25            2.1.56     <u>Fee Claim</u>.  A Claim under Sections 330 or 503 of the Bankruptcy Code

26 for allowance of compensation and reimbursement of expenses in the Cases.

27            2.1.57     <u>Fenway Capital</u>.  Fenway Capital Funding LLC, a Lehman Successor to

28 Lehman's Disputed Claims and Lehman's Disputed Liens arising from (i) SunCal Communities I

Loan Agreement, (ii) Ritter Ranch Loan Agreement, (iii) Bickford Second Loan Agreement,
(iv) SunCal PSV Loan Agreement, (v) SunCal Marblehead/SunCal Heartland Loan Agreement,
(vi) Delta Coves Loan Agreement (vii) SunCal Northlake Loan Agreement, and (viii) SunCal Oak
Valley Loan Agreement.  Such Disputed Claims and Disputed Liens were transferred back to
LCPI pursuant to a compromise approved by the New York Bankruptcy Court on May 12, 2010.

2.1.58    Filed.  Delivered to, received by and entered upon the legal docket by the
Clerk of the Bankruptcy Court.  "File" shall have a correlative meaning.

2.1.59    Final Order.  A judgment, order, ruling or other decree issued and entered
by the Bankruptcy Court.

2.1.60    General Unsecured Claim.  A Claim against a Group I Debtor that is not
(a) a Secured Claim, (b) an Administrative Claim, (c) a Tax Claim or (d) a Priority Claim.

2.1.61    Group I Debtors. Palmdale Hills Property, LLC, SunCal PSV, LLC,
SunCal Marblehead, LLC and SunCal Bickford Ranch, LLC.

2.1.62    Group I Projects. Ritter Ranch, the Palm Springs Village Project, the
Marblehead Project and the Bickford Ranch Project.

2.1.63    Holder.  The beneficial owner of any Claim or Interest.

2.1.64    Insider.  The term shall have the broadest meaning possible under
Section 101(31), including, but not limited to, a person in control of the Debtor, Affiliates and
Insiders of such Affiliates.

2.1.65    Interest.  Any equity security interest in any Group I Debtor within the
meaning, of Section 101(16) of the Bankruptcy Code, including, without limitation, any equity
ownership interest in any of the Group I Debtors, whether in the form of common or preferred
stock, stock options, warrants, partnership interests, or membership interests.

2.1.66    LBHI.  Lehman Brothers Holdings, Inc., a Lehman Entity, the parent
company of Lehman ALI and LCPI, and a Chapter 11 debtor in a bankruptcy proceeding pending
in the Bankruptcy Court for the Southern District of New York.

2.1.67    LCPI.  Lehman Commercial Paper, Inc., a Chapter 11 debtor in a
bankruptcy proceeding pending in the Bankruptcy Court for the Southern District of New York.

2.1.68    Legal Rate.  The rate of interest payable on judgments obtained in the United States District Courts as set forth in 28 U.S.C. § 1961.  The rate applicable under the Plan is 1.44% per annum, representing the applicable rate on November 6, 2008.

2.1.69    Lehman Adversary Proceeding.  The Debtors' pending adversary proceeding against the Lehman Lenders and/or the Lehman Successors asserting various causes of action including equitable subordination, fraudulent conveyances and preferential transfers.

2.1.70    Lehman ALI.  Lehman ALI, Inc.

2.1.71    Lehman Disputed Administrative Loans.  The post-petition financing provided by Lehman ALI to Palmdale Hills, SunCal Emerald, SunCal Bickford, Acton Estates, SunCal Oak Valley, SunCal Heartland, SunCal Northlake, SunCal Marblehead, SunCal Century City, SunCal PSV, Delta Coves, and SunCal Oak Knoll, which grants priming liens on all borrower Debtors' assets, and for super-priority administrative status to Lehman ALI.  The Voluntary Debtors have repaid to Lehman ALI the full amount of $270,731 loaned to the Voluntary Debtors.  The aggregate amount of the Lehman Administrative Loans to all of the Trustee Debtors is approximately $40 million as of March 1, 2011 and continuing to increase.  The Lehman Administrative Loans are the subject of claim objections. Until these objections are resolved, these Lehman Administrative Loans shall not be Allowed Claims.

2.1.72    Lehman Claim Objections. The objections filed by the Debtors to the claims filed by the Lehman Lenders that are based upon the Lehman Disputed Loans and the Lehman Disputed Administrative Loans, including, but not limited to, the Lehman Recoupment Objection and the Lehman 502(d) Objection.

2.1.73    Lehman Entities.  The Lehman Lenders, the Lehman Equity Members and LBHI.

2.1.74    Lehman Equity Members.  Lehman Entities that own direct or indirect membership Interests in all of the Trustee Debtors, except for SunCal Heartland and SunCal Marblehead.

2.1.75    Lehman Lenders.  Lehman ALI, LCPI, Northlake Holdings, and OVC Holdings.

-14-

1          2.1.76    Lehman Disputed Loans.  Collectively the following loans that are the

2    purported basis for the Lehman's Disputed Claims:  (a) SunCal Communities I Loan Agreement;

3    (b) Bickford Second Loan Agreement; (c) Ritter Ranch Loan Agreement; (d) SCC Palmdale Loan;

4    (e) Interim Loan Agreement; (f) SunCal Oak Knoll/SunCal Torrance Loan Agreement; (g) SunCal

5    Century City Loan Agreement; (h) SunCal PSV Loan Agreement; (i) SunCal Delta Coves Loan

6    Agreement; (j) SunCal Marblehead/SunCal Heartland Loan Agreement; (k) Sun Cal Oak Valley

7    Loan Agreement; (l) SunCal Northlake Loan Agreement; (m) Pacific Point First Loan Agreement;

8    and (n) Pacific Point Second Loan Agreement.

9          2.1.77    Lehman Representatives.  The individuals that controlled the Lehman

10    Entities.

11          2.1.78    Lehman Successor(s).  Entities other than the Lehman Lenders that either

12    assert to be or are determined by the Bankruptcy Court to be the beneficial owner(s) of the

13    Lehman Disputed Loan(s), including, but not limited to Fenway Capital, Lehman Re and Danske

14    Bank.

15          2.1.79    Lehman's Disputed Claim(s).  All of the Proofs of Secured Claims filed

16    by a Lehman Lender or a Lehman Successor in the Debtors' Chapter 11 Cases arising from the

17    Lehman Disputed Loans and the Lehman Disputed Administrative Loans.

18          2.1.80    Lehman's Disputed Lien(s).  All of the alleged liens relating to Proofs of

19    Secured Claims filed by a Lehman Lender or a Lehman Successor in the Debtor's Chapter 11

20    Cases arising from the Lehman Disputed Loans.

21          2.1.81    Lexon.  Lexon Insurance Co.

22          2.1.82    LitCo.  A newly formed Delaware limited liability company that will be

23    purchasing the claims and litigation rights held by the Reliance Claimants that choose Option A.

24          2.1.83    Litigation Claims.   Any and all interests of the Group I Debtors in any

25    and all Claims, rights, causes of action, and objections or defenses to Claims, liens, rights, or

26    causes of action which have been or may be commenced by the Group I Debtor(s), the Chapter 11

27    Trustee, or the Committee(s), as the case may be, including, but not limited to, any (i) Avoidance

28    Actions; (ii) for turnover of property to the Group I Debtors' Estates and/or the Plan Trust; (iii) for

the recovery of property or payment of money that belongs to the Debtors' Estates or the Plan Trust; (iv) the right to compensation in the form of damages, recoupment or setoff of the Debtors' Estates and/or the Plan Trust; (v) the Lehman Adversary Proceeding; (vi) the State Court Action, and (vii) any and all other Claims against Lehman's Disputed Claims and/or Disputed Liens referenced in the Plan or the Disclosure Statement.

2.1.84    <u>Litigation Recoveries</u>.  Any Cash or other property received by the Chapter 11 Trustee, the Group I Debtors, the Committees and/or the Plan Trust, as the case may be, from all or any portion of a Litigation Claim(s), including, but not limited to, awards of damages, attorneys' fees and expenses, interest and punitive damages, whether recovered by way of settlement, execution on judgment or otherwise.

2.1.85    <u>Litigation Rights</u>. Any Claims held by a party other than the Group I Debtors that have not been fixed in a final judgment prior to the Effective Date.

2.1.86    <u>Marblehead Project</u>.  The Project owned by SunCal Marblehead, located in the City of San Clemente, California, as more particularly described herein.

2.1.87    <u>Maximum Distributions</u>.  A Distribution to a Holder of an Allowed General Unsecured Claim against a Group I Debtor equal to one hundred percent (100%) of the amount of the Holder's Allowed General Unsecured Claim plus interest at the Legal Rate from and as of the Group I Debtor's Petition Date.

2.1.88    <u>MB Firm</u>.  Miller Barondess, LLP.

2.1.89    <u>Mechanic Lien Claims</u>.  Mechanic Lien Claims arising pursuant to California Civil Code §3110, et seq. that were either allegedly perfected prepetition or otherwise allegedly satisfy the requirements of Bankruptcy Code 546(b).

2.1.90    <u>Minimum Increment</u>.  Minimum Increment means the following: a) <u>For Sales of Projects</u>: One hundred percent of the preceding Qualifying Bid, plus any applicable Break-Up Fee, plus two hundred and fifty-thousand dollars ($250,000); and b) For Sales of Other Plan Trust Assets: One hundred percent (100%) of the preceding Qualifying Bid, plus any applicable Break-Up Fee, plus five percent (5%) of the preceding Qualifying Bid.

2.1.91    <u>Net Litigation Recoveries</u>.  Litigation Recoveries less associated Administrative Claims and Post-Confirmation Expenses incurred in connection with such Litigation Recoveries.

2.1.92    <u>Net Sales Proceeds</u>.  The Cash generated from the sale(s) or liquidation of the Group I Debtor(s)' Assets or the Plan Trust's Assets, less payment of selling expenses, taxes, Chapter 11 Trustee fees, and any associated Post-Confirmation Expenses and Administrative Claims incurred in furtherance of such sales or liquidation of such Assets.

2.1.93    <u>Net Sales Proceeds Account(s)</u>.  Separate account(s) that will be established by the Plan Trustee at an FDIC insured bank into which all Net Sale Proceeds shall be deposited from the sale of Assets that were allegedly encumbered by a Disputed Secured Claim(s) and/or a Disputed Lien(s).  There shall be a separate Net Sales Proceeds Account for the Net Sale Proceeds allegedly subject to each Disputed Secured Claim(s) and/or Disputed Lien(s), except where there are two Disputed Liens on a single Project, in which case, there shall be a single account for the proceeds generated from that Project.  The Disputed Secured Claim(s) and/or Disputed Lien(s) shall attach to the corresponding Net Sales Proceeds Account(s) pending any Final Order(s) of the Bankruptcy Court resolving the applicable Disputed Secured Claim(s) and/or applicable Disputed Lien(s).  To the extent that a particular Disputed Claim is disallowed or a particular Disputed Lien is avoided (other than transferred to the Estates pursuant to Bankruptcy Code Section 510(c)(2)) or otherwise invalidated, such Net Sales Proceeds allegedly subject thereto shall become Available Cash and shall be transferred to the applicable Distribution Account(s).  To the extent that a particular Disputed Secured Claim and a Disputed Lien are allowed and deemed valid but subject to the equitable subordination causes of action in the Lehman Adversary Proceeding, the funds shall remain in the Net Sales Accounts pending a Final Order on the equitable subordination causes of action in the Lehman Adversary Proceeding.

2.1.94    <u>Opening Bid</u>.  Opening Bid means the first Qualifying Bid accepted by the Debtor for any of the Plan Trust's Assets.

2.1.95    <u>Orders for Relief Date</u>.  The following are dates that orders for relief were entered for each of the Trustee Debtors:

| SunCal Oak Valley | January 6, 2009 |
| SunCal Heartland | January 6, 2009 |
| SunCal Northlake | January 6, 2009 |
| SunCal Marblehead | January 6, 2009 |
| SunCal Century City | January 6, 2009 |
| SunCal PSV | January 6, 2009 |
| Delta Coves | January 6, 2009 |
| SunCal Torrance | January 6, 2009 |
| SunCal Oak Knoll | January 6, 2009 |

2.1.96    <u>Palmdale Hills</u>.  Palmdale Hills Property, a Delaware limited liability company, a Voluntary Debtor herein, and the owner of the Ritter Ranch Project

2.1.97    <u>Palmdale Hills CFD Bonds</u>.  Certain CFD bonds issued by the City of Palmdale, in the amount of approximately $33 million that are owned by Palmdale Hills.

2.1.98    <u>Palm Springs Village Project</u>.  The Project owned by SunCal PSV, located in the City of Palm Springs, California, as more particularly described herein.

2.1.99    <u>Person</u>.  An individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, governmental authority, governmental unit, committee or other entity of whatever nature.

2.1.100   <u>Petition Dates</u>.  The following are dates that each of the Voluntary Debtors filed their Voluntary Chapter 11 petitions or Creditors filed involuntary Chapter 11 petitions against the Trustee Debtors:

| Palmdale Hills | November 6, 2008 |
| SunCal Beaumont | November 6, 2008 |
| SCC Palmdale | November 7, 2008 |
| SunCal Johannson | November 7, 2008 |
| SunCal Summit Valley | November 7, 2008 |
| SunCal Emerald | November 7, 2008 |
| SunCal Bickford | November 7, 2008 |
| Acton Estates | November 7, 2008 |
| Seven Brothers | November 7, 2008 |
| SJD Partners. | November 7, 2008 |
| SJD Development | November 7, 2008 |
| Kirby Estates | November 7, 2008 |
| SunCal I | November 7, 2008 |
| SunCal III | November 7, 2008 |
| SCC Communities | November 19, 2008 |
| Del Rio | November 19, 2008 |
| Tesoro | November 19, 2008 |

| Delta Coves Ventures, LLC | November 14, 2008 |
| SunCal Heartland, LLC | November 12, 2008 |
| SunCal Marblehead, LLC | November 12, 2008 |
| LB-L-SunCal Northlake, LLC | November 12, 2008 |
| LB-L-SunCal Oak Valley, LLC | November 12, 2008 |
| SunCal Century City, LLC | November 14, 2008 |
| SunCal PSV, LLC | November 14, 2008 |
| SunCal Torrance Properties, LLC | November 14, 2008 |
| SunCal Oak Knoll, LLC | November 19, 2008 |

2.1.101    Plan.  This Chapter 11 Plan together with the Exhibits thereto, as the same may be amended or modified from time to time in accordance with the Plan.

2.1.102    Plan Documents.  The Plan, the Plan Trust Agreement and all other documents attached to the Plan Supplement.

2.1.103    Plan Period. The period from the Effective Date to the Plan Termination Date.

2.1.104    Plan Supplement. The compilation of the Plan Documents to be filed with the Bankruptcy Court.

2.1.105    Plan Termination Date. The fifth (5th) anniversary date of the Effective Date, unless the Plan elects and earlier date.

2.1.106    Plan Sponsor.  The entity that has committed to cause the funding of certain specified obligations under the Plan on or after the Effective Date.  The Plan Sponsor is Acquisitions.

2.1.107    Plan Trust.  A liquidating trust to be established prior to or on the Effective Date, with Acquisitions as the Plan Trustee and the Holders of Allowed Claims against the Debtors as the beneficiaries.  The purpose of the Plan Trust will be to liquidate the Debtors' Assets and to otherwise consummate the Plan.

2.1.108    Plan Trustee. The Plan Trustee under the Plan Trust Agreement is Acquisitions.

2.1.109    Plan Trust Agreement. The liquidating trust agreement governing the affairs of the Plan Trust, which will be in substantially the form contained in the Plan Supplement.

MAINDOCS-#160298-v1-Disclosure_Statement_Group_I.DOC

2.1.110  <u>Plan Trust Beneficiaries</u>. The Plan Trust Beneficiaries are (i) the holders of Beneficial Interests, as of any point in time, and (ii) holders of Allowed Claims that shall be satisfied from Plan Trust Property in accordance with the terms of the Plan.

2.1.111  <u>Plan Trust Property</u>. Plan Trust Property means all property within the Chapter 11 estates of the Group I Debtors, other than property that is affirmatively excluded by the Plan Trustee.

2.1.112  <u>Post-Confirmation Expenses</u>.  The fees and expenses incurred by the Plan Sponsor, the Plan Trustee and the Committee(s) and their professionals following the Confirmation Date (including the fees and costs of Professionals) for the purpose of (i) prosecuting and liquidating the Litigation Claims; (ii) objecting to and resolving Disputed Claims and Disputed Liens; (iii) selling or otherwise liquidating the Plan Trust's Assets; (iv) effectuating Distributions under the Plan; and (v) otherwise consummating the Plan and closing the Group I Debtors' Chapter 11 Cases.

2.1.113  <u>Priority Claim</u>.  Any Claim, other than an Administrative Claim or a Tax Claim, to the extent entitled to priority under Section 507(a) of the Bankruptcy Code.

2.1.114  <u>Pro Rata</u>.  Proportionately, so that with respect to any distribution in respect of any Allowed Claim, the ratio of (a)(i) the amount of property distributed on account of such Allowed Claim to (ii) the amount of such Allowed Claim, is the same as the ratio of (b)(i) the amount of property distributed on account of all Allowed Claims of the Class or Classes sharing in such distribution to (ii) the amount of all Allowed Claims in such Class or Classes.

2.1.115  <u>Professional</u>.  A Person or Entity (a) employed by the Group I Debtors, the Committees pursuant to a Final Order in accordance with Sections 327 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to the Effective Date, pursuant to Sections 327, 328, 3291 330 and 331 of the Bankruptcy Code, or (b) for which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to Section 503(b) of the Bankruptcy Code.

2.1.116  <u>Professional Fees</u>.  All Allowed Claims for compensation and for reimbursement of expenses under Sections 328, 330 and/or 503(b) of the Bankruptcy Code

2.1.117   Projects.  The Debtors' residential real estate development projects and other assets as separately defined herein and described in Exhibit "1" to the Disclosure Statement.

2.1.118   Qualifying Bid.  Qualifying Bid means, with respect to a bid on a Project, a bid made by Qualifying Bidder that exceeds the immediately preceding Qualifying Bid by the Minimum Increment.

2.1.119   Qualifying Bidder.  Qualifying Bidder means a bidder who has provided the Plan Trustee, in the case of a bid for a Project, a deposit equal to two hundred and fifty thousand dollars ($250,000) and who has provided the Plan Trustee evidence confirming that the bidder has the financial means to acquire the Plan Trust Asset being offered for sale. In the case of a bid for an Asset owned by the Plan Trust, other than a Group I Project,  a Qualifying Bidder means a bidder who provides cash deposit equal to ten percent of the value of the Assets being offered for sale and evidence confirming the bidder's ability to timely pay the remainder of the purchase price.

2.1.120   Reliance Claim. An Allowed Unsecured Claim against a Group I Debtor that would entitle the holder thereof to be the beneficiary of any equitable subordination judgment obtained against a Lehman Entity by such Group I Debtor, or that would entitled the holder thereof to receive a share of any Claim Objection Reduction Amount obtained by the Debtor through a Lehman Claim Objection, before other holders of Allowed Unsecured Claims could participate in this recovery amount.

2.1.121   Reliance Claimant. The holder of a Reliance Claim. A list of the Reliance Claims and Reliance Claimants is attached hereto as Exhibit "8."

2.1.122   Ritter Ranch Loan Agreement.  That certain Credit Agreement, dated as of February 8, 2007, by and among Palmdale Hills, as borrower, LCPI, as administrative agent and lender, pursuant to which LCPI made a loan in the maximum aggregate principal amount of approximately $264,000,000.  The Ritter Ranch Loan Agreement is allegedly secured by a first-priority deed of trust on all real and personal property owned by Palmdale Hills.  The Ritter Ranch Loan Agreement has an asserted balance due of $287,252,096.31 as of March 30, 2009.

1       2.1.123   <u>Ritter Ranch Project</u>.  The Project owned by Palmdale Hills, located in the

2  City of Palmdale, California, as more particularly described herein.

3       2.1.124   <u>Sale Period</u>.  The Sale Period is the time period that the Plan Trustee is

4  provided under the Plan to consummate a sale or liquidation of the Plan Trust's Assets subject to

5  the Lehman Disputed Claims(s) and/or the Lehman Disputed Lien(s).  The Sales Period shall

6  commence on the Confirmation Date and shall expire sixty days after the Effective Date.

7       2.1.125   <u>SCC LLC</u>.  SCC Acquisitions LLC, a limited liability company, a

8  subsidiary of Acquisitions and an indirect and/or a direct parent company of all of the Debtors.

9       2.1.126   <u>Schedules</u>.  The schedules of assets and liabilities and list of equity

10  security holders Filed by the Group I Debtors, as required by Section 521(1) of the Bankruptcy

11  Code, Bankruptcy Rules 1007(a)(3) and (b)(1), and Official Bankruptcy Form No. 6, as amended

12  from time to time.

13       2.1.127   <u>Stalking Horse Bidder</u>.  Stalking Horse Bidder means the Qualifying

14  Bidder who submits the Opening Bid for any of the Plan Trust's Assets.

15       2.1.128   <u>Secured Claim</u>.  Any Claim, including interest, fees, costs, and charges to

16  the extent allowable pursuant to Bankruptcy Code Section 506, that is secured by a valid and

17  unavoidable Lien on the Group I Debtor(s)' Assets.

18       2.1.129   <u>State Court Action</u>. The action filed by certain Voluntary Debtors against

19  Lehman Ali, Inc., and certain other defendants, in California Superior Court for the County of

20  Orange (Case No. 30-2011-0040847-CU-BC-CJC).

21       2.1.130   <u>SunCal</u>.  The SunCal Companies, a trade name for Acquisitions and its

22  Affiliates.

23       2.1.131   <u>SunCal Bickford</u>.  SunCal Bickford Ranch, LLC, a Delaware limited

24  liability company, a Voluntary Debtor herein, and the owner of the Bickford Ranch Project.

25       2.1.132   <u>SunCal Management</u>.  SunCal Management, LLC, a Delaware limited

26  liability company, and the property manager for the Projects.

27       2.1.133   <u>SunCal Marblehead</u>. SunCal Marblehead, LLC, a Delaware limited

28  liability company, a Trustee Debtor (a Group I Debtor), and the owner of the Marblehead Project.

1        2.1.134   SunCal Marblehead/SunCal Heartland Loan Agreement.  That certain

2  Second Amended and Restated Term Loan and Revolving Line of Credit Loan Agreement, dated

3  as of October 3, 2007, by and among SunCal Marblehead Heartland Master LLC, SunCal

4  Marblehead, and SunCal Heartland, as borrowers, and Lehman ALI, as agent and sole lender,

5  pursuant to which Lehman ALI made a loan in the maximum aggregate principal amount of

6  approximately $316,061,300.  The SunCal Marblehead/SunCal Heartland Loan Agreement is

7  allegedly secured by first-priority deeds of trust on the Marblehead and the Heartland Projects.

8  The SunCal Marblehead/SunCal Heartland Loan Agreement has an alleged balance due of

9  $354,325,126.15 as of March 30, 2009. The proofs of claim filed with respect to this loan

10  agreement are the subject of the Lehman Adversary Proceeding and the Lehman Claim Objections.

11        2.1.135   SunCal Plan Proponent(s).  The Voluntary Debtors and Acquisitions as

12  the parties-in-interest that are proposing the Plan.

13        2.1.136   SunCal PSV. SunCal PSV, LLC, a Delaware limited liability company, a

14  Trustee Debtor (a Group I Debtor), and the owner of the Palm Springs Village Project.

15        2.1.137   SunCal PSV Loan Agreement.  That certain Term Loan and Revolving

16  Line of Credit Loan Agreement, dated as of February 12, 2007, between SunCal PSV, as

17  borrower, and Lehman ALI, as agent and sole lender, pursuant to which Lehman ALI made a loan

18  in the maximum aggregate principal amount of approximately $90 million.  The SunCal PSV Loan

19  Agreement is allegedly secured by a first-priority deed of trust on the Palm Springs Village

20  Project.  The SunCal PSV Loan Agreement has an alleged balance due of $88,257,340.20 as of

21  March 30, 2009.

22        2.1.138   Tax.  Any tax, charge, fee, levy, impost or other assessment by any

23  federal, state, local or foreign taxing authority, including, without limitation, income, excise,

24  property, sales, transfer, employment, payroll, franchise, profits, license, use, ad valorem,

25  estimated, severance, stamp, occupation and withholding tax.  "Tax" shall include any interest or

26  additions attributable to, or imposed on or with respect to such assessments.

27        2.1.139   Tax Claim.  Any Claim for any Tax to the extent that it is entitled to

28  priority in payment under Section 507(a)(8) of the Bankruptcy Code.

2.1.140    Trustee Debtor(s). The following Debtors, individually or collectively, that are represented by the Chapter 11 Trustee: Delta Coves, SunCal Heartland, SunCal Marblehead, SunCal Northlake, SunCal Oak Valley , SunCal Century City, SunCal PSV, SunCal Torrance, and SunCal Oak Knoll.

2.1.141    Trustee Debtors' Committee.  The Official Committee of Unsecured Creditors of the Trustee Debtors appointed in the Cases pursuant to Section 1102 of the Bankruptcy Code.

2.1.142    Unpaid Secured Real Property Tax Claims.  Secured Claims held by various government entities secured by liens on the underlying real properties owned by the Debtors but that are non-recourse to the Debtors.

2.1.143    Voluntary Debtor(s).  The following  Chapter 11 debtors and debtors-in-possession, individually or collectively, Palmdale Hills, SunCal I, SunCal III, SCC Palmdale, Acton Estates, SunCal Beaumont, SunCal Emerald, SunCal Johansson, SunCal Bickford, SunCal Summit, Seven Brothers, Kirby Estates, SJD Partners, SJD Development, SCC Communities, Del Rio and Tesoro.

2.1.144    Voluntary Debtors' Committee.  The Official Committee of Unsecured Creditors of the Voluntary Debtors appointed in the Cases pursuant to Section 1102 of the Bankruptcy Code.

**2.2**        **Rules of Construction.**

For purposes of the Plan and this Disclosure Statement, unless otherwise provided herein or in the Plan, (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural; (b) each pronoun stated in the masculine, feminine or neuter includes the masculine, feminine and neuter; (c) any reference in the Plan or this Disclosure Statement to an existing document or schedule filed or to be filed means such document or schedule, as it may have been or may be amended, modified or supplemented pursuant to the Plan; (d) any reference to an entity as a Holder of a Claim or Interest includes that entity' s successors and assigns; (e) except as otherwise indicated herein all references in the Plan or this Disclosure Statement to Sections, Articles and Exhibits are references to Sections, Articles

and Exhibits of or to the Plan; (f) the words "therein," "thereunder" and "thereto" refer to the Plan

in its entirety rather than to a particular portion of the Plan; and (g) unless otherwise provided in

the Plan or this Disclosure Statement, any reference in the Plan or this Disclosure Statement to a

contract, instrument, release, indenture, agreement, or other document being in a particular form or

on particular terms and conditions means that such document shall be substantially and materially

in such form or substantially and materially on such terms and conditions; (h) any reference in the

Plan or this Disclosure Statement to a document, schedule, or exhibit to the Plan or Disclosure

Statement Filed or to be Filed means such document, schedule, or exhibit, as it may have been or

may be amended, modified, or supplemented; and (i) the rules of construction set forth in Section

102 of the Bankruptcy Code shall apply to the extent such rules are not inconsistent with the

express terms of the Plan or this Disclosure Statement or any other provision in this Section 3.2.

    **2.3**       **Exhibits.**

    All Exhibits to the Plan are incorporated into and are a part of the Plan as if set forth in full

therein.

<div align="center">

**III.**

**PLAN CONFIRMATION DEADLINES**

</div>

    The Bankruptcy Court has not confirmed the Plan described in this Disclosure Statement.

Accordingly, the terms of the Plan are not binding on anyone.  However, if the Bankruptcy Court

confirms the Plan, then the Plan will be binding on the Debtor(s), the Plan Trustee, and on all

Creditors and Interest Holders in such Cases.

    **3.1**       **Time and Place of the Confirmation Hearing.**

    The hearing where the Bankruptcy Court will determine whether or not to confirm the Plan

will take place at 411 West Fourth Street, Santa Ana, CA 92701-4593 on _____, 2011, at ___

_.m. in Courtroom 5A.

    **3.2**       **Deadline for Voting for or Against the Plan.**

If you are entitled to vote, it is in your best interest to timely vote on the enclosed ballot and return the ballot to:

> Winthrop Couchot Professional Corporation
> 660 Newport Center Drive, Suite 400
> Newport Beach, CA 92660
> Facsimile:  (949) 720-4111
> Attn:  P.J. Marksbury

Your ballot must be **received by**  _____, 2011**,** or it will not be counted.

### 3.3    Deadline for Objecting to the Confirmation of the Plan.

Objections to the confirmation of the Plan must be filed with the Bankruptcy Court, and served upon the following parties so that they are received by _____, 2011:

| | |
|---|---|
| **Counsel to the Voluntary Debtors** | Paul J. Couchot<br>Winthrop Couchot Professional Corporation<br>660 Newport Center Drive, Suite 400,<br>Newport Beach, CA 92660 |
| **Authorized Agent for Voluntary Debtors** | Bruce V. Cook<br>General Counsel<br>2392 Morse Ave<br>Irvine, CA 92614-6234 |
| **Counsel for SunCal Management LLC and SCC Acquisitions Inc**. | Ronald Rus<br>Rus Miliband & Smith P.C.<br>2211 Michelson Drive, Seventh Floor<br>Irvine, California 92612 |
| **Authorized Agent for SunCal Management and SCC Acquisitions, Inc**. | Bruce V. Cook<br>General Counsel<br>2392 Morse Ave<br>Irvine, CA 92614-6234 |

### 3.4    Identity of Person to Contact for More Information Regarding the Plan.

Any interested party desiring further information about the Plan should contact the Voluntary Debtors' counsel, Winthrop Couchot Professional Corporation, 660 Newport Center Drive, Suite 400, Newport Beach, CA 92660, Attn:  Paul J. Couchot, (949) 720-4100; Peter W. Lianides, (949) 720-4155; Payam Khodadadi, (949) 720-4160.

### 3.5    **Disclaimer.**

The information contained in this Disclosure Statement is provided by the SunCal Plan Proponents.  The SunCal Plan Proponents represent that everything stated in this Disclosure Statement is true to the best of their knowledge.  The Bankruptcy Court has not yet determined whether or not the Plan is confirmable and makes no recommendation as to whether or not you should support or oppose the Plan.

The discussion in this Disclosure Statement regarding the Group I Debtors may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995.  Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate," or "continue," or the negative thereof or other variations thereon or comparable terminology.  The reader is cautioned that all forward looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements.  The liquidation analyses, distribution projections, projections of financial results and other information are estimates only, and the timing, amount and value of actual distributions to Creditors may be affected by many factors that cannot be predicted.  Therefore, any analyses, estimates, or projections may or may not turn out to be accurate.

The SunCal Plan Proponents and their professionals have made a diligent effort to identify in this Disclosure Statement all Litigation Claims, including claims for relief, counterclaims, and objections to claims.  However, no reliance should be placed on the fact that a particular Litigation Claim is or is not identified in this Disclosure Statement.  The Group I Debtors or other parties in interest may seek to investigate, file and prosecute Litigation Claims after the Confirmation Date, or the Plan Trust may seek to do so after the Effective Date of the Plan whether or not the Litigation Claims are identified in this Disclosure Statement.

# IV.

## FACTUAL BACKGROUND OF THE DEBTORS

### 4.1    The Formation of the Debtors and the Projects.

#### 4.1.1    Overview of the Debtors and their Projects.

The Group I Debtors are four of twenty-six entities (collectively the "Debtors") that were formed pursuant to a joint venture between Affiliates of the SunCal Companies ("SunCal") and the Lehman Entities (the "SunCal/Lehman Joint Venture"). The Debtors role in the venture was to own and develop the large residential projects that were the core assets in this joint undertaking. At the inception of SunCal/Lehman Joint Venture, it was agreed that SunCal would be the developer/manager of the Projects and the Lehman Entities would provide the necessary capital. Attached hereto as Exhibit "1" is a general description of the Debtors' Projects, including the Group I Projects, and the Debtors' other primary Assets, excluding Cash and the Litigation Claims, and a description of the loans for the Projects that are not a part of Group I Projects. All of the Debtors are Affiliates of Acquisitions and SCC LLC.  Some of the Debtors directly own the Projects, while others serve as holding companies, owning Allowed Interests in the Debtors that hold title to the Projects.  SunCal Management, LLC, a SunCal Affiliate, has management contracts with respect to all of the Projects and pursuant to this contract manages the Debtors' day-to-day business affairs.

The seventeen Debtors who are referred to herein as the "Voluntary Debtors" are wholly owned by SunCal Affiliates, and consequently the SunCal Affiliates have full corporate governance authority over these entities.  The Voluntary Debtors own eleven (11) of the Projects. In the case of the nine Trustee Debtors, the SunCal Affiliates and the Lehman Affiliates initially shared ownership equally (50% each). However, after the Petition Date, the SunCal Affiliates became the owner of hundred percent (100%) of the equity in two of the nine Trustee Debtors - SunCal Heartland and SunCal Marblehead.  The Trustee Debtors own nine (9) Projects. Attached hereto as Exhibit "2" is a chart that sets forth the appraised value of the Group II Debtors' Projects. This chart lists both the Lehman Lenders' value estimates and SunCal's

valuation estimates.[2]  As the chart indicates, the Lehman Lenders' valuation for the Group I Projects is in the aggregate amount of $273,700,000, while the Debtors' valuation of the Group I Projects is in the aggregate amount of $144,500,000.

The Plan eliminates any potential value disputes by providing for the sale of the Group II Projects through a sale procedure that is designed to yield the highest market price for these assets. Accordingly, to the extent any other party believes the Group II Projects have a greater value than the Opening Bid offered by another Qualifying Bidder, they will have the opportunity to submit a Qualifying Bid (but no credit-bids will be allowed) that exceeds the Opening Bid and, if they so desire, to become the prevailing bidder by offering the highest Qualifying Bid. This market sale process will insure that the rights of all stakeholders are protected.

### 4.1.2    The Debtors' Primary Secured Creditors and Their Disputed Claims.

LCPI holds the primary secured claims against the Ritter Ranch Project and the Bickford Ranch Project. LCPI's secured claim against Ritter Ranch, which is secured by a first priority deed of trust against this Project, is based upon the funding provided under the terms of the Ritter Ranch Loan Agreement. The asserted balance due under the terms of this loan was $287,252,096.31 as of March 30, 2009. LCPI's secured claim against the Bickford Ranch Project, which is also secured by a first priority deed of trust, is based upon funding provided under the terms of the SunCal Communities I Loan Agreement. The asserted balance due under terms of this loan was $343,221,391.06 as of March 30, 2009. This claim is also collateralized by liens against the Acton Estates Project and the SunCal Emerald Projects.

Lehman ALI holds the primary secured claims against the Marblehead Project and the Palm Springs Village Project. Lehman Ali's secured claim against the Bickford Ranch Project, which is secured by a first priority deed of trust, is based upon funding provided under the terms of the SunCal Marblehead/Heartland Loan Agreement. The asserted balance due under terms of this loan was $354,325,126.15 as of March 30, 2009. This claim is also collateralized by a lien against the Heartland Project.

---

[2] Values may have changed since these analyses were prepared.

1    Lehman Ali's secured claim against the Palm Spring Village Project, which is secured by a

2    first priority deed of trust, is based upon funding provided under the terms of the SunCal PSV Loan

3    Agreement. The asserted balance due under terms of this loan was $88,257,340.20 as of March 30,

4    2009. Lehman ALI also holds a second priority deed of trust on the Bickford Ranch Project. This

5    lien secures the funds advanced under Bickford Second Loan Agreement. Pursuant to a stipulation

6    entered into by Lehman Ali and the Debtors, the claim secured by this second lien has been

7    deemed unsecured due to the lack of any value.

8         **4.1.3    suted Claims and Liens.**

9    As discussed in detail herein, during the course of the Debtors' Cases, the Debtors initiated

10   litigation disputing the validity of Lehman's Disputed Secured Claims, and the validity, priority

11   and extent of Lehman's Disputed Liens (which includes the liens against the Group I Projects).

12   This litigation is being pursued through the Lehman Adversary Proceeding, various contested

13   matters, and in potential lawsuits based on the post-petition conduct of the Lehman Entities and/or

14   their agents.

15   Attached hereto as Exhibit "3" is a chart that sets forth Lehman's Disputed Secured

16   Claims, the alleged Holders of the Lehman Disputed Secured Claims, the collateral encumbered by

17   the Lehman Disputed Liens, and the alleged outstanding amount based on the filed Proofs of

18   Claim. As the chart indicates, the total of Lehman's Disputed Secured Claims pursuant to

19   Lehman's Disputed Secured Claims filed in the Debtor's bankruptcy cases with respect to the

20   Group I Debtors is approximately $1,129,550,012.

21        **4.1.4    A Summary of All of the Alleged Claims Against the Debtors.**

22   Attached hereto as Exhibit "4" is a chart that sets forth the prepetition Claims that have

23   been asserted against all of the Debtors. In summary, the asserted Claims against the Group I

24   Debtors consist of the following: $18,448,834 of Unpaid Secured Real Property Tax Claims;

25   $1,136,080,095 of primary Secured Claims; $11,113,695 of Mechanic Lien Claims; $13,461,053 of

26   Administrative Claims; $21,303,278 of General Unsecured Claims (exclusive of future Bond

27   Claims); $36,213,832 of Bond Safeguard future Bond Claims; and $69,409,229 of Arch future

28   Bond Claims .

### 4.1.5   Summary of the Group I Debtors' Cash.

The following chart sets forth the Group I Debtors' cash on hand as of January 31, 2011.

| DEBTORS | AMOUNT |
|---|---|
| Palmdale Hills - ELR Escrow | $   201,805.57 |
| Palmdale Hills | 16,861,677.73 |
| Palmdale Hills | 409,634.80 |
| Palmdale Hills | 2,717,151.17 |
| Palmdale Hills | 343,000.00 |
| SunCal Bickford | 1,105,003.87 |
| SunCal Bickford | 0.00 |
| **Voluntary Debtors' Total** | $22,068,699.99 |
|  |  |
| SunCal Marblehead | 1,745,046.39 |
| SunCal PSV | 3,516.63 |
| **Trustee Debtors' Total** | $11,703,872.82 |
|  |  |
| **Total** | $33,772,572.81 |

Although the Lehman Lenders have alleged that they hold liens on the above cash, a preliminary review of the applicable lien documents indicates that most of the alleged liens were not validly perfected. This means that these liens can be avoided, allowing the unsecured creditors recourse to these funds. The only accounts where the Lehman Lenders' alleged liens may be valid are the accounts held by Palmdale Hills with balances of $201,805.57 and $16,861,677.73. However, even if the liens against these accounts were properly perfected, the amount secured by these liens, and their priority and their enforceability will be subject to the results of the Lehman Claim Objections and the Lehman Adversary Proceeding.

### 4.2   Factual Circumstances Leading to the Filing of the Debtors' Chapter 11 Cases.

### 4.2.1   Introduction.

In this section of the Disclosure Statement, the SunCal Proponents have provided a brief description of the relationship between the Debtors and the Lehman Entities. This background is relevant to the Group I Debtors, and in fact all of the Debtors, for the following reasons. First, most of the unsecured claims asserted against the Debtors were incurred at the insistence of the Lehman Lenders, and they would have been paid if the Lehman Lenders had honored their obligation to pay these claims. Second, a substantial part of claims that the Lehman Lenders failed to pay are being asserted against all of the Debtors. If the litigation against the Lehman Lenders discussed herein is

successful, it will, at a minimum, reduce the pool of claims against the Group I Debtors, and thereby increase the dividend payable to the remaining creditors. Third and finally, this history allows the Creditors to take the measure of the parties who are now proffering the competing plan – the Lehman Lenders.  As the within discussion will establish, the Lehman Lenders failed to pay the claims of Creditors prepetition, the Lehman Lenders attempted to foreclose upon the Group I Projects post-petition in order to deny the unsecured creditors any recovery, and finally, when this foreclosure effort failed, the Lehman Lenders attempted to destroy the Debtors' reorganization and sale efforts to manipulating LCPI's alleged automatic stay. The SunCal Plan Proponents believe that this history will lead the Creditors to conclude, when weighing the merits of the Lehman Lenders Plan offer: "Fool me once shame on you, fool me twice shame on me."

### 4.2.2    Background of the SunCal Companies.

SunCal is a family-owned and operated real estate business that has been successfully developing properties throughout the western United States for over 70 years.  SunCal's business focuses upon the "development" of residential land. A typical SunCal development begins with the acquisition of one or more parcels of raw land. Thereafter, the SunCal team develops a master plan for the acreage that incorporates streets, homes, parks, schools and commercial areas, and then it works with the applicable municipal planning authorities (the city, county, state and federal) to secure the necessary approvals or "entitlements" to gain approval of this plan. This process, which requires the assistance of land planners, civil engineers, architects, lawyers, and other land specialists, takes a period of years. Once the master plan is approved, SunCal provides for the grading of the project and the installation of the foundational infrastructure (streets, utilities, etc.) and then sells the lots or parcels within the project to merchant builders.

### 4.2.3    The Origins of the SunCal/Lehman Joint Venture.

SunCal historically financed its projects with loans and/or equity from a number of different sources.  However, beginning in 1997, an increasing number of SunCal's projects were financed by the Lehman Entities, as Mark Walsh ("Walsh"), the head of LBHI's Global Real Estate Group, began cultivating a business relationship with SunCal's principals.

1       By 2003, the Lehman Entities and SunCal had entered into joint ventures involving

2 approximately fifteen projects.  By 2007, that number had grown to over forty, and the Lehman

3 Entities had become, with limited exceptions, the exclusive provider of financing for the SunCal

4 Projects pursuant to a written agreement executed in 2006.  The Lehman Entities also consisted of

5 the Lehman Equity Members that either directly or indirectly owned a fifty percent (50%) equity

6 interest in all nine of the Trustee Debtors.

7       In their dealings with SunCal, the Lehman Representatives made no distinction between

8 Projects financed by Lehman ALI and Projects financed by LCPI. They also made no distinction

9 between the Debtors in which Lehman Equity Members held 50% equity memberships or the

10 Debtors in which the Lehman Entities held no equity membership interest.  As agents of the

11 financial partner in the parties' joint venture, the Lehman Representatives would determine which

12 Lehman Entity would provide financing on which Projects, and would dictate the structure that the

13 financing would take, according to whatever suited the Lehman Entities' needs.

14         **4.2.4**   **Lehman's Effective Control over the Management of the Debtors and**

15                    **Promises of Ongoing Funding.**

16       Prior to the market downturn in the middle of 2007, Lehman Representatives afforded

17 SunCal substantial discretion in the management and development of the Projects.  The Debtors

18 would contract with third-party vendors to perform grading, health and safety compliance,

19 construction, landscaping, and other necessary services on the Project sites, and they would work

20 with the local municipalities to obtain the necessary entitlements and other authorizations

21 necessary to proceed with development.  The Lehman Representatives, SunCal and the Debtors

22 would discuss anticipated quarterly expenditures at periodic budget meetings, and , as expenses

23 were incurred each month, SunCal and the Debtors would submit requests for payment to the

24 Lehman Representatives, supported by the necessary documentation. The Lehman Representatives

25 would then provide the funding necessary to pay these expenses.

26       During the third quarter of 2007, the foregoing management and payment dichotomy

27 changed, after the real estate market experienced a sudden downturn, and many of the Projects

28 significantly declined in value.  In response to this dramatic economic change, a series of high

1    level discussions occurred between SunCal's representatives and the Lehman Representatives --

2    including Walsh, Paul Hughson ("Hughson") and Frank Gilhool ("Gilhool"), the Managing

3    Directors of Lehman's Global Real Estate.  In these discussions, SunCal's representatives, acting

4    on behalf of the Debtors, expressed concerns about the loans on the Projects being out of balance,

5    and suggested shutting down the Projects, or at least slowing the pace of development.  However,

6    Walsh specifically instructed SunCal not to slow down or stop work.  He assured SunCal that the

7    Lehman Entities would provide the necessary funding to pay vendors and to keep the development

8    of the Projects moving forward.

9        The foregoing assurances of payments were confirmed in numerous telephone

10   conversations between Gilhool and SunCal's COO, Frank Faye ("Faye"), and/or SunCal's

11   General Counsel, Bruce Cook ("Cook") that took place during 2007 and 2008. In each exchange,

12   Gilhool assured SunCal that the Lehman Entities were committed to funding the debts and

13   obligations being incurred at the Projects and they continued to insist that work proceed.

14       During this time frame, the Lehman Representatives became much more "hands on,"

15   scrutinizing and approving all budgets and expenses through a new control and approval structure.

16   Under the new structure, SunCal would submit budgets to the Lehman Representatives on a

17   weekly basis and explain, during period conference calls, what Project payables they believe had

18   to be paid and what work had to be performed on the Projects.  The Lehman Representatives

19   would then unilaterally decide what future work would proceed, the Lehman Representatives

20   would authorize the work and the Lehman Representatives would decide what payables would be

21   paid timely by designating them as "urgent," and what other payables were not urgent and hence

22   would not be paid on a timely basis.  However, even under this new Lehman controlled

23   management and payment regime, the Lehman Representatives made it clear that all payables

24   being incurred would be funded.

25          **4.2.5    The 2008 Restructuring Agreement.**

26       By the fall of 2007, both SunCal and the Lehman Representatives contemplated entering

27   into restructuring agreement in the near term, with a closing to occur no later than January or

28   February of 2008.  However, this transaction was delayed by the Lehman Entities' extensive

-34-

1    documentation demands until May 23, 2008. On this date, SunCal and most of the Debtors finally

2    entered into an omnibus "Restructuring Agreement" with LBHI, Lehman ALI and the other

3    Lehman Entities.  The same Lehman Representative signed the Restructuring Agreement on behalf

4    of all of the Lehman Entities.

5         Pursuant to the Restructuring Agreement, Lehman ALI, "as the Lender with respect to each

6    Loan," committed, among other things, to: (1) make advances under existing loans to fund the

7    continuing costs necessary to preserve the value of the Projects; (2) move forward to resolve the

8    accrued outstanding subcontractor payables, i.e., to make sure that the Projects' creditors were

9    paid for their work; and (3) to close the transaction, whereby newly-created Lehman Entities

10   would assume the debt and obligations of the Projects.

11        As originally executed in May 2008, the Restructuring Agreement applied to twelve of the

12   twenty Projects (as well as several other projects not at issue in the Lehman Adversary

13   Proceeding):  (1) Acton Estates; (2) Beaumont Heights; (3) Bickford Ranch; (4) Emerald

14   Meadows; (5) Heartland; (6) Johannson Ranch; (7) Marblehead; (8) Northlake; (9) Oak Valley;

15   (10) Pacific Point; (11) Ritter Ranch; and (12) Summit Valley.  The Debtors that owned and/or

16   held equity interests in the entities that owned  these Projects were signatories to the May 2008

17   agreement.[3]

18        Between May and August 2008, the parties agreed to add four additional projects to the

19   Restructuring Agreement: (1) Del Rio; (2) Joshua Ridge; (3) Palm Springs Village; and (4) Tesoro

20   Burnham, and the four Debtors associated with these Projects–SunCal Del Rio, SCC

21   Communities, SunCal PSV, and SunCal Tesoro.  Only four Projects were  not included in the

22   Restructuring Agreement: Century City, Delta Coves, Oak Knoll and Del Amo.  Accordingly, the

23

---

24   [3] Specifically, the Restructuring Agreement was entered into by, among others, the "Borrowers,"
     "Grantors" and "Pledgors," as defined in Annex 1 thereto.  The "Borrowers" included SunCal Marblehead,
25   SunCal Heartland, SunCal Northlake, SunCal Oak Valley, SJD Partners, Palmdale Hills, SCC Palmdale,
     SunCal I, SunCal III, and SunCal Bickford.
26
     The "Grantors" included SunCal Marblehead, SunCal Heartland, SunCal Northlake, SunCal Oak Valley,
27   SJD Partners, Palmdale Hills, SunCal Bickford, SunCal Acton, SunCal Summit and SunCal Emerald, and
     Debtors SunCal Beaumont and SunCal Johannson.
28
     The "Pledgors" included SCC Palmdale, SunCal I, SunCal Summit and SJD Development.

MAINDOCS-#160298-v1-Disclosure_Statement_Group_I.DOC

1    four Debtors associated with these Projects–SunCal Century City, Delta Coves, SunCal Oak Knoll

2    and SunCal Torrance–were not signatories thereto.  Lehman ALI was the lender on each of these

3    Projects and , and as with the other Projects, Lehman Ali continued to insist that these four debtors

4    proceed with the development of the four Projects, it approved all expenses, and it continually

5    provided assurances of payment.

6               **4.2.6    The Lehman Lenders Hire Radco.**

7               Subsequent to the execution of the Restructuring Agreement, Lehman ALI arranged for a

8    third party, Radco, to directly settle outstanding contractor payables, as its agent.  Radco was

9    provided some limited funding and authority to negotiate settlements, and did in fact reach

10   settlement with a number of creditors.  The funding for these settlements, whether the debts related

11   to Lehman ALI or LCPI funded Projects, came from the same source.  Lehman ALI and LCPI also

12   provided approval for new work on the Projects, and Lehman ALI paid for some of this work.

13   However, this funding was minimal and it soon stopped.

14              In August 2008, Lehman ALI withdrew funding and settlement authority from Radco,

15   leaving millions of dollars in outstanding contractor payables unresolved, notwithstanding the

16   contrary provisions in the Restructuring Agreement.  Leman Ali's actions also impaired the

17   Debtors' ability to resolve ongoing public health and safety issues arising at the Projects.

18   Ultimately,  only a fraction of the total outstanding payables were resolved, contrary to the  past

19   promises made by Lehman Representatives.

20              **4.2.7    The Lehman Lenders' Failure to Close on the Settlement Agreement.**

21              Pursuant to the terms of the Restructuring Agreement, the parties agreed to enter into a

22   Settlement Agreement, the form of which was attached to the Restructuring Agreement.  The

23   Settlement Agreement provided for the transfer of the Projects included within the Restructuring

24   Agreement to a series of  newly formed Lehman-controlled entities (each with "SCLV" in its

25   name, for "SunCal-Lehman Venture"). The agreement further provided that the entity taking title

26   to the Project would assume the  Lehman Lender debt obligations associated with the Projects,

27   assume certain bond obligations associated with the Projects, and provide indemnifications to

28   SunCal and the Debtors for unpaid claims.

1    The On August 25, 2008, the Settlement Agreement and a series of related documents were

2    formally executed by SunCal and the applicable Lehman Lenders and Lehman Equity Members at

3    a meeting was held in Los Angeles on August 25, 2008.  Once these documents were signed, all

4    that remained was the mechanical closing of the series of transactions described in the Settlement

5    Agreement. Since all of the conditions precedent to the latter closings had been satisfied, or could

6    have been satisfied at the meeting, this should have occurred at the August 25, 2008 meeting.

7    However, the Lehman Representative asked SunCal to extend the closing date for thirty days, to

8    September 30, 2008. Accordingly to the Lehman Representatives, this short extension would

9    enable them to secure certain outstanding third party consents. Although SunCal knew these third

10    party consents were readily available, they agreed to this extension, believing the request was

11    made in good faith. In fact, as more fully explained blow, it was not..

12    ### 4.2.8    <u>The Lehman Lenders' Undisclosed Sale of Most of the Debtors' Loans</u>.

13    As explained above, the Settlement Agreement was duly executed by all parties at a formal

14    closing meeting held on August 25, 2008. When the parties signed this agreement, which was a

15    binding contract, they both represented that they both intended and had the power and capacity to

16    perform all of the obligations undertaken therein. However, in the case of the Lehman Entities, this

17    representation was later discovered to be false. When the closing occurred on August 25, 2008, the

18    Lehman Lenders had already sold the very obligations they were agreeing to assume and

19    restructure in the Settlement Agreement to Fenway Capital pursuant to a repurchase agreement.

20    Accordingly, as of August 25, 2008, they lacked the power to perform the most essential

21    undertakings that they agreed to perform in the Settlement Agreement. Instead of disclosing this

22    fact at the August 25, 2008 meeting, the Lehman Lenders prevaricated and asked for the extension

23    of the closing date. This prevarication was necessary for an obvious reason: They lacked the ability

24    to perform the very obligations they had just agreed to perform in the Settlement Agreement.

25    The Lehman Representatives also did not disclose at the August 25, 2008 closing that they

26    intended to sell the Pacific Point First Loan to Lehman Re, approximately a week later, *even*

27    *though this loan was also subject to the Settlement Agreement*. To the contrary, the Lehman

28

1   Representatives affirmatively concealed these facts from SunCal and the Debtors by asserting that

2   ownership still existed in the case of seven of the eight loans.

3                    **4.2.9    Lehman's Foreclosure Sale and Purchase of the Pacific Point Project.**

4           At the time of the Restructuring Agreement and the Settlement Agreement were signed, the

5   Pacific Point Project, which was still owned by SJD Partners, was among the Projects included in

6   the Restructuring Agreement and the Settlement Agreement.  Pursuant to the Restructuring

7   Agreement, and as detailed in the Settlement Agreement attached thereto, SunCal, SJD Partners,

8   and its parent company, SJD Development, all agreed that they would not interfere with Lehman

9   ALI's (or its designee's) foreclosure on the Pacific Point Project. They further agreed that a new

10  Lehman entity, LV Pacific Point, would purchase the Pacific Point Project upon foreclosure and

11  that Lehman ALI and LV Pacific Point would (a) assume SJD Partners' and SJD Development's

12  outstanding accounts payable for Pacific Point third-party vendors, (b) assume the bond liability

13  associated with the Pacific Point Project, and (c) pay for the millions of dollars worth of work that

14  Lehman ALI representatives had authorized.

15          As previously stated, the Settlement Agreement was signed on August 25, 2008 by the

16  SunCal parties, including SJD Partners and SJD Development.  It was also signed by Gilhool as

17  authorized signatory on behalf of both Lehman ALI and LV Pacific Point.  As a signatory to the

18  Settlement Agreement, LV Pacific Point was required to purchase the Pacific Point Project at the

19  foreclosure sale subject to the above obligations. Consistent with this agreement, the City of San

20  Juan Capistrano executed an estoppel certificate for the benefit of SJD Partners and Lehman ALI—

21  at Lehman ALI's request—on August 26, 2008, two days before the foreclosure sale.  This

22  certificate stated, among other things, that the "Acquiring Entity [LV Pacific Point] shall by

23  operation of law become the legal successor-in-interest to Developer [SJD Partners]" under SJD

24  Partners' agreements with the City. That certificate further provided that there existed no

25  breaches, defaults, or claims under SJD Partners' agreements with the City.

26          On August 28, 2008, Lehman ALI foreclosed on the Pacific Point Project, and title was

27  transferred to LV Pacific Point at the foreclosure sale.  However, Lehman ALI and LV Pacific

28  Point failed to assume the liabilities and obligations associated with this Project as agreed.   This

1   breach of the parties' agreement, left SJD Partners without title to the Pacific Point Project, but

2   with the potential liability for the $50 million in unsecured claims relating to the Project, including

3   bond claims of approximately $34 million,.  Moreover, since Lehman Ali and LV Pacific Point

4   have continued to ignore their obligations under the above agreement, unpaid taxes, fines, and

5   penalties have continued to accrue to the detriment of the Project and these claims are being

6   asserted against SJD Partners..

7        Had SunCal, SJD Partners and SJD Development known that Lehman ALI and LV Pacific

8   Point had no intention of honoring their obligations under the foregoing agreement, they never

9   would have agreed to cooperate with the foreclosure.  Instead, SJD Partners would have filed for

10  bankruptcy earlier, thereby mitigating the damages from Lehman Ali's breach, by allowing

11  creditors recourse to the value of the Project.

12        This course of conduct is relevant to the unsecured creditors of the Group I Debtors for the

13  following reason. The holders of bond claims against SJD Partners are asserting their massive

14  claims against the estates of all of the Debtors, including the estates of the Group I Debtors.

15  Accordingly, Lehman Ali's wrongs against SJD Partners directly affect the Group I Debtors'

16  cases.

17        **4.2.10 <u>Alvarez and Marsal Take Over Control of the Lehman Entities After</u>**

18             **<u>the Chapter 11 Filings of LBHI and LCPI</u>.**

19        LBHI filed for bankruptcy in September 2008 and LCPI filed for bankruptcy in October

20  2008.  After LBHI's filing, Bryan Marsal ("Marsal") of Alvarez & Marsal ("A&M") was

21  appointed to serve as LBHI's Chief Restructuring Officer. Marsal and A&M are in charge of

22  liquidating the now defunct Lehman Entities, including Chapter 11 debtors LBHI and LCPI, and

23  the non-bankrupt Lehman Lenders (Lehman ALI, OVC, and Northlake Holdings, as well as the

24  non-bankrupt Lehman Equity Members.

25        Although A&M was not employed until after the events that occurred on August 25, 2008

26  described above, it should be noted that A&M hired the same law firm that represented the

27  Lehman Lenders in the August 25, 2008 meeting – Weil, Gotshal & Manges, LLP. Moreover, as

28  more fully explained herein, it was A&M that directed Lehman Ali not to perform its contractual

1    obligations under the Settlement Agreement after September of 2008. Accordingly, the same

2    individuals that caused the damages to unsecured creditors by insisting upon the breach of the

3    Settlement Agreement, are now asking for their vote in the competing plan filed by the Lehman

4    Lenders.

5         LBHI's bankruptcy filing and the Lehman Lenders refusal, at A&M's direction, to close

6    the transactions provided for under the Settlement Agreement as agreed, were not small matters.

7    They severely damaged the Debtors. Although the Debtors were not proceeding with any new

8    construction or development, the Debtors were still required to expend significant sums on site

9    security, erosion control, property taxes and other measures in order to prevent the Projects from

10    becoming a public safety hazard, and in order to avoid the loss of valuable entitlements, and to

11    mitigate penalties and fines being incurred by the Projects. Although SunCal and the Debtors

12    repeatedly requested that the Lehman Entities pay for critical health and safety and value

13    preservation measures on the Projects, these efforts were unavailing.

14         Between October 9 and November 4, 2008, SunCal's general counsel Cook sent Robert

15    Brusco, an authorized agent of the Lehman Entities, nearly two dozen letters requesting that the

16    Lehman Lenders provide the funding necessary to address critical needs on the Projects as

17    promised. A summary of these health and safety notices are attached hereto as Exhibit "5". The

18    Lehman Entities ignored these requests until November 2008, when Brusco, purportedly on behalf

19    of the Lehman Lenders, delivered the message that the Lehman Lenders were unwilling to fund

20    the Projects and that, instead, they intended to foreclose on all of the Projects.

21         As a result, as set forth in Exhibit "4," there are now over 240 vendors, municipalities,

22    counties and bonding companies claiming over $400 million in work, improvements and property

23    tax claims against the Projects. Substantially all of these sums are due to work performed or

24    bonded at Lehman's request based upon Lehman's promises of payment.

25    **4.3    The Debtors' Potential Preferential Transfers**.

26         Attached hereto as Exhibit "6" are charts setting forth payments made to third parties

27    during the ninety (90) day time period preceding the filing of the Debtors' Chapter 11 Cases as

28

1    well as payments made to the Lehman Entities and to SunCal Affiliates during the one-year time

2    period preceding the filing of the Debtors' Chapter 11 Cases.

3    As the charts in Exhibit 6" indicate, approximately $8,381,780 in payments were made to

4    non-insiders within the 90 day period preceding the Petition Dates for the Group I Debtors, and

5    approximately $2,591,931 in payments were made to SunCal Affiliates within the one year period

6    preceding the Petition Dates for the Group IV Debtors.  Approximately $6,195,440 in payments

7    were made to the Lehman Entities by Delta Coves within the one-year time period preceding the

8    Petition Date for Delta Coves.[4]

9    The Trustee and the Debtors are still in the process of investigating the amount of potential

10    preference claims that may exist in favor of the estates.  As of March 1, 2011, the Voluntary

11    Debtors had commenced Avoidance Actions to avoid and recover transfers, in the aggregate

12    amount of $3,790,452, made with the ninety (90) day time period preceding the filing of the

13    Debtors' Chapter 11 Cases with respect to the Group I Debtors, with respect to which (i) the

14    Voluntary Debtors had collected or settled to collect the amount of $23,280, and (ii) the aggregate

15    amount of $3,790,452 remained unresolved.

16    The Debtors have filed their pending Fourth Amended Complaint against the Lehman

17    Entities.  This complaint includes causes of action for, among other things, the recovery of the

18    preferential payments made to the Lehman Entities referenced above.  As to SunCal Affiliates,

19    Acquisitions believes, and counsel to the Trustee has preliminarily opined, that such entities either

20    have ordinary course or new value defenses for all payments received during the one-year time

21    period preceding the Petition Dates.

<div align="center">

**V.**

**SIGNIFICANT EVENTS IN THE DEBTORS' CHAPTER 11 CASES**

</div>

24    **5.1.    Voluntary Debtors.**

25    **5.1.1    Joint Administration of the Voluntary Debtors and the Trustee**

26    **Debtors.**

27

28    ───────────────

[4] Pending Fraudulent Conveyance and Preference Actions against the Lehman Entities and a discussion of intercompany Claims between the Debtors' Estates are discussed in detail in Section V of this Disclosure Statement.

MAINDOCS-#160298-v1-Disclosure_Statement_Group_I.DOC

1    Since their respective Petition Dates, the seventeen (17) Voluntary Debtors have continued

2    to operate as "debtors-in-possession," subject to the supervision of the Bankruptcy Court and in

3    accordance with the Bankruptcy Code.  The Voluntary Debtors are authorized to operate their

4    businesses in the ordinary course during the Chapter 11 proceedings.  Transactions outside the

5    ordinary course of business must be approved by the Bankruptcy Court.

6    The Voluntary Debtors' Cases are being jointly administered pursuant to orders entered on

7    November 19, 2008 and December 9, 2008.  The Voluntary Debtors' Cases are being jointly

8    administered with the Trustee Debtors' cases pursuant to an order entered on March 11, 2009.

9    The Voluntary Debtors have employed Winthrop Couchot Professional Corporation as

10   their general insolvency counsel, Morgan Lewis & Bockius LLP as their special litigation counsel

11   for the Southern District of New York and the MB Firm as their special litigation counsel.

12   ### 5.1.2    The Voluntary Debtors Court Employed Professionals.

13   The Voluntary Debtors' Committee has employed Irell & Manella LLP as its counsel

14   pursuant to an order entered on February 13, 2009.

15   Pursuant to the Court's Order regarding joint administration of the Voluntary Debtors, the

16   Voluntary Debtors' liability for professional fees is joint and several among the Voluntary

17   Debtors' Estates for fees incurred related to services for the benefit of all of the Voluntary

18   Debtors.  The Trustee Debtors' liability for professional fees is not joint and several.

19   Pursuant to the initial MB Firm employment application, Acquisitions was responsible for

20   the payment of their fees until December 31, 2009.  The MB Firm's application also allows for

21   payments from the Bond Companies.  The initial MB Firm employment application reserved the

22   right, should the Lehman Adversary Proceeding result in a benefit accruing to a particular

23   Debtors' Estates, to request that its fees and expenses be reimbursed by the Debtors' Estates.  The

24   Bond Companies have also agreed to jointly fund a portion of the professional fees and expenses

25   of the MB Firm with respect to the Lehman Adversary Proceeding.  The Bond Companies'

26   funding commitment can be terminated and after such a termination they will only be required to

27   cover fees and costs incurred during the period of their prior commitments.

28

1      The MB Firm employment application was subsequently amended.  Pursuant to an order

2  entered on April 14, 2010, (1) the Voluntary Debtors will pay up to one-half of the fees and

3  expenses incurred by the MB Firm from and after February 1, 2010 onward; and (2) the Trustee

4  Debtors do not have an obligation to pay any of the MB Firm's fees pertaining to the Trustee

5  Debtors' estates, unless and until a loan by the Voluntary Debtors to the Trustee Debtors is agreed

6  to by the Trustee and approved by the Court, or in accordance with the terms of the original

7  employment applications to the extent not superseded or modified by the amended employment

8  application.  The order does not affect the MB Firm's right to seek payment from the Bond

9  Companies without the need for an additional order of the Court.

10      The MB Firm recently filed an application seeking to further amend their employment to

11  include the right to pursue certain claims against the Lehman Entities and certain employees and

12  agents of these entities on behalf of the Voluntary Debtors.  The claims encompassed by this

13  amendment include claims that are based upon both prepetition and post-post petition actionable

14  conduct under both state law and federal law against the Lehman Entities and/or their agents.

### 5.1.3   LCPI's Motions for Relief from the Automatic Stay Against Certain of the Voluntary Debtors' Projects and Related Appeals.

17      On January 23, 2009, LCPI and Lehman ALI filed various motions for relief from the

18  automatic stay against Palmdale Hills, SCC Palmdale, SunCal Beaumont, SunCal Summit Valley,

19  SunCal Emerald, SunCal Bickford, Acton Estates, SunCal Johannson, and SCC Communities I

20  (the "Lehman Entities' Stay Motions").  Although the Debtors, were able to defeat these motions,

21  they are relevant in the following respect. Had the motions filed by LCPI and Lehman Ali

22  succeeded, it is almost certain that unsecured creditors would have received nothing on their

23  claims. Moreover, as more fully explained herein, since Lehman Ali and LCPI did not even own

24  the loans they were seeking to foreclose upon, Accordingly, these motions should never have been

25  filed in the first instance. Yet now, these same parties- Lehman Ali and LCPI – are asking these

26  same creditors to vote on their plan and to "trust" them.

### 5.2.   The Trustee Debtors and Their Professionals.

1     Orders for Relief were entered in the involuntary cases beginning on January 6, 2009.  The

2   Trustee Debtors are represented by their duly-appointed Chapter 11 Trustee, Mr. Steven M. Speier

3   pursuant to orders of the Bankruptcy Court entered on January 15, 2009.

4     The Chapter 11 Trustee has employed the Lobel Firm as the Chapter 11 Trustee's general

5   insolvency counsel and the MB Firm, as special litigation counsel and Squar Miller, LLP as its

6   accountants.

7     The Trustee Debtors' Committee has employed Weiland, Golden, Smiley, Wang Ekvall &

8   Strok as its general insolvency counsel.

9     **5.3.**     **The Debtors' Various Motions Relating to Financing for the Projects and to**

10            **Pay Professional Fees.**

11         **5.3.1    The Voluntary Debtors' Initial Motion for Surcharge and Use of Cash**

12                **Collateral.**

13     On January 16, 2009, seven of the Debtors, including Group I Debtor Palmdale Hills, filed

14   a motion authorizing Palmdale Hills to use and surcharge, pursuant to 11 U.S.C. § 506(c), and/or

15   use the purported cash collateral of LCPI arising from the Ritter Ranch Loan Agreement, pursuant

16   to 11 U.S.C. § 363(c)(2), in order to pay for the reasonable and necessary maintenance expenses

17   required to preserve the value of such Debtors' Projects subject to deeds of trust and other security

18   interests held by LCPI.

19     LCPI objected to the motion and subsequently filed a motion in its own Chapter 11

20   proceeding in the Southern District of New York seeking an order barring the motion as a

21   violation of the automatic stay.  Although the Debtors believe that LCPI's stay was not violated in

22   any way by the Motion, the Motion was taken off calendar prior to any ruling by the New York

23   Bankruptcy Court, based upon the threat of sanctions made against Debtors' counsel by the

24   presiding judge in LCPI's case.

25     As explained above, LCPI did not even own an interest in the Ritter Ranch Loan

26   Agreement when it asserted the automatic stay, since the Ritter Ranch Loan Agreement, which

27   was the subject of the cash collateral motion, had already been sold pursuant to the Fenway

28   Repurchase Agreement. Yet this wrongful action prevented Palmdale Hills from using its own

1  money to pay critical bills that Lehman Ali, LCPI's parent was contractually required to fund in

2  the first instance.

3

4

5  ### 5.3.2    The Lehman Administrative Loans.

6  As explained above, after the Petition Dates, the Debtors collectively demanded that the

7  Lehman Lenders comply with their contractual obligations to pay for the costs of maintaining and

8  preserving the value of the Projects, including the Group I Projects. However, the Lehman Lenders

9  not only refused to comply with their obligations, they actively attempted to bar the Debtors from

10  using their own funds to pay these critical costs, in the hope of forcing the Debtors to yield the

11  Projects without a fight.

12  In the face of the foregoing refusal and active interference, the Chapter 11 Trustee agreed

13  to enter into several stipulations with Lehman ALI for financing (in the total approximate amount

14  of $8,663,791 for the Group I Debtors) to pay for real property taxes and urgent public health and

15  safety issues on the Projects and to pay professionals under the caveat that such professionals

16  would not be paid for services against the Lehman Entities.  In return for this "forced loan", the

17  Lehman Lenders insisted that the Chapter 11 Trustee agree to withdraw a motion  providing for

18  the sale of certain Projects free and clear of the Lehman Lenders' Disputed Liens, and the Chapter

19  11 Trustee agreed.

20  ### 5.3.3    The Voluntary Debtors' Agreements with the Lehman Entities for Use

21  ### of Alleged Cash Collateral to Maintain the Properties and to Pay

22  ### Professional Fees.

23  On September 1, 2009, with the consent of the Lehman Entities, fourteen of the Voluntary

24  Debtors filed a motion authorizing surcharge pursuant to 11 U.S.C. § 506(c), and/or use of the

25  purported cash collateral for the purpose of addressing critical public health and safety issues and

26  other value preservation with respect to the Debtors Projects.  On September 10, 2009, the Lehman

27  Entities filed an opposition thereto, and on September 17, 2009, the Voluntary Debtors filed their

28  Reply.

MAINDOCS-#160298-v1-Disclosure_Statement_Group_I.DOC

1    Subsequently, the Voluntary Debtors learned that the Lehman Entities lacked control

2    agreements as to the majority of the depository accounts, and thus such accounts were not subject

3    to perfected liens and therefore did not constitute "cash collateral".  On October 15, 2009, the

4    Voluntary Debtors filed a *Motion For Order Authorizing Disposition Of Certain Depository*

5    *Accounts*.  On or about October 22, 2009, the Lehman Entities filed an opposition, and on October

6    29, 2009, the Voluntary Debtors filed their Reply.

7    The motion was consensually resolved by way of the *Stipulation Pursuant To 11 U.S.C. §§*

8    *362, 363, And 364: (1) Authorizing The Use Of Cash Collateral And Alleged Unencumbered*

9    *Cash; (2) Approving Postpetition Financing; (3) Providing Administrative Expense Status; And*

10   *(4) Modifying Automatic Stay To The Extent Necessary* filed on December 8, 2009, and the order

11   thereon entered on December 17, 2009.  The stipulation provides for a 120-day budget with

12   expenses totaling approximately $5 million, pursuant to which any Cash in the Estates is used first

13   and then money borrowed from the Palmdale Hills Estate is used thereafter on an administrative

14   basis.  The agreement also permitted the Voluntary Debtors to use their alleged unencumbered

15   cash to pay its professional fees.  This agreement has been renewed on several occasions.

16   **5.4.    The Debtors' Disputes and Claims Against the Lehman Entities.**

17   **5.4.1    The Lehman Adversary Proceeding.**

18   On January 6, 2009, the Voluntary Debtors initiated the Lehman Adversary Proceeding by

19   filing their initial complaint against Lehman ALI for equitable subordination of Lehman ALI' s

20   Disputed Claims and avoidance of its Disputed Liens pursuant to Bankruptcy Code Section 510(c).

21   On February 3, 2009, the Debtors filed a First Amended Complaint, which added the Trustee

22   Debtors as co-plaintiffs and added various other causes of action.  The First Amended Complaint

23   also named OVC Holdings, Northlake Holdings and various other entities as defendants.

24   Pursuant to a hearing on a motion to dismiss held on June 11, 2009, the Bankruptcy Court

25   granted the Debtors leave to amend the second amended complaint.  Thus, on July 10, 2009, the

26   Debtors filed their Third Amended Complaint.  The Third Amended Complaint addressed many of

27   the concerns raised by the Bankruptcy Court and also included various Avoidance Actions and

28   other causes of action against the Lehman Lenders and the Lehman Successors.  The Third

-46-

1    Amended Complaint also added Fenway Capital as a defendant based upon, the discovery of the

2    facts relating to the sale of the loans Fenway Capital and based upon the Court ruling that the Repo

3    was a true sale.

4        On September 30, 2009, the Lehman Entities filed a motion to dismiss the Third Amended

5    Complaint (which motion was amended on October 7, 2009 and October 22, 2009), alleging that

6    the relief requested by certain Debtors was not available as a matter of law.  On September 30,

7    2009, Fenway also filed a motion to dismiss the Third Amended Complaint.  On January 26, 2010

8    and January 28, 2010, the Debtors filed oppositions to the motions to dismiss the Third Amended

9    Complaint filed by the Lehman Entities and Fenway, respectively.  On February 4, 2010, the

10   Lehman Entities and Fenway filed their respective replies.  The Court entered an order granting in

11   part and denying in part the relief requested in the motions to dismiss. Most notably, the Court

12   denied  the defendants request for the dismissal of  the equitable subordination claims and the

13   Court permitted the Debtors to file an amended complaint.  LCPI was dismissed as a defendant at

14   this hearing, due to the fact that it did not own any interest in the loans at issue and due to potential

15   impact of the case upon LCPI' s automatic stay.  On March 26, 2010, the Debtors filed their Fourth

16   Amended Complaint. The following is a summary of the causes of action set forth in the Fourth

17   Amended Complaint:

18                    **5.4.1.1    Equitable Subordination.**

19       Based on the pre-petition inequitable conduct of the Lehman Entities, summarized in

20   Section 4.2, the Debtors have sought to subordinate the claims and avoid the liens of the Holders

21   of the Lehman Disputed Loans to the extent necessary to pay the Claims of unpaid Creditors that

22   were damaged by the inequitable conduct.

23                    **5.4.1.2    The Fraudulent Transfer Claims.**

24       The fraudulent conveyance claims set forth in the Fourth Amended Complaint include the

25   following:

26       A.        Acton Estates asserts a fraudulent conveyance claim against Fenway (as a non-

27   debtor success to LCPI) in order to avoid a lien in the amount of $342,841,322.

28

-47-

B.    SunCal Emerald asserts a fraudulent conveyance claim against Fenway (as a non-debtor success to LCPI) in order to avoid a lien in the amount of $298,457,533.

C.    SunCal Bickford asserts a fraudulent conveyance claim against Fenway (as a non-debtor success to LCPI) in order to avoid a lien in the amount of $168,651,104.

D.    SunCal Summit asserts a fraudulent conveyance claim against Fenway (as a non-debtor success to LCPI) in order to avoid a lien in the amount of $333,296,018.

E.    SunCal I asserts a fraudulent conveyance claim against Fenway (as a non-debtor success to LCPI) in order to avoid a lien in the amount of $343,221,391.

F.    SunCal III asserts a fraudulent conveyance claim against Fenway (as a non-debtor success to LCPI) in order to avoid a lien in the amount of $343,221,391.

G.    SunCal Oak Knoll asserts a fraudulent conveyance claim against Lehman ALI in order to avoid a lien in the amount of $54,565,939.

H.    SunCal Torrance asserts a fraudulent conveyance claim against Lehman ALI in order to avoid a lien in the amount of $112,956,015.

I.    SunCal Marblehead asserts a fraudulent conveyance claim against Lehman ALI in order to avoid a lien in the amount of $95,481,774.

J.    SunCal Heartland asserts a fraudulent conveyance claim against Lehman ALI in order to avoid a lien in the amount of $304,730,278.

K.    SCC Communities asserts a fraudulent conveyance claim against Lehman ALI in order to avoid a lien in the amount of $23,795,013.

L.    Tesoro asserts a fraudulent conveyance claim against Lehman ALI in order to avoid a lien in the amount of $23,795,013.

M.    Del Rio asserts a fraudulent conveyance claim against Lehman ALI in order to avoid a lien in the amount of $23,795,013.

### 5.4.1.3    The Preference Claims.

The preference claims set forth in the Fourth Amended Complaint include the following: Transfers made to a Lehman Entity by a Debtor, where such Debtor was either owned by a Lehman Equity Member (50%) or where a Lehman Equity Member of Lehman Entity controlled such

MAINDOCS-#160298-v1-Disclosure_Statement_Group_I.DOC

1  Debtor at the time of the transfer.  Furthermore, according to the Lehman Lenders' appraisals

2  submitted on the Projects of these Debtors, all of the loans were vastly undersecured at the time of

3  the transfers.

4      On April 12, 2010, the Lehman Entities filed a motion to dismiss the Fourth Amended

5  Complaint (as well as a related motion to strike portions of the same).  On that same date, the

6  Lehman Entities and Fenway, respectively, also filed answers to the Complaint denying the causes

7  of actions set forth in the Fourth Amended Complaint and alleging certain affirmative defenses.

8  Furthermore, as discussed herein, the New York Bankruptcy Court has approved Fenway's sale of

9  all Sold Loans to LCPI, which is subject to an appeal in the Second Circuit.  Consequently, the

10  filing of a fifth amended complaint may be necessary.

11          **5.4.1.4      The Debtors' Motions to Strike the Claims and Pleadings**

12                   **Arising from the Sold Loans to Fenway Capital and Related Appeals.**

13      Once the Debtors discovered that the Lehman Lenders had misrepresented their ownership

14  of seven loans– the loans sold to Fenway Capital back in August of 2008 - they filed motions, on

15  May 29, 2009, seeking an order striking the claims that were filed with respect to these sold (the

16  "Fenway Sold Loans").  The Fenway Sold Loans included the SunCal Communities I Loan

17  Agreement, the Ritter Ranch Loan Agreement, the SunCal PSV Loan Agreement, the SunCal

18  Marblehead/SunCal Heartland Loan Agreement, the Delta Coves Loan Agreement, the SunCal

19  Northlake Loan Agreement and SunCal Oak Valley Loan Agreement.  See Exhibit "3."

20      At the initial hearing on the Debtors' motion to strike the Claims held on June 30, 2009, the

21  Court held that the transfer of the Fenway Sold Loans pursuant to the MRA was a true purchase and

22  sale transaction (the "Ownership Issue") and, accordingly, the Lehman Lenders retained no right to

23  file the Proofs of claim on this basis, under Federal Rule of Bankruptcy Procedure 3001(e)(1).  The

24  Court entered an order regarding the Ownership Issue on October 2, 2009.

25      The Lehman Lenders also contended that they were entitled to file the Proofs of Claim as

26  the "Fenway's authorized agent" under Federal Rule of Bankruptcy Procedure 3001(b) (the

27  "Agency Issue").  A continued hearing on the Agency Issue was set for September 22, 2009 and the

28  Court ruled that the Lehman Lenders could file the Proofs of Claim an authorized agents.

1    The Lehman Entities appealed the Ownership Issue and the Debtors appealed the Agency Issue to

2    the Bankruptcy Appellate Panel.  These two appeals, which were consolidated, were argued in

3    September of 2010. The parties are awaiting a ruling.

4           **5.4.1.5**    **The Debtors' Motion Pursuant to Section 506(d) and the 506(d)**

5           **Valuation Stipulation.**

6          Bankruptcy Code Section 506(a) provides that an asserted Secured Claim is only an

7    Allowed Secured Claim to the extent of the value of such Creditor's interest in the Estate's

8    interest in such property.  Bankruptcy Code Section 506(d) then provides that liens against the

9    Debtor's Assets that have no such value to the Alleged Secured Creditor are void.  Finally,

10    Bankruptcy Code Section 551 provides that such liens that are void under Section 506(d) are

11    preserved for the benefit of the applicable Debtor's Estate.

12          On May 29, 2009 and June 9, 2009, the Debtors filed a motion seeking orders (i) valuing

13    certain collateral at zero dollars, (ii) voiding the corresponding liens, pursuant to 11 U.S.C. §

14    506(d), and (iii) preserving such voided liens for the benefit of the respective bankruptcy estates.

15          The Debtors and the Lehman Entities subsequently entered into a stipulation to resolve the

16    valuation of such Liens. This stipulation provided that these liens would be valued at zero for all

17    purposes, with the exception of potential equity distributions. Although the Lehman Entities

18    acknowledged the stipulation on the record before the bankruptcy court, and promised to file the

19    executed stipulation that day, counsel for the Lehman Entities subsequently refused to file the

20    document disclosed to the Court on the record, and the parties have subsequently entered into a

21    modified stipulation on substantially similar terms that have been filed with both the New York

22    and California Bankruptcy Courts.

23           **5.4.1.6**    **Debtors' 502(d) Objections and Objection to Lehman's Claim**

24           **Against Acton.**

25          The Voluntary Debtors and other parties-in-interest will shortly file a motion to disallow,

26    pursuant to 11 U.S.C. § 502(d), the following Disputed Claims filed by Lehman ALI and LCPI

27    based on the various causes of action set forth in the Lehman Adversary Proceeding, as well as

28

other potential defenses to the Lehman Entities Disputed Claims, including but not limited to the following:

| Disputed Proof of Claim No. | Debtor | Claim Holder | Claim Amount |
|---|---|---|---|
| 6 | Acton Estates | LCPI | $343,221,391 |
| 6 | SunCal Emerald | LCPI | $343,221,391 |
| 16 | SunCal Bickford | LCPI | $343,221,391 |
| 12 | SunCal Summit | LCPI | $343,221,391 |
| 1 | SunCal I | LCPI | $343,221,391 |
| 2 | SunCal III | LCPI | $343,221,391 |
| 1 | SCC Palmdale | LCPI | $119,664,305 |
| 9 | SunCal Heartland | LCPI | $354,325,126 |
| 21 | SunCal Marblehead | LCPI | $354,325,126 |
| 12 | SunCal Oak Knoll | Lehman ALI | $158,141,365 |
| 4 | SunCal Torrance | Lehman ALI | $158,141,365 |
| 9 | SCC Communities | Lehman ALI | $ 23,795,013 |
| 7 | Tesoro | Lehman ALI | $ 23,795,013 |
| 14 | Del Rio | Lehman ALI | $ 23,795,013 |
| 21 | Delta Coves | Lehman ALI | $  2,060,231 |

The Debtors have been provided a hearing date on this motion on June 9, 2011.

### 5.4.1.7  The Lehman Recoupment Claim Objections and the State Court Action.

Pursuant to the terms of the joint ventures entered into by and among the Debtors and the Lehman Entities, the Lehman Entities were responsible for paying the costs incurred in the development of the Projects. These costs included the claims of the vendors who provided goods and services to the Projects and the claims asserted by the Bond Claimants. Although the Lehman Entities contend that they were merely "lenders," and that they did not assume any liability for these claims, as the above facts and those that will be adduced prior to and at the confirmation of the Plan will demonstrate, the Lehman Entities are in fact obligated to pay these claims.

The Debtors' contend that direct liability can be imposed on the Lehman Entities on various grounds, including the following. First, the Lehman Entities were either in a joint venture relationship with the Debtors from the outset, or this relationship developed and became a legal fixture through the Lehman Entities' course of conduct. Pursuant to this relationship, and the promises and representations made therein, the Lehman Entities agreed to be responsible for all vendor and Bond Claims incurred at or in connection with the Projects. The role of each of the

-51-

1   Debtors, by mutual agreement, was to provide development expertise and project management

2   services. The Lehman Entities were required to provide the capital necessary to fund the Projects.

3       Second, during the last eighteen months of the relationship between the parties, the

4   Lehman Entities assumed direct responsibility for all claims incurred during this period, by

5   insisting that work continue on the Projects and by repeatedly promising to pay for this work.

6   Since the Lehman Entities ordered this work, and promised to pay for the same, they bear this

7   financial responsibility.

8       Third and finally, the Lehman Entities expressly agreed to pay the vendor and bond claims

9   described in the Restructuring Agreement and in the interrelated Settlement Agreement, but failed

10  to do so as contractually agreed.

11      The Lehman Entities failure to pay the vendor and Bond Claims associated with the

12  Projects as agreed, and as was their obligation under the terms of the joint ventures, the

13  Restructuring Agreement and the Settlement Agreement, has unjustly shifted responsibility for

14  these liabilities to the Debtors in breach of the joint venture terms. The Debtors believe that the

15  Lehman Entities' wrongs convey upon the Debtors the right to reduce the claims asserted by the

16  Lehman Entities through the affirmative defense of "recoupment".  The Debtors are filing

17  objections to the Secured Claims asserted by the Lehman Entities based upon these objections (the

18  "Lehman Recoupment Claim Objections"). If these claim objections are sustained by the Court,

19  then, in the case of the recoupment, the amount of damages incurred by the Debtors on account of

20  the Lehman Entities' failure to pay the vendor and bond claims will directly reduce the amount of

21  the Lehman Entities secured claims, leaving equity available for the payment of all Allowed

22  Unsecured Claims.[5]  The Debtors have been provided a hearing date on this motion on June 9,

23  2011.

24

25

26

27  [5] Recoupment is a defense under California law. These defenses are being pursued through claim
    objections, which are not subject to the automatic stay. *See In re Wheatfield Business Park*, 308 B.R. 463,
    466 (9th Cir. BAP 2004); *In re Financial News Network*, 158 B.R. 570 (S.D.N.Y. 1993); *In re Metiom*, 301

28  B.R. 634, 638-639 (Bankr.S.D.N.Y. 2003); *In re PRS Ins. Group*, 331 B.R. 580, 587 (Bankr.D.Del. 2005);
    *In re Meade*, 1999 WL 33496001, 1 (E.D.Pa. 1999).

MAINDOCS-#160298-v1-Disclosure_Statement_Group_I.DOC

1    Certain Voluntary Debtors have also filed the State Court Action against Lehman ALI and

2    other non-debtor Lehman Entities.  The State Court Action is based on Lehman ALI's breach of

3    contract on the Restructuring and Settlement Agreements.

### 5.4.1.8    The Debtors' Potential Post-Petition Claims Against Lehman and Their Agents.

6    The Voluntary Debtors believe that the Lehman Entities and certain agents of the Lehman

7    Entities (the "Culpable Agents") engaged in a post-petition course of conduct that severely

8    damaged the Voluntary Debtors, their estates and the recovery rights of creditors. In summary, the

9    actions taken by the Lehman Entities and the Culpable Agents included, among other things, the

10   following:

11           A.      Actively concealing the prepetition sale of the Lehman Disputed Loans to

12   Fenway Capital and misrepresenting themselves as the owners of these loans during the post-

13   petition period; and

14           B.      Improperly asserting that LCPI's automatic stay barred actions in the

15   Voluntary Debtors' Chapter 11 Cases relating to two of the Lehman Disputed Loans, when in fact

16   LCPI did not own any interest in such loans and hence the stay could not apply.

17   The foregoing course of conduct inflicted millions of dollars in damages upon the

18   Voluntary Debtors in the form of additional fees and costs, and it materially delayed the progress of

19   the Voluntary Debtors' reorganization effort. The Voluntary Debtors intend to seek recourse

20   against the Culpable Agents for these wrongs.

### 5.5.    The Lehman Fenway Claims Transaction, Compromise Motion Filed By the Lehman Entities.

### 5.5.1    Lehman Entities' and Fenway's Proposed Claims Transaction.

24   In April of 2010, LCPI and LBHI filed that certain *Motion Pursuant To Bankruptcy Rule

25   *9019 For Authority To Compromise Controversy In Connection With A Repurchase Transaction*

26   *With Fenway Capital, LLC And A Commercial Paper Program With Fenway Funding, LLC* (the

27   "Compromise Motion.").  In the motion, LCPI and LBHI represented that they were

28   "compromising" various issues and relationships arising out of the repurchase transaction

described in the LCPI – Fenway MRA (the "Repo"). However, a careful review of the transaction

described therein indicated that the motion was designed to accomplish the following objectives:

1. To transfer title to the Lehman Disputed Loans at issue in the Lehman
   Adversary Proceeding from Fenway Capital to LCPI, an entity that had no
   interest in five of the seven loans prepetition;

2. To allow LCPI, as the new owner of the Lehman Disputed Loans, to re-
   join the Lehman Adversary Proceeding as a defendant, and once there to
   use its automatic stay as a "sword" to stay this action;

3. To enable the Lehman Entities to thwart the pursuit of the SunCal Plan
   Proponents' Plan;

4. To bestow upon the Lehman Entities' purported competing plan an unfair
   advantage in the plan confirmation contest by delaying the effectiveness
   of critical provisions in the SunCal Plan Proponents' Plan; and

5. To shield Fenway Capital and its principals from liability and
   investigation through discovery.

At the hearing on the Compromise Motion, the bankruptcy court in New York approved

the Compromise Motion, and stated, consistent with the objectives of the Lehman Entities, that the

continued pursuit of the Lehman Adversary Proceeding would be stayed, once LCPI obtained title

to the Lehman Disputed Loans. The order reflecting this relief was entered on May 13, 2010 (the

"Compromise Order").

**5.6.**    **The Debtors' Motion for a Stay to Suspend Certain Lehman Actions.**

On September 21, 2010, the Voluntary Debtors, Acquisitions, and SunCal Management

filed a motion requesting, among other relief, for the Court to suspend the Lehman Entities

competing plan and disclosure statement unless and until the Lehman Entities agree to provide the

Debtors with relief from their automatic stay in the Debtors' Chapter 11 Cases (the "Suspension

Motion"). The Court granted this motion and stayed all matters until March 1, 2011. The Court

also ordered the parties to engage in a mediation. The Voluntary Debtors and the Lehman Entities

were unable to settle their claims through this process.

**5.7. The Debtors' Other Litigation with Non-Lehman Related Parties.**

**5.7.1    The Debtors' Failed Preliminary Injunction Motion Against the Holders of Bond Claims.**

On February 20, 2009, the Debtors filed a complaint and a Motion for Preliminary Injunction, pursuant to which the Debtors sought a Motion for Preliminary Injunction against the Holders of Bond Claims from pursuing such Claims. On February 23, 2009, the Court denied the Debtors' request for the TRO and granted the Debtors' request to require the defendants to show cause why the Motion for Preliminary Injunction should not be issued.

On March 2, 2009, several Holders of Bond Claims objected to the Motion for the Preliminary Injunction.  The objections generally alleged that the Debtors failed to show that the balancing of the equities favored granting the Preliminary Injunction versus the harm to the Holders of the Bond Claims.  At a hearing held on March 4, 2009, the Court denied the Preliminary Injunction Motion and the underlying complaint has subsequently voluntarily been dismissed without prejudice.

**5.7.2    The Contractors' Successful Motions for Relief from Stay to Pursue the Bond Claims.**

Various contractors that were hired to perform work on some of the Projects have filed motions for relief from stay with the Bankruptcy Court to pursue their purported Bond Claims. These creditors have requested that the Bankruptcy Court grant these creditors relief from the automatic stay to allow such creditors to enforce certain Claims that such creditors allege to have against some of the Debtors, including certain surety bonds that are alleged to have been issued in favor of such creditors.  The Debtors opposed the motions on the grounds that the various Debtors are indispensible parties.  The Court conditionally granted the motions provided that the Bond Claimants are able to sever the Debtors from their proceedings on the Bonds.

**5.7.3    The Non-Lehman Related Primary Secured Lenders' Successful Motions for Relief from Stay.**

Various secured creditors have filed motions for relief from stay with respect to portions of the properties owned by Seven Brothers, SunCal Summit and SunCal Beaumont.  Such secured

1    creditors are not defendants in the Adversary Proceeding and the Group I Debtors have not

2    opposed the requested relief.  A number of foreclosures have since been completed relating to the

3    parcels previously owned by Seven Brothers, SunCal Beaumont, and SunCal Summit, thereby

4    reducing the parcels owned by the Debtors in these Projects.

5

6                        **5.7.4**        **Arch's Motion for Relief from Stay.**

7            On March 10, 2010, Arch and the City of San Clemente jointly filed a motion for relief

8    from stay.  The motion requested an order granting the following relief: (1) allowing such parties

9    to obtain authorization from the Trustee for a right of entry to allow Arch, as subdivision

10   performance bond surety for debtor-in-possession SunCal Marblehead, and the City (and their

11   respective contractors and consultants) to enter onto land located entirely, or in part, on the

12   Property owned by SunCal Marblehead to complete works of improvement which, if left

13   unfinished, pose a health and safety risk to the general public; (2) to the extent such improvements

14   are located entirely, or in part, on the Project owned by SunCal Marblehead authorizing the City to

15   accept SunCal Marblehead' s offer of dedication for such improvements and the rights-of-way

16   pertaining thereto upon completion; and (3) to the extent SunCal Marblehead may have custody of

17   any equipment, materials, and supplies that are needed to complete the works of improvement,

18   Arch and City request that such equipment, materials, and supplies be released to Arch and its

19   completion contractors so that the applicable portion(s) of the Project can timely proceed.  There

20   has been no opposition to this motion.  On April 6, 2010, the Court granted this motion.

21                        **5.7.5**        **Shea's Successful Motion for Relief from Stay.**

22           On April 7, 2010, Shea Construction, Inc. filed a motion for relief from stay to pursue a

23   state court for foreclosure of liens on property previously owned by the Debtors and no longer

24   property of the Debtors' estate.  On May 14, 2010, the Court granted this motion.

25                        **5.7.6**        **Bond Safeguard Motion.**

26           Bond Safeguard, a surety that issued bonds to secure the performance of work on certain

27   projects, filed a motion seeking authority to file  claims relating to these bond claims after the bar

28   date. The Debtors opposed this motion. A hearing on the matter had not yet been held.

# VI.

## TREATMENT OF UNCLASSIFIED CLAIMS

**6.1** **Introduction**. As required by the Bankruptcy Code, the Plan places Claims and Interests into various Classes according to their right to priority.  However, certain types of Claims are not classified in any Classes under the Plan.  These Claims are deemed "unclassified" under the provisions of the Code.  They are not considered impaired and they do not vote on the Plan, because they are automatically entitled to specific treatment provided for them in the Code.  As such, the SunCal Plan Proponents have not placed the following Claims in a Class.  The treatment of these unclassified Claims is as provided below.

**6.2** **Treatment of Allowed Administrative Claims.**

The Code requires that all Allowed Administrative Claims be paid on the later of Effective Date of the Plan or the date of their allowance, unless a particular Holder agrees to a different treatment.  The treatment of Allowed Administrative Claims is as described below.  However, such Administrative Claims are continuing to be incurred.  The Allowed Administrative Claims shall be paid from the applicable Distribution Account(s) pursuant to the Acquisitions Administrative Loan.

**6.3** **Treatment and Repayment of the Lehman's Administrative Loan(s).**

Subject to any potential post-petition Claim Objection Reductions approved by the Court, the Lehman' s Administrative Loans shall continue to have a first priority lien against the respective Assets securing such loans and the applicable Net Sale Proceeds Account.  The Lehman Administrative Loans shall be payable from the applicable Net Sales Proceeds Accounts and from the Distribution Accounts of the Debtors that were the borrowers under the Lehman Administrative Loan(s) to the extent and amount that such borrower received loan proceeds.  In the event that the Plan Trust has not repaid such loan(s) by the expiration of the Sales Period, the Holders of the Lehman Administrative Loan(s) shall be free to pursue their rights and remedies against the Assets securing the Lehman Administrative Loans under applicable law.

**6.4** **Repayment of Allowed Administrative Claims Other than the Lehman Administrative Loans.**

MAINDOCS-#160298-v1-Disclosure_Statement_Group_I.DOC

Except to the extent that the Holder of an Allowed Administrative Claim agrees to a different treatment and subject to the Administrative Claims Bar Date set forth herein, the Distribution Agent shall pay each Allowed Administrative Claim in full, in Cash, on the later of (i) the Effective Date, (ii) within ten (10) Business Days after the date such Administrative Claim becomes an Allowed Administrative Claim, or (iii) the date such Allowed Administrative Claim becomes due according to its terms. Notwithstanding the foregoing, any Allowed Administrative Claim representing obligations incurred in the ordinary course of post-petition business by the Debtors in Possession (including without limitation post-petition trade obligations and routine post-petition payroll obligations) shall be paid in full or performed by the Plan Trustee in the ordinary course of business, in accordance with the terms of the particular obligation.

### 6.5    Administrative Claims Bar Date.

All applications for final compensation of Professionals for services rendered and for reimbursement of expenses incurred on or before the Effective Date and all other requests for payment of Administrative Claims incurred before the Effective Date under Sections 507(a)(2) or 507(b) of the Bankruptcy Code (except only for (i) post-petition, ordinary course trade obligations and routine post-petition payroll obligations incurred in the ordinary course of the Debtors' post-petition business, for which no bar date shall apply, and (ii) post-petition tax obligations, for which no bar date shall apply) shall be Filed with the Bankruptcy Court and served upon the Plan Trustee no later than the General Administrative Claims Bar Date, unless such date is extended by the Bankruptcy Court after notice to the Plan Trustee.  Any such request for payment of an Administrative Claim that is subject to the General Administrative Claims Bar Date and that is not Filed and served on or before the Administrative Claims Bar Date shall be forever barred; any party that seeks payment of Administrative Claims that (i) is required to file a request for payment of such Administrative Claims and (ii) does not file such a request by the deadline established herein shall be forever barred from asserting such Administrative Claims against the Debtors, the Plan Trust, their estates, or any of their property.

### 6.6    Treatment of Priority Unsecured Tax Claims.

1    Priority Tax Claims are certain unsecured income, employment and other taxes described

2  by Code Section 507(a)(8).  The Code requires that each holder of such a Section 507(a)(8)

3  priority tax claim receive the present value of such Claim in deferred cash payments, over a period

4  not exceeding five (5) years from the petition date and that such treatment not be less favorable

5  than the treatment accorded to non priority unsecured creditors.

6    At the election of the Plan Trustee, the Holder of each Allowed Priority Tax Claim shall be

7  entitled to receive, on account of such Claim, (i) equal cash payments on the last Business Day of

8  each three-month period following the Effective Date, during a period not to exceed five years

9  after November 6, 2008, totaling the principal amount of such Claim plus simple interest on any

10 unpaid balance from the Effective Date, calculated at the interest rate available on ninety (90) day

11 United States Treasuries on the Effective Date, (ii) such other treatment agreed to by the Holder of

12 the Allowed Priority Tax Claim and the Plan Trustee, provided such treatment is on more

13 favorable terms to the Debtors (or the Plan Trust after the Effective Date) than the treatment set

14 forth in clause (i) hereof, or (iii) payment of the full Allowed Priority Tax Claim in Cash.

<div align="center">

**VII**.

### CLASSIFICATION OF CLAIMS AND INTERESTS

</div>

17    As required by the Code, the Plan places Claims and Interests into various Classes

18 according to their right to priority and other relative rights.  The Plan specifies whether each Class

19 of Claims or Interests is impaired or unimpaired, and the Plan sets forth the treatment each Class

20 will receive.  The table below lists the Classes of Claims established under the Plan and states

21 whether each particular Class is impaired or left unimpaired by the Plan.  A Class is "unimpaired"

22 if the Plan leaves unaltered the legal, equitable and contractual rights to which the Holders of

23 Claims or Interests in the Class are entitled, with certain exceptions specified in the Bankruptcy

24 Code.

| CLASSIFICATION OF HOLDERS OF SECURED REAL PROPERTY TAX CLAIMS | | |
|---|---|---|
| **Class 1** | **Claimant** | **Claim Nos.**[6] |

---

[6] These Real Property Tax Claims have been updated to include amounts for which proofs of claim have not yet been filed.

| CLASSIFICATION OF HOLDERS OF SECURED REAL PROPERTY TAX CLAIMS | | |
|---|---|---|
| **Class 1** | **Claimant** | **Claim Nos.[6]** |
| **Class 1.1** | Los Angeles County as the Holder of an Unpaid Secured Real Property Tax Claim against the Ritter Ranch Project in the amount of $4,755,857. | Palmdale Hills 12 |
| **Class 1.2** | Placer County as the Holder of an Unpaid Secured Real Property Tax Claim against the Bickford Ranch Project in the amount of $9,467,165. | Scheduled Amount |
| **Class 1.3** | Orange County as the Holder of an Unpaid Secured Real Property Tax Claim against the Marblehead Project in the amount of $2,500,646. | SunCal Marblehead 49 and 57 |
| **Class 1.4** | San Bernardino County as the Holder of an Unpaid Secured Real Property Tax Claim against the Palm Springs Village Project in the amount of $1,725,166. | SunCal PSV 22 |

| CLASSIFICATION OF LEHMAN'S DISPUTED CLAIMS | | |
|---|---|---|
| **Class 2** | **Claims** | **Claim Nos.** |
| **Class 2.1** | The Holders of Lehman's Disputed Claims filed by LCPI against SunCal Bickford arising from the SunCal Communities I Loan Agreement in the asserted amount of $343,221,391. | SunCal Bickford: 16 |
| **Class 2.2** | The Holder of Lehman's Disputed Claims filed by LCPI against Palmdale Hills arising from the Ritter Ranch Loan Agreement in the asserted amount of $287,252,096. | Palmdale Hills 65 |
| **Class 2.3** | The Holder of Lehman's Disputed Claims filed by Lehman ALI against SunCal Marblehead and SunCal Heartland arising from the SunCal Marblehead/SunCal Heartland Loan Agreement in the asserted amount of $354,325,126. | SunCal Heartland: 9 SunCal Marblehead: 21 |
| **Class 2.4** | The Holder of Lehman's Disputed Claim filed by Lehman ALI against SunCal PSV arising from the SunCal PSV Loan Agreement in the asserted amount of $88,257,340. | SunCal PSV 12 |

| CLASSIFICATION OF ASSERTED MECHANIC LIEN CLAIMS ON THE RITTER RANCH PROJECT, THE BICKFORD RANCH PROJECT, THE MARBLEHEAD PROJECT AND THE PALM SPRINGS VILLAGE PROJECT | | |
|---|---|---|
| **Class 3** | **Claimant** | **Claim Nos.** |
| **Class 3.1** | The Holder of the asserted Mechanic Lien Claim held by Asphalt Professionals against the Ritter Ranch Project owned by Palmdale Hills in the amount of $38,249. | Palmdale Hills 1 and 46 |
| **Class 3.2** | The Holder of the asserted Mechanic Lien Claim held by Sierra Cascade Construction against the Ritter Ranch Project owned by Palmdale Hills in the amount of $550,677. | Palmdale Hills 33 |
| **Class 3.3** | The Holder of the asserted Mechanic Lien Claim held by Staats Construction. Inc. against the Ritter Ranch Project owned by Palmdale Hills in the amount of $166,105. | Palmdale Hills 51 |
| **Class 3.4** | The Holder of the asserted Mechanic Lien Claim held by Southland Farmers, Inc. against the Ritter Ranch Project owned by Palmdale Hills in the amount of $177,801. | Palmdale Hills 55, 67 and 68 |
| **Class 3.5** | The Holder of the asserted Mechanic Lien Claim held by Chamelon Design Inc. against the Ritter Ranch Project owned by Palmdale Hills in the amount of $60,920. | Palmdale Hills 93, 99 |
| **Class 3.6** | The Holder of the asserted Mechanic Lien Claim held by MHM Engineers against the Bickford Ranch Project in the amount of $8,916. | SunCal Bickford 5 |
| **Class 3.7** | The Holder of the asserted Mechanic Lien Claim held by Land Architecture against the Bickford Ranch Project in the amount of $100,245. | SunCal Bickford 6 |
| **Class 3.8** | The Holder of the asserted Mechanic Lien Claim held by Kiewit Pacific Co. against the Bickford Ranch Project in the amount of $1,868,357. | SunCal Bickford 10 |
| **Class 3.9** | The Holder of the asserted Mechanic Lien Claim held by ARB, Inc. against the Bickford Ranch Project in the amount of $1,052,272. | SunCal Bickford 15 |

| CLASSIFICATION OF ASSERTED MECHANIC LIEN CLAIMS ON THE RITTER RANCH PROJECT, THE BICKFORD RANCH PROJECT, THE MARBLEHEAD PROJECT AND THE PALM SPRINGS VILLAGE PROJECT | | |
|---|---|---|
| **Class 3** | **Claimant** | **Claim Nos.** |
| **Class 3.10** | The Holder of the asserted Mechanic Lien Claim held by Independent Construction against the Bickford Ranch Project in the amount of $117,209. | SunCal Bickford 28 |
| **Class 3.11** | The Holder of the asserted Mechanic Lien Claim held by Marques Pipeline, Inc. against the Bickford Ranch Project in the amount of $330,118. | SunCal Bickford 29 and 30 |
| **Class 3.12** | The Holder of the asserted Mechanic Lien Claim held by The Jasper Companies against the Marblehead Project in the amount of $146,657. | SunCal Marblehead 29 |
| **Class 3.13** | The Holder of the asserted Mechanic Lien Claim held by Kirk Negrete, Inc. dba United Steel Placers against the Marblehead Project in the amount of $270,056. | SunCal Marblehead 38 |
| **Class 3.14** | The Holder of the asserted Mechanic Lien Claim held by RBF Consulting against the Marblehead Project in the amount of $125,093. | SunCal Marblehead 39 |
| **Class 3.15** | The Holder of the asserted Mechanic Lien Claim held by RJ Noble Co. against the Marblehead Project in the amount of $175,030. | SunCal Marblehead 42, 50 and 58 |
| **Class 3.16** | The Holder of the asserted Mechanic Lien Claim held by Orange County Stripping Services against the Marblehead Project in the amount of $11,752. | SunCal Marblehead 46 and 54 |
| **Class 3.17** | The Holder of the asserted Mechanic Lien Claim held by Savala Equipment Co. Inc. against the Marblehead Project in the amount of $34,440. | SunCal Marblehead 48 and 56 |
| **Class 3.18** | The Holder of the asserted Mechanic Lien Claim held by All American Asphalt against the Marblehead Project in the amount of $1,344,445. | SunCal Marblehead 63 |
| **Class 3.19** | The Holder of the asserted Mechanic Lien Claim held by Rockey Murata Landscaping against the Marblehead Project in the amount of $285,643. | SunCal Marblehead 60 |

| CLASSIFICATION OF ASSERTED MECHANIC LIEN CLAIMS ON THE RITTER RANCH PROJECT, THE BICKFORD RANCH PROJECT, THE MARBLEHEAD PROJECT AND THE PALM SPRINGS VILLAGE PROJECT | | |
|---|---|---|
| **Class 3** | **Claimant** | **Claim Nos.** |
| **Class 3.20** | The Holder of the asserted Mechanic Lien Claim held by BNB Engineering, Inc. against the Marblehead Project in the amount of $1,608,723. | SunCal Marblehead 37 |
| **Class 3.21** | The Holder of the asserted Mechanic Lien Claim held by Brudvik Inc. against the Palm Springs Village Project in the amount of $43,365. | SunCal PSV 4 |
| **Class 3.22** | The Holder of the asserted Mechanic Lien Claim held by Larry Jacinto Construction Inc. against the Palm Springs Village Project in the amount of $212,663. | SunCal PSV 5 and 24 |
| **Class 3.23** | The Holder of the asserted Mechanic Lien Claim held by William + Paddon Architects + Planners Inc. against the Palm Springs Village Project in the amount of $73,798. | SunCal PSV 9 and 10 |
| **Class 3.24** | The Holder of the asserted Mechanic Lien Claim held by Southern California Edison against the Palm Springs Village Project in the amount of $23,861. | SunCal PSV 26 |
| **Class 3.25** | The Holder of the asserted Mechanic Lien Claim held by Pacific Masonry Walls, Inc. against the Palm Springs Village Project in the amount of $314,061. | SunCal PSV 33 and 39 |
| **Class 3.26** | The Holder of the asserted Mechanic Lien Claim held by J.R. Simplot Company against the Palm Springs Village Project in the amount of $3,467. | SunCal PSV 34 and 40 |
| **Class 3.27** | The Holder of the asserted Mechanic Lien Claim held by Desert Pipeline Inc. against the Palm Springs Village Project in the amount of $469,784. | SunCal PSV 36, 42 and 47 |
| **Class 3.28** | The Holder of the asserted Mechanic Lien Claim held by MSA Consulting against the Palm Springs Village Project in the amount of $666,897. | SunCal PSV 43 |
| **Class 3.29** | The Holder of the asserted Mechanic Lien Claim held by Jackson DeMarco against the Palm Springs Village Project in the amount of $52,234. | SunCal PSV 45 |

| CLASSIFICATION OF PRIORITY UNSECURED CLAIMS | | |
|---|---|---|
| **Class 4** | **Claimant** | **Claim Nos.** |
| **Class 4.1** | The Holder of Priority Claims that fall within Code Sections 507(a)(2), (4), (5), (6), and (7) in the asserted amount of $10,950 against SunCal Marblehead. | Scheduled Amount and SunCal Marblehead 45 |
| **Class 4.2** | The Holder of Priority Claims that fall within Code Sections 507(a)(4), (5), (6), and (7) in the asserted amount of $10,950 against Palmdale Hills. | Palmdale Hills 70 |

| CLASSIFICATION OF GENERAL UNSECURED CLAIMS THAT QUALIFY AS RELIANCE CLAIMS | | |
|---|---|---|
| **Class 5** | **Claimant** | **Claim Nos.** |
| **Class 5.1** | The holders of Reliance Claims against SunCal Palmdale Hills. | Various Filed and Scheduled |
| **Class 5.2** | The holders of Reliance Claims against SunCal Marblehead. | Various Filed and Scheduled |
| **Class 5. 3** | The holders of Reliance Claims against SunCal PSV. | Various Filed and Scheduled |
| **Class 5.4** | The holders of Reliance Claims against SunCal Bickford. | Various Filed and Scheduled |

| CLASSIFICATION OF GENERAL UNSECURED CLAIMS THAT DO NOT QUALIFY AS RELIANCE CLAIMS | | |
|---|---|---|
| **Class 6** | **Claimant** | **Claim Nos.** |
| **Class 6.1** | Claimants  holding Allowed Unsecured Claims against SunCal Palmdale Hills that are not Reliance Claims | Various Filed and Scheduled |
| **Class 6.2** | Claimants  holding Allowed Unsecured Claims against SunCal Marblehead that are not Reliance | Various Filed and Scheduled |
| **Class 6.3** | Claimants  holding Allowed Unsecured Claims against SunCal PSV that are not Reliance Claims | Various Filed and Scheduled |
| **Class 6.4** | Claimants  holding Allowed Unsecured Claims against SunCal Bickford that are not Reliance Claims | Various Filed and Scheduled |
| CLASSIFICATION OF INTEREST HOLDERS | | |

-64-

| Class 7 | Claimant | Scheduled |
|---------|----------|-----------|
| **Class 7.1** | Allowed Interests in Palmdale Hills held by SCC Palmdale. | Scheduled Amount |
| **Class 7.2** | Allowed Interests in SunCal Marblehead held by SunCal Marblehead Heartland Master LLC. | Scheduled Amount |
| **Class 7.3** | Allowed Interests in SunCal Bickford held by SunCal I. | Scheduled Amount |

## VIII.

### THE PLAN'S TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS

**8.1.    The Plan's Treatment of Holders of Allowed Secured Real Property Tax Claims on Real Properties Subject to Deeds of Trust Arising from Lehman's Disputed Secured Claims and Disputed Liens (Classes 1.1 Through 1. 4).**

The treatment of Holders of Allowed Secured Claims in Classes 1.1 through 1. 4 under the Plan is as follows:

The Holder(s)' rights are impaired under the Plan;

A.    The Holder(s) shall retain their underlying first priority liens on the applicable real property collateral, but they are barred from pursuing their rights and remedies against this collateral until the expiration of the applicable Sales Period;

B.    If the Plan Trustee is able to consummate a sale of the applicable underlying real property collateral during the applicable Sales Period, such Holder(s) shall receive a distribution to the extent of available Net Sale Proceeds from its underlying real property collateral in accordance with the priorities set forth in the Bankruptcy Code and under applicable California law; such distribution shall include accrued interest on such Allowed Claims pursuant to Sections 506 and 511 of the Bankruptcy Code and California Revenue and Tax Code Sections 4102 and 4103(b); and

C.    If the Plan Trustee is unable to consummate a sale of the applicable underlying real property collateral during the applicable Sales Period, the Holder(s) shall be free to

MAINDOCS-#160298-v1-Disclosure_Statement_Group_I.DOC

1   pursue their respective rights and remedies against the underlying real property collateral under

2   applicable California law, but shall have no recourse against the Plan Trust or Plan Trustee.

3   **8.2.**    **The Plan's Treatment of Lehman's Disputed Claim(s) and Disputed Lien(s)**

4   **(Classes 2.1 Through 2.4).**

5   The Holder(s) of claims within Classes 2.1 through 2.4 (Lehman's Disputed Secured

6   Claim(s) and Disputed Lien(s)) shall receive the indubitable equivalent of their claims, pursuant to

7   11 U.S.C. § 1129(b)(2)(A)(iii), through the following treatment:

8   A.    <u>Treatment of Claims Secured By Assets That Are Sold On Effective Date</u>.

9   The Plan Trustee shall proceed with sale of the Group I Projects and the other Assets under the

10   following terms and conditions after the Confirmation Date. If this sale effort is successful and

11   Qualified Bids are received that will result in a closing on the Effective Date, then the following

12   treatment shall apply to Classes 2.1 through 2.4:

13   1.    The Holder(s) shall retain their interest in their Disputed Lien(s) on

14   the applicable Plan Trust's Assets pending a Final Order(s) resolving the Allowance of the

15   applicable Disputed Claim(s) and determining the validity, priority and extent of the applicable

16   Disputed Lien(s) against the applicable Plan Trust's Assets, except as provided for below;

17   2.    The Holder(s) shall be barred from pursuing their rights and

18   remedies against the Plan Trust's Assets until the expiration of the Sales Period;

19   3.    The Plan Trustee shall sell the Group I Projects that are subject to

20   the Holder(s)' Disputed Secured Claims and Disputed Liens, free and clear of such claims and

21   liens, through a sale that satisfies the following conditions:

22   (a)The Group I Projects will be sold through a public auction after a

23   commercially reasonable marketing and advertising effort of at least sixty (60) days duration;

24   (b)The SunCal Plan Proponents shall have the right to provisionally

25   accept an Opening Bid from a Stalking Horse Bidder prior to the public auction and to grant this

26   bidder a Break-Up Fee;

27

28

1                  (c)      Other Qualified Bidders shall have the right to overbid the

2 Opening Bid by submitting a Qualifying Bid that is equal to or in excess of the Minimum

3 Increment;

4                  (d)      The Qualified Bidder that submits the highest Qualifying Bid

5 shall obtain title to the Group I Project being sold, free and clear of all applicable Disputed Liens

6 and Disputed Claims; and

7                  (e)      No bidder may submit or demand the acceptance of a "credit

8 bid" based upon an existing claim or lien.

9                4.      The Plan Trustee shall sell all Plan Trust Assets ( other than the

10 Group I Debtors Projects) that are subject to the Holder(s)' Disputed Secured Claims and Disputed

11 Liens, free and clear of such claims and liens, through a sale that satisfies the following conditions:

12                (a)      All other Plan Trust Assets will be sold through a public

13 auction after a commercially reasonable marketing and advertising effort of at least thirty (30)

14 days duration;

15                (b)      The SunCal Plan Proponents shall have the right to

16 provisionally accept an Opening Bid from a Stalking Horse Bidder prior to the public auction and

17 to grant this bidder a Break-Up Fee;

18                (c)      Other Qualified Bidders shall have the right to overbid the

19 Opening Bid by submitting a Qualifying Bid that is equal to or in excess of the Minimum

20 Increment;

21                (d)      The Qualified Bidder that submits the highest Qualifying Bid

22 shall obtain title to the Project being sold, free and clear of all applicable Disputed Liens and

23 Disputed Claims; and

24                (e)      No bidder may submit or demand the acceptance of a "credit

25 bid" based upon an existing claim or lien.

26                (f)      All Net Sale Proceeds generated from such sales shall be

27 deposited into the applicable Net Sales Proceeds Account with all Disputed Claims and Disputed

28 Liens attached thereto;

MAINDOCS-#160298-v1-Disclosure_Statement_Group_I.DOC

5.      If the Plan Trustee consummates a sale or otherwise liquidates the particular Asset(s) subject to a Disputed Claim(s) and/or Disputed Lien(s) during the Sales Period, as provided for above, the Holder(s) of such Disputed Claim shall receive a distribution to the extent of available funds from the applicable Net Sale Proceeds Account(s) to the extent required by a Final Order determining the allowance and priority of the Disputed Claims and the validity, priority and extent of the Disputed Liens in, including but not limited to, the Lehman Adversary Proceeding and the Lehman Claims Objections; and

A. <u>Treatment of Claims Secured By Assets That Are Not Sold Prior To Effective Date</u>. If the Plan Trustee is unable to consummate a sale or otherwise liquidate the particular Asset(s) subject to a Lehman Disputed Claim during the Sales Period, then the following treatment shall apply in the case of unsold Projects:

1.      The Plan Trust shall be granted a lien against any Project that is senior to any Disputed Lien held by any of the Lehman Entities. This lien shall secure any recoupment or offset amount allowed by the Court in favor of the Debtor that owned such Project, pursuant to a claim objection filed by such Debtor;

2.      The foregoing lien shall only be imposed after the Effective Date, which by definition only occurs after any applicable stay protecting the Lehman Entities is lifted or deemed applicable;

3.      The foregoing lien may be enforced after the Effective Date like any other judgment under the laws of the State of California.

All other unsold Asset(s) shall be deemed abandoned by the Plan Trust, no payment shall be made to such Holder(s), and such Holder(s) shall be allowed to pursue their respective rights and remedies against the underlying collateral under applicable law subject to a Final Order determining the allowance and priority of the Disputed Claims and the validity of the Disputed Liens in, including but not limited to, the Lehman Adversary Proceeding and the Lehman Claims Objections.

**8.3.    The Plan's Treatment of Holders of Asserted Mechanic Lien Claims Against the Debtors' Projects Subject to Lehman's Disputed Claims (Classes 3.1 Through 3.29).**

The treatment of the Holders of Allowed Classes 3.1 through 3.29 Secured Claims under the Plan shall be as follows:

A.    The Holder(s)' rights are impaired under the Plan;

B.    The Holder(s) shall retain their respective underlying liens on the applicable Projects, but shall forebear from pursuing their rights and remedies until the expiration of the Sales Period;

C.    If the Plan Trustee is able to consummate a sale of the Projects subject to the liens asserted by the Holders of Class 3.1 through 3.29 claims  during the Sales Period, such Holders shall receive a distribution, to the extent of available, Net Sale Proceeds in accordance with the priorities set forth under the Bankruptcy Code, subject to a Final Order(s) resolving the allowance and priority of the applicable Lehman's Disputed Claim(s) and the validity of the applicable Lehman Disputed Lien(s) in, including but not limited to, the Lehman Adversary Proceeding; and

D.    If the Plan Trustee is unable to consummate a sale of the applicable underlying real property collateral during the Sales Period, such real property collateral shall be deemed abandoned by the Plan Trustee, no payment shall be made to such Holder(s), and such Holder(s) shall be allowed to pursue their respective rights against the real property collateral under applicable California law, subject to a Final Order(s) resolving the allowance and priority of the applicable Lehman's Disputed Claim(s) and applicable Lehman Disputed Lien(s), without recourse to the Debtor (s).

**8.4.    The Plan's Treatment of Holders of Priority Claims (Classes 4.1 Through 4.2).**

The treatment of the Holders of Allowed Priority Claims under the Plan shall be as follows:

A.    The Holder(s) are unimpaired under the Plan; and

B.      The Holder(s) shall be paid either the applicable Distribution Account(s) (i) the full amount of such Allowed Priority Claim in Cash on the later of (x) the Effective Date, (y) the date such Claim becomes an Allowed Priority Claim or (z) the date such Allowed Priority Claim becomes payable in accordance with the terms governing such Allowed Priority Claim, or (ii) upon such other less favorable terms as may be agreed to by such Holder and the Plan Trustee.

**8.5.**    **The Plan's Treatment of Holders of General Unsecured Claims that are Reliance Claims (Classes 5.1 Through 5.4).**

The Holders of Allowed Classes 5.1 through 5.4 Claims under the Plan  have the right to choose between the following treatment options:

(1) <u>Option A</u>: Any Class 5 claimant *who votes in favor of the Plan*, and who chooses Option A, will have the right to sell to LitCo all of the claimant' s right, title and interest in all Allowed Reliance Claims and all of the claimant' s Litigation Rights against the applicable Debtor, SunCal Affiliates, and the Lehman Entities, for the sum of fifty-five cents ($0.55) per dollar of allowed claim, payable in cash on or before the sixtieth (60th) date after the Confirmation Date provided there is no stay pending an appeal of the Confirmation Order, in full satisfaction of such claimant' s Allowed Reliance Claims; or

B.      <u>Option B</u>: Any Class 5 claimant who votes against the Plan, or who votes in favor of the Plan, but does not choose Option A, or who does not vote on the Plan, will retain such claimant' s Reliance Claim(s) and rights against the Lehman Entities and to receive such claimant' s share, as determined by the Court, in the benefits and recoveries resulting from a judgment or order entered in the Lehman Adversary Proceeding, the State Court Action, or the Lehman Claims Objections,  and to receive a pro-rata share of any funds payable from the applicable Distribution Account(s), after payment in full of all Post Confirmation Expenses, Allowed Administrative Claims, and Allowed Priority Claims.

The Class 5 claimants' rights are impaired under the Plan.

**8.6.**    **The Plan's Treatment of Holders of Allowed General Unsecured Claims that Are Not Reliance Claims (Classes 6.1 Through 6.4).**

1    The treatment of the Holders of Allowed Classes 6.1 through 6.4 Claims under the Plan

2    shall be as follows:

3    A.    The Holders' rights are impaired under the Plan; and

4    B.    After payment in full of Post Confirmation Expenses, Allowed

5    Administrative Claims, Allowed Priority Claims, and any sums that the Bankruptcy Court

6    determines are payable to the Holders of Allowed Classes 5.1 through 5.4 Claims from either the

7    Claim Reduction Amounts or on account of a judgment in the Lehman Adversary, the Holders of

8    Allowed Classes 6.1 through 6.4 Claims shall receive their pro-rata share of funds remaining in the

9    applicable Distribution Account(s).

10    **8.7.    The Plan's Treatment of Holders of Allowed Interests.**

11    The treatment of the Holders of Allowed Classes 7.1 to 7.3 Interest(s) under the Plan shall

12    be as follows:

13    A.    The Holders of Allowed Classes 7.1 to 7.3 Interest(s) are impaired under the

14    Plan; and

15    B.    On the Effective Date, all such Allowed Interest shall be cancelled and will

16    not receive any distribution on account of such Interest(s).

17    **IX.**

18    **ACCEPTANCE OR REJECTION OF THE PLAN**

19    **9.1.    Introduction.**

20    PERSONS OR ENTITIES CONCERNED WITH CONFIRMATION OF THE PLAN

21    SHOULD CONSULT WITH THEIR OWN ATTORNEYS BECAUSE THE LAW ON

22    CONFIRMING A PLAN OF REORGANIZATION IS VERY COMPLEX.  The following

23    discussion is intended solely for the purpose of alerting readers about basic confirmation issues,

24    which they may wish to consider, as well as certain deadlines for filing Claims.  The Debtors

25    cannot represent that the discussion contained below is a complete summary of the law on this

26    topic.

27    Many requirements must be met before the Court can confirm the Plan.  Some of the

28    requirements include that the Plan must be proposed in good faith, acceptance of the Plan, whether

the Plan pays creditors at least as much as creditors would receive in a Chapter 7 liquidation, and whether the Plan is feasible.  The requirements described herein are <u>not</u> the only requirements for confirmation.

### 9.2. <u>Who May Object to Confirmation of the Plan</u>.

Any party in interest may object to the confirmation of the Plan, but as explained below not everyone is entitled to vote to accept or reject the Plan.

### 9.3. <u>Who May Vote to Accept/Reject the Plan</u>.

A Holder of a Claim or Interest has a right to vote for or against the Plan if that Holder of the Claim or Interest has a Claim which is both (1) Allowed or Allowed for voting purposes and (2) Classified in an impaired Class.  The votes will be tabulated on a Debtor by Debtor basis.

### 9.4. <u>What Is an Allowed Claim/Interest</u>.

As noted above, a Holder of Claim or Interest must first have an Allowed Claim or Allowed Interest to vote.

### 9.5. <u>What Is an Impaired Class</u>.

A Class is impaired if the Plan alters the legal, equitable, or contractual rights of the Claims or Interests in that Class, other than the right to accelerate the Claim upon certain kinds of defaults. In this case, the Debtors believe that all Classes, except for Classes 4.1 through 4.2, are impaired.

### 9.6. <u>Who Is Not Entitled to Vote</u>.

The following four types of Claims are <u>not</u> entitled to vote: (1) Claims that have been disallowed; (2) Claims in unimpaired Classes; (3) Claims entitled to priority pursuant to Bankruptcy Code Sections 507(a)(2) or (a)(3) and Claims in Classes that do not receive or retain any value under the Plan.  Claims in unimpaired Classes are not entitled to vote because such Classes are deemed to have accepted the Plan.  Claims entitled to priority pursuant to Bankruptcy Code Section 507(a)(8) are not entitled to vote because such Claims are not placed in Classes and they are required to receive certain treatment specified by the Bankruptcy Code.  Claims in Classes that do not receive or retain any property under the Plan do not vote because such Classes are deemed to have rejected the Plan.  The Debtors believe that all Classes are entitled to vote except Classes 4.1 and 4.2. These classes are not impaired under the Plan and consequently are not

entitled to vote. They are conclusively deemed to have accepted the Plan.  Classes 7.1 to 7.3 Interests are being cancelled under the Plan; accordingly these Interest Holders are deemed to have voted to reject the Plan.

EVEN IF YOUR CLAIM IS OF THE TYPE DESCRIBED ABOVE, YOU MAY STILL HAVE A RIGHT TO OBJECT TO THE CONFIRMATION OF THE PLAN.

### 9.7.    Who Can Vote in More than One Class.

A creditor whose Claim has been Allowed in part as a Secured Claim and in part as an Unsecured Claim is entitled to accept or reject a Plan in both capacities by casting one ballot for the secured part of the Claim and another ballot for the Unsecured Claim.  Also, a Creditor may otherwise hold Claims in more than one Class (such as a Holder of Senior Secured Claims and Subordinated Note Claims), and may vote the Claims held in each Class.

### 9.8.    Votes Necessary for a Class to Accept the Plan.

A Class of Claims is deemed to have accepted the Plan when more than one-half (1/2) in number and at least two-thirds (2/3) in dollar amount of the Claims *that actually voted*, vote to accept the Plan.  A Class of interests is deemed to have accepted the Plan when Holders of at least two-thirds (2/3) in amount of the interest-Holders of such Class which actually vote, vote to accept the Plan.

### 9.9.    Treatment of Nonaccepting Classes.

As noted above, even if there are impaired Classes that do not accept the proposed Plan, the Court may nonetheless confirm the Plan if the nonaccepting Classes are treated in the manner required by the Code and at least one impaired Class of Claims accepts the Plan.  The process by which a plan may be confirmed and become binding on non-accepting Classes is commonly referred to as "cramdown."  The Bankruptcy Code allows the Plan to be "crammed down" on nonaccepting Classes of Claims or interests if it meets all statutory requirements except the voting requirements of 1129(a)(8) and if the Plan does not "discriminate unfairly" and is "fair and equitable" with respect to each impaired Class that has not voted to accept the Plan, as set forth in 11 U.S.C. § 1129(b) and applicable case law.

### 9.10.    Request for Confirmation Despite Nonacceptance by Impaired Class(es).

1    The SunCal Plan Proponent will ask the Court to confirm the Plan by cramdown on any

2    impaired Class if such Class does not vote to accept the Plan.

3    <center>**X.**</center>

4    <center>**MEANS OF EXECUTION AND IMPLEMENTATION OF THE PLAN**</center>

5    **10.1.    Introduction.**  This section is intended to address how the SunCal Plan Proponents

6    intend to implement the provisions of the Plan.  It addresses the transfer of the Plan Trust Property

7    to the Plan Trust, the nature of the Plan Trust, the powers of the Plan Trust, the governance of the

8    Plan Trust, the resolution of disputed claims, the sources of funds that will be used to pay claims

9    and the mechanics of how claims will be paid.

10    **10.2.    Removal of Trustee**. As of the Effective Date, the appointment of the Trustee in

11    the SunCal Marblehead, LLC and SunCal PSV, LLC shall terminate, and possession and control

12    over all property within these estates shall pass to the Plan Trust.

13    **10.3.    Transfer of Property To The Plan Trust**. On the Effective Date, title to and

14    possession of all property of the Group I Debtors, excepting those items of property that the Plan

15    Trustee affirmatively elects not to transfer to the Plan Trust, shall be deemed transferred and

16    delivered to the Plan Trust, without further act or action under any applicable agreement, law,

17    regulation, order or rule of law.

18    **10.4.    Purposes of The Plan Trust**. The Plan Trust's purposes, powers and objectives

19    include, but are not limited to the following: (i) to take control over, manage and over time sell or

20    otherwise dispose of all Plan Trust Property for the highest return reasonably obtainable; (ii) to

21    pursue all Litigation Claims through collection efforts, including through litigation in any court of

22    competent jurisdiction, and to obtain the most favorable recovery on the same, with due

23    consideration of all relevant factors, including cost; (iii) to cause all Available Cash to be

24    deposited into the applicable Distribution Accounts; (iii) to initiate actions to resolve any

25    remaining issues regarding the allowance and payment of Claims including, as necessary,

26    initiation and/or participation in proceedings before the Bankruptcy Court; (iv) to take such other

27    actions as are necessary or useful to maximize the value of all property received by the Plan Trust;

28    (v) to make the payments and distributions to creditors and holders of Beneficial Interests as

required by the Plan; and (vi) to enforce all rights with respect to the Plan Trust Property; and (vii) to take all actions reasonable and necessary to implement the terms of the Plan, including but not limited to selling the Group I Projects and the Assets. A more complete statement of the Plan Trust's powers and limitations is set forth in the Plan Trust Agreement, which is a part of the Plan Supplement.

It is intended that the Plan Trust will be classified for U.S. federal income tax purposes as a "liquidating trust," with the primary objective of liquidating the Plan Trust Property and distributing the net proceeds thereof, with no objective to continue or engage in the conduct or a trade or business in accordance with Treasury Regulation 301.7701-4(d), and, notwithstanding anything to the contrary in the Plan, all actions taken by the Plan Trust or any person acting on behalf of the Plan Trust shall be consistent with such primary objective.

**10.5.    Trust Agreement**. Copies of the Plan Trust Agreement shall be contained in the Plan Supplement. The Plan Trust Agreement shall, among other matters, create the Plan Trust, identify Acquisitions as the initial trustee of the Plan Trust, identify the compensation of the Plan Trust, and specify the authorities and powers of the Plan Trustee, consistent with this Plan.

**10.6.    Operations of the Plan Trust**. From and after the Effective Date, the Plan Trust may use, acquire and dispose of the Plan Trust Property held in the Plan Trust, and take any of the actions set forth in this Article or in the Plan Trust Agreement, without the approval of the Bankruptcy Court and free of the restrictions of the Bankruptcy Code, the Bankruptcy Rules or the prior orders of the Bankruptcy Court, other than restrictions expressly imposed by the Plan, the Confirmation Order or the Plan Trust Agreement, provided that the Plan Trust is administered so that it qualifies as a liquidating trust under Treasury Regulation § 301.7701-4(d).

**10.7.    The Plan Trustee**.

Acquisitions shall be Trustee of the Plan Trust. Acquisitions is the direct or indirect parent of all of Debtors.

**10.8.    Payment of Trust Expenses.** The expenses incurred by the Plan Trust during the Plan Period, which shall include the compensation payable to the Acquisitions, shall be paid, or

1   adequate reserves shall be created for the payment of such expenses, prior to any distribution to

2   the Plan Trust Beneficiaries.

3       **10.9.    Plan Distribution System**. The Plan Trustee shall establish a separate

4   "Distribution Account" for each Group IV Debtor at an FDIC insured bank. Each Group I

5   Debtor's Available Cash, whether on hand as of the Effective Date or received thereafter, shall be

6   deposited into that Group IV Debtor's Distribution Account. The only exception to this provision

7   shall be in the case of Net Sales Proceeds that are subject to disputed liens. Such proceeds shall

8   remain in the applicable Net Proceeds Accounts established to receive the proceeds from the sale

9   of a particular property. Once all disputes regarding entitlement to the funds in the Net Proceeds

10  Accounts have been resolved, the proceeds remaining (after the payment of the Allowed Claims

11  secured by liens on these proceeds) shall be transferred to the Distribution Account. These funds

12  will then be used to pay the claims of Creditors holding Allowed Claims in their order of priority

13  as provided for in the Plan.

14      **10.10.   Claims Estimation Rights**. On the Confirmation Date, the SunCal Plan Proponents

15  shall be vested with standing to file a motion under 11 U.S.C. § 502(c), and they shall be

16  authorized and empowered to seek in such motion the estimation, for distribution purposes, of any

17  Disputed Claim seeking recourse to, or claiming an interest in, any asset of the Group I Debtors.

18  After the Bankruptcy Court estimates a Disputed Claimant's rights in, or against an asset of the

19  Estates through this procedure, the Committees shall have the right to use any funds or assets not

20  deemed subject to the rights of the Disputed Claimant, to pay the Allowed Claims under the terms

21  of the Plan, including Allowed Administrative Claims, after the Effective Date.

22      **10.11.   No Payment of Transfer-Related Fees to the United States Trustee**. The Plan

23  Trust shall not be required to pay any fees to the United States Trustee based on any transfers of

24  the Plan Trust Property to the Plan Trust or from the Plan Trust.

25      **10.12.   No Payment of Transfer-Related Fees to the Trustee**. The Plan Trust shall not be

26  required to pay any fees to the Trustee based on any transfers of Plan Trust Property from the

27  Trustee Debtors to the Plan Trust, or from the Plan Trust.

28

**10.13.  <u>Books and Records of Trust</u>.** The Plan Trustee, and to the extent of payments and distributions by any Disbursing Agent, the Disbursing Agent, shall maintain an accounting of receipts and disbursements of the Plan Trust. The Plan Trustee shall maintain the books and records of the Plan Trust, or provide storage for such book and records, for the longer of six (6) years, or while Plan is in existence, provided that the Court may, upon application by the Plan Trustee, authorize the Plan Trust to destroy all of the Plan Trusts books and records at such time as Plan Trust has no further need for such books and records. The Plan Trust' s books and records shall be open to inspection at all reasonable times, upon written request by the Committee.

**10.14.  <u>Limitations on Liability</u>.** The Plan Trustee shall not be liable for any act it may do or fail to do as the liquidating trustees hereunder while acting in good faith and in the exercise of its best judgment. The Plan Trust shall not be liable in any event for any claims, liabilities or damages based upon or arising out of any conduct of the Plan Trustee in the course of its activities as liquidating trustee, unless such claims, liabilities or damages arise from Plan' s gross negligence or willful misconduct.

The Plan Trustee, and its officers, directors, agents and employees shall not be liable for any indebtedness, liability or obligation incurred or entered into on behalf of the Plan Trust, including, without limitation, indebtedness, liabilities or obligations under agreements, undertakings or commitments entered into or executed on behalf of Plan Trust by the Plan Trustee or by any person employed by the Plan Trustee or the Plan, it being expressly understood that all such indebtedness, liabilities and obligations of, and claims against the Plan, shall be the sole responsibility of the Plan and shall be satisfied only from the Plan, or such portion thereof as shall, under the terms of any agreement, be stated to be liable therefore. No claim or cause of action may be asserted against the Plan Trustee, or any member of the New Board on account of any indebtedness, liability or obligation entered into on behalf of the Plan, whether by legal or equitable proceedings, or by virtue of any bankruptcy or non-bankruptcy statute, rule or regulation.

MAINDOCS-#160298-v1-Disclosure_Statement_Group_I.DOC

1    Any undertaking, contract or agreement entered into in writing by the Plan may, except as

2    otherwise provided by the Plan or the Plan Trust Agreement, expressly disclaim the personal

3    liability of Plan Trustee.

4    **10.15.  <u>Federal Income Tax Treatment of the Holders of Plan Trust Beneficial</u>**

5    **<u>Interests</u>**. For all United States federal income tax purposes, the transfers by the Group II Debtors

6    shall be treated by the Group II Debtors, their estates, the Plan Trust and the Plan Trust

7    Beneficiaries as a transfer of the Plan Trust Property by the Group II Debtors to the Plan Trust

8    Beneficiaries followed by a transfer of the Plan Trust Property by such the Plan Trust

9    Beneficiaries to the Trust. The Plan Trust Beneficiaries shall be treated as the grantors and deemed

10   owners of the Plan Trust for United States federal income tax purposes. The Plan Trust Trustee

11   and the Plan Trust Beneficiaries are required to value their interests in the Plan Trust Property

12   consistently with the values placed upon the Plan Trust Property by the Plan Trust, and to use such

13   valuations for all purposes. The Plan Trust Agreement shall provide for consistent valuations of

14   the Plan Trust Property by the Plan Trust Trustee and the Plan Trust Beneficiaries, and shall

15   provide that the Plan Trust will determine the fair market value of the Plan Trust Property within

16   thirty (30) days after the Effective Date, and send such determination to each the Plan Trust

17   Beneficiary. By its acceptance of a the Beneficial Interest, each recipient of such an interest will be

18   conclusively deemed to agree to use such valuations for all purposes, including, without limitation,

19   in computing any gain recognized upon the exchange of such holder's claim for purposes of

20   determining any United States Federal income tax, and shall be required to include those items of

21   income, deductions and tax credits that are attributable to its the Beneficial Interest in computing

22   its taxable income.

23   **10.16.  <u>Termination of the Trust.</u>** the Plan Trust shall continue in effect until the earlier

24   of: (a) the date that all the Plan Trust Property has been liquidated, all proceeds have been

25   converted to cash or distributed in kind, all the Plan Trust Expenses have been paid, all claims to

26   be paid under the Plan for which the Plan Trust Trustee is obligated to make distributions on have

27   been paid, all distributions to be made with respect to the Beneficial Interests have been made, all

28   litigation to which the Plan Trust is a party have been concluded by dismissal or an order issued by

-78-

the court in which such litigation is pending and such order has become "final" (consistent with the definition of Final Order in this Plan for orders issued by the Bankruptcy Court), and the Chapter 11 Case has been closed; and (b) the expiration of five (5) years from the Effective Date; provided, however, that the Plan Trust may request the Bankruptcy Court to extend the permitted life of the Plan Trust for such additional period as is reasonably necessary to conclude the liquidation and distributions, not to exceed a total of ten (10) years from the Effective Date, which request shall be filed so the Bankruptcy Court may consider and rule on the request within six (6) months prior to the expiration of the initial five-year term.

**10.17.  Exemption from Certain Transfer Taxes**. In accordance with Section 1146(c) of the Bankruptcy Code, the issuance, transfer or exchange of a security or the making or delivery of an instrument of transfer under this Plan may not be taxed under any law imposing a stamp tax or similar tax. All governmental officials and agents shall forego the assessment and collection of any such tax or governmental assessment and shall accept for filing and recordation any of the foregoing instruments or other documents without payment of such tax or other governmental assessment.

**10.18.  Tax Consequence of The Plan**. The implementation of the Plan may have federal, state and local tax consequences to the Group II Debtors, Creditors and Interest Holders.  No tax opinion has been sought or will be obtained with respect to any tax consequences of the Plan. This Disclosure Statement does not constitute and is not intended to constitute either a tax opinion or tax advice to any person, and the summary contained herein is provided for informational purposes only.

CREDITORS AND INTEREST HOLDERS ARE ADVISED TO CONSULT WITH THEIR OWN TAX ADVISORS REGARDING THE TAX CONSEQUENCES TO THEM AND TO THE DEBTOR OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES.

**10.19  The Plan Sponsor.**

The Plan Sponsor shall be Acquisitions.

**10.20.  Acquisitions' Funding Obligations Pursuant to the Acquisitions**

**Administrative Loan.**

As part of its obligations as the Plan Sponsor, Acquisitions has agreed to cause the funding of the payment of the following amounts required under the Plan to the extent necessary after all Available Cash has been exhausted:

        (a)      All Allowed Administrative Claims;

        (b)      Allowed Priority Claims; and

        (c)      Continuing Professional fees for the prosecution of the Litigation Claims and other post-confirmation expenses

In exchange for the above referenced funding commitments, Acquisitions, and all of its Affiliates shall receive (i) a complete release from all of the Debtors, the Estates, and the Plan Trust of any potential Litigation Claims, and (ii) Allowance of the Acquisitions Administrative Loan in an amount equal to all Chapter 11 and post-confirmation funding caused by Acquisitions to the extent that the same has not already been approved by the Court.

**10.21.  The Committee(s).**

On the Effective Date, the Committee(s) shall continue to serve their applicable Debtors as Committees to the applicable reorganized Debtors, subject to the following:

**10.22.1        Duties and Powers.**

The duties of the Committees after the Effective Date shall be limited to investigating and prosecuting potential claims objections against Acquisitions and its Affiliates, and monitoring the Plan's implementation, joint decision-making authority on a settlement of the Lehman Adversary Proceeding, and standing to object to any settlement of any Litigation Claim in excess of $100,000 and standing to object to any proposed sales procedures on sale of the Debtors' Projects.

The Committees shall be entitled to retain, employ and compensate Professionals, in order to assist with the obligations and rights of the Committees under the terms of the Plan.  Such compensation shall be from the applicable Distribution Account(s).

The Committee(s) shall receive notice of and the right to review all payments and Distributions.  In addition, each Committee shall have 25% decision-making authority with respect

MAINDOCS-#160298-v1-Disclosure_Statement_Group_I.DOC

to settlement of the Lehman Adversary Proceeding along with Acquisitions, which shall have 50% decision making authority.  The Bankruptcy Court shall resolve any impasse with respect to a proposed settlement.

### 10.22.2  Dissolution of Committees.

The Committees shall be dissolved upon the entry of an order converting, closing or dismissing the Chapter 11 Cases or entry of a final decree in the Chapter 11 Cases.  On dissolution, the Confirmation Committees shall have no other or further obligations or responsibilities on behalf of the Plan Trust.

### 10.22.  Litigation Claims.

Pursuant to Section 1123(b)(3) of the Bankruptcy Code, the Plan Trust shall retain all Litigation Claims whether or not pending on the Effective Date that are not purchased by LitCo. Unless a Litigation Claim is expressly waived, relinquished, released, compromised or settled in the Plan or in a Final Order, all rights with respect to such Litigation Claims are reserved and the Plan Trustee and the Committees  (in the case of Avoidance Actions) may pursue such Litigation Claims.  Notwithstanding the foregoing, the Plan Trustee and the Committees shall not settle or abandon a Litigation Claim valued at greater than $100,000 except upon ten (10) days' prior written notice and opportunity to object to one or another.  Any disputes concerning the settlement or abandonment of a Litigation Claim shall be submitted to the Bankruptcy Court for resolution on no less than ten (10) days' notice to the objecting party.

### 10.23.  Collection of Litigation Recoveries.

All Litigation Recoveries realized or obtained by the Plan Trustee and/or the Committee(s) shall be promptly deposited into the applicable Distribution Account(s).  Except as otherwise provided in the Plan and the Confirmation Order, the Litigation Recoveries shall be free and clear of all Claims and Liens and shall only be expended in accordance with the provisions of the Plan.

## XI.

## DISTRIBUTIONS

**11.1.    Distribution Agent.**

Acquisitions shall serve as the Distribution Agent for distributions due under the Plan.  The Distribution Agent may employ one or more sub agents on such terms and conditions as it may agree in its discretion and pay such sub agent as a Post Confirmation Expense from the Distribution Accounts.  The Distribution Agent shall not be required to provide any bond in connection with the making of any Distributions pursuant to the Plan.

**11.2.    Distributions.**

**11.2.1  Dates of Distributions.**

Any distribution required to be made on the Effective Date shall be deemed timely if made as soon as practicable after such date and, in any event, within thirty (30) days after such date. Any distribution required to be made upon a Disputed Claim becoming an Allowed Claim and no longer being a Disputed Claim shall be deemed timely if made as soon as practicable thereafter.

**11.2.2  Limitation on Liability.**

Neither the Plan Sponsor, the Plan Trustee, the Distribution Agent, their Affiliates, nor any of their employees, members, officers, directors, agents, or professionals or Affiliates shall be liable for (i) any acts or omissions (except for gross negligence or willful misconduct) in connection with implementing the Distribution provisions of the Plan and the making or withholding of Distributions pursuant to the Plan, or (ii) any change in the value of distributions made pursuant to the Plan resulting from any delays in making such distributions in accordance with the Plan's terms (including but not limited to any delays caused by the resolution of Disputed Claims).

**11.3.    Old Instruments and Securities.**

**11.3.1  Surrender and Cancellation of Instruments and Securities.**

As a condition to receiving any distribution pursuant to the Plan, each Person holding any note or other instrument or security (collectively "Instruments or Securities" and individually an

1  "Instrument or Security") evidencing, an existing Claim(s) against the Debtor(s) must surrender

2  such Instrument or Security to the Distribution Agent.

3  <div align="center">**11.3.2  <u>Cancellation of Liens</u>.**</div>

4  Except as otherwise provided in the Plan, any Lien securing any Secured Claim shall be

5  deemed released and discharged, and the Person holding such Secured Claim shall be authorized

6  and directed to release any collateral or other property of the Debtors (including, without

7  limitation, any cash collateral) held by such Person and to take such actions as may be requested

8  by the Plan Trustee to evidence the release of such Lien, including, without limitation, the

9  execution, delivery and Filing or recording of such releases as may be requested by the Plan

10  Trustee.

11  <div align="center">**11.4.    <u>De Minimis Distributions and Fractional Shares</u>.**</div>

12  No Cash payment of less than ten dollars ($10) shall be made by the Plan Trust to any

13  Holder of Claims unless a request therefore is made in writing to the Plan Trust.  Whenever

14  payment of a fraction of a cent would otherwise be called for, the actual payment shall reflect a

15  rounding down of such fraction to the nearest whole cent.  Any Cash or other property that is not

16  distributed as a consequence of this section shall, after the last distribution on account of Allowed

17  Claims in the applicable Class, be treated as "Unclaimed Property" under the Plan.

18  <div align="center">**11.5.    <u>Delivery of Distributions</u>.**</div>

19  Except as provided in the Plan with respect to Unclaimed Property, distributions to Holders

20  of Allowed Claims and Allowed Administrative Claims shall be distributed by mail as follows:

21  (1) with respect to each Holder of an Allowed Claim that has filed a Proof of Claim, at the address

22  for such Holder as maintained by the official claims agent for the Debtors; (2) with respect to each

23  Holder of an Allowed Claim that has not filed a Proof of Claim, at the address reflected on the

24  Schedules filed by the Debtors, <u>provided</u>, <u>however</u>, that if the Debtors or the Plan Trust has

25  received a written notice of a change of address for such Holder, the address set forth in such

26  notice shall be used; or (3) with respect to each Holder of an Allowed Administrative Claim, at

27  such address as the Holder may specify in writing.

28  <div align="center">**11.6.    <u>Undeliverable Distributions</u>.**</div>

1     If the Distribution of Cash to the Holder of any Allowed Claim is returned to the Plan

2   Trustee as undeliverable or the Distribution check is not negotiated within 90 days of mailing (any

3   such distribution being hereinafter referred to as "Unclaimed Property"), no further distribution

4   shall be made to such Holder unless and until the Plan Trustee is notified in writing of such

5   Holder' s then current address.  Subject to the remainder of this Section and the following section,

6   Unclaimed Property shall remain in the possession of the Plan Trustee pursuant to this Section,

7   and shall be set aside and (in the case of Cash) held in a segregated interest bearing account (as to

8   Cash Unclaimed Property) to be maintained by the Distribution Agent until such time as the

9   subject Distribution becomes deliverable.  Nothing contained in the Plan shall require the Plan

10   Trustee or any other Person to attempt to locate such Person.

11       **11.7.    Disposition of Unclaimed Property.**

12     If the Person entitled thereto notifies the Plan Trustee of such Person' s Claim to a

13   Distribution of Unclaimed Property within ninety (90) days following such Person' s initial

14   Distribution Date, Effective Date, the Unclaimed Property distributable to such Person, together

15   with any interest or dividends earned thereon, shall be paid or distributed to such Person as soon as

16   practicable.  Any Holder of an Allowed Claim that does not assert a Claim in writing for

17   Unclaimed Property held by the Plan Trustee within ninety (90) days after the Holder' s initial

18   Distribution Date shall no longer have any Claim to or Interest in such Unclaimed Property, and

19   shall be forever barred from receiving any distributions under the Plan or otherwise from the Plan

20   Trustee.  In such cases, any property held for Distribution on account of such Claims shall become

21   Available Cash and deposited into the Distribution Account.

22                              **XII.**

23              **OBJECTIONS TO CLAIMS AND DISPUTED CLAIMS**

24       **12.1.    Standing for Objections to Claims.**

25     The Plan Trustee shall have the sole and exclusive right to file, prosecute and resolve

26   objections to Claims other than to the right to object to the claims of SunCal Affiliates, which shall

27   be vested with the applicable Committee.  The applicable Committee shall have standing to object

28

1  to any settlement of any Litigation Claim in excess of $100,000 and standing to object to any

2  proposed sales procedures and sale of the Debtors' Projects.

3         Any objection to a Claim shall be Filed with the Bankruptcy Court and served on the

4  Person holding such Claim on or before the applicable Claims Objection Deadline.  The Plan

5  Trustee shall have the right to petition the Bankruptcy Court, without notice or a hearing, for an

6  extension of the Claims Objection Deadline if a complete review of all Claims cannot be

7  completed by such date.

8         **12.2.    Treatment of Disputed Claims and Disputed Liens.**

9              **12.2.1  No Distribution Pending Allowance.**

10        If any portion of a Claim or Lien is a Disputed Claim or Disputed Lien, no payment

11 or distribution provided for under the Plan shall be made on account of such Claim or Lien unless

12 and until such Claim or Lien becomes an Allowed Claim and/or Allowed Lien.

13             **12.2.2  Distribution After Allowance.**

14        On the next Distribution Date following the date on which a Disputed Claim

15 becomes an Allowed Claim and is no longer a Disputed Claim, the Distribution Agent shall

16 distribute to the Person holding such Claim any Cash that would have been distributable to such

17 Person if on the initial Distribution Date such Claim had been an Allowed Claim and not a

18 Disputed Claim.

19                    **XIII.**

20        **EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

21        **13.1.    Executory Contracts Potentially Being Assumed.**

22        The Plan Trustee shall have until the expiration of the Sales Period to assume or reject any

23 of the executory contracts and unexpired leases attached to the Plan as Exhibit "2" to the Plan.

24 The SunCal Plan Proponents may add any executory contract or unexpired leases to these exhibits,

25 or delete any contract or lease therefrom up to and including the Confirmation Date.  All contracts

26 or leases not assumed by the expiration of the Sales Period shall be deemed rejected.

27

28

### 13.2. **Executory Contracts Being Rejected**.

The Debtors hereby reject all of the executory contracts and unexpired leases set forth in the Debtors' Schedules attached to the Plan as Exhibit "3." The SunCal Plan Proponents reserve the right to amend Exhibit "3" to the Plan to include additional leases and contracts on this exhibit, or to delete leases and contracts from this exhibit, up to and including the Confirmation Date.

### 13.3. **Bar Date for Rejection Damages**.

Any Claim arising out of the rejection of an executory contract or unexpired lease shall be forever barred and shall not be enforceable against the Debtors, the Plan Trust, their Affiliates, their successors, or their properties, and shall not be entitled to any distribution under the Plan, unless a Proof of Claim for such Claim is filed and served on the Debtors, or the Plan Trust within thirty (30) days after the receipt of a notice of the rejection of any contract or lease.

### 13.4. **Changes in Rates Subject to Regulatory Commission Approval**.

The Debtors are not subject to governmental regulatory commission approval of their rates.

## XIV.

## **BEST INTEREST OF CREDITORS TEST AND PLAN FEASIBILITY**

**14.1** **Best Interests Test**. Pursuant to Section 1129(a)(7) of the Bankruptcy Code, a Plan cannot be confirmed unless the Bankruptcy Court determines that Distributions under the Plan to all Holders of Claims and Interests who have not accepted the plan and whose Claims are classified in Classes that are impaired under the plan, are not less than those which they would receive in a liquidation under Chapter 7 of the Bankruptcy Code.

The Best Interest of Creditors Test must be satisfied even if the Plan is accepted by each impaired Class of Claims and if any Holder of an Allowed Claim objects to the Plan on such basis. The Best Interests Test requires the Bankruptcy Court to find either that either (i) all Holders of Claims in an impaired Class of Claims have accepted the Plan or (ii) the Plan provides each Holder of Allowed Claims of an impaired Class who has not accepted the Plan with a recovery of property of a value, as of the effective date of the Plan, that is not less than the amount that such Holder would receive if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code.

1    The Plan proposed by the Plan Proponents is essentially a liquidating plan. It provides for

2 the sale of all assets of the estate for their fair market value, the collection or recovery of all other

3 assets, and for the distribution of the resulting net proceeds from the sale, in accordance with the

4 priorities provided for in the bankruptcy code and under California law. A Chapter 7 trustee

5 appointed in this case would be compelled to liquidate the Debtors' assets in the same manner as

6 provided for in the Plan and to pay out the proceeds in the same manner as provided for in the

7 Plan. Accordingly, under the terms of the Plan, each individual creditor is receiving "at least as

8 much" as such creditor would receive in a Chapter 7 case, which is all that is required under the

9 Best Interests Test.

10    Although the Lehman Entities will argue that they are being denied their "credit bid" rights

11 under the Plan, and this reduces their distribution below the level that they would receive in a

12 Chapter 7 case, this argument fails.  A credit bid right does not add or reduce the value of a

13 creditor's collateral, it simply allows a creditor holding such a right to bid against other bidders

14 using its debt as "credit", rather than bidding in cash. If the creditor's collateral is sold for its "fair

15 market value," in cash, and the creditor receives what it is entitled to from the sales proceeds, then

16 the creditor is necessarily receiving exactly what it would receive in a Chapter 7. This is all that

17 the Best Interest Test Requires.  See Exhibit "7" hereto.

18    **14.2    <u>Feasibility</u>**. In addition, in order to confirm the Plan, the Bankruptcy Court must

19 find that confirmation of the Plan is not likely to be followed by the liquidation or the need for

20 further financial reorganization of the Debtor(s).  This requirement is imposed by Section

21 1129(a)(11) of the Bankruptcy Code and is generally referred to as the "feasibility" requirement.

22 As explained above, the Debtors'  Plan provides for the sale of all assets of their respective estates

23 and for the distribution of the proceeds. Within the context of this Plan, feasibility is limited to

24 having sufficient funds to pay administrative and priority claims on the Effective Date and

25 sufficient funds to fund the sale of the Properties.

26    Under timeline provided for in the Plan, the four Projects addressed in the Plan will be sold

27 on the Effective Date. These sales will provide the Debtors the means to pay all claims, including

28

1    allowed administrative and priority claims on this same date, from escrow. All remaining

2    claimants will then receive what they are entitled under the Plan when their claims are allowed.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<div align="center">

**XV.**

**LIMITATION OF LIABILITY**

</div>

**15.1**    **No Liability for Solicitation or Participation.**

As specified in Section 1125(e) of the Bankruptcy Code, entities that solicit acceptances or rejections of the Plan and/or that participate in the offer, issuance, sale, or purchase of securities offered or sold under the Plan, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, shall not be liable, on account of such solicitation or participation, for violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer, issuance, sale, or purchase of securities.

<div align="center">

**XVI.**

**CONDITIONS TO CONFIRMATION AND**

**EFFECTIVENESS OF THE PLAN**

</div>

**16.1**    **Conditions Precedent to Plan Confirmation.**

The only condition precedent to confirmation of the Plan is that the Bankruptcy Court shall have entered a Confirmation Order in form and substance reasonably acceptable to the SunCal Plan Proponents.

**16.2**    **Conditions Precedent to Plan Effectiveness.**

The conditions precedent to the effectiveness of the Plan and the occurrence of the Effective Date is that the Confirmation Order shall be a Final Order in form and substance reasonably satisfactory to the SunCal Plan Proponents, and the resolutions of any material impairment of the Plan terms caused by the automatic stays applicable in the Lehman Entities cases. The automatic stay in the Debtors cases shall continue to be applicable until the Effective Date.

<div align="center">

**XVII.**

**RETENTION OF JURISDICTION**

</div>

Notwithstanding the entry of the Confirmation Order or the occurrence of the Effective Date, the Bankruptcy Court shall not be limited under the Plan and the Bankruptcy Court's jurisdiction shall apply to the fullest extent possible under applicable law.

# XVIII.

## MODIFICATION OR WITHDRAWAL OF THE PLAN

### 18.1    Modification of Plan.

At any time prior to confirmation of the Plan, the former Debtor(s) may supplement, amend or modify the Plan.  After confirmation of the Plan,  the Debtors or Plan Trustee may (x) apply to the Bankruptcy Court, pursuant to Section 1127 of the Bankruptcy Code, to modify the Plan; and (y) apply to the Bankruptcy Court to remedy defects or omissions in the Plan or to reconcile inconsistencies in the Plan.

### 18.2    Nonconsensual Confirmation.

In the event that any impaired Class of Claims or Interests shall fail to accept the Plan in accordance with Section 1129(a)(8) of the Bankruptcy Code, SunCal Plan Proponents (i) may request that the Bankruptcy Court confirm the Plan in accordance with Section 1129(b) of the Bankruptcy Code, and (ii) in accordance with Section 16.1 of the Plan, and may modify the Plan in accordance with Section 1127(a) of the Bankruptcy Code.

# XIX.

## MISCELLANEOUS

### 19.1    Payment of Statutory Fees.

All quarterly fees due and payable to the Office of the United States Trustee pursuant to Section 1930(a)(6) of title 28 of the United States Code shall be paid in full on or before the Effective Date, or, to the extent such quarterly fees are disputed, an adequate reserve shall have been established and set aside for payment in full thereof, as required by Section 1129(a)(12) of the Bankruptcy Code.  The Plan Trustee shall remain responsible for timely payment of quarterly fees due and payable after the Effective Date and until the Debtors' Cases are closed, to the extent required by Section 1930(a)(6) of title 28 of the United States Code.

### 19.2    Payment Dates.

Whenever any payment or distribution to be made under the Plan shall be due on a day other than a Business Day, such payment or distribution shall instead be made, without interest, on the immediately following Business Day.

### 19.3    Headings.

The headings used in this Disclosure Statement and in the Plan are inserted for convenience only and neither constitutes a portion of this Disclosure Statement or the Plan nor in any manner affect the construction of the provisions of this Disclosure Statement or the Plan.

### 19.4    Other Documents and Actions.

The Plan Trustee may execute such other documents and take such other actions as may be necessary or appropriate to effectuate the transactions contemplated under the Plan.

### 19.5    Notices.

All notices and requests in connection with this Disclosure Statement and the Plan shall be in writing and shall be hand delivered or sent by mail addressed to:

> **To the SunCal Plan Proponents**:
> Bruce V. Cook
> General Counsel
> Authorized Agent of the SunCal Plan Proponents
> 2392 Morse Ave
> Irvine, CA 92614-6234
>
> **With copies to:**
> Paul J. Couchot
> Winthrop & Couchot, Professional Corporation
> 660 Newport Center Drive, Suite 400
> Newport Beach, CA 92660
>
> Ronald Rus
> Rus Miliband & Smith P.C.
> 2211 Michelson Drive, Seventh Floor
> Irvine, California 92612

All notices and requests to any Person holding of record any Claim or Interest shall be sent to them at their last known address or to the last known address of their attorney of record.  Any such Person may designate in writing any other address for purposes of this Section 21.5, which designation will be effective on receipt.

### 19.6    Governing Law.

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), the laws of the State of California (without reference to its conflict of law rules) shall govern the construction and implementation of the Plan and any agreements,

documents, and instruments executed in connection with the Plan, unless otherwise specifically provided in such agreements, documents, or instruments.

### 19.7    Binding Effect.

The Plan and all rights, duties and obligations thereunder shall be binding upon and inure to the benefit of the Plan Sponsor Debtors, the Plan Trustee, Holders of Claims, Holders of Interests, and their respective successors and assigns.

### 19.8    Successors and Assigns.

The rights, benefits, and obligations of any entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, the heirs, executors, administrators, successors, and assigns of such entity.

### 19.9    Severability of Plan Provisions.

If, prior to the Confirmation Date, any term or provision of the Plan is held by the Bankruptcy Court to be illegal, impermissible, invalid, void or unenforceable, or otherwise to constitute grounds for denying confirmation of the Plan, the Bankruptcy Court shall, with the consent of the Debtors, have the power to interpret, modify or delete such term or provision (or portions thereof) to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be operative as interpreted, modified or deleted. Notwithstanding any such interpretation, modification or deletion, the remainder of the terms and provisions of the Plan shall in no way be affected, impaired or invalidated by such interpretation, modification or deletion.

**19.10  No Waiver.**

The failure of the Debtors or any other Person to object to any Claim for purposes of voting shall not be deemed a waiver of the Committee(s)', the Debtors' or the Plan Trustee's right to object to or examine such Claim, in whole or in part.

**19.11  Inconsistencies.**

In the event the terms or provisions of this Disclosure Statement are inconsistent with the terms and provisions of the Plan or documents executed in connection with the Plan, the terms of the Plan shall control.

**19.12  Exemption from Certain Transfer Taxes and Recording Fees.**

Pursuant to Section 1146(c) of the Bankruptcy Code, any transfers from a Debtor to the Plan Trust or to any other Person or entity pursuant to the Plan, or any agreement regarding the transfer of title to or ownership of any of the Debtors' real or personal property or of any other interest in such property (including, without limitation, a security interest) will not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax,

MAINDOCS-#160298-v1-Disclosure_Statement_Group_I.DOC

1  stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or

2  recording fee, or other similar tax or governmental assessment, and the Confirmation Order will

3  direct the appropriate state or local governmental officials or agents to forego the collection of any

4  such tax or governmental assessment and to accept for filing and recordation any of the foregoing

5  instruments or other documents without the payment of any such tax or governmental assessment.

6       **19.13  Post-Confirmation Status Report.**

7       Within 180 days following the entry of the Confirmation Order, the Plan Trustee shall file a

8  status report with the Court explaining what progress has been made toward consummation of the

9  confirmed Plan.  The status report shall be served on the United States Trustee, the twenty largest

10  unsecured creditors, and those parties who have requested special notice.  Unless otherwise

11  ordered, further status reports shall be filed every 180 days and served on the same entities.

12       **19.14  Post-Confirmation Conversion/Dismissal.**

13       A creditor or party in interest may bring a motion to convert or dismiss the case under

14  § 1112(b), after the Plan is confirmed, if there is a default in performing the Plan.  The Plan

15  Trustee reserves the right to object to any motion for conversion or dismissal.  If the Court orders

16  any of the Cases converted to Chapter 7 after the Plan is confirmed, then all property that had been

17  property of the Chapter 11 Estate, and that has not been disbursed pursuant to the Plan, will revest

18  in the Chapter 7 estate.  The automatic stay will be reimposed upon the revested property, but only

19  to the extent that relief from stay was not previously authorized by the Court during this case.

20       **19.15  Final Decree.**

21       Once an Estate has been fully administered, as referred to in Bankruptcy Rule 3022, the

22  Plan Trustee, or other party as the Court shall designate in the Confirmation Order, shall file a

23  motion with the Court to obtain a final decree to close the Case of such Debtor.

24  Date: April __, 2011

25

26

27  By: _____

28         Frank Faye
       Authorized Agent for the Voluntary Debtors and
       Acquisitions

MAINDOCS-#160298-v1-Disclosure_Statement_Group_1.DOC

**Submitted By:**

**WINTHROP COUCHOT**
**PROFESSIONAL CORPORATION**


By: /s/ *Paul J. Couchot*
      Paul J. Couchot,
      General Insolvency Counsel for
      the Voluntary Debtors

**EXHIBIT "1"**

# EXHIBIT 1

## THE DEBTORS' PROJECTS AND OTHER PRIMARY ASSETS
## (EXCLUDING CASH AND LITIGATION CLAIMS DISCUSSED INFRA)

| NAME OF DEBTOR | ASSET DESCRIPTION |
|---|---|

*Voluntary Debtors*

Palmdale Hills

Palmdale Hills Property, a Delaware limited liability company, a Voluntary Debtor ("Palmdale Hills")owns the Project (the "Ritter Ranch Project") consisting of a 10,625 acre site situated in the City of Palmdale, in Los Angeles County, California.  Grading of the first phase is complete with master infrastructure nearly 90% complete.  The specific plan and the development agreement were approved in 1992 and allow for the development of up to 7,200 residential units.  A vesting tentative parcel map consisting of 42 parcels has been processed and was recorded in 1995.  Additionally, six vesting tentative tract maps totaling 553 lots were approved by the city in December 1995.  All regulatory permits have been received.

Palmdale Hills is a party to a certain Credit Agreement, dated as of February 8, 2007, by and among Palmdale Hills, as borrower, LCPI, as administrative agent and lender, pursuant to which LCPI made a loan in the maximum aggregate principal amount of approximately $264,000,000 (the "Ritter Ranch Loan Agreement").  The Ritter Ranch Loan Agreement is allegedly secured by a first-priority deed of trust on all real and personal property owned by Palmdale Hills.  The Ritter Ranch Loan Agreement has an asserted balance due of $287,252,096.31 as of March 30, 2009.  For more detail, see Exhibit "3".

Palmdale Hills is also the owner of certain CFD bonds issued by the City of Palmdale, in the amount of approximately $33 million (the "Palmdale Hills CFD Bonds").

DS EXHIBITS.DOC

| NAME OF DEBTOR | ASSET DESCRIPTION |
|---|---|
| SCC Palmdale | SCC Palmdale, LLC, a Delaware limited liability company, a Voluntary Debtor ("SCC Palmdale") does not own any real property.  SCC Palmdale is the Holder of the Allowed Interest in Palmdale Hills.<br><br>SCC Palmdale is a party to a certain Mezzanine Credit Agreement, between SCC Palmdale as borrower and LCPI as lender.  The SCC Palmdale Loan is allegedly secured by a pledge of SCC Palmdale's Allowed Interest in Palmdale Hills (the "SCC Palmdale Loan").  The SCC Palmdale Loan has an alleged balance due of $119,664,305.25 as of March 30, 2009.  For more detail, see Exhibit "3". |
| Acton Estates | Acton Estates LLC, a Delaware limited liability company, a Voluntary Debtor ("Acton Estates") owns the Project(the "Acton Project") consisting of a 175-acre site situated in Los Angeles County, California.  The Acton Project is surrounded by mostly equestrian properties and light agricultural vacant land.  The Acton Project is expected to consist of 136 units. |
| SunCal Beaumont | SunCal Beaumont, LLC, a limited liability company, a Voluntary Debtor ("SunCal Beaumont") owns the Project (the "Beaumont Heights Project"), that originally consisted of a 1,191-acre site situated in the City of Beaumont, in Riverside County, California.  None of the 1,191 acres are subject to any option contracts.  The property is currently designated as low density residential use - rural residential use.  The City of Beaumont is in the process of amending the general plan, preparing an environmental impact report and annexing the assemblage.  The Beaumont Heights Project was expected to consist of 1,203 units.  Approximately 94 acres of the Beaumont Heights Project was lost through foreclosure sales completed prior to the Petition Date and approximately 343.5 acres of the Beaumont Heights Project has been lost through foreclosure sales completed after the Petition Date.  SunCal Beaumont owns approximately 551.6 acres of the Beaumont Heights Project. |

DS EXHIBITS.DOC

| NAME OF DEBTOR | ASSET DESCRIPTION |
|---|---|
| SunCal Bickford | SunCal Bickford Ranch, LLC, a Delaware limited liability company, a Voluntary Debtor ("SunCal Bickford") owns the Project (the "Bickford Ranch Project") consisting of a 1,940-acre site situated in the City of Penryn, in Placer County, California. The Bickford Ranch Project is fully entitled with an approved large lot tentative map, small lot tentative map, specific plan, design guidelines, development standards, and a development agreement. The offsite water and sewer improvements are mostly complete. Improvement plans for major roads and in-tract improvements are in process of being completed. As of the Petition Date, a memorandum of understanding between the City and County for the regional sewer pipeline was in process. The Bickford Ranch Project is expected to consist of 2,105 units.<br><br>SunCal Bickford is a party to a certain promissory note secured by a deed of trust, dated as of May 25, 2005, in the maximum aggregate principal amount of approximately $30,000,000 executed by SunCal Bickford, as borrower, and payable to the order of Lehman ALI ("Bickford Second Loan Ageement"). The Bickford Second Lien Loan Agreement is allegedly secured by a second priority deed of trust on the Bickford Ranch Project. The Bickford Second Loan Agreement has an asserted balance due of $56,494,059.38 as of March 30, 2009. For more detail, see Exhibit "3". |
| SunCal Emerald | SunCal Emerald Meadows, LLC, a Delaware limited liability company, a Voluntary Debtor ("SunCal Emerald") owns the Project located, consisting of a 178-acre site situated in the City of Rubidoux, in Riverside County, California. The specific plan, general plan and the environmental impact report were approved in October 2005. The tentative tract map & final map are in process. The Emerald Meadows Project is expected to consist of 1,002 units. |
| SunCal Johannson | SunCal Johansson Ranch, LLC, a Delaware limited liability company, a Voluntary Debtor ("SunCal Johannson") owns the Projct (the "Johannson Ranch Project") consisting of a 501-acre site in the City of Modesto, in Stanislaus County, California. Tentative maps are in the process of being prepared. Engineering plans and preparation of the draft specific plan have commenced. The SunCal Johannsson Project is expected to consist of 921 units. |

DS EXHIBITS.DOC

| NAME OF DEBTOR | ASSET DESCRIPTION |
| --- | --- |

**SJD Partners**

SJD Partners, Ltd., a California limited partnership, a Voluntary Debtor ("SJD Partners") currently owns no real property. SJD Partners formerly owned a project (the "Pacific Point Project") located in San Juan Capistrano known as the "Pacific Point Project". The Pacific Point Project was lost through a non-judicial foreclosure sale by Lehman ALI, which caused a Lehman Affiliate, LV Pacific Point LLC, a Delaware limited liability company, a Lehman Entity ("LV PacPoint"), a Delaware Limited Liability Company, to purchase the Pacific Point Project at a foreclosure sale conducted on August 28, 2008. SJD Partners has a pending fraudulent inducement action against the Lehman Entity Affiliates.

SJD Partners is a party to a certain loan agreement, dated February 16, 2006, by and among Lehman ALI, SJD Development and SJD Partners, pursuant to which Lehman ALI made a loan in the maximum aggregate principal amount of approximately $125,000,000 (the "Pacific Point First Loan Agreement"). The Pacific Point First Loan Agreement is allegedly secured by a first-priority deed of trust on the Pacific Point Project. The Pacific Point First Loan Agreement had an asserted balance due of $120,110,237 as of March 30, 2009, and ownership of this loan is now held by Lehman Re, a Bermuda business entity. For more detail, see Exhibit "3".

SJD Partners is also a party to a certain loan agreement, dated May 1997, by and between Lehman ALI and SJD Partners, pursuant to which Lehman ALI initially made a loan in the maximum aggregate principal amount of approximately $20,000,000 (the "Pacific Point Second Loan Agreement"). The Pacific Point Second Loan Agreement was secured by a second-priority deed of trust on the Pacific Point Project, which was foreclosed upon on August 28, 2008 by LV Pacific Point, as assignee of Lehman ALI. For more detail, see Exhibit "3".

**SJD Development**

SJD Development Corp., a California corporation, a Voluntary Debtor ("SJD Development") does not own any real property. SJD Development is the Holder of the Allowed Interest in SJD Partners.

SJD Development is a party to the Pacific Point First Loan Agreement.

DS EXHIBITS.DOC

| **NAME OF DEBTOR** | **ASSET DESCRIPTION** |
|---|---|
| SunCal Summit Valley | SunCal Summit Valley, LLC, a Delaware limited liability company, a Voluntary Debtor ("SunCal Summit Valley") owns most of the Project (the "Project") that originally consisted of a 2,500-acre site situated in the City of Hesperia, in San Bernardino County, California. The City of Hesperia's general plan allows for low density residential development. SunCal Summit Valley anticipated approximately 2.5 lots per acre over the entire assemblage. Most of the technical studies for the environmental impact report are complete. The Summit Valley Project is expected to consist of 6,023 units. Approximately 1061 acres of the Summit Valley Project have been lost through foreclosure proceedings completed prior to the Petition Date. No portion of the Summit Valley Project has been lost through foreclosure proceedings since the Petition Date. SunCal Summit Valley currently owns 541.2 acres of the Summit Valley Project.<br><br>SunCal Summit Valley is also the Holder of the Allowed Interests in Seven Brothers and Kirby Estates. |
| Seven Brothers | Seven Brothers, LLC, a Delaware limited liability company, a Voluntary Debtor ("Seven Brothers") owned 900 acres of the Summit Valley Project. Approximately 234 acres of Seven Brothers have been lost through foreclosure proceedings completed prior to the Petition Date and approximately 99 acres of Seven Brothers have been lost through foreclosure proceedings since the Petition Date. Seven Brothers currently owns 569.67 acres. |
| Kirby Estates | Kirby Estates, LLC, a Delaware limited liability company, a Voluntary Debtor ("Kirby Estates") owns 27.2 acres of the Summit Valley Project. No portion of the Summit Valley Project owned by Kirby Estates has been lost through foreclosure proceedings. |

DS EXHIBITS.DOC

| **NAME OF DEBTOR** | **ASSET DESCRIPTION** |
|---|---|
| SCC Communities | SCC Communities, LLC, a limited liability company, a Voluntary Debtor ("SCC Communities") owns the Project (the "Joshua Ridge Project") consisting of an 80-acre site situated in the City of Victorville in San Bernardino County, California. The Joshua Ridge Project was originally slated to be sold to the City and the City was scheduled to use the land to build a park or a school. Currently, SCC Communities does not have a plan for the Joshua Ridge Project.

SCC Communities is subject to a certain Loan Agreement, dated as of October 31, 2007, by and between SCC LLC, as borrower and Lehman ALI, as lender, pursuant to which Lehman ALI made a loan in the maximum aggregate amount of approximately $20 million (the "Interim Loan Agreement"). The Interim Loan Agreement has an alleged balance due of $23,795,012.59 as of March 30, 2009. The alleged obligation under the Interim Loan Agreement is allegedly secured by (a) an alleged first-priority deed of trust on the Joshua Ridge Project; (b) an alleged first-priority deed of trust on the Tesoro Project; and (c) an alleged first-priority lien on the Del Rio CFD Bond Proceeds. For more detail, see Exhibit "3". |
| Tesoro | Tesoro SF, LLC, a Delaware limited liability company, a Voluntary Debtor ("Tesoro") owns the Project (the "Tesoro Project") consisting of a 185-acre site situated in the City of Santa Clarita in Los Angeles County, California. The existing entitlements include a tentative tract map approved by the planning commission, which allows for 45 lots. |

DS EXHIBITS.DOC

| NAME OF DEBTOR | ASSET DESCRIPTION |
| --- | --- |

Del Rio

North Orange Del Rio Land, LLC, a limited liability company, a Voluntary Debtor ("Del Rio") does not own any real property. The Del Rio Estate owns the net proceeds of the proceeds of CFD Bonds that were issued by the City of Orange, authorized by the Order of the Bankruptcy Court on March 16, 2010. Del Rio CFD Bonds after use and application as provided in an Acquisition Agreement, including the payment of certain undisputed creditors

The Acquisition Agreement sets forth certain terms for the acquisition of various facilities by the City of Orange from Del Rio, the issuance of the Del Rio CFD Bonds and the use and application of a portion of the proceeds of the Del Rio Bonds for the construction of certain improvements and other applications, and with the remaining proceeds to go to Del Rio. The Acquisition Agreement provides for a maximum bond authorization in the amount of up to $25 million. The Court has entered an order approving the Acquisition Agreement, the sale of the Del Rio CFD Bonds, and creditor payments. The Acquisition Agreement was approved by the Court on March 16, 2010. From the closing, approximately $6,700,000 of claims (including approximately $2,924,827 of SunCal Management claims) have been paid. Upon the construction of the park within the project, which is anticipated to be completed by the end of 2011, any remaining net proceeds of the Del Rio CFD Bond Proceeds not used for such construction or other specified purposes will be disbursed to Del Rio. Such amounts are estimated to be approximately $7 million to $8 million.

DS EXHIBITS.DOC

| NAME OF DEBTOR | ASSET DESCRIPTION |
|---|---|
| SunCal I | SunCal Communities I, LLC, a Delaware limited liability company, a Voluntary Debtor ("SunCal I") does not own any real property.  SunCal I is the Holder of Allowed Interests in Acton Estates, SunCal Bickford, SunCal Beaumont, SunCal Summit Valley, SunCal Johannson and SunCal Emerald.

SunCal I is a party to the loan agreement by and among (i) SunCal I and SunCal III, as borrowers and (ii) LCPI, as administrative agent and lender, pursuant to which LCPI made a loan to SunCal I and SunCal III, as borrowers in the maximum aggregate principal amount of approximately $395,313,713.37 (the "SunCal Communities I Loan Agreement").  The loan agreement is allegedly secured by (a) alleged first-priority deeds of trust on the SunCal Bickford, the Acton Estates, and the SunCal Emerald Projects, (b) an alleged pledge of SunCal I's Allowed Interest in Acton Estates, SunCal Summit, SunCal Beaumont, SunCal Johannson, SunCal Emerald, and SunCal Bickford; and (c) an alleged pledge of SunCal Summit's Allowed Interest in Seven Brothers and Kirby.  The SunCal Communities I Loan Agreement has an alleged balance due of $343,221,391.06 as of March 30, 2009.  For more detail, see Exhibit "3". |
| SunCal III Debtor) | SunCal Communities III, LLC, a Delaware limited liability company, a Voluntary Debtor ("SunCal III") owns no real or personal property.  SunCal III is a party to SunCal Communities I Loan Agreement. |

***Trustee Debtors***

DS EXHIBITS.DOC

| **NAME OF DEBTOR** | **ASSET DESCRIPTION** |
|---|---|

Delta Coves

Delta Coves Ventures, LLC, a limited liability company, a Trustee Debtor ("Delta Coves") owns the Project (the "Delta Coves Project") consisting of a 310-acre site which is located on Bethel Island within Contra Costa County. The Delta Coves Project is expected to consist of 494 waterfront residential lots, some of which will be condominiums/townhomes and some of which will contain private boat docks. The Delta Coves Project is expected to include an interior lagoon that will provide direct boating access to San Joaquin River Delta.

Delta Coves is a party to a certain Amended and Restated Loan Agreement, dated as of April 20, 2007, by and between Delta Coves, as borrower, and Lehman ALI as lender, pursuant to which Lehman ALI made a loan in the maximum aggregate principal amount of approximately $236 million (the "Delta Coves Loan Agreement"). The Delta Coves Loan Agreement is allegedly secured by a first-priority deed of trust on the Delta Coves Project. The Delta Coves Loan Agreement has an asserted balance due of $206,023,142.48 as of March 30, 2009. For more detail, see Exhibit "3".

SunCal Heartland

Heartland, LLC, a Delaware limited liability company, a Trustee Debtor ("SunCal Heartland") owns the Project (the "Heartland Project") consisting of a 417 acre site located in Riverside County, California. The Heartland Project is expected to consist of 983 units.

SunCal Heartland is a party to a certain Second Amended and Restated Term Loan and Revolving Line of Credit Loan Agreement, dated as of October 3, 2007, by and among SunCal Marblehead Heartland Master LLC, SunCal Marblehead, and SunCal Heartland, as borrowers, and Lehman ALI, as agent and sole lender, pursuant to which Lehman ALI made a loan in the maximum aggregate principal amount of approximately $316,061,300 (the "SunCal Marblehead/SunCal Heartland Loan Agreement"). The SunCal Marblehead/SunCal Heartland Loan Agreement is allegedly secured by first-priority deeds of trust on the Marblehead and the Heartland Projects. The SunCal Marblehead/SunCal Heartland Loan Agreement has an alleged balance due of $354,325,126.15 as of March 30, 2009. For more detail, see Exhibit "3".

DS EXHIBITS.DOC

| **NAME OF DEBTOR** | **ASSET DESCRIPTION** |
|---|---|
| SunCal Marblehead | SunCal Marblehead, LLC, a Delaware limited liability company, a Trustee Debtor ("SunCal Marblehead") SunCal Marblehead owns the Marblehead Project, consisting of a 247-acre site and is expected to consist of 308 units in San Clemente, California.  The development is expected to offer canyon and ocean views from a number of lots throughout the Marblehead Project.  SunCal Marblehead is a party to the SunCal Marblehead/SunCal Heartland Loan Agreement. |
| SunCal Northlake | LB-L-SunCal Northlake, LLC, a Delaware limited liability company, a Trustee Debtor ("SunCal Northlake") owns the Project (the "Northlake Project") consisting of a 1,564-acre site which is located in Castaic, California, north of Valencia, approximately 45 miles north of downtown Los Angeles and 10 miles north of the San Fernando Valley.  The Northlake Project is expected to consist of 3,417 units.

Northlake Holdings LLC, a California limited liability company ("Northlake Holdings") is a Lehman Lender and the asserted Holder of the beneficial interest in the Disputed Secured Claim against the Northlake Project.

SunCal Northlake is a party to a certain Term Loan and Revolving Line of Credit Loan Agreement, dated as of September 5, 2009, between SunCal Northlake, as borrower, and Northlake Holdings, as successor agent and sole lender, pursuant to which Northlake Holdings' predecessor (Lehman ALI) made a loan in the maximum aggregate principal amount of approximately $100,000,000 (the "SunCal Northlake Loan Agreement").  The SunCal Northlake Loan Agreement is allegedly secured by a first-priority deed of trust on the Northlake Project.  The SunCal Northlake Loan Agreement has an alleged balance due of $123,654,776.88 as of March 30, 2009.  For more detail, see Exhibit "3". |

DS EXHIBITS.DOC

| **NAME OF DEBTOR** | **ASSET DESCRIPTION** |
|---|---|

SunCal Oak Valley          LB-L-SunCal Oak Valley, LLC, a Delaware limited liability company, a Trustee Debtor ("SunCal Oak Valley") owns the Project (the "Oak Valley Project") consisting of a 985-acre site which is located in Riverside County, California. The Oak Valley Project consists primarily of residential property and is expected to also include two commercial sites, one school site and several parks. The Oak Valley Project is expected to consist of 3,417 units.

OVC Holdings LLC, a California limited liability company ("OVC Holdigns") is a Lehman Lender and the asserted Holder of the beneficial interest in the Disputed Secured Claim against the Oak Valley Project.

SunCal Oak Valley is a party to a certain Term Loan and Revolving Line of Credit Loan Agreement, dated as of May 23, 2006, by and between SunCal Oak Valley, as borrower, and OVC Holdings, as successor agent and sole lender, pursuant to which OVC Holdings' predecessor (Lehman ALI) made a loan in the maximum aggregate principal amount of approximately $120,000,000 (the "SunCal Oak Valley Loan Agreement"). The SunCal Oak Valley Loan Agreement is allegedly secured by a first-priority deed of trust on the Oak Valley Project. The SunCal Oak Valley Loan Agreement has an alleged balance due of $141,630,091.63 as of March 30, 2009. For more detail, see Exhibit "3".

DS EXHIBITS.DOC

| NAME OF DEBTOR | ASSET DESCRIPTION |
|---|---|

**SunCal PSV**

SunCal PSV, LLC, a Delaware limited liability company, a Trustee Debtor ("SunCal PSV") owns the Project (the "Palm Springs Village Project") consisting of a 309-acre site which is located in the City of Palm Springs, California.  The current proposed development consists of 752 single family units, 398 multi-family units, an 18-hole executive golf course, a driving range, a golf clubhouse and recreational facilities.

SunCal PSV is a party to a certain Term Loan and Revolving Line of Credit Loan Agreement, dated as of February 12, 2007, between SunCal PSV, as borrower, and Lehman ALI, as agent and sole lender, pursuant to which Lehman ALI made a loan in the maximum aggregate principal amount of approximately $90 million (the "SunCal PSV Loan Agreement").  The SunCal PSV Loan Agreement is allegedly secured by a first-priority deed of trust on the Palm Springs Village Project.  The SunCal PSV Loan Agreement has an alleged balance due of $88,257,340.20 as of March 30, 2009.  For more detail, see Exhibit "3".

**SunCal Torrance**

SunCal Torrance Properties, LLC, a Delaware limited liability company, a Trustee Debtor ("SunCal Torrance") owns the Project (the "Del Amo Project") consisting of a 14-acre site which is located in the City of Torrance in Los Angeles County, California.  The site is currently a section of the Del Amo Fashion Center complex, a 3 million square feet retail mall.  The Del Amo Project is expected to consist of 365 units.

SunCal Torrance is a party to a certain Loan Agreement, dated as of November 30, 2006, between SunCal Torrance and SunCal Oak Knoll, as borrowers, and Lehman ALI, as agent and sole lender, pursuant to which Lehman ALI made a loan in the maximum aggregate principal amount of approximately $167.7 million (the "SunCal Oak Knoll/SunCal Torrance Loan Agreement").  The SunCal Oak Knoll/SunCal Torrance Loan Agreement is allegedly secured by first-priority deeds of trust on the Oak Knoll and the Del Amo Projects.  The SunCal Oak Knoll/SunCal Torrance Loan Agreement has an alleged balance due of $158,141,364.64 as of March 30, 2009.  For more detail, see Exhibit "3".

DS EXHIBITS.DOC

| NAME OF DEBTOR | ASSET DESCRIPTION |
|---|---|
| SunCal Oak Knoll | SunCal Oak Knoll, LLC, a Delaware limited liability company, a Trustee Debtor ("SunCal Oak Knoll") owns the Project (the "Oak Knoll Project") consisting of a 172.5-acre site which is located in the City of Oakland, California.  The Oak Knoll Project is expected to be a diverse master planned community that includes 960 residential units, including single family homes, town homes and apartments.  The Oak Knoll Project is also expected to consist of six restaurant spaces, along with a grocery anchor. |
| | SunCal Oak Knoll is a party to the SunCal Oak Knoll/SunCal Torrance Loan Agreement. |
| SunCal Century City | SunCal Century City, LLC, a Delaware limited liability company ("SunCal Century City") owned the Project located in Century City, California (the"10,000 Santa Monica Project")..  Pursuant to a settlement agreement, the Trustee has conveyed the 10,000 Santa Monica Project to Danske Bank in exchange for the full satisfaction of the SunCal Century City Loan Agreement and $5.3 million, approximately $1.4 of which was used to pay delinquent real property taxes. |
| | SunCal Century City was a party toa certain Loan Agreement by and between SunCal Century City, as borrower and Lehman ALI, as agent and sole lender pursuant to which Lehman ALI made a loan in the aggregate maximum principal amount of approximately $120,000,000.  The SunCal Century City Loan Agreement was allegedly secured by a first-priority deed of trust on the 10000 Santa Monica Project (the "SunCal Century City Loan Agreement").  The SunCal Century City Loan Agreement had an alleged balance due of $120,000,000.00 as of April 1, 2009.  Danske Bank was formerly the Holder of the Century City Loan Agreement and related deed of trust, which has been satisfied in full pursuant to Danske Bank's purchase of the 10000 Santa Monica Project for $5.3 million, less payment of an Unpaid Real Property Tax Claim of $1.6 million.  For more detail, see Exhibit "3". |

# EXHIBIT "2"

**EXHIBIT 2**

**THE LEHMAN LENDERS' APPRAISALS OF THE PROJECTS**

**AND SUNCAL'S VALUATION OPINIONS[1]**

| NAME OF DEBTOR | THE LEHMAN LENDERS' APPRAISLAS | SUNCAL'S VALUATION OPINIONS |
|---|---|---|
| *Voluntary Debtors* | | |
| Palmdale Hills | $42,900,000 | $21,800,000 |
| SunCal Beaumont | $1,020,000 (SunCal) | $1,020,000 |
| Acton Estates | $6,800,000 | $1,600,000 |
| SunCal Johannson | $4,000,000 | $540,000 |
| SunCal Summit Valley | $2,200,000 | $370,000 |
| Kirby Estates | $2,800,000 | See Summit |
| Seven Brothers | $200,000 | See Summit |
| Del Rio | $7,100,000 (SunCal) | $7,100,000 |
| SunCal Bickford | $29,500,000 | $10,900,000 |
| SunCal Emerald | $12,000,000 | $6,100,000 |
| Tesoro | $1,850,000 | $740,000 |
| SCC Communities | $1,200,000 | $160,000 |
| Total | $111,570,000 | $50,330,000 |
| *Trustee Debtors* | | |
| SunCal Marblehead | $187,500,000 | $93,800,000 |
| SunCal Heartland | $7,900,000 | $7,500,000 |
| OVC Holdings | $20,900,000 | $21,000,000 |
| Northlake Holdings | $23,000,000 | $4,100,000 |
| SunCal Oak Knoll | $48,000,000 | $25,400,000 |
| SunCal PSV | $13,800,000 | $18,000,000 |
| SunCal Torrance | $25,000,000 | $13,500,000 |
| Delta Coves | $25,200,000 | $20,800,000 |
| **Total** | $353,300,000 | $204,100,000 |
| **TOTAL** | $464,870,000 | $254,430,000 |

---

[1] The appraisals provided by the Lehman Entities were conducted shortly after the filing of these Cases and are approximately 2.5 years old. The SunCal Valuation opinions were conducted in April 2011.

DS EXHIBITS.DOC

- The Lehman Lenders' appraised value of the Summit Valley Project excludes the portions of the Summit Valley Project owned by Seven Brothers and Kirby Estates. Furthermore, the appraisal values the property that is owned outright by SunCal Summit, Seven Brothers and Kirby Estates, and not subject to any liens.

- The Lehman Lenders have not provided an appraisal of the Project belonging to SunCal Beaumont presumably because they do not have a deed of trust on such Project. However, the Lehman Lenders have a Disputed Lien on SunCal I's Allowed Interest in SunCal Beaumont. SunCal believes that the value of the Beaumont Heights Project is $1,200,000, net of portions of the Project that have been and are expected to be lost through foreclosure sales conducted by third-party seller financing lienholders.

- The Lehman Lenders did not provide an appraisal for the Del Rio CFD Bond Proceeds. SunCal believes that the net proceeds in the Del Rio CFD Bonds subject to Lehman's Disputed Liens are worth approximately $8 million to the Del Rio Estate, net of funds to be used in the constructing a sports park and in resolving claims pursuant to the terms of the Acquisition Agreement.

DS EXHIBITS.DOC

# EXHIBIT "3"

## EXHIBIT 3

## A SUMMARY OF THE LEHMAN LENDERS' AND

## LEHMAN SUCCESSORS' DISPUTED SECURED CLAIMS AND DISPUTED

## LIENS

| LEHMAN LOAN(S) | ALLEGED HOLDER | DEBTOR(S) | ALLEGED SECURITY | ALLEGED OUTSTANDING AMOUNT UNDER DISPUTED PROOFS OF SECURED CLAIMS |
|---|---|---|---|---|
| | | *Voluntary Debtors* | | |
| SunCal Communities I Loan Agreement | Lehman Commercial | SunCal I, SunCal III, Acton Estates, SunCal Emerald, SunCal Bickford, SunCal Summit Valley, SunCal Beaumont and SunCal Johannson | (a) Alleged first-priority deeds of trust on the SunCal Bickford, the Acton Estates and the SunCal Emerald Projects, (b) Alleged pledges of SunCal I's Allowed Interests in Acton Estates, SunCal Summit, SunCal Beaumont, SunCal Johannson, SunCal Emerald, and SunCal Bickford and (c) Alleged pledges of SunCal Summit Valley's Allowed Interests in Seven Brothers and Kirby. | Identical $343,221,391 Proof of Secured Claim No. 1 Asserted by Lehman Commercial Against SunCal I; Proof of Secured Claim No. 2 Asserted Against SunCal III; Proof of Secured Claim No. 6 Asserted Against Acton Estates; Proof of Secured Claim No. 7 Asserted Against SunCal Emerald; Proof of Secured Claim No. 16 Asserted Against SunCal Bickford; and Proof of Secured Claim No. 12 Asserted Against SunCal Summit |

DS EXHIBITS.DOC

| LEHMAN LOAN(S) | ALLEGED HOLDER | DEBTOR(S) | ALLEGED SECURITY | ALLEGED OUTSTANDING AMOUNT UNDER DISPUTED PROOFS OF SECURED CLAIMS |
|---|---|---|---|---|
| Ritter Ranch Loan Agreement | Lehman Commercial | Palmdale Hills | An alleged first-priority deed of trust on the Ritter Ranch Project an alleged first priority lien on all personal property owned by Palmdale Hills, including the Palmdale Hills Cash and the Palmdale Hills CFD Proceeds. | $287,252,096 Proof of Secured Claim No. 65 Asserted by Lehman Commercial Against Palmdale Hills |
| Pacific Point First Loan Agreement | Lehman Re (Lehman ALI Successor)[1] | SJD Development; SJD Partners | Alleged first priority deed of trust on the Pacific Point Project | Identical $120,110,237 Proof of Secured Claim No. 2 Asserted by Lehman ALI against SJD Development; $120,110,237 Proof of Secured Claim No. 23 Asserted by Lehman ALI against SJD Partners |
| SCC Palmdale Loan | Lehman Commercial | SCC Palmdale | An alleged pledge of SCC Palmdale's Allowed Interest in Palmdale Hills. | $119,664,305 Proof of Secured Claim No.: 1 Asserted by Lehman Commercial Against SCC Palmdale |
| Bickford Second Loan Agreement | Lehman ALI | SunCal Bickford | An alleged second priority deed of trust on the Bickford Ranch Project. | $56,494,059 Proof of Secured Claim No. 17 Asserted by Lehman ALI Against Bickford Ranch |

---

[1] Lehman ALI has also asserted an unliquidated contingent claim against SJD Partners based on the Pacific Point Second Loan Agreement.

DS EXHIBITS.DOC

| LEHMAN LOAN(S) | ALLEGED HOLDER | DEBTOR(S) | ALLEGED SECURITY | ALLEGED OUTSTANDING AMOUNT UNDER DISPUTED PROOFS OF SECURED CLAIMS |
|---|---|---|---|---|
| Interim Loan Agreement | Lehman ALI | SCC Communities, Tesoro and Del Rio | Alleged first-priority deeds of trust on the Joshua Ridge and the Tesoro Projects, and an alleged first-priority lien on the net proceeds of the Del Rio CFD Bonds. | Identical $23,795,013 Proof of Secured Claim No. 9 Asserted by Lehman Commercial Against SCC Communities Proof of Secured Claim No. 14 Asserted Against Del Rio; Proof of Secured Claim No. 7 Asserted Against Tesoro |
| | | ***Trustee Debtors*** | | |
| SunCal PSV Loan Agreement | Lehman Commercial | SunCal PSV | An alleged first-priority deed of trust on the Palm Springs Village Project. | $88,257,340 Proof of Secured Claim No. 12 Asserted by Lehman ALI Against SunCal PSV |
| SunCal Delta Coves Loan Agreement | Lehman Commercial | Delta Coves | An alleged first-priority deed of trust on the Delta Coves Project. | $206,023,142 Proof of Secured Claim No. 21 Asserted by Lehman ALI Against Delta Coves 21 |
| SunCal Marblehead/ SunCal Heartland Loan Agreement | Lehman Commercial | SunCal Marblehead; SunCal Heartland | Alleged first-priority deeds of trust on the Marblehead and the Heartland Projects. | Identical $354,325,126 Proof of Secured Claim No. 9 Asserted by Lehman ALI Against SunCal Heartland; Proof of Secured Claim No. 21 Asserted Against SunCal Marblehead |

DS EXHIBITS.DOC

| LEHMAN LOAN(S) | ALLEGED HOLDER | DEBTOR(S) | ALLEGED SECURITY | ALLEGED OUTSTANDING AMOUNT UNDER DISPUTED PROOFS OF SECURED CLAIMS |
|---|---|---|---|---|
| Sun Cal Oak Valley Loan Agreement | Lehman Commercial | SunCal Oak Valley | An alleged first-priority deed of trust on the Oak Valley Project. | $141,630,092 Proof of Secured Claim No. 16 Asserted by OVC Holdings Against SunCal Oak Valley |
| SunCal Northlake Loan Agreement | Lehman Commercial | SunCal Northlake | An alleged first-priority deed of trust on the Northlake Project. | $123,654,777 Proof of Secured Claim No. 6 Asserted by Northlake Holdings Against SunCal Northlake |
| SunCal Oak Knoll/SunCal Torrance Loan Agreement | Lehman ALI | SunCal Oak Knoll and SunCal Torrance | Alleged first-priority deeds of trust on the Oak Knoll Project and the Del Amo Project. | Identical $158,141,365 Proof of Secured Claim No. 12 Asserted by Lehman ALI against SunCal Oak Knoll; Proof of Secured Claim No. 4 Asserted Against SunCal Torrance |
| TOTAL | | | | $1,942,568,943 |

- All loans allegedly held by Lehman Commercial, with the exception of SCC Palmdale, were sold by Fenway Capital to Lehman Commercial post-petition pursuant to an order of the Bankruptcy Court in New York, which orders are currently on appeal in the Second Circuit. The Fenway Sold Loans include the SunCal Communities I Loan Agreement, the Ritter Ranch Loan Agreement, the SunCal PSV Loan Agreement, the SunCal Marblehead/SunCal Heartland Loan Agreement, the Delta Coves Loan Agreement, the SunCal Northlake Loan Agreement and SunCal Oak Valley Loan Agreement.

DS EXHIBITS.DOC

# EXHIBIT "4"

**EXHIBIT 4**
**CLAIMS CHART**

| Debtor | Unpaid Real Property Tax Claims | Alleged Secured Claims | Alleged Mechanic Lien Claims | Administrative Claims | General Unsecured Claims (Including Matured Bond Claims; Excluding Future Bond Claims) | Bond Safeguard Future Bond Claims | Arch Future Bond Claims |
|---|---|---|---|---|---|---|---|
| Palmdale Hills | $4,755,857 | $287,252,096 | $993,755 | #REF! | $6,393,490 | $14,943,900 | $12,936,047 |
| SCC Palmdale | $0 | $119,664,305 | $0 | $0 | $0 | $0 | $0 |
| SunCal Beaumont | $442,201 | $5,651,174 | $1,576,334 | #REF! | $180,713 | $0 | $0 |
| SCC Communities | $47,163 | $23,795,013 | $0 | $0 | $32,813 | $0 | $0 |
| Del Rio | $0 | (Same as SCC Communities) | $0 | $0 | $2,015,019 | $0 | $0 |
| Tesoro | $123,366 | (Same as SCC Communities) | $0 | #REF! | $170,969 | $0 | $0 |
| SunCal Bickford | $9,467,165 | $343,221,391 (Bickford 1st) | $3,477,120 | #REF! | $809,854 | $2,827,548 | $0 |
| | | $56,494,059 (Bickford 2nd) | | $0 | | $0 | $0 |
| | | $6,530,083 (Acquisitions) | | | | | |
| SunCal Emerald | $798,256 | (Same as Bickford 1st) | $1,242,582 | #REF! | $7,302,777 | $0 | $0 |
| Acton Estates | $1,652,389 | (Same as Bickford 1st) | $0 | #REF! | $145,314 | $1,290,000 | $0 |
| SunCal I | $0 | (Same as Bickford 1st) | $0 | $0 | $0 | $0 | $0 |
| Summit Valley | $835,541 | (Same as Bickford 1st) | $16,827 | #REF! | $281,690 | $0 | $0 |
| | | $3,306,650 | | | | | |
| SunCal III | $0 | (Same as Bickford 1st) | $0 | $0 | $0 | $0 | $0 |
| Seven Brothers | See SunCal Summit | $3,427,066 | $0 | $0 | $18,966 | $0 | $0 |
| Kirby Estates | See SunCal Summit | $0 | $0 | $0 | $0 | $0 | $0 |
| SunCal Johannson | $434,830 | $0 | $0 | #REF! | $41,181 | $0 | $0 |
| SJD Development | $0 | $120,110,237 | $0 | $0 | $0 | $0 | $0 |
| SJD Partners | $0 | (Same as SJD Development) | $0 | #REF! | $19,471,283 | $17,352,162 | $19,382,964 |
| **VDs Total** | $18,556,769 | $962,921,991 | $7,306,618 | #REF! | $36,864,069 | $36,413,610 | $32,319,011 |
| | | | | | | | |
| SunCal Heartland | $985,141 | $354,325,126 | $1,208,080 | #REF! | $2,895,676 | $28,947,440 | $0 |
| SunCal Marblehead | $2,500,646 | (Same as SunCal Heartland) | $4,326,390 | #REF! | $10,087,795 | $36,836 | $56,473,182 |
| SunCal Oak Knoll | $4,156,073 | $158,141,365 | $4,687,891 | #REF! | $938,074 | $0 | $0 |
| SunCal Torrance | $1,082,899 | (Same as SunCal Oak Knoll) | $0 | #REF! | $203,838 | $0 | $0 |
| Delta Coves | $406,976 | $206,023,142 | $468,358 | #REF! | $5,299,164 | $27,546,741 | $0 |
| Sun Cal Century City | $0 | $0 | $0 | - | $4,390,043 | $0 | $0 |
| SunCal Northlake | $5,605,574 | $123,654,777 | $0 | #REF! | $1,833,080 | $0 | $0 |
| SunCal Oak Valley | $175,158 | $141,630,092 | $1,618,699 | #REF! | $4,654,095 | $14,669,523 | $9,498,756 |
| SunCal PSV | $1,725,166 | $88,257,340 | $2,316,430 | #REF! | $4,012,139 | $18,405,548 | $0 |
| **TDs Total** | $16,637,633 | $1,072,031,842 | $14,625,848 | #REF! | $34,313,903 | $89,606,088 | $65,971,938 |
| | | | | | | | |
| **GRAND TOTAL** | $35,194,401 | $2,034,953,833 | $21,932,466 | #REF! | $71,177,972 | $126,019,698 | $98,290,949 |

- The Debtors have not yet completed their investigation on what Claims are Allowed Claims and their listing herein should not be construed as providing for Allowance under the Plan.
- Certain Disputed Claims, such as duplicative Claims, have been deducted from the figures above.
- Administrative Claims are ongoing.
- The Bond Issuers assert that their Claims are joint and several against all of the Debtors, which the Debotrs dispute as lacking in consideration and constituting fraudulent transfers.
- Lehman ALI has also filed a contingent claim against SJD Partners based on the Pacific Point Second Loan Agreement, which was the basis of the non-judicial foreclosure of the Pacific Point Project.

- Unpaid Real Property Tax Claims include post-petition unpaid property tax claims filed by government entities.
- The total amount of alleged future bond claims for the Trustee Debtors is $157,577,310 and for the Voluntary Debtors is $68,732,621, for a collective total of $226,309,931.

# EXHIBIT "5"

## EXHIBIT 5

## SUMMARY OF HEALTH AND SAFETY NOTICES

| Ex. No. | Citation | Date | Issuing Agency | Applicable Project |
|---|---|---|---|---|
| | *Voluntary Debtors* | | | |
| 1. | Letter from City of Palmdale | March 10, 2009 | City of Palmdale | Palmdale Hills |
| 2. | Request for Supplemental Deposit | February 19, 2009 | Los Angeles County Department of Regional Planning | Tesoro Project |
| | *Trustee Debtors* | | | |
| 3. | Notice of Violation of the California Coastal Act[3] | June 4, 2009 | California Coastal Commission | Marblehead Project |
| 4. | Order to Abate – Habitability Hazards | June 12, 2009 | City of Oakland | Oak Knoll Project |
| 5. | Notice of Violation | April 1, 2009 | City of Palm Springs Department of Building & Safety | Palm Springs Village Project |
| 6. | Notice of Violation, Construction Storm Water General Permit No. CAS000002, Delta Coves Venture LLC SunCal Company, WDID No. 5S07C344548, Contra Costa County | October 17, 2008 | California Regional Water Quality Control Board | Delta Coves Project |
| 7. | Administrative Citation for Violations of the City of San Clemente Municipal Code (SCMC): Storm Water Runoff Control (Chapter 13.40) and Excavations & Grading | October 15, 2008 | City of San Clemente, Engineering Division | Marblehead Project |
| 8. | Notice to Comply | October 14, 2008 | Contra Costa County – Building Inspection Department | Delta Coves Project |
| 9. | Notice of Violation No. A49456 | October 9, 2008 | Bay Area Air Quality Management District | Delta Coves Project |
| 11. | Notice of Violation No. A 49457 | October 10, 2008 | Bay Area Air Quality Management District | Delta Coves Project |
| 12. | Contra Costa County Stormwater Pollution Prevention Plan Notice of Correction | October 7, 2008 | Contra Costa County | Delta Coves Project |
| 13. | Letter from City of Palmdale | March 10, 2009 | City of Palmdale | Palmdale Hills |

---

[3] The potential penalties range from $254,000 to $3.8 million.

# EXHIBIT "6"

## EXHIBIT 6

## POTENTIAL PREFERENTIAL PAYMENTS

Below is a summary of the total payments made by each Debtor to non-insiders within the 90 days preceding the Petition Date for each Debtor.

| NAME OF DEBTOR | AMOUNT TRANSFERRED |
|---|---|
| *Voluntary Debtors* | |
| Acton Estates | $1,300.00 |
| SunCal Beaumont | $25,244.97 |
| SunCal Bickford | $133,669.98 |
| SunCal I | $0.00 |
| SunCal III | $0.00 |
| SunCal Emerald | $128,287.10 |
| SunCal Johansson | $26,187.00 |
| Kirby Estates | $0.00 |
| Del Rio | $86,622.93 |
| SCC Palmdale | $0.00 |
| Palmdale Hills | $6,002,491.87 |
| SCC Communities | $500.00 |
| Seven Brothers | $0.00 |
| SJD Development | $25.00 |
| SJD Partners | $748,926.28 |
| SunCal Summit Valley | $39,649.77 |
| Tesoro | $659.00 |
| **Total** | $7,193,563.90 |
| | |
| *Trustee Debtors* | |
| SunCal Century City | $190,087.05 |
| Delta Coves | $597,961.92 |
| SunCal Heartland | $48,896.50 |
| SunCal Marblehead | $1,798,895.67 |
| SunCal Northlake | $833,921.81 |
| SunCal Oak Knoll | $2,324,630.92 |
| SunCal Oak Valley | $316,534.90 |
| SunCal PSV | $446,722.69 |
| SunCal Torrance | $18,618.50 |
| **Total** | $6,576,269.96 |
| | |
| **TOTAL** | $13,769,833.86 |

The following chart represents the status of the avoidance actions which have been commenced by the Voluntary Debtors with respect to the transfers referenced in the chart above:

| Name of Debtor | Aggregate Amount of Complaints | Aggregate Amount Collected/Settled | Aggregate Amount Unresolved |
|---|---|---|---|
| Palmdale Hills | $3,790,452 | $0 | $3,790,452 |
| SunCal Emerald | $84,310 | $10,732 | $71,000 |
| SJD Partners | $268,776 | $22,500 | $237,426 |
| SunCal Bickford | $44,270 | $23,280 | $0 |
| **Total** | $4,187,808 | $56,512 | $4,098,878 |

DS EXHIBITS.DOC

Below is a summary of the total payments made by each Debtor to SunCal Affiliates within one year preceding the Petition Date for each Debtor.

| NAME OF DEBTOR | AMOUNT TRANSFERRED | RECIPIENT |
|---|---|---|
| *Voluntary Debtors* | | |
| Acton Estates | $7,885.12 | SunCal Management |
| SunCal Beaumont | $15,602.83 | SunCal Management |
| SunCal Bickford | $492,802.57 | SunCal Management & Acquisitions |
| SunCal I | $20,449.52 | SunCal Bickford |
| SunCal III | $0.00 | N/A |
| SunCal Emerald | $884,890.80 | SunCal Management & Acquisitions |
| SunCal Johansson | $8,046.53 | SunCal Management & Acquisitions |
| Kirby Estates | $500.00 | SunCal Management |
| Del Rio | $50,721.00 | SunCal Management & Acquisitions |
| SCC Palmdale | $238,352.34 | N/A |
| Palmdale Hills | $1,149,348.04 | SunCal Management & Acquisitions |
| SCC Communities | 0.00 | |
| Seven Brothers | $0.00 | N/A |
| SJD Development | $0.00 | N/A |
| SJD Partners | $498,351.39 | SunCal Management |
| SunCal Summit Valley | $16,717.60 | Acquisitions & SC Master Marketing LLC |
| Tesoro | $5,000.00 | Acquisitions |
| **Total** | $3,388,667.74 | |
| | | |
| *Trustee Debtors* | | |
| SunCal Century City | $747,727.13 | SunCal Management & Acquisitions |
| Delta Coves | $2,305,572.58 | SunCal Management & Acquisitions |
| SunCal Heartland | $282,628.75 | SunCal Management; SunCal Marblehead Heartland Master LLC |
| SunCal Marblehead | $945,435.28 | SunCal Management; Acquisitions; and SunCal Marblehead Heartland Master LLC |
| SunCal Northlake | $819,207.14 | SunCal Management; Acquisitions; SCC College Park LLC |
| SunCal Oak Knoll | $2,914,645.70 | SunCal Management and Acquisitions |
| SunCal Oak Valley | $87,293.65 | SunCal Management and Acquisitions |
| SunCal PSV | $4,345.05 | SunCal Management; Lehman SunCal Real Estate Fund |
| SunCal Torrance | $310,181.43 | SunCal Management; Acquisitions; SunCal PSV; and Lehman SunCal Real Estate Holdings |
| **Total** | $8,417,036.71 | |
| | | |
| **TOTAL** | $11,805,704.45 | |

DS EXHIBITS.DOC

Below is a summary of the total payments made by each Debtor to the Lehman Entities

within ninety days and one year preceding the Petition Date for each Debtor.

| NAME OF DEBTOR | AMOUNT TRANSFERRED WITHIN NINETY DAYS PRECEDING THE PETITION DATE | AMOUNT TRANSFERRED WITHIN ONE YEAR PRECEDING THE PETITION DATE | RECIPIENT |
|---|---|---|---|
| Delta Coves | $0.00 | $6,195,440.46 | Lehman ALI |
| SunCal Century City | $1,202,641.26 | $10,628,819.87 | Lehman ALI |
| **Total** | $1,202,641.26 | $16,824,260.33 | |

DS EXHIBITS.DOC

**EXHIBIT "7"**

**EXHIBIT 7**

**BEST INTEREST OF CREDITORS TEST ASSUMING THE DEBTORS PREVAIL IN EQUITABLE SUBORDINATION (LEHMAN VALUES SUPPLEMENTED BY SUNCAL VALUES)**

| Case Name | Estimated Values | Estimate of Allowed Non-Lehman Entities' Claims and Lehman Administrative Claims | Bond Claimant Claims Resolved By Sale | Available Distribution Assuming Sale | Percentage Distribution to Classes 8 and 9 Claimants |
|---|---|---|---|---|---|
| Palmdale Hills | $69,900,000 | #REF! | $27,879,947 | $69,900,000 | 100.00% |
| SunCal Beaumont | $1,020,000 | #REF! | $0 | $1,200,000 | #REF! |
| SCC Communities | $1,200,000 | #REF! | $0 | $1,200,000 | 100.00% |
| Del Rio | $7,100,000 | $2,015,019 | $0 | $5,500,000 | 100.00% |
| Tesoro | $1,850,000 | #REF! | $0 | $1,850,000 | 100.00% |
| SunCal Bickford | $29,500,000 | #REF! | $2,827,548 | $29,500,000 | 100.00% |
| SunCal Emerald | $12,000,000 | #REF! | $0 | $12,000,000 | 100.00% |
| Acton Estates | $6,800,000 | #REF! | $1,290,000 | $6,800,000 | 100.00% |
| SunCal Summit | $2,200,000 | #REF! | $0 | $2,200,000 | 100.00% |
| SunCal Johannson | $4,000,000 | #REF! | $0 | $4,000,000 | 100.00% |
| SJD Partners/ SJD Development | $16,000,000 | #REF! | $36,735,126 | $16,000,000 | 100.00% |
| SunCal Heartland | $7,900,000 | #REF! | $28,947,440 | $7,900,000 | 100.00% |
| SunCal Marblehead | $187,500,000 | #REF! | $56,510,018 | $187,500,000 | 100.00% |
| SunCal Oak Knoll | $48,000,000 | #REF! | $0 | $48,000,000 | 100.00% |
| SunCal Torrance | $25,000,000 | #REF! | $0 | $25,000,000 | 100.00% |
| Delta Coves Venture | $25,200,000 | #REF! | $27,546,741 | $25,200,000 | 100.00% |
| SunCal Northlake | $23,000,000 | #REF! | $0 | $23,000,000 | 100.00% |
| SunCal Oak Valley | $20,900,000 | #REF! | $24,168,279 | $20,900,000 | 100.00% |
| SunCal PSV | $13,800,000 | #REF! | $18,405,548 | $13,800,000 | 100.00% |
| Total | $502,870,000 | #REF! | $224,310,647 | $501,450,000 | |

· Estimate of Allowed Claims are based on filed Proofs of Claims and undisputed, noncontingent and unliquidated scheduled claims in which no Proof of Claim was filed on Claims classified in Classes 8 and 9, less duplicative claims.

· The chart excludes certain Administrative Claims and recovery on potential preference actions, except for the preference actions recoveries by Palmdale Hills.

· Various Bond Claims are duplicative of the Bond Issuer Claims. The existing claim amounts have been subtracted from the Bond Issuer Claims for each estate, where applicable.

· Approximately $35 million of Unpaid Real Property Taxes that would be paid or otherwise resolved by the consummation of the sale to a third party buyer have been excluded from the chart.

· The chart assumes that there will be a recovery of approximately $16,000,000 for the fraudulent inducement claims against Lehman ALI and LV Pacific Point.

· The asset valuations are based on the total of the Lehman Lenders appraised values or SunCal valuation opinions where the Lehman Lenders have not provided appraisals for the assets.  However, Palmdale Hills' cash of approximately $21 million has been added to the Ritter Ranch Project's appraised value of $42,900,000.

· The Lehman Lenders did not provide an appraisal for the Del Rio CFD Bond Proceeds.  The Plan Proponents believe that the net proceeds in the Del Rio CFD Bonds subject to Lehman's Disputed Liens are worth approximately $8 million to the Del Rio Estate, net of funds to be used in constructing a sports park and resolving claims pursuant to the terms of the Acquisition Agreement.

· The estimated values for SunCal Beaumont, SunCal Summit and Seven Brothers is net of the anticipated portions expected to be lost through non-judicial foreclosure sale of various undisputed secured creditors pursuant to orders of the Court granting them relief from the automatic stay.

· Estimate of Allowed Non-Lehman Entities' Claim includes certain claims that the Debtor does not believe will be beneficiaries of an equitable subordination judgment, such claims are identified in the Debtor's Disclosure Statement.

·  SJD Development is the parent company of SJD Partners.  Approximately $369,199 of General Unsecured Claims were filed against SJD Development, which presumably should have been filed against SJD Partners and are therefore included in the SJD Partners' row of the chart.  The chart also assumes that SJD Partners will be successful in its fraudulent inducement against certain Lehman Entities that seeks rescission of the non-judicial foreclosure sale and that the Pacific Point Project will thereafter be sold to a buyer that will assume the un-matured bond liabilities.

# EXHIBIT "8"

# EXHIBIT 8
## RELIANCE CLAIMS
### PART 1

| Debtor | Creditor | Proof of Claim # | Claim Amount |
|---|---|---|---|
| **Acton Estates, LLC** | | | |
| | SunCal Management, LLC | POC #2 | $ 44,173.26 |
| | SCC Acquisitions, Inc. | POC #3 | $ 3,000.00 |
| | SunCal Management, LLC | POC #4 | $ 59,241.68 |
| | Bond Safeguard Insurance Company and Lexon Insurance Company Insurance Company | POC #7 | $ 1,290,000.00 |
| | SCC Acquisitions, Inc. | POC #8 | $ 1,290,000.00 |
| | Bruce Elieff | POC #9 | $ 1,290,000.00 |
| | Arch Insurance Company | POC #10 | $155,423,657(contingent) $131,588.73 (liquidated) |
| | Rohm Insurance Agency | POC #11 | $ 14,150.00 |
| | | | |
| **SunCal Bickford Ranch, LLC** | | | |
| | Cook's Portable Toilets & Septic | POC #1 | $ 2,743.21 |
| | Hertz Equipment Rental Corp. | POC #2 | $ 25.51 |
| | Ecorp Consulting, Inc. | POC #3 | $ 23,211.60 |
| | MHM Engineers & Surveyors | POC #5 | $ 8,916.67 |
| | Land Architecture, Inc. | POC #6 | $ 100,245.39 |
| | Fehr & Peers Associates, Inc.Associates, Inc | POC #7 | $ 1,123.22 |
| | Far West Construction, Inc. | POC #8 | $ 72,602.47 |
| | BIA Riverside Sign Program | POC #9 | $ 5,175.00 |
| | Kiewit Pacific Co. | POC #10 | $ 1,868,357.50 |
| | SunCal Management, LLC | POC #11 | $ 321,103.03 |
| | SCC Acquisitions, Inc. | POC #12 | $ 3,000.00 |
| | SunCal Management, LLC | POC #13 | $ 324,769.28 |
| | ARB, Inc. | POC #15 | $ 1,052,272.82 |
| | SunCal Master Venture Member, LLC | POC #18 | $ 20,451.40 |
| | Bond Safeguard Ins. Co. & Lexon Ins. Co. | POC #19 | $ 2,500,000.00 |
| | Bond Safeguard Ins. Co. & Lexon Ins. Co. | POC #20 | $ 327,548.00 |
| | Pierce's Security | POC #21 | $ 53,919.09 |
| | Arch Insurance Company | POC #22 | $155,423,657(contingent) $131,588.73 (liquidated) |
| | Rohm Insurance Agency | POC #23 | $ 4,095.00 |
| | Bond Safeguard Ins. Co. & Lexon Ins. Co. | POC #24 | $ 2,827,548.00 |
| | SCC Acquisitions, Inc. | POC #25 | $ 2,827,548.00 |
| | Bruce Elieff | POC #26 | $ 2,827,548.00 |
| | Murray Smith & Associates Engineering | POC #27; POC #31 | $ 77,107.11 |
| | Independent Construction Co. | POC #28 | $ 117,209.80 |
| | Marques Pipeline, Inc. | POC #29; POC #30 | $ 330,118.00 |
| | MacKay & Somps Civil Eng | POC #32 | $ 14,851.80 |
| | | | |
| **SunCal Torrance Properties, LLC** | | | |
| | SunCal Management, LLC | POC #1 | $ 148,578.54 |
| | SunCal Management, LLC | POC #2 | $ 160,914.00 |

| | MWW Group Inc | POC #5 | $ 42,019.25 |
|---|---|---|---|
| | Arch Insurance Company | POC #6 | $155,423,657(contingent) $131,588.73 (liquidated) |
| | | | |

## North Orange Del Rio Land, LLC

| | | | |
|---|---|---|---|
| | Trench Shoring Company | POC #1 | $ 1,072.50 |
| | Debby Cobb Consulting | POC #2 | $ 415.00 |
| | Carmen A. Morinello | POC #3 | $ 110,000.00 |
| | Elfend & Associates, Inc. | POC #4 | $ 225,000.00 |
| | Matthew Cunningham dba Pacific Strategies | POC #5 | $ 30,000.00 |
| | Econolite Control Products | POC #6 | $ 21,932.51 |
| | SunCal Management, LLC | POC #7 | $ 2,242,240.45 |
| | Bond Safeguard Ins. Co. & Lexon Ins. Co. | POC #8 | $ 3,060,045.00 |
| | Bond Safeguard Ins. Co. & Lexon Ins. Co. | POC #9 | $ 250,100.00 |
| | Bond Safeguard Ins. Co. & Lexon Ins. Co. | POC #10 | $ 2,809,945.00 |
| | Bova Contracting Corporation | POC #11 | $ 275,918.33 |
| | SunCal Management, LLC | POC #12 | $ 213,668.78 |
| | SCC Acquisitions, Inc. | POC #15 | $ 3,159,945.00 |
| | Bruce Elieff | POC #16 | $ 3,159,945.00 |
| | Fuscoe Engineering, Inc. | POC #17 | $ 279,974.18 |
| | Hillcrest Contracting, Inc. | POC #18; POC #24 | $ 295,166.93 |
| | Arch Insurance Company | POC #19 | $155,423,657(contingent) $131,588.73 (liquidated) |
| | Summers Murphy & Partners, Inc. | POC #20 | $ 59,350.00 |
| | All American Asphalt | POC #21 | $ 124,037.20 |
| | Rohm Insurance Agency | POC #22 | $ 32,075.00 |
| | City of Orange | POC #23 | $ 47,818.75 |
| | | | |

## Delta Coves Venture, LLC

| | | | |
|---|---|---|---|
| | BKF Engineers | POC #1; POC #15 | $ 121,266.64 |
| | Hertz Equipment Rental Corporation | POC #2 | $ 25,444.15 |
| | Top Grade Construction, Inc. | POC #3; POC #17 | $ 250,000.00 |
| | Pacific Gas and Electric Company | POC #4 | $ 4,208.49 |
| | Howard Construction | POC #5 | $ 2,866.00 |
| | Bellingham Marine Industries, Inc. | POC #6 | $ 2,822,167.18 |
| | SunCal Management, LLC | POC #7 | $ 1,084,858.63 |
| | MBH Architects, Inc. | POC #8 | $ 97,091.24 |
| | Environmental Foresight, Inc. | POC #9 | $ 34,903.70 |
| | Weston/Mason Marketing, Tom Weston, President | POC #11 | $ 32,525.76 |
| | Gibson & Skordal, LLC | POC #12 | $ 586.50 |
| | vanderToolen Associates | POC #13; POC #24 | $ 15,028.09 |
| | Development Planning & Financing Group, Inc. | POC #14 | $ 6,428.00 |
| | Contra Costa County | POC #16 | $ 609,221.68 |
| | Rose Associates Landscape Architects, Inc. | POC #18 | $ 84,617.14 |
| | SunCal Management, LLC | POC #19 | $ 448,061.00 |
| | SCC Acquisitions, Inc. | POC#22 | $ 27,555,855.00 |
| | Bruce Elieff | POC #23 | $ 27,555,855.00 |

| | | |
|---|---|---|
| Arch Insurance Company | POC #25 | $155,423,657(contingent) $131,588.73 (liquidated) |
| Luce Forward Hamilton & Scripps LLP | POC #26; POC #27 | $            20,069.07 |
| Rohm Insurance Agency | POC #28 | $          270,225.00 |
| Jackson DeMarco Tidus & Peckenpaugh | POC #29 | $              1,890.00 |
| Fanelli Development Co | POC #30 | $            48,380.23 |
| | | |

## SunCal Emerald Meadows Ranch, LLC

| | | |
|---|---|---|
| Zeiser Kling Consultants | POC #1 | $              8,984.27 |
| Hillwig - Goodrow, LLC | POC #2 | $              3,860.00 |
| O'Reilly Public Relations | POC #3 | $                 967.90 |
| SCC Acquisitions, Inc. | POC #4 | $            15,777.78 |
| SunCal Management, LLC | POC #5 | $          174,624.56 |
| SunCal Master Venture Member, LLC | POC #8 | $            14,071.10 |
| Arch Insurance Company | POC #10 | $155,423,657(contingent) $131,588.73 (liquidated) |
| David Sandoval | POC #11 | $          500,000.00 |
| Moses Green | POC #12 | $          500,000.00 |
| Hall & Foreman, Inc. | POC #13 | $          288,631.72 |
| Life Church of God in Christ | POC #14 | $       6,055,000.00 |
| Proactive Engineering Consultants, Inc. | POC #15; POC #16 | $          991,315.27 |
| Rubidoux 60, LLC and EMR Residential Properties, LLC | POC #17 | Unknown |

## SunCal Heartland, LLC

| | | |
|---|---|---|
| Stantec Consulting, Inc. | POC #1; POC #22 | $          971,341.56 |
| HD Supply Construction Supply, LTD., dba HD Supply White Cap Construction Supply | POC #2 | $            44,310.80 |
| SunCal Management, LLC | POC #3 | $          397,455.41 |
| SCC Acquisitions, Inc. | POC #4 | $            24,065.05 |
| SunCal Management, LLC | POC #6 | $          227,266.85 |
| Pinnick, Inc. | POC #8 | $          563,159.02 |
| SunCal Master Venture Member, LLC | POC #10; POC #12 | $              1,512.80 |
| SCC JV Ventures, LLC | POC #11 | $              3,093.28 |
| Utility Specialists SW, Inc. | POC #13; POC #14 | $              3,787.50 |
| Skyview Imaging | POC #15 | $                 525.00 |
| Arch Insurance Company | POC #16 | $155,423,657(contingent) $131,588.73 (liquidated) |
| Stantec Consulting, Inc. | POC #17 | $            39,459.53 |
| Dennis M. McCoy & Sons | POC #18 | $          941,960.00 |
| SCC Acquisitions, Inc. | POC #19 | $     28,947,440.00 |
| Bruce Elieff | POC #20 | $     28,947,440.00 |
| Hall & Foreman, Inc. | POC #21; POC #23 | $              1,175.60 |
| Waterforce, Inc. | POC #24 | $          113,750.00 |
| Jackson DeMarco Idus & Peckenpaugh | POC #25 | $              3,445.50 |
| | | |

## SunCal Johannson Ranch, LLC

| | | | |
|---|---|---|---|
| SunCal Johannson Ranch, LLC | | $ | 75.45 |
| SCC Acquisitions, Inc. | POC #1 | $ | 9,417.65 |
| SunCal Management, LLC | POC #2 | $ | 25,598.23 |
| SunCal Management, LLC | POC #3 | $ | 34,101.28 |
| Arch Insurance Company | POC #5 | $155,423,657(contingent) $131,588.73 (liquidated) | |

## SCC Communities, LLC

| | | | |
|---|---|---|---|
| Southern Cal. Geotechnical | POC #1 | $ | 7,550.49 |
| SunCal Management, LLC | POC #2 | $ | 21,804.39 |
| SCC Acquisitions, Inc. | POC #3 | $ | 1,000.00 |
| Bond Safeguard Ins. Co. & Lexon Ins. Co. | POC #4 | $ | 25,000.00 |
| Bond Safeguard Ins. Co. & Lexon Ins. Co. | POC #5 | $ | 12,500.00 |
| Bond Safeguard Ins. Co. & Lexon Ins. Co. | POC #6 | $ | 12,500.00 |
| SunCal Management, LLC | POC #7 | $ | 27,072.52 |
| SCC Acquisitions, Inc. | POC #8 | | |
| Arch Insurance Company | POC #10 | $155,423,657(contingent) $131,588.73 (liquidated) | |

## SunCal Marblehead, LLC

| | | | |
|---|---|---|---|
| Outdoor Dimensions | POC #1 | $ | 57,247.88 |
| Stantec Consulting, Inc. | POC #2; POC #25 | $ | 39,459.53 |
| TriMax Systems, Inc. | POC #3 | $ | 75,286.70 |
| Butsko Utility Design, Inc. | POC #4 | $ | 6,250.00 |
| Creekside Development, Inc. | POC #5 | $ | 780,000.00 |
| Glenn Lukos Associates, Inc. | POC #6; POC #24 | $ | 1,733.34 |
| California Barricade Rentals, Inc. | POC #7 | $ | 5,992.00 |
| Debby Cobb Consulting, Inc. | POC #8 | $ | 2,618.64 |
| BR South Coast Private Security | POC #9 | $ | 38,446.80 |
| BNB Engineering, Inc. | POC #10; POC #37 | $ | 1,608,722.64 |
| SunCal Management, LLC | POC #11 | $ | 1,799,805.75 |
| SCC Acquisitions, Inc. | POC #12 | $ | 4,000.00 |
| Coastal Living | POC #13 | $ | 11,268.00 |
| Brion Jeannette Architecture | POC #14 | $ | 106,481.00 |
| Security Signal Devices | POC #15 | $ | 42,089.00 |
| Design Alliance | POC #16 | $ | 27,943.18 |
| Steiny and Company, Inc. | POC #17 | $ | 259,775.29 |
| SunCal Management, LLC | POC #18 | $ | 591,973.05 |
| Golden State Fence Co | POC #19 | $ | 74,337.00 |
| SCC JV Ventures, LLC | POC #22 | $ | 27,307.61 |
| SunCal Master Venture Member, LLC | POC #23 | $ | 110,151.48 |
| Bee Busters, Inc. | POC #26 | $ | 300.00 |
| Villa San Clemente, LLC | POC #27 | $ | 13,233,103.00 |
| RMF Contracting, Inc. dba R&M Electrical Contracting | POC #28 | $ | 315,591.63 |
| The Jasper Companies, Inc. | POC #29 | $ | 165,260.29 |
| MediaMax Network LLC | POC #30 | $ | 55,155.48 |
| S & S Seeds, Inc. | POC #31 | $ | 15,493.56 |
| Horticultural Specialists, Inc. | POC #32 | $ | 13,000.00 |

| | | |
|---|---|---|
| Horticultural Specialists, Inc. | POC #33 | $ 54,480.20 |
| Arch Insurance Company | POC #34 | $155,423,657(contingent) $131,588.73 (liquidated) |
| Roddan Paolucci Roddan Advertising | POC #35; POC #36 | $ 427,489.63 |
| Kirk Negrete, Inc., dba United Steel Placers | POC #38 | $ 270,056.42 |
| RBF Consulting | POC #39 | $ 132,188.70 |
| SCC Acquisitions, Inc. | POC #40 | $ 56,510,018.00 |
| Bruce Elieff | POC #41 | $ 56,510,018.00 |
| R.J. Noble | POC #42; POC #50; POC #58 | $ 175,030.81 |
| City of San Clemente | POC #43, POC #51; POC #59 | $ 39,971,734.00 |
| Jag Construction | POC #44; POC #52 | $ 178,047.68 |
| Lucast Consulting | POC #45; POC #53 | $ 22,808.26 |
| Orange County Striping Service, Inc. | POC #46; POC #54 | $ 11,752.27 |
| RH Masonry, Inc. | POC #47; POC #55 | $ 189,592.00 |
| Savala Equipment Company, Inc. | POC #48; POC #56 | $ 34,440.00 |
| Rockey Murata Landscaping, Inc. | POC #60 | $ 285,643.04 |
| | | |
| **LB/L - SunCal Northlake, LLC** | | |
| SunCal Management, LLC | POC #1 | $ 896,008.98 |
| SCC Acquisitions, Inc. | POC #2 | $ 6,617.65 |
| Southern California Edison Company | POC #3 | $ 34.48 |
| SunCal Management, LLC | POC #4 | $ 421,783.35 |
| Northlake Holdings, LLC | POC #6 | $ 123,654,776.88 |
| | | |
| **SunCal Oak Knoll, LLC** | | |
| RGA Environmental, Inc. | POC #1 | $ 75,617.45 |
| BKF Engineers | POC #2,#9 & #19 | $308,817.34 |
| Aboricultural Specialties, Inc. dba The Professional Tree Care Co. | POC #3 | $ 93,925.01 |
| CST Environmental, Inc. | POC #4 | $ 4,316,169.56 |
| A-1 Enterprises | POC #5 | $ 1,250.00 |
| Lamphier Gregory | POC #6 | $ 13,543.88 |
| SunCal Management, LLC | POC #7 | $ 462,392.86 |
| Pacific Gas & Electric Company | POC #8 | $ 1,148.52 |
| SunCal Management, LLC | POC #10 | $ 874,609.00 |
| Fehr & Peers | POC #13 | $ 3,560.00 |
| Ralph Osterling Consultants, Inc. | POC #14 | $ 11,688.00 |
| Tasini & Associates | POC #15 | $ 20,000.00 |
| WRA, Inc. | POC #16 | $ 27,450.19 |
| Philip Williams & Associates, Ltd. | POC #17, #18, #27 | $ 42,728.00 |

| | | | | |
|---|---|---|---|---|
| | ENGEO, Incorporated | POC #20 | $ | 55,825.91 |
| | SWA Group | POC #21 & #22 | $ | 32,584.54 |
| | Environmental Science Associates | POC #25 | $ | 24,234.39 |
| | Pacific Gas & Electric Company | POC #26 | $ | 235.96 |
| | Rohm Insurance Agency | POC #28 | $ | 8,560.00 |
| | East Bay Municipal Utility District | POC #29 | $ | 21,948.36 |
| | | | | |
| **LB/L - SunCal - Oak Valley, LLC** | | | | |
| | Outdoor Dimensions | POC #1 | $ | 170,819.50 |
| | Stantec Consulting, Inc. | POC #2 | $ | 174,572.17 |
| | HD Supply Construction Supply, LTD., dba HD Supply White Cap Construction Supply | POC #3 | $ | 52,806.70 |
| | Kevin L. Crook Architect, Inc. | POC #4 | $ | 65,340.00 |
| | Glenn Lukos Associates, Inc. | POC #5 & #18 | $ | 15,469.81 |
| | SunCal Management, LLC | POC #6 | $ | 1,163,688.91 |
| | SCC Acquisitions, Inc. | POC #7 | $ | 5,300.00 |
| | Weston Mason Marketing | POC #8 | $ | 7,721.41 |
| | Pacific Soils Engineering, Inc. | POC #10 & #21 | $ | 97,569.13 |
| | SunCal Management, LLC | POC #11 | $ | 132,568.22 |
| | Pinnick, Inc. | POC #12 | $ | 30,752.71 |
| | Pinnick, Inc. | POC #14 | $ | 966,987.04 |
| | SCC Acquisitions, Inc. | POC #15 | $ | 4,476.99 |
| | OVC Holdings, LLC | POC #16 | $ | 141,630,091.63 |
| | SunCal Master Venture Member, LLC | POC #17 | $ | 1,398.23 |
| | Utility Consultants of Orange County | POC #19 | $ | 5,550.00 |
| | Cal West Underground, Inc. | POC #20 | $ | 4,374.60 |
| | Skyview Imaging | POC #22 | $ | 1,025.00 |
| | Hillcrest Contracting, Inc | POC #23 | $ | 136,567.43 |
| | Arch Insurance Company | POC #24 | | $155,423,657(contingent) $131,588.73 (liquidated) |
| | MacKenzie Landscape | POC #25 | $ | 121,297.00 |
| | All American Asphalt | POC #26 | $ | 60,355.48 |
| | Rohm Insurance Agency | POC #27 | $ | 182,774.00 |
| | Pacific Soils Engineering Inc. | POC #28 | $ | 153,910.10 |
| | SCC Acquisitions, Inc. Inc | POC #29 | $ | 26,167,563.15 |
| | Bruce Elieff | POC #30 | $ | 26,167,563.15 |
| | Los Angeles Times | POC #31 & #33 | $ | 39,295.00 |
| | Los Angeles Times | POC #32 & #34 | $ | 4,315.00 |
| | Proactive Engineering Consultants, Inc. | POC #35 & #36 | $ | 280,685.20 |
| | Nissho of California, Inc. | POC #37 | $ | 42,570.00 |
| | Waterforce Inc. | POC #38 | $ | 20,893.30 |
| | Jackson DeMarco Tidus & Peckenpaugh | POC #39 | $ | 19,383.02 |
| | Corporation Service Company | POC # 40 | $ | 56.49 |
| | | | | |
| **SJD Development Corp.** | | | | |
| | SCC Acquisitions | POC #3 | $ | - |
| | MWW Group Inc. | POC #5 | $ | 42,019.25 |

| | | | |
|---|---|---|---|
| | Arch Insurance Company | POC #6 | $155,423,657(contingent) $131,588.73 (liquidated) |
| | | | |
| **SJD Partners, Ltd.** | | | |
| | Hunsaker & Associates - Irvine | POC #1 | $ 373,205.33 |
| | Palmieri, Tyler, Wiender, Wilhelm & Waldron LLP | POC #2; POC #5; POC #45; POC #46 | $ 7,080.17 |
| | KTGY Group, Inc. | POC #3 | $ 8,295.36 |
| | Utility Consultants of Orange | POC #4; POC #9 | $ 15,550.00 |
| | Contracting Engineers, Inc | POC #6 | $ 12,227.50 |
| | C.I. Printing Inc., dba Color Image Printing, Inc. | POC #7 | $ 22,127.70 |
| | Culbertson, Adams & Associates | POC #8 | $ 19,751.66 |
| | Gary L. Vogt & Associates | POC #10 | $ 2,250.00 |
| | Scoop Reprint Source | POC #11 | $ 5,215.38 |
| | Daren Saunders Photography | POC #12 | $ 1,131.21 |
| | GCI Associates, Inc. | POC #13 | $ 641.42 |
| | Dexter Wilson Engineering, Inc | POC #14 | $ 10,418.37 |
| | HomeBuyers Guide Real Estate Inc. | POC #15 | $ 69,900.00 |
| | Creekside Development, Inc. | POC #16 | $ 3,663,332.72 |
| | Centex Homes | POC #17 | $ 3,771,678.07 |
| | SunCal Management, LLC | POC #18 | $ 1,386,189.57 |
| | SCC Acquisitions, Inc. | POC #19 | $ 27,166.61 |
| | Boudreau Pipeline Corporation | POC #20 | $ 899,840.47 |
| | SunCal Management, LLC | POC #22 | $ 198,926.00 |
| | SunCal Master Venture Member, LLC | POC #25 | $ 45,164.31 |
| | Bond Safeguard Ins. Co. & Lexon Ins. Co. | POC #26 | $ 319,287.00 |
| | Bond Safeguard Ins. Co. & Lexon Ins. Co. | POC #27 | $ 343,468.00 |
| | Bond Safeguard Ins. Co. & Lexon Ins. Co. | POC #28 | $ 378,797.00 |
| | Bond Safeguard Ins. Co. & Lexon Ins. Co. | POC #29 | $ 114,291.00 |
| | Bond Safeguard Ins. Co. & Lexon Ins. Co. | POC #30 | $ 710,192.00 |
| | Bond Safeguard Ins. Co. & Lexon Ins. Co. | POC #31 | $ 476,943.00 |
| | Bond Safeguard Ins. Co. & Lexon Ins. Co. | POC #32 | $ 364,676.00 |
| | Bond Safeguard Ins. Co. & Lexon Ins. Co. | POC #33 | $ 262,073.00 |
| | Bond Safeguard Ins. Co. & Lexon Ins. Co. | POC #34 | $ 1,639,486.00 |
| | Bond Safeguard Ins. Co. & Lexon Ins. Co. | POC #35 | $ 1,537,973.00 |
| | Bond Safeguard Ins. Co. & Lexon Ins. Co. | POC #36 | $ 434,156.00 |
| | Bond Safeguard Ins. Co. & Lexon Ins. Co. | POC #37 | $ 763,671.00 |
| | Bond Safeguard Ins. Co. & Lexon Ins. Co. | POC #38 | $ 219,070.00 |
| | Bond Safeguard Ins. Co. & Lexon Ins. Co. | POC #39 | $ 70,005.00 |
| | Bond Safeguard Ins. Co. & Lexon Ins. Co. | POC #40 | $ 83,952.00 |
| | Bond Safeguard Ins. Co. & Lexon Ins. Co. | POC #41 | $ 78,031.00 |
| | Bond Safeguard Ins. Co. & Lexon Ins. Co. | POC #42 | $ 7,712,119.00 |
| | SCC Acquisitions, Inc. | POC #43 | $ 37,472,869.00 |
| | Bruce Elieff | POC #44 | $ 37,472,869.00 |
| | Arch Insurance Company | POC #47 | $155,423,657(contingent) $131,588.73 (liquidated) |
| | Summers Murphy & Partners, Inc | POC #48 | $ 8,350.00 |
| | 5th Gear, LLC | POC #49 | $ 97,531.77 |
| | All American Asphalt | POC #50 | $ 245,870.91 |
| | Halladay & Mim Mack, Inc. | POC #51 | $ 44,611.21 |
| | Voss, Cook & Thel, LLP | POC #52 | $ 205,322.98 |
| | Chino Grading, Inc. | POC #53 | $ 282,044.14 |

| | | | | |
|---|---|---|---|---|
| | Ron Martin & Associates, Inc. | POC #54 | $ | 35,217.09 |
| | Rohm Insurance Agency | POC #55 | $ | 109,185.00 |
| | | | | |
| **SunCal PSV, LLC** | | | | |
| | Desert Publications | POC #1 | $ | 10,385.00 |
| | SunCal Management, LLC | POC #2 | $ | 520,753.13 |
| | SCC Acquisitions, Inc. | POC #3 | $ | 22,977.13 |
| | Brudvik, Inc. | POC #4 | $ | 48,984.54 |
| | Larry Jacinto Construction, Inc. | POC #5; POC #24 | $ | 212,663.76 |
| | MOM Publications, Inc. dba New Homes Magazine | POC #6 | $ | 10,383.93 |
| | SunCal Management, LLC | POC #7 | $ | 206,329.30 |
| | SCC Acquisitions, Inc. | POC #8 | $ | 18,612.37 |
| | Williams + Paddon Architects + Planners, Inc | POC #9 | $ | 64,084.38 |
| | Williams + Paddon Architects + Planners, Inc | POC #10 | $ | 9,713.64 |
| | SCC Acquisitions, Inc. | POC #11 | $ | 17,993.01 |
| | SunCal Master Venture Member, LLC | POC #13 | $ | 72,278.26 |
| | SCC Acquisitions, Inc. | POC #14 | $ | 18,405,548.00 |
| | Bruce Elieff | POC #15 | $ | 18,405,548.00 |
| | Desert Water Agency | POC #16 | $ | 53,443.92 |
| | AP Medallion Gold LLC dba Golf Ventures West, LLC | POC #17 | | $4,072.97 |
| | Martin Excavation, Inc. | POC #18 | $ | 1,762.50 |
| | West Coast Turf | POC #19 | $ | 263,262.04 |
| | High Tech Irrigation, Inc. | POC #20 | $ | 50,526.39 |
| | Griffin Structures, Inc. | POC #21; POC #22 | $ | 80,001.60 |
| | The Collaborative West, Inc. | POC #23 | $ | 79,547.50 |
| | Southern California Edison Company | POC #25 | $ | 243.89 |
| | Southern California Edison Company | POC #26 | $ | 23,681.62 |
| | HSA Design Group | POC #27 | $ | 8,767.92 |
| | Arch Insurance Company | POC #28 | | $155,423,657(contingent) $131,588.73 (liquidated) |
| | 5th Gear, LLC | POC #29 | $ | 136,356.73 |
| | Rohm Insurance Agency | POC #30 | $ | 183,883.00 |
| | Stormwater Compliance Specialists, Inc. | POC #31; POC #37 | $ | 21,840.00 |
| | Swanillon Inc., dba The Land Stewards | POC #32; POC #38 | $ | 23,024.04 |
| | Pacific Masonry Walls Inc | POC #33; POC #39 | $ | 314,061.23 |
| | Simplot Partners (J.R. Simplot Company) | POC #34; POC #40 | $ | 3,467.88 |
| | Palm Springs Pump, Inc | POC #35; POC #41 | $ | 18,158.59 |
| | Desert Pipeline Inc | POC #36; POC #42; POC #47 | $ | 469,784.09 |
| | MSA Consulting, Inc. | POC #43 | $ | 666,897.27 |
| | Nissho of California, Inc. | POC #44 | $ | 1,856,428.02 |
| | Jackson, DeMarco, Tidus & Peckenpaugh | POC #45 | $ | 52,234.50 |
| | Oliphant Golf, Inc. | POC #46 | $ | 456,476.47 |
| | Protection One | POC #48 | $ | 2,194.19 |

## Palmdale Hills Property, LLC

|  |  |  |  |
|---|---|---|---|
| | Asphalt Professionals | POC #1; POC #46 | $ 35,528.13 |
| | Pinnacle Land Surveying, Inc | POC #2 | $ 66,051.00 |
| | Inland Blueprint Inc. dba IB Reprographics | POC #3; POC #21 | $ 2,320.77 |
| | Greg Norman Golf Course Design | POC #4 | $ 211,490.01 |
| | A.G.I. Geotechnical, Inc. | POC #5 | $ 20,045.81 |
| | The Corporation Int Rate Mgmt | POC #6 | $ 112,500.00 |
| | Geo Consultants, Inc. | POC #7 | $ 10,080.00 |
| | Glumac | POC #8 | $ 2,662.40 |
| | KTGY Group, Inc. | POC #9 | $ 49,996.82 |
| | Lim & Nascimento Engineering | POC #10; POC #45 | $ 1,830.00 |
| | Patricia I. Volkerts Trust dated August 7, 2000 | POC #11 | $ 871,703.19 |
| | SJD Partners, Ltd. | POC #13 | $ 12,584.00 |
| | Stantec Consulting | POC #14; POC #56 | $ 134,297.23 |
| | HD Supply Construction Supply, LTD., dba HD Supply White Cap Construction Supply | POC #15 | $ 14,893.18 |
| | Charles Skaggs | POC #16 | $ 6,096.25 |
| | Glenn Lukos Associates, Inc. | POC #17; POC #18;POC #36 | $ 1,216.78 |
| | Glenn Lukos Associates, Inc. | POC #19 | $ 11,326.13 |
| | Scott E. McDaniel | POC #20 | $ 535,000.00 |
| | So. & Associates Engineers | POC #22 | $ 15,485.00 |
| | SunCal Management, LLC | POC #23 | $ 1,379,367.84 |
| | SCC Acquisitions, Inc. | POC #24 | $ 3,000.00 |
| | Warmington Homes California | POC #25 | $ 1,771,232.88 |
| | Palmieri, Tyler, Wiender, Wilhelm & Waldron LLP | POC #26 | $ 91,034.50 |
| | Western Oilfields Supply Co. Inc. dba Rain for Rent | POC #27 | $ 2,160.11 |
| | Linscott, Law & Greenspan Engnrs | POC #28 | $ 608.50 |
| | Arleen Logan | POC #29 | $ 668,250.00 |
| | Amec Earth and Environmental | POC #30 | $ 17,906.39 |
| | Klassen Corporation | POC #31 | $ 306,350.99 |
| | Hewitt & O'Neil LLP | POC #32; POC #92 | $ 12,584.00 |
| | Sierra Cascade Construction | POC #33 | $ 550,677.29 |
| | Greg Norman Golf Course Design | POC #34 | $ 218,259.21 |
| | Dou Family Trust; Hsu Chih Chang Trust | POC #35 | $ 3,173,499.50 |
| | Glenn Lukos Associates, Inc. | POC #37 | $ 7,924.19 |
| | Ugalde Trucking Co., Inc. | POC #38 | $ 6,520.00 |
| | GCI Associates, Inc. | POC #39 | $ 641.42 |
| | Andy Gump | POC #40 | $ 11,183.08 |
| | Wood Rogers, Inc. | POC #41 | $ 34,119.11 |
| | GeoTeck, Inc. | POC #42 | $ 17,749.00 |
| | Cooks Portable Toilets & Septic, LLC | POC #43 | $ 2,743.21 |
| | HMK Engineers | POC #44 | $ 26,688.85 |
| | Zeiser KLing Consultants. Inc | POC #47 | $ 8,984.27 |
| | Asphalt Professionals | POC #48 | $ 75,188.52 |

| | | | |
|---|---|---|---:|
| | Bova Contracting Group | POC #49: POC #58 | $ 1,155,533.39 |
| | Cal-State Rent A Fence | POC #50; POC #100 | $ 1,679.72 |
| | Staats Construction, Inc. | POC #51 | $ 166,105.82 |
| | Pierce's Security | POC #52 | $ 53,919.09 |
| | Roddan Paolucci Roddan Advertising | POC #53 | $ 78,083.50 |
| | Arch Insurance Company | POC #54 | $155,423,657 (contingent) $131,588.73 (liquidated) |
| | Southland Framers, Inc. | POC #55; POC #67; POC #68 | $ 177,801.98 |
| | Jeanette C. Justus Associate | POC #57 | $ 28,428.59 |
| | SunCal Management, LLC | POC #59 | $ 489,020.27 |
| | Bethel Island Municipal Improvement District | POC #61 | $ 2,000,000.00 |
| | Pinnick, Inc. | POC #62 | $ 30,752.71 |
| | Pinnick, Inc. | POC #63 | $ 936,234.33 |
| | Pinnick, Inc. | POC #64 | $ 563,159.02 |
| | Summers/Murphy & Partners, I | POC #66 | $ 54,375.00 |
| | Urban CrossRoads, Inc. | POC #69 | $ 14,320.00 |
| | Outdoor Sales, Inc. | POC #70 | $ 785,282.57 |
| | Rohm Insurance Agency | POC #71 | $ 97,621.00 |
| | Bond Safeguard Ins. Co. & Lexon Ins. Co. | POC #72 | $ 1,784,700.00 |
| | Bond Safeguard Ins. Co. & Lexon Ins. Co. | POC #73 | $ 6,353,850.00 |
| | Bond Safeguard Ins. Co. & Lexon Ins. Co. | POC #74 | $ 150,700.00 |
| | Bond Safeguard Ins. Co. & Lexon Ins. Co. | POC #75 | $ 3,414,300.00 |
| | Bond Safeguard Ins. Co. & Lexon Ins. Co. | POC #76 | $ 240,750.00 |
| | Bond Safeguard Ins. Co. & Lexon Ins. Co. | POC #77 | $ 649,500.00 |
| | Bond Safeguard Ins. Co. & Lexon Ins. Co. | POC #78 | $ 3,160,650.00 |
| | Bond Safeguard Ins. Co. & Lexon Ins. Co. | POC #79 | $ 4,122,000.00 |
| | Bond Safeguard Ins. Co. & Lexon Ins. Co. | POC #80 | $ 784,050.00 |
| | Bond Safeguard Ins. Co. & Lexon Ins. Co. | POC #81 | $ 37,950.00 |
| | Bond Safeguard Ins. Co. & Lexon Ins. Co. | POC #82 | $ 19,500.00 |
| | Bond Safeguard Ins. Co. & Lexon Ins. Co. | POC #83 | $ 5,900.00 |
| | Bond Safeguard Ins. Co. & Lexon Ins. Co. | POC #84 | $ 13,000.00 |
| | Bond Safeguard Ins. Co. & Lexon Ins. Co. | POC #85 | $ 3,549,700.00 |
| | Bond Safeguard Ins. Co. & Lexon Ins. Co. | POC #86 | $ 573,400.00 |
| | Bond Safeguard Ins. Co. & Lexon Ins. Co. | POC #87; POC #103 | $ 24,859,950.00 |
| | Lennar Centex Del Rio Partners LLC | POC #88 | $ 3,063,489.30 |
| | The City of Palmdale | POC #89 | Unknown |
| | SCC Acquisitions, Inc. | POC #90 | $ 27,991,947.00 |
| | Bruce Elieff | POC #91 | $ 27,991,947.00 |
| | Chameleon Design, Inc. | POC #93; POC #99 | $ 48,240.00 |
| | Jag Construction | POC #96 | $ 163,018.12 |
| | County of San Bernardino | POC#97 | $ 504,245.23 |
| | AMEC Earth & Environmental, Inc. | POC #98 | $ 195,576.53 |
| | Cheryl R. Mims | POC #101 | $ 136,229.12 |
| | Wallace Kuhl & Associates, Inc. | POC #102 | $ 11,379.39 |
| | Southern California Edison Company | POC #104 | $ 43.68 |
| | Franchise Tax Board | POC #105 | $ 7,517.99 |
| | | | |

## SunCal Communities I, LLC

| | | | |
|---|---|---|---|
| | Arch Insurance Company | POC #1 | $155,423,657 (contingent) $131,588.73 (liquidated) |
| | | | |
| **SunCal Communities III, LLC** | | | |
| | Verizon California Inc. | POC #1 | $ 459.40 |
| | Arch Insurance Company | POC #3 | $155,423,657 (contingent) $131,588.73 (liquidated) |
| | | | |
| **SunCal Summit Valley, LLC** | | | |
| | Hunsaker & Associates - Irvine | POC #1 | $ 126,940.25 |
| | Development Planning Solutions | POC #2 | $ 12,420.54 |
| | LSA Associates, Inc. | POC #3 | $ 6,985.67 |
| | Arthur Riggs | POC #4 | $ 801,900.00 |
| | Arleen Logan | POC #5 | $ 668,250.00 |
| | Charles E. Skaggs | POC #6 & #14 | $ 6,096.25 |
| | SunCal Management, LLC | POC #7 | $ 7,436.33 |
| | SCC Acquisitions, Inc. | POC #8 | $ 2,500.00 |
| | Pacific Soils Engineering, Inc. | POC #9 | $ 16,827.00 |
| | SunCal Management, LLC | POC #10 | $ 42,027.08 |
| | SunCal Master Venture Member LLC | POC #13 | $ 5,991.40 |
| | Arch Insurance Company | POC #15 | $155,423,657 (contingent) $131,588.73 (liquidated) |
| | Summers/Murphy & Partners | POC #16 | $ 7,600.00 |
| | Cheltimalie Enterprises, a California Partnership | POC #17 | $ 1,388,156.25 |
| | | | |
| **Tesoro SF, LLC** | | | |
| | Glenn Lukos Associates, Inc. | POC #1 | $ 11,326.13 |
| | SCC Acquisitions, Inc. | POC #3 | $ 4,888.89 |
| | SunCal Management, LLC | POC #4 | $ 104,510.08 |
| | SunCal Management, LLC | POC #5 | $ 118,891.12 |
| | Arch Insurance Company | POC #8 | $155,423,657 (contingent) $131,588.73 (liquidated) |
| | Rohm Insurance Company | POC #9 | $ 8,560.00 |
| | | | |

**Note:** *Some claims listed may have been filed against the wrong debtors' estate. The information contained herein is based on information gathered to date, and is not, nor is it intended to be, an admission as to identity of all creditors, the total amounts claimed, or the amounts allowed.*

# EXHIBIT 8

## RELIANCE CLAIMS

### PART II

| Claimant | Claim Nos. |
|---|---|
| The Holder of the asserted Mechanic Lien Claim held by Asphalt Professionals against the Ritter Ranch Project owned by Palmdale Hills in the amount of $38,249. | Palmdale Hills 1 and 46 |
| The Holder of the asserted Mechanic Lien Claim held by Sierra Cascade Construction against the Ritter Ranch Project owned by Palmdale Hills in the amount of $550,677. | Palmdale Hills 33 |
| The Holder of the asserted Mechanic Lien Claim held by Staats Construction. Inc. against the Ritter Ranch Project owned by Palmdale Hills in the amount of $166,105. | Palmdale Hills 51 |
| The Holder of the asserted Mechanic Lien Claim held by Southland Farmers, Inc. against the Ritter Ranch Project owned by Palmdale Hills in the amount of $177,801. | Palmdale Hills 55, 67 and 68 |
| The Holder of the asserted Mechanic Lien Claim held by Pinnick, Inc. against the Ritter Ranch Project owned by Palmdale Hills in the amount of $1,530,146. | Palmdale Hills 62, 63 and 64 |
| The Holder of the asserted Mechanic Lien Claim held by Chamelon Design Inc. against the Ritter Ranch Project owned by Palmdale Hills in the amount of $73,600. | Palmdale Hills 93, 99 |
| The Holder of the asserted Mechanic Lien Claim held by Hall & Foreman, Inc. against the Emerald Meadows Project in the amount of $287,727. | SunCal Emerald 13 |
| The Holder of the asserted Mechanic Lien Claim held by Proactive Engineering against the Emerald Meadows Project in the amount of $991,315. | SunCal Emerald 15 and 16 |
| The Holder of the asserted Mechanic Lien Claim held by HD Supply Construction against the Ritter Ranch Project owned by Palmdale Hills in the amount of $14,893. | Palmdale Hills 15 |
| The Holder of the asserted Mechanic Lien Claim held by MHM Engineers against the Bickford Ranch Project in the amount of $8,916. | SunCal Bickford 5 |

DS EXHIBITS.DOC

| Claimant | Claim Nos. |
|---|---|
| The Holder of the asserted Mechanic Lien Claim held by Land Architecture against the Bickford Ranch Project in the amount of $100,245. | SunCal Bickford 6 |
| The Holder of the asserted Mechanic Lien Claim held by Kiewit Pacific Co. against the Bickford Ranch Project in the amount of $1,868,357. | SunCal Bickford 10 |
| The Holder of the asserted Mechanic Lien Claim held by ARB, Inc. against the Bickford Ranch Project in the amount of $1,052,272. | SunCal Bickford 15 |
| The Holder of the asserted Mechanic Lien Claim held by Independent Construction against the Bickford Ranch Project in the amount of $117,209. | SunCal Bickford 28 |
| The Holder of the asserted Mechanic Lien Claim held by Marques Pipeline, Inc. against the Bickford Ranch Project in the amount of $330,118. | SunCal Bickford 29 and 30 |
| The Holder of the asserted Mechanic Lien Claim held by Pacific Soils Engineering against the portion of the Summit Valley Project owned by Summit Valley in the amount of $16,827. | SunCal Summit 9 |
| The Holder of the disputed asserted Mechanic Lien Claim held by Hertz Equipment Rental Corporation against the Delta Coves Project in the amount of $25,444. | SunCal Delta Coves 2 |
| The Holder of the asserted Mechanic Lien Claim held by MBH Architects against the Delta Coves Project in the amount of $97,091. | SunCal Delta Coves 8 |
| The Holder of the asserted Mechanic Lien Claim held by HD Supply Construction against the Heartland Project in the amount of $47,675. | SunCal Heartland 2 |
| The Holder of the asserted Mechanic Lien Claim held by Pinnik, Inc. against the Heartland Project in the amount of $563,159. | SunCal Heartland 8 |
| The Holder of the asserted Mechanic Lien Claim held by Dennis M. McCoy & Sons against the Heartland Project in the amount of $941,960. | SunCal Heartland 16 |
| The Holder of the asserted Mechanic Lien Claim held by Trimax Systems, Inc. against the Marblehead Project in the amount of $75,286. | SunCal Marblehead 3 |
| The Holder of the asserted Mechanic Lien Claim held by Butsko Utility Design, Inc. against the Marblehead Project in the amount of $6,250. | SunCal Marblehead 4 |
| The Holder of the asserted Mechanic Lien Claim held by Dennis RMF Contracting, Inc. against the Marblehead Project in the amount of $264,749. | SunCal Marblehead 28 |

DS EXHIBITS.DOC

| Claimant | Claim Nos. |
|---|---|
| The Holder of the asserted Mechanic Lien Claim held by The Jasper Companies against the Marblehead Project in the amount of $165,260. | SunCal Marblehead 29 |
| The Holder of the asserted Mechanic Lien Claim held by Kirk Negrete, Inc. dba United Steel Placers against the Marblehead Project in the amount of $270,056. | SunCal Marblehead 38 |
| The Holder of the asserted Mechanic Lien Claim held by RBF Consulting against the Marblehead Project in the amount of $125,093. | SunCal Marblehead 39 |
| The Holder of the asserted Mechanic Lien Claim held by RJ Noble Co. against the Marblehead Project in the amount of $175,030. | SunCal Marblehead 42, 50 and 58 |
| The Holder of the asserted Mechanic Lien Claim held by Orange County Stripping Services against the Marblehead Project in the amount of $4,400. | SunCal Marblehead 46 and 54 |
| The Holder of the asserted Mechanic Lien Claim held by Savala Equipment Co. Inc. against the Marblehead Project in the amount of $34,440. | SunCal Marblehead 48 and 56 |
| The Holder of the asserted Mechanic Lien Claim held by Rockey Murata Landscaping against the Marblehead Project in the amount of $285,643. | SunCal Marblehead 60 |
| The Holder of the asserted Mechanic Lien Claim held by HD Supply Construction against the Oak Valley Project in the amount of $52,806. | SunCal Oak Valley 3 |
| The Holder of the asserted Mechanic Lien Claim held by Pinnik Inc. against the Oak Valley Project in the amount of $966,987. | SunCal Oak Valley 12 and 14 |
| The Holder of the asserted Mechanic Lien Claim held by Hillcrest Contracting Inc. against the Oak Valley Project in the amount of $136,567. | SunCal Oak Valley 23 |
| The Holder of the asserted Mechanic Lien Claim held by MacKenzie Landscape against the Oak Valley Project in the amount of $121,297. | SunCal Oak Valley 25 |
| The Holder of the asserted Mechanic Lien Claim held by All American Asphalt against the Oak Valley Project in the amount of $60,355. | SunCal Oak Valley 26 |
| The Holder of the asserted Mechanic Lien Claim held by Los Angeles Times against the Oak Valley Project in the amount of $43,610. | SunCal Oak Valley 31 and 32 |
| The Holder of the asserted Mechanic Lien Claim held by Proactive Engineering against the Oak Valley Project in the amount of $280,685. | SunCal Oak Valley 35 and 36 |
| The Holder of the asserted Mechanic Lien Claim held by Brudvik Inc. against the Palm Springs Village Project in the amount of $43,365. | SunCal PSV 4 |

DS EXHIBITS.DOC

| Claimant | Claim Nos. |
|---|---|
| The Holder of the asserted Mechanic Lien Claim held by Larry Jacinto Construction Inc. against the Palm Springs Village Project in the amount of $212,663. | SunCal PSV 5 and 24 |
| The Holder of the asserted Mechanic Lien Claim held by William + Paddon Architects + Planners Inc. against the Palm Springs Village Project in the amount of $73,798. | SunCal PSV 9 and 10 |
| The Holder of the asserted Mechanic Lien Claim held by Southern California Edison against the Palm Springs Village Project in the amount of $23,861. | SunCal PSV 26 |
| The Holder of the asserted Mechanic Lien Claim held by Pacific Masonry Walls, Inc. against the Palm Springs Village Project in the amount of $314,061. | SunCal PSV 33 and 39 |
| The Holder of the asserted Mechanic Lien Claim held by J.R. Simplot Company against the Palm Springs Village Project in the amount of $3,467. | SunCal PSV 34 and 40 |
| The Holder of the asserted Mechanic Lien Claim held by Desert Pipeline Inc. against the Palm Springs Village Project in the amount of $469,784. | SunCal PSV 36, 42 and 47 |
| The Holder of the asserted Mechanic Lien Claim held by MSA Consulting against the Palm Springs Village Project in the amount of $666,897. | SunCal PSV 43 |
| The Holder of the asserted Mechanic Lien Claim held by Jackson DeMarco against the Palm Springs Village Project in the amount of $52,234. | SunCal PSV 45 |
| The Holder of the asserted Mechanic Lien Claim held by Oliphant Gold, Inc. against the Oak Knoll Project in the amount of $456,476. | SunCal Oak Knoll 46 |
| The Holder of the asserted Mechanic Lien Claim held by RGA Environmental, Inc. against the Oak Knoll Project in the amount of $75,617. | SunCal Oak Knoll 1 |
| The Holder of the asserted Mechanic Lien Claim held by BKF Engineers against the Oak Knoll Project in the amount of $308,817. | SunCal Oak Knoll 2 and 19 |
| The Holder of the asserted Mechanic Lien Claim held by CST Environmental Inc. against the Oak Knoll Project in the amount of $4,316,169. | SunCal Oak Knoll 4 and 9 |

DS EXHIBITS.DOC

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 660 Newport Center Drive, 4th Fl., Newport Beach, CA 92660.

A true and correct copy of the foregoing document described as:  **DISCLOSURE STATEMENT DESCRIBING CHAPTER 11 PLAN FILED BY SUNCAL PLAN PROPONENTS IN THE CHAPTER 11 CASES OF PALMDALE HILLS PROPERTY, LLC, SUNCAL BICKFORD RANCH, LLC, SUNCAL MARBLEHEAD, LLC AND SUNCAL PSV, LLC [GROUP I DEBTORS]** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

**I.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On April 7, 2011, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

☒  Service information continued on attached page

**II. SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served):
On April 7, 2011, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☒  Service information continued on attached page

**III.  SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on April 7, 2011 I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.

| | |
|---|---|
| Debtor:  Bruce Cook:  bcook@suncal.com<br><br>U.S. Trustee's Office<br>Michael Hauser, Esq.<br>411 West Fourth St., #9041<br>Santa Ana, CA 92701 | Honorable Erithe Smith<br>Ronald Reagan Federal Bldg.<br>411 W. Fourth St., Suite 5041<br>Santa Ana, CA 92701 |

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| April 7, 2011 | Susan Connor | /s/ Susan Connor |
|---|---|---|
| Date | Type Name | Signature |

MAINDOCS-#160298-v1-Disclosure_Statement_Group_I.DOC

### NEF SERVICE LIST

- Selia M Acevedo    sacevedo@millerbarondess.com,
  mpritikin@millerbarondess.com;bprocel@millerbarondess.com
- Joseph M Adams    jadams@sycr.com
- Raymond H Aver    ray@averlaw.com
- James C Bastian    jbastian@shbllp.com
- Thomas Scott Belden    sbelden@kleinlaw.com, ecf@kleinlaw.com
- John A Boyd    fednotice@tclaw.net
- Mark Bradshaw    mbradshaw@shbllp.com
- Gustavo E Bravo    gbravo@smaha.com
- Jeffrey W Broker    jbroker@brokerlaw.biz
- Brendt C Butler    bbutler@mandersonllp.com
- Andrew W Caine    acaine@pszyjw.com
- Carollynn Callari    ccallari@venable.com
- Dan E Chambers    dchambers@jmbm.com
- Shirley Cho    scho@pszjlaw.com
- Vonn Christenson    vrc@paynefears.com
- Brendan P Collins    bpcollins@bhfs.com
- Vincent M Coscino    vcoscino@allenmatkins.com, emurdoch@allenmatkins.com
- Paul J Couchot    pcouchot@winthropcouchot.com,
  pj@winthropcouchot.com;sconnor@winthropcouchot.com
- Jonathan S Dabbieri    dabbieri@sullivan.com,
  hill@sullivanhill.com;mcallister@sullivanhill.com;stein@sullivanhill.com;vidovich@sullivanhill.com
- Ana Damonte    ana.damonte@pillsburylaw.com
- Vanessa S Davila    vsd@amclaw.com
- Melissa Davis    mdavis@shbllp.com
- Daniel Denny    ddenny@gibsondunn.com
- Caroline Djang    crd@jmbm.com
- Donald T Dunning    ddunning@dunningLaw.com
- Joseph A Eisenberg    jae@jmbm.com
- Lei Lei Wang Ekvall    lekvall@wgllp.com
- Richard W Esterkin    resterkin@morganlewis.com
- Marc C Forsythe    kmurphy@goeforlaw.com
- Alan J Friedman    afriedman@irell.com
- Steven M Garber    steve@smgarberlaw.com
- Christian J Gascou    cgascou@gascouhopkins.com
- Barry S Glaser    bglaser@swjlaw.com
- Robert P Goe    kmurphy@goeforlaw.com, rgoe@goeforlaw.com;mforsythe@goeforlaw.com
- Eric D Goldberg    egoldberg@stutman.com
- Richard H Golubow    rgolubow@winthropcouchot.com, pj@winthropcouchot.com
- Michael J Gomez    mgomez@frandzel.com, efiling@frandzel.com;sking@frandzel.com
- Kelly C Griffith    bkemail@harrisbeach.com
- Matthew Grimshaw    mgrimshaw@rutan.com
- Kavita Gupta    kgupta@winthropcouchot.com
- Asa S Hami    ahami@morganlewis.com
- Michael J Hauser    michael.hauser@usdoj.gov
- D Edward Hays    ehays@marshackhays.com
- Michael C Heinrichs    mheinrichs@omm.com
- Harry D. Hochman    hhochman@pszjlaw.com, hhochman@pszjlaw.com
- Jonathan M Hoff    jonathan.hoff@cwt.com
- Nancy Hotchkiss    nhotchkiss@trainorfairbrook.com
- Michelle Hribar    mhribar@rutan.com
- John J Immordino    john.immordino@wilsonelser.com, raquel.burgess@wilsonelser.com
- Lawrence A Jacobson    laj@cohenandjacobson.com

1
- Michael J Joyce   mjoyce@crosslaw.com
- Stephen M Judson   sjudson@fablaw.com

2
- Kaleb L Judy   ecf@kleinlaw.com, kjudy@kleinlaw.com
- Sheri Kanesaka   sheri.kanesaka@bryancave.com

3
- David I Katzen   katzen@ksfirm.com
- Christopher W Keegan   ckeegan@kirkland.com, gdupre@kirkland.com;alevin@kirkland.com

4
- Payam Khodadadi   pkhodadadi@winthropcouchot.com, pj@winthropcouchot.com
- Irene L Kiet   ikiet@hkclaw.com

5
- Mark J Krone   mk@amclaw.com, crs@amclaw.com;amc@amclaw.com
- David B Lally   davidlallylaw@gmail.com

6
- Leib M Lerner   leib.lerner@alston.com
- Peter W Lianides   plianides@winthropcouchot.com, pj@winthropcouchot.com

7
- Charles Liu   cliu@winthropcouchot.com
- Kerri A Lyman   klyman@irell.com

8
- Mariam S Marshall   mmarshall@marshallramoslaw.com
- Robert C Martinez   rmartinez@mclex.com

9
- Michael D May   mdmayesq@verizon.net
- Hutchison B Meltzer   hmeltzer@wgllp.com

10
- Krikor J Meshefejian   kjm@lnbrb.com
- Joel S. Miliband   jmiliband@rusmiliband.com

11
- James M Miller   jmiller@millerbarondess.com
- Louis R Miller   smiller@millerbarondess.com

12
- Randall P Mroczynski   randym@cookseylaw.com
- Mike D Neue   mneue@thelobelfirm.com, jmattiace@thelobelfirm.com;pnelson@thelobelfirm.com

13
- Robert Nida   Rnida@castlelawoffice.com
- Henry H Oh   henry.oh@dlapiper.com, janet.curley@dlapiper.com

14
- Sean A Okeefe   sokeefe@okeefelc.com
- Robert B Orgel   rorgel@pszjlaw.com, rorgel@pszjlaw.com

15
- Malhar S Pagay   mpagay@pszjlaw.com, mpagay@pszjlaw.com
- Penelope Parmes   pparmes@rutan.com

16
- Ronald B Pierce   ronald.pierce@sdma.com
- Katherine C Piper   kpiper@steptoe.com

17
- Cassandra J Richey   cmartin@pprlaw.net
- Debra Riley   driley@allenmatkins.com

18
- James S Riley   tgarza@sierrafunds.com
- Todd C. Ringstad   becky@ringstadlaw.com

19
- R Grace Rodriguez   ecf@lorgr.com
- Martha E Romero   Romero@mromerolawfirm.com

20
- Ronald Rus   rrus@rusmiliband.com
- John P Schafer   jschafer@mandersonllp.com

21
- John E Schreiber   jschreiber@dl.com
- William D Schuster   bills@allieschuster.org

22
- Christopher P Simon   csimon@crosslaw.com
- Wendy W Smith   wendy@bindermalter.com

23
- Steven M Speier   Sspeier@Squarmilner.com, ca85@ecfcbis.com
- Steven M Speier (TR)   Sspeier@asrmanagement.com, ca85@ecfcbis.com

24
- Michael St James   ecf@stjames-law.com
- Michael K Sugar   msugar@irell.com

25
- Cathy Ta   cathy.ta@bbklaw.com, Arthur.Johnston@bbklaw.com;Kenneth.Burgess@bbklaw.com
- David A Tilem   davidtilem@tilemlaw.com,

26
  malissamurguia@tilemlaw.com;dianachau@tilemlaw.com;kmishigian@tilemlaw.com

27
- James E Till   jtill@thelobelfirm.com, jmattiace@thelobelfirm.com;pnelson@thelobelfirm.com
- United States Trustee (SA)   ustpregion16.sa.ecf@usdoj.gov

28
- Carol G Unruh   cgunruh@sbcglobal.net
- Annie Verdries   verdries@lbbslaw.com

1
- Jason Wallach    jwallach@gladstonemichel.com
- Joshua D Wayser    , kim.johnson@kattenlaw.com

2
- Christopher T Williams    ctwilliams@venable.com, jcontreras@venable.com
- Marc J Winthrop    mwinthrop@winthropcouchot.com, pj@winthropcouchot.com

3
- David M Wiseblood    dwiseblood@seyfarth.com
- Brett K Wiseman    bwiseman@aalaws.com

4
- Dean A Ziehl    dziehl@pszjlaw.com, dziehl@pszjlaw.com
- Marc A. Zimmerman    joshuasdaddy@att.net

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28