1  PAUL J. COUCHOT -- State Bar No. 131934
SEAN A. O'KEEFE -- State Bar No. 122417
2  PETER W. LIANIDES – State Bar No. 160517
**WINTHROP COUCHOT**
3  **PROFESSIONAL CORPORATION**
660 Newport Center Drive, Fourth Floor
4  Newport Beach, CA 92660
Telephone: (949) 720-4100
5  Facsimile: (949) 720-4111
General Insolvency Counsel for Administratively Consolidated
6  Debtors-in-Possession

7  RONALD RUS - State Bar No. 67369
JOEL S. MILIBAND - State Bar No. 77438
8  **RUS MILIBAND & SMITH P.C.**
2211 Michelson Drive, Seventh Floor
9  Irvine, California 92612
Telephone: (949) 752-7100
10  Facsimile: (949) 252-1514

Counsel for SunCal Management LLC and
11  SCC Acquisitions Inc.

12         **UNITED STATES BANKRUPTCY COURT**
           **CENTRAL DISTRICT OF CALIFORNIA**
13            **SANTA ANA DIVISION**

14  In re
PALMDALE HILLS PROPERTY, LLC, AND
15  ITS RELATED DEBTORS,

16         Jointly Administered Debtors
           and Debtors-in-Possession

17  Affects:

18  ☐ All Debtors
☒ Palmdale Hills Property, LLC,
19  ☐ SunCal Beaumont Heights, LLC
20  ☐ SCC/Palmdale, LLC
☐ SunCal Johannson Ranch, LLC
21  ☒ SunCal Summit Valley, LLC
22  ☒ SunCal Emerald Meadows LLC
☒ SunCal Bickford Ranch, LLC
23  ☒ Acton Estates, LLC
24  ☐ Seven Brothers LLC
☒ SJD Partners, Ltd.
25  ☐ SJD Development Corp.
26  ☐ Kirby Estates, LLC
☐ SunCal Communities I, LLC
27  ☐ SunCal Communities III, LLC
28      ***Caption Continued on Next Page***

Case No. 8:08-bk-17206-ES
Jointly Administered With Case Nos.
8:08-17209-ES; 8:08-17240-ES; 8:08-17224-ES;
8:08-17242-ES; 8:08-17225-ES; 8:08-17245-ES;
8:08-17227-ES; 8:08-17246-ES; 8:08-17230-ES;
8:08-17231-ES; 8:08-17236-ES; 8:08-17248-ES;
8:08-17249-ES; 8:08-17573-ES; 8:08-17574 ES;
8:08-17575-ES; 8:08-17404-ES; 8:08-17407-ES;
8:08-17408-ES; 8:08-17409-ES; 8:08-17458-ES;
8:08-17465-ES; 8:08-17470-ES; 8:08-17472-ES; and
8:08-17588-ES

Chapter 11 Proceedings

**DECLARATION OF BRUCE V. COOK IN
SUPPORT OF MOTION FOR ORDER
DISALLOWING CERTAIN CLAIMS FILED
BY LEHMAN ALI INC. AND LEHMAN
COMMERCIAL PAPER INC.**

DATE:      June 9, 2011
TIME:      10:30 a.m.
   PLACE: Courtroom 5A

*Continued from Previous Page*

☒ SCC Communities LLC
☐ North Orange Del Rio Land, LLC
☒ Tesoro SF, LLC
☒ LBL-SunCal Oak Valley, LLC
☒ SunCal Heartland, LLC
☒ LBL-SunCal Northlake, LLC
☒ SunCal Marblehead, LLC
☐ SunCal Century City, LLC
☒ SunCal PSV, LLC
☐ Delta Coves Venture, LLC
☐ SunCal Torrance, LLC
☐ SunCal Oak Knoll, LLC

I, Bruce V. Cook, hereby declare and state as follows:

1.     I submit this declaration in support of the MOTION FOR ORDER DISALLOWING CERTAIN CLAIMS FILED BY LEHMAN ALI INC. AND LEHMAN COMMERCIAL PAPER INC. (the "Motion"). Unless stated otherwise, the terms used herein are as defined in the Motion. I have personal knowledge of the following facts and, if called as a witness, I could and would competently testify thereto.

2.     I am the General Counsel for SunCal Management, LLC ("SunCal Management") and SCC Acquisitions, Inc. ("SCC"). SCC is either a direct or indirect equity holder of the nine Trustee Debtors.[1] I am and have been the General Counsel for the seventeen Voluntary Debtors[2], in most cases since the formation of such entities. The thirteen (13) above identified debtors

---

[1]    They are: LB/L-SunCal Oak Valley LLC ("Oak Valley"), LB/L-SunCal Northlake LLC ("Northlake"), SunCal Heartland LLC ("Heartland"), SunCal Marblehead LLC ("SunCal Marblehead"), SunCal Century City LLC ("Century City"), SunCal PSV LLC ("PSV"), Delta Coves Venture LLC ("Delta Coves"), SunCal Torrance LLC ("Torrance"), and SunCal Oak Knoll LLC ("Oak Knoll").

[2]    They are: Acton Estates LLC ("Acton"), SunCal Beaumont Heights, LLC ("Beaumont"), SunCal Bickford Ranch LLC ("Bickford"), SunCal Emerald Meadows LLC ("Emerald Meadows"), SunCal Johannson Ranch, LLC ("Johannson"), SCC Palmdale LLC ("SCC Palmdale"), Palmdale Hills Property LLC ("Palmdale Hills"), SJD Partners, Ltd. ("SJD Partners"), SJD Development Corp. ("SJD Development"), SunCal Summit Valley LLC ("Summit Valley"), Seven Brothers LLC ("Seven Brothers"), Kirby Estates, LLC ("Kirby"), SCC Communities LLC ("SCC Communities"), SunCal Communities I LLC ("SunCal I"), SunCal Communities III LLC ("SunCal III"), North Orange Del Rio Land LLC ("Del Rio"), and Tesoro SF LLC ("Tesoro").
    The Trustee Debtors and Voluntary Debtors are referred to collectively herein as the "Debtors."

-2-

1  relevant to the Motion, i.e., Palmdale Hills, Summit Valley, Emerald Meadows, Bickford, Acton,

2  SJD Partners, SCC Communities, Tesoro, Oak Valley, Northlake, Heartland, Marblehead and PSV

3  are referred to herein as the "Relevant SunCal Debtors".

4      3.      I have knowledge of the Debtors' books and records, and I am familiar with the

5  Debtors' projects and their operational affairs. As to the following facts, I know them to be true of

6  my own knowledge, and, if called as a witness, I could and would competently testify thereto; or I

7  have gained such knowledge from the business records of the Debtors which were made at or near

8  the time of the acts, conditions or events to which they relate. Any such document or record was

9  prepared in the ordinary course of business by a person who had personal knowledge of the event

10  being recorded and had a business duty to accurately record such event.

11     4.      The Debtors are part of an integrated network of companies that operate under the

12  common dba "the SunCal Companies" or "SunCal." SunCal is a family-owned business; SunCal

13  and its related parties and affiliates have been in the land development business for over seventy

14  years. The Debtors were formed as part of a joint venture to develop a series of residential real

15  estate Projects with the Global Real Estate Group within Lehman Brothers Holdings, Inc. ("LBHI"),

16  through various affiliates that it wholly-owned and/or controlled (collectively, "Lehman"). These

17  entities included Lehman ALI, Inc. ("Lehman ALI") (and eventually, its apparent successors, OVC

18  Holdings, LLC ("OVC") and Northlake Holdings LLC ("Northlake Holdings") and Lehman

19  Commercial Paper, Inc. ("LCPI"), as well as the "Lehman Equity Members" described below.

20  **Lehman Entities' Representations**

21     5.      Frank Gilhool ("Gilhool") was, at least prior to late 2008, a Managing Director of

22  Global Real Estate at Lehman. I understood based on his representations and conduct that he had

23  authority to act and make representations on behalf of both Lehman ALI, in its capacity as lender to

24  the nine Trustee Debtors and SunCal Bickford, SJD Partners, SJD Development, SunCal Del Rio,

25  SCC Communities, and SunCal Tesoro; and LCPI, in its capacity as the lender to SunCal Bickford

26  and the remaining Voluntary Debtors.

27     6.      In numerous telephone conversations between Gilhool and myself in 2007 and 2008,

28  Gilhool assured me that Lehman ALI and LCPI were committed to funding debts and obligations of

1  the Projects and the work they directed to be performed; that funding would be forthcoming; and that

2  SunCal and the Relevant SunCal Debtors should continue to have contractors undertake work to

3  develop, maintain and preserve the value in the Projects.

4        7.     In reliance on these representations, SunCal and the Relevant SunCal Debtors

5  continued to move forward with the Projects and incurred substantial expenses in hiring contractors

6  to maintain and/or develop them and to deal with public health and safety issues and value

7  preservation.

8        8.     Substantially all of the unsecured creditor claims and mechanic's lien claims that

9  have been filed against each of the Debtors' estates are obligations that Lehman ALI or LCPI

10  authorized the Debtors to incur and promised to provide funding for and/or promised to assume.  A

11  list of the unsecured creditors that have filed proofs of claims against each of the Debtors, and the

12  amounts of their claims, is included in Exhibit 19 hereto.  A list of mechanic lien claims filed against

13  each of the Debtors, and the amounts of their claims, is included in Exhibit 20 attached hereto.

14  **Lehman Entities' Control and Exercise Thereof**

15        9.     Prior to the market downturn, Lehman afforded its partner SunCal substantial

16  discretion to use its expertise to manage development of the Projects.  However, beginning in or

17  about 2007, Lehman ALI and LCPI became much more "hands on" in scrutinizing—and

18  approving—budgets and expenses.  Lehman ALI and LCPI had not only input on, but importantly,

19  veto power over budgets delineating expenditures undertaken on the Projects.

20        10.    Lehman ALI and LCPI used their control to impose onerous financing terms that did

21  not benefit the Relevant SunCal Debtors.

22        11.    For example, when SunCal initially approached Lehman ALI and LCPI about the

23  Projects' financial difficulties, I was made aware that they assured SunCal of immediate financing to

24  cover operating expenses, starting out at the $20 to $25 million range per month, and increasing

25  from there.  However, only one such loan of $20 million (the October 2007 Interim Loan from

26  Lehman ALI) was made, as what was supposed to be "quick" financing got bogged down in Lehman

27  ALI's extensive documentation.

28

12.     Moreover, Lehman ALI insisted that SunCal put up security, previously unencumbered, to secure that financing, although that was not originally contemplated. In that connection, SunCal put up the interests of SunCal Del Rio, SCC Communities, and SunCal Tesoro in the Del Rio, Joshua Ridge and Tesoro Projects, respectively, as security for the Interim Loan.

13.     In addition, at the last minute, Lehman ALI decided to specify exactly what the $20 million could be used for, whereas all the way through the discussions, the money was simply to assist SunCal in meeting its operating expenses, as SunCal determined. Ultimately, Lehman ALI kept the funds and only disbursed them after it had approved the disbursements, most of which went to pay expenses of the Ritter Ranch Project, not any of SunCal Del Rio's, SCC Communities', or SunCal Tesoro's encumbered Projects.

14.     SunCal and the Relevant SunCal Debtors continued to work with the contractors in connection with the development, maintenance and preservation of the Projects in reliance on a promised overall "work out" or restructuring of the Projects and of the Loans and/or liens held by Lehman ALI and LCPI, as well as an assumption of SCC's and Elieff's indemnity liability on surety bonds covering work that had been done and was being done on the Projects.

15.     It was contemplated as of the October 2007 Interim Loan that a restructuring agreement would be entered into shortly, by no later than January or February of 2008. However, implementation was again dragged out due in large part to Lehman's extensive documentation.

16.     In the meantime, until a restructuring agreement was entered into, Lehman ALI and LCPI stopped paying vendor payables, nor would they pay any management fees of SunCal Management LLC, which was managing and continued to manage each of the Relevant SunCal Debtors' Projects.

17.     As the restructuring was pushed further and further out and Lehman ALI and LCPI continued to refuse to provide funding—despite their prior assurances—SunCal was effectively drained of liquidity, and so the Relevant SunCal Debtors became even more desperate and more dependent on Lehman ALI and LCPI financing.

18.     Lehman ALI and LCPI used the Relevant SunCal Debtors' vulnerability to their advantage in negotiating a restructuring agreement that was tipped heavily in Lehman's favor.

-5-

19.    For example, Lehman had indicated that it was open to suggestions from SunCal regarding the terms of a restructuring agreement. SunCal proposed that, particularly given the long and profitable history of the parties' venture together, the restructuring should take into account a reasonable view of the values of the properties, so that Lehman ALI and LCPI would at least in part share the burden of the market downturn.

20.    In response, Lehman became irate and countered with what was essentially a take-it-or-leave-it offer. Under the counter-proposal, (1) Lehman ALI and LCPI would be paid in full for every dollar that they had invested with SunCal that had not been returned, including interest on those amounts, default interest, and penalty fees; (2) Lehman would recoup all money that it had put in as equity in certain projects; and (3) Lehman would receive a 15% return on all funds contributed (both debt and equity) until they were returned—all without regard to the value of the properties. For the most part, this is how the restructuring agreement was ultimately structured.

21.    Similarly, when the restructuring agreement was finally entered into in late May 2008, SunCal sought to have its management fees reimbursed as of February 1, 2008, the date by which the restructuring agreement should have and would have been entered into but for Lehman's delays. Lehman ALI and LCPI refused, and in fact insisted upon a waiver of all past management fees, with only management fees from May 15, 2008 onward being payable, at reduced rates.

22.    Lehman ALI and LCPI also required that SunCal pledge $33 million of its equity interest in the four Lehman SunCal Fund projects (Century City, Del Amo, Oak Knoll and PSV) as partial consideration for Lehman ALI and LCPI's satisfaction of existing debt on the other Projects subject to the restructuring agreement. SunCal did not believe these Projects (and PSV in particular) should have to be included as collateral to secure the restructuring of the other Projects. Instead, SunCal felt that LBREP II/SCLFM, the Lehman equity member in the Lehman SunCal Fund, should cover the Fund Projects' expenses, as there was plenty of capital yet to be called to fund the existing debts and other needs of these Projects, per the terms of the Fund's Operating Agreement. (Lehman had committed to contributing up to $600 million in equity through the Fund, but had contributed only a fraction of that amount.) But Lehman ALI and LCPI insisted, and SunCal had no choice but to acquiesce.

-6-

**The Parties' Restructuring Agreement**

1

2      23.    Finally, on May 23, 2008, SunCal and certain of the Relevant SunCal Debtors entered

3    into an omnibus "Restructuring Agreement" with LBHI, Lehman ALI and other Lehman-controlled

4    entities. (LCPI, for reasons known to Lehman ALI and LCPI, was not a signatory to the

5    Restructuring Agreement, although it was a signatory to the subsequent "Settlement Agreement"

6    signed in August 2008.) Lehman's Gilhool signed the Restructuring Agreement on behalf of each of

7    these entities. A true and correct copy of the May 23, 2008 Restructuring Agreement (without its

8    exhibits, which are voluminous) is attached here to as Exhibit 1, and incorporated herein by this

9    reference.

10      24.    The Restructuring Agreement was designed to culminate in a closing ("Closing")

11    with the parties entering into a Settlement Agreement, the form of which was attached to the

12    Restructuring Agreement. Under the Settlement Agreement, new Lehman-controlled entities

13    (referred to as the "Venture Grantees" each with "SCLV" in its name, for "SunCal-Lehman

14    Venture") would take title to the properties, assume the Relevant SunCal Debtors' debt obligations

15    to Lehman ALI and LCPI and assume bond obligations and other accounts payable owed by the

16    Relevant SunCal Debtors, and with respect to which bond obligations SunCal and Elieff had signed

17    indemnifications. These SCLV entities—along with what was purported by Lehman ALI and LCPI

18    to be a substantial-net-worth Lehman-related entity—were also to provide indemnifications to

19    SunCal and the Relevant SunCal Debtors with respect to existing accounts payable, including bond

20    obligations. The Settlement Agreement was signed by the SunCal and Lehman parties on August

21    25, 2008. But as explained below, the Lehman parties did not close.

22      25.    As originally executed in May 2008, the Restructuring Agreement applied to twelve

23    Projects relevant herein (as well as several other projects not at issue in these bankruptcies):

24    (1) Acton Estates; (2) Beaumont Heights; (3) Bickford Ranch; (4) Emerald Meadows; (5) Heartland;

25    (6) Johannson Ranch; (7) Marblehead; (8) Northlake; (9) Oak Valley; (10) Pacific Point; (11) Ritter

26

27

28

1  Ranch; and (12) Summit Valley.  The Debtors that owned and/or held equity interests in the owners

2  of these Projects were signatories to the May 2008 agreement.[3]

3        26.     Between May and August 2008, four additional projects were added to the

4  Restructuring Agreement by agreement of the parties: (1) Del Rio; (2) Joshua Ridge; (3) Palm

5  Springs Village; and (4) Tesoro Burnham.  Accordingly, the Debtors associated with these

6  Projects— Del Rio, SCC Communities, PSV, and Tesoro—became parties to the Restructuring

7  Agreement as amended.  These Debtors were signatories to the August 25, 2008 Settlement

8  Agreement, along with the Debtors associated with the original twelve Projects, as "Borrowers"

9  and/or "Grantors."

10        27.     Lehman ALI at first held the Delta Coves Project out from the Restructuring

11  Agreement, apparently because of the problems it was having with a separate participant in that

12  Project.  But later in the summer, Lehman ALI indicated that it wanted that Project added as well.

13  SunCal and SunCal Delta Coves provided Lehman ALI information as to management fees, budgets,

14  and the like with respect to that Project being part of the restructuring.  But Delta Coves was not

15  formally added to the Restructuring or Settlement Agreement by the time that the parent Lehman

16  entity, LBIII, filed for bankruptcy and Lehman ALI, LCPI and the other Lehman entities stopped

17  moving forward with Closing.

18        28.     Thus, four Projects were not formally added to the Restructuring Agreement—

19  Century City, Delta Coves, Oak Knoll and Del Amo (Torrance); and the four Debtors associated

20  with these Projects—Century City, Delta Coves, Oak Knoll and SunCal Torrance—were not

21  signatories to the Settlement Agreement.  Lehman ALI was the lender on each of these Projects,

22  three of which were part of the Lehman SunCal Fund.

23

24  [3]  Specifically, the Restructuring Agreement was entered into by, among others, the "Borrowers,"
25  "Grantors" and "Pledgors," as defined in Annex 1 thereto.  The "Borrowers" included SunCal
    Marblehead, SunCal Heartland, SunCal Northlake, SunCal Oak Valley, SJD Partners, Palmdale
26  Hills, SCC Palmdale, SunCal I, SunCal III, and SunCal Bickford.
      The "Grantors" included SunCal Marblehead, SunCal Heartland, SunCal Northlake, SunCal Oak
27  Valley, SJD Partners, Palmdale Hills, SunCal Bickford, SunCal Acton, SunCal Summit and SunCal
    Emerald, and Debtors SunCal Beaumont and SunCal Johannson.
28        The "Pledgors" included SCC Palmdale, SunCal I, SunCal Summit and SJD Development.

29.     However, even as to these four Projects, Lehman ALI engaged in the same course of conduct that it had regarding the other Projects regarding representations of funding. Lehman ALI encouraged SunCal and these four Debtors to continue developing, maintaining and preserving these Projects, and made assurances of payment. Later, Lehman ALI approved all expenses, told these Debtors what work to move forward with, and promised it would pay for such work. These Debtors performed substantial work and incurred millions in third-party debt in reliance on Lehman ALI's promises of payment.

30.     Pursuant to the Restructuring Agreement, Lehman ALI, "as the Lender with respect to each Loan," committed, among other things, to: (1) make advances under existing loans to fund the continuing costs necessary to preserve the value of the Projects; (2) move forward to resolve the accrued outstanding subcontractor payables, i.e., to make sure that the Projects' creditors were paid for their work; and (3) to Close the transaction, whereby related Lehman entities (the Venture Grantees) would assume the debt and obligations of the Projects. The Restructuring Agreement was designed to culminate in a closing ("Closing") with the execution of a Settlement Agreement (and related settlement transaction documents), discussed in more detail below.

31.     SunCal and the Relevant SunCal Debtors signed the Restructuring Agreement with Lehman ALI with the understanding that Lehman ALI was by that point the entity that held the various first trust deeds and/or pledged interests on all of the Projects subject to the Restructuring Agreement, and that this was the reason why Lehman ALI, and not LCPI, was the signatory as "Lender." (Gilhool signed the Restructuring Agreement on behalf of Lehman ALI as well as all the other Lehman affiliates, including equity members in certain projects.)

32.     In any event, even after the Restructuring Agreement was signed, Lehman continued to make no distinction between LCPI-financed Projects and Lehman ALI-financed projects, and continued promises of financing emanated from the same Lehman representatives.

33.     SunCal and the Relevant SunCal Debtors believed and relied on Lehman ALI's and LCPI's promises to maintain the long-term value of the Projects and that Lehman ALI and LCPI intended to act in good faith to continue with those Projects.

-9-

34.     And it appeared—at least for a short while—that might be the case. Lehman ALI arranged for a third party, Radco, to settle outstanding contractor payables. On information and belief, Radco was provided some limited funding and authority to negotiate settlements, and did in fact do so with some creditors (funding for settlements on Lehman ALI- and LCPI-funded Projects came from the same source.) Lehman ALI and LCPI also provided approval for new work on the Projects, and Lehman ALI provided payment for some of it. But this funding was minimal and soon stopped.

**The Lehman Entities' Failure to Fund as Promised**

35.     After the Restructuring Agreement was executed, the Lehman Parties insisted that the Relevant SunCal Debtors continue work at the Projects. In reliance upon the Lehman ALI's promise to pay urgent payables, and to have the projects transferred to the Lehman created "Venture Grantees" who would be liable for the "assumed obligations," the Relevant SunCal Debtors continued authorize work on their respective Projects. However, when it came time to pay these expenses, as required under the terms of the Restructuring Agreement, Lehman ALI refused to so, despite written demands by SunCal.

36.     In the summer of 2008, SunCal and the Relevant SunCal Debtors were unaware that Lehman was facing a looming financial crisis or that an LBHI bankruptcy was impending. Prior to LBHI filing for bankruptcy in September 2008, Lehman ALI withdrew funding and settlement authority from Radco, and so halted the process of resolving millions of dollars of outstanding contractor payables on the Projects subject to the Restructuring Agreement. This included work that Lehman ALI and/or LCPI had previously authorized and directed SunCal to undertake, but that Lehman ALI later refused to pay for. The contractors would not perform new work unless they received payment for work already done. The halting of Radco's efforts further impeded development, maintenance and preservation of the Projects and also impeded the Relevant SunCal Debtors' ability to deal with public health and safety issues. Radco ultimately ended up resolving only a fraction of the total outstanding payables.

37.     Even as Lehman ALI was pulling back Radco's authority to fund, Lehman ALI's and LCPI's Gilhool continued to assure me that Lehman ALI and LCPI were committed to funding the

1 | Project obligations and paying for lender-authorized work, that the funds were coming, and that

2 | SunCal and the Relevant SunCal Debtors should continue work on the Projects.

3 |        38.    Pursuant to the Restructuring Agreement, Lehman ALI also agreed to pay monthly

4 | management fees for the management of each of the Projects, from May 15, 2008 forward.  Lehman ALI

5 | never provided thirty days' written notice of intent to cease payment of the monthly SunCal Management

6 | and the other SunCal Parties have continued to manage the Projects. All conditions precedent to Lehman

7 | ALI paying SunCal Management the monthly management fee from May 15, 2008 through at least

8 | November 12, 2008, and beyond, were satisfied. "Exhibit D" to the Restructuring Agreement listed a

9 | total of $580,352 in monthly management fees for ten of the twelve Projects." Subsequent

10 | documentation listed a total of $683,383 in monthly management fees for the fifteen Properties at issue

11 | that were ultimately subject to the agreement.  By Project, the monthly management fees listed in Exhibit

12 | D to the Restructuring Agreement were: (1) Acton Estates ($31,396); (2) Beaumont Heights ($53,862);

13 | (3) Bickford Ranch ($81,982); (4) Emerald Meadows ($43,593); (5) Heartland ($38,151); (6) Johannson

14 | Ranch ($35,868); (7) Marblehead ($111,137); (8) Oak Valley ($42,574); (9) Ritter Ranch ($110,772);

15 | and (10) Summit Valley ($31,017). See Exh. 1, at Exh. D.

16 |        39.    Lehman ALI also failed to provide the funding promised on the four Projects that

17 | were not made part of the Restructuring Agreement, i.e., Century City, Delta Coves, Oak Knoll and

18 | Del Amo.

19 |        40.    At an August 25, 2008 meeting to sign closing documents for the Restructuring

20 | Agreement held in Los Angeles—just days after most of the Loans and associated liens had

21 | apparently secretly been sold to Fenway—the Lehman parties announced that they wanted to push

22 | the Closing date out another month to September 30, 2008, ostensibly in order to obtain a few

23 | additional (and easily obtainable) third party consents.  SunCal, still believing that the Lehman

24 | Parties owned the Loans and were acting in good faith, agreed to the extension to September 30,

25 | 2008.

26 |        41.    I, among others, on behalf of SunCal and the Relevant SunCal Debtors, and Gilhool,

27 | on behalf of Lehman ALI, LCPI, and the other Lehman parties, signed hundreds of pages of

28 | settlement documents at the August 25 meeting, including the Settlement Agreement itself.

-11-

1   Specifically, Gilhool signed the settlement documents on behalf of, among others, OVC and

2   Northlake Holdings  Lehman affiliates that had apparently been assigned the Oak Valley and

3   Northlake Loans and associated liens at some point after the Restructuring Agreement was entered

4   into. A true and correct copy of what the latest version of the Settlement Agreement that the

5   Lehman parties provided to SunCal (without its exhibits, which are voluminous), along with the

6   signature pages signed at the August 25, 2008 meeting, as produced by the Lehman defendants in

7   response to discovery served in the equitable subordination action, is attached hereto as Exhibit 2.

8   True and correct copies of the relevant Schedules to the Settlement Agreement (both the May 2008

9   version, and the August 2008 version) are attached hereto as follows:

- Schedule 5 to the Settlement Agreement, May 2008, attached hereto as Exhibit 3.
- Schedule 5 to the Settlement Agreement, August 2008, attached hereto as Exhibit 4.[4]
- Schedule 17 to the Settlement Agreement, May 2008, attached hereto as Exhibit 5.
- Schedule 17 to the Settlement Agreement, August 2008, attached hereto as Exhibit 6.
- Schedule 12-C to the Settlement Agreement, May 2008, attached hereto as Exhibit 7.
- Schedule 12-C to the Settlement Agreement, August 2008 version, attached hereto as Exhibit 8 (reflecting date of printing).
- Schedule 13 to the Settlement Agreement, May 2008, attached hereto as Exhibit 9.
- Schedule 13 to the Settlement Agreement, August 2008, attached hereto as Exhibit 10.
- Schedule 4-A to the Settlement Agreement, May 2008, attached hereto as Exhibit 11.
- Schedule 4-A to the Settlement Agreement, August 2008, attached hereto as Exhibit 12.
- Schedule 4-B to the Settlement Agreement, May 2008, attached hereto as Exhibit 13.
- Schedule 4-B to the Settlement Agreement, August 2008, attached hereto as Exhibit 14.
- Exhibit I to the Settlement Agreement, and the corresponding signature pages produced by the Lehman Parties, attached hereto as Exhibit 15.

42.    Weil, Gotshal & Manges, the attorneys for Lehman ALI, LCPI, OVC and Northlake

Holdings (and who are also their bankruptcy counsel), took all of the original signed settlement

documents with them, claiming that they would provide copies to SunCal and the Relevant SunCal

Debtors and that the Closing would occur shortly thereafter. (Despite months of requests, Lehman

ALI, LCPI, OVC and Northlake Holdings only produced these signature pages in response to formal

discovery requests.)

---

[4] The sums in Schedule 5 understates the actual figure. The Scheduled Assumed Obligations reflected on the updated Schedule 5 take into consideration reductions resulting from certain settlements that were not paid in some instances.

**The Lehman Entities' Concealment of the Sale of the Loans**

43.     When I signed the Settlement Agreement and related documents on August 25, 2008,

I was unaware that, just days earlier, Lehman ALI (and apparently, OVC and Northlake Holdings)

had transferred certain Loans and liens on the Projects (set forth below as the "Sold Loans") to

LCPI, or that LCPI had immediately turned around and sold all of its interest in those Sold Loans

and liens to a third party, Fenway, pursuant to an August 22, 2008 repurchase agreement, or "Repo."

| Loan | Original Claimant | Alleged Balance |
| --- | --- | --- |
| SunCal Communities I Loan | LCPI | $343,221,391 |
| Ritter Ranch Loan | LCPI | $287,252,096 |
| SunCal PSV Loan | Lehman ALI | $88,257,340 |
| SunCal Delta Coves Loan | Lehman ALI | $206,023,142 |
| SunCal Marblehead/ Heartland Loan | Lehman ALI | $354,325,126 |
| Sun Cal Oak Valley Loan | OVC Holdings, LLC | $141,630,092 |
| SunCal Northlake Loan | Northlake Holdings, LLC | $123,654,777 |

(together the "Sold Loans").

44.     Lehman ALI, LCPI, OVC and Northlake Holdings did not disclose to me that they

were selling to third parties the very obligations they were supposedly about to assume and

restructure.

**Failure To Proceed With A Closing Under The Settlement Agreement.**

45.     The Restructuring Agreement was designed to serve as a financial bridge to the

implementation -- closing -- of the transactions described in the Settlement Agreement. One of

Lehman ALI's obligations under the Restructuring Agreement was to proceed with the closing of the

Settlement Agreement. By failing and refusing to proceed with a closing under the terms of the

Settlement Agreement, Lehman ALI-- breached the terms of the Restructuring Agreement. As a

result of Lehman ALI's breach, the Projects were never transferred to the Lehman "Venture

Grantees" who would be liable for the "assumed obligations" and the "Lender Authorized Work."

**Covenant Not To Sue.**

46.     The exhibits to the Settlement Agreement included a Covenant Not to Sue, which

provided that the lenders would not seek to enforce the rights against the SunCal Borrowers,

Guarantors and Pledgors, with respect to: "amounts owing pursuant to the Note, the Loan Agreement

or the Loan or obligations or liabilities arising under the Deed of Trust, Pledge Agreement,

1  Completion Guaranty, Limited Guaranty or the other Loan" if the applicable SunCal Parties

2  performed their obligations under the Settlement Agreement. See Exhibit 15. If the Lehman Parties

3  had not prevented the closing and consummation of the Settlement Agreement, the Relevant SunCal

4  Debtors would have been wholly exonerated from their obligations under the applicable Lehman

5  Claims.

6  **Lehman Parties Acquire the Pacific Point Project Without Payment.**

7      47.    LV Pac Point foreclosed on Pacific Point on August 28, 2008—three days after the

8  Settlement Agreement was signed—and acquired the property pursuant to a non-judicial foreclosure

9  sale. Title was thus transferred from SJD Partners to LV Pac Point, and so the Lehman parties

10  obtained the property as contemplated.

11      48.    Lehman ALI, SJD Partners and the City of San Juan Capistrano even entered into an

12  estoppel certificate—at Lehman ALI's request—on August 26, 2008, two days before the

13  foreclosure. That certificate stated, among other things, that the "Acquiring Entity [LV Pac Point]

14  shall by operation of law become the legal successor-in-interest to Developer [SJD Partners]" under

15  SJD Partners' agreements with the City. That certificate further provided that there existed no

16  breaches, defaults or claims under SJD Partners' agreements with the City. Yet demands have been

17  made by the City and/or other creditors—even after the estoppel was signed—against SJD Partners,

18  and its bond companies, because of LV Pac Point's failure to fulfill its assumption and payment

19  obligations.

20      49.    Nevertheless, LV Pac Point has not performed any of its Pacific Point obligations.

21  Nor has PAMI performed any of its Pacific Point indemnity obligations. The SunCal Parties related

22  to the project, SJD Partners and its parent, SJD Development, filed for bankruptcy in November

23  2008 as a result of the Lehman parties' failure to perform. These Debtors remain exposed to millions

24  of dollars in bond and non-bonded liability to third parties due to LV Pac Point's failure to fulfill its

25  payment obligations and PAMI's failure to fulfill its indemnity obligations.

26  **The Lehman Entities' Repudiation of the Restructuring Agreement**

27      50.    The additional third-party consents required for Closing of the Restructuring

28  Agreement and Settlement Agreement had been obtained (or could have been but for the Lehman

1  parties' refusal to pursue them in good faith) by about the first week of September 2008, and thus all

2  conditions precedent to closing had been met. Yet Lehman ALI, LCPI, OVC and Northlake

3  Holdings and the other Lehman entities took no steps to proceed with Closing.

4      51.    On September 15, 2008, LBHI filed a voluntary petition in bankruptcy court in the

5  Southern District of New York. (LCPI also filed for bankruptcy, on October 5, 2008, but the other

6  Lehman lending entities at issue have not.) Notwithstanding the bankruptcy, Gilhool was still

7  assuring me that Lehman ALI, LCPI, OVC and Northlake Holdings would continue to fund the

8  Relevant SunCal Debtors' respective Projects so as to avoid harm and damage to them and to ensure

9  that Debtors' creditors were paid.

10     52.    As the end of September approached, I became greatly concerned that Lehman ALI,

11  LCPI, OVC, Northlake Holdings and the other Lehman parties were still not doing anything to

12  facilitate closing. On September 29, 2008, counsel for SunCal and the Relevant SunCal Debtors sent

13  Weil Gotshal a notice indicating that they were prepared to close, and that all conditions precedent to

14  Closing had been satisfied. A true and correct copy of this letter is attached hereto as Exhibit 16.

15  Lehman ALI, LCPI, OVC and Northlake Holdings did not provide a definitive response for weeks.

16     53.    In the meantime, the Projects required work. Even if no new construction or

17  development was to be undertaken, significant sums had to be spent on site security, erosion

18  prevention, property taxes and other measures in order to prevent the Projects from becoming a

19  public safety hazard, and in order to prevent losing valuable entitlements, accruing penalties and

20  fines, and other losses to the Projects.

21     54.    SunCal and the Relevant SunCal Debtors repeatedly requested that Lehman ALI,

22  LCPI, OVC and Northlake Holdings provide funding to pay for critical health and safety and value

23  preservation measures on the Projects. Between October 9 and November 4, 2008, I sent Robert

24  Brusco, an authorized agent of Lehman ALI, LCPI, OVC and Northlake Holdings, nearly two dozen

25  letters practically begging them to provide promised funding to address critical needs on the Projects

26  as promised. A true and correct copy of some of these letters is attached hereto as Exhibit 17.

27     55.    These letters raised issues such as potential and/or actual public exposure to asbestos,

28  flooding, wind damage, looters and vandals, soil erosion and wildfires, in addition to demands from

−15−

1  third-party vendors for payment for services and threats to discontinue service. My letters attached

2  reports from governmental inspectors, and photographs documenting site conditions that posed a

3  threat to public safety or that could subject the Projects to fines and penalties.

4      56.    Despite Lehman ALI, LCPI, OVC and Northlake Holdings' assurances of their intent

5  to proceed with funding the Projects, the Relevant SunCal Debtors' request that Lehman ALI, LCPI,

6  OVC and Northlake Holdings address their critical financial needs fell on deaf ears. Lehman ALI,

7  LCPI, OVC and Northlake Holdings repeatedly requested detailed budgets regarding the needs of

8  the Projects, reinforcing the impression that they were willing and able to fund—budgets which

9  SunCal and the Relevant SunCal Debtors repeatedly and promptly provided. Lehman ALI, LCPI,

10  OVC and Northlake Holdings repeatedly promised the funding would be forthcoming. But the funds

11  never materialized.

12      57.    In November 2008, Brusco, on behalf of Lehman ALI, LCPI, OVC and Northlake

13  Holdings, delivered a message that these Lehman lenders were unwilling to fund the Projects and

14  that they intended to foreclose on all of the Projects.

15  **The Lehman Entities' Refusal to Fund Necessitates Debtors' Bankruptcies**

16      58.    In late October 2008, SunCal indicated to Lehman ALI, LCPI, OVC and Northlake

17  Holdings that if they continued to refuse to provide critical funding, the Relevant SunCal Debtors

18  associated with the Projects would have no choice but to file for bankruptcy.

19      59.    Finally, with creditor demands, fines and penalties and other expenses mounting, and

20  no financial assistance forthcoming from Lehman ALI, LCPI, OVC or Northlake Holdings, the

21  Voluntary Debtors filed for bankruptcy on November 6 and November 7, 2008. When the Lehman

22  Equity Members in the Trustee Debtors refused to provide consents to their filing, their creditors

23  filed involuntary petitions against them beginning on November 12, 2008.

24  **The Lehman Entities' Attempted Repudiation of the Restructuring and Settlement Agreement**

25      60.    On November 13, 2008, Lehman ALI, LCPI, OVC and Northlake sent SunCal and

26  the Relevant SunCal Debtors, to my attention, a letter repudiating the Restructuring and Settlement

27  Agreement and their prior promises of continued funding. A true and correct copy of this November

28  13, 2008 letter is attached hereto as Exhibit 18.

**Damages From the Breach of the Settlement Agreement**.

61.    As of September 30, 2008, Lehman ALI was bound to pay the "urgent payables" and certain management fees, as well as to cause the closing transferring the Projects to new Lehman entities (Venture Grantees), who would assume the unpaid vendor claims incurred at respective Projects, assume certain bond liabilities associated with each respective Projects.  Had the Lehman Parties performed their contractual obligations, the Relevant SunCal Debtors would have had little or no debt, and the instant Chapter 11 cases would have been unnecessary.

62.    The breaches of the Lehman Parties not only resulted in non-payment of all obligations to be paid and/or assumed, but they caused the bankruptcies themselves.  Thus, I believe the damages incurred by the Relevant SunCal Debtors from the breaches of the Restructuring Agreement and Settlement Agreement are all claims and costs incurred relating to their Projects since September 30, 2008.  I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 8th day of April 2011, at Irvine, California.

/s/ _____
Bruce V. Cook

# EXHIBIT "1"

## AGREEMENT

THIS AGREEMENT (this "Agreement"), dated as of May 23, 2008 (the "Effective Date, is made by and among (i) LEHMAN BROTHERS HOLDINGS INC., a Delaware corporation ("LBHI"), (ii) LEHMAN ALI, INC., a Delaware corporation ("Lehman ALI"), (iii) the Borrowers (as defined on Annex 1 hereto), (iv) the Grantors (as defined on Annex 1 hereto), (v) SCC ACQUISITIONS, INC., a California corporation ("SCC"), (vi) SCC ACQUISITIONS, LLC, a Delaware limited liability company, (vii) the Guarantors (as defined on Annex 1 hereto), (viii) the Pledgors (as defined on Annex 1 hereto), (ix) the SunCal Equity Partners (as defined on Annex 1 hereto), (x) the Lehman Equity Partners (as defined on Annex 1 hereto), (xi) SUNCAL COMMUNITIES II, LLC, a Delaware limited liability company, (xii) BRUCE ELIEFF, and (xiii) SUNCAL MANAGEMENT, LLC, a Delaware limited liability company. Capitalized terms used herein and not otherwise defined shall have the meanings given to them in the Settlement Agreement (as hereinafter defined).

## WITNESSETH

WHEREAS, SCC and LBHI executed and delivered that certain Omnibus Restructuring Summary of Terms (the "Term Sheet"), a copy of which is attached hereto as Exhibit A, which Term Sheet is expressly stated to be non-binding on all parties, reflecting the terms and conditions under which the parties hereto (the "Parties") and certain of their respective affiliates would enter into certain restructuring transactions relating to various loans and joint ventures to which the Parties and certain of their respective affiliates are parties; and

WHEREAS, since the execution and delivery of the Term Sheet, the Parties have negotiated and agreed upon (a) the form of the Settlement Agreement to be executed and delivered at the closing of the restructuring transactions contemplated in the Term Sheet, which form is attached hereto as Exhibit B (the "Settlement Agreement"), and (b) the forms of various other Settlement Documents to be executed and delivered contemporaneously with the execution and delivery of the Settlement Agreement, each of which is attached as an exhibit to the Settlement Agreement (collectively, the "Documented Additional Settlement Documents");

WHEREAS, this Agreement is being entered into for the purpose of setting forth certain agreements of the Parties.

NOW, THEREFORE, in consideration of the premises, the mutual agreements contained herein and for other good and valuable consideration, the receipt and adequacy of which hereby is acknowledged, the Parties agree as set forth below.

Section 1.    **Obligation to Execute the Settlement Documents.**

(a)    Each of Parties acknowledges and agrees that, provided that a Termination Event (as hereinafter defined) has not occurred and subject to the terms of Sections 2, 3 and 4 hereof, not later than three (3) Business Days following the satisfaction of all of the

MI1\I89190\12\49P2121DOC\73683 0995

Closing Conditions (as hereinafter defined) (such date being referred to herein as the "Closing Date"), each of the Parties will execute, deliver and enter into and will cause the other SunCal Parties and Lehman Parties, respectively, and any other Affiliates thereof, as applicable, to execute, deliver and enter into, the Settlement Agreement, the Documented Additional Settlement Documents and all other documents contemplated by the Settlement Agreement or any of the Documented Additional Settlement Documents to be entered into and/or delivered in connection with the Settlement Transactions (including, without limitation, the New Interim Loan Documents) or as the Parties may mutually agree are necessary to implement the terms of the Settlement Agreement or any of the Documented Additional Settlement Documents (collectively, the "Undocumented Additional Settlement Documents" and, together with the Settlement Agreement and the Documented Additional Settlement Documents, the "Settlement Documents"). Upon consummation of the Settlement Transactions on the Closing Date, this Agreement shall be deemed to be terminated and of no further force or effect except for those provisions which are expressly stated to survive the consummation of the Settlement Transactions or the termination of this Agreement.

(b)    Unless this Agreement shall have been terminated pursuant to the terms hereof, the obligations of the Parties to execute and deliver (or to have their Affiliates execute and deliver) the Settlement Agreement and the other Settlement Documents shall be unconditional and irrevocable provided that the following conditions are satisfied (collectively, the "Closing Conditions"):

(i)    Each of the representations and warranties of the Parties and any other parties set forth in the Settlement Agreement and each of the other Settlement Documents shall be true and correct as of the Closing Date in all material respects;

(ii)    All consents and approvals of governmental authorities and parties to any agreements to which the SunCal Parties and Lehman Parties, as applicable, are parties or to which they may be bound that are required to be obtained with respect to or as a result of any of the Settlement Transactions including, without limitation, consents under any Development Agreement, or otherwise with respect to any Development Right, with respect to the Conveyance Transactions, shall have been obtained on terms reasonably satisfactory to the Parties;

(iii)    The Parties shall have negotiated and agreed upon the form of each of the Undocumented Additional Settlement Documents, each of which shall be in form and substance reasonably satisfactory to the Parties, and shall have further agreed upon any other schedules, exhibits and annexes to the Settlement Agreement and/or any of the other Settlement Documents which have not been agreed upon as of the Effective Date (the "Outstanding Attachments"); provided that (i) each of the Parties agrees to negotiate the terms and conditions of the Undocumented Additional Settlement Documents and the final form

of any Outstanding Attachments in good faith, and (ii) to the extent that a term or condition is not specifically set forth in or contemplated by the Settlement Agreement or any of the Documented Additional Settlement Documents, the Parties agree that they will act in a commercially reasonable manner in approving customary terms and conditions for transactions of this type (in the context of the totality of the Settlement Documents, with such modifications as may be necessary to take into account the specific circumstances of the Settlement Transactions); notwithstanding the foregoing or anything herein to the contrary, the parties acknowledge that Schedule 14 and Schedule 17 of the Settlement Agreement have been appended to the Settlement Agreement in draft form only and that each of such schedules shall be subject to further modification as follows: (1) Schedule 14 shall be modified and updated as may be reasonably agreed upon by the parties, and (2) Schedule 17 shall be modified to include such level of detail and specificity regarding the costs, budgets and scope of work as may be required and approved by the Lehman Parties in their sole and absolute discretion.

(iv)     as to those Parties which are Lehman Parties only, (a) there shall have been no material adverse change in title to the Conveyance Properties from the condition of title reflected in various title reports received by the Lehman Parties as of the Effective Date other than changes reflecting the filing of additional mechanics' liens, stop notices or other matters resulting from the non-payment of the Vendor Obligations, and (b) the Title Insurer shall be prepared to issue the Title Policies as contemplated under the terms of the Settlement Agreement;

(v)     as to those Parties which are Lehman Parties only, there shall have occurred no material adverse change in (1) the organizational status of any of the Borrower Parties or other SunCal Parties, or (2) the physical or environmental condition of any of the Properties; and

(vi)     no governmental authority or court of competent jurisdiction shall have issued an order, decree or ruling or taken any other action materially restraining, enjoining or otherwise prohibiting any of the Settlement Transactions or any of the other transactions contemplated by the other Settlement Documents, it being agreed that the Parties shall reasonably cooperate with one another to contest and/or appeal any such order, decree, ruling or other action in good faith.

(c)     Upon satisfaction of the Closing Conditions, the Parties shall proceed to Closing but the obligation of the Parties to consummate the Settlement Transactions on the Closing Date shall be conditioned upon the satisfaction of all conditions precedent and the satisfaction and performance of and/or compliance with all requirements, covenants, conditions, obligations and undertakings set forth in the Settlement Agreement and each of

the other Settlement Documents and the delivery of such opinions, closing certificates, and other deliverables as contemplated in the Settlement Documents and/or as reflected in the preliminary closing checklist attached hereto as <u>Exhibit C</u>.

        (d)    This Agreement may be terminated as follows (each a "Termination Event"):

            (i)    by SCC or LBHI, if the Closing Conditions shall not have been satisfied on or prior to August 31, 2008; provided that neither SCC nor LBHI, as the case may be, shall be permitted to terminate this Agreement if the failure of any of the Closing Conditions shall have been due to such Party's (or such Party's Affiliate's) willful misconduct, gross negligence or failure to pursue the satisfaction the Closing Conditions in good faith;

            (ii)    by LBHI, if an Interference Event shall have occurred (other than those events described in clauses (v), (vi) or (vii) of the definition thereof which events shall not be relevant prior to the consummation of the Settlement Transactions);

            (iii)    by LBHI, if an Involuntary Bankruptcy Filing shall have occurred; or

            (iv)    by the mutual agreement of SCC and LBHI.

        (e)    Upon the termination of this Agreement, any obligations of the Parties hereunder shall terminate and each of the Parties shall have no further obligation to one another pursuant to this Agreement, notwithstanding anything to the contrary set forth herein, provided that, Sections 1(j), 1(k), 7, 8, 11 and 15 hereof shall survive the termination hereof and each Party shall remain liable for any breach by it of this Agreement.

        (f)    From the date of this Agreement through the consummation of the Settlement Transactions, the SunCal Parties shall cause (i) the Properties to be operated in the ordinary course of business, consistent with past practice during the period from November 1, 2007 through the Effective Date, and (ii) the Borrowers, Grantors and Pledgors to not make any distributions to their members or partners, to the Guarantors or to any Affiliates of any Borrower Party or to Elieff.

        (g)    Upon consummation of the Settlement Transactions with respect to a Property, any amounts actually paid by the Bond Obligors to any of the Bond Issuers in respect of any Approved Bond Claims with respect to such Property from the Effective Date through the Closing Date shall be reimbursed to such Bond Obligors at Closing by the applicable Venture Grantee(s) and/or Pac Point Lender, as applicable, if and to the extent that the same would otherwise have been payable to such Bond Obligors pursuant to Section 16 of the Settlement Agreement if the Settlement Agreement had been executed and delivered on the Effective Date (the aggregate amount so reimbursed at Closing being referred to as the "Bond Claim Reimbursement Amount"); provided, however, that the Bond Claim Reimbursement Amount shall be included for purposes of calculating the maximum aggregate amount of the Assumed Bond Obligations set forth in Section 16.c. of the Settlement Agreement.

(h)     During the term of this Agreement, Lehman ALI, as the Lender with respect to each Loan, and the respective Borrowers shall continue to have periodic meetings (by teleconference) to discuss and determine, with respect to each Property, the nature of the work and other services (including, without limitation, litigation defense costs) that need to be performed or provided with respect to each Property and any accounts payable arising from work previously authorized by Lehman ALI which need to be paid with respect to each Property (collectively, the "Urgent Payables") and Lehman ALI hereby agrees to make protective advances under the applicable Loan(s) to reimburse or otherwise provide funds to the applicable Borrowers for the payment of any such Urgent Payables which are approved by Lehman ALI (pursuant to such invoices and other documentation substantiating the same to Lehman ALI's reasonable satisfaction) and each of the relevant Borrower Parties hereby requests and agrees to the making of such protective advances and acknowledges and agrees that such protective advances shall be secured by the applicable Deed(s) of Trust and other Loan Documents notwithstanding anything to the contrary contained therein. Further, the Borrower Parties agree to cooperate with Lehman ALI and/or its designee (which may be a third party retained by Lehman ALI on its behalf and at its sole expense) and provide Lehman ALI and/or its designee an opportunity to discuss with the Borrower Parties the Urgent Payables and/or any other accounts payable or other obligations relating to any of the Properties and to participate with the Borrower Parties in the negotiation and settlement of any such payables or obligations and, to the extent agreed by the parties, to allow Lehman ALI (or its designee) to conduct or manage the negotiation of such payables or obligations.

(i)     On the Effective Date and on the first day of each calendar month thereafter until the termination of this Agreement, Lehman ALI, as the Lender with respect to each Loan, shall pay to the Manager, in advance, a management fee for the management of each Conveyance Property equal to, for each Conveyance Property, the applicable monthly management fee set forth on Exhibit D attached hereto (or prorated portion thereof with respect to the first period, which shall be from May 15, 2008 through May 31, 2008, and for the last period, which shall be from the first day of the month in which this Agreement is terminated through the day immediately preceding the date of such termination) (collectively, the "Monthly Management Fees"). Lehman ALI shall have the right to cease payment of any further Monthly Management Fees as to any or all of the Conveyance Properties at any time prior to the termination of this Agreement upon thirty (30) days' written notice to the Manager, and upon the giving of any such written notice by Lehman ALI to the Manager, this Section 1(i) shall terminate and be of no further force or effect with respect to such Conveyance Property and Manager shall immediately refund to Lehman ALI any Management Fees paid by Lehman ALI to the Manager with respect to such Conveyance Property for the period following the termination of this Section 1(i), failing which Lehman ALI shall have the right to offset any such refund obligation against any other Management Fees payable to Manager under this Section 1(i).

(j)     Nothing contained in this Agreement shall limit, restrict, alter, modify, waive, prejudice or otherwise affect any of the obligations, liabilities, rights or remedies of any of the Borrower Parties, Elieff, or any of the Lenders under the Loan Documents and upon termination of this Agreement for any reason, such parties rights and remedies shall remain unaffected. Further, nothing contained herein shall restrict, limit or prevent any of the Lenders from: (A) taking any action that any such Lender may take under the applicable

MJI \I99190\12\69\72121.DOC\73683 0995                5

Loan Documents or at law or in equity necessary or appropriate in such Lender's sole discretion to preserve, protect or defend any of the collateral described in the applicable Loan Documents including, without limitation (i) defending, intervening in or filing of any legal proceedings relating to any such collateral, (ii) the sending of any notices to any Person concerning the existence of security interests or liens in favor of such Lender relating to such collateral, or (iii) otherwise preserving any of such Lender's rights, remedies or positions; or (B) filing a statutory notice of default in accordance with California Civil Code Section 2924.3 at any time in such Lender's sole and absolute discretion and setting a sale date with respect to the sale of such collateral and continuing such foreclosure proceedings to conclusion, as described in Section 1(k) hereof. The Borrower Parties acknowledge and agree that the Lenders, or any of them, may, during the term of this Agreement accept any partial payments of the Loans tendered by the Borrowers or any of the other Borrower Parties or any other party or as a result of the application of any funds or deposits under the control of the Lenders. Furthermore, the Borrower Parties acknowledge that the acceptance of any such partial payments by any of the Lenders shall not (i) constitute any agreement or commitment by such Lender to amend, modify or extend the term of the applicable Loan(s) or any of the applicable Loan Documents, (ii) constitute any agreement by such Lender to continue to accept such partial payments, (iii) constitute any course of conduct by such Lender, (iv) extend the maturity date of or otherwise reinstate the applicable Loan(s) or cure any default or Event of Default (as such term is defined in the applicable Loan Agreement) under any of the applicable Loan Documents, (v) constitute any agreement or commitment by such Lender to forbear from the exercise of any of its rights or remedies, or (vi) otherwise waive or alter in any way any of such Lender's rights or remedies pursuant to the applicable Loan Documents, applicable law or otherwise. Additionally, the Borrower Parties further acknowledge and agree that this Agreement is not intended to be and shall not be deemed or construed to be a reinstatement, novation, release, modification, amendment or waiver of any of the Loans or the Loan Documents or any provision thereof, and shall not be deemed to extend the maturity date of any of the Loans or cure any other defaults or Events of Default (as defined under the respective Loan Agreements) under the Loan Documents or to cure or reinstate any of the Loans or the Loan Documents, it being the intention of the Parties that the Loans are and shall remain in default and immediately due and payable in full notwithstanding the agreement of the Parties to enter into the Settlement Transactions or anything to the contrary in this Agreement. Lenders reserve all of their respective rights and remedies in connection with any maturity of the Loans, defaults or Events of Default under the Loan Documents, at law or in equity.

(k)     Notwithstanding anything to the contrary contained herein, each Lender shall have the right, pursuant to the applicable Loan Documents, at law or in equity, at any time and in its sole and absolute discretion, to initiate foreclosure proceedings (judicial or non-judicial) with respect to the applicable Property(ies) and/or other collateral securing the applicable Loan(s) (including, without limitation, the right to a file statutory notice of default and to set a sale date with respect to the sale of such Property(ies) and/or other collateral) and continue such foreclosure proceedings to conclusion. If any such foreclosure proceedings result in the acquisition of title to any of the Properties (or equity interests in the entities which, as of the Effective Date, own, directly or indirectly, any of the Properties) by a Lender or any of its Affiliates, prior to the consummation of the Settlement Transactions, then the Parties shall, in connection with the consummation of the Settlement Transactions,

cooperate and take all steps necessary to effectuate the provisions of the penultimate sentence of Section 12.a. of the Settlement Agreement with respect to any such foreclosure. If any such foreclosure proceedings result in the acquisition of title to any of the Properties (or equity interests in the entities which, as of the Effective Date, own, directly or indirectly, any of the Properties) by a third party unrelated to the foreclosing Lender, prior to the consummation of the Settlement Transactions, then the Parties shall, in connection with the consummation of the Settlement Transactions, cooperate and take all steps necessary to effectuate the provisions of the last sentence of Section 12.a. of the Settlement Agreement with respect to any such foreclosure.

(l)    Prior to the Closing Date, unless otherwise elected in writing by Lehman ALI, Lehman ALI shall have the right to cause the Borrower Parties to terminate any or all of the infrastructure license agreements relating to or otherwise affecting various of the Properties (all of which agreements constitute Affiliate Agreements) as of the Closing Date and the termination of any such agreements shall be a condition precedent to the Closing.

(m)    The Settlement Agreement contemplates that each of the Mortgage Loans will be modified at Closing, pursuant to the Loan Modification Documents, to provide that all outstanding principal under the Mortgage Loans will accrue interest, from and after the Closing Date, at a rate of 15% per annum, compounded monthly. At Lehman ALI's sole election prior to the Closing, the Parties will cooperate in all commercially reasonable respects to revise the structure contemplated by the Settlement Agreement and eliminate the modifications contemplated to be made to the Mortgage Loans and instead provide for the same economic benefits to the Lehman Master Venture Member that were to be provided to the Lenders under the Mortgage Loans; provided, however, that such changes shall impose no economic detriment on any party. Specifically, the documents would be modified to provide that an amount equal to the aggregate amount of all indebtedness outstanding under the Mortgage Loan as of the Closing Date would accrue a return equal to 15% per annum, compounded monthly, and such indebtedness together with the return thereon would be paid to the Lehman Master Venture Member prior to any distributions to the SunCal Master Venture Member.

Section 2.    **Required Consents.**

(a)    Notwithstanding anything to the contrary contained herein or in the Settlement Agreement or any of the other Settlement Documents but subject to Section 3 and Section 4 hereof, if (i) all Closing Conditions have been satisfied except that the consents required to be obtained pursuant to Section 1(b)(ii) hereof (including, without limitation, consents under any Development Agreement or otherwise with respect to any Development Rights) (collectively, the "Required Consents") have not been obtained with respect to all of the Conveyance Properties, (ii) all Required Consents have been obtained as to at least eight (8) of such Conveyance Properties and as to the Pacific Point Property, and (iii) the Required Consents shall have been obtained for all Conveyance Properties which are within the same group of Related Conveyance Properties (as defined on Annex 2 attached hereto) (such that the consummation of the Closing as to all Related Conveyance Properties shall occur simultaneously), then the Parties shall proceed to consummate the Closing (the "Initial Closing") as to those Conveyance Properties for which the Required

Consents have been obtained and as to the Pacific Point Property (the Conveyance Properties for which the Required Consents have been obtained being collectively referred to as the "Initial Conveyance Properties" and the Conveyance Properties for which the Required Consents have not been obtained being collectively referred to as the "Subsequent Conveyance Properties") and each Subsequent Conveyance Property shall continue to be subject to the terms of this Agreement. After the Initial Closing, the Parties shall use commercially reasonable efforts to obtain all Required Consents with respect to each of the Subsequent Conveyance Properties and, upon obtaining all Required Consents with respect to any Subsequent Conveyance Property, the Parties shall proceed to consummate the Closing with respect to the conveyance of such Subsequent Conveyance Property pursuant to the terms of the Settlement Agreement within three (3) Business Days following the date upon which all Required Consents with respect to such Subsequent Conveyance Property have been obtained (the date on which the Closing of a Subsequent Conveyance Property occurs being referred to as a "Subsequent Closing Date"). In connection with the Initial Closing, the Parties shall modify the form of Settlement Agreement and any other Settlement Documents, as may be necessary, to provide for the subsequent Closing of each Subsequent Conveyance Property on the applicable Subsequent Closing Date. Upon termination of this Agreement for any reason (including pursuant to an election by SCC or LBHI under Section 1(d)(i) hereof), the applicable Lender as to any Subsequent Conveyance Property the Closing of which has not then occurred, shall have the right, in its sole and absolute discretion, to either (x) terminate this Agreement as to such Subsequent Conveyance Property, whereupon all references to such Subsequent Conveyance Property shall automatically be deemed to be deleted from the Settlement Agreement and all other Settlement Documents without further action by any party and this Agreement shall no longer be applicable to or otherwise affect or govern the Parties rights with respect to such Subsequent Conveyance Property except as provided in Section 1(j), or (y) proceed with a foreclosure (judicial or non-judicial or both) of the applicable Loan or Loans held by such Lender, in which event the provisions of Section 5 hereof shall apply.

(b)     Unless all Conveyance Properties shall have been conveyed to the applicable Venture Grantees on the Initial Closing Date or as of any Subsequent Closing Date, the provisions of this Section 2 shall survive the consummation of the Settlement Transactions on the Initial Closing Date and on any Subsequent Closing Date and shall further survive the termination of this Agreement at any time after the Initial Closing Date.

Section 3.    Northlake Mezz Consents.

(a)     Notwithstanding anything to the contrary contained herein or in the Settlement Agreement or any of the other Settlement Documents, if for any reason consents from the Northlake Mezz Lenders (collectively, the "Northlake Consents"), or either of them, have not been obtained as of the Initial Closing Date, then the Closing shall proceed as to all Initial Closing Properties and the Lender under the Loan Documents relating to the Northlake Property (the "Northlake Loan") shall have the right to proceed with a foreclosure (judicial or non-judicial or both) of the Northlake Loan, in which event the provisions of Section 5 hereof shall apply; provided, however, that if the Northlake Consents have been obtained but are effective as to a conveyance of the Northlake Property on a date that is after the Initial Closing Date (such date being referred to as the "Northlake Closing Date"), then,

MH:\l99190\02\49J2121.DOC\73683.0095                      8

subject to the terms of Section 2 hereof, the Closing of the Northlake Property shall be consummated on the Northlake Closing Date and the Settlement Agreement and other Settlement Documents shall be amended, as may be necessary, to reflect the Closing of the Northlake Property on such Northlake Closing Date. Nothing contained herein shall obligate or require the Borrower Parties under the Northlake Loan to take any action (including, without limitation, pursuant to or as may be required under Section 5 hereof) that would violate the terms of any agreements between such Borrower Parties and the Northlake Mezz Lenders. The Parties acknowledge that to the extent that schedules relating to the Northlake Property have not been appended to the Settlement Agreement as of the Effective Date, such schedules shall constitute Outstanding Attachments hereunder, to be agreed upon by the Parties prior to the Closing Date. Further, the Parties acknowledge that the Management Fee with respect to the Northlake Property has not been agreed upon as of the Effective Date and the Parties agree to cooperate in determining the amount of such Management Fee.

(b)     Unless the Northlake Property shall have been conveyed to the applicable Venture Grantee on the Initial Closing Date or on the Northlake Closing Date, the provisions of this Section 3 shall survive the consummation of the Settlement Transactions on the Initial Closing Date and any Subsequent Closing Date and shall further survive any termination of this Agreement at any time after the Initial Closing Date.

Section 4.     **Ritter Ranch Property**.

(a)     Notwithstanding anything to the contrary contained herein or in the Settlement Agreement or any of the other Settlement Documents, at any time prior to the Initial Closing Date, the applicable Lender (the "Ritter Ranch Lender") under the Loan Documents relating to the Ritter Ranch Property (the "Ritter Ranch Loan") shall have the right to elect to acquire title to the Ritter Ranch Property by proceeding with a foreclosure (judicial or non-judicial or both) of the Ritter Ranch Loan (the "Ritter Ranch Foreclosure Proceeding"), in which event the provisions of Section 5 hereof shall apply, in lieu of accepting a deed to the Ritter Ranch Property, as currently provided in the Settlement Agreement, and the Settlement Agreement and other Settlement Documents shall be amended, as may be necessary, to reflect the acquisition of the Ritter Ranch Property pursuant to the Ritter Ranch Foreclosure Proceeding.

(b)     Unless the Ritter Ranch Property shall have been conveyed to the applicable Venture Grantee on the Initial Closing Date, the provisions of this Section 4 shall survive the consummation of the Settlement Transactions on the Initial Closing Date and shall further survive any termination of this Agreement at any time after the Initial Closing Date if the Ritter Ranch Lender has elected to proceed with the Ritter Ranch Foreclosure Proceeding.

Section 5.     **Foreclosure Proceedings**.

(a)     In connection with the foreclosure of any Subsequent Conveyance Property, the Northlake Property or the Ritter Ranch Property (each, a "Foreclosure Property") as provided under Sections 2, 3 or 4 hereof, respectively (each, a "Foreclosure Proceeding"),

the applicable Borrower Parties (the "Applicable Borrower Parties") and other SunCal Parties shall execute and deliver such consents, acknowledgments, waivers, stipulations and approvals as the applicable Lender (the "Applicable Lender") may reasonably request in connection with the commencement and expeditious prosecution of the Foreclosure Proceeding and shall otherwise cooperate with the Applicable Lender and the purchaser at the foreclosure sale (any such purchaser which is an Affiliate of the Applicable Lender being referred to as the "Foreclosure Property Transferee"), to the maximum extent permitted by law, in connection with the Foreclosure Proceeding and the sale of the Foreclosure Property pursuant thereto and the pursuit of any other remedies by the Applicable Lender under the applicable Loan Documents (including the appointment of a receiver) (provided that the Applicable Borrower Parties and other SunCal Parties shall not be required to incur any liability or unreimbursed cost unless the Applicable Lender agrees to reimburse or indemnify the Applicable Borrower Parties and other SunCal Parties therefor) and neither the Applicable Borrower Parties nor any other SunCal Party shall take any action to enjoin, restrain, contest, defend, hinder or otherwise interfere with or delay the Foreclosure Proceeding or the exercise of any rights and remedies of the Applicable Lender ancillary thereto (including the appointment of a receiver) in any way or manner. Further, neither the Applicable Borrower Parties nor any other SunCal Party shall take any action, either directly or indirectly, to oppose, impede, obstruct, hinder, enjoin, defend or otherwise interfere with the Applicable Lender's exercise of its rights and remedies pursuant to the applicable Loan Documents or applicable law or otherwise with respect to the Foreclosure Property or the applicable Loan. All of the foregoing obligations, covenants and agreements of the Applicable Borrower Parties and the other SunCal Parties are collectively referred to herein as the "Foreclosure Covenants."

       (b)       Each of the Additional Indemnitors, jointly and severally with respect to each other Additional Indemnitor, as a primary obligor and not as a surety, hereby agrees to cause the Applicable Borrower Parties and the other SunCal Parties to comply with the Foreclosure Covenants and agrees, jointly and severally with each other Additional Indemnitor, as a primary obligor and not as a surety, to indemnify and hold the Applicable Lender, LBHI, any Foreclosure Property Transferee and each of their respective parents, predecessors, subsidiaries and affiliates and the respective employees, officers, directors, shareholders, partners, members, principals, agents, representatives, servants and counsel of any of the foregoing, and their successors and assigns (collectively, the "Foreclosure Property Indemnitees"), free and harmless from and against all losses, damages, liabilities , costs and expenses (including reasonable attorneys' fees ands costs) sustained by any of the Foreclosure Property Indemnitees as a result of (i) a breach by any of the Applicable Borrower Parties or any of the other SunCal Parties of, or a failure of any of the Applicable Borrower Parties or any of the other SunCal Parties to comply with, any of the Foreclosure Covenants, or (ii) the occurrence of any Interference Event. Notwithstanding the foregoing, except as provided in Section 33 of the Settlement Agreement, the Applicable Lender shall not pursue a money judgment against any Guarantor under any Guaranty executed and delivered in connection with the applicable Loan provided that (i) the Applicable Borrower Parties and the other SunCal Parties are in compliance with and have not breached any of the Foreclosure Covenants and (ii) no Interference Event shall have occurred.

(c)      At the time that the Applicable Lender makes an election to proceed with a Foreclosure Proceeding as to any Foreclosure Property, the Applicable Borrower Parties and Elieff shall execute and deliver a Release Agreement substantially in the form attached to the Settlement Agreement as Exhibit H-1, duly executed by the Applicable Borrower Parties and Elieff in favor of the Applicable Lender and LBHI and, upon completion of the Foreclosure Proceeding and acquisition of title to the Foreclosure Property by the Foreclosure Property Transferee, (i) the Applicable Borrower Parties and Elieff shall execute and deliver a second Release Agreement substantially in the form of Exhibit H-2 to the Settlement Agreement to the Applicable Lender and the Foreclosure Property Transferee, and (ii) subject to the terms of Section 33 of the Settlement Agreement and provided that the SunCal Parties have complied with the Foreclosure Covenants and have not asserted any claim against the Applicable Lender or against the Foreclosure Property, the Applicable Lender shall execute and deliver a Covenant Not to Sue substantially in the form of Exhibit I to the Settlement Agreement to and for the benefit of the Applicable Borrower Parties and Elieff with respect to the applicable Loan or Loans. If the Foreclosure Property is acquired by the Foreclosure Property Transferee, then the Applicable Lender (or its Affiliate) shall assign its interest in the Foreclosure Property Transferee to the Master Venture (free and clear of any liens or encumbrances affecting such interest) and the LB Master Venture Member shall be deemed to have made a capital contribution to the Master Venture in an amount equal to the sum of (i) the aggregate outstanding indebtedness and other amounts secured by the Applicable Lender's Deed of Trust on the Foreclosure Property as of the date of acquisition of title to the Foreclosure Property by the Foreclosure Property Transferee and (ii) the aggregate outstanding amount of any Related Mezzanine Loan. If the Applicable Lender (or its Affiliate) is not the successful bidder at the foreclosure sale but such successful bidder is a third party unrelated to the Applicable Lender, then any proceeds of such foreclosure sale which are received by any of the Applicable Borrower Parties shall be delivered by the Applicable Borrower Parties to the Master Venture for further distribution to the members thereof as provided in the Master Venture Operating Agreement. From and after the acquisition of title by the Foreclosure Property Transferee, the Foreclosure Property shall be treated as a Conveyance Property for all purposes under the Settlement Agreement.

(d)      The Parties shall cause the Settlement Agreement to be modified and amended, prior to the execution and delivery thereof on the Initial Closing Date and from time to time thereafter, as may be necessary, to provide for any Foreclosure Proceedings and to reflect the terms of this Section 5 as to any Foreclosure Property.

(e)      Unless all Conveyance Properties shall have been conveyed to the applicable Venture Grantees on the Initial Closing Date or as of the Northlake Closing Date or any Subsequent Closing Date, the provisions of this Section 5 shall survive the consummation of the Settlement Transactions on the Initial Closing Date, the Northlake Closing Date and on any Subsequent Closing Date and shall further survive any termination of this Agreement at any time after the Initial Closing Date.

Section 6.      Miscellaneous. This Agreement, together with the attachments hereto and the documents referred to herein, contain the entire agreement among the Parties with respect to the subject matter hereof, and any other agreements shall be deemed to have

merged herewith. This Agreement is for the benefit only of the Parties and their respective
Affiliates and no third party shall have any interest herein or rights pursuant hereto. This
Agreement is not assignable by any Party to any other Person without the prior written
consent of all other Parties, which may be given or withheld in such other Party's sole
discretion. Time is of the essence with respect to each of the Parties' obligations under this
Agreement. The terms and provisions of this Agreement cannot be waived or modified
except in writing and signed by all Parties. Nothing in this Agreement, express or implied,
is intended to confer upon any Person other than the SunCal Parties any right, benefit or
remedy against any other Person other than the Lehman Parties under or by reason of this
Agreement. Nothing in this Agreement, express or implied, is intended to confer upon any
Person other than the Lehman Parties any right, benefit or remedy against any other Person
other than the SunCal Parties under or by reason of this Agreement.

Section 7.    Confidentiality. The terms of Section 53 of the Settlement Agreement shall
apply mutandis mutatis.

Section 8.    Governing Law. This Agreement shall be governed by the laws of the State
of New York without regard to the principles of conflicts of law.

Section 9.    Further Assurances. Each of the Parties shall, as promptly as practicable,
execute and deliver, upon reasonable request by any other Party, all such other and further
documents, agreements, certificates and other instruments in compliance with, or
accomplishment of its covenants and agreements hereunder or to make any recording, filing
or notice or obtain any consent in compliance with, or accomplishment of its covenants and
agreements hereunder, all as may be reasonably necessary or appropriate in connection
therewith.

Section 10.    Successors and Assigns. This Agreement shall inure to the benefit of each
of the Parties' respective successors and permitted assigns.

Section 11.    No Fiduciary Duty. Nothing contained in this Agreement shall establish any
fiduciary, partnership, joint venture or similar relationship between or among the Parties or
any other duty or relationship except as specifically set forth herein. The Parties have an
arms-length business relationship that does not directly or indirectly give rise to, nor does
any Party rely on, any fiduciary duty on the part of any other Party. Each Party is capable of
evaluating and understanding, and each Party understands and accepts, the terms, risks and
conditions of the transactions contemplated by this Agreement. Each Party has been advised
that the other Parties are engaged in a broad range of transactions that may involve interests
that differ from such Party's interests, including the foregoing, and that none of the Parties
has any obligation to disclose such interests and transactions to any other Party by virtue of
any fiduciary, advisory or agency relationship. The foregoing is not intended to negate or
alter any fiduciary, advisory or agency relationship which may exist between or among
various of the Parties pursuant to agreements other than this Agreement.

Section 12.    Additional Indemnitors. To the extent that any Additional Indemnitor is
not a Party to this Agreement as of the Effective Date, SCC and the other Borrower Parties
which are Parties hereto shall cause any such Additional Indemnitor to acknowledge and

agree to be bound by the terms of Section 5 of this Agreement and to be made a Party hereunder on and as of the Initial Closing Date.

Section 13.    **Announcements**. Each Party agrees not to make any public announcements in relation to this Agreement without the prior approval of the other Parties.

Section 14.    **Counterpart Signatures**. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same document.

Section 15.    **Waiver of Jury Trial**. TO THE MAXIMUM EXTENT PERMITTED BY LAW, EACH OF THE PARTIES HERETO HEREBY KNOWINGLY, VOLUNTARILY, UNCONDITIONALLY, IRREVOCABLY AND INTENTIONALLY FOREVER WAIVES ANY RIGHT IT MAY HAVE TO TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED ON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT, THE TRANSACTIONS CONTEMPLATED THEREBY OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (VERBAL OR WRITTEN) OR ACTION OF ANY PERSON OR ANY EXERCISE BY ANY PARTY OF THEIR RESPECTIVE RIGHTS UNDER THIS AGREEMENT, WHETHER IN CONTRACT OR IN TORT (INCLUDING WITHOUT LIMITATION ANY ACTION TO RESCIND OR CANCEL THIS AGREEMENT OR ANY CLAIMS OR DEFENSES ASSERTING THAT THIS AGREEMENT WAS FRAUDULENTLY INDUCED OR ARE OTHERWISE VOID OR VOIDABLE). THIS PROVISION IS A MATERIAL INDUCEMENT TO ENTER INTO THIS AGREEMENT.

Signature Pages Follow.

MI1:\1991190\02\49P2!21.DOC\73683.0995                    13

[SIGNATURE PAGES TO BE PREPARED AND APPENDED TO THIS
AGREEMENT]

M01:s199190\12\169P2121.DOC\73683.0995

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first written above.

LEHMAN BROTHERS HOLDINGS INC.,
a Delaware corporation

By: _____
Name: FRANCIS X. GILHOOL
Title: AUTHORIZED SIGNATORY


LEHMAN ALI INC., a Delaware corporation

By: _____
Name: FRANCIS X. GILHOOL
Title: AUTHORIZED SIGNATORY


LB INDIO LAND VENTURES LLC, a Delaware limited
liability company

By: PAMI LLC, a Delaware limited liability company
Its: Managing Member

    By: _____
    Name: Francis X. Gilhool
    Its: Authorized Signatory


LB/LAKESIDE CAPITAL PARTNERS, LLC, a Delaware
limited liability company

By: _____
Name: _____
Its: Authorized Signatory


LB-DELTA MASTER IV MEMBER LLC, a Delaware limited
liability company

By: _____
Name: Francis X. Gilhool
Its: Authorized Signatory


[SIGNATURES CONTINUE ON FOLLOWING PAGE]


LEHMAN/Suncal – Signature Page to Restructuring Agreement (199190)

SUNCAL MARBLEHEAD HEARTLAND MASTER LLC,
a Delaware limited liability company

By:    SunCal Master JV LLC, a Delaware limited liability
       company
ITS:   Sole Member

       By:    SCC JV Ventures LLC, a Delaware
             limited liability company
       Its:   Operating Member

             By:   _____
                   Bruce V. Cook
             Its:   Secretary

SUNCAL MARBLEHEAD LLC, a Delaware limited liability
company

By:    SunCal Marblehead Heartland Master LLC, a Delaware
       limited liability company
Its:   Sole Member

       By:    SunCal Master JV LLC, a Delaware limited
             liability company
       Its:   Sole Member

             By:    SCC JV Ventures LLC, a Delaware
                   limited liability company
             Its:   Operating Member

                 By:   _____
                       Bruce V. Cook
                 Its:   Secretary

SUNCAL HEARTLAND LLC, a Delaware limited liability
company

By:    SunCal Marblehead Heartland Master LLC, a Delaware
       limited liability company
Its:   Sole Member

       By:    SunCal Master JV LLC, a Delaware limited
             liability company
       Its:   Sole Member

             By:    SCC JV Ventures LLC, a Delaware
                   limited liability company
             Its:   Operating Member

                 By:   _____
                       Bruce V. Cook
                 Its:   Secretary

[SIGNATURES CONTINUE ON FOLLOWING PAGE]

LB/L-SUNCAL OAK VALLEY LLC, a Delaware limited
liability company

By:    SCC/Oak Valley LLC, a Delaware limited
       liability company
Its:    Operating Member

       By:   _____
             Bruce V. Cook
       Its:   Secretary


SJD PARTNERS, LTD., a California limited partnership

By:  SJD Development Corp., a California corporation
Its:  General Partner

       By:   _____
             Bruce V. Cook
       Its:  Secretary


PALMDALE HILLS PROPERTY, LLC, a Delaware limited
liability company

By:   _____
     Bruce V. Cook
Its:   Secretary


SCC/PALMDALE, LLC, a Delaware limited liability
company

By:   _____
     Bruce V. Cook
Its:   Manager


SUNCAL COMMUNITIES I, LLC, a Delaware limited
liability company

By:   _____
     Bruce V. Cook
Its:   Secretary


[SIGNATURES CONTINUE ON FOLLOWING PAGE]

SUNCAL COMMUNITIES III, LLC, a Delaware limited
liability company

By: _____
Bruce V. Cook

Its: Secretary

SUNCAL BICKFORD RANCH LLC, a Delaware limited
liability company

By: _____
Bruce V. Cook

Its: Secretary

ACTON ESTATES, LLC, a Delaware limited liability
company

By: _____
Bruce V. Cook

Its: Secretary

SUNCAL SUMMIT VALLEY LLC, a Delaware limited
liability company

By: _____
Bruce V. Cook

Its: Secretary

KIRBY ESTATES, LLC, a Delaware limited liability
company

By: _____
Bruce V. Cook

Its: Secretary

SUNCAL BEAUMONT HEIGHTS, LLC, a Delaware
limited liability company

By: _____
Bruce V. Cook

Its: Secretary

**[SIGNATURES CONTINUE ON FOLLOWING PAGE]**

SUNCAL EMERALD MEADOWS LLC, a Delaware
limited liability company

By: _____

      Bruce V. Cook

Its:   Secretary

SUNCAL JOHANNSON RANCH LLC, a Delaware limited
liability company

By: _____

      Bruce V. Cook

Its:   Secretary

SCC ACQUISITIONS, INC., a California corporation

By: _____

      Bruce V. Cook

Its:   Secretary

SCC ACQUISITIONS, LLC, a Delaware limited liability
company

By: _____

      Bruce V. Cook

Its:   Secretary

SUNCAL MASTER JV LLC, a Delaware limited liability
company

By:   SCC JV Ventures LLC, a Delaware limited liability
      company

Its:   Operating Member

    By: _____

        Bruce V. Cook

    Its:   Secretary

SJD DEVELOPMENT CORP., a California corporation

By: _____

      Bruce V. Cook

Its:   Secretary

**[SIGNATURES CONTINUE ON FOLLOWING PAGE]**

SCC/INDIO LAND, LLC, a Delaware limited liability
company

By: _____
Bruce V. Cook

Its: Secretary


SCC MASTER IV COMMUNITIES LLC, a Delaware
limited liability company

By: _____
Bruce V. Cook

Its: Secretary


SCC/WEST CREEK, LLC, a Delaware limited liability
company

By: _____
Bruce Elieff

Its: Manager


SUNCAL COMMUNITIES II, LLC, a Delaware limited
liability company

By: _____
Bruce Elieff

Its: Manager


SEVEN BROTHERS LLC, a Delaware limited liability
company

By: _____
Bruce Elieff

Its: Manager


SUNCAL MANAGEMENT, LLC, a Delaware limited
liability company

By: _____
Bruce Elieff

Its: Manager


_____
BRUCE ELIEFF

[SIGNATURES CONTINUE ON FOLLOWING PAGE]

LEHMAN/Suncal – Signature Page to Restructuring Agreement (199190)

SCC/INDIO LAND, LLC, a Delaware limited liability
company

By: _____
Bruce V. Cook
Its:    Secretary

SCC MASTER IV COMMUNITIES LLC, a Delaware
limited liability company

By: _____
Bruce V. Cook
Its:    Secretary

SCC/WEST CREEK, LLC, a Delaware limited liability
company

By: _____
Bruce Elieff
Its:    Manager

SUNCAL COMMUNITIES II, LLC, a Delaware limited
liability company

By: _____
Bruce Elieff
Its:    Manager

SEVEN BROTHERS LLC, a Delaware limited liability
company

By: _____
Bruce Elieff
Its:    Manager

SUNCAL MANAGEMENT, LLC, a Delaware limited
liability company

By: _____
Bruce Elieff
Its:    Manager

_____
BRUCE ELIEFF

**[SIGNATURES CONTINUE ON FOLLOWING PAGE]**

LEHMAN/Suncal – Signature Page to Restructuring Agreement (199190)

38

LB/L - SUNCAL NORTHLAKE LLC, a Delaware limited
liability company

By:    SCLV Northlake LLC, a Delaware limited liability
       company
Its:    Managing Member

       By:   _____
       Name:     Francis X. Gilhool
       Title:  Authorized Signatory

By:    SCC/Northlake LLC, a Delaware limited
       liability company
Its:    Operating Member

       By:   _____
             Bruce V. Cook
       Its:    Secretary

LB/L - SUNCAL NORTHLAKE LLC, a Delaware limited
liability company

By:    [_____], a Delaware
        limited liability company
Its:    Managing Member

    By:    _____
    Name:  _____
    Title:  _____

By:    SCC/Northlake LLC, a Delaware limited
        liability company
Its:    Operating Member

    By:    _____
        Bruce V. Cook
    Its:    Secretary

ANNEX 1

"<u>Borrowers</u>" shall mean the following:

SCC
SunCal Marblehead Heartland Master LLC, a Delaware limited liability company
SunCal Marblehead LLC, a Delaware limited liability company ("<u>Marblehead Project Owner</u>")
SunCal Heartland LLC, a Delaware limited liability company ("<u>Heartland Project Owner</u>")
LB/L SunCal Northlake LLC, a Delaware limited liability company ("<u>Northlake Borrower</u>")
LB/L SunCal Oak Valley LLC, a Delaware limited liability company ("<u>Oak Valley Borrower</u>")
SJD Partners, Ltd., a California limited partnership ("<u>Pacific Point Borrower</u>")
Palmdale Hills Property, LLC, a Delaware limited liability company (the "<u>Ritter Ranch Mortgage Borrower</u>")
SCC/Palmdale, LLC, a Delaware limited liability company ("<u>Ritter Ranch Mezz Borrower</u>")
SunCal Communities I, LLC, a Delaware limited liability company ("<u>SunCal I Borrower</u>")
SunCal Communities III, LLC, a Delaware limited liability company
SunCal Bickford Ranch LLC, a Delaware limited liability company ("<u>Bickford Ranch Second Lien Borrower</u>")

"<u>Grantors</u>" shall mean the following:

SCC
Marblehead Project Owner
Heartland Project Owner
Northlake Borrower
Oak Valley Borrower
Pacific Point Borrower
Ritter Ranch Mortgage Borrower
Acton Estates, LLC, a Delaware limited liability company ("<u>Acton Estates Project Owner</u>")
SunCal Summit Valley LLC, a Delaware limited liability company ("<u>Summit Valley Project Owner</u>")
Seven Brothers LLC, a Delaware limited liability company
Kirby Estates, LLC, a Delaware limited liability company
SunCal Beaumont Heights, LLC, a Delaware limited liability company
Bickford Ranch Second Lien Borrower
SunCal Emerald Meadows LLC, a Delaware limited liability company ("<u>Emerald Meadows Project Owner</u>")
SunCal Johannson Ranch LLC, a Delaware limited liability company

"Guarantors" shall mean the following:

SCC
Bruce Elieff
Acton Estates Project Owner
Summit Valley Project Owner
Bickford Ranch Second Lien Borrower
Emerald Meadows Project Owner

"Pledgors" shall mean the following:

SCC
SunCal Master JV, LLC, a Delaware limited liability company
SJD Development Corp., a California corporation
Ritter Ranch Mezz Borrower
SunCal I Borrower
Summit Valley Project Owner

"SunCal Equity Partners" shall mean the following:

SCC/Indio Land, LLC, a Delaware limited liability company
SCC/West Creek, LLC, a Delaware limited liability company
SCC Master IV Communities LLC, a Delaware limited liability company

"Lehman Equity Partners" shall mean the following:

LB Indio Land Ventures LLC, a Delaware limited liability company
LB/Lakeside Capital Partners, LLC, a Delaware limited liability company
LB-Delta Master IV Member LLC, a Delaware limited liability company

ANNEX 2

Each of the Conveyance Properties within a particular group below are Related Conveyance
Properties to each other.

| Group A | Marblehead |
| | Heartland |

| Group B | Bickford Ranch |
| | Emerald Meadows |
| | Acton |
| | Beaumont Heights |
| | Summit Valley |
| | Johansen Ranch |

M01A199190U2V49P2I2LDOC\73683.0595

43

EXHIBIT D

Management Fees

[See Attached]

MH:\199190\12v49P2121.DOC\73685.0995

| Summary of Initial Management Fees - Emerald Meadows | | | | |
| Title / Department | Annual Hours | Hours /Week | Rate / Avg Rate | Total $ Per Year | Total $ /Month |
|---|---|---|---|---|---|
| Accounting | 163 | 3.13 | 103 | 16,664 | 1,389 |
| Analyst | 130 | 2.50 | 93 | 12,137 | 1,011 |
| Asset Management | 156 | 3.00 | 101 | 15,723 | 1,310 |
| Corp OH – Legal | 104 | 2.00 | 280 | 29,085 | 2,424 |
| Corp OH – Executive Team | 104 | 2.00 | 726 | 75,505 | 6,292 |
| Corp OH – Insur/Risk/Bonds | 52 | 1.00 | 152 | 7,911 | 659 |
| Corp OH – Project Management | 104 | 2.00 | 170 | 17,702 | 1,475 |
| Assistant Project Manager | - | - | 64 | - | - |
| Construction Manager | 208 | 4.00 | 177 | 36,769 | 3,064 |
| Contract Admin | 52 | 1.00 | 66 | 3,425 | 285 |
| Division President | 260 | 5.00 | 305 | 79,261 | 6,605 |
| Project Manager 1 | 780 | 15.00 | 196 | 153,120 | 12,760 |
| Project Manager 2 | - | - | 196 | - | - |
| Regional President | 150 | 2.88 | 486 | 72,908 | 6,076 |
| Superintendent | - | - | 156 | - | - |
| Tax | 26 | 0.50 | 112 | 2,909 | 242 |
| Subtotal | 2,289 | 44.01 | 229 | 523,119 | 43,593 |

| Summary of Initial Management Fees - Summit Valley | | | | |
|---|---|---|---|---|
| Title / Department | Annual Hours | Hours /Week | Rate / Avg Rate | Total $ Per Year | Total $ /Month |
| Accounting | 163 | 3.13 | 103 | 16,664 | 1,389 |
| Analyst | 130 | 2.50 | 93 | 12,137 | 1,011 |
| Asset Management | 78 | 1.50 | 101 | 7,862 | 655 |
| Corp OH – Legal | 100 | 1.92 | 280 | 27,967 | 2,331 |
| Corp OH – Executive Team | 104 | 2.00 | 726 | 75,505 | 6,292 |
| Corp OH – Insur/Risk/Bonds | 52 | 1.00 | 152 | 7,911 | 659 |
| Corp OH – Project Management | 52 | 1.00 | 170 | 8,851 | 738 |
| Assistant Project Manager | - | - | 64 | - | - |
| Construction Manager | 52 | 1.00 | 177 | 9,192 | 766 |
| Contract Admin | - | - | 66 | - | - |
| Division President | 260 | 5.00 | 305 | 79,261 | 6,605 |
| Project Manager 1 | 260 | 5.00 | 196 | 51,040 | 4,253 |
| Project Manager 2 | - | - | 196 | - | - |
| Regional President | 150 | 2.88 | 486 | 72,908 | 6,076 |
| Superintendent | - | - | 136 | - | - |
| Tax | 26 | 0.50 | 112 | 2,909 | 242 |
| Subtotal | 1,427 | 27.43 | 261 | 372,206 | 31,017 |

| Summary of Initial Management Fees - Acton Estates | | | | |
|---|---|---|---|---|
| Title / Department | Annual Hours | Hours /Week | Rate / Avg Rate | Total $ Per Year | Total $ /Month |
| Accounting | 163 | 3.13 | 103 | 16,664 | 1,389 |
| Analyst | 130 | 2.50 | 93 | 12,137 | 1,011 |
| Asset Management | 78 | 1.50 | 101 | 7,862 | 655 |
| Corp OH – Legal | 104 | 2.00 | 280 | 29,085 | 2,424 |
| Corp OH – Executive Team | 104 | 2.00 | 726 | 75,505 | 6,292 |
| Corp OH – Insur/Risk/Bonds | 52 | 1.00 | 152 | 7,911 | 659 |
| Corp OH – Project Management | 52 | 1.00 | 170 | 8,851 | 738 |
| Assistant Project Manager | - | - | 64 | - | - |
| Construction Manager | 52 | 1.00 | 177 | 9,192 | 766 |
| Contract Admin | 52 | 1.00 | 66 | 3,425 | 285 |
| Division President | 260 | 5.00 | 305 | 79,261 | 6,605 |
| Project Manager 1 | 260 | 5.00 | 196 | 51,040 | 4,253 |
| Project Manager 2 | - | - | 196 | - | - |
| Regional President | 130 | 2.88 | 486 | 72,908 | 6,076 |
| Superintendent | - | - | 136 | - | - |
| Tax | 26 | 0.50 | 112 | 2,909 | 242 |
| Subtotal | 1,483 | 28.51 | 254 | 376,750 | 31,396 |

| Summary of Initial Management Fees – Beaumont Heights | | | | |
|---|---|---|---|---|
| Title / Department | Annual Hours | Hours /Week | Rate/ Avg Rate | Total $ Per Year | Total $ /Month |
| Accounting | 163 | 3.13 | 103 | 16,664 | 1,389 |
| Analyst | 130 | 2.50 | 93 | 12,137 | 1,011 |
| Asset Management | 104 | 2.00 | 101 | 10,482 | 874 |
| Corp OH – Legal | 104 | 2.00 | 280 | 29,085 | 2,424 |
| Corp OH – Executive Team | 104 | 2.00 | 726 | 75,505 | 6,292 |
| Corp OH – Insur/Risk/Bonds | 52 | 1.00 | 152 | 7,911 | 659 |
| Corp OH – Project Management | 52 | 1.00 | 170 | 8,851 | 738 |
| Assistant Project Manager | - | - | 64 | - | - |
| Construction Manager | 52 | 1.00 | 177 | 9,192 | 766 |
| Contract Admin | 52 | 1.00 | 66 | 3,425 | 285 |
| Division President | 260 | 5.00 | 305 | 79,261 | 6,605 |
| Project Manager 1 | 1,620 | 31.15 | 196 | 318,018 | 26,501 |
| Project Manager 2 | - | - | 196 | - | - |
| Regional President | 150 | 2.88 | 486 | 72,908 | 6,076 |
| Superintendent | - | - | 136 | - | - |
| Tax | 26 | 0.50 | 112 | 2,909 | 242 |
| Subtotal | 2,869 | 55.16 | 225 | 646,348 | 53,862 |

| Summary of Initial Management Fees - Bickford Ranch | | | | |
|---|---|---|---|---|
| Title / Department | Annual Hours | Hours /Week | Rate / Avg Rate | Total $ Per Year | Total $ /Month |
| Accounting | 244 | 4.69 | 103 | 24,997 | 2,083 |
| Analyst | 130 | 2.50 | 93 | 12,137 | 1,011 |
| Asset Management | 156 | 3.00 | 101 | 15,723 | 1,310 |
| Corp OH - Legal | 260 | 5.00 | 280 | 72,714 | 6,059 |
| Corp OH - Executive Team | 156 | 3.00 | 726 | 113,258 | 9,438 |
| Corp OH - Insur/Risk/Bonds | 104 | 2.00 | 152 | 15,821 | 1,318 |
| Corp OH - Project Management | 104 | 2.00 | 170 | 17,702 | 1,475 |
| Assistant Project Manager | - | - | 64 | - | - |
| Construction Manager | 520 | 10.00 | 177 | 91,922 | 7,660 |
| Contract Admin | 130 | 2.50 | 66 | 8,562 | 713 |
| Division President | 416 | 8.00 | 305 | 126,818 | 10,568 |
| Project Manager 1 | 1,040 | 20.00 | 196 | 204,160 | 17,013 |
| Project Manager 2 | 1,040 | 20.00 | 196 | 204,160 | 17,013 |
| Regional President | 150 | 2.88 | 486 | 72,908 | 6,076 |
| Superintendent | - | - | 136 | - | - |
| Tax | 26 | 0.50 | 112 | 2,909 | 242 |
| Subtotal | 4,476 | 86.07 | 120 | 983,789 | 81,982 |

| Summary of Initial Management Fees - Heartland | | | | |
|---|---|---|---|---|
| Title / Department | Annual Hours | Hours /Week | Rate / Avg Rate | Total $ Per Year | Total $ /Month |
| Accounting | 163 | 3.13 | 103 | 16,664 | 1,389 |
| Analyst | 130 | 2.50 | 93 | 12,137 | 1,011 |
| Asset Management | 156 | 3.00 | 101 | 15,723 | 1,310 |
| Corp OH – Legal | 104 | 2.00 | 280 | 29,085 | 2,424 |
| Corp OH – Executive Team | 104 | 2.00 | 726 | 75,505 | 6,292 |
| Corp OH – Insur/Risk/Bonds | 52 | 1.00 | 152 | 7,911 | 659 |
| Corp OH – Project Management | 104 | 2.00 | 170 | 17,702 | 1,475 |
| Assistant Project Manager | - | - | 64 | - | - |
| Construction Manager | 416 | 8.00 | 177 | 73,538 | 6,128 |
| Contract Admin | 52 | 1.00 | 66 | 3,425 | 285 |
| Division President | 260 | 5.00 | 305 | 79,261 | 6,605 |
| Project Manager 1 | 260 | 5.00 | 196 | 51,040 | 4,253 |
| Project Manager 2 | - | - | 196 | - | - |
| Regional President | 150 | 2.88 | 486 | 72,908 | 6,076 |
| Superintendent | - | - | 136 | - | - |
| Tax | 26 | 0.50 | 112 | 2,909 | 242 |
| Subtotal | 1,977 | 38.01 | 232 | 457,808 | 38,151 |

| Summary of Initial Management Fees – Johanssen Ranch | | | | |
| Title / Department | Annual Hours | Hours /Week | Rate / Avg Rate | Total $ Per Year | Total $ /Month |
|---|---|---|---|---|---|
| Accounting | 163 | 3.13 | 103 | 16,664. | 1,389 |
| Analyst | 130 | 2.50 | 93 | 12,137 | 1,011 |
| Asset Management | 104 | 2.00 | 101 | 10,482 | 874 |
| Corp OH – Legal | 104 | 2.00 | 280 | 29,085 | 2,424 |
| Corp OH – Executive Team | 104 | 2.00 | 726 | 75,505 | 6,292 |
| Corp OH – Insur/Risk/Bonds | 52 | 1.00 | 152 | 7,911 | 659 |
| Corp OH – Project Management | 52 | 1.00 | 170 | 8,851 | 738 |
| Assistant Project Manager | - | - | 64 | - | - |
| Construction Manager | 52 | 1.00 | 177 | 9,192 | 766 |
| Contract Admin | 52 | 1.00 | 66 | 3,425 | 285 |
| Division President | 260 | 5.00 | 305 | 79,261 | 6,605 |
| Project Manager 1 | 520 | 10.00 | 196 | 102,080 | 8,507 |
| Project Manager 2 | - | - | 196 | - | - |
| Regional President | 150 | 2.88 | 486 | 72,908 | 6,076 |
| Superintendent | - | - | 136 | - | - |
| Tax | 26 | 0.50 | 112 | 2,909 | 242 |
| Subtotal | 1,769 | 34.01 | 243 | 430,410 | 35,868 |

| Summary of Initial Management Fees - Marblehead | | | | | |
|---|---|---|---|---|---|
| Title / Department | Annual Hours | Hours /Week | Rate / Avg Rate | Total $ Per Year | Total $ /Month |
| Accounting | 488 | 9 38 | 102 | 49,993 | 4,166 |
| Analyst | 150 | 2 50 | 93 | 12,137 | 1,011 |
| Asset Management | 624 | 12 00 | 101 | 62,894 | 5,241 |
| Corp OH - Legal | 520 | 10 00 | 280 | 145,427 | 12,119 |
| Corp OH - Executive Team | 208 | 4 00 | 726 | 151,011 | 12,584 |
| Corp OH - Insur/Risk/Bonds | 208 | 4 00 | 152 | 31,643 | 2,637 |
| Corp OH - Project Management | 208 | 4 00 | 170 | 35,403 | 2,950 |
| Assistant Project Manager | 780 | 15 00 | 64 | 50,045 | 4,170 |
| Construction Manager | 2 080 | 40 00 | 177 | 367,688 | 30,641 |
| Contract Admin | 260 | 5 00 | 66 | 17,124 | 1,427 |
| Division President | 260 | 5 00 | 305 | 79,261 | 6,605 |
| Project Manager 1 | 1,300 | 25 00 | 196 | 255,200 | 21,267 |
| Project Manager 2 | - | - | 196 | - | - |
| Regional President | 150 | 2 88 | 486 | 72,908 | 6,076 |
| Superintendent | - | | 136 | - | - |
| Tax | 26 | 0 50 | 112 | 2,909 | 242 |
| Subtotal | 7,242 | 139 26 | 184 | 1,333,642 | 111,137 |

| Summary of Initial Management Fees - Oak Valley Champions | | | | |
|---|---|---|---|---|
| Title / Department | Annual Hours | Hours /Week | Rate / Avg Rate | Total $ Per Year | Total $ /Month |
| Accounting | 163 | 3.13 | 103 | 16,664 | 1,389 |
| Analyst | 130 | 2.50 | 93 | 12,137 | 1,011 |
| Asset Management | 156 | 3.00 | 101 | 15,723 | 1,310 |
| Corp OH - Legal | 156 | 3.00 | 280 | 43,628 | 3,636 |
| Corp OH - Executive Team | 104 | 2.00 | 726 | 75,509 | 6,292 |
| Corp OH - Insur/Risk/Bonds | 104 | 2.00 | 152 | 15,821 | 1,318 |
| Corp OH - Project Management | 104 | 2.00 | 170 | 17,702 | 1,475 |
| Assistant Project Manager | - | - | 64 | - | - |
| Construction Manager | 416 | 8.00 | 177 | 73,538 | 6,128 |
| Contract Admin | 52 | 1.00 | 66 | 3,425 | 285 |
| Division President | 260 | 5.00 | 305 | 79,261 | 6,605 |
| Project Manager 1 | 416 | 8.00 | 196 | 81,664 | 6,805 |
| Project Manager 2 | - | - | 196 | - | - |
| Regional President | 150 | 2.88 | 486 | 72,908 | 6,076 |
| Superintendent | - | - | 136 | - | - |
| Tax | 26 | 0.50 | 112 | 2,909 | 242 |
| Subtotal | 2,237 | 43.01 | 228 | 510,885 | 42,574 |

| Summary of Initial Management Fees - Ritter Ranch | | | | |
|---|---|---|---|---|
| Title / Department | Annual Hours | Hours /Week | Rate / Avg Rate | Total $ Per Year | Total $ /Month |
| Accounting | 488 | 9.38 | 103 | 49,993 | 4,166 |
| Analyst | 130 | 2.50 | 93 | 12,137 | 1,011 |
| Asset Management | 312 | 6.00 | 101 | 31,447 | 2,621 |
| Corp OH - Legal | 250 | 4.81 | 280 | 69,917 | 5,826 |
| Corp OH - Executive Team | 156 | 3.00 | 726 | 113,258 | 9,438 |
| Corp OH - Insur/Risk/Bonds | 104 | 2.00 | 152 | 15,821 | 1,318 |
| Corp OH - Project Management | 104 | 2.00 | 170 | 17,702 | 1,475 |
| Assistant Project Manager | - | - | 84 | - | - |
| Construction Manager | 1,664 | 32.00 | 177 | 294,150 | 24,513 |
| Contract Admin | 260 | 5.00 | 66 | 17,124 | 1,427 |
| Division President | 260 | 5.00 | 305 | 79,261 | 6,605 |
| Project Manager 1 | 1,664 | 32.00 | 196 | 326,655 | 27,221 |
| Project Manager 2 | - | - | 196 | - | - |
| Regional President | 150 | 2.88 | 486 | 72,908 | 6,076 |
| Superintendent | 1,664 | 32.00 | 135 | 225,984 | 18,832 |
| Tax | 26 | 0.50 | 112 | 2,909 | 242 |
| Subtotal | 7,232 | 139.07 | 184 | 1,329,265 | 110,772 |

# EXHIBIT "2"

WGM DRAFT
8/26/08

## SETTLEMENT AGREEMENT

THIS SETTLEMENT AGREEMENT (this "Agreement") is dated as of the ____ day of _____, 2008, by and among (i) the Lenders, (ii) SCLV MP VENTURE LLC, a Delaware limited liability company (the "Master Venture" and in its capacity as a member of the SCLV Master III Member, the "Lehman Master III Member"), (iii) the Venture Grantees, (iv) LEHMAN BROTHERS HOLDINGS INC., a Delaware corporation ("LBHI"), (v) the Borrowers, (vi) the Grantors, (vii) SCC ACQUISITIONS, INC., a California corporation ("SCC"), (viii) SCC ACQUISITIONS, LLC, a Delaware limited liability company, and SCC (each in its capacity as a guarantor under the SCC Guaranty, collectively, the "SCC Guarantors"), (ix) the Guarantors, (x) the Pledgors, (xi) the SunCal Equity Partners, (xii) the Lehman Equity Partners, (xiii) SUNCAL COMMUNITIES II, LLC, a Delaware limited liability company (the "SunCal Master III Member"), (xiv) SCLV MASTER III LLC, a Delaware limited liability company (the "SCLV Master III Member"), (xv) SUNCAL MASTER VENTURE MEMBER LLC, a Delaware limited liability company (the "SunCal Master Venture Member"), (xvi) LB SCLVMPV MEMBER LLC, a Delaware limited liability company (the "LB Master Venture Member"), (xvii) BRUCE ELIEFF ("Elieff"), and (xviii) SUNCAL MANAGEMENT, LLC, a Delaware limited liability company (the "Manager"). All initially capitalized terms used in the preamble and in the Recitals hereto shall have the respective meanings set forth in Exhibit A attached hereto and made a part hereof.

## R E C I T A L S

A.     Each of the respective entities identified as "Grantors" on Annex 1 attached hereto (each, a "Grantor" and collectively, the "Grantors") is the owner of the fee simple interest in or, as to the Del Rio Grantor, an easement over, the respective parcels of land more particularly described on Annex 1 (each, a "Parcel" and collectively, the "Parcels"). The Parcels, and any and all buildings, structures and other improvements located thereon or appurtenant thereto (collectively, the "Improvements") and all appurtenant rights, privileges, and easements belonging or in any way relating thereto, are collectively referred to herein as the "Real Property".

B.     Each of the respective entities identified as "Lenders" on Annex 2 attached hereto (each, a "Lender" and collectively, the "Lenders") is the owner and holder, or arranger, of the respective loan or loans more particularly described on Annex 2 (each, a "Loan" and collectively, the "Loans"). The Loans were made by the Lenders to the respective borrower or borrowers described on Annex 2 (each, a "Borrower" and collectively, the "Borrowers") pursuant to the respective loan agreements described on Annex 2 (each, as heretofore assigned or amended, a "Loan Agreement" and collectively, the "Loan Agreements"). In connection with each of the Loans, the Borrowers, the respective entities identified as "Pledgors" on Annex 2 (each, a "Pledgor" and collectively, the "Pledgors"), the respective entities identified as "Guarantors" on Annex 2 (each, a "Guarantor" and collectively, the "Guarantors") and/or certain of the other Borrower Parties executed and delivered, inter alia, the respective promissory notes (each, as heretofore assigned or amended, a "Note" and collectively, the "Notes"), deeds of trust (each, as heretofore assigned or amended, a "Deed of Trust" and collectively, the "Deeds of Trust"), pledge agreements (each, as heretofore assigned or amended, a "Pledge Agreement" and

collectively, the "Pledge Agreements") and guaranties (each, as heretofore assigned or amended, a "Guaranty" and collectively, the "Guaranties") more particularly described on Annex 2.

C.    The Borrower Parties and Elieff acknowledge that neither the Borrowers nor any of the other Borrower Parties or Elieff have repaid any of the Loans in accordance with the applicable Loan Documents and that each of the Loans is currently due and payable in full and remains outstanding and in default and that Events of Default (as defined in the respective Loan Documents) have occurred and have not been cured.

D.    The Borrower Parties and Elieff further acknowledge and agree that, after giving effect to this Agreement, they have no offsets, counterclaims or defenses with respect to any of the Loans.

E.    Certain Affiliates of SCC (each, a "SunCal Equity Partner" and collectively, the "SunCal Equity Partners") and certain Affiliates of LBHI (each, a "Lehman Equity Partner" and collectively, the "Lehman Equity Partners") as more particularly described on Annex 4, are members in certain limited liability companies as more particularly described on Annex 4 (each, a "Joint Venture" and collectively, the "Joint Ventures") which Joint Ventures own, directly or indirectly, those properties more particularly described on Annex 4 (each, a "JV Property" and collectively, the "JV Properties").

F.    The SunCal Equity Partners and Lehman Equity Partners have certain ongoing disputes which they desire to resolve in the manner provided in this Agreement.

G.    The Borrower Parties, Elieff, the Lenders, the SunCal Equity Partners and the Lehman Equity Partners intend to avoid further cost and expense in resolving disputes which exist with respect to the Loans and/or the Joint Ventures and other matters set forth herein and, in furtherance thereof, the parties have agreed that (i) each of the Grantors shall convey title to each of the Conveyance Properties to the respective entities described on Annex 1, each of which is a wholly-owned subsidiary of the Master Venture (each, a "Venture Grantee" and collectively, the "Venture Grantees"), the respective Conveyance Properties as described on Annex 1 (the transactions described in this clause (i) being collectively referred to as the "Conveyance Property Transfers"), (ii) each of the Lehman Equity Partners shall assign all of its ownership interest in the applicable Joint Venture to the respective SunCal Equity Partner in such Joint Venture pursuant to the terms of this Agreement (the transactions described in this clause (ii) being collectively referred to as the "Equity Interest Transfers"), (iii) each of the Additional Indemnitors shall agree to perform certain obligations as provided herein and shall indemnify and hold harmless the Indemnitees and Pac Point Indemnitees for such matters as are more particularly provided for herein, (iv) the Manager shall enter into the Management Agreements with the respective Venture Grantees, (v) the SunCal Master Venture Member and the LB Master Venture Member shall enter into the Master Venture Operating Agreement and shall cause the Master Venture to enter into the Venture Grantee Operating Agreements, (vi) Elieff shall execute and deliver the Elieff Note to Lehman ALI, and (vii) the SunCal Master III Member shall contribute its membership interest in the Master III Venture to the SCLV Master III Member and the SunCal Master III Member and Master Venture shall enter into the SCLV Master III Member Operating Agreement, as provided herein. The Conveyance Property Transfers, the Equity Interest Transfers, all of the other transactions described above and all of

the other transactions contemplated under this Agreement or any of the other Settlement Documents (collectively, the "Settlement Transactions") shall be entered into and consummated pursuant to the terms, covenants and conditions set forth in this Agreement and shall be subject to the performance of all of the obligations of the parties set forth herein.

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing Recitals (which are hereby incorporated into the body of this Agreement), the covenants and agreements hereinafter set forth, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by all parties, it is agreed by and among the parties hereto as follows:

1.    Definitions.  All initially capitalized terms used in this Agreement or in any of the Exhibits, Schedules or Annexes hereto shall have the respective meanings set forth on Exhibit A attached hereto and made a part hereof.

2.    Conveyance of Conveyance Properties to Venture Grantees.  Subject to the terms and conditions hereof, each Grantor hereby agrees to convey, assign, and transfer to the applicable Venture Grantee (and each other Borrower Party agrees to convey, assign and transfer to the applicable Venture Grantee all of its respective right, title and interest, if any, in and to any of the property described below), and the applicable Venture Grantee agrees to accept a conveyance of, on the Closing Date, all of such Grantor's (and/or such other Borrower Party's) respective right, title and interest in and to the following:

a.    the Real Property;

b.    all personal property owned by such Grantor and located on the Real Property or any portion thereof or used in connection with the development and/or operation of the Real Property or any portion thereof, or acquired by such Grantor for installation or use in connection with the development and/or operation of the Real Property or any portion thereof, wherever located (collectively, the "Personal Property"), including, but not limited to, the fixtures, attachments, appliances, equipment, machinery, and other articles attached to the Improvements or located upon the Real Property or any portion thereof and all tangible personal property owned by such Grantor and located on or at the Real Property or any portion thereof or used or to be used in connection therewith or in connection with the development and/or operation of any of the Improvements, it being understood that the enumeration of any specific articles of property shall in no way result in the exclusion of or be held to exclude any items of personal property not specifically mentioned;

c.    (i) all development, use, air, zoning, water, infrastructure, building and other rights and entitlements obtained in connection with or in any way associated with the development of or construction on the Real Property including, without limitation, rights under or with respect to any environmental impact reports, specific plans, mitigation agreements, permits and any other documents relating to entitlements or approvals and LAFCO or any other annexation, (ii) all rights, interests, powers and benefits of such Grantor as a developer or declarant of the Real Property under any declaration, development agreement or other similar agreement for the development, construction, management, or maintenance of the Real Property

or under any covenant, restriction, or condition affecting the Real Property, together with all voting rights, declarant's rights, developer's rights, and similar rights arising under any such agreements or covenant, condition, or restriction, (iii) all rights of or reservations in favor of such Grantor under any deed or easement, or any similar instrument, affecting all or any portion of the Real Property, and (iv) all subdivision rights pursuant to any tentative or final parcel site or subdivision map or similar item (or any amendment of or modification to any such map or other similar item) pertaining to or in any manner affecting all or any portion of the Real Property, in each case whether or not appurtenant to the Real Property and including, without limitation, all uses, benefits, proceeds of, or incident to, such rights, interests, powers and benefits (collectively, the "Development Rights"); and

        d.    all assets, including all goodwill (other than the use of the name "SunCal") and other intangible property, owned by such Grantor or used in connection with the development and/or operation of the Real Property, the Development Rights or the Personal Property, or any portion thereof, including, without limitation: (i) any and all leases, subleases, licenses, use permits, contract rights, rental agreements, service agreements, management agreements, leasing agreements, purchase and sale agreements, option agreements, development agreements, consulting agreements, architectural and design agreements, engineering agreements, agreements granting or otherwise relating to any entitlements or other Development Rights, agreements with general contractors and subcontractors, construction agreements, guaranties, warranties and commitments and any other agreements, oral or written, similar to any of the foregoing relating to the Real Property, Personal Property, or Development Rights, as applicable (collectively, the "Contracts"), including, without limitation, those listed on Schedule 3 (the "Scheduled Contracts"), (ii) all rents, revenues, issues, profits, damages, royalties, receivables, income, notes and accounts receivable, reimbursements and other rights or benefits to payments of any kind arising out of the ownership, development, construction, management and/or operation of the Real Property including, without limitation any CFD Reimbursement Proceeds and all other rights and benefits arising under any CFD Bonds and, with respect to the Del Rio Grantor, all profit participation, proceeds and revenues derived under the Del Rio PSA (collectively, "Revenues"), (iii) all names, trade style, trade names and logos used in connection with any Conveyance Property or any portion thereof, (iv) (1) all unapplied deposits including, without limitation, utility deposits, bond deposits, prepaid permit fees, prepaid impact fees and prepaid sewer, water or similar service deposits, (2) all funds in any lockbox, reserve, escrow, pledged, operating or similar account, including, without limitation, the accounts identified on Schedule 1 attached hereto and made a part hereof (which includes any and all operating accounts held by or on behalf of or otherwise owned by any Borrower Party) and any other replacement or similar accounts held by such Grantor or any other Borrower Party on behalf of or as security for any Lender (collectively, the "Accounts"), and (3) all purchase, earnest money, or other deposits made under any Property PSAs respecting any portion of any Conveyance Property, including, without limitation, those deposits more particularly described on Schedule 2 (collectively, the "Deposits"), (v) all claims, causes of action, choses in action, rights or remedies which such Grantor may have, whether at law or in equity, against any party in connection with or arising out of the ownership, operation, repair, development, construction, maintenance and/or management of any Conveyance Property or any portion thereof, (vi) all right, title and interest in, to and under the Bonds and any other bond (including any payment and performance bonds and surety bonds) issued to or for the benefit of such Grantor or for the benefit of any Conveyance Property or any portion thereof; and (vii) all books and records (other than books

and records, and correspondence to and from counsel, relating to the Loans) in the possession of such Grantor or any of the other Borrower Parties or their respective agents relating to the ownership, operation, repair, development, construction, maintenance and/or management of the Real Property, Personal Property or the Development Rights, as applicable, including, without limitation, correspondence with purchasers, suppliers, contractors and subcontractors, booklets, manuals, utility contracts, marketing and advertising materials, soil testing and environmental reports and data, engineering data and reports, surveys, architectural and engineering plans and specifications, warranties, shop drawings and working drawings, tentative and final parcel and subdivision maps, licenses, easements, and such other rights as may be necessary for vehicular and pedestrian ingress and egress and the maintenance of utilities, parking, common areas and other site improvements, and other governmental permits, entitlements and permissions relating to the Real Property and the development and/or operation thereof (all items described in this Section 2.d. being hereinafter collectively referred to as the "Intangible Property").

The Real Property, the Personal Property, the Development Rights and the Intangible Property owned by any particular Grantor (or several Grantors, if the Real Property owned by such Grantors is located within the same master development) and/or otherwise pertaining to, relating to or otherwise appurtenant to the Real Property owned by such Grantor is sometimes collectively referred to herein as a "Conveyance Property."

3.    Conveyance of Lehman Equity Interests.

a.    Subject to the terms and conditions hereof, on the Closing Date, each Lehman Equity Partner hereby agrees to assign, transfer and convey to the applicable SunCal Equity Partner, and the applicable SunCal Equity Partner agrees to accept an assignment of all of such Lehman Equity Partner's ownership interest in the applicable Joint Venture (each, a "Lehman Equity Interest" and collectively, the "Lehman Equity Interests") and all other rights of such Lehman Equity Partner under the operating agreement creating such Joint Venture as more particularly described on Annex 4. In connection with and in consideration for the conveyance of the Lehman Equity Interests to the SunCal Equity Partners, an aggregate amount equal to $52,732,287[1] shall be allocated to, and shall increase the capital contributions of, the LB Master Venture Member in the Master Venture as provided in the Master Venture Operating Agreement.

b.    LBHI shall have a continuing right of first opportunity until the fifth (5th) anniversary of the Closing Date with respect to any third party equity investment in any Joint Venture or any joint venture or other entity formed by any SunCal Equity Partner Parties, the purpose of which is to own, directly or indirectly, or develop any JV Property or any portion thereof (each, a "JV Equity Transaction") in accordance with the terms set forth in this Section 3.b.. Before any SunCal Equity Partner, SCC, Elieff or any Affiliate thereof or any constituent owner, direct or indirect, of any SunCal Equity Partner (collectively, the "SunCal Equity Partner Parties"), enters into any binding agreement or commitment with any Person with respect to any JV Equity Transaction, the applicable SunCal Equity Partner Party shall give written notice to LBHI (the "Offer Notice") with all of the material terms and conditions of any

_____

[1] To be updated as of the Closing Date

such proposed JV Equity Transaction (the "Material Terms and Conditions"). The applicable SunCal Equity Partner Party shall use commercially reasonable efforts to provide LBHI with any additional information reasonably requested by LBHI in order to evaluate any proposed JV Equity Transaction within five (5) Business Days of LBHI's request therefor provided that any such request by LBHI shall be made within five (5) Business Days following its receipt of the applicable Offer Notice. Failure of LBHI to respond to an Offer Notice within thirty (30) days after receipt of an Offer Notice shall be deemed a waiver of the rights of LBHI pursuant to this Section 3.b. with respect to such proposed JV Equity Transaction only and the applicable SunCal Equity Partner Party shall thereafter be free to enter into the JV Equity Transaction described in the Offer Notice with any third party investor. If LBHI provides notice within such thirty (30) day period expressing LBHI's election to pursue the proposed JV Equity Transaction (the "LBHI Response Notice") on the terms set forth in the Offer Notice, then the applicable SunCal Equity Partner Party and LBHI shall negotiate in good faith the terms and conditions of a definitive agreement for the proposed JV Equity Transaction but in any event in accordance with the Material Terms and Conditions. If such negotiations do not result in the execution of a binding written definitive agreement between the applicable SunCal Equity Partner Party and LBHI within thirty (30) days after such LBHI Response Notice is given by LBHI (a "Non-Agreement Event"), then LBHI shall have no further right of first opportunity with respect to such proposed JV Equity Transaction and the applicable SunCal Equity Partner Party shall thereafter be free to enter into the JV Equity Transaction with any third party investor; provided, however, that in no event, shall any SunCal Equity Partner Party enter into any agreement with a third party investor with respect to the JV Equity Transaction which was the subject of the Non-Agreement Event on terms materially more favorable to such third party investor than the Material Terms and Conditions offered to LBHI for such JV Equity Transaction, as such Material Terms and Conditions may have been modified in the course of any negotiations between the parties, without once again complying with the provisions of this Section 3.b. Notwithstanding anything to the contrary contained herein, the rights of LBHI under this Section 3.b. are not intended to be and do not constitute a commitment by or obligation of LBHI or any Affiliate of LBHI to approve, engage in or otherwise consummate any JV Equity Transaction. Such a commitment, agreement or obligation, if any, on the part of LBHI or any Affiliate of LBHI will exist only upon the execution and delivery of binding written agreements and then only in accordance with the terms and conditions thereof. In any event, subject to the terms of any agreement pursuant to which LBHI or its Affiliate has agreed to participate in any JV Equity Transaction, LBHI or its Affiliate may determine in its sole discretion for any reason (including, without limitation, the results of its due diligence investigation, a material change in any Person's financial condition, business or prospects, the lack of appropriate internal committee approvals or then current market conditions) not to participate in the proposed JV Equity Transaction. In addition, provided that the SunCal Equity Partner Parties otherwise comply with the terms of this Section 3.b., nothing herein shall be construed as a prohibition on any SunCal Equity Partner Party's right to enter into discussions or non-binding arrangements with third parties in connection with a JV Equity Transaction as long as no binding agreement or commitment is entered into with respect to such JV Equity Transaction. LBHI shall have no obligation of any form or type or under any legal or equitable theory with respect to the breach or failure by LBHI or any Affiliate of LBHI to participate in any proposed JV Equity Transaction and in no event shall any SunCal Equity Partner Party have any claims or causes of action against LBHI or any of its Related

Parties or any other Lehman Party as a result of any participation (or lack of participation) in any proposed JV Equity Transaction by LBHI or any of its Affiliates.

        c.    If any SunCal Equity Partner Party fails to comply with the provisions of Section 3.b., LBHI shall have all rights and remedies available at law or in equity, including, without limitation, the right to specific performance, injunctive relief and damages, against such SunCal Equity Partner Party. The Additional Indemnitors shall, jointly and severally with each other, as primary obligors and not as sureties, pay to LBHI, immediately upon demand by LBHI, any and all damages for which any SunCal Equity Partner Party may become liable to LBHI as a result of any breach or violation of Section 3.b. and shall, jointly and severally, as primary obligors and not as sureties, indemnify and hold LBHI harmless from any and all liabilities, losses, damages, costs and expenses (including attorney's fees and costs) LBHI may suffer or incur in connection with any SunCal Equity Partner Party's failure to comply with the provisions of Section 3.b.

        4.    Pac Point Foreclosure Proceeding and Pac Point Acquisition.

        a.    The Pac Point Borrower Parties and Elieff acknowledge that the Pac Point Junior Lender has acquired title to the Pacific Point Property (in its capacity as the owner of the Pacific Point Property, the "Pac Point Transferee") through a foreclosure of the Pac Point Junior Loan (the "Pac Point Foreclosure Proceeding"), which acquisition occurred on August 28, 2008 (the "Pac Point Acquisition").

        b.    Each of the Additional Indemnitors, jointly and severally with each other Additional Indemnitor, as a primary obligor and not as a surety, hereby agrees, jointly and severally with each other Additional Indemnitor, as a primary obligor and not as a surety, to indemnify and hold the Pac Point Lenders, LBHI, the Pac Point Transferee and each of their respective parents, predecessors, subsidiaries and affiliates and the respective employees, officers, directors, shareholders, partners, members, principals, agents, representatives, servants and counsel of any of the foregoing, and their successors and assigns (collectively, the "Pac Point Indemnitees"), free and harmless from and against all losses, damages, liabilities, costs and expenses (including reasonable attorneys' fees and costs) sustained by any of the Pac Point Indemnitees as a result of the occurrence of any Interference Event.

        c.    Notwithstanding anything to the contrary contained in this Section 4, except as provided in Section 33, the Pac Point Lenders shall not pursue a money judgment against any Guarantor under any Guaranty executed and delivered in connection with either of the Pac Point Loans provided that no Interference Event shall have occurred.

        d.    At Closing, (i) the Pac Point Borrower Parties and Elieff shall execute and deliver the Pac Point Release Agreement to the Pac Point Lenders and Pac Point Transferee, and (ii) subject to the terms of Section 33, each of the Pac Point Lenders shall execute and deliver a Covenant Not to Sue substantially in the form of Exhibit I to and for the benefit of the Pac Point Borrower Parties and Elieff with respect to the respective Pac Point Loans.

5.      Management Agreements.  At Closing, each of the Venture Grantees shall enter inter a management and development services agreement with the Manager substantially in the form of Exhibit N-1 (each, a "Management Agreement" and collectively, the "Management Agreements") pursuant to which the Manager shall provide such management and development services with respect to the Conveyance Property owned by such Venture Grantee as provided for in the Management Agreement.  In addition, the Pac Point Transferee and Manager shall enter into a management and development services agreement substantially in the form of Exhibit N-2 (the "Pac Point Management Agreement") pursuant to which the Manager shall provide such management and development services with respect to the Pacific Point Property as provided for in the Pac Point Management Agreement.  SCC shall be jointly and severally liable with the Manager under the Management Agreements and the Pac Point Management Agreement as provided under the respective Management Agreements and Pac Point Management Agreement.

6.      OVC Property and Northlake Property.  The parties hereto acknowledge that all consents required in connection with the conveyance of the OVC Property (collectively, the "OVC Consents") and Northlake Property (collectively, the "Northlake Consents") have not yet been obtained and as a result, notwithstanding anything to the contrary contained in this Agreement, the OVC Property and Northlake Property are not being conveyed to the applicable Venture Grantees on the Closing Date but may be conveyed subsequent to the Closing Date pursuant to and in accordance with the terms of the Restructuring Agreement.  The parties hereby agree that within three (3) Business Days' of receipt of the OVC Consents by the SunCal Parties, the OVC Property shall be conveyed to the applicable Venture Grantee.  The parties hereby further agree that within three (3) Business Days' of receipt of the Northlake Consents by the SunCal Parties, the Northlake Property shall be conveyed to the applicable Venture Grantee. Notwithstanding the preceding two sentences, if the OVC Consents and/or Northlake Consents have not been obtained such that the conveyances of the OVC Property and/or Northlake Property have not been consummated on or prior to the Termination Date (as such term is defined in the Restructuring Agreement),no party shall have any further obligation thereafter to consummate such conveyances pursuant to this Agreement.  If the closing of either the OVC Property or the Northlake Property shall occur pursuant to this Agreement on a date hereafter (each, a "Subsequent Closing Date"), then on such date each of the Conveyance Documents respecting the conveyance of the OVC Property and/or the Northlake Property, as applicable, shall be executed and delivered in accordance with the terms of this Agreement as if such conveyance had occurred on the Closing Date.  Subject to the conditions set forth in this Section 6 and elsewhere in this Agreement and in the Restructuring Agreement, the parties shall consummate the conveyance of the OVC Property and Northlake Property in accordance with the terms of this Agreement upon receipt of all of the OVC Consents and/or Northlake Consents, as applicable; provided that the same are obtained prior to the Termination Date and provided further that (i) Schedules 3, 6, 7, 8, 11, 12-A, 12-B and 12-C relating to the OVC Property or Northlake Property shall be updated to the extent required to reflect matters in existence as of the Subsequent Closing Date and shall be subject to the approval of the applicable Lenders and Venture Grantees, (ii) all references in this Agreement to "the date hereof" or to the Closing Date, as it relates to the OVC Property or Northlake Property, shall mean the applicable Subsequent Closing Date, (iii) all representations herein shall be repeated and restated as of each Subsequent Closing Date, and (iv) all documents contemplated to be delivered in connection

with the conveyance of the OVC Property or Northlake Property on the Closing Date shall instead be delivered on the applicable Subsequent Conveyance Date. .

       7.    Existing Interim Loan.  Upon Closing, the Existing Interim Loan shall be deemed to have been paid in full and the capital contributions of the LB Master Venture Member to the Master Venture shall be increased by an amount equal to the aggregate outstanding balance of the Existing Interim Loan as of the Closing.

       8.    Master III Venture.  At Closing and in consideration of the agreements and concessions being made hereunder by the Lehman Parties, the SunCal Master III Member and the Lehman Master III Member shall enter into a limited liability company agreement in the form of Exhibit O (the "SCLV Master III Member Operating Agreement") and the SunCal Master III Member shall contribute its membership interest in the Master III Venture to the SCLV Master III Member pursuant to an assignment agreement (the "SunCal Master III Member Assignment").  In addition, the SCC Guarantors shall execute and deliver the SCC Guaranty in favor of the Lehman Master III Member.

       9.    Closing; Delivery of Possession.  The closing of the transactions contemplated by this Agreement (the "Closing") shall take place on the date on which this Agreement is executed (the "Closing Date").  The Closing shall take place at the offices of Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153, or at such other place as is mutually agreed upon by the parties hereto.  Possession of the Conveyance Properties shall be unconditionally and irrevocably delivered to the Venture Grantees upon Closing.

      10.    Delivery of Title Documents.  Concurrently with or prior to the date of this Agreement, the Grantors shall provide to the Lenders and the Venture Grantees the following:

         a.    Intentionally Omitted.

         b.    True, correct and complete copies of any and all Contracts and Bonds and all backup documentation (including, without limitation, invoices, statements, contracts, general ledgers and books and records) in the possession of the Grantors or any of their respective agents with respect to the items and matters identified, disclosed or reflected on any of the Schedules to this Agreement; provided, that the foregoing may be provided or made available to the Lenders and Venture Grantees by electronic means.

         c.    Copies of all surveys, soil test reports, engineering reports, environmental reports and any other studies or reports conducted by or for any Grantor or any other Borrower Party (which may be provided or made available to the Lenders and Venture Grantees by electronic means), and all other items of Personal Property or Intangible Property, to the extent in the possession of any Grantor, with respect to any Property.  As used in this Agreement, the phrase "in the possession of any Grantor" or similar phrases shall mean in the actual possession of any Borrower Party, any other SunCal Party or any employee or agent of any such Person.

      11.    Mortgage Loans.  The Borrower Parties hereby acknowledge and agree that each Mortgage Loan is currently accruing interest at the applicable default rate provided

under the applicable Loan Documents and shall continue to accrue interest at such default rate (provided, that such default rate shall not exceed 15% per annum; provided, however, that the foregoing limitation shall not be applicable to the Pac Point Loans) following the Closing until such Mortgage Loan has been repaid in full.

12.    Non-Judicial or Judicial Foreclosure.

a.    Notwithstanding anything to the contrary contained in any document or instrument delivered pursuant to this Agreement, at any time after the Closing, any Lender may, at such Lender's sole option and election, pursue, through litigation or otherwise, a non-judicial or judicial foreclosure of any of the Deeds of Trust and/or any other security instruments with respect to any Conveyance Property or any portion thereof (each, a "Foreclosure Proceeding"). In such event (but subject to the terms of the respective Covenants Not To Sue), each Borrower Party and Elieff hereby agrees to cooperate with each applicable Lender and each applicable Venture Grantee in all respects in connection with any such Foreclosure Proceeding (provided that the Borrower Parties and Elieff shall not be required to incur any liability or unreimbursed cost unless the applicable Lender and Venture Grantee(s) agree to reimburse or indemnify the Borrower Parties and Elieff therefor) and each such Person agrees not to in any way contest, defend, interfere with or hinder any such Foreclosure Proceeding; provided further, however, that the Lenders shall not have the right to seek any money or other judgment relating to any of the Loans or the Loan Documents, in such Foreclosure Proceeding, or to initiate any separate action, at law or in equity with respect to seeking any money or other judgment, against any such Person, except to the extent permitted by the Covenants Not To Sue and Section 33 of this Agreement or any other provision of this Agreement or the Settlement Documents; and provided further that such limitations on liability shall not apply to or affect any Lender's or any Venture Grantee's rights with respect to any breach or default by the Borrower Parties or other SunCal Parties under this Agreement or any of the other Settlement Documents. Nothing contained in this Agreement, however, shall affect or limit the recourse of the Venture Grantees or Lenders with respect to the Borrower Parties' or other SunCal Parties' obligations and liabilities pursuant to this Agreement or any of the other Settlement Documents or the Loan Documents except as otherwise provided in the Covenants Not to Sue. Further, the Borrower Parties and Elieff agree to execute and deliver any and all documents and to take any and all further actions as may be reasonably requested by any Lender or any Venture Grantee in order to effectuate the provisions of the preceding portions of this paragraph (provided that the Borrower Parties and Elieff shall not be required to incur any liability or unreimbursed cost unless the applicable Lender or Venture Grantee(s) agree to reimburse or indemnify the Borrower Parties and Elieff therefor). Notwithstanding the foregoing, in the event that any Lender initiates a Foreclosure Proceeding with respect to any Conveyance Property (such Conveyance Property being referred to as a "Foreclosure Property") and such Lender (or its Affiliate) is the successful bidder at the foreclosure sale respecting such Foreclosure Property and the entity to which title to the Foreclosure Property is to be transferred in connection with the foreclosure sale (such entity being referred to as the "Foreclosure Transferee") (which, for the avoidance of doubt, shall not include the interest of any Person which is not an Affiliate of Lehman) is an LB Lender Affiliate, then the Affiliate of Lehman in such Foreclosure Transferee (the "Foreclosure Transferee LB Member") shall assign the interest held by such Foreclosure Transferee LB Member to the Master Venture (free and clear of any liens or encumbrances affecting such interest other than any liens or encumbrances created

pursuant to the terms of the Master Venture Operating Agreement) and the LB Master Venture Member shall be deemed to have made a capital contribution to the Master Venture in an amount equal to the applicable LB Unreturned Loan Amount.  If such Lender (or its Affiliate) is the successful bidder at the foreclosure sale respecting such Foreclosure Property but the Foreclosure Transferee is not an LB Lender Affiliate, then neither such Lender (or its Affiliate) nor any member of the Foreclosure Transferee shall be required to assign or cause to be assigned any interests in the Foreclosure Transferee to the Master Venture and such Foreclosure Transferee shall acquire title to such Foreclosure Property free and clear of any obligations or rights arising under this Agreement or under any of the other Settlement Documents.  If such Lender (or its Affiliate) is not the successful bidder at the foreclosure sale but such successful bidder is a third party unrelated to such foreclosing Lender, then any proceeds of such foreclosure sale in excess of those received by the foreclosing Lender and to which the applicable Venture Grantee would be entitled, under applicable law, to receive, shall be distributed to the Master Venture for further distribution to the members thereof as provided in the Master Venture Operating Agreement.

b.     None of the provisions of Section 12.a. shall be applicable to, refer to, relate to or otherwise affect the Pac Point Loans, the Pac Point Loan Documents or the Pacific Point Property.

13.     Closing Costs and Prorations.

a.     Each of the parties hereto agrees to pay (i) all of its respective legal costs, (ii) the costs to provide the documentation and information described in Section 10, and (iii) any federal, state or local income taxes payable by any of such parties in connection with the Conveyance Property Transfers, the Equity Interest Transfers or any other Settlement Transaction.  Notwithstanding the foregoing or anything to the contrary contained herein, all costs incurred by any of the Lenders or Venture Grantees in connection with the Conveyance Property Transfers or any other Settlement Transaction (including, without limitation, legal fees, title insurance costs and transfer, mortgage and similar taxes and closing costs) shall, at Lenders' option, either be made by the Venture Grantees and included as a capital contribution by the LB Master Venture Member to the Master Venture or shall be made by the Lenders as protective advances under the Mortgage Loans secured by the Conveyance Properties and capitalized and included as principal under such Mortgage Loans (with the allocation of such protective advances among such Mortgage Loans to be made by the Lenders in their sole and absolute discretion).

b.     The Venture Grantees shall be solely responsible for the cost and payment of any transfer tax, conveyance tax, documentary tax or stamp tax, whether payable to the State of California, the counties in which any of the Conveyance Properties are located or any municipality, arising in connection with the Conveyance Property Transfers, and shall further be solely responsible for the cost and payment of any title insurance premiums, search fees, endorsement fees and all other title costs and charges incurred in connection with the issuance of the Title Policies.

c.     The Venture Grantees shall be solely responsible for the cost and payment of any transfer tax, conveyance, tax, documentary tax or stamp tax, whether payable to

the State of California, the Counties or any municipality, arising in connection with the Equity Interest Transfers.

        d.     At Closing, the Grantors shall deliver to the Venture Grantees all Deposits then held by any of the SunCal Parties or any Related Party thereof, if any, together with any and all interest accrued thereon through the Closing Date. The Venture Grantees shall assume all of the Grantors' respective obligations with respect to the continued holding of such Deposits, if any, to the extent and only to the extent that the same are actually delivered by the Grantors to the Venture Grantees at Closing.

        e.     At Closing, the Grantors and each of the other Borrower Parties and Elieff shall be deemed to have assigned, and do hereby assign, to the respective Venture Grantees all of their respective right, title and interest in and to the Accounts and all funds contained therein. Each of the Borrower Parties and Elieff hereby irrevocably constitutes and appoints each Venture Grantee as its attorney-in-fact, with full power of substitution and transfer, to execute and deliver any and all instruments, certificates, documents and agreements as may be necessary to effectuate any such assignment to the Venture Grantees and/or to access or transfer any funds contained in any of the Accounts. The power of attorney hereby granted by each Borrower Party and Elieff shall be coupled with an interest and shall be irrevocable.

        14.     Assumption of Obligations.

        a.     At Closing and to the extent the same have not been paid or satisfied as of the Closing Date, each of the Venture Grantees shall assume and be responsible for the payment of (i) those payables and other obligations of the Grantors as described on Schedule 5 that relate to such Venture Grantee's Conveyance Property to the extent and only to the extent of the amounts set forth on Schedule 5 and provided that such amounts are actually owed by the Grantors to the respective vendors and other obligees in accordance with the underlying contracts or agreements respecting such payables and other obligations, but subject to all valid claims and defenses with respect thereto (collectively, the "Scheduled Assumed Obligations"), and (ii) all payables arising from any Lender Authorized Work ("Authorized Assumed Obligations" and together with the Scheduled Assumed Obligations, the "Venture Grantee Assumed Obligations"). The Venture Grantees shall have the right to contest, negotiate, litigate, delay payment and/or settle any of the Venture Grantee Assumed Obligations with the applicable holders thereof, and/or retain an agent to do so on behalf of the Venture Grantees, on such terms as may be determined solely by the Venture Grantees without any participation by, or consent or waiver from any of the Borrower Parties or any other SunCal Parties; provided, that notwithstanding the foregoing, the parties acknowledge that the Venture Grantees may delegate certain of such rights to the Manager pursuant to the terms of and subject to the limitations and conditions set forth in the Management Agreements; provided, however, that in all events the Borrower Parties and Elieff shall cooperate with the Venture Grantees and their agents and consultants in all respects with respect to the Venture Grantee Assumed Obligations (provided, that the Borrower Parties and Elieff shall not be required to incur any material cost or liability unless the Venture Grantees otherwise agree to reimburse or indemnify the Borrower Parties and Elieff therefor). The Venture Grantees shall consult with the Manager in connection with the negotiation and settlement of any Venture Grantee Assumed Obligations provided that all decisions regarding the negotiation and settlement of the Venture Grantee Assumed Obligations

shall be made solely by the Venture Grantees. For purposes of clarity, the Venture Grantees shall have the right to contest and/or litigate any of the Venture Grantee Assumed Obligations to judgment and nothing contained herein shall require or compel the Venture Grantees to pay or settle any of the Venture Grantee Assumed Obligations at any time prior to a final unappealable judgment with respect thereto.

                    b.      Subject to the Pac Point Transferee's right to contest as provided in this Section 14.b. and subject further to the Pac Point Transferee's receipt of invoices, statements and other relevant documentation as the Pac Point Transferee may request in order to substantiate, verify and confirm the amounts actually owed with respect to the holders of the Pac Point Payable Obligations pursuant to their contractual agreements, at Closing, the Pac Point Transferee shall assume and be responsible for the payment of (i) those payables of the Pac Point Borrower more particularly described on Schedule 4-A in the aggregate amount of $3,956,693.30 (to the extent the same have not been paid or satisfied as of the Closing Date) (the "Bonded Pac Point Payable Obligations") and (ii) those payables of the Pac Point Borrower more particularly described on Schedule 4-B in the aggregate amount of $3,688,011 (to the extent the same have not been paid or satisfied as of the Closing Date) (the "Other Pac Point Payable Obligations" and together with the Bonded Pac Point Payable Obligations, the "Pac Point Payable Obligations") and provided that, with respect to the Pac Point Payable Obligations, that such amounts are actually owed by the Pac Point Borrower to the respective vendors and other obligees in accordance with the underlying contracts or agreements respecting such payables, but subject to all valid claims and defenses with respect thereto. The Pac Point Transferee shall have the right to contest, negotiate, litigate, delay payment and/or settle any of the Pac Point Payable Obligations with the applicable holders thereof, and/or retain an agent to do so on behalf of the Pac Point Transferee on such terms as may be determined solely by the Pac Point Transferee without participation by, or consent or waiver from any of the Pac Point Borrower Parties or any other SunCal Parties; provided, however, that in all events the Pac Point Borrower Parties and Elieff shall cooperate with the Pac Point Transferee and their respective agents and consultants in all respects with respect to the Pac Point Payable Obligations (provided, that the Pac Point Borrower Parties and Elieff shall not be required to incur any material cost or liability unless the Pac Point Transferee otherwise agrees to reimburse or indemnify the Pac Point Borrower Parties and Elieff therefor). For purposes of clarity, the Pac Point Transferee shall have the right to contest and/or litigate any of the Pac Point Payable Obligations to judgment and nothing contained herein shall require or compel the Pac Point Transferee to pay or settle any of the Pac Point Payable Obligations at any time prior to a final unappealable judgment with respect thereto.

                    c.      Subject to the Lehman DS Equity Partner's and Lehman TL Equity Partner's right to contest as provided in this Section 14.c., at Closing and to the extent the same have not been paid or satisfied as of the Closing Date, (i) the Lehman DS Equity Partner shall agree to pay up to 90% of those payables of the Delta Shores Joint Venture more particularly described on Schedule 4-C in the aggregate amount of $1,917,897 (the "Delta Shores Payable Obligations") (provided, that the Lehman DS Equity Partner shall have no obligation to pay an amount, with respect to any particular Delta Shores Payable Obligation, which exceeds 90% of the amount of such Delta Shores Payable Obligation reflected on Schedule 4-C), and (ii) the Lehman TL Equity Partner shall agree to pay up to 60% of those payables of the Terra Lago Joint Venture or the Terra Lago Property Owner more particularly described on Schedule 4-D in

the aggregate amount of $2,325,770 (the "Terra Lago Payable Obligations" and together with the Delta Shores Payable Obligations, the "Equity JV Payable Obligations") (provided, that the Lehman TL Equity Partner shall have no obligation to pay an amount, with respect to any Terra Lago Payable Obligation, which exceeds 60% of the amount of such Terra Lago Payable Obligation reflected on Schedule 4-D), provided that, with respect to the Equity JV Payable Obligations, that such amounts are actually owed by the Delta Shores Joint Venture, the Terra Lago Joint Venture and/or the Terra Lago Property Owner to the respective vendors and other obligees in accordance with the underlying contracts or agreements respecting such payables, but subject to all valid claims and defenses with respect thereto. The Lehman DS Equity Partner and Lehman TL Equity Partner shall have the right to contest, negotiate, litigate, delay payment and/or settle any of the Equity JV Payable Obligations with the applicable holders thereof, and/or retain an agent to do so on behalf of the Lehman DS Equity Partner and/or Lehman TL Equity Partner, as applicable, on such terms as may be determined solely by the Lehman DS Equity Partner and/or Lehman TL Equity Partner, as applicable, without participation by, or consent or waiver from any of the SunCal Equity Partners or any other SunCal Parties; provided, however, that in all events, the SunCal Equity Partners shall cooperate with the Lehman DS Equity Partner and Lehman TL Equity Partner, and their respective agents and consultants in all respect with respect to the Equity JV Payable Obligations (provided, that the SunCal Equity Partners shall not be required to incur any material cost or liability unless the Lehman DS Equity Partner and/or Lehman TL Equity Partner otherwise agrees to reimburse or indemnify the SunCal Equity Partners therefor). For purposes of clarity, the Lehman DS Equity Partner and Lehman TL Equity Partner shall have the right to contest and/or litigate any of the Equity JV Payable Obligations to judgment and nothing contained herein shall require or compel the Lehman DS Equity Partner and Lehman TL Equity Partner pay or settle any of the Equity JV Payable Obligations at any time prior to a final unappealable judgment with respect thereto. Notwithstanding anything to the contrary contained herein, at Closing, (i) the SunCal DS Equity Partner shall agree to pay and be responsible for the payment of 10% of any settlement amount or other amount ultimately determined to be owed with respect to any Delta Shores Payable Obligations, and (ii) the SunCal TL Equity Partner shall agree to pay and be responsible for the payment of 40% of any settlement amount or other amount ultimately determined to be owed with respect to any Terra Lago Payable Obligations. The obligations of the Lehman DS Equity Partner and the Lehman TL Equity Partner to pay their applicable shares of any Delta Shore Payable Obligations and Terra Lago Payable Obligations, respectively, shall be expressly conditioned upon the simultaneous payment by the SunCal DS Equity Partner and SunCal TL Equity Partner of their applicable share of any Delta Shores Payable Obligations and Terra Lago Payable Obligations, respectively, to the applicable venture or obligor thereof. Notwithstanding the foregoing, the SunCal TL Equity Partner shall cause all TL CFD Proceeds received by or on behalf of the Terra Lago Property Owner and all proceeds from any profit participation in existence as of the Closing Date (collectively, the "TL Profit Participation Proceeds") to be used for and applied solely and exclusively to the payment of the Terra Lago Payable Obligations and (1) the obligations of the Lehman TL Equity Partner with respect to the Terra Lago Payable Obligations shall be reduced by an amount equal to 60% of any TL CFD Proceeds actually received by or on behalf of the Terra Lago Property Owner and shall be reduced by 60% of any TL Profit Participation Proceeds (regardless of whether or not such proceeds are actually applied to the payment of the Terra Lago Payable Obligations) and (2) the obligations of the SunCal TL Equity Partner with respect to the Terra Lago Payable Obligations shall be reduced by an amount

equal to 40% of any TL CFD Proceeds actually received by or on behalf of the Terra Lago Property Owner and shall be reduced by 40% of any TL Profit Participation Proceeds (regardless of whether or not such proceeds are actually applied to the payment of the Terra Lago Payment Obligations).

                d.    Notwithstanding anything to the contrary in Section 14.a., Section 14.b, Section 14.c or elsewhere in this Agreement, to the extent that the aggregate amount actually paid by the Venture Grantees, the Pac Point Transferee and/or any other Lehman Party (including, without limitation, any Lender who funded such payments through protective advances under the applicable Loan(s) or otherwise prior to the Closing Date), collectively, with respect to Scheduled Assumed Obligations and Other Pac Point Payable Obligations exceeds (i) \$35,587,766[2] (such excess payments being referred to herein as the "Excess Vendor Payments"), the Lehman Preferred Amount (as such term is defined in the SCLV Master III Member Operating Agreement) shall be increased by the amount of any such Excess Vendor Payments (provided that, to the extent that SCC and/or the SCLV Master III Member or any other SunCal Party reimburses the applicable Venture Grantee, Pac Point Transferee or other Lehman Party, as applicable, for any Additional Excess Vendor Payments made by any such party as provided in clause (ii) below, the Lehman Preferred Amount shall thereafter be reduced by the amount of any such reimbursement (up to an amount not to exceed the amount of any Excess Vendor Payments that were added to the Lehman Preferred Amount)), and (ii) \$40,332,802[3] (such excess payments being referred to herein as the "Additional Excess Vendor Payments"), SCC and the SCLV Master III Member, jointly and severally, shall reimburse the applicable Venture Grantee, Pac Point Transferee or other Lehman Party, as applicable, for any such Additional Excess Vendor Payments immediately upon demand by the applicable Venture Grantee, Pac Point Transferee or other Lehman Party, as applicable. For the avoidance of doubt, Additional Excess Vendor Payments shall also be Excess Vendor Payments and shall be treated in accordance with clause (i) above. If, following the settlement of all Scheduled Assumed Obligations and Other Pac Point Payable Obligations, the aggregate amount actually paid by the Venture Grantees, Pac Point Transferee and any other Lehman Party, as applicable, in respect of the settlement of all Scheduled Assumed Obligations and Other Pac Point Payable Obligations, is less than \$35,587,766[4] (the "75% Threshold Amount"), then the Venture Grantees and Pac Point Transferee shall, jointly and severally, pay to SCC an amount equal to 15% of the difference between the 75% Threshold Amount and the actual aggregate amount so paid. All costs and expenses (including, without limitation, attorneys' fees and disbursements) incurred by the Venture Grantees, Pac Point Transferee or other Lehman Party, as applicable, in connection with the negotiation and settlement and/or prosecution or defense of any litigation respecting any of the Venture Grantee Assumed Obligations or Other Pac Point Payable Obligations shall be the sole responsibility of the Venture Grantees or Pac Point Transferee, as applicable, and shall not

---

[2] This figure will need to be modified to reflect any additional payables in connection with Joshua Ridge II, Tesoro Burnham, Del Rio sports park land and Palm Springs Village.

[3] This figure will need to be modified to reflect any additional payables in connection with Joshua Ridge II, Tesoro Burnham, Del Rio sports park land and Palm Springs Village.

[4] This figure will need to be modified to reflect any additional payables in connection with Joshua Ridge II, Tesoro Burnham, Del Rio sports park land and Palm Springs Village.

be included for purposes of determining Excess Vendor Payments, Additional Excess Vendor Payments or the 75% Threshold Amount.

e.      The Lehman Parties shall have no liability or obligation with respect to, and each of the Borrower Parties and other SunCal Parties shall continue to be liable and responsible for, any and all payables, liabilities, obligations, costs or expenses of any kind or nature accruing or arising prior to the Closing with respect to any of the Properties or any of the SunCal Parties, respectively, and all other expenses, liabilities and obligations of any kind or nature which are not Assumed Obligations (all such obligations and liabilities for which the Borrower Parties and other SunCal Parties, as applicable, shall continue to be liable and responsible being collectively referred to herein as the "Retained Obligations"). The Retained Obligations shall include, without limitation, all judgments, lien claims, Bond Obligations (other than the Assumed Bond Obligations), claims arising from any litigation or other legal proceedings relating to the Retained Obligations, claims in favor of any purchasers under any purchase or option agreements including any Property PSAs and including any claims for reimbursement or any return of any deposits paid by such purchasers (including, without limitation, any obligations or liabilities in favor of any of the Borrower Parties or any of their respective constituent owners or Related Parties or any of the other SunCal Parties) excluding, however any of the foregoing items which otherwise constitute Assumed Obligations. All Retained Obligations shall remain the obligations of the Grantors, Borrowers and/or other Borrower Parties or SunCal Parties, or their respective Related Parties, who are currently obligors with respect thereto as of the date hereof (without in any way creating any liability in any SunCal Party who is not otherwise obligated therefor as of the date hereof) and under no circumstances shall any of the Venture Grantees, Lenders, Lehman Parties or any other party assume or become liable or obligated for any of the Retained Obligations. For the avoidance of doubt, nothing contained in this Agreement shall create any liability or cause of action against a SunCal Party or Related Party thereof for or in respect of any Retained Obligations if such SunCal Party or Related Party thereof is not otherwise liable for such Retained Obligations as of the date hereof, nor does anything in this Agreement grant or create any rights in favor of any third party (other than the Indemnitees, the Pac Point Indemnitee and any other party expressly provided for hereunder, and then only to the extent provided in this Agreement) with respect to any Retained Obligations.

f.      Notwithstanding anything to the contrary in this Section 14 or anywhere else in this Agreement, (i) the Venture Grantees, Lenders and other Lehman Parties shall have the right to fully audit, verify and reconcile the amounts of the Assumed Obligations based upon actual invoices (both current and prior), contracts and other documents evidencing the Assumed Obligations against work in progress logs, contractor certifications, draw requests and requisitions with respect to any of the Loans, and other relevant documentation in order to substantiate, verify and confirm the amounts actually owed to the holders of the Assumed Obligations pursuant to their respective contractual agreements and the Borrower Parties shall provide or make available to the Lehman Parties any such information as may be requested by the Lehman Parties, and (ii) the Venture Grantees, Lenders and other Lehman Parties shall have the absolute right to contest any sums comprising any Assumed Obligations which are claimed by the holders thereof to be owed to them and which the Venture Grantees, Lenders and other Lehman Parties assert are not in fact owing in accordance with the contracts and agreements with such holders.

g.     If, and to the extent that, any Venture Grantee or the Pac Point Transferee desires, at its sole option and in its sole and absolute discretion, to proceed with the development of its Property in a material manner after the date of this Agreement ("Material Development Work"), such Venture Grantee or Pac Point Transferee, as applicable, shall use commercially reasonable efforts to replace and cause to be released each existing Payment and Performance Bond issued with respect to such Property that relates to or secures the Material Development Work to be undertaken and shall indemnify and hold the applicable Bond Obligor thereunder harmless from and against any claims or losses incurred by such Bond Obligor in respect of such Payment and Performance Bond until such time as such Payment and Performance Bond has been replaced and released. To the extent that a Venture Grantee or the Pac Point Transferee, undertakes or causes work to be performed on its Property after the date of this Agreement and as a result of such work, liability is created or arises under any existing Payment and Performance Bond, such Venture Grantee or Pac Point Transferee, as applicable, and PAMI LLC shall, jointly and severally, indemnify and hold harmless any applicable Bond Obligor from any liability with respect to, and to the extent of, the work so undertaken. Unless and until Material Development Work is undertaken with respect to a Property, neither the applicable Venture Grantee nor the Pac Point Transferee, as applicable, nor any other Lehman Party shall have any obligation to replace or cause to be replaced any existing Payment and Performance Bonds issued with respect to such Property; provided, however, that the applicable Venture Grantee or Pac Point Transferee, as applicable, shall pay the premiums for the maintenance of such Payment and Performance Bonds but shall have no obligation to pay any such premium (on an annualized basis) in excess of 125% of the most recent premium (on an annualized basis) paid with respect to the applicable Payment and Performance Bond. All premiums payable with respect to any Payment and Performance Bonds securing Material Development Work on any Property shall be paid by the applicable Venture Grantee or Pac Point Transferee, as applicable, without regard to the 125% limitation set forth in the preceding sentence.

h.     Nothing contained in this Section 14 shall create any rights in favor of any third party (other than the Indemnitees, the Pac Point Indemnitees or any other party expressly provided indemnification rights hereunder, and then only to the extent provided in this Agreement).

15.    Representations, Warranties and Covenants.

a.     The Borrower Parties, as of the date hereof, jointly and severally, represent, warrant and covenant to the Venture Grantees, the Lenders, LBHI, each of the other Lehman Parties, the Pac Point Transferee, and any subsequent transferee(s) of any of the Properties or any portion thereof who is an Affiliate of any Lender, Venture Grantee or the Pac Point Transferee, as follows:

1)     (A) The Scheduled Contracts constitute all contractual agreements (including, without limitation, any building, construction, infrastructure, or development agreements), entered into by any of the Sun Cal Parties or their respective Affiliates or agents, oral or written, with respect to, or which affect in any way, any of the Conveyance Properties or any portion thereof (other than the Loan Documents) (including, without limitation, all agreements, commitments and undertakings, written or oral, which have given or may

hereafter give rise to or have resulted in or may hereafter result in any Vendor Obligations or Bond Obligations), and (B) the contracts more particularly described on Schedule 16 constitute all contractual agreements (including, without limitation, any building, construction, infrastructure, or development agreements), entered into by any of the Sun Cal Parties or their respective Affiliates or agents, oral or written, with respect to, or which affect in any way, the Pacific Point Property or any portion thereof (other than the Pac Point Loan Documents) (including, without limitation, all agreements, commitments and undertakings, written or oral, which have given or may hereafter give rise to or have resulted in or may hereafter result in any Vendor Obligations or Bond Obligations).

2)      Except as set forth on Schedule 6, there are no leases or other occupancy agreements entered into by any of the Sun Cal Parties or their respective Affiliates or agents, affecting any Property or any portion thereof.

3)      Except as set forth on Schedule 6, none of the Borrower Parties or Elieff has received any notice from any Person (including, without limitation, any governmental or quasi-governmental authority) asserting that any Property (or any portion thereof) or the development or operation thereof currently violates any applicable laws, ordinances, codes, or regulations (including, without limitation, any zoning, building, fire, or safety laws, ordinances, codes or regulations) or any permits, licenses, entitlements or restrictions (including, without limitation, any restrictive covenants, easements or other agreements) imposed upon, benefiting or otherwise affecting or relating to the development, use, or operation of any portion of any Property.

4)      There are no unpaid assessments (including, without limitation, assessments payable to governmental authorities and assessments payable to any owner's association) with respect to any Property or any portion thereof except as set forth on Schedule 6 or otherwise reflected in the Title Policies.

5)      Except as set forth on Schedule 6, no broker's commissions or other brokerage or finder's fees are due and owing or shall be due or owing with respect to any of the Loans or the Properties (including with respect to any leasing or sales activities relating to any of the Properties or any portion thereof) as a result of any actions of any of the SunCal Parties or their respective Affiliates or agents, and none of the Borrower Parties or any of the other SunCal Parties nor any of their respective Affiliates or agents have engaged any broker as agent with respect to this Agreement or the Settlement Transactions.

6)      Except as set forth on Schedule 6, none of the Borrower Parties or Elieff has received any notice of any violation of any environmental laws or the existence of any hazardous substances on or emanating from any portion of any Property.

7)      (A) The Persons executing this Agreement and all other Settlement Documents on behalf of any of the SunCal Parties, have been duly authorized to execute this Agreement and all such other Settlement Documents and to bind the SunCal Parties hereunder and thereunder; (B) all consents and approvals required in connection with the consummation of the Settlement Transactions by the SunCal Parties have been obtained; and (C) this Agreement has been, and all other Settlement Documents to be delivered by the SunCal

Parties, or any of them, at Closing have been or will be, duly authorized, executed and delivered by the applicable SunCal Parties, and do not or will not violate the provisions of any of the Contracts, any organizational documents of any of the SunCal Parties or their constituent owners or any other agreements to which any of the SunCal Parties is a party or may be bound.

8)      (A) Other than as disclosed on Schedule 7, there are no litigation matters or regulatory proceedings with respect to which a complaint or other initial pleading has been received by any SunCal Party or an Affiliate thereof or, to the best of the Borrower Parties' knowledge, threatened (other than those resulting from any unpaid Vendor Obligations set forth on Schedule 12-A, unpaid Non-Vendor Monetary Obligations set forth on Schedule 12-B, unpaid Bond Claims and Bond Obligor Claims set forth on Schedule 12-C or any unpaid Authorized Assumed Obligations), with respect to any of the Borrower Parties or any of the Properties (or any portion thereof), (B) copies of all material pleadings and other documents relating to the litigation disclosed on Schedule 7 (other than pleadings, filings and documents related solely to discovery matters) have been provided to Lenders by the Borrower Parties, and (C) the SunCal Parties will cooperate after the Closing with the Lenders, Venture Grantees and the Pac Point Transferee in all reasonable respects in connection with such litigation matters (provided that the SunCal Parties shall not be required to incur any liability or unreimbursed cost in connection with any such cooperation unless the applicable Lender Parties, Venture Grantees and/or Pac Point Transferee agree to reimburse the SunCal Parties therefor). Nothing contained herein shall in any way or manner be construed as an assumption by any of the Venture Grantees, the Pac Point Transferee, the Lenders, or any of the other Lehman Parties, of any obligations or liabilities arising under or relating to any pending or threatened litigation (other than the Assumed Obligations to be assumed by the Venture Grantees, the Pac Point Transferee or other Lehman Parties as provided herein) including, without limitation, any of the matters described on Schedule 7.

9)      Except as set forth on Schedule 8, there are no current liens, attachments or other claims filed against or otherwise affecting any of the Properties or any portion thereof or any of the Borrower Parties which have been received by any of the Borrower Parties nor, to the best of the Borrower Parties' knowledge, are there any liens, attachments or other claims threatened to be filed against or threatened to otherwise affect any of the Properties or any portion thereof or any of the Borrower Parties (other than those resulting from any unpaid Vendor Obligations set forth on Schedule 12-A, unpaid Non-Vendor Monetary Obligations set forth on Schedule 12-B, unpaid Bond Claims and Bond Obligor Claims set forth on Schedule 12-C or any unpaid Authorized Assumed Obligations) other than those disclosed on Schedule 8.

10)      (A) There are no outstanding liabilities or obligations of any kind owed by any Grantor or any of the other Borrower Parties or Elieff to any other Borrower Party or Elieff or any Related Party of any Borrower Party or Elieff (collectively, "Affiliate Obligations") which could affect any of the Properties or impose any liability or obligation on any Lehman Party; (B) none of the Assumed Obligations include any Affiliate Obligations; and (C) there are no claims, causes of action or other rights held by any of the Borrower Parties or Elieff or any Related Party of any of the Borrower Parties or Elieff with respect to any Property (or any portion thereof), the Venture Grantees, the Pac Point Transferee, the Lenders, LBHI or any of their respective Related Parties.

MI1 \197196\u2;EM85_1718!DOC\73683.0995                    19

.

11)     Except as set forth on Schedule 6, the Borrower Parties and Elieff have terminated any and all agreements with the Borrower Parties or Elieff or any Related Parties of any of the Borrower Parties or Elieff concerning or respecting any Property or any portion thereof (collectively, "Affiliate Agreements"), and any and all such Affiliate Agreements are, as of the Closing Date, of no further force or effect and there are no outstanding obligations due and owing to any such Related Parties thereunder.

12)     Intentionally Omitted.

13)     Intentionally Omitted.

14)     Intentionally Omitted.

15)     All draws made under the respective Loans by any of the Borrower Parties or Elieff and funded by the Lenders have been used by the Borrower Parties or Elieff for the purpose stated in the applicable draw request submitted by such Borrower Parties or Elieff and for the benefit of the Properties (and no other property that is not a part of the Properties).

16)     There are no purchase and sale agreements or any option agreements affecting any portion of any Property or any other property located within the master development in which any Property is located pursuant to which any of the Grantors, Borrowers or other Borrower Parties or Elieff has any remaining obligations except as described on Schedule 11 (the "Property PSAs"). Schedule 2 is a true, complete and correct list of all Deposits (including any interest accrued thereon) and all other deposits (including any interest accrued thereof) made under any Property PSA and which have not otherwise been applied at closing or refunded to the applicable purchasers in accordance with the terms of the Property PSAs and/or applicable law.

17)     (A) None of the SunCal Parties or any Related Party thereof is holding any Deposits that have not been transferred to the Venture Grantees pursuant to this Agreement, and (B) there are no purchase and sale agreements or option agreements in effect with respect to any portion of any Property other than the Property PSAs.

18)     Other than the Authorized Assumed Obligations, Schedule 12-A fully and accurately reflects all payment obligations currently claimed by any vendors (collectively, the "Scheduled Vendors") of any Property or any portion thereof to be owed to such Scheduled Vendors (collectively, the "Vendor Obligations"), and the amounts set forth on Schedule 12-A accurately reflect the current outstanding obligations of the Borrower Parties and Elieff to the Scheduled Vendors that are claimed to be due and owing by the Scheduled Vendors as of the date hereof (including, without limitation, any and all retainage payments that may become due and payable to Scheduled Vendors upon completion of any work which has been performed through the date hereof). Other than the Authorized Assumed Obligations, Schedule 12-B fully and accurately reflects all monetary liabilities or obligations (other than the Vendor Obligations) which are due and owing or claimed to be due and owing to any Person as of the date hereof by any of the Borrower Parties or Elieff and which have been incurred with respect to, in connection with or otherwise in any way related to or affecting any portion of any Property

to the best of the Borrower Parties' knowledge after diligent inquiry and investigation (collectively, the "Non-Vendor Monetary Obligations") including, without limitation, all such monetary liabilities and obligations due and owing or claimed to be due and owing (i) to purchasers or any other Person under any Property PSAs (including any obligation to return any deposits made by such purchasers thereunder), (ii) to any Person under or pursuant to any Development Agreements, (iii) to any Person under any Contracts or any other agreements, contracts or undertakings including any agreements with Scheduled Vendors, (iv) to any Person pursuant to any pending or, to the best of the Borrower Parties' knowledge, threatened litigation (including as a result of any judgments, settlements or otherwise), (v) to any Bond Issuer or any other Person under, pursuant to or arising from any Payment and Performance Bonds, and (vi) to any Person pursuant to any Pre-Closing Commitments. Schedule 12-C fully and accurately describes (x) all Payment and Performance Bonds in effect as of the Closing Date, (y) all Bond Obligors who are liable to the applicable Bond Issuer in the event of any claim under such Payment and Performance Bonds, and (z) all Bond Claims and Bond Obligor Claims made under any such Payment and Performance Bonds as of the Closing Date. Except with respect to the Assumed Obligations being assumed by the Venture Grantees, the Pac Point Transferee or certain other Lehman Parties as provided herein, the Borrower Parties, Elieff and/or any other obligors with respect to the Vendor Obligations and/or Non-Vendor Monetary Obligations (including, without limitation any Bond Obligations, as applicable), shall remain fully liable and responsible for the payment of the Vendor Obligations and Non-Vendor Monetary Obligations of each such party and hereby acknowledge that none of the Lenders, Venture Grantees, Pac Point Transferee or any other Lehman Party shall assume any liability or responsibility for the payment or satisfaction of any of the Vendor Obligations or Non-Vendor Monetary Obligations. Other than (i) the Vendor Obligations set forth on Schedule 12-A, (ii) the Non-Vendor Monetary Obligations set forth on Schedule 12-B, (iii) Bond Claims and Bond Obligor Claims set forth on Schedule 12-C, and (iv) the Authorized Assumed Obligations, there are no other monetary obligations or liabilities which, to the best of the Borrower Parties' knowledge after diligent inquiry and investigation, are due and owing by any of the Borrower Parties to any Person as of the Closing Date and which have been incurred with respect to, in connection with or otherwise in any way related to or affecting any portion of any Property. Other than obligations and liabilities arising under the Scheduled Contracts (including any Property PSAs and the Authorized Assumed Obligations), there are no current or future non-monetary obligations or liabilities (including, without limitation, construction obligations) of any kind whatsoever arising or resulting from any Pre-Closing Commitments which could affect in any way or manner any of the Properties or any portion thereof or impose any obligation or liability upon any Venture Grantee or the Pac Point Transferee.

19)     There are no past due personal property taxes with respect to any Property or any portion thereof and copies of all statements respecting any personal property taxes currently due and payable have been provided to the Venture Grantees and the Lenders.

20)     All cash and cash equivalents held in any Accounts or otherwise in the possession of or owned or held by or for the benefit of any Borrower or any other Borrower Party (other than SCC) are being delivered or transferred to the Venture Grantees at Closing. Neither Elieff nor SCC are holding or are otherwise in possession or in control of

any cash or cash equivalents in any Accounts or otherwise for the benefit of any other Borrower Party.

           21)    All Development Agreements have been provided or otherwise made available, by electronic means, to the Venture Grantees, the Pac Point Transferee and the Lenders and the Borrower Parties have disclosed to the Venture Grantees, the Pac Point Transferee and the Lenders, either by delivery to the Venture Grantees, the Pac Point Transferee and the Lenders or by electronic means, all material Development Rights affecting or benefiting any portion of any Property. Except as set forth on Schedule 6, all Development Rights are held solely by the Grantors or Pac Point Borrower and no other SunCal Party or any Related Party thereof is the holder of any of the Development Rights. To to the extent that the "SunCal Companies" or any other SunCal Party or Related Party thereto, other than a Grantor or Pac Point Borrower, holds any of the Development Rights, the SunCal Parties shall cause the "SunCal Companies" and such other Persons to transfer, assign and convey such Development Rights to the applicable Grantor(s) or Pac Point Borrower prior to Closing in accordance with the terms and requirements set forth in any Development Agreements or otherwise applicable thereto.

           22)    (A) Schedule 14 sets forth (i) a comprehensive, true and accurate list and the status, as of the date hereof, of all community facility bonds, Mello-Roos bonds, and any other bonds issued or proposed to be issued by a governmental authority in connection with the development of any portion of any Property (collectively, the "CFD Bonds"), and (ii) the amount of any proceeds derived from the CFD Bonds to which any of the Borrowers, Grantors or any of the other Borrower Parties or Elieff are entitled to receive in reimbursement for any development, construction or other costs incurred in connection with the development or construction of any portion of any Property or otherwise (collectively, the "CFD Reimbursement Proceeds"); and (B) Schedule 12-C set forth a comprehensive, true and accurate list, as of the date hereof, of any bonds, surety obligations or similar obligations of any nature affecting or otherwise issued to obtain any permits, entitlements, recordation of parcel tract, site or subdivision maps or development approvals or otherwise issued in connection with the development, operation or any other aspect of any portion of any Property (including, without limitation, any surety bonds, payment and performance bonds, labor and material bonds and other bonds provided by any contractors or otherwise provided to any municipalities, utility companies and other Persons) (collectively, the "Payment and Performance Bonds"). None of the Borrower Parties or Elieff shall cause, or take any action that would cause, any of the CFD Bonds or Payment and Performance Bonds to be terminated or cancelled unless such termination or cancellation (x) does not materially adversely affect any Development Rights or any Property and does not materially adversely affect the owner of the affected Property, or (y) results from the failure of the Venture Grantees to pay any premiums which are required to be paid by the Venture Grantees pursuant to this Agreement in order to maintain the effectiveness of any Payment and Performance Bonds.

           23)    Other than as previously disclosed to the Lehman Parties in writing, none of the SunCal Parties or any of their respective Related Parties, or any officers, directors, or representatives of any of the foregoing, have entered into any binding agreements or commitments, written or oral, with any third parties with respect to the making of any equity investment, directly or indirectly, in any of the Joint Ventures or any other joint venture or entity

formed for the purpose of owning and developing any JV Property or any portion thereof, and no third party has any right, as of the Closing Date, to make any such equity investment.

24)    (A) SCC LLC is, and shall at all times be, owned and managed solely by SCC and Nevada Sun, (B) SCC is, and shall at all times be, owned and managed solely by Bruce Elieff, and (C) Nevada Sun is, and shall at all times be, owned and managed solely by Stephan Elieff. No direct or indirect interests in SCC LLC, SCC or Nevada Sun shall be Transferred, directly or indirectly, without the prior written consent of the Lehman Parties (which consent may be granted or withheld in the Lehman Parties' sole and absolute discretion) and any such Transfer shall be a violation of this Agreement and shall be void ab initio.

25)    After the Closing, (i) none of the Grantors will own, or have the right to purchase or acquire, directly or indirectly, any real property or other assets, and (ii) none of the SunCal Parties nor any Related Party thereof will own or have the right or option to purchase or acquire, directly or indirectly, any real property or other assets of any kind located within the master development of which any of the Properties are a part.

26)    The Borrower Parties and Elieff and their respective predecessors in title have complied in all respects with any requirements set forth in any Development Agreement or otherwise applicable to any Development Right which pertain to the conveyance of any of the Properties and/or the transfer or assignment of such Development Agreement or such Development Right, in connection with any conveyance of any Property or any transfer or assignment of any Development Agreement or Development Right occurring prior to the date hereof. All consents required to be obtained under any Development Agreement, or otherwise with respect to any Development Right, with respect to the Conveyance Transactions have been obtained.

27)    Following the Closing, none of the SunCal Parties will have any further right to receive any Revenues.

b.    As of the date hereof, the Manager represents and warrants to the Venture Grantees, the Pac Point Transferee and the other Lehman Parties as follows: (A) the Person executing this Agreement, the Management Agreements, the Pac Point Management Agreement and all other Settlement Documents on behalf of the Manager has been duly authorized to execute this Agreement, the Management Agreements, the Pac Point Management Agreement and all such other Settlement Documents and to bind the Manager hereunder and thereunder; (B) all consents and approvals required in connection with the consummation of the Settlement Transactions by the Manager have been obtained; and (C) this Agreement has been, and the Management Agreements, the Pac Point Management Agreement and all other Settlement Documents to be delivered by the Manager, or any of them, at Closing have been or will be, duly authorized, executed and delivered by the Manager, and do not or will not violate the provisions of any organizational documents of the Manager or its constituent owners or any other agreements to which the Manager is a party or may be bound.

c.    As of the date hereof, the Lehman Equity Partners represent and warrant to the SunCal Equity Partners as follows: (A) the Persons executing this Agreement, the

Equity Interest Assignments, and all other Settlement Documents on behalf of the Lehman Equity Partners have been duly authorized to execute this Agreement, the Equity Interest Assignments, and all such other Settlement Documents and to bind the Lehman Equity Partners hereunder and thereunder; (B) all consents and approvals required in connection with the consummation of the Settlement Transactions by the Lehman Equity Partners have been obtained; and (C) this Agreement has been, and the Equity Interest Assignments and all other Settlement Documents to be delivered by the Lehman Equity Partners, or any of them, at Closing have been or will be, duly authorized, executed and delivered by the Lehman Equity Partners, and do not or will not violate the provisions of any organizational documents of any of the Lehman Equity Partners or their constituent owners or any other agreements to which any of the Lehman Equity Partners is a party or may be bound.

d.    As of the date hereof, the SunCal Equity Partners represent and warrant to the Lehman Equity Partners as follows: (A) the Persons executing this Agreement, the Equity Interest Assignments and all other Settlement Documents on behalf of the SunCal Equity Partners have been duly authorized to execute this Agreement, the Equity Interest Assignments and all such other Settlement Documents and to bind the SunCal Equity Partners hereunder and thereunder; (B) all consents and approvals required in connection with the consummation of the Settlement Transactions by the SunCal Equity Partners have been obtained; and (C) this Agreement has been, and the Equity Interest Assignments and all other Settlement Documents to be delivered by the SunCal Equity Partners, or any of them, at Closing have been or will be, duly authorized, executed and delivered by the SunCal Equity Partners, and do not or will not violate the provisions of any organizational documents of any of the SunCal Equity Partners or any other agreements to which any of the SunCal Equity Partners is a party or may be bound.

e.    As of the date hereof, the SCC Guarantors hereby represent and warrant to the Lehman Master III Member as follows: (A) the Persons executing this Agreement, the SCC Guaranty and all other Settlement Documents on behalf of the SCC Guarantors have been duly authorized to execute this Agreement, the SCC Guaranty and all such other Settlement Documents and to bind the SCC Guaranty hereunder and thereunder; (B) all consents and approvals required in connection with the consummation of the Settlement Transactions by the SCC Guarantors have been obtained; and (C) this Agreement has been, and the SCC Guaranty and all other Settlement Documents to be delivered by the SCC Guarantors at Closing have been or will be, duly authorized, executed and delivered by the SCC Guarantors, and do not or will not violate the provisions of any organizational documents of any of the SCC Guarantors or any other agreements to which any of the SCC Guarantors is a party or may be bound.

f.    As of the date hereof, the SunCal Master III Member represents and warrants to the Lehman Master III Member and to the SCLV Master III Member as follows: (A) the Persons executing this Agreement, the SunCal Master III Member Assignment and all other Settlement Documents on behalf of the SunCal Master III Member have been duly authorized to execute this Agreement, the SunCal Master III Member Assignment and all such other Settlement Documents and to bind the SunCal Master III Member hereunder and thereunder; (B) all consents and approvals required in connection with the consummation of the Settlement Transactions by the SunCal Master III Member have been obtained; and (C) this

Agreement has been, and the SunCal Master III Member Assignment and all other Settlement Documents to be delivered by the SunCal Master III Member at Closing have been or will be, duly authorized, executed and delivered by the SunCal Master III Member, and do not or will not violate the provisions of any organizational documents of the SunCal Master III Member or any other agreements to which the SunCal Master III Member is a party or may be bound.

g.      As of the date hereof, the Lehman Master III Member represents and warrants to the SunCal Master III Member and to the SCLV Master III Member as follows: (A) the Persons executing this Agreement and all other Settlement Documents on behalf of the Lehman Master III Member have been duly authorized to execute this Agreement and all such other Settlement Documents and to bind the Lehman Master III Member hereunder and thereunder; (B) all consents and approvals required in connection with the consummation of the Settlement Transactions by the Lehman Master III Member have been obtained; and (C) this Agreement has been, and all other Settlement Documents to be delivered by the Lehman Master III Member at Closing have been or will be, duly authorized, executed and delivered by the Lehman Master III Member, and do not or will not violate the provisions of any organizational documents of the Lehman Master III Member or any other agreements to which the Lehman Master III Member is a party or may be bound.

h.      As of the date hereof, the Lenders and the Venture Grantees represent and warrant to the Grantors and other Borrower Parties as follows: (A) the Persons executing this Agreement and all other Settlement Documents on behalf of the Lenders and the Venture Grantees have been duly authorized to execute this Agreement and all such other Settlement Documents and to bind the Lenders and the Venture Grantees, respectively, hereunder and thereunder; (B) all consents and approvals required in connection with the consummation of the Settlement Transactions by the Lenders and the Venture Grantees have been obtained; and (C) this Agreement has been, and all other Settlement Documents to be delivered by the Lenders and the Venture Grantees, or any of them, at Closing have been or will be, duly authorized, executed and delivered by the Lenders and the Venture Grantees, and do not or will not violate the provisions of any organizational documents of the Lenders or the Venture Grantees or any other agreements to which any of the Lenders or Venture Grantees is a party or may be bound.

i.      As of the date hereof, the SunCal Master Venture Member represents and warrants to the Master Venture and the LB Master Venture Member as follows: (A) the Persons executing this Agreement and all other Settlement Documents on behalf of the SunCal Master Venture Member have been duly authorized to execute this Agreement and all such other Settlement Documents and to bind the SunCal Master Venture Member hereunder and thereunder; (B) all consents and approvals required in connection with the consummation of the Settlement Transactions by the SunCal Master Venture Member have been obtained; and (C) this Agreement has been, and all other Settlement Documents to be delivered by the SunCal Master Venture Member at Closing have been or will be, duly authorized, executed and delivered by the SunCal Master Venture Member, and do not or will not violate the provisions of any organizational documents of the SunCal Master Venture Member or any other agreements to which the SunCal Master Venture Member is a party or may be bound.

j.      As of the date hereof, the LB Master Venture Member represents and warrants to the Master Venture and the SunCal Master Venture Member as follows: (A) the Persons executing this Agreement and all other Settlement Documents on behalf of the LB Master Venture Member have been duly authorized to execute this Agreement and all such other Settlement Documents and to bind the LB Master Venture Member hereunder and thereunder; (B) all consents and approvals required in connection with the consummation of the Settlement Transactions by the LB Master Venture Member have been obtained; and (C) this Agreement has been, and all other Settlement Documents to be delivered by the LB Master Venture Member at Closing have been or will be, duly authorized, executed and delivered by the LB Master Venture Member, and do not or will not violate the provisions of any organizational documents of the LB Master Venture Member or any other agreements to which the LB Master Venture Member is a party or may be bound.

k.      All representations and warranties set forth in this <u>Section 15</u> shall survive the Closing.

The parties acknowledge and agree that the disclosures made on the Schedules attached hereto are intended to disclose and identify exceptions to the corresponding representations and warranties which reference such schedules and under no circumstances shall the disclosure of any matters on such schedules result in or otherwise impose any liability upon Lenders, Venture Grantees, Pac Point Transferee, LBHI, any of the other Lehman Parties or any of their respective Related Parties with respect to the obligations or liabilities disclosed in any such schedules or otherwise constitute, create or effect any assumption of liability by Lenders, Venture Grantees, Pac Point Transferee, LBHI, any of the other Lehman Parties or any of their respective Related Parties of any obligations or liabilities disclosed in any such schedules.  To the extent that any documents or matters, as applicable, are disclosed on at least one of <u>Schedules 3, 6, 7, 8, 11</u> or <u>16</u>, then such documents or matters, as applicable, shall be deemed to have been disclosed for purposes of <u>Sections 15.a(1), (8), (9)</u> and <u>(16)</u>.

16.      <u>Assumed Bond Obligations</u>.

a.      The Borrower Parties hereby represent and warrant that attached hereto as <u>Schedule 13</u> is a description of (i) certain Payment and Performance Bonds securing, directly or indirectly, the payment of any Venture Grantee Assumed Obligations and/or Pac Point Payable Obligations on which Bond Payment Demands have been made (collectively, the "<u>Pre-Closing Designated Payment and Performance Bonds</u>"), (ii) the amount of each Pre-Closing Designated Payment and Performance Bond, (iii) the name and contact information for the applicable Bond Issuer, (iv) the name and contact information for each applicable Bond Obligor, (v) the Property to which each Pre-Closing Designated Payment and Performance Bond relates, (vi) the amount of the Bond Payment Demand made on such Designated Payment and Performance Bond and the date on which such Bond Payment Demand was made, and (vii) the name of the claimant making such Bond Payment Demand.

b.      With respect to any Pre-Closing Designated Payment and Performance Bond and with respect to any other Payment and Performance Bond described on <u>Schedule 12-C</u> which secures, directly or indirectly, the payment of any Venture Grantee Assumed Obligation(s) or Pac Point Payable Obligation(s) and with respect to which a Bond

Payment Demand is made following the Closing (each, a "Post-Closing Designated Payment and Performance Bond" and collectively, the "Post-Closing Payment and Performance Bonds"; the Pre-Closing Designated Payment and Performance Bonds and the Post-Closing Designated Payment and Performance Bonds being collectively referred to as the "Designated Payment and Performance Bonds"), the applicable Bond Obligor with respect to such Designated Payment and Performance Bond shall provide the Venture Grantee that owns the Conveyance Property to which such Designated Payment and Performance Bond relates or, if such Designated Payment and Performance Bond relates to the Pacific Point Property, the Pac Point Transferee, with written notice of such Bond Payment Demand and in such written notice shall specify the Venture Grantee Assumed Obligation or Pac Point Payable Obligation to which the Bond Payment Demand relates together with invoices, statements and other relevant documentation substantiating the Bond Payment Demand or otherwise relevant to auditing, verifying and confirming the Bond Payment Demand. The Bond Obligor and the applicable Venture Grantee or Pac Point Transferee, as applicable, shall cooperate with each other to verify and evaluate the validity of the Bond Payment Demand and agree upon the amount of such Bond Payment Demand which they believe to be due and owing to the applicable claimant (the "Approved Bond Claim"). The Bond Obligor will vigorously defend itself against any Bond Payment Demand and avail itself of all available defenses with respect to any payment with respect thereto and shall cooperate with the applicable Venture Grantee or Pac Point Transferee, as applicable, in connection with the assertion of any such defenses. If, after exhausting all remedies and available defenses to the payment of any Bond Payment Demand, the applicable Bond Issuer has made a final determination that payment of the Approved Bond Claim must be made to the claimant, then, subject to Section 16.c., such Venture Grantee or Pac Point Transferee, as applicable, shall, within two (2) Business Days following its receipt of written notice that such final determination has been made by the Bond Issuer, pay an amount equal to the amount of such Approved Bond Claim directly to the claimant (at such address as is provided to such Venture Grantee or Pac Point Transferee, as applicable, by the Bond Obligor); provided, that if in such written notice to the Venture Grantee or Pac Point Transferee, as applicable, the Bond Obligor states that the claimant has already been paid for its Approved Bond Claim by the applicable Bond Issuer, then such Venture Grantee or Pac Point Transferee, as applicable, shall instead pay, within two (2) Business Days following its receipt of such written notice, an amount equal to the amount of the Approved Bond Claim to the applicable Bond Issuer at the address listed on Schedule 13 (or at such other address as may be provided to such Venture Grantee or Pac Point Transferee, as applicable, in such written notice); provided, further that if in such written notice to the Venture Grantee or Pac Point Transferee, as applicable, the Bond Obligor states that the claimant has already been paid for its Approved Bond Claim by the applicable Bond Issuer and that, further, the Bond Issuer has already been paid by the Bond Obligor with respect to such Bond Payment Demand, then the Venture Grantee or Pac Point Transferee, as applicable, shall instead pay, within two (2) Business Days following receipt of such written notice, an amount equal to the amount of the Approved Bond Claim to the applicable Bond Obligor at the address listed on Schedule 13 (or at such other address as may be provided to such Venture Grantee or Pac Point Transferee, as applicable, in such written notice). Upon payment of any Approved Bond Claim by any Venture Grantee, Pac Point Lender or Pac Point Transferee, as applicable, the corresponding Venture Grantee Assumed Obligation and/or Pac Point Payable Obligation, as applicable, shall be deemed to have been paid in full and none of the Lehman Parties shall have any further obligation hereunder to any of the SunCal Parties or

their Related Parties with respect to the payment thereof or otherwise with respect thereto. The payment of any Venture Grantee Assumed Obligation or Pac Point Payable Obligation which is secured by a Designated Payment and Performance Bond, shall reduce, dollar for dollar, the amount of the Assumed Bond Obligation related to such Designated Payment and Performance Bond.

           c.     Notwithstanding anything to the contrary contained in this <u>Section 16</u> or elsewhere in this Agreement or in any of the Settlement Documents, the maximum aggregate liability of the Venture Grantees and Pac Point Transferee, collectively, under <u>Section 16.b.</u> shall not exceed (i) $12,622,374.36 with respect to the payment of any claims arising under any and all Pre-Closing Designated Payment and Performance Bonds; provided that the maximum liability with respect to any particular Pre-Closing Designated Payment and Performance Bond shall not exceed the applicable claim amount set forth on <u>Schedule 13</u> for such Pre-Closing Designated Payment and Performance Bond, and (ii) $2,377,625.64 with respect to any claims arising under any and all Post-Closing Designated Payment and Performance Bonds, and under no circumstances shall any such parties be required or obligated to make any payments pursuant to <u>Section 16.b.</u> if the aggregate amount paid by such parties, collectively, pursuant to <u>Section 16.b.</u> would exceed such respective amounts (the obligations of the Venture Grantees and Pac Point Transferee to make payments under <u>Section 16.b.</u> up to such maximum aggregate amounts described in this <u>Section 16.c.</u> shall be referred to herein, collectively, as the "<u>Assumed Bond Obligations</u>"). Nothing contained in this <u>Section 16</u> shall impose or create a limitation or restriction on the Venture Grantees' respective obligations to pay the Scheduled Assumed Obligations as provided in <u>Section 14.a.</u>

        17.    Indemnification

           a.     Each of the Borrower Parties which is a signatory to this Agreement and each of the Additional Indemnitors agrees, jointly and severally with each such other Borrower Party and with each Additional Indemnitor, as a primary obligor and not as a surety, to indemnify and hold the Lenders, Venture Grantees, Pac Point Transferee, LBHI and each of the other Lehman Parties and each of their respective parents, predecessors, subsidiaries and Related Parties and the respective employees, officers, directors, shareholders, partners, members, principals, agents, representatives, servants and counsel of any of the foregoing, and their successors and assigns (collectively, the "<u>Indemnitees</u>"), free and harmless from and against all claims and causes of action asserted against and all losses, damages, liabilities, costs and expenses (including reasonable attorneys' fees and costs) sustained by any of the Indemnitees (and regardless of whether or not the active or passive negligence of any Indemnitee is a contributing cause thereof) as a result of (i) any inaccuracy in or breach of any of the representations, warranties or covenants made by any of the SunCal Parties as set forth in <u>Section 15.a.</u>, (ii) any claim or cause of action made or brought against any of the Indemnitees by any Person holding a direct or indirect legal or beneficial ownership or other economic interest in any of the Borrower Parties (other than any LBREP Entity), and which Person is not otherwise a party to this Agreement, arising in connection with any of the Loans, the Loan Documents, the Properties or the transactions contemplated by the Loan Documents or the Settlement Transactions, (iii) any claim or cause of action relating to any Undisclosed Retained Obligations, or (iv) any interference by any Borrower Party or Elieff or any Related Party or agent thereof with (x) ownership, management, development, or operation of any Property or any portion

thereof by the applicable Venture Grantee (except pursuant to and as provided for in this Agreement, in the other Settlement Documents or in the applicable Management Agreement) or Pac Point Transferee, as the case may be, or (y) LB Master Venture Member's management or control of the Master Venture or any Venture Grantee, except as may be provided in the Settlement Documents, or LBHI's management or control of the Pac Point Transferee. Notwithstanding anything to the contrary contained in the Management Agreements or the Pac Point Management Agreement, the Venture Grantees and Pac Point Transferee shall be entitled to offset any outstanding indemnity claims then due and owing by any Borrower Party or any Additional Indemnitor to any Indemnitee up to ten percent (10%) of the management fees then due and owing to the Manager under any of the Management Agreements and/or Pac Point Management Agreement as provided under the Management Agreements, the Pac Point Management Agreement and the Manager Pledge Agreement. Notwithstanding the foregoing, the Indemnitees shall not be entitled to seek indemnification for any breach of a representation, warranty or covenant of the SunCal Parties contained in Section 15.a.(18) if such breach is with respect to the amount of any Vendor Obligation and the actual aggregate amount of all Vendor Obligations is not in excess of one hundred five percent (105%) of the aggregate amount of the Vendor Obligations reflected on Schedule 12-A. For the avoidance of doubt, neither LBREP nor any LBREP Entity shall be considered to be an Indemnitee hereunder.

        b.     The Manager agrees to indemnify and hold the Indemnitees free and harmless from and against all losses, damages, liabilities, costs and expenses (including reasonable attorneys' fees and costs) sustained by any of the Indemnitees as a result of any inaccuracy in or breach of any of the representations or warranties set forth in Section 15.b.

        c.     The Lehman Equity Partners agree, jointly and severally with each other, to indemnify and hold the SunCal Equity Partners and their respective Related Parties free and harmless from and against all losses, damages, liabilities, costs and expenses (including reasonable attorneys' fees and costs) sustained by any of the parties indemnified under this Section 17.c. as a result of any inaccuracy in or breach of any of the representations or warranties set forth in Section 15.c.

        d.     The SunCal Equity Partners agree, jointly and severally with each other, as primary obligors and not as sureties, to indemnify and hold the Lehman Equity Partners and their respective Related Parties free and harmless from and against all losses, damages, liabilities, costs and expenses (including reasonable attorneys' fees and costs) sustained by any of the parties indemnified under this Section 17.d. as a result of any inaccuracy in or breach of any of the representations or warranties set forth in Section 15.d.

        e.     The SCC Guarantors agree to indemnify and hold the Lehman Master III Member and it Related Parties free and harmless from and against all losses, damages, liabilities, costs and expenses (including reasonable attorneys' fees and costs) sustained by any of the parties indemnified under this Section 17.e. as a result of any inaccuracy in or breach of any of the representations or warranties of the SCC Guarantors as set forth in Section 15.e.

        f.     The SunCal Master III Member agrees to indemnify and hold the Lehman Master III Member and SCLV Master III Member and their respective Related Parties free and harmless from and against all losses, damages, liabilities, costs and expenses (including

reasonable attorneys' fees and costs) sustained by any of the parties indemnified under this Section 17.f. as a result of any inaccuracy in or breach of any of the representations or warranties set forth in Section 15.f.

g.      The Lehman Master III Member agrees to indemnify and hold the SunCal Master III Member and SCLV Master III Member and their respective Related Parties free and harmless from and against all losses, damages, liabilities, costs and expenses (including reasonable attorneys' fees and costs) sustained by any of the parties indemnified under this Section 17.g. as a result of any inaccuracy in or breach of any of the representations or warranties set forth in Section 15.g.

h.      The Venture Grantees and Lehman Indemnitor agree, jointly and severally with each other, to indemnify and hold the Borrower Parties and their respective Related Parties free and harmless from and against all claims and causes of action asserted against and all losses, damages, liabilities, costs and expenses (including reasonable attorneys' fees and costs) sustained by any of the Borrower Parties or their respective Related Parties as a result of (i) any inaccuracy in or breach of any of the representations or warranties set forth in Section 15.h., (ii) the failure of any Venture Grantee or other Lehman Party to pay or otherwise satisfy or settle any of the Assumed Obligations or (iii) the failure of any Venture Grantee to pay any indemnification obligations arising under Section 14.d.

i.      The SunCal Master Venture Member agrees to indemnify and hold the Master Venture and the LB Master Venture Member and their respective Related Parties free and harmless from and against all losses, damages, liabilities, costs and expenses (including reasonable attorneys' fees and costs) sustained by any of the parties indemnified under this Section 17.i. as a result of any inaccuracy in or breach of any of the representations or warranties set forth in Section 15.i.

j.      The LB Master Venture Member agrees to indemnify and hold the Master Venture and the SunCal Master Venture Member and their respective Related Parties free and harmless from and against all losses, damages, liabilities, costs and expenses (including reasonable attorneys' fees and costs) sustained by any of the parties indemnified under this Section 17.j. as a result of any inaccuracy in or breach of any of the representations or warranties set forth in Section 15.j.

18.     Restrictive Covenants. Each of the SunCal Parties acknowledges the existence of certain restrictive covenants of the SunCal Master Venture Member in Section 7.3(c) of the Master Venture Operating Agreement and hereby agrees not to take any action that would constitute a violation of any such covenants.

19.     Elieff Note. At Closing, Elieff shall execute and deliver to Lehman ALI, a promissory note in the form of Exhibit R (the "Elieff Note"), which Elieff Note shall be given as consideration for (i) the Pac Point Lender's making of protective advances for the payment of the Pac Point Payable Obligations prior to the Pac Point Acquisition and the Pac Point Transferee's agreement to pay the Pac Point Payable Obligations following the Pac Point Acquisition, (ii) the Lehman DS Equity Partner's agreement to pay up to 90% of the Delta Shores Payable

Obligations, and (iii) the Lehman TL Equity Partner's agreement to pay up to 60% of the Terra Lago Payable Obligations.

      20.     Intentionally Omitted.

      21.     Deliveries at Closing.

           a.     On the Closing Date, the SunCal Parties shall deliver, or cause to be delivered, to the Venture Grantees, Pac Point Transferee, Lenders or other Lehman Parties, as the case may be, each of the following documents, duly executed by the appropriate parties, and other items:

           1)     Recordable grant deeds in the form of Exhibit B attached hereto (collectively, the "Deeds"), duly executed and acknowledged by each of the respective Grantors as to the portion of the Real Property owned by each Grantor, conveying the Real Property to the respective Venture Grantees subject only to those matters set forth in Exhibit B (provided that nothing contained therein shall negate any express assumption of obligations by the applicable Venture Grantees under this Agreement).

           2)     Assignments of the Development Rights in the form of Exhibit C attached hereto and in such other form(s) as may be prescribed under any applicable Development Agreement or as may otherwise be required or approved by the governmental entity, utility company or other party to any Development Agreement (collectively, the "Development Rights Assignments"), duly executed and acknowledged by each of the respective Grantors and, if requested by the Pac Point Transferee, by the Pac Point Borrower, as to the portion of the Real Property owned by each Grantor or, with respect to the Pac Point Borrower, as to the Pac Point Property, conveying the Development Rights to the respective Venture Grantees or Pac Point Transferee, as applicable.

           3)     Bills of sale in the form of Exhibit D attached hereto (collectively, the "Bills of Sale"), duly executed and acknowledged by each of the respective Grantors, conveying the Personal Property owned by each Grantor to the respective Venture Grantees.

           4)     Assignments in the form of Exhibit E attached hereto (collectively, the "Assignments"), duly executed and acknowledged by each of the respective Grantors, assigning all of the Intangible Property owned by each Grantor to the respective Venture Grantees.

           5)     To the extent same are in the possession of any Borrower Party or any Related Party thereof, (i) originals of all building permits, certificates of occupancy, permits, licenses and inspection certificates issued by any governmental agency or authority relating to any conveyance Property or any portion thereof, (ii) all architect's renderings, drawings or plans, land surveys, soil surveys or reports, engineering and environmental studies or reports, marketing studies, and data or specifications relating to any Conveyance Property, and (iii) any and all other items of Personal Property or Intangible Property not previously delivered to the Venture Grantees or Lenders to the extent they relate to any Conveyance Property and are in the possession of any Borrower Party or any Related Party thereof; provided, that the

foregoing may be delivered to the Venture Grantees by providing the same, or making the same available to the Venture Grantees, by electronic means.

6)      Not less than fifty (50) letters dated the Closing Date and duly executed by each of the respective Grantors and addressed "To Whom It May Concern" for delivery to governmental authorities, insurance carriers, persons working at the Conveyance Properties, utility companies and local officials, which letters shall be in the form of Exhibit F attached hereto, notifying them of the conveyance of the Conveyance Properties to the respective Venture Grantees.

7)      (i) Affidavits, duly executed and acknowledged by Grantors (and/or their Affiliates), as required by Section 1445 of the Internal Revenue Code of 1986, as amended, to the effect that the withholding of tax is not required under Section 1445 and (ii) Form 593-C, duly executed and acknowledged by Grantors (and/or their Affiliates) certifying that withholding of tax is not required under California law.

8)      The Borrower Parties and Elieff shall deliver, with respect to each Loan and any Related Mezzanine Loan, a separate Release Agreement in the form attached hereto as Exhibit H-1 or, with respect to the Pac Point Loans, the Pac Point Release Agreement (each, a "Release Agreement" and collectively, the "Release Agreements"), duly executed by the applicable Borrower Parties and Elieff in favor of the applicable Lender(s), Venture Grantee(s), Pac Point Transferee, Master Venture and LBHI.

9)      Intentionally Omitted.

10)     The Elieff Note, duly executed and delivered by Elieff.

11)     All keys, security cards, access cards and other entry devices in the possession of any Borrower Party with respect to any Conveyance Property.

12)     All Deposits, to the extent held by any of the SunCal Parties or any Related Parties thereof as of the Closing Date, and any and all funds held in any of the Accounts.

13)     Each SunCal Equity Partner shall deliver to the applicable Lehman Equity Partner, the applicable Equity Interest Assignment duly executed and acknowledged by such SunCal Equity Partner.

14)     Intentionally Omitted.

15)     The SCC Guaranty, duly executed and acknowledged by the SCC Guarantors.

16)     The SCLV Master III Member Operating Agreement and SunCal Master III Member Assignment, duly executed and acknowledged by the SunCal Master III Member.

17)    The Master Venture Operating Agreement, duly executed and acknowledged by the SunCal Master Venture Member.

18)    The Manager shall deliver to the applicable Venture Grantee or Pac Point Transferee, the applicable Management Agreement or Pac Point Management Agreement, as applicable, duly executed and acknowledged by the Manager and SCC shall deliver to the applicable Venture Grantee or Pac Point Transferee, its joinder to such Management Agreement or Pac Point Management Agreement, as applicable, duly executed and acknowledged by SCC.

19)    The SunCal Master Venture Member Pledge Agreement, duly executed and acknowledged by the SunCal Master Venture Member.

20)    The Manager Pledge Agreement, duly executed and acknowledged by the Manager.

21)    Intentionally Omitted.

22)    All books and records (other than such books and records, and correspondence to and from counsel, relating to the Loans and any other documents, correspondence and information which is confidential, proprietary or privileged) of the Grantors or any of the other Borrower Parties with respect to the Conveyance Properties; provided, that the foregoing may be delivered to the Venture Grantees by providing the same, or making the same available to the Venture Grantees, by electronic means.

23)    An opinion of counsel to the SunCal Parties as to the due authorization, execution and delivery by each of the SunCal Parties which are signatories to this Agreement or any of the other Settlement Documents, of this Agreement and the other Settlement Documents, in form reasonably acceptable to the Lehman Parties, together with copies of any authorizing resolutions or consents or other evidence reasonably satisfactory to the Title Insurer as a condition precedent to issuance of the Title Policies.

24)    All consents required to be obtained, pursuant to any of the Development Agreements, in connection with the Conveyance Transactions;

25)    All other deliveries required to be made by, or on behalf of, any of the Borrower Parties or any other SunCal Party pursuant to the terms of this Agreement.

26)    Such other documents and instruments as may be reasonably necessary in order to consummate the Settlement Transactions.

b.    At Closing, the Lehman Parties shall deliver to Grantors, and/or the other SunCal Parties, as applicable, the following documents, duly executed by the appropriate parties:

1)    The Lenders and LBHI shall deliver, with respect to each Loan (other than the Existing Interim Loan) and any Related Mezzanine Loan thereto, a Covenant Not To Sue executed by the applicable Lender(s) and LBHI in favor of the applicable

Borrower Parties in the form attached hereto as Exhibit I (each, a "Covenant Not to Sue" and collectively, the "Covenants Not to Sue").

2)      Each Venture Grantee shall deliver to the Manager, the applicable Management Agreement, duly executed and acknowledged by such Venture Grantee and the Pac Point Transferee shall deliver to the Manager, the Pac Point Management Agreement, duly executed and delivered by the Pac Point Transferee.

3)      Each Lehman Equity Partner shall deliver to the applicable SunCal Equity Partner, an assignment of the applicable Lehman Equity Interest in the form of Exhibit L (collectively, the "Equity Interest Assignments"), duly executed and acknowledged by such Lehman Equity Partner.

4)      Intentionally Omitted.

5)      The Existing Interim Loan Reconveyance Documents.

6)      The SCLV Master III Member Operating Agreement, duly executed and acknowledged by the Lehman Master III Member.

7)      The Master Venture Operating Agreement, duly executed and acknowledged by the LB Master Venture Member.

8)      The Venture Grantee Operating Agreements, duly executed and acknowledged by the Master Venture.

9)      All other deliveries required to be made by, or on behalf of, any of the Lehman Parties pursuant to the terms of this Agreement.

10)     Such other documents and instruments as may be reasonably necessary in order to consummate the Settlement Transactions.

c.      Grantors shall cooperate with the Lenders and Venture Grantees, at the Venture Grantees' sole cost and expense and at no liability or unreimbursed expense to the Grantors, in their efforts to obtain, at Closing, to the extent available, the following (collectively, the "Title Policies"): (i) endorsements, each of which endorsements shall be in the form of the Pro Forma Endorsement attached hereto as Exhibit Q-1, to the respective mortgagee title insurance policies issued to the Lenders in connection with the Loans secured by any of the Conveyance Properties indicating that (A) neither the lien nor the priority of the Deeds of Trust nor the coverage of the Lenders' existing mortgagee title insurance policies have been affected by the consummation of the Settlement Transactions, and (B) no merger of the fee and mortgage interests in any Conveyance Property has occurred as a result of the Settlement Transactions, and (ii) ALTA (2006) owner's title insurance policies, in the forms of the Pro Forma Title Policies attached hereto as Exhibit Q-2, with full extended coverage over the printed general exceptions in said policies, issued by one or more title insurance companies selected by the Lenders (the "Title Insurer") in such insured amounts as shall be approved by the Lenders.