1 | PAUL J. COUCHOT -- State Bar No. 131934
**WINTHROP COUCHOT**

2 | **PROFESSIONAL CORPORATION**
660 Newport Center Drive, Fourth Floor

3 | Newport Beach, CA 92660
Telephone: (949) 720-4100

4 | Facsimile: (949) 720-4111

5 | General Insolvency Counsel for Administratively
Consolidated Debtors-in-Possession

6 |

7 | RONALD RUS - State Bar No. 67369
  rrus@rusmiliband.com

8 | JOEL S. MILIBAND - State Bar No. 77438
  jmiliband@rusmiliband.com

9 | **RUS MILIBAND & SMITH P.C.**
2211 Michelson Drive, Seventh Floor

10 | Irvine, California 92612
Telephone: (949) 752-7100
Facsimile:  (949) 252-1514

11 | Counsel for SunCal Management, LLC

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SANTA ANA DIVISION**

| | |
|---|---|
| In re | Case No. 8:08-bk-17206-ES |
| Palmdale Hills Property, LLC, and its Related Debtors.<br>      Jointly Administered Debtors and Debtors-in-Possession | Jointly Administered With Case Nos. 8:08-bk-17209-ES; 8:08-bk-17240-ES; 8:08-bk-17224-ES; 8:08-bk-17242-ES; 8:08-bk-17225-ES; 8:08-bk-17245-ES; 8:08-bk-17227-ES; 8:08-bk-17246-ES; 8:08-bk-17230-ES; 8:08-bk-17231-ES; 8:08-bk-17236-ES; 8:08-bk-17248-ES; 8:08-bk-17249-ES; 8:08-bk-17573-ES; 8:08-bk-17574-ES; 8:08-bk-17575-ES; 8:08-bk-17404-ES; 8:08-bk-17407-ES; 8:08-bk-17408-ES; 8:08-bk-17409-ES; 8:08-bk-17458-ES; 8:08-bk-17465-ES; 8:08-bk-17470-ES; 8:08-bk-17472-ES; and 8:08-17588-ES. |

Affects:

☐ All Debtors
☒ Palmdale Hills Property, LLC,
☒ SunCal Beaumont Heights, LLC
☐ SCC/Palmdale, LLC
☒ SunCal Johannson Ranch, LLC
☒ SunCal Summit Valley, LLC
☒ SunCal Emerald Meadows LLC
☒ SunCal Bickford Ranch, LLC
☒ Acton Estates, LLC
☒ Seven Brothers LLC
☐ SJD Partners, Ltd.
☐ SJD Development Corp.
☒ Kirby Estates, LLC
☒ SunCal Communities I, LLC
☐ SunCal Communities III, LLC
☒ SCC Communities LLC
☒ North Orange Del Rio Land, LLC
***Caption Continued on Next Page***

Chapter 11 Cases

**SUNCAL PARTIES' OBJECTIONS TO:**
**(A)   DISCLOSURE STATEMENT WITH RESPECT TO FIRST AMENDED JOINT PLAN FOR ELEVEN VOLUNTARY DEBTORS PROPOSED BY THE LEHMAN VD LENDERS; AND**
**(B)   DISCLOSURE STATEMENT WITH RESPECT TO FIRST AME4NDED JOINT CHAPTER 11 PLAN FOR EIGHT TRUSTEE DEBTORS PROPOSED BY THE TRUSTEE AND LEHMAN CREDITORS**

DATE:     May 13, 2011
TIME:     9:30 a.m.
PLACE:    Courtroom 5A

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

***Caption Continued from Previous Page***

☒ Tesoro SF, LLC
☒ SunCal Heartland, LLC
☒ LBL-SunCal Northlake, LLC
☒ SunCal Marblehead, LLC
☐ SunCal Century City, LLC
☒ SunCal PSV, LLC
☒ Delta Coves Venture, LLC
☒ SunCal Torrance, LLC
☒ SunCal Oak Knoll, LLC

# **TABLE OF CONTENTS**

**PAGE**

I.    PRELIMINARY STATEMENT ................................................................... 1

II.   THE LEHMAN PLANS AND DISCLOSURE STATEMENTS
      SHOULD BE SUSPENDED UNTIL THE LEHMAN ENTITIES RESPOND
      TO DISCOVERY ................................................................................... 3

III.  THE DISCLOSURE DEFICIENCIES IN THE LEHMAN DISCLOSURE
      STATEMENTS...................................................................................... 7

      A.   The Applicable Disclosure Burden. ............................................ 7
      B.   The Disclosure Deficiencies. ..................................................... 8
           1.  The Dividend Level Omissions and Misrepresentations ......... 8
           2.  The Illusory Residual Cash Offer ....................................... 10
           3.  The Lehman Entities' Illusory Funding Promise.................... 11
           4.  The Disclosure Statement Fails To Disclose The Status of the
               Lehman Claims ............................................................... 12
           5.  The Lack of Disclosure Regarding Releases ........................ 12
           6.  The Lehman Entities Fail To Adequately Disclose What Will
               Happen If One of The Competing Plans Succeeds in the Lehman
               Debtors' Chapter 11 Cases................................................. 13
           7.  The Lehman Entities Fail To Disclose That Enforcement of The
               Plans Is Impossible .......................................................... 14
           8.  Consideration of the Lehman Disclosure Statements and the
               Lehman Plans Are Premature ............................................. 14
           9.  The Lehman Disclosure Statements Fail to Disclose That the
               Lehman Plans Violate California Anti-Deficiency Statutes ......... 15
           10. The Lehman Disclosure Statements Fail to Disclose That the
               Lehman Entities Are Insiders.............................................. 17
           11. The Lehman Disclosure Statements Inaccurately Describe the
               Status of the Lehman Adversary.......................................... 18
           12. The Voluntary Debtors' and Certain Trustee Debtors' Creditors'
               §502(d) Claim Objections Against the Lehman Entities ........... 19
           13. The Lehman Disclosure Statements' Fail to Address the
               SunCal Debtors' Recoupment Claim Objection ...................... 20
           14. The Lehman Entities' Joint Voluntary Disclosure Statement
               Fails to Address the Voluntary Debtors' Post-Petition Claims
               Against the Lehman Entities and Their Agents ....................... 22
           15. The Lehman Entities' Joint Disclosure Statement Fails to
               Address the SunCal Debtor's Causes of Action for Breach of
               Contract and Indemnity Agreements Against Lehman ALI, and
               Certain Non-Debtor Lehman Affiliates ................................. 23
           16. The Lehman Disclosure Statements Fail to Properly Present an
               Appropriate "Best Interest of Creditors Test" Under 11 U.S.C.
               § 1129(a)(7) Because the Lehman Plans Cannot Possibly Comply
               with this Bankruptcy Code Provision. ................................. 25

17. The Lehman Disclosure Statements Provide Inadequate Information Regarding the Lehman Plans' Feasibility. ............................................. 26

18. The Lehman Entities Mischaracterization of the SunCal Parties' Previous Plan Is Irrelevant, Inflammatory and Speculative and Should Be Deleted ................................................................................ 28

19. The Lehman Disclosure Statements Fail to Provide Sufficient Disclosure for the Separate Classification of the SunCal Debtors' Unsecured Creditors................................................................................ 30

20. The Lehman Plans Are Predicated upon Partial Substantive Consolidation of the Debtors .................................................................. 30

IV.    RESERVATION OF RIGHTS ................................................................. 31

V.    CONCLUSION........................................................................................ 31

1     The Voluntary Debtors[1] and SunCal Management, LLC (collectively the "SunCal Parties"),

2  hereby submit the following Objections (the "Objections") to (a) the Disclosure Statement (the

3  "VD Disclosure Statement") with Respect to First Amended Joint Chapter 11 Plan for Eleven

4  Voluntary Debtors proposed by Lehman VD Lenders (the "VD Plan"); and (b) the Disclosure

5  Statement (the "TD Disclosure Statement") with respect to First Amended Joint Chapter 11 Plan

6  for Eight Trustee Debtors proposed by the Trustee and the Lehman Creditors (the "TD Plan")

7  (collectively, the "Lehman Plans" and the "Lehman Disclosure Statements").[2]

8  DATED:  April 29, 2011

**WINTHROP COUCHOT
PROFESSIONAL CORPORATION**

By:_____/s/  Paul J. Couchot_____
       Paul J. Couchot
       Sean A. O'Keefe
       Peter W. Lianides
General Insolvency Counsel for Administratively
Consolidated Debtors-in-Possession

**RUS MILIBAND & SMITH
A PROFESSIONAL CORPORATION**

By: __/s/ Ronald Rus_____
       Ronald Rus, Esq.
       Joel S. Miliband, Esq.
       Catherine Castaldi, Esq.
Attorneys for SunCal Management, LLC

---

[1] The following objecting Voluntary Debtors are Palmdale Hills, LLC, a Delaware corporation ("Palmdale Hills"), SunCal Communities I ("Communities I"), Acton Estates, LLC ("Acton"), SunCal Beaumont, LLC ("Beaumont"), SunCal Emerald Meadows, LLC ("Emerald Meadows"), SunCal Johansson Ranch, LLC ("Johannson Ranch"), SunCal Bickford Ranch, LLC ("Bickford Ranch"), SunCal Summit Valley, LLC ("Summit Valley"), Seven Brothers, LLC ("Seven Brothers"), Kirby Estates, LLC ("Kirby Estates"), SCC Communities, LLC ("SCC Communities"), North Orange Del Rio Land, LLC ("Del Rio"), and Tesoro SF LLC ("Tesoro").

[2] The Lehman Disclosure Statements and the Lehman Plans, are virtually identical in structure and materially only vary in the proposed distributions.

# MEMORANDUM OF POINTS AND AUTHORITIES
## I.
## PRELIMINARY STATEMENT

The purpose of a disclosure statement is to provide a "typical" investor or claim holder with "adequate information" to make an informed decision regarding their decision as to how to vote on a proposed plan of reorganization.  To satisfy this burden, a disclosure statement must, at a minimum, present all material facts and assumptions that bear upon the merits and the viability of the plan, and present these facts *in a manner that is comprehensible to a "typical" investor or claim holder*.  The 400 page Joint Disclosure Statements filed by the Lehman Entities not only fail to meet this threshold, they obfuscate, and in some measure misrepresent, the facts through the use of a tactic employed by unscrupulous advertisers. A series of grand promises are made in the summary of the Plan that are later watered down or vitiated in the hundreds of definitions that appear at the very back of the Plan.

For example, in the opening pages of the VD and TD Disclosure Statements, the Lehman Entities boast that the Reliance Creditors will receive a dividend of between 40% and fifty percent under their plans through incoming Lehman funding. However, a careful review of the definitional maze woven into the Plan establishes are not necessarily funding anything, They are taking *the VD Debtors' own money*, unilaterally re-categorizing these funds as "Cash Collateral", without any basis, and then "loaning" as "Lehman Plan Funding" to fund the plans. In essence, the Reliance Creditors will be paid a dividend from what is really their own money. It is not clear that even one penny of Lehman Entity funds will be forthcoming.

The dividend percentages of 40% to 50% referenced in the VD Plans are as just illusory as the so-called Lehman Funding. These sums are only payable – again from the VD Debtors' own money – if the claims totals do not exceed certain specified levels. However, the Trustee himself has already acknowledged that these thresholds have been substantially exceeded. Accordingly, both the Lehman Entities and the Trustee are already aware that dividend percentages trumpeted throughout the disclosure statements will never be forthcoming.

Insofar as the purported distribution from "Residual Cash" is concerned, this too is illusory. A review of the definition of this term establishes that Residual Cash is largely comprised of the

proceeds of Litigation Recoveries. However, the Lehman Entities are the target of most of the Litigation Claims held by the estate – tens of millions in claims – and the VD Plan releases these claims. To the extent that any claims are left, and to the extent anything is recovered on these claims, this definition makes it clear that these funds will be used to repay the Lehman Entities for the for the "loans" they made to the VD Debtors *from their own money*. In short, this distribution source is illusory.

At bottom, what the Lehman Entities are "guaranteeing" in the VD and TD Plans is a 1% dividend. This dividend will be paid, in the first instance, from the VD Debtors own funds. In the unlikely circumstance that these funds are not sufficient, the Lehman Entities have agreed that some unknown entity, with unknown resources, will make up the difference necessary to fund this one penny distribution.

In return for offering the creditors the right to receive a one cent distribution, largely if not completely paid from funds already payable to the creditors, the Lehman Entities seek to immunize their disputed claims from attack, take all of the properties owned by the estates, create and retain deficiency claims that would otherwise be non-existent under California law, and obtain a global waiver and release of all claims against the Lehman Entities, and against an undefined universe of third parties.

The Lehman Entities are of course welcome to offer the creditors and interest holders this lopsided bargain, but they have to fairly describe it and disclose the truth regarding the material facts and variables. They must disclose exactly is being funded into the estate (not being taken from the estate and re-loaned to the estate), who is funding it, and when. They have to disclose the exact percentage that they are representing the creditors will receive and why this percentage will be forthcoming given the limitations in their Plans. They have to disclose what claims are being released, who they are against, and their value. Finally, they have to disclose what will occur if one of the three competing plans seeking to gain control over their cases in the New York Bankruptcy Court is approved, since it may well be  that such an event would render what is already a highly speculative and contingent plan[3], nugatory.

---

[3] See *Chapter 11 Trustee's Response To Motion For Discretionary Stay*, docket no. 1476, at 1:17.

1    Finally, both of the Lehman Plans require, as a condition to confirmation and plan

2    effectiveness, that the Lehman Plans be confirmed as to all of the VD Debtors and TD Debtors.[4]

3    In order words, if the VD Plan is not confirmed as to any one of the Voluntary Debtors, then it will

4    not be confirmed as to any Voluntary Debtors.  The TD Plan has the exacted same condition.  Not

5    only does this make confirmation far more speculative, in the case of the Trustee Debtors in which

6    the Trustee is a co-plan proponent, this places the Trustee in an accurate conflict-of-interest.  For

7    example, if it is clear that one of the SunCal Parties' Plans are superior to the Lehman TD Plans as

8    to a particular TD estate and its creditors, the Trustee (and possible the Trustee Committee) appear

9    to still be duty bound to support the inferior Lehman TD Plan which is conditioned upon

10    confirmation as to all TD Debtors.  The Trustee will be placed in an intolerable position of placing

11    the rights of one group of creditors and the expense of another.

12                                                     **II.**

13    **THE LEHMAN PLANS AND DISCLOSURE STATEMENTS SHOULD BE SUSPENDED**

14    **UNTIL THE LEHMAN ENTITIES RESPOND TO DISCOVERY**

15    As the Court is aware, two of the Lehman Entities, LBHI and LCPI (the "Lehman

16    Debtors"), are operating within their own Chapter 11 cases, before the United States Bankruptcy

17    Court for the Southern District of New York. Throughout this case, these two creditors have used,

18    and continue to use, the automatic stay applicable in their cases as a litigation tool to deny the VD

19    Debtors the right to pursue "core" bankruptcy actions. Although these "stay" threats were initially

20    successful, six months into this case, it was discovered that the Lehman Debtors did not even own

21    the Sold Loans[5] that were the purported basis for their stay claims. In fact, these Sold Loans and

22    the associated claims were owned by another entity, Fenway Capital, LLC ("Fenway").

23    _____

[4] See VD Disclosure Statement, 116:13 and 18-19.  TD Disclosure Statement, 148:8.

24    [5]

| Sold Loans | Original Claimant | Alleged Balance |
|---|---|---|
| SunCal Communities I Loan | LCPI | $343,221,391 |
| Ritter Ranch Loan | LCPI | $287,252,096 |
| PSV Loan | Lehman ALI | $88,257,340 |
| Delta Coves Loan | Lehman ALI | $206,023,142 |
| Marblehead/ Heartland Loan | Lehman ALI | $354,325,126 |
| Cal Oak Valley Loan | OVC Holdings, LLC | $141,630,092 |
| Northlake Loan | Northlake Holdings, LLC | $123,654,777 |

1    Once their ownership ruse was discovered, the Lehman Debtors raced back to New York

2 and purchased the claims at issue from Fenway, in order, once again, to gain the right to argue that

3 their stay barred the VD Debtors from resolving the priority of the Sold Loans and the associated

4 liens. In the hearing back on New York where this claims purchase was opposed, the Lehman

5 Debtors frankly admitted that one of the reasons why they were buying the Sold Loans was to stay

6 the VD Debtors attempt to resolve the priority of their claims and liens through the Lehman

7 Adversary.

8    Unfortunately, the presiding Judge in the New York Bankruptcy Court not only approved

9 the Lehman Debtors purchase of the Sold Loans, he affirmatively ruled that this purchase would

10 stay the pursuit of the Lehman Adversary against the Lehman Debtors. He also denied the VD

11 Debtors relief from the purportedly applicable automatic stay. Notably, during the oral arguments

12 relating to the above matters, the New York Bankruptcy Court made it clear that he did not view

13 claim objections to be in the same category as adversary proceedings, when it came to the scope of

14 the automatic stay.

15    On April 8, 2011, the SunCal Parties filed a Claim Objection wherein they disputed the

16 merits of substantially all of the claims held by the Lehman Entities, based upon a recoupment

17 defense (defined below as the "Recoupment Claim Objection"). There is ample authority in both

18 the Ninth Circuit and Second Circuit that claim objections, and recoupment objections in

19 particular, are not subject to the automatic stay.  See *In re Wheatfield Business Park*, 308 B.R. 463,

20 466 (9th Cir. BAP 2004) (claim objections do not violate the creditor's stay); *In re Financial News

21 Network*, 158 B.R. 570 (S.D.N.Y. 1993)(same); *Newbery Corp. v. Fireman's Fund Ins. Co.*, 95

22 F.3d 1392, 1400 (9th Cir. 1996) (automatic stay does not apply to the assertion of recoupment); *In

23 re McMahon*, 129 F.3d 93, 98 (2d Cir. 1997) ("a  recoupment not subject to the automatic stay of

24 11 U.S.C. § 362").

25    On April 15, 2011, one week after the Recoupment Claim Objection was filed, the SunCal

26 Parties prepared deposition subpoenas and accompanying notices of deposition of individuals

27 expected to have knowledge of the negotiation, drafting, and/or alleged breach of the

28 Restructuring Agreement and Settlement Agreement.  The SunCal Parties requested that counsel

for the Lehman Entities accept service of the subpoenas on behalf of the deponents, and contact

SunCal Parties' counsel to discuss mutually convenient times and locations for the depositions.  In

subsequent correspondence, SunCal Parties' counsel requested that, in the interest of efficiency,

the Lehman Entities stipulate that the document production generated in the adversary proceeding

be available for use in connection with the Claim Objection.

On April 22, 2011, counsel for the Lehman Entities advised  counsel for the Movants that

any discovery  effort in connection with the Recoupment Claim Objection would violate LCPI's

and LBHI's automatic stay, and on this basis he refused to accept service of deposition subpoenas,

and refused to discuss the document production.  The Lehman Entities' also counsel refused to

agree that this conversation with the VD Debtors' counsel qualified as a "meet and confer" on the

discovery issue in accordance with the Local Rules, in an obvious effort to thwart the VD Debtors

ability to present the discovery dispute to this Court for resolution.

On April 25, 2011, the Lehman Entities' counsel reaffirmed their latest "automatic stay"

litigation gambit, in a letter wherein they assert, in relevant part:

> The mere fact that a pleading is styled as an "objection to claims" or
> "motion to disallow claims" does not insulate it from the automatic stay when
> the issues raised therein implicate and depend upon affirmative action and
> relief against the Lehman Debtors. ***
> The Claim Objection is nothing more than a breach of contract claim of
> the Restructuring Agreement … and the purported September 2008 Settlement
> Agreement…, both of which came years after and are independent of the loan
> agreements on which the loans are based. As such, it is an attempt at setoff
> that is subject to the automatic stay.  Your characterization of this contract
> claim as recoupment is invalid.  ***
> It is clear that the SunCal Plan Proponents are attempting to use the Claim
> Objection to circumvent the Lehman Debtors' automatic stay…Consequently,
> the Lehman Parties will not participate in discovery unless and until your
> clients obtain relief from the automatic stay.

Notably, counsel for the Lehman Entities failed to cite a single authority in support of the

Lehman Entities' contention that claim objections generally, or recoupment objections in particular,

violate the automatic stay.  This is not surprising, since no such authority exists and in fact case law

is uniformly to the contrary. Instead, the Lehman Entities' stay argument is premised solely upon

the always persuasive "because we say so" authority.  If the Lehman Entities are inclined to raise

1    this argument in a formal pleading – an argument that falls well below the requisite threshold in

2    Fed.R.Bankr. P. 9011 – they are welcome to do so.

3           The Lehman Entities' obstructive tactics ignore the current status of their claims and the

4    relative burdens that exist at this juncture. The Recoupment Claim Objection filed by the SunCal

5    Parties is comprehensive and well supported by both documentary and testimonial evidence. The

6    filing of this objection punctured the "prima facie validity" accorded the Lehman Entities' claims

7    by 11 U.S.C. § 502(a). Now, the Lehman Entities must submit evidence establishing the validity,

8    priority and extent of their claims. Since they have refused to provide discovery in accordance with

9    the Federal Rules of Bankruptcy Procedure, without just cause, the Lehman Entities face the

10   exclusion of all evidence that would otherwise be necessary to meet this burden. See, Fed.R.Civ.P.

11   37(b)(2)(A)(ii). In light of the Lehman Entities' conduct, the SunCal Parties intend to file a motion

12   to compel or in the alternative seeking a preclusion order in accordance with FRCP Rule 37.

13          The Lehman Entities attempt to evade discovery also ignores the realities inherent in the

14   coming confirmation contest. The holder of a claim that is subject to an objection is not entitled to

15   submit a vote on the plan, or to receive a distribution, without relief from the Court. The Lehman

16   Entities also cannot meet their burden under Section 1129(a)(7) until the amount of their claims is

17   resolved or estimated. If, as the VD Debtors' contend in the Recoupment Claim Objection, the

18   damage recouped is so substantial that the liquidation value of the VD Debtors exceeds the amount

19   payable on the unsecured claims, then the Lehman Entities' plans fails on their face to comply with

20   this statutory provision.

21          Although it is clear that the Lehman Entities would like to ram their plans through the

22   Court based upon the assumption that their claims are valid, and that no inquiry into the merits of

23   the same should be allowed, this stands the burdens and in fact the entire confirmation system on

24   its head. A party seeking payment from the estate in the form of its claim must prove the bona

25   fides of the claim, when it is subjected to challenge, as here. As part of that process, the objecting

26   party has an absolute right to seek and obtain evidence through the discovery process relating to

27   the validity, priority and extent of the claim, and this necessarily encompasses discovery regarding

28   defenses to the claim.

1   The Lehman Entities' refusal to make discovery should have consequences. If they are not

2   inclined to allow discovery on their claims, then these claims should be stricken along with the

3   plans filed on the basis of these claims. Alternatively, this Court should enter an order staying the

4   Lehman Entities' confirmation efforts, and allowing the VD Debtors to proceed with theirs, until

5   the Lehman Entities provide full discovery regarding their claims.[6]

6   **III.**

7   **THE DISCLOSURE DEFICIENCIES IN THE**

8   **LEHMAN DISCLOSURE STATEMENTS**

9   **A)**      **The Applicable Disclosure Burden**. The Lehman Disclosure Statements do not

10  contain information sufficient to enable the Debtors' creditors to evaluate and make an informed

11  decision with respect to the Lehman Plans.  A disclosure statement must be approved by the court

12  before any party may use it to solicit votes to accept or reject a plan of reorganization.  11 U.S.C.

13  § 1125(b).  A court may not approve a disclosure statement unless it finds that the disclosure

14  statement contains adequate information. *Id.*

15  > Information of a kind, and in sufficient detail, as far as is reasonably practicable in
    > light of the nature and history of the debtor and the condition of the debtor's books
16  > and records, that would enable a hypothetical reasonable investor typical of
    > holders of claims or interests of the relevant class to make an informed judgment
17  > about the plan.

18  11 U.S.C. § 1125(a)(1).  Although Congress did not provide any more detailed description of what

19  constitutes "adequate information" in section 1125(a)(1), Congress intended "precisely what

20  constitutes adequate information in any particular instance will develop on a case-by-case basis."

21  H.R. Rep. No. 595, 95th Cong., 1st Sess. 408 (1977); *Tex. Extrusion Corp. v. Lockheed Corp. (In re*

22  *Tex. Extrusion Corp.)*, 844 F.2d 1142, 1157 (5th Cir. 1988) ("The determination of what is

23  adequate information is subjective and made on a case by case basis.  This determination is largely

24  within the discretion of the bankruptcy court.").  Full and adequate disclosure is critical to the

25  legitimacy of the reorganization process. *See Oneida Motor Freight, Inc. v. United Jersey Bank*,

26  848 F.2d 414, 417 (3d Cir. 1988) ("The importance of full disclosure is underlaid by the reliance

27
28  _____

[6] The Voluntary Debtors further note that they may soon obtain relief from the Ninth Circuit Court
of Appeals.  The Ninth Circuit has just set oral arguments for June 8, 2011, concerning the
pending appeal as to whether the equitable subordination action is subject to LCPI's automatic
stay.

placed upon the disclosure statement by the creditors and the court.  Given this reliance, [the Court] cannot overemphasize the debtor's obligation to provide sufficient data to satisfy the Code standard of 'adequate information'").  As a general rule, a disclosure statement should contain all pertinent information bearing upon the success or failure of the proposals contained in the plan of reorganization and should set forth all material information relating to the risks posed to creditors. *See e.g., In re Cardinal Congregate I*, 121 B.R. 760, 765 (Bankr. S.D. Ohio 1990).

Where, as here, the disclosure statement fails to provide information material to the proffered plan, courts will deny approval of the disclosure statement.  *See e.g., In re Main Street AC, Inc.* 234 B.R. 771 (Bankr. N.D. Cal. 1999) (disclosure statement denied as inadequate for failure to provide sufficient information concerning financial information of debtor's acquisition); *In re: Metrocraft Publishing Servs., Inc.,* 39 B.R. 567, 569-81 (Bankr. N. D. Ga. 1984) (approval denied where disclosure statement omitted information relating to value of debtor's fixtures and equipment, amount of unsecured claims, ability to collect accounts receivable, and estimated return to creditors in chapter 7 liquidation); *In re New Haven Radio, Inc.*, 18 B.R. 977 (Bankr. D. Conn. 1982) (disclosure statement inadequate for failure to provide sufficient information concerning debtor's assets and liabilities, specifically to identify creditors, to identify or indicate amount of or to classify claims, and to disclose status of debtor's FCC license); *In re Adana Mortgage Bankers, Inc.*, 14 B.R. 29 (Bankr. N.D. GA. 1981) (failure to disclose financial and other information relating to risks to creditors under the plan is inadequate); *In re McGrew,* 60 B.R. 276 (Bankr. W.D. Ark. 1986) (disclosure statement inadequate for failure to account for value of certain assets).

**B)** **The Disclosure Deficiencies**. As explained above, the entire structure of the VD and TD Disclosure Statements was designed to present an attractive offer in the text of the documents, while concurrently eliminating rendering it illusory through the hundreds of definitions parked behind the Plan. In the following subparagraphs the more material of the nondisclosures are addressed.

**1.** **The Dividend Level Omissions and Misrepresentations.** The fundamental disclosure defect in the Lehman DS is the failure to provide the creditors any clarity

1    on the most critical issue: *What they will in fact receive under the Plan*. Although the Lehman

2    Entities repeatedly state that the distribution percentage payable under their plan to the various

3    unsecured classes will range between 1% and 5% for the non-reliance unsecured creditors (VD

4    Disclosure Statement 4:13-21: TD Disclosure Statement 4:13-21) and between 40% and 50% for

5    Reliance unsecured creditors (*See* VD Disclosure Statement 3:15-20), at best this is pure

6    speculation and at worst a flat out misrepresentation. A careful reading of the definitional maze

7    that appears at the very back of the Plan establishes that the Lehman Entities are only guaranteeing

8    to pay a 1% distribution.

9          The foregoing disclosure deficiency can be illustrated through the following example. In

10    the Disclosure Statement, the Lehman Entities repeatedly state that the distribution to the Class 6

11    claimants under their plan will be between 40% and 50%. Any creditor reading these statements

12    would assume this to be true. However, what the Lehman Entities are in fact saying is that they

13    will on pay what is provided for in the "Lehman Distribution Enhancement." (Plan, P. 18, § 101.)

14    If you read the qualification to this qualification, which appears in the definition of term "On

15    Proportion Distribution Reduction" (Plan, P. 22, § 125), it is clear that the pot is capped at $20.5

16    million. So the "enhancement" is at best what they will receive, pro rata from this pot, not 40% to

17    50% of their claims.

18          However, there is yet another qualification to this payment right - an unquantified

19    qualification hidden in the Disclosure Statements. The participants in the above-referenced fixed

20    pool of cash are the Class 6 and 7 claimants and all "Senior Claims." The term "Senior Claims"

21    (Plan, P. 31, § 175) includes "Administrative Claims", "Priority Claims" and "Secured Claims."

22    Accordingly, when the whole sequence is put together the reality is this: The Class 6 and 7

23    claimants will only receive an increment over the "guaranteed" 1%, to the extent that anything is

24    left from the $20.5 million pot, after the payment of all "Administrative Claims", all "Priority

25    Claims" and all "Secured Claims". It is only at this point that this diminished and possibly zeroed

26    out sum will then be allocated pro rata among the Class 6 and 7 claimants.

27          Any creditor who took the time and had the capacity to muddle through this maze would

28    necessarily have to conclude that the so-called "Lehman Distribution Enhancement" was illusory

1    unless there was some certainty that substantial funds would in fact be left over after the payment

2    of the above referenced claims, and the creditor could be assured that the pot of claims in Class 6

3    and 7 was sufficiently small to enable the remaining allocable sum to yield something more than

4    an infinitesimal increment on the 1%. *In short, the VD Plan offers unsecured creditors a*

5    *guaranteed 1% and potentially nothing above this sum unless funds are left over from a very long*

6    *waterfall. This is the reality that should appear in the plan summary set forth in the Disclosure*

7    *Statements. The Lehman Entities should not be allowed to delude the great mass of creditors, who*

8    *lack the capacity to read this opaque tome, into believing that their 40% to 50% dividend offer is*

9    *real.*

10            **2.    The Illusory Residual Cash Offer**. In both the Plan and Disclosure

11    Statements, Lehman represents to the creditors that they will receive a pro rata portion of the

12    "Residual Cash". (Plan, P. 29, § 160). However, here again a line by line review of the definitional

13    maze in the Disclosure Statements establishes that this is illusory. If the Lehman Entities

14    conclude, unilaterally, that this cash is subject to their Secured Claims, it ceases to exist as a

15    payment source. *Id*. Moreover, even this payment source does survive the Lehman Entities'

16    secured claims, then it will be used to repay whatever Post-Confirmation Expenses that the

17    Lehman Entities deem appropriate, including the $500,000 "Post Confirmation Expense Funding"

18    (which was never funded in the first instance but taken from the VD Debtors' own cash). Finally,

19    since most of the Litigation Recoveries that will fund this defined source of cash are based upon

20    claims against the Lehman Entities that are being waived and released under the VD Plans, it is

21    difficult to see what will be in this pot in the first place.

22            *In sum, here again, this source of cash is illusory.* Yet, in the Disclosure Statement, the

23    Lehman Entities refer to this as real source of distributions for unsecured creditors. This is wrong.

24    If the Lehman Entities believe this will be a meaningful payment source then they should explain

25    why, what claims will fund it, what deductions will be made from it, and what is projected to be

26    left over.  If they cannot provide this specificity then they should acknowledge that it could be

27    zero and that they, not the creditors have first rights to the funds from this source.

28

1           **3.**      **The Lehman Entities' Illusory Funding Promise**. In the VD Disclosure

2 Statements, the Lehman Entities give the impression to creditors that they are generously agreeing

3 to fund the attractive, but as indicated above, illusory dividends being offered to creditors. Here

4 again a careful review of the Plan confirms that these are not the facts. In fact, the "Lehman Plan

5 Funding" (Plan, P. 19, § 106) is not "funding" at all. Under the VD Plans, the Lehman Entities

6 simply seize all of the Voluntary Debtors' cash, and then unilaterally categorize this as "cash

7 collateral", when in fact Lehman is well aware of the fact that this is not the case.[7] The Lehman

8 Entities then loan back to the Voluntary Debtors *their own money* as "new" so-called "Lehman

9 Plan Funding." The VD Plans then adds insult to injury by providing that this "loan" will be paid

10 back from the proceeds of the Debtors' litigation recoveries.

11        The "Lehman Plan Funding" is similar to a bank agreeing to loan a depositor the funds in

12 the depositor's own checking account, and then providing that this loan will be repaid from the

13 funds in the depositor's savings account. So at the end of the day, the bank has not advanced a

14 penny of its own funds, yet it has received "repayment" in the amount of funds that it never held

15 title in the first place. Given these facts, the Lehman Entities should plainly state in the Disclosure

16

---

17 [7] The Lehman Entities attempt to justify this sleight of hand by suggesting, without any specific legal basis,
18 that all cash held by the SunCal Debtors constitutes their "cash collateral"[7] and, therefore, they are the
funding source. This contention is demonstrably false. The Joint Disclosure Statements concede that most
19 of the cash in the Trustee Debtors' estates and a substantial portion of the cash in the Voluntary Debtors'
Cases are not subject to perfected security interests. "Cash collateral" is cash that is subject to *a perfected*
20 *security interest*, since any other interest falls to the debtor's strong arm powers under 11 U.S.C. § 544.
*Matter of Gotta*, 47 B.R. 198, 203 (Bankr. Wis. 1995) ("However, an entity has an interest in cash collateral
21 under the Code *only when it has a perfected security interest in that cash*.") (emphasis added). [7] Under
Sections 9312 and 9104 of the California Commercial Code a lien on a deposit account can *only* be
22 perfected by "control," which means a deposit control agreement.[7]

23 As set forth in the Khodadadi Declaration, the Voluntary Debtors have cash balances totaling approximately
$22.3 million and the Trustee Debtors (excluding SunCal Century City) have cash balances totaling
24 approximately $8.1 million. (See, Exhibit "2" to the Khodadadi Declaration.) The only deposit control
agreement in the SunCal Debtors' Cases that the SunCal Parties are aware of that *may* have been in
25 existence pre-petition is referred to as Account No 315-0504A-15-052 at Smith Barney, which was held in
the name of Palmdale Hills, LLC (the "SB Account"). The SB Account has a balance of approximately
26 $16.8 million. All other accounts of the SunCal Debtors' Cases are not even alleged to be subject to deposit
control agreements in the Lehman Disclosure Statements. Hence, the funds in these accounts are not
27 subject to perfected liens.[7] Accordingly, the Lehman Entities' implication that they are making available to
the SunCal Debtors' new money is illusory and the representation that they have the right to use the SunCal
28 Debtors' own cash is, with the noted exception, incorrect.

1    Statement that they propose to take the VD Debtors' own cash, re-label these funds as "Lehman

2    Plan Funding" and then advance these funds back to the VD Debtors. Not surprisingly, the

3    Lehman Entities are reluctant to disclose this obvious flim flam.

4        The Lehman Entities also fail to provide adequate disclosure regarding what exactly they

5    are committing to fund, and who is the purported funding party. The only apparent binding funding

6    provision in the Lehman Entities' Joint Plans states that that an unspecified party will advance

7    funds if the SunCal Debtors' cash is insufficient to pay Administrative Claims, Priority Claims,

8    and the guaranteed 1% distribution to unsecured creditors.  All other references to Lehman

9    Entities' potential funding are qualified with the phrase "may fund."  *See In re Unichem,* 72 B.R.

10   95, 97 (Bankr. N.D.Ill. 1987) *aff'd,* 80 B.R. 448 (N.D.Ill.1987) (disclosure statement did not

11   contain adequate information where proponent's cash infusion to debtor's estate was illusory).

12       **4.    The Disclosure Statement Fails To Disclose The Status of the Lehman**

13   **Claims**. The Lehman Entities represent to the creditors in the in their disclosures statements that

14   they holds over $700 million in claims. The clear inference is that these claims are allowed, when

15   in fact this is not the case. All of the Lehman Entities' claims are subject to pending objections,

16   which means they are presently not "allowed." Accordingly, the Lehman Entities cannot vote

17   these claims, or receive a distribution on the same until they are allowed through an order of this

18   Court. Since Lehman has refused to respond to discovery regarding these claims, it can never meet

19   this burden. To the contrary, its failure to respond is grounds for striking the claims in their

20   entirety. In order for the Disclosure Statements to have "adequate information" the Lehman

21   Entities must explain to the creditors that their claims are not allowed and in fact may never be

22   allowed in the amount claimed.

23       **5.    The Lack of Disclosure Regarding Releases**. The Lehman Entities fail to

24   adequately disclose in their Disclosure Statements that they are seeking to waive and release all

25   claims that the VD and TD Debtors hold against the Lehman Entities, and against an undefined

26   universe of Lehman related or affiliated parties. In order for the creditors to make a reasoned

27   decision on this aspect of the Plan, they have a right to know who is being released, what claims

28   are being released, the value of these claims, and why third parties who are not a part of this case

are being gratuitously released at the expense of the creditors. In sum, unless the creditors know what they are giving up in the release, against who and why, they cannot make a reasoned decision regarding the Plan.

6.    **The Lehman Entities Fail To Adequately Disclose What Will Happen If One of The Competing Plans Succeeds in the Lehman Debtors' Chapter 11 Cases.** As this Court is aware, LBHI and certain affiliates including LCPI, are subject to a jointly administered Chapter 11 proceeding in the Southern District of New York, Case No. 08-13555 JMP ("Lehman NY Bankruptcy Proceeding"). The Lehman Disclosure Statements fail to disclose that competing Chapter 11 plans have been in the Lehman NY Bankruptcy Proceeding. Specifically, on April 25, 2011, the *Non-Consolidation Plan Proponents*[8] filed a competing Chapter 11 plan in the Lehman NY Bankruptcy Proceeding ("Deutsche Bank Competing Plan" and "Deutsche Bank Disclosure Statement") and on April 27, 2011, the *Ad Hoc Group of Lehman Brothers Creditors*[9] filed a competing Chapter 11 plan and disclosure statement in the Lehman NY Bankruptcy Proceeding ("Ad Hoc Competing Plan" and "Ad Hoc Disclosure Statement").

Both of these competing plans provide for the removal of the Lehman Debtors existing Board of Directors and the installation of a new board. The new Board of Directors will have full discretion to terminate any existing managers or advisors to the Lehman Debtors. *See* Deutsche Bank Disclosure Statement, pgs. 90-91; Ad Hoc Disclosure Statement, pgs. 90-91.

---

[8] The members of the *Non-Consolidation Plan Proponents* include Deutsche Bank AG, State Street Bank and Trust Company, Cyrus Capital Partners, LP, Silver Point Capital, L.P., York Capital Management Global Advisors, LLC, Morgan Stanley & Co. International PLC, Morgan Stanley Capital Services Inc., D. E. Shaw Composite Portfolios, L.L.C., D.E. Shaw Oculus Portfolios, L.L.C., Goldman Sachs Bank USA, Goldman Sachs International, Credit Agricole CIB, Credit Suisse International, The Royal Bank of Scotland PLC, Oaktree Capital Management, L.P., solely in its capacity as agent on behalf of certain funds advised by it or their respective subsidiaries, and Silver Point Capital, L.P. on behalf of its affiliated investment funds, and certain funds managed by and/or affiliated with: Angelo, Gordon & Co., L.P., Contrarian Capital Management, LLC, Goldentree Asset Management, LP, Hayman Capital Management, LP, Knighthead Capital Management, LLC, Mason Capital Management LLC, Mount Kellett Capital Management, Oaktree Capital Management, L.P., and Serengeti Asset Management LP.

[9] Members of the Ad Hoc Group of Lehman Brothers Creditors are: 1. California Public Employees' Retirement System, 2. County of San Mateo,  3. Fiduciary Counselors Inc., 4. Fir Tree, Inc.,  5. Gruss Asset Management, L.P., 6. Owl Creek Asset Management, L.P.,  7. Paulson & Co. Inc.,  8. Perry Capital LLC on behalf of one or more investment funds for which it or an affiliate acts as investment advisor or general partner,  9. Taconic Capital Advisors L.P., 10. Western Asset Management Company.

If either of these competing plans is confirmed in the Lehman NY Bankruptcy Proceeding, there is a very real possibility that the new board will withdraw the Lehman Plans in the SunCal Cases. Notably, the Lehman Entities VD Plans allowed them to withdraw their Plans, even after confirmation, solely based upon the Lehman Entities' subjective determinations regarding funding and claims issues. Unless creditors are advised of the fact that the Lehman Entities are in the midst of a takeover fight that they could well lose, and that this could result in the withdrawal of the Plans, they will not be able to make a reasoned decision on the risks associated with a vote for the VD Plans.

**7.    The Lehman Entities Fail To Disclose That Enforcement of The Plans Is Impossible**. The VD and TD Plans provide that the Lehman Entities and the Trustee will receive full releases from the relevant SunCal Debtors' estates, *as well as prospective injunctions against both creditors and government agencies from compelling them to perform under the Lehman Plans*.[10]  The obvious objective of this provision is clear. It renders the Lehman Entities Plan funding obligations nonrecourse as to the Lehman Entities and the Trustee. Accordingly, if the Lehman Entities fail to fund, the creditors have no recourse. This unique "we will perform if we want to" provision requires more disclosure.

**8.    Consideration of the Lehman Disclosure Statements and the Lehman Plans Are Premature**.  The Lehman Plans contain material contingencies that have not been met and may not be met, that a typical creditor would need to know in order to make an informed voting decision on the Joint Plans.

For example, the Lehman Plans will not provide for any recovery to general unsecured creditors of the relevant SunCal Debtors unless the unsecured claims do not exceed $30 million in the Trustee Debtors' Cases.  Specifically, the Lehman Entities may withdraw the plan post-confirmation, but prior to the effective date, if "The Lehman Creditors' good faith estimate of the likely Classes 6/7 Claims Amount exceeds $30 million."  TD Disclosure Statement, 147:17-148:1. Similarly, the VD Disclosure Statement provides as a condition to entry of the confirmation order, that as to Group I Debtors, "the Lehman VD Lenders good faith estimate of all such Debtors'

---

[10] TD Disclosure Statement, 125:13 – 135:8.  VD Disclosure Statement 130:11– 140:2 and 148:23 – 150:3.

1  Allowed Senior Claims does not exceed $17 million" and as to the Group II Debtors, "Allowed

2  Senior Claims does not exceed $3 million".  VD Disclosure Statement, 116:9-12.

3          Currently, the general unsecured claims in the Trustee Debtors' Cases are approximately

4  $34 million without taking into account potential unsecured rejection claims and bond claims.

5  (See, Exhibit "1" to the Declaration of Payam Khodadadi ("Khodadadi Declaration").  Further, the

6  Lehman Entities can withdraw the Lehman TD Plan after confirmation if Lehman's funding

7  obligations exceeds $45 million in the Trustee Debtors' Cases based on the Lehman Entities' good

8  faith estimate.  TD Disclosure Statement, 148:2-4.  The Trustee Debtors' estates currently have

9  approximately $16 million of unpaid real property taxes that are to be paid in full, $48 million of

10 administrative and priority claims that are to be paid in full, and, as stated, approximately

11 $34 million of unsecured claims exclusive of potential Rejection Claims and Bond Claims even

12 after several rounds of claim objections.

13         The Lehman Plans are also contingent upon nonexistent settlements with the Bond

14 Companies and their approval by the New York Bankruptcy Court.  See VD Disclosure Statement,

15 16:15-17 ("as a condition to entry of the Confirmation Order and prior to the Effective Date,

16 certain Lehman Related Parties must have entered into a Settling Bond Issuer Agreement with

17 each Bond Issuer"); 116:1-8; 151:7-16.  TD Disclosure Statement, 146:19-147:1 (Conditions

18 Precedent to Entry of the Confirmation Order).  The Bond Companies have asserted future Bond

19 Claims of $157.5 million against the Trustee Debtors and $68.7 million against the Voluntary

20 Debtors.

21         Consequently, there are major and seemingly insurmountable contingencies under the

22 Lehman Plans that remain to be resolved.  Simply put, consideration of the adequacy of the

23 Lehman Disclosure Statements is premature.  Consequently, the SunCal Parties believe it would be

24 more efficient for the Court and all parties involved to address the Lehman Disclosure Statements

25 after these contingencies have been met or at least become more likely to be met.

26         **9.      The Lehman Disclosure Statements Fail to Disclose That the Lehman**

27 **Plans Violate California Anti-Deficiency Statutes**.  The State of California has a well-

28 recognized body of anti-deficiency laws that prevent land lenders such as the Lehman Entities

1   from obtaining deficiency judgment through nonjudicial foreclosures. Cal. Code Civ. Proc. § 580d.

2   The *only means* through which such a lender can obtain deficiency is through the procedure set

3   forth in Section 726(a) of the California Code of Civil Procedure. Under this procedure, any

4   deficiency is determined in a valuation trial known as a fair value hearing and the debtor is

5   afforded the right to reacquire the property at any time during the next year, if a deficiency is

6   granted. Cal. Code. Civ. Proc. § 726(e).

7        Under the Lehman Plans, the Lehman Entities propose to "convey" all of the SunCal

8   Debtors' real properties to a Lehman designee while concurrently proposing to provide the

9   Lehman Entities artificial deficiency claims against the estates based upon the differences between

10   the Lehman Entities' two-year old appraisals and the alleged amount of their disputed claims.

11   Based upon these appraisals, the value conclusions of which are referenced in the Lehman

12   Disclosure Statements, *collective deficiency* claims in excess of $1 billion would be created.  To

13   add further insult to further injury, the designee takes title to the real properties subject to

14   Lehman's pre-petition liens securing the full amount of Lehman's disputed pre-petition loans,

15   including the illegal deficiencies and the SunCal Debtors' cash is used to make the property taxes.

16        In their Joint Disclosure statements, the Lehman Entities provide that they will retain their

17   liens "pending full payment in Cash of both the secured and unsecured portions of its Claim." VD

18   Disclosure Statement, 97:7-9. TD Disclosure Statement, 91:5-7.  This provision essentially secures

19   an unsecured claim, in violation of 11 U.S.C. § 506(d), since the Lehman Entities are not making

20   the election under 11 U.S.C. § 1111(b). Notably, no other secured creditor is granted this right to

21   achieve an end-run around the statutory system.  Accordingly, the Lehman Entities' Joint Plans not

22   only violate the California's anti-deficiency rules, it affords the Lehman Entities claim treatment

23   that is contrary to explicit Bankruptcy Code provisions.

24        Pursuant to 28 U.S.C. § 959,[11] the Liquidating Trustee must comply with local law, which

25   includes California's foreclosure law. The above scheme would clearly violate this statutory

26

27   [11] Pursuant to 28 U.S.C. § 959:

28        a trustee, receiver or manager appointed in any case pending in any court of the United
        States, including a debtor in possession, shall manage and operate the property in his
        possession as such trustee, receiver or manager according to the requirements of the valid

1  restriction.  The provisions of the Lehman Plans not only attempt to evade the fundamental

2  protections afforded debtors under California law, they propose a system that is diametrically at

3  odds with the entire California foreclosure system.  In fact, the mere filing of the Lehman Plans

4  that seek to enforce deficiency claims without a non-judicial foreclosure could well be construed to

5  be an "action" exonerating their liens.  The SunCal Parties are certain that the entry of a

6  confirmation order approving such a plan would constitute an "action" - again resulting in

7  automatic exoneration of the liens.

8      **10.    The Lehman Disclosure Statements Fail to Disclose That the Lehman**

9  **Entities Are Insiders.**  The Lehman Entities describe themselves as "lenders" and they assume in

10  their Joint Plans and the Joint Disclosure Statements that they are not "insiders" as that term is

11  defined in 11 U.S.C. § 101(31).  This assumption is in error.  The Lehman Entities directly

12  controlled the management of the SunCal Debtors for almost two years prepetition.  Moreover, a

13  series of related Lehman affiliates, controlled by the same three management directors that

14  controlled LCPI and Lehman ALI, owned approximately 50% equity interests in all of the Trustee

15  Debtors as of the SunCal Debtors' Petition Date.

16      The insider issue raised by these facts is of critical importance to the creditors given the

17  Lehman Entities gerrymandering attempts on plan voting with the requirement of claim

18  assignments and the creation of illegal deficiency claims that will swamp the respective unsecured

19  classes.  If, in fact, the Lehman Entities are insiders as the SunCal Debtors contend, then their

20  votes do not count for the purposes of 11 U.S.C. § 1129(a)(10).  This means that the Lehman

21  Entities can only confirm a plan if an impaired class votes in favor of their plan, without

22  considering the Lehman Entity votes.  Consequently, the resolution of the Lehman Entities' insider

23  status could well determine the plight of the voting results of the Lehman Plans.  Disclosure of the

24  relevant facts that bear upon this issue is clearly required under 11 U.S.C. § 1125.

25      Furthermore, as to all of the Lehman Entities that are current defendants in the Lehman

26  Adversary Proceedings, this Court has held that the SunCal Debtors have alleged facts giving rise

27

28
laws of the State in which such property is located, in the same manner that the owner or
possessor thereof would be bound to do if in possession thereof.
28 U.S.C. § 959.

to a finding that such Lehman Entities are statutory insiders.[12] Specifically, on March 8, 2010, in issuing the ruling denying the Lehman Entities' motion to dismiss the Third Amended Complaint, this Court held:

> As to, in particular, the "statutory insider" status of Lehman ALI, OVC and Northlake Holdings, I did find persuasive the argument of the plaintiffs that these are "statutory insiders" within the meaning of Section 101(31)(E) as affiliates.

The standard of proof of many of the causes of action such as equitable subordination and breach of fiduciary duty in the Adversary Proceeding will be much easier and the value of the alleged preferential transfers to the Lehman Entities will have a one-year, rather than ninety-day look-back, that will then encompass approximately $16 million of potential preferential transfers to the Lehman Entities.

**11.** **The Lehman Disclosure Statements Inaccurately Describe the Status of the Lehman Adversary.** The Lehman Disclosure Statements essentially suggests that there is no probability of success in the Lehman Adversary Proceeding for the SunCal Debtors' estates.[13] Such "disclosure" is both inadequate and misleading. Lehman's one-sided and superficial factual rendition and conclusory legal argument is not adequate disclosure. In fact, a court has specifically emphasized the "over flowing opinions" of the proponents in determining the inadequacy of a disclosure statement." *In re Dakota Rail, Inc.*, 104 B.R. 138, 149 (Bankr. D.Minn. 1989).

---

[12] 11 U.S.C. § 101(31)(E) defines the term "insider" to include both an "affiliate" and an "insider of an affiliate as if such affiliate were the debtor". Lehman does not dispute that Lehman Brothers Holding Inc. ("LBHI") has at least a 50% ownership interest in each of the SunCal Debtors' Lehman Equity Partners, and also wholly owns the Lehman Lenders. The term "affiliate" includes an "entity that directly or *indirectly* owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor" 11 U.S.C. § 101(2)(A). Since the term includes "indirect" ownership, the term affiliate includes a parent of a parent of the debtor. See In re Interlink Home Health Care, Inc., 283 B.R. 429, 439 (Bankr. N.D.Tex. 2002) ("it is certain that the term 'affiliate' was intended to be broad enough to include a parent of a parent").

It is a matter of simple logic, LBHI is an affiliate of the Trustee Debtors because it indirectly owns or controls 20% or more of the Trustee Debtors via its ownership of the Lehman Equity Partners of the Trustee Debtors. Then looking at LBHI "as if such affiliate were the debtor," the Lender Lenders are each insiders of LBHI because these Lehman Lenders are admittedly 100% owned by LHBI and are thus affiliates of LBHI. Since an "affiliate" is included in the definition of an "insider" *supra*, the Lehman Lenders are insiders of LBHI, which is an affiliate of the Trustee Debtors. Accordingly, the Lehman Lenders are statutory insiders because they are each an "insider of an affiliate as if such affiliate were the debtor" pursuant to 11 U.S.C. §101(31)(E).

[13] VD Disclosure Statement 47:1- 50:20   TD Disclosure Statement 45:9-52:8.

1    At a minimum, the Lehman Disclosure Statements should disclose that on April 12,

2    2001, the Court entered an order denying most of the relief requested in the Lehman Entities'

3    motions to dismiss the Third Amended Complaint in the Lehman Adversary Proceeding.

4    Specifically, the Lehman Entities' Motion to Dismiss was ***denied*** as to the claims against the

5    Lehman Entities for equitable subordination against all of the Lehman Entities, except LCPI,

6    solely because of its automatic stay, fraudulent inducement on the foreclosure of the Pac Pointe

7    Project, fraudulent transfers to avoid liens securing disputed claims in excess of hundreds of

8    millions of dollars, and avoidance of preferential transfers on claims exceeding $16 million.  As

9    previously stated, the Court further found that the SunCal Debtors had pleaded factual allegations

10    sufficient to give rise to the conclusion that the defendant Lehman Entities are statutory insiders of

11    the Plaintiff SunCal Debtors.  Finally, aside from a single preference action of $3.4 million, the

12    aspects involving the partial granting of the Lehman Entities' motion to dismiss mostly pertained

13    to dismissing LCPI as a defendant underline(without prejudice) due to LCPI's assertion of its automatic stay

14    and not on the merits of the causes of action.  Further, as discussed below, these "stayed" causes

15    of action are currently addressed in objections to claims under Bankruptcy Code Section 502(d)

16    which is set for hearing on June 9, 2011, at 10:30 a.m.

17    **12.    The Voluntary Debtors' and Certain Trustee Debtors' Creditors'**

18    **§502(d) Claim Objections Against the Lehman Entities.**  As to those causes of action that are

19    currently stayed as to the Lehman Entities, the SunCal Parties have filed a motion to disallow such

20    disputed claims, pursuant to 11 U.S.C. § 502(d), filed on April 26, 2011, docket no. 1976

21    ("§502(d) Claim Objection").

22    The following is a nonexclusive list of the disputed claims filed by the Lehman

23    Entities that are subject to the §502(d)  Claim Objection that will have the effect of denying

24    distributions to the Lehman Entities with respect to the following claims, which includes six of the

25    disputed secured claims against the Trustee Debtors.

26    / / /

27

28

| Disputed Proof of Claim No. | Debtor | Claim Holder | Claim Amount |
|---|---|---|---|
| 1 | SunCal I | LCPI | $343,221,391 |
| 2 | SunCal III | LCPI | $343,221,391 |
| 6 | Acton Estates | LCPI | $343,221,391 |
| 6 | Emerald Meadows | LCPI | $343,221,391 |
| 16 | Bickford Ranch | LCPI | $343,221,391 |
| 12 | Summit Valley | LCPI | $343,221,391 |
| 1 | SCC/Palmdale | LCPI | $119,664,305 |
| 12 | Oak Knoll | Lehman ALI | $158,141,365 |
| 4 | Torrance | Lehman ALI | $158,141,365 |
| 9 | Heartland | LCPI | $354,325,126 |
| 21 | Marblehead | LCPI | $354,325,126 |
| 9 | SCC Communities | Lehman ALI | $ 23,795,013 |
| 7 | Tesoro | Lehman ALI | $ 23,795,013 |
| 14 | Del Rio | Lehman ALI | $ 23,795,013 |
| 21 | Delta Coves | Lehman ALI | $ 206,023,142 |

| Lehman Administrative Claims[14] | Debtor | Claim Holder | Claim Amount |
|---|---|---|---|
| | Delta Coves | Lehman ALI | $2,767,725 |
| | Heartland | Lehman ALI | $1,935,250 |
| | Marblehead | Lehman ALI | $5,634,270 |
| | Oak Knoll | Lehman ALI | $13,002,451 |
| | Torrance | Lehman ALI | $1,346,711 |

The SunCal Parties' §502(d) Claim Objection is currently set for hearing on June 9, 2011. The Lehman Disclosure Statements fails to discuss these objections to such claims that, if granted, would render the Lehman Plans unfeasible.

**13.    The Lehman Disclosure Statements' Fail to Address the SunCal Debtors' Recoupment Claim Objection.** Pursuant to the terms of the joint ventures entered into by and among the SunCal Debtors and the Lehman Entities, the Lehman Entities were responsible for paying the costs incurred in the development of the Projects. These costs include the claims of vendors who provided goods and services to the Projects and the claims asserted by the Bond Claimants. Although the Lehman Entities contend that they were merely "lenders," and that they did not assume any liability for these claims, as the above facts and those that will be adduced prior to and at the confirmation of the Joint Plans will demonstrate, the Lehman Entities are in fact obligated to pay these claims.

---

[14] Figures are from Disclosure Statement with Respect to First Amended Joint Chapter 11 Plan for Eight Trustee Debtors Proposed by the Trustee and Lehman Creditors [Docket No. 1876].

1    The Voluntary Debtors' and certain creditors of the Trustee Debtors' estates contend that

2    direct liability can be imposed on the Lehman Entities without violating the automatic stay of any

3    Lehman Entity on various grounds, including the following:

4    First, the Lehman Entities were either in a joint venture relationship with the SunCal

5    Debtors from the outset, or this relationship developed and became a legal fixture through the

6    Lehman Entities' course of conduct.  Pursuant to this relationship, and the promises and

7    representations made therein, the Lehman Entities agreed to be responsible for all vendors and

8    Bond Claims incurred at or in connection with the Projects. The role of each of the SunCal

9    Debtors, by mutual agreement, was to provide development expertise and project management

10   services. The Lehman Entities were required to provide the capital necessary to fund the Projects.

11   Second, in 2007, the Lehman Entities assumed direct responsibility for all claims incurred

12   during this period, by insisting that work continue on the Projects and by repeatedly promising to

13   pay for this work. Since the Lehman Entities ordered this work, and promised to pay for the same,

14   they bear this financial responsibility.  The Lehman Entities failure to pay the vendor and Bond

15   Claims associated with the real estate projects as agreed, and as was their obligation under the

16   terms of the joint ventures, has unjustly shifted responsibility for these liabilities to the SunCal

17   Debtors' estates in breach of the joint venture terms. Under these circumstances, the Voluntary

18   Debtors' and the Trustee Debtors' creditors believe they have the right to assert "recoupment"

19   claims against the disputed Secured Claims that the Lehman Entities are asserting against the

20   projects that are not violations of the Lehman Entities' automatic stay.

21   The recoupment claims held by each estate would be equal to the amount of the allowed

22   claims asserted in the applicable SunCal Debtor's estate by claimants who performed work or

23   services on the applicable project, but that was not paid for the same by the Lehman Entities as

24   promised, and the applicable Bond Claims asserted with respect to such SunCal Debtor's project.

25   These claims arise out of the "same transaction and occurrence" as the secured claims – the joint

26   ventures entered into, or arising by and among the applicable SunCal Debtors and the applicable

27   Lehman Entities, with respect to one or more of the Projects.

28

1    These recoupment claims are currently being pursued through claim objections filed on

2    April 8, 2011, docket no. 1901 ("Recoupment Claim Objection"). The Recoupment Claim

3    Objection seeks to recoup the amount of the applicable SunCal Debtor's estate's qualifying

4    recoupment claims against the secured claim asserted by the Lehman Entities. Once the amount of

5    the recoupment is fixed by the Court, this sum will be allocated to the applicable SunCal Debtor's

6    estate and distributed, upon the sale of the underlying project. Alternatively, in those cases where

7    the project does not sell, a lien will be imposed under the SunCal Debtors' Plan, as of the

8    Effective Date, on the project that will be senior to the Disputed Lehman Secured Claim and

9    disputed lien of the affected Lehman Entity.

10    As stated, recoupment is not subject to the automatic stay. *In re McMahon*, 129 F.3d 93, 98

11    (2d Cir. 1997) ("a recoupment not subject to the automatic stay of 11 U.S.C. § 362"); *Newbery*

12    *Corp. v. Fireman's Fund Ins. Co.*, 95 F.3d 1392, 1398 (9th Cir. 1996).  Moreover, the stay does

13    not apply to claim objections. See *In re Wheatfield Business Park*, 308 B.R. 463, 466 (9th Cir.

14    BAP 2004); *In re Financial News Network*, 158 B.R. 570 (S.D.N.Y. 1993); *In re Metiom*, 301

15    B.R. 634, 638-639 (Bankr.S.D.N.Y. 2003); *In re Meade*, 1999 WL 33496001, *1 (E.D.Pa. 1999).

16    Accordingly, the SunCal Debtors' recoupment rights are properly being pursued through the

17    claims objection procedure in order to eliminate the Lehman Entities' ongoing effort to use its stay

18    as a sword to prevent the resolution of the claims that it has filed against the SunCal Debtors.

19    **14.    The Lehman Entities' Joint Voluntary Disclosure Statement Fails to**

20    **Address the Voluntary Debtors' Post-Petition Claims Against the Lehman Entities and**

21    **Their Agents.**  The Voluntary Debtors believe that the Lehman Entities and certain agents of the

22    Lehman Entities (the "Culpable Agents") engaged in a post-petition course of conduct that

23    severely damaged the Voluntary Debtors, their estates and the recovery rights of creditors. In

24    summary, the actions taken by the Lehman Entities and the Culpable Agents included, among

25    other things, the following:

26    a.    Actively concealing the prepetition sale of the Lehman Disputed Loans to

27    Fenway Capital and misrepresenting themselves as the owners of these loans during the post-

28    petition period; and

b.      Improperly asserting that LCPI's automatic stay barred actions in the Voluntary Debtors' Chapter 11 Cases relating to two of the Lehman Disputed Loans, when in fact LCPI did not own any interest in such loans and hence the stay could not apply.

The foregoing course of conduct inflicted millions of dollars in damages upon the Voluntary Debtors in the form of additional fees and costs, and it materially delayed the progress of the Voluntary Debtors' reorganization effort.

A number of the Culpable Agents may fall within the reach of what is referred to as the "Barton Doctrine."  In summary, this doctrine requires a party seeking to file a complaint against certain court-appointed professionals representing a debtor to first seek the consent of the appointing court. The Voluntary Debtors will file the requisite "Barton" motion in the Lehman Entities' cases prior to filing a complaint against the Culpable Agents.

**15.      The Lehman Entities' Joint Disclosure Statement Fails to Address the SunCal Debtor's Causes of Action for Breach of Contract and Indemnity Agreements Against Lehman ALI, and Certain Non-Debtor Lehman Affiliates.**  On May 23, 2008, Lehman ALI, "as the Lender with respect to each Loan," entered into a "Restructuring Agreement" with, among others, SunCal and each of the Voluntary Debtors.   The Restructuring Agreement was to culminate in the execution of a "Settlement Agreement" and a Closing of the settlement transactions.  Upon consummation of the Closing, Lehman affiliates were to take title to the Projects, and were to assume tens of millions of dollars in Project-associated obligations to third parties, including, but not limited to, bonded obligations.  The transaction was to be structured somewhat differently for the Pacific Point Project, with Lehman ALI (or its designee) foreclosing on the property, but still agreeing to assume bonded and non-bonded obligations.  The Restructuring Agreement and Settlement agreement included schedules listing, often by individual third-party vendor and amount, the obligations and/or categories of work for which payment would be assumed.

Pursuant to the Restructuring May 23 Agreement, Lehman ALI agreed, among other things, to pay urgent payables associated with projects, as well as the monthly management fees that SunCal Management LLC (a major creditor of most of the SunCal Debtors' estates) would

1    incur in managing the Projects.  Lehman ALI also agreed that, upon satisfaction of all Closing

2    Conditions, it would proceed to Closing, execute the Settlement Agreement and related

3    documents, and cause each of its affiliates to do the same.

4         All material Closing Conditions were satisfied as of the Closing date, or could have been

5    but for Lehman ALI's failure to pursue them in good faith (which it was obligated to do under the

6    terms of the Restructuring Agreement).  On August 25, 2008, representatives of Lehman ALI and

7    the other Lehman parties, on the one hand, and representatives of SunCal, the SunCal Debtors, and

8    the other SunCal parties, on the other, executed signature pages for the Settlement Agreement and

9    related documents, totaling approximately 1,000 pages in all.  Moreover, on August 28, 2008,

10   Lehman ALI's designee, LV Pacific Point LLC, foreclosed on the Pacific Point property.

11   However, Lehman ALI and its affiliates failed to fulfill their payment obligations under the

12   Restructuring and Settlement Agreements, leaving the SunCal Debtors with massive creditor

13   exposure which they still face in bankruptcy.

14        The Voluntary Debtors, SCC Acquisition Inc., SCC Acquisitions LLC, SunCal

15   Management and Bruce Elieff filed a complaint with the Orange County Superior Court on March

16   24, 2011, against Lehman ALI, LV Pacific Point, PAMI, and other Lehman Parties for breach of

17   contract and breach of the covenant of good faith and fair dealing.  See Docket No. 1990, Exhibit

18   16.  The Trustee Debtors have the same breach of contract claims against the Lehman Entities but,

19   for reasons explained below, the Trustee has chosen to recommend that his creditors release such

20   claims under the TD Plan with the Trustee.

21        In light of all of the above subsections, the Lehman Disclosure Statements' failure to

22   disclose substantial value of these claims and mislead creditors with their disingenuous, over-

23   simplistic assessment that such claims are worthless.  The merits of these claims are exactly the

24   reason the Lehman Entities continue to embark on their inappropriate "stay as a sword" strategy.

25

26

27

28

16.    **The Lehman Disclosure Statements Fail to Properly Present an Appropriate "Best Interest of Creditors Test" Under 11 U.S.C. § 1129(a)(7) Because the Lehman Plans Cannot Possibly Comply with this Bankruptcy Code Provision.**

At a minimum, the Lehman Disclosure Statements must provide creditors sufficient information to enable them to determine whether they would receive at least as much under a proposed plan than they would receive in a hypothetical Chapter 7 proceeding. In recognition of their inability to meet this test, the Lehman Entities simply state in the Lehman Disclosure Statements that the creditors would receive nothing in a liquidation, and consequently the alleged dividends that are allegedly payable under their Joint Plan meet the criteria.  This conclusory effort does not satisfy the required disclosure standard. *In re Dakota Rail, Inc.*, 104 B.R. 138, 149 (Bankr. D.Minn. 1989) (disclosure statement is misleading where it contains glowing opinions having little basis in fact); *In re Civitella,* 15 B.R. 206, 208 (Bankr.E.D.Pa.1981) (mere allegations or opinions unsupported by factual information in the disclosure statement do not meet the standard of adequate information).  To meet the minimum disclosure burden required under 11 U.S.C. § 1125, the Lehman Entities' Joint Disclosure Statements must, at a minimum, disclose the following:

a.    If the Chapter 7 Trustee were able to obtain financing for the Lehman Adversary Proceeding to pursue the other referenced claims of the SunCal Debtors against the Lehman Entities, there is no reason the Chapter 7 Trustee could not pursue a litigation strategy similar to that of the SunCal Parties, which the SunCal Parties obviously believe would result in a substantial distribution as high as 100%; and

b.    If the Chapter 7 Trustee did not pursue the Lehman Adversary Proceeding and stipulated to relief from stay, under a foreclosure scenario, the Lehman Entities would have no deficiency claims against the SunCal Debtors' estates under California law. Cal. Code. Civ. Proc. § 580d and no further interest in the estates' cases.  As stated, the SunCal Debtors have cash of approximately $23.3 million and potential avoidance claims held by the Trustee and Voluntary Debtors estates against the Lehman Entities and third parties of approximately $30 million.  Since even a 1.1% recovery rate on these claims would result in a higher liquidating

1  dividend than the 1% that is guaranteed under the Lehman Plans, the Lehman Entities' Joint Plans

2  would not comply with Section 1129(a)(7).

3        In summary, although the Lehman Entities do not have to present the

4  SunCal Parties' perspective on the merits of their litigation, their Joint Disclosure Statements'

5  description of what will happen in a liquidation must bear *some* relationship to reality.

6  Furthermore, at the confirmation hearing, the Court will have to consider actual evidence regarding

7  the value of these claims under both the above scenarios in comparison to the guaranteed 1%

8  distribution under the Lehman Plans in order to make a finding that the Lehman Plans comply with

9  Section 1129(a)(7) even if the Lehman Entities are able to gerrymander the class voting as long as

10  there are objecting impaired creditors, which is a virtual certainty.

11        **17.    The Lehman Disclosure Statements Provide Inadequate Information**

12  **Regarding the Lehman Plans' Feasibility.**

13        a.   The Feasibility Standard and Its Purpose**.**  The feasibility test set forth in

14  section 1129(a)(11) requires the Court to determine whether the Plan is feasible and has a

15  reasonable likelihood of success.  See *In re Acequia*, 787 F.2d 1352, 1364 (9th Cir. 1986); *In re*

16  *Harbon*, 486 F.3d 510, 517 (9th Cir. 2007).  The key element of feasibility is whether there exists

17  a reasonable probability that the provisions of the plan can be performed.  The purpose of the

18  feasibility test is to protect against visionary or speculative plans that promise creditors more than

19  they can possibly obtain post-confirmation.  *In re Pizza of Hawaii*, 761 F.2d 1374 (9th Cir. 1985),

20  quoting 5 *Collier on Bankruptcy*, ¶ 1129.02[11] at 1129-34 (15th ed. 1984).

21        In contravention to the above-stated requirements under section 1129(a)(11), the Lehman

22  Entities have failed to clearly demonstrate their ability to pay claims under the Lehman Plans as

23  represented in the Joint Plan Summaries, which is the only section a hypothetical creditor can

24  possibly understand.  Consequently, the Lehman Disclosure Statements must be amended to

25  include a discussion which, at a minimum, should encompass the following points:

26        •    An analysis of the sources and amount of funds estimated to be required to confirm

27            the Lehman Plans as represented in the Plan Summaries and the specific sources of

28            such funds other than the SunCal Debtors' cash;  and

1        •    An analysis of the sources and amount of funds required to fund the post-

2             confirmation expenses necessary to implement the Lehman Plans, including amounts

3             necessary to pursue avoidance litigation.

4             b.    <u>The Lehman Entities Fail to Adequately Disclose That Their Bankruptcy</u>

5    <u>Could Affect Their Ability to Perform Under the Lehman Plans</u>.  The Lehman Entities fail to

6    provide any disclosure regarding the impact of LCPI's bankruptcy case on their ability to fund the

7    Lehman Plans.  *In re A&F Elec. Co., Inc*., 2007 WL 5582063, *8 (Bankr. M.D.Tenn. 2007) ("The

8    purpose of the disclosure provisions of Chapter 11 is to provide holders of claims and interests

9    with 'adequate information' prior to the acceptance or rejection of a reorganization plan, in order

10   for them to be able to make *an informed judgment as to the feasibility of the plan*.") (emphasis

11   added).  The references to LCPI's bankruptcy case are buried in the Lehman Disclosure

12   Statements, where the Lehman Lenders state that LCPI's status as a debtor may impair the SunCal

13   Debtors' ability to prosecute the equitable subordination claims and limit any recovery of that

14   action and any preference claims.  See VD Disclosure Statement, 46:20; 53:17-21; 57:20-59:2

15            Similarly, the references to LBHI's bankruptcy case in the Lehman Disclosure Statements

16   are that the Bond Companies are possibly being offered an administrative claim in LBHI to

17   guarantee reimbursement for future bond work.  VD Disclosure Statement 128:16-17.  Such

18   claims are estimated to be approximately $225 million the Joint Disclosure Statements provide

19   only conclusory information as to LBHI's ability to perform.

20            For example, it is only in a footnote, on page 147 of the TD Disclosure Statement, where

21   the Lehman Entities disclose that the Lehman Plan Funding is subject to various restrictions

22   imposed by the New York Bankruptcy Court.  As set forth above, as a result of the funding

23   restrictions, the Lehman Entities have reserved the right to withdraw the Plan even after

24   confirmation.

25            As noted above, there are at least two competing plans filed in the Lehman NY Bankruptcy

26   Proceeding, both of which provide that the existing Lehman Board of Directors shall be

27   terminated and replaced by a new Board of Directors.  If either of the competing plans is

28   confirmed, there is a very real possibility that the Lehman Entities' new management will

1    withdraw their support of the Lehman Plans in the SunCal Cases. In light of the highly subjective

2    criterion in which the Lehman Entities may withdraw the Lehman Plans, even after confirmation,

3    the Lehman Disclosure Statements must disclose the likely risk of the withdrawal of the Lehman

4    Plans.

5              **18.    The Lehman Entities Mischaracterization of the SunCal Parties'**

6    **Previous Plan Is Irrelevant, Inflammatory and Speculative and Should Be Deleted.**

7              In the Lehman Disclosure Statements, the Lehman Entities make a number of statements

8    regarding the Voluntary Debtors' prior Plan that are either false or misleading and not relevant to

9    the current disclosure statements.  Although the Lehman Entities are not required to provide the

10    Voluntary Debtors' perspective regarding the facts in their Plan, their presentation must at least

11    distinguish between facts and opinion. In the following paragraphs the more egregious

12    misrepresentations are addressed.

13              In their discussion of the SunCal Debtors' Plan, the Lehman Entities state that the Debtors'

14    litigation claims are a "smokescreen" and that the Plan represents a "lottery ticket litigation

15    strategy." VD Disclosure Statement, 7:26.  These statements are clearly biased and baseless

16    opinions and should be referenced as such in the Disclosure Statement;

17              The Lehman Entities' state the Voluntary Debtors' previous plan (defined by Lehman as

18    the "Elieff Plan") is primarily designed to reduce or eliminate Bruce Elieff's potential liability

19    under the $230 million in Bond Obligations incurred by the Debtors.  This is clearly speculation

20    and Lehman's speculation is clearly irrelevant with respect to a prior plan.  Moreover, at a

21    minimum, the Lehman Entities should explain that the estates are subject to these same Bond

22    Obligations and consequently the Bond Guarantors and the SunCal Debtors have a common

23    interest in reducing these claims.  Furthermore, the Lehman Disclosure Statements fail to disclose

24    that certain Lehman Entities agreed to indemnify the Bond Guarantors and that these Lehman

25    Entities have breached such indemnity agreements.

26              The Lehman Entities suggest that the SunCal Debtors' Plan gratuitously releases $11.0

27    million in preference claims against the SunCal insiders.  This is a false statement.  The Lehman

28    Entities should be required to disclose that the Trustee's counsel in the Trustee's Cases

1    investigated these claims, as part of negotiations involving SunCal providing the Trustee Debtors'

2    administrative financing, the Trustee's counsel concluded that valid defenses of new value and/or

3    ordinary course existed to most, if not all, of the potential claims.

4            The Lehman Disclosure Statements contain erroneous legal conclusions in its description

5    of the Debtors' pending avoidance actions.  For example, Lehman makes the erroneous legal

6    assertion that, by virtue of the "for the benefit of estate" provision in Section 550, "the potential

7    recovery on account of the [avoidance actions] would be capped at no more than … the unsecured

8    claims asserted against the …estate."  VD Disclosure Statement, 51:22-27; 53:11-13; TD

9    Disclosure Statement, 49:14-19; 51:4-6.  However, Lehman's legal assertion is flatly contradicted

10   by Ninth Circuit law.  The term "benefit to the estate" is broader than the amount of unsecured

11   claims.  See *In re Acequia, Inc.*, 34 F.3d 800, 811-812 (9th Cir. 1994) ("Thus, we conclude that the

12   magistrate judge erred by 'capping' [the estate's] recovery under [the avoidance action] at the

13   amount of unsecured claims against the bankruptcy estate." "Courts construe the 'benefit to the

14   estate' requirement broadly, permitting recovery under section 550(a) even in cases where

15   distribution to unsecured creditors is fixed by a plan of reorganization and in no way varies with

16   recovery of avoidable transfers.").  See also *In re Stubbs*, 2006 WL 2361814, 6 (N.D.Ind.)

17   (N.D.Ind. 2006) ("The requirement that the estate receive a benefit is broadly construed. [citing

18   *Acequia*] In this case, even if (as Appellants argue) avoidance of the lien would merely enables the

19   debtor to fund the plan, there would still be a benefit to the estate. The likelihood that the plan

20   would succeed would increase. Creditors have an interest in the plan succeeding. Although the

21   benefit may be indirect, it fulfills the requirement that there be a benefit to the estate."); *Stalnaker

22   v. DLC, Ltd.*, 376 F.3d 819, 823-824 (8th Cir. 2004) ("benefit to the estate" includes payment of

23   administrative expenses - "The facts of the present case make clear that the bankruptcy 'estate' is

24   not synonymous with the concept of a pool of assets to be gathered for the sole benefit of

25   unsecured creditors. Here, administrative claims that relate to over four years of attorneys' fees and

26   expenses and trustee's fees and expenses also exist").  Similarly, the Lehman Disclosure

27   Statements contend that the preference actions are without merit, on the purported basis that the

28   Lehman Entities hold a security interest in the assets transferred.  See VD Disclosure Statement,

53:6-7.  However, the Lehman Disclosure Statements fail to address their alleged security interest in the relevant deposit accounts was unperfected due to the absence of a control agreement.  See Section III(B)(3) *supra*, re UCC §§ 9312 and 9104.

**19.    The Lehman Disclosure Statements Fail to Provide Sufficient Disclosure for the Separate Classification of the SunCal Debtors' Unsecured Creditors nor Adequate Justification for Inferior Treatment.**

The Lehman Disclosure Statements provide arbitrary distinctions between the so-called Reliance Classes and the other general unsecured creditors.  It appears that the Lehman Entities intend to usurp this Court's role as the arbiter of which creditors are beneficiaries of the SunCal Debtors' pending Equitable Subordination Action against the Lehman Entities.  However, unless and until the Equitable Subordination Action is litigated and resolved by this Court, there is no legal determination of the actual beneficiaries.

**20.    The Lehman Plans Are Predicated upon Partial Substantive Consolidation of the Debtors.**  The Lehman Disclosure Statements state that confirmation of the Lehman Plans are not conditioned upon substantive consolidation[15], but the mechanics of the Joint Plans appear to be unworkable without at least partial substantive consolidation.  For instance, it appears from the Lehman Plans that all post-confirmation expenses, allowed administrative claims, and allowed priority claims are being paid from a commingled pool of cash of the Voluntary Debtors to their creditors and the commingled pool of the Trustee Debtors' cash to their creditors.  The VD Disclosure Statement provides, without differentiation between estates, that:

> "Cash that is not Cash Collateral will first be used to pay all Allowed Administrative Claims, and then Allowed Priority Claims, and then Allowed Secured Real Property Tax Claims, and any excess thereof may be held as a

---

[15] See TD Disclosure Statement, 78:3-7 ("The Plan does not intend to and does not provide for substantive consolidation of any of the TD Plan Debtors for any purpose, *e.g.*, for voting, for classification, for the testing of compliance of the Plan with applicable provisions of the Bankruptcy Code, for treatment of Claims and Interests, including calculations of Distributions among creditors, or for the obligations created under the Plan with respect to Distributions for Creditors.").  See also VD Disclosure Statement, 79:20-24 ("The Plan does not intend to and does not provide for substantive consolidation of any of the VD Plan Debtors for any purpose, *e.g.*, for voting, for classification, for the testing of compliance of the Plan with applicable provisions of the Bankruptcy Code, for treatment of Claims and Interests, including calculations of Distributions among creditors, or for the obligations created under the Plan with respect to Distributions for Creditors.")

1  reserve by the Liquidating Trustee for Post-Confirmation Expenses in lieu or
   prior to becoming Residual Cash."

2  VD Disclosure Statement, 116:23-26.  See also, TD Disclosure Statement, 112:8-10.

3      Furthermore, confirmation of any Plan is contingent on confirmation of all Plans in both

4  sets of Cases, respectively.

5                                    IV.

6                        **RESERVATION OF RIGHTS**

7      The foregoing discussion is not an exhaustive list of the infirmities in the Plan and the

8  ways in which the Disclosure Statement fails to provide adequate information to allow creditors to

9  decide whether to vote for or against the Plan.  The SunCal Parties expressly reserve their rights to

10 supplement and amend the Objections, seek discovery with respect to same, and introduce

11 evidence at any hearing to consider the Lehman Disclosure Statements and/or the Lehman Plans.

12

13                                    V.

14                           **CONCLUSION**

15     For all of these reasons set forth in detail throughout the Objections, the SunCal Parties

16 request the Court to deny approval of the Lehman Disclosure Statements.

17 DATED:  April 29, 2011                **WINTHROP COUCHOT**
18                                       **PROFESSIONAL CORPORATION**

19                                       By:___/s/ *Paul J. Couchot*_____
20                                           Paul J. Couchot, Esq.
                                             Sean Okeefe, Esq.
21                                           Peter Lianides, Esq.
                                         General Insolvency Counsel for Administratively
22                                       Consolidated Debtors-in-Possession

23

24                                       **RUS MILIBAND & SMITH P.C.**

25

                                         By: _/s/ *Ronald Rus*_____
26                                           Ronald Rus, Esq.
                                             Joel S. Miliband, Esq.
27                                           Catherine Castaldi, Esq.
                                         Attorneys for SunCal Management, LLC, and SCC
28                                       Acquisitions Inc.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 660 Newport Center Drive, 4th Fl., Newport Beach, CA 92660.

A true and correct copy of the foregoing document described as: **SUNCAL PARTIES' OBJECTIONS TO: (A)  DISCLOSURE STATEMENT WITH RESPECT TO FIRST AMENDED JOINT PLAN FOR ELEVEN VOLUNTARY DEBTORS PROPOSED BY THE LEHMAN VD LENDERS; AND (B)  DISCLOSURE STATEMENT WITH RESPECT TO FIRST AME4NDED JOINT CHAPTER 11 PLAN FOR EIGHT TRUSTEE DEBTORS PROPOSED BY THE TRUSTEE AND LEHMAN CREDITORS** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

I. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On April 29, 2011, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

☒  Service information continued on attached page

II.  **SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served)**:**
On _____, 2011, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐  Service information continued on attached page

III.  **SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on April 29, 2011 I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.

Richard Pachulski:  rpachulski@pszjlaw.com
Shai Y. Waisman:  hai.waisman@weil.com
Edward Soto:  Edward.soto@weil.com

Debtor:  Bruce Cook:  bcook@suncal.com

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| April 29, 2011 | Susan Connor | /s/ Susan Connor |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

**NEF SERVICE LIST**

- Selia M Acevedo     sacevedo@millerbarondess.com,
  mpritikin@millerbarondess.com;bprocel@millerbarondess.com
- Joseph M Adams     jadams@sycr.com
- Raymond H Aver     ray@averlaw.com
- James C Bastian     jbastian@shbllp.com
- Thomas Scott Belden     sbelden@kleinlaw.com, ecf@kleinlaw.com
- John A Boyd     fednotice@tclaw.net
- Mark Bradshaw     mbradshaw@shbllp.com
- Gustavo E Bravo     gbravo@smaha.com
- Jeffrey W Broker     jbroker@brokerlaw.biz
- Brendt C Butler     bbutler@mandersonllp.com
- Andrew W Caine     acaine@pszjw.com
- Carollynn Callari     ccallari@venable.com
- Cathrine M Castaldi     ccastaldi@rusmiliband.com
- Tara Castro Narayanan     tara.narayanan@msrlegal.com
- Dan E Chambers     dchambers@jmbm.com
- Shirley Cho     scho@pszjlaw.com
- Vonn Christenson     vrc@paynefears.com
- Brendan P Collins     bpcollins@bhfs.com
- Vincent M Coscino     vcoscino@allenmatkins.com, emurdoch@allenmatkins.com
- Paul J Couchot     pcouchot@winthropcouchot.com,
  pj@winthropcouchot.com;sconnor@winthropcouchot.com
- Jonathan S Dabbieri     dabbieri@sullivan.com,
  hill@sullivanhill.com;mcallister@sullivanhill.com;stein@sullivanhill.com;vidovich@sullivanhill.com
- Ana Damonte     ana.damonte@pillsburylaw.com
- Vanessa S Davila     vsd@amclaw.com
- Melissa Davis     mdavis@shbllp.com
- Daniel Denny     ddenny@gibsondunn.com
- Caroline Djang     crd@jmbm.com
- Donald T Dunning     ddunning@dunningLaw.com
- Joseph A Eisenberg     jae@jmbm.com
- Lei Lei Wang Ekvall     lekvall@wgllp.com
- Richard W Esterkin     resterkin@morganlewis.com
- Marc C Forsythe     kmurphy@goeforlaw.com
- Alan J Friedman     afriedman@irell.com
- Steven M Garber     steve@smgarberlaw.com
- Christian J Gascou     cgascou@gascouhopkins.com
- Barry S Glaser     bglaser@swjlaw.com
- Robert P Goe     kmurphy@goeforlaw.com, rgoe@goeforlaw.com;mforsythe@goeforlaw.com
- Eric D Goldberg     egoldberg@stutman.com
- Richard H Golubow     rgolubow@winthropcouchot.com, pj@winthropcouchot.com
- Michael J Gomez     mgomez@frandzel.com, efiling@frandzel.com;sking@frandzel.com
- Kelly C Griffith     bkemail@harrisbeach.com
- Matthew Grimshaw     mgrimshaw@rutan.com
- Kavita Gupta     kgupta@winthropcouchot.com
- Asa S Hami     ahami@morganlewis.com
- Michael J Hauser     michael.hauser@usdoj.gov
- D Edward Hays     ehays@marshackhays.com
- Michael C Heinrichs     mheinrichs@omm.com
- Harry D. Hochman     hhochman@pszjlaw.com, hhochman@pszjlaw.com
- Jonathan M Hoff     jonathan.hoff@cwt.com
- Nancy Hotchkiss     nhotchkiss@trainorfairbrook.com
- Michelle Hribar     mhribar@rutan.com
- John J Immordino     john.immordino@wilsonelser.com, raquel.burgess@wilsonelser.com

- Lawrence A Jacobson    laj@cohenandjacobson.com
- Michael J Joyce    mjoyce@crosslaw.com
- Stephen M Judson    sjudson@fablaw.com
- Kaleb L Judy    ecf@kleinlaw.com, kjudy@kleinlaw.com
- Steven J Kahn    skahn@pszyjw.com
- Sheri Kanesaka    sheri.kanesaka@bryancave.com
- David I Katzen    katzen@ksfirm.com
- Christopher W Keegan    ckeegan@kirkland.com, gdupre@kirkland.com;alevin@kirkland.com
- Payam Khodadadi    pkhodadadi@winthropcouchot.com, pj@winthropcouchot.com
- Irene L Kiet    ikiet@hkclaw.com
- Mark J Krone    mk@amclaw.com, crs@amclaw.com;amc@amclaw.com
- David B Lally    davidlallylaw@gmail.com
- Leib M Lerner    leib.lerner@alston.com
- Peter W Lianides    plianides@winthropcouchot.com, pj@winthropcouchot.com
- Charles Liu    cliu@winthropcouchot.com
- Kerri A Lyman    klyman@irell.com
- Mariam S Marshall    mmarshall@marshallramoslaw.com
- Robert C Martinez    rmartinez@mclex.com
- Michael D May    mdmayesq@verizon.net
- Hutchison B Meltzer    hmeltzer@wgllp.com
- Krikor J Meshefejian    kjm@lnbrb.com
- Joel S. Miliband    jmiliband@rusmiliband.com
- James M Miller    jmiller@millerbarondess.com, vgunderston@millerbarondess.com
- Louis R Miller    smiller@millerbarondess.com
- Randall P Mroczynski    randym@cookseylaw.com
- Mike D Neue    mneue@thelobelfirm.com, jmattiace@thelobelfirm.com;pnelson@thelobelfirm.com
- Robert Nida    Rnida@castlelawoffice.com
- Henry H Oh    henry.oh@dlapiper.com, janet.curley@dlapiper.com
- Sean A Okeefe    sokeefe@okeefelc.com
- Robert B Orgel    rorgel@pszjlaw.com, rorgel@pszjlaw.com – PLAN PROPONENT
- Malhar S Pagay    mpagay@pszjlaw.com, mpagay@pszjlaw.com
- Penelope Parmes    pparmes@rutan.com
- Ronald B Pierce    ronald.pierce@sdma.com
- Katherine C Piper    kpiper@steptoe.com
- Cassandra J Richey    cmartin@pprlaw.net
- Debra Riley    driley@allenmatkins.com
- James S Riley    tgarza@sierrafunds.com
- Todd C. Ringstad    becky@ringstadlaw.com
- R Grace Rodriguez    ecf@lorgr.com
- Martha E Romero    Romero@mromerolawfirm.com
- Ronald Rus    rrus@rusmiliband.com
- John P Schafer    jschafer@mandersonllp.com
- John E Schreiber    jschreiber@dl.com
- William D Schuster    bills@allieschuster.org
- Christopher P Simon    csimon@crosslaw.com
- Wendy W Smith    wendy@bindermalter.com
- Steven M Speier    Sspeier@Squarmilner.com, ca85@ecfcbis.com
- Steven M Speier (TR)    Sspeier@asrmanagement.com, ca85@ecfcbis.com
- Michael St James    ecf@stjames-law.com
- Michael K Sugar    msugar@irell.com
- Cathy Ta    cathy.ta@bbklaw.com, Arthur.Johnston@bbklaw.com;Kenneth.Burgess@bbklaw.com
- David A Tilem    davidtilem@tilemlaw.com,
  malissamurguia@tilemlaw.com;dianachau@tilemlaw.com;kmishigian@tilemlaw.com
- James E Till    jtill@thelobelfirm.com, jmattiace@thelobelfirm.com;pnelson@thelobelfirm.com
- United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov
- Carol G Unruh    cgunruh@sbcglobal.net

- Annie Verdries     verdries@lbbslaw.com
- Jason Wallach     jwallach@gladstonemichel.com
- Joshua D Wayser     , kim.johnson@kattenlaw.com
- Christopher T Williams     ctwilliams@venable.com, jcontreras@venable.com
- Marc J Winthrop     mwinthrop@winthropcouchot.com, pj@winthropcouchot.com
- David M Wiseblood     dwiseblood@seyfarth.com
- Brett K Wiseman     bwiseman@aalaws.com
- Dean A Ziehl     dziehl@pszjlaw.com, dziehl@pszjlaw.com
- Marc A. Zimmerman     joshuasdaddy@att.net