PACHULSKI STANG ZIEHL & JONES LLP
Richard M. Pachulski (CA Bar No. 90073)
Dean A. Ziehl (CA Bar No. 84529)
Robert B. Orgel (CA Bar No. 101875)
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 11th Floor
Los Angeles, California  90067-4100
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760

WEIL, GOTSHAL & MANGES LLP
Edward Soto (admitted *pro hac vice*)
1395 Brickell Avenue, Suite 1200
Miami, FL 33131
Telephone:  (305) 577-3125
Facsimile:  (305) 374-7159

Attorneys for Lehman Commercial Paper Inc., Lehman ALI, Inc.,
Northlake Holdings, LLC and OVC Holdings, LLC

# UNITED STATES BANKRUPTCY COURT
# CENTRAL DISTRICT OF CALIFORNIA
# SANTA ANA DIVISION

In re:

Palmdale Hills Property, LLC, and its Related Debtors,

Jointly Administered Debtors
and Debtors-In-Possession

Affects:
☐ All Debtors
☑ Palmdale Hills Property, LLC
☑ SunCal Beaumont Heights, LLC
☐ SCC/Palmdale, LLC
☑ SunCal Johannson Ranch, LLC
☑ SunCal Summit Valley, LLC
☑ SunCal Emerald Meadows LLC
☑ SunCal Bickford Ranch, LLC
☑ Acton Estates, LLC
☑ Seven Brothers LLC
☑ SJD Partners, Ltd.
☐ SJD Development Corp.
☑ Kirby Estates, LLC
☐ SunCal Communities I, LLC
☐ SunCal Communities III, LLC
☑ SCC Communities LLC
☑ North Orange Del Rio Land, LLC
☑ Tesoro SF, LLC
☑ LB-L-SunCal Oak Valley, LLC
☑ SunCal Heartland, LLC
☑ LB-L-SunCal Northlake, LLC
☑ SunCal Marblehead, LLC
☑ SunCal Century City, LLC
☑ SunCal PSV, LLC
☑ Delta Coves Venture, LLC
☑ SunCal Torrance, LLC
☑ SunCal Oak Knoll, LLC

Case No.: 8:08-bk-17206-ES
Chapter 11
Jointly Administered Case Nos.

8:08-bk-17209-ES; 8:08-bk-17240-ES;
8:08-bk-17224-ES; 8:08-bk-17242-ES;
8:08-bk-17225-ES; 8:08-bk-17245-ES;
8:08-bk-17227-ES; 8:08-bk-17246-ES;
8:08-bk-17230-ES; 8:08-bk-17231-ES;
8:08-bk-17236-ES; 8:08-bk-17248-ES;
8:08-bk-17249-ES; 8:08-bk-17573-ES;
8:08-bk-17574-ES; 8:08-bk-17575-ES;
8:08-bk-17404-ES; 8:08-bk-17407-ES;
8:08-bk-17408-ES; 8:08-bk-17409-ES;
8:08-bk-17458-ES; 8:08-bk-17465-ES;
8:08-bk-17470-ES; 8:08-bk-17472-ES;
and 8:08-bk-17588-ES

**OBJECTION OF LEHMAN
COMMERCIAL PAPER INC., LEHMAN
ALI, INC., NORTHLAKE HOLDINGS,
LLC AND OVC HOLDINGS, LLC TO
DISCLOSURE STATEMENTS
DESCRIBING CHAPTER 11 PLANS
FILED BY SUNCAL PLAN PROPONENTS
[GROUPS I - IV DEBTORS]**

Disclosure Statement Hearing:
Date:   May 13, 2011
Time:   9:30 a.m.
Place:  Courtroom 5A
        411 West Fourth Street
        Santa Ana, CA  92701

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

# TABLE OF CONTENTS

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**Page No.**

I. PRELIMINARY STATEMENT ................................................................................................. 3

II. STATEMENT OF RELEVANT FACTS .................................................................................. 11

   A.   The Lehman Creditors' Claims ........................................................................................ 11

   B.   The Lehman Adversary Proceeding .................................................................................. 11

   C.   The Plans, Disclosure Statements & Related Filings ....................................................... 13

III. DISCUSSION ........................................................................................................................ 19

   A.   The SunCal Discos Should Not Be Approved Because the SunCal Plans are Patently Unconfirmable ................................................................................................................. 19

      1.   The SunCal Plans Violate 11 U.S.C. § 1129(a)(9) ........................................................ 20

      2.   The Litco Offer in the SunCal Plan (Group I) is Unfair, Involves Improper Solicitation of Votes, and Results in Unequal Treatment of Class 5 Claims .................. 21

      3.   The SunCal Plans are Not Feasible .............................................................................. 22

      4.   The SunCal Plans' Treatment of Secured Claims is Unconfirmable .............................. 23

      5.   The SunCal Plans' Treatment of the Lehman Creditors' Claims is Unconfirmable ........ 24

         a.   Recoupment is not an Alternative Means of Accomplishing Equitable Subordination 24

         b.   The Creation of Priming Liens Precludes the Lehman Creditors From Receiving the Indubitable Equivalent of their Claims ..................................................................... 25

         c.   The Proposed Sales and Bidding Procedures are Improper, Unfair, and Tainted ........ 27

         d.   Prohibiting All Credit Bidding Is Unnecessary and Impermissible ............................ 35

         e.   The SunCal Plans propose to Improperly Strip the Lehman Creditors of Recourse Claims against the Plan Trust ................................................................................... 39

         f.   The SunCal Plans Must Provide Disputed Claims Reserves for Unsecured Claims .... 40

      6.   The SunCal Plans Violate the Absolute Priority Rule .................................................. 40

      7.   The Appointment of Acquisitions as the Plan Trustee Violates Bankruptcy Code Section 1129(a)(5)(A)(II) ........................................................................................... 42

      8.   The SunCal Plans Violate the Best Interest of Creditors Test ...................................... 42

   B.   The SunCal Discos Do Not Contain Adequate Information Pursuant to Section 1125 of the Bankruptcy Code ...................................................................................................... 44

      1.   The SunCal Proponents' Disclosure Concerning the Costs, Uncertainties, Merits and Effect of the Lehman Adversary Proceeding is Inadequate .......................................... 45

      2.   Inadequate Information is Provided regarding the Litco Offer in the SunCal Plan (Group I) ................................................................................................................... 47

      3.   The SunCal Discos Do Not Fully or Fairly Present Likely Distributions under the SunCal Plans or the Timing of Any Such Distributions ................................................ 48

      4.   The SunCal Discos Lack Adequate Information Concerning the Necessity, Availability and Effect of Partial Substantive Consolidation ........................................ 49

      5.   The Sales and Bidding Procedures Are Vague and Confusing ...................................... 50

6.  The SunCal Discos Lack Adequate Information Concerning the Best Interests of
    Creditors Test and Alternatives .......................................................................................... 50

7.  The SunCal Discos Do Not Provide Adequate Information Concerning Acquisitions'
    Conflicts of Interest and the General Release Being Granted to Acquisitions and its
    Affiliates ............................................................................................................................ 50

8.  The SunCal Discos Lack Adequate Information Regarding Feasibility, Including the
    Financial Wherewithal of Acquisitions .............................................................................. 51

IV. CONCLUSION ....................................................................................................................... 53

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

# TABLE OF AUTHORITIES

**Page No.**

## Cases

*Aetna Realty Inv., Inc. v. Monarch Beach Venture, Ltd. (In re Monarch Beach Venture, Ltd.)*
166 B.R. 428 (C.D. Cal. 1993) ............................................................... 34, 35

*Bank of New York Trust Co., et al. v. Official Unsecured Creditors' Committee, et al. (In re The Pacific Lumber Co., et al.)*
584 F.3d 229 (5th Cir. 2009) ..................................................................... 35

*Bank of Nova Scotia v. St. Croix Hotel Corp. (In re St. Croix Hotel Corp.)*
44 B.R. 277 (D.V.I. 1984) ........................................................................ 36

*Benjamin v. Diamond (In re Mobile Steel Co.)*,
563 F.2d 692, 699-700 (5th Cir. 1977) ..................................................... 43

*Bonner Mall P'ship v. U.S. Bancorp Mortgage Co. (In re Bonner Mall P'ship)*
2 F.3d 899 (9th Cir. 1993) ......................................................................... 38

*Calpine Corp. v. O'Brien Env't Energy, Inc. (In re O'Brien Env't Energy, Inc.)*
181 F.3d 527 (3d Cir. 1999) ...................................................................... 32

*Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Systems Corp.)*
432 F.3d 448 (3d Cir. 2006) ...................................................................... 36

*Crestar Bank v. Walker (In re Walker)*,
165 B.R. 994 (E.D. Va. 1994) ................................................................... 48

*Eastern Maine Elec. Co-op., Inc.,\*
125 B.R. 329 (Bankr. D. Me. 1991) .......................................................... 19

*Feder v. Lazar (In re Lazar)*,
83 F.3d 306 (9th Cir. 1996) ....................................................................... 43

*Gey Assocs. G.P. v. 310 Assocs., L.P.*
2002 WL 31426344, at *2, 2002 U.S. Dist. LEXIS 20759, at * 5 (S.D.N.Y. Oct. 29, 2002) ..... 32

*Great Western Bank v. Sierra Woods Group*
953 F.2d 1174 (9th Cir. 1992) ................................................................... 23

*Henry v. Lehman Commercial Paper, Inc. (In re First Alliance Mortgage Co.)*,
471 F.3d 977 (9th Cir. 2006) ..................................................................... 43

*In re 266 Washington Assocs.*,
141 B.R. 275 (Bankr. E.D.N.Y.), *aff'd*, 147 B.R. 827 (E.D.N.Y. 1992) ................. 19

*In re 995 Fifth Ave. Assocs.*
96 B.R. 24 (Bankr. S.D.N.Y. 1989) ........................................................... 31

*In re Adelphia Communications Corp.*
361 B.R. 337 (S.D.N.Y. 2007) ................................................................... 21

*In re Allied Gaming Mgmt., Inc.*,
209 B.R. 201 (Bankr. W.D. La. 1997) ....................................................... 19

*In re America West Airlines, Inc.*
166 B.R. 908 (Bankr. D. Ariz. 1994) .................................................... 31, 32

*In re American Appliance*
272 B.R. 587 (Bankr. D. N.J. 2002) ........................................................... 32

*In re APP Plus, Inc.*
223 B.R. 870 (Bankr. E.D.N.Y. 1998) ....................................................... 31

*In re Applegate Prop., Ltd.*,
133 B.R. 827 (Bankr. W.D. Tex. 1991) ...................................................... 41

*In re Atlanta West VI*,
91 B.R. 620 (Bankr. N.D. Ga. 1988) .......................................................... 19

*In re Beyond.com Corp.*,
289 B.R. 138 (Bankr. N.D. Cal. 2003) ....................................................... 19

*In re Bonham*
229 F.3d 750 (9th Cir. 2002) ..................................................................... 46

*In re Brotby*
303 B.R. 177 (B.A.P. 9th Cir. 2003) .......................................................... 21

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

*In re Cell Net Data Systems, Inc.*
Case No. 00–844(PJW) (Bankr. D. Del. 2000) ...................................... 31

*In re Crowthers McCall Pattern, Inc.*
114 B.R. 877 (Bankr. S.D.N.Y. 1990) ............................................... 31

*In re Dakota Rail, Inc.*,
104 B.R. 138 (Bankr. D. Minn. 1989) ............................................... 43

*In re Drexel Burnham Lambert Group, Inc.*
113 B.R. 830 (Bankr. S.D.N.Y. 1990) ............................................... 24

*In re Fabricators*
926 F.2d 1458 (5th Cir. 1991) ..................................................... 43

*In re Felicity Assocs., Inc.*,
197 B.R. 12 (Bankr. D.R.I. 1996) .................................................. 19

*In re Genicom*
Case No. 00-1383(PJW) (Bankr. D. Del. 2000) ...................................... 31

*In re Heartland Chemicals, Inc.*
136 B.R. 503 (Bankr. C.D. Ill. 1992) .............................................. 43

*In re Hupp Industries, Inc.*
140 B.R. 191 (Bankr. N.D. Ohio 1992) .............................................. 31

*In re Integrated Resources, Inc.*
147 B.R. 650 (S.D.N.Y. 1992) .................................................. 31, 32

*In re Kidron, Inc.*
278 B.R. 626 (Bankr. M.D. Fla. 2002) .............................................. 31

*In re Kings Terrance Nursing Home and Health Related Facility*
184 B.R. 200 (S.D.N.Y. 1995) ..................................................... 24

*In re Lamb*
No. 96-1-1099-DK, 2002 WL 31508913 (Bankr. D. Md. Oct. 11, 2002) .................. 31

*In re Lionel Corp.*
722 F.2d 1063 (2d Cir. 1983) ...................................................... 31

*In re Madigan*
270 B.R. 749 (B.A.P. 9th Cir. 2001) ............................................... 24

*In re Miami General Hospital, Inc.*
81 B.R. 682 (S.D. Fla. 1988) ...................................................... 36

*In re Octagon Roofing*
123 B.R. 583 (Bankr. N.D. Ill. 1991) .............................................. 36

*In re Penn Corp Financial Group, Inc.*
Case No. 00–888(PJW) (Bankr. D. Del. 2000) ....................................... 31

*In re Perez*,
30 F.3d 1209 (9th Cir. 1994) ...................................................... 42

*In re Philadelphia Newspapers, LLC*
599 F.3d 298 (3d Cir. 2010) ....................................................... 35

*In re S.N.A. Nut Co.*
186 B.R. 98 (Bankr. N.D. Ill. 1995) ............................................... 31

*In re Smith*
123 B.R. 863 (Bankr. C.D. Cal. 1991) .............................................. 21

*In re SunCruz Casinos, LLC*
298 B.R. 833 (Bankr. S.D. Fla. 2003) .............................................. 34

*In re Twenver, Inc.*
149 B.R. 954 (Bankr. D. Colo. 1992) ............................................... 31

*In re United States Brass Corp.*,
194 B.R. 420 (Bankr. E.D. Tex. 1996) .............................................. 41

*In re Westgate California Corp.*
642 F.2d 1174 (9th Cir. 1981) ..................................................... 43

*John Hancock Mutual Life Insurance Co. v. California Hancock, Inc.*
*(In re California Hancock, Inc.)*
88 B.R. 226 (B.A.P. 9th Cir. 1988) ............................................ 34, 35

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

*Liberty Nat'l Enters. v. Ambanc La Mesa Ltd. P'ship*
   (*In re Ambanc La Mesa Ltd. P'ship*)
   115 F.3d 650 (9th Cir. 1997), *cert. denied*, 522 U.S. 1110 (1998)..............................................38
*Matter of Bird Engineering, Inc.*
   47 B.R. 193 (Bankr. D. Neb. 1985) ....................................................................43
*New York State Elec. And Gas Corp. v. McMahon (In re McMahon)*
   129 F.3d 93 (2d Cir. 1997) ....................................................................24
*Newbery Corporation v. Fireman's Fund Insurance*
   95 F.3d 1392 (9th Cir. 1996) ....................................................................24
*S&P, Inc. v. Pfeifer*
   189 B.R. 173 (N.D. Ind. 1995), *aff'd*, 78 F.3d 587 (7th Cir. 1996)..........................................48
*Stoombus v. Kilimnik*
   988 F.2d 949 (9th Cir. 1993) ....................................................................43
*Westinghouse Credit Corp. v. D'Urso*
   278 F.3d 138 (2d Cir. 2002) ....................................................................24

**Statutes**
11 U.S.C. § 363....................................................................22, 31, 32
11 U.S.C. § 502(b)(1) ....................................................................24
11 U.S.C. § 510(c) ....................................................................24
11 U.S.C. § 1111(b) ....................................................................37
11 U.S.C. § 1125(a)(1) ....................................................................41
11 U.S.C. § 1129(a)(7)(A)(ii) ....................................................................40
11 U.S.C. § 1129(b) ....................................................................23
11 U.S.C. § 1129(b)(2)(A) ....................................................................35
11 U.S.C. § 1129(a)(5)(A)(II) ....................................................................39
Bankruptcy Code § 363(b) ....................................................................26
Bankruptcy Code § 364(d) ....................................................................25
Bankruptcy Code § 1123(a)(4) ....................................................................21
Bankruptcy Code § 1125 ....................................................................26
Bankruptcy Code § 1129(a)(3) ....................................................................26
Bankruptcy Code § 1129(a)(9)(A)....................................................................6, 8
Bankruptcy Code § 1129(a)(11) ....................................................................48
Bankruptcy Code § 1129(b)(2) ....................................................................38
Bankruptcy Code § 1129(b)(2)(A)(iii)....................................................................34, 35

**Other Authorities**
COLLIER ON BANKRUPTCY at ¶1129.03[11] (15th Ed. 1997)....................................................................48
COLLIER ON BANKRUPTCY at ¶510.02[3] (16th Ed. 2010) ....................................................................24

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1  **TO THE HONORABLE ERITHE A. SMITH, UNITED STATES BANKRUPTCY JUDGE,**

2  **AND ALL CREDITORS AND OTHER PARTIES IN INTEREST HEREIN:**

3      Lehman Commercial Paper, Inc. ("LCPI"), Lehman ALI, Inc. ("ALI"), Northlake Holdings,

4  LLC ("Northlake Holdings"), and OVC Holdings, LLC ("OVC Holdings" and, collectively, with

5  LCPI, ALI and Northlake Holdings, the "Lehman Creditors")[1] hereby file this objection (the

6  "Objection") to the following four disclosure statements (the "SunCal Discos") filed in support of,

7  and describing, the following four plans (the "SunCal Plans"), filed by SCC Acquisitions, Inc.

8  ("Acquisitions") and the Voluntary Debtors,[2] as plan proponents (the "SunCal Proponents"):

9      (1) Four Debtors:  Palmdale Hills Property LLC, SunCal Bickford Ranch, LLC, SunCal

10  Marblehead, LLC and SunCal PSV, LLC (the "Group I Debtors"):

11      a.  The *Disclosure Statement Describing Chapter 11 Plan Filed by SunCal Plan*

12  *Proponents in the Chapter 11 Cases of Palmdale Hills Property LLC, SunCal Bickford Ranch, LLC,*

13  *SunCal Marblehead, LLC and SunCal PSV, LLC [Group I Debtors]* (the "SunCal Disco (Group I)");

14  and

15      b.  The *Chapter 11 Plan Filed by SunCal Plan Proponents in the Chapter 11*

16  *Cases of Palmdale Hills Property LLC, SunCal Bickford Ranch, LLC, SunCal Marblehead, LLC and*

17  *SunCal PSV, LLC [Group I Debtors]* (the "SunCal Plan (Group I)");

18      (2) Six Debtors:  Acton Estates, LLC, SunCal Emerald Meadows, LLC, Delta Coves

19  Venture, LLC, SunCal Heartland, LLC and LBL-SunCal Northlake, LLC and LBL-SunCal Oak

20  Valley, LLC (the "Group II Debtors"):

21      a.  The *Disclosure Statement Describing Chapter 11 Plan Filed by SunCal Plan*

22  *Proponents in the Chapter 11 Cases of Acton Estates, LLC, SunCal Emerald Meadows, LLC, Delta*

---

[1]  The Lehman Creditors are filing this Objection in their own capacities as lenders as well as in their capacities as agents under the Lehman Loans (defined below).

[2]  The "Voluntary Debtors" in these cases are those for which the debtors remain debtors-in-possession and are as follows: Palmdale Hills Property, LLC (Main Case) (Case No. 8:08-17206-ES); Acton Estates LLC (Case No. 8:08-17236-ES); Kirby Estates, LLC (Case No. 8:08-17246-ES); North Orange Del Rio (Case No. 8:08-17574-ES); SCC Communities, LLC (Case No. 8:08-17573-ES); SCC/Palmdale, LLC (Case No. 8:08-17224-ES); Seven Brothers, LLC (Case No. 8:08-17240-ES); SJD Development Corp. (Case No. 8:08-17245-ES); SJD Partners, Ltd. (Case No. 8:08-17242-ES); SunCal Beaumont Heights, LLC (Case No. 8:08-17209-ES); SunCal Bickford Ranch LLC (Case No. 8:08-17231-ES); SunCal Communities I, LLC (Case No. 8:08-17248-ES); SunCal Communities III, LLC (Case No. 8:08-17249-ES); SunCal Emerald Meadows LLC (Case No. 8:08-17230-ES); SunCal Johannson Ranch, LLC (Case No. 8:08-17225-ES); SunCal Summit Valley LLC (Case No. 8:08-17227-ES); and Tesoro SF, LLC (Case No. 8:08-17575-ES).

1    *Coves Venture, LLC, SunCal Heartland, LLC and LBL-SunCal Northlake, LLC and LBL-SunCal*

2    *Oak Valley, LLC [Group II Debtors]* (the "SunCal Disco (Group II)"); and

3           b.    The *Chapter 11 Plan Filed by SunCal Plan Proponents in the Chapter 11*

4    *Cases of Acton Estates, LLC, SunCal Emerald Meadows, LLC, Delta Coves Venture, LLC, SunCal*

5    *Heartland, LLC and LBL-SunCal Northlake, LLC and LBL-SunCal Oak Valley, LLC [Group II*

6    *Debtors]* (the "SunCal Plan (Group II)");

7         (3)  Six Debtors:  SunCal Beaumont Heights, LLC, SunCal Johannson Ranch, LLC,

8    SunCal Summit Valley, LLC, Seven Brothers, LLC, Kirby Estates, LLC and SunCal Century City,

9    LLC (the "Group III Debtors"):

10           a.    The *Disclosure Statement Describing Chapter 11 Plan Filed by SunCal Plan*

11    *Proponents in the Chapter 11 Cases of SunCal Beaumont Heights, LLC, SunCal Johannson Ranch,*

12    *LLC, SunCal Summit Valley, Seven Brothers, LLC, Kirby Estates, LLC and SunCal Century City,*

13    *LLC [Group III Debtors]* (the "SunCal Disco (Group III)"); and

14           b.    The *Chapter 11 Plan Filed by SunCal Plan Proponents in the Chapter 11*

15    *Cases of SunCal Beaumont Heights, LLC, SunCal Johannson Ranch, LLC, SunCal Summit Valley,*

16    *Seven Brothers, LLC,  Kirby Estates, LLC and SunCal Century City, LLC [Group III Debtors]* (the

17    "SunCal Plan (Group III)"); and

18         (4)  Six Debtors:  SJD Partners, Ltd., SCC Communities, LLC, North Orange Del Rio

19    Land, LLC, Tesoro SF LLC, SunCal Torrance, LLC, and SunCal Oak Knoll, LLC (the "Group IV

20    Debtors"):

21           a.    The *Disclosure Statement Describing Chapter 11 Plan Filed by SunCal Plan*

22    *Proponents in the Chapter 11 Cases of SJD Partners, Ltd., SCC Communities, LLC, North Orange*

23    *Del Rio Land, LLC, Tesoro SF LLC, SunCal Torrance, LLC, and SunCal Oak Knoll, LLC [Group IV*

24    *Debtors]* (the "SunCal Disco (Group IV)"); and

25           b.    The *Chapter 11 Plan Filed by SunCal Plan Proponents in the Chapter 11*

26    *Cases of SJD Partners, Ltd., SCC Communities, LLC, North Orange Del Rio Land, LLC, Tesoro SF*

27    *LLC, SunCal Torrance, LLC, and SunCal Oak Knoll, LLC [Group IV Debtors]* (the "SunCal Plan

28    (Group IV)").

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    In support of the Objection, the Lehman Creditors respectfully submit as follows:[3]

2    **I.**

3    **PRELIMINARY STATEMENT**

4    As in the case of the prior iterations of the SunCal Plans, the SunCal Plans are structured as

5    liquidation plans with creditor recoveries premised on continued litigation with the Lehman

6    Creditors.  They contain a variety of illegal and impermissible variations and remain ambiguous,

7    incomplete and unconfirmable on their face.[4]  Accordingly, resources should not be wasted by

8    permitting solicitation for patently defective plans. Moreover, because the SunCal Discos are

9    materially inaccurate, misleading, one-sided and incomplete, the Court should deny their approval in

10    their current forms.

11    The SunCal Plans are similar to the SunCal Proponents' prior plans in providing procedures

12    for sales of Projects that are unfair, improper and among the host of provisions directly affecting the

13    objecting Lehman Creditors which, separately and in aggregate, fail to afford the Lehman Creditors

14    with the "indubitable equivalent" of their secured claims.  Whereas a prior SunCal plan proposed a

15    sale of certain Projects to D.E. Shaw at substantially under-market prices, but under terms that would

16    relieve Elieff and Acquisitions of their personal liability under various indemnity agreements given

17    in favor of the Bond Issuers through an assumption by D.E. Shaw of such indemnity obligations, the

18    SunCal Plans now, instead, say nothing about potential buyers or terms of sale, but leave

19    Acquisitions broad discretion such that the Lehman Creditors fear that Project sales under the

20    SunCal Plans again will have inappropriate terms that inure to the Lehman Creditors' detriment and

21    to the benefit of SunCal and Elieff.

22    The Lehman Creditors are offering other creditors a fair, alternative to the continued

23    litigation proposed by the SunCal Plans through the two plans proposed by the Lehman Creditors

24

25    _____
[3] Capitalized terms used herein that are not defined herein typically refer to defined terms in the SunCal Plans and
26    SunCal Discos.

[4] The SunCal Discos and SunCal Plans aggregate approximately 488 pages. Thus, the Lehman Creditors expressly
27    reserve their rights to supplement and amend this Objection, seek discovery with respect to same, and introduce
evidence at any hearing relating to this Objection or to consider the SunCal Discos, and without in any way limiting
28    any other rights that the Lehman Creditors may have. The Lehman Creditors also expressly reserve their rights to
object to confirmation of the SunCal Plans on any grounds, as may be appropriate.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    and/or Steven M. Speier, as the chapter 11 trustee (the "Trustee") for the Trustee Debtors[5] (the

2    "Lehman/Trustee Plans").[6]  If the Lehman/Trustee Plans are fairly presented and still rejected, a

3    litigation alternative remains even if no SunCal Plans are confirmed.  If, however, the litigation

4    alternative is to be structured through the SunCal Plans, those plans would require a significant

5    number of material modification:

6        (1)    Modifications are needed to ensure a fair, open, court-supervised Project sales

7    process, run by an independent trustee:

8            a.    For the Group I Debtors, Group II Debtors and Group IV Debtors, the

9    Lehman Creditors are the only parties who have a clear economic motivation to see a maximum

10    price achieved for the Projects.  Project prices are likely, in all events, to cover the amounts owed to

11    holders of Reliance Claims (who would benefit from, *inter alia,* any equitable subordination of the

12    Lehman Creditors' claims).  Because the secured claims of the Lehman Creditors either would come

13    ahead of Reliance Claims (absent equitable subordination) or immediately behind Reliance Claims

14    (if any equitable subordination were granted), and because the debt owed to the Lehman Creditors

15    far exceeds any possible Project sale prices, the Lehman Creditors likely would be the sole

16    beneficiaries of achieving maximum prices and the sole parties harmed if less is paid.[7]

17            b.    The SunCal Plans do not appear to contemplate court supervision of

18    the "public auctions" to be conducted by Acquisitions, an entity wholly owned by Elieff, as Plan

19    Trustee.  Moreover, the SunCal Plans afford the SunCal Proponents broad discretion in qualifying

20    bidders, selecting the terms of any stalking horse bid, selecting a stalking horse bidder (to receive a

---

21    [5]  The "Trustee Debtors" in these cases are those for which a chapter 11 trustee was appointed and are as follows:
SunCal Heartland, LLC (Case No. 8:08-17407-ES); LB-L-SunCal Northlake, LLC (Case No. 8:08-17408-ES);
22    SunCal Marblehead, LLC (Case No. 8:08-17409-ES); SunCal Century City, LLC (Case No. 8:08-17458-ES); SunCal
PSV, LLC (Case No. 8:08-17465-ES); Delta Coves Venture, LLC (Case No. 8:08-17470-ES); SunCal Torrance, LLC
23    (Case No. 8:08-17472-ES); LB-L SunCal Oak Valley LLC (Case No. 8:08-17404-ES); and SunCal Oak Knoll, LLC
(Case No. 8:08-17588-ES).

24    [6] The SunCal Plans are for 22 Debtors and the Leham/Trustee Plans are for 19 Debtors, of which 18 overlap. The
Lehman/Trustee Plans include SunCal I as a debtor, which is not included in the SunCal Plans. SunCal I owns no
25    Projects but owns interests in other Debtors, which interests were pledged to the Lehman Creditors. The SunCal Plans
include Del Rio (no Project), SJD Partners (Pacific Point Project – Lehman Re primary lender), SunCal Century City
26    (no Project; lender was Danske Bank) and SunCal Emerald (senior lender foreclosing; land swap creditors disputing
ownership issues), which are not Debtors included in the Lehman/Trustee Plans.

27    [7] For Group III Debtors, (a) holders of General Unsecured Claims may be interested in maximizing sales proceeds
because the Lehman Creditors have no liens on those Projects (and their values may be close to or less than the
28    amount owed to unsecured creditors); and (b) the Lehman Creditors hold pledges of the interests therein and thus have
an interest in ensuring that there is residual proceeds from the sales after payment of creditors.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

substantial break-up fee) and otherwise running and controlling the sales process for Projects.

        c.     Yet, as noted above, <u>SunCal lacks an economic interest in achieving the highest and best price</u>. Moreover, <u>SunCal has a substantial conflict</u>. SunCal and its principals would be benefited by trading a lower purchase price for sale of the Projects in exchange for either or both: (i) a buyer agreeing to assume or eliminate Elieff's and Acquisitions' Bond Issuer indemnification obligations; and (ii) a buyer agreeing to use and/or partner with SunCal, as developer or manager, to develop and/or manage the Projects.[8]

        d.     An independent trustee should run the sale process; and there should be court supervision of the auction and bidding to ensure:  (i) an appropriate stalking horse selection process; (ii) detailed, fair and appropriate bid procedures; (iii) that deposits are placed into a safe, segregated escrow or account subject to court oversight and are returned promptly after a bidder's bid is rejected; and (iv) that a separate form of order authorizing each sale would be circulated and subject to approval by the Court to facilitate the insuring of title in connection with each conveyance.

    (2)    So long as the Lehman Creditors' claims may be subordinated and thus junior to any other creditors' claims, <u>the Lehman Creditors must be afforded (and the SunCal Plans modified to provide the Lehman Creditors) an ability to object to claims</u>.  The SunCal Plans would vest all ability to object to claims in SunCal (and the Committees as to SunCal's claims).  Yet, just as (and for the same reasons that) the Lehman Creditors are the only parties with a clear economic interest in maximizing Project sale proceeds, they also are the only parties with a clear economic interest in objecting to inappropriate or invalid claims.

    (3)    <u>Plan modifications are needed to ensure that distributions are handled by an independent trustee</u>.  If any SunCal Plans are confirmed and a Project is sold, substantial funds would need to be escrowed and held pending the outcome of the Lehman Adversary Proceeding. Having SunCal, the protagonist in the Lehman Adversary Proceeding, hold for later distribution the

---

[8] SunCal (through its principals) is apparently attempting to remain in the business of developing and managing real property or partnering to own real property for development. As the Court is aware, SunCal participated in making the successful bid in an auction conducted by the trustee in other cases pending before this Court for other debtors affiliated with SunCal.

1    sale proceeds is inappropriate.

2    (4)    <u>Plan modifications must provide for payment in cash of administrative and priority</u>

3    <u>claims on their real effective date, when any material terms of the SunCal Plans go into effect</u>. The

4    SunCal Plans violate Bankruptcy Code § 1129(a)(9)(A) in several respects as more fully discussed

5    below.

6    The SunCal Discos also would need substantial revision.  Presently, they utterly fail to

7    provide creditors will full and fair information regarding SunCal's alternative litigation plans.

8    Moreover, as to the SunCal Plan (Group I), if the SunCal Proponents are serious about providing a

9    plan a cash-out offer for one or another formulation of "Reliance Claims," then it is essential that

10    they provide full information regarding the financial capabilities of the SunCal Proponents and any

11    proposed claims purchaser.

12    The SunCal Plans, as crafted, however, presently appear structured as little more than a

13    strategic effort by Bruce Elieff, SunCal's primary principal, to achieve his apparent personal goals:

14    (a) avoiding substantial indemnity liability to the Bond Issuers and, perhaps, (b) obtaining some

15    future profit from managing development of the Projects by enabling Project sales only to a buyer

16    who either or both (i) would assume or eliminate Elieff's and Acquisitions' Bond Issuer

17    indemnification obligations or (ii) select SunCal to use and/or partner with, as developer or manager,

18    to develop and/or manage the Projects.  This is particularly inappropriate because Elieff's equity

19    interests in the Voluntary Debtors and Trustee Debtors (collectively, the "<u>Debtors</u>") held through

20    Acquisitions, appear to be, in all events, worthless.

21    To achieve Elieff's strategic ends, SunCal chooses to cripple its own plan with a 'wish list'

22    of unconfirmable provisions.[9]  Among them, Elieff and Acquisitions, as the Plan Trustee, propose to

23    exercise almost unfettered control of Project sales[10] and, presumably, in similar fashion to the prior

24    sale that they had claimed to have arranged with D.E. Shaw, they can attempt to arrange sales to a

25    buyer who will assume or eliminate Elieff's and Acquisitions' Bond Issuer indemnity obligations

26
_____

27    [9] See attached Exhibit "A," which is a chart with comments and objections to the SunCal Disco (Group I) and plan
embodied therein, most of which comments and objections are generally applicable to all of the SunCal Discos and
SunCal Plans.

28    [10] Although the SunCal Plan includes proposed sale/bidding procedures, they are incomplete and unclear, leaving
substantial discretion to the Acquisitions in respect to potential sales.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

and/or agree to use and/or partner with SunCal to develop and/or manage the Projects.  While the benefits to SunCal and Elieff of liability relief and a role in the development or upside of the Projects would be immediate upon the SunCal Plans' Effective Date, creditors, on the other hand, are relegated to receiving a recovery (or not) from the outcome of the Lehman Adversary Proceeding.

Fundamentally, SunCal is just offering creditors the possibility of receiving net proceeds from highly speculative litigation that would take years to resolve even with immediate relief from the stay (the "Lehman Stay") in the chapter 11 case of LCPI,[11] while the Lehman Creditors for 19 Debtors (with the Trustee, as to eight Trustee Debtors) are proposing under the Lehman/Trustee Plans immediate payment of 40-50 cents on the dollar to accepting creditors that are beneficiaries of the equitable subordination claims. Critically, there is completely inadequate disclosure in the SunCal Discos regarding the financial problems of Plan Sponsor, Acquisitions, the estimated timing and speculative nature of the litigation and potential outcome for creditors if it fails, and Acquisitions' conflicting economic interests that might affect its funding of the litigation after the Effective Date.

In the SunCal Plan (Group I), lip service is paid to cashing out sooner those specified Group I Debtors' Reliance Claimants, identified in Exhibit 8 to the SunCal Disco (Group I), who vote in favor of the SunCal Plan (Group I), through a "right to sell" to a new "Litco" for 55% of the eventually allowed amount of their claims (the "Litco Offer").  The Litco Offer is unfunded, illusory and unfair, and impermissibly affords unequal, less favorable treatment to Class 5 creditors who vote to reject the SunCal Plan (Group I).  No information whatsoever is provided regarding the ownership of Litco or its financial wherewithal and there is no indication that it is or will be contractually bound to fund the Litco Offer.

The SunCal Discos fail to point out that SunCal's economic interest in pursuing and funding the Lehman Adversary Proceeding likely would be diminished once the Project sales, to be controlled by Elieff, are concluded and Elieff has been released from liability to the Bond Issuers and has or has not secured a position as developer/manager of the Projects.  Moreover, the Lehman

---

[11] LCPI is a debtor and debtor in possession in pending chapter 11 cases jointly administered under Case No. 08-13555 (JMP) in the New York Bankruptcy Court.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Adversary Proceeding is the lynchpin of the SunCal Plans. Yet, importantly, the SunCal Discos do not clearly disclose to creditors either SunCal's limited interest in that proceeding or that absent success with respect to the Lehman Adversary Proceeding, general unsecured creditors of all but four Debtors[12] are unlikely to receive any distributions under the SunCal Plans. This circumstance would persist even ignoring the filing of the competing Lehman/Trustee Plans offering creditors immediate payments. With the pendency of these Lehman/Trustee Plans, however, this omission from the SunCal Discos is striking.  Instead, SunCal obliquely refers to the Lehman/Trustee Plans by suggesting that, for creditors to benefit from them, creditors would need to, and cannot, trust the Lehman Creditors.  The failure of SunCal to acknowledge that the Lehman/Trustee Plans offer a relatively, straightforward 40 to 50% recovery to creditors holding "Reliance Claims" as an alternative to continued litigation is a fatal omission.

Soliciting votes pursuant to the SunCal Discos also is pointless due to the failure of the SunCal Plans to provide for permissible treatment of administrative and priority claims. Bankruptcy Code § 1129(a)(9)(A) mandates that payment of administrative and priority claims in cash in full on the effective date.  This treatment also must be afforded to the Lehman Administrative Loans. SunCal seeks to confirm plans for 22 debtors as they litigate with the Lehman Creditors, but violates Bankruptcy Code § 1129(a)(9)(A) by:  (a) leaving open the possibility of non-cash payment of the Lehman Creditors' administrative claim; (b) delaying payment of all parties' administrative and priority claims until long after the plan actually is "effective;" and (c) proposing, on the delayed effective date, to pay administrative and priority claims of the non-Lehman Creditors from proceeds of the Lehman Creditors' collateral, without ever getting relief from the Lehman Stay to prosecute their equitable subordination claims.  Each of these efforts fails to comport with the strict mandates of Bankruptcy Code § 1129(a)(9)(A) and must cause the SunCal Plans to fail:

a)    The SunCal Plans frivolously provide that all of the Lehman Creditors' administrative claims are disputed, including the millions in superpriority, secured administrative claims already

---

[12] The Lehman Creditors do not hold direct prepetition liens or prepetition claims against Kirby Estates, Seven Brothers, SunCal Beaumont, or SunCal Johannson and believe these entities may be solvent, depending on the extent of non-Lehman Creditor claims.

1   allowed by final court orders. *See, e.g.*, SunCal Disco (Group I), § 2.1.71, p. 14.[13]  They also

2   provide that each Plan Trust's obligation to pay the Lehman Creditors for their administrative claims

3   is non-recourse (limited to whatever the Lehman Creditors can collect from the applicable Debtors'

4   assets). *See id.* at § 6,3, p.57.

5       b)      At first look, it appears that SunCal claims to be offering to fund payment of

6   administrative and priority claims through the Acquisitions Administrative Loan. Closer

7   examination of the SunCal Discos reveal, instead, that while they say nothing at all about

8   Acquisitions' financial wherewithal, they do count upon using Project sale proceeds on the Effective

9   Date to pay administrative and priority claims. *See, e.g.*, SunCal Disco (Group I) § 14.2 (Feasibilty),

10  pp. 87-88. Yet, those sale proceeds are the collateral for the Lehman Creditors' Secured Claims,

11  presenting the SunCal Proponents with a plan funding dilemma.

12      Over 16 months ago, after an appeal in this case, the Ninth Circuit's Bankruptcy Appellate

13  Panel ("BAP") ruled (on December 15, 2009) that if SunCal wishes to pursue equitable

14  subordination claims against the Lehman Creditors, it could seek relief from the Lehman Stay in the

15  New York Bankruptcy Court. Yet, without acknowledging the law of the case or offering any legal

16  or equitable basis, the SunCal Plans impermissibly make equitable subordination of the Lehman

17  Creditors' claims occur by the simple fiat of saying so in the SunCal Plans, in order to claim an

18  ability to use Project sale proceeds to fund those SunCal Plans. The SunCal Plans provide that any

19  reductions to the claims of the Lehman Creditors achieved by SunCal in objecting to those claims

20  (*i.e.*, based on recoupment) would be transformed into priming liens or priority claims in the amount

21  of the claim reduction. The net effect of this is to subordinate the allowed portion of the Lehman

22  Creditors' claim to other claims in the amount of the ordered reduction to the Lehman Creditors'

23  claims. This attempt to create priming liens and priority claims out of thin air (without any legal

24  basis), so as to effectuate equitable subordination violates the indubitable equivalence and fair and

25

26  [13] The definition of "Lehman Disputed Administrative Loans" states:  "The aggregate amount of the Lehman
    Administrative Loans to all of the Trustee Debtors is approximately $40 million as of March 1, 2011 and continuing

27  to increase. The Lehman Administrative Loans are the subject of claim objections. Until these objections are resolved,
    these Lehman Administrative Loans shall not be Allowed Claims."  The Lehman Creditors are not aware of any

28  objections having been filed to their administrative claims and believe objections to claims previously allowed by
    final order are frivolous.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1 equitable requirements for cram-down and is a transparent attempt by the SunCal Proponents to

2 avoid either funding administrative and priority claims themselves or seeking the stay relief that

3 SunCal has been repeatedly told is necessary to attack the Lehman Creditors' secured claims.

4          c)          Administrative and priority claims need to get funded on a plan's effective date,

5 which must be whenever the plan's terms actually begin taking effect. Each SunCal Plan provides

6 for a delayed, so-called "Effective Date" that occurs long after many of their terms go into effect,

7 long after court supervision has ceased and after the Project sales process is well underway.[14]

8 Consistent with Elieff's apparent goal of selling Projects under terms that would, *inter alia*,

9 immediately relieve him and Acquisitions of their personal liability to the Bond Issuers, before they

10 would need to expend any substantial sums, all of the SunCal Plans provide that, during the Sale

11 Period prior to the Effective Date, among other things, the Plan Trustee (whose role and power is

12 created under the supposedly ineffective SunCal Plans) is empowered to sell all of the Debtors'

13 assets. Yet, payment of administrative and priority claims, required by statute to be paid on the

14 effective date, are not payable until the later date "defined" as the Effective Date. Moreover, for the

15 SunCal Plan (Group I) and SunCal Plan (Group II), SunCal tries to confuse matters further and

16 makes the Lehman Stay appear more significant than it is. It redefines the "Effective Dates" in these

17 plans to when the Lehman Stay expires or is lifted as to actions provided under the applicable

18 SunCal Plans, thereby deferring the Effective Date indefinitely  These delayed "Effective Dates" are

19 not only irrelevant to the Lehman Stay, but they and all the Effective Dates under the SunCal Plans

20 also are an impermissible sham, making all of the SunCal Plans unconfirmable.

21          Creating an indefinite Effective Date is not actually something that addresses the Lehman

22 Stay; that postulate is a subterfuge: SunCal's problem is not the Lehman Stay, it is that it lacks

23 money to pay a plan's effective date obligations, and that its plans are not winnable. The former

24 problem is reflected by absence of any mention in the SunCal Discos of the financial wherewithal of

25 anyone (as well as the unsatisfied writ of attachment for $7.9 million against Elieff and

26

[14] The Sale Period begins on confirmation (which can be long before the Effective Date): "The Sale Period is the time
27 period that the Plan Trustee is provided under the Plan to consummate a sale or liquidation of the Plan Trust' s Assets
subject to the Lehman Disputed Claims(s) and/or the Lehman Disputed Lien(s). The Sale Period shall commence on
28 the Confirmation Date and shall expire sixty days after the Effective Date." *See, e.g.*, SunCal Disco (Group I), §
2.1.124, p. 22.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Acquisitions).  The latter problem is inherent:  SunCal is offering creditors the possibility of receiving net proceeds from highly speculative litigation that would take years to resolve (even with immediate relief from the Lehman Stay as to the Group I Debtors and Group II Debtors), while the Lehman Creditors and the Trustee for the Trustee Debtors are proposing under the Lehman/Trustee Plans immediate payment of 40-50 cents on the dollar to accepting creditors that are beneficiaries of the equitable subordination claims.

For all of the reasons set forth herein, the SunCal Discos should be disapproved.

## II.

## STATEMENT OF RELEVANT FACTS

### A.    The Lehman Creditors' Claims

The Lehman Creditors made various loans, totaling (as of the respective Petition Dates) over $2 billion, to the Debtors and certain of their non-debtor affiliates pursuant to various separate loan agreements (collectively, the "Lehman Loans"),[15] secured by Projects, pledged interests in certain Debtors, cash collateral and other assets (collectively, "Collateral").[16]

### B.    The Lehman Adversary Proceeding

On January 6, 2009, the Voluntary Debtors filed an adversary proceeding in this Court seeking, *inter alia*, to equitably subordinate the claims of the Lehman Creditors (with the exception of LCPI) to the claims of all of the Voluntary Debtors' unsecured creditors and to transfer the subject liens to the Voluntary Debtors' Estates (the "Lehman Adversary Proceeding"). Subsequently, on February 3, 2009, the Voluntary Debtors filed a First Amended Complaint adding the Trustee Debtors as plaintiffs.[17]  All claims other than those for equitable subordination were

---

[15] A more complete description of most of the Lehman Loans and related claims is provided in the respective Exhibit 2 to the disclosure statements in respect of the Lehman/Trustee Plans.

[16] The Debtors allege that appraisals submitted on the Projects commissioned by the Lehman Creditors reflect an aggregate appraised value of approximately $465,000,000 and that the actual, aggregate value of such Projects is approximately $254,000,000.  *See* SunCal *Disco*, Exhibit 2.  Accordingly, under either valuation, based on the Lehman Creditors' Project liens and liens on equity interests, Acquisitions and Elieff have no equity in such Projects.

[17] The Lehman Creditors (with the exception of LCPI, which had not yet been named a defendant) filed a motion to dismiss the First Amended Complaint on or about February 13, 2009.  By order entered on March 24, 2009, this Court granted the Debtors' motion for leave to amend the complaint to add LCPI as a defendant, and deemed the Second Amended Complaint to be filed, thereby mooting the Lehman Creditors' motion to dismiss the First Amended Complaint.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1   removed in the Second Amended Complaint.[18]  In July, 2009, the plaintiffs filed a Third Amended

2   Complaint that added new causes of action.[19] On or about September 30, 2009, the Lehman

3   Creditors and other parties filed a motion to dismiss the Third Amended Complaint, which motion

4   was granted in part by the Court on March 9, 2010.  The Court has ruled that an equitable

5   subordination analysis must be creditor specific.

6       At the same time, the Lehman Creditors were contending that the automatic stay in the

7   bankruptcy case of LCPI precluded prosecution of challenges to the Liens of LCPI absent obtaining

8   prior stay relief in such case.  In an opinion entered on December 15, 2009, the BAP agreed.  The

9   panel held that

10      [the SunCal] Debtors' subordination action seeks affirmative control over property of
11      [LCPI's] bankruptcy estate by proposing to alter the priority of [LCPI's] claim and the
        transfer of [LCPI's] lien rights to [the SunCal] Debtors' estate. Thus, equitable subordination
12      seeks affirmative relief:  the modification of a claimant's valid claim and property interest . .
        . . Accordingly, we find the adjudication of [the SunCal] Debtors' equitable subordination
13      claim violates [LCPI's] automatic stay.[20]

14  Of particular pertinence here, the BAP stated:

15      Debtors are not without a remedy. They can seek relief from stay in Lehman Commercial's
        [LCPI's] case where their earlier motion was denied without prejudice."[21]  Therefore, while
16      the California bankruptcy court may have concurrent jurisdiction to determine the scope or
        applicability of the automatic stay, the New York bankruptcy court must have the final say as
17      to whether the automatic stay applies to the bankruptcy case before it. [citations omitted]
18      Debtors are not hamstrung by this decision; **Debtors may either seek relief from stay or
        initiate the equitable subordination action against Lehman Commercial [LCPI] in the
19      New York bankruptcy case**.[22]

20  The Voluntary Debtors have appealed.

21      Thereafter, the Trustee and Voluntary Debtors filed a Fourth Amended Complaint that does

22  not name LCPI as a defendant.  The Lehman Creditors have currently pending before this Court their

23

24  [18] The Lehman Creditors moved to dismiss the Second Amended Complaint.  At the hearing on June 11, 2009, the Court
    granted the motion to dismiss.

25  [19]  The Third Amended Complaint alleged preference and fraudulent transfer liability, and certain post-petition "bad
    acts" of the Lehman Creditors, but otherwise asserted similar allegations as the prior filed complaints. It failed to
26  correct any of the deficiencies previously identified by the Court.  It continued to be premised on vague allegations
    that unspecified creditors of unspecified Debtors were misled by unspecified representations on behalf of unspecified
27  entities into providing unspecified goods or services.

    [20] BAP Op., 423 B.R. at 667.

28  [21] *Id*. at 666, n. 8.

    [22] *Id*. at 668 (emphasis added).

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1 partial motion to dismiss and a motion to strike the Fourth Amended Complaint.

2 **C.    The Plans, Disclosure Statements & Related Filings**

3 **1.    Procedural History**

4 On or about February 4, 2009, the Voluntary Debtors filed their original proposed plan and

5 disclosure statement.[23]  In the summer of 2010, the Lehman Creditors and Trustee made the

6 Voluntary Debtors and the Court aware of their intent to file their joint plan and joint disclosure

7 statement.  To give sufficient time for the Voluntary Debtors to use the same date for a disclosure

8 statement hearing, the court postponed a previously scheduled date to November 5, 2010, meaning

9 September 30, 2010 would be the deadline for the filing of any disclosure statements or amended

10 disclosure statement for consideration on November 5, 2010.

11 On September 21, 2010, the Voluntary Debtors filed a motion seeking, *inter alia*, to stay the

12 plan proceedings.  It was temporarily granted and a mediation occurred, but the stay as to the plans

13 and disclosure statements now has expired.

14 On September 30, 2010, the SunCal Proponents, Lehman Creditors and Trustee filed plans

15 and disclosure statements.

16 On March 28, 2011, the Lehman Creditors and Trustee filed an amended plan for eight

17 Trustee Debtors (the "Lehman/Trustee TD Plan") and filed an amended plan for eleven Voluntary

18 Debtors (the "Lehman VD Plan").[24]

19 On April 7, 2011, the SunCal Proponents filed the four SunCal Plans and SunCal Discos.

20 **2.    Summary of the SunCal Plans**

21 The SunCal Plans provide, *inter alia*, the following:

22 The Voluntary Debtors, owned, controlled and managed by SunCal, and Acquisitions are the

---

23 [23]  On April 1, 2009, the Debtors filed a First Amended Plan and Disclosure Statement on behalf of the Voluntary
Debtors and the Trustee Debtors, which was further amended by a Second Amended Plan and a Second Amended

24 Disclosure Statement filed on June 10, 2009.  After two continuances of the hearing on the Second Amended
Disclosure Statement, the Voluntary Debtors and Acquisitions further amended their plan on September 9, 2009,

25 filing the Third Amended Plan and Third Amended Disclosure Statement.  The Voluntary Debtors and Acquisitions
abandoned efforts to move forward the process for obtaining confirmation of the Third Amended Plan, and no

26 disclosure statement with respect thereto was approved.

27 [24]  Under the Lehman/Trustee Plans, the Lehman Creditors (and the Trustee as to Trustee Debtors) propose immediate
payment of up to forty to fifty percent (40% to 50%) to accepting non-priority, unsecured creditors that are
beneficiaries of the equitable subordination claims and up to five percent (5%) to other accepting non-priority,

28 unsecured creditors (provided that for all non-priority, unsecured creditors of the four debtors against which the
Lehman Creditors hold no direct claims or liens, up to one-hundred percent (100%) is proposed).

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

plan proponents.  Acquisitions, an indirect parent of each of the Debtors, and its principal Elieff

receive under the SunCal Plans, among other things, control over the sales of Projects and the terms

of the agreements therefor, blanket releases of Estate claims against Acquisitions, Elieff and their

affiliates, allowance of claims for Acquisitions and control over the Lehman Adversary Proceeding.

Acquisitions is (1) the Plan Trustee with control over the sales of the Projects and other Assets

during the Sale Period; and (2) the sole entity authorized to object to Claims other than those held by

Acquisitions and its affiliates. It also is the Plan Sponsor, alleged in certain places to be responsible

for funding Administrative Claims, Priority Claims, "other post-confirmation expenses," and

Professional Fees incurred in the prosecution of the Lehman Adversary Proceeding.  *See, e.g.,*

SunCal Disco (Group I), §§ 6.2, 8.2, 10.3-9, 10.19, 10.20 & 12.1, pp. 15, 57, 66-68, 74-80, 84-85.

Yet, the feasibility discussion in the SunCal Discos (*see, e.g.*, SunCal Disco (Group I), § 14.2) omits

any mention of Acquisitions or its financial wherewithal and, instead, states Project sales proceeds

will pay for administrative and priority claims:  "[T]he four Projects addressed in this Plan will be

sold on the Effective Date.  These sales will provide the Debtors the means to pay all claims,

including allowed administrative and priority claims on this same date, from escrow."  *Id.* at pp. 87-

88.

Perhaps the reason for omitting mention of Acquisitions' financial capabilities is that they are

lacking:  (a) on April 21, 2010, Gray 1 CPB, LLC filed in these cases an *Amended Notice of Transfer*

*of Claims From SCC Acquisitions, Inc. and Bruce Elieff to Gray 1 CPB, LLC* (Docket No. 1086),

reflecting an outstanding writ of attachment against each of Elieff and Acquisitions, each in the

amount of $7,898,181.96;[25] and (b) on October 4, 2010, Manhard Consulting filed a Notice of Lien

against Acquisitions for approximately $156,000, based on an unpaid July 27, 2010 judgment.[26]

There also are other judgments and recorded liens against Elieff and Acquisitions that are left

unexplained.[27]  Nonetheless, in exchange for Acquisitions' uncertain and illusory obligations,

---

[25] Ex. 1 to Request for Judicial Notice in Support of Objection of Lehman Commercial Paper Inc., Lehman Ali, Inc., Northlake Holdings, LLC and OVC Holdings, LLC to the Debtors' Fourth Amended Joint Disclosure Statement Describing Debtors' Fourth Amended Joint Chapter 11 Plan ("RFN"), filed in October 2010..

[26] Ex. 2 to RFN.

[27] *See* the judgment and lien searches attached hereto as Exhibit B and Exhibit C and the supporting declaration of Leslie Forrester filed simultaneously herewith.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1  Acquisitions and its affiliates receive broad releases:

> In exchange for the above referenced funding commitments,
> Acquisitions, and all of its Affiliates shall receive (i) a complete
> release from all of the Debtors, the Estates, and the Plan Trust of any
> potential Litigation Claims, and (ii) Allowance of the Acquisitions
> Administrative Loan in an amount equal to all Chapter 11 and post-
> confirmation funding caused by Acquisitions to the extent that the
> same has not already been approved by the Court.

*See, e.g.,* SunCal Disco (Group I)*,* § 10.20.  Significantly, the released "Litigation Claims" are defined to include "objections . . . to Claims" as well (despite the handling of these released objections purportedly being assigned to the Committees). *Id.* at §§ 2.1.83 & 10.22.1, pp. 15, 80.

Project sales, controlled by Acquisitions, are to occur during a Sale Period, which begins on entry of the order of confirmation and ends sixty days after the Effective Date. *See, e.g.,* SunCal Disco (Group I), § 2.1.124, p. 22. The Court is to impose a continuing post-confirmation automatic stay until the Effective Date (*id.* at § 16.2, p. 89), and Class 1 real property taxing authorities, Class 2 Lehman Creditors and Class 3 Mechanic's Liens are barred from pursuing their remedies until the later expiration of the Sale Period. *Id.* at §§ 8.1, 8.2 & 8.3. For Project sales during the Sale Period, *inter alia*:

> The Plan Trustee shall sell the Group I Projects . . . free and clear of [the Lehman Creditors'] claims and liens, through a sale that satisfies the following conditions:
>
> (a) The Group I Projects will be sold through a public auction after a commercially reasonable marketing and advertising effort of at least sixty (60) days duration;
>
> (b) The SunCal Proponents shall have the right to provisionally accept an Opening Bid from a Stalking Horse Bidder prior to the public auction and to grant this bidder a Break-Up Fee;
>
> (c) Other Qualified Bidders shall have the right to overbid by submitting a Qualifying Bid that is equal to or in excess of the Minimum Increment;
>
> (d) The Qualified Bidder that submits the highest Qualifying Bid shall obtain title to the Group I Project being sold, free and clear of all applicable Disputed Liens and Disputed Claims; and
>
> (e) No bidder may submit or demand the acceptance of a "credit bid" based upon an existing claim or lien.
>
> * * *
>
> If the Plan Trustee consummates a sale or otherwise liquidates the particular Asset(s) subject to a Disputed Claim(s) and/or Disputed Lien(s) during the Sales Period, as provided for

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

above, the Holder(s) of such Disputed Claim shall receive a distribution to the extent of available funds from the applicable Net Sale Proceeds Account(s) to the extent required by a Final Order determining the allowance and priority of the Disputed Claims and the validity, priority and extent of the Disputed Liens in, including but not limited to, the Lehman Adversary Proceeding and the Lehman Claims Objection."

*Id.* at § 8.2, pp. 66-67. For Asset sales other than Projects, "[a]ll Net Sale Proceeds generated from such sales shall be deposited into the applicable Net Sales Proceeds Account with all Disputed Claims and Disputed Liens attached thereto." *Id.* No similar provision is contained in the description of Project sales.

The "Effective Date" under the SunCal Plan (Group I) and SunCal Plan (Group II) is the later of a date within 120 days after the Confirmation Date or when any stay barring the implementation of the SunCal Plans arising from the Lehman Creditors' cases is lifted or no longer applicable. *See, e.g.,* SunCal Disco (Group I) at § 2.1.52, p. 12. Under the SunCal Plan (Group III) and SunCal Plan (Group IV), the "Effective Date" is within 60 days after the Confirmation Date. *See, e.g.,* SunCal Disco (Group III), § 2.1.52, p.12.

Equitable subordination of Lehman Creditors is effectuated through claims objections that result in recoupment:

If these claim objections [against the Lehman Creditors' claims] are sustained by the Court, then, in the case of recoupment, the amount of damages incurred by the Debtors on account of the Lehman Entities' failure to pay the vendor and bond claims will directly reduce the amount of the Lehman Entities (sic) secured claims, leaving equity available for the payment of all Allowed Unsecured Claims.

and

The Plan Trust shall be granted a lien against any Project that is senior to any Disputed Lien held by any of the Lehman Entities. This lien shall secure any recoupment or offset amount allowed by the Court in favor of the Debtor that owned such Project pursuant to a claim objection filed by such Debtor.

*Id.* at §§ 5.4.1.7 & 8.2, pp. 52, 68.

For secured creditors, if the asset is not sold during the Sale Period, most are permitted to foreclose and exercise their remedies (*id.* at §§ 8.1 & 8.3, pp. 65-66, 69) except that no such provision is express as to the Lehman Creditors. In any event, some or all secured creditors, including the Lehman Creditors as to their allowed administrative, secured claims, appear to be

denied recourse.  *See, e.g.,* SunCal Disco (Group I) at § 6.3 & 8.3, pp. 57, 69.

Non-priority, unsecured claims are classified in Class 5 and/or Class 6 for all SunCal Plans. For Group III Debtors, against which the Lehman Creditors hold no direct claims or liens, all general, unsecured claims are classified in Class 5 and their holders receive a pro rata share of available funds after payment of senior claims, including whatever benefits are attributable to such claims from the proceeds against the Lehman Creditors:

> [Creditors of the Group III Debtors receive for their Class 5 claims a] pro rata share of Distributable Funds, up to the amount of each claimant's Allowed Unsecured Claim, plus a pro rata portion of any Claim Reduction Amount and benefit attributable to any judgments obtained in the Lehman Adversary Proceeding and in the State Court Action, to the extent determined by the Court.

SunCal Disco (Group III), § 8.5, pp. 57-58.

For all other Debtors, holders of general, unsecured claims that are not Reliance Claims are classified in Class 6.  These creditors also receive a pro rata distribution from the Distribution Accounts and the language for their treatment is similar in the SunCal Plans for the Group I Debtors, Group II Debtors and Group IV Debtors:

> After payment in full of Post Confirmation Expenses, Allowed Administrative Claims, Allowed Priority Claims, and any sums that the Bankruptcy Court determines are payable to the Holders of Allowed Classes 5.1 through 5.4 Claims from either the Claim Reduction Amounts or on account of a judgment in the Lehman Adversary, the Holders of Allowed Classes 6.1 through 6.4 Claims shall receive their pro-rata share of funds remaining in the applicable Distribution Account(s).

*See e.g.,* SunCal Disco (Group I)*, § 8.6, p. 71.

For Group I Debtors, Group II Debtors and Group IV Debtors, the SunCal Plans place general unsecured creditors that are beneficiaries of an "equitable subordination judgment" against the Lehman Creditors (Reliance Claims) in Class 5.  The holders of Reliance Claims are to receive certain benefits distinct from benefits payable to holders of other general, unsecured claims. The language affording these benefits to holders of Reliance Claims is the same for the SunCal Plans for the Group II Debtors and Group IV Debtors, which provides as follows:

> After the payment in full of all Post Confirmation Expenses, Allowed Administrative Claims, and Allowed Priority Claims, the Holders of Allowed Claims within these classes shall receive their pro-rata share of Distributions from the applicable Distribution Account(s), plus a pro rata portion of any Claim Reduction Amount or any benefit attributable to any

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

judgments obtained in the Lehman Adversary Proceeding and in the State Court Action, to the extent determined by the Court.

SunCal Disco (Group II) § 8.5, p. 70; SunCal Disco (Group IV), § 8.5, p. 61.

For the Group I Debtors, treatment is provided for holders of Reliance Claims who elect or are required to select "Option B" that is similar to the treatment afforded for holders of Reliance Claims against Group II Debtors and Group IV Debtors:

> [Creditors of Group I Debtors receive for their Class 5 claims under Option B] the benefits and recoveries resulting from a judgment or order entered in the Lehman Adversary Proceeding, the State Court Action or the Lehman Claims Objections and . . . a pro rata share of any funds payable from the applicable Distribution Account(s) after payment in full of all Post-Confirmation Expenses, Allowed Administrative Claims, and Allowed Priority Claims.

SunCal Disco (Group I), § 8.5, p. 70.

For the holders of Reliance Claims against Group I Debtors who are permitted to select "Option A," the SunCal Discos refer to various related definitions and provisions:

> "Reliance Claimant. The holder of a Reliance Claim. A list of the Reliance Claims and Reliance Claimants is attached hereto as Exhibit "8."

and

> "Litco. A newly formed Delaware limited liability company that will be purchasing the claims and litigation rights held by the Reliance Claimants that choose Option A."

and

> Any Class 5 claimant *who votes in favor of the Plan*, and who chooses Option A, will have the right to sell to Litco all of the claimant's right, title and interest in all Reliance Claims and all of the claimant's Litigation Rights against the applicable Debtor, SunCal Affiliates, and the Lehman Entities, for the sum of fifty-five cents ($0.55) per dollar of allowed claim, payable in cash on or before the sixtieth (60th) date after the Confirmation Date provided there is no stay pending an appeal of the Confirmation Order, in full satisfaction of such claimant's Allowed Reliance Claims.

SunCal Disco (Group I), §§ 2.1.121, 2.1.82, & 8.5, pp. 21, 15 & 70. No other information is provided regarding Litco or the Litco Offer.

A "best interests" analysis is attached as Exhibit 7 that currently is useless. The debt column for each debtor currently reflects the following error code: "#ref!." The classes referenced have incorrect class numbers. Moreover, there is no attempt at distinguishing Reliance Claims from other General Unsecured Claims. *See* Exhibit 7 to the SunCal Discos.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

# III.

## DISCUSSION

**A.    The SunCal Discos Should Not Be Approved Because the SunCal Plans are Patently Unconfirmable**

The SunCal Discos should not be approved because the SunCal Plans are patently unconfirmable as a matter of law: "[i]f the disclosure statement describes a plan that is so 'fatally flawed' that confirmation is 'impossible,' the court should exercise its discretion to refuse to consider the adequacy of disclosures." *Eastern Maine Elec. Co-op., Inc.*, 125 B.R. 329, 333 (Bankr. D. Me. 1991); *see also In re Beyond.com Corp.*, 289 B.R. 138, 140 (Bankr. N.D. Cal. 2003); *In re Allied Gaming Mgmt., Inc.*, 209 B.R. 201, 202 (Bankr. W.D. La. 1997) ("[N]otwithstanding adequate disclosure of information required by section 1125(b), a disclosure statement should not be approved if the proposed plan, as a matter of law, cannot be confirmed") (citations omitted); *In re 266 Washington Assocs.*, 141 B.R. 275, 288 (Bankr. E.D.N.Y.), *aff'd*, 147 B.R. 827 (E.D.N.Y. 1992) ("A disclosure statement will not be approved where, as here, it describes a plan which is fatally flawed and thus incapable of confirmation"); *In re Felicity Assocs., Inc.*, 197 B.R. 12, 14 (Bankr. D.R.I. 1996) (analysis of such issues at this stage of the confirmation process has become a "standard Chapter 11 practice"). The primary reason to evaluate confirmability is to "avoid engaging in a wasteful and fruitless exercise of sending the disclosure statement to creditors and soliciting votes on a plan when the plan is unconfirmable on its face. Such an exercise in futility only serves to further delay a debtor's attempts to reorganize." *In re Atlanta West VI*, 91 B.R. 620, 622 (Bankr. N.D. Ga. 1988).

Among the primary reasons the SunCal Plan cannot be confirmed are the following:

**1.    The SunCal Plans Violate 11 U.S.C. § 1129(a)(9)**

For administrative claims, a plan must provide that "on the effective date of the plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim" and for priority non-tax, unsecured claims that their holders either accept the plan or receive "cash on the effective date of the plan equal to the allowed amount of such claim." 11 U.S.C. § 1129(a)(9).

1    Under the SunCal Plans, confirmation is the actual effective date - when the plan goes

2    effective for multiple critical purposes (*e.g.*, the Plan Trustee has the power and role to fully

3    liquidate the Debtors as of confirmation). The SunCal Plans are unconfirmable because they fail to

4    provide for payment of administrative and priority claims on the plan's actual effective date, its

5    Confirmation Date.  This failing is dramatic for the SunCal Plans for the Group I Debtors and Group

6    II Debtors as to which the Effective Date may be substantially delayed after the Confirmation Date.

7    The SunCal Plans also must fail by leaving open the possibility of non-cash payment of the

8    Lehman Creditors' administrative claim.  As part of their transparent, impermissible effort to avoid

9    timely payment of administrative claims, the SunCal Proponents frivolously provide in the SunCal

10    Plans that all of the Lehman Creditors' administrative claims are disputed.  *See, e.g.*, SunCal Disco

11    (Group I), § 2.1.71, p. 14.  The Lehman Creditors are owed over $33 million for administrative

12    claims pursuant to a series of post-petition loans made pursuant to financing stipulations approved

13    by final orders of this Court.  These loans, stipulations and orders are set forth in detail in the

14    disclosure statements supporting the Lehman/Trustee Plans and most of the orders afford the

15    Lehman Creditors secured, superpriority administrative claims for their postpetition loans. SunCal

16    also denies the Lehman Creditors their right to cash payment of allowed administrative claims. Each

17    Plan Trust's obligation to pay the Lehman Creditors for their administrative claims, instead,

18    impermissibly is made non-recourse (limited to whatever the Lehman Creditors can collect from the

19    applicable Debtors' assets).  See *id.* at § 6,3, p.57.

20    **2.    The Litco Offer in the SunCal Plan (Group I) is Unfair, Involves**
**Improper Solicitation of Votes, and Results in Unequal Treatment of**
21    **Class 5 Claims.**

22    Section 8.5 of the SunCal Disco (Group I) describes a "right to sell" for Reliance Claimants

23    listed in Exhibit 8 at 55% of allowed claim amounts.  Litco is identified as the counterparty to that

24    Ltico Offer.  Yet, it really is not an offer. Nowhere is there any indication that Litco or anyone else is

25    committing to make the purchase or has the funds to do so.  If no party is committing to make the

26    Litco Offer or such party lacks the financial wherewithal to perform, then the Litco Offer is

27    misleading and unfair.  Because this is a competing plan situation, Lehman Creditors should not be

28    put in the position of bidding against a straw man (Litco) or competing against SunCal Plans that

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1  will not or cannot be effectuated.  Thus, the lack of information not only prevents adequate

2  disclosure, but also prevents the SunCal Plan (Group I) from being fair or equitable or from being

3  found to be offered in good faith as required by sections 1129(a)(3) & (b) of the Bankruptcy Code.

4       Additionally, the Litco Offer for Reliance Claimants of Group I Debtors includes a

5  contingency that creditors must vote in favor of the SunCal Plan (Group I). All other Reliance

6  Claimants will receive their pro rata share of litigation recoveries, and there is no guarantee such

7  recoveries will be equal to 55% or anything at all. SunCal Disco, § 8.5, p. 70. To the extent the Litco

8  Offer represents a determination by Litco, or the parties forming it, of its or their estimation of value

9  of the estates' litigation against the Lehman Creditors, such value is the consideration for Litco's

10  payment and this voting contingency is not a necessary feature to enable Litco to receive the benefit

11  of its bargain.

12       Instead, inclusion of this voting contingency represents a blatant effort to acquire votes in

13  support of the SunCal Plans.  Because this contingency is unnecessary and results in the unequal

14  treatment of creditors within Class 5, the treatment violates Bankruptcy Code § 1123(a)(4), which

15  requires a plan to "provide the same treatment for each claim or interest of a particular class, unless

16  the holder of a particular claim or interest agrees to a less favorable treatment of such particular

17  claim or interest."  11 U.S.C. § 1123(a)(4).  *In re Adelphia Communications Corp.*, 361 B.R. 337,

18  361 (S.D.N.Y. 2007) (granting releases only to creditors that accepted plan was not equal treatment);

19  *see also In re Brotby*, 303 B.R. 177, 185-86 (B.A.P. 9th Cir. 2003) (reversing plan approval where

20  single creditor in class would not receive distribution at same time as others); *In re Smith*, 123 B.R.

21  863, 865 (Bankr. C.D. Cal. 1991) (denying confirmation where all creditors in class paid except one

22  creditor forced to litigate outside of bankruptcy case).

23       **3.**     **The SunCal Plans are Not Feasible**

24       The SunCal Plans are not feasible, and the SunCal Discos lack adequate disclosure regarding

25  feasibility.  The SunCal Discos provide no financial information regarding anyone.  They essentially

26  claim that the liquidation is self-funding and hinge feasibility on using Project sales on the Effective

27  Date to fund administrative and priority claims.  SunCal Disco, § 14.2.

28       First, Project sales can occur up to 60 days after the Effective Date (*e.g.*, during the Sale

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    Period). Although the SunCal Plans also provide that administrative and priority claims are to be

2    funded "pursuant to the Acquisitions Administrative Loan," (*id.* at § 6.2), the SunCal Proponents

3    must, and fail, to show that Acquisitions has available cash to fund the administrative and priority

4    claims.

5          Second, the SunCal Proponents fail to disclose why Project sales proceeds will not be subject

6    to the liens of the Lehman Secured Claims, as required by the "best interests" and indubitable

7    equivalence requirements. Although the Voluntary Debtors' claim objections appear to seek to offset

8    against the Lehman Creditors' claims less than $100 million, the remaining Lehman claims, even

9    after a successful reduction by $100 million, still would greatly exceed the estimated value of the

10   Projects. Thus, any suggestion that "recoupment" will result in available cash on the "Effective

11   Date" to pay administrative and priority claim appears wrong or requires far, far more disclosure.

12         Third, the SunCal Proponents ignore that Acquisitions also is to fund Lehman Adversary

13   Proceeding litigation expenses and that Litco, supposedly, is to fund the "right to sell" of Reliance

14   Claimants in a total amount not disclosed, but which appears substantial from Exhibit 8.  The

15   omission of any information regarding the financial wherewithal of Acquisitions or Litco precludes a

16   finding of feasibility.  This disclosure omission also supports the Lehman Creditors view that

17   Acquisitions and its affiliates actually lack such financial capability and/or willingness, and validates

18   the Lehman Creditors' view that affording Acquisitions the "complete release" for its unsupported

19   Acquisitions Administrative Loan is wholly unjustified.

20         **4.    The SunCal Plans' Treatment of Secured Claims is Unconfirmable**

21         The SunCal Plan's proposed treatment of Secured Claims is unconfirmable over the

22   objection of secured creditors, such as the Lehman Creditors, which hereby so object.

23         First, until a plan's effective date, secured creditors are entitled to seek adequate protection

24   under 11 U.S.C. § 363. Yet, under the SunCal Plans, if the Plan Trustee does not sell a Project or any

25   other collateral during the Sale Period, the supposedly ineffective SunCal Plan purports to deprive

26   secured creditors of all remedies until the Effective Date. Moreover, the Plan Trustee is under no

27   express obligation to properly maintain or preserve the Collateral. *See, e.g.,* SunCal Disco (Group I),

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

§ 10.4, pp. 74-75.  The Lehman Creditors request, and are entitled to, adequate protection.[28]  Also, the mandatory forbearance, without any adequate protection, cannot constitute "fair and equitable" treatment pursuant to Bankruptcy Code § 1129(b).  Proposing no payments to a secured creditor while imposing an extended period of forbearance equates to extreme negative amortization of the secured claims while giving the Debtors a no-risk cost-free option.  That treatment could not remotely pass muster under the standards for negative amortization set forth in *Great Western Bank v. Sierra Woods Group*, 953 F.2d 1174, 1177 (9th Cir. 1992).

Second, the SunCal Plans provide that holders of certain secured claims (including the secured post-petition claims for the Lehman Creditors based on their post-petition loans) would have no recourse against the Plan Trust or the Plan Trustee.  *See e.g.,* SunCal Disco (Group I), §§ 6.3, 8.1-3, pp. 57, 65-69.  The intent appears to be to deprive even recourse secured creditors (or ones deemed to have recourse under the Bankruptcy Code) of any treatment for their deficiency claims.  Absent consent, which the Lehman Creditors do not grant as to their secured claims, this violates the cram down provisions of section 1129(b) of the Bankruptcy Code.

## 5.    The SunCal Plans' Treatment of the Lehman Creditors' Claims is Unconfirmable

The SunCal Plans' proposed treatment of the Lehman Creditors' Claims is unconfirmable over the objection of secured creditors, including the Lehman Creditors, which hereby so object.  Specifically:

### a.    Recoupment is not an Alternative Means of Accomplishing Equitable Subordination

Frustrated perhaps by the BAP rulings making clear that for SunCal to pursue equitable subordination claims against the Lehman Creditors, SunCal needs to obtain stay relief in New York, the SunCal Discos and SunCal Plans include an impermissible twist.  They purport to permit SunCal to accomplish equitable subordination by fiat.  Without authority or basis, they simply state that there is to be an amazing metamorphosis for any recoupment adjustments to the Lehman Creditors' claims whereby once the Court fixes any amount by which the Lehman Creditors' claims are to be

---

[28] By example only, the SunCal Plan Proponents should be obligated to assure Project maintenance and preservation, including paying real property taxes.  In addition, cash collateral and sales proceeds should be held unused and segregated, and remedies for creditors should be specified in a plan.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    reduced, these <u>reductions</u> in the amount owed to the Lehman Creditors <u>will be transformed into</u>

2    <u>affirmative claims supported by priming liens</u> on the Projects senior to the liens and claims of the

3    Lehman Creditors.  Apparently, the net effect sought through these creative mechanics is to

4    equitably subordinate the Lehman Creditors' claims by taking from the Lehman Creditors all or a

5    part of their allowed secured claims – all without a showing of the evidence, law, inequitable

6    conduct and creditor specific injury required under section 510(c) of the Bankruptcy Code to justify

7    equitable subordination.

8        This equitable subordination through recoupment and priming liens must fail.  Equitable

9    subordination and recoupment are not the same.  Section 502(b)(1) permits disallowance of a claim

10    "to the extent that (1) such claim is unenforceable against the debtor and property of the debtor,

11    under any agreement or applicable law."  Recoupment is a method under contract or applicable law

12    by which a claim is so reduced. Under applicable New York law,[29] "[r]ecoupment . . . is an equitable

13    remedy that, of itself, gives no right to actual payment."  *In re Kings Terrance Nursing Home and*

14    *Health Related Facility*, 184 B.R. 200, 202 (S.D.N.Y. 1995); *In re Drexel Burnham Lambert Group,*

15    *Inc.*, 113 B.R. 830, 854 (Bankr. S.D.N.Y. 1990) (holding and quoting *Wright & Miller*, recoupment

16    is "purely defensive in character and could be used only to defeat or diminish plaintiff's recovery;

17    recoupment could not be the basis for affirmative relief.").  On the other hand, section 510(c) of the

18    Bankruptcy Code governs equitable subordination "of all or part of an allowed claim to all or part of

19    another allowed claim."  <u>Section 510(c) of the Bankruptcy Code clearly reflects that subordination</u>

20    <u>can occur only as to "allowed claims."</u>  *See* COLLIER ON BANKRUPTCY at ¶510.02[3] (16th Ed. 2010)

21    ("subordination changes the priority among valid claims").  <u>Yet, once the claim is allowed, section</u>

22    <u>502 of the Bankruptcy Code, including recoupment and setoff, is irrelevant.</u> *Id.* ("[s]ubordination is a

23    remedy in which the order of payment rather than the existence of the debt is in issue").  SunCal

24

25    _____

26    [29] Both the Ninth Circuit and the Second Circuit are in agreement that any recoupment defense is governed by state law.
*Newbery Corp. v. Fireman's Fund Ins.*, 95 F.3d 1392, 1398 n.9 (9th Cir. 1996); *In re Madigan*, 270 B.R. 749, 758
(B.A.P. 9th Cir. 2001); *New York State Elec. And Gas Corp. v. McMahon (In re McMahon)*, 129 F.3d 93, 96 (2d Cir.

27    1997).  Where, as here, the underlying documents (the various loan agreements pursuant to which the loans were
made, the Restructuring Agreement and the purported Settlement Agreement) have New York choice of law
provisions, it is New York law that governs the analysis. *Westinghouse Credit Corp. v. D'Urso*, 278 F.3d 138, 146 n.3

28    (2d Cir. 2002).

attempts to conflate these two statutory processes to avoid the prior BAP ruling. Its effort makes the SunCal Plans unconfirmable.

**b.    The Creation of Priming Liens Precludes the Lehman Creditors From Receiving the Indubitable Equivalent of their Claims**

*The SunCal Plans include a frivolous effort to actually create priming liens for SunCal against SunCal's own property senior to the Lehman Creditors' secured claims.* The creation of priming liens is a frivolous, unsupported provision that denies the Lehman Creditors the indubitable equivalence of their claims, even if such claims were ultimately subordinated.  During a chapter 11 case, a debtor in possession may seek to grant a lender a non-consensual priming lien under Bankruptcy Code § 364(d), although they are infrequently sought, rarely granted and require a substantial evidentiary showing.  *Matter of St. Petersburg Hotel Associates Limited*, 44 B.R. 944 (Bankr.M.D. Fla. 1984).  Here, however, the provision is included under the guise of ensuring the Lehman Creditors "receive the indubitable equivalent of their claims." SunCal Disco (Group I), § 8,2, p. 66. By its own terms, this plan provision is intended to "secure any recoupment or offset amount allowed by the Court in favor of the Debtor that owned the Project, pursuant to a claim objection filed by such Debtor." *See, e.g.*, SunCal Disco (Group I) § 8.2, p. 68. As written, this provision is so broad as to provide a priming lien for any "offset amount" granted with respect to the Lehman Secured Claims, whether or not based on grounds that would warrant "equitable subordination."  But, even if actually restricted to equitable subordination, this provision remains frivolous.

The proposed priming liens are against only Projects and only apply "[i]f the Plan Trustee is unable to consummate a sale or otherwise liquidate the particular Asset(s) subject to a Lehman Disputed Claim during the Sales Period." *Id.*  "All other unsold Assets (presumably other than the Projects) shall be deemed abandoned by the Plan Trust." *Id.* (emphasis added).  Thus, for some reason, at a time when the SunCal Proponents have agreed to automatically abandon all other Assets not sold during the Sale Period (which Sale Period would not end until probably after more than three years from the commencement of these bankruptcy cases), the SunCal Proponents are planning to hold onto the Projects that they no longer have an ability to sell.  At the same time, the Lehman

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Creditors are not permitted to foreclose and are not afforded a similar time to sell or address the

Projects.  Instead, the SunCal Plans provide only that "Holder(s) [of the abandoned non-Project

Assets] shall be allowed to pursue their respective rights and remedies." *Id.* (Although, even then,

they only can pursue foreclosure or other remedies "subject to a Final Order determining the

allowance and priority of the Disputed Claims and the validity of the Disputed Liens."  *Id.*) But the

SunCal Proponents propose not only to hold onto title to the Projects <u>after</u> the Sale Period (without

taking on any obligations to maintain or protect that collateral), the SunCal Proponents also propose

to afford themselves the ability to foreclose on the Projects it still is holding: "The foregoing

[priming] lien may be enforced after the Effective Date like any other judgment under the laws of

the State of California."  *Id.* Thus, the SunCal Proponents can enforce <u>their lien against a Project</u>

<u>they own</u> while the Lehman Creditors have to just watch their, then, subordinated, junior lien be

wiped out.  This provision is not and cannot be part of providing the Lehman Creditors "the

indubitable equivalent of their claims."

> **c.      The Proposed Sales and Bidding Procedures are Improper,
> Unfair, and Tainted**

The SunCal Plans' sales and bidding procedures must be substantially modified in

order to satisfy Bankruptcy Code sections 363(b), 1125 and 1129(a)(3).  Bankruptcy courts

encourage competitive bidding of assets to facilitate an open and fair public sale designed to

maximize value for the estate.  Here, the SunCal Proponents are requesting the very opposite by

offering an "auction" process that is effectively a disguised private sale to an insider or a bidder who

likely will be asked to agree to assume or eliminate Elieff's and Acquisitions' Bond Issuer indemnity

obligations and/or agree to use and/or partner with SunCal, as developer or manager, to develop

and/or manage the Projects after the sale.  The control over the sales process provided to

Acquisitions is improper.  As a threshold matter, for the benefit of all creditors in these cases, an

independent trustee should helm the sale process and any auction should take place publicly in this

Court.

Each of the SunCal Plans provides for a sale of the Projects free and clear of disputed clams

and disputed liens through sales to be conducted during the Sale Period pursuant to the following

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

terms:[30]

      (i)     Sixty-day "commercially reasonable marketing and advertising effort";

      (ii)    Public auction;

      (iii)   SunCal Plan Proponents (*i.e.*, the Voluntary Debtors and Acquisitions)[31] shall have the right to provisionally accept an Opening Bid from a Stalking Horse Bidder prior to the public auction and grant such bidder a Break-Up Fee of up to 3% of the Opening Bid for a Project;

      (iv)   Other Qualifying Bidders shall have the right to overbid the Opening Bid by submitting a Qualifying Bid[32] equal to or in excess of the Minimum Increment;

      (v)    No bidder may submit a credit bid; and

      (vi)   Qualifying Bidder that submits the *highest* Qualifying Bid shall obtain title to the applicable Project(s) free and clear of all Disputed Claims and Disputed Liens.

    <u>For the following reasons each aspect of the sale procedures is inherently unfair, would be impermissible under section 363 of the Bankruptcy Code, and fails, separately or in aggregate, to provide the Lehman Creditors with the "indubitable equivalent" of their claims:</u>

        (1)    <u>Marketing Process</u>.

    The marketing process is crucial to a determination with respect to whether a stalking horse bidder's offer represents the best price for the Projects.  The SunCal Proponents propose a "commercially reasonable marketing and advertising effort" to be conducted in a matter of sixty days.  The broad marketing process described by the SunCal Discos is inadequate.  First, the SunCal Proponents must specify the efforts they will undertake to solicit competing bids.  Second, sixty days

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

---

[30] It is unclear whether the SunCal Plan Proponents intend for confirmation of the SunCal Plans to be final approval of the sales procedures contained in the plans or if the SunCal Proponents will seek separate approval of more detailed procedures.  In light of section 10.22.1 of each SunCal Disco providing that the Committees shall have "standing to object to sales procedures on the sale of the Projects," it appears that separate approval may be contemplated.  The SunCal Plan Proponents need to clarify their intentions with respect to this issue.

[31] In addition, due probably to the conflicting timing issues created by the Sale Period and Effective Date, the SunCal Discos are confusing with respect to which entity has the authority to accept bids, and which bids.  The definition of Qualifying Bidder references the Plan Trustee, the definition of Opening Bid references the Debtor and section 8.2.A.3(b) references the SunCal Plan Proponents.

[32] The SunCal Plan Proponents use the terms "Qualifying Bid" and Qualified Bid" interchangeably, but only define "Qualifying Bid."   Similarly, they use the terms "Qualifying Bidder" and "Qualified Bidder" interchangeably, but only define "Qualifying Bidder."  The Lehman Creditors use "Qualifying Bid" and "Qualifying Bidder" herein.

1    may not provide sufficient time for marketing by the Debtors, the negotiation and execution of

2    confidentiality agreements, and due diligence by potential bidders, including site tours.

3                    (2)    Stalking Horse Bidder.

4            No information or discussion is provided as to why a stalking horse bidder is required or

5    appropriate and the procedures for selecting a Stalking Horse Bidder are woefully inadequate.  A

6    "Stalking Horse Bidder" is defined as "the Qualifying Bidder who submits the Opening Bid for any

7    of the Plan Trust Assets."  As noted above, it is impossible to quantify an Opening Bid under the

8    procedures proposed by the SunCal Proponents.  Similarly, it is impossible to divine how a Stalking

9    Horse will be selected, if one is even necessary.  Providing for the selection of a stalking horse

10    bidder puts the cart before the horse.  Generally, a seller will have located potential buyers and seek

11    to turn one of those buyers into a stalking horse who will execute a letter of intent that will set out

12    not only the terms of the sale but also the procedures the debtor will ask the court to approve to

13    govern the auction process.[33]

14            Here, the SunCal Plan Proponents use the plan to obtain approval of barebones procedures

15    that will govern an insider's selection of a stalking horse and payment of a break-up fee without

16    disclosing what the selection process is.  It simply provides that nominally the SunCal Plan

17    Proponents may select the stalking horse.  Elsewhere it provides that the Plan Trustee (*i.e.*,

18    Acquisitions) shall sell the Projects.  It appears that the sale procedures are designed for

19    Acquisitions' and Elieff's benefit to enable them to choose in their discretion a stalking horse that

20    will use SunCal as the developer/manager on the sold Projects and/or agree to assume or eliminate

---

[33] The procedures set forth in the Plans and Disclosure Statements also fail to satisfy the sales procedures requirements set forth in Local Bankruptcy Rule 6004-1, which provides the following, among other, requirements:

>    Contents of Notice:  The notice must describe the proposed bidding
>    procedures and include a copy of the proposed purchase agreement.  If the
>    purchase agreement is not available, the moving party must describe the
>    terms of the sale proposed, when a copy of the actual agreement will be filed
>    with the court, and from whom it may be obtained.  The notice must describe
>    the marketing efforts undertaken and the anticipated marketing plan, or
>    explain why no marketing is required.  …

LBR 6004-1 (b)(2).

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Elieff's and Acquisitions' Bond Issuer indemnity obligations.  If the stalking horse bidder is not a proper party to be bidding at all (because it is an insider, affiliate of an insider or a party engaged in self-dealing with an insider or the Debtors) and the assets have not been fairly exposed to the market, no auction should be scheduled.  Permitting Acquisitions alone to use the bidding process to benefit itself and chill other potentially higher bids is unfair, inequitable, and deprives the Lehman Creditors of the "indubitable equivalent" of their claims.  At a minimum, the SunCal Plan Proponents must specify the standard for choosing a Stalking Horse Bidder.

(3)    <u>Opening Bid/Qualifying Bid/Minimum Increment</u>.

Under the SunCal Plans and SunCal Discos, it is impossible to determine what qualifies as an Opening Bid.  An "Opening Bid" means the *first* Qualifying Bid accepted "by the Debtor … ."  A "Qualifying Bid" means, with respect to a Project Sale, a bid *exceeding the immediately preceding Qualifying Bid* by the Minimum Increment.  A "Qualifying Bidder" with respect to the sale of Projects[34] is defined as a bidder who submits a $250,000 deposit and provides evidence to the Plan Trustee of its financial means to acquire the Project offered for sale.  "Minimum Increment" with respect to the sale of Projects is defined as 100% of the preceding Qualifying Bid, plus any applicable Break-Up Fee, plus $250,000.  This definitional circularity provides no standard for determining what qualifies as an Opening Bid or a Qualifying Bid.  It is also unclear whether the Qualifying Bid refers to a bid for all Projects or each individual Project.  If it applies to them in the aggregate, then what constitutes a Qualifying Bid for only one Project?  Alternatively, if it applies to only one Project and a bidder wishes to buy all of them, is the Qualifying Bid the same?

The proposed $250,000 deposit amount is arbitrary and may be too high or too low with respect to any single Project or multiple Projects.  In addition, the SunCal Plan Proponents impermissibly have provided no procedures for the segregation of such deposits or the return thereof.  It also is unclear whether the "plus $250,000" required as part of a Qualifying Bid is the

---

[34]  The SunCal Discos are also confusing with respect to which Projects this standard applies.  For example, in the definition of "Qualifying Bid" in SunCal Disco (Group I), this standard appears to apply only to the Projects of Group I Debtors while the other SunCal Discos appear to apply this standard to all Projects, or at least do not explicitly reference any "group debtors" in the definitions of Qualifying Bidder.  For purposes of this Objection, the Lehman Creditors assume that it applies to the sale of all Projects.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

deposit amount referenced in the definition of Qualifying Bidder or an additional $250,000 on top of the deposit.

In addition, the SunCal Proponents propose a lengthy Sale Period but no timeline with respect to the deadline for submission of bids and financial information to support the bidder's ability to consummate a sale, the form of bids, the location of the auction(s), the rights of other parties in interest to participate in the process, and other related information.

Thus, although the sale procedures are vague, confusing and incomplete, one thing is clear -- the intention is to provide Acquisitions, whether wearing its SunCal Plan Proponent or Plan Trustee hat, with control over the bidding and sales process.  In light of Acquisitions and its sole owner Elieff's substantial indemnity liabilities, permitting Acquisitions to use the bidding process to benefit itself and chill other potentially higher bidders is unfair and impermissible.

Lastly, the Minimum Increment should be determined with more precision based on the Project's values.  The sale process is intended to create proceeds to inure to the benefit of all creditors, and should not be an opportunity for SunCal to orchestrate a sale to a particular bidder for SunCal's own benefit to the possible detriment of creditors.  The proposed $250,000 overbid amount is arbitrary and may be too high or too low with respect to any single Project or multiple Projects. Overbid amounts should be high enough so that accepting the bid will leave a debtor at least as well off as accepting a preceding bid.

(4)    <u>Break-Up Fee</u>.

A "Break-Up Fee" is defined as a fee granted to a Stalking Horse Bidder of up to 3% of the Opening Bid for a Project.  It is impossible to determine the amount of the Break-Up Fee without knowing the Opening Bid amount, which is unquantified under the SunCal Plans, or the particular Projects being sold.  No break-up fee is appropriate in these cases, particularly in light of the control

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1   of the sales process by Acquisitions, which is conflicted, and, in any event, the proposed 3% fee

2   exceeds the average break-up fees approved by courts.[35]

3        Courts have been particularly willing to exercise independent review of debtors' requests for

4   approval of proposed "break-up fees" and expense reimbursements from prospective asset

5   purchasers in the context of section 363 asset sales. *See In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d

6   Cir. 1983) (a proposed break-up fee must be carefully scrutinized to insure that the Debtor's estate is

7   not unduly burdened and that the relative rights of the parties in interest are protected); *In re Hupp*

8   *Industries, Inc.*, 140 B.R. 191, 196 (Bankr. N.D. Ohio 1992).  (The analysis conducted by the Court

9   must include a determination that "all aspects of the transaction are in the best interests of all

10  concerned.").  In the bankruptcy context, "bidding incentives such as break-up fees and bid

11  increment limitations are carefully scrutinized in § 363(b) asset sales to insure that the debtor's

12  estate is not unduly burdened and that the relative rights of the parties in interest are protected." *Id.*

13       Where a court concluded that the proposed break-up fee would not induce further bidding or

14  bidding generally, the court refused to approve a break-up fee.  *See In re America West Airlines,*

15  *Inc.*, 166 B.R. 908, 912 (Bankr. D. Ariz. 1994); *accord In re S.N.A. Nut Co.*, 186 B.R. at 104

16  (following *America West*; additionally noting that no particular deference should be given to

17  debtor's business judgment where debtor was liquidating rather than reorganizing).  The standard is

18  not whether the break-up fee is within the business judgment of the debtor, but whether the

19  ────────────────

[35] Inside bankruptcy, a break-up fee should not exceed a reasonable percentage of the purchase price and the related risk,
20  effort, and expenses of the prospective purchaser.  *In re Integrated Resources, Inc.*, 147 B.R. 650, 662 (S.D.N.Y.
1992) (affirming a bankruptcy court's approval of a break up fee that at its maximum was 1.6% of the purchase price).
21  While break up fees are to be determined in light of the facts of the case, such fees are generally approved when they
are in the range of 2%.  *In re Hupp Industries, Inc.*, 140 B.R. 191, 194 (Bankr. N.D. Ohio 1992) ("Except in extremely
22  large transactions, break-up fees ranging from one to two percent of the purchase price have been authorized."); *see
also In re Twenver, Inc.*, 149 B.R. 954, 957 (Bankr. D. Colo. 1992) ("[T]he Court finds that the 10% [break-up fee] . .
23  . sought here greatly exceeds the 1% to 2% fees found to be reasonable in the majority of cases approving such
fees."); *In re 995 Fifth Ave. Assocs.*, 96 B.R. 24 (Bankr. S.D.N.Y. 1989) (0.68% break-up fee of $500,000 for a
24  $73,725,000 purchase price is reasonable); *In re Kidron, Inc.*, 278 B.R. 626 (Bankr. M.D. Fla. 2002) (0.91% break-up
fee of $100,000 for an $11 million purchase price is reasonable); *In re Crowthers McCall Pattern, Inc.*, 114 B.R. 877
25  (Bankr. S.D.N.Y. 1990) (1.11% break-up fee of $500,000 for a $45 million purchase price is reasonable); *In re
Genicom*, Case No. 00-1383(PJW) (Bankr. D. Del. 2000) (1.2% break-up fee is reasonable); *In re S.N.A. Nut Co.*, 186
26  B.R. 98 (Bankr. N.D. Ill. 1995) (1.22% break-up fee of $350,000 for a $28.8 million purchase price is reasonable); *In
re APP Plus, Inc.*, 223 B.R. 870 (Bankr. E.D.N.Y. 1998) (1.25% break-up fee of $250,000 for a $20 million purchase
27  price is reasonable); *In re Lamb*, No. 96-1-1099-DK, 2002 WL 31508913 (Bankr. D. Md. Oct. 11, 2002) (1.48%
break-up fee of $9,902.20 for a $670,000 purchase price is reasonable); *In re Cell Net Data Systems, Inc.*, Case No.
28  00–844(PJW) (Bankr. D. Del. 2000) (2.2% break-up fee is reasonable); *In re Penn Corp Financial Group, Inc.*, Case
No. 00–888(PJW) (Bankr. D. Del. 2000) (2.3% break-up fee is reasonable).

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

52063-001\DOCS_LA:236758.8                    31

transaction will further the diverse interests of the debtor, creditor and equity holders, alike. 166

B.R. at 912. As the *America West* court concluded, the analysis conducted by the court must

therefore include a determination that "*all* aspects of the transaction are in the best interests of all

concerned." *Id.* (emphasis in original).

Even courts that apply the business judgment standard to break-up fees have held that the

protection of the business judgment rule should be removed when a sale transaction process is

tainted by self-dealing. *See, e.g., In re Integrated Resources, Inc.*, 147 B.R. 650 (S.D.N.Y. 1992).

Moreover, even in the § 363 sale context, courts have generally held that break-up fees are

appropriate only if they are intended to induce bidding. *See America West*, 166 B.R., at 912 (held

that the payment of the contemplated break-up fee was not in the best interests of the estate, the

creditors, or the equity security holders because it would not induce bidding); *accord Gey Assocs.*

*G.P. v. 310 Assocs., L.P.*, 2002 WL 31426344, at *2, 2002 U.S. Dist. LEXIS 20759, at * 5 (S.D.N.Y.

Oct. 29, 2002) (break-up fee inappropriate where there were "two buyers drooling to make this

purchase"), *aff'd* 345 F.3d 31 (2d Cir. 2003); *Calpine Corp. v. O'Brien Env't Energy, Inc. (In re*

*O'Brien Env't Energy, Inc.)*, 181 F.3d 527, 537 (3d Cir. 1999) (where bidder "had strong financial

incentives to undertake the cost of submitting a bid," a break-up fee is not warranted); *In re*

*American Appliance*, 272 B.R. 587, 601 (Bankr. D. N.J. 2002) ("Where a potential purchaser would

bid whether or not break-up fees are offered, the award of a break-up fee cannot be characterized as

necessary to preserve the value of the estate."). Clearly, although the SunCal Discos and SunCal

Plans do not exclude insiders or their affiliates from being the possible recipient of a break-up fee,

no justification exists for the payment of any break-up fee whatsoever to a stalking horse that is an

insider, affiliate of an insider, or a party chosen by an insider because it has agreed to use SunCal as

the developer of the sold Projects and/or agreed to assume the insider's obligations.

Further, Local Bankruptcy Rule 6004-1 provides as follows with respect to requests for

break-up fees:

> Break-up Fees: If a break-up fee or other form of overbid protection is
> requested in the Sale Procedure Motion, the request must be supported
> by evidence establishing:
>
> (A) That such a fee is likely to enhance the ultimate sale price; and

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

(B) The reasonableness of the fee.

LBR 6004-1 (b)(2); (6). There is no reason that such requirements should not be satisfied simply because the SunCal Plan Proponents are seeking approval of bidding procedures in the context of their plans' treatment of secured creditors rather than through a sales procedures motion. No evidence has been – or could at this point be – submitted in support of the Break-Up Fee. Without such evidence, no Break-Up Fee should be approved.

This case presents all of the circumstances discussed above in which Courts typically exercise independent judgment. For all of the foregoing reasons, the Break-Up Fee is tainted by self-dealing, is not in the best interests of the estates or all parties concerned and accordingly should not be approved.

(5)    Sales Proceeds.

The SunCal Discos provide in the definition of "Net Sales Proceeds Account(s)" that "[t]he Disputed Secured Claim(s) and/or Disputed Lien(s) shall attach to the corresponding Net Sales Proceeds Account(s) pending any Final Order(s) of the Bankruptcy Court resolving the applicable Disputed Secured Claim(s) and/or applicable Disputed Lien(s)." *See, e.g.*, SunCal Disco (Group I), at § 2.1.93, p. 17. The description of Project sales contains no provision requiring the *deposit* of all net sales proceeds from the sale of any Project into the applicable Net Sales Proceeds Account with all Disputed Secured Claims and Disputed Liens *attaching* thereto. All proceeds generated from the sale of any assets must be deposited into the applicable Net Sales Proceeds Account, with all Disputed Secured Claims and Disputed Liens attaching thereto in the order of their priority pending a final disposition of such claims and liens.

(6)    Notice.

The SunCal Discos and SunCal Plans contain no provisions with respect to who will receive notice, or the contents of such notice, of the proposed bidding procedures or sales. The SunCal Plan Proponents must comply with Bankruptcy Rule 2002 and the Local Rule 6004-1 by providing the appropriate notice to the required parties.

d.    **Prohibiting All Credit Bidding Is Unnecessary and Impermissible**

SunCal commits that the SunCal Plans will not violate the LCPI automatic stay:

NO ACTION PROVIDED FOR IN THE PLAN SHALL BE TAKEN AGAINST EITHER LEHMAN COMMERCIAL PAPER, INC. ("LCPI") OR LEHMAN BROTHERS HOLDINGS, INC. ("LBHI") THAT WOULD HAVE THE EFFECT OF VIOLATING ANY APPLICABLE AUTOMATIC STAY THAT MAY EXIST IN THEIR CHAPTER 11 CASES.

SunCal Disco, p. 3.   To make that statement true, the SunCal Plans must eliminate the prohibition on credit bidding (Id. at § 8.2(A)(3)(e), p. 67), which only could be justified by successful prosecution of the stayed Lehman Adversary Proceeding as to its equitable subordination causes of action.  Just as the Lehman Creditors cannot be deprived of that basic right through the previously filed (February 18, 2009) and opposed motion before this Court seeking approval of overbid procedures for a purchase by D.E. Shaw of a significant portion of the Debtors' assets, they cannot be deprived of that right through a plan.

Without credit bidding, the proposed sale of the Lehman Creditors' collateral is patently unfair and fails to satisfy the indubitable equivalent standard under Bankruptcy Code § 1129(b)(2)(A)(iii). SunCal contends that fair market value can be obtained without credit bidding (*see, e.g.,* SunCal Disco (Group I), § 14.1, p. 87), but provides absolutely no explanation to support a need for the blanket prohibition against credit bidding.  The SunCal Proponents ignore that credit bidding balances the competing needs of a debtor, who gets the benefit of the automatic stay to shield the collateral from foreclosure, against a secured creditor's interest in the collateral.  It prevents the debtor from accepting an unreasonably low purchase price.  *Aetna Realty Inv., Inc. v. Monarch Beach Venture, Ltd. (In re Monarch Beach Venture, Ltd.)*, 166 B.R. 428, 433 (C.D. Cal. 1993) (chapter 11 plan purporting to take away secured creditor's right to credit bid could not be confirmed under cram down section allowing fulfillment of "fair and equitable" requirement by permitting debtor to pay proceeds of sale of collateral to creditor or to retain proceeds subject to lien); *John Hancock Mutual Life Insurance Co. v. California Hancock, Inc. (In re California Hancock, Inc.)*, 88 B.R. 226, 231 (B.A.P. 9th Cir. 1988) (upholding bankruptcy court's rejection of a reorganization plan that did not permit a nonrecourse creditor the right to credit bid, given the Congressional intent to allow a non-recourse creditor the right to credit bid in a proposed sale of the property pursuant to a plan of reorganization); *In re SunCruz Casinos, LLC*, 298 B.R. 833, 838-39 (Bankr. S.D. Fla. 2003) (denying confirmation of a plan that prohibited the secured creditor from

credit bidding its claim and holding that the secured creditor may credit bid the full amount of its claim including the unsecured deficiency portion).

The SunCal Plan Proponents have asserted that the Lehman Creditors' treatment is being offered under Bankruptcy Code §1129(b)(2)(A)(iii) (indubitable equivalence).  *See In re Philadelphia Newspapers, LLC*, 599 F.3d 298, 317-18 (3d Cir. 2010) (holding that the cramdown provisions under § 1129(b)(2)(A) provide a debtor with a set of options and subsection (iii) permits sales without credit bidding so long as the secured creditor receives the indubitable equivalent of its secured claim);[36] *Bank of New York Trust Co., et al. v. Official Unsecured Creditors' Committee, et al. (In re The Pacific Lumber Co., et al.)*, 584 F.3d 229 (5th Cir. 2009) (same).  Ninth Circuit law is inapposite and requires that credit bidding be afforded to secured creditors in the plan context.  *See Monarch Beach*, 166 B.R. 428 and *California Hancock, Inc.*, 88 B.R. 226.  In any event, even under the *Philadelphia Newspapers* and *Pacific Lumber* cases, the burden on the SunCal Proponents remains to show that its sales scheme affords the Lehman Creditors with the "indubitable equivalent" of their claims.  In *Philadelphia Newspapers*, the court held that the indubitable equivalent standard under § 1129(b)(2)(A)(iii) requires a debtor to establish that the consideration under the plan is equal to the unquestionable value of the secured creditor's interest in the collateral.  *Philadelphia Newspapers*, 599 F.3d at 310.  And, in Pacific Lumber the parties actually had litigated over the value of the collateral and the bankruptcy court had made findings prior to the confirmation hearing.  *Pacific Lumber*, 584 F.3d at 248 and 249.  The debtors in Pacific Lumber were permitted to sell their assets pursuant to § 1129(b)(2)(A)(iii) and prohibit credit bidding because the value of the collateral was known at the time of confirmation thereby ensuring that any cash payment equal to such value was the indubitable equivalent of the secured claims.  *Id.*  The SunCal Plan Proponents' efforts to exclude the Lehman Creditors from the confirmation process is contrary to the best means

---

[36] In the dissenting opinion in *Philadelphia Newspapers*, Judge Ambro recognized that the analyses in both the majority's opinion and Pacific Lumber are deficient because their reliance on disjunctive nature of section 1129(b)(2)(A) renders an anomalous interpretation of the secured creditor cramdown section.  In his persuasive dissent, Judge Ambro explains that by interpreting § 1129(b)(2)(A)(iii) to permit a sale of a secured creditor's collateral without credit bidding undoubtedly places the two clauses in conflict:  "It seems Pickwickian to believe that Congress would expend the ink and energy detailing procedures in clause (ii) that specifically deal with plan sales of property free of liens, only to leave general language in clause (iii) that could sidestep entirely those very procedures. Unlike the majority, I do not read the language to signal such a result; I read the text to show congressional intent to limit clause (iii) to those situations not already addressed in prior, specifically worded clauses." 599 F.3d at 329.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

to determine the value a secured creditor's collateral, *i.e.*, credit bidding. *Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Systems Corp.)*, 432 F.3d 448,460 (3d Cir. 2006) (permitting a secured creditor to credit bid the full amount of its claims (even the unsecured portion) and recognizing that this is the best way to determine the value of the collateral).

The SunCal Plan Proponents' pending claims objections, setoff/recoupment contentions, and equitable subordination claims should not foreclose the Lehman Creditors' rights to credit bid. The case law is full of examples permitting secured creditors holding disputed claims to credit bid. *Bank of Nova Scotia v. St. Croix Hotel Corp.* (*In re St. Croix Hotel Corp.*), 44 B.R. 277, (D.V.I. 1984); *In re Miami General Hospital, Inc.*, 81 B.R. 682, 687-88 (S.D. Fla. 1988); *In re Octagon Roofing*, 123 B.R. 583, 592 (Bankr. N.D. Ill. 1991). Although the Debtors' claim objections appear to seek to offset against the Lehman Creditors' claims under $100 million, the remaining Lehman claims, even after a successful reduction by $100 million, still would greatly exceed the estimated value of the Projects. Even if subordination were granted, there still would be no reason that the balance of the Lehman Creditors' claims (even if subordinated) could not be credit bid.

Here, a summary elimination of the rights of the Lehman Creditors to credit bid for the collateral is without any basis or justification. As noted above, the Lehman Creditors are contesting the proposed sales and bidding procedures. The Lehman Creditors believe that Elieff and SunCal are afforded too much discretion in the sales process, whether or not credit bidding is permitted, particularly in light of their conflicting economic interests in finding a buyer that will assume or eliminate their Bond Issuer indemnity obligations and use and/or partner with them to develop and/or manage the Projects. Only the Lehman Creditors have a strong incentive to see Project values maximized. If equitable subordination is denied, as the Lehman Creditors expect, no other creditor gets anything from the sales proceeds. If equitable subordination to any Claim ultimately is granted, because each Project likely is worth more than any Debtor's allowed Reliance Claims against such Debtor, again, only the Lehman Creditors' claims (even if subordinated) would be benefitted or harmed by a higher or lower Project sale price. Thus, without the ability to credit bid, the Lehman Creditors, who are the only party with a compelling interest in ensuring that a fair price is achieved, would have no tool to ensure that result. If the Lehman Creditors are prohibited from

1   credit bidding, the SunCal Plan Proponents' discretion over the sales process would be enhanced and

2   no substitute mechanism would be in place to assure the Lehman Creditors the indubitable

3   equivalence of their credit bidding protection or foreclosure rights.  Accordingly, absent elimination

4   of the prohibition on credit bidding, the SunCal Plans and the sale procedures therein are at odds

5   with the statutory scheme prescribed by Congress because without credit bidding they fail to show

6   how the Lehman Creditors will receive the indubitable equivalent of their secured claims.

7       Moreover, SunCal must concede that the Lehman Creditors, even if subordinated, would

8   have subordinated secured claims if any Project were worth more than the allowed claims against its

9   owner Debtor.  No argument can even be made that the Lehman Creditors should lose credit bid

10  rights for any such estimated residual portion of their secured claims.

11           **e.       The SunCal Plans propose to Improperly Strip the Lehman**
                         **Creditors of Recourse Claims against the Plan Trust**
12
13      The SunCal Plans propose to improperly strip the Lehman Creditors of recourse

14  claims against the Plan Trust, as reflected in SunCal Disco § 6.3 (Lehman Disputed Administrative

    Claims) and § 8.2 (all other Lehman Creditor Claims).  None of the distribution schedules reflect
15
    distributions on account of the Lehman Creditors' general unsecured claims.  Virtually all of the
16
    Lehman loans are entitled to recourse.  To the extent any would be non-recourse, they are entitled to
17
    recourse under 11 U.S.C. § 1111(b) because there is no definitive provision in the SunCal Plans for
18
    the sale of the Collateral, only an indication of a desire to sell.
19
20           **f.       The SunCal Plans Must Provide Disputed Claims Reserves for**
                         **Unsecured Claims**
21      The SunCal Plans do not require the Plan Trustee to set aside reserves to ensure that

22  the holders of disputed unsecured claims receive the same distributions as the holders of allowed

23  unsecured claims in the event their disputed unsecured claims are ultimately allowed.  This is

24  especially problematic given that, pending a resolution of the Lehman Adversary Proceeding, the

25  Lehman Creditors will have substantial deficiency claims against all or substantially all of the

26  Debtors for which substantial reserves must be retained.  Failure to provide adequate reserves for

27  disputed unsecured claims is disparate treatment that could not be confirmed as "fair and equitable"

28  to holders of such claims.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

### 6.    The SunCal Plans Violate the Absolute Priority Rule

The SunCal Plans violate the absolute priority rule in two respects:

First, Acquisitions, an indirect parent of each of the Debtors, and its principal Elieff receive under the SunCal Plans, among other things, (a) control over Project sales, the Lehman Adversary Proceeding and claims objections, all as Plan Trustee, (b) a blanket release of Estate claims and (c) allowance of claims for Acquisitions. Those rights have substantial value to Acquisitions and its direct and indirect owners. The valuation of the proposed exchange of consideration by the Estates and insiders is not possible; no estimates of relevant amounts or values were provided.

Equity security holders are not allowed to receive any distribution under a plan on account of their equity interests unless objecting classes of claims senior to their equity interests are afforded the treatment set forth in Section 1129(b)(2) of the Bankruptcy Code. *See Liberty Nat'l Enters. v. Ambanc La Mesa Ltd. P'ship (In re Ambanc La Mesa Ltd. P'ship)*, 115 F.3d 650, 654 (9th Cir. 1997), *cert. denied*, 522 U.S. 1110 (1998); *Bonner Mall P'ship v. U.S. Bancorp Mortgage Co. (In re Bonner Mall P'ship)*, 2 F.3d 899, 906-07 (9th Cir. 1993). The "new value" exception allows junior interest holders (*e.g.*, equity holders in a corporate debtor) to receive a distribution of property under a plan if they offer "value" to the reorganized debtor that is: (1) new; (2) substantial; (3) money or money's worth; (4) necessary for a successful reorganization; and (5) reasonably equivalent to the value or interest received. *Bonner Mall*, 2 F.3d at 909. Only those contributions that will actually be paid on the effective date of the plan may be considered as "money or money's worth" under the new value exception. *See, e.g., Ambanc*, 115 F.3d at 654-55 ("The relevant amount for the substantiality analysis is the partners' up-front contribution"). In determining whether the new value contribution is "reasonably equivalent to the value being received," courts have required that the new value be substantial in comparison to such things as (1) the total unsecured claims against the debtor, (2) the claims being discharged, or (3) the dividend being paid on unsecured claims by virtue of the contribution. *Id.* at 656.

Literally none of these requirements are satisfied by the SunCal Plans. The loan is not "money or money's worth." As noted above, SunCal Disco § 14.2 (Feasibility) makes clear that the SunCal Proponents intend to fund administrative and priority claims from Project sales. Thus, not

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

only is none of the loan being provided when the SunCal Plans *actually* go effective (upon

confirmation), even on the later, so-called "Effective Date," no funding may be needed or

forthcoming.  The loan is not "necessary for a successful reorganization" (this is a liquidation).

There also is no fair exchange of value. Whatever funds Acquisitions may be called upon to advance

are treated under the SunCal Plans as a <u>loan</u>.  The loan is contingent on the exhaustion of other

resources. Separately from the "new value" to be received through control of sales, litigation and

claims, Acquisitions also receives in exchange for the loan: (i) repayment of <u>previously extended</u>

<u>cash</u> even if previously disapproved by the Court and (ii) a blanket release of Estate claims (and,

gratuitously, a release of its direct and indirect owners).  The benefits on each side of the exchange

are not revealed; no analysis was provided. Thus, for the control afforded Acquisitions under the

SunCal Plans of sales and litigation and claims objections, the amount of the "new value" it offers

may be zero. Any such "new value" certainly is not substantial by any measure.

> **7.      The Appointment of Acquisitions as the Plan Trustee Violates
> Bankruptcy Code Section 1129(a)(5)(A)(II)**

In order for the SunCal Plans to be confirmed, the appointment of Acquisitions as the Plan

Trustee must be "consistent with the interest of creditors and equity security holders and with public

policy."  11 U.S.C. §1129(a)(5)(A)(II).  Under the SunCal Plans, the Plan Trustee will control the

sales of Projects and Assets, prosecute the Lehman Adversary Proceeding, receive undisclosed

compensation, and be the sole party responsible for objecting to Claims, with limited exceptions.

However, Acquisitions has irreconcilable conflicts in carrying out these responsibilities, because (a)

Elieff benefits from trading off a lower purchase price in Project sales for either or both (i)

assumption or elimination of Elieff's and Acquisitions' Bond Issuer indemnity obligations by the

Acquisitions' selected buyer, or (ii) the selection of SunCal by the buyer to develop/manage the

subject Project(s); and (b) as to the Lehman Adversary Proceeding, if Litco is tied in any fashion to

any of Elieff's affiliates (there is no disclosure on this point), then Elieff or his affiliates, as assignee

of claims purchased under the Litco Offer, may utilize Acquisitions' control of the Lehman

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1     Adversary Proceeding to afford their own Claims better treatment.[37]

2          **8.     The SunCal Plans Violate the Best Interest of Creditors Test**

3          The "best interest of creditors" test under section 11 U.S.C. § 1129(a)(7)(A)(ii) requires that

4     creditors receive as much pursuant to a chapter 11 plan as they would from a chapter 7 liquidation.

5     Yet, certain creditors appear likely to receive higher recoveries in a chapter 7 liquidation than under

6     the proposed SunCal Plans.  The SunCal Proponents sidestep this by relying on highly speculative,

7     baseless or unclear assumptions and projections.

8          Exhibit 7 to each of the SunCal Discos purports to summarize recoveries under the SunCal

9     Plans, but (a) it is wrong and wholly useless based on its inclusion of an error code ("#ref!") in lieu

10    of any debt amounts, (b) it assumes each Debtor will achieve entity-wide success (which the law

11    prohibits) on the equitable subordination claims against the Lehman Creditors, (c) it excludes the

12    Lehman Creditors altogether, (d) its chart misleadingly treats the claims of creditors who are not

13    beneficiaries of the Lehman Adversary Proceeding as if they were such beneficiaries, (e) it includes

14    no chapter 7 analysis, and (f) lumps together secured, priority and general unsecured creditors.

15    Without clarity and more detail, the projections' conclusions for creditors appear highly misleading.

16    The analysis is plainly inadequate and the "best interest of creditors" test is not met.

17         Moreover, there appears to be a partial redistribution built into the structure of the SunCal

18    Plans that should leave at least some creditors worse off under the SunCal Plans than in liquidation.

19    The SunCal Plans are unclear as to whether each Estate is being kept separate post-confirmation as

20    to payment of (i) the accrued post-confirmation fees and expenses of <u>all</u> Estates (which expenses are

21    likely to be substantial if the Lehman Adversary Proceeding is prosecuted) or (ii) the Acquisitions

22    Administrative Loan.  *Id.* at §§ 6.2, 6.4 & 10.8, pp. 57-58, & 75-76.  Some mechanics to prevent

23    and/or address this possible unfair allocation among the Debtors under a single plan are required.

24    Moreover, the four SunCal Plans lack any discussion of the allocation of costs among the 22 Debtors

25

---

26    [37]  As noted herein, the SunCal Plans provides that the two Committees will each have 25% "decision-making authority
      with respect to settlement of the Lehman Adversary Proceeding," while Acquisitions will have 50% decision-making

27    authority.  *See, e.g.,* SunCal Disco (Group I), § 10.22.1, pp. 80-81.  While the SunCal Disco indicates that Acquisitions
      will not have sole control over any settlement in the litigation, assuming majority votes control, (a) its 50% control

28    means it has a blocking position on all settlement decisions and needs only one creditor to join it to be able to control any
      settlement decision and (b) apparently, it will retain sole control over all other aspects of that litigation.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    covered by the four SunCal Plans.

2         In addition, showing the results of equitable subordination does not distinguish the recoveries

3    under the SunCal Plans from a chapter 7 liquidation. Whatever claims exist against the Lehman

4    Creditors would continue to exist after a conversion of all of these cases to chapter 7.  Yet, there are

5    claims that are released under the SunCal Plans against Acquisitions and affiliates that are not

6    identified or assigned any value in the SunCal Discos that should diminish the recovery rates under

7    the SunCal Plans as compared to recoveries in a chapter 7 liquidation.  This is not reflected.

8    **B.    The SunCal Discos Do Not Contain Adequate Information Pursuant to Section
         1125 of the Bankruptcy Code[38]**

9
10        Even if this Court were to conclude that the SunCal Plans are not so patently flawed as to

11   render them unconfirmable as a matter of law, the SunCal Discos fail to satisfy section 1125 of the

12   Bankruptcy Code in several material respects.  Section 1125 of the Bankruptcy Code requires that a

13   plan proponent must provide holders of impaired claims with "adequate information" so that

14   creditors can make an informed decision on whether they should support a proposed chapter 11 plan.

15   Specifically, section 1125(a)(1) of the Bankruptcy Code provides:

16        "[A]dequate information" means information of a kind, and in sufficient
          detail, as far as is reasonably practicable in light of the nature and history of
17        the debtor and the condition of the debtor's books and records … that would
          enable … a hypothetical investor of the relevant class to make an informed
18        judgment about the plan . . . .

19   11 U.S.C. § 1125(a)(1).  In determining whether a plan proponent has provided "adequate

20   information" to creditors and parties in interest, the standard is not whether the failure to disclose

21   information would harm creditors but whether "hypothetical reasonable investors receive such

22   information as will enable them to evaluate for themselves what impact the information might have

23   on their claims and on the outcome of the case, and to decide for themselves what course of action to

24   take."  *In re Applegate Prop., Ltd.*, 133 B.R. 827, 831 (Bankr. W.D. Tex. 1991); *see also In re*

25   *United States Brass Corp.*, 194 B.R. 420, 423 (Bankr. E.D. Tex. 1996) ("The purpose of the

26   disclosure statement is not to assure acceptance or rejection of a plan, but to provide enough

27
_____
[38] Due to page limitations, the following discussion and balance of this Objection do not offer exhaustive lists of the
     many ways in which the SunCal Discos fail to provide adequate information. The Lehman Creditors reserve all rights
28   to supplement this Objection to which they may be entitled or as permitted by the Court.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1  information to interested persons so they may make an informed choice between two alternatives").

2  Significantly, the Ninth Circuit has found that even if more thorough disclosure would not have

3  affected an objecting creditor's vote, that creditor still has standing to object because inadequate

4  disclosure may have induced *other* creditors to approve the plan. *In re Perez*, 30 F.3d 1209, 1217

5  (9th Cir. 1994).

6      As reflected above or discussed below, because the SunCal Discos omit basic information

7  about matters of primary concern to creditors, or misrepresents the facts or law concerning such

8  matters, creditors simply lack "adequate information" to make an informed decision as to whether to

9  accept or reject the SunCal Plans.

10      **1.    The SunCal Proponents' Disclosure Concerning the Costs, Uncertainties,
          Merits and Effect of the Lehman Adversary Proceeding is Inadequate**

11

12      There are only two reasons that a creditor would vote for the SunCal Plans: one reason is the

13  promise of recovery to be gained from Acquisitions' prosecution of the Lehman Adversary

14  Proceeding, and in particular the equitable subordination claims asserted therein; and the other

15  reason is the Litco Offer for Reliance Claims of Group I Debtors.  The SunCal Discos contain a

16  highly one-sided account of the Lehman Adversary Proceeding and other claims against the Lehman

17  Creditors that falls far short of adequately describing the risks, uncertainties, potential costs, and

18  likely delays of a successful outcome (if any) in the Lehman Adversary Proceeding or other

19  proceedings against the Lehman Creditors for the Debtors, as well as the significant steps that the

20  SunCal Proponents will have to undertake related thereto (including preparing for and engaging in

21  trial and the inevitable multi-year appeals).  Thus, by their omission of such details, the SunCal

22  Discos suggest by implication an inflated probability of success and inflated present value of any

23  recovery in the Lehman Adversary Proceeding.

24      As such, the SunCal Proponents' disclosure is both inadequate and misleading.  First, the

25  SunCal Discos must fairly disclose that absent success in the Lehman Adversary Proceeding, general

26  unsecured creditors of all but four Debtors will receive virtually nothing.  Second, the SunCal Discos

27  must clearly and thoroughly describe the risks of such litigation in this section and other sections of

28  the SunCal Discos.  As one bankruptcy court has emphasized in determining the inadequacy of a

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

disclosure statement that included only "glowing opinions" of the proponents:  "The path of all litigation tends to be uncertain … ."  *In re Dakota Rail, Inc.*, 104 B.R. 138, 149 (Bankr. D. Minn. 1989).  The SunCal Discos should either reference or attach as an exhibit the contentions of the Lehman Creditors with respect to the action.

Critically, the SunCal Discos must disclose that even if the Lehman Adversary Proceeding is "successful," because recoveries must be creditor specific, some creditors and/or creditors of some Estates may still receive nothing under the SunCal Plans.  The SunCal Plans simply disregard well-established law, and the representations in the SunCal Discos to that effect are fundamentally misleading.  The Ninth Circuit standard for the equitable subordination of a claim in a chapter 11 case is clear:

> The subordination of claims based on equitable considerations generally requires three findings: "(1) that the claimant engaged in some type of inequitable conduct, (2) that the misconduct injured creditors or conferred unfair advantage on the claimant, and (3) that subordination would not be inconsistent with the Bankruptcy Code."

*Henry v. Lehman Commercial Paper, Inc. (In re First Alliance Mortgage Co.)*, 471 F.3d 977, 1006 (9th Cir. 2006); *Feder v. Lazar (In re Lazar)*, 83 F.3d 306, 309 (9th Cir. 1996) (*citing Benjamin v. Diamond (In re Mobile Steel Co.*)), 563 F.2d 692, 699-700 (5th Cir. 1977)).  It is applied only to the extent necessary to offset the specific harm caused by the inequitable conduct.  *See In re Westgate California Corp.*, 642 F.2d 1174, 1178 (9th Cir. 1981).[39]  *The analysis is creditor-specific*:  "[a] claim will be subordinated only to the claims of creditors whom the inequitable conduct has disadvantaged."  *Stoombus v. Kilimnik*, 988 F.2d 949, 960 (9th Cir. 1993) ("the bankruptcy court should have looked at the harm to each of the relevant creditors to determine whether Kilimnik's claim should be subordinated to their claims and, if so, to what extent").[40]

In the face of the foregoing authority, the SunCal Discos and their recovery analysis,

---

[39] *See also In re Mobile Steel Co.*, 563 F.2d at 701 (amount of the claim subordinated must be proportionate to the damage caused by the alleged "inequitable conduct"); *Matter of Bird Engineering, Inc.*, 47 B.R. 193, 197 (Bankr. D. Neb. 1985) (equitable subordination goes no further than to level off actual disparities that have been created by consequence of a claimant's misconduct, and must be fitted to actual injury done or the unjust enrichment involved).

[40] *See also In re Fabricators*, 926 F.2d 1458, 1470 (5th Cir. 1991); *In re Heartland Chemicals, Inc.*, 136 B.R. 503 (Bankr. C.D. Ill. 1992) (secured creditor's claim could only be subordinated to extent of actual harm suffered by individual trade creditors as a result of secured creditor's alleged inequitable conduct; actual harm suffered by debtor's trade creditors could only be measured by amount of inventory actually shipped by trade creditors in reliance on secured creditor's purported misrepresentations).

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1   formatted as set forth in Exhibit 7, even if debt amounts were inserted therein, mislead creditors with

2   their disingenuous, over-simplistic assumption that all of the Lehman Creditors' claims will be

3   subordinated to claims of all creditors.  In the Lehman Adversary Proceeding, the Court already has

4   rejected such broad-brush analysis, ruling that any equitable subordination analysis must be creditor

5   specific. Thus, "success" as to equitable subordination does not support the amount or broad-based

6   nature of the recoveries that the SunCal Discos project will be available to all creditors.

7
          **2.      Inadequate Information is Provided regarding the Litco Offer in the
8                   SunCal Plan (Group I).**

9          The SunCal Disco (Group I) is wholly lacking in essential and material information

10  regarding the Litco Offer such that the SunCal Disco (Group I) provides inadequate disclosure.

11  Nowhere in the SunCal Disco (Group I) is there any indication that Litco or any one else is

12  committing to make the Ltico Offer or has the funds to do so.  Further, there is no estimate of the

13  total amount likely payable if all eligible Class 5 Reliance Claimants elect to receive the Litco Offer.

14  Without an estimate of the amount of claims in Class 5, no estimate is possible of the amount to be

15  paid by Litco under the Litco Offer and, thus, whether Litco has sufficient funds or financial

16  wherewithal to establish whether the SunCal Plan (Group I) is feasible.

17         Further, it is unclear whether the Exhibit 8 list of Reliance Claimants provides an exhaustive

18  list of holders of Reliance Claims or whether other creditors can obtain the Class 5 "right to sell"

19  their claims by in some manner, showing that they hold Reliance Claims.  If creditors not currently

20  on Exhibit 8 can obtain a Litco Offer, the procedures to become entitled to that offer must be

21  provided.

22         Moreover, if Exhibit 8 is exhaustive, then there must be disclosure of the methodology

23  utilized by SunCal in constructing Exhibit 8.  Only Reliance Claimants are to receive the option to

24  elect to vote for the Plan and receive the Litco Offer.  Yet, Reliance Claims are broadly defined as

25  claims that, *inter alia*, "would entitle the holder thereof to be the beneficiary of any equitable

26  subordination judgment." SunCal Disco, § 2.1.120, p. 21.  Information regarding how SunCal

27  determined which holders of Reliance Claims to include in Exhibit 8 is wholly lacking.

28         Even how to accept the Litco Offer is not explained. Without a more fulsome explanation in

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

the SunCal Disco (Group I) of the key information indicated above, the Litco Offer is wholly

illusory.

### 3. The SunCal Discos Do Not Fully or Fairly Present Likely Distributions under the SunCal Plans or the Timing of Any Such Distributions

The projections of distributions to general unsecured creditors in the SunCal Discos, set forth

in Exhibit 7, presently are altogether missing, but even if inserted, based on the current format,

would be highly misleading.

In the SunCal Discos, SunCal omits a "best interest of creditors" analysis that was included

in SunCal's Second Amended Disclosure Statement, namely an analysis that assumed that the

Lehman Creditors' claims are not equitably subordinated.  The reason for this omission is obvious:

the deleted chart (at pages 130-131 of SunCal's Second Amended Disclosure Statement) discloses

that, absent success in pursuit of the equitable subordination claims against the Lehman Creditors,

the creditors of all but four Estates receive nothing.  As mentioned above, at minimum, in

connection with any projections as to the effects of the SunCal Plans, the SunCal Discos must fully

and fairly disclose that absent success in the Lehman Adversary Proceeding, general unsecured

creditors of most Debtors will receive nothing.  Furthermore, the SunCal Discos should disclose that

even if the Lehman Adversary Proceeding is successful, for reasons more fully discussed above,

some creditors of certain Estates may still receive nothing under the SunCal Plan.

Exhibit 7 shows nothing as to recoveries for the Lehman Creditors. It is unclear as to which

other creditors they apply.  In any event, it is misleading whether it (a) lumps all creditors together

(whether holding secured, priority, and general unsecured claims) or (b) applies only to general

unsecured claims.  This is because they clearly fail to show different recoveries for Class 6 creditors

(who, by definition, are not beneficiaries of the equitable subordination claims) and Class 5 creditors

(entitled to the benefits of any equitable subordination judgment). SunCal's disregard for the

difference between the SunCal Plans' Class 5 and Class 6 creditors may reflect SunCal's mistaken

view that a recovery analysis for creditors can be predicated upon entity-wide Debtor by Debtor

equitable subordination of all of the Lehman Creditors' Claims to all general unsecured claims.  In

any event, the circumstance that would result if the Lehman Adversary Proceeding were wholly and

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

partially unsuccessful also should be set forth.

Importantly, as well, the SunCal Discos fail to estimate when any distributions to creditors will be made under the SunCal Plans (other than the Litco Offer for Reliance Claimants of Group I Debtors). Such information is plainly required for creditors to weigh the benefits and risks of the SunCal Plans, particularly in contrast to the timing of payments under the competing Lehman/Trustee Plans.

**4.    The SunCal Discos Lack Adequate Information Concerning the Necessity, Availability and Effect of Partial Substantive Consolidation**

The SunCal Discos are unclear as to the extent to which substantive consolidation of the Debtors' assets and liabilities is implemented under the SunCal Plans. As discussed above, the SunCal Plans' distributive mechanisms appear to implement a partial consolidation of the Debtors' assets and liabilities. In that SunCal removed the express provisions for substantive consolidation that had been contained in the prior SunCal plans, it is possible that the elements of substantive consolidation remaining are vestigial provisions that SunCal will hereafter remove. If not, the SunCal Proponents must discuss in the SunCal Discos the legal and factual grounds for any substantive consolidation in whole or in part under the SunCal Plans. Among other things, the SunCal Discos do not disclose any evidence indicating the ability to satisfy the requisite legal criteria for substantive consolidation. The SunCal Discos fail to indicate – let alone prove – that unsecured creditors dealt with the Debtors as a single economic unit, or that they did not rely on their separate identity in extending credit,[41] or that the Debtors' financial affairs are hopelessly entangled. *See In re Bonham*, 229 F.3d 750, 766 (9th Cir. 2002).

**5.    The Sales and Bidding Procedures Are Vague and Confusing**

The proposed bidding procedures described in the SunCal Discos and SunCal Plans not only are improper and inadequate for all of the reasons set forth above, but also are vague and confusing – even to parties actively involved in these cases. For voting on the pending competing plans to be

---

[41]   The Debtors' Projects are located throughout California. Even a cursory review of the claims docket reflects that creditors of the various Debtors were generally specific to a particular Project, and were obviously not dealing with the Debtors as a single entity. In addition, each of the subcontractors that has filed a motion for relief from the stay in these cases has sought such relief with respect to a specific Debtor legal entity related to work performed in connection with Project(s) owned by that respective entity.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

meaningful, the SunCal Proponents must address the numerous problems with the their proposed

bidding procedures prior to soliciting votes on such plans.

### 6. The SunCal Discos Lack Adequate Information Concerning the Best Interests of Creditors Test and Alternatives

The "best interests of creditors" test under section 11 U.S.C. § 1129(a)(7)(A)(ii) requires that

creditors receive as much pursuant to a chapter 11 plan as they would from a chapter 7 liquidation.

The analysis of the SunCal Disco on this issue (presented at pages 86-87 and in Exhibit 7) is

dismally inadequate.  Exhibit 7 purports to summarize recoveries under the SunCal Plans, but, as

noted above, is defective.

A creditor is left to assume that in most instances, it will receive a hundred cents on the

dollar or an otherwise substantial recovery, and therefore could not possibly do better in a

liquidation.  However, no comparison is made, and the assumptions are plainly false, as repeatedly

described above.  Moreover, aspects of the SunCal Plans that differ from a chapter 7 liquidation are

not highlighted.  Because alternatives are presented by the Lehman/Trustee Plans that offer set

percentage returns to creditors, adequate information to vote on the SunCal Plans requires that the

SunCal Proponents estimate creditor returns by Class and note the result if the Lehman Adversary

Proceeding and other litigation against the Lehman Creditors is unsuccessful.

### 7. The SunCal Discos Do Not Provide Adequate Information Concerning Acquisitions' Conflicts of Interest and the General Release Being Granted to Acquisitions and its Affiliates

Under the SunCal Plans, the Plan Trustee will control the sales of Projects and Assets,

prosecute the Lehman Adversary Proceeding and be the sole party responsible for objecting to

Claims, with limited exceptions.  However, Acquisitions has irreconcilable conflicts in carrying out

these responsibilities.

The projections attached to a prior disclosure statement of the SunCal Proponents (as well as

the terms of the prior attempted sale to D.E. Shaw) made clear that Elieff and Acquisitions intended,

to trade a lower purchase price for sale of certain Projects in exchange for the buyer agreeing to

assume or eliminate Elieff's and Acquisitions' Bond Issuer indemnity obligations. Because giving

Acquisitions control of the sales of the Projects affords it the opportunity to attempt to make this

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

tradeoff again, whether or not it makes economic sense for the Estates and their creditors, disclosure of this conflict is essential.

As to the prosecution of the Lehman Adversary Proceeding, the relief afforded for equitable subordination is to be determined creditor by creditor. Assuming that certain creditors elect to accept the Litco Offer and SunCal achieves some success in the highly speculative Lehman Adversary Proceeding, Acquisitions will be both the trustee of, and, in practical effect, a beneficiary of the Plan Trust with respect to any net proceeds from the Lehman Adversary Proceeding.  This creates inherent conflicts of interest.  With Acquisitions holding a block of such Claims and simultaneously prosecuting the Lehman Adversary Proceeding for other holders of such Claims, there is a significant risk that Acquisitions may utilize its control of the prosecution of the Lehman Adversary Proceeding to seek that its own Claims be afforded better treatment, through litigation or in a settlement, than that to which the facts entitle them.

The SunCal Discos also fail to adequately disclose and describe that only the Plan Trustee may object to claims and that intercreditor disputes as to priority with respect to collateral might thereby be ignored.

### 8.    The SunCal Discos Lack Adequate Information Regarding Feasibility, Including the Financial Wherewithal of Acquisitions

Pursuant to section 1129 of the Bankruptcy Code, the Court may not confirm the SunCal Plans if the SunCal Proponents fail to prove that the SunCal Plans are feasible.  Bankruptcy Code § 1129(a)(11) requires a plan proponent to show concrete evidence of sufficient funds to fulfill obligations under a plan.  *See* COLLIER ON BANKRUPTCY at ¶1129.03[11] (15th Ed. 1997); *S&P, Inc. v. Pfeifer*, 189 B.R. 173, 183 (N.D. Ind. 1995), *aff'd*, 78 F.3d 587 (7th Cir. 1996).  In addition, courts have denied confirmation of plans whose feasibility was contingent upon future sales of property if there is an inadequate showing that such future sales would occur.  *See, e.g.*, *Crestar Bank v. Walker (In re Walker)*, 165 B.R. 994, 1005 (E.D. Va. 1994).

While section 14.2 of the SunCal Discos is entitled "Feasibility," this section does not in fact contain any discussion of the amount of cash necessary both to confirm the SunCal Plan and to properly implement it nor address the ability of Acquisitions or Litco to fund administrative and

1    priority Claims, Professional Fees and other post-confirmation expenses or the Litco Offer.  In light

2    of the above referenced collection efforts against Acquisitions and Elieff and the pending judgments

3    and liens, such information is critical.

4                                                    **IV.**

5                                            **CONCLUSION**

6           WHEREFORE, the Lehman Creditors request that approval of the SunCal Discos be denied.

7    Dated:    April 29, 2011                    PACHULSKI STANG ZIEHL & JONES LLP

8

9                                          */s/ Robert B. Orgel*
                                           Richard M. Pachulski (CA Bar No. 90073)
10                                         Dean A. Ziehl (CA Bar No. 84529)
                                           Robert B. Orgel (CA Bar No. 101875)
11                                         10100 Santa Monica Blvd., Suite 1100
                                           Los Angeles, CA 90067-4100
12                                         Telephone:  (310) 277-6910
                                           Facsimile:  (310) 201-0760
13
                                           -and-
14
                                           WEIL, GOTSHAL & MANGES LLP
15                                         Edward Soto (admitted *pro hac vice*)
                                           1395 Brickell Avenue, Suite 1200
16                                         Miami, FL 33131
                                           Telephone:  (305) 577-3125
17                                         Facsimile:  (305) 374-7159

18                                         Attorneys for Lehman Commercial Paper Inc.,
                                           Lehman ALI, Inc., Northlake Holdings, LLC
19                                         and OVC Holdings, LLC

20

21

22

23

24

25

26

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

# EXHIBIT "A"

EXHIBIT "A"

**Exhibit "A"**
**to Lehman Creditors' Objections to SunCal Discos**

| Obj. # | Nature of Objection | Description of Objection | SunCal Disco (Group I) §; Page # |
|---|---|---|---|
| 1. | Disclosure | <u>Omission re Plan Groupings:</u>  SunCal inexplicably fails to itself disclose to the Court or creditors the basis for its plan groupings.  After doing their own analysis, the Lehman Creditors assume the following groupings have the following distinguishing characteristics:<br><br>Group I (4 Debtors):   Lehman Commercial asserts direct interest in some Loans: 55% ALLEGED Claims Purchase Offer & Auction:  (Palmdale Hills' Ritter Ranch Project, Bickford Ranch Project, Marblehead Project, SunCal PSV's Palm Springs Village Project) (Mixed Trustee Debtors and Voluntary Debtors)<br><br>Group II (6 Debtors):  Lehman Commercial asserts direct interest in some Loans: Auction but no Claims Purchase Offer:  (Acton Project, Delta Coves Project, Emerald Meadows Project, Heartland Project, Northlake Project & Oak Valley Project) (Mixed Trustee Debtors and Voluntary Debtors)<br><br>Group III (6 Debtors): There is No Lehman Claim or Lien Except at the Parent Level:  Auction but no Claims Purchase Offer: (Beaumont Heights Project, Johannson Ranch Project, Summit Valley Project - which is owned by 3 debtors, SunCal Summit Valley, Kirby Estates & Seven Brothers) (All Voluntary Debtors)<br><br>Group IV (6 Debtors): Lehman ALI (but not Lehman Commercial) asserts direct interests in the Loans: Auction but no Claims Purchase Offer:  (Del Rio (no Project), SCC Comm.'s Joshua Ridge Project, Oak Knoll Project, SJD Partners' Pacific Point Project, Tesoro Project & SunCal Torrance's Del Amo Project) (Mixed Trustee Debtors and Voluntary Debtors) | Cover page |
| 2. | Disclosure | <u>Omissions re Acquisitions Conflicts and Compensation:</u>  The Lehman Creditors, in their competing plans and disclosure statements, forthrightly acknowledge that they want to obtain conveyance of the Projects and provide for an independent trustee to be paid hourly to administer funds and claims for the creditors.  SunCal offers itself as Plan Trustee, gives itself a blocking position on settling the Lehman Adversary Proceeding, discretion to select an Opening Bid and Stalking Horse Bidder, to determine Qualifying Bidders and to determine the Claims to object to.  Yet, no where is there clear disclosure that SunCal has an economic interest in finding a buyer that will assume/eliminate Elieff's and Acquisitions' Bond Issuer indemnity obligations or select SunCal to develop/manage the Projects and that, once that happens (by the Effective Date) if its own Claims are disallowed, it will have no economic interest in prosecuting the Lehman Adversary Proceeding that it is supposed to fund, and that its compensation for its post-confirmation services are undisclosed. | |
| 3. | Disclosure | <u>Competing Plans:</u>  "[T]he creditors holding claims against the Debtors will have the opportunity to choose between one of the two Plans."<br><u>This misstates the law.</u> Creditors can vote for both competing plans.  One or the other Plan might fail at the confirmation hearing for other reasons, *e.g.*, a lack of feasibility. Also, if both Plans are confirmable, the Court decides which to confirm under § 1129(c). | Art. I, p. 3 |

| Obj. # | Nature of Objection | Description of Objection | SunCal Disco (Group I) §; Page # |
|---|---|---|---|
| 4. | Disclosure; Confirmation | "Acquisitions Administrative Loan:" The definition and description lack appropriate disclosure, is vague and ambiguous, and its terms appear inappropriate.<br><br>The definition affords "allowed" status to undisclosed sums for undisclosed purposes due from undisclosed Debtors allegedly advanced by Acquisitions even without Court approval or authority.  These insider Administrative Claims must be itemized and Court approved and/or verified by an independent trustee.<br><br>There must be disclosure of whether the repayment obligations of the Debtors are joint and several or independent and whether the Debtors will indemnify each other if one pays in excess of its share.<br><br>The "complete release" for Acquisitions, includes "Litigation Claims," which include claims objections. This is count to the power afforded the Committees to object under Plan § 7.21.1 to the claims of Acquisitions and its affiliates.  Further, the consideration for the release appear illusory. Discl. Stmt. § 14.2 provides that sales will fund all administrative and priority claims, such that the plan is not relying upon this loan. Further, Acquisitions has provided no evidence of its ability to fund anything at all, nor has explained what would be its motivation for providing such litigation funding if its own Claims are subject to disallowance and disallowed and will not benefit from the litigation.<br><br>Providing Elieff and Acquisitions and their affiliates a release, including as to objections to their claims, without fair consideration (as well as providing them control of sales and claims objections) violates the "absolute priority rule" and causes the plans not to be "fair and equitable." | §2.1.2 & 10.20, pp. 4-5, 80 |
| 5. | Confirmation | "Administrative Claim(s)" does not include Claims under §507(a)(3) (gap claims) as required by §1129(a)(9)(A) | § 2.1.3; p. 5 |
| 6. | Confirmation; Disclosure | "Allowed:" The relating definitions are unclear as to whether any objections are permissible to the status of claims, (e.g., administrative, priority or secured), as opposed to their amount, or whether objections are permitted to claims scheduled as undisputed, unliquidated and contingent.  Such objections must be permitted and the definitions should be clear on this. | §§ 2.1.6-10; p. 5-7 |
| 7. | Disclosure; Confirmation; Clerical Error | "Bond Claim(s)" and "Bond Indemnification Claim":  The use of the terms appears to be wrong; and thus, confusing and not fair. By example only, the definitions of "Acquisitions" and "Elieff" describe them as purportedly liable on the "Bond Claims" while it appears that they are purportedly liable on what are described here as "Bond Indemnification Claims." | § 2.1.21 and 2.1.23; p. 9 |
| 8. | Disclosure; Confirmation | "Break-Up Fee:"   The definition is part of a set of improper, slanted, unfair, tainted and bad faith bid procedures.  It also is vague, confusing and incomplete.  Nothing prevents Acquisitions from selecting itself or an affiliate to have the Opening Bid and thus receive the Break-Up Fee being proposed supposedly as a necessary tool to attract bidders.  Not only has SunCal failed to show a break-up fee is appropriate at all in these cases, it is proposing one that is higher than typical break fees in complicated transactions involving the sale of operating businesses.  Permitting Acquisitions to use the bidding process to benefit itself and chill other potentially higher bidders is not fair or equitable. | § 2.1.27; p. 9 |
| 9. | Confirmation or Clerical Error | "Claims Bar Date" definition of March 31, 2009 ignores exceptions identified in Debtors' prior Notice for governmental entities, rejection claims, etc. | § 2.1.34; p. 10 |
| 10. | Confirmation; Feasibility | No Disputed Claims Reserve:  Plan appears to contemplate claims objections post-Confirmation but lacks mechanic for delaying payment for potentially disputed Claims or reserving payment on initially Disputed Claims, such that ultimately Allowed Claims either may be (a) diluted by payments on ultimately disallowed Claims due to failing to delay payment pending objection or (b) altogether unpaid due to lack of reserved funds (which, in either event, would cause failure of the best interests test in a liquidating, absolute priority case and provide for disparate treatment within a class of creditors). | §§ 2.1.35, 2.1.51, 11.2.1 & 12.2.1; pp. 10, 12, 82, 85 |
| 11. | Disclosure; Clerical Error | "Contingent Bond Claims" being defined as "Unmatured Bond Claims" is misleading, confusing and wrong.  Maturity relates to whether a claim is "due". The contingent nature of a claim relates to whether a claim is "owing." The Lehman Creditors could not find where this confusing, wrong term was used. | § 2.1.41; p. 10 |

| Obj. # | Nature of Objection | Description of Objection | SunCal Disco (Group I) §; Page # |
|---|---|---|---|
| 12. | Disclosure; Confirmation | "Disputed Liens" appear to be defined too broadly by making all liens "disputed" that are "subject to a Disputed Secured Claim" whereas § 506(c) expressly provides that a lien cannot be avoided where the claim is disputed based on failure to file a timely proof of claim. The Debtors must either limit the definition or add a qualifier in usage of the term to avoid conflict with § 506(c). | § 2.1.47; p. 11 |
| 13. | Confirmability | "Effective Date": For Group I and II Debtors' SunCal Plans, this date is defined as one selected by SunCal Plan Proponents within 120 days after Confirmation Date or, if later, when the LCPI stay of the SunCal Plans terminates. For Group III and IV Debtors' SunCal Plans, this date is defined as one selected by SunCal Plan Proponents within 60 days after the Confirmation Date. Nonetheless, various authorizations are granted under the Plan effective as of the Confirmation Date, such that the Confirmation Date is the actual "effective date" of the Plan when administrative and priority claims must be paid, regardless of this definition to the contrary. | § 2.1.52; p. 12 |
| 14. | Disclosure; Clerical Error | "Final Order" is defined as any entered order, which makes calling it "Final" misleading and confusing. | § 2.1.59, 10.17 & 16.2; pp. 13, 79, 89 |
| 15. | Clerical Error | "Legal Rate:" This term is not used. | § 2.1.68; p. 14 |
| 16. | Disclosure; Clerical Error | "Lehman Adversary Proceeding" is defined incorrectly as being against the Lehman Lenders and/or the Lehman Successors. However, Lehman Commercial is not presently a defendant due to its stay, making this misleading and confusing. | § 2.1.69; p. 14 |
| 17. | Disclosure; Confirmation | "Lehman Disputed Administrative Loans:" The definition says that these loans are "the subject of claim objections." This appears to be a fanciful creation of the SunCal Proponents to delay paying timely and in cash these administrative claims of over $33 million. These postpetition loans already have been determined by final order of this Court to be allowed (generally as secured and superpriority administrative claims). The Lehman Creditors are anxious to scrutinize, and have not yet seen, any such objection to the status of these loans. Moreover, SunCal also contends that the far smaller loans to the Voluntary Debtors have been "repaid" in "the full amount." They fail to disclose that the interest thereupon was not repaid. | § 2.1.71; p. 14 |
| 18. |  | "Maximum Distribution:" This term is not used. |  |
| 19. | Disclosure; Confirmation | "Minimum Increment:" The definition is part of a set of improper, slanted, unfair, tainted and bad faith bid procedures. It also is vague, confusing and incomplete. First, setting a $250,000 minimum incremental overbid for any bid on one or more Projects might be too high or too low depending on which Project or Projects are the subject of the bid. SunCal has its and the Lehman Creditors' value estimates and can and should propose bid increments tied to each Project. Second, if a Break-Up fee is determined appropriate, it should only be part of the bid increment on the first overbid and not on any overbids thereafter. | §§ 2.1.90, p. 16 |
| 20. | Disclosure; Confirmation | "Net Sales Proceeds" hides within the definition that the Debtors propose to pay general costs of administration, including Trustee's fees, from Secured Creditors' collateral without their consent. Also, inclusion of all selling expenses is too broad. Secured Creditors are entitled to specific enumeration of expenses to be paid from their collateral and/or hearing after the fact for approval thereof. | §§ 2.1.92, p. 17 |
| 21. | Disclosure; Confirmation | "Opening Bid:" The definition is part of a set of improper, slanted, unfair, tainted and bad faith bid procedures. It also is vague, confusing and incomplete. Nothing prevents Acquisitions from selecting itself or an affiliate to have the Opening Bid and thus receive the Break-Up Fee being proposed supposedly as a necessary tool to attract bidders. Moreover, the terms of the Opening Bid are not even hinted at. Will Acquisitions only select an Opening Bid from an offeror who agrees to assume or eliminate Elieff's and Acquisitions' Bond Issuer indemnity obligations and/or to use/partner with SunCal? Permitting Acquisitions to use the bidding process to benefit itself and its affiliates and chill other potentially higher bidders is not fair or equitable. | §§ 2.1.94, p. 17 |

| Obj. # | Nature of Objection | Description of Objection | SunCal Disco (Group I) §; Page # |
|---|---|---|---|
| 22. | Disclosure; Confirmation; Clerical Error | <u>"Plan Documents"</u> and <u>"Plan Supplement"</u> are defined in a circular fashion. The "Plan Documents" are all documents attached to the Plan Supplement and the "Plan Supplement" is the "compilation of the Plan Documents." This is confusing, misleading and unfair. | §§ 2.1.102 & 2.1.104, p. 19 |
| 23. | Disclosure; Confirmation | <u>"Plan Trust Property:"</u>  The definition permits Acquisitions to exclude any property it chooses without any further discussion or disclosure of this broad discretion, the exercise of which prevents creditors from getting as much as they would in a liquidation, where assets would be excluded only where an independent party (trustee) assessed them to be burdensome to the estate. | § 2.1.111, p. 20 |
| 24. | Disclosure; Confirmation; Clerical Error | <u>"Projects:"</u> These are identified in Exh. "1." As SunCal is aware, the Lehman Creditors are attempting to investigate and get authority to obtain through discovery documents concerning Del Rio, its assets and/or their disposition.  The Del Rio asset description contains errors that make such description unclear and confusing.  In light of the questions raised concerning this debtor and its assets, if not corrected, leaving this uncorrected would contribute to making the Plan unfair: <br><br>   "The Del Rio Estate owns the net proceeds of the proceeds of the CFD Bonds that were issued by the City of Orange, authorized by the Order of the Bankruptcy Court on March 156, 2010. Del Rio CFD Bonds after use and application as provided in an Acquisition Agreement, including the payment of certain undisputed creditors" | § 2.1.117, p. 21; and Exh. 1, p. 103 |
| 25. | Disclosure; Confirmation | <u>"Qualifying Bidder:"</u> The definition is part of a set of improper, slanted, unfair, tainted and bad faith bid procedures.  It also is vague, confusing and incomplete.  Setting a $250,000 deposit amount for any bid for a Project might be too high or too low depending on which Project or Projects are the subject of the bid. SunCal has its and the Lehman Creditors' value estimates and can and should propose bid deposits tied to each Project.  Moreover, there should be clarity that the deposits will be held in segregated, DIP trust accounts or in escrow and the terms of return thereof should be detailed in accordance with customary practice. Further, nothing prevents Acquisitions from selecting as a Qualifying Bidder itself, an affiliate or an entity who agrees to use Acquisitions as its developer/manager, based on such self-serving purposes alone. Permitting Acquisitions to use the bidding process to benefit itself and chill other potentially higher bidders is not fair or equitable. | § 2.1.119, p. 21 |
| 26. | Disclosure; Confirmation | <u>"Reliance Claim"</u> and <u>"Reliance Claimants:"</u> The Lehman Creditors note that it is their understanding from SunCal that it does not necessarily intend to afford Reliance Claimants the "right to sell" at the amounts set forth on Exhibit 8 (*e.g.*, at least as to listed contingent claims and possibly others). Thus, while the listing of Reliance Claimants, in the appropriate context, may be beneficial to creditors, the following omissions or provisions make the current formulation of these definitions cause SunCal's disclosure statement to lack adequate disclosure and are vague and confusing, making the plan unfair and inequitable:  (a) SunCal fails to indicate whether this list of Reliance Claimants is exhaustive or others can apply to have the treatment made applicable to them, (b) if Exhibit 8 is an exhaustive list, then the definition of "Reliance Claim" makes no sense because SunCal reveals no connection between its definition and its list; (c) if Exhibit 8 is not an exhaustive list, SunCal fails to indicate the standards or process for a creditor to get onto the list; and (d) if Exhibit 8 is not an exhaustive list, SunCal fails to reveal its methodology for determining why it included some and excluded some claimants from the listing, which is necessary for the plan to be fair and equitable. | § 2.1.120 & 2.1.21, p. 21 |

EXHIBIT A, p. 4 (Lehman Creditors' Objection to SunCal Discos)

| Obj. # | Nature of Objection | Description of Objection | SunCal Disco (Group I) §; Page # |
|---|---|---|---|
| 27. | Disclosure; Confirmation | "Sale Period:" The concept and definition are vague, confusing, and fail to satisfy disclosure requirements, and leaves the plan unfair and inequitable. <br><br> First, in defining the "Sales Period" as the period starting on Confirmation and ending 60 days after the Effective Date for SunCal to "consummate a sale or liquidation of the Plan Trust's Assets," the Debtors utterly fail to delineate which, if any, actions the plan is authorizing them to undertake before the Effective Date (and thus while the stay is in place as to the Group I and II Debtors). To say they only will take actions not stayed is no disclosure at all.  Moreover, as to all Debtors, affected by the Lehman Commercial stay or not affected by the Lehman Commercial stay, if a plan is not effective before its Effective Date, it affords no one authority to do anything. Yet, SunCal appears to contemplate that confirmation of a non-effective plan will authorize something to occur during the portion of the Sales Period that is prior to the Effective Date. They just don't specify what. If a plan provides that prior to its defined "Effective Date," a plan actually is effective, then the plan's definitions are too confusing and leave the plan unfair and inequitable. <br><br> Second, as to the Group I and II Debtors Plans, the "Sales Period" extends for an indefinite period after Confirmation.  During the indefinite "Sales Period," collateral of certain holders of real property tax claims, mechanic's liens and the Lehman Creditors are not permitted to enforce their Liens. Yet, the Plan fails to provide adequate protection of any kind for these Claim holders by way of ensuring that there is no diminution in the value of their collateral, compensating for such diminution, paying interest, committing to maintain and pay taxes on properties, etc. | § 2.1.124, p. 22 |
| 28. | Disclosure; Confirmation | "Stalking Horse Bidder:" The definition is part of a set of improper, slanted, unfair, tainted and bad faith bid procedures.  It also is vague, confusing and incomplete.  The process for determining the Opening Bid and Stalking Horse Bidder are not set forth. Further, nothing prevents Acquisitions from selecting itself as the Stalking Horse Bidder, selecting an affiliate or only selecting an entity to be the Stalking Horse Bidder who agrees to use Acquisitions as its developer/manager. Permitting Acquisitions to use the bidding process to benefit itself and chill other potentially higher bidders is not fair or equitable. | § 2.1.127, p. 22 |
| 29. | Disclosure; Clerical Error | "[T]his Section 3.2" is a phrase contained in Section 2.2. | § 2.2, p. 25 |
| 30. | Disclosure | "SunCal Management … has management contracts with respect to all of the Projects."  This statement appears false or misleading.  While the Lehman Creditors continue to seek any such contracts in connection with their objections to the SunCal Management Claims, their understanding is that SunCal management contends certain of such contracts are not in writing and the phrasing above applies to the contrary. This is no small issue. The Lehman Creditors believe that the greatest barrier to a consensual plan is SunCal's claims or demands for itself. Accuracy as to SunCal's statements regarding its Claims is important. | § 4.1.1, p. 28 |
| 31. | Disclosure; Confirmation; Clerical Error | "Group II:"  Here and throughout the plan and disclosure statement, SunCal appears to incorrectly refer to a different debtor Group than the context suggests. Here, in the Group I Disclosure Statement, this section refers to where the values appear for Group II Projects and refers to the sale of Group II Projects. These repeated errors require correction. | § 4.1.1, p. 28 |
| 32. | Disclosure; Confirmation | Sales Procedures:  The disclosure statement inaccurately describes the plan's sales procedures as "designed to yield the highest market price for these assets."  This is false and misleading. The plan's actual procedures are improper, slanted, unfair, tainted and bad faith bid procedures.  They also are vague, confusing and incomplete.  Standard procedures for sales of substantial assets in a bankruptcy case are detailed, prevent insider manipulation, offer full transparency, limit the use of bid chilling break-up fees and minimum overbids to necessary cases, and include customary limitations upon break-up fees and bid increments when employed. | § 4.1.1, p. 28 |
| 33. | Disclosure | "Primary Secured Creditors:"  SunCal provides a confusing and inaccurate description in section 4.1.2.  Most importantly for disclosure purposes, SunCal's narrative description is inconsistent with its description of the same claims in Exhibit 3 to the disclosure statement, referenced in section 4.1.3. Also, this narrative is inconsistent with the plan debtor groupings, which appear to be based, in part, on whether or not Lehman Commercial asserts to hold any claims against the applicable grouping of debtors. Finally, this narrative is inconsistent with the Lehman Creditors' assertions contained in their previously and currently filed disclosure statements. | §§ 4.1.2 and 4.1.3, pp. 29-30 |

| Obj. # | Nature of Objection | Description of Objection | SunCal Disco (Group I) §; Page # |
|---|---|---|---|
| 34. | Disclosure | "Factual Circumstances," "Potential Preferential Transfers," and "Significant Events:" These discussions in the disclosure statement are outdated and replete with misleadingly undisclosed opinion statements portrayed as fact, and there are misleading omissions, including of the existence of Bankruptcy Court and District Court decisions, final orders and appellate opinions rejecting certain of the Debtors' contentions. In all, this is not only inadequate and misleading disclosure, but, in the context of competing plans, some scrutiny of the accuracy of SunCal's comments is critical to ensure a fair, voting process. As written, these discussions make the SunCal plans unfair and inequitable.  By example only: <br><br>a) In section 4.2.1, SunCal alleges as fact a series of unsubstantiated, opinion statements or factual statements with material omissions that lead it to, misleadingly, invite creditors "to take the measure of the parties who are now proffering the competing plans – the Lehman Lenders." In this one paragraph alone: <br><br>SunCal asserts as fact that "most of the unsecured claims asserted against the Debtors were incurred at the insistence of the Lehman Lenders" and "a substantial part of claims that the Lehman Lenders failed to pay are being asserted against all of the Debtors."  Yet, by far, the largest unsecured claims in the cases, outside of the Lehman Creditors' deficiency claims, appear to be the contingent claims of Arch and Bond Safeguard based on their performance bonds issued for the benefit of municipalities.  (*See* SunCal's Ex. 8 to disclosure statement.)  The Lehman Lenders believe that most of those commitments to the municipalities and issuances of performance bonds preceded mid-2007.  And, SunCal alleges that, "[p]rior to the market downturn in the middle of 2007, Lehman Representatives afforded SunCal substantial discretion in the management and development of the Projects." Thus, without more information or description, the above quoted statements appear substantially misleading and need clarification. <br><br>Also, SunCal states as fact that "the Lehman Lenders failed to pay the claims of Creditors prepetition" without adding, as it does buried in section 5.4.1.7, that the Lehman Creditors deny having had or having any obligation to make such payments. Further, SunCal states as fact that "the Lehman Lenders attempted to foreclose upon the Group I Project post-petition in order to deny the unsecured creditors any recovery" (emphasis added) without any basis for attributing such a ridiculous motive to the Lehman Creditors.  Finally, SunCal states as fact that "the Lehman Lenders attempted to destroy the Debtors' reorganization and sale efforts to (sic) manipulating LCPI's alleged automatic stay," (apparently referencing the unwinding of the Lehman Commercial repo to Fenway, which included certain of the subject loans), without mentioning, as SunCal appears to begrudgingly do later in section 5.5.1, that such unwinding of the repo was approved by the New York Bankruptcy Court. <br><br>Most importantly, SunCal asks that creditors use this misleading recitation of alleged facts "to take the measure of the parties who are now proffering the competing plans – the Lehman Lenders." SunCal is explicit in its hope that this false and misleading "history will lead the Creditors to conclude, when weighing the merits of the Lehman Lenders (sic) Plan offer:  "Fool me once shame on you, fool me twice shame on me." <br><br>b) In sections 4.2.2 to 4.3, SunCal sets forth allegations as if from a complaint without providing any disclosure of whether or the nature of the Lehman Creditors' disputes of the allegations.  This is not disclosure.  SunCal must acknowledge the disputed nature of the allegations and, where appropriate, set forth the nature of the disputes. <br><br>c) Section 5.1.2 speaks of a pending application by the MB Firm that already has been dealt with.  This section should be updated. <br><br>d) In section 5.1.3, SunCal accuses the Lehman Creditors of filing a motion for stay relief on loans they didn't own and implies this means creditors cannot "trust" them.  Yet, SunCal fails to disclose the position taken by the Lehman Creditors with respect to these loans or to explain how granting stay relief to a party that allegedly doesn't hold a lien would benefit that party or how it would hurt the Debtors.  The Debtors attempt to prove too much. <br><br>e) In section 5.3.2, SunCal refers to the DIP financing to the Trustee from the Lehman Creditors as a "forced loan" without mentioning that this Court approved the so-called "forced loan."  Moreover, SunCal defines these loans in its Plan as the Lehman Disputed Administrative Loans, without here or in section 5.4 disclosing the basis or nature of any dispute as to these loans for | §§ 4.1.5 – 5.7.6, pp. 30 - 56 |

| Obj. # | Nature of Objection | Description of Objection | SunCal Disco (Group I) §; Page # |
|---|---|---|---|
| | | which the final orders approved allowed claims for the Lehman Creditors (typically secured and superpriority administrative). As written, the disclosure is false and misleading and fails to separate fact from opinion. | |
| 35. | Disclosure | <u>SJD Partners' Connection to Other Debtor:</u>  "This course of conduct [of Lehman ALI and LV Pacific Point] is relevant [because] [t]he holders of bond claims against SJD Partners are asserting their massive claims against the estates of all of the Debtors, including the estates of the Group I Debtors. Accordingly, Lehman ALI's wrongs against SJD Partners directly affect the Group I Debtors' cases." This is misleading absent noting that SunCal also contends that the cross-indemnity claims of the bond issuers are voidable as fraudulent transfers, which, if correct, would undercut the foregoing contention. | § 4.2.10, p. 39 |
| 36. | Disclosure | <u>Allegation that Lehman Creditors cannot be trusted:</u>  "Lehman ALI and LCPI – are asking these same creditors to vote on their plan and to "trust" them. Besides the unfairness of the entire context of this, as noted above, this also is misleading absent identifying the sense in which the plans proposed or co-proposed by the Lehman Creditors ask creditors to "trust" them. | § 5.1.3, p. 43 |
| 37. | Disclosure | Alleged "Forced Loans" of Lehman Creditors:  In section 5.3.2, SunCal implies that each of the Group I Debtors had ample funds to pay for all expenses for which the Lehman Creditors advanced the Lehman Administrative Loans of approximately $33.5 million in total. This is false and misleading.  The Debtors appear to admit that most of the Debtors' cash is owned by Palmdale Hills and held in an account on which there is a prepetition control agreement for the Lehman Creditors. Absent disclosing that anywhere near $33.5 million would have been available, this discussion must be stricken. Moreover, to enable creditors to evaluate SunCal's contention in other places that the Lehman Administrative Loans are disputed, SunCal should disclose that those loans were allowed as administrative superpriority and secured claims by final court orders. | § 5.3.2, p. 45 |
| 38. | Disclosure | <u>Confirmation Hearing to be Used to Try Equitable Subordination Claims:</u>  "[A]s the above facts and those that will adduced prior to and at the confirmation of the Plan will demonstrate, the Lehman Entities are in fact obligated to pay [the claims of the vendors who provided goods and services to the Projects and the claims asserted by the Bond Claimants]" The Lehman Creditors believe that the trial on equitable subordination cannot and/or will not take place at the confirmation hearing and, thus, that the above statement either needs modification or elimination. | § 5.4.1.7, p. 51 |
| 39. | Disclosure | <u>Equitable Subordination by Recoupment</u>:  "If these claim objections are sustained by the Court, then, in the case of recoupment, the amount of damages incurred by the Debtors on account of the Lehman Entities' failure to pay the vendor and bond claims will directly reduce the amount of the Lehman Entities secured claims, leaving equity available for the payment of all Allowed Unsecured Claims." The Debtors should be required to disclose that <u>the Lehman Creditors contend</u>:  (a) that the relief sought by these Claim Objections requires stay relief in the Lehman Commercial bankruptcy case as to the Group I and Group II Debtors; (b) that any offset, if applicable, ultimately may result in a reduction of the debt amount, but such offset would occur <u>before</u> bifurcation of the debt into secured and unsecured claims, such that it only would affect the Lehman Creditors' deficiency claims; and (c) only equitable subordination on a creditor-by-creditor basis can re-order the priority of two allowed claims and the Lehman Creditors vigorously dispute the availability and applicability of equitable subordination in these cases. | § 5.4.1.7, p. 52 |
| 40. | Disclosure | <u>Bond Safeguard Motion</u>:  Wrongly states that the Bond Safeguard motion for approval of the late filing of its claims has not yet been heard. | § 5.7.6, p. 56 |

| Obj. # | Nature of Objection | Description of Objection | SunCal Disco (Group I) §; Page # |
|---|---|---|---|
| 41. | Confirmation | <u>Delayed Effective Date</u>:  Delaying the "Effective Date" (defined for at least the Group I and Group II Debtors as when the Lehman Commercial stay is lifted) impermissibly delays payment of priority and administrative claims payable under § 1129(a)(9) on the "effective date of the plan." Defining the "Effective Date" to be something other than the actual "effective date of the plan," cannot satisfy the mandate of § 1129(a)(9). | Art. VI, pp. 57-59 |
| 42. | Confirmation | <u>"Lehman Administrative Loans:"</u>  Provision for repayment of "Lehman Administrative Loans" is deficient.  This is an ILLEGAL PROVISION that does not comply with strict requirement for administrative claims of § 1129(a)(9)(A) that they receive "on the effective date . . . cash equal to the allowed amount of such claim." This provision, instead, proposes that Lehman Administrative Claims are non-recourse. It limits their payment to funds in specified accounts and certain assets. No plan can be confirmed without providing for payment of administrative claims on the effective date in cash. | § 6.3, p. 57 |
| 43. | Confirmation | <u>Discretion of Acquisitions to Repay Itself Without Court Approval</u>:  Repayment by Acquisitions of administrative claims without any prior court approval should exclude insider claims to prevent self-dealing.  In that SunCal contends that the Lehman Creditors hold the last position subordinated claims and Acquisitions is entitled to be repaid its Acquisitions Administrative Loan from proceeds of the liquidation, overpayment to SunCal or its affiliates would directly impact and prejudice the Lehman Creditors and deny them their best interests rights. | § 6.4, p. 58 |
| 44. | Clerical Error | <u>"General Administrative Claims Bar Date"</u> is an undefined term.  The appropriate term appears to be "Administrative Claims Bar Date." | § 6.5, p. 58 |
| 45. | Clerical Error | <u>"Priority Tax Claims"</u> is an undefined term. The appropriate term appears to be "Tax Claims entitled to priority under . . . ." | § 6.6, p. 59 |
| 46. | Confirmation | <u>Secured real property tax claims</u> in Classes 1.1 to 1.4 get no payments during the "Sales Period", are proscribed from enforcing their liens during the Sales Period and are not afforded adequate protection. This cannot afford them the indubitable equivalence of their liens. Rights to adequate protection pending payment cannot be taken away absent clear provisions to ensure collateral value will be maintained. | § 8.1; pp. 65-66 |
| 47. | Confirmation; Clerical Error | <u>Project Sales Provisions re Lehman Secured Claims</u>:<br><u>Clerical Error</u>:  It appears that §§ (A) and (B) are incomplete. § (A)(3) covers sales of Projects on the Effective Date. § (B) (mislabeled in the disclosure statement again as (A)) describes what happens after the Sales Period, which ends <u>60 days after</u> the Effective Date. Nothing describes what happens with Projects sold during the <u>60 days after</u> the Effective Date.<br><u>The treatment of Lehman Secured Claims cannot satisfy cramdown requirements</u>.<br>§ (A)(2): Lehman Secured Claims in Classes 2.1 to 2.4 get no payments during the "Sales Period," are proscribed from enforcing their liens during the Sales Period, and are not afforded adequate protection. This cannot afford them the indubitable equivalence of their liens. Rights to adequate protection pending payment cannot be taken away absent clear provisions to ensure collateral value will be maintained.<br>§ (A)(3)(a):  These provisions fail to describe required marketing. Secured creditors and other creditors have a right to be told and comment upon and Court must approve proposed marketing and advertising means, terms, cost, and effort, in addition to timing;<br>§ (A)(3)(b):  These provision give a conflicted party control over the process. It is improper for interested party, Acquisitions, to control selection of the Opening Bid and the Stalking Horse. An independent trustee could do it. In light of potential interest of Lehman Creditors in bidding and in accordance with customary practice for real estate sales in bankruptcy, it should be express that there will be no restrictive terms, such as might limit bidding to a single contract that includes terms not necessary to maximize the value of the Projects. This should not be left to Acquisitions.<br>§ (A)(3)(c):  This provision is improper. Acquisitions should not determine the Qualifying Bids and the $250,000 bid increment is too arbitrary.  An independent trustee should administer process and increment should be approved in advance using schedule that sets it Project by Project, essentially using a rounded percentage of estimated value.<br>§ (A)(3)(d):  Practically, to enable the free and clear sale there must be a provision that enables | § 8.2; pp. 66-68 |

EXHIBIT A, p. 8 (Lehman Creditors' Objection to SunCal Discos)

| Obj. # | Nature of Objection | Description of Objection | SunCal Disco (Group I) §; Page # |
|---|---|---|---|
| | | getting a separate recordable order for that purpose. Moreover, there must be certain limitations on the "free and clear" nature of the sale and those should be more clearly identified. E.g., (a) statutory liens for secured real property tax claims to the extent securing amounts required to be paid under the Plan; (b) certain easements, covenants, conditions, restrictions and other matters of record affecting real property, leasehold estates or personalty or any interest therein (to be particularly described with reference to appropriate preliminary title reports), (c) the effect of any building and zoning regulations, now existing or hereafter in effect with respect to the relevant Project that are not violated by the current use of the Project, (e) oil, mineral and/or water rights, and claims of title thereto, shown by the public records, (f) discrepancies, conflicts in boundary lines, shortages in area or encroachments which an inspection or survey of the subject Project would disclose and (g) other liens to which the transferee of the property, in connection with such transfer, agrees to take subject. | |
| | | § (A)(3)(e):  The Lehman Creditors dispute the denial of their credit bid rights and detail that argument in the accompanying pleading. Moreover, even as an allegedly subordinated creditor, there is no reason to deny the Lehman Creditors credit bid rights with respect to the balance of their enormous claims after the amount of the alleged Reliance Claims against the particular Debtor. | |
| | | <u>Omitted Provision for Project Sales on the Effective Date Requiring Proceeds to be Segregated and Liens to Attach to Proceeds</u>: | |
| | | (a) To provide the indubitable equivalence, there MUST be and is not a clear provision that the proceeds of the sales of the Projects all will be deposited into a Net Sales Proceeds account and that the disputed secured claims and liens will attach to the proceeds pending resolution of the disputes. There also must be provisions to provide adequate protection to the holders of disputed secured claims as to such account – that it will be held a U.S. Trustee approved institution, that the disputed secured creditors will be granted a lien on its contents which is perfected by the order confirming the plan and which they may require also be perfected by a control agreement (even if only enforceable on application to this Court) and that the account holder will be an independent trustee or disclosed and qualified institutional escrow agent. | |
| | | (b) The account must be interest bearing with the disputed lien attaching thereto as well. | |
| | | § (A)(4):  The definition of Plan Trust's Assets permits Acquisitions to exclude any asset it wishes to exclude. This is impermissible. Absent an order establishing that the asset is burdensome, failure to include it would deny creditor's indubitable equivalence and the plan would fail the "best interests" test. | |
| | | § (A)(4)(a) – (e):  All of the comments as to § 8.2(A)(3)(a) – (e) apply except as to the bid increment, as to which 5% is acceptable. | |
| | | § (A)(4):  The comments above as to the Net Sales Proceed account are equally applicable as to the account with respect to the sale of non-Project assets. | |
| | | § (B):  If the Project or Asset is not sold during the Sales Period, non-Project collateral is abandoned, but Project collateral is apparently retained. In either event: | |
| | | (a)        There is no explicit provision that the disputed secured creditor retains and may enforce its disputed claim and disputed lien, just a provision that the holder can pursue its claim "subject to a Final Order determining the … validity of the Disputed Liens;" and | |
| | | (b)        There is no provision requiring that the Plan Trustee maintain the Project or Asset or that otherwise affords a creditor adequate protection as to its collateral. Thus, the Plan Trustee can let the asset deteriorate while holding up the creditor by disputing its claim. | |
| | | (c)        MOREOVER, THERE IS AN ERROR. In the Class 2 Lehman Creditor treatment, while non-Project collateral is abandoned after the Sales Period, Projects are not. Yet, for Class 3 treatment of Mechanic's Liens, the Plan says "real property collateral" is abandoned if not sold by the end of the Sales Period. This is inconsistent. | |
| | | § (B)(1) – (3):  In violation of the indubitable equivalence requirements: | |
| | | (a)        This provision of the Plan PRIMES the Lehman Secured Creditors with a lien to "secure any recoupment or offset amount allowed by the Court in favor of the Debtor that owned such Project, pursuant to a claim objection filed by such Debtor." | |
| | | (b)        As written, this provision is so broad as to include any "offset amount" granted with | |

| Obj. # | Nature of Objection | Description of Objection | SunCal Disco (Group I) §; Page # |
|---|---|---|---|
| | | respect to the Lehman Secured Claims. Thus, this is a BAD FAITH provision not warranted by existing law or any nonfrivilous argument for extension, modification or reversal of existing law or the establishment of new law.<br><br>(c)  Further, the plan provides this impermissible priming lien may be enforced as if it were a judgment. However, because the Plan Trust is the owner of the Project and Assets, it is holding a lien against its own asset – which either should merge or permit it to foreclose out the then junior lien of the Lehman Secured Creditors without their having any ability to protect themselves from such windfall foreclosure. This is an outrageous provision.<br><br>(d)  Absent elimination or modification of this provision, the Plan violates § 1129(a)(3), which requires it be proposed in good faith. | |
| 48. | Disclosure; Confirmation | The Treatment of Mechanic's Liens cannot satisfy cramdown requirements to the extent any actually are Secured Claims.<br><br>Mechanic's Lien Claims in Classes 3.1 to 3.4 get no payments during the "Sales Period," are proscribed from enforcing their liens and are not afforded adequate protection. This cannot afford them the indubitable equivalence or their liens nor meet cramdown requirements. Rights to adequate protection pending payment cannot be taken away absent clear provisions to ensure collateral value will be maintained.<br><br>In the Class 2 Lehman Creditor treatment, while non-Project collateral is abandoned after the Sales Period, Projects are not. Yet, for Class 3 treatment of Mechanic's Liens, the Plan says "real property collateral" is abandoned if not sold by the end of the Sales Period. This is inconsistent.<br><br>The plan further provides that holders of Mechanic's Liens get no recourse to the Debtors. Because this class apparently includes Mechanic's Lien Claims, whether or not secured, to deny treatment to a creditors' deficiency claim would prevent the plan from satisfying the best interests test and would preclude cram down of this class. Moreover, affording a discharge to a Debtor in a liquidating Plan violates § 1141. | |
| 49. | Confirmation | The Treatment of Priority Claims is Unlawful.<br><br>Delaying the "Effective Date" (defined for at least the Group I and Group II Debtors as when the Lehman Commercial stay is lifted) impermissibly delays payment of priority and administrative claims payable under § 1129(a)(9) on the "effective date of the plan." Defining the "Effective Date" to be something other than the actual "effective date of the plan," cannot satisfy the mandate of § 1129(a)(9). | § 8.4, p. 69 |
| 50. | Disclosure; Confirmation | Reliance Claims Treatment Issues:<br><br>(a) Disclosure is inadequate where holders of Reliance Claims are afforded a "right to sell" their claims without anywhere creating an obligation of Litco to buy the Claims or providing any evidence or information regarding Litco's financial capabilities.<br><br>(b) See comments re definitions of Reliance Claims and Reliance Claimants for additional issues.<br><br>(c) The Group I Debtor plan violates § 1123(a)(4) and 1129(a)(3) due to the requirement that creditors are compelled to vote in favor of the Plan to receive the 55% cash out of their Claims. This treatment is not a necessary requirement to make the 55% "right to sell" effective. It thus violates the requirement for same treatment of each Claim in a class and is not fair and equitable. | § 8.5.; p. 70 |
| 51. | Clerical Error | Who Can Vote:  The sections contain errant and inconsistent statements about who can vote.  One section states that Allowed Claims in an impaired Class can vote without noting that the Claims must receive something under the plan.  The later section corrects that but also includes a statement that all Classes can vote other than Classes 4.1 and 4.2, although it later notes that Classes 7.1 to 7.3 are deemed to vote to reject the Plan. This is confusing. | § 9.3 & 9.6; p. 72 |
| 52. | Disclosure; Confirmation | Acquisitions as Plan Trustee:  Conflicts make this inappropriate. The SunCal disclosure fails to point out the conflicts. It also says the Plan Trust's expenses will include compensation payable to Acquisitions without disclosing that compensation. Acquisitions is aware of the Lehman Creditors view that it has asserted enormous administrative Claims in these Cases that appear wholly or largely unjustified. Failing to identify its conflicts and compensation going forward is a fatal failure for its disclosure and prevents confirmability due to, inter alia, §§ 1129(a)(5)(A) & (B). | § 10.3 & §10.9, pp. 74-76 |

| Obj. # | Nature of Objection | Description of Objection | SunCal Disco (Group I) §; Page # |
|---|---|---|---|
| 53. | Disclosure; Confirmation | <u>Acquisitions as Plan Trustee:</u>  Acquisitions conflicts are not disclosed, but disqualify it from serving as Plan Trustee under Bankruptcy Code § 1129(a)(5)(A)(II). | § 10.7, p. 75 |
| 54. | Disclosure; Confirmation | <u>Payment of Plan Trust Expenses:</u>  There is no indication of which Debtor will pay for what or how or whether allocation will occur of the Plan Trust's expenses.  Substantive consolidation is inappropriate with evidentiary showings likely impossible here. There must be a disclosed mechanism for allocation of expenses among Debtors. | § 10.8, p. 75-76 |
| 55. | Clerical Error | <u>Committees making Payment:</u>  This section says "the Committees" shall have the right to use certain funds to pay Allowed Claims. This is inconsistent with the rest of the Plan. | § 10.10, p. 76 |
| 56. | Confirmation | <u>Liability Limitations for Acquisitions are Inappropriate</u>:  As Benjamin Cardozo famously wrote in <i>Meinhard v. Salmon</i>, 249 N.Y. 458 (1928):  "A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior." SunCal proposes to be a go-forward, post-confirmation fiduciary, as Plan Trustee to the trust beneficiaries, including the Lehman Creditors, with no liability absent gross negligence or willful misconduct, and at times refers to only having to act in good faith. This is inappropriate, particularly here where the proposed Plan Trustee is a conflicted, insider being vested with broad discretionary powers that affect the Lehman Creditors and other creditors under the Plan, including tax valuations, abandonment of collateral, pursuit of Claims and a blocking position on settlement of the Lehman Adversary Proceeding. | § 10.14, p. 77 |
| 57. | Disclosure; Confirmation | <u>Acquisitions Obligations Pursuant to the Acquisitions Administrative Loan:</u>   See discussion of § 2.1.2, pp. 4-5. | § 10.20, p. 80 |
| 58. | Disclosure; Confirmation | <u>Acquisitions Conflicting Economic Interests and Settlement Blocking Position:</u>  With 50% voting to Acquisitions on any Lehman Adversary Proceeding settlement, SunCal must disclose that it is affording Acquisitions a <u>blocking position</u> on any settlement of the Lehman Adversary Proceeding.<br><br>Further, Acquisitions should be required to disclose that if the Claims of it and its affiliates are disallowed, Acquisition's sole economic interest in such a settlement would be to require that it be afforded the ability to develop the Projects. Thus, creditors looking for an economic settlement would be ceding control of settlement to a party with a very different motivation.<br><br>Acquisitions conflicted interests should preclude it from having a veto on any settlement.<br><br>If Lehman's Creditors' claims are subordinated, which is the goal of this plan, then only they will benefit or be harmed by the allowance or disallowance of SunCal's Claims and they must have authority to bring and prosecute such objections. | § 10.22.1, pp. 80-81 |
| 59. | Disclosure; Confirmation; Clerical Error | <u>Clarity, Modification Needed for "Litigation Claims" provisions</u>:  The "Litigation Claims" provision is confusing, lacks adequate disclosure and is inconsistent with other Plan provisions.<br><br>The section refers to the Plan Trust owning "Litigation Claims" (defined as claims belonging to a Debtor) "that are not purchased by Litco." But, while Reliance Claimants are afforded a "right to sell" their Reliance Claims to Litco, those claimants cannot sell what the Debtors own. This just makes no sense.<br><br>The section provides different treatment for Litigation Claims "valued at greater than" $100,000 without providing such valuation or means therefor.<br><br>Treatment sections for Mechanic's Liens and Lehman Secured Claims provide (inconsistently) for automatic abandonment of Assets (which, by definition, include Litigation Claims) and this section requires written notice for abandonment of Litigation Claims valued at greater than $100,000. | § 10.22, p. 81 |
| 60. | Clerical Error | <u>"Collection of Litigation Recoveries:"</u> This Plan section indicates that the Committees may deposit Litigation Recoveries in the applicable Distribution Accounts. Yet, it doesn't appear the Committees get control of anything other than insider claims objections. | § 10.23, p. 81 |
| 61. | Confirmation | <u>Another Inappropriate Limitation on Acquisitions' Liability</u>:  Limiting Acquisitions' liability to gross negligence or willful misconduct is inappropriate under this Plan.  Absent use of an independent trustee, with a conflicted insider involved, its fiduciary obligations should be as defined by California law and not limited.  See discussion of § 10.14. | § 11.2.2, p. 82 |

| Obj. # | Nature of Objection | Description of Objection | SunCal Disco (Group I) §; Page # |
|---|---|---|---|
| 62. | Confirmation | <u>Distribution Agent</u>: Acquisitions should not be excused from providing a fiduciary bond as to money for which it is a fiduciary. | § 11.1, p. 82 |
| 63. | Clerical Error | "<u>official claims agent for the Debtors:</u>" This section refers to an agent of which the Lehman Creditors are unaware. | § 11.5, p. 83 |
| 64. | Confirmation | <u>Acquisitions Exclusive Control of Claim Objections; Absence of Disputed Claims Reserve</u>: If Lehman's Creditors' claims are subordinated, which is the goal of this plan, then only they will benefit or be harmed by the allowance or disallowance of any Claims and they must have authority to bring and prosecute such objections.  Also, Acquisitions or its affiliates have a personal interest in allowance (and maximum payment by the Debtors) of the Bond Claims because they indemnified the Bond Issuers as to those debts.  Additionally, no Disputed Claims Reserve is provided for. | § 12.1, p. 84 |
| 65. | Disclosure; Confirmation; Clerical Error | <u>Best Interests:</u><br>Exh. 7 is in CLEAR ERROR, listing Claims at dollar amounts of "#REF".<br>Exh. 7 does not differentiate between the projected return for holders of Reliance Claims and other General Unsecured Claims.<br><u>SunCal's failure to disclose a projected return for Creditors holding General Unsecured Claims that are NOT "Reliance Claims" is a fatal omission</u>. In light of there being competing plans, this is essential to enable fair voting.<br>SunCal's statements regarding credit bidding are inaccurate and incomplete. Credit bidding is a protection for secured creditors to help ENSURE that any sales process achieves a "fair market value." The Lehman Creditors contend this assurance is essential here where the Lehman Creditors interest in achieving the highest and best price is in direct conflict with Acquisitions economic interest in being selected by the buyer as its partner to develop the Projects. | § 14.1, p. 87 |
| 66. | Disclosure; Confirmation | <u>Feasibility</u>:  SunCal's plan lacks feasibility and/or adequate disclosure regarding it.  SunCal's hinges feasibility on using Project sales on the Effective Date to fund administrative and priority claims.<br>First, Project sales can occur up to 60 days after the Effective Date, when the Project Sales are first to occur. Thus, SunCal must and fails to show that Acquisitions has available cash to fund the administrative and priority claims through the supposed "Acquisitions Administrative Loan."<br>Second, SunCal fails to disclose why Project sales proceeds will not be subject to the liens of the apparently disputed Lehman Secured Claims, as required by the "best interests" and indubitable equivalence requirements. Although the Debtors are seeking to offset against the Lehman Creditors' claims an amount less than $100 million, because the Lehman Creditors' claims are roughly $2 billion, collectively, the remaining Lehman claims still would greatly exceed the estimated value of the Projects. Thus, any suggestion that "recoupment" will result in available cash on the "Effective Date" to pay administrative and priority claim appears wrong or requires far more disclosure.<br>Third, SunCal ignores that Acquisitions also is to fund Lehman Adversary Proceeding litigation expenses and Litco supposedly is to fund the "right to sell" of Reliance Claimants in a total amount not disclosed, but which appears substantial from Exhibit 8.  The omission of any information regarding the financial wherewithal of Acquisitions or Litco precludes a finding of feasibility, supports the Lehman Creditors view that Acquisitions and its affiliates lack such financial capability and/or willingness, and validates the Lehman Creditors' view that affording Acquisitions the "complete release" for its unsupported Acquisitions Administrative Loan is wholly unjustified. | § 14.2, p. 87 |

# EXHIBIT "B"

EXHIBIT "B"

# EXHIBIT B

## Judgments*

| Creditor | Debtor | Amount Awarded | Filing County/Filing Date |
|---|---|---|---|
| Albuquerque Plaza Office Investments LLC | SunCal Management LLC | $198,002.00 | Orange (3/28/2011) |
| Baker Cal Venture, LP, A Limited Partnership | SCC Acquisitions, Inc. | $315,000.00 | Kern (3/28/11, 6/30/2010); Orange (7/6/2010) |
| GRAY1 CPB, LLC | Bruce Elieff, SCC Acquisitions, Inc. | $9,165,465.00 | Orange (9/10/2010) |
| Hopkins & Carley, A Law Corporation | SCC Acquisitions, Inc. | $265,557.00 | Los Angeles (7/28/10); San Bernardino (4/28/2010, 6/29/2010); Orange (4/9/10, 7/1/10); Ventura (6/28/2010) |
| HUI-LI DOU, Yen-Chu Change Dou, Yen-Chu Chang Dou as Trustee of TH HSU | SCC Acquisitions Inc. | | Riverside (12/29/2008) |
| John G Barthell | Bruce Elieff, CWC, Inc., Todd Kurtin | | Contra Costa (3/4/2002); Riverside (3/5/2002); San Bernardino (3/4/2002); San Diego (3/6/2002); San Joaquin (3/5/2002) |
| Jonathan H C and Cheng-Hua Tang | SunCal Investment Co Inc., Elieff Bruce, Casa Yorba Estates, JMC Development Inc. | $150,000.00 | San Diego (2/17/93) |
| Kapaar, Inc. | SunCal Management LLC | $320,584.00 | Riverside (4/23/2010); San Bernardino (4/23/2010); Orange (4/27/2010); Los Angeles (4/22/2010) |
| Manhard Consulting LTD ** | SCC Acquisitions Inc. | $155,731.00 | Orange (7/26/2010) |
| Michael Barnes | SCC Acquisitions, Inc., SunCal Copper Canyon LLC., et al | $26,006.00 | Contra Costa (9/27/2010); Sacramento (9/27/2010); San Bernardino (10/20/2010); Orange (9/29/2010) |
| Mobile Modular Management Corp., A California Corp. | SCC Acquisitions, Inc. | $72,000.00 | Orange (8/18/2010) |
| Mourier Land Investment Corporation | SCC Acquisitions, Inc. | $299,286.00 | Los Angeles (2/11/2011); Contra Costa (1/25/2011); Riverside (3/2/2011); San Bernardino (2/9/2011); San Diego (1/27/2011); Orange (2/8/2011); San Joaquin (2/2/2011); Ventura (1/27/2011) |

| Creditor | Debtor | Amount Awarded | Filing County/Filing Date |
|---|---|---|---|
| Park West Landscape Inc. | LBREP/L SunCal Master I LLC,<br><br>Mcallister Ranch,<br><br>SCC Acquisitions, LLC,<br><br>SCC Ranch Ventures, Inc.,<br><br>SunCal Management LLC | | Kern (9/22/2008) |
| RBF Consulting | SCC Acquisitions, Inc. | $238,464.00 | Orange (8/3/2010); Ventura (7/31/2009) |
| Rexco Magnolia, LLC | SunCal Management LLC | $387,500.00 | Los Angeles (3/1/2011); Riverside (3/1/2011); San Bernardino (3/3/2011); San Diego (3/1/2011); Orange (2/28/2011) |
| SDG Architects, Inc., Assigned to, Co-Operative AD | SCC Acquisitions, Inc. | $48,636.00 | Riverside (10/29/2010) |
| Wood Rodgers, Inc. | SCC Acquisitions, Inc. | $314,033.00 | Placer (4/19/2010); Santa Clara (4/15/2010); Sonoma (4/27/2010) |
| Wright Engineers of California | SCC Acquisitions, Inc. | $60,000.00 | Orange (10/26/2010) |
| | | | |
| **Totals:** | | | |
| **Bruce Elieff** | | **$9,315,465.00** | |
| **SCC Acquisitions, Inc.** | | **$10,934,172.00** | |
| **SunCal Management LLC** | | **$906,086.00** | |

\* The results set forth herein were obtained on April 27, 2011 by searching the California Public Records
database in Westlaw and accordingly include public filings only of counties that report electronically.
The public record reports obtained from Westlaw indicate that public record items
 reported therein may have been paid, terminated, vacated, or released.

\*\* On March 14, 2011, Manhard Consulting, Inc. ("Manhard") filed a Release of Lien [Dkt. # 1842] indicating that an
greement had been reached between Manhard and SCC Acquisitions, Inc. whereby Manhard will agree to accept an
agreed amount of money and file an Ackowledgment of Satisfaction of Judgment with respect to the action in which
Manhard obtained the judgment.  The Westlaw search results set forth herein indicate that the judgment is unsatisfied.

# EXHIBIT "C"

EXHIBIT "C"

# EXHIBIT C

## Liens*

| Secured Party | Debtor | Filing Type | Filing Date | Expiration Date |
|---|---|---|---|---|
| Baker-Cal Venture, LP | SCC Acquisitions Inc. | Judgment Lien | 7/1/2010 | 7/1/2015 |
| Gray1 CPB, LLC | SCC Acquisitions Inc. | Judgment Lien | 8/30/2010 | 8/30/2015 |
| Gray1 CPB, LLC | Bruce Elieff | Judgment Lien | 8/30/2010 | 8/30/2015 |
| Gulfstream Finance, Inc. | Bruce Elieff, Kathy Leight Abrahamson-Elieff, Kathy Leigh Elieff | Financing Statement | 10/3/2008 | 10/3/2013 |
| Hopkins & Carley, a Law Corporation | SCC Acquisitions Inc. | Judgment Lien | 6/24/2010 | 6/24/2015 |
| Hopkins & Carley, a Law Corporation | SCC Acquisitions Inc. | Attachment Lien | 12/5/2008 | 12/5/2011 |
| Kapaar, Inc. | SunCal Mangement LLC | Judgment Lien | 4/14/2010 | 4/15/2015 |
| Kapaar, Inc. | SunCal Mangement LLC | Judgment Lien | 6/7/2010 | 6/7/2015 |
| SDG Architects, Inc. | SCC Acquisitions Inc. | Judgment Lien | 10/13/2009 | 10/13/2014 |
| Wright Engineers of California, Inc. Lamb & Michael, A Professional Corporation | SCC Acquisitions Inc. | Judgment Lien | 7/21/2010 | 7/21/2015 |

* The results set forth herein were obtained on April 27, 2011 by searching the California Public Records
UCC database in Westlaw. The public record reports obtained from Westlaw indicate that public record items reported
therein may have been paid, terminated, vacated, or released.

| In re:<br>PALMDALE HILLS PROPERTY, LLC. AND ITS RELATED DEBTORS,<br>Debtor(s). | CHAPTER 11<br>CASE NUMBER 08-17206-ES |

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I.
Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

10100 Santa Monica Blvd., 11th Floor, Los Angeles, CA 90067

A true and correct copy of the foregoing document described as *OBJECTION OF LEHMAN COMMERCIAL PAPER INC.,*
*LEHMAN ALI, INC., NORTHLAKE HOLDINGS, LLC AND OVC HOLDINGS, LLC TO DISCLOSURE STATEMENTS*
*DESCRIBING CHAPTER 11 PLANS FILED BY SUNCAL PLAN PROPONENTS [GROUPS I - IV DEBTORS]* will be
served or was served **(a)** on the **judge in chambers** in the form and manner required by LBR 5005-2(d); and **(b)** in the
manner indicated below:

**I.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General
Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink
to the document. On _____April 29, 2011_____ I checked the CM/ECF docket for this bankruptcy case or adversary
proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission
at the email address(es) indicated below:

☒ Service information continued on attached page

**II.  SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served)**:**
On _____April 29, 2011_____ I served the following person(s) and/or entity(ies) at the last known address(es) in this
bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United
States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows.  *Listing the judge here*
*constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.*
JUDGE'S COPY [Overnight Delivery]
The Honorable Erithe A. Smith
United States Bankruptcy Court - Central District of California
411 West Fourth Street, Suite 5041
Santa Ana, CA 92701-4593

☐ Service information continued on attached page

**III.  SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or
entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on _____April 29, 2011_____ I served the following person(s)
and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile
transmission and/or email as follows. *Listing the judge here constitutes a declaration that personal delivery on the judge*
*will be completed no later than 24 hours after the document is filed.*

(1) Gen'l Counsel for Voluntary Debtors:
    Paul Couchot - pcouchot@winthropcouchot.com
    Marc J Winthrop - pj@winthropcouchot.com
    Paul Lianides - plianides@winthropcouchot.com
(2) Debtors (Palmdale Hills Property, LLC and related entities):
    bcook@suncal.com
(3) Counsel for SunCal Management:
    Ronald Rus – rrus@rusmiliband.com
(4) Special Counsel for Jt. Admin. Debtors & Trustee Speier:
    Louis Miller - smiller@millerbarondess.com
    Martin Pritikin – mpritikin@millerbarondess.com
(5) Gen'l Counsel for Ch. 11 Trustee (Speier):
    William Lobel - wlobel@thelobelfirm.com
    Mike Neue – mneue@thelobelfirm.com
(6) Ch. 11 Trustee (c/o Squar Milner):
    Steven N. Speier - sspeier@squarmilner.com; ca85@ecfcbis.com
(7) Office of the United States Trustee:
    Michael Hauser - michael.hauser@usdoj.gov

(8) Counsel for Voluntary Debtors' Committee:
    Alan Friedman - afriedman@irell.com
    Kerri A Lyman - klyman@irell.com
(9) Counsel for Trustee Debtors' Committee:
    Lei Lei Wang Ekvall - lekvall@wgllp.com
    Hutchison B Meltzer - hmeltzer@wgllp.com

Edward Soto - Edward.soto@weil.com; odalys.smith@weil.com;
lori.seavey@weil.com
Allen Blaustein - Allen.Blaustein@weil.com
Clay Roesch – clay.roesch@weil.com
Alfredo R. Perez - alfredo.perez@weil.com
Chauncey Cole – chauncey.cole@cwt.com
Betty Shumener - betty.shumener@dlapiper.com
John E. Schreiber - jschreiber@dl.com; rreinthaler@dl.com
Joseph A Eisenberg - jae@jmbm.com
Mark McKane - mark.mckane@kirkland.com
Atty for Bond Safeguard & Lexon - mea@amclaw.com

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| April 29, 2011 | Melisa DesJardien | /s/ Melisa DesJardien |
| Date | Type Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

F 9013-3.1.PROOF.SERVICE

In re:
PALMDALE HILLS PROPERTY, LLC. AND ITS RELATED DEBTORS,

Debtor(s).

CHAPTER 11

CASE NUMBER 08-17206-ES

## I. SERVED BY NEF

**8:08-bk-17206-ES Notice will be electronically mailed to:**

(1)  Selia M Acevedo for Atty Miller Barondess LLP
sacevedo@millerbarondess.com,
mpritikin@millerbarondess.com;bprocel@millerbarondess.com

(2)  Joseph M Adams for Def The City of San Juan Capistrano
jadams@sycr.com

(3)  Raymond H Aver for Debtor Palmdale Hills Property, LLC
ray@averlaw.com

(4)  James C Bastian for Cred ARB, Inc.
jbastian@shbllp.com

(5)  Thomas Scott Belden for Def Zim Industries, Inc. dba Bakersfield
Well & Pump
sbelden@kleinlaw.com, ecf@kleinlaw.com

(6)  John A Boyd for Int Pty Oliphant Golf Inc
fednotice@tclaw.net

(7)  Mark Bradshaw for Int Pty Courtesy NEF
mbradshaw@shbllp.com

(8)  Gustavo E Bravo for Cred Oliphant Golf, Inc.
gbravo@smaha.com

(9)  Jeffrey W Broker for Cred Bond Safeguard Ins Co
jbroker@brokerlaw.biz

(10)  Brendt C Butler for Cred EMR Residential Properties LLC
BButler@mandersonllp.com

(11)  Andrew W Caine for Cred Lehman ALI, Inc.
acaine@pszyjw.com

(12)  Carollynn Callari for Cred Danske Bank A/S London Branch
ccallari@venable.com

(13)  Cathrine M Castaldi for Cred SunCal Management, LLC
ccastaldi@rusmiliband.com

(14)  Tara Castro Narayanan for Int Pty Courtesy NEF
tara.narayanan@msrlegal.com

(15)  Dan E Chambers for Cred EMR Residential Properties LLC
dchambers@jmbm.com

(16)  Shirley Cho for Cred Lehman ALI, Inc.
scho@pszjlaw.com

(17)  Vonn Christenson for Int Pty Courtesy NEF
vrc@paynefears.com

(18)  Brendan P Collins for Cred Gray1 CPB, LLC
bpcollins@bhfs.com

(19)  Vincent M Coscino for Petitioning Cred CST Environmental Inc
vcoscino@allenmatkins.com, emurdoch@allenmatkins.com

(20)  Paul J Couchot for Cred SCC Acquisitions, Inc.
pcouchot@winthropcouchot.com,
pj@winthropcouchot.com;sconnor@winthropcouchot.com

(21)  Jonathan S Dabbieri for Int Pty Courtesy NEF
dabbieri@sullivan.com,
hill@sullivanhill.com;mcallister@sullivanhill.com;
stein@sullivanhill.com;vidovich@sullivanhill.com

(22)  Ana Damonte for Cred Top Grade Construction, Inc.
ana.damonte@pillsburylaw.com

(23)  Vanessa S Davila for Cred Bond Safeguard Ins Co
vsd@amclaw.com

(24)  Melissa Davis for Cred City of Orange
mdavis@shbllp.com

(25)  Daniel Denny for Int Pty Courtesy NEF
ddenny@gibsondunn.com

(26)  Caroline Djang for Cred Lehman ALI, Inc.
crd@jmbm.com

(27)  Donald T Dunning for Cred Hertz Equipment Rental Corp
ddunning@dunningLaw.com

(28)  Joseph A Eisenberg for Cred Lehman ALI, Inc.
jae@jmbm.com

(29)  Lei Lei Wang Ekvall for Atty Weiland Golden Smiley Wang
Ekvall & Strok, LLP
lekvall@wgllp.com

(30)  Richard W Esterkin for Debtor Palmdale Hills Property, LLC
resterkin@morganlewis.com

(31)  Marc C Forsythe for Atty Robert Goe
kmurphy@goeforlaw.com

(32)  Alan J Friedman for Atty Irell & Manella LLP
afriedman@irell.com

(33)  Steven M Garber for Cred Park West Landscape, Inc
steve@smgarberlaw.com

(34)  Christian J Gascou for 3rd Party Pltf Arch Ins Co
cgascou@gascouhopkins.com

(35)  Barry S Glaser for Cred County of Los Angeles
bglaser@swjlaw.com

(36)  Robert P Goe for Atty Robert Goe
kmurphy@goeforlaw.com,
rgoe@goeforlaw.com;mforsythe@goeforlaw.com

(37)  Eric D Goldberg for Int Pty Courtesy NEF
egoldberg@stutman.com

(38)  Richard H Golubow for Debtor Palmdale Hills Property, LLC
rgolubow@winthropcouchot.com, pj@winthropcouchot.com

(39)  Michael J Gomez for Int Pty Central Pacific Bank
mgomez@frandzel.com, efiling@frandzel.com;sking@frandzel.com

(40)  Kelly C Griffith for Cred Bond Safeguard Ins Co
bkemail@harrisbeach.com

(41)  Matthew Grimshaw for Int Pty City Of Torrance
mgrimshaw@rutan.com

(42)  Kavita Gupta for Debtor Palmdale Hills Property, LLC
kgupta@winthropcouchot.com

(43)  Asa S Hami for Debtor Palmdale Hills Property, LLC
ahami@morganlewis.com

(44)  Michael J Hauser for U.S. Trustee United States Trustee (SA)
michael.hauser@usdoj.gov

(45)  D Edward Hays for Cred Villa San Clemente, LLC
ehays@marshackhays.com

(46)  Michael C Heinrichs for Int Pty Courtesy NEF
mheinrichs@omm.com

(47)  Harry D. Hochman for Cred Lehman ALI, Inc.
hhochman@pszjlaw.com, hhochman@pszjlaw.com

(48)  Jonathan M Hoff for 3rd Party Pltf Jt Prov Liquidators
of Lehman RE Ltd
jonathan.hoff@cwt.com

(49)  Nancy Hotchkiss for Cred Murray Smith & Associates Engineering
nhotchkiss@trainorfairbrook.com

(50)  Michelle Hribar for Pltf EMR Residential Properties LLC
mhribar@rutan.com

(51)  John J Immordino for Cred Arch Ins Co.
john.immordino@wilsonelser.com,
raquel.burgess@wilsonelser.com

(52)  Lawrence A Jacobson for Cred BKF Engineers
laj@cohenandjacobson.com

(53)  Michael J Joyce for Int Pty Courtesy NEF
mjoyce@crosslaw.com

(54)  Stephen M Judson for Petitioning Cred The Professional Tree
Care Co
sjudson@fablaw.com

(55)  Kaleb L Judy for Def Zim Industries, Inc. dba Bakersfield Well
& Pump
ecf@kleinlaw.com, kjudy@kleinlaw.com

(56)  Sheri Kanesaka for Cred California Bank & Trust
sheri.kanesaka@bryancave.com

(57)  David I Katzen for Int Pty Bethel Island Muni Imp District
katzen@ksfirm.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

August 2010                                                                          F 9013-3.1.PROOF.SERVICE

In re:
PALMDALE HILLS PROPERTY, LLC. AND ITS RELATED DEBTORS,

Debtor(s).

CHAPTER 11

CASE NUMBER 08-17206-ES

(58) Christopher W Keegan for Cred SC Master Holdings II LLC
ckeegan@kirkland.com,
gdupre@kirkland.com;alevin@kirkland.com

(59) Payam Khodadadi for Debtor Palmdale Hills Property, LLC
pkhodadadi@winthropcouchot.com, pj@winthropcouchot.com

(60) Irene L Kiet for Cred BNB Engineering, Inc.
ikiet@hkclaw.com

(61) Mark J Krone for Cred Bond Safeguard Ins Co
mk@amclaw.com, crs@amclaw.com;amc@amclaw.com

(62) David B Lally for Def Contracting Engineers, Inc.
davidlallylaw@gmail.com

(63) Leib M Lerner for Cred Steiny and Co, Inc.
leib.lerner@alston.com

(64) Peter W Lianides for Debtor Palmdale Hills Property, LLC
plianides@winthropcouchot.com, pj@winthropcouchot.com

(65) Charles Liu for Debtor Palmdale Hills Property, LLC
cliu@winthropcouchot.com

(66) Kerri A Lyman for Atty Irell & Manella LLP
klyman@irell.com

(67) Mariam S Marshall for Cred RGA Environmental, Inc.
mmarshall@marshallramoslaw.com

(68) Robert C Martinez for Cred TC Construction Co, Inc
rmartinez@mclex.com

(69) Michael D May for Cred R.J. Noble Co.
mdmayesq@verizon.net

(70) Hutchison B Meltzer for Cred Com Holding Unsecured Claims
hmeltzer@wgllp.com

(71) Krikor J Meshefejian for Int Pty Courtesy NEF
kjm@lnbrb.com

(72) Joel S. Miliband for Cred RBF CONSULTING
jmiliband@rusmiliband.com

(73) James M Miller for Atty Miller Barondess LLP
jmiller@millerbarondess.com, vgunderston@millerbarondess.com

(74) Louis R Miller for Pltf Palmdale Hills Property, LLC
smiller@millerbarondess.com

(75) Randall P Mroczynski for Def Bob McGrann Construction, Inc.
randym@cookseylaw.com

(76) Mike D Neue for Atty The Lobel Firm, LLP
mneue@thelobelfirm.com,
jmattiace@thelobelfirm.com;pnelson@thelobelfirm.com

(77) Robert Nida for Cred Kirk Negrete, Inc
Rnida@castlelawoffice.com

(78) Henry H Oh for 3rd Party Pltf Jt Prov Liquidators of
Lehman RE Ltd
henry.oh@dlapiper.com, janet.curley@dlapiper.com

(79) Sean A Okeefe for Debtor Palmdale Hills Property, LLC
sokeefe@okeefelc.com

(80) Robert B Orgel for Cred Lehman ALI, Inc.
rorgel@pszjlaw.com, rorgel@pszjlaw.com

(81) Malhar S Pagay for Cred Lehman ALI, Inc.
mpagay@pszjlaw.com, mpagay@pszjlaw.com

(82) Penelope Parmes for Cred EMR Residential Properties LLC
pparmes@rutan.com

(83) Ronald B Pierce for Cred Griffith Co
ronald.pierce@sdma.com

(84) Katherine C Piper for Int Pty New Anaverde LLC
kpiper@steptoe.com

(85) Cassandra J Richey for Cred Patricia I Volkerts, as Trustee, et al
cmartin@pprlaw.net

(86) James S Riley for Cred Sierra Liquidity Fund, LLC
tgarza@sierrafunds.com

(87) Debra Riley for Int Pty City of Palmdale
driley@allenmatkins.com

(88) Todd C. Ringstad for Int Pty Courtesy NEF
becky@ringstadlaw.com

(89) R Grace Rodriguez for Def O&B Equipment, Inc.
ecf@lorgr.com

(90) Martha E Romero for Cred San Bernardino County Tax Collector
Romero@mromerolawfirm.com

(91) Ronald Rus for Cred SunCal Management, LLC
rrus@rusmiliband.com

(92) John P Schafer for Cred LB/L-DUC III Bethel Island, LLC
jschafer@mandersonllp.com

(93) John E Schreiber for Def Fenway Capital, LLC
jschreiber@dl.com

(94) William D Schuster for Cred HD Supply Construction Supply LTD
bills@allieschuster.org

(95) Christopher P Simon for Int Pty Courtesy NEF
csimon@crosslaw.com

(96) Wendy W Smith for Cred Castaic Union School District
wendy@bindermalter.com

(97) Steven M Speier (TR)
Sspeier@asrmanagement.com, ca85@ecfcbis.com

(98) Steven M Speier for Trustee Steven Speier (TR)
Sspeier@Squarmilner.com, ca85@ecfcbis.com

(99) Michael St James for Cred MBH Architects, Inc.
ecf@stjames-law.com

(100) Michael K Sugar for Off Committee of Unsecured Creds
msugar@irell.com

(101) Cathy Ta for Def Hi-Grade Material Co.
cathy.ta@bbklaw.com,
Arthur.Johnston@bbklaw.com;Kenneth.Burgess@bbklaw.com

(102) David A Tilem for Def Southland Pipe Corp
davidtilem@tilemlaw.com, malissamurguia@tilemlaw.com;
dianachau@tilemlaw.com;kmishigian@tilemlaw.com

(103) James E Till for Trustee Steven Speier (TR)
jtill@thelobelfirm.com, jmattiace@thelobelfirm.com;
pnelson@thelobelfirm.com

(104) United States Trustee (SA)
ustpregion16.sa.ecf@usdoj.gov

(105) Carol G Unruh for Cred Scott E. McDaniel
cgunruh@sbcglobal.net

(106) Annie Verdries for Cred WEC Corp
verdries@lbbslaw.com

(107) Jason Wallach for Def Professional Pipeline Contractors, Inc.
jwallach@gladstonemichel.com

(108) Joshua D Wayser for Other Professional D. E. Shaw & Co., L.P.
kim.johnson@kattenlaw.com

(109) Christopher T Williams for Cred Danske Bank A/S London Branch
ctwilliams@venable.com, jcontreras@venable.com

(110) Marc J Winthrop for Debtor Palmdale Hills Property, LLC
mwinthrop@winthropcouchot.com, pj@winthropcouchot.com

(111) David M Wiseblood for Cred Bethel Island Muni Imp District
dwiseblood@seyfarth.com

(112) Brett K Wiseman for Cred JF Shea Construction Inc
bwiseman@aalaws.com

(113) Dean A Ziehl for Counter-Def LV Pacific Point LLC
dziehl@pszjlaw.com, dziehl@pszjlaw.com

(114) Marc A. Zimmerman for Creditor Life Church of God in Christ
joshuasdaddy@att.net

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

August 2010                                                                F 9013-3.1.PROOF.SERVICE