1  PAUL J. COUCHOT -- State Bar No. 131934
   SEAN A. O'KEEFE -- State Bar No. 122417
2  **WINTHROP COUCHOT**
   **PROFESSIONAL CORPORATION**
3  660 Newport Center Drive, Fourth Floor
   Newport Beach, CA 92660
4  Telephone: (949) 720-4100
   Facsimile: (949) 720-4111
5  General Insolvency Counsel for Administratively Consolidated
6  Debtors-in-Possession

7  RONALD RUS - State Bar No. 67369
   JOEL S. MILIBAND - State Bar No. 77438
8  **RUS MILIBAND & SMITH**
   **A PROFESSIONAL CORPORATION**
9  2211 Michelson Drive, Seventh Floor
   Irvine, California 92612
10 Telephone: (949) 752-7100
   Facsimile:  (949) 252-1514
11 Counsel for SunCal Management LLC

12             **UNITED STATES BANKRUPTCY COURT**
               **CENTRAL DISTRICT OF CALIFORNIA**
13                    **SANTA ANA DIVISION**

14 In re                                          Case No. 8:08-bk-17206-ES

15 Palmdale Hills Property, LLC, and its         Jointly Administered With Case Nos.
16 Related Debtors.
                                                 8:08-bk-17209ES; 8:08-bk-17240ES; 8:08-bk-
17          Jointly Administered                 17224ES; 8:08-bk-17242ES; 8:08-bk-17225ES;
            Debtors and Debtors-in-              8:08-bk-17245ES; 8:08-bk-17227ES; 8:08-bk-
            Possession                           17246ES; 8:08-bk-17230ES; 8:08-bk-17231ES;
18                                               8:08-bk-17236ES; 8:08-bk-17248ES; 8:08-bk-
                                                 17249ES; 8:08-bk-17573ES; 8:08-bk-17574ES;
19 Affects:                                      8:08-bk-17575ES; 8:08-bk-17404ES; 8:08-bk-
   ☐ All Debtors                                 17407ES; 8:08-bk-17408ES; 8:08-bk-17409ES;
20 ☒ Palmdale Hills Property, LLC,               8:08-bk-17458ES; 8:08-bk-17465ES; 8:08-bk-
   ☐ SunCal Beaumont Heights, LLC                17470ES; 8:08-bk-17472ES; and 8:08-17588ES.
21 ☐ SCC/Palmdale, LLC                           Chapter 11 Cases
22 ☐ SunCal Johannson Ranch, LLC
   ☒ SunCal Summit Valley, LLC                   **REPLY TO OPPOSITION TO AMENDED**
23 ☒ SunCal Emerald Meadows LLC                  **MOTION AND AMENDED MOTION FOR**
   ☒ SunCal Bickford Ranch, LLC                  **ORDER DISALLOWING CERTAIN CLAIMS**
24 ☒ Acton Estates, LLC                          **HELD BY LEHMAN ALI INC. AND LEHMAN**
   ☐ Seven Brothers LLC                          **COMMERCIAL PAPER INC.**
25 ☒ SJD Partners, Ltd.
   ☐ SJD Development Corp.                        DATE:    June 9, 2011
26 ☐ Kirby Estates, LLC                           TIME:    10:30 a.m.
27 ☐ SunCal Communities I, LLC                    PLACE:   Courtroom 5A
   ☐ SunCal Communities III, LLC
28      *Continued on Next Page*

*Continued from Previous Page*

☒ SCC Communities LLC
☐ North Orange Del Rio Land, LLC
☒ Tesoro SF, LLC
☒ LBL-SunCal Oak Valley, LLC
☒ SunCal Heartland, LLC
☒ LBL-SunCal Northlake, LLC
☒ SunCal Marblehead, LLC
☐ SunCal Century City, LLC
☒ SunCal PSV, LLC
☐ Delta Coves Venture, LLC
☐ SunCal Torrance, LLC
☐ SunCal Oak Knoll, LLC

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

86122.4

1    Acton Estates LLC ("Acton"), SunCal Bickford Ranch LLC ("Bickford"), SunCal Emerald

2    Meadows LLC ("Emerald Meadows"), Palmdale Hills Property, LLC ("Palmdale Hills"), SJD

3    Partners, Ltd. ("SJD Partners"), SunCal Summit Valley LLC ("Summit Valley"), SCC

4    Communities LLC ("SCC Communities"), Tesoro SF LLC ("Tesoro") (the "SunCal Debtors"),,

5    and SunCal Management, LLC ("SunCal Management") (the "SunCal Parties"), hereby submit

6    their *Reply* to the *Opposition* (the "Opposition") filed by Lehman ALI, Inc. ("Lehman ALI") and

7    Lehman Commercial Paper, Inc. ("LCPI") (the "Lehman Entities") to the  *Amended Motion For*

8    *Order Disallowing Certain Claims Held By Lehman ALI Inc. And Lehman Commercial Paper Inc.*

9    (the "Claim Objection").

**I**

**INTRODUCTION**

12    If the Lehman Entities' Opposition demonstrates anything, it is that they believe they are

13    untouchable, have the right to defy the rules, and have the right to misrepresent the record to both

14    this Court and the Lehman Bankruptcy Court.  A few examples illustrate these points:

15    *First*, the SunCal Parties have filed only claim objections in this Court, in accordance with

16    Fed.R.Bankr.P. 3007(b). These filings do not and cannot violate the automatic stay, since case law

17    deems the claims filed by the Lehman Entities to be the equivalent of a "complaint," and a

18    responsive objection to be the equivalent of an "answer." *Matter of Continental Airlines,* 928 F.2d

19    127, 129 (5th Cir. 1991); *Nortex Trading Corp. v. Newfield,* 311 F.2d 163, 164 (2[d] Cir. 1962).  Yet

20    the Lehman Entities contend that LCPI's stay precludes even this, and they have gone so far as to

21    file a motion in New York that seeks to enjoin the pursuit of the claim objections. That motion

22    *itself* violates the *SunCal Debtors'* stay under 11 U.S.C. § 362(a)(3) and (4).  Depriving the

23    SunCal Debtors of the ability to defend their properties against the disputed claims and liens of the

24    Lehman Entities is not only an exercise of control over the SunCal Debtors' properties, in the final

25    analysis it will lead to a taking without due process. An owner who is denied the right to defend its

26    properties against the claims of others is ultimately denied ownership.

27    Moreover, the Lehman Entities, *by asking the bankruptcy court in New York to rule on the*

28    *merits of the claims objection pending  before this Court,* also seek to usurp this Court's exclusive

86122.4

jurisdiction over the claims allowance process and over the SunCal Debtors' real property under

11 U.S.C. § 1334(e).[1]  *Gardner v. State of N.J.,* 329 U.S. 565, 573-74 (1947) ("The whole process

of proof, allowance, and distribution is…an adjudication of interests claimed in a res."). The

Lehman Entities cannot file a claim in this Court, which is a demand for payment, and then seek a

ruling in another court regarding the validity of that claim. *See In re Coated Sales, Inc.,* 119 B.R.

452, 455 (Bankr. S.D.N.Y. 1990) ("[B]y submitting a claim against the bankruptcy estate,

creditors subject themselves to the court's equitable power to disallow those claims.").

*The SunCal Parties would respectfully request that this Court reject the Lehman Entities'*

*argument that the Claim Objection violates the stay, and specifically, make it clear to the Lehman*

*Entities that the priority, validity and amount of **their claims** is a central issue for this Court (not*

*only in the pending Claim Objections, as it should be, but also in the plan confirmation disputes.)*

The Lehman Entities have also misrepresented the record to both this Court and the New

York Bankruptcy Court.  They would have this Court believe they are only seeking enjoin claim

objections brought by non-debtor SunCal Management; yet the motion filed in New York makes

clear that they seek to attack the *SunCal Debtors'* claim objections as well.  Conversely, in New

York, they have falsely represented that *this Court has ruled that a **claim objection** filed under*

*Section 502(d) violates the stay* and they have suggested that the SunCal Parties have ignored this

ruling.[2]  Yet, the Lehman Entities were expressly advised by this Court on May 13, 2011 that this

---

[1] 28 U.S.C. § 1334(e) provides: "The district court in which a case under Title 11 is commenced or is pending shall have exclusive jurisdiction (1) of all of the property, wherever located of the debtor as of the commencement of such case and of property of the estate."

[2] The Lehman Entities cite the following snippet from last Spring, re the eighth claim (§ 502(d)):

> Under *In re Palmdale Hills Property, LLC,* the claims for relief brought against [LCPI]…are affirmative relief and, therefore violate LCPI's automatic stay. Consequently, the first, fifth, seventh, **eighth** and ninth claims for relief are dismissed without prejudice to the extent that they are brought against LCPI. Plaintiffs must seek relief from LCPI's automatic stay in the United States Bankruptcy Court for the Southern District of New York in order to bring any claims against LCPI *in this adversary proceeding*.

The SunCal Parties believe that this Court was simply indicating that after *Palmdale,* a Section 502(d) claim objection *had to be pursued in the form of a contested matter under Rule 3007*; it could not be pursued under Rule 7001. This Court was not ruling that a claim objection under Section 502(d) in any procedural form violates the stay. Obviously, if this Court considered that to be the case, it would have denied the SunCal Parties the right to engage in discovery!

86122.4

1   Court did not believe that either claim objection filed by the SunCal Parties violated the stay and

2   for this very reason authorized discovery. In short, the "truth" as presented in New York is very

3   different from the "truth" in California. *Since these misrepresentations intentionally contradict*

4   *the record and are being used as a sword in New York, the SunCal Parties would respectfully pray*

5   *that the Court specifically address this issue.*

6        *Second, t*he Lehman Entities have submitted multiple witness declarations in support of

7   their Opposition, yet have refused to allow the SunCal Parties' to depose these same witnesses and

8   other witnesses who are central to the claims dispute.  Since the SunCal Parties cannot respond to

9   claims unless they are allowed to obtain discovery with respect to these claims, and since the

10   ultimate burden of proof is on the claimant who seeks payment on its claim, *the SunCal Parties*

11   *would respectfully pray that this Court either strike the Lehman Entities' evidence and summarily*

12   *grant the Claim Objection, or else deny the Lehman Entities standing to file anything with respect*

13   *to these claims until they stipulate to produce all requested witnesses for examination.*

14        *Third*, the Lehman Entities signed the Settlement Agreement, and even took title to one of

15   the SunCal Debtors' properties three days later pursuant to the terms of that agreement; yet assert

16   that their claims cannot be disallowed or objected to on the basis of a breach of that agreement

17   because the agreement supposedly *never existed*.  This is nothing if not brazen.

18        Below, the SunCal Parties summarize their reply to each argument made in the Opposition:

19

20   A)    <u>The Standing Argument</u>. The Lehman Entities contend that only the Trustee, not SunCal Management, has standing to file the Claim Objection vis-à-vis the Trustee Debtors. The law is to the contrary. Section 502(a) states that any "party-in-interest" has standing to file an objection to a claim. This term includes "anyone whose financial interest may be affected by the outcome of a bankruptcy case." *In re Barnes*, 275 B.R. 889, 893 (Bankr. E.D. Cal. 2002). The cases cited by the Lehman Entities are inapposite. In those instances, a party other than the Trustee *filed an adversary proceeding seeking recovery on a claim held by the estate*. They did not involve claim objections. Under *In re P.R.T.C. Inc.,* 177 F.3d 774, 778 (9th Cir.1999), the relevant standing inquiry is whether there is a possibility that a distribution could be made to SunCal Management on account of its claims. Since that answer must be answered in the affirmative, standing exists.

21

22

23

24

25

26

27   B)    <u>The Automatic Stay Argument</u>. The Lehman Entities misleadingly cite to the SunCal Parties' *plan documents* to argue that the *Claim Objection* is a stay violation.  In any event, every case that has addressed the issue has held that a claim objection does *not* violate the claimant's automatic stay. In an attempt

28

-4-

evade this rule of law, the Lehman Entities argue that the Claim Objection is something other than a claim objection. This misdirection can easily be laid to rest. Under Federal Rule of Bankruptcy Procedure ("Rule") 3007(b), any claim objection within the parameters of Rule 3007 cannot seek relief within the parameters of Rule 7001. The SunCal Parties have already stated, and hereby reiterate, that they do not and will not seek any relief that falls outside the parameters of Rule 3007. Their claim objection is just that and no more. Ironically, the Lehman Entities have taken the exact same position regarding their own claim objections; but they apparently believe that what is acceptable when they do it is forbidden when the SunCal parties do it. In addition, the Lehman Entities have attempted to usurp this Court's exclusive jurisdiction over the claims allowance process (not to mention engaged in blatant forum shopping), by asking the Lehman Bankruptcy Court to decide the exact same issue.

C)      Recoupment Against A Secured Claim. The Lehman Entities contend that the SunCal cannot use the equitable doctrine of recoupment to reduce their secured claims. What they are really arguing is that they have the right to insist that in applying recoupment, the Court can only reduce the unsecured part of their bifurcated claim (pursuant to 11 U.S.C.§ 506(a)). This position is error. *In re Jablonski*, 70 B.R. 381, 390 (Bankr. E.D. Pa. 1987) *aff'd in part and remanded*, 88 B.R. 652 (E.D. Pa. 1988) (allowing recoupment against secured part of claim bifurcated under Section 506(a)). If the Court finds that recoupment applies, it has the power to "do equity" in fashioning a remedy. *See Young v. United States,* 535 U.S. 43, 50 (2002) ("[B]ankruptcy courts ... are courts of equity and 'appl[y] the principles and rules of equity jurisprudence.'"); *Lines v. Bank of Am. Nat. Trust & Sav. Ass'n*, 743 F. Supp. 176, 179 (S.D.N.Y. 1990) ("These doctrines are necessarily flexible because equity must apply its remedies to 'whatever knavery human ingenuity can invent.'").

D)      The Settlement Agreement Was A Binding Agreement That Was Breached. The Lehman Entities argue that recoupment cannot apply to damages incurred through their breach of the Settlement Agreement, because the agreement never "closed." The Lehman Entities are mixing apples and oranges. There is a distinction between whether an agreement was reached, and whether it was implemented. As the evidence submitted herewith confirms, on August 25, 2008, the parties signed over a thousand signature pages, and indicated that they had a binding agreement. The SunCal Parties even conveyed one of the properties to the Lehman Entities pursuant to the terms of the agreement. All conditions precedent to closing had occurred, and the parties' obligation to execute and deliver the agreement became "unconditional and irrevocable." The fact that transactions provided for in that agreement didn't "close" does not vitiate existence of an agreement; just the opposite—it proves a breach.

E)      LBHI's Chapter 11 Filing Was Irrelevant. The Lehman Entities argue that LBHI's Chapter 11 filing on September 15, 2008, relieved Lehman ALI of its obligation to perform under the terms of the Settlement Agreement. In fact, LBHI's filing was irrelevant to the existence and enforceability of the agreement. Agreement had already been reached—and the conditions precedent to performance were satisfied—*before* LBHI's bankruptcy. LBHI's later filing did

not relieve Lehman ALI of its preexisting obligations under the contract. At most, it may have relieved LBHI of its obligation to perform—and it *had no remaining obligations* under the contract in any event.

F)    The Failure to Pay "Urgent Payables."    Lehman ALI argues that under the Restructuring Agreement, it had discretion whether to pay the "Urgent Payables," and that given this discretion, it could not have breached the agreement. First, this position is directly contrary to New York law: The term "discretion" in a contract has boundaries and they are subject to breach.  *deCiutiis v. Nynex Corp.*, 1996 WL 512150, *3 (S.D.N.Y. Sept. 9, 1996) ("[A]n implied covenant of good faith does not conflict with NYNEX's 'sole, exclusive and complete discretion.' Rather, it requires NYNEX to exercise its discretion in good faith and not to act arbitrarily.").  Second, as the Second Cook Declaration confirms, Lehman ALI did not pay the agreed upon "Urgent Payables."

G)    The Failure To Pay Management Fees. The Lehman Entities argue that Lehman ALI's breach of its contractual obligation to pay management fees cannot warrant disallowance of their claims, because the obligation was owed to SunCal Management, not the SunCal Debtors, and so the SunCal Debtors ostensibly suffered no harm thereby. This argument ignores the fact that this failure to pay necessarily left the SunCal Debtors owing this obligation.

H)    Unjust Enrichment, Unclean Hand and Equitable Lien Claims Apply. The Lehman Entities argue that "[t]he existence of a written contract precludes claims of unjust enrichment or a constructive trust." This is an astonishing argument given the Lehman Entities' contrary assertion that no contract existed. Moreover, these equitable claims are not so limited given the circumstances. The Lehman Entities are coming to this Court seeking to enforce claims where they have engaged in substantial wrongdoing both in matters relating to these claims, and in matters relating to the enforcement of these claims. This course of conduct gives rise to the above stated equitable defenses.

I)    Recoupment Is Available On These Facts. The Lehman Entities insist that the instant facts do not meet New York's "same transaction or set of transactions" test for recoupment.  But the Lehman Entities erroneously assume that New York law applies to the SunCal Parties' equitable claim for recoupment.  Under the applicable "logical relationship" test in the Ninth Circuit, the breaches of the Restructuring and Settlement Agreement clearly bear a logical relationship to the loan agreements underlying the Lehman Claims: the whole point of the Restructuring and Settlement Agreement was to modify those loan agreements. Even under New York law, there are disputed factual issues regarding whether the "same transaction or set of transactions" test is satisfied, warranting discovery.

J)    The Claim Objection Does Not Have To Be Litigated In An Adversary Proceeding. The Lehman Entities contend that the Claim Objection must be litigated in an adversary proceeding. This is erroneous. Recoupment is an affirmative defense under both California and New York law. Pursuant to Rule 3007, it can be pursued in the form of a claim objection.

## II

### <u>REPLY TO STANDING ARGUMENT</u>

The Lehman Entities contend that only the Trustee has the right to file an objection to their claims and that he has "settled" any objection, depriving the SunCal Parties of standing.[3] The first position is contrary to the law and the second is contrary to the facts.  Section 502(a) states that any *party-in-interest* can object to a claim. 11 U.S.C. § 502(a).  Indeed, Section 502(a) expressly allows a creditor to object to claims *without limitation, qualification or exception*.  Moreover, the term "party in interest" is extremely broad.  *In re Barnes*, 275 B.R. 889, 893 (Bankr. E.D. Cal. 2002) ("The term "party in interest" is broad enough to include anyone whose financial interest may be affected by the outcome of a bankruptcy case"); *In re Haslam*, 2008 WL 8444816 (B.A.P. 9th Cir. 2008); *In re Jensen*, 369 B.R. 210, 229-30 (Bankr. E.D. Pa. 2007) ("In considering the scope of the term 'party in interest,' I find it significant that Congress employed that broad term, rather than other, more limiting potential terms, such as 'holder of an allowed claim' or 'holder of a filed proof of claim' or 'creditor'"); *In re Turpen*, 218 B.R. 908, 911 (Bankr. N.D. Iowa 1998) ("The Code does not require the allowance of a claim before the claimant may object to the plan. In providing who might object to plans, Congress used the broad term 'party in interest.' It did not restrict the filing of objections to creditors who hold allowed claims.").

The fact that a "trustee" is serving in the place of the debtor-in-possession in the Trustee Cases does not change the standing threshold that governs who can file an objection to a claim. Section 1107 makes it clear that both Chapter 11 trustees and debtors-in-possession have the same powers under the Code.

---

[3] The Chapter 11 Trustee for the Trustee Debtors filed a short Opposition to the SunCal Parties' objections to claims challenging the standing of SunCal Management to object to the Lehman claims in the Trustee Debtor cases.  The Trustee's arguments (and the cases relied upon) are similar to those asserted by the Lehman Entities.  The Trustee adds to the argument by contending that he has not authorized SunCal Management to pursue contract claims on behalf of the Trustee Debtors.

These contentions do not vitiate SunCal Management's standing to object to the claims under Section 502(a).  Both the plain language of Section 502(a) and applicable Circuit level case law confer standing on a creditor such as SunCal Management to object to the Lehman Entities' claims made in the Trustee Debtors' cases, regardless of authorization by the Trustee.

86122.4

1    In *In re P.R.T.C. Inc.,* 177 F.3d 774, 778 (9th Cir.1999), the Ninth Circuit made it clear

2    that even a debtor in a Chapter 7 case (where obviously a trustee is in place) has standing to object

3    to a claim, if there is a possibility that a distribution could be made to equity. Here, the standing

4    inquiry is whether or not there is a possibility that a distribution could be made to SunCal

5    Management on account of its claims. Since this will indisputably occur if the SunCal Parties'

6    claim objections prevail, SunCal Management has standing under Section 502(a).

7    The cases cited by the Lehman Entities in support of their position are off the mark. The

8    case of *Simon v. E. Kentucky Welfare Rights Org.*, 426 U.S. 26 (1976), offers no guidance on

9    anything other than the fact that standing is required under Article III.  In *In re Curry & Sorensen,*

10   *Inc.*, 57 B.R. 824 (B.A.P. 9th Cir. 1986), the BAP held that creditors lacked standing to file an

11   adversary proceeding seeking the recovery of a fraudulent transfer owed to the estate. This would

12   be true whether a trustee was appointed or not, but those are not the facts in this case. The SunCal

13   Parties are filing defensive claim objections, not adversary collection actions.

14   Similarly, in *Estate of Spirtos v. One San Bernardino County Sup. Ct. Case Numbered SPR*

15   *02211*, 443 F.3d 1172, 1174 (9th Cir. 2006), a purported beneficiary of the decedent debtor filed a

16   complaint against all of the representatives of his Chapter 7 estate contending these representatives

17   had concealed assets belonging to the estate. Since the estate held this claim, and since the

18   California Probate Court had concluded that this purported "beneficiary" of the decedent's estate

19   in fact had no beneficiary rights, standing obviously did not exist on two levels. Here again, the

20   issue is standing under the "party-in-interest" standard, and that threshold has clearly been met.

21   Further, the Lehman Entities' attempt to analogize their standing argument to an objection

22   to claim made under Section 502(d), based on the failure to turn over property recoverable under

23   Sections 547, 458 and/or 550 (with reference to the case of *In re Prime Motor Inns, Inc.*, 135 B.R.

24   917 (Bankr. S.D. Fla. 1992)), fails.  A creditor's right to object to a claim on the basis of avoidable

25   transfer liability is well entrenched – pre-dating the current Bankruptcy Code.[4]  In *Atwood-Larson*

26

27   [4] Pre-Bankruptcy Code judicial interpretations are presumed to have survived the enactment of the
Bankruptcy Code unless Congress has expressed an intention to change the interpretation of judicially
created concepts.  See, *U.S. v. Ron Pair Enterprises, Inc*., 489 U.S. 235 (1989); 18 Bankr. Ct. Dec. (CRR)
28   1150, Bankr. L. Rep. (CCH) P 72575, 89-1 U.S. Tax Cas. (CCH) P 9179, 63 A.F.T.R.2d 89-652 (1989).
Nothing in Section 502 or the Legislative History of the Section expresses such an intention.

1   *Co. v. Hasvold (In re Richmond Equity Exchange),* 280 F. 385 (8th Cir. 1922), certain creditors

2   filed written objections to the claims of a lender on the basis of payments made to the lender

3   which constituted voidable preferences.  *Atwood-Larson, supra,* 280 F. at 385.  The Court of

4   Appeals affirmatively held that "*it was clearly the duty of the referee to hear evidence on the*

5   *objections interposed by Hasvold and the other creditors.*"  *Id.,* at 386 (emphasis added).  The

6   Court of Appeals distinguished the claims objection from a proceeding to recover an alleged

7   avoidable transfer, acknowledging that "[i]t was not a proceeding to recover an alleged preference,

8   but to determine whether the referee would decline to allow a claim on account of petitioner's

9   having received a voidable preference." *Id.*  This distinction (an affirmative action to avoid a

10   transfer vs. the disallowance of a claim) is replete in current case law.

11        Most notably in *In re Parker North American*, 24 F. 3d 1145, 1155 (9th Cir. 1994), the

12   Ninth Circuit Court of Appeals provided that, unlike an avoidance action under Sections 547, 548

13   and 550, an objection under Section 502(d) "does not compel surrender, nor permit affirmative

14   relief of any kind," rather it acts to "disallow claims of transferees who do not surrender their

15   avoidable transfers."

16        The  2007 Amendment to Rule 3007 codifies this distinction drawn by the *Parker North*

17   *American* case between adversary proceedings and claim objections.  More specifically, "the

18   amendment prohibits a party in interest from including in a claim objection a request for relief that

19   requires an adversary proceeding."  FRBP 3007(a), *Advisory Committee Notes – 2007 Amendment*.

20   In other words, no affirmative relief can be granted by a claims objection.  The assertion of a

21   claims objection is a statutorily endowed right of a party of interest which is fundamentally

22   different that the assertion of an affirmative claim such as the commencement of an adversary

23   proceeding for the avoidance of transfers or contract damages.  This clear distinction, together

24   with the affirmatively permissive language of subsection Section 502(a), unmistakably confer

25   standing on any party in interest, including a creditor, to assert claim objections.

26        The primary case referenced by the Lehman Entities, *In re Prime Motor Inns, Inc.*, 135

27   B.R. 917 (Bankr. S.D. Fla. 1992), is easily distinguished.  First, the *Prime Motor* Court relies

28   heavily on the general proposition that a creditor does not have standing to prosecute preference

86122.4

actions under Section 547.  This is not in dispute.  However, like the Lehman Entities, the *Prime Motor* Court makes the unjustified leap that an objection under Section 502(d) is tantamount to a *disguised* preference action without sufficient analysis of the distinction between the two courses of action.  *Prime Motor*, 135 B.R. at 920.  Second, the *Prime Motor* Court acknowledges that its decision is based on a review of *the complaint at issue in that case* wherein the subject creditor asserted an independent claim for avoidance of a preferential transfer and "further sought" an order disallowing the lender's claim.  No such separate adversary action for the avoidance of transfers made to the Lehman Entities has been asserted by SunCal Management (under Sections 547, 548, or otherwise) in this case.  Likewise, no separate action for recovery of contract damages sustained *by the Trustee Debtors* has been commenced by SunCal Management.  The *Prime Motor* case, which fails to recognize the plain language of subsections (a) and (d) of Section 502, as well as the critical distinction between disallowance under Section 502 and affirmative prosecution of claims, as specifically recognized in the Ninth Circuit (see *In re Parker North American, supra*), is neither persuasive nor controlling.[5]

In sum, both the plain language of Section 502 and applicable Court of Appeals case law confer standing on a creditor such as SunCal Management to object to the Lehman Entities' claims made in the Trustee Debtors' cases.  The Lehman Entities' lack of standing argument is wrong on the law and should be rejected by the Court.

## III

## REPLY TO AUTOMATIC STAY ARGUMENT

### A.      The Lehman Entities' Stay Violation Arguments are Substantively Wrong

The Lehman Entities have filed a series of claims ( "Lehman Claims") in the Chapter 11 cases of the SunCal Voluntary Debtors, and in the related Chapter 11 cases of the SunCal Trustee Debtors. The SunCal Parties filed have two *claim objections* to the Lehman Claims. One of these, the instant one, is based upon recoupment, among other things (the "Recoupment Claim

---

[5] The *Prime Motors* case pre-dates the 2007 Amendment to Rule 3007 discussed above.  This may account for the court's failure to distinguish between disallowance under Section 502 and the affirmative prosecution of avoidance claims under the avoidance statutes.  At the very least, the 2007 Amendment which codifies the distinction recognized by the Ninth Circuit *Parker North American* case reveals the faulty analysis upon which the *Prime Motors* decision rests.

Objection"). The second is based upon 11 U.S.C. § 502(d) (the "502(d) Claim Objection")

(together the "Claim Objections"). The Claims Objections were filed pursuant to Federal Rule of

Bankruptcy Procedure 3007 *and seek no relief outside the parameters of this rule*.

On May 3, 2011, the SunCal Parties filed their *Motion Regarding Entitlement To*

*Discovery In Connection With Claim Objection And/Or Imposing Discretionary Stay* [D.E. 2039].

In opposing that motion, the Lehman Entities argued that the Claim Objections violated LCPI's

automatic stay, and consequently that any discovery propounded therewith should be barred.  In

their reply, the SunCal Parties could not have been more explicit in stating their intentions:

> The Lehman Entities' contention that the SunCal Parties' claim objection is
> something other than a claim objection, although absurd, is easily addressed. *The*
> *SunCal Parties hereby state that the claim objection is that and nothing more and*
> *no relief is sought, or should be granted, outside the parameters of Federal Rule*
> *of Bankruptcy Procedure 3007. Respectfully, they cannot be clearer than that*.[6]

The SunCal Parties' reference to Rule 3007 (entitled "Objections To Claims") was intended to

make it clear that the Claim Objections were subject to the express limitation in Rule 3007(b),

which provides:

> A party in interest *shall not* include a demand for relief of a kind specified in
> Rule 7001 in an objection to the allowance of a claim, but may include the
> objection in an adversary proceeding.

Fed.R.Bankr.P. 3007(b) (emphasis added).  Rule 3007(b) has the force of a statute. *In re Dorner*,

343 F.3d 910, 914 (7th Cir. 2003) ("[N]ational rules have the force of statutes."); 28 U.S.C. §

2072.  By submitting claim objections, the SunCal Parties have bound themselves by this rule.

In other words, the SunCal Parties do not merely contend that the relief they are seeking is

defensive and does not violate the stay.  Rather, if relief is affirmative and cannot be obtained via a

claim objection, *the SunCal Parties are not seeking it*.

At the conclusion of the May 13, 2011 hearing on the SunCal Parties' motion for

entitlement to discovery, the Court rejected the Lehman Entities' position.  As stated in the Court's

tentative ruling:

---

[6] *Suncal Parties' Reply To Opposition To Motion Regarding Entitlement To Discovery In Connection
With  Claim Objection And/Or Imposing Discretionary Stay*, [D.E. 2085] at 4:13-17 (emphasis added).

86122.4

> The fact that one of the claimants, LCPI, is a debtor in its own bankruptcy case is of no consequence as **the automatic stay does not apply to claim objections**. *See In re Palmdale Hills Property, LLC*, 423 B.R. 655, 665 (9th Cir. BAP 2010) ("...courts allow debtors to object to creditors' claims on the basis that it is a defense against the assertion of the claim, and therefore, does not violate the creditor's automatic stay."), citing *In re Wheatfield Bus. Park, LLC*, 308 B.R. 463, 466 (9th Cir. BAP 2004).
>
> Accordingly, **the Voluntary Debtors and SunCal may, via the claims objection process, seek and obtain a determination as to the validity or allowability of the claims filed by the Lehman Entities, including LCPI without violating the automatic stay of LCPI**. *Palmdale* at 665.

Miliband Decl., Exh. 1 at 2 (emphasis added). *See also In re Wheatfield Bus. Park*, 308 B.R. 463, 465 (9th Cir. BAP 2004) ("Hi-Tech is a claimant here. That's the role of a plaintiff. The automatic stay doesn't apply to plaintiffs…."); *In re Financial News Network*, 158 B.R. 570 (S.D.N.Y. 1993) (debtor's objection to bankrupt creditor's claim does not violate stay); *In re Metiom, Inc.*, 301 B.R. 634, 638-639 (Bankr. S.D.N.Y. 2003) (§502(d) claim objection was defensive and did not violate creditor's automatic stay); *In re PRS Ins. Group*, 331 B.R. 580, 584 (Bankr.D.Del. 2005) (applying *Metiom* to Ohio stay analogous to §362(a)(3), holding § 502(d) claim objection was defensive and did not violate the creditor's stay); *In re Meade*, 1999 WL 33496001, *1 (E.D.Pa. 1999); *In re Bousa, Inc.*, 2005 WL 1176108, *4 (S.D.N.Y. 2005) ("To the extent that the debtor has itself brought the claim, the automatic stay provision does not preclude adjudication.").[7]

The Lehman Entities cannot dispute that a claim objection for recoupment seeks a "determination as to the validity or allowability" of a claim. Numerous cases have held that recoupment may properly be sought via claim objection, and that this does not violate the automatic stay. *Newbery Corp. v. Fireman's Fund Ins. Co.*, 95 F .3d 1392, 1400 (9th Cir. 1996); *In re TLC Hospitals, Inc.*, 224 F.3d 1008, 1014 (9th Cir. 2000); *In re Palmdale Hills*, 423 B.R. at 667 n.9; *In re Petersen*, 2010 WL 3842157, *13 (D.Ariz. 2010); *In re McMahon*, 129 F.3d 93, 98 (2d Cir. 1997). Indeed, the Lehman Entities cite *In re Drexel Burnham Lambert Group, Inc.*, 113 B.R. 830, 854 (Bankr. S.D.N.Y. 1990) for the proposition that recoupment is "purely defensive in

---

[7] The Lehman Entities' attempts to distinguish or recharacterize the numerous cases cited by the SunCal Parties are unavailing. For example, they try to distinguish *In re Financial News Network*, 158 B.R. 570 (S.D.N.Y. 1993), based on the fact that the bankrupt creditor's claim was disallowed on the basis of a finding of no liability. Opp. at 16 n.9. This is a distinction without a difference: disallowance is disallowance, be it partial or total, and is not affirmative relief.

86122.4

1    character" and "could not be the basis for affirmative relief." Opp. at 18:8-11.[8]

2         Here, the Recoupment Claim Objection does not seek any affirmative recovery against

3    LCPI. Rather, the SunCal Parties are merely acting defensively to disallow the Lehman Claims,

4    placing the Claims Objections clearly outside the scope of LCPI's automatic stay.

5         The Lehman Entities, knowing full well that claim objections do not violate the stay, that

6    recoupment may be sought via claim objection, and that recoupment does not violate the stay,

7    assert that the instant claim objection is not "really" one for recoupment. Rather, they insist that

8    they know better than the SunCal Entities what the SunCal Entities seek via their claim objection:

9    "Subordination is exactly the intended effect of the Asserted Claim Objection. It is the only

10   reason for the Asserted Claim Objection." Opp. at 15:1-2.

11        The Lehman Entities' argument is not only wrong; it drips with irony. Just two days ago,

12   in response to an assertion that the Lehman Entities' own objections to SunCal Management's

13   claims sought the affirmative relief of subordination, and so had to be brought via an adversary

14   proceeding, the Lehman Entities insisted:

15        Your position is not well taken.

16        The prayer in each of the Objections to Claims seeks disallowance of the subject
17        claims, not subordination. Neither do they seek subordination in the alternative.

18        Rule 7001(a) defines adversary proceeding to include, "a proceeding to
19        subordinate an underlined_allowed claim or interest..." The Claims Objections, as noted
         above, seek only to disallow the claims. The prayer in each of the Claims
20        Objections further seeks an order that any ruling on the Claims Objections not
         preclude the right to assert any claims or demands for relief requiring an
21        adversary proceeding consistent with Rule 3007(b) or Rule 7001.

22        *To the extent that you read the Claims Objections otherwise, this email is sent to
         clarify and state with complete particularity that the Lehman Entities do not seek*
23        *through the Claims Objections an order subordinating any of SunCal*
24        *Management's claims.*

25   Miliband Declaration, Exh. 2 (italicized emphasis added).

26        _____

27   [8] Recoupment is considered a defense. *Buder v. United States*, 436 F.3d 936, 938 (8th Cir. 2006)
     ("Equitable recoupment is an affirmative defense"); *Enrico & Sons Contracting, Inc. v. Bridgemarket
     Associates*, 252 A.D.2d 429, 430, 675 N.Y.S.2d 351, 352-53 (N.Y. App. Div. 1998) ("It is really a defense,
28   as it denies the validity of plaintiff's claim in the amount claimed, and does not entitle defendants to any
     affirmative relief or any amounts in excess of the amount demanded by plaintiff.") (citation omitted).

-13-

86122.4

1    When the Lehman Entities assert that on ostensible claim objection is nothing more than a

2    claim objection, they expect their word to be accepted.  When the SunCal Parties do the same

3    thing, the Lehman Entities disregard it and file motions for violation of the automatic stay.

4    Desperate to swing the bat of LCPI's stay and hit something, the Lehman Entities argue

5    that even if the Claim Objection did not seek subordination, "it would nevertheless violate the stay

6    as the commencement of an action against LCPI to establish a right of setoff."  Opp. at 15:20-22.

7    But when the Recoupment Claim was amended on May 20, 2011, the SunCal Parties made clear

8    that while recoupment is sought against both Lehman ALI and LCPI, setoff is sought against

9    Lehman ALI only. (*See* Amended Notice of Motion to Disallow Claims [D.E. 2082] at viii.7-12.)

10    The Lehman Entities ignore this basic fact, once again insisting that *they* get to decide what relief

11    the *SunCal Parties* seek.  Because the SunCal Parties have chosen to file a claim objection and to

12    seek only relief properly obtainable thereby, the automatic stay is simply a non-issue.

13    **B.    The Lehman Entities' Stay Violation Arguments are Misleading and Improper**

14    In making their automatic stay arguments, the Lehman Entities engage in sleight-of-hand

15    regarding the evidence they cite and the relief they request.  More troubling, while accusing the

16    SunCal Parties of violating the automatic stay, it is the Lehman who are infringing upon the

17    SunCal Debtors' statutorily provided bankruptcy protection and upon this Court's jurisdiction.

18    First, in arguing that the Recoupment Claim Objection "really" seeks subordination

19    through a property sale procedure that places the SunCal Parties' recovery rights before those of

20    LCPI, the Lehman Entities do not cite to the Recoupment Claim Objection itself. They could not:

21    the Recoupment Objection does not provide for the sale of anything, and none of the prayers for

22    relief therein seek one penny from LCPI's collateral. It merely seeks a ruling reducing the amount

23    of the secured Lehman Claims, by the amount of damages suffered through a specified transaction.

24    The sale and distribution of proceeds provisions that the Lehman Entities contend equate to

25    subordination appear *only in the SunCal Parties' plan of reorganization* (the "SunCal Plan").  *See*

26    Opp. at 15:9-14 and n.8 (citing the "DS Reply" [D.E. 2046]).  The SunCal Plan then expressly

27    limits these sale and distribution provisions by stating that no sale or other relief will occur until

28

-14-

86122.4

1   LCPI's automatic stay is lifted or is determined not to apply.[9]  In the motion filed in New York to

2   enforce the Lehman debtors' automatic stay, LCPI  acknowledges this qualification in the SunCal

3   Plan, and is not contending that the SunCal Plan violates LCPI's automatic stay.[10]  As the Lehman

4   Entities well know, plan feasibility is not before the Court at this time, and their attempt to both

5   confuse the issues and jump the gun in this regard is improper.

6           Second, by filing the New York Stay Motion to enjoin the SunCal Parties' Claim

7   Objections, the Lehman Entities have infringed upon this Court's exclusive jurisdiction over the

8   claims allowance process and the administration of the SunCal Debtors' property thereby.  Since

9   the Lehman Claims were filed in this Court, and they seek payment from the *res* within the

10  exclusive control of this Court, the allowance and disallowance of these claims falls within the

11  exclusive jurisdiction of this Court. *In re W.G. Wade Shows, Inc.*, 218 B.R. 625, 628 (Bankr. M.D.

12  Fla. 1998) ("It can hardly be gainsaid that this Court has the exclusive jurisdiction to pass on the

13  allowability of any claims filed by Claimants. 11 U.S.C. § 503; 28 U.S.C. § 157(b)(2)(B)."); *In re*

14  *U.S. Lines, Inc.,* 199 B.R. 476, 480 (Bankr. S.D.N.Y. 1996) ("[T]he claims allowance process is

15  within the exclusive jurisdiction of the bankruptcy courts."); *In re Coated Sales, Inc.,* 119 B.R.

16  452, 455 (Bankr. S.D.N.Y. 1990) ("[B]y submitting a claim against the bankruptcy estate,

17  creditors subject themselves to the court's equitable power to disallow those claims.

18  Concomitantly, when the claimant invokes the equitable jurisdiction of the bankruptcy court to

19  establish its right to participate in distribution, it cannot, thereafter, object to the court's necessary

20  determination of any misappropriations by the claimant.").

21          A bankruptcy court's exclusive jurisdiction over the claims allowance process is

22  not only sensible, it is essential to the proper functioning of the bankruptcy system.  As

23  the Ninth Circuit stated in *In re Parker N. Am. Corp.*, 24 F.3d 1145, 1153 (9th Cir. 1994):

24  _____

25          [9] On June 8, 2011, the Ninth Circuit will hear oral argument regarding whether the adversary
proceeding for equitable subordination implicates LCPI's automatic stay.

26          [10] *See* New York Stay Enforcement Motion (Miliband Decl., Exh. 3) at 14 ¶ 30 ("On April 8, 2011, the
SunCal Plan Proponents mailed LCPI a letter request that LCPI confirm its view on the effect of the
27  SunCal Plans on the automatic stay in these chapter 11 cases…..On April 25, 2011,…LCPI advised the
SunCal Plan Proponents that it would accept the representation made in the SunCal Plans that 'no action
28  provided for in [the SunCal Plans] shall be taken against [LCPI] or [LBHI] that would have the effect of
violating any applicable automatic stay.'").

1

2    With no authority to allow or disallow [the RTC]'s claims against a bankruptcy
debtor, the system falls apart.... [I]n a Chapter 11 case, [the] inability to allow a
claim by [the RTC] would make plan confirmation impossible. The only option in
such a situation might well be to dismiss the case. We doubt that Congress
3    intended such a result.

4    *Id.* at 1153 (quotation omitted).  This position was echoed by the Second Circuit in *In re S.G.*

5    *Phillips Constructors, Inc.,* 45 F.3d 702, 705 (2d Cir. 1995) ("Because nothing is more directly at

6    the core of bankruptcy administration ... than the quantification of all liabilities of the debtor, the

7    bankruptcy court's determination whether to allow or disallow a claim is a core function.")

8    (quotation omitted).

9    Because this Court is in possession of the *res* from which a claimant seeks payment—the

10    properties in California—this Court has the exclusive right to decide what claims will be allowed

11    recourse to that *res*. *Chesley v. Union Carbide Corp.*, 927 F.2d 60, 66 (2d Cir. 1991) ("A

12    common-law rule of long standing prohibits a court, whether state or federal, from assuming in

13    rem jurisdiction over a res that is already under the *in rem* jurisdiction of another court.").[11]

14    Although the Lehman Entities contend that the issue presented in the New York Stay

15    Motion is a "home bankruptcy court" court versus "foreign bankruptcy court" automatic stay

16    issue, it is not.  The only provision in 11 U.S.C. § 362(a)(3) that could have any conceivable

17    application is subsection 362(a)(3) (subsection 362(a)(1) has no application, since claim

18    objections can only be filed post-petition);[12] and the filing of claim objections that only seek

19    disallowance of a claim is not an act to "exercise control over" the property of the claimant. It is

20    the equivalent of an answer to the claimant's proof of claim. *Nortex Trading Corp. v. Newfield,*

21

22    [11] The Supreme Court has consistently held that the disallowance of a claim is an act *in rem* that is not
"against" anyone. *Tennessee Student Assistance Corp. v. Hood*, 541 U.S. 440, 452 (2004) ("[T]here is no
23    need to engage in a comparative analysis to determine whether the adjudication would be an affront to
States' sovereignty. As noted above, we have long held that the bankruptcy courts' exercise of *in rem*
24    jurisdiction is not such an offense."); *Gardner v. State of N.J.,* 329 U.S. 565, 573-74 (1947) ("*The whole
process of proof, allowance, and distribution is, shortly speaking, an adjudication of interests claimed in a
25    res*. It is none the less such because the claim is rejected in toto, reduced in part, given a priority inferior to
that claimed, or satisfied in some way other than payment in cash.") (emphasis added).

26    [12] *In re S.G. Phillips Constructors, Inc.*, 45 F.3d 702, 706 (2d Cir. 1995) ("We do not think that
27    anything in Marathon alters the basic principle that the filing of a proof of claim invokes the special rules of
bankruptcy concerning objections to the claim, estimation of the claim for allowance purposes, and the
28    rights of the claimant to vote on the proposed distribution. Understood in this sense, a claim filed against
the estate is a core proceeding because it could arise only in the context of bankruptcy.").

-16-

1  311 F.2d 163, 164 (2$^d$ Cir. 1962) ("The filing by Nortex of its proof of claim is analogous to the

2  commencement of an action within the bankruptcy proceeding."); *In re Barclay Bros., Inc.*, 1986

3  WL 15884, *1 (Bankr.E.D.Pa. 1986) ("Since the filing of a proof of claim has been said to be

4  tantamount to the filing of a complaint in a civil action, the trustee's formal objection to the claim

5  is considered to be the answer to the claim under Bankruptcy Rule 9014.") (citing *Nortex*).

6      Third, the New York Stay Motion seeks relief that would violate the SunCal Debtors'

7  automatic stay, not to mention transgress the boundaries of due process. If the New York Stay

8  Motion were granted, it would effectively deny the SunCal Debtors the right to defend their assets

9  against the prepetition claims and liens that the Lehman Entities are asserting against these

10  properties. *A property owner who is denied the right to oppose claims and liens asserted against*

11  *its property is effectively denied ownership of the property*. This relief would therefore violate

12  Section 362(a)(3), and judicially enjoin the SunCal Debtors from defending themselves.[13]

13      The Lehman Entities, no doubt aware of this, misleadingly suggest to this Court that they

14  seek to enjoin the Claim Objection *only vis-à-vis non-debtor SunCal Management*:

15      *If the Court determines that SuCal Management does have standing* to prosecute
16      the Asserted Claim Objection on behalf of the relevant Trustee Debtors against
17      LCPI, LCPI respectfully requests that the Court defer ruling until the Lehman
        Bankruptcy Court has an opportunity to rule on the applicability of the Lehman
18      Debtors' automatic stay to the claims asserted therein.

19  ---

      [13] The New York Stay Motion also violates 11 U.S.C. § 362(a)(1) by seeking to enforce the prepetition
      Lehman Claims in the Lehman Bankruptcy Court. Although the Lehman Entities will contend that they are
20    only seeking to enforce their stay, this argument ignores the obvious effect of the ruling they seek. If this
      Court prohibits the SunCal Debtors from objecting to the Lehman Claims—*which is precisely the relief*
21    *sought by the New York Stay Motion*—then these claims instantly gain obtain validity, through the judicial
      immunity from challenge granted by the Lehman Bankruptcy Court. In essence, granting the New York
22    Stay Motion has the effect of a liability judgment for all practical purposes. This clearly violates Section
      362(a)(1).

23      The New York Stay Motion also seeks a ruling that would violate 11 U.S.C. § 362(a)(4). Although the
      Lehman Entities will argue that a ruling from the Lehman Bankruptcy Court immunizing their claims and
24    liens from challenge is not an "act to create, perfect, or enforce any lien against property of the estate," the
      effect of the requested ruling would be exactly that. Pursuant to 11 U.S.C. § 502(a), a filed claim is valid
25    until it is the subject to an objection. If the New York Stay Motion is granted, the SunCal Parties will be
      denied the right to object to the Lehman Claims, which effectively conveys upon such claims and liens the
26    validity and priority that asserted in these claims.

27      In short, if the Lehman Entities want the Court to consider the "true effect" of a motion, their argument
      proves too much.
28

86122.4

1   Opp. at 13:27-14:3 (emphasis added).  However, in the New York Stay Motion itself, the Lehman

2   Entities unequivocally seek to enjoin the claim objections not only as to the non-debtor SunCal

3   Management, but as to the SunCal Debtors as well:

4         [T]he "Debtors"...file this Motion (the "Motion") pursuant to section 362(a) of
          the Bankruptcy Code seeking entry of an order *enforcing the automatic stay with*
5         *respect to the SunCal Movants* (defined below)….

6
          [C]ertain of the SunCal Debtors, along with affiliated non-debtor SunCal
7         *Management LLC (collectively with the SunCal Debtors party to the SunCal*
          *Motions, the "SunCal Movants"*), through two separate motions (the "SunCal
8         Motions"), ask the California Bankruptcy Court to disallow 14 claims, totaling
          billions of dollars, held by LCPI against the SunCal Debtors.
9

10  Miliband Decl., Exh. 3 at Notice of Motion and p.1 ¶ 1 (emphasis added).  The Lehman Entities

11  have thus failed to make full disclosure to this Court regarding the scope of relief they are

12  (simultaneously) seeking from the Lehman Bankruptcy Court.

13        At the end of the day, the Lehman Entities are forum shopping.  At the same time that they

14  argue to this Court that their automatic stay is violated, they have asked the Lehman Bankruptcy

15  Court to delve into and pre-judge the merits of the claim objections pending before this Court.

16  The court in which proofs of claims are filed has exclusive jurisdiction over the allowance and

17  disallowance of those claims.  Moreover, a claimant who files a claim in one bankruptcy court

18  cannot seek review in another bankruptcy court in the hope of getting a better deal.  *See Pan Am.*

19  *World Airways, Inc. v. C.A.B.,* 517 F.2d 734, 741 (2d Cir. 1975) ("Possibly petitioners chose to

20  appeal the Board's ruling with respect to TGC/ABCs in this Circuit in the hopes of finding a court

21  more inclined toward their view.  Such 'forum shopping' should be discouraged.").

**IV**

**REPLY TO CONTENTION THAT RECOUPMENT DOES NOT**

**ALLOW REDUCTION OF SECURED CLAIM**

25        The Lehman Entities contend that the SunCal Parties' recoupment objection can never

26  result in the reduction of their secured claims. Stated otherwise, the Lehman Entities assert that

27  *they* have the right to insist that any sum that is recoupable must be applied against their unsecured

28  claim, not their secured claim. This is not the law.

-18-

1          Recoupment is an equitable doctrine. When a court fashions a remedy within the context of

2    an equitable defense, it has the flexibility to grant relief that addresses the wrong in a manner

3    consistent with the dictates of equity. The Supreme Court has consistently acknowledged this

4    power and flexibility. *Reiter v. Cooper,* 507 U.S. 258, 265 n. 2 (1993) ("It is well settled ... that a

5    bankruptcy defendant can meet a plaintiff-debtor's claim with a counterclaim arising out of the

6    same transaction, at least to the extent that the defendant merely seeks recoupment. Recoupment

7    permits a determination of the just and proper liability on the main issue and involves no element

8    of preference."); *Young v. United States,* 535 U.S. 43, 50 (2002) ("[B]ankruptcy courts ... are

9    courts of equity and 'appl[y] the principles and rules of equity jurisprudence.'"); *In re McMahon*,

10   129 F.3d 93, 96 (2d Cir. 1997) (quoting *Reiter*).  As the court aptly stated in *Lines v. Bank of Am.*

11   *Nat. Trust & Sav. Ass'n*, 743 F. Supp. 176, 179 (S.D.N.Y. 1990): "These doctrines are necessarily

12   flexible because equity must apply its remedies to 'whatever knavery human ingenuity can

13   invent.'").

14          What the SunCal Parties seek is neither novel nor unprecedented, as the Lehman Entities

15   would have this Court believe.  *See, e.g., In re Jablonski*, 70 B.R. 381, 390 (Bankr. E.D. Pa. 1987)

16   *aff'd in part and remanded*, 88 B.R. 652 (E.D. Pa. 1988) (allowing recoupment against secured

17   part of claim bifurcated under Section 506(a); the amount recouped "should be imposed in such a

18   manner as to have the most meaningful impact on the wrongdoing creditor").

19          The Lehman Entities' argument also ignores the gravamen of recoupment. This doctrine

20   allows the party claiming recoupment to retain its own property, by reducing the creditor's claim

21   against the same.  Here, the Lehman Entities are seeking payment from the Projects owned by the

22   Voluntary and Trustee Debtors.  Due to the nature of recoupment, the claims that seek payment

23   from this source must necessarily be reduced to do equity.

24          The Lehman Entities' argument is also premature.  The remedy that this Court will

25   ultimately grant, or not grant, will depend upon the facts and circumstances presented at the trial

26   on the merits. The range of remedies available to the Court is substantial and this is not the point

27   in time for the Court to decide, or to limit, what it will or will not do.

28

86122.4

V

**THE SETTLEMENT AGREEMENT WAS A BINDING**

**AGREEMENT THAT WAS BREACHED**

In attempting to argue that the Settlement Agreement[14] was not breached, the Lehman Entities turn both the language of the parties' agreement and logic on its head. They would have this Court believe that their execution and delivery of the agreement was a condition precedent to their execution and delivery of the agreement! They also argue that the fact that they didn't perform is proof that there must not have been a binding contract in the first place.

At the very least, if the Court is not willing to reject the Lehman Entities' unreasonable position out of hand, the parties' wildly divergent readings of the contracts, and of whether the parties intended to be bound thereby, mandate that discovery be taken to resolve these disputed factual issues. *Sayers v. Rochester Tel. Corp. Supp. Mgmt. Pension Plan*, 7 F.3d 1091, 1092 (2d Cir. 1993) (reversing summary judgment based on ambiguity of contract and parties' conflicting extrinsic evidence; "the parties…think their written agreement is clear and unambiguous. But, in light of the claimed clarity, surprisingly each of them interprets the writing differently.").

### A.    The Lehman Entities Misconstrue the Conditions Precedent to Closing

The Lehman Entities crystallize the circularity of their position when they argue:

> [T]he proposed parties, including LBHI and Lehman ALI, clearly intended to execute and deliver and be bound by the Proposed Settlement Agreement only <u>after</u> the closing conditions were satisfied and each and every proposed party thereto "execute[d], deliver[ed] and enter[ed] into" the Proposed Settlement Agreement.

Opp. at 22:5-7 (original emphasis). In other words—indeed, in so many words—the Lehman Entities argue that they did not "intend[] to execute and deliver and be bound by the Proposed Settlement Agreement" until they "'execute[d], deliver[ed] and enter[ed] into' the Proposed Settlement Agreement." *The Lehman Entities have thus made their execution and delivery a condition precedent to their execution and delivery.*

---

[14] In a not-so-subtle rhetorical ploy, the Lehman Entities repeatedly refer to the "Proposed Settlement Agreement." The SunCal Parties obviously disagree with their characterization of the Settlement Agreement as a mere "proposed" agreement, and will use the Lehman Entities' misleading terminology only when quoting their Opposition.

86122.4

1    Such an interpretation of the parties' agreement is an absurdity—an event cannot be a

2    condition precedent to itself.  Courts must avoid interpreting a contract in a manner that renders

3    the parties' contract meaningless or nonsensical.  *Greenwich Capital Fin. Prods., Inc. v. Negrin*,

4    74 A.D.3d 413, 415 (2010) (rejecting defendant's interpretation of contract which "depends on

5    'formalistic literalism,' ignores common sense, and could lead to absurd results"); *Smith v. Brown*

6    *& Jones*, 633 N.Y.S.2d 436, 442 (1995) ("An unreasonable interpretation or an absurd result

7    should be avoided.").  Accordingly, the Lehman Entities' position must be rejected.

8    Moreover, under the Lehman Entities' view, *regardless whether all other conditions*

9    *precedent to execution and delivery were satisfied*, the Lehman Entities could simply refuse to

10    execute and deliver for any reason or no reason whatsoever.  This would render the SunCal

11    Parties' rights under the contract illusory.  *Quantum Maint. Corp. v. Mercy College*, 798 N.Y.S.2d

12    652, 656 (2005) ("[C]ourts will not adopt an interpretation of a contract that would render the

13    benefit bestowed by the contract illusory.").   That is not a deal that the SunCal Parties would—or

14    did—agree to.  Nowhere in the contract does it state that execution and delivery are a condition

15    precedent to execution and delivery.

16    Nor is that the law.  It is basic blackletter law that a party cannot avoid liability under a

17    contract by preventing the performance of a condition precedent.  *Creighton v. Milbauer*, 594

18    N.Y.S.2d 185, 187-88 (1993) ("[A] party may not frustrate the performance of an agreement by

19    bringing about the failure of a condition precedent.").   Thus, the Lehman Entities could not fail

20    and refuse to execute and deliver when they were otherwise required to do so, and then argue that

21    that very failure excuses their non-performance.

22    Adding to the confusion regarding the Lehman Entities' position is the fact that in a

23    footnote, they assert that "[s]ince the closing never occurred, the signature pages were never

24    delivered."  Opp. at 21 n.13.  Here, they apparently argue that a closing was a condition precedent

25    to their obligation to deliver the signatures, whereas they had just argued above that the delivery of

26    their signatures was a condition precedent to their obligation to close.  Neither position is logical

27    (let alone true), but in any event, Lehman cannot take both positions at once.

28

86122.4

The language of the contract makes clear that execution and delivery of the Settlement Agreement and related documents is an *obligation triggered by* satisfaction of the closing conditions*, not a condition precedent to closing*:

> Each of the parties acknowledges and agrees that, provided that a Termination Event (as hereinafter defined) has not occurred and subject to the terms of Sections 2, 3 and 4 hereof, not later than three (3) Business Days *following the satisfaction of all the Closing Conditions* (as hereinafter defined) (such date being referred to herein as the "Closing Date"), *each of the Parties will execute, deliver, and enter into* and will cause the other SunCal Parties and Lehman Parties, respectively, and any other Affiliates thereof, as applicable, to execute, deliver and enter into, the Settlement Agreement….

Restructuring Agreement § 1(a) (emphasis added).  Furthermore, section 1(b) lists the "Closing Conditions," and on satisfaction of them, "*the obligations of the Parties to execute and deliver…the Settlement Agreement and the other Settlement Documents shall be unconditional and irrevocable*" (emphasis added).  Sensibly, "execution and delivery" are not included among the list of Closing Conditions.  The list does, however, include reference to obligation to negotiate the documents in good faith, as well as an acknowledgment that if a particular term is not specified or contemplated, the parties will act in a "commercially reasonable manner":

> (i) each of the Parties agrees to negotiate the terms and conditions of the Undocumented Additional Settlement Documents and the final form of any Outstanding Attachments in good faith, and (ii) to the extent that a term or condition is not specifically set forth in or contemplated by the Settlement Agreement or any of the Documented Additional Settlement Documents, the Parties agree that they will act in a commercially reasonable manner in approving customary terms and conditions for transactions of this type….

Restructuring Agreement § 1(b)(iii).  Thus, there is nothing in the language of the contract that indicates that the Lehman Entities could unilaterally refuse to perform.

At bottom, the Lehman Entities conflate the *obligation to proceed* to closing (Section 1(b)) with the *consummation* of the closing itself (Section 1(c)).  They argue that the Settlement Agreement and related Settlement Documents were "never intended to be and never became operative.  If they had, the deeds conveying title to the 'Venture Grantees' would have been recorded and title would have transferred (which has obviously not occurred)."  Opp. at 20:14-18.  Their position can be summarized as follows: "If there was an agreement, we would have done what we were supposed to do.  Since we didn't do what we were supposed to do, there must not have been an agreement."   The fact that the Lehman Entities did not consummate the closing is

-22-

86122.4

1    not proof that there was no obligation to close; just the opposite—it is proof of a breach.  There is

2    an obvious distinction between whether an agreement was reached, and whether it was completely

3    implemented. Lehman puts the cart before the horse—and then denies there was ever a horse.

4    **B.    The Evidence Shows the Parties Intended to Be, Believed They Were**

5    **Obligated to, and Were In Fact Obligated to Close**

6    The Lehman Entities conveniently ignore the fact that the Settlement Agreement—and all

7    related Settlement Documents—*were executed*.  The Lehman Entities assert that "[u]nder New

8    York law, if parties do not intend to be bound by an agreement until it is in writing and signed,

9    then there is no contract until that event occurs."  Opp. at 21:4-6 (quoting *R.G. Group, Inc. v.*

10   *Horn & Hardart Co.*, 751 F.2d 69, 74 (2d Cir. 1984)).  True enough.  They further cite to

11   *Reprosystem, B.V. v. SCM Corp.*, 727 F.2d 257, 262 (2d Cir. 1984), for the proposition that

12   language in an agreement that it "would be valid and binding 'when executed and delivered'

13   evidenced a mutual intent not be bound prior to *execution* of the documents."  Opp. at 21:9-12

14   (emphasis added).  But the Lehman Entities cite only to cases where the contract in question was

15   *not signed.  See R.G. Group*, 751 F.2d at 74 ("The agreement, however, was never signed.");

16   *Reprosystem*, 727 F.2d at 260 ("At no time [were] any of the draft contracts signed by either

17   side.").  Cases regarding unexecuted contracts do not help the Lehman Entities here, where the

18   documents were in fact signed.[15]

19   As the Declarations of Bruce Cook, Stephan Elieff and Matt Wyman filed concurrently

20   herewith demonstrate, at an August 25, 2008 meeting, Bruce Cook and Stephan Elieff, on behalf

21   of all of the relevant SunCal parties, and Robert Brusco and/or Frank Gilhool, on behalf of all of

22   the relevant Lehman parties, signed the signature pages of the Settlement Agreement and related

23

---

24   [15] The Lehman Entities, no doubt aware of this, assert:  "SunCal cannot represent in good faith that the
     Proposed Settlement Agreement was executed, if 'executed' is meant in a legal sense to connote entry into

25   a legally binding written contract."  Opp. at 21 n.13.  This, of course, assumes what the Lehman Entities
     seek to prove.  Whether the parties' signing of the agreement was intended to—and did—effectuate a

26   legally binding written contract is, at the very least, a disputed issue.  In both cases cited by the Lehman
     Entities, the parties took discovery and offered extrinsic evidence regarding their intent to be bound.  *R.G.*

27   *Group*, 751 F.2d at 76-77 (on appeal from summary judgment, court considered evidence of intent
     including, but not limited to, language of agreement); *Reprosystem*, 727 F.2d at 261 (appeal from

28   judgment; court focused on "documents and testimony" to determine parties' intent to be bound).

86122.4

1    Settlement Documents required to be signed prior to consummation of the Settlement

2    Transactions—in excess of 1000 pages in all.  During a breakout session among the principals that

3    took place during that August 25 meeting, the parties *resolved* any outstanding business issues,

4    and emerged asserting that the "deal was done."  Although some of the documents may have

5    needed to be revised or updated to reflect what was agreed to, it was the expressed understanding

6    of the parties immediately after that meeting that since the documents were now signed, once the

7    Required Consents were obtained, *nothing further would be required* for the parties to be

8    obligated to proceed to a closing.  Cook Decl. ¶¶ 12-25; Elieff Decl. ¶¶ 4-16; Wyman Decl. ¶¶ 11-

9    21.  As *Reprosystem*, the principal case relied upon by the Lehman Entities, points out:

10   > [T]he mere fact that the parties contemplate memorializing their agreement in a
   > formal document does not prevent their informal agreement from taking effect prior
11   > to that event. … These rules, placing the emphasis on intention rather than form,
   > are sensible and reasonable.

12   *Reprosystem*, 727 F.2d at 261; *V'Soske v. Barwick*, 404 F.2d 495, 500 (2d Cir.1968) ("[I]t is also

13   plain that all the terms contemplated by the agreement need not be fixed with complete and perfect

14   certainty for a contract to have legal efficacy.").

15            In support of their Opposition, the Lehman Entities submit two witness declarations—yet

16   they have *vigorously and repeatedly opposed efforts to obtain those witnesses' depositions*.

17   Notably, Weil attorney Nellie Camerik, the declarant who asserted that there were "open issues"

18   remaining after the August 25 meeting and that there was no binding agreement, did *not*

19   participate in the breakout session among principals where the open issues were resolved.  Robert

20   Brusco, the Lehman representative who was actually in that breakout session, makes no such

21   claim; rather, his declaration largely just authenticates documents.  The SunCal Parties have

22   submitted three declarations from people who were in that meeting and who have contradicted

23   Camerik's conclusions (of which she lacks personal knowledge in any event).  Cook Decl., ¶¶ 21-

24   23; Elieff Decl. ¶¶ 13-15; Wyman Decl. ¶¶ 19-21.  As such, there are, at the very least, important

25   disputed factual and credibility issues that require discovery.

26            The Lehman Entities argue that the Settlement Documents "were to be executed and

27   delivered in final form only at the closing of the Settlement Transactions."  Opp. at 20:18-20.  If

28   the Lehman Entities mean to suggest that the parties planned on *re-signing* over 1000 pages of

signatures pages after they had *already done so*, what was the point of having all the parties go through the trouble of signing them in the first place?  If the August 25 meeting took place, as Camerik suggests, just to accommodate Bruce Cook, who was about to leave for vacation, *why did the Lehman Entities also sign those 1000-plus pages?*  Why not save their signatures until every "i" was dotted, every "t" crossed?  Discovery should provide some clarity on these questions.  But the declarations submitted herewith already provide an answer:  the Lehman Entities' current position has been manufactured for litigation; the parties understood they had a deal.

In an effort to avoid the obvious fact that the Settlement Documents were signed, and that such signatures were not a mere superfluous nullity, the Lehman Entities argue that the signature pages to the Settlement Agreement had "several signatures still missing."  Opp. at 21 n.13.  But at the August 25, 2008 meeting, the SunCal parties and the Lehman parties signed *all* of the Settlement Documents presented to them that were required for a closing of the Settlement Transactions on behalf of *all* of the relevant entities, without withholding any signatures thereto. The Lehman Entities admit that they did not produce the signature pages—despite their assurances that they would do so—until formal discovery requests were made during the litigation.  But the Lehman Entities have been less than forthcoming during discovery. [16]  Thus, if the SunCal parties are not in possession of all the signed signature pages, that is most likely due to the Lehman Entities' wrongful withholding of them.  At the very least, the declarations submitted by the SunCal parties establish that if one or two signatures out of a 1000-plus signature pages were missing, it was the result of an oversight, not any intentional withholding of signatures.  Cook Decl. ¶¶ 14-20; Elieff Decl. ¶¶ 6-12; Wyman Decl. ¶¶ 13-18.  Once again, the Lehman Entities' argument is either entirely unavailing, or warrants discovery.

---

[16]  As just one example:  in February 2010, the plaintiffs in the adversary proceeding for equitable subordination brought—and won—a motion to compel the Lehman Entities to produce documents in Barclay's possession, on the ground that such documents, if not in defendants' "possession," were nevertheless within their "custody or control."  The Lehman Entities claimed that Barclay possessed all of their documents post-dating LBHI's September 15, 2008 bankruptcy—a time period that would include critical documents regarding the Lehman Entities' assurances that they would perform under the Settlement Agreement, and leading up to their repudiation of that agreement on November 13, 2008.  The Lehman Entities had apparently not even begun to search through such documents by the time the equitable subordination proceeding was stayed several months later, and have never produced those documents to this day.

1    The Lehman Entities will no doubt focus on the fact that the Restructuring Agreement

2  refers to the obligation not only to "execute" but to "deliver and enter into" the Settlement

3  Documents.  But as discussed, the SunCal Parties understood (and the Lehman Entities appeared

4  to agree) that execution was the significant act, and delivery was merely ministerial.  Cook Decl.

5  ¶¶ 12, 18, 20, 23; Elieff Decl. ¶¶ 4, 10, 12, 15-16; Wyman Decl. ¶¶ 11, 13, 17-18, 21-24.  More

6  importantly, once all parties were present at the August 25 meeting and executed the signature

7  pages, the SunCal Parties understood (and the Lehman Entities appeared to as well) that the

8  documents *were delivered*.  Although the Weil attorneys took the signature pages with them at the

9  end of the meeting, it was understood that this was for the purpose of making and distributing

10  copies to the parties in short order, not to prevent the effectuation of a deal that had otherwise been

11  agreed to.   Wyman Decl. ¶¶ 11, 22-25; Cook Decl. ¶ 23.  Under the Lehman Entities' view, it

12  appears the SunCal Parties, for their part, *never could have* "delivered" the Settlement Agreement

13  and Settlement Documents (because the Lehman Entities' attorneys were in possession of them),

14  and so never could have performed.  Again, this absurd reading of the contract must be rejected.

15    The parties thus dispute both the significance of the term "delivery" term in their

16  agreement,[17]  and what constitutes effective "delivery."   In *Birch v. McNall*, 244 N.Y.S.2d 60,

17  (1963), the trial court granted summary judgment to the defendant on plaintiff's breach of contract

18  claim, based on lack of delivery. The appellate court reversed, noting that the contention in an

19  affidavit of the defendant's agent that "defendant executed the contract as a matter of

20  convenience" was contradicted by plaintiff's testimony.  *Id.* at 61.  The court held:  "A binding

21  contract…may be made without a physical delivery of the instrument evidencing the contract.

22  *Whether certain acts, words, and circumstances constitute a delivery of an agreement is a*

23  *question of intent*."  *Id.* at 60 (quotation omitted) (emphasis added).

24    Further bolstering the conclusion that the parties intended to be bound is the fact that on

25  August 28, 2008—three days after the Settlement Documents were signed—the SunCal Parties

26  consented to a foreclosure by Lehman ALI's designee, LV Pacific Point LLC, of the Pacific Point

27

28    [17] There is also an apparent ambiguity, or at least disagreement, as to what the contractual term "enter into" means separate and apart from "execution and delivery."

1    project.  Cook Decl., ¶¶ 26-28.  Under the terms of the Settlement Agreement, consent to the

2    foreclosure was consideration for the promise to assume millions in Pacific Point payables and

3    bond obligations.  The SunCal Parties performed their part of the agreement, but never got the

4    benefit of their bargain.  *R.G. Group*, 751 F.2d at 75-76 ("[A] factor of major significance is

5    whether one party has partially performed, and that performance has been accepted by the party

6    disclaiming the contract. Aside from unilateral contracts, partial performance is an unmistakable

7    signal that one party believes there is a contract; and the party who accepts performance signals,

8    by that act, that it also understands a contract to be in effect.").

9        In other words, a "closing" of the Settlement Agreement would have meant conveyance of

10   the properties to the applicable Lehman parties.  As to Pacific Point, *the property was actually*

11   *conveyed.*  This was not merely *partial* performance, but *full* performance from the SunCal

12   Parties' side.  Although the Lehman Entities do not even attempt to address the Pacific Point issue

13   in their Opposition,[18] under their view, the SunCal parties were apparently just chumps for

14   consenting to the Pacific Point foreclosure.  That is simply not a position that a court of equity

15   should countenance—nor need it do so under the law.

16       Finally, the Lehman Entities argue there is no evidence that the closing conditions were

17   satisfied prior to September 30, 2008.  But as of September 2, 2008, all Required Consents as to at

18   least nine of the subject properties had been obtained—more than enough to commence an "Initial

19   Closing" pursuant to Section 2(a) of the Restructuring Agreement.  *See* Cook Decl. ¶¶ 29-35.  And

20   Required Consents for the other properties could have been obtained but for the Lehman Entities'

21   failure to pursue them in good faith—which they were contractually obligated to do.  *See* Cook

22   Decl. ¶¶ 36-7; Restructuring Agreement Section 2(a) ("After the Initial Closing, the Parties shall

23   use commercially reasonable efforts to obtain all Required Consents with respect to each of the

24   Subsequent Conveyance Properties….").  And notwithstanding the Lehman parties' non-

25   cooperation at least since early September 2008, prior to September 30, 2008, Required Consents

26   for all but three of the properties had been obtained.  Cook Decl. ¶¶ 36-39 & Exh. 1.

27

28       [18]  The Lehman Entities also do not respond to let alone refute the contention that, if the Settlement
Agreement was valid, the sale of certain of the subject loans to Fenway three days before signing of the
Settlement Agreement purporting to restructure those loans was a breach of that agreement.

-27-

86122.4

1    Because the Closing Conditions were satisfied, the Lehman Entities' obligations to execute

2   and deliver the Settlement Agreement and related documents became "unconditional and

3   irrevocable." Restructuring Agreement § 1(b). And any argument that the Closing Conditions

4   were not satisfied still would not justify the Lehman Entities' non-performance, because such

5   failure would be due to the Lehman Entities' failure to pursue them in good faith. *Id.* § 1(d)(i).

6                                                    **VI**

7                    **LBHI'S CHAPTER 11 FILING IS IRRELEVANT**

8                    **TO THE LEHMAN ENTITIES' BREACHES**

9    The Lehman Entities argue that once the parent Lehman entity, LBHI, filed for bankruptcy

10   on September 15, 2008, it was "legally impossible for the conditions to closing under the

11   Restructuring Agreement to be satisfied" because LBHI could not execute and deliver the

12   Settlement Agreement. Opp. at 22:19-20. This is a red herring, and a stale one at that.

13   LBHI had no payment obligations, nor *any* obligations under the Restructuring Agreement

14   or Settlement Agreement *other than*, as one of the "Lehman Parties," to "execute, deliver and

15   enter into" the agreements. And prior to filing for bankruptcy, LBHI (along with the other

16   Lehman Parties) *did* execute the Settlement Agreement and all related Settlement Documents.

17   Thus, LBHI already did everything it needed to do pre-petition. To the extent that the

18   obligation to "deliver" added anything, it was merely a ministerial act. Moreover, it was one

19   which Lehman ALI was fully able to (and obligated to) perform: as the Lehman Entities point

20   out, the signature pages were produced in response to document requests propounded on *them—*

21   not LBHI. Since Lehman ALI had possession of them, there was no "delivery" for LBHI to

22   effectuate that Lehman ALI could not have performed independently.[19] And as discussed above,

23

24   ─────────────────────
      [19] The Lehman Entities also argue that Section 1(b)(vi) of the Restructuring Agreement provides that
      LBHI's bankruptcy excused performance. Under that section, one of the Closing Conditions is that:

25       No governmental authority or court of competent jurisdiction shall have issued an order,
         decree or ruling or taken any other action materially restraining, enjoining or otherwise

26       prohibiting any of the Settlement Transactions or any of the other transactions
         contemplated by the other Settlement Documents, it being agreed that the Parties shall

27       reasonably cooperate with one another to contest and/or appeal any such order, decree,
         ruling or other action in good faith.

28   The Lehman Entities' argument fails for several reasons. First, this clause refers to a court order enjoining
     the "Settlement Transactions" themselves, not an order enjoining the parties' conduct. Second, assuming,

─────────────────────
86122.4

prior to LBHI's bankruptcy, the conditions precedent to a closing had already occurred, and the SunCal parties were urging that the Lehman parties close as contractually required.  Cook Decl. ¶¶ 36-37.  The Lehman parties cannot rely on their own wrongful delay in closing as an excuse.

It is worth pointing out that when the Lehman Entities sent their letter from Gerald Pietroforte on November 13, 2008, purporting to terminate the Restructuring Agreement and Settlement Agreement, LBHI had already been in bankruptcy for two months.  The agreements were terminated *not* by LBHI, but by Lehman ALI, LCPI (which filed on October 5, 2008), OVC Holdings LLC and Northlake Holdings LLC.  Moreover, the letter mentioned *nothing* about LBHI's bankruptcy excusing performance.  Rather, the *sole reason* cited in that letter was the (erroneous) assertion that an insufficient number of Required Consents had been obtained:

> [T]he SunCal Parties are required to obtain all Required Consents for a minimum of eight Conveyance Properties that are within the same group of Related Conveyance Properties.  It is our understanding that such Required Consents have not been obtained.

Cook Decl. ¶¶ 40-45; *see also* Restructuring Agreement § 1(d)(i) (non-satisfaction of Closing Conditions is a "Termination Event," but parties are not permitted to terminate if "the failure of any Closing Conditions shall have been due to such Party's (or Party's Affiliate's) …failure to pursue the satisfaction [of] the Closing Conditions in good faith.").

## VII

### THE LEHMAN ENTITIES' CLAIMS CAN BE DISALLOWED BASED
### ON THE BREACHES OF THE RESTRUCTURING AGREEMENT

The Lehman Entities' arguments regarding the Restructuring Agreement are largely a reprise of their arguments regarding the Settlement Agreement, which have been refuted above.

First, they argue that because LBHI was bankrupt, none of the Lehman Entities were obligated to "execute, deliver and enter into" the Settlement Agreement—and thus there could be no breach of the Restructuring Agreement for failing to enter the Settlement Agreement.  But as

---

*arguendo*, that this clause refers to a bankruptcy, given that the Lehman Entities apparently contend that the contract was executory as to LBHI (the SunCal Parties dispute this), they are interpreting the clause as an *ipso facto* clause, which is invalid in bankruptcy. *See, e.g.,* 11 U.S.C. 365(e)(1).  Third, the clause provides that the parties shall attempt in good faith to avoid the effect of such order.  There is no evidence that the Lehman Entities ever attempted to do so—indeed, they concede that they did not.  Opp. at 24:14-16.

86122.4

1    discussed, LBHI *did* execute both the Restructuring Agreement and the Settlement Agreement and

2    Settlement Documents prior to its bankruptcy.  Moreover, contrary to the Lehman Entities'

3    assertion, their execution and delivery of the agreements was not a "Closing Condition"; rather,

4    the satisfaction of the Closing Conditions was a condition to execution, which in fact occurred.

5        Second, the Lehman Entities argue that "[n]either Lehman ALI, nor any other parties to the

6    Restructuring Agreement, would, for example, have standing to bring a motion in the LBHI

7    bankruptcy case to compel LBHI to execute and deliver the Settlement Agreement."  Opp. at

8    24:14-16.  Again, given that LBHI already did what it needed to do pre-petition, this wrongly

9    assumes that such a motion would be necessary.  Moreover, even if such a motion were somehow

10   necessary, why *wouldn't* Lehman ALI have standing?   Even if Section 1(b)(vi) in the

11   Restructuring Agreement (providing that the non-existence of a court order restraining the

12   Settlement Transaction was a "Closing Condition") was applicable, that provision also provides

13   that it is "agreed that the Parties shall reasonably cooperate with one another to contest and/or

14   appeal any such order, decree, ruling or other action in good faith."

15       Third, the Lehman Entities baldly assert without support that neither Section 1(a) nor 1(c)

16   of the Restructuring Agreement was "designed to impose joint and several liability on a party

17   based on an affiliate's refusal or inability to close a transaction."  Opp. at 24:19-21.  Again, setting

18   aside that the SunCal Parties dispute that that is the relevant inquiry—LBHI already did what it

19   needed to do—the plain language of the agreement indicates otherwise.  Section 1(a) provides that

20   upon satisfaction of the Closing Conditions, "each of the Parties will execute, deliver and enter

21   into and *will cause the other … Lehman Parties…and any other Affiliates thereof, as applicable,*

22   *to execute, deliver and enter into*, the Settlement Agreement….." (emphasis added).  What would

23   be the point of providing that a Lehman Party would "cause" the other Lehman Parties or their

24   Affiliates to enter into the agreements, if there was no obligation to do so (or at the very least,

25   make a good faith effort to do so)?

26       Fourth, the Lehman Entities argue that the SunCal Parties were not damaged by Lehman

27   ALI's failure to perform, because it was LBHI's non-performance that caused the damage.  This

28   argument fails for the same reasons discussed above.  It also wrongly assumes that Lehman ALI

-30-

1    must have been the sole cause of damage to be liable.  *See Coastal Power Int'l., Ltd. v.*

2    *Transcont'l Capital Corp.*, 10 F.Supp.2d 345, 366 (S.D.N.Y. 1998) ("In the law of contracts, as in

3    torts, causation in fact is established if the defendant's breach of duty was a 'substantial factor' in

4    producing the damage.") (quotation omitted).  This argument also ignores the fact that sufficient

5    required consents for an "Initial Closing" had occurred—and the SunCal Parties were urging the

6    Lehman Entities to proceed to a closing as required—*prior to* LBHI's bankruptcy.

7          Fifth, the Lehman Entities argue that they cannot be liable for breaching their contractual

8    obligation to pay "Urgent Payables," because they were only obligated to pay whatever Urgent

9    Payables they approved, and that whatever such payables they approved, they paid.  As a threshold

10   matter, the fact that a party has discretion does not immunize the party from liability for a breach.

11   *Travellers Int'l, A.G. v. Trans World Airlines, Inc.,* 41 F.3d 1570, 1575 (2d Cir. 1994) ("Even

12   when a contract confers decision-making power on a single party, the resulting discretion is

13   nevertheless subject to an obligation that it be exercised in good faith."); *deCiutiis v. Nynex Corp.*,

14   1996 WL 512150, *3 (S.D.N.Y. Sep. 9, 1996) (the phrase "sole discretion" is "not necessarily the

15   equivalent of 'for any reason whatsoever, no matter how arbitrary or unreasonable.'") (quoting

16   *Tymshare, Inc. v. Covell,* 727 F.2d 1145, 1154 (D.C.Cir.1984) (Scalia, J.)).

17         Here, the SunCal Parties dispute that "Urgent Payables" are so narrowly confined under

18   the parties' agreement.  Indeed, they are defined in the Restructuring Agreement as

19         Work and other services (including, without limitation, litigation defense costs) that
20         need to be performed of provided with respect to each Property and *any accounts*
             *payable arising from work previously authorized by Lehman ALI which needs to be*
21         *paid* with respect to each Property (collectively, the "Urgent Payables").

22   Section 1(h) (emphasis added).  The SunCal Parties dispute that all such Urgent Payables were

23   paid.  Cook Decl. ¶¶ 46-47.  If Lehman ALI acted in bad faith in failing and refusing to "approve"

24   sums that otherwise met the definition of "Urgent Payables," it can be held liable therefor.

25         Indeed, the position the Lehman Entities take in their Opposition is not consistent with

26   Lehman ALI's conduct during the summer of 2008:  Lehman ALI had its payment agent, Radco,

27   undertake to settle and pay many more accounts payable than are reflected in the "Protective

28   Disbursement Agreements" cited by the Lehman Entities.  Yet Lehman ALI left millions of

dollars of those payables unresolved.  Cook Decl. ¶ 48.  This is yet another disputed issue.

86122.4

1      Finally, although the Lehman Entities do not argue that they fulfilled their obligation under

2 the Restructuring Agreement to pay management fees, they argue that this obligation was owed to

3 SunCal Management, not the SunCal Debtors, and so a breach of that obligation cannot be a basis

4 for disallowing the Lehman Entities' claims against the SunCal Debtors.  However, the SunCal

5 Debtors were the primary obligors of those management fee obligations, and SunCal Management

6 has filed claims against them therefor.  Accordingly, it is obvious that Lehman ALI's wrongful

7 non-payment of those amounts provides a basis to disallow its claims.

8                   **XIII**

9      **<u>RECOUPMENT IS AVAILABLE UNDER THESE FACTS</u>**

10      The Lehman Entities claim that LCPI cannot be liable for breach of the Restructuring

11 Agreement both because it was not a party thereto, and because it lacks the "mutuality" required

12 for set-off.  Both arguments can be summarily dispensed with.  Although LCPI was not a

13 signatory to the Restructuring Agreement, it *was* a signatory to the Settlement Agreement.  And

14 the issue of "mutuality" for setoff against LCPI's claims is irrelevant, since the SunCal Parties are

15 seeking setoff only against claims held by Lehman ALI, not LCPI.

16      The Lehman Entities' contention that the "recoupment" alleged in the Claim Objection is

17 really a "setoff" is erroneous. The Claim Objection makes it crystal clear that recoupment is the

18 applicable relief sought against LCPI.  Recoupment "is the setting up of a demand arising from the

19 *same transaction* as the plaintiff's claim or cause of action, strictly for the purpose of abatement or

20 reduction of such claim." *Newbery Corp. v. Fireman's Fund Ins. Co.,* 95 F.3d 1392, 1399 (9th

21 Cir.1996) (quoting 4 *Collier on Bankruptcy,* ¶ 553.03, at 553–15 (15th ed.1995)) (original

22 emphasis). It involves "netting out debt." *In re Harmon,* 188 B.R. 421, 425 (9th Cir. BAP 1995).

23 This is exactly what the SunCal Parties seek to do here.

24      In defining the parameters of the "transaction," the Ninth Circuit applies the "logical

25 relationship" test. *Sims v. U.S. Dept. of Health and Human Servs. (In re TLC Hosps., Inc.)*, 224

26 F.3d 1008, 1012 (9th Cir.2000).  This test has been described as follows:

27         A logical relationship exists when the counterclaim arises from the same
28         aggregate set of operative facts as the initial claim, in that the same operative facts
          serve as the basis of both claims or the aggregate core of facts upon which the
         claim rests activates additional legal rights otherwise dormant in the defendant.

86122.4

1  *Pinkstaff v. U.S. (In re Pinkstaff),* 974 F.2d 113, 115 (9th Cir.1992). "In applying this standard,

2  "courts have permitted a variety of obligations to be recouped against each other, requiring only

3  that the obligations be sufficiently interconnected so that it would be unjust to insist that one party

4  fulfill its obligation without requiring the same of the other party." *In re Madigan,* 270 B.R. 749,

5  755 (B.A.P. 9th Cir. 2001) (citing 5 *Collier,* at ¶ 553.10[1]).

6          Although the Lehman Entities argue that recoupment must be construed under New York

7  law due to a choice of law provision in their loan agreements, this argument fails for two reasons.

8  First, the cited choice-of-law provision governs only the interpretation of the contract.  It does not

9  govern equitable defenses like recoupment.[20]  Second, the logical relationship test is not based

10  upon the law of any state.  It is test that the Ninth Circuit employs when deciding whether

11  counterclaims are "compulsory" or not under Federal Rule of Civil Procedure 13, and that court

12  has decided that the recoupment should be judged under the same standard.[21]

13          The "logical relationship" between the underlying loan obligations and obligations

14  undertaken in the Restructuring Agreement and Settlement Agreement is undeniable. The latter

15  transactions were entered into to "restructure" the existing lending relationships by, *inter alia,*

16  transferring ownership of the collateral securing these loans to new entities, and by providing a

17  (Lehman) source of funding to pay the vendor claims and bond obligations that were inextricably

18  _____

19  [20] The choice of law provision in the Restructuring Agreement is a narrow one that merely applies New

20  York law to "this Agreement," not to all claims or defenses related to the agreement.  Restructuring
   Agreement § 8.  *See, e.g., Carideo v. Dell, Inc.,* 706 F.Supp.2d 1122, 1127 (W.D.Wash. 2010) ("Unlike the
   expansive language of the choice-of-law clauses at issue in [other cases], the language of the present

21  choice-of-law clause is relatively modest in scope and does not overtly state that the clause covers a wide
   range of claims, disputes, or controversies, including statutory and common law claims."); *E*Trade*

22  *Financial Corp. v. Deutsche Bank AG,*420 F.Supp.2d 273, 290 (S.D.N.Y.,2006) (contract language
   provided: "'This Agreement shall be governed by, and construed in accordance with, the laws of the State

23  of New York, applicable to contracts executed in and to be performed entirely within that state.' This
   language is narrow and purposefully does not apply New York law to any actions 'related to' the

24  transaction.").

   [21] Even if New York law were to apply, whether the facts of this case satisfy the recoupment doctrine is

25  a factual issue that cannot be resolved without discovery and an evidentiary hearing.  *See, e.g., White
   Plains Nursing Home v. Whalen,* N.E.2d 79, 80 (N.Y. 1977) ("The petitioner's objection is that the ultimate

26  determination in this instance is based on an erroneous, or at least disputed, question of fact regarding the
   nature of the relationship between the petitioner and its landlord....This [] in particular regarding

27  recoupment would affect petitioner's substantial interests so that it would be appropriate to provide a
   hearing resolve the factual dispute.").  The declarations submitted herewith, at the very least, raise serious

28  questions as to the intended effect and interpretation of the parties' agreements vis-à-vis the loans.

86122.4

1   tied to this collateral.  In sum, the relationship between the loans, and the Restructuring Agreement

2   and Settlement Agreement, was substantially more than merely "logical."

3          Although the Lehman Entities are welcome to contest the obvious *at the hearing on the*

4   *Claim Objection*, their efforts to persuade this Court to summarily dismiss the objection, and to

5   thereby deny the SunCal Parties any discovery, should be rejected.  In reviewing the Claim

6   Objection at this juncture (along with all the supporting declarations), its contents should be

7   construed in the light most favorable to the SunCal Parties, and all well-pleaded factual allegations

8   should be accepted as true.  *See Shwarz v. United States*, 234 F.3d 428, 435 (9th Cir. 2000); *Cahill*

9   *v. Liberty Mutual Ins. Co.,* 80 F.3d 336, 337-38 (9th Cir.1996). A contest over the facts, should, at

10  a minimum, await the conclusion of a reasonable amount of discovery, and a hearing on the merits.

**IX**

**UNJUST ENRICHMENT, UNCLEAN HAND**

**AND EQUITABLE LIEN CLAIMS APPLY**

14         The Lehman Entities contend that the SunCal Parties' assertion of "unjust enrichment" as a

15  defense fails, because the parties' rights are governed by the terms of an express contract.  This

16  argument is a non-starter.  Although it is true that that unjust enrichment will not lie where the

17  parties rights are clearly governed by the terms of an express contract, *Rodgers v. Roulette*

18  *Records, Inc.,* 677 F.Supp. 731, 740 (S.D.N.Y.1988); *Nixon Gear & Machine Co., Inc. v. Nixon*

19  *Gear Inc.,* 447 N.Y.S.2d 779, 781 (4th Dept.1982), where the existence of a contract is *disputed*,

20  as in this case, unjust enrichment will lie as an alternative count.

21         This exact circumstance was presented in *AML Int'l, Ltd. v. Orion Pictures Corp.,* 1991

22  WL 120323, *3 (S.D.N.Y., Jun. 24, 1991):

23         If plaintiff's contract claims fail, plaintiff seeks alternative relief under a theory of
       quasi-contract, or quantum meruit. Defendant argues that the court must dismiss
24     plaintiff's quantum meruit claim where it is grounded on the same facts as
       plaintiff's breach of contract claims and seeks the same relief. While defendant is
25     correct that plaintiff cannot recover under a theory of unjust enrichment where an
       express contract exists between the parties concerning the same subject matter,
26     *where defendant denies a contractual obligation to pay plaintiff commissions,*
       *plaintiff may be able to recover these monies on an unjust enrichment theory. Thus,*
27     *plaintiff's claim cannot be summarily dismissed.*

28

86122.4

*Id.* (emphasis added; citations omitted). Here, the Lehman Entities cannot insist that no relief can be had under the Settlement Agreement because it was allegedly never consummated, while concurrently denying the SunCal Parties relief under the equitable doctrine of unjust enrichment.

The Lehman Entities' contention that an equitable lien is unavailable is also in error:

> An equitable lien is the right, not recognized at law, to have a fund or specific property, *or its proceeds,* applied to the payment of a debt. It may arise either by express contract or by implication from the conduct and dealings of the parties. It also may be created by a judicial decree. All that is required is (1) the existence of a debt, duty or obligation and (2) the existence of property to which the obligation attaches.

*In re Wells*, 160 B.R. 726, 728-29 (Bankr.N.D.N.Y. 1993) (quotations omitted; original emphasis); *id.* at 729 ("[E]quity will consider as done that which was intended to be done by the parties....").

Here, the parties agreed in the Restructuring Agreement that Lehman ALI would pay the "urgent payables," and would proceed to a closing of the Settlement Agreement, whereby new entities would pay the remaining obligations associated with the Projects being transferred, including the Bond Obligations. Since the vendor and bond claims were not paid, and they were inextricably linked to the Projects being transferred pursuant to the parties' agreement, imposing an equitable lien tying these unpaid claims to the Projects effectuates the parties' intention.

The Lehman Entities' contentions regarding the "unclean hands" defense are equally baseless. "[T]he doctrine of unclean hands requires the defendant to prove that (1) the plaintiff is guilty of immoral, unconscionable conduct; (2) the conduct was relied upon by the defendant; and (3) the defendant was injured thereby." *Doe v. Deer Mountain Day Camp, Inc.,* 682 F.Supp.2d 324, 339 n. 31 (S.D.N.Y.2010) (citing *Nat'l Distillers & Chem. Corp. v. Seyopp Corp.,* 17 N.Y.2d 12, 15-16 (1966)). In addition, the alleged unconscionable conduct must be related to the subject matter of the litigation. *Mason v. Jamie Music Pub. Co.,* 658 F.Supp.2d 571, 588 (S.D.N.Y.2009); *Stokely-Van Camp, Inc. v. Coca-Cola Co.,* 646 F.Supp.2d 510, 533 (S.D.N.Y.2009) (misconduct must have a "material relation to the equitable relief that plaintiff seeks").

Here, the Lehman Entities entered into two agreements that were intended to restructure the parties' lending and collateral relationship. Tens of millions of dollars of debt were incurred in reliance upon these contracts. Now the Lehman Entities contend, in the case of the Restructuring Agreement, that the contract allowed them unfettered discretion to refuse to pay the obligations,

-35-

86122.4

for any reason or no reason, rendering the contract illusory. Yet, they concurrently are insisting that the agreements that were "restructured" by this agreement remain enforceable.  And the Restructuring Agreement was supposed to culminate in the consummation of the Settlement Transactions, whereby the properties would be conveyed.  Although the Lehman Entities signed the Settlement Agreement, and although they actually took title to one of the properties, they deny that the Settlement Agreement exists, and that they have any obligations thereunder.  But any failure of the Settlement Agreement to close is entirely the result of the Lehman Entities' bad faith refusal to pursue closing.  This course of conduct squarely falls within the unclean hands doctrine.

X

**THE CLAIM OBJECTION DOES NOT HAVE TO BE**

**LITIGATED IN AN ADVERSARY PROCEEDING**

The Lehman Entities contend that the Claim Objection of recoupment must be litigated in an adversary proceeding. This is erroneous. As discussed, recoupment is an affirmative defense under both California and New York law.  Pursuant to Federal Rule of Bankruptcy Procedure 3007, it can be pursued in the form of a claim objection. As the Court has probably surmised, this argument is part and parcel of the Lehman Entities' bald attempt to drag the Claim Objections within the parameters of LCPI's automatic stay, when in fact it has no bearing.

XI

**CONCLUSION**

For the foregoing reasons and the reasons stated in the opening brief, the SunCal Parties respectfully request that the Court sustain the Claim Objection.

DATED:  June 2, 2011                    **WINTHROP COUCHOT**
                                        **PROFESSIONAL CORPORATION**

                                        By:___/s/  *Paul J. Couchot*_____
                                              Paul J. Couchot, Esq.
                                              Sean Okeefe, Esq.
                                              Peter Lianides, Esq.
                                        General Insolvency Counsel for Administratively
                                        Consolidated Debtors-in-Possession

*[SIGNATURES CONTINUED ON NEXT PAGE]*

86122.4

1

**RUS MILIBAND & SMITH**
**A PROFESSIONAL CORPORATION**

2

By: _/s/ *Ronald Rus*_____
        Ronald Rus, Esq.

3

        Joel S. Miliband, Esq.
        Catherine Castaldi, Esq.

4

Attorneys for SunCal Management, LLC

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

86122.4

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 660 Newport Center Drive, 4ᵗʰ Fl., Newport Beach, CA 92660.

A true and correct copy of the foregoing document described as: **REPLY TO OPPOSITION TO AMENDED MOTION AND AMENDED MOTION FOR ORDER DISALLOWING CERTAIN CLAIMS HELD BY LEHMAN ALI INC. AND LEHMAN COMMERCIAL PAPER INC.** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

**I.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On June 2, 2011, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

☒  Service information continued on attached page

**II.  SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served)**:**
On _____, 2011, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐  Service information continued on attached page

**III.  SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on June 2, 2011, I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.

**Via Attorney Service**
Honorable Erithe Smith
Ronald Reagan Federal Bldg.
411 W. Fourth St., Suite 5041
Santa Ana, CA 92701

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| June 2, 2011 | Viann Corbin | /s/ Viann Corbin |
|---|---|---|
| Date | Type Name | Signature |

86122.4

**NEF SERVICE LIST**

- Selia M Acevedo    sacevedo@millerbarondess.com, mpritikin@millerbarondess.com
- Joseph M Adams    jadams@sycr.com
- Raymond H Aver    ray@averlaw.com
- James C Bastian    jbastian@shbllp.com
- Thomas Scott Belden    sbelden@kleinlaw.com, ecf@kleinlaw.com
- John A Boyd    fednotice@tclaw.net
- Mark Bradshaw    mbradshaw@shbllp.com
- Gustavo E Bravo    gbravo@smaha.com
- Jeffrey W Broker    jbroker@brokerlaw.biz
- Brendt C Butler    bbutler@mandersonllp.com
- Andrew W Caine    acaine@pszyjw.com
- Carollynn Callari    ccallari@venable.com
- Cathrine M Castaldi    ccastaldi@rusmiliband.com
- Tara Castro Narayanan    tara.narayanan@msrlegal.com, lisa.king@msrlegal.com
- Dan E Chambers    dchambers@jmbm.com
- Shirley Cho    scho@pszjlaw.com
- Vonn Christenson    vrc@paynefears.com
- Brendan P Collins    bpcollins@bhfs.com
- Vincent M Coscino    vcoscino@allenmatkins.com, emurdoch@allenmatkins.com
- Paul J Couchot    pcouchot@winthropcouchot.com, pj@winthropcouchot.com;sconnor@winthropcouchot.com
- Jonathan S Dabbieri    dabbieri@sullivan.com, hill@sullivanhill.com;mcallister@sullivanhill.com;stein@sullivanhill.com;vidovich@sullivanhill.com
- Ana Damonte    ana.damonte@pillsburylaw.com
- Vanessa S Davila    vsd@amclaw.com
- Melissa Davis    mdavis@shbllp.com
- Daniel Denny    ddenny@gibsondunn.com
- Caroline Djang    crd@jmbm.com
- Donald T Dunning    ddunning@dunningLaw.com
- Meredith R Edelman    meredith.edelman@dlapiper.com
- Joseph A Eisenberg    jae@jmbm.com
- Lei Lei Wang Ekvall    lekvall@wgllp.com
- Richard W Esterkin    resterkin@morganlewis.com
- Marc C Forsythe    kmurphy@goeforlaw.com
- Alan J Friedman    afriedman@irell.com
- Steven M Garber    steve@smgarberlaw.com
- Christian J Gascou    cgascou@gascouhopkins.com
- Barry S Glaser    bglaser@swjlaw.com
- Robert P Goe    kmurphy@goeforlaw.com, rgoe@goeforlaw.com;mforsythe@goeforlaw.com
- Eric D Goldberg    egoldberg@stutman.com
- Richard H Golubow    rgolubow@winthropcouchot.com, pj@winthropcouchot.com
- Michael J Gomez    mgomez@frandzel.com, efiling@frandzel.com;sking@frandzel.com
- Kelly C Griffith    bkemail@harrisbeach.com
- Matthew Grimshaw    mgrimshaw@rutan.com
- Kavita Gupta    kgupta@winthropcouchot.com
- Asa S Hami    ahami@morganlewis.com
- Michael J Hauser    michael.hauser@usdoj.gov
- D Edward Hays    ehays@marshackhays.com
- Michael C Heinrichs    mheinrichs@omm.com
- Harry D. Hochman    hhochman@pszjlaw.com, hhochman@pszjlaw.com

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

- Jonathan M Hoff    jonathan.hoff@cwt.com
- Nancy Hotchkiss    nhotchkiss@trainorfairbrook.com
- Michelle Hribar    mhribar@rutan.com
- John J Immordino    john.immordino@wilsonelser.com, raquel.burgess@wilsonelser.com
- Lawrence A Jacobson    laj@cohenandjacobson.com
- Michael J Joyce    mjoyce@crosslaw.com
- Stephen M Judson    sjudson@fablaw.com
- Kaleb L Judy    ecf@kleinlaw.com, kjudy@kleinlaw.com
- Steven J Kahn    skahn@pszjw.com
- Sheri Kanesaka    sheri.kanesaka@bryancave.com
- David I Katzen    katzen@ksfirm.com
- Christopher W Keegan    ckeegan@kirkland.com, gdupre@kirkland.com;alevin@kirkland.com
- Payam Khodadadi    pkhodadadi@winthropcouchot.com, pj@winthropcouchot.com
- Irene L Kiet    ikiet@hkclaw.com
- Claude F Kolm    claude.kolm@acgov.org
- Mark J Krone    mk@amclaw.com, crs@amclaw.com;amc@amclaw.com
- David B Lally    davidlallylaw@gmail.com
- Leib M Lerner    leib.lerner@alston.com
- Peter W Lianides    plianides@winthropcouchot.com, pj@winthropcouchot.com
- Charles Liu    cliu@winthropcouchot.com
- Kerri A Lyman    klyman@irell.com
- Mariam S Marshall    mmarshall@marshallramoslaw.com
- Robert C Martinez    rmartinez@mclex.com
- Michael D May    mdmayesq@verizon.net
- Hutchison B Meltzer    hmeltzer@wgllp.com
- Krikor J Meshefejian    kjm@lnbrb.com
- Joel S. Miliband    jmiliband@rusmiliband.com
- James M Miller    jmiller@millerbarondess.com, vgunderson@millerbarondess.com
- Louis R Miller    smiller@millerbarondess.com
- Randall P Mroczynski    randym@cookseylaw.com
- Mike D Neue    mneue@thelobelfirm.com,
  jmattiace@thelobelfirm.com;pnelson@thelobelfirm.com
- Robert Nida    Rnida@castlelawoffice.com
- Henry H Oh    henry.oh@dlapiper.com, janet.curley@dlapiper.com
- Sean A Okeefe    sokeefe@okeefelc.com
- Robert B Orgel    rorgel@pszjlaw.com, rorgel@pszjlaw.com
- Malhar S Pagay    mpagay@pszjlaw.com, mpagay@pszjlaw.com
- Penelope Parmes    pparmes@rutan.com
- Ronald B Pierce    ronald.pierce@sdma.com
- Katherine C Piper    kpiper@steptoe.com
- Cassandra J Richey    cmartin@pprlaw.net
- Debra Riley    driley@allenmatkins.com
- James S Riley    tgarza@sierrafunds.com
- Todd C. Ringstad    becky@ringstadlaw.com
- R Grace Rodriguez    ecf@lorgr.com
- Martha E Romero    Romero@mromerolawfirm.com
- Ronald Rus    rrus@rusmiliband.com
- John P Schafer    jschafer@mandersonllp.com
- John E Schreiber    jschreiber@dl.com
- William D Schuster    bills@allieschuster.org
- Christopher P Simon    csimon@crosslaw.com
- Wendy W Smith    wendy@bindermalter.com
- Steven M Speier    Sspeier@Squarmilner.com, ca85@ecfcbis.com
- Steven M Speier (TR)    Sspeier@asrmanagement.com, ca85@ecfcbis.com

86122.4

- Michael St James    ecf@stjames-law.com
- Michael K Sugar    msugar@irell.com
- Cathy Ta    cathy.ta@bbklaw.com, Arthur.Johnston@bbklaw.com;Kenneth.Burgess@bbklaw.com
- David A Tilem    davidtilem@tilemlaw.com, malissamurguia@tilemlaw.com;dianachau@tilemlaw.com;kmishigian@tilemlaw.com
- James E Till    jtill@thelobelfirm.com, jmattiace@thelobelfirm.com;pnelson@thelobelfirm.com
- United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov
- Carol G Unruh    cgunruh@sbcglobal.net
- Annie Verdries    verdries@lbbslaw.com
- Jason Wallach    jwallach@gladstonemichel.com
- Joshua D Wayser    , kim.johnson@kattenlaw.com
- Christopher T Williams    ctwilliams@venable.com, jcontreras@venable.com
- Marc J Winthrop    mwinthrop@winthropcouchot.com, pj@winthropcouchot.com
- David M Wiseblood    dwiseblood@seyfarth.com
- Brett K Wiseman    bwiseman@aalaws.com
- Dean A Ziehl    dziehl@pszjlaw.com, dziehl@pszjlaw.com
- Marc A. Zimmerman    joshuasdaddy@att.net

86122.4