1  PAUL J. COUCHOT -- State Bar No. 131934
   WINTHROP COUCHOT, P.C.
2  660 Newport Center Drive, Fourth Floor
   Newport Beach, CA 92660
3  Telephone: (949) 720-4100
   Facsimile: (949) 720-4111
4  General Insolvency Counsel for Palmdale Hills
   Property, LLC et. al. (the "Voluntary Debtors")

5  RONALD RUS - State Bar No. 67369
   JOEL S. MILIBAND - State Bar No. 77438
6  RUS MILIBAND & SMITH
   A PROFESSIONAL CORPORATION
7  2211 Michelson Drive, Seventh Floor
   Irvine, California 92612
8  Telephone: (949) 752-7100
   Facsimile: (949) 252-1514
9
   Counsel for SunCal Management LLC and
10 SCC Acquisitions Inc..

11              UNITED STATES BANKRUPTCY COURT
                CENTRAL DISTRICT OF CALIFORNIA
12                    Santa Ana Division

13 In re                                    Case No. 8:08-bk-17206-ES
   PALMDALE HILLS PROPERTY, AND ITS
   RELATED DEBTORS,                         Jointly Administered With Case Nos.
14                                          8:08-bk-17209-ES; 8:08-bk-17240-ES;
            Joint Administered Debtors and  8:08-bk-17224-ES; 8:08-bk-17242-ES;
15            Debtors-in-Possession         8:08-bk-17225-ES; 8:08-bk-17245-ES;
                                            8:08-bk-17227-ES; 8:08-bk-17246-ES;
16 Affects:                                 8:08-bk-17230-ES; 8:08-bk-17231-ES;
                                            8:08-bk-17236-ES; 8:08-bk-17248-ES;
17 ☐ All Debtors                            8:08-bk-17249-ES; 8:08-bk-17573-ES;
   ☐ Palmdale Hills Property, LLC           8:08-bk-17574 ES; 8:08-bk-17575-ES;
18 ☐ SunCal Beaumont Heights, LLC           8:08-bk-17404-ES; 8:08-bk-17407-ES;
                                            8:08-bk-17408-ES; 8:08-bk-17409-ES;
19 ☐ SCC/Palmdale, LLC                      8:08-bk-17458-ES; 8:08-bk-17465-ES;
   ☐ SunCal Johannson Ranch, LLC            8:08-bk-17470-ES; 8:08-bk-17472-ES;
20 ☐ SunCal Summit Valley, LLC              and 8:08-bk-17588-ES
21 ☐ SunCal Emerald Meadows LLC             Chapter 11 Proceedings
   ☐ SunCal Bickford Ranch, LLC
22 ☐ Acton Estates, LLC                     FIRST AMENDED DISCLOSURE
   ☐ Seven Brothers LLC                     STATEMENT DESCRIBING FIRST
23 ☐ SJD Partners, Ltd.                     AMENDED CHAPTER 11 PLANS FILED
   ☐ SJD Development Corp.                   BY SUNCAL PLAN PROPONENTS IN
24                                          THE CHAPTER 11 CASES OF SUNCAL
   ☐ Kirby Estates, LLC                     MARBLEHEAD, LLC AND SUNCAL PSV,
25 ☐ SunCal Communities I, LLC              LLC [GROUP I: TRUSTEE DEBTORS]
26 ☐ SunCal Communities III, LLC
   ☐ SCC Communities LLC                    Date:    July 22, 2011
27 ☐ North Orange Del Rio Land, LLC         Time:    11:00 a.m.
28 ☐ Tesoro SF LLC                          Place:   Courtroom 5A

1

*Continued from Previous Page*

2    ☐ LBL-SunCal Oak Valley, LLC

3    ☐ SunCal Heartland, LLC
     ☐ LBL-SunCal Northlake, LLC

4    ☒ SunCal Marblehead, LLC

5    ☐ SunCal Century City, LLC
     ☒ SunCal PSV, LLC

6    ☐ Delta Coves Venture, LLC

7    ☐ SunCal Torrance, LLC
     ☐ SunCal Oak Knoll, LLC

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

| | | PAGE |
|---|---|---|
| I. | INTRODUCTION | 2 |
| II. | DEFINITIONS AND RULES OF INTERPRETATION | 4 |
| III. | PLAN CONFIRMATION DEADLINES | 25 |
| IV. | FACTUAL BACKGROUND OF THE DEBTORS | 28 |
| V. | SIGNIFICANT EVENTS IN THE DEBTORS' CHAPTER 11 CASES | 41 |
| VI. | TREATMENT OF UNCLASSIFIED CLAIMS | 56 |
| VII. | CLASSIFICATION OF CLAIMS AND INTERESTS | 58 |
| VIII. | THE PLAN'S TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS | 63 |
| IX. | ACCEPTANCE OR REJECTION OF THE PLAN | 69 |
| X. | MEANS OF EXECUTION AND IMPLEMENTATION OF THE PLAN | 72 |
| XI. | DISTRIBUTIONS | 82 |
| XII. | OBJECTION TO CLAIMS AND DISPUTE CLAIMS | 83 |
| XIII. | EXECUTORY CONTRACTS AND UNEXPIRED LEASES | 86 |
| XIV. | BEST INTEREST OF CREDITORS TEST AND PLAN FEASIBILITY | 87 |
| XV. | BEST INTEREST OF CREDITORS TEST AND PLAN FEASIBILITY | 87 |
| XVI. | LIMITATION OF LIABILITY | |
| XVII. | CONDITIONS TO CONFIRMATION AND EFFECTIVENESS OF THE PLAN | 89 |
| XVIII. | RETENTION OF JURISDICTION | 90 |
| XIX. | MODIFICATION OR WITHDRAWAL OF THE PLAN | 90 |
| XIX. | MISCELLANEOUS | 90 |

MAINDOCS-#163281-v1-SCC_DS_Group_1_Trustee_Debtors_6-17.DOC

1

**I.**

**INTRODUCTION**

This DISCLOSURE STATEMENT[1] is filed by the Voluntary Debtors and Acquisitions, as the SunCal Plan Proponents, in the Chapter 11 Cases of the following Debtors:

        SunCal PSV, LLC
        SunCal Marblehead, LLC

(the "Group I: Trustee Debtors"). In addition to being one of the proponents of the Plan, Acquisitions is the Plan Sponsor, it will also serve as the Plan Trustee of the Plan Trust and as the Distribution Agent, if the Plan is confirmed.

Chapter 11 allows debtors-in-possession, Chapter 11 trustees, and under some circumstances, creditors, interest holders and others parties in interest, to propose a Chapter 11 plan. As stated, the SunCal Plan Proponents are the proponents of the Plan sent to you in the same envelope as this Disclosure Statement. This document summarizes the contents of the Plan, certain information relating to the Plan and the process the Bankruptcy Court follows in determining whether or not to confirm the Plan.

In summary, the Plan provides for sale of the Palms Springs Village Project and the Marblehead Project (the "Group I Projects"), and for the liquidation of all other assets of the Group I: Trustee Debtors. The Net Proceeds from these sales will then be distributed to Creditors holding Allowed Claims in accordance with their rights and priorities under the bankruptcy code and under other applicable law.

**The Plan also offers the holders of a certain category of general unsecured claims, which are defined herein as Reliance Claims, the right to sell these claims, and any Litigation Rights held by the holders of such claims against the Lehman Entities, to LitCo, for the sum of fifty five cents ($0.55) per dollar of claim. The purchase offer is conditioned upon confirmation of the applicable Plan and the lack of any stay pending an appeal of the Confirmation Order. However, this purchase offer is not contingent upon the sale of the**

---

[1] All defined terms used herein have the same meanings as set forth in Article II herein and Exhibit "1" attached hereto.

MAINDOCS-#163281-v1-SCC_DS_Group_I_Trustee_Debtors_6-17.DOC

1  Group I Projects or a determination regarding any alleged automatic stay claim by LCPI

2  arising from LCPI's pending Chapter 11 proceeding.

3  **EXCEPT AS PROVIDED IN THE PURCHASE OFFER TO HOLDERS OF**

4  **RELIANCE CLAIMS REFERENCED ABOVE, AS EXPLAINED IN THE DEFINITION**

5  **OF THE TERM "EFFECTIVE DATE," WHICH IS THE DATE ON WHICH THE PLAN**

6  **BECOMES EFFECTIVE, NO ACTION PROVIDED FOR IN THE PLAN SHALL BE**

7  **TAKEN AGAINST EITHER LEHMAN COMMERCIAL PAPER, INC. ("LCPI") OR**

8  **LEHMAN BROTHERS HOLDINGS, INC. ("LBHI") THAT WOULD HAVE THE**

9  **EFFECT OF VIOLATING ANY APPLICABLE AUTOMATIC STAY THAT MAY EXIST**

10  **IN THEIR CHAPTER 11 CASES. ANY SUCH ACTION WILL ONLY PROCEED AFTER**

11  **ANY APPLICABLE STAY IS EITHER LIFTED OR DEEMED INAPPLICABLE.**

12  Although the same Plan is being filed in the Cases of all four Group I: Trustee Debtors,

13  each Plan is independent of the others. The Creditors in each Case will determine, subject to Court

14  approval, whether the Plan will be approved in their Case. Accordingly, the Plan may be confirmed

15  in the Cases of some of the Group I: Trustee Debtors, but not in others.

16  The Lehman Lenders have filed a competing and alternative plan of reorganization in the

17  Cases. Accordingly, the creditors holding claims against the Debtors will have the opportunity to

18  vote for one plan or the other, or they can vote for both plans and allow the Court to decide which

19  plan should be approved. The Debtors believe that the aggregate benefits offered under their Plan

20  are superior to what is being offered to Creditors under the Lehman Lenders' competing Plan.

21  **READ THIS DISCLOSURE STATEMENT CAREFULLY IF YOU WANT TO**

22  **KNOW ABOUT**:

23  ➢ **WHO CAN VOTE OR OBJECT TO THE PLAN;**

24  ➢ **HOW YOUR CLAIM IS TREATED;**

25  ➢ **HOW THIS TREATMENT COMPARES TO WHAT YOUR CLAIM WOULD**

26  **RECEIVE IN LIQUIDATION;**

27  ➢ **A BRIEF HISTORY OF THE DEBTORS AND SIGNIFICANT EVENTS**

28  **DURING THEIR CHAPTER 11 BANKRUPTCY PROCEEDING;**

MAINDOCS-#163281-v1-SCC_DS_Group_I_Trustee_Debtors_6-17.DOC

1     ➢   **WHAT FACTORS THE BANKRUPTCY COURT WILL CONSIDER TO**

2        **DECIDE WHETHER OR NOT TO CONFIRM THE PLAN;**

3     ➢   **WHAT IS THE EFFECT OF CONFIRMATION; AND**

4     ➢   **WHETHER THE PLAN IS FEASIBLE.**

5     This Disclosure Statement cannot tell you everything about your rights.  You should

6 consider consulting your own attorney to obtain more specific advice on how the Plan will affect

7 you and your best course of action.

8     Be sure to read the Plan as well as this Disclosure Statement.  If there are any

9 inconsistencies between the Plan and this Disclosure Statement, the Plan provisions will govern.

10     The Bankruptcy Code requires a Disclosure Statement to contain "adequate information"

11 concerning the Plan.  On _____, 2011, the Bankruptcy Court entered an order approving this

12 Disclosure Statement, based upon a finding that this document contained "adequate information"

13 to enable parties affected by the Plan to make an informed judgment regarding the Plan.  Any party

14 can now solicit votes for or against the Plan.

15                **II.**

16     **DEFINITIONS AND RULES OF INTERPRETATION**

17     **2.1**    **Definitions.**

18     The following defined terms are used in this Disclosure Statement.  Any capitalized term

19 that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall

20 have the meaning ascribed to that term in the Bankruptcy Code or Bankruptcy Rules.

21       2.1.1   <u>Acquisitions</u>.  SCC Acquisitions, Inc., a California corporation, an indirect

22 parent company of all of the Debtors, a purported obligor on the Bond Claims, a Creditor of all of

23 the Debtors, a SunCal Plan Proponent, the Plan Sponsor and the proposed Plan Trustee.

24       2.1.2   <u>Administrative Claim(s)</u>.  Any Claim against a Group 1 Debtor or its Estate

25 incurred after the applicable Petition Date for the applicable Group 1 Debtor but before the

26 Confirmation Date, for any cost or expense of administration of the Case of the applicable Group 1

27 Debtor, which Claim is entitled to priority under section 507(a)(2) or (3) of the Bankruptcy Code,

28

including, without limitation, any fee or charge assessed against an Estate of a Group I Debtor under section 1930 of Title 28 of the United States Code.

2.1.3    Administrative Claims Bar Date. The last date fixed by the Plan for the filing of Proof of Claims or requests for payment of Administrative Claims. Under the Plan, the Administrative Claims Bar Date shall be the first business day after the sixtieth (60th) day after the Confirmation Date.

2.1.4    Affiliate. The term shall have the meaning set forth under Section 101(2), including, but not limited to, as to any Person, any other Person that directly or indirectly owns or controls, is owned or controlled by, or is under common ownership or control with, such Person. The term "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as applied to any Person, means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or other equity ownership interest, by contract or otherwise.

2.1.5    Allowed. When used to describe Claim(s) or Interest(s), such Claim(s) or Interest(s), to the extent that it or they are "Allowed Claim(s)" or "Allowed Interest(s)."

2.1.6    Allowed Amount shall mean:

A.    With respect to any Administrative Claim (i) if the Claim is based upon a Fee Application, the amount of such Fee Application that has been approved by a Final Order of the Bankruptcy Court; (ii) if the Claim is based upon any indebtedness or obligation incurred in the ordinary course of business of the Group I: Trustee Debtors and is not otherwise subject to an Administrative Claim Bar Date, the amount of such Claim that has been agreed to by the Group I: Trustee Debtors and such creditor, failing which, the amount thereof as fixed by a Final Order of the Bankruptcy Court; or (iii) if the Holder of such Claim was required to file and has filed proof thereof with the Bankruptcy Court prior to an Administrative Claim Bar Date, (1) the amount stated in such proof if no objection to such Proof of Claim is interposed within the applicable period of time fixed by the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court, or (2) the amount thereof as fixed by Final Order of the Bankruptcy Court if an objection to

1    such proof was interposed within the applicable period of time fixed by the Bankruptcy Code, the

2    Bankruptcy Rules or the Bankruptcy Court.  The Allowed Amount of any Administrative Claim

3    which is subject to an Administrative Claims Bar Date and not filed by the applicable

4    Administrative Claims Bar Date shall be zero, and no distribution shall be made on account of any

5    such Administrative Claim;

6                    B.    with respect to any Claim which is not an Administrative Claim

7    (the "Other Claim"):  (i) if the Holder of such Other Claim did not file proof thereof with the

8    Bankruptcy Court on or before the Claims Bar Date, the amount of such Claim as listed in the

9    Group I: Trustee Debtors'' Schedules as neither disputed, contingent nor unliquidated; or (ii) if the

10   Holder of such Claim has filed proof thereof with the Bankruptcy Court on or before the Claims

11   Bar Date, (a) the amount stated in such proof if no objection to such Proof of Claim was interposed

12   within the applicable period of time fixed by the Bankruptcy Code, the Bankruptcy Rules, the Plan

13   or the Bankruptcy Court, or (b) the amount thereof as fixed by Final Order of the Bankruptcy Court

14   if an objection to such proof was interposed within the applicable period of time fixed by the

15   Bankruptcy Code, the Bankruptcy Rules, the Plan or the Bankruptcy Court.  The Allowed Amount

16   of any Other Claim which is not Filed by the applicable Claims Bar Date, is not listed on the

17   Group I: Trustee Debtors' Schedules or is listed as disputed, unliquidated, contingent or unknown,

18   and is not allowed under the terms of the plan shall be zero, and no distribution shall be made on

19   account of any such Claim; and

20                   C.    with respect to any Interest, (i) the amount provided by or

21   established in the records of the Group I: Trustee Debtors at the Confirmation Date, provided,

22   however, that a timely filed proof of Interest shall supersede any listing of such Interest on the

23   records of the Group I: Trustee Debtors: or (ii) the amount stated in a proof of Interest Filed prior

24   to the Confirmation Date if no objection to such Interest was filed prior to the Confirmation Date

25   or such later date as the Bankruptcy Court allows; or (iii) the amount of such Interest as fixed by a

26   Final Order of the Bankruptcy Court.

27

28

MAINDOCS-#163281-v1-SCC_DS_Group_1_Trustee_Debtors_6-17.DOC

2.1.7    Allowed Claim. Except as otherwise provided in the Plan (including with respect to those Classes for which the amount of the Allowed Claims is specified by the Plan), a Claim to the extent (and only to the extent) of the Allowed Amount of such Claim.

2.1.8    Allowed Interest. Any Interest to the extent, and only to the extent, of the Allowed Amount of such Interest.

2.1.9    Allowed Secured Claims. All or a portion of a Secured Claim that is an Allowed Claim.

2.1.10    Allowed Unsecured Claim. All or a portion of an Unsecured Claim that is an Allowed Claim.

2.1.11    Assets. All assets that are property of the Debtor(s) pursuant to Bankruptcy Code Section 541.

2.1.12    Arch. Arch Insurance Company, a Bond Issuer.

2.1.13    Available Cash. Each Group I: Trustee Debtors' Cash deposited into the applicable Distribution Account(s) on or after the Effective Date that is available for making Distributions under the Plan to Holders of Allowed Administrative, Priority, and General Unsecured Claims. The Available Cash shall consist of the respective Group I: Trustee Debtors' cash on hand as of the Effective Date that is not subject to a Disputed Lien, proceeds of Net Litigation Recoveries that are not subject to a Disputed Lien, Net Sales Proceeds that become Available Cash upon the disallowance of a Disputed Claim or avoidance of a Disputed Lien purportedly encumbering such Cash, or proceeds from the Acquisitions Administrative Loan. All Available Cash shall be deposited into the applicable Distribution Account(s). Available Cash shall not include Net Sale Proceeds in the Net Sales Proceeds Account where the Disputed Secured Claims are Allowed but subject to an equitable subordination judgment.

2.1.14    Avoidance Actions. All Claims and defenses to Claims accruing to the Group I: Trustee Debtors and their Estates under Bankruptcy Code Sections 506(d), 510(c), 541, 544, 545, 547, 548, 549, 550, or 551.

2.1.15    Bankruptcy Code. The United States Bankruptcy Code.

MAINDOCS-#163281-v1-SCC_DS_Group_1_Trustee_Debtors_6-17.DOC

2.1.16   Bankruptcy Court. The United States Bankruptcy Court for the Central District of California, having jurisdiction over the Cases and, to the extent of any withdrawal of the reference made pursuant to Section 157 of title 28 of the United States Code, the United States District Court for the Central District of California; or, in the event such courts cease to exercise jurisdiction over the Cases, such court or unit thereof that exercises jurisdiction over the Cases in lieu thereof.

2.1.17   Bankruptcy Rules. Collectively, as now in effect or hereafter amended and as applicable to the Cases, (i) the Federal Rules of Bankruptcy Procedure, and (ii) the Local Bankruptcy Rules and General Orders applicable to cases pending before the Bankruptcy Court.

2.1.18   Beneficial Interests. means, collectively, the interests of the holders of Allowed Unsecured Claims in the Plan Trust and in all distributions to be made by the Plan Trust on account of Allowed Unsecured Claims. The Beneficial Interests (a) shall be noted in the books and records of the Plan Trust, (b) shall not be evidenced by a writing, and (c) may not be transferred, sold, assigned or transferred by will, intestate succession or operation of law.

2.1.19   Bickford Ranch Project. The Project owned by SunCal Bickford, located in the City of Penryn, California, as more particularly described herein.

2.1.20   Bickford Second Loan Agreement. That certain promissory note secured by a deed of trust, dated as of May 25, 2005, in the maximum aggregate principal amount of approximately $30,000,000 executed by SunCal Bickford, as borrower, and payable to the order of Lehman ALI. The Bickford Second Lien Loan Agreement is allegedly secured by a second priority deed of trust on the Bickford Ranch Project. The Bickford Second Loan Agreement has an asserted balance due of $56,494,059.38 as of March 30, 2009.

2.1.21   Bond Claim(s). Any Claim against the Debtor(s) and a Bond Issuer under various payment or performance bonds, and/or any claims of Bond Issuer(s) against the Debtor(s) under various payment or performance bonds.

2.1.22   Bond Claimant. Holder(s) of a Bond Claim.

2.1.23  <u>Bond Indemnification Claim</u>.  All Claims by Bond Safeguard, Lexon, and Arch for indemnification for payment by Bond Safeguard, Lexon and Arch of Bond Claims with respect to the Group I: Trustee Debtors' Projects.

2.1.24  <u>Bond Indemnitors</u>.  The individuals and entities that are allegedly liable on the Bond Indemnification Claims, including, allegedly, all of the Debtors, Acquisitions, all Affiliates of Acquisitions, and Elieff.

2.1.25  <u>Bond Issuer(s)</u>.  Bond Safeguard, Lexon and Arch in their capacities as issuers and sureties for payment and performance bonds for the benefit of certain of the Debtors.

2.1.26  <u>Bond Safeguard</u>.  Bond Safeguard Insurance Company, a Bond Issuer.

2.1.27  <u>Business Day</u>.  Any day, other than a Saturday, a Sunday or a "legal holiday," as defined in Bankruptcy Rule 9006(a).

2.1.28  <u>Cases</u>.  The Chapter 11 cases of the Group I: Trustee Debtors pending before the Bankruptcy Court.

2.1.29  <u>Cash</u>.  Currency of the United States of America and cash equivalents, including, but not limited to, bank deposits, immediately available or cleared checks, drafts, wire transfers and other similar forms of payment.

2.1.30  <u>CFD Bonds</u>.  Community facilities district bonds issued by a governmental entity.

2.1.31  <u>Chapter 11 Trustee</u>.  Steven M. Speier, the duly appointed trustee of the Trustee Debtors in their pending Chapter 11 Cases.

2.1.32  <u>Claim</u>.  This term shall have the broadest possible meaning under Section 101(5) of the Bankruptcy Code, and shall include (a) any right to payment from any of the Group I: Trustee Debtors, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, or (b) any right to an equitable remedy for breach of performance if such breach gives rise to a right of payment from any of the Group I: Trustee Debtors, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

2.1.33    Claims Bar Date. For any Claim other than an Administrative Claim, March 31, 2009, which was established by the Bankruptcy Court as the last date for creditors to file Proof of Claims with the Bankruptcy Court in all of the Group I: Trustee Debtors' cases.

2.1.34    Claims Objection Deadline. The later of (i) the first business day following the one hundred and eightieth (180th) day after the Effective Date, or (ii) such greater period of limitation as may be fixed or extended by the Bankruptcy Court or by agreement between the Plan Trustee and the Holder of the Claim.

2.1.35    Claim Objection Reduction Amount. The amount of Net Sales Proceeds that is made available to the holders of Allowed Unsecured Claims due to the entry of a judgment or order on a Lehman Claim Objection that disallows, reduces, or otherwise adversely modifies the secured claims filed by the Lehman Lenders.

2.1.36    Class. Each group of Claims or Interests classified in Article V of the Plan pursuant to Sections 1122 and 1123 of the Bankruptcy Code.

2.1.37    Committee. The Trustee Debtors' Committee, both before and after the Confirmation Date.

2.1.38    Confirmation Date. The date on which the Confirmation Order is entered in the Bankruptcy Court's docket.

2.1.39    Confirmation Order. The order entered by the Bankruptcy Court confirming the Plan in accordance with the provisions of Chapter 11 of the Bankruptcy Code.

2.1.40    Contingent Bond Claims. Unmatured Bond Claims.

2.1.41    Creditor. Any Person who is the Holder of a Claim against any Debtor that arose or accrued or is deemed to have arisen or accrued or to have matured, or otherwise become due, owing, and payable on or before the Petition Date, including, without limitation, Claims of the kind specified in Sections 502(g), 502(h) or 502(i) of the Bankruptcy Code.

2.1.42    Debtor(s). Individually or collectively, the Voluntary Debtors and the Trustee Debtors, as specifically defined in Exhibit "1" attached hereto.

2.1.43    Debtor(s)-in-Possession. The Voluntary Debtor(s) when acting in their capacity as representatives of their respective Estates in their respective Chapter 11 Cases.

2.1.44    Disclosure Statement.  The document accompanying the Plan that is entitled "Disclosure Statement Describing Chapter 11 Plan Filed by SunCal Plan Proponents In The Chapter 11 Cases Of SunCal Marblehead, LLC and SunCal PSV, LLC," as amended and with all accompanying exhibits.

2.1.45    Disputed Claim(s).  All or any part of a Claim other than any Allowed Amount thereof as to which any one of the following applies: (i) no Proof of Claim has been filed with respect to such Claim, and either (a) the Claim is not listed in the Schedules; or (b) the Claim is listed in the Schedules as unliquidated, disputed, contingent, unknown or in a zero amount, (ii) the Claim is the subject of (a) a Litigation Claim; (b) the Claim is subject to offset by a Litigation Claim; (c) a timely objection that has not been resolved by a Final Order; or (d) a request for estimation in accordance with the Bankruptcy Code, the Bankruptcy Rules, any applicable order of the Bankruptcy Court, or the Plan which is Filed on or before the Claims Objection Deadline, which Adversary Proceeding, objection, or request for estimation has not been dismissed, withdrawn or determined by a Final Order; or (iii) the Claim is otherwise treated as a "Disputed Claim" pursuant to the Plan.

2.1.46    Disputed Lien(s).  An asserted lien(s) against Assets of the Debtor(s) that is either subject to a Disputed Secured Claim, not duly perfected, subject to an Avoidance Action, or subject to an action pursuant to Bankruptcy Code Sections 510(c)(2) and/or 506(d).

2.1.47    Disputed Secured Claim(s).  That part of a Disputed Claim that is a Secured Claim.

2.1.48    Distribution(s).  Payments to Holders of Allowed Claims provided for under the Plan.

2.1.49    Distribution Agent.  The entity that is responsible for making Distributions under the Plan, which shall be Acquisitions.

2.1.50    Distribution Account(s).  Separate account(s) to be established by the Plan Trustee at an FDIC insured bank into which each Group I: Trustee Debtors' Available Cash shall be deposited and all Available Cash received by the Plan Trust after the Confirmation Date that

would have belonged to such Group I Debtor shall be deposited, other than Net Sales Proceeds that are subject to Disputed Claims and Disputed Liens.

2.1.51    Distribution Date. With respect to any Allowed Claim or Allowed Interest, the date on which a Distribution is required to be made under the Plan.

2.1.52    Effective Date. A date selected by the SunCal Plan Proponents that is not later than the ninetieth (90th) calendar day after the Confirmation Date. However, in any case where the actions provided for in the Plan would be delayed by the automatic stay applicable in the case of any Lehman Entity operating under the protection of Chapter 11 or Chapter 7, the SunCal Plan Proponents shall have the right to extend the Effective Date for an additional sixty (60) days to obtain relief from any such stay.

2.1.53    Elieff. Bruce Elieff, the president of Acquisitions, a purported obligor on the Bond Claims with corresponding indemnity Claims against the Debtors.

2.1.54    Estates. The bankruptcy estates of the Group I: Trustee Debtors created pursuant to Section 541 of the Bankruptcy Code.

2.1.55    Fee Applications. Applications of Professional Persons under Sections 330, 331 or 503 of the Bankruptcy Code for allowance of compensation and reimbursement of expenses in the Cases.

2.1.56    Fee Claim. A Claim under Sections 330 or 503 of the Bankruptcy Code for allowance of compensation and reimbursement of expenses in the Cases.

2.1.57    Fenway Capital. Fenway Capital Funding LLC, a Lehman Successor to Lehman's Disputed Claims and Lehman's Disputed Liens arising from (i) SunCal Communities I Loan Agreement, (ii) Ritter Ranch Loan Agreement, (iii) Bickford Second Loan Agreement, (iv) SunCal PSV Loan Agreement, (v) SunCal Marblehead/SunCal Heartland Loan Agreement, (vi) Delta Coves Loan Agreement (vii) SunCal Northlake Loan Agreement, and (viii) SunCal Oak Valley Loan Agreement. Such Disputed Claims and Disputed Liens were transferred back to LCPI pursuant to a compromise approved by the New York Bankruptcy Court on May 12, 2010.

2.1.58    Filed. Delivered to, received by and entered upon the legal docket by the Clerk of the Bankruptcy Court. "File" shall have a correlative meaning.

1    2.1.59 <u>Final Order</u>. A judgment, order, ruling or other decree issued and entered

2 by the Bankruptcy Court.

3    2.1.60 <u>General Unsecured Claim</u>. A Claim against a Group I Debtor that is not

4 (a) a Secured Claim, (b) an Administrative Claim, (c) a Tax Claim or (d) a Priority Claim.

5    2.1.61 <u>Group I: Trustee Debtors</u>. SunCal PSV, LLC and SunCal Marblehead,

6 LLC.

7    2.1.62 <u>Group I Projects</u>. The Palm Springs Village Project and the Marblehead

8 Project.

9    2.1.63 <u>Holder</u>. The beneficial owner of any Claim or Interest.

10    2.1.64 <u>Initial Overbid</u>. The Initial Overbid is the first Qualifying Bid after the

11 Opening Bid that is equal to or in excess of the Initial Overbid Amount.

12    2.1.65 <u>Initial Overbid Amount</u>. In the case of the Marblehead Project, the Initial

13 Overbid Amount is a sum that is not less than the sum of the Opening Bid, the Marblehead Break-

14 up Fee and one hundred thousand dollars ($100,000). In the case of the Palm Springs Village

15 Project, the Initial Overbid Amount is a sum that is not less than the sum of the Opening Bid, the

16 PSV Break-up Fee and seventy-five thousand dollars ($75,000).

17    2.1.66 <u>Insider</u>. The term shall have the broadest meaning possible under

18 Section 101(31), including, but not limited to, a person in control of the Debtor, Affiliates and

19 Insiders of such Affiliates.

20    2.1.67 <u>Interest</u>. Any equity security interest in any Group I Debtor within the

21 meaning, of Section 101(16) of the Bankruptcy Code, including, without limitation, any equity

22 ownership interest in any of the Group I: Trustee Debtors, whether in the form of common or

23 preferred stock, stock options, warrants, partnership interests, or membership interests.

24    2.1.68 <u>LBHI</u>. Lehman Brothers Holdings, Inc., a Lehman Entity, the parent

25 company of Lehman ALI and LCPI, and a Chapter 11 debtor in a bankruptcy proceeding pending

26 in the Bankruptcy Court for the Southern District of New York.

27    2.1.69 <u>LCPI</u>. Lehman Commercial Paper, Inc., a Chapter 11 debtor in a

28 bankruptcy proceeding pending in the Bankruptcy Court for the Southern District of New York.

1               2.1.70    Lehman Adversary Proceeding. The Debtors' pending adversary

2 proceeding against the Lehman Lenders and/or the Lehman Successors asserting various causes of

3 action including equitable subordination, fraudulent conveyances and preferential transfers.

4               2.1.71    Lehman ALI. Lehman ALI, Inc.

5               2.1.72    Lehman Disputed Administrative Loans. The post-petition financing

6 provided by Lehman ALI to Palmdale Hills, SunCal Emerald, SunCal Bickford, Acton Estates,

7 SunCal Oak Valley, SunCal Heartland, SunCal Northlake, SunCal Marblehead, SunCal Century

8 City, SunCal PSV, Delta Coves, and SunCal Oak Knoll, which grants priming liens on all

9 borrower Debtors' assets, and for super-priority administrative status to Lehman ALI. The

10 Voluntary Debtors have repaid to Lehman ALI the full amount of $270,731 loaned to the

11 Voluntary Debtors. The aggregate amount of the Lehman Administrative Loans to all of the

12 Trustee Debtors is approximately $40 million as of March 1, 2011 and continuing to increase. The

13 Lehman Administrative Loans are the subject of claim objections. Until these objections are

14 resolved, these Lehman Administrative Loans shall not be Allowed Claims.

15               2.1.73    Lehman Claim Objections. The objections filed by the Debtors to the

16 claims filed by the Lehman Lenders that are based upon the Lehman Disputed Loans and the

17 Lehman Disputed Administrative Loans, including, but not limited to, the Lehman Recoupment

18 Objection and the Lehman 502(d) Objection.

19               2.1.74    Lehman Entities. The Lehman Lenders, the Lehman Equity Members and

20 LBHI.

21               2.1.75    Lehman Equity Members. Lehman Entities that own direct or indirect

22 membership Interests in all of the Trustee Debtors, except for SunCal Heartland and SunCal

23 Marblehead.

24               2.1.76    Lehman Lenders. Lehman ALI, LCPI, Northlake Holdings, and OVC

25 Holdings.

26               2.1.77    Lehman Disputed Loans. Collectively the following loans that are the

27 purported basis for the Lehman's Disputed Claims: (a) SunCal Communities I Loan Agreement;

28 (b) Bickford Second Loan Agreement; (c) Ritter Ranch Loan Agreement; (d) SCC Palmdale Loan;

1  (e) Interim Loan Agreement; (f) SunCal Oak Knoll/SunCal Torrance Loan Agreement; (g) SunCal

2  Century City Loan Agreement; (h) SunCal PSV Loan Agreement; (i) SunCal Delta Coves Loan

3  Agreement; (j) SunCal Marblehead/SunCal Heartland Loan Agreement; (k) Sun Cal Oak Valley

4  Loan Agreement; (l) SunCal Northlake Loan Agreement; (m) Pacific Point First Loan Agreement;

5  and (n) Pacific Point Second Loan Agreement.

6         2.1.78    Lehman Representatives.  The individuals that controlled the Lehman

7  Entities.

8         2.1.79    Lehman Successor(s).  Entities other than the Lehman Lenders that either

9  assert to be or are determined by the Bankruptcy Court to be the beneficial owner(s) of the Lehman

10  Disputed Loan(s), including, but not limited to Fenway Capital, Lehman Re and Danske Bank.

11         2.1.80    Lehman's Disputed Claim(s).  All of the Proofs of Secured Claims filed by

12  a Lehman Lender or a Lehman Successor in the Debtors' Chapter 11 Cases arising from the

13  Lehman Disputed Loans and the Lehman Disputed Administrative Loans.

14         2.1.81    Lehman's Disputed Lien(s).  All of the alleged liens relating to Proofs of

15  Secured Claims filed by a Lehman Lender or a Lehman Successor in the Debtor's Chapter 11

16  Cases arising from the Lehman Disputed Loans.

17         2.1.82    Lexon.  Lexon Insurance Co.

18         2.1.83    LitCo. A newly formed Delaware limited liability company that will be

19  purchasing the claims and litigation rights held by the Reliance Claimants that choose Option A

20  provided for in the Plan.

21         2.1.84    LitCo Plan Loan. A loan that will be made by LitCo, to the extent

22  necessary to pay Administrative Claims, and post Confirmation Date costs incurred by the SunCal

23  Proponents in connection with the sale process, and to pay post Effective Date costs incurred by

24  the Plan Trust, including litigation expenses where applicable, if no other source is available to pay

25  these obligations. LitCo will be capitalized with funds provided by a third party.

26         2.1.85    Litigation Claims.  Any and all interests of the Group I: Trustee Debtors

27  in any and all Claims, rights, causes of action, and objections or defenses to Claims, liens, rights,

28  or causes of action which have been or may be commenced by the Group I Debtor(s), the

1 Chapter 11 Trustee, or the Committee, as the case may be, including, but not limited to, any

2 (i) Avoidance Actions; (ii) for turnover of property to the Group I: Trustee Debtors' Estates and/or

3 the Plan Trust; (iii) for the recovery of property or payment of money that belongs to the Debtors'

4 Estates or the Plan Trust; (iv) the right to compensation in the form of damages, recoupment or

5 setoff of the Debtors' Estates and/or the Plan Trust; (v) the Lehman Adversary Proceeding; (vi) the

6 State Court Action, and (vii) any and all other Claims against Lehman's Disputed Claims and/or

7 Disputed Liens referenced in the Plan or the Disclosure Statement.

8        2.1.86  Litigation Recoveries.  Any Cash or other property received by the

9 Chapter 11 Trustee, the Group I: Trustee Debtors, the Committee and/or the Plan Trust, as the case

10 may be, from all or any portion of a Litigation Claim(s), including, but not limited to, awards of

11 damages, attorneys' fees and expenses, interest and punitive damages, whether recovered by way

12 of settlement, execution on judgment or otherwise.

13        2.1.87  Litigation Rights. Any Claims held by a party other than the Group I:

14 Trustee Debtors that have not been fixed in a final judgment prior to the Effective Date.

15        2.1.88  Marblehead Break-up Fee. The sum of three hundred and three million

16 seven hundred and fifty dollars ($3,750,000) that will be paid to the Stalking Horse Bidder that

17 submits the Opening Bid for the Marblehead Project, if such Stalking Horse Bidder is not the

18 Winning Bidder.

19        2.1.89  Marblehead Project.  The Project owned by SunCal Marblehead, located in

20 the City of San Clemente, California, as more particularly described herein.

21        2.1.90  Maximum Distributions.  A Distribution to a Holder of an Allowed

22 General Unsecured Claim against a Group I Debtor equal to one hundred percent (100%) of the

23 amount of the Holder's Allowed General Unsecured Claim plus interest at the Legal Rate from and

24 as of the Group I Debtor's Petition Date.

25        2.1.91  MB Firm.  Miller Barondess, LLP.

26        2.1.92  Mechanic Lien Claims.  Mechanic Lien Claims arising pursuant to

27 California Civil Code §3110, et seq. that were either allegedly perfected prepetition or otherwise

28 allegedly satisfy the requirements of Bankruptcy Code 546(b).

MAINDOCS-#163281-v1-SCC_DS_Group_I_Trustee_Debtors_6-17.DOC

2.1.93  <u>Minimum Increment</u>. Minimum Increment applicable to the sales of the Group I Projects is one hundred thousand dollars ($100,000), until there are only two Qualified Bidders submitting bids for a Group I Project, then the Minimum Increment shall be fifty thousand dollars ($50,000).

2.1.94  <u>Minimum Sale Price</u>. The minimum gross sale price that must be paid for either the Marblehead Project or the Palm Spring Village Project before such project can be sold pursuant to the Plan. Such prices are $84,420,000 and $9,990,000, respectively.

2.1.95  <u>Net Litigation Recoveries</u>. Litigation Recoveries less associated Administrative Claims and Post-Confirmation Expenses incurred in connection with such Litigation Recoveries.

2.1.96  <u>Net Sales Proceeds</u>. The Cash generated from the sale(s) or liquidation of the Group I Debtor(s)' Assets or the Plan Trust's Assets, less payment of selling expenses, taxes, Chapter 11 Trustee fees, and any associated Post-Confirmation Expenses and Administrative Claims incurred in furtherance of such sales or liquidation of such Assets.

2.1.97  <u>Net Sales Proceeds Account(s)</u>. Separate account(s) that will be established by the Plan Trustee at an FDIC insured bank into which all Net Sale Proceeds shall be deposited from the sale of Assets that were allegedly encumbered by a Disputed Secured Claim(s) and/or a Disputed Lien(s). There shall be a separate Net Sales Proceeds Account for the Net Sale Proceeds allegedly subject to each Disputed Secured Claim(s) and/or Disputed Lien(s), except where there are two Disputed Liens on a single Project, in which case, there shall be a single account for the proceeds generated from that Project. The Disputed Secured Claim(s) and/or Disputed Lien(s) shall attach to the corresponding Net Sales Proceeds Account(s) pending any Final Order(s) of the Bankruptcy Court resolving the applicable Disputed Secured Claim(s) and/or applicable Disputed Lien(s). To the extent that a particular Disputed Claim is disallowed or a particular Disputed Lien is avoided (other than transferred to the Estates pursuant to Bankruptcy Code Section 510(c)(2)) or otherwise invalidated, such Net Sales Proceeds allegedly subject thereto shall become Available Cash and shall be transferred to the applicable Distribution Account(s). To the extent that a particular Disputed Secured Claim and a Disputed Lien are

allowed and deemed valid but subject to the equitable subordination causes of action in the
Lehman Adversary Proceeding, the funds shall remain in the Net Sales Accounts pending a Final
Order on the equitable subordination causes of action in the Lehman Adversary Proceeding.

2.1.98    Opening Bid.  Opening Bid means the offer for one, or both of the Group I
Projects, which is equal to the Minimum Sale Price(s) accepted by the Debtor for either one or
both of the Group I Projects.

2.1.99    Orders for Relief Date.  The following are dates that orders for relief were
entered for each of the Trustee Debtors:

| | |
|---|---|
| SunCal Oak Valley | January 6, 2009 |
| SunCal Heartland | January 6, 2009 |
| SunCal Northlake | January 6, 2009 |
| SunCal Marblehead | January 6, 2009 |
| SunCal Century City | January 6, 2009 |
| SunCal PSV | January 6, 2009 |
| Delta Coves | January 6, 2009 |
| SunCal Torrance | January 6, 2009 |
| SunCal Oak Knoll | January 6, 2009 |

2.1.100   Palmdale Hills.  Palmdale Hills Property, a Delaware limited liability
company, a Voluntary Debtor herein, and the owner of the Ritter Ranch Project

2.1.101   Palm Springs Village Project.  The Project owned by SunCal PSV, located
in the City of Palm Springs, California, as more particularly described herein.

2.1.102   PSV Break-up Fee.  The sum of four hundred and forty thousand dollars
($440,000) that will be paid to the Stalking Horse Bidder that submits the Opening Bid for the
Palm Springs Village Project, if such Stalking Horse Bidder is not the Winning Bidder.

2.1.103   Person.  An individual, partnership, corporation, limited liability company,
business trust, joint stock company, trust, unincorporated association, joint venture, governmental
authority, governmental unit, committee or other entity of whatever nature.

2.1.104   Petition Dates.  The following are dates that each of the Voluntary Debtors
filed their Voluntary Chapter 11 petitions or Creditors filed involuntary Chapter 11 petitions
against the Trustee Debtors:

| | |
|---|---|
| Palmdale Hills | November 6, 2008 |
| SunCal Beaumont | November 6, 2008 |

MAINDOCS-#163281-v1-SCC_DS_Group_1_Trustee_Debtors 6-17.DOC

| | |
|---|---|
| SCC Palmdale | November 7, 2008 |
| SunCal Johannson | November 7, 2008 |
| SunCal Summit Valley | November 7, 2008 |
| SunCal Emerald | November 7, 2008 |
| SunCal Bickford | November 7, 2008 |
| Acton Estates | November 7, 2008 |
| Seven Brothers | November 7, 2008 |
| SJD Partners. | November 7, 2008 |
| SJD Development | November 7, 2008 |
| Kirby Estates | November 7, 2008 |
| SunCal I | November 7, 2008 |
| SunCal III | November 7, 2008 |
| SCC Communities | November 19, 2008 |
| Del Rio | November 19, 2008 |
| Tesoro | November 19, 2008 |
| Delta Coves Ventures, LLC | November 14, 2008 |
| SunCal Heartland, LLC | November 12, 2008 |
| SunCal Marblehead, LLC | November 12, 2008 |
| LB-L-SunCal Northlake, LLC | November 12, 2008 |
| LB-L-SunCal Oak Valley, LLC | November 12, 2008 |
| SunCal Century City, LLC | November 14, 2008 |
| SunCal PSV, LLC | November 14, 2008 |
| SunCal Torrance Properties, LLC | November 14, 2008 |
| SunCal Oak Knoll, LLC | November 19, 2008 |

2.1.105   Plan.  This Chapter 11 Plan together with the Exhibits thereto, as the same may be amended or modified from time to time in accordance with the Plan.

2.1.106   Plan Documents.  The Plan, the Plan Trust Agreement and all other documents attached to the Plan Supplement.

2.1.107   Plan Period. The period from the Effective Date to the Plan Termination Date.

2.1.108   Plan Supplement. The compilation of the Plan Documents to be filed with the Bankruptcy Court.

2.1.109   Plan Termination Date. The fifth (5th) anniversary date of the Effective Date, unless the Plan elects and earlier date.

2.1.110   Plan Sponsor.  The entity that has committed to cause the funding of certain specified obligations under the Plan on or after the Effective Date.  The Plan Sponsor is Acquisitions.

-19-

1          2.1.111    Plan Trust.  A liquidating trust to be established prior to or on the

2   Effective Date, with Acquisitions as the Plan Trustee and the Holders of Allowed Claims against

3   the Debtors as the beneficiaries. The purpose of the Plan Trust will be to liquidate the Debtors'

4   Assets (other than Assets that are excluded by the Plan Trustee on the grounds that they lack value

5   or would be difficult to administer) and to otherwise consummate the Plan.

6          2.1.112    Plan Trustee. The Plan Trustee under the Plan Trust Agreement is

7   Acquisitions.

8          2.1.113    Plan Trust Agreement. The liquidating trust agreement governing the

9   affairs of the Plan Trust, which will be in substantially the form contained in the Plan Supplement.

10         2.1.114    Plan Trust Beneficiaries. The Plan Trust Beneficiaries are (i) the holders

11  of Beneficial Interests, as of any point in time, and (ii) holders of Allowed Claims that shall be

12  satisfied from Plan Trust Property in accordance with the terms of the Plan.

13         2.1.115    Plan Trust Property. Plan Trust Property means all property within the

14  Chapter 11 estates of the Group I: Trustee Debtors, other than property that is affirmatively

15  excluded by the Plan Trustee.

16         2.1.116    Post-Confirmation Expenses.  The fees and expenses incurred by the Plan

17  Sponsor, the Plan Trustee and the Committee and their professionals following the Confirmation

18  Date (including the fees and costs of Professionals) for the purpose of (i) prosecuting and

19  liquidating the Litigation Claims; (ii) objecting to and resolving Disputed Claims and Disputed

20  Liens; (iii) selling or otherwise liquidating the Plan Trust's Assets; (iv) effectuating Distributions

21  under the Plan; and (v) otherwise consummating the Plan and closing the Group I: Trustee

22  Debtors' Chapter 11 Cases.

23         2.1.117    Priority Claim.  Any Claim, other than an Administrative Claim or a Tax

24  Claim, to the extent entitled to priority under Section 507(a) of the Bankruptcy Code.

25         2.1.118    Pro Rata.  Proportionately, so that with respect to any distribution in

26  respect of any Allowed Claim, the ratio of (a)(i) the amount of property distributed on account of

27  such Allowed Claim to (ii) the amount of such Allowed Claim, is the same as the ratio of (b)(i) the

28

1    amount of property distributed on account of all Allowed Claims of the Class or Classes sharing in

2    such distribution to (ii) the amount of all Allowed Claims in such Class or Classes.

3           2.1.119    Professional. A Person or Entity (a) employed by the Group I: Trustee

4    Debtors, the Committee pursuant to a Final Order in accordance with Sections 327 and 1103 of the

5    Bankruptcy Code and to be compensated for services rendered prior to the Effective Date, pursuant

6    to Sections 327, 328, 3291 330 and 331 of the Bankruptcy Code, or (b) for which compensation

7    and reimbursement has been allowed by the Bankruptcy Court pursuant to Section 503(b) of the

8    Bankruptcy Code.

9           2.1.120    Professional Fees. All Allowed Claims for compensation and for

10    reimbursement of expenses under Sections 328, 330 and/or 503(b) of the Bankruptcy Code

11           2.1.121    Projects. The Debtors' residential real estate development projects and

12    other assets as separately defined herein and described in Exhibit "1" to the Disclosure Statement.

13           2.1.122    Qualifying Bid. Qualifying Bid means, with respect to any bid on a

14    Group I Project, a bid made by Qualifying Bidder that is A) equal to or in excess of the Initial

15    Overbid Amount, if it is the Initial Overbid, or B) in excess of the immediately preceding

16    Qualifying Bid by the Minimum Increment, if it is not the Initial Overbid.

17           2.1.123    Qualifying Bidder. Qualifying Bidder means a bidder who a) has

18    deposited the sum of five hundred thousand dollars ($500,000) in an escrow designated by the

19    SunCal Proponents; b) agreed that this sum will be forfeited as liquidated damages if such bidder

20    fails to perform; and c) who has provided the SunCal Plan Proponents evidence confirming that

21    such bidder has the financial means to acquire the applicable Group I Project(s) that such bidder is

22    seeking to acquire.

23           2.1.124    Reliance Claim. An Allowed Unsecured Claim against a Group I Debtor

24    that would entitle the holder thereof to be the beneficiary of any equitable subordination judgment

25    obtained against a Lehman Entity by such Group I Debtor.

26           2.1.125    Reliance Claimant. The holder of a Reliance Claim. A list of the Reliance

27    Claims and Reliance Claimants is attached hereto as Exhibit "8."

28

1    2.1.126    Sale Period. The Sale Period is the time period during which the SunCal

2 Proponents must consummate a sale or liquidation of the Group I Projects. The Sales Period shall

3 commence on the Confirmation Date and shall expire on the Effective Date.

4    2.1.127    SCC LLC. SCC Acquisitions LLC, a limited liability company, a

5 subsidiary of Acquisitions and an indirect and/or a direct parent company of all of the Debtors.

6    2.1.128    Schedules. The schedules of assets and liabilities and list of equity

7 security holders Filed by the Group I: Trustee Debtors, as required by Section 521(1) of the

8 Bankruptcy Code, Bankruptcy Rules 1007(a)(3) and (b)(1), and Official Bankruptcy Form No. 6,

9 as amended from time to time.

10    2.1.129    Stalking Horse Bidder. The Qualified Bidder who submits the Opening

11 Bid..

12    2.1.130    Secured Claim. Any Claim, including interest, fees, costs, and charges to

13 the extent allowable pursuant to Bankruptcy Code Section 506, that is secured by a valid and

14 unavoidable Lien on the Group I Debtor(s)' Assets.

15    2.1.131    State Court Action. The action filed by certain Voluntary Debtors against

16 Lehman Ali, Inc., and certain other defendants, in California Superior Court for the County of

17 Orange (Case No. 30-2011-0040847-CU-BC-CJC), and a reservation of rights to add the Plan

18 Trustee and/or the Trustee Debtors as additional plaintiffs therein.

19    2.1.132    SunCal. The SunCal Companies, a trade name for Acquisitions and its

20 Affiliates.

21    2.1.133    SunCal Bickford. SunCal Bickford Ranch, LLC, a Delaware limited

22 liability company, a Voluntary Debtor herein, and the owner of the Bickford Ranch Project.

23    2.1.134    SunCal Management. SunCal Management, LLC, a Delaware limited

24 liability company, and the property manager for the Projects.

25    2.1.135    SunCal Marblehead. SunCal Marblehead, LLC, a Delaware limited

26 liability company, a Trustee Debtor (a Group I Debtor), and the owner of the Marblehead Project.

27    2.1.136    SunCal Marblehead/SunCal Heartland Loan Agreement. That certain

28 Second Amended and Restated Term Loan and Revolving Line of Credit Loan Agreement, dated

1  as of October 3, 2007, by and among SunCal Marblehead Heartland Master LLC, SunCal

2  Marblehead, and SunCal Heartland, as borrowers, and Lehman ALI, as agent and sole lender,

3  pursuant to which Lehman ALI made a loan in the maximum aggregate principal amount of

4  approximately $316,061,300. The SunCal Marblehead/SunCal Heartland Loan Agreement is

5  allegedly secured by first-priority deeds of trust on the Marblehead and the Heartland Projects.

6  The SunCal Marblehead/SunCal Heartland Loan Agreement has an alleged balance due of

7  $354,325,126.15 as of March 30, 2009. The proofs of claim filed with respect to this loan

8  agreement are the subject of the Lehman Adversary Proceeding and the Lehman Claim Objections.

9          2.1.137    SunCal Plan Proponent(s). The Voluntary Debtors and Acquisitions as

10  the parties-in-interest that are proposing the Plan.

11         2.1.138    SunCal PSV. SunCal PSV, LLC, a Delaware limited liability company, a

12  Trustee Debtor (a Group I Debtor), and the owner of the Palm Springs Village Project.

13         2.1.139    SunCal PSV Loan Agreement. That certain Term Loan and Revolving

14  Line of Credit Loan Agreement, dated as of February 12, 2007, between SunCal PSV, as borrower,

15  and Lehman ALI, as agent and sole lender, pursuant to which Lehman ALI made a loan in the

16  maximum aggregate principal amount of approximately $90 million. The SunCal PSV Loan

17  Agreement is allegedly secured by a first-priority deed of trust on the Palm Springs Village Project.

18  The SunCal PSV Loan Agreement has an alleged balance due of $88,257,340.20 as of March 30,

19  2009.

20         2.1.140    Tax. Any tax, charge, fee, levy, impost or other assessment by any

21  federal, state, local or foreign taxing authority, including, without limitation, income, excise,

22  property, sales, transfer, employment, payroll, franchise, profits, license, use, ad valorem,

23  estimated, severance, stamp, occupation and withholding tax. "Tax" shall include any interest or

24  additions attributable to, or imposed on or with respect to such assessments.

25         2.1.141    Tax Claim. Any Claim for any Tax to the extent that it is entitled to

26  priority in payment under Section 507(a)(8) of the Bankruptcy Code.

27         2.1.142    Trustee Debtor(s). The following Debtors, individually or collectively,

28  that are represented by the Chapter 11 Trustee: Delta Coves, SunCal Heartland, SunCal

-23-

1    Marblehead, SunCal Northlake, SunCal Oak Valley , SunCal Century City, SunCal PSV, SunCal

2    Torrance, and SunCal Oak Knoll.

3          2.1.143    Trustee Debtors' Committee. The Official Committee of Unsecured

4    Creditors of the Trustee Debtors appointed in the Cases pursuant to Section 1102 of the

5    Bankruptcy Code.

6          2.1.144    Unpaid Secured Real Property Tax Claims. Secured Claims held by

7    various government entities secured by liens on the underlying real properties owned by the

8    Debtors but that are non-recourse to the Debtors.

9          2.1.145    Unsecured Claim. An Unsecured Claim is any Claim that is not an

10    Administrative Claim, Tax Claim, Secured Claim, or Priority Claim.

11          2.1.146    Voluntary Debtor(s). The following  Chapter 11 debtors and debtors-in-

12    possession, individually or collectively, Palmdale Hills, SunCal I, SunCal III, SCC Palmdale,

13    Acton Estates, SunCal Beaumont, SunCal Emerald, SunCal Johansson, SunCal Bickford, SunCal

14    Summit, Seven Brothers, Kirby Estates, SJD Partners, SJD Development, SCC Communities, Del

15    Rio and Tesoro.

16          2.1.147    Voluntary Debtors' Committee. The Official Committee of Unsecured

17    Creditors of the Voluntary Debtors appointed in the Cases pursuant to Section 1102 of the

18    Bankruptcy Code.

19          2.1.148    Winning Bid. The highest Qualifying Bid received for the Marblehead

20    Project or the Palm Springs Village Project.

21          2.1.149    Winning Bidder. The party that submits the highest Qualifying Bid.

22    **2.2**    **Rules of Construction.**

23       For purposes of the Plan and this Disclosure Statement, unless otherwise provided herein or

24    in the Plan, (a) whenever from the context it is appropriate, each term, whether stated in the

25    singular or the plural, will include both the singular and the plural; (b) each pronoun stated in the

26    masculine, feminine or neuter includes the masculine, feminine and neuter; (c) any reference in the

27    Plan or this Disclosure Statement to an existing document or schedule filed or to be filed means

28    such document or schedule, as it may have been or may be amended, modified or supplemented

1  pursuant to the Plan; (d) any reference to an entity as a Holder of a Claim or Interest includes that

2  entity's successors and assigns; (e) except as otherwise indicated herein all references in the Plan

3  or this Disclosure Statement to Sections, Articles and Exhibits are references to Sections, Articles

4  and Exhibits of or to the Plan; (f) the words "therein," "thereunder" and "thereto" refer to the Plan

5  in its entirety rather than to a particular portion of the Plan; and (g) unless otherwise provided in

6  the Plan or this Disclosure Statement, any reference in the Plan or this Disclosure Statement to a

7  contract, instrument, release, indenture, agreement, or other document being in a particular form or

8  on particular terms and conditions means that such document shall be substantially and materially

9  in such form or substantially and materially on such terms and conditions; (h) any reference in the

10 Plan or this Disclosure Statement to a document, schedule, or exhibit to the Plan or Disclosure

11 Statement Filed or to be Filed means such document, schedule, or exhibit, as it may have been or

12 may be amended, modified, or supplemented; and (i) the rules of construction set forth in Section

13 102 of the Bankruptcy Code shall apply to the extent such rules are not inconsistent with the

14 express terms of the Plan or this Disclosure Statement or any other provision in this Section.

15  **2.3    Exhibits.**

16  All Exhibits to the Plan are incorporated into and are a part of the Plan as if set forth in full

17 therein.

18  **III.**

19  **PLAN CONFIRMATION DEADLINES**

20  The Bankruptcy Court has not confirmed the Plan described in this Disclosure Statement.

21 Accordingly, the terms of the Plan are not binding on anyone. However, if the Bankruptcy Court

22 confirms the Plan, then the Plan will be binding on the Debtor(s), the Plan Trustee, and on all

23 Creditors and Interest Holders in such Cases.

24  **3.1    Time and Place of the Confirmation Hearing.**

25  The hearing where the Bankruptcy Court will determine whether or not to confirm the Plan

26 will take place at 411 West Fourth Street, Santa Ana, CA 92701-4593 on October 24, 2011, at 9:30

27 a.m. in Courtroom 5A.

28

MAINDOCS-#163281-v1-SCC_DS_Group_1_Trustee_Debtors_6-17.DOC

**3.2**    **Deadline for Voting for or Against the Plan.**

If you are entitled to vote, it is in your best interest to timely vote on the enclosed ballot and return the ballot to:

> Winthrop Couchot Professional Corporation
> 660 Newport Center Drive, Suite 400
> Newport Beach, CA 92660
> Facsimile: (949) 720-4111
> Attn: P.J. Marksbury

Your ballot must be **received by** September 26, 2011, or it will not be counted.

**3.3**    **Deadline for Objecting to the Confirmation of the Plan.**

Objections to the confirmation of the Plan must be filed with the Bankruptcy Court, and served upon the following parties so that they are received by September 26, 2011:

| | |
|---|---|
| **Counsel to the Voluntary Debtors** | Paul J. Couchot<br>Winthrop Couchot Professional Corporation<br>660 Newport Center Drive, Suite 400,<br>Newport Beach, CA 92660 |
| **Authorized Agent for Voluntary Debtors** | Bruce V. Cook<br>General Counsel<br>2392 Morse Ave<br>Irvine, CA 92614-6234 |
| **Counsel for SunCal Management LLC and SCC Acquisitions Inc.** | Ronald Rus<br>Rus Miliband & Smith P.C.<br>2211 Michelson Drive, Seventh Floor<br>Irvine, California 92612 |
| **Authorized Agent for SunCal Management and SCC Acquisitions, Inc.** | Bruce V. Cook<br>General Counsel<br>2392 Morse Ave<br>Irvine, CA 92614-6234 |

**3.4**    **Identity of Person to Contact for More Information Regarding the Plan.**

Any interested party desiring further information about the Plan should contact the Voluntary Debtors' counsel, Winthrop Couchot Professional Corporation, 660 Newport Center Drive, Suite 400, Newport Beach, CA 92660, Attn: Paul J. Couchot, (949) 720-4100; Peter W. Lianides, (949) 720-4155; Payam Khodadadi, (949) 720-4160.

MAINDOCS-#163281-v1-SCC_DS_Group_1_Trustee_Debtors_6-17.DOC

1    **3.5    Disclaimer.**

2        The information contained in this Disclosure Statement is provided by the SunCal Plan

3    Proponents. The SunCal Plan Proponents represent that everything stated in this Disclosure

4    Statement is true to the best of their knowledge. The Bankruptcy Court has not yet determined

5    whether or not the Plan is confirmable and makes no recommendation as to whether or not you

6    should support or oppose the Plan.

7        The discussion in this Disclosure Statement regarding the Group I: Trustee Debtors may

8    contain "forward looking statements" within the meaning of the Private Securities Litigation

9    Reform Act of 1995. Such statements consist of any statement other than a recitation of historical

10    fact and can be identified by the use of forward looking terminology such as "may," "expect,"

11    "anticipate," "estimate," or "continue," or the negative thereof or other variations thereon or

12    comparable terminology. The reader is cautioned that all forward looking statements are

13    necessarily speculative and there are certain risks and uncertainties that could cause actual events

14    or results to differ materially from those referred to in such forward looking statements. The

15    liquidation analyses, distribution projections, projections of financial results and other information

16    are estimates only, and the timing, amount and value of actual distributions to Creditors may be

17    affected by many factors that cannot be predicted. Therefore, any analyses, estimates, or

18    projections may or may not turn out to be accurate.

19        The SunCal Plan Proponents and their professionals have made a diligent effort to identify

20    in this Disclosure Statement all Litigation Claims, including claims for relief, counterclaims, and

21    objections to claims. However, no reliance should be placed on the fact that a particular Litigation

22    Claim is or is not identified in this Disclosure Statement. The Group I: Trustee Debtors or other

23    parties in interest may seek to investigate, file and prosecute Litigation Claims after the

24    Confirmation Date, or the Plan Trust may seek to do so after the Effective Date of the Plan whether

25    or not the Litigation Claims are identified in this Disclosure Statement.

26

27

28

MAINDOCS-#163281-v1-SCC_DS_Group_I_Trustee_Debtors_6-17.DOC

# IV.

## FACTUAL BACKGROUND OF THE DEBTORS

### 4.1    The Formation of the Debtors and the Projects.

#### 4.1.1    Overview of the Debtors and their Projects.

The Group I: Trustee Debtors are two of twenty-six entities (collectively the "Debtors") that were formed pursuant to a joint venture between Affiliates of the SunCal Companies ("SunCal") and the Lehman Entities (the "SunCal/Lehman Joint Venture"). The Debtors role in the venture was to own and develop the large residential projects that were the core assets in this joint undertaking.

At the inception of SunCal/Lehman Joint Venture, it was agreed that SunCal would be the developer/manager of the Projects and the Lehman Entities would provide the necessary capital. Attached hereto as Exhibit "1" is a general description of the Debtors' Projects, including the Group I Projects, and the Debtors' other primary Assets, excluding Cash and the Litigation Claims, and a description of the loans for the Projects that are not a part of Group I Projects.

All of the Debtors are Affiliates of Acquisitions and SCC LLC. Some of the Debtors directly own the Projects, while others serve as holding companies, owning Allowed Interests in the Debtors that hold title to the Projects. SunCal Management, LLC, a SunCal Affiliate, has management contracts with respect to all of the Projects and manages the Debtors' day-to-day business affairs.

The seventeen Debtors who are referred to herein as the "Voluntary Debtors" are wholly owned by SunCal Affiliates, and consequently the SunCal Affiliates have full corporate governance authority over these entities. The Voluntary Debtors own eleven (11) of the Projects. In the case of the nine Trustee Debtors, the SunCal Affiliates and the Lehman Affiliates initially shared ownership equally (50% each). However, after the Petition Date, the SunCal Affiliates became the owner of hundred percent (100%) of the equity in two of the nine Trustee Debtors - SunCal Heartland and SunCal Marblehead. The Trustee Debtors own nine (9) Projects. Attached hereto as Exhibit "2" is a chart that sets forth the appraised value of the Group I: Trustee Debtors' Projects. This chart lists both the Lehman Lenders' value estimates and SunCal's

---

-28-

1  valuation estimates.[2]  As the chart indicates, the Lehman Lenders' valuation for the Group I

2  Projects is in the aggregate amount of $200,800,000, while the Debtors' valuation of the Group I

3  Projects is in the aggregate amount of $84,000,000.

4      The Plan eliminates any potential value disputes by providing for the sale of the Group I

5  Projects through an auction that is designed to yield the highest market price for these assets.

6  Accordingly, to the extent any other party believes the Group I Projects have a greater value than

7  the Opening Bid offered by another Qualifying Bidder, they will have the opportunity to submit a

8  Qualifying Bid (but no credit-bids will be allowed) that exceeds the Opening Bid and, if they so

9  desire, to become the Winning Bidder by offering the highest Qualifying Bid. This market sale

10  process will insure that the rights of all stakeholders are protected.

11      **4.1.2    The Debtors' Primary Secured Creditors and Their Disputed Claims**.

12      Lehman ALI holds the primary secured claims against the Marblehead Project and the Palm

13  Springs Village Project. Lehman Ali's secured claim against the Marblehead Project, which is

14  secured by a first priority deed of trust, is based upon funding provided under the terms of the

15  SunCal Marblehead/Heartland Loan Agreement. The asserted balance due under terms of this loan

16  was $354,325,126.15 as of March 30, 2009. This claim is also collateralized by a lien against the

17  Heartland Project.

18      Lehman Ali's secured claim against the Palm Spring Village Project, which is secured by a

19  first priority deed of trust, is based upon funding provided under the terms of the SunCal PSV Loan

20  Agreement. The asserted balance due under terms of this loan was $88,257,340.20 as of March 30,

21  2009.

22      **4.1.3    Disputed Claims and Liens.**

23      As discussed in detail herein, during the course of the Debtors' Cases, the Debtors initiated

24  litigation disputing the validity of Lehman's Disputed Secured Claims, and the validity, priority

25  and extent of Lehman's Disputed Liens (which includes the liens against the Group I Projects).

26  This litigation is being pursued through the Lehman Adversary Proceeding, various contested

27

28

---

[2] Values may have changed since these analyses were prepared.

1 matters, and in potential lawsuits based on the post-petition conduct of the Lehman Entities and/or

2 their agents.

3  Attached hereto as Exhibit "3" is a chart that sets forth Lehman's Disputed Secured Claims,

4 the alleged Holders of the Lehman Disputed Secured Claims, the collateral encumbered by the

5 Lehman Disputed Liens, and the alleged outstanding amount based on the filed Proofs of Claim.

6 As the chart indicates, the total of Lehman's Disputed Secured Claims (based upon the proofs of

7 claims filed in the Debtor's bankruptcy cases) with respect to the Group I: Trustee Debtors is

8 approximately $442,582,466.

9  **4.1.4 A Summary of All of the Alleged Claims Against the Debtors.**

10  Attached hereto as Exhibit "4" is a chart that sets forth the prepetition Claims that have

11 been asserted against all of the Debtors.  In summary, the asserted Claims against the Group I:

12 Trustee Debtors consist of the following:

| Claims | Marblehead Project | Palm Springs Village Project |
|---|---|---|
| Unpaid Secured Real Property Tax Claims | $2,500,646 | $1,725,166 |
| The Disputed Lehman Secured Claims | $354,325,126 | $88,257,340 |
| Mechanics Lien Claims | $4,001,839 | $1,860,130 |
| Administrative and Priority Claims | $3,220,120 | $1,199,145 |
| General Unsecured Claims Including alleged Bond Claims | $109,697,964 | $21,892,343 |

 The SunCal Plan Proponents believe that these balances will ultimately be reduced through

claims objections resulting in lower "Allowed" claims balances.

  **4.1.5 Summary of the Group I: Trustee Debtors' Cash.**

 The following chart sets forth the Group I: Trustee Debtors' cash on hand as of January 31,

2011.

| Group I Debtor | Amount |
|---|---|
| SunCal Marblehead | 1,745,046.39 |
| SunCal PSV | 3,516.63 |
| **Group I: Trustee Debtors' Total** | $11,703,872.82 |

 Although the Lehman Lenders have alleged that they hold liens on the above cash, a

preliminary review of the applicable lien documents indicates that most of the alleged liens were

not validly perfected. This means that these liens can be avoided, allowing the unsecured creditors

1  recourse to these funds. Moreover, even if the liens against these accounts were properly perfected,

2  the amount secured by these liens, and their priority and their enforceability will be subject to the

3  results of the Lehman Claim Objections and the Lehman Adversary Proceeding.

4      **4.2**    **Factual Circumstances Leading to the Filing of the Debtors' Chapter 11 Cases.**

5      **4.2.1**    **Introduction.**

6      In this section of the Disclosure Statement, the SunCal Proponents have provided a brief

7  description of the relationship between the Debtors and the Lehman Entities. This background is

8  relevant to the Group I: Trustee Debtors, and in fact all of the Debtors, for the following reasons.

9  First, most of the unsecured claims asserted against the Debtors were incurred at the insistence of

10  the Lehman Lenders, and they would have been paid if the Lehman Lenders had honored their

11  obligation to pay these claims. Second, a substantial part of claims that the Lehman Lenders failed

12  to pay are being asserted against *all of the Debtors*. If the litigation against the Lehman Lenders

13  discussed herein is successful, it will, at a minimum, reduce the pool of claims against the Group I:

14  Trustee Debtors, and thereby increase the dividend payable to the remaining creditors. Third and

15  finally, this history allows the Creditors to take the measure of the parties who are now proffering

16  the competing plan – the Lehman Lenders.  As the within discussion will establish, the Lehman

17  Lenders failed to pay the claims of Creditors prepetition, the Lehman Lenders attempted to

18  foreclose upon the Group I Projects post-petition in order to deny the unsecured creditors any

19  recovery on the claims they failed to pay, and finally, when this foreclosure effort failed, the

20  Lehman Lenders attempted to destroy the Debtors' reorganization and sale efforts by manipulating

21  LCPI's alleged automatic stay. The SunCal Plan Proponents believe that this history will lead the

22  Creditors to conclude, when weighing the merits of the Lehman Lenders Plan offer: "Fool me once

23  shame on you, fool me twice shame on me."

24      **4.2.2**    **Background of the SunCal Companies.**

25      SunCal is a family-owned and operated real estate business that has been successfully

26  developing properties throughout the western United States for over 70 years.  SunCal's business

27  focuses upon the "development" of residential land. A typical SunCal development begins with the

28  acquisition of one or more parcels of raw land. Thereafter, the SunCal team develops a master plan

1    for the acreage that incorporates streets, homes, parks, schools and commercial areas, and then it

2    works with the applicable municipal planning authorities (the city, county, state and federal) to

3    secure the necessary approvals or "entitlements" to gain approval of this plan. This process, which

4    requires the assistance of land planners, civil engineers, architects, lawyers, and other land

5    specialists, takes a period of years. Once the master plan is approved, SunCal provides for the

6    grading of the project and the installation of the foundational infrastructure (streets, utilities, etc.)

7    and then sells the lots or parcels within the project to merchant builders.

8    ### 4.2.3    The Origins of the SunCal/Lehman Joint Venture.

9        SunCal historically financed its projects with loans and/or equity from a number of

10   different sources. However, beginning in 1997, an increasing number of SunCal's projects were

11   financed by the Lehman Entities, as Mark Walsh ("Walsh"), the head of LBHI's Global Real

12   Estate Group, began cultivating a business relationship with SunCal's principals.

13       By 2003, the Lehman Entities and SunCal had entered into joint ventures involving

14   approximately fifteen projects. By 2007, that number had grown to over forty, and the Lehman

15   Entities had become, with limited exceptions, the exclusive provider of financing for the SunCal

16   Projects pursuant to a written agreement executed in 2006. The Lehman Entities also consisted of

17   the Lehman Equity Members that either directly or indirectly owned a fifty percent (50%) equity

18   interest in all nine of the Trustee Debtors.

19       In their dealings with SunCal, the Lehman Representatives made no distinction between

20   Projects financed by Lehman ALI and Projects financed by LCPI. They also made no distinction

21   between the Debtors in which Lehman Equity Members held 50% equity memberships or the

22   Debtors in which the Lehman Entities held no equity membership interest. As agents of the

23   financial partner in the parties' joint venture, the Lehman Representatives would determine which

24   Lehman Entity would provide financing on which Projects, and would dictate the structure that the

25   financing would take, according to whatever suited the Lehman Entities' needs.

26

27

28

MAINDOCS-#163281-v1-SCC_DS_Group_1_Trustee_Debtors_6-17.DOC

1    **4.2.4    Lehman's Effective Control over the Management of the Debtors and**

2    **Promises of Ongoing Funding.**

3         Prior to the market downturn in the middle of 2007, Lehman Representatives afforded

4    SunCal substantial discretion in the management and development of the Projects. The Debtors

5    would contract with third-party vendors to perform grading, health and safety compliance,

6    construction, landscaping, and other necessary services on the Project sites, and they would work

7    with the local municipalities to obtain the necessary entitlements and other authorizations

8    necessary to proceed with development. The Lehman Representatives, SunCal and the Debtors

9    would discuss anticipated quarterly expenditures at periodic budget meetings, and , as expenses

10    were incurred each month, SunCal and the Debtors would submit requests for payment to the

11    Lehman Representatives, supported by the necessary documentation. The Lehman Representatives

12    would then provide the funding necessary to pay these expenses.

13         During the third quarter of 2007, the foregoing management and payment dichotomy

14    changed, after the real estate market experienced a sudden downturn, and many of the Projects

15    significantly declined in value. In response to this dramatic economic change, a series of high

16    level discussions occurred between SunCal's representatives and the Lehman Representatives --

17    including Walsh, Paul Hughson ("Hughson") and Frank Gilhool ("Gilhool"), the Managing

18    Directors of Lehman's Global Real Estate. In these discussions, SunCal's representatives, acting

19    on behalf of the Debtors, expressed concerns about the loans on the Projects being out of balance,

20    and suggested shutting down the Projects, or at least slowing the pace of development. However,

21    Walsh specifically instructed SunCal not to slow down or stop work. He assured SunCal that the

22    Lehman Entities would provide the necessary funding to pay vendors and to keep the development

23    of the Projects moving forward.

24         The foregoing assurances of payments were confirmed in numerous telephone

25    conversations between Gilhool and SunCal's COO, Frank Faye ("Faye"), and/or SunCal's General

26    Counsel, Bruce Cook ("Cook") that took place during 2007 and 2008. In each exchange, Gilhool

27    assured SunCal that the Lehman Entities were committed to funding the debts and obligations

28    being incurred at the Projects and they continued to insist that work proceed.

-33-

MAINDOCS-#163281-v1-SCC DS Group 1 Trustee Debtors 6-1?.DOC

1 During this time frame, the Lehman Representatives became much more "hands on,"

2 scrutinizing and approving all budgets and expenses through a new control and approval structure.

3 Under the new structure, SunCal would submit budgets to the Lehman Representatives on a

4 weekly basis and explain, during periodic conference calls, what Project payables they believe had

5 to be paid and what work had to be performed on the Projects. The Lehman Representatives

6 would then unilaterally decide what future work would proceed, the Lehman Representatives

7 would authorize the work and the Lehman Representatives would decide what payables would be

8 paid timely by designating them as "urgent," and what other payables were not urgent and hence

9 would not be paid on a timely basis. However, even under this new Lehman controlled

10 management and payment regime, the Lehman Representatives made it clear that all payables

11 being incurred would be funded.

12  **4.2.5 The 2008 Restructuring Agreement.**

13 By the fall of 2007, both SunCal and the Lehman Representatives contemplated entering

14 into restructuring agreement in the near term, with a closing to occur no later than January or

15 February of 2008. However, this transaction was delayed by the Lehman Entities' extensive

16 documentation demands until May 23, 2008. On this date, SunCal and most of the Debtors finally

17 entered into an omnibus "Restructuring Agreement" with LBHI, Lehman ALI and the other

18 Lehman Entities. The same Lehman Representative signed the Restructuring Agreement on behalf

19 of all of the Lehman Entities.

20 Pursuant to the Restructuring Agreement, Lehman ALI, "as the Lender with respect to each

21 Loan," committed, among other things, to: (1) make advances under existing loans to fund the

22 continuing costs necessary to preserve the value of the Projects; (2) move forward to resolve the

23 accrued outstanding subcontractor payables, i.e., to make sure that the Projects' creditors were paid

24 for their work; and (3) to close the transaction, whereby newly-created Lehman Entities would

25 assume the debt and obligations of the Projects.

26 As originally executed in May 2008, the Restructuring Agreement applied to twelve of the

27 twenty Projects (as well as several other projects not at issue in the Lehman Adversary

28 Proceeding): (1) Acton Estates; (2) Beaumont Heights; (3) Bickford Ranch; (4) Emerald

-34-

MAINDOCS-#163281-v1-SCC DS Group 1 Trustee Debtors 6-17.DOC

1    Meadows; (5) Heartland; (6) Johannson Ranch; (7) Marblehead; (8) Northlake; (9) Oak Valley;

2    (10) Pacific Point; (11) Ritter Ranch; and (12) Summit Valley.  The Debtors that owned and/or

3    held equity interests in the entities that owned these Projects were signatories to the May 2008

4    agreement.[3]

5          Between May and August 2008, the parties agreed to add four additional projects to the

6    Restructuring Agreement: (1) Del Rio; (2) Joshua Ridge; (3) Palm Springs Village; and (4) Tesoro

7    Burnham, and the four Debtors associated with these Projects—SunCal Del Rio, SCC

8    Communities, SunCal PSV, and SunCal Tesoro.  Only four Projects were not included in the

9    Restructuring Agreement: Century City, Delta Coves, Oak Knoll and Del Amo.  Accordingly, the

10   four Debtors associated with these Projects—SunCal Century City, Delta Coves, SunCal Oak

11   Knoll and SunCal Torrance—were not signatories thereto.  Lehman ALI was the lender on each of

12   these Projects and , and as with the other Projects, Lehman Ali continued to insist that these four

13   debtors proceed with the development of the four Projects, it approved all expenses, and it

14   continually provided assurances of payment.

15          **4.2.6    The Lehman Lenders Hire Radco.**

16          Subsequent to the execution of the Restructuring Agreement, Lehman ALI arranged for a

17   third party, Radco, to directly settle outstanding contractor payables, as its agent.  Radco was

18   provided some limited funding and authority to negotiate settlements, and did in fact reach

19   settlement with a number of creditors.  The funding for these settlements, whether the debts related

20   to Lehman ALI or LCPI funded Projects, came from the same source.  Lehman ALI and LCPI also

21   provided approval for new work on the Projects, and Lehman ALI paid for some of this work.

22   However, this funding was minimal and it soon stopped.

23

24   [3] Specifically, the Restructuring Agreement was entered into by, among others, the "Borrowers,"
     "Grantors" and "Pledgors," as defined in Annex 1 thereto.  The "Borrowers" included SunCal Marblehead,

25   SunCal Heartland, SunCal Northlake, SunCal Oak Valley, SJD Partners, Palmdale Hills, SCC Palmdale,
     SunCal I, SunCal III, and SunCal Bickford.

26
     The "Grantors" included SunCal Marblehead, SunCal Heartland, SunCal Northlake, SunCal Oak Valley,

27   SJD Partners, Palmdale Hills, SunCal Bickford, SunCal Acton, SunCal Summit and SunCal Emerald, and
     Debtors SunCal Beaumont and SunCal Johannson.

28
     The "Pledgors" included SCC Palmdale, SunCal I, SunCal Summit and SJD Development.

MAINDOCS-#163281-v1-SCC_DS_Group_1_Trustee_Debtors 6-17.DOC

1    In August 2008, Lehman ALI withdrew funding and settlement authority from Radco,

2  leaving millions of dollars in outstanding contractor payables unresolved, notwithstanding the

3  contrary provisions in the Restructuring Agreement. Leman Ali's actions also impaired the

4  Debtors' ability to resolve ongoing public health and safety issues arising at the Projects.

5  Ultimately, only a fraction of the total outstanding payables were resolved, contrary to the past

6  promises made by Lehman Representatives.

7          **4.2.7    The Lehman Lenders' Failure to Close on the Settlement Agreement.**

8    Pursuant to the terms of the Restructuring Agreement, the parties agreed to enter into a

9  Settlement Agreement, the form of which was attached to the Restructuring Agreement. The

10  Settlement Agreement provided for the transfer of the Projects included within the Restructuring

11  Agreement to a series of newly formed Lehman-controlled entities (each with "SCLV" in its

12  name, for "SunCal-Lehman Venture"). The agreement further provided that the entity taking title

13  to the Project would assume the Lehman Lender debt obligations associated with the Projects,

14  assume certain bond obligations associated with the Projects, and provide indemnifications to

15  SunCal and the Debtors for unpaid claims.

16    On August 25, 2008, the Settlement Agreement and a series of related documents were

17  formally executed by SunCal and the applicable Lehman Lenders and Lehman Equity Members at

18  a meeting held in Los Angeles on August 25, 2008. Once these documents were signed, all that

19  remained was the mechanical closing of the series of transactions described in the Settlement

20  Agreement. Since all of the conditions precedent to the closings had been satisfied, or could have

21  been satisfied at, or shortly after the meeting, this should have occurred at the August 25, 2008

22  meeting, or shortly after the meeting. However, the Lehman Representative asked SunCal to

23  extend the closing date for thirty days, to September 30, 2008. According to the Lehman

24  Representatives, this short extension would enable them to secure certain outstanding third party

25  consents. Although SunCal knew these third party consents were readily obtainable within a few

26  days, they agreed to this extension, believing the request was made in good faith. In fact, as more

27  fully explained blow, it was not.

28          **4.2.8    The Lehman Lenders' Undisclosed Sale of Most of the Debtors' Loans.**

1    As explained above, the Settlement Agreement was duly executed by all parties at a formal

2    closing meeting held on August 25, 2008. When the parties signed this agreement, which was a

3    binding contract, they both represented that they both intended and had the power and capacity to

4    perform all of the obligations undertaken therein. However, in the case of the Lehman Entities, this

5    representation was later discovered to be false. When the closing occurred on August 25, 2008, the

6    Lehman Lenders had already sold the very obligations they were agreeing to assume and restructure

7    in the Settlement Agreement to Fenway Capital pursuant to a repurchase agreement. Accordingly,

8    as of August 25, 2008, they lacked the power to perform the most essential undertakings that they

9    agreed to perform in the Settlement Agreement. Instead of disclosing this fact at the August 25,

10   2008 meeting, the Lehman Lenders requested additional time to execute the agreed upon transfers

11   provided for under this binding agreement. The Lehman Lenders needed this delay for an obvious,

12   but undisclosed reason: They lacked the ability to perform the very obligations they had just agreed

13   to perform in the Settlement Agreement.

14        The Lehman Representatives also did not disclose at the August 25, 2008 closing that they

15   intended to sell the Pacific Point First Loan to Lehman Re, approximately a week later, *even though*

16   *this loan was also subject to the Settlement Agreement*. To the contrary, the Lehman

17   Representatives affirmatively concealed these facts from SunCal and the Debtors by asserting that

18   ownership still existed in the case of seven of the eight loans.

19        **4.2.9    Lehman's Foreclosure Sale and Purchase of the Pacific Point Project.**

20        At the time the Restructuring Agreement and the Settlement Agreement were signed, the

21   Pacific Point Project, which was still owned by SJD Partners, was among the Projects included in

22   the Restructuring Agreement and the Settlement Agreement.  Pursuant to the Restructuring

23   Agreement, and as detailed in the Settlement Agreement attached thereto, SunCal, SJD Partners,

24   and its parent company, SJD Development, all agreed that they would not interfere with Lehman

25   ALI's (or its designee's) foreclosure on the Pacific Point Project. They further agreed that a new

26   Lehman entity, LV Pacific Point, would purchase the Pacific Point Project upon foreclosure and

27   that Lehman ALI and LV Pacific Point would (a) assume SJD Partners' and SJD Development's

28   outstanding accounts payable for Pacific Point third-party vendors, (b) assume certain bond

1  liability associated with the Pacific Point Project, and (c) pay for the millions of dollars worth of

2  work that Lehman ALI representatives had authorized.

3  As previously stated, the Settlement Agreement was signed on August 25, 2008 by the

4  SunCal parties, including SJD Partners and SJD Development. It was also signed by Gilhool as

5  authorized signatory on behalf of both Lehman ALI and LV Pacific Point. As a signatory to the

6  Settlement Agreement, LV Pacific Point was required to purchase the Pacific Point Project at the

7  foreclosure sale subject to the above obligations. Consistent with this agreement, the City of San

8  Juan Capistrano executed an estoppel certificate for the benefit of SJD Partners and Lehman ALI—

9  at Lehman ALI's request—on August 26, 2008, two days before the foreclosure sale. This

10  certificate stated, among other things, that the "Acquiring Entity [LV Pacific Point] shall by

11  operation of law become the legal successor-in-interest to Developer [SJD Partners]" under SJD

12  Partners' agreements with the City. That certificate further provided that there existed no breaches,

13  defaults, or claims under SJD Partners' agreements with the City.

14  On August 28, 2008, Lehman ALI foreclosed on the Pacific Point Project, and title was

15  transferred to LV Pacific Point at the foreclosure sale. However, Lehman ALI and LV Pacific

16  Point failed to assume the liabilities and obligations associated with this Project as agreed. This

17  breach of the parties' agreement, left SJD Partners without title to the Pacific Point Project, but

18  with the potential liability for the substantial unsecured claims relating to the Project, including

19  bond claims of approximately $34 million,. Moreover, since Lehman Ali and LV Pacific Point

20  have continued to ignore their obligations under the above agreement, unpaid taxes, fines, and

21  penalties have continued to accrue to the detriment of the Project and these claims are being

22  asserted against SJD Partners..

23  Had SunCal, SJD Partners and SJD Development known that Lehman ALI and LV Pacific

24  Point had no intention of honoring their obligations under the foregoing agreement, they never

25  would have agreed to cooperate with the foreclosure. Instead, SJD Partners would have filed for

26  bankruptcy earlier, thereby mitigating the damages from Lehman Ali's breach, by allowing

27  creditors recourse to the value of the Project.

28

-38-

MAINDOCS-#163281-v1-SCC_DS_Group_1_Trustee_Debtors_6-17.DOC

1    This course of conduct is relevant to the unsecured creditors of the Group I: Trustee

2    Debtors for the following reason. The holders of bond claims against SJD Partners are asserting

3    their massive claims against the estates of all of the Debtors, including the estates of the Group I:

4    Trustee Debtors. Accordingly, Lehman Ali's wrongs against SJD Partners directly affect the Group

5    I: Trustee Debtors' cases.

6            **4.2.10  Alvarez and Marsal Take Over Control of the Lehman Entities After**

7            **the Chapter 11 Filings of LBHI and LCPI.**

8    LBHI filed for bankruptcy in September 2008 and LCPI filed for bankruptcy in October

9    2008. After LBHI's filing, Bryan Marsal ("Marsal") of Alvarez & Marsal ("A&M") was appointed

10   to serve as LBHI's Chief Restructuring Officer. Marsal and A&M are in charge of liquidating the

11   now defunct Lehman Entities, including Chapter 11 debtors LBHI and LCPI, and the non-bankrupt

12   Lehman Lenders (Lehman ALI, OVC, and Northlake Holdings, as well as the non-bankrupt

13   Lehman Equity Members.

14   Although A&M was not employed until after the events that occurred on August 25, 2008

15   described above, it should be noted that A&M hired the same law firm that represented the

16   Lehman Lenders in the August 25, 2008 meeting – Weil, Gotshal & Manges, LLP. Moreover, as

17   more fully explained herein, it was A&M that directed Lehman Ali not to perform its contractual

18   obligations under the Settlement Agreement after September of 2008. Accordingly, the same

19   individuals that caused the damages to unsecured creditors by insisting upon the breach of the

20   Settlement Agreement, are now asking for their vote in the competing plan filed by the Lehman

21   Lenders.

22   LBHI's bankruptcy filing and the Lehman Lenders refusal, at A&M's direction, to close the

23   transactions provided for under the Settlement Agreement as agreed, were not small matters. They

24   severely damaged the Debtors. Although the Debtors were not proceeding with any new

25   construction or development, the Debtors were still required to expend significant sums on site

26   security, erosion control, property taxes and other measures in order to prevent the Projects from

27   becoming a public safety hazard, and in order to avoid the loss of valuable entitlements, and to

28   mitigate penalties and fines being incurred by the Projects.  Although SunCal and the Debtors

MAINDOCS-#163281-v1-SCC_DS_Group_1_Trustee_Debtors_6-17.DOC

1   repeatedly requested that the Lehman Entities pay for critical health and safety and value

2   preservation measures on the Projects, these efforts were unavailing.

3       Between October 9 and November 4, 2008, SunCal's general counsel Cook sent Robert

4   Brusco, an authorized agent of the Lehman Entities, nearly two dozen letters requesting that the

5   Lehman Lenders provide the funding necessary to address critical needs on the Projects as

6   promised. A summary of these health and safety notices are attached hereto as Exhibit "5". The

7   Lehman Entities ignored these requests until November 2008, when Brusco, purportedly on behalf

8   of the Lehman Lenders, delivered the message that the Lehman Lenders were unwilling to fund the

9   Projects and that, instead, they intended to foreclose on all of the Projects.

10      As a result, as set forth in Exhibit "4," there are now over 240 vendors, municipalities,

11  counties and bonding companies claiming over $400 million in work, improvements and property

12  tax claims against the Projects. Substantially all of these sums are due to work performed or

13  bonded at Lehman's request based upon Lehman's promises of payment.

14      **4.3**    **The Debtors' Potential Preferential Transfers**.

15      Attached hereto as Exhibit "6" are charts setting forth payments made to third parties

16  during the ninety (90) day time period preceding the filing of the Debtors' Chapter 11 Cases as

17  well as payments made to the Lehman Entities and to SunCal Affiliates during the one-year time

18  period preceding the filing of the Debtors' Chapter 11 Cases.

19      As the charts in Exhibit 6" indicate, Group I Debtor's made payments in the following

20  aggregate amounts to non-insiders within the 90 day preference period preceding the Petition Date:

21  SunCal Marblehead, $1,798,895.67, and SunCal PSV, $446,772.69. The corresponding figures for

22  payments made to "insiders" within the one year preference period preceding the Petition Date

23  were: SunCal Marblehead, $945,435.78 and SunCal PSV, $4,345.05.

24

25

26

27

28

MAINDOCS-#163281-v1-SCC_DS_Group_1_Trustee_Debtors_6-17.DOC

# V.

## SIGNIFICANT EVENTS IN THE DEBTORS' CHAPTER 11 CASES

### 5.1.    Voluntary Debtors.

#### 5.1.1    Joint Administration of the Voluntary Debtors and the Trustee Debtors.

Since their respective Petition Dates, the seventeen (17) Voluntary Debtors have continued to operate as "debtors-in-possession," subject to the supervision of the Bankruptcy Court and in accordance with the Bankruptcy Code. The Voluntary Debtors are authorized to operate their businesses in the ordinary course during the Chapter 11 proceedings. Transactions outside the ordinary course of business must be approved by the Bankruptcy Court.

The Voluntary Debtors' Cases are being jointly administered pursuant to orders entered on November 19, 2008 and December 9, 2008. The Voluntary Debtors' Cases are being jointly administered with the Trustee Debtors' cases pursuant to an order entered on March 11, 2009.

The Voluntary Debtors have employed Winthrop Couchot Professional Corporation as their general insolvency counsel, and the MB Firm as their special litigation counsel.

#### 5.1.2    The Voluntary Debtors Court Employed Professionals.

The Voluntary Debtors' Committee has employed Irell & Manella LLP as its counsel pursuant to an order entered on February 13, 2009.

Pursuant to the Court's Order regarding joint administration of the Voluntary Debtors, the Voluntary Debtors' liability for professional fees is joint and several among the Voluntary Debtors' Estates for fees incurred related to services for the benefit of all of the Voluntary Debtors. The Trustee Debtors' liability for professional fees is not joint and several.

Pursuant to the initial MB Firm employment application, Acquisitions was responsible for the payment of their fees until December 31, 2009. The MB Firm's application also allows for payments from the Bond Companies. The initial MB Firm employment application reserved the right, should the Lehman Adversary Proceeding result in a benefit accruing to particular Debtors' Estates, to request that its fees and expenses be reimbursed by the Debtors' Estates. The Bond Companies have also agreed to jointly fund a portion of the professional fees and expenses of the

-41-

1    MB Firm with respect to the Lehman Adversary Proceeding.  The Bond Companies' funding

2    commitment can be terminated and after such a termination they will only be required to cover fees

3    and costs incurred during the period of their prior commitments.

4        The MB Firm employment application was subsequently amended.  Pursuant to an order

5    entered on April 14, 2010, (1) the Voluntary Debtors will pay up to one-half of the fees and

6    expenses incurred by the MB Firm from and after February 1, 2010 onward; and (2) the Trustee

7    Debtors do not have an obligation to pay any of the MB Firm's fees pertaining to the Trustee

8    Debtors' estates, unless and until a loan by the Voluntary Debtors to the Trustee Debtors is agreed

9    to by the Trustee and approved by the Court, or in accordance with the terms of the original

10   employment applications to the extent not superseded or modified by the amended employment

11   application.  The order does not affect the MB Firm's right to seek payment from the Bond

12   Companies without the need for an additional order of the Court.

13       The MB Firm filed an updated application seeking to further amend their employment to

14   include the right to pursue certain claims against the Lehman Entities and certain employees and

15   agents of these entities on behalf of the Voluntary Debtors.  The claims encompassed by this

16   amendment include claims that are based upon both prepetition and post-post petition actionable

17   conduct under both state law and federal law against the Lehman Entities and/or their agents.

18           **5.1.3   LCPI's Motions for Relief from the Automatic Stay Against Certain of**

19                  **the Voluntary Debtors' Projects and Related Appeals.**

20       On January 23, 2009, LCPI and Lehman ALI filed various motions for relief from the

21   automatic stay against Palmdale Hills, SCC Palmdale, SunCal Beaumont, SunCal Summit Valley,

22   SunCal Emerald, SunCal Bickford, Acton Estates, SunCal Johannson, and SCC Communities I

23   (the "Lehman Entities' Stay Motions").  Although the Debtors, were able to defeat these motions,

24   they are relevant in the following respect. Had the motions filed by LCPI and Lehman Ali

25   succeeded, it is almost certain that unsecured creditors would have received nothing on their

26   claims. Moreover, as more fully explained herein, since Lehman Ali and LCPI did not even own

27   the loans they were seeking to foreclose upon, these motions should never have been filed in the

28

1  first instance. Yet now, these same parties- Lehman Ali and LCPI – are asking these same creditors

2  to vote on their plan and to "trust" them.

3      **5.2.**    **The Trustee Debtors and Their Professionals.**

4      Orders for Relief were entered in the involuntary cases beginning on January 6, 2009.  The

5  Trustee Debtors are represented by their duly-appointed Chapter 11 Trustee, Mr. Steven M. Speier

6  pursuant to orders of the Bankruptcy Court entered on January 15, 2009.

7      The Chapter 11 Trustee has employed the Lobel Firm as the Chapter 11 Trustee's general

8  insolvency counsel and the MB Firm, as special litigation counsel and Squar Miller, LLP as its

9  accountants.

10      The Trustee Debtors' Committee has employed Weiland, Golden, Smiley, Wang Ekvall &

11  Strok as its general insolvency counsel.

12      **5.3.**    **The Debtors' Various Motions Relating to Financing for the Projects and to**

13      **Pay Professional Fees.**

14          **5.3.1**    **The Voluntary Debtors' Initial Motion for Surcharge and Use of Cash**

15          **Collateral.**

16      On January 16, 2009, seven of the Debtors, including the Group I: Trustee Debtors, filed a

17  motion authorizing Palmdale Hills to use and surcharge, pursuant to 11 U.S.C. § 506(c), and/or use

18  the purported cash collateral of LCPI arising from the Ritter Ranch Loan Agreement, pursuant to

19  11 U.S.C. § 363(c)(2), in order to pay for the reasonable and necessary maintenance expenses

20  required to preserve the value of such Debtors' Projects subject to deeds of trust and other security

21  interests held by LCPI.

22      LCPI objected to the motion and subsequently filed a motion in its own Chapter 11

23  proceeding in the Southern District of New York seeking an order barring the motion as a violation

24  of the automatic stay.  Although the Debtors believe that LCPI's stay was not violated in any way

25  by the Motion, the Motion was taken off calendar prior to any ruling by the New York Bankruptcy

26  Court, based upon the threat of sanctions made against Debtors' counsel by the presiding judge in

27  LCPI's case.

28

MAINDOCS-#163281-v1-SCC_DS_Group_I_Trustee_Debtors_6-17.DOC

1    As explained above, LCPI did not even own an interest in the Ritter Ranch Loan

2    Agreement when it asserted the automatic stay, since the Ritter Ranch Loan Agreement, which was

3    the subject of the cash collateral motion, had already been sold pursuant to the Fenway Repurchase

4    Agreement. Yet this wrongful action prevented Palmdale Hills from using its own money to pay

5    critical bills that Lehman Ali, LCPI's parent, was contractually required to fund in the first

6    instance.

7        **5.3.2    The Lehman Disputed Administrative Loans.**

8        As explained above, after the Petition Dates, the Debtors collectively demanded that the

9    Lehman Lenders comply with their contractual obligations to pay for the costs of maintaining and

10    preserving the value of the Projects, including the Group I Projects. However, the Lehman Lenders

11    not only refused to comply with their obligations, they actively attempted to bar the Debtors from

12    using their own funds to pay these critical costs, in the hope of forcing the Debtors to yield the

13    Projects without a fight.

14        In the face of the foregoing refusal and active interference, the Chapter 11 Trustee agreed to

15    enter into several stipulations with Lehman ALI for financing (in the total approximate amount of

16    $8.5 million for the Group I: Trustee Debtors) to pay for real property taxes and urgent public

17    health and safety issues on the Projects and to pay professionals under the caveat that such

18    professionals would not be paid for services performed on matters that were considered contrary to

19    the interests of the Lehman Entities. This loan was approved pursuant to an order of the Court. In

20    return for what the SunCal Proponents view as a "forced loan," the Lehman Lenders insisted that

21    the Chapter 11 Trustee agree to withdraw a motion  providing for the sale of certain Projects free

22    and clear of the Lehman Lenders' Disputed Liens, and the Chapter 11 Trustee agreed.

23        The SunCal Proponents will be filing a series of objections to the administrative claims

24    asserted by the Lehman Lenders based upon Lehman Administrative Loans. These objections will

25    be based upon various grounds, including the following. *After* the Lehman Administrative Loans

26    were approved by the Court, the Lehman Lenders engaged in a series of wrongs that substantially

27    damaged both the Trustee Debtors and the Voluntary Debtors. The most material of these wrongs

28    included the misrepresentations that the Lehman Lenders made to the Debtors and the Court

-44-

1   regarding their purported ownership of eight of the Lehman Loans that are at issue in this case. In

2   fact, it was later discovered that these representations were false.

3        The eight loans that the Lehman Lenders contended they owned had, in fact, been sold to a

4   third party – Fenway Capital – prepetition. This misrepresentation, and LCPI's improper assertion

5   of its automatic stay as a bar to certain actions in the Debtors cases on the basis of an ownership

6   interest *that did not exist* caused the Debtors to suffer millions in damages. These damages include,

7   but are not limited to, millions in legal fees, the impairment of sales opportunities, and the

8   intervening costs and damages that were incurred or suffered by the Projects that would otherwise

9   have been eliminated through a prior sale of the Projects, but for these misrepresentations. Prior to

10  the hearing on the confirmation of the competing reorganization plans, the SunCal Proponents will

11  be filing objections to the Lehman Administrative Loans to eliminate or reduce the claims based

12  upon the Lehman Disputed Administrative Loans by offsetting the foregoing damage claims.

13       ### 5.3.3   The Voluntary Debtors' Agreements with the Lehman Entities for Use

14              of Alleged Cash Collateral to Maintain the Properties and to Pay

15              Professional Fees.

16       On September 1, 2009, with the consent of the Lehman Entities, fourteen of the Voluntary

17  Debtors filed a motion authorizing surcharge pursuant to 11 U.S.C. § 506(c), and/or use of the

18  purported cash collateral for the purpose of addressing critical public health and safety issues and

19  other value preservation with respect to the Debtors Projects.  On September 10, 2009, the Lehman

20  Entities filed an opposition thereto, and on September 17, 2009, the Voluntary Debtors filed their

21  Reply.

22       Subsequently, the Voluntary Debtors learned that the Lehman Entities lacked control

23  agreements as to the majority of the depository accounts, and thus such accounts were not subject

24  to perfected liens and therefore did not constitute "cash collateral".  On October 15, 2009, the

25  Voluntary Debtors filed a *Motion For Order Authorizing Disposition Of Certain Depository*

26  *Accounts*.  On or about October 22, 2009, the Lehman Entities filed an opposition, and on October

27  29, 2009, the Voluntary Debtors filed their Reply.

28

MAINDOCS-#163281-v1-SCC_DS_Group_1_Trustee_Debtors_6-17.DOC

1    The motion was consensually resolved by way of the *Stipulation Pursuant To 11 U.S.C. §§*

2    *362, 363. And 364: (1) Authorizing The Use Of Cash Collateral And Alleged Unencumbered Cash;*

3    *(2) Approving Postpetition Financing; (3) Providing Administrative Expense Status; And (4)*

4    *Modifying Automatic Stay To The Extent Necessary* filed on December 8, 2009, and the order

5    thereon entered on December 17, 2009.  The stipulation provides for a 120-day budget with

6    expenses totaling approximately $5 million, pursuant to which any Cash in the Estates is used first

7    and then money borrowed from the Palmdale Hills Estate is used thereafter on an administrative

8    basis.  The agreement also permitted the Voluntary Debtors to use their alleged unencumbered

9    cash to pay its professional fees.  This agreement has been renewed on several occasions.

10           **5.4.    The Debtors' Disputes and Claims Against the Lehman Entities.**

11                  **5.4.1    The Lehman Adversary Proceeding.**

12           On January 6, 2009, the Voluntary Debtors initiated the Lehman Adversary Proceeding by

13    filing their initial complaint against Lehman ALI for equitable subordination of Lehman ALI's

14    Disputed Claims and avoidance of its Disputed Liens pursuant to Bankruptcy Code Section 510(c).

15    On February 3, 2009, the Debtors filed a First Amended Complaint, which added the Trustee

16    Debtors as co-plaintiffs and added various other causes of action.  The First Amended Complaint

17    also named OVC Holdings, Northlake Holdings and various other entities as defendants.

18           Pursuant to a hearing on a motion to dismiss held on June 11, 2009, the Bankruptcy Court

19    granted the Debtors leave to amend the second amended complaint.  Thus, on July 10, 2009, the

20    Debtors filed their Third Amended Complaint.  The Third Amended Complaint addressed many of

21    the concerns raised by the Bankruptcy Court and also included various Avoidance Actions and

22    other causes of action against the Lehman Lenders and the Lehman Successors.  The Third

23    Amended Complaint also added Fenway Capital as a defendant based upon, the discovery of the

24    facts relating to the sale of the loans Fenway Capital and based upon the Court ruling that the Repo

25    was a true sale.

26           On September 30, 2009, the Lehman Entities filed a motion to dismiss the Third Amended

27    Complaint (which motion was amended on October 7, 2009 and October 22, 2009), alleging that

28    the relief requested by certain Debtors was not available as a matter of law.  On September 30,

1 | 2009, Fenway also filed a motion to dismiss the Third Amended Complaint. On January 26, 2010

2 | and January 28, 2010, the Debtors filed oppositions to the motions to dismiss the Third Amended

3 | Complaint filed by the Lehman Entities and Fenway, respectively. On February 4, 2010, the

4 | Lehman Entities and Fenway filed their respective replies. The Court entered an order granting in

5 | part and denying in part the relief requested in the motions to dismiss. Most notably, the Court

6 | denied the defendants request for the dismissal of the equitable subordination claims and the

7 | Court permitted the Debtors to file an amended complaint. LCPI was dismissed as a defendant at

8 | this hearing, due to the fact that it did not own any interest in the loans at issue and due to potential

9 | impact of the case upon LCPI's automatic stay. On March 26, 2010, the Debtors filed their Fourth

10 | Amended Complaint. The following is a summary of the causes of action set forth in the Fourth

11 | Amended Complaint:

12 | ### 5.4.1.1   Equitable Subordination.

13 | Based on the pre-petition inequitable conduct of the Lehman Entities, summarized in

14 | Section 4.2, the Debtors have sought to subordinate the claims and avoid the liens of the Holders

15 | of the Lehman Disputed Loans to the extent necessary to pay the Claims of unpaid Creditors that

16 | were damaged by the inequitable conduct.

17 | ### 5.4.1.2   The Fraudulent Transfer Claims.

18 | The fraudulent conveyance claims set forth in the Fourth Amended Complaint include the

19 | claim that SunCal Marblehead is asserting against Lehman ALI in order to avoid a lien securing an

20 | alleged claim in the amount of $95,481,774.

21 | ### 5.4.1.3   The Preference Claims.

22 | The preference claims set forth in the Fourth Amended Complaint include the following:

23 | Transfers made to a Lehman Entity by a Debtor, where such Debtor was either owned by a Lehman

24 | Equity Member (50%) or where a Lehman Equity Member of Lehman Entity controlled such

25 | Debtor at the time of the transfer. Furthermore, according to the Lehman Lenders' appraisals

26 | submitted on the Projects of these Debtors, all of the loans were vastly undersecured at the time of

27 | the transfers.

28 |

1    On April 12, 2010, the Lehman Entities filed a motion to dismiss the Fourth Amended

2    Complaint (as well as a related motion to strike portions of the same). On that same date, the

3    Lehman Entities and Fenway, respectively, also filed answers to the Complaint denying the causes

4    of actions set forth in the Fourth Amended Complaint and alleging certain affirmative defenses.

5    Furthermore, as discussed herein, the New York Bankruptcy Court has approved Fenway's sale of

6    all Sold Loans to LCPI. Consequently, the filing of a fifth amended complaint may be necessary.

7            **5.4.1.4**    **The Debtors' Motions to Strike the Claims and Pleadings**

8                      **Arising from the Sold Loans to Fenway Capital and Related Appeals.**

9    Once the Debtors discovered that the Lehman Lenders had misrepresented their ownership

10    of seven loans– the loans sold to Fenway Capital back in August of 2008 - they filed motions, on

11    May 29, 2009, seeking an order striking the claims that were filed with respect to these sold loans

12    (the "Fenway Sold Loans"). The Fenway Sold Loans included the SunCal Communities I Loan

13    Agreement, the Ritter Ranch Loan Agreement, the SunCal PSV Loan Agreement, the SunCal

14    Marblehead/SunCal Heartland Loan Agreement, the Delta Coves Loan Agreement, the SunCal

15    Northlake Loan Agreement and SunCal Oak Valley Loan Agreement. See Exhibit "3."

16    At the initial hearing on the Debtors' motion to strike the Claims held on June 30, 2009, the

17    Court held that the transfer of the Fenway Sold Loans pursuant to the MRA was a true purchase and

18    sale transaction (the "Ownership Issue") and, accordingly, the Lehman Lenders retained no right to

19    file the Proofs of claim on this basis, under Federal Rule of Bankruptcy Procedure 3001(e)(1). The

20    Court entered an order regarding the Ownership Issue on October 2, 2009.

21    The Lehman Lenders also contended that they were entitled to file the Proofs of Claim as the

22    "Fenway's authorized agent" under Federal Rule of Bankruptcy Procedure 3001(b) (the "Agency

23    Issue"). A continued hearing on the Agency Issue was set for September 22, 2009 and the Court

24    ruled that the Lehman Lenders could file the Proofs of Claim an authorized agents. The Lehman

25    Entities appealed the Ownership Issue and the Debtors appealed the Agency Issue to the Bankruptcy

26    Appellate Panel. These two appeals, which were consolidated, were argued in September of 2010.

27    The parties are awaiting a ruling.

28

MAINDOCS-#163281-v1-SCC_DS_Group_1_Trustee_Debtors_6-17.DOC

### 5.4.1.5    Debtors' 502(d) Objections and Objection to Lehman's Claim Against Acton.

The Voluntary Debtors and other parties-in-interest have filed a motion to disallow, pursuant to 11 U.S.C. § 502(d), the following Disputed Claims filed by Lehman ALI and LCPI, including the following claims filed against the Group 1 Trustee Debtors:

| Disputed Proof of Claim No. | Debtor | Claim Holder | Claim Amount |
|---|---|---|---|
| 21 | SunCal Marblehead | LCPI | $354,325,126 |

On June 9, 2011, a hearing was held on the Section 502(d) claim objection. At this hearing the Lehman Entities disputed the merits of the Section 502(d) claim objection and LCPI alleged that the filing of this objection violated its automatic stay. At the conclusion of the hearing, the Court ruled that the parties could proceed with their discovery in this matter.

If the Section 502(d) claim objection is successful, the claims of the Lehman Entities identified in the table above will be disallowed. Although the Lehman Entities will have the right to seek reconsideration of this disallowance, in order to obtain this relief they would have to repay the applicable transfers.

### 5.4.1.6    The Lehman Recoupment Claim Objections and the State Court Action.

Pursuant to the terms of the joint ventures entered into by and among the Debtors and the Lehman Entities, the Lehman Entities were responsible for paying the costs incurred in the development of the Projects. These costs included the claims of the vendors who provided goods and services to the Projects and the claims asserted by the Bond Claimants. Although the Lehman Entities contend that they were merely "lenders," and that they did not assume any liability for these claims, as the above facts and those that will be adduced prior to and at the confirmation of the Plan will demonstrate, the Lehman Entities are in fact obligated to pay these claims.

The Debtors' contend that direct liability can be imposed on the Lehman Entities on various grounds, including the following. First, the Lehman Entities were either in a joint venture relationship with the Debtors from the outset, or this relationship developed and became a legal fixture through the Lehman Entities' course of conduct. Pursuant to this relationship, and the

1   promises and representations made therein, the Lehman Entities agreed to be responsible for all

2   vendor and Bond Claims incurred at or in connection with the Projects. The role of each of the

3   Debtors, by mutual agreement, was to provide development expertise and project management

4   services. The Lehman Entities were required to provide the capital necessary to fund the Projects.

5       Second, during the last eighteen months of the relationship between the parties, the Lehman

6   Entitics assumed direct responsibility for all claims incurred during this period, by insisting that

7   work continue on the Projects and by repeatedly promising to pay for this work. Since the Lehman

8   Entities ordered this work, and promised to pay for the same, they bear this financial responsibility.

9       Third and finally, the Lehman Entities expressly agreed to pay the vendor and bond claims

10  described in the Restructuring Agreement and in the interrelated Settlement Agreement, but failed

11  to do so as contractually agreed.

12      It is the SunCal Proponent's contention that the Lehman Entities' failure to pay the vendor

13  and Bond Claims associated with the Projects as (as was their obligation under the terms of the

14  joint ventures, the Restructuring Agreement and the Settlement Agreement) unjustly shifted

15  responsibility for these liabilities to the Debtors in breach of the terms of joint venture, the

16  Restructuring Agreement and the Settlement Agreement. Accordingly, the SunCal Proponents have

17  filed objections to seven of the Secured Claims asserted by the Lehman Entities based upon the

18  affirmative defenses of recoupment, unjust enrichment and unclean hands (the "Lehman

19  Recoupment Claim Objections").

20      In the Lehman Recoupment Claim Objections, the SunCal Proponents seek the following

21  relief:

22             1) Disallowance of the claims asserted by the Lehman Lenders in their

23             entirety, pending compliance with the terms of the Restructuring

24             Agreement and the Settlement Agreement;

25             2) A reduction in the amount of the Lehman Entities' secured claims by

26             the amount of damages resulting from the Lehman Entities' breach of their

27             obligations under these agreements; and/or

28

1               3) An order barring the Lehman Entities from enforcing their rights under

2               the Lehman Loans until they cure their breaches under the above

3               agreements.

4      The first prayer for relief above is premised upon the contention that the Lehman Entities

5 agreed to transfer ownership of the Group I Projects to a series of newly formed entities under the

6 control of the Lehman Entities, pursuant to the terms of the Settlement Agreement. This agreement

7 further provided that these new entities would assume the vendor payables and certain Bond

8 Claims associated with these projects. Finally, this agreement included a covenant not to sue,

9 pursuant to which the Lehman Entities were barred from seeking further recourse against the

10 Debtors.

11      The SunCal Proponents believe that the positions asserted in the Lehman Recoupment

12 Claim Objections are well grounded in fact and in law. Had the Lehman Entities complied with

13 their contractual obligations, substantially all of the Group I Debtor's liabilities would have been

14 eliminated, the Group I: Trustee Debtors would not have had to file Chapter 11, and the Lehman

15 Entities would be barred from asserting claims against the Group I: Trustee Debtors based upon the

16 Lehman Disputed Loans. It is the SunCal Proponents position that the Lehman Entities effort to

17 enforce claims based upon Lehman Disputed Loans is directly contrary to the basic agreements

18 reached in the Restructuring Agreement and in the related Settlement Agreement.

19      The Lehman Entities dispute the merits of the Lehman Recoupment Claim Objections. It is

20 the Lehman Entities' position that it was within their absolute "discretion" to pay, or not to pay, the

21 vendor payables incurred during the term of the Restructuring Agreement. Accordingly, they

22 cannot, in their assessment, be held liable for these obligations. In the case of the Settlement

23 Agreement, the Lehman Entities contend that this agreement never became effective and therefore

24 they were not bound to comply with its terms. The SunCal Proponents do not believe that the

25 positions asserted by the Lehman Entities are supported by the facts, or existing law.

26      In addition to the Recoupment Claim Objections, certain Voluntary Debtors have also filed

27 the State Court Action against Lehman ALI and other non-debtor Lehman Entities. The State Court

28 Action is based on Lehman ALI's breach of contract on the Restructuring and Settlement

MAINDOCS-#163281-v1-SCC DS Group I Trustee Debtors 6-17.DOC

1    Agreements. The Group I: Trustee Debtors are potential plaintiffs in the State Court Action, and

2    such claims constitute property of their estates. The Trustee refused to authorize the Group II:

3    Trustee Debtors to become additional plaintiffs in the State Court Action. If the Plan is

4    Confirmed, the Plan Trustee and/or the Group I: Trustee Debtors reserve the right to join the State

5    Court Action as additional plaintiffs.

6        Although LCPI's automatic stay remains an impediment to the pursuit of the Lehman

7    Adversary Proceeding, the existence of this stay will not bar the SunCal Proponents from

8    implementing the material terms of the Plan for the following reason. LCPI's automatic say does

9    not bar the pursuit of the Lehman Claim Objections and in fact this litigation is proceeding. If these

10    objections are successful, the claims of the Lehman Entities will be disallowed, either in whole or

11    in part, or the Lehman Entities will be barred from pursuing these claims until they pay what they

12    owe to the Group I: Trustee Debtors. In either scenario, the Plan filed by the SunCal Proponents is

13    feasible and will yield a favorable return for creditors.

14        **5.4.1.7    The Debtors' Potential Post-Petition Claims Against Lehman**

15            **and Their Agents.**

16        The Voluntary Debtors believe that the Lehman Entities and certain agents of the Lehman

17    Entities (the "Culpable Agents") engaged in a post-petition course of conduct that severely

18    damaged the Voluntary Debtors, their estates and the recovery rights of creditors. In summary, the

19    actions taken by the Lehman Entities and the Culpable Agents included, among other things, the

20    following:

21        A.    Actively concealing the prepetition sale of the Lehman Disputed Loans to

22    Fenway Capital and misrepresenting themselves as the owners of these loans during the post-

23    petition period; and

24        B.    Improperly asserting that LCPI's automatic stay barred actions in the

25    Voluntary Debtors' Chapter 11 Cases relating to two of the Lehman Disputed Loans, when in fact

26    LCPI did not own any interest in such loans and hence the stay could not apply.

27        The foregoing course of conduct inflicted millions of dollars in damages upon the Voluntary

28    Debtors in the form of additional fees and costs, and it materially delayed the progress of the

-52-

1    Voluntary Debtors' reorganization effort. The Voluntary Debtors intend to seek recourse against the

2    Culpable Agents for these wrongs.

3        **5.5.**     **The Lehman Fenway Claims Transaction, Compromise Motion Filed By the**

4             **Lehman Entities.**

5             **5.5.1**     **Lehman Entities' and Fenway's Proposed Claims Transaction.**

6        In April of 2010, LCPI and LBHI filed that certain *Motion Pursuant To Bankrptcy Rule*

7    *9019 For Authority To Compromise Controversy In Connection With A Repurchase Transaction*

8    *With Fenway Capital, LLC And A Commercial Paper Program With Fenway Funding, LLC* (the

9    "Compromise Motion."). In the motion, LCPI and LBHI represented that they were

10    "compromising" various issues and relationships arising out of the repurchase transaction

11    described in the LCPI – Fenway MRA (the "Repo"). However, a careful review of the transaction

12    described therein indicated that the motion was designed to accomplish the following objectives:

13        1.   To transfer title to the Lehman Disputed Loans at issue in the Lehman

14            Adversary Proceeding from Fenway Capital to LCPI, an entity that had no

15            interest in five of the seven loans prepetition;

16        2.   To allow LCPI, as the new owner of the Lehman Disputed Loans, to re-

17            join the Lehman Adversary Proceeding as a defendant, and once there to

18            use its automatic stay as a "sword" to stay this action;

19        3.   To enable the Lehman Entities to thwart the pursuit of the SunCal Plan

20            Proponents' Plan;

21        4.   To bestow upon the Lehman Entities' purported competing plan an unfair

22            advantage in the plan confirmation contest by delaying the effectiveness of

23            critical provisions in the SunCal Plan Proponents' Plan; and

24        5.   To shield Fenway Capital and its principals from liability and investigation

25            through discovery.

26        At the hearing on the Compromise Motion, the bankruptcy court in New York approved the

27    Compromise Motion, and stated, consistent with the objectives of the Lehman Entities, that the

28    continued pursuit of the Lehman Adversary Proceeding would be stayed, once LCPI obtained title

MAINDOCS-#163281-v1-SCC_DS_Group_1_Trustee_Debtors_6-17.DOC

1  to the Lehman Disputed Loans. The order reflecting this relief was entered on May 13, 2010 (the

2  "Compromise Order").

3      **5.6.    The Debtors' Motion for a Stay to Suspend Certain Lehman Actions.**

4      On September 21, 2010, the Voluntary Debtors, Acquisitions, and SunCal Management

5  filed a motion requesting, among other relief, for the Court to suspend the Lehman Entities

6  competing plan and disclosure statement unless and until the Lehman Entities agree to provide the

7  Debtors with relief from their automatic stay in the Debtors' Chapter 11 Cases (the "Suspension

8  Motion"). The Court granted this motion and stayed all matters until March 1, 2011. The Court

9  also ordered the parties to engage in a mediation. The Voluntary Debtors and the Lehman Entities

10  were unable to settle their claims through this process.

11      **5.7.    The Debtors' Other Litigation with Non-Lehman Related Parties.**

12          **5.7.1   The Debtors' Failed Preliminary Injunction Motion Against the**

13                  **Holders of Bond Claims.**

14      On February 20, 2009, the Debtors filed a complaint and a Motion for Preliminary

15  Injunction, pursuant to which the Debtors sought a Motion for Preliminary Injunction against the

16  Holders of Bond Claims from pursuing such Claims. On February 23, 2009, the Court denied the

17  Debtors' request for the TRO and granted the Debtors' request to require the defendants to show

18  cause why the Motion for Preliminary Injunction should not be issued.

19      On March 2, 2009, several Holders of Bond Claims objected to the Motion for the

20  Preliminary Injunction. The objections generally alleged that the Debtors failed to show that the

21  balancing of the equities favored granting the Preliminary Injunction versus the harm to the

22  Holders of the Bond Claims. At a hearing held on March 4, 2009, the Court denied the

23  Preliminary Injunction Motion and the underlying complaint has subsequently voluntarily been

24  dismissed without prejudice.

25          **5.7.2   The Contractors' Successful Motions for Relief from Stay to Pursue the**

26                  **Bond Claims.**

27      Various contractors that were hired to perform work on some of the Projects have filed

28  motions for relief from stay with the Bankruptcy Court to pursue their purported Bond Claims.

1    These creditors have requested that the Bankruptcy Court grant these creditors relief from the

2    automatic stay to allow such creditors to enforce certain Claims that such creditors allege to have

3    against some of the Debtors, including certain surety bonds that are alleged to have been issued in

4    favor of such creditors.  The Debtors opposed the motions on the grounds that the various Debtors

5    are indispensible parties.  The Court conditionally granted the motions provided that the Bond

6    Claimants are able to sever the Debtors from their proceedings on the Bonds.

7               **5.7.3    Arch's Motion for Relief from Stay.**

8               On March 10, 2010, Arch and the City of San Clemente jointly filed a motion for relief

9    from stay.  The motion requested an order granting the following relief: (1) allowing such parties

10   to obtain authorization from the Trustee for a right of entry to allow Arch, as subdivision

11   performance bond surety for Group I Debtor SunCal Marblehead, and the City (and their respective

12   contractors and consultants), to enter onto land located entirely, or in part, on the Property owned

13   by Group I Debtor SunCal Marblehead to complete works of improvement which, if left

14   unfinished, pose a health and safety risk to the general public; (2) to the extent such improvements

15   are located entirely, or in part, on the Project owned by SunCal Marblehead authorizing the City to

16   accept SunCal Marblehead's offer of dedication for such improvements and the rights-of-way

17   pertaining thereto upon completion; and (3) to the extent SunCal Marblehead may have custody of

18   any equipment, materials, and supplies that are needed to complete the works of improvement,

19   Arch and City request that such equipment, materials, and supplies be released to Arch and its

20   completion contractors so that the applicable portion(s) of the Project can timely proceed.  There

21   was no opposition to this motion.  On April 6, 2010, the Court granted this motion.

22               **5.7.4    Shea's Successful Motion for Relief from Stay.**

23               On April 7, 2010, Shea Construction, Inc. filed a motion for relief from stay to pursue a

24   state court for foreclosure of liens on property previously owned by the Debtors and no longer

25   property of the Debtors' estate.  On May 14, 2010, the Court granted this motion.

26               **5.7.5    Bond Safeguard Motion.**

27               Bond Safeguard, a surety that issued bonds to secure the performance of work on certain

28   projects, filed a motion seeking authority to file  claims relating to these bond claims after the bar

-55-

1    date. The Debtors opposed this motion. This motion was granted pursuant to an order entered on

2    January 7, 2011.

3         **5.7.7**    **LitCo.** As more fully explained in Article VII, pursuant to the terms of the

4    Plan, LitCo, which is a newly formed Delaware limited liability company, will be making an offer

5    to purchase the Reliance Claims held by the Reliance Claimants in Classes 6.1 and 6.2 pursuant to

6    the Plan. LitCo will be capitalized by a third party capital partner with the funds necessary to fund

7    this claims purchase. Once the Reliance Claims are purchased, LitCo will pursue these claims

8    against the Lehman Entities. Since LitCo will be purchasing the Reliance Claims with non-estate

9    assets, the Plan Trust will not receive any part of the recoveries obtained on these purchased

10    claims.

11                 **VI.**

12         **TREATMENT OF UNCLASSIFIED CLAIMS**

13        **6.1**     **Introduction**. As required by the Bankruptcy Code, the Plan places Claims and

14    Interests into various Classes according to their right to priority. However, certain types of Claims

15    are not classified in any Classes under the Plan. These Claims are deemed "unclassified" under the

16    provisions of the Code. They are not considered impaired and they do not vote on the Plan,

17    because they are automatically entitled to specific treatment provided for them in the Code. As

18    such, the SunCal Plan Proponents have not placed the following Claims in a Class. The treatment

19    of these unclassified Claims is as provided below.

20        **6.2**     **Treatment of Allowed Administrative Claims.**

21        The Code requires that all Allowed Administrative Claims be paid on the later of Effective

22    Date of the Plan or the date of their allowance, unless a particular Holder agrees to a different

23    treatment. The treatment of Allowed Administrative Claims is as described below. However, such

24    Administrative Claims are continuing to be incurred. The Allowed Administrative Claims shall be

25    paid from the applicable Distribution Account(s) pursuant to the Acquisitions Administrative

26    Loan.

27

28

MAINDOCS-#163281-v1-SCC_DS_Group_1_Trustee_Debtors_6-17.DOC

**6.3**    **Treatment and Repayment of the Lehman's Administrative Loan(s).**

The Lehman Disputed Administrative Loans shall be paid in full on the later of the

Effective Date, or the date any objections to the same are overruled by the Court leaving them

Allowed claims. Prior to payment, or until disallowed, these claims shall continue to be secured by

their existing liens against the respective Assets of the Trustee Debtors.

The Lehman Disputed Administrative Loans shall be paid in full, on the date referenced

above, from either 1) funds loaned to the Plan Trust by LitCo or another designated third, or 2)

from the funds in the applicable Net Sale Proceeds Account.

**6.4**    **Repayment of Allowed Administrative Claims Other than the Lehman**

**Administrative Loans.**

Except to the extent that the Holder of an Allowed Administrative Claim agrees to a

different treatment and subject to the Administrative Claims Bar Date set forth herein, the

Distribution Agent shall pay each Allowed Administrative Claim in full, in Cash, on the later of

(i) the Effective Date, (ii) within ten (10) Business Days after the date such Administrative Claim

becomes an Allowed Administrative Claim, or (iii) the date such Allowed Administrative Claim

becomes due according to its terms. Notwithstanding the foregoing, any Allowed Administrative

Claim representing obligations incurred in the ordinary course of post-petition business by the

Debtors in Possession (including without limitation post-petition trade obligations and routine

post-petition payroll obligations) shall be paid in full or performed by the Plan Trustee in the

ordinary course of business, in accordance with the terms of the particular obligation.

**6.5**    **Administrative Claims Bar Date.**

All applications for final compensation of Professionals for services rendered and for

reimbursement of expenses incurred on or before the Effective Date and all other requests for

payment of Administrative Claims incurred before the Effective Date under Sections 507(a)(2)

or 507(b) of the Bankruptcy Code (except only for (i) post-petition, ordinary course trade

obligations and routine post-petition payroll obligations incurred in the ordinary course of the

Debtors' post-petition business, for which no bar date shall apply, and (ii) post-petition tax

obligations, for which no bar date shall apply) shall be Filed with the Bankruptcy Court and served

1  upon the Plan Trustee no later than the Administrative Claims Bar Date, unless such date is

2  extended by the Bankruptcy Court after notice to the Plan Trustee.  Any such request for payment

3  of an Administrative Claim that is subject to the General Administrative Claims Bar Date and that

4  is not Filed and served on or before the Administrative Claims Bar Date shall be forever barred;

5  any party that seeks payment of Administrative Claims that (i) is required to file a request for

6  payment of such Administrative Claims and (ii) does not file such a request by the deadline

7  established herein shall be forever barred from asserting such Administrative Claims against the

8  Debtors, the Plan Trust, their estates, or any of their property.

9  **6.6    Treatment of Unsecured Tax Claims.**

10        Tax Claims are certain unsecured income, employment and other taxes described by Code

11  Section 507(a)(8).  The Code requires that each holder of such a Section 507(a)(8) tax claim

12  receive the present value of such Claim in deferred cash payments, over a period not exceeding

13  five (5) years from the petition date and that such treatment not be less favorable than the treatment

14  accorded to non priority unsecured creditors.

15        At the election of the Plan Trustee, the Holder of each Allowed Priority Tax Claim shall be

16  entitled to receive, on account of such Claim, (i) equal cash payments on the last Business Day of

17  each three-month period following the Effective Date, during a period not to exceed five years

18  after November 6, 2008, totaling the principal amount of such Claim plus simple interest on any

19  unpaid balance from the Effective Date, calculated at the interest rate available on ninety (90) day

20  United States Treasuries on the Effective Date, (ii) such other treatment agreed to by the Holder of

21  the Allowed Priority Tax Claim and the Plan Trustee, provided such treatment is on more

22  favorable terms to the Debtors (or the Plan Trust after the Effective Date) than the treatment set

23  forth in clause (i) hereof, or (iii) payment of the full Allowed Priority Tax Claim in Cash.

24                              **VII.**

25              **CLASSIFICATION OF CLAIMS AND INTERESTS**

26        As required by the Code, the Plan places Claims and Interests into various Classes

27  according to their right to priority and other relative rights.  The Plan specifies whether each Class

28  of Claims or Interests is impaired or unimpaired, and the Plan sets forth the treatment each Class

MAINDOCS-#163281-v1-SCC_DS_Group_1_Trustee_Debtors_6-17.DOC

1  will receive. The table below lists the Classes of Claims established under the Plan and states

2  whether each particular Class is impaired or left unimpaired by the Plan. A Class is "unimpaired"

3  if the Plan leaves unaltered the legal, equitable and contractual rights to which the Holders of

4  Claims or Interests in the Class are entitled, with certain exceptions specified in the Bankruptcy

5  Code.

6

7

| CLASSIFICATION OF HOLDERS OF SECURED REAL PROPERTY TAX CLAIMS | | |
|---|---|---|
| **Class 1** | **Claimant** | **Claim Nos.[4]** |
| **Class 1.1** | Orange County as the Holder of an Unpaid Secured Real Property Tax Claim against the Marblehead Project in the amount of $2,500,646. | SunCal Marblehead 49 and 57 |
| **Class 1.2** | San Bernardino County as the Holder of an Unpaid Secured Real Property Tax Claim against the Palm Springs Village Project in the amount of $1,725,166. | SunCal PSV 22 |

| CLASSIFICATION OF LEHMAN'S DISPUTED CLAIMS | | |
|---|---|---|
| **Class 2** | **Claims** | **Claim Nos.** |
| **Class 2.1** | The Holder of the Disputed Secured Claim that is secured by a Disputed Lien against SunCal Marblehead and SunCal Heartland, which claim is based upon funds allegedly advanced pursuant to the SunCal Marblehead/SunCal Heartland Loan Agreement. | SunCal Marblehead: 21 |
| **Class 2.2** | The Holder of the Disputed Secured Claim that is secured by a Disputed Lien against the Palm Springs Village Project, which claim is based upon funds allegedly advanced pursuant to the SunCal PSV Loan Agreement in the asserted amount of $88,257,340. | SunCal PSV 12 |

| CLASSIFICATION OF ASSERTED MECHANIC LIEN CLAIMS ON THE MARBLEHEAD PROJECT AND THE PALM SPRINGS VILLAGE PROJECT | | |
|---|---|---|
| **Class 3** | **Claimant** | **Claim Nos.** |

---

[4] These Real Property Tax Claims have been updated to include amounts for which proofs of claim have not yet been filed.

| CLASSIFICATION OF ASSERTED MECHANIC LIEN CLAIMS ON THE MARBLEHEAD PROJECT AND THE PALM SPRINGS VILLAGE PROJECT | | |
|---|---|---|
| **Class 3** | **Claimant** | **Claim Nos.** |
| **Class 3.1** | The Holder of the asserted Mechanic Lien Claim held by The Jasper Companies against the Marblehead Project in the amount of $146,657. | SunCal Marblehead 29 |
| **Class 3.2** | The Holder of the asserted Mechanic Lien Claim held by Kirk Negrete, Inc. dba United Steel Placers against the Marblehead Project in the amount of $270,056. | SunCal Marblehead 38 |
| **Class 3.3** | The Holder of the asserted Mechanic Lien Claim held by RBF Consulting against the Marblehead Project in the amount of $125,093. | SunCal Marblehead 39 |
| **Class 3.4** | The Holder of the asserted Mechanic Lien Claim held by RJ Noble Co. against the Marblehead Project in the amount of $175,030. | SunCal Marblehead 42, 50 and 58 |
| **Class 3.5** | The Holder of the asserted Mechanic Lien Claim held by Orange County Stripping Services against the Marblehead Project in the amount of $11,752. | SunCal Marblehead 46 and 54 |
| **Class 3.6** | The Holder of the asserted Mechanic Lien Claim held by Savala Equipment Co. Inc. against the Marblehead Project in the amount of $34,440. | SunCal Marblehead 48 and 56 |
| **Class 3.7** | The Holder of the asserted Mechanic Lien Claim held by All American Asphalt against the Marblehead Project in the amount of $1,344,445. | SunCal Marblehead 63 |
| **Class 3.8** | The Holder of the asserted Mechanic Lien Claim held by Rockey Murata Landscaping against the Marblehead Project in the amount of $285,643. | SunCal Marblehead 60 |
| **Class 3.9** | The Holder of the asserted Mechanic Lien Claim held by BNB Engineering, Inc. against the Marblehead Project in the amount of $1,608,723. | SunCal Marblehead 37 |
| **Class 3.10** | The Holder of the asserted Mechanic Lien Claim held by Brudvik Inc. against the Palm Springs Village Project in the amount of $43,365. | SunCal PSV 4 |

| CLASSIFICATION OF ASSERTED MECHANIC LIEN CLAIMS ON THE MARBLEHEAD PROJECT AND THE PALM SPRINGS VILLAGE PROJECT | | |
|---|---|---|
| **Class 3** | **Claimant** | **Claim Nos.** |
| **Class 3.11** | The Holder of the asserted Mechanic Lien Claim held by Larry Jacinto Construction Inc. against the Palm Springs Village Project in the amount of $212,663. | SunCal PSV 5 and 24 |
| **Class 3.12** | The Holder of the asserted Mechanic Lien Claim held by William + Paddon Architects + Planners Inc. against the Palm Springs Village Project in the amount of $73,798. | SunCal PSV 9 and 10 |
| **Class 3.13** | The Holder of the asserted Mechanic Lien Claim held by Southern California Edison against the Palm Springs Village Project in the amount of $23,861. | SunCal PSV 26 |
| **Class 3.14** | The Holder of the asserted Mechanic Lien Claim held by Pacific Masonry Walls, Inc. against the Palm Springs Village Project in the amount of $314,061. | SunCal PSV 33 and 39 |
| **Class 3.15** | The Holder of the asserted Mechanic Lien Claim held by J.R. Simplot Company against the Palm Springs Village Project in the amount of $3,467. | SunCal PSV 34 and 40 |
| **Class 3.16** | The Holder of the asserted Mechanic Lien Claim held by Desert Pipeline Inc. against the Palm Springs Village Project in the amount of $469,784. | SunCal PSV 36, 42 and 47 |
| **Class 3.17** | The Holder of the asserted Mechanic Lien Claim held by MSA Consulting against the Palm Springs Village Project in the amount of $666,897. | SunCal PSV 43 |
| **Class 3.18** | The Holder of the asserted Mechanic Lien Claim held by Jackson DeMarco against the Palm Springs Village Project in the amount of $52,234. | SunCal PSV 45 |

| CLASSIFICATION OF BOND INDEMNIFICATION CLAIMS | | |
|---|---|---|
| **Class 4** | **Claimant** | **Claim Nos.** |
| **Class 4.1** | The holders of Bond Claims arising from bonds issued with respect to the Group I Projects | |

-61-

| CLASSIFICATION OF PRIORITY UNSECURED CLAIMS | | |
|---|---|---|
| **Class 5** | **Claimant** | **Claim Nos.** |
| **Class 5.1** | The Holder of Priority Claims that fall within Code Sections 507(a)(2), (4), (5), (6), and (7) in the asserted amount of $10,950 against SunCal Marblehead. | Scheduled Amount and SunCal Marblehead 45 |

| CLASSIFICATION OF GENERAL UNSECURED CLAIMS THAT QUALIFY AS RELIANCE CLAIMS[5] | | |
|---|---|---|
| **Class 6** | **Claimant** | **Claim Nos.** |
| **Class 6.1** | The holders of Reliance Claims against SunCal Marblehead. | Various Filed and Scheduled |
| **Class 6. 2** | The holders of Reliance Claims against SunCal PSV. | Various Filed and Scheduled |

| CLASSIFICATION OF GENERAL UNSECURED CLAIMS THAT DO NOT QUALIFY AS RELIANCE CLAIMS[6] | | |
|---|---|---|
| **Class 7** | **Claimant** | **Claim Nos.** |
| **Class 7.1** | Claimants holding Allowed Unsecured Claims against SunCal Marblehead that are not Reliance Claims | Various Filed and Scheduled |
| **Class 7.2** | Claimants holding Allowed Unsecured Claims against SunCal PSV that are not Reliance Claims | Various Filed and Scheduled |

[5] Unsecured Claims are generally placed within the same class and they receive the same treatment under a Plan. However, the SunCal Proponents have divided Unsecured claims into two classes in the Plan – Classes 6.1 and 6.2, and 7.1 and 7.2. This separate classification has been implemented for the following reason. The Holders of Unsecured Claims in Classes 6.1 and 6.2, who are referred to as "Reliance Claimants," hold specific Litigation Rights that are referred to herein as "Reliance Claims." The Unsecured Creditors in Classes 7.1 and 7.2 do not hold Reliance Claims. Under the Plan, the Reliance Claimants who sell their Reliance Claimants to LitCo, and who vote in favor of the Plan, which is Option A, will receive a distribution of $.55 cents on their Allowed Unsecured Claims *from non-estate funds. Accordingly, the $.55 cent payment is being paid from non-estate funds, for a non-estate asset.* If a Reliance Claimant elects not to sell this claim, then this claimant will receive the exact same distribution rights that the Class 7.1 and 7.2 claimants will receive under the Plan, unless the Court allocates a part of any judgment granted in the Lehman Adversary Proceeding to these particular claims. In summary, the classification difference was made to provide for the purchase offer relating to the sale of the Reliance Claims. In all other respects the Holders of Unsecured Claims receive the same treatment under the Plan.

[6] This Class includes, but is not limited to, Bond Claims that are not Allowed Secured Claims within Class 4.1.

| Class 8 | Claimant | Scheduled |
|---|---|---|
| **Class 8.1** | Allowed Interests in SunCal Marblehead held by SunCal Marblehead Heartland Master LLC. | Scheduled Amount |
| **Class 8.2** | Allowed Interests in SunCal PSV, LLC held by Lehman SunCal Real Estate Fund LLC | Scheduled Amount |

# VIII.

## THE PLAN'S TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS

**8.1.** **The Plan's Treatment of Holders of Allowed Secured Real Property Tax Claims secured by Group I Projects (Classes 1.1 and 1.2).**

The rights of the Holder(s)' of Allowed Secured Claims in Classes 1.1 and 1.2 are not impaired under the Plan. Such claimants shall retain their existing lien rights and one of the following two non-impairment options shall apply, at the election of the Plan Trustee: 1) On the Effective Date, such claims shall be satisfied in accordance with the provision of 11 U.S.C. § 1124(2), or 2) on the Effective Date, or the Holder(s) shall be free to pursue their respective rights and remedies against the underlying real property collateral under applicable California law.

**8.2.** **The Plan's Treatment of Lehman's Disputed Claim(s) and Disputed Lien(s) (Classes 2.1 and 2.2).**

The Holder(s) of Disputed Secured Claims within Class 2.1 and Class 2.2 shall receive the indubitable equivalent of their claims under the Plan, pursuant to 11 U.S.C. § 1129(b)(2)(A)(iii), through the following treatment:

A.    Lien Rights. The Class 2.1 and Class 2.2 Holder(s) shall retain their interest in the Disputed Lien(s) against Plan Trust Assets that secure the Disputed Secured Claims, pending a Final Order(s) resolving the Allowance of such Disputed Secured Claims and determining the validity, priority and extent of the applicable Disputed Liens against the applicable Plan Trust Assets, which secure these claims, except as follows:

1.    The Plan Trust Assets subject to the Class 2.1 and 2.1 Disputed Liens may be sold free and clear of such liens on the Effective Date. These Disputed Liens shall

1  then attach to the Net Proceeds from the sale, which shall be deposited into the Net Proceeds

2  Account;

3          2.      To the extent that a Disputed Secured Claim held by either the Class

4  2.1 or 2.2 Claimants against either Group I Project is disallowed, and the Disputed Lien associated

5  with this Disputed Secured Claim is consequently released to the extent of this disallowance, the

6  Plan Trustee shall be authorized to use the Net Proceeds that are no longer subject to the Disputed

7  Lien(s) to pay other Allowed Claims in their order of priority, in accordance with the terms of the

8  Plan;

9          3.      To the extent that a Disputed Secured Claim held by either the Class

10 2.1 or 2.2 Claimant and the associated Disputed Lien(s) against either Group I Project are

11 subordinated, the Plan Trustee shall be authorized to use the Net Proceeds that are no longer

12 subject to the Disputed Lien(s) , or where the priority of the Disputed Liens has been subordinated

13 by the Court, to pay other Allowed Claims in their order of priority, in accordance with the terms

14 of the Plan, to the extent of the subordination; and

15          Notwithstanding the existence of the Disputed Secured Claims and the

16 Disputed Liens, the Plan Trustee may a seek a release of the funds in the Net Proceeds Account

17 subject to these claims and liens to pay the claims of other creditors in accordance with the terms

18 of the Plan, if the Class 2.1 and 2.2 claimants' interests in this property will remain adequately

19 protected after this release.

20          B.      Sale of Group I Projects. The Plan Trustee shall complete the sale of Group I

21 Projects on the Effective Date that are subject to the Holder(s)' Disputed Secured Claims and

22 Disputed Liens, free and clear of such claims and liens, through a sale that satisfies the following

23 conditions:

24          1.      The Group I Projects will be sold through a public auction after a

25 commercially reasonable marketing and advertising effort of at least sixty (60) days duration;

26          2.      The SunCal Plan Proponents shall have the right to provisionally

27 accept an Opening Bid from a Stalking Horse Bidder prior to the public auction and to grant this

28 bidder either the Marblehead Break-Up Fee or the PSV Break-up Fee as the case may be;

-64-

3.      Other Qualified Bidders shall have the right to overbid the Opening Bid by submitting a Qualifying Bid. The first round of Qualifying Bids after the Opening Bid must be equal to or in excess of the Initial Overbid Amount. Thereafter, all Qualifying Bids shall be equal to or in excess or the Minimum Increment;

4.      The highest Qualifying Bid received from a Qualified Bidder, shall be accepted as the Winning Bid, and the submitting bidder shall be the Winning Bidder. Upon payment of the Winning Bid, the Winning Bidder shall receive title to the applicable Group I Project free and clear of all monetary liens and encumbrances; and

5.      No bidder shall be allowed to submit or demand the acceptance of a "credit bid" based upon an existing claim or lien.

C.      Abandonment of Unsold Group I Project(s). If for any reason the Plan Trustee is unable to sell either or both Group I Projects on the Effective Date, they will be abandoned as of 11:59 p.m. on the Effective Date, and the Class 2.1 and 2.2 claimants shall be free to exercise any and all remedies that they may hold with respect to these Assets.

D.      Sale of Other Plan Trust Assets Subject To Liens of Class 2.1 and 2.2 Claimants. The Plan Trustee shall complete the sale of all other Plan Trust Assets that are subject to the Disputed Secured Claims and the Disputed Liens of the Class 2.1 and Class 2.2 claimants Liens and Disputed Claims, free and clear of such claims and liens, through a sale that satisfies the following conditions:

1.      Such Assets will be sold through a public auction after a commercially reasonable marketing and advertising effort of at least thirty (30) days duration;

2.      The Committee shall approve the terms of the sale;

3.      The sale will be held and completed within ninety (90) days of the Effective Date;

4.      No bidder may submit or demand the acceptance of a "credit bid" based upon an existing claim or lien; and

-65-

MAINDOCS-#163281-v1-SCC_DS_Group_I_Trustee_Debtors_6-17.DOC

1          5.       All Net Sale Proceeds generated from such sales shall be deposited

2    into the applicable Net Sales Proceeds Account with all Disputed Claims and Disputed Liens

3    attached thereto.

4          E.       Abandonment of Assets Other Than Group I Projects. All Asset(s), other

5    than the Litigation Claims (which shall be retained), that are not sold within ninety (90) days of the

6    Effective Date shall be deemed abandoned by the Plan Trust as of the ninety-first (91st) day after

7    the Effective Date, no payment shall be made to such Holder(s), and such Holder(s) shall be

8    allowed to pursue their respective rights and remedies against such assets under applicable law

9    subject to a Final Order determining the allowance and priority of the Disputed Claims and the

10   validity of the Disputed Liens in, including but not limited to, the Lehman Adversary Proceeding

11   and the Lehman Claims Objections.

12         F.       Distributions To The Class 2.1 and Class 2.2 Claimants. If the Plan Trustee

13   consummates a sale or otherwise liquidates the particular Asset(s) subject to the Class 2.1 and 2.2

14   Disputed Secured Claim(s) and/or Disputed Lien(s) during the Sales Period, as provided for above,

15   the Holder(s) of such Disputed Secured Claim shall receive a distribution to the extent of available

16   funds from the applicable Net Sale Proceeds Account(s) to the extent required by a Final Order

17   determining the allowance and priority of the Disputed Secured Claims and the validity, priority

18   and extent of the Disputed Liens in, including but not limited to, the Lehman Adversary

19   Proceeding and the Lehman Claims Objections.

20   **8.3.    The Plan's Treatment of Holders of Asserted Mechanic Lien Claims Against**

21           **the Group I Projects Subject to Lehman's Disputed Claims (Classes 3.1**

22           **Through 3.18).**

23   The treatment of the Holders of Allowed Classes 3.1 through 3.18 Secured Claims under

24   the Plan shall be as follows:

25         A.       The Holder(s)' rights are impaired under the Plan;

26         B.       The Holder(s) shall retain their respective underlying liens on the applicable

27   Group I Project(s), but shall forebear from pursuing their rights and remedies until the expiration

28   of the Sales Period;

-66-

1    C.    If the Plan Trustee is able to consummate a sale of the Group I Projects

2    subject to the liens asserted by the Holders of Class 3.1 through 3.18 claims  during the Sales

3    Period, such Holders shall receive a distribution, to the extent of available, of Net Sale Proceeds in

4    accordance with the priorities set forth under the Bankruptcy Code, subject to a Final Order(s)

5    resolving the allowance and priority of the applicable Lehman's Disputed Claim(s) and the validity

6    of the applicable Lehman Disputed Lien(s) in, including but not limited to, the Lehman Adversary

7    Proceeding; and

8    D.    If the Plan Trustee is unable to consummate a sale of the applicable Group I

9    Project(s) during the Sales Period, such projects shall be deemed abandoned by the Plan Trustee,

10    no payment shall be made to such Holder(s), and such Holder(s) shall be allowed to pursue their

11    respective rights against these project(s) under applicable California law.

12    **8.4.    The Plan's Treatment of Holders of Bond Indemnification Claims (Class 4.1).**

13    The rights of each holder of an Allowed Bond Indemnification Claim arising from a bond

14    issued with respect to a Group I Project, shall, to the extent such claim(s) are determined to be a

15    secured claim(s), be impaired under the Plan. Such claims shall receive the following treatment:

16    E.    Each such Allowed Secured Claim shall be placed in a separate class and

17    receive a separate ballot for voting purpose

18    F.    Each Holder(s) shall retain their respective underlying liens on the

19    applicable Group I Project(s), but shall forebear from pursuing their rights and remedies until the

20    expiration of the Sales Period;

21    G.    If the Plan Trustee is able to consummate a sale of the Group I Projects

22    subject to the liens asserted by the Holders of Class 4.1 claimants during the Sales Period, such

23    Holders shall receive a distribution, to the extent available, Net Sale Proceeds in accordance with

24    the priorities set forth under the Bankruptcy Code, subject to a Final Order(s) resolving the

25    allowance and priority of the applicable Lehman's Disputed Claim(s) and the validity of the

26    applicable Lehman Disputed Lien(s) in, including but not limited to, the Lehman Adversary

27    Proceeding and; and

28

-67-

1    H.    If the Plan Trustee is unable to consummate a sale of the applicable Group 1

2  Project(s) during the Sales Period, such projects shall be deemed abandoned by the Plan Trustee,

3  no payment shall be made to such Holder(s), and such Holder(s) shall be allowed to pursue their

4  respective rights against these project(s) under applicable California law.

5    **8.5.    The Plan's Treatment of Holders of Priority Claims (Class 5.1).**

6    The treatment of the Holders of Allowed Priority Claims under the Plan shall be as follows:

7    A.    The Holder(s) are unimpaired under the Plan; and

8    B.    The Holder(s) shall be paid from either the applicable Distribution

9  Account(s) (i) the full amount of such Allowed Priority Claim in Cash on the later of (x) the

10  Effective Date, (y) the date such Claim becomes an Allowed Priority Claim or (z) the date such

11  Allowed Priority Claim becomes payable in accordance with the terms governing such Allowed

12  Priority Claim, or (ii) upon such other less favorable terms as may be agreed to by such Holder and

13  the Plan Trustee.

14    **8.6.    The Plan's Treatment of Holders of General Unsecured Claims that are**

15    **Reliance Claims (Classes 6.1 and 6.2).**

16    The rights of Holders of Allowed Class 6.1 and 6.2 Claims are impaired under the Plan.

17  They have the right to choose between the following treatment options:

18    A.    Option A: A claimant in these classes *who votes in favor of the Plan*, and

19  who chooses Option A, will have the right to sell to LitCo all of the claimant's right, title and

20  interest in all Allowed Reliance Claims and all of the claimant's Litigation Rights against the

21  applicable Debtor, SunCal Affiliates, and the Lehman Entities, for the sum of fifty five cents

22  ($0.55) per dollar of allowed claim, payable in cash on the Effective Date, provided there is no stay

23  pending an appeal of the Confirmation Order, in full satisfaction of such claimant's Allowed

24  Reliance Claims; or

25    B.    Option B: A claimant in these classes who votes against the Plan, or who

26  votes in favor of the Plan, but does not choose Option A, or who does not vote on the Plan, will 1)

27  receive a minimum distribution in cash, on the Effective Date, equal to one percent (1%) of such

28  claimant's Allowed Claim, 2) retain such claimant's Reliance Claim(s) and rights against the

1   Lehman Entities and its right to receive such claimant's share, as determined by the Court, in the

2   benefits and recoveries resulting from a judgment or order entered in the Lehman Adversary

3   Proceeding, the State Court Action, or the Lehman Claims Objections, and 3) right to receive a

4   pro-rata share of any funds payable from the applicable Distribution Account(s), after payment in

5   full of all Post Confirmation Expenses, Allowed Administrative Claims, and Allowed Priority

6   Claims.

7       **8.7.    The Plan's Treatment of Holders of Allowed General Unsecured Claims that**

8                 **Are Not Reliance Claims (Classes 7.1 and 7.2).**

9           The rights of Holders of Allowed Class 7.1 and 7.2 Claims are impaired under the Plan.

10  Under the Plan, each claimant will 1) receive a minimum distribution in cash, on the Effective

11  Date, equal to one percent (1%) of such claimant's Allowed Claim, and 2) receive a pro-rata share

12  of any funds payable from the applicable Distribution Account(s), after payment in full of all Post

13  Confirmation Expenses, Allowed Administrative Claims, and Allowed Priority Claims and any

14  sums that the Bankruptcy Court determines are payable to the Holders of Allowed Class 6.1 and

15  6.2 Claims from either the Claim Reduction Amounts or on account of a judgment in the Lehman

16  Adversary Proceeding.

17      **8.8.    The Plan's Treatment of Holders of Allowed Interests.**

18          The Interests of the Holders in Class 8.1 and 8.2 are impaired under the Plan. All such

19  Interests shall be cancelled as of the Effective Date and no distribution shall be made to these

20  Holders on account of such Interest(s).

21                                          **IX.**

22                  **ACCEPTANCE OR REJECTION OF THE PLAN**

23      **9.1.    Introduction.**

24          PERSONS OR ENTITIES CONCERNED WITH CONFIRMATION OF THE PLAN

25  SHOULD CONSULT WITH THEIR OWN ATTORNEYS BECAUSE THE LAW ON

26  CONFIRMING A PLAN OF REORGANIZATION IS VERY COMPLEX. The following

27  discussion is intended solely for the purpose of alerting readers about basic confirmation issues,

28  which they may wish to consider, as well as certain deadlines for filing Claims. The Debtors

1 | cannot represent that the discussion contained below is a complete summary of the law on this
2 | topic.

3 | Many requirements must be met before the Court can confirm the Plan. Some of the
4 | requirements include that the Plan must be proposed in good faith, acceptance of the Plan, whether
5 | the Plan pays creditors at least as much as creditors would receive in a Chapter 7 liquidation, and
6 | whether the Plan is feasible. The requirements described herein are <u>not</u> the only requirements for
7 | confirmation.

8 | **9.2.    Who May Object to Confirmation of the Plan.**

9 | Any party in interest may object to the confirmation of the Plan, but as explained below not
10 | everyone is entitled to vote to accept or reject the Plan.

11 | **9.3.    Who May Vote to Accept/Reject the Plan.**

12 | A Holder of a Claim or Interest has a right to vote for or against the Plan if that Holder of
13 | the Claim or Interest has a Claim which is both (1) Allowed or Allowed for voting purposes and
14 | (2) Classified in an impaired Class. The votes will be tabulated on a Debtor by Debtor basis.

15 | **9.4.    What Is an Allowed Claim/Interest.**

16 | As noted above. a Holder of a Claim or Interest must first have an Allowed Claim or
17 | Allowed Interest to vote.

18 | **9.5.    What Is an Impaired Class.**

19 | A Class is impaired if the Plan alters the legal, equitable, or contractual rights of the Claims
20 | or Interests in that Class, other than the right to accelerate the Claim upon certain kinds of defaults.
21 | In this case, the Debtors believe that all Classes, except for Class 5.1 are impaired.

22 | **9.6.    Who Is Not Entitled to Vote.**

23 | The following four types of Claims are <u>not</u> entitled to vote: (1) Claims that have been
24 | disallowed; (2) Claims in unimpaired Classes; (3) Claims entitled to priority pursuant to
25 | Bankruptcy Code Sections 507(a)(2) or (a)(3) and Claims in Classes that do not receive or retain
26 | any value under the Plan. Claims in unimpaired Classes are not entitled to vote because such
27 | Classes are deemed to have accepted the Plan. Claims entitled to priority pursuant to Bankruptcy
28 | Code Section 507(a)(8) are not entitled to vote because such Claims are not placed in Classes and

MAINDOCS-#163281-v1-SCC_DS_Group_1_Trustee_Debtors_6-17.DOC