1  PAUL J. COUCHOT -- State Bar No. 131934
   WINTHROP COUCHOT, P.C.
   660 Newport Center Drive, Fourth Floor
2  Newport Beach, CA 92660
   Telephone: (949) 720-4100
3  Facsimile: (949) 720-4111
   General Insolvency Counsel for Palmdale Hills
4  Property, LLC et. al. (the "Voluntary Debtors")

5  RONALD RUS - State Bar No. 67369
   JOEL S. MILIBAND - State Bar No. 77438
   RUS MILIBAND & SMITH
6  A PROFESSIONAL CORPORATION
   2211 Michelson Drive, Seventh Floor
7  Irvine, California 92612
   Telephone: (949) 752-7100
8  Facsimile: (949) 252-1514
   Counsel for SunCal Management LLC and
9  SCC Acquisitions Inc.

10              **UNITED STATES BANKRUPTCY COURT**
                **CENTRAL DISTRICT OF CALIFORNIA**
11                      **Santa Ana Division**

    In re
12  PALMDALE HILLS PROPERTY, AND ITS
    RELATED DEBTORS,
13
                Joint Administered Debtors and
14                Debtors-in-Possession

15  Affects:

16  ☐ All Debtors
17  ☐ Palmdale Hills Property, LLC
    ☐ SunCal Beaumont Heights, LLC
18  ☐ SCC/Palmdale, LLC
    ☐ SunCal Johannson Ranch, LLC
19  ☐ SunCal Summit Valley, LLC
20  ☐ SunCal Emerald Meadows LLC
    ☐ SunCal Bickford Ranch, LLC
21  ☐ Acton Estates, LLC
22  ☐ Seven Brothers LLC
    ☐ SJD Partners, Ltd.
23  ☐ SJD Development Corp.
24  ☐ Kirby Estates, LLC
    ☐ SunCal Communities I, LLC
25  ☐ SunCal Communities III, LLC
26  ☐ SCC Communities LLC
    ☐ North Orange Del Rio Land, LLC
27  ☐ Tesoro SF LLC
28

Case No. 8:08-bk-17206-ES

Jointly Administered With Case Nos.
8:08-bk-17209-ES; 8:08-bk-17240-ES;
8:08-bk-17224-ES; 8:08-bk-17242-ES;
8:08-bk-17225-ES; 8:08-bk-17245-ES;
8:08-bk-17227-ES; 8:08-bk-17246-ES;
8:08-bk-17230-ES; 8:08-bk-17231-ES;
8:08-bk-17236-ES; 8:08-bk-17248-ES;
8:08-bk-17249-ES; 8:08-bk-17573-ES;
8:08-bk-17574 ES; 8:08-bk-17575-ES;
8:08-bk-17404-ES; 8:08-bk-17407-ES;
8:08-bk-17408-ES; 8:08-bk-17409-ES;
8:08-bk-17458-ES; 8:08-bk-17465-ES;
8:08-bk-17470-ES; 8:08-bk-17472-ES;
and 8:08-bk-17588-ES

Chapter 11 Proceedings

**FIRST AMENDED DISCLOSURE
STATEMENT DESCRIBING FIRST
AMENDED CHAPTER 11 PLANS FILED
BY SUNCAL PLAN PROPONENTS IN
THE CHAPTER 11 CASES OF SUNCAL
OAK VALLEY, LLC, SUNCAL
HEARTLAND, LLC, DELTA COVES
VENTURE LLC AND LBL-SUNCAL
NORTHLAKE, LLC [GROUP III:
TRUSTEE DEBTORS]**

Date:      July 22, 2011
Time:      11:00 a.m.
Place:     Courtroom 5A

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Continued from Previous Page*

☒ LBL-SunCal Oak Valley, LLC
☒ SunCal Heartland, LLC
☒ LBL-SunCal Northlake, LLC
☐ SunCal Marblehead, LLC
☐ SunCal Century City, LLC
☐ SunCal PSV, LLC
☒ Delta Coves Venture, LLC
☐ SunCal Torrance, LLC
☐ SunCal Oak Knoll, LLC

## TABLE OF CONTENTS

**PAGE**

I.    INTRODUCTION .................................................................................... 2

II.   DEFINITIONS AND RULES OF INTERPRETATION ......................... 4
      2.1   Definitions .................................................................................. 4
      2.2   Rules of Construction ................................................................ 24
      2.3   Exhibits ...................................................................................... 25

III.  PLAN CONFIRMATION DEADLINES .............................................. 26
      3.1   Time and Place of the Confirmation Hearing ........................... 26
      3.2   Deadline for Voting for or Against the Plan ............................. 27
      3.3   Deadline for Objecting to the Confirmation of the Plan ........... 27
      3.4   Identity of Person to Contact for More Information
            Regarding the Plan ..................................................................... 27
      3.5   Disclaimer .................................................................................. 28

IV.   FACTUAL BACKGROUND OF THE DEBTORS .............................. 29
      4.1   The Formation of the Debtors and the Projects ......................... 29
            4.1.1  Overview of the Debtors and Their Projects ................... 30
            4.1.2  The Debtors' Primary Secured Creditors and
                   Their Disputed Claims .................................................... 30
            4.1.3  The Lehman Disputed Claims and Liens ........................ 30
            4.1.4  A Summary of All of the Alleged Claims
                   Against the Debtors ......................................................... 30
            4.1.5  Summary of the Group III: Trustee Debtors Cash ......... 31
      4.2   Factual Circumstances Leading to the Filing of the
            Debtors' Chapter 11 Cases ......................................................... 32
            4.2.1  Introduction .................................................................... 32
            4.2.2  Background on the SunCal Companies ........................... 33
            4.2.3  The Origins of the SunCal/Lehman Joint Venture .......... 33
            4.2.4  Lehman's Effective Control over the Management
                   of the Debtors and Promises of Ongoing Funding ......... 34
            4.2.5  The 2008 Restructuring Agreement ................................ 35
            4.2.6  The Lehman Lenders Hire Radco .................................... 37
            4.2.7  The Lehman Lenders' Failure to Close on the
                   Settlement Agreement ..................................................... 37
            4.2.8  The Lehman Lenders' Undisclosed Sale of Most
                   of the Debtors' Loans ...................................................... 38
            4.2.9  Lehman's Foreclosure Sale and Purchase of the
                   Pacific Point Project ........................................................ 39
            4.2.10 Alvarez and Marsal Take Over Control of the
                   Lehman Entities After the Chapter 11 Filing of
                   LBHI and LCPI ................................................................ 40
      4.3   The Debtors' Potential Preferential Transfers ........................... 1

MAINDOCS-_163443-v1-SCC_DS_Group_3_TD FINAL.doc

## TABLE OF CONTENTS

### (Continued)

PAGE

V.    SIGNIFICANT EVENTS IN THE DEBTORS' CHAPTER 11 CASES ................... 42
      5.1    Voluntary Debtors ........................................................................... 42
             5.1.1   Joint Administration of the Voluntary Debtors
                     and the Trustee Debtors .................................................. 43
             5.1.2   The Voluntary Debtors Court Employed Professionals .................... 44
             5.1.3   LCPI's Motions for Relief from the Automatic Stay
                     Against Certain of the Voluntary Debtors' Projects
                     and Related Appeals ........................................................ 44
      5.2    The Trustee Debtors and Their Professionals ................................. 44
      5.3    The Debtors' Various Motions Relating to Financing for the
             Projects and to Pay Professional Fees ......................................... 45
             5.3.1   The Voluntary Debtors' Initial Motion for Surcharge
                     and Use of Cash Collateral .............................................. 44
             5.3.2   The Lehman Administrative Loans ..................................... 44
             5.3.3   The Voluntary Debtors' Agreements with the Lehman
                     Entities for Use of Alleged Cash Collateral to Maintain
                     the Properties and to Pay Professional Fees ......................... 45
      5.4    The Debtors' Disputes and Claims Against the Lehman Entities ................. 46
             5.4.1   The Lehman Adversary Proceeding ..................................... 46
                     5.4.1.1   Equitable Subordination ................................... 47
                     5.4.1.2   The Fraudulent Transfer Claims ......................... 47
                     5.4.1.3   The Preference Claims ..................................... 48
                     5.4.1.4   The Debtors' Motions to Strike the Claims and
                               Pleadings Arising from the Sold Loans to Fenway
                               Capital and Related Appeals ............................... 49
                     5.4.1.5   The Debtors' Motion Pursuant to Section 506(d) and
                               the 506(d) Valuation Stipulation ......................... 50
                     5.4.1.6   The Debtors' 502(d) Objections .......................... 50
                     5.4.1.7   The Lehman Claim Objections. ........................... 51
                     5.4.1.8   The Debtors' Potential Post-Petition Claims
                               Against Lehman and Their Agents ......................... 52
      5.5    The Lehman Fenway Claims Transaction, Compromise
             Motion Filed By the Lehman Entities ........................................... 53
             5.5.1   Lehman Entities' and Fenway's Proposed Claims Transaction ........ 53

MAINDOCS-_163443-v1-SCC_DS_Group_3_TD FINAL.doc

## TABLE OF CONTENTS

### (Continued)

PAGE

5.6   The Debtors' Motion for a Stay to Suspend Certain Lehman Actions .................................................................... 54

5.7   The Debtors' Other Litigation with Non-Lehman Related Parties ............... 54

    5.7.1   The Debtors' Failed Preliminary Injunction Motion Against the Holders of Bond Claims .............................. 54

    5.7.2   The Contractors' Successful Motions for Relief from Stay to Pursue the Bond Claims.................................... 55

    5.7.3   The Non-Lehman Related Primary Secured Lenders' Successful Motions for Relief from Stay ..................... 55

    5.7.4   Arch's Motion for Relief from Stay.................................. 56

    5.7.4   Shea's Successful Motion for Relief from Stay................ 56

    5.7.6   Bond Safeguard Motion ................................................... 56

VI.   TREATMENT OF UNCLASSIFIED CLAIMS ......................................... 56

6.1   Introductions ......................................................................... 56

6.2   Treatment of Allowed Administrative Claims............................ 57

6.3   Treatment and Repayment of the Lehman Administrative Loan(s).............. 57

6.4   Repayment of Alleged Administrative Claims Other than the Lehman Administrative Loans............................ 57

6.5   Administrative Claims Bar Date .............................................. 58

6.6   Treatment of Priority Unsecured Tax Claims............................ 58

VII.   CLASSIFICATION OF CLAIMS AND INTERESTS ............................ 58

VIII.   THE PLAN'S TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS ........................................................................... 64

8.1   The Plan's Treatment of Holders of Allowed Secured Real Property Tax Claims on Real Properties Subject to Deeds of Trust Arising from Lehman's Disputed Secured Claims and Disputed Liens (Classes 1.1 Through 1.14)................ 64

8.2   The Plan's Treatment of Holders of Lehman's Disputed Claim(s) and Disputed Lien(s) (Classes 2.1 Through 2.4)............ 65

-iii-

# TABLE OF CONTENTS

### (Continued)

PAGE

| | | | |
|---|---|---|---|
| | 8.3 | The Plan's Treatment of Holders of Asserted Mechanic Lien Claims Against the Debtors' Projects Subject to Lehman's Disputed Claims (Classes 3.1 Through 3.29) | 67 |
| | 8.4 | The Plan's Treatment of Holders of Priority Claims (Classes 4.1 Through 4.2) | 68 |
| | 8.5 | The Plan's Treatment of Holders of General Unsecured Claims that Are Reliance Claims (Classes 5.1 Through 8.4) | 69 |
| | 8.6 | The Plan's Treatment of Holders of Allowed General Unsecured Claims that Are Not Reliance Claims (Classes 6.1 Through 6.4) | 60 |
| | 8.7 | The Plan's Treatment of Holders of Allowed Interests | 70 |
| IX. | | ACCEPTANCE OR REJECTION OF THE PLAN | 70 |
| | 9.1 | Introduction | 70 |
| | 9.2 | Who May Object to Confirmation of the Plan | 71 |
| | 9.3 | Who May Vote to Accept/Reject the Plan | 71 |
| | 9.4 | What Is an Allowed Claim/Interest | 71 |
| | 9.5 | What Is an Impaired Class | 71 |
| | 9.6 | Who Is Not Entitled to Vote | 71 |
| | 9.7 | Who Can Vote in More than One Class | 72 |
| | 9.8 | Votes Necessary for a Class to Accept the Plan | 72 |
| | 9.9 | Treatment of Nonaccepting Classes | 72 |
| | 9.10 | Request for Confirmation Despite Nonacceptance by Impaired Class(es) | 73 |
| X. | | MEANS OF EXECUTION AND IMPLEMENTATION OF THE PLAN | 73 |
| | 10.1 | Introduction | 73 |
| | 10.2 | Removal of Trustee | 74 |
| | 10.3 | Transfer of Property To The Plan Trust | 74 |
| | 10.5 | Purpose of the Plan Trust Assets After Effective Date | 75 |
| | 10.6 | Operations of the Plan Trust | 75 |
| | 10.7 | The Plan Trustee | 75 |
| | 10.8 | Payment of Trust Expenses | 75 |
| | 10.9 | Plan Distribution System | 75 |
| | 10.10 | Claims Estimation Rights | 76 |
| | 10.11 | No Payment of Transfer-Related Fees to the United States Trustee | 76 |
| | 10.12 | NO PAYMENT OF TRANSFER-RELATED FEES TO THE TRUSTEE | 76 |
| | 10.13 | BOOKS AND RECORDS OF TRUST | 76 |
| | 10.14 | LIMITATIONS ON LIABILITY | 77 |
| | 10.15 | FEDERAL INCOME TAX TREATMENT OF THE HOLDERS OF PLAN TRUST BENEFICIAL INTERESTS | 77 |
| | 10.16 | TERMINATION OF THE TRUST | 78 |
| | 10.17 | EXEMPTION FROM CERTAIN TRANSFER TAXES | 79 |
| | 10.18 | TAX CONSEQUENCE OF THE PLAN | 79 |

MAINDOCS_163443-v1-SCC_DS_Group_3_TD FINAL.doc

| | | |
|---|---|---|
| 10.19 | THE PLAN SPONSOR | 79 |
| 10.20 | ACQUISITIONS' FUNDING OBLIGATIONS PURSUANT TO THE ACQUISITIONS ADMINISTRATIVE LOAN | 79 |
| 10.21 | THE COMMITTEE. | 80 |
| | 10.21.1 DUTIES AND POWERS. | 80 |
| | 10.21.2 DISSOLUTION OF COMMITTEE | 80 |
| 10.22 | LITIGATION CLAIMS | 80 |
| 10.23 | Collection of Litigation Recoveries | 81 |

| | | |
|---|---|---|
| XI | RISK FACTORS | 82 |

| | | |
|---|---|---|
| XII. | DISTRIBUTIONS | 83 |
| 11.1 | Distribution Agent | 83 |
| 11.2 | Distributions | 83 |
| | 11.2.1 Dates of Distributions | 83 |
| | 11.2.2 Limitation on Liability | 83 |
| 11.3 | Old Instruments and Securities | 83 |
| | 11.3.1 Surrender and Cancellation of Instruments and Securities | 83 |
| | 11.3.2) Cancellation of Liens | 83 |
| 11.4 | De Minimis Distributions and Fractional Shares | 83 |
| 11.5 | Delivery of Distributions | 83 |
| 11.6 | Undeliverable Distributions | 83 |
| 11.7 | Disposition of Unclaimed Property | 83 |

| | | |
|---|---|---|
| XIII. | OBJECTION TO CLAIMS AND DISPUTE CLAIMS | 83 |
| 12.1 | Standing for Objections to Claims | 84 |
| 12.2 | Treatment of Disputed Claims and Disputed Liens | 84 |
| | 12.2.1 No Distribution Pending Allowance | 85 |
| | 12.2.2 Distribution After Allowance | 85 |

| | | |
|---|---|---|
| XIV. | EXECUTORY CONTRACTS AND UNEXPIRED LEASES | 86 |
| 13.1 | Executory Contracts Being Assumed | 86 |
| 13.2 | Executory Contracts Being Rejected | 86 |
| 13.3 | Bar Date for Rejection Damages | 86 |
| 13.4 | Changes in Rates Subject to Regulatory Commission Approval | 86 |

| | | |
|---|---|---|
| XV. | BEST INTEREST OF CREDITORS TEST AND PLAN FEASIBILITY | 87 |
| 14.1 | Best Interest Test | 87 |
| 14.2 | Feasibility | 87 |

| | | |
|---|---|---|
| XVI. | LIMITATION OF LIABILITY | 87 |
| 15.1 | No Liability for Solicitation or Participation | 87 |

| | | |
|---|---|---|
| XVII. | CONDITIONS TO CONFIRMATION AND EFFECTIVENESS OF THE PLAN | 89 |
| 16.1 | Conditions Precedent to Plan Confirmation | 89 |
| 16.2 | Conditions Precedent to Plan Effectiveness | 89 |

**TABLE OF CONTENTS** PAGE

**(Continued)**

XVIII. RETENTION OF JURISDICTION ................................................................. 90

XIX  MODIFICATION OR WITHDRAWAL OF THE PLAN ...................................... 90
  18.1  Modification of Plan ......................................................... 90
  18.2  Nonconsensual Confirmation.................................................. 90

XX.  MISCELLANEOUS .................................................................. 90
  19.1  Payment of Statutory Fees ................................................... 90
  19.2  Payment Dates.............................................................. 90
  19.3  Headings .................................................................. 90
  19.4  Other Documents and Actions................................................ 90
  19.5  Notices ................................................................... 90
  19.6  Governing Law ............................................................. 91
  19.7  Binding Effect ............................................................ 91
  19.8  Successors and Assigns..................................................... 91
  19.9  Severability of Plan Provisions ............................................ 91
  19.10 No Waiver.................................................................. 92
  19.11 Inconsistencies ........................................................... 92
  19.12 Exemption from Certain Transfer Taxes and Recording Fees.................... 92
  19.13 Post-Confirmation Status Report ........................................... 93
  19.14 Post-Confirmation Conversion/Dismissal .................................... 93
  19.15 Final Decree .............................................................. 93

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

MAINDOCS-_163443-v1-SCC_DS_Group_3_TD.FINAL.doc

**I.**

**INTRODUCTION**

This DISCLOSURE STATEMENT[1] is filed by the Voluntary Debtors and Acquisitions, as the SunCal Plan Proponents, in the Chapter 11 Cases of the following Debtors:

> **SunCal Oak Valley, LLC**
> **SunCal Heartland, LLC**
> **LBL-SunCal Northlake, LLC**
> **Delta Coves Venture, LLC**

(the "Group III: Trustee Debtors"). In addition to being one of the proponents of the Plan, Acquisitions is the Plan Sponsor, it will also serve as the Plan Trustee of the Plan Trust and as the Distribution Agent, if the Plan is confirmed.

Chapter 11 allows debtors-in-possession, Chapter 11 trustees, and under some circumstances, creditors, interest holders and others parties in interest, to propose a Chapter 11 plan. As stated, the SunCal Plan Proponents are the proponents of the Plan sent to you in the same envelope as this Disclosure Statement. This document summarizes the contents of the Plan, certain information relating to the Plan and the process the Bankruptcy Court follows in determining whether or not to confirm the Plan.

In summary, the Plan provides for sale of the Oak Valley Project, the Heartland Project, the Delta Coves Project, and the Northlake Project (the "Group III Projects"), and for the liquidation of all other assets of the Group III: Trustee Debtors. The Net Proceeds from these sales will then be distributed to Creditors holding Allowed Claims in accordance with their rights and priorities under the bankruptcy code and under other applicable law.

**AS EXPLAINED IN THE DEFINITION OF THE TERM "EFFECTIVE DATE," WHICH IS THE DATE ON WHICH THE PLAN BECOMES EFFECTIVE, NO ACTION PROVIDED FOR IN THE PLAN SHALL BE TAKEN AGAINST EITHER LEHMAN COMMERCIAL PAPER, INC. ("LCPI") OR LEHMAN BROTHERS HOLDINGS, INC. ("LBHI") THAT WOULD HAVE THE EFFECT OF VIOLATING ANY APPLICABLE**

---

[1] All defined terms used herein have the same meanings as set forth in Article II herein and Exhibit "1" attached hereto.

MAINDOCS-_163443-v1-SCC_DS_Group_3_TD FINAL.doc

1  AUTOMATIC STAY THAT MAY EXIST IN THEIR CHAPTER 11 CASES. ANY SUCH

2  ACTION WILL ONLY PROCEED AFTER ANY APPLICABLE STAY IS EITHER

3  LIFTED OR DEEMED INAPPLICABLE.

4       The same Plan is being filed in the Cases of all three Group III: Trustee Debtors, each Plan

5  is independent of the others. The Creditors in each Case will determine, subject to Court approval,

6  whether the Plan will be approved in their Case. Accordingly, the Plan may be confirmed in the

7  Cases of some of the Group III: Trustee Debtors, but not in others.

8       The Lehman Lenders have filed a competing and alternative plan of reorganization in the

9  Cases. Accordingly, the creditors holding claims against the Debtors will have the opportunity to

10  vote for one plan or the other, or they can vote for both plans and allow the Court to decide which

11  plan should be approved. The Debtors believe that the aggregate benefits offered under their Plan

12  are superior to what is being offered to Creditors under the Lehman Lenders' competing Plan.

13       **READ THIS DISCLOSURE STATEMENT CAREFULLY IF YOU WANT TO**

14  **KNOW ABOUT**:

15       ➢  **WHO CAN VOTE OR OBJECT TO THE PLAN;**

16       ➢  **HOW YOUR CLAIM IS TREATED;**

17       ➢  **HOW THIS TREATMENT COMPARES TO WHAT YOUR CLAIM WOULD**

18            **RECEIVE IN LIQUIDATION;**

19       ➢  **A BRIEF HISTORY OF THE DEBTORS AND SIGNIFICANT EVENTS**

20            **DURING THEIR CHAPTER 11 BANKRUPTCY PROCEEDING;**

21       ➢  **WHAT FACTORS THE BANKRUPTCY COURT WILL CONSIDER TO**

22            **DECIDE WHETHER OR NOT TO CONFIRM THE PLAN;**

23       ➢  **WHAT IS THE EFFECT OF CONFIRMATION; AND**

24       ➢  **WHETHER THE PLAN IS FEASIBLE.**

25       This Disclosure Statement cannot tell you everything about your rights.  You should

26  consider consulting your own attorney to obtain more specific advice on how the Plan will affect

27  you and your best course of action.

28

MAINDOCS-_163443-v1-SCC_DS_Group_3_TD FINAL.doc

1    Be sure to read the Plan as well as this Disclosure Statement. If there are any

2   inconsistencies between the Plan and this Disclosure Statement, the Plan provisions will govern.

3    The Bankruptcy Code requires a Disclosure Statement to contain "adequate information"

4   concerning the Plan. On _____, 2011, the Bankruptcy Court entered an order approving this

5   Disclosure Statement, based upon a finding that this document contained "adequate information"

6   to enable parties affected by the Plan to make an informed judgment regarding the Plan. Any party

7   can now solicit votes for or against the Plan.

8                                        II.

9                    **DEFINITIONS AND RULES OF INTERPRETATION**

10       **2.1    Definitions.**

11       The following defined terms are used in this Disclosure Statement. Any capitalized term

12  that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall

13  have the meaning ascribed to that term in the Bankruptcy Code or Bankruptcy Rules.

14           2.1.1    Acquisitions. SCC Acquisitions, Inc., a California corporation, an indirect

15  parent company of all of the Debtors, a purported obligor on the Bond Claims, a Creditor of all of

16  the Debtors, a SunCal Plan Proponent, the Plan Sponsor and the proposed Plan Trustee.

17           2.1.2    Administrative Claim(s). Any Claim against a Group III Debtor or its Estate

18  incurred after the applicable Petition Date for the applicable Group III: Trustee Debtor but before

19  the Confirmation Date, for any cost or expense of administration of the Case of the applicable

20  Group III: Trustee Debtor, which Claim is entitled to priority under section 507(a)(2) or (3) of the

21  Bankruptcy Code, including, without limitation, any fee or charge assessed against an Estate of a

22  Group III: Trustee Debtor under section 1930 of Title 28 of the United States Code.

23           2.1.3    Administrative Claims Bar Date. The last date fixed by the Plan for the

24  filing of Proof of Claims or requests for payment of Administrative Claims. Under the Plan, the

25  Administrative Claims Bar Date shall be the first business day after the sixtieth (60th) day after the

26  Confirmation Date.

27           2.1.4    Affiliate. The term shall have the meaning set forth under Section 101(2),

28  including, but not limited to, as to any Person, any other Person that directly or indirectly owns or

-4-

1  controls, is owned or controlled by, or is under common ownership or control with, such Person.

2  The term "control" (including, with correlative meanings, the terms "controlled by" and "under

3  common control with"), as applied to any Person, means the possession, direct or indirect, of the

4  power to direct or cause the direction of the management and policies of such Person, whether

5  through the ownership of voting securities or other equity ownership interest, by contract or

6  otherwise.

7        2.1.5   Allowed.  When used to describe Claim(s) or Interest(s), such Claim(s) or

8  Interest(s), to the extent that it or they are "Allowed Claim(s)" or "Allowed Interest(s)."

9        2.1.6   Allowed Amount shall mean:

10        A.   With respect to any Administrative Claim (i) if the Claim is based

11  upon a Fee Application, the amount of such Fee Application that has been approved by a Final

12  Order of the Bankruptcy Court; (ii) if the Claim is based upon any indebtedness or obligation

13  incurred in the ordinary course of business of the Group III: Trustee Debtors and is not otherwise

14  subject to an Administrative Claim Bar Date, the amount of such Claim that has been agreed to by

15  the Group III: Trustee Debtors and such creditor, failing which, the amount thereof as fixed by a

16  Final Order of the Bankruptcy Court; or (iii) if the Holder of such Claim was required to file and

17  has filed proof thereof with the Bankruptcy Court prior to an Administrative Claim Bar Date,

18  (1) the amount stated in such proof if no objection to such Proof of Claim is interposed within the

19  applicable period of time fixed by the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy

20  Court, or (2) the amount thereof as fixed by Final Order of the Bankruptcy Court if an objection to

21  such proof was interposed within the applicable period of time fixed by the Bankruptcy Code, the

22  Bankruptcy Rules or the Bankruptcy Court. The Allowed Amount of any Administrative Claim

23  which is subject to an Administrative Claims Bar Date and not filed by the applicable

24  Administrative Claims Bar Date shall be zero, and no distribution shall be made on account of any

25  such Administrative Claim;

26        B.   with respect to any Claim which is not an Administrative Claim

27  (the "Other Claim"): (i) if the Holder of such Other Claim did not file proof thereof with the

28  Bankruptcy Court on or before the Claims Bar Date, the amount of such Claim as listed in the

1  Group III: Trustee Debtors'' Schedules as neither disputed, contingent nor unliquidated; or (ii) if

2  the Holder of such Claim has filed proof thereof with the Bankruptcy Court on or before the

3  Claims Bar Date, (a) the amount stated in such proof if no objection to such Proof of Claim was

4  interposed within the applicable period of time fixed by the Bankruptcy Code, the Bankruptcy

5  Rules, the Plan or the Bankruptcy Court, or (b) the amount thereof as fixed by Final Order of the

6  Bankruptcy Court if an objection to such proof was interposed within the applicable period of time

7  fixed by the Bankruptcy Code, the Bankruptcy Rules, the Plan or the Bankruptcy Court. The

8  Allowed Amount of any Other Claim which is not Filed by the applicable Claims Bar Date, is not

9  listed on the Group III: Trustee Debtors' Schedules or is listed as disputed, unliquidated,

10  contingent or unknown, and is not allowed under the terms of the plan shall be zero, and no

11  distribution shall be made on account of any such Claim; and

12               C.     with respect to any Interest, (i) the amount provided by or

13  established in the records of the Group III: Trustee Debtors at the Confirmation Date, provided,

14  however, that a timely filed proof of Interest shall supersede any listing of such Interest on the

15  records of the Group III: Trustee Debtors; or (ii) the amount stated in a proof of Interest Filed prior

16  to the Confirmation Date if no objection to such Interest was filed prior to the Confirmation Date

17  or such later date as the Bankruptcy Court allows; or (iii) the amount of such Interest as fixed by a

18  Final Order of the Bankruptcy Court.

19               2.1.7     Allowed Claim.  Except as otherwise provided in the Plan (including with

20  respect to those Classes for which the amount of the Allowed Claims is specified by the Plan), a

21  Claim to the extent (and only to the extent) of the Allowed Amount of such Claim.

22               2.1.8     Allowed Interest.  Any Interest to the extent, and only to the extent, of the

23  Allowed Amount of such Interest.

24               2.1.9     Allowed Secured Claims.  All or a portion of a Secured Claim that is an

25  Allowed Claim.

26               2.1.10    Allowed Unsecured Claim. All or a portion of an Unsecured Claim that is

27  an Allowed Claim.

28

1                2.1.11    Assets.  All assets that are property of the Debtor(s) pursuant to

2   Bankruptcy Code Section 541.

3                2.1.12    Arch.  Arch Insurance Company, a Bond Issuer.

4                2.1.13    Available Cash.  Each Group III: Trustee Debtors' Cash deposited into the

5   applicable Distribution Account(s) on or after the Effective Date that is available for making

6   Distributions under the Plan to Holders of Allowed Administrative, Priority, and General

7   Unsecured Claims.  The Available Cash shall consist of the respective Group III: Trustee Debtors'

8   cash on hand as of the Effective Date that is not subject to a Disputed Lien, proceeds of Net

9   Litigation Recoveries that are not subject to a Disputed Lien, Net Sales Proceeds that become

10   Available Cash upon the disallowance of a Disputed Claim or avoidance of a Disputed Lien

11   purportedly encumbering such Cash, or proceeds from the Acquisitions Administrative Loan.  All

12   Available Cash shall be deposited into the applicable Distribution Account(s).  Available Cash

13   shall not include Net Sale Proceeds in the Net Sales Proceeds Account where the Disputed Secured

14   Claims are Allowed but subject to an equitable subordination judgment.

15                2.1.14    Avoidance Actions.  All Claims and defenses to Claims accruing to the

16   Group III: Trustee Debtors and their Estates under Bankruptcy Code Sections 506(d), 510(c), 541,

17   544, 545, 547, 548, 549, 550, or 551.

18                2.1.15    Bankruptcy Code.  The United States Bankruptcy Code.

19                2.1.16    Bankruptcy Court.  The United States Bankruptcy Court for the Central

20   District of California, having jurisdiction over the Cases and, to the extent of any withdrawal of the

21   reference made pursuant to Section 157 of title 28 of the United States Code, the United States

22   District Court for the Central District of California; or, in the event such courts cease to exercise

23   jurisdiction over the Cases, such court or unit thereof that exercises jurisdiction over the Cases in

24   lieu thereof.

25                2.1.17    Bankruptcy Rules.  Collectively, as now in effect or hereafter amended

26   and as applicable to the Cases, (i) the Federal Rules of Bankruptcy Procedure, and (ii) the Local

27   Bankruptcy Rules and General Orders applicable to cases pending before the Bankruptcy Court.

28

MAINDOCS-_163443-v1-SCC_DS_Group_3_TD FINAL.doc

1         2.1.18    <u>Beneficial Interests</u>. means, collectively, the interests of the holders of

2    Allowed Unsecured Claims in the Plan Trust and in all distributions to be made by the Plan Trust

3    on account of Allowed Unsecured Claims. The Beneficial Interests (a) shall be noted in the books

4    and records of the Plan Trust, (b) shall not be evidenced by a writing, and (c) may not be

5    transferred, sold, assigned or transferred by will, intestate succession or operation of law.

6         2.1.19    <u>Bond Claim(s)</u>. Any Claim against the Debtor(s) and a Bond Issuer under

7    various payment or performance bonds, and/or any claims of Bond Issuer(s) against the Debtor(s)

8    under various payment or performance bonds.

9         2.1.20    <u>Bond Claimant</u>. Holder(s) of a Bond Claim.

10         2.1.21    <u>Bond Indemnification Claim</u>. All Claims by Bond Safeguard, Lexon, and

11    Arch for indemnification for payment by Bond Safeguard, Lexon and Arch of Bond Claims with

12    respect to the Group III: Trustee Debtors' Projects.

13         2.1.22    <u>Bond Indemnitors</u>. The individuals and entities that are allegedly liable on

14    the Bond Indemnification Claims, including, allegedly, all of the Debtors, Acquisitions, all

15    Affiliates of Acquisitions, and Elieff.

16         2.1.23    <u>Bond Issuer(s)</u>. Bond Safeguard, Lexon and Arch in their capacities as

17    issuers and sureties for payment and performance bonds for the benefit of certain of the Debtors.

18         2.1.24    <u>Bond Safeguard</u>. Bond Safeguard Insurance Company, a Bond Issuer.

19         2.1.25    <u>Business Day</u>. Any day, other than a Saturday, a Sunday or a "legal

20    holiday," as defined in Bankruptcy Rule 9006(a).

21         2.1.26    <u>Cases</u>. The Chapter 11 cases of the Group III: Trustee Debtors pending

22    before the Bankruptcy Court.

23         2.1.27    <u>Cash</u>. Currency of the United States of America and cash equivalents,

24    including, but not limited to, bank deposits, immediately available or cleared checks, drafts, wire

25    transfers and other similar forms of payment.

26         2.1.28    <u>CFD Bonds</u>. Community facilities district bonds issued by a

27    governmental entity.

28

-8-

2.1.29 <u>Chapter 11 Trustee</u>. Steven M. Speier, the duly appointed trustee of the Trustee Debtors in their pending Chapter 11 Cases.

2.1.30 <u>Claim</u>. This term shall have the broadest possible meaning under Section 101(5) of the Bankruptcy Code, and shall include (a) any right to payment from any of the Group III: Trustee Debtors, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, or (b) any right to an equitable remedy for breach of performance if such breach gives rise to a right of payment from any of the Group III: Trustee Debtors, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

2.1.31 <u>Claims Bar Date</u>. For any Claim other than an Administrative Claim, March 31, 2009, which was established by the Bankruptcy Court as the last date for creditors to file Proof of Claims with the Bankruptcy Court in all of the Group III: Trustee Debtors' cases.

2.1.32 <u>Claims Objection Deadline</u>. The later of (i) the first business day following the one hundred and eightieth (180th) day after the Effective Date, or (ii) such greater period of limitation as may be fixed or extended by the Bankruptcy Court or by agreement between the Plan Trustee and the Holder of the Claim.

2.1.33 <u>Claim Objection Reduction Amount</u>. The amount of Net Sales Proceeds that is made available to the holders of Allowed Unsecured Claims due to the entry of a judgment or order on a Lehman Claim Objection that disallows, reduces, or otherwise adversely modifies the secured claims filed by the Lehman Lenders.

2.1.34 <u>Class</u>. Each group of Claims or Interests classified in Article V of the Plan pursuant to Sections 1122 and 1123 of the Bankruptcy Code.

2.1.35 <u>Committee</u>. The Trustee Debtors' Committee, both before and after the Confirmation Date.

2.1.36 <u>Confirmation Date</u>. The date on which the Confirmation Order is entered in the Bankruptcy Court's docket.

1    2.1.37   Confirmation Order.  The order entered by the Bankruptcy Court

2  confirming the Plan in accordance with the provisions of Chapter 11 of the Bankruptcy Code.

3    2.1.38   Contingent Bond Claims.  Unmatured Bond Claims.

4    2.1.39   Creditor.  Any Person who is the Holder of a Claim against any Debtor

5  that arose or accrued or is deemed to have arisen or accrued or to have matured, or otherwise

6  become due, owing, and payable on or before the Petition Date, including, without limitation,

7  Claims of the kind specified in Sections 502(g), 502(h) or 502(i) of the Bankruptcy Code.

8    2.1.40   Debtor(s).  Individually or collectively, the Voluntary Debtors and the

9  Trustee Debtors, as specifically defined in Exhibit "1" attached hereto.

10    2.1.41   Debtor(s)-in-Possession.  The Voluntary Debtor(s) when acting in their

11  capacity as representatives of their respective Estates in their respective Chapter 11 Cases.

12    2.1.42   Delta Coves.  Delta Coves Ventures, LLC, a limited liability company, a

13  Trustee Debtor, and the owner of the Delta Coves Project.

14    2.1.43   Delta Coves Project.  The Project owned by Delta Coves, located in the

15  Contra Costa County, California, as more particularly described herein.

16    2.1.44   Delta Coves Project Break-up Fee. The sum eight hundred thirty two

17  thousand dollars ($832,000) that will be paid to the Stalking Horse Bidder that submits the

18  Opening Bid for the Delta Coves Project, if such Stalking Horse Bidder is not the Winning Bidder

19    2.1.45   Delta Coves Loan Agreement.  A certain Amended and Restated Loan

20  Agreement, dated as of April 20, 2007, by and between Delta Coves, as borrower, and Lehman

21  ALI as lender, pursuant to which Lehman ALI made a loan in the maximum aggregate principal

22  amount of approximately $236 million.  The Delta Coves Loan Agreement is allegedly secured by

23  a first-priority deed of trust on the Delta Coves Project.  The Delta Coves Loan Agreement has an

24  asserted balance due of $206,023,142.48 as of March 30, 2009.

25    2.1.46   Disclosure Statement.  This document accompanying the Plan that is

26  entitled "First Amended Disclosure Statement Describing First Amended Chapter 11 Plan Filed by

27  SunCal Plan Proponents In The Chapter 11 Cases Of SunCal Oak Valley, LLC, SunCal Heartland,

28

1  LLC, Delta Coves Venture, LLC, and SunCal Northlake, LLC, as amended and with all

2  accompanying exhibits.

3      2.1.47    Disputed Claim(s). All or any part of a Claim other than any Allowed

4  Amount thereof as to which any one of the following applies: (i) no Proof of Claim has been filed

5  with respect to such Claim, and either (a) the Claim is not listed in the Schedules; or (b) the Claim

6  is listed in the Schedules as unliquidated, disputed, contingent, unknown or in a zero amount,

7  (ii) the Claim is the subject of (a) a Litigation Claim; (b) the Claim is subject to offset by a

8  Litigation Claim; (c) a timely objection that has not been resolved by a Final Order; or (d) a request

9  for estimation in accordance with the Bankruptcy Code, the Bankruptcy Rules, any applicable

10  order of the Bankruptcy Court, or the Plan which is Filed on or before the Claims Objection

11  Deadline, which Adversary Proceeding, objection, or request for estimation has not been

12  dismissed, withdrawn or determined by a Final Order; or (iii) the Claim is otherwise treated as a

13  "Disputed Claim" pursuant to the Plan.

14      2.1.48    Disputed Lien(s). An asserted lien(s) against Assets of the Debtor(s) that

15  is either subject to a Disputed Secured Claim, not duly perfected, subject to an Avoidance Action,

16  or subject to an action pursuant to Bankruptcy Code Sections 510(c)(2) and/or 506(d).

17      2.1.49    Disputed Secured Claim(s). That part of a Disputed Claim that is a

18  Secured Claim.

19      2.1.50    Distribution(s). Payments to Holders of Allowed Claims provided for

20  under the Plan.

21      2.1.51    Distribution Agent. The entity that is responsible for making Distributions

22  under the Plan, which shall be Acquisitions.

23      2.1.52    Distribution Account(s). Separate account(s) to be established by the Plan

24  Trustee at an FDIC insured bank into which each Group III: Trustee Debtors' Available Cash shall

25  be deposited and all Available Cash received by the Plan Trust after the Confirmation Date that

26  would have belonged to such Group III: Trustee Debtor shall be deposited, other than Net Sales

27  Proceeds that are subject to Disputed Claims and Disputed Liens.

28

MAINDOCS-_163443-v1-SCC_DS_Group_3_TD FINAL.doc

1    2.1.53    Distribution Date. With respect to any Allowed Claim or Allowed

2  Interest, the date on which a Distribution is required to be made under the Plan.

3    2.1.54    Effective Date. A date selected by the SunCal Plan Proponents that is not

4  later than the ninetieth (90th) calendar day after the Confirmation Date. However, in any case where

5  the actions provided for in the Plan would be delayed by the automatic stay applicable in the case

6  of any Lehman Entity operating under the protection of Chapter 11 or Chapter 7, the SunCal Plan

7  Proponents shall have the right to extend the Effective Date for an additional sixty (60) days to

8  obtain relief from any such stay.

9    2.1.55    Elieff. Bruce Elieff, the president of Acquisitions, a purported obligor on

10  the Bond Claims with corresponding indemnity Claims against the Debtors.

11    2.1.56    Estates. The bankruptcy estates of the Group III: Trustee Debtors created

12  pursuant to Section 541 of the Bankruptcy Code.

13    2.1.57    Fee Applications. Applications of Professional Persons under Sections

14  330, 331 or 503 of the Bankruptcy Code for allowance of compensation and reimbursement of

15  expenses in the Cases.

16    2.1.58    Fee Claim. A Claim under Sections 330 or 503 of the Bankruptcy Code

17  for allowance of compensation and reimbursement of expenses in the Cases.

18    2.1.59    Fenway Capital. Fenway Capital Funding LLC, a Lehman Successor to

19  Lehman's Disputed Claims and Lehman's Disputed Liens arising from (i) SunCal Communities I

20  Loan Agreement, (ii) Ritter Ranch Loan Agreement, (iii) Bickford Second Loan Agreement,

21  (iv) SunCal PSV Loan Agreement, (v) SunCal Marblehead/SunCal Heartland Loan Agreement,

22  (vi) Delta Coves Loan Agreement (vii) SunCal Northlake Loan Agreement, and (viii) SunCal Oak

23  Valley Loan Agreement. Such Disputed Claims and Disputed Liens were transferred back to LCPI

24  pursuant to a compromise approved by the New York Bankruptcy Court on May 12, 2010.

25    2.1.60    Filed. Delivered to, received by and entered upon the legal docket by the

26  Clerk of the Bankruptcy Court. "File" shall have a correlative meaning.

27    2.1.61    Final Order. A judgment, order, ruling or other decree issued and entered

28  by the Bankruptcy Court.

-12-

MAINDOCS-_163443-v1-SCC_DS_Group_3_TD FINAL.doc

1    2.1.62 General Unsecured Claim. A Claim against a Group III: Trustee Debtor

2 that is not (a) a Secured Claim, (b) an Administrative Claim, (c) a Tax Claim or (d) a Priority

3 Claim.

4    2.1.63 Group III: Trustee Debtors. SunCal Oak Valley, LLC, SunCal Heartland,

5 LLC, Delta Coves Venture, LLC, and SunCal Northlake, LLC.

6    2.1.64 Group III Projects. The Oak Valley Project, the Heartland Project, the

7 Delta Coves Project and the Northlake Project.

8    2.1.65 Heartland Project Break-up Fee. The sum of three hundred thousand

9 dollars ($300,000) that will be paid to the Stalking Horse Bidder that submits the Opening Bid for

10 the Heartland Project, if such Stalking Horse Bidder is not the Winning Bidder.

11    2.1.66 Heartland Project. The Project owned by SunCal Heartland, located in the

12 Riverside County, California, as more particularly described herein.

13    2.1.67 Holder. The beneficial owner of any Claim or Interest.

14    2.1.68 Initial Overbid. The Initial Overbid is the first Qualifying Bid after the

15 Opening Bid that is equal to or in excess of the Initial Overbid Amount.

16    2.1.69 Initial Overbid Amount. In the case of the Oak Valley Project, the Initial

17 Overbid Amount is a sum that is not less than the sum of the Opening Bid, the Oak Valley Project

18 Break-up Fee and one hundred thousand dollars ($100,000). In the case of the Heartland Project,

19 the Initial Overbid Amount is a sum that is not less than the sum of the Opening Bid, the

20 Heartland Project Break-up Fee and one hundred thousand dollars ($100,000). In the case of the

21 Delta Coves Project, the Initial Overbid Amount is a sum that is not less than the sum of the

22 Opening Bid, the Delta Coves Project Break-up Fee and one hundred thousand dollars

23 ($100,000). In the case of the Northlake Project, the Initial Overbid Amount is a sum that is not

24 less than the sum of the Opening Bid, the Northlake Project Break-up Fee and seventy-five

25 thousand dollars ($75,000).

26    2.1.70 Insider. The term shall have the broadest meaning possible under

27 Section 101(31), including, but not limited to, a person in control of the Debtor, Affiliates and

28 Insiders of such Affiliates.

1        2.1.71    Interest. Any equity security interest in any Group III: Trustee Debtor

2    within the meaning, of Section 101(16) of the Bankruptcy Code, including, without limitation, any

3    equity ownership interest in any of the Group III: Trustee Debtors, whether in the form of common

4    or preferred stock, stock options, warrants, partnership interests, or membership interests.

5        2.1.72    LBHI. Lehman Brothers Holdings, Inc., a Lehman Entity, the parent

6    company of Lehman ALI and LCPI, and a Chapter 11 debtor in a bankruptcy proceeding pending

7    in the Bankruptcy Court for the Southern District of New York.

8        2.1.73    LCPI. Lehman Commercial Paper, Inc., a Chapter 11 debtor in a

9    bankruptcy proceeding pending in the Bankruptcy Court for the Southern District of New York.

10       2.1.74    Lehman Adversary Proceeding. The Debtors' pending adversary

11   proceeding against the Lehman Lenders and/or the Lehman Successors asserting various causes of

12   action including equitable subordination, fraudulent conveyances and preferential transfers.

13       2.1.75    Lehman ALI. Lehman ALI, Inc.

14       2.1.76    Lehman Disputed Administrative Loans. The post-petition financing

15   provided by Lehman ALI to Palmdale Hills, SunCal Emerald, SunCal Bickford, Acton Estates,

16   SunCal Oak Valley, SunCal Heartland, SunCal Northlake, SunCal Marblehead, SunCal Century

17   City, SunCal PSV, Delta Coves, and SunCal Oak Knoll, which grants priming liens on all

18   borrower Debtors' assets, and for super-priority administrative status to Lehman ALI. The

19   Voluntary Debtors have repaid to Lehman ALI the full amount of $270,731 loaned to the

20   Voluntary Debtors. The aggregate amount of the Lehman Administrative Loans to all of the

21   Trustee Debtors is approximately $40 million as of March 1, 2011 and continuing to increase. The

22   Lehman Administrative Loans are the subject of claim objections. Until these objections are

23   resolved, these Lehman Administrative Loans shall not be Allowed Claims.

24       2.1.77    Lehman Claim Objections. The objections filed by the Debtors to the

25   claims filed by the Lehman Lenders that are based upon the Lehman Disputed Loans and the

26   Lehman Disputed Administrative Loans, including, but not limited to, the Lehman Recoupment

27   Objection and the Lehman 502(d) Objection.

28

1             2.1.78    Lehman Entities. The Lehman Lenders, the Lehman Equity Members and

2  LBHI.

3             2.1.79    Lehman Equity Members. Lehman Entities that own direct or indirect

4  membership Interests in all of the Trustee Debtors, except for SunCal Heartland and SunCal

5  Marblehead.

6             2.1.80    Lehman Lenders. Lehman ALI, LCPI, Northlake Holdings, and OVC

7  Holdings.

8             2.1.81    Lehman Disputed Loans. Collectively the following loans that are the

9  purported basis for the Lehman's Disputed Claims: (a) SunCal Communities I Loan Agreement;

10  (b) Bickford Second Loan Agreement; (c) Ritter Ranch Loan Agreement; (d) SCC Palmdale Loan;

11  (e) Interim Loan Agreement; (f) SunCal Oak Knoll/SunCal Torrance Loan Agreement; (g) SunCal

12  Century City Loan Agreement; (h) SunCal PSV Loan Agreement; (i) SunCal Delta Coves Loan

13  Agreement; (j) SunCal Marblehead/SunCal Heartland Loan Agreement; (k) Sun Cal Oak Valley

14  Loan Agreement; (l) SunCal Northlake Loan Agreement; (m) Pacific Point First Loan Agreement;

15  and (n) Pacific Point Second Loan Agreement.

16             2.1.82    Lehman Representatives. The individuals that controlled the Lehman

17  Entities.

18             2.1.83    Lehman Successor(s). Entities other than the Lehman Lenders that either

19  assert to be or are determined by the Bankruptcy Court to be the beneficial owner(s) of the Lehman

20  Disputed Loan(s), including, but not limited to Fenway Capital, Lehman Re and Danske Bank.

21             2.1.84    Lehman's Disputed Claim(s). All of the Proofs of Secured Claims filed by

22  a Lehman Lender or a Lehman Successor in the Debtors' Chapter 11 Cases arising from the

23  Lehman Disputed Loans and the Lehman Disputed Administrative Loans.

24             2.1.85    Lehman's Disputed Lien(s). All of the alleged liens relating to Proofs of

25  Secured Claims filed by a Lehman Lender or a Lehman Successor in the Debtor's Chapter 11

26  Cases arising from the Lehman Disputed Loans.

27             2.1.86    Lexon. Lexon Insurance Co.

28

MAINDOCS-_163443-v1-SCC_DS_Group_3_1D FINAL.doc

1      2.1.87   LitCo. A newly formed Delaware limited liability company that will be

2   capitalized by a third party capital partner with the funds necessary to pay Allowed Administrative

3   Claims and the expenses of the Plan Trust.

4      2.1.88   LitCo Plan Loan. A loan that will be made by LitCo, to the extent

5   necessary to pay Administrative Claims, and post Confirmation Date costs incurred by the SunCal

6   Proponents in connection with the sale process, and to pay post Effective Date costs incurred by

7   the Plan Trust, including litigation expenses where applicable, if no other source is available to

8   pay these obligations. LitCo will be capitalized with funds provided by a third party.

9      2.1.89   Litigation Claims.  Any and all interests of the Group III: Trustee Debtors

10   in any and all Claims, rights, causes of action, and objections or defenses to Claims, liens, rights,

11   or causes of action which have been or may be commenced by the Group III: Trustee Debtor(s), the

12   Chapter 11 Trustee, or the Committee, as the case may be, including, but not limited to, any

13   (i) Avoidance Actions; (ii) for turnover of property to the Group III: Trustee Debtors' Estates

14   and/or the Plan Trust; (iii) for the recovery of property or payment of money that belongs to the

15   Debtors' Estates or the Plan Trust; (iv) the right to compensation in the form of damages,

16   recoupment or setoff of the Debtors' Estates and/or the Plan Trust; (v) the Lehman Adversary

17   Proceeding; (vi) the State Court Action, and (vii) any and all other Claims against Lehman's

18   Disputed Claims and/or Disputed Liens referenced in the Plan or the Disclosure Statement.

19      2.1.90   Litigation Recoveries.  Any Cash or other property received by the

20   Chapter 11 Trustee, the Group III: Trustee Debtors, the Committee and/or the Plan Trust, as the

21   case may be, from all or any portion of a Litigation Claim(s), including, but not limited to, awards

22   of damages, attorneys' fees and expenses, interest and punitive damages, whether recovered by

23   way of settlement, execution on judgment or otherwise.

24      2.1.91   Litigation Rights. Any Claims held by a party other than the Group III:

25   Trustee Debtors that have not been fixed in a final judgment prior to the Effective Date.

26      2.1.92   Maximum Distributions.  A Distribution to a Holder of an Allowed

27   General Unsecured Claim equal to one hundred percent (100%) of the amount of the Holder's

28

1    Allowed General Unsecured Claim plus interest at the Legal Rate from and as of the applicable

2    Group III: Trustee Debtor's Petition Date.

3                2.1.93    MB Firm.  Miller Barondess, LLP.

4                2.1.94    Mechanic Lien Claims.  Mechanic Lien Claims arising pursuant to

5    California Civil Code §3110, et seq. that were either allegedly perfected prepetition or otherwise

6    allegedly satisfy the requirements of Bankruptcy Code 546(b).

7                2.1.95    Minimum Increment.  The Minimum Increment is the additional sum that

8    must be bid for one of the Group III Projects in excess of a prior Qualified Bid. The Minimum

9    Increment applicable to the sale of the Oak Valley Project and the Delta Coves Project is the sum

10    of seventy-five thousand dollars ($75,000), until there are only two Qualified Bidders submitting

11    bids for these Projects, then the Minimum Increment shall be fifty thousand dollars ($50,000). The

12    Minimum Increment applicable to the sale of the Heartland Project and the Northlake Project is the

13    sum of fifty thousand dollars ($50,000), until there are only two Qualified Bidders submitting bids

14    for these Projects, then the Minimum Increment shall be twenty thousand dollars ($20,000).

15                2.1.96    Minimum Sale Price. The minimum gross sale price that must be paid for

16    the Oak Valley Project, the Heartland Project, the Delta Cove Project or the Northlake Project

17    before such project can be sold pursuant to the Plan. Such prices are $18,900,000, $6,750,000,

18    $18,720,000 and $6,750,000, respectively.

19                2.1.97    Net Litigation Recoveries.  Litigation Recoveries less associated

20    Administrative Claims and Post-Confirmation Expenses incurred in connection with such

21    Litigation Recoveries.

22                2.1.98    Net Sales Proceeds.  The Cash generated from the sale(s) or liquidation of

23    the Group III: Trustee Debtor(s)' Assets or the Plan Trust's Assets, less payment of selling

24    expenses, taxes, Chapter 11 Trustee fees, and any associated Post-Confirmation Expenses and

25    Administrative Claims incurred in furtherance of such sales or liquidation of such Assets.

26                2.1.99    Net Sales Proceeds Account(s).  Separate account(s) that will be

27    established by the Plan Trustee at an FDIC insured bank into which all Net Sale Proceeds shall be

28    deposited from the sale of Assets that were allegedly encumbered by a Disputed Secured Claim(s)

1  and/or a Disputed Lien(s). There shall be a separate Net Sales Proceeds Account for the Net Sale

2  Proceeds allegedly subject to each Disputed Secured Claim(s) and/or Disputed Lien(s), except

3  where there are two Disputed Liens on a single Project, in which case, there shall be a single

4  account for the proceeds generated from that Project. The Disputed Secured Claim(s) and/or

5  Disputed Lien(s) shall attach to the corresponding Net Sales Proceeds Account(s) pending any

6  Final Order(s) of the Bankruptcy Court resolving the applicable Disputed Secured Claim(s) and/or

7  applicable Disputed Lien(s). To the extent that a particular Disputed Claim is disallowed or a

8  particular Disputed Lien is avoided (other than transferred to the Estates pursuant to Bankruptcy

9  Code Section 510(c)(2)) or otherwise invalidated, such Net Sales Proceeds allegedly subject

10  thereto shall become Available Cash and shall be transferred to the applicable Distribution

11  Account(s). To the extent that a particular Disputed Secured Claim and a Disputed Lien are

12  allowed and deemed valid but subject to the equitable subordination causes of action in the

13  Lehman Adversary Proceeding, the funds shall remain in the Net Sales Accounts pending a Final

14  Order on the equitable subordination causes of action in the Lehman Adversary Proceeding.

15         2.1.100  Northlake Project. The Project owned by Northlake, located in Castaic,

16  California, north of Valencia, approximately 45 miles north of downtown Los Angeles and 10

17  miles north of the San Fernando Valley, as more particularly described herein.

18         2.1.101  Northlake Project Break-up Fee. The sum three hundred thousand dollars

19  ($300,000) that will be paid to the Stalking Horse Bidder that submits the Opening Bid for the

20  Northlake Project, if such Stalking Horse Bidder is not the Winning Bidder

21         2.1.102  Northlake Loan Agreement. A certain Term Loan and Revolving Line of

22  Credit Loan Agreement, dated as of September 5, 2009, between SunCal Northlake, as borrower,

23  and Northlake Holdings, as successor agent and sole lender, pursuant to which Northlake

24  Holdings' predecessor (Lehman ALI) made a loan in the maximum aggregate principal amount of

25  approximately $100,000,000. The SunCal Northlake Loan Agreement is allegedly secured by a

26  first-priority deed of trust on the Northlake Project. The SunCal Northlake Loan Agreement has an

27  alleged balance due of $123,654,776.88 as of March 30, 2009.

28

-18-

2.1.103   <u>Oak Valley Project</u>. The Project owned by SunCal Oak Valley, located in the Riverside County, California, as more particularly described herein.

2.1.104   <u>Oak Valley Project Break-up Fee</u>. The sum of eight hundred forty thousand dollars (\$\$840,000) that will be paid to the Stalking Horse Bidder that submits the Opening Bid for the Oak Valley Project, if such Stalking Horse Bidder is not the Winning Bidder.

2.1.105   <u>Opening Bid</u>. Opening Bid means the offer for one, or both of the Group III Projects, which is equal to the Minimum Sale Price(s) accepted by the Debtor for either one or both of the Group III Projects.

2.1.106   <u>Orders for Relief Date</u>. The following are dates that orders for relief were entered for each of the Trustee Debtors:

| | |
|---|---|
| SunCal Oak Valley | January 6, 2009 |
| SunCal Heartland | January 6, 2009 |
| SunCal Northlake | January 6, 2009 |
| SunCal Marblehead | January 6, 2009 |
| SunCal Century City | January 6, 2009 |
| SunCal PSV | January 6, 2009 |
| Delta Coves | January 6, 2009 |
| SunCal Torrance | January 6, 2009 |
| SunCal Oak Knoll | January 6, 2009 |

2.1.107   <u>Palmdale Hills</u>. Palmdale Hills Property, a Delaware limited liability company, a Voluntary Debtor herein, and the owner of the Ritter Ranch Project

2.1.108   <u>Person</u>. An individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, governmental authority, governmental unit, committee or other entity of whatever nature.

2.1.109   <u>Petition Dates</u>. The following are dates that each of the Voluntary Debtors filed their Voluntary Chapter 11 petitions or Creditors filed involuntary Chapter 11 petitions against the Trustee Debtors:

| | |
|---|---|
| Palmdale Hills | November 6, 2008 |
| SunCal Beaumont | November 6, 2008 |
| SCC Palmdale | November 7, 2008 |
| SunCal Johannson | November 7, 2008 |
| SunCal Summit Valley | November 7, 2008 |
| SunCal Emerald | November 7, 2008 |
| SunCal Bickford | November 7, 2008 |

| Acton Estates | November 7, 2008 |
| Seven Brothers | November 7, 2008 |
| SJD Partners. | November 7, 2008 |
| SJD Development | November 7, 2008 |
| Kirby Estates | November 7, 2008 |
| SunCal I | November 7, 2008 |
| SunCal III | November 7, 2008 |
| SCC Communities | November 19, 2008 |
| Del Rio | November 19, 2008 |
| Tesoro | November 19, 2008 |
| Delta Coves Ventures, LLC | November 14, 2008 |
| SunCal Heartland, LLC | November 12, 2008 |
| SunCal Marblehead, LLC | November 12, 2008 |
| LB-L-SunCal Northlake, LLC | November 12, 2008 |
| LB-L-SunCal Oak Valley, LLC | November 12, 2008 |
| SunCal Century City, LLC | November 14, 2008 |
| SunCal PSV, LLC | November 14, 2008 |
| SunCal Torrance Properties, LLC | November 14, 2008 |
| SunCal Oak Knoll, LLC | November 19, 2008 |

2.1.110   Plan. The "First Amended Chapter 11 Plan Filed by SunCal Plan Proponents In The Chapter 11 Cases Of SunCal Oak Valley, LLC, SunCal Heartland, LLC, and Delta Coves Venture, LLC [Group III: Trustee Debtors]"together with the Exhibits thereto, as the same may be amended or modified from time to time in accordance with the Plan.

2.1.111   Plan Documents. The Plan, the Plan Trust Agreement and all other documents attached to the Plan Supplement.

2.1.112   Plan Period. The period from the Effective Date to the Plan Termination Date.

2.1.113   Plan Supplement. The compilation of the Plan Documents to be filed with the Bankruptcy Court.

2.1.114   Plan Termination Date. The fifth (5th) anniversary date of the Effective Date, unless the Plan elects and earlier date.

2.1.115   Plan Sponsor. The entity that has committed to cause the funding of certain specified obligations under the Plan on or after the Effective Date.  The Plan Sponsor is Acquisitions.

2.1.116   Plan Trust. A liquidating trust to be established prior to or on the Effective Date, with Acquisitions as the Plan Trustee and the Holders of Allowed Claims against

-20-

1   the Debtors as the beneficiaries. The purpose of the Plan Trust will be to liquidate the Debtors'

2   Assets (other than Assets that are excluded by the Plan Trustee on the grounds that they lack value

3   or would be difficult to administer) and to otherwise consummate the Plan.

4            2.1.117   Plan Trustee. The Plan Trustee under the Plan Trust Agreement is

5   Acquisitions.

6            2.1.118   Plan Trust Agreement. The liquidating trust agreement governing the

7   affairs of the Plan Trust, which will be in substantially the form contained in the Plan Supplement.

8            2.1.119   Plan Trust Beneficiaries. The Plan Trust Beneficiaries are (i) the holders

9   of Beneficial Interests, as of any point in time, and (ii) holders of Allowed Claims that shall be

10   satisfied from Plan Trust Property in accordance with the terms of the Plan.

11           2.1.120   Plan Trust Property. Plan Trust Property means all property within the

12   Chapter 11 estates of the Group III: Trustee Debtors, other than property that is affirmatively

13   excluded by the Plan Trustee.

14           2.1.121   Post-Confirmation Expenses.  The fees and expenses incurred by the Plan

15   Sponsor, the Plan Trustee and the Committee and their professionals following the Confirmation

16   Date (including the fees and costs of Professionals) for the purpose of (i) prosecuting and

17   liquidating the Litigation Claims; (ii) objecting to and resolving Disputed Claims and Disputed

18   Liens; (iii) selling or otherwise liquidating the Plan Trust's Assets; (iv) effectuating Distributions

19   under the Plan; and (v) otherwise consummating the Plan and closing the Group III: Trustee

20   Debtors' Chapter 11 Cases.

21           2.1.122   Priority Claim.  Any Claim, other than an Administrative Claim or a Tax

22   Claim, to the extent entitled to priority under Section 507(a) of the Bankruptcy Code.

23           2.1.123   Pro Rata.  Proportionately, so that with respect to any distribution in

24   respect of any Allowed Claim, the ratio of (a)(i) the amount of property distributed on account of

25   such Allowed Claim to (ii) the amount of such Allowed Claim, is the same as the ratio of (b)(i) the

26   amount of property distributed on account of all Allowed Claims of the Class or Classes sharing in

27   such distribution to (ii) the amount of all Allowed Claims in such Class or Classes.

28

1         2.1.124   Professional. A Person or Entity (a) employed by the Group III: Trustee

2 Debtors, the Committee pursuant to a Final Order in accordance with Sections 327 and 1103 of the

3 Bankruptcy Code and to be compensated for services rendered prior to the Effective Date, pursuant

4 to Sections 327, 328, 3291 330 and 331 of the Bankruptcy Code, or (b) for which compensation

5 and reimbursement has been allowed by the Bankruptcy Court pursuant to Section 503(b) of the

6 Bankruptcy Code.

7         2.1.125   Professional Fees. All Allowed Claims for compensation and for

8 reimbursement of expenses under Sections 328, 330 and/or 503(b) of the Bankruptcy Code

9         2.1.126   Projects. The Debtors' residential real estate development projects and

10 other assets as separately defined herein and described in Exhibit "1" to the Disclosure Statement.

11        2.1.127   Qualifying Bid. Qualifying Bid means, with respect to any bid on a

12 Group III Project, a bid made by Qualifying Bidder that is A) equal to or in excess of the Initial

13 Overbid Amount, if it is the Initial Overbid, or B) in excess of the immediately preceding

14 Qualifying Bid by the Minimum Increment, if it is not the Initial Overbid.

15        2.1.128   Qualifying Bidder. Qualifying Bidder means a bidder who a) has

16 deposited the sum of five hundred thousand dollars ($500,000) in an escrow designated by the

17 SunCal Proponents; b) agreed that this sum will be forfeited as liquidated damages if such bidder

18 fails to perform; and c) who has provided the SunCal Plan Proponents evidence confirming that

19 such bidder has the financial means to acquire the applicable Group III Project(s) that such bidder

20 is seeking to acquire.

21        2.1.129   Reliance Claim. An Allowed Unsecured Claim against a Group III:

22 Trustee Debtor that would entitle the holder thereof to be the beneficiary of any equitable

23 subordination judgment obtained against a Lehman Entity by such Group III: Trustee Debtor.

24        2.1.130   Reliance Claimant. The holder of a Reliance Claim. A list of the Reliance

25 Claims and Reliance Claimants is attached hereto as Exhibit "8."

26        2.1.131   Sale Period. The Sale Period is the time period during which the SunCal

27 Proponents must consummate a sale or liquidation of the Group III Projects. The Sales Period shall

28 commence on the Confirmation Date and shall expire on the Effective Date.

1         2.1.132    SCC LLC.  SCC Acquisitions LLC, a limited liability company, a

2  subsidiary of Acquisitions and an indirect and/or a direct parent company of all of the Debtors.

3         2.1.133    Schedules.  The schedules of assets and liabilities and list of equity

4  security holders Filed by the Group III: Trustee Debtors, as required by Section 521(1) of the

5  Bankruptcy Code, Bankruptcy Rules 1007(a)(3) and (b)(1), and Official Bankruptcy Form No. 6,

6  as amended from time to time.

7         2.1.134    Stalking Horse Bidder.  The Qualified Bidder who submits the Opening

8  Bid..

9         2.1.135    Secured Claim.  Any Claim, including interest, fees, costs, and charges to

10  the extent allowable pursuant to Bankruptcy Code Section 506, that is secured by a valid and

11  unavoidable Lien on the Group III: Trustee Debtor(s)' Assets.

12         2.1.136    State Court Action. The action filed by certain Voluntary Debtors against

13  Lehman Ali, Inc., and certain other defendants, in California Superior Court for the County of

14  Orange (Case No. 30-2011-0040847-CU-BC-CJC), and a reservation of rights to add the Plan

15  Trustee and/or the Trustee Debtors as additional plaintiffs therein.

16         2.1.137    SunCal.  The SunCal Companies, a trade name for Acquisitions and its

17  Affiliates.

18         2.1.138    SunCal Bickford.  SunCal Bickford Ranch, LLC, a Delaware limited

19  liability company, a Voluntary Debtor herein, and the owner of the Bickford Ranch Project.

20         2.1.139    SunCal Heartland. SunCal Heartland, LLC, a Delaware limited liability

21  company, a Trustee Debtor (a Group III: Trustee Debtor), and the owner of the Heartland Project

22         2.1.140    SunCal Management.  SunCal Management, LLC, a Delaware limited

23  liability company, and the property manager for the Projects.

24         2.1.141    SunCal Marblehead/SunCal Heartland Loan Agreement.  That certain

25  Second Amended and Restated Term Loan and Revolving Line of Credit Loan Agreement, dated

26  as of October 3, 2007, by and among SunCal Marblehead Heartland Master LLC, SunCal

27  Marblehead, and SunCal Heartland, as borrowers, and Lehman ALI, as agent and sole lender,

28  pursuant to which Lehman ALI made a loan in the maximum aggregate principal amount of

1    approximately $316,061,300. The SunCal Marblehead/SunCal Heartland Loan Agreement is

2    allegedly secured by first-priority deeds of trust on the Marblehead and the Heartland Projects.

3    The SunCal Marblehead/SunCal Heartland Loan Agreement has an alleged balance due of

4    $354,325,126.15 as of March 30, 2009. The proofs of claim filed with respect to this loan

5    agreement are the subject of the Lehman Adversary Proceeding and the Lehman Claim Objections.

6         2.1.142   SunCal Northlake. LBL-SunCal Northlake, LLC, a limited liability

7    company, a Trustee Debtor, and the owner of the Northlake Project.

8         2.1.143   SunCal Oak Valley. SunCal Oak Valley, LLC, a Delaware limited

9    liability company, a Trustee Debtor (a Group III: Trustee Debtor), and the owner of the Oak Valley

10   Project.

11        2.1.144   SunCal Oak Valley Loan Agreement. A certain Term Loan and

12   Revolving Line of Credit Loan Agreement, dated as of May 23, 2006, by and between SunCal Oak

13   Valley, as borrower, and OVC Holdings, as successor agent and sole lender, pursuant to which

14   OVC Holdings' predecessor (Lehman ALI) made a loan in the maximum aggregate principal

15   amount of approximately $120,000,000. The SunCal Oak Valley Loan Agreement is allegedly

16   secured by a first-priority deed of trust on the Oak Valley Project. The SunCal Oak Valley Loan

17   Agreement has an alleged balance due of $141,630,091.63 as of March 30, 2009.

18        2.1.145   SunCal Plan Proponent(s). The Voluntary Debtors and Acquisitions as

19   the parties-in-interest that are proposing the Plan.

20        2.1.146   Tax. Any tax, charge, fee, levy, impost or other assessment by any

21   federal, state, local or foreign taxing authority, including, without limitation, income, excise,

22   property, sales, transfer, employment, payroll, franchise, profits, license, use, ad valorem,

23   estimated, severance, stamp, occupation and withholding tax. "Tax" shall include any interest or

24   additions attributable to, or imposed on or with respect to such assessments.

25        2.1.147   Tax Claim. Any Claim for any Tax to the extent that it is entitled to

26   priority in payment under Section 507(a)(8) of the Bankruptcy Code.

27        2.1.148   Trustee Debtor(s). The following Debtors, individually or collectively,

28   that are represented by the Chapter 11 Trustee: Delta Coves, SunCal Heartland, SunCal

MAINDOCS-_163443-v1-SCC_DS_Group_3_TD FINAL.doc

1    Marblehead, SunCal Northlake, SunCal Oak Valley , SunCal Century City, SunCal PSV, SunCal

2    Torrance, and SunCal Oak Knoll.

3        2.1.149    Trustee Debtors' Committee.  The Official Committee of Unsecured

4    Creditors of the Trustee Debtors appointed in the Cases pursuant to Section 1102 of the

5    Bankruptcy Code.

6        2.1.150    Unpaid Secured Real Property Tax Claims.  Secured Claims held by

7    various government entities secured by liens on the underlying real properties owned by the

8    Debtors but that are non-recourse to the Debtors.

9        2.1.151    Unsecured Claim. An Unsecured Claim is any Claim that is not an

10    Administrative Claim, Tax Claim, Secured Claim, or Priority Claim.

11        2.1.152    Voluntary Debtor(s).  The following  Chapter 11 debtors and debtors-in-

12    possession, individually or collectively, Palmdale Hills, SunCal I, SunCal III, SCC Palmdale,

13    Acton Estates, SunCal Beaumont, SunCal Emerald, SunCal Johansson, SunCal Bickford, SunCal

14    Summit, Seven Brothers, Kirby Estates, SJD Partners, SJD Development, SCC Communities, Del

15    Rio and Tesoro.

16        2.1.153    Voluntary Debtors' Committee.  The Official Committee of Unsecured

17    Creditors of the Voluntary Debtors appointed in the Cases pursuant to Section 1102 of the

18    Bankruptcy Code.

19        2.1.154    Winning Bid. The highest Qualifying Bid received for the Marblehead

20    Project or the Palm Springs Village Project.

21        2.1.155    Winning Bidder.  The party that submits the highest Qualifying Bid.

22    **2.2    Rules of Construction.**

23        For purposes of the Plan and this Disclosure Statement, unless otherwise provided herein or

24    in the Plan, (a) whenever from the context it is appropriate, each term, whether stated in the

25    singular or the plural, will include both the singular and the plural; (b) each pronoun stated in the

26    masculine, feminine or neuter includes the masculine, feminine and neuter; (c) any reference in the

27    Plan or this Disclosure Statement to an existing document or schedule filed or to be filed means

28    such document or schedule, as it may have been or may be amended, modified or supplemented

1    pursuant to the Plan; (d) any reference to an entity as a Holder of a Claim or Interest includes that

2    entity's successors and assigns; (e) except as otherwise indicated herein all references in the Plan

3    or this Disclosure Statement to Sections, Articles and Exhibits are references to Sections, Articles

4    and Exhibits of or to the Plan; (f) the words "therein," "thereunder" and "thereto" refer to the Plan

5    in its entirety rather than to a particular portion of the Plan; and (g) unless otherwise provided in

6    the Plan or this Disclosure Statement, any reference in the Plan or this Disclosure Statement to a

7    contract, instrument, release, indenture, agreement, or other document being in a particular form or

8    on particular terms and conditions means that such document shall be substantially and materially

9    in such form or substantially and materially on such terms and conditions; (h) any reference in the

10   Plan or this Disclosure Statement to a document, schedule, or exhibit to the Plan or Disclosure

11   Statement Filed or to be Filed means such document, schedule, or exhibit, as it may have been or

12   may be amended, modified, or supplemented; and (i) the rules of construction set forth in Section

13   102 of the Bankruptcy Code shall apply to the extent such rules are not inconsistent with the

14   express terms of the Plan or this Disclosure Statement or any other provision in this Section 2.2.

15       **2.3    Exhibits.**

16       All Exhibits to the Plan are incorporated into and are a part of the Plan as if set forth in full

17   therein.

18                                    **III.**

19                      **PLAN CONFIRMATION DEADLINES**

20       The Bankruptcy Court has not confirmed the Plan described in this Disclosure Statement.

21   Accordingly, the terms of the Plan are not binding on anyone. However, if the Bankruptcy Court

22   confirms the Plan, then the Plan will be binding on the Debtor(s), the Plan Trustee, and on all

23   Creditors and Interest Holders in such Cases.

24       **3.1    Time and Place of the Confirmation Hearing.**

25       The hearing where the Bankruptcy Court will determine whether or not to confirm the Plan

26   will take place at 411 West Fourth Street, Santa Ana, CA 92701-4593 on October 24, 2011, at 9:30

27   a.m. in Courtroom 5A.

28

**3.2    Deadline for Voting for or Against the Plan.**

If you are entitled to vote, it is in your best interest to timely vote on the enclosed ballot and return the ballot to:

> Winthrop Couchot Professional Corporation
> 660 Newport Center Drive, Suite 400
> Newport Beach, CA 92660
> Facsimile: (949) 720-4111
> Attn: P.J. Marksbury

Your ballot must be **received by** September 26, 2011, or it will not be counted.

**3.3    Deadline for Objecting to the Confirmation of the Plan.**

Objections to the confirmation of the Plan must be filed with the Bankruptcy Court, and served upon the following parties so that they are received by September 26, 2011:

| | |
|---|---|
| **Counsel to the Voluntary Debtors** | Paul J. Couchot<br>Winthrop Couchot Professional Corporation<br>660 Newport Center Drive, Suite 400,<br>Newport Beach, CA 92660 |
| **Authorized Agent for Voluntary Debtors** | Bruce V. Cook<br>General Counsel<br>2392 Morse Ave<br>Irvine, CA 92614-6234 |
| **Counsel for SunCal Management LLC and SCC Acquisitions Inc.** | Ronald Rus<br>Rus Miliband & Smith A<br>Professional Corporation<br>2211 Michelson Drive, Seventh Floor<br>Irvine, California 92612 |
| **Authorized Agent for SunCal Management and SCC Acquisitions, Inc.** | Bruce V. Cook<br>General Counsel<br>2392 Morse Ave<br>Irvine, CA 92614-6234 |

**3.4    Identity of Person to Contact for More Information Regarding the Plan.**

Any interested party desiring further information about the Plan should contact the Voluntary Debtors' counsel, Winthrop Couchot Professional Corporation, 660 Newport Center Drive, Suite 400, Newport Beach, CA 92660, Attn: Paul J. Couchot, (949) 720-4100; Peter W. Lianides, (949) 720-4155; Payam Khodadadi, (949) 720-4160.

-27-

### 3.5    **Disclaimer.**

The information contained in this Disclosure Statement is provided by the SunCal Plan Proponents. The SunCal Plan Proponents represent that everything stated in this Disclosure Statement is true to the best of their knowledge. The Bankruptcy Court has not yet determined whether or not the Plan is confirmable and makes no recommendation as to whether or not you should support or oppose the Plan.

The discussion in this Disclosure Statement regarding the Group III: Trustee Debtors may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate," or "continue," or the negative thereof or other variations thereon or comparable terminology. The reader is cautioned that all forward looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements. The liquidation analyses, distribution projections, projections of financial results and other information are estimates only, and the timing, amount and value of actual distributions to Creditors may be affected by many factors that cannot be predicted. Therefore, any analyses, estimates, or projections may or may not turn out to be accurate.

The SunCal Plan Proponents and their professionals have made a diligent effort to identify in this Disclosure Statement all Litigation Claims, including claims for relief, counterclaims, and objections to claims. However, no reliance should be placed on the fact that a particular Litigation Claim is or is not identified in this Disclosure Statement. The Group III: Trustee Debtors or other parties in interest may seek to investigate, file and prosecute Litigation Claims after the Confirmation Date, or the Plan Trust may seek to do so after the Effective Date of the Plan whether or not the Litigation Claims are identified in this Disclosure Statement.

MAINDOCS-_163443-v1-SCC_DS_Group_3_TD FINAL.doc

IV.

**FACTUAL BACKGROUND OF THE DEBTORS**

**4.1    The Formation of the Debtors and the Projects.**

**4.1.1    Overview of the Debtors and their Projects.**

The Group III: Trustee Debtors are three of twenty-six entities (collectively the "Debtors") that were formed pursuant to a joint venture between Affiliates of the SunCal Companies ("SunCal") and the Lehman Entities (the "SunCal/Lehman Joint Venture"). The Debtors role in the venture was to own and develop the large residential projects that were the core assets in this joint undertaking.

At the inception of SunCal/Lehman Joint Venture, it was agreed that SunCal would be the developer/manager of the Projects and the Lehman Entities would provide the necessary capital. Attached hereto as Exhibit "1" is a general description of the Debtors' Projects, including the Group III Projects, and the Debtors' other primary Assets, excluding Cash and the Litigation Claims, and a description of the loans for the Projects that are not a part of Group III Projects.

All of the Debtors are Affiliates of Acquisitions and SCC LLC. Some of the Debtors directly own the Projects, while others serve as holding companies, owning Allowed Interests in the Debtors that hold title to the Projects. SunCal Management, LLC, a SunCal Affiliate, has management contracts with respect to all of the Projects and manages the Debtors' day-to-day business affairs.

The seventeen Debtors who are referred to herein as the "Voluntary Debtors" are wholly owned by SunCal Affiliates, and consequently the SunCal Affiliates have full corporate governance authority over these entities. The Voluntary Debtors own eleven (11) of the Projects. In the case of the nine Trustee Debtors, the SunCal Affiliates and the Lehman Affiliates initially shared ownership equally (50% each). However, after the Petition Date, the SunCal Affiliates became the owner of hundred percent (100%) of the equity in two of the nine Trustee Debtors - SunCal Heartland and SunCal Marblehead. The Trustee Debtors own nine (9) Projects. Attached hereto as Exhibit "2" is a chart that sets forth the appraised value of the Group III Projects. This chart lists both the Lehman Lenders' value estimates and SunCal's valuation

MAINDOCS-_163443-v1-SCC_DS_Group_3_TD FINAL.doc

1    estimates.[2] As the chart indicates, the Lehman Lenders' valuation for the Group III Projects is in

2    the aggregate amount of $54,000,000, while the Debtors' valuation of the Group III Projects is in

3    the aggregate amount of $49,300,000.

4         The Plan eliminates any potential value disputes by providing for the sale of the Group III

5    Projects through an auction that is designed to yield the highest market price for these assets.

6    Accordingly, to the extent any other party believes the Group III Projects have a greater value than

7    the Opening Bid offered by another Qualifying Bidder, they will have the opportunity to submit a

8    Qualifying Bid (but no credit-bids will be allowed) that exceeds the Opening Bid and, if they so

9    desire, to become the Winning Bidder by offering the highest Qualifying Bid. This market sale

10   process will insure that the rights of all stakeholders are protected.

11          **4.1.2    The Debtors' Primary Secured Creditors and Their Disputed Claims**.

12        Lehman Commercial holds the primary secured claims against the Oak Valley Project, the

13   Heartland Project and the Delta Cove Project.

14   Lehman Commercial's secured claim against the Oak Valley Project, which is secured by a first

15   priority deed of trust, is based upon funding provided under the terms of the SunCal Oak Valley

16   Loan Agreement. The asserted balance due under terms of this loan was $141,630,092 as of March

17   30, 2009.

18        Lehman Commercial's secured claim against the Heartland Project, which is secured by a

19   first priority deed of trust, is based upon funding provided under the terms of the SunCal

20   Marblehead/SunCal Heartland Agreement. The asserted balance due under terms of this loan was

21   $354,325,126 as of March 30, 2009. This claim is also collateralized by a lien against the

22   Marblehead Project.

23        Lehman Commercial's secured claim against the Delta Coves Project, which is secured by a

24   first priority deed of trust, is based upon funding provided under the terms of the SunCal Delta

25   Coves Loan Agreement. The asserted balance due under terms of this loan was $206,023,142 as of

26   March 30, 2009.

27

28

_____

[2] Values may have changed since these analyses were prepared.

1       **4.1.3  Disputed Claims and Liens.**

2       As discussed in detail herein, during the course of the Debtors' Cases, the Debtors initiated

3 litigation disputing the validity of Lehman's Disputed Secured Claims, and the validity, priority

4 and extent of Lehman's Disputed Liens (which includes the liens against the Group III Projects).

5 This litigation is being pursued through the Lehman Adversary Proceeding, various contested

6 matters, and in potential lawsuits based on the post-petition conduct of the Lehman Entities and/or

7 their agents.

8       Attached hereto as Exhibit "3" is a chart that sets forth Lehman's Disputed Secured Claims,

9 the alleged Holders of the Lehman Disputed Secured Claims, the collateral encumbered by the

10 Lehman Disputed Liens, and the alleged outstanding amount based on the filed Proofs of Claim.

11 As the chart indicates, the total of Lehman's Disputed Secured Claims (based upon the proofs of

12 claims filed in the Debtor's bankruptcy cases) with respect to the Group III: Trustee Debtors is

13 approximately $701,978,360.

14       **4.1.4  A Summary of All of the Alleged Claims Against the Debtors.**

15       Attached hereto as Exhibit "4" is a chart that sets forth the prepetition Claims that have

16 been asserted against all of the Debtors.  In summary, the asserted Claims against the Group III:

17 Trustee Debtors consist of the following:

| Claims | Oak Valley | Heartland | Delta Coves | Northlake |
|---|---|---|---|---|
| Unpaid Secured Real Property Tax Claims | $175,158 | $985,141 | $406,976 | $2,767,794 |
| The Disputed Lehman Secured Claims | $141,630,092 | $354,325,126 | $206,023,142 | $123,654,776 |
| Mechanics Lien Claims | $1,618,699 | $1,208,080 | $468,358 | $0.00 |
| Administrative and Priority Claims | $2,480,171 | $3,001,257 | $4,327,749 | $7,703,076 |
| General Unsecured Claims Including alleged Bond Claims | $28,822,374 | $31,843,116 | $32,845,905 | $1,833,080 |

25       The SunCal Plan Proponents believe that these balances will ultimately be reduced through

26 claims objections resulting in lower "Allowed" claims balances.

27

28

### 4.1.5    Summary of the Group III: Trustee Debtors' Cash.

The following chart sets forth the Group III: Trustee Debtors' cash on hand as of January 31, 2011:

| Group III Debtor | Amount |
|---|---:|
| SunCal Oak Valley | 437,426.62 |
| SunCal Heartland | 55,730.48 |
| Delta Coves | 2,608,588.87 |
| SunCal Northlake | 1,349,609.88 |
| **Group III: Trustee Debtors' Total** | 4,451,355.85 |

Although the Lehman Lenders have alleged that they hold liens on the above cash, a preliminary review of the applicable lien documents indicates that most of the alleged liens were not validly perfected. This means that these liens can be avoided, allowing the unsecured creditors recourse to these funds. Moreover, even if the liens against these accounts were properly perfected, the amount secured by these liens, and their priority and their enforceability will be subject to the results of the Lehman Claim Objections and the Lehman Adversary Proceeding.

### 4.2    Factual Circumstances Leading to the Filing of the Debtors' Chapter 11 Cases.

#### 4.2.1    Introduction.

In this section of the Disclosure Statement, the SunCal Proponents have provided a brief description of the relationship between the Debtors and the Lehman Entities. This background is relevant to the Group III: Trustee Debtors, and in fact all of the Debtors, for the following reasons. First, most of the unsecured claims asserted against the Debtors were incurred at the insistence of the Lehman Lenders, and they would have been paid if the Lehman Lenders had honored their obligation to pay these claims. Second, a substantial part of claims that the Lehman Lenders failed to pay are being asserted against *all of the Debtors*. If the litigation against the Lehman Lenders discussed herein is successful, it will, at a minimum, reduce the pool of claims against the Group III: Trustee Debtors, and thereby increase the dividend payable to the remaining creditors. Third and finally, this history allows the Creditors to take the measure of the parties who are now proffering the competing plan – the Lehman Lenders. As the within discussion will establish, the Lehman Lenders failed to pay the claims of Creditors prepetition, the Lehman Lenders attempted to foreclose upon the Group III Projects post-petition in order to deny the unsecured creditors any

-32-

1  recovery on the claims they failed to pay, and finally, when this foreclosure effort failed, the

2  Lehman Lenders attempted to destroy the Debtors' reorganization and sale efforts by manipulating

3  LCPI's alleged automatic stay. The SunCal Plan Proponents believe that this history will lead the

4  Creditors to conclude, when weighing the merits of the Lehman Lenders Plan offer: "Fool me once

5  shame on you, fool me twice shame on me."

6  ### 4.2.2   Background of the SunCal Companies.

7  SunCal is a family-owned and operated real estate business that has been successfully

8  developing properties throughout the western United States for over 70 years. SunCal's business

9  focuses upon the "development" of residential land. A typical SunCal development begins with the

10  acquisition of one or more parcels of raw land. Thereafter, the SunCal team develops a master plan

11  for the acreage that incorporates streets, homes, parks, schools and commercial areas, and then it

12  works with the applicable municipal planning authorities (the city, county, state and federal) to

13  secure the necessary approvals or "entitlements" to gain approval of this plan. This process, which

14  requires the assistance of land planners, civil engineers, architects, lawyers, and other land

15  specialists, takes a period of years. Once the master plan is approved, SunCal provides for the

16  grading of the project and the installation of the foundational infrastructure (streets, utilities, etc.)

17  and then sells the lots or parcels within the project to merchant builders.

18  ### 4.2.3   The Origins of the SunCal/Lehman Joint Venture.

19  SunCal historically financed its projects with loans and/or equity from a number of

20  different sources. However, beginning in 1997, an increasing number of SunCal's projects were

21  financed by the Lehman Entities, as Mark Walsh ("Walsh"), the head of LBHI's Global Real

22  Estate Group, began cultivating a business relationship with SunCal's principals.

23  By 2003, the Lehman Entities and SunCal had entered into joint ventures involving

24  approximately fifteen projects. By 2007, that number had grown to over forty, and the Lehman

25  Entities had become, with limited exceptions, the exclusive provider of financing for the SunCal

26  Projects pursuant to a written agreement executed in 2006. The Lehman Entities also consisted of

27  the Lehman Equity Members that either directly or indirectly owned a fifty percent (50%) equity

28  interest in all nine of the Trustee Debtors.

1         In their dealings with SunCal, the Lehman Representatives made no distinction between

2   Projects financed by Lehman ALI and Projects financed by LCPI. They also made no distinction

3   between the Debtors in which Lehman Equity Members held 50% equity memberships or the

4   Debtors in which the Lehman Entities held no equity membership interest. As agents of the

5   financial partner in the parties' joint venture, the Lehman Representatives would determine which

6   Lehman Entity would provide financing on which Projects, and would dictate the structure that the

7   financing would take, according to whatever suited the Lehman Entities' needs.

8           **4.2.4**   **Lehman's Effective Control over the Management of the Debtors and**

9               **Promises of Ongoing Funding.**

10        Prior to the market downturn in the middle of 2007, Lehman Representatives afforded

11  SunCal substantial discretion in the management and development of the Projects. The Debtors

12  would contract with third-party vendors to perform grading, health and safety compliance,

13  construction, landscaping, and other necessary services on the Project sites, and they would work

14  with the local municipalities to obtain the necessary entitlements and other authorizations

15  necessary to proceed with development. The Lehman Representatives, SunCal and the Debtors

16  would discuss anticipated quarterly expenditures at periodic budget meetings, and , as expenses

17  were incurred each month, SunCal and the Debtors would submit requests for payment to the

18  Lehman Representatives, supported by the necessary documentation. The Lehman Representatives

19  would then provide the funding necessary to pay these expenses.

20        During the third quarter of 2007, the foregoing management and payment dichotomy

21  changed, after the real estate market experienced a sudden downturn, and many of the Projects

22  significantly declined in value. In response to this dramatic economic change, a series of high

23  level discussions occurred between SunCal's representatives and the Lehman Representatives --

24  including Walsh, Paul Hughson ("Hughson") and Frank Gilhool ("Gilhool"), the Managing

25  Directors of Lehman's Global Real Estate. In these discussions, SunCal's representatives, acting

26  on behalf of the Debtors, expressed concerns about the loans on the Projects being out of balance,

27  and suggested shutting down the Projects, or at least slowing the pace of development. However,

28  Walsh specifically instructed SunCal not to slow down or stop work. He assured SunCal that the

1   Lehman Entities would provide the necessary funding to pay vendors and to keep the development
2   of the Projects moving forward.

3        The foregoing assurances of payments were confirmed in numerous telephone
4   conversations between Gilhool and SunCal's COO, Frank Faye ("Faye"), and/or SunCal's General
5   Counsel, Bruce Cook ("Cook") that took place during 2007 and 2008. In each exchange, Gilhool
6   assured SunCal that the Lehman Entities were committed to funding the debts and obligations
7   being incurred at the Projects and they continued to insist that work proceed.

8        During this time frame, the Lehman Representatives became much more "hands on,"
9   scrutinizing and approving all budgets and expenses through a new control and approval structure.
10  Under the new structure, SunCal would submit budgets to the Lehman Representatives on a
11  weekly basis and explain, during periodic conference calls, what Project payables they believe had
12  to be paid and what work had to be performed on the Projects. The Lehman Representatives
13  would then unilaterally decide what future work would proceed, the Lehman Representatives
14  would authorize the work and the Lehman Representatives would decide what payables would be
15  paid timely by designating them as "urgent," and what other payables were not urgent and hence
16  would not be paid on a timely basis. However, even under this new Lehman controlled
17  management and payment regime, the Lehman Representatives made it clear that all payables
18  being incurred would be funded.

19  ### 4.2.5   The 2008 Restructuring Agreement.

20       By the fall of 2007, both SunCal and the Lehman Representatives contemplated entering
21  into restructuring agreement in the near term, with a closing to occur no later than January or
22  February of 2008. However, this transaction was delayed by the Lehman Entities' extensive
23  documentation demands until May 23, 2008. On this date, SunCal and most of the Debtors finally
24  entered into an omnibus "Restructuring Agreement" with LBHI, Lehman ALI and the other
25  Lehman Entities. The same Lehman Representative signed the Restructuring Agreement on behalf
26  of all of the Lehman Entities.

27       Pursuant to the Restructuring Agreement, Lehman ALI, "as the Lender with respect to each
28  Loan," committed, among other things, to: (1) make advances under existing loans to fund the

-35-

1   continuing costs necessary to preserve the value of the Projects; (2) move forward to resolve the

2   accrued outstanding subcontractor payables, i.e., to make sure that the Projects' creditors were paid

3   for their work; and (3) to close the transaction, whereby newly-created Lehman Entities would

4   assume the debt and obligations of the Projects.

5         As originally executed in May 2008, the Restructuring Agreement applied to twelve of the

6   twenty Projects (as well as several other projects not at issue in the Lehman Adversary

7   Proceeding):  (1) Acton Estates; (2) Beaumont Heights; (3) Bickford Ranch; (4) Emerald

8   Meadows; (5) Heartland; (6) Johannson Ranch; (7) Marblehead; (8) Northlake; (9) Oak Valley;

9   (10) Pacific Point; (11) Ritter Ranch; and (12) Summit Valley.  The Debtors that owned and/or

10   held equity interests in the entities that owned  these Projects were signatories to the May 2008

11   agreement.[3]

12         Between May and August 2008, the parties agreed to add four additional projects to the

13   Restructuring Agreement: (1) Del Rio; (2) Joshua Ridge; (3) Palm Springs Village; and (4) Tesoro

14   Burnham, and the four Debtors associated with these Projects—SunCal Del Rio, SCC

15   Communities, SunCal PSV, and SunCal Tesoro.  Only four Projects were  not included in the

16   Restructuring Agreement: Century City, Delta Coves, Oak Knoll and Del Amo.  Accordingly, the

17   four Debtors associated with these Projects—SunCal Century City, Delta Coves, SunCal Oak

18   Knoll and SunCal Torrance—were not signatories thereto.  Lehman ALI was the lender on each of

19   these Projects and , and as with the other Projects, Lehman Ali continued to insist that these four

20   debtors  proceed with the development of the four Projects, it approved all expenses, and it

21   continually provided assurances of payment.

22

23

24   [3] Specifically, the Restructuring Agreement was entered into by, among others, the "Borrowers,"
"Grantors" and "Pledgors," as defined in Annex 1 thereto. The "Borrowers" included SunCal Marblehead,

25   SunCal Heartland, SunCal Northlake, SunCal Oak Valley, SJD Partners, Palmdale Hills, SCC Palmdale,
SunCal I, SunCal III, and SunCal Bickford.

26

27   The "Grantors" included SunCal Marblehead, SunCal Heartland, SunCal Northlake, SunCal Oak Valley,
SJD Partners, Palmdale Hills, SunCal Bickford, SunCal Acton, SunCal Summit and SunCal Emerald, and

28   Debtors SunCal Beaumont and SunCal Johannson.

The "Pledgors" included SCC Palmdale, SunCal I, SunCal Summit and SJD Development.

MAINDOCS-_163443-v1-SCC_DS_Group 3 TD FINAL.doc

### 4.2.6   The Lehman Lenders Hire Radco.

Subsequent to the execution of the Restructuring Agreement, Lehman ALI arranged for a third party, Radco, to directly settle outstanding contractor payables, as its agent. Radco was provided some limited funding and authority to negotiate settlements, and did in fact reach settlement with a number of creditors. The funding for these settlements, whether the debts related to Lehman ALI or LCPI funded Projects, came from the same source. Lehman ALI and LCPI also provided approval for new work on the Projects, and Lehman ALI paid for some of this work. However, this funding was minimal and it soon stopped.

In August 2008, Lehman ALI withdrew funding and settlement authority from Radco, leaving millions of dollars in outstanding contractor payables unresolved, notwithstanding the contrary provisions in the Restructuring Agreement. Leman Ali's actions also impaired the Debtors' ability to resolve ongoing public health and safety issues arising at the Projects. Ultimately, only a fraction of the total outstanding payables were resolved, contrary to the past promises made by Lehman Representatives.

### 4.2.7   The Lehman Lenders' Failure to Close on the Settlement Agreement.

Pursuant to the terms of the Restructuring Agreement, the parties agreed to enter into a Settlement Agreement, the form of which was attached to the Restructuring Agreement. The Settlement Agreement provided for the transfer of the Projects included within the Restructuring Agreement to a series of newly formed Lehman-controlled entities (each with "SCLV" in its name, for "SunCal-Lehman Venture"). The agreement further provided that the entity taking title to the Project would assume the Lehman Lender debt obligations associated with the Projects, assume certain bond obligations associated with the Projects, and provide indemnifications to SunCal and the Debtors for unpaid claims.

On August 25, 2008, the Settlement Agreement and a series of related documents were formally executed by SunCal and the applicable Lehman Lenders and Lehman Equity Members at a meeting held in Los Angeles on August 25, 2008. Once these documents were signed, all that remained was the mechanical closing of the series of transactions described in the Settlement Agreement. Since all of the conditions precedent to the closings had been satisfied, or could have

1  been satisfied at, or shortly after the meeting, this should have occurred at the August 25, 2008

2  meeting, or shortly after the meeting. However, the Lehman Representative asked SunCal to

3  extend the closing date for thirty days, to September 30, 2008. According to the Lehman

4  Representatives, this short extension would enable them to secure certain outstanding third party

5  consents. Although SunCal knew these third party consents were readily obtainable within a few

6  days, they agreed to this extension, believing the request was made in good faith. In fact, as more

7  fully explained blow, it was not.

8         **4.2.8   The Lehman Lenders' Undisclosed Sale of Most of the Debtors' Loans.**

9         As explained above, the Settlement Agreement was duly executed by all parties at a formal

10  closing meeting held on August 25, 2008. When the parties signed this agreement, which was a

11  binding contract, they both represented that they both intended and had the power and capacity to

12  perform all of the obligations undertaken therein. However, in the case of the Lehman Entities, this

13  representation was later discovered to be false. When the closing occurred on August 25, 2008, the

14  Lehman Lenders had already sold the very obligations they were agreeing to assume and restructure

15  in the Settlement Agreement to Fenway Capital pursuant to a repurchase agreement. Accordingly,

16  as of August 25, 2008, they lacked the power to perform the most essential undertakings that they

17  agreed to perform in the Settlement Agreement. Instead of disclosing this fact at the August 25,

18  2008 meeting, the Lehman Lenders requested additional time to execute the agreed upon transfers

19  provided for under this binding agreement. The Lehman Lenders needed this delay for an obvious,

20  but undisclosed reason: They lacked the ability to perform the very obligations they had just agreed

21  to perform in the Settlement Agreement.

22         The Lehman Representatives also did not disclose at the August 25, 2008 closing that they

23  intended to sell the Pacific Point First Loan to Lehman Re, approximately a week later, *even though*

24  *this loan was also subject to the Settlement Agreement.* To the contrary, the Lehman

25  Representatives affirmatively concealed these facts from SunCal and the Debtors by asserting that

26  ownership still existed in the case of seven of the eight loans.

27

28

MAINDOCS- 163443-v1-SCC_DS_Group_3_TD FINAL.doc

### 4.2.9    Lehman's Foreclosure Sale and Purchase of the Pacific Point Project.

At the time the Restructuring Agreement and the Settlement Agreement were signed, the Pacific Point Project, which was still owned by SJD Partners, was among the Projects included in the Restructuring Agreement and the Settlement Agreement.  Pursuant to the Restructuring Agreement, and as detailed in the Settlement Agreement attached thereto, SunCal, SJD Partners, and its parent company, SJD Development, all agreed that they would not interfere with Lehman ALI's (or its designee's) foreclosure on the Pacific Point Project. They further agreed that a new Lehman entity, LV Pacific Point, would purchase the Pacific Point Project upon foreclosure and that Lehman ALI and LV Pacific Point would (a) assume SJD Partners' and SJD Development's outstanding accounts payable for Pacific Point third-party vendors, (b) assume certain bond liability associated with the Pacific Point Project, and (c) pay for the millions of dollars worth of work that Lehman ALI representatives had authorized.

As previously stated, the Settlement Agreement was signed on August 25, 2008 by the SunCal parties, including SJD Partners and SJD Development.  It was also signed by Gilhool as authorized signatory on behalf of both Lehman ALI and LV Pacific Point.  As a signatory to the Settlement Agreement, LV Pacific Point was required to purchase the Pacific Point Project at the foreclosure sale subject to the above obligations. Consistent with this agreement, the City of San Juan Capistrano executed an estoppel certificate for the benefit of SJD Partners and Lehman ALI— at Lehman ALI's request—on August 26, 2008, two days before the foreclosure sale.  This certificate stated, among other things, that the "Acquiring Entity [LV Pacific Point] shall by operation of law become the legal successor-in-interest to Developer [SJD Partners]" under SJD Partners' agreements with the City. That certificate further provided that there existed no breaches, defaults, or claims under SJD Partners' agreements with the City.

On August 28, 2008, Lehman ALI foreclosed on the Pacific Point Project, and title was transferred to LV Pacific Point at the foreclosure sale.  However, Lehman ALI and LV Pacific Point failed to assume the liabilities and obligations associated with this Project as agreed.   This breach of the parties' agreement, left SJD Partners without title to the Pacific Point Project, but with the potential liability for the substantial unsecured claims relating to the Project, including

MAINDOCS-_163443-v1-SCC_DS_Group_3_1D FINAL.doc

1  bond claims of approximately $34 million,. Moreover, since Lehman Ali and LV Pacific Point

2  have continued to ignore their obligations under the above agreement, unpaid taxes, fines, and

3  penalties have continued to accrue to the detriment of the Project and these claims are being

4  asserted against SJD Partners..

5      Had SunCal, SJD Partners and SJD Development known that Lehman ALI and LV Pacific

6  Point had no intention of honoring their obligations under the foregoing agreement, they never

7  would have agreed to cooperate with the foreclosure. Instead, SJD Partners would have filed for

8  bankruptcy earlier, thereby mitigating the damages from Lehman Ali's breach, by allowing

9  creditors recourse to the value of the Project.

10     This course of conduct is relevant to the unsecured creditors of the Group III: Trustee

11  Debtors for the following reason. The holders of bond claims against SJD Partners are asserting

12  their massive claims against the estates of all of the Debtors, including the estates of the Group III:

13  Trustee Debtors. Accordingly, Lehman Ali's wrongs against SJD Partners directly affect the Group

14  III: Trustee Debtors' cases.

15      **4.2.10  Alvarez and Marsal Take Over Control of the Lehman Entities After**

16      **the Chapter 11 Filings of LBHI and LCPI.**

17      LBHI filed for bankruptcy in September 2008 and LCPI filed for bankruptcy in October

18  2008. After LBHI's filing, Bryan Marsal ("Marsal") of Alvarez & Marsal ("A&M") was appointed

19  to serve as LBHI's Chief Restructuring Officer. Marsal and A&M are in charge of liquidating the

20  now defunct Lehman Entities, including Chapter 11 debtors LBHI and LCPI, and the non-bankrupt

21  Lehman Lenders (Lehman ALI, OVC, and Northlake Holdings, as well as the non-bankrupt

22  Lehman Equity Members.

23      Although A&M was not employed until after the events that occurred on August 25, 2008

24  described above, it should be noted that A&M hired the same law firm that represented the

25  Lehman Lenders in the August 25, 2008 meeting – Weil, Gotshal & Manges, LLP. Moreover, as

26  more fully explained herein, it was A&M that directed Lehman Ali not to perform its contractual

27  obligations under the Settlement Agreement after September of 2008. Accordingly, the same

28  individuals that caused the damages to unsecured creditors by insisting upon the breach of the

-40-

1  Settlement Agreement, are now asking for their vote in the competing plan filed by the Lehman

2  Lenders.

3      LBHI's bankruptcy filing and the Lehman Lenders refusal, at A&M's direction, to close the

4  transactions provided for under the Settlement Agreement as agreed, were not small matters. They

5  severely damaged the Debtors. Although the Debtors were not proceeding with any new

6  construction or development, the Debtors were still required to expend significant sums on site

7  security, erosion control, property taxes and other measures in order to prevent the Projects from

8  becoming a public safety hazard, and in order to avoid the loss of valuable entitlements, and to

9  mitigate penalties and fines being incurred by the Projects.  Although SunCal and the Debtors

10  repeatedly requested that the Lehman Entities pay for critical health and safety and value

11  preservation measures on the Projects, these efforts were unavailing.

12      Between October 9 and November 4, 2008, SunCal's general counsel Cook sent Robert

13  Brusco, an authorized agent of the Lehman Entities, nearly two dozen letters requesting that the

14  Lehman Lenders provide the funding necessary to address critical needs on the Projects as

15  promised.  A summary of these health and safety notices are attached hereto as Exhibit "5".  The

16  Lehman Entities ignored these requests until November 2008, when Brusco, purportedly on behalf

17  of the Lehman Lenders, delivered the message that the Lehman Lenders were unwilling to fund the

18  Projects and that, instead, they intended to foreclose on all of the Projects.

19      As a result, as set forth in Exhibit "4," there are now over 240 vendors, municipalities,

20  counties and bonding companies claiming over $400 million in work, improvements and property

21  tax claims against the Projects.  Substantially all of these sums are due to work performed or

22  bonded at Lehman's request based upon Lehman's promises of payment.

23      **4.3     The Debtors' Potential Preferential Transfers**.

24      Attached hereto as Exhibit "6" are charts setting forth payments made to third parties

25  during the ninety (90) day time period preceding the filing of the Debtors' Chapter 11 Cases as

26  well as payments made to the Lehman Entities and to SunCal Affiliates during the one-year time

27  period preceding the filing of the Debtors' Chapter 11 Cases.

28

MAINDOCS-_163443-v1-SCC_DS_Group_3_TD FINAL.doc

1    As the charts in Exhibit 6" indicate, Group III: Trustee Debtors' made payments in the

2  following aggregate amounts to non-insiders within the 90 day preference period preceding the

3  Petition Date: SunCal Oak Valley: $316,534.90, SunCal Heartland: $48,896.50, Delta Coves:

4  $597,961.92. The corresponding figures for payments made to "insiders" within the one year

5  preference period preceding the Petition Date were: SunCal Oak Valley: $87,293.65, SunCal

6  Heartland: $282,628.75, Delta Coves: $8,501,013.04.05.

7                                                                  **V.**

8                  **SIGNIFICANT EVENTS IN THE DEBTORS' CHAPTER 11 CASES**

9        **5.1.    Voluntary Debtors.**

10              **5.1.1    Joint Administration of the Voluntary Debtors and the Trustee**

11                        **Debtors.**

12    Since their respective Petition Dates, the seventeen (17) Voluntary Debtors have continued

13  to operate as "debtors-in-possession," subject to the supervision of the Bankruptcy Court and in

14  accordance with the Bankruptcy Code. The Voluntary Debtors are authorized to operate their

15  businesses in the ordinary course during the Chapter 11 proceedings. Transactions outside the

16  ordinary course of business must be approved by the Bankruptcy Court.

17    The Voluntary Debtors' Cases are being jointly administered pursuant to orders entered on

18  November 19, 2008 and December 9, 2008. The Voluntary Debtors' Cases are being jointly

19  administered with the Trustee Debtors' cases pursuant to an order entered on March 11, 2009.

20    The Voluntary Debtors have employed Winthrop Couchot Professional Corporation as their

21  general insolvency counsel, and the MB Firm as their special litigation counsel.

22              **5.1.2    The Voluntary Debtors Court Employed Professionals.**

23    The Voluntary Debtors' Committee has employed Irell & Manella LLP as its counsel

24  pursuant to an order entered on February 13, 2009.

25    Pursuant to the Court's Order regarding joint administration of the Voluntary Debtors, the

26  Voluntary Debtors' liability for professional fees is joint and several among the Voluntary Debtors'

27  Estates for fees incurred related to services for the benefit of all of the Voluntary Debtors. The

28  Trustee Debtors' liability for professional fees is not joint and several.

-42-

MAINDOCS-_163443-v1-SCC_DS_Group_3_TD_FINAL.doc

1    Pursuant to the initial MB Firm employment application, Acquisitions was responsible for

2    the payment of their fees until December 31, 2009. The MB Firm's application also allows for

3    payments from the Bond Companies. The initial MB Firm employment application reserved the

4    right, should the Lehman Adversary Proceeding result in a benefit accruing to particular Debtors'

5    Estates, to request that its fees and expenses be reimbursed by the Debtors' Estates. The Bond

6    Companies have also agreed to jointly fund a portion of the professional fees and expenses of the

7    MB Firm with respect to the Lehman Adversary Proceeding. The Bond Companies' funding

8    commitment can be terminated and after such a termination they will only be required to cover fees

9    and costs incurred during the period of their prior commitments.

10    The MB Firm employment application was subsequently amended. Pursuant to an order

11    entered on April 14, 2010, (1) the Voluntary Debtors will pay up to one-half of the fees and

12    expenses incurred by the MB Firm from and after February 1, 2010 onward; and (2) the Trustee

13    Debtors do not have an obligation to pay any of the MB Firm's fees pertaining to the Trustee

14    Debtors' estates, unless and until a loan by the Voluntary Debtors to the Trustee Debtors is agreed

15    to by the Trustee and approved by the Court, or in accordance with the terms of the original

16    employment applications to the extent not superseded or modified by the amended employment

17    application. The order does not affect the MB Firm's right to seek payment from the Bond

18    Companies without the need for an additional order of the Court.

19    The MB Firm filed an updated application seeking to further amend their employment to

20    include the right to pursue certain claims against the Lehman Entities and certain employees and

21    agents of these entities on behalf of the Voluntary Debtors. The claims encompassed by this

22    amendment include claims that are based upon both prepetition and post-post petition actionable

23    conduct under both state law and federal law against the Lehman Entities and/or their agents.

24    ### 5.1.3    LCPI's Motions for Relief from the Automatic Stay Against Certain of

25    ### the Voluntary Debtors' Projects and Related Appeals.

26    On January 23, 2009, LCPI and Lehman ALI filed various motions for relief from the

27    automatic stay against Palmdale Hills, SCC Palmdale, SunCal Beaumont, SunCal Summit Valley,

28    SunCal Emerald, SunCal Bickford, Acton Estates, SunCal Johannson, and SCC Communities I

-43-

1  (the "Lehman Entities' Stay Motions"). Although the Debtors, were able to defeat these motions,

2  they are relevant in the following respect. Had the motions filed by LCPI and Lehman Ali

3  succeeded, it is almost certain that unsecured creditors would have received nothing on their

4  claims. Moreover, as more fully explained herein, since Lehman Ali and LCPI did not even own

5  the loans they were seeking to foreclose upon, these motions should never have been filed in the

6  first instance. Yet now, these same parties- Lehman Ali and LCPI – are asking these same creditors

7  to vote on their plan and to "trust" them.

8         **5.2.    The Trustee Debtors and Their Professionals.**

9         Orders for Relief were entered in the involuntary cases beginning on January 6, 2009.  The

10 Trustee Debtors are represented by their duly-appointed Chapter 11 Trustee, Mr. Steven M. Speier

11 pursuant to orders of the Bankruptcy Court entered on January 15, 2009.

12        The Chapter 11 Trustee has employed the Lobel Firm as the Chapter 11 Trustee's general

13 insolvency counsel and the MB Firm, as special litigation counsel and Squar Miller, LLP as its

14 accountants.

15        The Trustee Debtors' Committee has employed Weiland, Golden, Smiley, Wang Ekvall &

16 Strok as its general insolvency counsel.

17        **5.3.    The Debtors' Various Motions Relating to Financing for the Projects and to**

18              **Pay Professional Fees.**

19              **5.3.1    The Voluntary Debtors' Initial Motion for Surcharge and Use of Cash**

20                    **Collateral.**

21        On January 16, 2009, seven of the Debtors, including the Group III: Trustee Debtors, filed a

22 motion authorizing Palmdale Hills to use and surcharge, pursuant to 11 U.S.C. § 506(c), and/or use

23 the purported cash collateral of LCPI arising from the Ritter Ranch Loan Agreement, pursuant to

24 11 U.S.C. § 363(c)(2), in order to pay for the reasonable and necessary maintenance expenses

25 required to preserve the value of such Debtors' Projects subject to deeds of trust and other security

26 interests held by LCPI.

27        LCPI objected to the motion and subsequently filed a motion in its own Chapter 11

28 proceeding in the Southern District of New York seeking an order barring the motion as a violation

-44-

1   of the automatic stay. Although the Debtors believe that LCPI's stay was not violated in any way

2   by the Motion, the Motion was taken off calendar prior to any ruling by the New York Bankruptcy

3   Court, based upon the threat of sanctions made against Debtors' counsel by the presiding judge in

4   LCPI's case.

5       As explained above, LCPI did not even own an interest in the Ritter Ranch Loan

6   Agreement when it asserted the automatic stay, since the Ritter Ranch Loan Agreement, which was

7   the subject of the cash collateral motion, had already been sold pursuant to the Fenway Repurchase

8   Agreement. Yet this wrongful action prevented Palmdale Hills from using its own money to pay

9   critical bills that Lehman Ali, LCPI's parent, was contractually required to fund in the first

10   instance.

11                 **5.3.2   The Lehman Disputed Administrative Loans.**

12       As explained above, after the Petition Dates, the Debtors collectively demanded that the

13   Lehman Lenders comply with their contractual obligations to pay for the costs of maintaining and

14   preserving the value of the Projects, including the Group III Projects. However, the Lehman

15   Lenders not only refused to comply with their obligations, they actively attempted to bar the

16   Debtors from using their own funds to pay these critical costs, in the hope of forcing the Debtors to

17   yield the Projects without a fight.

18       In the face of the foregoing refusal and active interference, the Chapter 11 Trustee agreed to

19   enter into several stipulations with Lehman ALI for financing (in the total approximate amount of

20   $8.5 million for the Group III: Trustee Debtors) to pay for real property taxes and urgent public

21   health and safety issues on the Projects and to pay professionals under the caveat that such

22   professionals would not be paid for services performed on matters that were considered contrary to

23   the interests of the Lehman Entities. This loan was approved pursuant to an order of the Court. In

24   return for what the SunCal Proponents view as a "forced loan," the Lehman Lenders insisted that

25   the Chapter 11 Trustee agree to withdraw a motion providing for the sale of certain Projects free

26   and clear of the Lehman Lenders' Disputed Liens, and the Chapter 11 Trustee agreed.

27       The SunCal Proponents will be filing a series of objections to the administrative claims

28   asserted by the Lehman Lenders based upon Lehman Administrative Loans. These objections will

-45-

1    be based upon various grounds, including the following. *After* the Lehman Administrative Loans

2    were approved by the Court, the Lehman Lenders engaged in a series of wrongs that substantially

3    damaged both the Trustee Debtors and the Voluntary Debtors. The most material of these wrongs

4    included the misrepresentations that the Lehman Lenders made to the Debtors and the Court

5    regarding their purported ownership of eight of the Lehman Loans that are at issue in this case. In

6    fact, it was later discovered that these representations were false.

7        The eight loans that the Lehman Lenders contended they owned had, in fact, been sold to a

8    third party – Fenway Capital – prepetition. This misrepresentation, and LCPI's improper assertion

9    of its automatic stay as a bar to certain actions in the Debtors cases on the basis of an ownership

10   interest *that did not exist* caused the Debtors to suffer millions in damages. These damages include,

11   but are not limited to, millions in legal fees, the impairment of sales opportunities, and the

12   intervening costs and damages that were incurred or suffered by the Projects that would otherwise

13   have been eliminated through a prior sale of the Projects, but for these misrepresentations. Prior to

14   the hearing on the confirmation of the competing reorganization plans, the SunCal Proponents will

15   be filing objections to the Lehman Administrative Loans to eliminate or reduce the claims based

16   upon the Lehman Disputed Administrative Loans by offsetting the foregoing damage claims.

17       **5.4.**    **The Debtors' Disputes and Claims Against the Lehman Entities.**

18       **5.4.1**    **The Lehman Adversary Proceeding.**

19       On January 6, 2009, the Voluntary Debtors initiated the Lehman Adversary Proceeding by

20   filing their initial complaint against Lehman ALI for equitable subordination of Lehman ALI's

21   Disputed Claims and avoidance of its Disputed Liens pursuant to Bankruptcy Code Section 510(c).

22   On February 3, 2009, the Debtors filed a First Amended Complaint, which added the Trustee

23   Debtors as co-plaintiffs and added various other causes of action. The First Amended Complaint

24   also named OVC Holdings, Northlake Holdings and various other entities as defendants.

25       Pursuant to a hearing on a motion to dismiss held on June 11, 2009, the Bankruptcy Court

26   granted the Debtors leave to amend the second amended complaint. Thus, on July 10, 2009, the

27   Debtors filed their Third Amended Complaint. The Third Amended Complaint addressed many of

28   the concerns raised by the Bankruptcy Court and also included various Avoidance Actions and

MAINDOCS-_163443-v1-SCC_DS_Group_3_TD_FINAL.doc

1  other causes of action against the Lehman Lenders and the Lehman Successors. The Third

2  Amended Complaint also added Fenway Capital as a defendant based upon, the discovery of the

3  facts relating to the sale of the loans Fenway Capital and based upon the Court ruling that the Repo

4  was a true sale.

5       On September 30, 2009, the Lehman Entities filed a motion to dismiss the Third Amended

6  Complaint (which motion was amended on October 7, 2009 and October 22, 2009), alleging that

7  the relief requested by certain Debtors was not available as a matter of law. On September 30,

8  2009, Fenway also filed a motion to dismiss the Third Amended Complaint. On January 26, 2010

9  and January 28, 2010, the Debtors filed oppositions to the motions to dismiss the Third Amended

10  Complaint filed by the Lehman Entities and Fenway, respectively. On February 4, 2010, the

11  Lehman Entities and Fenway filed their respective replies. The Court entered an order granting in

12  part and denying in part the relief requested in the motions to dismiss. Most notably, the Court

13  denied the defendants request for the dismissal of the equitable subordination claims and the

14  Court permitted the Debtors to file an amended complaint. LCPI was dismissed as a defendant at

15  this hearing, due to the fact that it did not own any interest in the loans at issue and due to potential

16  impact of the case upon LCPI's automatic stay. On March 26, 2010, the Debtors filed their Fourth

17  Amended Complaint. The following is a summary of the causes of action set forth in the Fourth

18  Amended Complaint:

19       ### 5.4.1.1    Equitable Subordination.

20       Based on the pre-petition inequitable conduct of the Lehman Entities, summarized in

21  Section 4.2, the Debtors have sought to subordinate the claims and avoid the liens of the Holders

22  of the Lehman Disputed Loans to the extent necessary to pay the Claims of unpaid Creditors that

23  were damaged by the inequitable conduct.

24       ### 5.4.1.2    The Fraudulent Transfer Claims.

25       The fraudulent conveyance claims set forth in the Fourth Amended Complaint include the

26  claim that SunCal Heartland is asserting against Lehman ALI in order to avoid a lien securing an

27  alleged claim in the amount of $304,730,278.

28

### 5.4.1.3 The Preference Claims.

The preference claims set forth in the Fourth Amended Complaint include the following: Transfers made to a Lehman Entity by a Debtor, where such Debtor was either owned by a Lehman Equity Member (50%) or where a Lehman Equity Member of Lehman Entity controlled such Debtor at the time of the transfer. Furthermore, according to the Lehman Lenders' appraisals submitted on the Projects of these Debtors, all of the loans were vastly undersecured at the time of the transfers.

On April 12, 2010, the Lehman Entities filed a motion to dismiss the Fourth Amended Complaint (as well as a related motion to strike portions of the same). On that same date, the Lehman Entities and Fenway, respectively, also filed answers to the Complaint denying the causes of actions set forth in the Fourth Amended Complaint and alleging certain affirmative defenses. Furthermore, as discussed herein, the New York Bankruptcy Court has approved Fenway's sale of all Sold Loans to LCPI. Consequently, the filing of a fifth amended complaint may be necessary.

### 5.4.1.4 The Debtors' Motions to Strike the Claims and Pleadings Arising from the Sold Loans to Fenway Capital and Related Appeals.

Once the Debtors discovered that the Lehman Lenders had misrepresented their ownership of seven loans– the loans sold to Fenway Capital back in August of 2008 - they filed motions, on May 29, 2009, seeking an order striking the claims that were filed with respect to these sold loans (the "Fenway Sold Loans"). The Fenway Sold Loans included the SunCal Communities 1 Loan Agreement, the Ritter Ranch Loan Agreement, the SunCal PSV Loan Agreement, the SunCal Marblehead/SunCal Heartland Loan Agreement, the Delta Coves Loan Agreement, the SunCal Northlake Loan Agreement and SunCal Oak Valley Loan Agreement. See Exhibit "3."

At the initial hearing on the Debtors' motion to strike the Claims held on June 30, 2009, the Court held that the transfer of the Fenway Sold Loans pursuant to the MRA was a true purchase and sale transaction (the "Ownership Issue") and, accordingly, the Lehman Lenders retained no right to file the Proofs of claim on this basis, under Federal Rule of Bankruptcy Procedure 3001(e)(1). The Court entered an order regarding the Ownership Issue on October 2, 2009.

1    The Lehman Lenders also contended that they were entitled to file the Proofs of Claim as the

2    "Fenway's authorized agent" under Federal Rule of Bankruptcy Procedure 3001(b) (the "Agency

3    Issue"). A continued hearing on the Agency Issue was set for September 22, 2009 and the Court

4    ruled that the Lehman Lenders could file the Proofs of Claim an authorized agents. The Lehman

5    Entities appealed the Ownership Issue and the Debtors appealed the Agency Issue to the Bankruptcy

6    Appellate Panel. These two appeals, which were consolidated, were argued in September of 2010.

7    The parties are awaiting a ruling.

### 5.4.1.5    Debtors' 502(d) Objections and Objection to Lehman's Claim Against Acton.

The Voluntary Debtors and other parties-in-interest have filed a motion to disallow,
pursuant to 11 U.S.C. § 502(d), the following Disputed Claims filed by Lehman ALI and LCPI,
including the following claims filed against the Group III: Trustee Debtors:

| Disputed Proof of Claim No. | Debtor | Claim Holder | Claim Amount |
|---|---|---|---|
| 21 | Delta Coves | Lehman ALI | $ 206,023,142 |
| 9 | Heartland | LCPI | $354,325,126 |

On June 9, 2011, a hearing was held on the Section 502(d) claim objection. At this hearing
the Lehman Entities disputed the merits of the Section 502(d) claim objection and LCPI alleged
that the filing of this objection violated its automatic stay. At the conclusion of the hearing, the
Court ruled that the parties could proceed with their discovery in this matter.

If the Section 502(d) claim objection is successful, the claims of the Lehman Entities
identified in the table above will be disallowed. Although the Lehman Entities will have the right
to seek reconsideration of this disallowance, in order to obtain this relief they would have to repay
the applicable transfers.

### 5.4.1.6  The Lehman Recoupment Claim Objections and the State Court Action.

Pursuant to the terms of the joint ventures entered into by and among the Debtors and the
Lehman Entities, the Lehman Entities were responsible for paying the costs incurred in the
development of the Projects. These costs included the claims of the vendors who provided goods
and services to the Projects and the claims asserted by the Bond Claimants. Although the Lehman

-49-

1   Entities contend that they were merely "lenders," and that they did not assume any liability for

2   these claims, as the above facts and those that will be adduced prior to and at the confirmation of

3   the Plan will demonstrate, the Lehman Entities are in fact obligated to pay these claims.

4       The Debtors' contend that direct liability can be imposed on the Lehman Entities on various

5   grounds, including the following. First, the Lehman Entities were either in a joint venture

6   relationship with the Debtors from the outset, or this relationship developed and became a legal

7   fixture through the Lehman Entities' course of conduct. Pursuant to this relationship, and the

8   promises and representations made therein, the Lehman Entities agreed to be responsible for all

9   vendor and Bond Claims incurred at or in connection with the Projects. The role of each of the

10  Debtors, by mutual agreement, was to provide development expertise and project management

11  services. The Lehman Entities were required to provide the capital necessary to fund the Projects.

12      Second, during the last eighteen months of the relationship between the parties, the Lehman

13  Entities assumed direct responsibility for all claims incurred during this period, by insisting that

14  work continue on the Projects and by repeatedly promising to pay for this work. Since the Lehman

15  Entities ordered this work, and promised to pay for the same, they bear this financial responsibility.

16      Third and finally, the Lehman Entities expressly agreed to pay the vendor and bond claims

17  described in the Restructuring Agreement and in the interrelated Settlement Agreement, but failed

18  to do so as contractually agreed.

19      It is the SunCal Proponent's contention that the Lehman Entities' failure to pay the vendor

20  and Bond Claims associated with the Projects as (as was their obligation under the terms of the

21  joint ventures, the Restructuring Agreement and the Settlement Agreement) unjustly shifted

22  responsibility for these liabilities to the Debtors in breach of the terms of joint venture, the

23  Restructuring Agreement and the Settlement Agreement. Accordingly, the SunCal Proponents have

24  filed objections to seven of the Secured Claims asserted by the Lehman Entities based upon the

25  affirmative defenses of recoupment, unjust enrichment and unclean hands (the "Lehman

26  Recoupment Claim Objections").

27      In the Lehman Recoupment Claim Objections, the SunCal Proponents seek the following

28  relief:

1          1) Disallowance of the claims asserted by the Lehman Lenders in their

2          entirety, pending compliance with the terms of the Restructuring

3          Agreement and the Settlement Agreement;

4          2) A reduction in the amount of the Lehman Entities' secured claims by

5          the amount of damages resulting from the Lehman Entities' breach of their

6          obligations under these agreements; and/or

7          3) An order barring the Lehman Entities from enforcing their rights under

8          the Lehman Loans until they cure their breaches under the above

9          agreements.

10         The first prayer for relief above is premised upon the contention that the Lehman Entities

11    agreed to transfer ownership of the Group III Projects to a series of newly formed entities under the

12    control of the Lehman Entities, pursuant to the terms of the Settlement Agreement. This agreement

13    further provided that these new entities would assume the vendor payables and certain Bond

14    Claims associated with these projects. Finally, this agreement included a covenant not to sue,

15    pursuant to which the Lehman Entities were barred from seeking further recourse against the

16    Debtors.

17         The SunCal Proponents believe that the positions asserted in the Lehman Recoupment

18    Claim Objections are well grounded in fact and in law. Had the Lehman Entities complied with

19    their contractual obligations, substantially all of the Group III: Trustee Debtor's liabilities would

20    have been eliminated, the Group III: Trustee Debtors would not have had to file Chapter 11, and

21    the Lehman Entities would be barred from asserting claims against the Group III: Trustee Debtors

22    based upon the Lehman Disputed Loans. It is the SunCal Proponents position that the Lehman

23    Entities effort to enforce claims based upon Lehman Disputed Loans is directly contrary to the

24    basic agreements reached in the Restructuring Agreement and in the related Settlement Agreement.

25         The Lehman Entities dispute the merits of the Lehman Recoupment Claim Objections. It is

26    the Lehman Entities' position that it was within their absolute "discretion" to pay, or not to pay, the

27    vendor payables incurred during the term of the Restructuring Agreement. Accordingly, they

28    cannot, in their assessment, be held liable for these obligations. In the case of the Settlement

MAINDOCS- 163443-v1-SCC_DS_Group_3_TD FINAL.doc

1  Agreement, the Lehman Entities contend that this agreement never became effective and therefore

2  they were not bound to comply with its terms. The SunCal Proponents do not believe that the

3  positions asserted by the Lehman Entities are supported by the facts, or existing law.

4      In addition to the Recoupment Claim Objections, certain Voluntary Debtors have also filed

5  the State Court Action against Lehman ALI and other non-debtor Lehman Entities. The State Court

6  Action is based on Lehman ALI's breach of contract on the Restructuring and Settlement

7  Agreements. The Group III: Trustee Debtors are potential plaintiffs in the State Court Action, and

8  such claims constitute property of their estates. The Trustee refused to authorize these Debtors to

9  become additional plaintiffs in the State Court Action. If the Plan is Confirmed, the Plan Trustee

10  and/or the Group III: Trustee Debtors reserve the right to join the State Court Action as additional

11  plaintiffs.

12      Although LCPI's automatic stay remains an impediment to the pursuit of the Lehman

13  Adversary Proceeding, the existence of this stay will not bar the SunCal Proponents from

14  implementing the material terms of the Plan for the following reason. LCPI's automatic say does

15  not bar the pursuit of the Lehman Claim Objections and in fact this litigation is proceeding. If these

16  objections are successful, the claims of the Lehman Entities will be disallowed, either in whole or

17  in part, or the Lehman Entities will be barred from pursuing these claims until they pay what they

18  owe to the Group III: Trustee Debtors. In either scenario, the Plan filed by the SunCal Proponents

19  is feasible and will yield a favorable return for creditors.

20          **5.4.1.7    The Debtors' Potential Post-Petition Claims Against Lehman**

21          **and Their Agents.**

22      The Voluntary Debtors believe that the Lehman Entities and certain agents of the Lehman

23  Entities (the "Culpable Agents") engaged in a post-petition course of conduct that severely

24  damaged the Voluntary Debtors, their estates and the recovery rights of creditors. In summary, the

25  actions taken by the Lehman Entities and the Culpable Agents included, among other things, the

26  following:

27

28

A.    Actively concealing the prepetition sale of the Lehman Disputed Loans to Fenway Capital and misrepresenting themselves as the owners of these loans during the post-petition period; and

B.    Improperly asserting that LCPI's automatic stay barred actions in the Voluntary Debtors' Chapter 11 Cases relating to two of the Lehman Disputed Loans, when in fact LCPI did not own any interest in such loans and hence the stay could not apply.

The foregoing course of conduct inflicted millions of dollars in damages upon the Voluntary Debtors in the form of additional fees and costs, and it materially delayed the progress of the Voluntary Debtors' reorganization effort. The Voluntary Debtors intend to seek recourse against the Culpable Agents for these wrongs.

**5.5.    The Lehman Fenway Claims Transaction, Compromise Motion Filed By the Lehman Entities.**

**5.5.1    Lehman Entities' and Fenway's Proposed Claims Transaction.**

In April of 2010, LCPI and LBHI filed that certain *Motion Pursuant To Bankruptcy Rule 9019 For Authority To Compromise Controversy In Connection With A Repurchase Transaction With Fenway Capital, LLC And A Commercial Paper Program With Fenway Funding, LLC* (the "Compromise Motion."). In the motion, LCPI and LBHI represented that they were "compromising" various issues and relationships arising out of the repurchase transaction described in the LCPI – Fenway MRA (the "Repo"). However, a careful review of the transaction described therein indicated that the motion was designed to accomplish the following objectives:

1.   To transfer title to the Lehman Disputed Loans at issue in the Lehman Adversary Proceeding from Fenway Capital to LCPI, an entity that had no interest in five of the seven loans prepetition;

2.   To allow LCPI, as the new owner of the Lehman Disputed Loans, to re-join the Lehman Adversary Proceeding as a defendant, and once there to use its automatic stay as a "sword" to stay this action;

3.   To enable the Lehman Entities to thwart the pursuit of the SunCal Plan Proponents' Plan;

4.  To bestow upon the Lehman Entities' purported competing plan an unfair advantage in the plan confirmation contest by delaying the effectiveness of critical provisions in the SunCal Plan Proponents' Plan; and

5.  To shield Fenway Capital and its principals from liability and investigation through discovery.

At the hearing on the Compromise Motion, the bankruptcy court in New York approved the Compromise Motion, and stated, consistent with the objectives of the Lehman Entities, that the continued pursuit of the Lehman Adversary Proceeding would be stayed, once LCPI obtained title to the Lehman Disputed Loans. The order reflecting this relief was entered on May 13, 2010 (the "Compromise Order").

### 5.6.    The Debtors' Motion for a Stay to Suspend Certain Lehman Actions.

On September 21, 2010, the Voluntary Debtors, Acquisitions, and SunCal Management filed a motion requesting, among other relief, for the Court to suspend the Lehman Entities competing plan and disclosure statement unless and until the Lehman Entities agree to provide the Debtors with relief from their automatic stay in the Debtors' Chapter 11 Cases (the "Suspension Motion"). The Court granted this motion and stayed all matters until March 1, 2011. The Court also ordered the parties to engage in a mediation. The Voluntary Debtors and the Lehman Entities were unable to settle their claims through this process.

### 5.7.    The Debtors' Other Litigation with Non-Lehman Related Parties.

#### 5.7.1    The Debtors' Failed Preliminary Injunction Motion Against the Holders of Bond Claims.

On February 20, 2009, the Debtors filed a complaint and a Motion for Preliminary Injunction, pursuant to which the Debtors sought a Motion for Preliminary Injunction against the Holders of Bond Claims from pursuing such Claims. On February 23, 2009, the Court denied the Debtors' request for the TRO and granted the Debtors' request to require the defendants to show cause why the Motion for Preliminary Injunction should not be issued.

On March 2, 2009, several Holders of Bond Claims objected to the Motion for the Preliminary Injunction. The objections generally alleged that the Debtors failed to show that the

1    balancing of the equities favored granting the Preliminary Injunction versus the harm to the

2    Holders of the Bond Claims.  At a hearing held on March 4, 2009, the Court denied the

3    Preliminary Injunction Motion and the underlying complaint has subsequently voluntarily been

4    dismissed without prejudice.

5            **5.7.2**  **The Contractors' Successful Motions for Relief from Stay to Pursue the**

6                    **Bond Claims.**

7          Various contractors that were hired to perform work on some of the Projects have filed

8    motions for relief from stay with the Bankruptcy Court to pursue their purported Bond Claims.

9    These creditors have requested that the Bankruptcy Court grant these creditors relief from the

10   automatic stay to allow such creditors to enforce certain Claims that such creditors allege to have

11   against some of the Debtors, including certain surety bonds that are alleged to have been issued in

12   favor of such creditors.  The Debtors opposed the motions on the grounds that the various Debtors

13   are indispensible parties.  The Court conditionally granted the motions provided that the Bond

14   Claimants are able to sever the Debtors from their proceedings on the Bonds.

15           **5.7.3**  **Arch's Motion for Relief from Stay.**

16         On March 10, 2010, Arch and the City of San Clemente jointly filed a motion for relief

17   from stay.  The motion requested an order granting the following relief: (1) allowing such parties

18   to obtain authorization from the Trustee for a right of entry to allow Arch, as subdivision

19   performance bond surety for SunCal Marblehead, and the City (and their respective contractors and

20   consultants), to enter onto land located entirely, or in part, on the Property owned by Debtor

21   SunCal Marblehead to complete works of improvement which, if left unfinished, pose a health and

22   safety risk to the general public; (2) to the extent such improvements are located entirely, or in

23   part, on the Project owned by SunCal Marblehead authorizing the City to accept SunCal

24   Marblehead's offer of dedication for such improvements and the rights-of-way pertaining thereto

25   upon completion; and (3) to the extent SunCal Marblehead may have custody of any equipment,

26   materials, and supplies that are needed to complete the works of improvement, Arch and City

27   request that such equipment, materials, and supplies be released to Arch and its completion

28

MAINDOCS-_163443-v1-SCC_DS_Group_3_TD.FINAL.doc

1  contractors so that the applicable portion(s) of the Project can timely proceed.  There was no

2  opposition to this motion.  On April 6, 2010, the Court granted this motion.

3       **5.7.4  Shea's Successful Motion for Relief from Stay.**

4       On April 7, 2010, Shea Construction, Inc. filed a motion for relief from stay to pursue a

5  state court for foreclosure of liens on property previously owned by the Debtors and no longer

6  property of the Debtors' estate.  On May 14, 2010, the Court granted this motion.

7       **5.7.5  Bond Safeguard Motion.**

8       Bond Safeguard, a surety that issued bonds to secure the performance of work on certain

9  projects, filed a motion seeking authority to file  claims relating to these bond claims after the bar

10  date. The Debtors opposed this motion. This motion was granted pursuant to an order entered on

11  January 7, 2011.

12                                         **VI.**

13               **TREATMENT OF UNCLASSIFIED CLAIMS**

14       **6.1**    **Introduction**. As required by the Bankruptcy Code, the Plan places Claims and

15  Interests into various Classes according to their right to priority.  However, certain types of Claims

16  are not classified in any Classes under the Plan.  These Claims are deemed "unclassified" under the

17  provisions of the Code.  They are not considered impaired and they do not vote on the Plan,

18  because they are automatically entitled to specific treatment provided for them in the Code.  As

19  such, the SunCal Plan Proponents have not placed the following Claims in a Class.  The treatment

20  of these unclassified Claims is as provided below.

21       **6.2**    **Treatment of Allowed Administrative Claims.**

22       The Code requires that all Allowed Administrative Claims be paid on the later of Effective

23  Date of the Plan or the date of their allowance, unless a particular Holder agrees to a different

24  treatment.  The treatment of Allowed Administrative Claims is as described below.  However, such

25  Administrative Claims are continuing to be incurred.  The Allowed Administrative Claims shall be

26  paid from the applicable Distribution Account(s) pursuant to the Acquisitions Administrative

27  Loan.

28

**6.3**     <u>Treatment and Repayment of the Lehman's Administrative Loan(s).</u>

The Lehman Disputed Administrative Loans shall be paid in full on the later of the Effective Date, or the date any objections to the same are overruled by the Court leaving them Allowed claims. Prior to payment, or until disallowed, these claims shall continue to be secured by their existing liens against the respective Assets of the Trustee Debtors.

The Lehman Disputed Administrative Loans shall be paid in full, on the date referenced above, from either 1) funds loaned to the Plan Trust by LitCo or another designated third party, or 2) from the funds in the applicable Net Sale Proceeds Account.

**6.4**     <u>Repayment of Allowed Administrative Claims Other than the Lehman Administrative Loans.</u>

Except to the extent that the Holder of an Allowed Administrative Claim agrees to a different treatment and subject to the Administrative Claims Bar Date set forth herein, the Distribution Agent shall pay each Allowed Administrative Claim in full, in Cash, on the later of (i) the Effective Date, (ii) within ten (10) Business Days after the date such Administrative Claim becomes an Allowed Administrative Claim, or (iii) the date such Allowed Administrative Claim becomes due according to its terms. Notwithstanding the foregoing, any Allowed Administrative Claim representing obligations incurred in the ordinary course of post-petition business by the Debtors in Possession (including without limitation post-petition trade obligations and routine post-petition payroll obligations) shall be paid in full or performed by the Plan Trustee in the ordinary course of business, in accordance with the terms of the particular obligation.

**6.5**     <u>Administrative Claims Bar Date.</u>

All applications for final compensation of Professionals for services rendered and for reimbursement of expenses incurred on or before the Effective Date and all other requests for payment of Administrative Claims incurred before the Effective Date under Sections 507(a)(2) or 507(b) of the Bankruptcy Code (except only for (i) post-petition, ordinary course trade obligations and routine post-petition payroll obligations incurred in the ordinary course of the Debtors' post-petition business, for which no bar date shall apply, and (ii) post-petition tax obligations, for which no bar date shall apply) shall be Filed with the Bankruptcy Court and served

MAINDOCS-_163443-v1-SCC_DS_Group_3_TD FINAL.doc

1 upon the Plan Trustee no later than the Administrative Claims Bar Date, unless such date is

2 extended by the Bankruptcy Court after notice to the Plan Trustee. Any such request for payment

3 of an Administrative Claim that is subject to the General Administrative Claims Bar Date and that

4 is not Filed and served on or before the Administrative Claims Bar Date shall be forever barred;

5 any party that seeks payment of Administrative Claims that (i) is required to file a request for

6 payment of such Administrative Claims and (ii) does not file such a request by the deadline

7 established herein shall be forever barred from asserting such Administrative Claims against the

8 Debtors, the Plan Trust, their estates, or any of their property.

9      **6.6**    **Treatment of Unsecured Tax Claims.**

10      Tax Claims are certain unsecured income, employment and other taxes described by Code

11 Section 507(a)(8). The Code requires that each holder of such a Section 507(a)(8) tax claim

12 receive the present value of such Claim in deferred cash payments, over a period not exceeding

13 five (5) years from the petition date and that such treatment not be less favorable than the treatment

14 accorded to non priority unsecured creditors.

15      At the election of the Plan Trustee, the Holder of each Allowed Priority Tax Claim shall be

16 entitled to receive, on account of such Claim, (i) equal cash payments on the last Business Day of

17 each three-month period following the Effective Date, during a period not to exceed five years

18 after November 6, 2008, totaling the principal amount of such Claim plus simple interest on any

19 unpaid balance from the Effective Date, calculated at the interest rate available on ninety (90) day

20 United States Treasuries on the Effective Date, (ii) such other treatment agreed to by the Holder of

21 the Allowed Priority Tax Claim and the Plan Trustee, provided such treatment is on more

22 favorable terms to the Debtors (or the Plan Trust after the Effective Date) than the treatment set

23 forth in clause (i) hereof, or (iii) payment of the full Allowed Priority Tax Claim in Cash.

24                                        **VII.**

25               **CLASSIFICATION OF CLAIMS AND INTERESTS**

26      As required by the Code, the Plan places Claims and Interests into various Classes

27 according to their right to priority and other relative rights. The Plan specifies whether each Class

28 of Claims or Interests is impaired or unimpaired, and the Plan sets forth the treatment each Class

MAINDOCS _163443-v1-SCC_DS_Group_3_TD FINAL.doc

will receive.  The table below lists the Classes of Claims established under the Plan and states

whether each particular Class is impaired or left unimpaired by the Plan.  A Class is "unimpaired"

if the Plan leaves unaltered the legal, equitable and contractual rights to which the Holders of

Claims or Interests in the Class are entitled, with certain exceptions specified in the Bankruptcy

Code.

| CLASSIFICATION OF HOLDERS OF UNPAID SECURED REAL PROPERTY TAX CLAIMS | | |
|---|---|---|
| Class | Claimant | Claim Nos.[4] |
| Class 1.1 | Contra Costa County as the Holder of an Unpaid Secured Real Property Tax Claim against the Delta Coves Project in alleged  the amount of $406,976. | Delta Coves 16 |
| Class 1.2 | Riverside County as the Holder of an Unpaid Secured Real Property Tax Claim against the Heartland Project in the alleged amount of $985,141. | SunCal Heartland 5 |
| Class 1.3 | Riverside County as the Holder of an Unpaid Secured Real Property Tax Claim against the Oak Valley Project in the alleged amount of $175,158. | SunCal Oak Valley 9 |
| Class 1.4 | Los Angeles County as the Holder of an Unpaid Secured Real Property Tax Claim against the Northlake  Project in the alleged amount of $5,605,574. | Scheduled Amount |

| CLASSIFICATION OF LEHMAN'S DISPUTED CLAIMS | | |
|---|---|---|
| Class | Claims | Claim Nos. |
| Class 2.1 | The Holder of Lehman's Disputed Claims filed by Lehman ALI against Delta Coves arising from the Delta Coves Loan Agreement in the asserted amount of $206,023,142. | Delta Coves 21 |

---

[4] These Real Property Tax Claims have been updated to include amounts for which proofs of claim have not yet been filed.

MAINDOCS-_163443-v1-SCC_DS_Group_3_TD FINAL.doc

| CLASSIFICATION OF LEHMAN'S DISPUTED CLAIMS | | |
|---|---|---|
| **Class** | **Claims** | **Claim Nos.** |
| Class 2.2 | The Holder of the Disputed Secured Claim that is secured by a Disputed Lien against SunCal Marblehead and SunCal Heartland, which claim is based upon funds allegedly advanced pursuant to the SunCal Marblehead/SunCal Heartland Loan Agreement. | SunCal Heartland 9 |
| Class 2.3 | The Holder of Lehman's Disputed Claims filed by OVC Holdings against SunCal Oak Valley arising from the SunCal Oak Valley Loan Agreement in the asserted amount of $141,630,091. | SunCal Oak Valley 16 |
| Class 2.4 | The Holder of Lehman's Dispute Claim Northlake Holdings against SunCal Northlake arising from the North Lake Loan Agreement in the asserted amount of $123,654,776 | |

| CLASSIFICATION OF ASSERTED MECHANIC LIEN CLAIMS | | |
|---|---|---|
| **Class** | **Claimant** | **Claim Nos.** |
| Class 3.1 | The Holder of the disputed asserted Mechanic Lien Claim held by Hertz Equipment Rental Corporation against the Delta Coves Project in the amount of $25,444. | Delta Coves 2 |
| Class 3.2 | The Holder of the asserted Mechanic Lien Claim held by MBH Architects against the Delta Coves Project in the amount of $97,091. | Delta Coves 8 |
| Class 3.3 | The Holder of the asserted Mechanic Lien Claim held by Top Grade Construction, Inc. against the Delta Coves Project in the amount of $250,000. | Delta Coves 3 |
| Class 3.4 | The Holder of the asserted Mechanic Lien Claim held by HD Supply Construction against the Heartland Project in the amount of $47,675. | SunCal Heartland 2 |
| Class 3.5 | The Holder of the asserted Mechanic Lien Claim held by Pinnik, Inc. against the Heartland Project in the amount of $522,238,. | SunCal Heartland 8 |

| CLASSIFICATION OF ASSERTED MECHANIC LIEN CLAIMS | | |
|---|---|---|
| **Class** | **Claimant** | **Claim Nos.** |
| Class 3.6 | The Holder of the asserted Mechanic Lien Claim held by Dennis M. McCoy & Sons against the Heartland Project in the amount of $638,167. | SunCal Heartland 16 |
| Class 3.7 | The Holder of the asserted Mechanic Lien Claim held by HD Supply Construction against the Oak Valley Project in the amount of $52,806. | SunCal Oak Valley 3 |
| Class 3.8 | The Holder of the asserted Mechanic Lien Claim held by Pinnik Inc. against the Oak Valley Project in the amount of $966,987. | SunCal Oak Valley 12 and 14 |
| Class 3.9 | The Holder of the asserted Mechanic Lien Claim held by Hillcrest Contracting Inc. against the Oak Valley Project in the amount of $136,567. | SunCal Oak Valley 23 |
| Class 3.10 | The Holder of the asserted Mechanic Lien Claim held by MacKenzie Landscape against the Oak Valley Project in the amount of $121,297. | SunCal Oak Valley 25 |
| Class 3.11 | The Holder of the asserted Mechanic Lien Claim held by All American Asphalt against the Oak Valley Project in the amount of $60,355. | SunCal Oak Valley 26 |
| Class 3.12 | The Holder of the asserted Mechanic Lien Claim held by Proactive Engineering against the Oak Valley Project in the amount of $280,685. | SunCal Oak Valley 35 and 36 |

| CLASSIFICATION OF BOND INDEMNIFICATION CLAIMS | | |
|---|---|---|
| **Class 4** | **Claimant** | **Claim Nos.** |
| **Class 4.1** | The holders of Bond Claims arising from bonds issued with respect to the Del Coves Project. | Various Filed |
| **Class 4.2** | The holders of Bond Claims arising from bonds issued with respect the Heartland Project. | Various Filed |
| **Class 4.3** | The holders of Bond Claims arising from bonds issued with respect to the Oak Valley Project. | Various Filed |

MAINDOCS-_163443-v1-SCC_DS_Group_3_TD FINAL.doc

| CLASSIFICATION OF BOND INDEMNIFICATION CLAIMS | | |
|---|---|---|
| **Class 4** | **Claimant** | **Claim Nos.** |
| **Class 4.4** | The holders of Bond Claims arising from bonds issued with respect to the Northlake Project. | |

| CLASSIFICATION OF PRIORITY UNSECURED CLAIMS | | |
|---|---|---|
| **Class 5** | **Claimant** | **Claim Nos.** |
| Class 5.1 | The Holder of Priority Claims that fall within Code Sections 507(a)(2), (4), (5), (6), and (7) against Delta Coves. | Various Filed and Scheduled |
| Class 5.2 | The Holder of Priority Claims that fall within Code Sections 507(a)(2), (4), (5), (6), and (7) against SunCal Heartland. | Various Filed and Scheduled |
| Class 5.3 | The Holder of Priority Claims that fall within Code Sections 507(a)(2), (4), (5), (6), and (7) against Oak Valley. | Various Filed and Scheduled |
| Class 5.4 | The Holder of Priority Claims that fall within Code Sections 507(a)(2), (4), (5), (6), and (7) against Northlake. | Various Filed and Scheduled |

| CLASSIFICATION OF GENERAL UNSECURED CLAIMS THAT QUALIFY AS RELIANCE CLAIMS[5] | | |
|---|---|---|
| **Class** | **Claimant** | **Claim Nos.** |
| Class 6.1 | The holders of Reliance Claims against Delta Coves. | Various Filed and Scheduled |
| Class 6.2 | The holders of Reliance Claims against SunCal Heartland. | Various Filed and Scheduled |
| Class 6.3 | The holders of Reliance Claims against SunCal Oak Valley. | Various Filed and Scheduled |

[5] Unsecured Claims are generally placed within the same class and they receive the same treatment under a Plan. However, the SunCal Proponents have divided Unsecured claims into two classes in the Plan. This separate classification has been implemented for the following reason. The Holders of Unsecured Claims who are referred to as "Reliance Claimants," hold specific Litigation Rights that are referred to herein as "Reliance Claims." The other Unsecured Creditors do not hold Reliance Claims.

-62-

MAINDOCS- 163443-v1-SCC_DS_Group_3_TD FINAL.doc

| CLASSIFICATION OF GENERAL UNSECURED CLAIMS THAT QUALIFY AS RELIANCE CLAIMS[5] | | |
|---|---|---|
| **Class** | **Claimant** | **Claim Nos.** |
| Class 6.4 | The holders of Reliance Claims against SunCal Northlake. | Various Filed and Scheduled |

| CLASSIFICATION OF GENERAL UNSECURED CLAIMS THAT DO NOT QUALIFY AS RELIANCE CLAIMS | | |
|---|---|---|
| **Class** | **Claimant** | **Claim Nos.** |
| Class 7.1 | Claimants holding Allowed Unsecured Claims against Delta Coves that are not Reliance Claims. | Various Filed and Scheduled |
| Class 7.2 | Claimants holding Allowed Unsecured Claims against SunCal Heartland that are not Reliance Claims. | Various Filed and Scheduled |
| Class 7.3 | Claimants holding Allowed Unsecured Claims against Oak Valley that are not Reliance Claims. | Various Filed and Scheduled |
| Class 7.4 | Claimants holding Allowed Unsecured Claims against Northlake that are not Reliance Claims. | Various Filed and Scheduled |

| CLASSIFICATION OF INTEREST HOLDERS | | |
|---|---|---|
| **Class** | **Claimant** | **Scheduled** |
| Class 8.1 | Allowed Interests in Delta Coves held by Delta Coves Master JV LLC and LB/L-DUC III Master LLC. | Scheduled Amount |
| Class 8.2 | Allowed Interests in SunCal Heartland held by SunCal Marblehead Heartland Master LLC. | Scheduled Amount |
| Class 8.3 | Allowed Interests in SunCal Oak Valley held by SCLV Oak Valley, LLC and SCC/Oak Valley, LLC. | Scheduled Amount |
| Class 8.4 | Allowed Interests in SunCal Northlake held by SCLV Northlake, LLC and SCC/Northlake, LLC. | Scheduled Amount |

MAINDOCS-_163443-v1-SCC_DS_Group_3_TD FINAL.doc

VIII.

## THE PLAN'S TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS

**8.1.    The Plan's Treatment of Holders of Allowed Secured Real Property Tax Claims secured by Group III Projects (Classes 1.1 through 1.4).**

The rights of the Holder(s)' of Allowed Secured Claims in Classes 1.1, 1.2, 1.3 and 1.4 are not impaired under the Plan. Such claimants shall retain their existing lien rights and one of the following two non-impairment options shall apply, at the election of the Plan Trustee: 1) On the Effective Date, such claims shall be satisfied in accordance with the provision of 11 U.S.C. § 1124(2), or 2) on the Effective Date, or the Holder(s) shall be free to pursue their respective rights and remedies against the underlying real property collateral under applicable California law.

**8.2.    The Plan's Treatment of Lehman's Disputed Claim(s) and Disputed Lien(s) (Classes 2.1, 2.2, 2.3 and 2.4).**

The Holder(s) of Disputed Secured Claims within Classes 2.1, 2.2, 2.3 and 2.4  shall receive the indubitable equivalent of their claims under the Plan, pursuant to 11 U.S.C. § 1129(b)(2)(A)(iii), through the following treatment:

A.    Lien Rights. The Class 2.1, 2.2, 2.3 and 2.4 Holder(s) shall retain their interest in the Disputed Lien(s) against Plan Trust Assets that secure the Disputed Secured Claims, pending a Final Order(s) resolving the Allowance of such Disputed Secured Claims and determining the validity, priority and extent of the applicable Disputed Liens against the applicable Plan Trust Assets, which secure these claims, except as follows:

1.    The Plan Trust Assets subject to the Class 2.1, 2.2, 2.3 and 2.4 Disputed Liens may be sold free and clear of such liens on the Effective Date. These Disputed Liens shall then attach to the Net Proceeds from the sale, which shall be deposited into the Net Proceeds Account;

2.    To the extent that a Disputed Secured Claim held by either the Class 2.1, 2.2, 2.3 or 2.4 Claimants against either Group III Project is disallowed, and the Disputed Lien associated with this Disputed Secured Claim is consequently released to the extent of this disallowance, the Plan Trustee shall be authorized to use the Net Proceeds that are no longer

MAINDOCS-_163443-v1-SCC_DS_Group_3_TD FINAL.doc

1 | subject to the Disputed Lien(s) to pay other Allowed Claims in their order of priority, in

2 | accordance with the terms of the Plan;

3 |         3.     To the extent that a Disputed Secured Claim held by either the Class

4 | 2.1, 2.2, 2.3 or 2.4 Claimant and the associated Disputed Lien(s) against either Group III Project

5 | are subordinated, the Plan Trustee shall be authorized to use the Net Proceeds that are no longer

6 | subject to the Disputed Lien(s) , or where the priority of the Disputed Liens has been subordinated

7 | by the Court, to pay other Allowed Claims in their order of priority, in accordance with the terms

8 | of the Plan, to the extent of the subordination; and

9 |         Notwithstanding the existence of the Disputed Secured Claims and the

10 | Disputed Liens, the Plan Trustee may a seek a release of the funds in the Net Proceeds Account

11 | subject to these claims and liens to pay the claims of other creditors in accordance with the terms

12 | of the Plan, if the Class 2.1. 2.2, 2.3 and 2.4 claimants' interests in this property will remain

13 | adequately protected after this release.

14 |         B.     Sale of Group III Projects. The Plan Trustee shall complete the sale of

15 | Group III Projects on the Effective Date that are subject to the Holder(s)' Disputed Secured Claims

16 | and Disputed Liens, free and clear of such claims and liens, through a sale that satisfies the

17 | following conditions:

18 |         1.     The Group III Projects will be sold through a public auction after a

19 | commercially reasonable marketing and advertising effort of at least sixty (60) days duration;

20 |         2.     The SunCal Plan Proponents shall have the right to provisionally

21 | accept an Opening Bid from a Stalking Horse Bidder prior to the public auction and to grant this

22 | bidder a break-up fee (either the Oak Valley Project Break-up Fee, the Heartland Project Break-up

23 | Fee or the Delta Coves Project Break-up Fee;

24 |         3.     Other Qualified Bidders shall have the right to overbid the Opening

25 | Bid by submitting a Qualifying Bid. The first round of Qualifying Bids after the Opening Bid must

26 | be equal to or in excess of the Initial Overbid Amount. Thereafter, all Qualifying Bids shall be

27 | equal to or in excess or the Minimum Increment;

28 |

MAINDOCS-_163443-v1-SCC_DS_Group_3_TD FINAL.doc