1  PAUL J. COUCHOT -- State Bar No. 131934
   WINTHROP COUCHOT, P.C.
2  660 Newport Center Drive, Fourth Floor
   Newport Beach, CA 92660
3  Telephone: (949) 720-4100
   Facsimile: (949) 720-4111
4  General Insolvency Counsel for Palmdale Hills
   Property, LLC et. al. (the "Voluntary Debtors")
5
6  RONALD RUS - State Bar No. 67369
   JOEL S. MILIBAND - State Bar No. 77438
7  RUS MILIBAND & SMITH A PROFESSIONAL
   CORPORATION
   2211 Michelson Drive, Seventh Floor
8  Irvine, California 92612
   Telephone: (949) 752-7100
9  Facsimile:  (949) 252-1514
10 Counsel for SunCal Management LLC and
   SCC Acquisitions Inc.
11
   **UNITED STATES BANKRUPTCY COURT**
   **CENTRAL DISTRICT OF CALIFORNIA**
12 **SANTA ANA DIVISION**

| | |
|---|---|
| 13 In re<br>PALMDALE HILLS PROPERTY, AND ITS RELATED DEBTORS,<br><br>14  Joint Administered Debtors and<br>15  Debtors-in-Possession | Case No. 8-08-bk-17206-ES<br><br>Jointly Administered With Case Nos.<br>8:08-bk-17209-ES; 8:08-bk-17240-ES;<br>8:08-bk-17224-ES; 8:08-bk-17242-ES;<br>8:08-bk-17225-ES; 8:08-bk-17245-ES;<br>8:08-bk-17227-ES; 8:08-bk-17246-ES; |

16 Affects:
17  ☐ All Debtors
    ☐ Palmdale Hills Property, LLC
18  ☐ SunCal Beaumont Heights, LLC
    ☐ SCC/Palmdale, LLC
19  ☐ SunCal Johannson Ranch, LLC
20  ☐ SunCal Summit Valley, LLC
    ☐ SunCal Emerald Meadows LLC
21  ☐ SunCal Bickford Ranch, LLC
22  ☐ Acton Estates, LLC
23  ☐ Seven Brothers LLC
    ☒ SJD Partners, Ltd.
24  ☒ SJD Development Corp.
25  ☐ Kirby Estates, LLC
    ☐ SunCal Communities I, LLC
26  ☐ SunCal Communities III, LLC
27  ☐ SCC Communities LLC
    ☐ North Orange Del Rio Land, LLC
28  ☐ Tesoro SF LLC

8:08-bk-17230-ES; 8:08-bk-17231-ES;
8:08-bk-17236-ES; 8:08-bk-17248-ES;
8:08-bk-17249-ES; 8:08-bk-17573-ES;
8:08-bk-17574-ES; 8:08-bk-17575-ES;
8:08-bk-17404-ES; 8:08-bk-17407-ES;
8:08-bk-17408-ES; 8:08-bk-17409-ES;
8:08-bk-17458-ES; 8:08-bk-17465-ES;
8:08-bk-17470-ES; 8:08-bk-17472-ES;
and 8:08-bk-17588-ES

Chapter 11 Proceedings

**FIRST AMENDED DISCLOSURE STATEMENT DESCRIBING FIRST AMENDED JOINT CHAPTER 11 PLAN FILED BY SJD PARTNERS, LTD. AND SJD DEVELOPMENT CORP. [GROUP IV: VOLUNTARY DEBTORS]**

Date:      July 22, 2011
Time:      11:00 a.m.
Place:     Courtroom 5A

1

*Continued from Previous Page*

2  ☐ LBL-SunCal Oak Valley, LLC

3  ☐ SunCal Heartland, LLC
   ☐ LBL-SunCal Northlake, LLC

4  ☐ SunCal Marblehead, LLC

5  ☐ SunCal Century City, LLC
   ☐ SunCal PSV, LLC

6  ☐ Delta Coves Venture, LLC

7  ☐ SunCal Torrance, LLC
   ☐ SunCal Oak Knoll, LLC

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**PAGE**

I.  INTRODUCTION ........................................................................................... 2

II.  DEFINITIONS AND RULES OF INTERPRETATION ........................................... 4

III.  PLAN CONFIRMATION DEADLINES .................................................................. 22

IV.  FACTUAL BACKGROUND OF THE DEBTORS ..................................................... 24

V.  SIGNIFICANT EVENTS IN THE DEBTORS' CHAPTER 11 CASES .................. 37

VI.  TREATMENT OF UNCLASSIFIED CLAIMS ......................................................... 40

VII.  CLASSIFICATION OF CLAIMS AND INTERESTS ............................................. 59

VIII.  THE PLAN'S TREATMENT OF CLASSIFIED CLAIMS
AND INTERESTS ............................................................................................... 43

IX.  ACCEPTANCE OR REJECTION OF THE PLAN ................................................. 46

X.  MEANS OF EXECUTION AND IMPLEMENTATION OF THE PLAN .............. 49

XI.  RISK FACTORS .................................................................................................. 56

XII.  DISTRIBUTIONS ............................................................................................... 57

XIII.  OBJECTION TO CLAIMS AND DISPUTE CLAIMS ........................................... 60

XIV.  EXECUTORY CONTRACTS AND UNEXPIRED LEASES ................................. 60

XV.  BEST INTEREST OF CREDITORS TEST AND PLAN FEASIBILITY .............. 61

XVI.  LIMITATION OF LIABILITY ............................................................................. 63

XVII.  CONDITIONS TO CONFIRMATION AND EFFECTIVENESS
OF THE PLAN .................................................................................................... 63

XVIII. RETENTION OF JURISDICTION ........................................................................ 63

XIX.  MODIFICATION OR WITHDRAWAL OF THE PLAN ....................................... 64

XX.  MISCELLANEOUS ............................................................................................. 64

# I.

## INTRODUCTION

This DISCLOSURE STATEMENT[1] is filed respectively by, and the accompanying Plan is proposed by SJD Partners and SJD Development (the "Group IV: Voluntary Debtors"), as the SunCal Plan Proponents, in respective Chapter 11 Cases of the Group IV: Voluntary Debtors. In addition to being the proponent in the Trustee Debtors' Cases, Acquisitions shall be the Plan Sponsor, the Plan Trustee of the Plan Trust, and the Distribution Agent for all of the Debtors' cases for such Plans that are confirmed. This Disclosure Statement and the Plan assume that all claims filed against SJD Development should have been filed against SJD Partners.

SJD Development is the 100% equity holder of SJD Partners. SJD Partners formerly owned the Pacific Point Project. The Pacific Point Project was lost through a non-judicial foreclosure sale by Lehman ALI, which caused a Lehman Affiliate, LV Pacific Point LLC, a Delaware limited liability company, a Lehman Entity, a Delaware Limited Liability Company, to purchase the Pacific Point Project at a foreclosure sale conducted on August 28, 2008. The Group IV: Voluntary Debtors believe that the foreclosure was illegal and have initiated litigation regarding same as described herein.

Chapter 11 allows debtors-in-possession, Chapter 11 trustees, and under some circumstances, creditors, interest holders and others parties in interest, to propose a Chapter 11 plan. As stated, the SunCal Plan Proponents are the proponents of the Plan sent to you in the same envelope as this Disclosure Statement. This document summarizes the contents of the Plan, certain information relating to the Plan and the process the Bankruptcy Court follows in determining whether or not to confirm the Plan.

In summary, the Plan provides for the recovery of the Pacific Point Project and/or liquidation of Litigation Recoveries of Group IV: Voluntary Debtors. The Net Proceeds will then be distributed to Creditors holding Allowed Claims in accordance with their rights and priorities under the Bankruptcy Code and under other applicable law.

---

[1] All defined terms used herein have the same meanings as set forth in Article II herein and Exhibit "1" attached hereto.

1     The same Plan is being filed in the Cases of all two Group IV: Voluntary Debtors because

2    the Group IV: Voluntary Debtors believe that all claims in SJD Development were inadvertent and

3    should have been filed in the case of SJD Partners.

4     **READ THIS DISCLOSURE STATEMENT CAREFULLY IF YOU WANT TO**

5    **KNOW ABOUT:**

6       ➤  **WHO CAN VOTE OR OBJECT TO THE PLAN;**

7       ➤  **HOW YOUR CLAIM IS TREATED;**

8       ➤  **HOW THIS TREATMENT COMPARES TO WHAT YOUR CLAIM WOULD**

9           **RECEIVE IN LIQUIDATION;**

10      ➤  **A BRIEF HISTORY OF THE DEBTORS AND SIGNIFICANT EVENTS**

11          **DURING THEIR CHAPTER 11 BANKRUPTCY PROCEEDING;**

12      ➤  **WHAT FACTORS THE BANKRUPTCY COURT WILL CONSIDER TO**

13          **DECIDE WHETHER OR NOT TO CONFIRM THE PLAN;**

14      ➤  **WHAT IS THE EFFECT OF CONFIRMATION; AND**

15      ➤  **WHETHER THE PLAN IS FEASIBLE.**

16     This Disclosure Statement cannot tell you everything about your rights. You should

17    consider consulting your own attorney to obtain more specific advice on how the Plan will affect

18    you and your best course of action.

19     Be sure to read the Plan as well as this Disclosure Statement. If there are any

20    inconsistencies between the Plan and this Disclosure Statement, the Plan provisions will govern.

21     The Bankruptcy Code requires a Disclosure Statement to contain "adequate information"

22    concerning the Plan. On        , 2011, the Bankruptcy Court entered an order approving this

23    Disclosure Statement, based upon a finding that this document contained "adequate information"

24    to enable parties affected by the Plan to make an informed judgment regarding the Plan. Any party

25    can now solicit votes for or against the Plan.

26

27

28

## II.

## DEFINITIONS AND RULES OF INTERPRETATION

**2.1    Definitions.**

The following defined terms are used in this Disclosure Statement. Any capitalized term that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term in the Bankruptcy Code or Bankruptcy Rules.

2.1.1    Acquisitions. SCC Acquisitions, Inc., a California corporation, an indirect parent company of all of the Debtors, a purported obligor on the Bond Claims, a Creditor of all of the Debtors, a SunCal Plan Proponent, the Plan Sponsor and the proposed Plan Trustee.

2.1.2    Administrative Claim(s). Any Claim against a Group IV: Voluntary Debtor or its Estate incurred after the applicable Petition Date for the applicable Group IV: Voluntary Debtor but before the Confirmation Date, for any cost or expense of administration of the Case of the applicable Group IV: Voluntary Debtor, which Claim is entitled to priority under section 507(a)(2) or (3) of the Bankruptcy Code, including, without limitation, any fee or charge assessed against an Estate of a Group IV: Voluntary Debtor under section 1930 of Title 28 of the United States Code.

2.1.3    Administrative Claims Bar Date. The last date fixed by the Plan for the filing of Proof of Claims or requests for payment of Administrative Claims. Under the Plan, the Administrative Claims Bar Date shall be the first business day after the sixtieth (60th) day after the Confirmation Date.

2.1.4    Affiliate. The term shall have the meaning set forth under Section 101(2), including, but not limited to, as to any Person, any other Person that directly or indirectly owns or controls, is owned or controlled by, or is under common ownership or control with, such Person. The term "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as applied to any Person, means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or other equity ownership interest, by contract or otherwise.

1          2.1.5   Allowed. When used to describe Claim(s) or Interest(s), such Claim(s) or

2   Interest(s), to the extent that it or they are "Allowed Claim(s)" or "Allowed Interest(s)."

3          2.1.6   Allowed Amount shall mean:

4          A.   With respect to any Administrative Claim (i) if the Claim is based

5   upon a Fee Application, the amount of such Fee Application that has been approved by a Final

6   Order of the Bankruptcy Court; (ii) if the Claim is based upon any indebtedness or obligation

7   incurred in the ordinary course of business of the Group IV: Voluntary Debtors and is not

8   otherwise subject to an Administrative Claim Bar Date, the amount of such Claim that has been

9   agreed to by the Group IV: Voluntary Debtors and such creditor, failing which, the amount thereof

10  as fixed by a Final Order of the Bankruptcy Court; or (iii) if the Holder of such Claim was required

11  to file and has filed proof thereof with the Bankruptcy Court prior to an Administrative Claim Bar

12  Date, (1) the amount stated in such proof if no objection to such Proof of Claim is interposed

13  within the applicable period of time fixed by the Bankruptcy Code, the Bankruptcy Rules or the

14  Bankruptcy Court, or (2) the amount thereof as fixed by Final Order of the Bankruptcy Court if an

15  objection to such proof was interposed within the applicable period of time fixed by the

16  Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court. The Allowed Amount of any

17  Administrative Claim which is subject to an Administrative Claims Bar Date and not filed by the

18  applicable Administrative Claims Bar Date shall be zero, and no distribution shall be made on

19  account of any such Administrative Claim;

20         B.   with respect to any Claim which is not an Administrative Claim

21  (the "Other Claim"): (i) if the Holder of such Other Claim did not file proof thereof with the

22  Bankruptcy Court on or before the Claims Bar Date, the amount of such Claim as listed in the

23  Group IV: Voluntary Debtors'' Schedules as neither disputed, contingent nor unliquidated; or (ii) if

24  the Holder of such Claim has filed proof thereof with the Bankruptcy Court on or before the

25  Claims Bar Date, (a) the amount stated in such proof if no objection to such Proof of Claim was

26  interposed within the applicable period of time fixed by the Bankruptcy Code, the Bankruptcy

27  Rules, the Plan or the Bankruptcy Court, or (b) the amount thereof as fixed by Final Order of the

28  Bankruptcy Court if an objection to such proof was interposed within the applicable period of time

1  fixed by the Bankruptcy Code, the Bankruptcy Rules, the Plan or the Bankruptcy Court. The

2  Allowed Amount of any Other Claim which is not Filed by the applicable Claims Bar Date, is not

3  listed on the Group IV: Voluntary Debtors' Schedules or is listed as disputed, unliquidated,

4  contingent or unknown, and is not allowed under the terms of the Plan shall be zero, and no

5  distribution shall be made on account of any such Claim; and

6              C.     with respect to any Interest, (i) the amount provided by or

7  established in the records of the Group IV: Voluntary Debtors at the Confirmation Date, provided,

8  however, that a timely filed proof of Interest shall supersede any listing of such Interest on the

9  records of the Group IV: Voluntary Debtors; or (ii) the amount stated in a proof of Interest Filed

10  prior to the Confirmation Date if no objection to such Interest was filed prior to the Confirmation

11  Date or such later date as the Bankruptcy Court allows; or (iii) the amount of such Interest as fixed

12  by a Final Order of the Bankruptcy Court.

13          2.1.7    Allowed Claim. Except as otherwise provided in the Plan (including with

14  respect to those Classes for which the amount of the Allowed Claims is specified by the Plan), a

15  Claim to the extent (and only to the extent) of the Allowed Amount of such Claim.

16          2.1.8    Allowed Interest. Any Interest to the extent, and only to the extent, of the

17  Allowed Amount of such Interest.

18          2.1.9    Allowed Secured Claims. All or a portion of a Secured Claim that is an

19  Allowed Claim.

20          2.1.10   Allowed Unsecured Claim. All or a portion of an Unsecured Claim that is

21  an Allowed Claim.

22          2.1.11   Assets. All assets that are property of the Debtor(s) pursuant to

23  Bankruptcy Code Section 541.

24          2.1.12   Arch. Arch Insurance Company, a Bond Issuer.

25          2.1.13   Available Cash. Each Group IV: Voluntary Debtors' Cash deposited into

26  the applicable Distribution Account(s) on or after the Effective Date that is available for making

27  Distributions under the Plan to Holders of Allowed Administrative, Priority, and General

28  Unsecured Claims. The Available Cash shall consist of the respective Group IV: Voluntary

Debtors' cash on hand as of the Effective Date that is not subject to a Disputed Lien, proceeds of Net Litigation Recoveries that are not subject to a Disputed Lien, Net Sales Proceeds that become Available Cash upon the disallowance of a Disputed Claim or avoidance of a Disputed Lien purportedly encumbering such Cash. All Available Cash shall be deposited into the applicable Distribution Account(s). Available Cash shall not include Net Sale Proceeds in the Net Sales Proceeds Account where the Disputed Secured Claims are Allowed but subject to an equitable subordination judgment.

2.1.14    Avoidance Actions. All Claims and defenses to Claims accruing to the Group IV: Voluntary Debtors and their Estates under Bankruptcy Code Sections 506(d), 510(c), 541, 544, 545, 547, 548, 549, 550, or 551.

2.1.15    Bankruptcy Code. The United States Bankruptcy Code.

2.1.16    Bankruptcy Court. The United States Bankruptcy Court for the Central District of California, having jurisdiction over the Cases and, to the extent of any withdrawal of the reference made pursuant to Section 157 of title 28 of the United States Code, the United States District Court for the Central District of California; or, in the event such courts cease to exercise jurisdiction over the Cases, such court or unit thereof that exercises jurisdiction over the Cases in lieu thereof.

2.1.17    Bankruptcy Rules. Collectively, as now in effect or hereafter amended and as applicable to the Cases, (i) the Federal Rules of Bankruptcy Procedure, and (ii) the Local Bankruptcy Rules and General Orders applicable to cases pending before the Bankruptcy Court.

2.1.18    Beneficial Interests. means, collectively, the interests of the holders of Allowed Unsecured Claims in the Plan Trust and in all distributions to be made by the Plan Trust on account of Allowed Unsecured Claims. The Beneficial Interests (a) shall be noted in the books and records of the Plan Trust, (b) shall not be evidenced by a writing, and (c) may not be transferred, sold, assigned or transferred by will, intestate succession or operation of law.

2.1.19    Bond Claim(s). Any Claim against the Debtor(s) and a Bond Issuer under various payment or performance bonds, and/or any claims of Bond Issuer(s) against the Debtor(s) under various payment or performance bonds.

1        2.1.20    Bond Claimant. Holder(s) of a Bond Claim.

2        2.1.21    Bond Indemnification Claim. All Claims by Bond Safeguard, Lexon, and

3    Arch for indemnification for payment by Bond Safeguard, Lexon and Arch of Bond Claims with

4    respect to the Group IV: Voluntary Debtors' Projects.

5        2.1.22    Bond Indemnitors. The individuals and entities that are allegedly liable on

6    the Bond Indemnification Claims, including, allegedly, all of the Debtors, Acquisitions, all

7    Affiliates of Acquisitions, and Elieff.

8        2.1.23    Bond Issuer(s). Bond Safeguard, Lexon and Arch in their capacities as

9    issuers and sureties for payment and performance bonds for the benefit of certain of the Debtors.

10        2.1.24    Bond Safeguard. Bond Safeguard Insurance Company, a Bond Issuer.

11        2.1.25    Business Day. Any day, other than a Saturday, a Sunday or a "legal

12    holiday," as defined in Bankruptcy Rule 9006(a).

13        2.1.26    Cases. The Chapter 11 cases of the Group IV: Voluntary Debtors pending

14    before the Bankruptcy Court.

15        2.1.27    Cash. Currency of the United States of America and cash equivalents,

16    including, but not limited to, bank deposits, immediately available or cleared checks, drafts, wire

17    transfers and other similar forms of payment.

18        2.1.28    Claim. This term shall have the broadest possible meaning under

19    Section 101(5) of the Bankruptcy Code, and shall include (a) any right to payment from any of the

20    Group IV: Voluntary Debtors, whether or not such right is reduced to judgment, liquidated,

21    unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable,

22    secured, or unsecured, or (b) any right to an equitable remedy for breach of performance if such

23    breach gives rise to a right of payment from any of the Group IV: Voluntary Debtors, whether or

24    not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured,

25    unmatured, disputed, undisputed, secured, or unsecured.

26        2.1.29    Claims Bar Date. For any Claim other than an Administrative Claim,

27    March 31, 2009, which was established by the Bankruptcy Court as the last date for creditors to

28    file Proof of Claims with the Bankruptcy Court in all of the Group IV: Voluntary Debtors' cases.

2.1.30    Claims Objection Deadline. The later of (i) the first business day following the one hundred and eightieth (180th) day after the Effective Date, or (ii) such greater period of limitation as may be fixed or extended by the Bankruptcy Court or by agreement between the Plan Trustee and the Holder of the Claim.

2.1.31    Claim Objection Reduction Amount. The amount of Net Sales Proceeds that is made available to the holders of Allowed Unsecured Claims due to the entry of a judgment or order on a Lehman Claim Objection that disallows, reduces, or otherwise adversely modifies the secured claims filed by the Lehman Lenders.

2.1.32    Class. Each group of Claims or Interests classified in Article V of the Plan pursuant to Sections 1122 and 1123 of the Bankruptcy Code.

2.1.33    Committee. The Voluntary Debtors' Committee, both before and after the Confirmation Date.

2.1.34    Confirmation Date. The date on which the Confirmation Order is entered in the Bankruptcy Court's docket.

2.1.35    Confirmation Order. The order entered by the Bankruptcy Court confirming the Plan in accordance with the provisions of Chapter 11 of the Bankruptcy Code.

2.1.36    Contingent Bond Claims. Unmatured Bond Claims.

2.1.37    Creditor. Any Person who is the Holder of a Claim against any Debtor that arose or accrued or is deemed to have arisen or accrued or to have matured, or otherwise become due, owing, and payable on or before the Petition Date, including, without limitation, Claims of the kind specified in Sections 502(g), 502(h) or 502(i) of the Bankruptcy Code.

2.1.38    Debtor(s). Individually or collectively, the Voluntary Debtors and the Trustee Debtors, as specifically defined in Exhibit "1" attached hereto.

2.1.39    Debtor(s)-in-Possession. The Voluntary Debtor(s) when acting in their capacity as representatives of their respective Estates in their respective Chapter 11 Cases.

2.1.40    Disclosure Statement. The document accompanying the Plan for the Group IV: Voluntary Debtors that is entitled "First Amended Disclosure Statement Describing

First Amended Joint Chapter 11 Plan Filed by SJD Partners, Ltd. and SJD Development Corp."
and with all accompanying exhibits.

        2.1.41   Disputed Claim(s). All or any part of a Claim other than any Allowed Amount thereof as to which any one of the following applies: (i) no Proof of Claim has been filed with respect to such Claim, and either (a) the Claim is not listed in the Schedules; or (b) the Claim is listed in the Schedules as unliquidated, disputed, contingent, unknown or in a zero amount, (ii) the Claim is the subject of (a) a Litigation Claim; (b) the Claim is subject to offset by a Litigation Claim; (c) a timely objection that has not been resolved by a Final Order; or (d) a request for estimation in accordance with the Bankruptcy Code, the Bankruptcy Rules, any applicable order of the Bankruptcy Court, or the Plan which is Filed on or before the Claims Objection Deadline, which Adversary Proceeding, objection, or request for estimation has not been dismissed, withdrawn or determined by a Final Order; or (iii) the Claim is otherwise treated as a "Disputed Claim" pursuant to the Plan.

        2.1.42   Disputed Lien(s). An asserted lien(s) against Assets of the Debtor(s) that is either subject to a Disputed Secured Claim, not duly perfected, subject to an Avoidance Action, or subject to an action pursuant to Bankruptcy Code Sections 510(c)(2) and/or 506(d).

        2.1.43   Disputed Secured Claim(s). That part of a Disputed Claim that is a Secured Claim.

        2.1.44   Distribution(s). Payments to Holders of Allowed Claims provided for under the Plan.

        2.1.45   Distribution Agent. The entity that is responsible for making Distributions under the Plan, which shall be Acquisitions.

        2.1.46   Distribution Account(s). Separate account(s) to be established by the Plan Trustee at an FDIC insured bank into which each Group IV: Voluntary Debtors' Available Cash shall be deposited and all Available Cash received by the Plan Trust after the Confirmation Date that would have belonged to such Group IV: Voluntary Debtor shall be deposited, other than Net Sales Proceeds that are subject to Disputed Claims and Disputed Liens.

1    2.1.47    Distribution Date.  With respect to any Allowed Claim or Allowed

2    Interest, the date on which a Distribution is required to be made under the Plan.

3    2.1.48    Effective Date. A date selected by the SunCal Plan Proponents that is not

4    later than the ninetieth (90th) calendar day after the Confirmation Date, provided there is not stay

5    pending appeal, in which case the deadline for the Effective Date will be tolled until such stay

6    pending appeal has expired.

7    2.1.49    Elieff.  Bruce Elieff, the president of Acquisitions, a purported obligor on

8    the Bond Claims with corresponding indemnity Claims against the Debtors.

9    2.1.50    Estates.  The bankruptcy estates of the Group IV: Voluntary Debtors

10    created pursuant to Section 541 of the Bankruptcy Code.

11    2.1.51    Fee Applications.  Applications of Professional Persons under Sections

12    330, 331 or 503 of the Bankruptcy Code for allowance of compensation and reimbursement of

13    expenses in the Cases.

14    2.1.52    Fee Claim.  A Claim under Sections 330 or 503 of the Bankruptcy Code

15    for allowance of compensation and reimbursement of expenses in the Cases.

16    2.1.53    Filed.  Delivered to, received by and entered upon the legal docket by the

17    Clerk of the Bankruptcy Court.  "File" shall have a correlative meaning.

18    2.1.54    Final Order.  A judgment, order, ruling or other decree issued and entered

19    by the Bankruptcy Court.

20    2.1.55    General Unsecured Claim.  A Claim against a Group IV: Voluntary Debtor

21    that is not (a) a Secured Claim, (b) an Administrative Claim, (c) a Tax Claim or (d) a Priority

22    Claim.

23    2.1.56    Group IV: Voluntary Debtors. SJD Partners, Ltd. and SJD Development

24    Corp..

25    2.1.57    Holder.  The beneficial owner of any Claim or Interest.

26    2.1.58    Insider.  The term shall have the broadest meaning possible under

27    Section 101(31), including, but not limited to, a person in control of the Debtor, Affiliates and

28    Insiders of such Affiliates, including the Lehman Entities.

1          2.1.59   Interest. Any equity security interest in any Group IV: Voluntary Debtor

2  within the meaning, of Section 101(16) of the Bankruptcy Code, including, without limitation, any

3  equity ownership interest in any of the Group IV: Voluntary Debtors, whether in the form of

4  common or preferred stock, stock options, warrants, partnership interests, or membership interests.

5          2.1.60   LBHI. Lehman Brothers Holdings, Inc., a Lehman Entity, the parent

6  company of Lehman ALI and LCPI, and a Chapter 11 debtor in a bankruptcy proceeding pending

7  in the Bankruptcy Court for the Southern District of New York.

8          2.1.61   LCPI. Lehman Commercial Paper, Inc., a Chapter 11 debtor in a

9  bankruptcy proceeding pending in the Bankruptcy Court for the Southern District of New York.

10         2.1.62   Lehman Adversary Proceeding. The Debtors' pending adversary

11  proceeding against the Lehman Lenders and/or the Lehman Successors asserting various causes of

12  action including equitable subordination, fraudulent conveyances and preferential transfers.

13         2.1.63   Lehman ALI. Lehman ALI, Inc.

14         2.1.64   Lehman Re. Lehman Re LTD., an Affiliate of the Lehman Entities and a

15  Lehman Successor to Lehman's Disputed Claim and Disputed Liens arising from the Pacific Point

16  First Loan Agreement.

17         2.1.65   Lehman Claim Objections. The objections filed by the Debtors to the

18  claims filed by the Lehman Lenders that are based upon the Lehman Disputed Loans and the

19  Lehman Disputed Administrative Loans, including, but not limited to, the Lehman Recoupment

20  Objection and the Lehman 502(d) Objection.

21         2.1.66   Lehman Entities. The Lehman Lenders, the Lehman Equity Members and

22  LBHI.

23         2.1.67   Lehman Equity Members. Lehman Entities that own direct or indirect

24  membership Interests in all of the Trustee Debtors, except for SunCal Heartland and SunCal

25  Marblehead.

26         2.1.68   Lehman Lenders. Lehman ALI, LCPI, Northlake Holdings, and OVC

27  Holdings.

28

1      2.1.69    Lehman Disputed Loans. Collectively the following loans that are the

2  purported basis for the Lehman's Disputed Claims:  (a) SunCal Communities I Loan Agreement;

3  (b) Bickford Second Loan Agreement; (c) Ritter Ranch Loan Agreement; (d) SCC Palmdale Loan;

4  (e) Interim Loan Agreement; (f) SunCal Oak Knoll/SunCal Torrance Loan Agreement; (g) SunCal

5  Century City Loan Agreement; (h) SunCal PSV Loan Agreement; (i) SunCal Delta Coves Loan

6  Agreement; (j) SunCal Marblehead/SunCal Heartland Loan Agreement; (k) Sun Cal Oak Valley

7  Loan Agreement; (l) SunCal Northlake Loan Agreement; (m) Pacific Point First Loan Agreement;

8  and (n) Pacific Point Second Loan Agreement.

9      2.1.70    Lehman Representatives. The individuals that controlled the Lehman

10  Entities.

11      2.1.71    Lehman Successor(s). Entities other than the Lehman Lenders that either

12  assert to be or are determined by the Bankruptcy Court to be the beneficial owner(s) of the Lehman

13  Disputed Loan(s), including, but not limited to Fenway Capital, Lehman Re and Danske Bank.

14      2.1.72    Lehman's Disputed Claim(s). All of the Proofs of Secured Claims filed by

15  a Lehman Lender or a Lehman Successor in the Debtors' Chapter 11 Cases arising from the

16  Lehman Disputed Loans and the Lehman Disputed Administrative Loans.

17      2.1.73    Lehman's Disputed Lien(s). All of the alleged liens relating to Proofs of

18  Secured Claims filed by a Lehman Lender or a Lehman Successor in the Debtor's Chapter 11

19  Cases arising from the Lehman Disputed Loans.

20      2.1.74    Lexon. Lexon Insurance Co.

21      2.1.75    LitCo. A newly formed Delaware limited liability company that will be

22  purchasing the claims and litigation rights held by the Reliance Claimants that choose Option A

23  provided for in the Plan.

24      2.1.76    Litigation Claims.  Any and all interests of the Group IV: Voluntary

25  Debtors in any and all Claims, rights, causes of action, and objections or defenses to Claims, liens,

26  rights, or causes of action which have been or may be commenced by the Group IV: Voluntary

27  Debtor(s), the Chapter 11 Trustee, or the Voluntary Debtors, as the case may be, including, but not

28  limited to, any (i) Avoidance Actions; (ii) for turnover of property to the Group IV: Voluntary

Debtors' Estates and/or the Plan Trust; (iii) for the recovery of property or payment of money that belongs to the Debtors' Estates or the Plan Trust; (iv) the right to compensation in the form of damages, recoupment or setoff of the Debtors' Estates and/or the Plan Trust; (v) the Lehman Adversary Proceeding; (vi) the State Court Action, and (vii) any and all other Claims against Lehman's Disputed Claims and/or Disputed Liens referenced in the Plan or the Disclosure Statement.

2.1.77    Litigation Recoveries. Any Cash or other property received by the Chapter 11 Trustee, the Group IV: Voluntary Debtors, the Voluntary Debtors' Committee and/or the Plan Trust, as the case may be, from all or any portion of a Litigation Claim(s), including, but not limited to, awards of damages, attorneys' fees and expenses, interest and punitive damages, whether recovered by way of settlement, execution on judgment or otherwise.

2.1.78    Maximum Distributions. A Distribution to a Holder of an Allowed General Unsecured Claim against a Group IV: Voluntary Debtor equal to one hundred percent (100%) of the amount of the Holder's Allowed General Unsecured Claim plus interest at the Legal Rate from and as of the Group IV: Voluntary Debtor's Petition Date.

2.1.79    MB Firm. Miller Barondess, LLP.

2.1.80    Mechanic Lien Claims. Mechanic Lien Claims arising pursuant to California Civil Code §3110, et seq. that were either allegedly perfected prepetition or otherwise allegedly satisfy the requirements of Bankruptcy Code 546(b).

2.1.81    Net Litigation Recoveries. Litigation Recoveries less associated Administrative Claims and Post-Confirmation Expenses incurred in connection with such Litigation Recoveries.

2.1.82    Net Sales Proceeds. The Cash generated from the sale(s) or liquidation of the Group IV: Voluntary Debtor(s)' Assets or the Plan Trust's Assets, less payment of selling expenses, taxes, Chapter 11 Trustee fees, and any associated Post-Confirmation Expenses and Administrative Claims incurred in furtherance of such sales or liquidation of such Assets.

2.1.83    Net Sales Proceeds Account(s). Separate account(s) that will be established by the Plan Trustee at an FDIC insured bank into which all Net Sale Proceeds shall be

deposited from the sale of Assets that were allegedly encumbered by a Disputed Secured Claim(s) and/or a Disputed Lien(s). There shall be a separate Net Sales Proceeds Account for the Net Sale Proceeds allegedly subject to each Disputed Secured Claim(s) and/or Disputed Lien(s), except where there are two Disputed Liens on a single Project, in which case, there shall be a single account for the proceeds generated from that Project. The Disputed Secured Claim(s) and/or Disputed Lien(s) shall attach to the corresponding Net Sales Proceeds Account(s) pending any Final Order(s) of the Bankruptcy Court resolving the applicable Disputed Secured Claim(s) and/or applicable Disputed Lien(s). To the extent that a particular Disputed Claim is disallowed or a particular Disputed Lien is avoided (other than transferred to the Estates pursuant to Bankruptcy Code Section 510(c)(2)) or otherwise invalidated, such Net Sales Proceeds allegedly subject thereto shall become Available Cash and shall be transferred to the applicable Distribution Account(s). To the extent that a particular Disputed Secured Claim and a Disputed Lien are allowed and deemed valid but subject to the equitable subordination causes of action in the Lehman Adversary Proceeding, the funds shall remain in the Net Sales Accounts pending a Final Order on the equitable subordination causes of action in the Lehman Adversary Proceeding.

2.1.84    Orders for Relief Date. The following are dates that orders for relief were entered for each of the Trustee Debtors:

| SunCal Oak Valley | January 6, 2009 |
|---|---|
| SunCal Heartland | January 6, 2009 |
| SunCal Northlake | January 6, 2009 |
| SunCal Marblehead | January 6, 2009 |
| SunCal Century City | January 6, 2009 |
| SunCal PSV | January 6, 2009 |
| Delta Coves | January 6, 2009 |
| SunCal Torrance | January 6, 2009 |
| SunCal Oak Knoll | January 6, 2009 |

2.1.85    Pacific Point First Loan Agreement. A certain loan agreement, dated February 16, 2006, by and among Lehman ALI, SJD Development and SJD Partners, pursuant to which Lehman ALI made a loan in the maximum aggregate principal amount of approximately $125,000,000. The Pacific Point First Loan Agreement is allegedly secured by a first-priority deed of trust on the Pacific Point Project. The Pacific Point First Loan Agreement had an asserted

1  balance due of $120,110,237 as of March 30, 2009, and ownership of this loan is now held by

2  Lehman Re, a Bermuda business entity.

3         2.1.86    Pacific Point Second Loan Agreement. A certain loan agreement, dated

4  May 1997, by and between Lehman ALI and SJD Partners, pursuant to which Lehman ALI initially

5  made a loan in the maximum aggregate principal amount of approximately $20,000,000.  The

6  Pacific Point Second Loan Agreement was secured by a second-priority deed of trust on the Pacific

7  Point Project, which was foreclosed upon on August 28, 2008 by LV Pacific Point, as assignee of

8  Lehman ALI.

9         2.1.87    Pacific Point Project. The Project formerly owned by SJD Partners,

10  located in the San Juan Capistrano, California, as more particularly described herein.

11         2.1.88    Person. An individual, partnership, corporation, limited liability company,

12  business trust, joint stock company, trust, unincorporated association, joint venture, governmental

13  authority, governmental unit, committee or other entity of whatever nature.

14         2.1.89    Petition Dates. The following are dates that each of the Voluntary Debtors

15  filed their Voluntary Chapter 11 petitions or Creditors filed involuntary Chapter 11 petitions

16  against the Trustee Debtors:

| Palmdale Hills | November 6, 2008 |
|---|---|
| SunCal Beaumont | November 6, 2008 |
| SCC Palmdale | November 7, 2008 |
| SunCal Johannson | November 7, 2008 |
| SunCal Summit Valley | November 7, 2008 |
| SunCal Emerald | November 7, 2008 |
| SunCal Bickford | November 7, 2008 |
| Acton Estates | November 7, 2008 |
| Seven Brothers | November 7, 2008 |
| SJD Partners. | November 7, 2008 |
| SJD Development | November 7, 2008 |
| Kirby Estates | November 7, 2008 |
| SunCal I | November 7, 2008 |
| SunCal III | November 7, 2008 |
| SCC Communities | November 19, 2008 |
| Del Rio | November 19, 2008 |
| Tesoro | November 19, 2008 |
| Delta Coves Ventures, LLC | November 14, 2008 |
| SunCal Heartland, LLC | November 12, 2008 |
| SunCal Marblehead, LLC | November 12, 2008 |

| LB-L-SunCal Northlake, LLC | November 12, 2008 |
| LB-L-SunCal Oak Valley, LLC | November 12, 2008 |
| SunCal Century City, LLC | November 14, 2008 |
| SunCal PSV, LLC | November 14, 2008 |
| SunCal Torrance Properties, LLC | November 14, 2008 |
| SunCal Oak Knoll, LLC | November 19, 2008 |

2.1.90    Plan. The First Amended Joint Chapter 11 Plan Filed by SJD Partners, Ltd. and SJD Development Corp. together with the Exhibits thereto, as the same may be amended or modified from time to time in accordance with the Plan.

2.1.91    Plan Documents. The Plan, the Plan Trust Agreement and all other documents attached to the Plan Supplement.

2.1.92    Plan Period. The period from the Effective Date to the Plan Termination Date.

2.1.93    Plan Supplement. The compilation of the Plan Documents to be filed with the Bankruptcy Court.

2.1.94    Plan Termination Date. The fifth (5th) anniversary date of the Effective Date, unless the Plan elects an earlier date.

2.1.95    Plan Sponsor. The entity that has committed to cause the funding of certain specified obligations under the Plan on or after the Effective Date. The Plan Sponsor is Acquisitions.

2.1.96    Plan Trust. A liquidating trust to be established prior to or on the Effective Date, with Acquisitions as the Plan Trustee and the Holders of Allowed Claims against the Debtors as the beneficiaries. The purpose of the Plan Trust will be to liquidate the Debtors' Assets (other than Assets that are excluded by the Plan Trustee on the grounds that they lack value or would be difficult to administer) and to otherwise consummate the Plan.

2.1.97    Plan Trustee. The Plan Trustee under the Plan Trust Agreement is Acquisitions.

2.1.98    Plan Trust Agreement. The liquidating trust agreement governing the affairs of the Plan Trust, which will be in substantially the form contained in the Plan Supplement.

1        2.1.99    <u>Plan Trust Beneficiaries</u>. The Plan Trust Beneficiaries are (i) the holders

2  of Beneficial Interests, as of any point in time, and (ii) holders of Allowed Claims that shall be

3  satisfied from Plan Trust Property in accordance with the terms of the Plan.

4        2.1.100   <u>Plan Trust Property</u>. Plan Trust Property means all property within the

5  Chapter 11 estates of the Group IV: Voluntary Debtors, other than property that is affirmatively

6  excluded by the Plan Trustee.

7        2.1.101   <u>Post-Confirmation Expenses</u>.  The fees and expenses incurred by the Plan

8  Sponsor, the Plan Trustee and the Voluntary Debtors' Committee and their professionals following

9  the Confirmation Date (including the fees and costs of Professionals) for the purpose of

10  (i) prosecuting and liquidating the Litigation Claims; (ii) objecting to and resolving Disputed

11  Claims and Disputed Liens; (iii) selling or otherwise liquidating the Plan Trust's Assets;

12  (iv) effectuating Distributions under the Plan; and (v) otherwise consummating the Plan and

13  closing the Group IV: Voluntary Debtors' Chapter 11 Cases.

14        2.1.102   <u>Priority Claim</u>.  Any Claim, other than an Administrative Claim or a Tax

15  Claim, to the extent entitled to priority under Section 507(a) of the Bankruptcy Code.

16        2.1.103   <u>Pro Rata</u>.  Proportionately, so that with respect to any distribution in

17  respect of any Allowed Claim, the ratio of (a)(i) the amount of property distributed on account of

18  such Allowed Claim to (ii) the amount of such Allowed Claim, is the same as the ratio of (b)(i) the

19  amount of property distributed on account of all Allowed Claims of the Class or Classes sharing in

20  such distribution to (ii) the amount of all Allowed Claims in such Class or Classes.

21        2.1.104   <u>Professional</u>.  A Person or Entity (a) employed by the Group IV:

22  Voluntary Debtors, the Voluntary Debtors' Committee pursuant to a Final Order in accordance

23  with Sections 327 and 1103 of the Bankruptcy Code and to be compensated for services rendered

24  prior to the Effective Date, pursuant to Sections 327, 328, 3291 330 and 331 of the Bankruptcy

25  Code, or (b) for which compensation and reimbursement has been allowed by the Bankruptcy

26  Court pursuant to Section 503(b) of the Bankruptcy Code.

27        2.1.105   <u>Professional Fees</u>.  All Allowed Claims for compensation and for

28  reimbursement of expenses under Sections 328, 330 and/or 503(b) of the Bankruptcy Code

1        2.1.106  Projects. The Debtors' residential real estate development projects and

2  other assets as separately defined herein and described in Exhibit "1" to the Disclosure Statement.

3        2.1.107  Reliance Claim. An Allowed Unsecured Claim against a Group IV:

4  Voluntary Debtor that would entitle the holder thereof to be the beneficiary of any equitable

5  subordination judgment obtained against a Lehman Entity by such Group IV: Voluntary Debtor.

6        2.1.108  Reliance Claimant. The holder of a Reliance Claim. A list of the Reliance

7  Claims and Reliance Claimants is attached hereto as Exhibit "8."

8        2.1.109  Sale Period. The Sale Period is the time period during which the SunCal

9  Proponents must consummate a sale or liquidation of the Pacific Point Project. The Sales Period

10  shall commence on the Confirmation Date and shall expire on the Effective Date.

11        2.1.110  SCC LLC. SCC Acquisitions LLC, a limited liability company, a

12  subsidiary of Acquisitions and an indirect and/or a direct parent company of all of the Debtors.

13        2.1.111  Schedules. The schedules of assets and liabilities and list of equity

14  security holders Filed by the Group IV: Voluntary Debtors, as required by Section 521(1) of the

15  Bankruptcy Code, Bankruptcy Rules 1007(a)(3) and (b)(1), and Official Bankruptcy Form No. 6,

16  as amended from time to time.

17        2.1.112  Secured Claim. A Claim secured by a lien on any property of any of the

18  Estate, but only to the extent of the value of the interest of the holder of such Allowed Claim in the

19  interest of the Estate in such property.

20        2.1.113  Secured Claim. Any Claim, including interest, fees, costs, and charges to

21  the extent allowable pursuant to Bankruptcy Code Section 506, that is secured by a valid and

22  unavoidable Lien on the Group IV: Voluntary Debtor(s)' Assets.

23        2.1.114  SJD Development. SJD Development Corp., a California corporation, a

24  Voluntary Debtor, a Voluntary Debtor (a Group IV: Voluntary Debtor), and the parent of SJD

25  Partners.

26        2.1.115  SJD Partners. SJD Partners, Ltd., a Voluntary Debtor (a Group IV:

27  Voluntary Debtor), and the owner of the former owner of the Pacific Point Project.

28

1          2.1.116    State Court Action. The action filed by certain Voluntary Debtors against

2  Lehman Ali, Inc., and certain other defendants, in California Superior Court for the County of

3  Orange (Case No. 30-2011-0040847-CU-BC-CJC), and a reservation of rights to add the Plan

4  Trustee and/or the Trustee Debtors as additional plaintiffs therein.

5          2.1.117    SunCal. The SunCal Companies, a trade name for Acquisitions and its

6  Affiliates.

7          2.1.118    SunCal Management. SunCal Management, LLC, a Delaware limited

8  liability company, and the property manager for the Projects.

9          2.1.119    SunCal Plan Proponent(s). The Group IV: Voluntary Debtors and

10  Acquisitions as the parties-in-interest that are proposing the Plan.

11          2.1.120    Tax. Any tax, charge, fee, levy, impost or other assessment by any

12  federal, state, local or foreign taxing authority, including, without limitation, income, excise,

13  property, sales, transfer, employment, payroll, franchise, profits, license, use, ad valorem,

14  estimated, severance, stamp, occupation and withholding tax. "Tax" shall include any interest or

15  additions attributable to, or imposed on or with respect to such assessments.

16          2.1.121    Tax Claim. Any Claim for any Tax to the extent that it is entitled to

17  priority in payment under Section 507(a)(8) of the Bankruptcy Code.

18          2.1.122    Trustee Debtor(s). The following Debtors, individually or collectively,

19  that are represented by the Chapter 11 Trustee: Delta Coves, SunCal Heartland, SunCal

20  Marblehead, SunCal Northlake, SunCal Oak Valley , SunCal Century City, SunCal PSV, SunCal

21  Torrance, and SunCal Oak Knoll.

22          2.1.123    Unpaid Secured Real Property Tax Claims. Secured Claims held by

23  various government entities secured by liens on the underlying real properties owned by the

24  Debtors but that are non-recourse to the Debtors.

25          2.1.124    Unsecured Claim. An Unsecured Claim is any Claim that is not an

26  Administrative Claim, Tax Claim, Secured Claim, or Priority Claim.

27          2.1.125    Voluntary Debtor(s). The following Chapter 11 debtors and debtors-in-

28  possession, individually or collectively, Palmdale Hills, SunCal I, SunCal III, SCC Palmdale,

1    Acton Estates, SunCal Beaumont, SunCal Emerald, SunCal Johansson, SunCal Bickford, SunCal

2    Summit, Seven Brothers, Kirby Estates, SJD Partners, SJD Development, SCC Communities, Del

3    Rio and Tesoro.

4           2.1.126    Voluntary Debtors' Committee.  The Official Committee of Unsecured

5    Creditors of the Voluntary Debtors appointed in the Cases pursuant to Section 1102 of the

6    Bankruptcy Code.

7        **2.2**    **Rules of Construction.**

8        For purposes of the Plan and this Disclosure Statement, unless otherwise provided herein or

9    in the Plan, (a) whenever from the context it is appropriate, each term, whether stated in the

10   singular or the plural, will include both the singular and the plural; (b) each pronoun stated in the

11   masculine, feminine or neuter includes the masculine, feminine and neuter; (c) any reference in the

12   Plan or this Disclosure Statement to an existing document or schedule filed or to be filed means

13   such document or schedule, as it may have been or may be amended, modified or supplemented

14   pursuant to the Plan; (d) any reference to an entity as a Holder of a Claim or Interest includes that

15   entity's successors and assigns; (e) except as otherwise indicated herein all references in the Plan

16   or this Disclosure Statement to Sections, Articles and Exhibits are references to Sections, Articles

17   and Exhibits of or to the Plan; (f) the words "therein," "thereunder" and "thereto" refer to the Plan

18   in its entirety rather than to a particular portion of the Plan; and (g) unless otherwise provided in

19   the Plan or this Disclosure Statement, any reference in the Plan or this Disclosure Statement to a

20   contract, instrument, release, indenture, agreement, or other document being in a particular form or

21   on particular terms and conditions means that such document shall be substantially and materially

22   in such form or substantially and materially on such terms and conditions; (h) any reference in the

23   Plan or this Disclosure Statement to a document, schedule, or exhibit to the Plan or Disclosure

24   Statement Filed or to be Filed means such document, schedule, or exhibit, as it may have been or

25   may be amended, modified, or supplemented; and (i) the rules of construction set forth in Section

26   102 of the Bankruptcy Code shall apply to the extent such rules are not inconsistent with the

27   express terms of the Plan or this Disclosure Statement or any other provision in this Section 2.2.

28

**2.3**    **Exhibits**.

All Exhibits to the Plan are incorporated into and are a part of the Plan as if set forth in full therein.

### III.

### PLAN CONFIRMATION DEADLINES

The Bankruptcy Court has not confirmed the Plan described in this Disclosure Statement. Accordingly, the terms of the Plan are not binding on anyone. However, if the Bankruptcy Court confirms the Plan, then the Plan will be binding on the Debtor(s), the Plan Trustee, and on all Creditors and Interest Holders in such Cases.

**3.1**    **Time and Place of the Confirmation Hearing**.

The hearing where the Bankruptcy Court will determine whether or not to confirm the Plan will take place at 411 West Fourth Street, Santa Ana, CA 92701-4593 on October 24, 2011, at 9:30 a.m. in Courtroom 5A.

**3.2**    **Deadline for Voting for or Against the Plan**.

If you are entitled to vote, it is in your best interest to timely vote on the enclosed ballot and return the ballot to:

> Winthrop Couchot Professional Corporation
> 660 Newport Center Drive, Suite 400
> Newport Beach, CA 92660
> Facsimile: (949) 720-4111
> Attn: P.J. Marksbury

Your ballot must be **received by** September 26, 2011, or it will not be counted.

**3.3**    **Deadline for Objecting to the Confirmation of the Plan**.

Objections to the confirmation of the Plan must be filed with the Bankruptcy Court, and served upon the following parties so that they are received by September 26, 2011:

| | |
|---|---|
| **Counsel to the Voluntary Debtors** | Paul J. Couchot<br>Winthrop Couchot Professional Corporation<br>660 Newport Center Drive, Suite 400,<br>Newport Beach, CA 92660 |
| **Authorized Agent for Voluntary Debtors** | Bruce V. Cook<br>General Counsel |

|   | 2392 Morse Ave<br>Irvine, CA 92614-6234 |
|---|---|
| **Counsel for SunCal<br>Management LLC and<br>SCC Acquisitions Inc.** | Ronald Rus<br>Rus Miliband & Smith A<br>Professional Corporation<br>2211 Michelson Drive, Seventh Floor<br>Irvine, California 92612 |
| **Authorized Agent for<br>SunCal Management and<br>SCC Acquisitions, Inc.** | Bruce V. Cook<br>General Counsel<br>2392 Morse Ave<br>Irvine, CA 92614-6234 |

### 3.4    Identity of Person to Contact for More Information Regarding the Plan.

Any interested party desiring further information about the Plan should contact the Voluntary Debtors' counsel, Winthrop Couchot Professional Corporation, 660 Newport Center Drive, Suite 400, Newport Beach, CA 92660, Attn: Paul J. Couchot, (949) 720-4100; Peter W. Lianides, (949) 720-4155; Payam Khodadadi, (949) 720-4160.

### 3.5    Disclaimer.

The information contained in this Disclosure Statement is provided by the SunCal Plan Proponents. The SunCal Plan Proponents represent that everything stated in this Disclosure Statement is true to the best of their knowledge. The Bankruptcy Court has not yet determined whether or not the Plan is confirmable and makes no recommendation as to whether or not you should support or oppose the Plan.

The discussion in this Disclosure Statement regarding the Group IV: Voluntary Debtors may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate," or "continue," or the negative thereof or other variations thereon or comparable terminology. The reader is cautioned that all forward looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements. The liquidation analyses, distribution projections, projections of financial results and other information

1   are estimates only, and the timing, amount and value of actual distributions to Creditors may be

2   affected by many factors that cannot be predicted.  Therefore, any analyses, estimates, or

3   projections may or may not turn out to be accurate.

4       The SunCal Plan Proponents and their professionals have made a diligent effort to identify

5   in this Disclosure Statement all Litigation Claims, including claims for relief, counterclaims, and

6   objections to claims.  However, no reliance should be placed on the fact that a particular Litigation

7   Claim is or is not identified in this Disclosure Statement.  The Group IV: Voluntary Debtors or

8   other parties in interest may seek to investigate, file and prosecute Litigation Claims after the

9   Confirmation Date, or the Plan Trust may seek to do so after the Effective Date of the Plan whether

10   or not the Litigation Claims are identified in this Disclosure Statement.

11
### IV.

12
## FACTUAL BACKGROUND OF THE DEBTORS

13   **4.1**    **The Formation of the Debtors and the Projects.**

14       **4.1.1**   **Overview of the Debtors and their Projects.**

15       The Group IV: Voluntary Debtors are two of twenty-six entities (collectively the "Debtors")

16   that were formed pursuant to a joint venture between Affiliates of the SunCal Companies

17   ("SunCal") and the Lehman Entities (the "SunCal/Lehman Joint Venture"). The Debtors role in the

18   venture was to own and develop the large residential projects that were the core assets in this joint

19   undertaking. At the inception of SunCal/Lehman Joint Venture, it was agreed that SunCal would be

20   the developer/manager of the Projects and the Lehman Entities would provide the necessary capital.

21   Attached hereto as Exhibit "1" is a general description of the Debtors' Projects, including the

22   Debtors' other primary Assets, excluding Cash and the Litigation Claims, and a description of the

23   loans for the Projects.

24       All of the Debtors are Affiliates of Acquisitions and SCC LLC.  Some of the Debtors

25   directly own the Projects, while others serve as holding companies, owning Allowed Interests in the

26   Debtors that hold title to the Projects.  SunCal Management, LLC, a SunCal Affiliate, has

27   management contracts with respect to all of the Projects and manages the Debtors' day-to-day

28   business affairs.

The seventeen Debtors who are referred to herein as the "Voluntary Debtors" are wholly owned by SunCal Affiliates, and consequently the SunCal Affiliates have full corporate governance authority over these entities. The Voluntary Debtors own eleven (11) of the Projects. As described herein, SJD Partners formerly owned the Pacific Point Project. In the case of the nine Trustee Debtors, the SunCal Affiliates and the Lehman Affiliates initially shared ownership equally (50% each). However, after the Petition Date, the SunCal Affiliates became the owner of hundred percent (100%) of the equity in two of the nine Trustee Debtors - SunCal Heartland and SunCal Marblehead. The Trustee Debtors own nine (9) Projects.

Attached hereto as Exhibit "2" is a chart that sets forth the appraised value of the Debtors' Projects.[2] The Group IV: Voluntary Debtors value the Pacific Point Project at $16,000,000, which is the subject of litigation described herein.

### 4.1.2    The Debtors' Primary Secured Creditors and Their Disputed Claims.

SJD Partners is a party to a certain loan agreement, dated February 16, 2006, by and among Lehman ALI, SJD Development and SJD Partners, pursuant to which Lehman ALI made a loan in the maximum aggregate principal amount of approximately $125,000,000 (the "Pacific Point First Loan Agreement"). The Pacific Point First Loan Agreement is allegedly secured by a first-priority deed of trust on the Pacific Point Project. The Pacific Point First Loan Agreement had an asserted balance due of $120,110,237 as of March 30, 2009, and ownership of this loan is now held by Lehman Re, a Bermuda business entity. For more detail, see Exhibit "3".

SJD Partners was also a party to a certain loan agreement, dated May 1997, by and between Lehman ALI and SJD Partners, pursuant to which Lehman ALI initially made a loan in the maximum aggregate principal amount of approximately $20,000,000 (the "Pacific Point Second Loan Agreement"). The Pacific Point Second Loan Agreement was secured by a second-priority deed of trust on the Pacific Point Project, which was foreclosed upon on August 28, 2008 by LV Pacific Point, as assignee of Lehman ALI ("LV Pacific Point")

---

[2] Values may have changed since these analyses were prepared.

1    As stated, SJD Partners no longer owns the Pacific Point Project, allegedly due to the

2  illegal foreclosure of the Pacific Point Project. Pursuant to the Lehman Adversary Proceeding and

3  the State Court Action, the litigation over the Pacific Point Project is based on the following facts:

4    Pursuant to the Restructuring Agreement and Settlement Agreement, the SunCal parties

5  agreed not to interfere with the foreclosure of the Pacific Point Project, in consideration for the

6  assumption and payment of the specified payables and obligations. Although LV Pacific Point

7  took title to the Pacific Point Project, it has failed and refused to pay any of payables or obligations

8  for which it is liable pursuant to the parties' agreements. In other words, the SunCal parties have

9  done, vis-à-vis Pacific Point, everything they could do under the agreement. Yet the Lehman

10  Entities, despite having gotten all of the benefits of the agreement in connection therewith, have

11  still refused to pay.

12    Pursuant to the Lehman Adversary Proceeding, SJD Partners has a fraudulent inducement

13  action against LV Pacific Point, a Lehman Entity, seeking rescission and/or damages. Moreover,

14  the Sixth Claim for Relief in the State Court Action for breach of contract is brought by SJD

15  Partners, Ltd. (the owner of the Pacific Point Project prior to the foreclosure) against Lehman ALI,

16  LV Pacific Point, PAMI LLC, and PAM Inc.(PAMI LLC's parent) for failure to pay urgent

17  payables, assumed Pacific Point obligations and lender authorized work. This claim seeks

18  damages in excess of ten million dollars.

19    The Seventh Claim for Relief for breach of contract is brought by Bruce Elieff and SCC

20  Acquisitions, Inc., against the same defendants for the same Pacific Point-related obligations,

21  seeking recovery of damages to the extent that these plaintiffs face exposure for these amounts.

22  These plaintiffs also join with all other plaintiffs in the Eighth Claim for Relief against Lehman

23  ALI for breach of the covenant of good faith and fair dealing, which seeks in excess of $100

24  million.

25

26

27

28

### 4.1.3    A Summary of All of the Alleged Claims Against the Group IV:
### Voluntary Debtors.

Attached hereto as Exhibit "4" is a chart that sets forth the prepetition Claims that have been asserted against all of the Debtors.  In summary, the asserted Claims against the Group IV: Voluntary Debtors consist of the following:

| Claims | SJD Partners |
|---|---|
| Unpaid Secured Real Property Tax Claims | $0 |
| The Disputed Lehman Secured Claims | $120,110,237 |
| Mechanics Lien Claims | $0 |
| Administrative and Priority Claims | $550,693 |
| General Unsecured Claims Including alleged Bond Claims | $56,206,409 |

The SunCal Plan Proponents believe that these balances will ultimately be reduced through claims objections resulting in lower "Allowed" claims balances.

### 4.1.4    Summary of the Group IV: Voluntary Debtors' Cash.

The following chart sets forth the Group IV: Voluntary Debtors' cash on hand as of January 31, 2011.

| Group IV: Voluntary Debtors | Amount |
|---|---|
| SJD Partners | 35,568.50 |
| SJD Development | 205.99 |

The Group IV: Voluntary Debtors' review of the applicable loan and lien document indicates that most of the alleged liens were not validly perfected.

### 4.2    Factual Circumstances Leading to the Filing of the Debtors' Chapter 11 Cases.

### 4.2.1    Introduction.

In this section of the Disclosure Statement, the SunCal Proponents have provided a brief description of the relationship between the Debtors and the Lehman Entities. This background is relevant to the Group IV: Voluntary Debtors, and in fact all of the Debtors, for the following reasons. First, most of the unsecured claims asserted against the Debtors were incurred at the insistence of the Lehman Lenders, and they would have been paid if the Lehman Lenders had honored their obligation to pay these claims. Second, a substantial part of claims that the Lehman Lenders failed to pay are being asserted against *all of the Debtors*. If the litigation against the

1    Lehman Lenders discussed herein is successful, it will, at a minimum, reduce the pool of claims

2    against the Group IV: Voluntary Debtors, and thereby increase the dividend payable to the

3    remaining creditors. Third and finally, this history allows the Creditors to take the measure of the

4    parties who are now proffering the competing plan – the Lehman Lenders.  As the within

5    discussion will establish, the Lehman Lenders failed to pay the claims of Creditors prepetition, and

6    the Lehman Lenders attempted to destroy the Debtors' reorganization and sale efforts by

7    manipulating LCPI's alleged automatic stay. The SunCal Plan Proponents believe that this history

8    will lead the Creditors to conclude, when weighing the merits of the Lehman Lenders Plan offer:

9    "Fool me once shame on you, fool me twice shame on me."

10              **4.2.2    Background of the SunCal Companies**.

11          SunCal is a family-owned and operated real estate business that has been successfully

12    developing properties throughout the western United States for over 70 years.  SunCal's business

13    focuses upon the "development" of residential land. A typical SunCal development begins with the

14    acquisition of one or more parcels of raw land. Thereafter, the SunCal team develops a master plan

15    for the acreage that incorporates streets, homes, parks, schools and commercial areas, and then it

16    works with the applicable municipal planning authorities (the city, county, state and federal) to

17    secure the necessary approvals or "entitlements" to gain approval of the Plan. This process, which

18    requires the assistance of land planners, civil engineers, architects, lawyers, and other land

19    specialists, takes a period of years. Once the master plan is approved, SunCal provides for the

20    grading of the project and the installation of the foundational infrastructure (streets, utilities, etc.)

21    and then sells the lots or parcels within the project to merchant builders.

22              **4.2.3    The Origins of the SunCal/Lehman Joint Venture.**

23          SunCal historically financed its projects with loans and/or equity from a number of

24    different sources.  However, beginning in 1997, an increasing number of SunCal's projects were

25    financed by the Lehman Entities, as Mark Walsh ("Walsh"), the head of LBHI's Global Real

26    Estate Group, began cultivating a business relationship with SunCal's principals.

27          By 2003, the Lehman Entities and SunCal had entered into joint ventures involving

28    approximately fifteen projects.  By 2007, that number had grown to over forty, and the Lehman

1    Entities had become, with limited exceptions, the exclusive provider of financing for the SunCal

2    Projects pursuant to a written agreement executed in 2006. The Lehman Entities also consisted of

3    the Lehman Equity Members that either directly or indirectly owned a fifty percent (50%) equity

4    interest in all nine of the Trustee Debtors.

5        In their dealings with SunCal, the Lehman Representatives made no distinction between

6    Projects financed by Lehman ALI and Projects financed by LCPI. They also made no distinction

7    between the Debtors in which Lehman Equity Members held 50% equity memberships or the

8    Debtors in which the Lehman Entities held no equity membership interest. As agents of the

9    financial partner in the parties' joint venture, the Lehman Representatives would determine which

10   Lehman Entity would provide financing on which Projects, and would dictate the structure that the

11   financing would take, according to whatever suited the Lehman Entities' needs.

12           **4.2.4    Lehman's Effective Control over the Management of the Debtors and**

13                      **Promises of Ongoing Funding.**

14       Prior to the market downturn in the middle of 2007, Lehman Representatives afforded

15   SunCal substantial discretion in the management and development of the Projects. The Debtors

16   would contract with third-party vendors to perform grading, health and safety compliance,

17   construction, landscaping, and other necessary services on the Project sites, and they would work

18   with the local municipalities to obtain the necessary entitlements and other authorizations

19   necessary to proceed with development. The Lehman Representatives, SunCal and the Debtors

20   would discuss anticipated quarterly expenditures at periodic budget meetings, and , as expenses

21   were incurred each month, SunCal and the Debtors would submit requests for payment to the

22   Lehman Representatives, supported by the necessary documentation. The Lehman Representatives

23   would then provide the funding necessary to pay these expenses.

24       During the third quarter of 2007, the foregoing management and payment dichotomy

25   changed, after the real estate market experienced a sudden downturn, and many of the Projects

26   significantly declined in value. In response to this dramatic economic change, a series of high

27   level discussions occurred between SunCal's representatives and the Lehman Representatives --

28   including Walsh, Paul Hughson ("Hughson") and Frank Gilhool ("Gilhool"), the Managing

1  Directors of Lehman's Global Real Estate. In these discussions, SunCal's representatives, acting

2  on behalf of the Debtors, expressed concerns about the loans on the Projects being out of balance,

3  and suggested shutting down the Projects, or at least slowing the pace of development. However,

4  Walsh specifically instructed SunCal not to slow down or stop work. He assured SunCal that the

5  Lehman Entities would provide the necessary funding to pay vendors and to keep the development

6  of the Projects moving forward.

7      The foregoing assurances of payments were confirmed in numerous telephone

8  conversations between Gilhool and SunCal's COO, Frank Faye ("Faye"), SunCal's General

9  Counsel, Bruce Cook ("Cook"), Steve Elieff and/or Bruce Elieff that took place during 2007 and

10 2008. In each exchange, Gilhool assured SunCal that the Lehman Entities were committed to

11 funding the debts and obligations being incurred at the Projects and they continued to insist that

12 work proceed.

13     During this time frame, the Lehman Representatives became much more "hands on,"

14 scrutinizing and approving all budgets and expenses through a new control and approval structure.

15 Under the new structure, SunCal would submit budgets to the Lehman Representatives on a

16 weekly basis and explain, during period conference calls, what Project payables they believe had to

17 be paid and what work had to be performed on the Projects. The Lehman Representatives would

18 then unilaterally decide what future work would proceed, the Lehman Representatives would

19 authorize the work and the Lehman Representatives would decide what payables would be paid

20 timely by designating them as "urgent," and what other payables were not urgent and hence would

21 not be paid on a timely basis. However, even under this new Lehman controlled management and

22 payment regime, the Lehman Representatives made it clear that all payables being incurred would

23 be funded.

24         **4.2.5   The 2008 Restructuring Agreement.**

25     By the fall of 2007, both SunCal and the Lehman Representatives contemplated entering

26 into restructuring agreement in the near term, with a closing to occur no later than January or

27 February of 2008. However, this transaction was delayed by the Lehman Entities' extensive

28 documentation demands until May 23, 2008. On this date, SunCal and most of the Debtors finally

1    entered into an omnibus "Restructuring Agreement" with LBHI, Lehman ALI and the other

2    Lehman Entities.  The same Lehman Representative signed the Restructuring Agreement on behalf

3    of all of the Lehman Entities.

4        Pursuant to the Restructuring Agreement, Lehman ALI, "as the Lender with respect to each

5    Loan," committed, among other things, to: (1) make advances under existing loans to fund the

6    continuing costs necessary to preserve the value of the Projects; (2) move forward to resolve the

7    accrued outstanding subcontractor payables, i.e., to make sure that the Projects' creditors were paid

8    for their work; and (3) to close the transaction, whereby newly-created Lehman Entities would

9    assume the debt and obligations of the Projects.

10        As originally executed in May 2008, the Restructuring Agreement applied to twelve of the

11    twenty Projects (as well as several other projects not at issue in the Lehman Adversary

12    Proceeding):  (1) Acton Estates; (2) Beaumont Heights; (3) Bickford Ranch; (4) Emerald

13    Meadows; (5) Heartland; (6) Johannson Ranch; (7) Marblehead; (8) Northlake; (9) Oak Valley;

14    (10) Pacific Point; (11) Ritter Ranch; and (12) Summit Valley.  The Debtors that owned and/or

15    held equity interests in the entities that owned  these Projects were signatories to the May 2008

16    agreement.[3]

17        Between May and August 2008, the parties agreed to add four additional projects to the

18    Restructuring Agreement: (1) Del Rio; (2) Joshua Ridge; (3) Palm Springs Village; and (4) Tesoro

19    Burnham, and the four Debtors associated with these Projects—SunCal Del Rio, SCC

20    Communities, SunCal PSV, and SunCal Tesoro.  Only four Projects were  not included in the

21    Restructuring Agreement: Century City, Delta Coves, Oak Knoll and Del Amo.  Accordingly, the

22    four Debtors associated with these Projects—SunCal Century City, Delta Coves, SunCal Oak

23

---

24    [3] Specifically, the Restructuring Agreement was entered into by, among others, the "Borrowers,"
"Grantors" and "Pledgors," as defined in Annex 1 thereto.  The "Borrowers" included SunCal Marblehead,
25    SunCal Heartland, SunCal Northlake, SunCal Oak Valley, SJD Partners, Palmdale Hills, SCC Palmdale,
SunCal I, SunCal III, and SunCal Bickford.

26
The "Grantors" included SunCal Marblehead, SunCal Heartland, SunCal Northlake, SunCal Oak Valley,
27    SJD Partners, Palmdale Hills, SunCal Bickford, SunCal Acton, SunCal Summit and SunCal Emerald, and
Debtors SunCal Beaumont and SunCal Johannson.
28

The "Pledgors" included SCC Palmdale, SunCal I, SunCal Summit and SJD Development.

1  Knoll and SunCal Torrance—were not signatories thereto.  Lehman ALI was the lender on each of

2  these Projects and , and as with the other Projects, Lehman Ali continued to insist that these four

3  debtors  proceed with the development of the four Projects, it approved all expenses, and it

4  continually provided assurances of payment.

5         **4.2.6    The Lehman Lenders Hire Radco.**

6         Subsequent to the execution of the Restructuring Agreement, Lehman ALI arranged for a

7  third party, Radco, to directly settle outstanding contractor payables, as its agent.  Radco was

8  provided some limited funding and authority to negotiate settlements, and did in fact reach

9  settlement with a number of creditors.  The funding for these settlements, whether the debts related

10 to Lehman ALI or LCPI funded Projects, came from the same source.  Lehman ALI and LCPI also

11 provided approval for new work on the Projects, and Lehman ALI paid for some of this work.

12 However, this funding was minimal and it soon stopped.

13        In August 2008, Lehman ALI withdrew funding and settlement authority from Radco,

14 leaving millions of dollars in outstanding contractor payables unresolved, notwithstanding the

15 contrary provisions in the Restructuring Agreement.  Leman Ali's actions also impaired the

16 Debtors' ability to resolve ongoing public health and safety issues arising at the Projects.

17 Ultimately,  only a fraction of the total outstanding payables were resolved, contrary to the  past

18 promises made by Lehman Representatives.

19        **4.2.7    The Lehman Lenders' Failure to Close on the Settlement Agreement.**

20        Pursuant to the terms of the Restructuring Agreement, the parties agreed to enter into a

21 Settlement Agreement, the form of which was attached to the Restructuring Agreement.  The

22 Settlement Agreement provided for the transfer of the Projects included within the Restructuring

23 Agreement to a series of  newly formed Lehman-controlled entities (each with "SCLV" in its

24 name, for "SunCal-Lehman Venture"). The agreement further provided that the entity taking title

25 to the Project would assume the  Lehman Lender debt obligations associated with the Projects,

26 assume certain bond obligations associated with the Projects, and provide indemnifications to

27 SunCal and the Debtors for unpaid claims.

28

1    On August 25, 2008, the Settlement Agreement and a series of related documents were

2  formally executed by SunCal and the applicable Lehman Lenders and Lehman Equity Members at

3  a meeting held in Los Angeles on August 25, 2008.  Once these documents were signed, all that

4  remained was the mechanical closing of the series of transactions described in the Settlement

5  Agreement. Since all of the conditions precedent to the closings had been satisfied, or could have

6  been satisfied at the meeting, this should have occurred at the August 25, 2008 meeting. However,

7  the Lehman Representative asked SunCal to extend the closing date for thirty days, to September

8  30, 2008. Accordingly to the Lehman Representatives, this short extension would enable them to

9  secure certain outstanding third party consents. Although SunCal knew these third party consents

10  were readily available, within a few days they agreed to this extension, believing the request was

11  made in good faith. In fact, as more fully explained blow, it was not..

12    **4.2.8    The Lehman Lenders' Undisclosed Sale of Most of the Debtors' Loans.**

13    As explained above, the Settlement Agreement was duly executed by all parties at a formal

14  closing meeting held on August 25, 2008. When the parties signed this agreement, which was a

15  binding contract, they both represented that they both intended and had the power and capacity to

16  perform all of the obligations undertaken therein. However, in the case of the Lehman Entities, this

17  representation was later discovered to be false. When the closing occurred on August 25, 2008, the

18  Lehman Lenders had already sold the very obligations they were agreeing to assume and restructure

19  in the Settlement Agreement to Fenway Capital pursuant to a repurchase agreement.  Accordingly,

20  as of August 25, 2008, they lacked the power to perform the most essential undertakings that they

21  agreed to perform in the Settlement Agreement. Instead of disclosing this fact at the August 25,

22  2008 meeting, the Lehman Lenders requested additional time to execute the agreed upon transfers

23  provided for under this binding agreement. The Lehman Lenders needed this delay for an obvious,

24  but undisclosed reason: They lacked the ability to perform the very obligations they had just agreed

25  to perform in the Settlement Agreement.

26    The Lehman Representatives also did not disclose at the August 25, 2008 closing that they

27  intended to sell the Pacific Point First Loan to Lehman Re, approximately a week later, *even though*

28  *this loan was also subject to the Settlement Agreement*. To the contrary, the Lehman

1  Representatives affirmatively concealed these facts from SunCal and the Debtors by asserting that

2  ownership still existed in the case of seven of the eight loans.

3      **4.2.9**    **Lehman's Foreclosure Sale and Purchase of the Pacific Point Project.**

4        At the time the Restructuring Agreement and the Settlement Agreement were signed, the

5  Pacific Point Project, which was still owned by SJD Partners, was among the Projects included in

6  the Restructuring Agreement and the Settlement Agreement.  Pursuant to the Restructuring

7  Agreement, and as detailed in the Settlement Agreement attached thereto, SunCal, SJD Partners,

8  and its parent company, SJD Development, all agreed that they would not interfere with Lehman

9  ALI's (or its designee's) foreclosure on the Pacific Point Project. They further agreed that a new

10  Lehman entity, LV Pacific Point, would purchase the Pacific Point Project upon foreclosure and

11  that Lehman ALI and LV Pacific Point would (a) assume SJD Partners' and SJD Development's

12  outstanding accounts payable for Pacific Point third-party vendors, (b) assume certain bond

13  liability associated with the Pacific Point Project, and (c) pay for the millions of dollars worth of

14  work that Lehman ALI representatives had authorized.

15        As previously stated, the Settlement Agreement was signed on August 25, 2008 by the

16  SunCal parties, including SJD Partners and SJD Development.  It was also signed by Gilhool as

17  authorized signatory on behalf of both Lehman ALI and LV Pacific Point.  As a signatory to the

18  Settlement Agreement, LV Pacific Point was required to purchase the Pacific Point Project at the

19  foreclosure sale subject to the above obligations. Consistent with this agreement, the City of San

20  Juan Capistrano executed an estoppel certificate for the benefit of SJD Partners and Lehman ALI—

21  at Lehman ALI's request—on August 26, 2008, two days before the foreclosure sale.  This

22  certificate stated, among other things, that the "Acquiring Entity [LV Pacific Point] shall by

23  operation of law become the legal successor-in-interest to Developer [SJD Partners]" under SJD

24  Partners' agreements with the City. That certificate further provided that there existed no breaches,

25  defaults, or claims under SJD Partners' agreements with the City.

26        On August 28, 2008, Lehman ALI foreclosed on the Pacific Point Project, and title was

27  transferred to LV Pacific Point at the foreclosure sale.  However, Lehman ALI and LV Pacific

28  Point failed to assume the liabilities and obligations associated with this Project as agreed.  This

1  breach of the parties' agreement, left SJD Partners without title to the Pacific Point Project, but

2  with the potential liability for the unsecured claims relating to the Project, including bond claims of

3  approximately $34 million,. Moreover, since Lehman Ali and LV Pacific Point have continued to

4  ignore their obligations under the above agreement, unpaid taxes, fines, and penalties have

5  continued to accrue to the detriment of the Project and these claims are being asserted against SJD

6  Partners..

7       Had SunCal, SJD Partners and SJD Development known that Lehman ALI and LV Pacific

8  Point had no intention of honoring their obligations under the foregoing agreement, they never

9  would have agreed to cooperate with the foreclosure. Instead, SJD Partners would have filed for

10  bankruptcy earlier, thereby mitigating the damages from Lehman Ali's breach, by allowing

11  creditors recourse to the value of the Project.

12       This course of conduct is relevant to the unsecured creditors of the Group IV: Voluntary

13  Debtors for the following reason. The holders of bond claims against SJD Partners are asserting

14  their massive claims against the estates of all of the Debtors, including the estates of the Group IV:

15  Voluntary Debtors. Accordingly, Lehman Ali's wrongs against SJD Partners directly affect the

16  Group IV: Voluntary Debtors' cases.

17       **4.2.10  Alvarez and Marsal Take Over Control of the Lehman Entities After**

18              **the Chapter 11 Filings of LBHI and LCPI.**

19       LBHI filed for bankruptcy in September 2008 and LCPI filed for bankruptcy in October

20  2008. After LBHI's filing, Bryan Marsal ("Marsal") of Alvarez & Marsal ("A&M") was appointed

21  to serve as LBHI's Chief Restructuring Officer. Marsal and A&M are in charge of liquidating the

22  now defunct Lehman Entities, including Chapter 11 debtors LBHI and LCPI, and the non-bankrupt

23  Lehman Lenders (Lehman ALI, OVC, and Northlake Holdings, as well as the non-bankrupt

24  Lehman Equity Members.

25       Although A&M was not employed until after the events that occurred on August 25, 2008

26  described above, it should be noted that A&M hired the same law firm that represented the

27  Lehman Lenders in the August 25, 2008 meeting – Weil, Gotshal & Manges, LLP. Moreover, as

28  more fully explained herein, it was A&M that directed Lehman Ali not to perform its contractual

1   obligations under the Settlement Agreement after September of 2008. Accordingly, the same

2   individuals that caused the damages to unsecured creditors by insisting upon the breach of the

3   Settlement Agreement, are now asking for their vote in the competing plan filed by the Lehman

4   Lenders.

5         LBHI's bankruptcy filing and the Lehman Lenders refusal, at A&M's direction, to close the

6   transactions provided for under the Settlement Agreement as agreed, were not small matters. They

7   severely damaged the Debtors. Although the Debtors were not proceeding with any new

8   construction or development, the Debtors were still required to expend significant sums on site

9   security, erosion control, property taxes and other measures in order to prevent the Projects from

10  becoming a public safety hazard, and in order to avoid the loss of valuable entitlements, and to

11  mitigate penalties and fines being incurred by the Projects. Although SunCal and the Debtors

12  repeatedly requested that the Lehman Entities pay for critical health and safety and value

13  preservation measures on the Projects, these efforts were unavailing.

14        Between October 9 and November 4, 2008, SunCal's general counsel Cook sent Robert

15  Brusco, an authorized agent of the Lehman Entities, nearly two dozen letters requesting that the

16  Lehman Lenders provide the funding necessary to address critical needs on the Projects as

17  promised. A summary of these health and safety notices are attached hereto as Exhibit "5". The

18  Lehman Entities ignored these requests until November 2008, when Brusco, purportedly on behalf

19  of the Lehman Lenders, delivered the message that the Lehman Lenders were unwilling to fund the

20  Projects and that, instead, they intended to foreclose on all of the Projects.

21        As a result, as set forth in Exhibit "4," there are now over 240 vendors, municipalities,

22  counties and bonding companies claiming over $400 million in work, improvements and property

23  tax claims against the Projects. Substantially all of these sums are due to work performed or

24  bonded at Lehman's request based upon Lehman's promises of payment.

25  **4.3     The Debtors' Potential Preferential Transfers**.

26        Attached hereto as Exhibit "6" are charts setting forth payments made to third parties

27  during the ninety (90) day time period preceding the filing of the Debtors' Chapter 11 Cases as

28

1  well as payments made to the Lehman Entities and to SunCal Affiliates during the one-year time

2  period preceding the filing of the Debtors' Chapter 11 Cases.

3      As the charts in Exhibit 6" indicate, Group IV: Voluntary Debtors made payments in the

4  following aggregate amounts to non-insiders within the 90 day preference period preceding the

5  Petition Date:  SJD Partners: $748,926.28, SJD Development: $25.00.  The corresponding figures

6  for payments made to "insiders" within the one year preference period preceding the Petition Date

7  were: SJD Partners: $498,351.39, SJD Development: $0.00.

8                                   **V.**

9      **SIGNIFICANT EVENTS IN THE DEBTORS' CHAPTER 11 CASES**

10     **5.1.    Voluntary Debtors.**

11         **5.1.1    Joint Administration of the Voluntary Debtors and the Trustee**

12                   **Debtors.**

13     Since their respective Petition Dates, the seventeen (17) Voluntary Debtors have continued

14 to operate as "debtors-in-possession," subject to the supervision of the Bankruptcy Court and in

15 accordance with the Bankruptcy Code.  The Voluntary Debtors are authorized to operate their

16 businesses in the ordinary course during the Chapter 11 proceedings.  Transactions outside the

17 ordinary course of business must be approved by the Bankruptcy Court.

18     The Voluntary Debtors' Cases are being jointly administered pursuant to orders entered on

19 November 19, 2008 and December 9, 2008.  The Voluntary Debtors' Cases are being jointly

20 administered with the Trustee Debtors' cases pursuant to an order entered on March 11, 2009.

21         **5.1.2    The Voluntary Debtors Court Employed Professionals.**

22     The Voluntary Debtors have employed Winthrop Couchot Professional Corporation as their

23 general insolvency counsel, and the MB Firm as their special litigation counsel in the Lehman

24 Adversary Proceeding and the State Court Action.

25     The Voluntary Debtors' Committee has employed Irell & Manella LLP as its counsel

26 pursuant to an order entered on February 13, 2009.

27     Pursuant to the Court's Order regarding joint administration of the Voluntary Debtors, the

28 Voluntary Debtors' liability for professional fees is joint and several among the Voluntary Debtors'

1  Estates for fees incurred related to services for the benefit of all of the Voluntary Debtors. The

2  Trustee Debtors' liability for professional fees is not joint and several.

3        Pursuant to the initial MB Firm employment application, Acquisitions was responsible for

4  the payment of their fees until December 31, 2009. The MB Firm's application also allows for

5  payments from the Bond Companies. The initial MB Firm employment application reserved the

6  right, should the Lehman Adversary Proceeding result in a benefit accruing to particular Debtors'

7  Estates, to request that its fees and expenses be reimbursed by the Debtors' Estates. The Bond

8  Companies have also agreed to jointly fund a portion of the professional fees and expenses of the

9  MB Firm with respect to the Lehman Adversary Proceeding. The Bond Companies' funding

10  commitment can be terminated and after such a termination they will only be required to cover fees

11  and costs incurred during the period of their prior commitments.

12        The MB Firm employment application was subsequently amended. Pursuant to an order

13  entered on April 14, 2010, (1) the Voluntary Debtors will pay up to one-half of the fees and

14  expenses incurred by the MB Firm from and after February 1, 2010 onward; and (2) the Trustee

15  Debtors do not have an obligation to pay any of the MB Firm's fees pertaining to the Trustee

16  Debtors' estates, unless and until a loan by the Voluntary Debtors to the Trustee Debtors is agreed

17  to by the Trustee and approved by the Court, or in accordance with the terms of the original

18  employment applications to the extent not superseded or modified by the amended employment

19  application. The order does not affect the MB Firm's right to seek payment from the Bond

20  Companies without the need for an additional order of the Court.

21        The MB Firm filed an updated application seeking to further amend their employment to

22  include the right to pursue certain claims against the Lehman Entities and certain employees and

23  agents of these entities on behalf of the Voluntary Debtors. The claims encompassed by this

24  amendment include claims that are based upon both prepetition and post-post petition actionable

25  conduct under both state law and federal law against the Lehman Entities and/or their agents.

26      **5.2.**   **The Debtors' Motion for a Stay to Suspend Certain Lehman Actions.**

27        On September 21, 2010, the Voluntary Debtors, Acquisitions, and SunCal Management

28  filed a motion requesting, among other relief, for the Court to suspend the Lehman Entities

1    competing plan and disclosure statement unless and until the Lehman Entities agree to provide the

2    Debtors with relief from their automatic stay in the Debtors' Chapter 11 Cases (the "Suspension

3    Motion"). The Court granted this motion and stayed all matters until March 1, 2011. The Court

4    also ordered the parties to engage in a mediation. The Voluntary Debtors and the Lehman Entities

5    were unable to settle their claims through this process.

6         **5.3.**    **The Debtors' Other Litigation with Non-Lehman Related Parties.**

7              **5.3.1**    **The Debtors' Failed Preliminary Injunction Motion Against the**

8                       **Holders of Bond Claims.**

9    On February 20, 2009, the Debtors filed a complaint and a Motion for Preliminary

10    Injunction, pursuant to which the Debtors sought a Motion for Preliminary Injunction against the

11    Holders of Bond Claims from pursuing such Claims. On February 23, 2009, the Court denied the

12    Debtors' request for the TRO and granted the Debtors' request to require the defendants to show

13    cause why the Motion for Preliminary Injunction should not be issued.

14    On March 2, 2009, several Holders of Bond Claims objected to the Motion for the

15    Preliminary Injunction. The objections generally alleged that the Debtors failed to show that the

16    balancing of the equities favored granting the Preliminary Injunction versus the harm to the

17    Holders of the Bond Claims. At a hearing held on March 4, 2009, the Court denied the

18    Preliminary Injunction Motion and the underlying complaint has subsequently voluntarily been

19    dismissed without prejudice.

20              **5.3.2**    **The Contractors' Successful Motions for Relief from Stay to Pursue the**

21                       **Bond Claims.**

22    Various contractors that were hired to perform work on some of the Projects have filed

23    motions for relief from stay with the Bankruptcy Court to pursue their purported Bond Claims.

24    These creditors have requested that the Bankruptcy Court grant these creditors relief from the

25    automatic stay to allow such creditors to enforce certain Claims that such creditors allege to have

26    against some of the Debtors, including certain surety bonds that are alleged to have been issued in

27    favor of such creditors. The Debtors opposed the motions on the grounds that the various Debtors

28

are indispensible parties. The Court conditionally granted the motions provided that the Bond

Claimants are able to sever the Debtors from their proceedings on the Bonds.

## VI.

## TREATMENT OF UNCLASSIFIED CLAIMS

**6.1    Introduction.** As required by the Bankruptcy Code, the Plan places Claims and

Interests into various Classes according to their right to priority. However, certain types of Claims

are not classified in any Classes under the Plan. These Claims are deemed "unclassified" under the

provisions of the Code. They are not considered impaired and they do not vote on the Plan,

because they are automatically entitled to specific treatment provided for them in the Code. As

such, the SunCal Plan Proponents have not placed the following Claims in a Class. The treatment

of these unclassified Claims is as provided below.

**6.2    Treatment of Allowed Administrative Claims.**

The Code requires that all Allowed Administrative Claims be paid on the later of Effective

Date of the Plan or the date of their allowance, unless a particular Holder agrees to a different

treatment. The treatment of Allowed Administrative Claims is as described below. However, such

Administrative Claims are continuing to be incurred. The Allowed Administrative Claims shall be

paid from the applicable Distribution Account(s).

Except to the extent that the Holder of an Allowed Administrative Claim agrees to a

different treatment and subject to the Administrative Claims Bar Date set forth herein, the

Distribution Agent shall pay each Allowed Administrative Claim in full, in Cash, on the later of

(i) the Effective Date, (ii) within ten (10) Business Days after the date such Administrative Claim

becomes an Allowed Administrative Claim, or (iii) the date such Allowed Administrative Claim

becomes due according to its terms. Notwithstanding the foregoing, any Allowed Administrative

Claim representing obligations incurred in the ordinary course of post-petition business by the

Debtors in Possession (including without limitation post-petition trade obligations and routine

post-petition payroll obligations) shall be paid in full or performed by the Plan Trustee in the

ordinary course of business, in accordance with the terms of the particular obligation.

### 6.3    Administrative Claims Bar Date.

All applications for final compensation of Professionals for services rendered and for reimbursement of expenses incurred on or before the Effective Date and all other requests for payment of Administrative Claims incurred before the Effective Date under Sections 507(a)(2) or 507(b) of the Bankruptcy Code (except only for (i) post-petition, ordinary course trade obligations and routine post-petition payroll obligations incurred in the ordinary course of the Debtors' post-petition business, for which no bar date shall apply, and (ii) post-petition tax obligations, for which no bar date shall apply) shall be Filed with the Bankruptcy Court and served upon the Plan Trustee no later than the Administrative Claims Bar Date, unless such date is extended by the Bankruptcy Court after notice to the Plan Trustee.  Any such request for payment of an Administrative Claim that is subject to the General Administrative Claims Bar Date and that is not Filed and served on or before the Administrative Claims Bar Date shall be forever barred; any party that seeks payment of Administrative Claims that (i) is required to file a request for payment of such Administrative Claims and (ii) does not file such a request by the deadline established herein shall be forever barred from asserting such Administrative Claims against the Debtors, the Plan Trust, their estates, or any of their property.

### 6.4    Treatment of Unsecured Tax Claims.

Tax Claims are certain unsecured income, employment and other taxes described by Code Section 507(a)(8).  The Code requires that each holder of such a Section 507(a)(8) tax claim receive the present value of such Claim in deferred cash payments, over a period not exceeding five (5) years from the petition date and that such treatment not be less favorable than the treatment accorded to non priority unsecured creditors.

At the election of the Plan Trustee, the Holder of each Allowed Priority Tax Claim shall be entitled to receive, on account of such Claim, (i) equal cash payments on the last Business Day of each three-month period following the Effective Date, during a period not to exceed five years after November 6, 2008, totaling the principal amount of such Claim plus simple interest on any unpaid balance from the Effective Date, calculated at the interest rate available on ninety (90) day United States Treasuries on the Effective Date, (ii) such other treatment agreed to by the Holder of

1   the Allowed Priority Tax Claim and the Plan Trustee, provided such treatment is on more

2   favorable terms to the Debtors (or the Plan Trust after the Effective Date) than the treatment set

3   forth in clause (i) hereof, or (iii) payment of the full Allowed Priority Tax Claim in Cash.

4

**VII.**

5

**CLASSIFICATION OF CLAIMS AND INTERESTS**

6      As required by the Code, the Plan places Claims and Interests into various Classes

7   according to their right to priority and other relative rights. The Plan specifies whether each Class

8   of Claims or Interests is impaired or unimpaired, and the Plan sets forth the treatment each Class

9   will receive. The table below lists the Classes of Claims established under the Plan and states

10   whether each particular Class is impaired or left unimpaired by the Plan. A Class is "unimpaired"

11   if the Plan leaves unaltered the legal, equitable and contractual rights to which the Holders of

12   Claims or Interests in the Class are entitled, with certain exceptions specified in the Bankruptcy

13   Code.

| CLASSIFICATION OF LEHMAN'S DISPUTED CLAIMS | | |
|---|---|---|
| **Class 1** | **Claims** | **Claim Nos.** |
| Class 1.1 | The Holder of Lehman's Disputed Claim filed by Lehman ALI against SJD Partners arising from the Pacific Point First Loan Agreement in the asserted amount of $120,110,237. | SJD Partners 23; SJD Development 2 |
| Class 1.2 | The Holder of Lehman's Disputed Claim (contingent) filed by Lehman ALI against SJD Partners arising from the Pacific Point Second Loan. | SJD Partners 24 |

| CLASSIFICATION OF BOND INDEMNIFICATION CLAIMS | | |
|---|---|---|
| **Class 2** | **Claimant** | Claim Nos. |
| Class 2.1 | The holders of Bond Claims arising from bonds issued with respect to the Group IV Debtors Assets. | Various Claims |

| CLASSIFICATION OF PRIORITY UNSECURED CLAIMS | | |
|---|---|---|
| **Class 3** | **Claimant** | **Claim Nos.** |
| Class 3.1 | The Holder of Priority Claims that fall within Code Sections 507(a)(4), (5), (6), and (7) in the asserted amount of $4,188 against SJD Partners. | Schedule Amount and SJD Partners 12 |

| CLASSIFICATION OF GENERAL UNSECURED CLAIMS THAT QUALIFY AS RELIANCE CLAIMS[4] | | |
|---|---|---|
| **Class 4** | **Claimant** | **Claim Nos.** |
| Class 4.1 | The holders of Reliance Claims against SJD Partners. | Various Filed and Scheduled |

| CLASSIFICATION OF GENERAL UNSECURED CLAIMS THAT DO NOT QUALIFY AS RELIANCE CLAIMS | | |
|---|---|---|
| **Class 5** | **Claimant** | **Claim Nos.** |
| Class 5.1 | Claimants holding Allowed Unsecured Claims against SJD Partners that are not Reliance Claims. | Various Filed and Scheduled |

| CLASSIFICATION OF INTEREST HOLDERS | | |
|---|---|---|
| **Class 6** | **Claimant** | **Amount** |
| Class 6.1 | Allowed Interests in SJD Partners held by SJD Development. | 100% |
| Class 6.2 | Allowed Interests in SJD Development held by Elieff. | 100% |

---

[4] Unsecured Claims are generally placed within the same class and they receive the same treatment under a Plan. However, the SunCal Proponents have divided Unsecured claims into two classes in the Plan. This separate classification has been implemented for the following reason. The Holders of Unsecured Claims who are referred to as "Reliance Claimants," hold specific Litigation Rights that are referred to herein as "Reliance Claims." The other Unsecured Creditors do not hold Reliance Claims.

**VIII.**

**THE PLAN'S TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS**

**8.1.** **The Plan's Treatment of Lehman's Disputed Secured Claim(s) and Disputed Lien(s) Against Group IV: Voluntary Debtors (Classes 1.1 and 1.2).**

The Disputed Secured Claims within Classes 1.1and 1.2 shall be disallowed pursuant to Section 506(a) and 506(d) of the Bankruptcy Code because there is no collateral to support such alleged Claims and the liens shall be declared null and void. Therefore, the Holders of such Disputed Secured Claims shall not receive a distribution under the Plan.

**8.2.** **The Plan's Treatment of Holders of Bond Indemnification Claims Against Group IV: Voluntary Debtors (Class 2.1).**

The rights of each holder of an Allowed Bond Indemnification Claim arising from a bond issued with respect to the Pacific Point Project, shall, to the extent such claim(s) are determined to be a secured claim(s), be impaired under the Plan. Such claims shall receive the following treatment:

A.    Each such Allowed Secured Claim shall be placed in a separate class and receive a separate ballot for voting purpose;

B.    Each Holder(s) shall retain their respective underlying liens on the Pacific Point Projects, but shall forebear from pursuing their rights and remedies until the expiration of the Sales Period;

C.    If the Plan Trustee or Litco is able to reacquire the Pacific Point Project and consummate a sale of the Pacific Point Project subject to the liens asserted by the Holders of Class 2.1 claimants, such Holders shall receive a distribution, to the extent available, of Net Sale Proceeds in accordance with the priorities set forth under the Bankruptcy Code, subject to a Final Order(s) resolving the allowance and priority of the applicable Lehman's Disputed Claim(s) and the validity of the applicable Lehman Disputed Lien(s) in, including but not limited to, the Lehman Adversary Proceeding; and if the Plan Trustee or Litco is unable reacquire the Pacific Point Project and/or if Plan Trustee or Litco reacquires the Pacific Point Project but is unable to consummate a sale of such project, such project shall be deemed abandoned by the Plan Trustee, no payment shall

1    be made to such Holder(s), and such Holder(s) shall be allowed to pursue their respective rights

2    against these project under applicable California law.

3        **8.3.**    **The Plan's Treatment of Holders of Priority Claims Against Group IV:**

4                **Voluntary Debtors (Class 3.1)**.

5        The treatment of the Holders of Allowed Priority Claims under the Plan shall be as follows:

6            A.    The Holder(s) are unimpaired under the Plan; and

7            B.    The Holder(s) shall be paid either from the applicable Distribution

8    Account(s) (i) the full amount of such Allowed Priority Claim in Cash on the later of (x) the

9    Effective Date, (y) the date such Claim becomes an Allowed Priority Claim or (z) the date such

10   Allowed Priority Claim becomes payable in accordance with the terms governing such Allowed

11   Priority Claim, or (ii) upon such other less favorable terms as may be agreed to by such Holder and

12   the Plan Trustee.

13       **8.4.**    **The Plan's Treatment of Holders of General Unsecured Claims Against Group**

14               **IV: Voluntary Debtors that are Reliance Claims Estimated to be in the**

15               **Amount of $6,419,915) (See Exhibit 8 to Disclosure Statement) (Class 4.1)**.

16       The rights of Holders of Allowed Class 4.1 Claims are impaired under the Plan and shall be

17   treated as follows:

18           A.    On the distribution date, such Holders will receive a distribution in cash, on

19   the Effective Date, equal to one percent (1%) of such claimant's Allowed Claim.

20           B.    Such Holders will receive a pro-rata share of any funds payable from the

21   applicable Distribution Account(s), including recoveries from the Lehman Adversary Proceeding,

22   after payment in full of all Post Confirmation Expenses, Allowed Administrative Claims, and

23   Allowed Priority Claims, if and when such funds become available for Distribution.

24           C.    If Litco acquires the Pacific Point Project free and clear of all claims and

25   liens, and to the extent the Distribution made to such Holders is less than 50% on account of such

26   Allowed Claims, such Holders will receive an additional distribution equaling the difference

27   between the distribution previously provided to such Holders and a 50% distribution on account of

28   such Holders' Allowed Claims in full satisfaction of such Allowed Claims.

**8.5.** **The Plan's Treatment of Holders of Allowed General Unsecured Claims Against Group IV: Voluntary Debtors that Are Not Reliance Claims (Estimated to be in the Amount of $49,786,494) (Class 5.1).**

The rights of Holders of Allowed Class 5.1 Claims are impaired under the Plan. Under the Plan, each claimant will receive a distribution in cash, on the Effective Date, equal to one percent (1%) of such claimant's Allowed Claim, and 2) receive a pro-rata share of any funds payable from the applicable Distribution Account(s) (except for recoveries from the Lehman Adversary Proceeding), after payment in full of all Post Confirmation Expenses, Allowed Administrative Claims, and Allowed Priority Claims and any sums that the Bankruptcy Court determines are payable to the Holders of Allowed Class 4.1 Claims.

**8.6.** **The Plan's Treatment of Holders of Allowed Interests Against Group IV: Voluntary Debtors.**

The Interests of the Holders in Class 6.1 to 6.3 are impaired under the Plan. All such Interests shall be cancelled as of the Effective Date and no distribution shall be made to these Holders on account of such Interest(s).

## IX.

## ACCEPTANCE OR REJECTION OF THE PLAN

**9.1.** **Introduction.**

PERSONS OR ENTITIES CONCERNED WITH CONFIRMATION OF THE PLAN SHOULD CONSULT WITH THEIR OWN ATTORNEYS BECAUSE THE LAW ON CONFIRMING A PLAN OF REORGANIZATION IS VERY COMPLEX. The following discussion is intended solely for the purpose of alerting readers about basic confirmation issues, which they may wish to consider, as well as certain deadlines for filing Claims. The Debtors cannot represent that the discussion contained below is a complete summary of the law on this topic.

Many requirements must be met before the Court can confirm the Plan. Some of the requirements include that the Plan must be proposed in good faith, acceptance of the Plan, whether the Plan pays creditors at least as much as creditors would receive in a Chapter 7 liquidation, and

whether the Plan is feasible.  The requirements described herein are not the only requirements for confirmation.

### 9.2.    Who May Object to Confirmation of the Plan.

Any party in interest may object to the confirmation of the Plan, but as explained below not everyone is entitled to vote to accept or reject the Plan.

### 9.3.    Who May Vote to Accept/Reject the Plan.

A Holder of a Claim or Interest has a right to vote for or against the Plan if that Holder of the Claim or Interest has a Claim which is both (1) Allowed or Allowed for voting purposes and (2) Classified in an impaired Class.  The votes will be tabulated on a Debtor by Debtor basis.

### 9.4.    What Is an Allowed Claim/Interest.

As noted above, a Holder of Claim or Interest must first have an Allowed Claim or Allowed Interest to vote.

### 9.5.    What Is an Impaired Class.

A Class is impaired if the Plan alters the legal, equitable, or contractual rights of the Claims or Interests in that Class, other than the right to accelerate the Claim upon certain kinds of defaults. In this case, the Debtors believe that all Classes, except for Class 3.1 are impaired.

### 9.6.    Who Is Not Entitled to Vote.

The following four types of Claims are not entitled to vote: (1) Claims that have been disallowed; (2) Claims in unimpaired Classes; (3) Claims entitled to priority pursuant to Bankruptcy Code Sections 507(a)(2) or (a)(3) and Claims in Classes that do not receive or retain any value under the Plan.  Claims in unimpaired Classes are not entitled to vote because such Classes are deemed to have accepted the Plan.  Claims entitled to priority pursuant to Bankruptcy Code Section 507(a)(8) are not entitled to vote because such Claims are not placed in Classes and they are required to receive certain treatment specified by the Bankruptcy Code.  Claims in Classes that do not receive or retain any property under the Plan do not vote because such Classes are deemed to have rejected the Plan.  The Debtors believe that all Classes are entitled to vote except Class 5.1. These classes are not impaired under the Plan and consequently are not entitled to vote. They are conclusively deemed to have accepted the Plan.  The Interests held by the Holders in

Classes 6.1 and 6.2 are being cancelled under the Plan; accordingly these Interest Holders are deemed to have voted to reject the Plan.

EVEN IF YOUR CLAIM IS OF THE TYPE DESCRIBED ABOVE, YOU MAY STILL HAVE A RIGHT TO OBJECT TO THE CONFIRMATION OF THE PLAN.

### 9.7.    Who Can Vote in More than One Class.

A creditor whose Claim has been Allowed in part as a Secured Claim and in part as an Unsecured Claim is entitled to accept or reject a Plan in both capacities by casting one ballot for the secured part of the Claim and another ballot for the Unsecured Claim. Also, a Creditor may otherwise hold Claims in more than one Class (such as a Holder of Senior Secured Claims and Subordinated Note Claims), and may vote the Claims held in each Class.

### 9.8.    Votes Necessary for a Class to Accept the Plan.

A Class of Claims is deemed to have accepted the Plan when more than one-half (1/2) in number and at least two-thirds (2/3) in dollar amount of the Claims *that actually voted*, vote to accept the Plan. A Class of interests is deemed to have accepted the Plan when Holders of at least two-thirds (2/3) in amount of the interest-Holders of such Class which actually vote, vote to accept the Plan.

### 9.9.    Treatment of Nonaccepting Classes.

As noted above, even if there are impaired Classes that do not accept the proposed Plan, the Court may nonetheless confirm the Plan if the nonaccepting Classes are treated in the manner required by the Code and at least one impaired Class of Claims accepts the Plan. The process by which a plan may be confirmed and become binding on non-accepting Classes is commonly referred to as "cramdown." The Bankruptcy Code allows the Plan to be "crammed down" on nonaccepting Classes of Claims or interests if it meets all statutory requirements except the voting requirements of 1129(a)(8) and if the Plan does not "discriminate unfairly" and is "fair and equitable" with respect to each impaired Class that has not voted to accept the Plan, as set forth in 11 U.S.C. § 1129(b) and applicable case law.

**9.10.    Request for Confirmation Despite Nonacceptance by Impaired Class(es).**

The SunCal Plan Proponents will ask the Court to confirm the Plan by cramdown on any impaired Class if such Class does not vote to accept the Plan.

## X.

## MEANS OF EXECUTION AND IMPLEMENTATION OF THE PLAN

**10.1.    Introduction.**

This section is intended to address how the SunCal Plan Proponents intend to implement the provisions of the Plan. It addresses the transfer of the Plan Trust Property to the Plan Trust, the nature of the Plan Trust, the powers of the Plan Trust, the governance of the Plan Trust, the resolution of disputed claims, the sources of funds that will be used to pay claims and the mechanics of how claims will be paid.

**10.3.    Transfer of Property To The Plan Trust.**

On the Effective Date, title to and possession of all property of the Group IV: Voluntary Debtors, excepting those items of property that the Plan Trustee affirmatively elects not to transfer to the Plan Trust, shall be deemed transferred and delivered to the Plan Trust, without further act or action under any applicable agreement, law, regulation, order or rule of law.

**10.4.    Purposes of The Plan Trust.**

The Plan Trust's purposes, powers and objectives include, but are not limited to the following: (i) to take control over, manage and over time sell or otherwise dispose of all Plan Trust Property for the highest return reasonably obtainable; (ii) to pursue all Litigation Claims through collection efforts, including through litigation in any court of competent jurisdiction, and to obtain the most favorable recovery on the same, with due consideration of all relevant factors, including cost; (iii) to cause all Available Cash to be deposited into the applicable Distribution Accounts; (iii) to initiate actions to resolve any remaining issues regarding the allowance and payment of Claims including, as necessary, initiation and/or participation in proceedings before the Bankruptcy Court; (iv) to take such other actions as are necessary or useful to maximize the value of all property received by the Plan Trust; (v) to make the payments and distributions to creditors and holders of Beneficial Interests as required by the Plan; and (vi) to enforce all rights with respect to

1  the Plan Trust Property; and (vii) to take all actions reasonable and necessary to implement the

2  terms of the Plan. A more complete statement of the Plan Trust's powers and limitations is set

3  forth in the Plan Trust Agreement, which is a part of the Plan Supplement.

4        It is intended that the Plan Trust will be classified for U.S. federal income tax purposes as a

5  "liquidating trust," with the primary objective of liquidating the Plan Trust Property and

6  distributing the net proceeds thereof, with no objective to continue or engage in the conduct or a

7  trade or business in accordance with Treasury Regulation 301.7701-4(d), and, notwithstanding

8  anything to the contrary in the Plan, all actions taken by the Plan Trust or any person acting on

9  behalf of the Plan Trust shall be consistent with such primary objective.

10      **10.5.  Trust Agreement**.

11        Copies of the Plan Trust Agreement shall be contained in the Plan Supplement. The Plan

12  Trust Agreement shall, among other matters, create the Plan Trust, identify Acquisitions as the

13  initial trustee of the Plan Trust, identify the compensation of the Plan Trust, and specify the

14  authorities and powers of the Plan Trustee, consistent with the Plan.

15      **10.6.  Operations of the Plan Trust**.

16        From and after the Effective Date, the Plan Trust may use, acquire and dispose of the Plan

17  Trust Property held in the Plan Trust, and take any of the actions set forth in this Article or in the

18  Plan Trust Agreement, without the approval of the Bankruptcy Court and free of the restrictions of

19  the Bankruptcy Code, the Bankruptcy Rules or the prior orders of the Bankruptcy Court, other than

20  restrictions expressly imposed by the Plan, the Confirmation Order or the Plan Trust Agreement,

21  provided that the Plan Trust is administered so that it qualifies as a liquidating trust under Treasury

22  Regulation § 301.7701-4(d).

23      **10.7.  The Plan Trustee**.

24        Acquisitions shall be Trustee of the Plan Trust. Acquisitions is the direct or indirect parent

25  of all of Debtors.

26

27

28

**10.8.  Payment of Trust Expenses.**

The expenses incurred by the Plan Trust during the Plan Period, which shall include the compensation payable to the Acquisitions, shall be paid, or adequate reserves shall be created for the payment of such expenses, prior to any distribution to the Plan Trust Beneficiaries.

**10.9.  Plan Distribution System.**

The Plan Trustee shall establish a separate "Distribution Account" for each Group IV: Voluntary Debtor at an FDIC insured bank. Each Group IV: Voluntary Debtor's Available Cash, whether on hand as of the Effective Date or received thereafter, shall be deposited into that Group IV: Voluntary Debtor's Distribution Account. The only exception to this provision shall be in the case of Net Sales Proceeds that are subject to disputed liens. Such proceeds shall remain in the applicable Net Proceeds Accounts established to receive the proceeds from the sale of a particular property. Once all disputes regarding entitlement to the funds in the Net Proceeds Accounts have been resolved, the proceeds remaining (after the payment of the Allowed Claims secured by liens on these proceeds) shall be transferred to the Distribution Account. These funds will then be used to pay the claims of Creditors holding Allowed Claims in their order of priority as provided for in the Plan.

**10.10.  Claims Estimation Rights.**

On the Confirmation Date, the SunCal Proponents shall be vested with standing to file a motion under 11 U.S.C. § 502(c), and they shall be authorized and empowered to seek in such motion the estimation, for distribution purposes, of any Disputed Claim seeking recourse to, or claiming an interest in, any asset of the Group IV: Voluntary Debtors. After the Bankruptcy Court estimates a Disputed Claimant's rights in, or against an asset of the Estates through this procedure, the Voluntary Debtors' Committee shall have the right to use any funds or assets not deemed subject to the rights of the Disputed Claimant, to pay the Allowed Claims under the terms of the Plan, including Allowed Administrative Claims, after the Effective Date.

**10.11.  No Payment of Transfer-Related Fees to the United States Trustee.**

The Plan Trust shall not be required to pay any fees to the United States Trustee based on any transfers of the Plan Trust Property to the Plan Trust or from the Plan Trust.

**10.12.  No Payment of Transfer-Related Fees to the Trustee.**

The Plan Trust shall not be required to pay any fees to the Trustee based on any transfers of Plan Trust Property from the Trustee Debtors to the Plan Trust, or from the Plan Trust.

**10.13.  Books and Records of Trust.**

The Plan Trustee, and to the extent of payments and distributions by any Disbursing Agent, the Disbursing Agent, shall maintain an accounting of receipts and disbursements of the Plan Trust. The Plan Trustee shall maintain the books and records of the Plan Trust, or provide storage for such book and records, for the longer of six (6) years, or while Plan is in existence, provided that the Court may, upon application by the Plan Trustee, authorize the Plan Trust to destroy all of the Plan Trusts books and records at such time as Plan Trust has no further need for such books and records. The Plan Trust's books and records shall be open to inspection at all reasonable times, upon written request by the Voluntary Debtors' Committee.

**10.14.  Limitations on Liability.**

The Plan Trustee shall not be liable for any act it may do or fail to do as the liquidating trustees hereunder while acting in good faith and in the exercise of its best judgment. The Plan Trust shall not be liable in any event for any claims, liabilities or damages based upon or arising out of any conduct of the Plan Trustee in the course of its activities as liquidating trustee, unless such claims, liabilities or damages arise from Plan's gross negligence or willful misconduct.

The Plan Trustee, and its officers, directors, agents and employees shall not be liable for any indebtedness, liability or obligation incurred or entered into on behalf of the Plan Trust, including, without limitation, indebtedness, liabilities or obligations under agreements, undertakings or commitments entered into or executed on behalf of Plan Trust by the Plan Trustee or by any person employed by the Plan Trustee or the Plan, it being expressly understood that all such indebtedness, liabilities and obligations of, and claims against the Plan, shall be the sole responsibility of the Plan and shall be satisfied only from the Plan, or such portion thereof as shall, under the terms of any agreement, be stated to be liable therefore. No claim or cause of action may be asserted against the Plan Trustee, or any member of the New Board on account of any

1  indebtedness, liability or obligation entered into on behalf of the Plan, whether by legal or

2  equitable proceedings, or by virtue of any bankruptcy or non-bankruptcy statute, rule or regulation.

3    Any undertaking, contract or agreement entered into in writing by the Plan may, except as

4  otherwise provided by the Plan or the Plan Trust Agreement, expressly disclaim the personal

5  liability of Plan Trustee.

6    **10.15. <u>Federal Income Tax Treatment of the Holders of Plan Trust Beneficial**

7  **Interests</u>.**

8    For all United States federal income tax purposes, the transfers by the Group IV: Voluntary

9  Debtors shall be treated by the Group IV: Voluntary Debtors, their estates, the Plan Trust and the

10  Plan Trust Beneficiaries as a transfer of the Plan Trust Property by the Group IV: Voluntary

11  Debtors to the Plan Trust Beneficiaries followed by a transfer of the Plan Trust Property by such

12  the Plan Trust Beneficiaries to the Trust. The Plan Trust Beneficiaries shall be treated as the

13  grantors and deemed owners of the Plan Trust for United States federal income tax purposes. The

14  Plan Trust Trustee and the Plan Trust Beneficiaries are required to value their interests in the Plan

15  Trust Property consistently with the values placed upon the Plan Trust Property by the Plan Trust,

16  and to use such valuations for all purposes. The Plan Trust Agreement shall provide for consistent

17  valuations of the Plan Trust Property by the Plan Trust Trustee and the Plan Trust Beneficiaries,

18  and shall provide that the Plan Trust will determine the fair market value of the Plan Trust Property

19  within thirty (30) days after the Effective Date, and send such determination to each the Plan Trust

20  Beneficiary. By its acceptance of a the Beneficial Interest, each recipient of such an interest will be

21  conclusively deemed to agree to use such valuations for all purposes, including, without limitation,

22  in computing any gain recognized upon the exchange of such holder's claim for purposes of

23  determining any United States Federal income tax, and shall be required to include those items of

24  income, deductions and tax credits that are attributable to its the Beneficial Interest in computing

25  its taxable income.

26    **10.16. <u>Termination of the Trust</u>.**

27    The Plan Trust shall continue in effect until the earlier of: (a) the date that all the Plan Trust

28  Property has been liquidated, all proceeds have been converted to cash or distributed in kind, all

1   the Plan Trust Expenses have been paid, all claims to be paid under the Plan for which the Plan

2   Trust Trustee is obligated to make distributions on have been paid, all distributions to be made

3   with respect to the Beneficial Interests have been made, all litigation to which the Plan Trust is a

4   party have been concluded by dismissal or an order issued by the court in which such litigation is

5   pending and such order has become "final" (consistent with the definition of Final Order in the

6   Plan for orders issued by the Bankruptcy Court), and the Chapter 11 Case has been closed; and (b)

7   the expiration of five (5) years from the Effective Date; provided, however, that the Plan Trust may

8   request the Bankruptcy Court to extend the permitted life of the Plan Trust for such additional

9   period as is reasonably necessary to conclude the liquidation and distributions, not to exceed a total

10  of ten (10) years from the Effective Date, which request shall be filed so the Bankruptcy Court may

11  consider and rule on the request within six (6) months prior to the expiration of the initial five-year

12  term.

13      **10.17. <u>Exemption from Certain Transfer Taxes</u>**.

14      In accordance with Section 1146(c) of the Bankruptcy Code, the issuance, transfer or

15  exchange of a security or the making or delivery of an instrument of transfer under the Plan may

16  not be taxed under any law imposing a stamp tax or similar tax. All governmental officials and

17  agents shall forego the assessment and collection of any such tax or governmental assessment and

18  shall accept for filing and recordation any of the foregoing instruments or other documents without

19  payment of such tax or other governmental assessment.

20      **10.18. <u>Tax Consequence of The Plan</u>**.

21      The implementation of the Plan may have federal, state and local tax consequences to the

22  Group IV: Voluntary Debtors, Creditors and Interest Holders.  No tax opinion has been sought or

23  will be obtained with respect to any tax consequences of the Plan. This Disclosure Statement does

24  not constitute and is not intended to constitute either a tax opinion or tax advice to any person, and

25  the summary contained herein is provided for informational purposes only.

26      CREDITORS AND INTEREST HOLDERS ARE ADVISED TO CONSULT WITH THEIR

27  OWN TAX ADVISORS REGARDING THE TAX CONSEQUENCES TO THEM AND TO THE

28  DEBTOR OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING

FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES.

**10.19  The Plan Sponsor.**

The Plan Sponsor shall be Acquisitions.

**10.20.  The Voluntary Debtors' Committee.**

On the Effective Date, the Voluntary Debtors' Committee shall continue to serve its applicable Group IV: Voluntary Debtors as Voluntary Debtors' Committee to the applicable reorganized Group IV: Voluntary Debtors, subject to the following:

**10.21.1  Duties and Powers.**

The duties of the Committee after the Effective Date shall be limited to monitoring the Plan's implementation, notice and opportunity to object to any settlement of the Lehman Adversary Proceeding, standing to object to any settlement of any Litigation Claim in excess of $100,000, and standing to object to any proposed sales procedures on sale of the Debtors' Projects. The Voluntary Debtors' Committee shall receive notice of and the right to review all payments and Distributions.

The Voluntary Debtors' Committee shall be entitled to retain, employ and compensate Professionals, in order to assist with the obligations and rights of the Voluntary Debtors' Committee under the terms of the Plan.  Such compensation shall be paid from the applicable Distribution Account(s).

**10.21.2  Dissolution of Voluntary Debtors' Committee.**

The Voluntary Debtors' Committee shall be dissolved upon the entry of an order converting, closing or dismissing the Chapter 11 Cases or entry of a final decree in the Chapter 11 Cases.  On dissolution, the Voluntary Debtors' Committee shall have no other or further obligations or responsibilities on behalf of the Plan Trust.

**10.21.  Litigation Claims.**

Pursuant to Section 1123(b)(3) of the Bankruptcy Code, the Plan Trust shall retain all Litigation Claims whether or not pending on the Effective Date that are not purchased by LitCo. Unless a Litigation Claim is expressly waived, relinquished, released, compromised, settled or sold in the Plan or in a Final Order, all rights with respect to such Litigation Claims are reserved and the

1    Plan Trustee may pursue such Litigation Claims.  Notwithstanding the foregoing, the Plan Trustee

2    shall not settle or abandon a Litigation Claim valued at greater than $100,000 except upon ten (10)

3    days' prior written notice and opportunity to object to the Voluntary Debtors' Committee.  Any

4    disputes concerning the settlement or abandonment of a Litigation Claim shall be submitted to the

5    Bankruptcy Court for resolution on no less than ten (10) days' notice to the objecting party.

6         **10.22.  Collection of Litigation Recoveries.**

7         All Litigation Recoveries realized or obtained by the Plan Trustee and/or the Voluntary

8    Debtors' Committee shall be promptly deposited into the applicable Distribution Account(s).

9    Except as otherwise provided in the Plan and the Confirmation Order, the Litigation Recoveries

10   shall be free and clear of all Claims and Liens and shall only be expended in accordance with the

11   provisions of the Plan.

12   **XI.**

13   **RISK FACTORS**

14        **11.1  Plan Risks.**

15        The Plan in this case, like any Chapter 11 reorganization plan, includes a number of risks

16   that creditors should be aware of prior to voting on the Plan.  The more material of these risks are

17   summarized below.

18        **11.2.  The Plan May Not Be Accepted or Confirmed.**

19        While the SunCal Proponents believe that the Plan is confirmable under the standards set

20   forth in 11 U.S.C. § 1129, there can be no guarantee that the Bankruptcy Court will find the Plan to

21   be confirmable. If the Plan is not confirmed, it is possible that an alternative plan can be negotiated

22   and presented to the Bankruptcy Court for approval; however, there can be no assurance that any

23   alternative plan would be confirmed, that the Chapter 11 Cases would not be converted to a

24   liquidation, or that any alternative plan of reorganization could or would be formulated on terms as

25   favorable to the Creditors and holders of Equity Interests as the terms of the Plan.

26        **11.3  Adverse Outcome of Pending Litigation.**

27        The Group IV: Voluntary Debtors are plaintiffs in the Lehman Adversary Proceeding and

28   the State Court Action.  The Group IV: Voluntary Debtors believe that their causes of action in the

Lehman Adversary Proceeding and the State Court Action are meritorious. . However, there is no assurance that they will prevail in either action. .

## XII.

## DISTRIBUTIONS

### 12.1   Distribution Agent.

Acquisitions shall serve as the Distribution Agent for distributions due under the Plan. The Distribution Agent may employ one or more sub agents on such terms and conditions as it may agree in its discretion and pay such sub agent as a Post Confirmation Expense from the Distribution Accounts. The Distribution Agent shall not be required to provide any bond in connection with the making of any Distributions pursuant to the Plan.

### 12.2   Distributions.

#### 12.2.1   Dates of Distributions.

Any distribution required to be made on the Effective Date shall be deemed timely if made as soon as practicable after such date and, in any event, within thirty (30) days after such date. Any distribution required to be made upon a Disputed Claim becoming an Allowed Claim and no longer being a Disputed Claim shall be deemed timely if made as soon as practicable thereafter.

#### 12.2.2   Limitation on Liability.

Neither the Plan Sponsor, the Plan Trustee, the Distribution Agent, their Affiliates, nor any of their employees, members, officers, directors, agents, or professionals or Affiliates shall be liable for (i) any acts or omissions (except for gross negligence or willful misconduct) in connection with implementing the Distribution provisions of the Plan and the making or withholding of Distributions pursuant to the Plan, or (ii) any change in the value of distributions made pursuant to the Plan resulting from any delays in making such distributions in accordance with the Plan's terms (including but not limited to any delays caused by the resolution of Disputed Claims).

### 12.3 Old Instruments and Securities.

#### 12.3.1 Surrender and Cancellation of Instruments and Securities.

As a condition to receiving any distribution pursuant to the Plan, each Person holding any note or other instrument or security (collectively "Instruments or Securities" and individually an "Instrument or Security") evidencing, an existing Claim(s) against the Debtor(s) must surrender such Instrument or Security to the Distribution Agent.

#### 12.3.2 Cancellation of Liens.

Except as otherwise provided in the Plan, any Lien securing any Secured Claim shall be deemed released and discharged, and the Person holding such Secured Claim shall be authorized and directed to release any collateral or other property of the Debtors (including, without limitation, any cash collateral) held by such Person and to take such actions as may be requested by the Plan Trustee to evidence the release of such Lien, including, without limitation, the execution, delivery and Filing or recording of such releases as may be requested by the Plan Trustee.

#### 12.3.3 De Minimis Distributions and Fractional Shares.

No Cash payment of less than ten dollars ($10) shall be made by the Plan Trust to any Holder of Claims unless a request therefore is made in writing to the Plan Trust. Whenever payment of a fraction of a cent would otherwise be called for, the actual payment shall reflect a rounding down of such fraction to the nearest whole cent. Any Cash or other property that is not distributed as a consequence of this section shall, after the last distribution on account of Allowed Claims in the applicable Class, be treated as "Unclaimed Property" under the Plan.

#### 12.3.4 Delivery of Distributions.

Except as provided in the Plan with respect to Unclaimed Property, distributions to Holders of Allowed Claims and Allowed Administrative Claims shall be distributed by mail as follows: (1) with respect to each Holder of an Allowed Claim that has filed a Proof of Claim, at the address for such Holder as maintained by the official claims agent for the Debtors; (2) with respect to each Holder of an Allowed Claim that has not filed a Proof of Claim, at the address reflected on the Schedules filed by the Debtors, provided, however, that if the Debtors or the Plan Trust has received a written notice of a change of address for such Holder, the address set forth in such

notice shall be used; or (3) with respect to each Holder of an Allowed Administrative Claim, at such address as the Holder may specify in writing.

### 12.3.5 Undeliverable Distributions.

If the Distribution of Cash to the Holder of any Allowed Claim is returned to the Plan Trustee as undeliverable or the Distribution check is not negotiated within 90 days of mailing (any such distribution being hereinafter referred to as "Unclaimed Property"), no further distribution shall be made to such Holder unless and until the Plan Trustee is notified in writing of such Holder's then current address. Subject to the remainder of this Section and the following section, Unclaimed Property shall remain in the possession of the Plan Trustee pursuant to this Section, and shall be set aside and (in the case of Cash) held in a segregated interest bearing account (as to Cash Unclaimed Property) to be maintained by the Distribution Agent until such time as the subject Distribution becomes deliverable. Nothing contained in the Plan shall require the Plan Trustee or any other Person to attempt to locate such Person.

### 12.3.6 Disposition of Unclaimed Property.

If the Person entitled thereto notifies the Plan Trustee of such Person's Claim to a Distribution of Unclaimed Property within ninety (90) days following such Person's initial Distribution Date, Effective Date, the Unclaimed Property distributable to such Person, together with any interest or dividends earned thereon, shall be paid or distributed to such Person as soon as practicable. Any Holder of an Allowed Claim that does not assert a Claim in writing for Unclaimed Property held by the Plan Trustee within ninety (90) days after the Holder's initial Distribution Date shall no longer have any Claim to or Interest in such Unclaimed Property, and shall be forever barred from receiving any distributions under the Plan or otherwise from the Plan Trustee. In such cases, any property held for Distribution on account of such Claims shall become Available Cash and deposited into the Distribution Account.

## XIII.

## OBJECTIONS TO CLAIMS AND DISPUTED CLAIMS

### 13.1    Standing for Objections to Claims.

The Plan Trustee shall have the sole and exclusive right to file, prosecute and resolve objections to Claims other than to the right to object to the claims of SunCal Affiliates, which shall be vested with the Voluntary Debtors' Committee. The Voluntary Debtors' Committee shall have standing to object to any settlement of any Litigation Claim in excess of $100,000 and standing to object to any proposed sales procedures and sale of the Debtors' Projects.

Any objection to a Claim shall be Filed with the Bankruptcy Court and served on the Person holding such Claim on or before the applicable Claims Objection Deadline. The Plan Trustee shall have the right to petition the Bankruptcy Court, without notice or a hearing, for an extension of the Claims Objection Deadline if a complete review of all Claims cannot be completed by such date.

### 13.2    Treatment of Disputed Claims and Disputed Liens.

#### 13.2.1    No Distribution Pending Allowance.

If any portion of a Claim or Lien is a Disputed Claim or Disputed Lien, no payment or distribution provided for under the Plan shall be made on account of such Claim or Lien unless and until such Claim or Lien becomes an Allowed Claim and/or Allowed Lien.

#### 13.2.2    Distribution After Allowance.

On the next Distribution Date following the date on which a Disputed Claim becomes an Allowed Claim and is no longer a Disputed Claim, the Distribution Agent shall distribute to the Person holding such Claim any Cash that would have been distributable to such Person if on the initial Distribution Date such Claim had been an Allowed Claim and not a Disputed Claim.

## XIV.

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 14.1    Executory Contracts Potentially Being Assumed.

The Plan Trustee shall have until the expiration of the Sales Period to assume or reject any of the executory contracts and unexpired leases attached to the Plan as Exhibit "2" to the Plan.

The SunCal Plan Proponents may add any executory contract or unexpired leases to these exhibits, or delete any contract or lease therefrom up to and including the Confirmation Date. All contracts or leases not assumed by the expiration of the Sales Period shall be deemed rejected.

### 14.2    **Executory Contracts Being Rejected**.

The Debtors hereby reject all of the executory contracts and unexpired leases set forth in the Debtors' Schedules attached to the Plan as Exhibit "3." The SunCal Plan Proponents reserve the right to amend Exhibit "3" to the Plan to include additional leases and contracts on this exhibit, or to delete leases and contracts from this exhibit, up to and including the Confirmation Date.

### 14.3    **Bar Date for Rejection Damages**.

Any Claim arising out of the rejection of an executory contract or unexpired lease shall be forever barred and shall not be enforceable against the Debtors, the Plan Trust, their Affiliates, their successors, or their properties, and shall not be entitled to any distribution under the Plan, unless a Proof of Claim for such Claim is filed and served on the Debtors, or the Plan Trust within thirty (30) days after the receipt of a notice of the rejection of any contract or lease.

### 14.4    **Changes in Rates Subject to Regulatory Commission Approval**.

The Debtors are not subject to governmental regulatory commission approval of their rates.

## XV.

## BEST INTEREST OF CREDITORS TEST AND PLAN FEASIBILITY

### 15.1    **Best Interests Test**.

Pursuant to Section 1129(a)(7) of the Bankruptcy Code, a Plan cannot be confirmed unless the Bankruptcy Court determines that Distributions under the Plan to all Holders of Claims and Interests who have not accepted the plan and whose Claims are classified in Classes that are impaired under the plan, are not less than those which they would receive in a liquidation under Chapter 7 of the Bankruptcy Code.

The Best Interest of Creditors Test must be satisfied even if the Plan is accepted by each impaired Class of Claims and if any Holder of an Allowed Claim objects to the Plan on such basis. The Best Interests Test requires the Bankruptcy Court to find either that either (i) all Holders of Claims in an impaired Class of Claims have accepted the Plan or (ii) the Plan provides each Holder

1   of Allowed Claims of an impaired Class who has not accepted the Plan with a recovery of property

2   of a value, as of the effective date of the Plan, that is not less than the amount that such Holder

3   would receive if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code.

4        The Plan proposed by the Group IV: Voluntary Debtors is essentially a litigation and

5   liquidation plan. It provides for the recovery of the Pacific Point Project and/or damages through

6   the Lehman Adversary Proceeding or the State Court Action and for the distribution of the

7   resulting net proceeds, in accordance with the priorities provided for in the Bankruptcy Code and

8   under California law.

9        If a Chapter 7 trustee were appointed in this case and had sufficient financing to pursue the

10  causes of action in the Lehman Adversary Proceeding and the State Court Action, it would be

11  compelled to liquidate the Group IV: Voluntary Debtors' assets in the same manner as provided for

12  in the Plan and to pay out the proceeds in the same manner as provided for in the Plan.

13  Accordingly, under the terms of the Plan, each individual creditor is receiving "at least as much" as

14  such creditor would receive in a Chapter 7 case, which is all that is required under the Best

15  Interests Test.

16       **15.2    Feasibility**.

17       In addition, in order to confirm the Plan, the Bankruptcy Court must find that confirmation

18  of the Plan is not likely to be followed by the liquidation or the need for further financial

19  reorganization of the Debtor(s).  This requirement is imposed by Section 1129(a)(11) of the

20  Bankruptcy Code and is generally referred to as the "feasibility" requirement. As explained above,

21  the Group IV: Voluntary Debtors' Plan provides for pursuing the Group IV: Voluntary Debtors'

22  litigation rights, the liquidation of any recoveries, and for the distribution of the proceeds. Within

23  the context of the Plan, feasibility is limited to having sufficient funds to pay administrative and

24  priority claims on the Effective Date and sufficient funds to finance the litigation.

25

26

27

28

## XVI.

## LIMITATION OF LIABILITY

**16.1    No Liability for Solicitation or Participation.**

As specified in Section 1125(e) of the Bankruptcy Code, entities that solicit acceptances or rejections of the Plan and/or that participate in the offer, issuance, sale, or purchase of securities offered or sold under the Plan, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, shall not be liable, on account of such solicitation or participation, for violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer, issuance, sale, or purchase of securities.

## XVII.

## CONDITIONS TO CONFIRMATION AND

## EFFECTIVENESS OF THE PLAN

**17.1    Conditions Precedent to Plan Confirmation.**

The only condition precedent to confirmation of the Plan is that the Bankruptcy Court shall have entered a Confirmation Order in form and substance reasonably acceptable to the SunCal Plan Proponents.

**17.2    Conditions Precedent to Plan Effectiveness.**

The conditions precedent to the effectiveness of the Plan and the occurrence of the Effective Date is that the Confirmation Order shall be a Final Order in form and substance reasonably satisfactory to the SunCal Plan Proponents, and the resolutions of any material impairment of the Plan terms caused by the automatic stays applicable in the Lehman Entities cases. The automatic stay in the Debtors cases shall continue to be applicable until the Effective Date.

## XVIII.

## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order or the occurrence of the Effective Date, the Bankruptcy Court shall not be limited under the Plan and the Bankruptcy Court's jurisdiction shall apply to the fullest extent possible under applicable law.

## XIX.

## MODIFICATION OR WITHDRAWAL OF THE PLAN

**19.1    Modification of Plan.**

At any time prior to confirmation of the Plan, the former Debtor(s) may supplement, amend or modify the Plan.  After confirmation of the Plan,  the Debtors or Plan Trustee may (x) apply to the Bankruptcy Court, pursuant to Section 1127 of the Bankruptcy Code, to modify the Plan; and (y) apply to the Bankruptcy Court to remedy defects or omissions in the Plan or to reconcile inconsistencies in the Plan.

**19.2    Nonconsensual Confirmation.**

In the event that any impaired Class of Claims or Interests shall fail to accept the Plan in accordance with Section 1129(a)(8) of the Bankruptcy Code, SunCal Plan Proponents (i) may request that the Bankruptcy Court confirm the Plan in accordance with Section 1129(b) of the Bankruptcy Code, and (ii) in accordance with Section 16.1 of the Plan, and may modify the Plan in accordance with Section 1127(a) of the Bankruptcy Code.

## XX.

## MISCELLANEOUS

**20.1    Payment of Statutory Fees.**

All quarterly fees due and payable to the Office of the United States Trustee pursuant to Section 1930(a)(6) of title 28 of the United States Code shall be paid in full on or before the Effective Date, or, to the extent such quarterly fees are disputed, an adequate reserve shall have been established and set aside for payment in full thereof, as required by Section 1129(a)(12) of the Bankruptcy Code.  The Plan Trustee shall remain responsible for timely payment of quarterly fees due and payable after the Effective Date and until the Debtors' Cases are closed, to the extent required by Section 1930(a)(6) of title 28 of the United States Code.

**20.2    Payment Dates.**

Whenever any payment or distribution to be made under the Plan shall be due on a day other than a Business Day, such payment or distribution shall instead be made, without interest, on the immediately following Business Day.

**20.3    Headings.**

The headings used in this Disclosure Statement and in the Plan are inserted for convenience only and neither constitutes a portion of this Disclosure Statement or the Plan nor in any manner affect the construction of the provisions of this Disclosure Statement or the Plan.

**20.4    Other Documents and Actions.**

The Plan Trustee may execute such other documents and take such other actions as may be necessary or appropriate to effectuate the transactions contemplated under the Plan.

**20.5    Notices.**

All notices and requests in connection with this Disclosure Statement and the Plan shall be in writing and shall be hand delivered or sent by mail addressed to:

> **To the SunCal Plan Proponents**:
> Bruce V. Cook
> General Counsel
> Authorized Agent of the SunCal Plan Proponents
> 2392 Morse Ave
> Irvine, CA 92614-6234
>
> **With copies to:**
> Paul J. Couchot
> Winthrop & Couchot, Professional Corporation
> 660 Newport Center Drive, Suite 400
> Newport Beach, CA 92660
>
> Ronald Rus
> Rus Miliband & Smith A Professional Corporation
> 2211 Michelson Drive, Seventh Floor
> Irvine, California 92612

All notices and requests to any Person holding of record any Claim or Interest shall be sent to them at their last known address or to the last known address of their attorney of record. Any such Person may designate in writing any other address for purposes of this Section, which designation will be effective on receipt.

**20.6    Governing Law.**

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), the laws of the State of California (without reference to its conflict of

1   law rules) shall govern the construction and implementation of the Plan and any agreements,

2   documents, and instruments executed in connection with the Plan, unless otherwise specifically

3   provided in such agreements, documents, or instruments.

4       **20.7**   **Binding Effect.**

5       The Plan and all rights, duties and obligations thereunder shall be binding upon and inure to

6   the benefit of the Plan Sponsor Debtors, the Plan Trustee, Holders of Claims, Holders of Interests,

7   and their respective successors and assigns.

8       **20.8**   **Successors and Assigns.**

9       The rights, benefits, and obligations of any entity named or referred to in the Plan shall be

10   binding on, and shall inure to the benefit of, the heirs, executors, administrators, successors, and

11   assigns of such entity.

12       **20.9**   **Severability of Plan Provisions.**

13       If, prior to the Confirmation Date, any term or provision of the Plan is held by the

14   Bankruptcy Court to be illegal, impermissible, invalid, void or unenforceable, or otherwise to

15   constitute grounds for denying confirmation of the Plan, the Bankruptcy Court shall, with the

16   consent of the Debtors, have the power to interpret, modify or delete such term or provision (or

17   portions thereof) to make it valid or enforceable to the maximum extent practicable, consistent

18   with the original purpose of the term or provision held to be invalid, void or unenforceable, and

19   such term or provision shall then be operative as interpreted, modified or deleted.  Notwithstanding

20   any such interpretation, modification or deletion, the remainder of the terms and provisions of the

21   Plan shall in no way be affected, impaired or invalidated by such interpretation, modification or

22   deletion.

23       **20.10**   **No Waiver.**

24       The failure of the Debtors or any other Person to object to any Claim for purposes of voting

25   shall not be deemed a waiver of the Voluntary Debtors' Committee', the Debtors' or the Plan

26   Trustee's right to object to or examine such Claim, in whole or in part.

27

28

**20.11  Inconsistencies.**

In the event the terms or provisions of this Disclosure Statement are inconsistent with the terms and provisions of the Plan or documents executed in connection with the Plan, the terms of the Plan shall control.

**20.12  Exemption from Certain Transfer Taxes and Recording Fees.**

Pursuant to Section 1146(c) of the Bankruptcy Code, any transfers from a Debtor to the Plan Trust or to any other Person or entity pursuant to the Plan, or any agreement regarding the transfer of title to or ownership of any of the Debtors' real or personal property or of any other interest in such property (including, without limitation, a security interest) will not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, and the Confirmation Order will direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**20.13  Post-Confirmation Status Report.**

Within 180 days following the entry of the Confirmation Order, the Plan Trustee shall file a status report with the Court explaining what progress has been made toward consummation of the confirmed Plan.  The status report shall be served on the United States Trustee, the twenty largest unsecured creditors, and those parties who have requested special notice.  Unless otherwise ordered, further status reports shall be filed every 180 days and served on the same entities.

**20.14  Post-Confirmation Conversion/Dismissal.**

A creditor or party in interest may bring a motion to convert or dismiss the case under § 1112(b), after the Plan is confirmed, if there is a default in performing the Plan.  The Plan Trustee reserves the right to object to any motion for conversion or dismissal.  If the Court orders any of the Cases converted to Chapter 7 after the Plan is confirmed, then all property that had been property of the Chapter 11 Estate, and that has not been disbursed pursuant to the Plan, will revest

1  in the Chapter 7 estate. The automatic stay will be reimposed upon the revested property, but only

2  to the extent that relief from stay was not previously authorized by the Court during this case.

3      **20.15  Final Decree.**

4      Once an Estate has been fully administered, as referred to in Bankruptcy Rule 3022, the

5  Plan Trustee, or other party as the Court shall designate in the Confirmation Order, shall file a

6  motion with the Court to obtain a final decree to close the Case of such Debtor.

7  Date:  June 20, 2011

8

9                                    By: _____

10                                          Bruce Cook
                                            General Counsel, Authorized Agent for the
11                                          Voluntary Debtors and Acquisitions

12  **Submitted By:**

13  **WINTHROP COUCHOT
    PROFESSIONAL CORPORATION**

14

15  By: /s/ Paul J. Couchot

16         Paul J. Couchot,
    General Insolvency Counsel for
17  the Voluntary Debtors

18  **RUS MILIBAND & SMITH
    A PROFESSIONAL CORPORATION**

19

20  By:  /s/ Ronald Rus
           Ronald Rus, Esq.
21         Joel S. Miliband, Esq.
           Cathrine Castaldi, Esq.
22  Attorneys for SunCal Management, LLC and
23  SCC Acquisitions Inc.

24

25

26

27

28

-68-

MAINDOCS-#163418-v3-SCC_Group_IV_VDs_DS__SJD_Finances_and_SJD_Dev_.DOC

# EXHIBIT "1"

## EXHIBIT 1

## THE DEBTORS' PROJECTS AND OTHER PRIMARY ASSETS
## (EXCLUDING CASH AND LITIGATION CLAIMS DISCUSSED INFRA)

### NAME OF DEBTOR                    ASSET DESCRIPTION

*Voluntary Debtors*

Palmdale Hills                Palmdale Hills Property, a Delaware limited liability company, a
                             Voluntary Debtor ("Palmdale Hills")owns the Project (the "Ritter
                             Ranch Project") consisting of a 10,625 acre site situated in the
                             City of Palmdale, in Los Angeles County, California.  Grading of
                             the first phase is complete with master infrastructure nearly 90%
                             complete.  The specific plan and the development agreement were
                             approved in 1992 and allow for the development of up to 7,200
                             residential units.  A vesting tentative parcel map consisting of 42
                             parcels has been processed and was recorded in 1995.
                             Additionally, six vesting tentative tract maps totaling 553 lots
                             were approved by the city in December 1995.  All regulatory
                             permits have been received.  The Development Agreement is set
                             to expire July 2012 and approved Tentative Tract Maps are set to
                             expire in June and December of 2012.

                             Palmdale Hills is a party to a certain Credit Agreement, dated as of
                             February 8, 2007, by and among Palmdale Hills, as borrower,
                             LCPI, as administrative agent and lender, pursuant to which LCPI
                             made a loan in the maximum aggregate principal amount of
                             approximately $264,000,000 (the "Ritter Ranch Loan
                             Agreement").  The Ritter Ranch Loan Agreement is allegedly
                             secured by a first-priority deed of trust on all real and personal
                             property owned by Palmdale Hills.  The Ritter Ranch Loan
                             Agreement has an asserted balance due of $287,252,096.31 as of
                             March 30, 2009.  For more detail, see Exhibit "3".

                             Palmdale Hills is also the owner of certain CFD bonds issued by
                             the City of Palmdale, in the amount of approximately $33 million
                             (the "Palmdale Hills CFD Bonds").

| **NAME OF DEBTOR** | **ASSET DESCRIPTION** |
|---|---|
| SCC Palmdale | SCC Palmdale, LLC, a Delaware limited liability company, a Voluntary Debtor ("SCC Palmdale") does not own any real property. SCC Palmdale is the Holder of the Allowed Interest in Palmdale Hills.

SCC Palmdale is a party to a certain Mezzanine Credit Agreement, between SCC Palmdale as borrower and LCPI as lender. The SCC Palmdale Loan is allegedly secured by a pledge of SCC Palmdale's Allowed Interest in Palmdale Hills (the "SCC Palmdale Loan"). The SCC Palmdale Loan has an alleged balance due of $119,664,305.25 as of March 30, 2009. For more detail, see Exhibit "3". |
| Acton Estates | Acton Estates LLC, a Delaware limited liability company, a Voluntary Debtor ("Acton Estates") owns the Project(the "Acton Project") consisting of a 175-acre site situated in Los Angeles County, California. The Acton Project is surrounded by mostly equestrian properties and light agricultural vacant land. The Acton Project is expected to consist of 136 units. The final tract map for Acton Estates was recorded in May 2009. |
| SunCal Beaumont | SunCal Beaumont, LLC, a limited liability company, a Voluntary Debtor ("SunCal Beaumont") owns the Project (the "Beaumont Heights Project"), that originally consisted of a 1,191-acre site situated in the City of Beaumont, in Riverside County, California. None of the 1,191 acres are subject to any option contracts. The property is currently designated as low density residential use - rural residential use. The City of Beaumont is in the process of amending the general plan, preparing an environmental impact report and annexing the assemblage. The Beaumont Heights Project was expected to consist of 1,203 units. Approximately 94 acres of the Beaumont Heights Project was lost through foreclosure sales completed prior to the Petition Date and approximately 343.5 acres of the Beaumont Heights Project has been lost through foreclosure sales completed after the Petition Date. SunCal Beaumont owns approximately 551.6 acres of the Beaumont Heights Project. No entitlements were in place of the Debtor's Petition Date. |

| **NAME OF DEBTOR** | **ASSET DESCRIPTION** |
|---|---|

SunCal Bickford

SunCal Bickford Ranch, LLC, a Delaware limited liability company, a Voluntary Debtor ("SunCal Bickford") owns the Project (the "Bickford Ranch Project") consisting of a 1,940-acre site situated in the City of Penryn, in Placer County, California. The Bickford Ranch Project is fully entitled with an approved large lot tentative map, small lot tentative map, specific plan, design guidelines, development standards, and a development agreement. The offsite water and sewer improvements are mostly complete. Improvement plans for major roads and in-tract improvements are in process of being completed. As of the Petition Date, a memorandum of understanding between the City and County for the regional sewer pipeline was in process. The Bickford Ranch Project is expected to consist of 2,105 units.

Specific Plan, environmental impact report, and tentative maps are approved for this Project. The Development Plan Agreement expires in December 2016. Both small lot and large lot Vesting Tentative Maps run with the Development Plan Agreement.

SunCal Bickford is a party to a certain promissory note secured by a deed of trust, dated as of May 25, 2005, in the maximum aggregate principal amount of approximately $30,000,000 executed by SunCal Bickford, as borrower, and payable to the order of Lehman ALI ("Bickford Second Loan Ageement"). The Bickford Second Lien Loan Agreement is allegedly secured by a second priority deed of trust on the Bickford Ranch Project. The Bickford Second Loan Agreement has an asserted balance due of $56,494,059.38 as of March 30, 2009. For more detail, see Exhibit "3".

SunCal Emerald

SunCal Emerald Meadows, LLC, a Delaware limited liability company, a Voluntary Debtor ("SunCal Emerald") owns the Project located, consisting of a 178-acre site situated in the City of Rubidoux, in Riverside County, California.

The specific plan, general plan and the environmental impact report were approved in October 2005. Currently there are four approved tentative maps set to expire in February 2013. These could be extended if necessary. The Emerald Meadows Project is expected to consist of 1,002 units.

| NAME OF DEBTOR | ASSET DESCRIPTION |
|---|---|
| SunCal Johannson | SunCal Johansson Ranch, LLC, a Delaware limited liability company, a Voluntary Debtor ("SunCal Johannson") owns the Projct (the "Johannson Ranch Project") consisting of a 501-acre site in the City of Modesto, in Stanislaus County, California. Tentative maps are in the process of being prepared. Engineering plans and preparation of the draft specific plan have commenced. The SunCal Johannsson Project is expected to consist of 921 units. No entitlements were in place of the Debtor's Petition Date. |

| NAME OF DEBTOR | ASSET DESCRIPTION |
|---|---|

**SJD Partners**

SJD Partners, Ltd., a California limited partnership, a Voluntary Debtor ("SJD Partners") currently owns no real property. SJD Partners formerly owned a project (the "Pacific Point Project") located in San Juan Capistrano known as the "Pacific Point Project". The Pacific Point Project was lost through a non-judicial foreclosure sale by Lehman ALI, which caused a Lehman Affiliate, LV Pacific Point LLC, a Delaware limited liability company, a Lehman Entity ("LV PacPoint"), a Delaware Limited Liability Company, to purchase the Pacific Point Project at a foreclosure sale conducted on August 28, 2008. SJD Partners has a pending fraudulent inducement action against the Lehman Entity Affiliates.

SJD Partners is a party to a certain loan agreement, dated February 16, 2006, by and among Lehman ALI, SJD Development and SJD Partners, pursuant to which Lehman ALI made a loan in the maximum aggregate principal amount of approximately $125,000,000 (the "Pacific Point First Loan Agreement"). The Pacific Point First Loan Agreement is allegedly secured by a first-priority deed of trust on the Pacific Point Project. The Pacific Point First Loan Agreement had an asserted balance due of $120,110,237 as of March 30, 2009, and ownership of this loan is now held by Lehman Re, a Bermuda business entity. For more detail, see Exhibit "3".

SJD Partners is also a party to a certain loan agreement, dated May 1997, by and between Lehman ALI and SJD Partners, pursuant to which Lehman ALI initially made a loan in the maximum aggregate principal amount of approximately $20,000,000 (the "Pacific Point Second Loan Agreement"). The Pacific Point Second Loan Agreement was secured by a second-priority deed of trust on the Pacific Point Project, which was foreclosed upon on August 28, 2008 by LV Pacific Point, as assignee of Lehman ALI. For more detail, see Exhibit "3".

**SJD Development**

SJD Development Corp., a California corporation, a Voluntary Debtor ("SJD Development") does not own any real property. SJD Development is the Holder of the Allowed Interest in SJD Partners.

SJD Development is a party to the Pacific Point First Loan Agreement.

| **NAME OF DEBTOR** | **ASSET DESCRIPTION** |
|---|---|
| SCC Communities | SCC Communities, LLC, a limited liability company, a Voluntary Debtor ("SCC Communities") owns the Project (the "Joshua Ridge Project") consisting of an 80-acre site situated in the City of Victorville in San Bernardino County, California. The Joshua Ridge Project was originally slated to be sold to the City and the City was scheduled to use the land to build a park or a school. Currently, SCC Communities does not have a plan for the Joshua Ridge Project. . No entitlements were in place of the Debtor's Petition Date.

SCC Communities is subject to a certain Loan Agreement, dated as of October 31, 2007, by and between SCC LLC, as borrower and Lehman ALI, as lender, pursuant to which Lehman ALI made a loan in the maximum aggregate amount of approximately $20 million (the "Interim Loan Agreement"). The Interim Loan Agreement has an alleged balance due of $23,795,012.59 as of March 30, 2009. The alleged obligation under the Interim Loan Agreement is allegedly secured by (a) an alleged first-priority deed of trust on the Joshua Ridge Project; (b) an alleged first-priority deed of trust on the Tesoro Project; and (c) an alleged first-priority lien on the Del Rio CFD Bond Proceeds. For more detail, see Exhibit "3". |
| Tesoro | Tesoro SF, LLC, a Delaware limited liability company, a Voluntary Debtor ("Tesoro") owns the Project (the "Tesoro Project") consisting of a 185-acre site situated in the City of Santa Clarita in Los Angeles County, California. The existing entitlements include a tentative tract map approved by the planning commission, which allows for 45 lots. Vesting Tentative Tract Map and CUP were approved in February of 2008, subject to final submittal of map consistent with conditions of approval. Final submittal and approval of this amended map never occurred as a result of the bankruptcy and remains on file with the County of Los Angeles. |

**NAME OF DEBTOR**                         **ASSET DESCRIPTION**

Del Rio

North Orange Del Rio Land, LLC, a limited liability company, a
Voluntary Debtor ("Del Rio") does not own any real property.
The Del Rio Estate owns the net proceeds of the proceeds of CFD
Bonds that were issued by the City of Orange, authorized by the
Order of the Bankruptcy Court on March 16, 2010.

The Acquisition Agreement sets forth certain terms for the
acquisition of various facilities by the City of Orange from Del
Rio, the issuance of the Del Rio CFD Bonds and the use and
application of a portion of the proceeds of the Del Rio Bonds for
the construction of certain improvements and other applications,
and with the remaining proceeds to go to Del Rio. The
Acquisition Agreement provides for a maximum bond
authorization in the amount of up to $25 million. The Court has
entered an order approving the Acquisition Agreement, the sale of
the Del Rio CFD Bonds, and creditor payments. The Acquisition
Agreement was approved by the Court on March 16, 2010. From
the closing, approximately $6,700,000 of claims (including
approximately $2,924,827 of SunCal Management claims) have
been paid. On April 13, 2011, Del Rio and SunCal Management
filed a joint motion with the Bankruptcy Court to confirm these
payments. The hearing on this motion is scheduled for July 19,
2011.

Upon the construction of the park within the project, which is
anticipated to be completed by the end of 2011, any remaining net
proceeds of the Del Rio CFD Bond Proceeds not used for such
construction or other specified purposes will be disbursed to Del
Rio. Such amounts are estimated to be approximately $7.1
million.

| **NAME OF DEBTOR** | **ASSET DESCRIPTION** |
|---|---|

**SunCal I**

SunCal Communities I, LLC, a Delaware limited liability company, a Voluntary Debtor ("SunCal I") does not own any real property. SunCal I is the Holder of Allowed Interests in Acton Estates, SunCal Bickford, SunCal Beaumont, SunCal Summit Valley LLC ("SunCal Summit"), SunCal Johannson and SunCal Emerald.

SunCal I is a party to the loan agreement by and among (i) SunCal I and SunCal III, as borrowers and (ii) LCPI, as administrative agent and lender, pursuant to which LCPI made a loan to SunCal I and SunCal III, as borrowers in the maximum aggregate principal amount of approximately $395,313,713.37 (the "SunCal Communities I Loan Agreement"). The loan agreement is allegedly secured by (a) alleged first-priority deeds of trust on the SunCal Bickford, the Acton Estates, and the SunCal Emerald Projects, (b) an alleged pledge of SunCal I's Allowed Interest in Acton Estates, SunCal Summit, SunCal Beaumont, SunCal Johannson, SunCal Emerald, and SunCal Bickford; and (c) an alleged pledge of SunCal Summit's Allowed Interest in Seven Brothers LLC ("Seven Brothers") and Kirby Estates LLC ("Kirby Estates"). The SunCal Communities I Loan Agreement has an alleged balance due of $343,221,391.06 as of March 30, 2009. For more detail, see Exhibit "3".

**SunCal III Debtor)**

SunCal Communities III, LLC, a Delaware limited liability company, a Voluntary Debtor ("SunCal III") owns no real or personal property. SunCal III is a party to SunCal Communities I Loan Agreement.

***Trustee Debtors***

Delta Coves

Delta Coves Ventures, LLC, a limited liability company, a Trustee Debtor ("Delta Coves") owns the Project (the "Delta Coves Project") consisting of a 310-acre site which is located on Bethel Island within Contra Costa County. The Delta Coves Project is expected to consist of 494 waterfront residential lots, some of which will be condominiums/townhomes and some of which will contain private boat docks. The Delta Coves Project is expected to include an interior lagoon that will provide direct boating access to San Joaquin River Delta. The maps for this Project have been recorded.

Delta Coves is a party to a certain Amended and Restated Loan Agreement, dated as of April 20, 2007, by and between Delta Coves, as borrower, and Lehman ALI as lender, pursuant to which Lehman ALI made a loan in the maximum aggregate principal amount of approximately $236 million (the "Delta Coves Loan Agreement"). The Delta Coves Loan Agreement is allegedly secured by a first-priority deed of trust on the Delta Coves Project. The Delta Coves Loan Agreement has an asserted balance due of $206,023,142.48 as of March 30, 2009. For more detail, see Exhibit "3".

SunCal Heartland

Heartland, LLC, a Delaware limited liability company, a Trustee Debtor ("SunCal Heartland") owns the Project (the "Heartland Project") consisting of a 417 acre site located in Riverside County, California. The Heartland Project is expected to consist of 983 units.

The Development Agreement for this Project expires in December 2018. The Tentative Maps are technically expired. However, Final Maps were approved by City Council in November 2007 but have not been recorded pending payment of outstanding taxes.

SunCal Heartland is a party to a certain Second Amended and Restated Term Loan and Revolving Line of Credit Loan Agreement, dated as of October 3, 2007, by and among SunCal Marblehead Heartland Master LLC, SunCal Marblehead, and SunCal Heartland, as borrowers, and Lehman ALI, as agent and sole lender, pursuant to which Lehman ALI made a loan in the maximum aggregate principal amount of approximately $316,061,300 (the "SunCal Marblehead/SunCal Heartland Loan Agreement"). The SunCal Marblehead/SunCal Heartland Loan Agreement is allegedly secured by first-priority deeds of trust on the Marblehead and the Heartland Projects. The SunCal Marblehead/SunCal Heartland Loan Agreement has an alleged balance due of $354,325,126.15 as of March 30, 2009. For more detail, see Exhibit "3".

SunCal Marblehead

SunCal Marblehead, LLC, a Delaware limited liability company, a Trustee Debtor ("SunCal Marblehead") SunCal Marblehead owns the Marblehead Project, consisting of a 247-acre site and is expected to consist of 308 units in San Clemente, California. The development is expected to offer canyon and ocean views from a number of lots throughout the Marblehead Project.

The Specific Plan, environmental impact report, the Development Agreement, and Coastal Development Permit are approved. The Development Agreement is set to expire in October 2018. The Final Tract Map was recorded for entire project in April 2006.

SunCal Marblehead is a party to the SunCal Marblehead/SunCal Heartland Loan Agreement.

SunCal Northlake

LB-L-SunCal Northlake, LLC, a Delaware limited liability company, a Trustee Debtor ("SunCal Northlake") owns the Project (the "Northlake Project") consisting of a 1,564-acre site which is located in Castaic, California, north of Valencia, approximately 45 miles north of downtown Los Angeles and 10 miles north of the San Fernando Valley. The Northlake Project is expected to consist of 3,417 units. No entitlements were in place of the Debtor's Petition Date.

Northlake Holdings LLC, a California limited liability company ("Northlake Holdings") is a Lehman Lender and the asserted Holder of the beneficial interest in the Disputed Secured Claim against the Northlake Project.

SunCal Northlake is a party to a certain Term Loan and Revolving Line of Credit Loan Agreement, dated as of September 5, 2009, between SunCal Northlake, as borrower, and Northlake Holdings, as successor agent and sole lender, pursuant to which Northlake Holdings' predecessor (Lehman ALI) made a loan in the maximum aggregate principal amount of approximately $100,000,000 (the "SunCal Northlake Loan Agreement"). The SunCal Northlake Loan Agreement is allegedly secured by a first-priority deed of trust on the Northlake Project. The SunCal Northlake Loan Agreement has an alleged balance due of $123,654,776.88 as of March 30, 2009. For more detail, see Exhibit "3".

SunCal Oak Valley

LB-L-SunCal Oak Valley, LLC, a Delaware limited liability company, a Trustee Debtor ("SunCal Oak Valley") owns the Project (the "Oak Valley Project") consisting of a 985-acre site which is located in Riverside County, California. The Oak Valley Project consists primarily of residential property and is expected to also include two commercial sites, one school site and several parks. The Oak Valley Project is expected to consist of 3,417 units.

The Development Agreement for this Project expires in November 2028. The life of remaining tentative maps run with the Development Agreement.

OVC Holdings LLC, a California limited liability company ("OVC Holdigns") is a Lehman Lender and the asserted Holder of the beneficial interest in the Disputed Secured Claim against the Oak Valley Project.

SunCal Oak Valley is a party to a certain Term Loan and Revolving Line of Credit Loan Agreement, dated as of May 23, 2006, by and between SunCal Oak Valley, as borrower, and OVC Holdings, as successor agent and sole lender, pursuant to which OVC Holdings' predecessor (Lehman ALI) made a loan in the maximum aggregate principal amount of approximately $120,000,000 (the "SunCal Oak Valley Loan Agreement"). The SunCal Oak Valley Loan Agreement is allegedly secured by a first-priority deed of trust on the Oak Valley Project. The SunCal Oak Valley Loan Agreement has an alleged balance due of $141,630,091.63 as of March 30, 2009. For more detail, see Exhibit "3".

SunCal PSV

SunCal PSV, LLC, a Delaware limited liability company, a Trustee Debtor ("SunCal PSV") owns the Project (the "Palm Springs Village Project") consisting of a 309-acre site which is located in the City of Palm Springs, California. The current proposed development consists of 752 single family units, 398 multi-family units, an 18-hole executive golf course, a driving range, a golf clubhouse and recreational facilities.

Final Tract Map for phase 1 was recorded in December 2006. Tentative Tract Map for remainder (phase 2) and Subdivision Improvement Agreement is scheduled to expire May 2012. The Debtor expects to make a request for extension with City of Palm Springs in the first quarter of 2012.

SunCal PSV is a party to a certain Term Loan and Revolving Line of Credit Loan Agreement, dated as of February 12, 2007, between SunCal PSV, as borrower, and Lehman ALI, as agent and sole lender, pursuant to which Lehman ALI made a loan in the maximum aggregate principal amount of approximately $90 million (the "SunCal PSV Loan Agreement"). The SunCal PSV Loan Agreement is allegedly secured by a first-priority deed of trust on the Palm Springs Village Project. The SunCal PSV Loan Agreement has an alleged balance due of $88,257,340.20 as of March 30, 2009. For more detail, see Exhibit "3".

| | |
|---|---|
| SunCal Torrance | SunCal Torrance Properties, LLC, a Delaware limited liability company, a Trustee Debtor ("SunCal Torrance") owns the Project (the "Del Amo Project") consisting of a 14-acre site which is located in the City of Torrance in Los Angeles County, California. The site is currently a section of the Del Amo Fashion Center complex, a 3 million square feet retail mall. The Del Amo Project is expected to consist of 365 units. No entitlements were in place at the time of the Debtor's Petition Date. |

SunCal Torrance is a party to a certain Loan Agreement, dated as of November 30, 2006, between SunCal Torrance and SunCal Oak Knoll, as borrowers, and Lehman ALI, as agent and sole lender, pursuant to which Lehman ALI made a loan in the maximum aggregate principal amount of approximately $167.7 million (the "SunCal Oak Knoll/SunCal Torrance Loan Agreement"). The SunCal Oak Knoll/SunCal Torrance Loan Agreement is allegedly secured by first-priority deeds of trust on the Oak Knoll and the Del Amo Projects. The SunCal Oak Knoll/SunCal Torrance Loan Agreement has an alleged balance due of $158,141,364.64 as of March 30, 2009. For more detail, see Exhibit "3".

| | |
|---|---|
| SunCal Oak Knoll | SunCal Oak Knoll, LLC, a Delaware limited liability company, a Trustee Debtor ("SunCal Oak Knoll") owns the Project (the "Oak Knoll Project") consisting of a 172.5-acre site which is located in the City of Oakland, California. The Oak Knoll Project is expected to be a diverse master planned community that includes 960 residential units, including single family homes, town homes and apartments. The Oak Knoll Project is also expected to consist of six restaurant spaces, along with a grocery anchor. No entitlements were in place of the Debtor's Petition Date. |

SunCal Oak Knoll is a party to the SunCal Oak Knoll/SunCal Torrance Loan Agreement.

| SunCal Century City | SunCal Century City, LLC, a Delaware limited liability company ("SunCal Century City") owned the Project located in Century City, California (the"10,000 Santa Monica Project").. Pursuant to a settlement agreement, the Trustee has conveyed the 10,000 Santa Monica Project to Danske Bank in exchange for the full satisfaction of the SunCal Century City Loan Agreement and $5.3 million, approximately $1.4 of which was used to pay delinquent real property taxes. |
| --- | --- |
| | SunCal Century City was a party toa certain Loan Agreement by and between SunCal Century City, as borrower and Lehman ALI, as agent and sole lender pursuant to which Lehman ALI made a loan in the aggregate maximum principal amount of approximately $120,000,000. The SunCal Century City Loan Agreement was allegedly secured by a first-priority deed of trust on the 10000 Santa Monica Project (the "SunCal Century City Loan Agreement"). The SunCal Century City Loan Agreement had an alleged balance due of $120,000,000.00 as of April 1, 2009. Danske Bank was formerly the Holder of the Century City Loan Agreement and related deed of trust, which has been satisfied in full pursuant to Danske Bank's purchase of the 10000 Santa Monica Project for $5.3 million, less payment of an Unpaid Real Property Tax Claim of $1.6 million. For more detail, see Exhibit "3". |

# EXHIBIT "2"

## EXHIBIT 2

## THE LEHMAN LENDERS' APPRAISALS OF THE PROJECTS

## AND SUNCAL'S VALUATION OPINIONS[1]

| NAME OF DEBTOR | THE LEHMAN LENDERS' APPRAISLAS | SUNCAL'S VALUATION OPINIONS |
|---|---|---|
| *Voluntary Debtors* | | |
| Palmdale Hills | $42,900,000 | $21,800,000 |
| SunCal Beaumont | $1,020,000 (SunCal) | $1,020,000 |
| Acton Estates | $6,800,000 | $1,600,000 |
| SunCal Johannson | $4,000,000 | $540,000 |
| Del Rio | $7,100,000 (SunCal) | $7,100,000 |
| SunCal Bickford | $29,500,000 | $10,900,000 |
| SunCal Emerald | $12,000,000 | $6,100,000 |
| Tesoro | $1,850,000 | $740,000 |
| SCC Communities | $1,200,000 | $160,000 |
| Total | $106,370,000 | $49,960,0000 |
| *Trustee Debtors* | | |
| SunCal Marblehead | $187,500,000 | $93,800,000 |
| SunCal Heartland | $7,900,000 | $7,500,000 |
| OVC Holdings | $20,900,000 | $21,000,000 |
| Northlake Holdings | $23,000,000 | $4,100,000 |
| SunCal Oak Knoll | $48,000,000 | $25,400,000 |
| SunCal PSV | $13,800,000 | $18,000,000 |
| SunCal Torrance | $25,000,000 | $13,500,000 |
| Delta Coves | $25,200,000 | $20,800,000 |
| Total | $353,300,000 | $204,100,000 |
| TOTAL | $459,670,000 | $254,060,000 |

- The Lehman Lenders have not provided an appraisal of the Project

belonging to SunCal Beaumont presumably because they do not have a deed of trust on

---

[1] The appraisals provided by the Lehman Entities were conducted shortly after the filing of these Cases and are approximately 2.5 years old. The SunCal Valuation opinions were conducted in April 2011.

such Project. However, the Lehman Lenders have a Disputed Lien on SunCal I's Allowed Interest in SunCal Beaumont. SunCal believes that the value of the Beaumont Heights Project is $1,200,000, net of portions of the Project that have been and are expected to be lost through foreclosure sales conducted by third-party seller financing lienholders.

- The Lehman Lenders did not provide an appraisal for the Del Rio CFD Bond Proceeds. SunCal believes that the net proceeds in the Del Rio CFD Bonds subject to Lehman's Disputed Liens are worth approximately $7.1 million to the Del Rio Estate, net of funds to be used in the constructing a sports park and in resolving claims pursuant to the terms of the Acquisition Agreement.

# EXHIBIT "3"

## EXHIBIT 3

## A SUMMARY OF THE LEHMAN LENDERS' AND

## LEHMAN SUCCESSORS' DISPUTED SECURED CLAIMS AND DISPUTED

## LIENS

| LEHMAN LOAN(S) | ALLEGED HOLDER | DEBTOR(S) | ALLEGED SECURITY | ALLEGED OUTSTANDING AMOUNT UNDER DISPUTED PROOFS OF SECURED CLAIMS |
|---|---|---|---|---|
| | | *Voluntary Debtors* | | |
| SunCal Communities I Loan Agreement | Lehman Commercial | SunCal I, SunCal III, Acton Estates, SunCal Emerald, SunCal Bickford, SunCal Summit Valley, SunCal Beaumont and SunCal Johannson | (a) Alleged first-priority deeds of trust on the SunCal Bickford, the Acton Estates and the SunCal Emerald Projects, (b) Alleged pledges of SunCal I's Allowed Interests in Acton Estates, SunCal Summit, SunCal Beaumont, SunCal Johannson, SunCal Emerald, and SunCal Bickford and (c) Alleged pledges of SunCal Summit Valley's Allowed Interests in Seven Brothers and Kirby. | Identical $343,221,391 Proof of Secured Claim No. 1 Asserted by Lehman Commercial Against SunCal I; Proof of Secured Claim No. 2 Asserted Against SunCal III; Proof of Secured Claim No. 6 Asserted Against Acton Estates; Proof of Secured Claim No. 7 Asserted Against SunCal Emerald; Proof of Secured Claim No. 16 Asserted Against SunCal Bickford; and Proof of Secured Claim No. 12 Asserted Against SunCal Summit |

| LEHMAN LOAN(S) | ALLEGED HOLDER | DEBTOR(S) | ALLEGED SECURITY | ALLEGED OUTSTANDING AMOUNT UNDER DISPUTED PROOFS OF SECURED CLAIMS |
|---|---|---|---|---|
| Ritter Ranch Loan Agreement | Lehman Commercial | Palmdale Hills | An alleged first-priority deed of trust on the Ritter Ranch Project an alleged first priority lien on all personal property owned by Palmdale Hills, including the Palmdale Hills Cash and the Palmdale Hills CFD Proceeds. | $287,252,096 Proof of Secured Claim No. 65 Asserted by Lehman Commercial Against Palmdale Hills |
| Pacific Point First Loan Agreement | Lehman Re (Lehman ALI Successor)[1] | SJD Development; SJD Partners | Alleged first priority deed of trust on the Pacific Point Project | Identical $120,110,237 Proof of Secured Claim No. 2 Asserted by Lehman ALI against SJD Development; $120,110,237 Proof of Secured Claim No. 23 Asserted by Lehman ALI against SJD Partners |
| SCC Palmdale Loan | Lehman Commercial | SCC Palmdale | An alleged pledge of SCC Palmdale's Allowed Interest in Palmdale Hills. | $119,664,305 Proof of Secured Claim No.: 1 Asserted by Lehman Commercial Against SCC Palmdale |
| Bickford Second Loan Agreement | Lehman ALI | SunCal Bickford | An alleged second priority deed of trust on the Bickford Ranch Project. | $56,494,059 Proof of Secured Claim No. 17 Asserted by Lehman ALI Against Bickford Ranch |

---

[1] Lehman ALI has also asserted an unliquidated contingent claim against SJD Partners based on the Pacific Point Second Loan Agreement.

MAINDOCS-#160236-v5-SunCal_DS_Exhibits.DOC

| LEHMAN LOAN(S) | ALLEGED HOLDER | DEBTOR(S) | ALLEGED SECURITY | ALLEGED OUTSTANDING AMOUNT UNDER DISPUTED PROOFS OF SECURED CLAIMS |
|---|---|---|---|---|
| Interim Loan Agreement | Lehman ALI | SCC Communities, Tesoro and Del Rio | Alleged first-priority deeds of trust on the Joshua Ridge and the Tesoro Projects, and an alleged first-priority lien on the net proceeds of the Del Rio CFD Bonds. | Identical $23,795,013 Proof of Secured Claim No. 9 Asserted by Lehman Commercial Against SCC Communities Proof of Secured Claim No. 14 Asserted Against Del Rio; Proof of Secured Claim No. 7 Asserted Against Tesoro |
| | | ***Trustee Debtors*** | | |
| SunCal PSV Loan Agreement | Lehman Commercial | SunCal PSV | An alleged first-priority deed of trust on the Palm Springs Village Project. | $88,257,340 Proof of Secured Claim No. 12 Asserted by Lehman ALI Against SunCal PSV |
| SunCal Delta Coves Loan Agreement | Lehman Commercial | Delta Coves | An alleged first-priority deed of trust on the Delta Coves Project. | $206,023,142 Proof of Secured Claim No. 21 Asserted by Lehman ALI Against Delta Coves 21 |
| SunCal Marblehead/ SunCal Heartland Loan Agreement | Lehman Commercial | SunCal Marblehead; SunCal Heartland | Alleged first-priority deeds of trust on the Marblehead and the Heartland Projects. | Identical $354,325,126 Proof of Secured Claim No. 9 Asserted by Lehman ALI Against SunCal Heartland; Proof of Secured Claim No. 21 Asserted Against SunCal Marblehead |

| LEHMAN LOAN(S) | ALLEGED HOLDER | DEBTOR(S) | ALLEGED SECURITY | ALLEGED OUTSTANDING AMOUNT UNDER DISPUTED PROOFS OF SECURED CLAIMS |
|---|---|---|---|---|
| Sun Cal Oak Valley Loan Agreement | Lehman Commercial | SunCal Oak Valley | An alleged first-priority deed of trust on the Oak Valley Project. | $141,630,092 Proof of Secured Claim No. 16 Asserted by OVC Holdings Against SunCal Oak Valley |
| SunCal Northlake Loan Agreement | Lehman Commercial | SunCal Northlake | An alleged first-priority deed of trust on the Northlake Project. | $123,654,777 Proof of Secured Claim No. 6 Asserted by Northlake Holdings Against SunCal Northlake |
| SunCal Oak Knoll/SunCal Torrance Loan Agreement | Lehman ALI | SunCal Oak Knoll and SunCal Torrance | Alleged first-priority deeds of trust on the Oak Knoll Project and the Del Amo Project. | Identical $158,141,365 Proof of Secured Claim No. 12 Asserted by Lehman ALI against SunCal Oak Knoll; Proof of Secured Claim No. 4 Asserted Against SunCal Torrance |
| **TOTAL** | | | | $1,942,568,943 |

- All loans allegedly held by Lehman Commercial, with the exception of SCC Palmdale, were sold by Fenway Capital to Lehman Commercial post-petition pursuant to an order of the Bankruptcy Court in New York, which orders are currently on appeal in the Second Circuit. The Fenway Sold Loans include the SunCal Communities I Loan Agreement, the Ritter Ranch Loan Agreement, the SunCal PSV Loan Agreement, the SunCal Marblehead/SunCal Heartland Loan Agreement, the Delta Coves Loan Agreement, the SunCal Northlake Loan Agreement and SunCal Oak Valley Loan Agreement.

# EXHIBIT "4"

**EXHIBIT 4**

**SUMMARY OF ALL OF THE ALLEGED CLAIMS AGAINST THE DEBTORS**

## EXHIBIT 4
## CLAIMS CHART

| Debtor | Unpaid Real Property Tax Claims | Alleged Secured Claims | Alleged Mechanic Lien Claims | Administrative Claims | General Unsecured Claims (Including Matured Bond Claims; Excluding Future Bond Claims) | Bond Safeguard Future Bond Claims | Arch Future Bond Claims |
|---|---|---|---|---|---|---|---|
| Palmdale Hills | $4,755,857 | $287,252,096 | $995,755 | 1,488,092.57 | $6,393,490 | $14,943,900 | $12,936,047 |
| SCC Palmdale | $0 | $119,664,305 | $0 | $0 | $0 | $0 | $0 |
| SunCal Beaumont | $442,201 | $5,651,174 | $1,576,334 | 104,616.01 | $180,713 | $0 | $0 |
| SCC Communities | $47,163 | $23,795,013 | $0 | 87,984.52 | $32,813 | $0 | $0 |
| Del Rio | $0 | (Same as SCC Communities) | $0 | $0 | $2,015,019 | $0 | $0 |
| Tesoro | $123,366 | (Same as SCC Communities) | $0 | 385,198.12 | $170,969 | $0 | $0 |
| SunCal Bickford | $9,467,165 | $343,221,391 (Bickford 1st) | $3,477,120 | 1,026,274.97 | $809,854 | $2,827,548 | $0 |
|  | $56,494,059 (Bickford 2nd) |  |  | $0 |  | $0 |  |
|  | $6,530,083 (Acquisitions) |  |  |  |  |  |  |
| SunCal Emerald | $798,256 | (Same as Bickford 1st) | $1,242,582 | 597,552.42 | $7,302,777 | $0 | $0 |
| Acton Estates | $1,652,339 | (Same as Bickford 1st) | $0 | 199,052.10 | $145,314 | $1,290,000 | $0 |
| SunCal I | $0 | (Same as Bickford 1st) | $0 | $0 | $0 | $0 | $0 |
| SunCal III | $0 | (Same as Bickford 1st) | $0 | $0 | $0 | $0 | $0 |
| SunCal Johannson | $434,830 | $0 | $0 | 110,151.28 | $41,181 | $0 | $0 |
| SJD Development | $0 | $120,110,237 | $0 | $0 | $0 | $0 | $0 |
| SJD Partners | $0 | (Same as SJD Development) | $0 | 550,693.39 | $19,471,283 | $17,352,162 | $19,382,964 |
| **VDs Total** | $17,721,228 | $962,718,358 | $7,289,791 | $4,549,615 | $36,563,413 | $36,413,610 | $32,319,011 |
|  |  |  |  |  |  |  |  |
| SunCal Heartland | $985,141 | $354,325,126 | $1,208,080 | 3,001,257 | $2,895,676 | $28,947,440 | $0 |
| SunCal Marblehead | $2,500,646 | (Same as SunCal Heartland) | $4,326,390 | 7,845,100 | $10,087,795 | $36,836 | $56,473,182 |
| SunCal Oak Knoll | $4,156,073 | $158,141,365 | $4,687,891 | 18,022,329 | $938,074 | $0 | $0 |
| SunCal Torrance | $1,082,899 | (Same as SunCal Oak Knoll) | $0 | 2,064,158 | $203,838 | $0 | $0 |
| Delta Coves | $406,976 | $206,023,142 | $468,358 | 4,327,749 | $5,299,164 | $27,546,741 | $0 |
| Sun Cal Century City | $0 | $0 | $0 | $0 | $4,390,043 | $0 | $0 |
| SunCal Northlake | $5,605,574 | $123,654,777 | $0 | 7,703,076 | $1,833,080 | $0 | $0 |
| SunCal Oak Valley | $175,158 | $141,630,092 | $1,618,699 | 2,480,171 | $4,654,095 | $14,669,523 | $9,498,756 |
| SunCal PSV | $1,725,166 | $88,257,340 | $2,316,430 | 3,101,586 | $4,012,139 | $18,405,548 | $0 |
| **TDs Total** | $16,637,633 | $1,072,031,842 | $14,625,848 | 48,545,425 | $34,313,995 | $89,606,088 | $65,971,938 |
|  |  |  |  |  |  |  |  |
| **GRAND TOTAL** | $34,358,860 | $2,034,750,200 | $21,915,639 | $53,095,040 | $70,877,316 | $126,019,698 | $98,290,949 |

- The Debtors have not yet completed their investigation on what Claims are Allowed Claims and their listing herein should not be construed as providing for Allowance under the Plan.
- Certain Disputed Claims, such as duplicative Claims, have been deducted from the figures above.
- Administrative Claims are ongoing.

- The Bond Issuers assert that their Claims are joint and several against all of the Debtors, which the Debotrs dispute as lacking in consideration and constituting fraudulent transfers.
- Lehman ALI has also filed a contingent claim against SJD Partners based on the Pacific Point Second Loan Agreement, which was the basis of the non-judicial foreclosure of the Pacific Point Project.
- Unpaid Real Property Tax Claims include post-petition unpaid property tax claims filed by government entities.

# EXHIBIT "5"

**EXHIBIT 5**

**SUMMARY OF HEALTH AND SAFETY NOTICES**

| Ex. No. | Citation | Date | Issuing Agency | Applicable Project |
|---|---|---|---|---|
| | *Voluntary Debtors* | | | |
| 1. | Letter from City of Palmdale | March 10, 2009 | City of Palmdale | Palmdale Hills |
| 2. | Request for Supplemental Deposit | February 19, 2009 | Los Angeles County Department of Regional Planning | Tesoro Project |
| | *Trustee Debtors* | | | |
| 3. | Notice of Violation of the California Coastal Act[3] | June 4, 2009 | California Coastal Commission | Marblehead Project |
| 4. | Order to Abate – Habitability Hazards | June 12, 2009 | City of Oakland | Oak Knoll Project |
| 5. | Notice of Violation | April 1, 2009 | City of Palm Springs Department of Building & Safety | Palm Springs Village Project |
| 6. | Notice of Violation, Construction Storm Water General Permit No. CAS000002, Delta Coves Venture LLC SunCal Company, WDID No. 5S07C344548, Contra Costa County | October 17, 2008 | California Regional Water Quality Control Board | Delta Coves Project |
| 7. | Administrative Citation for Violations of the City of San Clemente Municipal Code (SCMC): Storm Water Runoff Control (Chapter 13.40) and Excavations & Grading | October 15, 2008 | City of San Clemente, Engineering Division | Marblehead Project |
| 8. | Notice to Comply | October 14, 2008 | Contra Costa County – Building Inspection Department | Delta Coves Project |
| 9. | Notice of Violation No. A49456 | October 9, 2008 | Bay Area Air Quality Management District | Delta Coves Project |
| 11. | Notice of Violation No. A 49457 | October 10, 2008 | Bay Area Air Quality Management District | Delta Coves Project |
| 12. | Contra Costa County Stormwater Pollution Prevention Plan Notice of Correction | October 7, 2008 | Contra Costa County | Delta Coves Project |
| 13. | Letter from City of Palmdale | March 10, 2009 | City of Palmdale | Palmdale Hills |

---

[3] The potential penalties range from $254,000 to $3.8 million.

# EXHIBIT "6"

## EXHIBIT 6

## POTENTIAL PREFERENTIAL PAYMENTS

Below is a summary of the total payments made by each Debtor to non-insiders within the 90 days preceding the Petition Date for each Debtor.

| NAME OF DEBTOR | AMOUNT TRANSFERRED |
|---|---|
| **Voluntary Debtors** | |
| Acton Estates | $1,300.00 |
| SunCal Beaumont | $25,244.97 |
| SunCal Bickford | $133,669.98 |
| SunCal I | $0.00 |
| SunCal III | $0.00 |
| SunCal Emerald | $128,287.10 |
| SunCal Johansson | $26,187.00 |
| Del Rio | $86,622.93 |
| SCC Palmdale | $0.00 |
| Palmdale Hills | $6,002,491.87 |
| SCC Communities | $500.00 |
| SJD Development | $25.00 |
| SJD Partners | $748,926.28 |
| Tesoro | $659.00 |
| **Total** | $7,153,914.13 |
| | |
| **Trustee Debtors** | |
| SunCal Century City | $190,087.05 |
| Delta Coves | $597,961.92 |
| SunCal Heartland | $48,896.50 |
| SunCal Marblehead | $1,798,895.67 |
| SunCal Northlake | $833,921.81 |
| SunCal Oak Knoll | $2,324,630.92 |
| SunCal Oak Valley | $316,534.90 |
| SunCal PSV | $446,722.69 |
| SunCal Torrance | $18,618.50 |
| **Total** | $6,576,269.96 |
| | |
| **TOTAL** | $13,730,184.09 |

The following chart represents the status of the avoidance actions which have been commenced by the Voluntary Debtors with respect to the transfers referenced in the chart above:

| Name of Debtor | Aggregate Amount of Complaints | Aggregate Amount Collected/Settled | Aggregate Amount Unresolved |
|---|---|---|---|
| Palmdale Hills | $3,790,452 | $0 | $3,790,452 |
| SunCal Emerald | $84,310 | $10,732 | $71,000 |
| SJD Partners | $268,776 | $22,500 | $237,426 |
| SunCal Bickford | $44,270 | $23,280 | $0 |
| Total | $4,187,808 | $56,512 | $4,098,878 |

MAINDOCS-#160236-v5-SunCal_DS_Exhibits.DOC

Below is a summary of the total payments made by each Debtor to SunCal Affiliates

within one year preceding the Petition Date for each Debtor.

| NAME OF DEBTOR | AMOUNT TRANSFERRED | RECIPIENT |
|---|---|---|
| *Voluntary Debtors* | | |
| Acton Estates | $7,885.12 | SunCal Management |
| SunCal Beaumont | $15,602.83 | SunCal Management |
| SunCal Bickford | $492,802.57 | SunCal Management & Acquisitions |
| SunCal I | $20,449.52 | SunCal Bickford |
| SunCal III | $0.00 | N/A |
| SunCal Emerald | $884,890.80 | SunCal Management & Acquisitions |
| SunCal Johansson | $8,046.53 | SunCal Management & Acquisitions |
| Del Rio | $50,721.00 | SunCal Management & Acquisitions |
| SCC Palmdale | $238,352.34 | N/A |
| Palmdale Hills | $1,149,348.04 | SunCal Management & Acquisitions |
| SCC Communities | 0.00 | |
| SJD Development | $0.00 | N/A |
| SJD Partners | $498,351.39 | SunCal Management |
| Tesoro | $5,000.00 | Acquisitions |
| **Total** | $3,371,450.14 | |
| | | |
| *Trustee Debtors* | | |
| SunCal Century City | $747,727.13 | SunCal Management & Acquisitions |
| Delta Coves | $2,305,572.58 | SunCal Management & Acquisitions |
| SunCal Heartland | $282,628.75 | SunCal Management; SunCal Marblehead Heartland Master LLC |
| SunCal Marblehead | $945,435.28 | SunCal Management; Acquisitions; and SunCal Marblehead Heartland Master LLC |
| SunCal Northlake | $819,207.14 | SunCal Management; Acquisitions; SCC College Park LLC |
| SunCal Oak Knoll | $2,914,645.70 | SunCal Management and Acquisitions |
| SunCal Oak Valley | $87,293.65 | SunCal Management and Acquisitions |
| SunCal PSV | $4,345.05 | SunCal Management; Lehman SunCal Real Estate Fund |
| SunCal Torrance | $310,181.43 | SunCal Management; Acquisitions; SunCal PSV; and Lehman SunCal Real Estate Holdings |
| **Total** | $8,417,036.71 | |
| | | |
| **TOTAL** | $11,788,486.85 | |

Below is a summary of the total payments made by each Debtor to the Lehman Entities within ninety days and one year preceding the Petition Date for each Debtor.

| NAME OF DEBTOR | AMOUNT TRANSFERRED WITHIN NINETY DAYS PRECEDING THE PETITION DATE | AMOUNT TRANSFERRED WITHIN ONE YEAR PRECEDING THE PETITION DATE | RECIPIENT |
|---|---|---|---|
| Delta Coves | $0.00 | $6,195,440.46 | Lehman ALI |
| SunCal Century City | $1,202,641.26 | $10,628,819.87 | Lehman ALI |
| **Total** | $1,202,641.26 | $16,824,260.33 | |

# EXHIBIT "7"

# EXHIBIT 7

## BEST INTEREST OF CREDITORS

MAINDOCS-#160236-v5-SunCal_DS_Exhibits.DOC

**EXHIBIT 7 - GROUP IV: VOLUNTARY DEBTORS**

### BEST INTEREST OF CREDITORS TEST ASSUMING THE DEBTORS PREVAIL IN LITIGATION AGAINST LEHMAN ALI AND LV PACIFIC POINT

| Case Name | Estimated Values | Estimate of Allowed Non-Lehman Entities' Claims and Lehman Administrative Claims | Bond Claimant Claims Resolved By Sale | Available Distribution Assuming Sale | Percentage Distribution to Classes 4 and 5 Claimants |
|---|---|---|---|---|---|
| SJD Partners/ SJD Development | $16,000,000 | $56,757,102 | $36,735,126 | $16,000,000 | 79.91% |

### BEST INTEREST OF CREDITORS TEST ASSUMING THE DEBTORS DO NOT PREVAIL IN LITIGATION AGAINST LEHMAN ALI AND LV PACIFIC POINT

| Case Name | Estimated Values | Estimate of Allowed Non-Lehman Entities' Claims and Lehman Administrative Claims | Bond Claimant Claims Resolved By Sale | Available Distribution Assuming Sale | Percentage Distribution to Classes 4 and 5 Claimants |
|---|---|---|---|---|---|
| SJD Partners/ SJD Development | $0 | $56,757,102 | $0 | $0 | 0.00% |

· Estimate of Allowed Claims are based on filed Proofs of Claims and undisputed, noncontingent and unliquidated scheduled claims in which no Proof of Claim was filed on Claims, less duplicative claims.

· Various Bond Claims are duplicative of the Bond Issuer Claims. The existing claim amounts have been subtracted from the Bond Issuer Claims for each estate, where applicable.

· The first table assumes that there will be a recovery of approximately $16,000,000 for the fraudulent inducement claims against Lehman ALI and LV Pacific Point. The second assumes that this litigation does not succeed.

· SJD Development is the parent company of SJD Partners. Approximately $369,199 of General Unsecured Claims were filed against SJD Development, which presumably should have been filed against SJD Partners and are therefore included in the SJD Partners' row of the chart. The chart also assumes that SJD Partners will be successful in its fraudulent inducement against certain Lehman Entities that seeks rescission of the non-judicial foreclosure sale and that the Pacific Point Project will thereafter be sold to a buyer that will assume the un-matured bond liabilities.

# EXHIBIT "8"

**EXHIBIT 8**

**RELIANCE CLAIMS**

MAINDOCS-#160236-v5-SunCal_DS_Exhibits.DOC

SJD Partners
Case No 8:08-17242 ES

| Claimant | Estimated Amount of Pre-petition Reliance Claims |
|---|---|
| 5th Gear, LLC | $85,601.53 |
| All American Asphalt | $209,144.00 |
| AMEC Earth & Environ Inc. | $66,668.04 |
| Archive Technologies | $1,050.00 |
| AT & T | $1,040.06 |
| BNB Engineering Inc. | $7,599.43 |
| Boudreau Pipeline Corp | $840,000.00 |
| Bova Contracting Group | $632,169.00 |
| Carl Warren & Co | $2,023.07 |
| Chino Grading, Inc. | $282,044.14 |
| City of San Juan Capistrano | $3,057.48 |
| Color Image Printing, Inc. | $22,127.70 |
| Consolidated Reprographics | $161.57 |
| Cox Communications | $18,409.44 |
| CR & R, Inc. | $110.25 |
| Creekside Development, Inc. | $568,888.88 |
| Crummack Huseby, Inc. | $600.00 |
| Culbertson, Adams & Associates | $19,751.66 |
| Daren Saunders Photography | $1,131.21 |
| Dexter Wilson Engineering, Inc | $10,418.37 |
| DGW Budget Preparation | $27,340.00 |
| Diamond Environmental Svcs | $211.44 |
| Fidelity National Title Co. | $90.00 |
| Firesafe Planning Solutions | $8,750.00 |
| Gary L. Vogt & Associates | $2,250.00 |
| GCI Associates, Inc. | $641.42 |
| Glen Lukas Associates Inc | $7,294.19 |
| Golden State Fence Company | $11,479.43 |
| GreenField Communications, Inc | $39,762.28 |
| Hartzog & Crabill, Inc. | $1,153.75 |
| Hewitt & O'Neil, LLP | $9,609.60 |
| HomeBuyers Guide Real Estate Inc. | $24,000.00 |
| Hunsaker & Associates - Irvine | $366,720.83 |
| Jackson, DeMarco, Tidus & Peckenpa | $310.75 |
| Jag Construction | $163,018.12 |
| Katz, Okitsu & Associates | $2,923.59 |
| KTGY Group, Inc. | $8,295.36 |
| Kuno's Grading | $2,509.39 |

**SJD Partners**
Case No 8:08-17242 ES

| Claimant | Estimated Amount of Pre-petition Reliance Claims |
| --- | --- |
| Laguna Playhouse | $2,550.00 |
| LDB & Associates, Inc. | $1,500.00 |
| Mesa Pacific Construction, Inc. | $88,822.10 |
| Miller Barondess, LLP | $911,593.98 |
| Mobile Mini, Inc. | $2,312.39 |
| MSE Retaining Systems, Inc. | $45,754.22 |
| MWW Group Inc | $42,019.25 |
| National Construction Rentals | $2,233.06 |
| OCB Reprographics, Inc. | $952.60 |
| Outdoor Dimensions | $7,235.96 |
| Palmieri,Tyler,Wilhelm & Waldr | $5,254.67 |
| Playa Digital Media, Inc. | $1,050.02 |
| Professional Reprographics Svcs | $1,749.92 |
| R&M Electrical Contracting | $24,996.40 |
| Roddan Paolucci Roddan | $33,760.22 |
| Rohm Insurance Agency | $109,185.00 |
| Ron Martin & Associates, Inc. | $160.63 |
| Roundup Funding LLC | $487.04 |
| SCC Acquisitions | $27,166.61 |
| Scoop ReprintSource | $5,215.38 |
| South County Publications, Inc | $2,800.00 |
| Summers/Murphy & Partners, Inc | $8,350.00 |
| SunCal Management, LLC | $1,386,189.57 |
| Tensar Earth Technologies | $19,515.80 |
| The Gas Company | $8,128.57 |
| Ugalde Trucking Co, Inc. | $6,520.00 |
| Utility Consultants of Orange | $15,550.00 |
| Voss, Cook & Thel, LLP | $205,322.98 |
| Whittier Mailing Service, Inc. | $2,287.68 |
| Wiredhat Interactive | $2,895.75 |
| **Total** | **$6,419,915.78** |

| In re: | CHAPTER  11 |
| Debtor(s). | CASE NUMBER |

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 660 Newport Center Drive, 4th Fl., Newport Beach, CA 92660.

A true and correct copy of the foregoing document described as:  **FIRST AMENDED DISCLOSURE STATEMENT DESCRIBING FIRST AMENDED JOINT CHAPTER 11 PLAN FILED BY SJD PARTNERS, LTD. AND SJD DEVELOPMENT CORP. [GROUP IV: VOLUNTARY DEBTORS]**  will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

I. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On June 20, 2011, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

☒ Service information continued on attached page

II. **SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served):
On _____, 2011, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

III. **SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on _____, 2011, I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| June 20, 2011 | Susan Connor | /s/ Susan Connor |
| Date | Type Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**F 9013-3.1**

| In re: | CHAPTER 11 |
|---|---|
| Debtor(s). | CASE NUMBER |

## NEF SERVICE LIST

- Selia M Acevedo    sacevedo@millerbarondess.com, mpritikin@millerbarondess.com
- Joseph M Adams    jadams@sycr.com
- Raymond H Aver    ray@averlaw.com
- James C Bastian    jbastian@shbllp.com
- Thomas Scott Belden    sbelden@kleinlaw.com, ecf@kleinlaw.com
- John A Boyd    fednotice@tclaw.net
- Mark Bradshaw    mbradshaw@shbllp.com
- Gustavo E Bravo    gbravo@smaha.com
- Jeffrey W Broker    jbroker@brokerlaw.biz
- Brendt C Butler    bbutler@mandersonllp.com
- Andrew W Caine    acaine@pszyjw.com
- Carollynn Callari    ccallari@venable.com
- Cathrine M Castaldi    ccastaldi@rusmiliband.com
- Tara Castro Narayanan    tara.narayanan@msrlegal.com, lisa.king@msrlegal.com
- Dan E Chambers    dchambers@jmbm.com
- Shirley Cho    scho@pszjlaw.com
- Vonn Christenson    vrc@paynefears.com
- Brendan P Collins    bpcollins@bhfs.com
- Vincent M Coscino    vcoscino@allenmatkins.com, emurdoch@allenmatkins.com
- Paul J Couchot    pcouchot@winthropcouchot.com, pj@winthropcouchot.com;sconnor@winthropcouchot.com
- Jonathan S Dabbieri    dabbieri@sullivan.com,
  hill@sullivanhill.com;mcallister@sullivanhill.com;stein@sullivanhill.com;vidovich@sullivanhill.com
- Ana Damonte    ana.damonte@pillsburylaw.com
- Vanessa S Davila    vsd@amclaw.com
- Melissa Davis    mdavis@shbllp.com
- Daniel Denny    ddenny@gibsondunn.com
- Caroline Djang    crd@jmbm.com
- Donald T Dunning    ddunning@dunningLaw.com
- Meredith R Edelman    meredith.edelman@dlapiper.com
- Joseph A Eisenberg    jac@jmbm.com
- Lei Lei Wang Ekvall    lekvall@wgllp.com
- Richard W Esterkin    resterkin@morganlewis.com
- Marc C Forsythe    kmurphy@goeforlaw.com
- Alan J Friedman    afriedman@irell.com
- Steven M Garber    steve@smgarberlaw.com
- Christian J Gascou    cgascou@gascouhopkins.com
- Barry S Glaser    bglaser@swjlaw.com
- Robert P Goe    kmurphy@goeforlaw.com, rgoe@goeforlaw.com;mforsythe@goeforlaw.com
- Eric D Goldberg    egoldberg@stutman.com
- Richard H Golubow    rgolubow@winthropcouchot.com, pj@winthropcouchot.com
- Michael J Gomez    mgomez@frandzel.com, efiling@frandzel.com;sking@frandzel.com
- Kelly C Griffith    bkemail@harrisbeach.com
- Matthew Grimshaw    mgrimshaw@rutan.com
- Kavita Gupta    kgupta@winthropcouchot.com
- Asa S Hami    ahami@morganlewis.com
- Michael J Hauser    michael.hauser@usdoj.gov
- D Edward Hays    ehays@marshackhays.com
- Michael C Heinrichs    mheinrichs@omm.com
- Harry D. Hochman    hhochman@pszjlaw.com, hhochman@pszjlaw.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*

**F 9013-3.1**

| In re: | CHAPTER  11 |
|---|---|
| Debtor(s). | CASE NUMBER |

- Jonathan M Hoff    jonathan.hoff@cwt.com
- Nancy Hotchkiss    nhotchkiss@trainorfairbrook.com
- Michelle Hribar    mhribar@rutan.com
- John J Immordino    john.immordino@wilsonelser.com, raquel.burgess@wilsonelser.com
- Lawrence A Jacobson    laj@cohenandjacobson.com
- Michael J Joyce    mjoyce@crosslaw.com
- Stephen M Judson    sjudson@fablaw.com
- Kaleb L Judy    ecf@kleinlaw.com, kjudy@kleinlaw.com
- Steven J Kahn    skahn@pszyjw.com
- Sheri Kanesaka    sheri.kanesaka@bryancave.com
- David I Katzen    katzen@ksfirm.com
- Christopher W Keegan    ckeegan@kirkland.com, gdupre@kirkland.com;alevin@kirkland.com
- Payam Khodadadi    pkhodadadi@winthropcouchot.com, pj@winthropcouchot.com
- Irene L Kiet    ikiet@hkclaw.com
- Claude F Kolm    claude.kolm@acgov.org
- Mark J Krone    mk@amclaw.com, crs@amclaw.com;amc@amclaw.com
- David B Lally    davidlallylaw@gmail.com
- Leib M Lerner    leib.lerner@alston.com
- Peter W Lianides    plianides@winthropcouchot.com, pj@winthropcouchot.com
- Charles Liu    cliu@winthropcouchot.com
- Kerri A Lyman    klyman@irell.com
- Mariam S Marshall    mmarshall@marshallramoslaw.com
- Robert C Martinez    rmartinez@mclex.com
- Michael D May    mdmayesq@verizon.net
- Hutchison B Meltzer    hmeltzer@wgllp.com
- Krikor J Meshefejian    kjm@lnbrb.com
- Joel S. Miliband    jmiliband@rusmiliband.com
- James M Miller    jmiller@millerbarondess.com, vgunderson@millerbarondess.com
- Louis R Miller    smiller@millerbarondess.com
- Randall P Mroczynski    randym@cookseylaw.com
- Mike D Neue    mneue@thelobelfirm.com, jmattiace@thelobelfirm.com;pnelson@thelobelfirm.com
- Robert Nida    Rnida@castlelawoffice.com
- Henry H Oh    henry.oh@dlapiper.com, janet.curley@dlapiper.com
- Sean A Okeefe    sokeefe@okeefelc.com
- Robert B Orgel    rorgel@pszjlaw.com, rorgel@pszjlaw.com
- Malhar S Pagay    mpagay@pszjlaw.com, mpagay@pszjlaw.com
- Penelope Parmes    pparmes@rutan.com
- Ronald B Pierce    ronald.pierce@sdma.com
- Katherine C Piper    kpiper@steptoe.com
- Cassandra J Richey    cmartin@pprlaw.net
- Debra Riley    driley@allenmatkins.com
- James S Riley    tgarza@sierrafunds.com
- Todd C. Ringstad    becky@ringstadlaw.com
- R Grace Rodriguez    ecf@lorgr.com
- Martha E Romero    Romero@mromerolawfirm.com
- Ronald Rus    rrus@rusmiliband.com
- John P Schafer    jschafer@mandersonllp.com
- John E Schreiber    jschreiber@dl.com
- William D Schuster    bills@allieschuster.org
- Christopher P Simon    csimon@crosslaw.com
- Wendy W Smith    wendy@bindermalter.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

January 2009                                                                                    F 9013-3.1

| In re: | CHAPTER 11 |
|---|---|
| Debtor(s). | CASE NUMBER |

- Steven M Speier    Sspeier@Squarmilner.com, ca85@ecfcbis.com
- Steven M Speier (TR)    Sspeier@asrmanagement.com, ca85@ecfcbis.com
- Michael St James    ecf@stjames-law.com
- Michael K Sugar    msugar@irell.com
- Cathy Ta    cathy.ta@bbklaw.com, Arthur.Johnston@bbklaw.com;Kenneth.Burgess@bbklaw.com
- David A Tilem    davidtilem@tilemlaw.com,
  malissamurguia@tilemlaw.com;dianachau@tilemlaw.com;kmishigian@tilemlaw.com
- James E Till    jtill@thelobelfirm.com, jmattiace@thelobelfirm.com;pnelson@thelobelfirm.com
- United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov
- Carol G Unruh    cgunruh@sbcglobal.net
- Annie Verdries    verdries@lbbslaw.com
- Jason Wallach    jwallach@gladstonemichel.com
- Joshua D Wayser    , kim.johnson@kattenlaw.com
- Marc J Winthrop    mwinthrop@winthropcouchot.com, pj@winthropcouchot.com
- David M Wiseblood    dwiseblood@seyfarth.com
- Brett K Wiseman    bwiseman@aalaws.com
- Dean A Ziehl    dziehl@pszjlaw.com, dziehl@pszjlaw.com
- Marc A. Zimmerman    joshuasdaddy@att.net

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*                                                                                        **F 9013-3.1**