1
PAUL J. COUCHOT -- State Bar No. 131934
WINTHROP COUCHOT, P.C.
2
660 Newport Center Drive, Fourth Floor
Newport Beach, CA 92660
3
Telephone: (949) 720-4100
Facsimile: (949) 720-4111
4
General Insolvency Counsel for Palmdale Hills
Property, LLC et. al. (the "Voluntary Debtors")

5
RONALD RUS - State Bar No. 67369
JOEL S. MILIBAND - State Bar No. 77438
6
RUS MILIBAND & SMITH
A PROFESSIONAL CORPORATION
7
2211 Michelson Drive, Seventh Floor
Irvine, California 92612
8
Telephone: (949) 752-7100
Facsimile: (949) 252-1514
9
Counsel for SunCal Management LLC and
10
SCC Acquisitions Inc.

11
**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**Santa Ana Division**

12
| In re | Case No. 8:08-bk-17206-ES |

13
PALMDALE HILLS PROPERTY, AND ITS
RELATED DEBTORS,

Jointly Administered With Case Nos.
14
8:08-bk-17209-ES; 8:08-bk-17240-ES;
Joint Administered Debtors and
8:08-bk-17224-ES; 8:08-bk-17242-ES;
15
Debtors-in-Possession
8:08-bk-17225-ES; 8:08-bk-17245-ES;
8:08-bk-17227-ES; 8:08-bk-17246-ES;
16
8:08-bk-17230-ES; 8:08-bk-17231-ES;
Affects:
8:08-bk-17236-ES; 8:08-bk-17248-ES;
17
☐ All Debtors
8:08-bk-17249-ES; 8:08-bk-17573-ES;
☐ Palmdale Hills Property, LLC
8:08-bk-17574 ES; 8:08-bk-17575-ES;
18
☐ SunCal Beaumont Heights, LLC
8:08-bk-17404-ES; 8:08-bk-17407-ES;
8:08-bk-17408-ES; 8:08-bk-17409-ES;
19
☐ SCC/Palmdale, LLC
8:08-bk-17458-ES; 8:08-bk-17465-ES;
☐ SunCal Johannson Ranch, LLC
8:08-bk-17470-ES; 8:08-bk-17472-ES;
20
☐ SunCal Summit Valley, LLC
and 8:08-bk-17588-ES
21
☐ SunCal Emerald Meadows LLC
Chapter 11 Proceedings
☐ SunCal Bickford Ranch, LLC
22
☐ Acton Estates, LLC
**FIRST AMENDED DISCLOSURE**
23
☐ Seven Brothers LLC
**STATEMENT DESCRIBING FIRST**
**AMENDED CHAPTER 11 PLANS FILED**
☐ SJD Partners, Ltd.
**BY SUNCAL PLAN PROPONENTS IN**
24
☐ SJD Development Corp.
**THE CHAPTER 11 CASES OF SUNCAL**
**OAK KNOLL, LLC AND SUNCAL**
25
☐ Kirby Estates, LLC
**TORRANCE, LLC [GROUP II: TRUSTEE**
☐ SunCal Communities I, LLC
**DEBTORS]**
26
☐ SunCal Communities III, LLC
27
☐ SCC Communities LLC
| Date: | July 22, 2011 |
☐ North Orange Del Rio Land, LLC
| Time: | 11:00 a.m. |
28
☐ Tesoro SF LLC
| Place: | Courtroom 5A |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Continued from Previous Page*

- ☐ LBL-SunCal Oak Valley, LLC
- ☐ SunCal Heartland, LLC
- ☐ LBL-SunCal Northlake, LLC
- ☐ SunCal Marblehead, LLC
- ☐ SunCal Century City, LLC
- ☐ SunCal PSV, LLC
- ☐ Delta Coves Venture, LLC
- ☒ SunCal Torrance, LLC
- ☒ SunCal Oak Knoll, LLC

# TABLE OF CONTENTS

|  | | | | PAGE |
|---|---|---|---|---|
| I. | INTRODUCTION | | | 2 |
| II. | DEFINITIONS AND RULES OF INTERPRETATION | | | 4 |
| | 2.1 | Definitions | | 4 |
| | 2.2 | Rules of Construction | | 23 |
| | 2.3 | Exhibits | | 24 |
| III. | PLAN CONFIRMATION DEADLINES | | | 24 |
| | 3.1 | Time and Place of the Confirmation Hearing | | 24 |
| | 3.2 | Deadline for Voting for or Against the Plan | | 24 |
| | 3.3 | Deadline for Objecting to the Confirmation of the Plan | | 25 |
| | 3.4 | Identity of Person to Contact for More Information Regarding the Plan | | 25 |
| | 3.5 | Disclaimer | | 25 |
| IV. | FACTUAL BACKGROUND OF THE DEBTORS | | | 26 |
| | 4.1 | The Formation of the Debtors and the Projects | | 26 |
| | | 4.1.1 | Overview of the Debtors and Their Projects | 26 |
| | | 4.1.2 | The Debtors' Primary Secured Creditors and Their Disputed Claims | 28 |
| | | 4.1.3 | Disputed Claims and Liens | 28 |
| | | 4.1.4 | A Summary of All of the Alleged Claims Against the Debtors | 29 |
| | | 4.1.5 | Summary of the Group II: Trustee Debtors' Cash | 29 |
| | 4.2 | Factual Circumstances Leading to the Filing of the Debtors' Chapter 11 Cases | | 29 |
| | | 4.2.1 | Introduction | 29 |
| | | 4.2.2 | Background on the SunCal Companies | 30 |
| | | 4.2.3 | The Origins of the SunCal/Lehman Joint Venture | 31 |
| | | 4.2.4 | Lehman's Effective Control over the Management of the Debtors and Promises of Ongoing Funding | 31 |
| | | 4.2.5 | The 2008 Restructuring Agreement | 33 |
| | | 4.2.6 | The Lehman Lenders Hire Radco | 34 |
| | | 4.2.7 | The Lehman Lenders' Failure to Close on the Settlement Agreement | 34 |
| | | 4.2.8 | The Lehman Lenders' Undisclosed Sale of Most of the Debtors' Loans | 35 |
| | | 4.2.9 | Lehman's Foreclosure Sale and Purchase of the Pacific Point Project | 36 |
| | | 4.2.10 | Alvarez and Marsal Take Over Control of the Lehman Entities After the Chapter 11 Filing of LBHI and LCPI | 37 |
| | 4.3 | The Debtors' Potential Preferential Transfers | | 39 |

1

## TABLE OF CONTENTS

2

### (Continued)

3

| | | | PAGE |
|---|---|---|---|
| V. | SIGNIFICANT EVENTS IN THE DEBTORS' CHAPTER 11 CASES | | 39 |
| | 5.1 | Voluntary Debtors | 39 |
| | | 5.1.1 Joint Administration of the Voluntary Debtors and the Trustee Debtors | 39 |
| | | 5.1.2 The Voluntary Debtors Court Employed Professionals | 40 |
| | | 5.1.3 LCPI's Motions for Relief from the Automatic Stay Against Certain of the Voluntary Debtors' Projects and Related Appeals | 41 |
| | 5.2 | The Trustee Debtors and Their Professionals | 41 |
| | 5.3 | The Debtors' Various Motions Relating to Financing for the Projects and to Pay Professional Fees | 42 |
| | | 5.3.1 The Voluntary Debtors' Initial Motion for Surcharge and Use of Cash Collateral | 42 |
| | | 5.3.2 The Lehman Disputed Administrative Loans | 42 |
| | | 5.3.3 The Voluntary Debtors' Agreements with the Lehman Entities for Use of Alleged Cash Collateral to Maintain the Properties and to Pay Professional Fees | 44 |
| | 5.4 | The Debtors' Disputes and Claims Against the Lehman Entities | 45 |
| | | 5.4.1 The Lehman Adversary Proceeding | 45 |
| | | 5.4.1.1 Equitable Subordination | 46 |
| | | 5.4.1.2 The Fraudulent Transfer Claims | 46 |
| | | 5.4.1.3 The Preference Claims | 46 |
| | | 5.4.1.4 The Debtors' Motions to Strike the Claims and Pleadings Arising from the Sold Loans to Fenway Capital and Related Appeals | 46 |
| | | 5.4.1.5 Debtors' 502(d) Objections and Lehman's Claim Against Acton | 47 |
| | | 5.4.1.6 The Lehman Recoupment Claim Objections and the State Court Action | 48 |
| | | 5.4.1.7 The Debtors' Potential Post-Petition Claims Against Lehman and Their Agents | 52 |
| | 5.5 | The Lehman Fenway Claims Transaction, Compromise Motion Filed by the Lehman Entities | 52 |
| | | 5.5.1 Lehman Entities' and Fenway's Proposed Claims Transaction | 52 |
| | 5.6 | The Debtors' Motion for a Stay to Suspend Certain Lehman Actions | 53 |
| | 5.7 | The Debtors' Other Litigation with Non-Lehman Related Parties | 54 |
| | | 5.7.1 The Debtors' Failed Preliminary Injunction Motion Against the Holders of Bond Claims | 54 |

# TABLE OF CONTENTS

## (Continued)

**PAGE**

|  |  |  |
|---|---|---|
| | 5.7.2 | The Contractors' Successful Motions for Relief from Stay to Pursue the Bond Claims ........................................................... 54 |
| | 5.7.3 | Bond Safeguard Motion ......................................................................... 54 |
| | 5.7.4 | LitCo. ...................................................................................................... 55 |

| | | |
|---|---|---|
| VI. | | TREATMENT OF UNCLASSIFIED CLAIMS ....................................................... 55 |
| | 6.1 | Introduction .......................................................................................... 55 |
| | 6.2 | Treatment of Allowed Administrative Claims ..................................... 55 |
| | 6.3 | Treatment and Repayment of the Lehman Administrative Loan(s) ............... 55 |
| | 6.4 | Repayment of Allowed Administrative Claims Other than the Lehman Administrative Loans ............................................... 56 |
| | 6.5 | Administrative Claims Bar Date ........................................................... 56 |
| | 6.6 | Treatment of Unsecured Tax Claims ..................................................... 57 |

| | | |
|---|---|---|
| VII. | | CLASSIFICATION OF CLAIMS AND INTERESTS ............................................. 57 |

| | | |
|---|---|---|
| VIII. | | THE PLAN'S TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS ............................................................................................... 60 |
| | 8.1 | The Plan's Treatment of Holders of Allowed Secured Real Property Tax Claims on Real Properties Subject to Deeds of Trust Arising from Lehman's Disputed Secured Claims and Disputed Liens (Classes 1.1 Through 1.2) .................................... 60 |
| | 8.2 | The Plan's Treatment of Holders of Lehman's Disputed Claim(s) and Disputed Lien(s) (Classes 2.1 Through 2.2) ............................. 61 |
| | | A.    Lien Rights ................................................................................. 61 |
| | | B.    Sale of Group II:  Trustee Debtor Projects ............................... 62 |
| | | C.    Abandonment of Unsold Group II:  Trustee Debtor Project(s) ..................................................................... 62 |
| | | D.    Sale of Other Plan Trust Assets Subject to Liens of Class 2.1 and Class 2.2 Claimants ...................................... 63 |
| | | E.    Abandonment of Assets Other Than Group II: Trustee Debtor Projects .............................................................. 63 |
| | | F.    Distributions to the Class 2.1 and Class 2.2 Claimants ..................................................................................... 63 |
| | 8.3 | THE PLAN'S TREATMENT OF HOLDERS OF ASSERTED MECHANIC LIEN CLAIMS AGAINST THE GROUP II: TRUSTEE DEBTOR PROJECTS SUBJECT TO LEHMAN'S DISPUTED CLAIMS (CLASSES 3.1 THROUGH 3.4) ................................................................... 64 |
| | 8.4 | The Plan's Treatment of Holders of Bond Indemnification Claims (Class 4.1) ..................................................................................... 64 |

# TABLE OF CONTENTS

## (Continued)

|  |  | PAGE |
|---|---|---|
| 8.5 | The Plan's Treatment of Holders of Priority Claims (Class 5.1) | 65 |
| 8.6 | THE PLAN'S TREATMENT OF HOLDERS OF GENERAL UNSECURED CLAIMS THAT ARE RELIANCE CLAIMS (CLASSES 6.1 AND 6.2). | 66 |
|  | A.    OPTION A | 66 |
|  | B.    OPTION B | 66 |
|  | Claims that Are Not Reliance Claims (Classes 6.1 Through 6.4) | 66 |
| 8.7 | THE PLAN'S TREATMENT OF HOLDERS OF ALLOWED GENERAL UNSECURED CLAIMS THAT ARE NOT RELIANCE CLAIMS (CLASSES 7.1 AND 7.2) | 66 |
| 88 | The Plan's Treatment of Holders of Allowed Interests | 67 |
| IX. | ACCEPTANCE OR REJECTION OF THE PLAN | 67 |
| 9.1 | Introduction | 67 |
| 9.2 | Who May Object to Confirmation of the Plan | 67 |
| 9.3 | Who May Vote to Accept/Reject the Plan | 68 |
| 9.4 | What Is an Allowed Claim/Interest | 68 |
| 9.5 | What Is an Impaired Class | 68 |
| 9.6 | Who Is Not Entitled to Vote | 68 |
| 9.7 | Who Can Vote in More than One Class | 69 |
| 9.8 | Votes Necessary for a Class to Accept the Plan | 69 |
| 9.9 | Treatment of Nonaccepting Classes | 69 |
| 9.10 | Request for Confirmation Despite Nonacceptance by Impaired Class(es) | 69 |
| X. | MEANS OF EXECUTION AND IMPLEMENTATION OF THE PLAN | 70 |
| 10.1 | Introduction | 70 |
| 10.2 | Sale Process After Confirmation Date but prior to Effective Date | 70 |
|  | A.    Implementation of a Marketing Program | 70 |
|  | B.    Indentifying a Stalking Horse Bidder | 71 |
|  | C.    The Sale Contract | 71 |
|  | 1.    Overbid Provisions | 71 |
|  | 2.    A Break-Up Fee | 71 |
|  | 3.    Sale Free and Clear of Liens | 71 |
|  | D.    The Auction | 71 |
| 10.3 | Removal of Chapter 11 Trustee | 72 |
| 10.4 | Transfer of Property to the Plan Trust | 72 |

# TABLE OF CONTENTS

## (Continued)

PAGE

|      |        |                                                                                 |     |
|------|--------|---------------------------------------------------------------------------------|-----|
|      | 10.5   | Closing of Group II: Trustee Debtor Project Sales                               | 72  |
|      | 10.6   | Purpose of the Plan Trust Assets                                                | 72  |
|      | 10.7   | Trust Agreement                                                                 | 73  |
|      | 10.8   | Operations of the Plan Trust                                                    | 73  |
|      | 10.9   | The Plan Trustee                                                                | 74  |
|      | 10.10  | Payment of Trust Expenses                                                       | 74  |
|      | 10.11  | Plan Distribution System                                                        | 74  |
|      | 10.12  | Claims Estimation Rights                                                        | 74  |
|      | 10.13  | No Payment of Transfer-Related Fees to the United States Trustee                | 75  |
|      | 10.14  | NO PAYMENT OF TRANSFER-RELATED FEES TO THE TRUSTEE                              | 75  |
|      | 10.15  | Books and Records of Trust                                                       | 75  |
|      | 10.16  | Limitations on Liability                                                         | 75  |
|      | 10.17  | Federal Income Tax Treatment of the Holders of Plan Trust Beneficial Interests  | 76  |
|      | 10.18  | Termination of the Trust                                                         | 77  |
|      | 10.19  | Exemption from Certain Transfer Taxes                                            | 77  |
|      | 10.20  | Tax Consequence of The Plan                                                      | 77  |
|      | 10.21  | The Plan Sponsor                                                                 | 78  |
|      | 10.22  | Acquisitions' Obligations                                                        | 78  |
|      | 10.23  | The Trustee Debtors' committee                                                   | 78  |
|      |        | 10.23.1      Duties and Powers                                                   | 78  |
|      |        | 10.23.2      Dissolution of Committee                                            | 80  |
|      | 10.24  | Litigation Claims                                                                | 80  |
|      | 10.25  | Collection of Litigation Recoveries                                             | 80  |
| XI.  | RISK FACTORS |                                                                           | 80  |
|      | 11.1   | Plan Risks                                                                       | 80  |
|      |        | 11.1.1 The Plan May Not Be Accepted or Confirmed                                | 80  |
|      |        | 11.1.2 Failure to Sell the Group II: Trustee Debtor Projects                     | 80  |
|      |        | 11.1.3 Adverse Outcome of Pending Litigation                                     | 81  |
|      |        | 11.1.4 Risks Associated with Lehman Disputed Administrative Loans                | 81  |
| XII. | DISTRIBUTIONS |                                                                          | 81  |
|      | 12.1   | Distribution Agent                                                               | 81  |
|      | 12.2   | Distributions                                                                    | 82  |
|      |        | 12.2.1 Dates of Distributions                                                    | 82  |
|      |        | 12.2.2 Limitation on Liability                                                   | 82  |
|      | 12.3   | Old Instruments and Securities                                                   | 82  |
|      |        | 12.3.1 Surrender and Cancellation of Instruments and Securities                  | 82  |
|      |        | 12.3.2) Cancellation of Liens                                                    | 82  |

# TABLE OF CONTENTS

## (Continued)

|  |  |  | PAGE |
|---|---|---|---|
| 12.4 | De Minimis Distributions and Fractional Shares | | 83 |
| 12.5 | Delivery of Distributions | | 83 |
| 12.6 | Undeliverable Distributions | | 83 |
| 12.7 | Disposition of Unclaimed Property | | 84 |
| XIII. | OBJECTION TO CLAIMS AND DISPUTE CLAIMS | | 84 |
| 13.1 | Standing for Objections to Claims | | 84 |
| 13.2 | Treatment of Disputed Claims and Disputed Liens | | 85 |
| | 13.2.1 | No Distribution Pending Allowance | 85 |
| | 13.2.2 | Distribution After Allowance | 85 |
| XIV. | EXECUTORY CONTRACTS AND UNEXPIRED LEASES | | 85 |
| 14.1 | Executory Contracts Being Assumed | | 85 |
| 14.2 | Bar Date for Rejection Damages | | 85 |
| 14.3 | Changes in Rates Subject to Regulatory Commission Approval | | 85 |
| XV. | BEST INTEREST OF CREDITORS TEST AND PLAN FEASIBILITY | | 86 |
| 15.1 | Best Interests Test | | 86 |
| 15.2 | Feasibility | | 87 |
| XVI. | LIMITATION OF LIABILITY | | 87 |
| 16.1 | No Liability for Solicitation or Participation | | 87 |
| XVII. | CONDITIONS TO CONFIRMATION AND EFFECTIVENESS OF THE PLAN | | 88 |
| 17.1 | Conditions Precedent to Plan Confirmation | | 88 |
| 17.2 | Conditions Precedent to Plan Effectiveness | | 88 |
| XVIII. | RETENTION OF JURISDICTION | | 88 |
| XIX. | MODIFICATION OR WITHDRAWAL OF THE PLAN | | 88 |
| 19.1 | Modification of Plan | | 88 |
| 19.2 | Nonconsensual Confirmation | | 89 |
| XX. | MISCELLANEOUS | | 89 |
| 20.1 | Payment of Statutory Fees | | 89 |
| 20.2 | Payment Dates | | 89 |
| 20.3 | Headings | | 89 |
| 20.4 | Other Documents and Actions | | 89 |
| 20.5 | Notices | | 90 |
| 20.6 | Governing Law | | 90 |

1

## TABLE OF CONTENTS

2

### (Continued)

3

**PAGE**

4

| | | |
|---|---|---|
| 20.7 | Binding Effect | 90 |
| 20.8 | Successors and Assigns | 91 |
| 20.9 | Severability of Plan Provisions | 91 |
| 20.10 | No Waiver | 91 |
| 20.11 | Inconsistencies | 91 |
| 20.12 | Exemption from Certain Transfer Taxes and Recording Fees | 91 |
| 20.13 | Post-Confirmation Status Report | 92 |
| 20.14 | Post-Confirmation Conversion/Dismissal | 92 |
| 20.15 | Final Decree | 93 |

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

# I.

2

## INTRODUCTION

3    This DISCLOSURE STATEMENT[1] is filed by the Voluntary Debtors and Acquisitions, as

4    the SunCal Plan Proponents, in the Chapter 11 Cases of the following Debtors:

5            SunCal Torrance, LLC
        SunCal Oak Knoll, LLC

6    (the "Group II: Trustee Debtors"). In addition to being one of the proponents of the Plan,

7    Acquisitions is the Plan Sponsor, it will also serve as the Plan Trustee of the Plan Trust and as the

8    Distribution Agent, if the Plan is confirmed.

9        Chapter 11 allows debtors-in-possession, Chapter 11 trustees, and under some

10    circumstances, creditors, interest holders and others parties in interest, to propose a Chapter 11

11    plan.  As stated, the SunCal Plan Proponents are the proponents of the Plan sent to you in the same

12    envelope as this Disclosure Statement.  This document summarizes the contents of the Plan,

13    certain information relating to the Plan and the process the Bankruptcy Court follows in

14    determining whether or not to confirm the Plan.

15        In summary, the Plan provides for sale of the Oak Knoll Project and the Del Amo Project

16    (the "Group II: Trustee Debtors Projects"), and for the liquidation of all other assets of the Group

17    II: Trustee Debtors. The Net Proceeds from these sales will then be distributed to Creditors holding

18    Allowed Claims in accordance with their rights and priorities under the bankruptcy code and under

19    other applicable law.

20        **The Plan also offers the holders of a certain category of general unsecured claims,**

21    **which are defined herein as Reliance Claims, the right to sell these claims, and any Litigation**

22    **Rights held by the holders of such claims against the Lebman Entities, to LitCo, for the sum**

23    **of fifty five cents ($0.55) per dollar of claim. The purchase offer is conditioned upon**

24    **confirmation of the applicable Plan and the lack of any stay pending an appeal of the**

25    **Confirmation Order. However, this purchase offer is not contingent upon the sale of the**

26

27

28
---
[1] All defined terms used herein have the same meanings as set forth in Article II herein and Exhibit "1" attached hereto.

1 | **Group II: Trustee Debtor Projects or a determination regarding any alleged automatic stay**

2 | **claim by LCPI arising from LCPI's pending Chapter 11 proceeding.**

3 | Although the same Plan is being filed in the Cases of all Group II: Trustee Debtors, each

4 | Plan is independent of the others. The Creditors in each Case will determine, subject to Court

5 | approval, whether the Plan will be approved in their Case. Accordingly, the Plan may be confirmed

6 | in the Cases of some of the Group II: Trustee Debtors, but not in others.

7 | The Lehman Lenders have filed a competing and alternative plan of reorganization in the

8 | Cases. Accordingly, the creditors holding claims against the Debtors will have the opportunity to

9 | vote for one plan or the other, or they can vote for both plans and allow the Court to decide which

10 | plan should be approved. The Debtors believe that the aggregate benefits offered under their Plan

11 | are superior to what is being offered to Creditors under the Lehman Lenders' competing Plan.

12 | **READ THIS DISCLOSURE STATEMENT CAREFULLY IF YOU WANT TO**

13 | **KNOW ABOUT**:

14 | ➢ **WHO CAN VOTE OR OBJECT TO THE PLAN;**

15 | ➢ **HOW YOUR CLAIM IS TREATED;**

16 | ➢ **HOW THIS TREATMENT COMPARES TO WHAT YOUR CLAIM WOULD**

17 | **RECEIVE IN LIQUIDATION;**

18 | ➢ **A BRIEF HISTORY OF THE DEBTORS AND SIGNIFICANT EVENTS**

19 | **DURING THEIR CHAPTER 11 BANKRUPTCY PROCEEDING;**

20 | ➢ **WHAT FACTORS THE BANKRUPTCY COURT WILL CONSIDER TO**

21 | **DECIDE WHETHER OR NOT TO CONFIRM THE PLAN;**

22 | ➢ **WHAT IS THE EFFECT OF CONFIRMATION; AND**

23 | ➢ **WHETHER THE PLAN IS FEASIBLE.**

24 | This Disclosure Statement cannot tell you everything about your rights.  You should

25 | consider consulting your own attorney to obtain more specific advice on how the Plan will affect

26 | you and your best course of action.

27 | Be sure to read the Plan as well as this Disclosure Statement.  If there are any

28 | inconsistencies between the Plan and this Disclosure Statement, the Plan provisions will govern.

1     The Bankruptcy Code requires a Disclosure Statement to contain "adequate information"

2   concerning the Plan.  On _____, 2011, the Bankruptcy Court entered an order approving this

3   Disclosure Statement, based upon a finding that this document contained "adequate information"

4   to enable parties affected by the Plan to make an informed judgment regarding the Plan.  Any party

5   can now solicit votes for or against the Plan.

6                                                    II.

7                        **DEFINITIONS AND RULES OF INTERPRETATION**

8       **2.1    Definitions.**

9     The following defined terms are used in this Disclosure Statement.  Any capitalized term

10  that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall

11  have the meaning ascribed to that term in the Bankruptcy Code or Bankruptcy Rules.

12           2.1.1   Acquisitions.  SCC Acquisitions, Inc., a California corporation, an indirect

13  parent company of all of the Debtors, a purported obligor on the Bond Claims, a Creditor of all of

14  the Debtors, a SunCal Plan Proponent, the Plan Sponsor and the proposed Plan Trustee.

15           2.1.2   Administrative Claim(s).  Any Claim against a Group II: Trustee Debtor or

16  its Estate incurred after the applicable Petition Date for the applicable Group II: Trustee Debtor but

17  before the Confirmation Date, for any cost or expense of administration of the Case of the

18  applicable Group II: Trustee Debtor, which Claim is entitled to priority under section 507(a)(2) or

19  (3) of the Bankruptcy Code, including, without limitation, any fee or charge assessed against an

20  Estate of a Group II: Trustee Debtor under section 2030 of Title 28 of the United States Code.

21           2.1.3   Administrative Claims Bar Date.  The last date fixed by the Plan for the

22  filing of Proof of Claims or requests for payment of Administrative Claims.  Under the Plan, the

23  Administrative Claims Bar Date shall be the first business day after the sixtieth (60th) day after the

24  Confirmation Date.

25           2.1.4   Affiliate.  The term shall have the meaning set forth under Section 101(2),

26  including, but not limited to, as to any Person, any other Person that directly or indirectly owns or

27  controls, is owned or controlled by, or is under common ownership or control with, such Person.

28  The term "control" (including, with correlative meanings, the terms "controlled by" and "under

1   common control with"), as applied to any Person, means the possession, direct or indirect, of the

2   power to direct or cause the direction of the management and policies of such Person, whether

3   through the ownership of voting securities or other equity ownership interest, by contract or

4   otherwise.

5             2.1.5    Allowed.  When used to describe Claim(s) or Interest(s), such Claim(s) or

6   Interest(s), to the extent that it or they are "Allowed Claim(s)" or "Allowed Interest(s)."

7             2.1.6    Allowed Amount shall mean:

8                     A.      With respect to any Administrative Claim (i) if the Claim is based

9   upon a Fee Application, the amount of such Fee Application that has been approved by a Final

10  Order of the Bankruptcy Court; (ii) if the Claim is based upon any indebtedness or obligation

11  incurred in the ordinary course of business of the Group II: Trustee Debtors and is not otherwise

12  subject to an Administrative Claim Bar Date, the amount of such Claim that has been agreed to by

13  the Group II: Trustee Debtors and such creditor, failing which, the amount thereof as fixed by a

14  Final Order of the Bankruptcy Court; or (iii) if the Holder of such Claim was required to file and

15  has filed proof thereof with the Bankruptcy Court prior to an Administrative Claim Bar Date,

16  (1) the amount stated in such proof if no objection to such Proof of Claim is interposed within the

17  applicable period of time fixed by the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy

18  Court, or (2) the amount thereof as fixed by Final Order of the Bankruptcy Court if an objection to

19  such proof was interposed within the applicable period of time fixed by the Bankruptcy Code, the

20  Bankruptcy Rules or the Bankruptcy Court.  The Allowed Amount of any Administrative Claim

21  which is subject to an Administrative Claims Bar Date and not filed by the applicable

22  Administrative Claims Bar Date shall be zero, and no distribution shall be made on account of any

23  such Administrative Claim;

24                    B.      with respect to any Claim which is not an Administrative Claim

25  (the "Other Claim"): (i) if the Holder of such Other Claim did not file proof thereof with the

26  Bankruptcy Court on or before the Claims Bar Date, the amount of such Claim as listed in the

27  Group II: Trustee Debtors'' Schedules as neither disputed, contingent nor unliquidated; or (ii) if

28  the Holder of such Claim has filed proof thereof with the Bankruptcy Court on or before the

1    Claims Bar Date, (a) the amount stated in such proof if no objection to such Proof of Claim was

2    interposed within the applicable period of time fixed by the Bankruptcy Code, the Bankruptcy

3    Rules, the Plan or the Bankruptcy Court, or (b) the amount thereof as fixed by Final Order of the

4    Bankruptcy Court if an objection to such proof was interposed within the applicable period of time

5    fixed by the Bankruptcy Code, the Bankruptcy Rules, the Plan or the Bankruptcy Court.  The

6    Allowed Amount of any Other Claim which is not Filed by the applicable Claims Bar Date, is not

7    listed on the Group II: Trustee Debtors' Schedules or is listed as disputed, unliquidated, contingent

8    or unknown, and is not allowed under the terms of the Plan shall be zero, and no distribution shall

9    be made on account of any such Claim; and

10                                C.    with respect to any Interest, (i) the amount provided by or

11    established in the records of the Group II: Trustee Debtors at the Confirmation Date, provided,

12    however, that a timely filed proof of Interest shall supersede any listing of such Interest on the

13    records of the Group II: Trustee Debtors; or (ii) the amount stated in a proof of Interest Filed prior

14    to the Confirmation Date if no objection to such Interest was filed prior to the Confirmation Date

15    or such later date as the Bankruptcy Court allows; or (iii) the amount of such Interest as fixed by a

16    Final Order of the Bankruptcy Court.

17                2.1.7    Allowed Claim.  Except as otherwise provided in the Plan (including with

18    respect to those Classes for which the amount of the Allowed Claims is specified by the Plan), a

19    Claim to the extent (and only to the extent) of the Allowed Amount of such Claim.

20                2.1.8    Allowed Interest.  Any Interest to the extent, and only to the extent, of the

21    Allowed Amount of such Interest.

22                2.1.9    Allowed Secured Claims.  All or a portion of a Secured Claim that is an

23    Allowed Claim.

24                2.1.10    Allowed Unsecured Claim. All or a portion of an Unsecured Claim that is

25    an Allowed Claim.

26                2.1.11    Assets.  All assets that are property of the Debtor(s) pursuant to

27    Bankruptcy Code Section 541.

28                2.1.12    Arch.  Arch Insurance Company, a Bond Issuer.

1    2.1.13    Available Cash. Each Group II: Trustee Debtors' Cash deposited into the

2 applicable Distribution Account(s) on or after the Effective Date that is available for making

3 Distributions under the Plan to Holders of Allowed Administrative, Priority, and General

4 Unsecured Claims. The Available Cash shall consist of the respective Group II: Trustee Debtors'

5 cash on hand as of the Effective Date that is not subject to a Disputed Lien, proceeds of Net

6 Litigation Recoveries that are not subject to a Disputed Lien, Net Sales Proceeds that become

7 Available Cash upon the disallowance of a Disputed Claim or avoidance of a Disputed Lien

8 purportedly encumbering such Cash, or proceeds from the Acquisitions Administrative Loan. All

9 Available Cash shall be deposited into the applicable Distribution Account(s). Available Cash

10 shall not include Net Sale Proceeds in the Net Sales Proceeds Account where the Disputed Secured

11 Claims are Allowed but subject to an equitable subordination judgment.

12    2.1.14    Avoidance Actions. All Claims and defenses to Claims accruing to the

13 Group II: Trustee Debtors and their Estates under Bankruptcy Code Sections 506(d), 510(c), 541,

14 544, 545, 547, 548, 549, 550, or 551.

15    2.1.15    Bankruptcy Code. The United States Bankruptcy Code.

16    2.1.16    Bankruptcy Court. The United States Bankruptcy Court for the Central

17 District of California, having jurisdiction over the Cases and, to the extent of any withdrawal of the

18 reference made pursuant to Section 157 of title 28 of the United States Code, the United States

19 District Court for the Central District of California; or, in the event such courts cease to exercise

20 jurisdiction over the Cases, such court or unit thereof that exercises jurisdiction over the Cases in

21 lieu thereof.

22    2.1.17    Bankruptcy Rules. Collectively, as now in effect or hereafter amended

23 and as applicable to the Cases, (i) the Federal Rules of Bankruptcy Procedure, and (ii) the Local

24 Bankruptcy Rules and General Orders applicable to cases pending before the Bankruptcy Court.

25    2.1.18    Beneficial Interests. means, collectively, the interests of the holders of

26 Allowed Unsecured Claims in the Plan Trust and in all distributions to be made by the Plan Trust

27 on account of Allowed Unsecured Claims. The Beneficial Interests (a) shall be noted in the books

28

1  and records of the Plan Trust, (b) shall not be evidenced by a writing, and (c) may not be

2  transferred, sold, assigned or transferred by will, intestate succession or operation of law.

3          2.1.19  Bond Claim(s). Any Claim against the Debtor(s) and a Bond Issuer under

4  various payment or performance bonds, and/or any claims of Bond Issuer(s) against the Debtor(s)

5  under various payment or performance bonds.

6          2.1.20  Bond Claimant. Holder(s) of a Bond Claim.

7          2.1.21  Bond Indemnification Claim. All Claims by Bond Safeguard, Lexon, and

8  Arch for indemnification for payment by Bond Safeguard, Lexon and Arch of Bond Claims with

9  respect to the Group II: Trustee Debtors' Projects.

10          2.1.22  Bond Indemnitors. The individuals and entities that are allegedly liable on

11  the Bond Indemnification Claims, including, allegedly, all of the Debtors, Acquisitions, all

12  Affiliates of Acquisitions, and Elieff.

13          2.1.23  Bond Issuer(s). Bond Safeguard, Lexon and Arch in their capacities as

14  issuers and sureties for payment and performance bonds for the benefit of certain of the Debtors.

15          2.1.24  Bond Safeguard. Bond Safeguard Insurance Company, a Bond Issuer.

16          2.1.25  Business Day. Any day, other than a Saturday, a Sunday or a "legal

17  holiday," as defined in Bankruptcy Rule 9006(a).

18          2.1.26  Cases. The Chapter 11 cases of the Group II: Trustee Debtors pending

19  before the Bankruptcy Court.

20          2.1.27  Cash. Currency of the United States of America and cash equivalents,

21  including, but not limited to, bank deposits, immediately available or cleared checks, drafts, wire

22  transfers and other similar forms of payment.

23          2.1.28  CFD Bonds. Community facilities district bonds issued by a

24  governmental entity.

25          2.1.29  Chapter 11 Trustee. Steven M. Speier, the duly appointed trustee of the

26  Trustee Debtors in their pending Chapter 11 Cases.

27          2.1.30  Claim. This term shall have the broadest possible meaning under

28  Section 101(5) of the Bankruptcy Code, and shall include (a) any right to payment from any of the

1  Group II: Trustee Debtors, whether or not such right is reduced to judgment, liquidated,

2  unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable,

3  secured, or unsecured, or (b) any right to an equitable remedy for breach of performance if such

4  breach gives rise to a right of payment from any of the Group II: Trustee Debtors, whether or not

5  such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured,

6  disputed, undisputed, secured, or unsecured.

7          2.1.31    Claims Bar Date. For any Claim other than an Administrative Claim,

8  March 31, 2009, which was established by the Bankruptcy Court as the last date for creditors to

9  file Proof of Claims with the Bankruptcy Court in all of the Group II: Trustee Debtors' cases.

10          2.1.32    Claims Objection Deadline. The later of (i) the first business day

11  following the one hundred and eightieth (180th) day after the Effective Date, or (ii) such greater

12  period of limitation as may be fixed or extended by the Bankruptcy Court or by agreement between

13  the Plan Trustee and the Holder of the Claim.

14          2.1.33    Claim Objection Reduction Amount. The amount of Net Sales Proceeds

15  that is made available to the holders of Allowed Unsecured Claims due to the entry of a judgment

16  or order on a Lehman Claim Objection that disallows, reduces, or otherwise adversely modifies the

17  secured claims filed by the Lehman Lenders.

18          2.1.34    Class. Each group of Claims or Interests classified in Article V of the Plan

19  pursuant to Sections 1122 and 1123 of the Bankruptcy Code.

20          2.1.35    Committee. The Official Committee of Unsecured Creditors of the

21  Trustee Debtors appointed in the Cases pursuant to Section 1102 of the Bankruptcy Code.

22          2.1.36    Confirmation Date. The date on which the Confirmation Order is entered

23  in the Bankruptcy Court's docket.

24          2.1.37    Confirmation Order. The order entered by the Bankruptcy Court

25  confirming the Plan in accordance with the provisions of Chapter 11 of the Bankruptcy Code.

26          2.1.38    Contingent Bond Claims. Unmatured Bond Claims.

27          2.1.39    Creditor. Any Person who is the Holder of a Claim against any Debtor

28  that arose or accrued or is deemed to have arisen or accrued or to have matured, or otherwise

1  become due, owing, and payable on or before the Petition Date, including, without limitation,

2  Claims of the kind specified in Sections 502(g), 502(h) or 502(i) of the Bankruptcy Code.

3          2.1.40    Debtor(s). Individually or collectively, the Voluntary Debtors and the

4  Trustee Debtors, as specifically defined in Exhibit "1" attached hereto

5          2.1.41    Debtor(s)-in-Possession. The Voluntary Debtor(s) when acting in their

6  capacity as representatives of their respective Estates in their respective Chapter 11 Cases.

7          2.1.42    Del Amo Project. The Project owned by SunCal Torrance, located in the

8  City of Torrance, California, as more particularly described herein.

9          2.1.43    Del Amo Project Value. The value of $13,500,000, which is the SunCal

10  Proponent's conclusion regarding the fair market value of the Del Amo Project based upon their

11  knowledge of the Project and present market conditions.

12          2.1.44    Disclosure Statement. The document accompanying the Plan that is

13  entitled "First Amended Disclosure Statement Describing First Amended Chapter 11 Plan Filed by

14  SunCal Plan Proponents In The Chapter 11 Cases Of SunCal Oak Knoll, LLC and SunCal

15  Torrance, LLC," as amended and with all accompanying exhibits.

16          2.1.45    Disputed Claim(s). All or any part of a Claim other than any Allowed

17  Amount thereof as to which any one of the following applies: (i) no Proof of Claim has been filed

18  with respect to such Claim, and either (a) the Claim is not listed in the Schedules; or (b) the Claim

19  is listed in the Schedules as unliquidated, disputed, contingent, unknown or in a zero amount,

20  (ii) the Claim is the subject of (a) a Litigation Claim; (b) the Claim is subject to offset by a

21  Litigation Claim; (c) a timely objection that has not been resolved by a Final Order; or (d) a request

22  for estimation in accordance with the Bankruptcy Code, the Bankruptcy Rules, any applicable

23  order of the Bankruptcy Court, or the Plan which is Filed on or before the Claims Objection

24  Deadline, which Adversary Proceeding, objection, or request for estimation has not been

25  dismissed, withdrawn or determined by a Final Order; or (iii) the Claim is otherwise treated as a

26  "Disputed Claim" pursuant to the Plan.

27

28

1    2.1.46    Disputed Lien(s). An asserted lien(s) against Assets of the Debtor(s) that

2  is either subject to a Disputed Secured Claim, not duly perfected, subject to an Avoidance Action,

3  or subject to an action pursuant to Bankruptcy Code Sections 510(c)(2) and/or 506(d).

4    2.1.47    Disputed Secured Claim(s). That part of a Disputed Claim that is a

5  Secured Claim.

6    2.1.48    Distribution(s). Payments to Holders of Allowed Claims provided for

7  under the Plan.

8    2.1.49    Distribution Agent. The entity that is responsible for making Distributions

9  under the Plan, which shall be Acquisitions.

10    2.1.50    Distribution Account(s). Separate account(s) to be established by the Plan

11  Trustee at an FDIC insured bank into which each Group II: Trustee Debtors' Available Cash shall

12  be deposited and all Available Cash received by the Plan Trust after the Confirmation Date that

13  would have belonged to such Group II: Trustee Debtor shall be deposited, other than Net Sales

14  Proceeds that are subject to Disputed Claims and Disputed Liens.

15    2.1.51    Distribution Date. With respect to any Allowed Claim or Allowed

16  Interest, the date on which a Distribution is required to be made under the Plan.

17    2.1.52    Effective Date. A date selected by the SunCal Plan Proponents that is not

18  later than the ninetieth (90th) calendar day after the Confirmation Date.

19    2.1.53    Elieff. Bruce Elieff, the president of Acquisitions, a purported obligor on

20  the Bond Claims with corresponding indemnity Claims against the Debtors.

21    2.1.54    Estates. The bankruptcy estates of the Group II: Trustee Debtors created

22  pursuant to Section 541 of the Bankruptcy Code.

23    2.1.55    Fee Applications. Applications of Professional Persons under Sections

24  330, 331 or 503 of the Bankruptcy Code for allowance of compensation and reimbursement of

25  expenses in the Cases.

26    2.1.56    Fee Claim. A Claim under Sections 330 or 503 of the Bankruptcy Code

27  for allowance of compensation and reimbursement of expenses in the Cases.

28

1        2.1.57    Fenway Capital. Fenway Capital Funding LLC, a Lehman Successor to

2  Lehman's Disputed Claims and Lehman's Disputed Liens arising from (i) SunCal Communities I

3  Loan Agreement, (ii) Ritter Ranch Loan Agreement, (iii) Bickford Second Loan Agreement,

4  (iv) SunCal PSV Loan Agreement, (v) SunCal Marblehead/SunCal Heartland Loan Agreement,

5  (vi) Delta Coves Loan Agreement (vii) SunCal Northlake Loan Agreement, and (viii) SunCal Oak

6  Valley Loan Agreement. Such Disputed Claims and Disputed Liens were transferred back to LCPI

7  pursuant to a compromise approved by the New York Bankruptcy Court on May 12, 2010.

8        2.1.58    Filed. Delivered to, received by and entered upon the legal docket by the

9  Clerk of the Bankruptcy Court. "File" shall have a correlative meaning.

10        2.1.59    Final Order. A judgment, order, ruling or other decree issued and entered

11  by the Bankruptcy Court.

12        2.1.60    General Unsecured Claim. A Claim against a Group II: Trustee Debtor

13  that is not (a) a Secured Claim, (b) an Administrative Claim, (c) a Tax Claim or (d) a Priority

14  Claim.

15        2.1.61    Group II: Trustee Debtors. SunCal Torrance, LLC and SunCal Oak Knoll,

16  LLC.

17        2.1.62    Group II: Trustee Debtor Projects. The Del Amo Project and the Oak

18  Knoll Project.

19        2.1.63    Holder. The beneficial owner of any Claim or Interest.

20        2.1.64    Initial Overbid. The Initial Overbid is the first Qualifying Bid after the

21  Opening Bid that is equal to or in excess of the Initial Overbid Amount.

22        2.1.65    Initial Overbid Amount. In the case of the Oak Knoll Project, the Initial

23  Overbid Amount is a sum that is not less than the sum of the Opening Bid, the Oak Knoll Break-up

24  Fee and seventy five thousand dollars ($75,000). In the case of the Del Amo Project, the Initial

25  Overbid Amount is a sum that is not less than the sum of the Opening Bid, the Torrance Break-up

26  Fee and seventy-five thousand dollars ($75,000).

27

28

1        2.1.66    Insider. The term shall have the broadest meaning possible under

2    Section 101(31), including, but not limited to, a person in control of the Debtor, Affiliates and

3    Insiders of such Affiliates.

4        2.1.67    Interest. Any equity security interest in any Group II: Trustee Debtor

5    within the meaning, of Section 101(16) of the Bankruptcy Code, including, without limitation, any

6    equity ownership interest in any of the Group II: Trustee Debtors, whether in the form of common

7    or preferred stock, stock options, warrants, partnership interests, or membership interests.

8        2.1.68    LBHI. Lehman Brothers Holdings, Inc., a Lehman Entity, the parent

9    company of Lehman ALI and LCPI, and a Chapter 11 debtor in a bankruptcy proceeding pending

10    in the Bankruptcy Court for the Southern District of New York.

11        2.1.69    LCPI. Lehman Commercial Paper, Inc., a Chapter 11 debtor in a

12    bankruptcy proceeding pending in the Bankruptcy Court for the Southern District of New York.

13        2.1.70    Lehman Adversary Proceeding. The Debtors' pending adversary

14    proceeding against the Lehman Lenders and/or the Lehman Successors asserting various causes of

15    action including equitable subordination, fraudulent conveyances and preferential transfers.

16        2.1.71    Lehman ALI. Lehman ALI, Inc.

17        2.1.72    Lehman Disputed Administrative Loans. The post-petition financing

18    provided by Lehman ALI to Palmdale Hills, SunCal Emerald, SunCal Bickford, Acton Estates,

19    SunCal Oak Valley, SunCal Heartland, SunCal Northlake, SunCal Marblehead, SunCal Century

20    City, SunCal PSV, Delta Coves, and SunCal Oak Knoll, which grants priming liens on all

21    borrower Debtors' assets, and for super-priority administrative status to Lehman ALI. The

22    Voluntary Debtors have repaid to Lehman ALI the full amount of $270,731 loaned to the

23    Voluntary Debtors. The aggregate amount of the Lehman Administrative Loans to all of the

24    Trustee Debtors is approximately $40 million as of March 1, 2011 and continuing to increase. The

25    Lehman Administrative Loans are the subject of claim objections. Until these objections are

26    resolved, these Lehman Administrative Loans shall not be Allowed Claims.

27        2.1.73    Lehman Claim Objections. The objections filed by the Debtors to the

28    claims filed by the Lehman Lenders that are based upon the Lehman Disputed Loans and the

1  Lehman Disputed Administrative Loans, including, but not limited to, the Lehman Recoupment

2  Objection and the Lehman 502(d) Objection.

3        2.1.74   Lehman Entities.  The Lehman Lenders, the Lehman Equity Members and

4  LBHI.

5        2.1.75   Lehman Equity Members.  Lehman Entities that own direct or indirect

6  membership Interests in all of the Trustee Debtors, except for SunCal Heartland and SunCal

7  Marblehead.

8        2.1.76   Lehman Lenders.  Lehman ALI, LCPI, Northlake Holdings, and OVC

9  Holdings.

10        2.1.77   Lehman Disputed Loans.  Collectively the following loans that are the

11  purported basis for the Lehman's Disputed Claims:  (a) SunCal Communities I Loan Agreement;

12  (b) Bickford Second Loan Agreement; (c) Ritter Ranch Loan Agreement; (d) SCC Palmdale Loan;

13  (e) Interim Loan Agreement; (f) SunCal Oak Knoll/SunCal Torrance Loan Agreement; (g) SunCal

14  Century City Loan Agreement; (h) SunCal PSV Loan Agreement; (i) SunCal Delta Coves Loan

15  Agreement; (j) SunCal Marblehead/SunCal Heartland Loan Agreement; (k) Sun Cal Oak Valley

16  Loan Agreement; (l) SunCal Northlake Loan Agreement; (m) Pacific Point First Loan Agreement;

17  and (n) Pacific Point Second Loan Agreement.

18        2.1.78   Lehman Representatives.  The individuals that controlled the Lehman

19  Entities.

20        2.1.79   Lehman Successor(s).  Entities other than the Lehman Lenders that either

21  assert to be or are determined by the Bankruptcy Court to be the beneficial owner(s) of the Lehman

22  Disputed Loan(s), including, but not limited to Fenway Capital, Lehman Re and Danske Bank.

23        2.1.80   Lehman's Disputed Claim(s).  All of the Proofs of Secured Claims filed by

24  a Lehman Lender or a Lehman Successor in the Debtors' Chapter 11 Cases arising from the

25  Lehman Disputed Loans and the Lehman Disputed Administrative Loans.

26        2.1.81   Lehman's Disputed Lien(s).  All of the alleged liens relating to Proofs of

27  Secured Claims filed by a Lehman Lender or a Lehman Successor in the Debtor's Chapter 11

28  Cases arising from the Lehman Disputed Loans.

1          2.1.82    Lexon. Lexon Insurance Co.

2          2.1.83    LitCo. A newly formed Delaware limited liability company that will be

3    purchasing the claims and litigation rights held by the Reliance Claimants that choose Option A

4    provided for in the Plan.

5          2.1.84    LitCo Plan Loan. A loan that will be made by LitCo, to the extent

6    necessary to pay Administrative Claims, and post Confirmation Date costs incurred by the SunCal

7    Proponents in connection with the sale process, and to pay post Effective Date costs incurred by

8    the Plan Trust, including litigation expenses where applicable, if no other source is available to pay

9    these obligations. LitCo will be capitalized with funds provided by a third party.

10          2.1.85    Litigation Claims. Any and all interests of the Group II: Trustee Debtors

11    in any and all Claims, rights, causes of action, and objections or defenses to Claims, liens, rights,

12    or causes of action which have been or may be commenced by the Group II: Trustee Debtor(s), the

13    Chapter 11 Trustee, or the Committee, as the case may be, including, but not limited to, any

14    (i) Avoidance Actions; (ii) for turnover of property to the Group II: Trustee Debtors' Estates and/or

15    the Plan Trust; (iii) for the recovery of property or payment of money that belongs to the Debtors'

16    Estates or the Plan Trust; (iv) the right to compensation in the form of damages, recoupment or

17    setoff of the Debtors' Estates and/or the Plan Trust; (v) the Lehman Adversary Proceeding; (vi) the

18    State Court Action, and (vii) any and all other Claims against Lehman's Disputed Claims and/or

19    Disputed Liens referenced in the Plan or the Disclosure Statement.

20          2.1.86    Litigation Recoveries. Any Cash or other property received by the

21    Chapter 11 Trustee, the Group II: Trustee Debtors, the Committee and/or the Plan Trust, as the

22    case may be, from all or any portion of a Litigation Claim(s), including, but not limited to, awards

23    of damages, attorneys' fees and expenses, interest and punitive damages, whether recovered by

24    way of settlement, execution on judgment or otherwise.

25          2.1.87    Litigation Rights. Any Claims held by a party other than the Group II:

26    Trustee Debtors that have not been fixed in a final judgment prior to the Effective Date.

27          2.1.88    Maximum Distributions. A Distribution to a Holder of an Allowed

28    General Unsecured Claim against a Group II: Trustee Debtor equal to one hundred percent (100%)

1  of the amount of the Holder's Allowed General Unsecured Claim plus interest at the Legal Rate

2  from and as of the Group II: Trustee Debtor's Petition Date.

3         2.1.89    MB Firm. Miller Barondess, LLP.

4         2.1.90    Mechanic Lien Claims. Mechanic Lien Claims arising pursuant to

5  California Civil Code §3110, et seq. that were either allegedly perfected prepetition or otherwise

6  allegedly satisfy the requirements of Bankruptcy Code 546(b).

7         2.1.91    Minimum Increment. Minimum Increment applicable to the sales of the

8  Group II: Trustee Debtor Projects is one hundred thousand dollars ($100,000), until there are only

9  two Qualified Bidders submitting bids for a Group II: Trustee Debtor Project, then the Minimum

10  Increment shall be fifty thousand dollars ($50,000).

11         2.1.92    Minimum Sale Price. The minimum gross sale price that must be paid for

12  either the Oak Knoll Project or the Del Amo Project before such project can be sold pursuant to the

13  Plan. Such prices are $22,860,000 and $12,150,000 respectively.

14         2.1.93    Net Litigation Recoveries. Litigation Recoveries less associated

15  Administrative Claims and Post-Confirmation Expenses incurred in connection with such

16  Litigation Recoveries.

17         2.1.94    Net Sales Proceeds. The Cash generated from the sale(s) or liquidation of

18  the Group II: Trustee Debtor(s)' Assets or the Plan Trust's Assets, less payment of selling

19  expenses, taxes, Chapter 11 Trustee fees, and any associated Post-Confirmation Expenses and

20  Administrative Claims incurred in furtherance of such sales or liquidation of such Assets.

21         2.1.95    Net Sales Proceeds Account(s). Separate account(s) that will be

22  established by the Plan Trustee at an FDIC insured bank into which all Net Sale Proceeds shall be

23  deposited from the sale of Assets that were allegedly encumbered by a Disputed Secured Claim(s)

24  and/or a Disputed Lien(s). There shall be a separate Net Sales Proceeds Account for the Net Sale

25  Proceeds allegedly subject to each Disputed Secured Claim(s) and/or Disputed Lien(s), except

26  where there are two Disputed Liens on a single Project, in which case, there shall be a single

27  account for the proceeds generated from that Project. The Disputed Secured Claim(s) and/or

28  Disputed Lien(s) shall attach to the corresponding Net Sales Proceeds Account(s) pending any

1   Final Order(s) of the Bankruptcy Court resolving the applicable Disputed Secured Claim(s) and/or

2   applicable Disputed Lien(s). To the extent that a particular Disputed Claim is disallowed or a

3   particular Disputed Lien is avoided (other than transferred to the Estates pursuant to Bankruptcy

4   Code Section 510(c)(2)) or otherwise invalidated, such Net Sales Proceeds allegedly subject

5   thereto shall become Available Cash and shall be transferred to the applicable Distribution

6   Account(s). To the extent that a particular Disputed Secured Claim and a Disputed Lien are

7   allowed and deemed valid but subject to the equitable subordination causes of action in the

8   Lehman Adversary Proceeding, the funds shall remain in the Net Sales Accounts pending a Final

9   Order on the equitable subordination causes of action in the Lehman Adversary Proceeding.

10          2.1.96   Oak Knoll Break-up Fee. The sum of one million, sixteen thousand dollars

11   ($1,016,000) that will be paid to the Stalking Horse Bidder that submits the Opening Bid for the

12   Oak Knoll Project, if such Stalking Horse Bidder is not the Winning Bidder.

13          2.1.97   Oak Knoll Project. The Project owned by SunCal Marblehead, located in

14   the City of San Clemente, California, as more particularly described herein.

15          2.1.98   Opening Bid. Opening Bid means the offer for one, or both of the Group

16   II: Trustee Debtor Projects, which is equal to the Minimum Sale Price(s) accepted by the Debtor

17   for either one or both of the Group II: Trustee Debtor Projects.

18          2.1.99   Orders for Relief Date. The following are dates that orders for relief were

19   entered for each of the Trustee Debtors:

| SunCal Oak Valley | January 6, 2009 |
| SunCal Heartland | January 6, 2009 |
| SunCal Northlake | January 6, 2009 |
| SunCal Marblehead | January 6, 2009 |
| SunCal Century City | January 6, 2009 |
| SunCal PSV | January 6, 2009 |
| Delta Coves | January 6, 2009 |
| SunCal Torrance | January 6, 2009 |
| SunCal Oak Knoll | January 6, 2009 |

26          2.1.100  Palmdale Hills. Palmdale Hills Property, a Delaware limited liability

27   company, a Voluntary Debtor herein, and the owner of the Ritter Ranch Project.

28

1       2.1.101   Torrance Break-up Fee. The sum of five hundred and forty thousand

2   dollars ($540,000) that will be paid to the Stalking Horse Bidder that submits the Opening Bid for

3   the Del Amo Project, if such Stalking Horse Bidder is not the Winning Bidder.

4       2.1.102   Person. An individual, partnership, corporation, limited liability company,

5   business trust, joint stock company, trust, unincorporated association, joint venture, governmental

6   authority, governmental unit, committee or other entity of whatever nature.

7       2.1.103   Petition Dates. The following are dates that each of the Voluntary Debtors

8   filed their Voluntary Chapter 11 petitions or Creditors filed involuntary Chapter 11 petitions

9   against the Trustee Debtors:

| | |
|---|---|
| Palmdale Hills | November 6, 2008 |
| SunCal Beaumont | November 6, 2008 |
| SCC Palmdale | November 7, 2008 |
| SunCal Johannson | November 7, 2008 |
| SunCal Summit Valley | November 7, 2008 |
| SunCal Emerald | November 7, 2008 |
| SunCal Bickford | November 7, 2008 |
| Acton Estates | November 7, 2008 |
| Seven Brothers | November 7, 2008 |
| SJD Partners. | November 7, 2008 |
| SJD Development | November 7, 2008 |
| Kirby Estates | November 7, 2008 |
| SunCal I | November 7, 2008 |
| SunCal III | November 7, 2008 |
| SCC Communities | November 20, 2008 |
| Del Rio | November 20, 2008 |
| Tesoro | November 20, 2008 |
| Delta Coves Ventures, LLC | November 14, 2008 |
| SunCal Heartland, LLC | November 12, 2008 |
| SunCal Marblehead, LLC | November 12, 2008 |
| LB-L-SunCal Northlake, LLC | November 12, 2008 |
| LB-L-SunCal Oak Valley, LLC | November 12, 2008 |
| SunCal Century City, LLC | November 14, 2008 |
| SunCal PSV, LLC | November 14, 2008 |
| SunCal Torrance Properties, LLC | November 14, 2008 |
| SunCal Oak Knoll, LLC | November 20, 2008 |

26      2.1.104   Plan. The "First Amended Chapter 11 Plan Filed by SunCal Plan

27  Proponents In The Chapter 11 Cases Of SunCal Oak Knoll, LLC and SunCal Torrance, LLC,"

28

1  together with the Exhibits thereto, as the same may be amended or modified from time to time in

2  accordance with the Plan.

3         2.1.105  Plan Documents.  The Plan, the Plan Trust Agreement and all other

4  documents attached to the Plan Supplement.

5         2.1.106  Plan Period. The period from the Effective Date to the Plan Termination

6  Date.

7         2.1.107  Plan Supplement. The compilation of the Plan Documents to be filed with

8  the Bankruptcy Court.

9         2.1.108  Plan Termination Date. The fifth (5th) anniversary date of the Effective

10  Date, unless the Plan elects an earlier date.

11         2.1.109  Plan Sponsor.  The entity that has committed to cause the funding of

12  certain specified obligations under the Plan on or after the Effective Date.  The Plan Sponsor is

13  Acquisitions..

14         2.1.110  Plan Trust.  A liquidating trust to be established prior to or on the

15  Effective Date, with Acquisitions as the Plan Trustee and the Holders of Allowed Claims against

16  the Debtors as the beneficiaries. The purpose of the Plan Trust will be to liquidate the Debtors'

17  Assets (other than Assets that are excluded by the Plan Trustee on the grounds that they lack value

18  or would be difficult to administer) and to otherwise consummate the Plan.

19         2.1.111   Plan Trustee. The Plan Trustee under the Plan Trust Agreement is

20  Acquisitions.

21         2.1.112   Plan Trust Agreement. The liquidating trust agreement governing the

22  affairs of the Plan Trust, which will be in substantially the form contained in the Plan Supplement.

23         2.1.113   Plan Trust Beneficiaries. The Plan Trust Beneficiaries are (i) the holders

24  of Beneficial Interests, as of any point in time, and (ii) holders of Allowed Claims that shall be

25  satisfied from Plan Trust Property in accordance with the terms of the Plan.

26         2.1.114   Plan Trust Property. Plan Trust Property means all property within the

27  Chapter 11 estates of the Group II: Trustee Debtors, other than property that is affirmatively

28  excluded by the Plan Trustee.

1    2.1.115 <u>Post-Confirmation Expenses</u>. The fees and expenses incurred by the Plan

2 Sponsor, the Plan Trustee and the Committee and their professionals following the Confirmation

3 Date (including the fees and costs of Professionals) for the purpose of (i) prosecuting and

4 liquidating the Litigation Claims; (ii) objecting to and resolving Disputed Claims and Disputed

5 Liens; (iii) selling or otherwise liquidating the Plan Trust's Assets; (iv) effectuating Distributions

6 under the Plan; and (v) otherwise consummating the Plan and closing the Group II: Trustee

7 Debtors' Chapter 11 Cases.

8    2.1.116 <u>Priority Claim</u>. Any Claim, other than an Administrative Claim or a Tax

9 Claim, to the extent entitled to priority under Section 507(a) of the Bankruptcy Code.

10    2.1.117 <u>Pro Rata</u>. Proportionately, so that with respect to any distribution in

11 respect of any Allowed Claim, the ratio of (a)(i) the amount of property distributed on account of

12 such Allowed Claim to (ii) the amount of such Allowed Claim, is the same as the ratio of (b)(i) the

13 amount of property distributed on account of all Allowed Claims of the Class or Classes sharing in

14 such distribution to (ii) the amount of all Allowed Claims in such Class or Classes.

15    2.1.118 <u>Professional</u>. A Person or Entity (a) employed by the Group II: Trustee

16 Debtors, the Committee pursuant to a Final Order in accordance with Sections 327 and 1103 of the

17 Bankruptcy Code and to be compensated for services rendered prior to the Effective Date, pursuant

18 to Sections 327, 328, 3291 330 and 331 of the Bankruptcy Code, or (b) for which compensation

19 and reimbursement has been allowed by the Bankruptcy Court pursuant to Section 503(b) of the

20 Bankruptcy Code.

21    2.1.119 <u>Professional Fees</u>. All Allowed Claims for compensation and for

22 reimbursement of expenses under Sections 328, 330 and/or 503(b) of the Bankruptcy Code

23    2.1.120 <u>Projects</u>. The Debtors' residential real estate development projects and

24 other assets as separately defined herein and described in Exhibit "1" to the Disclosure Statement.

25    2.1.121 <u>Qualifying Bid</u>. Qualifying Bid means, with respect to any bid on a

26 Group II: Trustee Project, a bid made by Qualifying Bidder that is A) equal to or in excess of the

27 Initial Overbid Amount, if it is the Initial Overbid, or B) in excess of the immediately preceding

28 Qualifying Bid by the Minimum Increment, if it is not the Initial Overbid.

1         2.1.122   Qualifying Bidder.  Qualifying Bidder means a bidder who a) has

2   deposited the sum of five hundred thousand dollars ($500,000) in an escrow designated by the

3   SunCal Proponents; b) agreed that this sum will be forfeited as liquidated damages if such bidder

4   fails to perform; and c) who has provided the SunCal Plan Proponents evidence confirming that

5   such bidder has the financial means to acquire the applicable Group II: Trustee Project(s) that such

6   bidder is seeking to acquire.

7         2.1.123   Reliance Claim. An Allowed Unsecured Claim against a Group II:

8   Trustee Debtor that would entitle the holder thereof to be the beneficiary of any equitable

9   subordination judgment obtained against a Lehman Entity by such Group II: Trustee Debtor.

10        2.1.124   Reliance Claimant. The holder of a Reliance Claim. A list of the Reliance

11   Claims and Reliance Claimants is attached hereto as Exhibit "8."

12        2.1.125   Sale Period.  The Sale Period is the time period during which the SunCal

13   Proponents must consummate a sale or liquidation of the Group II: Trustee Projects. The Sales

14   Period shall commence on the Confirmation Date and shall expire on the Effective Date.

15        2.1.126   SCC LLC.  SCC Acquisitions LLC, a limited liability company, a

16   subsidiary of Acquisitions and an indirect and/or a direct parent company of all of the Debtors.

17        2.1.127   Schedules.  The schedules of assets and liabilities and list of equity

18   security holders Filed by the Group II: Trustee Debtors, as required by Section 521(1) of the

19   Bankruptcy Code, Bankruptcy Rules 1007(a)(3) and (b)(1), and Official Bankruptcy Form No. 6,

20   as amended from time to time.

21        2.1.128   Stalking Horse Bidder.  The Qualified Bidder who submits the Opening

22   Bid.

23        2.1.129   State Court Action. The action filed by certain Voluntary Debtors against

24   Lehman ALI, Inc., and certain other defendants, in California Superior Court for the County of

25   Orange (Case No. 30-2011-0040847-CU-BC-CJC), and a reservation of rights to add the Plan

26   Trustee and/or the Trustee Debtors as additional plaintiffs therein.

27        2.1.130   SunCal.  The SunCal Companies, a trade name for Acquisitions and its

28   Affiliates.

1          2.1.131    SunCal Management. SunCal Management, LLC, a Delaware limited

2 liability company, and the property manager for the Projects.

3          2.1.132    SunCal Oak Knoll. SunCal Oak Knoll, LLC, a Delaware limited liability

4 company, a Trustee Debtor (a Group II: Trustee Debtor), and the owner of the Oak Knoll Project.

5          2.1.133    SunCal Oak Knoll/SunCal Torrance Loan Agreement. That certain Loan

6 Agreement, dated as of November 30, 2006, between SunCal Torrance and SunCal Oak Knoll, as

7 borrowers, and Lehman ALI, as agent and sole lender, pursuant to which Lehman ALI made a loan

8 in the maximum aggregate principal amount of approximately $167.7 million. The SunCal Oak

9 Knoll/SunCal Torrance Loan Agreement is allegedly secured by first-priority deeds of trust on the

10 Oak Knoll and the Del Amo Projects. The SunCal Oak Knoll/SunCal Torrance Loan Agreement

11 has an alleged balance due of $158,141,364.64 as of March 30, 2009. . The proofs of claim filed

12 with respect to this loan agreement are the subject of the Lehman Adversary Proceeding and the

13 Lehman Claim Objections.

14          2.1.134    SunCal Plan Proponent(s). The Voluntary Debtors and Acquisitions as

15 the parties-in-interest that are proposing the Plan.

16          2.1.135    SunCal Torrance. SunCal Torrance, LLC, a Delaware limited liability

17 company, a Trustee Debtor (a Group II: Trustee Debtor), and the owner of the Del Amo Project.

18          2.1.136    Tax. Any tax, charge, fee, levy, impost or other assessment by any

19 federal, state, local or foreign taxing authority, including, without limitation, income, excise,

20 property, sales, transfer, employment, payroll, franchise, profits, license, use, ad valorem,

21 estimated, severance, stamp, occupation and withholding tax. "Tax" shall include any interest or

22 additions attributable to, or imposed on or with respect to such assessments.

23          2.1.137    Tax Claim. Any Claim for any Tax to the extent that it is entitled to

24 priority in payment under Section 507(a)(8) of the Bankruptcy Code.

25          2.1.138    Trustee Debtor(s). The following Debtors, individually or collectively,

26 that are represented by the Chapter 11 Trustee: Delta Coves, SunCal Heartland, SunCal

27 Marblehead, SunCal Northlake, SunCal Oak Valley , SunCal Century City, SunCal PSV, SunCal

28 Torrance, and SunCal Oak Knoll.

1          2.1.139    <u>Trustee Debtors' Committee</u>. The Official Committee of Unsecured

2    Creditors of the Trustee Debtors appointed in the Cases pursuant to Section 1102 of the

3    Bankruptcy Code.

4          2.1.140    <u>Unpaid Secured Real Property Tax Claims</u>. Secured Claims held by

5    various government entities secured by liens on the underlying real properties owned by the

6    Debtors but that are non-recourse to the Debtors.

7          2.1.141    <u>Unsecured Claim</u>. An Unsecured Claim is any Claim that is not an

8    Administrative Claim, Tax Claim, Secured Claim, or Priority Claim.

9          2.1.142    <u>Voluntary Debtor(s)</u>. The following  Chapter 11 debtors and debtors-in-

10   possession, individually or collectively, Palmdale Hills, SunCal I, SunCal III, SCC Palmdale,

11   Acton Estates, SunCal Beaumont, SunCal Emerald, SunCal Johansson, SunCal Bickford, SunCal

12   Summit, Seven Brothers, Kirby Estates, SJD Partners, SJD Development, SCC Communities, Del

13   Rio and Tesoro.

14         2.1.143    <u>Voluntary Debtors' Committee</u>. The Official Committee of Unsecured

15   Creditors of the Voluntary Debtors appointed in the Cases pursuant to Section 1102 of the

16   Bankruptcy Code.

17         2.1.144    <u>Winning Bid</u>. The highest Qualifying Bid received for the Oak Knoll

18   Project or the Del Amo Project.

19         2.1.145    <u>Winning Bidder</u>. The party that submits the highest Qualifying Bid.

20   **2.2**    **<u>Rules of Construction</u>.**

21       For purposes of the Plan and this Disclosure Statement, unless otherwise provided herein or

22   in the Plan, (a) whenever from the context it is appropriate, each term, whether stated in the

23   singular or the plural, will include both the singular and the plural; (b) each pronoun stated in the

24   masculine, feminine or neuter includes the masculine, feminine and neuter; (c) any reference in the

25   Plan or this Disclosure Statement to an existing document or schedule filed or to be filed means

26   such document or schedule, as it may have been or may be amended, modified or supplemented

27   pursuant to the Plan; (d) any reference to an entity as a Holder of a Claim or Interest includes that

28   entity's successors and assigns; (e) except as otherwise indicated herein all references in the Plan

1  or this Disclosure Statement to Sections, Articles and Exhibits are references to Sections, Articles

2  and Exhibits of or to the Plan; (f) the words "therein," "thereunder" and "thereto" refer to the Plan

3  in its entirety rather than to a particular portion of the Plan; and (g) unless otherwise provided in

4  the Plan or this Disclosure Statement, any reference in the Plan or this Disclosure Statement to a

5  contract, instrument, release, indenture, agreement, or other document being in a particular form or

6  on particular terms and conditions means that such document shall be substantially and materially

7  in such form or substantially and materially on such terms and conditions; (h) any reference in the

8  Plan or this Disclosure Statement to a document, schedule, or exhibit to the Plan or Disclosure

9  Statement Filed or to be Filed means such document, schedule, or exhibit, as it may have been or

10  may be amended, modified, or supplemented; and (i) the rules of construction set forth in Section

11  102 of the Bankruptcy Code shall apply to the extent such rules are not inconsistent with the

12  express terms of the Plan or this Disclosure Statement or any other provision in this Section.

13  **2.3**    **Exhibits.**

14  All Exhibits to the Plan are incorporated into and are a part of the Plan as if set forth in full

15  therein.

16  **III.**

17  **PLAN CONFIRMATION DEADLINES**

18  The Bankruptcy Court has not confirmed the Plan described in this Disclosure Statement.

19  Accordingly, the terms of the Plan are not binding on anyone. However, if the Bankruptcy Court

20  confirms the Plan, then the Plan will be binding on the Debtor(s), the Plan Trustee, and on all

21  Creditors and Interest Holders in such Cases.

22  **3.1**    **Time and Place of the Confirmation Hearing.**

23  The hearing where the Bankruptcy Court will determine whether or not to confirm the Plan

24  will take place at 411 West Fourth Street, Santa Ana, CA 92701-4593 on October 24, 2011, at 9:30

25  a.m. in Courtroom 5A.

26  **3.2**    **Deadline for Voting for or Against the Plan.**

27  If you are entitled to vote, it is in your best interest to timely vote on the enclosed ballot and

28  return the ballot to:

Winthrop Couchot Professional Corporation
660 Newport Center Drive, Suite 400
Newport Beach, CA 92660
Facsimile: (949) 720-4111
Attn: P.J. Marksbury

Your ballot must be **received by** September 26, 2011, or it will not be counted.

### 3.3    Deadline for Objecting to the Confirmation of the Plan.

Objections to the confirmation of the Plan must be filed with the Bankruptcy Court, and

served upon the following parties so that they are received by September 26, 2011:

| | |
|---|---|
| **Counsel to the Voluntary Debtors** | Paul J. Couchot<br>Winthrop Couchot Professional Corporation<br>660 Newport Center Drive, Suite 400,<br>Newport Beach, CA 92660 |
| **Authorized Agent for Voluntary Debtors** | Bruce V. Cook<br>General Counsel<br>2392 Morse Ave<br>Irvine, CA 92614-6234 |
| **Counsel for SunCal Management LLC and SCC Acquisitions Inc.** | Ronald Rus<br>Rus Miliband & Smith P.C.<br>2211 Michelson Drive, Seventh Floor<br>Irvine, California 92612 |
| **Authorized Agent for SunCal Management and SCC Acquisitions, Inc.** | Bruce V. Cook<br>General Counsel<br>2392 Morse Ave<br>Irvine, CA 92614-6234 |

### 3.4    Identity of Person to Contact for More Information Regarding the Plan.

Any interested party desiring further information about the Plan should contact the

Voluntary Debtors' counsel, Winthrop Couchot Professional Corporation, 660 Newport Center

Drive, Suite 400, Newport Beach, CA 92660, Attn: Paul J. Couchot, (949) 720-4100; Peter W.

Lianides, (949) 720-4155; Payam Khodadadi, (949) 720-4160.

### 3.5    Disclaimer.

The information contained in this Disclosure Statement is provided by the SunCal Plan

Proponents. The SunCal Plan Proponents represent that everything stated in this Disclosure

Statement is true to the best of their knowledge. The Bankruptcy Court has not yet determined

1    whether or not the Plan is confirmable and makes no recommendation as to whether or not you

2    should support or oppose the Plan.

3     The discussion in this Disclosure Statement regarding the Group II: Trustee Debtors may

4    contain "forward looking statements" within the meaning of the Private Securities Litigation

5    Reform Act of 2095. Such statements consist of any statement other than a recitation of historical

6    fact and can be identified by the use of forward looking terminology such as "may," "expect,"

7    "anticipate," "estimate," or "continue," or the negative thereof or other variations thereon or

8    comparable terminology. The reader is cautioned that all forward looking statements are

9    necessarily speculative and there are certain risks and uncertainties that could cause actual events

10   or results to differ materially from those referred to in such forward looking statements. The

11   liquidation analyses, distribution projections, projections of financial results and other information

12   are estimates only, and the timing, amount and value of actual distributions to Creditors may be

13   affected by many factors that cannot be predicted. Therefore, any analyses, estimates, or

14   projections may or may not turn out to be accurate.

15    The SunCal Plan Proponents and their professionals have made a diligent effort to identify

16   in this Disclosure Statement all Litigation Claims, including claims for relief, counterclaims, and

17   objections to claims. However, no reliance should be placed on the fact that a particular Litigation

18   Claim is or is not identified in this Disclosure Statement. The Group II: Trustee Debtors or other

19   parties in interest may seek to investigate, file and prosecute Litigation Claims after the

20   Confirmation Date, or the Plan Trust may seek to do so after the Effective Date of the Plan whether

21   or not the Litigation Claims are identified in this Disclosure Statement.

22   **IV.**

23   **FACTUAL BACKGROUND OF THE DEBTORS**

24    **4.1**  **The Formation of the Debtors and the Projects.**

25     **4.1.1**  **Overview of the Debtors and Their Projects.**

26    The Group II: Trustee Debtors are two of twenty-six entities (collectively the "Debtors")

27   that were formed pursuant to a joint venture between Affiliates of the SunCal Companies

28   ("SunCal") and the Lehman Entities (the "SunCal/Lehman Joint Venture"). The Debtors role in the

1   venture was to own and develop the large residential projects that were the core assets in this joint

2   undertaking.

3          At the inception of SunCal/Lehman Joint Venture, it was agreed that SunCal would be the

4   developer/manager of the Projects and the Lehman Entities would provide the necessary capital.

5   Attached hereto as Exhibit "1" is a general description of the Debtors' Projects, including the

6   Group II: Trustee Debtor Projects, and the Debtors' other primary Assets, excluding Cash and the

7   Litigation Claims, and a description of the loans for the Projects that are not a part of Group II:

8   Trustee Debtor Projects.

9          All of the Debtors are Affiliates of Acquisitions and SCC LLC.  Some of the Debtors

10  directly own the Projects, while others serve as holding companies, owning Allowed Interests in the

11  Debtors that hold title to the Projects.  SunCal Management, LLC, a SunCal Affiliate, has

12  management contracts with respect to all of the Projects and manages the Debtors' day-to-day

13  business affairs.

14         The seventeen Debtors who are referred to herein as the "Voluntary Debtors" are wholly

15  owned by SunCal Affiliates, and consequently the SunCal Affiliates have full corporate

16  governance authority over these entities.  The Voluntary Debtors own eleven (11) of the Projects.

17  In the case of the nine Trustee Debtors, the SunCal Affiliates and the Lehman Affiliates initially

18  shared ownership equally (50% each). However, after the Petition Date, the SunCal Affiliates

19  became the owner of hundred percent (100%) of the equity in two of the nine Trustee Debtors –

20  SunCal Heartland and SunCal Marblehead.  The Trustee Debtors own nine (9) Projects.

21  Attached hereto as Exhibit "2" is a chart that sets forth the appraised value of the Group II: Trustee

22  Debtors' Projects. This chart lists both the Lehman Lenders' value estimates and SunCal's

23  valuation estimates.[2]  As the chart indicates, the Lehman Lenders' valuation for the Group II:

24  Trustee Debtor Projects is in the aggregate amount of $73,000,000, while the Debtors' valuation of

25  the Group II: Trustee Debtor Projects is in the aggregate amount of $38,900,000.

26         The Plan eliminates any potential value disputes by providing for the sale of the Group II:

27  Trustee Debtor Projects through an auction that is designed to yield the highest market price for

28

[2] Values may have changed since these analyses were prepared.

1    these assets. Accordingly, to the extent any other party believes the Group II: Trustee Debtor

2    Projects have a greater value than the Opening Bid offered by another Qualifying Bidder, they will

3    have the opportunity to submit a Qualifying Bid (but no credit-bids will be allowed) that exceeds

4    the Opening Bid and, if they so desire, to become the Winning Bidder by offering the highest

5    Qualifying Bid. This market sale process will insure that the rights of all stakeholders are

6    protected.

7    **4.1.2    The Debtors' Primary Secured Creditors and Their Disputed Claims**.

8    Lehman ALI holds the primary secured claims against the Oak Knoll Project and the Del

9    Amo Project. Lehman ALI's secured claim against the Oak Knoll Project and the Del Amo Project,

10    which are secured by a first priority deed of trust, is based upon funding provided under the terms

11    of the SunCal Oak Knoll/SunCal Torrance Loan Agreement. The asserted balance due under terms

12    of this loan was $158,141,365 as of March 30, 2009.

13    **4.1.3    Disputed Claims and Liens.**

14    As discussed in detail herein, during the course of the Debtors' Cases, the Debtors initiated

15    litigation disputing the validity of Lehman's Disputed Secured Claims, and the validity, priority

16    and extent of Lehman's Disputed Liens (which includes the liens against the Group II: Trustee

17    Debtor Projects). This litigation is being pursued through the Lehman Adversary Proceeding,

18    various contested matters, and in potential lawsuits based on the post-petition conduct of the

19    Lehman Entities and/or their agents.

20    Attached hereto as Exhibit "3" is a chart that sets forth Lehman's Disputed Secured Claims,

21    the alleged Holders of the Lehman Disputed Secured Claims, the collateral encumbered by the

22    Lehman Disputed Liens, and the alleged outstanding amount based on the filed Proofs of Claim.

23    As the chart indicates, the total of Lehman's Disputed Secured Claims (based upon the proofs of

24    claims filed in the Debtor's bankruptcy cases) with respect to the Group II: Trustee Debtors is

25    approximately $158,141,364.64 as of March 30, 2009.

26

27

28

#### 4.1.4   A Summary of All of the Alleged Claims Against the Debtors.

Attached hereto as Exhibit "4" is a chart that sets forth the prepetition Claims that have been asserted against all of the Debtors. In summary, the asserted Claims against the Group II: Trustee Debtors consist of the following:

| Claims | Oak Knoll Project | Del Amo Project |
|---|---|---|
| Unpaid Secured Real Property Tax Claims | $4,156,073 | $1,082,899 |
| The Disputed Lehman Secured Claims | $158,141,365 | $158,141,365 |
| Mechanics Lien Claims | $4,687,891 | $0 |
| Administrative and Priority Claims | $18,022,329 | $2,064,158 |
| General Unsecured Claims Including alleged Bond Claims | $938,074 | $203,838 |

The SunCal Plan Proponents believe that these balances will ultimately be reduced through claims objections resulting in lower "Allowed" claims balances.

#### 4.1.5   Summary of the Group II: Trustee Debtors' Cash.

The following chart sets forth the Group II: Trustee Debtors' cash on hand as of January 31, 2011.

| Group II: Trustee Debtors | Amount |
|---|---|
| SunCal Oak Knoll | $1,658,646.25 |
| SunCal Torrance | $118,023.78 |
| **Group II: Trustee Debtors' Total** | $1,776,670.03 |

Although the Lehman Lenders have alleged that they hold liens on the above cash, a preliminary review of the applicable lien documents indicates that most of the alleged liens were not validly perfected. This means that these liens can be avoided, allowing the unsecured creditors recourse to these funds. Moreover, even if the liens against these accounts were properly perfected, the amount secured by these liens, and their priority and their enforceability will be subject to the results of the Lehman Claim Objections and the Lehman Adversary Proceeding.

### 4.2   Factual Circumstances Leading to the Filing of the Debtors' Chapter 11 Cases.

#### 4.2.1   Introduction.

In this section of the Disclosure Statement, the SunCal Proponents have provided a brief description of the relationship between the Debtors and the Lehman Entities. This background is relevant to the Group II: Trustee Debtors, and in fact all of the Debtors, for the following reasons.

1    First, most of the unsecured claims asserted against the Debtors were incurred at the insistence of

2    the Lehman Lenders, and they would have been paid if the Lehman Lenders had honored their

3    obligation to pay these claims. Second, a substantial part of claims that the Lehman Lenders failed

4    to pay are being asserted against *all of the Debtors*. If the litigation against the Lehman Lenders

5    discussed herein is successful, it will, at a minimum, reduce the pool of claims against the Group II:

6    Trustee Debtors, and thereby increase the dividend payable to the remaining creditors. Third and

7    finally, this history allows the Creditors to take the measure of the parties who are now proffering

8    the competing plan – the Lehman Lenders.  As the within discussion will establish, the Lehman

9    Lenders failed to pay the claims of Creditors prepetition, the Lehman Lenders attempted to

10   foreclose upon the Group II: Trustee Debtor Projects post-petition in order to deny the unsecured

11   creditors any recovery on the claims they failed to pay, and finally, when this foreclosure effort

12   failed, the Lehman Lenders attempted to destroy the Debtors' reorganization and sale efforts by

13   manipulating LCPI's alleged automatic stay. The SunCal Plan Proponents believe that this history

14   will lead the Creditors to conclude, when weighing the merits of the Lehman Lenders Plan offer:

15   "Fool me once shame on you, fool me twice shame on me."

16              **4.2.2   Background of the SunCal Companies**.

17          SunCal is a family-owned and operated real estate business that has been successfully

18   developing properties throughout the western United States for over 70 years. SunCal's business

19   focuses upon the "development" of residential land. A typical SunCal development begins with the

20   acquisition of one or more parcels of raw land. Thereafter, the SunCal team develops a master plan

21   for the acreage that incorporates streets, homes, parks, schools and commercial areas, and then it

22   works with the applicable municipal planning authorities (the city, county, state and federal) to

23   secure the necessary approvals or "entitlements" to gain approval of this plan. This process, which

24   requires the assistance of land planners, civil engineers, architects, lawyers, and other land

25   specialists, takes a period of years. Once the master plan is approved, SunCal provides for the

26   grading of the project and the installation of the foundational infrastructure (streets, utilities, etc.)

27   and then sells the lots or parcels within the project to merchant builders.

28

### 4.2.3    The Origins of the SunCal/Lehman Joint Venture.

SunCal historically financed its projects with loans and/or equity from a number of different sources. However, beginning in 2097, an increasing number of SunCal's projects were financed by the Lehman Entities, as Mark Walsh ("Walsh"), the head of LBHI's Global Real Estate Group, began cultivating a business relationship with SunCal's principals.

By 2003, the Lehman Entities and SunCal had entered into joint ventures involving approximately fifteen projects. By 2007, that number had grown to over forty, and the Lehman Entities had become, with limited exceptions, the exclusive provider of financing for the SunCal Projects pursuant to a written agreement executed in 2006. The Lehman Entities also consisted of the Lehman Equity Members that either directly or indirectly owned a fifty percent (50%) equity interest in all nine of the Trustee Debtors.

In their dealings with SunCal, the Lehman Representatives made no distinction between Projects financed by Lehman ALI and Projects financed by LCPI. They also made no distinction between the Debtors in which Lehman Equity Members held 50% equity memberships or the Debtors in which the Lehman Entities held no equity membership interest. As agents of the financial partner in the parties' joint venture, the Lehman Representatives would determine which Lehman Entity would provide financing on which Projects, and would dictate the structure that the financing would take, according to whatever suited the Lehman Entities' needs.

### 4.2.4    Lehman's Effective Control over the Management of the Debtors and Promises of Ongoing Funding.

Prior to the market downturn in the middle of 2007, Lehman Representatives afforded SunCal substantial discretion in the management and development of the Projects. The Debtors would contract with third-party vendors to perform grading, health and safety compliance, construction, landscaping, and other necessary services on the Project sites, and they would work with the local municipalities to obtain the necessary entitlements and other authorizations necessary to proceed with development. The Lehman Representatives, SunCal and the Debtors would discuss anticipated quarterly expenditures at periodic budget meetings, and, as expenses were incurred each month, SunCal and the Debtors would submit requests for payment to the

1   Lehman Representatives, supported by the necessary documentation. The Lehman Representatives

2   would then provide the funding necessary to pay these expenses.

3   During the third quarter of 2007, the foregoing management and payment dichotomy

4   changed, after the real estate market experienced a sudden downturn, and many of the Projects

5   significantly declined in value. In response to this dramatic economic change, a series of high

6   level discussions occurred between SunCal's representatives and the Lehman Representatives --

7   including Walsh, Paul Hughson ("Hughson") and Frank Gilhool ("Gilhool"), the Managing

8   Directors of Lehman's Global Real Estate. In these discussions, SunCal's representatives, acting

9   on behalf of the Debtors, expressed concerns about the loans on the Projects being out of balance,

10  and suggested shutting down the Projects, or at least slowing the pace of development. However,

11  Walsh specifically instructed SunCal not to slow down or stop work. He assured SunCal that the

12  Lehman Entities would provide the necessary funding to pay vendors and to keep the development

13  of the Projects moving forward.

14  The foregoing assurances of payments were confirmed in numerous telephone

15  conversations between Gilhool and SunCal's COO, Frank Faye ("Faye"), SunCal's General

16  Counsel, Bruce Cook ("Cook"), Steve Elieff and/or Bruce Elieff that took place during 2007 and

17  2008. In each exchange, Gilhool assured SunCal that the Lehman Entities were committed to

18  funding the debts and obligations being incurred at the Projects and they continued to insist that

19  work proceed.

20  During this time frame, the Lehman Representatives became much more "hands on,"

21  scrutinizing and approving all budgets and expenses through a new control and approval structure.

22  Under the new structure, SunCal would submit budgets to the Lehman Representatives on a

23  weekly basis and explain, during periodic conference calls, what Project payables they believe had

24  to be paid and what work had to be performed on the Projects. The Lehman Representatives

25  would then unilaterally decide what future work would proceed, the Lehman Representatives

26  would authorize the work and the Lehman Representatives would decide what payables would be

27  paid timely by designating them as "urgent," and what other payables were not urgent and hence

28  would not be paid on a timely basis. However, even under this new Lehman controlled

1    management and payment regime, the Lehman Representatives made it clear that all payables

2    being incurred would be funded.

3                        ### 4.2.5    The 2008 Restructuring Agreement.

4              By the fall of 2007, both SunCal and the Lehman Representatives contemplated entering

5    into restructuring agreement in the near term, with a closing to occur no later than January or

6    February of 2008.  However, this transaction was delayed by the Lehman Entities' extensive

7    documentation demands until May 23, 2008.  On this date, SunCal and most of the Debtors finally

8    entered into an omnibus "Restructuring Agreement" with LBHI, Lehman ALI and the other

9    Lehman Entities.  The same Lehman Representative signed the Restructuring Agreement on behalf

10   of all of the Lehman Entities.

11             Pursuant to the Restructuring Agreement, Lehman ALI, "as the Lender with respect to each

12   Loan," committed, among other things, to: (1) make advances under existing loans to fund the

13   continuing costs necessary to preserve the value of the Projects; (2) move forward to resolve the

14   accrued outstanding subcontractor payables, i.e., to make sure that the Projects' creditors were paid

15   for their work; and (3) to close the transaction, whereby newly-created Lehman Entities would

16   assume the debt and obligations of the Projects.

17             As originally executed in May 2008, the Restructuring Agreement applied to twelve of the

18   twenty Projects (as well as several other projects not at issue in the Lehman Adversary

19   Proceeding):  (1) Acton Estates; (2) Beaumont Heights; (3) Bickford Ranch; (4) Emerald

20   Meadows; (5) Heartland; (6) Johannson Ranch; (7) Marblehead; (8) Northlake; (9) Oak Valley;

21   (10) Pacific Point; (11) Ritter Ranch; and (12) Summit Valley.  The Debtors that owned and/or

22   held equity interests in the entities that owned these Projects were signatories to the May 2008

23   agreement.[3]

24

25   [3]  Specifically, the Restructuring Agreement was entered into by, among others, the "Borrowers,"
     "Grantors" and "Pledgors," as defined in Annex 1 thereto.  The "Borrowers" included SunCal Marblehead,
26   SunCal Heartland, SunCal Northlake, SunCal Oak Valley, SJD Partners, Palmdale Hills, SCC Palmdale,
     SunCal I, SunCal III, and SunCal Bickford.
27        The "Grantors" included SunCal Marblehead, SunCal Heartland, SunCal Northlake, SunCal Oak Valley,
     SJD Partners, Palmdale Hills, SunCal Bickford, SunCal Acton, SunCal Summit and SunCal Emerald, and
28   Debtors SunCal Beaumont and SunCal Johannson.
          The "Pledgors" included SCC Palmdale, SunCal I, SunCal Summit and SJD Development.

1       Between May and August 2008, the parties agreed to add four additional projects to the

2   Restructuring Agreement: (1) Del Rio; (2) Joshua Ridge; (3) Palm Springs Village; and (4) Tesoro

3   Burnham, and the four Debtors associated with these Projects—SunCal Del Rio, SCC

4   Communities, SunCal PSV, and SunCal Tesoro.  Only four Projects were not included in the

5   Restructuring Agreement: Century City, Delta Coves, Oak Knoll and Del Amo.  Accordingly, the

6   four Debtors associated with these Projects—SunCal Century City, Delta Coves, SunCal Oak

7   Knoll and SunCal Torrance—were not signatories thereto.  Lehman ALI was the lender on each of

8   these Projects and, as with the other Projects, Lehman ALI continued to insist that these four

9   debtors proceed with the development of the four Projects, it approved all expenses, and it

10  continually provided assurances of payment.

11          **4.2.6    The Lehman Lenders Hire Radco.**

12      Subsequent to the execution of the Restructuring Agreement, Lehman ALI arranged for a

13  third party, Radco, to directly settle outstanding contractor payables, as its agent.  Radco was

14  provided some limited funding and authority to negotiate settlements, and did in fact reach

15  settlement with a number of creditors.  The funding for these settlements, whether the debts related

16  to Lehman ALI or LCPI funded Projects, came from the same source.  Lehman ALI and LCPI also

17  provided approval for new work on the Projects, and Lehman ALI paid for some of this work.

18  However, this funding was minimal and it soon stopped.

19      In August 2008, Lehman ALI withdrew funding and settlement authority from Radco,

20  leaving millions of dollars in outstanding contractor payables unresolved, notwithstanding the

21  contrary provisions in the Restructuring Agreement.  Leman ALI's actions also impaired the

22  Debtors' ability to resolve ongoing public health and safety issues arising at the Projects.

23  Ultimately, only a fraction of the total outstanding payables were resolved, contrary to the  past

24  promises made by Lehman Representatives.

25          **4.2.7    The Lehman Lenders' Failure to Close on the Settlement Agreement.**

26      Pursuant to the terms of the Restructuring Agreement, the parties agreed to enter into a

27  Settlement Agreement, the form of which was attached to the Restructuring Agreement.  The

28  Settlement Agreement provided for the transfer of the Projects included within the Restructuring

1    Agreement to a series of newly formed Lehman-controlled entities (each with "SCLV" in its name,

2    for "SunCal-Lehman Venture"). The agreement further provided that the entity taking title to the

3    Project would assume the Lehman Lender debt obligations associated with the Projects, assume

4    certain bond obligations associated with the Projects, and provide indemnifications to SunCal and

5    the Debtors for unpaid claims.

6          On August 25, 2008, the Settlement Agreement and a series of related documents were

7    formally executed by SunCal and the applicable Lehman Lenders and Lehman Equity Members at

8    a meeting held in Los Angeles on August 25, 2008. Once these documents were signed, all that

9    remained was the mechanical closing of the series of transactions described in the Settlement

10   Agreement. Since all of the conditions precedent to the closings had been satisfied, or could have

11   been satisfied shortly after the meeting, this should have occurred on or shortly after the August 25,

12   2008 meeting. However, the Lehman Representative asked SunCal to extend the closing date for

13   thirty days, to September 30, 2008. According to the Lehman Representatives, this short extension

14   would enable them to secure certain outstanding third party consents. Although SunCal knew these

15   third party consents were readily obtainable within a few days, they agreed to this extension,

16   believing the request was made in good faith. In fact, as more fully explained blow, it was not.

17                **4.2.8    The Lehman Lenders' Undisclosed Sale of Most of the Debtors' Loans.**

18         As explained above, the Settlement Agreement was duly executed by all parties at a formal

19   closing meeting held on August 25, 2008. When the parties signed this agreement, which was a

20   binding contract, they both represented that they both intended and had the power and capacity to

21   perform all of the obligations undertaken therein. However, in the case of the Lehman Entities, this

22   representation was later discovered to be false. When the closing occurred on August 25, 2008, the

23   Lehman Lenders had already sold the very obligations they were agreeing to assume and restructure

24   in the Settlement Agreement to Fenway Capital pursuant to a repurchase agreement (the "Fenway

25   Repurchase Agreement"). Accordingly, as of August 25, 2008, they lacked the power to perform

26   the most essential undertakings that they agreed to perform in the Settlement Agreement. Instead of

27   disclosing this fact at the August 25, 2008 meeting, the Lehman Lenders requested additional time

28   to execute the agreed upon transfers provided for under this binding agreement. The Lehman

1    Lenders needed this delay for an obvious, but undisclosed reason: They lacked the ability to

2    perform the very obligations they had just agreed to perform in the Settlement Agreement.

3         The Lehman Representatives also did not disclose at the August 25, 2008 closing that they

4    intended to sell the Pacific Point First Loan to Lehman Re, approximately a week later, *even though*

5    *this loan was also subject to the Settlement Agreement.* To the contrary, the Lehman

6    Representatives affirmatively concealed these facts from SunCal and the Debtors by asserting that

7    ownership still existed in the case of seven of the eight loans.

8              **4.2.9    Lehman's Foreclosure Sale and Purchase of the Pacific Point Project.**

9         At the time the Restructuring Agreement and the Settlement Agreement were signed, the

10    Pacific Point Project, which was still owned by SJD Partners, was among the Projects included in

11    the Restructuring Agreement and the Settlement Agreement.  Pursuant to the Restructuring

12    Agreement, and as detailed in the Settlement Agreement attached thereto, SunCal, SJD Partners,

13    and its parent company, SJD Development, all agreed that they would not interfere with Lehman

14    ALI's (or its designee's) foreclosure on the Pacific Point Project. They further agreed that a new

15    Lehman entity, LV Pacific Point, would purchase the Pacific Point Project upon foreclosure and

16    that Lehman ALI and LV Pacific Point would (a) assume SJD Partners' and SJD Development's

17    outstanding accounts payable for Pacific Point third-party vendors, (b) assume certain bond

18    liability associated with the Pacific Point Project, and (c) pay for the millions of dollars worth of

19    work that Lehman ALI representatives had authorized.

20         As previously stated, the Settlement Agreement was signed on August 25, 2008 by the

21    SunCal parties, including SJD Partners and SJD Development.  It was also signed by Gilhool as

22    authorized signatory on behalf of both Lehman ALI and LV Pacific Point.  As a signatory to the

23    Settlement Agreement, LV Pacific Point was required to purchase the Pacific Point Project at the

24    foreclosure sale subject to the above obligations. Consistent with this agreement, the City of San

25    Juan Capistrano executed an estoppel certificate for the benefit of SJD Partners and Lehman ALI—

26    at Lehman ALI's request—on August 26, 2008, two days before the foreclosure sale.  This

27    certificate stated, among other things, that the "Acquiring Entity [LV Pacific Point] shall by

28    operation of law become the legal successor-in-interest to Developer [SJD Partners]" under SJD

1  Partners' agreements with the City. That certificate further provided that there existed no breaches,

2  defaults, or claims under SJD Partners' agreements with the City.

3      On August 28, 2008, Lehman ALI foreclosed on the Pacific Point Project, and title was

4  transferred to LV Pacific Point at the foreclosure sale.  However, Lehman ALI and LV Pacific

5  Point failed to assume the liabilities and obligations associated with this Project as agreed.  This

6  breach of the parties' agreement, left SJD Partners without title to the Pacific Point Project, but

7  with the potential liability for the substantial unsecured claims relating to the Project, including

8  bond claims of approximately $34 million.  Moreover, since Lehman Ali and LV Pacific Point

9  have continued to ignore their obligations under the above agreement, unpaid taxes, fines, and

10 penalties have continued to accrue to the detriment of the Project and these claims are being

11 asserted against SJD Partners..

12     Had SunCal, SJD Partners and SJD Development known that Lehman ALI and LV Pacific

13 Point had no intention of honoring their obligations under the foregoing agreement, they never

14 would have agreed to cooperate with the foreclosure.  Instead, SJD Partners would have filed for

15 bankruptcy earlier, thereby mitigating the damages from Lehman Ali's breach, by allowing

16 creditors recourse to the value of the Project.

17     This course of conduct is relevant to the unsecured creditors of the Group II: Trustee

18 Debtors for the following reason. The holders of bond claims against SJD Partners are asserting

19 their massive claims against the estates of all of the Debtors, including the estates of the Group II:

20 Trustee Debtors. Accordingly, Lehman ALI's wrongs against SJD Partners directly affect the

21 Group II: Trustee Debtors' cases.

22     **4.2.10  Alvarez and Marsal Take over Control of the Lehman Entities After the**

23     **Chapter 11 Filings of LBHI and LCPI.**

24     LBHI filed for bankruptcy in September 2008 and LCPI filed for bankruptcy in October

25 2008.  After LBHI's filing, Bryan Marsal ("Marsal") of Alvarez & Marsal ("A&M") was appointed

26 to serve as LBHI's Chief Restructuring Officer. Marsal and A&M are in charge of liquidating the

27 now defunct Lehman Entities, including Chapter 11 debtors LBHI and LCPI, and the non-bankrupt

28

1    Lehman Lenders (Lehman ALI, OVC, and Northlake Holdings, as well as the non-bankrupt
2    Lehman Equity Members.

3        Although A&M was not employed until after the events that occurred on August 25, 2008
4    described above, it should be noted that A&M hired the same law firm that represented the
5    Lehman Lenders in the August 25, 2008 meeting – Weil, Gotshal & Manges, LLP. Moreover, as
6    more fully explained herein, it was A&M that directed Lehman ALI not to perform its contractual
7    obligations under the Settlement Agreement after September of 2008. Accordingly, the same
8    individuals that caused the damages to unsecured creditors by insisting upon the breach of the
9    Settlement Agreement, are now asking for their vote in the competing plan filed by the Lehman
10   Lenders.

11       LBHI's bankruptcy filing and the Lehman Lenders refusal, at A&M's direction, to close the
12   transactions provided for under the Settlement Agreement as agreed, were not small matters. They
13   severely damaged the Debtors. Although the Debtors were not proceeding with any new
14   construction or development, the Debtors were still required to expend significant sums on site
15   security, erosion control, property taxes and other measures in order to prevent the Projects from
16   becoming a public safety hazard, and in order to avoid the loss of valuable entitlements, and to
17   mitigate penalties and fines being incurred by the Projects. Although SunCal and the Debtors
18   repeatedly requested that the Lehman Entities pay for critical health and safety and value
19   preservation measures on the Projects, these efforts were unavailing.

20       Between October 9 and November 4, 2008, SunCal's general counsel Bruce Cook sent
21   Robert Brusco, an authorized agent of the Lehman Entities, nearly two dozen letters requesting that
22   the Lehman Lenders provide the funding necessary to address critical needs on the Projects as
23   promised. A summary of these health and safety notices are attached hereto as Exhibit "5". The
24   Lehman Entities ignored these requests until November 2008, when Brusco, purportedly on behalf
25   of the Lehman Lenders, delivered the message that the Lehman Lenders were unwilling to fund the
26   Projects and that, instead, they intended to foreclose on all of the Projects.

27       As a result, as set forth in Exhibit "4," there are now over 240 vendors, municipalities,
28   counties and bonding companies claiming over $400 million in work, improvements and property

1    tax claims against the Projects. Substantially all of these sums are due to work performed or

2    bonded at Lehman's request based upon Lehman's promises of payment.

3        **4.3    The Debtors' Potential Preferential Transfers.**

4        Attached hereto as Exhibit "6" are charts setting forth payments made to third parties

5    during the ninety (90) day time period preceding the filing of the Debtors' Chapter 11 Cases as

6    well as payments made to the Lehman Entities and to SunCal Affiliates during the one-year time

7    period preceding the filing of the Debtors' Chapter 11 Cases.

8        As the charts in Exhibit 6" indicate, Group II: Trustee Debtor's made  payments in the

9    following aggregate amounts to non-insiders within the 90 day preference period preceding the

10    Petition Date: SunCal Oak Knoll, $2,324,630.92, and SunCal Torrance, $18,618.50. The

11    corresponding figures for payments made to "insiders" within the one year preference period

12    preceding the Petition Date were: SunCal Oak Knoll, $2,914,645.70 and SunCal Torrance,

13    $310,181.43.

14                                    **V.**

15                **SIGNIFICANT EVENTS IN THE DEBTORS' CHAPTER 11 CASES**

16        **5.1.    Voluntary Debtors.**

17            **5.1.1    Joint Administration of the Voluntary Debtors and the Trustee**

18                    **Debtors.**

19        Since their respective Petition Dates, the seventeen (17) Voluntary Debtors have continued

20    to operate as "debtors-in-possession," subject to the supervision of the Bankruptcy Court and in

21    accordance with the Bankruptcy Code. The Voluntary Debtors are authorized to operate their

22    businesses in the ordinary course during the Chapter 11 proceedings. Transactions outside the

23    ordinary course of business must be approved by the Bankruptcy Court.

24        The Voluntary Debtors' Cases are being jointly administered pursuant to orders entered on

25    November 20, 2008 and December 9, 2008. The Voluntary Debtors' Cases are being jointly

26    administered with the Trustee Debtors' cases pursuant to an order entered on March 11, 2009.

27        The Voluntary Debtors have employed Winthrop Couchot Professional Corporation as their

28    general insolvency counsel, and the MB Firm as their special litigation counsel.

### 5.1.2   The Voluntary Debtors Court Employed Professionals.

The Voluntary Debtors' Committee has employed Irell & Manella LLP as its counsel pursuant to an order entered on February 13, 2009.

Pursuant to the Court's Order regarding joint administration of the Voluntary Debtors, the Voluntary Debtors' liability for professional fees is joint and several among the Voluntary Debtors' Estates for fees incurred related to services for the benefit of all of the Voluntary Debtors. The Trustee Debtors' liability for professional fees is not joint and several.

Pursuant to the initial MB Firm employment application, Acquisitions was responsible for the payment of their fees until December 31, 2009. The MB Firm's application also allows for payments from the Bond Companies. The initial MB Firm employment application reserved the right, should the Lehman Adversary Proceeding result in a benefit accruing to particular Debtors' Estates, to request that its fees and expenses be reimbursed by the Debtors' Estates. The Bond Companies have also agreed to jointly fund a portion of the professional fees and expenses of the MB Firm with respect to the Lehman Adversary Proceeding. The Bond Companies' funding commitment can be terminated and after such a termination they will only be required to cover fees and costs incurred during the period of their prior commitments.

The MB Firm employment application was subsequently amended. Pursuant to an order entered on April 14, 2010, (1) the Voluntary Debtors will pay up to one-half of the fees and expenses incurred by the MB Firm from and after February 1, 2010 onward; and (2) the Trustee Debtors do not have an obligation to pay any of the MB Firm's fees pertaining to the Trustee Debtors' estates, unless and until a loan by the Voluntary Debtors to the Trustee Debtors is agreed to by the Trustee and approved by the Court, or in accordance with the terms of the original employment applications to the extent not superseded or modified by the amended employment application. The order does not affect the MB Firm's right to seek payment from the Bond Companies without the need for an additional order of the Court.

The MB Firm filed an updated application seeking to further amend their employment to include the right to pursue certain claims against the Lehman Entities and certain employees and agents of these entities on behalf of the Voluntary Debtors. The claims encompassed by this

1  amendment include claims that are based upon both prepetition and post-post petition actionable

2  conduct under both state law and federal law against the Lehman Entities and/or their agents.

3          ### 5.1.3  LCPI's Motions for Relief from the Automatic Stay Against Certain of

4          ### the Voluntary Debtors' Projects and Related Appeals.

5          On January 23, 2009, LCPI and Lehman ALI filed various motions for relief from the

6  automatic stay against Palmdale Hills, SCC Palmdale, SunCal Beaumont, SunCal Summit Valley,

7  SunCal Emerald, SunCal Bickford, Acton Estates, SunCal Johannson, and SCC Communities I

8  (the "Lehman Entities' Stay Motions"). Although the Debtors were able to defeat the Lehman

9  Entities' Stay Motions, they are relevant in the following respect. Had the motions filed by LCPI

10 and Lehman Ali succeeded, it is almost certain that unsecured creditors would have received

11 nothing on their claims. Moreover, as more fully explained herein, since Lehman ALI and LCPI

12 did not even own the loans they were seeking to foreclose upon, these motions should never have

13 been filed in the first instance. Yet now, these same parties- Lehman ALI and LCPI – are asking

14 these same creditors to vote on their plan and to "trust" them.

15          ### 5.2.    The Trustee Debtors and Their Professionals.

16         Orders for Relief were entered in the involuntary cases beginning on January 6, 2009. The

17 Trustee Debtors are represented by their duly-appointed Chapter 11 Trustee, Mr. Steven M. Speier,

18 pursuant to orders of the Bankruptcy Court entered on January 15, 2009.

19         The Chapter 11 Trustee has employed the Lobel Firm as the Chapter 11 Trustee's general

20 insolvency counsel, the MB Firm as special litigation counsel, and Squar Miller, LLP as its

21 accountants.

22         The Trustee Debtors' Committee has employed Weiland, Golden, Smiley, Wang Ekvall &

23 Strok as its general insolvency counsel.

24 ///

25

26

27

28