1  PAUL J. COUCHOT -- State Bar No. 131934
   WINTHROP COUCHOT, P.C.
2  660 Newport Center Drive, Fourth Floor
   Newport Beach, CA 92660
3  Telephone: (949) 720-4100
   Facsimile: (949) 720-4111
4  General Insolvency Counsel for Palmdale Hills
   Property, LLC et. al. (the "Voluntary Debtors")
5
   RONALD RUS - State Bar No. 67369
6  JOEL S. MILIBAND - State Bar No. 77438
   RUS MILIBAND & SMITH, APC
7  2211 Michelson Drive, Seventh Floor
   Irvine, California 92612
8  Telephone: (949) 752-7100
   Facsimile: (949) 252-1514
9
   Counsel for SunCal Management LLC and
10 SCC Acquisitions Inc.

11              UNITED STATES BANKRUPTCY COURT
                CENTRAL DISTRICT OF CALIFORNIA
12                      Santa Ana Division

13 In re                                  Case No. 8:08-bk-17206-ES

   PALMDALE HILLS PROPERTY, AND ITS       Jointly Administered With Case Nos.
14 RELATED DEBTORS,                       8:08-bk-17209-ES; 8:08-bk-17240-ES;
                                          8:08-bk-17224-ES; 8:08-bk-17242-ES;
15          Joint Administered Debtors and 8:08-bk-17225-ES; 8:08-bk-17245-ES;
            Debtors-in-Possession         8:08-bk-17227-ES; 8:08-bk-17246-ES;
16                                        8:08-bk-17230-ES; 8:08-bk-17231-ES;
   Affects:                               8:08-bk-17236-ES; 8:08-bk-17248-ES;
17 ☐ All Debtors                          8:08-bk-17249-ES; 8:08-bk-17573-ES;
                                          8:08-bk-17574 ES; 8:08-bk-17575-ES;
   ☐ Palmdale Hills Property, LLC         8:08-bk-17404-ES; 8:08-bk-17407-ES;
18 ☒ SunCal Beaumont Heights, LLC         8:08-bk-17408-ES; 8:08-bk-17409-ES;
   ☐ SCC/Palmdale, LLC                    8:08-bk-17458-ES; 8:08-bk-17465-ES;
19 ☒ SunCal Johannson Ranch, LLC          8:08-bk-17470-ES; 8:08-bk-17472-ES;
20 ☐ SunCal Summit Valley, LLC            and 8:08-bk-17588-ES
   ☐ SunCal Emerald Meadows LLC
21 ☐ SunCal Bickford Ranch, LLC           Chapter 11 Proceedings
   ☐ Acton Estates, LLC                   FIRST AMENDED DISCLOSURE
22 ☐ Seven Brothers LLC                   STATEMENT DESCRIBING FIRST
23 ☐ SJD Partners, Ltd.                   AMENDED CHAPTER 11 PLANS FILED
   ☐ SJD Development Corp.                 BY SUNCAL PLAN PROPONENTS IN
24 ☐ Kirby Estates, LLC                   THE CHAPTER 11 CASES OF SUNCAL
                                          BEAUMONT HEIGHTS, LLC AND
25 ☐ SunCal Communities I, LLC            SUNCAL JOHANNSON RANCH, LLC ,
   ☐ SunCal Communities III, LLC          [GROUP II: VOLUNTARY DEBTORS]
26
   ☐ SCC Communities LLC
27 ☐ North Orange Del Rio Land, LLC       Date:    July 22, 2011
   ☐ Tesoro SF LLC                        Time:    11:00 a.m.
28                                        Place:   Courtroom 5A

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Continued from Previous Page*

- ☐ LBL-SunCal Oak Valley, LLC
- ☐ SunCal Heartland, LLC
- ☐ LBL-SunCal Northlake, LLC
- ☐ SunCal Marblehead, LLC
- ☐ SunCal Century City, LLC
- ☐ SunCal PSV, LLC
- ☐ Delta Coves Venture, LLC
- ☐ SunCal Torrance, LLC
- ☐ SunCal Oak Knoll, LLC

# **TABLE OF CONTENTS**

**PAGE**

| | | | |
|---|---|---|---|
| I. | INTRODUCTION | | 2 |
| II. | DEFINITIONS AND RULES OF INTERPRETATION | | 4 |
| | 2.1 | Definitions | 4 |
| | 2.2 | Rules of Construction | 25 |
| | 2.3 | Exhibits | 26 |
| III. | PLAN CONFIRMATION DEADLINES | | 26 |
| | 3.1 | Time and Place of the Confirmation Hearing | 26 |
| | 3.2 | Deadline for Voting for or Against the Plan | 27 |
| | 3.3 | Deadline for Objecting to the Confirmation of the Plan | 27 |
| | 3.4 | Identity of Person to Contact for More Information Regarding the Plan | 27 |
| | 3.5 | Disclaimer | 28 |
| IV. | FACTUAL BACKGROUND OF THE DEBTORS | | 29 |
| | 4.1 | The Formation of the Debtors and the Projects | 29 |
| | | 4.1.1 Overview of the Debtors and Their Projects | 29 |
| | | 4.1.2 The Debtors' Primary Secured Creditors and Their Disputed Claims | 30 |
| | | 4.1.3 The Lehman Disputed Claims and Liens | 30 |
| | | 4.1.4 Summary of the Group II Voluntary Debtors' Cash | 31 |
| | 4.2 | Factual Circumstances Leading to the Filing of the Debtors' Chapter 11 Cases | 32 |
| | | 4.2.1 Introduction | 32 |
| | | 4.2.2 Background on the SunCal Companies | 33 |
| | | 4.2.3 The Origins of the SunCal/Lehman Joint Venture | 33 |
| | | 4.2.4 Lehman's Effective Control over the Management of the Debtors and Promises of Ongoing Funding | 34 |
| | | 4.2.5 The 2008 Restructuring Agreement | 35 |
| | | 4.2.6 The Lehman Lenders Hire Radco | 36 |
| | | 4.2.7 The Lehman Lenders' Failure to Close on the Settlement Agreement | 37 |
| | | 4.2.8 The Lehman Lenders' Undisclosed Sale of Most of the Debtors' Loans | 38 |
| | | 4.2.9 Lehman's Foreclosure Sale and Purchase of the Pacific Point Project | 38 |
| | | 4.2.10 Alvarez and Marsal Take Over Control of the Lehman Entities After the Chapter 11 Filing of LBHI and LCPI | 40 |
| | 4.3 | The Group II Debtors' Potential Preferential Transfers | 41 |

# TABLE OF CONTENTS

### (Continued)

|  | | | PAGE |
|---|---|---|---|
| V. | | SIGNIFICANT EVENTS IN THE DEBTORS' CHAPTER 11 CASES | 42 |
| | 5.1 | Voluntary Debtors | 42 |
| | | 5.1.1 Joint Administration of the Voluntary Debtors and the Trustee Debtors | 42 |
| | | 5.1.2 The Voluntary Debtors Court Employed Professionals | 42 |
| | | 5.1.3 LCPI's Motions for Relief from the Automatic Stay Against Certain of the Voluntary Debtors' Projects and Related Appeals | 43 |
| | 5.2 | The Trustee Debtors and Their Professionals | 44 |
| | 5.3 | The Debtors' Various Motions Relating to Financing for the Projects and to Pay Professional Fees | 44 |
| | | 5.3.1 The Voluntary Debtors' Initial Motion for Surcharge and Use of Cash Collateral | 44 |
| | | 5.3.2 The Lehman Administrative Loans | 45 |
| | | 5.3.3 The Voluntary Debtors' Agreements with the Lehman Entities for Use of Alleged Cash Collateral to Maintain the Properties and to Pay Professional Fees | 45 |
| | 5.4 | The Debtors' Disputes and Claims Against the Lehman Entities | 46 |
| | | 5.4.1 The Lehman Adversary Proceeding | 46 |
| | | 5.4.2 The Debtors' Motions to Strike the Claims and Pleadings Arising from the Sold Loans to Fenway Capital and Related Appeals | 46 |
| | | 5.4.3 The Debtors' Motion Pursuant to Section 506(d) and the 506(d) Valuation Stipulation | 47 |
| | | 5.4.4 Lehman 502(d) Objections and Objections to Lehman's Claim Against Acton | 47 |
| | | 5.4.5 The Lehman Recoupment Objection and the State Court Action | 48 |
| | | 5.4.6 The Debtors' Potential Post-Petition Claims Against Lehman and Their Agents | 50 |
| | 5.5 | The Lehman Fenway Claims Transaction, Compromise Motion Filed by the Lehman Entities | 51 |
| | | 5.5.1 Lehman Entities' and Fenway's Proposed Claims Transaction | 51 |
| | 5.6 | The Debtors' Motion for a Stay to Suspend Certain Lehman Actions | 52 |
| | 5.7 | The Debtors' Other Litigation with Non-Lehman Related Parties | 52 |
| | | 5.7.1 The Debtors' Failed Preliminary Injunction Motion Against the Holders of Bond Claims | 52 |
| | | 5.7.2 The Contractors' Successful Motions for Relief from Stay to Pursue the Bond Claims | 53 |
| | | 5.7.3 Bond Safeguard Motion | 53 |

# TABLE OF CONTENTS

## (Continued)

|  | | PAGE |
|---|---|---|
| VI. | TREATMENT OF UNCLASSIFIED CLAIMS | 53 |
| | 6.1 Introduction | 53 |
| | 6.2 Treatment of Allowed Administrative Claims | 54 |
| | 6.3 Treatment and Repayment of the Lehman Administrative Loan(s) | 54 |
| | 6.4 Repayment of Allowed Administrative Claims Other than the Lehman Administrative Loans | 54 |
| | 6.5 Administrative Claims Bar Date | 55 |
| | 6.6 Treatment of Priority Unsecured Tax Claims | 55 |
| VII. | CLASSIFICATION OF CLAIMS AND INTERESTS | 56 |
| VIII. | THE PLAN'S TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS | 57 |
| | 8.1 The Plan's Treatment of Holders of Allowed Secured Real Property Tax Claims on Real Properties Subject to Deeds of Trust Arising from Lehman's Disputed Secured Claims and Disputed Liens (Classes 1.1 Through 1.2) | 57 |
| | 8.2 The Plan's Treatment of Mechanic Lien Claims Against Group II Projects (Class 2.1) | 58 |
| | 8.3 The Plan's Treatment of Holders of Priority Claims (Class 3.1) | 59 |
| | 8.4 The Plan's Treatment of Holders of Allowed General Unsecured Claims (Class 4.1). | 60 |
| | 8.5 The Plan's Treatment of Holders of Allowed Interests | 60 |
| IX. | ACCEPTANCE OR REJECTION OF THE PLAN | 60 |
| | 9.1 Introduction | 60 |
| | 9.2 Who May Object to Confirmation of the Plan | 60 |
| | 9.3 Who May Vote to Accept/Reject the Plan | 61 |
| | 9.4 What Is an Allowed Claim/Interest | 61 |
| | 9.5 What Is an Impaired Class | 61 |
| | 9.6 Who Is Not Entitled to Vote | 61 |
| | 9.7 Who Can Vote in More than One Class | 62 |
| | 9.8 Votes Necessary for a Class to Accept the Plan | 62 |
| | 9.9 Treatment of Nonaccepting Classes | 62 |
| | 9.10 Request for Confirmation Despite Nonacceptance by Impaired Class(es) | 62 |
| X. | MEANS OF EXECUTION AND IMPLEMENTATION OF THE PLAN | 63 |
| | 10.1 Introduction | 63 |
| | 10.2 Sale Process After Confirmation Date but prior to Effective Date | 63 |

MAINDOCS-#163410-v1-SCC_GroupIIVoluntaryDebtorsDisclosureStatement.DOC

**TABLE OF CONTENTS**

**(Continued)**

**PAGE**

| | | | |
|---|---|---|---|
| | A. | Implementation of a Marketing Program | 63 |
| | B. | Indentifying a Stalking Horse Bidder | 63 |
| | C. | The Sale Contract | 64 |
| | | 1. Overbid Provisions | 64 |
| | | 2. Break-Up Fees | 64 |
| | | 3. Sale Free and Clear of Liens | 64 |
| | D. | The Auction | 64 |
| 10.3 | Transfer of Property To The Plan Trust | | 65 |
| 10.4 | Closing of Group II Project Sales | | 65 |
| 10.5 | Purposes of the Plan Trust | | 65 |
| 10.6 | Trust Agreement | | 66 |
| 10.7 | Operations of the Plan Trust | | 66 |
| 10.8 | The Plan Trustee | | 66 |
| 10.9 | Payment of Trust Expenses | | 66 |
| 10.10 | Plan Distribution System | | 67 |
| 10.11 | Claims Estimation Rights | | 67 |
| 10.12 | No Payment of Transfer-Related Fees to the United States Trustee | | 67 |
| 10.13 | No Payment of Transfer-Related Fees to the Trustee | | 67 |
| 10.14 | Books and Records of Trust | | 68 |
| 10.15 | Limitations on Liability | | 68 |
| 10.16 | Federal Income Tax Treatment of the Holders of Plan Trust Beneficial Interests | | 69 |
| 10.17 | Termination of the Trust | | 69 |
| 10.18 | Exemption from Certain Transfer Taxes | | 70 |
| 10.19 | Tax Consequences of the Plan | | 70 |
| 10.20 | The Plan Sponsor | | 71 |
| 10.21 | Acquisitions' Obligations | | 71 |
| 10.22 | The Committee(s). | | 71 |
| | 10.21.1 | Duties and Powers | 71 |
| | 10.21.2 | Dissolution of Committees | 71 |
| 10.23 | Litigation Claims | | 72 |
| 10.24 | Collection of Litigation Recoveries | | 72 |
| **XI.** | **RISK FACTORS** | | 72 |
| 11.1 | Plan Risks | | 72 |
| | 11.1.1 The Plan May Not Be Accepted or Confirmed | | 72 |
| | 11.1.2 Failure to Sell the Group II: Trustee Debtor Projects | | 73 |
| **XII.** | **DISTRIBUTIONS** | | 73 |
| 12.1 | Distribution Agent | | 73 |
| 12.2 | Distributions | | 73 |

**TABLE OF CONTENTS**

**(Continued)**

| | PAGE |
|---|---|
| 12.2.1 Dates of Distributions | 73 |
| 12.2.2 Limitation on Liability | 74 |
| 12.3 Old Instruments and Securities | 74 |
| 12.3.1 Surrender and Cancellation of Instruments and Securities | 74 |
| 12.3.2) Cancellation of Liens | 74 |
| 12.4 De Minimis Distributions and Fractional Shares | 74 |
| 12.5 Delivery of Distributions | 75 |
| 12.6 Undeliverable Distributions | 75 |
| 12.7 Disposition of Unclaimed Property | 75 |
| XIII. OBJECTION TO CLAIMS AND DISPUTE CLAIMS | 76 |
| 13.1 Standing for Objections to Claims | 76 |
| 13.2 Treatment of Disputed Claims and Disputed Liens | 76 |
| 13.2.1 No Distribution Pending Allowance | 76 |
| 13.2.2 Distribution After Allowance | 76 |
| XIV. EXECUTORY CONTRACTS AND UNEXPIRED LEASES | 77 |
| 14.1 Executory Contracts | 77 |
| 14.3 Bar Date for Rejection Damages | 77 |
| 14.4 Changes in Rates Subject to Regulatory Commission Approval | 77 |
| XV. BEST INTEREST OF CREDITORS TEST AND PLAN FEASIBILITY | 77 |
| 15.1 Best Interests Test | 77 |
| 15.2 Feasibility | 78 |
| XVI. LIMITATION OF LIABILITY | 79 |
| 16.1 No Liability for Solicitation or Participation | 79 |
| XVII. CONDITIONS TO CONFIRMATION AND EFFECTIVENESS OF THE PLAN | 79 |
| 17.1 Conditions Precedent to Plan Confirmation | 79 |
| 17.2 Conditions Precedent to Plan Effectiveness | 79 |
| XVIII. RETENTION OF JURISDICTION | 80 |
| XIX. MODIFICATION OR WITHDRAWAL OF THE PLAN | 80 |
| 18.1 Modification of Plan | 80 |
| 18.2 Nonconsensual Confirmation | 80 |
| XIX. MISCELLANEOUS | 80 |
| 19.1 Payment of Statutory Fees | 80 |
| 19.2 Payment Dates | 81 |
| 19.3 Headings | 82 |

MAINDOCS-#163410-v1-SCC_GroupIIVoluntaryDebtorsDisclosureStatement.DOC

## TABLE OF CONTENTS

### (Continued)

**PAGE**

| | | |
|---|---|---|
| 19.4 | Other Documents and Actions | 82 |
| 19.5 | Notices | 82 |
| 19.6 | Governing Law | 83 |
| 19.7 | Binding Effect | 83 |
| 19.8 | Successors and Assigns | 83 |
| 19.9 | Severability of Plan Provisions | 83 |
| 19.10 | No Waiver | 84 |
| 19.11 | Inconsistencies | 84 |
| 19.12 | Exemption from Certain Transfer Taxes and Recording Fees | 84 |
| 19.13 | Post-Confirmation Status Report | 84 |
| 19.14 | Post-Confirmation Conversion/Dismissal | 85 |
| 19.15 | Final Decree | 85 |

# I.

## **INTRODUCTION**

This DISCLOSURE STATEMENT[1] is filed by the Voluntary Debtors and Acquisitions, as the SunCal Plan Proponents, in the Chapter 11 Cases of the following Debtors: **SunCal Beaumont Heights, LLC** and **SunCal Johannson, LLC** (the "Group II: Voluntary Debtors"). In addition to being one of the proponents of the Plan, Acquisitions is the Plan Sponsor, it will also serve as the Plan Trustee of the Plan Trust and as the Distribution Agent, if the Plan is confirmed.

Chapter 11 allows debtors-in-possession, Chapter 11 trustees, and under some circumstances, creditors, interest holders and others parties in interest, to propose a Chapter 11 plan. As stated, the SunCal Plan Proponents are the proponents of the Plan sent to you in the same envelope as this Disclosure Statement. This document summarizes the contents of the Plan, certain information relating to the Plan and the process the Bankruptcy Court follows in determining whether or not to confirm the Plan.

In summary, the Plan provides for sale of the Beaumont Heights Project and the Johannson Ranch Project (the "Group II Projects"), and for the liquidation of all other assets of the Group II: Voluntary Debtors. The Net Proceeds from these sales will then be distributed to Creditors holding Allowed Claims in accordance with their rights and priorities under the bankruptcy code and under other applicable law. Based upon the SunCal Proponents' analysis of the value of the Group II Projects, and the amount of Allowed Claims against the estates of the respective Group II: Voluntary Debtors, there is a reasonable likelihood that all Allowed Claims will be paid in full under the Plan.

Although the same Plan is being filed in the Cases of all four Group II: Voluntary Debtors, each Plan is independent of the others. The Creditors in each Case will determine, subject to Court approval, whether the Plan will be approved in their Case. Accordingly, the Plan may be confirmed in the Cases of all of the Group II: Voluntary Debtors, but not in others.

The Lehman Lenders have filed a competing and alternative plan of reorganization in the Cases. Accordingly, the creditors holding claims against the Debtors will have the opportunity to

---

[1] All defined terms used herein have the same meanings as set forth in Article II herein and Exhibit "1" attached hereto.

vote for one plan or the other, or they can vote for both plans and allow the Court to decide which plan should be approved. The Debtors believe that the aggregate benefits offered under their Plan are superior to what is being offered to Creditors under the Lehman Lenders' competing Plan.

**READ THIS DISCLOSURE STATEMENT CAREFULLY IF YOU WANT TO KNOW ABOUT:**

> ➢ **WHO CAN VOTE OR OBJECT TO THE PLAN;**
> ➢ **HOW YOUR CLAIM IS TREATED;**
> ➢ **HOW THIS TREATMENT COMPARES TO WHAT YOUR CLAIM WOULD RECEIVE IN LIQUIDATION;**
> ➢ **A BRIEF HISTORY OF THE DEBTORS AND SIGNIFICANT EVENTS DURING THEIR CHAPTER 11 BANKRUPTCY PROCEEDING;**
> ➢ **WHAT FACTORS THE BANKRUPTCY COURT WILL CONSIDER TO DECIDE WHETHER OR NOT TO CONFIRM THE PLAN;**
> ➢ **WHAT IS THE EFFECT OF CONFIRMATION; AND**
> ➢ **WHETHER THE PLAN IS FEASIBLE.**

This Disclosure Statement cannot tell you everything about your rights. You should consider consulting your own attorney to obtain more specific advice on how the Plan will affect you and your best course of action.

Be sure to read the Plan as well as this Disclosure Statement. If there are any inconsistencies between the Plan and this Disclosure Statement, the Plan provisions will govern.

The Bankruptcy Code requires a Disclosure Statement to contain "adequate information" concerning the Plan. On _____, 2011, the Bankruptcy Court entered an order approving this Disclosure Statement, based upon a finding that this document contained "adequate information" to enable parties affected by the Plan to make an informed judgment regarding the Plan. Any party can now solicit votes for or against the Plan.

/ / /

# II.

## DEFINITIONS AND RULES OF INTERPRETATION

### 2.1    Definitions.

The following defined terms are used in this Disclosure Statement. Any capitalized term that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term in the Bankruptcy Code or Bankruptcy Rules.

2.1.1    Acquisitions. SCC Acquisitions, Inc., a California corporation, an indirect parent company of all of the Debtors, a purported obligor on the Bond Claims, a Creditor of all of the Debtors, a SunCal Plan Proponent, the Plan Sponsor and the proposed Plan Trustee.

2.1.2

2.1.3    Acton Estates. Acton Estates, LLC, a Delaware limited liability, and the owner of the Acton Project.

2.1.4    Acton Project. The Project owned by Acton Estates, located in Los Angeles County, California, as more particularly described herein.

2.1.5    Administrative Claim(s). Any Claim against a Group V Debtor or its Estate incurred after the applicable Petition Date for the applicable Group V Debtor but before the Confirmation Date, for any cost or expense of administration of the Case of the applicable Group V Debtor, which Claim is entitled to priority under section 507(a)(2) or (3) of the Bankruptcy Code, including, without limitation, any fee or charge assessed against an Estate of a Group V Debtor under section 1930 of Title 28 of the United States Code.

2.1.6    Administrative Claims Bar Date. The last date fixed by the Plan for the filing of Proof of Claims or requests for payment of Administrative Claims. Under the Plan, the Administrative Claims Bar Date shall be the first business day after the sixtieth (60th) day after the Confirmation Date.

2.1.7    Affiliate. The term shall have the meaning set forth under Section 101(2), including, but not limited to, as to any Person, any other Person that directly or indirectly owns or controls, is owned or controlled by, or is under common ownership or control with, such Person. The term "control" (including, with correlative meanings, the terms "controlled by" and "under

-4-

1    common control with"), as applied to any Person, means the possession, direct or indirect, of the

2    power to direct or cause the direction of the management and policies of such Person, whether

3    through the ownership of voting securities or other equity ownership interest, by contract or

4    otherwise.

5        2.1.8    Allowed. When used to describe Claim(s) or Interest(s), such Claim(s) or

6    Interest(s), to the extent that it or they are "Allowed Claim(s)" or "Allowed Interest(s)."

7        2.1.9    Allowed Amount shall mean:

8        A.    With respect to any Administrative Claim (i) if the Claim is based

9    upon a Fee Application, the amount of such Fee Application that has been approved by a Final

10   Order of the Bankruptcy Court; (ii) if the Claim is based upon any indebtedness or obligation

11   incurred in the ordinary course of business of the Group II: Voluntary Debtors and is not otherwise

12   subject to an Administrative Claim Bar Date, the amount of such Claim that has been agreed to by

13   the Group II: Voluntary Debtors and such creditor, failing which, the amount thereof as fixed by a

14   Final Order of the Bankruptcy Court; or (iii) if the Holder of such Claim was required to file and

15   has filed proof thereof with the Bankruptcy Court prior to an Administrative Claim Bar Date,

16   (1) the amount stated in such proof if no objection to such Proof of Claim is interposed within the

17   applicable period of time fixed by the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy

18   Court, or (2) the amount thereof as fixed by Final Order of the Bankruptcy Court if an objection to

19   such proof was interposed within the applicable period of time fixed by the Bankruptcy Code, the

20   Bankruptcy Rules or the Bankruptcy Court. The Allowed Amount of any Administrative Claim

21   which is subject to an Administrative Claims Bar Date and not filed by the applicable

22   Administrative Claims Bar Date shall be zero, and no distribution shall be made on account of any

23   such Administrative Claim;

24       B.    with respect to any Claim which is not an Administrative Claim

25   (the "Other Claim"): (i) if the Holder of such Other Claim did not file proof thereof with the

26   Bankruptcy Court on or before the Claims Bar Date, the amount of such Claim as listed in the

27   Group II: Voluntary Debtors" Schedules as neither disputed, contingent nor unliquidated; or (ii) if

28   the Holder of such Claim has filed proof thereof with the Bankruptcy Court on or before the

1  Claims Bar Date, (a) the amount stated in such proof if no objection to such Proof of Claim was

2  interposed within the applicable period of time fixed by the Bankruptcy Code, the Bankruptcy

3  Rules, the Plan or the Bankruptcy Court, or (b) the amount thereof as fixed by Final Order of the

4  Bankruptcy Court if an objection to such proof was interposed within the applicable period of time

5  fixed by the Bankruptcy Code, the Bankruptcy Rules, the Plan or the Bankruptcy Court.  The

6  Allowed Amount of any Other Claim which is not Filed by the applicable Claims Bar Date, is not

7  listed on the Group II: Voluntary Debtors' Schedules or is listed as disputed, unliquidated,

8  contingent or unknown, and is not allowed under the terms of this Plan shall be zero, and no

9  distribution shall be made on account of any such Claim; and

10                      C.      with respect to any Interest, (i) the amount provided by or

11  established in the records of the Group II: Voluntary Debtors at the Confirmation Date, provided,

12  however, that a timely filed proof of Interest shall supersede any listing of such Interest on the

13  records of the Group II: Voluntary Debtors; or (ii) the amount stated in a proof of Interest Filed

14  prior to the Confirmation Date if no objection to such Interest was filed prior to the Confirmation

15  Date or such later date as the Bankruptcy Court allows; or (iii) the amount of such Interest as fixed

16  by a Final Order of the Bankruptcy Court.

17           2.1.10    Allowed Claim.  Except as otherwise provided in the Plan (including with

18  respect to those Classes for which the amount of the Allowed Claims is specified by the Plan), a

19  Claim to the extent (and only to the extent) of the Allowed Amount of such Claim.

20           2.1.11    Allowed Interest.  Any Interest to the extent, and only to the extent, of the

21  Allowed Amount of such Interest.

22           2.1.12    Allowed Secured Claims.  All or  a portion of a Secured Claim that is an

23  Allowed Claim.

24           2.1.13    Allowed Unsecured Claim.  All or a portion of an Unsecured Claim that is

25  an Allowed Claim.

26           2.1.14    Assets.  All assets that are property of the Debtor(s) pursuant to

27  Bankruptcy Code Section 541.

28           2.1.15    Arch.  Arch Insurance Company, a Bond Issuer.

1    2.1.16 <u>Available Cash</u>. Each Group II: Voluntary Debtors' Cash deposited into

2  the applicable Distribution Account(s) on or after the Effective Date that is available for making

3  Distributions under the Plan to Holders of Allowed Administrative, Priority, and Unsecured

4  Claims. The Available Cash shall consist of the respective Group II: Voluntary Debtors' cash on

5  hand as of the Effective Date that is not subject to a Disputed Lien, proceeds of Net Litigation

6  Recoveries that are not subject to a Disputed Lien, Net Sales Proceeds that become Available Cash

7  upon the disallowance of a Disputed Claim or avoidance of a Disputed Lien purportedly

8  encumbering such Cash, or proceeds from the Acquisitions Administrative Loan. All Available

9  Cash shall be deposited into the applicable Distribution Account(s). Available Cash shall not

10  include Net Sale Proceeds in the Net Sales Proceeds Account where the Disputed Secured Claims

11  are Allowed but subject to an equitable subordination judgment.

12    2.1.17 <u>Avoidance Actions</u>. All Claims and defenses to Claims accruing to the

13  Group II: Voluntary Debtors and their Estates under Bankruptcy Code Sections 506(d), 510(c),

14  541, 544, 545, 547, 548, 549, 550, or 551.

15    2.1.18 <u>Bankruptcy Code</u>. The United States Bankruptcy Code.

16    2.1.19 <u>Bankruptcy Court</u>. The United States Bankruptcy Court for the Central

17  District of California, having jurisdiction over the Cases and, to the extent of any withdrawal of the

18  reference made pursuant to Section 157 of title 28 of the United States Code, the United States

19  District Court for the Central District of California; or, in the event such courts cease to exercise

20  jurisdiction over the Cases, such court or unit thereof that exercises jurisdiction over the Cases in

21  lieu thereof.

22    2.1.20 <u>Bankruptcy Rules</u>. Collectively, as now in effect or hereafter amended

23  and as applicable to the Cases, (i) the Federal Rules of Bankruptcy Procedure, and (ii) the Local

24  Bankruptcy Rules and General Orders applicable to cases pending before the Bankruptcy Court.

25    2.1.21 <u>Beaumont Heights Project</u>. The Project owned by SunCal Beaumont,

26  located in the City of Beaumont, California, as more particularly described herein.

27

28

1    2.1.22    Beaumont Heights Break-up Fee. The sum of forty-one thousand dollars

2  ($41,000) that will be paid to the Stalking Horse Bidder that submits the Opening Bid for the

3  Beaumont Heights Project, if such Stalking Horse Bidder is not the Winning Bidder.

4    2.1.23    Beneficial Interests. means, collectively, the interests of the holders of

5  Allowed Unsecured Claims in the Plan Trust and in all distributions to be made by the Plan Trust

6  on account of Allowed Unsecured Claims. The Beneficial Interests (a) shall be noted in the books

7  and records of the Plan Trust, (b) shall not be evidenced by a writing, and (c) may not be

8  transferred, sold, assigned or transferred by will, intestate succession or operation of law.

9    2.1.24    Bickford Ranch Project. The Project owned by SunCal Bickford, located

10  in the City of Penryn, California, as more particularly described herein.

11    2.1.25    Bickford Second Loan Agreement. That certain promissory note secured

12  by a deed of trust, dated as of May 25, 2005, in the maximum aggregate principal amount of

13  approximately $30,000,000 executed by SunCal Bickford, as borrower, and payable to the order of

14  Lehman ALI. The Bickford Second Lien Loan Agreement is allegedly secured by a second priority

15  deed of trust on the Bickford Ranch Project. The Bickford Second Loan Agreement has an

16  asserted balance due of $56,494,059.38 as of March 30, 2009.

17    2.1.26    Bond Claim(s). Any Claim against the Debtor(s) and a Bond Issuer under

18  various payment or performance bonds, and/or any claims of Bond Issuer(s) against the Debtor(s)

19  under various payment or performance bonds.

20    2.1.27    Bond Claimant. Holder(s) of a Bond Claim.

21    2.1.28    Bond Indemnification Claim. All Claims by Bond Safeguard, Lexon, and

22  Arch for indemnification for payment by Bond Safeguard, Lexon and Arch of Bond Claims with

23  respect to the Group II: Voluntary Debtors' Projects.

24    2.1.29    Bond Indemnitors. The individuals and entities that are allegedly liable on

25  the Bond Indemnification Claims, including, allegedly, all of the Debtors, Acquisitions, all

26  Affiliates of Acquisitions, and Elieff.

27    2.1.30    Bond Issuer(s). Bond Safeguard, Lexon and Arch in their capacities as

28  issuers and sureties for payment and performance bonds for the benefit of certain of the Debtors.

1          2.1.31    Bond Safeguard. Bond Safeguard Insurance Company, a Bond Issuer.

2          2.1.32    Business Day. Any day, other than a Saturday, a Sunday or a "legal

3    holiday," as defined in Bankruptcy Rule 9006(a).

4          2.1.33    Cases. The Chapter 11 cases of the Group II: Voluntary Debtors pending

5    before the Bankruptcy Court.

6          2.1.34    Cash. Currency of the United States of America and cash equivalents,

7    including, but not limited to, bank deposits, immediately available or cleared checks, drafts, wire

8    transfers and other similar forms of payment.

9          2.1.35    CFD Bonds. Community facilities district bonds issued by a

10   governmental entity.

11         2.1.36    Chapter 11 Trustee. Steven M. Speier, the duly appointed trustee of the

12   Trustee Debtors in their pending Chapter 11 Cases.

13         2.1.37    Claim. This term shall have the broadest possible meaning under

14   Section 101(5) of the Bankruptcy Code, and shall include (a) any right to payment from any of the

15   Group II: Voluntary Debtors, whether or not such right is reduced to judgment, liquidated,

16   unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable,

17   secured, or unsecured, or (b) any right to an equitable remedy for breach of performance if such

18   breach gives rise to a right of payment from any of the Group II: Voluntary Debtors, whether or not

19   such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured,

20   disputed, undisputed, secured, or unsecured.

21         2.1.38    Claims Bar Date. For any Claim other than an Administrative Claim,

22   March 31, 2009, which was established by the Bankruptcy Court as the last date for creditors to

23   file Proof of Claims with the Bankruptcy Court in all of the Group II: Voluntary Debtors' cases.

24         2.1.39    Claims Objection Deadline. The later of (i) the first business day

25   following the one hundred and eightieth (180th) day after the Effective Date, or (ii) such greater

26   period of limitation as may be fixed or extended by the Bankruptcy Court or by agreement between

27   the Plan Trustee and the Holder of the Claim.

28

1    2.1.40    Claim Objection Reduction Amount. The amount of Net Sales Proceeds

2  that is made available to the holders of Allowed Unsecured Claims due to the entry of a judgment

3  or order on a Lehman Claim Objection that disallows, reduces, or otherwise adversely modifies the

4  secured claims filed by the Lehman Lenders.

5    2.1.41    Class. Each group of Claims or Interests classified in Article V of the Plan

6  pursuant to Sections 1122 and 1123 of the Bankruptcy Code.

7    2.1.42    Committees. Collectively, the Voluntary Debtors' Committee and the

8  Trustee Debtors' Committee, both before and after the Confirmation Date.

9    2.1.43    Confirmation Date. The date on which the Confirmation Order is entered

10  in the Bankruptcy Court's docket.

11    2.1.44    Confirmation Order. The order entered by the Bankruptcy Court

12  confirming the Plan in accordance with the provisions of Chapter 11 of the Bankruptcy Code.

13    2.1.45    Contingent Bond Claims. Unmatured Bond Claims.

14    2.1.46    Creditor. Any Person who is the Holder of a Claim against any Debtor

15  that arose or accrued or is deemed to have arisen or accrued or to have matured, or otherwise

16  become due, owing, and payable on or before the Petition Date, including, without limitation,

17  Claims of the kind specified in Sections 502(g), 502(h) or 502(i) of the Bankruptcy Code.

18    2.1.47    Debtor(s). Individually or collectively, the Voluntary Debtors and the

19  Trustee Debtors, as specifically defined in Exhibit "1" attached hereto.

20    2.1.48    Debtor(s)-in-Possession. The Voluntary Debtor(s) when acting in their

21  capacity as representatives of their respective Estates in their respective Chapter 11 Cases.

22    2.1.49    Disclosure Statement. The document accompanying the Plan that is

23  entitled "Disclosure Statement Describing Chapter 11 Plan Filed by SunCal Plan Proponents In

24  The Chapter 11 Cases Of SunCal Beaumont Heights, LLC and SunCal Johannson Ranch, LLC

25  [Group II: Voluntary Debtors]," as amended and with all accompanying exhibits.

26    2.1.50    Disputed Claim(s). All or any part of a Claim other than any Allowed

27  Amount thereof as to which any one of the following applies: (i) no Proof of Claim has been filed

28  with respect to such Claim, and either (a) the Claim is not listed in the Schedules; or (b) the Claim

1    is listed in the Schedules as unliquidated, disputed, contingent, unknown or in a zero amount,

2    (ii) the Claim is the subject of (a) a Litigation Claim; (b) the Claim is subject to offset by a

3    Litigation Claim; (c) a timely objection that has not been resolved by a Final Order; or (d) a request

4    for estimation in accordance with the Bankruptcy Code, the Bankruptcy Rules, any applicable

5    order of the Bankruptcy Court, or the Plan which is Filed on or before the Claims Objection

6    Deadline, which Adversary Proceeding, objection, or request for estimation has not been

7    dismissed, withdrawn or determined by a Final Order; or (iii) the Claim is otherwise treated as a

8    "Disputed Claim" pursuant to the Plan.

9          2.1.51    Disputed Lien(s). An asserted lien(s) against Assets of the Debtor(s) that

10    is either subject to a Disputed Secured Claim, not duly perfected, subject to an Avoidance Action,

11    or subject to an action pursuant to Bankruptcy Code Sections 510(c)(2) and/or 506(d).

12          2.1.52    Disputed Secured Claim(s). That part of a Disputed Claim that is a

13    Secured Claim.

14          2.1.53    Distribution(s). Payments to Holders of Allowed Claims provided for

15    under the Plan.

16          2.1.54    Distribution Agent. The entity that is responsible for making Distributions

17    under the Plan, which shall be Acquisitions.

18          2.1.55    Distribution Account(s). Separate account(s) to be established by the Plan

19    Trustee at an FDIC insured bank into which each Group II: Voluntary Debtors' Available Cash

20    shall be deposited and all Available Cash received by the Plan Trust after the Confirmation Date

21    that would have belonged to such Group V Debtor shall be deposited, other than Net Sales

22    Proceeds that are subject to Disputed Claims and Disputed Liens.

23          2.1.56    Distribution Date. With respect to any Allowed Claim or Allowed

24    Interest, the date on which a Distribution is required to be made under the Plan.

25          2.1.57    Effective Date. A date selected by the SunCal Plan Proponents that is not

26    later than the ninetieth (90th) calendar day after the Confirmation Date. However, the SunCal Plan

27    Proponents shall have the right to extend the Effective Date for an additional thirty (30) days.

28

1    2.1.58    Elieff. Bruce Elieff, the president of Acquisitions, a purported obligor on

2    the Bond Claims with corresponding indemnity Claims against the Debtors.

3    2.1.59    Estates. The bankruptcy estates of the Group II: Voluntary Debtors

4    created pursuant to Section 541 of the Bankruptcy Code.

5    2.1.60    Fee Applications. Applications of Professional Persons under Sections

6    330, 331 or 503 of the Bankruptcy Code for allowance of compensation and reimbursement of

7    expenses in the Cases.

8    2.1.61    Fee Claim. A Claim under Sections 330 or 503 of the Bankruptcy Code

9    for allowance of compensation and reimbursement of expenses in the Cases.

10    2.1.62    Fenway Capital. Fenway Capital Funding LLC, a Lehman Successor to

11    Lehman's Disputed Claims and Lehman's Disputed Liens arising from (i) SunCal Communities I

12    Loan Agreement, (ii) Ritter Ranch Loan Agreement, (iii) Bickford Second Loan Agreement,

13    (iv) SunCal PSV Loan Agreement, (v) SunCal Marblehead/SunCal Heartland Loan Agreement,

14    (vi) Delta Coves Loan Agreement (vii) SunCal Northlake Loan Agreement, and (viii) SunCal Oak

15    Valley Loan Agreement. Such Disputed Claims and Disputed Liens were transferred back to LCPI

16    pursuant to a compromise approved by the New York Bankruptcy Court on May 12, 2010.

17    2.1.63    Filed. Delivered to, received by and entered upon the legal docket by the

18    Clerk of the Bankruptcy Court. "File" shall have a correlative meaning.

19    2.1.64    Final Order. A judgment, order, ruling or other decree issued and entered

20    by the Bankruptcy Court.

21    2.1.65    General Unsecured Claim. A Claim against a Group V Debtor that is not

22    (a) a Secured Claim, (b) an Administrative Claim, (c) a Tax Claim or (d) a Priority Claim.

23    2.1.66    Group II: Voluntary Debtors. SunCal Beaumont Heights, LLC and SunCal

24    Johannson, LLC.

25    2.1.67    Group II Projects. Beaumont Heights Project and Johannson Ranch

26    Project.

27    2.1.68    Holder. The beneficial owner of any Claim or Interest.

28

1       2.1.69   Initial Overbid. The Initial Overbid is the first Qualifying Bid after the

2  Opening Bid that is equal to or in excess of the Initial Overbid Amount.

3       2.1.70   Initial Overbid Amount. In the case of Ritter Ranch Project, the Initial

4  Overbid Amount is a sum that is not less than the sum of the applicable Opening Bid, the

5  Beaumont Heights Project Break-up Fee and the Minimum Increment. In the case of the Johannson

6  Ranch Project, the Initial Overbid Amount is a sum that is not less than the sum of the applicable

7  Opening Bid, the Johannson Project Break-up Fee and the Minimum Increment.

8       2.1.71   Insider. The term shall have the broadest meaning possible under

9  Section 101(31), including, but not limited to, a person in control of the Debtor, Affiliates and

10  Insiders of such Affiliates.

11       2.1.72   Interest. Any equity security interest in any Group II Debtor within the

12  meaning, of Section 101(16) of the Bankruptcy Code, including, without limitation, any equity

13  ownership interest in any of the Group II Debtors, whether in the form of common or preferred

14  stock, stock options, warrants, partnership interests, or membership interests.

15       2.1.73   Johannson Ranch Project. The Project owned by SunCal Johannson,

16  located in the City of Modesto, California, as more particularly described herein.

17       2.1.74   Johannson Ranch Break-up Fee. The sum of twenty-two thousand dollars

18  ($22,000) that will be paid to the Stalking Horse Bidder that submits the Opening Bid for the

19  Johannson Ranch Project, if such Stalking Horse Bidder is not the Winning Bidder.

20       2.1.75   Kirby Estates. Kirby Estates, LLC, a Delaware limited liability company,

21  a Voluntary Debtor herein, and the owner of a portion of the Summit Valley Project not owned by

22  SunCal Summit Valley and Seven Brothers.

23       2.1.76   LBHI. Lehman Brothers Holdings, Inc., a Lehman Entity, the parent

24  company of Lehman ALI and LCPI, and a Chapter 11 debtor in a bankruptcy proceeding pending

25  in the Bankruptcy Court for the Southern District of New York.

26       2.1.77   LCPI. Lehman Commercial Paper, Inc., a Chapter 11 debtor in a

27  bankruptcy proceeding pending in the Bankruptcy Court for the Southern District of New York.

28

1    2.1.78    Legal Rate. The rate of interest payable on judgments obtained in the

2  United States District Courts as set forth in 28 U.S.C. § 1961. The rate applicable under the Plan is

3  1.44% per annum, representing the applicable rate on November 6, 2008.

4    2.1.79    Lehman Adversary Proceeding. The Debtors' pending adversary

5  proceeding against the Lehman Lenders and/or the Lehman Successors asserting various causes of

6  action including equitable subordination, fraudulent conveyances and preferential transfers.

7    2.1.80    Lehman ALI. Lehman ALI, Inc.

8    2.1.81    Lehman Disputed Administrative Loans. The post-petition financing

9  provided by Lehman ALI to Palmdale Hills, SunCal Emerald, SunCal Bickford, Acton Estates,

10  SunCal Oak Valley, SunCal Heartland, SunCal Northlake, SunCal Marblehead, SunCal Century

11  City, SunCal PSV, Delta Coves, and SunCal Oak Knoll, which grants priming liens on all

12  borrower Debtors' assets, and for super-priority administrative status to Lehman ALI. The

13  Voluntary Debtors have repaid to Lehman ALI the full amount of $270,731 loaned to the

14  Voluntary Debtors. The aggregate amount of the Lehman Administrative Loans to all of the

15  Trustee Debtors is approximately $40 million as of March 1, 2011 and continuing to increase. The

16  Lehman Administrative Loans are the subject of claim objections. Until these objections are

17  resolved, these Lehman Administrative Loans shall not be Allowed Claims.

18    2.1.82    Lehman Claim Objections. The objections filed by the Debtors to the

19  claims filed by the Lehman Lenders that are based upon the Lehman Disputed Loans and the

20  Lehman Disputed Administrative Loans, including, but not limited to, the Lehman Recoupment

21  Objection and the Lehman 502(d) Objection.

22    2.1.83    Lehman Entities. The Lehman Lenders, the Lehman Equity Members and

23  LBHI.

24    2.1.84    Lehman Equity Members. Lehman Entities that own direct or indirect

25  membership Interests in all of the Trustee Debtors, except for SunCal Heartland and SunCal

26  Marblehead.

27    2.1.85    Lehman Lenders. Lehman ALI, LCPI, Northlake Holdings, and OVC

28  Holdings.

1          2.1.86    Lehman Disputed Loans. Collectively the following loans that are the

2  purported basis for the Lehman's Disputed Claims:  (a) SunCal Communities I Loan Agreement;

3  (b) Bickford Second Loan Agreement; (c) Ritter Ranch Loan Agreement; (d) SCC Palmdale Loan;

4  (e) Interim Loan Agreement; (f) SunCal Oak Knoll/SunCal Torrance Loan Agreement; (g) SunCal

5  Century City Loan Agreement; (h) SunCal PSV Loan Agreement; (i) SunCal Delta Coves Loan

6  Agreement; (j) SunCal Marblehead/SunCal Heartland Loan Agreement; (k) Sun Cal Oak Valley

7  Loan Agreement; (l) SunCal Northlake Loan Agreement; (m) Pacific Point First Loan Agreement;

8  and (n) Pacific Point Second Loan Agreement.

9          2.1.87    Lehman Recoupment Objection. A claim objection filed with respect to

10  certain claims filed by the Lehman Lenders that is based upon the affirmative defenses of

11  recoupment, unjust enrichment and unclean hands.

12          2.1.88    Lehman Representatives. The individuals that controlled the Lehman

13  Entities.

14          2.1.89    Lehman Successor(s). Entities other than the Lehman Lenders that either

15  assert to be or are determined by the Bankruptcy Court to be the beneficial owner(s) of the Lehman

16  Disputed Loan(s), including, but not limited to Fenway Capital, Lehman Re and Danske Bank.

17          2.1.90    Lehman's Disputed Claim(s). All of the Proofs of Secured Claims filed by

18  a Lehman Lender or a Lehman Successor in the Debtors' Chapter 11 Cases arising from the

19  Lehman Disputed Loans and the Lehman Disputed Administrative Loans.

20          2.1.91    Lehman's Disputed Lien(s). All of the alleged liens relating to Proofs of

21  Secured Claims filed by a Lehman Lender or a Lehman Successor in the Debtor's Chapter 11

22  Cases arising from the Lehman Disputed Loans.

23          2.1.92    Lehman 502(d) Objection. A claim objection filed with respect to certain

24  claims filed by the Lehman Lenders that based upon Section 502(d) of the bankruptcy code.

25          2.1.93    Lexon. Lexon Insurance Co.

26          2.1.94    Litigation Claims. Any and all interests of the Group II: Voluntary

27  Debtors in any and all Claims, rights, causes of action, and objections or defenses to Claims, liens,

28  rights, or causes of action which have been or may be commenced by the Group V Debtor(s), the

1   Chapter 11 Trustee, or the Committee(s), as the case may be, including, but not limited to, any

2   (i) Avoidance Actions; (ii) for turnover of property to the Group II: Voluntary Debtors' Estates

3   and/or the Plan Trust; (iii) for the recovery of property or payment of money that belongs to the

4   Debtors' Estates or the Plan Trust; (iv) the right to compensation in the form of damages,

5   recoupment or setoff of the Debtors' Estates and/or the Plan Trust; (v) the Lehman Adversary

6   Proceeding; (vi) the State Court Action, and (vii) any and all other Claims against Lehman's

7   Disputed Claims and/or Disputed Liens referenced in the Plan or the Disclosure Statement.

8           2.1.95    Litigation Recoveries.  Any Cash or other property received by the

9   Chapter 11 Trustee, the Group II Debtors, the Committees and/or the Plan Trust, as the case may

10  be, from all or any portion of a Litigation Claim(s), including, but not limited to, awards of

11  damages, attorneys' fees and expenses, interest and punitive damages, whether recovered by way

12  of settlement, execution on judgment or otherwise.

13          2.1.96    Litigation Rights. Any Claims held by a party other than the Group II:

14  Voluntary Debtors that have not been fixed in a final judgment prior to the Effective Date.

15          2.1.97    Marblehead Project.  The Project owned by SunCal Marblehead, located

16  in the City of San Clemente, California, as more particularly described herein.

17          2.1.98    Maximum Distribution.  A Distribution to a Holder of an Allowed

18  Unsecured Claim against a Group II: Voluntary Debtor equal to one hundred percent (100%) of the

19  amount of the Holder's Allowed General Unsecured Claim plus interest at the Legal Rate from and

20  as of the Group II: Voluntary Debtor's Petition Date.

21          2.1.99    MB Firm.  Miller Barondess, LLP.

22          2.1.100   Mechanic Lien Claims.  Mechanic Lien Claims arising pursuant to

23  California Civil Code §3110, et seq. that were either allegedly perfected prepetition or otherwise

24  allegedly satisfy the requirements of Bankruptcy Code 546(b).

25          2.1.101   Minimum Increment.  Minimum Increment applicable to the sales of the

26  Group II Projects are the following: twenty thousand dollars ($20,000) for the Beaumont Heights

27  Project and ten thousand dollars ($10,000) for the Johannson Ranch Project, until there are only

28

1  two Qualified Bidders submitting bids for a Group II Project, then the Minimum Increment shall be
2  five thousand dollars ($5,000).

3        2.1.102  Minimum Sale Price. The minimum gross sale price that must be paid for
4  each Group V Project before such projects can be sold pursuant to the Plan, which prices are the
5  following: Beaumont Height Project - $918,000, and Johannson Ranch Project - $486,000.

6        2.1.103  Net Litigation Recoveries. Litigation Recoveries less associated
7  Administrative Claims and Post-Confirmation Expenses incurred in connection with such
8  Litigation Recoveries.

9        2.1.104  Net Sales Proceeds. The Cash generated from the sale(s) or liquidation of
10 the Group V Debtor(s)' Assets or the Plan Trust's Assets, less payment of selling expenses, taxes,
11 Chapter 11 Trustee fees, and any associated Post-Confirmation Expenses and Administrative
12 Claims incurred in furtherance of such sales or liquidation of such Assets.

13       2.1.105  Net Sales Proceeds Account(s). Separate account(s) that will be
14 established by the Plan Trustee at an FDIC insured bank into which all Net Sale Proceeds shall be
15 deposited from the sale of Assets that were allegedly encumbered by a Disputed Secured Claim(s)
16 and/or a Disputed Lien(s). There shall be a separate Net Sales Proceeds Account for the Net Sale
17 Proceeds allegedly subject to each Disputed Secured Claim(s) and/or Disputed Lien(s), except
18 where there are two Disputed Liens on a single Project, in which case, there shall be a single
19 account for the proceeds generated from that Project. The Disputed Secured Claim(s) and/or
20 Disputed Lien(s) shall attach to the corresponding Net Sales Proceeds Account(s) pending any
21 Final Order(s) of the Bankruptcy Court resolving the applicable Disputed Secured Claim(s) and/or
22 applicable Disputed Lien(s). To the extent that a particular Disputed Claim is disallowed or a
23 particular Disputed Lien is avoided (other than transferred to the Estates pursuant to Bankruptcy
24 Code Section 510(c)(2)) or otherwise invalidated, such Net Sales Proceeds allegedly subject
25 thereto shall become Available Cash and shall be transferred to the applicable Distribution
26 Account(s). To the extent that a particular Disputed Secured Claim and a Disputed Lien are
27 allowed and deemed valid but subject to the equitable subordination causes of action in the
28

1    Lehman Adversary Proceeding, the funds shall remain in the Net Sales Accounts pending a Final

2    Order on the equitable subordination causes of action in the Lehman Adversary Proceeding.

3              2.1.106    Opening Bid.  Opening Bid means the offer for one, or both of the Group

4    II Projects, which is equal to the Minimum Sale Price(s) accepted by the Debtor for either one or

5    both of the Group II Projects.

6              2.1.107    Orders for Relief Date.  The following are dates that orders for relief were

7    entered for each of the Trustee Debtors:

8
              SunCal Oak Valley              January 6, 2009
9              SunCal Heartland              January 6, 2009
              SunCal Northlake              January 6, 2009
10             SunCal Marblehead             January 6, 2009
              SunCal Century City           January 6, 2009
11             SunCal PSV                    January 6, 2009
              Delta Coves                   January 6, 2009
12             SunCal Torrance               January 6, 2009
              SunCal Oak Knoll              January 6, 2009
13

14             2.1.108    Palmdale Hills.  Palmdale Hills Property LLC, a Delaware limited liability

15    company, a Voluntary Debtor herein, and the owner of the Ritter Ranch Project

16             2.1.109    Palmdale Hills CFD Bonds.  Certain CFD bonds issued by the City of

17    Palmdale, in the amount of approximately $33 million that are owned by Palmdale Hills.

18             2.1.110    Palm Springs Village Project.  The Project owned by SunCal PSV, located

19    in the City of Palm Springs, California, as more particularly described herein.

20             2.1.111    Person.  An individual, partnership, corporation, limited liability company,

21    business trust, joint stock company, trust, unincorporated association, joint venture, governmental

22    authority, governmental unit, committee or other entity of whatever nature.

23             2.1.112    Petition Dates.  The following are dates that each of the Voluntary Debtors

24    filed their Voluntary Chapter 11 petitions or Creditors filed involuntary Chapter 11 petitions

25    against the Trustee Debtors:

26    / / /

27

28

-18-
MAINDOCS-#163410-v1-SCC_GroupIIVoluntaryDebtorsDisclosureStatement.DOC

| | |
|---|---|
| Palmdale Hills | November 6, 2008 |
| SunCal Beaumont | November 6, 2008 |
| SCC Palmdale | November 7, 2008 |
| SunCal Johannson | November 7, 2008 |
| SunCal Summit Valley | November 7, 2008 |
| SunCal Emerald | November 7, 2008 |
| SunCal Bickford | November 7, 2008 |
| Acton Estates | November 7, 2008 |
| Seven Brothers | November 7, 2008 |
| SJD Partners. | November 7, 2008 |
| SJD Development | November 7, 2008 |
| Kirby Estates | November 7, 2008 |
| SunCal I | November 7, 2008 |
| SunCal III | November 7, 2008 |
| SCC Communities | November 19, 2008 |
| Del Rio | November 19, 2008 |
| Tesoro | November 19, 2008 |
| Delta Coves Ventures, LLC | November 14, 2008 |
| SunCal Heartland, LLC | November 12, 2008 |
| SunCal Marblehead, LLC | November 12, 2008 |
| LB-L-SunCal Northlake, LLC | November 12, 2008 |
| LB-L-SunCal Oak Valley, LLC | November 12, 2008 |
| SunCal Century City, LLC | November 14, 2008 |
| SunCal PSV, LLC | November 14, 2008 |
| SunCal Torrance Properties, LLC | November 14, 2008 |
| SunCal Oak Knoll, LLC | November 19, 2008 |

2.1.113   Plan. This Chapter 11 Plan together with the Exhibits thereto, as the same may be amended or modified from time to time in accordance with the Plan.

2.1.114   Plan Documents. The Plan, the Plan Trust Agreement and all other documents attached to the Plan Supplement.

2.1.115   Plan Period. The period from the Effective Date to the Plan Termination Date.

2.1.116   Plan Supplement. The compilation of the Plan Documents to be filed with the Bankruptcy Court.

2.1.117   Plan Termination Date. The fifth (5th) anniversary date of the Effective Date, unless the Plan elects and earlier date.

MAINDOCS-#163410-v1-SCC_GroupII VoluntaryDebtorsDisclosureStatement.DOC

1    2.1.118 Plan Sponsor. The entity that has committed to cause the funding of

2 certain specified obligations under the Plan on or after the Effective Date. The Plan Sponsor is

3 Acquisitions.

4    2.1.119 Plan Trust. A liquidating trust to be established prior to or on the

5 Effective Date, with Acquisitions as the Plan Trustee and the Holders of Allowed Claims against

6 the Debtors as the beneficiaries. The purpose of the Plan Trust will be to liquidate the Debtors'

7 Assets (other than Assets that are excluded by the Plan Trustee on the grounds that they lack value

8 or would be difficult to administer) and to otherwise consummate the Plan.

9    2.1.120 Plan Trustee. The Plan Trustee under the Plan Trust Agreement is

10 Acquisitions.

11    2.1.121 Plan Trust Agreement. The liquidating trust agreement governing the

12 affairs of the Plan Trust, which will be in substantially the form contained in the Plan Supplement.

13    2.1.122 Plan Trust Beneficiaries. The Plan Trust Beneficiaries are (i) the holders

14 of Beneficial Interests, as of any point in time, and (ii) holders of Allowed Claims that shall be

15 satisfied from Plan Trust Property in accordance with the terms of the Plan.

16    2.1.123 Plan Trust Property. Plan Trust Property means all property within the

17 Chapter 11 estates of the Group II Debtors, other than property that is affirmatively excluded by the

18 Plan Trustee.

19    2.1.124 Post-Confirmation Expenses. The fees and expenses incurred by the Plan

20 Sponsor, the Plan Trustee and the Committee(s) and their professionals following the Confirmation

21 Date (including the fees and costs of Professionals) for the purpose of (i) prosecuting and

22 liquidating the Litigation Claims; (ii) objecting to and resolving Disputed Claims and Disputed

23 Liens; (iii) selling or otherwise liquidating the Plan Trust's Assets; (iv) effectuating Distributions

24 under the Plan; and (v) otherwise consummating the Plan and closing the Group II Debtors'

25 Chapter 11 Cases.

26    2.1.125 Priority Claim. Any Claim, other than an Administrative Claim or a Tax

27 Claim, to the extent entitled to priority under Section 507(a) of the Bankruptcy Code.

28

1          2.1.126   Pro Rata. Proportionately, so that with respect to any distribution in

2 respect of any Allowed Claim, the ratio of (a)(i) the amount of property distributed on account of

3 such Allowed Claim to (ii) the amount of such Allowed Claim, is the same as the ratio of (b)(i) the

4 amount of property distributed on account of all Allowed Claims of the Class or Classes sharing in

5 such distribution to (ii) the amount of all Allowed Claims in such Class or Classes.

6          2.1.127   Professional. A Person or Entity (a) employed by the Group II: Voluntary

7 Debtors, the Committees pursuant to a Final Order in accordance with Sections 327 and 1103 of

8 the Bankruptcy Code and to be compensated for services rendered prior to the Effective Date,

9 pursuant to Sections 327, 328, 329, 330 and 331 of the Bankruptcy Code, or (b) for which

10 compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to

11 Section 503(b) of the Bankruptcy Code.

12          2.1.128   Professional Fees. All Allowed Claims for compensation and for

13 reimbursement of expenses under Sections 328, 330 and/or 503(b) of the Bankruptcy Code

14          2.1.129   Projects. The Debtors' residential real estate development projects and

15 other assets as separately defined herein and described in Exhibit "1" to the Disclosure Statement.

16          2.1.130   Qualifying Bid. Qualifying Bid means, with respect to any bid on a

17 Group V Project, a bid made by Qualifying Bidder that is A) equal to or in excess of the Initial

18 Overbid Amount, if it is the Initial Overbid, or B) in excess of the immediately preceding

19 Qualifying Bid by the Minimum Increment, if it is not the Initial Overbid.

20          2.1.131   Qualifying Bidder. Qualifying Bidder means a bidder who a) has

21 deposited the sum of seventy-five thousand dollars ($75,000) into an escrow designated by the

22 SunCal Proponents in the case of a bid for the Beaumont Heights Project, fifteen thousand dollars

23 or ($15,000) in the case of a bid for the Johannson Ranch Project; b) agreed that this sum will be

24 forfeited as liquidated damages if such bidder fails to perform; and c) who has provided the SunCal

25 Plan Proponents evidence confirming that such bidder has the financial means to acquire the

26 applicable Group II Project(s) that such bidder is seeking to acquire.

27          2.1.132   Ritter Ranch Loan Agreement. That certain Credit Agreement, dated as

28 of February 8, 2007, by and among Palmdale Hills, as borrower, LCPI, as administrative agent and

lender, pursuant to which LCPI made a loan in the maximum aggregate principal amount of approximately $264,000,000. The Ritter Ranch Loan Agreement is allegedly secured by a first-priority deed of trust on all real and personal property owned by Palmdale Hills. The Ritter Ranch Loan Agreement has an asserted balance due of $287,252,096.31 as of March 30, 2009.

2.1.133   Ritter Ranch Project. The Project owned by Palmdale Hills, located in the City of Palmdale, California, as more particularly described herein.

2.1.134   Sale Period. The Sale Period is the time period during which the SunCal Proponents must consummate a sale or liquidation of the Group II Projects. The Sale Period shall commence on the Confirmation Date and shall expire on the Effective Date.

2.1.135   SCC LLC. SCC Acquisitions LLC, a limited liability company, a subsidiary of Acquisitions and an indirect and/or a direct parent company of all of the Debtors.

2.1.136   Schedules. The schedules of assets and liabilities and list of equity security holders Filed by the Group II: Voluntary Debtors, as required by Section 521(1) of the Bankruptcy Code, Bankruptcy Rules 1007(a)(3) and (b)(1), and Official Bankruptcy Form No. 6, as amended from time to time.

2.1.137   Seven Brothers. Seven Brothers, LLC, a Delaware limited liability company, a Voluntary Debtor herein, and the owner of the portion of the Summit Valley Project not owned by Kirby Estates and SunCal Summit Valley.

2.1.138   Secured Claim. Any Claim, including interest, fees, costs, and charges to the extent allowable pursuant to Bankruptcy Code Section 506, that is secured by a valid and unavoidable Lien on the Group II: Voluntary Debtor(s)' Assets.

2.1.139   Stalking Horse Bidder. The Qualified Bidder who submits the Opening Bid.

2.1.140   State Court Action. The action filed by certain Voluntary Debtors against Lehman Ali, Inc., and certain other defendants, in California Superior Court for the County of Orange (Case No. 30-2011-0040847-CU-BC-CJC).

1        2.1.141    Summit Valley Project. The Project owned in part by SunCal Summit

2    Valley, Seven Brothers and Kirby Estates, located in the City of Hesperia, California, as more

3    particularly described herein.

4        2.1.142    SunCal. The SunCal Companies, a trade name for Acquisitions and its

5    Affiliates.

6        2.1.143    SunCal Bickford. SunCal Bickford Ranch, LLC, a Delaware limited

7    liability company, a Voluntary Debtor herein, and the owner of the Bickford Ranch Project.

8        2.1.144    SunCal I. SunCal Communities I, LLC, a Delaware limited liability

9    company, a Voluntary Debtor herein, and the owner of the equity membership interests in Acton

10    Estates, SunCal Bickford, SunCal Beaumont, SunCal Summit Valley, SunCal Johannson and

11    SunCal Emerald.

12        2.1.145    SunCal Communities I Loan Agreement. The loan agreement by and

13    among (i) SunCal I and SunCal III, as borrowers and (ii) LCPI, as administrative agent and lender,

14    pursuant to which LCPI made a loan to SunCal I and SunCal III, as borrowers in the maximum

15    aggregate principal amount of approximately $395,313,713.37. The loan agreement is allegedly

16    secured by (a) alleged first-priority deeds of trust on the SunCal Bickford, the Acton Estates, and

17    the SunCal Emerald Projects, (b) an alleged pledge of SunCal I's Allowed Interest in Acton

18    Estates, SunCal Summit, SunCal Beaumont, SunCal Johannson, SunCal Emerald, and SunCal

19    Bickford; and (c) an alleged pledge of SunCal Summit's Allowed Interest in Seven Brothers and

20    Kirby. The SunCal Communities I Loan Agreement has an alleged balance due of

21    $343,221,391.06 as of March 30, 2009.

22        2.1.146    SunCal Management. SunCal Management, LLC, a Delaware limited

23    liability company, and the property manager for the Projects.

24        2.1.147    SunCal Marblehead. SunCal Marblehead, LLC, a Delaware limited

25    liability company, a Trustee Debtor, and the owner of the Marblehead Project.

26        2.1.148    SunCal Marblehead/SunCal Heartland Loan Agreement. That certain

27    Second Amended and Restated Term Loan and Revolving Line of Credit Loan Agreement, dated

28    as of October 3, 2007, by and among SunCal Marblehead Heartland Master LLC, SunCal

Marblehead, and SunCal Heartland, as borrowers, and Lehman ALI, as agent and sole lender,
pursuant to which Lehman ALI made a loan in the maximum aggregate principal amount of
approximately $316,061,300. The SunCal Marblehead/SunCal Heartland Loan Agreement is
allegedly secured by first-priority deeds of trust on the Marblehead and the Heartland Projects.
The SunCal Marblehead/SunCal Heartland Loan Agreement has an alleged balance due of
$354,325,126.15 as of March 30, 2009. The proofs of claim filed with respect to this loan
agreement are the subject of the Lehman Adversary Proceeding and the Lehman Claim Objections.

   2.1.149 SunCal Plan Proponent(s). The Voluntary Debtors and Acquisitions as
the parties-in-interest that are proposing the Plan.

   2.1.150 SunCal PSV. SunCal PSV, LLC, a Delaware limited liability company, a
Trustee Debtor, and the owner of the Palm Springs Village Project.

   2.1.151 SunCal PSV Loan Agreement. That certain Term Loan and Revolving
Line of Credit Loan Agreement, dated as of February 12, 2007, between SunCal PSV, as borrower,
and Lehman ALI, as agent and sole lender, pursuant to which Lehman ALI made a loan in the
maximum aggregate principal amount of approximately $90 million. The SunCal PSV Loan
Agreement is allegedly secured by a first-priority deed of trust on the Palm Springs Village Project.
The SunCal PSV Loan Agreement has an alleged balance due of $88,257,340.20 as of March 30,
2009.

   2.1.152 Tax. Any tax, charge, fee, levy, impost or other assessment by any
federal, state, local or foreign taxing authority, including, without limitation, income, excise,
property, sales, transfer, employment, payroll, franchise, profits, license, use, ad valorem,
estimated, severance, stamp, occupation and withholding tax. "Tax" shall include any interest or
additions attributable to, or imposed on or with respect to such assessments.

   2.1.153 Tax Claim. Any Claim for any Tax to the extent that it is entitled to
priority in payment under Section 507(a)(8) of the Bankruptcy Code.

   2.1.154 Trustee Debtor(s). The following Debtors, individually or collectively,
that are represented by the Chapter 11 Trustee: Delta Coves, SunCal Heartland, SunCal

1  Marblehead, SunCal Northlake, SunCal Oak Valley, SunCal Century City, SunCal PSV, SunCal

2  Torrance, and SunCal Oak Knoll.

3        2.1.155   Trustee Debtors' Committee. The Official Committee of Unsecured

4  Creditors of the Trustee Debtors appointed in the Cases pursuant to Section 1102 of the

5  Bankruptcy Code.

6        2.1.156   Unpaid Secured Real Property Tax Claims. Secured Claims held by

7  various government entities secured by liens on the underlying real properties owned by the

8  Debtors but that are non-recourse to the Debtors.

9        2.1.157   Unsecured Claim. An Unsecured Claim is any Claim that is not an

10  Administrative Claim, Tax Claim, Secured Claim, or Priority Claim.

11        2.1.158   Voluntary Debtor(s). The following Chapter 11 debtors and debtors-in-

12  possession, individually or collectively, Palmdale Hills, SunCal I, SunCal III, SCC Palmdale,

13  Acton Estates, SunCal Beaumont, SunCal Emerald, SunCal Johansson, SunCal Bickford, SunCal

14  Summit, Seven Brothers, Kirby Estates, SJD Partners, SJD Development, SCC Communities, Del

15  Rio and Tesoro.

16        2.1.159   Voluntary Debtors' Committee. The Official Committee of Unsecured

17  Creditors of the Voluntary Debtors appointed in the Cases pursuant to Section 1102 of the

18  Bankruptcy Code.

19        2.1.160   Winning Bid. The highest Qualifying Bid received for the Beaumont

20  Heights Project, the Johannson Ranch Project or the Summit Valley Project.

21        2.1.161   Winning Bidder.  The party that submits the highest Qualifying Bid.

22  **2.2**    **Rules of Construction.**

23  For purposes of the Plan and this Disclosure Statement, unless otherwise provided herein or

24  in the Plan, (a) whenever from the context it is appropriate, each term, whether stated in the

25  singular or the plural, will include both the singular and the plural; (b) each pronoun stated in the

26  masculine, feminine or neuter includes the masculine, feminine and neuter; (c) any reference in the

27  Plan or this Disclosure Statement to an existing document or schedule filed or to be filed means

28  such document or schedule, as it may have been or may be amended, modified or supplemented

1   pursuant to the Plan; (d) any reference to an entity as a Holder of a Claim or Interest includes that

2   entity's successors and assigns; (e) except as otherwise indicated herein all references in the Plan

3   or this Disclosure Statement to Sections, Articles and Exhibits are references to Sections, Articles

4   and Exhibits of or to the Plan; (f) the words "therein," "thereunder" and "thereto" refer to the Plan

5   in its entirety rather than to a particular portion of the Plan; and (g) unless otherwise provided in

6   the Plan or this Disclosure Statement, any reference in the Plan or this Disclosure Statement to a

7   contract, instrument, release, indenture, agreement, or other document being in a particular form or

8   on particular terms and conditions means that such document shall be substantially and materially

9   in such form or substantially and materially on such terms and conditions; (h) any reference in the

10  Plan or this Disclosure Statement to a document, schedule, or exhibit to the Plan or Disclosure

11  Statement Filed or to be Filed means such document, schedule, or exhibit, as it may have been or

12  may be amended, modified, or supplemented; and (i) the rules of construction set forth in Section

13  102 of the Bankruptcy Code shall apply to the extent such rules are not inconsistent with the

14  express terms of the Plan or this Disclosure Statement or any other provision in this Section 2.2.

15      **2.3**    **Exhibits.**

16      All Exhibits to the Plan are incorporated into and are a part of the Plan as if set forth in full

17  therein.

18                                          **III.**

19                      **PLAN CONFIRMATION DEADLINES**

20      The Bankruptcy Court has not confirmed the Plan described in this Disclosure Statement.

21  Accordingly, the terms of the Plan are not binding on anyone. However, if the Bankruptcy Court

22  confirms the Plan, then the Plan will be binding on the Debtor(s), the Plan Trustee, and on all

23  Creditors and Interest Holders in such Cases.

24      **3.1**    **Time and Place of the Confirmation Hearing.**

25      The hearing where the Bankruptcy Court will determine whether or not to confirm the Plan

26  will take place at 411 West Fourth Street, Santa Ana, CA 92701-4593 on October 24, 2011, at 9:30

27  a.m. in Courtroom 5A.

28

**3.2    Deadline for Voting for or Against the Plan.**

If you are entitled to vote, it is in your best interest to timely vote on the enclosed ballot and return the ballot to:

> Winthrop Couchot Professional Corporation
> 660 Newport Center Drive, Suite 400
> Newport Beach, CA 92660
> Facsimile: (949) 720-4111
> Attn: P.J. Marksbury

Your ballot must be **received by** September 26, 2011, or it will not be counted.

**3.3    Deadline for Objecting to the Confirmation of the Plan.**

Objections to the confirmation of the Plan must be filed with the Bankruptcy Court, and served upon the following parties so that they are received by September 26, 2011:

| | |
|---|---|
| **Counsel to the Voluntary Debtors** | Paul J. Couchot<br>Winthrop Couchot Professional Corporation<br>660 Newport Center Drive, Suite 400,<br>Newport Beach, CA 92660 |
| **Authorized Agent for Voluntary Debtors** | Bruce V. Cook<br>General Counsel<br>2392 Morse Ave<br>Irvine, CA 92614-6234 |
| **Counsel for SunCal Management LLC and SCC Acquisitions Inc.** | Ronald Rus<br>Rus Miliband & Smith P.C.<br>2211 Michelson Drive, Seventh Floor<br>Irvine, California 92612 |
| **Authorized Agent for SunCal Management and SCC Acquisitions, Inc.** | Bruce V. Cook<br>General Counsel<br>2392 Morse Ave<br>Irvine, CA 92614-6234 |

**3.4    Identity of Person to Contact for More Information Regarding the Plan.**

Any interested party desiring further information about the Plan should contact the Voluntary Debtors' counsel, Winthrop Couchot Professional Corporation, 660 Newport Center Drive, Suite 400, Newport Beach, CA 92660, Attn: Paul J. Couchot, (949) 720-4100; Peter W. Lianides, (949) 720-4155; Payam Khodadadi, (949) 720-4160.

### 3.5    **Disclaimer.**

The information contained in this Disclosure Statement is provided by the SunCal Plan Proponents. The SunCal Plan Proponents represent that everything stated in this Disclosure Statement is true to the best of their knowledge. The Bankruptcy Court has not yet determined whether or not the Plan is confirmable and makes no recommendation as to whether or not you should support or oppose the Plan.

The discussion in this Disclosure Statement regarding the Group II: Voluntary Debtors may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate," or "continue," or the negative thereof or other variations thereon or comparable terminology. The reader is cautioned that all forward looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements. The liquidation analyses, distribution projections, projections of financial results and other information are estimates only, and the timing. amount and value of actual distributions to Creditors may be affected by many factors that cannot be predicted. Therefore, any analyses, estimates, or projections may or may not turn out to be accurate.

The SunCal Plan Proponents and their professionals have made a diligent effort to identify in this Disclosure Statement all Litigation Claims, including claims for relief, counterclaims, and objections to claims. However, no reliance should be placed on the fact that a particular Litigation Claim is or is not identified in this Disclosure Statement. The Group II: Voluntary Debtors or other parties in interest may seek to investigate, file and prosecute Litigation Claims after the Confirmation Date, or the Plan Trust may seek to do so after the Effective Date of the Plan whether or not the Litigation Claims are identified in this Disclosure Statement.

/ / /

1

# IV.

# FACTUAL BACKGROUND OF THE DEBTORS

## 4.1    The Formation of the Debtors and the Projects.

### 4.1.1    Overview of the Debtors and their Projects.

The Group II: Voluntary Debtors are four of twenty-six entities (collectively the "Debtors")
that were formed pursuant to a joint venture between Affiliates of the SunCal Companies
("SunCal") and the Lehman Entities (the "SunCal/Lehman Joint Venture"). The Debtors role in the
venture was to own and develop the large residential projects that were the core assets in this joint
undertaking.

At the inception of SunCal/Lehman Joint Venture, it was agreed that SunCal would be the
developer/manager of the Projects and the Lehman Entities would provide the necessary capital.
Attached hereto as Exhibit "1" is a general description of the Debtors' Projects, including the
Group II Projects, and the Debtors' other primary Assets, excluding Cash and the Litigation
Claims, and a description of the loans for the Projects that are not a part of Group II Projects.
All of the Debtors are Affiliates of Acquisitions and SCC LLC.  Some of the Debtors directly own
the Projects, while others serve as holding companies, owning Allowed Interests in the Debtors that
hold title to the Projects.  SunCal Management, LLC, a SunCal Affiliate, has management contracts
with respect to all of the Projects and pursuant to this contract manages the Debtors' day-to-day
business affairs.

The seventeen Debtors who are referred to herein as the "Voluntary Debtors" are wholly
owned by SunCal Affiliates, and consequently the SunCal Affiliates have full corporate
governance authority over these entities.  The Voluntary Debtors own eleven (11) of the Projects.
In the case of the nine Trustee Debtors, the SunCal Affiliates and the Lehman Affiliates initially
shared ownership equally (50% each).  However, after the Petition Date, the SunCal Affiliates
became the owner of hundred percent (100%) of the equity in two of the nine Trustee Debtors -
SunCal Heartland and SunCal Marblehead.  The Trustee Debtors own nine (9) Projects.

1   Attached hereto as Exhibit "2" is a chart that sets forth the appraised value of the Group II

2   Voluntary Debtors' Projects. This chart lists both the Lehman Lenders' value estimates and

3   SunCal's valuation estimates.[2]

4        The Plan eliminates any potential value disputes by providing for the sale of the Group II

5   Projects through an auction that is designed to yield the highest market price for these assets.

6   Accordingly, to the extent any other party believes the Group II Projects have a greater value than

7   the Opening Bid offered by another Qualifying Bidder, they will have the opportunity to submit a

8   Qualifying Bid (but no credit-bids will be allowed) that exceeds the Opening Bid and, if they so

9   desire, to become the Winning Bidder by offering the highest Qualifying Bid. This market sale

10  process will insure that the rights of all stakeholders are protected.

11       **4.1.2    The Debtors' Primary Secured Creditors and Their Disputed Claims**.

12       Only Creditors holding liens against the Beaumont Heights Project and the Johannson

13  Ranch Project are Riverside County, as the Holder of an Unpaid Secured Real Property Tax

14  Claim against the Beaumont Heights Project in the approximate amount of $442,201, and

15  Stanislaus County as the Holder of an Unpaid Secured Real Property Tax Claim against the

16  Johannson Ranch Project in the amount of $434,830.

17       **4.1.3    Lehman Disputed Claims and Liens.**

18       As discussed in detail herein, during the course of the Debtors' Cases, the Debtors initiated

19  litigation disputing the validity of Lehman's Disputed Secured Claims, and the validity, priority

20  and extent of Lehman's Disputed Liens.  This litigation was being pursued through the Lehman

21  Adversary Proceeding until this matter was stayed pursuant to a ruling by the court presiding over

22  LCPI's Chapter 11 case in New York. However, Lehman's Disputed Secured Claims are being

23  separately contested through claims objections. In addition, a lawsuit has been filed in California

24  Superior Court against certain Lehman Entities and their agents who are not in Chapter 11, based

25  upon their post-petition conduct.

26       The only Lehman Disputed Secured Claims of relevance to the Creditors of the Group II:

27  Voluntary Debtors are the claims that LCPI is asserting based upon the SunCal Communities I

28

---

[2] Values may have changed since these analyses were prepared.

1    Loan. According to LCPI, the collateral securing the outstanding balance allegedly owed on this

2    loan ($343,221,391) includes a lien against the equity interests that SunCal I owns (100%) in

3    SunCal Beaumont, LLC and SunCal Johannson, LLC. Since these equity level lien rights only

4    become relevant after all allowed claims are paid in Group II: Voluntary Debtors' estates, the

5    disallowance of the claims secured by these liens would not seems to be relevant to the Group II:

6    Voluntary Debtors' Creditors. However, the creditor level distribution picture in the Group II:

7    Voluntary Debtors' cases has been complicated by the existence of the Bond Claims filed against

8    the Group II: Voluntary Debtors' estate.

9        Both Arch and Bond Safeguard contend that they have the right to assert claims arising

10    from unpaid bond obligations relating to Projects owned by other Debtors, in the estates of all of

11    the Debtors. Accordingly, they have submitted in excess of $100,000,000 million in claims against

12    the estates of the Group II: Voluntary Debtors. Although the Group II: Voluntary Debtors do not

13    believe these claims are valid, and that they will not be allowed, these claims must be disallowed

14    before final distributions can be made to the Creditors holding Allowed Claims, or paid through

15    distributions made in the other Debtors' cases. It is in this respect that the litigation over the

16    validity and amount of the Lehman Secured Claims is relevant.

17        If the Lehman Recoupment Objection and the Lehman 502(d) Objection discussed herein

18    are successful, or if the Lehman Adversary Proceeding is successful, then the claims filed by Arch

19    and Bond Safeguard may be paid through distributions payable from the estates of the other

20    Debtors' cases where these claims may have right to payment. For this reason, the SunCal

21    Proponents have described the background and status of this litigation at some length in this

22    Disclosure Statement.

23            **4.1.4    Summary of the Group II: Voluntary Debtors' Cash.**

24        The following chart sets forth the Group II: Voluntary Debtors' cash on hand as of

25    January 31, 2011. The Lehman Lenders may assert liens against some or all of this Cash. To the

26    extent such liens exist, it does not appear that they were perfected on the Petition Dates.

27    Accordingly, they are subject to avoidance. Moreover, even if such lien existed on the Petition Date

28

MAINDOCS-#163410-v1-SCC_GroupIIVoluntaryDebtorsDisclosureStatement.DOC

1   and they were duly perfected, the priority of these liens and the amount of the claims secured by the

2   same is being contested in the Lehman Claims Objections and the Lehman Adversary.

| GROUP II: VOLUNTARY DEBTORS | AMOUNT |
|---|---|
| SunCal Beaumont Heights | 11.11 |
| SunCal Johannson | 28,595.64 |
| **Total** | **28,606.75** |

**4.2**   **Factual Circumstances Leading to the Filing of the Debtors' Chapter 11 Cases.**

    **4.2.1**   **Introduction**.

In this section of the Disclosure Statement, the SunCal Proponents have provided a brief description of the relationship between the Debtors and the Lehman Entities. This background is relevant to the Group II: Voluntary Debtors, and in fact all of the Debtors, for the following reasons. First, most of the unsecured claims asserted against the Debtors were incurred at the insistence of the Lehman Lenders, and they would have been paid if the Lehman Lenders had honored their obligation to pay these claims. Second, as explained above, a substantial part of claims that the Lehman Lenders failed to pay are being asserted against *all of the Debtors*. If the litigation against the Lehman Lenders discussed herein is successful, it will, at a minimum, reduce the pool of claims against the Group II: Voluntary Debtors, and thereby increase the dividend payable to the remaining creditors. Third and finally, this history allows the Creditors to take the measure of the parties who are now proffering the competing plan – the Lehman Lenders.  As the within discussion will establish, the Lehman Lenders failed to pay the claims of Creditors prepetition, the Lehman Lenders attempted to foreclose upon the Projects that were subject to their liens post-petition in order to deny the unsecured creditors any recovery on the claims they failed to pay, and finally, when this foreclosure effort failed, the Lehman Lenders attempted to destroy the Debtors' reorganization and sale efforts to manipulating LCPI's alleged automatic stay. The SunCal Plan Proponents believe that this history will lead the Creditors to conclude, when weighing the merits of the Lehman Lenders Plan offer: "Fool me once shame on you, fool me twice shame on me."

### 4.2.2   Background of the SunCal Companies.

SunCal is a family-owned and operated real estate business that has been successfully developing properties throughout the western United States for over 70 years. SunCal's business focuses upon the "development" of residential land. A typical SunCal development begins with the acquisition of one or more parcels of raw land. Thereafter, the SunCal team develops a master plan for the acreage that incorporates streets, homes, parks, schools and commercial areas, and then it works with the applicable municipal planning authorities (the city, county, state and federal) to secure the necessary approvals or "entitlements" to gain approval of this plan. This process, which requires the assistance of land planners, civil engineers, architects, lawyers, and other land specialists, takes a period of years. Once the master plan is approved, SunCal provides for the grading of the project and the installation of the foundational infrastructure (streets, utilities, etc.) and then sells the lots or parcels within the project to merchant builders.

### 4.2.3   The Origins of the SunCal/Lehman Joint Venture.

SunCal historically financed its projects with loans and/or equity from a number of different sources. However, beginning in 1997, an increasing number of SunCal's projects were financed by the Lehman Entities, as Mark Walsh ("Walsh"), the head of LBHI's Global Real Estate Group, began cultivating a business relationship with SunCal's principals.

By 2003, the Lehman Entities and SunCal had entered into joint ventures involving approximately fifteen projects. By 2007, that number had grown to over forty, and the Lehman Entities had become, with limited exceptions, the exclusive provider of financing for the SunCal Projects pursuant to a written agreement executed in 2006. The Lehman Entities also consisted of the Lehman Equity Members that either directly or indirectly owned a fifty percent (50%) equity interest in all nine of the Trustee Debtors.

In their dealings with SunCal, the Lehman Representatives made no distinction between Projects financed by Lehman ALI and Projects financed by LCPI. They also made no distinction between the Debtors in which Lehman Equity Members held 50% equity memberships or the Debtors in which the Lehman Entities held no equity membership interest. As agents of the financial partner in the parties' joint venture, the Lehman Representatives would determine which

1  Lehman Entity would provide financing on which Projects, and would dictate the structure that the

2  financing would take, according to whatever suited the Lehman Entities' needs.

3      **4.2.4**    **Lehman's Effective Control over the Management of the Debtors and**

4          **Promises of Ongoing Funding.**

5      Prior to the market downturn in the middle of 2007, Lehman Representatives afforded

6  SunCal substantial discretion in the management and development of the Projects.  The Debtors

7  would contract with third-party vendors to perform grading, health and safety compliance,

8  construction, landscaping, and other necessary services on the Project sites, and they would work

9  with the local municipalities to obtain the necessary entitlements and other authorizations

10  necessary to proceed with development.  The Lehman Representatives, SunCal and the Debtors

11  would discuss anticipated quarterly expenditures at periodic budget meetings, and , as expenses

12  were incurred each month, SunCal and the Debtors would submit requests for payment to the

13  Lehman Representatives, supported by the necessary documentation. The Lehman Representatives

14  would then provide the funding necessary to pay these expenses.

15      During the third quarter of 2007, the foregoing management and payment dichotomy

16  changed, after the real estate market experienced a sudden downturn, and many of the Projects

17  significantly declined in value.  In response to this dramatic economic change, a series of high

18  level discussions occurred between SunCal's representatives and the Lehman Representatives --

19  including Walsh, Paul Hughson ("Hughson") and Frank Gilhool ("Gilhool"), the Managing

20  Directors of Lehman's Global Real Estate.  In these discussions, SunCal's representatives, acting

21  on behalf of the Debtors, expressed concerns about the loans on the Projects being out of balance,

22  and suggested shutting down the Projects, or at least slowing the pace of development.  However,

23  Walsh specifically instructed SunCal not to slow down or stop work. He assured SunCal that the

24  Lehman Entities would provide the necessary funding to pay vendors and to keep the development

25  of the Projects moving forward.

26      The foregoing assurances of payments were confirmed in numerous telephone

27  conversations between Gilhool and SunCal's COO, Frank Faye ("Faye"), and/or SunCal's General

28  Counsel, Bruce Cook ("Cook") that took place during 2007 and 2008. In each exchange, Gilhool

1  assured SunCal that the Lehman Entities were committed to funding the debts and obligations

2  being incurred at the Projects and they continued to insist that work proceed.

3      During this time frame, the Lehman Representatives became much more "hands on,"

4  scrutinizing and approving all budgets and expenses through a new control and approval structure.

5  Under the new structure, SunCal would submit budgets to the Lehman Representatives on a

6  weekly basis and explain, during period conference calls, what Project payables they believe had to

7  be paid and what work had to be performed on the Projects. The Lehman Representatives would

8  then unilaterally decide what future work would proceed, the Lehman Representatives would

9  authorize the work and the Lehman Representatives would decide what payables would be paid

10  timely by designating them as "urgent," and what other payables were not urgent and hence would

11  not be paid on a timely basis. However, even under this new Lehman controlled management and

12  payment regime, the Lehman Representatives made it clear that all payables being incurred would

13  be funded.

14          **4.2.5   The 2008 Restructuring Agreement.**

15      By the fall of 2007, both SunCal and the Lehman Representatives contemplated entering

16  into restructuring agreement in the near term, with a closing to occur no later than January or

17  February of 2008.  However, this transaction was delayed by the Lehman Entities' extensive

18  documentation demands until May 23, 2008. On this date, SunCal and most of the Debtors finally

19  entered into an omnibus "Restructuring Agreement" with LBHI, Lehman ALI and the other

20  Lehman Entities.  The same Lehman Representative signed the Restructuring Agreement on behalf

21  of all of the Lehman Entities.

22      Pursuant to the Restructuring Agreement, Lehman ALI, "as the Lender with respect to each

23  Loan," committed, among other things, to: (1) make advances under existing loans to fund the

24  continuing costs necessary to preserve the value of the Projects; (2) move forward to resolve the

25  accrued outstanding subcontractor payables, i.e., to make sure that the Projects' creditors were paid

26  for their work; and (3) to close the transaction, whereby newly-created Lehman Entities would

27  assume the debt and obligations of the Projects.

28

1   As originally executed in May 2008, the Restructuring Agreement applied to twelve of the

2   twenty Projects (as well as several other projects not at issue in the Lehman Adversary

3   Proceeding): (1) Acton Estates; (2) Beaumont Heights; (3) Bickford Ranch; (4) Emerald

4   Meadows; (5) Heartland; (6) Johannsen Ranch; (7) Marblehead; (8) Northlake; (9) Oak Valley;

5   (10) Pacific Point; (11) Ritter Ranch; and (12) Summit Valley.  The Debtors that owned and/or

6   held equity interests in the entities that owned  these Projects were signatories to the May 2008

7   agreement.[3]

8       Between May and August 2008, the parties agreed to add four additional projects to the

9   Restructuring Agreement: (1) Del Rio; (2) Joshua Ridge; (3) Palm Springs Village; and (4) Tesoro

10  Burnham, and the four Debtors associated with these Projects—SunCal Del Rio, SCC

11  Communities, SunCal PSV, and SunCal Tesoro.  Only four Projects were  not included in the

12  Restructuring Agreement: Century City, Delta Coves, Oak Knoll and Del Amo.  Accordingly, the

13  four Debtors associated with these Projects—SunCal Century City, Delta Coves, SunCal Oak

14  Knoll and SunCal Torrance—were not signatories thereto.  Lehman ALI was the lender on each of

15  these Projects and , and as with the other Projects, Lehman Ali continued to insist that these four

16  debtors proceed with the development of the four Projects, it approved all expenses, and it

17  continually provided assurances of payment.

18      **4.2.6    The Lehman Lenders Hire Radco.**

19      Subsequent to the execution of the Restructuring Agreement, Lehman ALI arranged for a

20  third party, Radco, to directly settle outstanding contractor payables, as its agent.  Radco was

21  provided some limited funding and authority to negotiate settlements, and did in fact reach

22  settlement with a number of creditors.  The funding for these settlements, whether the debts related

23

24  [3] Specifically, the Restructuring Agreement was entered into by, among others, the "Borrowers,"
    "Grantors" and "Pledgors," as defined in Annex 1 thereto. The "Borrowers" included SunCal Marblehead,
25  SunCal Heartland, SunCal Northlake, SunCal Oak Valley, SJD Partners, Palmdale Hills, SCC Palmdale,
    SunCal I, SunCal III, and SunCal Bickford.

26
    The "Grantors" included SunCal Marblehead, SunCal Heartland, SunCal Northlake, SunCal Oak Valley,
27  SJD Partners, Palmdale Hills, SunCal Bickford, SunCal Acton, SunCal Summit and SunCal Emerald, and
    Debtors SunCal Beaumont and SunCal Johannson.
28
    The "Pledgors" included SCC Palmdale, SunCal I, SunCal Summit and SJD Development.

1   to Lehman ALI or LCPI funded Projects, came from the same source. Lehman ALI and LCPI also

2   provided approval for new work on the Projects, and Lehman ALI paid for some of this work.

3   However, this funding was minimal and it soon stopped.

4        In August 2008, Lehman ALI withdrew funding and settlement authority from Radco,

5   leaving millions of dollars in outstanding contractor payables unresolved, notwithstanding the

6   contrary provisions in the Restructuring Agreement. Leman Ali's actions also impaired the

7   Debtors' ability to resolve ongoing public health and safety issues arising at the Projects.

8   Ultimately, only a fraction of the total outstanding payables were resolved, contrary to the past

9   promises made by Lehman Representatives.

10        **4.2.7    The Lehman Lenders' Failure to Close on the Settlement Agreement.**

11        Pursuant to the terms of the Restructuring Agreement, the parties agreed to enter into a

12   Settlement Agreement, the form of which was attached to the Restructuring Agreement. The

13   Settlement Agreement provided for the transfer of the Projects included within the Restructuring

14   Agreement to a series of newly formed Lehman-controlled entities (each with "SCLV" in its

15   name, for "SunCal-Lehman Venture"). The agreement further provided that the entity taking title

16   to the Project would assume the Lehman Lender debt obligations associated with the Projects,

17   assume certain bond obligations associated with the Projects, and provide indemnifications to

18   SunCal and the Debtors for unpaid claims.

19        On August 25, 2008, the Settlement Agreement and a series of related documents were

20   formally executed by SunCal and the applicable Lehman Lenders and Lehman Equity Members at

21   a meeting held in Los Angeles on August 25, 2008. Once these documents were signed, all that

22   remained was the mechanical closing of the series of transactions described in the Settlement

23   Agreement. Since all of the conditions precedent to the closings had been satisfied, or could have

24   been satisfied at, or shortly after the meeting, this should have occurred at the August 25, 2008

25   meeting, or shortly after the meeting. However, the Lehman Representative asked SunCal to

26   extend the closing date for thirty days, to September 30, 2008. According to the Lehman

27   Representatives, this short extension would enable them to secure certain outstanding third party

28   consents. Although SunCal knew these third party consents were readily obtainable within a few

1    days, they agreed to this extension, believing the request was made in good faith. In fact, as more

2    fully explained blow, it was not.

3               **4.2.8    The Lehman Lenders' Undisclosed Sale of Most of the Debtors' Loans.**

4               As explained above, the Settlement Agreement was duly executed by all parties at a formal

5    closing meeting held on August 25, 2008. When the parties signed this agreement, which was a

6    binding contract, they both represented that they both intended and had the power and capacity to

7    perform all of the obligations undertaken therein. However, in the case of the Lehman Entities, this

8    representation was later discovered to be false. When the closing occurred on August 25, 2008, the

9    Lehman Lenders had already sold the very obligations they were agreeing to assume and restructure

10   in the Settlement Agreement to Fenway Capital pursuant to a repurchase agreement. Accordingly,

11   as of August 25, 2008, they lacked the power to perform the most essential undertakings that they

12   agreed to perform in the Settlement Agreement. Instead of disclosing this fact at the August 25,

13   2008 meeting, the Lehman Lenders requested additional time to execute the agreed upon transfers

14   provided for under this binding agreement. The Lehman Lenders needed to this delay for an

15   obvious, but undisclosed reason: They lacked the ability to perform the very obligations they had

16   just agreed to perform in the Settlement Agreement.

17              The Lehman Representatives also did not disclose at the August 25, 2008 closing that they

18   intended to sell the Pacific Point First Loan to Lehman Re, approximately a week later, *even though*

19   *this loan was also subject to the Settlement Agreement.* To the contrary, the Lehman

20   Representatives affirmatively concealed these facts from SunCal and the Debtors by asserting that

21   ownership still existed in the case of seven of the eight loans.

22              **4.2.9    Lehman's Foreclosure Sale and Purchase of the Pacific Point Project.**

23              At the time the Restructuring Agreement and the Settlement Agreement were signed, the

24   Pacific Point Project, which was still owned by SJD Partners, was among the Projects included in

25   the Restructuring Agreement and the Settlement Agreement.  Pursuant to the Restructuring

26   Agreement, and as detailed in the Settlement Agreement attached thereto, SunCal, SJD Partners,

27   and its parent company, SJD Development, all agreed that they would not interfere with Lehman

28   ALI's (or its designee's) foreclosure on the Pacific Point Project. They further agreed that a new

1    Lehman entity, LV Pacific Point, would purchase the Pacific Point Project upon foreclosure and

2    that Lehman ALI and LV Pacific Point would (a) assume SJD Partners' and SJD Development's

3    outstanding accounts payable for Pacific Point third-party vendors, (b) assume certain bond

4    liability associated with the Pacific Point Project, and (c) pay for the millions of dollars worth of

5    work that Lehman ALI representatives had authorized.

6        As previously stated, the Settlement Agreement was signed on August 25, 2008 by the

7    SunCal parties, including SJD Partners and SJD Development.  It was also signed by Gilhool as

8    authorized signatory on behalf of both Lehman ALI and LV Pacific Point.  As a signatory to the

9    Settlement Agreement, LV Pacific Point was required to purchase the Pacific Point Project at the

10    foreclosure sale subject to the above obligations. Consistent with this agreement, the City of San

11    Juan Capistrano executed an estoppel certificate for the benefit of SJD Partners and Lehman ALI—

12    at Lehman ALI's request—on August 26, 2008, two days before the foreclosure sale.  This

13    certificate stated, among other things, that the "Acquiring Entity [LV Pacific Point] shall by

14    operation of law become the legal successor-in-interest to Developer [SJD Partners]" under SJD

15    Partners' agreements with the City. That certificate further provided that there existed no breaches,

16    defaults, or claims under SJD Partners' agreements with the City.

17        On August 28, 2008, Lehman ALI foreclosed on the Pacific Point Project, and title was

18    transferred to LV Pacific Point at the foreclosure sale.  However, Lehman ALI and LV Pacific

19    Point failed to assume the liabilities and obligations associated with this Project as agreed.   This

20    breach of the parties' agreement, left SJD Partners without title to the Pacific Point Project, but

21    with substantial unpaid unsecured claims relating to the Project, including bond claims of

22    approximately $34 million,.  Moreover, since Lehman Ali and LV Pacific Point have continued to

23    ignore their obligations under the above agreement, unpaid taxes, fines, and penalties have

24    continued to accrue to the detriment of the Project and these claims are being asserted against SJD

25    Partners..

26        Had SunCal, SJD Partners and SJD Development known that Lehman ALI and LV Pacific

27    Point had no intention of honoring their obligations under the foregoing agreement, they never

28    would have agreed to cooperate with the foreclosure.  Instead, SJD Partners would have filed for

1  bankruptcy earlier, thereby mitigating the damages from Lehman Ali's breach, by allowing

2  creditors recourse to the value of the Project.

3      This course of conduct is relevant to the unsecured creditors of the Group II: Voluntary

4  Debtors for the following reason. The holders of bond claims against SJD Partners are asserting

5  their massive claims against the estates of all of the Debtors, including the estates of the Group II:

6  Voluntary Debtors. Accordingly, Lehman Ali's wrongs against SJD Partners directly affect the

7  Group II: Voluntary Debtors' cases.

8      **4.2.10  Alvarez and Marsal Take Over Control of the Lehman Entities After**

9      **the Chapter 11 Filings of LBHI and LCPI.**

10      LBHI filed for bankruptcy in September 2008 and LCPI filed for bankruptcy in October

11  2008. After LBHI's filing, Bryan Marsal ("Marsal") of Alvarez & Marsal ("A&M") was appointed

12  to serve as LBHI's Chief Restructuring Officer. Marsal and A&M are in charge of liquidating the

13  now defunct Lehman Entities, including Chapter 11 debtors LBIII and LCPI, and the non-bankrupt

14  Lehman Lenders (Lehman ALI, OVC, and Northlake Holdings, as well as the non-bankrupt

15  Lehman Equity Members.

16      Although A&M was not employed until after the events that occurred on August 25, 2008

17  described above, it should be noted that A&M hired the same law firm that represented the

18  Lehman Lenders in the August 25, 2008 meeting – Weil, Gotshal & Manges, LLP. Moreover, as

19  more fully explained herein, it was A&M that directed Lehman Ali not to perform its contractual

20  obligations under the Settlement Agreement after September of 2008. Accordingly, the same

21  individuals that caused the damages to unsecured creditors by insisting upon the breach of the

22  Settlement Agreement, are now asking for their vote in the competing plan filed by the Lehman

23  Lenders.

24      LBHI's bankruptcy filing and the Lehman Lenders refusal, at A&M's direction, to close the

25  transactions provided for under the Settlement Agreement as agreed, were not small matters. They

26  severely damaged the Debtors. Although the Debtors were not proceeding with any new

27  construction or development, the Debtors were still required to expend significant sums on site

28  security, erosion control, property taxes and other measures in order to prevent the Projects from

1   becoming a public safety hazard, and in order to avoid the loss of valuable entitlements, and to

2   mitigate penalties and fines being incurred by the Projects.  Although SunCal and the Debtors

3   repeatedly requested that the Lehman Entities pay for critical health and safety and value

4   preservation measures on the Projects, these efforts were unavailing.

5           Between October 9 and November 4, 2008, SunCal's general counsel Cook sent Robert

6   Brusco, an authorized agent of the Lehman Entities, nearly two dozen letters requesting that the

7   Lehman Lenders provide the funding necessary to address critical needs on the Projects as

8   promised.  A summary of these health and safety notices are attached hereto as Exhibit "5".  The

9   Lehman Entities ignored these requests until November 2008, when Brusco, purportedly on behalf

10  of the Lehman Lenders, delivered the message that the Lehman Lenders were unwilling to fund the

11  Projects and that, instead, they intended to foreclose on all of the Projects.

12          As a result, as set forth in Exhibit "4," there are now over 240 vendors, municipalities,

13  counties and bonding companies claiming over $400 million in work, improvements and property

14  tax claims against the Projects.  Substantially all of these sums are due to work performed or

15  bonded at Lehman's request based upon Lehman's promises of payment.

16          **4.3     The Group II Debtors' Potential Preferential Transfers**.

17          Attached hereto as Exhibit "6" are charts setting forth payments made to third parties

18  during the ninety (90) day time period preceding the filing of the Debtors' Chapter 11 Cases as

19  well as payments made to the Lehman Entities and to SunCal Affiliates during the one-year time

20  period preceding the filing of the Debtors' Chapter 11 Cases. These total transfers total

21  approximately fifty thousand dollars ($50,000). In those instances where the Group II: Voluntary

22  Debtors believe there are reasonable grounds to recover these transfers, at a reasonable cost, they

23  have filed complaints.

24  / / /

25

26

27

28

# V.

## SIGNIFICANT EVENTS IN THE DEBTORS' CHAPTER 11 CASES

### 5.1.    Voluntary Debtors.

#### 5.1.1    Joint Administration of the Voluntary Debtors and the Trustee Debtors.

Since their respective Petition Dates, the seventeen (17) Voluntary Debtors have continued to operate as "debtors-in-possession," subject to the supervision of the Bankruptcy Court and in accordance with the Bankruptcy Code. The Voluntary Debtors are authorized to operate their businesses in the ordinary course during the Chapter 11 proceedings. Transactions outside the ordinary course of business must be approved by the Bankruptcy Court.

The Voluntary Debtors' Cases are being jointly administered pursuant to orders entered on November 19, 2008 and December 9, 2008. The Voluntary Debtors' Cases are being jointly administered with the Trustee Debtors' cases pursuant to an order entered on March 11, 2009.

The Voluntary Debtors have employed Winthrop Couchot Professional Corporation as their general insolvency counsel, and the MB Firm as their special litigation counsel.

#### 5.1.2    The Voluntary Debtors Court Employed Professionals.

The Voluntary Debtors' Committee has employed Irell & Manella LLP as its counsel pursuant to an order entered on February 13, 2009.

Pursuant to the Court's Order regarding joint administration of the Voluntary Debtors, the Voluntary Debtors' liability for professional fees is joint and several among the Voluntary Debtors' Estates for fees incurred related to services for the benefit of all of the Voluntary Debtors. The Trustee Debtors' liability for professional fees is not joint and several.

Pursuant to the initial MB Firm employment application, Acquisitions was responsible for the payment of their fees until December 31, 2009. The MB Firm's application also allows for payments from the Bond Companies. The initial MB Firm employment application reserved the right, should the Lehman Adversary Proceeding result in a benefit accruing to a particular Debtors' Estates, to request that its fees and expenses be reimbursed by the Debtors' Estates. The Bond Companies have also agreed to jointly fund a portion of the professional fees and expenses of the

1  MB Firm with respect to the Lehman Adversary Proceeding. The Bond Companies' funding

2  commitment can be terminated and after such a termination they will only be required to cover fees

3  and costs incurred during the period of their prior commitments.

4      The MB Firm employment application was subsequently amended. Pursuant to an order

5  entered on April 14, 2010, (1) the Voluntary Debtors will pay up to one-half of the fees and

6  expenses incurred by the MB Firm from and after February 1, 2010 onward; and (2) the Trustee

7  Debtors do not have an obligation to pay any of the MB Firm's fees pertaining to the Trustee

8  Debtors' estates, unless and until a loan by the Voluntary Debtors to the Trustee Debtors is agreed

9  to by the Trustee and approved by the Court, or in accordance with the terms of the original

10  employment applications to the extent not superseded or modified by the amended employment

11  application. The order does not affect the MB Firm's right to seek payment from the Bond

12  Companies without the need for an additional order of the Court.

13      The MB Firm filed an updated application seeking to further amend their employment to

14  include the right to pursue certain claims against the Lehman Entities and certain employees and

15  agents of these entities on behalf of the Voluntary Debtors. The claims encompassed by this

16  amendment include claims that are based upon both prepetition and post-petition actionable

17  conduct under both state law and federal law against the Lehman Entities and/or their agents.

18      ### 5.1.3   LCPI's Motions for Relief from the Automatic Stay Against Certain of

19      ### the Voluntary Debtors' Projects and Related Appeals.

20      On January 23, 2009, LCPI and Lehman ALI filed various motions for relief from the

21  automatic stay against a number of the Voluntary Debtors including Group II Debtors Palmdale

22  Hills, SunCal Bickford and Acton Estates (the "Lehman Entities' Stay Motions"). Although the

23  Debtors, were able to defeat these motions, they are relevant in the following respect. Had the

24  motions filed by LCPI and Lehman Ali succeeded, it is almost certain that unsecured creditors

25  would have received nothing on their claims. Moreover, as more fully explained herein, since

26  Lehman Ali and LCPI did not even own the loans they were seeking to foreclose upon, these

27  motions should never have been filed in the first instance. Yet now, these same parties- Lehman

28  Ali and LCPI – are asking these same creditors to vote on their plan and to "trust" them.

1    **5.2.    The Trustee Debtors and Their Professionals.**

2    Orders for Relief were entered in the involuntary cases beginning on January 6, 2009.  The

3    Trustee Debtors are represented by their duly-appointed Chapter 11 Trustee, Mr. Steven M. Speier

4    pursuant to orders of the Bankruptcy Court entered on January 15, 2009.

5    The Chapter 11 Trustee has employed the Lobel Firm as the Chapter 11 Trustee's general

6    insolvency counsel and the MB Firm, as special litigation counsel and Squar Miller, LLP as its

7    accountants.

8    The Trustee Debtors' Committee has employed Weiland, Golden, Smiley, Wang Ekvall &

9    Strok as its general insolvency counsel.

10    **5.3.    The Debtors' Various Motions Relating to Financing for the Projects and to**

11    **Pay Professional Fees.**

12    **5.3.1    The Voluntary Debtors' Initial Motion for Surcharge and Use of Cash**

13    **Collateral.**

14    On January 16, 2009, seven of the Debtors, including Group II Debtor Palmdale Hills, filed

15    a motion authorizing Palmdale Hills to use and surcharge, pursuant to 11 U.S.C. § 506(c), and/or

16    use the purported cash collateral of LCPI arising from the Ritter Ranch Loan Agreement, pursuant

17    to 11 U.S.C. § 363(c)(2), in order to pay for the reasonable and necessary maintenance expenses

18    required to preserve the value of such Debtors' Projects subject to deeds of trust and other security

19    interests held by LCPI.

20    LCPI objected to the motion and subsequently filed a motion in its own Chapter 11

21    proceeding in the Southern District of New York seeking an order barring the motion as a violation

22    of the automatic stay.  Although the Debtors believe that LCPI's stay was not violated in any way

23    by the Motion, the Motion was taken off calendar prior to any ruling by the New York Bankruptcy

24    Court, based upon the threat of sanctions made against Debtors' counsel by the presiding judge in

25    LCPI's case.

26    As explained above, LCPI did not even own an interest in the Ritter Ranch Loan

27    Agreement when it asserted the automatic stay, since the Ritter Ranch Loan Agreement, which was

28    the subject of the cash collateral motion, had already been sold pursuant to the Fenway Repurchase

1    Agreement. Yet this wrongful action prevented Palmdale Hills from using its own money to pay

2    critical bills that Lehman Ali, LCPI's parent was contractually required to fund in the first instance.

3           **5.3.2**    **The Voluntary Debtors' Agreements with the Lehman Entities for Use**

4                   **of Alleged Cash Collateral to Maintain the Properties and to Pay**

5                   **Professional Fees.**

6       On September 1, 2009, with the consent of the Lehman Entities, fourteen of the Voluntary

7    Debtors filed a motion authorizing surcharge pursuant to 11 U.S.C. § 506(c), and/or use of the

8    purported cash collateral for the purpose of addressing critical public health and safety issues and

9    other value preservation with respect to the Debtors Projects.  On September 10, 2009, the Lehman

10    Entities filed an opposition thereto, and on September 17, 2009, the Voluntary Debtors filed their

11    Reply.

12       Subsequently, the Voluntary Debtors learned that the Lehman Entities lacked control

13    agreements as to the majority of the depository accounts, and thus such accounts were not subject

14    to perfected liens and therefore did not constitute "cash collateral."  On October 15, 2009, the

15    Voluntary Debtors filed a *Motion For Order Authorizing Disposition Of Certain Depository*

16    *Accounts.*  On or about October 22, 2009, the Lehman Entities filed an opposition, and on

17    October 29, 2009, the Voluntary Debtors filed their Reply.

18       The motion was consensually resolved by way of the *Stipulation Pursuant To 11 U.S.C. §§*

19    *362, 363, And 364: (1) Authorizing The Use Of Cash Collateral And Alleged Unencumbered Cash;*

20    *(2) Approving Postpetition Financing; (3) Providing Administrative Expense Status; And (4)*

21    *Modifying Automatic Stay To The Extent Necessary* filed on December 8, 2009, and the order

22    thereon entered on December 17, 2009.  The stipulation provides for a 120-day budget with

23    expenses totaling approximately $5 million, pursuant to which any Cash in the Estates is used first

24    and then money borrowed from the Palmdale Hills Estate is used thereafter on an administrative

25    basis.  The agreement also permitted the Voluntary Debtors to use their alleged unencumbered

26    cash to pay its professional fees.  This agreement has been renewed on several occasions.

27

28

1    **5.4.**    **The Debtors' Disputes and Claims Against the Lehman Entities.**

2      **5.4.1**    **The Lehman Adversary Proceeding.**

3        On January 6, 2009, the Voluntary Debtors initiated the Lehman Adversary Proceeding by

4 filing their initial complaint against Lehman ALI for equitable subordination of Lehman ALI's

5 Disputed Claims and avoidance of its Disputed Liens pursuant to Bankruptcy Code Section 510(c).

6 This action is presently stayed as to LCPI.

7      **5.4.2**    **The Debtors' Motions to Strike the Claims and Pleadings Arising from**

8          **the Sold Loans to Fenway Capital and Related Appeals.**

9        Once the Debtors discovered that the Lehman Lenders had misrepresented their ownership

10 of seven loans– the loans sold to Fenway Capital back in August of 2008 - they filed motions, on

11 May 29, 2009, seeking an order striking the claims that were filed with respect to these sold (the

12 "Fenway Sold Loans"). The Fenway Sold Loans included the SunCal Communities I Loan

13 Agreement, the Ritter Ranch Loan Agreement, the SunCal PSV Loan Agreement, the SunCal

14 Marblehead/SunCal Heartland Loan Agreement, the Delta Coves Loan Agreement, the SunCal

15 Northlake Loan Agreement and SunCal Oak Valley Loan Agreement. See Exhibit "3."

16        At the initial hearing on the Debtors' motion to strike the Claims held on June 30, 2009, the

17 Court held that the transfer of the Fenway Sold Loans pursuant to the MRA was a true purchase and

18 sale transaction (the "Ownership Issue") and, accordingly, the Lehman Lenders retained no right to

19 file the Proofs of claim on this basis, under Federal Rule of Bankruptcy Procedure 3001(e)(1). The

20 Court entered an order regarding the Ownership Issue on October 2, 2009.

21        The Lehman Lenders also contended that they were entitled to file the Proofs of Claim as the

22 "Fenway's authorized agent" under Federal Rule of Bankruptcy Procedure 3001(b) (the "Agency

23 Issue"). A continued hearing on the Agency Issue was set for September 22, 2009 and the Court

24 ruled that the Lehman Lenders could file the Proofs of Claim an authorized agents.

25 The Lehman Entities appealed the Ownership Issue and the Debtors appealed the Agency Issue to

26 the Bankruptcy Appellate Panel. These two appeals, which were consolidated, were argued in

27 September of 2010. The parties are awaiting a ruling.

28

### 5.4.3    The Debtors' Motion Pursuant to Section 506(d) and the 506(d) Valuation Stipulation.

Bankruptcy Code Section 506(a) provides that an asserted Secured Claim is only an Allowed Secured Claim to the extent of the value of such Creditor's interest in the Estate's interest in such property. Bankruptcy Code Section 506(d) then provides that liens against the Debtor's Assets that have no such value to the Alleged Secured Creditor are void. Finally, Bankruptcy Code Section 551 provides that such liens that are void under Section 506(d) are preserved for the benefit of the applicable Debtor's Estate.

On May 29, 2009 and June 9, 2009, the Debtors filed a motion seeking orders (i) valuing certain collateral at zero dollars, (ii) voiding the corresponding liens, pursuant to 11 U.S.C. § 506(d), and (iii) preserving such voided liens for the benefit of the respective bankruptcy estates.

The Debtors and the Lehman Entities subsequently entered into a stipulation to resolve the valuation of such Liens. This stipulation provided that these liens would be valued at zero for all purposes, with the exception of potential equity distributions. Although the Lehman Entities acknowledged the stipulation on the record before the bankruptcy court, and promised to file the executed stipulation that day, counsel for the Lehman Entities subsequently refused to file the document disclosed to the Court on the record, and the parties have subsequently entered into a modified stipulation on substantially similar terms that have been filed with both the New York and California Bankruptcy Courts.

### 5.4.4    Lehman 502(d) Objection and Objection to Lehman's Claim Against Acton.

The Voluntary Debtors and other parties-in-interest have filed a motion to disallow, pursuant to 11 U.S.C. § 502(d), a number of Disputed Claims filed by Lehman ALI and LCPI, including claims based upon the SunCal Communities I Loan. On June 9, 2011, a hearing was held on the Lehman 502(d) Objection. At this hearing the Lehman Entities disputed the merits of the Section 502(d) claim objection and LCPI alleged that the filing of this objection violated its automatic stay. At the conclusion of the hearing, the Court ruled that the parties could proceed with their discovery in this matter. If the Lehman 502(d) Objection is successful, the claims that are the

1  subject of the motion will be disallowed. Although the Lehman Entities will have the right to seek

2  reconsideration of this disallowance, in order to obtain this relief they would have to repay the

3  applicable transfers.

4      **5.4.5  The Lehman Recoupment Objection and the State Court Action.**

5      Pursuant to the terms of the joint ventures entered into by and among the Debtors and the

6  Lehman Entities, the Lehman Entities were responsible for paying the costs incurred in the

7  development of the Projects. These costs included the claims of the vendors who provided goods

8  and services to the Projects and the claims asserted by the Bond Claimants. Although the Lehman

9  Entities contend that they were merely "lenders," and that they did not assume any liability for

10  these claims, as the above facts and those that will be adduced prior to and at the confirmation of

11  the Plan will demonstrate, the Lehman Entities are in fact obligated to pay these claims.

12      The Debtors' contend that the Lehman Entities have contractual liability on various

13  grounds, including the following. First, the Lehman Entities were either in a joint venture

14  relationship with the Debtors from the outset, or this relationship developed and became a legal

15  fixture through the Lehman Entities' course of conduct. Pursuant to this relationship, and the

16  promises and representations made therein, the Lehman Entities agreed to be responsible for all

17  vendor and Bond Claims incurred at or in connection with the Projects. The role of each of the

18  Debtors, by mutual agreement, was to provide development expertise and project management

19  services. The Lehman Entities were required to provide the capital necessary to fund the Projects.

20      Second, during the last eighteen months of the relationship between the parties, the Lehman

21  Entities assumed direct responsibility for all claims incurred during this period, by insisting that

22  work continue on the Projects and by repeatedly promising to pay for this work. Since the Lehman

23  Entities ordered this work, and promised to pay for the same, they bear this financial responsibility.

24      Third and finally, the Lehman Entities expressly agreed to pay the vendor and bond claims

25  described in the Restructuring Agreement and in the interrelated Settlement Agreement, but failed

26  to do so as contractually agreed.

27      It is the SunCal Proponent's contention that the Lehman Entities' failure to pay the vendor

28  and Bond Claims associated with the Projects as (as was their obligation under the terms of the

1 | joint ventures, the Restructuring Agreement and the Settlement Agreement) unjustly shifted
2 | responsibility for these liabilities to the Debtors in breach of the terms of joint venture, the
3 | Restructuring Agreement and the Settlement Agreement. Accordingly, the SunCal Proponents have
4 | filed the Lehman Recoupment Objection which seeks the disallowance of certain claims filed by
5 | the Lehman Lenders, including the claims filed against the Group II: Voluntary Debtors.

6 |      In the Lehman Recoupment Objection, the SunCal Proponents seek the following relief:

7 |      1) Disallowance of the claims asserted by the Lehman Lenders in their
8 |      entirety, pending compliance with the terms of the Restructuring
9 |      Agreement and the Settlement Agreement;

10 |      2) A reduction in the amount of the Lehman Entities' secured claims by
11 |      the amount of damages resulting from the Lehman Entities' breach of their
12 |      obligations under these agreements; and/or

13 |      3)  An order barring the Lehman Entities from enforcing their rights under
14 |      the Lehman Loans until they cure their breaches under the above
15 |      agreements.

16 |      The first prayer for relief above is premised upon the contention that the Lehman Entities
17 | agreed to transfer ownership of the Projects described in this agreement, including the Group II
18 | Projects, to a series of newly formed entities under the control of the Lehman Entities, pursuant to
19 | the terms of the Settlement Agreement. This agreement further provided that these new entities
20 | would assume the vendor payables and certain Bond Claims associated with these projects. Finally,
21 | this agreement included a covenant not to sue, pursuant to which the Lehman Entities were barred
22 | from seeking further recourse against the Debtors.

23 |      The SunCal Proponents believe that the positions asserted in the Lehman Recoupment
24 | Objection are well grounded in fact and in law. Had the Lehman Entities complied with their
25 | contractual obligations, substantially all of the Group V Debtor's liabilities would have been
26 | eliminated, the Group II: Voluntary Debtors would not have had to file Chapter 11, and the
27 | Lehman Entities would be barred from asserting claims against the Group II: Voluntary Debtors
28 | based upon the Lehman Disputed Loans. It is the SunCal Proponents position that the Lehman

1  Entities' effort to enforce claims based upon Lehman Disputed Loans is directly contrary to the

2  basic agreements reached in the Restructuring Agreement and in the related Settlement Agreement.

3        The Lehman Entities dispute the merits of the Lehman Recoupment Objection. It the

4  Lehman Entities' position that it was within their absolute "discretion" to pay, or not to pay, the

5  vendor payables incurred during the term of the Restructuring Agreement, even where they

6  authorized the work. Accordingly, they cannot, in their assessment, be held liable for these

7  obligations. In the case of the Settlement Agreement, the Lehman Entities contend that this

8  agreement never became effective and therefore they were not bound to comply with its terms. The

9  SunCal Proponents do not believe that the positions asserted by the Lehman Entities are supported

10  by the facts, or existing law.

11        In addition to the Lehman Recoupment Objection, certain Voluntary Debtors have also

12  filed the State Court Action against Lehman ALI and other non-debtor Lehman Entities. The State

13  Court Action is based on Lehman ALI's breach of contract on the Restructuring and Settlement

14  Agreements.

15        Although LCPI's automatic stay remains an impediment to the pursuit of the Lehman

16  Adversary Proceeding, the existence of this stay will not bar the SunCal Proponents from

17  implementing the material terms of the Plan for the following reason. LCPI's automatic say does

18  not bar the pursuit of the Lehman Claim Objections and in fact this litigation is proceeding. If these

19  objections are successful, the claims of the Lehman Entities will be disallowed, either in whole or

20  in part, or the Lehman Entities will be barred from pursuing these claims until they pay what they

21  owe to the Group II: Voluntary Debtors. In either scenario, the Plan filed by the SunCal Proponents

22  is feasible and will yield a favorable return for creditors.

23        **5.4.6    The Debtors' Potential Post-Petition Claims Against Lehman and Their**

24              **Agents.**

25        The Voluntary Debtors believe that the Lehman Entities and certain agents of the Lehman

26  Entities (the "Culpable Agents") engaged in a post-petition course of conduct that severely

27  damaged the Voluntary Debtors, their estates and the recovery rights of creditors. In summary, the

28

actions taken by the Lehman Entities and the Culpable Agents included, among other things, the following:

   A. Actively concealing the prepetition sale of the Lehman Disputed Loans to Fenway Capital and misrepresenting themselves as the owners of these loans during the post-petition period; and

   B. Improperly asserting that LCPI's automatic stay barred actions in the Voluntary Debtors' Chapter 11 Cases relating to two of the Lehman Disputed Loans, when in fact LCPI did not own any interest in such loans and hence the stay could not apply.

  The foregoing course of conduct inflicted millions of dollars in damages upon the Voluntary Debtors in the form of additional fees and costs, and it materially delayed the progress of the Voluntary Debtors' reorganization effort. The Voluntary Debtors intend to seek recourse against the Culpable Agents for these wrongs.

  **5.5.** **The Lehman Fenway Claims Transaction, Compromise Motion Filed By the Lehman Entities.**

   **5.5.1** **Lehman Entities' and Fenway's Proposed Claims Transaction.**

  In April of 2010, LCPI and LBHI filed that certain *Motion Pursuant To Bankruptcy Rule 9019 For Authority To Compromise Controversy In Connection With A Repurchase Transaction With Fenway Capital, LLC And A Commercial Paper Program With Fenway Funding, LLC* (the "Compromise Motion."). In the motion, LCPI and LBHI represented that they were "compromising" various issues and relationships arising out of the repurchase transaction described in the LCPI – Fenway MRA (the "Repo"). However, a careful review of the transaction described therein indicated that the motion was designed to accomplish the following objectives:

   1. To transfer title to the Lehman Disputed Loans at issue in the Lehman Adversary Proceeding from Fenway Capital to LCPI, an entity that had no interest in five of the seven loans prepetition;

   2. To allow LCPI, as the new owner of the Lehman Disputed Loans, to re-join the Lehman Adversary Proceeding as a defendant, and once there to use its automatic stay as a "sword" to stay this action;

3. To enable the Lehman Entities to thwart the pursuit of the SunCal Plan Proponents' Plan;

4. To bestow upon the Lehman Entities' purported competing plan an unfair advantage in the plan confirmation contest by delaying the effectiveness of critical provisions in the SunCal Plan Proponents' Plan; and

5. To shield Fenway Capital and its principals from liability and investigation through discovery.

At the hearing on the Compromise Motion, the bankruptcy court in New York approved the Compromise Motion, and stated, consistent with the objectives of the Lehman Entities, that the continued pursuit of the Lehman Adversary Proceeding would be stayed, once LCPI obtained title to the Lehman Disputed Loans. The order reflecting this relief was entered on May 13, 2010 (the "Compromise Order").

### 5.6. The Debtors' Motion for a Stay to Suspend Certain Lehman Actions.

On September 21, 2010, the Voluntary Debtors, Acquisitions, and SunCal Management filed a motion requesting, among other relief, for the Court to suspend the Lehman Entities competing plan and disclosure statement unless and until the Lehman Entities agree to provide the Debtors with relief from their automatic stay in the Debtors' Chapter 11 Cases (the "Suspension Motion"). The Court granted this motion and stayed all matters until March 1, 2011. The Court also ordered the parties to engage in a mediation. The Voluntary Debtors and the Lehman Entities were unable to settle their claims through this process.

### 5.7. The Debtors' Other Litigation with Non-Lehman Related Parties.

#### 5.7.1 The Debtors' Failed Preliminary Injunction Motion Against the Holders of Bond Claims.

On February 20, 2009, the Debtors filed a complaint and a Motion for Preliminary Injunction, pursuant to which the Debtors sought a Motion for Preliminary Injunction against the Holders of Bond Claims from pursuing such Claims. On February 23, 2009, the Court denied the Debtors' request for the TRO and granted the Debtors' request to require the defendants to show cause why the Motion for Preliminary Injunction should not be issued.

1      On March 2, 2009, several Holders of Bond Claims objected to the Motion for the

2    Preliminary Injunction. The objections generally alleged that the Debtors failed to show that the

3    balancing of the equities favored granting the Preliminary Injunction versus the harm to the

4    Holders of the Bond Claims.  At a hearing held on March 4, 2009, the Court denied the

5    Preliminary Injunction Motion and the underlying complaint has subsequently voluntarily been

6    dismissed without prejudice.

7          **5.7.2    The Contractors' Successful Motions for Relief from Stay to Pursue the**

8                        **Bond Claims.**

9      Various contractors that were hired to perform work on some of the Projects have filed

10   motions for relief from stay with the Bankruptcy Court to pursue their purported Bond Claims.

11   These creditors have requested that the Bankruptcy Court grant these creditors relief from the

12   automatic stay to allow such creditors to enforce certain Claims that such creditors allege to have

13   against some of the Debtors, including certain surety bonds that are alleged to have been issued in

14   favor of such creditors.  The Debtors opposed the motions on the grounds that the various Debtors

15   are indispensible parties.  The Court conditionally granted the motions provided that the Bond

16   Claimants are able to sever the Debtors from their proceedings on the Bonds.

17          **5.7.3    Bond Safeguard Motion.**

18     Bond Safeguard, a surety that issued bonds to secure the performance of work on certain

19   projects, filed a motion seeking authority to file  claims relating to these bond claims after the bar

20   date. The Debtors opposed this motion. This motion was granted pursuant to an order entered on

21   January 7, 2011.

22                                      **VI.**

23                  **TREATMENT OF UNCLASSIFIED CLAIMS**

24          **6.1      Introduction**. As required by the Bankruptcy Code, the Plan places Claims and

25   Interests into various Classes according to their right to priority.  However, certain types of Claims

26   are not classified in any Classes under the Plan. These Claims are deemed "unclassified" under the

27   provisions of the Code. They are not considered impaired and they do not vote on the Plan,

28   because they are automatically entitled to specific treatment provided for them in the Code.  As

such, the SunCal Plan Proponents have not placed the following Claims in a Class. The treatment of these unclassified Claims is as provided below.

### 6.2    Treatment of Allowed Administrative Claims.

The Code requires that all Allowed Administrative Claims be paid on the later of Effective Date of the Plan or the date of their allowance, unless a particular Holder agrees to a different treatment. The treatment of Allowed Administrative Claims is as described below. However, such Administrative Claims are continuing to be incurred. The Allowed Administrative Claims shall be paid from the applicable Distribution Account(s) pursuant to the Acquisitions Administrative Loan.

### 6.3    Treatment and Repayment of the Lehman's Administrative Loan(s).

The Lehman Disputed Administrative Loans shall be paid in full on the later of the Effective Date, or the date any objections to the same are overruled by the Court leaving them Allowed claims. Prior to payment, these claims shall continue to be secured by their existing liens against the respective Assets of the Trustee Debtors.

### 6.4    Repayment of Allowed Administrative Claims Other than the Lehman Administrative Loans.

Except to the extent that the Holder of an Allowed Administrative Claim agrees to a different treatment and subject to the Administrative Claims Bar Date set forth herein, the Distribution Agent shall pay each Allowed Administrative Claim in full, in Cash, on the later of (i) the Effective Date, (ii) within ten (10) Business Days after the date such Administrative Claim becomes an Allowed Administrative Claim, or (iii) the date such Allowed Administrative Claim becomes due according to its terms. Notwithstanding the foregoing, any Allowed Administrative Claim representing obligations incurred in the ordinary course of post-petition business by the Debtors in Possession (including without limitation post-petition trade obligations and routine post-petition payroll obligations) shall be paid in full or performed by the Plan Trustee in the ordinary course of business, in accordance with the terms of the particular obligation.

### 6.5 **Administrative Claims Bar Date**.

All applications for final compensation of Professionals for services rendered and for reimbursement of expenses incurred on or before the Effective Date and all other requests for payment of Administrative Claims incurred before the Effective Date under Sections 507(a)(2) or 507(b) of the Bankruptcy Code (except only for (i) post-petition, ordinary course trade obligations and routine post-petition payroll obligations incurred in the ordinary course of the Debtors' post-petition business, for which no bar date shall apply, and (ii) post-petition tax obligations, for which no bar date shall apply) shall be Filed with the Bankruptcy Court and served upon the Plan Trustee no later than the Administrative Claims Bar Date, unless such date is extended by the Bankruptcy Court after notice to the Plan Trustee. Any such request for payment of an Administrative Claim that is subject to the General Administrative Claims Bar Date and that is not Filed and served on or before the Administrative Claims Bar Date shall be forever barred; any party that seeks payment of Administrative Claims that (i) is required to file a request for payment of such Administrative Claims and (ii) does not file such a request by the deadline established herein shall be forever barred from asserting such Administrative Claims against the Debtors, the Plan Trust, their estates, or any of their property.

### 6.6 **Treatment of Unsecured Tax Claims**.

Tax Claims are certain unsecured income, employment and other taxes described by Code Section 507(a)(8). The Code requires that each holder of such a Section 507(a)(8) tax claim receive the present value of such Claim in deferred cash payments, over a period not exceeding five (5) years from the petition date and that such treatment not be less favorable than the treatment accorded to non priority unsecured creditors.

At the election of the Plan Trustee, the Holder of each Allowed Priority Tax Claim shall be entitled to receive, on account of such Claim, (i) equal cash payments on the last Business Day of each three-month period following the Effective Date, during a period not to exceed five years after November 6, 2008, totaling the principal amount of such Claim plus simple interest on any unpaid balance from the Effective Date, calculated at the interest rate available on ninety (90) day United States Treasuries on the Effective Date, (ii) such other treatment agreed to by the Holder of

1    the Allowed Priority Tax Claim and the Plan Trustee, provided such treatment is on more

2    favorable terms to the Debtors (or the Plan Trust after the Effective Date) than the treatment set

3    forth in clause (i) hereof, or (iii) payment of the full Allowed Priority Tax Claim in Cash.

4

**VII.**

**CLASSIFICATION OF CLAIMS AND INTERESTS**

6        As required by the Code, the Plan places Claims and Interests into various Classes

7    according to their right to priority and other relative rights. The Plan specifies whether each Class

8    of Claims or Interests is impaired or unimpaired, and the Plan sets forth the treatment each Class

9    will receive. The table below lists the Classes of Claims established under the Plan and states

10    whether each particular Class is impaired or left unimpaired by the Plan. A Class is "unimpaired"

11    if the Plan leaves unaltered the legal, equitable and contractual rights to which the Holders of

12    Claims or Interests in the Class are entitled, with certain exceptions specified in the Bankruptcy

13    Code.

| CLASSIFICATION OF HOLDERS OF UNPAID SECURED REAL PROPERTY TAX CLAIMS ON GROUP II PROJECTS | | |
|---|---|---|
| **Class 1** | **Claimant** | **Claim Nos.** |
| Class 1.1 | Riverside County as the Holder of an Unpaid Secured Real Property Tax Claim against the Beaumont Heights Project in the amount of $442,201. | SunCal Beaumont 9 |
| Class 1.2 | Stanislaus County as the Holder of an Unpaid Secured Real Property Tax Claim against the Johannson Ranch Project in the amount of $434,830. | Unknown |

| CLASSIFICATION OF ASSERTED MECHANICS LIEN CLAIMS AGAINST GROUP II PROJECTS | | |
|---|---|---|
| **Class 2** | **Claimant** | **Claim Nos.** |
| Class 2.1 | The Holder of the asserted Mechanic Lien Claim held by Proactive Engineering against the Beaumont Heights Project in the amount of $43,355. | SunCal Beaumont 11 and 12 |

-56-

| CLASSIFICATION OF PRIORITY UNSECURED CLAIMS | | |
|---|---|---|
| Class 3 | Claimant | Claim Nos. |
| Class 3.1 | The Holder of Allowed Priority Claims that fall within Code Sections 507(a)(2), (4), (5), (6), and (7) against any of the Group II: Voluntary Debtors | None filed |

| CLASSIFICATION OF GENERAL UNSECURED CLAIMS | | |
|---|---|---|
| Class 4 | Claimant | Claim Nos. |
| Class 4.1 | Claimants holding Allowed Unsecured Claims against SunCal Beaumont. | Various Filed and Scheduled |
| Class 4.2 | Claimants holding Allowed Unsecured Claims against SunCal Johannson Ranch. | Various Filed and Scheduled |

| CLASSIFICATION OF INTEREST HOLDERS | | |
|---|---|---|
| Class 5 | Claimant | Scheduled |
| Class 5.1 | Allowed Interests in SunCal Beaumont held by SunCal I. | Scheduled Amount |
| Class 5.2 | Allowed Interests in SunCal Johannson Ranch held by SunCal I | Scheduled Amount |

## VIII.

## THE PLAN'S TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS

### 8.1.    The Plan's Treatment of Holders of Allowed Secured Real Property Tax Claims on the Group II Projects (Classes 1.1 and 1.2).

The rights of the Holder(s)' of Allowed Secured Claims in Classes 1.1and 1.2 are not impaired under the Plan. Such claimant's shall retain their existing lien rights and one of the following two non-impairment options shall apply, at the election of the Plan Trustee: 1) On the Effective Date, such claims shall be satisfied in accordance with the provision of 11 U.S.C. § 1124(2), or 2) on the Effective Date, or the Holder(s) shall be free to pursue their respective rights and remedies against the underlying real property collateral under applicable California law.

MAINDOCS-#163410-v1-SCC_GroupIIVoluntaryDebtorsDisclosureStatement.DOC

**8.2.** **The Plan's Treatment of Mechanics Lien Claims Against Group II Projects**

**(Class 2.1).**

The Holder(s) of Allowed Secured Claims within Class 2.1 shall receive the indubitable equivalent of their claims under the Plan, pursuant to 11 U.S.C. § 1129(b)(2)(A)(ii), through the following treatment:

      A.    The sale of the Group II Projects shall be sold, free and clear of all monetary liens and encumbrance pursuant to the following sales procedures:

      1.    The Group II Projects will be sold through a public auction after a commercially reasonable marketing and advertising effort of at least sixty (60) days duration;

      2.    The SunCal Plan Proponents shall have the right to provisionally accept an Opening Bid from a Stalking Horse Bidder prior to the public auction and to grant this bidder the right to receive the Beaumont Heights Project Break-up Fee or the Johannson Ranch Project Break-up Fee, the as the case may be, if such bidder is not the Winning Bidder;

      3.    Other Qualified Bidders shall have the right to overbid the Opening Bid by submitting a Qualifying Bid. The first round of Qualifying Bids after the Opening Bid must be equal to or in excess of the Initial Overbid Amount. Thereafter, all Qualifying Bids shall be equal to or in excess or the Minimum Increment;

      4.    The highest Qualifying Bid received from a Qualified Bidder, shall be accepted as the Winning Bid, and the submitting bidder shall be the Winning Bidder. Upon payment of the Winning Bid, the Winner bidder shall receive title to the applicable Group V Project free and clear of all monetary liens and encumbrances; and

      5.    The Net Sales Proceeds from the sale of the Group II Projects shall be deposited into the applicable Net Sales Proceeds Account and the liens held by the holder of the Class 2.1 lien shall attach to the Net Sales Proceeds. The Class 2.1 claim shall be paid from the Net Sales Proceeds within three (3) business days of the date they are Allowed.

      6.    If for any reason the Plan Trustee is unable to sell any of the Group II Projects on the Effective Date, they will be abandoned as of 11:59 p.m. on the Effective Date, and

the Class 2.1 claimant shall be free to exercise any and all remedies that it may hold with respect to these Assets.

        **B.**    Sale of Other Plan Trust Assets Subject To Liens of Class 2.1 Claimant(s). The Plan Trustee shall complete the sale of all other Plan Trust Assets that are subject to the Liens of the Class 2.1 claimant, if any, free and clear of such claims and liens, through a sale that satisfies the following conditions:

        1.    Such Assets will be sold through a public auction after a commercially reasonable marketing and advertising effort of at least thirty (30) days duration;

        2.    The Committee shall approve the terms of the sale;

        3.    The sale will be held and completed within ninety (90) days of the Effective Date; and

        5.    The Net Sales Proceeds from the sale of the these Assets shall be deposited into the applicable Net Sales Proceeds Account and the liens held by the holder of claims within Class 2.1 shall attach to the Net Sales Proceeds in accordance with their existing priority. The claims within Class 2.1 shall then be paid from the Net Sales Proceeds within three (3) business days of the date they are Allowed.

        6.    If for any reason the Plan Trustee is unable to sell any of remaining Assets within the foregoing time frame, other than Litigation Claims, which shall be retained, they will be abandoned and the claimant within Class 2.1 who hold liens on these unsold Assets shall be free to exercise any and all remedies that it may hold against these Assets.

    **8.3.**    **The Plan's Treatment of Holders of Priority Claims (Class 3.1)**.

    The treatment of the Holders of Allowed Priority Claims under the Plan shall be as follows:

        A.    The Holder(s) are unimpaired under the Plan; and

        B.    The Holder(s) shall be paid from the applicable Distribution Account(s) (i) the full amount of such Allowed Priority Claim in Cash on the later of (x) the Effective Date, (y) the date such Claim becomes an Allowed Priority Claim or (z) the date such Allowed Priority Claim becomes payable in accordance with the terms governing such Allowed Priority Claim, or (ii) upon such other less favorable terms as may be agreed to by such Holder and the Plan Trustee.

MAINDOCS-#163410-v1-SCC_GroupIIVoluntaryDebtorsDisclosureStatement.DOC