1  PAUL J. COUCHOT -- State Bar No. 131934
   WINTHROP COUCHOT, P.C.
2  660 Newport Center Drive, Fourth Floor
   Newport Beach, CA 92660
3  Telephone: (949) 720-4100
   Facsimile: (949) 720-4111
4  General Insolvency Counsel for Palmdale Hills
   Property, LLC et. al. (the "Voluntary Debtors")
5
6  RONALD RUS - State Bar No. 67369
   JOEL S. MILIBAND - State Bar No. 77438
7  RUS MILIBAND & SMITH A PROFESSIONAL
   CORPORATION
8  2211 Michelson Drive, Seventh Floor
   Irvine, California 92612
9  Telephone: (949) 752-7100
   Facsimile: (949) 252-1514
10 Counsel for SunCal Management LLC and
   SCC Acquisitions Inc.

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**SANTA ANA DIVISION**

| | |
|---|---|
| In re<br>PALMDALE HILLS PROPERTY, AND ITS RELATED DEBTORS,<br>    Joint Administered Debtors and<br>    Debtors-in-Possession | Case No. 8:08-bk-17206-ES<br>Jointly Administered With Case Nos.<br>8:08-bk-17209-ES; 8:08-bk-17240-ES;<br>8:08-bk-17224-ES; 8:08-bk-17242-ES;<br>8:08-bk-17225-ES; 8:08-bk-17245-ES;<br>8:08-bk-17227-ES; 8:08-bk-17246-ES;<br>8:08-bk-17230-ES; 8:08-bk-17231-ES;<br>8:08-bk-17236-ES; 8:08-bk-17248-ES;<br>8:08-bk-17249-ES; 8:08-bk-17573-ES;<br>8:08-bk-17574 ES; 8:08-bk-17575-ES;<br>8:08-bk-17404-ES; 8:08-bk-17407-ES;<br>8:08-bk-17408-ES; 8:08-bk-17409-ES;<br>8:08-bk-17458-ES; 8:08-bk-17465-ES;<br>8:08-bk-17470-ES; 8:08-bk-17472-ES;<br>and 8:08-bk-17588-ES<br><br>Chapter 11 Proceedings |

Affects:

- ☐ All Debtors
- ☐ Palmdale Hills Property, LLC
- ☐ SunCal Beaumont Heights, LLC
- ☐ SCC/Palmdale, LLC
- ☐ SunCal Johannson Ranch, LLC
- ☐ SunCal Summit Valley, LLC
- ☐ SunCal Emerald Meadows LLC
- ☐ SunCal Bickford Ranch, LLC
- ☐ Acton Estates, LLC
- ☐ Seven Brothers LLC
- ☐ SJD Partners, Ltd.
- ☐ SJD Development Corp.
- ☐ Kirby Estates, LLC
- ☐ SunCal Communities I, LLC
- ☐ SunCal Communities III, LLC
- ☒ SCC Communities LLC
- ☒ North Orange Del Rio Land, LLC
- ☒ Tesoro SF LLC

**FIRST AMENDED DISCLOSURE STATEMENT DESCRIBING FIRST AMENDED CHAPTER 11 PLANS FILED BY THE APPLICABLE SUNCAL PLAN PROPONENTS IN THE CHAPTER 11 CASES OF SCC COMMUNITIES, LLC, NORTH ORANGE DEL RIO LAND LLC AND TESORO SF LLC [GROUP III: VOLUNTARY DEBTORS]**

Date:      July 22, 2011
Time:      11:00 a.m.
Place:     Courtroom 5A

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Continued from Previous Page*

☐ LBL-SunCal Oak Valley, LLC
☐ SunCal Heartland, LLC
☐ LBL-SunCal Northlake, LLC
☐ SunCal Marblehead, LLC
☐ SunCal Century City, LLC
☐ SunCal PSV, LLC
☐ Delta Coves Venture, LLC
☐ SunCal Torrance, LLC
☐ SunCal Oak Knoll, LLC

# TABLE OF CONTENTS

**PAGE**

I. INTRODUCTION ................................................................................................ 2

II. DEFINITIONS AND RULES OF INTERPRETATION ........................................... 4

III. PLAN CONFIRMATION DEADLINES ................................................................ 23

IV. FACTUAL BACKGROUND OF THE DEBTORS ................................................ 26

V. SIGNIFICANT EVENTS IN THE DEBTORS' CHAPTER 11 CASES ................. 38

VI. TREATMENT OF UNCLASSIFIED CLAIMS ...................................................... 45

VII. CLASSIFICATION OF CLAIMS AND INTERESTS ............................................. 47

VIII. THE PLAN'S TREATMENT OF CLASSIFIED CLAIMS
AND INTERESTS ............................................................................................... 49

IX. ACCEPTANCE OR REJECTION OF THE PLAN ................................................ 53

X. MEANS OF EXECUTION AND IMPLEMENTATION OF THE PLAN .............. 55

XI. RISK FACTORS ................................................................................................. 65

XII. DISTRIBUTIONS ................................................................................................ 66

XIII. OBJECTION TO CLAIMS AND DISPUTE CLAIMS ........................................... 69

XIV. EXECUTORY CONTRACTS AND UNEXPIRED LEASES .................................. 70

XV. BEST INTEREST OF CREDITORS TEST AND PLAN FEASIBILITY ................ 70

XVI. LIMITATION OF LIABILITY ............................................................................. 72

XVII. CONDITIONS TO CONFIRMATION AND EFFECTIVENESS
OF THE PLAN ................................................................................................... 72

XVIII. RETENTION OF JURISDICTION ...................................................................... 73

XIX. MODIFICATION OR WITHDRAWAL OF THE PLAN ........................................ 73

XX. MISCELLANEOUS ............................................................................................. 73

MAINDOCS-#163424-v1-Group_III_VDs_DS_Tesoro_Del_Rio_SCC_.DOC

# I.

## **INTRODUCTION**

This DISCLOSURE STATEMENT[1] is filed respectively by, and the accompanying Plan proposed by, SCC Communities, Del Rio and Tesoro (the "Group III: Voluntary Debtors"), as the SunCal Plan Proponents, in the respective Chapter 11 Cases of the Group III: Voluntary Debtors. In addition to being the proponent in the Trustee Debtors' Cases, Acquisitions shall be the Plan Sponsor, the Plan Trustee of the Plan Trust, and the Distribution Agent for all of the Debtors' cases for such Plans that are confirmed.

Chapter 11 allows debtors-in-possession, Chapter 11 trustees, and under some circumstances, creditors, interest holders and others parties in interest, to propose a Chapter 11 plan. As stated, the SunCal Plan Proponents are the proponents of the Plan sent to you in the same envelope as this Disclosure Statement. This document summarizes the contents of the Plan, certain information relating to the Plan and the process the Bankruptcy Court follows in determining whether or not to confirm the Plan.

In summary, the Plan provides for sale of the Joshua Ridge Project, the Tesoro Project and the Net Del Rio CFD Bonds Proceeds (the "Group III Assets: Voluntary Debtors"), free and clear of all claims and liens, and for the liquidation of all other assets of the Group III: Voluntary Debtors. The Net Proceeds from these sales and/or liquidation will then be distributed to Creditors holding Allowed Claims in accordance with their rights and priorities under the Bankruptcy Code and under other applicable law.

Although similar and joint Plans are being filed in the Cases of all three Group III: Voluntary Debtors, each Plan is independent of the others. The Creditors in each Case will determine, subject to Court approval, whether the Plan will be approved in their Case. Accordingly, the Plan may be confirmed in the Cases of some of the Group III: Voluntary Debtors, but not in others.

---

[1] All defined terms used herein have the same meanings as set forth in Article II herein and Exhibit "1" attached hereto.

1         The Lehman Lenders have filed competing and alternative plans of reorganization in the

2    SCC Communities and Tesoro Cases, but not in the Del Rio Case. Accordingly, the creditors

3    holding claims against SCC Communities and Tesoro  will have the opportunity to vote for one

4    plan or the other, or they can vote for both plans and allow the Court to decide which plan should

5    be approved.

6         **READ THIS DISCLOSURE STATEMENT CAREFULLY IF YOU WANT TO**

7    **KNOW ABOUT**:

8         ➤  **WHO CAN VOTE OR OBJECT TO THE PLAN;**

9         ➤  **HOW YOUR CLAIM IS TREATED;**

10         ➤  **HOW THIS TREATMENT COMPARES TO WHAT YOUR CLAIM WOULD**

11         **RECEIVE IN LIQUIDATION;**

12         ➤  **A BRIEF HISTORY OF THE DEBTORS AND SIGNIFICANT EVENTS**

13         **DURING THEIR CHAPTER 11 BANKRUPTCY PROCEEDING;**

14         ➤  **WHAT FACTORS THE BANKRUPTCY COURT WILL CONSIDER TO**

15         **DECIDE WHETHER OR NOT TO CONFIRM THE PLAN;**

16         ➤  **WHAT IS THE EFFECT OF CONFIRMATION; AND**

17         ➤  **WHETHER THE PLAN IS FEASIBLE.**

18         This Disclosure Statement cannot tell you everything about your rights.  You should

19    consider consulting your own attorney to obtain more specific advice on how the Plan will affect

20    you and your best course of action.

21         Be sure to read the Plan as well as this Disclosure Statement.  If there are any

22    inconsistencies between the Plan and this Disclosure Statement, the Plan provisions will govern.

23         The Bankruptcy Code requires a Disclosure Statement to contain "adequate information"

24    concerning the Plan.  On _____, 2011, the Bankruptcy Court entered an order approving this

25    Disclosure Statement, based upon a finding that this document contained "adequate information"

26    to enable parties affected by the Plan to make an informed judgment regarding the Plan.  Any party

27    can now solicit votes for or against the Plan.

28                                    **II.**

1          **DEFINITIONS AND RULES OF INTERPRETATION**

2          **2.1**    **Definitions.**

3          The following defined terms are used in this Disclosure Statement.  Any capitalized term

4    that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall

5    have the meaning ascribed to that term in the Bankruptcy Code or Bankruptcy Rules.

6          2.1.1    Acquisitions.  SCC Acquisitions, Inc., a California corporation, an indirect

7    parent company of all of the Debtors, a purported obligor on the Bond Claims, a Creditor of all of

8    the Debtors, a SunCal Plan Proponent, the Plan Sponsor and the proposed Plan Trustee.

9          2.1.2    Administrative Claim(s).  Any Claim against a Group III: Voluntary Debtor

10   or its Estate  incurred after the applicable Petition Date for the applicable Group III: Voluntary

11   Debtor but before the Confirmation Date, for any cost or expense of administration of the Case of

12   the applicable Group III: Voluntary Debtor, which Claim is entitled to priority under section

13   507(a)(2) or (3) of the Bankruptcy Code, including, without limitation, any fee or charge assessed

14   against an Estate of a Group III: Voluntary Debtor under section 1930 of Title 28 of the United

15   States Code.

16         2.1.3    Administrative Claims Bar Date.  The last date fixed by the Plan for the

17   filing of Proof of Claims or requests for payment of Administrative Claims.  Under the Plan, the

18   Administrative Claims Bar Date shall be the first business day after the sixtieth (60th) day after the

19   Confirmation Date.

20         2.1.4    Affiliate.  The term shall have the meaning set forth under Section 101(2),

21   including, but not limited to, as to any Person, any other Person that directly or indirectly owns or

22   controls, is owned or controlled by, or is under common ownership or control with, such Person.

23   The term "control" (including, with correlative meanings, the terms "controlled by" and "under

24   common control with"), as applied to any Person, means the possession, direct or indirect, of the

25   power to direct or cause the direction of the management and policies of such Person, whether

26   through the ownership of voting securities or other equity ownership interest, by contract or

27   otherwise.

28

MAINDOCS-#163424-v1-Group_III_VDs_DS_Tesoro__Del_Rio_SCC_.DOC

1    2.1.5    Allowed. When used to describe Claim(s) or Interest(s), such Claim(s) or

2    Interest(s), to the extent that it or they are "Allowed Claim(s)" or "Allowed Interest(s)."

3    2.1.6    Allowed Amount shall mean:

4    A.    With respect to any Administrative Claim (i) if the Claim is based

5    upon a Fee Application, the amount of such Fee Application that has been approved by a Final

6    Order of the Bankruptcy Court; (ii) if the Claim is based upon any indebtedness or obligation

7    incurred in the ordinary course of business of the Group III: Voluntary Debtors and is not

8    otherwise subject to an Administrative Claim Bar Date, the amount of such Claim that has been

9    agreed to by the Group III: Voluntary Debtors and such creditor, failing which, the amount thereof

10    as fixed by a Final Order of the Bankruptcy Court; or (iii) if the Holder of such Claim was required

11    to file and has filed proof thereof with the Bankruptcy Court prior to an Administrative Claim Bar

12    Date, (1) the amount stated in such proof if no objection to such Proof of Claim is interposed

13    within the applicable period of time fixed by the Bankruptcy Code, the Bankruptcy Rules or the

14    Bankruptcy Court, or (2) the amount thereof as fixed by Final Order of the Bankruptcy Court if an

15    objection to such proof was interposed within the applicable period of time fixed by the

16    Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court. The Allowed Amount of any

17    Administrative Claim which is subject to an Administrative Claims Bar Date and not filed by the

18    applicable Administrative Claims Bar Date shall be zero, and no distribution shall be made on

19    account of any such Administrative Claim;

20    B.    with respect to any Claim which is not an Administrative Claim

21    (the "Other Claim"): (i) if the Holder of such Other Claim did not file proof thereof with the

22    Bankruptcy Court on or before the Claims Bar Date, the amount of such Claim as listed in the

23    Group III: Voluntary Debtors'' Schedules as neither disputed, contingent nor unliquidated; or (ii) if

24    the Holder of such Claim has filed proof thereof with the Bankruptcy Court on or before the

25    Claims Bar Date, (a) the amount stated in such proof if no objection to such Proof of Claim was

26    interposed within the applicable period of time fixed by the Bankruptcy Code, the Bankruptcy

27    Rules, the Plan or the Bankruptcy Court, or (b) the amount thereof as fixed by Final Order of the

28    Bankruptcy Court if an objection to such proof was interposed within the applicable period of time

1  fixed by the Bankruptcy Code, the Bankruptcy Rules, the Plan or the Bankruptcy Court. The

2  Allowed Amount of any Other Claim which is not Filed by the applicable Claims Bar Date, is not

3  listed on the Group III: Voluntary Debtors' Schedules or is listed as disputed, unliquidated,

4  contingent or unknown, and is not allowed under the terms of the Plan shall be zero, and no

5  distribution shall be made on account of any such Claim; and

6                    C.     with respect to any Interest, (i) the amount provided by or

7  established in the records of the Group III: Voluntary Debtors at the Confirmation Date, provided,

8  however, that a timely filed proof of Interest shall supersede any listing of such Interest on the

9  records of the Group III: Voluntary Debtors; or (ii) the amount stated in a proof of Interest Filed

10  prior to the Confirmation Date if no objection to such Interest was filed prior to the Confirmation

11  Date or such later date as the Bankruptcy Court allows; or (iii) the amount of such Interest as fixed

12  by a Final Order of the Bankruptcy Court.

13          2.1.7     Allowed Claim. Except as otherwise provided in the Plan (including with

14  respect to those Classes for which the amount of the Allowed Claims is specified by the Plan), a

15  Claim to the extent (and only to the extent) of the Allowed Amount of such Claim.

16          2.1.8     Allowed Interest. Any Interest to the extent, and only to the extent, of the

17  Allowed Amount of such Interest.

18          2.1.9     Allowed Secured Claims. All or a portion of a Secured Claim that is an

19  Allowed Claim.

20          2.1.10    Allowed Unsecured Claim. All or a portion of an Unsecured Claim that is

21  an Allowed Claim.

22          2.1.11    Assets. All assets that are property of the Debtor(s) pursuant to

23  Bankruptcy Code Section 541.

24          2.1.12    Arch. Arch Insurance Company, a Bond Issuer.

25          2.1.13    Available Cash. Each Group III: Voluntary Debtors' Cash deposited into

26  the applicable Distribution Account(s) on or after the Effective Date that is available for making

27  Distributions under the Plan to Holders of Allowed Administrative, Priority, and General

28  Unsecured Claims. The Available Cash shall consist of the respective Group III: Voluntary

1    Debtors' cash on hand as of the Effective Date that is not subject to a Disputed Lien, proceeds of

2    Net Litigation Recoveries that are not subject to a Disputed Lien, Net Sales Proceeds that become

3    Available Cash upon the disallowance of a Disputed Claim or avoidance of a Disputed Lien

4    purportedly encumbering such Cash,. All Available Cash shall be deposited into the applicable

5    Distribution Account(s). Available Cash shall not include Net Sale Proceeds in the Net Sales

6    Proceeds Account where the Disputed Secured Claims are Allowed but subject to an equitable

7    subordination judgment.

8           2.1.14    Avoidance Actions. All Claims and defenses to Claims accruing to the

9    Group III: Voluntary Debtors and their Estates under Bankruptcy Code Sections 506(d), 510(c),

10    541, 544, 545, 547, 548, 549, 550, or 551.

11           2.1.15    Bankruptcy Code. The United States Bankruptcy Code.

12           2.1.16    Bankruptcy Court. The United States Bankruptcy Court for the Central

13    District of California, having jurisdiction over the Cases and, to the extent of any withdrawal of the

14    reference made pursuant to Section 157 of title 28 of the United States Code, the United States

15    District Court for the Central District of California; or, in the event such courts cease to exercise

16    jurisdiction over the Cases, such court or unit thereof that exercises jurisdiction over the Cases in

17    lieu thereof.

18           2.1.17    Bankruptcy Rules. Collectively, as now in effect or hereafter amended

19    and as applicable to the Cases, (i) the Federal Rules of Bankruptcy Procedure, and (ii) the Local

20    Bankruptcy Rules and General Orders applicable to cases pending before the Bankruptcy Court.

21           2.1.18    Beneficial Interests. means, collectively, the interests of the holders of

22    Allowed Unsecured Claims in the Plan Trust and in all distributions to be made by the Plan Trust

23    on account of Allowed Unsecured Claims. The Beneficial Interests (a) shall be noted in the books

24    and records of the Plan Trust, (b) shall not be evidenced by a writing, and (c) may not be

25    transferred, sold, assigned or transferred by will, intestate succession or operation of law.

26           2.1.19    Bond Claim(s). Any Claim against the Debtor(s) and a Bond Issuer under

27    various payment or performance bonds, and/or any claims of Bond Issuer(s) against the Debtor(s)

28    under various payment or performance bonds.

1            2.1.20    Bond Claimant. Holder(s) of a Bond Claim.

2            2.1.21    Bond Indemnification Claim. All Claims by Bond Safeguard, Lexon, and

3 Arch for indemnification for payment by Bond Safeguard, Lexon and Arch of Bond Claims with

4 respect to the Group III: Voluntary Debtors' Projects.

5            2.1.22    Bond Indemnitors. The individuals and entities that are allegedly liable on

6 the Bond Indemnification Claims, including, allegedly, all of the Debtors, Acquisitions, all

7 Affiliates of Acquisitions, and Elieff.

8            2.1.23    Bond Issuer(s). Bond Safeguard, Lexon and Arch in their capacities as

9 issuers and sureties for payment and performance bonds for the benefit of certain of the Debtors.

10            2.1.24    Bond Safeguard. Bond Safeguard Insurance Company, a Bond Issuer.

11            2.1.25    Business Day. Any day, other than a Saturday, a Sunday or a "legal

12 holiday," as defined in Bankruptcy Rule 9006(a).

13            2.1.26    Cases. The Chapter 11 cases of the Group III: Voluntary Debtors pending

14 before the Bankruptcy Court.

15            2.1.27    Cash. Currency of the United States of America and cash equivalents,

16 including, but not limited to, bank deposits, immediately available or cleared checks, drafts, wire

17 transfers and other similar forms of payment.

18            2.1.28    CFD Bonds. Community facilities district bonds issued by a

19 governmental entity.

20            2.1.29    Claim. This term shall have the broadest possible meaning under

21 Section 101(5) of the Bankruptcy Code, and shall include (a) any right to payment from any of the

22 Group III: Voluntary Debtors, whether or not such right is reduced to judgment, liquidated,

23 unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable,

24 secured, or unsecured, or (b) any right to an equitable remedy for breach of performance if such

25 breach gives rise to a right of payment from any of the Group III: Voluntary Debtors, whether or

26 not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured,

27 unmatured, disputed, undisputed, secured, or unsecured.

28

1    2.1.30    Claims Bar Date. For any Claim other than an Administrative Claim,

2    March 31, 2009, which was established by the Bankruptcy Court as the last date for creditors to

3    file Proof of Claims with the Bankruptcy Court in all of the Group III: Voluntary Debtors' cases.

4    2.1.31    Claims Objection Deadline. The later of (i) the first business day

5    following the one hundred and eightieth (180th) day after the Effective Date, or (ii) such greater

6    period of limitation as may be fixed or extended by the Bankruptcy Court or by agreement between

7    the Plan Trustee and the Holder of the Claim.

8    2.1.32    Claim Objection Reduction Amount. The amount of Net Sales Proceeds

9    that is made available to the holders of Allowed Unsecured Claims due to the entry of a judgment

10    or order on a Lehman Claim Objection that disallows, reduces, or otherwise adversely modifies the

11    secured claims filed by the Lehman Lenders.

12    2.1.33    Class. Each group of Claims or Interests classified in Article V of the Plan

13    pursuant to Sections 1122 and 1123 of the Bankruptcy Code.

14    2.1.34    Confirmation Date. The date on which the Confirmation Order is entered

15    in the Bankruptcy Court's docket.

16    2.1.35    Confirmation Order. The order entered by the Bankruptcy Court

17    confirming the Plan in accordance with the provisions of Chapter 11 of the Bankruptcy Code.

18    2.1.36    Contingent Bond Claims. Unmatured Bond Claims.

19    2.1.37    Creditor. Any Person who is the Holder of a Claim against any Debtor

20    that arose or accrued or is deemed to have arisen or accrued or to have matured, or otherwise

21    become due, owing, and payable on or before the Petition Date, including, without limitation,

22    Claims of the kind specified in Sections 502(g), 502(h) or 502(i) of the Bankruptcy Code.

23    2.1.38    Debtor(s). Individually or collectively, the Voluntary Debtors and the

24    Trustee Debtors, as specifically defined in Exhibit "1" attached hereto.

25    2.1.39    Debtor(s)-in-Possession. The Voluntary Debtor(s) when acting in their

26    capacity as representatives of their respective Estates in their respective Chapter 11 Cases.

27    2.1.40    Del Rio. North Orange Del Rio Land, LLC, a limited liability company, a

28    Voluntary Debtor, and the owner of the Net Del Rio CFD Bonds Proceeds.

1               2.1.41    Del Rio Break-Up Fee. The sum of two hundred eighty four thousand

2 dollars ($284,000) that will be paid to the Stalking Horse Bidder that submits the Opening Bid for

3 the Net Del Rio CFD Bonds Proceeds, if such Stalking Horse Bidder is not the Winning Bidder.

4               2.1.42    Del Rio CFD Bonds. The Communities Facilities District Bonds

5 described in Exhibit "1."

6               2.1.43    Disclosure Statement. The document accompanying the Plans for the

7 Group III: Voluntary Debtors that is entitled "First Amended Disclosure Statement Describing

8 First Amended Chapter 11 Plans Filed by SunCal Plan Proponents In The Chapter 11 Cases Of

9 SCC Communities LLC, North Orange Del Rio Land, LLC and Tesoro SF LLC," and with all

10 accompanying exhibits.

11               2.1.44    Disputed Claim(s). All or any part of a Claim other than any Allowed

12 Amount thereof as to which any one of the following applies: (i) no Proof of Claim has been filed

13 with respect to such Claim, and either (a) the Claim is not listed in the Schedules; or (b) the Claim

14 is listed in the Schedules as unliquidated, disputed, contingent, unknown or in a zero amount,

15 (ii) the Claim is the subject of (a) a Litigation Claim; (b) the Claim is subject to offset by a

16 Litigation Claim; (c) a timely objection that has not been resolved by a Final Order; or (d) a request

17 for estimation in accordance with the Bankruptcy Code, the Bankruptcy Rules, any applicable

18 order of the Bankruptcy Court, or the Plan which is Filed on or before the Claims Objection

19 Deadline, which Adversary Proceeding, objection, or request for estimation has not been

20 dismissed, withdrawn or determined by a Final Order; or (iii) the Claim is otherwise treated as a

21 "Disputed Claim" pursuant to the Plan.

22               2.1.45    Disputed Interim Loan Agreement. A certain Loan Agreement, dated as of

23 October 31, 2007, by and between SCC LLC, as borrower and Lehman ALI, as lender, pursuant to

24 which Lehman ALI made a loan in the maximum aggregate amount of approximately $20 million.

25 The Interim Loan Agreement has an alleged balance due of $23,795,012.59 as of March 30, 2009.

26 The alleged obligation under the Interim Loan Agreement is allegedly secured by (a) an alleged

27 first-priority deed of trust on the Joshua Ridge Project; (b) an alleged first-priority deed of trust on

28 the Tesoro Project; and (c) an alleged first-priority lien on the Del Rio CFD Bonds Proceeds.

1         2.1.46   Disputed Lien(s). An asserted lien(s) against Assets of the Debtor(s) that

2 is either subject to a Disputed Secured Claim, not duly perfected, subject to an Avoidance Action,

3 or subject to an action pursuant to Bankruptcy Code Sections 510(c)(2) and/or 506(d).

4         2.1.47   Disputed Secured Claim(s). That part of a Disputed Claim that is a

5 Secured Claim.

6         2.1.48   Distribution(s). Payments to Holders of Allowed Claims provided for

7 under the Plan.

8         2.1.49   Distribution Agent. The entity that is responsible for making Distributions

9 under the Plan, which shall be Acquisitions.

10         2.1.50   Distribution Account(s). Separate account(s) to be established by the Plan

11 Trustee at an FDIC insured bank into which each Group III: Voluntary Debtors' Available Cash

12 shall be deposited and all Available Cash received by the Plan Trust after the Confirmation Date

13 that would have belonged to such Group III: Voluntary Debtor shall be deposited, other than Net

14 Sales Proceeds that are subject to Disputed Claims and Disputed Liens.

15         2.1.51   Distribution Date. With respect to any Allowed Claim or Allowed

16 Interest, the date on which a Distribution is required to be made under the Plan.

17         2.1.52   Effective Date. A date selected by the SunCal Plan Proponents that is not

18 later than the ninetieth (90th) calendar day after the Confirmation Date.

19         2.1.53   Elieff. Bruce Elieff, the president of Acquisitions, a purported obligor on

20 the Bond Claims with corresponding indemnity Claims against the Debtors.

21         2.1.54   Estates. The bankruptcy estates of the Group III: Voluntary Debtors

22 created pursuant to Section 541 of the Bankruptcy Code.

23         2.1.55   Fee Applications. Applications of Professional Persons under Sections

24 330, 331 or 503 of the Bankruptcy Code for allowance of compensation and reimbursement of

25 expenses in the Cases.

26         2.1.56   Fee Claim. A Claim under Sections 330 or 503 of the Bankruptcy Code

27 for allowance of compensation and reimbursement of expenses in the Cases.

28

1        2.1.57   Filed. Delivered to, received by and entered upon the legal docket by the

2  Clerk of the Bankruptcy Court. "File" shall have a correlative meaning.

3        2.1.58   Final Order. A judgment, order, ruling or other decree issued and entered

4  by the Bankruptcy Court.

5        2.1.59   General Unsecured Claim. A Claim against a Group III: Voluntary Debtor

6  that is not (a) a Secured Claim, (b) an Administrative Claim, (c) a Tax Claim or (d) a Priority

7  Claim.

8        2.1.60   Group III: Voluntary Debtors. SCC Communities LLC, North Orange Del

9  Rio Land, LLC and Tesoro SF LLC

10

11       2.1.61   Group III Assets: Voluntary Debtors. The Joshua Ridge Project, the

12  Tesoro Project and the Net Del Rio CFD Bonds Proceeds.

13       2.1.62   Holder. The beneficial owner of any Claim or Interest.

14       2.1.63   Initial Overbid. The Initial Overbid is the first Qualifying Bid after the

15  Opening Bid that is equal to or in excess of the Initial Overbid Amount.

16       2.1.64   Initial Overbid Amount. In the case of the Joshua Ridge Project, the Initial

17  Overbid Amount is a sum that is not less than the sum of the Opening Bid, the Joshua Ridge

18  Break-up Fee and ten dollars ($10,000). In the case of the Tesoro Project, the Initial Overbid

19  Amount is a sum that is not less than the sum of the Opening Bid, the Tesoro Break-up Fee and

20  thirty five thousand dollars ($35,000). In the case of the Net Del Rio CFD Bonds Proceeds, the

21  Initial Overbid Amount is a sum that is not less than the sum of the Opening Bid, the Del Rio

22  Break-Up Fee and one hundred thousand dollars ($100,000).

23       2.1.65   Insider. The term shall have the broadest meaning possible under

24  Section 101(31), including, but not limited to, a person in control of the Debtor, Affiliates and

25  Insiders of such Affiliates, including the Lehman Entities.

26       2.1.66   Interest. Any equity security interest in any Group III: Voluntary Debtor

27  within the meaning, of Section 101(16) of the Bankruptcy Code, including, without limitation, any

28

MAINDOCS-#163424-v1-Group_III_VDs_DS_Tesoro_Del_Rio_SCC_.DOC

1   equity ownership interest in any of the Group III: Voluntary Debtors, whether in the form of

2   common or preferred stock, stock options, warrants, partnership interests, or membership interests.

3           2.1.67   Joshua Ridge Project.  The Project owned by SCC Communities, located

4   in the City of Victorville, California, as more particularly described herein.

5           2.1.68   LBHI.  Lehman Brothers Holdings, Inc., a Lehman Entity, the parent

6   company of Lehman ALI and LCPI, and a Chapter 11 debtor in a bankruptcy proceeding pending

7   in the Bankruptcy Court for the Southern District of New York.

8           2.1.69   LCPI.  Lehman Commercial Paper, Inc., a Chapter 11 debtor in a

9   bankruptcy proceeding pending in the Bankruptcy Court for the Southern District of New York.

10           2.1.70   Lehman Adversary Proceeding.  The Group III: Voluntary Debtors' claims

11   pending in the adversary proceeding against the Lehman Lenders and/or the Lehman Successors

12   asserting various causes of action including fraudulent conveyances in connection with the

13   Disputed Interim Loan Agreement.

14           2.1.71   Lehman ALI.  Lehman ALI, Inc.

15           2.1.72   Lehman Claim Objections.  The objections filed by the Debtors to the

16   claims filed by the Lehman Lenders that are based upon the Lehman Disputed Loans and the

17   Lehman Disputed Administrative Loans, including, but not limited to, the Lehman Recoupment

18   Objection and the Lehman 502(d) Objection.

19           2.1.73   Lehman Entities.  The Lehman Lenders, the Lehman Equity Members and

20   LBHI.

21           2.1.74   Lehman Equity Members.  Lehman Entities that own direct or indirect

22   membership Interests in all of the Trustee Debtors, except for SunCal Heartland and SunCal

23   Marblehead.

24           2.1.75   Lehman Lenders.  Lehman ALI, LCPI, Northlake Holdings, and OVC

25   Holdings.

26           2.1.76   Lehman Disputed Loans.  Collectively the following loans that are the

27   purported basis for the Lehman's Disputed Claims:  (a) SunCal Communities I Loan Agreement;

28   (b) Bickford Second Loan Agreement; (c) Ritter Ranch Loan Agreement; (d) SCC Palmdale Loan;

1  (e) Disputed Interim Loan Agreement; (f) SunCal Oak Knoll/SunCal Torrance Loan Agreement;

2  (g) SunCal Century City Loan Agreement; (h) SunCal PSV Loan Agreement; (i) SunCal Delta

3  Coves Loan Agreement; (j) SunCal Marblehead/SunCal Heartland Loan Agreement; (k) Sun Cal

4  Oak Valley Loan Agreement; (l) SunCal Northlake Loan Agreement; (m) Pacific Point First Loan

5  Agreement; and (n) Pacific Point Second Loan Agreement.

6         2.1.77   Lehman Representatives.  The individuals that controlled the Lehman

7  Entities.

8         2.1.78   Lehman Successor(s).  Entities other than the Lehman Lenders that either

9  assert to be or are determined by the Bankruptcy Court to be the beneficial owner(s) of the Lehman

10  Disputed Loan(s), including, but not limited to Fenway Capital, Lehman Re and Danske Bank.

11         2.1.79   Lehman's Disputed Claim(s).  All of the Proofs of Secured Claims filed by

12  a Lehman Lender or a Lehman Successor in the Debtors' Chapter 11 Cases arising from the

13  Lehman Disputed Loans and the Lehman Disputed Administrative Loans.

14         2.1.80   Lehman's Disputed Lien(s).  All of the alleged liens relating to Proofs of

15  Secured Claims filed by a Lehman Lender or a Lehman Successor in the Debtor's Chapter 11

16  Cases arising from the Lehman Disputed Loans.

17         2.1.81   Lexon.  Lexon Insurance Co.

18         2.1.82   Litco.  Anewly formed Delaware limited liability company.

19         2.1.83   LitCo Plan Loan. A loan that will be made by LitCo, to the extent

20  necessary to pay Administrative Claims, and post Confirmation Date costs incurred by the SunCal

21  Proponents in connection with the sale process, and to pay post Effective Date costs incurred by

22  the Plan Trust, including litigation expenses where applicable, if no other source is available to pay

23  these obligations. LitCo will be capitalized with funds provided by a third party.

24         2.1.84   Litigation Claims.  Any and all interests of the Group III: Voluntary

25  Debtors in any and all Claims, rights, causes of action, and objections or defenses to Claims, liens,

26  rights, or causes of action which have been or may be commenced by the Group III: Voluntary

27  Debtor(s), the Chapter 11 Trustee, or the Voluntary Debtors' Committee, as the case may be,

28  including, but not limited to, any (i) Avoidance Actions; (ii) for turnover of property to the Group

1  III: Voluntary Debtors' Estates and/or the Plan Trust; (iii) for the recovery of property or payment

2  of money that belongs to the Debtors' Estates or the Plan Trust; (iv) the right to compensation in

3  the form of damages, recoupment or setoff of the Debtors' Estates and/or the Plan Trust; (v) the

4  Lehman Adversary Proceeding; (vi) the State Court Action, and (vii) any and all other Claims

5  against Lehman's Disputed Claims and/or Disputed Liens referenced in the Plan or the Disclosure

6  Statement.

7          2.1.85   Litigation Recoveries. Any Cash or other property received by the

8  Chapter 11 Trustee, the Group III: Voluntary Debtors, the Voluntary Debtors' Committee and/or

9  the Plan Trust, as the case may be, from all or any portion of a Litigation Claim(s), including, but

10  not limited to, awards of damages, attorneys' fees and expenses, interest and punitive damages,

11  whether recovered by way of settlement, execution on judgment or otherwise.

12          2.1.86   Joshua Ridge Break-up Fee. The sum of six thousand four hundred dollars

13  ($6,400) that will be paid to the Stalking Horse Bidder that submits the Opening Bid for the Joshua

14  Ridge Project, if such Stalking Horse Bidder is not the Winning Bidder.

15          2.1.87   Maximum Distributions. A Distribution to a Holder of an Allowed

16  General Unsecured Claim against a Group III: Voluntary Debtor equal to one hundred percent

17  (100%) of the amount of the Holder's Allowed General Unsecured Claim plus interest at the Legal

18  Rate from and as of the Group III: Voluntary Debtor's Petition Date.

19          2.1.88   MB Firm. Miller Barondess, LLP.

20          2.1.89   Minimum Increment. Minimum Increment applicable to the sales of the

21  Group III Assets: Voluntary Debtors is fifty thousand dollars ($50,000), until there are only two

22  Qualified Bidders submitting bids for a Group III Asset: Voluntary Debtor, then the Minimum

23  Increment shall be fifty thousand dollars ($25,000).

24          2.1.90   Minimum Sale Price. The minimum gross sale price that must be paid for

25  either the Joshua Ridge Project, the Tesoro Project or the Net Del Rio CFD Bonds Proceeds before

26  such project can be sold pursuant to the Plan. Such prices are $144,000, $666,000 and $6,390,000

27  respectively.

28

MAINDOCS-#163424-v1-Group_III_VDs_DS_Tesoro__Del_Rio_SCC_.DOC

1         2.1.91     Net Del Rio CFD Bonds Proceeds. The net proceeds of CFD Bonds that

2 were issued by City of Orange and authorized by Order of the Bankruptcy Court, described in

3 Exhibit "1."

4         2.1.92     Net Litigation Recoveries. Litigation Recoveries less associated

5 Administrative Claims and Post-Confirmation Expenses incurred in connection with such

6 Litigation Recoveries.

7         2.1.93     Net Sales Proceeds. The Cash generated from the sale(s) or liquidation of

8 the Group III: Voluntary Debtor(s)' Assets or the Plan Trust's Assets, less payment of selling

9 expenses, taxes, Chapter 11 Trustee fees, and any associated Post-Confirmation Expenses and

10 Administrative Claims incurred in furtherance of such sales or liquidation of such Assets.

11         2.1.94     Net Sales Proceeds Account(s). Separate account(s) that will be

12 established by the Plan Trustee at an FDIC insured bank into which all Net Sale Proceeds shall be

13 deposited from the sale of Assets that were allegedly encumbered by a Disputed Secured Claim(s)

14 and/or a Disputed Lien(s). There shall be a separate Net Sales Proceeds Account for the Net Sale

15 Proceeds allegedly subject to each Disputed Secured Claim(s) and/or Disputed Lien(s), except

16 where there are two Disputed Liens on a single Project, in which case, there shall be a single

17 account for the proceeds generated from that Project. The Disputed Secured Claim(s) and/or

18 Disputed Lien(s) shall attach to the corresponding Net Sales Proceeds Account(s) pending any

19 Final Order(s) of the Bankruptcy Court resolving the applicable Disputed Secured Claim(s) and/or

20 applicable Disputed Lien(s). To the extent that a particular Disputed Claim is disallowed or a

21 particular Disputed Lien is avoided (other than transferred to the Estates pursuant to Bankruptcy

22 Code Section 510(c)(2)) or otherwise invalidated, such Net Sales Proceeds allegedly subject

23 thereto shall become Available Cash and shall be transferred to the applicable Distribution

24 Account(s). To the extent that a particular Disputed Secured Claim and a Disputed Lien are

25 allowed and deemed valid but subject to the equitable subordination causes of action in the

26 Lehman Adversary Proceeding, the funds shall remain in the Net Sales Accounts pending a Final

27 Order on the equitable subordination causes of action in the Lehman Adversary Proceeding.

28

2.1.95   Opening Bid. Opening Bid means the offer for one, or both of the Group III Assets: Voluntary Debtors, which is equal to the Minimum Sale Price(s) accepted by the Debtor for either one or both of the Group III Assets: Voluntary Debtors.

2.1.96   Orders for Relief Date. The following are dates that orders for relief were entered for each of the Trustee Debtors:

| | |
|---|---|
| SunCal Oak Valley | January 6, 2009 |
| SunCal Heartland | January 6, 2009 |
| SunCal Northlake | January 6, 2009 |
| SunCal Marblehead | January 6, 2009 |
| SunCal Century City | January 6, 2009 |
| SunCal PSV | January 6, 2009 |
| Delta Coves | January 6, 2009 |
| SunCal Torrance | January 6, 2009 |
| SunCal Oak Knoll | January 6, 2009 |

2.1.97   Tesoro Break-up Fee. The sum of thirty thousand four hundreddollars ($30,400) that will be paid to the Stalking Horse Bidder that submits the Opening Bid for the Tesoro Project, if such Stalking Horse Bidder is not the Winning Bidder.

2.1.98   Person. An individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, governmental authority, governmental unit, committee or other entity of whatever nature.

2.1.99   Petition Dates. The following are dates that each of the Voluntary Debtors filed their Voluntary Chapter 11 petitions or Creditors filed involuntary Chapter 11 petitions against the Trustee Debtors:

| | |
|---|---|
| Palmdale Hills | November 6, 2008 |
| SunCal Beaumont | November 6, 2008 |
| SCC Palmdale | November 7, 2008 |
| SunCal Johannson | November 7, 2008 |
| SunCal Summit Valley | November 7, 2008 |
| SunCal Emerald | November 7, 2008 |
| SunCal Bickford | November 7, 2008 |
| Acton Estates | November 7, 2008 |
| Seven Brothers | November 7, 2008 |
| SJD Partners. | November 7, 2008 |
| SJD Development | November 7, 2008 |
| Kirby Estates | November 7, 2008 |
| SunCal I | November 7, 2008 |

MAINDOCS-#163424-v1-Group_III_VDs_DS_Tesoro_Del_Rio_SCC_.DOC

| SunCal III | November 7, 2008 |
| SCC Communities | November 19, 2008 |
| Del Rio | November 19, 2008 |
| Tesoro | November 19, 2008 |
| Delta Coves Ventures, LLC | November 14, 2008 |
| SunCal Heartland, LLC | November 12, 2008 |
| SunCal Marblehead, LLC | November 12, 2008 |
| LB-L-SunCal Northlake, LLC | November 12, 2008 |
| LB-L-SunCal Oak Valley, LLC | November 12, 2008 |
| SunCal Century City, LLC | November 14, 2008 |
| SunCal PSV, LLC | November 14, 2008 |
| SunCal Torrance Properties, LLC | November 14, 2008 |
| SunCal Oak Knoll, LLC | November 19, 2008 |

2.1.100   Plan. The First Amended Chapter 11 Plans Filed by SunCal Plan Proponents In The Chapter 11 Cases Of SCC Communities LLC, North Orange Del Rio Land, LLC and Tesoro SF LLC

2.1.101   Plan Documents. The Plan, the Plan Trust Agreement and all other documents attached to the Plan Supplement.

2.1.102   Plan Period. The period from the Effective Date to the Plan Termination Date.

2.1.103   Plan Supplement. The compilation of the Plan Documents to be filed with the Bankruptcy Court.

2.1.104   Plan Termination Date. The fifth (5th) anniversary date of the Effective Date, unless the Plan elects an earlier date.

2.1.105   Plan Sponsor. The entity that has committed to cause the funding of certain specified obligations under the Plan on or after the Effective Date. The Plan Sponsor is Acquisitions.

2.1.106   Plan Trust. A liquidating trust to be established prior to or on the Effective Date, with Acquisitions as the Plan Trustee and the Holders of Allowed Claims against the Debtors as the beneficiaries. The purpose of the Plan Trust will be to liquidate the Debtors' Assets (other than Assets that are excluded by the Plan Trustee on the grounds that they lack value or would be difficult to administer) and to otherwise consummate the Plan.

1            2.1.107    Plan Trustee. The Plan Trustee under the Plan Trust Agreement is

2 Acquisitions.

3            2.1.108    Plan Trust Agreement. The liquidating trust agreement governing the

4 affairs of the Plan Trust, which will be in substantially the form contained in the Plan Supplement.

5            2.1.109    Plan Trust Beneficiaries. The Plan Trust Beneficiaries are (i) the holders

6 of Beneficial Interests, as of any point in time, and (ii) holders of Allowed Claims that shall be

7 satisfied from Plan Trust Property in accordance with the terms of the Plan.

8            2.1.110    Plan Trust Property. Plan Trust Property means all property within the

9 Chapter 11 estates of the Group III: Voluntary Debtors, other than property that is affirmatively

10 excluded by the Plan Trustee.

11            2.1.111    Post-Confirmation Expenses. The fees and expenses incurred by the Plan

12 Sponsor, the Plan Trustee and the Voluntary Debtors' Committee and their professionals following

13 the Confirmation Date (including the fees and costs of Professionals) for the purpose of

14 (i) prosecuting and liquidating the Litigation Claims; (ii) objecting to and resolving Disputed

15 Claims and Disputed Liens; (iii) selling or otherwise liquidating the Plan Trust's Assets;

16 (iv) effectuating Distributions under the Plan; and (v) otherwise consummating the Plan and

17 closing the Group III: Voluntary Debtors' Chapter 11 Cases.

18            2.1.112    Priority Claim. Any Claim, other than an Administrative Claim or a Tax

19 Claim, to the extent entitled to priority under Section 507(a) of the Bankruptcy Code.

20            2.1.113    Pro Rata. Proportionately, so that with respect to any distribution in

21 respect of any Allowed Claim, the ratio of (a)(i) the amount of property distributed on account of

22 such Allowed Claim to (ii) the amount of such Allowed Claim, is the same as the ratio of (b)(i) the

23 amount of property distributed on account of all Allowed Claims of the Class or Classes sharing in

24 such distribution to (ii) the amount of all Allowed Claims in such Class or Classes.

25            2.1.114    Professional. A Person or Entity (a) employed by the Group III:

26 Voluntary Debtors, the Voluntary Debtors' Committee pursuant to a Final Order in accordance

27 with Sections 327 and 1103 of the Bankruptcy Code and to be compensated for services rendered

28 prior to the Effective Date, pursuant to Sections 327, 328, 3291 330 and 331 of the Bankruptcy

1  Code, or (b) for which compensation and reimbursement has been allowed by the Bankruptcy

2  Court pursuant to Section 503(b) of the Bankruptcy Code.

3        2.1.115   Professional Fees.  All Allowed Claims for compensation and for

4  reimbursement of expenses under Sections 328, 330 and/or 503(b) of the Bankruptcy Code

5        2.1.116   Projects.  The Debtors' residential real estate development projects and

6  other assets as separately defined herein and described in Exhibit "1" to the Disclosure Statement.

7        2.1.117   Qualifying Bid.  Qualifying Bid means, with respect to any bid on a

8  Group III Asset: Voluntary Debtor, a bid made by Qualifying Bidder that is A) equal to or in

9  excess of the Initial Overbid Amount, if it is the Initial Overbid, or B) in excess of the immediately

10  preceding Qualifying Bid by the Minimum Increment, if it is not the Initial Overbid.

11        2.1.118   Qualifying Bidder.  Qualifying Bidder means a bidder who a) has

12  deposited the sum of one hundred thousand dollars ($100,000) in an escrow designated by the

13  SunCal Proponents; b) agreed that this sum will be forfeited as liquidated damages if such bidder

14  fails to perform; and c) who has provided the SunCal Plan Proponents evidence confirming that

15  such bidder has the financial means to acquire the applicable Group III Asset: Voluntary Debtor(s)

16  that such bidder is seeking to acquire.

17        2.1.119   Sale Period.  The Sale Period is the time period during which the SunCal

18  Proponents must consummate a sale or liquidation of the Group III Assets: Voluntary Debtors.

19  The Sales Period shall commence on the Confirmation Date and shall expire on the Effective Date.

20        2.1.120   SCC Communities. SCC Communities LLC, a limited liability company,

21  a Voluntary Debtor (a Group III: Voluntary Debtor), and the owner of the Joshua Ridge Project

22        2.1.121   SCC LLC.  SCC Acquisitions LLC, a limited liability company, a

23  subsidiary of Acquisitions and an indirect and/or a direct parent company of all of the Debtors.

24        2.1.122   Schedules.  The schedules of assets and liabilities and list of equity

25  security holders Filed by the Group III: Voluntary Debtors, as required by Section 521(1) of the

26  Bankruptcy Code, Bankruptcy Rules 1007(a)(3) and (b)(1), and Official Bankruptcy Form No. 6,

27  as amended from time to time.

28

1          2.1.123  Secured Claim. A Claim secured by a lien on any property of any of the

2  Estate, but only to the extent of the value of the interest of the holder of such Allowed Claim in the

3  interest of the Estate in such property.

4          2.1.124  Stalking Horse Bidder. The Qualified Bidder who submits the Opening

5  Bid.

6          2.1.125  Secured Claim. Any Claim, including interest, fees, costs, and charges to

7  the extent allowable pursuant to Bankruptcy Code Section 506, that is secured by a valid and

8  unavoidable Lien on the Group III: Voluntary Debtor(s)' Assets.

9          2.1.126  State Court Action. The action filed by certain Voluntary Debtors against

10  Lehman Ali, Inc., and certain other defendants, in California Superior Court for the County of

11  Orange (Case No. 30-2011-0040847-CU-BC-CJC), and a reservation of rights to add the Plan

12  Trustee and/or the Trustee Debtors as additional plaintiffs therein.

13          2.1.127  SunCal. The SunCal Companies, a trade name for Acquisitions and its

14  Affiliates.

15          2.1.128  SunCal Management. SunCal Management, LLC, a Delaware limited

16  liability company, and the property manager for the Projects.

17          2.1.129  SunCal Plan Proponent(s). The Group III: Voluntary Debtors and

18  Acquisitions as the parties-in-interest that are proposing the Plan.

19          2.1.130  Tax. Any tax, charge, fee, levy, impost or other assessment by any

20  federal, state, local or foreign taxing authority, including, without limitation, income, excise,

21  property, sales, transfer, employment, payroll, franchise, profits, license, use, ad valorem,

22  estimated, severance, stamp, occupation and withholding tax. "Tax" shall include any interest or

23  additions attributable to, or imposed on or with respect to such assessments.

24          2.1.131  Tax Claim. Any Claim for any Tax to the extent that it is entitled to

25  priority in payment under Section 507(a)(8) of the Bankruptcy Code.Tesoro. Tesoro SF, LLC, a

26  Delaware limited liability company, a Voluntary Debtor (a Group III: Voluntary Debtor), and the

27  owner of the Tesoro Project.

28

MAINDOCS-#163424-v1-Group_III_VDs_DS_Tesoro__Del_Rio_SCC_.DOC

1    2.1.132   Tesoro Project. The Project owned by Tesoro, located in the City of

2    Santa Clarita, California, as more particularly described herein.

3    2.1.133   Trustee Debtor(s). The following Debtors, individually or collectively,

4    that are represented by the Chapter 11 Trustee: Delta Coves, SunCal Heartland, SunCal

5    Marblehead, SunCal Northlake, SunCal Oak Valley , SunCal Century City, SunCal PSV, SunCal

6    Torrance, and SunCal Oak Knoll.

7    2.1.134   Unpaid Secured Real Property Tax Claims. Secured Claims held by

8    various government entities secured by liens on the underlying real properties owned by the

9    Debtors but that are non-recourse to the Debtors.

10    2.1.135   Unsecured Claim. An Unsecured Claim is any Claim that is not an

11    Administrative Claim, Tax Claim, Secured Claim, or Priority Claim.

12    2.1.136   Voluntary Debtor(s). The following  Chapter 11 debtors and debtors-in-

13    possession, individually or collectively, Palmdale Hills, SunCal I, SunCal III, SCC Palmdale,

14    Acton Estates, SunCal Beaumont, SunCal Emerald, SunCal Johansson, SunCal Bickford, SunCal

15    Summit, Seven Brothers, Kirby Estates, SJD Partners, SJD Development, SCC Communities, Del

16    Rio and Tesoro.

17    2.1.137   Voluntary Debtors' Committee. The Official Committee of Unsecured

18    Creditors of the Voluntary Debtors appointed in the Cases pursuant to Section 1102 of the

19    Bankruptcy Code.

20    2.1.138   Winning Bid. The highest Qualifying Bid received for the Joshua Ridge

21    Project or the Tesoro Project.

22    2.1.139   Winning Bidder. The party that submits the highest Qualifying Bid.

23    **2.2**    **Rules of Construction.**

24    For purposes of the Plan and this Disclosure Statement, unless otherwise provided herein or

25    in the Plan, (a) whenever from the context it is appropriate, each term, whether stated in the

26    singular or the plural, will include both the singular and the plural; (b) each pronoun stated in the

27    masculine, feminine or neuter includes the masculine, feminine and neuter; (c) any reference in the

28    Plan or this Disclosure Statement to an existing document or schedule filed or to be filed means

1   such document or schedule, as it may have been or may be amended, modified or supplemented

2   pursuant to the Plan; (d) any reference to an entity as a Holder of a Claim or Interest includes that

3   entity's successors and assigns; (e) except as otherwise indicated herein all references in the Plan

4   or this Disclosure Statement to Sections, Articles and Exhibits are references to Sections, Articles

5   and Exhibits of or to the Plan; (f) the words "therein," "thereunder" and "thereto" refer to the Plan

6   in its entirety rather than to a particular portion of the Plan; and (g) unless otherwise provided in

7   the Plan or this Disclosure Statement, any reference in the Plan or this Disclosure Statement to a

8   contract, instrument, release, indenture, agreement, or other document being in a particular form or

9   on particular terms and conditions means that such document shall be substantially and materially

10  in such form or substantially and materially on such terms and conditions; (h) any reference in the

11  Plan or this Disclosure Statement to a document, schedule, or exhibit to the Plan or Disclosure

12  Statement Filed or to be Filed means such document, schedule, or exhibit, as it may have been or

13  may be amended, modified, or supplemented; and (i) the rules of construction set forth in Section

14  102 of the Bankruptcy Code shall apply to the extent such rules are not inconsistent with the

15  express terms of the Plan or this Disclosure Statement or any other provision in this Section 3.2.

16      **2.3      Exhibits.**

17      All Exhibits to the Plan are incorporated into and are a part of the Plan as if set forth in full

18  therein.

19                                   **III.**

20                      **PLAN CONFIRMATION DEADLINES**

21      The Bankruptcy Court has not confirmed the Plan described in this Disclosure Statement.

22  Accordingly, the terms of the Plan are not binding on anyone. However, if the Bankruptcy Court

23  confirms the Plan, then the Plan will be binding on the Debtor(s), the Plan Trustee, and on all

24  Creditors and Interest Holders in such Cases.

25      **3.1      Time and Place of the Confirmation Hearing.**

26      The hearing where the Bankruptcy Court will determine whether or not to confirm the Plan

27  will take place at 411 West Fourth Street, Santa Ana, CA 92701-4593 on October 24, 2011, at 9:30

28  a.m. in Courtroom 5A.

**3.2**     **Deadline for Voting for or Against the Plan.**

If you are entitled to vote, it is in your best interest to timely vote on the enclosed ballot and return the ballot to:

> Winthrop Couchot Professional Corporation
> 660 Newport Center Drive, Suite 400
> Newport Beach, CA 92660
> Facsimile: (949) 720-4111
> Attn: P.J. Marksbury

Your ballot must be **received by** September 26, 2011, or it will not be counted.

**3.3**     **Deadline for Objecting to the Confirmation of the Plan.**

Objections to the confirmation of the Plan must be filed with the Bankruptcy Court, and served upon the following parties so that they are received by September 26, 2011:

| | |
|---|---|
| **Counsel to the Voluntary Debtors** | Paul J. Couchot<br>Winthrop Couchot Professional Corporation<br>660 Newport Center Drive, Suite 400,<br>Newport Beach, CA 92660 |
| **Authorized Agent for Voluntary Debtors** | Bruce V. Cook<br>General Counsel<br>2392 Morse Ave<br>Irvine, CA 92614-6234 |
| **Counsel for SunCal Management LLC and SCC Acquisitions Inc.** | Ronald Rus<br>Rus Miliband & Smith A<br>Professional Corporation<br>2211 Michelson Drive, Seventh Floor<br>Irvine, California 92612 |
| **Authorized Agent for SunCal Management and SCC Acquisitions, Inc.** | Bruce V. Cook<br>General Counsel<br>2392 Morse Ave<br>Irvine, CA 92614-6234 |

**3.4**     **Identity of Person to Contact for More Information Regarding the Plan.**

Any interested party desiring further information about the Plan should contact the Voluntary Debtors' counsel, Winthrop Couchot Professional Corporation, 660 Newport Center Drive, Suite 400, Newport Beach, CA 92660, Attn: Paul J. Couchot, (949) 720-4100; Peter W. Lianides, (949) 720-4155; Payam Khodadadi, (949) 720-4160.

### 3.5     Disclaimer.

The information contained in this Disclosure Statement is provided by the SunCal Plan Proponents. The SunCal Plan Proponents represent that everything stated in this Disclosure Statement is true to the best of their knowledge. The Bankruptcy Court has not yet determined whether or not the Plan is confirmable and makes no recommendation as to whether or not you should support or oppose the Plan.

The discussion in this Disclosure Statement regarding the Group III: Voluntary Debtors may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate," or "continue," or the negative thereof or other variations thereon or comparable terminology. The reader is cautioned that all forward looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements. The liquidation analyses, distribution projections, projections of financial results and other information are estimates only, and the timing, amount and value of actual distributions to Creditors may be affected by many factors that cannot be predicted. Therefore, any analyses, estimates, or projections may or may not turn out to be accurate.

The SunCal Plan Proponents and their professionals have made a diligent effort to identify in this Disclosure Statement all Litigation Claims, including claims for relief, counterclaims, and objections to claims. However, no reliance should be placed on the fact that a particular Litigation Claim is or is not identified in this Disclosure Statement. The Group III: Voluntary Debtors or other parties in interest may seek to investigate, file and prosecute Litigation Claims after the Confirmation Date, or the Plan Trust may seek to do so after the Effective Date of the Plan whether or not the Litigation Claims are identified in this Disclosure Statement.

### IV.

### FACTUAL BACKGROUND OF THE DEBTORS

### 4.1     The Formation of the Debtors and the Projects.

1

### 4.1.1   Overview of the Debtors and their Projects.

2       The Group III: Voluntary Debtors are two of twenty-six entities (collectively the "Debtors")

3   that were formed pursuant to a joint venture between Affiliates of the SunCal Companies

4   ("SunCal") and the Lehman Entities (the "SunCal/Lehman Joint Venture"). The Debtors role in the

5   venture was to own and develop the large residential projects that were the core assets in this joint

6   undertaking.

7       At the inception of SunCal/Lehman Joint Venture, it was agreed that SunCal would be the

8   developer/manager of the Projects and the Lehman Entities would provide the necessary capital.

9   Attached hereto as Exhibit "1" is a general description of the Debtors' Projects, including the

10   Group III Assets: Voluntary Debtors, and the Debtors' other primary Assets, excluding Cash and

11   the Litigation Claims, and a description of the loans for the Projects that are not a part of Group III

12   Assets: Voluntary Debtors.

13       All of the Debtors are Affiliates of Acquisitions and SCC LLC.  Some of the Debtors

14   directly own the Projects, while others serve as holding companies, owning Allowed Interests in the

15   Debtors that hold title to the Projects.  SunCal Management, LLC, a SunCal Affiliate, has

16   management contracts with respect to all of the Projects and manages the Debtors' day-to-day

17   business affairs.

18       The seventeen Debtors who are referred to herein as the "Voluntary Debtors" are wholly

19   owned by SunCal Affiliates, and consequently the SunCal Affiliates have full corporate

20   governance authority over these entities.  The Voluntary Debtors own eleven (11) of the Projects.

21   In the case of the nine Trustee Debtors, the SunCal Affiliates and the Lehman Affiliates initially

22   shared ownership equally (50% each). However, after the Petition Date, the SunCal Affiliates

23   became the owner of hundred percent (100%) of the equity in two of the nine Trustee Debtors -

24   SunCal Heartland and SunCal Marblehead.  The Trustee Debtors own nine (9) Projects.

25   Attached hereto as Exhibit "2" is a chart that sets forth the appraised value of the Group III:

26   Voluntary Debtors' Projects. This chart lists both the Lehman Lenders' value estimates and

27   SunCal's valuation estimates.[2]  As the chart indicates, the Lehman Lenders' valuation for the

28

---

[2] Values may have changed since these analyses were prepared.

1    Group III Assets: Voluntary Debtors is in the aggregate amount of $3,050,000, while the Debtors'

2    valuation of the Group III Assets: Voluntary Debtors is in the aggregate amount of $900,000.

3    The Plan eliminates any potential value disputes by providing for the sale of the Group III

4    Assets: Voluntary Debtors through an auction that is designed to yield the highest market price for

5    these assets. Accordingly, to the extent any other party believes the Group III Assets: Voluntary

6    Debtors have a greater value than the Opening Bid offered by another Qualifying Bidder, they will

7    have the opportunity to submit a Qualifying Bid (but no credit-bids will be allowed) that exceeds

8    the Opening Bid and, if they so desire, to become the Winning Bidder by offering the highest

9    Qualifying Bid. This market sale process will insure that the rights of all stakeholders are

10    protected.

11    **4.1.2    The Debtors' Primary Secured Creditors and Their Disputed Claims.**

12    Lehman ALI holds the primary secured claims against the Joshua Ridge Project, the Tesoro

13    Project and the Del Rio CFD Bonds. Lehman Ali's secured claim is based upon funding provided

14    under the terms of the Disputed Interim Loan Agreement. The asserted balance due under terms of

15    this loan was $23,795,012.59 as of March 30, 2009. This claim is also collateralized by a lien

16    against the Heartland Project.

17    **4.1.3    Disputed Claims and Liens.**

18    As discussed in detail herein, during the course of the Debtors' Cases, the Debtors initiated

19    litigation disputing the validity of Lehman's Disputed Secured Claims, and the validity, priority

20    and extent of Lehman's Disputed Liens. This litigation is being pursued through the Lehman

21    Adversary Proceeding, various contested matters, and in potential lawsuits based on the post-

22    petition conduct of the Lehman Entities and/or their agents.

23    Attached hereto as Exhibit "3" is a chart that sets forth Lehman's Disputed Secured Claims,

24    the alleged Holders of the Lehman Disputed Secured Claims, the collateral encumbered by the

25    Lehman Disputed Liens, and the alleged outstanding amount based on the filed Proofs of Claim.

26    As the chart indicates, the total of Lehman's Disputed Secured Claims (based upon the proofs of

27    claims filed in the Debtor's bankruptcy cases) with respect to the Group III: Voluntary Debtors is

28    approximately $23,795,013.

MAINDOCS-#163424-v1-Group_III_VDs_DS_Tesoro_Del_Rio_SCC_DOC

**4.1.4    A Summary of All of the Alleged Claims Against the Group III:**

**Voluntary Debtors.**

Attached hereto as Exhibit "4" is a chart that sets forth the prepetition Claims that have

been asserted against all of the Debtors. In summary, the asserted Claims against the Group III:

Voluntary Debtors consist of the following:

| Claims | SCC Communities | Del Rio | Tesoro |
|---|---|---|---|
| Unpaid Secured Real Property Tax Claims | $47,163 | $0 | $123,366 |
| The Disputed Lehman Secured Claims | $23,795,013 | $23,795,013 | $23,795,013 |
| Administrative and Priority Claims | $87,984.52 | $0 | $385,198.12 |
| General Unsecured Claims Including alleged Bond Claims | $32,813 | $2,015,019 | $170,969 |

The SunCal Plan Proponents believe that these balances will ultimately be reduced through

claims objections resulting in lower "Allowed" claims balances.

**4.1.5    Summary of the Group III: Voluntary Debtors' Cash.**

The following chart sets forth the Group III: Voluntary Debtors' cash on hand as of

January 31, 2011.

| Group III: Voluntary Debtor | Amount |
|---|---|
| SCC Communities | 2,668.92 |
| Del Rio | 248,821.62 |
| Tesoro | 71.07 |
| **Group III: Voluntary Debtors Total** | $251,561.61 |

Although the Lehman Lenders have alleged that they hold liens on the above cash, a

preliminary review of the applicable lien documents indicates that most of the alleged liens were

not validly perfected. This means that these liens can be avoided, allowing the unsecured creditors

recourse to these funds. Moreover, even if the liens against these accounts were properly perfected,

the amount secured by these liens, and their priority and their enforceability will be subject to the

results of the Lehman Claim Objections and the Lehman Adversary Proceeding.

**4.2    Factual Circumstances Leading to the Filing of the Debtors' Chapter 11 Cases.**

**4.2.1    Introduction.**

1        In this section of the Disclosure Statement, the SunCal Proponents have provided a brief
2 description of the relationship between the Debtors and the Lehman Entities. This background is
3 relevant to the Group III: Voluntary Debtors, and in fact all of the Debtors, for the following
4 reasons. First, most of the unsecured claims asserted against the Debtors were incurred at the
5 insistence of the Lehman Lenders, and they would have been paid if the Lehman Lenders had
6 honored their obligation to pay these claims. Second, a substantial part of claims that the Lehman
7 Lenders failed to pay are being asserted against *all of the Debtors*. If the litigation against the
8 Lehman Lenders discussed herein is successful, it will, at a minimum, reduce the pool of claims
9 against the Group III: Voluntary Debtors, and thereby increase the dividend payable to the
10 remaining creditors. Third and finally, this history allows the Creditors to take the measure of the
11 parties who are now proffering the competing plan – the Lehman Lenders. As the within
12 discussion will establish, the Lehman Lenders failed to pay the claims of Creditors prepetition, the
13 Lehman Lenders attempted to foreclose upon the Group III Assets: Voluntary Debtors post-petition
14 in order to deny the unsecured creditors any recovery on the claims they failed to pay, and finally,
15 when this foreclosure effort failed, the Lehman Lenders attempted to destroy the Debtors'
16 reorganization and sale efforts by manipulating LCPI's alleged automatic stay. The SunCal Plan
17 Proponents believe that this history will lead the Creditors to conclude, when weighing the merits
18 of the Lehman Lenders Plan offer: "Fool me once shame on you, fool me twice shame on me."

19        **4.2.2**   **Background of the SunCal Companies**.

20        SunCal is a family-owned and operated real estate business that has been successfully
21 developing properties throughout the western United States for over 70 years. SunCal's business
22 focuses upon the "development" of residential land. A typical SunCal development begins with the
23 acquisition of one or more parcels of raw land. Thereafter, the SunCal team develops a master plan
24 for the acreage that incorporates streets, homes, parks, schools and commercial areas, and then it
25 works with the applicable municipal planning authorities (the city, county, state and federal) to
26 secure the necessary approvals or "entitlements" to gain approval of the Plan. This process, which
27 requires the assistance of land planners, civil engineers, architects, lawyers, and other land
28 specialists, takes a period of years. Once the master plan is approved, SunCal provides for the

1   grading of the project and the installation of the foundational infrastructure (streets, utilities, etc.)

2   and then sells the lots or parcels within the project to merchant builders.

3   ### 4.2.3   The Origins of the SunCal/Lehman Joint Venture.

4   SunCal historically financed its projects with loans and/or equity from a number of

5   different sources. However, beginning in 1997, an increasing number of SunCal's projects were

6   financed by the Lehman Entities, as Mark Walsh ("Walsh"), the head of LBHI's Global Real

7   Estate Group, began cultivating a business relationship with SunCal's principals.

8   By 2003, the Lehman Entities and SunCal had entered into joint ventures involving

9   approximately fifteen projects. By 2007, that number had grown to over forty, and the Lehman

10   Entities had become, with limited exceptions, the exclusive provider of financing for the SunCal

11   Projects pursuant to a written agreement executed in 2006. The Lehman Entities also consisted of

12   the Lehman Equity Members that either directly or indirectly owned a fifty percent (50%) equity

13   interest in all nine of the Trustee Debtors.

14   In their dealings with SunCal, the Lehman Representatives made no distinction between

15   Projects financed by Lehman ALI and Projects financed by LCPI. They also made no distinction

16   between the Debtors in which Lehman Equity Members held 50% equity memberships or the

17   Debtors in which the Lehman Entities held no equity membership interest. As agents of the

18   financial partner in the parties' joint venture, the Lehman Representatives would determine which

19   Lehman Entity would provide financing on which Projects, and would dictate the structure that the

20   financing would take, according to whatever suited the Lehman Entities' needs.

21   ### 4.2.4   Lehman's Effective Control over the Management of the Debtors and

22   ### Promises of Ongoing Funding.

23   Prior to the market downturn in the middle of 2007, Lehman Representatives afforded

24   SunCal substantial discretion in the management and development of the Projects. The Debtors

25   would contract with third-party vendors to perform grading, health and safety compliance,

26   construction, landscaping, and other necessary services on the Project sites, and they would work

27   with the local municipalities to obtain the necessary entitlements and other authorizations

28   necessary to proceed with development. The Lehman Representatives, SunCal and the Debtors

1  would discuss anticipated quarterly expenditures at periodic budget meetings, and , as expenses

2  were incurred each month, SunCal and the Debtors would submit requests for payment to the

3  Lehman Representatives, supported by the necessary documentation. The Lehman Representatives

4  would then provide the funding necessary to pay these expenses.

5        During the third quarter of 2007, the foregoing management and payment dichotomy

6  changed, after the real estate market experienced a sudden downturn, and many of the Projects

7  significantly declined in value. In response to this dramatic economic change, a series of high

8  level discussions occurred between SunCal's representatives and the Lehman Representatives --

9  including Walsh, Paul Hughson ("Hughson") and Frank Gilhool ("Gilhool"), the Managing

10  Directors of Lehman's Global Real Estate. In these discussions, SunCal's representatives, acting

11  on behalf of the Debtors, expressed concerns about the loans on the Projects being out of balance,

12  and suggested shutting down the Projects, or at least slowing the pace of development. However,

13  Walsh specifically instructed SunCal not to slow down or stop work. He assured SunCal that the

14  Lehman Entities would provide the necessary funding to pay vendors and to keep the development

15  of the Projects moving forward.

16        The foregoing assurances of payments were confirmed in numerous telephone

17  conversations between Gilhool and SunCal's COO, Frank Faye ("Faye"), SunCal's General

18  Counsel, Bruce Cook ("Cook"), Steve Elieff and/or Bruce Elieff that took place during 2007 and

19  2008. In each exchange, Gilhool assured SunCal that the Lehman Entities were committed to

20  funding the debts and obligations being incurred at the Projects and they continued to insist that

21  work proceed.

22        During this time frame, the Lehman Representatives became much more "hands on,"

23  scrutinizing and approving all budgets and expenses through a new control and approval structure.

24  Under the new structure, SunCal would submit budgets to the Lehman Representatives on a

25  weekly basis and explain, during period conference calls, what Project payables they believe had to

26  be paid and what work had to be performed on the Projects. The Lehman Representatives would

27  then unilaterally decide what future work would proceed, the Lehman Representatives would

28  authorize the work and the Lehman Representatives would decide what payables would be paid

MAINDOCS-#163424-v1-Group_III_VDs_DS_Tesoro__Del_Rio_SCC_.DOC

1    timely by designating them as "urgent," and what other payables were not urgent and hence would

2    not be paid on a timely basis. However, even under this new Lehman controlled management and

3    payment regime, the Lehman Representatives made it clear that all payables being incurred would

4    be funded.

### 4.2.5    The Disputed Interim Loan Agreement and the Group III: Voluntary Debtors Fraudulent Conveyance Actions in the Lehman Adversary Proceeding.

8        On October 31, 2007, SCC Acquisitions LLC, as borrower, and Lehman ALT, as lender,

9    entered into the Disputed Interim Loan Agreement.

10        Although none of the Plaintiffs was a "borrower" under the Disputed Interim Loan

11    Agreement, they each concurrently executed a Subsidiary Guaranty with Lehman ALI guaranteeing

12    the same. The obligation under the Interim Loan Agreement also purports to be secured by (a) a

13    first-priority deed of trust on the Joshua Ridge Project owned by SCC Communities; (b) a first-

14    prioritydeed of trust on the Tesoro Prroject owned by SunCal Tesoro; and (c) an alleged first-

15    priority lien on the right to receive future anticipated Net Del Rio CFD Bonds Proceeds.

16        Deeds of trust were recorded against the properties owned by Tesoro and SCC

17    Communities on November 2, 2007; and an assignment of the right to receive future anticipated

18    CFD Bond Proceeds proceeds was signed by Del Rio on October 31, 2007. *{NET}*

19        On or about March 27, 2009, Lehman ALI filed identical proof of secured claim No. 9

20    against SCC Communities, proof of secured claim No. 7 against Tesoro, and proof of

21    secured claim No. 14 against SunCal Del Rio arising from the Disputed Interim Loan Agreement in

22    the

23    amount of $23,795,013. These Debtors incurrence of the foregoing obligations and their transfers

24    of interests are referred to herein as the "Interim Loan Transfers."

25        Of the $20 million in proceeds from the Disputed Interim Loan Agreement paid to the

26    parent entity, SCC Acquisitions LLC, only $78,000—less than one half of one percent of the

27    total—was used to fund SCC Communities, SunCal Tesoro or Rio or their properties. At Lehman

28    ALI's direction and insistence, the remainder of the proceeds was transferred to parties other than

1   these Debtors, primarily those which owed debts with regard to Projects on which Lehman ALI or

2   its Affiliates were lenders.

3       Accordingly, the Group III: Voluntary Debtors have in the Lehman Adversary Proceeding

4   sought to avoid the Interim Loan Transfer obligation as fraudulent to the extent the value of the

5   obligation exceeds the value of the loan proceeds each Debtor received. The $20 million-plus

6   obligations which each of the three Debtors incurred in connection with the Interim Loan exceeded

7   the value of their assets, which in each case consisted exclusively of the assets securing the loan.

8                   **4.2.6    The 2008 Restructuring Agreement.**

9       By the fall of 2007, both SunCal and the Lehman Representatives contemplated entering

10  into restructuring agreement in the near term, with a closing to occur no later than January or

11  February of 2008. However, this transaction was delayed by the Lehman Entities' extensive

12  documentation demands until May 23, 2008. On this date, SunCal and most of the Debtors finally

13  entered into an omnibus "Restructuring Agreement" with LBHI, Lehman ALI and the other

14  Lehman Entities. The same Lehman Representative signed the Restructuring Agreement on behalf

15  of all of the Lehman Entities.

16      Pursuant to the Restructuring Agreement, Lehman ALI, "as the Lender with respect to each

17  Loan," committed, among other things, to: (1) make advances under existing loans to fund the

18  continuing costs necessary to preserve the value of the Projects; (2) move forward to resolve the

19  accrued outstanding subcontractor payables, i.e., to make sure that the Projects' creditors were paid

20  for their work; and (3) to close the transaction, whereby newly-created Lehman Entities would

21  assume the debt and obligations of the Projects.

22      As originally executed in May 2008, the Restructuring Agreement applied to twelve of the

23  twenty Projects (as well as several other projects not at issue in the Lehman Adversary

24  Proceeding): (1) Acton Estates; (2) Beaumont Heights; (3) Bickford Ranch; (4) Emerald

25  Meadows; (5) Heartland; (6) Johannson Ranch; (7) Marblehead; (8) Northlake; (9) Oak Valley;

26  (10) Pacific Point; (11) Ritter Ranch; and (12) Summit Valley. The Debtors that owned and/or

27

28

1    held equity interests in the entities that owned these Projects were signatories to the May 2008

2    agreement.[3]

3    Between May and August 2008, the parties agreed to add four additional projects to the

4    Restructuring Agreement: (1) Del Rio; (2) Joshua Ridge; (3) Palm Springs Village; and (4) Tesoro

5    Burnham, and the four Debtors associated with these Projects—SunCal Del Rio, SCC

6    Communities, SunCal PSV, and SunCal Tesoro.  Only four Projects were not included in the

7    Restructuring Agreement: Century City, Delta Coves, Oak Knoll and Del Amo.  Accordingly, the

8    four Debtors associated with these Projects—SunCal Century City, Delta Coves, SunCal Oak

9    Knoll and SunCal Torrance—were not signatories thereto.  Lehman ALI was the lender on each of

10    these Projects and , and as with the other Projects, Lehman Ali continued to insist that these four

11    debtors proceed with the development of the four Projects, it approved all expenses, and it

12    continually provided assurances of payment.

13    ### 4.2.7    The Lehman Lenders Hire Radco.

14    Subsequent to the execution of the Restructuring Agreement, Lehman ALI arranged for a

15    third party, Radco, to directly settle outstanding contractor payables, as its agent.  Radco was

16    provided some limited funding and authority to negotiate settlements, and did in fact reach

17    settlement with a number of creditors.  The funding for these settlements, whether the debts related

18    to Lehman ALI or LCPI funded Projects, came from the same source.  Lehman ALI and LCPI also

19    provided approval for new work on the Projects, and Lehman ALI paid for some of this work.

20    However, this funding was minimal and it soon stopped.

21    In August 2008, Lehman ALI withdrew funding and settlement authority from Radco,

22    leaving millions of dollars in outstanding contractor payables unresolved, notwithstanding the

23

---

24    [3] Specifically, the Restructuring Agreement was entered into by, among others, the "Borrowers,"
"Grantors" and "Pledgors," as defined in Annex 1 thereto.  The "Borrowers" included SunCal Marblehead,

25    SunCal Heartland, SunCal Northlake, SunCal Oak Valley, SJD Partners, Palmdale Hills, SCC Palmdale,
SunCal I, SunCal III, and SunCal Bickford.

26
The "Grantors" included SunCal Marblehead, SunCal Heartland, SunCal Northlake, SunCal Oak Valley,

27    SJD Partners, Palmdale Hills, SunCal Bickford, SunCal Acton, SunCal Summit and SunCal Emerald, and
Debtors SunCal Beaumont and SunCal Johannson.

28
The "Pledgors" included SCC Palmdale, SunCal I, SunCal Summit and SJD Development.

1 | contrary provisions in the Restructuring Agreement. Leman Ali's actions also impaired the

2 | Debtors' ability to resolve ongoing public health and safety issues arising at the Projects.

3 | Ultimately, only a fraction of the total outstanding payables were resolved, contrary to the past

4 | promises made by Lehman Representatives.

5 |        **4.2.8**   **The Lehman Lenders' Failure to Close on the Settlement Agreement.**

6 |       Pursuant to the terms of the Restructuring Agreement, the parties agreed to enter into a

7 | Settlement Agreement, the form of which was attached to the Restructuring Agreement. The

8 | Settlement Agreement provided for the transfer of the Projects included within the Restructuring

9 | Agreement to a series of newly formed Lehman-controlled entities (each with "SCLV" in its

10 | name, for "SunCal-Lehman Venture"). The agreement further provided that the entity taking title

11 | to the Project would assume the Lehman Lender debt obligations associated with the Projects,

12 | assume certain bond obligations associated with the Projects, and provide indemnifications to

13 | SunCal and the Debtors for unpaid claims.

14 |       On August 25, 2008, the Settlement Agreement and a series of related documents were

15 | formally executed by SunCal and the applicable Lehman Lenders and Lehman Equity Members at

16 | a meeting held in Los Angeles on August 25, 2008.  Once these documents were signed, all that

17 | remained was the mechanical closing of the series of transactions described in the Settlement

18 | Agreement. Since all of the conditions precedent to the closings had been satisfied, or could have

19 | been satisfied at the meeting, this should have occurred at the August 25, 2008 meeting. However,

20 | the Lehman Representative asked SunCal to extend the closing date for thirty days, to September

21 | 30, 2008. Accordingly to the Lehman Representatives, this short extension would enable them to

22 | secure certain outstanding third party consents. Although SunCal knew these third party consents

23 | were readily available, within a few days they agreed to this extension, believing the request was

24 | made in good faith.  However, as later discovered, it was not.

25 |        **4.2.9**   **Alvarez and Marsal Take Over Control of the Lehman Entities After**

26 |                 **the Chapter 11 Filings of LBHI and LCPI.**

27 |       LBHI filed for bankruptcy in September 2008 and LCPI filed for bankruptcy in October

28 | 2008. After LBHI's filing, Bryan Marsal ("Marsal") of Alvarez & Marsal ("A&M") was appointed

1    to serve as LBHI's Chief Restructuring Officer. Marsal and A&M are in charge of liquidating the

2    now defunct Lehman Entities, including Chapter 11 debtors LBHI and LCPI, and the non-bankrupt

3    Lehman Lenders (Lehman ALI, OVC, and Northlake Holdings, as well as the non-bankrupt

4    Lehman Equity Members.

5          Although A&M was not employed until after the events that occurred on August 25, 2008

6    described above, it should be noted that A&M hired the same law firm that represented the

7    Lehman Lenders in the August 25, 2008 meeting – Weil, Gotshal & Manges, LLP. Moreover, as

8    more fully explained herein, it was A&M that directed Lehman Ali not to perform its contractual

9    obligations under the Settlement Agreement after September of 2008. Accordingly, the same

10    individuals that caused the damages to unsecured creditors by insisting upon the breach of the

11    Settlement Agreement, are now asking for their vote in the competing plan filed by the Lehman

12    Lenders.

13          LBHI's bankruptcy filing and the Lehman Lenders refusal, at A&M's direction, to close the

14    transactions provided for under the Settlement Agreement as agreed, were not small matters. They

15    severely damaged the Debtors. Although the Debtors were not proceeding with any new

16    construction or development, the Debtors were still required to expend significant sums on site

17    security, erosion control, property taxes and other measures in order to prevent the Projects from

18    becoming a public safety hazard, and in order to avoid the loss of valuable entitlements, and to

19    mitigate penalties and fines being incurred by the Projects. Although SunCal and the Debtors

20    repeatedly requested that the Lehman Entities pay for critical health and safety and value

21    preservation measures on the Projects, these efforts were unavailing.

22          Between October 9 and November 4, 2008, SunCal's general counsel Cook sent Robert

23    Brusco, an authorized agent of the Lehman Entities, nearly two dozen letters requesting that the

24    Lehman Lenders provide the funding necessary to address critical needs on the Projects as

25    promised. A summary of these health and safety notices are attached hereto as Exhibit "5". The

26    Lehman Entities ignored these requests until November 2008, when Brusco, purportedly on behalf

27    of the Lehman Lenders, delivered the message that the Lehman Lenders were unwilling to fund the

28    Projects and that, instead, they intended to foreclose on all of the Projects.

1    As a result, as set forth in Exhibit "4," there are now over 240 vendors, municipalities,

2  counties and bonding companies claiming over $400 million in work, improvements and property

3  tax claims against the Projects.  Substantially all of these sums are due to work performed or

4  bonded at Lehman's request based upon Lehman's promises of payment.

5      **4.3    The Debtors' Potential Preferential Transfers**.

6    Attached hereto as Exhibit "6" are charts setting forth payments made to third parties

7  during the ninety (90) day time period preceding the filing of the Debtors' Chapter 11 Cases as

8  well as payments made to the Lehman Entities and to SunCal Affiliates during the one-year time

9  period preceding the filing of the Debtors' Chapter 11 Cases.

10    As the charts in Exhibit 6" indicate, Group III: Voluntary Debtors made payments in the

11  following aggregate amounts to non-insiders within the 90 day preference period preceding the

12  Petition Date:  SCC Communities: $500.00, Del Rio: $86,622.93, Tesoro: $659.00.  The

13  corresponding figures for payments made to "insiders" within the one year preference period

14  preceding the Petition Date were: SCC Communities: $0.00, Del Rio: $50,721.00, Tesoro:

15  $5,000.00.

16

17

18

19

20

21

22

23

24

25

26

27

28

-37-

1

2                                              **V.**

3              **SIGNIFICANT EVENTS IN THE DEBTORS' CHAPTER 11 CASES**

4        **5.1.    Voluntary Debtors.**

5               **5.1.1    Joint Administration of the Voluntary Debtors and the Trustee**

6                      **Debtors.**

7        Since their respective Petition Dates, the seventeen (17) Voluntary Debtors have continued

8   to operate as "debtors-in-possession," subject to the supervision of the Bankruptcy Court and in

9   accordance with the Bankruptcy Code. The Voluntary Debtors are authorized to operate their

10  businesses in the ordinary course during the Chapter 11 proceedings. Transactions outside the

11  ordinary course of business must be approved by the Bankruptcy Court.

12        The Voluntary Debtors' Cases are being jointly administered pursuant to orders entered on

13  November 19, 2008 and December 9, 2008. The Voluntary Debtors' Cases are being jointly

14  administered with the Trustee Debtors' cases pursuant to an order entered on March 11, 2009.

15

16               **5.1.2    The Voluntary Debtors Court Employed Professionals.**

17        The Voluntary Debtors have employed Winthrop Couchot Professional Corporation as their

18  general insolvency counsel, and the MB Firm as their special litigation counsel in the Lehman

19  Adversary Proceeding and the State Court Action.

20        The Voluntary Debtors' Committee has employed Irell & Manella LLP as its counsel

21  pursuant to an order entered on February 13, 2009.

22        Pursuant to the Court's Order regarding joint administration of the Voluntary Debtors, the

23  Voluntary Debtors' liability for professional fees is joint and several among the Voluntary Debtors'

24  Estates for fees incurred related to services for the benefit of all of the Voluntary Debtors. The

25  Trustee Debtors' liability for professional fees is not joint and several.

26        Pursuant to the initial MB Firm employment application, Acquisitions was responsible for

27  the payment of their fees until December 31, 2009. The MB Firm's application also allows for

28  payments from the Bond Companies. The initial MB Firm employment application reserved the

1    right, should the Lehman Adversary Proceeding result in a benefit accruing to particular Debtors'

2    Estates, to request that its fees and expenses be reimbursed by the Debtors' Estates. The Bond

3    Companies have also agreed to jointly fund a portion of the professional fees and expenses of the

4    MB Firm with respect to the Lehman Adversary Proceeding. The Bond Companies' funding

5    commitment can be terminated and after such a termination they will only be required to cover fees

6    and costs incurred during the period of their prior commitments.

7    　　　　The MB Firm employment application was subsequently amended. Pursuant to an order

8    entered on April 14, 2010, (1) the Voluntary Debtors will pay up to one-half of the fees and

9    expenses incurred by the MB Firm from and after February 1, 2010 onward; and (2) the Trustee

10    Debtors do not have an obligation to pay any of the MB Firm's fees pertaining to the Trustee

11    Debtors' estates, unless and until a loan by the Voluntary Debtors to the Trustee Debtors is agreed

12    to by the Trustee and approved by the Court, or in accordance with the terms of the original

13    employment applications to the extent not superseded or modified by the amended employment

14    application. The order does not affect the MB Firm's right to seek payment from the Bond

15    Companies without the need for an additional order of the Court.

16    　　　　The MB Firm filed an updated application seeking to further amend their employment to

17    include the right to pursue certain claims against the Lehman Entities and certain employees and

18    agents of these entities on behalf of the Voluntary Debtors. The claims encompassed by this

19    amendment include claims that are based upon both prepetition and post-post petition actionable

20    conduct under both state law and federal law against the Lehman Entities and/or their agents.

21    　　　　　　　　**5.1.3    LCPI's Motions for Relief from the Automatic Stay Against Certain of**

22    　　　　　　　　**the Voluntary Debtors' Projects and Related Appeals.**

23    　　　　On January 23, 2009, LCPI and Lehman ALI filed various motions for relief from the

24    automatic stay against Palmdale Hills, SCC Palmdale, SunCal Beaumont, SunCal Summit Valley,

25    SunCal Emerald, SunCal Bickford, Acton Estates, SunCal Johannson, and SCC Communities I

26    (the "Lehman Entities' Stay Motions"). Although the Debtors, were able to defeat these motions,

27    they are relevant in the following respect. Had the motions filed by LCPI and Lehman Ali

28    succeeded, it is almost certain that unsecured creditors would have received nothing on their

1   claims. Moreover, as more fully explained herein, since Lehman Ali and LCPI did not even own

2   the loans they were seeking to foreclose upon, Accordingly, these motions should never have been

3   filed in the first instance. Yet now, these same parties- Lehman Ali and LCPI – are asking these

4   same creditors to vote on their plan and to "trust" them.

5       **5.2.    The Debtors' Various Motions Relating to Financing for the Projects and to**

6              **Pay Professional Fees.**

7           **5.3.1    The Voluntary Debtors' Initial Motion for Surcharge and Use of Cash**

8                  **Collateral.**

9           On January 16, 2009, seven of the Debtors filed a motion authorizing Palmdale Hills to use

10  and surcharge, pursuant to 11 U.S.C. § 506(c), and/or use the purported cash collateral of LCPI

11  arising from the Ritter Ranch Loan Agreement, pursuant to 11 U.S.C. § 363(c)(2), in order to pay

12  for the reasonable and necessary maintenance expenses required to preserve the value of such

13  Debtors' Projects subject to deeds of trust and other security interests held by LCPI.

14          LCPI objected to the motion and subsequently filed a motion in its own Chapter 11

15  proceeding in the Southern District of New York seeking an order barring the motion as a violation

16  of LCPI's automatic stay. Although the Debtors believe that LCPI's stay was not violated in any

17  way by the Motion, the Motion was taken off calendar prior to any ruling by the New York

18  Bankruptcy Court, based upon the threat of sanctions made against Debtors' counsel by the

19  presiding judge in LCPI's case.

20          As explained above, LCPI did not even own an interest in the Ritter Ranch Loan

21  Agreement when it asserted the automatic stay, since the Ritter Ranch Loan Agreement, which was

22  the subject of the cash collateral motion, had already been sold pursuant to the Fenway Repurchase

23  Agreement. Yet this wrongful action prevented Palmdale Hills from using its own money to pay

24  critical bills that Lehman Ali, LCPI's parent was contractually required to fund in the first instance.

25      **5.3.2    The Voluntary Debtors' Agreements with the Lehman Entities for Use**

26              **of Alleged Cash Collateral to Maintain the Properties and to Pay**

27              **Professional Fees.**

28

1    On September 1, 2009, with the consent of the Lehman Entities, fourteen of the Voluntary

2   Debtors filed a motion authorizing surcharge pursuant to 11 U.S.C. § 506(c), and/or use of the

3   purported cash collateral for the purpose of addressing critical public health and safety issues and

4   other value preservation with respect to the Debtors Projects.  On September 10, 2009, the Lehman

5   Entities filed an opposition thereto, and on September 17, 2009, the Voluntary Debtors filed their

6   Reply.

7    Subsequently, the Voluntary Debtors learned that the Lehman Entities lacked control

8   agreements as to the majority of the depository accounts, and thus such accounts were not subject

9   to perfected liens and therefore did not constitute "cash collateral".  On October 15, 2009, the

10   Voluntary Debtors filed a *Motion For Order Authorizing Disposition Of Certain Depository*

11   *Accounts*.  On or about October 22, 2009, the Lehman Entities filed an opposition, and on October

12   29, 2009, the Voluntary Debtors filed their Reply.

13    The motion was consensually resolved by way of the *Stipulation Pursuant To 11 U.S.C. §§*

14   *362, 363, And 364: (1) Authorizing The Use Of Cash Collateral And Alleged Unencumbered Cash;*

15   *(2) Approving Postpetition Financing; (3) Providing Administrative Expense Status; And (4)*

16   *Modifying Automatic Stay To The Extent Necessary* filed on December 8, 2009, and the order

17   thereon entered on December 17, 2009.  The stipulation provides for a 120-day budget with

18   expenses totaling approximately $5 million, pursuant to which any Cash in the Estates is used first

19   and then money borrowed from the Palmdale Hills Estate is used thereafter on an administrative

20   basis.  The agreement also permitted the Voluntary Debtors to use their alleged unencumbered

21   cash to pay its professional fees.  This agreement has been renewed on several occasions.

22    **5.3.    The Debtors' Disputes and Claims Against the Lehman Entities.**

23    **5.4.1    The Lehman Adversary Proceeding.**

24    On January 6, 2009, the Voluntary Debtors initiated the Lehman Adversary Proceeding by

25   filing their initial complaint against Lehman ALI for equitable subordination of Lehman ALI's

26   Disputed Claims and avoidance of its Disputed Liens pursuant to Bankruptcy Code Section 510(c).

27   On February 3, 2009, the Debtors filed a First Amended Complaint, which added the Trustee

28

1 | Debtors as co-plaintiffs and added various other causes of action. The First Amended Complaint
2 | also named OVC Holdings, Northlake Holdings and various other entities as defendants.

3 |     Pursuant to a hearing on a motion to dismiss held on June 11, 2009, the Bankruptcy Court
4 | granted the Debtors leave to amend the second amended complaint. Thus, on July 10, 2009, the
5 | Debtors filed their Third Amended Complaint. The Third Amended Complaint addressed many of
6 | the concerns raised by the Bankruptcy Court and also included various Avoidance Actions and
7 | other causes of action against the Lehman Lenders and the Lehman Successors. The Third
8 | Amended Complaint also added Fenway Capital as a defendant based upon, the discovery of the
9 | facts relating to the sale of the loans Fenway Capital and based upon the Court ruling that the Repo
10 | was a true sale.

11 |     On September 30, 2009, the Lehman Entities filed a motion to dismiss the Third Amended
12 | Complaint (which motion was amended on October 7, 2009 and October 22, 2009), alleging that
13 | the relief requested by certain Debtors was not available as a matter of law. On September 30,
14 | 2009, Fenway also filed a motion to dismiss the Third Amended Complaint. On January 26, 2010
15 | and January 28, 2010, the Debtors filed oppositions to the motions to dismiss the Third Amended
16 | Complaint filed by the Lehman Entities and Fenway, respectively. On February 4, 2010, the
17 | Lehman Entities and Fenway filed their respective replies. The Court entered an order granting in
18 | part and denying in part the relief requested in the motions to dismiss. Most notably, the Court
19 | denied the defendants request for the dismissal of the equitable subordination claims and the
20 | Court permitted the Debtors to file an amended complaint. LCPI was dismissed as a defendant at
21 | this hearing, due to the fact that it did not own any interest in the loans at issue and due to potential
22 | impact of the case upon LCPI's automatic stay. On March 26, 2010, the Debtors filed their Fourth
23 | Amended Complaint.

24 |     The causes of action in the Fourth Amended Complaint set forth the fraudulent conveyance
25 | claims by the Group III: Voluntary Debtors against Lehman ALI arising from the Disputed Interim
26 | Loan Agreement, described above. Accordingly, the Group III: Voluntary Debtors have filed a
27 | motion for summary judgment for these causes of action, which are set for hearing on August 25,
28 | 2011.

MAINDOCS-#163424-v1-Group_III_VDs_DS_Tesoro_Del_Rio_SCC_DOC

1

#### 5.4.1.4    Debtors' 502(d) Objections.

2    The Voluntary Debtors and other parties-in-interest have filed a motion to disallow,

3    pursuant to 11 U.S.C. § 502(d), the following Disputed Claims filed by Lehman ALI and LCPI,

4    including the following claims filed against the Group III: Voluntary Debtors:

| Disputed Proof of Claim No. | Debtor | Claim Holder | Claim Amount |
|---|---|---|---|
| 9 | SCC Communities | Lehman ALI | $ 23,795,013 |
| 7 | Tesoro | Lehman ALI | $ 23,795,013 |
| 14 | Del Rio | Lehman ALI | $ 23,795,013 |

9    On June 9, 2011, a hearing was held on the Section 502(d) claim objection. At this hearing

10    the Lehman Entities disputed the merits of the Section 502(d) claim objection and LCPI alleged

11    that the filing of this objection violated its automatic stay. At the conclusion of the hearing, the

12    Court ruled that the parties could proceed with their discovery in this matter.

13    If the Section 502(d) claim objection is successful, the claims of the Lehman Entities

14    identified in the table above will be disallowed. Although the Lehman Entities will have the right

15    to seek reconsideration of this disallowance, in order to obtain this relief they would have to repay

16    the applicable transfers.

#### 5.4.1.5        The Del Rio CFD Bonds and Potential Disputes Under the

#### Acquisition Agreement.

19    An Acquisition Agreement among the City of Orange, for itself and on behalf of City of

20    Orange Community Facilities District No. 06-1 (Del Rio Public Improvements) sets forth certain

21    terms for the acquisition of various facilities by the City of Orange from Del Rio, the issuance of

22    the Del Rio CFD Bonds and the use and application of a portion of the proceeds of the Del Rio

23    Bonds for the construction of certain improvements and other applications, and with the remaining

24    proceeds to go to Del Rio.  The Acquisition Agreement provides for a maximum bond

25    authorization in the amount of up to $25 million.  The Court has entered an order approving the

26    Acquisition Agreement, the sale of the Del Rio CFD Bonds, and creditor payments.  The

27    Acquisition Agreement was approved by the Court on March 16, 2010.  From the closing,

28

1    approximately $6,700,000 of claims (including approximately $2,924,827 of SunCal Management

2    claims) have been paid.

3        On April 13, 2011, Del Rio and SunCal Management filed a joint motion with the

4    Bankruptcy Court to reconfirm these payments due to overpayment and disclosure issues raised by

5    the Lehman Entities. The hearing on this motion is scheduled for July 19, 2011.

6        Upon the construction of the park within the project, which is anticipated to be completed

7    by the end of 2011, any Net Del Rio CFD Bonds Proceeds not used for such construction or other

8    specified purposes will be disbursed to Del Rio. Such amounts are estimated to be approximately

9    $7 million to $8 million.

10       **5.4.    The Debtors' Motion for a Stay to Suspend Certain Lehman Actions.**

11       On September 21, 2010, the Voluntary Debtors, Acquisitions, and SunCal Management

12   filed a motion requesting, among other relief, for the Court to suspend the Lehman Entities

13   competing plan and disclosure statement unless and until the Lehman Entities agree to provide the

14   Debtors with relief from their automatic stay in the Debtors' Chapter 11 Cases (the "Suspension

15   Motion"). The Court granted this motion and stayed all matters until March 1, 2011. The Court

16   also ordered the parties to engage in a mediation. The Voluntary Debtors and the Lehman Entities

17   were unable to settle their claims through this process.

18       **5.5.    The Debtors' Other Litigation with Non-Lehman Related Parties.**

19       **5.5.1    The Debtors' Failed Preliminary Injunction Motion Against the**

20              **Holders of Bond Claims.**

21       On February 20, 2009, the Debtors filed a complaint and a Motion for Preliminary

22   Injunction, pursuant to which the Debtors sought a Motion for Preliminary Injunction against the

23   Holders of Bond Claims from pursuing such Claims. On February 23, 2009, the Court denied the

24   Debtors' request for the TRO and granted the Debtors' request to require the defendants to show

25   cause why the Motion for Preliminary Injunction should not be issued.

26       On March 2, 2009, several Holders of Bond Claims objected to the Motion for the

27   Preliminary Injunction. The objections generally alleged that the Debtors failed to show that the

28   balancing of the equities favored granting the Preliminary Injunction versus the harm to the

1  Holders of the Bond Claims.  At a hearing held on March 4, 2009, the Court denied the

2  Preliminary Injunction Motion and the underlying complaint has subsequently voluntarily been

3  dismissed without prejudice.

4          **5.5.2   The Contractors' Successful Motions for Relief from Stay to Pursue the**

5                      **Bond Claims.**

6          Various contractors that were hired to perform work on some of the Projects have filed

7  motions for relief from stay with the Bankruptcy Court to pursue their purported Bond Claims.

8  These creditors have requested that the Bankruptcy Court grant these creditors relief from the

9  automatic stay to allow such creditors to enforce certain Claims that such creditors allege to have

10  against some of the Debtors, including certain surety bonds that are alleged to have been issued in

11  favor of such creditors.  The Debtors opposed the motions on the grounds that the various Debtors

12  are indispensible parties.  The Court conditionally granted the motions provided that the Bond

13  Claimants are able to sever the Debtors from their proceedings on the Bonds.

14          **5.5.3   Shea's Successful Motion for Relief from Stay.**

15          On April 7, 2010, Shea Construction, Inc. filed a motion for relief from stay to pursue a

16  state court for foreclosure of liens on property previously owned by the Debtors and no longer

17  property of the Debtors' estate.  On May 14, 2010, the Court granted this motion.

18          **5.5.4   Bond Safeguard Motion.**

19          Bond Safeguard, a surety that issued bonds to secure the performance of work on certain

20  projects, filed a motion seeking authority to file  claims relating to these bond claims after the bar

21  date. The Debtors opposed this motion. This motion was granted pursuant to an order entered on

22  January 7, 2011.

23                                      **VI.**

24                  **TREATMENT OF UNCLASSIFIED CLAIMS**

25          **6.1      Introduction**. As required by the Bankruptcy Code, the Plan places Claims and

26  Interests into various Classes according to their right to priority.  However, certain types of Claims

27  are not classified in any Classes under the Plan. These Claims are deemed "unclassified" under the

28  provisions of the Code.  They are not considered impaired and they do not vote on the Plan,

                                      -45-

1  because they are automatically entitled to specific treatment provided for them in the Code. As

2  such, the SunCal Plan Proponents have not placed the following Claims in a Class. The treatment

3  of these unclassified Claims is as provided below.

4      **6.2     Treatment of Allowed Administrative Claims.**

5      The Code requires that all Allowed Administrative Claims be paid on the later of Effective

6  Date of the Plan or the date of their allowance, unless a particular Holder agrees to a different

7  treatment. The treatment of Allowed Administrative Claims is as described below. However, such

8  Administrative Claims are continuing to be incurred.

9      Except to the extent that the Holder of an Allowed Administrative Claim agrees to a

10  different treatment and subject to the Administrative Claims Bar Date set forth herein, the

11  Distribution Agent shall pay each Allowed Administrative Claim in full, in Cash, on the later of

12  (i) the Effective Date, (ii) within ten (10) Business Days after the date such Administrative Claim

13  becomes an Allowed Administrative Claim, or (iii) the date such Allowed Administrative Claim

14  becomes due according to its terms. Notwithstanding the foregoing, any Allowed Administrative

15  Claim representing obligations incurred in the ordinary course of post-petition business by the

16  Debtors in Possession (including without limitation post-petition trade obligations and routine

17  post-petition payroll obligations) shall be paid in full or performed by the Plan Trustee in the

18  ordinary course of business, in accordance with the terms of the particular obligation.

19      **6.3     Administrative Claims Bar Date.**

20      All applications for final compensation of Professionals for services rendered and for

21  reimbursement of expenses incurred on or before the Effective Date and all other requests for

22  payment of Administrative Claims incurred before the Effective Date under Sections 507(a)(2)

23  or 507(b) of the Bankruptcy Code (except only for (i) post-petition, ordinary course trade

24  obligations and routine post-petition payroll obligations incurred in the ordinary course of the

25  Debtors' post-petition business, for which no bar date shall apply, and (ii) post-petition tax

26  obligations, for which no bar date shall apply) shall be Filed with the Bankruptcy Court and served

27  upon the Plan Trustee no later than the Administrative Claims Bar Date, unless such date is

28  extended by the Bankruptcy Court after notice to the Plan Trustee. Any such request for payment

1  of an Administrative Claim that is subject to the General Administrative Claims Bar Date and that

2  is not Filed and served on or before the Administrative Claims Bar Date shall be forever barred;

3  any party that seeks payment of Administrative Claims that (i) is required to file a request for

4  payment of such Administrative Claims and (ii) does not file such a request by the deadline

5  established herein shall be forever barred from asserting such Administrative Claims against the

6  Debtors, the Plan Trust, their estates, or any of their property.

7       **6.4    Treatment of Unsecured Tax Claims.**

8       Tax Claims are certain unsecured income, employment and other taxes described by Code

9  Section 507(a)(8).  The Code requires that each holder of such a Section 507(a)(8) tax claim

10  receive the present value of such Claim in deferred cash payments, over a period not exceeding

11  five (5) years from the petition date and that such treatment not be less favorable than the treatment

12  accorded to non priority unsecured creditors.

13       At the election of the Plan Trustee, the Holder of each Allowed Priority Tax Claim shall be

14  entitled to receive, on account of such Claim, (i) equal cash payments on the last Business Day of

15  each three-month period following the Effective Date, during a period not to exceed five years

16  after November 6, 2008, totaling the principal amount of such Claim plus simple interest on any

17  unpaid balance from the Effective Date, calculated at the interest rate available on ninety (90) day

18  United States Treasuries on the Effective Date, (ii) such other treatment agreed to by the Holder of

19  the Allowed Priority Tax Claim and the Plan Trustee, provided such treatment is on more

20  favorable terms to the Debtors (or the Plan Trust after the Effective Date) than the treatment set

21  forth in clause (i) hereof, or (iii) payment of the full Allowed Priority Tax Claim in Cash.

22                                        **VII.**

23                    **CLASSIFICATION OF CLAIMS AND INTERESTS**

24       As required by the Code, the Plan places Claims and Interests into various Classes

25  according to their right to priority and other relative rights.  The Plan specifies whether each Class

26  of Claims or Interests is impaired or unimpaired, and the Plan sets forth the treatment each Class

27  will receive.  The table below lists the Classes of Claims established under the Plan and states

28  whether each particular Class is impaired or left unimpaired by the Plan.  A Class is "unimpaired"

if the Plan leaves unaltered the legal, equitable and contractual rights to which the Holders of

Claims or Interests in the Class are entitled, with certain exceptions specified in the Bankruptcy

Code.

| CLASSIFICATION OF HOLDERS OF UNPAID SECURED REAL PROPERTY TAX CLAIMS | | |
|---|---|---|
| **Class 1** | **Claimant** | **Claim Nos.[4]** |
| Class 1.1 | Los Angeles County as the Holder of an Unpaid Secured Real Property Tax Claim against the Tesoro Project in the amount of $123,366. | Tesoro 2 |
| Class 1.2 | San Bernardino County as the Holder of an Unpaid Secured Real Property Tax Claim against the Joshua Ridge Project in the amount of $47,163. | Estimate as of March 1, 2011 But Ongoing |

| CLASSIFICATION OF LEHMAN'S DISPUTED CLAIMS | | |
|---|---|---|
| **Class 2** | **Claims** | **Claim Nos.** |
| Class 2.1 | The Holder of Lehman's Disputed Claims filed by Lehman ALI against SCC Communities, Tesoro and Del Rio arising from the Disputed Interim Loan Agreement in the asserted amount of $23,795,012. | SCC Communities: 9 Del Rio: 14 Tesoro: 7 |

| CLASSIFICATION OF PRIORITY UNSECURED CLAIMS | | |
|---|---|---|
| **Class 3** | **Claimant** | **Claim Nos.** |
| Class 3.1 | The Holder of Priority Claims that fall within Code Sections 507(a)(2), (4), (5), (6), and (7) in the asserted against SCC Communities. | Scheduled Amount |
| Class 3.2 | The Holder of Priority Claims that fall within Code Sections 507(a)(4), (5), (6), and (7) in the asserted against Del Rio. | Scheduled Amount |

---

[4] These Real Property Tax Claims have been updated to include amounts for which proofs of claim have not yet been filed.

MAINDOCS-#163424-v1-Group_III_VDs_DS_Tesoro__Del_Rio_SCC_.DOC

| CLASSIFICATION OF PRIORITY UNSECURED CLAIMS | | |
|---|---|---|
| **Class 3** | **Claimant** | **Claim Nos.** |
| Class 3.3 | The Holder of Priority Claims that fall within Code Sections 507(a)(4), (5), (6), and (7) in the asserted against Tesoro. | Scheduled Amount |

| CLASSIFICATION OF GENERAL UNSECURED CLAIMS | | |
|---|---|---|
| **Class 4** | **Claimant** | **Claim Nos.** |
| Class 4.1 | Claimants holding Allowed Unsecured Claims against SCC Communities. | Various Filed and Scheduled |
| Class 4.2 | Claimants holding Allowed Unsecured Claims against Del Rio. | Various Filed and Scheduled |
| Class 4.3 | Claimants holding Allowed Unsecured Claims against Tesoro. | Various Filed and Scheduled |

| CLASSIFICATION OF INTEREST HOLDERS | | |
|---|---|---|
| **Class 5** | **Claimant** | **Amount** |
| Class 5.1 | Allowed Interests in SCC Communities held by SCC LCC | 100% |
| Class 5.2 | Allowed Interests in Tesoro held by SCC LLC | 100% |
| Class 5.3 | Allowed Interests in Del Rio held by SCC LLC | 100% |

VIII.

THE PLAN'S TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS

**8.1.    The Plan's Treatment of Holders of Allowed Secured Real Property Tax Claims secured by Group III Assets: Voluntary Debtors Against Group III: Voluntary Debtors (Classes 1.1 and 1.2).**

The rights of the Holder(s)' of Allowed Secured Claims in Classes 1.1 and 1.2 are not impaired under the Plan. Such claimants shall retain their existing lien rights and one of the following two non-impairment options shall apply, at the election of the Plan Trustee: 1) On the Effective Date, such claims shall be satisfied in accordance with the provision of 11 U.S.C. §

-49-

1  1124(2), or 2) on the Effective Date, or the Holder(s) shall be free to pursue their respective rights

2  and remedies against the underlying real property collateral under applicable California law.

3      **8.2.**    **The Plan's Treatment of Lehman's Disputed Claim(s) and Disputed Lien(s)**

4          **Against Group III: Voluntary Debtors (Class 2.1).**

5        The Holder of Disputed Secured Claims within Class 2.1 shall receive the indubitable

6  equivalent of their claims under the Plan, pursuant to 11 U.S.C. § 1129(b)(2)(A)(iii), through the

7  following treatment:

8          A.      <u>Lien Rights</u>. The Class 2.1 Holder shall retain their alleged interest, if any,

9  in the Disputed Lien(s) against Plan Trust Assets that secure the Disputed Secured Claims, pending

10  a Final Order(s) resolving the Allowance of such Disputed Secured Claims and determining the

11  validity, priority and extent of the applicable Disputed Liens against the applicable Plan Trust

12  Assets, which secure these claims, except as follows:

13          1.      The Plan Trust Assets subject to the Class 2.1 Disputed Liens may

14  be sold free and clear of such liens on the Effective Date. These Disputed Liens shall then attach to

15  the Net Proceeds from the sale, which shall be deposited into the Net Proceeds Account;

16          2.      To the extent that a Disputed Secured Claim held by either the Class

17  2.1 Claimant against either Group III Asset: Voluntary Debtor is disallowed, and the Disputed Lien

18  associated with this Disputed Secured Claim is consequently released to the extent of this

19  disallowance, the Plan Trustee shall be authorized to use the Net Proceeds that are no longer

20  subject to the Disputed Lien(s) or entitled to priority over the Disputed Lien(s)  to pay other

21  Allowed Claims in their order of priority, in accordance with the terms of the Plan;

22          3.      To the extent that a Disputed Secured Claim held by either the Class

23  2.1 Claimant and the associated Disputed Lien(s) against either Group III Asset: Voluntary Debtor

24  are subordinated, the Plan Trustee shall be authorized to use to the Net Proceeds that are no longer

25  subject to the Disputed Lien(s) to pay other Allowed Claims in their order of priority, in

26  accordance with the terms of the Plan, to the extent of the subordination; and

27        Notwithstanding the existence of the Disputed Secured Claims and the

28  Disputed Liens, the Plan Trustee may a seek a release of the funds in the Net Proceeds Account

1    subject to these claims and liens to pay the claims of other creditors in accordance with the terms

2    of the Plan, if the Class 2.1 Claimant's interests in this property will remain adequately protected

3    after this release.

4           B.      Sale of Group III Assets: Voluntary Debtors. The Plan Trustee shall

5    complete the sale of Group III Assets: Voluntary Debtors on the Effective Date that are subject to

6    the Holder(s)' Disputed Secured Claims and Disputed Liens, free and clear of such claims and

7    liens, through a sale that satisfies the following conditions:

8           1.      The Group III Assets: Voluntary Debtors will be sold through a

9    public auction after a commercially reasonable marketing and advertising effort of at least sixty

10    (60) days duration;

11           2.      The SunCal Plan Proponents shall have the right to provisionally

12    accept an Opening Bid from a Stalking Horse Bidder prior to the public auction and to grant this

13    bidder either the Joshua Ridge Break-Up Fee, the Tesoro Break-up Fee as the case may be, or the

14    Del Rio Break-Up Fee;

15           3.      Other Qualified Bidders shall have the right to overbid the Opening

16    Bid by submitting a Qualifying Bid. The first round of Qualifying Bids after the Opening Bid must

17    be equal to or in excess of the Initial Overbid Amount. Thereafter, all Qualifying Bids shall be

18    equal to or in excess or the Minimum Increment;

19           4.      The highest Qualifying Bid received from a Qualified Bidder, shall

20    be accepted as the Winning Bid, and the submitting bidder shall be the Winning Bidder. Upon

21    payment of the Winning Bid, the Winning bidder shall receive title to the applicable Group III

22    Asset: Voluntary Debtor free and clear of all monetary liens and encumbrances; and

23           5.      No bidder shall be allowed to submit or demand the acceptance of a

24    "credit bid" based upon an existing claim or lien.

25           C.

26           C.      Distributions To The Class 2.1 Claimant. If the Plan Trustee consummates a

27    sale or otherwise liquidates the particular Asset(s) subject to the Class 2.1 Disputed Secured

28    Claim(s) and/or Disputed Lien(s) during the Sales Period, as provided for above, the Holder(s) of

1  such Disputed Secured Claim shall receive a distribution to the extent of available funds from the

2  applicable Net Sale Proceeds Account(s) to the extent required by a Final Order determining the

3  allowance and priority of the Disputed Secured Claims and the validity, priority and extent of the

4  Disputed Liens in, including but not limited to, the Lehman Adversary Proceeding and the Lehman

5  Claims Objections.

6      **8.3.**    **The Plan's Treatment of Holders of Priority Claims Against Group III:**

7      **Voluntary Debtors (Classes 3.1 to 3.3)**.

8      The treatment of the Holders of Allowed Priority Claims under the Plan shall be as follows:

9          A.    The Holder(s) are unimpaired under the Plan; and

10          B.    The Holder(s) shall be paid either from the applicable Distribution

11  Account(s) (i) the full amount of such Allowed Priority Claim in Cash on the later of (x) the

12  Effective Date, (y) the date such Claim becomes an Allowed Priority Claim or (z) the date such

13  Allowed Priority Claim becomes payable in accordance with the terms governing such Allowed

14  Priority Claim, or (ii) upon such other less favorable terms as may be agreed to by such Holder and

15  the Plan Trustee.

16      **8.4.**    **The Plan's Treatment of Holders of Allowed General Unsecured Claims**

17      **Against Group III: Voluntary Debtors (Classes 4.1 to 4.3)**.

18      The rights of Holders of Allowed Class 4.1 to 4.3 Claims are impaired under the Plan.

19  Under the Plan, each claimant will receive, after payment in full of all Post Confirmation

20  Expenses, Allowed Administrative Claims, and Allowed Priority Claims, a pro-rata distribution up

21  to 100% of such Holder's Allowed Claim from funds payable from the applicable Distribution

22  Account(s).

23      **8.5.**    **The Plan's Treatment of Holders of Allowed Interests Against Group III:**

24      **Voluntary Debtors.**

25      The Interests of the Holders in Class 5.1 to 5.3 are impaired under the Plan. Any potential

26  distribution to Holders of Allowed Interest against the Group III: Voluntary Debtor shall first be

27  used to pay any deficit to Holders of Allowed General Unsecured Claims in the other Group III:

28

1    Voluntary Debtors, and second to be used to fund Allowed Administrative Claims in the Voluntary

2    Debtors' cases, and then to repay the Litco. Administrative Claim.

3                                          IX.

4                    **ACCEPTANCE OR REJECTION OF THE PLAN**

5        **9.1.    Introduction.**

6            PERSONS OR ENTITIES CONCERNED WITH CONFIRMATION OF THE PLAN

7    SHOULD CONSULT WITH THEIR OWN ATTORNEYS BECAUSE THE LAW ON

8    CONFIRMING A PLAN OF REORGANIZATION IS VERY COMPLEX.  The following

9    discussion is intended solely for the purpose of alerting readers about basic confirmation issues,

10   which they may wish to consider, as well as certain deadlines for filing Claims.  The Debtors

11   cannot represent that the discussion contained below is a complete summary of the law on this

12   topic.

13           Many requirements must be met before the Court can confirm the Plan.  Some of the

14   requirements include that the Plan must be proposed in good faith, acceptance of the Plan, whether

15   the Plan pays creditors at least as much as creditors would receive in a Chapter 7 liquidation, and

16   whether the Plan is feasible.  The requirements described herein are <u>not</u> the only requirements for

17   confirmation.

18       **9.2.    Who May Object to Confirmation of the Plan.**

19           Any party in interest may object to the confirmation of the Plan, but as explained below not

20   everyone is entitled to vote to accept or reject the Plan.

21       **9.3.    Who May Vote to Accept/Reject the Plan.**

22           A Holder of a Claim or Interest has a right to vote for or against the Plan if that Holder of

23   the Claim or Interest has a Claim which is both (1) Allowed or Allowed for voting purposes and

24   (2) Classified in an impaired Class.  The votes will be tabulated on a Debtor by Debtor basis.

25       **9.4.    What Is an Allowed Claim/Interest.**

26           As noted above, a Holder of Claim or Interest must first have an Allowed Claim or

27   Allowed Interest to vote.

28       **9.5.    What Is an Impaired Class.**

MAINDOCS-#163424-v1-Group_III_VDs_DS_Tesoro_Del_Rio_SCC_.DOC

1    A Class is impaired if the Plan alters the legal, equitable, or contractual rights of the Claims

2  or Interests in that Class, other than the right to accelerate the Claim upon certain kinds of defaults.

3  In this case, the Debtors believe that all Classes, except for Class 1.1, 1.2, 3.1, 3.2 and 3.3 are

4  impaired.

5    **9.6.    Who Is Not Entitled to Vote.**

6    The following four types of Claims are not entitled to vote: (1) Claims that have been

7  disallowed; (2) Claims in unimpaired Classes; (3) Claims entitled to priority pursuant to

8  Bankruptcy Code Sections 507(a)(2) or (a)(3) and Claims in Classes that do not receive or retain

9  any value under the Plan. Claims in unimpaired Classes are not entitled to vote because such

10  Classes are deemed to have accepted the Plan. Claims entitled to priority pursuant to Bankruptcy

11  Code Section 507(a)(8) are not entitled to vote because such Claims are not placed in Classes and

12  they are required to receive certain treatment specified by the Bankruptcy Code. Claims in Classes

13  that do not receive or retain any property under the Plan do not vote because such Classes are

14  deemed to have rejected the Plan. The Debtors believe that all Classes are entitled to vote except

15  Class 1.1, 1.2, 3.1, 3.2, and 3.3. These classes are not impaired under the Plan and consequently are

16  not entitled to vote. They are conclusively deemed to have accepted the Plan. The Interests held by

17  the Holders in Classes 5.1, 5.2 and 5.3 are being cancelled under the Plan; accordingly these

18  Interest Holders are deemed to have voted to reject the Plan.

19    EVEN IF YOUR CLAIM IS OF THE TYPE DESCRIBED ABOVE, YOU MAY STILL

20  HAVE A RIGHT TO OBJECT TO THE CONFIRMATION OF THE PLAN.

21    **9.7.    Who Can Vote in More than One Class.**

22    A creditor whose Claim has been Allowed in part as a Secured Claim and in part as an

23  Unsecured Claim is entitled to accept or reject a Plan in both capacities by casting one ballot for

24  the secured part of the Claim and another ballot for the Unsecured Claim. Also, a Creditor may

25  otherwise hold Claims in more than one Class (such as a Holder of Senior Secured Claims and

26  Subordinated Note Claims), and may vote the Claims held in each Class.

27    **9.8.    Votes Necessary for a Class to Accept the Plan.**

28

1    A Class of Claims is deemed to have accepted the Plan when more than one-half (1/2) in

2  number and at least two-thirds (2/3) in dollar amount of the Claims *that actually voted*, vote to

3  accept the Plan. A Class of interests is deemed to have accepted the Plan when Holders of at least

4  two-thirds (2/3) in amount of the interest-Holders of such Class which actually vote, vote to accept

5  the Plan.

6    **9.9.    Treatment of Nonaccepting Classes.**

7    As noted above, even if there are impaired Classes that do not accept the proposed Plan, the

8  Court may nonetheless confirm the Plan if the nonaccepting Classes are treated in the manner

9  required by the Code and at least one impaired Class of Claims accepts the Plan. The process by

10  which a plan may be confirmed and become binding on non-accepting Classes is commonly

11  referred to as "cramdown." The Bankruptcy Code allows the Plan to be "crammed down" on

12  nonaccepting Classes of Claims or interests if it meets all statutory requirements except the voting

13  requirements of 1129(a)(8) and if the Plan does not "discriminate unfairly" and is "fair and

14  equitable" with respect to each impaired Class that has not voted to accept the Plan, as set forth in

15  11 U.S.C. § 1129(b) and applicable case law.

16    **9.10.    Request for Confirmation Despite Nonacceptance by Impaired Class(es).**

17    The SunCal Plan Proponents will ask the Court to confirm the Plan by cramdown on any

18  impaired Class if such Class does not vote to accept the Plan.

19                                **X.**

20              **MEANS OF EXECUTION AND IMPLEMENTATION OF THE PLAN**

21    **10.1.    Introduction.**

22    This section is intended to address how the SunCal Plan Proponents intend to implement

23  the provisions of the Plan. It addresses the transfer of the Plan Trust Property to the Plan Trust, the

24  nature of the Plan Trust, the powers of the Plan Trust, the governance of the Plan Trust, the

25  resolution of disputed claims, the sources of funds that will be used to pay claims and the

26  mechanics of how claims will be paid.

27    **10.2    Sale Process After Confirmation Date But Prior To Effective Date.**

28

MAINDOCS-#163424-v1-Group_III_VDs_DS_Tesoro__Del_Rio_SCC_.DOC

1    The core objective of the Plan is to enable all creditors holding Allowed Claims to receive

2    the highest dividend possible by selling the estates' primary assets, the Group III Assets: Voluntary

3    Debtors, to the highest bidder. The process of marketing the Group III Assets: Voluntary Debtors

4    for sale will begin, pursuant to the Confirmation Order, immediately after the entry of this order.

5    Although the Chapter 11 Trustee will not be formally removed under the Plan until the Effective

6    Date, he will be required to work with the SunCal Proponents after the Confirmation Date to

7    promote and facilitate the sale of the Group III Assets: Voluntary Debtors in accordance with the

8    Plan terms.

9    The SunCal Proponents will pursue the following sale procedures after the Confirmation

10   Date:

11   A.   Implementation of a marketing program. Once the Plan is confirmed, the

12   SunCal Proponents will market the Group III Assets: Voluntary Debtors for sale through a

13   comprehensive sale effort during the Sale Period. This sale effort will include 1) sending sale

14   packages describing each Group III Asset: Voluntary Debtor to the real estate brokerage

15   community; b) advertising the Group III Assets: Voluntary Debtors for sale on a website that

16   includes links allowing direct access to all relevant information regarding the Group III Assets:

17   Voluntary Debtors; and c) sending packages to a list of prospects nationally who are actively

18   seeking or may have interest in these kinds of assets.

19   B.   Identifying a Stalking Horse Bidder. During the Sale Period, the SunCal

20   Parties will accept, on a provisional basis, an Opening Bid for one or both of the Group III Assets:

21   Voluntary Debtors. The bidder whose Opening Bid is accepted will become the "Stalking Horse

22   Bidder." The Opening Bid must be equal to the Minimum Sale Price(s) fixed in the Plan for each

23   Group III Asset: Voluntary Debtor: $144,000 for the Joshua Ridge Project, $666,000for the

24   Tesoro Project and $6,390.000 for the Net Del Rio CFD Bonds Proceeds.

25   C.   The Sale Contract. The sale contract that will be entered into with the

26   Stalking Horse Bidder will include the following bankruptcy-sale related provisions:

27   1.   Overbid Provisions. The contract will allow the SunCal Proponents

28   to seek "overbids" from other Qualified Buyers, and to accept an Initial Overbid that exceeds the

1   Stalking Horse Bid by the Initial Overbid Amount applicable to each Group III Asset: Voluntary

2   Debtor. In the case of the Joshua Ridge Project, the Initial Overbid Amount is a sum that is not less

3   than $144,000, plus the Joshua Ridge Break-up Fee, plus ten thousand dollars ($10,000). In the

4   case of the Tesoro Project, the Initial Overbid Amount is $666,000, plus the Tesoro Break-up Fee,

5   plus thirty five thousand dollars ($35,000).  In the case of the Net Del Rio CFD Bonds Proceeds,

6   the Initial Overbid Amount is $6,390,000, plus the Del Rio Break-up Fee, plus one-hundred

7   thousand dollars ($100,000).

8                              2.       A Break-Up Fee. The sale contract will include a "break-up fee"

9   provision. This fee will be payable to the Stalking Horse Bidder if the Opening Bid is overbid, and

10  another Qualified Bidder purchases the Group III Asset: Voluntary Debtor(s) that is the subject of

11  the Opening Bid. The Joshua Ridge Break-up Fee is $6,400, the Tesoro Break-up Fee is $30,400

12  and the Del Rio Break-Up Fee is $284,000.

13                             3.       Sale Free And Clear of Liens. The sale contract will provide that the

14  Group III Asset: Voluntary Debtor(s) are being sold free and clear of all monetary liens and

15  encumbrances and that no party holding a lien against the projects, including the Lehman Lenders,

16  may submit a "credit bid" based upon the amount allegedly owing on the claims secured by the

17  project being sold.

18                     D) The Auction. Ten days prior to the Effective Date, the SunCal Proponents will

19  conduct an auction wherein all Qualified Bidders who have submitted Qualified Bids for the Group

20  III Assets: Voluntary Debtors will have the opportunity to increase their bids for these Projects.

21  The Qualified Bidder that submits the highest bid for the Project will then be designated the

22  Winning Bidder. The Winning Bidder will then have twenty (20) days to prepare to close this

23  purchase transaction by paying the Winning Bid amount. Once the Winning Bidder advises the

24  SunCal Plan Proponents that they are ready to close, the sequence of events described in

25  paragraphs 10.3 through 10.5 shall be implemented.

26          **10.3.   Possession and Control**.

27          As of the Effective Date, possession and control over all property within these estates shall

28  pass to the Plan Trust.

1      **10.4.    Transfer of Property To The Plan Trust**.

2           On the Effective Date, title to and possession of all property of the Group III: Voluntary

3    Debtors, excepting those items of property that the Plan Trustee affirmatively elects not to transfer

4    to the Plan Trust, shall be deemed transferred and delivered to the Plan Trust, without further act or

5    action under any applicable agreement, law, regulation, order or rule of law.

6      **10.5.    Closing of Group III Asset: Voluntary Debtor Sales**. On the Effective Date, the

7    Winning Bidder and the Plan Trustee shall open escrow and the Group III Asset: Voluntary

8    Debtor(s) shall be sold free and clear of liens to the Winning Bidder, at the Winning Bid.

9      **10.6.    Purposes of The Plan Trust**.

10          The Plan Trust's purposes, powers and objectives include, but are not limited to the

11   following: (i) to take control over, manage and over time sell or otherwise dispose of all Plan Trust

12   Property for the highest return reasonably obtainable; (ii) to pursue all Litigation Claims through

13   collection efforts, including through litigation in any court of competent jurisdiction, and to obtain

14   the most favorable recovery on the same, with due consideration of all relevant factors, including

15   cost; (iii) to cause all Available Cash to be deposited into the applicable Distribution Accounts;

16   (iii) to initiate actions to resolve any remaining issues regarding the allowance and payment of

17   Claims including, as necessary, initiation and/or participation in proceedings before the Bankruptcy

18   Court; (iv) to take such other actions as are necessary or useful to maximize the value of all

19   property received by the Plan Trust; (v) to make the payments and distributions to creditors and

20   holders of Beneficial Interests as required by the Plan; and (vi) to enforce all rights with respect to

21   the Plan Trust Property; and (vii) to take all actions reasonable and necessary to implement the

22   terms of the Plan, including but not limited to selling the Group III Assets: Voluntary Debtors and

23   the Assets. A more complete statement of the Plan Trust's powers and limitations is set forth in the

24   Plan Trust Agreement, which is a part of the Plan Supplement.

25          It is intended that the Plan Trust will be classified for U.S. federal income tax purposes as a

26   "liquidating trust," with the primary objective of liquidating the Plan Trust Property and

27   distributing the net proceeds thereof, with no objective to continue or engage in the conduct or a

28   trade or business in accordance with Treasury Regulation 301.7701-4(d), and, notwithstanding

MAINDOCS-#163424-v1-Group_III_VDs_DS_Tesoro__Del_Rio_SCC_.DOC