1  PAUL J. COUCHOT -- State Bar No. 131934
   WINTHROP COUCHOT, P.C.
2  660 Newport Center Drive, Fourth Floor
   Newport Beach, CA 92660
3  Telephone: (949) 720-4100
   Facsimile: (949) 720-4111
4  General Insolvency Counsel for Palmdale Hills
   Property, LLC et. al. (the "Voluntary Debtors")
5
6  RONALD RUS - State Bar No. 67369
   JOEL S. MILIBAND - State Bar No. 77438
7  RUS MILIBAND & SMITH P.C.
   2211 Michelson Drive, Seventh Floor
8  Irvine, California 92612
   Telephone: (949) 752-7100
9  Facsimile: (949) 252-1514
10 Counsel for SunCal Management LLC and
   SCC Acquisitions Inc.

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**Santa Ana Division**

| | |
|---|---|
| In re<br>PALMDALE HILLS PROPERTY, AND ITS RELATED DEBTORS,<br>    Joint Administered Debtors and<br>    Debtors-in-Possession | Case No. 8:08-bk-17206-ES<br>Jointly Administered With Case Nos.<br>8:08-bk-17209-ES; 8:08-bk-17240-ES;<br>8:08-bk-17224-ES; 8:08-bk-17242-ES;<br>8:08-bk-17225-ES; 8:08-bk-17245-ES;<br>8:08-bk-17227-ES; 8:08-bk-17246-ES; |

Affects:
- [ ] All Debtors
- [x] Palmdale Hills Property, LLC
- [ ] SunCal Beaumont Heights, LLC
- [ ] SCC/Palmdale, LLC
- [ ] SunCal Johannson Ranch, LLC
- [ ] SunCal Summit Valley, LLC
- [ ] SunCal Emerald Meadows LLC
- [x] SunCal Bickford Ranch, LLC
- [x] Acton Estates, LLC
- [ ] Seven Brothers LLC
- [ ] SJD Partners, Ltd.
- [ ] SJD Development Corp.
- [ ] Kirby Estates, LLC
- [ ] SunCal Communities I, LLC
- [ ] SunCal Communities III, LLC
- [ ] SCC Communities LLC
- [ ] North Orange Del Rio Land, LLC
- [ ] Tesoro SF LLC

8:08-bk-17230-ES; 8:08-bk-17231-ES;
8:08-bk-17236-ES; 8:08-bk-17248-ES;
8:08-bk-17249-ES; 8:08-bk-17573-ES;
8:08-bk-17574-ES; 8:08-bk-17575-ES;
8:08-bk-17404-ES; 8:08-bk-17407-ES;
8:08-bk-17408-ES; 8:08-bk-17409-ES;
8:08-bk-17458-ES; 8:08-bk-17465-ES;
8:08-bk-17470-ES; 8:08-bk-17472-ES;
and 8:08-bk-17588-ES
Chapter 11 Proceedings

**FIRST AMENDED DISCLOSURE STATEMENT DESCRIBING FIRST AMENDED CHAPTER 11 PLANS FILED BY SUNCAL PLAN PROPONENTS IN THE CHAPTER 11 CASES OF PALMDALE HILLS PROPERTY, LLC, SUNCAL BICKFORD RANCH, LLC, SUNCAL EMERALD MEADOWS, LLC AND ACTON ESTATES, LLC [GROUP I: VOLUNTARY DEBTORS]**

Date:     July 22, 2011
Time:     11:00 a.m.
Place:    Courtroom 5A

MAINDOCS-#163407-v2-SCC_DS_Group_1_Vol_Debtors.DOC

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Continued from Previous Page*

- [ ] LBL-SunCal Oak Valley, LLC
- [ ] SunCal Heartland, LLC
- [ ] LBL-SunCal Northlake, LLC
- [ ] SunCal Marblehead, LLC
- [ ] SunCal Century City, LLC
- [ ] SunCal PSV, LLC
- [ ] Delta Coves Venture, LLC
- [ ] SunCal Torrance, LLC
- [ ] SunCal Oak Knoll, LLC

1
2

## **TABLE OF CONTENTS**

**PAGE**

I. INTRODUCTION ................................................................................................ 2

II. DEFINITIONS AND RULES OF INTERPRETATION ................................... 4

III. PLAN CONFIRMATION DEADLINES ......................................................... 27

IV. FACTUAL BACKGROUND OF THE DEBTORS ......................................... 29

V. SIGNIFICANT EVENTS IN THE DEBTORS' CHAPTER 11 CASES ......... 42

VI. TREATMENT OF UNCLASSIFIED CLAIMS .............................................. 56

VII. CLASSIFICATION OF CLAIMS AND INTERESTS .................................... 59

VIII. THE PLAN'S TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS ...... 64

IX. ACCEPTANCE OR REJECTION OF THE PLAN ........................................ 71

X. MEANS OF EXECUTION AND IMPLEMENTATION OF THE PLAN .............. 74

XI. RISK FACTORS ............................................................................................. 83

XII. DISTRIBUTIONS ........................................................................................... 85

XIII. OBJECTIONS TO CLAIMS AND DISPUTED CLAIMS ............................. 87

XIV. EXECUTORY CONTRACTS AND UNEXPIRED LEASES ......................... 88

XV. BEST INTEREST OF CREDITORS TEST AND PLAN FEASIBILITY ............... 89

XVI. LIMITATION OF LIABILITY ...................................................................... 90

XVII. CONDITIONS TO CONFIRMATION AND EFFECTIVENESS OF THE PLAN .. 91

XVIII. RETENTION OF JURISDICTION ................................................................ 91

XIX. MODIFICATION OR WITHDRAWAL OF THE PLAN ............................... 91

XX. MISCELLANEOUS ....................................................................................... 92

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

MAINDOCS-#163407-v2-SCC_DS_Group_1_Vol_Debtors.DOC

# I.

# <u>INTRODUCTION</u>

This DISCLOSURE STATEMENT[1] is filed by the Voluntary Debtors and Acquisitions, as the SunCal Plan Proponents, in the Chapter 11 Cases of the following Debtors:

> Palmdale Hills Property, LLC
> SunCal Bickford, LLC
> SunCal Emerald Meadows, LLC
> Acton Estates, LLC

(the "Group I: Voluntary Debtors"). In addition to being one of the proponents of the Plan, Acquisitions is the Plan Sponsor, it will also serve as the Plan Trustee of the Plan Trust and as the Distribution Agent, if the Plan is confirmed.

Chapter 11 allows debtors-in-possession, Chapter 11 trustees, and under some circumstances, creditors, interest holders and others parties in interest, to propose a Chapter 11 plan. As stated, the SunCal Plan Proponents are the proponents of the Plan sent to you in the same envelope as this Disclosure Statement. This document summarizes the contents of the Plan, certain information relating to the Plan and the process the Bankruptcy Court follows in determining whether or not to confirm the Plan.

In summary, the Plan provides for sale of the Ritter Ranch Project, the Bickford Ranch, SunCal Emerald and the Acton Project (the "Group I Projects"), and for the liquidation of all other assets of the Group I: Voluntary Debtors. The Net Proceeds from these sales will then be distributed to Creditors holding Allowed Claims in accordance with their rights and priorities under the bankruptcy code and under other applicable law.

**The Plan also offers the holders of a certain category of general unsecured claims, which are defined herein as Reliance Claims, the right to sell these claims, and any Litigation Rights held by the holders of such claims against the Lehman Entities, to LitCo, for the sum of sixty cents ($0.60) per dollar of claim. The purchase offer is conditioned upon confirmation of the applicable Plan and the lack of any stay pending an appeal of the Confirmation Order.**

---

[1] All defined terms used herein have the same meanings as set forth in Article II herein and Exhibit "1" attached hereto.

MAINDOCS-#163407-v2-SCC_DS_Group_1_Vol_Debtors.DOC

1    **EXCEPT AS PROVIDED IN THE PURCHASE OFFER TO HOLDERS OF**

2    **RELIANCE CLAIMS REFERENCED ABOVE, AS EXPLAINED IN THE DEFINITION**

3    **OF THE TERM "EFFECTIVE DATE," WHICH IS THE DATE ON WHICH THE PLAN**

4    **BECOMES EFFECTIVE, NO ACTION PROVIDED FOR IN THE PLAN SHALL BE**

5    **TAKEN AGAINST EITHER LEHMAN COMMERCIAL PAPER, INC. ("LCPI") OR**

6    **LEHMAN BROTHERS HOLDINGS, INC. ("LBHI") THAT WOULD HAVE THE**

7    **EFFECT OF VIOLATING ANY APPLICABLE AUTOMATIC STAY THAT MAY EXIST**

8    **IN THEIR CHAPTER 11 CASES. ANY SUCH ACTION WILL ONLY PROCEED AFTER**

9    **ANY APPLICABLE STAY IS EITHER LIFTED OR DEEMED INAPPLICABLE.**

10    Although the same Plan is being filed in the Cases of all four Group I: Voluntary Debtors,

11   each Plan is independent of the others. The Creditors in each Case will determine, subject to Court

12   approval, whether the Plan will be approved in their Case. Accordingly, the Plan may be confirmed

13   in the Cases of all of the Group I: Voluntary Debtors, but not in others.

14    The Lehman Lenders have filed a competing and alternative plan of reorganization in the

15   Cases. Accordingly, the creditors holding claims against the Debtors will have the opportunity to

16   vote for one plan or the other, or they can vote for both plans and allow the Court to decide which

17   plan should be approved. The Debtors believe that the aggregate benefits offered under their Plan

18   are superior to what is being offered to Creditors under the Lehman Lenders' competing Plan.

19    **READ THIS DISCLOSURE STATEMENT CAREFULLY IF YOU WANT TO**

20   **KNOW ABOUT**:

21        ➢   **WHO CAN VOTE OR OBJECT TO THE PLAN;**

22        ➢   **HOW YOUR CLAIM IS TREATED;**

23        ➢   **HOW THIS TREATMENT COMPARES TO WHAT YOUR CLAIM WOULD**

24            **RECEIVE IN LIQUIDATION;**

25        ➢   **A BRIEF HISTORY OF THE DEBTORS AND SIGNIFICANT EVENTS**

26            **DURING THEIR CHAPTER 11 BANKRUPTCY PROCEEDING;**

27        ➢   **WHAT FACTORS THE BANKRUPTCY COURT WILL CONSIDER TO**

28            **DECIDE WHETHER OR NOT TO CONFIRM THE PLAN;**

MAINDOCS-#163407-v2-SCC_DS_Group_I_Vol_Debtors.DOC

1     ➢   **WHAT IS THE EFFECT OF CONFIRMATION; AND**

2     ➢   **WHETHER THE PLAN IS FEASIBLE.**

3     This Disclosure Statement cannot tell you everything about your rights. You should

4 consider consulting your own attorney to obtain more specific advice on how the Plan will affect

5 you and your best course of action.

6     Be sure to read the Plan as well as this Disclosure Statement. If there are any

7 inconsistencies between the Plan and this Disclosure Statement, the Plan provisions will govern.

8     The Bankruptcy Code requires a Disclosure Statement to contain "adequate information"

9 concerning the Plan. On _____, 2011, the Bankruptcy Court entered an order approving this

10 Disclosure Statement, based upon a finding that this document contained "adequate information"

11 to enable parties affected by the Plan to make an informed judgment regarding the Plan. Any party

12 can now solicit votes for or against the Plan.

13 **II.**

14 **DEFINITIONS AND RULES OF INTERPRETATION**

15     **2.1**    **Definitions.**

16     The following defined terms are used in this Disclosure Statement. Any capitalized term

17 that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall

18 have the meaning ascribed to that term in the Bankruptcy Code or Bankruptcy Rules.

19         2.1.1   Acquisitions. SCC Acquisitions, Inc., a California corporation, an indirect

20 parent company of all of the Debtors, a purported obligor on the Bond Claims, a Creditor of all of

21 the Debtors, a SunCal Plan Proponent, the Plan Sponsor and the proposed Plan Trustee.

22         2.1.2   Acton Estates. Acton Estates, LLC, a Delaware limited liability, a

23 Voluntary Debtor herein, and the owner of the Acton Project.

24         2.1.3   Acton Project. The Project owned by Acton Estates, located in Los Angeles

25 County, California, as more particularly described herein.

26         2.1.4   Acton Project Break-up Fee. The sum of sixty-four thousand dollars

27 ($64,000) that will be paid to the Stalking Horse Bidder that submits the Opening Bid for the

28 Acton Project, if such Stalking Horse Bidder is not the Winning Bidder.

MAINDOCS-#163407-v2-SCC_DS_Group_1_Vol_Debtors.DOC

1    2.1.5   Administrative Claim(s). Any Claim against a Group I: Voluntary Debtor or

2  its Estate incurred after the applicable Petition Date for the applicable Group I: Voluntary Debtor

3  but before the Confirmation Date, for any cost or expense of administration of the Case of the

4  applicable Group I: Voluntary Debtor, which Claim is entitled to priority under section 507(a)(2)

5  or (3) of the Bankruptcy Code, including, without limitation, any fee or charge assessed against an

6  Estate of a Group I: Voluntary Debtor under section 1930 of Title 28 of the United States Code.

7    2.1.6   Administrative Claims Bar Date. The last date fixed by the Plan for the

8  filing of Proof of Claims or requests for payment of Administrative Claims. Under the Plan, the

9  Administrative Claims Bar Date shall be the first business day after the sixtieth (60th) day after the

10  Confirmation Date.

11    2.1.7   Affiliate. The term shall have the meaning set forth under Section 101(2),

12  including, but not limited to, as to any Person, any other Person that directly or indirectly owns or

13  controls, is owned or controlled by, or is under common ownership or control with, such Person.

14  The term "control" (including, with correlative meanings, the terms "controlled by" and "under

15  common control with"), as applied to any Person, means the possession, direct or indirect, of the

16  power to direct or cause the direction of the management and policies of such Person, whether

17  through the ownership of voting securities or other equity ownership interest, by contract or

18  otherwise.

19    2.1.8   Allowed. When used to describe Claim(s) or Interest(s), such Claim(s) or

20  Interest(s), to the extent that it or they are "Allowed Claim(s)" or "Allowed Interest(s)."

21    2.1.9   Allowed Amount shall mean:

22    A.   With respect to any Administrative Claim (i) if the Claim is based

23  upon a Fee Application, the amount of such Fee Application that has been approved by a Final

24  Order of the Bankruptcy Court; (ii) if the Claim is based upon any indebtedness or obligation

25  incurred in the ordinary course of business of the Group I: Voluntary Debtor and is not otherwise

26  subject to an Administrative Claim Bar Date, the amount of such Claim that has been agreed to by

27  the Group I: Voluntary Debtor and such creditor, failing which, the amount thereof as fixed by a

28  Final Order of the Bankruptcy Court; or (iii) if the Holder of such Claim was required to file and

1    has filed proof thereof with the Bankruptcy Court prior to an Administrative Claim Bar Date,

2    (1) the amount stated in such proof if no objection to such Proof of Claim is interposed within the

3    applicable period of time fixed by the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy

4    Court, or (2) the amount thereof as fixed by Final Order of the Bankruptcy Court if an objection to

5    such proof was interposed within the applicable period of time fixed by the Bankruptcy Code, the

6    Bankruptcy Rules or the Bankruptcy Court. The Allowed Amount of any Administrative Claim

7    which is subject to an Administrative Claims Bar Date and not filed by the applicable

8    Administrative Claims Bar Date shall be zero, and no distribution shall be made on account of any

9    such Administrative Claim;

10            B.     with respect to any Claim which is not an Administrative Claim

11    (the "Other Claim"): (i) if the Holder of such Other Claim did not file proof thereof with the

12    Bankruptcy Court on or before the Claims Bar Date, the amount of such Claim as listed in the

13    Group I: Voluntary Debtors' Schedules as neither disputed, contingent nor unliquidated; or (ii) if

14    the Holder of such Claim has filed proof thereof with the Bankruptcy Court on or before the

15    Claims Bar Date, (a) the amount stated in such proof if no objection to such Proof of Claim was

16    interposed within the applicable period of time fixed by the Bankruptcy Code, the Bankruptcy

17    Rules, the Plan or the Bankruptcy Court, or (b) the amount thereof as fixed by Final Order of the

18    Bankruptcy Court if an objection to such proof was interposed within the applicable period of time

19    fixed by the Bankruptcy Code, the Bankruptcy Rules, the Plan or the Bankruptcy Court. The

20    Allowed Amount of any Other Claim which is not Filed by the applicable Claims Bar Date, is not

21    listed on the Group I: Voluntary Debtors' Schedules or is listed as disputed, unliquidated,

22    contingent or unknown, and is not allowed under the terms of the Plan shall be zero, and no

23    distribution shall be made on account of any such Claim; and

24            C.     with respect to any Interest, (i) the amount provided by or

25    established in the records of the Group I: Voluntary Debtors at the Confirmation Date, provided,

26    however, that a timely filed proof of Interest shall supersede any listing of such Interest on the

27    records of the Group I: Voluntary Debtors; or (ii) the amount stated in a proof of Interest Filed

28    prior to the Confirmation Date if no objection to such Interest was filed prior to the Confirmation

1    Date or such later date as the Bankruptcy Court allows; or (iii) the amount of such Interest as fixed

2    by a Final Order of the Bankruptcy Court.

3          2.1.10    Allowed Claim.  Except as otherwise provided in the Plan (including with

4    respect to those Classes for which the amount of the Allowed Claims is specified by the Plan), a

5    Claim to the extent (and only to the extent) of the Allowed Amount of such Claim.

6          2.1.11    Allowed Interest.  Any Interest to the extent, and only to the extent, of the

7    Allowed Amount of such Interest.

8          2.1.12    Allowed Secured Claims.  All or a portion of a Secured Claim that is an

9    Allowed Claim.

10         2.1.13    Allowed Unsecured Claim. All or a portion of an Unsecured Claim that is

11   an Allowed Claim.

12         2.1.14    Assets.  All assets that are property of the Debtor(s) pursuant to

13   Bankruptcy Code Section 541.

14         2.1.15    Arch.  Arch Insurance Company, a Bond Issuer.

15         2.1.16    Available Cash.  Each Group I: Voluntary Debtors' Cash deposited into

16   the applicable Distribution Account(s) on or after the Effective Date that is available for making

17   Distributions under the Plan to Holders of Allowed Administrative, Priority, and Unsecured

18   Claims.  The Available Cash shall consist of the respective Group I: Voluntary Debtors' cash on

19   hand as of the Effective Date that is not subject to a Disputed Lien, proceeds of Net Litigation

20   Recoveries that are not subject to a Disputed Lien, Net Sales Proceeds that become Available Cash

21   upon the disallowance of a Disputed Claim or avoidance of a Disputed Lien purportedly

22   encumbering such Cash, or proceeds from the Acquisitions Administrative Loan.  All Available

23   Cash shall be deposited into the applicable Distribution Account(s).  Available Cash shall not

24   include Net Sale Proceeds in the Net Sales Proceeds Account where the Disputed Secured Claims

25   are Allowed but subject to an equitable subordination judgment.

26         2.1.17    Avoidance Actions.  All Claims and defenses to Claims accruing to the

27   Group I: Voluntary Debtors and their Estates under Bankruptcy Code Sections 506(d), 510(c), 541,

28   544, 545, 547, 548, 549, 550, or 551.

MAINDOCS-#163407-v2-SCC_DS_Group_I_Vol_Debtors.DOC

1          2.1.18    Bankruptcy Code. The United States Bankruptcy Code.

2          2.1.19    Bankruptcy Court. The United States Bankruptcy Court for the Central

3    District of California, having jurisdiction over the Cases and, to the extent of any withdrawal of the

4    reference made pursuant to Section 157 of title 28 of the United States Code, the United States

5    District Court for the Central District of California; or, in the event such courts cease to exercise

6    jurisdiction over the Cases, such court or unit thereof that exercises jurisdiction over the Cases in

7    lieu thereof.

8          2.1.20    Bankruptcy Rules. Collectively, as now in effect or hereafter amended

9    and as applicable to the Cases, (i) the Federal Rules of Bankruptcy Procedure, and (ii) the Local

10   Bankruptcy Rules and General Orders applicable to cases pending before the Bankruptcy Court.

11         2.1.21    Beneficial Interests. means, collectively, the interests of the holders of

12   Allowed Unsecured Claims in the Plan Trust and in all distributions to be made by the Plan Trust

13   on account of Allowed Unsecured Claims. The Beneficial Interests (a) shall be noted in the books

14   and records of the Plan Trust, (b) shall not be evidenced by a writing, and (c) may not be

15   transferred, sold, assigned or transferred by will, intestate succession or operation of law.

16         2.1.22    Bickford Ranch Project. The Project owned by SunCal Bickford, located

17   in the City of Penryn, California, as more particularly described herein.

18         2.1.23    Bickford Ranch Project Break-up Fee. The sum of four hundred and

19   thirty-six thousand dollars ($436,000) that will be paid to the Stalking Horse Bidder that submits

20   the Opening Bid for the Bickford Ranch Project, if such Stalking Horse Bidder is not the Winning

21   Bidder.

22         2.1.24    Bickford Second Loan Agreement. That certain promissory note secured

23   by a deed of trust, dated as of May 25, 2005, in the maximum aggregate principal amount of

24   approximately $30,000,000 executed by SunCal Bickford, as borrower, and payable to the order of

25   Lehman ALI. The Bickford Second Lien Loan Agreement is allegedly secured by a second priority

26   deed of trust on the Bickford Ranch Project. The Bickford Second Loan Agreement has an

27   asserted balance due of $56,494,059.38 as of March 30, 2009.

28

MAINDOCS-#163407-v2-SCC_DS_Group_I_Vol_Debtors.DOC

1    2.1.25    Bond Claim(s).  Any Claim against the Debtor(s) and a Bond Issuer under

2    various payment or performance bonds, and/or any claims of Bond Issuer(s) against the Debtor(s)

3    under various payment or performance bonds.

4    2.1.26    Bond Claimant.  Holder(s) of a Bond Claim.

5    2.1.27    Bond Indemnification Claim.  All Claims by Bond Safeguard, Lexon, and

6    Arch for indemnification for payment by Bond Safeguard, Lexon and Arch of Bond Claims with

7    respect to the Group I: Voluntary Debtors' Projects.

8    2.1.28    Bond Indemnitors.  The individuals and entities that are allegedly liable on

9    the Bond Indemnification Claims, including, allegedly, all of the Debtors, Acquisitions, all

10    Affiliates of Acquisitions, and Elieff.

11    2.1.29    Bond Issuer(s).  Bond Safeguard, Lexon and Arch in their capacities as

12    issuers and sureties for payment and performance bonds for the benefit of certain of the Debtors.

13    2.1.30    Bond Safeguard.  Bond Safeguard Insurance Company, a Bond Issuer.

14    2.1.31    Business Day.  Any day, other than a Saturday, a Sunday or a "legal

15    holiday," as defined in Bankruptcy Rule 9006(a).

16    2.1.32    Cases.  The Chapter 11 cases of the Group I: Voluntary Debtors pending

17    before the Bankruptcy Court.

18    2.1.33    Cash.  Currency of the United States of America and cash equivalents,

19    including, but not limited to, bank deposits, immediately available or cleared checks, drafts, wire

20    transfers and other similar forms of payment.

21    2.1.34    CFD Bonds.  Community facilities district bonds issued by a

22    governmental entity.

23    2.1.35    Chapter 11 Trustee.  Steven M. Speier, the duly appointed trustee of the

24    Trustee Debtors in their pending Chapter 11 Cases.

25    2.1.36    Claim.  This term shall have the broadest possible meaning under

26    Section 101(5) of the Bankruptcy Code, and shall include (a) any right to payment from any of the

27    Group I: Voluntary Debtors, whether or not such right is reduced to judgment, liquidated,

28    unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable,

MAINDOCS-#163407-v2-SCC_DS_Group_I_Vol_Debtors.DOC

1    secured, or unsecured, or (b) any right to an equitable remedy for breach of performance if such

2    breach gives rise to a right of payment from any of the Group II Debtors, whether or not such right

3    to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed,

4    undisputed, secured, or unsecured.

5            2.1.37    Claims Bar Date. For any Claim other than an Administrative Claim,

6    March 31, 2009, which was established by the Bankruptcy Court as the last date for creditors to

7    file Proof of Claims with the Bankruptcy Court in all of the Group I: Voluntary Debtors' cases.

8            2.1.38    Claims Objection Deadline. The later of (i) the first business day

9    following the one hundred and eightieth (180th) day after the Effective Date, or (ii) such greater

10    period of limitation as may be fixed or extended by the Bankruptcy Court or by agreement between

11    the Plan Trustee and the Holder of the Claim.

12            2.1.39    Claim Objection Reduction Amount. The amount of Net Sales Proceeds

13    that is made available to the holders of Allowed Unsecured Claims due to the entry of a judgment

14    or order on a Lehman Claim Objection that disallows, reduces, or otherwise adversely modifies the

15    secured claims filed by the Lehman Lenders.

16            2.1.40    Class. Each group of Claims or Interests classified in Article V of the Plan

17    pursuant to Sections 1122 and 1123 of the Bankruptcy Code.

18            2.1.41    Committee. The Voluntary Debtors' Committee both before and after the

19    Confirmation Date.

20            2.1.42    Confirmation Date. The date on which the Confirmation Order is entered

21    in the Bankruptcy Court's docket.

22            2.1.43    Confirmation Order. The order entered by the Bankruptcy Court

23    confirming the Plan in accordance with the provisions of Chapter 11 of the Bankruptcy Code.

24            2.1.44    Contingent Bond Claims. Unmatured Bond Claims.

25            2.1.45    Creditor. Any Person who is the Holder of a Claim against any Debtor

26    that arose or accrued or is deemed to have arisen or accrued or to have matured, or otherwise

27    become due, owing, and payable on or before the Petition Date, including, without limitation,

28    Claims of the kind specified in Sections 502(g), 502(h) or 502(i) of the Bankruptcy Code.

MAINDOCS-#163407-v2-SCC_DS_Group_1_Vol_Debtors.DOC

1    2.1.46    Debtor(s). Individually or collectively, the Voluntary Debtors and the

2    Trustee Debtors, as specifically defined in Exhibit "1" attached hereto.

3    2.1.47    Debtor(s)-in-Possession. The Voluntary Debtor(s) when acting in their

4    capacity as representatives of their respective Estates in their respective Chapter 11 Cases.

5    2.1.48    Disclosure Statement. This document accompanying the Plan that is

6    entitled "First Amended Disclosure Statement Describing First Amended Chapter 11 Plan Filed by

7    SunCal Plan Proponents In The Chapter 11 Cases Of Palmdale Hills Property, LLC, SunCal

8    Bickford Ranch, LLC, and Acton Estates, LLC," as amended and with all accompanying exhibits.

9    2.1.49    Disputed Claim(s). All or any part of a Claim other than any Allowed

10    Amount thereof as to which any one of the following applies: (i) no Proof of Claim has been filed

11    with respect to such Claim, and either (a) the Claim is not listed in the Schedules; or (b) the Claim

12    is listed in the Schedules as unliquidated, disputed, contingent, unknown or in a zero amount,

13    (ii) the Claim is the subject of (a) a Litigation Claim; (b) the Claim is subject to offset by a

14    Litigation Claim; (c) a timely objection that has not been resolved by a Final Order; or (d) a request

15    for estimation in accordance with the Bankruptcy Code, the Bankruptcy Rules, any applicable

16    order of the Bankruptcy Court, or the Plan which is Filed on or before the Claims Objection

17    Deadline, which Adversary Proceeding, objection, or request for estimation has not been

18    dismissed, withdrawn or determined by a Final Order; or (iii) the Claim is otherwise treated as a

19    "Disputed Claim" pursuant to the Plan.

20    2.1.50    Disputed Lien(s). An asserted lien(s) against Assets of the Debtor(s) that

21    is either subject to a Disputed Secured Claim, not duly perfected, subject to an Avoidance Action,

22    or subject to an action pursuant to Bankruptcy Code Sections 510(c)(2) and/or 506(d).

23    2.1.51    Disputed Secured Claim(s). That part of a Disputed Claim that is a

24    Secured Claim.

25    2.1.52    Distribution(s). Payments to Holders of Allowed Claims provided for

26    under the Plan.

27    2.1.53    Distribution Agent. The entity that is responsible for making Distributions

28    under the Plan, which shall be Acquisitions.

2.1.54    Distribution Account(s). Separate account(s) to be established by the Plan Trustee at an FDIC insured bank into which each Group I: Voluntary Debtors' Available Cash shall be deposited and all Available Cash received by the Plan Trust after the Confirmation Date that would have belonged to such Group II Debtor shall be deposited, other than Net Sales Proceeds that are subject to Disputed Claims and Disputed Liens.

2.1.55    Distribution Date. With respect to any Allowed Claim or Allowed Interest, the date on which a Distribution is required to be made under the Plan.

2.1.56    Effective Date. A date selected by the SunCal Plan Proponents that is not later than the ninetieth (90th) calendar day after the Confirmation Date. However, in any case where the actions provided for in the Plan would be delayed by the automatic stay applicable in the case of any Lehman Entity operating under the protection of Chapter 11 or Chapter 7, the SunCal Plan Proponents shall have the right to extend the Effective Date for an additional sixty (60) days to obtain relief from any such stay.

2.1.57    Elieff. Bruce Elieff, the president of Acquisitions, a purported obligor on the Bond Claims with corresponding indemnity Claims against the Debtors.

2.1.58    Emerald Meadows Project. The Project owned by SunCal Emerald, located in the City of Rubidoux, California, as more particularly described herein.

2.1.59    Estates. The bankruptcy estates of the Group I: Voluntary Debtors created pursuant to Section 541 of the Bankruptcy Code.

2.1.60    Fee Applications. Applications of Professional Persons under Sections 330, 331 or 503 of the Bankruptcy Code for allowance of compensation and reimbursement of expenses in the Cases.

2.1.61    Fee Claim. A Claim under Sections 330 or 503 of the Bankruptcy Code for allowance of compensation and reimbursement of expenses in the Cases.

2.1.62    Fenway Capital. Fenway Capital Funding LLC, a Lehman Successor to Lehman's Disputed Claims and Lehman's Disputed Liens arising from (i) SunCal Communities I Loan Agreement, (ii) Ritter Ranch Loan Agreement, (iii) Bickford Second Loan Agreement, (iv) SunCal PSV Loan Agreement, (v) SunCal Marblehead/SunCal Heartland Loan Agreement,

-12-

1  (vi) Delta Coves Loan Agreement (vii) SunCal Northlake Loan Agreement, and (viii) SunCal Oak

2  Valley Loan Agreement.  Such Disputed Claims and Disputed Liens were transferred back to LCPI

3  pursuant to a compromise approved by the New York Bankruptcy Court on May 12, 2010.

4          2.1.63    Filed.  Delivered to, received by and entered upon the legal docket by the

5  Clerk of the Bankruptcy Court. "File" shall have a correlative meaning.

6          2.1.64    Final Order.  A judgment, order, ruling or other decree issued and entered

7  by the Bankruptcy Court.

8          2.1.65    General Unsecured Claim.  A Claim against a Group II Debtor that is not

9  (a) a Secured Claim, (b) an Administrative Claim, (c) a Tax Claim or (d) a Priority Claim.

10          2.1.66    Group I: Voluntary Debtors. Palmdale Hills Property, LLC, SunCal

11  Bickford Ranch, LLC, and Acton Estates, LLC.

12          2.1.67    Group I Projects. Ritter Ranch, the Bickford Ranch Project, Emerald

13  Project and the Acton Project.

14          2.1.68    Holder.  The beneficial owner of any Claim or Interest.

15          2.1.69    Initial Overbid. The Initial Overbid is the first Qualifying Bid after the

16  Opening Bid that is equal to or in excess of the Initial Overbid Amount.

17          2.1.70    Initial Overbid Amount. In the case of Ritter Ranch Project, the Initial

18  Overbid Amount is a sum that is not less than the sum of the applicable Opening Bid, the Ritter

19  Ranch Project Break-up Fee and one hundred thousand dollars ($100,000). In the case of the

20  Bickford Ranch Project, the Initial Overbid Amount is a sum that is not less than the sum of the

21  applicable Opening Bid, the Bickford Ranch Project Break-up Fee and seventy-five thousand

22  dollars ($75,000). In the case of the SunCal Emerald Project, the Initial Overbid Amount is a sum

23  that is not less than the sum of the applicable Opening Bid, the SunCal Emerald Project Break-up

24  Fee and seventy-five thousand dollars ($75,000). In the case of the Acton Project, the Initial

25  Overbid Amount is a sum that is not less than the sum of the applicable Opening Bid, the Acton

26  Project Break-up Fee, and the fifty-thousand dollars ($50,000).

27

28

MAINDOCS-#163407-v2-SCC_DS_Group_I_Vol_Debtors.DOC

2.1.71   Insider. The term shall have the broadest meaning possible under Section 101(31), including, but not limited to, a person in control of the Debtor, Affiliates and Insiders of such Affiliates.

2.1.72   Interest. Any equity security interest in any Group II Debtor within the meaning, of Section 101(16) of the Bankruptcy Code, including, without limitation, any equity ownership interest in any of the Group I: Voluntary Debtors, whether in the form of common or preferred stock, stock options, warrants, partnership interests, or membership interests.

2.1.73   LBHI. Lehman Brothers Holdings, Inc., a Lehman Entity, the parent company of Lehman ALI and LCPI, and a Chapter 11 debtor in a bankruptcy proceeding pending in the Bankruptcy Court for the Southern District of New York.

2.1.74   LCPI. Lehman Commercial Paper, Inc., a Chapter 11 debtor in a bankruptcy proceeding pending in the Bankruptcy Court for the Southern District of New York.

2.1.75   Legal Rate. The rate of interest payable on judgments obtained in the United States District Courts as set forth in 28 U.S.C. § 1961. The rate applicable under the Plan is 1.44% per annum, representing the applicable rate on November 6, 2008.

2.1.76   Lehman Adversary Proceeding. The Debtors' pending adversary proceeding against the Lehman Lenders and/or the Lehman Successors asserting various causes of action including equitable subordination, fraudulent conveyances and preferential transfers.

2.1.77   Lehman ALI. Lehman ALI, Inc.

2.1.78   Lehman Disputed Administrative Loans. The post-petition financing provided by Lehman ALI to Palmdale Hills, SunCal Emerald, SunCal Bickford, Acton Estates, SunCal Oak Valley, SunCal Heartland, SunCal Northlake, SunCal Marblehead, SunCal Century City, SunCal PSV, Delta Coves, and SunCal Oak Knoll, which grants priming liens on all borrower Debtors' assets, and for super-priority administrative status to Lehman ALI. The Voluntary Debtors have repaid to Lehman ALI the full amount of $270,731 loaned to the Voluntary Debtors. The aggregate amount of the Lehman Administrative Loans to all of the Trustee Debtors is approximately $40 million as of March 1, 2011 and continuing to increase. The

-14-

Lehman Administrative Loans are the subject of claim objections. Until these objections are resolved, these Lehman Administrative Loans shall not be Allowed Claims.

2.1.79 **Lehman Claim Objections.** The objections filed by the Debtors to the claims filed by the Lehman Lenders that are based upon the Lehman Disputed Loans and the Lehman Disputed Administrative Loans, including, but not limited to, the Lehman Recoupment Objection and the Lehman 502(d) Objection.

2.1.80 **Lehman Entities.** The Lehman Lenders, the Lehman Equity Members and LBHI.

2.1.81 **Lehman Equity Members.** Lehman Entities that own direct or indirect membership Interests in all of the Trustee Debtors, except for SunCal Heartland and SunCal Marblehead.

2.1.82 **Lehman Lenders.** Lehman ALI, LCPI, Northlake Holdings, and OVC Holdings.

2.1.83 **Lehman Disputed Loans.** Collectively the following loans that are the purported basis for the Lehman's Disputed Claims: (a) SunCal Communities I Loan Agreement; (b) Bickford Second Loan Agreement; (c) Ritter Ranch Loan Agreement; (d) SCC Palmdale Loan; (e) Interim Loan Agreement; (f) SunCal Oak Knoll/SunCal Torrance Loan Agreement; (g) SunCal Century City Loan Agreement; (h) SunCal PSV Loan Agreement; (i) SunCal Delta Coves Loan Agreement; (j) SunCal Marblehead/SunCal Heartland Loan Agreement; (k) Sun Cal Oak Valley Loan Agreement; (l) SunCal Northlake Loan Agreement; (m) Pacific Point First Loan Agreement; and (n) Pacific Point Second Loan Agreement.

2.1.84 **Lehman Recoupment Objection.** A claim objection filed with respect to certain claims filed by the Lehman Lenders that is based upon the affirmative defenses of recoupment, unjust enrichment and unclean hands.

2.1.85 **Lehman Representatives.** The individuals that controlled the Lehman Entities.

1          2.1.86    Lehman Successor(s). Entities other than the Lehman Lenders that either

2    assert to be or are determined by the Bankruptcy Court to be the beneficial owner(s) of the Lehman

3    Disputed Loan(s), including, but not limited to Fenway Capital, Lehman Re and Danske Bank.

4          2.1.87    Lehman's Disputed Claim(s). All of the Proofs of Secured Claims filed by

5    a Lehman Lender or a Lehman Successor in the Debtors' Chapter 11 Cases arising from the

6    Lehman Disputed Loans and the Lehman Disputed Administrative Loans.

7          2.1.88    Lehman's Disputed Lien(s). All of the alleged liens relating to Proofs of

8    Secured Claims filed by a Lehman Lender or a Lehman Successor in the Debtor's Chapter 11

9    Cases arising from the Lehman Disputed Loans.

10         2.1.89    Lehman 502(d) Objection. A claim objection filed with respect to certain

11   claims filed by the Lehman Lenders that based upon Section 502(d) of the bankruptcy code.

12         2.1.90    Lexon. Lexon Insurance Co.

13         2.1.91    LitCo. A newly formed Delaware limited liability company that will be

14   purchasing the claims and Litigation Rights held by the Reliance Claimants that choose Option A

15   provided for in the Plan.

16         2.1.92    LitCo Plan Loan. A loan that will be made by LitCo, to the extent

17   necessary to pay Administrative Claims, and post Confirmation Date costs incurred by the SunCal

18   Proponents in connection with the sale process, and to pay post Effective Date costs incurred by

19   the Plan Trust, including litigation expenses where applicable, if no other source is available to pay

20   these obligations. LitCo will be capitalized with funds provided by a third party.

21         2.1.93    Litigation Claims.  Any and all interests of the Group I: Voluntary

22   Debtors in any and all Claims, rights, causes of action, and objections or defenses to Claims, liens,

23   rights, or causes of action which have been or may be commenced by the Group II Debtor(s), the

24   Chapter 11 Trustee, or the Committee, as the case may be, including, but not limited to, any

25   (i) Avoidance Actions; (ii) for turnover of property to the Group I: Voluntary Debtors' Estates

26   and/or the Plan Trust; (iii) for the recovery of property or payment of money that belongs to the

27   Debtors' Estates or the Plan Trust; (iv) the right to compensation in the form of damages,

28   recoupment or setoff of the Debtors' Estates and/or the Plan Trust; (v) the Lehman Adversary

1   Proceeding; (vi) the State Court Action, and (vii) any and all other Claims against Lehman's

2   Disputed Claims and/or Disputed Liens referenced in the Plan or the Disclosure Statement.

3         2.1.94  Litigation Recoveries. Any Cash or other property received by the

4   Chapter 11 Trustee, the Group I: Voluntary Debtors, the Committee and/or the Plan Trust, as the

5   case may be, from all or any portion of a Litigation Claim(s), including, but not limited to, awards

6   of damages, attorneys' fees and expenses, interest and punitive damages, whether recovered by

7   way of settlement, execution on judgment or otherwise.

8         2.1.95  Litigation Rights. Any Claims held by a party other than the Group I:

9   Voluntary Debtors that have not been fixed in a final judgment prior to the Effective Date.

10        2.1.96  Marblehead Project. The Project owned by SunCal Marblehead, located

11   in the City of San Clemente, California, as more particularly described herein.

12        2.1.97  Maximum Distribution. A Distribution to a Holder of an Allowed

13   Unsecured Claim against a Group I Debtor equal to one hundred percent (100%) of the amount of

14   the Holder's Allowed General Unsecured Claim plus interest at the Legal Rate from and as of the

15   Group II Debtor's Petition Date.

16        2.1.98  MB Firm. Miller Barondess, LLP.

17        2.1.99  Mechanic Lien Claims. Mechanic Lien Claims arising pursuant to

18   California Civil Code §3110, et seq. that were either allegedly perfected prepetition or otherwise

19   allegedly satisfy the requirements of Bankruptcy Code 546(b).

20        2.1.100  Minimum Increment. Minimum Increment applicable to the sales of the

21   Group II Projects are the following: one hundred thousand dollars ($100,000) for the Ritter Ranch

22   Project, seventy-five thousand dollars ($75,000) for the Bickford Ranch Project, seventy-five

23   thousand dollars ($75,000) for the SunCal Emerald Project and fifty thousand dollars ($50,000) for

24   the Acton Project, until there are only two Qualified Bidders submitting bids for a Group II Project,

25   then the Minimum Increment shall be twenty-five thousand dollars ($25,000).

26        2.1.101  Minimum Sale Price. The minimum gross sale price that must be paid for

27   Group II Project before such projects can be sold pursuant to the Plan, which prices are the

28

MAIN DOCS-#163407 v2-SCC_DS_Group_i_Vol_Debtors.DOC

following: Ritter Ranch Project - $19,620,000, Bickford Ranch Project - $9,810,000, Emerald Meadows Project - $5,490,000, and Acton Project - $1,440,000.

2.1.102   Net Litigation Recoveries. Litigation Recoveries less associated Administrative Claims and Post-Confirmation Expenses incurred in connection with such Litigation Recoveries.

2.1.103   Net Sales Proceeds. The Cash generated from the sale(s) or liquidation of the Group II Debtor(s)' Assets or the Plan Trust's Assets, less payment of selling expenses, taxes, Chapter 11 Trustee fees, and any associated Post-Confirmation Expenses and Administrative Claims incurred in furtherance of such sales or liquidation of such Assets.

2.1.104   Net Sales Proceeds Account(s). Separate account(s) that will be established by the Plan Trustee at an FDIC insured bank into which all Net Sale Proceeds shall be deposited from the sale of Assets that were allegedly encumbered by a Disputed Secured Claim(s) and/or a Disputed Lien(s). There shall be a separate Net Sales Proceeds Account for the Net Sale Proceeds allegedly subject to each Disputed Secured Claim(s) and/or Disputed Lien(s), except where there are two Disputed Liens on a single Project, in which case, there shall be a single account for the proceeds generated from that Project. The Disputed Secured Claim(s) and/or Disputed Lien(s) shall attach to the corresponding Net Sales Proceeds Account(s) pending any Final Order(s) of the Bankruptcy Court resolving the applicable Disputed Secured Claim(s) and/or applicable Disputed Lien(s). To the extent that a particular Disputed Claim is disallowed or a particular Disputed Lien is avoided (other than transferred to the Estates pursuant to Bankruptcy Code Section 510(c)(2)) or otherwise invalidated, such Net Sales Proceeds allegedly subject thereto shall become Available Cash and shall be transferred to the applicable Distribution Account(s). To the extent that a particular Disputed Secured Claim and a Disputed Lien are allowed and deemed valid but subject to the equitable subordination causes of action in the Lehman Adversary Proceeding, the funds shall remain in the Net Sales Accounts pending a Final Order on the equitable subordination causes of action in the Lehman Adversary Proceeding.

2.1.105    Opening Bid. Opening Bid means the offer for one, or both of the Group II Projects, which is equal to the Minimum Sale Price(s) accepted by the Debtor for either one or both of the Group II Projects.

2.1.106    Orders for Relief Date. The following are dates that orders for relief were entered for each of the Trustee Debtors:

| | |
|---|---|
| SunCal Oak Valley | January 6, 2009 |
| SunCal Heartland | January 6, 2009 |
| SunCal Northlake | January 6, 2009 |
| SunCal Marblehead | January 6, 2009 |
| SunCal Century City | January 6, 2009 |
| SunCal PSV | January 6, 2009 |
| Delta Coves | January 6, 2009 |
| SunCal Torrance | January 6, 2009 |
| SunCal Oak Knoll | January 6, 2009 |

2.1.107    Palmdale Hills. Palmdale Hills Property LLC, a Delaware limited liability company, a Voluntary Debtor herein, and the owner of the Ritter Ranch Project

2.1.108    Palmdale Hills CFD Bonds. Certain CFD bonds issued by the City of Palmdale, in the amount of approximately $33 million that are owned by Palmdale Hills.

2.1.109    Palm Springs Village Project. The Project owned by SunCal PSV, located in the City of Palm Springs, California, as more particularly described herein.

2.1.110    Person. An individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, governmental authority, governmental unit, committee or other entity of whatever nature.

2.1.111    Petition Dates. The following are dates that each of the Voluntary Debtors filed their Voluntary Chapter 11 petitions or Creditors filed involuntary Chapter 11 petitions against the Trustee Debtors:

| | |
|---|---|
| Palmdale Hills | November 6, 2008 |
| SunCal Beaumont | November 6, 2008 |
| SCC Palmdale | November 7, 2008 |
| SunCal Johannson | November 7, 2008 |
| SunCal Summit Valley | November 7, 2008 |
| SunCal Emerald | November 7, 2008 |
| SunCal Bickford | November 7, 2008 |
| Acton Estates | November 7, 2008 |
| Seven Brothers | November 7, 2008 |

-19-

| SJD Partners. | November 7, 2008 |
| SJD Development | November 7, 2008 |
| Kirby Estates | November 7, 2008 |
| SunCal I | November 7, 2008 |
| SunCal III | November 7, 2008 |
| SCC Communities | November 19, 2008 |
| Del Rio | November 19, 2008 |
| Tesoro | November 19, 2008 |
| Delta Coves Ventures, LLC | November 14, 2008 |
| SunCal Heartland, LLC | November 12, 2008 |
| SunCal Marblehead, LLC | November 12, 2008 |
| LB-L-SunCal Northlake, LLC | November 12, 2008 |
| LB-L-SunCal Oak Valley, LLC | November 12, 2008 |
| SunCal Century City, LLC | November 14, 2008 |
| SunCal PSV, LLC | November 14, 2008 |
| SunCal Torrance Properties, LLC | November 14, 2008 |
| SunCal Oak Knoll, LLC | November 19, 2008 |

2.1.112   Plan. The "First Amended Chapter 11 Plan Filed by SunCal Plan Proponents In The Chapter 11 Cases Of Palmdale Hills Property, LLC, SunCal Bickford Ranch, LLC, and Acton Estates, LLC," together with the Exhibits thereto, as the same may be amended or modified from time to time in accordance with the Plan.

2.1.113   Plan Documents. The Plan, the Plan Trust Agreement and all other documents attached to the Plan Supplement.

2.1.114   Plan Period. The period from the Effective Date to the Plan Termination Date.

2.1.115   Plan Supplement. The compilation of the Plan Documents to be filed with the Bankruptcy Court.

2.1.116   Plan Termination Date. The fifth (5th) anniversary date of the Effective Date, unless the Plan elects and earlier date.

2.1.117   Plan Sponsor. The entity that has committed to cause the funding of certain specified obligations under the Plan on or after the Effective Date. The Plan Sponsor is Acquisitions.

2.1.118   Plan Trust. A liquidating trust to be established prior to or on the Effective Date, with Acquisitions as the Plan Trustee and the Holders of Allowed Claims against the Debtors as the beneficiaries. The purpose of the Plan Trust will be to liquidate the Debtors'

-20-

Assets (other than Assets that are excluded by the Plan Trustee on the grounds that they lack value or would be difficult to administer) and to otherwise consummate the Plan.

        2.1.119   Plan Trustee. The Plan Trustee under the Plan Trust Agreement is Acquisitions.

        2.1.120   Plan Trust Agreement. The liquidating trust agreement governing the affairs of the Plan Trust, which will be in substantially the form contained in the Plan Supplement.

        2.1.121   Plan Trust Beneficiaries. The Plan Trust Beneficiaries are (i) the holders of Beneficial Interests, as of any point in time, and (ii) holders of Allowed Claims that shall be satisfied from Plan Trust Property in accordance with the terms of the Plan.

        2.1.122   Plan Trust Property. Plan Trust Property means all property within the Chapter 11 estates of the Group I: Voluntary Debtors, other than property that is affirmatively excluded by the Plan Trustee.

        2.1.123   Post-Confirmation Expenses. The fees and expenses incurred by the Plan Sponsor, the Plan Trustee and the Committee and their professionals following the Confirmation Date (including the fees and costs of Professionals) for the purpose of (i) prosecuting and liquidating the Litigation Claims; (ii) objecting to and resolving Disputed Claims and Disputed Liens; (iii) selling or otherwise liquidating the Plan Trust's Assets; (iv) effectuating Distributions under the Plan; and (v) otherwise consummating the Plan and closing the Group I: Voluntary Debtors' Chapter 11 Cases.

        2.1.124   Priority Claim. Any Claim, other than an Administrative Claim or a Tax Claim, to the extent entitled to priority under Section 507(a) of the Bankruptcy Code.

        2.1.125   Pro Rata. Proportionately, so that with respect to any distribution in respect of any Allowed Claim, the ratio of (a)(i) the amount of property distributed on account of such Allowed Claim to (ii) the amount of such Allowed Claim, is the same as the ratio of (b)(i) the amount of property distributed on account of all Allowed Claims of the Class or Classes sharing in such distribution to (ii) the amount of all Allowed Claims in such Class or Classes.

        2.1.126   Professional. A Person or Entity (a) employed by the Group I: Voluntary Debtors, the Committee pursuant to a Final Order in accordance with Sections 327 and 1103 of the

-21-

1  Bankruptcy Code and to be compensated for services rendered prior to the Effective Date, pursuant

2  to Sections 327, 328, 329, 330 and 331 of the Bankruptcy Code, or (b) for which compensation and

3  reimbursement has been allowed by the Bankruptcy Court pursuant to Section 503(b) of the

4  Bankruptcy Code.

5         2.1.127  Professional Fees. All Allowed Claims for compensation and for

6  reimbursement of expenses under Sections 328, 330 and/or 503(b) of the Bankruptcy Code

7         2.1.128  Projects. The Debtors' residential real estate development projects and

8  other assets as separately defined herein and described in Exhibit "1" to the Disclosure Statement.

9         2.1.129  Qualifying Bid. Qualifying Bid means, with respect to any bid on a

10  Group II Project, a bid made by Qualifying Bidder that is A) equal to or in excess of the Initial

11  Overbid Amount, if it is the Initial Overbid, or B) in excess of the immediately preceding

12  Qualifying Bid by the Minimum Increment, if it is not the Initial Overbid.

13         2.1.130  Qualifying Bidder. Qualifying Bidder means a bidder who a) has

14  deposited the sum of three hundred thousand dollars ($300,000) into an escrow designated by the

15  SunCal Proponents in the case of a bid for the Ritter Ranch Project or a bid for the Bickford Ranch

16  Project, the sum of two hundred thousand dollars ($200,000) in the case of the Emerald Meadows

17  Project, and $100,000 in the case of a bid for the Acton Project; b) agreed that this sum will be

18  forfeited as liquidated damages if such bidder fails to perform; and c) who has provided the SunCal

19  Plan Proponents evidence confirming that such bidder has the financial means to acquire the

20  applicable Group II Project(s) that such bidder is seeking to acquire.

21         2.1.131  Reliance Claim. An Allowed Unsecured Claim against a Group I:

22  Voluntary Debtors that would entitle the holder thereof to be the beneficiary of any equitable

23  subordination judgment obtained against a Lehman Entity by such holder. This definition includes

24  the holders of qualifying claims that are secured by mechanics liens.

25         2.1.132  Reliance Claimant. The holder of a Reliance Claim. A list of the Reliance

26  Claims and Reliance Claimants is attached hereto as Exhibit "8," and the holders of mechanics lien

27  claims.

28

MAINDOCS-#163407-v2-SCC_DS_Group_I_Vol_Debtors.DOC

1          2.1.133   Ritter Ranch Loan Agreement. That certain Credit Agreement, dated as

2  of February 8, 2007, by and among Palmdale Hills, as borrower, LCPI, as administrative agent and

3  lender, pursuant to which LCPI made a loan in the maximum aggregate principal amount of

4  approximately $264,000,000. The Ritter Ranch Loan Agreement is allegedly secured by a first-

5  priority deed of trust on all real and personal property owned by Palmdale Hills. The Ritter Ranch

6  Loan Agreement has an asserted balance due of $287,252,096.31 as of March 30, 2009.

7          2.1.134   Ritter Ranch Project. The Project owned by Palmdale Hills, located in

8  the City of Palmdale, California, as more particularly described herein.

9          2.1.135   Ritter Ranch Project Break-up Fee. The sum of eight hundred and seventy

10  thousand dollars ($870,000) that will be paid to the Stalking Horse Bidder that submits the

11  Opening Bid for the Ritter Ranch Project, if such Stalking Horse Bidder is not the Winning Bidder.

12          2.1.136   Sale Period. The Sale Period is the time period during which the SunCal

13  Proponents must consummate a sale or liquidation of the Group I Projects. The Sale Period shall

14  commence on the Confirmation Date and shall expire on the Effective Date.

15          2.1.137   SCC LLC. SCC Acquisitions LLC, a limited liability company, a

16  subsidiary of Acquisitions and an indirect and/or a direct parent company of all of the Debtors.

17          2.1.138   Schedules. The schedules of assets and liabilities and list of equity

18  security holders Filed by the Group I: Voluntary Debtors, as required by Section 521(1) of the

19  Bankruptcy Code, Bankruptcy Rules 1007(a)(3) and (b)(1), and Official Bankruptcy Form No. 6,

20  as amended from time to time.

21          2.1.139   Secured Claim. Any Claim, including interest, fees, costs, and charges to

22  the extent allowable pursuant to Bankruptcy Code Section 506, that is secured by a valid and

23  unavoidable Lien on the Group II Debtor(s)' Assets.

24          2.1.140   Stalking Horse Bidder. The Qualified Bidder who submits the Opening

25  Bid.

26          2.1.141   State Court Action. The action filed by certain Voluntary Debtors against

27  Lehman Ali, Inc., and certain other defendants, in California Superior Court for the County of

28

MAINDOCS-#163407-v2-SCC_DS_Group_I_Vol_Debtors.DOC

1  Orange (Case No. 30-2011-0040847-CU-BC-CJC), and a reservation of rights to add the Plan

2  Trustee and/or the Trustee Debtors as additional plaintiffs therein.

3          2.1.142    SunCal. The SunCal Companies, a trade name for Acquisitions and its

4  Affiliates.

5          2.1.143    SunCal Bickford. SunCal Bickford Ranch, LLC, a Delaware limited

6  liability company, a Voluntary Debtor herein, and the owner of the Bickford Ranch Project.

7          2.1.144    SunCal Emerald. SunCal Emerald Meadows, LLC, a Delaware limited

8  liability company, a Voluntary Debtor herein, and the owner of the Emerald Meadows Project.

9          2.1.145    SunCal Emerald Project Break-up Fee. The sum of two hundred and fifty

10  thousand dollars ($250,000) that will be paid to the Stalking Horse Bidder that submits the

11  Opening Bid for the SunCal Emerald Project, if such Stalking Horse Bidder is not the Winning

12  Bidder.

13          2.1.146    SunCal Management. SunCal Management, LLC, a Delaware limited

14  liability company, and the property manager for the Projects.

15          2.1.147    SunCal Marblehead. SunCal Marblehead, LLC, a Delaware limited

16  liability company, a Trustee Debtor, and the owner of the Marblehead Project.

17          2.1.148    SunCal Marblehead/SunCal Heartland Loan Agreement. That certain

18  Second Amended and Restated Term Loan and Revolving Line of Credit Loan Agreement, dated

19  as of October 3, 2007, by and among SunCal Marblehead Heartland Master LLC, SunCal

20  Marblehead, and SunCal Heartland, as borrowers, and Lehman ALI, as agent and sole lender,

21  pursuant to which Lehman ALI made a loan in the maximum aggregate principal amount of

22  approximately $316,061,300. The SunCal Marblehead/SunCal Heartland Loan Agreement is

23  allegedly secured by first-priority deeds of trust on the Marblehead and the Heartland Projects.

24  The SunCal Marblehead/SunCal Heartland Loan Agreement has an alleged balance due of

25  $354,325,126.15 as of March 30, 2009. The proofs of claim filed with respect to this loan

26  agreement are the subject of the Lehman Adversary Proceeding and the Lehman Claim Objections.

27          2.1.149    SunCal Plan Proponent(s). The Voluntary Debtors and Acquisitions as

28  the parties-in-interest that are proposing the Plan.

-24-

1         2.1.150   SunCal PSV. SunCal PSV, LLC, a Delaware limited liability company, a

2 Trustee Debtor (a Group II Debtor), and the owner of the Palm Springs Village Project.

3         2.1.151   SunCal PSV Loan Agreement. That certain Term Loan and Revolving

4 Line of Credit Loan Agreement, dated as of February 12, 2007, between SunCal PSV, as borrower,

5 and Lehman ALI, as agent and sole lender, pursuant to which Lehman ALI made a loan in the

6 maximum aggregate principal amount of approximately $90 million. The SunCal PSV Loan

7 Agreement is allegedly secured by a first-priority deed of trust on the Palm Springs Village Project.

8 The SunCal PSV Loan Agreement has an alleged balance due of $88,257,340.20 as of March 30,

9 2009.

10         2.1.152   Tax. Any tax, charge, fee, levy, impost or other assessment by any

11 federal, state, local or foreign taxing authority, including, without limitation, income, excise,

12 property, sales, transfer, employment, payroll, franchise, profits, license, use, ad valorem,

13 estimated, severance, stamp, occupation and withholding tax. "Tax" shall include any interest or

14 additions attributable to, or imposed on or with respect to such assessments.

15         2.1.153   Tax Claim. Any Claim for any Tax to the extent that it is entitled to

16 priority in payment under Section 507(a)(8) of the Bankruptcy Code.

17         2.1.154   Trustee Debtor(s). The following Debtors, individually or collectively,

18 that are represented by the Chapter 11 Trustee: Delta Coves, SunCal Heartland, SunCal

19 Marblehead, SunCal Northlake, SunCal Oak Valley, SunCal Century City, SunCal PSV, SunCal

20 Torrance, and SunCal Oak Knoll.

21         2.1.155   Trustee Debtors' Committee. The Official Committee of Unsecured

22 Creditors of the Trustee Debtors appointed in the Cases pursuant to Section 1102 of the

23 Bankruptcy Code.

24         2.1.156   Unpaid Secured Real Property Tax Claims. Secured Claims held by

25 various government entities secured by liens on the underlying real properties owned by the

26 Debtors but that are non-recourse to the Debtors.

27         2.1.157   Unsecured Claim. An Unsecured Claim is any Claim that is not an

28 Administrative Claim, Tax Claim, Secured Claim, or Priority Claim.

1    2.1.158    Voluntary Debtor(s). The following Chapter 11 debtors and debtors-in-

2    possession, individually or collectively, Palmdale Hills, SunCal I, SunCal III, SCC Palmdale,

3    Acton Estates, SunCal Beaumont, SunCal Emerald, SunCal Johansson, SunCal Bickford, SunCal

4    Summit, Seven Brothers, Kirby Estates, SJD Partners, SJD Development, SCC Communities, Del

5    Rio and Tesoro.

6    2.1.159    Voluntary Debtors' Committee. The Official Committee of Unsecured

7    Creditors of the Voluntary Debtors appointed in the Cases pursuant to Section 1102 of the

8    Bankruptcy Code.

9    2.1.160    Winning Bid. The highest Qualifying Bid received for the Ritter Ranch

10    Project, the Bickford Ranch Project or the Acton Project.

11    2.1.161    Winning Bidder. The party that submits the highest Qualifying Bid.

12    **2.2    Rules of Construction.**

13    For purposes of the Plan and this Disclosure Statement, unless otherwise provided herein or

14    in the Plan, (a) whenever from the context it is appropriate, each term, whether stated in the

15    singular or the plural, will include both the singular and the plural; (b) each pronoun stated in the

16    masculine, feminine or neuter includes the masculine, feminine and neuter; (c) any reference in the

17    Plan or this Disclosure Statement to an existing document or schedule filed or to be filed means

18    such document or schedule, as it may have been or may be amended, modified or supplemented

19    pursuant to the Plan; (d) any reference to an entity as a Holder of a Claim or Interest includes that

20    entity's successors and assigns; (e) except as otherwise indicated herein all references in the Plan

21    or this Disclosure Statement to Sections, Articles and Exhibits are references to Sections, Articles

22    and Exhibits of or to the Plan; (f) the words "therein," "thereunder" and "thereto" refer to the Plan

23    in its entirety rather than to a particular portion of the Plan; and (g) unless otherwise provided in

24    the Plan or this Disclosure Statement, any reference in the Plan or this Disclosure Statement to a

25    contract, instrument, release, indenture, agreement, or other document being in a particular form or

26    on particular terms and conditions means that such document shall be substantially and materially

27    in such form or substantially and materially on such terms and conditions; (h) any reference in the

28    Plan or this Disclosure Statement to a document, schedule, or exhibit to the Plan or Disclosure

Statement Filed or to be Filed means such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; and (i) the rules of construction set forth in Section 102 of the Bankruptcy Code shall apply to the extent such rules are not inconsistent with the express terms of the Plan or this Disclosure Statement or any other provision in this Section 2.2.

**2.3    Exhibits.**

All Exhibits to the Plan are incorporated into and are a part of the Plan as if set forth in full therein.

### III.

### PLAN CONFIRMATION DEADLINES

The Bankruptcy Court has not confirmed the Plan described in this Disclosure Statement. Accordingly, the terms of the Plan are not binding on anyone. However, if the Bankruptcy Court confirms the Plan, then the Plan will be binding on the Debtor(s), the Plan Trustee, and on all Creditors and Interest Holders in such Cases.

**3.1    Time and Place of the Confirmation Hearing.**

The hearing where the Bankruptcy Court will determine whether or not to confirm the Plan will take place at 411 West Fourth Street, Santa Ana, CA 92701-4593 on October 24, 2011, at 9:30 a.m. in Courtroom 5A.

**3.2    Deadline for Voting for or Against the Plan.**

If you are entitled to vote, it is in your best interest to timely vote on the enclosed ballot and return the ballot to:

> Winthrop Couchot Professional Corporation
> 660 Newport Center Drive, Suite 400
> Newport Beach, CA 92660
> Facsimile: (949) 720-4111
> Attn: P.J. Marksbury

Your ballot must be **received by** September 26, 2011, or it will not be counted.

**3.3    Deadline for Objecting to the Confirmation of the Plan.**

Objections to the confirmation of the Plan must be filed with the Bankruptcy Court, and served upon the following parties so that they are received by September 26, 2011:

-27-

| | |
|---|---|
| **Counsel to the Voluntary Debtors** | Paul J. Couchot<br>Winthrop Couchot Professional Corporation<br>660 Newport Center Drive, Suite 400,<br>Newport Beach, CA 92660 |
| **Authorized Agent for Voluntary Debtors** | Bruce V. Cook<br>General Counsel<br>2392 Morse Ave<br>Irvine, CA 92614-6234 |
| **Counsel for SunCal Management LLC and SCC Acquisitions Inc.** | Ronald Rus<br>Rus Miliband & Smith P.C.<br>2211 Michelson Drive, Seventh Floor<br>Irvine, California 92612 |
| **Authorized Agent for SunCal Management and SCC Acquisitions, Inc.** | Bruce V. Cook<br>General Counsel<br>2392 Morse Ave<br>Irvine, CA 92614-6234 |

### 3.4    Identity of Person to Contact for More Information Regarding the Plan.

Any interested party desiring further information about the Plan should contact the Voluntary Debtors' counsel, Winthrop Couchot Professional Corporation, 660 Newport Center Drive, Suite 400, Newport Beach, CA 92660, Attn: Paul J. Couchot, (949) 720-4100; Peter W. Lianides, (949) 720-4155; Payam Khodadadi, (949) 720-4160.

### 3.5    Disclaimer.

The information contained in this Disclosure Statement is provided by the SunCal Plan Proponents. The SunCal Plan Proponents represent that everything stated in this Disclosure Statement is true to the best of their knowledge. The Bankruptcy Court has not yet determined whether or not the Plan is confirmable and makes no recommendation as to whether or not you should support or oppose the Plan.

The discussion in this Disclosure Statement regarding the Group I: Voluntary Debtors may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate," or "continue," or the negative thereof or other variations thereon or comparable terminology. The reader is cautioned that all forward looking statements are

-28-

1    necessarily speculative and there are certain risks and uncertainties that could cause actual events

2    or results to differ materially from those referred to in such forward looking statements. The

3    liquidation analyses, distribution projections, projections of financial results and other information

4    are estimates only, and the timing, amount and value of actual distributions to Creditors may be

5    affected by many factors that cannot be predicted. Therefore, any analyses, estimates, or

6    projections may or may not turn out to be accurate.

7    The SunCal Plan Proponents and their professionals have made a diligent effort to identify

8    in this Disclosure Statement all Litigation Claims, including claims for relief, counterclaims, and

9    objections to claims. However, no reliance should be placed on the fact that a particular Litigation

10   Claim is or is not identified in this Disclosure Statement. The Group I: Voluntary Debtors or other

11   parties in interest may seek to investigate, file and prosecute Litigation Claims after the

12   Confirmation Date, or the Plan Trust may seek to do so after the Effective Date of the Plan whether

13   or not the Litigation Claims are identified in this Disclosure Statement.

14                                              **IV.**

15                  **FACTUAL BACKGROUND OF THE DEBTORS**

16   **4.1    The Formation of the Debtors and the Projects.**

17          4.1.1    **Overview of the Debtors and their Projects.**

18   The Group I: Voluntary Debtors are four of twenty-six entities (collectively the "Debtors")

19   that were formed pursuant to a joint venture between Affiliates of the SunCal Companies

20   ("SunCal") and the Lehman Entities (the "SunCal/Lehman Joint Venture"). The Debtors role in the

21   venture was to own and develop the large residential projects that were the core assets in this joint

22   undertaking.

23   At the inception of SunCal/Lehman Joint Venture, it was agreed that SunCal would be the

24   developer/manager of the Projects and the Lehman Entities would provide the necessary capital.

25   Attached hereto as Exhibit "1" is a general description of the Debtors' Projects, including the

26   Group II Projects, and the Debtors' other primary Assets, excluding Cash and the Litigation

27   Claims, and a description of the loans for the Projects that are not a part of Group II Projects.

28

1    All of the Debtors are Affiliates of Acquisitions and SCC LLC. Some of the Debtors directly own

2    the Projects, while others serve as holding companies, owning Allowed Interests in the Debtors that

3    hold title to the Projects. SunCal Management, LLC, a SunCal Affiliate, has management contracts

4    with respect to all of the Projects and manages the Debtors' day-to-day business affairs.

5         The seventeen Debtors who are referred to herein as the "Voluntary Debtors" are wholly

6    owned by SunCal Affiliates, and consequently the SunCal Affiliates have full corporate

7    governance authority over these entities. The Voluntary Debtors own eleven (11) of the Projects.

8    In the case of the nine Trustee Debtors, the SunCal Affiliates and the Lehman Affiliates initially

9    shared ownership equally (50% each). However, after the Petition Date, the SunCal Affiliates

10   became the owner of hundred percent (100%) of the equity in two of the nine Trustee Debtors -

11   SunCal Heartland and SunCal Marblehead. The Trustee Debtors own nine (9) Projects.

12   Attached hereto as Exhibit "2" is a chart that sets forth the appraised value of the Group I Projects.

13   This chart lists both the Lehman Lenders' value estimates and SunCal's valuation estimates.[2]

14        The Plan eliminates any potential value disputes by providing for the sale of the Group II

15   Projects through an auction that is designed to yield the highest market price for these assets.

16   Accordingly, to the extent any other party believes the Group II Projects have a greater value than

17   the Opening Bid offered by another Qualifying Bidder, they will have the opportunity to submit a

18   Qualifying Bid (but no credit-bids will be allowed) that exceeds the Opening Bid and, if they so

19   desire, to become the Winning Bidder by offering the highest Qualifying Bid. This market sale

20   process will insure that the rights of all stakeholders are protected.

21        4.1.2    **The Debtors' Primary Secured Creditors and Their Disputed Claims**.

22        LCPI holds the primary secured claims against the Ritter Ranch Project and the Bickford

23   Ranch Project. LCPI's secured claim against Ritter Ranch, which is secured by a first priority deed

24   of trust against this Project, is based upon the funding provided under the terms of the Ritter Ranch

25   Loan Agreement. The asserted balance due under the terms of this loan was $287,252,096.31 as of

26   March 30, 2009. LCPI's secured claim against the Bickford Ranch Project, which is also secured by

27   a first priority deed of trust, is based upon funding provided under the terms of the SunCal

28

---

[2] Values may have changed since these analyses were prepared.

MAINDOCS-#163407-v2-SCC_DS_Group_I_Vol_Debtors.DOC

1   Communities I Loan Agreement. The asserted balance due under terms of this loan was

2   $343,221,391.06 as of March 30, 2009. LCPI contends that this loan is also collateralized by liens

3   against the Acton Project and the SunCal Emerald Projects. However, as more fully explained

4   herein, this claim is clearly untenable in the case of the Acton Project, since Acton Estates never

5   signed the loan document that purportedly conveyed a lien to LCPI.

6         4.1.3   **Disputed Claims and Liens.**

7         As discussed in detail herein, during the course of the Debtors' Cases, the Debtors initiated

8   litigation disputing the validity of Lehman's Disputed Secured Claims, and the validity, priority

9   and extent of Lehman's Disputed Liens (which includes the liens against the Group II Projects).

10  This litigation was being pursued through the Lehman Adversary Proceeding until this matter was

11  stayed pursuant to a ruling by the court presiding over LCPI's Chapter 11 case in New York.

12  However, Lehman's Disputed Secured Claims are being separately contested through claims

13  objections. In addition, a lawsuit has been filed in California Superior Court against certain

14  Lehman Entities and their agents who are not in Chapter 11, based upon their post-petition

15  conduct.

16        Attached hereto as Exhibit "3" is a chart that sets forth Lehman's Disputed Secured Claims,

17  the alleged Holders of the Lehman Disputed Secured Claims, the collateral encumbered by the

18  Lehman Disputed Liens, and the alleged outstanding amount based on the filed Proofs of Claim.

19  As the chart indicates, LCPI has filed claims in the following amounts against the Group I:

20  Voluntary Debtors: $287,252,096 against Palmdale Hills, $343,221,391 against SunCal Bickford

21  and $343,221,391 against Acton Estates. Lehman Ali has also filed a claim in the amount of

22  $56,494,059 against SunCal Bickford based upon an alleged second lien held against the Bickford

23  Ranch.

24        4.1.4   **Summary of the Group I: Voluntary Debtors' Cash.**

25        The following chart sets forth the Group I: Voluntary Debtors' cash-on-hand as of

26  January 31, 2011.

27

| DEBTORS | AMOUNT |
|---|---|
| Palmdale Hills - FLR Escrow | $    201,805.57 |
| Palmdale Hills | 16,861,677.73 |

-31-

| | |
|---|---|
| Palmdale Hills | 409,634.80 |
| Palmdale Hills | 2,717,151.17 |
| Palmdale Hills | 343,000.00 |
| SunCal Bickford | 1,105,003.87 |
| SunCal Emerald | $7,825.57 |
| Acton Estates | $0.00 |
| **Group I: Voluntary Debtors' Total** | **$21,646,098.71** |

Although the Lehman Lenders have alleged that they hold liens on the above cash, a preliminary review of the applicable lien documents indicates that most of the alleged liens were not validly perfected. This means that these liens can be avoided, allowing the unsecured creditors recourse to these funds. Moreover, even if the liens against these accounts were properly perfected, the amount secured by these liens, and their priority and their enforceability will be subject to the results of the Lehman Claim Objections and the Lehman Adversary Proceeding.

## 4.2 Factual Circumstances Leading to the Filing of the Debtors' Chapter 11 Cases.

### 4.2.1    Introduction.

In this section of the Disclosure Statement, the SunCal Proponents have provided a brief description of the relationship between the Debtors and the Lehman Entities. This background is relevant to the Group I: Voluntary Debtors, and in fact all of the Debtors, for the following reasons. First, most of the unsecured claims asserted against the Debtors were incurred at the insistence of the Lehman Lenders, and they would have been paid if the Lehman Lenders had honored their obligation to pay these claims. Second, a substantial part of claims that the Lehman Lenders failed to pay are being asserted against *all of the Debtors*. If the litigation against the Lehman Lenders discussed herein is successful, it will, at a minimum, reduce the pool of claims against the Group I: Voluntary Debtors, and thereby increase the dividend payable to the remaining creditors. Third and finally, this history allows the Creditors to take the measure of the parties who are now proffering the competing plan – the Lehman Lenders. As the within discussion will establish, the Lehman Lenders failed to pay the claims of Creditors prepetition, the Lehman Lenders attempted to foreclose upon the Group II Projects post-petition in order to deny the unsecured creditors any recovery on the claims they failed to pay, and finally, when this foreclosure effort failed, the Lehman Lenders attempted to destroy the Debtors' reorganization and sale efforts by manipulating LCPI's alleged automatic stay. The SunCal Plan Proponents believe that this history will lead the

MAINDOCS-#163407-v2-SCC_DS_Group_I_Vol_Debtors.DOC

1  Creditors to conclude, when weighing the merits of the Lehman Lenders Plan offer: "Fool me once

2  shame on you, fool me twice shame on me."

3                     **4.2.2   Background of the SunCal Companies.**

4       SunCal is a family-owned and operated real estate business that has been successfully

5  developing properties throughout the western United States for over 70 years. SunCal's business

6  focuses upon the "development" of residential land. A typical SunCal development begins with the

7  acquisition of one or more parcels of raw land. Thereafter, the SunCal team develops a master plan

8  for the acreage that incorporates streets, homes, parks, schools and commercial areas, and then it

9  works with the applicable municipal planning authorities (the city, county, state and federal) to

10  secure the necessary approvals or "entitlements" to gain approval of this plan. This process, which

11  requires the assistance of land planners, civil engineers, architects, lawyers, and other land

12  specialists, takes a period of years. Once the master plan is approved, SunCal provides for the

13  grading of the project and the installation of the foundational infrastructure (streets, utilities, etc.)

14  and then sells the lots or parcels within the project to merchant builders.

15                     **4.2.3   The Origins of the SunCal/Lehman Joint Venture.**

16       SunCal historically financed its projects with loans and/or equity from a number of

17  different sources. However, beginning in 1997, an increasing number of SunCal's projects were

18  financed by the Lehman Entities, as Mark Walsh ("Walsh"), the head of LBHI's Global Real

19  Estate Group, began cultivating a business relationship with SunCal's principals.

20       By 2003, the Lehman Entities and SunCal had entered into joint ventures involving

21  approximately fifteen projects. By 2007, that number had grown to over forty, and the Lehman

22  Entities had become, with limited exceptions, the exclusive provider of financing for the SunCal

23  Projects pursuant to a written agreement executed in 2006. The Lehman Entities also consisted of

24  the Lehman Equity Members that either directly or indirectly owned a fifty percent (50%) equity

25  interest in all nine of the Trustee Debtors.

26       In their dealings with SunCal, the Lehman Representatives made no distinction between

27  Projects financed by Lehman ALI and Projects financed by LCPI. They also made no distinction

28  between the Debtors in which Lehman Equity Members held 50% equity memberships or the

MAINDOCS-#163407-v2-SCC_DS_Group_I_Vol_Debtors.DOC

1  Debtors in which the Lehman Entities held no equity membership interest. As agents of the

2  financial partner in the parties' joint venture, the Lehman Representatives would determine which

3  Lehman Entity would provide financing on which Projects, and would dictate the structure that the

4  financing would take, according to whatever suited the Lehman Entities' needs.

5          **4.2.4   Lehman's Effective Control over the Management of the Debtors and**

6                    **Promises of Ongoing Funding.**

7          Prior to the market downturn in the middle of 2007, Lehman Representatives afforded

8  SunCal substantial discretion in the management and development of the Projects. The Debtors

9  would contract with third-party vendors to perform grading, health and safety compliance,

10 construction, landscaping, and other necessary services on the Project sites, and they would work

11 with the local municipalities to obtain the necessary entitlements and other authorizations

12 necessary to proceed with development. The Lehman Representatives, SunCal and the Debtors

13 would discuss anticipated quarterly expenditures at periodic budget meetings, and , as expenses

14 were incurred each month, SunCal and the Debtors would submit requests for payment to the

15 Lehman Representatives, supported by the necessary documentation. The Lehman Representatives

16 would then provide the funding necessary to pay these expenses.

17         During the third quarter of 2007, the foregoing management and payment dichotomy

18 changed, after the real estate market experienced a sudden downturn, and many of the Projects

19 significantly declined in value. In response to this dramatic economic change, a series of high

20 level discussions occurred between SunCal's representatives and the Lehman Representatives --

21 including Walsh, Paul Hughson ("Hughson") and Frank Gilhool ("Gilhool"), the Managing

22 Directors of Lehman's Global Real Estate. In these discussions, SunCal's representatives, acting

23 on behalf of the Debtors, expressed concerns about the loans on the Projects being out of balance,

24 and suggested shutting down the Projects, or at least slowing the pace of development. However,

25 Walsh specifically instructed SunCal not to slow down or stop work. He assured SunCal that the

26 Lehman Entities would provide the necessary funding to pay vendors and to keep the development

27 of the Projects moving forward.

28

1    The foregoing assurances of payments were confirmed in numerous telephone

2    conversations between Gilhool and SunCal's COO, Frank Faye ("Faye"), and/or SunCal's General

3    Counsel, Bruce Cook ("Cook") that took place during 2007 and 2008. In each exchange, Gilhool

4    assured SunCal that the Lehman Entities were committed to funding the debts and obligations

5    being incurred at the Projects and they continued to insist that work proceed.

6    During this time frame, the Lehman Representatives became much more "hands on,"

7    scrutinizing and approving all budgets and expenses through a new control and approval structure.

8    Under the new structure, SunCal would submit budgets to the Lehman Representatives on a

9    weekly basis and explain, during period conference calls, what Project payables they believe had to

10    be paid and what work had to be performed on the Projects. The Lehman Representatives would

11    then unilaterally decide what future work would proceed, the Lehman Representatives would

12    authorize the work and the Lehman Representatives would decide what payables would be paid

13    timely by designating them as "urgent," and what other payables were not urgent and hence would

14    not be paid on a timely basis. However, even under this new Lehman controlled management and

15    payment regime, the Lehman Representatives made it clear that all payables being incurred would

16    be funded.

17    **4.2.5    The 2008 Restructuring Agreement.**

18    By the fall of 2007, both SunCal and the Lehman Representatives contemplated entering

19    into restructuring agreement in the near term, with a closing to occur no later than January or

20    February of 2008. However, this transaction was delayed by the Lehman Entities' extensive

21    documentation demands until May 23, 2008. On this date, SunCal and most of the Debtors finally

22    entered into an omnibus "Restructuring Agreement" with LBHI, Lehman ALI and the other

23    Lehman Entities. The same Lehman Representative signed the Restructuring Agreement on behalf

24    of all of the Lehman Entities.

25    Pursuant to the Restructuring Agreement, Lehman ALI, "as the Lender with respect to each

26    Loan," committed, among other things, to: (1) make advances under existing loans to fund the

27    continuing costs necessary to preserve the value of the Projects; (2) move forward to resolve the

28    accrued outstanding subcontractor payables, i.e., to make sure that the Projects' creditors were paid

1  for their work; and (3) to close the transaction, whereby newly-created Lehman Entities would

2  assume the debt and obligations of the Projects.

3      As originally executed in May 2008, the Restructuring Agreement applied to twelve of the

4  twenty Projects (as well as several other projects not at issue in the Lehman Adversary

5  Proceeding): (1) Acton Estates; (2) Beaumont Heights; (3) Bickford Ranch; (4) Emerald

6  Meadows; (5) Heartland; (6) Johannson Ranch; (7) Marblehead; (8) Northlake; (9) Oak Valley;

7  (10) Pacific Point; (11) Ritter Ranch; and (12) Summit Valley. The Debtors that owned and/or

8  held equity interests in the entities that owned these Projects were signatories to the May 2008

9  agreement.[3]

10     Between May and August 2008, the parties agreed to add four additional projects to the

11  Restructuring Agreement: (1) Del Rio; (2) Joshua Ridge; (3) Palm Springs Village; and (4) Tesoro

12  Burnham, and the four Debtors associated with these Projects—SunCal Del Rio, SCC

13  Communities, SunCal PSV, and SunCal Tesoro. Only four Projects were not included in the

14  Restructuring Agreement: Century City, Delta Coves, Oak Knoll and Del Amo. Accordingly, the

15  four Debtors associated with these Projects—SunCal Century City, Delta Coves, SunCal Oak

16  Knoll and SunCal Torrance—were not signatories thereto. Lehman ALI was the lender on each of

17  these Projects and , and as with the other Projects, Lehman Ali continued to insist that these four

18  debtors proceed with the development of the four Projects, it approved all expenses, and it

19  continually provided assurances of payment.

20              **4.2.6   The Lehman Lenders Hire Radco.**

21     Subsequent to the execution of the Restructuring Agreement, Lehman ALI arranged for a

22  third party, Radco, to directly settle outstanding contractor payables, as its agent. Radco was

23

24  ───────────────
[3] Specifically, the Restructuring Agreement was entered into by, among others, the "Borrowers,"
    "Grantors" and "Pledgors," as defined in Annex 1 thereto. The "Borrowers" included SunCal Marblehead,

25  SunCal Heartland, SunCal Northlake, SunCal Oak Valley, SJD Partners, Palmdale Hills, SCC Palmdale,
    SunCal I, SunCal III, and SunCal Bickford.

26
    The "Grantors" included SunCal Marblehead, SunCal Heartland, SunCal Northlake, SunCal Oak Valley,

27  SJD Partners, Palmdale Hills, SunCal Bickford, SunCal Acton, SunCal Summit and SunCal Emerald, and
    Debtors SunCal Beaumont and SunCal Johannson.

28
    The "Pledgors" included SCC Palmdale, SunCal I, SunCal Summit and SJD Development.

1   provided some limited funding and authority to negotiate settlements, and did in fact reach

2   settlement with a number of creditors.  The funding for these settlements, whether the debts related

3   to Lehman ALI or LCPI funded Projects, came from the same source.  Lehman ALI and LCPI also

4   provided approval for new work on the Projects, and Lehman ALI paid for some of this work.

5   However, this funding was minimal and it soon stopped.

6       In August 2008, Lehman ALI withdrew funding and settlement authority from Radco,

7   leaving millions of dollars in outstanding contractor payables unresolved, notwithstanding the

8   contrary provisions in the Restructuring Agreement.  Leman Ali's actions also impaired the

9   Debtors' ability to resolve ongoing public health and safety issues arising at the Projects.

10  Ultimately, only a fraction of the total outstanding payables were resolved, contrary to the  past

11  promises made by Lehman Representatives.

12          **4.2.7   The Lehman Lenders' Failure to Close on the Settlement Agreement.**

13      Pursuant to the terms of the Restructuring Agreement, the parties agreed to enter into a

14  Settlement Agreement, the form of which was attached to the Restructuring Agreement.  The

15  Settlement Agreement provided for the transfer of the Projects included within the Restructuring

16  Agreement to a series of newly formed Lehman-controlled entities (each with "SCLV" in its

17  name, for "SunCal-Lehman Venture"). The agreement further provided that the entity taking title

18  to the Project would assume the Lehman Lender debt obligations associated with the Projects,

19  assume certain bond obligations associated with the Projects, and provide indemnifications to

20  SunCal and the Debtors for unpaid claims.

21      On August 25, 2008, the Settlement Agreement and a series of related documents were

22  formally executed by SunCal and the applicable Lehman Lenders and Lehman Equity Members at

23  a meeting held in Los Angeles on August 25, 2008.  Once these documents were signed, all that

24  remained was the mechanical closing of the series of transactions described in the Settlement

25  Agreement. Since all of the conditions precedent to the closings had been satisfied, or could have

26  been satisfied at, or shortly after the meeting, this should have occurred at the August 25, 2008

27  meeting, or shortly after the meeting. However, the Lehman Representative asked SunCal to

28  extend the closing date for thirty days, to September 30, 2008. According to the Lehman

1    Representatives, this short extension would enable them to secure certain outstanding third party

2    consents. Although SunCal knew these third party consents were readily obtainable within a few

3    days, they agreed to this extension, believing the request was made in good faith. In fact, as more

4    fully explained blow, it was not.

5    **4.2.8   The Lehman Lenders' Undisclosed Sale of Most of the Debtors' Loans.**

6    As explained above, the Settlement Agreement was duly executed by all parties at a formal

7    closing meeting held on August 25, 2008. When the parties signed this agreement, which was a

8    binding contract, they both represented that they both intended and had the power and capacity to

9    perform all of the obligations undertaken therein. However, in the case of the Lehman Entities, this

10   representation was later discovered to be false. When the closing occurred on August 25, 2008, the

11   Lehman Lenders had already sold the very obligations they were agreeing to assume and restructure

12   in the Settlement Agreement to Fenway Capital pursuant to a repurchase agreement. Accordingly,

13   as of August 25, 2008, they lacked the power to perform the most essential undertakings that they

14   agreed to perform in the Settlement Agreement. Instead of disclosing this fact at the August 25,

15   2008 meeting, the Lehman Lenders requested additional time to execute the agreed upon transfers

16   provided for under this binding agreement. The Lehman Lenders needed to this delay for an

17   obvious, but undisclosed reason: They lacked the ability to perform the very obligations they had

18   just agreed to perform in the Settlement Agreement.

19   The Lehman Representatives also did not disclose at the August 25, 2008 closing that they

20   intended to sell the Pacific Point First Loan to Lehman Re, approximately a week later, *even though*

21   *this loan was also subject to the Settlement Agreement.* To the contrary, the Lehman

22   Representatives affirmatively concealed these facts from SunCal and the Debtors by asserting that

23   ownership still existed in the case of seven of the eight loans.

24   **4.2.9   Lehman's Foreclosure Sale and Purchase of the Pacific Point Project.**

25   At the time of the Restructuring Agreement and the Settlement Agreement were signed, the

26   Pacific Point Project, which was still owned by SJD Partners, was among the Projects included in

27   the Restructuring Agreement and the Settlement Agreement. Pursuant to the Restructuring

28   Agreement, and as detailed in the Settlement Agreement attached thereto, SunCal, SJD Partners,

MAINDOCS-#163407-v2-SCC_DS_Group_I_Vol_Debtors.DOC

1   and its parent company, SJD Development, all agreed that they would not interfere with Lehman

2   ALI's (or its designee's) foreclosure on the Pacific Point Project. They further agreed that a new

3   Lehman entity, LV Pacific Point, would purchase the Pacific Point Project upon foreclosure and

4   that Lehman ALI and LV Pacific Point would (a) assume SJD Partners' and SJD Development's

5   outstanding accounts payable for Pacific Point third-party vendors, (b) assume certain bond

6   liabilities associated with the Pacific Point Project, and (c) pay for the millions of dollars worth of

7   work that Lehman ALI representatives had authorized.

8       As previously stated, the Settlement Agreement was signed on August 25, 2008 by the

9   SunCal parties, including SJD Partners and SJD Development. It was also signed by Gilhool as

10  authorized signatory on behalf of both Lehman ALI and LV Pacific Point. As a signatory to the

11  Settlement Agreement, LV Pacific Point was required to purchase the Pacific Point Project at the

12  foreclosure sale subject to the above obligations. Consistent with this agreement, the City of San

13  Juan Capistrano executed an estoppel certificate for the benefit of SJD Partners and Lehman ALI—

14  at Lehman ALI's request—on August 26, 2008, two days before the foreclosure sale. This

15  certificate stated, among other things, that the "Acquiring Entity [LV Pacific Point] shall by

16  operation of law become the legal successor-in-interest to Developer [SJD Partners]" under SJD

17  Partners' agreements with the City. That certificate further provided that there existed no breaches,

18  defaults, or claims under SJD Partners' agreements with the City.

19      On August 28, 2008, Lehman ALI foreclosed on the Pacific Point Project, and title was

20  transferred to LV Pacific Point at the foreclosure sale. However, Lehman ALI and LV Pacific

21  Point failed to assume the liabilities and obligations associated with this Project as agreed.  This

22  breach of the parties' agreement, left SJD Partners without title to the Pacific Point Project, but

23  with substantial unsecured claims relating to the Project, including certain bond claims of

24  approximately $34 million. Moreover, since Lehman Ali and LV Pacific Point have continued to

25  ignore their obligations under the above agreement, unpaid taxes, fines, and penalties have

26  continued to accrue to the detriment of the Project and these claims are being asserted against SJD

27  Partners..

28

MAINDOCS-#163407-v2-SCC_DS_Group_I_Vol_Debtors.DOC

1    Had SunCal, SJD Partners and SJD Development known that Lehman ALI and LV Pacific

2  Point had no intention of honoring their obligations under the foregoing agreement, they never

3  would have agreed to cooperate with the foreclosure. Instead, SJD Partners would have filed for

4  bankruptcy earlier, thereby mitigating the damages from Lehman Ali's breach, by allowing

5  creditors recourse to the value of the Project.

6    This course of conduct is relevant to the unsecured creditors of the Group I Debtors for the

7  following reason. The holders of bond claims against SJD Partners are asserting their massive

8  claims against the estates of all of the Debtors, including the estates of the Group I Debtors.

9  Accordingly, Lehman Ali's wrongs against SJD Partners directly affect the Group I Debtors' cases.

10    **4.2.10 <u>Alvarez and Marsal Take Over Control of the Lehman Entities After</u>**

11    **<u>the Chapter 11 Filings of LBHI and LCPI.</u>**

12    LBHI filed for bankruptcy in September 2008 and LCPI filed for bankruptcy in October

13  2008. After LBHI's filing, Bryan Marsal ("Marsal") of Alvarez & Marsal ("A&M") was appointed

14  to serve as LBHI's Chief Restructuring Officer. Marsal and A&M are in charge of liquidating the

15  now defunct Lehman Entities, including Chapter 11 debtors LBHI and LCPI, and the non-bankrupt

16  Lehman Lenders (Lehman ALI, OVC, and Northlake Holdings, as well as the non-bankrupt

17  Lehman Equity Members.

18    Although A&M was not employed until after the events that occurred on August 25, 2008

19  described above, it should be noted that A&M hired the same law firm that represented the

20  Lehman Lenders in the August 25, 2008 meeting – Weil, Gotshal & Manges, LLP. Moreover, as

21  more fully explained herein, it was A&M that directed Lehman Ali not to perform its contractual

22  obligations under the Settlement Agreement after September of 2008. Accordingly, the same

23  individuals that caused the damages to unsecured creditors by insisting upon the breach of the

24  Settlement Agreement, are now asking for their vote in the competing plan filed by the Lehman

25  Lenders.

26    LBHI's bankruptcy filing and the Lehman Lenders refusal, at A&M's direction, to close the

27  transactions provided for under the Settlement Agreement as agreed, were not small matters. They

28  severely damaged the Debtors. Although the Debtors were not proceeding with any new

-40-

1   construction or development, the Debtors were still required to expend significant sums on site

2   security, erosion control, property taxes and other measures in order to prevent the Projects from

3   becoming a public safety hazard, and in order to avoid the loss of valuable entitlements, and to

4   mitigate penalties and fines being incurred by the Projects. Although SunCal and the Debtors

5   repeatedly requested that the Lehman Entities pay for critical health and safety and value

6   preservation measures on the Projects, these efforts were unavailing.

7        Between October 9 and November 4, 2008, SunCal's general counsel Cook sent Robert

8   Brusco, an authorized agent of the Lehman Entities, nearly two dozen letters requesting that the

9   Lehman Lenders provide the funding necessary to address critical needs on the Projects as

10   promised. A summary of these health and safety notices are attached hereto as Exhibit "5". The

11   Lehman Entities ignored these requests until November 2008, when Brusco, purportedly on behalf

12   of the Lehman Lenders, delivered the message that the Lehman Lenders were unwilling to fund the

13   Projects and that, instead, they intended to foreclose on all of the Projects.

14        As a result, as set forth in Exhibit "4," there are now over 240 vendors, municipalities,

15   counties and bonding companies claiming over $400 million in work, improvements and property

16   tax claims against the Projects. Substantially all of these sums are due to work performed or

17   bonded at Lehman's request based upon Lehman's promises of payment.

18       **4.3    The Group I: Voluntary Debtors' Potential Preferential Transfers.**

19        Attached hereto as Exhibit "6" are charts setting forth payments made to third parties

20   during the ninety (90) day time period preceding the filing of the Debtors' Chapter 11 Cases as

21   well as payments made to the Lehman Entities and to SunCal Affiliates during the one-year time

22   period preceding the filing of the Debtors' Chapter 11 Cases. In those instances where the Group I:

23   Voluntary Debtors believe there are reasonable grounds to recover these transfers, at a reasonable

24   cost, they have filed complaints.

25        The Debtors have also filed a Fourth Amended Complaint against the Lehman Entities,

26   who were the recipients of a substantial number of these transfers. This complaint includes causes

27   of action for, among other things, the recovery of the preferential payments made to the Lehman

28   Entities referenced above. As explained herein, this action is presently stayed as to LCPI.

MAINDOCS-#163407-v2-SCC_DS_Group_I_Vol_Debtors.DOC

As to SunCal Affiliates, Acquisitions believes, and counsel to the Trustee has preliminarily opined, that such entities either have ordinary course or new value defenses for all payments received during the one-year time period preceding the Petition Dates.

## V.

## SIGNIFICANT EVENTS IN THE DEBTORS' CHAPTER 11 CASES

### 5.1.    Voluntary Debtors.

#### 5.1.1    Joint Administration of the Voluntary Debtors and the Trustee Debtors.

Since their respective Petition Dates, the seventeen (17) Voluntary Debtors have continued to operate as "debtors-in-possession," subject to the supervision of the Bankruptcy Court and in accordance with the Bankruptcy Code. The Voluntary Debtors are authorized to operate their businesses in the ordinary course during the Chapter 11 proceedings. Transactions outside the ordinary course of business must be approved by the Bankruptcy Court.

The Voluntary Debtors' Cases are being jointly administered pursuant to orders entered on November 19, 2008 and December 9, 2008. The Voluntary Debtors' Cases are being jointly administered with the Trustee Debtors' cases pursuant to an order entered on March 11, 2009.

The Voluntary Debtors have employed Winthrop Couchot Professional Corporation as their general insolvency counsel, and the MB Firm as their special litigation counsel.

#### 5.1.2    The Voluntary Debtors Court Employed Professionals.

The Voluntary Debtors' Committee has employed Irell & Manella LLP as its counsel pursuant to an order entered on February 13, 2009.

Pursuant to the Court's Order regarding joint administration of the Voluntary Debtors, the Voluntary Debtors' liability for professional fees is joint and several among the Voluntary Debtors' Estates for fees incurred related to services for the benefit of all of the Voluntary Debtors. The Trustee Debtors' liability for professional fees is not joint and several.

Pursuant to the initial MB Firm employment application, Acquisitions was responsible for the payment of their fees until December 31, 2009. The MB Firm's application also allows for payments from the Bond Companies. The initial MB Firm employment application reserved the

-42-

right, should the Lehman Adversary Proceeding result in a benefit accruing to a particular Debtors'

Estates, to request that its fees and expenses be reimbursed by the Debtors' Estates. The Bond

Companies have also agreed to jointly fund a portion of the professional fees and expenses of the

MB Firm with respect to the Lehman Adversary Proceeding. The Bond Companies' funding

commitment can be terminated and after such a termination they will only be required to cover fees

and costs incurred during the period of their prior commitments.

The MB Firm employment application was subsequently amended. Pursuant to an order

entered on April 14, 2010, (1) the Voluntary Debtors will pay up to one-half of the fees and

expenses incurred by the MB Firm from and after February 1, 2010 onward; and (2) the Trustee

Debtors do not have an obligation to pay any of the MB Firm's fees pertaining to the Trustee

Debtors' estates, unless and until a loan by the Voluntary Debtors to the Trustee Debtors is agreed

to by the Trustee and approved by the Court, or in accordance with the terms of the original

employment applications to the extent not superseded or modified by the amended employment

application. The order does not affect the MB Firm's right to seek payment from the Bond

Companies without the need for an additional order of the Court.

The MB Firm filed an updated application seeking to further amend their employment to

include the right to pursue certain claims against the Lehman Entities and certain employees and

agents of these entities on behalf of the Voluntary Debtors. The claims encompassed by this

amendment include claims that are based upon both prepetition and post-post petition actionable

conduct under both state law and federal law against the Lehman Entities and/or their agents.

### 5.1.3    LCPI's Motions for Relief from the Automatic Stay Against Certain of the Voluntary Debtors' Projects and Related Appeals.

On January 23, 2009, LCPI and Lehman ALI filed various motions for relief from the

automatic stay against a number of the Voluntary Debtors including Group I Debtors Palmdale

Hills, SunCal Bickford and Acton Estates (the "Lehman Entities' Stay Motions"). Although the

Debtors, were able to defeat these motions, they are relevant in the following respect. Had the

motions filed by LCPI and Lehman Ali succeeded, it is almost certain that unsecured creditors

would have received nothing on their claims. Moreover, as more fully explained herein, since

1  Lehman Ali and LCPI did not even own the loans they were seeking to foreclose upon, these

2  motions should never have been filed in the first instance. Yet now, these same parties- Lehman

3  Ali and LCPI – are asking these same creditors to vote on their plan and to "trust" them.

### 5.2. The Trustee Debtors and Their Professionals.

5      Orders for Relief were entered in the involuntary cases beginning on January 6, 2009. The

6  Trustee Debtors are represented by their duly-appointed Chapter 11 Trustee, Mr. Steven M. Speier

7  pursuant to orders of the Bankruptcy Court entered on January 15, 2009.

8      The Chapter 11 Trustee has employed the Lobel Firm as the Chapter 11 Trustee's general

9  insolvency counsel and the MB Firm, as special litigation counsel and Squar Miller, LLP as its

10  accountants.

11      The Trustee Debtors' Committee has employed Weiland, Golden, Smiley, Wang Ekvall &

12  Strok as its general insolvency counsel.

### 5.3. The Debtors' Various Motions Relating to Financing for the Projects and to Pay Professional Fees.

#### 5.3.1  The Voluntary Debtors' Initial Motion for Surcharge and Use of Cash Collateral.

17      On January 16, 2009, seven of the Debtors, including Group I Debtor Palmdale Hills, filed

18  a motion authorizing Palmdale Hills to use and surcharge, pursuant to 11 U.S.C. § 506(c), and/or

19  use the purported cash collateral of LCPI arising from the Ritter Ranch Loan Agreement, pursuant

20  to 11 U.S.C. § 363(c)(2), in order to pay for the reasonable and necessary maintenance expenses

21  required to preserve the value of such Debtors' Projects subject to deeds of trust and other security

22  interests held by LCPI.

23      LCPI objected to the motion and subsequently filed a motion in its own Chapter 11

24  proceeding in the Southern District of New York seeking an order barring the motion as a violation

25  of the automatic stay. Although the Debtors believe that LCPI's stay was not violated in any way

26  by the Motion, the Motion was taken off calendar prior to any ruling by the New York Bankruptcy

27  Court, based upon the threat of sanctions made against Debtors' counsel by the presiding judge in

28  LCPI's case.

-44-

1    As explained above, LCPI did not even own an interest in the Ritter Ranch Loan

2    Agreement when it asserted the automatic stay, since the Ritter Ranch Loan Agreement, which was

3    the subject of the cash collateral motion, had already been sold pursuant to the Fenway Repurchase

4    Agreement. Yet this wrongful action prevented Palmdale Hills from using its own money to pay

5    critical bills that Lehman Ali, LCPI's parent was contractually required to fund in the first instance.

6       **5.3.2    The Voluntary Debtors' Agreements with the Lehman Entities for Use of**

7              **Alleged Cash Collateral to Maintain the Properties and to Pay Professional Fees.**

8       On September 1, 2009, with the consent of the Lehman Entities, fourteen of the Voluntary

9    Debtors filed a motion authorizing surcharge pursuant to 11 U.S.C. § 506(c), and/or use of the

10   purported cash collateral for the purpose of addressing critical public health and safety issues and

11   other value preservation with respect to the Debtors Projects.  On September 10, 2009, the Lehman

12   Entities filed an opposition thereto, and on September 17, 2009, the Voluntary Debtors filed their

13   Reply.

14      Subsequently, the Voluntary Debtors learned that the Lehman Entities lacked control

15   agreements as to the majority of the depository accounts, and thus such accounts were not subject

16   to perfected liens and therefore did not constitute "cash collateral."  On October 15, 2009, the

17   Voluntary Debtors filed a *Motion For Order Authorizing Disposition Of Certain Depository*

18   *Accounts.*  On or about October 22, 2009, the Lehman Entities filed an opposition, and on October

19   29, 2009, the Voluntary Debtors filed their Reply.

20      The motion was consensually resolved by way of the *Stipulation Pursuant To 11 U.S.C. §§*

21   *362, 363, And 364: (1) Authorizing The Use Of Cash Collateral And Alleged Unencumbered Cash;*

22   *(2) Approving Postpetition Financing; (3) Providing Administrative Expense Status; And (4)*

23   *Modifying Automatic Stay To The Extent Necessary* filed on December 8, 2009, and the order

24   thereon entered on December 17, 2009.  The stipulation provides for a 120-day budget with

25   expenses totaling approximately $5 million, pursuant to which any Cash in the Estates is used first

26   and then money borrowed from the Palmdale Hills Estate is used thereafter on an administrative

27   basis.  The agreement also permitted the Voluntary Debtors to use their alleged unencumbered

28   cash to pay its professional fees.  This agreement has been renewed on several occasions.

MAINDOCS-#163407-v2-SCC_DS_Group_1_Vol_Debtors.DOC

**5.4.**   **The Debtors' Disputes and Claims Against the Lehman Entities.**

5.4.1   **The Lehman Adversary Proceeding.**

On January 6, 2009, the Voluntary Debtors initiated the Lehman Adversary Proceeding by filing their initial complaint against Lehman ALI for equitable subordination of Lehman ALI's Disputed Claims and avoidance of its Disputed Liens pursuant to Bankruptcy Code Section 510(c). On February 3, 2009, the Debtors filed a First Amended Complaint, which added the Trustee Debtors as co-plaintiffs and added various other causes of action. The First Amended Complaint also named OVC Holdings, Northlake Holdings and various other entities as defendants.

Pursuant to a hearing on a motion to dismiss held on June 11, 2009, the Bankruptcy Court granted the Debtors leave to amend the second amended complaint. Thus, on July 10, 2009, the Debtors filed their Third Amended Complaint. The Third Amended Complaint addressed many of the concerns raised by the Bankruptcy Court and also included various Avoidance Actions and other causes of action against the Lehman Lenders and the Lehman Successors. The Third Amended Complaint also added Fenway Capital as a defendant based upon, the discovery of the facts relating to the sale of the loans Fenway Capital and based upon the Court ruling that the Repo was a true sale.

On September 30, 2009, the Lehman Entities filed a motion to dismiss the Third Amended Complaint (which motion was amended on October 7, 2009 and October 22, 2009), alleging that the relief requested by certain Debtors was not available as a matter of law. On September 30, 2009, Fenway also filed a motion to dismiss the Third Amended Complaint. On January 26, 2010 and January 28, 2010, the Debtors filed oppositions to the motions to dismiss the Third Amended Complaint filed by the Lehman Entities and Fenway, respectively. On February 4, 2010, the Lehman Entities and Fenway filed their respective replies. The Court entered an order granting in part and denying in part the relief requested in the motions to dismiss. Most notably, the Court denied the defendants request for the dismissal of the equitable subordination claims and the Court permitted the Debtors to file an amended complaint. LCPI was dismissed as a defendant at this hearing, due to the fact that it did not own any interest in the loans at issue and due to potential impact of the case upon LCPI's automatic stay. On March 26, 2010, the Debtors filed their Fourth

-46-

Amended Complaint. The following is a summary of the causes of action set forth in the Fourth Amended Complaint:

### 5.4.1.1    **Equitable Subordination.**

Based on the pre-petition inequitable conduct of the Lehman Entities, summarized in Section 4.2, the Debtors have sought to subordinate the claims and avoid the liens of the Holders of the Lehman Disputed Loans to the extent necessary to pay the Claims of unpaid Creditors that were damaged by the inequitable conduct.

### 5.4.1.2    **The Fraudulent Transfer Claims.**

The fraudulent conveyance claims set forth in the Fourth Amended Complaint include the following:

A.    Acton Estates asserts a fraudulent conveyance claim against Fenway (as a non-debtor success to LCPI) in order to avoid a lien in the amount of $342,841,322.

B.    SunCal Bickford asserts a fraudulent conveyance claim against Fenway (as a non-debtor success to LCPI) in order to avoid a lien in the amount of $168,651,104.

C.    Acton Estates asserts a fraudulent conveyance claim against Fenway (as a non-debtor success to LCPI) in order to avoid a lien in the amount of $342,841,322.

D.    SunCal Emerald asserts a fraudulent conveyance claim against Fenway (as a non-debtor success to LCPI) in order to avoid a lien in the amount of $298,457,533.

E.    SunCal Bickford asserts a fraudulent conveyance claim against LCPI (as a non-debtor success to LCPI) in order to avoid a lien in the amount of $168,651,104.

### 5.4.1.3    **The Preference Claims.**

The preference claims set forth in the Fourth Amended Complaint include the following: Transfers made to a Lehman Entity by a Debtor, where such Debtor was either owned by a Lehman Equity Member (50%) or where a Lehman Equity Member of Lehman Entity controlled such Debtor at the time of the transfer.  Furthermore, according to the Lehman Lenders' appraisals submitted on the Projects of these Debtors, all of the loans were vastly under-secured at the time of the transfers.

-47-

1    On April 12, 2010, the Lehman Entities filed a motion to dismiss the Fourth Amended

2    Complaint (as well as a related motion to strike portions of the same). On that same date, the

3    Lehman Entities and Fenway, respectively, also filed answers to the Complaint denying the causes

4    of actions set forth in the Fourth Amended Complaint and alleging certain affirmative defenses.

5    This action is presently stayed as against LCPI.

6            5.4.1.4    **The Debtors' Motions to Strike the Claims and Pleadings**

7                    **Arising from the Sold Loans to Fenway Capital and Related Appeals.**

8    Once the Debtors discovered that the Lehman Lenders had misrepresented their ownership

9    of seven loans– the loans sold to Fenway Capital back in August of 2008 - they filed motions, on

10    May 29, 2009, seeking an order striking the claims that were filed with respect to these sold (the

11    "Fenway Sold Loans"). The Fenway Sold Loans included the SunCal Communities I Loan

12    Agreement, the Ritter Ranch Loan Agreement, the SunCal PSV Loan Agreement, the SunCal

13    Marblehead/SunCal Heartland Loan Agreement, the Delta Coves Loan Agreement, the SunCal

14    Northlake Loan Agreement and SunCal Oak Valley Loan Agreement. See Exhibit "3."

15    At the initial hearing on the Debtors' motion to strike the Claims held on June 30, 2009, the

16    Court held that the transfer of the Fenway Sold Loans pursuant to the MRA was a true purchase and

17    sale transaction (the "Ownership Issue") and, accordingly, the Lehman Lenders retained no right to

18    file the Proofs of claim on this basis, under Federal Rule of Bankruptcy Procedure 3001(e)(1). The

19    Court entered an order regarding the Ownership Issue on October 2, 2009.

20    The Lehman Lenders also contended that they were entitled to file the Proofs of Claim as the

21    "Fenway's authorized agent" under Federal Rule of Bankruptcy Procedure 3001(b) (the "Agency

22    Issue"). A continued hearing on the Agency Issue was set for September 22, 2009 and the Court

23    ruled that the Lehman Lenders could file the Proofs of Claim an authorized agents.

24    The Lehman Entities appealed the Ownership Issue and the Debtors appealed the Agency Issue to

25    the Bankruptcy Appellate Panel. These two appeals, which were consolidated, were argued in

26    September of 2010. The parties are awaiting a ruling.

27

28

MAINDOCS-#163407-v2-SCC_DS_Group_1_Vol_Debtors.DOC

### 5.4.1.5 The Debtors' Motion Pursuant to Section 506(d) and the 506(d) Valuation Stipulation.

Bankruptcy Code Section 506(a) provides that an asserted Secured Claim is only an Allowed Secured Claim to the extent of the value of such Creditor's interest in the Estate's interest in such property. Bankruptcy Code Section 506(d) then provides that liens against the Debtor's Assets that have no such value to the Alleged Secured Creditor are void. Finally, Bankruptcy Code Section 551 provides that such liens that are void under Section 506(d) are preserved for the benefit of the applicable Debtor's Estate.

On May 29, 2009 and June 9, 2009, the Debtors filed a motion seeking orders (i) valuing certain collateral at zero dollars, (ii) voiding the corresponding liens, pursuant to 11 U.S.C. § 506(d), and (iii) preserving such voided liens for the benefit of the respective bankruptcy estates.

The Debtors and the Lehman Entities subsequently entered into a stipulation to resolve the valuation of such Liens. This stipulation provided that these liens would be valued at zero for all purposes, with the exception of potential equity distributions. Although the Lehman Entities acknowledged the stipulation on the record before the bankruptcy court, and promised to file the executed stipulation that day, counsel for the Lehman Entities subsequently refused to file the document disclosed to the Court on the record, and the parties have subsequently entered into a modified stipulation on substantially similar terms that have been filed with both the New York and California Bankruptcy Courts.

### 5.4.1.6 Lehman 502(d) Objection and Objection to Lehman's Claim Against Acton.

The Voluntary Debtors and other parties-in-interest have filed a motion to disallow, pursuant to 11 U.S.C. § 502(d), a number of Disputed Claims filed by Lehman ALI and LCPI, including the following claims filed in the cases of the Group I: Voluntary Debtors:

| Disputed Proof of Claim No. | Debtor | Claim Holder | Claim Amount |
|---|---|---|---|
| 6 | SunCal Emerald Meadows | LCPI | $343,221,391 |
| 6 | Acton Estates | LCPI | $343,221,391 |
| 16 | SunCal Bickford | LCPI | $343,221,391 |

1    In summary, the Group I Debtors allege in the Lehman 502(d) Objection that the Lehman

2    Entities received prepetition transfers that are avoidable under certain sections of the bankruptcy

3    code. This objection also explains that Acton Estates never signed a loan document, in own right,

4    that would make Acton an obligor on the SunCal I Loan. If these objections are sustained, the

5    above claims would be disallowed, unless the Lehman Entities repaid the avoidable transfers.

6    Moreover, in the case of Acton, a finding in favor of the Group I Debtors would eliminate Claim 6

7    reference above, leaving the Acton Project free of the lien asserted by LCPI as security for Claim 6

8    (based upon the SunCal I Loan.

9    On June 9, 2011, a hearing was held on the Lehman 502(d) Objection. At this hearing the

10   Lehman Entities disputed the merits of the Section 502(d) claim objection and LCPI alleged that

11   the filing of this objection violated its automatic stay. At the conclusion of the hearing, the Court

12   ruled that the parties could proceed with their discovery in this matter.

13   If the Lehman 502(d) Objection is successful, the claims of the Lehman Entities identified

14   in the table above will be disallowed. Although the Lehman Entities will have the right to seek

15   reconsideration of this disallowance, in order to obtain this relief they would have to repay the

16   applicable transfers.

17   5.4.1.7   **The Lehman Recoupment Objection and the State Court Action.**

18   Pursuant to the terms of the joint ventures entered into by and among the Debtors and the

19   Lehman Entities, the Lehman Entities were responsible for paying the costs incurred in the

20   development of the Projects. These costs included the claims of the vendors who provided goods

21   and services to the Projects and the claims asserted by the Bond Claimants. Although the Lehman

22   Entities contend that they were merely "lenders," and that they did not assume any liability for

23   these claims, as the above facts and those that will be adduced prior to and at the confirmation of

24   the Plan will demonstrate, the Lehman Entities are in fact obligated to pay these claims.

25   The Debtors' contend that the Lehman Entities have contractual liability on various

26   grounds, including the following. First, the Lehman Entities were either in a joint venture

27   relationship with the Debtors from the outset, or this relationship developed and became a legal

28   fixture through the Lehman Entities' course of conduct. Pursuant to this relationship, and the

-50-

1    promises and representations made therein, the Lehman Entities agreed to be responsible for all

2    vendor and Bond Claims incurred at or in connection with the Projects. The role of each of the

3    Debtors, by mutual agreement, was to provide development expertise and project management

4    services. The Lehman Entities were required to provide the capital necessary to fund the Projects.

5         Second, during the last eighteen months of the relationship between the parties, the Lehman

6    Entities assumed direct responsibility for all claims incurred during this period, by insisting that

7    work continue on the Projects and by repeatedly promising to pay for this work. Since the Lehman

8    Entities ordered this work, and promised to pay for the same, they bear this financial responsibility.

9         Third and finally, the Lehman Entities expressly agreed to pay the vendor and bond claims

10    described in the Restructuring Agreement and in the interrelated Settlement Agreement, but failed

11    to do so as contractually agreed.

12         It is the SunCal Proponent's contention that the Lehman Entities' failure to pay the vendor

13    and Bond Claims associated with the Projects as (as was their obligation under the terms of the

14    joint ventures, the Restructuring Agreement and the Settlement Agreement) unjustly shifted

15    responsibility for these liabilities to the Debtors in breach of the terms of joint venture, the

16    Restructuring Agreement and the Settlement Agreement. Accordingly, the SunCal Proponents have

17    filed the Lehman Recoupment Objection which seeks the disallowance of certain claims filed by

18    the Lehman Lenders, including the claims filed against the Group I: Voluntary Debtors.

19         In the Lehman Recoupment Objection, the SunCal Proponents seek the following relief:

20           1) Disallowance of the claims asserted by the Lehman Lenders in their

21           entirety, pending compliance with the terms of the Restructuring

22           Agreement and the Settlement Agreement;

23           2) A reduction in the amount of the Lehman Entities' secured claims by

24           the amount of damages resulting from the Lehman Entities' breach of their

25           obligations under these agreements; and/or

26           3) An order barring the Lehman Entities from enforcing their rights under

27           the Lehman Loans until they cure their breaches under the above

28           agreements.

MAINDOCS-#163407-v2-SCC_DS_Group_I_Vol_Debtors.DOC

1    The first prayer for relief above is premised upon the contention that the Lehman Entities

2    agreed to transfer ownership of the Projects described in this agreement, including the Group I

3    Projects, to a series of newly formed entities under the control of the Lehman Entities, pursuant to

4    the terms of the Settlement Agreement. This agreement further provided that these new entities

5    would assume the vendor payables and certain Bond Claims associated with these projects. Finally,

6    this agreement included a covenant not to sue, pursuant to which the Lehman Entities were barred

7    from seeking further recourse against the Debtors.

8        The SunCal Proponents believe that the positions asserted in the Lehman Recoupment

9    Objection are well grounded in fact and in law. Had the Lehman Entities complied with their

10   contractual obligations, substantially all of the Group I Debtor's liabilities would have been

11   eliminated, the Group I Debtors would not have had to file Chapter 11, and the Lehman Entities

12   would be barred from asserting claims against the Group I Debtors based upon the Lehman

13   Disputed Loans. It is the SunCal Proponents position that the Lehman Entities' effort to enforce

14   claims based upon Lehman Disputed Loans is directly contrary to the basic agreements reached in

15   the Restructuring Agreement and in the related Settlement Agreement.

16       The Lehman Entities dispute the merits of the Lehman Recoupment Objection. It the

17   Lehman Entities' position that it was within their absolute "discretion" to pay, or not to pay, the

18   vendor payables incurred during the term of the Restructuring Agreement, even where they

19   authorized the work. Accordingly, they cannot, in their assessment, be held liable for these

20   obligations. In the case of the Settlement Agreement, the Lehman Entities contend that this

21   agreement never became effective and therefore they were not bound to comply with its terms. The

22   SunCal Proponents do not believe that the positions asserted by the Lehman Entities are supported

23   by the facts, or existing law.

24       In addition to the Lehman Recoupment Objection, certain Voluntary Debtors have also

25   filed the State Court Action against Lehman ALI and other non-debtor Lehman Entities. The State

26   Court Action is based on Lehman ALI's breach of contract on the Restructuring and Settlement

27   Agreements.

28

-52-

MAINDOCS-#163407-v2-SCC_DS_Group_1_Vol_Debtors.DOC

1    Although LCPI's automatic stay remains an impediment to the pursuit of the Lehman

2    Adversary Proceeding, the existence of this stay will not bar the SunCal Proponents from

3    implementing the material terms of the Plan for the following reason. LCPI's automatic say does

4    not bar the pursuit of the Lehman Claim Objections and in fact this litigation is proceeding. If these

5    objections are successful, the claims of the Lehman Entities will be disallowed, either in whole or

6    in part, or the Lehman Entities will be barred from pursuing these claims until they pay what they

7    owe to the Group I: Voluntary Debtors. In either scenario, the Plan filed by the SunCal Proponents

8    is feasible and will yield a favorable return for creditors.

9                  5.4.1.8    **The Debtors' Potential Post-Petition Claims Against Lehman**

10                             **and Their Agents.**

11   The Voluntary Debtors believe that the Lehman Entities and certain agents of the Lehman

12   Entities (the "Culpable Agents") engaged in a post-petition course of conduct that severely

13   damaged the Voluntary Debtors, their estates and the recovery rights of creditors. In summary, the

14   actions taken by the Lehman Entities and the Culpable Agents included, among other things, the

15   following:

16           A.    Actively concealing the prepetition sale of the Lehman Disputed Loans to

17   Fenway Capital and misrepresenting themselves as the owners of these loans during the post-

18   petition period; and

19           B.    Improperly asserting that LCPI's automatic stay barred actions in the

20   Voluntary Debtors' Chapter 11 Cases relating to two of the Lehman Disputed Loans, when in fact

21   LCPI did not own any interest in such loans and hence the stay could not apply.

22   The foregoing course of conduct inflicted millions of dollars in damages upon the Voluntary

23   Debtors in the form of additional fees and costs, and it materially delayed the progress of the

24   Voluntary Debtors' reorganization effort. The Voluntary Debtors intend to seek recourse against the

25   Culpable Agents for these wrongs.

26

27

28

MAINDOCS-#163407-v2-SCC_DS_Group_I_Vol_Debtors.DOC

5.5.    **The Lehman Fenway Claims Transaction, Compromise Motion Filed By the**

**Lehman Entities.**

5.5.1    **Lehman Entities' and Fenway's Proposed Claims Transaction.**

In April of 2010, LCPI and LBHI filed that certain *Motion Pursuant To Bankruptcy Rule 9019 For Authority To Compromise Controversy In Connection With A Repurchase Transaction With Fenway Capital, LLC And A Commercial Paper Program With Fenway Funding, LLC* (the "Compromise Motion."). In the motion, LCPI and LBHI represented that they were "compromising" various issues and relationships arising out of the repurchase transaction described in the LCPI – Fenway MRA (the "Repo"). However, a careful review of the transaction described therein indicated that the motion was designed to accomplish the following objectives:

1. To transfer title to the Lehman Disputed Loans at issue in the Lehman Adversary Proceeding from Fenway Capital to LCPI, an entity that had no interest in five of the seven loans prepetition;

2. To allow LCPI, as the new owner of the Lehman Disputed Loans, to re-join the Lehman Adversary Proceeding as a defendant, and once there to use its automatic stay as a "sword" to stay this action;

3. To enable the Lehman Entities to thwart the pursuit of the SunCal Plan Proponents' Plan;

4. To bestow upon the Lehman Entities' purported competing plan an unfair advantage in the plan confirmation contest by delaying the effectiveness of critical provisions in the SunCal Plan Proponents' Plan; and

5. To shield Fenway Capital and its principals from liability and investigation through discovery.

At the hearing on the Compromise Motion, the bankruptcy court in New York approved the Compromise Motion, and stated, consistent with the objectives of the Lehman Entities, that the continued pursuit of the Lehman Adversary Proceeding would be stayed, once LCPI obtained title to the Lehman Disputed Loans. The order reflecting this relief was entered on May 13, 2010 (the "Compromise Order").

MAINDOCS-#163407-v2-SCC_DS_Group_1_Vol_Debtors.DOC

**5.6.    The Debtors' Motion for a Stay to Suspend Certain Lehman Actions.**

On September 21, 2010, the Voluntary Debtors, Acquisitions, and SunCal Management filed a motion requesting, among other relief, for the Court to suspend the Lehman Entities competing plan and disclosure statement unless and until the Lehman Entities agree to provide the Debtors with relief from their automatic stay in the Debtors' Chapter 11 Cases (the "Suspension Motion"). The Court granted this motion and stayed all matters until March 1, 2011. The Court also ordered the parties to engage in a mediation. The Voluntary Debtors and the Lehman Entities were unable to settle their claims through this process.

**5.7.    The Debtors' Other Litigation with Non-Lehman Related Parties.**

**5.7.1    The Debtors' Failed Preliminary Injunction Motion Against the Holders of Bond Claims.**

On February 20, 2009, the Debtors filed a complaint and a Motion for Preliminary Injunction, pursuant to which the Debtors sought a Motion for Preliminary Injunction against the Holders of Bond Claims from pursuing such Claims. On February 23, 2009, the Court denied the Debtors' request for the TRO and granted the Debtors' request to require the defendants to show cause why the Motion for Preliminary Injunction should not be issued.

On March 2, 2009, several Holders of Bond Claims objected to the Motion for the Preliminary Injunction. The objections generally alleged that the Debtors failed to show that the balancing of the equities favored granting the Preliminary Injunction versus the harm to the Holders of the Bond Claims. At a hearing held on March 4, 2009, the Court denied the Preliminary Injunction Motion and the underlying complaint has subsequently voluntarily been dismissed without prejudice.

**5.7.2    The Contractors' Successful Motions for Relief from Stay to Pursue the Bond Claims.**

Various contractors that were hired to perform work on some of the Projects have filed motions for relief from stay with the Bankruptcy Court to pursue their purported Bond Claims. These creditors have requested that the Bankruptcy Court grant these creditors relief from the automatic stay to allow such creditors to enforce certain Claims that such creditors allege to have

MAINDOCS-#163407-v2-SCC_DS_Group_1_Vol_Debtors.DOC

against some of the Debtors, including certain surety bonds that are alleged to have been issued in favor of such creditors. The Debtors opposed the motions on the grounds that the various Debtors are indispensible parties. The Court conditionally granted the motions provided that the Bond Claimants are able to sever the Debtors from their proceedings on the Bonds.

### 5.7.3  **Bond Safeguard Motion.**

Bond Safeguard, a surety that issued bonds to secure the performance of work on certain projects, filed a motion seeking authority to file claims relating to these bond claims after the bar date. The Debtors opposed this motion. This motion was granted pursuant to an order entered on January 7, 2011.

### 5.7.7  **LitCo.** As more fully explained in Article VII, pursuant to the terms of the Plan, LitCo, which is a newly formed Delaware limited liability company, will be making an offer to purchase the Reliance Claims held by the Reliance Claimants in Classes 6.1, 6.2, 6.3 and 6.4 pursuant to the Plan. LitCo will be capitalized by a third party capital partner with the funds necessary to fund this claims purchase. Once the Reliance Claims are purchased, LitCo will pursue these claims against the Lehman Entities. Since LitCo will be purchasing the Reliance Claims with non-estate assets, the Plan Trust will not receive any part of the recoveries obtained on these purchased claims.

## VI.

## **TREATMENT OF UNCLASSIFIED CLAIMS**

6.1    **Introduction**. As required by the Bankruptcy Code, the Plan places Claims and Interests into various Classes according to their right to priority. However, certain types of Claims are not classified in any Classes under the Plan. These Claims are deemed "unclassified" under the provisions of the Code. They are not considered impaired and they do not vote on the Plan, because they are automatically entitled to specific treatment provided for them in the Code. As such, the SunCal Plan Proponents have not placed the following Claims in a Class. The treatment of these unclassified Claims is as provided below.

MAINDOCS-#163407-v2-SCC_DS_Group_I_Voi_Debtors.DOC

6.2    **Treatment of Allowed Administrative Claims.**

The Code requires that all Allowed Administrative Claims be paid on the later of Effective Date of the Plan or the date of their allowance, unless a particular Holder agrees to a different treatment. The treatment of Allowed Administrative Claims is as described below. However, such Administrative Claims are continuing to be incurred. The Allowed Administrative Claims shall be paid from the applicable Distribution Account(s) pursuant to the Acquisitions Administrative Loan.

6.3    **Treatment and Repayment of the Lehman's Administrative Loan(s).**

The Lehman Disputed Administrative Loans shall be paid in full on the later of the Effective Date, or the date any objections to the same are overruled by the Court leaving them Allowed claims. Prior to payment, or until disallowed, these claims shall continue to be secured by their existing liens against the respective Assets of the Trustee Debtors.

The Lehman Disputed Administrative Loans shall be paid in full, on the date referenced above, from either 1) funds loaned to the Plan Trust by LitCo or another designated third, or 2) from the funds in the applicable Net Sale Proceeds Account.

6.4    **Repayment of Allowed Administrative Claims Other than the Lehman Administrative Loans.**

Except to the extent that the Holder of an Allowed Administrative Claim agrees to a different treatment and subject to the Administrative Claims Bar Date set forth herein, the Distribution Agent shall pay each Allowed Administrative Claim in full, in Cash, on the later of (i) the Effective Date, (ii) within ten (10) Business Days after the date such Administrative Claim becomes an Allowed Administrative Claim, or (iii) the date such Allowed Administrative Claim becomes due according to its terms. Notwithstanding the foregoing, any Allowed Administrative Claim representing obligations incurred in the ordinary course of post-petition business by the Debtors in Possession (including without limitation post-petition trade obligations and routine post-petition payroll obligations) shall be paid in full or performed by the Plan Trustee in the ordinary course of business, in accordance with the terms of the particular obligation.

1    6.5    **Administrative Claims Bar Date.**

2    All applications for final compensation of Professionals for services rendered and for

3    reimbursement of expenses incurred on or before the Effective Date and all other requests for

4    payment of Administrative Claims incurred before the Effective Date under Sections 507(a)(2)

5    or 507(b) of the Bankruptcy Code (except only for (i) post-petition, ordinary course trade

6    obligations and routine post-petition payroll obligations incurred in the ordinary course of the

7    Debtors' post-petition business, for which no bar date shall apply, and (ii) post-petition tax

8    obligations, for which no bar date shall apply) shall be Filed with the Bankruptcy Court and served

9    upon the Plan Trustee no later than the Administrative Claims Bar Date, unless such date is

10    extended by the Bankruptcy Court after notice to the Plan Trustee.  Any such request for payment

11    of an Administrative Claim that is subject to the General Administrative Claims Bar Date and that

12    is not Filed and served on or before the Administrative Claims Bar Date shall be forever barred;

13    any party that seeks payment of Administrative Claims that (i) is required to file a request for

14    payment of such Administrative Claims and (ii) does not file such a request by the deadline

15    established herein shall be forever barred from asserting such Administrative Claims against the

16    Debtors, the Plan Trust, their estates, or any of their property.

17    6.6    **Treatment of Unsecured Tax Claims.**

18    Tax Claims are certain unsecured income, employment and other taxes described by Code

19    Section 507(a)(8).  The Code requires that each holder of such a Section 507(a)(8) tax claim

20    receive the present value of such Claim in deferred cash payments, over a period not exceeding

21    five (5) years from the petition date and that such treatment not be less favorable than the treatment

22    accorded to non priority unsecured creditors.

23    At the election of the Plan Trustee, the Holder of each Allowed Priority Tax Claim shall be

24    entitled to receive, on account of such Claim, (i) equal cash payments on the last Business Day of

25    each three-month period following the Effective Date, during a period not to exceed five years

26    after November 6, 2008, totaling the principal amount of such Claim plus simple interest on any

27    unpaid balance from the Effective Date, calculated at the interest rate available on ninety (90) day

28    United States Treasuries on the Effective Date, (ii) such other treatment agreed to by the Holder of

MAINDOCS-#163407-v2-SCC_DS_Group_I_Vol Debtors.DOC

1  the Allowed Priority Tax Claim and the Plan Trustee, provided such treatment is on more

2  favorable terms to the Debtors (or the Plan Trust after the Effective Date) than the treatment set

3  forth in clause (i) hereof, or (iii) payment of the full Allowed Priority Tax Claim in Cash.

**VII.**

## CLASSIFICATION OF CLAIMS AND INTERESTS

As required by the Code, the Plan places Claims and Interests into various Classes
according to their right to priority and other relative rights. The Plan specifies whether each Class
of Claims or Interests is impaired or unimpaired, and the Plan sets forth the treatment each Class
will receive. The table below lists the Classes of Claims established under the Plan and states
whether each particular Class is impaired or left unimpaired by the Plan. A Class is "unimpaired"
if the Plan leaves unaltered the legal, equitable and contractual rights to which the Holders of
Claims or Interests in the Class are entitled, with certain exceptions specified in the Bankruptcy
Code.

| CLASSIFICATION OF HOLDERS OF SECURED REAL PROPERTY TAX CLAIMS | | |
|---|---|---|
| **Class 1** | **Claimant** | **Claim Nos.[4]** |
| **Class 1.1** | Los Angeles County as the Holder of an Unpaid Secured Real Property Tax Claim against the Ritter Ranch Project in the amount of $4,755,857. | Palmdale Hills 12 |
| **Class 1.2** | Placer County as the Holder of an Unpaid Secured Real Property Tax Claim against the Bickford Ranch Project in the amount of $9,467,165. | Scheduled Amount |
| **Class 1.3** | Riverside County as the Holder of an Unpaid Secured Real Property Tax Claim against the Emerald Meadows Project in the amount of $798,256. | SunCal Emerald Meadows 9 |
| **Class 1.4** | Los Angeles County as the Holder of an Unpaid Secured Real Property Tax Claim against the Acton Project in the amount of $1,652,389. | Acton Estates 1 |

| CLASSIFICATION OF LEHMAN'S DISPUTED CLAIMS |
|---|

---

[4] These Real Property Tax Claims have been updated to include amounts for which proofs of claim have not yet been filed.

| Class 2 | Claims | Claim Nos. |
|---|---|---|
| **Class 2.1** | The Holders of Lehman's Disputed Claims filed by LCPI against SunCal Bickford arising from the SunCal Communities I Loan Agreement in the asserted amount of $343,221,391. | SunCal Bickford: 16 |
| **Class 2.2** | The Holder of Lehman's Disputed Claims filed by LCPI against Palmdale Hills arising from the Ritter Ranch Loan Agreement in the asserted amount of $287,252,096. | Palmdale Hills 65 |
| **Class 2.3** | The Holders of Lehman's Disputed Claims filed by LCPI against SunCal I, SunCal III, Acton Estates, SunCal Emerald, SunCal Bickford, SunCal Summit Valley arising from the SunCal Communities I Loan Agreement in the asserted amount of $343,221,391. | SunCal Emerald Meadows 7 |
| **Class 2.4** | The Holders of Lehman's Disputed Claims filed by LCPI against SunCal I, SunCal III, Acton Estates, SunCal Emerald, SunCal Bickford, SunCal Summit Valley arising from the SunCal Communities I Loan Agreement in the asserted amount of $343,221,391. | Acton Estates: 6 |

| CLASSIFICATION OF ASSERTED MECHANIC LIEN CLAIMS ON THE RITTER RANCH PROJECT, THE BICKFORD RANCH PROJECT, AND THE ACTON PROJECT | | |
|---|---|---|
| **Class 3** | **Claimant** | **Claim Nos.** |
| **Class 3.1** | The Holder of the asserted Mechanic Lien Claim held by Asphalt Professionals against the Ritter Ranch Project owned by Palmdale Hills in the amount of $38,249. | Palmdale Hills 1 and 46 |
| **Class 3.2** | The Holder of the asserted Mechanic Lien Claim held by Sierra Cascade Construction against the Ritter Ranch Project owned by Palmdale Hills in the amount of $550,677. | Palmdale Hills 33 |

-60-

| CLASSIFICATION OF ASSERTED MECHANIC LIEN CLAIMS ON THE RITTER RANCH PROJECT, THE BICKFORD RANCH PROJECT, AND THE ACTON PROJECT | | |
|---|---|---|
| **Class 3** | **Claimant** | **Claim Nos.** |
| **Class 3.3** | The Holder of the asserted Mechanic Lien Claim held by Staats Construction. Inc. against the Ritter Ranch Project owned by Palmdale Hills in the amount of $166,105. | Palmdale Hills 51 |
| **Class 3.4** | The Holder of the asserted Mechanic Lien Claim held by Southland Farmers, Inc. against the Ritter Ranch Project owned by Palmdale Hills in the amount of $177,801. | Palmdale Hills 55, 67 and 68 |
| **Class 3.5** | The Holder of the asserted Mechanic Lien Claim held by Chamelon Design Inc. against the Ritter Ranch Project owned by Palmdale Hills in the amount of $60,920. | Palmdale Hills 93, 99 |
| **Class 3.6** | The Holder of the asserted Mechanic Lien Claim held by MHM Engineers against the Bickford Ranch Project in the amount of $8,916. | SunCal Bickford 5 |
| **Class 3.7** | The Holder of the asserted Mechanic Lien Claim held by Land Architecture against the Bickford Ranch Project in the amount of $100,245. | SunCal Bickford 6 |
| **Class 3.8** | The Holder of the asserted Mechanic Lien Claim held by Kiewit Pacific Co. against the Bickford Ranch Project in the amount of $1,868,357. | SunCal Bickford 10 |
| **Class 3.9** | The Holder of the asserted Mechanic Lien Claim held by ARB, Inc. against the Bickford Ranch Project in the amount of $1,052,272. | SunCal Bickford 15 |
| **Class 3.10** | The Holder of the asserted Mechanic Lien Claim held by Independent Construction against the Bickford Ranch Project in the amount of $117,209. | SunCal Bickford 28 |
| **Class 3.11** | The Holder of the asserted Mechanic Lien Claim held by Marques Pipeline, Inc. against the Bickford Ranch Project in the amount of $330,118. | SunCal Bickford 29 and 30 |

| CLASSIFICATION OF ASSERTED MECHANIC LIEN CLAIMS ON THE RITTER RANCH PROJECT, THE BICKFORD RANCH PROJECT, AND THE ACTON PROJECT | | |
|---|---|---|
| Class 3 | Claimant | Claim Nos. |
| Class 3.12 | The Holder of the asserted Mechanic Lien Claim held by Hall & Foreman, Inc. against the Emerald Meadows Project in the amount of $287,727. | SunCal Emerald 13 |
| Class 3.13 | The Holder of the asserted Mechanic Lien Claim held by Proactive Engineering against the Emerald Meadows Project in the amount of $991,315. | SunCal Emerald 15 and 16 |
| Class 3.14 | The Holder of the asserted Mechanic Lien Claim held by HD Supply Construction against the Emerald Meadows Project owned by SunCal Emerald in the amount of $14,893. | Palmdale Hills 15 |

| CLASSIFICATION OF BOND CLAIMS | | |
|---|---|---|
| Class 4 | Claimant | Claim Nos. |
| Class 4.1 | The holders of Bond Claims that are Allowed Secured Claims arising from bonds issued with respect to the Group I Projects | **Various Filed and Scheduled** |

| CLASSIFICATION OF PRIORITY UNSECURED CLAIMS | | |
|---|---|---|
| Class 5 | Claimant | Claim Nos. |
| Class 5.1 | The Holder of Priority Claims that fall within Code Sections 507(a)(2), (4), (5), (6), and (7) in the asserted amount of $10,950 against the Group I: Voluntary Debtors | Various Filed and Scheduled |

| CLASSIFICATION OF GENERAL UNSECURED CLAIMS THAT QUALIFY AS RELIANCE CLAIMS[5] | | |
|---|---|---|
| **Class 6** | **Claimant** | **Claim Nos.** |
| **Class 6.1** | The holders of Reliance Claims against Palmdale. | Various Filed and Scheduled |
| **Class 6.2** | The holders of Reliance Claims against SunCal Bickford. | Various Filed and Scheduled |
| **Class 6.3** | The holders of Reliance Claims against SunCal Emerald Meadows. | Various Filed and Scheduled |
| **Class 6.4** | The holders of Reliance Claims against Acton Estates. | Various Filed and Scheduled |

| CLASSIFICATION OF GENERAL UNSECURED CLAIMS THAT DO NOT QUALIFY AS RELIANCE CLAIMS[6] | | |
|---|---|---|
| **Class 7** | **Claimant** | **Claim Nos.** |
| **Class 7.1** | Claimants holding Allowed Unsecured Claims against Palmdale that are not Reliance Claims | Various Filed and Scheduled |
| **Class 7.2** | Claimants holding Allowed Unsecured Claims against SunCal Bickford that are not Reliance Claims | Various Filed and Scheduled |

---

[5] Unsecured Claims are generally be placed within the same class and they receive the same treatment under a Plan. However, the SunCal Proponents have divided Unsecured claims into two classes in the Plan – Classes 6.1, 6.2 and 6.3, and 7.1, 7.2 and 7.3. This separate classification has been implemented for the following reason. The Holders of Unsecured Claims in Classes 6.1, 6.2 and 6.3, who are referred to as "Reliance Claimants," hold specific Litigation Rights that are referred to herein as "Reliance Claims." The Unsecured Creditors in Classes 7.1, 7.2 and 7.3 do not hold Reliance Claims. Under the Plan, the Reliance Claimants who sell their Reliance Claimants to LitCo, and who vote in favor of the Plan, which is Option A, will receive a distribution of $.60 cents on their Allowed Unsecured Claims *from non-estate funds. Accordingly, the $.60 cent payment is being paid from non-estate funds, for a non-estate asset.* If a Reliance Claimant elects not to sell this claim, then this claimant will receive the exact same distribution rights that the Class 7.1, and 7.2 claimants will receive under the Plan, unless the Court allocates a part of any judgment granted in the Lehman Adversary Proceeding to these particular claims. In summary, the classification difference was made to provide for the purchase offer relating to the sale of the Reliance Claims. In all other respects the Holders of Unsecured Claims receive the same treatment under the Plan.

[6] This Class includes, but is not limited to, Bond Claims that are not Allowed Secured Claims within Class 4.1.

MAINDOCS-#163407-v2-SCC_DS_Group_1_Vol_Debtors.DOC

| CLASSIFICATION OF GENERAL UNSECURED CLAIMS THAT DO NOT QUALIFY AS RELIANCE CLAIMS[6] | | |
|---|---|---|
| **Class 7** | **Claimant** | **Claim Nos.** |
| **Class 7.3** | Claimants holding Allowed Unsecured Claims against SunCal Emerald Meadows that are not Reliance Claims | Various Filed and Scheduled |
| **Class 7.4** | Claimants holding Allowed Unsecured Claims against Acton Estates that are not Reliance Claims | Various Filed and Scheduled |

| **Class 8** | **Claimant** | **Scheduled** |
|---|---|---|
| **Class 8.1** | Allowed Interests in Palmdale held by SCC Palmdale, LLC | As scheduled |
| **Class 8.2** | Allowed Interests in SunCal Bickford held by SunCal I. | Scheduled Amount |
| **Class 8.3** | Allowed Interests in SunCal Emerald Meadows held by SunCal I | Scheduled Amount |
| **Class 8.4** | Allowed Interests in Acton Estates held by SunCal I | Scheduled Amount |

## VIII.

## THE PLAN'S TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS

8.1.    **The Plan's Treatment of Holders of Allowed Secured Real Property Tax Claims on the Group II Projects (Classes 1.1 through 1.4).**

The rights of the Holder(s)' of Allowed Secured Claims in Classes 1.1 through 1.4 are not impaired under the Plan. Such claimant's shall retain their existing lien rights and one of the following two non-impairment options shall apply, at the election of the Plan Trustee: 1) On the Effective Date, such claims shall be satisfied in accordance with the provision of 11 U.S.C. § 1124(2), or 2) on the Effective Date, or the Holder(s) shall be free to pursue their respective rights and remedies against the underlying real property collateral under applicable California law.

MAINDOCS-#163407-v2-SCC_DS_Group_I_Vol_Debtors.DOC

8.2.    **The Plan's Treatment of Lehman's Disputed Claim(s) and Disputed Lien(s)**
**(Class 2.1 through 2.4).**

The Holder(s) of Disputed Secured Claims within Class 2.1 through 2.4 shall receive the indubitable equivalent of their claims under the Plan, pursuant to 11 U.S.C. § 1129(b)(2)(A)(iii), through the following treatment:

A.    Group I Project Lien Rights. The Class 2.1 through 2.4 Holder(s) shall retain their interest in the Disputed Lien(s) against Plan Trust Assets that secure the Disputed Secured Claims, pending a Final Order(s) resolving the Allowance of such Disputed Secured Claims and determining the validity, priority and extent of the applicable Disputed Liens against the applicable Plan Trust Assets, which secure these claims, except as follows:

1.    The Plan Trust Assets subject to the Class 2.1 through 2.4 Disputed Liens may be sold free and clear of such liens on the Effective Date. These Disputed Liens shall then attach to the Net Proceeds from the sale, which shall be deposited into the Net Proceeds Account;

1.    To the extent that a Disputed Secured Claim held by either the Class 2.1 through 2.4 Claimants against a Group I Project is disallowed, and the Disputed Lien associated with this Disputed Secured Claim is consequently released to the extent of this disallowance, the Plan Trustee shall be authorized to use to the Net Proceeds that are no longer subject to the Disputed Lien(s) to pay other Allowed Claims in their order of priority, in accordance with the terms of the Plan;

2.    To the extent that a Disputed Secured Claim held by either the Class 2.1 through 2.4 Claimant and the associated Disputed Lien(s) against a Group I Project is subordinated, the Plan Trustee shall be authorized to use to the Net Proceeds that are no longer subject to the Disputed Lien(s), or where the priority of the Disputed Liens has been subordinated by the Court, to pay other Allowed Claims in their order of priority, in accordance with the terms of the Plan, to the extent of the subordination; and

Notwithstanding the existence of the Disputed Secured Claims and the Disputed Liens, the Plan Trustee may a seek a release of the funds in the Net Proceeds Account

MAINDOCS-#163407-v2-SCC_DS_Group_I_Vol_Debtors.DOC

1    subject to these claims and liens to pay the claims of other creditors in accordance with the terms

2    of the Plan, if the Class 2.1 through 2.4 claimants' interests in this property will remain adequately

3    protected after this release.

4        B.    Sale of Group I Projects. The Plan Trustee shall complete the sale of Group I

5    Projects on the Effective Date that are subject to the Holder(s)' Disputed Secured Claims and

6    Disputed Liens, free and clear of such claims and liens, through a sale that satisfies the following

7    conditions:

8        1.    The Group I Projects will be sold through a public auction after a

9    commercially reasonable marketing and advertising effort of at least sixty (60) days duration;

10        2.    The SunCal Plan Proponents shall have the right to provisionally

11    accept an Opening Bid from a Stalking Horse Bidder prior to the public auction and to grant this

12    bidder the right to receive the Ritter Ranch Project Break-up Fee, the Bickford Ranch Project

13    Break-up Fee, the Emerald Meadows Project Break-up Fee or Acton Project Break-up Fee, the as

14    the case may be, if such bidder is not the Winning Bidder;

15        3.    Other Qualified Bidders shall have the right to overbid the Opening

16    Bid by submitting a Qualifying Bid. The first round of Qualifying Bids after the Opening Bid must

17    be equal to or in excess of the Initial Overbid Amount. Thereafter, all Qualifying Bids shall be

18    equal to or in excess or the Minimum Increment;

19        4.    The highest Qualifying Bid received from a Qualified Bidder, shall

20    be accepted as the Winning Bid, and the submitting bidder shall be the Winning Bidder. Upon

21    payment of the Winning Bid, the Winning bidder shall receive title to the applicable Group I

22    Project free and clear of all monetary liens and encumbrances; and

23        5.    No bidder shall be allowed to submit or demand the acceptance of a

24    "credit bid" based upon an existing claim or lien.

25        C.    Abandonment of Unsold Group I Project(s). If for any reason the Plan

26    Trustee is unable to sell any of the Group I Projects on the Effective Date, they will be abandoned

27    as of 11:59 p.m. on the Effective Date, and the Class 2.1, 2.2, 2.3 and 2.43 claimants, as the case

28

-66-

MAINDOCS-#163407-v2-SCC_DS_Group_I_Vol_Debtors.DOC

1    may be, shall be free to exercise any and all remedies that they may hold with respect to these

2    Assets.

3         D.    Sale of Other Plan Trust Assets Subject To Liens of Class 2.1 through 2.4

4    Claimants. The Plan Trustee shall complete the sale of all other Plan Trust Assets that are subject

5    to the Disputed Secured Claims and the Disputed Liens of the Class 2.1, 2.2, 2.3 and 2.4 claimants

6    Liens and Disputed Claims, free and clear of such claims and liens, through a sale that satisfies the

7    following conditions:

8         1.    Such Assets will be sold through a public auction after a

9    commercially reasonable marketing and advertising effort of at least thirty (30) days duration;

10        2.    The Committee shall approve the terms of the sale;

11        3.    The sale will be held and completed within ninety (90) days of the

12   Effective Date;

13        4.    No bidder may submit or demand the acceptance of a "credit bid"

14   based upon an existing claim or lien; and

15        5.    All Net Sale Proceeds generated from such sales shall be deposited

16   into the applicable Net Sales Proceeds Account with all Disputed Claims and Disputed Liens

17   attached thereto.

18        E.    Abandonment of Assets Other Than Group I Projects. All Asset(s), other

19   than Litigation Claims (which shall be retained), that are not sold within ninety (90) days of the

20   Effective Date shall be deemed abandoned by the Plan Trust as of the ninety-first (91st) day after

21   the Effective Date, no payment shall be made to such Holder(s), and such Holder(s) shall be

22   allowed to pursue their respective rights and remedies against such assets under applicable law

23   subject to a Final Order determining the allowance and priority of the Disputed Claims and the

24   validity of the Disputed Liens in, including but not limited to, the Lehman Adversary Proceeding

25   and the Lehman Claims Objections.

26        F.    Distributions To The Class 2.1 through 2.4 Claimants. If the Plan Trustee

27   consummates a sale or otherwise liquidates the particular Asset(s) subject to the Class 2.1, 2.2, 2.3

28   and 2.4 Disputed Secured Claim(s) and/or Disputed Lien(s) during the Sales Period, as provided

-67-

MAINDOCS-#163407-v2-SCC_DS_Group_I_Vol_Debtors.DOC

for above, the Holder(s) of such Disputed Secured Claim shall receive a distribution to the extent

of available funds from the applicable Net Sale Proceeds Account(s) to the extent required by a

Final Order determining the allowance and priority of the Disputed Secured Claims and the

validity, priority and extent of the Disputed Liens in, including but not limited to, the Lehman

Adversary Proceeding and the Lehman Claims Objections.

8.3.    **The Plan's Treatment of Holders of Asserted Mechanic Lien Claims Against the Group I Projects (Classes 3.1 Through 3.14).**

The treatment of the Holders of Allowed Classes 3.1 through 3.14 Secured Claims under the Plan shall be as follows:

A.    The Holder(s)' rights are impaired under the Plan;

B.    The Holder(s) shall retain their respective underlying liens on the applicable Projects, but shall forebear from pursuing their rights and remedies until the expiration of the Sales Period;

C.    If the Plan Trustee is able to consummate a sale of the Group II Projects subject to the liens asserted by the Holders of Class 3.1 through 3.14 claims during the Sales Period, such Holders shall receive a distribution, to the extent of available, of Net Sale Proceeds in accordance with the priorities set forth under the Bankruptcy Code, subject to a Final Order(s) resolving the allowance and priority of the applicable Lehman's Disputed Claim(s) and the validity of the applicable Lehman Disputed Lien(s) in, including but not limited to, the Lehman Adversary Proceeding; and

D.    If the Plan Trustee is unable to consummate a sale of the applicable underlying real property collateral during the Sales Period, such real property collateral shall be deemed abandoned by the Plan Trustee, no payment shall be made to such Holder(s), and such Holder(s) shall be allowed to pursue their respective rights against the real property collateral under applicable California law, subject to a Final Order(s) resolving the allowance and priority of the applicable Lehman's Disputed Claim(s) and applicable Lehman Disputed Lien(s), without recourse to the Debtor (s).

MAINDOCS-#163407-v2-SCC_DS_Group_I_Vol_Debtors.DOC

8.4.  **The Plan's Treatment of Holders of Bond Claims that qualify As Allowed**

**Secured Claims with Liens against a Group I Project (s) (Class 4.1).**

The rights of each holder of an Allowed Bond Indemnification Claim arising from a bond issued with respect to a Group I Project, shall, to the extent such claim(s) are determined to be a secured claim(s), be impaired under the Plan. Such claims shall receive the following treatment:

A.    Each such Allowed Secured Claim shall be placed in a separate class and receive a separate ballot for voting purpose;

B.    Each Holder(s) shall retain their respective underlying liens on the applicable Group II Project, but shall forebear from pursuing their rights and remedies until the expiration of the Sales Period;

C.    If the Plan Trustee is able to consummate a sale of the Group I Projects subject to the liens asserted by the Holders of Class 4.1 claimants during the Sales Period, such Holders shall receive a distribution, to the extent of available, of Net Sale Proceeds in accordance with the priorities set forth under the Bankruptcy Code, subject to a Final Order(s) resolving the allowance and priority of the applicable Lehman's Disputed Claim(s) and the validity of the applicable Lehman Disputed Lien(s) in, including but not limited to, the Lehman Adversary Proceeding; and

D.    If the Plan Trustee is unable to consummate a sale of the applicable underlying real property collateral during the Sales Period, such real property collateral shall be deemed abandoned by the Plan Trustee, no payment shall be made to such Holder(s), and such Holder(s) shall be allowed to pursue their respective rights against the real property collateral under applicable California law.

8.5.  **The Plan's Treatment of Holders of Priority Claims (Class 5.1)**.

The treatment of the Holders of Allowed Priority Claims under the Plan shall be as follows:

A.    The Holder(s) are unimpaired under the Plan; and

B.    The Holder(s) shall be paid from the applicable Distribution Account(s) (i) the full amount of such Allowed Priority Claim in Cash on the later of (x) the Effective Date, (y) the date such Claim becomes an Allowed Priority Claim or (z) the date such Allowed Priority

-69-