1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PAUL J. COUCHOT -- State Bar No. 131934
WINTHROP COUCHOT, P.C.
660 Newport Center Drive, Fourth Floor
Newport Beach, CA 92660
Telephone: (949) 720-4100
Facsimile: (949) 720-4111
General Insolvency Counsel for
Palmdale Hills Property, LLC et. al. (the "Voluntary Debtors")

RONALD RUS - State Bar No. 67369
JOEL S. MILIBAND - State Bar No. 77438
RUS MILIBAND & SMITH
A PROFESSIONAL CORPORATION
2211 Michelson Drive, Seventh Floor
Irvine, California 92612
Telephone: (949) 752-7100
Facsimile:  (949) 252-1514
Counsel for SunCal Management LLC and
SCC Acquisitions Inc.

## UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA
### Santa Ana Division

In re
PALMDALE HILLS PROPERTY, AND ITS
RELATED DEBTORS,
          Joint Administered Debtors and
          Debtors-in-Possession

Affects:

☐ All Debtors
☒ Palmdale Hills Property, LLC
☐ SunCal Beaumont Heights, LLC
☐ SCC/Palmdale, LLC
☐ SunCal Johannson Ranch, LLC
☐ SunCal Summit Valley, LLC
☒☐ SunCal Emerald Meadows LLC
☒ SunCal Bickford Ranch, LLC
☒ Acton Estates, LLC
☐ Seven Brothers LLC
☐ SJD Partners, Ltd.
☐ SJD Development Corp.
☐ Kirby Estates, LLC
☐ SunCal Communities I, LLC
☐ SunCal Communities III, LLC
☐ SCC Communities LLC
☐ North Orange Del Rio Land, LLC
☐ Tesoro SF LLC

Case No. 8-08-bk-17206-ES
Jointly Administered With Case Nos.
8-08-bk-17209-ES; 8-08-bk-17240-ES;
8-08-bk-17224-ES; 8-08-bk-17242-ES;
8-08-bk-17225-ES; 8-08-bk-17245-ES;
8-08-bk-17227-ES; 8-08-bk-17246-ES;
8-08-bk-17230-ES; 8-08-bk-17231-ES;
8-08-bk-17236-ES; 8-08-bk-17248-ES;
8-08-bk-17249-ES; 8-08-bk-17573-ES;
8-08-bk-17574 ES; 8-08-bk-17575-ES;
8-08-bk-17404-ES; 8-08-bk-17407-ES;
8-08-bk-17408-ES; 8-08-bk-17409-ES;
8-08-bk-17458-ES; 8-08-bk-17465-ES;
8-08-bk-17470-ES; 8-08-bk-17472-ES;
and 8-08-bk-17588-ES

Chapter 11 Proceedings

**[REDLINED] FIRST SECOND AMENDED
DISCLOSURE STATEMENT DESCRIBING
SECONDFIRST AMENDED CHAPTER 11
PLANS FILED BY SUNCAL PLAN
PROPONENTS IN THE CHAPTER 11 CASES
OF PALMDALE HILLS PROPERTY, LLC,
SUNCAL BICKFORD RANCH, LLC, SUNCAL
EMERALD MEADOWS, LLC AND ACTON
ESTATES, LLC [GROUP I: VOLUNTARY
DEBTORS]**

Date:       July 22, 2011
Time:       11:00 a.m.
Place:      Courtroom 5A

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Continued from Previous Page*

☐ LBL-SunCal Oak Valley, LLC
☐ SunCal Heartland, LLC
☐ LBL-SunCal Northlake, LLC
☐ SunCal Marblehead, LLC
☐ SunCal Century City, LLC
☐ SunCal PSV, LLC
☐ Delta Coves Venture, LLC
☐ SunCal Torrance, LLC
☐ SunCal Oak Knoll, LLC

# **TABLE OF CONTENTS**

**PAGE**

I.      INTRODUCTION ............................................................................................... 2

II.     DEFINITIONS AND RULES OF INTERPRETATION ................................... 4
    2.1    Definitions .............................................................................................
    2.2    Rules of Construction ..........................................................................
    2.3    Exhibits ................................................................................................

III.    PLAN CONFIRMATION DEADLINES ......................................................... 27
    3.1    Time and Place of the Confirmation Hearing ................................................
    3.2    Deadline for Voting for or Against the Plan .................................................
    3.3    Deadline for Objecting to the Confirmation of the Plan ...............................
    3.4    Identity of Person to Contact for More Information Regarding
          the Plan ....................................................................................................
    3.5    Disclaimer .............................................................................................

IV.    FACTUAL BACKGROUND OF THE DEBTORS ........................................ 29
    4.1    The Formation of the Debtors and the Projects ........................................ 22
          4.1.1    Overview of the Debtors and Their Projects ................................ 22
          4.1.2    The Debtors' Primary Secured Creditors and Their
                Disputed Claims ..................................................................
          4.1.3    Disputed Claims and Liens ......................................................... 23
          4.1.4    Summary of the Group I:  Voluntary Debtors' Cash ........................
    4.2    Factual Circumstances Leading to the Filing of the Debtors'
          Chapter 11 Cases .................................................................................... 24
          4.2.1    Introduction ............................................................................... 24
          4.2.2    Background of the SunCal Companies ........................................ 24
          4.2.3    The Origins of the SunCal/Lehman Joint Venture ........................... 24
          4.2.4    Lehman's Effective Control over the Management
                of the Debtors and Promises of Ongoing Funding ........................... 25
          4.2.5    The 2008 Restructuring Agreement ............................................ 26
          4.2.6    The Lehman Lenders Hire Radco ................................................ 28
          4.2.7    The Lehman Lenders' Failure to Close on the
                Settlement Agreement ........................................................... 28
          4.2.8    The Lehman Lenders' Undisclosed Sale of Most
                of the Debtors' Loans ........................................................... 29
          4.2.9    Lehman's Foreclosure Sale and Purchase of the
                Pacific Point Project ............................................................. 29
          4.2.10  Alvarez and Marsal Take Over Control of the
                Lehman Entities After the Chapter 11 Filing of
                LBHI and LCPI .................................................................... 31
    4.3    The Group I:  Voluntary Debtors' Potential Preferential
          Transfers ................................................................................................ 31

V.     SIGNIFICANT EVENTS IN THE DEBTORS' CHAPTER 11 CASES ................. 42
    5.1    Voluntary Debtors .................................................................................. 31

MAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOC~~MAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-~~
~~SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOC~~MAINDOCS-#163407-v3-SCC_Group_I_VD_DS.DOC

| | | | |
|---|---|---|---|
| | 5.1.1 | Joint Administration of the Voluntary Debtors and the Trustee Debtors .................................................. | 31 |
| | 5.1.2 | The Voluntary Debtors Court Employed Professionals .................... | |
| | 5.1.3 | LCPI's Motions for Relief from the Automatic Stay Against Certain of the Voluntary Debtors' Projects and Related Appeals ................................................ | |
| 5.2 | | The Trustee Debtors and Their Professionals ............................................. | 31 |
| 5.3 | | The Debtors' Various Motions Relating to Financing for the Projects and to Pay Professional Fees ............................................ | 32 |
| | 5.3.1 | The Voluntary Debtors' Initial Motion for Surcharge and Use of Cash Collateral ................................................ | |
| | 5.3.2 | The Voluntary Debtors' Agreements with the Lehman Entities for Use of Alleged Cash Collateral to Maintain the Properties and to Pay Professional Fees ............................ | |
| 5.4 | | The Debtors' Disputes and Claims Against the Lehman Entities ................. | |
| | 5.4.1 | The Lehman Adversary Proceeding ................................................ | |
| | | 5.4.1.1 Equitable Subordination ................................................ | |
| | | 5.4.1.2 The Fraudulent Transfer Claims .................................... | |
| | | 5.4.1.3 The Preference Claims .................................................... | |
| | | 5.4.1.4 The Debtors' Motion to Strike the Claims and Pleadings Arising from the Sold Loans to Fenway Capital and Related Appeals ............................ | |
| | | 5.4.1.5 The Debtors' Motion Pursuant to Section 506(d) and the 506(d) Valuation Stipulation ............................... | |
| | | 5.4.1.6 Lehman 502(d) Objection and Objection to Lehman's Claim Against Acton ..................................... | |
| | | 5.4.1.7 The Lehman Recoupment Objection and the ~~State Court~~Contract Action ................................................ | |
| | | 5.4.1.8 The Debtors' Potential Post-Petition Claims Against Lehman and Their Agents .................................. | |
| 5.5 | | The Lehman Fenway Claims Transaction, Compromise Motion Filed by the Lehman Entities .................................................................. | |
| | 5.5.1 | Lehman Entities' and Fenway's Proposed Claims Transaction .............................................................................. | |
| 5.6 | | The Debtors' Motion for a Stay to Suspend Certain Lehman Actions ................................................................................... | |
| 5.7 | | The Debtors' Other Litigation with Non-Lehman Related Parties ................................................................................... | |
| | 5.7.1 | The Rubidoux 60 Litigation and Life Church Adversary Action ...................................................................... | |
| | 5.7.2 | The Debtors' Failed Preliminary Injunction Motion Again the Holders of Bond Claims ......................................... | |
| | 5.7.3 | The Contractors' Successful Motions for Relief from Stay to Pursue the Bond Claims ................................. | |
| | 5.7.4 | Bond Safeguard Motion ...................................................... | |
| | 5.7.5 | LitCo ................................................................................... | |
| VI. | | TREATMENT OF UNCLASSIFIED CLAIMS ............................................ | 56 |

~~MAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOC~~~~MAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOC~~~~MAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOC~~~~MAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOC~~MAINDOCS-#163407-v3-SCC_Group_I_VD_DS.DOC

| | | | |
|---|---|---|---|
| | 6.1 | Introduction .................................................................................... | 33 |
| | 6.2 | Treatment of Allowed Administrative Claims........................................... | 33 |
| | 6.3 | Treatment and Repayment of the Lehman's Administrative Loan(s) ................................................ | |
| | 6.4 | Repayment of Allowed Administrative Claims Other Than the Lehman Administrative Loans..................... | |
| | 6.5 | Administrative Claims Bar Date .......................................................... | 34 |
| | 6.6 | Treatment of Unsecured Tax Claims ................................................... | 35 |
| VII. | | CLASSIFICATION OF CLAIMS AND INTERESTS ............................................ | 59 |
| VIII. | | THE PLAN'S TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS....... | 64 |
| | 8.1 | The Plan's Treatment of Holders of Allowed Secured Real Property Tax Claims on the Group I:  Voluntary Projects (Class 1.1 through 1.4)............................................... | 36 |
| | 8.2 | The Plan's Treatment of Lehman's Disputed Claim(s) and Disputed Lien(s) (Classes 2.1 through 2.4)............................... | |
| | | A.    Group I Project Lien Rights ..................................................... | |
| | | B.    Sale of Group I Projects ........................................................ | |
| | | C.    Abandonment of Unsold Group I Project(s) ................................ | |
| | | D.    Sale of Other Plan Trust Assets Subject to Liens of Classes 2.1 through 2.4 ................................................... | |
| | | E.    Abandonment of Assets Other Than Group I Projects..................... | |
| | | F.    Distributions to the Class 2.1 through 2.4 Claimants ...................... | |
| | 8.3 | The Plan's Treatment of Holders of Asserted Mechanic Lien Claims Against the Group I Projects (Classes 3.1 Through 3.14) ................ | 36 |
| | 8.4 | The Plan's Treatment of Holders of Bond Claims that Qualify as Allowed Secured Claims with Liens Against a Group I Project(s) (Class 4.1) ...................................... | |
| | 8.5 | The Plan's Treatment of Holders of Priority Claims (Class 5.1).................. | |
| | 8.6 | The Plan's Treatment of Holders of General Unsecured Claims that Are Reliance Claims (Classes 6.1 Through 6.4)....................... | |
| | | A.    Option A........................................................................... | |
| | | B.    Option B........................................................................... | |
| | 8.7 | The Plan's Treatment of Holders of Allowed General Unsecured Claims that Are Not Reliance Claims (Classes 7.1 Through 7.4) .............................................. | |
| | 8.8 | The Plan's Treatment of Holders of Allowed Interests ............................ | |
| IX. | | ACCEPTANCE OR REJECTION OF THE PLAN ............................................ | 71 |
| | 9.1 | Introduction .................................................................................... | 36 |
| | 9.2 | Who May Object to Confirmation of the Plan.......................................... | 37 |
| | 9.3 | Who May Vote to Accept/Reject the Plan .............................................. | 37 |
| | 9.4 | What Is an Allowed Claim/Interest ....................................................... | 37 |
| | 9.5 | What Is an Impaired Class ................................................................. | 37 |
| | 9.6 | Who Is Not Entitled to Vote ............................................................... | 37 |
| | 9.7 | Who Can Vote in More than One Class.................................................. | 38 |
| | 9.8 | Votes Necessary for a Class to Accept the Plan ..................................... | 38 |

-iii-

| | | |
|---|---|---|
| 9.9 | Treatment of Nonaccepting Classes | 38 |
| 9.10 | Request for Confirmation Despite Nonacceptance by Impaired Class(es) | 39 |
| X. | MEANS OF EXECUTION AND IMPLEMENTATION OF THE PLAN | 74 |
| 10.1 | Introduction | 39 |
| 10.2 | Sale Process After Confirmation Date but Prior to Effective Date | |
| | A. Implementation of a Marketing Program | |
| | B. Identifying a Stalking Horse Bidder | |
| | C. The Sale Contract | |
| | D. Overbid Provisions | |
| | 1. Break-Up Fees | |
| | 2. Sale Free and Clear of Liens | |
| | E. The Auction | |
| 10.3 | Transfer of Property to the Plan Trust | 39 |
| 10.4 | Closing of Group I Project Sales | |
| 10.5 | Purposes of the Plan Trust | 40 |
| 10.6 | Trust Agreement | 40 |
| 10.7 | Operations of the Plan Trustee | 41 |
| 10.8 | The Plan Trustee | 41 |
| 10.9 | Payment of Trust Expenses | 41 |
| 10.10 | Plan Distribution System | 41 |
| 10.11 | Claims Estimation Rights | 42 |
| 10.12 | No Payment of Transfer-Related Fees to the United States Trustee | 42 |
| 10.13 | No Payment of Transfer-Related Fees to the Trustee | 42 |
| 10.14 | Books and Records of Trust | 42 |
| 10.15 | Limitations on Liability | 42 |
| 10.16 | Federal Income Tax Treatment of the Holders of Plan Trust Beneficial Interests | 43 |
| 10.17 | Termination of the Trust | 44 |
| 10.18 | Exemption from Certain Transfer Taxes | 44 |
| 10.19 | Tax Consequence of The Plan | 45 |
| 10.20 | The Plan Sponsor | 45 |
| 10.21 | Acquisitions' Obligations | |
| 10.22 | The Committee. | 45 |
| | 10.22.1 Duties and Powers | 45 |
| | 10.22.2 Dissolution of Committee | 46 |
| 10.23 | Litigation Claims | 46 |
| 10.24 | Collection of Litigation Recoveries | 46 |
| XI. | RISK FACTORS | 83 |
| 11.1 | Plan Risks | 46 |
| | 11.1.1 The Plan May Not Be Accepted or Confirmed | |
| | 11.1.2 Failure to Sell the Group I: Voluntary Projects | |
| | 11.1.3 Adverse Outcome of Pending Litigation | |
| XII. | DISTRIBUTIONS | 85 |

MAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-
SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v3-SCC_Group_I_VD_DS.DOC

| | | | |
|---|---|---|---|
| | 12.1 | Distribution Agent ................................................................. | 47 |
| | 12.2 | Distributions........................................................................... | 47 |
| | | 12.2.1    Dates of Distributions........................................... | 47 |
| | | 12.2.2    Limitation on Liability ......................................... | 48 |
| | 12.3 | Old Instruments and Securities ............................................. | 48 |
| | | 12.3.1    Surrender and Cancellation of Instruments and Securities............ | 48 |
| | | 12.3.2    Cancellation of Liens............................................ | 48 |
| | | 12.3.3    De Minimis Distributions and Fractional Shares ........ | 48 |
| | | 12.3.4    Delivery of Distributions ..................................... | 49 |
| | | 12.3.5    Undeliverable Distributions ................................. | 49 |
| | | 12.3.6    Disposition of Unclaimed Property ....................... | 49 |
| XIII. | | OBJECTIONS TO CLAIMS AND DISPUTED CLAIMS .............. | 87 |
| | 13.1 | Standing for Objections to Claims ....................................... | 50 |
| | 13.2 | Treatment of Disputed Claims and Disputed Liens ............. | 50 |
| | | 13.2.1    No Distribution Pending Allowance ..................... | 50 |
| | | 13.2.2    Distribution After Allowance .............................. | 50 |
| XIV. | | EXECUTORY CONTRACTS AND UNEXPIRED LEASES............ | 88 |
| | 14.1 | Executory Contracts Being Assumed or Rejected ............... | 51 |
| | 14.2 | Bar Date for Rejection Damages........................................... | 51 |
| | 14.3 | Changes in Rates Subject to Regulatory Commission Approval.................. | 51 |
| XV. | | BEST INTEREST OF CREDITORS TEST AND PLAN FEASIBILITY ............... | 89 |
| | 15.1 | Best Interest Test................................................................. | 51 |
| | 15.2 | Feasibility.............................................................................. | 52 |
| XVI. | | LIMITATION OF LIABILITY .................................................. | 90 |
| | 16.1 | No Liability for Solicitation or Participation .................... | 53 |
| XVII. | | CONDITIONS TO CONFIRMATION AND EFFECTIVENESS OF THE PLAN.. | 91 |
| | 17.1 | Conditions Precedent to Plan Confirmation ....................... | 53 |
| | 17.2 | Conditions Precedent to Plan Effectiveness ....................... | 53 |
| XVIII. | | RETENTION OF JURISDICTION ........................................... | 91 |
| XIX. | | MODIFICATION OR WITHDRAWAL OF THE PLAN................ | 91 |
| | 19.1 | Modification of Plan ............................................................. | 54 |
| | 19.2 | Nonconsensual Confirmation................................................ | 54 |
| XX. | | MISCELLANEOUS ................................................................. | 92 |
| | 20.1 | Payment of Statutory Fees ................................................... | 54 |
| | 20.2 | Payment Dates....................................................................... | 55 |
| | 20.3 | Headings ................................................................................ | 55 |
| | 20.4 | Other Documents and Actions.............................................. | 55 |
| | 20.5 | Notices .................................................................................. | 55 |
| | 20.6 | Governing Law ...................................................................... | 56 |
| | 20.7 | Binding Effect....................................................................... | 56 |
| | 20.8 | Successors and Assigns......................................................... | 56 |

MAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-
SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v3-SCC_Group_I_VD_DS.DOC

20.9    Severability of Plan Provisions ................................................................ 56

20.10   No Waiver ............................................................................................. 57

20.11   Inconsistencies ..................................................................................... 57

20.12   Exemption from Certain Transfer Taxes and Recording Fees ..................... 57

20.13   Post-Confirmation Status Report ............................................................ 57

20.14   Post-Confirmation Conversion/Dismissal ................................................ 58

20.15   Final Decree .......................................................................................... 58

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

MAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-
SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v3-SCC_Group_I_VD_DS.DOC

# I.

## INTRODUCTION

This Disclosure Statement[1] is filed jointly by, and the accompanying Plans are proposed respectively by, ~~the Voluntary Debtors and Acquisitions, as the SunCal Plan Proponents, in the Chapter 11 Cases of the following Debtors:~~

Palmdale Hills Property, LLC.

SunCal Bickford, LLC.

SunCal Emerald Meadows, LLC, and

Acton Estates, LLC

~~-~~(the "Group I: Voluntary Debtors"), as the SunCal Proponents, in their respective Chapter 11 Cases in their capacities as debtors in possession. ~~In addition to being one of the proponents of the Plan~~Under each of the Group I Voluntary Debtor's Plans, Acquisitions is the Plan Sponsor, ~~it will also serve as~~the Plan Trustee of the Plan Trust, and ~~as~~ the Distribution Agent for each Group I Voluntary Debtor's Plan that is confirmed~~ if the Plan is confirmed~~.

Chapter 11 allows debtors-in-possession, Chapter 11 trustees, and under some circumstances, creditors, interest holders and others parties in interest, to propose a Chapter 11 plan.  As stated, the ~~SunCal Plan Proponents~~Group I: Voluntary Debtors are the proponents of the Plan sent to you in the same envelope as this Disclosure Statement.  This document summarizes the contents of the Plan, certain information relating to the Plan and the process the Bankruptcy Court follows in determining whether or not to confirm the Plan.

In summary, the Plan(s) individually provides for the sale of the Ritter Ranch Project, the Bickford Ranch, SunCal Emerald and the Acton Project (the "Group I Projects"), and for the liquidation of all other assets of the Group I: Voluntary Debtors. The Net Sale Proceeds from these sales will then be distributed to Creditors holding Allowed Claims in accordance with their rights and priorities under the bankruptcy code and under other applicable law.

**The Plan also offers the holders of a certain ~~category of general unsecured~~ claims against the Group I: Voluntary Debtors, which are defined herein as Reliance Claims, the**

---

[1] All defined terms used herein have the same meanings as set forth in Article II herein and Exhibit "1" attached hereto.

MAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v3-SCC_Group_I_VD_DS.DOC

1    **right to sell these claims, a**~~long with~~**nd any Litigation Rights arisng from and/or related to**

2    **such Reliance Claim**~~held by the holders of such claims against the Lehman Entities~~**, to LitCo,**

3    **for the sum of** ~~sixty~~**fifty-five cents ($0.**~~60~~**55) per dollar of claim.  The purchase offer is**

4    **conditioned upon confirmation of the applicable Plan , the entry of a Final Confirmation**

5    **Order confirming such Plan, and shall occur on or before the applicable Plan's Effective**

6    **Date as defined herein**~~and the lack of any stay pending an appeal of the Confirmation Order~~**.**

7    **EXCEPT AS PROVIDED IN THE PURCHASE OFFER TO HOLDERS OF**

8    **RELIANCE CLAIMS REFERENCED ABOVE, AS EXPLAINED IN THE DEFINITION**

9    **OF THE TERM "EFFECTIVE DATE," WHICH IS THE DATE ON WHICH THE PLAN**

10    **BECOMES EFFECTIVE, NO ACTION PROVIDED FOR IN THE PLAN SHALL BE**

11    **TAKEN AGAINST EITHER LEHMAN COMMERCIAL PAPER, INC. ("LCPI") OR**

12    **LEHMAN BROTHERS HOLDINGS, INC. ("LBHI") THAT WOULD HAVE THE**

13    **EFFECT OF VIOLATING ANY APPLICABLE AUTOMATIC STAY THAT MAY EXIST**

14    **IN THEIR CHAPTER 11 CASES. ANY SUCH ACTION WILL ONLY PROCEED AFTER**

15    **ANY APPLICABLE STAY IS EITHER LIFTED OR DEEMED INAPPLICABLE.**

16    Although ~~the same~~ substantial identical and consolidated Plans are~~is~~ being filed in the

17    Cases of all four Group I: Voluntary Debtors, confirmation of each such Plan is independent of ~~the~~

18    each others.  In other words, t~~T~~he Creditors in each Case will determine, subject to Court approval,

19    whether the applicable Plan will be approved in their Case.  Accordingly, the applicable Plan may

20    be confirmed in the Cases of ~~all~~ some of the Group I: Voluntary Debtors, but not in others.

21    The Lehman Lenders and the Chapter 11 Trustee have also filed a competing and

22    alternative plan of reorganization in the Group I: Voluntary Debtors' Cases ("Lehman Competing

23    Group I: Voluntary Debtors Plan").  ~~Accordingly~~Accordingly, the creditors holding claims against

24    the Group I: Voluntary Debtors will have the opportunity to vote for the applicable Sun Cal

25    Proponents Group I:  Voluntary Debtors Plan or for Lehman's Competing Group I:  Voluntary

26    Debtors Plan.  Alternatively, they can vote for or reject all of the Plans and allow the Court to

27    decide which plan should be approved~~one plan or the other, or they can vote for both plans and~~

28    ~~allow the Court to decide which plan should be approved~~.  The ~~Debtors~~Group I:  Voluntary

Debtors believe that the aggregate benefits offered under their Plans are superior to what is being offered to Creditors under the Lehman Lenders' competing Plans, because the consideration paid to the holders of the Reliance Claims is 55 percent under the SunCal Plans in contrast to only a potential distribution of 40 percent under the Lehman Lenders and Chapter 11 Trustee Plans for the Group I: Voluntary DebtorsPlan.

**READ THIS DISCLOSURE STATEMENT CAREFULLY IF YOU WANT TO KNOW ABOUT**:

> ➢ **WHO CAN VOTE OR OBJECT TO THE PLAN;**
>
> ➢ **HOW YOUR CLAIM IS TREATED;**
>
> ➢ **HOW THIS TREATMENT COMPARES TO WHAT YOUR CLAIM WOULD RECEIVE IN LIQUIDATION;**
>
> ➢ **A BRIEF HISTORY OF THE DEBTORS AND SIGNIFICANT EVENTS DURING THEIR CHAPTER 11 BANKRUPTCY PROCEEDING;**
>
> ➢ **WHAT FACTORS THE BANKRUPTCY COURT WILL CONSIDER TO DECIDE WHETHER OR NOT TO CONFIRM THE PLAN;**
>
> ➢ **WHAT IS THE EFFECT OF CONFIRMATION; AND**
>
> ➢ **WHETHER THE PLAN IS FEASIBLE.**

This Disclosure Statement cannot tell you everything about your rights.  You should consider consulting your own attorney to obtain more specific advice on how the Plan will affect you and your best course of action.

Be sure to read the applicable Plan as well as this Disclosure Statement.  If there are any inconsistencies between the applicable Plan and this Disclosure Statement, the applicable Plan provisions will govern.

The Bankruptcy Code requires a Disclosure Statement to contain "adequate information" concerning the Plans.  On _____, 2011, the Bankruptcy Court entered an order approving this Disclosure Statement, based upon a finding that this document contained "adequate information" to enable parties affected by the Plans to make an informed judgment regarding the Plan.  Any party can now solicit votes for or against the Plans.

MAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v3-SCC_Group_I_VD_DS.DOC

**II.**

**DEFINITIONS AND RULES OF INTERPRETATION**

    **2.1**    **Definitions.**

       The following defined terms are used in this Disclosure Statement.  Any capitalized term that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term in the Bankruptcy Code or Bankruptcy Rules.

       2.1.1   Acquisitions.  SCC Acquisitions, Inc., a California corporation, an indirect parent company of all of the Debtors, a purported ~~obligor on the~~ Bond Indemnitor~~Claims~~, a Creditor of all of the Debtors, a SunCal Plan Proponent, the Plan Sponsor and the proposed Plan Trustee.

       2.1.2   Acton Estates.  Acton Estates, LLC, a Delaware limited liability, a Voluntary Debtor herein, and the owner of the Acton Project.

       2.1.3   Acton Project. The Project owned by Acton Estates, located in Los Angeles County, California, as more particularly described herein.

       2.1.4   Acton Project Break-up Fee. The amount equal to 2.5% of the Minimum Sales Price for the Acton Project, plus actual amounts paid on Allowed Administrative Claims for the Acton Estates Case,~~sum of sixty-four thousand dollars ($64,000)~~ that will be paid to the Stalking Horse Bidder that submits the Opening Bid for the Acton Project, if such Stalking Horse Bidder is not the Winning Bidder.

       2.1.5   Administrative Claim(s).  Any Claim against a Group I: Voluntary Debtor or its Estate -incurred after the applicable Petition Date for the applicable Group I: Voluntary Debtor but before the ~~Confirmation~~ Effective Date, for any cost or expense of administration of the Case of the applicable Group I: Voluntary Debtor, which Claim is entitled to priority under section 507(a)(2) or (3) of the Bankruptcy Code, including, without limitation, any fee or charge assessed against an Estate of a Group I: Voluntary Debtor under section 1930 of Title 28 of the United States Code.

       2.1.6   Administrative Claims Bar Date.  The last date fixed by the Plan for the filing of ~~Proof of Claims or~~ requests for payment of Administrative Claims.  Under the Plan, the

MAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOC~~MAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOC~~~~MAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOC~~~~MAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOC~~MAINDOCS-#163407-v3-SCC_Group_I_VD_DS.DOC

1   Administrative Claims Bar Date shall be the first business day after the twenty-firstsixtieth

2   (60th21st) day after the Confirmation Effective Date.

3           2.1.7   Affiliate.  The term shall have the meaning set forth under Section 101(2),

4   including, but not limited to, as to any Person, any other Person that directly or indirectly owns or

5   controls, is owned or controlled by, or is under common ownership or control with, such Person.

6   The term "control" (including, with correlative meanings, the terms "controlled by" and "under

7   common control with"), as applied to any Person, means the possession, direct or indirect, of the

8   power to direct or cause the direction of the management and policies of such Person, whether

9   through the ownership of voting securities or other equity ownership interest, by contract or

10  otherwise.

11          2.1.8   Allowed.  When used to describe Claim(s) or Interest(s), such Claim(s) or

12  Interest(s), to the extent that it or they are "Allowed Claim(s)" or "Allowed Interest(s)."

13          2.1.9   Allowed Amount shall mean:

14                  A.      With respect to any Administrative Claim (i) if the Claim is based

15  upon a Fee Application, the amount of such Fee Application that has been approved by a Final

16  Order of the Bankruptcy Court; (ii) if the Claim is based upon any indebtedness or obligation

17  incurred in the ordinary course of business of the Group I: Voluntary Debtor and is not otherwise

18  subject to an Administrative Claim Bar Date, the amount of such Claim that has been agreed to by

19  the Group I: Voluntary Debtor and such creditor, failing which, the amount thereof as fixed by a

20  Final Order of the Bankruptcy Court; or (iii) if the Holder of such Claim was required to file and

21  has filed proof thereof with the Bankruptcy Court prior to an Administrative Claim Bar Date,

22  (1) the amount stated in such proof if no objection to such Proof of Claim is interposed within the

23  applicable period of time fixed by the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy

24  Court, or (2) the amount thereof as fixed by Final Order of the Bankruptcy Court if an objection to

25  such proof was interposed within the applicable period of time fixed by the Bankruptcy Code, the

26  Bankruptcy Rules or the Bankruptcy Court.  The Allowed Amount of any Administrative Claim

27  which is subject to an Administrative Claims Bar Date and not filed by the applicable

28

MAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v3-SCC_Group_I_VD_DS.DOC

1    Administrative Claims Bar Date shall be zero, and no distribution shall be made on account of any

2    such Administrative Claim;

3                    B.    with respect to any Claim which is not an Administrative Claim

4    (the "Other Claim"):  (i) if the Holder of such Other Claim did not file proof thereof with the

5    Bankruptcy Court on or before the Claims Bar Date, the amount of such Claim as listed in the

6    Group I: Voluntary Debtors' Schedules as neither disputed, contingent nor unliquidated; or (ii) if

7    the Holder of such Claim has filed proof thereof with the Bankruptcy Court on or before the

8    Claims Bar Date, (a) the amount stated in such proof if no objection to such Proof of Claim was

9    interposed within the applicable period of time fixed by the Bankruptcy Code, the Bankruptcy

10   Rules, the Plan or the Bankruptcy Court, or (b) the amount thereof as fixed by Final Order of the

11   Bankruptcy Court if an objection to such proof was interposed within the applicable period of time

12   fixed by the Bankruptcy Code, the Bankruptcy Rules, the Plan or the Bankruptcy Court.  The

13   Allowed Amount of any Other Claim which is not Filed by the applicable Claims Bar Date, is not

14   listed on the Group I: Voluntary Debtors' Schedules or is listed as disputed, unliquidated,

15   contingent or unknown, and is not allowed under the terms of the Plan shall be zero, and no

16   distribution shall be made on account of any such Claim; and

17                   C.    with respect to any Interest, (i) the amount provided by or

18   established in the records of the Group I: Voluntary Debtors at the Confirmation Date, provided,

19   however, that a timely filed proof of Interest shall supersede any listing of such Interest on the

20   records of the Group I: Voluntary Debtors; or (ii) the amount stated in a proof of Interest Filed

21   prior to the Confirmation Date if no objection to such Interest was filed prior to the Confirmation

22   Date or such later date as the Bankruptcy Court allows; or (iii) the amount of such Interest as fixed

23   by a Final Order of the Bankruptcy Court.

24           2.1.10    Allowed Claim.  Except as otherwise provided in the Plan (including with

25   respect to those Classes for which the amount of the Allowed Claims is specified by the Plan), a

26   Claim to the extent (and only to the extent) of the Allowed Amount of such Claim.

27           2.1.11    Allowed Interest.  Any Interest to the extent, and only to the extent, of the

28   Allowed Amount of such Interest.

MAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOC
SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v3-SCC_Group_I_VD_DS.DOC

1         2.1.12    <u>Allowed Secured Claims</u>.  All or  a portion of a Secured Claim that is an

2  Allowed Claim.

3         2.1.13    <u>Allowed Unsecured Claim</u>. All or a portion of an Unsecured Claim that is

4  an Allowed Claim.

5         2.1.14    <u>Assets</u>.  All assets that are property of the Debtor(s) pursuant to

6  Bankruptcy Code Section 541.

7         2.1.15    <u>Arch</u>.  Arch Insurance Company, a Bond Issuer.

8         2.1.16    <u>Available Cash</u>.  Each Group I: Voluntary Debtors' Cash deposited into

9  the applicable Distribution Account(s) on or after the Effective Date that is available for making

10  Distributions under the Plan to Holders of Allowed Administrative, Priority, and Unsecured

11  Claims.  The Available Cash shall consist of the respective Group I: Voluntary Debtors' cash on

12  hand as of the Effective Date that is not subject to a Disputed Lien, proceeds of Net Litigation

13  Recoveries that are not subject to a Disputed Lien, Net Sales Proceeds that become Available Cash

14  upon the disallowance of a Disputed Claim or avoidance of a Disputed Lien purportedly

15  encumbering such Cash, or proceeds from the LitCo Plan ~~Acquisitions Administrative~~ Loan.  All

16  Available Cash shall be deposited into the applicable Distribution Account(s).  Available Cash

17  shall not include Net Sale Proceeds in the Net Sales Proceeds Account where the Disputed Secured

18  Claims are Allowed but subject to an equitable subordination judgment.  For avoidance of doubt,

19  and notwithstanding anything to the contrary contained herein or any Confirmation Order, (i)

20  Available Cash shall not include any Cash held in the "Funds Control Account" pursuant to that

21  certain *Work and Cost Payment Agreement and First Amendment to Reciprocal Easement*

22  *Agreement and Cooperation Agreement* between Anaverde LLC and Palmdale Hills, dated as of

23  June 29, 2001 (the "Work and Cost Agreement "), (ii) the claims, defenses and all other rights of

24  all applicable parties, including New Anaverde LLC and Palmdale Hills Property, LLC, with

25  respect to the Funds Control Account and the Work and Cost Agreement are expressly preserved,

26  and (iii) the Funds Control Account shall only be distributed upon (a) agreement of all of  the

27  applicable parties, including New Anaverde LLC, and Palmdale Hills Property, LLC, (b) as

28

MAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-
SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v3-SCC_Group_I_VD_DS.DOC

1  provided pursuant to the terms of the Work and Cost Agreement, or (c) further order of a court of

2  competent jurisdiction.

3          2.1.17    Avoidance Actions.  All Claims and defenses to Claims accruing to the

4  Group I: Voluntary Debtors and their Estates under Bankruptcy Code Sections 506(d), 510(c), 541,

5  544, 545, 547, 548, 549, 550, or 551.

6          2.1.18    Bankruptcy Code.  The United States Bankruptcy Code.

7          2.1.19    Bankruptcy Court.  The United States Bankruptcy Court for the Central

8  District of California, having jurisdiction over the Cases and, to the extent of any withdrawal of the

9  reference made pursuant to Section 157 of title 28 of the United States Code, the United States

10 District Court for the Central District of California; or, in the event such courts cease to exercise

11 jurisdiction over the Cases, such court or unit thereof that exercises jurisdiction over the Cases in

12 lieu thereof.

13         2.1.20    Bankruptcy Rules.  Collectively, as now in effect or hereafter amended

14 and as applicable to the Cases, (i) the Federal Rules of Bankruptcy Procedure, and (ii) the Local

15 Bankruptcy Rules and General Orders applicable to cases pending before the Bankruptcy Court.

16         2.1.21    Beneficial Interests. means, cCollectively, the interests of the holders of

17 Allowed Unsecured Claims in the Plan Trust and in all distributions to be made by the Plan Trust

18 on account of Allowed Unsecured Claims. The Beneficial Interests (a) shall be noted in the books

19 and records of the Plan Trust, (b) shall not be evidenced by a writing, and (c) may not be

20 transferred, sold, assigned or transferred by will, intestate succession or operation of law without

21 written notification to the Plan Trustee confirming and acknowledging the transfer by both the

22 holder and the transferee.

23         2.1.22    Bickford Ranch Project.  The Project owned by SunCal Bickford, located

24 in the City of Penryn, California, as more particularly described herein.

25         2.1.23    Bickford Ranch Project Break-up Fee. The sumamount equal to 2.5% of

26 the Minimum Sales Price for the Bickford Ranch Project, plus actual amounts paid on Allowed

27 Administrative Claims for the SunCal Bickford Case, of four hundred and thirty-six thousand

28

MAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-
SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v3-SCC_Group_I_VD_DS.DOC

1    ~~dollars ($436,000)~~ that will be paid to the Stalking Horse Bidder that submits the Opening Bid for

2    the Bickford Ranch Project, if such Stalking Horse Bidder is not the Winning Bidder.

3            2.1.24    Bickford Second Loan Agreement.  That certain promissory note secured

4    by a deed of trust, dated as of May 25, 2005, in the maximum aggregate principal amount of

5    approximately $30,000,000 executed by SunCal Bickford, as borrower, and payable to the order of

6    Lehman ALI.  The Bickford Second Lien Loan Agreement is allegedly secured by a second priority

7    deed of trust on the Bickford Ranch Project.  The Bickford Second Loan Agreement has an

8    asserted balance due of $56,494,059.38 as of March 30, 2009.

9            2.1.25    Bond Claim(s).  Any Claim against the Debtor(s) and a Bond Issuer under

10   various payment or performance bonds~~, and/or any claims of Bond Issuer(s) against the Debtor(s)~~

11   ~~under various payment or performance bonds~~.

12           2.1.26    Bond Claimant.  Holder(s) of a Bond Claim.

13           2.1.27    Bond Indemnification Claim.  All Claims by Bond Issuers for

14   indemnification against a Bond Indemnitor for the Bond Issuer's actual payment or purchase of a

15   Bond Claim ~~All Claims by Bond Safeguard, Lexon, and Arch for indemnification for payment by~~

16   ~~Bond Safeguard, Lexon and Arch of Bond Claims~~ with respect to the Group I: Voluntary Debtors'

17   Projects.

18           2.1.28    Bond Indemnitors.  The individuals and entities that are allegedly liable on

19   the Bond Indemnification Claims, including, allegedly, all of the Debtors, Acquisitions, all

20   Affiliates of Acquisitions, and Elieff.

21           2.1.29    Bond Issuer(s).  Bond Safeguard, Lexon and Arch in their capacities as

22   issuers and sureties for payment and performance bonds for the benefit of certain of the Debtors.

23           2.1.30    Bond Safeguard.  Bond Safeguard Insurance Company, a Bond Issuer.

24           2.1.31    Business Day.  Any day, other than a Saturday, a Sunday or a "legal

25   holiday," as defined in Bankruptcy Rule 9006(a).

26           2.1.32    Cases.  The Chapter 11 cases of the Group I: Voluntary Debtors pending

27   before the Bankruptcy Court.

28

MAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-
SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v3-SCC_Group_I_VD_DS.DOC

1        2.1.33    Cash.  Currency of the United States of America and cash equivalents,

2  including, but not limited to, bank deposits, immediately available or cleared checks, drafts, wire

3  transfers and other similar forms of payment.

4        2.1.34    CFD Bonds.  Community facilities district bonds issued by a

5  governmental entity.

6        2.1.35    Chapter 11 Trustee.  Steven M. Speier, the duly appointed trustee of the

7  Trustee Debtors in their pending Chapter 11 Cases.

8        2.1.36    Claim.  This term shall have the broadest possible meaning under

9  Section 101(5) of the Bankruptcy Code, and shall include (a) any right to payment from any of the

10  Group I: Voluntary Debtors, whether or not such right is reduced to judgment, liquidated,

11  unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable,

12  secured, or unsecured, or (b) any right to an equitable remedy for breach of performance if such

13  breach gives rise to a right of payment from any of the ~~Group II~~Group I: Voluntary Debtors,

14  whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent,

15  matured, unmatured, disputed, undisputed, secured, or unsecured.

16        2.1.37    Claims Bar Date.  For any Claim ~~other than an Administrative Claim~~,

17  other than the exceptions noted below, March 31, 2009, which was established by the Bankruptcy

18  Court as the last date for creditors to file Proof of Claims with the Bankruptcy Court in all of the

19  Group I: Voluntary Debtors' cases, except for the following: (a) Administrative Claims, for which

20  the Administrative Claims Bar Date shall apply, (b) claims arising from rejection of executory

21  contracts or unexpired leases pursuant to 11 U.S.C. § 365, for which the last day to file a proof of

22  claim is (i) 30 days after the date of entry of the order authorizing the rejection, or (ii) March 31,

23  2009, whichever is later, (c) claims of "governmental units," as that term is defined in 11 U.S.C. §

24  101(27), for which proofs of claim are timely filed if filed: (i) before 180 days after the date of the

25  Order for Relief in this case, or (ii) by March 31, 2009, whichever is later (11 U.S.C. § 502(b)(9)),

26  and (d) claims arising from the avoidance of a transfer under chapter 5 of the Bankruptcy Code, the

27  last day to file a proof of claim is 30 days after the entry of judgment avoiding the transfer or

28  March 31, 2009, whichever is later.~~, subject to the following:.  For claims arising from rejection of~~

-11-

1    ~~executory contracts or unexpired leases pursuant to 11 U.S.C. § 365, the last day to file a proof of~~

2    ~~claim is (a) 30 days after the date of entry of the order authorizing the rejection, or (b) March 31,~~

3    ~~2009, whichever is later.  For claims of "governmental units," as that term is defined in 11 U.S.C.~~

4    ~~§ 101(27), proofs of claim are timely filed if filed: (a) before 180 days after the date of the Order~~

5    ~~for Relief in this case, or (b) by March 31, 2009, whichever is later. 11 U.S.C. § 502(b)(9).  For~~

6    ~~claims arising from the avoidance of a transfer under chapter 5 of the Bankruptcy Code, the last~~

7    ~~day to file a proof of claim is 30 days after the entry of judgment avoiding the transfer, or~~

8    ~~(b) March 31, 2009, whichever is later.~~

9    2.1.38    <u>Claims Objection Deadline</u>.  The later of (i) the first business day

10    following the one hundred and eightieth (180th) day after the Effective Date, or (ii) such greater

11    period of limitation as may be fixed or extended by the Bankruptcy Court or by agreement between

12    the Plan Trustee and the Holder of the Claim.

13    2.1.39    <u>Claim Objection Reduction Amount</u>. The amount of Net Sales Proceeds

14    that is made available to the holders of Allowed Unsecured Claims due to the entry of a judgment

15    or order on a Lehman Claim Objection that disallows, reduces, or otherwise adversely modifies the

16    secured claims filed by the Lehman Lenders.

17    2.1.40    <u>Class</u>.  Each group of Claims or Interests classified in Article V of the Plan

18    pursuant to Sections 1122 and 1123 of the Bankruptcy Code.

19    2.1.41    <u>Committee</u>.  The Voluntary Debtors' Committee both before and after the

20    Confirmation Date.

21    2.1.42    <u>Confirmation Date</u>.  The date on which the Confirmation Order is entered

22    in the Bankruptcy Court's docket.

23    2.1.43    <u>Confirmation Order</u>.  The order entered by the Bankruptcy Court

24    confirming the Plan in accordance with the provisions of Chapter 11 of the Bankruptcy Code.

25    2.1.44    <u>Contingent Bond Claims</u>.  Bond Indemnification Claims in which the

26    Bond Issuer has not yet paid or purchased the underlying Bond Claim.

27    2.1.45    <u>Contract Action. The action filed by certain Voluntary Debtors against</u>

28    Lehman ALI, Inc., and certain other defendants, in California Superior Court for the County of

Orange (Case No. 30-2011-0040847-CU-BC-CJC), that was removed to the bankruptcy court as Adv. No. 8:11-ap-01212-ES, and a reservation of rights to add the Plan Trustee and/or the Trustee Debtors (and their successors) as additional plaintiffs therein.

2.1.44  2.1.46  **Creditor.**  Any Person who is the Holder of a Claim against any Debtor that arose or accrued or is deemed to have arisen or accrued or to have matured, or otherwise become due, owing, and payable on or before the Petition Date, including, without limitation, Claims of the kind specified in Sections 502(g), 502(h) or 502(i) of the Bankruptcy Code.

2.1.45  2.1.47  **Debtor(s).**  Individually or collectively, the Voluntary Debtors and the Trustee Debtors, as specifically defined in Exhibit "1" attached hereto.

2.1.46  2.1.48  **Debtor(s)-in-Possession.**  The Voluntary Debtor(s) when acting in their capacity as representatives of their respective Estates in their respective Chapter 11 Cases.

2.1.47  2.1.49  **Disclosure Statement.**  This document accompanying the Plan that is entitled "First Second Amended Disclosure Statement Describing First Second Amended Chapter 11 Plan Filed by SunCal Plan Proponents In The Chapter 11 Cases Of Palmdale Hills Property, LLC, SunCal Bickford Ranch, LLC, SunCal Emerald Meadows, LLC and Acton Estates, LLC," as amended and with all accompanying exhibits.

2.1.48  2.1.50  **Disputed Claim(s).**  All or any part of a Claim other than any Allowed Amount thereof as to which any one of the following applies: (i) no Proof of Claim has been filed with respect to such Claim, and either (a) the Claim is not listed in the Schedules; or (b) the Claim is listed in the Schedules as unliquidated, disputed, contingent, unknown or in a zero amount, (ii) the Claim is the subject of (a) an unresolved Litigation Claim; (b) the Claim is subject to offset by a Litigation Claim; (c) a timely objection to such Claim that has not been resolved by a Final Order; or (d) a request for estimation in accordance with the Bankruptcy Code, the Bankruptcy Rules, any applicable order of the Bankruptcy Court, or the applicable Plan(s) which is Filed on or before the Claims Objection Deadline, which Adversary Proceeding, objection, or request for estimation has not been dismissed, withdrawn or determined by a Final Order; or (iii) the Claim is otherwise treated as a "Disputed Claim" pursuant to the Plan.

MAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v3-SCC_Group_I_VD_DS.DOC

1  ~~2.1.49~~ 2.1.51  Disputed Lien(s).  An asserted lien(s) against Assets of the Group I

2  Voluntary Debtor(s) that is either subject to a Disputed Secured Claim, not duly perfected, subject

3  to an Avoidance Action, or subject to an action pursuant to Bankruptcy Code Sections 510(c)(2)

4  and/or 506(d).  However, pursuant to Section 506(d)(2), a lien is not disputed merely because it

5  secures a claim that "is not an allowed secured claim due only to the failure of any entity to file a

6  proof of such claim under section 501 of this title."

7  ~~2.1.50~~ 2.1.52  Disputed Secured Claim(s). That part of a Disputed Claim that is a

8  Secured Claim.

9  ~~2.1.51~~ 2.1.53  Distribution(s).  Payments to Holders of Allowed Claims provided

10  for under the Plan.

11  ~~2.1.52~~ 2.1.54  Distribution Agent.  The entity that is responsible for making

12  Distributions under the Plan, which shall be Acquisitions.

13  ~~2.1.53~~ 2.1.55  Distribution Account(s).  Separate account(s) to be established by the

14  Plan Trustee at an FDIC insured bank into which each Group I: Voluntary Debtor's[2] Available

15  Cash shall be deposited and all Available Cash received by the Plan Trust after the Confirmation

16  Date that would have belonged to such Group I: Voluntary~~I~~ Debtor shall be deposited, other than

17  Net Sales Proceeds that are subject to Disputed Claims and Disputed Liens.

18  ~~2.1.54~~ 2.1.56  Distribution Date.  With respect to any Allowed Claim or Allowed

19  Interest, the date on which a Distribution is required to be made under the Plan.

20  ~~2.1.55~~ 2.1.57  Effective Date. A date selected by the applicable SunCal Plan

21  Proponent(s) that is not later than the ninetieth (90th) calendar day after the Confirmation Date, and

22  provided there is no stay pending appeal of the Confirmation Order. However, in any case where

23  the actions provided for in the Plan would be delayed by the automatic stay applicable in the case

24  of any Lehman Entity operating under the protection of Chapter 11 or Chapter 7, the SunCal Plan

25  Proponents shall have the right to extend the Effective Date for an additional sixty (60) days to

26  obtain relief from any such stay.  The Effective Date may be further extended by the Bankruptcy

27  Court after notice and hearing to all parties in interest.

28

MAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-
SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v3-SCC_Group_I_VD_DS.DOC

1    2.1.56  2.1.58  Elieff.  Bruce Elieff, the president of Acquisitions, a purported

2    obligor on the Bond Indemnitor Claims with alleged corresponding indemnity Claims against the

3    Debtors.

4    2.1.57  2.1.59  Emerald Compromise.  The compromise set forth and attached to the

5    *Motion For An Order Approving Compromise of Controversies with Rubidoux 60, LLC, EMR*

6    *Residential Properties LLC, Mitchell Ogron, Life Church of God in Christ, Moses Green and*

7    *David Sandoval* ("Emerald Compromise Motion"), filed on or about March 14, 2011, by SunCal

8    Emerald, as may be further amended or revised.

9    2.1.58  2.1.60  Emerald Meadows Project.  The Project owned by SunCal Emerald,

10    located in the City of Rubidoux, California, as more particularly described herein.

11    2.1.59  2.1.61  Estates.  The bankruptcy estates of the Group I: Voluntary Debtors

12    created pursuant to Section 541 of the Bankruptcy Code.

13    2.1.60  2.1.62  Fee Applications.  Applications of Professional Persons under

14    Sections 330, 331 or 503 of the Bankruptcy Code for allowance of compensation and

15    reimbursement of expenses in the Cases.

16    2.1.61  2.1.63  Fee Claim.  A Claim under Sections 330 or 503 of the Bankruptcy

17    Code for allowance of compensation and reimbursement of expenses in the Cases.

18    2.1.62  2.1.64  Fenway Capital.  Fenway Capital Funding LLC, a Lehman Successor

19    to Lehman's Disputed Claims and Lehman's Disputed Liens arising from (i) SunCal

20    Communities I Loan Agreement, (ii) Ritter Ranch Loan Agreement, (iii) Bickford Second Loan

21    Agreement, (iv) SunCal PSV Loan Agreement, (v) SunCal Marblehead/SunCal Heartland Loan

22    Agreement, (vi) Delta Coves Loan Agreement (vii) SunCal Northlake Loan Agreement, and

23    (viii) SunCal Oak Valley Loan Agreement.  Such Disputed Claims and Disputed Liens were

24    transferred back to LCPI pursuant to a compromise approved by the New York Bankruptcy Court

25    on May 12, 2010.

26    2.1.63  2.1.65  Filed.  Delivered to, received by and entered upon the legal docket

27    by the Clerk of the Bankruptcy Court.  "File" shall have a correlative meaning.

28

MAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-
SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v3-SCC_Group_I_VD_DS.DOC

1    ~~2.1.64~~ 2.1.66  **Final Order**.  A judgment, order, ruling or other decree issued and

2  entered by the Bankruptcy Court, that has not been reversed, stayed, modified or amended.

3    ~~2.1.65~~ 2.1.67  **General Unsecured Claim**.  A Claim against a ~~Group II~~Group I:

4  Voluntary Debtor that is not (a) a Secured Claim, (b) an Administrative Claim, (c) a Tax Claim or

5  (d) a Priority Claim.

6    ~~2.1.66~~ 2.1.68  **Group I: Voluntary Debtors**. Palmdale Hills Property, LLC, SunCal

7  Bickford Ranch, LLC, SunCal Emerald Meadows, LLC and Acton Estates, LLC.

8    ~~2.1.67~~ 2.1.69  **Group I Projects**. The Ritter Ranch Project, the Bickford Ranch

9  Project, the Emerald Project and the Acton Project.

10    ~~2.1.68~~ 2.1.70  **Holder**.  The beneficial owner of any Claim or Interest.

11    ~~2.1.69~~ 2.1.71  **Initial Overbid**. The Initial Overbid is the first Qualifying Bid after

12  the Opening Bid that is equal to or in excess of the Initial Overbid Amount.

13    ~~2.1.70~~ 2.1.72  **Initial Overbid Amount**. In the case of the Ritter Ranch Project, the

14  Initial Overbid Amount is a sum that is not less than the sum of the applicable Opening Bid, the

15  Ritter Ranch Project Break-up Fee and one hundred thousand dollars ($100,000). In the case of the

16  Bickford Ranch Project, the Initial Overbid Amount is a sum that is not less than the sum of the

17  applicable Opening Bid, the Bickford Ranch Project Break-up Fee and seventy-five thousand

18  dollars ($75,000). In the case of the ~~SunCal~~ Emerald Meadow Project, the Initial Overbid Amount

19  is a sum that is not less than the sum of the applicable Opening Bid, the ~~SunCal~~ Emerald Meadow

20  Project Break-up Fee and seventy-five thousand dollars ($75,000). In the case of the Acton Project,

21  the Initial Overbid Amount is a sum that is not less than the sum of the applicable Opening Bid, the

22  Acton Project Break-up Fee, and ~~the~~ fifty-thousand dollars ($50,000).

23    ~~2.1.71~~ 2.1.73  **Insider**.  The term shall have the broadest meaning possible under

24  Section 101(31), including, but not limited to, a person in control of the Debtor, Affiliates and

25  Insiders of such Affiliates.

26    ~~2.1.72~~ 2.1.74  **Interest**.  Any equity security interest in any ~~Group II~~Group I:

27  Voluntary Debtor within the meaning, of Section 101(16) of the Bankruptcy Code, including,

28  without limitation, any equity ownership interest in any of the Group I: Voluntary Debtors, whether

1    in the form of common or preferred stock, stock options, warrants, partnership interests, or

2    membership interests.

3           ~~2.1.73~~ 2.1.75  **LBHI**.  Lehman Brothers Holdings, Inc., a Lehman Entity, the parent

4    company of Lehman ALI and LCPI, and a Chapter 11 debtor in a bankruptcy proceeding pending

5    in the Bankruptcy Court for the Southern District of New York.

6           ~~2.1.74~~ 2.1.76  **LCPI**.  Lehman Commercial Paper, Inc., a Chapter 11 debtor in a

7    bankruptcy proceeding pending in the Bankruptcy Court for the Southern District of New York.

8           ~~2.1.75~~ 2.1.77  **Legal Rate**.  The rate of interest payable on judgments obtained in

9    the United States District Courts as set forth in 28 U.S.C. § 1961.  The rate applicable under the

10   Plan is 1.44% per annum, representing the applicable rate on November 6, 2008.

11          ~~2.1.76~~ 2.1.78  **Lehman Adversary Proceeding**.  The Debtors' pending adversary

12   proceeding against the Lehman Lenders and/or the Lehman Successors asserting various causes of

13   action including equitable subordination, fraudulent conveyances and preferential transfers.

14          ~~2.1.77~~ 2.1.79  **Lehman ALI**.  Lehman ALI, Inc.

15          ~~2.1.78~~ 2.1.80  **Lehman Disputed Administrative Loans**.  The post-petition financing

16   provided by Lehman ALI to ~~Palmdale Hills, SunCal Emerald, SunCal Bickford, Acton Estates,~~

17   SunCal Oak Valley, SunCal Heartland, SunCal Northlake, SunCal Marblehead, SunCal Century

18   City, SunCal PSV, Delta Coves, and SunCal Oak Knoll, which grants priming liens on all

19   borrower Trustee Debtors' assets, and for super-priority administrative status to Lehman ALI.  ~~The~~

20   ~~Voluntary Debtors have repaid to Lehman ALI the full amount of $270,731 loaned to the~~

21   ~~Voluntary Debtors.~~ The aggregate amount of the Lehman Disputed Administrative Loans to all of

22   the above reference Trustee Debtors wa~~s~~i approximately $40 million as of March 1, 2011 and

23   continuing to increase.  The Lehman Disputed Administrative Loans are the subject of claim

24   objections, specifically the pending 502(d) Objection. Until these objections are resolved in the

25   applicable Case, these Lehman Disputed Administrative Loans shall not be Allowed Claims.

26          ~~2.1.79~~ 2.1.81  **Lehman Claim Objections**. The objections filed by the Debtors to the

27   claims filed by the Lehman Lenders that are based upon the Lehman Disputed Loans and the

28

MAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-
SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v3-SCC_Group_I_VD_DS.DOC

Lehman Disputed Administrative Loans, including, but not limited to, the Lehman Recoupment Objection and the Lehman 502(d) Objection.

2.1.80  2.1.82  Lehman Entities.  The Lehman Lenders, the Lehman Equity Members and LBHI.

2.1.81  2.1.83  Lehman Equity Members.  Lehman Entities that own direct or indirect membership Interests in all of the Trustee Debtors, except for SunCal Heartland and SunCal Marblehead.

2.1.82  2.1.84  Lehman Lenders.  Lehman ALI, LCPI, Northlake Holdings, and OVC Holdings.

2.1.83  2.1.85  Lehman Disputed Loans.  Collectively the following loans that are the purported basis for the Lehman's Disputed Claims:  (a) SunCal Communities I Loan Agreement; (b) Bickford Second Loan Agreement; (c) Ritter Ranch Loan Agreement; (d) SCC Palmdale Loan; (e) Interim Loan Agreement; (f) SunCal Oak Knoll/SunCal Torrance Loan Agreement; (g) SunCal Century City Loan Agreement; (h) SunCal PSV Loan Agreement; (i) SunCal Delta Coves Loan Agreement; (j) SunCal Marblehead/SunCal Heartland Loan Agreement; (k) Sun Cal Oak Valley Loan Agreement; (l) SunCal Northlake Loan Agreement; (m) Pacific Point First Loan Agreement; and (n) Pacific Point Second Loan Agreement, and (o) the Lehman Disputed Administrative Loan.

2.1.84  2.1.86  Lehman Recoupment Objection. A claim objection filed with respect to certain claims filed by the Lehman Lenders that is based upon the affirmative defenses of recoupment, unjust enrichment and unclean hands.

2.1.85  2.1.87  Lehman Representatives.  The individuals that controlled the Lehman Entities.

2.1.86  2.1.88  Lehman Successor(s).  Entities other than the Lehman Lenders that either assert to be or are determined by the Bankruptcy Court to be the beneficial owner(s) of the Lehman Disputed Loan(s), including, but not limited to Fenway Capital, Lehman Re and Danske Bank.

2.1.87  2.1.89  Lehman's Disputed Claim(s).  All of the Proofs of Secured Claims filed by a Lehman Lender or a Lehman Successor in the Debtors' Chapter 11 Cases arising from the Lehman Disputed Loans and the Lehman Disputed Administrative Loans.

2.1.88  2.1.90  Lehman's Disputed Lien(s).  All of the alleged liens relating to Proofs of Secured Claims filed by a Lehman Lender or a Lehman Successor in the Debtor's Chapter 11 Cases arising from the Lehman Disputed Loans.

2.1.89  2.1.91  Lehman 502(d) Objection. A claim objection filed with respect to certain claims filed by the Lehman Lenders that based upon Section 502(d) of the bankruptcy code.

2.1.90  2.1.92  Lexon.  Lexon Insurance Co.

2.1.91  2.1.93  LitCo. A newly formed Delaware limited liability company that will be purchasing the claims and Litigation Rights held by the Reliance Claimants that choose Option A provided for in the Plan.

2.1.92  2.1.94  LitCo Plan Loan. A loan that will be made by LitCo, to the extent necessary to pay Administrative Claims, and post Confirmation Date costs incurred by the SunCal Proponent SunCal Plan Proponents in connection with the sale process, and to pay post Effective Date costs incurred by the Plan Trust, including litigation expenses where applicable, if no other source is available to pay these obligations. LitCo will be capitalized with funds provided by a third party.

2.1.93  2.1.95  Litigation Claims.   Any and all interests of the Group I: Voluntary Debtors in any and all Claims, rights, causes of action, and objections or defenses to Claims, liens, rights, or causes of action which have been or may be commenced by the Group II Group I: Voluntary Debtor(s), the Chapter 11 Trustee, or the Committee, as the case may be, including, but not limited to, any (i) Avoidance Actions; (ii) for turnover of property to the Group I: Voluntary Debtors' Estates and/or the Plan Trust; (iii) for the recovery of property or payment of money that belongs to the Debtors' Estates or the Plan Trust; (iv) the right to compensation in the form of damages, recoupment or setoff of the Debtors' Estates and/or the Plan Trust; (v) the Lehman Adversary Proceeding; (vi) the State Court Contract Action, and (vii) any and all other Claims

MAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v3-SCC_Group_I_VD_DS.DOC

against Lehman's Disputed Claims and/or Disputed Liens referenced in the Plan or the Disclosure Statement.

2.1.94  2.1.96  Litigation Recoveries.  Any Cash or other property received by the Chapter 11 Trustee, the Group I: Voluntary Debtors, the Committee and/or the Plan Trust, as the case may be, from all or any portion of a Litigation Claim(s), including, but not limited to, awards of damages, attorneys' fees and expenses, interest and punitive damages, whether recovered by way of settlement, execution on judgment or otherwise.

2.1.95  2.1.97  Litigation Rights. Any Claims held by a party other than against the Group I: Voluntary Debtors , and if applicable, against third parties arising or relating to the Claim against the applicable Group I Voluntary Debtor, that have not been fixed in a final judgment prior to the Effective Date.

2.1.96  2.1.98        Marblehead Project.  The Project owned by SunCal Marblehead, located in the City of San Clemente, California, as more particularly described herein.

2.1.97  2.1.99        Maximum Distribution.  A Distribution to a Holder of an Allowed Unsecured Claim against a Group I Debtor equal to one hundred percent (100%) of the amount of the Holder's Allowed General Unsecured Claim plus interest at the Legal Rate from and as of the Group II Group I: Voluntary Debtor's Petition Date.

2.1.98  2.1.100        MB Firm.  Miller Barondess, LLP.

2.1.99  2.1.101        Mechanic Lien Claims.  Mechanic Lien Claims arising pursuant to California Civil Code §3110, et seq. that were either allegedly perfected prepetition or otherwise allegedly satisfy the requirements of Bankruptcy Code 546(b).

2.1.100  2.1.102        Minimum Increment.  Minimum Increment applicable to the sales of the Group II Group I: Voluntary Projects are the following: one hundred thousand dollars ($100,000) for the Ritter Ranch Project, seventy-five thousand dollars ($75,000) for the Bickford Ranch Project, seventy-five thousand dollars ($75,000) for the SunCal Emerald Meadow Project and fifty thousand dollars ($50,000) for the Acton Project, until there are only two Qualified Bidders submitting bids for a Group II Project, then the Minimum Increment shall be twenty-five thousand dollars ($25,000).

MAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v3-SCC_Group_I_VD_DS.DOC

1    ~~2.1.101~~ 2.1.103    Minimum Sale Price. The minimum gross sale price that

2    must be paid for ~~Group II~~Group I: Voluntary Project before such projects can be sold pursuant to

3    the Plan, which prices are the following: Ritter Ranch Project - $19,620,000, Bickford Ranch

4    Project - $9,810,000, Emerald Meadows Project - $5,490,000, and Acton Project - $1,440,000.

5    ~~2.1.102~~ 2.1.104    Net Litigation Recoveries.  Litigation Recoveries less

6    associated Administrative Claims and Post-Confirmation Expenses incurred in connection with

7    such Litigation Recoveries.

8    ~~2.1.103~~ 2.1.105    Net Sales Proceeds.  The Cash generated from the sale(s) or

9    liquidation of the ~~Group II~~Group I: Voluntary Debtor(s)' Assets or the Plan Trust's Assets, less

10    payment of selling expenses, taxes, ~~Chapter 11 Trustee fees,~~ and any associated Post-Confirmation

11    Expenses and Administrative Claims incurred in furtherance of such sales or liquidation of such

12    Assets.

13    ~~2.1.104~~ 2.1.106    Net Sales Proceeds Account(s).  Separate account(s) that will

14    be established by the Plan Trustee at an FDIC insured bank into which all Net Sale Proceeds shall

15    be deposited from the sale of Assets that were allegedly encumbered by a Disputed Secured

16    Claim(s) and/or a Disputed Lien(s).  There shall be a separate Net Sales Proceeds Account for the

17    Net Sale Proceeds allegedly subject to each Disputed Secured Claim(s) and/or Disputed Lien(s),

18    except where there are two Disputed Liens on a single Project, in which case, there shall be a

19    single account for the proceeds generated from that Project.  The Disputed Secured Claim(s) and/or

20    Disputed Lien(s) shall attach to the corresponding Net Sales Proceeds Account(s) pending any

21    Final Order(s) of the Bankruptcy Court resolving the applicable Disputed Secured Claim(s) and/or

22    applicable Disputed Lien(s).  To the extent that a particular Disputed Claim is disallowed or a

23    particular Disputed Lien is avoided (other than transferred to the Estates pursuant to Bankruptcy

24    Code Section 510(c)(2)) or otherwise invalidated, such Net Sales Proceeds allegedly subject

25    thereto shall become Available Cash and shall be transferred to the applicable Distribution

26    Account(s).  To the extent that a particular Disputed Secured Claim and a Disputed Lien are

27    allowed and deemed valid but subject to the equitable subordination causes of action in the

28

MAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-
SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v3-SCC_Group_I_VD_DS.DOC

1  Lehman Adversary Proceeding, the funds shall remain in the Net Sales Accounts pending a Final

2  Order on the equitable subordination causes of action in the Lehman Adversary Proceeding.

3       2.1.105  2.1.107    Opening Bid.  Opening Bid means the offer for one, or both

4  of the Group II Group I: Voluntary Projects, which is equal to the Minimum Sale Price(s) accepted

5  by the Debtor for either one or both of the Group II Group I: Voluntary Projects.

6       2.1.106  2.1.108    Orders for Relief Date.  The following are dates that orders

7  for relief were entered for each of the Trustee Debtors:

8  
9  
| SunCal Oak Valley | January 6, 2009 |
| SunCal Heartland | January 6, 2009 |
| SunCal Northlake | January 6, 2009 |
| SunCal Marblehead | January 6, 2009 |
| SunCal Century City | January 6, 2009 |
| SunCal PSV | January 6, 2009 |
| Delta Coves | January 6, 2009 |
| SunCal Torrance | January 6, 2009 |
| SunCal Oak Knoll | January 6, 2009 |

14       2.1.107  2.1.109    Palmdale Hills.  Palmdale Hills Property LLC, a Delaware

15  limited liability company, a Voluntary Debtor herein, and the owner of the Ritter Ranch Project

16       2.1.108  2.1.110    Palmdale Hills CFD Bonds.  Certain CFD bonds issued by

17  the City of Palmdale, in the amount of approximately $33 million that are owned by Palmdale

18  Hills.

19       2.1.109  2.1.111    Palm Springs Village Project.  The Project owned by SunCal

20  PSV, located in the City of Palm Springs, California, as more particularly described herein.

21       2.1.110  2.1.112    Person.  An individual, partnership, corporation, limited

22  liability company, business trust, joint stock company, trust, unincorporated association, joint

23  venture, governmental authority, governmental unit, committee or other entity of whatever nature.

24       2.1.111  2.1.113    Petition Dates.  The following are dates that each of the

25  Voluntary Debtors filed their Voluntary Chapter 11 petitions or Creditors filed involuntary

26  Chapter 11 petitions against the Trustee Debtors:

27  
28  
| Palmdale Hills | November 6, 2008 |
| SunCal Beaumont | November 6, 2008 |
| SCC Palmdale | November 7, 2008 |
| SunCal Johannson | November 7, 2008 |

MAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v3-SCC_Group_I_VD_DS.DOC

| SunCal Summit Valley | November 7, 2008 |
|---|---|
| SunCal Emerald | November 7, 2008 |
| SunCal Bickford | November 7, 2008 |
| Acton Estates | November 7, 2008 |
| Seven Brothers | November 7, 2008 |
| SJD Partners. | November 7, 2008 |
| SJD Development | November 7, 2008 |
| Kirby Estates | November 7, 2008 |
| SunCal I | November 7, 2008 |
| SunCal III | November 7, 2008 |
| SCC Communities | November 19, 2008 |
| Del Rio | November 19, 2008 |
| Tesoro | November 19, 2008 |
| Delta Coves Ventures, LLC | November 14, 2008 |
| SunCal Heartland, LLC | November 12, 2008 |
| SunCal Marblehead, LLC | November 12, 2008 |
| LB-L-SunCal Northlake, LLC | November 12, 2008 |
| LB-L-SunCal Oak Valley, LLC | November 12, 2008 |
| SunCal Century City, LLC | November 14, 2008 |
| SunCal PSV, LLC | November 14, 2008 |
| SunCal Torrance Properties, LLC | November 14, 2008 |
| SunCal Oak Knoll, LLC | November 19, 2008 |

2.1.112  2.1.114      Plan(s).  The "First Second Amended Chapter 11 Plan Filed
by SunCal Plan Proponents In The Chapter 11 Cases Of Palmdale Hills Property, LLC, SunCal
Bickford Ranch, LLC, SunCal Emerald Meadows, LLC and Acton Estates, LLC," together with
the Exhibits thereto, as the same may be amended or modified from time to time in accordance
with the Plan(s).

2.1.113   Plan Documents.  The Plan, the Plan Trust Agreement and all other
documents attached to the Plan Supplement.

2.1.114  2.1.115      Plan Period. The period from the Effective Date to the Plan
Termination Date.

2.1.115   Plan Supplement. The compilation of the Plan Documents to be filed with
the Bankruptcy Court.

2.1.116   Plan Termination Date. The fifth (5th) anniversary date of the Effective
Date, unless the Plan elects and earlier date.

MAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v3-SCC_Group_I_VD_DS.DOC

1    2.1.117   Plan Sponsor.  The entity that has committed to cause the funding of

2 certain specified obligations under the Plan on or after the Effective Date.  The Plan Sponsor is

3 Acquisitions.

4    2.1.118    Plan Trust.  A liquidating trust to be established prior to or on the

5 Effective Date, with Acquisitions as the Plan Trustee and the Holders of Allowed Claims against

6 the Debtors as the beneficiaries. The purpose of the Plan Trust will be to liquidate the Debtors'

7 Assets (other than Assets that are excluded by the Plan Trustee on the grounds that they lack value

8 or would be difficult to administer) and to otherwise consummate the Plan.

9    2.1.119    Plan Trustee. The Plan Trustee under the Plan Trust Agreement is

10 Acquisitions.

11    2.1.120    Plan Trust Agreement. The liquidating trust agreement governing the

12 affairs of the Plan Trust, which will be in substantially the form contained in the Plan Supplement.

13    2.1.121 2.1.120        Plan Trust Beneficiaries. The Plan Trust Beneficiaries are (i)

14 the holders of Beneficial Interests, as of any point in time, and (ii) holders of Allowed Claims that

15 shall be satisfied from Plan Trust Assets Property in accordance with the terms of the Plan.

16    2.1.122 2.1.121        Plan Trust PropertyAssets. Plan Trust Property Assets means

17 all property within the Chapter 11 estates of the Group I: Voluntary Debtors, other than property

18 that is affirmatively excluded by the Plan Trustee.

19    2.1.123 2.1.122        Post-Confirmation Expenses.  The fees and expenses

20 incurred by the Plan SponsorTrust, the Plan Trustee and the Committee and their professionals

21 following the Confirmation Date (including the fees and costs of Professionals) for the purpose of

22 (i) prosecuting and liquidating the Litigation Claims; (ii) objecting to and resolving Disputed

23 Claims and Disputed Liens; (iii) selling or otherwise liquidating the Plan Trust's Assets;

24 (iv) effectuating Distributions under the Plan; and (v) otherwise consummating the Plan and

25 closing the Group I: Voluntary Debtors' Chapter 11 Cases.

26    2.1.124 2.1.123        Priority Claim.  Any Claim, other than an Administrative

27 Claim or a Tax Claim, to the extent entitled to priority under Section 507(a) of the Bankruptcy

28 Code.

MAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-
SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v3-SCC_Group_I_VD_DS.DOC

1    ~~2.1.125~~ 2.1.124    Pro Rata.  Proportionately, so that with respect to any

2    distribution in respect of any Allowed Claim, the ratio of (a)(i) the amount of property distributed

3    on account of such Allowed Claim to (ii) the amount of such Allowed Claim, is the same as the

4    ratio of (b)(i) the amount of property distributed on account of all Allowed Claims of the Class or

5    Classes sharing in such distribution to (ii) the amount of all Allowed Claims in such Class or

6    Classes.

7    ~~2.1.126~~ 2.1.125    Professional.  A Person or Entity (a) employed by the Group

8    I: Voluntary Debtors, the Committee pursuant to a Final Order in accordance with Sections 327

9    and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to the

10    Effective Date, pursuant to Sections 327, 328, 329, 330 and 331 of the Bankruptcy Code, or (b) for

11    which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to

12    Section 503(b) of the Bankruptcy Code.

13    ~~2.1.127~~ 2.1.126    Professional Fees.  All Allowed Claims for compensation and

14    for reimbursement of expenses under Sections 328, 330 and/or 503(b) of the Bankruptcy Code

15    ~~2.1.128~~ 2.1.127    Projects.  The Debtors' residential real estate development

16    projects and other assets as separately defined herein and described in Exhibit "1" to the Disclosure

17    Statement.

18    ~~2.1.129~~ 2.1.128    Qualifying Bid.  Qualifying Bid means, with respect to any

19    bid on a ~~Group II~~Group I: Voluntary Project, a bid made by Qualifying Bidder that is A) equal to or

20    in excess of the Initial Overbid Amount, unless~~if~~ it is the Initial Overbid, or B) in excess of the

21    immediately preceding Qualifying Bid by the Minimum Increment, if it is not the Initial Overbid.

22    ~~2.1.130~~ 2.1.129    Qualifying Bidder.  Qualifying Bidder means a bidder who a)

23    has deposited the sum of three hundred thousand dollars ($300,000) into an escrow designated by

24    the ~~SunCal Proponent~~SunCal Plan Proponents in the case of a bid for the Ritter Ranch Project or a

25    bid for the Bickford Ranch Project, the sum of two hundred thousand dollars ($200,000) in the

26    case of the Emerald Meadows Project, and $100,000 in the case of a bid for the Acton Project; b)

27    who has provided the SunCal Plan Proponents evidence confirming that such bidder has the

28    financial means to acquire the applicable Group I Assets: Voluntary Debtor(s) that such bidder is

-25-

seeking to acquire, and c) b) agreed that this sum will be forfeited as liquidated damages if such bidder is the Winning Bidder and fails to perform; and c) who has provided the SunCal Plan Proponents evidence confirming that such bidder has the financial means to acquire the applicable Group II Project(s) that such bidder is seeking to acquire.

2.1.131 2.1.130      Reliance Claim. An Allowed Unsecured Claim, Allowed Mechanic's Lien Claim, or Allowed Bond Indemnification Claim against a Group I: Voluntary Debtors that would entitle the holder thereof to be the beneficiary of any equitable subordination judgment obtained against a Lehman Entity by such holder. This definition includes the holders of qualifying claims that are secured by mechanics liens. All Allowed Mechanic's Lien Claims and Bond Indemnification Claims are Reliance Claims. Moreover, all Allowed General Unsecured Claims against Acton are Reliance Claims (excluding any deficiency claim arising from the Lehman Disputed Claims). Further, all Allowed General Unsecured Claim Aagainst SunCal Emerald are also Reliance Claims (excluding claims address in the Emerald Compromise and excluding any deficiency claim arising from the Lehman Disputed Claims). A list of the Reliance Claims for the Group I: Voluntary DebtorsPalmdale Hills and SunCal Bickford is attached hereto as Exhibit "8."

2.1.132 2.1.131      Reliance Claimant. The holder of a Reliance Claim. A list of the Reliance Claims and Reliance Claimants is attached hereto as Exhibit "8," and the holders of mechanics lien claims.

2.1.133 2.1.132      Ritter Ranch Loan Agreement. That certain Credit Agreement, dated as of February 8, 2007, by and among Palmdale Hills, as borrower, LCPI as administrative agent and lender, pursuant to which LCPI made a loan in the maximum aggregate principal amount of approximately $264,000,000. The Ritter Ranch Loan Agreement is allegedly secured by a first-priority deed of trust on all real and personal property owned by Palmdale Hills. The Ritter Ranch Loan Agreement has an asserted balance due of $287,252,096.31 as of March 30, 2009.

2.1.134 2.1.133      Ritter Ranch Project. The Project owned by Palmdale Hills, located in the City of Palmdale, California, as more particularly described herein.

MAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v3-SCC_Group_I_VD_DS.DOC

1    ~~2.1.135~~ 2.1.134    Ritter Ranch Project Break-up Fee. The amount equal to

2    2.5% of the Minimum Sales Price for the Ritter Ranch Project, plus actual amounts paid on

3    Allowed Administrative Claims for the Palmdale Hills Case,~~sum of eight hundred and seventy~~

4    ~~thousand dollars ($870,000)~~ that will be paid to the Stalking Horse Bidder that submits the

5    Opening Bid for the Ritter Ranch Project, if such Stalking Horse Bidder is not the Winning Bidder.

6    ~~2.1.136~~ 2.1.135    Sale Period.  The Sale Period is the time period during which

7    the ~~SunCal Proponent~~SunCal Plan Proponents must consummate a sale or liquidation of the Group

8    I Projects. The Sale Period shall commence on the Confirmation Date and shall expire on the

9    Effective Date, unless extended by the Bankruptcy Court after notice and hearing.

10    ~~2.1.137~~ 2.1.136    SCC LLC.  SCC Acquisitions LLC, a limited liability

11    company, a subsidiary of Acquisitions and an indirect and/or a direct parent company of all of the

12    Debtors.

13    ~~2.1.138~~ 2.1.137    Schedules.  The schedules of assets and liabilities and list of

14    equity security holders Filed by the Group I: Voluntary Debtors, as required by Section 521(1) of

15    the Bankruptcy Code, Bankruptcy Rules 1007(a)(3) and (b)(1), and Official Bankruptcy Form No.

16    6, as amended from time to time.

17    ~~2.1.139~~ 2.1.138    Secured Claim.  Any Claim, including interest, fees, costs,

18    and charges to the extent allowable pursuant to Bankruptcy Code Section 506, that is secured by a

19    valid and unavoidable Lien on the ~~Group II~~Group I: Voluntary Debtor(s)' Assets.

20    ~~2.1.140~~ 2.1.139    Stalking Horse Bidder.  The Qualified Bidder who submits

21    the Opening Bid.

22    ~~2.1.141    State Court Action. The action filed by certain Voluntary Debtors against~~

23    ~~Lehman Ali, Inc., and certain other defendants, in California Superior Court for the County of~~

24    ~~Orange (Case No. 30-2011-0040847-CU-BC-CJC), and a reservation of rights to add the Plan~~

25    ~~Trustee and/or the Trustee Debtors as additional plaintiffs therein.~~

26    ~~2.1.142~~ 2.1.140    SunCal.  The SunCal Companies, a trade name for

27    Acquisitions and its Affiliates.

28

MAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v3-SCC_Group_I_VD_DS.DOC

2.1.143 2.1.141    **SunCal Bickford**.  SunCal Bickford Ranch, LLC, a Delaware limited liability company, a Voluntary Debtor herein, and the owner of the Bickford Ranch Project.

2.1.144 2.1.142    **SunCal Emerald**. SunCal Emerald Meadows, LLC, a Delaware limited liability company, a Voluntary Debtor herein, and the owner of the Emerald Meadows Project.

2.1.145 2.1.143    **SunCal Emerald Meadow Project Break-up Fee**. The amount equal to 2.5% of the Minimum Sales Price for the Emerald Meadows Project, plus actual amounts paid on Allowed Administrative Claims for the SunCal Emerald Case, The sum of two hundred and fifty thousand dollars ($250,000) that will be paid to the Stalking Horse Bidder that submits the Opening Bid for the SunCal Emerald Meadow Project, if such Stalking Horse Bidder is not the Winning Bidder.

2.1.146 2.1.144    **SunCal Management**.  SunCal Management, LLC, a Delaware limited liability company, and the former property manager for the Projects, which has been succeed by Argent Management and the property manager for the Projects.

2.1.147 2.1.145    **SunCal Marblehead**. SunCal Marblehead, LLC, a Delaware limited liability company, a Trustee Debtor, and the owner of the Marblehead Project.

2.1.148 2.1.146    **SunCal Marblehead/SunCal Heartland Loan Agreement**. That certain Second Amended and Restated Term Loan and Revolving Line of Credit Loan Agreement, dated as of October 3, 2007, by and among SunCal Marblehead Heartland Master LLC, SunCal Marblehead, and SunCal Heartland, as borrowers, and Lehman ALI, as agent and sole lender, pursuant to which Lehman ALI made a loan in the maximum aggregate principal amount of approximately $316,061,300.  The SunCal Marblehead/SunCal Heartland Loan Agreement is allegedly secured by first-priority deeds of trust on the Marblehead and the Heartland Projects.  The SunCal Marblehead/SunCal Heartland Loan Agreement has an alleged balance due of $354,325,126.15 as of March 30, 2009. The proofs of claim filed with respect to this loan agreement are the subject of the Lehman Adversary Proceeding and the Lehman Claim Objections.

2.1.149 2.1.147    **SunCal Plan Proponent(s)**.  The Voluntary Debtors, in their capacity as debtors and debtors in possession in their respective Chapter 11 cases, and Acquisitions

-28-

1  as the creditor and -partyies-in-interest that are is proposing the Plans in the applicable Trustee

2  Debtors' Cases.

3           2.1.150 2.1.148       SunCal PSV. SunCal PSV, LLC, a Delaware limited liability

4  company, a Trustee Debtor (a Group IIGroup I: Voluntary Debtor), and the owner of the Palm

5  Springs Village Project.

6           2.1.151 2.1.149       SunCal PSV Loan Agreement.  That certain Term Loan and

7  Revolving Line of Credit Loan Agreement, dated as of February 12, 2007, between SunCal PSV,

8  as borrower, and Lehman ALI, as agent and sole lender, pursuant to which Lehman ALI made a

9  loan in the maximum aggregate principal amount of approximately $90 million.  The SunCal PSV

10 Loan Agreement is allegedly secured by a first-priority deed of trust on the Palm Springs Village

11 Project.  The SunCal PSV Loan Agreement has an alleged balance due of $88,257,340.20 as of

12 March 30, 2009.

13          2.1.152 2.1.150       Tax.  Any tax, charge, fee, levy, impost or other assessment

14 by any federal, state, local or foreign taxing authority, including, without limitation, income,

15 excise, property, sales, transfer, employment, payroll, franchise, profits, license, use, ad valorem,

16 estimated, severance, stamp, occupation and withholding tax.  "Tax" shall include any interest or

17 additions attributable to, or imposed on or with respect to such assessments.

18          2.1.153 2.1.151       Tax Claim.  Any Claim for any Tax to the extent that it is

19 entitled to priority in payment under Section 507(a)(8) of the Bankruptcy Code.

20          2.1.154 2.1.152       Trustee Debtor(s). The following Debtors, individually or

21 collectively, that are represented by the Chapter 11 Trustee: Delta Coves, SunCal Heartland,

22 SunCal Marblehead, SunCal Northlake, SunCal Oak Valley, SunCal Century City, SunCal PSV,

23 SunCal Torrance, and SunCal Oak Knoll.

24          2.1.155 2.1.153       Trustee Debtors' Committee.  The Official Committee of

25 Unsecured Creditors of the Trustee Debtors appointed in the Cases pursuant to Section 1102 of the

26 Bankruptcy Code.

27

28

MAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v3-SCC_Group_I_VD_DS.DOC

1    ~~2.1.156~~ 2.1.154    Unpaid Secured Real Property Tax Claims.  Secured Claims

2    held by various government entities secured by liens on the underlying real properties owned by

3    the Debtors but that are non-recourse to the Debtors.

4    ~~2.1.157~~ 2.1.155    Unsecured Claim. An Unsecured Claim is any Claim that is

5    not an Administrative Claim, Tax Claim, Secured Claim, or Priority Claim.

6    ~~2.1.158~~ 2.1.156    Voluntary Debtor(s).  The following  Chapter 11 debtors and

7    debtors-in-possession, individually or collectively, Palmdale Hills, SunCal I, SunCal III, SCC

8    Palmdale, Acton Estates, SunCal Beaumont, SunCal Emerald, SunCal Johansson, SunCal

9    Bickford, SunCal Summit, Seven Brothers, Kirby Estates, SJD Partners, SJD Development, SCC

10    Communities, Del Rio and Tesoro.

11    ~~2.1.159~~ 2.1.157    Voluntary Debtors' Committee.  The Official Committee of

12    Unsecured Creditors of the Voluntary Debtors appointed in the Cases pursuant to Section 1102 of

13    the Bankruptcy Code.

14    ~~2.1.160~~ 2.1.158    Winning Bid. The highest Qualifying Bid received for the

15    Ritter Ranch Project, the Bickford Ranch Project, Emerald Meadows Project or the Acton Project.

16    ~~2.1.161~~ 2.1.159    Winning Bidder.  The party that submits the highest

17    Qualifying Bid.

18    **2.2    Rules of Construction.**

19    For purposes of the Plan and this Disclosure Statement, unless otherwise provided herein or

20    in the Plan, (a) whenever from the context it is appropriate, each term, whether stated in the

21    singular or the plural, will include both the singular and the plural; (b) each pronoun stated in the

22    masculine, feminine or neuter includes the masculine, feminine and neuter; (c) any reference in the

23    Plan or this Disclosure Statement to an existing document or schedule filed or to be filed means

24    such document or schedule, as it may have been or may be amended, modified or supplemented

25    pursuant to the Plan; (d) any reference to an entity as a Holder of a Claim or Interest includes that

26    entity's successors and assigns; (e) except as otherwise indicated herein all references in the Plan

27    or this Disclosure Statement to Sections, Articles and Exhibits are references to Sections, Articles

28    and Exhibits of or to the Plan; (f) the words "therein," "thereunder" and "thereto" refer to the Plan

MAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-
SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v3-SCC_Group_I_VD_DS.DOC

in its entirety rather than to a particular portion of the Plan; and (g) unless otherwise provided in the Plan or this Disclosure Statement, any reference in the Plan or this Disclosure Statement to a contract, instrument, release, indenture, agreement, or other document being in a particular form or on particular terms and conditions means that such document shall be substantially and materially in such form or substantially and materially on such terms and conditions; (h) any reference in the Plan or this Disclosure Statement to a document, schedule, or exhibit to the Plan or Disclosure Statement Filed or to be Filed means such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; and (i) the rules of construction set forth in Section 102 of the Bankruptcy Code shall apply to the extent such rules are not inconsistent with the express terms of the Plan or this Disclosure Statement or any other provision in this Section 2.2.

**2.3    Exhibits.**

All Exhibits to the Plan are incorporated into and are a part of the Plan as if set forth in full therein.

**III.**

**PLAN CONFIRMATION DEADLINES**

The Bankruptcy Court has not confirmed the Plan described in this Disclosure Statement. Accordingly, the terms of the Plan are not binding on anyone.  However, if the Bankruptcy Court confirms the Plan, then the Plan will be binding on the Debtor(s), the Plan Trustee, and on all Creditors and Interest Holders in such Cases.

**3.1    Time and Place of the Confirmation Hearing.**

The hearing where the Bankruptcy Court will determine whether or not to confirm the Plan will take place at 411 West Fourth Street, Santa Ana, CA 92701-4593 on October 24, 2011, at 9:30 a.m. in Courtroom 5A.

**3.2    Deadline for Voting for or Against the Plan.**

If you are entitled to vote, it is in your best interest to timely vote on the enclosed ballot and return the ballot to:

> Winthrop Couchot Professional Corporation
> 660 Newport Center Drive, Suite 400
> Newport Beach, CA 92660

MAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v3-SCC_Group_I_VD_DS.DOC

1

                       Facsimile:  (949) 720-4111
                       Attn:  P.J. Marksbury

2

Your ballot must be **received by**  September 26, 2011**,** or it will not be counted.

3

    **3.3**     **Deadline for Objecting to the Confirmation of the Plan.**

4

Objections to the confirmation of the Plan must be filed with the Bankruptcy Court, and

5

served upon the following parties so that they are received by September 26, 2011:

6

7

8

| **Counsel to the Voluntary Debtors** | Paul J. Couchot<br>Winthrop Couchot Professional Corporation<br>660 Newport Center Drive, Suite 400,<br>Newport Beach, CA 92660 |

9

10

11

| **Authorized Agent for Voluntary Debtors** | Bruce V. Cook<br>General Counsel<br>2392 Morse Ave<br>Irvine, CA 92614-6234 |

12

13

14

| **Counsel for SunCal Management LLC and SCC Acquisitions Inc**. | Ronald Rus<br>Rus Miliband & Smith P.C.<br>2211 Michelson Drive, Seventh Floor<br>Irvine, California 92612 |

15

16

17

| **Authorized Agent for SunCal Management and SCC Acquisitions, Inc**. | Bruce V. Cook<br>General Counsel<br>2392 Morse Ave<br>Irvine, CA 92614-6234 |

18

    **3.4**     **Identity of Person to Contact for More Information Regarding the Plan.**

19

Any interested party desiring further information about the Plan should contact the

20

Voluntary Debtors' counsel, Winthrop Couchot Professional Corporation, 660 Newport Center

21

Drive, Suite 400, Newport Beach, CA 92660, Attn:  Paul J. Couchot, (949) 720-4100; Peter W.

22

Lianides, (949) 720-4155; Payam Khodadadi, (949) 720-4160.

23

    **3.5**     **Disclaimer.**

24

The information contained in this Disclosure Statement is provided by the SunCal Plan

25

Proponents.  The SunCal Plan Proponents represent that everything stated in this Disclosure

26

Statement is true to the best of their knowledge.  The Bankruptcy Court has not yet determined

27

whether or not the Plan is confirmable and makes no recommendation as to whether or not you

28

should support or oppose the Plan.

MAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-
SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v3-SCC_Group_I_VD_DS.DOC

1    The discussion in this Disclosure Statement regarding the Group I: Voluntary Debtors may

2    contain "forward looking statements" within the meaning of the Private Securities Litigation

3    Reform Act of 1995.  Such statements consist of any statement other than a recitation of historical

4    fact and can be identified by the use of forward looking terminology such as "may," "expect,"

5    "anticipate," "estimate," or "continue," or the negative thereof or other variations thereon or

6    comparable terminology.  The reader is cautioned that all forward looking statements are

7    necessarily speculative and there are certain risks and uncertainties that could cause actual events

8    or results to differ materially from those referred to in such forward looking statements.  The

9    liquidation analyses, distribution projections, projections of financial results and other information

10    are estimates only, and the timing, amount and value of actual distributions to Creditors may be

11    affected by many factors that cannot be predicted.  Therefore, any analyses, estimates, or

12    projections may or may not turn out to be accurate.

13    The SunCal Plan Proponents and their professionals have made a diligent effort to identify

14    in this Disclosure Statement all Litigation Claims, including claims for relief, counterclaims, and

15    objections to claims.  However, no reliance should be placed on the fact that a particular Litigation

16    Claim is or is not identified in this Disclosure Statement.  The Group I: Voluntary Debtors or other

17    parties in interest may seek to investigate, file and prosecute Litigation Claims after the

18    Confirmation Date, or the Plan Trust may seek to do so after the Effective Date of the Plan whether

19    or not the Litigation Claims are identified in this Disclosure Statement.

20    **IV.**

21    **FACTUAL BACKGROUND OF THE DEBTORS**

22    **4.1    The Formation of the Debtors and the Projects.**

23    **4.1.1    Overview of the Debtors and their Projects.**

24    The Group I: Voluntary Debtors are four of twenty-six entities (collectively the "Debtors")

25    that were formed pursuant to a joint venture between Affiliates of the SunCal Companies

26    ("SunCal") and the Lehman Entities (the "SunCal/Lehman Joint Venture"). The Debtors role in the

27    venture was to own and develop the large residential projects that were the core assets in this joint

28    undertaking.

1    At the inception of SunCal/Lehman Joint Venture, it was agreed that SunCal would be the

2  developer/manager of the Projects and the Lehman Entities would provide the necessary capital.

3  Attached hereto as Exhibit "1" is a general description of the Debtors' Projects, including the

4  ~~Group II~~Group I: Voluntary Projects, and the Debtors' other primary Assets, excluding Cash and

5  the Litigation Claims, and a description of the loans for the Projects that are not a part of ~~Group~~

6  ~~II~~Group I: Voluntary Projects.

7    All of the Debtors are Affiliates of Acquisitions and SCC LLC.  Some of the Debtors

8  directly own the Projects, while others serve as holding companies, owning Allowed Interests in the

9  Debtors that hold title to the Projects.  SunCal Management, LLC, a SunCal Affiliate, has

10  management contracts with respect to all of the Projects and manages the Debtors' day-to-day

11  business affairs.

12    The seventeen Debtors who are referred to herein as the "Voluntary Debtors" are wholly

13  owned by SunCal Affiliates, and consequently the SunCal Affiliates have full corporate

14  governance authority over these entities.  The Voluntary Debtors own eleven (11) of the Projects.

15  In the case of the nine Trustee Debtors, the SunCal Affiliates and the Lehman Affiliates initially

16  shared ownership equally (50% each). However, after the Petition Date, the SunCal Affiliates

17  became the owner of hundred percent (100%) of the equity in two of the nine Trustee Debtors -

18  SunCal Heartland and SunCal Marblehead.  The Trustee Debtors own nine (9) Projects.

19  Attached hereto as Exhibit "2" is a chart that sets forth the appraised value of the Group I  Projects.

20  This chart lists both the Lehman Lenders' value estimates and SunCal's valuation estimates.[2]

21    The Plan eliminates any potential value disputes by providing for the sale of the ~~Group~~

22  ~~II~~Group I: Voluntary Projects through an auction that is designed to yield the highest market price

23  for these assets. Accordingly, to the extent any other party believes the ~~Group II~~Group I: Voluntary

24  Projects have a greater value than the Opening Bid offered by another Qualifying Bidder, they will

25  have the opportunity to submit a Qualifying Bid (but no credit-bids will be allowed) that exceeds

26  the Opening Bid and, if they so desire, to become the Winning Bidder by offering the highest

27

28

---

[2] Values may have changed since these analyses were prepared.

1    Qualifying Bid. This market sale process will insure that the rights of all stakeholders are

2    protected.

3        **4.1.2**    **The Group I: Voluntary Debtors' Primary Secured Creditors and Their**

4    **Disputed Claims**.

5        LCPI holds the primary secured claims against the Ritter Ranch Project and the Bickford

6    Ranch Project. LCPI's secured claim against Ritter Ranch, which is secured by a first priority deed

7    of trust against this Project, is based upon the funding provided under the terms of the Ritter Ranch

8    Loan Agreement. The asserted balance due under the terms of this loan was $287,252,096.31 as of

9    March 30, 2009. LCPI's secured claim against the Bickford Ranch Project, which is also secured by

10    a first priority deed of trust, is based upon funding provided under the terms of the SunCal

11    Communities I Loan Agreement. The asserted balance due under terms of this loan was

12    $343,221,391.06 as of March 30, 2009. LCPI contends that this loan is also collateralized by liens

13    against the Acton Project and the ~~SunCal~~ Emerald Meadow Projects. However, as more fully

14    explained herein, this claim is clearly untenable in the case of the Acton Project, since Acton

15    Estates never signed the loan document that purportedly conveyed a lien to LCPI.

16        ~~**4.1.3**    **Disputed Claims and Liens.**~~

17        As discussed in detail herein, during the course of the Debtors' Cases, the Debtors initiated

18    litigation disputing the validity of Lehman's Disputed Secured Claims, and the validity, priority

19    and extent of Lehman's Disputed Liens (which includes the liens against the ~~Group II~~Group I:

20    Voluntary Projects).  This litigation was being pursued through the Lehman Adversary Proceeding

21    until this matter was stayed pursuant to a ruling by the court presiding over LCPI's Chapter 11 case

22    in New York. However, Lehman's Disputed Secured Claims are being separately contested

23    through claims objections. In addition, a lawsuit has been filed in California Superior Court against

24    certain Lehman Entities and their agents who are not in Chapter 11, based upon their post-petition

25    conduct.

26        Attached hereto as Exhibit "3" is a chart that sets forth Lehman's Disputed Secured Claims,

27    the alleged Holders of the Lehman Disputed Secured Claims, the collateral encumbered by the

28    Lehman Disputed Liens, and the alleged outstanding amount based on the filed Proofs of Claim.

As the chart indicates, LCPI has filed claims in the following amounts against the Group I: Voluntary Debtors:  $287,252,096 against Palmdale Hills, $343,221,391 against SunCal Bickford and $343,221,391 against Acton Estates. Lehman ALI has also filed a claim in the amount of $56,494,059 against SunCal Bickford based upon an alleged second lien held against the Bickford Ranch.

**4.1.3    A Summary of All of the Alleged Claims Against the Group I: Voluntary Debtors.**

Attached hereto as Exhibit "4" is a chart that sets forth the prepetition Claims that have been asserted against all of the Debtors.  In summary, the asserted Claims against the Group I: Voluntary Debtors consist of the following:

| Claims | Palmdale Hills | SunCal Emerald | SunCal Bickford | Acton Estates |
|---|---|---|---|---|
| Unpaid Secured Real Property Tax Claims | $3,008,044 | $798,256 | $9,467,165 | $463,325 |
| The Disputed Lehman Secured Claims | $287,252,096 | $343,221,391 | $343,221,391 $56,494,059 | $343,221,391 |
| Alleged Mechanic Lien Claims | $993,755 | $1,242,582 | $3,477,120 | $0 |
| Administrative and Priority Claims | $1,488,092.57 | $597,552.42 | $1,026,274.97 | $199,052.10 |
| General Unsecured Claims Including alleged Bond Claims | $34,273,437 | $7,302,777 | $3,637,402 | $1,435,314 |

The SunCal Plan Proponents believe that these balances will ultimately be reduced through the Lehman Adversary Action, the Contract Action, and the Lehman Claims Objections resulting in lower "Allowed" claims balances.

**4.1.1  4.1.4    Summary of the Group I: Voluntary Debtors' Cash.**

The following chart sets forth the Group I: Voluntary Debtors' cash-on-hand as of July~~anuary 3~~ 1, 2011.

|  DEBTORS |  | AMOUNT |
|---|---|---|
| 1. Palmdale Hills - ELR Escrow | $ | 198,445.98~~201,805.57~~ |
| 2. Palmdale Hills | | 16,855,262.09~~61,677.73~~ |
| 3. Palmdale Hills | | 404,922.11,~~634.80~~ |
| 4. Palmdale Hills (Funds Control Account) | | 2,717,486.22~~151.17~~ |
| 5. Palmdale Hills | | 343,000.00 |
| 6. SunCal Bickford | | 456,499.54~~1,105,003.87~~ |

MAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v3-SCC_Group_I_VD_DS.DOC

| | | |
|---|---|---|
| 7. SunCal Emerald | | $3,172,677,825.57 |
| 8. Acton Estates | | $0.00 |
| **Group I: Voluntary Debtors' Total** | | **$21,646,098.71$20,978,788.61** |

Although the Lehman Lenders have alleged that they hold liens on the above cash, a preliminary review of the applicable lien documents indicates that most of the alleged liens were not validly perfected.  As set forth in Section 5.3.2 below, the Voluntary Debtors and the Lehman Entities have entered into various stipulations which identified the "Alleged Unencumbered Accounts" to include the accounts set forth above as numbers 3, 5, 6, 7 and 8.  This means that these liens can be avoided, allowing the unsecured creditors recourse to these funds.  Moreover, even if the liens against these accounts were properly perfected, the amount secured by these liens, and their priority and their enforceability will be subject to the results of the Lehman Claim Objections and the Lehman Adversary Proceeding.

**4.2 Factual Circumstances Leading to the Filing of the Debtors' Chapter 11 Cases.**

**4.2.1    Introduction.**

In this section of the Disclosure Statement, the ~~SunCal Proponent~~SunCal Plan Proponents have provided a brief description of the relationship between the Debtors and the Lehman Entities. This background is relevant to the Group I: Voluntary Debtors, and in fact all of the Debtors, for the following reasons. First, most of the unsecured claims asserted against the Debtors were incurred at the insistence of the Lehman Lenders, and they would have been paid if the Lehman Lenders had honored their obligation to pay these claims. Second, a substantial part of claims that the Lehman Lenders failed to pay are being asserted against *all of the Debtors*. If the litigation against the Lehman Lenders discussed herein is successful, it will, at a minimum, reduce the pool of claims against the Group I: Voluntary Debtors, and thereby increase the dividend payable to the remaining creditors. Third and finally, this history allows the Creditors to take the measure of the parties who are now proffering the competing plan – the Lehman Lenders.  As the within discussion will establish, the Lehman Lenders failed to pay the claims of Creditors prepetition, the Lehman Lenders attempted to foreclose upon the ~~Group II~~Group I: Voluntary Projects post-petition in order to deny the unsecured creditors any recovery on the claims they failed to pay, and finally, when this foreclosure effort failed, the Lehman Lenders attempted to destroy the Debtors'

1    reorganization and sale efforts by manipulating LCPI's alleged automatic stay. ~~The SunCal Plan~~

2    ~~Proponents believe that this history will lead the Creditors to conclude, when weighing the merits~~

3    ~~of the Lehman Lenders Plan offer: "Fool me once shame on you, fool me twice shame on me."~~

### 4.2.2    Background of the SunCal Companies.

SunCal is a family-owned and operated real estate business that has been successfully developing properties throughout the western United States for over 70 years.  SunCal's business focuses upon the "development" of residential land. A typical SunCal development begins with the acquisition of one or more parcels of raw land. Thereafter, the SunCal team develops a master plan for the acreage that incorporates streets, homes, parks, schools and commercial areas, and then it works with the applicable municipal planning authorities (the city, county, state and federal) to secure the necessary approvals or "entitlements" to gain approval of this plan. This process, which requires the assistance of land planners, civil engineers, architects, lawyers, and other land specialists, takes a period of years. Once the master plan is approved, SunCal provides for the grading of the project and the installation of the foundational infrastructure (streets, utilities, etc.) and then sells the lots or parcels within the project to merchant builders.

### 4.2.3    The Origins of the SunCal/Lehman Joint Venture.

SunCal historically financed its projects with loans and/or equity from a number of different sources.  However, beginning in 1997, an increasing number of SunCal's projects were financed by the Lehman Entities, as Mark Walsh ("Walsh"), the head of LBHI's Global Real Estate Group, began cultivating a business relationship with SunCal's principals.

By 2003, the Lehman Entities and SunCal had entered into joint ventures involving approximately fifteen projects.  By 2007, that number had grown to over forty, and the Lehman Entities had become, with limited exceptions, the exclusive provider of financing for the SunCal Projects pursuant to a written agreement executed in 2006.  The Lehman Entities also consisted of the Lehman Equity Members that either directly or indirectly owned a fifty percent (50%) equity interest in all nine of the Trustee Debtors.

In their dealings with SunCal, the Lehman Representatives made no distinction between Projects financed by Lehman ALI and Projects financed by LCPI. They also made no distinction

MAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-
SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v3-SCC_Group_I_VD_DS.DOC

1   between the Debtors in which Lehman Equity Members held 50% equity memberships or the

2   Debtors in which the Lehman Entities held no equity membership interest.  As agents of the

3   financial partner in the parties' joint venture, the Lehman Representatives would determine which

4   Lehman Entity would provide financing on which Projects, and would dictate the structure that the

5   financing would take, according to whatever suited the Lehman Entities' needs.

6   ### 4.2.4   Lehman's Effective Control over the Management of the Debtors and

7   ### Promises of Ongoing Funding.

8          Prior to the market downturn in the middle of 2007, Lehman Representatives afforded

9   SunCal substantial discretion in the management and development of the Projects.  The Debtors

10  would contract with third-party vendors to perform grading, health and safety compliance,

11  construction, landscaping, and other necessary services on the Project sites, and they would work

12  with the local municipalities to obtain the necessary entitlements and other authorizations

13  necessary to proceed with development.  The Lehman Representatives, SunCal and the Debtors

14  would discuss anticipated quarterly expenditures at periodic budget meetings, and , as expenses

15  were incurred each month, SunCal and the Debtors would submit requests for payment to the

16  Lehman Representatives, supported by the necessary documentation. The Lehman Representatives

17  would then provide the funding necessary to pay these expenses.

18         During the third quarter of 2007, the foregoing management and payment dichotomy

19  changed, after the real estate market experienced a sudden downturn, and many of the Projects

20  significantly declined in value.  In response to this dramatic economic change, a series of high

21  level discussions occurred between SunCal's representatives and the Lehman Representatives --

22  including Walsh, Paul Hughson ("Hughson") and Frank Gilhool ("Gilhool"), the Managing

23  Directors of Lehman's Global Real Estate.  In these discussions, SunCal's representatives, acting

24  on behalf of the Debtors, expressed concerns about the loans on the Projects being out of balance,

25  and suggested shutting down the Projects, or at least slowing the pace of development.  However,

26  Walsh specifically instructed SunCal not to slow down or stop work.  He assured SunCal that the

27  Lehman Entities would provide the necessary funding to pay vendors and to keep the development

28  of the Projects moving forward.

MAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-
SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v3-SCC_Group_I_VD_DS.DOC

1    The foregoing assurances of payments were confirmed in numerous telephone

2    conversations between Gilhool and SunCal's COO, Frank Faye ("Faye"), and/or SunCal's General

3    Counsel, Bruce Cook ("Cook") that took place during 2007 and 2008. In each exchange, Gilhool

4    assured SunCal that the Lehman Entities were committed to funding the debts and obligations

5    being incurred at the Projects and they continued to insist that work proceed.

6    During this time frame, the Lehman Representatives became much more "hands on,"

7    scrutinizing and approving all budgets and expenses through a new control and approval structure.

8    Under the new structure, SunCal would submit budgets to the Lehman Representatives on a

9    weekly basis and explain, during period conference calls, what Project payables they believe had to

10    be paid and what work had to be performed on the Projects. The Lehman Representatives would

11    then unilaterally decide what future work would proceed, the Lehman Representatives would

12    authorize the work and the Lehman Representatives would decide what payables would be paid

13    timely by designating them as "urgent," and what other payables were not urgent and hence would

14    not be paid on a timely basis. However, even under this new Lehman controlled management and

15    payment regime, the Lehman Representatives made it clear that all payables being incurred would

16    be funded.

17    **4.2.5    The 2008 Restructuring Agreement.**

18    By the fall of 2007, both SunCal and the Lehman Representatives contemplated entering

19    into a restructuring agreement in the near term, with a closing to occur no later than January or

20    February of 2008.  However, this transaction was delayed by the Lehman Entities' extensive

21    documentation demands until May 23, 2008. On this date, SunCal and most of the Debtors finally

22    entered into an omnibus "Restructuring Agreement" with LBHI, Lehman ALI and the other

23    Lehman Entities.  The same Lehman Representative signed the Restructuring Agreement on behalf

24    of all of the Lehman Entities.

25    Pursuant to the Restructuring Agreement, Lehman ALI, "as the Lender with respect to each

26    Loan," committed, among other things, to: (1) make advances under existing loans to fund the

27    continuing costs necessary to preserve the value of the Projects; (2) move forward to resolve the

28    accrued outstanding subcontractor payables, i.e., to make sure that the Projects' creditors were paid

1  for their work; and (3) to close the transaction, whereby newly-created Lehman Entities would

2  assume the debt and obligations of the Projects.

3         As originally executed in May 2008, the Restructuring Agreement applied to twelve of the

4  twenty Projects (as well as several other projects not at issue in the Lehman Adversary

5  Proceeding):  (1) Acton Estates; (2) Beaumont Heights; (3) Bickford Ranch; (4) Emerald

6  Meadows; (5) Heartland; (6) Johannson Ranch; (7) Marblehead; (8) Northlake; (9) Oak Valley;

7  (10) Pacific Point; (11) Ritter Ranch; and (12) Summit Valley.  The Debtors that owned and/or

8  held equity interests in the entities that owned  these Projects were signatories to the May 2008

9  agreement.[3]

10        Between May and August 2008, the parties agreed to add four additional projects to the

11  Restructuring Agreement: (1) Del Rio; (2) Joshua Ridge; (3) Palm Springs Village; and (4) Tesoro

12  Burnham, and the four Debtors associated with these Projects—SunCal Del Rio, SCC

13  Communities, SunCal PSV, and SunCal Tesoro.  Only four Projects were  not included in the

14  Restructuring Agreement: Century City, Delta Coves, Oak Knoll and Del Amo.  Accordingly, the

15  four Debtors associated with these Projects—SunCal Century City, Delta Coves, SunCal Oak

16  Knoll and SunCal Torrance— were not signatories thereto.  Lehman ALI was the lender on each of

17  these Projects and , and as with the other Projects, Lehman Ali continued to insist that these four

18  debtors  proceed with the development of the four Projects, it approved all expenses, and it

19  continually provided assurances of payment.

20              **4.2.6    The Lehman Lenders Hire Radco.**

21        Subsequent to the execution of the Restructuring Agreement, Lehman ALI arranged for a

22  third party, Radco, to directly settle outstanding contractor payables, as its agent.  Radco was

23

24  _____

    [3] Specifically, the Restructuring Agreement was entered into by, among others, the "Borrowers,"
    "Grantors" and "Pledgors," as defined in Annex 1 thereto.  The "Borrowers" included SunCal Marblehead,
25  SunCal Heartland, SunCal Northlake, SunCal Oak Valley, SJD Partners, Palmdale Hills, SCC Palmdale,
    SunCal I, SunCal III, and SunCal Bickford.

26
    The "Grantors" included SunCal Marblehead, SunCal Heartland, SunCal Northlake, SunCal Oak Valley,
27  SJD Partners, Palmdale Hills, SunCal Bickford, SunCal Acton, SunCal Summit and SunCal Emerald, and
    Debtors SunCal Beaumont and SunCal Johannson.

28
    The "Pledgors" included SCC Palmdale, SunCal I, SunCal Summit and SJD Development.

MAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-
SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v3-SCC_Group_I_VD_DS.DOC

1   provided some limited funding and authority to negotiate settlements, and did in fact reach

2   settlement with a number of creditors.  The funding for these settlements, whether the debts related

3   to Lehman ALI or LCPI funded Projects, came from the same source.  Lehman ALI and LCPI also

4   provided approval for new work on the Projects, and Lehman ALI paid for some of this work.

5   However, this funding was minimal and it soon stopped.

6          In August 2008, Lehman ALI withdrew funding and settlement authority from Radco,

7   leaving millions of dollars in outstanding contractor payables unresolved, notwithstanding the

8   contrary provisions in the Restructuring Agreement.  Leman Ali's actions also impaired the

9   Debtors' ability to resolve ongoing public health and safety issues arising at the Projects.

10  Ultimately,  only a fraction of the total outstanding payables were resolved, contrary to the  past

11  promises made by Lehman Representatives.

12          **4.2.7    <u>The Lehman Lenders' Failure to Close on the Settlement Agreement</u>.**

13          Pursuant to the terms of the Restructuring Agreement, the parties agreed to enter into a

14  Settlement Agreement, the form of which was attached to the Restructuring Agreement.  The

15  Settlement Agreement provided for the transfer of the Projects included within the Restructuring

16  Agreement to a series of -newly formed Lehman-controlled entities (each with "SCLV" in its

17  name, for "SunCal-Lehman Venture"). The agreement further provided that the entity taking title

18  to the Project would assume the  Lehman Lender debt obligations associated with the Projects,

19  assume certain bond obligations associated with the Projects, and provide indemnifications to

20  SunCal and the Debtors for unpaid claims.

21          On August 25, 2008, the Settlement Agreement and a series of related documents were

22  formally executed by SunCal and the applicable Lehman Lenders and Lehman Equity Members at

23  a meeting held in Los Angeles on August 25, 2008.  Once these documents were signed, all that

24  remained was the mechanical closing of the series of transactions described in the Settlement

25  Agreement. Since all of the conditions precedent to the closings had been satisfied, or could have

26  been satisfied at, or shortly after the meeting, this should have occurred at the August 25, 2008

27  meeting, or shortly after the meeting. However, the Lehman Representative asked SunCal to

28  extend the closing date for thirty days, to September 30, 2008. According to the Lehman

MAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-
SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v3-SCC_Group_I_VD_DS.DOC

1   Representatives, this short extension would enable them to secure certain outstanding third party

2   consents. Although SunCal knew these third party consents were readily obtainable within a few

3   days, they agreed to this extension, believing the request was made in good faith. In fact, as more

4   fully explained blow, it was not.

5          **4.2.8**    **The Lehman Lenders' Undisclosed Sale of Most of the Debtors' Loans.**

6         As explained above, the Settlement Agreement was duly executed by all parties at a formal

7   closing meeting held on August 25, 2008. When the parties signed this agreement, which was a

8   binding contract, they both represented that they both intended and had the power and capacity to

9   perform all of the obligations undertaken therein. However, in the case of the Lehman Entities, this

10  representation was later discovered to be false. When the closing occurred on August 25, 2008, the

11  Lehman Lenders had already sold the very obligations they were agreeing to assume and restructure

12  in the Settlement Agreement to Fenway Capital pursuant to a repurchase agreement.  Accordingly,

13  as of August 25, 2008, they lacked the power to perform the most essential undertakings that they

14  agreed to perform in the Settlement Agreement. Instead of disclosing this fact at the August 25,

15  2008 meeting, the Lehman Lenders requested additional time to execute the agreed upon transfers

16  provided for under this binding agreement. The Lehman Lenders needed to this delay for an

17  obvious, but undisclosed reason: They lacked the ability to perform the very obligations they had

18  just agreed to perform in the Settlement Agreement.

19        The Lehman Representatives also did not disclose at the August 25, 2008 closing that they

20  intended to sell the Pacific Point First Loan to Lehman Re, approximately a week later, *even though*

21  *this loan was also subject to the Settlement Agreement*. To the contrary, the Lehman

22  Representatives affirmatively concealed these facts from SunCal and the Debtors by asserting that

23  ownership still existed in the case of seven of the eight loans.

24          **4.2.9**    **Lehman's Foreclosure Sale and Purchase of the Pacific Point Project.**

25        At the time of the Restructuring Agreement and the Settlement Agreement were signed, the

26  Pacific Point Project, which was still owned by SJD Partners, was among the Projects included in

27  the Restructuring Agreement and the Settlement Agreement.  Pursuant to the Restructuring

28  Agreement, and as detailed in the Settlement Agreement attached thereto, SunCal, SJD Partners,

MAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-
SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v3-SCC_Group_I_VD_DS.DOC

1   and its parent company, SJD Development, all agreed that they would not interfere with Lehman

2   ALI's (or its designee's) foreclosure on the Pacific Point Project. They further agreed that a new

3   Lehman entity, LV Pacific Point, would purchase the Pacific Point Project upon foreclosure and

4   that Lehman ALI and LV Pacific Point would (a) assume SJD Partners' and SJD Development's

5   outstanding accounts payable for Pacific Point third-party vendors, (b) assume certain bond

6   liabilities associated with the Pacific Point Project, and (c) pay for the millions of dollars worth of

7   work that Lehman ALI representatives had authorized.

8           As previously stated, the Settlement Agreement was signed on August 25, 2008 by the

9   SunCal parties, including SJD Partners and SJD Development.  It was also signed by Gilhool as

10  authorized signatory on behalf of both Lehman ALI and LV Pacific Point.  As a signatory to the

11  Settlement Agreement, LV Pacific Point was required to purchase the Pacific Point Project at the

12  foreclosure sale subject to the above obligations. Consistent with this agreement, the City of San

13  Juan Capistrano executed an estoppel certificate for the benefit of SJD Partners and Lehman ALI—

14  at Lehman ALI's request—on August 26, 2008, two days before the foreclosure sale.  This

15  certificate stated, among other things, that the "Acquiring Entity [LV Pacific Point] shall by

16  operation of law become the legal successor-in-interest to Developer [SJD Partners]" under SJD

17  Partners' agreements with the City. That certificate further provided that there existed no breaches,

18  defaults, or claims under SJD Partners' agreements with the City.

19          On August 28, 2008, Lehman ALI foreclosed on the Pacific Point Project, and title was

20  transferred to LV Pacific Point at the foreclosure sale.  However, Lehman ALI and LV Pacific

21  Point failed to assume the liabilities and obligations associated with this Project as agreed.   This

22  breach of the parties' agreement, left SJD Partners without title to the Pacific Point Project, but

23  with substantial unsecured claims relating to the Project, including certain bond claims of

24  approximately $34 million.  Moreover, since Lehman Ali and LV Pacific Point have continued to

25  ignore their obligations under the above agreement, unpaid taxes, fines, and penalties have

26  continued to accrue to the detriment of the Project and these claims are being asserted against SJD

27  Partners.

28

MAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v3-SCC_Group_I_VD_DS.DOC

1    Had SunCal, SJD Partners and SJD Development known that Lehman ALI and LV Pacific

2    Point had no intention of honoring their obligations under the foregoing agreement, they never

3    would have agreed to cooperate with the foreclosure.  Instead, SJD Partners would have filed for

4    bankruptcy earlier, thereby mitigating the damages from Lehman Ali's breach, by allowing

5    creditors recourse to the value of the Project.

6    This course of conduct is relevant to the unsecured creditors of the Group I Debtors for the

7    following reason. The holders of bond claims against SJD Partners are asserting their massive

8    claims against the estates of all of the Debtors, including the estates of the Group I Debtors.

9    Accordingly, Lehman Ali's wrongs against SJD Partners directly affect the Group I Debtors' cases.

10    **4.2.10   Alvarez and Marsal Take Over Control of the Lehman Entities After**

11    **the Chapter 11 Filings of LBHI and LCPI.**

12    LBHI filed for bankruptcy in September 2008 and LCPI filed for bankruptcy in October

13    2008.  After LBHI's filing, Bryan Marsal ("Marsal") of Alvarez & Marsal ("A&M") was appointed

14    to serve as LBHI's Chief Restructuring Officer. Marsal and A&M are in charge of liquidating the

15    now defunct Lehman Entities, including Chapter 11 debtors LBHI and LCPI, and the non-bankrupt

16    Lehman Lenders (Lehman ALI, OVC, and Northlake Holdings, as well as the non-bankrupt

17    Lehman Equity Members.

18    Although A&M was not employed until after the events that occurred on August 25, 2008

19    described above, it should be noted that A&M hired the same law firm that represented the

20    Lehman Lenders in the August 25, 2008 meeting – Weil, Gotshal & Manges, LLP. Moreover, as

21    more fully explained herein, it was A&M that directed Lehman ALIi not to perform its contractual

22    obligations under the Settlement Agreement after September of 2008. Accordingly, the same

23    individuals that caused the damages to unsecured creditors by insisting upon the breach of the

24    Settlement Agreement, are now asking for their vote in the competing plan filed by the Lehman

25    Lenders.

26    LBHI's bankruptcy filing and the Lehman Lenders refusal, at A&M's direction, to close the

27    transactions provided for under the Settlement Agreement as agreed, were not small matters. They

28    severely damaged the Debtors. Although the Debtors were not proceeding with any new

-45-

MAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-
SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v3-SCC_Group_I_VD_DS.DOC

1   construction or development, the Debtors were still required to expend significant sums on site

2   security, erosion control, property taxes and other measures in order to prevent the Projects from

3   becoming a public safety hazard, and in order to avoid the loss of valuable entitlements, and to

4   mitigate penalties and fines being incurred by the Projects.  Although SunCal and the Debtors

5   repeatedly requested that the Lehman Entities pay for critical health and safety and value

6   preservation measures on the Projects, these efforts were unavailing.

7        Between October 9 and November 4, 2008, SunCal's general counsel Cook sent Robert

8   Brusco, an authorized agent of the Lehman Entities, nearly two dozen letters requesting that the

9   Lehman Lenders provide the funding necessary to address critical needs on the Projects as

10  promised.  A summary of these health and safety notices are attached hereto as Exhibit "5".  The

11  Lehman Entities ignored these requests until November 2008, when Brusco, purportedly on behalf

12  of the Lehman Lenders, delivered the message that the Lehman Lenders were unwilling to fund the

13  Projects and that, instead, they intended to foreclose on all of the Projects.

14       As a result, as set forth in Exhibit "4," there are now over 240 vendors, municipalities,

15  counties and bonding companies claiming over $400 million in work, improvements and property

16  tax claims against the Projects.  Substantially all of these sums are due to work performed or

17  bonded at Lehman's request based upon Lehman's promises of payment.

18       **4.3      The Group I: Voluntary Debtors' Potential Preferential Transfers**.

19       Attached hereto as Exhibit "6" are charts setting forth payments made to third parties

20  during the ninety (90) day time period preceding the filing of the Debtors' Chapter 11 Cases as

21  well as payments made to the Lehman Entities and to SunCal Affiliates during the one-year time

22  period preceding the filing of the Debtors' Chapter 11 Cases. In those instances where the Group I:

23  Voluntary Debtors believe there are reasonable grounds to recover these transfers, at a reasonable

24  cost, they have filed complaints.

25       The Debtors have also filed a Fourth Amended Complaint against the Lehman Entities,

26  who were the recipients of a substantial number of these transfers. This complaint includes causes

27  of action for, among other things, the recovery of the preferential payments made to the Lehman

28  Entities referenced above. As explained herein, this action is presently stayed as to LCPI.

MAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v3-SCC_Group_I_VD_DS.DOC

1    As to SunCal Affiliates, Acquisitions believes, and counsel to the Trustee has preliminarily

2    opined, that such entities either have ordinary course or new value defenses for all payments

3    received during the one-year time period preceding the Petition Dates.

4    **V.**

5    **SIGNIFICANT EVENTS IN THE DEBTORS' CHAPTER 11 CASES**

6    **5.1.    Voluntary Debtors.**

7    **5.1.1    Joint Administration of the Voluntary Debtors and the Trustee**

8    **Debtors.**

9    Since their respective Petition Dates, the seventeen (17) Voluntary Debtors have continued

10   to operate as "debtors-in-possession," subject to the supervision of the Bankruptcy Court and in

11   accordance with the Bankruptcy Code.  The Voluntary Debtors are authorized to operate their

12   businesses in the ordinary course during the Chapter 11 proceedings. Transactions outside the

13   ordinary course of business must be approved by the Bankruptcy Court.

14   The Voluntary Debtors' Cases are being jointly administered pursuant to orders entered on

15   November 19, 2008 and December 9, 2008.  The Voluntary Debtors' Cases are being jointly

16   administered with the Trustee Debtors' cases pursuant to an order entered on March 11, 2009.

17   The Voluntary Debtors have employed Winthrop Couchot Professional Corporation as their

18   general insolvency counsel, and the MB Firm as their special litigation counsel.

19   **5.1.2    The Voluntary Debtors Court Employed Professionals.**

20   The Voluntary Debtors have employed Winthrop Couchot Professional Corporation as their

21   general insolvency counsel, and the MB Firm as their special litigation counsel in the Lehman

22   Adversary Proceeding and the Contract Action.  The Voluntary Debtors' Committee has employed

23   Irell & Manella LLP as its counsel pursuant to an order entered on February 13, 2009.

24   Pursuant to the Court's Order regarding joint administration of the Voluntary Debtors, the

25   Voluntary Debtors' liability for professional fees is joint and several among the Voluntary Debtors'

26   Estates for fees incurred related to services for the benefit of all of the Voluntary Debtors.  The

27   Trustee Debtors' liability for professional fees is not joint and several.

28

MAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-
SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v3-SCC_Group_I_VD_DS.DOC

1    Pursuant to the initial MB Firm employment application, Acquisitions was responsible for

2    the payment of their fees until December 31, 2009.  The MB Firm's application also allows for

3    payments from the Bond Companies.  The initial MB Firm employment application reserved the

4    right, should the Lehman Adversary Proceeding result in a benefit accruing to a particular Debtors'

5    Estates, to request that its fees and expenses be reimbursed by the Debtors' Estates.  The Bond

6    Companies have also agreed to jointly fund a portion of the professional fees and expenses of the

7    MB Firm with respect to the Lehman Adversary Proceeding.  The Bond Companies' funding

8    commitment can be terminated and after such a termination they will only be required to cover fees

9    and costs incurred during the period of their prior commitments.

10    The MB Firm employment application was subsequently amended.  Pursuant to an order

11    entered on April 14, 2010, (1) the Voluntary Debtors will pay up to one-half of the fees and

12    expenses incurred by the MB Firm from and after February 1, 2010 onward; and (2) the Trustee

13    Debtors do not have an obligation to pay any of the MB Firm's fees pertaining to the Trustee

14    Debtors' estates, unless and until a loan by the Voluntary Debtors to the Trustee Debtors is agreed

15    to by the Trustee and approved by the Court, or in accordance with the terms of the original

16    employment applications to the extent not superseded or modified by the amended employment

17    application.  The order does not affect the MB Firm's right to seek payment from the Bond

18    Companies without the need for an additional order of the Court.

19    The MB Firm filed an updated application seeking to further amend their employment to

20    include the right to pursue certain claims against the Lehman Entities and certain employees and

21    agents of these entities on behalf of the Voluntary Debtors.  The claims encompassed by this

22    amendment include claims that are based upon both prepetition and post-post petition actionable

23    conduct under both state law and federal law against the Lehman Entities and/or their agents.

### 5.1.3    LCPI's Motions for Relief from the Automatic Stay Against Certain of the Voluntary Debtors' Projects and Related Appeals.

26    On January 23, 2009, LCPI and Lehman ALI filed various motions for relief from the

27    automatic stay against a number of the Voluntary Debtors including Group I Debtors Palmdale

28    Hills, SunCal Bickford and Acton Estates (the "Lehman Entities' Stay Motions").  Although the

MAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v3-SCC_Group_I_VD_DS.DOC

1    Debtors, were able to defeat these motions, they are relevant in the following respect. Had the

2    motions filed by LCPI and Lehman Ali succeeded, it is almost certain that unsecured creditors

3    would have received nothing on their claims. Moreover, as more fully explained herein, since

4    Lehman Ali and LCPI did not even own the loans they were seeking to foreclose upon, these

5    motions should never have been filed in the first instance. Yet now, these same parties- Lehman

6    Ali and LCPI – are asking these same creditors to vote on their plan and to "trust" them.

7    **5.2.    The Trustee Debtors and Their Professionals.**

8    Orders for Relief were entered in the involuntary cases beginning on January 6, 2009.  The

9    Trustee Debtors are represented by their duly-appointed Chapter 11 Trustee, Mr. Steven M. Speier

10   pursuant to orders of the Bankruptcy Court entered on January 15, 2009.

11   The Chapter 11 Trustee has employed the Lobel Firm as the Chapter 11 Trustee's general

12   insolvency counsel and the MB Firm, as special litigation counsel and Squar Miller, LLP as its

13   accountants.

14   The Trustee Debtors' Committee has employed Weiland, Golden, Smiley, Wang Ekvall &

15   Strok as its general insolvency counsel.

16   **5.3.5.2.The Debtors' Various Motions Relating to Financing for the Projects and to**

17          **Pay Professional Fees.**

18          **5.2.1    The Voluntary Debtors' Initial Motion for Surcharge and Use of Cash**

19          **Collateral.**

20   On January 16, 2009, seven of the Debtors, including Group I Debtor Palmdale Hills, filed

21   a motion authorizing Palmdale Hills to use and surcharge, pursuant to 11 U.S.C. § 506(c), and/or

22   use the purported cash collateral of LCPI arising from the Ritter Ranch Loan Agreement, pursuant

23   to 11 U.S.C. § 363(c)(2), in order to pay for the reasonable and necessary maintenance expenses

24   required to preserve the value of such Debtors' Projects subject to deeds of trust and other security

25   interests held by LCPI.

26   LCPI objected to the motion and subsequently filed a motion in its own Chapter 11

27   proceeding in the Southern District of New York seeking an order barring the motion as a violation

28   of the automatic stay.  Although the Debtors believe that LCPI's stay was not violated in any way

1  by the Motion, the Motion was taken off calendar prior to any ruling by the New York Bankruptcy

2  Court, based upon the threat of sanctions made against Debtors' counsel by the presiding judge in

3  LCPI's case.

4         As explained above, LCPI did not even own an interest in the Ritter Ranch Loan

5  Agreement when it asserted the automatic stay, since the Ritter Ranch Loan Agreement, which was

6  the subject of the cash collateral motion, had already been sold pursuant to the Fenway Repurchase

7  Agreement. Yet this wrongful action prevented Palmdale Hills from using its own money to pay

8  critical bills that Lehman ALI~i, LCPI's parent was contractually required to fund in the first

9  instance.

10         **5.2.2**    **The Voluntary Debtors' Agreements with the Lehman Entities for Use**

11              **of Alleged Cash Collateral to Maintain the Properties and to Pay Professional Fees**.

12         On September 1, 2009, with the consent of the Lehman Entities, fourteen of the Voluntary

13  Debtors filed a motion authorizing surcharge pursuant to 11 U.S.C. § 506(c), and/or use of the

14  purported cash collateral for the purpose of addressing critical public health and safety issues and

15  other value preservation with respect to the Debtors Projects.  On September 10, 2009, the Lehman

16  Entities filed an opposition thereto, and on September 17, 2009, the Voluntary Debtors filed their

17  Reply.

18         Subsequently, the Voluntary Debtors learned that the Lehman Entities lacked control

19  agreements as to the majority of the depository accounts, and thus such accounts were not subject

20  to perfected liens and therefore did not constitute "cash collateral."  On October 15, 2009, the

21  Voluntary Debtors filed a *Motion For Order Authorizing Disposition Of Certain Depository*

22  *Accounts*.  On or about October 22, 2009, the Lehman Entities filed an opposition, and on October

23  29, 2009, the Voluntary Debtors filed their Reply.

24         The motion was consensually resolved by way of the *Stipulation Pursuant To 11 U.S.C. §§*

25  *362, 363, And 364: (1) Authorizing The Use Of Cash Collateral And Alleged Unencumbered Cash;*

26  *(2) Approving Postpetition Financing; (3) Providing Administrative Expense Status; And (4)*

27  *Modifying Automatic Stay To The Extent Necessary* filed on December 8, 2009, and the order

28  thereon entered on December 17, 2009.  The stipulation provides for a 120-day budget with

1    expenses totaling approximately $5 million, pursuant to which any Cash in the Estates is used first

2    and then money borrowed from the Palmdale Hills Estate is used thereafter on an administrative

3    basis.  The agreement also permitted the Voluntary Debtors to use their alleged unencumbered

4    cash to pay its professional fees.  This agreement has been renewed on several occasions.

5           5.4.5.3.    **The Debtors' Disputes and Claims Against the Lehman Entities.**

6           **5.3.1    The Lehman Adversary Proceeding.**

7           On January 6, 2009, the Voluntary Debtors initiated the Lehman Adversary Proceeding by

8    filing their initial complaint against Lehman ALI for equitable subordination of Lehman ALI's

9    Disputed Claims and avoidance of its Disputed Liens pursuant to Bankruptcy Code Section 510(c).

10    On February 3, 2009, the Debtors filed a First Amended Complaint, which added the Trustee

11    Debtors as co-plaintiffs and added various other causes of action.  The First Amended Complaint

12    also named OVC Holdings, Northlake Holdings and various other entities as defendants.

13           Pursuant to a hearing on a motion to dismiss held on June 11, 2009, the Bankruptcy Court

14    granted the Debtors leave to amend the second amended complaint.  Thus, on July 10, 2009, the

15    Debtors filed their Third Amended Complaint.  The Third Amended Complaint addressed many of

16    the concerns raised by the Bankruptcy Court and also included various Avoidance Actions and

17    other causes of action against the Lehman Lenders and the Lehman Successors.  The Third

18    Amended Complaint also added Fenway Capital as a defendant based upon, the discovery of the

19    facts relating to the sale of the loans Fenway Capital and based upon the Court ruling that the Repo

20    was a true sale.

21           On September 30, 2009, the Lehman Entities filed a motion to dismiss the Third Amended

22    Complaint (which motion was amended on October 7, 2009 and October 22, 2009), alleging that

23    the relief requested by certain Debtors was not available as a matter of law.  On September 30,

24    2009, Fenway also filed a motion to dismiss the Third Amended Complaint.  On January 26, 2010

25    and January 28, 2010, the Debtors filed oppositions to the motions to dismiss the Third Amended

26    Complaint filed by the Lehman Entities and Fenway, respectively.  On February 4, 2010, the

27    Lehman Entities and Fenway filed their respective replies.  The Court entered an order granting in

28    part and denying in part the relief requested in the motions to dismiss. Most notably, the Court

denied  the defendants' request for the dismissal of  the equitable subordination claims and the

Court permitted the Debtors to file an amended complaint.  LCPI was dismissed as a defendant at

this hearing, due to the fact that it did not own any interest in the loans at issue and due to potential

impact of the case upon LCPI's automatic stay.  On March 26, 2010, the Debtors filed their Fourth

Amended Complaint. The following is a summary of the causes of action set forth in the Fourth

Amended Complaint:

### 5.3.1.1    Equitable Subordination.

Based on the pre-petition inequitable conduct of the Lehman Entities, summarized in

Section 4.2, the Debtors have sought to subordinate the claims and avoid the liens of the Holders

of the Lehman Disputed Loans to the extent necessary to pay the Claims of unpaid Creditors that

were damaged by the inequitable conduct.

### 5.3.1.2    The Fraudulent Transfer Claims.

The fraudulent conveyance claims set forth in the Fourth Amended Complaint include the

following:

A.    Acton Estates asserts a fraudulent conveyance claim against Fenway (as a non-

debtor success to LCPI) in order to avoid a lien in the amount of $342,841,322.

B.    SunCal Bickford asserts a fraudulent conveyance claim against Fenway (as a non-

debtor success to LCPI) in order to avoid a lien in the amount of $168,651,104.

C.    Acton Estates asserts a fraudulent conveyance claim against Fenway (as a non-

debtor success to LCPI) in order to avoid a lien in the amount of $342,841,322.

D.    SunCal Emerald asserts a fraudulent conveyance claim against Fenway (as a non-

debtor success to LCPI) in order to avoid a lien in the amount of $298,457,533.

E.    SunCal Bickford asserts a fraudulent conveyance claim against LCPI (as a non-

debtor success to LCPI) in order to avoid a lien in the amount of $168,651,104.

### 5.3.1.3    The Preference Claims.

The preference claims set forth in the Fourth Amended Complaint include the following: Transfers

made to a Lehman Entity by a Debtor, where such Debtor was either owned by a Lehman Equity

Member (50%) or where a Lehman Equity Member of Lehman Entity controlled such Debtor at the

1    ~~time of the transfer.  Furthermore, according to the Lehman Lenders' appraisals submitted on the~~

2    ~~Projects of these Debtors, all of the loans were vastly under-secured at the time of the transfers.~~

3    ~~On April 12, 2010, the Lehman Entities filed a motion to dismiss the Fourth Amended Complaint~~

4    ~~(as well as a related motion to strike portions of the same).  On that same date, the Lehman Entities~~

5    ~~and Fenway, respectively, also filed answers to the Complaint denying the causes of actions set~~

6    ~~forth in the Fourth Amended Complaint and alleging certain affirmative defenses.  This action is~~

7    ~~presently stayed as against LCPI.~~

8                **5.3.2    The Debtors' Motions to Strike the Claims and Pleadings Arising from**

9                              **the Sold Loans to Fenway Capital and Related Appeals.**

10   ~~**5.3.1.4**~~

11        Once the Debtors discovered that the Lehman Lenders had misrepresented their ownership

12   of seven loans– the loans sold to Fenway Capital back in August of 2008 - they filed motions, on

13   May 29, 2009, seeking an order striking the claims that were filed with respect to these sold (the

14   "Fenway Sold Loans").  The Fenway Sold Loans included the SunCal Communities I Loan

15   Agreement, the Ritter Ranch Loan Agreement, the SunCal PSV Loan Agreement, the SunCal

16   Marblehead/SunCal Heartland Loan Agreement, the Delta Coves Loan Agreement, the SunCal

17   Northlake Loan Agreement and SunCal Oak Valley Loan Agreement.  See Exhibit "3."

18        At the initial hearing on the Debtors' motion to strike the Claims held on June 30, 2009, the

19   Court held that the transfer of the Fenway Sold Loans pursuant to the MRA was a true purchase and

20   sale transaction (the "Ownership Issue") and, accordingly, the Lehman Lenders retained no right to

21   file the Proofs of claim on this basis, under Federal Rule of Bankruptcy Procedure 3001(e)(1).  The

22   Court entered an order regarding the Ownership Issue on October 2, 2009.

23        The Lehman Lenders also contended that they were entitled to file the Proofs of Claim as the

24   "Fenway's authorized agent" under Federal Rule of Bankruptcy Procedure 3001(b) (the "Agency

25   Issue").  A continued hearing on the Agency Issue was set for September 22, 2009 and the Court

26   ruled that the Lehman Lenders could file the Proofs of Claim <u>as</u> ~~an~~ authorized agents.

27

28

MAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOC<del>MAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOC</del><del>MAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOC</del><del>MAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOC</del><del>MAINDOCS-#163407-v3-SCC_Group_I_VD_DS.DOC</del>

1    The Lehman Entities appealed the Ownership Issue and the Debtors appealed the Agency

2  Issue to the Bankruptcy Appellate Panel.  These two appeals, which were consolidated, were

3  argued in September of 2010. The parties are awaiting a ruling.

4    ### 5.3.3    The Debtors' Motion Pursuant to Section 506(d) and the 506(d)

5    ### Valuation Stipulation.

6  **5.3.1.5**

7    Bankruptcy Code Section 506(a) provides that an asserted Secured Claim is only an

8  Allowed Secured Claim to the extent of the value of such Creditor's interest in the Estate's interest

9  in such property.  Bankruptcy Code Section 506(d) then provides that liens against the Debtor's

10  Assets that have no such value to the Alleged Secured Creditor are void.  Finally, Bankruptcy Code

11  Section 551 provides that such liens that are void under Section 506(d) are preserved for the

12  benefit of the applicable Debtor's Estate.

13    On May 29, 2009 and June 9, 2009, the Debtors filed a motion seeking orders (i) valuing

14  certain collateral at zero dollars, (ii) voiding the corresponding liens, pursuant to 11 U.S.C. §

15  506(d), and (iii) preserving such voided liens for the benefit of the respective bankruptcy estates.

16    The Debtors and the Lehman Entities subsequently entered into a stipulation to resolve the

17  valuation of such Liens. This stipulation provided that these liens would be valued at zero for all

18  purposes, with the exception of potential equity distributions. Although the Lehman Entities

19  acknowledged the stipulation on the record before the bankruptcy court, and promised to file the

20  executed stipulation that day, counsel for the Lehman Entities subsequently refused to file the

21  document disclosed to the Court on the record, and the parties have subsequently entered into a

22  modified stipulation on substantially similar terms that have been filed with both the New York

23  and California Bankruptcy Courts.

24    ### 5.3.4    Lehman 502(d) Objection and Objection to Lehman's Claim Against

25    ### Acton.

26    **5.3.1.6**

27

28

MAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v3-SCC_Group_I_VD_DS.DOC

The Voluntary Debtors and other parties-in-interest have filed a motion to disallow, pursuant to 11 U.S.C. § 502(d), a number of Disputed Claims filed by Lehman ALI and LCPI, including the following claims filed in the cases of the Group I: Voluntary Debtors:

| Disputed Proof of Claim No. | Debtor | Claim Holder | Claim Amount |
|---|---|---|---|
| 6 | SunCal Emerald Meadows | LCPI | $343,221,391 |
| 6 | Acton Estates | LCPI | $343,221,391 |
| 16 | SunCal Bickford | LCPI | $343,221,391 |

In summary, the Group I Debtors allege in the Lehman 502(d) Objection that the Lehman Entities received prepetition transfers that are avoidable under certain sections of the bankruptcy code.

The Lehman Entities oppose the 502(d) Objection, inter alia, on the following grounds:

(1)    SunCal Management allegedly lacks standing to object to claims in the Trustee Debtor cases.  However, Section 502 provides that any party in interest may object to claims.

(2)    Disallowance is allegedly premature because there has been no judicial determination of the avoidance liability.  However, the only "judicial determination" necessary to invoke section 502(d) is that the objecting party have established a prima facie case for avoidance.  Courts have repeatedly characterized disallowance under Section 502(d) as temporary, pending a later ultimate determination of the avoidance claims in an adversary action.

(3)    The 502(d) objection purported violated LCPI's automatic stay. However, several courts have specifically concluded that an objection under Section 502(d) does not violate the creditor's automatic stay.  See In re Metiom, 301 B.R. 634 (Bankr.S.D.N.Y. 2003); In re PRS Ins. Group, 331 B.R. 580, 584 (Bankr.D.Del. 2005).

(4)    The 502(d) Objection allegedly fails to establish a prim facie case for avoidance.  However, applicable case law establishes that a prima facie case merely requires that the underlying avoidance allegations survive a motion to dismiss.  Here, the Court has already denied the Lehman Entities' Motion to dismiss the applicable avoidance

-55-

1    action.  Moreover, the 502(d) Objection further submits substantive evidence establishing

2    the merits of the avoidance claims.

3        (5)    The Lehman Entities argue that they would be entitled to retain liens in the

4    properties to the extent they gave value in good faith under Section 548(c). However, the

5    Lehman Entities failed to cite any authority to support their novel argument that Section

6    548(c) can defeat disallowance under Section 502(d).  The only authority on this point is

7    directly contrary to the Lehman Entities' argument.  See In re Interstate Cigar Co., Inc.,  278 B.R.

8    8 (Bankr.E.D.N.Y. 2002).

9        This objection also explains that Acton Estates never signed a loan document, in own right,

10   that would make Acton an obligor on the SunCal I Loan.  If these objections are sustained, the

11   above claims would be disallowed, unless the Lehman Entities repaid the avoidable transfers.

12   Moreover, in the case of Acton, a finding in favor of the Group I Debtors would eliminate Claim 6

13   reference above, leaving the Acton Project free of the lien asserted by LCPI as security for Claim 6

14   (based upon the SunCal I Loan.

15       On June 9, 2011, a hearing was held on the Lehman 502(d) Objection. At this hearing the

16   Lehman Entities disputed the merits of the Section 502(d) claim objection and LCPI alleged that

17   the filing of this objection violated its automatic stay. At the conclusion of the hearing, the Court

18   ruled that the parties could proceed with their discovery in this matter.

19       If the Lehman 502(d) Objection is successful, the claims of the Lehman Entities identified

20   in the table above will be disallowed. Although the Lehman Entities will have the right to seek

21   reconsideration of this disallowance, in order to obtain this relief they would have to repay the

22   applicable transfers.

23        **5.3.5    The Lehman Recoupment Objection and the ~~State Court~~Contract**

24            **Action**.

25        **~~5.3.1.7~~**

26       Pursuant to the terms of the joint ventures entered into by and among the Debtors and the

27   Lehman Entities, the Lehman Entities were responsible for paying the costs incurred in the

28   development of the Projects. These costs included the claims of the vendors who provided goods

1  and services to the Projects and the claims asserted by the Bond Claimants. Although the Lehman

2  Entities contend that they were merely "lenders," and that they did not assume any liability for

3  these claims, as the above facts and those that will be adduced prior to and at the confirmation of

4  the Plan will demonstrate, the Lehman Entities are in fact obligated to pay these claims.

5  The Debtors[1] contend that the Lehman Entities have contractual liability on various

6  grounds, including the following. First, the Lehman Entities were either in a joint venture

7  relationship with the Debtors from the outset, or this relationship developed and became a legal

8  fixture through the Lehman Entities' course of conduct. Pursuant to this relationship, and the

9  promises and representations made therein, the Lehman Entities agreed to be responsible for all

10  vendor and Bond Claims incurred at or in connection with the Projects. The role of each of the

11  Debtors, by mutual agreement, was to provide development expertise and project management

12  services. The Lehman Entities were required to provide the capital necessary to fund the Projects.

13  Second, during the last eighteen months of the relationship between the parties, the Lehman

14  Entities assumed direct responsibility for all claims incurred during this period, by insisting that

15  work continue on the Projects and by repeatedly promising to pay for this work. Since the Lehman

16  Entities ordered this work, and promised to pay for the same, they bear this financial responsibility.

17  Third and finally, the Lehman Entities expressly agreed to pay the vendor and bond claims

18  described in the Restructuring Agreement and in the interrelated Settlement Agreement, but failed

19  to do so as contractually agreed.

20  It is the ~~SunCal Proponent~~SunCal Plan Proponent's contention that the Lehman Entities'

21  failure to pay the vendor and Bond Claims associated with the Projects ~~as~~ (as was their obligation

22  under the terms of the joint ventures, the Restructuring Agreement and the Settlement Agreement)

23  unjustly shifted responsibility for these liabilities to the Debtors in breach of the terms of joint

24  venture, the Restructuring Agreement and the Settlement Agreement. Accordingly, the SunCal

25  Plan Proponents have filed the Lehman Recoupment Objection which seeks the disallowance of

26  certain claims filed by the Lehman Lenders, including the claims filed against the Group I:

27  Voluntary Debtors.

28

MAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v3-SCC_Group_I_VD_DS.DOC

1    In the Lehman Recoupment Objection, the ~~SunCal Proponent~~SunCal Plan Proponents seek

2  the following relief:

3          1) Disallowance of the claims asserted by the Lehman Lenders in their

4          entirety, pending compliance with the terms of the Restructuring

5          Agreement and the Settlement Agreement;

6          2) A reduction in the amount of the Lehman Entities' secured claims by

7          the amount of damages resulting from the Lehman Entities' breach of their

8          obligations under these agreements; and/or

9          3)  An order barring the Lehman Entities from enforcing their rights under

10          the Lehman Loans until they cure their breaches under the above

11          agreements.

12    The first prayer for relief above is premised upon the contention that the Lehman Entities

13  agreed to transfer ownership of the Projects described in this agreement, including the Group I

14  Projects, to a series of newly formed entities under the control of the Lehman Entities, pursuant to

15  the terms of the Settlement Agreement. This agreement further provided that these new entities

16  would assume the vendor payables and certain Bond Claims associated with these projects. Finally,

17  this agreement included a covenant not to sue, pursuant to which the Lehman Entities were barred

18  from seeking further recourse against the Debtors.

19    The ~~SunCal Proponent~~SunCal Plan Proponents believe that the positions asserted in the

20  Lehman Recoupment Objection are well grounded in fact and in law. Had the Lehman Entities

21  complied with their contractual obligations, substantially all of the Group I Debtor's liabilities

22  would have been eliminated, the Group I Debtors would not have had to file Chapter 11, and the

23  Lehman Entities would be barred from asserting claims against the Group I Debtors based upon the

24  Lehman Disputed Loans. It is the ~~SunCal Proponent~~SunCal Plan Proponents position that the

25  Lehman Entities' effort to enforce claims based upon Lehman Disputed Loans is directly contrary

26  to the basic agreements reached in the Restructuring Agreement and in the related Settlement

27  Agreement.

28

MAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-
SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v3-SCC_Group_I_VD_DS.DOC

1    The Lehman Entities dispute the merits of the Lehman Recoupment Objection. It the

2    Lehman Entities' position that it was within their absolute "discretion" to pay, or not to pay, the

3    vendor payables incurred during the term of the Restructuring Agreement, even where they

4    authorized the work. Accordingly, they cannot, in their assessment, be held liable for these

5    obligations. In the case of the Settlement Agreement, the Lehman Entities contend that this

6    agreement never became effective and therefore they were not bound to comply with its terms. The

7    ~~SunCal Proponent~~SunCal Plan Proponents do not believe that the positions asserted by the Lehman

8    Entities are supported by the facts, or existing law.

9    In addition to the Recoupment Claim Objections, certain Voluntary Debtors, including the

10   Group I Voluntary Debtors, have also filed the Contract Action against Lehman ALI and other

11   non-debtor Lehman Entities in Orange County Superior Court. The Contract Action is based on

12   Lehman ALI's breach of contract on the Restructuring and Settlement Agreements.  On May 9,

13   2011, the Defendants in the Contract Action filed a Notice of Removal which removed the

14   Contract Action from the Orange County Superior Court to the Bankruptcy Court, as adversary no.

15   8:11-ap-01212ES.  The Voluntary Debtor-Plaintiffs moved to remand the Contract Action back to

16   the Orange County Superior Court ("Remand Motion").  The Bankruptcy Court denied the

17   Remand Motion at the hearing on July 12, 2011.

18   ~~In addition to the Lehman Recoupment Objection, certain Voluntary Debtors have also~~

19   ~~filed the State Court Action against Lehman ALI and other non-debtor Lehman Entities. The State~~

20   ~~Court Action is based on Lehman ALI's breach of contract on the Restructuring and Settlement~~

21   ~~Agreements.~~

22   Although LCPI's automatic stay remains an impediment to the pursuit of the Lehman

23   Adversary Proceeding, the existence of this stay will not bar the ~~SunCal Proponent~~SunCal Plan

24   Proponents from implementing the material terms of the Plan for the following reason. LCPI's

25   automatic stay does not bar the pursuit of the Lehman Claim Objections or the Contract Action.  In

26   fact, these matters are proceeding in the Bankruptcy Court~~and in fact this litigation is proceeding~~.

27   If these objections are successful, the claims of the Lehman Entities will be disallowed, either in

28   whole or in part, or the Lehman Entities will be barred from pursuing these claims until they pay

what they owe to the Group I: Voluntary Debtors.  If the Contract Action is successful, it will generate a further recovery for creditors.  In either scenario, the Plan filed by the SunCal ProponentSunCal Plan Proponents is feasible and will yield a favorable return for creditors.

### 5.3.1.8  5.3.6   The Debtors' Potential Post-Petition Claims Against Lehman and Their Agents.

The Voluntary Debtors believe that the Lehman Entities and certain agents of the Lehman Entities (the "Culpable Agents") engaged in a post-petition course of conduct that severely damaged the Voluntary Debtors, their estates and the recovery rights of creditors. In summary, the actions taken by the Lehman Entities and the Culpable Agents included, among other things, the following:

A.    Actively concealing the prepetition sale of the Lehman Disputed Loans to Fenway Capital and misrepresenting themselves as the owners of these loans during the post-petition period; and

B.    Improperly asserting that LCPI's automatic stay barred actions in the Voluntary Debtors' Chapter 11 Cases relating to two of the Lehman Disputed Loans, when in fact LCPI did not own any interest in such loans and hence the stay could not apply.

The foregoing course of conduct inflicted millions of dollars in damages upon the Voluntary Debtors in the form of additional fees and costs, and it materially delayed the progress of the Voluntary Debtors' reorganization effort. The Voluntary Debtors intend to seek recourse against the Culpable Agents for these wrongs.

### 5.5.5.4.The Lehman Fenway Claims Transaction, Compromise Motion Filed By the Lehman Entities.

#### 5.4.1   Lehman Entities' and Fenway's Proposed Claims Transaction.

In April of 2010, LCPI and LBHI filed that certain *Motion Pursuant To Bankruptcy Rule 9019 For Authority To Compromise Controversy In Connection With A Repurchase Transaction With Fenway Capital, LLC And A Commercial Paper Program With Fenway Funding, LLC* (the "Compromise Motion.").  In the motion, LCPI and LBHI represented that they were "compromising" various issues and relationships arising out of the repurchase transaction

MAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v3-SCC_Group_I_VD_DS.DOC

described in the LCPI – Fenway MRA (the "Repo"). However, a careful review of the transaction described therein indicated that the motion was designed to accomplish the following objectives:

1. To transfer title to the Lehman Disputed Loans at issue in the Lehman Adversary Proceeding from Fenway Capital to LCPI, an entity that had no interest in five of the seven loans prepetition;

2. To allow LCPI, as the new owner of the Lehman Disputed Loans, to re-join the Lehman Adversary Proceeding as a defendant, and once there to use its automatic stay as a "sword" to stay this action;

3. To enable the Lehman Entities to thwart the pursuit of the SunCal Plan Proponents' Plan;

4. To bestow upon the Lehman Entities' purported competing plan an unfair advantage in the plan confirmation contest by delaying the effectiveness of critical provisions in the SunCal Plan Proponents' Plan; and

5. To shield Fenway Capital and its principals from liability and investigation through discovery.

At the hearing on the Compromise Motion, the bankruptcy court in New York approved the Compromise Motion, and stated, consistent with the objectives of the Lehman Entities, that the continued pursuit of the Lehman Adversary Proceeding would be stayed, once LCPI obtained title to the Lehman Disputed Loans. The order reflecting this relief was entered on May 13, 2010 (the "Compromise Order").

### 5.6.5.5. The Debtors' Motion for a Stay to Suspend Certain Lehman Actions.

On September 21, 2010, the Voluntary Debtors, Acquisitions, and SunCal Management filed a motion requesting, among other relief, for the Court to suspend the Lehman Entities competing plan and disclosure statement unless and until the Lehman Entities agree to provide the Debtors with relief from their automatic stay in the Debtors' Chapter 11 Cases (the "Suspension Motion"). The Court granted this motion and stayed all matters until March 1, 2011. The Court also ordered the parties to engage in a mediation. The Voluntary Debtors and the Lehman Entities were unable to settle their claims through this process.

MAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v3-SCC_Group_I_VD_DS.DOC

1    ~~5.7.5.6.~~The Debtors' Other Litigation with Non-Lehman Related Parties.

2    **5.6.1    The Rubidoux 60 Litigation and Life Church Adversary Action.**

3    Rubidoux and EMR were the plaintiffs in a lawsuit against SunCal Emerald entitled

4    *Rubidoux 60, et al. v. SunCal Emerald Meadows, LLC,* which was pending before the Superior

5    Court of the State of California for the County of Riverside as Case No. RIC 503235 (the

6    "Rubidoux Action").  The Rubidoux Action asserts causes of action against SunCal Emerald for

7    breach of contract, breach of implied covenant of good faith and fair dealings, and declaratory

8    relief.  On or about December 17, 2008, Rubidoux removed the Rubidoux 60 Action to Bankruptcy

9    Court, initiating Adv. Case No. 8:08-ap-01511-ES.  On or about May 7, 2009, the Bankruptcy

10    Court remanded the Rubidoux Action back to the Riverside County Superior Court.

11    In addition, Life Church of God in Christ ("Life Church") is the plaintiff in an adversary

12    proceeding against the Debtor entitled *Life Church of God in Christ v. Sun Cal Emerald Meadows*

13    *LLC,* which is pending before the United States Bankruptcy Court for the Central District of

14    California as Case No. 8:09-ap- 01258-ES (the "Life Church Action").  The Rubidoux Action and

15    the Life Church Action are referred to herein as the "SunCal Emerald Lawsuits."

16    The SunCal Emerald Lawsuits revolved around a planned mixed-use development project

17    in Riverside County that was to include residential, commercial, church, school, and park uses on

18    an approximate 245-acre site (the "Project").  As part of the Project, Rubidoux, EMR, SunCal

19    Emerald, the Life Church, and others, entered into a series of written agreements (the "Project

20    Agreements") regarding the transfer and/or purchase of the Project properties, the recordation of a

21    necessary subdivision map (the "I-Map"), the obtaining of entitlements, and the construction of

22    certain Project-related improvements.

23    The Parties to the SunCal Emerald Lawsuits recently entered into a Settlement Agreement,

24    which *inter alia* provided for the release of certain escrowed funds (in which the Debtor has no

25    interest), and the extension of certain deadlines under the Project Agreements with respect to the

26    finalization and recordation of the I-Map, the transfer of the Project properties, and the

27    commencement and completion dates for the construction of certain subdivision improvements

28    ("Emerald Compromise").

1   *On or about March 14, 2011, SunCal Emerald filed a Motion For An Order Approving*

2   *Compromise of Controversies with Rubidoux 60, LLC, EMR Residential Properties LLC, Mitchell*

3   *Ogron, Life Church of God in Christ, Moses Green and David Sandoval* ("Emerald Compromise

4   Motion").  SunCal Emerald and LCPI are currently in informal discussions to resolve LCPI's

5   concerns with respect to the Emerald Compromise Motion.  SunCal Emerald has extended LCPI's

6   deadline to file an opposition to the Emerald Compromise Motion to June 30, 2011.

7           The Evangelical Christian Credit Union ("ECCU") holds a lien on the "Old Church

8   Parcel" securing a loan to Life Church.  The Old Church Parcel is currently held by SunCal

9   Emerald Meadows, and is further subject to a junior lien in favor of LCPI.  ECCU has recent filed

10  a motion for relief from stay in LCPI's New York bankruptcy proceeding to allow ECCU to

11  enforce its remedies against the Old Church Parcel, which has been continued pending discussions

12  between the parties.  ECCU has not yet file a motion for relief from stay as against SunCal

13  Emerald Meadows.

14  ~~5.7.1~~ **5.6.2**     **The Debtors' Failed Preliminary Injunction Motion Against the**

15  **Holders of Bond Claims.**

16          On February 20, 2009, the Debtors filed a complaint and a Motion for Preliminary

17  Injunction, pursuant to which the Debtors sought a Motion for Preliminary Injunction against the

18  Holders of Bond Claims from pursuing such Claims. On February 23, 2009, the Court denied the

19  Debtors' request for the TRO and granted the Debtors' request to require the defendants to show

20  cause why the Motion for Preliminary Injunction should not be issued.

21          On March 2, 2009, several Holders of Bond Claims objected to the Motion for the

22  Preliminary Injunction.  The objections generally alleged that the Debtors failed to show that the

23  balancing of the equities favored granting the Preliminary Injunction versus the harm to the

24  Holders of the Bond Claims.  At a hearing held on March 4, 2009, the Court denied the

25  Preliminary Injunction Motion and the underlying complaint has subsequently voluntarily been

26  dismissed without prejudice.

27  ~~5.7.2~~ **5.6.3**     **The Contractors' Successful Motions for Relief from Stay to**

28  **Pursue the Bond Claims.**

MAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-
SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v3-SCC_Group_I_VD_DS.DOC

1    Various contractors that were hired to perform work on some of the Projects have filed

2    motions for relief from stay with the Bankruptcy Court to pursue their purported Bond Claims.

3    These creditors have requested that the Bankruptcy Court grant these creditors relief from the

4    automatic stay to allow such creditors to enforce certain Claims that such creditors allege to have

5    against some of the Debtors, including certain surety bonds that are alleged to have been issued in

6    favor of such creditors.  The Debtors opposed the motions on the grounds that the various Debtors

7    are indispensible parties.  The Court conditionally granted the motions provided that the Bond

8    Claimants are able to sever the Debtors from their proceedings on the Bonds.

9    5.7.3 **5.6.4    Bond Safeguard Motion.**

10    Bond Safeguard, a surety that issued bonds to secure the performance of work on certain

11    projects, filed a motion seeking authority to file claims against the Trustee Debtors relating to

12    these bond claims after the bar date. The Debtors opposed this motion. This motion was granted

13    pursuant to an order entered on January 7, 2011.

14    The Bond Issuers assert that surety bonds were executed on behalf of all of the SunCal

15    Debtors and the Bond Indemnitors.  However, Bond Safeguard only filed proofs of claims

16    asserting joint and several liability ("Cross-Indemnity Claims") against the Trustee Debtors.  Bond

17    Safeguard did not file any Cross-Indemnity Claims against the Voluntary Debtors.

18    **5.6.1 5.7    5.7.7    LitCo.**  As more fully explained in Article VII, pursuant to the terms

19    of the Plan, LitCo, which is a newly formed Delaware limited liability company, will be making an

20    offer to purchase the Reliance Claims held by the Reliance Claimants in Classes 6.1, 6.2, 6.3 and

21    6.4 pursuant to the Plan. LitCo will be capitalized by a third party capital partner with the funds

22    necessary to fund this claims purchase. Once the Reliance Claims are purchased, LitCo will pursue

23    these claims against the Lehman Entities. Since LitCo will be purchasing the Reliance Claims with

24    non-estate assets, the Plan Trust will not receive any part of the recoveries obtained on these

25    purchased claims.

26

27

28

MAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-
SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v3-SCC_Group_I_VD_DS.DOC

# VI.

## TREATMENT OF UNCLASSIFIED CLAIMS

**6.1** **Introduction**. As required by the Bankruptcy Code, the Plan places Claims and Interests into various Classes according to their right to priority.  However, certain types of Claims are not classified in any Classes under the Plan.  These Claims are deemed "unclassified" under the provisions of the Code.  They are not considered impaired and they do not vote on the Plan, because they are automatically entitled to specific treatment provided for them in the Code.  As such, the SunCal Plan Proponents have not placed the following Claims in a Class.  The treatment of these unclassified Claims is as provided below.

**6.2** **Treatment of Allowed Administrative Claims**.

The Code requires that all Allowed Administrative Claims be paid on the later of Effective Date of the Plan(s) or the date of their allowance, unless a particular Holder agrees to a different treatment.  The treatment of Allowed Administrative Claims is as described below.  However, such Administrative Claims are continuing to be incurred.  The Allowed Administrative Claims shall be paid from the applicable Distribution Account(s) pursuant to the LitCo Plan ~~Acquisitions Administrative~~ Loan.

**6.3    ~~Treatment and Repayment of the Lehman's Administrative Loan(s).~~**

~~The Lehman Disputed Administrative Loans shall be paid in full on the later of the Effective Date, or the date any objections to the same are overruled by the Court leaving them Allowed claims. Prior to payment, or until disallowed, these claims shall continue to be secured by their existing liens against the respective Assets of the Trustee Debtors.~~

~~The Lehman Disputed Administrative Loans shall be paid in full, on the date referenced above, from either 1) funds loaned to the Plan Trust by LitCo or another designated third, or 2) from the funds in the applicable Net Sale Proceeds Account.~~

**6.4~~6~~.3  Repayment of Allowed Administrative Claims ~~Other than the Lehman Administrative Loans~~**.

Except to the extent that the Holder of an Allowed Administrative Claim agrees to a different treatment and subject to the Administrative Claims Bar Date set forth herein, the

-65-

1   Distribution Agent shall pay each Allowed Administrative Claim in full, in Cash, on the later of

2   (i) the Effective Date, (ii) within ten (10) Business Days after the date such Administrative Claim

3   becomes an Allowed Administrative Claim, or (iii) the date such Allowed Administrative Claim

4   becomes due according to its terms. Notwithstanding the foregoing, any Allowed Administrative

5   Claim representing obligations incurred in the ordinary course of post-petition business by the

6   Debtors in Possession (including without limitation post-petition trade obligations and routine

7   post-petition payroll obligations) shall be paid in full or performed by the Plan Trustee in the

8   ordinary course of business, in accordance with the terms of the particular obligation.

9       6.56.4 **Administrative Claims Bar Date.**

10      All applications for final compensation of Professionals for services rendered and for

11   reimbursement of expenses incurred on or before the Effective Date and all other requests for

12   payment of Administrative Claims incurred before the Effective Date under Sections 507(a)(2)

13   or 507(b) of the Bankruptcy Code (except only for (i) post-petition, ordinary course trade

14   obligations and routine post-petition payroll obligations incurred in the ordinary course of the

15   Debtors' post-petition business, for which no bar date shall apply, and (ii) post-petition tax

16   obligations, for which no bar date shall apply) shall be Filed with the Bankruptcy Court and served

17   upon the Plan Trustee no later than the Administrative Claims Bar Date, unless such date is

18   extended by the Bankruptcy Court after notice to the Plan Trustee.  Any such request for payment

19   of an Administrative Claim that is subject to the General Administrative Claims Bar Date and that

20   is not Filed and served on or before the Administrative Claims Bar Date shall be forever barred;

21   any party that seeks payment of Administrative Claims that (i) is required to file a request for

22   payment of such Administrative Claims and (ii) does not file such a request by the deadline

23   established herein shall be forever barred from asserting such Administrative Claims against the

24   Debtors, the Plan Trust, their estates, or any of their property.

25      6.66.5 **Treatment of Unsecured Tax Claims.**

26      Tax Claims are certain unsecured income, employment and other taxes described by Code

27   Section 507(a)(8).  The Code requires that each holder of such a Section 507(a)(8) tax claim

28   receive the present value of such Claim in deferred cash payments, over a period not exceeding

MAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v3-SCC_Group_I_VD_DS.DOC

1  five (5) years from the petition date and that such treatment not be less favorable than the treatment

2  accorded to non priority unsecured creditors.

3  At the election of the Plan Trustee, the Holder of each Allowed Priority Tax Claim shall be

4  entitled to receive, on account of such Claim, (i) equal cash payments on the last Business Day of

5  each three-month period following the Effective Date, during a period not to exceed five years

6  after November 6, 2008, totaling the principal amount of such Claim plus simple interest on any

7  unpaid balance from the Effective Date, calculated at the interest rate available on ninety (90) day

8  United States Treasuries on the Effective Date, (ii) such other treatment agreed to by the Holder of

9  the Allowed Priority Tax Claim and the Plan Trustee, provided such treatment is on more

10  favorable terms to the Debtors (or the Plan Trust after the Effective Date) than the treatment set

11  forth in clause (i) hereof, or (iii) payment of the full Allowed Priority Tax Claim in Cash.

12  **6.7    Summary of the Plan's Treatment of Various Bond Indemnity Claims.**

13  Allowed Bond Indemnification Claims are treated as Reliance Claims.  In the event that

14  such Bond Indemnification Claim arises from a general unsecured claim, it is classified in Class 6.

15  If the event that such Bond indemnification Claim arises from a Mechanic's Lien Claim, then it is

16  classified in Class 3.  Contingent Bond Indemnification Claims are classified separately as Class 4

17  Claims.

18  The Bond Companies assert that surety bonds were executed on behalf of all or some of the

19  Group I: Voluntary Debtors as a principal for its respective Group I: Voluntary Project ("Surety

20  Bonds").  The Surety Bond(s) will not be transferred to the Winning Bidder(s) and, if a Winning

21  Bidder(s) determines to develop the Group I: Voluntary Debtor Project(s), the Surety Bond will not

22  apply to the Winning Bidder(s)' bonding requirements with respect to such development.  If a

23  Winning Bidder(s) determines to develop all or a portion of its respective Group I: Voluntary

24  Debtor Project(s), it will be require at that time to obtain new Surety Bonds from the Bond

25  Companies or another surety, to the extent surety bonds are required by applicable state and local

26  development requirements.

27

28

MAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-
SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v3-SCC_Group_I_VD_DS.DOC

## VII.

## CLASSIFICATION OF CLAIMS AND INTERESTS

As required by the Code, the Plan places Claims and Interests into various Classes according to their right to priority and other relative rights.  Each of t~~T~~he Plan(s) specif~~yies~~ whether each Class of Claims or Interests is impaired or unimpaired, and the Plan sets forth the treatment each Class will receive.  The table below lists the Classes of Claims established under the Plan and states whether each particular Class is impaired or left unimpaired by the Plan.  A Class is "unimpaired" if the Plan leaves unaltered the legal, equitable and contractual rights to which the Holders of Claims or Interests in the Class are entitled, with certain exceptions specified in the Bankruptcy Code.

| CLASSIFICATION OF HOLDERS OF SECURED REAL PROPERTY TAX CLAIMS AGAINST THE GROUP I: VOLUNTARY DEBTORS | | |
|---|---|---|
| **Class 1** | **Claimant** | **Claim Nos.[4]** |
| **Class 1.1** | Los Angeles County as the Holder of an Unpaid Secured Real Property Tax Claim against the Ritter Ranch Project in the amount of $3,008,044.29~~4,755,857~~. | Palmdale Hills 12 |
| **Class 1.2** | Placer County as the Holder of an Unpaid Secured Real Property Tax Claim against the Bickford Ranch Project in the amount of $9,467,165. | Scheduled Amount |
| **Class 1.3** | Riverside County as the Holder of an Unpaid Secured Real Property Tax Claim against the Emerald Meadows Project in the amount of $798,256. | SunCal Emerald Meadows 9 |
| **Class 1.4** | Los Angeles County as the Holder of an Unpaid Secured Real Property Tax Claim against the Acton Project in the amount of $1,652,389~~463,325~~. | Acton Estates  1 |

| CLASSIFICATION OF LEHMAN'S DISPUTED CLAIMS AGAINST THE GROUP I: VOLUNTARY DEBTORS |
|---|

---

[4] These Real Property Tax Claims have been updated to include amounts for which proofs of claim have not yet been filed.

MAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v3-SCC_Group_I_VD_DS.DOC

| Class 2 | Claims | Claim Nos. |
|---|---|---|
| Class 2.1 | The Holders of Lehman's Disputed Claims filed by LCPI against SunCal Bickford arising from the SunCal Communities I Loan Agreement in the asserted amount of $343,221,391. | SunCal Bickford: 16 |
| Class 2.2 | The Holder of Lehman's Disputed Claims filed by LCPI against Palmdale Hills arising from the Ritter Ranch Loan Agreement in the asserted amount of $287,252,096. | Palmdale Hills 65 |
| Class 2.3 | The Holders of Lehman's Disputed Claims filed by LCPI against SunCal I, SunCal III, Acton Estates, SunCal Emerald, SunCal Bickford, SunCal Summit Valley arising from the SunCal Communities I Loan Agreement in the asserted amount of $343,221,391. | SunCal Emerald Meadows 7 |
| Class 2.4 | The Holders of Lehman's Disputed Claims filed by LCPI against SunCal I, SunCal III, Acton Estates, SunCal Emerald, SunCal Bickford, SunCal Summit Valley arising from the SunCal Communities I Loan Agreement in the asserted amount of $343,221,391. | Acton Estates: 6 |

| CLASSIFICATION OF ASSERTED MECHANIC LIEN CLAIMS **AGAINST THE GROUP I: VOLUNTARY DEBTORS**~~ON THE RITTER RANCH PROJECT, THE BICKFORD RANCH PROJECT, AND THE ACTON PROJECT~~ | | |
|---|---|---|
| Class 3 | Claimant | Claim Nos. |
| Class 3.1 | The Holder of the asserted Mechanic Lien Claim held by Asphalt Professionals against the Ritter Ranch Project owned by Palmdale Hills in the amount of $38,249. | Palmdale Hills 1 and 46 |
| Class 3.2 | The Holder of the asserted Mechanic Lien Claim held by Sierra Cascade Construction against the Ritter Ranch Project owned by Palmdale Hills in the amount of $550,677. | Palmdale Hills 33 |

-69-

| CLASSIFICATION OF ASSERTED MECHANIC LIEN CLAIMS **AGAINST THE GROUP I: VOLUNTARY DEBTORS**~~ON THE RITTER RANCH PROJECT, THE BICKFORD RANCH PROJECT, AND THE ACTON PROJECT~~ | | |
|---|---|---|
| **Class 3** | **Claimant** | **Claim Nos.** |
| **Class 3.3** | The Holder of the asserted Mechanic Lien Claim held by Staats Construction. Inc. against the Ritter Ranch Project owned by Palmdale Hills in the amount of $166,105. | Palmdale Hills 51 |
| **Class 3.4** | The Holder of the asserted Mechanic Lien Claim held by Southland Farmers, Inc. against the Ritter Ranch Project owned by Palmdale Hills in the amount of $177,801. | Palmdale Hills 55, 67 and 68 |
| **Class 3.5** | The Holder of the asserted Mechanic Lien Claim held by Chamelon Design Inc. against the Ritter Ranch Project owned by Palmdale Hills in the amount of $60,920. | Palmdale Hills 93, 99 |
| **Class 3.6** | The Holder of the asserted Mechanic Lien Claim held by MHM Engineers against the Bickford Ranch Project in the amount of $8,916. | SunCal Bickford 5 |
| **Class 3.7** | The Holder of the asserted Mechanic Lien Claim held by Land Architecture against the Bickford Ranch Project in the amount of $100,245. | SunCal Bickford 6 |
| **Class 3.8** | The Holder of the asserted Mechanic Lien Claim held by Kiewit Pacific Co. against the Bickford Ranch Project in the amount of $1,868,357. | SunCal Bickford 10 |
| **Class 3.9** | The Holder of the asserted Mechanic Lien Claim held by ARB, Inc. against the Bickford Ranch Project in the amount of $1,052,272. | SunCal Bickford 15 |
| **Class 3.10** | The Holder of the asserted Mechanic Lien Claim held by Independent Construction against the Bickford Ranch Project in the amount of $117,209. | SunCal Bickford 28 |
| **Class 3.11** | The Holder of the asserted Mechanic Lien Claim held by Marques Pipeline, Inc. against the Bickford Ranch Project in the amount of $330,118. | SunCal Bickford 29 and 30 |

MAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v3-SCC_Group_I_VD_DS.DOC

| CLASSIFICATION OF ASSERTED MECHANIC LIEN CLAIMS **AGAINST THE GROUP I: VOLUNTARY DEBTORS**~~ON THE RITTER RANCH PROJECT, THE BICKFORD RANCH PROJECT, AND THE ACTON PROJECT~~ | | |
|---|---|---|
| **Class 3** | **Claimant** | **Claim Nos.** |
| **Class 3.12** | The Holder of the asserted Mechanic Lien Claim held by Hall & Foreman, Inc. against the Emerald Meadows Project in the amount of $287,727. | SunCal Emerald 13 |
| **Class 3.13** | The Holder of the asserted Mechanic Lien Claim held by Proactive Engineering against the Emerald Meadows Project in the amount of $991,315. | SunCal Emerald 15 and 16 |
| **Class 3.14** | The Holder of the asserted Mechanic Lien Claim held by HD Supply Construction against the Emerald Meadows Project owned by SunCal Emerald in the amount of $14,893. | Palmdale Hills 15 |

| CLASSIFICATION OF **CONTINGENT** BOND **INDEMNIFICATION** CLAIMS **AGAINST THE GROUP I: VOLUNTARY DEBTORS** | | |
|---|---|---|
| **Class 4** | **Claimant** | **Claim Nos.** |
| **Class 4.1** | The holders of Contingent Bond Indemnification Claims that are Allowed Secured Claims arising from bonds issued with respect to the Group I Projects | **Various Filed and Scheduled** |

| CLASSIFICATION OF PRIORITY UNSECURED CLAIMS | | |
|---|---|---|
| **Class 5** | **Claimant** | **Claim Nos.** |
| **Class 5.1** | The Holder of Priority Claims that fall within Code Sections 507(a)(2), (4), (5), (6), and (7) in the asserted amount of $10,950 against the Group I: Voluntary Debtors | Various Filed and Scheduled |

| CLASSIFICATION OF GENERAL UNSECURED CLAIMS THAT QUALIFY AS RELIANCE CLAIMS[5] | | |
|---|---|---|
| **Class 6** | **Claimant** | **Claim Nos.** |
| **Class 6.1** | The holders of Allowed Unsecured Reliance Claims against Palmdale. | Various Filed and Scheduled |
| **Class 6.2** | The holders of Allowed Unsecured Reliance Claims against SunCal Bickford. | Various Filed and Scheduled |
| **Class 6.3** | The holders of Allowed Unsecured Reliance Claims against SunCal Emerald Meadows. | Various Filed and Scheduled |
| **Class 6.4** | The holders of Allowed Unsecured Reliance Claims against Acton Estates. | Various Filed and Scheduled |

| CLASSIFICATION OF GENERAL UNSECURED CLAIMS THAT DO NOT QUALIFY AS RELIANCE CLAIMS[6] | | |
|---|---|---|
| **Class 7** | **Claimant** | **Claim Nos.** |
| **Class 7.1** | Claimants  holding Allowed Unsecured Claims against Palmdale that are not Reliance Claims | Various Filed and Scheduled |

---

[5] Unsecured Claims are generally be placed within the same class and they receive the same treatment under a Plan. However, the SunCal Proponents have divided Unsecured claims into two classes in the Plan – Classes 6.1, 6.2, 6.3 and 6.43, and 7.1, 7.2, 7.3 and 7.34. This separate classification has been implemented for the following reason. The Holders of Unsecured Claims in Classes 6.1, 6.2, 6.3 and 6.43, who are referred to as "Reliance Claimants," hold specific Litigation Rights that are referred to herein as "Reliance Claims." The Unsecured Creditors in Classes 7.1, 7.2, 7.3 and 7.34 do not hold Reliance Claims. Under the Plan, the Reliance Claimants who sell their Reliance Claimants to LitCo, and who vote in favor of the Plan, which is Option A, will receive a distribution of $.6055 percents on their Allowed Unsecured Claims *from non-estate funds. Accordingly, the $.6055 percent payment is being paid from non-estate funds, for a non-estate asset.* If a Reliance Claimant elects not to sell this claim, then this claimant will receive the exact same distribution rights that the Class 7.1, 7.2, 7.3 and 7.24  claimants, respectively, will receive under the Plan, unless the Court allocates a part of any judgment granted in the Lehman Adversary Proceeding to these particular claims. In summary, the classification difference was made to provide for the purchase offer relating to the sale of the Reliance Claims. In all other respects the Holders of Unsecured Claims receive the same treatment under the Plan.

[6] This Class includes, but it is not limited to, Bond Claims that are not Allowed Secured Claims within Class 4.1.

| CLASSIFICATION OF GENERAL UNSECURED CLAIMS THAT DO NOT QUALIFY AS RELIANCE CLAIMS[6] | | |
|---|---|---|
| **Class 7** | **Claimant** | **Claim Nos.** |
| **Class 7.2** | Claimants holding Allowed Unsecured Claims against SunCal Bickford that are not Reliance Claims | Various Filed and Scheduled |
| **Class 7.3** | Claimants holding Allowed Unsecured Claims against SunCal Emerald Meadows that are not Reliance Claims | Various Filed and Scheduled |
| **Class 7.4** | Claimants holding Allowed Unsecured Claims against Acton Estates that are not Reliance Claims | Various Filed and Scheduled |

| **Class 8** | **Claimant** | **Scheduled** |
|---|---|---|
| **Class 8.1** | Allowed Interests in Palmdale held by SCC Palmdale, LLC | As scheduled |
| **Class 8.2** | Allowed Interests in SunCal Bickford held by SunCal I. | Scheduled Amount |
| **Class 8.3** | Allowed Interests in SunCal Emerald Meadows held by SunCal I | Scheduled Amount |
| **Class 8.4** | Allowed Interests in Acton Estates held by SunCal I | Scheduled Amount |

## VIII.

## THE PLAN'S TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS

**8.1.    The Plan's Treatment of Holders of Allowed Secured Real Property Tax Claims on the ~~Group II~~Group I: Voluntary Projects (Classes 1.1 through 1.4).**

The rights of the Holder(s)' of Allowed Secured Claims in Classes 1.1 through 1.4 are not impaired under the Plan. Such claimant's shall retain their existing lien rights, and shall accrue interest as provided under applicable nonbankruptcy law pursuant to 11 U.S.C. § 511.  O~~and one of the following two non-impairment options shall apply, at the election of the Plan Trustee: 1) O~~n the Effective Date, such claims shall be satisfied in accordance with the provision of 11 U.S.C. § 1124(2)~~, or 2) on the Effective Date, or the Holder(s) shall be free to pursue their respective rights and remedies against the underlying real property collateral under applicable California law~~.

MAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v3-SCC_Group_I_VD_DS.DOC

**8.2.**    **The Plan's Treatment of Lehman's Disputed Claim(s) and Disputed Lien(s)
(Class 2.1 through 2.4).**

The Holder(s) of Disputed Secured Claims within Class 2.1 through 2.4 shall receive the indubitable equivalent of their claims under the Plan, pursuant to 11 U.S.C. § 1129(b)(2)(A)(iii), through the following treatment:

A.    Group I Project Lien Rights. The Class 2.1 through 2.4 Holder(s) shall retain their interest in the Disputed Lien(s) against Plan Trust Assets that secure the Disputed Secured Claims, pending a Final Order(s) resolving the Allowance of such Disputed Secured Claims and determining the validity, priority and extent of the applicable Disputed Liens against the applicable Plan Trust Assets, which secure these claims, except as follows:

1.    ~~1.~~    The Plan Trust Assets subject to the Class 2.1 through 2.4 Disputed Liens may be sold free and clear of such liens on the Effective Date, without the right to credit bid under Section 363(k) with respect to Disputed Claims and Disputed Liens. These Disputed Liens shall then attach to the ~~Net Proceed~~Net Sales Proceeds from the sale, which shall be deposited into the ~~Net Proceed~~Net Sales Proceeds Account, pending a resolution of such Disputed Secured Claims and Disputed Liens;

~~1.~~    2.    To the extent that a Disputed Secured Claim held by either the Class 2.1 through 2.4 Claimants against a Group I Project is disallowed, and the Disputed Lien associated with this Disputed Secured Claim is consequently released to the extent of this disallowance, the Plan Trustee shall be authorized to use to the ~~Net Proceed~~Net Sales Proceeds that are no longer subject to the Disputed Lien(s) to pay other Allowed Claims in their order of priority, in accordance with the terms of the Plan;

~~2.~~    3.    To the extent that a Disputed Secured Claim held by either the Class 2.1 through 2.4 Claimant and the associated Disputed Lien(s) against a Group I Project is subordinated, the Plan Trustee shall be authorized to use to the ~~Net Proceed~~Net Sales Proceeds that are no longer subject to the Disputed Lien(s), or where the priority of the Disputed Liens has been subordinated by the Court, to pay other Allowed Claims in their order of priority, in accordance with the terms of the Plan, to the extent of the subordination; and

-74-

1    Notwithstanding the existence of the Disputed Secured Claims and the

2    Disputed Liens, the Plan Trustee may a seek a release of the funds in the ~~Net Proceed~~Net Sales

3    Proceeds Account subject to these claims and liens to pay the claims of other creditors in

4    accordance with the terms of the applicable Plan, if the Class 2.1 through 2.4 claimants' interests

5    in this property will remain adequately protected after this release.

6    B.    Sale of Group I ~~Projects~~Assets. The Plan Trustee shall complete the sale of

7    Group I ~~Projects~~Assets on the Effective Date that are subject to the Holder(s)' Disputed Secured

8    Claims and Disputed Liens, free and clear of such claims and liens, through a sale that satisfies the

9    following conditions:

10    1.    The Group I ~~Projects~~Assets will be sold through a public auction

11    after a commercially reasonable marketing and advertising effort of at least sixty (60) days

12    duration;

13    2.    The SunCal Plan Proponents shall have the right to provisionally

14    accept an Opening Bid from a Stalking Horse Bidder prior to the public auction and to grant this

15    bidder the right to receive the Ritter Ranch Project Break-up Fee, the Bickford Ranch Project

16    Break-up Fee, the Emerald Meadows Project Break-up Fee or Acton Project Break-up Fee, the as

17    the case may be, if such bidder is not the Winning Bidder;

18    3.    Other Qualified Bidders shall have the right to overbid the Opening

19    Bid by submitting a Qualifying Bid. The first round of Qualifying Bids after the Opening Bid must

20    be equal to or in excess of the Initial Overbid Amount. Thereafter, all Qualifying Bids shall be

21    equal to or in excess of~~r~~ the Minimum Increment;

22    4.    The highest and best Qualifying Bid received from a Qualified

23    Bidder, shall be accepted as the Winning Bid, and the submitting bidder shall be the Winning

24    Bidder. Upon payment of the Winning Bid, the Winning bidder shall receive title to the applicable

25    Group I Project free and clear of all monetary liens and encumbrances; and

26    5.    No bidder shall be allowed to submit or demand the acceptance of a

27    "credit bid" based upon an existing claim or lien.

28

MAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v3-SCC_Group_I_VD_DS.DOC

1          CC.    Abandonment of Unsold Group I Project(s). If for any reason the Plan

2    Trustee is unable to sell any of the Group I Projects on the Effective Date, they will be abandoned

3    as of 11:59 p.m. on the Effective Date, and the Class 2.1, 2.2, 2.3 and 2.43 claimants, as the case

4    may be, shall be free to exercise any and all remedies that they may hold with respect to these

5    Assets.

6          D.    Sale of Other Plan Trust Assets Subject To Liens of Class 2.1 through 2.4

7    Claimants. The Plan Trustee shall complete the sale of all other Plan Trust Assets that are subject

8    to the Disputed Secured Claims and the Disputed Liens of the Class 2.1, 2.2, 2.3 and 2.4 claimants

9    Liens and Disputed Claims, free and clear of such claims and liens, through a sale that satisfies the

10   following conditions:

11          1.    Such Assets will be sold through a public auction after a commercially

12   reasonable marketing and advertising effort of at least thirty (30) days duration;

13          2.    The Committee shall approve the terms of the sale;

14          3.    The sale will be held and completed within ninety (90) days of the Effective

15   Date;

16          4.    No bidder may submit or demand the acceptance of a "credit bid" based

17   upon an existing claim or lien; and

18          5.    All Net Sale Proceeds generated from such sales shall be deposited into the

19   applicable Net Sales Proceeds Account with all Disputed Claims and Disputed Liens attached

20   thereto.

21          E.    Abandonment of Assets Other Than Group I Projects. All Asset(s), other

22   than Litigation Claims (which shall be retained), that are not sold within ninety (90) days of the

23   Effective Date shall be deemed abandoned by the Plan Trust as of the ninety-first (91st) day after

24   the Effective Date, no payment shall be made to such Holder(s), and such Holder(s) shall be

25   allowed to pursue their respective rights and remedies against such assets under applicable law

26   subject to a Final Order determining the allowance and priority of the Disputed Claims and the

27   validity of the Disputed Liens in, including but not limited to, the Lehman Adversary Proceeding

28   and the Lehman Claims Objections.

1    ~~F.~~    Distributions To The Class 2.1 through 2.4 Claimants. If the Plan Trustee

2 consummates a sale or otherwise liquidates the particular Asset(s) subject to the Class 2.1, 2.2, 2.3

3 and 2.4 Disputed Secured Claim(s) and/or Disputed Lien(s) during the Sales Period, as provided

4 for above, the Holder(s) of such Disputed Secured Claim shall receive a distribution to the extent

5 of available funds from the applicable Net Sale Proceeds Account(s) to the extent required by a~~n~~

6 entered ~~Final~~ Order of the Court, that is not subject to a stay pending appeal, determining the

7 allowance and priority of the Disputed Secured Claims and the validity, priority and extent of the

8 Disputed Liens in, including but not limited to, the Lehman Adversary Proceeding and the Lehman

9 Claims Objections.

10    **8.3.**    **The Plan's Treatment of Holders of Asserted Mechanic Lien Claims Against**

11    **the Group I ~~Projects~~ Voluntary Debtors (Classes 3.1 Through 3.14).**

12    The treatment of the Holders of Allowed Classes 3.1 through 3.14 Secured Claims under

13 the applicable Plan shall be as follows:

14    A.    The Holder(s)' rights are impaired under the Plan;

15    B.    The Holder(s) shall retain their respective underlying liens on the applicable

16 Projects, but shall forebear from pursuing their rights and remedies until the expiration of the Sales

17 Period;

18    C.    ~~If the Plan Trustee is able to consummate a sale of the Group II Projects~~

19 ~~subject to the liens asserted by t~~The Holders of Class 3.1 through 3.14 claims ~~during the Sales~~

20 ~~Period, such Holders~~ shall receive a distribution, to the extent of available, of Net Sale Proceeds in

21 accordance with the priorities set forth under the Bankruptcy Code, subject to a Final Order(s)

22 resolving the allowance and priority of the applicable Lehman's Disputed Claim(s) and the validity

23 of the applicable Lehman Disputed Lien(s) in, including but not limited to, the Lehman Adversary

24 Proceeding; and

25    ~~D.    If the Plan Trustee is unable to consummate a sale of the applicable~~

26 ~~underlying real property collateral during the Sales Period, such real property collateral shall be~~

27 ~~deemed abandoned by the Plan Trustee, no payment shall be made to such Holder(s), and such~~

28 ~~Holder(s) shall be allowed to pursue their respective rights against the real property collateral~~

MAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v3-SCC_Group_I_VD_DS.DOC

1 under applicable California law, subject to a Final Order(s) resolving the allowance and priority of

2 the applicable Lehman's Disputed Claim(s) and applicable Lehman Disputed Lien(s), without

3 recourse to the Debtor (s).

4     **8.4.**    **The Plan's Treatment of Holders of Contingent Bond Indemnification Claims**

5         **that qualify As Allowed Secured Claims with Liens against a Group I Project**

6         **(s) (Class 4.1).**

7     The Bond Companies assert that surety bonds were executed on behalf of all or some of the

8 Group I: Voluntary Debtors as a principal for its respective Group I: Voluntary Project ("Surety

9 Bonds"). The Surety Bond(s) will not be transferred to the Winning Bidder(s) and, if a Winning

10 Bidder(s) determines to develop the Group I: Voluntary Debtor Project(s), the Surety Bond will not

11 apply to the Winning Bidder(s)' bonding requirements with respect to such development. If a

12 Winning Bidder(s) determines to develop all or a portion of tis respective Group I: Voluntary

13 Debtor Project(s), it will be require at that time to obtain new Surety Bonds from the Bond

14 Companies or another surety, to the extent surety bonds are required by applicable state and local

15 development requirements.

16     The rights of each holder of an Allowed Contingent Bond Indemnification Claim arising

17 from a bond issued with respect to a Group I Project, shall, to the extent such claim(s) are

18 determined to be a secured claim(s), be impaired under the Plan. Such claims shall receive the

19 following treatment:

20         A.     Each such Allowed Secured Claim shall be placed in a separate class and

21 receive a separate ballot for voting purpose;

22         B.     Each Holder(s) shall retain their respective underlying liens on the

23 applicable Group II Group I: Voluntary Project, but shall forebear from pursuing their rights and

24 remedies until the expiration of the Sales Period;

25         C.     If the Plan Trustee is able to consummate a sale of the Group I Projects

26 subject to the liens asserted by the Holders of Class 4.1 claimants during the Sales Period, such

27 Holders shall receive a distribution, to the extent of available, of Net Sale Proceeds in accordance

28 with the priorities set forth under the Bankruptcy Code, subject to a Final Order(s) resolving the

MAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-
SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v3-SCC_Group_I_VD_DS.DOC

1    allowance and priority of the applicable Lehman's Disputed Claim(s) and the validity of the

2    applicable Lehman Disputed Lien(s) in, including but not limited to, the Lehman Adversary

3    Proceeding; and

4              D.      If the Plan Trustee is unable to consummate a sale of the applicable

5    underlying real property collateral during the Sales Period, such real property collateral shall be

6    deemed abandoned by the Plan Trustee, no payment shall be made to such Holder(s), and such

7    Holder(s) shall be allowed to pursue their respective rights against the real property collateral

8    under applicable California law.

9        **8.5.      The Plan's Treatment of Holders of Priority Claims (Class 5.1)**.

10            The treatment of the Holders of Allowed Priority Claims under the Plan shall be as follows**:**

11             A.      The Holder(s) are unimpaired under the Plan; and

12             B.      The Holder(s) shall be paid from the applicable Distribution Account(s) or

13    the LitcoPlan Loan (i) the full amount of such Allowed Priority Claim in Cash on the later of (x)

14    the Effective Date, (y) the date such Claim becomes an Allowed Priority Claim or (z) the date such

15    Allowed Priority Claim becomes payable in accordance with the terms governing such Allowed

16    Priority Claim, or (ii) upon such other less favorable terms as may be agreed to by such Holder and

17    the Plan Trustee.

18        **8.6.      The Plan's Treatment of Holders of General Unsecured Claims that are**

19                    **Reliance Claims (Classes 6.1, 6.2. 6.3 and 6.4).**

20            The rights of Holders of Allowed Class 6.1, 6.2., 6.3 and 6.4 Claims are impaired under the

21    Plan. They have the right to choose between the following treatment options:

22             A.      Option A: A claimant in these classes *who votes in favor of the Plan*, and

23    who chooses Option A, will have the right to sell to LitCo all of the claimant's right, title and

24    interest in all Allowed Reliance Claims and all of the claimant's Litigation Rights against the

25    applicable Debtor, SunCal Affiliates, and the Lehman Entities, for the sum of ~~sixty~~fifty-five cents

26    ($0.~~60~~55) per dollar of allowed claim, payable in cash on the Effective Date, provided there is no

27    stay pending an appeal of the Confirmation Order, in full satisfaction of such claimant's Allowed

28    Reliance Claims; or

MAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-
SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v3-SCC_Group_I_VD_DS.DOC

1          B.      Option B: A claimant in these classes who votes against the Plan, or who

2    votes in favor of the Plan, but does not choose Option A, or who does not vote on the Plan, will 1)

3    receive a minimum distribution in cash, on the Effective Date, equal to one percent (1%) of such

4    claimant's Allowed Claim, 2) retain such claimant's Reliance Claim(s) and rights against the

5    Lehman Entities and its right to receive such claimant's share, as determined by the Court, in the

6    benefits and Litigation Recoveries~~recoveries~~ resulting from a judgment or order entered in the

7    Lehman Adversary Proceeding, the ~~State Court~~Contract Action, or the Lehman Claims Objections,

8    and 3) right to receive a pro-rata share of any funds payable from the applicable Distribution

9    Account(s), after payment in full of all Post Confirmation Expenses, Allowed Administrative

10    Claims, and Allowed Priority Claims.

11        **8.7.    The Plan's Treatment of Holders of Allowed General Unsecured Claims that**

12                **Are Not Reliance Claims (Classes 7.1. 7.2, 7.3 and 7.4).**

13          The rights of Holders of Allowed Class 7.1, 7.2, and 7.4 Claims are impaired under the

14    Plan. Under the Plan, each claimant will 1) receive a minimum distribution in cash, on the

15    Effective Date, equal to one percent (1%) of such claimant's Allowed Claim, and 2) receive a pro-

16    rata share of any funds payable from the applicable Distribution Account(s), after payment in full

17    of all Post Confirmation Expenses, Allowed Administrative Claims, and Allowed Priority Claims

18    and any sums that the Bankruptcy Court determines are payable to the Holders of Allowed Class

19    6.1, 6.2, 6.3 and 6.4 Claims from either the Claim Reduction Amounts, or on account of a

20    judgment in the Lehman Adversary Proceeding.

21          Class 7.3 consists of the claims subject to the Emerald Compromise.  The Emerald

22    Compromise, as modified or amended, shall be approved by separate order of the Court pursuant to

23    Bankruptcy Rule 9019, or as provided in the Plan and approved by the Court.

24        **8.8.    The Plan's Treatment of Holders of Allowed Interests.**

25          The Interests of the Holders in Class 8.1, 8.2, 8.3 and 8.4 are impaired under the Plan. All

26    such Interests shall be cancelled as of the Effective Date and no distribution shall be made to these

27    Holders on account of such Interest(s).

28

**IX.**

**ACCEPTANCE OR REJECTION OF THE PLAN**

**9.1.    Introduction.**

PERSONS OR ENTITIES CONCERNED WITH CONFIRMATION OF THE PLAN SHOULD CONSULT WITH THEIR OWN ATTORNEYS BECAUSE THE LAW ON CONFIRMING A PLAN OF REORGANIZATION IS VERY COMPLEX.  The following discussion is intended solely for the purpose of alerting readers about basic confirmation issues, which they may wish to consider, as well as certain deadlines for filing Claims.  The Debtors cannot represent that the discussion contained below is a complete summary of the law on this topic.

Many requirements must be met before the Court can confirm the Plan.  Some of the requirements include that the Plan must be proposed in good faith, acceptance of the Plan, whether the Plan pays creditors at least as much as creditors would receive in a Chapter 7 liquidation, and whether the Plan is feasible.  The requirements described herein are <u>not</u> the only requirements for confirmation.

**9.2.    Who May Object to Confirmation of the Plan.**

Any party in interest may object to the confirmation of the Plan, but as explained below not everyone is entitled to vote to accept or reject the Plan.

**9.3.    Who May Vote to Accept/Reject the Plan.**

A Holder of a Claim or Interest has a right to vote for or against the Plan if that Holder of the Claim or Interest has a Claim which is both (1) Allowed or Allowed for voting purposes and (2) Classified in an impaired Class <u>(excluding any class in which the Plan is "deemed rejected")</u>. The votes will be tabulated on a Debtor by Debtor basis.

**9.4.    What Is an Allowed Claim/Interest.**

As noted above, a Holder of a Claim or Interest must first have an Allowed Claim or Allowed Interest to vote.

**9.5.    What Is an Impaired Class.**

MAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v3-SCC_Group_I_VD_DS.DOC

1      A Class is impaired if the Plan alters the legal, equitable, or contractual rights of the Claims

2  or Interests in that Class, other than the right to accelerate the Claim upon certain kinds of defaults.

3  In this case, the Debtors believe that all Classes, except for Class 5.1 are impaired.

4      **9.6.**   **Who Is Not Entitled to Vote.**

5      The following four types of Claims are <u>not</u> entitled to vote: (1) Claims that have been

6  disallowed; (2) Claims in unimpaired Classes; (3) Claims entitled to priority pursuant to

7  Bankruptcy Code Sections 507(a)(2) or (a)(3) and Claims in Classes that do not receive or retain

8  any value under the Plan.  Claims in unimpaired Classes are not entitled to vote because such

9  Classes are deemed to have accepted the Plan.  Claims entitled to priority pursuant to Bankruptcy

10  Code Section 507(a)(8) are not entitled to vote because such Claims are not placed in Classes and

11  they are required to receive certain treatment specified by the Bankruptcy Code.  Claims in Classes

12  that do not receive or retain any property under the Plan do not vote because such Classes are

13  deemed to have rejected the Plan. The Debtors believe that all Classes are entitled to vote except

14  Class<u>es 1.1 through 1.4 and </u> 5.1. These classes are not impaired under the Plan and consequently

15  are not entitled to vote. They are conclusively deemed to have accepted the Plan. The Interests held

16  by the Holders in Classes 8.1, 8.2, 8.3 and 8.4 are being cancelled under the Plan; accordingly

17  these Interest Holders are deemed to have voted to reject the Plan.

18      EVEN IF YOUR CLAIM IS OF THE TYPE DESCRIBED ABOVE, YOU MAY STILL

19  HAVE A RIGHT TO OBJECT TO THE CONFIRMATION OF THE PLAN.

20      **9.7.**   **Who Can Vote in More than One Class.**

21      A creditor whose Claim has been Allowed in part as a Secured Claim and in part as an

22  Unsecured Claim is entitled to accept or reject a Plan in both capacities by casting one ballot for

23  the secured part of the Claim and another ballot for the Unsecured Claim.  Also, a Creditor may

24  otherwise hold Claims in more than one Class (such as a Holder of Senior Secured Claims and

25  Subordinated Note Claims), and may vote the Claims held in each Class.

26      **9.8.**   **Votes Necessary for a Class to Accept the Plan.**

27      A Class of Claims is deemed to have accepted the Plan when more than one-half (1/2) in

28  number and at least two-thirds (2/3) in dollar amount of the Claims *that actually voted*, vote to

MAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-
SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v3-SCC_Group_I_VD_DS.DOC

accept the Plan.  A Class of interests is deemed to have accepted the Plan when Holders of at least two-thirds (2/3) in amount of the interest-Holders of such Class which actually vote, vote to accept the Plan.

**9.9.    Treatment of Nonaccepting Classes.**

As noted above, even if there are impaired Classes that do not accept the proposed Plan, the Court may nonetheless confirm the Plan if the nonaccepting Classes are treated in the manner required by the Code and at least one impaired Class of Claims accepts the Plan. The process by which a plan may be confirmed and become binding on non-accepting Classes is commonly referred to as "cramdown."  The Bankruptcy Code allows the Plan to be "crammed down" on nonaccepting Classes of Claims or interests if it meets all statutory requirements except the voting requirements of 1129(a)(8) and if the Plan does not "discriminate unfairly" and is "fair and equitable" with respect to each impaired Class that has not voted to accept the Plan, as set forth in 11 U.S.C. § 1129(b) and applicable case law.

**9.10.    Request for Confirmation Despite Nonacceptance by Impaired Class(es).**

The SunCal Plan Proponents will ask the Court to confirm the Plan by cramdown on any impaired Class if such Class does not vote to accept the Plan.

**X.**

**MEANS OF EXECUTION AND IMPLEMENTATION OF THE PLAN**

**10.1.    Introduction.**

This section is intended to address how the SunCal Plan Proponents intend to implement the provisions of the Plan.  It addresses the transfer of the Plan Trust Assets~~Property~~ to the Plan Trust, the nature of the Plan Trust, the powers of the Plan Trust, the governance of the Plan Trust, the resolution of disputed claims, the sources of funds that will be used to pay claims and the mechanics of how claims will be paid.

**10.2    Sale Process After Confirmation Date But Prior To Effective Date**.

The core objective of the Plan is to enable all creditors holding Allowed Claims to receive the highest dividend possible by selling the estates' primary assets, the ~~Group II~~Group I: Voluntary Projects, to the highest bidder. The process of marketing the ~~Group II~~Group I: Voluntary Projects

for sale will begin, pursuant to the Confirmation Order, immediately after the entry of this order. ~~Although the Chapter 11 Trustee will not be formally removed under the Plan until the Effective Date, he will be required to work with the SunCal Proponent~~SunCal Plan Proponents after the ~~Confirmation Date to promote and facilitate the sale of the Group II Projects in accordance with the Plan terms.~~

The Plan Trustee shall complete the sale of Group I Assets on the Effective Date that are subject to the Holder(s)' Disputed Secured Claims and Disputed Liens, free and clear of such claims and liens, through a sale that satisfies the following conditions:

1.    The Group I Assets will be sold through a public auction after a commercially reasonable marketing and advertising effort of at least sixty (60) days duration;

2.    The SunCal Plan Proponents shall have the right to provisionally accept an Opening Bid from a Stalking Horse Bidder prior to the public auction and to grant this bidder the right to receive the Ritter Ranch Project Break-up Fee, the Bickford Ranch Project Break-up Fee, the Emerald Meadows Project Break-up Fee or Acton Project Break-up Fee, the as the case may be, if such bidder is not the Winning Bidder;

3.    Other Qualified Bidders shall have the right to overbid the Opening Bid by submitting a Qualifying Bid. The first round of Qualifying Bids after the Opening Bid must be equal to or in excess of the Initial Overbid Amount. Thereafter, all Qualifying Bids shall be equal to or in excess of the Minimum Increment;

4.    The highest and best Qualifying Bid received from a Qualified Bidder, shall be accepted as the Winning Bid, and the submitting bidder shall be the Winning Bidder. Upon payment of the Winning Bid, the Winning bidder shall receive title to the applicable Group I Project free and clear of all monetary liens and encumbrances; and

5.    No bidder shall be allowed to submit or demand the acceptance of a "credit bid" based upon an existing claim or lien.

The ~~SunCal Proponent~~SunCal Plan Proponents will pursue the following sale procedures after the Confirmation Date:

MAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v3-SCC_Group_I_VD_DS.DOC

1       A.      Implementation of a Marketing Program. Once the Plan is confirmed, the

2   ~~SunCal Proponent~~SunCal Plan Proponents will market the Group I Voluntary Projects for sale

3   through a comprehensive sale effort during the Sale Period. This sale effort will include 1) sending

4   sale packages describing each Group I Voluntary Project to the real estate brokerage community;

5   b) advertising the Group I Voluntary Projects for sale on a website that includes links allowing

6   direct access to all relevant information regarding the Group I Projects; and c) sending packages to

7   a list of prospects nationally who are actively seeking or may have interest in these kinds of assets.

8       B.      Identifying a Stalking Horse Bidder. On or before the commencement

9   of~~During~~ the Sale Period, the SunCal Parties will accept, on a provisional basis, an Opening Bid

10  for one or both of the Group I Projects. The bidder whose Opening Bid is accepted will become

11  the "Stalking Horse Bidder." The Opening Bid must be equal to the Minimum Sale Price(s) fixed

12  in the Plan for each Group I Project.

13      ~~C.      The Sale Contract. The sale contract that will be entered into with the~~

14  ~~Stalking Horse Bidder will include the following bankruptcy-sale related provisions:]~~

15      C.

16      ~~D.      1.~~      Overbid Provisions. The contract will allow the ~~SunCal~~

17  ~~Proponent~~SunCal Plan Proponents to seek "overbids" from other Qualified Buyers, and to accept

18  an Initial Overbid that exceeds the Stalking Horse Bid by the Initial Overbid Amount applicable to

19  each Group I Project. In the case of Ritter Ranch Project, the Initial Overbid Amount is a sum that

20  is not less than the sum of the applicable Opening Bid, the Ritter Ranch Break-up Fee and one

21  hundred thousand dollars ($100,000). In the case of the Bickford Ranch Project, the Initial Overbid

22  Amount is a sum that is not less than the sum of the applicable Opening Bid, the Bickford Ranch

23  Break-up Fee and seventy-five thousand dollars ($75,000). In the case of the Emerald Meadows

24  Project, the Initial Overbid Amount is a sum that is not less than the sum of the applicable Opening

25  Bid, the Emerald Meadows Break-up Fee and seventy-five thousand dollars ($75,000). In the case

26  of the Acton Project, the Initial Overbid Amount is a sum that is not less than the sum of the

27  applicable Opening Bid, the Acton Project Break-up Fee, and the fifty-thousand dollars ($50,000).

28

MAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v3-SCC_Group_I_VD_DS.DOC

1                    1.2.     **Break-Up Fees**. The sale contract will include a "break-up fee"

2   provision. This fee will be payable to the Stalking Horse Bidder if the Opening Bid is overbid, and

3   another Qualified Bidder purchases the Group I Project(s) that is the subject of the Opening Bid.

4                    2.3.     **Sale Free and Clear of Liens**. The sale contract will provide that the

5   Group I Project(s) are being sold free and clear of all monetary liens and encumbrances and that no

6   party holding a lien against the projects, including the Lehman Lenders, may submit a "credit bid"

7   based upon the amount allegedly owing on the claims secured by the project being sold.

8               E.D.     **The Auction**. Ten days prior to the Effective Date, the ~~SunCal~~

9   ~~Proponent~~SunCal Plan Proponents will conduct an auction wherein all Qualified Bidders who have

10   submitted Qualified Bids for the ~~Group II~~Group I: Voluntary Projects will have the opportunity to

11   increase their bids for these Projects. The Qualified Bidder that submits the highest bid for the

12   Project will then be designated the Winning Bidder. The Winning Bidder will then have twenty

13   (20) days to prepare to close this purchase transaction by paying the Winning Bid amount. Once

14   the Winning Bidder advises the SunCal Plan Proponents that they are ready to close, the sequence

15   of events described in paragraphs 10.3 through 10.5 shall be implemented.

16        The entire process of marketing and selling the ~~Group II~~Group I: Voluntary Projects will be

17   overseen by an independent real estate professional with experience managing sales of this kind.

18   This professional will participate in every material aspect of the sale effort, and he or she shall

19   have the right to file an objection to the sale effort with the Court if the process is not proceeding

20   in a fair and effective manner.

21        **10.3.**    **Transfer of Property To The Plan Trust**.

22        On the Effective Date, title to and possession of all property of the Group I: Voluntary

23   Debtors, excepting those items of property that the Plan Trustee affirmatively elects not to transfer

24   to the Plan Trust, shall be deemed transferred and delivered to the Plan Trust, without further act or

25   action under any applicable agreement, law, regulation, order or rule of law.

26        **10.4.**    **Closing of Group I Project Sales**. On the Effective Date, the Group I Project(s)

27   shall be sold free and clear of liens to the Winning Bidder, for a price equal to the Winning Bid.

28

MAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-
SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v3-SCC_Group_I_VD_DS.DOC

1      **10.5.**    __Purposes of The Plan Trust__.

2            The Plan Trust's purposes, powers and objectives include, but are not limited to the

3      following: (i) to take control over, manage and over time sell or otherwise dispose of all Plan Trust

4      ~~Property~~ Assets for the highest return reasonably obtainable; (ii) to pursue all Litigation Claims

5      through collection efforts, including through litigation in any court of competent jurisdiction, and

6      to obtain the most favorable recovery on the same, with due consideration of all relevant factors,

7      including cost; (iii) to cause all Available Cash to be deposited into the applicable Distribution

8      Accounts; (iii) to initiate actions to resolve any remaining issues regarding the allowance and

9      payment of Claims including, as necessary, initiation and/or participation in proceedings before the

10     Bankruptcy Court; (iv) to take such other actions as are necessary or useful to maximize the value

11     of all property received by the Plan Trust; (v) to make the payments and distributions to creditors

12     and holders of Beneficial Interests as required by the Plan; and (vi) to enforce all rights with

13     respect to the Plan Trust Assets~~Property~~; and (vii) to take all actions reasonable and necessary to

14     implement the terms of the Plan, including but not limited to selling the ~~Group II~~Group I:

15     Voluntary Projects and the Assets. A more complete statement of the Plan Trust's powers and

16     limitations is set forth in the Plan Trust Agreement, which is a part of the Plan Supplement.

17           It is intended that the Plan Trust will be classified for U.S. federal income tax purposes as a

18     "liquidating trust," with the primary objective of liquidating the Plan Trust Assets~~Property~~ and

19     distributing the net proceeds thereof, with no objective to continue or engage in the conduct or a

20     trade or business in accordance with Treasury Regulation 301.7701-4(d), and, notwithstanding

21     anything to the contrary in the Plan, all actions taken by the Plan Trust or any person acting on

22     behalf of the Plan Trust shall be consistent with such primary objective.

23     **10.6.**    **Preservation of Litigation Claims for the Plan Trust**~~Trust Agreement~~.

24           The Plan Trustee reserves for the Estates and the Plan Trust all rights to commence and

25     pursue, as appropriate, any and all Litigation Claims, whether arising prior to or after the petition

26     Date, in any court or other tribunal, including without limitation, any adversary proceeding filed

27     and/or pending in the Court.  On the Effective Date, the Plan Trustee will be vested with authority

28     to enforce, file, litigate, prosecute, settle and collect with respect to the Litigation Claims, although

MAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-
SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v3-SCC_Group_I_VD_DS.DOC

1  it will not be required to do so and the determination of whether to so will be made solely by the

2  Plan Trustee in his absolute discretion.  With respect to any Litigation Claims commenced prior to

3  the Effective Date to which any or all of the Group I: Voluntary Debtors is a party, the Plan Trustee

4  shall replace and stand in the shoes of such Debtors as the real party in interest.

5      While the SunCal Plan Proponents have attempted to identify all Litigation Claims in the

6  Disclosure Statement which may be pursued, and hereby incorporates by reference those

7  disclosures and provisions, the failure to list any potential Litigation Claims, generally or

8  specifically, is not intended to limit the rights of the Plan Trustee to pursue such Litigation Claims.

9  Unless a Litigation Claims against any Person is expressly waived, relinquished, released,

10  compromised or settled as provided or identified in the Plan, any Confirmation Order or prior order

11  of the Court, the Plan Trustee expressly reserves any Litigation Claims for later adjudication.

12  Therefore, no preclusion doctrine, including, without limitation, the doctrine of res judicata,

13  collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or

14  laches shall apply to such Litigation Claims upon or after Confirmation or consummation of the

15  Plan.  All Litigation Claims are preserved under the Plan for the benefit of the Estates and the Plan

16  Trust.  Any recoveries from Litigation Claims will be paid to the Plan Trust.

17  ANY CREDITORS THAT BELIEVE THEY RECEIVED A TRANSFER OR SETOFF THAT IS

18  AVOIDABLE UNDER THE CODE OR THAT HOLDS A CLAIM AGAINST THE ESTATES

19  THAT COULD BE SUBJECT TO AN OBJECTION BASED UPON FAILURE TO RETURN AN

20  AVOIDABLE TRANSFER OR SETOFF, ARE DIRECTED TO REVIEW THEIR RECORDS

21  AND/OR THE DEBTORS' SCHEDULES FOR FURTHER INFORMATION.  HOWEVER, ALL

22  RIGHTS OF THE DEBTORS AND THE ESTATES ARE RESERVED WITH RESPECT TO

23  ANY AND ALL TRANSFERS OR SETOFFS WHICH MAY BE AVOIDABLE UNDER THE

24  BANKRUPTCY CODE.Copies of the Plan Trust Agreement shall be contained in the Plan

25  Supplement. The Plan Trust Agreement shall, among other matters, create the Plan Trust, identify

26  Acquisitions as the initial trustee of the Plan Trust, identify the compensation of the Plan Trust,

27  and specify the authorities and powers of the Plan Trustee, consistent with the plan.

28

MAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-
SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v3-SCC_Group_I_VD_DS.DOC

1    **10.7.    Establishment and Operations of the Plan Trust.**

2    The Plan Trust shall be established and shall become effective on the Effective Date.  The

3    Plan Trust is created pursuant to the Plan and the Confirmation Order.  The primary purpose of the

4    Plan Trust is the liquidation and distribution of the Plan Trust Property transferred to it, with no

5    objective to continue or engage in the conduct of a trade or business, except to the extent

6    reasonably necessary to, and consistent with, the liquidating purpose of the Plan Trust.  The Plan

7    Trust shall hold and administer the Plan Trust Property, including, but not limited to, any

8    Litigation Claims, and the proceeds thereof for liquidation and distribution in accordance with the

9    terms of the Plan.

10    From and after the Effective Date, the Plan Trust may use, acquire and dispose of the Plan

11    Trust AssetsProperty held in the Plan Trust, and take any of the actions set forth in this Article or

12    in the Plan Trust Agreement, without the approval of the Bankruptcy Court and free of the

13    restrictions of the Bankruptcy Code, the Bankruptcy Rules or the prior orders of the Bankruptcy

14    Court, other than restrictions expressly imposed by the Plan, the Confirmation Order or the Plan

15    Trust Agreement, provided that the Plan Trust is administered so that it qualifies as a liquidating

16    trust under Treasury Regulation § 301.7701-4(d).

17    **10.8.    Payment of Plan Trust ExpensesThe Plan Trustee.**

18    The expenses incurred by the Plan Trust or the Plan Trustee during the Plan Period, shall be

19    paid, or adequate reserves shall be created for the payment of such expenses, prior to any

20    distribution to the Plan Trust Beneficiaries.Acquisitions shall be Trustee of the Plan Trust.

21    Acquisitions is the direct or indirect parent of all of Debtors.

22    **10.9.    The Plan Trust Distribution SystemPayment of Trust Expenses.**

23    The Plan Trustee shall establish a separate "Distribution Account" for each Group I

24    Voluntary Debtor at an FDIC insured bank. Each Group I: Voluntary Debtor's Available Cash,

25    whether on hand as of the Effective Date or received thereafter, shall be deposited into that Group

26    I: Voluntary Debtor's Distribution Account.  These funds will then be used to pay the claims of

27    Creditors holding Allowed Claims in their order of priority as provided for in the Plan.  Persons

28    dealing with the Plan Trustee, or seeking to assert Claims against the Debtors, the Estates or the

MAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-
SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v3-SCC_Group_I_VD_DS.DOC

Plan Trust, shall look only to property of the Debtors, the Estates or the Plan Trust to satisfy any liability to such Persons, and the Plan Trustee shall have no corporate, personal, or individual obligation to satisfy any such liability. ~~The expenses incurred by the Plan Trust during the Plan Period, which shall include the compensation payable to the Acquisitions, shall be paid, or adequate reserves shall be created for the payment of such expenses, prior to any distribution to the Plan Trust Beneficiaries.~~

**10.10.  The Plan Trustee~~Plan Distribution System~~**.

       **10.10.1    Appointment**.  Acquisitions shall be Plan Trustee of the Plan Trust. The appointment of the Plan Trustee shall be effective as of the Effective Date.

       **10.10.2    Term**.  Unless the Plan Trustee resigns, dissolves or is removed by Court order earlier, the Plan Trustee's term shall expire upon termination of the Plan Trust pursuant to the Plan.  In the event the Plan Trustee resigns, dies or is removed by Court order prior to termination of the Plan Trust, the UST shall select and recommend to the Court a successor Plan Trustee.

       **10.10.3    Powers and Duties**.  On the Effective Date, the Plan Trustee shall have the rights, powers and duties set forth in the Plan, the Confirmation Order, and Bankruptcy Code §§505, 1107 and 1108.  The Plan Trustee shall be governed in all things by the terms of the Plan and the Confirmation Order.  The Plan Trustee shall administer the Plan Trust in accordance with the Plan.  Without limitation, the Plan Trustee shall file final federal, state, foreign and, to the extent applicable, local, tax returns.  Without further Motion, notice, or order of the Court, the Plan Trustee shall be authorized, empowered and directed to take all actions necessary to comply with the Plan and exercise and fulfill the duties and obligations arising thereunder, including, without limitation to:

       i.        employ, retain, and replace one or more attorneys, accountants, auctioneers, brokers, managers, consultants, other professionals, agents, investigators, expert witnesses, consultants, and advisors as necessary to discharge the duties of the Plan Trustee under the Plan;

MAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v3-SCC_Group_I_VD_DS.DOC

ii.    control and effectuate the Claims reconciliation process, including to object to, seek to subordinate, compromise or settle any and all Claims against the Debtors pursuant to the terms of the Plan;

iii.    open, maintain and administer bank accounts as necessary to discharge the duties of the Plan Trustee under the Plan;

iv.    make Distributions to the Holders of Allowed Claims in accordance with the Plan;

v.    retain professionals to assist in performing his or her duties under the Plan;

vi.    pay reasonable and necessary professional fees, costs, and expenses;

vii.    investigate, analyze, commence, prosecute, litigate, compromise, settle, dismiss, and otherwise administer all Causes of Action and Avoidance Actions for the benefit of the Plan Trust and its beneficiaries, as set forth in the Plan, and to take all other necessary and appropriate steps to collect, recover, settle, liquidate, or otherwise reduce to Cash all Causes of Action and Avoidance Actions, as the Plan Trustee may determine is in the best interests of the Plan Trust;

viii.   administer, sell, liquidate, or otherwise dispose of the Assets in accordance with the terms of the Plan;

ix.    incur and pay reasonable and necessary expenses in connection with the performance of the Plan Trustee's duties under the Plan;

x.    represent the Estates before the Court and other courts of competent jurisdiction with respect to mattes concerning the Plan Trust;

xi.    seek the examination of any entity under the subject to the provisions of Bankruptcy Rule 2004;

xii.   comply with applicable orders of the court and any other court of competent jurisdiction over the matters set forth in the Plan;

xiii.  comply with all applicable laws and regulations concerning the matters set forth in the Plan;

-91-

1          xiv.   exercise such other powers as may be vested in the Plan Trust pursuant to

2    the Plan, the Confirmation Order, or other Final Orders of the Court.

3          xv.   execute any documents, instruments, contracts, and agreements necessary

4    and appropriate to carry out the powers and duties of the Plan Trust;

5          xvi.   (1) seek a determination of tax liability under §505 of the code, (2) pay

6    taxes, if any, related to a Debtor, (3) file, if necessary, any and all tax and information returns

7    r3equired with the respect to the Plan Trust, including, if appropriate, treating the Plan Trust as a

8    "grantor trust" pursuant to Treas. Reg 1.671-4 or otherwise, (4) make tax elections by and on

9    behalf of the Plan Trust, and 95) pay taxes, if any, payable by the Plan Trust; and

10          xvii.  stand in the shoes of the Debtors for all purposes.

11    **10.10.4     Retention of Professionals and Compensation Procedure.**

12    On and after the Effective Date, the Plan Trustee may, without further application or

13    Motion, notice, hearing, or Court order, engage or employ such professionals and experts as may

14    be deemed necessary and appropriate by the Plan Trustee to assist the Plan Trustee in carrying out

15    the provisions of the Plan, including, but not limited to, the Professionals retained prior to the

16    Effective Date by either the Debtors or the Committee.  The Plan Trustee may employ such

17    professionals on any reasonable terms and conditions of employment to be determined by the Plan

18    Trustee.  For the services performed on and after the Effective Date, the professionals engaged by

19    the Plan Trustee (the "Plan Trustee Professionals") shall receive reasonable compensation and

20    reimbursement of expenses in a manner to be determined by the Plan Trustee.

21    **10.10.5     Fees and Expenses.**

22    Acquisitions shall not receive any compensation for the services it performs as the Plan

23    Trustee, other than the release provided for in the Plan, but shall be entitled to reimbursement of

24    reasonable expenses.  The Plan Trustee Professionals shall be entitled to reasonable compensation

25    for their services, and reimbursement of expenses.  The costs and expenses of the Plan trust

26    (including, without limitation, fees and expenses of the Plan Trustee Professionals) shall be paid

27    from the Plan Trust.  The Plan Trustee shall pay, without further order, notice or application to the

28    Court, the reasonable fees and expenses of the Plan Trustee Professionals, as necessary to

MAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-
SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v3-SCC_Group_I_VD_DS.DOC

discharge the Plan Trustee's duties under the Plan. The Plan Trustee shall be authorized to reserve funds from the Plan Trust as is reasonable to pay the expenses of the Plan Trustee and the expenses and fees of the Plan Trustee Professionals before making any Distributions under the Plan.

### 10.10.6    Limitation of Liability and Indemnification.

Neither the Plan Trustee nor its employees, Plan Trustee Professionals or agents shall be liable (a) for any loss or damages by reason of any action taken or omitted by him or her, except in the case of fraud, willful misconduct, bad faith, or gross negligence, or (b) for any act or omission made in reliance upon the Debtors' books and records or upon information or advice given to the Plan Trustee by his or her professionals. Except as otherwise provided in this Plan, the Plan Trustee shall rely and shall be protected in acting upon any resolution, certificate, statement, instrument, opinion, report, notice, consent, or other document believed by him or her to be genuine and to have been signed by the proper party or parties.

The Plan Trustee and its employees, Plan Trustee Professionals or agents (collectively, the "Indemnified Parties" and each, an "Indemnified Party") shall be indemnified and receive reimbursement from and against any and all loss, liability, expense (including attorneys' fees) or damage of any kind, type or nature, which the Indemnified Party may incur or sustain the exercise and performance of any of the Plan Trustee's powers and duties under this Plan or the Confirmation Order, or in the rendering of services by the Indemnified Party to the Plan Trustee, to the full extent permitted by applicable law, except if such loss, liability, expense or damage is finally determined by a court of competent jurisdiction to result from the Plan Trustee's or an Indemnified Person's fraud, willful misconduct, bad faith, or gross negligence. The amounts necessary for such indemnification and reimbursement shall be paid by the Plan Trustee out of the Plan Trust Property. The Plan Trustee shall not be liable for the payment of any Plan Trust expense or claim or other liability of the Plan Trust, and no Person shall look to the Indemnified Parties for the payment of any such expense or liability. This indemnification shall survive the dissolution, resignation or removal, as may be applicable, of the Plan Trustee, or the termination of the Plan Trust, and shall inure to the benefit of the Plan Trustee's and the Indemnified Person's heirs and assigns.

MAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v3-SCC_Group_I_VD_DS.DOC

1    **10.10.7    Plan Trustee as Successor.**

2        Pursuant to Code §1123(b), the Plan Trustee shall be the successor to the Group I

3    Voluntary Debtors for all purposes.  ~~The Plan Trustee shall establish a separate "Distribution~~

4    ~~Account" for each Group II Debtor at an FDIC insured bank. Each Group II Debtor's Available~~

5    ~~Cash, whether on hand as of the Effective Date or received thereafter, shall be deposited into that~~

6    ~~Group II Debtor's Distribution Account. The only exception to this provision shall be in the case of~~

7    ~~Net Sales Proceeds that are subject to disputed liens. Such proceeds shall remain in the applicable~~

8    ~~Net Proceed~~Net Sales Proceeds~~Accounts established to receive the proceeds from the sale of a~~

9    ~~particular property. Once all disputes regarding entitlement to the funds in the Net Proceed~~Net

10   ~~Sales Proceed~~s ~~Accounts have been resolved, the proceeds remaining (after the payment of the~~

11   ~~Allowed Claims secured by liens on these proceeds) shall be transferred to the Distribution~~

12   ~~Account. These funds will then be used to pay the claims of Creditors holding Allowed Claims in~~

13   ~~their order of priority as provided for in the Plan.~~

14       **10.11.   Beneficiaries~~Claims Estimation Rights~~**.

15       The Holders of Allowed Claims under the Plan, or any successors to such Holders'

16   Allowed Claims ("Beneficiary" or "Beneficiaries") shall own a beneficial interest in the Plan Trust

17   which shall, subject to the Plan, be entitled to a Distribution, if any, in the amounts, and at the

18   times, set forth in the Plan.  Ownership of a beneficial interest in the Plan Trust shall not be

19   evidenced by any certificate, security, or receipt or in any other form or manner whatsoever, except

20   as maintained on the books and records of the Plan Trust by the Plan Trustee.  The ownership of a

21   beneficial interest in the Plan Trust shall not entitle any Beneficiary to any title in or to the Plan

22   Trust assets or to any right to call for a partition or division of such assets or to require an

23   accounting.  The Plan Trustee shall make Distributions, if any, to Beneficiaries in the manner

24   provided in the Plan.

25       The rights of the Beneficiaries arising under the Plan Trust may be deemed "securities"

26   under applicable law.  However, such rights have not been defined as "securities" under the Plan

27   because (a) the intent of the Plan is that such rights shall not be securities, and (b) if the rights

28   arising under the Plan Trust are deemed to be "securities," the exemption from registration under

1    §1145 of the Bankruptcy code is intended to be applicable to such securities.On the Confirmation

2    Date, the SunCal ProponentSunCal Plan Proponents shall be vested with standing to file a motion

3    under 11 U.S.C. § 502(c), and they shall be authorized and empowered to seek in such motion the

4    estimation, for distribution purposes, of any Disputed Claim seeking recourse to, or claiming an

5    interest in, any asset of the Group I: Voluntary Debtors. After the Bankruptcy Court estimates a

6    Disputed Claimant's rights in, or against an asset of the Estates through this procedure, the

7    Committee shall have the right to use any funds or assets not deemed subject to the rights of the

8    Disputed Claimant, to pay the Allowed Claims under the terms of the Plan, including Allowed

9    Administrative Claims, after the Effective Date.

10        **10.12.  Claims Estimation Rights.**

11        On the Confirmation Date, the SunCal Plan Proponents shall be vested with standing to file

12    a motion under 11 U.S.C. § 502(c), and they shall be authorized and empowered to seek in such

13    motion the estimation, for Distribution purposes, of any Disputed Claim seeking recourse to, or

14    claiming an interest in, any asset of the Group I: Voluntary Debtors. After the Bankruptcy Court

15    estimates a Disputed Claimant's rights in, or against an asset of the Estates through this procedure,

16    the Plan Trustee shall have the right to use any funds or assets not deemed subject to the rights of

17    the Disputed Claimant, to pay the Allowed Claims under the terms of the Plan, including Allowed

18    Administrative Claims, after the Effective Date.

19        10.12.10.13.    **No Payment of Transfer-Related Fees to the United States Trustee**.

20        The Plan Trust shall not be required to pay any fees to the United States Trustee based on

21    any transfers of the Plan Trust AssetsProperty to the Plan Trust or from the Plan Trust.

22        10.13.10.14.    **No Payment of Transfer-Related Fees to the Trustee**.

23        The Plan Trust shall not be required to pay any fees to the Trustee based on any transfers of

24    Plan Trust AssetsProperty from the Trustee Voluntary Debtors to the Plan Trust, or from the Plan

25    Trust.

26        10.14.10.15.    **Books and Records of Trust**.

27        **10.15.** The Plaaan Trustee, and to the extent of payments and distributions by any

28    Disbursing Agent, the Disbursing Agent, shall maintain an accounting of receipts and

MAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-
SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v3-SCC_Group_I_VD_DS.DOC

disbursements of the Plan Trust. The Plan Trustee shall maintain the books and records of the Plan Trust, or provide storage for such book and records, for the longer of six (6) years, or while Plan is in existence, provided that the Court may, upon application by the Plan Trustee, authorize the Plan Trust to destroy all of the Plan Trusts books and records at such time as Plan Trust has no further need for such books and records. The Plan Trust's books and records shall be open to inspection at all reasonable times, upon written request by the Committee.

**10.16.  Limitations on Liability**.

The Plan Trustee shall not be liable for any act it may do or fail to do as the liquidating trustees hereunder while acting in good faith and in the exercise of its best judgment. The Plan Trust shall not be liable in any event for any claims, liabilities or damages based upon or arising out of any conduct of the Plan Trustee in the course of its activities as liquidating trustee, unless such claims, liabilities or damages arise from Plan's gross negligence or willful misconduct.

The Plan Trustee, and its officers, directors, agents and employees shall not be liable for any indebtedness, liability or obligation incurred or entered into on behalf of the Plan Trust, including, without limitation, indebtedness, liabilities or obligations under agreements, undertakings or commitments entered into or executed on behalf of Plan Trust by the Plan Trustee or by any person employed by the Plan Trustee or the Plan, it being expressly understood that all such indebtedness, liabilities and obligations of, and claims against the Plan, shall be the sole responsibility of the Plan and shall be satisfied only from the Plan, or such portion thereof as shall, under the terms of any agreement, be stated to be liable therefore. No claim or cause of action may be asserted against the Plan Trustee, or any member of the New Board on account of any indebtedness, liability or obligation entered into on behalf of the Plan, whether by legal or equitable proceedings, or by virtue of any bankruptcy or non-bankruptcy statute, rule or regulation.

Any undertaking, contract or agreement entered into in writing by the Plan may, except as otherwise provided by the Plan or the Plan Trust Agreement, expressly disclaim the personal liability of Plan Trustee.

10.17.10.16.    **Federal Income Tax Treatment of the Holders of the Plan Trust Beneficial Interests.**

For all United States federal income tax purposes, the transfers by the Group III Group I: Voluntary Debtors shall be treated by the Group I: Voluntary Debtors, their estates, the Plan Trust and the Plan Trust Beneficiaries as a transfer of the Plan Trust Assets Property by the Group I: Voluntary Debtors to the Plan Trust Beneficiaries followed by a transfer of the Plan Trust Assets Property by such the Plan Trust Beneficiaries to the Trust. The Plan Trust Beneficiaries shall be treated as the grantors and deemed owners of the Plan Trust for United States federal income tax purposes. The Plan Trust Trustee and the Plan Trust Beneficiaries are required to value their interests in the Plan Trust Assets Property consistently with the values placed upon the Plan Trust Assets Property by the Plan Trust, and to use such valuations for all purposes. The Plan Trust Agreement shall provide for consistent valuations of the Plan Trust Assets Property by the Plan Trust Trustee and the Plan Trust Beneficiaries, and shall provide that the Plan Trust will determine the fair market value of the Plan Trust Assets Property within thirty (30) days after the Effective Date, and send such determination to each the Plan Trust Beneficiary. By its acceptance of a the Beneficial Interest, each recipient of such an interest will be conclusively deemed to agree to use such valuations for all purposes, including, without limitation, in computing any gain recognized upon the exchange of such holder's claim for purposes of determining any United States Federal income tax, and shall be required to include those items of income, deductions and tax credits that are attributable to its the Beneficial Interest in computing its taxable income.

10.18.10.17.    **Termination of the Trust.**

The Plan Trust shall continue in effect until the earlier of: (a) the date that all the Plan Trust Assets Property has been liquidated, all proceeds have been converted to cash or distributed in kind, all the Plan Trust Expenses have been paid, all claims to be paid under the Plan for which the Plan Trust Trustee is obligated to make distributions on have been paid, all distributions to be made with respect to the Beneficial Interests have been made, all litigation to which the Plan Trust is a party have been concluded by dismissal or an order issued by the court in which such litigation is pending and such order has become "final" (consistent with the definition of Final Order in the

MAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v3-SCC_Group_I_VD_DS.DOC

plan for orders issued by the Bankruptcy Court), and the Chapter 11 Case has been closed; and (b) the expiration of five (5) years from the Effective Date; provided, however, that the Plan Trust may request the Bankruptcy Court to extend the permitted life of the Plan Trust for such additional period as is reasonably necessary to conclude the liquidation and distributions, not to exceed a total of ten (10) years from the Effective Date, which request shall be filed so the Bankruptcy Court may consider and rule on the request within six (6) months prior to the expiration of the initial five-year term.

10.19.10.18.    **Exemption from Certain Transfer Taxes**.

In accordance with Section 1146(ae) of the Bankruptcy Code, the issuance, transfer or exchange of a security or the making or delivery of an instrument of transfer under the plan may not be taxed under any law imposing a stamp tax or similar tax. All governmental officials and agents shall forego the assessment and collection of any such tax or governmental assessment and shall accept for filing and recordation any of the foregoing instruments or other documents without payment of such tax or other governmental assessment.

10.20.10.19.    **Tax Consequence of The Plan**.

The implementation of the Plan may have federal, state and local tax consequences to the Group IIIGroup I: Voluntary Debtors, Creditors and Interest Holders.  No tax opinion has been sought or will be obtained with respect to any tax consequences of the Plan. This Disclosure Statement does not constitute and is not intended to constitute either a tax opinion or tax advice to any person, and the summary contained herein is provided for informational purposes only.

CREDITORS AND INTEREST HOLDERS ARE ADVISED TO CONSULT WITH THEIR OWN TAX ADVISORS REGARDING THE TAX CONSEQUENCES TO THEM AND TO THE DEBTOR OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES.

**10.20    The Plan Sponsor.**

The Plan Sponsor shall be Acquisitions.

**10.21.    Acquisitions' Obligations** .

1      As part of its obligations as the Plan Sponsor, Acquisitions will manage the affairs of the

2  Plan Trust and manage the payment of the following amounts required under the Plan:

3          (a)     All Allowed Administrative Claims;

4          (b)     Allowed Priority Claims; and

5          (c)     Continuing Professional fees for the prosecution of the Litigation Claims

6          and other post-confirmation expenses

7      The actual source of the funding for these obligations will either be funds obtained from the

8  Net Sales Proceeds, or from the LitCo Plan Loan. ~~In exchange for the above referenced services,~~

9  ~~Acquisitions, and all of its Affiliates shall receive a complete release from all of the Debtors, the~~

10  ~~Estates, and the Plan Trust of any potential Litigation Claims. The Group I Debtors consider this a~~

11  ~~fair exchange, because they do not believe that they hold any material claims against Acquisitions.~~

12      **10.22.  The Committee.**

13      On the Effective Date, the Committee shall continue to serve their applicable Debtors as

14  Committee to the applicable reorganized Debtors, subject to the following:

15      **10.22.1  Duties and Powers.**

16      The duties of the Committee after the Effective Date shall be limited to monitoring the

17  Plan's implementation, notice and opportunity to object to any settlement of the Lehman

18  Adversary Proceeding, <u>and the Contract Action</u> standing to object to any settlement of any

19  Litigation Claim in excess of $100,000, ~~and~~ standing to object to any proposed sales procedures on

20  sale of the Debtors' Projects <u>and standing to file, prosecute and resolve objections to Claims filed</u>

21  <u>by Insiders that are SunCal Affiliates</u>.  The Committee shall receive notice of and the right to

22  review all payments and Distributions.

23      The Committee shall be entitled to retain, employ and compensate Professionals, in order

24  to assist with the obligations and rights of the Committee under the terms of the Plan.  Such

25  compensation shall be paid from the applicable Distribution Account(s).

26      **10.22.2  Dissolution of Committee.**

27      The Committee shall be dissolved upon the entry of an order converting, closing or

28  dismissing the Chapter 11 Cases or entry of a final decree in the Chapter 11 Cases.  On dissolution,

the ~~Confirmation~~ Committee shall have no other or further obligations or responsibilities on behalf of the Plan Trust.

**10.23.  Litigation Claims.**

Pursuant to Section 1123(b)(3) of the Bankruptcy Code, the Plan Trust shall retain all Litigation Claims whether or not pending on the Effective Date that are not purchased by LitCo. Unless a Litigation Claim is expressly waived, relinquished, released, sold, compromised or settled in the Plan or in a Final Order, all rights with respect to such Litigation Claims are reserved and the Plan Trustee may pursue such Litigation Claims.  Notwithstanding the foregoing, the Plan Trustee shall not settle or abandon a Litigation Claim valued at greater than $100,000 except upon ten (10) days' prior written notice and opportunity to object to one or another.  Any disputes concerning the settlement or abandonment of a Litigation Claim shall be submitted to the Bankruptcy Court for resolution on no less than ten (10) days' notice to the objecting party.

**10.24.  Collection of Litigation Recoveries.**

All Litigation Recoveries realized or obtained by the Plan Trustee ~~and/or the Committee~~ shall be promptly deposited into the applicable Distribution Account(s).  Except as otherwise provided in the Plan and the Confirmation Order, the Litigation Recoveries shall be free and clear of all Claims and Liens and shall only be expended in accordance with the provisions of the Plan.

**XI.**

**RISK FACTORS**

**11.1    Plan Risks.**

The Plan in this case, like any Chapter 11 reorganization plan, includes a number of risks that creditors should be aware of prior to voting on the Plan. The more material of these risks are summarized below.

**11.1.1  The Plan May Not Be Accepted or Confirmed.**

While the ~~SunCal Proponent~~SunCal Plan Proponents believe that the Plan is confirmable under the standards set forth in 11 U.S.C. § 1129, there can be no guarantee that the

MAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v3-SCC_Group_I_VD_DS.DOC

1    Bankruptcy Court will find the Plan to be confirmable. If the Plan is not confirmed, it is possible

2    that an alternative plan can be negotiated and presented to the Bankruptcy Court for approval;

3    however, there can be no assurance that any alternative plan would be confirmed, that the Chapter

4    11 Cases would not be converted to a liquidation, or that any alternative plan of reorganization

5    could or would be formulated on terms as favorable to the Creditors and holders of Equity Interests

6    as the terms of the Plan.

7    **11.1.2   Failure to Sell The ~~Group II~~Group I: Voluntary Projects**.

8    The Plan is based upon the assumption that the SunCal Plan Proponents will be able to

9    close the sale of the Group I Projects for at least the Minimum Sales Prices on the Effective Date.

10   Although the ~~SunCal Proponent~~SunCal Plan Proponents are confident that they can achieve sales

11   at these prices based upon their market research and familiarity with the projects, a possibility

12   exists that these sales will not occur. If this occurs then the creditors holding liens against the

13   Group I Projects will be entitled to seek recourse against these properties, and this recourse would

14   include foreclosure.

15   **11.1.3  Adverse Outcome of Pending Litigation.**

16   The SunCal Plan Proponents have filed objections to the claims of the Lehman Lenders,

17   and they intend to pursue the Lehman Adversary Proceeding against LCPI claims and liens once

18   they obtain relief from the automatic stay in LCPI's Chapter 11 case. The ~~SunCal~~

19   ~~Proponent~~SunCal Plan Proponents believe that their defenses to the claims asserted by the Lehman

20   Lender have merits and that they will be sustained and that relief will also be granted in the

21   Lehman Adversary Proceeding. However, there is no assurance that this will occur. Litigation

22   involves risks, including most importantly the risk of an adverse ruling. Although the risk of an

23   adverse ruling will not affect Holders of Class 6.1, 6.2, 6.3 and 6.4 Claims that vote in favor of

24   Option A (~~$.60~~55 percent distribution), it will affect those that vote in favor of Option B, and it

25   will affect the future distributions payable to the Class 7.1, 7.2, 7.3 and 7.4.

26

27   **XI.**

28   **DISTRIBUTIONS**

MAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-
SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v3-SCC_Group_I_VD_DS.DOC

1   **12.1   Distribution Agent**.

2   Acquisitions shall serve as the Distribution Agent for distributions due under the Plan.  The

3   Distribution Agent may employ one or more sub agents on such terms and conditions as it may

4   agree in its discretion and pay such sub agent as a Post Confirmation Expense from the

5   Distribution Accounts.  The Distribution Agent shall not be required to provide any bond in

6   connection with the making of any Distributions pursuant to the Plan.

7   **12.2   Distributions**.

8   **12.2.1   Dates of Distributions**.

9   Any distribution required to be made on the Effective Date shall be deemed timely if made

10  as soon as practicable after such date and, in any event, within thirty (30) days after such date.  Any

11  distribution required to be made upon a Disputed Claim becoming an Allowed Claim and no

12  longer being a Disputed Claim shall be deemed timely if made as soon as practicable thereafter.

13  **12.2.2   Limitation on Liability**.

14  Neither the Plan Sponsor, the Plan Trustee, the Distribution Agent, their Affiliates, nor any

15  of their employees, members, officers, directors, agents, or professionals or Affiliates shall be

16  liable for (i) any acts or omissions (except for gross negligence or willful misconduct) in

17  connection with implementing the Distribution provisions of the Plan and the making or

18  withholding of Distributions pursuant to the Plan, or (ii) any change in the value of distributions

19  made pursuant to the Plan resulting from any delays in making such distributions in accordance

20  with the Plan's terms (including but not limited to any delays caused by the resolution of Disputed

21  Claims).

22  **12.3   Old Instruments and Securities**.

23  **12.3.1   Surrender and Cancellation of Instruments and Securities**.

24  As a condition to receiving any distribution pursuant to the Plan, each Person holding any

25  note or other instrument or security (collectively "Instruments or Securities" and individually an

26  "Instrument or Security") evidencing, an existing Claim(s) against the Debtor(s) must surrender

27  such Instrument or Security to the Distribution Agent.

28  **12.3.2   Cancellation of Liens**.

MAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-
SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v3-SCC_Group_I_VD_DS.DOC

1    Except as otherwise provided in the Plan, any Lien securing any Secured Claim shall be

2  deemed released and discharged, and the Person holding such Secured Claim shall be authorized

3  and directed to release any collateral or other property of the Debtors (including, without

4  limitation, any cash collateral) held by such Person and to take such actions as may be requested by

5  the Plan Trustee to evidence the release of such Lien, including, without limitation, the execution,

6  delivery and Filing or recording of such releases as may be requested by the Plan Trustee.

7              **12.3.3        De Minimis Distributions and Fractional Shares.**

8    No Cash payment of less than ten dollars ($10) shall be made by the Plan Trust to any

9  Holder of Claims unless a request therefore is made in writing to the Plan Trust.  Whenever

10  payment of a fraction of a cent would otherwise be called for, the actual payment shall reflect a

11  rounding down of such fraction to the nearest whole cent.  Any Cash or other property that is not

12  distributed as a consequence of this section shall, after the last distribution on account of Allowed

13  Claims in the applicable Class, be treated as "Unclaimed Property" under the Plan.

14              **12.3.4        Delivery of Distributions.**

15    Except as provided in the Plan with respect to Unclaimed Property, distributions to Holders

16  of Allowed Claims and Allowed Administrative Claims shall be distributed by mail as follows:  (1)

17  with respect to each Holder of an Allowed Claim that has filed a Proof of Claim, at the address for

18  such Holder as maintained by the official claims agent for the Debtors; (2) with respect to each

19  Holder of an Allowed Claim that has not filed a Proof of Claim, at the address reflected on the

20  Schedules filed by the Debtors, provided, however, that if the Debtors or the Plan Trust has

21  received a written notice of a change of address for such Holder, the address set forth in such

22  notice shall be used; or (3) with respect to each Holder of an Allowed Administrative Claim, at

23  such address as the Holder may specify in writing.

24

25

26              **12.3.5        Undeliverable Distributions.**

27    If the Distribution of Cash to the Holder of any Allowed Claim is returned to the Plan

28  Trustee as undeliverable or the Distribution check is not negotiated within 90 days of mailing (any

MAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-
SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v3-SCC_Group_I_VD_DS.DOC

such distribution being hereinafter referred to as "Unclaimed Property"), no further distribution shall be made to such Holder unless and until the Plan Trustee is notified in writing of such Holder's then current address.  Subject to the remainder of this Section and the following section, Unclaimed Property shall remain in the possession of the Plan Trustee pursuant to this Section, and shall be set aside and (in the case of Cash) held in a segregated interest bearing account (as to Cash Unclaimed Property) to be maintained by the Distribution Agent until such time as the subject Distribution becomes deliverable.  Nothing contained in the Plan shall require the Plan Trustee or any other Person to attempt to locate such Person.

### 12.3.6    Disposition of Unclaimed Property.

If the Person entitled thereto notifies the Plan Trustee of such Person's Claim to a Distribution of Unclaimed Property within ninety (90) days following such Person's initial Distribution Date, Effective Date, the Unclaimed Property distributable to such Person, together with any interest or dividends earned thereon, shall be paid or distributed to such Person as soon as practicable.  Any Holder of an Allowed Claim that does not assert a Claim in writing for Unclaimed Property held by the Plan Trustee within ninety (90) days after the Holder's initial Distribution Date shall no longer have any Claim to or Interest in such Unclaimed Property, and shall be forever barred from receiving any distributions under the Plan or otherwise from the Plan Trustee.  In such cases, any property held for Distribution on account of such Claims shall become Available Cash and deposited into the Distribution Account.

### XIII.

### OBJECTIONS TO CLAIMS AND DISPUTED CLAIMS

### 13.1    Standing for Objections to Claims.

~~that are SunCal Affiliates that are SunCal AffiliatesThe Plan Trustee shall have the sole and exclusive right to file, prosecute and resolve objections to Claims other than to the right to object to the claims of SunCal Affiliates, which shall be vested with the applicable Committee. The applicable Committee shall have standing to object to any settlement of any Litigation Claim in excess of $100,000 and standing to object to any proposed sales procedures and sale of the Debtors' Projects.~~ The Plan Trustee shall have the sole and exclusive right to file, prosecute and

-104-

1  resolve objections to Claims, excluding Claims filed by Insiders that are SunCal Affiliates.  The

2  Committee shall have the sole and exclusive right to file, prosecute and resolve objections to

3  Claims filed by Insiders that are SunCal Affiliates.

4

5        Any objection to a Claim shall be Filed with the Bankruptcy Court and served on the Person

6  holding such Claim on or before the applicable Claims Objection Deadline.  The Plan Trustee shall

7  have the right to petition the Bankruptcy Court, without notice or a hearing, for an extension of the

8  Claims Objection Deadline if a complete review of all Claims cannot be completed by such date.

9      **13.2**  **Treatment of Disputed Claims and Disputed Liens.**

10       **13.2.1  No Distribution Pending Allowance.**

11        If any portion of a Claim or Lien is a Disputed Claim or Disputed Lien, no payment

12  or distribution provided for under the Plan shall be made on account of such Claim or Lien unless

13  and until such Claim or Lien becomes an Allowed Claim and/or Allowed Lien, and all objections

14  thereto have been settled or withdrawn or have been determined by Final Order, and the Disputed

15  Claim, or some portion thereof, has become an Allowed Claim; provided, however, that if the only

16  dispute regarding a Disputed Claim is to the amount of the Disputed Claim, the Holder of a

17  Disputed Claim shall be entitled to a Distribution on account of that portion of the Disputed Claim

18  which the Plan Trustee does not dispute at the time and in the manner that the Plan Trustee makes

19  Distributions to the Holders of Allowed Claims pursuant to the provisions of the Plan.

20       **13.2.2  Distribution After Allowance.**

21        On the next Distribution Date following the date on which a Disputed Claim

22  becomes an Allowed Claim and is no longer a Disputed Claim, the Distribution Agent shall

23  distribute to the Person holding such Claim any Cash that would have been distributable to such

24  Person if on the initial Distribution Date such Claim had been an Allowed Claim and not a

25  Disputed Claim.

26                         **XIV.**

27       **EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

28

**14.1    Executory Contracts to be Assumed and Assigned**~~Executory Contracts
Potentially Being Assumed or Rejected~~.

Under the Plans, the Group I: Voluntary Debtors Projects will be sold.  As a result, the Group I: Voluntary Debtors will assume only those executory contracts and unexpired leases to be assigned to the Winning Bidder with respect to the applicable Project.

On the Effective Date, the executory contracts and unexpired leases identified on the Schedule of Assumed and Assigned Agreements attached or to be attached hereto as Exhibit "9" or filed or to be filed as Exhibit "9" to this document shall be deemed assumed and assigned to the applicable Winning Bidder, as specified in the Confirmation Order.  The SunCal Plan Proponents intend to file the Schedule of Assumed and Assigned Agreements with the Court no later than _____ (____) days prior to the Confirmation Hearing.  The Schedule of Assumed and Assigned Agreements also identifies or will identify any amounts that must be paid to cure defaults under the executory contacts and unexpired leases to be assumed and assigned under the Plan (the "Cure Amount").  If filed earlier, the SunCal Plan Proponents reserve the right to amend the Schedule of Assumed Agreements up to _____ (__) days prior to the Confirmation Hearing (_____, 2011) to: (a) add any executory contract or unexpired lease and provide for its assumption and assignment; or (b) modify the Cure Amount for any particular executory contract or unexpired lease.  The SunCal Plan Proponents further reserve the right to amend the Schedule of Assumed Agreements to delete any executory contract or unexpired lease and provide for its rejection at any time prior to the Confirmation Hearing.  The SunCal Plan Proponents will provide notice of any amendment to the Schedule of Assumed and Assigned Agreements to any party or parties to the executory contracts or unexpired leases affected by the amendment.  Absent a timely objection as provided below, the Confirmation Order will constitute a Court Order approving the assumption and assignment, on the Effective Date, of the executory contracts and unexpired leases then identified on the Schedule of Assumed and Assigned Agreements, and shall constitute a final determination of the Cure Amount and that the estate has shown adequate assurance of future performance.  Furthermore, any Cure Amount ordered by the Court, through entry of the Confirmation Order, and paid shall be deemed to satisfy any and all defaults arising from, out of or

related to the executory contract of unexpired lease, including any tort claims that were or could be asserted by the non-debtor party to the contract or lease on or prior to the entry of the Confirmation Order, and all actual or pecuniary losses that have resulted from such defaults.

If you are a party to an executory contract or unexpired lease to be assumed and assigned and you object to the assumption and assignment of your lease or contract and/or you dispute the Cure Amount related to your lease or contract, then you must File and serve upon counsels for the SunCal Plan Proponents (at the address on the upper left hand corner of the caption page) a written objection by ____, 2011.  An objection to the Cure Amount must also set forth the amount you contend to be the correct Cure Amount and contain evidence to support such amount.  Failure to timely File an objection as provided herein shall be deemed consent to the proposed assumption and assignment and to the Cure Amount and a waiver of any and all rights to challenge such assumption and assignment and the Cure Amount.

With respect to each executory contract and unexpired lease identified on the Schedule of Assumed and Assigned Agreements, if no dispute arises regarding the Cure Amount, adequate assurances, or some other matter related to the assumption of the executory contact or unexpired lease, then the Cure Amount set forth in the schedule of Assumed and Assigned Agreements shall be paid to the applicable non-debtor party in Cash on the Effective Date or as soon as reasonably practicable thereafter.  If a dispute arises regarding (a) whether the proposed assignee has provided adequate assurance of future performance of an executory contract or unexpired lease to be assumed, or (b) any other matter pertaining to a proposed assumption and assignment, the Cure Amount will be paid on the later of (1) the Effective Date or as soon as practicable thereafter, or (2) within thirty (30) days after entry of a Final order resolving the dispute and approving the assumption and assignment; provided, however, if a dispute arises regarding any of the foregoing, the SunCal Plan Proponents reserve, for themselves and the Plan Trustee, the right to completely forego assumption and assignment of and, instead, reject the subject executory contract or unexpired lease.

If a party to an executory contract or unexpired lease identified on the Schedule of Assumed and Assigned Agreements Files an objection disputing the Cure Amount, then the

MAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-
SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v3-SCC_Group_I_VD_DS.DOC

SunCal Plan Proponents may amend the Schedule of Assumed and Assigned Agreements at any time prior to the Confirmation Hearing to delete the subject executory contract or unexpired lease and provide for its rejection.  Executory contracts or unexpired leases not so deleted shall be conditionally assumed, subject to the SunCal Plan Proponents' and/or the Plan Trustee's right to file a Motion to determine the appropriate Cure Amount up to the first (1st) Business Day that is at least sixty (60) days following the Effective Date.  The SunCal Plan Proponents and/or the Plan Trustee will serve any such Motion on the party to the executory contract or unexpired lease affected by the Motion (or its attorneys, if any).  If the SunCal Plan Proponents and Plan Trustee does not file a Motion to determine the appropriate Cure Amount, then the executory contract or unexpired lease shall be assumed and assigned, as of the Effective Date, and the Cure Amount shall be the alternative Cure Amount asserted by the non-debtor party to the subject executory contract or unexpired lease in its objection to the Plan.  The Cure Amount shall be paid as soon as reasonably practicable following the expiration of the 60-day deadline.

If the SunCal Plan Proponents or the Plan Trustee files a Motion to determine the appropriate Cure Amount, then the SunCal Plan Proponents and/or Plan Trust shall have the right to amend the Schedule of Assume and Assigned Agreements to completely forego assumption and assignment of and, instead, reject the subject executory contract or unexpired lease up to the first (1st) Business Day that is at least fifteen (15) days after the entry of an order fixing the Cure Amount.  The SunCal Plan Proponents and/or Plan Trustee will provide notice of any amendment to the Schedule of Assumed and Assigned Agreements to the party to the executory contract or unexpired lease affected by the amendment.  If the SunCal Plan Proponents and/or Plan Trustee has filed such a Motion and does not timely amend the Schedule of Assumed and Assigned Agreements within fifteen (15) days after entry of an order fixing the Cure Amount, then the executory contract or unexpired lease shall be assumed and assigned, as of the Effective Date, and the Cure Amount shall be fixed as the Cure Amount ordered by the Court.  The Cure Amount as soon as reasonably practicable following the expiration of the 15-day deadline.~~The SunCal ProponentSunCal Plan Proponents shall provide a list of those contracts that being assumed or rejected under the Plan in the Plan supplement. However, this list may be amended at any time~~

1  prior to the Effective Date.  All contracts or leases not assumed by the Effective Date shall be

2  deemed rejected.

3       **14.2**  **Executory Contracts to be Rejected~~Bar Date for Rejection Damages~~**.

4       On the Effective Date, the estate will be deemed to have rejected any and all executory

5  contacts and unexpired leases not identified on the Schedule of Assumed and Assigned

6  Agreements attached or to be attached hereto as Exhibit "9," or filed or to be filed as Exhibit "9" to

7  this document.  The Confirmation Order will constitute a Court order approving the rejection, as of

8  the Effective Date, of such executory contacts and unexpired leases.  Any Claim for damages

9  arising from the rejection under the Plan of any executory contract or unexpired lease must be filed

10  with the Court and served upon the SunCal Plan Proponents and the Plan Trustee within thirty (30)

11  days of the later of (a) the Confirmation Date, and (b) the Plan Trustee's amendment of the

12  Schedule of Assumed and Assigned Agreements to eliminate the executory contract or unexpired

13  lease.  Any such damage Claims that are not timely filed and served will be forever barred and

14  unenforceable against the applicable Debtors, the Estates, the Plan Trustee, the Plan Trust, and

15  their respective property.  Persons holding these Claims who fail to timely file claims will be

16  barred from receiving any Distributions under the Plan on account of their rejection damage

17  Claims.

18       If you are a party to a lease or contract to be rejected and you object to the rejection

19  of your lease or contract, then you must file and serve your objection by _____.~~Any Claim~~

20  ~~arising out of the rejection of an executory contract or unexpired lease shall be forever barred and~~

21  ~~shall not be enforceable against the Debtors, the Plan Trust, their Affiliates, their successors, or~~

22  ~~their properties, and shall not be entitled to any distribution under the Plan, unless a Proof of Claim~~

23  ~~for such Claim is filed and served on the Debtors, or the Plan Trust within thirty (30) days after the~~

24  ~~receipt of a notice of the rejection of any contract or lease.~~

25       **14.3**  **Changes in Rates Subject to Regulatory Commission Approval.**

26       The Debtors are not subject to governmental regulatory commission approval of their rates**.**

27                **XV.**

28       **BEST INTEREST OF CREDITORS TEST AND PLAN FEASIBILITY**

MAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-
SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v3-SCC_Group_I_VD_DS.DOC

1        **15.1    Best Interests Test**.

2            Pursuant to Section 1129(a)(7) of the Bankruptcy Code, a Plan cannot be confirmed unless

3    the Bankruptcy Court determines that Distributions under the Plan to all Holders of Claims and

4    Interests who have not accepted the plan and whose Claims are classified in Classes that are

5    impaired under the plan, are not less than those which they would receive in a liquidation under

6    Chapter 7 of the Bankruptcy Code.

7            The Best Interest of Creditors Test must be satisfied even if the Plan is accepted by each

8    impaired Class of Claims and if any Holder of an Allowed Claim objects to the Plan on such basis.

9    The Best Interests Test requires the Bankruptcy Court to find either that either (i) <u>all</u> Holders of

10    Claims in an impaired Class of Claims have accepted the Plan or (ii) the Plan provides each Holder

11    of Allowed Claims of an impaired Class who has not accepted the Plan with a recovery of property

12    of a value, as of the effective date of the Plan, that is not less than the amount that such Holder

13    would receive if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code.

14            The Plan proposed by the Plan Proponents is essentially a liquidating plan. It provides for

15    the sale of all assets of the estate for their fair market value, the collection or recovery of all other

16    assets, and for the distribution of the resulting net proceeds from the sale, in accordance with the

17    priorities provided for in the bankruptcy code and under California law. A Chapter 7 trustee

18    appointed in this case would be compelled to liquidate the Debtors' assets in the same manner as

19    provided for in the Plan and to pay out the proceeds in the same manner as provided for in the

20    Plan. Accordingly, under the terms of the Plan, each individual creditor is receiving "at least as

21    much" as such creditor would receive in a Chapter 7 case, which is all that is required under the

22    Best Interests Test.

23            Although the Lehman Entities will argue that they are being denied their "credit bid" rights

24    under the Plan, and this reduces their distribution below the level that they would receive in a

25    Chapter 7 case, this argument fails.  A credit bid right does not add or reduce the value of a

26    creditor's collateral, it simply allows a creditor holding such a right to bid against other bidders

27    using its debt as "credit", rather than bidding in cash. If the creditor's collateral is sold for its "fair

28    market value," in cash, and the creditor receives what it is entitled to from the sales proceeds, then

MAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-
SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v3-SCC_Group_I_VD_DS.DOC

1    the creditor is necessarily receiving exactly what it would receive in a Chapter 7. This is all that the

2    Best Interest Test Requires.  See Exhibit "7" hereto.

3        **15.2    Feasibility**.

4        In addition, in order to confirm the Plan, the Bankruptcy Court must find that confirmation

5    of the Plan is not likely to be followed by the liquidation or the need for further financial

6    reorganization of the Debtor(s).  This requirement is imposed by Section 1129(a)(11) of the

7    Bankruptcy Code and is generally referred to as the "feasibility" requirement. As explained above,

8    the Debtors' Plan provides for the sale of all assets of their respective estates and for the

9    distribution of the proceeds. Within the context of the plan, feasibility is limited to having

10    sufficient funds to pay administrative and priority claims on the Effective Date and sufficient funds

11    to fund the sale of the Properties.

12        Under timeline provided for in the Plan, the Group I Project will be sold on the Effective

13    Date. The ~~Net Proceed~~Net Sales Proceeds from these sales, plus the proceeds of the LitCo Plan

14    Loan, will provide the Debtors the means to pay all claims, including allowed administrative and

15    priority claims on this same date, from escrow. All remaining claimants will then receive what they

16    are entitled under the Plan when their claims are allowed.

17                            **XVI.**

18                    **LIMITATION OF LIABILITY**

19        **16.1    No Liability for Solicitation or Participation.**

20        As specified in Section 1125(e) of the Bankruptcy Code, entities that solicit acceptances or

21    rejections of the Plan and/or that participate in the offer, issuance, sale, or purchase of securities

22    offered or sold under the Plan, in good faith and in compliance with the applicable provisions of

23    the Bankruptcy Code, shall not be liable, on account of such solicitation or participation, for

24    violation of any applicable law, rule, or regulation governing the solicitation of acceptances or

25    rejections of the Plan or the offer, issuance, sale, or purchase of securities.

26                            **XVII.**

27                **CONDITIONS TO CONFIRMATION AND**

28                    **EFFECTIVENESS OF THE PLAN**

**17.1    Conditions Precedent to Plan Confirmation.**

The only condition precedent to confirmation of the Plan is that the Bankruptcy Court shall have entered a Confirmation Order in form and substance reasonably acceptable to the SunCal Plan Proponents.

**17.2    Conditions Precedent to Plan Effectiveness.**

The conditions precedent to the effectiveness of the Plan and the occurrence of the Effective Date is that the Confirmation Order shall be a Final Order in form and substance reasonably satisfactory to the SunCal Plan Proponents~~, and the resolutions of any material impairment of the Plan terms caused by the automatic stays applicable in the Lehman Entities cases. The automatic stay in the Debtors'~~ cases shall continue to be applicable until the Effective Date.

## XVIII.

## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order or the occurrence of the Effective Date, the Bankruptcy Court shall not be limited under the Plan and the Bankruptcy Court's jurisdiction shall apply to the fullest extent possible under applicable law.  The Court will retain exclusive jurisdiction during the Plan payout period to resolve disputes and conflicts arising from the administration of the Plan, upon request of a party-in-interest and after notice and a hearing, including, without limitation:

a.    The adjudication of the validity, scope, classification, allowance, and disallowance of any Claim;

b.    The estimation of any Claim;

c.    The allowance or disallowance of Professional-Fee Claims, compensation, or other Administrative Expense Claims;

d.    To her and determine Claims concerning taxes pursuant to Bankruptcy Code §§ 346, 505, 525, and 1146;

e.    To hear and determine any action or proceeding brought under Bankruptcy Code §§108, 510, 543, 544, 545, 547, 548, 549, 550, 551 and 553;

MAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v3-SCC_Group_I_VD_DS.DOC

f.      To hear and determine all actions and proceedings which relate to pre-confirmation matters;

g.      To hear and determine any issue relating to the assumption or rejection of executory contracts and unexpired leases;

h.      To hear and determine any modification to the plan in accordance with the Bankruptcy Rules and Bankruptcy Code;

i.      To enforce and interpret the terms of the Plan;

j.      To correct any defects, cure any omissions, or reconcile any inconsistency in the Plan or the Confirmation Order as may be necessary to carry out the purpose and intent of the Plan;

k.      the entry of any order, including injunctions, necessary to enforce title, rights and powers of the Plan Trust, and to impose such limitations, restrictions, terms and conditions on such title, rights and powers as the Court may deem necessary including, without limitation, any right of the Plan Trust to recover and liquidate assets;

l.      To determine the validity, extent and priority of all liens and security interests against property of the Estates or the Plan trust;

m.      To hear and resolve any disputes regarding employment applications and professional fees;

n.      To her and determine such matters and make such orders as are consistent with the Plan as may be necessary to carry out the provisions thereof and to adjudicate any disputes arising under or relating to any order entered by the Court in these Cases;

o.      The entry of an order concluding and terminating these Cases; and

p.      To resolve any disputes as to whether there has been a default under the Plan.

## XIX.

## MODIFICATION OR WITHDRAWAL OF THE PLAN

### 19.1    Modification of Plan.

At any time prior to confirmation of the Plan, the former Debtor(s) may supplement, amend or modify the Plan.  After confirmation of the Plan,  the Debtors or Plan Trustee may (x) apply to the Bankruptcy Court, pursuant to Section 1127 of the Bankruptcy Code, to modify the Plan; and

MAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v3-SCC_Group_I_VD_DS.DOC

1   (y) apply to the Bankruptcy Court to remedy defects or omissions in the Plan or to reconcile

2   inconsistencies in the Plan.

3   **19.2    Nonconsensual Confirmation.**

4       In the event that any impaired Class of Claims or Interests shall fail to accept the Plan in

5   accordance with Section 1129(a)(8) of the Bankruptcy Code, SunCal Plan Proponents (i) may

6   request that the Bankruptcy Court confirm the Plan in accordance with Section 1129(b) of the

7   Bankruptcy Code, and (ii) in accordance with Section 16.1 of the Plan, and may modify the Plan in

8   accordance with Section 1127(a) of the Bankruptcy Code.

9                                   XX.

10                      **EFFECT OF CONFIRMATION**

11      **20.1    Discharge.**

12          Confirmation of the Plan does not discharge the Group I: Voluntary Debtors as set

13  forth in Bankruptcy Code §1141.

14      **20.2    Revesting of the Assets.**

15          The Assets shall not be vested in the Group I: Voluntary Debtors on or following

16  the Effective Date, but shall be vested in the Plan Trust and continue to be subject to the

17  jurisdiction of the Court following confirmation of the Plan until such Assets are distributed to the

18  Holders of Allowed Claims in accordance with the provisions of the Plan.

19      **20.3    Exculpation and Releases**

20          Effective upon the entry of the Confirmation Order, neither the Group I: Voluntary Debtors,

21  the Committees, Plan Sponsor, the SunCal Plan Proponents, the Professionals, nor any of their

22  respective members, officers, directors, shareholders, employees, or agents, shall have or incur any

23  liability to any Person, including any creditors or Interest Holder of the Debtors, for any act taken

24  or omission made in connection with or related to the negotiation, formulation, or preparation of

25  the Plan and the Disclosure Statement, the approval of the Disclosure Statement, the confirmation

26  of the Plan, the consummation of the Plan, or the administration of the Plan, the Cases, or the

27  property to be distributed under the Plan, to the fullest extent permitted by applicable statues and

28

MAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v3-SCC_Group_I_VD_DS.DOC

case law, except that the Plan Trust will be liable for the performance of obligations assumed by it or imposed upon it under or by the Plan.

## XXI.

## MISCELLANEOUS

### 21.1    Payment of Statutory Fees.

All quarterly fees due and payable to the Office of the United States Trustee pursuant to Section 1930(a)(6) of title 28 of the United States Code shall be paid in full on or before the Effective Date, or, to the extent such quarterly fees are disputed, an adequate reserve shall have been established and set aside for payment in full thereof, as required by Section 1129(a)(12) of the Bankruptcy Code.  The Plan Trustee shall remain responsible for timely payment of quarterly fees due and payable after the Effective Date and until the Debtors' Cases are closed, to the extent required by Section 1930(a)(6) of title 28 of the United States Code.

### 21.2    Payment Dates.

Whenever any payment or distribution to be made under the Plan shall be due on a day other than a Business Day, such payment or distribution shall instead be made, without interest, on the immediately following Business Day.

### 21.3    Headings.

The headings used in this Disclosure Statement and in the Plan are inserted for convenience only and neither constitutes a portion of this Disclosure Statement or the Plan nor in any manner affect the construction of the provisions of this Disclosure Statement or the Plan.

### 21.4    Other Documents and Actions.

The Plan Trustee may execute such other documents and take such other actions as may be necessary or appropriate to effectuate the transactions contemplated under the Plan.

### 21.5    Notices.

All notices and requests in connection with this Disclosure Statement and the Plan shall be in writing and shall be hand delivered or sent by mail addressed to:

MAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v3-SCC_Group_I_VD_DS.DOC

**To the SunCal Plan Proponents**:
Bruce V. Cook
General Counsel
Authorized Agent of the SunCal Plan Proponents
2392 Morse Ave
Irvine, CA 92614-6234

**With copies to:**
Paul J. Couchot
Winthrop & Couchot, Professional Corporation
660 Newport Center Drive, Suite 400
Newport Beach, CA 92660

Ronald Rus
Rus Miliband & Smith P.C.
2211 Michelson Drive, Seventh Floor
Irvine, California 92612

All notices and requests to any Person holding of record any Claim or Interest shall be sent to them at their last known address or to the last known address of their attorney of record. Any such Person may designate in writing any other address for purposes of this Section, which designation will be effective on receipt.

**21.6    Governing Law.**

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), the laws of the State of California (without reference to its conflict of law rules) shall govern the construction and implementation of the Plan and any agreements, documents, and instruments executed in connection with the Plan, unless otherwise specifically provided in such agreements, documents, or instruments.

**21.7    Binding Effect.**

The Plan and all rights, duties and obligations thereunder shall be binding upon and inure to the benefit of the Plan Sponsor Debtors, the Plan Trustee, Holders of Claims, Holders of Interests, and their respective successors and assigns.

**21.8    Successors and Assigns.**

MAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v3-SCC_Group_I_VD_DS.DOC

1    The rights, benefits, and obligations of any entity named or referred to in the Plan shall be

2    binding on, and shall inure to the benefit of, the heirs, executors, administrators, successors, and

3    assigns of such entity.

4    **21.9    Severability of Plan Provisions.**

5    If, prior to the Confirmation Date, any term or provision of the Plan is held by the

6    Bankruptcy Court to be illegal, impermissible, invalid, void or unenforceable, or otherwise to

7    constitute grounds for denying confirmation of the Plan, the Bankruptcy Court shall, with the

8    consent of the Debtors, have the power to interpret, modify or delete such term or provision (or

9    portions thereof) to make it valid or enforceable to the maximum extent practicable, consistent

10    with the original purpose of the term or provision held to be invalid, void or unenforceable, and

11    such term or provision shall then be operative as interpreted, modified or deleted.  Notwithstanding

12    any such interpretation, modification or deletion, the remainder of the terms and provisions of the

13    Plan shall in no way be affected, impaired or invalidated by such interpretation, modification or

14    deletion.

15    **21.10    No Waiver.**

16    The failure of the Debtors or any other Person to object to any Claim for purposes of voting

17    shall not be deemed a waiver of the Committee', the Debtors' or the Plan Trustee's right to object

18    to or examine such Claim, in whole or in part.

19    **21.11    Inconsistencies.**

20    In the event the terms or provisions of this Disclosure Statement are inconsistent with the

21    terms and provisions of the Plan or documents executed in connection with the Plan, the terms of

22    the Plan shall control.

23

24    **21.12    Exemption from Certain Transfer Taxes and Recording Fees.**

25    Pursuant to Section 1146(c) of the Bankruptcy Code, any transfers from a Debtor to the

26    Plan Trust or to any other Person or entity pursuant to the Plan, or any agreement regarding the

27    transfer of title to or ownership of any of the Debtors' real or personal property or of any other

28

1   interest in such property (including, without limitation, a security interest) will not be subject to

2   any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax,

3   stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or

4   recording fee, or other similar tax or governmental assessment, and the Confirmation Order will

5   direct the appropriate state or local governmental officials or agents to forego the collection of any

6   such tax or governmental assessment and to accept for filing and recordation any of the foregoing

7   instruments or other documents without the payment of any such tax or governmental assessment.

8       **21.13   Post-Confirmation Status Report.**

9       Within 180 days following the entry of the Confirmation Order, the Plan Trustee shall file a

10  status report with the Court explaining what progress has been made toward consummation of the

11  confirmed Plan.  The status report shall be served on the United States Trustee, the twenty largest

12  unsecured creditors, and those parties who have requested special notice.  Unless otherwise

13  ordered, further status reports shall be filed every 180 days and served on the same entities.

14      **21.14   Post-Confirmation Conversion/Dismissal.**

15      A creditor or party in interest may bring a motion to convert or dismiss the case under

16  § 1112(b), after the Plan is confirmed, if there is a default in performing the Plan.  The Plan

17  Trustee reserves the right to object to any motion for conversion or dismissal.  In addition, as set

18  forth in the definition of the Effective Date, the Effective Date may be further extended by order of

19  the Bankruptcy Court after notice and hearing to all parties in interest.  If the Court determines

20  there is no "cause" for the extension of the Effective Date, a party in interest may move to dismiss

21  or convert the case.

22      If the Court orders any of the Cases converted to Chapter 7 after the Plan is confirmed, then

23  all property that had been property of the Chapter 11 Estate, and that has not been disbursed

24  pursuant to the Plan, will revest in the Chapter 7 estate.  The automatic stay will be re-imposed

25  upon the revested property, but only to the extent that relief from stay was not previously

26  authorized by the Court during this case.

27

28

MAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-
SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v3-SCC_Group_I_VD_DS.DOC

1  **21.15   Final Decree.**

2  Once an Estate has been fully administered, as referred to in Bankruptcy Rule 3022, the

3  Plan Trustee, or other party as the Court shall designate in the Confirmation Order, shall file a

4  motion with the Court to obtain a final decree to close the Case of such Debtor.

5  Date:  July~~ne~~ 18~~—~~, 2011

6

7

8                                          By: _____

                                              Bruce Cook
9                                             General Counsel, Authorized Agent for the
                                              Voluntary Debtors and Acquisitions
10
**Submitted By:**
11

12  **WINTHROP COUCHOT**                   **RUS MILIBAND & SMITH**
    **PROFESSIONAL CORPORATION**          **A PROFESSIONAL CORPORATION**

13
                                           By:    */s/ Ronald Rus*_____
14  By: */s/ Paul J. Couchot*_____
       Paul J. Couchot,                        Ronald Rus, Esq.
15     General Insolvency Counsel for         Joel S. Miliband, Esq.
       the Voluntary Debtors              Attorneys for SCC Acquisitions, ~~LLC~~Inc.
16

17

18

19

20

21

22

23

24

25

26

27

28

MAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-
SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v3-SCC_Group_I_VD_DS.DOC

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 660 Newport Center Drive, 4th Fl., Newport Beach, CA 92660.

A true and correct copy of the foregoing document described as: ~~FIRST AMENDED~~SECOND AMENDED **DISCLOSURE STATEMENT DESCRIBING** ~~FIRST AMENDED~~SECOND AMENDED **CHAPTER 11 PLANS FILED BY SUNCAL PLAN PROPONENTS IN THE CHAPTER 11 CASES OF PALMDALE HILLS PROPERTY, LLC, SUNCAL BICKFORD RANCH, LLC, SUNCAL EMERALD MEADOWS, LLC AND ACTON ESTATES, LLC [GROUP I: VOLUNTARY DEBTORS]**will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

I.  **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On July 18, ~~ne 20,~~ 2011, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

☒  Service information continued on attached page

II.  **SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served)**:**
On _____, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐  Service information continued on attached page

III.  **SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on ____, 2011 I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


July 18, ~~ne 20,~~ 2011     ~~Susan Connor~~Gretchen Crumpacker          /s/ ~~Susan Connor~~ Gretchen Crumpacker
_____
Date                          Type Name                          Signature

MAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOC~~MAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v4-SCC_Group_I_VD_DS.DOCMAINDOCS-#163407-v3-SCC_Group_I_VD_DS.DOC~~

**NEF SERVICE LIST**

- Selia M Acevedo     sacevedo@millerbarondess.com, mpritikin@millerbarondess.com
- Joseph M Adams     jadams@sycr.com
- Raymond H Aver     ray@averlaw.com
- James C Bastian     jbastian@shbllp.com
- Thomas Scott Belden     sbelden@kleinlaw.com, ecf@kleinlaw.com
- John A Boyd     fednotice@tclaw.net
- Mark Bradshaw     mbradshaw@shbllp.com
- Gustavo E Bravo     gbravo@smaha.com
- Jeffrey W Broker     jbroker@brokerlaw.biz
- Brendt C Butler     bbutler@mandersonllp.com
- Andrew W Caine     acaine@pszyjw.com
- Carollynn Callari     ccallari@venable.com
- Cathrine M Castaldi     ccastaldi@rusmiliband.com
- Tara Castro Narayanan     tara.narayanan@msrlegal.com, lisa.king@msrlegal.com
- Dan E Chambers     dchambers@jmbm.com
- Shirley Cho     scho@pszjlaw.com
- Vonn Christenson     vrc@paynefears.com
- Brendan P Collins     bpcollins@bhfs.com
- Vincent M Coscino     vcoscino@allenmatkins.com, emurdoch@allenmatkins.com
- Paul J Couchot     pcouchot@winthropcouchot.com,
  pj@winthropcouchot.com;sconnor@winthropcouchot.com
- Jonathan S Dabbieri     dabbieri@sullivan.com,
  hill@sullivanhill.com;mcallister@sullivanhill.com;stein@sullivanhill.com;vidovich@sullivanhill.com
- Ana Damonte     ana.damonte@pillsburylaw.com
- Vanessa S Davila     vsd@amclaw.com
- Melissa Davis     mdavis@shbllp.com
- Daniel Denny     ddenny@gibsondunn.com
- Caroline Djang     crd@jmbm.com
- Donald T Dunning     ddunning@dunningLaw.com
- Meredith R Edelman     meredith.edelman@dlapiper.com
- Joseph A Eisenberg     jae@jmbm.com
- Lei Lei Wang Ekvall     lekvall@wgllp.com
- Richard W Esterkin     resterkin@morganlewis.com
- Marc C Forsythe     kmurphy@goeforlaw.com
- Alan J Friedman     afriedman@irell.com
- Steven M Garber     steve@smgarberlaw.com
- Christian J Gascou     cgascou@gascouhopkins.com
- Barry S Glaser     bglaser@swjlaw.com
- Robert P Goe     kmurphy@goeforlaw.com,
  rgoe@goeforlaw.com;mforsythe@goeforlaw.com
- Eric D Goldberg     egoldberg@stutman.com
- Richard H Golubow     rgolubow@winthropcouchot.com, pj@winthropcouchot.com
- Michael J Gomez     mgomez@frandzel.com, efiling@frandzel.com;sking@frandzel.com
- Kelly C Griffith     bkemail@harrisbeach.com
- Matthew Grimshaw     mgrimshaw@rutan.com

- Kavita Gupta    kgupta@winthropcouchot.com
- Asa S Hami    ahami@morganlewis.com
- Michael J Hauser    michael.hauser@usdoj.gov
- D Edward Hays    ehays@marshackhays.com
- Michael C Heinrichs    mheinrichs@omm.com
- Harry D. Hochman    hhochman@pszjlaw.com, hhochman@pszjlaw.com
- Jonathan M Hoff    jonathan.hoff@cwt.com
- Nancy Hotchkiss    nhotchkiss@trainorfairbrook.com
- Michelle Hribar    mhribar@rutan.com
- John J Immordino    john.immordino@wilsonelser.com, raquel.burgess@wilsonelser.com
- Lawrence A Jacobson    laj@cohenandjacobson.com
- Michael J Joyce    mjoyce@crosslaw.com
- Stephen M Judson    sjudson@fablaw.com
- Kaleb L Judy    ecf@kleinlaw.com, kjudy@kleinlaw.com
- Steven J Kahn    skahn@pszyjw.com
- Sheri Kanesaka    sheri.kanesaka@bryancave.com
- David J Katzen    katzen@ksfirm.com
- Christopher W Keegan    ckeegan@kirkland.com, gdupre@kirkland.com;alevin@kirkland.com
- Payam Khodadadi    pkhodadadi@winthropcouchot.com, pj@winthropcouchot.com
- Irene L Kiet    ikiet@hkclaw.com
- Claude F Kolm    claude.kolm@acgov.org
- Mark J Krone    mk@amclaw.com, crs@amclaw.com;amc@amclaw.com
- David B Lally    davidlallylaw@gmail.com
- Leib M Lerner    leib.lerner@alston.com
- Peter W Lianides    plianides@winthropcouchot.com, pj@winthropcouchot.com
- Charles Liu    cliu@winthropcouchot.com
- Kerri A Lyman    klyman@irell.com
- Mariam S Marshall    mmarshall@marshallramoslaw.com
- Robert C Martinez    rmartinez@mclex.com
- Michael D May    mdmayesq@verizon.net
- Hutchison B Meltzer    hmeltzer@wgllp.com
- Krikor J Meshefejian    kjm@lnbrb.com
- Joel S. Miliband    jmiliband@rusmiliband.com
- James M Miller    jmiller@millerbarondess.com, vgunderson@millerbarondess.com
- Louis R Miller    smiller@millerbarondess.com
- Craig Millet    cmillet@gibsondunn.com, pcrawford@gibsondunn.com;cmillet@gibsondunn.com
- Randall P Mroczynski    randym@cookseylaw.com
- Mike D Neue    mneue@thelobelfirm.com, jmattiace@thelobelfirm.com;pnelson@thelobelfirm.com
- Robert Nida    Rnida@castlelawoffice.com
- Henry H Oh    henry.oh@dlapiper.com, janet.curley@dlapiper.com
- Sean A Okeefe    sokeefe@okeefelc.com
- Robert B Orgel    rorgel@pszjlaw.com, rorgel@pszjlaw.com
- Malhar S Pagay    mpagay@pszjlaw.com, mpagay@pszjlaw.com
- Daryl G Parker    dparker@pszjlaw.com
- Penelope Parmes    pparmes@rutan.com

1
- Robert J Pfister     rpfister@ktbslaw.com
- Ronald B Pierce     ronald.pierce@sdma.com

2
- Katherine C Piper     kpiper@steptoe.com
- Cassandra J Richey     cmartin@pprlaw.net

3
- Debra Riley     driley@allenmatkins.com
- James S Riley     tgarza@sierrafunds.com

4
- Todd C. Ringstad     becky@ringstadlaw.com
- R Grace Rodriguez     ecf@lorgr.com

5
- Martha E Romero     Romero@mromerolawfirm.com

6
- Ronald Rus     rrus@rusmiliband.com

7
- John P Schafer     jschafer@mandersonllp.com
- John E Schreiber     jschreiber@dl.com

8
- William D Schuster     bills@allieschuster.org
- Christopher P Simon     csimon@crosslaw.com

9
- Wendy W Smith     wendy@bindermalter.com

10
- Steven M Speier     Sspeier@Squarmilner.com, ca85@ecfcbis.com
- Steven M Speier (TR)     Sspeier@asrmanagement.com, ca85@ecfcbis.com

11
- Michael St James     ecf@stjames-law.com
- Michael K Sugar     msugar@irell.com

12
- Cathy Ta     cathy.ta@bbklaw.com,
  Arthur.Johnston@bbklaw.com;Kenneth.Burgess@bbklaw.com

13
- David A Tilem     davidtilem@tilemlaw.com,

14
  malissamurguia@tilemlaw.com;dianachau@tilemlaw.com;kmishigian@tilemlaw.com
- James E Till     jtill@thelobelfirm.com,

15
  jmattiace@thelobelfirm.com;pnelson@thelobelfirm.com
- United States Trustee (SA)     ustpregion16.sa.ecf@usdoj.gov

16
- Carol G Unruh     cgunruh@sbcglobal.net
- Annie Verdries     verdries@lbbslaw.com

17
- Jason Wallach     jwallach@gladstonemichel.com

18
- Joshua D Wayser     , kim.johnson@kattenlaw.com
- Marc J Winthrop     mwinthrop@winthropcouchot.com, pj@winthropcouchot.com

19
- David M Wiseblood     dwiseblood@seyfarth.com
- Brett K Wiseman     bwiseman@aalaws.com

20
- Dean A Ziehl     dziehl@pszjlaw.com, dziehl@pszjlaw.com

21
- Marc A. Zimmerman     joshuasdaddy@att.net

22

23
- Selia M Acevedo     sacevedo@millerbarondess.com, mpritikin@millerbarondess.com
- Joseph M Adams     jadams@sycr.com
- Raymond H Aver     ray@averlaw.com

24
- James C Bastian     jbastian@shbllp.com
- Thomas Scott Belden     sbelden@kleinlaw.com, ecf@kleinlaw.com

25
- John A Boyd     fednotice@tclaw.net
- Mark Bradshaw     mbradshaw@shbllp.com

26
- Gustavo E Bravo     gbravo@smaha.com
- Jeffrey W Broker     jbroker@brokerlaw.biz

27
- Brendt C Butler     bbutler@mandersonllp.com
- Andrew W Caine     acaine@pszjw.com

28
- Carollynn Callari     ccallari@venable.com
- Cathrine M Castaldi     ccastaldi@rusmiliband.com

1
- Tara Castro Narayanan — tara.narayanan@msrlegal.com, lisa.king@msrlegal.com
- Dan E Chambers — dchambers@jmbm.com

2
- Shirley Cho — scho@pszjlaw.com
- Vonn Christenson — vrc@paynefears.com

3
- Brendan P Collins — bpcollins@bhfs.com
- Vincent M Coscino — vcoscino@allenmatkins.com, emurdoch@allenmatkins.com

4
- Paul J Couchot — pcouchot@winthropcouchot.com,
  pj@winthropcouchot.com;sconnor@winthropcouchot.com

5
- Jonathan S Dabbieri — dabbieri@sullivan.com,
  hill@sullivanhill.com;mcallister@sullivanhill.com;stein@sullivanhill.com;vidovich@sullivanhill.com

6
- Ana Damonte — ana.damonte@pillsburylaw.com
- Vanessa S Davila — vsd@amclaw.com

7
- Melissa Davis — mdavis@shbllp.com
- Daniel Denny — ddenny@gibsondunn.com

8
- Caroline Djang — crd@jmbm.com
- Donald T Dunning — ddunning@dunningLaw.com

9
- Meredith R Edelman — meredith.edelman@dlapiper.com
- Joseph A Eisenberg — jae@jmbm.com

10
- Lei Lei Wang Ekvall — lekvall@wgllp.com
- Richard W Esterkin — resterkin@morganlewis.com

11
- Marc C Forsythe — kmurphy@goeforlaw.com
- Alan J Friedman — afriedman@irell.com

12
- Steven M Garber — steve@smgarberlaw.com
- Christian J Gascou — cgascou@gascouhopkins.com

13
- Barry S Glaser — bglaser@swjlaw.com
- Robert P Goe — kmurphy@goeforlaw.com, rgoe@goeforlaw.com;mforsythe@goeforlaw.com

14
- Eric D Goldberg — egoldberg@stutman.com
- Richard H Golubow — rgolubow@winthropcouchot.com, pj@winthropcouchot.com

15
- Michael J Gomez — mgomez@frandzel.com, efiling@frandzel.com;sking@frandzel.com
- Kelly C Griffith — bkemail@harrisbeach.com

16
- Matthew Grimshaw — mgrimshaw@rutan.com
- Kavita Gupta — kgupta@winthropcouchot.com

17
- Asa S Hami — ahami@morganlewis.com
- Michael J Hauser — michael.hauser@usdoj.gov

18
- D Edward Hays — ehays@marshackhays.com
- Michael C Heinrichs — mheinrichs@omm.com

19
- Harry D. Hochman — hhochman@pszjlaw.com, hhochman@pszjlaw.com
- Jonathan M Hoff — jonathan.hoff@cwt.com

20
- Nancy Hotchkiss — nhotchkiss@trainorfairbrook.com
- Michelle Hribar — mhribar@rutan.com

21
- John J Immordino — john.immordino@wilsonelser.com, raquel.burgess@wilsonelser.com
- Lawrence A Jacobson — laj@cohenandjacobson.com

22
- Michael J Joyce — mjoyce@crosslaw.com
- Stephen M Judson — sjudson@fablaw.com

23
- Kaleb L Judy — ecf@kleinlaw.com, kjudy@kleinlaw.com
- Steven J Kahn — skahn@pszyjw.com

24
- Sheri Kanesaka — sheri.kanesaka@bryancave.com
- David I Katzen — katzen@ksfirm.com

25
- Christopher W Keegan — ckeegan@kirkland.com, gdupre@kirkland.com;alevin@kirkland.com

26
- Payam Khodadadi — pkhodadadi@winthropcouchot.com, pj@winthropcouchot.com
- Irene L Kiet — ikiet@hkclaw.com

27
- Claude F Kolm — claude.kolm@acgov.org
- Mark J Krone — mk@amclaw.com, crs@amclaw.com;amc@amclaw.com

28
- David B Lally — davidlallylaw@gmail.com
- Leib M Lerner — leib.lerner@alston.com

- Peter W Lianides — plianides@winthropcouchot.com, pj@winthropcouchot.com
- Charles Liu — cliu@winthropcouchot.com
- Kerri A Lyman — klyman@irell.com
- Mariam S Marshall — mmarshall@marshallramoslaw.com
- Robert C Martinez — rmartinez@mclex.com
- Michael D May — mdmayesq@verizon.net
- Hutchison B Meltzer — hmeltzer@wgllp.com
- Krikor J Meshefejian — kjm@lnbrb.com
- Joel S. Miliband — jmiliband@rusmiliband.com
- James M Miller — jmiller@millerbarondess.com, vgunderson@millerbarondess.com
- Louis R Miller — smiller@millerbarondess.com
- Randall P Mroczynski — randym@cookseylaw.com
- Mike D Neue — mneue@thelobelfirm.com, jmattiace@thelobelfirm.com;pnelson@thelobelfirm.com
- Robert Nida — Rnida@castlelawoffice.com
- Henry H Oh — henry.oh@dlapiper.com, janet.curley@dlapiper.com
- Sean A Okeefe — sokeefe@okeefelc.com
- Robert B Orgel — rorgel@pszjlaw.com, rorgel@pszjlaw.com
- Malhar S Pagay — mpagay@pszjlaw.com, mpagay@pszjlaw.com
- Penelope Parmes — pparmes@rutan.com
- Ronald B Pierce — ronald.pierce@sdma.com
- Katherine C Piper — kpiper@steptoe.com
- Cassandra J Richey — cmartin@pprlaw.net
- Debra Riley — driley@allenmatkins.com
- James S Riley — tgarza@sierrafunds.com
- Todd C. Ringstad — becky@ringstadlaw.com
- R Grace Rodriguez — ecf@lorgr.com
- Martha E Romero — Romero@mromerolawfirm.com
- Ronald Rus — rrus@rusmiliband.com
- John P Schafer — jschafer@mandersonllp.com
- John E Schreiber — jschreiber@dl.com
- William D Schuster — bills@allieschuster.org
- Christopher P Simon — csimon@crosslaw.com
- Wendy W Smith — wendy@bindermalter.com
- Steven M Speier — Sspeier@Squarmilner.com, ca85@ecfcbis.com
- Steven M Speier (TR) — Sspeier@asrmanagement.com, ca85@ecfcbis.com
- Michael St James — ecf@stjames-law.com
- Michael K Sugar — msugar@irell.com
- Cathy Ta — cathy.ta@bbklaw.com, Arthur.Johnston@bbklaw.com;Kenneth.Burgess@bbklaw.com
- David A Tilem — davidtilem@tilemlaw.com, malissamurguia@tilemlaw.com;dianachau@tilemlaw.com;kmishigian@tilemlaw.com
- James E Till — jtill@thelobelfirm.com, jmattiace@thelobelfirm.com;pnelson@thelobelfirm.com
- United States Trustee (SA) — ustpregion16.sa.ecf@usdoj.gov
- Carol G Unruh — cgunruh@sbcglobal.net
- Annie Verdries — verdries@lbbslaw.com
- Jason Wallach — jwallach@gladstonemichel.com
- Joshua D Wayser — , kim.johnson@kattenlaw.com
- Marc J Winthrop — mwinthrop@winthropcouchot.com, pj@winthropcouchot.com
- David M Wiseblood — dwiseblood@seyfarth.com
- Brett K Wiseman — bwiseman@aalaws.com
- Dean A Ziehl — dziehl@pszjlaw.com, dziehl@pszjlaw.com
- Marc A. Zimmerman — joshuasdaddy@att.net