1  PAUL J. COUCHOT -- State Bar No. 131934
   WINTHROP COUCHOT, P.C.
2  660 Newport Center Drive, Fourth Floor
   Newport Beach, CA 92660
3  Telephone: (949) 720-4100
   Facsimile: (949) 720-4111
4  General Insolvency Counsel for
   Palmdale Hills Property, LLC et. al. (the "Voluntary Debtors")

5
   RONALD RUS - State Bar No. 67369
6  JOEL S. MILIBAND - State Bar No. 77438
   RUS MILIBAND & SMITH,
7  A PROFESSIONAL CORPORATION APC
   2211 Michelson Drive, Seventh Floor
8  Irvine, California 92612
   Telephone: (949) 752-7100
9  Facsimile:  (949) 252-1514
   Counsel for SunCal Management LLC and
10 SCC Acquisitions Inc.

11              **UNITED STATES BANKRUPTCY COURT**
                **CENTRAL DISTRICT OF CALIFORNIA**
12                     **Santa Ana Division**

   In re                          | Case No. 8:08-bk-17206-ES
13 PALMDALE HILLS PROPERTY, AND ITS
   RELATED DEBTORS,               | Jointly Administered With Case Nos.
14                                  8:08-bk-17209-ES; 8:08-bk-17240-ES;
          Joint Administered Debtors and   8:08-bk-17224-ES; 8:08-bk-17242-ES;
15        Debtors-in-Possession    | 8:08-bk-17225-ES; 8:08-bk-17245-ES;
                                     8:08-bk-17227-ES; 8:08-bk-17246-ES;
16 ─────────────────────────────     8:08-bk-17230-ES; 8:08-bk-17231-ES;
   Affects:                          8:08-bk-17236-ES; 8:08-bk-17248-ES;
17 ☐ All Debtors                     8:08-bk-17249-ES; 8:08-bk-17573-ES;
                                     8:08-bk-17574 ES; 8:08-bk-17575-ES;
18 ☐ Palmdale Hills Property, LLC    8:08-bk-17404-ES; 8:08-bk-17407-ES;
   ☒ SunCal Beaumont Heights, LLC    8:08-bk-17408-ES; 8:08-bk-17409-ES;
19 ☐ SCC/Palmdale, LLC               8:08-bk-17458-ES; 8:08-bk-17465-ES;
                                     8:08-bk-17470-ES; 8:08-bk-17472-ES;
   ☒ SunCal Johannson Ranch, LLC     and 8:08-bk-17588-ES
20 ☐ SunCal Summit Valley, LLC
21 ☐ SunCal Emerald Meadows LLC     | Chapter 11 Proceedings
   ☐ SunCal Bickford Ranch, LLC
22 ☐ Acton Estates, LLC             | **[REDLINED] FIRST SECOND AMENDED**
23 ☐ Seven Brothers LLC             **DISCLOSURE STATEMENT**
                                     **DESCRIBING FIRST SECOND AMENDED**
   ☐ SJD Partners, Ltd.             **CHAPTER 11 PLANS FILED BY SUNCAL**
24 ☐ SJD Development Corp.          **PLAN PROPONENTS IN THE CHAPTER**
25 ☐ Kirby Estates, LLC             **11 CASES OF SUNCAL BEAUMONT**
                                     **HEIGHTS, LLC AND SUNCAL**
   ☐ SunCal Communities I, LLC      **JOHANNSON RANCH, LLC , [GROUP II:**
26 ☐ SunCal Communities III, LLC    **VOLUNTARY DEBTORS]**
27 ☐ SCC Communities LLC
   ☐ North Orange Del Rio Land, LLC | Date:   July 22, 2011
28 ☐ Tesoro SF LLC                   Time:    11:00 a.m.
                                     Place:   Courtroom 5A

1

*Continued from Previous Page*

2    ☐ LBL-SunCal Oak Valley, LLC

3    ☐ SunCal Heartland, LLC
     ☐ LBL-SunCal Northlake, LLC

4    ☐ SunCal Marblehead, LLC

5    ☐ SunCal Century City, LLC
     ☐ SunCal PSV, LLC

6    ☐ Delta Coves Venture, LLC

7    ☐ SunCal Torrance, LLC
     ☐ SunCal Oak Knoll, LLC

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**PAGE**

I.     INTRODUCTION ..................................................................................................    2

II.    DEFINITIONS AND RULES OF INTERPRETATION .....................................    4
    2.1    Definitions ..................................................................................................    4
    2.2    Rules of Construction ................................................................................    25
    2.3    Exhibits .....................................................................................................    26

III.   PLAN CONFIRMATION DEADLINES ............................................................    26
    3.1    Time and Place of the Confirmation Hearing ..........................................    26
    3.2    Deadline for Voting for or Against the Plan ............................................    27
    3.3    Deadline for Objecting to the Confirmation of the Plan ...........................    27
    3.4    Identity of Person to Contact for More Information
           Regarding the Plan ....................................................................................    27
    3.5    Disclaimer .................................................................................................    28

IV.    FACTUAL BACKGROUND OF THE DEBTORS .............................................    29
    4.1    The Formation of the Debtors and the Projects ........................................    29
           4.1.1   Overview of the Debtors and Their Projects.....................................    29
           4.1.2   The Debtors' Primary Secured Creditors and
                   Their Disputed Claims ......................................................................    30
           4.1.3   The Lehman Disputed Claims and Liens ...........................................    30
           4.1.4   Summary of the Group II:  Voluntary Debtors' Cash .......................    31
    4.2    Factual Circumstances Leading to the Filing of the
           Debtors' Chapter 11 Cases........................................................................    32
           4.2.1   Introduction......................................................................................    32
           4.2.2   Background on the SunCal Companies ..............................................    33
           4.2.3   The Origins of the SunCal/Lehman Joint Venture............................    33
           4.2.4   Lehman's Effective Control over the Management
                   of the Debtors and Promises of Ongoing Funding............................    34
           4.2.5   The 2008 Restructuring Agreement...................................................    35
           4.2.6   The Lehman Lenders Hire Radco ......................................................    36
           4.2.7   The Lehman Lenders' Failure to Close on the
                   Settlement Agreement .......................................................................    37
           4.2.8   The Lehman Lenders' Undisclosed Sale of Most
                   of the Debtors' Loans.......................................................................    38
           4.2.9   Lehman's Foreclosure Sale and Purchase of the
                   Pacific Point Project .........................................................................    38
           4.2.10 Alvarez and Marsal Take Over Control of the
                   Lehman Entities After the Chapter 11 Filing of
                   LBHI and LCPI ..............................................................................    40
    4.3    The ~~Group II Debtor~~Group II: Voluntary Debtors' Potential Preferential Transfers
    41

# TABLE OF CONTENTS

## (Continued)

PAGE

V.     SIGNIFICANT EVENTS IN THE DEBTORS' CHAPTER 11 CASES .................. 42
       5.1     Voluntary Debtors......................................................................... 42
               5.1.1   Joint Administration of the Voluntary Debtors
                       and the Trustee Debtors ................................................ 42
               5.1.2   The Voluntary Debtors Court Employed Professionals..................... 42
               5.1.3   LCPI's Motions for Relief from the Automatic Stay
                       Against Certain of the Voluntary Debtors' Projects
                       and Related Appeals ...................................................... 43
       5.2     The Trustee Debtors and Their Professionals ................................... 44
       5.3     The Debtors' Various Motions Relating to Financing for the
               Projects and to Pay Professional Fees............................................. 44
               5.3.1   The Voluntary Debtors' Initial Motion for Surcharge
                       and Use of Cash Collateral ............................................ 44
               5.3.2   The Lehman Administrative Loans...................................... 45
               5.3.3   The Voluntary Debtors' Agreements with the Lehman
                       Entities for Use of Alleged Cash Collateral to Maintain
                       the Properties and to Pay Professional Fees......................... 45
       5.4     The Debtors' Disputes and Claims Against the Lehman Entities.................. 46
               5.4.1   The Lehman Adversary Proceeding.................................... 46
               5.4.2   The Debtors' Motions to Strike the Claims and
                       Pleadings Arising from the Sold Loans to Fenway
                       Capital and Related Appeals........................................... 46
               5.4.3   The Debtors' Motion Pursuant to Section 506(d) and
                       the 506(d) Valuation Stipulation...................................... 47
               5.4.4   Lehman 502(d) Objections and Objections to
                       Lehman's Claim Against Acton........................................ 47
               5.4.5   The Lehman Recoupment Objection and the State
                       Court Action............................................................. 48
               5.4.6   The Debtors' Potential Post-Petition Claims
                       Against Lehman and Their Agents .................................... 50
       5.5     The Lehman Fenway Claims Transaction, Compromise
               Motion Filed by the Lehman Entities............................................... 51
               5.5.1   Lehman Entities' and Fenway's Proposed Claims Transaction........ 51
       5.6     The Debtors' Motion for a Stay to Suspend Certain
               Lehman Actions ...................................................................... 52
       5.7     The Debtors' Other Litigation with Non-Lehman Related Parties ............... 52
               5.7.1   The Debtors' Failed Preliminary Injunction Motion
                       Against the Holders of Bond Claims .................................. 52
               5.7.2   The Contractors' Successful Motions for Relief from
                       Stay to Pursue the Bond Claims....................................... 53
               5.7.3   Bond Safeguard Motion ................................................ 53

MAINDOCS-#163410-v2-SCC_Group_II_VD_DS.DOC

# TABLE OF CONTENTS

### (Continued)

| | | | PAGE |
|---|---|---|---|
| VI. | | TREATMENT OF UNCLASSIFIED CLAIMS | 53 |
| | 6.1 | Introduction | 53 |
| | 6.2 | Treatment of Allowed Administrative Claims | 54 |
| | 6.3 | Treatment and Repayment of the Lehman Administrative Loan(s) | 54 |
| | 6.4 | Repayment of Allowed Administrative Claims Other than the Lehman Administrative Loans | 54 |
| | 6.5 | Administrative Claims Bar Date | 55 |
| | 6.6 | Treatment of Priority Unsecured Tax Claims | 55 |
| VII. | | CLASSIFICATION OF CLAIMS AND INTERESTS | 56 |
| VIII. | | THE PLAN'S TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS | 57 |
| | 8.1 | The Plan's Treatment of Holders of Allowed Secured Real Property Tax Claims on Real Properties Subject to Deeds of Trust Arising from Lehman's Disputed Secured Claims and Disputed Liens (Classes 1.1 Through 1.2) | 57 |
| | 8.2 | The Plan's Treatment of Mechanic Lien Claims Against ~~Group II Project~~Group II: Voluntary Debtors Projects (Class 2.1) | 58 |
| | 8.3 | The Plan's Treatment of Holders of Priority Claims (Class 3.1) | 59 |
| | 8.4 | The Plan's Treatment of Holders of Allowed General Unsecured Claims (Class 4.1). | 60 |
| | 8.5 | The Plan's Treatment of Holders of Allowed Interests | 60 |
| IX. | | ACCEPTANCE OR REJECTION OF THE PLAN | 60 |
| | 9.1 | Introduction | 60 |
| | 9.2 | Who May Object to Confirmation of the Plan | 60 |
| | 9.3 | Who May Vote to Accept/Reject the Plan | 61 |
| | 9.4 | What Is an Allowed Claim/Interest | 61 |
| | 9.5 | What Is an Impaired Class | 61 |
| | 9.6 | Who Is Not Entitled to Vote | 61 |
| | 9.7 | Who Can Vote in More than One Class | 62 |
| | 9.8 | Votes Necessary for a Class to Accept the Plan | 62 |
| | 9.9 | Treatment of Nonaccepting Classes | 62 |
| | 9.10 | Request for Confirmation Despite Nonacceptance by Impaired Class(es) | 62 |
| X. | | MEANS OF EXECUTION AND IMPLEMENTATION OF THE PLAN | 63 |
| | 10.1 | Introduction | 63 |
| | 10.2 | Sale Process After Confirmation Date but prior to Effective Date | 63 |

MAINDOCS-#163410-v2-SCC_Group_II_VD_DS.DOC

# TABLE OF CONTENTS

## (Continued)

**PAGE**

|  |  |  |
|---|---|---|
| A. | Implementation of a Marketing Program | 63 |
| B. | Indentifying a Stalking Horse Bidder | 63 |
| C. | The Sale Contract | 64 |
| | 1. Overbid Provisions | 64 |
| | 2. Break-Up Fees | 64 |
| | 3. Sale Free and Clear of Liens | 64 |
| D. | The Auction | 64 |
| 10.3 | Transfer of Property To The Plan Trust | 65 |
| 10.4 | Closing of ~~Group II Project~~Group II: Voluntary Debtors Project Sales | 65 |
| 10.5 | Purposes of the Plan Trust | 65 |
| 10.6 | Trust Agreement | 66 |
| 10.7 | Operations of the Plan Trust | 66 |
| 10.8 | The Plan Trustee | 66 |
| 10.9 | Payment of Trust Expenses | 66 |
| 10.10 | Plan Distribution System | 67 |
| 10.11 | Claims Estimation Rights | 67 |
| 10.12 | No Payment of Transfer-Related Fees to the United States Trustee | 67 |
| 10.13 | No Payment of Transfer-Related Fees to the Trustee | 67 |
| 10.14 | Books and Records of Trust | 68 |
| 10.15 | Limitations on Liability | 68 |
| 10.16 | Federal Income Tax Treatment of the Holders of Plan Trust Beneficial Interests | 69 |
| 10.17 | Termination of the Trust | 69 |
| 10.18 | Exemption from Certain Transfer Taxes | 70 |
| 10.19 | Tax Consequences of the Plan | 70 |
| 10.20 | The Plan Sponsor | 71 |
| 10.21 | Acquisitions' Obligations | 71 |
| 10.22 | The Committee(s). | 71 |
| | 10.21.1 Duties and Powers | 71 |
| | 10.21.2 Dissolution of Committees | 71 |
| 10.23 | Litigation Claims | 72 |
| 10.24 | Collection of Litigation Recoveries | 72 |
| **XI.** | **RISK FACTORS** | 72 |
| 11.1 | Plan Risks | 72 |
| | 11.1.1 The Plan May Not Be Accepted or Confirmed | 72 |
| | 11.1.2 Failure to Sell the Group II: Trustee Debtor Projects | 73 |
| **XII.** | **DISTRIBUTIONS** | 73 |
| 12.1 | Distribution Agent | 73 |
| 12.2 | Distributions | 73 |

# TABLE OF CONTENTS

## (Continued)

**PAGE**

|  |  |  |
|---|---|---|
| | 12.2.1 Dates of Distributions | 73 |
| | 12.2.2 Limitation on Liability | 74 |
| 12.3 | Old Instruments and Securities | 74 |
| | 12.3.1 Surrender and Cancellation of Instruments and Securities | 74 |
| | 12.3.2) Cancellation of Liens | 74 |
| 12.4 | De Minimis Distributions and Fractional Shares | 74 |
| 12.5 | Delivery of Distributions | 75 |
| 12.6 | Undeliverable Distributions | 75 |
| 12.7 | Disposition of Unclaimed Property | 75 |

**XIII. OBJECTION TO CLAIMS AND DISPUTE CLAIMS** ........... 76
- 13.1 Standing for Objections to Claims ........... 76
- 13.2 Treatment of Disputed Claims and Disputed Liens ........... 76
  - 13.2.1 No Distribution Pending Allowance ........... 76
  - 13.2.2 Distribution After Allowance ........... 76

**XIV. EXECUTORY CONTRACTS AND UNEXPIRED LEASES** ........... 77
- 14.1 Executory Contracts ........... 77
- 14.3 Bar Date for Rejection Damages ........... 77
- 14.4 Changes in Rates Subject to Regulatory Commission Approval ........... 77

**XV. BEST INTEREST OF CREDITORS TEST AND PLAN FEASIBILITY** ........... 77
- 15.1 Best Interests Test ........... 77
- 15.2 Feasibility ........... 78

**XVI. LIMITATION OF LIABILITY** ........... 79
- 16.1 No Liability for Solicitation or Participation ........... 79

**XVII. CONDITIONS TO CONFIRMATION AND EFFECTIVENESS OF THE PLAN** ........... 79
- 17.1 Conditions Precedent to Plan Confirmation ........... 79
- 17.2 Conditions Precedent to Plan Effectiveness ........... 79

**XVIII. RETENTION OF JURISDICTION** ........... 80

**XIX. MODIFICATION OR WITHDRAWAL OF THE PLAN** ........... 80
- 18.1 Modification of Plan ........... 80
- 18.2 Nonconsensual Confirmation ........... 80

**XIX. MISCELLANEOUS** ........... 80
- 19.1 Payment of Statutory Fees ........... 80
- 19.2 Payment Dates ........... 81
- 19.3 Headings ........... 82

# TABLE OF CONTENTS

### (Continued)

PAGE

| | | |
|---|---|---|
| 19.4 | Other Documents and Actions | 82 |
| 19.5 | Notices | 82 |
| 19.6 | Governing Law | 83 |
| 19.7 | Binding Effect | 83 |
| 19.8 | Successors and Assigns | 83 |
| 19.9 | Severability of Plan Provisions | 83 |
| 19.10 | No Waiver | 84 |
| 19.11 | Inconsistencies | 84 |
| 19.12 | Exemption from Certain Transfer Taxes and Recording Fees | 84 |
| 19.13 | Post-Confirmation Status Report | 84 |
| 19.14 | Post-Confirmation Conversion/Dismissal | 85 |
| 19.15 | Final Decree | 85 |

MAINDOCS-#163410-v2-SCC_Group_II_VD_DS.DOC

# I.

## INTRODUCTION

This DISCLOSURE STATEMENT[1] is filed by ~~the Voluntary Debtors and Acquisitions, as the SunCal Plan Proponents, in the Chapter 11 Cases of the following Debtors:~~ SunCal Beaumont Heights, LLC and SunCal Johannson, LLC in their capacities as debtors and debtors in possession in their pending Chapter 11 Cases with respect to the receptive Plans of the Group II: Voluntary Debtors.   ~~(the "Group II: Voluntary Debtors"). In addition to being one of the proponents of the Plan,~~ Acquisitions is the Plan Sponsor.  Acquisitions, ~~it~~ will also serve as the Plan Trustee of the Plan Trust and as the Distribution Agent, if the Plan is confirmed.

Chapter 11 allows debtors-in-possession, Chapter 11 trustees, and under some circumstances, creditors, interest holders and others parties in interest, to propose a Chapter 11 plan.  As stated, the Group II: Voluntary Debtors ~~SunCal Plan Proponents~~ are the proponents of their respective Plans sent to you in the same envelope as this Disclosure Statement.  This document summarizes the contents of the Plans, certain information relating to the Plans and the process the Bankruptcy Court follows in determining whether or not to confirm the Plans.

In summary, the Plans provides for sale of the Beaumont Heights Project and the Johannson Ranch Project (the "~~Group II Project~~ Group II: Voluntary Debtors Projects"), and for the liquidation of all other assets of the Group II: Voluntary Debtors. The ~~Net Proceed~~ Net Sales Proceeds from these sales will then be distributed to Creditors holding Allowed Claims in accordance with their rights and priorities under the ~~bankruptcy~~ Bankruptcy Ceode and under any other applicable law. Based upon the ~~SunCal Proponent~~ SunCal Plan Proponents' analysis of the value of the ~~Group II Project~~ Group II: Voluntary Debtors Projects, and the amount of Allowed Claims against the estates of the respective Group II: Voluntary Debtors, there is a reasonable likelihood that all Allowed Claims will be paid in full under the Plan.

Although ~~the same~~ substantially ~~identical~~ similar Plans are ~~is~~ being filed in the Cases of ~~both~~ all four Group II: Voluntary Debtors, confirmation of each Plan is independent of ~~the~~ each others. In other works, t~~T~~he Creditors in each Case will determine, subject to Court approval,

---

[1] All defined terms used herein have the same meanings as set forth in Article II herein and Exhibit "1" attached hereto.

1    whether the applicable Plan will be approved in their Case. Accordingly, ~~the~~ a Plan may be

2    confirmed in one of the Group II: Voluntary Debtors Cases ~~of all of the Group II: Voluntary~~

3    ~~Debtors~~, but not in the others.

4        The Lehman Lenders have filed a competing and alternative plan of reorganization in the

5    Group II Voluntary Debtors' Cases.  Accordingly, the creditors holding claims against the Group

6    II: Voluntary Debtors will have the opportunity to vote for one plan or the other, or they can vote

7    for both plans and allow the Court to decide which plan should be approved. ~~The Group II:~~

8    ~~Voluntary Debtors believe that the aggregate benefits offered under their Plan are superior to what~~

9    ~~is being offered to Creditors under the Lehman Lenders' competing Plan~~.

10      **READ THIS DISCLOSURE STATEMENT CAREFULLY IF YOU WANT TO**

11   **KNOW ABOUT**:

12         ➢   **WHO CAN VOTE OR OBJECT TO THE ~~PLAN~~PLANS;**

13         ➢   **HOW YOUR CLAIM IS TREATED;**

14         ➢   **HOW THIS TREATMENT COMPARES TO WHAT YOUR CLAIM WOULD**

15                **RECEIVE IN LIQUIDATION;**

16         ➢   **A BRIEF HISTORY OF THE DEBTORS AND SIGNIFICANT EVENTS**

17                **DURING THEIR CHAPTER 11 BANKRUPTCY PROCEEDING;**

18         ➢   **WHAT FACTORS THE BANKRUPTCY COURT WILL CONSIDER TO**

19                **DECIDE WHETHER OR NOT TO CONFIRM THE ~~PLAN~~PLANS;**

20         ➢   **WHAT IS THE EFFECT OF CONFIRMATION; AND**

21         ➢   **WHETHER THE ~~PLAN~~PLANS ~~IS~~ ARE FEASIBLE.**

22        This Disclosure Statement cannot tell you everything about your rights.  You should

23   consider consulting your own attorney to obtain more specific advice on how the ~~Plan~~Plans will

24   affect you and your best course of action.

25        Be sure to read the applicable Plan as well as this Disclosure Statement.  If there are any

26   inconsistencies between the applicable Plan and this Disclosure Statement, the applicable Plan

27   provisions will govern.

28

1    The Bankruptcy Code requires a Disclosure Statement to contain "adequate information"

2    concerning the Plans.  On _____, 2011, the Bankruptcy Court entered an order approving

3    this Disclosure Statement, based upon a finding that this document contained "adequate

4    information" to enable parties affected by the Plans to make an informed judgment regarding the

5    Plan.  Any party can now solicit votes for or against the Plans.

6    ///

7                                        **II.**

8                    **DEFINITIONS AND RULES OF INTERPRETATION**

9        **2.1    Definitions.**

10        The following defined terms are used in this Disclosure Statement.  Any capitalized term

11    that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall

12    have the meaning ascribed to that term in the Bankruptcy Code or Bankruptcy Rules.

13            2.1.1    Acquisitions.  SCC Acquisitions, Inc., a California corporation, an indirect

14    parent company of all of the Debtors, a purported obligor on the Bond Indemnitor Claims, a

15    Creditor of all of the Debtors, a SunCal Plan Proponent, the Plan Sponsor and the proposed Plan

16    Trustee.

17            2.1.2

18            2.1.3    Acton Estates.  Acton Estates, LLC, a Delaware limited liability, and the

19    owner of the Acton Project.

20            2.1.4    Acton Project. The Project owned by Acton Estates, located in Los Angeles

21    County, California, as more particularly described herein.

22            2.1.5    Administrative Claim(s).  Any Claim against a Group V Debtor or its Estate

23    incurred after the applicable Petition Date for the applicable Group V Debtor but before the

24    Confirmation Effective Date, for any cost or expense of administration of the Case of the applicable

25    Group V Debtor, which Claim is entitled to priority under section 507(a)(2) or (3) of the

26    Bankruptcy Code, including, without limitation, any fee or charge assessed against an Estate of a

27    Group V Debtor under section 1930 of Title 28 of the United States Code.

28

1    2.1.6    Administrative Claims Bar Date.  The last date fixed by the Plan for the

2    filing of requests for payment of Administrative Claims.  Under the Plan, the Administrative

3    Claims Bar Date shall be the first business day after the twenty-first (21st) day after the Effective

4    Date~~The last date fixed by the Plan for the filing of Proof of Claims or requests for payment of~~

5    ~~Administrative Claims.  Under the Plan, the Administrative Claims Bar Date shall be the first~~

6    ~~business day after the sixtieth (60th) day after the Confirmation Date~~.

7    2.1.7    Affiliate.  The term shall have the meaning set forth under Section 101(2),

8    including, but not limited to, as to any Person, any other Person that directly or indirectly owns or

9    controls, is owned or controlled by, or is under common ownership or control with, such Person.

10    The term "control" (including, with correlative meanings, the terms "controlled by" and "under

11    common control with"), as applied to any Person, means the possession, direct or indirect, of the

12    power to direct or cause the direction of the management and policies of such Person, whether

13    through the ownership of voting securities or other equity ownership interest, by contract or

14    otherwise.

15    2.1.8    Allowed.  When used to describe Claim(s) or Interest(s), such Claim(s) or

16    Interest(s), to the extent that it or they are "Allowed Claim(s)" or "Allowed Interest(s)."

17    2.1.9    Allowed Amount shall mean:

18    A.    With respect to any Administrative Claim (i) if the Claim is based

19    upon a Fee Application, the amount of such Fee Application that has been approved by a Final

20    Order of the Bankruptcy Court; (ii) if the Claim is based upon any indebtedness or obligation

21    incurred in the ordinary course of business of the Group II: Voluntary Debtors and is not otherwise

22    subject to an Administrative Claim Bar Date, the amount of such Claim that has been agreed to by

23    the Group II: Voluntary Debtors and such creditor, failing which, the amount thereof as fixed by a

24    Final Order of the Bankruptcy Court; or (iii) if the Holder of such Claim was required to file and

25    has filed proof thereof with the Bankruptcy Court prior to an Administrative Claim Bar Date,

26    (1) the amount stated in such proof if no objection to such Proof of Claim is interposed within the

27    applicable period of time fixed by the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy

28    Court, or (2) the amount thereof as fixed by Final Order of the Bankruptcy Court if an objection to

1    such proof was interposed within the applicable period of time fixed by the Bankruptcy Code, the

2    Bankruptcy Rules or the Bankruptcy Court.  The Allowed Amount of any Administrative Claim

3    which is subject to an Administrative Claims Bar Date and not filed by the applicable

4    Administrative Claims Bar Date shall be zero, and no distribution shall be made on account of any

5    such Administrative Claim;

6                           B.      with respect to any Claim which is not an Administrative Claim

7    (the "Other Claim"):  (i) if the Holder of such Other Claim did not file proof thereof with the

8    Bankruptcy Court on or before the Claims Bar Date, the amount of such Claim as listed in the

9    Group II: Voluntary Debtors'' Schedules as neither disputed, contingent nor unliquidated; or (ii) if

10   the Holder of such Claim has filed proof thereof with the Bankruptcy Court on or before the

11   Claims Bar Date, (a) the amount stated in such proof if no objection to such Proof of Claim was

12   interposed within the applicable period of time fixed by the Bankruptcy Code, the Bankruptcy

13   Rules, the Plan or the Bankruptcy Court, or (b) the amount thereof as fixed by Final Order of the

14   Bankruptcy Court if an objection to such proof was interposed within the applicable period of time

15   fixed by the Bankruptcy Code, the Bankruptcy Rules, the Plan or the Bankruptcy Court.  The

16   Allowed Amount of any Other Claim which is not Filed by the applicable Claims Bar Date, is not

17   listed on the Group II: Voluntary Debtors' Schedules or is listed as disputed, unliquidated,

18   contingent or unknown, and is not allowed under the terms of this Plan shall be zero, and no

19   distribution shall be made on account of any such Claim; and

20                          C.      with respect to any Interest, (i) the amount provided by or

21   established in the records of the Group II: Voluntary Debtors at the Confirmation Date, provided,

22   however, that a timely filed proof of Interest shall supersede any listing of such Interest on the

23   records of the Group II: Voluntary Debtors; or (ii) the amount stated in a proof of Interest Filed

24   prior to the Confirmation Date if no objection to such Interest was filed prior to the Confirmation

25   Date or such later date as the Bankruptcy Court allows; or (iii) the amount of such Interest as fixed

26   by a Final Order of the Bankruptcy Court.

27

28

MAINDOCS-#163410-v2-SCC_Group_II_VD_DS.DOC

1         2.1.10    <u>Allowed Claim</u>.  Except as otherwise provided in the Plan (including with

2 respect to those Classes for which the amount of the Allowed Claims is specified by the Plan), a

3 Claim to the extent (and only to the extent) of the Allowed Amount of such Claim.

4         2.1.11    <u>Allowed Interest</u>.  Any Interest to the extent, and only to the extent, of the

5 Allowed Amount of such Interest.

6         2.1.12    <u>Allowed Secured Claims</u>.  All or  a portion of a Secured Claim that is an

7 Allowed Claim.

8         2.1.13    <u>Allowed Unsecured Claim</u>. All or a portion of an Unsecured Claim that is

9 an Allowed Claim.

10        2.1.14    <u>Assets</u>.  All assets that are property of the Debtor(s) pursuant to

11 Bankruptcy Code Section 541.

12        2.1.15    <u>Arch</u>.  Arch Insurance Company, a Bond Issuer.

13        2.1.16    <u>Available Cash</u>.  Each Group II: Voluntary Debtors' Cash deposited into

14 the applicable Distribution Account(s) on or after the Effective Date that is available for making

15 Distributions under the Plan to Holders of Allowed Administrative, Priority, and Unsecured

16 Claims.  The Available Cash shall consist of the respective Group II: Voluntary Debtors' cash on

17 hand as of the Effective Date that is not subject to a Disputed Lien, proceeds of Net Litigation

18 Recoveries that are not subject to a Disputed Lien, Net Sales Proceeds that become Available Cash

19 upon the disallowance of a Disputed Claim or avoidance of a Disputed Lien purportedly

20 encumbering such Cash, or proceeds from the ~~Acquisitions Administrative~~Litco. Plan Loan.  All

21 Available Cash shall be deposited into the applicable Distribution Account(s).  Available Cash

22 shall not include Net Sale Proceeds in the Net Sales Proceeds Account where the Disputed Secured

23 Claims are Allowed but subject to an equitable subordination judgment.

24        2.1.17    <u>Avoidance Actions</u>.  All Claims and defenses to Claims accruing to the

25 Group II: Voluntary Debtors and their Estates under Bankruptcy Code Sections 506(d), 510(c),

26 541, 544, 545, 547, 548, 549, 550, or 551.

27        2.1.18    <u>Bankruptcy Code</u>.  The United States Bankruptcy Code.

28

2.1.19    Bankruptcy Court.  The United States Bankruptcy Court for the Central District of California, having jurisdiction over the Cases and, to the extent of any withdrawal of the reference made pursuant to Section 157 of title 28 of the United States Code, the United States District Court for the Central District of California; or, in the event such courts cease to exercise jurisdiction over the Cases, such court or unit thereof that exercises jurisdiction over the Cases in lieu thereof.

2.1.20    Bankruptcy Rules.  Collectively, as now in effect or hereafter amended and as applicable to the Cases, (i) the Federal Rules of Bankruptcy Procedure, and (ii) the Local Bankruptcy Rules and General Orders applicable to cases pending before the Bankruptcy Court.

2.1.21    Beaumont Heights Project.  The Project owned by SunCal Beaumont, located in the City of Beaumont, California, as more particularly described herein.

2.1.22    Beaumont Heights Break-up Fee. The amount equal to 2.5% of the Minimum Sales Price for the Beaumont Heights Project, plus actual amounts paid on Allowed Administrative Claims for the SunCal Beaumont Case, sum of forty-one thousand dollars ($41,000) that will be paid to the Stalking Horse Bidder that submits the Opening Bid for the Beaumont Heights Project, if such Stalking Horse Bidder is not the Winning Bidder.

2.1.23    Beneficial Interests. means, collectively, the interests of the holders of Allowed Unsecured Claims in the Plan Trust and in all distributions to be made by the Plan Trust on account of Allowed Unsecured Claims. The Beneficial Interests (a) shall be noted in the books and records of the Plan Trust, (b) shall not be evidenced by a writing, and (c) may not be transferred, sold, assigned or transferred by will, intestate succession or operation of law without written notification to the Plan Trustee confirming and acknowledging the transfer by both the holder and the transferee.

2.1.24    Bickford Ranch Project.  The Project owned by SunCal Bickford, located in the City of Penryn, California, as more particularly described herein.

2.1.25    Bickford Second Loan Agreement.  That certain promissory note secured by a deed of trust, dated as of May 25, 2005, in the maximum aggregate principal amount of approximately $30,000,000 executed by SunCal Bickford, as borrower, and payable to the order of

Lehman ALI.  The Bickford Second Lien Loan Agreement is allegedly secured by a second priority deed of trust on the Bickford Ranch Project.  The Bickford Second Loan Agreement has an asserted balance due of $56,494,059.38 as of March 30, 2009.

2.1.26  2.1.24  **Bond Claim(s)**.  Any Claim against the Debtor(s) and a Bond Issuer under various payment or performance bonds, and/or any claims of Bond Issuer(s) against the Debtor(s) under various payment or performance bonds.

2.1.27  2.1.25  **Bond Claimant**.  Holder(s) of a Bond Claim.

2.1.28    Bond Indemnification Claim.  All Claims by Bond Safeguard, Lexon, and Arch for indemnification for payment by Bond Safeguard, Lexon and Arch of Bond Claims with respect to the Group II: Voluntary Debtors' Projects.

2.1.29  2.1.26  **Bond Indemnitors**.  The individuals and entities that are allegedly liable on the Bond Indemnification Claims, including, allegedly, all of the Debtors, Acquisitions, all Affiliates of Acquisitions, and Elieff.

2.1.30  2.1.27  **Bond Issuer(s)**.  Bond Safeguard, Lexon and Arch in their capacities as issuers and sureties for payment and performance bonds for the benefit of certain of the Debtors.

2.1.31  2.1.28  **Bond Safeguard**.  Bond Safeguard Insurance Company, a Bond Issuer.

2.1.32  2.1.29  **Business Day**.  Any day, other than a Saturday, a Sunday or a "legal holiday," as defined in Bankruptcy Rule 9006(a).

2.1.33  2.1.30  **Cases**.  The Chapter 11 cases of the Group II: Voluntary Debtors pending before the Bankruptcy Court.

2.1.34  2.1.31  **Cash**.  Currency of the United States of America and cash equivalents, including, but not limited to, bank deposits, immediately available or cleared checks, drafts, wire transfers and other similar forms of payment.

2.1.35  2.1.32  **CFD Bonds**.  Community facilities district bonds issued by a governmental entity.

2.1.36    Chapter 11 Trustee.  Steven M. Speier, the duly appointed trustee of the Trustee Debtors in their pending Chapter 11 Cases.

1       2.1.37  2.1.33  **Claim**.  This term shall have the broadest possible meaning under

2  Section 101(5) of the Bankruptcy Code, and shall include (a) any right to payment from any of the

3  Group II: Voluntary Debtors, whether or not such right is reduced to judgment, liquidated,

4  unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable,

5  secured, or unsecured, or (b) any right to an equitable remedy for breach of performance if such

6  breach gives rise to a right of payment from any of the Group II: Voluntary Debtors, whether or not

7  such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured,

8  disputed, undisputed, secured, or unsecured.

9       2.1.38  2.1.34  **Claims Bar Date**.  For any Claim the exceptions noted below other

10  than an Administrative Claim, March 31, 2009, which was established by the Bankruptcy Court as

11  the last date for creditors to file Proof of Claims with the Bankruptcy Court in all of the Group II:

12  Voluntary Debtors' cases, except for the following: (a) Administrative Claims, for which the

13  Administrative Claims Bar Date shall apply, (b) claims arising from rejection of executory

14  contracts or unexpired leases pursuant to 11 U.S.C. § 365, for which the last day to file a proof of

15  claim is (i) 30 days after the date of entry of the order authorizing the rejection, or (ii) March 31,

16  2009, whichever is later, (c) claims of "governmental units," as that term is defined in 11 U.S.C. §

17  101(27), for which proofs of claim are timely filed if filed: (i) before 180 days after the date of the

18  Order for Relief in this case, or (ii) by March 31, 2009, whichever is later (11 U.S.C. § 502(b)(9)),

19  and (d) claims arising from the avoidance of a transfer under chapter 5 of the Bankruptcy Code, the

20  last day to file a proof of claim is 30 days after the entry of judgment avoiding the transfer or

21  March 31, 2009, whichever is later.

22       2.1.39  2.1.35  **Claims Objection Deadline**.  The later of (i) the first business day

23  following the one hundred and eightieth (180th) day after the Effective Date, or (ii) such greater

24  period of limitation as may be fixed or extended by the Bankruptcy Court or by agreement between

25  the Plan Trustee and the Holder of the Claim.

26       2.1.40  2.1.36  **Claim Objection Reduction Amount**. The amount of Net Sales

27  Proceeds that is made available to the holders of Allowed Unsecured Claims due to the entry of a

judgment or order on a Lehman Claim Objection that disallows, reduces, or otherwise adversely modifies the secured claims filed by the Lehman Lenders.

2.1.41  2.1.37  Class.  Each group of Claims or Interests classified in Article V of the Plan pursuant to Sections 1122 and 1123 of the Bankruptcy Code.

2.1.42  2.1.38  Committees.  Collectively, the Voluntary Debtors' Committee and the Trustee Debtors' Committee, both before and after the Confirmation Date.

2.1.43  2.1.39  Confirmation Date.  The date on which the Confirmation Order is entered in the Bankruptcy Court's docket.

2.1.44  2.1.40  Confirmation Order.  The order entered by the Bankruptcy Court confirming the Plan in accordance with the provisions of Chapter 11 of the Bankruptcy Code.

2.1.45  Contingent Bond Claims.  Contract Action. The action filed by certain Voluntary Debtors against Lehman ALI, Inc., and certain other defendants, in California Superior Court for the County of Orange (Case No. 30-2011-0040847-CU-BC-CJC), that was removed to the bankruptcy court as Adv.  No. 8:11-ap-01212-ES, and a reservation of rights to add the Plan Trustee and/or the Trustee Debtors as additional plaintiffs therein.Unmatured Bond Claims.

2.1.46  2.1.41  Creditor.  Any Person who is the Holder of a Claim against any Debtor that arose or accrued or is deemed to have arisen or accrued or to have matured, or otherwise become due, owing, and payable on or before the Petition Date, including, without limitation, Claims of the kind specified in Sections 502(g), 502(h) or 502(i) of the Bankruptcy Code.

2.1.47  2.1.42  Debtor(s).  Individually or collectively, the Voluntary Debtors and the Trustee Debtors, as specifically defined in Exhibit "1" attached hereto.

2.1.48  2.1.43  Debtor(s)-in-Possession.  The Voluntary Debtor(s) when acting in their capacity as representatives of their respective Estates in their respective Chapter 11 Cases.

2.1.49  2.1.44  Disclosure Statement.  The document accompanying the Plan that is entitled "Second Amended Disclosure Statement Describing Second Amended Chapter 11 Plan Filed by SunCal Plan Proponents In The Chapter 11 Cases Of SunCal Beaumont Heights, LLC and

SunCal Johannson Ranch, LLC [Group II: Voluntary Debtors]," as amended and with all accompanying exhibits.

~~2.1.50~~ 2.1.45  Disputed Claim(s).  All or any part of a Claim other than any Allowed Amount thereof as to which any one of the following applies: (i) no Proof of Claim has been filed with respect to such Claim, and either (a) the Claim is not listed in the Schedules; or (b) the Claim is listed in the Schedules as unliquidated, disputed, contingent, unknown or in a zero amount, (ii) the Claim is the subject of (a) a<u>n unresolved</u> Litigation Claim; (b) the Claim is subject to offset by a Litigation Claim; (c) a timely objection <u>to such Claim</u> that has not been resolved by a Final Order; or (d) a request for estimation in accordance with the Bankruptcy Code, the Bankruptcy Rules, any applicable order of the Bankruptcy Court, or the Plan which is Filed on or before the Claims Objection Deadline, which Adversary Proceeding, objection, or request for estimation has not been dismissed, withdrawn or determined by a Final Order; or (iii) the Claim is otherwise treated as a "Disputed Claim" pursuant to the Plan.

~~2.1.51~~ 2.1.46  Disputed Lien(s).  An asserted lien(s) against Assets of the Debtor(s) that is either subject to a Disputed Secured Claim, not duly perfected, subject to an Avoidance Action, or subject to an action pursuant to Bankruptcy Code Sections 510(c)(2) and/or 506(d). <u>However, pursuant to Section 506(d)(2), a lien is not disputed merely because it secures a claim that "is not an allowed secured claim due only to the failure of any entity to file a proof of such claim under section 501 of this title."</u>

~~2.1.52~~ 2.1.47  Disputed Secured Claim(s). That part of a Disputed Claim that is a Secured Claim.

~~2.1.53~~ 2.1.48  Distribution(s).  Payments to Holders of Allowed Claims provided for under the Plan.

~~2.1.54~~ 2.1.49  Distribution Agent.  The entity that is responsible for making Distributions under the Plan, which shall be Acquisitions.

~~2.1.55~~ 2.1.50     Distribution Account(s).  Separate account(s) to be established by the Plan Trustee at an FDIC insured bank into which each Group II: Voluntary Debtors' Available Cash shall be deposited and all Available Cash received by the Plan Trust after the

1  Confirmation Date. ~~that would have belonged to such Group V Debtor shall be deposited, other~~

2  ~~than Net Sales Proceeds that are subject to Disputed Claims and Disputed Liens.~~

3  ~~2.1.56~~ 2.1.51  **Distribution Date.**  With respect to any Allowed Claim or Allowed

4  Interest, the date on which a Distribution is required to be made under the Plan.

5  ~~2.1.57~~ 2.1.52  **Effective Date.** A date selected by the applicable SunCal Plan

6  Proponent(s) that is not later than the ninetieth (90th) calendar day after the Confirmation Date and

7  provided there is no stay pending appeal of the Confirmation Order. However, the SunCal Plan

8  Proponents shall have the right to extend the Effective Date for an additional thirty (30) days.  The

9  Effective Date may be further extended by the Bankruptcy Court after notice and hearing to all

10  parties in interest.

11  ~~2.1.58~~ 2.1.53  **Elieff.**  Bruce Elieff, the president of Acquisitions, a purported

12  ~~obligor on the~~ Bond Indemnitor~~Claims~~ with alleged corresponding indemnity Claims against the

13  Debtors.

14  ~~2.1.59~~ 2.1.54  **Estates.**  The bankruptcy estates of the Group II: Voluntary Debtors

15  created pursuant to Section 541 of the Bankruptcy Code.

16  ~~2.1.60~~ 2.1.55  **Fee Applications.**  Applications of Professional Persons under

17  Sections 330, 331 or 503 of the Bankruptcy Code for allowance of compensation and

18  reimbursement of expenses in the Cases.

19  ~~2.1.61~~ 2.1.56  **Fee Claim.**  A Claim under Sections 330 or 503 of the Bankruptcy

20  Code for allowance of compensation and reimbursement of expenses in the Cases.

21  ~~2.1.62    Fenway Capital.  Fenway Capital Funding LLC, a Lehman Successor to~~

22  ~~Lehman's Disputed Claims and Lehman's Disputed Liens arising from (i) SunCal Communities I~~

23  ~~Loan Agreement, (ii) Ritter Ranch Loan Agreement, (iii) Bickford Second Loan Agreement,~~

24  ~~(iv) SunCal PSV Loan Agreement, (v) SunCal Marblehead/SunCal Heartland Loan Agreement,~~

25  ~~(vi) Delta Coves Loan Agreement (vii) SunCal Northlake Loan Agreement, and (viii) SunCal Oak~~

26  ~~Valley Loan Agreement.  Such Disputed Claims and Disputed Liens were transferred back to LCPI~~

27  ~~pursuant to a compromise approved by the New York Bankruptcy Court on May 12, 2010.~~

28

2.1.63  2.1.57  Filed.  Delivered to, received by and entered upon the legal docket by the Clerk of the Bankruptcy Court.  "File" shall have a correlative meaning.

2.1.64  2.1.58  Final Order.  A judgment, order, ruling or other decree issued and entered by the Bankruptcy Court, that has not been reversed, stayed, modified or amended.

2.1.65  2.1.59  General Unsecured Claim.  A Claim against a Group V Debtor that is not (a) a Secured Claim, (b) an Administrative Claim, (c) a Tax Claim or (d) a Priority Claim.

2.1.66  2.1.60  Group II: Voluntary Debtors. SunCal Beaumont Heights, LLC and SunCal Johannson, LLC.

2.1.67  2.1.61  Group II ProjectGroup II: Voluntary Debtors Projects. Beaumont Heights Project and Johannson Ranch Project.

2.1.68  2.1.62  Holder.  The beneficial owner of any Claim or Interest.

2.1.69  2.1.63  Initial Overbid. The Initial Overbid is the first Qualifying Bid after the Opening Bid that is equal to or in excess of the Initial Overbid Amount.

2.1.70  2.1.64  Initial Overbid Amount. In the case of Ritter Ranch    Beaumont Heights Project, the Initial Overbid Amount is a sum that is not less than the sum of the applicable Opening Bid, the Beaumont Heights Project Break-up Fee and the Minimum Increment. In the case of the Johannson Ranch Project, the Initial Overbid Amount is a sum that is not less than the sum of the applicable Opening Bid, the Johannson Project Break-up Fee and the Minimum Increment.

2.1.71  2.1.65  Insider.  The term shall have the broadest meaning possible under Section 101(31), including, but not limited to, a person in control of the Debtor, Affiliates and Insiders of such Affiliates.

2.1.72  2.1.66  Interest.  Any equity security interest in any Group II DebtorGroup II: Voluntary Debtor within the meaning, of Section 101(16) of the Bankruptcy Code, including, without limitation, any equity ownership interest in any of the Group II DebtorGroup II: Voluntary Debtors, whether in the form of common or preferred stock, stock options, warrants, partnership interests, or membership interests.

2.1.73  2.1.67  Johannson Ranch Project.  The Project owned by SunCal Johannson, located in the City of Modesto, California, as more particularly described hereinin Exhibit 1.

1   ~~2.1.74~~ 2.1.68    Johannson Ranch Break-up Fee. The amount equal to 2.5% of

2   the Minimum Sales Price for the Johannson Ranch Project, plus actual amounts paid on Allowed

3   Administrative Claims for the SunCal Johannson Case,~~The sum of twenty-two thousand dollars~~

4   ~~($22,000)~~ that will be paid to the Stalking Horse Bidder that submits the Opening Bid for the

5   Johannson Ranch Project, if such Stalking Horse Bidder is not the Winning Bidder.

6   ~~2.1.75    Kirby Estates.   Kirby Estates, LLC, a Delaware limited liability company,~~

7   ~~a Voluntary Debtor herein, and the owner of a portion of the Summit Valley Project not owned by~~

8   ~~SunCal Summit Valley and Seven Brothers.~~

9   ~~2.1.76~~ 2.1.69  LBHI.  Lehman Brothers Holdings, Inc., a Lehman Entity, the parent

10  company of Lehman ALI and LCPI, and a Chapter 11 debtor in a bankruptcy proceeding pending

11  in the Bankruptcy Court for the Southern District of New York.

12  ~~2.1.77~~ 2.1.70  LCPI.  Lehman Commercial Paper, Inc., a Chapter 11 debtor in a

13  bankruptcy proceeding pending in the Bankruptcy Court for the Southern District of New York.

14  ~~2.1.78~~ 2.1.71    Legal Rate.  The rate of interest payable on judgments

15  obtained in the United States District Courts as set forth in 28 U.S.C. § 1961.  The rate applicable

16  under the Plan is 1.44% per annum, representing the applicable rate on November 6, 2008.

17  ~~2.1.79~~ 2.1.72  Lehman Adversary Proceeding.  The Debtors' pending adversary

18  proceeding against the Lehman Lenders and/or the Lehman Successors asserting various causes of

19  action including equitable subordination, fraudulent conveyances and preferential transfers.

20  ~~2.1.80~~ 2.1.73  Lehman ALI.  Lehman ALI, Inc.

21  ~~2.1.81    Lehman Disputed Administrative Loans.  The post-petition financing~~

22  ~~provided by Lehman ALI to Palmdale Hills, SunCal Emerald, SunCal Bickford, Acton Estates,~~

23  ~~SunCal Oak Valley, SunCal Heartland, SunCal Northlake, SunCal Marblehead, SunCal Century~~

24  ~~City, SunCal PSV, Delta Coves, and SunCal Oak Knoll, which grants priming liens on all~~

25  ~~borrower~~ Trustee ~~Debtors' assets, and for super-priority administrative status to Lehman ALI.  The~~

26  ~~Voluntary Debtors have repaid to Lehman ALI the full amount of $270,731 loaned to the~~

27  ~~Voluntary Debtors.  The aggregate amount of the Lehman Administrative Loans to all of the~~ above

28  ~~Trustee Debtors wa~~is ~~approximately $40 million as of March 1, 2011 and continuing to increase.~~

MAINDOCS-#163410-v2-SCC_Group_II_VD_DS.DOC

1    The Lehman Disputed Administrative Loans are the subject of claim objections, specifically the

2    pending 502(d) Objection. Until these objections are resolved in the applicable Case, these Lehman

3    Disputed Administrative Loans shall not be Allowed Claims.

4    2.1.82    Lehman Claim Objections. The objections filed by the Debtors to the

5    claims filed by the Lehman Lenders that are based upon the Lehman Disputed Loans and the

6    Lehman Disputed Administrative Loans, including, but not limited to, the Lehman Recoupment

7    Objection and the Lehman 502(d) Objection.

8    2.1.83  2.1.74  Lehman Entities.  The Lehman Lenders, the Lehman Equity

9    Members and LBHI.

10    2.1.84    Lehman Equity Members.  Lehman Entities that own direct or indirect

11    membership Interests in all of the Trustee Debtors, except for SunCal Heartland and SunCal

12    Marblehead.

13    2.1.85  2.1.75  Lehman Lenders.  Lehman ALI, LCPI, Northlake Holdings, and

14    OVC Holdings.

15    2.1.86    Lehman Disputed Loans.  Collectively the following loans that are the

16    purported basis for the Lehman's Disputed Claims:  (a) SunCal Communities I Loan Agreement;

17    (b) Bickford Second Loan Agreement; (c) Ritter Ranch Loan Agreement; (d) SCC Palmdale Loan;

18    (e) Interim Loan Agreement; (f) SunCal Oak Knoll/SunCal Torrance Loan Agreement; (g) SunCal

19    Century City Loan Agreement; (h) SunCal PSV Loan Agreement; (i) SunCal Delta Coves Loan

20    Agreement; (j) SunCal Marblehead/SunCal Heartland Loan Agreement; (k) Sun Cal Oak Valley

21    Loan Agreement; (l) SunCal Northlake Loan Agreement; (m) Pacific Point First Loan Agreement;

22    and (n) Pacific Point Second Loan Agreement, and (o) the Lehman Disputed Administrative Loan.

23    2.1.87  2.1.76  Lehman Recoupment Objection. A claim objection filed with respect

24    to certain claims filed by the Lehman Lenders that is based upon the affirmative defenses of

25    recoupment, unjust enrichment and unclean hands.

26    2.1.88  2.1.77  Lehman Representatives.  The individuals that controlled the

27    Lehman Entities.

28

MAINDOCS-#163410-v2-SCC_Group_II_VD_DS.DOC

1    2.1.89    Lehman Successor(s).  Entities other than the Lehman Lenders that either

2    assert to be or are determined by the Bankruptcy Court to be the beneficial owner(s) of the Lehman

3    Disputed Loan(s), including, but not limited to Fenway Capital, Lehman Re and Danske Bank.

4    2.1.90    Lehman's Disputed Claim(s).  All of the Proofs of Secured Claims filed by

5    a Lehman Lender or a Lehman Successor in the Debtors' Chapter 11 Cases arising from the

6    Lehman Disputed Loans and the Lehman Disputed Administrative Loans.

7    2.1.91    Lehman's Disputed Lien(s).  All of the alleged liens relating to Proofs of

8    Secured Claims filed by a Lehman Lender or a Lehman Successor in the Debtor's Chapter 11

9    Cases arising from the Lehman Disputed Loans.

10    ~~2.1.92~~ 2.1.78  Lehman 502(d) Objection. A claim objection filed with respect to

11    certain claims filed by the Lehman Lenders that based upon Section 502(d) of the bankruptcy code.

12    2.1.93    Lexon.  Lexon Insurance Co.

13    ~~2.1.94~~ 2.1.79  Litigation Claims.   Any and all interests of the Group II: Voluntary

14    Debtors in any and all Claims, rights, causes of action, and objections or defenses to Claims, liens,

15    rights, or causes of action which have been or may be commenced by the Group V Debtor(s), the

16    Chapter 11 Trustee, or the Committee(s), as the case may be, including, but not limited to, any

17    (i) Avoidance Actions; (ii) for turnover of property to the Group II: Voluntary Debtors' Estates

18    and/or the Plan Trust; (iii) for the recovery of property or payment of money that belongs to the

19    Debtors' Estates or the Plan Trust; (iv) the right to compensation in the form of damages,

20    recoupment or setoff of the Debtors' Estates and/or the Plan Trust; (v) the Lehman Adversary

21    Proceeding; (vi) the ~~State Court~~Contract Action, and (vii) any and all other Claims against

22    Lehman's Disputed Claims and/or Disputed Liens referenced in the Plan or the Disclosure

23    Statement.

24    ~~2.1.95~~ 2.1.80  Litigation Recoveries.  Any Cash or other property received by the

25    Chapter 11 Trustee, the ~~Group II Debtor~~Group II: Voluntary Debtors, the Committees and/or the

26    Plan Trust, as the case may be, from all or any portion of a Litigation Claim(s), including, but not

27    limited to, awards of damages, attorneys' fees and expenses, interest and punitive damages,

28    whether recovered by way of settlement, execution on judgment or otherwise.

-17-

2.1.96  2.1.81  Litigation Rights. Any Claims held by a party other than against the Group II: Voluntary Debtors, and if applicable, against third parties arising or relating to the Claim against the applicable Group II Voluntar Debtor, that have not been fixed in a final judgment prior to the Effective Date.

2.1.97    Marblehead Project.  The Project owned by SunCal Marblehead, located in the City of San Clemente, California, as more particularly described herein.

2.1.98  2.1.82    Maximum Distribution.  A Distribution to a Holder of an Allowed Unsecured Claim against a Group II: Voluntary Debtor equal to one hundred percent (100%) of the amount of the Holder's Allowed General Unsecured Claim plus interest at the Legal Rate from and as of the Group II: Voluntary Debtor's Petition Date.

2.1.99  2.1.83    MB Firm.  Miller Barondess, LLP.

2.1.100  2.1.84    Mechanic Lien Claims.  Mechanic Lien Claims arising pursuant to California Civil Code §3110, et seq. that were either allegedly perfected prepetition or otherwise allegedly satisfy the requirements of Bankruptcy Code 546(b).

2.1.101  2.1.85    Minimum Increment.  Minimum Increment applicable to the sales of the Group II Project Group II: Voluntary Debtors Projects are the following: twenty thousand dollars ($20,000) for the Beaumont Heights Project and ten thousand dollars ($10,000) for the Johannson Ranch Project., until there are only two Qualified Bidders submitting bids for a Group II Project Group II: Voluntary Debtors Project, then the Minimum Increment shall be five thousand dollars ($5,000).

2.1.102  2.1.86    Minimum Sale Price. The minimum gross sale price that must be paid for each Group VII Project before such projects can be sold pursuant to the Plan, which prices are the following: Beaumont Height Project - $918,000, and Johannson Ranch Project - $486 00,000.

2.1.103  2.1.87    Net Litigation Recoveries.  Litigation Recoveries less associated Administrative Claims and Post-Confirmation Expenses incurred in connection with such Litigation Recoveries.

2.1.104 2.1.88    Net Sales Proceeds.  The Cash generated from the sale(s) or liquidation of the Group V Debtor(s)' Assets or the Plan Trust's Assets, less payment of selling expenses, taxes, Chapter 11 Trustee fees, and any associated Post-Confirmation Expenses and Administrative Claims incurred in furtherance of such sales or liquidation of such Assets.

2.1.105 2.1.89    Net Sales Proceeds Account(s).  Separate account(s) that will be established by the Plan Trustee at an FDIC insured bank into which all Net Sale Proceeds shall be deposited from the sale of Assets that were allegedly encumbered by a Disputed Secured Claim(s) and/or a Disputed Lien(s).  There shall be a separate Net Sales Proceeds Account for the Net Sale Proceeds allegedly subject to each Disputed Secured Claim(s) and/or Disputed Lien(s), except where there are two Disputed Liens on a single Project, in which case, there shall be a single account for the proceeds generated from that Project.  The Disputed Secured Claim(s) and/or Disputed Lien(s) shall attach to the corresponding Net Sales Proceeds Account(s) pending any Final Order(s) of the Bankruptcy Court resolving the applicable Disputed Secured Claim(s) and/or applicable Disputed Lien(s).  To the extent that a particular Disputed Claim is disallowed or a particular Disputed Lien is avoided (other than transferred to the Estates pursuant to Bankruptcy Code Section 510(c)(2)) or otherwise invalidated, such Net Sales Proceeds allegedly subject thereto shall become Available Cash and shall be transferred to the applicable Distribution Account(s).  To the extent that a particular Disputed Secured Claim and a Disputed Lien are allowed and deemed valid but subject to the equitable subordination causes of action in the Lehman Adversary Proceeding, the funds shall remain in the Net Sales Accounts pending a Final Order on the equitable subordination causes of action in the Lehman Adversary Proceeding.

2.1.106 2.1.90    Opening Bid.  Opening Bid means the offer by a Qualified Bidder for one, or both of the Group II Project Group II: Voluntary Debtors Projects, which is equal to the Minimum Sale Price(s) accepted by the Debtor for either one or both of the Group II Project Group II: Voluntary Debtors Projects.

2.1.107 2.1.91    Orders for Relief Date.  The following are dates that orders for relief were entered for each of the Trustee Debtors:

SunCal Oak Valley                    January 6, 2009

-19-

| | |
|---|---|
| SunCal Heartland | January 6, 2009 |
| SunCal Northlake | January 6, 2009 |
| SunCal Marblehead | January 6, 2009 |
| SunCal Century City | January 6, 2009 |
| SunCal PSV | January 6, 2009 |
| Delta Coves | January 6, 2009 |
| SunCal Torrance | January 6, 2009 |
| SunCal Oak Knoll | January 6, 2009 |

2.1.108   Palmdale Hills.  Palmdale Hills Property LLC, a Delaware limited liability company, a Voluntary Debtor herein, and the owner of the Ritter Ranch Project

2.1.109   Palmdale Hills CFD Bonds.  Certain CFD bonds issued by the City of Palmdale, in the amount of approximately $33 million that are owned by Palmdale Hills.

2.1.110   Palm Springs Village Project.  The Project owned by SunCal PSV, located in the City of Palm Springs, California, as more particularly described herein.

2.1.111  2.1.92     Person.  An individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, governmental authority, governmental unit, committee or other entity of whatever nature.

2.1.112  2.1.93     Petition Dates.  The following are dates that each of the Voluntary Debtors filed their Voluntary Chapter 11 petitions or Creditors filed involuntary Chapter 11 petitions against the Trustee Debtors:

///

| | |
|---|---|
| Palmdale Hills | November 6, 2008 |
| SunCal Beaumont | November 6, 2008 |
| SCC Palmdale | November 7, 2008 |
| SunCal Johannson | November 7, 2008 |
| SunCal Summit Valley | November 7, 2008 |
| SunCal Emerald | November 7, 2008 |
| SunCal Bickford | November 7, 2008 |
| Acton Estates | November 7, 2008 |
| Seven Brothers | November 7, 2008 |
| SJD Partners. | November 7, 2008 |
| SJD Development | November 7, 2008 |
| Kirby Estates | November 7, 2008 |
| SunCal I | November 7, 2008 |
| SunCal III | November 7, 2008 |
| SCC Communities | November 19, 2008 |
| Del Rio | November 19, 2008 |
| Tesoro | November 19, 2008 |
| Delta Coves Ventures, LLC | November 14, 2008 |
| SunCal Heartland, LLC | November 12, 2008 |
| SunCal Marblehead, LLC | November 12, 2008 |
| LB-L-SunCal Northlake, LLC | November 12, 2008 |
| LB-L-SunCal Oak Valley, LLC | November 12, 2008 |
| SunCal Century City, LLC | November 14, 2008 |
| SunCal PSV, LLC | November 14, 2008 |
| SunCal Torrance Properties, LLC | November 14, 2008 |
| SunCal Oak Knoll, LLC | November 19, 2008 |

2.1.113  2.1.94    Plan(s).  This The Chapter 11 Plan for the Group II: Voluntary Debtors together with the Exhibits thereto, as the same may be amended or modified from time to time in accordance with the Plan.

2.1.114  Plan Documents.  The Plan, the Plan Trust Agreement and all other documents attached to the Plan Supplement.

2.1.115  2.1.95    Plan Period. The period from the Effective Date to the Plan Termination Date.

2.1.116  Plan Supplement. The compilation of the Plan Documents to be filed with the Bankruptcy Court, and served on Creditors by the date set by the Bankruptcy Court.

2.1.117  2.1.96    Plan Termination Date. The fifth (5th) anniversary date of the Effective Date, unless the Plan elects and earlier date.

-21-

2.1.118  2.1.97    **Plan Sponsor**.  The entity that has committed to cause the funding of certain specified obligations under the Plan on or after the Effective Date.  The Plan Sponsor is Acquisitions.

2.1.119  2.1.98    **Plan Trust**.  A liquidating trust to be established prior to or on the Effective Date, with Acquisitions as the Plan Trustee and the Holders of Allowed Claims against the Debtors as the beneficiaries. The purpose of the Plan Trust will be to liquidate the Debtors' Assets (other than Assets that are excluded by the Plan Trustee on the grounds that they lack value or would be difficult to administer) and to otherwise consummate the Plan.

2.1.120  2.1.99    **Plan Trustee**. The Plan Trustee under the Plan Trust ~~Agreement~~ is Acquisitions.

~~2.1.121    Plan Trust Agreement. The liquidating trust agreement governing the affairs of the Plan Trust, which will be in substantially the form contained in the Plan Supplement.~~

2.1.122  2.1.100    **Plan Trust Beneficiaries**. The Plan Trust Beneficiaries are (i) the holders of Beneficial Interests, as of any point in time, and (ii) holders of Allowed Claims that shall be satisfied from ~~Plan Trust Property~~Plan Trust Asset in accordance with the terms of the Plan.

2.1.123  2.1.101    **~~Plan Trust Property~~Plan Trust Asset**. ~~Plan Trust Property~~Plan Trust Asset means all property within the Chapter 11 estates of the ~~Group II Debtor~~Group II: Voluntary Debtors, other than property that is affirmatively excluded by the Plan Trustee.

2.1.124  2.1.102    **Post-Confirmation Expenses**.  The fees and expenses incurred by the Plan ~~Sponsor~~Trust, the Plan Trustee and the Committee(s) and their professionals following the Confirmation Date (including the fees and costs of Professionals) for the purpose of (i) prosecuting and liquidating the Litigation Claims; (ii) objecting to and resolving Disputed Claims and Disputed Liens; (iii) selling or otherwise liquidating the Plan Trust's Assets; (iv) effectuating Distributions under the Plan; and (v) otherwise consummating the Plan and closing the ~~Group II Debtor~~Group II: Voluntary Debtors' Chapter 11 Cases.

2.1.125  2.1.103    **Priority Claim**.  Any Claim, other than an Administrative Claim or a Tax Claim, to the extent entitled to priority under Section 507(a) of the Bankruptcy Code.

2.1.126 2.1.104    Pro Rata.  Proportionately, so that with respect to any distribution in respect of any Allowed Claim, the ratio of (a)(i) the amount of property distributed on account of such Allowed Claim to (ii) the amount of such Allowed Claim, is the same as the ratio of (b)(i) the amount of property distributed on account of all Allowed Claims of the Class or Classes sharing in such distribution to (ii) the amount of all Allowed Claims in such Class or Classes.

2.1.127 2.1.105    Professional.  A Person or Entity (a) employed by the Group II: Voluntary Debtors, the Committees pursuant to a Final Order in accordance with Sections 327 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to the Effective Date, pursuant to Sections 327, 328, 329, 330 and 331 of the Bankruptcy Code, or (b) for which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to Section 503(b) of the Bankruptcy Code.

2.1.128 2.1.106    Professional Fees.  All Allowed Claims for compensation and for reimbursement of expenses under Sections 328, 330 and/or 503(b) of the Bankruptcy Code

2.1.129 2.1.107    Projects.  The Debtors' residential real estate development projects and other assets as separately defined herein and described in Exhibit "1" to the Disclosure Statement.

2.1.130 2.1.108    Qualifying Bid.  Qualifying Bid means, with respect to any bid on a Group V II Voluntary Debtor Project, a bid made by Qualifying Bidder that is A) equal to or in excess of the Initial Overbid Amount, if unless it is the Initial Overbid, or B) in excess of the immediately preceding Qualifying Bid by the Minimum Increment, if it is not the Initial Overbid.

2.1.131 2.1.109    Qualifying Bidder.  Qualifying Bidder means a bidder who a) has deposited the sum of seventyforty-five thousand dollars ($7545,000) into an escrow designated by the SunCal ProponentSunCal Plan Proponents in the case of a bid for the Beaumont Heights Project, fifteen twenty five thousand dollars or ($1525,000) in the case of a bid for the Johannson Ranch Project; b) agreed that this sum will be forfeited as liquidated damages if such bidder fails to perform; and c) who has provided the SunCal Plan Proponents evidence confirming that such bidder has the financial means to acquire the applicable Group II ProjectGroup II: Voluntary Debtors Project(s) that such bidder is seeking to acquire.

2.1.132   Ritter Ranch Loan Agreement.  That certain Credit Agreement, dated as of February 8, 2007, by and among Palmdale Hills, as borrower, LCPI, as administrative agent and lender, pursuant to which LCPI made a loan in the maximum aggregate principal amount of approximately $264,000,000.  The Ritter Ranch Loan Agreement is allegedly secured by a first-priority deed of trust on all real and personal property owned by Palmdale Hills.  The Ritter Ranch Loan Agreement has an asserted balance due of $287,252,096.31 as of March 30, 2009.

2.1.133   Ritter Ranch Project.  The Project owned by Palmdale Hills, located in the City of Palmdale, California, as more particularly described herein.

2.1.134  2.1.110   Sale Period.  For each Group II: Voluntary Debtors' Plan(s), the The Sale Period is the time period during which the SunCal ProponentSunCal Plan Proponents must consummate a sale or liquidation of the Group II ProjectGroup II: Voluntary Debtors Projects. The Sale Period shall commence on the Confirmation Date and shall expire on thirty days after the Effective Date, unless extended by the Bankruptcy Court after notice and hearing.

2.1.135  2.1.111   SCC LLC.  SCC Acquisitions LLC, a limited liability company, a subsidiary of Acquisitions and an indirect and/or a direct parent company of all of the Debtors.

2.1.136  2.1.112   Schedules.  The schedules of assets and liabilities and list of equity security holders Filed by the Group II: Voluntary Debtors, as required by Section 521(1) of the Bankruptcy Code, Bankruptcy Rules 1007(a)(3) and (b)(1), and Official Bankruptcy Form No. 6, as amended from time to time.

2.1.137   Seven Brothers.  Seven Brothers, LLC, a Delaware limited liability company, a Voluntary Debtor herein, and the owner of the portion of the Summit Valley Project not owned by Kirby Estates and SunCal Summit Valley.

2.1.138  2.1.113   Secured Claim.  Any Claim, including interest, fees, costs, and charges to the extent allowable pursuant to Bankruptcy Code Section 506, that is secured by a valid and unavoidable Lien on the Group II: Voluntary Debtor(s)' Assets.

2.1.139  2.1.114   Stalking Horse Bidder.  The Qualified Bidder who submits the Opening Bid.

2.1.140    State Court Action.  The action filed by certain Voluntary Debtors against Lehman AliALI, Inc., and certain other defendants, in California Superior Court for the County of Orange (Case No. 30-2011-0040847-CU-BC-CJC).

2.1.141    Summit Valley Project.  The Project owned in part by SunCal Summit Valley, Seven Brothers and Kirby Estates, located in the City of Hesperia, California, as more particularly described herein.

2.1.142  2.1.115    SunCal.  The SunCal Companies, a trade name for Acquisitions and its Affiliates.

2.1.143    SunCal Bickford.  SunCal Bickford Ranch, LLC, a Delaware limited liability company, a Voluntary Debtor herein, and the owner of the Bickford Ranch Project.

2.1.144  2.1.116    SunCal I. SunCal Communities I, LLC, a Delaware limited liability company, a Voluntary Debtor herein, and the owner of the equity membership interests in Acton Estates, SunCal Bickford, SunCal Beaumont, SunCal Summit Valley, SunCal Johannson and SunCal Emerald.

2.1.145  2.1.117    SunCal Communities I Loan Agreement.  The loan agreement by and among (i) SunCal I and SunCal III, as borrowers and (ii) LCPI, as administrative agent and lender, pursuant to which LCPI made a loan to SunCal I and SunCal III, as borrowers in the maximum aggregate principal amount of approximately $395,313,713.37.  The loan agreement is allegedly secured by (a) alleged first-priority deeds of trust on the SunCal Bickford, the Acton Estates, and the SunCal Emerald Projects, (b) an alleged pledge of SunCal I's Allowed Interest in Acton Estates, SunCal Summit, SunCal Beaumont, SunCal Johannson, SunCal Emerald, and SunCal Bickford; and (c) an alleged pledge of SunCal Summit's Allowed Interest in Seven Brothers and Kirby.  The SunCal Communities I Loan Agreement has an alleged balance due of $343,221,391.06 as of March 30, 2009.

2.1.146  2.1.118    SunCal Management.  SunCal Management, LLC, a Delaware limited liability company, and the former property manager for the Projects, which has been succeed by Argent Management.and the property manager for the Projects.

1         2.1.147    SunCal Marblehead. SunCal Marblehead, LLC, a Delaware limited

2 liability company, a Trustee Debtor, and the owner of the Marblehead Project.

3         2.1.148    SunCal Marblehead/SunCal Heartland Loan Agreement.  That certain

4 Second Amended and Restated Term Loan and Revolving Line of Credit Loan Agreement, dated

5 as of October 3, 2007, by and among SunCal Marblehead Heartland Master LLC, SunCal

6 Marblehead, and SunCal Heartland, as borrowers, and Lehman ALI, as agent and sole lender,

7 pursuant to which Lehman ALI made a loan in the maximum aggregate principal amount of

8 approximately $316,061,300.  The SunCal Marblehead/SunCal Heartland Loan Agreement is

9 allegedly secured by first-priority deeds of trust on the Marblehead and the Heartland Projects.

10 The SunCal Marblehead/SunCal Heartland Loan Agreement has an alleged balance due of

11 $354,325,126.15 as of March 30, 2009. The proofs of claim filed with respect to this loan

12 agreement are the subject of the Lehman Adversary Proceeding and the Lehman Claim Objections.

13         2.1.149  2.1.119    SunCal Plan Proponent(s).  The Voluntary Debtors, in their

14 capacity as debtors and debtors in possession in their respective Chapter 11 cases, and Acquisitions

15 as the creditor and party-in-interest that is proposing the Plans in the applicable Trustee Debtors'

16 CasesThe Voluntary Debtors and Acquisitions as the parties-in-interest that are proposing the Plan.

17         2.1.150    SunCal PSV. SunCal PSV, LLC, a Delaware limited liability company, a

18 Trustee Debtor, and the owner of the Palm Springs Village Project.

19         2.1.151    SunCal PSV Loan Agreement.  That certain Term Loan and Revolving

20 Line of Credit Loan Agreement, dated as of February 12, 2007, between SunCal PSV, as borrower,

21 and Lehman ALI, as agent and sole lender, pursuant to which Lehman ALI made a loan in the

22 maximum aggregate principal amount of approximately $90 million.  The SunCal PSV Loan

23 Agreement is allegedly secured by a first-priority deed of trust on the Palm Springs Village Project.

24 The SunCal PSV Loan Agreement has an alleged balance due of $88,257,340.20 as of March 30,

25 2009.

26         2.1.152  2.1.120    Tax.  Any tax, charge, fee, levy, impost or other assessment by

27 any federal, state, local or foreign taxing authority, including, without limitation, income, excise,

28 property, sales, transfer, employment, payroll, franchise, profits, license, use, ad valorem,

estimated, severance, stamp, occupation and withholding tax.  "Tax" shall include any interest or additions attributable to, or imposed on or with respect to such assessments.

2.1.153  2.1.121    Tax Claim.  Any Claim for any Tax to the extent that it is entitled to priority in payment under Section 507(a)(8) of the Bankruptcy Code.

2.1.154  2.1.122    Trustee Debtor(s). The following Debtors, individually or collectively, that are represented by the Chapter 11 Trustee: Delta Coves, SunCal Heartland, SunCal Marblehead, SunCal Northlake, SunCal Oak Valley, SunCal Century City, SunCal PSV, SunCal Torrance, and SunCal Oak Knoll.

2.1.155    Trustee Debtors' Committee.  The Official Committee of Unsecured Creditors of the Trustee Debtors appointed in the Cases pursuant to Section 1102 of the Bankruptcy Code.

2.1.156  2.1.123    Unpaid Secured Real Property Tax Claims.  Secured Claims held by various government entities secured by liens on the underlying real properties owned by the Debtors but that are non-recourse to the Debtors.

2.1.157  2.1.124    Unsecured Claim. An Unsecured Claim is any Claim that is not an Administrative Claim, Tax Claim, Secured Claim, or Priority Claim.

2.1.158  2.1.125    Voluntary Debtor(s).  The following  Chapter 11 debtors and debtors-in-possession, individually or collectively, Palmdale Hills, SunCal I, SunCal III, SCC Palmdale, Acton Estates, SunCal Beaumont, SunCal Emerald, SunCal Johansson, SunCal Bickford, SunCal Summit, Seven Brothers, Kirby Estates, SJD Partners, SJD Development, SCC Communities, Del Rio and Tesoro.

2.1.159  2.1.126    Voluntary Debtors' Committee.  The Official Committee of Unsecured Creditors of the Voluntary Debtors appointed in the Cases pursuant to Section 1102 of the Bankruptcy Code.

2.1.160  2.1.127    Winning Bid. The highest and best Qualifying Bid received for the Beaumont Heights Project, and/or the Johannson Ranch Project or the Summit Valley Project.

2.1.161  2.1.128    Winning Bidder.  The party that submits the highest Qualifying Bid that is accepted by the applicable Group II: Voluntary Debtor.

2.2     **Rules of Construction.**

For purposes of the Plan and this Disclosure Statement, unless otherwise provided herein or in the Plan, (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural; (b) each pronoun stated in the masculine, feminine or neuter includes the masculine, feminine and neuter; (c) any reference in the Plan or this Disclosure Statement to an existing document or schedule filed or to be filed means such document or schedule, as it may have been or may be amended, modified or supplemented pursuant to the Plan; (d) any reference to an entity as a Holder of a Claim or Interest includes that entity's successors and assigns; (e) except as otherwise indicated herein all references in the Plan or this Disclosure Statement to Sections, Articles and Exhibits are references to Sections, Articles and Exhibits of or to the Plan; (f) the words "therein," "thereunder" and "thereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; and (g) unless otherwise provided in the Plan or this Disclosure Statement, any reference in the Plan or this Disclosure Statement to a contract, instrument, release, indenture, agreement, or other document being in a particular form or on particular terms and conditions means that such document shall be substantially and materially in such form or substantially and materially on such terms and conditions; (h) any reference in the Plan or this Disclosure Statement to a document, schedule, or exhibit to the Plan or Disclosure Statement Filed or to be Filed means such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; and (i) the rules of construction set forth in Section 102 of the Bankruptcy Code shall apply to the extent such rules are not inconsistent with the express terms of the Plan or this Disclosure Statement or any other provision in this Section 2.2.

2.3     **Exhibits.**

All Exhibits to the Plan are incorporated into and are a part of the Plan as if set forth in full therein.

## III.

## PLAN CONFIRMATION DEADLINES

The Bankruptcy Court has not confirmed any of the Plan(s) described in this Disclosure Statement. Accordingly, the terms of the Plan are not binding on anyone. However, if the

-28-

Bankruptcy Court confirms one or both of the Plan(s), then the Plan(s) will be binding on the applicable Debtor(s), the Plan Trustee, and on all Creditors and Interest Holders in such Cases.

### 3.1 Time and Place of the Confirmation Hearing.

The hearing where the Bankruptcy Court will determine whether or not to confirm the Plan will take place at 411 West Fourth Street, Santa Ana, CA 92701-4593 on October 24, 2011, at 9:30 a.m. in Courtroom 5A.

### 3.2 Deadline for Voting for or Against the Plan(s).

If you are entitled to vote, it is in your best interest to timely vote on the enclosed ballot and return the ballot to:

> Winthrop Couchot Professional Corporation
> 660 Newport Center Drive, Suite 400
> Newport Beach, CA 92660
> Facsimile: (949) 720-4111
> Attn: P.J. Marksbury

Your ballot must be **received by** September 26, 2011**,** or it will not be counted.

### 3.3 Deadline for Objecting to the Confirmation of the Plan.

Objections to the confirmation of the Plan must be filed with the Bankruptcy Court, and served upon the following parties so that they are received by September 26, 2011:

| | |
|---|---|
| **Counsel to the ~~Voluntary Group II:~~ Voluntary Debtors** | Paul J. Couchot<br>Winthrop Couchot Professional Corporation<br>660 Newport Center Drive, Suite 400,<br>Newport Beach, CA 92660 |
| **Authorized Agent for the Group II: Voluntary Debtors** | Bruce V. Cook<br>General Counsel<br>2392 Morse Ave<br>Irvine, CA 92614-6234 |
| **Counsel for SunCal Management LLC and SCC Acquisitions Inc**. | Ronald Rus<br>Rus Miliband & Smith P.C.<br>2211 Michelson Drive, Seventh Floor<br>Irvine, California 92612 |
| **Authorized Agent for SunCal Management and SCC Acquisitions, Inc**. | Bruce V. Cook<br>General Counsel<br>2392 Morse Ave<br>Irvine, CA 92614-6234 |

-29-

**3.4    Identity of Person to Contact for More Information Regarding the Plan.**

Any interested party desiring further information about the Plan should contact the Voluntary Debtors' counsel, Winthrop Couchot Professional Corporation, 660 Newport Center Drive, Suite 400, Newport Beach, CA 92660, Attn:  Paul J. Couchot, (949) 720-4100; Peter W. Lianides, (949) 720-4155; Payam Khodadadi, (949) 720-4160.

**3.5    Disclaimer.**

The information contained in this Disclosure Statement is provided by the SunCal Plan Proponents.  The SunCal Plan Proponents represent that everything stated in this Disclosure Statement is true to the best of their knowledge.  The Bankruptcy Court has not yet determined whether or not the Plan is confirmable and makes no recommendation as to whether or not you should support or oppose the Plan.

The discussion in this Disclosure Statement regarding the Group II: Voluntary Debtors may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995.  Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate," or "continue," or the negative thereof or other variations thereon or comparable terminology.  The reader is cautioned that all forward looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements.  The liquidation analyses, distribution projections, projections of financial results and other information are estimates only, and the timing, amount and value of actual distributions to Creditors may be affected by many factors that cannot be predicted.  Therefore, any analyses, estimates, or projections may or may not turn out to be accurate.

The SunCal Plan Proponents and their professionals have made a diligent effort to identify in this Disclosure Statement all Litigation Claims, including claims for relief, counterclaims, and objections to claims.  However, no reliance should be placed on the fact that a particular Litigation Claim is or is not identified in this Disclosure Statement.  The Group II: Voluntary Debtors or other parties in interest may seek to investigate, file and prosecute Litigation Claims after the

1    Confirmation Date, or the Plan Trust may seek to do so after the Effective Date of the Plan whether

2    or not the Litigation Claims are identified in this Disclosure Statement.

3    / / /

# IV.

## FACTUAL BACKGROUND OF THE DEBTORS

### 4.1     The Formation of the Debtors and the Projects.

#### 4.1.1     Overview of the Debtors and their Projects.

The Group II: Voluntary Debtors are ~~four~~two of twenty-six entities (collectively the "Debtors") that were formed pursuant to a joint venture between Affiliates of the SunCal Companies ("SunCal") and the Lehman Entities (the "SunCal/Lehman Joint Venture"). The Debtors role in the venture was to own and develop the large residential projects that were the core assets in this joint undertaking.

At the inception of SunCal/Lehman Joint Venture, it was agreed that SunCal would be the developer/manager of the Projects and the Lehman Entities would provide the necessary capital. Attached hereto as Exhibit "1" is a general description of the Debtors' Projects, including the ~~Group II Project~~Group II: Voluntary Debtors Projects, and the Debtors' other primary Assets, excluding Cash and the Litigation Claims, and a description of the loans for the Projects that are not a part of ~~Group II Project~~Group II: Voluntary Debtors Projects.

All of the Debtors are Affiliates of Acquisitions and SCC LLC. Some of the Debtors directly own the Projects, while others serve as holding companies, owning Allowed Interests in the Debtors that hold title to the Projects. ~~SunCal Management, LLC, a SunCal Affiliate, has management contracts with respect to all of the Projects and pursuant to this contract manages the Debtors' day-to-day business affairs.~~

The seventeen Debtors who are referred to herein as the "Voluntary Debtors" are wholly owned by SunCal Affiliates, and consequently the SunCal Affiliates have full corporate governance authority over these entities. The Voluntary Debtors own eleven (11) of the Projects. In the case of the nine Trustee Debtors, the SunCal Affiliates and the Lehman Affiliates initially shared ownership equally (50% each). However, after the Petition Date, the SunCal Affiliates became the owner of hundred percent (100%) of the equity in two of the nine Trustee Debtors - SunCal Heartland and SunCal Marblehead. The Trustee Debtors own nine (9) Projects.

1  Attached hereto as Exhibit "2" is a chart that sets forth the appraised value of the Group II:

2  Voluntary Debtors' Projects. This chart lists both the Lehman Lenders' value estimates and

3  SunCal's valuation estimates.[2]

4      The Plan eliminates any potential value disputes by providing for the sale of the ~~Group II~~

5  ~~Project~~Group II: Voluntary Debtors Projects through an auction that is designed to yield the highest

6  market price for these assets. Accordingly, to the extent any other party believes the ~~Group II~~

7  ~~Project~~Group II: Voluntary Debtors Projects have a greater value than the Opening Bid offered by

8  another Qualifying Bidder, they will have the opportunity to submit a Qualifying Bid (but no

9  credit-bids will be allowed) that exceeds the Opening Bid and, if they so desire, to become the

10  Winning Bidder by offering the highest Qualifying Bid. This market sale process will insure that

11  the rights of all stakeholders are protected.

12  **4.1.2    The Group II: Voluntary Debtors' Primary Secured Creditors and**

13  ~~**Their Disputed Claims**~~**Their Projects**.

14      Only Creditors holding liens against the Beaumont Heights Project and the Johannson

15  Ranch Project are Riverside County, as the Holder of an Unpaid Secured Real Property Tax

16  Claim against the Beaumont Heights Project in the approximate amount of $442,201, and

17  Stanislaus County as the Holder of an Unpaid Secured Real Property Tax Claim against the

18  Johannson Ranch Project in the amount of $434,830.

19  **4.1.3    Lehman Disputed Claims and Liens.**

20      As discussed in detail herein, during the course of the Debtors' Cases, the Debtors initiated

21  litigation disputing the validity of Lehman's Disputed Secured Claims, and the validity, priority

22  and extent of Lehman's Disputed Liens, including the Voluntary Debtors' pledge of their equity

23  interest in the Group II: Voluntary Debtors based on the SunCal Communities I Loan.  This

24  litigation was being pursued through the Lehman Adversary Proceeding until this matter was

25  stayed and is now being pursued in the Lehman Claim Objections and the Contract Action.

26  ~~pursuant to a ruling by the court presiding over LCPI's Chapter 11 case in New York. However,~~

27  ~~Lehman's Disputed Secured Claims are being separately contested through claims objections. In~~

28

---

[2] Values may have changed since these analyses were prepared.

1    addition, a lawsuit has been filed in California Superior Court against certain Lehman Entities and

2    their agents who are not in Chapter 11, based upon their post-petition conduct.

3        The only Lehman Disputed Secured Claims of relevance to the Creditors of the Group II:

4    Voluntary Debtors are the claims that LCPI is asserting based upon the SunCal Communities I

5    Loan. According to LCPI, the collateral securing the outstanding balance allegedly owed on this

6    loan ($343,221,391) includes a lien against the equity interests that SunCal I owns (100%) in

7    SunCal Beaumont, LLC and SunCal Johannson, LLC. Since these equity level lien rights only

8    become relevant after all allowed claims are paid in Group II: Voluntary Debtors' estates, the

9    disallowance of the claims secured by these liens would not seems to be relevant to the Group II:

10    Voluntary Debtors' Creditors.

11        However, the creditor level distribution picture in the Group II: Voluntary Debtors' cases

12    has been complicated by the existence of the Bond Claims filed against the Group II: Voluntary

13    Debtors' estate.

14        Both Arch and Bond Safeguard contend that they have the right to assert claims arising

15    from unpaid bond obligations relating to Projects owned by other Debtors, in the estates of all of

16    the Debtors. Accordingly, they have submitted in excess of $100,000,000 million in claims against

17    the estates of the Group II: Voluntary Debtors. Although the Group II: Voluntary Debtors do not

18    believe these claims are valid, and that they will not be allowed, these claims must be disallowed

19    before final distributions can be made to the Creditors holding Allowed Claims, or paid through

20    distributions made in the other Debtors' cases. It is in this respect that the litigation over the

21    validity and amount of the Lehman Secured Claims is relevant.

22        If the Lehman Recoupment Objection and the Lehman 502(d) Objection discussed herein

23    are successful, or if the Lehman Adversary Proceeding is successful, then the claims filed by Arch

24    and Bond Safeguard may be paid through distributions payable from the estates of the other

25    Debtors' cases where these claims may have right to payment. For this reason, the SunCal

26    Proponents have described the background and status of this litigation at some length in this

27    Disclosure Statement.

28

MAINDOCS-#163410-v2-SCC_Group_II_VD_DS.DOC

### 4.1.4    A Summary of All of the Alleged Claims Against the Group II: Voluntary Debtors.

Attached hereto as Exhibit "4" is a chart that sets forth the prepetition Claims that have been asserted against all of the Debtors.  In summary, the asserted Claims against the Group II: Voluntary Debtors consist of the following:

| Claims | SunCal Beaumont | SunCal Johannson |
|---|---|---|
| Unpaid Secured Real Property Tax Claims | $442,201 | $434,830 |
| Alleged Mechanics Lien Claims | $~~1,576,334~~ 43,355 | $0 |
| Administrative and Priority Claims | $104,616.01 | $110,151.28 |
| General Unsecured Claims | $180,713 | $41,181 |

### ~~4.1.1~~  4.1.5.    Summary of the Group II: Voluntary Debtors' Cash.

The following chart sets forth the Group II: Voluntary Debtors' cash on hand as of ~~January 31~~July 1, 2011. ~~The Lehman Lenders may assert liens against some or all of this Cash.  To the extent such liens exist, it does not appear that they were perfected on the Petition Dates. Accordingly, they are subject to avoidance. Moreover, even if such lien existed on the Petition Date and they were duly perfected, the priority of these liens and the amount of the claims secured by the same is being contested in the Lehman Claims Objections and the Lehman Adversary.~~

| GROUP II: VOLUNTARY DEBTORS | AMOUNT |
|---|---|
| SunCal Beaumont Heights | $11.11 |
| SunCal Johannson | ~~28,595.64~~$106,087.22 |
| **Total** | ~~28,606.75~~$106,098.33 |

## 4.2    Factual Circumstances Leading to the Filing of the Debtors' Chapter 11 Cases.

### 4.2.1    Introduction.

In this section of the Disclosure Statement, the ~~SunCal Proponent~~SunCal Plan Proponents have provided a brief description of the relationship between the Debtors and the Lehman Entities. This background is relevant to the Group II: Voluntary Debtors, and in fact all of the Debtors, for the following reasons. First, most of the unsecured claims asserted against the Debtors were incurred at the insistence of the Lehman Lenders, and they would have been paid if the Lehman

-35-

Lenders had honored their obligation to pay these claims. Second, as explained above, a substantial part of claims that the Lehman Lenders failed to pay are being asserted against *all of the Debtors*. If the litigation against the Lehman Lenders discussed herein is successful, it will, at a minimum, reduce the pool of claims against the Group II: Voluntary Debtors, and thereby increase the dividend payable to the remaining creditors. Third and finally, this history allows the Creditors to take the measure of the parties who are now proffering the competing plan – the Lehman Lenders. As the within discussion will establish, the Lehman Lenders failed to pay the claims of Creditors prepetition, the Lehman Lenders attempted to foreclose upon the Projects that were subject to their liens post-petition in order to deny the unsecured creditors any recovery on the claims they failed to pay, and finally, when this foreclosure effort failed, the Lehman Lenders attempted to destroy the Debtors' reorganization and sale efforts to manipulating LCPI's alleged automatic stay. The SunCal Plan Proponents believe that this history will lead the Creditors to conclude, when weighing the merits of the Lehman Lenders Plan offer: "Fool me once shame on you, fool me twice shame on me."

-36-

### 4.2.2    Background of the SunCal Companies.

SunCal is a family-owned and operated real estate business that has been successfully developing properties throughout the western United States for over 70 years.  SunCal's business focuses upon the "development" of residential land. A typical SunCal development begins with the acquisition of one or more parcels of raw land. Thereafter, the SunCal team develops a master plan for the acreage that incorporates streets, homes, parks, schools and commercial areas, and then it works with the applicable municipal planning authorities (the city, county, state and federal) to secure the necessary approvals or "entitlements" to gain approval of this plan. This process, which requires the assistance of land planners, civil engineers, architects, lawyers, and other land specialists, takes a period of years. Once the master plan is approved, SunCal provides for the grading of the project and the installation of the foundational infrastructure (streets, utilities, etc.) and then sells the lots or parcels within the project to merchant builders.

### 4.2.3    The Origins of the SunCal/Lehman Joint Venture.

SunCal historically financed its projects with loans and/or equity from a number of different sources.  However, beginning in 1997, an increasing number of SunCal's projects were financed by the Lehman Entities, as Mark Walsh ("Walsh"), the head of LBHI's Global Real Estate Group, began cultivating a business relationship with SunCal's principals.

By 2003, the Lehman Entities and SunCal had entered into joint ventures involving approximately fifteen projects.  By 2007, that number had grown to over forty, and the Lehman Entities had become, with limited exceptions, the exclusive provider of financing for the SunCal Projects pursuant to a written agreement executed in 2006.  The Lehman Entities also consisted of the Lehman Equity Members that either directly or indirectly owned a fifty percent (50%) equity interest in all nine of the Trustee Debtors.

In their dealings with SunCal, the Lehman Representatives made no distinction between Projects financed by Lehman ALI and Projects financed by LCPI. They also made no distinction between the Debtors in which Lehman Equity Members held 50% equity memberships or the Debtors in which the Lehman Entities held no equity membership interest.  As agents of the financial partner in the parties' joint venture, the Lehman Representatives would determine which

MAINDOCS-#163410-v2-SCC_Group_II_VD_DS.DOC

1    Lehman Entity would provide financing on which Projects, and would dictate the structure that the

2    financing would take, according to whatever suited the Lehman Entities' needs.

3    **4.2.4    Lehman's Effective Control over the Management of the Debtors and**

4    **Promises of Ongoing Funding.**

5    Prior to the market downturn in the middle of 2007, Lehman Representatives afforded

6    SunCal substantial discretion in the management and development of the Projects.  The Debtors

7    would contract with third-party vendors to perform grading, health and safety compliance,

8    construction, landscaping, and other necessary services on the Project sites, and they would work

9    with the local municipalities to obtain the necessary entitlements and other authorizations

10    necessary to proceed with development.  The Lehman Representatives, SunCal and the Debtors

11    would discuss anticipated quarterly expenditures at periodic budget meetings, and , as expenses

12    were incurred each month, SunCal and the Debtors would submit requests for payment to the

13    Lehman Representatives, supported by the necessary documentation. The Lehman Representatives

14    would then provide the funding necessary to pay these expenses.

15    During the third quarter of 2007, the foregoing management and payment dichotomy

16    changed, after the real estate market experienced a sudden downturn, and many of the Projects

17    significantly declined in value.  In response to this dramatic economic change, a series of high

18    level discussions occurred between SunCal's representatives and the Lehman Representatives --

19    including Walsh, Paul Hughson ("Hughson") and Frank Gilhool ("Gilhool"), the Managing

20    Directors of Lehman's Global Real Estate.  In these discussions, SunCal's representatives, acting

21    on behalf of the Debtors, expressed concerns about the loans on the Projects being out of balance,

22    and suggested shutting down the Projects, or at least slowing the pace of development.  However,

23    Walsh specifically instructed SunCal not to slow down or stop work.  He assured SunCal that the

24    Lehman Entities would provide the necessary funding to pay vendors and to keep the development

25    of the Projects moving forward.

26    The foregoing assurances of payments were confirmed in numerous telephone

27    conversations between Gilhool and SunCal's COO, Frank Faye ("Faye"), and/or SunCal's General

28    Counsel, Bruce Cook ("Cook") that took place during 2007 and 2008. In each exchange, Gilhool

1    assured SunCal that the Lehman Entities were committed to funding the debts and obligations

2    being incurred at the Projects and they continued to insist that work proceed.

3         During this time frame, the Lehman Representatives became much more "hands on,"

4    scrutinizing and approving all budgets and expenses through a new control and approval structure.

5    Under the new structure, SunCal would submit budgets to the Lehman Representatives on a

6    weekly basis and explain, during period conference calls, what Project payables they believe had to

7    be paid and what work had to be performed on the Projects. The Lehman Representatives would

8    then unilaterally decide what future work would proceed, the Lehman Representatives would

9    authorize the work and the Lehman Representatives would decide what payables would be paid

10    timely by designating them as "urgent," and what other payables were not urgent and hence would

11    not be paid on a timely basis. However, even under this new Lehman controlled management and

12    payment regime, the Lehman Representatives made it clear that all payables being incurred would

13    be funded.

14         ### 4.2.5    The 2008 Restructuring Agreement.

15         By the fall of 2007, both SunCal and the Lehman Representatives contemplated entering

16    into a restructuring agreement in the near term, with a closing to occur no later than January or

17    February of 2008.  However, this transaction was delayed by the Lehman Entities' extensive

18    documentation demands until May 23, 2008. On this date, SunCal and most of the Debtors finally

19    entered into an omnibus "Restructuring Agreement" with LBHI, Lehman ALI and the other

20    Lehman Entities.  The same Lehman Representative signed the Restructuring Agreement on behalf

21    of all of the Lehman Entities.

22         Pursuant to the Restructuring Agreement, Lehman ALI, "as the Lender with respect to each

23    Loan," committed, among other things, to: (1) make advances under existing loans to fund the

24    continuing costs necessary to preserve the value of the Projects; (2) move forward to resolve the

25    accrued outstanding subcontractor payables, i.e., to make sure that the Projects' creditors were paid

26    for their work; and (3) to close the transaction, whereby newly-created Lehman Entities would

27    assume the debt and obligations of the Projects.

28

1    As originally executed in May 2008, the Restructuring Agreement applied to twelve of the

2    twenty Projects (as well as several other projects not at issue in the Lehman Adversary

3    Proceeding):  (1) Acton Estates; (2) Beaumont Heights; (3) Bickford Ranch; (4) Emerald

4    Meadows; (5) Heartland; (6) Johannson Ranch; (7) Marblehead; (8) Northlake; (9) Oak Valley;

5    (10) Pacific Point; (11) Ritter Ranch; and (12) Summit Valley.  The Debtors that owned and/or

6    held equity interests in the entities that owned  these Projects were signatories to the May 2008

7    agreement.[3]

8    Between May and August 2008, the parties agreed to add four additional projects to the

9    Restructuring Agreement: (1) Del Rio; (2) Joshua Ridge; (3) Palm Springs Village; and (4) Tesoro

10   Burnham, and the four Debtors associated with these Projects—SunCal Del Rio, SCC

11   Communities, SunCal PSV, and SunCal Tesoro.  Only four Projects were  not included in the

12   Restructuring Agreement: Century City, Delta Coves, Oak Knoll and Del Amo.  Accordingly, the

13   four Debtors associated with these Projects—SunCal Century City, Delta Coves, SunCal Oak

14   Knoll and SunCal Torrance—were not signatories thereto.  Lehman ALI was the lender on each of

15   these Projects and , and as with the other Projects, Lehman ~~Ali~~ALI continued to insist that these

16   four debtors  proceed with the development of the four Projects, it approved all expenses, and it

17   continually provided assurances of payment.

18                          **4.2.6    The Lehman Lenders Hire Radco.**

19   Subsequent to the execution of the Restructuring Agreement, Lehman ALI arranged for a

20   third party, Radco, to directly settle outstanding contractor payables, as its agent.  Radco was

21   provided some limited funding and authority to negotiate settlements, and did in fact reach

22   settlement with a number of creditors.  The funding for these settlements, whether the debts related

23

24   [3] Specifically, the Restructuring Agreement was entered into by, among others, the "Borrowers,"
"Grantors" and "Pledgors," as defined in Annex 1 thereto.  The "Borrowers" included SunCal Marblehead,

25   SunCal Heartland, SunCal Northlake, SunCal Oak Valley, SJD Partners, Palmdale Hills, SCC Palmdale,
SunCal I, SunCal III, and SunCal Bickford.

26

27   The "Grantors" included SunCal Marblehead, SunCal Heartland, SunCal Northlake, SunCal Oak Valley,
SJD Partners, Palmdale Hills, SunCal Bickford, SunCal Acton, SunCal Summit and SunCal Emerald, and

28   Debtors SunCal Beaumont and SunCal Johannson.

The "Pledgors" included SCC Palmdale, SunCal I, SunCal Summit and SJD Development.

1   to Lehman ALI or LCPI funded Projects, came from the same source.  Lehman ALI and LCPI also

2   provided approval for new work on the Projects, and Lehman ALI paid for some of this work.

3   However, this funding was minimal and it soon stopped.

4        In August 2008, Lehman ALI withdrew funding and settlement authority from Radco,

5   leaving millions of dollars in outstanding contractor payables unresolved, notwithstanding the

6   contrary provisions in the Restructuring Agreement.  Leman ~~Ali~~ALI's actions also impaired the

7   Debtors' ability to resolve ongoing public health and safety issues arising at the Projects.

8   Ultimately,  only a fraction of the total outstanding payables were resolved, contrary to the  past

9   promises made by Lehman Representatives.

10         **4.2.7**   **The Lehman Lenders' Failure to Close on the Settlement Agreement**.

11        Pursuant to the terms of the Restructuring Agreement, the parties agreed to enter into a

12   Settlement Agreement, the form of which was attached to the Restructuring Agreement.  The

13   Settlement Agreement provided for the transfer of the Projects included within the Restructuring

14   Agreement to a series of  newly formed Lehman-controlled entities (each with "SCLV" in its

15   name, for "SunCal-Lehman Venture"). The agreement further provided that the entity taking title

16   to the Project would assume the  Lehman Lender debt obligations associated with the Projects,

17   assume certain bond obligations associated with the Projects, and provide indemnifications to

18   SunCal and the Debtors for unpaid claims.

19        On August 25, 2008, the Settlement Agreement and a series of related documents were

20   formally executed by SunCal and the applicable Lehman Lenders and Lehman Equity Members at

21   a meeting held in Los Angeles on August 25, 2008.  Once these documents were signed, all that

22   remained was the mechanical closing of the series of transactions described in the Settlement

23   Agreement. Since all of the conditions precedent to the closings had been satisfied, or could have

24   been satisfied at, or shortly after the meeting, this should have occurred at the August 25, 2008

25   meeting, or shortly after the meeting. However, the Lehman Representative asked SunCal to

26   extend the closing date for thirty days, to September 30, 2008. According to the Lehman

27   Representatives, this short extension would enable them to secure certain outstanding third party

28   consents. Although SunCal knew these third party consents were readily obtainable within a few

1    days, they agreed to this extension, believing the request was made in good faith. In fact, as more

2    fully explained blow, it was not.

3    **4.2.8    The Lehman Lenders' Undisclosed Sale of Most of the Debtors' Loans.**

4    As explained above, the Settlement Agreement was duly executed by all parties at a formal

5    closing meeting held on August 25, 2008. When the parties signed this agreement, which was a

6    binding contract, they both represented that they both intended and had the power and capacity to

7    perform all of the obligations undertaken therein. However, in the case of the Lehman Entities, this

8    representation was later discovered to be false. When the closing occurred on August 25, 2008, the

9    Lehman Lenders had already sold the very obligations they were agreeing to assume and restructure

10    in the Settlement Agreement to Fenway Capital pursuant to a repurchase agreement.  Accordingly,

11    as of August 25, 2008, they lacked the power to perform the most essential undertakings that they

12    agreed to perform in the Settlement Agreement. Instead of disclosing this fact at the August 25,

13    2008 meeting, the Lehman Lenders requested additional time to execute the agreed upon transfers

14    provided for under this binding agreement. The Lehman Lenders needed to this delay for an

15    obvious, but undisclosed reason: They lacked the ability to perform the very obligations they had

16    just agreed to perform in the Settlement Agreement.

17    The Lehman Representatives also did not disclose at the August 25, 2008 closing that they

18    intended to sell the Pacific Point First Loan to Lehman Re, approximately a week later, *even though*

19    *this loan was also subject to the Settlement Agreement*. To the contrary, the Lehman

20    Representatives affirmatively concealed these facts from SunCal and the Debtors by asserting that

21    ownership still existed in the case of seven of the eight loans.

22    **4.2.9    Lehman's Foreclosure Sale and Purchase of the Pacific Point Project.**

23    At the time the Restructuring Agreement and the Settlement Agreement were signed, the

24    Pacific Point Project, which was still owned by SJD Partners, was among the Projects included in

25    the Restructuring Agreement and the Settlement Agreement.  Pursuant to the Restructuring

26    Agreement, and as detailed in the Settlement Agreement attached thereto, SunCal, SJD Partners,

27    and its parent company, SJD Development, all agreed that they would not interfere with Lehman

28    ALI's (or its designee's) foreclosure on the Pacific Point Project. They further agreed that a new

-42-

1    Lehman entity, LV Pacific Point, would purchase the Pacific Point Project upon foreclosure and

2    that Lehman ALI and LV Pacific Point would (a) assume SJD Partners' and SJD Development's

3    outstanding accounts payable for Pacific Point third-party vendors, (b) assume certain bond

4    liability associated with the Pacific Point Project, and (c) pay for the millions of dollars worth of

5    work that Lehman ALI representatives had authorized.

6        As previously stated, the Settlement Agreement was signed on August 25, 2008 by the

7    SunCal parties, including SJD Partners and SJD Development.  It was also signed by Gilhool as

8    authorized signatory on behalf of both Lehman ALI and LV Pacific Point.  As a signatory to the

9    Settlement Agreement, LV Pacific Point was required to purchase the Pacific Point Project at the

10   foreclosure sale subject to the above obligations. Consistent with this agreement, the City of San

11   Juan Capistrano executed an estoppel certificate for the benefit of SJD Partners and Lehman ALI—

12   at Lehman ALI's request—on August 26, 2008, two days before the foreclosure sale.  This

13   certificate stated, among other things, that the "Acquiring Entity [LV Pacific Point] shall by

14   operation of law become the legal successor-in-interest to Developer [SJD Partners]" under SJD

15   Partners' agreements with the City. That certificate further provided that there existed no breaches,

16   defaults, or claims under SJD Partners' agreements with the City.

17       On August 28, 2008, Lehman ALI foreclosed on the Pacific Point Project, and title was

18   transferred to LV Pacific Point at the foreclosure sale.  However, Lehman ALI and LV Pacific

19   Point failed to assume the liabilities and obligations associated with this Project as agreed.  This

20   breach of the parties' agreement, left SJD Partners without title to the Pacific Point Project, but

21   with substantial unpaid unsecured claims relating to the Project, including bond claims of

22   approximately $34 million,.  Moreover, since Lehman Ali and LV Pacific Point have continued to

23   ignore their obligations under the above agreement, unpaid taxes, fines, and penalties have

24   continued to accrue to the detriment of the Project and these claims are being asserted against SJD

25   Partners..

26       Had SunCal, SJD Partners and SJD Development known that Lehman ALI and LV Pacific

27   Point had no intention of honoring their obligations under the foregoing agreement, they never

28   would have agreed to cooperate with the foreclosure.  Instead, SJD Partners would have filed for

1    bankruptcy earlier, thereby mitigating the damages from Lehman Ali's breach, by allowing

2    creditors recourse to the value of the Project.

3           This course of conduct is relevant to the unsecured creditors of the Group II: Voluntary

4    Debtors for the following reason. The holders of bond claims against SJD Partners are asserting

5    their massive claims against the estates of all of the Debtors, including the estates of the Group II:

6    Voluntary Debtors. Accordingly, Lehman Ali's wrongs against SJD Partners directly affect the

7    Group II: Voluntary Debtors' cases.

8                      4.2.10~~4.2.8~~    **Alvarez and Marsal Take Over Control of the Lehman Entities**

9                      **After the Chapter 11 Filings of LBHI and LCPI.**

10    LBHI filed for bankruptcy in September 2008 and LCPI filed for bankruptcy in October

11    2008.  After LBHI's filing, Bryan Marsal ("Marsal") of Alvarez & Marsal ("A&M") was appointed

12    to serve as LBHI's Chief Restructuring Officer. Marsal and A&M are in charge of liquidating the

13    now defunct Lehman Entities, including Chapter 11 debtors LBHI and LCPI, and the non-bankrupt

14    Lehman Lenders (Lehman ALI, OVC, and Northlake Holdings, as well as the non-bankrupt

15    Lehman Equity Members.

16           Although A&M was not employed until after the events that occurred on August 25, 2008

17    described above, it should be noted that A&M hired the same law firm that represented the

18    Lehman Lenders in the August 25, 2008 meeting – Weil, Gotshal & Manges, LLP. Moreover, as

19    more fully explained herein, it was A&M that directed Lehman ~~Ali~~ALI not to perform its

20    contractual obligations under the Settlement Agreement after September of 2008. Accordingly, the

21    same individuals that caused the damages to unsecured creditors by insisting upon the breach of

22    the Settlement Agreement, are now asking for their vote in the competing plan filed by the Lehman

23    Lenders.

24           LBHI's bankruptcy filing and the Lehman Lenders refusal, at A&M's direction, to close the

25    transactions provided for under the Settlement Agreement as agreed, were not small matters. They

26    severely damaged the Debtors. Although the Debtors were not proceeding with any new

27    construction or development, the Debtors were still required to expend significant sums on site

28    security, erosion control, property taxes and other measures in order to prevent the Projects from

1   becoming a public safety hazard, and in order to avoid the loss of valuable entitlements, and to

2   mitigate penalties and fines being incurred by the Projects.  Although SunCal and the Debtors

3   repeatedly requested that the Lehman Entities pay for critical health and safety and value

4   preservation measures on the Projects, these efforts were unavailing.

5        Between October 9 and November 4, 2008, SunCal's general counsel Cook sent Robert

6   Brusco, an authorized agent of the Lehman Entities, nearly two dozen letters requesting that the

7   Lehman Lenders provide the funding necessary to address critical needs on the Projects as

8   promised.  A summary of these health and safety notices are attached hereto as Exhibit "5".  The

9   Lehman Entities ignored these requests until November 2008, when Brusco, purportedly on behalf

10  of the Lehman Lenders, delivered the message that the Lehman Lenders were unwilling to fund the

11  Projects and that, instead, they intended to foreclose on all of the Projects.

12       As a result, as set forth in Exhibit "4," there are now over 240 vendors, municipalities,

13  counties and bonding companies claiming over $400 million in work, improvements and property

14  tax claims against the Projects.  Substantially all of these sums are due to work performed or

15  bonded at Lehman's request based upon Lehman's promises of payment.

16  **4.3     The ~~Group II Debtor~~Group II: Voluntary Debtors' Potential Preferential**

17  **Transfers**.

18       Attached hereto as Exhibit "6" are charts setting forth payments made to third parties

19  during the ninety (90) day time period preceding the filing of the Debtors' Chapter 11 Cases as

20  well as payments made to the Lehman Entities and to SunCal Affiliates during the one-year time

21  period preceding the filing of the Debtors' Chapter 11 Cases. These total transfers total

22  approximately fifty thousand dollars ($50,000). In those instances where the Group II: Voluntary

23  Debtors believe there are reasonable grounds to recover these transfers, at a reasonable cost, they

24  have filed complaints.

25  *///*

26

27

28

# V.

## SIGNIFICANT EVENTS IN THE DEBTORS' CHAPTER 11 CASES

### 5.1.    Voluntary Debtors.

#### 5.1.1    Joint Administration of the Voluntary Debtors and the Trustee Debtors.

Since their respective Petition Dates, the seventeen (17) Voluntary Debtors have continued to operate as "debtors-in-possession," subject to the supervision of the Bankruptcy Court and in accordance with the Bankruptcy Code.  The Voluntary Debtors are authorized to operate their businesses in the ordinary course during the Chapter 11 proceedings. Transactions outside the ordinary course of business must be approved by the Bankruptcy Court.

The Voluntary Debtors' Cases are being jointly administered pursuant to orders entered on November 19, 2008 and December 9, 2008.  The Voluntary Debtors' Cases are being jointly administered with the Trustee Debtors' cases pursuant to an order entered on March 11, 2009.

The Voluntary Debtors have employed Winthrop Couchot Professional Corporation as their general insolvency counsel, and the MB Firm as their special litigation counsel.

#### 5.1.2    The Voluntary Debtors Court Employed Professionals.

The Voluntary Debtors have employed Winthrop Couchot Professional Corporation as their general insolvency counsel.  The Voluntary Debtors' Committee has employed Irell & Manella LLP as its counsel pursuant to an order entered on February 13, 2009.

Pursuant to the Court's Order regarding joint administration of the Voluntary Debtors, the Voluntary Debtors' liability for professional fees is joint and several among the Voluntary Debtors' Estates for fees incurred related to services for the benefit of all of the Voluntary Debtors.  The Trustee Debtors' liability for professional fees is not joint and several.

Pursuant to the initial MB Firm employment application, Acquisitions was responsible for the payment of their fees until December 31, 2009.  The MB Firm's application also allows for payments from the Bond Companies.  The initial MB Firm employment application reserved the right, should the Lehman Adversary Proceeding result in a benefit accruing to a particular Debtors' Estates, to request that its fees and expenses be reimbursed by the Debtors' Estates.  The Bond

MAINDOCS-#163410-v2-SCC_Group_II_VD_DS.DOC

Companies have also agreed to jointly fund a portion of the professional fees and expenses of the MB Firm with respect to the Lehman Adversary Proceeding.  The Bond Companies' funding commitment can be terminated and after such a termination they will only be required to cover fees and costs incurred during the period of their prior commitments.

The MB Firm employment application was subsequently amended.  Pursuant to an order entered on April 14, 2010, (1) the Voluntary Debtors will pay up to one-half of the fees and expenses incurred by the MB Firm from and after February 1, 2010 onward; and (2) the Trustee Debtors do not have an obligation to pay any of the MB Firm's fees pertaining to the Trustee Debtors' estates, unless and until a loan by the Voluntary Debtors to the Trustee Debtors is agreed to by the Trustee and approved by the Court, or in accordance with the terms of the original employment applications to the extent not superseded or modified by the amended employment application.  The order does not affect the MB Firm's right to seek payment from the Bond Companies without the need for an additional order of the Court.

The MB Firm filed an updated application seeking to further amend their employment to include the right to pursue certain claims against the Lehman Entities and certain employees and agents of these entities on behalf of the Voluntary Debtors.  The claims encompassed by this amendment include claims that are based upon both prepetition and post-petition actionable conduct under both state law and federal law against the Lehman Entities and/or their agents.

### 5.1.3    LCPI's Motions for Relief from the Automatic Stay Against Certain of the Voluntary Debtors' Projects and Related Appeals.

On January 23, 2009, LCPI and Lehman ALI filed various motions for relief from the automatic stay against a number of the Voluntary Debtors including ~~Group II Debtor~~Group II: Voluntary Debtors Palmdale Hills, SunCal Bickford and Acton Estates (the "Lehman Entities' Stay Motions"). Although the Debtors, were able to defeat these motions, they are relevant in the following respect. Had the motions filed by LCPI and Lehman ~~Ali~~ALI succeeded, it is almost certain that unsecured creditors would have received nothing on their claims. Moreover, as more fully explained herein, since Lehman ~~Ali~~ALI and LCPI did not even own the loans they were seeking to foreclose upon, these motions should never have been filed in the first instance. Yet

1    now, these same parties- Lehman ~~Ali~~ALI and LCPI – are asking these same creditors to vote on

2    their plan and to "trust" them.

3    ~~**5.2.**     **The Trustee Debtors and Their Professionals.**~~

4    ~~Orders for Relief were entered in the involuntary cases beginning on January 6, 2009.  The~~

5    ~~Trustee Debtors are represented by their duly-appointed Chapter 11 Trustee, Mr. Steven M. Speier~~

6    ~~pursuant to orders of the Bankruptcy Court entered on January 15, 2009.~~

7    ~~The Chapter 11 Trustee has employed the Lobel Firm as the Chapter 11 Trustee's general~~

8    ~~insolvency counsel and the MB Firm, as special litigation counsel and Squar Miller, LLP as its~~

9    ~~accountants.~~

10    ~~The Trustee Debtors' Committee has employed Weiland, Golden, Smiley, Wang Ekvall &~~

11    ~~Strok as its general insolvency counsel.~~

12    ### ~~5.3.~~5.2.The Debtors' Various Motions Relating to Financing for the Projects and to

13    ### Pay Professional Fees.

14    #### 5.3.1    The Voluntary Debtors' Initial Motion for Surcharge and Use of Cash

15    #### Collateral.

16    On January 16, 2009, seven of the Debtors, including ~~Group II Debtor~~Group II: Voluntary

17    Debtor Palmdale Hills, filed a motion authorizing Palmdale Hills to use and surcharge, pursuant to

18    11 U.S.C. § 506(c), and/or use the purported cash collateral of LCPI arising from the Ritter Ranch

19    Loan Agreement, pursuant to 11 U.S.C. § 363(c)(2), in order to pay for the reasonable and

20    necessary maintenance expenses required to preserve the value of such Debtors' Projects subject to

21    deeds of trust and other security interests held by LCPI.

22    LCPI objected to the motion and subsequently filed a motion in its own Chapter 11

23    proceeding in the Southern District of New York seeking an order barring the motion as a violation

24    of the automatic stay.  Although the Debtors believe that LCPI's stay was not violated in any way

25    by the Motion, the Motion was taken off calendar prior to any ruling by the New York Bankruptcy

26    Court, based upon the threat of sanctions made against Debtors' counsel by the presiding judge in

27    LCPI's case.

28

As explained above, LCPI did not even own an interest in the Ritter Ranch Loan Agreement when it asserted the automatic stay, since the Ritter Ranch Loan Agreement, which was the subject of the cash collateral motion, had already been sold pursuant to the Fenway Repurchase Agreement. Yet this wrongful action prevented Palmdale Hills from using its own money to pay critical bills that Lehman ~~Ali~~ALI, LCPI's parent was contractually required to fund in the first instance.

### 5.3.2    The Voluntary Debtors' Agreements with the Lehman Entities for Use of Alleged Cash Collateral to Maintain the Properties and to Pay Professional Fees.

On September 1, 2009, with the consent of the Lehman Entities, fourteen of the Voluntary Debtors filed a motion authorizing surcharge pursuant to 11 U.S.C. § 506(c), and/or use of the purported cash collateral for the purpose of addressing critical public health and safety issues and other value preservation with respect to the Debtors Projects.  On September 10, 2009, the Lehman Entities filed an opposition thereto, and on September 17, 2009, the Voluntary Debtors filed their Reply.

Subsequently, the Voluntary Debtors learned that the Lehman Entities lacked control agreements as to the majority of the depository accounts, and thus such accounts were not subject to perfected liens and therefore did not constitute "cash collateral."  On October 15, 2009, the Voluntary Debtors filed a *Motion For Order Authorizing Disposition Of Certain Depository Accounts*.  On or about October 22, 2009, the Lehman Entities filed an opposition, and on October 29, 2009, the Voluntary Debtors filed their Reply.

The motion was consensually resolved by way of the *Stipulation Pursuant To 11 U.S.C. §§ 362, 363, And 364: (1) Authorizing The Use Of Cash Collateral And Alleged Unencumbered Cash; (2) Approving Postpetition Financing; (3) Providing Administrative Expense Status; And (4) Modifying Automatic Stay To The Extent Necessary* filed on December 8, 2009, and the order thereon entered on December 17, 2009.  The stipulation provides for a 120-day budget with expenses totaling approximately $5 million, pursuant to which any Cash in the Estates is used first and then money borrowed from the Palmdale Hills Estate is used thereafter on an administrative

basis.  The agreement also permitted the Voluntary Debtors to use their alleged unencumbered
cash to pay its professional fees.  This agreement has been renewed on several occasions.

### 5.4.5.3.        The Debtors' Disputes and Claims Against the Lehman Entities.

#### 5.4.1    The Lehman Adversary Proceeding.

On January 6, 2009, the Voluntary Debtors initiated the Lehman Adversary Proceeding by filing their initial complaint against Lehman ALI for equitable subordination of Lehman ALI's Disputed Claims and avoidance of its Disputed Liens pursuant to Bankruptcy Code Section 510(c). This action is presently stayed as to LCPI.

#### 5.4.2    The Debtors' Motions to Strike the Claims and Pleadings Arising from the Sold Loans to Fenway Capital and Related Appeals.

Once the Debtors discovered that the Lehman Lenders had misrepresented their ownership of seven loans—the loans sold to Fenway Capital back in August of 2008—they filed motions, on May 29, 2009, seeking an order striking the claims that were filed with respect to these sold (the "Fenway Sold Loans").  The Fenway Sold Loans included the SunCal Communities I Loan Agreement, the Ritter Ranch Loan Agreement, the SunCal PSV Loan Agreement, the SunCal Marblehead/SunCal Heartland Loan Agreement, the Delta Coves Loan Agreement, the SunCal Northlake Loan Agreement and SunCal Oak Valley Loan Agreement.  See Exhibit "3."

At the initial hearing on the Debtors' motion to strike the Claims held on June 30, 2009, the Court held that the transfer of the Fenway Sold Loans pursuant to the MRA was a true purchase and sale transaction (the "Ownership Issue") and, accordingly, the Lehman Lenders retained no right to file the Proofs of claim on this basis, under Federal Rule of Bankruptcy Procedure 3001(e)(1).  The Court entered an order regarding the Ownership Issue on October 2, 2009.

The Lehman Lenders also contended that they were entitled to file the Proofs of Claim as the "Fenway's authorized agent" under Federal Rule of Bankruptcy Procedure 3001(b) (the "Agency Issue").  A continued hearing on the Agency Issue was set for September 22, 2009 and the Court ruled that the Lehman Lenders could file the Proofs of Claim as an authorized agents.

The Lehman Entities appealed the Ownership Issue and the Debtors appealed the Agency Issue to the Bankruptcy Appellate Panel. These two appeals, which were consolidated, were argued in September of 2010. The parties are awaiting a ruling.

### 5.4.3    The Debtors' Motion Pursuant to Section 506(d) and the 506(d) Valuation Stipulation.

Bankruptcy Code Section 506(a) provides that an asserted Secured Claim is only an Allowed Secured Claim to the extent of the value of such Creditor's interest in the Estate's interest in such property. Bankruptcy Code Section 506(d) then provides that liens against the Debtor's Assets that have no such value to the Alleged Secured Creditor are void. Finally, Bankruptcy Code Section 551 provides that such liens that are void under Section 506(d) are preserved for the benefit of the applicable Debtor's Estate.

On May 29, 2009 and June 9, 2009, the Debtors filed a motion seeking orders (i) valuing certain collateral at zero dollars, (ii) voiding the corresponding liens, pursuant to 11 U.S.C. § 506(d), and (iii) preserving such voided liens for the benefit of the respective bankruptcy estates.

The Debtors and the Lehman Entities subsequently entered into a stipulation to resolve the valuation of such Liens. This stipulation provided that these liens would be valued at zero for all purposes, with the exception of potential equity distributions. Although the Lehman Entities acknowledged the stipulation on the record before the bankruptcy court, and promised to file the executed stipulation that day, counsel for the Lehman Entities subsequently refused to file the document disclosed to the Court on the record, and the parties have subsequently entered into a modified stipulation on substantially similar terms that have been filed with both the New York and California Bankruptcy Courts.

### 5.4.4    Lehman 502(d) Objection and Objection to Lehman's Claim Against Acton.

The Voluntary Debtors and other parties-in-interest have filed a motion to disallow, pursuant to 11 U.S.C. § 502(d), a number of Disputed Claims filed by Lehman ALI and LCPI, including claims based upon the SunCal Communities I Loan. On June 9, 2011, a hearing was held on the Lehman 502(d) Objection. At this hearing the Lehman Entities disputed the merits of the

1   ~~Section 502(d) claim objection and LCPI alleged that the filing of this objection violated its~~
2   ~~automatic stay. At the conclusion of the hearing, the Court ruled that the parties could proceed with~~
3   ~~their discovery in this matter. If the Lehman 502(d) Objection is successful, the claims that are the~~
4   ~~subject of the motion will be disallowed. Although the Lehman Entities will have the right to seek~~
5   ~~reconsideration of this disallowance, in order to obtain this relief they would have to repay the~~
6   ~~applicable transfers.~~

7           **~~5.4.5~~  5.4.1       The Lehman Recoupment Objection and the ~~State~~**

8                              **~~Court~~Contract Action.**

9           Pursuant to the terms of the joint ventures entered into by and among the Debtors and the

10   Lehman Entities, the Lehman Entities were responsible for paying the costs incurred in the

11   development of the Projects. These costs included the claims of the vendors who provided goods

12   and services to the Projects and the claims asserted by the Bond Claimants. Although the Lehman

13   Entities contend that they were merely "lenders," and that they did not assume any liability for

14   these claims, as the above facts and those that will be adduced prior to and at the confirmation of

15   the Plan will demonstrate, the Lehman Entities are in fact obligated to pay these claims.

16           The Debtors' contend that the Lehman Entities have contractual liability on various

17   grounds, including the following. First, the Lehman Entities were either in a joint venture

18   relationship with the Debtors from the outset, or this relationship developed and became a legal

19   fixture through the Lehman Entities' course of conduct. Pursuant to this relationship, and the

20   promises and representations made therein, the Lehman Entities agreed to be responsible for all

21   vendor and Bond Claims incurred at or in connection with the Projects. The role of each of the

22   Debtors, by mutual agreement, was to provide development expertise and project management

23   services. The Lehman Entities were required to provide the capital necessary to fund the Projects.

24           Second, during the last eighteen months of the relationship between the parties, the Lehman

25   Entities assumed direct responsibility for all claims incurred during this period, by insisting that

26   work continue on the Projects and by repeatedly promising to pay for this work. Since the Lehman

27   Entities ordered this work, and promised to pay for the same, they bear this financial responsibility.

28

1   Third and finally, the Lehman Entities expressly agreed to pay the vendor and bond claims

2   described in the Restructuring Agreement and in the interrelated Settlement Agreement, but failed

3   to do so as contractually agreed.

4   It is the ~~SunCal Proponent~~SunCal Plan Proponent's contention that the Lehman Entities'

5   failure to pay the vendor and Bond Claims associated with the Projects as (as was their obligation

6   under the terms of the joint ventures, the Restructuring Agreement and the Settlement Agreement)

7   unjustly shifted responsibility for these liabilities to the Debtors in breach of the terms of joint

8   venture, the Restructuring Agreement and the Settlement Agreement. Accordingly, the ~~SunCal~~

9   ~~Proponent~~SunCal Plan Proponents have filed the Lehman Recoupment Objection which seeks the

10  disallowance of certain claims filed by the Lehman Lenders, including the claims filed against the

11  Group II: Voluntary Debtors.

12  In the Lehman Recoupment Objection, the ~~SunCal Proponent~~SunCal Plan Proponents seek

13  the following relief:

14      1) Disallowance of the claims asserted by the Lehman Lenders in their

15      entirety, pending compliance with the terms of the Restructuring

16      Agreement and the Settlement Agreement;

17      2) A reduction in the amount of the Lehman Entities' secured claims by

18      the amount of damages resulting from the Lehman Entities' breach of their

19      obligations under these agreements; and/or

20      3)  An order barring the Lehman Entities from enforcing their rights under

21      the Lehman Loans until they cure their breaches under the above

22      agreements.

23  The first prayer for relief above is premised upon the contention that the Lehman Entities

24  agreed to transfer ownership of the Projects described in this agreement, including the ~~Group II~~

25  ~~Project~~Group II: Voluntary Debtors Projects, to a series of newly formed entities under the control

26  of the Lehman Entities, pursuant to the terms of the Settlement Agreement. This agreement further

27  provided that these new entities would assume the vendor payables and certain Bond Claims

28

1    associated with these projects. Finally, this agreement included a covenant not to sue, pursuant to

2    which the Lehman Entities were barred from seeking further recourse against the Debtors.

3        The ~~SunCal Proponent~~SunCal Plan Proponents believe that the positions asserted in the

4    Lehman Recoupment Objection are well grounded in fact and in law. Had the Lehman Entities

5    complied with their contractual obligations, substantially all of the Group V Debtor's liabilities

6    would have been eliminated, the Group II: Voluntary Debtors would not have had to file Chapter

7    11, and the Lehman Entities would be barred from asserting claims against the Group II: Voluntary

8    Debtors based upon the Lehman Disputed Loans. It is the ~~SunCal Proponent~~SunCal Plan

9    Proponents position that the Lehman Entities' effort to enforce claims based upon Lehman

10   Disputed Loans is directly contrary to the basic agreements reached in the Restructuring

11   Agreement and in the related Settlement Agreement.

12       The Lehman Entities dispute the merits of the Lehman Recoupment Objection. It the

13   Lehman Entities' position that it was within their absolute "discretion" to pay, or not to pay, the

14   vendor payables incurred during the term of the Restructuring Agreement, even where they

15   authorized the work. Accordingly, they cannot, in their assessment, be held liable for these

16   obligations. In the case of the Settlement Agreement, the Lehman Entities contend that this

17   agreement never became effective and therefore they were not bound to comply with its terms. The

18   ~~SunCal Proponent~~SunCal Plan Proponents do not believe that the positions asserted by the Lehman

19   Entities are supported by the facts, or existing law.

20       In addition to the Recoupment Claim Objections, certain Voluntary Debtors, including the

21   Group II Voluntary Debtors, have also filed the Contract Action against Lehman ALI and other

22   non-debtor Lehman Entities in Orange County Superior Court. The Contract Action is based on

23   Lehman ALI's breach of contract on the Restructuring and Settlement Agreements.  On May 9,

24   2011, the Defendants in the Contract Action filed a Notice of Removal which removed the

25   Contract Action from the Orange County Superior Court to the Bankruptcy Court, as adversary no.

26   8:11-ap-01212ES.  The Voluntary Debtor-Plaintiffs moved to remand the Contract Action back to

27   the Orange County Superior Court ("Remand Motion").  The Bankruptcy Court denied the

28   Remand Motion at the hearing on July 12, 2011.

1    In addition to the Lehman Recoupment Objection, certain Voluntary Debtors have also

2    filed the State Court Action against Lehman ALI and other non-debtor Lehman Entities. The State

3    Court Action is based on Lehman ALI's breach of contract on the Restructuring and Settlement

4    Agreements.

5    Although LCPI's automatic stay remains an impediment to the pursuit of the Lehman

6    Adversary Proceeding, the existence of this stay will not bar the ~~SunCal Proponent~~SunCal Plan

7    Proponents from implementing the material terms of the Group II: Voluntary Debtors Plans for the

8    following reason. LCPI's automatic stay does not bar the pursuit of the Lehman Claim Objections

9    or the Contract Action.  In fact, these matters are proceeding in the Bankruptcy Court~~and in fact~~

10   ~~this litigation is proceeding~~. If these objections are successful, the claims of the Lehman Entities

11   will be disallowed, either in whole or in part, or the Lehman Entities will be barred from pursuing

12   these claims until they pay what they owe to the Group II: Voluntary Debtors. If the Contract

13   Action is successful, it will generate a further recovery for creditors.  In either scenario, the Plan

14   filed by the ~~SunCal Proponent~~SunCal Plan Proponents is feasible and will yield a favorable return

15   for creditors.

16   **5.4.6   The Debtors' Potential Post-Petition Claims Against Lehman and Their**

17   **Agents.**

18   The Voluntary Debtors believe that the Lehman Entities and certain agents of the Lehman

19   Entities (the "Culpable Agents") engaged in a post-petition course of conduct that severely

20   damaged the Voluntary Debtors, their estates and the recovery rights of creditors. In summary, the

21   actions taken by the Lehman Entities and the Culpable Agents included, among other things, the

22   following:

23   A.    Actively concealing the prepetition sale of the Lehman Disputed Loans to

24   Fenway Capital and misrepresenting themselves as the owners of these loans during the post-

25   petition period; and

26   B.    Improperly asserting that LCPI's automatic stay barred actions in the

27   Voluntary Debtors' Chapter 11 Cases relating to two of the Lehman Disputed Loans, when in fact

28   LCPI did not own any interest in such loans and hence the stay could not apply.

1    The foregoing course of conduct inflicted millions of dollars in damages upon the Voluntary

2    Debtors in the form of additional fees and costs, and it materially delayed the progress of the

3    Voluntary Debtors' reorganization effort. The Voluntary Debtors intend to seek recourse against the

4    Culpable Agents for these wrongs.

5    **5.5.    The Lehman Fenway Claims Transaction, Compromise Motion Filed By the**

6    **Lehman Entities.**

7    **5.5.1    Lehman Entities' and Fenway's Proposed Claims Transaction.**

8    In April of 2010, LCPI and LBHI filed that certain *Motion Pursuant To Bankruptcy Rule*

9    *9019 For Authority To Compromise Controversy In Connection With A Repurchase Transaction*

10    *With Fenway Capital, LLC And A Commercial Paper Program With Fenway Funding, LLC* (the

11    "Compromise Motion.").  In the motion, LCPI and LBHI represented that they were

12    "compromising" various issues and relationships arising out of the repurchase transaction

13    described in the LCPI – Fenway MRA (the "Repo"). However, a careful review of the transaction

14    described therein indicated that the motion was designed to accomplish the following objectives:

15        1.   To transfer title to the Lehman Disputed Loans at issue in the Lehman

16            Adversary Proceeding from Fenway Capital to LCPI, an entity that had no

17            interest in five of the seven loans prepetition;

18        2.   To allow LCPI, as the new owner of the Lehman Disputed Loans, to re-

19            join the Lehman Adversary Proceeding as a defendant, and once there to

20            use its automatic stay as a "sword" to stay this action;

21        3.   To enable the Lehman Entities to thwart the pursuit of the SunCal Plan

22            Proponents' Plan;

23        4.   To bestow upon the Lehman Entities' purported competing plan an unfair

24            advantage in the plan confirmation contest by delaying the effectiveness of

25            critical provisions in the SunCal Plan Proponents' Plan; and

26        5.   To shield Fenway Capital and its principals from liability and investigation

27            through discovery.

28

1    ~~At the hearing on the Compromise Motion, the bankruptcy court in New York approved the~~

2    ~~Compromise Motion, and stated, consistent with the objectives of the Lehman Entities, that the~~

3    ~~continued pursuit of the Lehman Adversary Proceeding would be stayed, once LCPI obtained title~~

4    ~~to the Lehman Disputed Loans. The order reflecting this relief was entered on May 13, 2010 (the~~

5    ~~"Compromise Order").~~

6    **~~5.6.~~5.4.The Debtors' Motion for a Stay to Suspend Certain Lehman Actions.**

7    On September 21, 2010, the Voluntary Debtors, Acquisitions, and SunCal Management

8    filed a motion requesting, among other relief, for the Court to suspend the Lehman Entities

9    competing plan and disclosure statement unless and until the Lehman Entities agree to provide the

10   Debtors with relief from their automatic stay in the Debtors' Chapter 11 Cases (the "Suspension

11   Motion").  The Court granted this motion and stayed all matters until March 1, 2011. The Court

12   also ordered the parties to engage in a mediation. The Voluntary Debtors and the Lehman Entities

13   were unable to settle their claims through this process.

14   **~~5.7.    The Debtors' Other Litigation with Non-Lehman Related Parties.~~**

15   **~~5.7.1    The Debtors' Failed Preliminary Injunction Motion Against the~~**

16   **~~Holders of Bond Claims.~~**

17   ~~On February 20, 2009, the Debtors filed a complaint and a Motion for Preliminary~~

18   ~~Injunction, pursuant to which the Debtors sought a Motion for Preliminary Injunction against the~~

19   ~~Holders of Bond Claims from pursuing such Claims. On February 23, 2009, the Court denied the~~

20   ~~Debtors' request for the TRO and granted the Debtors' request to require the defendants to show~~

21   ~~cause why the Motion for Preliminary Injunction should not be issued.~~

22   ~~On March 2, 2009, several Holders of Bond Claims objected to the Motion for the~~

23   ~~Preliminary Injunction. The objections generally alleged that the Debtors failed to show that the~~

24   ~~balancing of the equities favored granting the Preliminary Injunction versus the harm to the~~

25   ~~Holders of the Bond Claims.  At a hearing held on March 4, 2009, the Court denied the~~

26   ~~Preliminary Injunction Motion and the underlying complaint has subsequently voluntarily been~~

27   ~~dismissed without prejudice.~~

28

### 5.7.2    The Contractors' Successful Motions for Relief from Stay to Pursue the Bond Claims.

Various contractors that were hired to perform work on some of the Projects have filed motions for relief from stay with the Bankruptcy Court to pursue their purported Bond Claims. These creditors have requested that the Bankruptcy Court grant these creditors relief from the automatic stay to allow such creditors to enforce certain Claims that such creditors allege to have against some of the Debtors, including certain surety bonds that are alleged to have been issued in favor of such creditors.  The Debtors opposed the motions on the grounds that the various Debtors are indispensible parties.  The Court conditionally granted the motions provided that the Bond Claimants are able to sever the Debtors from their proceedings on the Bonds.

### 5.7.3    Bond Safeguard Motion.

Bond Safeguard, a surety that issued bonds to secure the performance of work on certain projects, filed a motion seeking authority to file  claims relating to these bond claims after the bar date. The Debtors opposed this motion. This motion was granted pursuant to an order entered on January 7, 2011.

The Bond Issuers assert that surety bonds were executed on behalf of all of the SunCal Debtors and the Bond Indemnitors.  However, Bond Safeguard only filed proofs of claims asserting joint and several liability ("Cross-Indemnity Claims") against the Trustee Debtors.  Bond Safeguard did not file any Cross-Indemnity Claims against the Voluntary Debtors.

## VI.

## TREATMENT OF UNCLASSIFIED CLAIMS

**6.1**    **Introduction**. As required by the Bankruptcy Code, the Plan places Claims and Interests into various Classes according to their right to priority.  However, certain types of Claims are not classified in any Classes under the Plan.  These Claims are deemed "unclassified" under the provisions of the Code.  They are not considered impaired and they do not vote on the Plan, because they are automatically entitled to specific treatment provided for them in the Code.  As such, the SunCal Plan Proponents have not placed the following Claims in a Class.  The treatment of these unclassified Claims is as provided below.

**6.2     Treatment of Allowed Administrative Claims**.

The Code requires that all Allowed Administrative Claims be paid on the later of Effective Date of the Plan or the date of their allowance, unless a particular Holder agrees to a different treatment.  The treatment of Allowed Administrative Claims is as described below.  However, such Administrative Claims are continuing to be incurred.  The Allowed Administrative Claims shall be paid from the applicable Distribution Account(s) pursuant to the ~~Acquisitions Administrative~~Litco. ~~Plan~~ Loan.

~~**6.3     Treatment and Repayment of the Lehman's Administrative Loan(s)**.~~

~~The Lehman Disputed Administrative Loans shall be paid in full on the later of the Effective Date, or the date any objections to the same are overruled by the Court leaving them Allowed claims. Prior to payment, these claims shall continue to be secured by their existing liens against the respective Assets of the Trustee Debtors.~~

**6.4~~6.3~~     Repayment of Allowed Administrative Claims ~~Other than the Lehman Administrative Loans~~**.

Except to the extent that the Holder of an Allowed Administrative Claim agrees to a different treatment and subject to the Administrative Claims Bar Date set forth herein, the Distribution Agent shall pay each Allowed Administrative Claim in full, in Cash, on the later of (i) the Effective Date, (ii) within ten (10) Business Days after the date such Administrative Claim becomes an Allowed Administrative Claim, or (iii) the date such Allowed Administrative Claim becomes due according to its terms. Notwithstanding the foregoing, any Allowed Administrative Claim representing obligations incurred in the ordinary course of post-petition business by the Debtors in Possession (including without limitation post-petition trade obligations and routine post-petition payroll obligations) shall be paid in full or performed by the Plan Trustee in the ordinary course of business, in accordance with the terms of the particular obligation.

**6.5~~6.4~~     Administrative Claims Bar Date**.

All applications for final compensation of Professionals for services rendered and for reimbursement of expenses incurred on or before the Effective Date and all other requests for payment of Administrative Claims incurred before the Effective Date under Sections 507(a)(2)

-59-

1   or 507(b) of the Bankruptcy Code (except only for (i) post-petition, ordinary course trade

2   obligations and routine post-petition payroll obligations incurred in the ordinary course of the

3   Debtors' post-petition business, for which no bar date shall apply, and (ii) post-petition tax

4   obligations, for which no bar date shall apply) shall be Filed with the Bankruptcy Court and served

5   upon the Plan Trustee no later than the Administrative Claims Bar Date, unless such date is

6   extended by the Bankruptcy Court after notice to the Plan Trustee.  Any such request for payment

7   of an Administrative Claim that is subject to the General Administrative Claims Bar Date and that

8   is not Filed and served on or before the Administrative Claims Bar Date shall be forever barred;

9   any party that seeks payment of Administrative Claims that (i) is required to file a request for

10  payment of such Administrative Claims and (ii) does not file such a request by the deadline

11  established herein shall be forever barred from asserting such Administrative Claims against the

12  Debtors, the Plan Trust, their estates, or any of their property.

13              ~~6.66.5~~  **Treatment of Unsecured Tax Claims**.

14              Tax Claims are certain unsecured income, employment and other taxes described by Code

15  Section 507(a)(8).  The Code requires that each holder of such a Section 507(a)(8) tax claim

16  receive the present value of such Claim in deferred cash payments, over a period not exceeding

17  five (5) years from the petition date and that such treatment not be less favorable than the treatment

18  accorded to non priority unsecured creditors.

19              At the election of the Plan Trustee, the Holder of each Allowed Priority Tax Claim shall be

20  entitled to receive, on account of such Claim, (i) equal cash payments on the last Business Day of

21  each three-month period following the Effective Date, during a period not to exceed five years

22  after November 6, 2008, totaling the principal amount of such Claim plus simple interest on any

23  unpaid balance from the Effective Date, calculated at the interest rate available on ninety (90) day

24  United States Treasuries on the Effective Date, (ii) such other treatment agreed to by the Holder of

25  the Allowed Priority Tax Claim and the Plan Trustee, provided such treatment is on more

26  favorable terms to the Debtors (or the Plan Trust after the Effective Date) than the treatment set

27  forth in clause (i) hereof, or (iii) payment of the full Allowed Priority Tax Claim in Cash.

28

**VII**.

**CLASSIFICATION OF CLAIMS AND INTERESTS**

As required by the Code, the Plan places Claims and Interests into various Classes according to their right to priority and other relative rights.  The Plan specifies whether each Class of Claims or Interests is impaired or unimpaired, and the Plan sets forth the treatment each Class will receive.  The table below lists the Classes of Claims established under the Plan and states whether each particular Class is impaired or left unimpaired by the Plan.  A Class is "unimpaired" if the Plan leaves unaltered the legal, equitable and contractual rights to which the Holders of Claims or Interests in the Class are entitled, with certain exceptions specified in the Bankruptcy Code.

| CLASSIFICATION OF HOLDERS OF UNPAID SECURED REAL PROPERTY TAX CLAIMS AGAINST THE GROUP II: VOLUNTARY DEBTORSON GROUP II PROJECTGROUP II: VOLUNTARY DEBTORS PROJECTS | | |
|---|---|---|
| **Class 1** | **Claimant** | **Claim Nos.** |
| Class 1.1 | Riverside County as the Holder of an Unpaid Secured Real Property Tax Claim against the Beaumont Heights Project in the amount of $442,201. | SunCal Beaumont 9 |
| Class 1.2 | Stanislaus County as the Holder of an Unpaid Secured Real Property Tax Claim against the Johannson Ranch Project in the amount of $434,830. | Unknown |

| CLASSIFICATION OF ASSERTED MECHANICS LIEN CLAIMS AGAINST THE GROUP II: VOLUNTARY DEBTORSAGAINST GROUP II PROJECTGROUP II: VOLUNTARY DEBTORS PROJECTS | | |
|---|---|---|
| **Class 2** | **Claimant** | **Claim Nos.** |
| Class 2.1 | The Holder of the asserted Mechanic Lien Claim held by Proactive Engineering against the Beaumont Heights Project in the amount of $43,355. | SunCal Beaumont 11 and 12 |

| CLASSIFICATION OF PRIORITY UNSECURED CLAIMS AGAINST THE GROUP II: VOLUNTARY DEBTORS |
|---|

| Class 3 | Claimant | Claim Nos. |
|---------|----------|------------|
| Class 3.1 | The Holder of Allowed Priority Claims that fall within Code Sections 507(a)(2), (4), (5), (6), and (7) against any of the Group II: Voluntary Debtors | None filed |

| CLASSIFICATION OF GENERAL UNSECURED CLAIMS AGAINST THE GROUP II: VOLUNTARY DEBTORS | | |
|---------|----------|------------|
| **Class 4** | **Claimant** | **Claim Nos.** |
| Class 4.1 | Claimants holding Allowed Unsecured Claims against SunCal Beaumont in the amount of $180,713. | Various Filed and Scheduled |
| Class 4.2 | Claimants holding Allowed Unsecured Claims against SunCal Johannson Ranch in the amount of $41,181. | Various Filed and Scheduled |

| CLASSIFICATION OF INTEREST HOLDERS AGAINST THE GROUP II: VOLUNTARY DEBTORS | | |
|---------|----------|------------|
| **Class 5** | **Claimant** | **Scheduled** |
| Class 5.1 | Allowed Interests in SunCal Beaumont held by SunCal I. | Scheduled Amount |
| Class 5.2 | Allowed Interests in SunCal Johannson Ranch held by SunCal I | Scheduled Amount |

## VIII.

## THE PLAN'S TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS

**8.1.** **The Plan's Treatment of Holders of Allowed Secured Real Property Tax Claims on the ~~Group II Project~~Group II: Voluntary Debtors Projects (Classes 1.1 and 1.2).**

The rights of the Holder(s)' of Allowed Secured Claims in Classes 1.1and 1.2 are not impaired under the Plan. Such claimant's shall retain their existing lien rights, and shall accrue interest as provided under applicable nonbankruptcy law pursuant to 11 U.S.C. § 511, and ~~one of the following two non-impairment options shall apply, at the election of the Plan Trustee: 1) O~~on the Effective Date, such claims shall be satisfied in accordance with the provision of 11 U.S.C.

1    § 1124(2), or 2) on the Effective Date, or the Holder(s) shall be free to pursue their respective

2    rights and remedies against the underlying real property collateral under applicable California law.

3        **8.2.**    **The Plan's Treatment of Mechanics Lien Claims Against ~~Group II~~**

4        **~~Project~~Group II: Voluntary Debtors Projects (Class 2.1).**

5        The Holder(s) of Allowed Secured Claims within Class 2.1 shall receive the indubitable

6    equivalent of their claims under the Plan, pursuant to 11 U.S.C. § 1129(b)(2)(A)(ii),  after payment

7    of Class 1 Claims, through the following treatment:

8        A.    The sale of the ~~Group II Project~~Group II: Voluntary Debtors Projects shall

9    be sold, free and clear of all monetary liens and encumbrance, pursuant to the following sales

10   procedures:

11       1.    The ~~Group II Project~~Group II: Voluntary Debtors Projects will be

12   sold through a public auction after a commercially reasonable marketing and advertising effort of

13   at least sixty (60) days duration;

14       2.    The SunCal Plan Proponents shall have the right to provisionally

15   accept an Opening Bid from a Stalking Horse Bidder prior to the public auction and to grant this

16   bidder the right to receive the Beaumont Heights Project Break-up Fee or the Johannson Ranch

17   Project Break-up Fee, the as the case may be, if such bidder is not the Winning Bidder;

18       3.    Other Qualified Bidders shall have the right to overbid the Opening

19   Bid by submitting a Qualifying Bid. The first round of Qualifying Bids after the Opening Bid must

20   be equal to or in excess of the Initial Overbid Amount. Thereafter, all Qualifying Bids shall be

21   equal to or in excess or the Minimum Increment;

22       4.    The highest Qualifying Bid received from a Qualified Bidder, shall

23   be accepted as the Winning Bid, and the submitting bidder shall be the Winning Bidder. Upon

24   payment of the Winning Bid, the Winner bidder shall receive title to the applicable Group V

25   Project free and clear of all monetary liens and encumbrances; and

26       5.    The Net Sales Proceeds from the sale of the ~~Group II Project~~Group

27   II: Voluntary Debtors Projects shall be deposited into the applicable Net Sales Proceeds Account

28   and the liens held by the holder of the Class 2.1 lien shall attach to the Net Sales Proceeds. The

MAINDOCS-#163410-v2-SCC_Group_II_VD_DS.DOC

Class 2.1 claim shall be paid from the Net Sales Proceeds within three (3) business days of the date they are Allowed.

6.    If for any reason the Plan Trustee is unable to sell any of the Group II ProjectGroup II: Voluntary Debtors Projects on the Effective Date, they will be abandoned as of 11:59 p.m. on the Effective Date, and the Class 2.1 claimant shall be free to exercise any and all remedies that it may hold with respect to these Assets.

B.    Sale of Other Plan Trust Assets Subject To Liens of Class 2.1 Claimant(s). The Plan Trustee shall complete the sale of all other Plan Trust Assets that are subject to the Liens of the Class 2.1 claimant, if any, free and clear of such claims and liens, through a sale that satisfies the following conditions:

1.    Such Assets will be sold through a public auction after a commercially reasonable marketing and advertising effort of at least thirty (30) days duration;

2.    The Committee shall approve the terms of the sale;

3.    The sale will be held and completed within ninety (90) days of the Effective Date; and

5.    The Net Sales Proceeds from the sale of the these Assets shall be deposited into the applicable Net Sales Proceeds Account and the liens held by the holder of claims within Class 2.1 shall attach to the Net Sales Proceeds in accordance with their existing priority. The claims within Class 2.1 shall then be paid from the Net Sales Proceeds within three (3) business days of the date they are Allowed.

6.    If for any reason the Plan Trustee is unable to sell any of remaining Assets within the foregoing time frame, other than Litigation Claims, which shall be retained, they will be abandoned and the claimant within Class 2.1 who hold liens on these unsold Assets shall be free to exercise any and all remedies that it may hold against these Assets.

**8.3.    The Plan's Treatment of Holders of Priority Claims (Class 3.1)**.

The treatment of the Holders of Allowed Priority Claims under the Plan shall be as follows:

A.    The Holder(s) are unimpaired under the Plan; and

B.    The Holder(s) shall be paid from the applicable Distribution Account(s) (i) the full amount of such Allowed Priority Claim in Cash on the later of (x) the Effective Date, (y) the date such Claim becomes an Allowed Priority Claim or (z) the date such Allowed Priority Claim becomes payable in accordance with the terms governing such Allowed Priority Claim, or (ii) upon such other less favorable terms as may be agreed to by such Holder and the Plan Trustee.

**8.4.    The Plan's Treatment of Holders of Allowed General Unsecured Claims (Class 4.1).**

The rights of Holders of Allowed Class 4.1 Claims are impaired under the Plan. Under the Plan, each claimant will receive a distribution ~~in cash~~of the Available Cash, if any, on ~~or before the thirtieth (30th) day after~~ the Effective Date, equal to the ~~Net Proceed~~Net Sales Proceeds remaining after the payment of all Allowed Administrative, Priority and Secured Claims, including Holders of Mechanic Lien Claims, but only up to the Maximum Distribution.

**8.5.    The Plan's Treatment of Holders of Allowed Interests.**

The Interests of the Holders in Class 5.1and 5.2 are impaired under the Plan. All such Interests shall be cancelled as of the Effective Date and no distribution shall be made to these Holders on account of such Interest(s).

**IX.**

**ACCEPTANCE OR REJECTION OF THE PLAN**

**9.1.    Introduction.**

PERSONS OR ENTITIES CONCERNED WITH CONFIRMATION OF THE PLAN SHOULD CONSULT WITH THEIR OWN ATTORNEYS BECAUSE THE LAW ON CONFIRMING A PLAN OF REORGANIZATION IS VERY COMPLEX.  The following discussion is intended solely for the purpose of alerting readers about basic confirmation issues, which they may wish to consider, as well as certain deadlines for filing Claims.  The Debtors cannot represent that the discussion contained below is a complete summary of the law on this topic.

Many requirements must be met before the Court can confirm the Plan.  Some of the requirements include that the Plan must be proposed in good faith, acceptance of the Plan, whether

the Plan pays creditors at least as much as creditors would receive in a Chapter 7 liquidation, and whether the Plan is feasible.  The requirements described herein are <u>not</u> the only requirements for confirmation.

**9.2.** **<u>Who May Object to Confirmation of the Plan</u>.**

Any party in interest may object to the confirmation of the Plan, but as explained below not everyone is entitled to vote to accept or reject the Plan.

**9.3.** **<u>Who May Vote to Accept/Reject the Plan</u>.**

A Holder of a Claim or Interest has a right to vote for or against the Plan if that Holder of the Claim or Interest has a Claim which is both (1) Allowed or Allowed for voting purposes and (2) Classified in an impaired Class (excluding any class in which the Plan is "deemed rejected"). The votes will be tabulated on a Debtor by Debtor basis.

**9.4.** **<u>What Is an Allowed Claim/Interest</u>.**

As noted above, a Holder of Claim or Interest must first have an Allowed Claim or Allowed Interest to vote.

**9.5.** **<u>What Is an Impaired Class</u>.**

A Class is impaired if the Plan alters the legal, equitable, or contractual rights of the Claims or Interests in that Class, other than the right to accelerate the Claim upon certain kinds of defaults. In this case, the Debtors believe that all Classes, except for Class 3.1 are impaired.

**9.6.** **<u>Who Is Not Entitled to Vote</u>.**

The following four types of Claims are <u>not</u> entitled to vote: (1) Claims that have been disallowed; (2) Claims in unimpaired Classes; (3) Claims entitled to priority pursuant to Bankruptcy Code Sections 507(a)(2) or (a)(3) and Claims in Classes that do not receive or retain any value under the Plan.  Claims in unimpaired Classes are not entitled to vote because such Classes are deemed to have accepted the Plan.  Claims entitled to priority pursuant to Bankruptcy Code Section 507(a)(8) are not entitled to vote because such Claims are not placed in Classes and they are required to receive certain treatment specified by the Bankruptcy Code.  Claims in Classes that do not receive or retain any property under the Plan do not vote because such Classes are deemed to have rejected the Plan. The Debtors believe that all Classes are entitled to vote except

1    ~~Classes 1.1, 1.2 and 3.1. These classes are not impaired under the Plan and consequently are not~~

2    ~~entitled to vote. They are conclusively deemed to have accepted the Plan. The Interests held by the~~

3    ~~Holders in Classes 5.1 and 5.2 are being cancelled under the Plan; accordingly these Interest~~

4    ~~Holders are deemed to have voted to reject the Plan.~~

5    EVEN IF YOUR CLAIM IS OF THE TYPE DESCRIBED ABOVE, YOU MAY STILL

6    HAVE A RIGHT TO OBJECT TO THE CONFIRMATION OF THE PLAN.

7    **9.7.    Who Can Vote in More than One Class.**

8    A creditor whose Claim has been Allowed in part as a Secured Claim and in part as an

9    Unsecured Claim is entitled to accept or reject a Plan in both capacities by casting one ballot for

10    the secured part of the Claim and another ballot for the Unsecured Claim.  Also, a Creditor may

11    otherwise hold Claims in more than one Class (such as a Holder of Senior Secured Claims and

12    Subordinated Note Claims), and may vote the Claims held in each Class.

13    **9.8.    Votes Necessary for a Class to Accept the Plan.**

14    A Class of Claims is deemed to have accepted the Plan when more than one-half (1/2) in

15    number and at least two-thirds (2/3) in dollar amount of the Claims *that actually voted*, vote to

16    accept the Plan.  A Class of interests is deemed to have accepted the Plan when Holders of at least

17    two-thirds (2/3) in amount of the interest-Holders of such Class which actually vote, vote to accept

18    the Plan.

19    **9.9.    Treatment of Nonaccepting Classes.**

20    As noted above, even if there are impaired Classes that do not accept the proposed Plan, the

21    Court may nonetheless confirm the Plan if the nonaccepting Classes are treated in the manner

22    required by the Code and at least one impaired Class of Claims accepts the Plan. The process by

23    which a plan may be confirmed and become binding on non-accepting Classes is commonly

24    referred to as "cramdown."  The Bankruptcy Code allows the Plan to be "crammed down" on

25    nonaccepting Classes of Claims or interests if it meets all statutory requirements except the voting

26    requirements of 1129(a)(8) and if the Plan does not "discriminate unfairly" and is "fair and

27    equitable" with respect to each impaired Class that has not voted to accept the Plan, as set forth in

28    11 U.S.C. § 1129(b) and applicable case law.

**9.10.    Request for Confirmation Despite Nonacceptance by Impaired Class(es).**

The SunCal Plan Proponents will ask the Court to confirm the Plan by cramdown on any impaired Class if such Class does not vote to accept the Plan.

/ / /

## X.

## MEANS OF EXECUTION AND IMPLEMENTATION OF THE PLAN

**10.1.    Introduction.**

This section is intended to address how the SunCal Plan Proponents intend to implement the provisions of the Plan.  It addresses the transfer of the ~~Plan Trust Property~~Plan Trust Asset to the Plan Trust, the nature of the Plan Trust, the powers of the Plan Trust, the governance of the Plan Trust, the resolution of disputed claims, the sources of funds that will be used to pay claims and the mechanics of how claims will be paid.

**10.2    Sale Process ~~After Confirmation Date But Prior To Effective Date~~During Marketing Period**.

The core objective of the Plan is to enable all creditors holding Allowed Claims to receive the highest dividend possible by selling the estates' primary assets, the ~~Group II Project~~Group II: Voluntary Debtors Project s, to the highest bidder. The process of marketing the ~~Group II Project~~Group II: Voluntary Debtors Project s for sale will begin, pursuant to the Confirmation Order, immediately after the entry of this order. Although the Chapter 11 Trustee will not be formally removed under the Plan until the Effective Date, he will be required to work with the ~~SunCal Proponent~~SunCal Plan Proponent s after the Confirmation Date to promote and facilitate the sale of the ~~Group II Project~~Group II: Voluntary Debtors Project s in accordance with the Plan terms.

The sale of the Group II: Voluntary Debtors Projects shall be sold, free and clear of all monetary liens and encumbrance,  pursuant to the following sales procedures:

1.    The Group II: Voluntary Debtors Projects will be sold through a public auction after a commercially reasonable marketing and advertising effort of at least sixty (60) days duration;

2.      The SunCal Plan Proponents shall have the right to provisionally accept an Opening Bid from a Stalking Horse Bidder prior to the public auction and to grant this bidder the right to receive the Beaumont Heights Project Break-up Fee or the Johannson Ranch Project Break-up Fee, the as the case may be, if such bidder is not the Winning Bidder;

3.      Other Qualified Bidders shall have the right to overbid the Opening Bid by submitting a Qualifying Bid. The first round of Qualifying Bids after the Opening Bid must be equal to or in excess of the Initial Overbid Amount. Thereafter, all Qualifying Bids shall be equal to or in excess or the Minimum Increment;

4.      The highest Qualifying Bid received from a Qualified Bidder, shall be accepted as the Winning Bid, and the submitting bidder shall be the Winning Bidder. Upon payment of the Winning Bid, the Winner bidder shall receive title to the applicable Group V Project free and clear of all monetary liens and encumbrances; and

5.      The Net Sales Proceeds from the sale of the Group II: Voluntary Debtors Projects shall be deposited into the applicable Net Sales Proceeds Account.

The ~~SunCal Proponent~~SunCal Plan Proponents will pursue the following sale procedures after the Confirmation Date:

A.      Implementation of a Marketing Program. ~~Once~~ On or before the Confirmation Date, the Plan is confirmed, the ~~SunCal Proponent~~SunCal Plan Proponents will market the ~~Group II Project~~Group II: Voluntary Debtors Projects for sale through a comprehensive sale effort during the Sale Period. This sale effort will include 1) sending sale packages describing each ~~Group II Project~~Group II: Voluntary Debtors Project to the real estate brokerage community; b) advertising the ~~Group II Project~~Group II: Voluntary Debtors Projects for sale on a website that includes links allowing direct access to all relevant information regarding the ~~Group II Project~~Group II: Voluntary Debtors Projects; and c) sending packages to a list of prospects nationally who are actively seeking or may have interest in these kinds of assets.

B.      Identifying a Stalking Horse Bidder. ~~During~~ On or before the commencement of the Sale Period, the SunCal Parties will accept, on a provisional basis, an Opening Bid for one or both of the ~~Group II Project~~Group II: Voluntary Debtors Projects. The

MAINDOCS-#163410-v2-SCC_Group_II_VD_DS.DOC

bidder whose Opening Bid is accepted will become the "Stalking Horse Bidder." The Opening Bid must be equal to the Minimum Sale Price(s) fixed in the Plan for each ~~Group II Project~~Group II: Voluntary Debtors Project.

C.    The Sale Contract. The sale contract that will be entered into with the Stalking Horse Bidder will include the following bankruptcy-sale related provisions:

1.    Overbid Provisions. The contract will allow the ~~SunCal Proponent~~SunCal Plan Proponents to seek "overbids" from other Qualified Buyers, and to accept an Initial Overbid that exceeds the Stalking Horse Bid by the Initial Overbid Amount applicable to each ~~Group II Project~~Group II: Voluntary Debtors Project. In the case of Beaumont Heights Project, the Initial Overbid Amount is a sum that is not less than the sum of the applicable Opening Bid, the Beaumont Heights Ranch Break-up Fee and Minimum Increment. In the case of the Johannson Ranch Project, the Initial Overbid Amount is a sum that is not less than the sum of the applicable Opening Bid, the Johannson Ranch Break-up Fee and the Minimum Increment.

2.    Break-Up Fees. The sale contract will include a "break-up fee" provision. This fee will be payable to the Stalking Horse Bidder if the Opening Bid is overbid, and another Qualified Bidder purchases the ~~Group II Project~~Group II: Voluntary Debtors Project(s) that is the subject of the Opening Bid. ~~The Beaumont Heights Project Break-up Fee is fifty thousand dollars ($50,000), and the Johannson Ranch Project Break-up Fee is twenty-seven thousand dollars ($27,000).~~

3.    Sale Free And Clear of Liens. The sale contract will provide that the ~~Group II Project~~Group II: Voluntary Debtors Project(s) are being sold free and clear of all monetary liens and encumbrances and that no party holding a lien against the projects.

D.    The Auction.  On or ~~Thirty~~ thirty (30) days prior to the Effective Date, the ~~SunCal Proponent~~SunCal Plan Proponents will conduct an auction wherein all Qualified Bidders who have submitted Qualified Bids for the ~~Group II Project~~Group II: Voluntary Debtors Projects will have the opportunity to increase their bids for these Projects. The Qualified Bidder that submits the highest bid for the Project will then be designated the Winning Bidder. The Winning Bidder will then have thirty (30) days to close this purchase transaction by paying the Winning Bid

1  amount. ~~Once the Winning Bidder advises the SunCal Plan Proponents that they are ready to close,~~

2  ~~the sequence of events described in paragraphs 10.3 through 10.5 shall be implemented.~~

3      ~~The entire process of marketing and selling the Group II Projects will be overseen by an~~

4  ~~independent real estate professional with experience managing sales of this kind. This professional~~

5  ~~will participate in every material aspect of the sale effort, and he or she shall have the right to file~~

6  ~~an objection to the sale effort with the Court if the process is not proceeding in a fair and effective~~

7  ~~manner.~~

8      **10.3.    Transfer of Property To The Plan Trust**.

9      On the Effective Date, title to and possession of all property of the Group II: Voluntary

10  Debtors, excepting those items of property that the Plan Trustee affirmatively elects not to transfer

11  to the Plan Trust, shall be deemed transferred and delivered to the Plan Trust, without further act or

12  action under any applicable agreement, law, regulation, order or rule of law.

13      **10.4.    Closing of ~~Group II Project~~ Group II: Voluntary Debtors Project Sales**.

14      On the Effective Date, the ~~Group II Project~~ Group II: Voluntary Debtors Project(s) shall be

15  sold free and clear of liens to the Winning Bidder, at the Winning Bid.

16      **10.5.    Purposes of The Plan Trust**.

17      The Plan Trust's purposes, powers and objectives include, but are not limited to the

18  following: (i) to take control over, manage and over time sell or otherwise dispose of all ~~Plan Trust~~

19  ~~Property~~ Plan Trust Asset for the highest return reasonably obtainable; (ii) to pursue all Litigation

20  Claims through collection efforts, including through litigation in any court of competent

21  jurisdiction, and to obtain the most favorable recovery on the same, with due consideration of all

22  relevant factors, including cost; (iii) to cause all Available Cash to be deposited into the applicable

23  Distribution Accounts; (iii) to initiate actions to resolve any remaining issues regarding the

24  allowance and payment of Claims including, as necessary, initiation and/or participation in

25  proceedings before the Bankruptcy Court; (iv) to take such other actions as are necessary or useful

26  to maximize the value of all property received by the Plan Trust; (v) to make the payments and

27  distributions to creditors and holders of Beneficial Interests as required by the Plan; and (vi) to

28  enforce all rights with respect to the ~~Plan Trust Property~~ Plan Trust Asset; and (vii) to take all

actions reasonable and necessary to implement the terms of the Plan, including but not limited to selling the ~~Group II Project~~Group II: Voluntary Debtors Projects and the Assets. ~~A more complete statement of the Plan Trust's powers and limitations is set forth in the Plan Trust Agreement, which is a part of the Plan Supplement.~~

It is intended that the Plan Trust will be classified for U.S. federal income tax purposes as a "liquidating trust," with the primary objective of liquidating the ~~Plan Trust Property~~Plan Trust Asset and distributing the net proceeds thereof, with no objective to continue or engage in the conduct or a trade or business in accordance with Treasury Regulation 301.7701-4(d), and, notwithstanding anything to the contrary in the Plan, all actions taken by the Plan Trust or any person acting on behalf of the Plan Trust shall be consistent with such primary objective.

~~**10.6.    Trust Agreement**.~~

~~Copies of the Plan Trust Agreement shall be contained in the Plan Supplement. The Plan Trust Agreement shall, among other matters, create the Plan Trust, identify Acquisitions as the initial trustee of the Plan Trust, identify the compensation of the Plan Trustee, and specify the authorities and powers of the Plan Trustee, consistent with this Plan.~~

~~**10.7.    Operations of the Plan Trust**.~~

~~From and after the Effective Date, the Plan Trust may use, acquire and dispose of the Plan Trust Property held in the Plan Trust, and take any of the actions set forth in this Article or in the Plan Trust Agreement, without the approval of the Bankruptcy Court and free of the restrictions of the Bankruptcy Code, the Bankruptcy Rules or the prior orders of the Bankruptcy Court, other than restrictions expressly imposed by the Plan, the Confirmation Order or the Plan Trust Agreement, provided that the Plan Trust is administered so that it qualifies as a liquidating trust under Treasury Regulation § 301.7701-4(d).~~

~~**10.8.    The Plan Trustee**.~~

~~Acquisitions shall be Trustee of the Plan Trust. Acquisitions is the direct or indirect parent of all of Debtors.~~

~~**10.9.    Payment of Trust Expenses**.~~

1    The expenses incurred by the Plan Trust during the Plan Period, which shall include the

2    compensation payable to the Acquisitions, shall be paid, or adequate reserves shall be created for

3    the payment of such expenses, prior to any distribution to the Plan Trust Beneficiaries.

4    **10.10.   Plan Distribution System.**

5    The Plan Trustee shall establish a separate "Distribution Account" for each Group II:

6    Voluntary Debtor at an FDIC insured bank. Each Group II DebtorGroup II: Voluntary Debtor's

7    Available Cash, whether on hand as of the Effective Date or received thereafter, shall be deposited

8    into that Group II DebtorGroup II: Voluntary Debtor's Distribution Account. The only exception to

9    this provision shall be in the case of Net Sales Proceeds that are subject to disputed liens. Such

10    proceeds shall remain in the applicable Net ProceedNet Sales Proceeds Accounts established to

11    receive the proceeds from the sale of a particular property. Once all disputes regarding entitlement

12    to the funds in the Net ProceedNet Sales Proceeds Accounts have been resolved, the proceeds

13    remaining (after the payment of the Allowed Claims secured by liens on these proceeds) shall be

14    transferred to the Distribution Account. These funds will then be used to pay the claims of

15    Creditors holding Allowed Claims in their order of priority as provided for in the Plan.

16    **10.6    Preservation of Litigation Claims for the Plan Trust.**

17    The Plan Trustee reserves for the Estates and the Plan Trust all rights to commence and

18    pursue, as appropriate, any and all Litigation Claims, whether arising prior to or after the petition

19    Date, in any court or other tribunal, including without limitation, in an adversary proceeding filed

20    or pending in the Court.  On the Effective Date, the Plan Trustee will be vested with authority to

21    enforce, file, litigate, prosecute, settle and collect with respect to the Litigation Claims, although it

22    will not be required to do so and the determination of whether to so will be made solely by the Plan

23    Trustee in his absolute discretion.  With respect to any Litigation Claims commenced prior to the

24    Effective Date to which any or all of the Group II: Voluntary Debtors is a party, the Plan Trustee

25    shall replace and stand in the shoes of such Debtors as the real party in interest.

26    While the SunCal Plan Proponents have attempted to identify all Litigation Claims in the

27    Disclosure Statement which may be pursued, and hereby incorporates by reference those

28    disclosures and provisions, the failure to list any potential Litigation Claims, generally or

-73-

specifically, is not intended to limit the rights of the Plan Trustee to pursue such Litigation Claims. Unless a Litigation Claims against any Person is expressly waived, relinquished, released, compromised or settled as provided or identified in the Plan, any Confirmation Order or prior order of the Court, the Plan Trustee expressly reserves any Litigation Claims for later adjudication. Therefore, no preclusion doctrine, including, without limitation, the doctrine of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches shall apply to such Litigation Claims upon or after Confirmation or consummation of the Plan.  All Litigation Claims are preserved under the Plan for the benefit of the Estates and the Plan Trust.  Any recoveries from Litigation Claims will be paid to the Plan Trust.

ANY CREDITORS THAT BELIEVE THEY RECEIVED A TRANSFER OR SETOFF THAT IS AVOIDABLE UNDER THE CODE OR THAT HOLDS A CLAIM AGAINST THE ESTATES THAT COULD BE SUBJECT TO AN OBJECTION BASED UPON FAILURE TO RETURN AN AVOIDABLE TRANSFER OR SETOFF, ARE DIRECTED TO REVIEW THEIR RECORDS AND/OR THE DEBTORS' SCHEDULES FOR FURTHER INFORMATION. HOWEVER, ALL RIGHTS OF THE DEBTORS AND THE ESTATES ARE RESERVED WITH RESPECT TO ANY AND ALL TRANSFERS OR SETOFFS WHICH MAY BE AVOIDABLE UNDER THE BANKRUPTCY CODE.

**10.7    Establishment and Operations of the Plan Trust.**

The Plan Trust shall be established and shall become effective on the Effective Date.  The Plan Trust is created pursuant to the Plan and the Confirmation Order.  The primary purpose of the Plan Trust is the liquidation and distribution of the Plan Trust Asset transferred to it, with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Plan Trust.  The Plan Trust shall hold and administer the Plan Trust Asset, including, but not limited to, any Litigation Claims, and the proceeds thereof for liquidation and distribution in accordance with the terms of the Plan.

From and after the Effective Date, the Plan Trust may use, acquire and dispose of the Plan Trust Asset held in the Plan Trust, and take any of the actions set forth in this Article, without the

MAINDOCS-#163410-v2-SCC_Group_II_VD_DS.DOC

approval of the Bankruptcy Court and free of the restrictions of the Bankruptcy Code, the

Bankruptcy Rules or the prior orders of the Bankruptcy Court, other than restrictions expressly

imposed by the Plan, the Confirmation Order, provided that the Plan Trust is administered so that

it qualifies as a liquidating trust under Treasury Regulation § 301.7701-4(d).

**10.8    Payment of Plan Trust Expenses.**

The expenses incurred by the Plan Trust or the Plan Trustee during the Plan Period, shall be

paid, or adequate reserves shall be created for the payment of such expenses, prior to any

distribution to the Plan Trust Beneficiaries.

**10.9.  The Plan Trust Distribution System.**

The Plan Trustee shall establish a separate "Distribution Account" for each Group II:

Voluntary Debtor at an FDIC insured bank. Each Group II: Voluntary Debtor's Available Cash,

whether on hand as of the Effective Date or received thereafter, shall be deposited into that Group

II: Voluntary Debtor's Distribution Account. The only exception to this provision shall be in the

case of Net Sales Proceeds that are subject to disputed liens. Such proceeds shall remain in the

applicable Net Sales Proceeds Accounts established to receive the proceeds from the sale of a

particular property. Once all disputes regarding entitlement to the funds in the Net Sales Proceeds

Accounts have been resolved, the proceeds remaining (after the payment of the Allowed Claims

secured by liens on these proceeds) shall be transferred to the Distribution Account. These funds

will then be used to pay the claims of Creditors holding Allowed Claims in their order of priority

as provided for in the Plan.  Persons dealing with the Plan Trustee, or seeking to assert Claims

against the Debtors, the Estates or the Plan Trust, shall look only to property of the Debtors, the

Estates or the Plan Trust to satisfy any liability to such Persons, and the Plan Trustee shall have no

corporate, personal, or individual obligation to satisfy any such liability.

**10.10    The Plan Trustee**.

**10.10.1  Appointment**.  Acquisitions shall be Plan Trustee of the Plan Trust.  The

appointment of the Plan Trustee shall be effective as of the Effective Date.

**10.10.2  Term**.  Unless the Plan Trustee resigns, dissolves or is removed by Court

order earlier, the Plan Trustee's term shall expire upon termination of the Plan Trust pursuant to



the Plan.  In the event the Plan Trustee resigns, dies or is removed by Court order prior to termination of the Plan Trust, the UST shall select and recommend to the Court a successor Plan Trustee.

**10.10.3  Powers and Duties**.  On the Effective Date, the Plan Trustee shall have the rights, powers and duties set forth in the Plan, the Confirmation Order, and Bankruptcy Code §§505, 1107 and 1108.  The Plan Trustee shall be governed in all things by the terms of the Plan and the Confirmation Order.  The Plan Trustee shall administer the Plan Trust in accordance with the Plan.  Without limitation, the Plan Trustee shall file final federal, state, foreign and, to the extent applicable, local, tax returns.  Without further Motion, notice, or order of the Court, the Plan Trustee shall be authorized, empowered and directed to take all actions necessary to comply with the Plan and exercise and fulfill the duties and obligations arising thereunder, including, without limitation to:

i.      employ, retain, and replace one or more attorneys, accountants, auctioneers, brokers, managers, consultants, other professionals, agents, investigators, expert witnesses, consultants, and advisors as necessary to discharge the duties of the Plan Trustee under the Plan;

ii.      control and effectuate the Claims reconciliation process, including to object to, seek to subordinate, compromise or settle any and all Claims against the Debtors pursuant to the terms of the Plan;

iii.      open, maintain and administer bank accounts as necessary to discharge the duties of the Plan Trustee under the Plan;

iv.      make Distributions to the Holders of Allowed Claims in accordance with the Plan;

v.      retain professionals to assist in performing its duties under the Plan;

vi.      pay reasonable and necessary professional fees, costs, and expenses;

vii.      investigate, analyze, commence, prosecute, litigate, compromise, settle, dismiss, and otherwise administer all Causes of Action and Avoidance Actions for the benefit of the Plan Trust and its beneficiaries, as set forth in the Plan, and to take all other necessary and appropriate steps to collect, recover, settle, liquidate, or otherwise reduce to Cash all Causes of

-76-

Action and Avoidance Actions, as the Plan Trustee may determine is in the best interests of the Plan Trust;

viii.    administer, sell, liquidate, or otherwise dispose of the Assets in accordance with the terms of the Plan;

ix.    incur and pay reasonable and necessary expenses in connection with the performance of the Plan Trustee's duties under the Plan;

x.    represent the Estates before the Court and other courts of competent jurisdiction with respect to mattes concerning the Plan Trust;

xi.    seek the examination of any entity under the subject to the provisions of Bankruptcy Rule 2004;

xii.    comply with applicable orders of the court and any other court of competent jurisdiction over the matters set forth in the Plan;

xiii.    comply with all applicable laws and regulations concerning the matters set forth in the Plan;

xiv.    exercise such other powers as may be vested in the Plan Trust pursuant to the Plan, the Confirmation Order, or other Final Orders of the Court.

xv.    execute any documents, instruments, contracts, and agreements necessary and appropriate to carry out the powers and duties of the Plan Trust;

xvi.    (1) seek a determination of tax liability under §505 of the code, (2) pay taxes, if any, related to a Debtor, (3) file, if necessary, any and all tax and information returns r3equired with the respect to the Plan Trust, including, if appropriate, treating the Plan Trust as a "grantor trust" pursuant to Treas. Reg 1.671-4 or otherwise, (4) make tax elections by and on behalf of the Plan Trust, and 95) pay taxes, if any, payable by the Plan Trust; and

xvii.    stand in the shoes of the Debtors for all purposes.

**10.10.4    Retention of Professionals and Compensation Procedure.**

On and after the Effective Date, the Plan Trustee may, without further application or Motion, notice, hearing, or Court order, engage or employ such professionals and experts as may be deemed necessary and appropriate by the Plan Trustee to assist the Plan Trustee in carrying out

MAINDOCS-#163410-v2-SCC_Group_II_VD_DS.DOC

the provisions of the Plan, including, but not limited to, the Professionals retained prior to the Effective Date by either the Debtors or the Committee.  The Plan Trustee may employ such professionals on any reasonable terms and conditions of employment to be determined by the Plan Trustee.  For the services performed on and after the Effective Date, the professionals engaged by the Plan Trustee (the "Plan Trustee Professionals") shall receive reasonable compensation and reimbursement of expenses in a manner to be determined by the Plan Trustee.

### 10.10.5    Fees and Expenses.

Acquisitions shall not receive any compensation for the services it performs as the Plan Trustee, other than the release provided for in the Plan, but shall be entitled to reimbursement of reasonable expenses.  The Plan Trustee Professionals shall be entitled to reasonable compensation for their services, and reimbursement of expenses.  The costs and expenses of the Plan trust (including, without limitation, fees and expenses of the Plan Trustee Professionals) shall be paid from the Plan Trust.  The Plan Trustee shall pay, without further order, notice or application to the Court, the reasonable fees and expenses of the Plan Trustee Professionals, as necessary to discharge the Plan Trustee's duties under the Plan.  The Plan Trustee shall be authorized to reserve funds from the Plan Trust as is reasonable to pay the expenses of the Plan Trustee and the expenses and fees of the Plan Trustee Professionals before making any Distributions under the Plan.

### 10.10.6    Limitation of Liability and Indemnification.

Neither the Plan Trustee nor its employees, Plan Trustee Professionals or agents shall be liable (a) for any loss or damages by reason of any action taken or omitted by him or her, except in the case of fraud, willful misconduct, bad faith, or gross negligence, or (b) for any act or omission made in reliance upon the Debtors' books and records or upon information or advice given to the Plan Trustee by its professionals.  Except as otherwise provided in this Plan, the Plan Trustee shall rely and shall be protected in acting upon any resolution, certificate, statement, instrument, opinion, report, notice, consent, or other document believed by him or her to be genuine and to have been signed by the proper party or parties.

The Plan Trustee and its employees, Plan Trustee Professionals or agents (collectively, the "Indemnified Parties" and each, an "Indemnified Party") shall be indemnified and receive

MAINDOCS-#163410-v2-SCC_Group_II_VD_DS.DOC

reimbursement from and against any and all loss, liability, expense (including attorneys' fees) or damage of any kind, type or nature, which the Indemnified Party may incur or sustain the exercise and performance of any of the Plan Trustee's powers and duties under this Plan or the Confirmation Order, or in the rendering of services by the Indemnified Party to the Plan Trustee, to the full extent permitted by applicable law, except if such loss, liability, expense or damage is finally determined by a court of competent jurisdiction to result from the Plan Trustee's or an Indemnified Person's fraud, willful misconduct, bad faith, or gross negligence.  The amounts necessary for such indemnification and reimbursement shall be paid by the Plan Trustee out of the Plan Trust Asset.  The Plan Trustee shall not be liable for the payment of any Plan Trust expense or claim or other liability of the Plan Trust, and no Person shall look to the Indemnified Parties personally for the payment of any such expense or liability.  This indemnification shall survive the dissolution, resignation or removal, as may be applicable, of the Plan Trustee, or the termination of the Plan Trust, and shall inure to the benefit of the Plan Trustee's and the Indemnified Person's heirs and assigns.

### 10.10.7    Plan Trustee as Successor.

Pursuant to Code §1123(b), the Plan Trustee shall be the successor to the Group II Voluntary Debtors for all purposes.

### 10.11   Beneficiaries

The Holders of Allowed Claims under the Plan, or any successors to such Holders' Allowed Claims ("Beneficiary" or "Beneficiaries") shall own a beneficial interest in the Plan Trust which shall, subject to the Plan, be entitled to a Distribution, if any, in the amounts, and at the times, set forth in the Plan.  Ownership of a beneficial interest in the Plan Trust shall not be evidenced by any certificate, security, or receipt or in any other form or manner whatsoever, except as maintained on the books and records of the Plan Trust by the Plan Trustee.  The ownership of a beneficial interest in the Plan Trust shall not entitle any Beneficiary to any title in or to the Plan Trust assets or to any right to call for a partition or division of such assets or to require an accounting.  The Plan Trustee shall make Distributions, if any, to Beneficiaries in the manner provided in the Plan.

1  The rights of the Beneficiaries arising under the Plan Trust may be deemed "securities"

2  under applicable law.  However, such rights have not been defined as "securities" under the Plan

3  because (a) the intent of the Plan is that such rights shall not be securities, and (b) if the rights

4  arising under the Plan Trust are deemed to be "securities," the exemption from registration under

5  §1145 of the Bankruptcy code is intended to be applicable to such securities.

6       **10.11.10.6.    Claims Estimation Rights**.

7       On the Confirmation Date, the ~~SunCal Proponent~~SunCal Plan Proponents shall be vested

8  with standing to file a motion under 11 U.S.C. § 502(c), and they shall be authorized and

9  empowered to seek in such motion the estimation, for distribution purposes, of any Disputed Claim

10  seeking recourse to, or claiming an interest in, any asset of the Group II: Voluntary Debtors. After

11  the Bankruptcy Court estimates a Disputed Claimant's rights in, or against an asset of the Estates

12  through this procedure, the ~~Committees~~ Plan Trustee shall have the right to use any funds or assets

13  not deemed subject to the rights of the Disputed Claimant, to pay the Allowed Claims under the

14  terms of the Plan, including Allowed Administrative Claims, after the Effective Date.

15       **10.12.10.7.    No Payment of Transfer-Related Fees to the United States Trustee**.

16       The Plan Trust shall not be required to pay any fees to the United States Trustee based on

17  any transfers of the ~~Plan Trust Property~~Plan Trust Asset to the Plan Trust or from the Plan Trust.

18       **10.13.10.8.    No Payment of Transfer-Related Fees to the Trustee**.

19       The Plan Trust shall not be required to pay any fees to the Trustee based on any transfers of

20  ~~Plan Trust Property~~Plan Trust Asset from the ~~Trustee~~ Voluntary Debtors to the Plan Trust, or from

21  the Plan Trust.

22       **10.14.10.9.    Books and Records of Trust**.

23       The Plan Trustee, and to the extent of payments and distributions by any Disbursing Agent,

24  the Disbursing Agent, shall maintain an accounting of receipts and disbursements of the Plan

25  Trust. The Plan Trustee shall maintain the books and records of the Plan Trust, or provide storage

26  for such book and records, for the longer of six (6) years, or while Plan is in existence, provided

27  that the Court may, upon application by the Plan Trustee, authorize the Plan Trust to destroy all of

28  the Plan Trusts books and records at such time as Plan Trust has no further need for such books

1  and records. The Plan Trust's books and records shall be open to inspection at all reasonable times,

2  upon written request by the Committee.

3      **10.15.   Limitations on Liability**.

4      The Plan Trustee shall not be liable for any act it may do or fail to do as the liquidating

5  trustees hereunder while acting in good faith and in the exercise of its best judgment. The Plan

6  Trust shall not be liable in any event for any claims, liabilities or damages based upon or arising

7  out of any conduct of the Plan Trustee in the course of its activities as liquidating trustee, unless

8  such claims, liabilities or damages arise from Plan's gross negligence or willful misconduct.

9      The Plan Trustee, and its officers, directors, agents and employees shall not be liable for

10  any indebtedness, liability or obligation incurred or entered into on behalf of the Plan Trust,

11  including, without limitation, indebtedness, liabilities or obligations under agreements,

12  undertakings or commitments entered into or executed on behalf of Plan Trust by the Plan Trustee

13  or by any person employed by the Plan Trustee or the Plan, it being expressly understood that all

14  such indebtedness, liabilities and obligations of, and claims against the Plan, shall be the sole

15  responsibility of the Plan and shall be satisfied only from the Plan, or such portion thereof as shall,

16  under the terms of any agreement, be stated to be liable therefore. No claim or cause of action may

17  be asserted against the Plan Trustee, or any member of the New Board on account of any

18  indebtedness, liability or obligation entered into on behalf of the Plan, whether by legal or

19  equitable proceedings, or by virtue of any bankruptcy or non-bankruptcy statute, rule or regulation.

20      Any undertaking, contract or agreement entered into in writing by the Plan Trustee may,

21  except as otherwise provided by the Plan or the Plan Trust Agreement, expressly disclaim the

22  personal liability of Plan Trustee.

23      ~~10.16.~~10.10.   **Federal Income Tax Treatment of the Holders of the Plan Trust**

24          **Beneficial Interests**.

25      For all United States federal income tax purposes, the transfers by the Group II: Voluntary

26  Debtors shall be treated by the Group II: Voluntary Debtors, their estates, the Plan Trust and the

27  Plan Trust Beneficiaries as a transfer of the ~~Plan Trust Property~~Plan Trust Asset by the Group II:

28  Voluntary Debtors to the Plan Trust Beneficiaries followed by a transfer of the ~~Plan Trust~~

1  ~~Property~~Plan Trust Asset by such the Plan Trust Beneficiaries to the Trust. The Plan Trust

2  Beneficiaries shall be treated as the grantors and deemed owners of the Plan Trust for United

3  States federal income tax purposes. The Plan Trust Trustee and the Plan Trust Beneficiaries are

4  required to value their interests in the ~~Plan Trust Property~~Plan Trust Asset consistently with the

5  values placed upon the ~~Plan Trust Property~~Plan Trust Asset by the Plan Trust, and to use such

6  valuations for all purposes. The Plan Trust ~~Agreement~~ shall provide for consistent valuations of the

7  ~~Plan Trust Property~~Plan Trust Asset by the Plan Trust Trustee and the Plan Trust Beneficiaries, and

8  shall provide that the Plan Trust will determine the fair market value of the ~~Plan Trust~~

9  ~~Property~~Plan Trust Asset within thirty (30) days after the Effective Date, and send such

10  determination to each the Plan Trust Beneficiary. By its acceptance of a the Beneficial Interest,

11  each recipient of such an interest will be conclusively deemed to agree to use such valuations for

12  all purposes, including, without limitation, in computing any gain recognized upon the exchange of

13  such holder's claim for purposes of determining any United States Federal income tax, and shall be

14  required to include those items of income, deductions and tax credits that are attributable to its the

15  Beneficial Interest in computing its taxable income.

16      ~~10.17.~~10.11.   **Termination of the Trust**.

17      The Plan Trust shall continue in effect until the earlier of: (a) the date that all the ~~Plan Trust~~

18  ~~Property~~Plan Trust Asset has been liquidated, all proceeds have been converted to cash or

19  distributed in kind, all the Plan Trust Expenses have been paid, all claims to be paid under the Plan

20  for which the Plan Trust Trustee is obligated to make distributions on have been paid, all

21  distributions to be made with respect to the Beneficial Interests have been made, all litigation to

22  which the Plan Trust is a party have been concluded by dismissal or an order issued by the court in

23  which such litigation is pending and such order has become "final" (consistent with the definition

24  of Final Order in this Plan for orders issued by the Bankruptcy Court), and the Chapter 11 Case has

25  been closed; and (b) the expiration of five (5) years from the Effective Date; provided, however,

26  that the Plan Trust may request the Bankruptcy Court to extend the permitted life of the Plan Trust

27  for such additional period as is reasonably necessary to conclude the liquidation and distributions,

28  not to exceed a total of ten (10) years from the Effective Date, which request shall be filed so the

1   Bankruptcy Court may consider and rule on the request within six (6) months prior to the

2   expiration of the initial five-year term.

3   ~~10.18.~~10.12.    **Exemption from Certain Transfer Taxes**.

4   In accordance with Section 1146(~~a~~e) of the Bankruptcy Code, the issuance, transfer or

5   exchange of a security or the making or delivery of an instrument of transfer under this Plan may

6   not be taxed under any law imposing a stamp tax or similar tax. All governmental officials and

7   agents shall forego the assessment and collection of any such tax or governmental assessment and

8   shall accept for filing and recordation any of the foregoing instruments or other documents without

9   payment of such tax or other governmental assessment.

10   ~~10.19.~~10.13.    **Tax Consequence of The Plan**.

11   The implementation of the Plan may have federal, state and local tax consequences to the

12   Group II: Voluntary Debtors, Creditors and Interest Holders.  No tax opinion has been sought or will

13   be obtained with respect to any tax consequences of the Plan. This Disclosure Statement does not

14   constitute and is not intended to constitute either a tax opinion or tax advice to any person, and the

15   summary contained herein is provided for informational purposes only.

16   CREDITORS AND INTEREST HOLDERS ARE ADVISED TO CONSULT WITH THEIR

17   OWN TAX ADVISORS REGARDING THE TAX CONSEQUENCES TO THEM AND TO THE

18   DEBTOR OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING

19   FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES.

20   **10.20   The Plan Sponsor**.

21   The Plan Sponsor shall be Acquisitions.

22   **10.21.  Acquisitions' Obligations**.

23   As part of its obligations as the Plan Sponsor, Acquisitions will manage the affairs of the

24   Plan Trust and manage the payment of the following amounts required under the Plan:

25   (a)    All Allowed Administrative Claims;

26   (b)    Allowed Priority Claims; and

27   (c)    Continuing Professional fees for the prosecution of the Litigation Claims and

28   other post-confirmation expenses

1    In exchange for the above referenced services, Acquisitions, and all of its Affiliates

2    shall receive a complete release from all of the Debtors, the Estates, and the Plan

3    Trust of any potential Litigation Claims. The Group II: Voluntary Debtors consider

4    this a fair exchange, because they do not believe that they hold any material claims

5    against Acquisitions.

6    **10.22.  The Committee(s).**

7    On the Effective Date, the Voluntary Debtors Committee(s) shall continue to serve their

8    applicable Debtors as Committees to the applicable reorganized Debtors, subject to the

9    followingPlan Trust:

10    **10.22.1  Duties and Powers.**

11    The duties of the Committees after the Effective Date shall be limited to monitoring the

12    Plan's implementation, joint decision-making authority on a settlement of the Lehman Adversary

13    Proceeding, and standing to object to any settlement of any Litigation Claim in excess of $100,000,

14    and standing to object to any proposed sales procedures on sale of the Debtors' Projects and

15    standing to file, prosecute and resolve objections to Claims filed by Insiders that arethe SunCal

16    Affiliates.  The Committee shall receive notice of and the right to review all payments and

17    Distributions.

18    The Voluntary Debtors Committees shall be entitled to retain, employ and compensate

19    Professionals, in order to assist with the obligations and rights of the Committees under the terms

20    of the Plan.  Such compensation shall be paid from the applicable Distribution Account(s).

21    **10.22.2  Dissolution of Committees.**

22    The Committees shall be dissolved upon the entry of an order converting, closing or

23    dismissing the Chapter 11 Cases or entry of a final decree in the Chapter 11 Cases.  On dissolution,

24    the Confirmation Committees shall have no other or further obligations or responsibilities on

25    behalf of the Plan Trust.

26    **10.23.  Litigation Claims.**

27    Pursuant to Section 1123(b)(3) of the Bankruptcy Code, the Plan Trust shall retain all

28    Litigation Claims whether or not pending on the Effective Date that are not purchased by LitCo.

Unless a Litigation Claim is expressly waived, relinquished, released, compromised or settled in the Plan or in a Final Order, all rights with respect to such Litigation Claims are reserved and the Plan Trustee and the Committees  (in the case of Avoidance Actions) may pursue such Litigation Claims.  Notwithstanding the foregoing, the Plan Trustee and the Committees shall not settle or abandon a Litigation Claim valued at greater than $100,000 except upon ten (10) days' prior written notice and opportunity to object to one or another.  Any disputes concerning the settlement or abandonment of a Litigation Claim shall be submitted to the Bankruptcy Court for resolution on no less than ten (10) days' notice to the objecting party.

### 10.24.  Collection of Litigation Recoveries.

All Litigation Recoveries realized or obtained by the Plan Trustee ~~and/or the Committee(s)~~ shall be promptly deposited into the applicable Distribution Account(s).  Except as otherwise provided in the Plan and the Confirmation Order, the Litigation Recoveries shall be free and clear of all Claims and Liens and shall only be expended in accordance with the provisions of the Plan.

### 10.25.  Dissolution of the Group II: Voluntary Debtors.

On the Effective Date, each of the Group II: Voluntary Debtors shall be deemed dissolved for all purposes without the necessity for any other further actions to be taken by or on behalf of such Debtors or payments to be made in connection therewith.

### XI.

### RISK FACTORS

### 11.1    Plan Risks.

The Plan in this case, like any Chapter 11 reorganization plan, includes a number of risks that creditors should be aware of prior to voting on the Plan. The more material of these risks are summarized below.

#### 11.1.1  The Plan May Not Be Accepted or Confirmed.

While the ~~SunCal Proponent~~SunCal Plan Proponents believe that the Plan is confirmable under the standards set forth in 11 U.S.C. § 1129, there can be no guarantee that the Bankruptcy Court will find the Plan to be confirmable. If the Plan is not confirmed, it is possible that an alternative plan can be negotiated and presented to the Bankruptcy Court for approval;

however, there can be no assurance that any alternative plan would be confirmed, that the Chapter 11 Cases would not be converted to a liquidation, or that any alternative plan of reorganization could or would be formulated on terms as favorable to the Creditors and holders of Equity Interests as the terms of the Plan.

**11.1.2   Failure to Sell The ~~Group II Project~~Group II: Voluntary Debtors Projects**.

The Plan is based upon the assumption that the SunCal Plan Proponents will be able to close the sale of the ~~Group II Project~~Group II: Voluntary Debtors Projects for at least Minimum Sales Prices on the Effective Date. Although the ~~SunCal Proponent~~SunCal Plan Proponents are confident that they can achieve sales at these prices based upon their market research and familiarity with the projects, a possibility exists that these sales will not occur. If this occurs then the creditors holding liens against the ~~Group II Project~~Group II: Voluntary Debtors Projects will be entitled to seek recourse against these properties, and this recourse would include foreclosure.

**XII.**

**DISTRIBUTIONS**

**12.1   Distribution Agent.**

Acquisitions shall serve as the Distribution Agent for distributions due under the Plan.  The Distribution Agent may employ one or more sub agents on such terms and conditions as it may agree in its discretion and pay such sub agent as a Post Confirmation Expense from the Distribution Accounts.  The Distribution Agent shall not be required to provide any bond in connection with the making of any Distributions pursuant to the Plan.

**12.2   Distributions.**

**12.2.1   Dates of Distributions.**

Any distribution required to be made on the Effective Date shall be deemed timely if made as soon as practicable after such date and, in any event, within thirty (30) days after such date.  Any distribution required to be made upon a Disputed Claim becoming an Allowed Claim and no longer being a Disputed Claim shall be deemed timely if made as soon as practicable thereafter.

### 12.2.2    Limitation on Liability.

Neither the Plan Sponsor, the Plan Trustee, the Distribution Agent, their Affiliates, nor any of their employees, members, officers, directors, agents, or professionals or Affiliates shall be liable for (i) any acts or omissions (except for gross negligence or willful misconduct) in connection with implementing the Distribution provisions of the Plan and the making or withholding of Distributions pursuant to the Plan, or (ii) any change in the value of distributions made pursuant to the Plan resulting from any delays in making such distributions in accordance with the Plan's terms (including but not limited to any delays caused by the resolution of Disputed Claims).

### 12.3    Old Instruments and Securities.

### 12.3.1    Surrender and Cancellation of Instruments and Securities.

As a condition to receiving any distribution pursuant to the Plan, each Person holding any note or other instrument or security (collectively "Instruments or Securities" and individually an "Instrument or Security") evidencing, an existing Claim(s) against the Debtor(s) must surrender such Instrument or Security to the Distribution Agent.

### 12.3.2    Cancellation of Liens.

Except as otherwise provided in the Plan, any Lien securing any Secured Claim shall be deemed released and discharged, and the Person holding such Secured Claim shall be authorized and directed to release any collateral or other property of the Debtors (including, without limitation, any cash collateral) held by such Person and to take such actions as may be requested by the Plan Trustee to evidence the release of such Lien, including, without limitation, the execution, delivery and Filing or recording of such releases as may be requested by the Plan Trustee.

### 12.3.3    De Minimis Distributions and Fractional Shares.

No Cash payment of less than ten dollars ($10) shall be made by the Plan Trust to any Holder of Claims unless a request therefore is made in writing to the Plan Trust.  Whenever payment of a fraction of a cent would otherwise be called for, the actual payment shall reflect a rounding down of such fraction to the nearest whole cent.  Any Cash or other property that is not

MAINDOCS-#163410-v2-SCC_Group_II_VD_DS.DOC

1  distributed as a consequence of this section shall, after the last distribution on account of Allowed

2  Claims in the applicable Class, be treated as "Unclaimed Property" under the Plan.

3                    **12.3.4      Delivery of Distributions.**

4          Except as provided in the Plan with respect to Unclaimed Property, distributions to Holders

5  of Allowed Claims and Allowed Administrative Claims shall be distributed by mail as follows:  (1)

6  with respect to each Holder of an Allowed Claim that has filed a Proof of Claim, at the address for

7  such Holder as maintained by the official claims agent for the Debtors; (2) with respect to each

8  Holder of an Allowed Claim that has not filed a Proof of Claim, at the address reflected on the

9  Schedules filed by the Debtors, provided, however, that if the Debtors or the Plan Trust has

10 received a written notice of a change of address for such Holder, the address set forth in such

11 notice shall be used; or (3) with respect to each Holder of an Allowed Administrative Claim, at

12 such address as the Holder may specify in writing.

13                   **12.3.5      Undeliverable Distributions.**

14         If the Distribution of Cash to the Holder of any Allowed Claim is returned to the Plan

15 Trustee as undeliverable or the Distribution check is not negotiated within 90 days of mailing (any

16 such distribution being hereinafter referred to as "Unclaimed Property"), no further distribution

17 shall be made to such Holder unless and until the Plan Trustee is notified in writing of such

18 Holder's then current address.  Subject to the remainder of this Section and the following section,

19 Unclaimed Property shall remain in the possession of the Plan Trustee pursuant to this Section, and

20 shall be set aside and (in the case of Cash) held in a segregated interest bearing account (as to Cash

21 Unclaimed Property) to be maintained by the Distribution Agent until such time as the subject

22 Distribution becomes deliverable.  Nothing contained in the Plan shall require the Plan Trustee or

23 any other Person to attempt to locate such Person.

24                   **12.3.6      Disposition of Unclaimed Property.**

25         If the Person entitled thereto notifies the Plan Trustee of such Person's Claim to a

26 Distribution of Unclaimed Property within ninety (90) days following such Person's initial

27 Distribution Date, Effective Date, the Unclaimed Property distributable to such Person, together

28 with any interest or dividends earned thereon, shall be paid or distributed to such Person as soon as

1    practicable.  Any Holder of an Allowed Claim that does not assert a Claim in writing for

2    Unclaimed Property held by the Plan Trustee within ninety (90) days after the Holder's initial

3    Distribution Date shall no longer have any Claim to or Interest in such Unclaimed Property, and

4    shall be forever barred from receiving any distributions under the Plan or otherwise from the Plan

5    Trustee.  In such cases, any property held for Distribution on account of such Claims shall become

6    Available Cash and deposited into the Distribution Account.

7                                        **XIII.**

8                  **OBJECTIONS TO CLAIMS AND DISPUTED CLAIMS**

9         **13.1    Standing for Objections to Claims.**

10        The Plan Trustee shall have the sole and exclusive right to file, prosecute and resolve

11   objections to Claims other than to the right to object to the claims of SunCal Affiliates, which shall

12   be vested with the applicable Committee.  The applicable Committee shall have standing to object

13   to any settlement of any Litigation Claim in excess of $100,000 and standing to object to any

14   proposed sales procedures and sale of the Debtors' Projects.The Plan Trustee shall have the sole

15   and exclusive right to file, prosecute and resolve objections to Claims, excluding Claims filed by

16   Insiders that are SunCal Affiliates.  The Committee shall have the sole and exclusive right to file,

17   prosecute and resolve objections to Claims filed by Insiders that are SunCal Affiliates.

18

19        Any objection to a Claim shall be Filed with the Bankruptcy Court and served on the Person

20   holding such Claim on or before the applicable Claims Objection Deadline.  The Plan Trustee shall

21   have the right to petition the Bankruptcy Court, without notice or a hearing, for an extension of the

22   Claims Objection Deadline if a complete review of all Claims cannot be completed by such date.

23        **13.2    Treatment of Disputed Claims and Disputed Liens.**

24              **13.2.1  No Distribution Pending Allowance.**

25        If any portion of a Claim or Lien is a Disputed Claim or Disputed Lien, no payment

26   or distribution provided for under the Plan shall be made on account of such Claim or Lien unless

27   and until such Claim or Lien becomes an Allowed Claim and/or Allowed Lien.

28              **13.2.2  Distribution After Allowance.**

-89-

On the next Distribution Date following the date on which a Disputed Claim becomes an Allowed Claim and is no longer a Disputed Claim, the Distribution Agent shall distribute to the Person holding such Claim any Cash that would have been distributable to such Person if on the initial Distribution Date such Claim had been an Allowed Claim and not a Disputed Claim.

### 13.2.3  Reserves for Disputed Claims

In the event that Disputed Claims are pending at the time of a Distribution under the Plan, the Plan Trustee shall establish and maintain a reserve for such Disputed Claims.  For purposes of establishing a reserve, Cash will be set aside equal to the amount that would have been distributed to the Holders of the Disputed Claims had the Disputed Claims been Allowed on the date a Distribution is made to the Holders of Allowed Claims in the same Class or of the same priority as the Disputed Claims.  If a Disputed Claim ultimately becomes an Allowed Claim, the amount of Cash reserved for that Disputed Claim shall be distributed on the earlier of (a) the distributed Date following the date when the Disputed Claim becomes an Allowed Claim, or (b) ninety (90) days after such Disputed Claim becomes an Allowed Claim.  Any reserved Cash not ultimately distributed to the Holder of a Disputed Claim because the Disputed Claim does not become an Allowed Claim shall become property of the Plan Trust and shall be distributed in accordance with the terms of the Plan.

## XIV.

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 14.1    Executory Contracts to be Assumed and Assigned

Under the Plans, the Group II: Voluntary Debtors Projects will be sold.  As a result, the Group II: Voluntary Debtors will assume only those executory contracts and unexpired leases to be assigned to the Winning Bidder with respect to the applicable Project.

On the Effective Date, the executory contracts and unexpired leases identified on the Schedule of Assumed and Assigned Agreements attached or to be attached hereto as Exhibit "9" or filed or to be filed as Exhibit "9" to this document shall be deemed assumed and assigned to the

applicable Winning Bidder, as specified in the Confirmation Order.  The SunCal Plan Proponents intend to file the Schedule of Assumed and Assigned Agreements with the Court no later than _____ (___) days prior to the Confirmation Hearing.  The Schedule of Assumed and Assigned Agreements also identifies or will identify any amounts that must be paid to cure defaults under the executory contacts and unexpired leases to be assumed and assigned under the Plan (the "Cure Amount").  If filed earlier, the SunCal Plan Proponents reserve the right to amend the Schedule of Assumed Agreements up to _____ (___) days prior to the Confirmation Hearing (_____, 2011) to: (a) add any executory contract or unexpired lease and provide for its assumption and assignment; or (b) modify the Cure Amount for any particular executory contract or unexpired lease.  The SunCal Plan Proponents further reserve the right to amend the Schedule of Assumed Agreements to delete any executory contract or unexpired lease and provide for its rejection at any time prior to the Confirmation Hearing.  The SunCal Plan Proponents will provide notice of any amendment to the Schedule of Assumed and Assigned Agreements to any party or parties to the executory contracts or unexpired leases affected by the amendment.  Absent a timely objection as provided below, the Confirmation Order will constitute a Court Order approving the assumption and assignment, on the Effective Date, of the executory contracts and unexpired leases then identified on the Schedule of Assumed and Assigned Agreements, and shall constitute a final determination of the Cure Amount and that the estate has shown adequate assurance of future performance.  Furthermore, any Cure Amount ordered by the Court, through entry of the Confirmation Order, and paid shall be deemed to satisfy any and all defaults arising from, out of or related to the executory contract of unexpired lease, including any tort claims that were or could be asserted by the non-debtor party to the contract or lease on or prior to the entry of the Confirmation Order, and all actual or pecuniary losses that have resulted from such defaults.

      If you are a party to an executory contract or unexpired lease to be assumed and assigned and you object to the assumption and assignment of your lease or contract and/or you dispute the Cure Amount related to your lease or contract, then you must File and serve upon counsels for the SunCal Plan Proponents (at the address on the upper left hand corner of the caption page) a written objection by _____, 2011.  An objection to the Cure Amount must also set forth the amount you

contend to be the correct Cure Amount and contain evidence to support such amount.  Failure to timely File an objection as provided herein shall be deemed consent to the proposed assumption and assignment and to the Cure Amount and a waiver of any and all rights to challenge such assumption and assignment and the Cure Amount.

With respect to each executory contract and unexpired lease identified on the Schedule of Assumed and Assigned Agreements, if no dispute arises regarding the Cure Amount, adequate assurances, or some other matter related to the assumption of the executory contact or unexpired lease, then the Cure Amount set forth in the schedule of Assumed and Assigned Agreements shall be paid to the applicable non-debtor party in Cash on the Effective Date or as soon as reasonably practicable thereafter.  If a dispute arises regarding (a) whether the proposed assignee has provided adequate assurance of future performance of an executory contract or unexpired lease to be assumed, or (b) any other matter pertaining to a proposed assumption and assignment, the Cure Amount will be paid on the later of (1) the Effective Date or as soon as practicable thereafter, or (2) within thirty (30) days after entry of a Final order resolving the dispute and approving the assumption and assignment; provided, however, if a dispute arises regarding any of the foregoing, the SunCal Plan Proponents reserve, for themselves and the Plan Trustee, the right to completely forego assumption and assignment of and, instead, reject the subject executory contract or unexpired lease.

If a party to an executory contract or unexpired lease identified on the Schedule of Assumed and Assigned Agreements Files an objection disputing the Cure Amount, then the SunCal Plan Proponents may amend the Schedule of Assumed and Assigned Agreements at any time prior to the Confirmation Hearing to delete the subject executory contract or unexpired lease and provide for its rejection.  Executory contracts or unexpired leases not so deleted shall be conditionally assumed, subject to the SunCal Plan Proponents' and/or the Plan Trustee's right to file a Motion to determine the appropriate Cure Amount up to the first (1st) Business Day that is at least sixty (60) days following the Effective Date.  The SunCal Plan Proponents and/or the Plan Trustee will serve any such Motion on the party to the executory contract or unexpired lease affected by the Motion (or its attorneys, if any).  If the SunCal Plan Proponents and Plan Trustee

MAINDOCS-#163410-v2-SCC_Group_II_VD_DS.DOC

does not file a Motion to determine the appropriate Cure Amount, then the executory contract or unexpired lease shall be assumed and assigned, as of the Effective Date, and the Cure Amount shall be the alternative Cure Amount asserted by the non-debtor party to the subject executory contract or unexpired lease in its objection to the Plan.  The Cure Amount shall be paid as soon as reasonably practicable following the expiration of the 60-day deadline.

If the SunCal Plan Proponents or the Plan Trustee files a Motion to determine the appropriate Cure Amount, then the SunCal Plan Proponents and/or Plan Trust shall have the right to amend the Schedule of Assume and Assigned Agreements to completely forego assumption and assignment of and, instead, reject the subject executory contract or unexpired lease up to the first (1st) Business Day that is at least fifteen (15) days after the entry of an order fixing the Cure Amount.  The SunCal Plan Proponents and/or Plan Trustee will provide notice of any amendment to the Schedule of Assumed and Assigned Agreements to the party to the executory contract or unexpired lease affected by the amendment.  If the SunCal Plan Proponents and/or Plan Trustee has filed such a Motion and does not timely amend the Schedule of Assumed and Assigned Agreements within fifteen (15) days after entry of an order fixing the Cure Amount, then the executory contract or unexpired lease shall be assumed and assigned, as of the Effective Date, and the Cure Amount shall be fixed as the Cure Amount ordered by the Court.  The Cure Amount as soon as reasonably practicable following the expiration of the 15-day deadline.

**14.2    Executory Contracts to be Rejected**

On the Effective Date, the estate will be deemed to have rejected any and all executory contacts and unexpired leases not identified on the Schedule of Assumed and Assigned Agreements attached or to be attached hereto as Exhibit "9," or filed or to be filed as Exhibit "9" to this document.  The Confirmation Order will constitute a Court order approving the rejection, as of the Effective Date, of such executory contacts and unexpired leases.  Any Claim for damages arising from the rejection under the Plan of any executory contract or unexpired lease must be filed with the Court and served upon the SunCal Plan Proponents and the Plan Trustee within thirty (30) days of the later of (a) the Confirmation Date, and (b) the Plan Trustee's amendment of the Schedule of Assumed and Assigned Agreements to eliminate the executory contract or unexpired

1  lease.  Any such damage Claims that are not timely filed and served will be forever barred and

2  unenforceable against the applicable Debtors, the Estates, the Plan Trustee, the Plan Trust, and

3  their respective property.  Persons holding these Claims who fail to timely file claims will be

4  barred from receiving any Distributions under the Plan on account of their rejection damage

5  Claims.

6       If you are a party to a lease or contract to be rejected and you object to the rejection of your

7  lease or contract, then you must file and serve your objection by _____.

8  **14.1    Executory Contracts.**

9  The SunCal ProponentSunCal Plan Proponents shall provide a list of those contracts that are being

10  assumed or rejected under the Plan in the Plan supplement. However, this list may be amended at

11  any time prior to the Effective Date.  All contracts or leases not assumed by the Effective Date

12  shall be deemed rejected.

13  **14.2    Bar Date for Rejection Damages.**

14  Any Claim arising out of the rejection of an executory contract or unexpired lease shall be forever

15  barred and shall not be enforceable against the Debtors, the Plan Trust, their Affiliates, their

16  successors, or their properties, and shall not be entitled to any distribution under the Plan, unless a

17  Proof of Claim for such Claim is filed and served on the Debtors, or the Plan Trust within thirty

18  (30) days after the receipt of a notice of the rejection of any contract or lease.

19  **Changes in Rates Subject to Regulatory Commission Approval.**

20  The Debtors are not subject to governmental regulatory commission approval of their rates.

21                                    **XV.**

22             **BEST INTEREST OF CREDITORS TEST AND PLAN FEASIBILITY**

23         **15.1    Best Interests Test.**

24         Pursuant to Section 1129(a)(7) of the Bankruptcy Code, a Plan cannot be confirmed unless

25  the Bankruptcy Court determines that Distributions under the Plan to all Holders of Claims and

26  Interests who have not accepted the plan and whose Claims are classified in Classes that are

27  impaired under the plan, are not less than those which they would receive in a liquidation under

28  Chapter 7 of the Bankruptcy Code.

MAINDOCS-#163410-v2-SCC_Group_II_VD_DS.DOC

The Best Interest of Creditors Test must be satisfied even if the Plan is accepted by each impaired Class of Claims and if any Holder of an Allowed Claim objects to the Plan on such basis. The Best Interests Test requires the Bankruptcy Court to find either that either (i) <u>all</u> Holders of Claims in an impaired Class of Claims have accepted the Plan or (ii) the Plan provides each Holder of Allowed Claims of an impaired Class who has not accepted the Plan with a recovery of property of a value, as of the effective date of the Plan, that is not less than the amount that such Holder would receive if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code.

The Plan proposed by the Plan Proponents is essentially a liquidating plan. It provides for the sale of all assets of the estate for their fair market value, the collection or recovery of all other assets, and for the distribution of the resulting net proceeds from the sale, in accordance with the priorities provided for in the bankruptcy code and under California law. A Chapter 7 trustee appointed in this case would be compelled to liquidate the Debtors' assets in the same manner as provided for in the Plan and to pay out the proceeds in the same manner as provided for in the Plan. Accordingly, under the terms of the Plan, each individual creditor is receiving "at least as much" as such creditor would receive in a Chapter 7 case, which is all that is required under the Best Interests Test.

~~Although the Lehman Entities will argue that they are being denied their "credit bid" rights under the Plan, and this reduces their distribution below the level that they would receive in a Chapter 7 case, this argument fails. A credit bid right does not add or reduce the value of a creditor's collateral, it simply allows a creditor holding such a right to bid against other bidders using its debt as "credit", rather than bidding in cash. If the creditor's collateral is sold for its "fair market value," in cash, and the creditor receives what it is entitled to from the sales proceeds, then the creditor is necessarily receiving exactly what it would receive in a Chapter 7. This is all that the Best Interest Test Requires. See Exhibit "7" hereto.~~

### 15.2    <u>Feasibility</u>.

In addition, in order to confirm the Plan, the Bankruptcy Court must find that confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor(s). This requirement is imposed by Section 1129(a)(11) of the

1    Bankruptcy Code and is generally referred to as the "feasibility" requirement. As explained above,

2    the Debtors' Plan provides for the sale of all assets of their respective estates and for the

3    distribution of the proceeds. Within the context of this Plan, feasibility is limited to having

4    sufficient funds to pay administrative and priority claims on the Effective Date and sufficient funds

5    to fund the sale of the Properties.

6         Under timeline provided for in the Plan, the ~~Group II Project~~Group II: Voluntary Debtors

7    Projects will be sold within thirty (30) days of~~on~~ the Effective Date. These sales will provide the

8    Debtors the means to pay all claims, including allowed administrative and priority claims on this

9    same date, from escrow. All remaining claimants will then receive what they are entitled under the

10   Plan when their claims are allowed.

11   **XVI.**

12   **LIMITATION OF LIABILITY**

13   **16.1    No Liability for Solicitation or Participation.**

14        As specified in Section 1125(e) of the Bankruptcy Code, entities that solicit acceptances or

15   rejections of the Plan and/or that participate in the offer, issuance, sale, or purchase of securities

16   offered or sold under the Plan, in good faith and in compliance with the applicable provisions of

17   the Bankruptcy Code, shall not be liable, on account of such solicitation or participation, for

18   violation of any applicable law, rule, or regulation governing the solicitation of acceptances or

19   rejections of the Plan or the offer, issuance, sale, or purchase of securities.

20   **XVII.**

21   **CONDITIONS TO CONFIRMATION AND**

22   **EFFECTIVENESS OF THE PLAN**

23   **17.1    Conditions Precedent to Plan Confirmation.**

24        The only condition precedent to confirmation of the Plan is that the Bankruptcy Court shall

25   have entered a Confirmation Order in form and substance reasonably acceptable to the SunCal Plan

26   Proponents.

27   **17.2    Conditions Precedent to Plan Effectiveness.**

28

1    The conditions precedent to the effectiveness of the Plan and the occurrence of the

2    Effective Date is that the Confirmation Order shall be a Final Order in form and substance

3    reasonably satisfactory to the SunCal Plan Proponents, and the resolutions of any material

4    impairment of the Plan terms caused by the automatic stays applicable in the Lehman Entities

5    cases. The automatic stay in the Debtors cases shall continue to be applicable until the Effective

6    Date.

7    **XVIII.**

8    **RETENTION OF JURISDICTION**

9    Notwithstanding the entry of the Confirmation Order or the occurrence of the Effective

10   Date, the Bankruptcy Court shall not be limited under the Plan and the Bankruptcy Court's

11   jurisdiction shall apply to the fullest extent possible under applicable law.  The Court will retain

12   exclusive jurisdiction during the Plan payout period to resolve disputes and conflicts arising from

13   the administration of the Plan, upon request of a party-in-interest and after notice and a hearing,

14   including, without limitation:

15        a.    The adjudication of the validity, scope, classification, allowance, and disallowance

16   of any Claim;

17        b.    The estimation of any Claim;

18        c.    The allowance or disallowance of Professional-Fee Claims, compensation, or other

19   Administrative Expense Claims;

20        d.    To her and determine Claims concerning taxes pursuant to Bankruptcy Code §§

21   346, 505, 525, and 1146;

22        e.    To hear and determine any action or proceeding brought under Bankruptcy Code

23   §§108, 510, 543, 544, 545, 547, 548, 549, 550, 551 and 553;

24        f.    To hear and determine all actions and proceedings which relate to pre-confirmation

25   matters;

26        g.    To hear and determine any issue relating to the assumption or rejection of executory

27   contracts and unexpired leases;

28

h.      To hear and determine any modification to the plan in accordance with the Bankruptcy Rules and Bankruptcy Code;

i.      To enforce and interpret the terms of the Plan;

j.      To correct any defects, cure any omissions, or reconcile any inconsistency in the Plan or the Confirmation Order as may be necessary to carry out the purpose and intent of the Plan;

k.      the entry of any order, including injunctions, necessary to enforce title, rights and powers of the Plan Trust, and to impose such limitations, restrictions, terms and conditions on such title, rights and powers as the Court may deem necessary including, without limitation, any right of the Plan Trust to recover and liquidate assets;

l.      To determine the validity, extent and priority of all liens and security interests against property of the Estates or the Plan trust;

m.      To hear and resolve any disputes regarding employment applications and professional fees;

n.      To her and determine such matters and make such orders as are consistent with the Plan as may be necessary to carry out the provisions thereof and to adjudicate any disputes arising under or relating to any order entered by the Court in these Cases;

o.      The entry of an order concluding and terminating these Cases; and

p.      To resolve any disputes as to whether there has been a default under the Plan.

### XIX.

### MODIFICATION OR WITHDRAWAL OF THE PLAN

**19.1    Modification of Plan.**

At any time prior to confirmation of the Plan, the former Debtor(s) may supplement, amend or modify the Plan.  After confirmation of the Plan,  the Debtors or Plan Trustee may (x) apply to the Bankruptcy Court, pursuant to Section 1127 of the Bankruptcy Code, to modify the Plan; and (y) apply to the Bankruptcy Court to remedy defects or omissions in the Plan or to reconcile inconsistencies in the Plan.

**19.2    Nonconsensual Confirmation.**

1    In the event that any impaired Class of Claims or Interests shall fail to accept the Plan in

2  accordance with Section 1129(a)(8) of the Bankruptcy Code, SunCal Plan Proponents (i) may

3  request that the Bankruptcy Court confirm the Plan in accordance with Section 1129(b) of the

4  Bankruptcy Code, and (ii) in accordance with Section 16.1 of the Plan, and may modify the Plan in

5  accordance with Section 1127(a) of the Bankruptcy Code.

6                                      XX.

7                          **EFFECT OF CONFIRMATION**

8        **20.1    Discharge.**

9        Confirmation of the Plan does not discharge the Group II: Voluntary Debtors as set forth in

10  Bankruptcy Code §1141.

11       **20.2    Revesting of the Assets.**

12       The Assets shall not be vested in the Group II: Voluntary Debtors on or following the

13  Effective Date, but shall be vested in the Plan Trust and continue to be subject to the jurisdiction of

14  the Court following confirmation of the Plan until such Assets are distributed to the Holders of

15  Allowed Claims in accordance with the provisions of the Plan.

16       **20.3    Exculpation and Releases**

17       Effective upon the entry of the Confirmation Order, neither the Group II: Voluntary

18  Debtors, the Committees, Plan Sponsor, the SunCal Plan Proponents, the Professionals, nor any of

19  their respective members, officers, directors, shareholders, employees, or agents, shall have or

20  incur any liability to any Person, including any creditors or Interest Holder of the Debtors, for any

21  act taken or omission made in connection with or related to the negotiation, formulation, or

22  preparation of the Plan and the Disclosure Statement, the approval of the Disclosure Statement, the

23  confirmation of the Plan, the consummation of the Plan, or the administration of the Plan, the

24  Cases, or the property to be distributed under the Plan, to the fullest extent permitted by applicable

25  statues and case law, except that the Plan Trust will be liable for the performance of obligations

26  assumed by it or imposed upon it under or by the Plan.

27                                      **XXI.**

28                          **MISCELLANEOUS**

### 21.1.  Payment of Statutory Fees.

All quarterly fees due and payable to the Office of the United States Trustee pursuant to Section 1930(a)(6) of title 28 of the United States Code shall be paid in full on or before the Effective Date, or, to the extent such quarterly fees are disputed, an adequate reserve shall have been established and set aside for payment in full thereof, as required by Section 1129(a)(12) of the Bankruptcy Code.  The Plan Trustee shall remain responsible for timely payment of quarterly fees due and payable after the Effective Date and until the Debtors' Cases are closed, to the extent required by Section 1930(a)(6) of title 28 of the United States Code.

### 21.2.  Payment Dates.

Whenever any payment or distribution to be made under the Plan shall be due on a day other than a Business Day, such payment or distribution shall instead be made, without interest, on the immediately following Business Day.

### 21.3.  Headings.

The headings used in this Disclosure Statement and in the Plan are inserted for convenience only and neither constitutes a portion of this Disclosure Statement or the Plan nor in any manner affect the construction of the provisions of this Disclosure Statement or the Plan.

### 21.4.  Other Documents and Actions.

The Plan Trustee may execute such other documents and take such other actions as may be necessary or appropriate to effectuate the transactions contemplated under the Plan.

### 21.5.  Notices.

All notices and requests in connection with this Disclosure Statement and the Plan shall be in writing and shall be hand delivered or sent by mail addressed to:

> **To the SunCal Plan Proponents**:
> Bruce V. Cook
> General Counsel
> Authorized Agent of the SunCal Plan Proponents
> 2392 Morse Ave
> Irvine, CA 92614-6234
>
> **With copies to:**
> Paul J. Couchot
> Winthrop & Couchot, Professional Corporation

-100-

MAINDOCS-#163410-v2-SCC_Group_II_VD_DS.DOC

660 Newport Center Drive, Suite 400
Newport Beach, CA 92660

Ronald Rus
Rus Miliband & Smith P.C.
2211 Michelson Drive, Seventh Floor
Irvine, California 92612

All notices and requests to any Person holding of record any Claim or Interest shall be sent to them at their last known address or to the last known address of their attorney of record.  Any such Person may designate in writing any other address for purposes of this Section 21.5, which designation will be effective on receipt.

**21.6.    Governing Law.**

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), the laws of the State of California (without reference to its conflict of law rules) shall govern the construction and implementation of the Plan and any agreements, documents, and instruments executed in connection with the Plan, unless otherwise specifically provided in such agreements, documents, or instruments.

**21.7.    Binding Effect.**

The Plan and all rights, duties and obligations thereunder shall be binding upon and inure to the benefit of the Plan Sponsor Debtors, the Plan Trustee, Holders of Claims, Holders of Interests, and their respective successors and assigns.

**21.8.    Successors and Assigns.**

The rights, benefits, and obligations of any entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, the heirs, executors, administrators, successors, and assigns of such entity.

**21.9.    Severability of Plan Provisions.**

If, prior to the Confirmation Date, any term or provision of the Plan is held by the Bankruptcy Court to be illegal, impermissible, invalid, void or unenforceable, or otherwise to constitute grounds for denying confirmation of the Plan, the Bankruptcy Court shall, with the consent of the Debtors, have the power to interpret, modify or delete such term or provision (or portions thereof) to make it valid or enforceable to the maximum extent practicable, consistent

-101-

1    with the original purpose of the term or provision held to be invalid, void or unenforceable, and

2    such term or provision shall then be operative as interpreted, modified or deleted.  Notwithstanding

3    any such interpretation, modification or deletion, the remainder of the terms and provisions of the

4    Plan shall in no way be affected, impaired or invalidated by such interpretation, modification or

5    deletion.

6        **21.10.  No Waiver.**

7        The failure of the Debtors or any other Person to object to any Claim for purposes of voting

8    shall not be deemed a waiver of the Committee(s)', the Debtors' or the Plan Trustee's right to

9    object to or examine such Claim, in whole or in part.

10       **21.11.  Inconsistencies.**

11       In the event the terms or provisions of this Disclosure Statement are inconsistent with the

12   terms and provisions of the Plan or documents executed in connection with the Plan, the terms of

13   the Plan shall control.

14       **21.12.  Exemption from Certain Transfer Taxes and Recording Fees.**

15       Pursuant to Section 1146(c) of the Bankruptcy Code, any transfers from a Debtor to the

16   Plan Trust or to any other Person or entity pursuant to the Plan, or any agreement regarding the

17   transfer of title to or ownership of any of the Debtors' real or personal property or of any other

18   interest in such property (including, without limitation, a security interest) will not be subject to

19   any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax,

20   stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or

21   recording fee, or other similar tax or governmental assessment, and the Confirmation Order will

22   direct the appropriate state or local governmental officials or agents to forego the collection of any

23   such tax or governmental assessment and to accept for filing and recordation any of the foregoing

24   instruments or other documents without the payment of any such tax or governmental assessment.

25       **21.13.  Post-Confirmation Status Report.**

26       Within 180 days following the entry of the Confirmation Order, the Plan Trustee shall file a

27   status report with the Court explaining what progress has been made toward consummation of the

28   confirmed Plan.  The status report shall be served on the United States Trustee, the twenty largest

1  unsecured creditors, and those parties who have requested special notice.  Unless otherwise

2  ordered, further status reports shall be filed every 180 days and served on the same entities.

3      **21.14.  <u>Post-Confirmation Conversion/Dismissal.</u>**

4      A creditor or party in interest may bring a motion to convert or dismiss the case under

5  § 1112(b), after the Plan is confirmed, if there is a default in performing the Plan.  The Plan

6  Trustee reserves the right to object to any motion for conversion or dismissal.  <u>In addition, as set</u>

7  <u>forth in the definition of the Effective Date, the Effective Date may be further extended by order of</u>

8  <u>the Bankruptcy Court after notice and hearing to all parties in interest.  If the Court determines</u>

9  <u>there is no "cause" for the extension of the Effective Date, a party in interest may move to dismiss</u>

10  <u>or convert the case.</u>

11      If the Court orders any of the Cases converted to Chapter 7 after the Plan is confirmed, then

12  all property that had been property of the Chapter 11 Estate, and that has not been disbursed

13  pursuant to the Plan, will revest in the Chapter 7 estate.  The automatic stay will be re-imposed

14  upon the revested property, but only to the extent that relief from stay was not previously

15  authorized by the Court during this case.

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2          **21.15.  <u>Final Decree.</u>**

3              Once an Estate has been fully administered, as referred to in Bankruptcy Rule 3022, the

4    Plan Trustee, or other party as the Court shall designate in the Confirmation Order, shall file a

5    motion with the Court to obtain a final decree to close the Case of such Debtor.

6    Date:  June 18, 2011

7
                                              By: _____
8                                                    Bruce Cook
                                              General Counsel, Authorized Agent for the Voluntary
9                                             Debtors and Acquisitions

10   DATED: June 18, 2011                      **WINTHROP COUCHOT**
                                              **PROFESSIONAL CORPORATION**
11

12
                                              By:_____/s/ *Paul J. Couchot*_____
13                                                   Paul J. Couchot, Esq.
                                                     Sean Okeefe, Esq.
14                                            General Insolvency Counsel for
                                              Administratively Consolidated Voluntary Debtors
15

16

17                                            **RUS MILIBAND & SMITH**
                                              **A PROFESSIONAL CORPORATION**
18
                                                     /s/ *Ronald Rus*
19                                            By_____
                                                     Ronald Rus, Esq.
20                                                   Joel S. Miliband, Esq.
                                                     Attorneys for SCC Acquisitions, LLC
21

22

23

24

25

26

27

28

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 660 Newport Center Drive, 4th Fl., Newport Beach, CA 92660.

A true and correct copy of the foregoing document described as:  [REDLINED] ~~FIRST~~ SECOND **AMENDED DISCLOSURE STATEMENT DESCRIBING ~~FIRST~~ SECOND AMENDED CHAPTER 11 PLANS FILED BY SUNCAL PLAN PROPONENTS IN THE CHAPTER 11 CASES OF SUNCAL BEAUMONT HEIGHTS, LLC AND SUNCAL JOHANNSON RANCH, LLC , [GROUP II: VOLUNTARY DEBTORS]** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

I.  **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On Ju~~ne 20,~~ly 18, 2011, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

☒  Service information continued on attached page

II.  **SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served)**:**
On _____, 2011, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐  Service information continued on attached page

III.  **SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on _____, 2011, I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| | | |
|---|---|---|
| Ju~~ne 20,~~ly 18, 2011 | ~~Susan Connor~~Gretchen Crumpacker | /s/ Gretchen Crumpacker |
| *Date* | *Type Name* | *Signature* |

MAINDOCS-#163410-v2-SCC_Group_II_VD_DS.DOC

**NEF SERVICE LIST**

- Selia M Acevedo    sacevedo@millerbarondess.com, mpritikin@millerbarondess.com
- Joseph M Adams    jadams@sycr.com
- Raymond H Aver    ray@averlaw.com
- James C Bastian    jbastian@shbllp.com
- Thomas Scott Belden    sbelden@kleinlaw.com, ecf@kleinlaw.com
- John A Boyd    fednotice@tclaw.net
- Mark Bradshaw    mbradshaw@shbllp.com
- Gustavo E Bravo    gbravo@smaha.com
- Jeffrey W Broker    jbroker@brokerlaw.biz
- Brendt C Butler    bbutler@mandersonllp.com
- Andrew W Caine    acaine@pszyjw.com
- Carollynn Callari    ccallari@venable.com
- Cathrine M Castaldi    ccastaldi@rusmiliband.com
- Tara Castro Narayanan    tara.narayanan@msrlegal.com, lisa.king@msrlegal.com
- Dan E Chambers    dchambers@jmbm.com
- Shirley Cho    scho@pszjlaw.com
- Vonn Christenson    vrc@paynefears.com
- Brendan P Collins    bpcollins@bhfs.com
- Vincent M Coscino    vcoscino@allenmatkins.com, emurdoch@allenmatkins.com
- Paul J Couchot    pcouchot@winthropcouchot.com, pj@winthropcouchot.com;sconnor@winthropcouchot.com
- Jonathan S Dabbieri    dabbieri@sullivan.com, hill@sullivanhill.com;mcallister@sullivanhill.com;stein@sullivanhill.com;vidovich@sullivanhill.com
- Ana Damonte    ana.damonte@pillsburylaw.com
- Vanessa S Davila    vsd@amclaw.com
- Melissa Davis    mdavis@shbllp.com
- Daniel Denny    ddenny@gibsondunn.com
- Caroline Djang    crd@jmbm.com
- Donald T Dunning    ddunning@dunningLaw.com
- Meredith R Edelman    meredith.edelman@dlapiper.com
- Joseph A Eisenberg    jae@jmbm.com
- Lei Lei Wang Ekvall    lekvall@wgllp.com
- Richard W Esterkin    resterkin@morganlewis.com
- Marc C Forsythe    kmurphy@goeforlaw.com
- Alan J Friedman    afriedman@irell.com
- Steven M Garber    steve@smgarberlaw.com
- Christian J Gascou    cgascou@gascouhopkins.com
- Barry S Glaser    bglaser@swjlaw.com
- Robert P Goe    kmurphy@goeforlaw.com, rgoe@goeforlaw.com;mforsythe@goeforlaw.com
- Eric D Goldberg    egoldberg@stutman.com
- Richard H Golubow    rgolubow@winthropcouchot.com, pj@winthropcouchot.com
- Michael J Gomez    mgomez@frandzel.com, efiling@frandzel.com;sking@frandzel.com
- Kelly C Griffith    bkemail@harrisbeach.com
- Matthew Grimshaw    mgrimshaw@rutan.com
- Kavita Gupta    kgupta@winthropcouchot.com
- Asa S Hami    ahami@morganlewis.com
- Michael J Hauser    michael.hauser@usdoj.gov
- D Edward Hays    ehays@marshackhays.com
- Michael C Heinrichs    mheinrichs@omm.com

1
- Harry D. Hochman    hhochman@pszjlaw.com, hhochman@pszjlaw.com
- Jonathan M Hoff    jonathan.hoff@cwt.com
2
- Nancy Hotchkiss    nhotchkiss@trainorfairbrook.com
- Michelle Hribar    mhribar@rutan.com
3
- John J Immordino    john.immordino@wilsonelser.com, raquel.burgess@wilsonelser.com
- Lawrence A Jacobson    laj@cohenandjacobson.com
4
- Michael J Joyce    mjoyce@crosslaw.com
- Stephen M Judson    sjudson@fablaw.com
5
- Kaleb L Judy    ecf@kleinlaw.com, kjudy@kleinlaw.com
- Steven J Kahn    skahn@pszyjw.com
6
- Sheri Kanesaka    sheri.kanesaka@bryancave.com
- David I Katzen    katzen@ksfirm.com
7
- Christopher W Keegan    ckeegan@kirkland.com, gdupre@kirkland.com;alevin@kirkland.com
- Payam Khodadadi    pkhodadadi@winthropcouchot.com, pj@winthropcouchot.com
8
- Irene L Kiet    ikiet@hkclaw.com
- Claude F Kolm    claude.kolm@acgov.org
9
- Mark J Krone    mk@amclaw.com, crs@amclaw.com;amc@amclaw.com
- David B Lally    davidlallylaw@gmail.com
10
- Leib M Lerner    leib.lerner@alston.com
- Peter W Lianides    plianides@winthropcouchot.com, pj@winthropcouchot.com
11
- Charles Liu    cliu@winthropcouchot.com
- Kerri A Lyman    klyman@irell.com
12
- Mariam S Marshall    mmarshall@marshallramoslaw.com
- Robert C Martinez    rmartinez@mclex.com
13
- Michael D May    mdmayesq@verizon.net
- Hutchison B Meltzer    hmeltzer@wgllp.com
14
- Krikor J Meshefejian    kjm@lnbrb.com
- Joel S. Miliband    jmiliband@rusmiliband.com
15
- James M Miller    jmiller@millerbarondess.com, vgunderson@millerbarondess.com
- Louis R Miller    smiller@millerbarondess.com
16
- Craig Millet    cmillet@gibsondunn.com, pcrawford@gibsondunn.com;cmillet@gibsondunn.com
- Randall P Mroczynski    randym@cookseylaw.com
17
- Mike D Neue    mneue@thelobelfirm.com,
  jmattiace@thelobelfirm.com;pnelson@thelobelfirm.com
18
- Robert Nida    Rnida@castlelawoffice.com
- Henry H Oh    henry.oh@dlapiper.com, janet.curley@dlapiper.com
19
- Sean A Okeefe    sokeefe@okeefelc.com
- Robert B Orgel    rorgel@pszjlaw.com, rorgel@pszjlaw.com
20
- Malhar S Pagay    mpagay@pszjlaw.com, mpagay@pszjlaw.com
- Daryl G Parker    dparker@pszjlaw.com
21
- Penelope Parmes    pparmes@rutan.com
- Robert J Pfister    rpfister@ktbslaw.com
22
- Ronald B Pierce    ronald.pierce@sdma.com
- Katherine C Piper    kpiper@steptoe.com
23
- Cassandra J Richey    cmartin@pprlaw.net
- Debra Riley    driley@allenmatkins.com
24
- James S Riley    tgarza@sierrafunds.com
- Todd C. Ringstad    becky@ringstadlaw.com
25
- R Grace Rodriguez    ecf@lorgr.com
- Martha E Romero    Romero@mromerolawfirm.com
26
- Ronald Rus    rrus@rusmiliband.com
- John P Schafer    jschafer@mandersonllp.com
27

28

MAINDOCS-#163410-v2-SCC_Group_II_VD_DS.DOC

- John E Schreiber    jschreiber@dl.com
- William D Schuster    bills@allieschuster.org
- Christopher P Simon    csimon@crosslaw.com
- Wendy W Smith    wendy@bindermalter.com
- Steven M Speier    Sspeier@Squarmilner.com, ca85@ecfcbis.com
- Steven M Speier (TR)    Sspeier@asrmanagement.com, ca85@ecfcbis.com
- Michael St James    ecf@stjames-law.com
- Michael K Sugar    msugar@irell.com
- Cathy Ta    cathy.ta@bbklaw.com, Arthur.Johnston@bbklaw.com;Kenneth.Burgess@bbklaw.com
- David A Tilem    davidtilem@tilemlaw.com,
  malissamurguia@tilemlaw.com;dianachau@tilemlaw.com;kmishigian@tilemlaw.com
- James E Till    jtill@thelobelfirm.com, jmattiace@thelobelfirm.com;pnelson@thelobelfirm.com
- United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov
- Carol G Unruh    cgunruh@sbcglobal.net
- Annie Verdries    verdries@lbbslaw.com
- Jason Wallach    jwallach@gladstonemichel.com
- Joshua D Wayser    , kim.johnson@kattenlaw.com
- Marc J Winthrop    mwinthrop@winthropcouchot.com, pj@winthropcouchot.com
- David M Wiseblood    dwiseblood@seyfarth.com
- Brett K Wiseman    bwiseman@aalaws.com
- Dean A Ziehl    dziehl@pszjlaw.com, dziehl@pszjlaw.com
- Marc A. Zimmerman    joshuasdaddy@att.net


Selia M Acevedo    sacevedo@millerbarondess.com, mpritikin@millerbarondess.com
- Joseph M Adams    jadams@sycr.com
- Raymond H Aver    ray@averlaw.com
- James C Bastian    jbastian@shbllp.com
- Thomas Scott Belden    sbelden@kleinlaw.com, ecf@kleinlaw.com
- John A Boyd    fednotice@tclaw.net
- Mark Bradshaw    mbradshaw@shbllp.com
- Gustavo E Bravo    gbravo@smaha.com
- Jeffrey W Broker    jbroker@brokerlaw.biz
- Brendt C Butler    bbutler@mandersonllp.com
- Andrew W Caine    acaine@pszyjw.com
- Carollynn Callari    ccallari@venable.com
- Cathrine M Castaldi    ccastaldi@rusmiliband.com
- Tara Castro Narayanan    tara.narayanan@msrlegal.com, lisa.king@msrlegal.com
- Dan E Chambers    dchambers@jmbm.com
- Shirley Cho    scho@pszjlaw.com
- Vonn Christenson    vrc@paynefears.com
- Brendan P Collins    bpcollins@bhfs.com
- Vincent M Coscino    vcoscino@allenmatkins.com, emurdoch@allenmatkins.com
- Paul J Couchot    pcouchot@winthropcouchot.com,
  pj@winthropcouchot.com;sconnor@winthropcouchot.com
- Jonathan S Dabbieri    dabbieri@sullivan.com,
  hill@sullivanhill.com;mcallister@sullivanhill.com;stein@sullivanhill.com;vidovich@sullivanhill.com
- Ana Damonte    ana.damonte@pillsburylaw.com
- Vanessa S Davila    vsd@amclaw.com
- Melissa Davis    mdavis@shbllp.com
- Daniel Denny    ddenny@gibsondunn.com
- Caroline Djang    crd@jmbm.com
- Donald T Dunning    ddunning@dunningLaw.com
- Meredith R Edelman    meredith.edelman@dlapiper.com

MAINDOCS-#163410-v2-SCC_Group_II_VD_DS.DOC

| | |
|---|---|
| 1 | Joseph A Eisenberg — jae@jmbm.com |
| | Lei Lei Wang Ekvall — lekvall@wgllp.com |
| 2 | Richard W Esterkin — resterkin@morganlewis.com |
| | Marc C Forsythe — kmurphy@goeforlaw.com |
| 3 | Alan J Friedman — afriedman@irell.com |
| | Steven M Garber — steve@smgarberlaw.com |
| 4 | Christian J Gascou — cgascou@gascouhopkins.com |
| | Barry S Glaser — bglaser@swjlaw.com |
| 5 | Robert P Goe — kmurphy@goeforlaw.com, rgoe@goeforlaw.com;mforsythe@goeforlaw.com |
| | Eric D Goldberg — egoldberg@stutman.com |
| 6 | Richard H Golubow — rgolubow@winthropcouchot.com, pj@winthropcouchot.com |
| | Michael J Gomez — mgomez@frandzel.com, efiling@frandzel.com;sking@frandzel.com |
| 7 | Kelly C Griffith — bkemail@harrisbeach.com |
| | Matthew Grimshaw — mgrimshaw@rutan.com |
| 8 | Kavita Gupta — kgupta@winthropcouchot.com |
| | Asa S Hami — ahami@morganlewis.com |
| 9 | Michael J Hauser — michael.hauser@usdoj.gov |
| | D Edward Hays — ehays@marshackhays.com |
| 10 | Michael C Heinrichs — mheinrichs@omm.com |
| | Harry D. Hochman — hhochman@pszjlaw.com, hhochman@pszjlaw.com |
| 11 | Jonathan M Hoff — jonathan.hoff@cwt.com |
| | Nancy Hotchkiss — nhotchkiss@trainorfairbrook.com |
| 12 | Michelle Hribar — mhribar@rutan.com |
| | John J Immordino — john.immordino@wilsonelser.com, raquel.burgess@wilsonelser.com |
| 13 | Lawrence A Jacobson — laj@cohenandjacobson.com |
| | Michael J Joyce — mjoyce@crosslaw.com |
| 14 | Stephen M Judson — sjudson@fablaw.com |
| | Kaleb L Judy — ecf@kleinlaw.com, kjudy@kleinlaw.com |
| 15 | Steven J Kahn — skahn@pszyjw.com |
| | Sheri Kanesaka — sheri.kanesaka@bryancave.com |
| 16 | David I Katzen — katzen@ksfirm.com |
| | Christopher W Keegan — ckeegan@kirkland.com, gdupre@kirkland.com;alevin@kirkland.com |
| 17 | Payam Khodadadi — pkhodadadi@winthropcouchot.com, pj@winthropcouchot.com |
| | Irene L Kiet — ikiet@hkclaw.com |
| 18 | Claude F Kolm — claude.kolm@acgov.org |
| | Mark J Krone — mk@amclaw.com, crs@amclaw.com;amc@amclaw.com |
| 19 | David B Lally — davidlallylaw@gmail.com |
| | Leib M Lerner — leib.lerner@alston.com |
| 20 | Peter W Lianides — plianides@winthropcouchot.com, pj@winthropcouchot.com |
| | Charles Liu — cliu@winthropcouchot.com |
| 21 | Kerri A Lyman — klyman@irell.com |
| | Mariam S Marshall — mmarshall@marshallramoslaw.com |
| 22 | Robert C Martinez — rmartinez@mclex.com |
| | Michael D May — mdmayesq@verizon.net |
| 23 | Hutchison B Meltzer — hmeltzer@wgllp.com |
| | Krikor J Meshefejian — kjm@lnbrb.com |
| 24 | Joel S. Miliband — jmiliband@rusmiliband.com |
| | James M Miller — jmiller@millerbarondess.com, vgunderson@millerbarondess.com |
| 25 | Louis R Miller — smiller@millerbarondess.com |
| | Randall P Mroczynski — randym@cookseylaw.com |
| 26 | Mike D Neue — mneue@thelobelfirm.com, jmattiace@thelobelfirm.com;pnelson@thelobelfirm.com |
| | Robert Nida — Rnida@castlelawoffice.com |
| 27 | Henry H Oh — henry.oh@dlapiper.com, janet.curley@dlapiper.com |
| | Sean A Okeefe — sokeefe@okeefelc.com |
| 28 | Robert B Orgel — rorgel@pszjlaw.com, rorgel@pszjlaw.com |

- Malhar S Pagay    mpagay@pszjlaw.com, mpagay@pszjlaw.com
- Penelope Parmes    pparmes@rutan.com
- Ronald B Pierce    ronald.pierce@sdma.com
- Katherine C Piper    kpiper@steptoe.com
- Cassandra J Richey    cmartin@pprlaw.net
- Debra Riley    driley@allenmatkins.com
- James S Riley    tgarza@sierrafunds.com
- Todd C. Ringstad    becky@ringstadlaw.com
- R Grace Rodriguez    ecf@lorgr.com
- Martha E Romero    Romero@mromerolawfirm.com
- Ronald Rus    rrus@rusmiliband.com
- John P Schafer    jschafer@mandersonllp.com
- John E Schreiber    jschreiber@dl.com
- William D Schuster    bills@allieschuster.org
- Christopher P Simon    csimon@crosslaw.com
- Wendy W Smith    wendy@bindermalter.com
- Steven M Speier    Sspeier@Squarmilner.com, ca85@ecfcbis.com
- Steven M Speier (TR)    Sspeier@asrmanagement.com, ca85@ecfcbis.com
- Michael St James    ecf@stjames-law.com
- Michael K Sugar    msugar@irell.com
- Cathy Ta    cathy.ta@bbklaw.com, Arthur.Johnston@bbklaw.com;Kenneth.Burgess@bbklaw.com
- David A Tilem    davidtilem@tilemlaw.com,
  malissamurguia@tilemlaw.com;dianachau@tilemlaw.com;kmishigian@tilemlaw.com
- James E Till    jtill@thelobelfirm.com, jmattiace@thelobelfirm.com;pnelson@thelobelfirm.com
- United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov
- Carol G Unruh    cgunruh@sbcglobal.net
- Annie Verdries    verdries@lbbslaw.com
- Jason Wallach    jwallach@gladstonemichel.com
- Joshua D Wayser    , kim.johnson@kattenlaw.com
- Marc J Winthrop    mwinthrop@winthropcouchot.com, pj@winthropcouchot.com
- David M Wiseblood    dwiseblood@seyfarth.com
- Brett K Wiseman    bwiseman@aalaws.com
- Dean A Ziehl    dziehl@pszjlaw.com, dziehl@pszjlaw.com
- Marc A. Zimmerman    joshuasdaddy@att.net

MAINDOCS-#163410-v2-SCC_Group_II_VD_DS.DOC