1  PAUL J. COUCHOT -- State Bar No. 131934
   WINTHROP COUCHOT, P.C.
2  660 Newport Center Drive, Fourth Floor
   Newport Beach, CA 92660
3  Telephone: (949) 720-4100
   Facsimile: (949) 720-4111
4  General Insolvency Counsel for
   Palmdale Hills Property, LLC et. al. (the "Voluntary Debtors")

5
   RONALD RUS - State Bar No. 67369
6  JOEL S. MILIBAND - State Bar No. 77438
   RUS MILIBAND & SMITH
7  A PROFESSIONAL CORPORATION
   2211 Michelson Drive, Seventh Floor
8  Irvine, California 92612
   Telephone: (949) 752-7100
9  Facsimile:  (949) 252-1514
   Counsel for SunCal Management LLC and
10 SCC Acquisitions Inc.

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**SANTA ANA DIVISION**

12  In re                                      | Case No. 8:08-bk-17206-ES

    PALMDALE HILLS PROPERTY, AND ITS
13  RELATED DEBTORS,

              Joint Administered Debtors and
14            Debtors-in-Possession

Case No. 8:08-bk-17206-ES

Jointly Administered With Case Nos.
8:08-bk-17209-ES; 8:08-bk-17240-ES;
8:08-bk-17224-ES; 8:08-bk-17242-ES;
8:08-bk-17225-ES; 8:08-bk-17245-ES;
8:08-bk-17227-ES; 8:08-bk-17246-ES;
8:08-bk-17230-ES; 8:08-bk-17231-ES;
8:08-bk-17236-ES; 8:08-bk-17248-ES;
8:08-bk-17249-ES; 8:08-bk-17573-ES;
8:08-bk-17574-ES; 8:08-bk-17575-ES;
8:08-bk-17404-ES; 8:08-bk-17407-ES;
8:08-bk-17408-ES; 8:08-bk-17409-ES;
8:08-bk-17458-ES; 8:08-bk-17465-ES;
8:08-bk-17470-ES; 8:08-bk-17472-ES;
and 8:08-bk-17588-ES

Chapter 11 Proceedings

Affects:

☐ All Debtors
☐ Palmdale Hills Property, LLC
☐ SunCal Beaumont Heights, LLC
☐ SCC/Palmdale, LLC
☐ SunCal Johannson Ranch, LLC
☐ SunCal Summit Valley, LLC
☐ SunCal Emerald Meadows LLC
☐ SunCal Bickford Ranch, LLC
☐ Acton Estates, LLC
☐ Seven Brothers LLC
☐ SJD Partners, Ltd.
☐ SJD Development Corp.
☐ Kirby Estates, LLC
☐ SunCal Communities I, LLC
☐ SunCal Communities III, LLC
☒ SCC Communities LLC
☒ North Orange Del Rio Land, LLC
☒ Tesoro SF LLC

**[REDLINED] FIRST SECOND AMENDED DISCLOSURE STATEMENT DESCRIBING FIRST SECOND AMENDED CHAPTER 11 PLANS FILED BY THE APPLICABLE SUNCAL PLAN PROPONENTS IN THE CHAPTER 11 CASES OF SCC COMMUNITIES, LLC, NORTH ORANGE DEL RIO LAND LLC AND TESORO SF LLC [GROUP III: VOLUNTARY DEBTORS]**

Date:      July 22, 2011
Time:      11:00 a.m.
Place:     Courtroom 5A

*Continued from Previous Page*

- ☐ LBL-SunCal Oak Valley, LLC
- ☐ SunCal Heartland, LLC
- ☐ LBL-SunCal Northlake, LLC
- ☐ SunCal Marblehead, LLC
- ☐ SunCal Century City, LLC
- ☐ SunCal PSV, LLC
- ☐ Delta Coves Venture, LLC
- ☐ SunCal Torrance, LLC
- ☐ SunCal Oak Knoll, LLC

# TABLE OF CONTENTS

**PAGE**

I.      INTRODUCTION ................................................................................................ 2

II.     DEFINITIONS AND RULES OF INTERPRETATION ............................................. 3
        2.1     Definitions ................................................................................................ 3
        2.2     Rules of Construction ............................................................................. 23
        2.3     Exhibits .................................................................................................... 24

III.    PLAN CONFIRMATION DEADLINES .................................................................. 24
        3.1     Time and Place of the Confirmation Hearing ....................................... 24
        3.2     Deadline for Voting For or Against the Plan ........................................ 24
        3.3     Deadline for Objecting to Confirmation of the Plan............................. 24
        3.4     Identity of Person to Contact for More Information Regarding the Plan...... 25
        3.5     Disclaimer ............................................................................................... 25

IV.     FACTUAL BACKGROUND OF THE DEBTORS ................................................... 26
        4.1     The Formation of the Debtors and the Projects .................................... 26
                4.1.1   Overview of the Debtors and Their Projects.......................... 26
                4.1.2   The Debtors' Primary Secured Creditors and
                        Their Disputed Claims ........................................................... 28
                4.1.3   Disputed Claims and Liens .................................................... 28
                4.1.4   A Summary of All of the Alleged Claims Against
                        the Group III: Voluntary Debtors .......................................... 28
                4.1.5   Summary of the Group III: Voluntary Debtors' Cash........... 29
        4.2     Factual Circumstances Leading to the Filing of the Debtors'
                Chapter 11 Cases..................................................................................... 29
                4.2.1   Introduction............................................................................. 29
                4.2.2   Background of the SunCal Companies .................................. 30
                4.2.3   The Origins of the SunCal/Lehman Joint Venture................. 30
                4.2.4   Lehman's Effective Control Over the Management of the
                        Debtors and Promises of Ongoing Funding .......................... 31
                4.2.5   The Disputed Interim Loan Agreement and the Group III:
                        Voluntary Debtors' Fraudulent Conveyance Actions in
                        the Lehman Adversary Proceeding ........................................ 32
                4.2.6   The 2008 Restructuring Agreement ....................................... 33
                4.2.7   The Lehman Lenders Hire Radco ........................................... 35
                4.2.8   The Lehman Lenders' Failure to Close on the
                        Settlement Agreement............................................................ 35
                4.2.9   Alvarez and Marsal Take Over Control of the Lehman
                        Entities After the Chapter 11 Filings of LBHI and LCPI................. 36
        4.3     The Debtors' Potential Preferential Transfers ...................................... 37

V.      SIGNIFICANT EVENTS IN THE DEBTORS' CHAPTER 11 CASES ................. 38
        5.1     Voluntary Debtors................................................................................... 38
                5.1.1   Joint Administration of the Voluntary Debtors

|  |  | and the Trustee Debtors | 38 |
| | 5.1.2 | The Voluntary Debtors' Court Employed Professionals | 38 |
| | 5.1.3 | LCPI's Motions for Relief from the Automatic Stay Against Certain of the Voluntary Debtors' Projects and Related Appeals | 39 |
| 5.2 | | The Debtors' Various Motions Relating to Financing for the Projects and to Pay Professional Fees | 40 |
| | 5.2.1 | The Voluntary Debtors' Initial Motion for Surcharge and Use of Cash Collateral | 40 |
| | 5.2.2 | The Voluntary Debtors' Agreements with the Lehman Entities for Use of Alleged Cash Collateral to Maintain the Properties and to Pay Professional Fees | 41 |
| 5.3 | | The Debtors' Disputes and Claims Against the Lehman Entities | 41 |
| | 5.3.1 | The Lehman Adversary Proceeding | 41 |
| | 5.3.2 | Debtors' 502(d) Objections | 43 |
| | 5.3.3 | The Del Rio CFD Bonds and Potential Disputes Under the Acquisition Agreement | 43 |
| 5.4 | | The Debtors' Motion for a Stay to Suspend Certain Lehman Actions | 44 |
| 5.5 | | The Debtors' Other Litigation with Non-Lehman Related Parties | 44 |
| | 5.5.1 | The Debtors' Failed Preliminary Injunction Motion Against the Holders of Bond Claims | 44 |
| | 5.5.2 | The Contractors' Successful Motions for Relief from Stay to Pursue the Bond Claims | 45 |
| | 5.5.3 | Shea's Successful Motion for Relief from Stay | 45 |
| | 5.5.4 | Bond Safeguard Motion | 45 |
| **VI.** | | **TREATMENT OF UNCLASSIFIED CLAIMS** | 45 |
| 6.1 | | Introduction | 45 |
| 6.2 | | Treatment of Allowed Administrative Claims | 46 |
| 6.3 | | Administrative Claims Bar Date | 46 |
| 6.4 | | Treatment of Unsecured Tax Claims | 47 |
| **VII.** | | **CLASSIFICATION OF CLAIMS AND INTERESTS** | 47 |
| **VIII.** | | **THE PLAN'S TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS** | 49 |
| 8.1 | | The Plan(s)' Treatment of Holders of Allowed Secured Real Property Tax Claims Secured by Group III Assets: Voluntary Debtors Against Group III: Voluntary Debtors (Classes 1.1 and 1.2) | 50 |
| 8.2 | | The Plan(s)' Treatment of Lehman's Disputed Claim(s) and Disputed Lien(s) Against Group III: Voluntary Debtors (Class 2.1) | 50 |
| 8.3 | | The Plan(s)' Treatment of Holders of ~~Prioerty~~Priority Claims Against Group III: Voluntary Debtors (Classes 3.1 to 3.2) | 52 |
| 8.4 | | The Plan(s)' Treatment of Holders of Allowed General Unsecured Claims Against Group III: Voluntary Debtors (Classes 4.1 to 4.3) | 53 |
| 8.5 | | The Plan(s)' Treatment of Holders of Allowed Interests Against Group III: Voluntary Debtors | 53 |

IX.    ACCEPTANCE OR REJECTION OF THE PLAN ................................................... 53
       9.1    Introduction    ........................................................................................... 53
       9.2    Who May Object to Confirmation of the Plan(s) ...................................... 54
       9.3    Who May Vote to Accept/Reject the Plan(s) ............................................ 54
       9.4    What Is an Allowed Claim/Interest........................................................... 54
       9.5    What Is an Impaired Class ....................................................................... 54
       9.6    Who is Not Entitled to Vote ..................................................................... 54
       9.7    Who Can Vote in More Than One Class ................................................... 55
       9.8    Votes Necessary for a Class to Accept the Plan(s) ................................... 55
       9.9    Treatment of Nonaccepting Classes.......................................................... 56
       9.10   Request for Confirmation Despite Nonacceptance by Impaired Class(es) .... 56

X.     MEANS OF EXECUTION AND IMPLEMENTATION OF THE PLAN ............... 56
       10.1   Introduction    ........................................................................................... 56
       10.2   Sale Process After Confirmation Date But Prior
              to Effective Date ..................................................................................... 56
       10.3   Possession and Control ............................................................................ 58
       10.4   Transfer of Property to the Plan Trust....................................................... 58
       10.5   Closing of Group III Asset: Voluntary Debtor Sales ................................. 59
       10.6   Purposes of the Plan Trust ....................................................................... 59
       10.7   Trust Agreement ...................................................................................... 60
       10.8   Operations of the Plan Trust .................................................................... 60
       10.9   The Plan Trustee ...................................................................................... 61
       10.10  Payment of Trust Expenses....................................................................... 61
       10.11  Plan Distribution System ......................................................................... 61
       10.12  Claims Estimation Rights ......................................................................... 61
       10.13  No Payment of Transfer-Related Fees to the United States Trustee.............. 62
       10.14  Books and Records of Trust...................................................................... 62
       10.15  Limitations on Liability............................................................................ 62
       10.16  Federal Income Tax Treatment of the Holders of Plan
              Trust Beneficial Interests ......................................................................... 63
       10.17  Termination of the Trust .......................................................................... 64
       10.18  Exemption from Certain Transfer Taxes ................................................... 65
       10.19  Tax Consequences of the Plan .................................................................. 65
       10.20  The Plan Sponsor ..................................................................................... 66
       10.21  The Voluntary Debtors' Committee .......................................................... 66
              10.21.1    Duties and Powers....................................................... 66
              10.21.2    Dissolution of Committee ............................................ 66
       10.22  Litigation Claims ..................................................................................... 67
       10.23  Collection of Litigation Recoveries .......................................................... 67

XI.    RISK FACTORS ................................................................................................. 67
       11.1   Plan Risks ................................................................................................ 67
       11.2   The Plan(s) May Not All Be Accepted or Confirmed................................. 67
       11.3   Adverse Outcome of Pending Litigation.................................................... 68

XII.   DISTRIBUTIONS................................................................................................ 68
       12.1   Distribution Agent ................................................................................... 68

MAINDOCS-#163424-v4-SCC_Group_III_VD_DS.DOC

| 12.2 | Distributions | 68 |
| | 12.2.1 Dates of Distributions | 68 |
| | 12.2.2 Limitation on Liability | 68 |
| 12.3 | Old Instruments and Securities | 69 |
| | 12.3.1 Surrender and Cancellation of Instruments and Securities | 69 |
| | 12.3.2 Cancellation of Liens | 69 |
| | 12.3.3 De Minimis Distributions and Fractional Shares | 69 |
| | 12.3.4 Delivery of Distributions | 70 |
| | 12.3.5 Undeliverable Distributions | 70 |
| | 12.3.6 Disposition of Unclaimed Property | 71 |

| XIII. | OBJECTION TO CLAIMS AND DISPUTED CLAIMS | 71 |
| 13.1 | Standing for Objections to Claims | 71 |
| 13.2 | Treatment of Disputed Claims and Disputed Liens | 72 |
| | 13.2.1 No Distribution Pending Allowance | 72 |
| | 13.2.2 Distribution After Allowance | 72 |

| XIV. | EXECUTORY CONTRACTS AND UNEXPIRED LEASES | 72 |
| 14.1 | Executory Contracts Potentially Being Assumed | 72 |
| 14.2 | Executory Contracts Being Rejected | 72 |
| 14.3 | Bar Date for Rejection Damages | 73 |
| 14.4 | Changes in Rates Subject to Regulatory Commission Approval | 73 |

| XV. | BEST INTEREST OF CREDITORS TEST AND PLAN FEASIBILITY | 73 |
| 15.1 | Best Interests Test | 73 |
| 15.2 | Feasibility | 74 |

| XVI. | LIMITATION OF LIABILITY | 75 |

| XVII. | CONDITIONS TO CONFIRMATION AND EFFECTIVENESS OF THE PLAN | 75 |
| 17.1 | Conditions Precedent to Plan Confirmation | 75 |
| 17.2 | Conditions Precedent to Plan Effectiveness | 75 |

| XVIII. | RETENTION OF JURISDICTION | 75 |

| XIX. | MODIFICATION OR WITHDRAWAL OF THE PLAN | 76 |
| 19.1 | Modification of Plan(s) | 76 |
| 19.2 | Nonconsensual Confirmation | 76 |

| XX. | MISCELLANEOUS | 76 |
| 20.1 | Payment of Statutory Fees | 76 |
| 20.2 | Payment Dates | 77 |
| 20.3 | Headings | 77 |
| 20.4 | Other Documents and Actions | 77 |
| 20.5 | Notices | 77 |
| 20.6 | Governing Law | 78 |
| 20.7 | Binding Effect | 78 |

MAINDOCS-#163424-v4-SCC_Group_III_VD_DS.DOC

20.8    Successors and Assigns ................................................................ 78
20.9    Severability of Plan Provisions .................................................... 78
20.10   No Waiver ..................................................................................... 79
20.11   Inconsistencies .............................................................................. 79
20.12   Exemption from Certain Transfer Taxes and Recording Fees ....... 79
20.13   Post-Confirmation Status Report ................................................. 80
20.14   Post-Confirmation Conversion/Dismissal ................................... 80
20.15   Final Decree ................................................................................. 81

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# I.

## INTRODUCTION

This Disclosure Statement[1] is filed ~~respectively~~ jointly by, and the accompanying Plans are proposed respectively by, SCC Communities, Del Rio and Tesoro (the "Group III: Voluntary Debtors"), as the Sun-Cal Plan Proponents, in their respective Chapter 11 Cases ~~of the Group III: Voluntary Debtors~~ in their capacities as debtors-in-possession. ~~In addition to being the proponent~~ ~~Sun Cal Plan Proponent in the Trustee Debtors' Cases,~~ Under each of the Group III Voluntary Debtor's Plans, Acquisitions shall be the Plan Sponsor, the Plan Trustee of the Plan Trust, and the Distribution Agent for each Group III Voluntary Debtor's Plan that is confirmed ~~all of the Debtors' cases for such Plans that~~ ~~Cases in which the Sun Cal Proponents' Plan(s) are confirmed~~.

Chapter 11 allows debtors-in-possession, Chapter 11 trustees, and under some circumstances, creditors, interest holders and others parties in interest, to propose a Chapter 11 plan. As stated, ~~the Sun Cal Plan Proponents~~ the Group III Voluntary Debtors are the proponents of ~~the~~ their respective Plan(s) sent to you in the same envelope as this Disclosure Statement. This document summarizes the contents of the Plan, (s), certain information relating to the Plan and the process the Bankruptcy Court follows in determining whether or not to confirm the Plan.

In summary, the Plan(s) ~~respectively~~ individually provides for the sale of the ~~Joshua Ridge Project,~~ SCC Communities Assets, the Tesoro ~~Project~~ Assets, and the ~~Net~~ Del Rio ~~CFD Bonds Proceeds~~ Assets (the "Group III Assets: Voluntary Debtors"), free and clear of all claims and liens, ~~and for the liquidation of all other assets of the Group III: Voluntary Debtors.~~. The ~~Net Proceed~~ Net Sales Proceeds from these sales and/or liquidation ~~will then~~ shall be distributed to Creditors holding Allowed Claims in accordance with their rights and priorities under the Bankruptcy Code and under any other applicable law.

Although substantially identical ~~similar~~ ~~and joint~~ and consolidated Plans are being filed in the Cases of all three Group III: Voluntary Debtors, confirmation of each such Plan is independent of each ~~the~~ others. In other words, t~~T~~he Creditors in each Case will determine, subject to Court

---

[1] All defined terms used herein have the same meanings as set forth in Article II herein and Exhibit "1" attached hereto.

MAINDOCS-#163424-v4-SCC_Group_III_VD_DS.DOC

approval, whether the applicable Plan will be approved in their Case. Accordingly, the a particular Plan may be confirmed in the Cases of some of the Group III: Voluntary Debtors, but not in others.

The Lehman Lenders have also filed competing and alternative plans of reorganization in the SCC Communities and Tesoro Chapter 11 Cases, but not in the Del Rio Chapter 11 Case. ("Lehman Competing Group III:  Voluntary Debtors Plan").  Accordingly, the creditors holding claims against SCC Communities and Tesoro will have the opportunity to vote for one plan the applicable Sun Cal Proponents Group III:  Voluntary Debtors Plan or for the other Lehman's Competing Group III:  Voluntary Debtors Plan.  Alternatively, or they can vote for or reject all of the both pPlans and allow the Court to decide which plan should be approved.

**READ THIS DISCLOSURE STATEMENT CAREFULLY IF YOU WANT TO KNOW ABOUT**:

> **WHO CAN VOTE OR OBJECT TO THE PLAN;**

> **HOW YOUR CLAIM IS TREATED;**

> **HOW THIS TREATMENT COMPARES TO WHAT YOUR CLAIM WOULD RECEIVE IN LIQUIDATION;**

> **A BRIEF HISTORY OF THE DEBTORS AND SIGNIFICANT EVENTS DURING THEIR CHAPTER 11 BANKRUPTCY PROCEEDING;**

> **WHAT FACTORS THE BANKRUPTCY COURT WILL CONSIDER TO DECIDE WHETHER OR NOT TO CONFIRM THE PLAN;**

> **WHAT IS THE EFFECT OF CONFIRMATION; AND**

> **WHETHER THE PLAN IS FEASIBLE.**

This Disclosure Statement cannot tell you everything about your rights.  You should consider consulting your own attorney to obtain more specific advice on how the Plan will affect you and your best course of action.

Be sure to read the applicable Plan as well as this Disclosure Statement.  If there are any inconsistencies between the applicable Plan and this Disclosure Statement, the applicable Plan provisions will govern.

The Bankruptcy Code requires a Disclosure Statement to contain "adequate information" concerning the Plans.  On _____, 2011, the Bankruptcy Court entered an order approving this Disclosure Statement, based upon a finding that this document contained "adequate information" to enable parties affected by the Plan to make an informed judgment regarding the Plan.  Any party can now solicit votes for or against the Plans.

**II.**

**DEFINITIONS AND RULES OF INTERPRETATION**

**2.1**    **Definitions.**

The following defined terms are used in this Disclosure Statement.  Any capitalized term that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term in the Bankruptcy Code or Bankruptcy Rules.

2.1.1    <u>Acquisitions</u>.  SCC Acquisitions, Inc., a California corporation, an indirect parent company of all of the Debtors, a purported ~~Bobligor on the Bond Claims~~certain bond Indemnitor~~claims~~, a Creditor of all of the Debtors, a Sun Cal Plan Proponent, the Plan Sponsor and the proposed Plan Trustee.

2.1.2    <u>Administrative Claim(s)</u>.  Any Claim against a Group III: Voluntary Debtor or ~~its~~such Group III: Voluntary Debtor's Estate  incurred after the applicable Petition Date for the applicable Group III: Voluntary Debtor but before the ~~Confirmation~~ Effective Date, for any cost or expense of administration of the Case of the applicable Group III: Voluntary Debtor, which Claim is entitled to priority under section 507(a)(2) or (3) of the Bankruptcy Code, including, without limitation, any fee or charge assessed against an Estate of a Group III: Voluntary Debtor under section 1930 of Title 28 of the United States Code.

2.1.3    <u>Administrative Claims Bar Date</u>.  The last date fixed by the Group III: Voluntary Debtors Plan(s) for the filing of requests for payment of Administrative Claims.  Under the Group III: Voluntary Debtors Plan(s), the Administrative Claims Bar Date shall be the first business day after the twenty-first (21st) day after the Effective Date.~~The last date fixed by the Plan for the filing of Proof of Claims or requests for payment of Administrative Claims.  Under the Group III: Voluntary Debtor's Plan, the Administrative Claims Bar Date shall be the first business~~

-4-

1    ~~day after the sixtieth (60th) day after the Confirmation Date.~~

2           2.1.4    <u>Affiliate</u>.  The term shall have the meaning set forth under Section 101(2),

3    including, but not limited to, as to any Person, any other Person that directly or indirectly owns or

4    controls, is owned or controlled by, or is under common ownership or control with, such Person.

5    The term "control" (including, with correlative meanings, the terms "controlled by" and "under

6    common control with"), as applied to any Person, means the possession, direct or indirect, of the

7    power to direct or cause the direction of the management and policies of such Person, whether

8    through the ownership of voting securities or other equity ownership interest, by contract or

9    otherwise.

10           2.1.5    <u>Allowed</u>.    When used to describe Claim(s) or Interest(s~~.,~~) against the

11    applicable Group III: Voluntary Debtor, such Claim(s) or Interest(s), to the extent that it or they are

12    "Allowed Claim(s)" or "Allowed Interest(s)."

13           2.1.6    <u>Allowed Amount</u> shall mean:

14           A.    With respect to any Administrative Claim (I) if the Claim is based

15    upon a Fee Application, the amount of such Fee Application that has been approved by a Final

16    Order of the Bankruptcy Court; (ii) if the Claim is based upon any indebtedness or obligation

17    incurred in the ordinary course of business of the Group III: Voluntary Debtors and is not otherwise

18    subject to an Administrative Claim Bar Date, the amount of such Claim that has been agreed to by

19    the Group III: Voluntary Debtors and such creditor, failing which, the amount thereof as fixed by a

20    Final Order of the Bankruptcy Court; or (iii) if the Holder of such Claim was required to file and

21    has filed proof thereof with the Bankruptcy Court prior to an Administrative Claim Bar Date,

22    (1) the amount stated in such proof if no objection to such Proof of Claim is interposed within the

23    applicable period of time fixed by the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy

24    Court, or (2) the amount thereof as fixed by Final Order of the Bankruptcy Court if an objection to

25    such proof was interposed within the applicable period of time fixed by the Bankruptcy Code, the

26    Bankruptcy Rules or the Bankruptcy Court.  The Allowed Amount of any Administrative Claim

27    which is subject to an Administrative Claims Bar Date and not filed by the applicable

28    Administrative Claims Bar Date shall be zero, and no ~~distribution~~Distribution shall be made on

account of any such Administrative Claim;

B.    with respect to any Claim which is not an Administrative Claim (the "Other Claim"):  (i) if the Holder of such Other Claim did not file proof thereof with the Bankruptcy Court on or before the Claims Bar Date, the amount of such Claim as listed in the Group III: Voluntary Debtors'' Schedules as neither disputed, contingent nor unliquidated; or (ii) if the Holder of such Claim has filed proof thereof with the Bankruptcy Court on or before the Claims Bar Date, (a) the amount stated in such proof if no objection to such Proof of Claim was interposed within the applicable period of time fixed by the Bankruptcy Code, the Bankruptcy Rules, the Plan or the Bankruptcy Court, or (b) the amount thereof as fixed by Final Order of the Bankruptcy Court if an objection to such proof was interposed within the applicable period of time fixed by the Bankruptcy Code, the Bankruptcy Rules, the Plan or the Bankruptcy Court.  The Allowed Amount of any Other Claim which is not Filed by the applicable Claims Bar Date, is not listed on the Group III: Voluntary Debtors' Schedules or is listed as disputed, unliquidated, contingent or unknown, and is not allowed under the terms of ~~the~~this Plan shall be zero, and no ~~distribution~~Distribution shall be made on account of any such Claim; and

C.    with respect to any Interest, (i) the amount provided by or established in the records of the Group III: Voluntary Debtors at the Confirmation Date, provided, however, that a timely filed proof of Interest shall supersede any listing of such Interest on the records of the Group III: Voluntary Debtors; or (ii) the amount stated in a proof of Interest Filed prior to the Confirmation Date if no objection to such Interest was filed prior to the Confirmation Date or such later date as the Bankruptcy Court allows; or (iii) the amount of such Interest as fixed by a Final Order of the Bankruptcy Court.

2.1.7    Allowed Claim.  Except as otherwise provided in the~~-~~ Plan(s) (including with respect to those Classes for which the amount of the Allowed Claims is specified by the Plan), a Claim to the extent (and only to the extent) of the Allowed Amount of such Claim.

2.1.8    Allowed Interest.  Any Interest to the extent, and only to the extent, of the Allowed Amount of such Interest.

2.1.9    Allowed Secured Claims.  All or ~~a~~ portion of a Secured Claim that is an

Allowed Claim against the applicable Group III: Voluntary Debtor.

2.1.10   Allowed Unsecured Claim. All or a portion of an Unsecured Claim that is an Allowed Claim against the applicable Group III: Voluntary Debtor.

2.1.11   Assets.   All assets that are property of the Debtor(s) pursuant to Bankruptcy Code Section 541.

2.1.12   Arch.  Arch Insurance Company, a Bond Issuer.

2.1.13   Available Cash.  Each Group III: Voluntary Debtors' Cash deposited into the applicable Distribution Account(s) on or after the Effective Date that is available for making Distributions under the Plan to Holders of Allowed Administrative, Priority, and General Unsecured Claims.  The Available Cash shall consist of the respective Group III: Voluntary Debtors' cash on hand as of the Effective Date that is not subject to a Disputed Lien, proceeds of Net Litigation Recoveries that are not subject to a Disputed Lien, Net Sales Proceeds that become Available Cash upon the disallowance of a Disputed Claim or avoidance of a Disputed Lien purportedly encumbering such Cash.  All Available Cash shall be deposited into the applicable Distribution Account(s).  Available Cash shall not include Net Sale Proceeds in the Net Sales Proceeds Account where the Disputed Secured Claims are Allowed but subject to an equitable subordination judgment.

2.1.14   Avoidance Actions.  All Claims and defenses to Claims accruing to the Group III: Voluntary Debtors and their Estates under Bankruptcy Code Sections 506(d), 510(c), 541, 544, 545, 547, 548, 549, 550, or 551.

2.1.15   Bankruptcy Code.  The United States Bankruptcy Code.

2.1.16   Bankruptcy Court.  The United States Bankruptcy Court for the Central District of California, having jurisdiction over the Cases and, to the extent of any withdrawal of the reference made pursuant to Section 157 of title 28 of the United States Code, the United States District Court for the Central District of California; or, in the event such courts cease to exercise jurisdiction over the Cases, such court or unit thereof that exercises jurisdiction over the Cases in lieu thereof.

2.1.17   Bankruptcy Rules.  Collectively, as now in effect or hereafter amended and

as applicable to the Cases, (i) the Federal Rules of Bankruptcy Procedure, and (ii) the Local Bankruptcy Rules and General Orders applicable to cases pending before the Bankruptcy Court.

2.1.18    Beneficial Interests.  ~~means, collectively~~Collectively, the interests of the holders of Allowed Unsecured Claims in the Plan Trust and in all ~~distributions~~Distributions to be made by the Plan Trust on account of Allowed Unsecured Claims with respect to the applicable Group III: Voluntary Debtor. The Beneficial Interests (a) shall be noted in the books and records of the Plan Trust, (b) shall not be evidenced by a writing, and (c) may not be transferred, sold, assigned or transferred by will, intestate succession or operation of law without written notification to the Plan Trustee confirming and acknowledging the transfer by both the holder and the transferee.

2.1.19    Bond Claim(s).  Any Claim against the Debtor(s) and a Bond Issuer under various payment or performance bonds, and/or any claims of Bond Issuer(s) against the Debtor(s) under various payment or performance bonds.

2.1.20    Bond Claimant.  Holder(s) of a Bond Claim.

2.1.21    Bond Indemnification Claim.  All Claims by Bond Safeguard, Lexon, and Arch for indemnification for payment by Bond Safeguard, Lexon and Arch of Bond Claims with respect to the Group III: Voluntary Debtors' Projects.

2.1.22    Bond Indemnitors.  The individuals and entities that are allegedly liable on the Bond Indemnification Claims, including, allegedly, all of the Debtors, Acquisitions, all Affiliates of Acquisitions, and Elieff.

2.1.23    Bond Issuer(s).  Bond Safeguard, Lexon and Arch in their capacities as issuers and sureties for payment and performance bonds for the benefit of certain of the Debtors.

2.1.24    Bond Safeguard.  Bond Safeguard Insurance Company, a Bond Issuer.

2.1.25    Business Day.  Any day, other than a Saturday, a Sunday or a "legal holiday," as defined in Bankruptcy Rule 9006(a).

2.1.26    Cases.  The Chapter 11 cases of the Group III: Voluntary Debtors pending before the Bankruptcy Court.

2.1.27    Cash.  Currency of the United States of America and cash equivalents,

1   including, but not limited to, bank deposits, immediately available or cleared checks, drafts, wire

2   transfers and other similar forms of payment.

3           2.1.28   <u>CFD Bonds</u>.  Community facilities district bonds issued by a governmental

4   entity.

5           2.1.29   <u>Claim</u>.    This term shall have the broadest possible meaning under

6   Section 101(5) of the Bankruptcy Code, and shall include (a) any right to payment from any of the

7   Group III: Voluntary Debtors, whether or not such right is reduced to judgment, liquidated,

8   unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable,

9   secured, or unsecured, or (b) any right to an equitable remedy for breach of performance if such

10   breach gives rise to a right of payment from any of the Group III: Voluntary Debtors, whether or not

11   such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured,

12   disputed, undisputed, secured, or unsecured.

13           2.1.30   <u>Claims Bar Date</u>.  For any Claim ~~-~~ other than <u>the exceptions noted below</u>~~an~~

14   ~~Administrative Claim~~, March 31, 2009, which was established by the Bankruptcy Court as the last

15   date for creditors to file Proof of Claims with the Bankruptcy Court in all of the Group III:

16   Voluntary Debtors' ~~cases~~<u>Cases, except for the following: (a) Administrative Claims, for which the</u>

17   <u>Administrative Claims Bar Date shall apply, (b) claims arising from rejection of executory contracts</u>

18   <u>or unexpired leases pursuant to 11 U.S.C. § 365, for which the last day to file a proof of claim is (i)</u>

19   <u>30 days after the date of entry of the order authorizing the rejection, or (ii) March 31, 2009,</u>

20   <u>whichever is later, (c) claims of "governmental units," as that term is defined in 11 U.S.C. §</u>

21   <u>101(27), for which proofs of claim are timely filed if filed: (i) before 180 days after the date of the</u>

22   <u>Order for Relief in this case, or (ii) by March 31, 2009, whichever is later (11 U.S.C. § 502(b)(9)),</u>

23   <u>and (d) claims arising from the avoidance of a transfer under chapter 5 of the Bankruptcy Code, the</u>

24   <u>last day to file a proof of claim is 30 days after the entry of judgment avoiding the transfer or March</u>

25   <u>31, 2009, whichever is later.</u>~~, subject tto the following:~~.

26           2.1.31   <u>Claims Objection Deadline</u>.    The later of (i) the first business day

27   following the one hundred and eightieth (180th) day after the Effective Date, or (ii) such greater

28   period of limitation as may be fixed or extended by the Bankruptcy Court or by agreement between

the Plan Trustee and the Holder of the Claim.

2.1.32    <u>Claim Objection Reduction Amount</u>. The amount of Net Sales Proceeds that is made available to the holders of Allowed Unsecured Claims due to the entry of a judgment or order on a Lehman Claim Objection that disallows, reduces, or otherwise adversely modifies the secured claims filed by the Lehman Lenders.

2.1.33    <u>Class</u>.  Each group of Claims or Interests classified in Article ~~V~~IV of the applicable Group III: Voluntary Debtor's Plan pursuant to Sections 1122 and 1123 of the Bankruptcy Code.

2.1.34    <u>Confirmation Date</u>.  The date on which the Confirmation Order is entered in the Bankruptcy Court's docket with respect to the applicable Group III Voluntary Debtor's Plan.

2.1.35    <u>Confirmation Order</u>.   The order entered by the Bankruptcy Court confirming the Plan in accordance with the provisions of Chapter 11 of the Bankruptcy Code.

~~2.1.36    Contingent Bond Claims.  Unmatured Bond Claims.~~ Contract Action. The action filed by certain Voluntary Debtors against Lehman ALI, Inc., and certain other defendants, in California Superior Court for the County of Orange (Case No. 30-2011-0040847-CU-BC-CJC), that was removed to the bankruptcy court as Adv.  No. 8:11-ap-01212-ES, and a reservation of rights to add the Plan Trustee and/or the Trustee Debtors (or theirs sucessors) as additional plaintiffs therein.

2.1.36

2.1.37    <u>Creditor</u>.  Any Person who is the Holder of a Claim against any Group III: Voluntary Debtor that arose or accrued or is deemed to have arisen or accrued or to have matured, or otherwise become due, owing, and payable on or before the Petition Date, including, without limitation, Claims of the kind specified in Sections 502(g), 502(h) or 502(i) of the Bankruptcy Code.

2.1.38    <u>Debtor(s)</u>.   Individually or collectively, the Voluntary Debtors and the Trustee Debtors, as specifically defined in Exhibit "1" attached ~~hereto~~to the Disclosure Statement.

2.1.39    <u>Debtor(s)-in-Possession</u>.  The Voluntary Debtor(s) when acting in their capacity as representatives of their respective Estates in their respective Chapter 11 Cases.

2.1.40    <u>Del Rio</u>.  North Orange Del Rio Land, LLC, a limited liability company, a Group III: Voluntary Debtor, and the owner of the Net Del Rio CFD Bonds ProceedsAssets.

2.1.41    <u>Del Rio Assets</u>.  All Assets of Del Rio, including but not limited to cash on hand, Litigation Claims, potential claims of Del Rio pursuant to the Acquisition Agreement, and the Net Del Rio CFD Bonds Proceeds.

2.1.41  2.1.42  <u>Del Rio Break-Up Fee</u>.  The amount equal to 2.5% of the Minimum Sales Price for the Del Rio Assets, plus actual amounts paid on Allowed Administrative Claims for the Del Rio Case. The sum of two hundred eighty fourtwo thousand dollars ($2842,000) that will be paid to the Stalking Horse Bidder that submits the Opening Bid for the Net Del Rio CFD Bonds ProceedsAssets, if such Stalking Horse Bidder is not the Winning Bidder.

2.1.42  2.1.43  <u>Del Rio CFD Bonds</u>.   The Communities Facilities District Bonds described in Exhibit "1."

2.1.43  2.1.44  <u>Disclosure Statement</u>.   The document accompanying the Plans for theapplicable Group III: Voluntary DebtorsDebtor's Plan that is entitled "First Second Amended Disclosure Statement Describing First Second Amended Chapter 11 Plans Filed by Sun Cal Plan Proponents In The Chapter 11 Cases Of SCC Communities LLC, North Orange Del Rio Land, LLC and Tesoro SF LLC," and with all accompanying exhibits.

2.1.44  2.1.45  <u>Disputed Claim(s)</u>.  All or any part of Claims asserted against aan applicable Group III Voluntary Debtor(s)' Claim other than any Allowed Amount thereof as to which any one of the following applies: (i) no Proof of Claim has been filed with respect to such Claim, and either (a) the Claim is not listed in the Schedules; or (b) the Claim is listed in the Schedules as unliquidated, disputed, contingent, unknown or in a zero amount, (ii) the Claim is the subject of (a) an unresolved Litigation Claim; (b) the Claim is subject to offset by a Litigation Claim; (c) a timely objection to such Claim that has not been resolved by a Final Order; or (d) a request for estimation in accordance with the Bankruptcy Code, the Bankruptcy Rules, any applicable order of the Bankruptcy Court, or the applicable Plan(s) which is Filed on or before the Claims Objection Deadline, which Adversary Proceeding, objection, or request for estimation has not been dismissed, withdrawn or determined by a Final Order; or (iii) the Claim is otherwise

MAINDOCS-#163424-v4-SCC_Group_III_VD_DS.DOC

1    treated as a "Disputed Claim" pursuant to the Plan.

2    2.1.45  2.1.46  **Disputed Interim Loan Agreement**.  A certain Loan Agreement, dated

3    as of October 31, 2007, by and between SCC LLC, as borrower and Lehman ALI, as lender,

4    pursuant to which Lehman ALI allegedly made a loan in the maximum aggregate amount of

5    approximately $20 million.  The Disputed Interim Loan Agreement has an alleged balance due of

6    $23,795,012.59 as of March 30, 2009.  The alleged obligation under the Disputed Interim Loan

7    Agreement is allegedly puroportedly secured by (a) an alleged first-priority deed of trust on the

8    Joshua Ridge Project; (b) an alleged first-priority deed of trust on the Tesoro Project; and (c) an

9    alleged first-priority lien on the Net Del Rio CFD Bonds Proceeds to secure a purported guaranty of

10   SCC LLC's purported obligation.

11   2.1.46  2.1.47  **Disputed Lien(s)**.  An asserted lien(s) against Assets of the Group III:

12   Voluntary Debtor(s) that is either subject to a Disputed Secured Claim, not duly perfected, subject

13   to an Avoidance Action, or subject to an action pursuant to Bankruptcy Code Sections 510(c)(2)

14   and/or 506(d).  However, pursuant to Section 506(d)(2), a lien is not disputed merely because it

15   secures a claim that "is not an allowed secured claim due only to the failure of any entity to file a

16   proof of such claim under section 501 of this title."

17   2.1.47  2.1.48  **Disputed Secured Claim(s)**. That part of a Disputed Claim against the

18   Group III: Voluntary Debtors that is a Secured Claim.

19   2.1.48  2.1.49  **Distribution(s)**.  Payments to Holders of Allowed Claims provided

20   for under the Plan applicable Plan for the Group III: Voluntary Debtors.

21   2.1.49  2.1.50  **Distribution Agent**.  The entity that is responsible for making

22   Distributions under the Plan Group III: Voluntary Debtors' Plans, which shall be Acquisitions.

23   2.1.50  2.1.51  **Distribution Account(s)**.  Separate account(s) to be

24   established by the Plan Trustee at an FDIC insured bank into which each Group III: Voluntary

25   Debtors' Debtor's Available Cash shall be deposited and all Available Cash received by the Plan

26   Trust after the Confirmation Date that would have belonged to such Group III: Voluntary Debtor

27   shall be deposited, other than Net Sales Proceeds that are subject to Disputed Claims and Disputed

28   Liens.

MAINDOCS-#163424-v4-SCC_Group_III_VD_DS.DOC

2.1.51 2.1.52 **Distribution Date**.  With respect to any Allowed Claim or Allowed Interest, the date on which a Distribution is required to be made under the Plan.applicable Group III: Voluntary Debtor's Plan.

2.1.52 2.1.53 **Effective Date**. A date selected by the SunCal Plan Proponents that is not later than the ninetieth (90th) calendar day after the Confirmation Date. of the applicable Group III: Voluntary Debtor's Plan, and provided there is no stay pending appeal of the Confirmation Order.  The Effective Date may be further extended by the Bankruptcy Court after notice and hearing.  The Effective Date may be further extended by the Bankruptcy Court after notice and hearing to all parties in interest.

2.1.53 2.1.54 **Elieff**.   Bruce Elieff, the president of Acquisitions, a purported obligor on the Bond Claimscertain bond claimsBond Indemnitor with alleged corresponding indemnity Claims against the Debtors.

2.1.54 2.1.55 **Estates**.  The bankruptcy estates of the Group III: Voluntary Debtors created pursuant to Section 541 of the Bankruptcy Code.

2.1.55 2.1.56 **Fee Applications**.   Applications of Professional Persons under Sections 330, 331 or 503 of the Bankruptcy Code for allowance of compensation and reimbursement of expenses in the Group III: Voluntary Debtors' Cases.

2.1.56 2.1.57 **Fee Claim**.  A Claim under Sections 330 or 503 of the Bankruptcy Code for allowance of compensation and reimbursement of expenses in the Group III: Voluntary Debtors' Cases.

2.1.57 2.1.58 **Filed**.  Delivered to, received by and entered upon the legal docket by the Clerk of the Bankruptcy Court.  "File" shall have a correlative meaning.

2.1.58 2.1.59 **Final Order**.  A judgment, order, ruling or other decree issued and entered by the Bankruptcy Court that has not been reversed, stayed, modified or amended.

2.1.59 2.1.60 **General Unsecured Claim**.  A Claim against a Group III: Voluntary Debtor that is not (a) a Secured Claim, (b) an Administrative Claim, (c) a Tax Claim or (d) a Priority Claim.

1    ~~2.1.60~~ 2.1.61  Group III: Voluntary Debtors.    SCC Communities LLC, North

2    Orange Del Rio Land, LLC and Tesoro SF LLC

3

4    ~~2.1.61~~ 2.1.62  Group III Assets: Voluntary Debtors.  The ~~Joshua Ridge Project~~SCC

5    Communities Assets, the Tesoro ~~Project~~Assets and the ~~Net~~ Del Rio ~~CFD Bonds Proceeds~~Assets.

6    ~~2.1.62~~ 2.1.63  Holder.    The beneficial owner of any Claim or Interest against an

7    applicable Group III: Voluntary Debtor.

8    ~~2.1.63~~ 2.1.64  Initial Overbid. The Initial Overbid is the first Qualifying Bid after

9    the Opening Bid that is equal to or in excess of the Initial Overbid Amount.

10    ~~2.1.64~~ 2.1.65  Initial Overbid Amount(s).  In the case of SCC Communities Assets,

11    the Initial Overbid Amount is a sum that is not less than the sum of the Opening Bid, the SCC

12    Communities Break-Up Fee and fifteen thousand dollars ($15,000). In the case of the Tesoro

13    Assets, the Initial Overbid Amount is a sum that is not less than the sum of the Opening Bid, the

14    Tesoro Break-Up Fee and sixty thousand dollars ($60,000).  In the case of the Del Rio Assets, the

15    Initial Overbid Amount is a sum that is not less than the sum of the Opening Bid, the Del Rio

16    Break-Up Fee and six hundred thousand dollars ($600,000)~~In the case of the Joshua Ridge~~

17    ~~Project~~SCC Communities Assets, ~~the Initial Overbid Amount is a sum that is not less than the sum~~

18    ~~of the Opening Bid, the Joshua Ridge~~SCC Communities ~~Break-up~~Up ~~Fee and ten dollars ($10,000).~~

19    ~~In the case of the Tesoro Project~~Assets, ~~the Initial Overbid Amount is a sum that is not less than the~~

20    ~~sum of the Opening Bid, the Tesoro Break-up~~Up ~~Fee and thirty five thousand dollars ($35,000).  In~~

21    ~~the case of the Net Del Rio CFD Bonds Proceeds~~Assets, ~~the Initial Overbid Amount is a sum that is~~

22    ~~not less than the sum of the Opening Bid, the Del Rio Break-Up Fee and one hundred thousand~~

23    ~~dollars ($100,000).~~

24    ~~2.1.65~~ 2.1.66  Insider.   The term shall have the broadest meaning possible under

25    Section 101(31), including, but not limited to, a person in control of the applicable Group III:

26    Voluntary Debtor, Affiliates and Insiders of such Affiliates, including the Lehman Entities.

27

28    ~~2.1.66~~ 2.1.67  Interest.   Any equity security interest in any Group III: Voluntary

Debtor within the meaning, of Section 101(16) of the Bankruptcy Code, including, without limitation, any equity ownership interest in any of the Group III: Voluntary Debtors, whether in the form of common or preferred stock, stock options, warrants, partnership interests, or membership interests.

2.1.67  2.1.68  Joshua Ridge Project.   The Project owned by SCC Communities, located in the City of Victorville, California, as more particularly described herein.

2.1.68  2.1.69  LBHI.   Lehman Brothers Holdings, Inc., a Lehman Entity, the parent company of Lehman ALI and LCPI, and a Chapter 11 debtor in a bankruptcy proceeding pending in the Bankruptcy Court for the Southern District of New York.

2.1.69  2.1.70  LCPI.   Lehman Commercial Paper, Inc., a Chapter 11 debtor in a bankruptcy proceeding pending in the Bankruptcy Court for the Southern District of New York.

2.1.70  2.1.71  Lehman Adversary Proceeding.   The Group III: Voluntary Debtors' claims pending in the adversary proceeding against the Lehman Lenders and/or the Lehman Successors asserting various causes of action including fraudulent inducement, and fraudulent conveyances in connection with the Disputed Interim Loan Agreement.

2.1.71  2.1.72  Lehman ALI.  Lehman ALI, Inc.

2.1.72  2.1.73  Lehman Claim Objections. The objections filed by the Debtors to the claims filed by the Lehman Lenders that are based upon the Lehman Disputed Loans and the Lehman Disputed Administrative Loans, including, but not limited to, the Lehman Recoupment Objection and the Lehman 502(d) Objection.

2.1.74   Lehman's Disputed Claim(s).  All of the Proofs of Secured Claims filed by a Lehman Lender or a Lehman Successor in the Debtors' Chapter 11 Cases, including in the Group III: Voluntary Debtors' Cases, arising from the Lehman Disputed Loans and the Lehman Disputed Administrative Loans.

2.1.73  2.1.75  Lehman's Disputed Lien(s).   All of the alleged liens relating to Proofs of Secured Claims filed by a Lehman Lender or a Lehman Successor in the Debtor's Chapter 11 Cases arising from the Lehman Disputed Loans.

2.1.74   Lehman Entities.  The Lehman Lenders, the Lehman Equity Members and

-15-

1  ~~LBHI.~~

2  ~~2.1.75   Lehman Equity Members.   Lehman Entities that own direct or indirect~~

3  ~~membership Interests in all of the Trustee Debtors, except for SunCal Heartland and SunCal~~

4  ~~Marblehead.~~

5  ~~2.1.76    . Lehman ALI, LCPI, Northlake Holdings, and OVC Holdings.~~

6  ~~2.1.77~~ 2.1.76 Lehman Disputed Loans.  Collectively the following loans that are

7  the purported basis for the Lehman's Disputed Claims:   (a) SunCal Communities I Loan

8  Agreement; (b) Bickford Second Loan Agreement; (c) Ritter Ranch Loan Agreement; (d) SCC

9  Palmdale Loan; (e) Disputed Interim Loan Agreement; (f) SunCal Oak Knoll/SunCal Torrance

10 Loan Agreement; (g) SunCal Century City Loan Agreement; (h) SunCal PSV Loan Agreement;

11 (i) SunCal Delta Coves Loan Agreement; (j) SunCal Marblehead/SunCal Heartland Loan

12 Agreement; (k) Sun Cal Oak Valley Loan Agreement; (l) SunCal Northlake Loan Agreement; (m)

13 Pacific Point First Loan Agreement; ~~and~~ (n) Pacific Point Second Loan Agreement, and (o) the

14 Lehman Disputed Administrative Loan.

15 ~~2.1.78~~ 2.1.77 Lehman Entities.   The Lehman Lenders, the Lehman Equity

16 Members and LBHI.

17 ~~2.1.79~~ 2.1.78 Lehman Equity Members.   Lehman Entities that own direct or

18 indirect membership Interests in all of the Trustee Debtors, except for SunCal Heartland and

19 SunCal Marblehead.

20 ~~2.1.80~~ 2.1.79 Lehman Lenders.   Lehman ALI, LCPI, Northlake Holdings, and

21 OVC Holdings.

22 ~~2.1.81~~ 2.1.80 Lehman Representatives.  The individuals that controlled the Lehman

23 Entities.

24 ~~2.1.82~~ 2.1.81 Lehman Successor(s).  Entities other than the Lehman Lenders that

25 either assert to be or are determined by the Bankruptcy Court to be the beneficial owner(s) of the

26 Lehman Disputed Loan(s), including, but not limited to Fenway Capital, Lehman Re and Danske

27 Bank.

28

MAINDOCS-#163424-v4-SCC_Group_III_VD_DS.DOC

1    2.1.83    Lehman's Disputed Claim(s).  All of the Proofs of Secured Claims filed by

2  a Lehman Lender or a Lehman Successor in the Debtors' Chapter 11 Cases arising from the

3  Lehman Disputed Loans and the Lehman Disputed Administrative Loans.

4    2.1.84  2.1.82  Lehman's Disputed Lien(s).  All of the alleged liens relating to

5  Proofs of Secured Claims filed by a Lehman Lender or a Lehman Successor in the Debtor's Chapter

6  11 Cases arising from the Lehman Disputed Loans.

7    2.1.85    Lexon.  Lexon Insurance Co.

8    2.1.86  2.1.83  Litco.  AnewlyA newly formed Delaware limited liability company.

9    2.1.87  2.1.84  LitCo Plan Loan. A loan that will be made by LitCo, to the extent

10  necessary to pay Administrative Claims against the Debtors, and post Confirmation Effective Date

11  costs incurred by the Plan Trust, including  SunCal ProponentSunCal Plan Proponents in

12  connection with the sale process, and to pay post Effective Date costs incurred by the Plan Trust,

13  including litigation expenses where if applicable, if no other estate funds aresource is available to

14  pay these obligations. LitCo will be capitalized with funds provided by a third party.

15    2.1.88  2.1.85  Litigation Claims.   Any and all interests of the Group III: Voluntary

16  Debtors in any and all Claims, rights, causes of action, and objections or defenses to Claims, liens,

17  rights, or causes of action which have been or may be commenced by the Group III: Voluntary

18  Debtor(s), the Chapter 11 Trustee, or the Voluntary Debtors' Committee and/or the Plan Trust, as

19  the case may be, including, but not limited to, any (i) Avoidance Actions; (ii) for turnover of

20  property to the Group III: Voluntary Debtors' Estates and/or the Plan Trust; (iii) for the recovery of

21  property or payment of money that belongs to the Debtors' Estates or the Plan Trust; (iv) the right to

22  compensation in the form of damages, recoupment or setoff of the Debtors' Estates and/or the Plan

23  Trust; (v) the Lehman Adversary Proceeding; (vi) the State CourtContract Action, and (vii(vii)

24  Lehman Claim Objections (and related Claim Objection Reduction Amount) and (viii) any and all

25  other Claims against Lehman's Disputed Claims and/or Disputed Liens referenced in the Plan or

26  the Disclosure Statement.

27    2.1.89  2.1.86  Litigation Recoveries.  Any Cash or other property received by the

28  Chapter 11 Trustee, the Group III: Voluntary Debtors, the Voluntary Debtors' Committee and/or

1  the Plan Trust, as the case may be, from all or any portion of a Litigation Claim(s), including, but

2  not limited to, awards of damages, attorneys' fees and expenses, interest and punitive damages,

3  whether recovered by way of settlement, execution on judgment or otherwise.

4  2.1.90  Joshua Ridge Break up Fee. The sum of six thousand four hundred dollars

5  ($6,400) that will be paid to the Stalking Horse Bidder that submits the Opening

6  Bid for the Joshua Ridge Project, if such Stalking Horse Bidder is not the Winning

7  Bidder.

8  2.1.91 2.1.87  **Maximum Distributions.**  A Distribution to a Holder of an

9  Allowed General Unsecured Claim against a Group III: Voluntary Debtor equal to one hundred

10 percent (100%) of the amount of the Holder's Allowed General Unsecured Claim plus interest at

11 the Legal Rate from and as of the Group III: Voluntary Debtor's Petition Date.

12 2.1.92 2.1.88  **MB Firm.**  Miller Barondess, LLP.

13 2.1.93 2.1.89  **Minimum Increment.**  The Minimum Increment is the

14 minimum bid after the Initial Overbid.  The Minimum Increment applicable to the sales of the

15 Group III Assets: Voluntary Debtors is as follows:  $300,000 with respect to the Del Rio Assets,

16 $7,500 with respect to the SCC Communities Assets and $30,000 with respect to the Tesoro Assets

17 Minimum Increment applicable to the sales of the Group III Assets: Voluntary Debtors is fifty

18 thousand dollars ($50,000), until there are only two Qualified Bidders submitting bids for a Group

19 III Asset: Voluntary Debtor, then the Minimum Increment shall be fifty thousand dollars ($25,000).

20 2.1.94 2.1.90 **Minimum Sale Price**. The minimum gross sale price that must be

21 paid for either the Joshua Ridge Project SCC Communities Assets, the Tesoro Project Assets or the

22 Net Del Rio CFD Bonds Proceeds Assets before such project Assets can be sold pursuant to the

23 Plan. Group III: Voluntary Debtor(s)' Plans. Such prices are $144,000, $666,000 and $6,390,000

24 respectively.

25 2.1.95 2.1.91 **Net Del Rio CFD Bonds Proceeds.** The net proceeds of the CFD

26 Bonds that were issued by City of Orange and authorized by Order of the Bankruptcy Court,

27 described in Exhibit "1." to the Disclosure Statement after payment of all Claims authorized under

28 the Acquisition Agreement.

2.1.96  2.1.92  Net Litigation Recoveries.   Litigation Recoveries less associated Administrative Claims and Post-Confirmation Expenses incurred in connection with such Litigation Recoveries.

2.1.97  2.1.93  Net Sales Proceeds.   The Cash generated from the sale(s) or liquidation of the Group III: Voluntary Debtor(s)' Assets or the Plan Trust's Assets, less payment of selling expenses, taxes, Chapter 11 Trustee fees, and any associated Post-Confirmation Expenses and Administrative Claims incurred in furtherance of such sales or liquidation of such Assets.

2.1.98  2.1.94  Net Sales Proceeds Account(s).   Separate account(s) that will be established by the Plan Trustee at an FDIC insured bank into which all Net Sale Sales Proceeds shall be deposited from the sale of Assets that were allegedly encumbered by a Disputed Secured Claim(s) and/or a Disputed Lien(s).  There shall be a separate Net Sales Proceeds Account for the Net Sale Proceeds allegedly subject to each Disputed Secured Claim(s) and/or Disputed Lien(s), except where there are two Disputed Liens on a single Project, in which case, there shall be a single account for the proceeds generated from that Project.  The Disputed Secured Claim(s) and/or Disputed Lien(s) shall attach to the corresponding Net Sales Proceeds Account(s) pending any Final Order(s) of the Bankruptcy Court resolving the applicable Disputed Secured Claim(s) and/or applicable Disputed Lien(s).  To the extent that a particular Disputed Claim is disallowed or a particular Disputed Lien is avoided (other than transferred to the Estates pursuant to Bankruptcy Code Section 510(c)(2)) or otherwise invalidated, such Net Sales Proceeds allegedly subject thereto shall become Available Cash and shall be transferred to the applicable Distribution Account(s).  To the extent that a particular Disputed Secured Claim and a Disputed Lien are allowed and deemed valid but subject to the equitable subordination causes of action in the Lehman Adversary Proceeding, the funds shall remain in the Net Sales Accounts pending a Final Order on the equitable subordination causes of action in the Lehman Adversary Proceeding.

2.1.99  2.1.95  Opening Bid.  Opening Bid means the offer for one, or both or all three of the Group III Assets: Voluntary Debtors, which is equal to the Minimum Sale Price(s) accepted by the Debtor for either one, or both or all of the Group III Assets: Voluntary Debtors as the case may be.  The Opening Bid for the Del Rio Assets is $ 6,390,000; the Opening Bid for the

SCC Communities Assets is $ 144,000; and the Opening Bid for the Tesoro Assets is $ 666,000.

2.1.100  2.1.96    Orders for Relief Date.  The following are dates that orders for relief were entered for each of the Trustee Debtors:

| | |
|---|---|
| SunCal Oak Valley | January 6, 2009 |
| SunCal Heartland | January 6, 2009 |
| SunCal Northlake | January 6, 2009 |
| SunCal Marblehead | January 6, 2009 |
| SunCal Century City | January 6, 2009 |
| SunCal PSV | January 6, 2009 |
| Delta Coves | January 6, 2009 |
| SunCal Torrance | January 6, 2009 |
| SunCal Oak Knoll | January 6, 2009 |

2.1.101  Tesoro Assets Break-up Fee.  The sum of thirty thousand four hundreddollarshundred dollars ($30,400) that will be paid to the Stalking Horse Bidder that submits the Opening Bid for the Tesoro ProjectAssets, if such Stalking Horse Bidder is not the Winning Bidder.

2.1.102  2.1.97    Person.  An individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, governmental authority, governmental unit, committee or other entity of whatever nature.

2.1.103  2.1.98    Petition Dates.  The following are dates that each of the Voluntary Debtors filed their Voluntary Chapter 11 petitions or Creditors filed involuntary Chapter 11 petitions against the Trustee Debtors:

| | |
|---|---|
| Palmdale Hills | November 6, 2008 |
| SunCal Beaumont | November 6, 2008 |
| SCC Palmdale | November 7, 2008 |
| SunCal Johannson | November 7, 2008 |
| SunCal Summit Valley | November 7, 2008 |
| SunCal Emerald | November 7, 2008 |
| SunCal Bickford | November 7, 2008 |
| Acton Estates | November 7, 2008 |
| Seven Brothers | November 7, 2008 |
| SJD Partners. | November 7, 2008 |
| SJD Development | November 7, 2008 |
| Kirby Estates | November 7, 2008 |

| SunCal I | November 7, 2008 |
| SunCal III | November 7, 2008 |
| SCC Communities | November 19, 2008 |
| Del Rio | November 19, 2008 |
| Tesoro | November 19, 2008 |
| Delta Coves Ventures, LLC | November 14, 2008 |
| SunCal Heartland, LLC | November 12, 2008 |
| SunCal Marblehead, LLC | November 12, 2008 |
| LB-L-SunCal Northlake, LLC | November 12, 2008 |
| LB-L-SunCal Oak Valley, LLC | November 12, 2008 |
| SunCal Century City, LLC | November 14, 2008 |
| SunCal PSV, LLC | November 14, 2008 |
| SunCal Torrance Properties, LLC | November 14, 2008 |
| SunCal Oak Knoll, LLC | November 19, 2008 |

2.1.104  2.1.99    Plan (s).  The First  Second  Amended Chapter 11 Plans Filed Plan(s) filed respectively by SunCal Plan Proponents In The Chapter 11 Cases Of SCC Communities LLC, North Orange Del Rio Land, LLC and Tesoro SF LLC, in their capacities as debtors and debtors in possession, together with the Exhibits thereto, as the same may be amended or modified from time to time in accordance with the Plan.

2.1.105  Plan Documents.  The respective Group III: Voluntary Debtor(s) Plan,(s), the respective Group III: Voluntary Debtor(s) Plan Trust Agreement(s) and all other documents attached to the respective Group III: Voluntary Debtor(s) Plan Supplement.(s).

2.1.100   Plan Period.  The respective Group III: Voluntary Debtor(s) period(s) from the Effective Date to the Group III: Voluntary Debtor(s) Plan Termination Date.

2.1.106  Plan Supplement.  The compilation of the respective Group III: Voluntary Debtor(s) Plan Documents to be filed with the Bankruptcy Court.

2.1.107  2.1.101    Plan  for the respective Group III: Voluntary Debtor(s). Plan Termination Date.  The fifth (5th) anniversary date of the Effective Date, for the Group III: Voluntary Debtor(s) Plan(s), unless the Group III: Voluntary Debtor(s) Plan elects(s) elect an earlier date.

2.1.108  2.1.102    Plan Sponsor.  The entity that has committed to cause the funding of certain specified obligations under the Group III: Voluntary Debtor(s) Plan(s) on or after

the Effective Date.  The Plan Sponsor is Acquisitions.

2.1.109  2.1.103    Plan Trust(s).  A liquidating trust to be established prior to or on the Effective Date, for the Group III: Voluntary Debtor(s) Plan(s), with Acquisitions as the Plan Trustee and the Holders of Allowed Claims against the Debtors Group III: Voluntary Debtor(s) as the beneficiaries. The purpose of the Group III: Voluntary Debtor(s) Plan Trust will be to liquidate the Debtors' Group III Assets: Voluntary Debtor(s) (other than Assets that are excluded by the Plan Trustee on the grounds that they lack value or would be difficult to administer) and to otherwise consummate the Plan. Group III: Voluntary Debtor(s) Plan(s).

2.1.110  2.1.104    Plan Trustee. The Group III: Voluntary Debtor(s) Plan Trustee under the Group III: Voluntary Debtor(s) Plan Trust Agreement is Acquisitions.

2.1.111    Plan Trust Agreement(s). The liquidating trust agreement for each of Group III: Voluntary Debtor(s) governing the affairs of the Group III: Voluntary Debtor(s) Plan Trust, which will be in substantially the form contained in the Group III: Voluntary Debtor(s) Plan Supplement.

2.1.112  2.1.105    Plan Trust Beneficiaries. The The Group III: Voluntary Debtor(s) Plan Trust Beneficiaries are (i) the holders of Beneficial Interests, as of any point in time, and (ii) holders of Allowed Claims that shall be satisfied from the Group III: Voluntary Debtor(s) Plan Trust Assets Property in accordance with the terms of the Plan. Group III: Voluntary Debtor(s) Plan(s).

2.1.113  2.1.106    Plan Trust Property Assets. Plan Trust Property means all All property  assets within the Chapter 11 estates of the Group III: Voluntary Debtors, other than property that is affirmatively excluded by the Group III: Voluntary Debtor(s) Plan Trustee.

2.1.114  2.1.107    Post-Confirmation Expenses.  The fees and expenses incurred by the Group III: Voluntary Debtor(s) Plan Sponsor Trust, the Group III: Voluntary Debtor(s) Plan Trustee and the Voluntary Debtors' Committee and their professionals following the Confirmation Date (including the fees and costs of Professionals) for the purpose of otherwise consummating the Group III: Voluntary Debtors' Plan(s) (i) prosecuting and liquidating the Litigation Claims; (ii) objecting to and resolving Disputed Claims and Disputed Liens; (iii) selling or otherwise

liquidating the Plan Trust's Assets; (iv) effectuating Distributions under the ~~Plan;~~Group III: Voluntary Debtors' Plan(s); and (v) otherwise consummating the Plan and closing the Group III: Voluntary Debtors' Chapter 11 Cases.

~~2.1.115~~ 2.1.108    Priority Claim.    Any Claim, other than an Administrative Claim or a Tax Claim, to the extent entitled to priority under Section 507(a) of the Bankruptcy Code.

~~2.1.116~~ 2.1.109    Pro Rata.    Proportionately, so that with respect to any ~~distribution~~Distribution in respect of any Allowed Claim, the ratio of (a)(i) the amount of property distributed on account of such Allowed Claim to (ii) the amount of such Allowed Claim, is the same as the ratio of (b)(i) the amount of property distributed on account of all Allowed Claims of the Class or Classes sharing in such ~~distribution~~Distribution to (ii) the amount of all Allowed Claims in such Class or Classes.

~~2.1.117~~ 2.1.110    Professional.    A Person or Entity (a) employed by the Group III: Voluntary Debtors, the Voluntary Debtors' Committee pursuant to a Final Order in accordance with Sections 327 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to the Effective Date, pursuant to Sections 327, 328, 3291 330 and 331 of the Bankruptcy Code, or (b) for which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to Section 503(b) of the Bankruptcy Code.

~~2.1.118~~ 2.1.111    Professional Fees.    All Allowed Claims for compensation and for reimbursement of expenses under Sections 328, 330 and/or 503(b) of the Bankruptcy Code

~~2.1.119~~ 2.1.112    Projects.    The Debtors' residential real estate development projects and other assets as separately defined herein and described in Exhibit "1" to the Disclosure Statement.

~~2.1.120~~ 2.1.113    Qualifying Bid.    Qualifying Bid means, with respect to any bid on a Group III Asset:(s): Voluntary ~~Debtor~~Debtors, a bid made by Qualifying Bidder that is A) equal to or in excess of the Initial Overbid Amount, ~~if~~ unless it is the Initial Overbid, or B) in excess of the immediately preceding Qualifying Bid by the Minimum Increment, if it is not the Initial Overbid.

1    ~~2.1.121~~ 2.1.114    Qualifying Bidder.  Qualifying Bidder means a bidder who a)

2    has deposited the following sum(s) in an escrow designated by the SunCal Plan Proponents:

3    $150,000 with respect to the Del Rio Assets, $75,000 with respect to the Tesoro Assets and

4    $25,000 with respect to the SCC Communities Assets; ~~Qualifying Bidder means a bidder who a)~~

5    ~~has deposited the sum of one hundred thousand dollars ($100,000) in an escrow designated by the~~

6    ~~SunCal Proponent~~SunCal Plan Proponents; b) who has provided the SunCal Plan Proponents

7    evidence confirming that such bidder has the financial means to acquire the applicable Group III

8    Assets: Voluntary Debtor(s) that such bidder is seeking to acquire, and c) agreed that this sum will

9    be forfeited as liquidated damages if such bidder is the Winning Bidder and fails to perform; and ~~c)~~

10    ~~who has provided the SunCal Plan Proponents evidence confirming that such bidder has the~~

11    ~~financial means to acquire the applicable Group III Asset~~Assets: Voluntary Debtor(s) that such

12    ~~bidder is seeking to acquire~~.

13    ~~2.1.122~~ 2.1.115    Sale Period. ~~The~~ For each Group III: Voluntary Debtors'

14    Plan(s), the Sale Period is the time period during which the ~~SunCal Proponent~~SunCal Plan

15    Proponents must consummate a sale or liquidation of the Group III Assets: Voluntary Debtors.  The

16    Sales Period shall commence on the Confirmation Date and shall expire on or before thirty (30)

17    days the Effective Date unless extended by the Bankruptcy Court after notice and hearing.

18    ~~2.1.123~~ 2.1.116    SCC Communities.  SCC Communities LLC, a limited

19    liability company, a ~~Voluntary Debtor (a~~ Group III: Voluntary Debtor~~),~~, and the owner of the

20    ~~Joshua Ridge Project~~SCC Communities Assets.

21    2.1.117    SCC Communities Assets.  All Assets of SCC Communities, including but

22    not limited to cash on hand, Litigation Claims, and the Joshua Ridge Project.

23

24    2.1.118    SCC Communities Assets Break-Up Fee. The amount equal to 2.5% of

25    the Minimum Sales Price for the SCC Communities Assets, plus actual amounts paid on Allowed

26    Administrative Claims for the SCC Communities Case, ~~The sum of six thousand four hundred~~

27    ~~dollars ($6,400)~~ that will be paid to the Stalking Horse Bidder that submits the Opening Bid for the

28    SCC Communities Assets, if such Stalking Horse Bidder is not the Winning Bidder.

2.1.124  2.1.119    **SCC LLC**.    SCC Acquisitions LLC, a limited liability company, a subsidiary of Acquisitions and an indirect and/or a direct parent company of all of the Debtors.

2.1.125  2.1.120    **Schedules**.  The schedules of assets and liabilities and list of equity security holders Filed by the Group III: Voluntary Debtors, as required by Section 521(1) of the Bankruptcy Code, Bankruptcy Rules 1007(a)(3) and (b)(1), and Official Bankruptcy Form No. 6, as amended from time to time.

2.1.126  2.1.121    **Secured Claim**.  A Claim secured by a lien on any property of any of the Group III: Voluntary Debtor(s) Estate.(s), but only to the extent of the value of the interest of the holder of such Allowed Claim in the interest of the Estate in such property.

2.1.127  2.1.122    **Stalking Horse Bidder**.  The Qualified Bidder who submits the Opening Bid on the applicable Group III Asset(s): Voluntary Debtors that is accepted by such Debtor.

2.1.128  2.1.123    **Secured Claim**.  Any Claim, including interest, fees, costs, and charges to the extent allowable pursuant to Bankruptcy Code Section 506, that is secured by a valid and unavoidable Lien on the Group III: Voluntary Debtor(s)' Assets.

2.1.129   State Court Action. The action filed by certain Voluntary Debtors against Lehman AliALI, Inc., and certain other defendants, in California Superior Court for the County of Orange (Case No. 30-2011-0040847-CU-BC-CJC), and a reservation of rights to add the Plan Trustee and/or the Trustee Debtors as additional plaintiffs therein.

2.1.130  2.1.124    **SunCal**.    The SunCal Companies, a trade name for Acquisitions and its Affiliates.

2.1.131  2.1.125    **SunCal Management**.    SunCal Management, LLC, a Delaware limited liability company, and the former property manager for the Projects, which has been succeed by Argent Managementand the property manager for the Projects.

2.1.132  2.1.126    **SunCal Plan Proponent(s)**. The Group III: Voluntary Debtors in their capacity as debtors and debtors-in-possession in their respective Chapter 11 Cases and Acquisitions as the parties-in-interest that are proposing that are proposing the PlanGroup III:

Voluntary Debtors' Plans in their respectivethe applicable Voluntary Debtors Cases.

2.1.133 2.1.127    **Tax**.  Any tax, charge, fee, levy, impost or other assessment by any federal, state, local or foreign taxing authority, including, without limitation, income, excise, property, sales, transfer, employment, payroll, franchise, profits, license, use, ad valorem, estimated, severance, stamp, occupation and withholding tax.  "Tax" shall include any interest or additions attributable to, or imposed on or with respect to such assessments.

2.1.134 2.1.128    **Tax Claim**.  Any Claim for any Tax to the extent that it is entitled to priority in payment under Section 507(a)(8) of the Bankruptcy Code.Tesoro.  Tesoro SF, LLC, a Delaware limited liability company, a Voluntary Debtor (a Group III: Voluntary Debtor), and the owner of the Tesoro Project.

2.1.129    Tesoro.  Tesoro SF, LLC, a limited liability company, a Group III: Voluntary Debtor, and the owner of the Tesoro Assets.

2.1.130    Tesoro Assets.  All Assets owned by Tesoro, including but not limited to cash on hand, Litigation Claims, and the Tesoro Project.

2.1.131    Tesoro Break-up Fee. The amount equal to 2.5% of the Minimum Sales Price for the Tesoro Assets, plus actual amounts paid on Allowed Administrative Claims for  the Tesoro Case, that submits the Opening Bid for the Tesoro Assets, if such Stalking Horse Bidder is not the Winning Bidder.

2.1.135 2.1.132    **Tesoro Project**.  The Project owned by Tesoro, located in the City of Santa Clarita, California, as more particularly described herein.

2.1.136 2.1.133    **Trustee Debtor(s)**. The following Debtors, individually or collectively, that are represented by the Chapter 11 Trustee: Delta Coves, SunCal Heartland, SunCal Marblehead, SunCal Northlake, SunCal Oak Valley , SunCal Century City, SunCal PSV, SunCal Torrance, and SunCal Oak Knoll.

2.1.137 2.1.134    **Unpaid Secured Real Property Tax Claims**.  Secured Claims held by various government entities secured by liens on the underlying real properties owned by the DebtorsGroup III: Voluntary Debtor(s) but that are non-recourse to the Debtors.

2.1.138 2.1.135    **Unsecured Claim**. An Unsecured Claim is any Claim that is

not an Administrative Claim, Tax Claim, Secured Claim, or Priority Claim.

~~2.1.139~~ 2.1.136    **Voluntary Debtor(s).**  The following  Chapter 11 debtors and debtors-in-possession, individually or collectively, Palmdale Hills, SunCal I, SunCal III, SCC Palmdale, Acton Estates, SunCal Beaumont, SunCal Emerald, SunCal Johansson, SunCal Bickford, SunCal Summit, Seven Brothers, Kirby Estates, SJD Partners, SJD Development, SCC Communities, Del Rio and Tesoro.

~~2.1.140~~ 2.1.137    **Voluntary Debtors' Committee.**  The Official Committee of Unsecured Creditors of the Voluntary Debtors appointed in the Cases pursuant to Section 1102 of the Bankruptcy Code.

~~2.1.141~~ 2.1.138    **Winning Bid.** The highest and best Qualifying Bid received for the ~~Joshua Ridge Project or the Tesoro Project.~~Group III Asset(s): Voluntary Debtors and accepted by the Applicable Debtor.~~.~~

~~2.1.142~~ 2.1.139    **Winning Bidder.**  The party that submits the highest and best Qualifying Bid that is accepted by the applicable Debtor.

**2.2    Rules of Construction.**

For purposes of the applicable Plan(s) and ~~this~~the Disclosure Statement, unless otherwise provided herein or in the ~~Plan.~~applicable Plan(s), (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural; (b) each pronoun stated in the masculine, feminine or neuter includes the masculine, feminine and neuter; (c) any reference in the applicable Plan(s) or ~~this~~the Disclosure Statement to an existing document or schedule filed or to be filed means such document or schedule, as it may have been or may be amended, modified or supplemented pursuant to the ~~Plan:~~applicable Plan(s); (d) any reference to an entity as a Holder of a Claim or Interest includes that entity's successors and assigns; (e) except as otherwise indicated herein all references in the Group III: Voluntary Debtors Plan(s) or ~~this~~the Disclosure Statement to Sections, Articles and Exhibits are references to Sections, Articles and Exhibits of or to the applicable Plan~~:~~(s); (f) the words "therein," "thereunder" and "thereto" refer to the ~~PlanPlan~~applicable Plan(s) in its entirety rather than to a particular portion of the ~~Plan:~~applicable Plan(s); and (g) unless otherwise provided in the

MAINDOCS-#163424-v4-SCC_Group_III_VD_DS.DOC

1    applicable Plan(s) or thisthe Disclosure Statement, any reference in the Plan(s) or thisthe

2    applicable Disclosure Statement to a contract, instrument, release, indenture, agreement, or other

3    document being in a particular form or on particular terms and conditions means that such

4    document shall be substantially and materially in such form or substantially and materially on such

5    terms and conditions; (h) any reference in the applicable Plan(s) or thisthe Disclosure Statement to

6    a document, schedule, or exhibit to the Planapplicable Plan(s) or Disclosure Statement Filed or to

7    be Filed means such document, schedule, or exhibit, as it may have been or may be amended,

8    modified, or supplemented; and (i) the rules of construction set forth in Section 102 of the

9    Bankruptcy Code shall apply to the extent such rules are not inconsistent with the express terms of

10    the applicable Plan(s) or thisthe Disclosure Statement or any other provision in this Section 32.2.

11        **2.3**    **Exhibits.**

12        All Exhibits to the Plan are incorporated into and are a part of the Plan as if set forth in full

13    therein.

14    **III.**

15    **PLAN CONFIRMATION DEADLINES**

16        The Bankruptcy Court has not confirmed any of the Plan(s) described in this Disclosure

17    Statement.  Accordingly, the terms of the Plan are not binding on anyone.  However, if the

18    Bankruptcy Court confirms one or all of the Plan(s), then the Plan will be binding on the applicable

19    Debtor(s), the Plan Trustee, and on all Creditors and Interest Holders in such Cases.

20        **3.1**    **Time and Place of the Confirmation Hearing.**

21        The hearing where the Bankruptcy Court will determine whether or not to confirm the Plan

22    will take place at 411 West Fourth Street, Santa Ana, CA 92701-4593 on October 24, 2011, at 9:30

23    a.m. in Courtroom 5A.

24        **3.2**    **Deadline for Voting for or Against the Plan.**

25        If you are entitled to vote, it is in your best interest to timely vote on the enclosed ballot and

26    return the ballot to:

27            Winthrop Couchot Professional Corporation
28            660 Newport Center Drive, Suite 400
        Newport Beach, CA 92660

Facsimile:  (949) 720-4111
Attn:  P.J. Marksbury

Your ballot must be **received by** September 26, 2011**,** or it will not be counted.

### 3.3   Deadline for Objecting to the Confirmation of the Plan(s).

Objections to the confirmation of the Plan must be filed with the Bankruptcy Court, and served upon the following parties so that they are received by September 26, 2011:

| | |
|---|---|
| **Counsel to the Voluntary Debtors** | Paul J. Couchot<br>Winthrop Couchot Professional Corporation<br>660 Newport Center Drive, Suite 400,<br>Newport Beach, CA 92660 |
| **Authorized Agent for Voluntary Debtors** | Bruce V. Cook<br>General Counsel<br>2392 Morse Ave<br>Irvine, CA 92614-6234 |
| **Counsel for SunCal Management LLC and SCC Acquisitions Inc**. | Ronald Rus<br>Rus Miliband & Smith A<br>Professional Corporation<br>2211 Michelson Drive, Seventh Floor<br>Irvine, California 92612 |
| **Authorized Agent for SunCal Management and SCC Acquisitions, Inc**. | Bruce V. Cook<br>General Counsel<br>2392 Morse Ave<br>Irvine, CA 92614-6234 |

### 3.4   Identity of Person to Contact for More Information Regarding the Plan.

Any interested party desiring further information about the Plan should contact the Voluntary Debtors' counsel, Winthrop Couchot Professional Corporation, 660 Newport Center Drive, Suite 400, Newport Beach, CA 92660, Attn:  Paul J. Couchot, (949) 720-4100; Peter W. Lianides, (949) 720-4155; Payam Khodadadi, (949) 720-4160.

### 3.5   Disclaimer.

The information contained in this Disclosure Statement is provided by the SunCal Plan Proponents.  The SunCal Plan Proponents represent that everything stated in this Disclosure Statement is true to the best of their knowledge.  The Bankruptcy Court has not yet determined

1    whether or not the Plan is confirmable and makes no recommendation as to whether or not you

2    should support or oppose the Plan.

3        The discussion in this Disclosure Statement regarding the Group III: Voluntary Debtors

4    may contain "forward looking statements" within the meaning of the Private Securities Litigation

5    Reform Act of 1995.  Such statements consist of any statement other than a recitation of historical

6    fact and can be identified by the use of forward looking terminology such as "may," "expect,"

7    "anticipate," "estimate," or "continue," or the negative thereof or other variations thereon or

8    comparable terminology.  The reader is cautioned that all forward looking statements are

9    necessarily speculative and there are certain risks and uncertainties that could cause actual events

10   or results to differ materially from those referred to in such forward looking statements.  The

11   liquidation analyses, distribution projections, projections of financial results and other information

12   are estimates only, and the timing, amount and value of actual distributions to Creditors may be

13   affected by many factors that cannot be predicted.  Therefore, any analyses, estimates, or

14   projections may or may not turn out to be accurate.

15       The SunCal Plan Proponents and their professionals have made a diligent effort to identify

16   in this Disclosure Statement all Litigation Claims, including claims for relief, counterclaims, and

17   objections to claims.  However, no reliance should be placed on the fact that a particular Litigation

18   Claim is or is not identified in this Disclosure Statement.  The Group III: Voluntary Debtors or

19   other parties in interest may seek to investigate, file and prosecute Litigation Claims after the

20   Confirmation Date, or the Plan Trust may seek to do so after the Effective Date of the Plan whether

21   or not the Litigation Claims are identified in this Disclosure Statement.

22                              **IV.**

23                **FACTUAL BACKGROUND OF THE DEBTORS**

24   **4.1        The Formation of the Debtors and the Projects.**

25          **4.1.1    Overview of the Debtors and their Projects.**

26   The Group III: Voluntary Debtors are ~~two~~ three of twenty-six entities (collectively the

27   "Debtors") that were formed pursuant to a joint venture between Affiliates of the SunCal

28   Companies ("SunCal") and the Lehman Entities (the "SunCal/Lehman Joint Venture").  The

1  Debtors role in the venture was to own and develop the large residential projects that were the core

2  assets in this joint undertaking.

3     At the inception of SunCal/Lehman Joint Venture, it was agreed that SunCal would be the

4  developer/manager of the Projects and the Lehman Entities would provide the necessary capital.

5  Attached hereto as Exhibit "1" is a general description of the Debtors' Projects, including the

6  Group III Assets: Voluntary Debtors, and the Debtors' other primary Assets, excluding Cash and

7  the Litigation Claims, and a description of the loans for the Projects that are not a part of Group III

8  Assets: Voluntary Debtors.

9     All of the Debtors are Affiliates of Acquisitions and SCC LLC.  Some of the Debtors

10  directly own the Projects, while others serve as holding companies, owning Allowed Interests in the

11  Debtors that hold title to the Projects.  ~~SunCal Management, LLC, a SunCal Affiliate, has~~

12  ~~management contracts with respect to all of the Projects and manages the Debtors' day-to-day~~

13  ~~business affairs.~~

14     The seventeen Debtors who are referred to herein as the "Voluntary Debtors" are wholly

15  owned by SunCal Affiliates, and consequently the SunCal Affiliates have full corporate

16  governance authority over these entities.  The Voluntary Debtors own eleven (11) of the Projects.

17  In the case of the nine Trustee Debtors, the SunCal Affiliates and the Lehman Affiliates initially

18  shared ownership equally (50% each). However, after the Petition Date, the SunCal Affiliates

19  became the owner of hundred percent (100%) of the equity in two of the nine Trustee Debtors -

20  SunCal Heartland and SunCal Marblehead.  The Trustee Debtors own nine (9) Projects.

21  Attached hereto as Exhibit "2" is a chart that sets forth the appraised value of the Group III:

22  Voluntary Debtors' Projects. This chart lists both the Lehman Lenders' value estimates and

23  SunCal's valuation estimates.[2]  As the chart indicates, the Lehman Lenders' valuation for the

24  Joshua Ridge Project is $1,200,000 and for the Tesoro Project is $1,850,000.  The Lehman Lenders

25  have not provided a value for the Net Del Rio CFD Bonds Proceeds.  The SunCal valuation for the

26  Joshua Ridge Project is $160,000, for the Tesoro Project is $740,000 and for the Net Del Rio CFD

27  Bonds Proceeds is $7,100,000.  ~~Group III Assets: Voluntary Debtors is in the aggregate amount of~~

28

---

[2] Values may have changed since these analyses were prepared.

1    $3,050,000, while the Debtors' valuation of the Group III Assets: Voluntary Debtors is in the

2    aggregate amount of $900,000.

3         The Plan eliminates any potential value disputes by providing for the sale of the Group III

4    Assets: Voluntary Debtors through an auction that is designed to yield the highest market price for

5    these assets. Accordingly, to the extent any other party believes the Group III Assets: Voluntary

6    Debtors have a greater value than the Opening Bid offered by another Qualifying Bidder, they will

7    have the opportunity to submit a Qualifying Bid (but no credit-bids will be allowed) that exceeds

8    the Opening Bid and, if they so desire, to become the Winning Bidder by offering the highest

9    Qualifying Bid. This market sale process will insure that the rights of all stakeholders are

10   protected.

11        **4.1.2    The Group III: Voluntary Debtors' Primary Secured Creditors and**

12   **Their Disputed Claims.**

13        Lehman ALI holds the primary secured claims against the Joshua Ridge Project belonging

14   to SCC Communities, the Tesoro Project belonging to Tesoro, and the net Del Rio CFD Bonds

15   belonging to Del Rio. Lehman AliALI's secured claim is based upon its funding provided under the

16   terms ofpursuant to the Disputed Interim Loan Agreement. The asserted balance due under terms of

17   this loan was $23,795,012.59 as of March 30, 2009. This claim is also collateralized by a lien

18   against the Heartland Project.

19        **4.1.3    Disputed Claims and Liens.**

20        As discussed in detail herein, during the course of the Debtors' Cases, most of the Debtors

21   initiated litigation disputing the validity of Lehman's Disputed Secured Claims, and the validity,

22   priority and extent of Lehman's Disputed Liens.  This litigation is being pursued through the

23   Lehman Adversary Proceeding, various contested matters, and in potential lawsuits based on the

24   post-petition conduct of the Lehman Entities and/or their agents.

25        Attached hereto as Exhibit "3" is a chart that sets forth Lehman's Disputed Secured Claims,

26   the alleged Holders of the Lehman Disputed Secured Claims, the collateral encumbered by the

27   Lehman Disputed Liens, and the alleged outstanding amount based on the filed Proofs of Claim.

28   As the chart indicates, the total of Lehman's Disputed Secured Claims (based upon the proofs of

claims filed in the Debtor's bankruptcy cases) with respect to the Group III: Voluntary Debtors is approximately $23,795,013 in each cash.  However, as explained below, Lehman directed the loan proceeds to be mostly used for purposes other than the needs of the Group III Voluntary Debtor Projects.

### 4.1.3.   Del Rio Bond Issuance.

Del Rio sold its Project prepetition.  However, it continues to hold the right to receive the Net Del Rio CFD Bonds Proceeds issued by the City of Orange, which have an estimated value of approximately $7.1 million to $8 million.

On March 16, 2010, the Court entered an order which authorized the issuance and the sale of the Del Rio CFD Bonds, and certain creditor payments.  As set forth in detail below, from the closing, approximately $6.7 million of claims (including approximately $2,924,827 of SunCal Management claims) against Del Rio were paid.

| | |
|---|---|
| All American Asphalt | $52,468.13 |
| Bova Contracting Corp. | $199,982.63 |
| Sierra Pacific Electrical Contracting | $49,507.61 |
| Charles Backlet & Associates | $241.00 |
| Chino Grading, Inc. | $3,256.00 |
| City of Orange | $1,959.00 |
| Consolidated Reprographics | $281.96 |
| County of Orange | $192.50 |
| Coastal Traffic Systems | $1,800.00 |
| Debby Cobb Consulting | $207.50 |
| Elfend and Associates, Inc. | $225,000.00 |
| Fuscoe Engineering, Inc. | $288,800.00 |
| Greenfield Communications, Inc. | $1,419,697.52 |
| Goodwin Procter LLP | $100,000.00 |
| Hillcrest Contracting, Inc. | $153,859.95 |
| Jackson, DeMarco, Tidus & Peck | $834.50 |
| Lennar/Centex Del Rio Partners | $495,644.56 |
| Michael Brandman and Associates | $2,117.52 |
| Mobile Mini, Inc. | $585.25 |
| OCB Reprographics, Inc. | $6,054.59 |
| Pacific Soils Engineering, Inc. | $80,077.38 |
| Pacific Strategies | $30,000.00 |
| Park West Landscape, Inc. | $185,136.21 |
| Professional Reprographic Services | $592.35 |
| Reznick Group, Inc. | $946.00 |
| Robert Law | $4,000.00 |
| Rohm Insurance Agency | $33,825.00 |

-33-

| | |
|---|---|
| SWRCB Accounting Office | $1,622.00 |
| Summers, Murphy and Partners, Inc. | $53,350.00 |
| SunCal Management LLC | $2,924,827.08 |
| The Law Offices of Carmen A. Morinello | $110,000.00 |
| Trench Shoring Company | $536.25 |
| Voss, Cook and Thel, LLP | $768.00 |
| White and Case | $277,679.00 |
| **TOTAL** | **$6,705,849.49** |

As set forth below, there are currently asserted General Unsecured Claims against Del Rio in the amount of $2,013,641 that have not been paid.  The Holders of such Claims include Bond Safeguard, asserting a Claim in the amount of $3,159,945 which Del Rio disputes, Lennar Centex, asserting a Claim in the amount of $3,063,480 which Del Rio disputes, and National Registered Agents, asserting a Claim in the amount of $1,537.  The Holders of these Claims will be provided the treatment set forth in the Group III: Voluntary Debtor Plan.

**4.1.4  4.1.3    A Summary of All of the Alleged Claims Against the Group III: Voluntary Debtors.**

Attached hereto as Exhibit "4" is a chart that sets forth the prepetition Claims that have been asserted against all of the Debtors.  In summary, the asserted Claims against the Group III: Voluntary Debtors consist of the following:

| Claims | SCC Communities | Del Rio | Tesoro |
|---|---|---|---|
| Unpaid Secured Real Property Tax Claims | $47,163 | $0 | $~~123,366~~103,085 |
| The Disputed Lehman Secured Claims | $23,795,013 | $23,795,013 | $23,795,013 |
| Administrative and Priority Claims | $87,984.52 | $0 | $385,198.12 |
| General Unsecured Claims Including alleged Bond Claims | $32,813 | $~~2,015,019~~$2,013,641 | $170,969 |

The SunCal Plan Proponents believe that these balances will ultimately be reduced through the Lehman Adversary Action, the Contract Action, and the Lehman Claims Objections resulting in lower "Allowed" claims balances.

**4.1.5  4.1.4    Summary of the Group III: Voluntary Debtors' Cash.**

The following chart sets forth the Group III: Voluntary Debtors' cash on hand, exclusive of the Net Del Rio CFD Bonds Proceeds, as of ~~January 31~~July 1, 2011.

| Group III: Voluntary Debtor | Amount |
|---|---|
| SCC Communities | ~~2,668.92~~2,343.92 |
| Del Rio | ~~248,821.62~~207,803.47 |
| Tesoro | 71.07 |
| **Group III: Voluntary Debtors Total** | $~~251,561.61~~210,218.46 |

Although the Lehman Lenders ~~have~~ may alleged that they hold liens on the above cash, a ~~preliminary~~ review of the applicable lien documents indicates that any purported ~~most of the alleged~~ liens on the cash were not validly perfected. As set forth below, the Voluntary Debtors and the Lehman Entities have entered into various stipulations which identified the "Alleged Unencumbered Accounts" to include the accounts set forth above.  This means that these liens can be avoided, allowing the unsecured creditors recourse to these funds. Moreover, even if the liens against these accounts were properly perfected, the amount secured by these liens, and their priority and their enforceability will be subject to the results of the Lehman Claim Objections and the Lehman Adversary Proceeding.

### 4.2    Factual Circumstances Leading to the Filing of the Debtors' Chapter 11 Cases.

#### 4.2.1    Introduction.

In this section of the Disclosure Statement, the ~~SunCal Proponent~~SunCal Plan Proponents have provided a brief description of the relationship between the Debtors and the Lehman Entities. This background is relevant to the Group III: Voluntary Debtors, and in fact all of the Debtors, for the following reasons. First, most of the unsecured claims asserted against the Debtors were incurred at the insistence of ~~the~~ Lehman ~~Lenders~~ALI, and they would have been paid if ~~the~~ Lehman ~~Lenders~~ ALI had honored their obligation to pay these claims. Second, a substantial part of claims that ~~the~~ Lehman ALI~~Lenders~~ failed to pay are being asserted against *all of the Debtors*. If the litigation against ~~the~~ Lehman ALI~~Lenders~~ discussed herein is successful, it will, at a minimum, reduce the pool of claims against the Group III: Voluntary Debtors, and thereby increase the dividend payable to the remaining creditors. Third and finally, this history allows the Creditors to take the measure of the parties who are now proffering the competing plan – the Lehman Lenders. As the within discussion will establish, the Lehman Lenders failed to pay the claims of Creditors prepetition, the Lehman Lenders attempted to foreclose upon the Group III Assets: Voluntary Debtors post-petition in order to deny the unsecured creditors any recovery on the claims they

1    failed to pay, and finally, when this foreclosure effort failed, the Lehman Lenders attempted to

2    destroy the Debtors' reorganization and sale efforts by manipulating LCPI's alleged automatic stay.

3    ~~The SunCal Plan Proponents believe that this history will lead the Creditors to conclude, when~~

4    ~~weighing the merits of the Lehman Lenders Plan offer: "Fool me once shame on you, fool me twice~~

5    ~~shame on me."~~

6    ### 4.2.2    Background of the SunCal Companies.

7    SunCal is a family-owned and operated real estate business that has been successfully

8    developing properties throughout the western United States for over 70 years.  SunCal's business

9    focuses upon the "development" of residential land. A typical SunCal development begins with the

10    acquisition of one or more parcels of raw land. Thereafter, the SunCal team develops a master plan

11    for the acreage that incorporates streets, homes, parks, schools and commercial areas, and then it

12    works with the applicable municipal planning authorities (the city, county, state and federal) to

13    secure the necessary approvals or "entitlements" to gain approval of the Plan. This process, which

14    requires the assistance of land planners, civil engineers, architects, lawyers, and other land

15    specialists, takes a period of years. Once the master plan is approved, SunCal provides for the

16    grading of the project and the installation of the foundational infrastructure (streets, utilities, etc.)

17    and then sells the lots or parcels within the project to merchant builders.

18    ### 4.2.3    The Origins of the SunCal/Lehman Joint Venture.

19    SunCal historically financed its projects with loans and/or equity from a number of

20    different sources.  However, beginning in 1997, an increasing number of SunCal's projects were

21    financed by the Lehman Entities, as Mark Walsh ("Walsh"), the head of LBHI's Global Real

22    Estate Group, began cultivating a business relationship with SunCal's principals.

23    By 2003, the Lehman Entities and SunCal had entered into joint ventures involving

24    approximately fifteen projects.  By 2007, that number had grown to over forty, and the Lehman

25    Entities had become, with limited exceptions, the exclusive provider of financing for the SunCal

26    Projects pursuant to a written agreement executed in 2006.  The Lehman Entities also consisted of

27    the Lehman Equity Members that either directly or indirectly owned a fifty percent (50%) equity

28    interest in all nine of the Trustee Debtors.

1        In their dealings with SunCal, the Lehman Representatives made no distinction between

2   Projects financed by Lehman ALI and Projects financed by LCPI. They also made no distinction

3   between the Debtors in which Lehman Equity Members held 50% equity memberships or the

4   Debtors in which the Lehman Entities held no equity membership interest.  As agents of the

5   financial partner in the parties' joint venture, the Lehman Representatives would determine which

6   Lehman Entity would provide financing on which Projects, and would dictate the structure that the

7   financing would take, according to whatever suited the Lehman Entities' needs.

8        **4.2.4**   **Lehman's Effective Control over the Management of the Debtors and**

9                     **Promises of Ongoing Funding.**

10        Prior to the market downturn in the middle of 2007, Lehman Representatives afforded

11   SunCal substantial discretion in the management and development of the Projects.  The Debtors

12   would contract with third-party vendors to perform grading, health and safety compliance,

13   construction, landscaping, and other necessary services on the Project sites, and they would work

14   with the local municipalities to obtain the necessary entitlements and other authorizations

15   necessary to proceed with development.  The Lehman Representatives, SunCal and the Debtors

16   would discuss anticipated quarterly expenditures at periodic budget meetings, and , as expenses

17   were incurred each month, SunCal and the Debtors would submit requests for payment to the

18   Lehman Representatives, supported by the necessary documentation. The Lehman Representatives

19   would then provide the funding necessary to pay these expenses.

20        During the third quarter of 2007, the foregoing management and payment dichotomy

21   changed, after the real estate market experienced a sudden downturn, and many of the Projects

22   significantly declined in value.  In response to this dramatic economic change, a series of high

23   level discussions occurred between SunCal's representatives and the Lehman Representatives --

24   including Walsh, Paul Hughson ("Hughson") and Frank Gilhool ("Gilhool"), the Managing

25   Directors of Lehman's Global Real Estate.  In these discussions, SunCal's representatives, acting

26   on behalf of the Debtors, expressed concerns about the loans on the Projects being out of balance,

27   and suggested shutting down the Projects, or at least slowing the pace of development.  However,

28   Walsh specifically instructed SunCal not to slow down or stop work.  He assured SunCal that the

1    Lehman Entities would provide the necessary funding to pay vendors and to keep the development

2    of the Projects moving forward.

3        The foregoing assurances of payments were confirmed in numerous telephone

4    conversations between Gilhool and SunCal's COO, Frank Faye ("Faye"), SunCal's General

5    Counsel, Bruce Cook ("Cook"), Steve Elieff and/or Bruce Elieff that took place during 2007 and

6    2008. In each exchange, Gilhool assured SunCal that the Lehman Entities were committed to

7    funding the debts and obligations being incurred at the Projects and they continued to insist that

8    work proceed.

9        During this time frame, the Lehman Representatives became much more "hands on,"

10    scrutinizing and approving all budgets and expenses through a new control and approval structure.

11    Under the new structure, SunCal would submit budgets to the Lehman Representatives on a

12    weekly basis and explain, during period conference calls, what Project payables they believe had to

13    be paid and what work had to be performed on the Projects.  The Lehman Representatives would

14    then unilaterally decide what future work would proceed, the Lehman Representatives would

15    authorize the work and the Lehman Representatives would decide what payables would be paid

16    timely by designating them as "urgent," and what other payables were not urgent and hence would

17    not be paid on a timely basis.  However, even under this new Lehman controlled management and

18    payment regime, the Lehman Representatives made it clear that all payables being incurred would

19    be funded.

20        **4.2.5    The Disputed Interim Loan Agreement and the Group III: Voluntary**

21        **Debtors** ~~Fraudulent Conveyance Actions in the Lehman Adversary~~

22        ~~Proceeding~~.

23        On October 31, 2007, SCC Acquisitions LLC, as borrower, and Lehman ALT, as lender,

24    entered into the Disputed Interim Loan Agreement.

25        Although none of the Plaintiffs was a "borrower" under the Disputed Interim Loan

26    Agreement, they each concurrently executed a Subsidiary Guaranty with Lehman ALI guaranteeing

27    the same.  The obligation under the Interim Loan Agreement also purports to be secured by (a) a

28    first-priority deed of trust on the Joshua Ridge Project owned by SCC Communities; (b) a first-

1    ~~prioritydeed~~priority deed of trust on the Tesoro ~~Prroject~~Project owned by SunCal Tesoro; and (c) an

2    alleged first-priority lien on the right to receive future anticipated Net Del Rio CFD Bonds

3    Proceeds.

4            Deeds of trust were recorded against the properties owned by Tesoro and SCC

5    Communities on November 2, 2007; and an assignment of the right to receive the Net Del Rio CFD

6    Bonds Proceeds ~~future anticipated CFD Bond Proceeds~~ was signed by Del Rio on October 31,

7    2007.  *[NET]*Del Rio is not aware of any UCC statement having been filed against Del Rio in

8    connection with the Del Rio CFD Bonds either in Delaware or in California as of Del Rio's

9    Petition Date.

10           On or about March 27, 2009, Lehman ALI filed identical proof of secured claim No. 9

11   against SCC Communities, proof of secured claim No. 7 against Tesoro, and proof of

12    secured claim No. 14 against SunCal Del Rio arising from the Disputed Interim Loan

13   Agreement in the

14           amount of $23,795,013.  These Debtors' incurrence of the foregoing obligations and their

15   transfers of interests are referred to herein as the "Interim Loan Transfers."

16           Of the $20 million in proceeds from the Disputed Interim Loan Agreement paid to the

17   parent entity, SCC Acquisitions LLC, only $78,000—less than one half of one percent of the

18   total—was used to fund SCC Communities, SunCal Tesoro or Rio or their properties.  At Lehman

19   ALI's direction and insistence, the remainder of the proceeds was transferred to parties other than

20   these Debtors, primarily those which owed debts with regard to Projects on which Lehman ALI or

21   its Affiliates were lenders.

22           Accordingly, the Group III: Voluntary Debtors have sought in the Lehman Adversary

23   Proceeding ~~sought~~ to avoid the Interim Loan Transfer obligation as fraudulent to the extent the

24   value of the obligation exceeds the value of the loan proceeds each Debtor received.  The $20

25   million-plus obligations which each of the three Debtors incurred in connection with the Interim

26   Loan exceeded the value of their assets, which in each case consisted exclusively of the assets

27   securing the loan.

28

1          ### 4.2.6    The 2008 Restructuring Agreement.

2                  By the fall of 2007, both SunCal and the Lehman Representatives contemplated entering

3      into a restructuring agreement in the near term, with a closing to occur no later than January or

4      February of 2008.  However, this transaction was delayed by the Lehman Entities' extensive

5      documentation demands until May 23, 2008. On this date, SunCal and most of the Debtors finally

6      entered into an omnibus "Restructuring Agreement" with LBHI, Lehman ALI and the other

7      Lehman Entities.  The same Lehman Representative signed the Restructuring Agreement on behalf

8      of all of the Lehman Entities.

9                  Pursuant to the Restructuring Agreement, Lehman ALI, "as the Lender with respect to each

10     Loan," committed, among other things, to: (1) make advances under existing loans to fund the

11     continuing costs necessary to preserve the value of the Projects; (2) move forward to resolve the

12     accrued outstanding subcontractor payables, i.e., to make sure that the Projects' creditors were paid

13     for their work; and (3) to close the transaction, whereby newly-created Lehman Entities would

14     assume the debt and obligations of the Projects.

15                 As originally executed in May 2008, the Restructuring Agreement applied to twelve of the

16     twenty Projects (as well as several other projects not at issue in the Lehman Adversary

17     Proceeding):  (1) Acton Estates; (2) Beaumont Heights; (3) Bickford Ranch; (4) Emerald

18     Meadows; (5) Heartland; (6) Johannson Ranch; (7) Marblehead; (8) Northlake; (9) Oak Valley;

19     (10) Pacific Point; (11) Ritter Ranch; and (12) Summit Valley.  The Debtors that owned and/or

20     held equity interests in the entities that owned  these Projects were signatories to the May 2008

21     agreement.[3]

22

23

       _____

24     [3] Specifically, the Restructuring Agreement was entered into by, among others, the "Borrowers,"
       "Grantors" and "Pledgors," as defined in Annex 1 thereto.  The "Borrowers" included SunCal Marblehead,

25     SunCal Heartland, SunCal Northlake, SunCal Oak Valley, SJD Partners, Palmdale Hills, SCC Palmdale,
       SunCal I, SunCal III, and SunCal Bickford.

26
       The "Grantors" included SunCal Marblehead, SunCal Heartland, SunCal Northlake, SunCal Oak Valley,

27     SJD Partners, Palmdale Hills, SunCal Bickford, SunCal Acton, SunCal Summit and SunCal Emerald, and
       Debtors SunCal Beaumont and SunCal Johannson.

28
       The "Pledgors" included SCC Palmdale, SunCal I, SunCal Summit and SJD Development.

1    However, bBetween May and August 2008, the parties agreed to add four additional

2    projects to the Restructuring Agreement: (1) Del Rio; (2) Joshua Ridge; (3) Palm Springs Village;

3    and (4) Tesoro Burnham, and the four Debtors associated with these Projects—SunCal Del Rio,

4    SCC Communities, SunCal PSV, and SunCal Tesoro.  Only four Projects were  not included in the

5    Restructuring Agreement: Century City, Delta Coves, Oak Knoll and Del Amo.  Accordingly, the

6    four Debtors associated with these Projects—SunCal Century City, Delta Coves, SunCal Oak

7    Knoll and SunCal Torrance—were not signatories thereto.  Lehman ALI was the lender on each of

8    these Projects and , and as with the other Projects, Lehman Ali continued to insist that these four

9    debtors  proceed with the development of the four Projects, it approved all expenses, and it

10    continually provided assurances of payment.

### 4.2.7    The Lehman Lenders Hire Radco.

12    Subsequent to the execution of the Restructuring Agreement, Lehman ALI arranged for a

13    third party, Radco, to directly settle outstanding contractor payables, as its agent.  Radco was

14    provided some limited funding and authority to negotiate settlements, and did in fact reach

15    settlement with a number of creditors.  The funding for these settlements, whether the debts related

16    to Lehman ALI or LCPI funded Projects, came from the same source.  Lehman ALI and LCPI also

17    provided approval for new work on the Projects, and Lehman ALI paid for some of this work.

18    However, this funding was minimal and it soon stopped.

19    In August 2008, Lehman ALI withdrew funding and settlement authority from Radco,

20    leaving millions of dollars in outstanding contractor payables unresolved, notwithstanding the

21    contrary provisions in the Restructuring Agreement.  Leman AliALI's actions also impaired the

22    Debtors' ability to resolve ongoing public health and safety issues arising at the Projects.

23    Ultimately,  only a fraction of the total outstanding payables were resolved, contrary to the  past

24    promises made by Lehman Representatives.

### 4.2.8    The Lehman Lenders' Failure to Close on the Settlement Agreement.

26    Pursuant to the terms of the Restructuring Agreement, the parties agreed to enter into a

27    Settlement Agreement, the form of which was attached to the Restructuring Agreement.  The

28    Settlement Agreement provided for the transfer of the Projects included within the Restructuring

1    Agreement to a series of newly formed Lehman-controlled entities (each with "SCLV" in its

2    name, for "SunCal-Lehman Venture"). The agreement further provided that the entity taking title

3    to the Project would assume the Lehman Lender debt obligations associated with the Projects,

4    assume certain bond obligations associated with the Projects, and provide indemnifications to

5    SunCal and the Debtors for unpaid claims.

6         On August 25, 2008, the Settlement Agreement and a series of related documents were

7    formally executed by SunCal and the applicable Lehman Lenders and Lehman Equity Members at

8    a meeting held in Los Angeles on August 25, 2008.  Once these documents were signed, all that

9    remained was the mechanical closing of the series of transactions described in the Settlement

10   Agreement. Since all of the conditions precedent to the closings had been satisfied, or could have

11   been satisfied at the meeting, this should have occurred at the August 25, 2008 meeting. However,

12   the Lehman Representative asked SunCal to extend the closing date for thirty days, to September

13   30, 2008. Accordingly to the Lehman Representatives, this short extension would enable them to

14   secure certain outstanding third party consents. Although SunCal knew these third party consents

15   were readily available, within a few days they agreed to this extension, believing the request was

16   made in good faith.  However, as later discovered, it was not.

17              **4.2.9    Alvarez and Marsal Take Over Control of the Lehman Entities After**

18                       **the Chapter 11 Filings of LBHI and LCPI.**

19         LBHI filed for bankruptcy in September 2008 and LCPI filed for bankruptcy in October

20   2008.  After LBHI's filing, Bryan Marsal ("Marsal") of Alvarez & Marsal ("A&M") was appointed

21   to serve as LBHI's Chief Restructuring Officer. Marsal and A&M are in charge of liquidating the

22   now defunct Lehman Entities, including Chapter 11 debtors LBHI and LCPI, and the non-bankrupt

23   Lehman Lenders (Lehman ALI, OVC, and Northlake Holdings, as well as the non-bankrupt

24   Lehman Equity Members.

25         Although A&M was not employed until after the events that occurred on August 25, 2008

26   described above, it should be noted that A&M hired the same law firm that represented the

27   Lehman Lenders in the August 25, 2008 meeting – Weil, Gotshal & Manges, LLP. Moreover, as

28   more fully explained herein, it was A&M that directed Lehman ~~Ali~~ALI not to perform its

1    contractual obligations under the Settlement Agreement after September of 2008. Accordingly, the

2    same individuals that caused the damages to unsecured creditors by insisting upon the breach of

3    the Settlement Agreement, are now asking for their vote in the competing plan filed by the Lehman

4    Lenders.

5           LBHI's bankruptcy filing and the Lehman Lenders refusal, at A&M's direction, to close the

6    transactions provided for under the Settlement Agreement as agreed, were not small matters. They

7    severely damaged the Debtors. Although the Debtors were not proceeding with any new

8    construction or development, the Debtors were still required to expend significant sums on site

9    security, erosion control, property taxes and other measures in order to prevent the Projects from

10   becoming a public safety hazard, and in order to avoid the loss of valuable entitlements, and to

11   mitigate penalties and fines being incurred by the Projects.  Although SunCal and the Debtors

12   repeatedly requested that the Lehman Entities pay for critical health and safety and value

13   preservation measures on the Projects, these efforts were unavailing.

14          Between October 9 and November 4, 2008, SunCal's general counsel Cook sent Robert

15   Brusco, an authorized agent of the Lehman Entities, nearly two dozen letters requesting that the

16   Lehman Lenders provide the funding necessary to address critical needs on the Projects as

17   promised.  A summary of these health and safety notices are attached hereto as Exhibit "5".  The

18   Lehman Entities ignored these requests until November 2008, when Brusco, purportedly on behalf

19   of the Lehman Lenders, delivered the message that the Lehman Lenders were unwilling to fund the

20   Projects and that, instead, they intended to foreclose on all of the Projects.

21          As a result, as set forth in Exhibit "4," there are now over 240 vendors, municipalities,

22   counties and bonding companies claiming over $400 million in work, improvements and property

23   tax claims against the Projects.  Substantially all of these sums are due to work performed or

24   bonded at Lehman's request based upon Lehman's promises of payment.

25          **4.3**      **The Group III Voluntary Debtors' Potential Preferential Transfers**.

26          Attached hereto as Exhibit "6" are charts setting forth payments made to third parties

27   during the ninety (90) day time period preceding the filing of the Debtors' Chapter 11 Cases as

28

-43-

1  well as payments made to the Lehman Entities and to SunCal Affiliates during the one-year time

2  period preceding the filing of the Debtors' Chapter 11 Cases.

3      As the charts in Exhibit 6" indicate, Group III: Voluntary Debtors made payments in the

4  following aggregate amounts to non-insiders within the 90 day preference period preceding the

5  Petition Date:  SCC Communities: $500.00, Del Rio: $86,622.93, Tesoro: $659.00.  The

6  corresponding figures for payments made to "insiders" within the one year preference period

7  preceding the Petition Date were: SCC Communities: $0.00, Del Rio: $50,721.00, Tesoro:

8  $5,000.00.

9                                          **V.**

10              **SIGNIFICANT EVENTS IN THE DEBTORS' CHAPTER 11 CASES**

11      **5.1.    Voluntary Debtors.**

12          **5.1.1    Joint Administration of the Voluntary Debtors and the Trustee Debtors.**

13      Since their respective Petition Dates, the seventeen (17) Voluntary Debtors have continued

14  to operate as "debtors-in-possession," subject to the supervision of the Bankruptcy Court and in

15  accordance with the Bankruptcy Code.  The Voluntary Debtors are authorized to operate their

16  businesses in the ordinary course during the Chapter 11 proceedings.  Transactions outside the

17  ordinary course of business must be approved by the Bankruptcy Court.

18      The Voluntary Debtors' Cases are being jointly administered pursuant to orders entered on

19  November 19, 2008 and December 9, 2008.  The Voluntary Debtors' Cases are being jointly

20  administered with the Trustee Debtors' cases pursuant to an order entered on March 11, 2009.

21          **5.1.2    The Voluntary Debtors Court Employed Professionals.**

22      The Voluntary Debtors have employed Winthrop Couchot Professional Corporation as their

23  general insolvency counsel, and the MB Firm as their special litigation counsel in the Lehman

24  Adversary Proceeding and the ~~State Court~~Contract Action.

25       The Voluntary Debtors' Committee has employed Irell & Manella LLP as its counsel

26  pursuant to an order entered on February 13, 2009.

27      Pursuant to the Court's Order regarding joint administration of the Voluntary Debtors, the

28  Voluntary Debtors' liability for professional fees is joint and several among the Voluntary Debtors'

1    Estates for fees incurred related to services for the benefit of all of the Voluntary Debtors.  The

2    Trustee Debtors' liability for professional fees is not joint and several.

3            Pursuant to the initial MB Firm employment application, Acquisitions was responsible for

4    the payment of their fees until December 31, 2009.  The MB Firm's application also allows for

5    payments from the Bond Companies.  The initial MB Firm employment application reserved the

6    right, should the Lehman Adversary Proceeding result in a benefit accruing to particular Debtors'

7    Estates, to request that its fees and expenses be reimbursed by the Debtors' Estates.  The Bond

8    Companies have also agreed to jointly fund a portion of the professional fees and expenses of the

9    MB Firm with respect to the Lehman Adversary Proceeding.  The Bond Companies' funding

10   commitment can be terminated and after such a termination they will only be required to cover fees

11   and costs incurred during the period of their prior commitments.

12           The MB Firm employment application was subsequently amended.  Pursuant to an order

13   entered on April 14, 2010, (1) the Voluntary Debtors will pay up to one-half of the fees and

14   expenses incurred by the MB Firm from and after February 1, 2010 onward; and (2) the Trustee

15   Debtors do not have an obligation to pay any of the MB Firm's fees pertaining to the Trustee

16   Debtors' estates, unless and until a loan by the Voluntary Debtors to the Trustee Debtors is agreed

17   to by the Trustee and approved by the Court, or in accordance with the terms of the original

18   employment applications to the extent not superseded or modified by the amended employment

19   application.  The order does not affect the MB Firm's right to seek payment from the Bond

20   Companies without the need for an additional order of the Court.

21           The MB Firm filed an updated application seeking to further amend their employment to

22   include the right to pursue certain claims against the Lehman Entities and certain employees and

23   agents of these entities on behalf of the Voluntary Debtors.  The claims encompassed by this

24   amendment include claims that are based upon both prepetition and post-post petition actionable

25   conduct under both state law and federal law against the Lehman Entities and/or their agents.

26           **5.1.3    <u>LCPI's Motions for Relief from the Automatic Stay Against Certain of</u>**

27                   **<u>the Voluntary Debtors' Projects and Related Appeals.</u>**

28

On January 23, 2009, LCPI and Lehman ALI filed various motions for relief from the automatic stay against Palmdale Hills, SCC Palmdale, SunCal Beaumont, SunCal Summit Valley, SunCal Emerald, SunCal Bickford, Acton Estates, SunCal Johannson, and SCC Communities I (the "Lehman Entities' Stay Motions").  Although the Debtors, were able to defeat these motions, they are relevant in the following respect. Had the motions filed by LCPI and Lehman ~~Ali~~ALI succeeded, it is almost certain that unsecured creditors would have received nothing on their claims. Moreover, as more fully explained herein, since Lehman ~~Ali~~ALI and LCPI did not even own the loans they were seeking to foreclose upon. ~~.~~ Accordingly, these motions should never have been filed in the first instance. Yet now, these same parties- Lehman ~~Ali~~ALI and LCPI – are asking these same creditors to vote on their plan and to "trust" them.

**5.2.    The Debtors' Various Motions Relating to Financing for the Projects and to Pay Professional Fees.**

**5.3.1    The Voluntary Debtors' Initial Motion for Surcharge and Use of Cash Collateral.**

On January 16, 2009, seven of the Debtors filed a motion authorizing Palmdale Hills to use and surcharge, pursuant to 11 U.S.C. § 506(c), and/or use the purported cash collateral of LCPI arising from the Ritter Ranch Loan Agreement, pursuant to 11 U.S.C. § 363(c)(2), in order to pay for the reasonable and necessary maintenance expenses required to preserve the value of such Debtors' Projects subject to deeds of trust and other security interests held by LCPI.

LCPI objected to the motion and subsequently filed a motion in its own Chapter 11 proceeding in the Southern District of New York seeking an order barring the motion as a violation of LCPI's automatic stay.  Although the Debtors believe that LCPI's stay was not violated in any way by the Motion, the Motion was taken off calendar prior to any ruling by the New York Bankruptcy Court, based upon the threat of sanctions made against Debtors' counsel by the presiding judge in LCPI's case.

As explained above, LCPI did not even own an interest in the Ritter Ranch Loan Agreement when it asserted the automatic stay, since the Ritter Ranch Loan Agreement, which was the subject of the cash collateral motion, had already been sold pursuant to the Fenway Repurchase

1   Agreement. Yet this wrongful action prevented Palmdale Hills from using its own money to pay

2   critical bills that Lehman ~~Ali~~ALI, LCPI's parent was contractually required to fund in the first

3   instance.

4

5          **5.3.2**   **The Voluntary Debtors' Agreements with the Lehman Entities for Use**

6               **of Alleged Cash Collateral to Maintain the Properties and to Pay**

7               **Professional Fees.**

8         On September 1, 2009, with the consent of the Lehman Entities, fourteen of the Voluntary

9   Debtors filed a motion authorizing surcharge pursuant to 11 U.S.C. § 506(c), and/or use of the

10  purported cash collateral for the purpose of addressing critical public health and safety issues and

11  other value preservation with respect to the Debtors Projects.  On September 10, 2009, the Lehman

12  Entities filed an opposition thereto, and on September 17, 2009, the Voluntary Debtors filed their

13  Reply.

14        Subsequently, the Voluntary Debtors learned that the Lehman Entities lacked control

15  agreements as to the majority of the depository accounts, and thus such accounts were not subject

16  to perfected liens and therefore did not constitute "cash collateral".  On October 15, 2009, the

17  Voluntary Debtors filed a *Motion For Order Authorizing Disposition Of Certain Depository*

18  *Accounts*.  On or about October 22, 2009, the Lehman Entities filed an opposition, and on October

19  29, 2009, the Voluntary Debtors filed their Reply.

20        The motion was consensually resolved by way of the *Stipulation Pursuant To 11 U.S.C. §§*

21  *362, 363, And 364: (1) Authorizing The Use Of Cash Collateral And Alleged Unencumbered Cash;*

22  *(2) Approving Postpetition Financing; (3) Providing Administrative Expense Status; And (4)*

23  *Modifying Automatic Stay To The Extent Necessary* filed on December 8, 2009, and the order

24  thereon entered on December 17, 2009.  The stipulation provides for a 120-day budget with

25  expenses totaling approximately $5 million, pursuant to which any Cash in the Estates is used first

26  and then money borrowed from the Palmdale Hills Estate is used thereafter on an administrative

27  basis.  The agreement also permitted the Voluntary Debtors to use their alleged unencumbered

28  cash to pay its professional fees.  This agreement has been renewed on several occasions.

**5.3.**     **The Debtors' Disputes and Claims Against the Lehman Entities.**

**5.3.1**     **The Lehman Adversary Proceeding.**

On January 6, 2009, the Voluntary Debtors initiated the Lehman Adversary Proceeding by filing their initial complaint against Lehman ALI for equitable subordination of Lehman ALI's Disputed Claims and avoidance of its Disputed Liens pursuant to Bankruptcy Code Section 510(c). On February 3, 2009, the Debtors filed a First Amended Complaint, which added the Trustee Debtors as co-plaintiffs and added various other causes of action.  The First Amended Complaint also named OVC Holdings, Northlake Holdings and various other entities as defendants.

Pursuant to a hearing on a motion to dismiss held on June 11, 2009, the Bankruptcy Court granted the Debtors leave to amend the second amended complaint.  Thus, on July 10, 2009, the Debtors filed their Third Amended Complaint.  The Third Amended Complaint addressed many of the concerns raised by the Bankruptcy Court and also included various Avoidance Actions and other causes of action against the Lehman Lenders and the Lehman Successors.  The Third Amended Complaint also added Fenway Capital as a defendant based upon the discovery of the facts relating to the sale of the loans Fenway Capital and based upon the Court ruling that the Repo was a true sale.

On September 30, 2009, the Lehman Entities filed a motion to dismiss the Third Amended Complaint (which motion was amended on October 7, 2009 and October 22, 2009), alleging that the relief requested by certain Debtors was not available as a matter of law.  On September 30, 2009, Fenway also filed a motion to dismiss the Third Amended Complaint.  On January 26, 2010 and January 28, 2010, the Debtors filed oppositions to the motions to dismiss the Third Amended Complaint filed by the Lehman Entities and Fenway, respectively.  On February 4, 2010, the Lehman Entities and Fenway filed their respective replies.  The Court entered an order granting in part and denying in part the relief requested in the motions to dismiss. Most notably, the Court denied  the defendants request for the dismissal of  the equitable subordination claims and the Court permitted the Debtors to file an amended complaint.  LCPI was dismissed as a defendant at this hearing, due to the fact that it did not own any interest in the loans at issue and due to potential

1    impact of the case upon LCPI's automatic stay.  On March 26, 2010, the Debtors filed their Fourth

2    Amended Complaint.

### 5.3.1.1    The Group III Voluntary Debtors Pending in the Lehman Adversary Proceeding.

5    The causes of action of the Group III Voluntary Debtors in the Fourth Amended Complaint

6    set forth the fraudulent conveyance claims by the Group III: Voluntary Debtors against Lehman

7    ALI arising from the Disputed Interim Loan Agreement, described above.  Accordingly, the Group

8    III: Voluntary Debtors have filed a motion for summary judgment for these causes of action, which

9    are set for hearing on August 25, 2011.

### 5.4.1.4  5.3.2   Debtors' 502(d) Objections.

11    The Voluntary Debtors and other parties-in-interest have filed a motion to disallow,

12    pursuant to 11 U.S.C. § 502(d), the following Disputed Claims filed by Lehman ALI and LCPI,

13    including the following claims filed against the Group III: Voluntary Debtors:

| Disputed Proof of Claim No. | Debtor | Claim Holder | Claim Amount |
|---|---|---|---|
| 9 | SCC Communities | Lehman ALI | $ 23,795,013 |
| 7 | Tesoro | Lehman ALI | $ 23,795,013 |
| 14 | Del Rio | Lehman ALI | $ 23,795,013 |

17    In summary, the Group I Debtors allege in the Lehman 502(d) Objection that the Lehman

18    Entities received prepetition transfers that are avoidable under certain sections of the bankruptcy

19    code.

20    The Lehman Entities oppose the 502(d) Objection, inter alia, on the following grounds:

21    (1)    SunCal Management allegedly lacks standing to object to claims in the

22    Trustee Debtor cases.  However, Section 502 provides that any party in interest may object

23    to claims.

24    (2)    Disallowance is allegedly premature because there has been no judicial

25    determination of the avoidance liability.  However, the only "judicial determination"

26    necessary to invoke section 502(d) is that the objecting party have established a prima facie

27    case for avoidance.  Courts have repeatedly characterized disallowance under Section

28

-49-

502(d) as temporary, pending a later ultimate determination of the avoidance claims in an adversary action.

(3)    The 502(d) objection purported violated LCPI's automatic stay. However, several courts have specifically concluded that an objection under Section 502(d) does not violate the creditor's automatic stay.  See In re Metiom, 301 B.R. 634 (Bankr.S.D.N.Y. 2003); In re PRS Ins. Group, 331 B.R. 580, 584 (Bankr.D.Del. 2005).

(4)    The 502(d) Objection allegedly fails to establish a prim facie case for avoidance.  However, applicable case law establishes that a prima facie case merely requires that the underlying avoidance allegations survive a motion to dismiss.  Here, the Court has already denied the Lehman Entities' Motion to dismiss the applicable avoidance action.  Moreover, the 502(d) Objection further submits substantive evidence establishing the merits of the avoidance claims.

(5)    The Lehman Entities argue that they would be entitled to retain liens in the properties to the extent they gave value in good faith under Section 548(c). However, the Lehman Entities failed to cite any authority to support their novel argument that Section 548(c) can defeat disallowance under Section 502(d).  The only authority on this point is directly contrary to the Lehman Entities' argument.  See In re Interstate Cigar Co., Inc.,  278 B.R. 8 (Bankr.E.D.N.Y. 2002).

On June 9, 2011, a hearing was held on the Section 502(d) claim objection. At this hearing the Lehman Entities disputed the merits of the Section 502(d) claim objection and LCPI alleged that the filing of this objection violated its automatic stay. At the conclusion of the hearing, the Court ruled that the parties could proceed with their discovery in this matter.

If the Section 502(d) claim objection is successful, the claims of the Lehman Entities identified in the table above will be disallowed. Although the Lehman Entities will have the right to seek reconsideration of this disallowance, in order to obtain this relief they would have to repay the applicable transfers.

### 5.3.3    The Lehman Recoupment Objection and the Contract Action.

Pursuant to the terms of the joint ventures entered into by and among the Debtors and the Lehman Entities, the Lehman Entities were responsible for paying the costs incurred in the development of the Projects. These costs included the claims of the vendors who provided goods and services to the Projects and the claims asserted by the Bond Claimants. Although the Lehman Entities contend that they were merely "lenders," and that they did not assume any liability for these claims, as the above facts and those that will be adduced prior to and at the confirmation of the Plan will demonstrate, the Lehman Entities are in fact obligated to pay these claims.

The Debtors contend that the Lehman Entities have contractual liability on various grounds, including the following. First, the Lehman Entities were either in a joint venture relationship with the Debtors from the outset, or this relationship developed and became a legal fixture through the Lehman Entities' course of conduct. Pursuant to this relationship, and the promises and representations made therein, the Lehman Entities agreed to be responsible for all vendor and Bond Claims incurred at or in connection with the Projects. The role of each of the Debtors, by mutual agreement, was to provide development expertise and project management services. The Lehman Entities were required to provide the capital necessary to fund the Projects.

Second, during the last eighteen months of the relationship between the parties, the Lehman Entities assumed direct responsibility for all claims incurred during this period, by insisting that work continue on the Projects and by repeatedly promising to pay for this work. Since the Lehman Entities ordered this work, and promised to pay for the same, they bear this financial responsibility.

Third and finally, the Lehman Entities expressly agreed to pay the vendor and bond claims described in the Restructuring Agreement and in the interrelated Settlement Agreement, but failed to do so as contractually agreed.

It is the SunCal Plan Proponent's contention that the Lehman Entities' failure to pay the vendor and Bond Claims associated with the Projects (as was their obligation under the terms of the joint ventures, the Restructuring Agreement and the Settlement Agreement) unjustly shifted responsibility for these liabilities to the Debtors in breach of the terms of joint venture, the Restructuring Agreement and the Settlement Agreement. Accordingly, the SunCal Plan Proponents (including SCC Communities and Tesoro) have filed the Lehman Recoupment Objection which

1   seeks the disallowance of certain claims filed by the Lehman Lenders, including the claims filed

2   against the Group III: Voluntary Debtors.

3       In the Lehman Recoupment Objection, the SunCal Plan Proponents seek the following

4   relief:

5           1) Disallowance of the claims asserted by the Lehman Lenders in their

6           entirety, pending compliance with the terms of the Restructuring

7           Agreement and the Settlement Agreement;

8           2) A reduction in the amount of the Lehman Entities' secured claims by

9           the amount of damages resulting from the Lehman Entities' breach of their

10          obligations under these agreements; and/or

11          3)  An order barring the Lehman Entities from enforcing their rights under

12          the Lehman Loans until they cure their breaches under the above

13          agreements.

14      The first prayer for relief above is premised upon the contention that the Lehman Entities

15  agreed to transfer ownership of the Projects described in this agreement, including the Group

16  III:Projects, to a series of newly formed entities under the control of the Lehman Entities, pursuant

17  to the terms of the Settlement Agreement. This agreement further provided that these new entities

18  would assume the vendor payables and certain Bond Claims associated with these projects. Finally,

19  this agreement included a covenant not to sue, pursuant to which the Lehman Entities were barred

20  from seeking further recourse against the Debtors.

21      The SunCal Plan Proponents believe that the positions asserted in the Lehman Recoupment

22  Objection are well grounded in fact and in law. Had the Lehman Entities complied with their

23  contractual obligations, substantially all of the SCC Communities' and Tesoro's liabilities would

24  have been eliminated, SCC Communities and Tesoro would not have had to file Chapter 11, and

25  the Lehman Entities would be barred from asserting claims against SCC Communities and Tesoro

26  based upon the Lehman Disputed Loans.  It is the SunCal Plan Proponents position that the

27  Lehman Entities' effort to enforce claims based upon Lehman Disputed Loans is directly contrary

28

to the basic agreements reached in the Restructuring Agreement and in the related Settlement Agreement.

The Lehman Entities dispute the merits of the Lehman Recoupment Objection.  It the Lehman Entities' position that it was within their absolute "discretion" to pay, or not to pay, the vendor payables incurred during the term of the Restructuring Agreement, even where they authorized the work.  Accordingly, they cannot, in their assessment, be held liable for these obligations. In the case of the Settlement Agreement, the Lehman Entities contend that this agreement never became effective and therefore they were not bound to comply with its terms. The SunCal Plan Proponents do not believe that the positions asserted by the Lehman Entities are supported by the facts, or existing law.

In addition to the Recoupment Claim Objections, certain Voluntary Debtors, including SCC Communities and Tesoro, have also filed the Contract Action against Lehman ALI and other non-debtor Lehman Entities in Orange County Superior Court.  The Contract Action is based on Lehman ALI's breach of contract on the Restructuring and Settlement Agreements.  On May 9, 2011, the Defendants in the Contract Action filed a Notice of Removal which removed the Contract Action from the Orange County Superior Court to the Bankruptcy Court, as adversary no. 8:11-ap-01212ES.  The Voluntary Debtor-Plaintiffs moved to remand the Contract Action back to the Orange County Superior Court ("Remand Motion").  The Bankruptcy Court denied the Remand Motion at the hearing on July 12, 2011.

Although LCPI's automatic stay remains an impediment to the pursuit of the Lehman Adversary Proceeding, the existence of this stay will not bar the SunCal Plan Proponents from implementing the material terms of the Plan for the following reason. LCPI's automatic stay does not bar the pursuit of the Lehman Claim Objections or the Contract Action.  In fact, these matters are proceeding in the Bankruptcy Court.  If these objections are successful, the claims of the Lehman Entities will be disallowed, either in whole or in part, or the Lehman Entities will be barred from pursuing these claims until they pay what they owe to the Group III: Voluntary Debtors.  If the Contract Action is successful, it will generate a further recovery for creditors of

SCC Communities and Tesoro.  In either scenario, the Plan filed by the SunCal Plan Proponents is feasible and will yield a favorable return for creditors.

### ~~5.4.1.4~~  5.3.4   The Del Rio CFD Bonds and Potential Disputes Under the Acquisition Agreement.

An Acquisition Agreement among the City of Orange, for itself and on behalf of City of Orange Community Facilities District No. 06-1 (Del Rio Public Improvements) sets forth certain terms for the acquisition of various facilities by the City of Orange from Del Rio, the issuance of the Del Rio CFD Bonds and the use and application of a portion of the proceeds of the Del Rio Bonds for the construction of certain improvements and other applications, and with the remaining proceeds to go to Del Rio.  The Acquisition Agreement provides for a maximum bond authorization in the amount of up to $25 million.  After notice of hearing and no objections, on March 16, 2010, t~~T~~he Court ~~has~~ entered an order approving the Acquisition Agreement, the issuance and sale of the Del Rio CFD Bonds, and creditor payments from the closing.  ~~The Acquisition Agreement was approved by the Court on March 16, 2010.  From the closing~~

Based upon the entered order, approximately $6,700,000 of claims (including approximately $2,924,827 of SunCal Management claims) were ~~have been~~ paid.~~, with respect to which~~ However, a dispute has now arisen among Del Rio, SunCal Management, and the Lehman Entities regarding the Court's approval of certain payments.~~.~~

On April 13, 2011, Del Rio and SunCal Management filed a joint motion with the Bankruptcy Court to reconfirm these payments due to overpayment and disclosure issues raised by the Lehman Entities, which was temporarily withdrawn on June 28, 2011, and shall be re-calendered.

On April 14, 2011 Lehman ALI filed a motion, pursuant to Rule2004 of the Federal Rules of Bankruptcy Procedure, for examination of Del Rio and SunCal Management.  Pursuant to the Order of the Bankruptcy Court entered on April 25, 2011, Del Rio and SunCal Management have produced in excess of 12,000 pages of documents to Lehman ALI.  Moreover, Lehman ALI has taken the deposition of Bruce V. Cook in connection therewith.  Lehman ALI has filed a motion to

1  compel further production of documents, which Del Rio and SunCal Management have opposed.  .

2  The hearing on this motion is scheduled for July 19, 2011.

3  Upon the construction of the park within the project, which is anticipated to be completed

4  by the end of 2011, any Net Del Rio CFD Bonds Proceeds not used for such construction or other

5  specified purposes will be disbursed to Del Rio subject to Lehman ALI's disputed liens.  Such

6  amounts are estimated to be approximately $7 million to $8 million.

7  Lennar's Motion to Compel Del Rio to Assume or Reject Purchase Agreement.

8  On April 27, 2011, Lennar Centex Del Rio Partners LLC ("Lennar") filed a motion to

9  compel Del Rio to assume or reject a certain Purchase Agreement and Escrow Instructions dated

10  June 14, 2005, as further amended on January 30, 2007 and October 9, 2008 (the "Purchase

11  Agreement").  The motion alleges that Del Rio has demanded Lennar perform certain obligations

12  that Lennar owes to Del Rio under the Purchase Agreement and further alleges that Del Rio still

13  owes nearly $1 million to Lennar under the Purchase Agreement.  On May 11, 2001, Del Rio filed

14  an opposition to this motion and on May 18, 2011, Lennar filed its reply.  On June 3, 2011, the

15  Court entered an order granting the motion.  The order provides that Del Rio shall file a motion to

16  assume or reject the Purchase Agreement on or before July 25, 2011 and that such motion shall be

17  set for hearing on August 25, 2011 at 2:00 p.m.

18  **5.4.    The Debtors' Motion for a Stay to Suspend Certain Lehman Actions.**

19  On September 21, 2010, the Voluntary Debtors, Acquisitions, and SunCal Management

20  filed a motion requesting, among other relief, for the Court to suspend the Lehman Entities

21  competing plan and disclosure statement unless and until the Lehman Entities agree to provide the

22  Debtors with relief from their automatic stay in the Debtors' Chapter 11 Cases (the "Suspension

23  Motion").  The Court granted this motion and stayed all matters until March 1, 2011. The Court

24  also ordered the parties to engage in a mediation. The Voluntary Debtors and the Lehman Entities

25  were unable to settle their claims through this process.

26  **5.5.    The Debtors' Other Litigation with Non-Lehman Related Parties.**

27  **5.5.1    The Debtors' Failed Preliminary Injunction Motion Against the Holders**

28  **of Bond Claims.**

1    On February 20, 2009, the Debtors filed a complaint and a Motion for Preliminary

2    Injunction, pursuant to which the Debtors sought a Motion for Preliminary Injunction against the

3    Holders of Bond Claims from pursuing such Claims. On February 23, 2009, the Court denied the

4    Debtors' request for the TRO and granted the Debtors' request to require the defendants to show

5    cause why the Motion for Preliminary Injunction should not be issued.

6    On March 2, 2009, several Holders of Bond Claims objected to the Motion for the

7    Preliminary Injunction.  The objections generally alleged that the Debtors failed to show that the

8    balancing of the equities favored granting the Preliminary Injunction versus the harm to the

9    Holders of the Bond Claims.  At a hearing held on March 4, 2009, the Court denied the

10    Preliminary Injunction Motion and the underlying complaint has subsequently voluntarily been

11    dismissed without prejudice.

12    **5.5.2    The Contractors' Successful Motions for Relief from Stay to Pursue the**

13    **Bond Claims.**

14    Various contractors that were hired to perform work on some of the Projects have filed

15    motions for relief from stay with the Bankruptcy Court to pursue their purported Bond Claims.

16    These creditors have requested that the Bankruptcy Court grant these creditors relief from the

17    automatic stay to allow such creditors to enforce certain Claims that such creditors allege to have

18    against some of the Debtors, including certain surety bonds that are alleged to have been issued in

19    favor of such creditors.  The Debtors opposed the motions on the grounds that the various Debtors

20    are indispensible parties.  The Court conditionally granted the motions provided that the Bond

21    Claimants are able to sever the Debtors from their proceedings on the Bonds.

22    **5.5.3    Shea's Successful Motion for Relief from Stay.**

23    On April 7, 2010, Shea Construction, Inc. filed a motion for relief from stay to pursue a

24    state court for foreclosure of liens on property previously owned by the Debtors and no longer

25    property of the Debtors' estate.  On May 14, 2010, the Court granted this motion.

26    **5.5.4    Bond Safeguard Motion.**

27    Bond Safeguard, a surety that issued bonds to secure the performance of work on certain

28    projects, filed a motion seeking authority to file -claims against the Trustee Debtors relating to

these bond claims after the bar date. The Debtors opposed this motion. This motion was granted pursuant to an order entered on January 7, 2011.

The Bond Issuers assert that surety bonds were executed on behalf of all of the SunCal Debtors and the Bond Indemnitors.  However, Bond Safeguard only filed proofs of claims asserting joint and several liability ("Cross-Indemnity Claims") against the Trustee Debtors.  Bond Safeguard did not file any Cross-Indemnity Claims against the Voluntary Debtors.

### 5.5.5    Lennar's Motion to Compel Del Rio to Assume or Reject Purchase Agreement.

On April 27, 2011, Lennar Centex Del Rio Partners LLC ("Lennar") filed a motion to compel Del Rio to assume or reject a certain Purchase Agreement and Escrow Instructions dated June 14, 2005, as further amended on January 30, 2007 and October 9, 2008 (the "Purchase Agreement").  The motion alleges that Del Rio has demanded Lennar perform certain obligations that Lennar owes to Del Rio under the Purchase Agreement and further alleges that Del Rio still owes nearly $1 million to Lennar under the Purchase Agreement.  On May 11, 2001, Del Rio filed an opposition to this motion and on May 18, 2011, Lennar filed its reply.  On June 3, 2011, the Court entered an order granting Lennar's motion.  The order provides that Del Rio shall file a motion to assume or reject the Purchase Agreement on or before July 25, 2011 and that such motion shall be set for hearing on August 25, 2011 at 2:00 p.m., the same date as the Group III Voluntary Debtors' summary judgment motion against Lehman ALI under the Disputed Interim Loan.

## VI.

## TREATMENT OF UNCLASSIFIED CLAIMS

**6.1    Introduction**. As required by the Bankruptcy Code, the Group III: Voluntary Debtors Plan places(s) place Claims and Interests into various Classes according to their right to priority.  However, certain types of Claims are not classified in any Classes under the Plan.Group III: Voluntary Debtors Plan(s).  These Claims are deemed "unclassified" under the provisions of the Code.  They are not considered impaired and they do not vote on the Plan,Group III: Voluntary Debtors Plan(s), because they are automatically entitled to specific treatment provided for them in

1  the Code.  As such, the SunCal Plan Proponents have not placed the following Claims in a Class.

2  The treatment of these unclassified Claims is as provided below.

3      **6.2**    **Treatment of Allowed Administrative Claims.**

4      The Code requires that all Allowed Administrative Claims be paid on the later of Effective

5  Date of the ~~Plan~~Plan(s) or the date of their allowance, unless a particular Holder agrees to a

6  different treatment.  The treatment of Allowed Administrative Claims is as described below.

7  However, such Administrative Claims are continuing to be incurred.

8      Except to the extent that the Holder of an Allowed Administrative Claim agrees to a

9  different treatment and subject to the Administrative Claims Bar Date set forth herein, the

10  Distribution Agent shall pay each Allowed Administrative Claim in full, in Cash, on the later of

11  (i) the Effective Date, (ii) within ten (10) Business Days after the date such Administrative Claim

12  becomes an Allowed Administrative Claim, or (iii) the date such Allowed Administrative Claim

13  becomes due according to its terms. Notwithstanding the foregoing, any Allowed Administrative

14  Claim representing obligations incurred in the ordinary course of post-petition business by the

15  Debtors in Possession (including without limitation post-petition trade obligations and routine post-

16  petition payroll obligations) shall be paid in full or performed by the Plan Trustee in the ordinary

17  course of business, in accordance with the terms of the particular obligation.

18      **6.3**    **Administrative Claims Bar Date.**

19      All applications for final compensation of Professionals for services rendered and for

20  reimbursement of expenses incurred on or before the Effective Date and all other requests for

21  payment of Administrative Claims incurred before the Effective Date under Sections 507(a)(2)

22  or 507(b) of the Bankruptcy Code (except only for (i) post-petition, ordinary course trade

23  obligations and routine post-petition payroll obligations incurred in the ordinary course of the

24  ~~Debtors'~~ Group III: Voluntary Debtor(s)' post-petition business, for which no bar date shall apply,

25  and (ii) post-petition tax obligations, for which no bar date shall apply) shall be Filed with the

26  Bankruptcy Court and served upon the Plan Trustee no later than the Administrative Claims Bar

27  Date, unless such date is extended by the Bankruptcy Court after notice to the Plan Trustee.  Any

28  such request for payment of an Administrative Claim that is subject to the General Administrative

Claims Bar Date and that is not Filed and served on or before the Administrative Claims Bar Date shall be forever barred; any party that seeks payment of Administrative Claims that (i) is required to file a request for payment of such Administrative Claims and (ii) does not file such a request by the deadline established herein shall be forever barred from asserting such Administrative Claims against the ~~Debtors,~~ Group III: Voluntary Debtor(s), the Plan Trust, their estates, or any of their property.

### 6.4 Treatment of Unsecured Tax Claims.

Tax Claims are certain unsecured income, employment and other taxes described by Code Section 507(a)(8). The Code requires that each holder of such a Section 507(a)(8) tax claim receive the present value of such Claim in deferred cash payments, over a period not exceeding five (5) years from the petition date and that such treatment not be less favorable than the treatment accorded to non priority unsecured creditors.

At the election of the Plan Trustee, the Holder of each Allowed Priority Tax Claim shall be entitled to receive, on account of such Claim, (i) equal cash payments on the last Business Day of each three-month period following the Effective Date, during a period not to exceed five years after November 6, 2008, totaling the principal amount of such Claim plus simple interest on any unpaid balance from the Effective Date, calculated at the interest rate available on ninety (90) day United States Treasuries on the Effective Date, (ii) such other treatment agreed to by the Holder of the Allowed Priority Tax Claim and the Plan Trustee, provided such treatment is on more favorable terms to the ~~Debtors~~ Group III: Voluntary Debtor(s) (or the Plan Trust after the Effective Date) than the treatment set forth in clause (i) hereof, or (iii) payment of the full Allowed Priority Tax Claim in Cash.

### VII.

### CLASSIFICATION OF CLAIMS AND INTERESTS

As required by the Code, the ~~Plan places~~ **Plan(s) place** Claims and Interests into various Classes according to their right to priority and other relative rights. ~~The~~ Each of the Plan(s) ~~specifies~~ **specify** whether each Class of Claims or Interests is impaired or unimpaired, and the ~~Plan sets~~ **Plan(s) set** forth the treatment each Class will receive. The table below lists the Classes of

Claims established under the Plan(s) and states whether each particular Class is impaired or left unimpaired by the ~~Plan.~~**Plan(s).** A Class is "unimpaired" if the Plan(s) ~~leaves~~ **leave** unaltered the legal, equitable and contractual rights to which the Holders of Claims or Interests in the Class are entitled, with certain exceptions specified in the Bankruptcy Code.

| CLASSIFICATION OF HOLDERS OF UNPAID SECURED REAL PROPERTY TAX CLAIMS AGAINST THE GROUP III: VOLUNTARY DEBTORS | | |
|---|---|---|
| **Class 1** | **Claimant** | **Claim Nos.[4]** |
| Class 1.1 | Los Angeles County as the Holder of an Unpaid Secured Real Property Tax Claim against the Tesoro Project ~~in the amount of $123,366~~. | Tesoro No. 2<br><br>Estimated to be in the Amount of $~~123,366~~103,085 as of March 1, 2011 But Ongoing |
| Class 1.2 | San Bernardino County as the Holder of an Unpaid Secured Real Property Tax Claim against the Joshua Ridge Project ~~in the amount of $47,163~~. | Estimated to be in the Amount of $47,163 as of March 1, 2011 But Ongoing |

| CLASSIFICATION OF LEHMAN'S DISPUTED CLAIMS AGAINST THE GROUP III: VOLUNTARY DEBTORS | | |
|---|---|---|
| **Class 2** | **Claims** | **Claim Nos.** |
| Class 2.1 | The Holder of Lehman's Disputed Claims filed by Lehman ALI against SCC Communities, arising from the Disputed Interim Loan Agreement | SCC Communities: No. 9, Disputed in the Amount of $23,795,012 |
| Class 2.2 | The Holder of Lehman's Disputed Claims filed by Lehman ALI against Tesoro arising from the Disputed Interim Loan Agreement | Tesoro No. 7, Disputed in the Amount of $23,795,012 |
| Class 2.3 | The Holder of Lehman's Disputed Claims filed by Lehman ALI against Del Rio arising from the Disputed Interim Loan Agreement | Del Rio No. 14, Disputed in the Amount of $23,795,012 |

---

[4] These Real Property Tax Claims have been updated to include amounts for which proofs of claim have not yet been filed.

| CLASSIFICATION OF LEHMAN'S DISPUTED CLAIMS AGAINST THE GROUP III: VOLUNTARY DEBTORS | | |
|---|---|---|
| **Class 2** | **Claims** | **Claim Nos.** |
| ~~Class 2.1~~ | ~~The Holder of Lehman's Disputed Claims filed by Lehman ALI against SCC Communities, Tesoro and Del Rio arising from the Disputed Interim Loan Agreement in the asserted amount of $23,795,012.~~ | ~~SCC Communities: No. 9; Del Rio: No. 14; Tesoro: No. 7~~ ~~Disputed in the Amount of $23,795,012~~ |

| CLASSIFICATION OF PRIORITY UNSECURED CLAIMS AGAINST THE GROUP III: VOLUNTARY DEBTORS | | |
|---|---|---|
| **Class 3** | **Claimant** | **Claim Nos.** |
| Class 3.1 | The Holder of Priority Claims that fall within Code Sections 507(a)(2), (4), (5), (6), and (7) in the asserted against SCC Communities. | Scheduled Claims in the Estimated Amount of $5,900.39 |
| ~~Class 3.2~~ | ~~The Holder of Priority Claims that fall within Code Sections 507(a)(4), (5), (6), and (7) in the asserted against Del Rio.~~ | ~~Scheduled Amount~~ |
| Class 3.~~3~~2 | The Holder of Priority Claims that fall within Code Sections 507(a)(4), (5), (6), and (7) in the asserted against Tesoro. | Scheduled Claims in the Estimated Amount of $15,812.25 |

| CLASSIFICATION OF GENERAL UNSECURED CLAIMS AGAINST THE GROUP III: VOLUNTARY DEBTORS | | |
|---|---|---|
| **Class 4** | **Claimant** | **Claim Nos.** |
| Class 4.1 | Claimants holding Allowed Unsecured Claims against SCC Communities. | Various Filed and Scheduled Claims in the Estimated Amount of $32,813 |
| Class 4.2 | Claimants holding Allowed Unsecured Claims against Del Rio. | Various Filed and Scheduled Claims in the Estimated Amount of $2,015,019 |

| CLASSIFICATION OF GENERAL UNSECURED CLAIMS AGAINST THE GROUP III: VOLUNTARY DEBTORS | | |
|---|---|---|
| **Class 4** | **Claimant** | **Claim Nos.** |
| Class 4.3 | Claimants holding Allowed Unsecured Claims against Tesoro. | Various Filed and Scheduled Claims in the Estimated Amount of $170,969 |

| CLASSIFICATION OF INTEREST HOLDERS AGAINST THE GROUP III: VOLUNTARY DEBTORS | | |
|---|---|---|
| **Class 5** | **Claimant** | **Amount** |
| Class 5.1 | Allowed Interests in SCC Communities held by SCC LCC | 100% |
| Class 5.2 | Allowed Interests in Tesoro held by SCC LLC | 100% |
| Class 5.3 | Allowed Interests in Del Rio held by SCC LLC | 100% |

## VIII.

## THE ~~PLAN'S~~PLAN(S)' TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS

8.1.    The  ~~Plan's~~Plan(s)'  Treatment of Holders of Allowed Secured Real Property Tax Claims ~~secured~~Secured by Group III Assets: Voluntary Debtors Against Group III: Voluntary Debtors (Classes 1.1 and 1.2).

The rights of the Holder(s)' of Allowed Secured Claims in Classes 1.1 and 1.2 are not impaired under the ~~Plan.~~Group III: Voluntary Debtors Plan(s). Such claimants shall retain their existing lien rights, and shall accrue interest as provided under applicable nonbankruptcy law pursuant to 11 U.S.C. § 511, ~~and one of the following two non-impairment options shall apply, at the election of the Plan Trustee:~~and 1) On  on later of  the Effective Date or the date of the Closing of the real property, such claims shall be satisfied in accordance with the provision of 11 U.S.C. § 1124(2). ~~, or 2) on the Effective Date, or the Holder(s) shall be free to pursue their respective rights and remedies against the underlying real property collateral under applicable California law.~~

MAINDOCS-#163424-v4-SCC_Group_III_VD_DS.DOC

**8.2.    The ~~Plan's~~Plan(s)' Treatment of Lehman's Disputed Claim(s) and Disputed Lien(s) Against Group III: Voluntary Debtors (Classes 2.1 through 2.3).**

The Holder of Disputed Secured Claims within Classes 2.1, 2.2 and 2.3 shall receive the indubitable equivalent of their Disputed claims under the ~~Plan,~~Plan(s), pursuant to 11 U.S.C. § 1129(b)(2)(A)(iii), through the following treatment:

A.    Lien Rights. The Class 2.1, 2.2 and 2.3 Holder shall retain their alleged interest, if any, in the Disputed Lien(s) against Plan Trust Assets that secure the Disputed Secured Claims, pending a Final Order(s) resolving the Allowance of such Disputed Secured Claims and determining the validity, priority and extent of the applicable Disputed Liens against the applicable Plan Trust Assets, which secure these claims, except as follows:

~~1.~~

1.    The Plan Trust Assets subject to the Class 2.1, 2,2 and 2.3 Disputed Liens may be sold free and clear of such liens on the Effective Date, without the right to credit bid under Section 363(k) with respect to Disputed Claims and Disputed Liens. These Disputed Liens shall then attach to the ~~Net Proceed~~Net Sales Proceeds from the sale, which shall be deposited into the ~~Net Proceed~~Net Sales Proceeds Account, pending a resolution of such Disputed Secured Claims and Disputed Liens;

2.    To the extent that a Disputed Secured Claim held by ~~either the~~any Class 2.1, 2,2 and 2.3 Claimant against ~~either~~a Group III Asset:(s): Voluntary Debtor is disallowed, and the Disputed Lien associated with this Disputed Secured Claim is consequently released to the extent of this disallowance, the Plan Trustee shall be authorized to use the ~~Net Proceed~~Net Sales Proceeds that are no longer subject to the Disputed Lien(s) or entitled to priority over the Disputed Lien(s)  to pay other Allowed Claims in their order of priority, in accordance with the terms of the ~~Plan;~~Group III: Voluntary Debtors Plan(s);

3.    To the extent that a Disputed Secured Claim held by ~~either the~~any Class 2.1, 2,2 and 2.3 Claimant and the associated Disputed Lien(s) against ~~either~~a Group III Asset:(s): Voluntary Debtor are subordinated, the Plan Trustee shall be authorized to use to the ~~Net Proceed~~Net Sales Proceeds that are no longer subject to the Disputed Lien(s) to pay other Allowed

1  Claims in their order of priority, in accordance with the terms of the ~~Plan,~~Group III: Voluntary

2  Debtors Plan(s), to the extent of the subordination; and

3          Notwithstanding the existence of the Disputed Secured Claims and the

4  Disputed Liens, the Plan Trustee may a seek a release of the funds in the ~~Net Proceed~~Net Sales

5  Proceeds Account subject to these claims and liens to pay the claims of other creditors in

6  accordance with the terms of the applicable ~~Plan.~~Plan(s), if the Class 2.1, 2.2 and 2.3 Claimant's

7  interests in this property ~~will~~shall remain adequately protected after this release.

8          B.    Sale of Group III Assets: Voluntary Debtors. The Plan Trustee shall

9  complete the sale of Group III Assets: Voluntary Debtors on the Effective Date that are subject to

10  the Holder(s)' Disputed Secured Claims and Disputed Liens, free and clear of such claims and liens,

11  through a sale that satisfies the following conditions:

12          ~~11~~    1.    The Group III Assets: Voluntary Debtors ~~will~~shall be sold

13  separately through a public auction after a commercially reasonable marketing and advertising

14  effort of at least sixty (60) days duration;

15          ~~12~~    ~~2.~~  The SunCal Plan Proponents shall have the right to

16  provisionally accept an Opening Bid from a Stalking Horse Bidder prior to the public auction and to

17  grant this bidder ~~either~~ the ~~Joshua Ridge~~SCC Communities Break-Up Fee, the Tesoro Break-up Fee

18  ~~as the case may be,~~ or the Del Rio Break-Up Fee as the case may be;

19          ~~13~~    3.    Other Qualified Bidders shall have the right to overbid the

20  Opening Bid by submitting a Qualifying Bid. The first round of Qualifying Bids after the Opening

21  Bid must be equal to or in excess of the Initial Overbid Amount. Thereafter, all Qualifying Bids

22  shall be equal to or in excess or the Minimum Increment;

23          ~~14~~    4.    The highest and best Qualifying Bid received from a

24  Qualified Bidder respectively for each of the Group III: Voluntary Debtors' Assets, shall be

25  accepted as the Winning Bid, and the submitting bidder shall be the Winning Bidder. Upon

26  payment of the Winning Bid, the Winning bidder shall receive title to the applicable Group III

27  Asset: Voluntary Debtor free and clear of all monetary liens and encumbrances; and

28          ~~15~~  5.    No bidder shall be allowed to submit or demand the

MAINDOCS-#163424-v4-SCC_Group_III_VD_DS.DOC

acceptance of a "credit bid" based upon an existing claim or lien on a Group III Assets: Voluntary Debtors.

C.

16    C.    Distributions To The Class 2.1 Claimant. If the Plan Trustee consummates a sale or otherwise liquidates the particular Asset(s) subject to the Class 2.1 Disputed Secured Claim(s) and/or Disputed Lien(s) during the Sales Period, as provided for above, the Holder(s) of such Disputed Secured Claim shall receive a distributionDistribution to the extent of available funds from the applicable Net Sale Proceeds Account(s) to the extent required by an entered Final Order of the Court, that is not subject to a stay pending appeal, determining the allowance and priority of the Disputed Secured Claims and the validity, priority and extent of the Disputed Liens in, including but not limited to, the Lehman Adversary Proceeding and the Lehman Claims Objections.

**8.3.    The Plan'sPlan(s)' Treatment of Holders of Priority Claims Against Group III: Voluntary Debtors (Classes 3.1 to 3.3).2).**

The treatment of the Holders of Allowed Priority Claims under the PlanGroup III: Voluntary Debtors Plan(s) shall be as follows:

A.    The Holder(s) are unimpaired under the Plan:Group III: Voluntary Debtors Plan(s); and

B.    The Holder(s) shall be paid either from the applicable Distribution Account(s) (i) the full amount of such Allowed Priority Claim in Cash on the later of (x) the Effective Date, (y) the date such Claim becomes an Allowed Priority Claim or (z) the date such Allowed Priority Claim becomes payable in accordance with the terms governing such Allowed Priority Claim, or (ii) upon such other less favorable terms as may be agreed to by such Holder and the Plan Trustee.

**8.4.    The Plan'sPlan(s)' Treatment of Holders of Allowed General Unsecured Claims Against Group III: Voluntary Debtors (Classes 4.1 to 4.3).**

The rights of Holders of Allowed Class 4.1 to 4.3 Claims are impaired under the applicable Plan.(s). Under the applicable Plan.(s), each claimant willshall receive, after payment in full of all

Post- Confirmation Expenses, Allowed Administrative Claims, and Allowed Priority Claims, a pro-rata distributionDistribution up to the Maximum Distribution100% of such Holder's Allowed Claim from funds payable from the applicable Distribution Account(s).

**8.5.    The Plan'sPlan(s)' Treatment of Holders of Allowed Interests Against Group III: Voluntary Debtors.**

The Interests of the Holders in Class 5.1 to 5.3 are impaired under the –Plan.(s). Any potential distributionDistribution to Holders of Allowed Interest against the Group III: Voluntary Debtor shall first be used to pay any deficit to Holders of Allowed General Unsecured Claims in the other Group III: Voluntary Debtors, and second to be used to fund Allowed Administrative Claims in the Voluntary Debtors' cases, and then to repay the Litco Administrative Claim Plan Loan.

**IX.**

**ACCEPTANCE OR REJECTION OF THE PLAN(S)**

**9.1.    Introduction.**

PERSONS OR ENTITIES CONCERNED WITH CONFIRMATION OF THE PLAN(S) SHOULD CONSULT WITH THEIR OWN ATTORNEYS BECAUSE THE LAW ON CONFIRMING A PLAN OF REORGANIZATION IS VERY COMPLEX.  The following discussion is intended solely for the purpose of alerting readers about basic confirmation issues, which they may wish to consider, as well as certain deadlines for filing Claims.  The Debtors cannot represent that the discussion contained below is a complete summary of the law on this topic.

Many requirements must be met before the Court can confirm the respective Group III: Voluntary Debtor's Plan.(s).  Some of the requirements include that the respective Group III: Voluntary Debtor's Plan (s)must be proposed in good faith, acceptance of the respective Group III: Voluntary Debtor's Plan.(s), whether the respective Group III: Voluntary Debtor's Plan pays(s)pay creditors at least as much as creditors would receive in a Chapter 7 liquidation, and whether the Plan isrespective Group III: Voluntary Debtor's Plan(s)are feasible.  The requirements described herein are not the only requirements for confirmation.

**9.2.    Who May Object to Confirmation of the Plan.(s).**

Any party in interest may object to the confirmation of the ~~Plan,~~respective Group III: Voluntary Debtor's Plan(s), but as explained below not everyone is entitled to vote to accept or reject the ~~Plan.~~respective Group III: Voluntary Debtor's Plan(s).

**9.3.    Who May Vote to Accept/Reject the Plan.(s).**

A Holder of a Claim or Interest has a right to vote for or against the ~~Plan~~respective Group III: Voluntary Debtor's Plan(s) if that Holder of the Claim or Interest has a Claim which is both (1) Allowed or Allowed for voting purposes and (2) Classified in an impaired Class (excluding any class in which the Plan is "deemed rejected").  The votes will be tabulated on a Debtor by Debtor basis.

**9.4.    What Is an Allowed Claim/Interest.**

As noted above, a Holder of Claim or Interest must first have an Allowed Claim or Allowed Interest to vote.

**9.5.    What Is an Impaired Class.**

A Class is impaired if the respective Group III: Voluntary Debtor's Plan ~~alters~~alter the legal, equitable, or contractual rights of the Claims or Interests in that Class, other than the right to accelerate the Claim upon certain kinds of defaults.  In this case, the Debtors believe that all Classes, except for Class 1.1, 1.2, 3.1, ~~3.2~~ and 3.~~3~~2 are impaired.

**9.6.    Who Is Not Entitled to Vote.**

The following four types of Claims are <u>not</u> entitled to vote: (1) Claims that have been disallowed; (2) Claims in unimpaired Classes; (3) Claims entitled to priority pursuant to Bankruptcy Code Sections 507(a)(2) or (a)(3) and Claims in Classes that do not receive or retain any value under the ~~Plan.~~respective Group III: Voluntary Debtor's Plan(s).  Claims in unimpaired Classes are not entitled to vote because such Classes are deemed to have accepted the ~~Plan.~~respective Group III: Voluntary Debtor's Plan(s).  Claims entitled to priority pursuant to Bankruptcy Code Section 507(a)(8) are not entitled to vote because such Claims are not placed in Classes and they are required to receive certain treatment specified by the Bankruptcy Code. Claims in Classes that do not receive or retain any property under the respective Group III: Voluntary Debtor's Plan(s) do not vote because such Classes are deemed to have rejected the

Plan.respective Group III: Voluntary Debtor's Plan(s).    The Debtors believe that all Classes are

entitled to vote except Class 1.1, 1.2, 3.1, 3.2, and 3.32. These classes are not impaired under the

respective Group III: Voluntary Debtor's Plan(s) and consequently are not entitled to vote. They are

conclusively deemed to have accepted the Plan.respective Group III: Voluntary Debtor's Plan(s).

The Interests held by the Holders in Classes 5.1, 5.2 and 5.3 are being cancelled under the

Plan:respective Group III: Voluntary Debtor's Plan(s); accordingly these Interest Holders are

deemed to have voted to reject the Plan.respective Group III: Voluntary Debtor's Plan(s).

EVEN IF YOUR CLAIM IS OF THE TYPE DESCRIBED ABOVE, YOU MAY STILL

HAVE A RIGHT TO OBJECT TO THE CONFIRMATION OF THE PLAN.GROUP III:

VOLUNTARY DEBTORS PLAN(S).

**9.7.    Who Can Vote in More than One Class.**

A creditor whose Claim has been Allowed in part as a Secured Claim and in part as an

Unsecured Claim is entitled to accept or reject a Planrespective Group III: Voluntary Debtor's

Plan(s) in both capacities by casting one ballot for the secured part of the Claim and another ballot

for the Unsecured Claim.  Also, a Creditor may otherwise hold Claims in more than one Class (such

as a Holder of Senior Secured Claims and Subordinated Note Claims), and may vote the Claims

held in each Class.

**9.8.    Votes Necessary for a Class to Accept the Plan.(s).**

A Class of Claims is deemed to have accepted the respective Group III: Voluntary Debtor's

Plan(s) when more than one-half (1/2) in number and at least two-thirds (2/3) in dollar amount of

the Claims *that actually voted*, vote to accept the respective Group III: Voluntary Debtor's Plan.(s).

A Class of interests is deemed to have accepted the Planrespective Group III: Voluntary Debtor's

Plan(s) when Holders of at least two-thirds (2/3) in amount of the interest-Holders of such Class

which actually vote, vote to accept the Plan.respective Group III: Voluntary Debtor's Plan(s).

**9.9.    Treatment of Nonaccepting Classes.**

As noted above, even if there are impaired Classes that do not accept the proposed

respective Group III: Voluntary Debtor's Plan.(s), the Court may nonetheless confirm the respective

Group III: Voluntary Debtor's Plan(s) if the nonaccepting Classes are treated in the manner

-68-

1   required by the Code and at least one impaired Class of Claims accepts the ~~Plan.~~respective Group

2   III: Voluntary Debtor's Plan(s).   The process by which a plan may be confirmed and become

3   binding on non-accepting Classes is commonly referred to as "cramdown."  The Bankruptcy Code

4   allows the ~~Plan~~respective Group III: Voluntary Debtor's Plan(s) to be "crammed down" on

5   nonaccepting Classes of Claims or interests if it meets all statutory requirements except the voting

6   requirements of 1129(a)(8) and if the ~~Plan~~respective Group III: Voluntary Debtor's Plan(s) does not

7   "discriminate unfairly" and is "fair and equitable" with respect to each impaired Class that has not

8   voted to accept the ~~Plan.~~respective Group III: Voluntary Debtor's Plan(s), as set forth in 11 U.S.C.

9   § 1129(b) and applicable case law.

10      **9.10.    Request for Confirmation Despite Nonacceptance by Impaired Class(es).**

11      The SunCal Plan Proponents will ask the Court to confirm the respective Group III:

12   Voluntary Debtor's Plan(s) by cramdown on any impaired Class if such Class does not vote to

13   accept the ~~Plan.~~respective Group III: Voluntary Debtor's Plan(s).

14                                              **X.**

15              **MEANS OF EXECUTION AND IMPLEMENTATION OF THE PLAN**

16          ~~10.1.~~10.1              **Introduction.**

17      This section is intended to address how the SunCal Plan Proponents intend to implement the

18   provisions of the ~~Plan.~~respective Group III: Voluntary Debtor's Plan(s).   It addresses the transfer of

19   the Plan Trust ~~Property~~Assets to the Plan Trust, the nature of the Plan Trust, the powers of the Plan

20   Trust, the governance of the Plan Trust, the resolution of disputed claims, the sources of funds that

21   will be used to pay claims and the mechanics of how claims will be paid.

22          **10.2        Sale Process After Confirmation Date But Prior To Effective Date.**

23      ~~17~~     The core objective of the applicable Plan(s) is to enable all creditors holding

24   Allowed Claims to receive the highest dividend possible by selling the estates' primary assets, the

25   Group III Assets: Voluntary Debtors, to the highest bidder. The process of marketing the Group III

26   Assets: Voluntary Debtors for sale will begin, pursuant to the Confirmation Order, immediately

27   after the entry of this order. ~~Although the Chapter 11 Trustee will not be formally removed under~~

28   ~~the PlanRespective Group III: Voluntary Debtor's Plan(s) until the Effective Date, he will be~~

required to work with the ~~SunCal Proponent~~SunCal Plan Proponents ~~after the Confirmation Date to promote and facilitate the sale of the Group III Assets: Voluntary Debtors in accordance with the Plan~~respective Group III: Voluntary Debtor's Plan(s) terms.

The Plan Trustee shall complete the sale of Group III Assets: Voluntary Debtors on the Effective Date that are subject to the Holder(s)' Disputed Secured Claims and Disputed Liens, free and clear of such claims and liens, through a sale that satisfies the following conditions:

1. The Group III Assets: Voluntary Debtors shall be sold separately through a public auction after a commercially reasonable marketing and advertising effort of at least sixty (60) days duration;

2. The SunCal Plan Proponents shall have the right to provisionally accept an Opening Bid from a Stalking Horse Bidder prior to the public auction and to grant this bidder the SCC Communities Break-Up Fee, the Tesoro Break-up Fee or the Del Rio Break-Up Fee as the case may be;

3. Other Qualified Bidders shall have the right to overbid the Opening Bid by submitting a Qualifying Bid. The first round of Qualifying Bids after the Opening Bid must be equal to or in excess of the Initial Overbid Amount. Thereafter, all Qualifying Bids shall be equal to or in excess of the Minimum Increment;

4. The highest and best Qualifying Bid received from a Qualified Bidder respectively for each of the Group III: Voluntary Debtors' Assets, shall be accepted as the Winning Bid, and the submitting bidder shall be the Winning Bidder. Upon payment of the Winning Bid, the Winning bidder shall receive title to the applicable Group III Asset: Voluntary Debtor free and clear of all monetary liens and encumbrances; and

5. No bidder shall be allowed to submit or demand the acceptance of a "credit bid" based upon an existing claim or lien on a Group III Assets: Voluntary Debtors.

The ~~SunCal Proponent~~SunCal Plan Proponents will pursue the following sale procedures after the Confirmation Date:

A. <u>Implementation of a marketing program</u>. On or before ~~co~~ the applicable Plan ~~is~~(s) are confirmed, the ~~SunCal Proponent~~SunCal Plan Proponents will market the applicable Group

III Assets: Voluntary Debtors for sale through a comprehensive sale effort during the Sale Period. This sale effort will include 1) sending sale packages describing each Group III Asset: Voluntary Debtor to the real estate brokerage community; b) advertising the Group III Assets: Voluntary Debtors for sale on a website that includes links allowing direct access to all relevant information regarding the Group III Assets: ~~Voluntary Debtors; and c) sending packages to a list of prospects nationally who are actively seeking or may have interest in these kinds of assets.~~

B.  Identifying a Stalking Horse Bidder. On or before the commencement~~During~~ of the Sale Period, the SunCal Parties may~~will~~ accept, on a provisional basis, an Opening Bid for one or both of the Group III Assets: Voluntary Debtors. The bidder whose Opening Bid is accepted will become the "Stalking Horse Bidder." The Opening Bid must be equal to the Minimum Sale Price(s) fixed in the applicable Plan(s) for each Group III Asset: Voluntary Debtor:  $144,000 for the ~~Joshua Ridge Project~~SCC Communities Assets, $666,~~000for~~000 for the Tesoro ~~Project~~Assets and $6,390,~~.~~000 for the ~~Net~~ Del Rio ~~CFD Bonds Proceeds.~~Assets.

C.  The Sale Contract. The sale contract for the Group III Asset(s): Voluntary Debtors that will be entered into with the Stalking Horse Bidder will include the following bankruptcy-sale related provisions:

1.    In the case of the SCC Communities Assets, the Initial Overbid Amount is a sum that is not less than $144,000, plus the SCC Communities Break-Up Fee, plus fifteen thousand dollars ($15,000). In the case of the Tesoro Assets, the Initial Overbid Amount is $666,000, plus the Tesoro Break-up Fee, plus sixty thousand dollars ($60,000).  In the case of the Del Rio Assets, the Initial Overbid Amount is $6,390,000, plus the Del Rio Break-Up Fee, plus six-hundred thousand dollars ($600,000).

2.    A Break-Up Fee. The sale contract will include a "break-up fee" provision. This fee will be payable to the Stalking Horse Bidder if the Opening Bid is overbid, and another Qualified Bidder purchases the Group III Asset: Voluntary Debtor(s) that is the subject of the Opening Bid.

~~1.    Overbid Provisions. The contract will allow the SunCal Proponent~~SunCal Plan Proponent~~s to seek "overbids" from other Qualified Buyers, and to accept an~~

MAINDOCS-#163424-v4-SCC_Group_III_VD_DS.DOC

Initial Overbid that exceeds the Stalking Horse Bid by the Initial Overbid Amount applicable to each Group III Asset: Voluntary Debtor. In the case of the Joshua Ridge ProjectAssets, the Initial Overbid Amount is a sum that is not less than $144,000, plus the Joshua RidgeSCC Communities Break-upUp Fee, plus ten thousand dollars ($10,000). In the case of the Tesoro ProjectAssets, the Initial Overbid Amount is $666,000, plus the Tesoro Break-up Fee, plus thirty five thousand dollars ($35,000).  In the case of the Net Del Rio CFD Bonds ProceedsAssets, the Initial Overbid Amount is $6,390,000, plus the Del Rio Break-upUp Fee, plus one hundred thousand dollars ($100,000).

2.      A Break-Up Fee. The sale contract will include a "break-up fee" provision. This fee will be payable to the Stalking Horse Bidder if the Opening Bid is overbid, and another Qualified Bidder purchases the Group III Asset: Voluntary Debtor(s) that is the subject of the Opening Bid. The Joshua RidgeSCC Communities Break-upUp Fee is $6,400, the Tesoro Break-up Fee is $30,400, and the Del Rio Break Up Fee is $284,000.

3.      Sale Free And Clear of Liens. The sale contract will provide that the Group III AssetAssets: Voluntary Debtor(s) are being sold free and clear of all monetary liens and encumbrances and that no party holding a lien against the projects, including the Lehman Lenders, may submit a "credit bid" based upon the amount allegedly owing on the claims secured by the project being sold.

D. D)  The Auction. Ten days prior to the Effective Date, the SunCal ProponentSunCal Plan Proponents will conduct an auction wherein all Qualified Bidders who have submitted Qualified Bids for the Group III Assets: Voluntary Debtors will have the opportunity to increase their bids for these ProjectsAssets. The Qualified Bidder that submits the highest bid for the Project will then be designated the Winning Bidder. The Winning Bidder will then have twenty (20) days to prepare to close this purchase transaction by paying the Winning Bid amount. Once the Winning Bidder advises the SunCal Plan Proponents that they are ready to close, the sequence of events described in paragraphs 107.3 through 107.5 shall be implemented.

10.3.10.3      **Possession and Control**.

18      As of the Effective Date, possession and control over all property within these estatesthe Estates of the Group III: Voluntary Debtors shall pass to the respective Group III:

Voluntary Debtor's Plan Trust.

#### ~~10.4.~~10.4        **Transfer of Property To The Plan Trust**.

~~19~~    On the Effective Date, title to and possession of all property of the Group III: Voluntary Debtors, excepting those items of property that the respective Group III: Voluntary Debtor's Plan Trustee affirmatively elects not to transfer to the respective Group III: Voluntary Debtor's Plan Trust, shall be deemed transferred and delivered to the respective Group III: Voluntary Debtor's Plan Trust, without further act or action under any applicable agreement, law, regulation, order or rule of law.

#### 10.5        Closing of **Group III Asset: Voluntary Debtor Sales**.

~~10.5.~~    On the Effective Date, the Winning Bidder and the respective Group III: Voluntary Debtor's Plan Trustee shall open escrow and the Group III Asset: Voluntary Debtor(s) shall be sold free and clear of liens to the Winning Bidder, at the Winning Bid.

#### ~~10.6.~~10.6        **Purposes of The Plan Trust**.

~~20~~    ~~The~~The respective Group III: Voluntary Debtor's Plan Trust's purposes, powers and objectives include, but are not limited to the following: (i) to take control over, manage and over time sell or otherwise dispose of all respective Group III: Voluntary Debtor's Plan Trust Assets ~~Property~~ for the highest return reasonably obtainable; (ii) to pursue all Litigation Claims through collection efforts, including through litigation in any court of competent jurisdiction, and to obtain the most favorable recovery on the same, with due consideration of all relevant factors, including cost; (iii) to cause all Available Cash to be deposited into the applicable Distribution Accounts; (iii) to initiate actions to resolve any remaining issues regarding the allowance and payment of Claims including, as necessary, initiation and/or participation in proceedings before the Bankruptcy Court; (iv) to take such other actions as are necessary or useful to maximize the value of all property received by the respective Group III: Voluntary Debtor's Plan Trust; (v) to make the payments and ~~distributions~~Distributions to creditors and holders of Beneficial Interests as required by the ~~Plan;~~respective Group III: Voluntary Debtor's Plan(s); and (vi) to enforce all rights with respect to the respective Group III: Voluntary Debtor's Plan Trust Assets~~Property~~; and (vii) to take all actions reasonable and necessary to implement the terms of the ~~Plan.~~respective Group III: Voluntary

MAINDOCS-#163424-v4-SCC_Group_III_VD_DS.DOC

Debtor's Plan(s), including but not limited to selling the Group III Assets: Voluntary Debtors and the Assets. A more complete statement of the respective Group III: Voluntary Debtor's Plan Trust's powers and limitations is set forth in the respective Group III: Voluntary Debtor's Plan Trust Agreement, which is a part of the respective Group III: Voluntary Debtor's Plan Supplement.

21    It is intended that the respective Group III: Voluntary Debtor's Plan Trust will be classified for U.S. federal income tax purposes as a "liquidating trust," with the primary objective of liquidating the respective Group III: Voluntary Debtor's Plan Trust AssetsProperty and distributing the net proceedsNet Sales Proceeds thereof, with no objective to continue or engage in the conduct or a trade or business in accordance with Treasury Regulation 301.7701-4(d), and, notwithstanding anything to the contrary in the respective Group III: Voluntary Debtor's Plan.(s), all actions taken by the respective Group III: Voluntary Debtor's Plan Trust or any person acting on behalf of the respective Group III: Voluntary Debtor's Plan Trust shall be consistent with such primary objective.

10.7.10.7    **Preservation of Litigation Claims for the Plan Trust**Trust Agreement.

The Plan Trustee reserves for Estates and the Plan Trust all rights to commence and pursue, as appropriate, any and all Litigation Claims, whether arising prior to or after the petition Date, in any court or other tribunal, including without limitation, in an adversary proceeding filed in the Court. On the Effective Date, the Plan Trustee will be vested with authority to enforce, file, litigate, prosecute, settle and collect with respect to the Litigation Claims, although he will not be required to do so and the determination of whether to so will be made solely by the Plan Trustee in his absolute discretion.  With respect to any Litigation Claims commenced prior to the Effective Date to which any or all of the Group III: Voluntary Debtors is a party, the Plan Trustee shall replace and stand in the shoes of such Debtor(s) as the real party in interest.

While the SunCal Plan Proponents have attempted to identify all Litigation Claims in the Disclosure Statement which may be pursued, and hereby incorporates by reference those disclosures and provisions, the failure to list any potential Litigation Claims, generally or specifically, is not intended to limit the rights of the Plan Trustee to pursue such Litigation Claims.

MAINDOCS-#163424-v4-SCC_Group_III_VD_DS.DOC

1    Unless a Litigation Claims against any Person is expressly waived, relinquished, released,

2    compromised or settled as provided or identified in the Plan, any Confirmation Order or prior order

3    of the Court, the Plan Trustee expressly reserves any Litigation Claims for later adjudication.

4    Therefore, no preclusion doctrine, including, without limitation, the doctrine of res judicata,

5    collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or

6    laches shall apply to such Litigation Claims upon or after Confirmation or consummation of the

7    Plan.  All Litigation Claims are preserved under the Plan for the benefit of the Estates and the Plan

8    Trust.  Any recoveries from Litigation Claims will be paid to the Plan Trust.

9    ~~22~~      ANY CREDITORS THAT BELIEVE THEY RECEIVED A TRANSFER OR

10    SETOFF THAT IS AVOIDABLE UNDER THE CODE OR THAT HOLDS A CLAIM AGAINST

11    THE ESTATES THAT COULD BE SUBJECT TO AN OBJECTION BASED UPON FAILURE

12    TO RETURN AN AVOIDABLE TRANSFER OR SETOFF, ARE DIRECTED TO REVIEW

13    THEIR RECORDS AND/OR THE DEBTORS' SCHEDULES FOR FURTHER INFORMATION.

14    HOWEVER, ALL RIGHTS OF THE DEBTORS AND THE ESTATES ARE RESERVED WITH

15    RESPECT TO ANY AND ALL TRANSFERS OR SETOFFS WHICH MAY BE AVOIDABLE

16    UNDER THE BANKRUPTCY CODE.~~Copies of the respective Group III: Voluntary Debtor's Plan~~

17    ~~Trust Agreement shall be contained in the respective Group III: Voluntary Debtor's Plan~~

18    ~~Supplement. The respective Group III: Voluntary Debtor's Plan Trust Agreement shall, among~~

19    ~~other matters, create the respective Group III: Voluntary Debtor's Plan Trust, identify Acquisitions~~

20    ~~as the initial trustee of the respective Group III: Voluntary Debtor's Plan Trust, identify the~~

21    ~~compensation of the respective Group III: Voluntary Debtor's Plan Trust, and specify the~~

22    ~~authorities and powers of the respective Group III: Voluntary Debtor's~~ Plan Trustee, consistent with

23    ~~the respective Group III: Voluntary Debtor's~~ Plan.~~(s).~~

24        ~~10.8.~~**10.8**          **Establishment and** Operations of the Plan Trust.

25        The Plan Trust shall be established and shall become effective on the Effective Date.  The

26    Plan Trust is created pursuant to the Plan and the Confirmation Order.  The primary purpose of the

27    Plan Trust is the liquidation and distribution of the Plan Trust Assets transferred to it, with no

28    objective to continue or engage in the conduct of a trade or business, except to the extent

reasonably necessary to, and consistent with, the liquidating purpose of the Plan Trust. The Plan Trust shall hold and administer the Plan Trust Assets, including, but not limited to, any Litigation Claims, and the proceeds thereof for liquidation and distribution in accordance with the terms of the Plan.

23    From and after the Effective Date, the respective Group III: Voluntary Debtor's Plan Trust may use, acquire and dispose of the respective Group III: Voluntary Debtor's Plan Trust AssetsProperty held in the respective Group III: Voluntary Debtor's Plan Trust, and take any of the actions set forth in the Planis Article or in the respective Group III: Voluntary Debtor's Plan Trust Agreement, without the approval of the Bankruptcy Court and free of the restrictions of the Bankruptcy Code, the Bankruptcy Rules or the prior orders of the Bankruptcy Court, other than restrictions expressly imposed by the respective Group III: Voluntary Debtor's Plan (s), the Confirmation Order or the respective Group III: Voluntary Debtor's Plan Trust Agreement, provided that the respective Group III: Voluntary Debtor's Plan Trust is administered so that it qualifies as a liquidating trust under Treasury Regulation § 301.7701-4(d).

**10.9    Payment of Trust Expenses.**

The expenses incurred by the respective Group III: Voluntary Debtor's Plan Trust during the respective Group III: Voluntary Debtor's Plan Period, which shall include the compensation payable to the Acquisitions, shall be paid, or adequate reserves shall be created for the payment of such expenses, prior to any Distribution to the respective Group III: Voluntary Debtor's Plan Trust Beneficiaries.

**10.9.10.10    The Plan Trust Distribution SystemThe Plan Trustee.**

The Plan Trustee shall establish a separate "Distribution Account" for each Group III: Voluntary Debtor at an FDIC insured bank. Each Group III: Voluntary Debtor's Available Cash, whether on hand as of the Effective Date or received thereafter, shall be deposited into that Group III: Voluntary Debtor's Distribution Account. The only exception to this provision shall be in the case of Net Sales Proceeds that are subject to disputed liens. Such proceeds shall remain in the applicable Net Sales Proceeds Accounts established to receive the proceeds from the sale of a particular property. Once all disputes regarding entitlement to the funds in the Net Sales Proceeds

MAINDOCS-#163424-v4-SCC_Group_III_VD_DS.DOC

Accounts have been resolved, the proceeds remaining (after the payment of the Allowed Claims secured by liens on these proceeds) shall be transferred to the Distribution Account. These funds will then be used to pay the claims of Creditors holding Allowed Claims in their order of priority as provided for in the Plan.  Persons dealing with the Plan Trustee, or seeking to assert Claims against the Debtors, the Estates or the Plan Trust, shall look only to property of the Debtors, the Estates or the Plan Trust to satisfy any liability to such Persons, and the Plan Trustee shall have no corporate, personal, or individual obligation to satisfy any such liability.~~Acquisitions shall be Trustee of the respective Group III: Voluntary Debtor's Plan Trust. Acquisitions is the~~a direct or indirect parent of all of Debtors.

    **10.10.10.11**   **The Plan Trustee~~Payment of Trust Expenses~~**.

     **10.10.1**   **Appointment**.  Acquisitions shall be Plan Trustee of the Plan Trust. The appointment of the Plan Trustee shall be effective as of the Effective Date.

     **10.11.2**   **Term**.  Unless the Plan Trustee resigns, dissolves or is removed by Court order earlier, the Plan Trustee's term shall expire upon termination of the Plan Trust pursuant to the Plan.  In the event the Plan Trustee resigns, dies or is removed by Court order prior to termination of the Plan Trust, the UST shall select and recommend to the Court a successor Plan Trustee.

     **10.11.3**   **Powers and Duties**.  On the Effective Date, the Plan Trustee shall have the rights, powers and duties set forth in the Plan, the Confirmation Order, and Bankruptcy Code §§505, 1107 and 1108.  The Plan Trustee shall be governed in all things by the terms of the Plan and the Confirmation Order.  The Plan Trustee shall administer the Plan Trust in accordance with the Plan.  Without limitation, the Plan Trustee shall file final federal, state, foreign and, to the extent applicable, local, tax returns.  Without further Motion, notice, or order of the Court, the Plan Trustee shall be authorized, empowered and directed to take all actions necessary to comply with the Plan and exercise and fulfill the duties and obligations arising thereunder, including, without limitation to:

i.     employ, retain, and replace one or more attorneys, accountants, auctioneers, brokers, managers, consultants, other professionals, agents, investigators, expert witnesses, consultants, and advisors as necessary to discharge the duties of the Plan Trustee under the Plan;

ii.     control and effectuate the Claims reconciliation process, including to object to, seek to subordinate, compromise or settle any and all Claims against the Debtors pursuant to the terms of the Plan;

iii.     open, maintain and administer bank accounts as necessary to discharge the duties of the Plan Trustee under the Plan;

iv.     make Distributions to the Holders of Allowed Claims in accordance with the Plan;

v.     retain professionals to assist in performing its duties under the Plan;

vi.     pay reasonable and necessary professional fees, costs, and expenses;

vii.     investigate, analyze, commence, prosecute, litigate, compromise, settle, dismiss, and otherwise administer all Causes of Action and Avoidance Actions for the benefit of the Plan Trust and its beneficiaries, as set forth in the Plan, and to take all other necessary and appropriate steps to collect, recover, settle, liquidate, or otherwise reduce to Cash all Causes of Action and Avoidance Actions, as the Plan Trustee may determine is in the best interests of the Plan Trust;

viii.     administer, sell, liquidate, or otherwise dispose of the Assets in accordance with the terms of the Plan;

ix.     incur and pay reasonable and necessary expenses in connection with the performance of the Plan Trustee's duties under the Plan;

x.     represent the Estates before the Court and other courts of competent jurisdiction with respect to mattes concerning the Plan Trust;

xi.     seek the examination of any entity under the subject to the provisions of Bankruptcy Rule 2004;

xii.     comply with applicable orders of the court and any other court of competent jurisdiction over the matters set forth in the Plan;

xiii.   comply with all applicable laws and regulations concerning the matters set forth in the Plan;

xiv.   exercise such other powers as may be vested in the Plan Trust pursuant to the Plan, the Confirmation Order, or other Final Orders of the Court.

xv.   execute any documents, instruments, contracts, and agreements necessary and appropriate to carry out the powers and duties of the Plan Trust;

xvi.   (1) seek a determination of tax liability under §505 of the code, (2) pay taxes, if any, related to a Debtor, (3) file, if necessary, any and all tax and information returns r3equired with the respect to the Plan Trust, including, if appropriate, treating the Plan Trust as a "grantor trust" pursuant to Treas. Reg 1.671-4 or otherwise, (4) make tax elections by and on behalf of the Plan Trust, and 95) pay taxes, if any, payable by the Plan Trust; and

xvii.   stand in the shoes of the Debtors for all purposes.

**10.11.4      Retention of Professionals and Compensation Procedure.**

On and after the Effective Date, the Plan Trustee may, without further application or Motion, notice, hearing, or Court order, engage or employ such professionals and experts as may be deemed necessary and appropriate by the Plan Trustee to assist the Plan Trustee in carrying out the provisions of the Plan, including, but not limited to, the Professionals retained prior to the Effective Date by either the Debtors or the Committee.  The Plan Trustee may employ such professionals on any reasonable terms and conditions of employment to be determined by the Plan Trustee.  For the services performed on and after the Effective Date, the professionals engaged by the Plan Trustee (the "Plan Trustee Professionals") shall receive reasonable compensation and reimbursement of expenses in a manner to be determined by the Plan Trustee.

**10.11.5      Fees and Expenses.**

Acquisitions shall not receive any compensation for the services it performs as the Plan Trustee, other than the release provided for in the Plan, but shall be entitled to reimbursement of reasonable expenses.  The Plan Trustee Professionals shall be entitled to reasonable compensation for their services, and reimbursement of expenses.  The costs and expenses of the Plan trust (including, without limitation, fees and expenses of the Plan Trustee Professionals) shall be paid

MAINDOCS-#163424-v4-SCC_Group_III_VD_DS.DOC

from the Plan Trust.  The Plan Trustee shall pay, without further order, notice or application to the

Court, the reasonable fees and expenses of the Plan Trustee Professionals, as necessary to

discharge the Plan Trustee's duties under the Plan.  The Plan Trustee shall be authorized to reserve

funds from the Plan Trust as is reasonable to pay the expenses of the Plan Trustee and the expenses

and fees of the Plan Trustee Professionals before making any Distributions under the Plan.

**10.11.6    Limitation of Liability and Indemnification.**

Neither the Plan Trustee nor its employees, Plan Trustee Professionals or agents shall be

liable (a) for any loss or damages by reason of any action taken or omitted by him or her, except in

the case of fraud, willful misconduct, bad faith, or gross negligence, or (b) for any act or omission

made in reliance upon the Debtors' books and records or upon information or advice given to the

Plan Trustee by its professionals.  Except as otherwise provided in this Plan, the Plan Trustee shall

rely and shall be protected in acting upon any resolution, certificate, statement, instrument,

opinion, report, notice, consent, or other document believed by him or her to be genuine and to

have been signed by the proper party or parties.

The Plan Trustee and its employees, Plan Trustee Professionals or agents (collectively, the

"Indemnified Parties" and each, an "Indemnified Party") shall be indemnified and receive

reimbursement from and against any and all loss, liability, expense (including attorneys' fees) or

damage of any kind, type or nature, which the Indemnified Party may incur or sustain the exercise

and performance of any of the Plan Trustee's powers and duties under this Plan or the

Confirmation Order, or in the rendering of services by the Indemnified Party to the Plan Trustee, to

the full extent permitted by applicable law, except if such loss, liability, expense or damage is

finally determined by a court of competent jurisdiction to result from the Plan Trustee's or an

Indemnified Person's fraud, willful misconduct, bad faith, or gross negligence.  The amounts

necessary for such indemnification and reimbursement shall be paid by the Plan Trustee out of the

Plan Trust Assets.  The Plan Trustee shall not be liable for the payment of any Plan Trust expense

or claim or other liability of the Plan Trust, and no Person shall look to the Indemnified Parties

personally for the payment of any such expense or liability.  This indemnification shall survive the

dissolution, resignation or removal, as may be applicable, of the Plan Trustee, or the termination of

MAINDOCS-#163424-v4-SCC_Group_III_VD_DS.DOC

the Plan Trust, and shall inure to the benefit of the Plan Trustee's and the Indemnified Person's

heirs and assigns.

**10.11.7      Plan Trustee as Successor.**

Pursuant to Code §1123(b), the Plan Trustee shall be the successor to the Group

III:Voluntary Debtors for all purposes. The expenses incurred by the respective Group III: Voluntary

Debtor's Plan Trust during the respective Group III: Voluntary Debtor's Plan Period, which shall

include the compensation payable to the Acquisitions, shall be paid, or adequate reserves shall be

created for the payment of such expenses, prior to any distribution to the Distribution to the

respective Group III: Voluntary Debtor's Plan Trust Beneficiaries.

**10.11.10.12      Plan Truste BeneficiariesDistribution System.**

The The Holders of Allowed Claims under the Plan, or any successors to such Holders'

Allowed Claims ("Beneficiary" or "Beneficiaries") shall own a beneficial interest in the Plan Trust

which shall, subject to the Plan, be entitled to a Distribution, if any, in the amounts, and at the

times, set forth in the Plan.  Ownership of a beneficial interest in the Plan Trust shall not be

evidenced by any certificate, security, or receipt or in any other form or manner whatsoever, except

as maintained on the books and records of the Plan Trust by the Plan Trustee.  The ownership of a

beneficial interest in the Plan Trust shall not entitle any Beneficiary to any title in or to the Plan

Trust assets or to any right to call for a partition or division of such assets or to require an

accounting.  The Plan Trustee shall make Distributions, if any, to Beneficiaries in the manner

provided in the Plan.

The rights of the Beneficiaries arising under the Plan Trust may be deemed "securities"

under applicable law.  However, such rights have not been defined as "securities" under the Plan

because (a) the intent of the Plan is that such rights shall not be securities, and (b) if the rights

arising under the Plan Trust are deemed to be "securities," the exemption from registration under

§1145 of the Bankruptcy code is intended to be applicable to such securities The respective Group

III: Voluntary Debtor's Plan Trustee shall establish a separate "Distribution Account" for each

Group III: Voluntary Debtor at an FDIC insured bank. Each Group III: Voluntary Debtor's

Available Cash, whether on hand as of the Effective Date or received thereafter, shall be deposited

into that Group III: Voluntary Debtor's Distribution Account. The only exception to this provision shall be in the case of Net Sales Proceeds that are subject to disputed liens. Such proceeds shall remain in the applicable Net ProceedNet Sales Proceeds Accounts established to receive the proceeds from the sale of a particular property. Once all disputes regarding entitlement to the funds in the Net ProceedNet Sales Proceeds Accounts have been resolved, the proceeds remaining (after the payment of the Allowed Claims secured by liens on these proceeds) shall be transferred to the Distribution Account. These funds will then be used to pay the claims of Creditors holding Allowed Claims in their order of priority as provided for in the Plan.respective Group III: Voluntary Debtor's Plan(s).

10.12.10.13    **Claims Estimation Rights**.

On the Confirmation Date, the SunCal ProponentSunCal Plan Proponents shall be vested with standing to file a motion under 11 U.S.C. § 502(c), and they shall be authorized and empowered to seek in such motion the estimation, for distributionDistribution purposes, of any Disputed Claim seeking recourse to, or claiming an interest in, any asset of the Group III: Voluntary Debtors. After the Bankruptcy Court estimates a Disputed Claimant's rights in, or against an asset of the Estates through this procedure, the Voluntary Debtors' CommitteePlan Trustee shall have the right to use any funds or assets not deemed subject to the rights of the Disputed Claimant, to pay the Allowed Claims under the terms of the Plan,respective Group III: Voluntary Debtor's Plan(s), including Allowed Administrative Claims, after the Effective Date.

10.13.10.14    **No Payment of Transfer-Related Fees to the United States Trustee**.

TheThe respective Group III: Voluntary Debtor's Plan Trust shall not be required to pay any fees to the United States Trustee based on any transfers of the respective Group III: Voluntary Debtor's Plan Trust AssetsProperty to the respective Group III: Voluntary Debtor's Plan Trust or from the respective Group III: Voluntary Debtor's Plan Trust.

10.14.   No Payment of Transfer-Related Fees to the Trustee.

The Plan Trust shall not be required to pay any fees to the Trustee based on any transfers of Plan Trust Property from the Trustee Debtors to the Plan Trust, or from the Plan Trust.

-82-

1    10.15.10.15      **Books and Records of Trust**.

2    The~~The~~ respective Group III: Voluntary Debtor's Plan Trustee, and to the extent of

3    payments and ~~distributions~~Distributions by any Disbursing Agent, the Disbursing Agent, shall

4    maintain an accounting of receipts and disbursements of the respective Group III: Voluntary

5    Debtor's Plan Trust. ~~The~~ The respective Group III: Voluntary Debtor's Plan Trustee shall maintain

6    the books and records of the respective Group III: Voluntary Debtor's Plan Trust, or provide storage

7    for such book and records, for the longer of six (6) years, or while respective Group III: Voluntary

8    Debtor's Plan(s) is in existence, provided that the Court may, upon application by the respective

9    Group III: Voluntary Debtor's Plan Trustee, authorize the respective Group III: Voluntary Debtor's

10   Plan Trust to destroy all of the respective Group III: Voluntary Debtor's Plan Trusts books and

11   records at such time as respective Group III: Voluntary Debtor's Plan Trust has no further need for

12   such books and records. The respective Group III: Voluntary Debtor's Plan Trust's books and

13   records shall be open to inspection at all reasonable times, upon written request by the Voluntary

14   Debtors' Committee.

15   10.16.10.16      **Limitations on Liability**.

16   ~~The~~~~The~~The respective Group III: Voluntary Debtor's Plan Trustee shall not be liable for any

17   act it may do or fail to do as the liquidating trustees hereunder while acting in good faith and in the

18   exercise of its best judgment. ~~The~~ The respective Group III: Voluntary Debtor's Plan Trust shall not

19   be liable in any event for any claims, liabilities or damages based upon or arising out of any conduct

20   of the respective Group III: Voluntary Debtor's Plan Trustee in the course of its activities as

21   liquidating trustee, unless such claims, liabilities or damages arise from Plan's gross negligence or

22   willful misconduct.

23   ~~The~~~~The~~The respective Group III: Voluntary Debtor's Plan Trustee, and its officers,

24   directors, agents and employees shall not be liable for any indebtedness, liability or obligation

25   incurred or entered into on behalf of the respective Group III: Voluntary Debtor's Plan Trust,

26   including, without limitation, indebtedness, liabilities or obligations under agreements,

27   undertakings or commitments entered into or executed on behalf of respective Group III: Voluntary

28   Debtor's Plan Trust by the respective Group III: Voluntary Debtor's Plan Trustee or by any person

employed by the respective Group III: Voluntary Debtor's Plan Trustee or the respective Group III: Voluntary Debtor's Plan.(s), it being expressly understood that all such indebtedness, liabilities and obligations of, and claims against the respective Group III: Voluntary Debtor's Plan.(s), shall be the sole responsibility of the respective Group III: Voluntary Debtor's Plan(s) and shall be satisfied only from the respective Group III: Voluntary Debtor's Plan.(s), or such portion thereof as shall, under the terms of any agreement, be stated to be liable therefore. No claim or cause of action may be asserted against the respective Group III: Voluntary Debtor's Plan Trustee, or any member of the New Board on account of any indebtedness, liability or obligation entered into on behalf of the Plan, respective Group III: Voluntary Debtor's Plan(s), whether by legal or equitable proceedings, or by virtue of any bankruptcy or non-bankruptcy statute, rule or regulation.

Any undertaking, contract or agreement entered into in writing by the respective Group III: Voluntary Debtor's Plan(s) may, except as otherwise provided by the respective Group III: Voluntary Debtor's Plan(s) or the respective Group III: Voluntary Debtor's Plan Trust Agreement, expressly disclaim the personal liability of respective Group III: Voluntary Debtor's Plan Trustee.

### 10.17.10.17    Federal Income Tax Treatment of the Holders of Plan Trust Beneficial Interests.

For all United States federal income tax purposes, the transfers by the Group III: Voluntary Debtors s shall be treated by the Group III: Voluntary Debtors, their estates, the respective Group III: Voluntary Debtor's Plan Trust and the respective Group III: Voluntary Debtor's Plan Trust Beneficiaries as a transfer of the respective Group III: Voluntary Debtor's Plan Trust AssetsProperty by the Group III: Voluntary Debtors to the respective Group III: Voluntary Debtor's Plan Trust Beneficiaries followed by a transfer of the respective Group III: Voluntary Debtor's Plan Trust AssetsProperty by such the respective Group III: Voluntary Debtor's Plan Trust Beneficiaries to the Trust. The The respective Group III: Voluntary Debtor's Plan Trust Beneficiaries shall be treated as the grantors and deemed owners of the respective Group III: Voluntary Debtor's Plan Trust for United States federal income tax purposes. The respective Group III: Voluntary Debtor's Plan Trust Trustee and the respective Group III: Voluntary Debtor's Plan Trust Beneficiaries are required to value their interests in the respective Group III: Voluntary Debtor's Plan Trust

MAINDOCS-#163424-v4-SCC_Group_III_VD_DS.DOC

AssetsProperty consistently with the values placed upon the respective Group III: Voluntary Debtor's Plan Trust AssetsProperty by the respective Group III: Voluntary Debtor's Plan Trust, and to use such valuations for all purposes. The The respective Group III: Voluntary Debtor's Plan Trust Agreement shall provide for consistent valuations of the respective Group III: Voluntary Debtor's Plan Trust AssetsProperty by the respective Group III: Voluntary Debtor's Plan Trust Trustee and the respective Group III: Voluntary Debtor's Plan Trust Beneficiaries, and shall provide that the respective Group III: Voluntary Debtor's Plan Trust will determine the fair market value of the respective Group III: Voluntary Debtor's Plan Trust AssetsProperty within thirty (30) days after the Effective Date, and send such determination to each the respective Group III: Voluntary Debtor's Plan Trust Beneficiary. By its acceptance of a the Beneficial Interest, each recipient of such an interest will be conclusively deemed to agree to use such valuations for all purposes, including, without limitation, in computing any gain recognized upon the exchange of such holder's claim for purposes of determining any United States Federal income tax, and shall be required to include those items of income, deductions and tax credits that are attributable to its the Beneficial Interest in computing its taxable income.

    **10.18.10.18        Termination of the Trust.**

    TheTheThe respective Group III: Voluntary Debtor's Plan Trust shall continue in effect until the earlier of: (a) the date that all the respective Group III: Voluntary Debtor's Plan Trust AssetsProperty has been liquidated, all proceeds have been converted to cash or distributed in kind, all the respective Group III: Voluntary Debtor's Plan Trust Expenses have been paid, all claims to be paid under the respective Group III: Voluntary Debtor's Plan for which the respective Group III: Voluntary Debtor's Plan Trust Trustee is obligated to make distributionsDistributions on have been paid, all distributionsDistributions to be made with respect to the Beneficial Interests have been made, all litigation to which the respective Group III: Voluntary Debtor's Plan Trust is a party have been concluded by dismissal or an order issued by the court in which such litigation is pending and such order has become "final" (consistent with the definition of Final Order in the Planrespective Group III: Voluntary Debtor's Plan(s) for orders issued by the Bankruptcy Court), and the Chapter 11 Case has been closed; and (b) the expiration of five (5) years from the Effective Date; provided,

however, that the respective Group III: Voluntary Debtor's Plan Trust may request the Bankruptcy Court to extend the permitted life of the respective Group III: Voluntary Debtor's Plan Trust for such additional period as is reasonably necessary to conclude the liquidation and distributionsDistributions, not to exceed a total of ten (10) years from the Effective Date, which request shall be filed so the Bankruptcy Court may consider and rule on the request within six (6) months prior to the expiration of the initial five-year term.

**10.19.10.19    Exemption from Certain Transfer Taxes**.

In accordance with Section 1146(ea) of the Bankruptcy Code, the issuance, transfer or exchange of a security or the making or delivery of an instrument of transfer under the respective Group III: Voluntary Debtor's Plan may not be taxed under any law imposing a stamp tax or similar tax. All governmental officials and agents shall forego the assessment and collection of any such tax or governmental assessment and shall accept for filing and recordation any of the foregoing instruments or other documents without payment of such tax or other governmental assessment.

**10.20.10.20    Tax Consequence of The Plan**.

The implementation of the respective Group III: Voluntary Debtor's Plan may have federal, state and local tax consequences to the Group III: Voluntary Debtors, Creditors and Interest Holders. No tax opinion has been sought or will be obtained with respect to any tax consequences of the Plan. Thisrespective Group III: Voluntary Debtor's Plan. The Disclosure Statement does not constitute and is not intended to constitute either a tax opinion or tax advice to any person, and the summary contained herein is provided for informational purposes only.

CREDITORS AND INTEREST HOLDERS ARE ADVISED TO CONSULT WITH THEIR OWN TAX ADVISORS REGARDING THE TAX CONSEQUENCES TO THEM AND TO THE DEBTOR OF THE TRANSACTIONS CONTEMPLATEDCONTEMPLATED BY THE PLAN, INCLUDINGINCLUDING    FEDERAL,    STATE,    LOCAL    AND    FOREIGN    TAX CONSEQUENCES.

**10.1910.21    The Plan Sponsor.**

TheThe respective Group III: Voluntary Debtor's Plan Sponsor shall be Acquisitions.

**10.20.10.22    The Voluntary Debtors' Committee.**

On the Effective Date, the Voluntary Debtors' Committee shall continue to serve its applicable Group III: Voluntary Debtors as Voluntary Debtors' Committee to the applicable reorganized Group III: Voluntary Debtors, subject to the following:

### 10.21.1 10.22.1  Duties and Powers.

10 The duties of the Voluntary Debtors' Committee after the Effective Date shall be limited to monitoring the respective Group III: Voluntary Debtor's Plan's implementation, notice and opportunity to object to any settlement of the Lehman Adversary Proceeding, and the Contract Action standing to object to any settlement of any Litigation Claim in excess of $100,000, and standing to object to any proposed sales procedures on sale of the Debtors' Projects.Group III Assets: Voluntary Debtors and standing to file, prosecute and resolve objections to Claims filed by Insiders that are SunCal Affiliates.  The Voluntary Debtors' Committee shall receive notice of and the right to review all payments and Distributions.

11 The Voluntary Debtors' Committee shall be entitled to retain, employ and compensate Professionals, in order to assist with the obligations and rights of the Voluntary Debtors' Committee under the terms of the Plan.respective Group III: Voluntary Debtor's Plan. Such compensation shall be paid from the applicable Distribution Account(s).

### 10.21.2 10.22.2  Dissolution of Committee.

12 The Voluntary Debtors' Committee shall be dissolved upon the entry of an order converting, closing or dismissing the Chapter 11 Cases or entry of a final decree in the Chapter 11 Cases.  On dissolution, the Voluntary Debtors' Committee shall have no other or further obligations or responsibilities on behalf of the respective Group III: Voluntary Debtor's Plan Trust.

### 10.21. 10.23    Litigation Claims.

Pursuant to Section 1123(b)(3) of the Bankruptcy Code, the respective Group III: Voluntary Debtor's Plan Trust shall retain all Litigation Claims whether or not pending on the Effective Date that are not purchased by the winning bidder.  Notwithstanding the foregoing, the respective Group III: Voluntary Debtor's Plan Trustee shall not settle or abandon a Litigation Claim valued at greater

than $100,000 except upon ten (10) days' prior written notice and opportunity to object to the Voluntary Debtors' Committee. Any disputes concerning the settlement or abandonment of a Litigation Claim shall be submitted to the Bankruptcy Court for resolution on no less than ten (10) days' notice to the objecting party.

**10.22.10.24     Collection of Litigation Recoveries.**

All Litigation Recoveries realized or obtained by the respective Group III: Voluntary Debtor's Plan Trustee and/or the Voluntary Debtors' Committee shall be promptly deposited into the applicable Distribution Account(s). Except as otherwise provided in the respective Group III: Voluntary Debtor's Plan and the Confirmation Order, the Litigation Recoveries shall be free and clear of all Claims and Liens and shall only be expended in accordance with the provisions of the respective Group III: Voluntary Debtor's Plan.

**10.25     Dissolution of the Group III: Voluntary Debtors.**

On the Effective Date, each of the Group III: Voluntary Debtors shall be deemed dissolved for all purposes without the necessity for any other further actions to be taken by or on behalf of such Debtors or payments to be made in connection therewith.

**XI.**

**RISK FACTORS**

**11.1     Plan(s) Risks.**

The ~~Plan in this case~~respective Group III: Voluntary Debtor's Plan, like any Chapter 11 reorganization plan, includes a number of risks that creditors should be aware of prior to voting on the ~~Plan.~~respective Group III: Voluntary Debtor's Plan. The more material of these risks are summarized below.

**11.2     The Plan(s) May All Not Be Accepted or Confirmed.**

While the ~~SunCal Proponent~~SunCal Plan Proponents believe that the respective Group III: Voluntary Debtor's Plan ~~is~~are confirmable under the standards set forth in 11 U.S.C. § 1129, there

-88-

can be no guarantee that the Bankruptcy Court will find the respective Group III: Voluntary Debtor's Plan to be confirmable. If thea respective Group III: Voluntary Debtor's Plan is not confirmed, it is possible that an alternative plan can be negotiated and presented to the Bankruptcy Court for approval; however, there can be no assurance that any alternative plan would be confirmed, that the Chapter 11 Cases would not be converted to a liquidation, or that any alternative plan of reorganization could or would be formulated on terms as favorable to the Creditors and holders of Equity Interests as the terms of the Plan.respective Group III: Voluntary Debtor's Plan.

**11.3** **Failure to Sell The Group III Assets: Voluntary Debtors**.

The Plan is based upon the assumption that the SunCal Plan Proponents will be able to sell the Group III Assets: Voluntary Debtors for at least the Minimum Sales Prices on the Effective Date. Although the Proponents are confident that they can achieve sales at these prices based upon their market research and familiarity with the projects, a possibility exists that these sale will not occur. If this occurs then the creditors holding liens against the Group III Assets: Voluntary Debtors will be entitled to seek recourse against these properties, and this recourse would include foreclosure.

**11.4** **Adverse Outcome of Pending Litigation**.

The SunCal Plan Proponents have filed objections to the claims of the Lehman Lenders, and they intend to pursue the Lehman Adversary Proceeding, Lehman Claim Objections and the State CourtContract Action against Lehman ALI. The SunCal ProponentSunCal Plan Proponents believe that their defenses to the claims asserted by the Lehman LenderALI have merits and that they will be sustained and that relief will also be granted in the Lehman Adversary Proceeding and any applicable claim objection and state court action. However, there is no assurance that this will occur. Litigation involves risks, including most importantly the risk of an adverse ruling.

**XII.**

**DISTRIBUTIONS**

**12.1** **Distribution Agent**.

Acquisitions shall serve as the Distribution Agent for distributionsDistributions due under

the respective Group III: Voluntary Debtor's Plan.  The Distribution Agent may employ one or more sub agents on such terms and conditions as it may agree in its discretion and pay such sub agent as a Post-Confirmation Expense from the Distribution Accounts.  The Distribution Agent shall not be required to provide any bond in connection with the making of any Distributions pursuant to the Plan.respective Group III: Voluntary Debtor's Plan.

### 12.2    Distributions.

#### 12.2.1    Dates of Distributions.

Any distributionDistribution required to be made on the Effective Date shall be deemed timely if made as soon as practicable after such date and, in any event, within thirty (30) days after such date.  Any distributionDistribution required to be made upon a Disputed Claim becoming an Allowed Claim and no longer being a Disputed Claim shall be deemed timely if made as soon as practicable thereafter.

#### 12.2.2    Limitation on Liability.

Neither None of the respective Group III: Voluntary Debtor's Plan Sponsor, the respective Group III: Voluntary Debtor's Plan Trustee, the Distribution Agent, their Affiliates, nor any of their employees, members, officers, directors, agents, or professionals or Affiliates shall be liable for (i) any acts or omissions (except for gross negligence or willful misconduct) in connection with implementing the Distribution provisions of the respective Group III: Voluntary Debtor's Plan and the making or withholding of Distributions pursuant to the respective Group III: Voluntary Debtor's Plan, or (ii) any change in the value of distributionsDistributions made pursuant to the respective Group III: Voluntary Debtor's Plan resulting from any delays in making such distributionsDistributions in accordance with the respective Group III: Voluntary Debtor's Plan's terms (including but not limited to any delays caused by the resolution of Disputed Claims).

### 12.312.3    Old Instruments and Securities.

#### 12.3.1        Surrender and Cancellation of Instruments and Securities.

As a condition to receiving any distributionDistribution pursuant to the respective Group III: Voluntary Debtor's Plan, each Person holding any note or other instrument or security (collectively "Instruments or Securities" and individually an "Instrument or Security") evidencing, an existing

1  Claim(s) against the Debtor(s) must surrender such Instrument or Security to the Distribution

2  Agent.

3  ### 12.3.2    Cancellation of Liens.

4      Except as otherwise provided in the respective Group III: Voluntary Debtor's Plan, any Lien

5  securing any Secured Claim shall be deemed released and discharged, and the Person holding such

6  Secured Claim shall be authorized and directed to release any collateral or other property of the

7  Group III: Voluntary Debtors (including, without limitation, any cash collateral) held by such

8  Person and to take such actions as may be requested by the respective Group III: Voluntary

9  Debtor's Plan Trustee to evidence the release of such Lien, including, without limitation, the

10  execution, delivery and Filing or recording of such releases as may be requested by the respective

11  Group III: Voluntary Debtor's Plan Trustee.

12  ### 12.3.3    De Minimis Distributions and Fractional Shares.

13      No Cash payment of less than ten dollars ($10) shall be made by the respective Group III:

14  Voluntary Debtor's Plan Trust to any Holder of Claims unless a request therefore is made in writing

15  to the respective Group III: Voluntary Debtor's Plan Trust.  Whenever payment of a fraction of a

16  cent would otherwise be called for, the actual payment shall reflect a rounding down of such

17  fraction to the nearest whole cent.   Any Cash or other property that is not distributed as a

18  consequence of this section shall, after the last ~~distribution~~Distribution on account of Allowed

19  Claims in the applicable Class, be treated as "Unclaimed Property" under the ~~Plan.~~respective Group

20  III: Voluntary Debtor's Plan.

21  ### 12.3.4    Delivery of Distributions.

22      Except as provided in the respective Group III: Voluntary Debtor's Plan with respect to

23  Unclaimed Property, ~~distributions~~Distributions to Holders of Allowed Claims and Allowed

24  Administrative Claims shall be distributed by mail as follows:  (1) with respect to each Holder of an

25  Allowed Claim that has filed a Proof of Claim, at the address for such Holder as maintained by the

26  official claims agent for the Group III: Voluntary Debtors; (2) with respect to each Holder of an

27  Allowed Claim that has not filed a Proof of Claim, at the address reflected on the Schedules filed by

28  the ~~Debtors,~~Group III: Voluntary Debtor(s), provided, however, that if the ~~Debtors~~Group III:

Voluntary Debtor(s) or the respective Group III: Voluntary Debtor's Plan Trust has received a written notice of a change of address for such Holder, the address set forth in such notice shall be used; or (3) with respect to each Holder of an Allowed Administrative Claim, at such address as the Holder may specify in writing.

### 12.3.5    Undeliverable Distributions.

If the Distribution of Cash to the Holder of any Allowed Claim is returned to the respective Group III: Voluntary Debtor's Plan Trustee as undeliverable or the Distribution check is not negotiated within 90 days of mailing (any such ~~distribution~~Distribution being hereinafter referred to as "Unclaimed Property"), no further ~~distribution~~Distribution shall be made to such Holder unless and until the respective Group III: Voluntary Debtor's Plan Trustee is notified in writing of such Holder's then current address.  Subject to the remainder of this Section and the following section, Unclaimed Property shall remain in the possession of the respective Group III: Voluntary Debtor's Plan Trustee pursuant to this Section, and shall be set aside and (in the case of Cash) held in a segregated interest bearing account (as to Cash Unclaimed Property) to be maintained by the Distribution Agent until such time as the subject Distribution becomes deliverable.  Nothing contained in the respective Group III: Voluntary Debtor's Plan shall require the respective Group III: Voluntary Debtor's Plan Trustee or any other Person to attempt to locate such Person.

### 12.3.6    Disposition of Unclaimed Property.

If the Person entitled thereto notifies the respective Group III: Voluntary Debtor's Plan Trustee of such Person's Claim to a Distribution of Unclaimed Property within ninety (90) days following such Person's initial Distribution Date, Effective Date, the Unclaimed Property distributable to such Person, together with any interest or dividends earned thereon, shall be paid or distributed to such Person as soon as practicable.  Any Holder of an Allowed Claim that does not assert a Claim in writing for Unclaimed Property held by the respective Group III: Voluntary Debtor's Plan Trustee within ninety (90) days after the Holder's initial Distribution Date shall no longer have any Claim to or Interest in such Unclaimed Property, and shall be forever barred from receiving any ~~distributions~~Distributions under the respective Group III: Voluntary Debtor's Plan or otherwise from the respective Group III: Voluntary Debtor's Plan Trustee.  In such cases, any

property held for Distribution on account of such Claims shall become Available Cash and deposited into the Distribution Account.

**XIII.**

**OBJECTIONS TO CLAIMS AND DISPUTED CLAIMS**

**13.1    Standing for Objections to Claims.**

~~TheTheThe respective Group III: Voluntary Debtor's Plan Trustee shall have the sole and exclusive right to file, prosecute and resolve objections to Claims other than to the right to object to the claims of SunCal Affiliates, which shall be vested with the Voluntary Debtors' Committee.  The Voluntary Debtors' Committee shall have standing to object to any settlement of any Litigation Claim in excess of $100,000 and standing to object to any proposed sales procedures and sale of the Debtors' Projects.Group III Assets: Voluntary Debtors.~~  <u>The Plan Trustee shall have the sole and exclusive right to file, prosecute and resolve objections to Claims, excluding Claims filed by Insiders that are SunCal Affiliates.  The Committee shall have the sole and exclusive right to file, prosecute and resolve objections to Claims filed by Insiders that are SunCal Affiliates.</u>

Any objection to a Claim shall be Filed with the Bankruptcy Court and served on the Person holding such Claim on or before the applicable Claims Objection Deadline.  ~~The~~<u>The respective Group III: Voluntary Debtor's</u> Plan Trustee shall have the right to petition the Bankruptcy Court, without notice or a hearing, for an extension of the Claims Objection Deadline if a complete review of all Claims cannot be completed by such date.

**13.2    Treatment of Disputed Claims and Disputed Liens.**

**13.2.1  No Distribution Pending Allowance.**

If any portion of a Claim or Lien is a Disputed Claim or Disputed Lien, no payment or ~~distribution~~<u>Distribution</u> provided for under the <u>respective Group III: Voluntary Debtor's</u> Plan shall be made on account of such Claim or Lien unless and until such Claim or Lien becomes an

Allowed Claim and/or Allowed Lien.

### 13.2.2  Distribution After Allowance.

On the next Distribution Date following the date on which a Disputed Claim becomes an Allowed Claim and is no longer a Disputed Claim, the Distribution Agent shall distribute to the Person holding such Claim any Cash that would have been distributable to such Person if on the initial Distribution Date such Claim had been an Allowed Claim and not a Disputed Claim.

### 13.2.3  Reserves for Disputed Claims

In the event that Disputed Claims are pending at the time of a Distribution under the Plan, the Plan Trustee shall establish and maintain a reserve for such Disputed Claims.  For purposes of establishing a reserve, Cash will be set aside equal to the amount that would have been distributed to the Holders of the Disputed Claims had the Disputed Claims been Allowed on the date a Distribution is made to the Holders of Allowed Claims in the same Class or of the same priority as the Disputed Claims.  If a Disputed Claim ultimately becomes an Allowed Claim, the amount of Cash reserved for that Disputed Claim shall be distributed on the earlier of (a) the distributed Date following the date when the Disputed Claim becomes an Allowed Claim, or (b) ninety (90) days after such Disputed Claim becomes an Allowed Claim.  Any reserved Cash not ultimately distributed to the Holder of a Disputed Claim because the Disputed Claim does not become an Allowed Claim shall become property of the Plan Trust and shall be distributed in accordance with the terms of the Plan.

1

2

3

4

5

**XIV.**

6

**EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

7

**14.1   Executory Contracts to be Assumed and Assigned~~Executory Contracts~~**

8

**~~Potentially Being Assumed~~.**

9   Under the Plans, the Group III: Voluntary Debtors Projects will be sold.  As a result, the

10   Group III: Voluntary Debtors will assume only those executory contracts and unexpired leases to

11   be assigned to the Winning Bidder with respect to the applicable Project.

12   On the Effective Date, the executory contracts and unexpired leases identified on the

13   Schedule of Assumed and Assigned Agreements attached or to be attached hereto as Exhibit "9" or

14   filed or to be filed as Exhibit "9" to this document shall be deemed assumed and assigned to the

15   applicable Winning Bidder, as specified in the Confirmation Order.  The SunCal Plan Proponents

16   intend to file the Schedule of Assumed and Assigned Agreements with the Court no later than

17   _____ (___) days prior to the Confirmation Hearing.  The Schedule of Assumed and Assigned

18   Agreements also identifies or will identify any amounts that must be paid to cure defaults under the

19   executory contacts and unexpired leases to be assumed and assigned under the Plan (the "Cure

20   Amount").  If filed earlier, the SunCal Plan Proponents reserve the right to amend the Schedule of

21   Assumed Agreements up to _____ (__) days prior to the Confirmation Hearing (_____,

22   2011) to: (a) add any executory contract or unexpired lease and provide for its assumption and

23   assignment; or (b) modify the Cure Amount for any particular executory contract or unexpired

24   lease.  The SunCal Plan Proponents further reserve the right to amend the Schedule of Assumed

25   Agreements to delete any executory contract or unexpired lease and provide for its rejection at any

26   time prior to the Confirmation Hearing.  The SunCal Plan Proponents will provide notice of any

27   amendment to the Schedule of Assumed and Assigned Agreements to any party or parties to the

28   executory contracts or unexpired leases affected by the amendment.  Absent a timely objection as

provided below, the Confirmation Order will constitute a Court Order approving the assumption
and assignment, on the Effective Date, of the executory contracts and unexpired leases then
identified on the Schedule of Assumed and Assigned Agreements, and shall constitute a final
determination of the Cure Amount and that the estate has shown adequate assurance of future
performance.  Furthermore, any Cure Amount ordered by the Court, through entry of the
Confirmation Order, and paid shall be deemed to satisfy any and all defaults arising from, out of or
related to the executory contract of unexpired lease, including any tort claims that were or could be
asserted by the non-debtor party to the contract or lease on or prior to the entry of the Confirmation
Order, and all actual or pecuniary losses that have resulted from such defaults.

        If you are a party to an executory contract or unexpired lease to be assumed and assigned
and you object to the assumption and assignment of your lease or contract and/or you dispute the
Cure Amount related to your lease or contract, then you must File and serve upon counsels for the
SunCal Plan Proponents (at the address on the upper left hand corner of the caption page) a written
objection by _____, 2011.  An objection to the Cure Amount must also set forth the amount you
contend to be the correct Cure Amount and contain evidence to support such amount.  Failure to
timely File an objection as provided herein shall be deemed consent to the proposed assumption
and assignment and to the Cure Amount and a waiver of any and all rights to challenge such
assumption and assignment and the Cure Amount.

        With respect to each executory contract and unexpired lease identified on the Schedule of
Assumed and Assigned Agreements, if no dispute arises regarding the Cure Amount, adequate
assurances, or some other matter related to the assumption of the executory contact or unexpired
lease, then the Cure Amount set forth in the schedule of Assumed and Assigned Agreements shall
be paid to the applicable non-debtor party in Cash on the Effective Date or as soon as reasonably
practicable thereafter.  If a dispute arises regarding (a) whether the proposed assignee has provided
adequate assurance of future performance of an executory contract or unexpired lease to be
assumed, or (b) any other matter pertaining to a proposed assumption and assignment, the Cure
Amount will be paid on the later of (1) the Effective Date or as soon as practicable thereafter, or
(2) within thirty (30) days after entry of a Final order resolving the dispute and approving the

MAINDOCS-#163424-v4-SCC_Group_III_VD_DS.DOC

assumption and assignment; provided, however, if a dispute arises regarding any of the foregoing, the SunCal Plan Proponents reserve, for themselves and the Plan Trustee, the right to completely forego assumption and assignment of and, instead, reject the subject executory contract or unexpired lease.

If a party to an executory contract or unexpired lease identified on the Schedule of Assumed and Assigned Agreements Files an objection disputing the Cure Amount, then the SunCal Plan Proponents may amend the Schedule of Assumed and Assigned Agreements at any time prior to the Confirmation Hearing to delete the subject executory contract or unexpired lease and provide for its rejection. Executory contracts or unexpired leases not so deleted shall be conditionally assumed, subject to the SunCal Plan Proponents' and/or the Plan Trustee's right to file a Motion to determine the appropriate Cure Amount up to the first (1st) Business Day that is at least sixty (60) days following the Effective Date. The SunCal Plan Proponents and/or the Plan Trustee will serve any such Motion on the party to the executory contract or unexpired lease affected by the Motion (or its attorneys, if any). If the SunCal Plan Proponents and Plan Trustee does not file a Motion to determine the appropriate Cure Amount, then the executory contract or unexpired lease shall be assumed and assigned, as of the Effective Date, and the Cure Amount shall be the alternative Cure Amount asserted by the non-debtor party to the subject executory contract or unexpired lease in its objection to the Plan. The Cure Amount shall be paid as soon as reasonably practicable following the expiration of the 60-day deadline.

If the SunCal Plan Proponents or the Plan Trustee files a Motion to determine the appropriate Cure Amount, then the SunCal Plan Proponents and/or Plan Trust shall have the right to amend the Schedule of Assume and Assigned Agreements to completely forego assumption and assignment of and, instead, reject the subject executory contract or unexpired lease up to the first (1st) Business Day that is at least fifteen (15) days after the entry of an order fixing the Cure Amount. The SunCal Plan Proponents and/or Plan Trustee will provide notice of any amendment to the Schedule of Assumed and Assigned Agreements to the party to the executory contract or unexpired lease affected by the amendment. If the SunCal Plan Proponents and/or Plan Trustee has filed such a Motion and does not timely amend the Schedule of Assumed and Assigned Agreements

within fifteen (15) days after entry of an order fixing the Cure Amount, then the executory contract or unexpired lease shall be assumed and assigned, as of the Effective Date, and the Cure Amount shall be fixed as the Cure Amount ordered by the Court.  The Cure Amount as soon as reasonably practicable following the expiration of the 15-day deadline.The respective Group III: Voluntary Debtor's Plan Trustee shall have until the expiration of the Sales Period to assume or reject any of the executory contracts and unexpired leases attached to the respective Group III: Voluntary Debtor's Plan as Exhibit "2" to the respective Group III: Voluntary Debtor's Plan.  The SunCal Plan Proponents may add any executory contract or unexpired leases to these exhibits, or delete any contract or lease therefrom up to and including the Confirmation Date.  All contracts or leases not assumed by the expiration of the Sales Period shall be deemed rejected.

### 14.2    Executory Contracts Being Rejected.

On the Effective Date, the estate will be deemed to have rejected any and all executory contacts and unexpired leases not identified on the Schedule of Assumed and Assigned Agreements attached or to be attached hereto as Exhibit "9," or filed or to be filed as Exhibit "9" to this document (excluding any executory contacts and unexpired leases that were assumed or rejected pursuant to a prior order of the Court, or otherwise subject to a pending motion to assume or reject).  The Confirmation Order will constitute a Court order approving the rejection, as of the Effective Date, of such executory contacts and unexpired leases.  Any Claim for damages arising from the rejection under the Plan of any executory contract or unexpired lease must be filed with the Court and served upon the SunCal Plan Proponents and the Plan Trustee within thirty (30) days of the later of (a) the Confirmation Date, and (b) the Plan Trustee's amendment of the Schedule of Assumed and Assigned Agreements to eliminate the executory contract or unexpired lease.  Any such damage Claims that are not timely filed and served will be forever barred and unenforceable against the applicable Debtors, the Estates, the Plan Trustee, the Plan Trust, and their respective property.  Persons holding these Claims who fail to timely file claims will be barred from receiving any Distributions under the Plan on account of their rejection damage Claims.

If you are a party to a lease or contract to be rejected and you object to the rejection of your lease or contract, then you must file and serve your objection by _____.The Group III:

1  Voluntary Debtors hereby reject all of the executory contracts and unexpired leases set forth in the

2  Group III: Voluntary Debtors' Schedules attached to the respective Group III: Voluntary Debtor's

3  Plan as Exhibit "3."  The SunCal Plan Proponents reserve the right to amend Exhibit "3" to the

4  respective Group III: Voluntary Debtor's Plan to include additional leases and contracts on this

5  exhibit, or to delete leases and contracts from this exhibit, up to and including the Confirmation

6  Date.

7       **14.3    Bar Date for Rejection Damages.**

8           Any Claim arising out of the rejection of an executory contract or unexpired lease shall be

9  forever barred and shall not be enforceable against the Group III: Voluntary Debtors, the respective

10 Group III: Voluntary Debtor's Plan Trust, their Affiliates, their successors, or their properties, and

11 shall not be entitled to any distributionDistribution under the respective Group III: Voluntary

12 Debtor's Plan, unless a Proof of Claim for such Claim is filed and served on the Group III:

13 Voluntary Debtors, or the respective Group III: Voluntary Debtor's Plan Trust within thirty (30)

14 days after the receipt of a notice of the rejection of any contract or lease.

15      **14.4    Changes in Rates Subject to Regulatory Commission Approval.**

16          The Group III: Voluntary Debtors are not subject to governmental regulatory commission

17 approval of their rates.

18                               **XV.**

19          **BEST INTEREST OF CREDITORS TEST AND PLAN FEASIBILITY**

20      **15.1    Best Interests Test**.

21          Pursuant to Section 1129(a)(7) of the Bankruptcy Code, a Plan cannot be confirmed unless

22 the Bankruptcy Court determines that Distributions under the Plan to all Holders of Claims and

23 Interests who have not accepted the plan and whose Claims are classified in Classes that are

24 impaired under the plan, are not less than those which they would receive in a liquidation under

25 Chapter 7 of the Bankruptcy Code.

26          The Best Interest of Creditors Test must be satisfied even if the Plan is accepted by each

27 impaired Class of Claims and if any Holder of an Allowed Claim objects to the Plan on such basis.

28 The Best Interests Test requires the Bankruptcy Court to find either that either (i) all Holders of

1    Claims in an impaired Class of Claims have accepted the Plan or (ii) the Plan provides each Holder

2    of Allowed Claims of an impaired Class who has not accepted the Plan with a recovery of property

3    of a value, as of the effective date of the Plan, that is not less than the amount that such Holder

4    would receive if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code.

5        The Plan proposed by the Plan Proponents for the Group III: Voluntary Debtors is

6    essentially a litigation and liquidation plan. It provides for the litigation of the Group III: Voluntary

7    Debtors fraudulent conveyance actions in the Lehman Adversary Proceeding, sale of all assets of

8    the estate subject to overbid, the collection or recovery of all other assets, and for the distribution of

9    the resulting net proceeds from the sale, in accordance with the priorities provided for in the

10    Bankruptcy Code and under California law.  The Plans are funded by the Litco. Plan Loan.

11        If a Chapter 7 trustee appointed in this case were able to finance such litigation and

12    liquidation, it would be compelled to liquidate the Debtors' assets in the same manner as provided

13    for in the Plan and to pay out the proceeds in the same manner as provided for in the Plan.

14    Accordingly, under the terms of the Plan, each individual creditor is receiving "at least as much" as

15    such creditor would receive in a Chapter 7 case, which is all that is required under the Best Interests

16    Test.

17        **15.2    Feasibility**.

18        In addition, in order to confirm the Plan, the Bankruptcy Court must find that confirmation

19    of the Plan is not likely to be followed by the liquidation or the need for further financial

20    reorganization of the Debtor(s).  This requirement is imposed by Section 1129(a)(11) of the

21    Bankruptcy Code and is generally referred to as the "feasibility" requirement. As explained above,

22    the Debtors' Plan provides for the sale of all assets of their respective estates and for the

23    distribution of the proceeds. Within the context of the Plan, feasibility is limited to having

24    sufficient funds to pay administrative and priority claims on the Effective Date and sufficient funds

25    to fund the sale of the Properties.

26        Under timeline provided for in the Plan, the ~~Group III Assets: Voluntary Debtors two~~

27    ~~Projects~~ addressed in the Plan will be sold ~~on the Effective Date~~within sixty days of the Effective

28    Date. These sales will provide the Debtors the means to pay all claims, including allowed

1  administrative and priority claims on this same date, from escrow. All remaining claimants will

2  then receive what they are entitled under the Plan when their claims are allowed.

3                                    **XVI.**

4                       **LIMITATION OF LIABILITY**

5           ~~16.1    No Liability for Solicitation or Participation.~~

6           As specified in Section 1125(e) of the Bankruptcy Code, entities that solicit acceptances or

7  rejections of the respective Group III: Voluntary Debtor's Plan and/or that participate in the offer,

8  issuance, sale, or purchase of securities offered or sold under the respective Group III: Voluntary

9  Debtor's Plan, in good faith and in compliance with the applicable provisions of the Bankruptcy

10 Code, shall not be liable, on account of such solicitation or participation, for violation of any

11 applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the

12 respective Group III: Voluntary Debtor's Plan or the offer, issuance, sale, or purchase of securities.

13                                   **XVII.**

14                  **CONDITIONS TO CONFIRMATION AND**

15                   **EFFECTIVENESS OF THE PLAN**

16          **17.1    Conditions Precedent to Plan Confirmation.**

17          The only condition precedent to confirmation of the respective Group III: Voluntary

18 Debtor's Plan is that the Bankruptcy Court shall have entered a Confirmation Order in form and

19 substance reasonably acceptable to the SunCal Plan Proponents.

20          **17.2    Conditions Precedent to Plan Effectiveness.**

21          The conditions precedent to the effectiveness of the respective Group III: Voluntary

22 Debtor's Plan and the occurrence of the Effective Date is that the Confirmation Order shall be a

23 Final Order in form and substance reasonably satisfactory to the SunCal Plan Proponents~~, and the~~

24 ~~resolutions of any material impairment of the respective Group III: Voluntary Debtor's Plan terms~~

25 ~~caused by the automatic stays applicable in the Lehman Entities cases~~. ~~The automatic stay in the~~

26 ~~Voluntary Debtors cases shall continue to be applicable until the Effective Date.~~

27

28                                   **XVIII.**

1    **RETENTION OF JURISDICTION**

2         Notwithstanding the entry of the Confirmation Order or the occurrence of the Effective

3    Date, the Bankruptcy Court shall not be limited under the respective Group III: Voluntary Debtor's

4    Plan and the Bankruptcy Court's jurisdiction shall apply to the fullest extent possible under

5    applicable law.  The Court will retain exclusive jurisdiction during the Plan payout period to

6    resolve disputes and conflicts arising from the administration of the Plan, upon request of a party-

7    in-interest and after notice and a hearing, including, without limitation:

8         a.    The adjudication of the validity, scope, classification, allowance, and disallowance

9    of any Claim;

10        b.    The estimation of any Claim;

11        c.    The allowance or disallowance of Professional-Fee Claims, compensation, or other

12   Administrative Expense Claims;

13        d.    To her and determine Claims concerning taxes pursuant to Bankruptcy Code §§

14   346, 505, 525, and 1146;

15        e.    To hear and determine any action or proceeding brought under Bankruptcy Code

16   §§108, 510, 543, 544, 545, 547, 548, 549, 550, 551 and 553;

17        f.    To hear and determine all actions and proceedings which relate to pre-confirmation

18   matters;

19        g.    To hear and determine any issue relating to the assumption or rejection of executory

20   contracts and unexpired leases;

21        h.    To hear and determine any modification to the plan in accordance with the

22   Bankruptcy Rules and Bankruptcy Code;

23        i.    To enforce and interpret the terms of the Plan;

24        j.    To correct any defects, cure any omissions, or reconcile any inconsistency in the

25   Plan or the Confirmation Order as may be necessary to carry out the purpose and intent of the Plan;

26        k.    the entry of any order, including injunctions, necessary to enforce title, rights and

27   powers of the Plan Trust, and to impose such limitations, restrictions, terms and conditions on such

28

title, rights and powers as the Court may deem necessary including, without limitation, any right of the Plan Trust to recover and liquidate assets;

l.      To determine the validity, extent and priority of all liens and security interests against property of the Estates or the Plan trust;

m.      To hear and resolve any disputes regarding employment applications and professional fees;

n.      To her and determine such matters and make such orders as are consistent with the Plan as may be necessary to carry out the provisions thereof and to adjudicate any disputes arising under or relating to any order entered by the Court in these Cases;

o.      The entry of an order concluding and terminating these Cases; and

p.      To resolve any disputes as to whether there has been a default under the Plan.

XIX.

## MODIFICATION OR WITHDRAWAL OF THE PLAN(S)

**19.1    Modification of Plan (s).**

At any time prior to confirmation of the respective Group III: Voluntary Debtor's Plan, the former Debtor(s)SunCal Plan Proponents may supplement, amend or modify the Plan.respective Group III: Voluntary Debtor's Plan.  After confirmation of the Plan, the Debtorsrespective Group III: Voluntary Debtor's Plan, SunCal Plan Proponents or respective Group III: Voluntary Debtor's Plan Trustee may (x) apply to the Bankruptcy Court, pursuant to Section 1127 of the Bankruptcy Code, to modify the respective Group III: Voluntary Debtor's Plan; and (y) apply to the Bankruptcy Court to remedy defects or omissions in the respective Group III: Voluntary Debtor's Plan or to reconcile inconsistencies in the respective Group III: Voluntary Debtor's Plan.

**19.2    Nonconsensual Confirmation.**

In the event that any impaired Class of Claims or Interests shall fail to accept the respective Group III: Voluntary Debtor's Plan in accordance with Section 1129(a)(8) of the Bankruptcy Code, SunCal Plan Proponents (i) may request that the Bankruptcy Court confirm the respective Group III: Voluntary Debtor's Plan in accordance with Section 1129(b) of the Bankruptcy Code, and (ii) in accordance with Section 16.1 of the respective Group III: Voluntary Debtor's Plan, and may

modify the respective Group III: Voluntary Debtor's Plan in accordance with Section 1127(a) of the Bankruptcy Code.

## XX.

## EFFECT OF CONFIRMATION

**20.1    Discharge.**

Confirmation of the Plan does not discharge the Group III: Voluntary Debtors as set forth in Bankruptcy Code §1141.

**20.2    Revesting of the Assets.**

The Assets shall not be vested in the Group III: Voluntary Debtors on or following the Effective Date, but shall be vested in the Plan Trust and continue to be subject to the jurisdiction of the Court following confirmation of the Plan until such Assets are distributed to the Holders of Allowed Claims in accordance with the provisions of the Plan.

**20.3    Exculpation and Releases**

Effective upon the entry of the Confirmation Order, neither the Group III: Voluntary Debtors, the Committees, Plan Sponsor, the SunCal Plan Proponents, the Professionals, nor any of their respective members, officers, directors, shareholders, employees, or agents, shall have or incur any liability to any Person, including any creditors or Interest Holder of the Debtors, for any act taken or omission made in connection with or related to the negotiation, formulation, or preparation of the Plan and the Disclosure Statement, the approval of the Disclosure Statement, the confirmation of the Plan, the consummation of the Plan, or the administration of the Plan, the Cases, or the property to be distributed under the Plan, to the fullest extent permitted by applicable statues and case law, except that the Plan Trust will be liable for the performance of obligations assumed by it or imposed upon it under or by the Plan.

## XXI.

## MISCELLANEOUS

**21.1    Payment of Statutory Fees.**

All quarterly fees due and payable to the Office of the United States Trustee pursuant to

MAINDOCS-#163424-v4-SCC_Group_III_VD_DS.DOC

Section 1930(a)(6) of title 28 of the United States Code shall be paid in full on or before the Effective Date, or, to the extent such quarterly fees are disputed, an adequate reserve shall have been established and set aside for payment in full thereof, as required by Section 1129(a)(12) of the Bankruptcy Code. ~~The~~The respective Group III: Voluntary Debtor's Plan Trustee shall remain responsible for timely payment of quarterly fees due and payable after the Effective Date and until the ~~Debtors' Cases are~~respective Group III: Voluntary Debtor's Case is closed, to the extent required by Section 1930(a)(6) of title 28 of the United States Code.

**21.2    Payment Dates.**

Whenever any payment or ~~distribution~~Distribution to be made under the respective Group III: Voluntary Debtor's Plan shall be due on a day other than a Business Day, such payment or ~~distribution~~Distribution shall instead be made, without interest, on the immediately following Business Day.

**21.3    Headings.**

The headings used in ~~this~~the Disclosure Statement and in the respective Group III: Voluntary Debtor's Plan are inserted for convenience only and neither constitutes a portion of ~~this~~the Disclosure Statement or the respective Group III: Voluntary Debtor's Plan nor in any manner affect the construction of the provisions of ~~this~~the Disclosure Statement or the respective Group III: Voluntary Debtor's Plan.

**21.4    Other Documents and Actions.**

~~TheThe~~The respective Group III: Voluntary Debtor's Plan Trustee may execute such other documents and take such other actions as may be necessary or appropriate to effectuate the transactions contemplated under the ~~Plan.~~respective Group III: Voluntary Debtor's Plan.

**21.5    Notices.**

All notices and requests in connection with ~~this~~the Disclosure Statement and the respective Group III: Voluntary Debtor's Plan shall be in writing and shall be hand delivered or sent by mail addressed to:

> **To the SunCal Plan Proponents**:
> Bruce V. Cook
> General Counsel

MAINDOCS-#163424-v4-SCC_Group_III_VD_DS.DOC

Authorized Agent of the SunCal Plan Proponents
2392 Morse Ave
Irvine, CA 92614-6234

**With copies to:**
Paul J. Couchot
Winthrop & Couchot, Professional Corporation
660 Newport Center Drive, Suite 400
Newport Beach, CA 92660

Ronald Rus
Rus Miliband & Smith A Professional Corporation
2211 Michelson Drive, Seventh Floor
Irvine, California 92612

All notices and requests to any Person holding of record any Claim or Interest shall be sent to them at their last known address or to the last known address of their attorney of record.  Any such Person may designate in writing any other address for purposes of this Section 21.5, which designation will be effective on receipt.

### 21.6    Governing Law.

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), the laws of the State of California (without reference to its conflict of law rules) shall govern the construction and implementation of the respective Group III: Voluntary Debtor's Plan and any agreements, documents, and instruments executed in connection with the respective Group III: Voluntary Debtor's Plan, unless otherwise specifically provided in such agreements, documents, or instruments.

### 21.7    Binding Effect.

TheThe respective Group III: Voluntary Debtor's Plan and all rights, duties and obligations thereunder shall be binding upon and inure to the benefit of the respective Group III: Voluntary Debtor's Plan Sponsor Debtors, the respective Group III: Voluntary Debtor's Plan Trustee, Holders of Claims, Holders of Interests, and their respective successors and assigns.

### 21.8    Successors and Assigns.

The rights, benefits, and obligations of any entity named or referred to in the respective

Group III: Voluntary Debtor's Plan shall be binding on, and shall inure to the benefit of, the heirs,

executors, administrators, successors, and assigns of such entity.

**21.9**    **Severability of Plan Provisions.**

If, prior to the Confirmation Date, any term or provision of the respective Group III:

Voluntary Debtor's Plan is held by the Bankruptcy Court to be illegal, impermissible, invalid, void

or unenforceable, or otherwise to constitute grounds for denying confirmation of the respective

Group III: Voluntary Debtor's Plan, the Bankruptcy Court shall, with the consent of the

Debtorsrespective Group III: Voluntary Debtor, have the power to interpret, modify or delete such

term or provision (or portions thereof) to make it valid or enforceable to the maximum extent

practicable, consistent with the original purpose of the term or provision held to be invalid, void or

unenforceable, and such term or provision shall then be operative as interpreted, modified or

deleted.  Notwithstanding any such interpretation, modification or deletion, the remainder of the

terms and provisions of the respective Group III: Voluntary Debtor's Plan shall in no way be

affected, impaired or invalidated by such interpretation, modification or deletion.

**21.10**    **No Waiver.**

The failure of the Debtorsrespective Group III: Voluntary Debtor or any other Person to object

to any Claim for purposes of voting shall not be deemed a waiver of the Voluntary Debtors'

Committee², the Debtors' or therespective Group III: Voluntary Debtor or the respective Group III:

Voluntary Debtor's Plan Trustee's right to object to or examine such Claim, in whole or in part.

**21.11**    **Inconsistencies.**

In the event the terms or provisions of thisthe Disclosure Statement are inconsistent with the

terms and provisions of the respective Group III: Voluntary Debtor's Plan or documents executed in

connection with the respective Group III: Voluntary Debtor's Plan, the terms of the respective

Group III: Voluntary Debtor's Plan shall control.

**21.12**    **Exemption from Certain Transfer Taxes and Recording Fees.**

Pursuant to Section 1146(c) of the Bankruptcy Code, any transfers from a Group III:

Voluntary Debtor to the respective Group III: Voluntary Debtor's Plan Trust or to any other Person

1  or entity pursuant to the respective Group III: Voluntary Debtor's Plan, or any agreement regarding

2  the transfer of title to or ownership of any of the Debtors' respective Group III: Voluntary Debtor's

3  real or personal property or of any other interest in such property (including, without limitation, a

4  security interest) will not be subject to any document recording tax, stamp tax, conveyance fee,

5  intangibles or similar tax, mortgage tax,

6  stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or

7  recording fee, or other similar tax or governmental assessment, and the Confirmation Order will

8  direct the appropriate state or local governmental officials or agents to forego the collection of any

9  such tax or governmental assessment and to accept for filing and recordation any of the foregoing

10 instruments or other documents without the payment of any such tax or governmental assessment.

11 **21.13  Post-Confirmation Status Report.**

12 Within 180 days following the entry of the Confirmation Order, the respective Group III:

13 Voluntary Debtor's Plan Trustee shall file a status report with the Court explaining what progress

14 has been made toward consummation of the confirmed Plan. respective Group III: Voluntary

15 Debtor's Plan.  The status report shall be served on the United States Trustee, the twenty largest

16 unsecured creditors, and those parties who have requested special notice.  Unless otherwise ordered,

17 further status reports shall be filed every 180 days and served on the same entities.

18 **21.14  Post-Confirmation Conversion/Dismissal.**

19 A creditor or party in interest may bring a motion to convert or dismiss the case under

20 § 1112(b), after the respective Group III: Voluntary Debtor's Plan is confirmed, if there is a default

21 in performing the respective Group III: Voluntary Debtor's Plan.  The respective Group III:

22 Voluntary Debtor's Plan Trustee reserves the right to object to any motion for conversion or

23 dismissal.  In addition, as set forth in the definition of the Effective Date, the Effective Date may be

24 further extended by order of the Bankruptcy Court after notice and hearing to all parties in interest.

25 If the Court determines there is no "cause" for the extension of the Effective Date, a party in interest

26 may move to dismiss or convert the case.

27 If the Court orders any of the Cases converted to Chapter 7 after the respective Group III:

28 Voluntary Debtor's Plan is confirmed, then all property that had been property of the Chapter 11

Estate, and that has not been disbursed pursuant to the respective Group III: Voluntary Debtor's Plan, will revest in the Chapter 7 estate.  The automatic stay will be reimposed upon the revested property, but only to the extent that relief from stay was not previously authorized by the Court during this case.

### 21.15   Final Decree.

Once an Estate has been fully administered, as referred to in Bankruptcy Rule 3022, the respective Group III: Voluntary Debtor's Plan Trustee, or other party as the Court shall designate in the Confirmation Order, shall file a motion with the Court to obtain a final decree to close the Case of such Debtor.

Date:  Ju~~lyne  2018~~, 2011

By:  ___/s/ Bruce Cook_____
        Bruce Cook
        General Counsel, Authorized Agent for the
        Voluntary Debtors and Acquisitions

**Submitted By:**

**WINTHROP COUCHOT
PROFESSIONAL CORPORATION**

**RUS MILIBAND & SMITH
A PROFESSIONAL CORPORATION**

By: _/s/ *Ronald Rus*_____
        Ronald Rus, Esq.
        Joel S. Miliband, Esq.
        Cathrine Castaldi, Esq.
Attorneys for SunCal Management, LLC and
SCC Acquisitions Inc.

By: /s/ *Paul J. Couchot*_____
        Paul J. Couchot,
        General Insolvency Counsel for
        the Voluntary Debtors

| In re: | CHAPTER  11 |
|---|---|
| Debtor(s). | CASE NUMBER |

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 660 Newport Center Drive, 4th Fl., Newport Beach, CA 92660.

A true and correct copy of the foregoing document described as:  [REDLINED[ ~~FIRST~~  SECOND AMENDED DISCLOSURE STATEMENT DESCRIBING ~~FIRST~~ SECOND AMENDED CHAPTER 11 PLANS FILED BY THE APPLICABLE SUNCAL PLAN PROPONENTS IN THE CHAPTER 11 CASES OF SCC COMMUNITIES, LLC, NORTH ORANGE DEL RIO LAND LLC AND TESORO SF LLC [GROUP III: VOLUNTARY DEBTORS] will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

I.  **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On July 18, ~~ne 20,~~ 2011, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

☒  Service information continued on attached page

II.  **SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served)**:**
On _____, 2011, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐  Service information continued on attached page

III.  **SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on _____, 2011, I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| July 18, ~~ne 20,~~ 2011 | ~~Susan Connor~~Gretchen Crumpacker | /s/ ~~Susan Connor~~Gretchen Crumpacker |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*                                                                                                          **F 9013-3.1**

| In re: | | CHAPTER 11 |
|---|---|---|
| | Debtor(s). | CASE NUMBER |

## NEF SERVICE LIST

- Selia M Acevedo    sacevedo@millerbarondess.com, mpritikin@millerbarondess.com
- Joseph M Adams    jadams@sycr.com
- Raymond H Aver    ray@averlaw.com
- James C Bastian    jbastian@shbllp.com
- Thomas Scott Belden    sbelden@kleinlaw.com, ecf@kleinlaw.com
- John A Boyd    fednotice@tclaw.net
- Mark Bradshaw    mbradshaw@shbllp.com
- Gustavo E Bravo    gbravo@smaha.com
- Jeffrey W Broker    jbroker@brokerlaw.biz
- Brendt C Butler    bbutler@mandersonllp.com
- Andrew W Caine    acaine@pszyjw.com
- Carollynn Callari    ccallari@venable.com
- Cathrine M Castaldi    ccastaldi@rusmiliband.com
- Tara Castro Narayanan    tara.narayanan@msrlegal.com, lisa.king@msrlegal.com
- Dan E Chambers    dchambers@jmbm.com
- Shirley Cho    scho@pszjlaw.com
- Vonn Christenson    vrc@paynefears.com
- Brendan P Collins    bpcollins@bhfs.com
- Vincent M Coscino    vcoscino@allenmatkins.com, emurdoch@allenmatkins.com
- Paul J Couchot    pcouchot@winthropcouchot.com, pj@winthropcouchot.com;sconnor@winthropcouchot.com
- Jonathan S Dabbieri    dabbieri@sullivan.com, hill@sullivanhill.com;mcallister@sullivanhill.com;stein@sullivanhill.com;vidovich@sullivanhill.com
- Ana Damonte    ana.damonte@pillsburylaw.com
- Vanessa S Davila    vsd@amclaw.com
- Melissa Davis    mdavis@shbllp.com
- Daniel Denny    ddenny@gibsondunn.com
- Caroline Djang    crd@jmbm.com
- Donald T Dunning    ddunning@dunningLaw.com
- Meredith R Edelman    meredith.edelman@dlapiper.com
- Joseph A Eisenberg    jae@jmbm.com
- Lei Lei Wang Ekvall    lekvall@wgllp.com
- Richard W Esterkin    resterkin@morganlewis.com
- Marc C Forsythe    kmurphy@goeforlaw.com
- Alan J Friedman    afriedman@irell.com
- Steven M Garber    steve@smgarberlaw.com
- Christian J Gascou    cgascou@gascouhopkins.com
- Barry S Glaser    bglaser@swjlaw.com
- Robert P Goe    kmurphy@goeforlaw.com, rgoe@goeforlaw.com;mforsythe@goeforlaw.com
- Eric D Goldberg    egoldberg@stutman.com
- Richard H Golubow    rgolubow@winthropcouchot.com, pj@winthropcouchot.com
- Michael J Gomez    mgomez@frandzel.com, efiling@frandzel.com;sking@frandzel.com
- Kelly C Griffith    bkemail@harrisbeach.com
- Matthew Grimshaw    mgrimshaw@rutan.com
- Kavita Gupta    kgupta@winthropcouchot.com
- Asa S Hami    ahami@morganlewis.com
- Michael J Hauser    michael.hauser@usdoj.gov
- D Edward Hays    ehays@marshackhays.com
- Michael C Heinrichs    mheinrichs@omm.com
- Harry D. Hochman    hhochman@pszjlaw.com, hhochman@pszjlaw.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*                                                                                    **F 9013-3.1**

| In re: | CHAPTER 11 |
|---|---|
| Debtor(s). | CASE NUMBER |

- Jonathan M Hoff    jonathan.hoff@cwt.com
- Nancy Hotchkiss    nhotchkiss@trainorfairbrook.com
- Michelle Hribar    mhribar@rutan.com
- John J Immordino    john.immordino@wilsonelser.com, raquel.burgess@wilsonelser.com
- Lawrence A Jacobson    laj@cohenandjacobson.com
- Michael J Joyce    mjoyce@crosslaw.com
- Stephen M Judson    sjudson@fablaw.com
- Kaleb L Judy    ecf@kleinlaw.com, kjudy@kleinlaw.com
- Steven J Kahn    skahn@pszyjw.com
- Sheri Kanesaka    sheri.kanesaka@bryancave.com
- David I Katzen    katzen@ksfirm.com
- Christopher W Keegan    ckeegan@kirkland.com, gdupre@kirkland.com;alevin@kirkland.com
- Payam Khodadadi    pkhodadadi@winthropcouchot.com, pj@winthropcouchot.com
- Irene L Kiet    ikiet@hkclaw.com
- Claude F Kolm    claude.kolm@acgov.org
- Mark J Krone    mk@amclaw.com, crs@amclaw.com;amc@amclaw.com
- David B Lally    davidlallylaw@gmail.com
- Leib M Lerner    leib.lerner@alston.com
- Peter W Lianides    plianides@winthropcouchot.com, pj@winthropcouchot.com
- Charles Liu    cliu@winthropcouchot.com
- Kerri A Lyman    klyman@irell.com
- Mariam S Marshall    mmarshall@marshallramoslaw.com
- Robert C Martinez    rmartinez@mclex.com
- Michael D May    mdmayesq@verizon.net
- Hutchison B Meltzer    hmeltzer@wgllp.com
- Krikor J Meshefejian    kjm@lnbrb.com
- Joel S. Miliband    jmiliband@rusmiliband.com
- James M Miller    jmiller@millerbarondess.com, vgunderson@millerbarondess.com
- Louis R Miller    smiller@millerbarondess.com
- Craig Millet    cmillet@gibsondunn.com, pcrawford@gibsondunn.com;cmillet@gibsondunn.com
- Randall P Mroczynski    randym@cookseylaw.com
- Mike D Neue    mneue@thelobelfirm.com, jmattiace@thelobelfirm.com;pnelson@thelobelfirm.com
- Robert Nida    Rnida@castlelawoffice.com
- Henry H Oh    henry.oh@dlapiper.com, janet.curley@dlapiper.com
- Sean A Okeefe    sokeefe@okeefelc.com
- Robert B Orgel    rorgel@pszjlaw.com, rorgel@pszjlaw.com
- Malhar S Pagay    mpagay@pszjlaw.com, mpagay@pszjlaw.com
- Daryl G Parker    dparker@pszjlaw.com
- Penelope Parmes    pparmes@rutan.com
- Robert J Pfister    rpfister@ktbslaw.com
- Ronald B Pierce    ronald.pierce@sdma.com
- Katherine C Piper    kpiper@steptoe.com
- Cassandra J Richey    cmartin@pprlaw.net
- Debra Riley    driley@allenmatkins.com
- James S Riley    tgarza@sierrafunds.com
- Todd C. Ringstad    becky@ringstadlaw.com
- R Grace Rodriguez    ecf@lorgr.com
- Martha E Romero    Romero@mromerolawfirm.com
- Ronald Rus    rrus@rusmiliband.com
- John P Schafer    jschafer@mandersonllp.com
- John E Schreiber    jschreiber@dl.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

January 2009

F 9013-3.1

| In re: | CHAPTER 11 |
|---|---|
| Debtor(s). | CASE NUMBER |

- William D Schuster    bills@allieschuster.org
- Christopher P Simon    csimon@crosslaw.com
- Wendy W Smith    wendy@bindermalter.com
- Steven M Speier    Sspeier@Squarmilner.com, ca85@ecfcbis.com
- Steven M Speier (TR)    Sspeier@asrmanagement.com, ca85@ecfcbis.com
- Michael St James    ecf@stjames-law.com
- Michael K Sugar    msugar@irell.com
- Cathy Ta    cathy.ta@bbklaw.com, Arthur.Johnston@bbklaw.com;Kenneth.Burgess@bbklaw.com
- David A Tilem    davidtilem@tilemlaw.com,
  malissamurguia@tilemlaw.com;dianachau@tilemlaw.com;kmishigian@tilemlaw.com
- James E Till    jtill@thelobelfirm.com, jmattiace@thelobelfirm.com;pnelson@thelobelfirm.com
- United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov
- Carol G Unruh    cgunruh@sbcglobal.net
- Annie Verdries    verdries@lbbslaw.com
- Jason Wallach    jwallach@gladstonemichel.com
- Joshua D Wayser    , kim.johnson@kattenlaw.com
- Marc J Winthrop    mwinthrop@winthropcouchot.com, pj@winthropcouchot.com
- David M Wiseblood    dwiseblood@seyfarth.com
- Brett K Wiseman    bwiseman@aalaws.com
- Dean A Ziehl    dziehl@pszjlaw.com, dziehl@pszjlaw.com
- Marc A. Zimmerman    joshuasdaddy@att.net


- Selia M Acevedo    sacevedo@millerbarondess.com, mpritikin@millerbarondess.com
- Joseph M Adams    jadams@sycr.com
- Raymond H Aver    ray@averlaw.com
- James C Bastian    jbastian@shbllp.com
- Thomas Scott Belden    sbelden@kleinlaw.com, ecf@kleinlaw.com
- John A Boyd    fednotice@tclaw.net
- Mark Bradshaw    mbradshaw@shbllp.com
- Gustavo E Bravo    gbravo@smaha.com
- Jeffrey W Broker    jbroker@brokerlaw.biz
- Brendt C Butler    bbutler@mandersonllp.com
- Andrew W Caine    acaine@pszyjw.com
- Carollynn Callari    ccallari@venable.com
- Cathrine M Castaldi    ccastaldi@rusmiliband.com
- Tara Castro Narayanan    tara.narayanan@msrlegal.com, lisa.king@msrlegal.com
- Dan E Chambers    dchambers@jmbm.com
- Shirley Cho    scho@pszjlaw.com
- Vonn Christenson    vrc@paynefears.com
- Brendan P Collins    bpcollins@bhfs.com
- Vincent M Coscino    vcoscino@allenmatkins.com, emurdoch@allenmatkins.com
- Paul J Couchot    pcouchot@winthropcouchot.com, pj@winthropcouchot.com;sconnor@winthropcouchot.com
- Jonathan S Dabbieri    dabbieri@sullivan.com,
  hill@sullivanhill.com;mcallister@sullivanhill.com;stein@sullivanhill.com;vidovich@sullivanhill.com
- Ana Damonte    ana.damonte@pillsburylaw.com
- Vanessa S Davila    vsd@amclaw.com
- Melissa Davis    mdavis@shbllp.com
- Daniel Denny    ddenny@gibsondunn.com
- Caroline Djang    crd@jmbm.com
- Donald T Dunning    ddunning@dunningLaw.com

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*    **F 9013-3.1**

| | |
|---|---|
| In re: | CHAPTER 11 |
| Debtor(s). | CASE NUMBER |

- Meredith R Edelman — meredith.edelman@dlapiper.com
- Joseph A Eisenberg — jae@jmbm.com
- Lei Lei Wang Ekvall — lekvall@wgllp.com
- Richard W Esterkin — resterkin@morganlewis.com
- Marc C Forsythe — kmurphy@goeforlaw.com
- Alan J Friedman — afriedman@irell.com
- Steven M Garber — steve@smgarberlaw.com
- Christian J Gascou — cgascou@gascouhopkins.com
- Barry S Glaser — bglaser@swjlaw.com
- Robert P Goe — kmurphy@goeforlaw.com, rgoe@goeforlaw.com;mforsythe@goeforlaw.com
- Eric D Goldberg — egoldberg@stutman.com
- Richard H Golubow — rgolubow@winthropcouchot.com, pj@winthropcouchot.com
- Michael J Gomez — mgomez@frandzel.com, efiling@frandzel.com;sking@frandzel.com
- Kelly C Griffith — bkemail@harrisbeach.com
- Matthew Grimshaw — mgrimshaw@rutan.com
- Kavita Gupta — kgupta@winthropcouchot.com
- Asa S Hami — ahami@morganlewis.com
- Michael J Hauser — michael.hauser@usdoj.gov
- D Edward Hays — ehays@marshackhays.com
- Michael C Heinrichs — mheinrichs@omm.com
- Harry D. Hochman — hhochman@pszjlaw.com, hhochman@pszjlaw.com
- Jonathan M Hoff — jonathan.hoff@cwt.com
- Nancy Hotchkiss — nhotchkiss@trainorfairbrook.com
- Michelle Hribar — mhribar@rutan.com
- John J Immordino — john.immordino@wilsonelser.com, raquel.burgess@wilsonelser.com
- Lawrence A Jacobson — laj@cohenandjacobson.com
- Michael J Joyce — mjoyce@crosslaw.com
- Stephen M Judson — sjudson@fablaw.com
- Kaleb L Judy — ecf@kleinlaw.com, kjudy@kleinlaw.com
- Steven J Kahn — skahn@pszyjw.com
- Sheri Kanesaka — sheri.kanesaka@bryancave.com
- David I Katzen — katzen@ksfirm.com
- Christopher W Keegan — ckeegan@kirkland.com, gdupre@kirkland.com;alevin@kirkland.com
- Payam Khodadadi — pkhodadadi@winthropcouchot.com, pj@winthropcouchot.com
- Irene L Kiet — ikiet@hkclaw.com
- Claude F Kolm — claude.kolm@acgov.org
- Mark J Krone — mk@amclaw.com, crs@amclaw.com;amc@amclaw.com
- David B Lally — davidlallylaw@gmail.com
- Leib M Lerner — leib.lerner@alston.com
- Peter W Lianides — plianides@winthropcouchot.com, pj@winthropcouchot.com
- Charles Liu — cliu@winthropcouchot.com
- Kerri A Lyman — klyman@irell.com
- Mariam S Marshall — mmarshall@marshallramoslaw.com
- Robert C Martinez — rmartinez@mclex.com
- Michael D May — mdmayesq@verizon.net
- Hutchison B Meltzer — hmeltzer@wgllp.com
- Krikor J Meshefejian — kjm@lnbrb.com
- Joel S. Miliband — jmiliband@rusmiliband.com
- James M Miller — jmiller@millerbarondess.com, vgunderson@millerbarondess.com
- Louis R Miller — smiller@millerbarondess.com
- Randall P Mroczynski — randym@cookseylaw.com

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*                                                                                    **F 9013-3.1**

| In re: | CHAPTER 11 |
|---|---|
| Debtor(s). | CASE NUMBER |

- Mike D Neue     mneue@thelobelfirm.com, jmattiace@thelobelfirm.com;pnelson@thelobelfirm.com
- Robert Nida     Rnida@castlelawoffice.com
- Henry H Oh     henry.oh@dlapiper.com, janet.curley@dlapiper.com
- Sean A Okeefe     sokeefe@okeefelc.com
- Robert B Orgel     rorgel@pszjlaw.com, rorgel@pszjlaw.com
- Malhar S Pagay     mpagay@pszjlaw.com, mpagay@pszjlaw.com
- Penelope Parmes     pparmes@rutan.com
- Ronald B Pierce     ronald.pierce@sdma.com
- Katherine C Piper     kpiper@steptoe.com
- Cassandra J Richey     cmartin@pprlaw.net
- Debra Riley     driley@allenmatkins.com
- James S Riley     tgarza@sierrafunds.com
- Todd C. Ringstad     becky@ringstadlaw.com
- R Grace Rodriguez     ecf@lorgr.com
- Martha E Romero     Romero@mromerolawfirm.com
- Ronald Rus     rrus@rusmiliband.com
- John P Schafer     jschafer@mandersonllp.com
- John E Schreiber     jschreiber@dl.com
- William D Schuster     bills@allieschuster.org
- Christopher P Simon     csimon@crosslaw.com
- Wendy W Smith     wendy@bindermalter.com
- Steven M Speier     Sspeier@Squarmilner.com, ca85@ecfcbis.com
- Steven M Speier (TR)     Sspeier@asrmanagement.com, ca85@ecfcbis.com
- Michael St James     ecf@stjames-law.com
- Michael K Sugar     msugar@irell.com
- Cathy Ta     cathy.ta@bbklaw.com, Arthur.Johnston@bbklaw.com;Kenneth.Burgess@bbklaw.com
- David A Tilem     davidtilem@tilemlaw.com, malissamurguia@tilemlaw.com;dianachau@tilemlaw.com;kmishigian@tilemlaw.com
- James E Till     jtill@thelobelfirm.com, jmattiace@thelobelfirm.com;pnelson@thelobelfirm.com
- United States Trustee (SA)     ustpregion16.sa.ecf@usdoj.gov
- Carol G Unruh     cgunruh@sbcglobal.net
- Annie Verdries     verdries@lbbslaw.com
- Jason Wallach     jwallach@gladstonemichel.com
- Joshua D Wayser     , kim.johnson@kattenlaw.com
- Marc J Winthrop     mwinthrop@winthropcouchot.com, pj@winthropcouchot.com
- David M Wiseblood     dwiseblood@seyfarth.com
- Brett K Wiseman     bwiseman@aalaws.com
- Dean A Ziehl     dziehl@pszjlaw.com, dziehl@pszjlaw.com
- Marc A. Zimmerman     joshuasdaddy@att.net

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*                                                                 **F 9013-3.1**