1  PAUL J. COUCHOT -- State Bar No. 131934
   WINTHROP COUCHOT, P.C.
2  660 Newport Center Drive, Fourth Floor
   Newport Beach, CA 92660
3  Telephone: (949) 720-4100
   Facsimile: (949) 720-4111

4  General Insolvency Counsel for Palmdale Hills
   Property, LLC et. al. (the "Voluntary Debtors")

5

6  RONALD RUS - State Bar No. 67369
   JOEL S. MILIBAND - State Bar No. 77438
7  RUS MILIBAND & SMITH
   A PROFESSIONAL CORPORATION
8  2211 Michelson Drive, Seventh Floor
   Irvine, California 92612
9  Telephone: (949) 752-7100
   Facsimile:  (949) 252-1514

10 Counsel for SunCal Management LLC and
   SCC Acquisitions Inc.

11

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**SANTA ANA DIVISION**

12

| | |
|---|---|
| In re | Case No. 8:08-bk-17206-ES |
| PALMDALE HILLS PROPERTY, AND ITS RELATED DEBTORS, | Jointly Administered With Case Nos. 8:08-bk-17209-ES; 8:08-bk-17240-ES; 8:08-bk-17224-ES; 8:08-bk-17242-ES; 8:08-bk-17225-ES; 8:08-bk-17245-ES; 8:08-bk-17227-ES; 8:08-bk-17246-ES; 8:08-bk-17230-ES; 8:08-bk-17231-ES; 8:08-bk-17236-ES; 8:08-bk-17248-ES; 8:08-bk-17249-ES; 8:08-bk-17573-ES; 8:08-bk-17574 ES; 8:08-bk-17575-ES; 8:08-bk-17404-ES; 8:08-bk-17407-ES; 8:08-bk-17408-ES; 8:08-bk-17409-ES; 8:08-bk-17458-ES; 8:08-bk-17465-ES; 8:08-bk-17470-ES; 8:08-bk-17472-ES; and 8:08-bk-17588-ES |
| Joint Administered Debtors and Debtors-in-Possession | |
| Affects: | Chapter 11 Proceedings |
| ☐ All Debtors | **[REDLINED] SECOND~~FIRST~~ AMENDED DISCLOSURE STATEMENT DESCRIBING SECOND~~FIRST~~ AMENDED JOINT CHAPTER 11 PLAN FILED BY SJD PARTNERS, LTD. AND SJD DEVELOPMENT CORP. [GROUP IV: VOLUNTARY DEBTORS]** |
| ☐ Palmdale Hills Property, LLC | |
| ☐ SunCal Beaumont Heights, LLC | |
| ☐ SCC/Palmdale, LLC | |
| ☐ SunCal Johannson Ranch, LLC | |
| ☐ SunCal Summit Valley, LLC | |
| ☐ SunCal Emerald Meadows LLC | Date:      July 22, 2011 |
| ☐ SunCal Bickford Ranch, LLC | Time:      11:00 a.m. |
| ☐ Acton Estates, LLC | Place:     Courtroom 5A |
| ☐ Seven Brothers LLC | |
| ☒ SJD Partners, Ltd. | |
| ☒ SJD Development Corp. | |
| ☐ Kirby Estates, LLC | |
| ☐ SunCal Communities I, LLC | |
| ☐ SunCal Communities III, LLC | |
| ☐ SCC Communities LLC | |
| ☐ North Orange Del Rio Land, LLC | |
| ☐ Tesoro SF LLC | |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Continued from Previous Page*

☐ LBL-SunCal Oak Valley, LLC

☐ SunCal Heartland, LLC

☐ LBL-SunCal Northlake, LLC

☐ SunCal Marblehead, LLC

☐ SunCal Century City, LLC

☐ SunCal PSV, LLC

☐ Delta Coves Venture, LLC

☐ SunCal Torrance, LLC

☐ SunCal Oak Knoll, LLC

# **TABLE OF CONTENTS**

**PAGE**

I.      INTRODUCTION ................................................................................................    2

II.     DEFINITIONS AND RULES OF INTERPRETATION ..................................    4
        2.1     Definitions ...........................................................................................    4
        2.2     Rules of Construction ..........................................................................    25
        2.3     Exhibits ................................................................................................    26

III.    PLAN CONFIRMATION DEADLINES ........................................................    26
        3.1     Time and Place of the Confirmation Hearing ...................................    26
        3.2     Deadline for Voting for or Against the Plan ......................................    27
        3.3     Deadline for Objecting to the Confirmation of the Plan .....................    27
        3.4     Identity of Person to Contact for More Information
                Regarding the Plan ..............................................................................    27
        3.5     Disclaimer ............................................................................................    28

IV.     FACTUAL BACKGROUND OF THE DEBTORS .........................................    29
        4.1     The Formation of the Debtors and the Projects ...................................    29
                4.1.1   Overview of the Debtors and Their Projects.......................    29
                4.1.2   The Debtors' Primary Secured Creditors and
                        Their Disputed Claims ........................................................    30
                4.1.3   A Summary of All of the Alleged Claims Against
                        the Group IV:  Voluntary Debtors .......................................    31
                4.1.4   Summary of the Group IV:  Voluntary Debtors' Cash .....    
        4.2     Factual Circumstances Leading to the Filing of the
                Debtors' Chapter 11 Cases..................................................................    32
                4.2.1   Introduction ...........................................................................    32
                4.2.2   Background on the SunCal Companies ................................    33
                4.2.3   The Origins of the SunCal/Lehman Joint Venture.............    33
                4.2.4   Lehman's Effective Control over the Management
                        of the Debtors and Promises of Ongoing Funding.............    34
                4.2.5   The 2008 Restructuring Agreement ....................................    35
                4.2.6   The Lehman Lenders Hire Radco .......................................    36
                4.2.7   The Lehman Lenders' Failure to Close on the
                        Settlement Agreement .........................................................    37
                4.2.8   The Lehman Lenders' Undisclosed Sale of Most
                        of the Debtors' Loans .........................................................    38
                4.2.9   Lehman's Foreclosure Sale and Purchase of the
                        Pacific Point Project............................................................    38
                4.2.10  Alvarez and Marsal Take Over Control of the
                        Lehman Entities After the Chapter 11 Filing of
                        LBHI and LCPI ...................................................................    40
        4.3     The Debtors' Potential Preferential Transfers .................................    41

-i-

MAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMAINDOCS-#163418-v9-
SCC_Group_IV_VD_DS.DOCMerged.DOC

**TABLE OF CONTENTS**

**(Continued)**

|  |  |  |  | **PAGE** |
|---|---|---|---|---|
| V. | | SIGNIFICANT EVENTS IN THE DEBTORS' CHAPTER 11 CASES ................. | | 42 |
| | 5.1 | Voluntary Debtors........................................................................ | | 42 |
| | | 5.1.1 | Joint Administration of the Voluntary Debtors and the Trustee Debtors ........................................ | 42 |
| | | 5.1.2 | The Voluntary Debtors Court Employed Professionals.................... | 42 |
| | 5.2 | The Debtors' Motion for a Stay to Suspend Certain Lehman Actions .................................................... | | |
| | 5.3 | The Debtors' Other Litigation with Non-Lehman Related Parties ............... | | |
| | | 5.3.1 | The Debtors' Failed Preliminary Injunction Motion Against the Holders of Bond Claims ................................ | |
| | | 5.3.2 | The Contractors' Successful Motions for Relief from Stay to Pursue the Bond Claims........................... | |
| VI. | | TREATMENT OF UNCLASSIFIED CLAIMS ................................... | | 53 |
| | 6.1 | Introduction................................................................ | | 53 |
| | 6.2 | Treatment of Allowed Administrative Claims............................. | | 54 |
| | 6.3 | Administrative Claims Bar Date ........................................ | | 55 |
| | 6.4 | Treatment of Unsecured Tax Claims ..................................... | | 55 |
| VII. | | CLASSIFICATION OF CLAIMS AND INTERESTS........................... | | 56 |
| VIII. | | THE PLAN'S TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS................................................. | | 57 |
| | 8.1 | The Plan's Treatment of Lehman's Disputed Secured Claim(s) and Disputed Lien(s) Against Group IV:  Voluntary Debtors (Classes 1.1 and 1.2) ....................................... | | 57 |
| | 8.2 | The Plan's Treatment of Holders of Bond Indemnification Claims Against Group IV:  Voluntary Debtors (Class 2.1) ........................... | | 57 |
| | 8.3 | The Plan's Treatment of Holders of Priority Claims Against Group IV:  Voluntary Debtors (Class 3.1)..................................... | | 59 |
| | 8.4 | The Plan's Treatment of Holders of General Unsecured Claims Against Group IV:  Voluntary Debtors that Are Reliance Claims (See Exhibit 8 to Disclosure Statement (Class 4.1) ........................................ | | 60 |
| | 8.5 | The Plan's Treatment of Holders of Allowed General Unsecured Claims Against Group IV:  Voluntary Debtors that Are Not Reliance Claims (Class 5.1) ........................................ | | 60 |
| | 8.6 | The Plan's Treatment of Holders of Allowed Interests Against Group IV:  Voluntary Debtors .......................... | | 60 |
| IX. | | ACCEPTANCE OR REJECTION OF THE PLAN ................................. | | 60 |
| | 9.1 | Introduction................................................................ | | 60 |
| | 9.2 | Who May Object to Confirmation of the Plan............................. | | 60 |

| | | | |
|---|---|---|---|
| | 9.3 | Who May Vote to Accept/Reject the Plan | 61 |
| | 9.4 | What Is an Allowed Claim/Interest | 61 |
| | 9.5 | What Is an Impaired Class | 61 |
| | 9.6 | Who Is Not Entitled to Vote | 61 |
| | 9.7 | Who Can Vote in More than One Class | 62 |
| | 9.8 | Votes Necessary for a Class to Accept the Plan | 62 |
| | 9.9 | Treatment of Nonaccepting Classes | 62 |
| | 9.10 | Request for Confirmation Despite Nonacceptance by Impaired Class(es) | 62 |
| | | | |
| X. | MEANS OF EXECUTION AND IMPLEMENTATION OF THE PLAN | | 63 |
| | 10.1 | Introduction | 63 |
| | 10.2 | Transfer of Property To The Plan Trust | 65 |
| | 10.3 | Purposes of the Plan Trust | 65 |
| | 10.4 | Trust Agreement | 66 |
| | 10.5 | Operations of the Plan Trust | 66 |
| | 10.6 | The Plan Trustee | 66 |
| | 10.7 | Payment of Trust Expenses | 66 |
| | 10.8 | Plan Distribution System | 67 |
| | 10.9 | Claims Estimation Rights | 67 |
| | 10.10 | No Payment of Transfer-Related Fees to the United States Trustee | 67 |
| | 10.11 | Books and Records of Trust | 68 |
| | 10.12 | Limitations on Liability | 68 |
| | 10.13 | Federal Income Tax Treatment of the Holders of Plan Trust Beneficial Interests | 69 |
| | 10.14 | Termination of the Trust | 69 |
| | 10.15 | Exemption from Certain Transfer Taxes | 70 |
| | 10.16 | Tax Consequences of the Plan | 70 |
| | 10.17 | The Plan Sponsor | 71 |
| | 10.18 | The Voluntary Debtors' Committee | 71 |
| | | 10.18.1 Duties and Powers | 71 |
| | | 10.18.2 Dissolution of Voluntary Debtors' Committees | 71 |
| | 10.19 | Litigation Claims | 72 |
| | 10.20 | Collection of Litigation Recoveries | 72 |
| | | | |
| XI. | RISK FACTORS | | 72 |
| | 11.1 | Plan Risks | 72 |
| | 11.2 | The Plan May Not Be Accepted or Confirmed | 72 |
| | 11.3 | Adverse Outcome of Pending Litigation | 73 |
| | | | |
| XII. | DISTRIBUTIONS | | 73 |
| | 12.1 | Distribution Agent | 73 |
| | 12.2 | Distributions | 73 |
| | | 12.2.1 Dates of Distributions | 73 |
| | | 12.2.2 Limitation on Liability | 74 |
| | 12.3 | Old Instruments and Securities | 74 |
| | | 12.3.1 Surrender and Cancellation of Instruments and Securities | 74 |
| | | 12.3.2 Cancellation of Liens | 74 |

MAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMerged.DOC

|  |  |  |  |
|---|---|---|---|
|  | 12.3.3 | De Minimis Distributions and Fractional Shares | 74 |
|  | 12.3.4 | Delivery of Distributions | 75 |
|  | 12.3.5 | Undeliverable Distributions | 75 |
|  | 12.3.6 | Disposition of Unclaimed Property | 75 |
| XIII. | OBJECTION TO CLAIMS AND DISPUTE CLAIMS | | 76 |
|  | 13.1 | Standing for Objections to Claims | 76 |
|  | 13.2 | Treatment of Disputed Claims and Disputed Liens | 76 |
|  | 13.2.1 | No Distribution Pending Allowance | 76 |
|  | 13.2.2 | Distribution After Allowance | 76 |
| XIV. | EXECUTORY CONTRACTS AND UNEXPIRED LEASES | | 77 |
|  | 14.1 | Executory Contracts Potentially Being Assumed | 77 |
|  | 14.2 | Executory Contracts Being Rejected | |
|  | 14.3 | Bar Date for Rejection Damages | 77 |
|  | 14.4 | Changes in Rates Subject to Regulatory Commission Approval | 77 |
| XV. | BEST INTEREST OF CREDITORS TEST AND PLAN FEASIBILITY | | 77 |
|  | 15.1 | Best Interests Test | 77 |
|  | 15.2 | Feasibility | 78 |
| XVI. | LIMITATION OF LIABILITY | | 79 |
|  | 16.1 | No Liability for Solicitation or Participation | 79 |
| XVII. | CONDITIONS TO CONFIRMATION AND EFFECTIVENESS OF THE PLAN | | 79 |
|  | 17.1 | Conditions Precedent to Plan Confirmation | 79 |
|  | 17.2 | Conditions Precedent to Plan Effectiveness | 79 |
| XVIII. | RETENTION OF JURISDICTION | | 80 |
| XIX. | MODIFICATION OR WITHDRAWAL OF THE PLAN | | 80 |
|  | 18.1 | Modification of Plan | 80 |
|  | 18.2 | Nonconsensual Confirmation | 80 |
| XX. | MISCELLANEOUS | | 80 |
|  | 20.1 | Payment of Statutory Fees | 80 |
|  | 20.2 | Payment Dates | 81 |
|  | 20.3 | Headings | 82 |
|  | 20.4 | Other Documents and Actions | 82 |
|  | 20.5 | Notices | 82 |
|  | 20.6 | Governing Law | 83 |
|  | 20.7 | Binding Effect | 83 |
|  | 20.8 | Successors and Assigns | 83 |
|  | 20.9 | Severability of Plan Provisions | 83 |
|  | 20.10 | No Waiver | 84 |
|  | 20.11 | Inconsistencies | 84 |
|  | 20.12 | Exemption from Certain Transfer Taxes and Recording Fees | 84 |

-iv-

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

20.13  Post-Confirmation Status Report .................................................................  84
20.14  Post-Confirmation Conversion/Dismissal ....................................................  85
20.15  Final Decree .................................................................................................  85

# I.

## __INTRODUCTION__

This Disclosure Statement[1] is filed ~~respectively~~ by, and the accompanying Plan is proposed by SJD Partners and SJD Development (the "Group IV: Voluntary Debtors"), as the SunCal Plan Proponents, in respective Chapter 11 Cases of the Group IV: Voluntary Debtors.  In addition to being the ~~proponent~~SunCal Plan Proponent in the Trustee Debtors' Cases,~~,~~ Acquisitions shall be the Plan Sponsor, the Plan Trustee of the Plan Trust, and the Distribution Agent for all of the Debtors' ~~cases for such Plans that~~Cases in which the SunCal Plan Proponents' Plan(s) are confirmed.  SJD Development is the sole equity owner of SJD Partners.  SJD Partners is the former owner of the Pacific Point Project.  This Disclosure Statement and the Plan assume that all claims filed against SJD Development were inadvertent and should have been filed against SJD Partners~~.~~ as the project-owning entity that incurred such debt.  Consequently, a joint Plan is filed in the cases of the Group IV:  Voluntary Debtors.

SJD Development is the 100% equity holder of SJD Partners.  SJD Partners formerly owned the Pacific Point Project.  The Pacific Point Project was lost through a non-judicial foreclosure sale by Lehman ALI, which caused a Lehman Affiliate, LV Pacific Point LLC, a Delaware limited liability company, a Lehman Entity, a Delaware Limited Liability Company, to purchase the Pacific Point Project at a foreclosure sale conducted on August 28, 2008.  The Group IV: Voluntary Debtors ~~believe that the foreclosure was illegal and~~ have initiated litigation regarding ~~same~~ the foregoing as described herein.

Chapter 11 allows debtors-in-possession, Chapter 11 trustees, and under some circumstances, creditors, interest holders and others parties in interest, to propose a Chapter 11 plan.  As stated, the SunCal Plan Proponents are the proponents of the Plan sent to you in the same envelope as this Disclosure Statement.  This document summarizes the contents of the Plan, certain information relating to the Plan and the process the Bankruptcy Court follows in determining whether or not to confirm the Plan.

---

[1] All defined terms used herein have the same meanings as set forth in Article II herein and Exhibit "1" attached hereto.

1    In summary, the Plan provides for the recovery of the Pacific Point Project and/or

2  liquidation of Litigation Recoveries of Group IV: Voluntary Debtors.  The ~~Net Proceed~~Net Sales

3  ~~Proceed~~s will then be distributed to Creditors holding Allowed Claims in accordance with their

4  rights and priorities under the Bankruptcy Code and under other applicable law.

5    ~~The same Plan is being filed in the Cases of all two Group IV: Voluntary Debtors because~~

6  ~~the Group IV: Voluntary Debtors believe that all claims in SJD Development were inadvertent and~~

7  ~~should have been filed in the case of SJD Partners.~~

8    **READ THIS DISCLOSURE STATEMENT CAREFULLY IF YOU WANT TO**

9  **KNOW ABOUT**:

10   ➢ **WHO CAN VOTE OR OBJECT TO THE PLAN;**

11   ➢ **HOW YOUR CLAIM IS TREATED;**

12   ➢ **HOW THIS TREATMENT COMPARES TO WHAT YOUR CLAIM WOULD**

13    **RECEIVE IN LIQUIDATION;**

14   ➢ **A BRIEF HISTORY OF THE DEBTORS AND SIGNIFICANT EVENTS**

15    **DURING THEIR CHAPTER 11 BANKRUPTCY PROCEEDING;**

16   ➢ **WHAT FACTORS THE BANKRUPTCY COURT WILL CONSIDER TO**

17    **DECIDE WHETHER OR NOT TO CONFIRM THE PLAN;**

18   ➢ **WHAT IS THE EFFECT OF CONFIRMATION; AND**

19   ➢ **WHETHER THE PLAN IS FEASIBLE.**

20    This Disclosure Statement cannot tell you everything about your rights.  You should

21  consider consulting your own attorney to obtain more specific advice on how the Plan will affect

22  you and your best course of action.

23    Be sure to read the applicable Plan as well as this Disclosure Statement.  If there are any

24  inconsistencies between the applicable Plan and this Disclosure Statement, the applicable Plan

25  provisions will govern.

26    The Bankruptcy Code requires a Disclosure Statement to contain "adequate information"

27  concerning the Plans.  On _____, 2011, the Bankruptcy Court entered an order approving

28  this Disclosure Statement, based upon a finding that this document contained "adequate

1    information" to enable parties affected by the Plans to make an informed judgment regarding the

2    Plan.  Any party can now solicit votes for or against the Plans.

## II.

### DEFINITIONS AND RULES OF INTERPRETATION

**2.1**    **Definitions.**

The following defined terms are used in this Disclosure Statement.  Any capitalized term

that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall

have the meaning ascribed to that term in the Bankruptcy Code or Bankruptcy Rules.

2.1.1    Acquisitions.  SCC Acquisitions, Inc., a California corporation, an indirect

parent company of all of the Debtors, a purported obligor on the Bond Indemnitor Claims, a

Creditor of all of the Debtors, a SunCal Plan Proponent, the Plan Sponsor and the proposed Plan

Trustee.

2.1.2    Administrative Claim(s).  Any Claim against a Group IV: Voluntary Debtor

or its such Group IV: Voluntary Debtor's Estate incurred after the applicable Petition Date for the

applicable Group IV: Voluntary Debtor but before the Confirmation Effective Date, for any cost or

expense of administration of the Case of the applicable Group IV: Voluntary Debtor, which Claim

is entitled to priority under section 507(a)(2) or (3) of the Bankruptcy Code, including, without

limitation, any fee or charge assessed against an Estate of a Group IV: Voluntary Debtor under

section 1930 of Title 28 of the United States Code.

2.1.3    Administrative Claims Bar Date.  The last date fixed by the Group IV:

Voluntary Debtors Plan for the filing of requests for payment of Administrative Claims.  Under the

Group IV: Voluntary Debtors Plan, the Administrative Claims Bar Date shall be the first business

day after the twenty-first (21st) day after the Effective Date. The last date fixed by the Plan for the

filing of Proof of Claims or requests for payment of Administrative Claims.  Under the Group IV:

Voluntary Debtor's Plan, the Administrative Claims Bar Date shall be the first business day after

the sixtieth (60th) day after the Confirmation Date.

2.1.4    Affiliate.  The term shall have the meaning set forth under Section 101(2),

including, but not limited to, as to any Person, any other Person that directly or indirectly owns or

-4-

controls, is owned or controlled by, or is under common ownership or control with, such Person. The term "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as applied to any Person, means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or other equity ownership interest, by contract or otherwise.

   2.1.5 <u>Allowed</u>.  When used to describe Claim(s) or Interest(s~~,~~) against the applicable Group IV: Voluntary Debtor, such Claim(s) or Interest(s), to the extent that it or they are "Allowed Claim(s)" or "Allowed Interest(s)."

   2.1.6 <u>Allowed Amount</u> shall mean:

    A. With respect to any Administrative Claim (i) if the Claim is based upon a Fee Application, the amount of such Fee Application that has been approved by a Final Order of the Bankruptcy Court; (ii) if the Claim is based upon any indebtedness or obligation incurred in the ordinary course of business of the Group IV: Voluntary Debtors and is not otherwise subject to an Administrative Claim Bar Date, the amount of such Claim that has been agreed to by the Group IV: Voluntary Debtors and such creditor, failing which, the amount thereof as fixed by a Final Order of the Bankruptcy Court; or (iii) if the Holder of such Claim was required to file and has filed proof thereof with the Bankruptcy Court prior to an Administrative Claim Bar Date, (1) the amount stated in such proof if no objection to such Proof of Claim is interposed within the applicable period of time fixed by the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court, or (2) the amount thereof as fixed by Final Order of the Bankruptcy Court if an objection to such proof was interposed within the applicable period of time fixed by the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court.  The Allowed Amount of any Administrative Claim which is subject to an Administrative Claims Bar Date and not filed by the applicable Administrative Claims Bar Date shall be zero, and no ~~distribution~~Distribution shall be made on account of any such Administrative Claim;

    B. with respect to any Claim which is not an Administrative Claim (the "Other Claim"):  (i) if the Holder of such Other Claim did not file proof thereof with the

1    Bankruptcy Court on or before the Claims Bar Date, the amount of such Claim as listed in the

2    Group IV: Voluntary Debtors'' Schedules as neither disputed, contingent nor unliquidated; or (ii) if

3    the Holder of such Claim has filed proof thereof with the Bankruptcy Court on or before the

4    Claims Bar Date, (a) the amount stated in such proof if no objection to such Proof of Claim was

5    interposed within the applicable period of time fixed by the Bankruptcy Code, the Bankruptcy

6    Rules, the Plan or the Bankruptcy Court, or (b) the amount thereof as fixed by Final Order of the

7    Bankruptcy Court if an objection to such proof was interposed within the applicable period of time

8    fixed by the Bankruptcy Code, the Bankruptcy Rules, the Plan or the Bankruptcy Court.  The

9    Allowed Amount of any Other Claim which is not Filed by the applicable Claims Bar Date, is not

10   listed on the Group IV: Voluntary Debtors' Schedules or is listed as disputed, unliquidated,

11   contingent or unknown, and is not allowed under the terms of the Plan shall be zero, and no

12   ~~distribution~~Distribution shall be made on account of any such Claim; and

13                            C.     with respect to any Interest, (i) the amount provided by or

14   established in the records of the Group IV: Voluntary Debtors at the Confirmation Date, provided,

15   however, that a timely filed proof of Interest shall supersede any listing of such Interest on the

16   records of the Group IV: Voluntary Debtors; or (ii) the amount stated in a proof of Interest Filed

17   prior to the Confirmation Date if no objection to such Interest was filed prior to the Confirmation

18   Date or such later date as the Bankruptcy Court allows; or (iii) the amount of such Interest as fixed

19   by a Final Order of the Bankruptcy Court.

20           2.1.7    Allowed Claim.  Except as otherwise provided in the~~-~~ Plan(s) (including

21   with respect to those Classes for which the amount of the Allowed Claims is specified by the Plan),

22   a Claim to the extent (and only to the extent) of the Allowed Amount of such Claim.

23           2.1.8    Allowed Interest.  Any Interest to the extent, and only to the extent, of the

24   Allowed Amount of such Interest.

25           2.1.9    Allowed Secured Claims.  All or a portion of a Secured Claim that is an

26   Allowed Claim against the applicable Group IV: Voluntary Debtor.

27           2.1.10   Allowed Unsecured Claim. All or a portion of an Unsecured Claim that is

28   an Allowed Claim against the applicable Group IV: Voluntary Debtor.

MAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMAINDOCS-#163418-v9-
SCC_Group_IV_VD_DS.DOCMerged.DOC

1          2.1.11    Assets.  All assets that are property of the Group IV: Voluntary Debtor(s)

2    pursuant to Bankruptcy Code Section 541, which include the Group IV: Voluntary Debtor(s)'

3    Assets described in Exhibit "1" hereto, the Group IV: Voluntary Debtors' Cash, and the Group IV:

4    Voluntary Debtor(s)' Litigation Claims.

5          2.1.12    Arch.  Arch Insurance Company, a Bond Issuer.

6          2.1.13    Available Cash.  Each Group IV: Voluntary Debtors' Cash deposited into

7    the applicable Distribution Account(s) on or after the Effective Date that is available for making

8    Distributions under the Plan to Holders of Allowed Administrative, Priority, and General

9    Unsecured Claims.  The Available Cash shall consist of the respective Group IV: Voluntary

10   Debtors' cash on hand as of the Effective Date that is not subject to a Disputed Lien, proceeds of

11   Net Litigation Recoveries that are not subject to a Disputed Lien, Net Sales Proceeds that become

12   Available Cash upon the disallowance of a Disputed Claim or avoidance of a Disputed Lien

13   purportedly encumbering such Cash.  All Available Cash shall be deposited into the applicable

14   Distribution Account(s).  Available Cash shall not include Net Sale Proceeds in the Net Sales

15   Proceeds Account where the Disputed Secured Claims are Allowed but subject to an equitable

16   subordination judgment.

17         2.1.14    Avoidance Actions.  All Claims and defenses to Claims accruing to the

18   Group IV: Voluntary Debtors and their Estates under Bankruptcy Code Sections 506(d), 510(c),

19   541, 544, 545, 547, 548, 549, 550, or 551.

20         2.1.15    Bankruptcy Code.  The United States Bankruptcy Code.

21         2.1.16    Bankruptcy Court.  The United States Bankruptcy Court for the Central

22   District of California, having jurisdiction over the Cases and, to the extent of any withdrawal of the

23   reference made pursuant to Section 157 of title 28 of the United States Code, the United States

24   District Court for the Central District of California; or, in the event such courts cease to exercise

25   jurisdiction over the Cases, such court or unit thereof that exercises jurisdiction over the Cases in

26   lieu thereof.

27

28

MAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMerged.DOC

2.1.17    Bankruptcy Rules.  Collectively, as now in effect or hereafter amended and as applicable to the Cases, (i) the Federal Rules of Bankruptcy Procedure, and (ii) the Local Bankruptcy Rules and General Orders applicable to cases pending before the Bankruptcy Court.

2.1.18    Beneficial Interests. ~~means, collectively~~Collectively, the interests of the holders of Allowed Unsecured Claims in the Plan Trust and in all ~~distributions~~Distributions to be made by the Plan Trust on account of Allowed Unsecured Claims with respect to the Group IV: Voluntary Debtors. The Beneficial Interests (a) shall be noted in the books and records of the Plan Trust, (b) shall not be evidenced by a writing, and (c) may not be transferred, sold, assigned or transferred by will, intestate succession or operation of law without written notification to the Plan Trustee confirming and acknowledging the transfer by both the holder and the transferee.

2.1.19    Bond Claim(s).  Any Claim against the Group IV: Voluntary Debtor(s) and a Bond Issuer under various payment or performance bonds~~, and/or any claims of Bond Issuer(s) against the Group IV: Voluntary Debtor(s) under various payment or performance bonds~~.

2.1.20    Bond Claimant.  Holder(s) of a Bond Claim.

2.1.21    Bond Indemnification Claim.  All Claims by Bond Issuers for indemnification against a Bond Indemnitor for the Bond Issuer's actual payment or purchase of a Bond Claim ~~All Claims by Bond Safeguard, Lexon, and Arch for indemnification for payment by Bond Safeguard, Lexon and Arch of Bond Claims~~ with respect to the ~~Group IV: Voluntary Debtors' Projects~~Pacific Point Project.

2.1.22    Bond Indemnitors.  The individuals and entities that are allegedly liable on the Bond Indemnification Claims, including, allegedly, all of the Debtors, Acquisitions, all Affiliates of Acquisitions, and Elieff.

2.1.23    Bond Issuer(s).  Bond Safeguard, Lexon and Arch in their capacities as issuers and sureties for payment and performance bonds for the benefit of certain of the Debtors.

2.1.24    Bond Safeguard.  Bond Safeguard Insurance Company, a Bond Issuer.

2.1.25    Business Day.  Any day, other than a Saturday, a Sunday or a "legal holiday," as defined in Bankruptcy Rule 9006(a).

1      2.1.26    <u>Cases</u>.  The Chapter 11 cases of the Group IV: Voluntary Debtors pending

2  before the Bankruptcy Court.

3      2.1.27    <u>Cash</u>.  Currency of the United States of America and cash equivalents,

4  including, but not limited to, bank deposits, immediately available or cleared checks, drafts, wire

5  transfers and other similar forms of payment.

6      2.1.28    <u>Claim</u>.  This term shall have the broadest possible meaning under

7  Section 101(5) of the Bankruptcy Code, and shall include (a) any right to payment from any of the

8  Group IV: Voluntary Debtors, whether or not such right is reduced to judgment, liquidated,

9  unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable,

10  secured, or unsecured, or (b) any right to an equitable remedy for breach of performance if such

11  breach gives rise to a right of payment from any of the Group IV: Voluntary Debtors, whether or

12  not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured,

13  unmatured, disputed, undisputed, secured, or unsecured.

14      2.1.29    <u>Claims Bar Date</u>.  For any Claim other than <u>the exceptions noted below</u><s>an</s>

15  <s>Administrative Claim</s>, March 31, 2009, which was established by the Bankruptcy Court as the last

16  date for creditors to file Proof of Claims with the Bankruptcy Court in all of the Group IV:

17  Voluntary Debtors' <s>cases</s><u>Cases, except for the following: (a) Administrative Claims, for which the</u>

18  <u>Administrative Claims Bar Date shall apply, (b) claims arising from rejection of executory</u>

19  <u>contracts or unexpired leases pursuant to 11 U.S.C. § 365, for which the last day to file a proof of</u>

20  <u>claim is (i) 30 days after the date of entry of the order authorizing the rejection, or (ii) March 31,</u>

21  <u>2009, whichever is later, (c) claims of "governmental units," as that term is defined in 11 U.S.C. §</u>

22  <u>101(27), for which proofs of claim are timely filed if filed: (i) before 180 days after the date of the</u>

23  <u>Order for Relief in this case, or (ii) by March 31, 2009, whichever is later (11 U.S.C. § 502(b)(9)),</u>

24  <u>and (d) claims arising from the avoidance of a transfer under chapter 5 of the Bankruptcy Code, the</u>

25  <u>last day to file a proof of claim is 30 days after the entry of judgment avoiding the transfer or</u>

26  <u>March 31, 2009, whichever is later.</u><s>.</s>

27      2.1.30    <u>Claims Objection Deadline</u>.  The later of (i) the first business day

28  following the one hundred and eightieth (180th) day after the Effective Date, or (ii) such greater

MAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMAINDOCS-#163418-v9-
SCC_Group_IV_VD_DS.DOCMerged.DOC

period of limitation as may be fixed or extended by the Bankruptcy Court or by agreement between the Plan Trustee and the Holder of the Claim.

2.1.31    Claim Objection Reduction Amount. The amount of Net Sales Proceeds that is made available to the holders of Allowed Unsecured Claims due to the entry of a judgment or order on a Lehman Claim Objection that disallows, reduces, or otherwise adversely modifies the secured claims filed by the Lehman Lenders.

2.1.32    Class. Each group of Claims or Interests classified in Article ~~V~~IV of the Group IV: Voluntary Debtor's Plan pursuant to Sections 1122 and 1123 of the Bankruptcy Code.

2.1.33    Committee.  The Voluntary Debtors' Committee, both before and after the Confirmation Date.

2.1.34    Confirmation Date.  The date on which the Confirmation Order is entered in the Bankruptcy Court's docket.

2.1.35    Confirmation Order.  The order entered by the Bankruptcy Court confirming the Plan in accordance with the provisions of Chapter 11 of the Bankruptcy Code with respect to the Group IV Voluntary Debtor's Plan.

2.1.36    Contingent Bond Claims.  Bond Indemnification Claims in which the Bond Issuer has not yet paid or purchased the underlying Bond Claim~~Unmatured Bond Claims against the Group IV: Voluntary Debtors~~.

2.1.37    Contract Action. The action filed by certain Voluntary Debtors against Lehman Ali, Inc., and certain other defendants, in California Superior Court for the County of Orange (Case No. 30-2011-0040847-CU-BC-CJC), that was removed to the Bankruptcy Court as Adv. No. 8:11-ap-01212-ES, and a reservation of rights to add the Plan Trustee and/or the Trustee Debtors (or their sucessors) as additional plaintiffs therein.

~~2.1.37~~ 2.1.38  Creditor.  Any Person who is the Holder of a Claim against any Group IV: Voluntary Debtor that arose or accrued or is deemed to have arisen or accrued or to have matured, or otherwise become due, owing, and payable on or before the Petition Date, including, without limitation, Claims of the kind specified in Sections 502(g), 502(h) or 502(i) of the Bankruptcy Code.

MAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMerged.DOC

2.1.38 2.1.39  Debtor(s).  Individually or collectively, the Voluntary Debtors and the Trustee Debtors, as specifically defined in Exhibit "1" attached hereto to the Disclosure Statement.

2.1.39 2.1.40  Debtor(s)-in-Possession.  The Voluntary Debtor(s) when acting in their capacity as representatives of their respective Estates in their respective Chapter 11 Cases.

2.1.40 2.1.41  Disclosure Statement.  The document accompanying the Plan for the applicable Group IV: Voluntary Debtors Debtors' Plan that is entitled "First Amended Second Amended Disclosure Statement Describing First Amended Second Amended Joint Chapter 11 Plan Filed by SJD Partners, Ltd. and SJD Development Corp." and with all accompanying exhibits.

2.1.41 2.1.42  Disputed Claim(s).  All or any part of a Group IV: Voluntary Debtors' Claim other than any Allowed Amount thereof as to which any one of the following applies: (i) no Proof of Claim has been filed with respect to such Claim, and either (a) the Claim is not listed in the Schedules; or (b) the Claim is listed in the Schedules as unliquidated, disputed, contingent, unknown or in a zero amount, (ii) the Claim is the subject of (a) an unresolved Litigation Claim; (b) the Claim is subject to offset by a Litigation Claim; (c) a timely objection to such Claim that has not been resolved by a Final Order; or (d) a request for estimation in accordance with the Bankruptcy Code, the Bankruptcy Rules, any applicable order of the Bankruptcy Court, or the applicable Plan which is Filed on or before the Claims Objection Deadline, which Adversary Proceeding, objection, or request for estimation has not been dismissed, withdrawn or determined by a Final Order; or (iii) the Claim is otherwise treated as a "Disputed Claim" pursuant to the Plan.

2.1.42 2.1.43  Disputed Lien(s).  An asserted lien(s) against Assets of the Group IV: Voluntary Debtor(s) that is either subject to a Disputed Secured Claim, not duly perfected, subject to an Avoidance Action, or subject to an action pursuant to Bankruptcy Code Sections 510(c)(2) and/or 506(d).  However, pursuant to Section 506(d)(2), a lien is not disputed merely because it secures a claim that "is not an allowed secured claim due only to the failure of any entity to file a proof of such claim under section 501 of this title."

MAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMerged.DOC

2.1.43  2.1.44  **Disputed Secured Claim(s)**. That part of a Disputed Claim against the Group IV: Voluntary Debtors that is a Secured Claim.

2.1.44  2.1.45  **Distribution(s)**.  Payments to Holders of Allowed Claims provided for under the Plan.

2.1.45  2.1.46  **Distribution Agent**.  The entity that is responsible for making Distributions under the Group IV: Voluntary Debtors' Plan, which shall be Acquisitions.

2.1.46  2.1.47  **Distribution Account(s)**.  Separate account(s) to be established by the Plan Trustee at an FDIC insured bank into which each Group IV: Voluntary Debtors' Available Cash shall be deposited and all Available Cash received by the Plan Trust after the Confirmation Date that would have belonged to such Group IV: Voluntary Debtor shall be deposited, other than Net Sales Proceeds that are subject to Disputed Claims and Disputed Liens.

2.1.47  2.1.48  **Distribution Date**.  With respect to any Allowed Claim or Allowed Interest, the date on which a Distribution is required to be made under the Group IV: Voluntary Debtors' Plan.

2.1.48  2.1.49  **Effective Date**. A date selected by the SunCal Plan Proponents that is not later than the thirteenthninetieth (930)th calendar day after the Confirmation Date of the Group IV: Voluntary Debtors' Plan, provided there is not stay pending appeal of the Confirmation Order, in which case the deadline for the Effective Date will be tolled until such stay pending appeal has expired.  The Effective Date may be further extended by the Bankruptcy Court after notice and hearing to all parties in interest.

2.1.49  2.1.50  **Elieff**.  Bruce Elieff, the president of Acquisitions, a purported obligor on the Bond Indemnitor Claims with alleged corresponding indemnity Claims against the Debtors.

2.1.50  2.1.51  **Estates**.  The bankruptcy estates of the Group IV: Voluntary Debtors created pursuant to Section 541 of the Bankruptcy Code.

2.1.51  2.1.52  **Fee Applications**.  Applications of Professional Persons under Sections 330, 331 or 503 of the Bankruptcy Code for allowance of compensation and reimbursement of expenses in the Group IV: Voluntary Debtors' Cases.

1    2.1.52  2.1.53  <u>Fee Claim</u>.  A Claim under Sections 330 or 503 of the Bankruptcy

2    Code for allowance of compensation and reimbursement of expenses in the <u>Group IV Voluntary</u>

3    <u>Debtors'</u> Cases.

4    2.1.53  2.1.54  <u>Filed</u>.  Delivered to, received by and entered upon the legal docket

5    by the Clerk of the Bankruptcy Court.  "File" shall have a correlative meaning.

6    2.1.54  2.1.55  <u>Final Order</u>.  A judgment, order, ruling or other decree issued and

7    entered by the Bankruptcy Court <u>that has not been reversed, stayed, modified or amended.</u>.

8    2.1.55  2.1.56  <u>General Unsecured Claim</u>.  A Claim against a Group IV: Voluntary

9    Debtor that is not (a) a Secured Claim, (b) an Administrative Claim, (c) a Tax Claim or (d) a

10   Priority <u>Claim or (e) a Bond Indemnification</u> Claim.

11   2.1.56  2.1.57  <u>Group IV: Voluntary Debtors</u>.  SJD Partners, Ltd. and SJD

12   Development Corp..

13   2.1.57  2.1.58  <u>Holder</u>.  The beneficial owner of any Claim or Interest. <u>against the</u>

14   <u>Group IV: Voluntary Debtors.</u>

15   2.1.58  2.1.59  <u>Insider</u>.  The term shall have the broadest meaning possible under

16   Section 101(31), including, but not limited to, a person in control of the Debtor<u>Group IV:</u>

17   <u>Voluntary Debtors</u>, Affiliates and Insiders of such Affiliates, including the Lehman Entities.

18   2.1.59  2.1.60  <u>Interest</u>.  Any equity security interest in any Group IV: Voluntary

19   Debtor within the meaning, of Section 101(16) of the Bankruptcy Code, including, without

20   limitation, any equity ownership interest in any of the Group IV: Voluntary Debtors, whether in the

21   form of common or preferred stock, stock options, warrants, partnership interests, or membership

22   interests.

23   2.1.60  2.1.61  <u>LBHI</u>.  Lehman Brothers Holdings, Inc., a Lehman Entity, the parent

24   company of Lehman ALI and LCPI, and a Chapter 11 debtor in a bankruptcy proceeding pending

25   in the Bankruptcy Court for the Southern District of New York.

26   2.1.61  2.1.62  <u>LCPI</u>.  Lehman Commercial Paper, Inc., a Chapter 11 debtor in a

27   bankruptcy proceeding pending in the Bankruptcy Court for the Southern District of New York.

28

MAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMerged.DOC

1    ~~2.1.62~~ 2.1.63  Lehman Adversary Proceeding.  The Debtors' (including the Group

2    IV: Voluntary Debtors) pending adversary proceeding against the Lehman Lenders and/or the

3    Lehman Successors asserting various causes of action including equitable subordination,

4    fraudulent inducement, fraudulent conveyances and preferential transfers.

5    ~~2.1.63~~ 2.1.64  Lehman ALI.  Lehman ALI, Inc.

6    ~~2.1.64~~ 2.1.65  Lehman Re.  Lehman Re LTD., an Affiliate of the Lehman Entities

7    and a Lehman Successor to Lehman's Disputed Claim and Disputed Liens arising from the Pacific

8    Point First Loan Agreement.

9    ~~2.1.65~~ 2.1.66  Lehman Claim Objections. The objections filed by the Debtors to the

10   claims filed by the Lehman Lenders that are based upon the Lehman Disputed Loans and the

11   Lehman Disputed Administrative Loans, including, but not limited to, the Lehman Recoupment

12   Objection and the Lehman 502(d) Objection.

13   2.1.67   Lehman's Disputed Claim(s).  All of the Proofs of Secured Claims filed by

14   a Lehman Lender or a Lehman Successor in the Debtors' Chapter 11 Cases, including in the Group

15   IV: Voluntary Debtors' Cases, arising from the Lehman Disputed Loans and the Lehman Disputed

16   Administrative Loans.

17   2.1.68   Lehman's Disputed Lien(s).  All of the alleged liens relating to Proofs of

18   Secured Claims filed by a Lehman Lender or a Lehman Successor in the Debtor's Chapter 11

19   Cases arising from the Lehman Disputed Loans.

20   ~~2.1.66   Lehman Entities.  The Lehman Lenders, the Lehman Equity Members and~~

21   ~~LBHI.~~

22   ~~2.1.67   Lehman Equity Members.  Lehman Entities that own direct or indirect~~

23   ~~membership Interests in all of the Trustee Debtors, except for SunCal Heartland and SunCal~~

24   ~~Marblehead.~~

25   ~~2.1.68   Lehman Lenders.  Lehman ALI, LCPI, Northlake Holdings, and OVC~~

26   ~~Holdings.~~

27   2.1.69   Lehman Disputed Loans.  Collectively the following loans that are the

28   purported basis for the Lehman's Disputed Claims:  (a) SunCal Communities I Loan Agreement;

(b) Bickford Second Loan Agreement; (c) Ritter Ranch Loan Agreement; (d) SCC Palmdale Loan;
(e) Interim Loan Agreement; (f) SunCal Oak Knoll/SunCal Torrance Loan Agreement; (g) SunCal
Century City Loan Agreement; (h) SunCal PSV Loan Agreement; (i) SunCal Delta Coves Loan
Agreement; (j) SunCal Marblehead/SunCal Heartland Loan Agreement; (k) Sun Cal Oak Valley
Loan Agreement; (l) SunCal Northlake Loan Agreement; (m) Pacific Point First Loan Agreement;
~~and~~ (n) Pacific Point Second Loan Agreement , and (o) the Lehman Disputed Administrative Loan.

2.1.70    Lehman Entities.  The Lehman Lenders, the Lehman Equity Members and
LBHI.

2.1.71    Lehman Equity Members.  Lehman Entities that own direct or indirect
membership Interests in all of the Trustee Debtors, except for SunCal Heartland and SunCal
Marblehead.

2.1.72    Lehman Lenders.  Lehman ALI, LCPI, Northlake Holdings, and OVC
Holdings.

~~2.1.70~~ 2.1.73  Lehman Representatives.  The individuals that controlled the
Lehman Entities.

~~2.1.71~~ 2.1.74  Lehman Successor(s).  Entities other than the Lehman Lenders that
either assert to be or are determined by the Bankruptcy Court to be the beneficial owner(s) of the
Lehman Disputed Loan(s), including, but not limited to Fenway Capital, Lehman Re and Danske
Bank.

~~2.1.72    Lehman's Disputed Claim(s).  All of the Proofs of Secured Claims filed by
a Lehman Lender or a Lehman Successor in the Debtors' Chapter 11 Cases arising from the
Lehman Disputed Loans and the Lehman Disputed Administrative Loans.~~

~~2.1.73    Lehman's Disputed Lien(s).  All of the alleged liens relating to Proofs of
Secured Claims filed by a Lehman Lender or a Lehman Successor in the Debtor's Chapter 11
Cases arising from the Lehman Disputed Loans.~~

~~2.1.74~~ 2.1.75  Lexon.  Lexon Insurance Co.

MAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMAINDOCS-#163418-v9-
SCC_Group_IV_VD_DS.DOCMerged.DOC

2.1.75  2.1.76  **LitCo.** A newly formed Delaware limited liability company that will be purchasing the claims and litigation rights held by the Reliance Claimants that choose Option A provided for in the Plan, and funding certain distributions.

2.1.76  2.1.77  **Litigation Claims.**  Any and all interests of the Group IV: Voluntary Debtors in any and all Claims, rights, causes of action, and objections or defenses to Claims, liens, rights, or causes of action which have been or may be commenced by the Group IV: Voluntary Debtor(s), the Chapter 11 Trustee, or the Voluntary Debtors and/or the Plan Trust, as the case may be, including, but not limited to, any (i) Avoidance Actions; (ii) for turnover of property to the Group IV: Voluntary Debtors' Estates and/or the Plan Trust; (iii) for the recovery of property or payment of money that belongs to the Debtors' Estates or the Plan Trust; (iv) the right to compensation in the form of damages, recoupment or setoff of the Debtors' Estates and/or the Plan Trust; (v) the Lehman Adversary Proceeding; (vi) the State Court ActionContract Action, and (vii(vii) Lehman Claim Objections (and related Claim Objection Reduction Amount) and (viii) any and all other Claims against Lehman's Disputed Claims and/or Disputed Liens referenced in the Plan or the Disclosure Statement.

2.1.78  **Litigation Recoveries.** Any Cash or other property received by the Chapter 11 Trustee, the Group IV: Voluntary Debtors, the Voluntary Debtors' Committee and/or the Plan Trust, as the case may be, from all or any portion of a Litigation Claim(s), including, but not limited to, awards of damages, attorneys' fees and expenses, interest and punitive damages, whether recovered by way of settlement, execution on judgment or otherwise.

2.1.77  2.1.79  **Litigation Rights.** Any Claims held by a party against the Group IV: Voluntary Debtors, and if applicable, against third parties arising or relating to the Claim against the applicable Group IV Voluntary Debtor, that have not been fixed in a final judgment prior to the Effective Date.

2.1.78  2.1.80  **Maximum Distributions.** A Distribution to a Holder of an Allowed General Unsecured Claim against a Group IV: Voluntary Debtor equal to one hundred percent (100%) of the amount of the Holder's Allowed General Unsecured Claim plus interest at the Legal Rate from and as of the Group IV: Voluntary Debtor's Petition Date.

1    ~~2.1.79~~ 2.1.81          MB Firm.  Miller Baroness, LLP.

2    ~~2.1.80~~ 2.1.82          Mechanic Lien Claims.  Mechanic Lien Claims arising

3    pursuant to California Civil Code §3110, et seq. that were either allegedly perfected prepetition or

4    otherwise allegedly satisfy the requirements of Bankruptcy Code 546(b).

5    ~~2.1.81~~ 2.1.83  Net Litigation Recoveries.  Litigation Recoveries less associated

6    Administrative Claims and Post-Confirmation Expenses incurred in connection with such

7    Litigation Recoveries.

8    ~~2.1.82~~ 2.1.84  Net Sales Proceeds.  The Cash generated from the sale(s) or

9    liquidation of the Group IV: Voluntary Debtor(s)' Assets or the Plan Trust's Assets, less payment

10   of selling expenses, taxes, ~~Chapter 11 Trustee fees,~~ and any associated Post-Confirmation

11   Expenses and Administrative Claims incurred in furtherance of such sales or liquidation of such

12   Assets.

13   ~~2.1.83~~ 2.1.85  Net Sales Proceeds Account(s).  Separate account(s) that will be

14   established by the Plan Trustee at an FDIC insured bank into which all Net ~~Sale~~Sales Proceeds

15   shall be deposited from the sale of Assets that were allegedly encumbered by a Disputed Secured

16   Claim(s) and/or a Disputed Lien(s).  There shall be a separate Net Sales Proceeds Account for the

17   Net Sale Proceeds allegedly subject to each Disputed Secured Claim(s) and/or Disputed Lien(s),

18   except where there are two Disputed Liens on a single Project, in which case, there shall be a

19   single account for the proceeds generated from that Project.  The Disputed Secured Claim(s) and/or

20   Disputed Lien(s) shall attach to the corresponding Net Sales Proceeds Account(s) pending any

21   Final Order(s) of the Bankruptcy Court resolving the applicable Disputed Secured Claim(s) and/or

22   applicable Disputed Lien(s).  To the extent that a particular Disputed Claim is disallowed or a

23   particular Disputed Lien is avoided (other than transferred to the Estates pursuant to Bankruptcy

24   Code Section 510(c)(2)) or otherwise invalidated, such Net Sales Proceeds allegedly subject

25   thereto shall become Available Cash and shall be transferred to the applicable Distribution

26   Account(s).  To the extent that a particular Disputed Secured Claim and a Disputed Lien are

27   allowed and deemed valid but subject to the equitable subordination causes of action in the

28

MAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMerged.DOC

1  Lehman Adversary Proceeding, the funds shall remain in the Net Sales Accounts pending a Final

2  Order on the equitable subordination causes of action in the Lehman Adversary Proceeding.

3      ~~2.1.84~~ 2.1.86  **Orders for Relief Date**.  The following are dates that orders for relief

4  were entered for each of the Trustee Debtors:

| | |
|---|---|
| SunCal Oak Valley | January 6, 2009 |
| SunCal Heartland | January 6, 2009 |
| SunCal Northlake | January 6, 2009 |
| SunCal Marblehead | January 6, 2009 |
| SunCal Century City | January 6, 2009 |
| SunCal PSV | January 6, 2009 |
| Delta Coves | January 6, 2009 |
| SunCal Torrance | January 6, 2009 |
| SunCal Oak Knoll | January 6, 2009 |

11     ~~2.1.85~~ 2.1.87  **Pacific Point First Loan Agreement**.  A certain loan agreement, dated

12  February 16, 2006, by and among Lehman ALI, SJD Development and SJD Partners, pursuant to

13  which Lehman ALI made a loan in the maximum aggregate principal amount of approximately

14  $125,000,000. The Pacific Point First Loan Agreement is allegedly secured by a first-priority deed

15  of trust on the Pacific Point Project.  The Pacific Point First Loan Agreement had an asserted

16  balance due of $120,110,237 as of March 30, 2009~~,~~.  The ownership of the term loan portion of the

17  Pacific Point First Loan Agreement ~~and ownership of this loan~~ is now allegedly held by Lehman

18  Re, a Bermuda business entity~~.~~  and the ownership of the revolving portion of this loan is allegedly

19  held by Lehman ALI.

20     ~~2.1.86~~ 2.1.88  **Pacific Point Second Loan Agreement**. A certain loan agreement,

21  dated May 1997, by and between Lehman ALI and SJD Partners, pursuant to which Lehman ALI

22  initially made a loan in the maximum aggregate principal amount of approximately $20,000,000.

23  The Pacific Point Second Loan Agreement was secured by a second-priority deed of trust on the

24  Pacific Point Project, which was foreclosed upon on August 28, 2008 by LV Pacific Point, as

25  assignee of Lehman ALI.

26     ~~2.1.87~~ 2.1.89  **Pacific Point Project**.  The Project formerly owned by SJD Partners,

27  located in the San Juan Capistrano, California, as more particularly described herein.

28

MAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMerged.DOC

1    ~~2.1.88~~ 2.1.90    Person.  An individual, partnership, corporation, limited

2    liability company, business trust, joint stock company, trust, unincorporated association, joint

3    venture, governmental authority, governmental unit, committee or other entity of whatever nature.

4    ~~2.1.89~~ 2.1.91    Petition Dates.  The following are dates that each of the

5    Voluntary Debtors filed their Voluntary Chapter 11 petitions or Creditors filed involuntary

6    Chapter 11 petitions against the Trustee Debtors:

| | |
|---|---|
| Palmdale Hills | November 6, 2008 |
| SunCal Beaumont | November 6, 2008 |
| SCC Palmdale | November 7, 2008 |
| SunCal Johannson | November 7, 2008 |
| SunCal Summit Valley | November 7, 2008 |
| SunCal Emerald | November 7, 2008 |
| SunCal Bickford | November 7, 2008 |
| Acton Estates | November 7, 2008 |
| Seven Brothers | November 7, 2008 |
| SJD Partners. | November 7, 2008 |
| SJD Development | November 7, 2008 |
| Kirby Estates | November 7, 2008 |
| SunCal I | November 7, 2008 |
| SunCal III | November 7, 2008 |
| SCC Communities | November 19, 2008 |
| Del Rio | November 19, 2008 |
| Tesoro | November 19, 2008 |
| Delta Coves Ventures, LLC | November 14, 2008 |
| SunCal Heartland, LLC | November 12, 2008 |
| SunCal Marblehead, LLC | November 12, 2008 |
| LB-L-SunCal Northlake, LLC | November 12, 2008 |
| LB-L-SunCal Oak Valley, LLC | November 12, 2008 |
| SunCal Century City, LLC | November 14, 2008 |
| SunCal PSV, LLC | November 14, 2008 |
| SunCal Torrance Properties, LLC | November 14, 2008 |
| SunCal Oak Knoll, LLC | November 19, 2008 |

23    ~~2.1.90~~ 2.1.92    Plan.  The ~~First Amended~~Second Amended Joint Chapter 11

24    Plan Filed by SJD Partners, Ltd. and SJD Development Corp. in their capacities as debtors and

25    debtors in possession, together with the Exhibits thereto, as the same may be amended or modified

26    from time to time in accordance with the Plan.

27

28

1          2.1.91    Plan Documents. The Group IV: Voluntary Debtors Plan, the Group IV:

2  Voluntary Debtors Plan Trust Agreement and all other documents attached to the Group IV:

3  Voluntary Debtors Plan Supplement.

4          2.1.92 2.1.93          Plan Period. The period from the Effective Date to the Group

5  IV: Voluntary Debtors Plan Termination Date.

6          2.1.93    Plan Supplement. The compilation of the Group IV: Voluntary Debtors

7  Plan Documents to be filed with the Bankruptcy Court.

8          2.1.94    Plan Termination Date. The fifth (5th) anniversary date of the Effective

9  Date for the Group IV: Voluntary Debtors, unless the Group IV: Voluntary Debtors Plan elects an

10  earlier date.

11          2.1.95    Plan Sponsor. The entity that has committed to cause the funding of

12  certain specified obligations under the Plan on or after the Effective Date. TheThe Group IV:

13  Voluntary Debtors Plan Sponsor is Acquisitions.

14          2.1.96    Plan Trust. A liquidating trust to be established prior to or on the

15  Effective Date, with Acquisitions as the Group IV: Voluntary Debtors Plan Trustee and the

16  Holders of Allowed Claims against the Group IV: Voluntary Debtors as the beneficiaries. The

17  purpose of the Group IV: Voluntary Debtors Plan Trust will be to liquidate the Group IV:

18  Voluntary Debtors' Assets (other than Assets that are excluded by the Group IV: Voluntary

19  Debtors Plan Trustee on the grounds that they lack value or would be difficult to administer) and to

20  otherwise consummate the Group IV: Voluntary Debtors Plan.

21          2.1.97    Plan Trustee. The Group IV: Voluntary Debtors Plan Trustee under the

22  Group IV: Voluntary Debtors Plan Trust Agreement is Acquisitions.

23          2.1.98    Plan Trust Agreement. The liquidating trust agreement governing the

24  affairs of the Group IV: Voluntary Debtors Plan Trust, which will be in substantially the form

25  contained in the Group IV: Voluntary Debtors Plan Supplement.

26          2.1.99 2.1.98          Plan Trust Beneficiaries. The Group IV: Voluntary Debtors

27  Plan Trust Beneficiaries are (i) the holders of Beneficial Interests, as of any point in time, and (ii)

28

-20-

MAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMAINDOCS-#163418-v9-
SCC_Group_IV_VD_DS.DOCMerged.DOC

holders of Allowed Claims that shall be satisfied from the Group IV: Voluntary Debtors Plan Trust Property in accordance with the terms of the Group IV: Voluntary Debtors Plan.

2.1.100 2.1.99       Plan Trust Property. Plan Trust Property means all All property within the Chapter 11 estates of the Group IV: Voluntary Debtors, other than property that is affirmatively excluded by the Group IV: Voluntary Debtors Plan Trustee.

2.1.101 2.1.100       Post-Confirmation Expenses.  The fees and expenses incurred by the Group IV: Voluntary Debtors Plan Sponsor Trust, the Group IV: Voluntary Debtors Plan Trustee and the Voluntary Debtors' Committee and their professionals following the Confirmation Date (including the fees and costs of Professionals) for the purpose of (i) prosecuting and liquidating the Litigation Claims; (ii) objecting to and resolving Disputed Claims and Disputed Liens; (iii) selling or otherwise liquidating the Plan Trust's Assets; (iv) effectuating Distributions under the Plan; and (v) otherwise consummating the Plan and closing the Group IV: Voluntary Debtors' Chapter 11 Cases.

2.1.102 2.1.101       Priority Claim.  Any Claim, other than an Administrative Claim or a Tax Claim, to the extent entitled to priority under Section 507(a) of the Bankruptcy Code.

2.1.103 2.1.102       Pro Rata.  Proportionately, so that with respect to any distribution Distribution in respect of any Allowed Claim, the ratio of (a)(i) the amount of property distributed on account of such Allowed Claim to (ii) the amount of such Allowed Claim, is the same as the ratio of (b)(i) the amount of property distributed on account of all Allowed Claims of the Class or Classes sharing in such distribution Distribution to (ii) the amount of all Allowed Claims in such Class or Classes.

2.1.104 2.1.103       Professional.  A Person or Entity (a) employed by the Group IV: Voluntary Debtors, the Voluntary Debtors' Committee pursuant to a Final Order in accordance with Sections 327 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to the Effective Date, pursuant to Sections 327, 328, 329 1330 and 331 of the Bankruptcy Code, or (b) for which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to Section 503(b) of the Bankruptcy Code.

MAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMerged.DOC

1    ~~2.1.105~~ 2.1.104        Professional Fees.  All Allowed Claims for compensation and

2    for reimbursement of expenses under Sections 328, 330 and/or 503(b) of the Bankruptcy Code

3    ~~2.1.106~~ 2.1.105        Projects.  The Debtors' residential real estate development

4    projects and other assets as separately defined herein and described in Exhibit "1" to the Disclosure

5    Statement.

6    ~~2.1.107~~ 2.1.106        Reliance Claim.~~(s)~~. An Allowed Unsecured Claim, Allowed

7    Mechanic's Lien Claim, or Allowed Bond Indemnification Claim against a Group IV: Voluntary

8    Debtor that would entitle the holder thereof to be the beneficiary of any ~~equitable subordination~~

9    judgment obtained in the Lehman Adversary Action against a Lehman Entity by such Group IV~~:~~

10   ~~Trustee~~Voluntary Debtor.  All Allowed Mechanic's Lien Claims and Bond Indemnification Claims

11   are Reliance Claims.  A list of the Reliance Claims for the Group IV: Voluntary Debtors is

12   attached hereto as Exhibit "8."~~An Allowed Unsecured Claim and/or Allowed Mechanics Lien~~

13   ~~Claim against a Group IV: Voluntary Debtor that would entitle the holder thereof to be the~~

14   ~~beneficiary of any equitable subordination judgment obtained against a Lehman Entity by such~~

15   ~~Group IV: Voluntary Debtor.~~

16   ~~2.1.108~~ 2.1.107        Reliance Claimant. The holder of a Reliance Claim~~.~~ against a

17   Group IV: Voluntary Debtor.  A list of the ~~Reliance Claims and~~ Reliance Claimants against the

18   Group IV: Voluntary Debtors is attached ~~hereto~~to the Disclosure Statement as Exhibit "8.~~"~~."

19   ~~2.1.109    Sale Period.  The Sale Period is the time period during which the SunCal~~

20   ~~Proponents must consummate a sale or liquidation of the Pacific Point Project.  The Sales Period~~

21   ~~shall commence on the Confirmation Date and shall expire on the Effective Date.~~

22   ~~2.1.110~~ 2.1.108        SCC LLC.  SCC Acquisitions LLC, a limited liability

23   company, a subsidiary of Acquisitions and an indirect and/or a direct parent company of all of the

24   Debtors.

25   ~~2.1.111~~ 2.1.109        Schedules.  The schedules of assets and liabilities and list of

26   equity security holders Filed by the Group IV: Voluntary Debtors, as required by Section 521(1) of

27   the Bankruptcy Code, Bankruptcy Rules 1007(a)(3) and (b)(1), and Official Bankruptcy Form No.

28   6, as amended from time to time.

MAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMAINDOCS-#163418-v9-
SCC_Group_IV_VD_DS.DOCMerged.DOC

1    2.1.112  2.1.110    Secured Claim.  A Claim secured by a lien on any property of

2    any of the Estate Group IV: Voluntary Debtors' Estates, but only to the extent of the value of the

3    interest of the holder of such Allowed Claim in the interest of the Estate in such property.

4    2.1.113  2.1.111    Secured Claim.  Any Claim, including interest, fees, costs,

5    and charges to the extent allowable pursuant to Bankruptcy Code Section 506, that is secured by a

6    valid and unavoidable Lien on the Group IV: Voluntary Debtor(s)' Assets.

7    2.1.114  2.1.112    SJD Development. SJD Development Corp., a California

8    corporation, a Voluntary Debtor, a Voluntary Debtor (a Group IV: Voluntary Debtor), and the

9    parent of SJD Partners.

10    2.1.115  2.1.113    SJD Partners. SJD Partners, Ltd., a Voluntary Debtor (a

11    Group IV: Voluntary Debtor), and the owner of the former owner of the Pacific Point Project.

12    2.1.116   State Court Action. The action filed by certain Voluntary Debtors,

13    including the Group IV: Voluntary Debtors, against Lehman Ali, Inc., and certain other defendants,

14    in California Superior Court for the County of Orange (Case No. 30-2011-0040847-CU-BC-CJC),

15    and a reservation of rights to add the Plan Trustee and/or the Trustee Debtors as additional

16    plaintiffs therein.

17    2.1.117  2.1.114    SunCal.  The SunCal Companies, a trade name for

18    Acquisitions and its Affiliates.

19    2.1.118  2.1.115    SunCal Management.  SunCal Management, LLC, a

20    Delaware limited liability company, and the former property manager for the Projects, which has

21    been succeed by Argent Management. and the property manager for the Projects.

22    2.1.119  2.1.116    SunCal Plan Proponent(s).  The Voluntary Debtors in their

23    capacity as debtors and debtors-in-possession in their respective Chapter 11 Cases and Acquisitions

24    as the parties-in-interest that are proposing the Plans in the applicable Voluntary Trustee Debtors'

25    Cases.  The Group IV: Voluntary Debtors in their capacities as debtors in possession in their

26    respective Chapter 11 Cases, and Acquisitions as the parties-in-interest that are proposing the

27    Group IV: Voluntary Debtors Plan.

28

MAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMAINDOCS-#163418-v9-
SCC-Group_IV_VD_DS.DOCMerged.DOC

2.1.120 2.1.117    Tax.  Any tax, charge, fee, levy, impost or other assessment by any federal, state, local or foreign taxing authority, including, without limitation, income, excise, property, sales, transfer, employment, payroll, franchise, profits, license, use, ad valorem, estimated, severance, stamp, occupation and withholding tax.  "Tax" shall include any interest or additions attributable to, or imposed on or with respect to such assessments.

2.1.121 2.1.118    Tax Claim.  Any Claim for any Tax to the extent that it is entitled to priority in payment under Section 507(a)(8) of the Bankruptcy Code.

2.1.122 2.1.119    Trustee Debtor(s). The following Debtors, individually or collectively, that are represented by the Chapter 11 Trustee: Delta Coves, SunCal Heartland, SunCal Marblehead, SunCal Northlake, SunCal Oak Valley , SunCal Century City, SunCal PSV, SunCal Torrance, and SunCal Oak Knoll.

2.1.123    Unpaid Secured Real Property Tax Claims.  Secured Claims held by various government entities secured by liens on the underlying real properties owned by the Debtors but that are non-recourse to the Debtors.

2.1.124 2.1.120    Unsecured Claim. An Unsecured Claim is any Claim that is not an Administrative Claim, Tax Claim, Secured Claim, or Priority Claim.

2.1.125 2.1.121    Voluntary Debtor(s).  The following  Chapter 11 debtors and debtors-in-possession, individually or collectively, Palmdale Hills, SunCal I, SunCal III, SCC Palmdale, Acton Estates, SunCal Beaumont, SunCal Emerald, SunCal Johansson, SunCal Bickford, SunCal Summit, Seven Brothers, Kirby Estates, SJD Partners, SJD Development, SCC Communities, Del Rio and Tesoro.

2.1.126 2.1.122    Voluntary Debtors' Committee.  The Official Committee of Unsecured Creditors of the Voluntary Debtors appointed in the Cases pursuant to Section 1102 of the Bankruptcy Code.

## 2.2    **Rules of Construction.**

For purposes of the Plan and this Disclosure Statement, unless otherwise provided herein or in the Plan, (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural; (b) each pronoun stated in the

-24-

masculine, feminine or neuter includes the masculine, feminine and neuter; (c) any reference in the Plan or this Disclosure Statement to an existing document or schedule filed or to be filed means such document or schedule, as it may have been or may be amended, modified or supplemented pursuant to the Plan; (d) any reference to an entity as a Holder of a Claim or Interest includes that entity's successors and assigns; (e) except as otherwise indicated herein all references in the Plan or this Disclosure Statement to Sections, Articles and Exhibits are references to Sections, Articles and Exhibits of or to the Plan; (f) the words "therein," "thereunder" and "thereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; and (g) unless otherwise provided in the Plan or this Disclosure Statement, any reference in the Plan or this Disclosure Statement to a contract, instrument, release, indenture, agreement, or other document being in a particular form or on particular terms and conditions means that such document shall be substantially and materially in such form or substantially and materially on such terms and conditions; (h) any reference in the Plan or this Disclosure Statement to a document, schedule, or exhibit to the Plan or Disclosure Statement Filed or to be Filed means such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; and (i) the rules of construction set forth in Section 102 of the Bankruptcy Code shall apply to the extent such rules are not inconsistent with the express terms of the Plan or this Disclosure Statement or any other provision in this Section 2.2.

**2.3    Exhibits.**

All Exhibits to the Plan are incorporated into and are a part of the Plan as if set forth in full therein.

**III.**

**PLAN CONFIRMATION DEADLINES**

The Bankruptcy Court has not confirmed the Plan described in this Disclosure Statement. Accordingly, the terms of the Plan are not binding on anyone.  However, if the Bankruptcy Court confirms the Plan, then the Plan will be binding on the Debtor(s), the Plan Trustee, and on all Creditors and Interest Holders in such Cases.

**3.1    Time and Place of the Confirmation Hearing.**

MAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMerged.DOC

1    The hearing where the Bankruptcy Court will determine whether or not to confirm the Plan

2    will take place at 411 West Fourth Street, Santa Ana, CA 92701-4593 on October 24, 2011, at 9:30

3    a.m. in Courtroom 5A.

4    **3.2    Deadline for Voting for or Against the Plan.**

5    If you are entitled to vote, it is in your best interest to timely vote on the enclosed ballot and

6    return the ballot to:

7
                              Winthrop Couchot Professional Corporation
8                             660 Newport Center Drive, Suite 400
                              Newport Beach, CA 92660
9                             Facsimile:  (949) 720-4111
                              Attn:  P.J. Marksbury
10

11    Your ballot must be **received by**  September 26, 2011**,** or it will not be counted.

      **3.3    Deadline for Objecting to the Confirmation of the Plan.**
12

13    Objections to the confirmation of the Plan must be filed with the Bankruptcy Court, and

14    served upon the following parties so that they are received by September 26, 2011:

15    **Counsel to the Voluntary**          Paul J. Couchot
      **Debtors**                           Winthrop Couchot Professional Corporation
16                                           660 Newport Center Drive, Suite 400,
                                             Newport Beach, CA 92660
17

18    **Authorized Agent for**             Bruce V. Cook
      **Voluntary Debtors**               General Counsel
19                                         2392 Morse Ave
                                           Irvine, CA 92614-6234
20

21    **Counsel for SunCal**               Ronald Rus
      **Management LLC and**               Rus Miliband & Smith A
22    **SCC Acquisitions Inc**.            Professional Corporation
                                           2211 Michelson Drive, Seventh Floor
23                                         Irvine, California 92612

24    **Authorized Agent for**             Bruce V. Cook
25    **SunCal Management and**            General Counsel
      **SCC Acquisitions, Inc**.           2392 Morse Ave
26                                         Irvine, CA 92614-6234

27    **3.4    Identity of Person to Contact for More Information Regarding the Plan.**

28

-26-

1    Any interested party desiring further information about the Plan should contact the

2    Voluntary Debtors' counsel, Winthrop Couchot Professional Corporation, 660 Newport Center

3    Drive, Suite 400, Newport Beach, CA 92660, Attn:  Paul J. Couchot, (949) 720-4100; Peter W.

4    Lianides, (949) 720-4155; Payam Khodadadi, (949) 720-4160.

5        **3.5**    __Disclaimer.__

6        The information contained in this Disclosure Statement is provided by the SunCal Plan

7    Proponents.  The SunCal Plan Proponents represent that everything stated in this Disclosure

8    Statement is true to the best of their knowledge.  The Bankruptcy Court has not yet determined

9    whether or not the Plan is confirmable and makes no recommendation as to whether or not you

10   should support or oppose the Plan.

11       The discussion in this Disclosure Statement regarding the Group IV: Voluntary Debtors

12   may contain "forward looking statements" within the meaning of the Private Securities Litigation

13   Reform Act of 1995.  Such statements consist of any statement other than a recitation of historical

14   fact and can be identified by the use of forward looking terminology such as "may," "expect,"

15   "anticipate," "estimate," or "continue," or the negative thereof or other variations thereon or

16   comparable terminology.  The reader is cautioned that all forward looking statements are

17   necessarily speculative and there are certain risks and uncertainties that could cause actual events

18   or results to differ materially from those referred to in such forward looking statements.  The

19   liquidation analyses, distribution projections, projections of financial results and other information

20   are estimates only, and the timing, amount and value of actual distributions to Creditors may be

21   affected by many factors that cannot be predicted.  Therefore, any analyses, estimates, or

22   projections may or may not turn out to be accurate.

23       The SunCal Plan Proponents and their professionals have made a diligent effort to identify

24   in this Disclosure Statement all Litigation Claims, including claims for relief, counterclaims, and

25   objections to claims.  However, no reliance should be placed on the fact that a particular Litigation

26   Claim is or is not identified in this Disclosure Statement.  The Group IV: Voluntary Debtors or

27   other parties in interest may seek to investigate, file and prosecute Litigation Claims after the

28

1   Confirmation Date, or the Plan Trust may seek to do so after the Effective Date of the Plan whether

2   or not the Litigation Claims are identified in this Disclosure Statement.

3   <center>**IV.**</center>

4   <center>**FACTUAL BACKGROUND OF THE DEBTORS**</center>

5   **4.1    The Formation of the Debtors and the Projects.**

6   **4.1.1    Overview of the Debtors and their Projects.**

7   The Group IV: Voluntary Debtors are two of twenty-six entities (collectively the "Debtors")

8   that were formed pursuant to a joint venture between Affiliates of the SunCal Companies

9   ("SunCal") and the Lehman Entities (the "SunCal/Lehman Joint Venture"). The Debtors role in the

10  venture was to own and develop the large residential projects that were the core assets in this joint

11  undertaking. At the inception of SunCal/Lehman Joint Venture, it was agreed that SunCal would be

12  the developer/manager of the Projects and the Lehman Entities would provide the necessary capital.

13  Attached hereto as Exhibit "1" is a general description of the Debtors' Projects, including the

14  Debtors' other primary Assets, excluding Cash and the Litigation Claims, and a description of the

15  loans for the Projects.

16  All of the Debtors are Affiliates of Acquisitions and SCC LLC.  Some of the Debtors

17  directly own the Projects, while others serve as holding companies, owning Allowed Interests in the

18  Debtors that hold title to the Projects.  SunCal Management, LLC, a SunCal Affiliate, has

19  management contracts with respect to all of the Projects and manages the Debtors' day-to-day

20  business affairs.

21  The seventeen Debtors who are referred to herein as the "Voluntary Debtors" are wholly

22  owned by SunCal Affiliates, and consequently the SunCal Affiliates have full corporate

23  governance authority over these entities.  The Voluntary Debtors own eleven (11) of the Projects.

24  As described herein, SJD Partners formerly owned the Pacific Point Project.  In the case of the nine

25  Trustee Debtors, the SunCal Affiliates and the Lehman Affiliates initially shared ownership

26  equally (50% each). However, after the Petition Date, the SunCal Affiliates became the owner of

27  hundred percent (100%) of the equity in two of the nine Trustee Debtors - SunCal Heartland and

28  SunCal Marblehead.  The Trustee Debtors own nine (9) Projects.

<center>-28-</center>

Attached hereto as Exhibit "2" is a chart that sets forth the appraised value of the Debtors' Projects.[2]  The Group IV: Voluntary Debtors value the Pacific Point Project at $16,000,000, which is the subject of litigation described herein.  The $16,000,000 value reflects the estimate made by SunCal's underwriting team.

### 4.1.2    The Group IV: Voluntary Debtors' Primary Secured Creditors and Their Disputed Claims.

SJD Partners is a party to a certain loan agreement, dated February 16, 2006, by and among Lehman ALI, SJD Development and SJD Partners, pursuant to which Lehman ALI made a loan in the maximum aggregate principal amount of approximately $125,000,000 (the "Pacific Point First Loan Agreement"). The Pacific Point First Loan Agreement is allegedly secured by a first-priority deed of trust on the Pacific Point Project.  The Pacific Point First Loan Agreement had an asserted balance due of $120,110,237 as of March 30, 2009, and ownership of this loan is now held by Lehman Re, a Bermuda business entit.y.  The ownership of the term loan portion of the Pacific Point First Loan Agreement is now allegedly held by Lehman Re, a Bermuda business entity and the ownership of the revolving portion of this loan is allegedly held by Lehman ALI.  For more detail, see Exhibit "3".

SJD Partners was also a party to a certain loan agreement, dated May 1997, by and between Lehman ALI and SJD Partners, pursuant to which Lehman ALI initially made a loan in the maximum aggregate principal amount of approximately $20,000,000 (the "Pacific Point Second Loan Agreement").  The Pacific Point Second Loan Agreement was secured by a second-priority deed of trust on the Pacific Point Project, which was foreclosed upon on August 28, 2008 by LV Pacific Point, as assignee of Lehman ALI ("LV Pacific Point")

As stated, SJD Partners no longer owns the Pacific Point Project, allegedly due to the illegal foreclosure of the Pacific Point Project.  Pursuant to the Lehman Adversary Proceeding and the State Court ActionContract Action, the litigation over the Pacific Point Project is based on the following facts:

---

[2] Values may have changed since these analyses were prepared.

1    Pursuant to the Restructuring Agreement and Settlement Agreement, the SunCal parties

2    agreed not to interfere with the foreclosure of the Pacific Point Project, in consideration for the

3    assumption and payment of the specified payables and obligations.  Although LV Pacific Point

4    took title to the Pacific Point Project, it has failed and refused to pay any of payables or obligations

5    for which it is liable pursuant to the parties' agreements.  In other words, the SunCal parties have

6    done, vis-à-vis Pacific Point, everything they could do under the agreement.  Yet the Lehman

7    Entities, despite having gotten all of the benefits of the agreement in connection therewith, have

8    still refused to pay.

9    ~~Pursuant to the Lehman Adversary Proceeding, SJD Partners has a fraudulent inducement~~

10   ~~action against LV Pacific Point, a Lehman Entity, seeking rescission and/or damages.  Moreover,~~

11   Tthe Sixth Claim for Relief in the ~~State Court Action~~Contract Action for breach of contract is

12   brought by SJD Partners, Ltd. (the owner of the Pacific Point Project prior to the foreclosure)

13   against Lehman ALI, LV Pacific Point, PAMI LLC, and PAM Inc.(PAMI LLC's parent) for failure

14   to pay urgent payables, assumed Pacific Point obligations and lender authorized work.  This claim

15   seeks damages in excess of ten million dollars.

16   The Seventh Claim for Relief in the Contract Action for breach of contract is brought by

17   ~~Bruce~~ Elieff and SCC Acquisitions, Inc., against the same defendants for the same Pacific Point-

18   related obligations, seeking recovery of damages to the extent that these plaintiffs face exposure

19   for these amounts.  These plaintiffs also join with all other plaintiffs in the Eighth Claim for Relief

20   in the Contract Action against Lehman ALI for breach of the covenant of good faith and fair

21   dealing, which seeks damages in excess of $100 million.

22   Moreover, pursuant to the Lehman Adversary Proceeding, SJD Partners has a fraudulent

23   inducement action against LV Pacific Point and Lehmand ALI seeking rescission and/or damages.

24   On June 17, 2011, Lehman Re filed a Motion For Judgment On The Pleadings And To

25   Expunge Lis Pendens Relating To The Pacific Point Property ("JOP Motion") in the Lehman

26   Adversary Proceeding.  In the JOP Motion, Lehman Re alleges that the SJD Partners' requests to

27   undo the foreclosure sale on the Pacific Point Project are improper and not available as a matter of

28

law.  Based on the foregoing, Lehman Re further alleges that SJD's efforts to reclaim the Pacific Point Project may be subject to dismissal in the near future by the Bankruptcy Court.

In particular, Lehman Re alleges that the foreclosure of the Pacific Point Project was based on a default on over $50 million worth of loans secured by the Pacific Point Project, which loans, according to Lehman Re were issued before the Restructuring Agreement was signed.  Lehman Re further alleges that SunCal received substantial benefits from the Lehman Entities' partial performance of the Restructuring Agreement, which according to Lehman Re would need to be returned in order to rescind the Restructuring Agreement.  Finally, Lehman Re asserts that the Debtors cannot rescind part, but not all, of the Restructuring Agreement.

As set forth above, the SunCal Plan Proponents ~~oppose~~disagrees with these allegations and will continue the prosecution of the Lehman Adversary Proceeding and the ~~Statue Court~~Contract Action.  In fact, in a recent status conference, SJD Partners agreed, and Lehman Re declined, to set a hearing date on the JOP Motion.

### 4.1.3    A Summary of All of the Alleged Claims Against the Group IV: Voluntary Debtors.

Attached hereto as Exhibit "4" is a chart that sets forth the prepetition Claims that have been asserted against all of the Debtors.  In summary, the asserted Claims against the Group IV: Voluntary Debtors consist of the following:

| Claims | SJD Partners |
|---|---|
| Unpaid Secured Real Property Tax Claims | $0 |
| The Disputed Lehman Secured Claims | $120,110,237 |
| Mechanics Lien Claims | $0 |
| Administrative and Priority Claims | $550,693 |
| General Unsecured Claims Including alleged Bond Claims | $56,206,409 |

The SunCal Plan Proponents believe that these balances will ultimately be reduced through claims objections resulting in lower "Allowed" claims balances.

### 4.1.4    Summary of the Group IV: Voluntary Debtors' Cash.

The following chart sets forth the Group IV: Voluntary Debtors' cash on hand as of ~~January 31~~July 1, 2011.

Amount

MAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMerged.DOC

Group IV: Voluntary Debtors

| | |
|---|---|
| SJD Partners | ~~35,568.50~~19,622.94 |
| SJD Development | 205.99 |

The Group IV: Voluntary Debtors' review of the applicable loan and lien document indicates that any purported liens on the cash ~~most of the alleged liens~~ were not validly perfected because the accounts lack control agreements and therefore do not constitute "cash collateral." ~~.~~

**4.2      Factual Circumstances Leading to the Filing of the Debtors' Chapter 11 Cases.**

**4.2.1      Introduction.**

In this section of the Disclosure Statement, the ~~SunCal Proponent~~SunCal Plan Proponents have provided a brief description of the relationship between the Debtors and the Lehman Entities. This background is relevant to the Group IV: Voluntary Debtors, and in fact all of the Debtors, for the following reasons. First, most of the unsecured claims asserted against the Debtors were incurred at the insistence of the Lehman Lenders, and they would have been paid if the Lehman Lenders had honored their obligation to pay these claims. Second, a substantial part of claims that the Lehman Lenders failed to pay are being asserted against *all of the Debtors*. If the litigation against the Lehman Lenders discussed herein is successful, it will, at a minimum, reduce the pool of claims against the Group IV: Voluntary Debtors, and thereby increase the dividend payable to the remaining creditors. Third and finally, this history allows the Creditors to take the measure of the parties who are now proffering the competing plan – the Lehman Lenders.  As the within discussion will establish, the Lehman Lenders failed to pay the claims of Creditors prepetition, and the Lehman Lenders attempted to destroy the Debtors' reorganization and sale efforts by manipulating LCPI's alleged automatic stay. ~~The SunCal Plan Proponents believe that this history will lead the Creditors to conclude, when weighing the merits of the Lehman Lenders Plan offer: "Fool me once shame on you, fool me twice shame on me."~~s

**4.2.2      Background of the SunCal Companies.**

SunCal is a family-owned and operated real estate business that has been successfully developing properties throughout the western United States for over 70 years.  SunCal's business focuses upon the "development" of residential land. A typical SunCal development begins with the acquisition of one or more parcels of raw land. Thereafter, the SunCal team develops a master plan

-32-

MAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMerged.DOC

1   for the acreage that incorporates streets, homes, parks, schools and commercial areas, and then it

2   works with the applicable municipal planning authorities (the city, county, state and federal) to

3   secure the necessary approvals or "entitlements" to gain approval of the Plan. This process, which

4   requires the assistance of land planners, civil engineers, architects, lawyers, and other land

5   specialists, takes a period of years. Once the master plan is approved, SunCal provides for the

6   grading of the project and the installation of the foundational infrastructure (streets, utilities, etc.)

7   and then sells the lots or parcels within the project to merchant builders.

8   ### 4.2.3    The Origins of the SunCal/Lehman Joint Venture.

9   SunCal historically financed its projects with loans and/or equity from a number of

10   different sources.  However, beginning in 1997, an increasing number of SunCal's projects were

11   financed by the Lehman Entities, as Mark Walsh ("Walsh"), the head of LBHI's Global Real

12   Estate Group, began cultivating a business relationship with SunCal's principals.

13   By 2003, the Lehman Entities and SunCal had entered into joint ventures involving

14   approximately fifteen projects.  By 2007, that number had grown to over forty, and the Lehman

15   Entities had become, with limited exceptions, the exclusive provider of financing for the SunCal

16   Projects pursuant to a written agreement executed in 2006.  The Lehman Entities also consisted of

17   the Lehman Equity Members that either directly or indirectly owned a fifty percent (50%) equity

18   interest in all nine of the Trustee Debtors.

19   In their dealings with SunCal, the Lehman Representatives made no distinction between

20   Projects financed by Lehman ALI and Projects financed by LCPI. They also made no distinction

21   between the Debtors in which Lehman Equity Members held 50% equity memberships or the

22   Debtors in which the Lehman Entities held no equity membership interest.  As agents of the

23   financial partner in the parties' joint venture, the Lehman Representatives would determine which

24   Lehman Entity would provide financing on which Projects, and would dictate the structure that the

25   financing would take, according to whatever suited the Lehman Entities' needs.

26   ### 4.2.4    Lehman's Effective Control over the Management of the Debtors and

27   ### Promises of Ongoing Funding.

28

MAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMerged.DOC

1       Prior to the market downturn in the middle of 2007, Lehman Representatives afforded

2  SunCal substantial discretion in the management and development of the Projects.  The Debtors

3  would contract with third-party vendors to perform grading, health and safety compliance,

4  construction, landscaping, and other necessary services on the Project sites, and they would work

5  with the local municipalities to obtain the necessary entitlements and other authorizations

6  necessary to proceed with development.  The Lehman Representatives, SunCal and the Debtors

7  would discuss anticipated quarterly expenditures at periodic budget meetings, and , as expenses

8  were incurred each month, SunCal and the Debtors would submit requests for payment to the

9  Lehman Representatives, supported by the necessary documentation. The Lehman Representatives

10  would then provide the funding necessary to pay these expenses.

11      During the third quarter of 2007, the foregoing management and payment dichotomy

12  changed, after the real estate market experienced a sudden downturn, and many of the Projects

13  significantly declined in value.  In response to this dramatic economic change, a series of high

14  level discussions occurred between SunCal's representatives and the Lehman Representatives --

15  including Walsh, Paul Hughson ("Hughson") and Frank Gilhool ("Gilhool"), the Managing

16  Directors of Lehman's Global Real Estate.  In these discussions, SunCal's representatives, acting

17  on behalf of the Debtors, expressed concerns about the loans on the Projects being out of balance,

18  and suggested shutting down the Projects, or at least slowing the pace of development.  However,

19  Walsh specifically instructed SunCal not to slow down or stop work.  He assured SunCal that the

20  Lehman Entities would provide the necessary funding to pay vendors and to keep the development

21  of the Projects moving forward.

22      The foregoing assurances of payments were confirmed in numerous telephone

23  conversations between Gilhool and SunCal's COO, Frank Faye ("Faye"), SunCal's General

24  Counsel, Bruce Cook ("Cook"), Steve Elieff and/or Bruce Elieff that took place during 2007 and

25  2008. In each exchange, Gilhool assured SunCal that the Lehman Entities were committed to

26  funding the debts and obligations being incurred at the Projects and they continued to insist that

27  work proceed.

28

MAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMerged.DOC

1   During this time frame, the Lehman Representatives became much more "hands on,"

2   scrutinizing and approving all budgets and expenses through a new control and approval structure.

3   Under the new structure, SunCal would submit budgets to the Lehman Representatives on a

4   weekly basis and explain, during period conference calls, what Project payables they believe had to

5   be paid and what work had to be performed on the Projects.  The Lehman Representatives would

6   then unilaterally decide what future work would proceed, the Lehman Representatives would

7   authorize the work and the Lehman Representatives would decide what payables would be paid

8   timely by designating them as "urgent," and what other payables were not urgent and hence would

9   not be paid on a timely basis.  However, even under this new Lehman controlled management and

10   payment regime, the Lehman Representatives made it clear that all payables being incurred would

11   be funded.

12   **4.2.5    The 2008 Restructuring Agreement.**

13   By the fall of 2007, both SunCal and the Lehman Representatives contemplated entering

14   into restructuring agreement in the near term, with a closing to occur no later than January or

15   February of 2008.  However, this transaction was delayed by the Lehman Entities' extensive

16   documentation demands until May 23, 2008. On this date, SunCal and most of the Debtors finally

17   entered into an omnibus "Restructuring Agreement" with LBHI, Lehman ALI and the other

18   Lehman Entities.  The same Lehman Representative signed the Restructuring Agreement on behalf

19   of all of the Lehman Entities.

20   Pursuant to the Restructuring Agreement, Lehman ALI, "as the Lender with respect to each

21   Loan," committed, among other things, to: (1) make advances under existing loans to fund the

22   continuing costs necessary to preserve the value of the Projects; (2) move forward to resolve the

23   accrued outstanding subcontractor payables, i.e., to make sure that the Projects' creditors were paid

24   for their work; and (3) to close the transaction, whereby newly-created Lehman Entities would

25   assume the debt and obligations of the Projects.

26   As originally executed in May 2008, the Restructuring Agreement applied to twelve of the

27   twenty Projects (as well as several other projects not at issue in the Lehman Adversary

28   Proceeding):  (1) Acton Estates; (2) Beaumont Heights; (3) Bickford Ranch; (4) Emerald

1  Meadows; (5) Heartland; (6) Johannson Ranch; (7) Marblehead; (8) Northlake; (9) Oak Valley;

2  (10) Pacific Point; (11) Ritter Ranch; and (12) Summit Valley.  The Debtors that owned and/or

3  held equity interests in the entities that owned these Projects were signatories to the May 2008

4  agreement.[3]

5  Between May and August 2008, the parties agreed to add four additional projects to the

6  Restructuring Agreement: (1) Del Rio; (2) Joshua Ridge; (3) Palm Springs Village; and (4) Tesoro

7  Burnham, and the four Debtors associated with these Projects.  SunCal Del Rio, SCC

8  Communities, SunCal PSV, and SunCal Tesoro.  Only four Projects were  not included in the

9  Restructuring Agreement: Century City, Delta Coves, Oak Knoll and Del Amo.  Accordingly, the

10  four Debtors associated with these Projects  SunCal Century City, Delta Coves, SunCal Oak

11  Knoll and SunCal Torrance  were not signatories thereto.  Lehman ALI was the lender on each of

12  these Projects and , and as with the other Projects, Lehman AliALI continued to insist that these

13  four debtors  proceed with the development of the four Projects, it approved all expenses, and it

14  continually provided assurances of payment.

15  ### 4.2.6    The Lehman Lenders Hire Radco.

16  Subsequent to the execution of the Restructuring Agreement, Lehman ALI arranged for a

17  third party, Radco, to directly settle outstanding contractor payables, as its agent.  Radco was

18  provided some limited funding and authority to negotiate settlements, and did in fact reach

19  settlement with a number of creditors.  The funding for these settlements, whether the debts related

20  to Lehman ALI or LCPI funded Projects, came from the same source.  Lehman ALI and LCPI also

21  provided approval for new work on the Projects, and Lehman ALI paid for some of this work.

22  However, this funding was minimal and it soon stopped.

23  

---

[3] Specifically, the Restructuring Agreement was entered into by, among others, the "Borrowers,"
"Grantors" and "Pledgors," as defined in Annex 1 thereto.  The "Borrowers" included SunCal Marblehead,
SunCal Heartland, SunCal Northlake, SunCal Oak Valley, SJD Partners, Palmdale Hills, SCC Palmdale,
SunCal I, SunCal III, and SunCal Bickford.

The "Grantors" included SunCal Marblehead, SunCal Heartland, SunCal Northlake, SunCal Oak Valley,
SJD Partners, Palmdale Hills, SunCal Bickford, SunCal Acton, SunCal Summit and SunCal Emerald, and
Debtors SunCal Beaumont and SunCal Johannson.

The "Pledgors" included SCC Palmdale, SunCal I, SunCal Summit and SJD Development.

1  In August 2008, Lehman ALI withdrew funding and settlement authority from Radco,

2  leaving millions of dollars in outstanding contractor payables unresolved, notwithstanding the

3  contrary provisions in the Restructuring Agreement.  Leman AliALI's actions also impaired the

4  Debtors' ability to resolve ongoing public health and safety issues arising at the Projects.

5  Ultimately,  only a fraction of the total outstanding payables were resolved, contrary to the  past

6  promises made by Lehman Representatives.

7  **4.2.7    The Lehman Lenders' Failure to Close on the Settlement Agreement.**

8  Pursuant to the terms of the Restructuring Agreement, the parties agreed to enter into a

9  Settlement Agreement, the form of which was attached to the Restructuring Agreement.  The

10  Settlement Agreement provided for the transfer of the Projects included within the Restructuring

11  Agreement to a series of  newly formed Lehman-controlled entities (each with "SCLV" in its

12  name, for "SunCal-Lehman Venture"). The agreement further provided that the entity taking title

13  to the Project would assume the  Lehman Lender debt obligations associated with the Projects,

14  assume certain bond obligations associated with the Projects, and provide indemnifications to

15  SunCal and the Debtors for unpaid claims.

16  On August 25, 2008, the Settlement Agreement and a series of related documents were

17  formally executed by SunCal and the applicable Lehman Lenders and Lehman Equity Members at

18  a meeting held in Los Angeles on August 25, 2008.  Once these documents were signed, all that

19  remained was the mechanical closing of the series of transactions described in the Settlement

20  Agreement. Since all of the conditions precedent to the closings had been satisfied, or could have

21  been satisfied at the meeting, this should have occurred at the August 25, 2008 meeting. However,

22  the Lehman Representative asked SunCal to extend the closing date for thirty days, to September

23  30, 2008. Accordingly to the Lehman Representatives, this short extension would enable them to

24  secure certain outstanding third party consents. Although SunCal knew these third party consents

25  were readily available, within a few days they agreed to this extension, believing the request was

26  made in good faith. In fact, as more fully explained blow, it was not.

27  **4.2.8    The Lehman Lenders' Undisclosed Sale of Most of the Debtors' Loans.**

28

1    As explained above, the Settlement Agreement was duly executed by all parties at a formal

2  closing meeting held on August 25, 2008. When the parties signed this agreement, which was a

3  binding contract, they both represented that they both intended and had the power and capacity to

4  perform all of the obligations undertaken therein. However, in the case of the Lehman Entities, this

5  representation was later discovered to be false. When the closing occurred on August 25, 2008, the

6  Lehman Lenders had already sold the very obligations they were agreeing to assume and restructure

7  in the Settlement Agreement to Fenway Capital pursuant to a repurchase agreement.  Accordingly,

8  as of August 25, 2008, they lacked the power to perform the most essential undertakings that they

9  agreed to perform in the Settlement Agreement. Instead of disclosing this fact at the August 25,

10  2008 meeting, the Lehman Lenders requested additional time to execute the agreed upon transfers

11  provided for under this binding agreement. The Lehman Lenders needed this delay for an obvious,

12  but undisclosed reason: They lacked the ability to perform the very obligations they had just agreed

13  to perform in the Settlement Agreement.

14    The Lehman Representatives also did not disclose at the August 25, 2008 closing that they

15  intended to sell the Pacific Point First Loan to Lehman Re, approximately a week later, *even though*

16  *this loan was also subject to the Settlement Agreement*. To the contrary, the Lehman

17  Representatives affirmatively concealed these facts from SunCal and the Debtors by asserting that

18  ownership still existed in the case of seven of the eight loans.

19             **4.2.9    Lehman's Foreclosure Sale and Purchase of the Pacific Point Project.**

20    At the time the Restructuring Agreement and the Settlement Agreement were signed, the

21  Pacific Point Project, which was still owned by SJD Partners, was among the Projects included in

22  the Restructuring Agreement and the Settlement Agreement.  Pursuant to the Restructuring

23  Agreement, and as detailed in the Settlement Agreement attached thereto, SunCal, SJD Partners,

24  and its parent company, SJD Development, all agreed that they would not interfere with Lehman

25  ALI's (or its designee's) foreclosure on the Pacific Point Project. They further agreed that a new

26  Lehman entity, LV Pacific Point, would purchase the Pacific Point Project upon foreclosure and

27  that Lehman ALI and LV Pacific Point would (a) assume SJD Partners' and SJD Development's

28  outstanding accounts payable for Pacific Point third-party vendors, (b) assume certain bond

1  liability associated with the Pacific Point Project, and (c) pay for the millions of dollars worth of

2  work that Lehman ALI representatives had authorized.

3      As previously stated, the Settlement Agreement was signed on August 25, 2008 by the

4  SunCal parties, including SJD Partners and SJD Development.  It was also signed by Gilhool as

5  authorized signatory on behalf of both Lehman ALI and LV Pacific Point.  As a signatory to the

6  Settlement Agreement, LV Pacific Point was required to purchase the Pacific Point Project at the

7  foreclosure sale subject to the above obligations. Consistent with this agreement, the City of San

8  Juan Capistrano executed an estoppel certificate for the benefit of SJD Partners and Lehman ALI—

9  at Lehman ALI's request—on August 26, 2008, two days before the foreclosure sale.  This

10  certificate stated, among other things, that the "Acquiring Entity [LV Pacific Point] shall by

11  operation of law become the legal successor-in-interest to Developer [SJD Partners]" under SJD

12  Partners' agreements with the City. That certificate further provided that there existed no breaches,

13  defaults, or claims under SJD Partners' agreements with the City.

14      On August 28, 2008, Lehman ALI foreclosed on the Pacific Point Project, and title was

15  transferred to LV Pacific Point at the foreclosure sale.  However, Lehman ALI and LV Pacific

16  Point failed to assume the liabilities and obligations associated with this Project as agreed.   This

17  breach of the parties' agreement, left SJD Partners without title to the Pacific Point Project, but

18  with the potential liability for the unsecured claims relating to the Project, including bond claims of

19  approximately $34 million,.  Moreover, since Lehman ~~Ali~~ALI and LV Pacific Point have

20  continued to ignore their obligations under the above agreement, unpaid taxes, fines, and penalties

21  have continued to accrue to the detriment of the Project and these claims are being asserted against

22  SJD Partners~~.~~.

23      Had SunCal, SJD Partners and SJD Development known that Lehman ALI and LV Pacific

24  Point had no intention of honoring their obligations under the foregoing agreement, they never

25  would have agreed to cooperate with the foreclosure.  Instead, SJD Partners would have filed for

26  bankruptcy earlier, thereby mitigating the damages from Lehman ~~Ali~~ALI's breach, by allowing

27  creditors recourse to the value of the Project.

28

MAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMerged.DOC

1       This course of conduct is relevant to the unsecured creditors of the Group IV: Voluntary

2   Debtors for the following reason. The holders of bond claims against SJD Partners are asserting

3   their massive claims against the estates of all of the Debtors, including the estates of the Group IV:

4   Voluntary Debtors. Accordingly, Lehman ~~Ali~~ALI's wrongs against SJD Partners directly affect the

5   Group IV: Voluntary Debtors' cases.

6       **4.2.10  Alvarez and Marsal Take Over Control of the Lehman Entities After**

7               **the Chapter 11 Filings of LBHI and LCPI.**

8       LBHI filed for bankruptcy in September 2008 and LCPI filed for bankruptcy in October

9   2008.  After LBHI's filing, Bryan Marsal ("Marsal") of Alvarez & Marsal ("A&M") was appointed

10  to serve as LBHI's Chief Restructuring Officer. Marsal and A&M are in charge of liquidating the

11  now defunct Lehman Entities, including Chapter 11 debtors LBHI and LCPI, and the non-bankrupt

12  Lehman Lenders (Lehman ALI, OVC, and Northlake Holdings, as well as the non-bankrupt

13  Lehman Equity Members.

14      Although A&M was not employed until after the events that occurred on August 25, 2008

15  described above, it should be noted that A&M hired the same law firm that represented the

16  Lehman Lenders in the August 25, 2008 meeting – Weil, Gotshal & Manges, LLP. Moreover, as

17  more fully explained herein, it was A&M that directed Lehman ~~Ali~~ALI not to perform its

18  contractual obligations under the Settlement Agreement after September of 2008. Accordingly, the

19  same individuals that caused the damages to unsecured creditors by insisting upon the breach of

20  the Settlement Agreement, are now asking for their vote in the competing plan filed by the Lehman

21  Lenders.

22      LBHI's bankruptcy filing and the Lehman Lenders refusal, at A&M's direction, to close the

23  transactions provided for under the Settlement Agreement as agreed, were not small matters. They

24  severely damaged the Debtors. Although the Debtors were not proceeding with any new

25  construction or development, the Debtors were still required to expend significant sums on site

26  security, erosion control, property taxes and other measures in order to prevent the Projects from

27  becoming a public safety hazard, and in order to avoid the loss of valuable entitlements, and to

28  mitigate penalties and fines being incurred by the Projects.  Although SunCal and the Debtors

1    repeatedly requested that the Lehman Entities pay for critical health and safety and value

2    preservation measures on the Projects, these efforts were unavailing.

3        Between October 9 and November 4, 2008, SunCal's general counsel Cook sent Robert

4    Brusco, an authorized agent of the Lehman Entities, nearly two dozen letters requesting that the

5    Lehman Lenders provide the funding necessary to address critical needs on the Projects as

6    promised.  A summary of these health and safety notices are attached hereto as Exhibit "5".  The

7    Lehman Entities ignored these requests until November 2008, when Brusco, purportedly on behalf

8    of the Lehman Lenders, delivered the message that the Lehman Lenders were unwilling to fund the

9    Projects and that, instead, they intended to foreclose on all of the Projects.

10        As a result, as set forth in Exhibit "4," there are now over 240 vendors, municipalities,

11   counties and bonding companies claiming over $400 million in work, improvements and property

12   tax claims against the Projects.  Substantially all of these sums are due to work performed or

13   bonded at Lehman's request based upon Lehman's promises of payment.

14        **4.3        The Debtors' Potential Preferential Transfers**.

15   I        Attached hereto as Exhibit "6" are charts setting forth payments made to third parties

16   during the ninety (90) day time period preceding the filing of the Debtors' Chapter 11 Cases as

17   well as payments made to the Lehman Entities and to SunCal Affiliates during the one-year time

18   period preceding the filing of the Debtors' Chapter 11 Cases.

19   II        As the charts in Exhibit 6" indicate, Group IV: Voluntary Debtors made payments in the

20   following aggregate amounts to non-insiders within the 90 day preference period preceding the

21   Petition Date:  SJD Partners: $748,926.28, SJD Development: $25.00.  The corresponding figures

22   for payments made to "insiders" within the one year preference period preceding the Petition Date

23   were: SJD Partners: $498,351.39, SJD Development: $0.00.

24                                        **V.**

25        **SIGNIFICANT EVENTS IN THE DEBTORS' CHAPTER 11 CASES**

26        **5.1.        Voluntary Debtors.**

27            **5.1.1        Joint Administration of the Voluntary Debtors and the Trustee Debtors.**

28

III    Since their respective Petition Dates, the seventeen (17) Voluntary Debtors have continued to operate as "debtors-in-possession," subject to the supervision of the Bankruptcy Court and in accordance with the Bankruptcy Code.  The Voluntary Debtors are authorized to operate their businesses in the ordinary course during the Chapter 11 proceedings.  Transactions outside the ordinary course of business must be approved by the Bankruptcy Court.

IV    The Voluntary Debtors' Cases are being jointly administered pursuant to orders entered on November 19, 2008 and December 9, 2008.  The Voluntary Debtors' Cases are being jointly administered with the Trustee Debtors' cases pursuant to an order entered on March 11, 2009.

### 5.1.2    The Voluntary Debtors Court Employed Professionals.

V The Voluntary Debtors have employed Winthrop Couchot Professional Corporation as their general insolvency counsel, and the MB Firm as their special litigation counsel in the Lehman Adversary Proceeding and the ~~State Court Action~~Contract Action.

VI    The Voluntary Debtors' Committee has employed Irell & Manella LLP as its counsel pursuant to an order entered on February 13, 2009.

VII    Pursuant to the Court's Order regarding joint administration of the Voluntary Debtors, the Voluntary Debtors' liability for professional fees is joint and several among the Voluntary Debtors' Estates for fees incurred related to services for the benefit of all of the Voluntary Debtors.  The Trustee Debtors' liability for professional fees is not joint and several.

VIII    Pursuant to the initial MB Firm employment application, Acquisitions was responsible for the payment of their fees until December 31, 2009.  The MB Firm's application also allows for payments from the Bond Companies.  The initial MB Firm employment application reserved the right, should the Lehman Adversary Proceeding result in a benefit accruing to particular Debtors' Estates, to request that its fees and expenses be reimbursed by the Debtors' Estates.  The Bond Companies have also agreed to jointly fund a portion of the professional fees and expenses of the MB Firm with respect to the Lehman Adversary Proceeding.  The Bond Companies' funding commitment can be terminated and after such a termination they will only be required to cover fees and costs incurred during the period of their prior commitments.

MAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMerged.DOC

Case 8:08-bk-17206-ES   Doc 2394   Filed 07/18/11   Entered 07/18/11 11:56:35   Desc
Main Document   Page 49 of 105

IX        The MB Firm employment application was subsequently amended.  Pursuant to an order entered on April 14, 2010, (1) the Voluntary Debtors will pay up to one-half of the fees and expenses incurred by the MB Firm from and after February 1, 2010 onward; and (2) the Trustee Debtors do not have an obligation to pay any of the MB Firm's fees pertaining to the Trustee Debtors' estates, unless and until a loan by the Voluntary Debtors to the Trustee Debtors is agreed to by the Trustee and approved by the Court, or in accordance with the terms of the original employment applications to the extent not superseded or modified by the amended employment application.  The order does not affect the MB Firm's right to seek payment from the Bond Companies without the need for an additional order of the Court.

X        The MB Firm filed an updated application seeking to further amend their employment to include the right to pursue certain claims against the Lehman Entities and certain employees and agents of these entities on behalf of the Voluntary Debtors.  The claims encompassed by this amendment include claims that are based upon both prepetition and post-postpetition actionable conduct under both state law and federal law against the Lehman Entities and/or their agents.

**5.2.    The Debtors' Disputes and Claims Against the Lehman Entities.**

**5.2.1.   The Lehman Adversary Proceeding.**

On January 6, 2009, the Voluntary Debtors initiated the Lehman Adversary Proceeding by filing their initial complaint against Lehman ALI for equitable subordination of Lehman ALI's Disputed Claims and avoidance of its Disputed Liens pursuant to Bankruptcy Code Section 510(c).  On February 3, 2009, the Debtors filed a First Amended Complaint, which added the Trustee Debtors as co-plaintiffs and added various other causes of action.  The First Amended Complaint also named OVC Holdings, Northlake Holdings and various other entities as defendants.

Pursuant to a hearing on a motion to dismiss held on June 11, 2009, the Bankruptcy Court granted the Debtors leave to amend the second amended complaint.  Thus, on July 10, 2009, the Debtors filed their Third Amended Complaint.  The Third Amended Complaint addressed many of the concerns raised by the Bankruptcy Court and also included various Avoidance Actions and other causes of action against the Lehman Lenders and the Lehman Successors.  The Third

-43-
MAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMerged.DOC

Amended Complaint also added Fenway Capital as a defendant based upon, the discovery of the facts relating to the sale of the loans Fenway Capital and based upon the Court ruling that the Repo was a true sale.

On September 30, 2009, the Lehman Entities filed a motion to dismiss the Third Amended Complaint (which motion was amended on October 7, 2009 and October 22, 2009), alleging that the relief requested by certain Debtors was not available as a matter of law.  On September 30, 2009, Fenway also filed a motion to dismiss the Third Amended Complaint.  On January 26, 2010 and January 28, 2010, the Debtors filed oppositions to the motions to dismiss the Third Amended Complaint filed by the Lehman Entities and Fenway, respectively.  On February 4, 2010, the Lehman Entities and Fenway filed their respective replies.  The Court entered an order granting in part and denying in part the relief requested in the motions to dismiss. Most notably, the Court denied  the defendants' request for the dismissal of  the equitable subordination claims and the Court permitted the Debtors to file an amended complaint.  LCPI was dismissed as a defendant at this hearing, due to the fact that it did not own any interest in the loans at issue and due to potential impact of the case upon LCPI's automatic stay.  On March 26, 2010, the Debtors filed their Fourth Amended Complaint. The following is a summary of the causes of action set forth in the Fourth Amended Complaint:

### 5.2.2.   Equitable Subordination.

Based on the pre-petition inequitable conduct of the Lehman Entities, the Debtors have sought to subordinate the claims and avoid the liens of the Holders of the Lehman Disputed Loans to the extent necessary to pay the Claims of unpaid Creditors that were damaged by the inequitable conduct.

### 5.2.3.   The Lehman Recoupment Objection and the Contract Action.

Pursuant to the terms of the joint ventures entered into by and among the Debtors and the Lehman Entities, the Lehman Entities were responsible for paying the costs incurred in the development of the Projects. These costs included the claims of the vendors who provided goods and services to the Projects and the claims asserted by the Bond Claimants. Although the Lehman Entities contend that they were merely "lenders," and that they did not assume any liability for

-44-

these claims, as the above facts and those that will be adduced prior to and at the confirmation of the Plan will demonstrate, the Lehman Entities are in fact obligated to pay these claims.

The Debtors contend that the Lehman Entities have contractual liability on various grounds, including the following. First, the Lehman Entities were either in a joint venture relationship with the Debtors from the outset, or this relationship developed and became a legal fixture through the Lehman Entities' course of conduct. Pursuant to this relationship, and the promises and representations made therein, the Lehman Entities agreed to be responsible for all vendor and Bond Claims incurred at or in connection with the Projects. The role of each of the Debtors, by mutual agreement, was to provide development expertise and project management services. The Lehman Entities were required to provide the capital necessary to fund the Projects.

Second, during the last eighteen months of the relationship between the parties, the Lehman Entities assumed direct responsibility for all claims incurred during this period, by insisting that work continue on the Projects and by repeatedly promising to pay for this work. Since the Lehman Entities ordered this work, and promised to pay for the same, they bear this financial responsibility.

Third and finally, the Lehman Entities expressly agreed to pay the vendor and bond claims described in the Restructuring Agreement and in the interrelated Settlement Agreement, but failed to do so as contractually agreed.

It is the SunCal Plan Proponent's contention that the Lehman Entities' failure to pay the vendor and Bond Claims associated with the Projects (as was their obligation under the terms of the joint ventures, the Restructuring Agreement and the Settlement Agreement) unjustly shifted responsibility for these liabilities to the Debtors in breach of the terms of joint venture, the Restructuring Agreement and the Settlement Agreement.  Accordingly, the SunCal Plan Proponents have filed the Lehman Recoupment Objection which seeks the disallowance of certain claims filed by the Lehman ALI, including inter alia the claim filed against SJD Partners:

| Claim No. | Relevant SunCal Debtors | Current Claim Holder | Claim Amount |
|---|---|---|---|
| 23 | SJD Partners | Lehman ALI | $120,110,237 |

In the Lehman Recoupment Objection, the SunCal Plan Proponents seek the following relief:

1) Disallowance of the claims asserted by the Lehman Lenders in their entirety, pending compliance with the terms of the Restructuring Agreement and the Settlement Agreement;

2) A reduction in the amount of the Lehman Entities' secured claims by the amount of damages resulting from the Lehman Entities' breach of their obligations under these agreements; and/or

3)  An order barring the Lehman Entities from enforcing their rights under the Lehman Loans until they cure their breaches under the above agreements.

The first prayer for relief above is premised upon the contention that the Lehman Entities agreed to transfer ownership of the Projects described in this agreement to a series of newly formed entities under the control of the Lehman Entities, pursuant to the terms of the Settlement Agreement. This agreement further provided that these new entities would assume the vendor payables and certain Bond Claims associated with these projects.  Finally, this agreement included a covenant not to sue, pursuant to which the Lehman Entities were barred from seeking further recourse against the Debtors.

The SunCal Plan Proponents believe that the positions asserted in the Lehman Recoupment Objection are well grounded in fact and in law. Had the Lehman Entities complied with their contractual obligations, substantially all of the Group IV Debtor's liabilities would have been eliminated, SJD Parnters would not have had to file Chapter 11, and the Lehman Entities would be barred from asserting claims against SJD Partners based upon the Lehman Disputed Loans. It is the SunCal Plan Proponents position that the Lehman Entities' effort to enforce claims based upon Lehman Disputed Loans is directly contrary to the basic agreements reached in the Restructuring Agreement and in the related Settlement Agreement.

The Lehman Entities dispute the merits of the Lehman Recoupment Objection. It the Lehman Entities' position that it was within their absolute "discretion" to pay, or not to pay, the vendor payables incurred during the term of the Restructuring Agreement, even where they authorized the work. Accordingly, they cannot, in their assessment, be held liable for these

obligations. In the case of the Settlement Agreement, the Lehman Entities contend that this agreement never became effective and therefore they were not bound to comply with its terms. The SunCal Plan Proponents do not believe that the positions asserted by the Lehman Entities are supported by the facts, or existing law.

In addition to the Recoupment Claim Objections, certain Voluntary Debtors, including SJD Partners, have also filed the Contract Action against Lehman ALI and other non-debtor Lehman Entities in Orange County Superior Court. The Contract Action is based on Lehman ALI's breach of contract on the Restructuring and Settlement Agreements.  On May 9, 2011, the Defendants in the Contract Action filed a Notice of Removal which removed the Contract Action from the Orange County Superior Court to the Bankruptcy Court, as adversary no. 8:11-ap-01212ES.  The Voluntary Debtor-Plaintiffs moved to remand the Contract Action back to the Orange County Superior Court ("Remand Motion").  The Bankruptcy Court denied the Remand Motion at the hearing on July 12, 2011.

Although LCPI's automatic stay remains an impediment to the pursuit of many of the causes of action in the Lehman Adversary Proceeding, the existence of this stay will not bar the SunCal Plan Proponents from implementing the material terms of the Plan for the Group IV Voluntary Debtors for the following reason. LCPI is not a creditor of the Group IV Voluntary Debtors.  LCPI's automatic stay does not bar the pursuit of the Lehman Claim Objections or the Contract Action.  If these objections are successful, the claims of the Lehman Entities will be disallowed, either in whole or in part, or the Lehman Entities will be barred from pursuing these claims until they pay what they owe to the Group IV Voluntary Debtors.  If the Contract Action is successful, it will generate a further recovery for creditors of the Group IV Voluntary Debtors.  In either scenario, the Plan filed by the SunCal Plan Proponents is feasible and will yield a favorable return for creditors.

5.2.    **5.2.4    The Debtors' Motion for a Stay to Suspend Certain Lehman Actions.**

On September 21, 2010, the Voluntary Debtors, Acquisitions, and SunCal Management filed a motion requesting, among other relief, for the Court to suspend the Lehman Entities

1   competing plan and disclosure statement unless and until the Lehman Entities agree to provide the

2   Debtors with relief from their automatic stay in the Debtors' Chapter 11 Cases (the "Suspension

3   Motion").  The Court granted this motion and stayed all matters until March 1, 2011. The Court

4   also ordered the parties to engage in a mediation. The Voluntary Debtors and the Lehman Entities

5   were unable to settle their claims through this process.

6   **XI**

7       **5.3.    The Debtors' Other Litigation with Non-Lehman Related Parties**.

8           **5.3.1    The Debtors' Failed Preliminary Injunction Motion Against the Holders**

9               **of Bond Claims**.

10      **XII**    On February 20, 2009, the Debtors filed a complaint and a Motion for Preliminary

11  Injunction, pursuant to which the Debtors sought a Motion for Preliminary Injunction against the

12  Holders of Bond Claims from pursuing such Claims. On February 23, 2009, the Court denied the

13  Debtors' request for the TRO and granted the Debtors' request to require the defendants to show

14  cause why the Motion for Preliminary Injunction should not be issued.

15          On March 2, 2009, several Holders of Bond Claims objected to the Motion for the

16  Preliminary Injunction.  The objections generally alleged that the Debtors failed to show that the

17  balancing of the equities favored granting the Preliminary Injunction versus the harm to the

18  Holders of the Bond Claims.  At a hearing held on March 4, 2009, the Court denied the

19  Preliminary Injunction Motion and the underlying complaint has subsequently voluntarily been

20  dismissed without prejudice.

21          **5.3.2    The Contractors' Successful Motions for Relief from Stay to Pursue the**

22              **Bond Claims**.

23          Various contractors that were hired to perform work on some of the Projects have filed

24  motions for relief from stay with the Bankruptcy Court to pursue their purported Bond Claims.

25  These creditors have requested that the Bankruptcy Court grant these creditors relief from the

26  automatic stay to allow such creditors to enforce certain Claims that such creditors allege to have

27  against some of the Debtors, including certain surety bonds that are alleged to have been issued in

28  favor of such creditors.  The Debtors opposed the motions on the grounds that the various Debtors

MAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMerged.DOC

1    are indispensible parties.  The Court conditionally granted the motions provided that the Bond

2    Claimants are able to sever the Debtors from their proceedings on the Bonds.

3                    **5.3.3    Bond Safeguard Motion and Claims.**

4        Bond Safeguard, a surety that issued bonds to secure the performance of work on certain

5    projects, filed a motion seeking authority to file claims against the Trustee Debtors relating to these

6    bond claims after the bar date. The Debtors opposed this motion. This motion was granted

7    pursuant to an order entered on January 7, 2011.

8    ~~XIII~~    The Bond Issuers assert that surety bonds were executed on behalf of all of the SunCal

9    Debtors and the Bond Indemnitors.  However, Bond Safeguard only filed proofs of claims

10    asserting joint and several liability ("Cross-Indemnity Claims") against the Trustee Debtors.  Bond

11    Safeguard did not file any Cross-Indemnity Claims against the Voluntary Debtors.

12                              **VI.**

13              **TREATMENT OF UNCLASSIFIED CLAIMS**

14        **6.1    Introduction**. As required by the Bankruptcy Code, the Group IV: Voluntary

15    Debtors Plan places Claims and Interests into various Classes according to their right to priority.

16    However, certain types of Claims are not classified in any Classes under the Group IV: Voluntary

17    Debtors Plan.  These Claims are deemed "unclassified" under the provisions of the Code.  They are

18    not considered impaired and they do not vote on the Group IV: Voluntary Debtors Plan, because

19    they are automatically entitled to specific treatment provided for them in the Code.  As such, the

20    SunCal Plan Proponents have not placed the following Claims in a Class.  The treatment of these

21    unclassified Claims is as provided below.

22        **6.2    Treatment of Allowed Administrative Claims.**

23        The Code requires that all Allowed Administrative Claims be paid on the later of Effective

24    Date of the Group IV: Voluntary Debtors Plan or the date of their allowance, unless a particular

25    Holder agrees to a different treatment.  The treatment of Allowed Administrative Claims is as

26    described below.  However, such Administrative Claims are continuing to be incurred.  The

27    Allowed Administrative Claims shall be paid from the applicable Distribution Account(s).

28

MAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMAINDOCS-#163418-v9-
SCC_Group_IV_VD_DS.DOCMerged.DOC

Except to the extent that the Holder of an Allowed Administrative Claim agrees to a different treatment and subject to the Administrative Claims Bar Date set forth herein, the Distribution Agent shall pay each Allowed Administrative Claim in full, in Cash, on the later of (i) the Effective Date, (ii) within ten (10) Business Days after the date such Administrative Claim becomes an Allowed Administrative Claim, or (iii) the date such Allowed Administrative Claim becomes due according to its terms. Notwithstanding the foregoing, any Allowed Administrative Claim representing obligations incurred in the ordinary course of post-petition business by the Debtors in Possession (including without limitation post-petition trade obligations and routine post-petition payroll obligations) shall be paid in full or performed by the Plan Trustee in the ordinary course of business, in accordance with the terms of the particular obligation.

**6.3      Administrative Claims Bar Date.**

All applications for final compensation of Professionals for services rendered and for reimbursement of expenses incurred on or before the Effective Date and all other requests for payment of Administrative Claims incurred before the Effective Date under Sections 507(a)(2) or 507(b) of the Bankruptcy Code (except only for (i) post-petition, ordinary course trade obligations and routine post-petition payroll obligations incurred in the ordinary course of the Group IV: Voluntary Debtors' post-petition business, for which no bar date shall apply, and (ii) post-petition tax obligations, for which no bar date shall apply) shall be Filed with the Bankruptcy Court and served upon the Plan Trustee no later than the Administrative Claims Bar Date, unless such date is extended by the Bankruptcy Court after notice to the Plan Trustee.  Any such request for payment of an Administrative Claim that is subject to the General Administrative Claims Bar Date and that is not Filed and served on or before the Administrative Claims Bar Date shall be forever barred; any party that seeks payment of Administrative Claims that (i) is required to file a request for payment of such Administrative Claims and (ii) does not file such a request by the deadline established herein shall be forever barred from asserting such Administrative Claims against the Group IV: Voluntary Debtors, the Plan Trust, their estates, or any of their property.

**6.4      Treatment of Unsecured Tax Claims.**

1    Tax Claims are certain unsecured income, employment and other taxes described by Code

2    Section 507(a)(8).  The Code requires that each holder of such a Section 507(a)(8) tax claim

3    receive the present value of such Claim in deferred cash payments, over a period not exceeding

4    five (5) years from the petition date and that such treatment not be less favorable than the treatment

5    accorded to non priority unsecured creditors.

6    At the election of the Plan Trustee, the Holder of each Allowed Priority Tax Claim shall be

7    entitled to receive, on account of such Claim, (i) equal cash payments on the last Business Day of

8    each three-month period following the Effective Date, during a period not to exceed five years

9    after November 6, 2008, totaling the principal amount of such Claim plus simple interest on any

10   unpaid balance from the Effective Date, calculated at the interest rate available on ninety (90) day

11   United States Treasuries on the Effective Date, (ii) such other treatment agreed to by the Holder of

12   the Allowed Priority Tax Claim and the Plan Trustee, provided such treatment is on more

13   favorable terms to the Group IV: Voluntary Debtors (or the Plan Trust after the Effective Date)

14   than the treatment set forth in clause (i) hereof, or (iii) payment of the full Allowed Priority Tax

15   Claim in Cash.

16   **6.5    Summary of the Plan's Treatment of Bond Indemnity Claims.**

17   Allowed Bond Indemnification Claims are treated as Reliance Claims.  In the event that

18   such Bond Indemnification Claim arises from a general unsecured claim, it is classified in Class 3.

19                                    **VII**.

20                     **CLASSIFICATION OF CLAIMS AND INTERESTS**

21   As required by the Code, the Group IV: Voluntary Debtors Plan places Claims and Interests

22   into various Classes according to their right to priority and other relative rights.  The ~~Plan~~Group IV:

23   Voluntary Debtors specifies whether each Class of Claims or Interests is impaired or unimpaired,

24   and the ~~Plan~~Group IV: Voluntary Debtors sets forth the treatment each Class will receive.  The

25   table below lists the Classes of Claims established under the ~~Plan~~Group IV: Voluntary Debtors and

26   states whether each particular Class is impaired or left unimpaired by the ~~Plan.~~Group IV: Voluntary

27   Debtors.  A Class is "unimpaired" if the ~~Plan~~Group IV: Voluntary Debtors leaves unaltered the

28

legal, equitable and contractual rights to which the Holders of Claims or Interests in the Class are

entitled, with certain exceptions specified in the Bankruptcy Code.

**CLASSIFICATION OF LEHMAN'S DISPUTED CLAIMS AGAINST THE GROUP IV: VOLUNTARY DEBTORS**

| Class 1 | Claims | Claim Nos. |
|---|---|---|
| Class 1.1 | The Holder of ~~Lehman's~~ the Disputed ~~(Contingent)~~ Claim filed by Lehman ALI on behalf of Lehman Re and Lehman ALI against SJD Partners arising from the Pacific Point First Loan Agreement in the asserted amount of $120,110,237. | SJD Partners No. 23; SJD Development No. 2<br><br>Disputed in the Amount of $120,110,237 |
| Class 1.2 | The Holder of Lehman's Disputed (Contingent) Claim ~~(contingent)~~ filed by Lehman ALI against SJD Partners arising from the Pacific Point Second Loan Agreement. | SJD Partners No. 24<br><br>Disputed |

| ~~CLASSIFICATION OF BOND INDEMNIFICATION CLAIMS AGAINST THE GROUP IV: VOLUNTARY DEBTORS~~ | | |
|---|---|---|
| ~~Class 2~~ | ~~Claimant~~ | ~~Claim Nos.~~ |
| ~~Class 2.1~~ | ~~The holders of Bond Claims arising from bonds issued with respect to the Group Pacific Point IV Debtors AssetsI Project.~~ | ~~Various Claims~~ |

**CLASSIFICATION OF PRIORITY UNSECURED CLAIMS AGAINST THE GROUP IV: VOLUNTARY DEBTORS**

| Class 2~~3~~ | Claimant | Claim Nos. |
|---|---|---|
| Class 2~~3~~.1 | The Holder of Priority Claims that fall within Code Sections 507(a)(4), (5), (6), and (7) ~~in the asserted amount of $4,188 against SJD Partners.)~~. | Schedule Amount and SJD Partners ~~12~~No. 12 in the Estimated Amount of $4,188 |

**CLASSIFICATION OF GENERAL UNSECURED CLAIMS THAT QUALIFY AS RELIANCE CLAIMS[45] AGAINST THE GROUP IV: VOLUNTARY DEBTORS AS SET FORTH IN EXHIBIT "8"**

---

[4] ~~Unsecured Claims are generally placed within the same class and they receive the same treatment under a Plan. However, the SunCal Proponents have divided Unsecured claims into two classes in the Plan. This separate classification has been implemented for the following reason. The Holders~~

| Class 43 | Claimant | Claim Nos. |
|---|---|---|
| Class 43.1 | The holders of Reliance Claims against SJD Partners. | Various Filed and Scheduled Claims in the Estimated Amount of $6,419,915 |

| CLASSIFICATION OF GENERAL UNSECURED CLAIMS THAT DO NOT QUALIFY AS RELIANCE CLAIMS AGAINST THE GROUP IV: VOLUNTARY DEBTORS | | |
|---|---|---|
| Class 54 | Claimant | Claim Nos. |
| Class 54.1 | Claimants holding Allowed Unsecured Claims against SJD Partners that are not Reliance Claims, including any Allowed deficiency claim arising from the Pacific Point First Loan and/or the Pacific Point Second Loan. | Various Filed and Scheduled Claims in the Estimated Amount of $49,786,494 |

| CLASSIFICATION OF INTEREST HOLDERS AGAINST THE GROUP IV: VOLUNTARY DEBTORS | | |
|---|---|---|
| Class 65 | Claimant | Amount |
| Class 65.1 | Allowed Interests in SJD Partners held by SJD Development. | 100% |
| Class 56.2 | Allowed Interests in SJD Development held by Elieff. | 100% |

## VIII.

## THE PLAN'S TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS

of Unsecured Claims who are referred to as "Reliance Claimants," hold specific Litigation Rights that are referred to herein as "Reliance Claims." The other Unsecured Creditors do not hold Reliance Claims.

[5] Unsecured Claims are generally placed within the same class and they receive the same treatment under the Group IV: Voluntary Debtors Plan. However, the SunCal ProponentSunCal Plan Proponents have divided Unsecured claims into two classes in the Group IV: Voluntary Debtors Plan. This separate classification has been implemented for the following reason. The Holders of Unsecured Claims who are referred to as "Reliance Claimants," hold specific Litigation Rights that are referred to herein as "Reliance Claims." The other Unsecured Creditors do not hold Reliance Claims.

**8.1.    The Plan's Treatment of Lehman's Disputed Secured Claim(s) and Disputed Lien(s) Against Group IV: Voluntary Debtors (Classes 1.1 and 1.2).**

The Disputed Secured Claims within Classes 1.1and 1.2 shall be disallowed pursuant to ~~Section~~Bankruptcy Code Sections 506(a) and 506(d) ~~of the Bankruptcy Code~~ because there is no collateral to support such alleged Claims and the liens shall be declared null and void. ~~Furthermore, such Claims shall be disallowed pursuant to Bankruptcy Code Section 502(e) as contingent claims.~~ Therefore, the Holders of such Disputed Secured Claims shall not receive a ~~distribution~~Distribution under the Plan.  To the extent that any Allowed deficiency Cclaim arises under Classes 1.1 and 1.2 Claims, ~~such Claims shall qualify as Reliance Claims, and to the extent that such Claims are Allowed,~~ such Claims shall be treated as Class 45.1 General Unsecured Claims.

~~8.2.    The Plan's Treatment of Holders of Bond Indemnification Claims Against Group IV: Voluntary Debtors (Class 2.1).~~

~~To the extent that Litco. and/or its designee acquires the Pacific Point Project free and clear of all claims and liens, except for the rights of the Class 2.1 Allowed Claims, the rights of each holder of an Allowed Bond Indemnification Claim arising from a bond issued with respect to the Pacific Point Project, shall, to the extent such claim(s) are determined to be a secured claim(s), be impairedunimpaired under the Plan. Such claims shall receive the following treatment:~~

~~A.    Each such Allowed Secured Claim shall be placed in a separate class and receive a separate ballot for voting purpose;~~

~~B.    Each Holder(s) shall retain their respective underlying liens on the Pacific Point Projects, but shall forebear from pursuing their rights and remedies until the expiration of the Sales Period;~~

~~C.    If the Plan Trustee or Litco is able to reacquire the Pacific Point Project and consummate a sale of the Pacific Point Project subject to the liens asserted by the Holders of Class 2.1 claimants, such Holders shall receive a distribution, to the extent available, of Net Sale Proceeds in accordance with the priorities set forth under the Bankruptcy Code, subject to a Final Order(s) resolving the allowance and priority of the applicable Lehman's Disputed Claim(s) and~~

1  the validity of the applicable Lehman Disputed Lien(s) in, including but not limited to, the Lehman

2  Adversary Proceeding; and if the Plan Trustee or Litco is unable reacquire the Pacific Point Project

3  and/or if Plan Trustee or Litco reacquires the Pacific Point Project but is unable to consummate a

4  sale of such project, such project shall be deemed abandoned by the Plan Trustee, no payment shall

5  be made to such Holder(s), and such Holder(s) shall be allowed to pursue their respective rights

6  against these project under applicable California law.

7  8.3.8.2.     **The Plan's Treatment of Holders of Priority Claims Against Group IV:**

8  **Voluntary Debtors (Class 2̶3̶.1).**

9  The treatment of the Holders of Allowed Priority Claims under the Group IV: Voluntary

10  Debtors Plan shall be as follows**:**

11      A.   The Holder(s) are unimpaired under the Group IV: Voluntary

12      Debtors Plan; and

13      B.   The Holder(s) shall be paid either from the applicable Distribution

14      Account(s) or Litco Plan Loan (i) the full amount of such Allowed Priority Claim in

15      Cash on the later of (x) the Effective Date, (y) the date such Claim becomes an Allowed

16      Priority Claim or (z) the date such Allowed Priority Claim becomes payable in

17      accordance with the terms governing such Allowed Priority Claim, or (ii) upon such

18      other less favorable terms as may be agreed to by such Holder and the Plan Trustee.

19  8.4.8.3.     **The Plan's Treatment of Holders of General Unsecured Claims Against**

20  **Group IV: Voluntary Debtors that are Reliance Claims E̶s̶t̶i̶m̶a̶t̶e̶d̶ ̶t̶o̶ ̶b̶e̶ ̶i̶n̶ ̶t̶h̶e̶**

21  **A̶m̶o̶u̶n̶t̶ ̶o̶f̶ ̶$̶6̶,̶4̶1̶9̶,̶9̶1̶5̶)̶ (See Exhibit 8 to Disclosure Statement) (Class 4.1).**

22  The rights of Holders of Allowed Class 4.1 Claims are impaired under the Group IV:

23  Voluntary Debtors Plan and shall be treated as follows:

24      A.   On the d̶i̶s̶t̶r̶i̶b̶u̶t̶i̶o̶n̶ ̶d̶a̶t̶e̶Distribution Date, such Holders w̶i̶l̶l̶shall

25      receive a d̶i̶s̶t̶r̶i̶b̶u̶t̶i̶o̶n̶Distribution in cash, on the Effective Date, equal to one percent

26      (1%) of such claimant's Allowed Claim.

27      B.   S̶u̶c̶h̶On or after the Distribution Date, such Holders w̶i̶l̶l̶shall receive

28      a pro-rata share of any funds payable from the applicable Distribution Account(s),

MAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMAINDOCS-#163418-v9-
SCC_Group_IV_VD_DS.DOCMerged.DOC

including recoveries from the Lehman Adversary ProceedingLitigation Recoveries (inclusive of applicable Litigation Recoveries from the Lehman Adversary Proceeding), after payment in full of all Post Confirmation Expenses, Allowed Administrative Claims, andAllowed Priority Claims, if and when such funds become available for Distribution.

              C.    If Litco. and/or its designee acquires the Pacific Point Project free and clear of all claims and liens, (with the exception of Allowed Contingent Bond Indemnification Claims), and to the extent the Distribution to date made to such Holders is less than 50% on account of such Allowed Claims, such Holders willshall receive an additional distributionDistribution equal toing the difference between the distributionDistribution previously provided to such Holders and a 50% distributionDistribution on account of such Holders' Allowed Claims in full satisfaction of such Allowed Claims.

**8.5.8.4.**    **The Plan's Treatment of Holders of Allowed General Unsecured Claims Against Group IV: Voluntary Debtors that Are Not Reliance Claims (Estimated to be in the Amount of $49,786,494) (Class 5.1).**

The rights of Holders of Allowed Class 5.1 Claims are impaired under the Group IV: Voluntary Debtors Plan.  Under the Group IV: Voluntary Debtors Plan, each claimant willshall receive a distributionDistribution in cash, on the Effective Date, equal to one percent (1%) of such claimant's Allowed Claim, and 2) receive a their pro-rata share of any funds payable from the applicable Distribution Account(s) arising from Litigation Claims (except forexcluding recoveries from the Lehman Adversary Proceeding), after payment in full of all Post Confirmation Expenses, Allowed Administrative Claims, and Allowed Priority Claims and Allowed PriorityBond Indemnification Claims and any sums that the Bankruptcy Court determines are payable to the Holders of Allowed Class 4.1 Claims.

**8.6.8.5.**    **The Plan's Treatment of Holders of Allowed Interests Against Group IV: Voluntary Debtors.**

The Interests of the Holders in Class 6.1 to 6.3 are impaired under the Group IV: Voluntary Debtors Plan. All such Interests shall be cancelled as of the Effective Date and no ~~distribution~~Distribution shall be made to these Holders on account of such Interest(s).

**IX.**

**ACCEPTANCE OR REJECTION OF THE PLAN**

**9.1.    Introduction.**

PERSONS OR ENTITIES CONCERNED WITH CONFIRMATION OF THE PLAN SHOULD CONSULT WITH THEIR OWN ATTORNEYS BECAUSE THE LAW ON CONFIRMING A PLAN OF REORGANIZATION IS VERY COMPLEX.  The following discussion is intended solely for the purpose of alerting readers about basic confirmation issues, which they may wish to consider, as well as certain deadlines for filing Claims.  The Group IV: Voluntary Debtors cannot represent that the discussion contained below is a complete summary of the law on this topic.

Many requirements must be met before the Court can confirm the Plan.  Some of the requirements include that the Plan must be proposed in good faith, acceptance of the Plan, whether the Plan pays creditors at least as much as creditors would receive in a Chapter 7 liquidation, and whether the Plan is feasible.  The requirements described herein are <u>not</u> the only requirements for confirmation.

**9.2.    Who May Object to Confirmation of the Plan.**

Any party in interest may object to the confirmation of the Plan, but as explained below not everyone is entitled to vote to accept or reject the Plan.

**9.3.    Who May Vote to Accept/Reject the Plan.**

A Holder of a Claim or Interest has a right to vote for or against the Plan if that Holder of the Claim or Interest has a Claim which is both (1) Allowed or Allowed for voting purposes and (2) Classified in an impaired Class (excluding any class in which the Plan is "deemed rejected"). The votes will be tabulated on a Debtor by Debtor basis.

**9.4.    What Is an Allowed Claim/Interest.**

1    As noted above, a Holder of Claim or Interest must first have an Allowed Claim or

2    Allowed Interest to vote.

3    **9.5.    What Is an Impaired Class.**

4    A Class is impaired if the Plan alters the legal, equitable, or contractual rights of the Claims

5    or Interests in that Class, other than the right to accelerate the Claim upon certain kinds of defaults.

6    In this case, the Group IV: Voluntary Debtors believe that all Classes, except for Class 3.1 are

7    impaired.

8    **9.6.    Who Is Not Entitled to Vote.**

9    The following four types of Claims are <u>not</u> entitled to vote: (1) Claims that have been

10   disallowed; (2) Claims in unimpaired Classes; (3) Claims entitled to priority pursuant to

11   Bankruptcy Code Sections 507(a)(2) or (a)(3) and Claims in Classes that do not receive or retain

12   any value under the Plan.  Claims in unimpaired Classes are not entitled to vote because such

13   Classes are deemed to have accepted the Plan.  Claims entitled to priority pursuant to Bankruptcy

14   Code Section 507(a)(8) are not entitled to vote because such Claims are not placed in Classes and

15   they are required to receive certain treatment specified by the Bankruptcy Code.  Claims in Classes

16   that do not receive or retain any property under the Plan do not vote because such Classes are

17   deemed to have rejected the Plan.  The Group IV: Voluntary Debtors believe that all Classes are

18   entitled to vote except Class 5.1. These classes are not impaired under the Plan and consequently

19   are not entitled to vote. They are conclusively deemed to have accepted the Plan.  The Interests

20   held by the Holders in Classes 6.1 and 6.2 are being cancelled under the Plan; accordingly these

21   Interest Holders are deemed to have voted to reject the Plan.

22   EVEN IF YOUR CLAIM IS OF THE TYPE DESCRIBED ABOVE, YOU MAY STILL

23   HAVE A RIGHT TO OBJECT TO THE CONFIRMATION OF THE PLAN.

24   **9.7.    Who Can Vote in More than One Class.**

25   A creditor whose Claim has been Allowed in part as a Secured Claim and in part as an

26   Unsecured Claim is entitled to accept or reject a Plan in both capacities by casting one ballot for

27   the secured part of the Claim and another ballot for the Unsecured Claim.  Also, a Creditor may

28

MAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMAINDOCS-#163418-v9-
SCC_Group_IV_VD_DS.DOCMerged.DOC

1  otherwise hold Claims in more than one Class (such as a Holder of Senior Secured Claims and

2  Subordinated Note Claims), and may vote the Claims held in each Class.

3  **9.8.    <u>Votes Necessary for a Class to Accept the Plan</u>.**

4  A Class of Claims is deemed to have accepted the Plan when more than one-half (1/2) in

5  number and at least two-thirds (2/3) in dollar amount of the Claims *that actually voted*, vote to

6  accept the Plan.  A Class of interests is deemed to have accepted the Plan when Holders of at least

7  two-thirds (2/3) in amount of the interest-Holders of such Class which actually vote, vote to accept

8  the Plan.

9  **9.9.    <u>Treatment of Nonaccepting Classes</u>.**

10  As noted above, even if there are impaired Classes that do not accept the proposed Plan, the

11  Court may nonetheless confirm the Plan if the nonaccepting Classes are treated in the manner

12  required by the Code and at least one impaired Class of Claims accepts the Plan.  The process by

13  which a plan may be confirmed and become binding on non-accepting Classes is commonly

14  referred to as "cramdown."  The Bankruptcy Code allows the Plan to be "crammed down" on

15  nonaccepting Classes of Claims or interests if it meets all statutory requirements except the voting

16  requirements of 1129(a)(8) and if the Plan does not "discriminate unfairly" and is "fair and

17  equitable" with respect to each impaired Class that has not voted to accept the Plan, as set forth in

18  11 U.S.C. § 1129(b) and applicable case law.

19  **9.10.    <u>Request for Confirmation Despite Nonacceptance by Impaired Class(es)</u>.**

20  The SunCal Plan Proponents will ask the Court to confirm the Plan by cramdown on any

21  impaired Class if such Class does not vote to accept the Plan.

22  **X.**

23  **<u>MEANS OF EXECUTION AND IMPLEMENTATION OF THE PLAN</u>**

24  **10.3.    <u>Introduction</u>.**

25  This section is intended to address how the SunCal Plan Proponents intend to implement

26  the provisions of the Plan.  It addresses the transfer of the Plan Trust Property to the Plan Trust, the

27  nature of the Plan Trust, the powers of the Plan Trust, the governance of the Plan Trust, the

28

resolution of disputed claims, the sources of funds that will be used to pay claims and the mechanics of how claims will be paid.

### ~~10.3.~~10.4.    Transfer of Property To The Plan Trust.

~~11~~      On the Effective Date, title to and possession of all property of the Group IV: Voluntary Group IV: Voluntary Debtors, excepting those items of property that the Plan Trustee affirmatively elects not to transfer to the Plan Trust, shall be deemed transferred and delivered to the Plan Trust, without further act or action under any applicable agreement, law, regulation, order or rule of law.

### ~~10.4.~~10.5.    Purposes of The Plan Trust.

~~12~~      The Plan Trust's purposes, powers and objectives include, but are not limited to the following: (i) to take control over, manage and over time sell or otherwise dispose of all Plan Trust Property for the highest return reasonably obtainable; (ii) to pursue all Litigation Claims through collection efforts, including through litigation in any court of competent jurisdiction, and to obtain the most favorable recovery on the same, with due consideration of all relevant factors, including cost; (iii) to cause all Available Cash to be deposited into the applicable Distribution Accounts; (iii) to initiate actions to resolve any remaining issues regarding the allowance and payment of Claims including, as necessary, initiation and/or participation in proceedings before the Bankruptcy Court; (iv) to take such other actions as are necessary or useful to maximize the value of all property received by the Plan Trust; (v) to make the payments and ~~distributions~~Distributions to creditors and holders of Beneficial Interests as required by the Plan; and (vi) to enforce all rights with respect to the Plan Trust Property; and (vii) to take all actions reasonable and necessary to implement the terms of the Plan. ~~A more complete statement of the Plan Trust's powers and limitations is set forth in the Plan Trust Agreement, which is a part of the Plan Supplement.~~

~~13~~      It is intended that the Plan Trust will be classified for U.S. federal income tax purposes as a "liquidating trust," with the primary objective of liquidating the Plan Trust Property and distributing the net proceeds thereof, with no objective to continue or engage in the conduct or a trade or business in accordance with Treasury Regulation 301.7701-4(d), and, notwithstanding

anything to the contrary in the Plan, all actions taken by the Plan Trust or any person acting on behalf of the Plan Trust shall be consistent with such primary objective.

**10.5.    Trust Agreement.**

**10.6.**    Copies of the Plan Trust Agreement shall be contained in the Plan Supplement. The Plan Trust Agreement shall, among other matters, create the Plan Trust, identify Acquisitions as the initial trustee of the Plan Trust, identify the compensation of the Plan Trustee, and specify the authorities and powers of the Plan Trustee, consistent with the Plan. **Preservation of Litigation Claims for the Plan Trust.**

The Plan Trustee reserves for the Estates and the Plan Trust all rights to commence and pursue, as appropriate, any and all Litigation Claims, whether arising prior to or after the petition Date, in any court or other tribunal, including without limitation, any adversary proceeding filed and/or pending in the Court.  On the Effective Date, the Plan Trustee will be vested with authority to enforce, file, litigate, prosecute, settle and collect with respect to the Litigation Claims, although it will not be required to do so and the determination of whether to so will be made solely by the Plan Trustee in his absolute discretion.  With respect to any Litigation Claims commenced prior to the Effective Date to which any or all of the Group IV: Voluntary Debtors is a party, the Plan Trustee shall replace and stand in the shoes of such Debtors as the real party in interest.

While the SunCal Plan Proponents have attempted to identify all Litigation Claims in the Disclosure Statement which may be pursued, and hereby incorporates by reference those disclosures and provisions, the failure to list any potential Litigation Claims, generally or specifically, is not intended to limit the rights of the Plan Trustee to pursue such Litigation Claims. Unless a Litigation Claims against any Person is expressly waived, relinquished, released, compromised or settled as provided or identified in the Plan, any Confirmation Order or prior order of the Court, the Plan Trustee expressly reserves any Litigation Claims for later adjudication. Therefore, no preclusion doctrine, including, without limitation, the doctrine of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches shall apply to such Litigation Claims upon or after Confirmation or consummation of the

Plan.  All Litigation Claims are preserved under the Plan for the benefit of the Estates and the Plan Trust.  Any recoveries from Litigation Claims will be paid to the Plan Trust.

ANY CREDITORS THAT BELIEVE THEY RECEIVED A TRANSFER OR SETOFF THAT IS AVOIDABLE UNDER THE CODE OR THAT HOLDS A CLAIM AGAINST THE ESTATES THAT COULD BE SUBJECT TO AN OBJECTION BASED UPON FAILURE TO RETURN AN AVOIDABLE TRANSFER OR SETOFF, ARE DIRECTED TO REVIEW THEIR RECORDS AND/OR THE DEBTORS' SCHEDULES FOR FURTHER INFORMATION. HOWEVER, ALL RIGHTS OF THE DEBTORS AND THE ESTATES ARE RESERVED WITH RESPECT TO ANY AND ALL TRANSFERS OR SETOFFS WHICH MAY BE AVOIDABLE UNDER THE BANKRUPTCY CODE.

**10.7.    Establishment and Operations of the Plan Trust.**

The Plan Trust shall be established and shall become effective on the Effective Date.  The Plan Trust is created pursuant to the Plan and the Confirmation Order.  The primary purpose of the Plan Trust is the liquidation and distribution of the Plan Trust Property transferred to it, with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Plan Trust.  The Plan Trust shall hold and administer the Plan Trust Property, including, but not limited to, any Litigation Claims, and the proceeds thereof for liquidation and distribution in accordance with the terms of the Plan.

From and after the Effective Date, the Plan Trust may use, acquire and dispose of the Plan Trust Property held in the Plan Trust, and take any of the actions set forth in this Article, without the approval of the Bankruptcy Court and free of the restrictions of the Bankruptcy Code, the Bankruptcy Rules or the prior orders of the Bankruptcy Court, other than restrictions expressly imposed by the Plan, the Confirmation Order, provided that the Plan Trust is administered so that it qualifies as a liquidating trust under Treasury Regulation § 301.7701-4(d).

**10.8.    Payment of Plan Trust Expenses.**

The expenses incurred by the Plan Trust or the Plan Trustee during the Plan Period, shall be paid, or adequate reserves shall be created for the payment of such expenses, prior to any distribution to the Plan Trust Beneficiaries.

**10.9.    The Plan Trust Distribution System.**

The Plan Trustee shall establish a separate "Distribution Account" for each Group IV: Voluntary Debtor at an FDIC insured bank. Each Group IV: Voluntary Debtor's Available Cash, whether on hand as of the Effective Date or received thereafter, shall be deposited into that Group IV: Voluntary Debtor's Distribution Account.  These funds will then be used to pay the claims of Creditors holding Allowed Claims in their order of priority as provided for in the Plan.  Persons dealing with the Plan Trustee, or seeking to assert Claims against the Debtors, the Estates or the Plan Trust, shall look only to property of the Debtors, the Estates or the Plan Trust to satisfy any liability to such Persons, and the Plan Trustee shall have no corporate, personal, or individual obligation to satisfy any such liability.

**10.10.  The Plan Trustee**.

**10.10.1.        Appointment**.  Acquisitions shall be Plan Trustee of the Plan Trust. The appointment of the Plan Trustee shall be effective as of the Effective Date.

**10.10.2.        Term**.  Unless the Plan Trustee resigns, dissolves or is removed by Court order earlier, the Plan Trustee's term shall expire upon termination of the Plan Trust pursuant to the Plan.  In the event the Plan Trustee resigns, dies or is removed by Court order prior to termination of the Plan Trust, the UST shall select and recommend to the Court a successor Plan Trustee.

**10.10.3.        Powers and Duties**.  On the Effective Date, the Plan Trustee shall have the rights, powers and duties set forth in the Plan, the Confirmation Order, and Bankruptcy Code §§505, 1107 and 1108.  The Plan Trustee shall be governed in all things by the terms of the Plan and the Confirmation Order.  The Plan Trustee shall administer the Plan Trust in accordance with the Plan.  Without limitation, the Plan Trustee shall file final federal, state, foreign and, to the extent applicable, local, tax returns.  Without further Motion, notice, or order of the Court, the Plan Trustee shall be authorized, empowered and directed to take all actions necessary to comply with

MAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMerged.DOC

the Plan and exercise and fulfill the duties and obligations arising thereunder, including, without limitation to:

      i.    employ, retain, and replace one or more attorneys, accountants, auctioneers, brokers, managers, consultants, other professionals, agents, investigators, expert witnesses, consultants, and advisors as necessary to discharge the duties of the Plan Trustee under the Plan;

      ii.    control and effectuate the Claims reconciliation process, including to object to, seek to subordinate, compromise or settle any and all Claims against the Debtors pursuant to the terms of the Plan;

      iii.    open, maintain and administer bank accounts as necessary to discharge the duties of the Plan Trustee under the Plan;

      iv.    make Distributions to the Holders of Allowed Claims in accordance with the Plan;

      v.    retain professionals to assist in performing his or her duties under the Plan;

      vi.    pay reasonable and necessary professional fees, costs, and expenses;

      vii.    investigate, analyze, commence, prosecute, litigate, compromise, settle, dismiss, and otherwise administer all Causes of Action and Avoidance Actions for the benefit of the Plan Trust and its beneficiaries, as set forth in the Plan, and to take all other necessary and appropriate steps to collect, recover, settle, liquidate, or otherwise reduce to Cash all Causes of Action and Avoidance Actions, as the Plan Trustee may determine is in the best interests of the Plan Trust;

      viii.    administer, sell, liquidate, or otherwise dispose of the Assets in accordance with the terms of the Plan;

      ix.    incur and pay reasonable and necessary expenses in connection with the performance of the Plan Trustee's duties under the Plan;

      x.    represent the Estates before the Court and other courts of competent jurisdiction with respect to mattes concerning the Plan Trust;

      xi.    seek the examination of any entity under the subject to the provisions of Bankruptcy Rule 2004;

MAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMAINDOCS #163418-v9-SCC_Group_IV_VD_DS.DOCMerged.DOC

xii.   comply with applicable orders of the court and any other court of competent jurisdiction over the matters set forth in the Plan;

xiii.   comply with all applicable laws and regulations concerning the matters set forth in the Plan;

xiv.   exercise such other powers as may be vested in the Plan Trust pursuant to the Plan, the Confirmation Order, or other Final Orders of the Court.

xv.   execute any documents, instruments, contracts, and agreements necessary and appropriate to carry out the powers and duties of the Plan Trust;

xvi.   (1) seek a determination of tax liability under §505 of the code, (2) pay taxes, if any, related to a Debtor, (3) file, if necessary, any and all tax and information returns r3equired with the respect to the Plan Trust, including, if appropriate, treating the Plan Trust as a "grantor trust" pursuant to Treas. Reg 1.671-4 or otherwise, (4) make tax elections by and on behalf of the Plan Trust, and 95) pay taxes, if any, payable by the Plan Trust; and

xvii.  stand in the shoes of the Debtors for all purposes.

**10.10.4.      Retention of Professionals and Compensation Procedure.**

On and after the Effective Date, the Plan Trustee may, without further application or Motion, notice, hearing, or Court order, engage or employ such professionals and experts as may be deemed necessary and appropriate by the Plan Trustee to assist the Plan Trustee in carrying out the provisions of the Plan, including, but not limited to, the Professionals retained prior to the Effective Date by either the Debtors or the Committee.  The Plan Trustee may employ such professionals on any reasonable terms and conditions of employment to be determined by the Plan Trustee.  For the services performed on and after the Effective Date, the professionals engaged by the Plan Trustee (the "Plan Trustee Professionals") shall receive reasonable compensation and reimbursement of expenses in a manner to be determined by the Plan Trustee.

**10.10.5.      Fees and Expenses.**

Acquisitions shall not receive any compensation for the services it performs as the Plan Trustee, other than the release provided for in the Plan, but shall be entitled to reimbursement of reasonable expenses.  The Plan Trustee Professionals shall be entitled to reasonable compensation

MAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMerged.DOC

1   for their services, and reimbursement of expenses.  The costs and expenses of the Plan trust

2   (including, without limitation, fees and expenses of the Plan Trustee Professionals) shall be paid

3   from the Plan Trust.  The Plan Trustee shall pay, without further order, notice or application to the

4   Court, the reasonable fees and expenses of the Plan Trustee Professionals, as necessary to

5   discharge the Plan Trustee's duties under the Plan.  The Plan Trustee shall be authorized to reserve

6   funds from the Plan Trust as is reasonable to pay the expenses of the Plan Trustee and the expenses

7   and fees of the Plan Trustee Professionals before making any Distributions under the Plan.

8           **10.10.6.      Limitation of Liability and Indemnification.**

9       Neither the Plan Trustee nor its employees, Plan Trustee Professionals or agents shall be

10   liable (a) for any loss or damages by reason of any action taken or omitted by him or her, except in

11   the case of fraud, willful misconduct, bad faith, or gross negligence, or (b) for any act or omission

12   made in reliance upon the Debtors' books and records or upon information or advice given to the

13   Plan Trustee by his or her professionals.  Except as otherwise provided in this Plan, the Plan

14   Trustee shall rely and shall be protected in acting upon any resolution, certificate, statement,

15   instrument, opinion, report, notice, consent, or other document believed by him or her to be

16   genuine and to have been signed by the proper party or parties.

17       The Plan Trustee and its employees, Plan Trustee Professionals or agents (collectively, the

18   "Indemnified Parties" and each, an "Indemnified Party") shall be indemnified and receive

19   reimbursement from and against any and all loss, liability, expense (including attorneys' fees) or

20   damage of any kind, type or nature, which the Indemnified Party may incur or sustain the exercise

21   and performance of any of the Plan Trustee's powers and duties under this Plan or the

22   Confirmation Order, or in the rendering of services by the Indemnified Party to the Plan Trustee, to

23   the full extent permitted by applicable law, except if such loss, liability, expense or damage is

24   finally determined by a court of competent jurisdiction to result from the Plan Trustee's or an

25   Indemnified Person's fraud, willful misconduct, bad faith, or gross negligence.  The amounts

26   necessary for such indemnification and reimbursement shall be paid by the Plan Trustee out of the

27   Plan Trust Property.  The Plan Trustee shall not be liable for the payment of any Plan Trust

28   expense or claim or other liability of the Plan Trust, and no Person shall look to the Indemnified

MAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMAINDOCS-#163418-v9-
SCC_Group_IV_VD_DS.DOCMAINDOCS-#163418-v9-
SCC_Group_IV_VD_DS.DOCMerged.DOC

1   Parties personally for the payment of any such expense or liability.  This indemnification shall

2   survive the dissolution, resignation or removal, as may be applicable, of the Plan Trustee, or the

3   termination of the Plan Trust, and shall inure to the benefit of the Plan Trustee's and the

4   Indemnified Person's heirs and assigns.

5           **10.10.7.       Plan Trustee as Successor.**

6           Pursuant to Code §1123(b), the Plan Trustee shall be the successor to the Group IV

7   Voluntary Debtors for all purposes.

8       **10.11.  Beneficiaries**

9           The Holders of Allowed Claims under the Plan, or any successors to such Holders'

10  Allowed Claims ("Beneficiary" or "Beneficiaries") shall own a beneficial interest in the Plan Trust

11  which shall, subject to the Plan, be entitled to a Distribution, if any, in the amounts, and at the

12  times, set forth in the Plan.  Ownership of a beneficial interest in the Plan Trust shall not be

13  evidenced by any certificate, security, or receipt or in any other form or manner whatsoever, except

14  as maintained on the books and records of the Plan Trust by the Plan Trustee.  The ownership of a

15  beneficial interest in the Plan Trust shall not entitle any Beneficiary to any title in or to the Plan

16  Trust assets or to any right to call for a partition or division of such assets or to require an

17  accounting.  The Plan Trustee shall make Distributions, if any, to Beneficiaries in the manner

18  provided in the Plan.

19          The rights of the Beneficiaries arising under the Plan Trust may be deemed "securities"

20  under applicable law.  However, such rights have not been defined as "securities" under the Plan

21  because (a) the intent of the Plan is that such rights shall not be securities, and (b) if the rights

22  arising under the Plan Trust are deemed to be "securities," the exemption from registration under

23  §1145 of the Bankruptcy code is intended to be applicable to such securities.

24          ~~14~~

25          ~~**10.6.    Operations of the Plan Trust**~~.

26  ~~**15**    From and after the Effective Date, the Plan Trust may use, acquire and dispose of the Plan~~

27  ~~Trust Property held in the Plan Trust, and take any of the actions set forth in this Article or in~~

28  ~~the Plan Trust Agreement, without the approval of the Bankruptcy Court and free of the~~

MAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMerged.DOC

1 restrictions of the Bankruptcy Code, the Bankruptcy Rules or the prior orders of the

2 Bankruptcy Court, other than restrictions expressly imposed by the Plan, the Confirmation

3 Order or the Plan Trust Agreement, provided that the Plan Trust is administered so that it

4 qualifies as a liquidating trust under Treasury Regulation § 301.7701-4(d).

5  **10.7. The Plan Trustee.**

6 Acquisitions shall be Trustee of the Plan Trust. Acquisitions is thea direct or indirect parent of

7 all of Debtors.

8  **10.8. Payment of Trust Expenses.**

9 The expenses incurred by the Plan Trust during the Plan Period, which shall include the

10 compensation payable to the Acquisitions, shall be paid, or adequate reserves shall be created

11 for the payment of such expenses, prior to any distributionDistribution to the Plan Trust

12 Beneficiaries.

13  **10.9. Plan Distribution System.**

14 The Plan Trustee shall establish a separate "Distribution Account" for each Group IV:

15 Voluntary Debtor at an FDIC insured bank. Each Group IV: Voluntary Debtor's Available

16 Cash, whether on hand as of the Effective Date or received thereafter, shall be deposited into

17 that Group IV: Voluntary Debtor's Distribution Account. The only exception to this provision

18 shall be in the case of Net Sales Proceeds that are subject to disputed liens. Such proceeds

19 shall remain in the applicable Net ProceedNet Sales Proceeds Accounts established to receive

20 the proceeds from the sale of a particular property. Once all disputes regarding entitlement to

21 the funds in the Net ProceedNet Sales Proceeds Accounts have been resolved, the proceeds

22 remaining (after the payment of the Allowed Claims secured by liens on these proceeds) shall

23 be transferred to the Distribution Account. These funds will then be used to pay the claims of

24 Creditors holding Allowed Claims in their order of priority as provided for in the Plan.

25  **10.12.  Claims Estimation Rights.**

26 **10.10.**

27  On the Confirmation Date, the SunCal ProponentSunCal Plan Proponents shall be vested

28 with standing to file a motion under 11 U.S.C. § 502(c), and they shall be authorized and

empowered to seek in such motion the estimation, for ~~distribution~~Distribution purposes, of any

Disputed Claim seeking recourse to, or claiming an interest in, any asset of the Group IV:

Voluntary Debtors. After the Bankruptcy Court estimates a Disputed Claimant's rights in, or

against an asset of the Estates through this procedure, the ~~Voluntary Debtors' Committee~~Plan

Trustee shall have the right to use any funds or assets not deemed subject to the rights of the

Disputed Claimant, to pay the Allowed Claims under the terms of the Plan, including Allowed

Administrative Claims, after the Effective Date.

**10.11.  No Payment of Transfer-Related Fees to the United States Trustee**.

**10.13.**

The Plan Trust shall not be required to pay any fees to the United States Trustee based on

any transfers of the Plan Trust Property to the Plan Trust or from the Plan Trust.

~~10.    No Payment of Transfer-Related Fees to the Trustee.~~

~~11.  The Plan Trust shall not be required to pay any fees to the Trustee based on any transfers of~~

~~Plan Trust Property from the Trustee Debtors to the Plan Trust, or from the Plan Trust.~~

**10.14.  Books and Records of Trust**.

**10.12.**

The Plan Trustee, and to the extent of payments and ~~distributions~~Distributions by any

Disbursing Agent, the Disbursing Agent, shall maintain an accounting of receipts and

disbursements of the Plan Trust. The Plan Trustee shall maintain the books and records of the Plan

Trust, or provide storage for such book and records, for the longer of six (6) years, or while Plan is

in existence, provided that the Court may, upon application by the Plan Trustee, authorize the Plan

Trust to destroy all of the Plan Trusts books and records at such time as Plan Trust has no further

need for such books and records. The Plan Trust's books and records shall be open to inspection at

all reasonable times, upon written request by the Voluntary Debtors' Committee.

~~**10.13.  Limitations on Liability**.~~

~~The Plan Trustee shall not be liable for any act it may do or fail to do as the liquidating~~

~~trustees hereunder while acting in good faith and in the exercise of its best judgment. The~~

~~Plan Trust shall not be liable in any event for any claims, liabilities or damages based upon or~~

MAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMAINDOCS_#163418-v9-
SCC_Group_IV_VD_DS.DOCMerged.DOC

1    arising out of any conduct of the Plan Trustee in the course of its activities as liquidating

2    trustee, unless such claims, liabilities or damages arise from Plan's gross negligence or willful

3    misconduct.

4    The Plan Trustee, and its officers, directors, agents and employees shall not be liable for any

5    indebtedness, liability or obligation incurred or entered into on behalf of the Plan Trust,

6    including, without limitation, indebtedness, liabilities or obligations under agreements,

7    undertakings or commitments entered into or executed on behalf of Plan Trust by the Plan

8    Trustee or by any person employed by the Plan Trustee or the Plan, it being expressly

9    understood that all such indebtedness, liabilities and obligations of, and claims against the

10    Plan, shall be the sole responsibility of the Plan and shall be satisfied only from the Plan, or

11    such portion thereof as shall, under the terms of any agreement, be stated to be liable

12    therefore. No claim or cause of action may be asserted against the Plan Trustee, or any

13    member of the New Board on account of any indebtedness, liability or obligation entered into

14    on behalf of the Plan, whether by legal or equitable proceedings, or by virtue of any

15    bankruptcy or non-bankruptcy statute, rule or regulation.

16    Any undertaking, contract or agreement entered into in writing by the Plan may, except as

17    otherwise provided by the Plan or the Plan Trust Agreement, expressly disclaim the personal

18    liability of Plan Trustee.

19    **10.15.  Federal Income Tax Treatment of the Holders of Plan Trust Beneficial**

20    **Interests**

21    **10.14.**

22    For all United States federal income tax purposes, the transfers by the Group IV: Voluntary

23    Debtors shall be treated by the Group IV: Voluntary Debtors, their estates, the Plan Trust and the

24    Plan Trust Beneficiaries as a transfer of the Plan Trust Property by the Group IV: Voluntary

25    Debtors to the Plan Trust Beneficiaries followed by a transfer of the Plan Trust Property by such

26    the Plan Trust Beneficiaries to the Trust. The Plan Trust Beneficiaries shall be treated as the

27    grantors and deemed owners of the Plan Trust for United States federal income tax purposes. The

28    Plan Trust Trustee and the Plan Trust Beneficiaries are required to value their interests in the Plan

Trust Property consistently with the values placed upon the Plan Trust Property by the Plan Trust, and to use such valuations for all purposes. The Plan Trust ~~Agreement~~ shall provide for consistent valuations of the Plan Trust Property by the Plan Trust Trustee and the Plan Trust Beneficiaries, and shall provide that the Plan Trust will determine the fair market value of the Plan Trust Property within thirty (30) days after the Effective Date, and send such determination to each the Plan Trust Beneficiary. By its acceptance of a the Beneficial Interest, each recipient of such an interest will be conclusively deemed to agree to use such valuations for all purposes, including, without limitation, in computing any gain recognized upon the exchange of such holder's claim for purposes of determining any United States Federal income tax, and shall be required to include those items of income, deductions and tax credits that are attributable to its Beneficial Interest in computing its taxable income.

**~~10.15.~~10.16.    Termination of the Trust.**

The Plan Trust shall continue in effect until the earlier of: (a) the date that all the Plan Trust Property has been liquidated, all proceeds have been converted to cash or distributed in kind, all the Plan Trust Expenses have been paid, all claims to be paid under the Plan for which the Plan Trust Trustee is obligated to make ~~distributions~~Distributions on have been paid, all ~~distributions~~Distributions to be made with respect to the Beneficial Interests have been made, all litigation to which the Plan Trust is a party have been concluded by dismissal or an order issued by the court in which such litigation is pending and such order has become "final" (consistent with the definition of Final Order in the Plan for orders issued by the Bankruptcy Court), and the Chapter 11 Case has been closed; and (b) the expiration of five (5) years from the Effective Date; provided, however, that the Plan Trust may request the Bankruptcy Court to extend the permitted life of the Plan Trust for such additional period as is reasonably necessary to conclude the liquidation and ~~distributions~~Distributions, not to exceed a total of ten (10) years from the Effective Date, which request shall be filed so the Bankruptcy Court may consider and rule on the request within six (6) months prior to the expiration of the initial five-year term.

**10.17.  Exemption from Certain Transfer Taxes.**

**~~10.16.~~**

In accordance with Section 1146(ea) of the Bankruptcy Code, the issuance, transfer or exchange of a security or the making or delivery of an instrument of transfer under the Plan may not be taxed under any law imposing a stamp tax or similar tax. All governmental officials and agents shall forego the assessment and collection of any such tax or governmental assessment and shall accept for filing and recordation any of the foregoing instruments or other documents without payment of such tax or other governmental assessment.

**10.17.10.18.   Tax Consequence of The Plan.**

The implementation of the Plan may have federal, state and local tax consequences to the Group IV: Voluntary Debtors, Creditors and Interest Holders.  No tax opinion has been sought or will be obtained with respect to any tax consequences of the Plan. ThisThe Disclosure Statement does not constitute and is not intended to constitute either a tax opinion or tax advice to any person, and the summary contained herein is provided for informational purposes only.

CREDITORS AND INTEREST HOLDERS ARE ADVISED TO CONSULT WITH THEIR OWN TAX ADVISORS REGARDING THE TAX CONSEQUENCES TO THEM AND TO THE DEBTOR OF THE TRANSACTIONS CONTEMPLATED**CONTEMPLATED** BY THE PLAN, INCLUDING**INCLUDING** FEDERAL, STATE, AND FOREIGN TAX CONSEQUENCES.

**10.1910.19.   The Plan Sponsor.**

The Plan Sponsor shall be Acquisitions.

**10.20.  The Voluntary Debtors' Committee.**

On the Effective Date, the Voluntary Debtors' Committee shall continue to serve its applicable Group IV: Voluntary Debtors as Voluntary Debtors' Committee to the applicable reorganized Group IV: Voluntary Debtors, subject to the following:

**10.21.110.20.1.      10.18.1      Duties and Powers.**

10    The duties of the Committee after the Effective Date shall be limited to monitoring the Plan's implementation, notice and opportunity to object to any settlement of the Lehman Adversary Proceeding and the Contract Action, and standing to object to any settlement of any Litigation Claim in excess of $100,000 and standing to file, prosecute and resolve objections to

Claims filed by Insiders that are SunCal Affiliates., and standing to object to any proposed sales procedures on sale of the Debtors' Projects.,. The Voluntary Debtors' Committee shall receive notice of and the right to review all payments and Distributions.

11 The Voluntary Debtors' Committee shall be entitled to retain, employ and compensate Professionals, in order to assist with the obligations and rights of the Voluntary Debtors' Committee under the terms of the Plan. Such compensation shall be paid from the applicable Distribution Account(s).

### 10.20.2.    10.18.2    Dissolution of Voluntary Debtors' Committee.
10.21.2

12 The Voluntary Debtors' Committee shall be dissolved upon the entry of an order converting, closing or dismissing the Chapter 11 Cases or entry of a final decree in the Chapter 11 Cases. On dissolution, the Voluntary Debtors' Committee shall have no other or further obligations or responsibilities on behalf of the Plan Trust.

### 10.21.  Litigation Claims.
10.21.

Pursuant to Section 1123(b)(3) of the Bankruptcy Code, the Plan Trust shall retain all Litigation Claims whether or not pending on the Effective Date that are not purchased by LitCo.. Unless a Litigation Claim is expressly waived, relinquished, released, compromised, settled or sold in the Plan or in a Final Order, all rights with respect to such Litigation Claims are reserved and the Plan Trustee (in the case of Avoidance Actions) may pursue such Litigation Claims. Notwithstanding the foregoing, the Plan Trustee shall not settle or abandon a Litigation Claim valued at greater than $100,000 except upon ten (10) days' prior written notice and opportunity to object to the Voluntary Debtors' Committee. Any disputes concerning the settlement or abandonment of a Litigation Claim shall be submitted to the Bankruptcy Court for resolution on no less than ten (10) days' notice to the objecting party. ——

### 10.22.  Collection of Litigation Recoveries.

All Litigation Recoveries realized or obtained by the Plan Trustee and/or the Voluntary Debtors' Committee shall be promptly deposited into the applicable Distribution Account(s).

MAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMerged.DOC

1    Except as otherwise provided in the Plan and the Confirmation Order, the Litigation Recoveries

2    shall be free and clear of all Claims and Liens and shall only be expended in accordance with the

3    provisions of the Plan.

4    **10.23.  Dissolution of the Group IV Debtors**

5    On the Effective Date, each of the Group IV: Voluntary Debtors shall be deemed dissolved

6    for all purposes without the necessity for any other further actions to be taken by or on behalf of

7    such Debtors or payments to be made in connection therewith.

8    **XI.**

9    **RISK FACTORS**

10    **11.1    Plan Risks**.

11    The Plan in this case, like any Chapter 11 reorganization plan, includes a number of risks

12    that creditors should be aware of prior to voting on the Plan. The more material of these risks are

13    summarized below.

14    **11.2.    The Plan May Not Be Accepted or Confirmed.**

15    While the ~~SunCal Proponent~~SunCal Plan Proponents believe that the Plan is confirmable

16    under the standards set forth in 11 U.S.C. § 1129, there can be no guarantee that the Bankruptcy

17    Court will find the Plan to be confirmable. If the Plan is not confirmed, it is possible that an

18    alternative plan can be negotiated and presented to the Bankruptcy Court for approval; however,

19    there can be no assurance that any alternative plan would be confirmed, that the Chapter 11 Cases

20    would not be converted to a liquidation, or that any alternative plan of reorganization could or

21    would be formulated on terms as favorable to the Creditors and holders of Equity Interests as the

22    terms of the Plan.

23    **11.3    Adverse Outcome of Pending Litigation.**

24    The Group IV: Voluntary Debtors are plaintiffs in the Lehman Adversary Proceeding and

25    the ~~State Court Action~~Contract Action.  The Group IV: Voluntary Debtors believe that their causes

26    of action in the Lehman Adversary Proceeding and the ~~State Court Action~~Contract Action are

27    meritorious. ~~.~~ However, there is no assurance that they will prevail in either action.~~.~~

28    **XII.**

# DISTRIBUTIONS

**12.1**    **Distribution Agent.**

Acquisitions shall serve as the Distribution Agent for ~~distributions~~Distributions due under the Plan.  The Distribution Agent may employ one or more sub agents on such terms and conditions as it may agree in its discretion and pay such sub agent as a Post Confirmation Expense from the Distribution Accounts.  The Distribution Agent shall not be required to provide any bond in connection with the making of any Distributions pursuant to the Plan.

**12.2**    **Distributions.**

### 12.2.1    **Dates of Distributions.**

Any ~~distribution~~Distribution required to be made on the Effective Date shall be deemed timely if made as soon as practicable after such date and, in any event, within thirty (30) days after such date.  Any ~~distribution~~Distribution required to be made upon a Disputed Claim becoming an Allowed Claim and no longer being a Disputed Claim shall be deemed timely if made as soon as practicable thereafter.

### 12.2.2    **Limitation on Liability.**

Neither the Plan Sponsor, the Plan Trustee, the Distribution Agent, their Affiliates, nor any of their employees, members, officers, directors, agents, or professionals or Affiliates shall be liable for (i) any acts or omissions (except for gross negligence or willful misconduct) in connection with implementing the Distribution provisions of the Plan and the making or withholding of Distributions pursuant to the Plan, or (ii) any change in the value of ~~distributions~~Distributions made pursuant to the Plan resulting from any delays in making such ~~distributions~~Distributions in accordance with the Plan's terms (including but not limited to any delays caused by the resolution of Disputed Claims).

**~~12.3~~12.3**    **Old Instruments and Securities.**

### 12.3.1    **Surrender and Cancellation of Instruments and Securities.**

As a condition to receiving any ~~distribution~~Distribution pursuant to the Plan, each Person holding any note or other instrument or security (collectively "Instruments or Securities" and individually an "Instrument or Security") evidencing, an existing Claim(s) against the

1   ~~Debtor(s)~~Group IV: Voluntary Debtors must surrender such Instrument or Security to the

2   Distribution Agent.

### 12.3.2    Cancellation of Liens.

4   Except as otherwise provided in the Plan, any Lien securing any Secured Claim shall be

5   deemed released and discharged, and the Person holding such Secured Claim shall be authorized

6   and directed to release any collateral or other property of the Group IV: Voluntary Debtors

7   (including, without limitation, any cash collateral) held by such Person and to take such actions as

8   may be requested by the Plan Trustee to evidence the release of such Lien, including, without

9   limitation, the execution, delivery and Filing or recording of such releases as may be requested by

10  the Plan Trustee.

### 12.3.3    De Minimis Distributions and Fractional Shares.

12  No Cash payment of less than ten dollars ($10) shall be made by the Plan Trust to any

13  Holder of Claims unless a request therefore is made in writing to the Plan Trust.  Whenever

14  payment of a fraction of a cent would otherwise be called for, the actual payment shall reflect a

15  rounding down of such fraction to the nearest whole cent.  Any Cash or other property that is not

16  distributed as a consequence of this section shall, after the last ~~distribution~~Distribution on account

17  of Allowed Claims in the applicable Class, be treated as "Unclaimed Property" under the Plan.

### 12.3.4    Delivery of Distributions.

19  Except as provided in the Plan with respect to Unclaimed Property,

20  ~~distributions~~Distributions to Holders of Allowed Claims and Allowed Administrative Claims

21  shall be distributed by mail as follows:  (1) with respect to each Holder of an Allowed Claim that

22  has filed a Proof of Claim, at the address for such Holder as ~~maintained by the official claims agent~~

23  ~~for the Group IV: Voluntary Debtors~~set forth in the Proof of Claim; (2) with respect to each Holder

24  of an Allowed Claim that has not filed a Proof of Claim, at the address reflected on the Schedules

25  filed by the Group IV: Voluntary Debtors, provided, however, that if the Group IV: Voluntary

26  Debtors or the Plan Trust has received a written notice of a change of address for such Holder, the

27  address set forth in such notice shall be used; or (3) with respect to each Holder of an Allowed

28  Administrative Claim, at such address as the Holder may specify in writing.

MAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMAINDOCS_#163418-v9-
SCC_Group_IV_VD_DS.DOCMerged.DOC

1    **12.3.5    Undeliverable Distributions.**

2        If the Distribution of Cash to the Holder of any Allowed Claim is returned to the Plan

3    Trustee as undeliverable or the Distribution check is not negotiated within 90 days of mailing (any

4    such ~~distribution~~Distribution being hereinafter referred to as "Unclaimed Property"), no further

5    ~~distribution~~Distribution shall be made to such Holder unless and until the Plan Trustee is notified in

6    writing of such Holder's then current address.  Subject to the remainder of this Section and the

7    following section, Unclaimed Property shall remain in the possession of the Plan Trustee pursuant

8    to this Section, and shall be set aside and (in the case of Cash) held in a segregated interest bearing

9    account (as to Cash Unclaimed Property) to be maintained by the Distribution Agent until such

10    time as the subject Distribution becomes deliverable.  Nothing contained in the Plan shall require

11    the Plan Trustee or any other Person to attempt to locate such Person.

12    **12.3.6    Disposition of Unclaimed Property.**

13        If the Person entitled thereto notifies the Plan Trustee of such Person's Claim to a

14    Distribution of Unclaimed Property within ninety (90) days following such Person's initial

15    Distribution Date, Effective Date, the Unclaimed Property distributable to such Person, together

16    with any interest or dividends earned thereon, shall be paid or distributed to such Person as soon as

17    practicable.  Any Holder of an Allowed Claim that does not assert a Claim in writing for

18    Unclaimed Property held by the Plan Trustee within ninety (90) days after the Holder's initial

19    Distribution Date shall no longer have any Claim to or Interest in such Unclaimed Property, and

20    shall be forever barred from receiving any ~~distributions~~Distributions under the Plan or otherwise

21    from the Plan Trustee.  In such cases, any property held for Distribution on account of such Claims

22    shall become Available Cash and deposited into the Distribution Account.

23    **XIII.**

24    **OBJECTIONS TO CLAIMS AND DISPUTED CLAIMS**

25    **13.1    Standing for Objections to Claims.**

26    ~~The Plan Trustee shall have the sole and exclusive right to file, prosecute and resolve~~

27    ~~objections to Claims other than to the right to object to the claims of SunCal Affiliates, which shall~~

28    ~~be vested with the Voluntary Debtors' Committee.  The Voluntary Debtors' Committee shall have~~

MAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMAINDOCS-#163418-v9-
SCC_Group_IV_VD_DS.DOCMerged.DOC

1  standing to object to any settlement of any Litigation Claim in excess of $100,000 and standing to

2  object to any proposed sales procedures and sale of the Debtors' Projects.,  The Plan Trustee shall

3  have the sole and exclusive right to file, prosecute and resolve objections to Claims, excluding

4  Claims filed by Insiders that are SunCal Affiliates.  The Voluntary Debtors Committee shall have

5  the sole and exclusive right to file, prosecute and resolve objections to Claims filed by Insiders that

6  are SunCal Affiliates.

7      Any objection to a Claim shall be Filed with the Bankruptcy Court and served on the Person

8  holding such Claim on or before the applicable Claims Objection Deadline.  The Plan Trustee shall

9  have the right to petition the Bankruptcy Court, without notice or a hearing, for an extension of the

10  Claims Objection Deadline if a complete review of all Claims cannot be completed by such date.

11      **13.2      Treatment of Disputed Claims and Disputed Liens.**

12          **13.2.1  No Distribution Pending Allowance.**

13      If any portion of a Claim or Lien is a Disputed Claim or Disputed Lien, no payment

14  or ~~distribution~~Distribution provided for under the Plan shall be made on account of such Claim or

15  Lien unless and until such Claim or Lien becomes an Allowed Claim and/or Allowed Lien.

16          **13.2.2  Distribution After Allowance.**

17      On the next Distribution Date following the date on which a Disputed Claim

18  becomes an Allowed Claim and is no longer a Disputed Claim, the Distribution Agent shall

19  distribute to the Person holding such Claim any Cash that would have been distributable to such

20  Person if on the initial Distribution Date such Claim had been an Allowed Claim and not a

21  Disputed Claim.

22          **13.2.3  Reserves for Disputed Claims**

23      In the event that Disputed Claims are pending at the time of a Distribution under the Plan,

24  the Plan Trustee shall establish and maintain a reserve for such Disputed Claims.  For purposes of

25  establishing a reserve, Cash will be set aside equal to the amount that would have been distributed

26  to the Holders of the Disputed Claims had the Disputed Claims been Allowed on the date a

27  Distribution is made to the Holders of Allowed Claims in the same Class or of the same priority as

28  the Disputed Claims.  If a Disputed Claim ultimately becomes an Allowed Claim, the amount of

MAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMAINDOCS-#163418-v9-
SCC_Group_IV_VD_DS.DOCMerged.DOC

Cash reserved for that Disputed Claim shall be distributed on the earlier of (a) the distributed Date following the date when the Disputed Claim becomes an Allowed Claim, or (b) ninety (90) days after such Disputed Claim becomes an Allowed Claim.  Any reserved Cash not ultimately distributed to the Holder of a Disputed Claim because the Disputed Claim does not become an Allowed Claim shall become property of the Plan Trust and shall be distributed in accordance with the terms of the Plan.

## XIV.

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 14.1    Executory Contracts to be Assumed and Assigned

Under the Plans, the Group IV: Voluntary Debtors Projects will be sold.  As a result, the Group IV: Voluntary Debtors will assume only those executory contracts and unexpired leases to be assigned to the Winning Bidder with respect to the applicable Project.

On the Effective Date, the executory contracts and unexpired leases identified on the Schedule of Assumed and Assigned Agreements attached or to be attached hereto as Exhibit "9" or filed or to be filed as Exhibit "9" to this document shall be deemed assumed and assigned to the applicable Winning Bidder, as specified in the Confirmation Order.  The SunCal Plan Proponents intend to file the Schedule of Assumed and Assigned Agreements with the Court no later than _____ (___) days prior to the Confirmation Hearing.  The Schedule of Assumed and Assigned Agreements also identifies or will identify any amounts that must be paid to cure defaults under the executory contacts and unexpired leases to be assumed and assigned under the Plan (the "Cure Amount").  If filed earlier, the SunCal Plan Proponents reserve the right to amend the Schedule of Assumed Agreements up to _____ (___) days prior to the Confirmation Hearing (_____, 2011) to: (a) add any executory contract or unexpired lease and provide for its assumption and assignment; or (b) modify the Cure Amount for any particular executory contract or unexpired lease.  The SunCal Plan Proponents further reserve the right to amend the Schedule of Assumed Agreements to delete any executory contract or unexpired lease and provide for its rejection at any time prior to the Confirmation Hearing.  The SunCal Plan Proponents will provide notice of any

amendment to the Schedule of Assumed and Assigned Agreements to any party or parties to the executory contracts or unexpired leases affected by the amendment.  Absent a timely objection as provided below, the Confirmation Order will constitute a Court Order approving the assumption and assignment, on the Effective Date, of the executory contracts and unexpired leases then identified on the Schedule of Assumed and Assigned Agreements, and shall constitute a final determination of the Cure Amount and that the estate has shown adequate assurance of future performance.  Furthermore, any Cure Amount ordered by the Court, through entry of the Confirmation Order, and paid shall be deemed to satisfy any and all defaults arising from, out of or related to the executory contract of unexpired lease, including any tort claims that were or could be asserted by the non-debtor party to the contract or lease on or prior to the entry of the Confirmation Order, and all actual or pecuniary losses that have resulted from such defaults.

        If you are a party to an executory contract or unexpired lease to be assumed and assigned and you object to the assumption and assignment of your lease or contract and/or you dispute the Cure Amount related to your lease or contract, then you must File and serve upon counsels for the SunCal Plan Proponents (at the address on the upper left hand corner of the caption page) a written objection by ____, 2011.  An objection to the Cure Amount must also set forth the amount you contend to be the correct Cure Amount and contain evidence to support such amount.  Failure to timely File an objection as provided herein shall be deemed consent to the proposed assumption and assignment and to the Cure Amount and a waiver of any and all rights to challenge such assumption and assignment and the Cure Amount.

        With respect to each executory contract and unexpired lease identified on the Schedule of Assumed and Assigned Agreements, if no dispute arises regarding the Cure Amount, adequate assurances, or some other matter related to the assumption of the executory contact or unexpired lease, then the Cure Amount set forth in the schedule of Assumed and Assigned Agreements shall be paid to the applicable non-debtor party in Cash on the Effective Date or as soon as reasonably practicable thereafter.  If a dispute arises regarding (a) whether the proposed assignee has provided adequate assurance of future performance of an executory contract or unexpired lease to be assumed, or (b) any other matter pertaining to a proposed assumption and assignment, the Cure

MAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMerged.DOC

Amount will be paid on the later of (1) the Effective Date or as soon as practicable thereafter, or (2) within thirty (30) days after entry of a Final order resolving the dispute and approving the assumption and assignment; provided, however, if a dispute arises regarding any of the foregoing, the SunCal Plan Proponents reserve, for themselves and the Plan Trustee, the right to completely forego assumption and assignment of and, instead, reject the subject executory contract or unexpired lease.

If a party to an executory contract or unexpired lease identified on the Schedule of Assumed and Assigned Agreements Files an objection disputing the Cure Amount, then the SunCal Plan Proponents may amend the Schedule of Assumed and Assigned Agreements at any time prior to the Confirmation Hearing to delete the subject executory contract or unexpired lease and provide for its rejection.  Executory contracts or unexpired leases not so deleted shall be conditionally assumed, subject to the SunCal Plan Proponents' and/or the Plan Trustee's right to file a Motion to determine the appropriate Cure Amount up to the first (1st) Business Day that is at least sixty (60) days following the Effective Date.  The SunCal Plan Proponents and/or the Plan Trustee will serve any such Motion on the party to the executory contract or unexpired lease affected by the Motion (or its attorneys, if any).  If the SunCal Plan Proponents and Plan Trustee does not file a Motion to determine the appropriate Cure Amount, then the executory contract or unexpired lease shall be assumed and assigned, as of the Effective Date, and the Cure Amount shall be the alternative Cure Amount asserted by the non-debtor party to the subject executory contract or unexpired lease in its objection to the Plan.  The Cure Amount shall be paid as soon as reasonably practicable following the expiration of the 60-day deadline.

If the SunCal Plan Proponents or the Plan Trustee files a Motion to determine the appropriate Cure Amount, then the SunCal Plan Proponents and/or Plan Trust shall have the right to amend the Schedule of Assume and Assigned Agreements to completely forego assumption and assignment of and, instead, reject the subject executory contract or unexpired lease up to the first (1st) Business Day that is at least fifteen (15) days after the entry of an order fixing the Cure Amount.  The SunCal Plan Proponents and/or Plan Trustee will provide notice of any amendment to the Schedule of Assumed and Assigned Agreements to the party to the executory contract or

MAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMerged.DOC

unexpired lease affected by the amendment.  If the SunCal Plan Proponents and/or Plan Trustee has filed such a Motion and does not timely amend the Schedule of Assumed and Assigned Agreements within fifteen (15) days after entry of an order fixing the Cure Amount, then the executory contract or unexpired lease shall be assumed and assigned, as of the Effective Date, and the Cure Amount shall be fixed as the Cure Amount ordered by the Court.  The Cure Amount as soon as reasonably practicable following the expiration of the 15-day deadline.

**14.2    Executory Contracts to be Rejected**

On the Effective Date, the estate will be deemed to have rejected any and all executory contacts and unexpired leases not identified on the Schedule of Assumed and Assigned Agreements attached or to be attached hereto as Exhibit "9," or filed or to be filed as Exhibit "9" to this document.  The Confirmation Order will constitute a Court order approving the rejection, as of the Effective Date, of such executory contacts and unexpired leases.  Any Claim for damages arising from the rejection under the Plan of any executory contract or unexpired lease must be filed with the Court and served upon the SunCal Plan Proponents and the Plan Trustee within thirty (30) days of the later of (a) the Confirmation Date, and (b) the Plan Trustee's amendment of the Schedule of Assumed and Assigned Agreements to eliminate the executory contract or unexpired lease.  Any such damage Claims that are not timely filed and served will be forever barred and unenforceable against the applicable Debtors, the Estates, the Plan Trustee, the Plan Trust, and their respective property.  Persons holding these Claims who fail to timely file claims will be barred from receiving any Distributions under the Plan on account of their rejection damage Claims.

~~**14.1**~~     If you are a party to a lease or contract to be rejected and you object to the rejection of your lease or contract, then you must file and serve your objection by _____ .~~**Executory Contracts Potentially Being Assumed**~~.

~~The Plan Trustee shall have until the expiration of the Sales Period~~Effective Date ~~to assume or reject any of the executory contracts and unexpired leases attached to the Plan as Exhibit ""2" to the Plan.  The SunCal Plan Proponents may add any executory contract or unexpired leases to these exhibits, or delete any contract or lease therefrom up to and including the Confirmation Date.~~

1   All contracts or leases not assumed by the expiration of the Sales PeriodEffective shall be deemed

2   rejected.

3   **14.2    Executory Contracts Being Rejected.**

4   The DebtorsSunCal Plan Proponents hereby reject all of the executory contracts and unexpired

5   leases set forth in the Group IV: Voluntary Debtors' Schedules attached to the Plan as Exhibit "3."

6   The SunCal Plan Proponents reserve the right to amend Exhibit "3" to the Plan to include

7   additional leases and contracts on this exhibit, or to delete leases and contracts from this exhibit,

8   up to and including the Confirmation Date.

9   **14.3    Bar Date for Rejection Damages.**

10  Any Claim arising out of the rejection of an executory contract or unexpired lease shall be forever

11  barred and shall not be enforceable against the Group IV: Voluntary Debtors, the Plan Trust, their

12  Affiliates, their successors, or their properties, and shall not be entitled to any

13  distributionDistribution under the Plan, unless a Proof of Claim for such Claim is filed and served

14  on the Group IV: Voluntary Debtors, or the Plan Trust within thirty (30) days after the receipt of a

15  notice of the rejection of any contract or lease.

16      **14.4    Changes in Rates Subject to Regulatory Commission Approval.**

17      The Group IV: Voluntary Debtors are not subject to governmental regulatory commission

18  approval of their rates.

19  <div align="center">**XV.**</div>

20  <div align="center">**BEST INTEREST OF CREDITORS TEST AND PLAN FEASIBILITY**</div>

21  **15.1    Best Interests Test.**

22      Pursuant to Section 1129(a)(7) of the Bankruptcy Code, a Plan cannot be confirmed unless

23  the Bankruptcy Court determines that Distributions under the Plan to all Holders of Claims and

24  Interests who have not accepted the plan and whose Claims are classified in Classes that are

25  impaired under the plan, are not less than those which they would receive in a liquidation under

26  Chapter 7 of the Bankruptcy Code.

27      The Best Interest of Creditors Test must be satisfied even if the Plan is accepted by each

28  impaired Class of Claims and if any Holder of an Allowed Claim objects to the Plan on such basis.

The Best Interests Test requires the Bankruptcy Court to find either that either (i) all Holders of Claims in an impaired Class of Claims have accepted the Plan or (ii) the Plan provides each Holder of Allowed Claims of an impaired Class who has not accepted the Plan with a recovery of property of a value, as of the effective date of the Plan, that is not less than the amount that such Holder would receive if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code.

The Plan proposed by the Group IV: Voluntary Debtors is essentially a litigation and liquidation plan. It provides for the recovery of the Pacific Point Project and/or damages through the Lehman Adversary Proceeding or the ~~State Court Action~~Contract Action and for the distribution of the resulting net proceeds, in accordance with the priorities provided for in the Bankruptcy Code and under California law.

If a Chapter 7 trustee were appointed in this case and had sufficient financing to pursue the causes of action in the Lehman Adversary Proceeding and the ~~State Court Action~~Contract Action, it would be compelled to liquidate the Group IV: Voluntary Debtors' assets in the same manner as provided for in the Plan and to pay out the proceeds in the same manner as provided for in the Plan. Accordingly, under the terms of the Plan, each individual creditor is receiving "at least as much" as such creditor would receive in a Chapter 7 case, which is all that is required under the Best Interests Test.

### 15.2    Feasibility.

In addition, in order to confirm the Plan, the Bankruptcy Court must find that confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor(s).  This requirement is imposed by Section 1129(a)(11) of the Bankruptcy Code and is generally referred to as the "feasibility" requirement. As explained above, the Group IV: Voluntary Debtors' Plan provides for pursuing the Group IV: Voluntary Debtors' litigation rights, the liquidation of any recoveries, and for the distribution of the proceeds. Within the context of the Plan, feasibility is limited to having sufficient funds to pay administrative and priority claims on the Effective Date and sufficient funds to finance the litigation.

### XVI.

### LIMITATION OF LIABILITY

1    **16.1**    **No Liability for Solicitation or Participation.**

2    As specified in Section 1125(e) of the Bankruptcy Code, entities that solicit acceptances or

3    rejections of the Plan and/or that participate in the offer, issuance, sale, or purchase of securities

4    offered or sold under the Plan, in good faith and in compliance with the applicable provisions of

5    the Bankruptcy Code, shall not be liable, on account of such solicitation or participation, for

6    violation of any applicable law, rule, or regulation governing the solicitation of acceptances or

7    rejections of the Plan or the offer, issuance, sale, or purchase of securities.

8    **XVII.**

9    **CONDITIONS TO CONFIRMATION AND**

10    **EFFECTIVENESS OF THE PLAN**

11    **17.1**    **Conditions Precedent to Plan Confirmation.**

12    The only condition precedent to confirmation of the Plan is that the Bankruptcy Court shall

13    have entered a Confirmation Order in form and substance reasonably acceptable to the SunCal Plan

14    Proponents.

15    **17.2**    **Conditions Precedent to Plan Effectiveness.**

16    The conditions precedent to the effectiveness of the Plan and the occurrence of the

17    Effective Date is that the Confirmation Order shall be a Final Order in form and substance

18    reasonably satisfactory to the SunCal Plan Proponents, and the resolutions of any material

19    impairment of the Plan terms caused by the automatic stays applicable in the Lehman Entities

20    cases. The automatic stay in the Group IV: Voluntary Debtors cases shall continue to be applicable

21    until the Effective Date.

22    **XVIII.**

23    **RETENTION OF JURISDICTION**

24    Notwithstanding the entry of the Confirmation Order or the occurrence of the Effective

25    Date, the Bankruptcy Court shall not be limited under the Plan and the Bankruptcy Court's

26    jurisdiction shall apply to the fullest extent possible under applicable law. The Court will retain

27    exclusive jurisdiction during the Plan payout period to resolve disputes and conflicts arising from

28

MAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMAINDOCS-#163418-v9-
SCC_Group_IV_VD_DS.DOCMerged.DOC

the administration of the Plan, upon request of a party-in-interest and after notice and a hearing, including, without limitation:

    a.    The adjudication of the validity, scope, classification, allowance, and disallowance of any Claim;

    b.    The estimation of any Claim;

    c.    The allowance or disallowance of Professional-Fee Claims, compensation, or other Administrative Expense Claims;

    d.    To her and determine Claims concerning taxes pursuant to Bankruptcy Code §§ 346, 505, 525, and 1146;

    e.    To hear and determine any action or proceeding brought under Bankruptcy Code §§108, 510, 543, 544, 545, 547, 548, 549, 550, 551 and 553;

    f.    To hear and determine all actions and proceedings which relate to pre-confirmation matters;

    g.    To hear and determine any issue relating to the assumption or rejection of executory contracts and unexpired leases;

    h.    To hear and determine any modification to the plan in accordance with the Bankruptcy Rules and Bankruptcy Code;

    i.    To enforce and interpret the terms of the Plan;

    j.    To correct any defects, cure any omissions, or reconcile any inconsistency in the Plan or the Confirmation Order as may be necessary to carry out the purpose and intent of the Plan;

    k.    the entry of any order, including injunctions, necessary to enforce title, rights and powers of the Plan Trust, and to impose such limitations, restrictions, terms and conditions on such title, rights and powers as the Court may deem necessary including, without limitation, any right of the Plan Trust to recover and liquidate assets;

    l.    To determine the validity, extent and priority of all liens and security interests against property of the Estates or the Plan trust;

    m.    To hear and resolve any disputes regarding employment applications and professional fees;

MAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMerged.DOC

n.      To her and determine such matters and make such orders as are consistent with the Plan as may be necessary to carry out the provisions thereof and to adjudicate any disputes arising under or relating to any order entered by the Court in these Cases;

o.      The entry of an order concluding and terminating these Cases; and

p.      To resolve any disputes as to whether there has been a default under the Plan.

## XIX.

## MODIFICATION OR WITHDRAWAL OF THE PLAN

### 19.1    Modification of Plan.

At any time prior to confirmation of the Plan, the ~~former Debtor(s)~~SunCal Plan Proponents may supplement, amend or modify the Plan.  After confirmation of the Plan, ~~the Debtors~~SunCal Plan Proponents or Plan Trustee may (x) apply to the Bankruptcy Court, pursuant to Section 1127 of the Bankruptcy Code, to modify the Plan; and (y) apply to the Bankruptcy Court to remedy defects or omissions in the Plan or to reconcile inconsistencies in the Plan.

### 19.2    Nonconsensual Confirmation.

In the event that any impaired Class of Claims or Interests shall fail to accept the Plan in accordance with Section 1129(a)(8) of the Bankruptcy Code, SunCal Plan Proponents (i) may request that the Bankruptcy Court confirm the Plan in accordance with Section 1129(b) of the Bankruptcy Code, and (ii) in accordance with Section 16.1 of the Plan, and may modify the Plan in accordance with Section 1127(a) of the Bankruptcy Code.

## XX.

## EFFECT OF CONFIRMATION

### 20.1    Discharge.

Confirmation of the Plan does not discharge the Group IV: Voluntary Debtors as set forth in Bankruptcy Code §1141.

### 20.2    Revesting of the Assets.

The Assets shall not be vested in the Group IV: Voluntary Debtors on or following the Effective Date, but shall be vested in the Plan Trust and continue to be subject to the

1  jurisdiction of the Court following confirmation of the Plan until such Assets are distributed to the

2  Holders of Allowed Claims in accordance with the provisions of the Plan.

3  **20.3    Exculpation and Releases**

4  Effective upon the entry of the Confirmation Order, neither the Group IV: Voluntary

5  Debtors, the Committees, Plan Sponsor, the SunCal Plan Proponents, the Professionals, nor any of

6  their respective members, officers, directors, shareholders, employees, or agents, shall have or

7  incur any liability to any Person, including any creditors or Interest Holder of the Debtors, for any

8  act taken or omission made in connection with or related to the negotiation, formulation, or

9  preparation of the Plan and the Disclosure Statement, the approval of the Disclosure Statement, the

10  confirmation of the Plan, the consummation of the Plan, or the administration of the Plan, the

11  Cases, or the property to be distributed under the Plan, to the fullest extent permitted by applicable

12  statues and case law, except that the Plan Trust will be liable for the performance of obligations

13  assumed by it or imposed upon it under or by the Plan.

14  **XXI.**

15  **MISCELLANEOUS**

16  **21.1    Payment of Statutory Fees.**

17  All quarterly fees due and payable to the Office of the United States Trustee pursuant to

18  Section 1930(a)(6) of title 28 of the United States Code shall be paid in full on or before the

19  Effective Date, or, to the extent such quarterly fees are disputed, an adequate reserve shall have

20  been established and set aside for payment in full thereof, as required by Section 1129(a)(12) of the

21  Bankruptcy Code.  The Plan Trustee shall remain responsible for timely payment of quarterly fees

22  due and payable after the Effective Date and until the Group IV: Voluntary Debtors' Cases are

23  closed, to the extent required by Section 1930(a)(6) of title 28 of the United States Code.

24  **21.2    Payment Dates.**

25  Whenever any payment or ~~distribution~~Distribution to be made under the Plan shall be due on

26  a day other than a Business Day, such payment or ~~distribution~~Distribution shall instead be made,

27  without interest, on the immediately following Business Day.

28  **21.3    Headings.**

The headings used in ~~this~~the Disclosure Statement and in the Plan are inserted for convenience only and neither constitutes a portion of ~~this~~the Disclosure Statement or the Plan nor in any manner affect the construction of the provisions of ~~this~~the Disclosure Statement or the Plan.

**21.4    Other Documents and Actions.**

The Plan Trustee may execute such other documents and take such other actions as may be necessary or appropriate to effectuate the transactions contemplated under the Plan.

**21.5    Notices.**

All notices and requests in connection with ~~this~~the Disclosure Statement and the Plan shall be in writing and shall be hand delivered or sent by mail addressed to:

> **To the SunCal Plan Proponents**:
> Bruce V. Cook
> General Counsel
> Authorized Agent of the SunCal Plan Proponents
> 2392 Morse Ave
> Irvine, CA 92614-6234
>
> **With copies to:**
> Paul J. Couchot
> Winthrop & Couchot, Professional Corporation
> 660 Newport Center Drive, Suite 400
> Newport Beach, CA 92660
>
> Ronald Rus
> Rus Miliband & Smith A Professional Corporation
> 2211 Michelson Drive, Seventh Floor
> Irvine, California 92612

All notices and requests to any Person holding of record any Claim or Interest shall be sent to them at their last known address or to the last known address of their attorney of record.  Any such Person may designate in writing any other address for purposes of this Section 16.5, which designation will be effective on receipt.

**21.6    Governing Law.**

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), the laws of the State of California (without reference to its conflict of law rules) shall govern the construction and implementation of the Plan and any agreements,

1    documents, and instruments executed in connection with the Plan, unless otherwise specifically

2    provided in such agreements, documents, or instruments.

3    **21.7    Binding Effect.**

4    The Plan and all rights, duties and obligations thereunder shall be binding upon and inure to

5    the benefit of the Plan Sponsor Debtors, the Plan Trustee, Holders of Claims, Holders of Interests,

6    and their respective successors and assigns.

7    **21.8    Successors and Assigns.**

8    The rights, benefits, and obligations of any entity named or referred to in the Plan shall be

9    binding on, and shall inure to the benefit of, the heirs, executors, administrators, successors, and

10    assigns of such entity.

11    **21.9    Severability of Plan Provisions.**

12    If, prior to the Confirmation Date, any term or provision of the Plan is held by the

13    Bankruptcy Court to be illegal, impermissible, invalid, void or unenforceable, or otherwise to

14    constitute grounds for denying confirmation of the Plan, the Bankruptcy Court shall, with the

15    consent of the Group IV: Voluntary Debtors, have the power to interpret, modify or delete such

16    term or provision (or portions thereof) to make it valid or enforceable to the maximum extent

17    practicable, consistent with the original purpose of the term or provision held to be invalid, void or

18    unenforceable, and such term or provision shall then be operative as interpreted, modified or

19    deleted.  Notwithstanding any such interpretation, modification or deletion, the remainder of the

20    terms and provisions of the Plan shall in no way be affected, impaired or invalidated by such

21    interpretation, modification or deletion.

22    **21.10    No Waiver.**

23    The failure of the Group IV: Voluntary Debtors or any other Person to object to any Claim

24    for purposes of voting shall not be deemed a waiver of the Voluntary Debtors' Committee[2], the

25    Group IV: Voluntary Debtors' or the Plan Trustee's right to object to or examine such Claim, in

26    whole or in part.

27    **21.11    Inconsistencies.**

28

MAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMerged.DOC

1    In the event the terms or provisions of ~~this~~the Disclosure Statement are inconsistent with the

2    terms and provisions of the Plan or documents executed in connection with the Plan, the terms of

3    the Plan shall control.

4    **21.12   Exemption from Certain Transfer Taxes and Recording Fees.**

5    Pursuant to Section 1146(c) of the Bankruptcy Code, any transfers from a Group IV:

6    Voluntary Debtor to the Plan Trust or to any other Person or entity pursuant to the Plan, or any

7    agreement regarding the transfer of title to or ownership of any of the Group IV: Voluntary

8    Debtors' real or personal property or of any other interest in such property (including, without

9    limitation, a security interest) will not be subject to any document recording tax, stamp tax,

10   conveyance fee, intangibles or similar tax, mortgage tax,

11   stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or

12   recording fee, or other similar tax or governmental assessment, and the Confirmation Order will

13   direct the appropriate state or local governmental officials or agents to forego the collection of any

14   such tax or governmental assessment and to accept for filing and recordation any of the foregoing

15   instruments or other documents without the payment of any such tax or governmental assessment.

16   **21.13   Post-Confirmation Status Report.**

17   Within 180 days following the entry of the Confirmation Order, the Plan Trustee shall file a

18   status report with the Court explaining what progress has been made toward consummation of the

19   confirmed Plan.  The status report shall be served on the United States Trustee, the twenty largest

20   unsecured creditors, and those parties who have requested special notice.  Unless otherwise

21   ordered, further status reports shall be filed every 180 days and served on the same entities.

22   **21.14   Post-Confirmation Conversion/Dismissal.**

23   A creditor or party in interest may bring a motion to convert or dismiss the case under

24   § 1112(b), after the Plan is confirmed, if there is a default in performing the Plan.  The Plan

25   Trustee reserves the right to object to any motion for conversion or dismissal.  In addition, as set

26   forth in the definition of the Effective Date, the Effective Date may be further extended by order of

27   the Bankruptcy Court after notice and hearing to all parties in interest.  If the Court determines

28

1  there is no "cause" for the extension of the Effective Date, a party in interest may move to dismiss
2  or convert the case.

3       If the Court orders any of the Cases converted to Chapter 7 after the Plan is confirmed, then
4  all property that had been property of the Chapter 11 Estate, and that has not been disbursed
5  pursuant to the Plan, will revest in the Chapter 7 estate.  The automatic stay will be reimposed
6  upon the revested property, but only to the extent that relief from stay was not previously
7  authorized by the Court during this case.

8       **21.15**   **Final Decree.**

9       Once an Estate has been fully administered, as referred to in Bankruptcy Rule 3022, the
10  Plan Trustee, or other party as the Court shall designate in the Confirmation Order, shall file a
11  motion with the Court to obtain a final decree to close the Case of such Group IV: Voluntary
12  Debtor.

13  Date:  ~~June 20~~July 18~~5~~, 2011

14

15                      By: ____*/s/ Bruce v.*
16  *Cook*_____
                      Bruce Cook
17                   General Counsel, Authorized Agent for the Voluntary
                 Debtors and Acquisitions

18  **Submitted By:**

19  **WINTHROP COUCHOT**
20  **PROFESSIONAL CORPORATION**

21

22  By: */s/ Paul J. Couchot*_____
23       Paul J. Couchot,
General Insolvency Counsel for
24  the Voluntary Debtors

25  **RUS MILIBAND & SMITH**
**A PROFESSIONAL CORPORATION**
26

27  By: _*/s/ Ronald Rus*_____
     Ronald Rus, Esq.
28       Joel S. Miliband, Esq.
Attorneys for SunCal Management, LLC and

MAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMAINDOCS-#163418-v9-SCC_Group_IV_VD_DS.DOCMAINDOCS_#163418-v9-SCC_Group_IV_VD_DS.DOCMerged.DOC

1    SCC Acquisitions Inc.

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

| In re: | CHAPTER  11 |
|---|---|
| Debtor(s). | CASE NUMBER |

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 660 Newport Center Drive, 4th Fl., Newport Beach, CA 92660.

A true and correct copy of the foregoing document described as:  ~~FIRST AMENDED~~SECOND AMENDED **DISCLOSURE STATEMENT DESCRIBING** ~~FIRST AMENDED~~SECOND AMENDED **JOINT CHAPTER 11 PLAN FILED BY SJD PARTNERS, LTD. AND SJD DEVELOPMENT CORP. [GROUP IV: VOLUNTARY DEBTORS]**  will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

I.  **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On July 18, ~~ne 20,~~ 2011, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

☒  Service information continued on attached page

II.  **SERVED BY U.S. MAIL OR OVERNIGHT MAIL** (indicate method for each person or entity served)**:**
On _____, 2011, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐  Service information continued on attached page

III.  **SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on _____, 2011, I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| July 18, ~~ne 20,~~ 2011 | ~~Susan Connor~~Gretchen Crumpacker | /s/ ~~Susan Connor~~Gretchen Crumpacker |
|---|---|---|
| Date | Type Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

| In re: | CHAPTER  11 |
|---|---|
| Debtor(s). | CASE NUMBER |

**NEF SERVICE LIST**

- Selia M Acevedo    sacevedo@millerbarondess.com, mpritikin@millerbarondess.com
- Joseph M Adams    jadams@sycr.com
- Raymond H Aver    ray@averlaw.com
- James C Bastian    jbastian@shbllp.com
- Thomas Scott Belden    sbelden@kleinlaw.com, ecf@kleinlaw.com
- John A Boyd    fednotice@tclaw.net
- Mark Bradshaw    mbradshaw@shbllp.com
- Gustavo E Bravo    gbravo@smaha.com
- Jeffrey W Broker    jbroker@brokerlaw.biz
- Brendt C Butler    bbutler@mandersonllp.com
- Andrew W Caine    acaine@pszyjw.com
- Carollynn Callari    ccallari@venable.com
- Cathrine M Castaldi    ccastaldi@rusmiliband.com
- Tara Castro Narayanan    tara.narayanan@msrlegal.com, lisa.king@msrlegal.com
- Dan E Chambers    dchambers@jmbm.com
- Shirley Cho    scho@pszjlaw.com
- Vonn Christenson    vrc@paynefears.com
- Brendan P Collins    bpcollins@bhfs.com
- Vincent M Coscino    vcoscino@allenmatkins.com, emurdoch@allenmatkins.com
- Paul J Couchot    pcouchot@winthropcouchot.com, pj@winthropcouchot.com;sconnor@winthropcouchot.com
- Jonathan S Dabbieri    dabbieri@sullivan.com,
  hill@sullivanhill.com;mcallister@sullivanhill.com;stein@sullivanhill.com;vidovich@sullivanhill.com
- Ana Damonte    ana.damonte@pillsburylaw.com
- Vanessa S Davila    vsd@amclaw.com
- Melissa Davis    mdavis@shbllp.com
- Daniel Denny    ddenny@gibsondunn.com
- Caroline Djang    crd@jmbm.com
- Donald T Dunning    ddunning@dunningLaw.com
- Meredith R Edelman    meredith.edelman@dlapiper.com
- Joseph A Eisenberg    jae@jmbm.com
- Lei Lei Wang Ekvall    lekvall@wgllp.com
- Richard W Esterkin    resterkin@morganlewis.com
- Marc C Forsythe    kmurphy@goeforlaw.com
- Alan J Friedman    afriedman@irell.com
- Steven M Garber    steve@smgarberlaw.com
- Christian J Gascou    cgascou@gascouhopkins.com
- Barry S Glaser    bglaser@swjlaw.com
- Robert P Goe    kmurphy@goeforlaw.com, rgoe@goeforlaw.com;mforsythe@goeforlaw.com
- Eric D Goldberg    egoldberg@stutman.com
- Richard H Golubow    rgolubow@winthropcouchot.com, pj@winthropcouchot.com
- Michael J Gomez    mgomez@frandzel.com, efiling@frandzel.com;sking@frandzel.com
- Kelly C Griffith    bkemail@harrisbeach.com
- Matthew Grimshaw    mgrimshaw@rutan.com
- Kavita Gupta    kgupta@winthropcouchot.com
- Asa S Hami    ahami@morganlewis.com
- Michael J Hauser    michael.hauser@usdoj.gov
- D Edward Hays    ehays@marshackhays.com
- Michael C Heinrichs    mheinrichs@omm.com
- Harry D. Hochman    hhochman@pszjlaw.com, hhochman@pszjlaw.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*                                                                                                    **F 9013-3.1**

| In re: | CHAPTER  11 |
|---|---|
| Debtor(s). | CASE NUMBER |

- Jonathan M Hoff     jonathan.hoff@cwt.com
- Nancy Hotchkiss     nhotchkiss@trainorfairbrook.com
- Michelle Hribar     mhribar@rutan.com
- John J Immordino     john.immordino@wilsonelser.com, raquel.burgess@wilsonelser.com
- Lawrence A Jacobson     laj@cohenandjacobson.com
- Michael J Joyce     mjoyce@crosslaw.com
- Stephen M Judson     sjudson@fablaw.com
- Kaleb L Judy     ecf@kleinlaw.com, kjudy@kleinlaw.com
- Steven J Kahn     skahn@pszyjw.com
- Sheri Kanesaka     sheri.kanesaka@bryancave.com
- David I Katzen     katzen@ksfirm.com
- Christopher W Keegan     ckeegan@kirkland.com, gdupre@kirkland.com;alevin@kirkland.com
- Payam Khodadadi     pkhodadadi@winthropcouchot.com, pj@winthropcouchot.com
- Irene L Kiet     ikiet@hkclaw.com
- Claude F Kolm     claude.kolm@acgov.org
- Mark J Krone     mk@amclaw.com, crs@amclaw.com;amc@amclaw.com
- David B Lally     davidlallylaw@gmail.com
- Leib M Lerner     leib.lerner@alston.com
- Peter W Lianides     plianides@winthropcouchot.com, pj@winthropcouchot.com
- Charles Liu     cliu@winthropcouchot.com
- Kerri A Lyman     klyman@irell.com
- Mariam S Marshall     mmarshall@marshallramoslaw.com
- Robert C Martinez     rmartinez@mclex.com
- Michael D May     mdmayesq@verizon.net
- Hutchison B Meltzer     hmeltzer@wgllp.com
- Krikor J Meshefejian     kjm@lnbrb.com
- Joel S. Miliband     jmiliband@rusmiliband.com
- James M Miller     jmiller@millerbarondess.com, vgunderson@millerbarondess.com
- Louis R Miller     smiller@millerbarondess.com
- Craig Millet     cmillet@gibsondunn.com, pcrawford@gibsondunn.com;cmillet@gibsondunn.com
- Randall P Mroczynski     randym@cookseylaw.com
- Mike D Neue     mneue@thelobelfirm.com, jmattiace@thelobelfirm.com;pnelson@thelobelfirm.com
- Robert Nida     Rnida@castlelawoffice.com
- Henry H Oh     henry.oh@dlapiper.com, janet.curley@dlapiper.com
- Sean A Okeefe     sokeefe@okeefelc.com
- Robert B Orgel     rorgel@pszjlaw.com, rorgel@pszjlaw.com
- Malhar S Pagay     mpagay@pszjlaw.com, mpagay@pszjlaw.com
- Daryl G Parker     dparker@pszjlaw.com
- Penelope Parmes     pparmes@rutan.com
- Robert J Pfister     rpfister@ktbslaw.com
- Ronald B Pierce     ronald.pierce@sdma.com
- Katherine C Piper     kpiper@steptoe.com
- Cassandra J Richey     cmartin@pprlaw.net
- Debra Riley     driley@allenmatkins.com
- James S Riley     tgarza@sierrafunds.com
- Todd C. Ringstad     becky@ringstadlaw.com
- R Grace Rodriguez     ecf@lorgr.com
- Martha E Romero     Romero@mromerolawfirm.com
- Ronald Rus     rrus@rusmiliband.com
- John P Schafer     jschafer@mandersonllp.com
- John E Schreiber     jschreiber@dl.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*

**F 9013-3.1**

| In re: | CHAPTER 11 |
| --- | --- |
| Debtor(s). | CASE NUMBER |

- William D Schuster     bills@allieschuster.org
- Christopher P Simon     csimon@crosslaw.com
- Wendy W Smith     wendy@bindermalter.com
- Steven M Speier     Sspeier@Squarmilner.com, ca85@ecfcbis.com
- Steven M Speier (TR)     Sspeier@asrmanagement.com, ca85@ecfcbis.com
- Michael St James     ecf@stjames-law.com
- Michael K Sugar     msugar@irell.com
- Cathy Ta     cathy.ta@bbklaw.com, Arthur.Johnston@bbklaw.com;Kenneth.Burgess@bbklaw.com
- David A Tilem     davidtilem@tilemlaw.com,
  malissamurguia@tilemlaw.com;dianachau@tilemlaw.com;kmishigian@tilemlaw.com
- James E Till     jtill@thelobelfirm.com, jmattiace@thelobelfirm.com;pnelson@thelobelfirm.com
- United States Trustee (SA)     ustpregion16.sa.ecf@usdoj.gov
- Carol G Unruh     cgunruh@sbcglobal.net
- Annie Verdries     verdries@lbbslaw.com
- Jason Wallach     jwallach@gladstonemichel.com
- Joshua D Wayser     , kim.johnson@kattenlaw.com
- Marc J Winthrop     mwinthrop@winthropcouchot.com, pj@winthropcouchot.com
- David M Wisebloom     dwiseblood@seyfarth.com
- Brett K Wiseman     bwiseman@aalaws.com
- Dean A Ziehl     dziehl@pszjlaw.com, dziehl@pszjlaw.com
- Marc A. Zimmerman     joshuasdaddy@att.net


- Selia M Acevedo     sacevedo@millerbarondess.com, mpritikin@millerbarondess.com
- Joseph M Adams     jadams@sycr.com
- Raymond H Aver     ray@averlaw.com
- James C Bastian     jbastian@shbllp.com
- Thomas Scott Belden     sbelden@kleinlaw.com, ecf@kleinlaw.com
- John A Boyd     fednotice@tclaw.net
- Mark Bradshaw     mbradshaw@shbllp.com
- Gustavo E Bravo     gbravo@smaha.com
- Jeffrey W Broker     jbroker@brokerlaw.biz
- Brendt C Butler     bbutler@mandersonllp.com
- Andrew W Caine     acaine@pszjw.com
- Carollynn Callari     ccallari@venable.com
- Cathrine M Castaldi     ccastaldi@rusmiliband.com
- Tara Castro Narayanan     tara.narayanan@msrlegal.com, lisa.king@msrlegal.com
- Dan E Chambers     dchambers@jmbm.com
- Shirley Cho     scho@pszjlaw.com
- Vonn Christenson     vrc@paynefears.com
- Brendan P Collins     bpcollins@bhfs.com
- Vincent M Coscino     vcoscino@allenmatkins.com, emurdoch@allenmatkins.com
- Paul J Couchot     pcouchot@winthropcouchot.com, pj@winthropcouchot.com;sconnor@winthropcouchot.com
- Jonathan S Dabbieri     dabbieri@sullivan.com,
  hill@sullivanhill.com;mcallister@sullivanhill.com;stein@sullivanhill.com;vidovich@sullivanhill.com
- Ana Damonte     ana.damonte@pillsburylaw.com
- Vanessa S Davila     vsd@amclaw.com
- Melissa Davis     mdavis@shbllp.com
- Daniel Denny     ddenny@gibsondunn.com
- Caroline Djang     crd@jmbm.com
- Donald T Dunning     ddunning@dunningLaw.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*                                                                                                    **F 9013-3.1**

| In re: | CHAPTER  11 |
|---|---|
| Debtor(s). | CASE NUMBER |

- Meredith R Edelman — meredith.edelman@dlapiper.com
- Joseph A Eisenberg — jae@jmbm.com
- Lei Lei Wang Ekvall — lekvall@wgllp.com
- Richard W Esterkin — resterkin@morganlewis.com
- Marc C Forsythe — kmurphy@goeforlaw.com
- Alan J Friedman — afriedman@irell.com
- Steven M Garber — steve@smgarberlaw.com
- Christian J Gascou — cgascou@gascouhopkins.com
- Barry S Glaser — bglaser@swjlaw.com
- Robert P Goe — kmurphy@goeforlaw.com, rgoe@goeforlaw.com;mforsythe@goeforlaw.com
- Eric D Goldberg — egoldberg@stutman.com
- Richard H Golubow — rgolubow@winthropcouchot.com, pj@winthropcouchot.com
- Michael J Gomez — mgomez@frandzel.com, efiling@frandzel.com;sking@frandzel.com
- Kelly C Griffith — bkemail@harrisbeach.com
- Matthew Grimshaw — mgrimshaw@rutan.com
- Kavita Gupta — kgupta@winthropcouchot.com
- Asa S Hami — ahami@morganlewis.com
- Michael J Hauser — michael.hauser@usdoj.gov
- D Edward Hays — ehays@marshackhays.com
- Michael C Heinrichs — mheinrichs@omm.com
- Harry D. Hochman — hhochman@pszjlaw.com, hhochman@pszjlaw.com
- Jonathan M Hoff — jonathan.hoff@cwt.com
- Nancy Hotchkiss — nhotchkiss@trainorfairbrook.com
- Michelle Hribar — mhribar@rutan.com
- John J Immordino — john.immordino@wilsonelser.com, raquel.burgess@wilsonelser.com
- Lawrence A Jacobson — laj@cohenandjacobson.com
- Michael J Joyce — mjoyce@crosslaw.com
- Stephen M Judson — sjudson@fablaw.com
- Kaleb L Judy — ecf@kleinlaw.com, kjudy@kleinlaw.com
- Steven J Kahn — skahn@pszyjw.com
- Sheri Kanesaka — sheri.kanesaka@bryancave.com
- David I Katzen — katzen@ksfirm.com
- Christopher W Keegan — ckeegan@kirkland.com, gdupre@kirkland.com;alevin@kirkland.com
- Payam Khodadadi — pkhodadadi@winthropcouchot.com, pj@winthropcouchot.com
- Irene L Kiet — ikiet@hkclaw.com
- Claude F Kolm — claude.kolm@acgov.org
- Mark J Krone — mk@amclaw.com, crs@amclaw.com;amc@amclaw.com
- David B Lally — davidlallylaw@gmail.com
- Leib M Lerner — leib.lerner@alston.com
- Peter W Lianides — plianides@winthropcouchot.com, pj@winthropcouchot.com
- Charles Liu — cliu@winthropcouchot.com
- Kerri A Lyman — klyman@irell.com
- Mariam S Marshall — mmarshall@marshallramoslaw.com
- Robert C Martinez — rmartinez@mclex.com
- Michael D May — mdmayesq@verizon.net
- Hutchison B Meltzer — hmeltzer@wgllp.com
- Krikor J Meshefejian — kjm@lnbrb.com
- Joel S. Miliband — jmiliband@rusmiliband.com
- James M Miller — jmiller@millerbaronedss.com, vgunderson@millerbaroness.com
- Louis R Miller — smiller@millerbaroness.com
- Randall P Mroczynski — randym@cookseylaw.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

January 2009

F 9013-3.1

| In re: | | CHAPTER  11 |
|---|---|---|
| | Debtor(s). | CASE NUMBER |

- Mike D Neue     mneue@thelobelfirm.com, jmattiace@thelobelfirm.com;pnelson@thelobelfirm.com
- Robert Nida     Rnida@castlelawoffice.com
- Henry H Oh     henry.oh@dlapiper.com, janet.curley@dlapiper.com
- Sean A Okeefe     sokeefe@okeefelc.com
- Robert B Orgel     rorgel@pszjlaw.com, rorgel@pszjlaw.com
- Malhar S Pagay     mpagay@pszjlaw.com, mpagay@pszjlaw.com
- Penelope Parmes     pparmes@rutan.com
- Ronald B Pierce     ronald.pierce@sdma.com
- Katherine C Piper     kpiper@steptoe.com
- Cassandra J Richey     cmartin@pprlaw.net
- Debra Riley     driley@allenmatkins.com
- James S Riley     tgarza@sierrafunds.com
- Todd C. Ringstad     becky@ringstadlaw.com
- R Grace Rodriguez     ecf@lorgr.com
- Martha E Romero     Romero@mromerolawfirm.com
- Ronald Rus     rrus@rusmiliband.com
- John P Schafer     jschafer@mandersonllp.com
- John E Schreiber     jschreiber@dl.com
- William D Schuster     bills@allieschuster.org
- Christopher P Simon     csimon@crosslaw.com
- Wendy W Smith     wendy@bindermalter.com
- Steven M Speier     Sspeier@Squarmilner.com, ca85@ecfcbis.com
- Steven M Speier (TR)     Sspeier@asrmanagement.com, ca85@ecfcbis.com
- Michael St James     ecf@stjames-law.com
- Michael K Sugar     msugar@irell.com
- Cathy Ta     cathy.ta@bbklaw.com, Arthur.Johnston@bbklaw.com;Kenneth.Burgess@bbklaw.com
- David A Tilem     davidtilem@tilemlaw.com, malissamurguia@tilemlaw.com;dianachau@tilemlaw.com;kmishigian@tilemlaw.com
- James E Till     jtill@thelobelfirm.com, jmattiace@thelobelfirm.com;pnelson@thelobelfirm.com
- United States Trustee (SA)     ustpregion16.sa.ecf@usdoj.gov
- Carol G Unruh     cgunruh@sbcglobal.net
- Annie Verdries     verdries@lbbslaw.com
- Jason Wallach     jwallach@gladstonemichel.com
- Joshua D Wayser     , kim.johnson@kattenlaw.com
- Marc J Winthrop     mwinthrop@winthropcouchot.com, pj@winthropcouchot.com
- David M Wiseblood     dwiseblood@seyfarth.com
- Brett K Wiseman     bwiseman@aalaws.com
- Dean A Ziehl     dziehl@pszjlaw.com, dziehl@pszjlaw.com
- Marc A. Zimmerman     joshuasdaddy@att.net

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*                                                                                             **F 9013-3.1**