PAUL J. COUCHOT -- State Bar No. 131934
SEAN A. O'KEEFE -- State Bar No. 122417
**WINTHROP COUCHOT**
**PROFESSIONAL CORPORATION**
660 Newport Center Drive, Fourth Floor
Newport Beach, CA 92660
Telephone: (949) 720-4100
Facsimile: (949) 720-4111

General Insolvency Counsel for Voluntary Debtors,
Palmdale Hills Property, LLC,  et. al.

RONALD RUS - State Bar No. 67369
JOEL S. MILIBAND - State Bar No. 77438
RUS MILIBAND & SMITH
A PROFESSIONAL CORPORATION
2211 Michelson Drive, Seventh Floor
Irvine, California 92612
Telephone: (949) 752-7100
Facsimile:  (949) 252-1514

Counsel for SunCal Management LLC and
SCC Acquisitions Inc.

# UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA
### SANTA ANA DIVISION

|  |  |
|---|---|
| In re:<br><br>PALMDALE HILLS PROPERTY, LLC,<br>and Its Related Debtors,<br><br>       Jointly Administered Debtors<br>       and Debtors-in-Possession. | Case No. 8:08-bk-17206-ES<br>Jointly Administered With Case Nos.<br>8:08-bk-17209-ES; 8:08-bk-17224-ES;<br>8:08-bk-17242-ES; 8:08-bk-17225-ES; 8:08-bk-17245-ES;<br>8:08-bk-17227-ES; 8:08-bk-17246-ES;8:08-bk-17230-ES;<br>8:08-bk-17231-ES; 8:08-bk-17236-ES; 8:08-bk-17248-ES;<br>8:08-bk-17249-ES; 8:08-bk-17573 ES;8:08-bk-17574 ES;<br>8:08-bk-17575 ES;8:08-bk-17404-ES; 8:08-bk-17407-ES;<br>8:08-bk-17408-ES; 8:08-bk-17409-ES;8:08-bk-17458-ES;<br>8:08-bk-17465-ES;8:08-bk-17470-ES; 8:08-bk-17472-ES;<br>and 8:08-bk-17588-ES |

Affects:

☐ All Debtors
☒ Palmdale Hills Property, LLC
☒ SunCal Beaumont Heights, LLC
☐ SCC/Palmdale
☒ SunCal Johannson Ranch, LLC
☐ SunCal Summit Valley, LLC
☒ SunCal Emerald Meadows LLC
☒ SunCal Bickford Ranch, LLC
☒ Acton Estates, LLC
☐ Seven Brothers LLC
☒ SJD Partners, Ltd.
☒ SJD Development Corp.
☐ Kirby Estates, LLC
☒ SunCal Communities I, LLC
☐ SunCal Communities III, LLC
☒ SCC Communities LLC
☒ North Orange Del Rio Land, LLC
☒ Tesoro SF, LLC

Chapter 11 cases

**STATEMENT OF SUNCAL PLAN
PROPONENTS REGARDING THE
PROPOSED DELETIONS TO THE SEVEN
PROPOSED DISCLOSURE STATEMENTS
FILED BY THE SUNCAL PLAN
PROPONENTS**

Date:      July 22, 2011
Time:     11:00 a.m.
Place:    Courtroom 5A

1

☒ LB-L-SunCal Oak Valley, LLC
☒ SunCal Heartland, LLC

2

☐ LB-L-SunCal Northlake, LLC

3

☒ SunCal Marblehead, LLC
☒ SunCal Century City, LLC

4

☒ SunCal PSV, LLC

5

☒ Delta Coves Venture, LLC
☒ SunCal Torrance, LLC

6

☒ SunCal Oak Knoll, LLC

7        The Voluntary Debtors and SCC Acquisitions, Inc. ("SunCal Plan Proponents"), hereby file

8   this statement regarding the proposed deletions to the seven proposed disclosure statements filed by

9   the SunCal Plan Proponents.

10        On July 22, 2011, the Court held a hearing on the proposed disclosure statements

11  (collectively, the "Disclosure Statements") describing the proposed *Second Amended Chapter 11*

12  *Plans* (collectively, the "Plans") filed by the SunCal Plan Proponents.  The Court indicated that

13  certain language should be excised from their Disclosure Statements, and the Court set July 26,

14  2011 at 12:00 p.m. (Pacific) as the deadline for the Lehman Creditors to submit the proposed

15  deletions to the Disclosure Statements for the remaining seven Plans ("Lehman Statement").

16        The SunCal Proponents have agreed to substantially all of the deletions in the Lehman

17  Statement with the exception that the SunCal Plan Proponents wish to retain the phrase, "believing

18  the request was made in good faith."  The Lehman Creditors have agreed to the retention of this

19  phrase. Annexed hereto as **Exhibit A** through **Exhibit G** are blackline versions of the Disclosure

20  Statements that reflect the deletions proposed by the SunCal Plan Proponents, and agreed to by the

21  Lehman Creditors.

22        Accordingly, the SunCal Plan Proponents respectfully request the Court to adopt and

23  approve the agreed upon deletions in the annexed exhibits.

24  DATED:  July 28, 2011                              **WINTHROP COUCHOT**
                                                   **PROFESSIONAL CORPORATION**

25

26                                                 By:   */s/ Paul J. Couchot*
                                                        Paul J. Couchot

27                                                      Sean A. O'Keefe

28                                                 General Insolvency Counsel for Palmdale Hills
                                                   Property, LLC et. al.

2

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT A**

**(Proposed Deletions: VD Group I Disclosure Statement)**

1    Agreement to a series of newly formed Lehman-controlled entities (each with "SCLV" in its name,

2    for "SunCal-Lehman Venture"). The agreement further provided that the entity taking title to the

3    Project would assume the  Lehman Lender debt obligations associated with the Projects, assume

4    certain bond obligations associated with the Projects, and provide indemnifications to SunCal and

5    the Debtors for unpaid claims.

6          On August 25, 2008, the Settlement Agreement and a series of related documents were

7    formally executed by SunCal and the applicable Lehman Lenders and Lehman Equity Members at a

8    meeting held in Los Angeles on August 25, 2008.  Once these documents were signed, all that

9    remained was the mechanical closing of the series of transactions described in the Settlement

10   Agreement. Since all of the conditions precedent to the closings had been satisfied, or could have

11   been satisfied at, or shortly after the meeting, this should have occurred at the August 25, 2008

12   meeting, or shortly after the meeting. However, the Lehman Representative asked SunCal to extend

13   the closing date for thirty days, to September 30, 2008. According to the Lehman Representatives,

14   this short extension would enable them to secure certain outstanding third party consents. Although

15   SunCal knew these third party consents were readily obtainable within a few days, they agreed to

16   this extension, believing the request was made in good faith. In fact, as more fully explained blow, it

17   was not.

18          **4.2.8    The Lehman Lenders' Undisclosed Sale of Most of the Debtors' Loans.**

19   As explained above, the Settlement Agreement was duly executed by all parties at a formal closing

20   meeting held on August 25, 2008. When the parties signed this agreement, which was a binding

21   contract, they both represented that they both intended and had the power and capacity to perform

22   all of the obligations undertaken therein. However, in the case of the Lehman Entities, this

23   representation was later discovered to be false. When the closing occurred on August 25, 2008, the

24   Lehman Lenders had already sold the very obligations they were agreeing to assume and restructure

25   in the Settlement Agreement to Fenway Capital pursuant to a repurchase agreement.  Accordingly,

26   as of August 25, 2008, they lacked the power to perform the most essential undertakings that they

27   agreed to perform in the Settlement Agreement. Instead of disclosing this fact at the August 25,

28   2008 meeting, the Lehman Lenders requested additional time to execute the agreed upon transfers

Exhibit A, Page 4

1   provided for under this binding agreement. The Lehman Lenders needed ~~to~~ this delay ~~for an obvious,~~

2   ~~but undisclosed reason: They~~ because they lacked the ability to perform the very obligations they

3   had just agreed to perform in the Settlement Agreement.

4        The Lehman Representatives also did not disclose at the August 25, 2008 closing that they

5   intended to sell the Pacific Point First Loan to Lehman Re, approximately a week later, *even though*

6   *this loan was also subject to the Settlement Agreement*. To the contrary, the Lehman Representatives

7   affirmatively concealed these facts from SunCal and the Debtors by asserting that ownership still

8   existed in the case of seven of the eight loans.

9        **4.2.9.   Lehman's Foreclosure Sale and Purchase of the Pacific Point Project.**

10       At the time of the Restructuring Agreement and the Settlement Agreement were signed, the

11   Pacific Point Project, which was still owned by SJD Partners, was among the Projects included in

12   the Restructuring Agreement and the Settlement Agreement.  Pursuant to the Restructuring

13   Agreement, and as detailed in the Settlement Agreement attached thereto, SunCal, SJD Partners, and

14   its parent company, SJD Development, all agreed that they would not interfere with Lehman ALI's

15   (or its designee's) foreclosure on the Pacific Point Project. They further agreed that a new Lehman

16   entity, LV Pacific Point, would purchase the Pacific Point Project upon foreclosure and that Lehman

17   ALI and LV Pacific Point would (a) assume SJD Partners' and SJD Development's outstanding

18   accounts payable for Pacific Point third-party vendors, (b) assume certain bond liabilities associated

19   with the Pacific Point Project, and (c) pay for the millions of dollars worth of work that Lehman

20   ALI representatives had authorized.

21       As previously stated, the Settlement Agreement was signed on August 25, 2008 by the

22   SunCal parties, including SJD Partners and SJD Development.  It was also signed by Gilhool as

23   authorized signatory on behalf of both Lehman ALI and LV Pacific Point.  As a signatory to the

24   Settlement Agreement, LV Pacific Point was required to purchase the Pacific Point Project at the

25   foreclosure sale subject to the above obligations. Consistent with this agreement, the City of San

26   Juan Capistrano executed an estoppel certificate for the benefit of SJD Partners and Lehman ALI—

27   at Lehman ALI's request—on August 26, 2008, two days before the foreclosure sale.  This

28   certificate stated, among other things, that the "Acquiring Entity [LV Pacific Point] shall by

1 operation of law become the legal successor-in-interest to Developer [SJD Partners]" under SJD

2 Partners' agreements with the City. That certificate further provided that there existed no breaches,

3 defaults, or claims under SJD Partners' agreements with the City.

4     On August 28, 2008, Lehman ALI foreclosed on the Pacific Point Project, and title was

5 transferred to LV Pacific Point at the foreclosure sale. However, Lehman ALI and LV Pacific Point

6 failed to assume the liabilities and obligations associated with this Project as agreed. This breach of

7 the parties' agreement, left SJD Partners without title to the Pacific Point Project, but with

8 substantial unsecured claims relating to the Project, including certain bond claims of approximately

9 $34 million. Moreover, since Lehman Ali and LV Pacific Point have continued to ~~ignore~~ breach

10 their obligations under the above agreement, unpaid taxes, fines, and penalties have continued to

11 accrue to the detriment of the Project and these claims are being asserted against SJD Partners.

12     Had SunCal, SJD Partners and SJD Development known that Lehman ALI and LV Pacific

13 Point had no intention of honoring their obligations under the foregoing agreement, they never

14 would have agreed to cooperate with the foreclosure. Instead, SJD Partners would have filed for

15 bankruptcy earlier, thereby mitigating the damages from Lehman Ali's breach, by allowing creditors

16 recourse to the value of the Project.

17     This course of conduct is relevant to the unsecured creditors of the Group I Debtors for the

18 following reason. The holders of bond claims against SJD Partners are asserting their massive

19 claims against the estates of all of the Debtors, including the estates of the Group I Debtors.

20 Accordingly, Lehman Ali's wrongs against SJD Partners directly affect the Group I Debtors' cases.

21     **4.2.10  Alvarez and Marsal Take Over Control of the Lehman Entities After the**

22     **Chapter 11 Filings of LBHI and LCPI.**

23     LBHI filed for bankruptcy in September 2008 and LCPI filed for bankruptcy in October

24 2008. After LBHI's filing, Bryan Marsal ("Marsal") of Alvarez & Marsal ("A&M") was appointed

25 to serve as LBHI's Chief Restructuring Officer. Marsal and A&M are in charge of liquidating the

26 now defunct Lehman Entities, including Chapter 11 debtors LBHI and LCPI, and the non-bankrupt

27 Lehman Lenders (Lehman ALI, OVC, and Northlake Holdings, as well as the non-bankrupt Lehman

28 Equity Members.

41

1    Although A&M was not employed until after the events that occurred on August 25, 2008

2    described above, it should be noted that A&M hired the same law firm that represented the Lehman

3    Lenders in the August 25, 2008 meeting – Weil, Gotshal & Manges, LLP. Moreover, as more fully

4    explained herein, it was A&M that directed Lehman ALI not to perform its contractual obligations

5    under the Settlement Agreement after September of 2008. ~~Accordingly, the same individuals that~~

6    ~~caused the damages to unsecured creditors by insisting upon the breach of the Settlement~~

7    ~~Agreement, are now asking for their vote in the competing plan filed by the Lehman Lenders.~~

8    LBHI's bankruptcy filing and the Lehman Lenders refusal, at A&M's direction, to close the

9    transactions provided for under the Settlement Agreement as agreed, were not small matters. They

10    severely damaged the Debtors. Although the Debtors were not proceeding with any new

11    construction or development, the Debtors were still required to expend significant sums on site

12    security, erosion control, property taxes and other measures in order to prevent the Projects from

13    becoming a public safety hazard, and in order to avoid the loss of valuable entitlements, and to

14    mitigate penalties and fines being incurred by the Projects.  Although SunCal and the Debtors

15    repeatedly requested that the Lehman Entities pay for critical health and safety and value

16    preservation measures on the Projects, these efforts were unavailing.

17    Between October 9 and November 4, 2008, SunCal's general counsel Cook sent Robert

18    Brusco, an authorized agent of the Lehman Entities, nearly two dozen letters requesting that the

19    Lehman Lenders provide the funding necessary to address critical needs on the Projects as promised.

20    A summary of these health and safety notices are attached hereto as Exhibit "5".  The Lehman

21    Entities ignored these requests until November 2008, when Brusco, purportedly on behalf of the

22    Lehman Lenders, delivered the message that the Lehman Lenders were unwilling to fund the

23    Projects and that, instead, they intended to foreclose on all of the Projects.

24    As a result, as set forth in Exhibit "4," there are now over 240 vendors, municipalities,

25    counties and bonding companies claiming over $400 million in work, improvements and property

26    tax claims against the Projects.  Substantially all of these sums are due to work performed or bonded

27    at Lehman's request based upon Lehman's promises of payment.

28    4.3    **The Group I: Voluntary Debtors' Potential Preferential Transfers**.

42

1    agents of these entities on behalf of the Voluntary Debtors.  The claims encompassed by this

2    amendment include claims that are based upon both prepetition and post-post petition actionable

3    conduct under both state law and federal law against the Lehman Entities and/or their agents.

4        **5.1.1   LCPI's Motions for Relief from the Automatic Stay Against Certain of**

5        **the Voluntary Debtors' Projects and Related Appeals.**

6        On January 23, 2009, LCPI and Lehman ALI filed various motions for relief from the

7    automatic stay against a number of the Voluntary Debtors including Group I Debtors Palmdale

8    Hills, SunCal Bickford and Acton Estates (the "Lehman Entities' Stay Motions"). Although the

9    Debtors, were able to defeat these motions, they are relevant in the following respect. Had the

10   motions filed by LCPI and Lehman Ali succeeded, it is almost certain that unsecured creditors

11   would have received nothing on their claims. Moreover, as more fully explained herein, since

12   Lehman Ali and LCPI did not even own the loans they were seeking to foreclose upon these

13   motions should never have been filed in the first instance. ~~Yet now, these same parties- Lehman Ali~~

14   ~~and LCPI   are asking these same creditors to vote on their plan and to "trust" them.~~

15       **5.1.   The Debtors' Various Motions Relating to Financing for the Projects and to Pay**

16       **Professional Fees.**

17       **5.2.1   The Voluntary Debtors' Initial Motion for Surcharge and Use of Cash**

18       **Collateral.**

19       On January 16, 2009, seven of the Debtors, including Group I Debtor Palmdale Hills, filed a

20   motion authorizing Palmdale Hills to use and surcharge, pursuant to 11 U.S.C. § 506(c), and/or use

21   the purported cash collateral of LCPI arising from the Ritter Ranch Loan Agreement, pursuant to 11

22   U.S.C. § 363(c)(2), in order to pay for the reasonable and necessary maintenance expenses required

23   to preserve the value of such Debtors' Projects subject to deeds of trust and other security interests

24   held by LCPI.

25       LCPI objected to the motion and subsequently filed a motion in its own Chapter 11

26   proceeding in the Southern District of New York seeking an order barring the motion as a violation

27   of the automatic stay.  Although the Debtors believe that LCPI's stay was not violated in any way

28   by the Motion, the Motion was taken off calendar prior to any ruling by the New York Bankruptcy

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT B**

**(Proposed Deletions: VD Group II Disclosure Statement)**

1    Settlement Agreement, the form of which was attached to the Restructuring Agreement.  The

2    Settlement Agreement provided for the transfer of the Projects included within the

3    RestructuringAgreement to a series of newly formed Lehman-controlled entities (each with "SCLV"

4    in its name, for "SunCal-Lehman Venture"). The agreement further provided that the entity taking

5    title to the Project would assume the  Lehman Lender debt obligations associated with the Projects,

6    assume certain bond obligations associated with the Projects, and provide indemnifications to

7    SunCal and the Debtors for unpaid claims.

8         On August 25, 2008, the Settlement Agreement and a series of related documents were

9    formally executed by SunCal and the applicable Lehman Lenders and Lehman Equity Members at a

10   meeting held in Los Angeles on August 25, 2008.  Once these documents were signed, all that

11   remained was the mechanical closing of the series of transactions described in the Settlement

12   Agreement. Since all of the conditions precedent to the closings had been satisfied, or could have

13   been satisfied at, or shortly after the meeting, this should have occurred at the August 25, 2008

14   meeting, or shortly after the meeting. However, the Lehman Representative asked SunCal to extend

15   the closing date for thirty days, to September 30, 2008. According to the Lehman Representatives,

16   this short extension would enable them to secure certain outstanding third party consents. Although

17   SunCal knew these third party consents were readily obtainable within a few days, they agreed to

18   this extension, believing the request was made in good faith. ~~In fact, as more fully explained blow, it~~

19   ~~was not.~~

20        **4.2.8    Alvarez and Marsal Take Over Control of the Lehman Entities After the**

21        **Chapter 11 Filings of LBHI and LCPI.**

22        LBHI filed for bankruptcy in September 2008 and LCPI filed for bankruptcy in October

23   2008. After LBHI's filing, Bryan Marsal ("Marsal") of Alvarez & Marsal ("A&M") was appointed

24   to serve as LBHI's Chief Restructuring Officer. Marsal and A&M are in charge of liquidating the

25   now defunct Lehman Entities, including Chapter 11 debtors LBHI and LCPI, and the non-bankrupt

26   Lehman Lenders (Lehman ALI, OVC, and Northlake Holdings, as well as the non-bankrupt Lehman

27   Equity Members.

28

33

1        Although A&M was not employed until after the events that occurred on August 25, 2008

2  described above, it should be noted that A&M hired the same law firm that represented the Lehman

3  Lenders in the August 25, 2008 meeting – Weil, Gotshal & Manges, LLP. Moreover, as more fully

4  explained herein, it was A&M that directed Lehman ALI not to perform its contractual obligations

5  under the Settlement Agreement after September of 2008. ~~Accordingly, the same individuals that~~

6  ~~caused the damages to unsecured creditors by insisting upon the breach of the Settlement~~

7  ~~Agreement, are now asking for their vote in the competing plan filed by the Lehman Lenders.~~

8        LBHI's bankruptcy filing and the Lehman Lenders refusal, at A&M's direction, to close the

9  transactions provided for under the Settlement Agreement as agreed, were not small matters. They

10  severely damaged the Debtors. Although the Debtors were not proceeding with any new

11  construction or development, the Debtors were still required to expend significant sums on site

12  security, erosion control, property taxes and other measures in order to prevent the Projects from

13  becoming a public safety hazard, and in order to avoid the loss of valuable entitlements, and to

14  mitigate penalties and fines being incurred by the Projects.  Although SunCal and the Debtors

15  repeatedly requested that the Lehman Entities pay for critical health and safety and value

16  preservation measures on the Projects, these efforts were unavailing.

17        Between October 9 and November 4, 2008, SunCal's general counsel Cook sent Robert

18  Brusco, an authorized agent of the Lehman Entities, nearly two dozen letters requesting that the

19  Lehman Lenders provide the funding necessary to address critical needs on the Projects as promised.

20  A summary of these health and safety notices are attached hereto as Exhibit "5".  The Lehman

21  Entities ignored these requests until November 2008, when Brusco, purportedly on behalf of the

22  Lehman Lenders, delivered the message that the Lehman Lenders were unwilling to fund the

23  Projects and that, instead, they intended to foreclose on all of the Projects.

24        As a result, as set forth in Exhibit "4," there are now over 240 vendors, municipalities,

25  counties and bonding companies claiming over $400 million in work, improvements and property

26  tax claims against the Projects.  Substantially all of these sums are due to work performed or bonded

27  at Lehman's request based upon Lehman's promises of payment.

28     **4.3**    **The Group II: Voluntary Debtors' Potential Preferential Transfers**.

Exhibit B, Page 10

1   Although the Debtors, were able to defeat these motions, they are relevant in the following respect.

2   Had the motions filed by LCPI and Lehman ALI succeeded, it is almost certain that unsecured

3   creditors would have received nothing on their claims. Moreover, as more fully explained herein,

4   since Lehman ALI and LCPI did not even own the loans they were seeking to foreclose upon, these

5   motions should never have been filed in the first instance. ~~Yet now, these same parties  Lehman ALI~~

6   ~~and LCPI  are asking these same creditors to vote on their plan and to "trust" them.~~

7      **5.2**    **The Debtors' Various Motions Relating to Financing for the Projects and to Pay**

8      **Professional Fees.**

9          **5.2.1.**   **The Voluntary Debtors' Initial Motion for Surcharge and Use of Cash**

10          **Collateral.**

11      On January 16, 2009, seven of the Debtors, including Group II: Voluntary Debtor Palmdale

12   Hills, filed a motion authorizing Palmdale Hills to use and surcharge, pursuant to 11 U.S.C.

13   § 506(c), and/or use the purported cash collateral of LCPI arising from the Ritter Ranch Loan

14   Agreement, pursuant to 11 U.S.C. § 363(c)(2), in order to pay for the reasonable and necessary

15   maintenance expenses required to preserve the value of such Debtors' Projects subject to deeds of

16   trust and other security interests held by LCPI.

17      LCPI objected to the motion and subsequently filed a motion in its own Chapter 11

18   proceeding in the Southern District of New York seeking an order barring the motion as a violation

19   of the automatic stay.  Although the Debtors believe that LCPI's stay was not violated in any way

20   by the Motion, the Motion was taken off calendar prior to any ruling by the New York Bankruptcy

21   Court, based upon the threat of sanctions made against Debtors' counsel by the presiding judge in

22   LCPI's case.

23      As explained above, LCPI did not even own an interest in the Ritter Ranch Loan Agreement

24   when it asserted the automatic stay, since the Ritter Ranch Loan Agreement, which was the subject

25   of the cash collateral motion, had already been sold pursuant to the Fenway Repurchase Agreement.

26   Yet this wrongful action prevented Palmdale Hills from using its own money to pay critical bills that

27   Lehman ALI, LCPI's parent was contractually required to fund in the first instance.

28          **5.2.2**   **The Voluntary Debtors' Agreements with the Lehman Entities for Use of**

Exhibit B, Page 11

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT** C

**(Proposed Deletions: VD Group III Disclosure Statement)**

1

1  Settlement Agreement provided for the transfer of the Projects included within the Restructuring

2  Agreement to a series of newly formed Lehman-controlled entities (each with "SCLV" in its name,

3  for "SunCal-Lehman Venture"). The agreement further provided that the entity taking title to the

4  Project would assume the Lehman Lender debt obligations associated with the Projects, assume

5  certain bond obligations associated with the Projects, and provide indemnifications to SunCal and

6  the Debtors for unpaid claims.

7      On August 25, 2008, the Settlement Agreement and a series of related documents were

8  formally executed by SunCal and the applicable Lehman Lenders and Lehman Equity Members at a

9  meeting held in Los Angeles on August 25, 2008.  Once these documents were signed, all that

10  remained was the mechanical closing of the series of transactions described in the Settlement

11  Agreement. Since all of the conditions precedent to the closings had been satisfied, or could have

12  been satisfied at the meeting, this should have occurred at the August 25, 2008 meeting. However,

13  the Lehman Representative asked SunCal to extend the closing date for thirty days, to September

14  30, 2008. Accordingly to the Lehman Representatives, this short extension would enable them to

15  secure certain outstanding third party consents. Although SunCal knew these third party consents

16  were readily available, within a few days they agreed to this extension, believing the request was

17  made in good faith.  ~~However, as later discovered, it was not.~~

18      **4.2.9   Alvarez and Marsal Take Over Control of the Lehman Entities After the**

19      **Chapter 11 Filings of LBHI and LCPI.**

20      LBHI filed for bankruptcy in September 2008 and LCPI filed for bankruptcy in October

21  2008.  After LBHI's filing, Bryan Marsal ("Marsal") of Alvarez & Marsal ("A&M") was appointed

22  to serve as LBHI's Chief Restructuring Officer. Marsal and A&M are in charge of liquidating the

23  now defunct Lehman Entities, including Chapter 11 debtors LBHI and LCPI, and the non-bankrupt

24  Lehman Lenders (Lehman ALI, OVC, and Northlake Holdings, as well as the non-bankrupt Lehman

25  Equity Members.

26      Although A&M was not employed until after the events that occurred on August 25, 2008

27  described above, it should be noted that A&M hired the same law firm that represented the Lehman

28  Lenders in the August 25, 2008 meeting – Weil, Gotshal & Manges, LLP. Moreover, as more fully

Exhibit C, Page 12

1   explained herein, it was A&M that directed Lehman ALI not to perform its contractual obligations

2   under the Settlement Agreement after September of 2008. ~~Accordingly, the same individuals that~~

3   ~~caused the damages to unsecured creditors by insisting upon the breach of the Settlement~~

4   ~~Agreement, are now asking for their vote in the competing plan filed by the Lehman Lenders.~~

5        LBHI's bankruptcy filing and the Lehman Lenders refusal, at A&M's direction, to close the

6   transactions provided for under the Settlement Agreement as agreed, were not small matters. They

7   severely damaged the Debtors. Although the Debtors were not proceeding with any new

8   construction or development, the Debtors were still required to expend significant sums on site

9   security, erosion control, property taxes and other measures in order to prevent the Projects from

10  becoming a public safety hazard, and in order to avoid the loss of valuable entitlements, and to

11  mitigate penalties and fines being incurred by the Projects. Although SunCal and the Debtors

12  repeatedly requested that the Lehman Entities pay for critical health and safety and value

13  preservation measures on the Projects, these efforts were unavailing.

14       Between October 9 and November 4, 2008, SunCal's general counsel Cook sent Robert

15  Brusco, an authorized agent of the Lehman Entities, nearly two dozen letters requesting that the

16  Lehman Lenders provide the funding necessary to address critical needs on the Projects as promised.

17  A summary of these health and safety notices are attached hereto as Exhibit "5". The Lehman

18  Entities ignored these requests until November 2008, when Brusco, purportedly on behalf of the

19  Lehman Lenders, delivered the message that the Lehman Lenders were unwilling to fund the

20  Projects and that, instead, they intended to foreclose on all of the Projects.

21       As a result, as set forth in Exhibit "4," there are now over 240 vendors, municipalities,

22  counties and bonding companies claiming over $400 million in work, improvements and property

23  tax claims against the Projects. Substantially all of these sums are due to work performed or bonded

24  at Lehman's request based upon Lehman's promises of payment.

25       **4.3    The Group III Voluntary Debtors' Potential Preferential Transfers.**

26       Attached hereto as Exhibit "6" are charts setting forth payments made to third parties during

27  the ninety (90) day time period preceding the filing of the Debtors' Chapter 11 Cases as well as

28  payments made to the Lehman Entities and to SunCal Affiliates during the one-year time period

39

Exhibit C, Page 13

1  "Lehman Entities' Stay Motions"). Although the Debtors, were able to defeat these motions, they

2  are relevant in the following respect. Had the motions filed by LCPI and Lehman ALI succeeded, it

3  is almost certain that unsecured creditors would have received nothing on their claims. Moreover, as

4  more fully explained herein, since Lehman ALI and LCPI did not even own the loans they were

5  seeking to foreclose upon. Accordingly, these motions should never have been filed in the first

6  instance. ~~Yet now, these same parties  Lehman ALI and LCPI   are asking these same creditors to~~

7  ~~vote on their plan and to "trust" them.~~

8      **5.2**    **The Debtors' Various Motions Relating to Financing for the Projects and to Pay**

9                **Professional Fees.**

10          **5.2.1**    **The Voluntary Debtors' Initial Motion for Surcharge and Use of Cash**

11                   **Collateral.**

12        On January 16, 2009, seven of the Debtors filed a motion authorizing Palmdale Hills to use

13  and surcharge, pursuant to 11 U.S.C. § 506(c), and/or use the purported cash collateral of LCPI

14  arising from the Ritter Ranch Loan Agreement, pursuant to 11 U.S.C. § 363(c)(2), in order to pay

15  for the reasonable and necessary maintenance expenses required to preserve the value of such

16  Debtors' Projects subject to deeds of trust and other security interests held by LCPI.

17        LCPI objected to the motion and subsequently filed a motion in its own Chapter 11

18  proceeding in the Southern District of New York seeking an order barring the motion as a violation

19  of LCPI's automatic stay. Although the Debtors believe that LCPI's stay was not violated in any

20  way by the Motion, the Motion was taken off calendar prior to any ruling by the New York

21  Bankruptcy Court, based upon the threat of sanctions made against Debtors' counsel by the

22  presiding judge in LCPI's case.

23        As explained above, LCPI did not even own an interest in the Ritter Ranch Loan Agreement

24  when it asserted the automatic stay, since the Ritter Ranch Loan Agreement, which was the subject

25  of the cash collateral motion, had already been sold pursuant to the Fenway Repurchase Agreement.

26  Yet this wrongful action prevented Palmdale Hills from using its own money to pay critical bills that

27  Lehman ALI, LCPI's parent was contractually required to fund in the first instance.

28          **5.2.2.**  **The Voluntary Debtors' Agreements with the Lehman Entities for Use of**

Exhibit C, Page 14

**EXHIBIT D**

**(Proposed Deletions: VD Group IV Disclosure Statement)**

1

1   been satisfied at the meeting, this should have occurred at the August 25, 2008 meeting. However,

2   the Lehman Representative asked SunCal to extend the closing date for thirty days, to September

3   30, 2008. Accordingly to the Lehman Representatives, this short extension would enable them to

4   secure certain outstanding third party consents. Although SunCal knew these third party consents

5   were readily available, within a few days they agreed to this extension, believing the request was

6   made in good faith. ~~In fact, as more fully explained blow, it was not.~~

7       **4.2.8    The Lehman Lenders' Undisclosed Sale of Most of the Debtors' Loans.**

8       As explained above, the Settlement Agreement was duly executed by all parties at a formal

9   closing meeting held on August 25, 2008. When the parties signed this agreement, which was a

10  binding contract, they both represented that they both intended and had the power and capacity to

11  perform all of the obligations undertaken therein. However, in the case of the Lehman Entities, this

12  representation was later discovered to be false. When the closing occurred on August 25, 2008, the

13  Lehman Lenders had already sold the very obligations they were agreeing to assume and restructure

14  in the Settlement Agreement to Fenway Capital pursuant to a repurchase agreement.  Accordingly,

15  as of August 25, 2008, they lacked the power to perform the most essential undertakings that they

16  agreed to perform in the Settlement Agreement. Instead of disclosing this fact at the August 25, 2008

17  meeting, the Lehman Lenders requested additional time to execute the agreed upon transfers

18  provided for under this binding agreement. The Lehman Lenders needed this delay ~~for an obvious,~~

19  ~~but undisclosed reason: They~~ because they lacked the ability to perform the very obligations they

20  had just agreed to perform in the Settlement Agreement.

21      The Lehman Representatives also did not disclose at the August 25, 2008 closing that they

22  intended to sell the Pacific Point First Loan to Lehman Re, approximately a week later, *even though*

23  *this loan was also subject to the Settlement Agreement*. To the contrary, the Lehman Representatives

24  affirmatively concealed these facts from SunCal and the Debtors by asserting that ownership still

25  existed in the case of seven of the eight loans.

26      **4.2.9    Lehman's Foreclosure Sale and Purchase of the Pacific Point Project.**

27      At the time the Restructuring Agreement and the Settlement Agreement were signed, the

28  Pacific Point Project, which was still owned by SJD Partners, was among the Projects included in the

34

1    Partners.

2         Had SunCal, SJD Partners and SJD Development known that Lehman ALI and LV Pacific

3    Point had no intention of honoring their obligations under the foregoing agreement, they never

4    would have agreed to cooperate with the foreclosure. Instead, SJD Partners would have filed for

5    bankruptcy earlier, thereby mitigating the damages from Lehman ALI's breach, by allowing

6    creditors recourse to the value of the Project.

7         This course of conduct is relevant to the unsecured creditors of the Group IV: Voluntary

8    Debtors for the following reason. The holders of bond claims against SJD Partners are asserting

9    their massive claims against the estates of all of the Debtors, including the estates of the Group IV:

10   Voluntary Debtors. Accordingly, Lehman ALI's wrongs against SJD Partners directly affect the

11   Group IV: Voluntary Debtors' cases.

12        **4.2.10** **Alvarez and Marsal Take Over Control of the Lehman Entities After the**

13             **Chapter 11 Filings of LBHI and LCPI.**

14        LBHI filed for bankruptcy in September 2008 and LCPI filed for bankruptcy in October

15   2008. After LBHI's filing, Bryan Marsal ("Marsal") of Alvarez & Marsal ("A&M") was appointed

16   to serve as LBHI's Chief Restructuring Officer. Marsal and A&M are in charge of liquidating the

17   now defunct Lehman Entities, including Chapter 11 debtors LBHI and LCPI, and the non-bankrupt

18   Lehman Lenders (Lehman ALI, OVC, and Northlake Holdings, as well as the non-bankrupt Lehman

19   Equity Members.

20        Although A&M was not employed until after the events that occurred on August 25, 2008

21   described above, it should be noted that A&M hired the same law firm that represented the Lehman

22   Lenders in the August 25, 2008 meeting – Weil, Gotshal & Manges, LLP. Moreover, as more fully

23   explained herein, it was A&M that directed Lehman ALI not to perform its contractual obligations

24   under the Settlement Agreement after September of 2008. ~~Accordingly, the same individuals that~~

25   ~~caused the damages to unsecured creditors by insisting upon the breach of the Settlement~~

26   ~~Agreement, are now asking for their vote in the competing plan filed by the Lehman Lenders.~~

27        LBHI's bankruptcy filing and the Lehman Lenders refusal, at A&M's direction, to close the

28   transactions provided for under the Settlement Agreement as agreed, were not small matters. They

36

Exhibit D, Page16

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT E**

**(Proposed Deletions: TD Group I Disclosure Statement)**

1  for "SunCal-Lehman Venture"). The agreement further provided that the entity taking title to the

2  Project would assume the Lehman Lender debt obligations associated with the Projects, assume

3  certain bond obligations associated with the Projects, and provide indemnifications to SunCal and

4  the Debtors for unpaid claims.

5      On August 25, 2008, the Settlement Agreement and a series of related documents were

6  formally executed by SunCal and the applicable Lehman Lenders and Lehman Equity Members at a

7  meeting held in Los Angeles on August 25, 2008.  Once these documents were signed, all that

8  remained was the mechanical closing of the series of transactions described in the Settlement

9  Agreement. Since all of the conditions precedent to the closings had been satisfied, or could have

10  been satisfied at, or shortly after the meeting, this should have occurred at the August 25, 2008

11  meeting, or shortly after the meeting. However, the Lehman Representative asked SunCal to extend

12  the closing date for thirty days, to September 30, 2008. According to the Lehman Representatives,

13  this short extension would enable them to secure certain outstanding third party consents. Although

14  SunCal knew these third party consents were readily obtainable within a few days, they agreed to

15  this extension, believing the request was made in good faith. ~~In fact, as more fully explained blow, it~~

16  ~~was not.~~

17      **4.2.8    The Lehman Lenders' Undisclosed Sale of Most of the Debtors' Loans.**

18      As explained above, the Settlement Agreement was duly executed by all parties at a formal

19  closing meeting held on August 25, 2008. When the parties signed this agreement, which was a

20  binding contract, they both represented that they both intended and had the power and capacity to

21  perform all of the obligations undertaken therein. However, in the case of the Lehman Entities, this

22  representation was later discovered to be false. When the closing occurred on August 25, 2008, the

23  Lehman Lenders had already sold the very obligations they were agreeing to assume and restructure

24  in the Settlement Agreement to Fenway Capital pursuant to a repurchase agreement.  Accordingly,

25  as of August 25, 2008, they lacked the power to perform the most essential undertakings that they

26  agreed to perform in the Settlement Agreement. Instead of disclosing this fact at the August 25,

27  2008 meeting, the Lehman Lenders requested additional time to execute the agreed upon transfers

28  provided for under this binding agreement. The Lehman Lenders needed this delay ~~for an obvious,~~

Exhibit E, Page 17

1  but undisclosed reason: They because they lacked the ability to perform the very obligations they

2  had just agreed to perform in the Settlement Agreement.

3      The Lehman Representatives also did not disclose at the August 25, 2008 closing that they

4  intended to sell the Pacific Point First Loan to Lehman Re, approximately a week later, *even though*

5  *this loan was also subject to the Settlement Agreement*. To the contrary, the Lehman Representatives

6  affirmatively concealed these facts from SunCal and the Debtors by asserting that ownership still

7  existed in the case of seven of the eight loans.

8      **4.2.9    Lehman's Foreclosure Sale and Purchase of the Pacific Point Project.**

9      At the time the Restructuring Agreement and the Settlement Agreement were signed, the

10  Pacific Point Project, which was still owned by SJD Partners, was among the Projects included in

11  the Restructuring Agreement and the Settlement Agreement.  Pursuant to the Restructuring

12  Agreement, and as detailed in the Settlement Agreement attached thereto, SunCal, SJD Partners, and

13  its parent company, SJD Development, all agreed that they would not interfere with Lehman ALI's

14  (or its designee's) foreclosure on the Pacific Point Project. They further agreed that a new Lehman

15  entity, LV Pacific Point, would purchase the Pacific Point Project upon foreclosure and that Lehman

16  ALI and LV Pacific Point would (a) assume SJD Partners' and SJD Development's outstanding

17  accounts payable for Pacific Point third-party vendors, (b) assume certain bond liability associated

18  with the Pacific Point Project, and (c) pay for the millions of dollars worth of work that Lehman

19  ALI representatives had authorized.

20      As previously stated, the Settlement Agreement was signed on August 25, 2008 by the

21  SunCal parties, including SJD Partners and SJD Development.  It was also signed by Gilhool as

22  authorized signatory on behalf of both Lehman ALI and LV Pacific Point.  As a signatory to the

23  Settlement Agreement, LV Pacific Point was required to purchase the Pacific Point Project at the

24  foreclosure sale subject to the above obligations. Consistent with this agreement, the City of San

25  Juan Capistrano executed an estoppel certificate for the benefit of SJD Partners and Lehman ALI—

26  at Lehman ALI's request—on August 26, 2008, two days before the foreclosure sale.  This

27  certificate stated, among other things, that the "Acquiring Entity [LV Pacific Point] shall by

28  operation of law become the legal successor-in-interest to Developer [SJD Partners]" under SJD

Exhibit E, Page 18

1  Equity Members.

2      Although A&M was not employed until after the events that occurred on August 25, 2008

3  described above, it should be noted that A&M hired the same law firm that represented the Lehman

4  Lenders in the August 25, 2008 meeting – Weil, Gotshal & Manges, LLP. Moreover, as more fully

5  explained herein, it was A&M that directed Lehman ALI not to perform its contractual obligations

6  under the Settlement Agreement after September of 2008. ~~Accordingly, the same individuals that~~

7  ~~caused the damages to unsecured creditors by insisting upon the breach of the Settlement~~

8  ~~Agreement, are now asking for their vote in the competing plan filed by the Lehman Lenders.~~

9      LBHI's bankruptcy filing and the Lehman Lenders refusal, at A&M's direction, to close the

10  transactions provided for under the Settlement Agreement as agreed, were not small matters. They

11  severely damaged the Debtors. Although the Debtors were not proceeding with any new

12  construction or development, the Debtors were still required to expend significant sums on site

13  security, erosion control, property taxes and other measures in order to prevent the Projects from

14  becoming a public safety hazard, and in order to avoid the loss of valuable entitlements, and to

15  mitigate penalties and fines being incurred by the Projects. Although SunCal and the Debtors

16  repeatedly requested that the Lehman Entities pay for critical health and safety and value

17  preservation measures on the Projects, these efforts were unavailing.

18      Between October 9 and November 4, 2008, SunCal's general counsel Cook sent Robert

19  Brusco, an authorized agent of the Lehman Entities, nearly two dozen letters requesting that the

20  Lehman Lenders provide the funding necessary to address critical needs on the Projects as promised.

21  A summary of these health and safety notices are attached hereto as Exhibit "5". The Lehman

22  Entities ignored these requests until November 2008, when Brusco, purportedly on behalf of the

23  Lehman Lenders, delivered the message that the Lehman Lenders were unwilling to fund the

24  Projects and that, instead, they intended to foreclose on all of the Projects.

25      As a result, as set forth in Exhibit "4," there are now over 240 vendors, municipalities,

26  counties and bonding companies claiming over $400 million in work, improvements and property

27  tax claims against the Projects. Substantially all of these sums are due to work performed or bonded

28  at Lehman's request based upon Lehman's promises of payment.

42

### 5.1.3  LCPI's Motions for Relief from the Automatic Stay Against Certain of the Voluntary Debtors' Projects and Related Appeals.

On January 23, 2009, LCPI and Lehman ALI filed various motions for relief from the automatic stay against Palmdale Hills, SCC Palmdale, SunCal Beaumont, SunCal Summit Valley, SunCal Emerald, SunCal Bickford, Acton Estates, SunCal Johannson, and SCC Communities I (the "Lehman Entities' Stay Motions"). Although the Debtors, were able to defeat these motions, they are relevant in the following respect. Had the motions filed by LCPI and Lehman Ali succeeded, it is almost certain that unsecured creditors would have received nothing on their claims. Moreover, as more fully explained herein, since Lehman Ali and LCPI did not even own the loans they were seeking to foreclose upon, these motions should never have been filed in the first instance. ~~Yet now, these same parties- Lehman Ali and LCPI - are asking these same creditors to vote on their plan and to "trust" them.~~

### 5.2  The Trustee Debtors and Their Professionals.

Orders for Relief were entered in the involuntary cases beginning on January 6, 2009. The Trustee Debtors are represented by their duly-appointed Chapter 11 Trustee, Mr. Steven M. Speier pursuant to orders of the Bankruptcy Court entered on January 15, 2009.

The Chapter 11 Trustee has employed the Lobel Firm as the Chapter 11 Trustee's general insolvency counsel and the MB Firm, as special litigation counsel and Squar Milner, LLP as its accountants.

The Trustee Debtors' Committee has employed Weiland, Golden, Smiley, Wang Ekvall & Strok as its general insolvency counsel.

### 5.3  The Debtors' Various Motions Relating to Financing for the Projects and to Pay Professional Fees.

### 5.3.1  The Voluntary Debtors' Initial Motion for Surcharge and Use of Cash Collateral.

On January 16, 2009, seven of the Debtors filed a motion authorizing Palmdale Hills to use and surcharge, pursuant to 11 U.S.C. § 506(c), and/or use the purported cash collateral of LCPI arising from the Ritter Ranch Loan Agreement, pursuant to 11 U.S.C. § 363(c)(2), in order to pay for

**EXHIBIT F**

**(Proposed Deletions: TD Group II Disclosure Statement**

1

1   Representatives.

2       **4.2.7**   **The Lehman Lenders' Failure to Close on the Settlement Agreement.**

3       Pursuant to the terms of the Restructuring Agreement, the parties agreed to enter into a

4   Settlement Agreement, the form of which was attached to the Restructuring Agreement. The

5   Settlement Agreement provided for the transfer of the Projects included within the Restructuring

6   Agreement to a series of newly formed Lehman-controlled entities (each with "SCLV" in its name,

7   for "SunCal-Lehman Venture"). The agreement further provided that the entity taking title to the

8   Project would assume the Lehman Lender debt obligations associated with the Projects, assume

9   certain bond obligations associated with the Projects, and provide indemnifications to SunCal and

10   the Debtors for unpaid claims.

11       On August 25, 2008, the Settlement Agreement and a series of related documents were

12   formally executed by SunCal and the applicable Lehman Lenders and Lehman Equity Members at a

13   meeting held in Los Angeles on August 25, 2008. Once these documents were signed, all that

14   remained was the mechanical closing of the series of transactions described in the Settlement

15   Agreement. Since all of the conditions precedent to the closings had been satisfied, or could have

16   been satisfied shortly after the meeting, this should have occurred on or shortly after the August 25,

17   2008 meeting. However, the Lehman Representative asked SunCal to extend the closing date for

18   thirty days, to September 30, 2008. According to the Lehman Representatives, this short extension

19   would enable them to secure certain outstanding third party consents. Although SunCal knew these

20   third party consents were readily obtainable within a few days, they agreed to this extension,

21   believing the request was made in good faith. ~~In fact, as more fully explained blow, it was not.~~

22       **4.2.8**   **The Lehman Lenders' Undisclosed Sale of Most of the Debtors' Loans.**

23       As explained above, the Settlement Agreement was duly executed by all parties at a formal

24   closing meeting held on August 25, 2008. When the parties signed this agreement, which was a

25   binding contract, they both represented that they both intended and had the power and capacity to

26   perform all of the obligations undertaken therein. However, in the case of the Lehman Entities, this

27   representation was later discovered to be false. When the closing occurred on August 25, 2008, the

28   Lehman Lenders had already sold the very obligations they were agreeing to assume and restructure

Exhibit F, Page 21

1  in the Settlement Agreement to Fenway Capital pursuant to a repurchase agreement (the "Fenway

2  Repurchase Agreement").  Accordingly, as of August 25, 2008, they lacked the power to perform the

3  most essential undertakings that they agreed to perform in the Settlement Agreement. Instead of

4  disclosing this fact at the August 25, 2008 meeting, the Lehman Lenders requested additional time to

5  execute the agreed upon transfers provided for under this binding agreement. The Lehman Lenders

6  needed this ~~delay for an obvious, but undisclosed reason: They~~ because they lacked the ability to

7  perform the very obligations they had just agreed to perform in the Settlement Agreement.

8          The Lehman Representatives also did not disclose at the August 25, 2008 closing that they

9  intended to sell the Pacific Point First Loan to Lehman Re, approximately a week later, *even though*

10  *this loan was also subject to the Settlement Agreement*. To the contrary, the Lehman Representatives

11  affirmatively concealed these facts from SunCal and the Debtors by asserting that ownership still

12  existed in the case of seven of the eight loans.

13          **4.2.9    Lehman's Foreclosure Sale and Purchase of the Pacific Point Project.**

14          At the time the Restructuring Agreement and the Settlement Agreement were signed, the

15  Pacific Point Project, which was still owned by SJD Partners, was among the Projects included in

16  the Restructuring Agreement and the Settlement Agreement.  Pursuant to the Restructuring

17  Agreement, and as detailed in the Settlement Agreement attached thereto, SunCal, SJD Partners, and

18  its parent company, SJD Development, all agreed that they would not interfere with Lehman ALI's

19  (or its designee's) foreclosure on the Pacific Point Project. They further agreed that a new Lehman

20  entity, LV Pacific Point, would purchase the Pacific Point Project upon foreclosure and that Lehman

21  ALI and LV Pacific Point would (a) assume SJD Partners' and SJD Development's outstanding

22  accounts payable for Pacific Point third-party vendors, (b) assume certain bond liability associated

23  with the Pacific Point Project, and (c) pay for the millions of dollars worth of work that Lehman

24  ALI representatives had authorized.

25          As previously stated, the Settlement Agreement was signed on August 25, 2008 by the

26  SunCal parties, including SJD Partners and SJD Development.  It was also signed by Gilhool as

27  authorized signatory on behalf of both Lehman ALI and LV Pacific Point.  As a signatory to the

28  Settlement Agreement, LV Pacific Point was required to purchase the Pacific Point Project at the

1    foreclosure sale subject to the above obligations. Consistent with this agreement, the City of San

2    Juan Capistrano executed an estoppel certificate for the benefit of SJD Partners and Lehman ALI—

3    at Lehman ALI's request—on August 26, 2008, two days before the foreclosure sale. This

4    certificate stated, among other things, that the "Acquiring Entity [LV Pacific Point] shall by

5    operation of law become the legal successor-in-interest to Developer [SJD Partners]" under SJD

6    Partners' agreements with the City. That certificate further provided that there existed no breaches,

7    defaults, or claims under SJD Partners' agreements with the City.

8        On August 28, 2008, Lehman ALI foreclosed on the Pacific Point Project, and title was

9    transferred to LV Pacific Point at the foreclosure sale. However, Lehman ALI and LV Pacific Point

10   failed to assume the liabilities and obligations associated with this Project as agreed. This breach of

11   the parties' agreement, left SJD Partners without title to the Pacific Point Project, but with the

12   potential liability for the substantial unsecured claims relating to the Project, including bond claims

13   of approximately $34 million. Moreover, since Lehman ALI and LV Pacific Point have continued

14   to ~~ignore~~ breach their obligations under the above agreement, unpaid taxes, fines, and penalties have

15   continued to accrue to the detriment of the Project and these claims are being asserted against SJD

16   Partners.

17       Had SunCal, SJD Partners and SJD Development known that Lehman ALI and LV Pacific

18   Point had no intention of honoring their obligations under the foregoing agreement, they never

19   would have agreed to cooperate with the foreclosure. Instead, SJD Partners would have filed for

20   bankruptcy earlier, thereby mitigating the damages from Lehman Ali's breach, by allowing creditors

21   recourse to the value of the Project.

22       This course of conduct is relevant to the unsecured creditors of the Group II: Trustee Debtors

23   for the following reason. The holders of bond claims against SJD Partners are asserting their

24   massive claims against the estates of all of the Debtors, including the estates of the Group II: Trustee

25   Debtors. Accordingly, Lehman ALI's wrongs against SJD Partners directly affect the Group II:

26   Trustee Debtors' cases.

27       **4.2.10 Alvarez and Marsal Take over Control of the Lehman Entities After the**

28       **Chapter 11 Filings of LBHI and LCPI.**

37

Exhibit F, Page 23

1    LBHI filed for bankruptcy in September 2008 and LCPI filed for bankruptcy in October

2    2008. After LBHI's filing, Bryan Marsal ("Marsal") of Alvarez & Marsal ("A&M") was appointed

3    to serve as LBHI's Chief Restructuring Officer. Marsal and A&M are in charge of liquidating the

4    now defunct Lehman Entities, including Chapter 11 debtors LBHI and LCPI, and the non-bankrupt

5    Lehman Lenders (Lehman ALI, OVC, and Northlake Holdings, as well as the non-bankrupt Lehman

6    Equity Members.

7         Although A&M was not employed until after the events that occurred on August 25, 2008

8    described above, it should be noted that A&M hired the same law firm that represented the Lehman

9    Lenders in the August 25, 2008 meeting – Weil, Gotshal & Manges, LLP. Moreover, as more fully

10   explained herein, it was A&M that directed Lehman ALI not to perform its contractual obligations

11   under the Settlement Agreement after September of 2008. ~~Accordingly, the same individuals that~~

12   ~~caused the damages to unsecured creditors by insisting upon the breach of the Settlement~~

13   ~~Agreement, are now asking for their vote in the competing plan filed by the Lehman Lenders.~~

14        LBHI's bankruptcy filing and the Lehman Lenders refusal, at A&M's direction, to close the

15   transactions provided for under the Settlement Agreement as agreed, were not small matters. They

16   severely damaged the Debtors. Although the Debtors were not proceeding with any new

17   construction or development, the Debtors were still required to expend significant sums on site

18   security, erosion control, property taxes and other measures in order to prevent the Projects from

19   becoming a public safety hazard, and in order to avoid the loss of valuable entitlements, and to

20   mitigate penalties and fines being incurred by the Projects. Although SunCal and the Debtors

21   repeatedly requested that the Lehman Entities pay for critical health and safety and value

22   preservation measures on the Projects, these efforts were unavailing.

23        Between October 9 and November 4, 2008, SunCal's general counsel Bruce Cook sent

24   Robert Brusco, an authorized agent of the Lehman Entities, nearly two dozen letters requesting that

25   the Lehman Lenders provide the funding necessary to address critical needs on the Projects as

26   promised. A summary of these health and safety notices are attached hereto as Exhibit "5". The

27   Lehman Entities ignored these requests until November 2008, when Brusco, purportedly on behalf

28   of the Lehman Lenders, delivered the message that the Lehman Lenders were unwilling to fund the

Exhibit F, Page 24

1  include the right to pursue certain claims against the Lehman Entities and certain employees and

2  agents of these entities on behalf of the Voluntary Debtors. The claims encompassed by this

3  amendment include claims that are based upon both prepetition and post-post petition actionable

4  conduct under both state law and federal law against the Lehman Entities and/or their agents.

5       **5.1.3   LCPI's Motions for Relief from the Automatic Stay Against Certain of**

6              **the Voluntary Debtors' Projects and Related Appeals.**

7       On January 23, 2009, LCPI and Lehman ALI filed various motions for relief from the

8  automatic stay against Palmdale Hills, SCC Palmdale, SunCal Beaumont, SunCal Summit Valley,

9  SunCal Emerald, SunCal Bickford, Acton Estates, SunCal Johannson, and SCC Communities I (the

10 "Lehman Entities' Stay Motions"). Although the Debtors were able to defeat the Lehman Entities'

11 Stay Motions, they are relevant in the following respect. Had the motions filed by LCPI and Lehman

12 Ali succeeded, it is almost certain that unsecured creditors would have received nothing on their

13 claims. Moreover, as more fully explained herein, since Lehman ALI and LCPI did not even own

14 the loans they were seeking to foreclose upon, these motions should never have been filed in the

15 first instance. ~~Yet now, these same parties—Lehman ALI and LCPI—are asking these same creditors~~

16 ~~to vote on their plan and to "trust" them.~~

17      **5.2   The Trustee Debtors and Their Professionals.**

18      Orders for Relief were entered in the involuntary cases beginning on January 6, 2009. The

19 Trustee Debtors are represented by their duly-appointed Chapter 11 Trustee, Mr. Steven M. Speier,

20 pursuant to orders of the Bankruptcy Court entered on January 15, 2009.

21      The Chapter 11 Trustee has employed the Lobel Firm as the Chapter 11 Trustee's general

22 insolvency counsel, the MB Firm as special litigation counsel, and Squar Milner, LLP as its

23 accountants.

24      The Trustee Debtors' Committee has employed Weiland, Golden, Smiley, Wang Ekvall &

25 Strok as its general insolvency counsel.

26      **5.3   The Debtors' Various Motions Relating to Financing for the Projects and to Pay**

27            **Professional Fees.**

28            **5.3.1   The Voluntary Debtors' Initial Motion for Surcharge and Use of Cash**

41

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT G**

**(Proposed Deletions: SCC Disclosure Statement)**

1

1  certain bond obligations associated with the Projects, and provide indemnifications to SunCal and

2  the Debtors for unpaid claims.

3        On August 25, 2008, the Settlement Agreement and a series of related documents were

4  formally executed by SunCal and the applicable Lehman Lenders and Lehman Equity Members at a

5  meeting held in Los Angeles on August 25, 2008.  Once these documents were signed, all that

6  remained was the mechanical closing of the series of transactions described in the Settlement

7  Agreement. Since all of the conditions precedent to the closings had been satisfied, or could have

8  been satisfied at the meeting, this should have occurred at the August 25, 2008 meeting. However,

9  the Lehman Representative asked SunCal to extend the closing date for thirty days, to September

10  30, 2008. Accordingly to the Lehman Representatives, this short extension would enable them to

11  secure certain outstanding third party consents. Although SunCal knew these third party consents

12  were readily available, within a few days they agreed to this extension, believing the request was

13  made in good faith. In fact, as more fully explained blow, it was not.

14            **4.2.8   The Lehman Lenders' Undisclosed Sale of Most of the Debtors' Loans.**

15        As explained above, the Settlement Agreement was duly executed by all parties at a formal

16  closing meeting held on August 25, 2008. When the parties signed this agreement, which was a

17  binding contract, they both represented that they intended and had the power and capacity to perform

18  all of the obligations undertaken therein. However, in the case of the Lehman Entities, this

19  representation was later discovered to be false.

20        When the closing occurred on August 25, 2008, the Lehman Lenders had already sold the

21  very obligations they were agreeing to assume and restructure in the Settlement Agreement to either

22  Fenway Capital, Lehman Re, and in the case of SunCal Century City, Danske Bank, pursuant to

23  repurchase agreement.

24            **4.2.9   Alvarez and Marsal Take Over Control of the Lehman Entities After the**

25                 **Chapter 11 Filings of LBHI and LCPI.**

26        LBHI filed for bankruptcy in September 2008 and LCPI filed for bankruptcy in October

27  2008. After LBHI's filing, Bryan Marsal ("Marsal") of Alvarez & Marsal ("A&M") was appointed

28  to serve as LBHI's Chief Restructuring Officer. Marsal and A&M are in charge of liquidating the

Exhibit G, Page 26

1    now defunct Lehman Entities, including Chapter 11 debtors LBHI and LCPI, and the non-bankrupt

2    Lehman Lenders (Lehman ALI, OVC, and Northlake Holdings, as well as the non-bankrupt Lehman

3    Equity Members.

4         Although A&M was not employed until after the events that occurred on August 25, 2008

5    described above, it should be noted that A&M hired the same law firm that represented the Lehman

6    Lenders in the August 25, 2008 meeting – Weil, Gotshal & Manges, LLP. Moreover, as more fully

7    explained herein, it was A&M that directed Lehman Ali not to perform its contractual obligations

8    under the Settlement Agreement after September of 2008. ~~Accordingly, the same individuals that~~

9    ~~caused the damages to unsecured creditors by insisting upon the breach of the Settlement~~

10   ~~Agreement, are now asking for their vote in the competing plan filed by the Lehman Lenders.~~

11        LBHI's bankruptcy filing and the Lehman Lenders refusal, at A&M's direction, to close the

12   transactions provided for under the Settlement Agreement as agreed, were not small matters. They

13   severely damaged the Debtors. Although the Debtors were not proceeding with any new

14   construction or development, the Debtors were still required to expend significant sums on site

15   security, erosion control, property taxes and other measures in order to prevent the Projects from

16   becoming a public safety hazard, and in order to avoid the loss of valuable entitlements, and to

17   mitigate penalties and fines being incurred by the Projects. Although SunCal and the Debtors

18   repeatedly requested that the Lehman Entities pay for critical health and safety and value

19   preservation measures on the Projects, these efforts were unavailing.

20        Between October 9 and November 4, 2008, SunCal's general counsel Cook sent Robert

21   Brusco, an authorized agent of the Lehman Entities, nearly two dozen letters requesting that the

22   Lehman Lenders provide the funding necessary to address critical needs on the Projects as promised.

23   A summary of these health and safety notices are attached hereto as Exhibit "5". The Lehman

24   Entities ignored these requests until November 2008, when Brusco, purportedly on behalf of the

25   Lehman Lenders, delivered the message that the Lehman Lenders were unwilling to fund the

26   Projects and that, instead, they intended to foreclose on all of the Projects.

27        As a result, as set forth in Exhibit "4," there are now over 240 vendors, municipalities,

28   counties and bonding companies claiming over $400 million in work, improvements and property

Exhibit G, Page 27

**PROOF OF SERVICE OF DOCUMENT**

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 660 Newport Center Drive, 4th Fl., Newport Beach, CA 92660.

A true and correct copy of the foregoing document described as: **STATEMENT OF SUNCAL PLAN PROPONENTS REGARDING THE PROPOSED DELETIONS TO THE SEVEN PROPOSED DISCLOSURE STATEMENTS FILED BY THE SUNCAL PLAN PROPONENTS** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

**I. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On July 28, 2011, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:
☒ Service information continued on attached page

**II. SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served):
On July 28, 2011, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be</u> completed no later than 24 hours after the document is filed.
Via first class mail

| | |
|---|---|
| T. Scott Leo, Esq.<br>Leo & Weber<br>One N. LaSalle St., #2600<br>Chicago, IL 60602 | Counsel for Arch Ins. |

☐ Service information continued on attached page
**III. SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on July 28, 2011 I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on the judge <u>will be</u> completed no later than 24 hours after the document is filed.
**Via Attorney Service**
Honorable Erithe Smith
Ronald Reagan Federal Bldg.
411 W. Fourth St., Suite 5041
Santa Ana, CA 92701

☒ Service information continued on attached page
I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| July 28, 2011 | Viann Corbin | /s/ Viann Corbin |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

## NEF SERVICE LIST

- Selia M Acevedo    sacevedo@millerbarondess.com, mpritikin@millerbarondess.com
- Joseph M Adams    jadams@sycr.com
- Raymond H Aver    ray@averlaw.com
- James C Bastian    jbastian@shbllp.com
- Thomas Scott Belden    sbelden@kleinlaw.com, ecf@kleinlaw.com
- John A Boyd    fednotice@tclaw.net
- Mark Bradshaw    mbradshaw@shbllp.com
- Gustavo E Bravo    gbravo@smaha.com
- Jeffrey W Broker    jbroker@brokerlaw.biz
- Brendt C Butler    bbutler@mandersonllp.com
- Andrew W Caine    acaine@pszyjw.com
- Carollynn Callari    ccallari@venable.com
- Cathrine M Castaldi    ccastaldi@rusmiliband.com
- Tara Castro Narayanan    tara.narayanan@msrlegal.com, lisa.king@msrlegal.com
- Dan E Chambers    dchambers@jmbm.com
- Shirley Cho    scho@pszjlaw.com
- Vonn Christenson    vrc@paynefears.com
- Brendan P Collins    bpcollins@bhfs.com
- Vincent M Coscino    vcoscino@allenmatkins.com, emurdoch@allenmatkins.com
- Paul J Couchot    pcouchot@winthropcouchot.com,
  pj@winthropcouchot.com;gcrumpacker@winthropcouchot.com
- Jonathan S Dabbieri    dabbieri@sullivan.com,
  hill@sullivanhill.com;mcallister@sullivanhill.com;stein@sullivanhill.com;vidovich@sullivanhill.com
- Ana Damonte    ana.damonte@pillsburylaw.com
- Vanessa S Davila    vsd@amclaw.com
- Melissa Davis    mdavis@shbllp.com
- Daniel Denny    ddenny@gibsondunn.com
- Caroline Djang    crd@jmbm.com
- Donald T Dunning    ddunning@dunningLaw.com
- Meredith R Edelman    meredith.edelman@dlapiper.com
- Joseph A Eisenberg    jae@jmbm.com
- Lei Lei Wang Ekvall    lekvall@wgllp.com
- Richard W Esterkin    resterkin@morganlewis.com
- Marc C Forsythe    kmurphy@goeforlaw.com
- Alan J Friedman    afriedman@irell.com
- Steven M Garber    steve@smgarberlaw.com
- Christian J Gascou    cgascou@gascouhopkins.com
- Barry S Glaser    bglaser@swjlaw.com
- Robert P Goe    kmurphy@goeforlaw.com, rgoe@goeforlaw.com;mforsythe@goeforlaw.com
- Eric D Goldberg    egoldberg@stutman.com
- Richard H Golubow    rgolubow@winthropcouchot.com, pj@winthropcouchot.com
- Michael J Gomez    mgomez@frandzel.com, efiling@frandzel.com;sking@frandzel.com
- Kelly C Griffith    bkemail@harrisbeach.com
- Matthew Grimshaw    mgrimshaw@rutan.com
- Kavita Gupta    kgupta@winthropcouchot.com
- Asa S Hami    ahami@morganlewis.com
- Michael J Hauser    michael.hauser@usdoj.gov
- D Edward Hays    ehays@marshackhays.com
- Michael C Heinrichs    mheinrichs@omm.com

- Harry D. Hochman    hhochman@pszjlaw.com, hhochman@pszjlaw.com
- Jonathan M Hoff    jonathan.hoff@cwt.com
- Nancy Hotchkiss    nhotchkiss@trainorfairbrook.com
- Michelle Hribar    mhribar@rutan.com
- John J Immordino    john.immordino@wilsonelser.com, raquel.burgess@wilsonelser.com
- Lawrence A Jacobson    laj@cohenandjacobson.com
- Michael J Joyce    mjoyce@crosslaw.com
- Stephen M Judson    sjudson@fablaw.com
- Kaleb L Judy    ecf@kleinlaw.com, kjudy@kleinlaw.com
- Steven J Kahn    skahn@pszjw.com
- Sheri Kanesaka    sheri.kanesaka@bryancave.com
- David I Katzen    katzen@ksfirm.com
- Christopher W Keegan    ckeegan@kirkland.com, gdupre@kirkland.com;alevin@kirkland.com
- Payam Khodadadi    pkhodadadi@winthropcouch.com, pj@winthropcouchot.com
- Irene L Kiet    ikiet@hkclaw.com
- Claude F Kolm    claude.kolm@acgov.org
- Mark J Krone    mk@amclaw.com, crs@amclaw.com;amc@amclaw.com
- David B Lally    davidlallylaw@gmail.com
- Leib M Lerner    leib.lerner@alston.com
- Peter W Lianides    plianides@winthropcouchot.com, pj@winthropcouchot.com
- Charles Liu    cliu@winthropcouchot.com
- Kerri A Lyman    klyman@irell.com
- Mariam S Marshall    mmarshall@marshallramoslaw.com
- Robert C Martinez    rmartinez@mclex.com
- Michael D May    mdmayesq@verizon.net
- Hutchison B Meltzer    hmeltzer@wgllp.com
- Krikor J Meshefejian    kjm@lnbrb.com
- Joel S. Miliband    jmiliband@rusmiliband.com
- James M Miller    jmiller@millerbarondess.com,
  vgunderson@millerbarondess.com;smiller@millerbarondess.com;mpritikin@millerbarondess.com
- Louis R Miller    smiller@millerbarondess.com
- Craig Millet    cmillet@gibsondunn.com, pcrawford@gibsondunn.com;cmillet@gibsondunn.com
- Randall P Mroczynski    randym@cookseylaw.com
- Mike D Neue    mneue@thelobelfirm.com, jmattiace@thelobelfirm.com;pnelson@thelobelfirm.com
- Robert Nida    Rnida@castlelawoffice.com
- Henry H Oh    henry.oh@dlapiper.com, janet.curley@dlapiper.com
- Sean A Okeefe    sokeefe@okeefelc.com
- Scott H Olson    solson@seyfarth.com
- Robert B Orgel    rorgel@pszjlaw.com, rorgel@pszjlaw.com
- Malhar S Pagay    mpagay@pszjlaw.com, mpagay@pszjlaw.com
- Daryl G Parker    dparker@pszjlaw.com
- Penelope Parmes    pparmes@rutan.com
- Robert J Pfister    rpfister@ktbslaw.com
- Ronald B Pierce    ronald.pierce@sdma.com
- Katherine C Piper    kpiper@steptoe.com, smcloughlin@steptoe.com
- Cassandra J Richey    cmartin@pprlaw.net
- Debra Riley    driley@allenmatkins.com
- James S Riley    tgarza@sierrafunds.com
- Todd C. Ringstad    becky@ringstadlaw.com
- R Grace Rodriguez    ecf@lorgr.com
- Martha E Romero    Romero@mromerolawfirm.com
- Ronald Rus    rrus@rusmiliband.com
- John P Schafer    jschafer@mandersonllp.com

- John E Schreiber    jschreiber@dl.com
- William D Schuster    bills@allieschuster.org
- Christopher P Simon    csimon@crosslaw.com
- Gerald N Sims    jerrys@psdslaw.com, bonniec@psdslaw.com
- Wendy W Smith    wendy@bindermalter.com
- Steven M Speier    Sspeier@Squarmilner.com, ca85@ecfcbis.com
- Steven M Speier (TR)    Sspeier@asrmanagement.com, ca85@ecfcbis.com
- Michael St James    ecf@stjames-law.com
- Michael K Sugar    msugar@irell.com
- Cathy Ta    cathy.ta@bbklaw.com, Arthur.Johnston@bbklaw.com;Kenneth.Burgess@bbklaw.com
- David A Tilem    davidtilem@tilemlaw.com,
  malissamurguia@tilemlaw.com;dianachau@tilemlaw.com;kmishigian@tilemlaw.com
- James E Till    jtill@thelobelfirm.com, jmattiace@thelobelfirm.com;pnelson@thelobelfirm.com
- United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov
- Carol G Unruh    cgunruh@sbcglobal.net
- Annie Verdries    verdries@lbbslaw.com
- Jason Wallach    jwallach@gladstonemichel.com
- Joshua D Wayser    , kim.johnson@kattenlaw.com
- Marc J Winthrop    mwinthrop@winthropcouchot.com, pj@winthropcouchot.com
- David M Wiseblood    dwiseblood@seyfarth.com
- Brett K Wiseman    bwiseman@aalaws.com
- Dean A Ziehl    dziehl@pszjlaw.com, dziehl@pszjlaw.com
- Marc A. Zimmerman    joshuasdaddy@att.net

**SERVICE VIA E-MAIL**

Edward Soto – Edward.soto@weil.com; odalys.smith@weil.com; lori.seavey@weil.com
Allen Blaustein – Allen.Blaustein@weil.com
Alfredo R. Perez – alfredo.perez@weil.com
Lauren Zerbinopoulos – lauren.xzerbinopoulos@weil.com
Erica Rutner – Erica.rutner@weil.com
Chauncey Cole – Chauncey.cole@cwt.com
R. Reinthaler@dl.com
Marc McKane – Mark.mckane@kirkland.com
Counsel for Bond Sageguard – Mark E. Aronson – mea@amclaw.com
Counsel for Joint Provisional Liquidators of Lehman RE Lt'd. – Betty Shumener –
betty.shumener@dlapiper.com
Counsel for New Anaverde – Sean Jacobson – sean@cohenandjacobson.com
Counsel for City of Oakland/Oakland Redev. Agency – Filbert Augsti – faugusti@steptoe.com