1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PAUL J. COUCHOT -- State Bar No. 131934
WINTHROP COUCHOT, P.C.
660 Newport Center Drive, Fourth Floor
Newport Beach, CA 92660
Telephone: (949) 720-4100
Facsimile: (949) 720-4111
General Insolvency Counsel for
Palmdale Hills Property, LLC et. al. (the "Voluntary Debtors")

RONALD RUS - State Bar No. 67369
JOEL S. MILIBAND - State Bar No. 77438
RUS MILIBAND & SMITH
A PROFESSIONAL CORPORATION
2211 Michelson Drive, Seventh Floor
Irvine, California 92612
Telephone: (949) 752-7100
Facsimile:  (949) 252-1514
Counsel for SCC Acquisitions Inc.

## UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA
## SANTA ANA DIVISION

| | |
|---|---|
| In re<br>PALMDALE HILLS PROPERTY, AND ITS RELATED DEBTORS,<br>　　　Joint Administered Debtors and<br>　　　Debtors-in-Possession | Case No. 8:08-bk-17206-ES<br>Jointly Administered With Case Nos.<br>8:08-bk-17209-ES; 8:08-bk-17240-ES;<br>8:08-bk-17224-ES; 8:08-bk-17242-ES;<br>8:08-bk-17225-ES; 8:08-bk-17245-ES;<br>8:08-bk-17227-ES; 8:08-bk-17246-ES; |

Affects:

☐ All Debtors
☒ Palmdale Hills Property, LLC
☐ SunCal Beaumont Heights, LLC
☐ SCC/Palmdale, LLC
☐ SunCal Johannson Ranch, LLC
☐ SunCal Summit Valley, LLC
☒ SunCal Emerald Meadows LLC
☒ SunCal Bickford Ranch, LLC
☒ Acton Estates, LLC
☐ Seven Brothers LLC
☐ SJD Partners, Ltd.
☐ SJD Development Corp.
☐ Kirby Estates, LLC
☐ SunCal Communities I, LLC
☐ SunCal Communities III, LLC
☐ SCC Communities LLC
☐ North Orange Del Rio Land, LLC
☐ Tesoro SF LLC

8:08-bk-17230-ES; 8:08-bk-17231-ES;
8:08-bk-17236-ES; 8:08-bk-17248-ES;
8:08-bk-17249-ES; 8:08-bk-17573-ES;
8:08-bk-17574 ES; 8:08-bk-17575-ES;
8:08-bk-17404-ES; 8:08-bk-17407-ES;
8:08-bk-17408-ES; 8:08-bk-17409-ES;
8:08-bk-17458-ES; 8:08-bk-17465-ES;
8:08-bk-17470-ES; 8:08-bk-17472-ES;
and 8:08-bk-17588-ES

Chapter 11 Proceedings

**THIRD AMENDED DISCLOSURE STATEMENT DESCRIBING THIRD AMENDED CHAPTER 11 PLANS FILED BY PALMDALE HILLS PROPERTY, LLC, SUNCAL BICKFORD RANCH, LLC, SUNCAL EMERALD MEADOWS, LLC AND ACTON ESTATES, LLC [GROUP I: VOLUNTARY DEBTORS]**

Date:　　　July 22, 2011
Time:　　　11:00 a.m.
Place:　　　Courtroom 5A

1

*Continued from Previous Page*

☐  LBL-SunCal Oak Valley, LLC

2   ☐  SunCal Heartland, LLC

☐  LBL-SunCal Northlake, LLC

3   ☐  SunCal Marblehead, LLC

4   ☐  SunCal Century City, LLC

☐  SunCal PSV, LLC

5   ☐  Delta Coves Venture, LLC

6   ☐  SunCal Torrance, LLC

☐  SunCal Oak Knoll, LLC

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

**PAGE**

I.       INTRODUCTION.............................................................................................    2

II.      DEFINITIONS AND RULES OF INTERPRETATION...........................    5
         2.1    Definitions. ..........................................................................    5
         2.2    Rules of Construction.  .......................................................    28
         2.3    Exhibits .................................................................................    29

III.     PLAN CONFIRMATION DEADLINES ........................................    29
         3.1    Time and Place of the Confirmation Hearing.  ...............    29
         3.2    Deadline for Voting for or Against the Plan.  ..................    29
         3.3    Deadline for Objecting to the Confirmation of the Plan.  ...    29
         3.4    Identity of Person to Contact for More Information Regarding the Plan.  ....    30
         3.5    Disclaimer.  ..........................................................................    30

IV.     FACTUAL BACKGROUND OF THE DEBTORS ...........................    31
         4.1 The Formation of the Debtors and the Projects. ................    31
         4.2 Factual Circumstances Leading to the Filing of the Debtors'
             Chapter 11 Cases. ............................................................    35
         4.3 The Group I: Voluntary Debtors' Potential Preferential Transfers. ...................    44

V.      SIGNIFICANT EVENTS IN THE DEBTORS' CHAPTER 11 CASES .................    44
         5.1.   Voluntary Debtors.  .............................................................    44
         5.2.   The Debtors' Various Motions Relating to Financing for the
                Projects and to Pay Professional Fees.  ...........................    47
         5.3.   The Debtors' Disputes and Claims Against the Lehman Entities. ...............    48
         5.4.   The Lehman / Fenway Claims Transaction and Compromise
                Motion Filed By the Lehman Entities.  ............................    57
         5.5.   The Debtors' Motion for a Stay to Suspend Certain Lehman Actions. ........    58
         5.6.   The Debtors' Other Litigation with Non-Lehman Related Parties.  .............    59
         5.7    LitCo. ....................................................................................    61
         5.8    Reliance Claims. .................................................................    62

VI.     TREATMENT OF UNCLASSIFIED CLAIMS ...............................    63
         6.1    Introduction. .......................................................................    63
         6.2    Treatment of Allowed Administrative Claims.  ...............    63
         6.3    Repayment of Allowed Administrative Claims.  ..............    63
         6.4    Administrative Claims Bar Date. .......................................    64
         6.5    Treatment of Unsecured Tax Claims.  ...............................    64
         6.6    Summary of the Group I: Voluntary Debtors Plans' Treatment
                of Bond Indemnity Claims. ..............................................    65

VII.    CLASSIFICATION OF CLAIMS AND INTERESTS............................    65

VIII.   THE PLAN'S TREATMENT OF CLASSIFIED CLAIMS
AND INTERESTS .................................................................................   70

8.1.   The Plan's Treatment of Holders of Allowed Secured Real
Property Tax Claims Against the Group I: Voluntary Projects
(Classes 1.1 through 1.4). ...............................................   70

8.2.   The Plan's Treatment of Lehman's Disputed Claim(s) and
Disputed Lien(s) Against the Group I: Voluntary Debtors
(Class 2.1 through 2.4). ..................................................   71

8.3.   The Plan's Treatment of Holders of Asserted Mechanic
Lien Claims Against the Group I: Voluntary Projects
(Classes 3.1 Through 3.14). ...........................................   73

8.4.   The Plan's Treatment of Holders of Contingent Bond
Indemnification Claims Against the Group I: Voluntary
Projects (Class 4.1). .......................................................   74

8.5.   The Plan's Treatment of Holders of Priority Claims Against
the Group I: Voluntary Debtors (Class 5.1). ..................   75

8.6.   The Plan's Treatment of Holders of General Unsecured
Claims that are Reliance Claims Against the Group I:
Voluntary Debtors (Classes 6.1, 6.2. 6.3 and 6.4). ........   75

8.7.   The Plan's Treatment of Holders of Allowed General
Unsecured Claims that Are Not Reliance Claims Against
the Group I: Voluntary Debtors (Classes 7.1. 7.2, 7.3 and 7.4). ..................   76

8.8.   The Plan's Treatment of Holders of Allowed Interests
Against the Group I: Voluntary Debtors. ........................   76

IX.   ACCEPTANCE OR REJECTION OF THE PLAN ..........................   77
9.1.   Introduction.  .................................................................   77
9.2.   Who May Object to Confirmation of the Plan.  .............   77
9.3.   Who May Vote to Accept/Reject the Plan.  ...................   77
9.4.   What Is an Allowed Claim/Interest.  .............................   77
9.5.   What Is an Impaired Class.  ...........................................   78
9.6.   Who Is Not Entitled to Vote.  ........................................   78
9.7.   Who Can Vote in More than One Class.  ........................   78
9.8.   Votes Necessary for a Class to Accept the Plan.  ..........   79
9.9.   Treatment of Nonaccepting Classes.  ............................   79
9.10.   Request for Confirmation Despite Nonacceptance by
Impaired Class(es).  .......................................................   79

X.   MEANS OF EXECUTION AND IMPLEMENTATION OF THE PLAN ..............   79
10.1.   Introduction.  .................................................................   79
10.2   Sale Process for the Group I: Voluntary Projects and Group I:
Voluntary Other Assets During the Sales Period. ..........   80
10.3   Establishment and Operations of the Plan Trust. ..........   82
10.4   Preservation and Pursuit of Litigation Claims and Recovery for
the Plan Trust. ...............................................................   83
10.5   Payment of Plan Trust Expenses. ..................................   83
10.6   The Plan Trust Distribution System. .............................   84
10.7   The Plan Trustee. ...........................................................   84

MAINDOCS-#164803-v4-SunCal_3rd_Am_Group_I_VD_DS.DOC

10.8    The Plan Trust Beneficiaries. ........................................................ 88
10.9    No Payment of Transfer-Related Fees to the United States Trustee. ........... 89
10.10   No Payment of Transfer-Related Fees to the Plan Trustee. ..................... 89
10.11   Books and Records of Trust. ..................................................... 89
10.12   Federal Income Tax Treatment of the Holders of the Plan
         Trust Beneficial Interests. .................................................. 89
10.13   Termination of the Trust. ...................................................... 90
10.14   Exemption from Certain Transfer Taxes. .......................................... 90
10.15   Tax Consequence of The Plan. .................................................... 91
10.16   The Voluntary Debtors' Committee. ............................................... 91
10.17   Claims Estimation Rights. ....................................................... 92

XI.     RISK FACTORS ............................................................... 92
11.1    Plan Risks. ...................................................................... 92

XII.    DISTRIBUTIONS.............................................................. 94
12.1    Distribution Agent. .............................................................. 94
12.2    Distributions. ................................................................... 94
12.3    Old Instruments and Securities. .................................................. 95

XIII.   OBJECTIONS TO CLAIMS AND DISPUTED CLAIMS ..................................... 96
13.1    Standing for Objections to Claims. ............................................... 96
13.2    Treatment of Disputed Claims and Disputed Liens. ................................. 97

XIV.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES.................................. 97
14.1    Executory Contracts to be Assumed and Assigned. ................................. 97
14.2    Executory Contracts to be Rejected. ............................................. 100

XV.     BEST INTEREST OF CREDITORS TEST AND PLAN FEASIBILITY ............... 101
15.1    Best Interests Test. ............................................................ 101
15.2    Feasibility. .................................................................... 102

XVI.    LIMITATION OF LIABILITY .................................................. 103
16.1    No Liability for Solicitation or Participation. ................................. 103

XVII.   CONDITIONS TO CONFIRMATION AND
        EFFECTIVENESS OF THE PLAN.................................................. 103
17.1    Conditions Precedent to Plan Confirmation. ...................................... 103
17.2    Conditions Precedent to Plan Effectiveness. ..................................... 103

XVIII. RETENTION OF JURISDICTION ..................................................... 103

XIX.    MODIFICATION OR WITHDRAWAL OF THE PLAN ...................................... 105
19.1    Modification of Plan. ........................................................... 105
19.2    Nonconsensual Confirmation. ..................................................... 105

XX.     EFFECT OF CONFIRMATION........................................................ 105
20.1    Discharge. ...................................................................... 105

20.2    Revesting of the Assets. .................................................................................    105

XXI.    MISCELLANEOUS .......................................................................................................    106
   21.1    Payment of Statutory Fees. .........................................................................    106
   21.2    Changes in Rates Subject to Regulatory Commission Approval. ...............    106
   21.3    Payment Dates. ............................................................................................    106
   21.4    Headings. .....................................................................................................    106
   21.5    Other Documents and Actions. ...................................................................    106
   21.6    Notices. ........................................................................................................    107
   21.7    Governing Law. ...........................................................................................    107
   21.8    Binding Effect. ............................................................................................    107
   21.9    Successors and Assigns. ..............................................................................    108
   21.10    Severability of Plan Provisions. .................................................................    108
   21.11    No Waiver. ...................................................................................................    108
   21.12    Inconsistencies. ...........................................................................................    108
   21.13    Exemption from Certain Transfer Taxes and Recording Fees. ...................    108
   21.14    Post-Confirmation Status Report. ...............................................................    109
   21.15    Post-Confirmation Conversion/Dismissal. .................................................    109
   21.16    Final Decree. ...............................................................................................    110

## I.

## __INTRODUCTION__

This Disclosure Statement[1] is filed jointly by, and the accompanying Plans are proposed respectively by, Palmdale Hills Property, LLC, SunCal Bickford, LLC, SunCal Emerald Meadows, LLC, and Acton Estates, LLC (the "Group I: Voluntary Debtors"), in their respective Chapter 11 Cases in their capacities as debtors in possession, and by Acquisitions, as the SunCal Proponents. In addition to being one of the SunCal Plan Proponents, Acquisitions is also the Plan Sponsor, the Plan Trustee of the Plan Trust, and the Distribution Agent for each Group I: Voluntary Debtor's Plan that is confirmed.

Chapter 11 allows debtors-in-possession, Chapter 11 trustees, and under some circumstances, creditors, interest holders and others parties in interest, to propose a Chapter 11 plan.  As stated, the Group I: Voluntary Debtors are the proponents of the Plan sent to you in the same envelope as this Disclosure Statement.  This document summarizes the contents of the Plan, certain information relating to the Plan and the process the Bankruptcy Court follows in determining whether or not to confirm the Plan.

In summary, the Plan(s) individually provides for the sale of the Ritter Ranch Project, the Bickford Ranch, SunCal Emerald and the Acton Project (the "Group I Projects"), and for the liquidation of all other assets of the Group I: Voluntary Debtors. The Net Sale Proceeds from these sales will then be distributed to Creditors holding Allowed Claims in accordance with their rights and priorities under the bankruptcy code and under other applicable law.

**The Plan also offers the holders of a certain claims against the Group I: Voluntary Debtors, which are defined herein as Reliance Claims, the right to sell these claims, along with any Litigation Rights arising from and/or related to such Reliance Claim, to LitCo, for the sum of fifty-five cents ($0.55) per dollar of claim.  The purchase offer is conditioned upon confirmation of the applicable Plan, the entry of a Final Confirmation Order confirming such Plan, and shall occur on or before the applicable Plan's Effective Date as defined herein.**

---

[1] All defined terms used herein have the same meanings as set forth in Article II herein and Exhibit "1" attached hereto.

MAINDOCS-#164803-v4-SunCal_3rd_Am_Group_I_VD_DS.DOC

1    The offer by LitCo to purchase Allowed Reliance Claims for the sum of fifty-five cents

2  ($0.55) per dollar of claim and certain other Plan funding (*e.g.*, to make required payments to

3  Creditors holding Allowed Administrative Claims, Priority Claims and Tax Claims) will not be

4  funded by the SunCal Plan Proponents.  Instead, the SunCal Plan Proponents are working with

5  proposed investors/lenders who would provide such funding.  While the SunCal Plan Proponents

6  are in discussions with third parties with respect to obtaining funding for the SunCal Plan, no

7  commitment has yet been obtained for such funding and thus SunCal Plan Proponents are not in a

8  position to disclose the terms of such funding at this time.  There is no guarantee that such funding

9  will be obtained.

10    **EXCEPT AS PROVIDED IN THE PURCHASE OFFER TO HOLDERS OF**

11  **RELIANCE CLAIMS REFERENCED ABOVE, AS EXPLAINED IN THE DEFINITION**

12  **OF THE TERM "EFFECTIVE DATE," WHICH IS THE DATE ON WHICH THE PLAN**

13  **BECOMES EFFECTIVE, NO ACTION PROVIDED FOR IN THE PLAN SHALL BE**

14  **TAKEN AGAINST EITHER LEHMAN COMMERCIAL PAPER, INC. ("LCPI") OR**

15  **LEHMAN BROTHERS HOLDINGS, INC. ("LBHI") THAT WOULD HAVE THE**

16  **EFFECT OF VIOLATING ANY APPLICABLE AUTOMATIC STAY THAT MAY EXIST**

17  **IN THEIR CHAPTER 11 CASES. ANY SUCH ACTION WILL ONLY PROCEED AFTER**

18  **ANY APPLICABLE STAY IS EITHER LIFTED OR DEEMED INAPPLICABLE.**

19    Although substantial identical and consolidated Plans are being filed in the Cases of all four

20  Group I: Voluntary Debtors, confirmation of each such Plan is independent of each other.  In other

21  words, the Creditors in each Case will determine, subject to Court approval, whether the applicable

22  Plan will be approved in their Case.  Accordingly, the applicable Plan may be confirmed in the

23  Cases of some of the Group I: Voluntary Debtors, but not in others.

24    The Lehman Lenders and the Chapter 11 Trustee have also filed a competing and

25  alternative plan of reorganization in the Group I: Voluntary Debtors' Cases ("Lehman Competing

26  Group I: Voluntary Debtors Plan").  Accordingly, the creditors holding claims against the Group I:

27  Voluntary Debtors will have the opportunity to vote for the applicable Sun Cal Proponents Group

28  I:  Voluntary Debtors Plan or for Lehman's Competing Group I:  Voluntary Debtors Plan.

1  Alternatively, they can vote for or reject all of the Plans and allow the Court to decide which plan

2  should be approved.  The Group I:  Voluntary Debtors believe that the aggregate benefits offered

3  under their Plans are superior to what is being offered to Creditors under the Lehman Lenders'

4  competing Plans, because the consideration paid to the holders of the Reliance Claims is 55

5  percent under the SunCal Plans in contrast to only a potential distribution of 40percent under the

6  Lehman Lenders and Chapter 11 Trustee Plans for the Group I: Voluntary Debtors.

7  **READ THIS DISCLOSURE STATEMENT CAREFULLY IF YOU WANT TO**

8  **KNOW ABOUT**:

9  ➢  **WHO CAN VOTE OR OBJECT TO THE PLAN;**

10  ➢  **HOW YOUR CLAIM IS TREATED;**

11  ➢  **HOW THIS TREATMENT COMPARES TO WHAT YOUR CLAIM WOULD**

12  **RECEIVE IN LIQUIDATION;**

13  ➢  **A BRIEF HISTORY OF THE DEBTORS AND SIGNIFICANT EVENTS**

14  **DURING THEIR CHAPTER 11 BANKRUPTCY PROCEEDING;**

15  ➢  **WHAT FACTORS THE BANKRUPTCY COURT WILL CONSIDER TO**

16  **DECIDE WHETHER OR NOT TO CONFIRM THE PLAN;**

17  ➢  **WHAT IS THE EFFECT OF CONFIRMATION; AND**

18  ➢  **WHETHER THE PLAN IS FEASIBLE.**

19  This Disclosure Statement cannot tell you everything about your rights.  You should

20  consider consulting your own attorney to obtain more specific advice on how the Plan will affect

21  you and your best course of action.

22  Be sure to read the applicable Plan as well as this Disclosure Statement.  If there are any

23  inconsistencies between the applicable Plan and this Disclosure Statement, the applicable Plan

24  provisions will govern.

25  **THE BANKRUPTCY CODE REQUIRES A DISCLOSURE STATEMENT TO**

26  **CONTAIN "ADEQUATE INFORMATION" CONCERNING THE PLANS.  ON**

27  **_____, 2011, THE BANKRUPTCY COURT ENTERED AN ORDER APPROVING**

28  **THIS DISCLOSURE STATEMENT, BASED UPON A FINDING THAT THIS**

-4-

1  **DOCUMENT CONTAINED "ADEQUATE INFORMATION" TO ENABLE PARTIES**

2  **AFFECTED BY THE PLAN TO MAKE AN INFORMED JUDGMENT REGARDING THE**

3  **PLAN.  ANY PARTY CAN NOW SOLICIT VOTES FOR OR AGAINST THE PLANS.**

4                                          **II.**

5                        **DEFINITIONS AND RULES OF INTERPRETATION**

6       **2.2    Definitions.**

7       The following defined terms are used in this Disclosure Statement.  Any capitalized term

8  that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall

9  have the meaning ascribed to that term in the Bankruptcy Code or Bankruptcy Rules.

10       2.1.1    Acquisitions.  SCC Acquisitions, Inc., a California corporation, an indirect

11  parent company of all of the Debtors, a purported Bond Indemnitor, a Creditor of all of the

12  Debtors, a SunCal Plan Proponent, the Plan Sponsor and the proposed Plan Trustee.

13       2.1.2    Acton Estates.  Acton Estates, LLC, a Delaware limited liability, a

14  Voluntary Debtor herein, and the owner of the Acton Project.

15       2.1.3    Acton Project. The Project owned by Acton Estates, located in Los Angeles

16  County, California, as more particularly described herein.

17       2.1.4    Acton Project Break-up Fee. The amount equal to 2.5% of the Minimum

18  Sales Price for the Acton Project, plus actual amounts paid by LitCo on Allowed Administrative

19  Claims for the Acton Estates Case if LitCo is the Stalking Horse Bidder and is not the Winning

20  Bidder..

21       2.1.5    Administrative Claim(s).  Any Claim against a Group I: Voluntary Debtor or

22  its Estate incurred after the applicable Petition Date for the applicable Group I: Voluntary Debtor

23  but before the Effective Date, for any cost or expense of administration of the Case of the

24  applicable Group I: Voluntary Debtor, which Claim is entitled to priority under section 507(a)(2)

25  or (3) of the Bankruptcy Code, including, without limitation, any fee or charge assessed against an

26  Estate of a Group I: Voluntary Debtor under section 1930 of Title 28 of the United States Code.

27       2.1.6    Administrative Claims Bar Date.  The last date fixed by the Plan for the

28  filing of requests for payment of Administrative Claims.  Under the Plan, the Administrative

1  Claims Bar Date shall be the first business day after the twenty-first (21st) day after the Effective

2  Date.

3          2.1.7  <u>Affiliate</u>.  The term shall have the meaning set forth under Section 101(2),

4  including, but not limited to, as to any Person, any other Person that directly or indirectly owns or

5  controls, is owned or controlled by, or is under common ownership or control with, such Person.

6  The term "control" (including, with correlative meanings, the terms "controlled by" and "under

7  common control with"), as applied to any Person, means the possession, direct or indirect, of the

8  power to direct or cause the direction of the management and policies of such Person, whether

9  through the ownership of voting securities or other equity ownership interest, by contract or

10  otherwise.

11          2.1.8  <u>Allowed</u>.  When used to describe Claim(s) or Interest(s), such Claim(s) or

12  Interest(s), to the extent that it or they are "Allowed Claim(s)" or "Allowed Interest(s)."

13          2.1.9  <u>Allowed Amount</u> shall mean:

14          A.  With respect to any Administrative Claim (i) if the Claim is based upon a

15  Fee Application, the amount of such Fee Application that has been approved by a Final Order of

16  the Bankruptcy Court; (ii) if the Claim is based upon any indebtedness or obligation incurred in the

17  ordinary course of business of the Group I: Voluntary Debtor and is not otherwise subject to an

18  Administrative Claim Bar Date, the amount of such Claim that has been agreed to by the Group I:

19  Voluntary Debtor and such creditor, failing which, the amount thereof as fixed by a Final Order of

20  the Bankruptcy Court; or (iii) if the Holder of such Claim was required to file and has filed proof

21  thereof with the Bankruptcy Court prior to an Administrative Claim Bar Date, (1) the amount

22  stated in such proof if no objection to such Proof of Claim is interposed within the applicable

23  period of time fixed by the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court, or

24  (2) the amount thereof as fixed by Final Order of the Bankruptcy Court if an objection to such

25  proof was interposed within the applicable period of time fixed by the Bankruptcy Code, the

26  Bankruptcy Rules or the Bankruptcy Court.  The Allowed Amount of any Administrative Claim

27  which is subject to an Administrative Claims Bar Date and not filed by the applicable

28

MAINDOCS-#164803-v4-SunCal_3rd_Am_Group_I_VD_DS.DOC

1    Administrative Claims Bar Date shall be zero, and no distribution shall be made on account of any

2    such Administrative Claim;

3              B.        with respect to any Claim which is not an Administrative Claim (the "Other

4    Claim"):  (i) if the Holder of such Other Claim did not file proof thereof with the Bankruptcy Court

5    on or before the Claims Bar Date, the amount of such Claim as listed in the Group I: Voluntary

6    Debtors' Schedules as neither disputed, contingent nor unliquidated; or (ii) if the Holder of such

7    Claim has filed proof thereof with the Bankruptcy Court on or before the Claims Bar Date, (a) the

8    amount stated in such proof if no objection to such Proof of Claim was interposed within the

9    applicable period of time fixed by the Bankruptcy Code, the Bankruptcy Rules, the Plan or the

10   Bankruptcy Court, or (b) the amount thereof as fixed by Final Order of the Bankruptcy Court if an

11   objection to such proof was interposed within the applicable period of time fixed by the

12   Bankruptcy Code, the Bankruptcy Rules, the Plan or the Bankruptcy Court.  The Allowed Amount

13   of any Other Claim which is not Filed by the applicable Claims Bar Date, is not listed on the

14   Group I: Voluntary Debtors' Schedules or is listed as disputed, unliquidated, contingent or

15   unknown, and is not allowed under the terms of the Plan shall be zero, and no distribution shall be

16   made on account of any such Claim; and

17            C.        with respect to any Interest, (i) the amount provided by or established in the

18   records of the Group I: Voluntary Debtors at the Confirmation Date, provided, however, that a

19   timely filed proof of Interest shall supersede any listing of such Interest on the records of the Group

20   I: Voluntary Debtors; or (ii) the amount stated in a proof of Interest Filed prior to the Confirmation

21   Date if no objection to such Interest was filed prior to the Confirmation Date or such later date as

22   the Bankruptcy Court allows; or (iii) the amount of such Interest as fixed by a Final Order of the

23   Bankruptcy Court.

24            2.1.10    <u>Allowed Claim</u>.  Except as otherwise provided in the Plan (including with

25   respect to those Classes for which the amount of the Allowed Claims is specified by the Plan), a

26   Claim to the extent (and only to the extent) of the Allowed Amount of such Claim.

27            2.1.11    <u>Allowed Interest</u>.  Any Interest to the extent, and only to the extent, of the

28   Allowed Amount of such Interest.

2.1.12    <u>Allowed Secured Claims</u>.  All or a portion of a Secured Claim that is an Allowed Claim.

2.1.13    <u>Allowed Unsecured Claim</u>. All or a portion of an Unsecured Claim that is an Allowed Claim.

2.1.14    <u>Arch</u>.  Arch Insurance Company, a Bond Issuer.

2.1.15    <u>Available Cash</u>.  Each Group I: Voluntary Debtors' Cash deposited into the applicable Distribution Account(s) on or after the Effective Date that is available for making Distributions under the Plan to Holders of Allowed Administrative, Priority, and Unsecured Claims.  The Available Cash shall consist of the respective Group I: Voluntary Debtors' cash on hand as of the Effective Date that is not subject to a Disputed Lien, proceeds of Net Litigation Recoveries that are not subject to a Disputed Lien, Net Sales Proceeds that become Available Cash upon the disallowance of a Disputed Claim or avoidance of a Disputed Lien purportedly encumbering such Cash, or proceeds from the LitCo Plan Loan.  All Available Cash shall be deposited into the applicable Distribution Account(s).  Available Cash shall not include Net Sale Proceeds in the Net Sales Proceeds Account where the Disputed Secured Claims are Allowed but subject to an equitable subordination judgment.  For avoidance of doubt, and notwithstanding anything to the contrary contained herein or any Confirmation Order, (i) Available Cash shall not include any Cash held in the "Funds Control Account" pursuant to that certain *Work and Cost Payment Agreement and First Amendment to Reciprocal Easement Agreement and Cooperation Agreement* between Anaverde LLC and Palmdale Hills, dated as of June 29, 2001 (the "Work and Cost Agreement "), (ii) the claims, defenses and all other rights of all applicable parties, including New Anaverde LLC and Palmdale Hills Property, LLC, with respect to the Funds Control Account and the Work and Cost Agreement are expressly preserved, and (iii) the Funds Control Account shall only be distributed upon (a) agreement of all of the applicable parties, including New Anaverde LLC, and Palmdale Hills Property, LLC, (b) as provided pursuant to the terms of the Work and Cost Agreement, or (c) further order of a court of competent jurisdiction.

2.1.16    <u>Avoidance Actions</u>.  All Claims and defenses to Claims accruing to the Group I: Voluntary Debtors and their Estates under Bankruptcy Code Sections 506(d), 510(c), 541, 544, 545, 547, 548, 549, 550, or 551.

2.1.17    <u>Bankruptcy Code</u>.  The United States Bankruptcy Code.

2.1.18    <u>Bankruptcy Court</u>.  The United States Bankruptcy Court for the Central District of California, having jurisdiction over the Cases and, to the extent of any withdrawal of the reference made pursuant to Section 157 of title 28 of the United States Code, the United States District Court for the Central District of California; or, in the event such courts cease to exercise jurisdiction over the Cases, such court or unit thereof that exercises jurisdiction over the Cases in lieu thereof.

2.1.19    <u>Bankruptcy Rules</u>.  Collectively, as now in effect or hereafter amended and as applicable to the Cases, (i) the Federal Rules of Bankruptcy Procedure, and (ii) the Local Bankruptcy Rules and General Orders applicable to cases pending before the Bankruptcy Court.

2.1.20    <u>Beneficial Interests</u>.  Collectively, the interests of the holders of Allowed Unsecured Claims in the Plan Trust and in all distributions to be made by the Plan Trust on account of Allowed Unsecured Claims. The Beneficial Interests (a) shall be noted in the books and records of the Plan Trust, (b) shall not be evidenced by a writing, and (c) may not be transferred, sold, assigned or transferred by will, intestate succession or operation of law without written notification to the Plan Trustee confirming and acknowledging the transfer by both the holder and the transferee.

2.1.21    <u>Bickford Ranch Project</u>.  The Project owned by SunCal Bickford, located in the City of Penryn, California, as more particularly described herein.

2.1.22    <u>Bickford Ranch Project Break-up Fee</u>. The amount equal to 2.5% of the Minimum Sales Price for the Bickford Ranch Project, plus actual amounts paid by LitCo on Allowed Administrative Claims for the SunCal Bickford Case if LitCo is the Stalking Horse Bidder and is not the Winning Bidder.

2.1.23    <u>Bickford Second Loan Agreement</u>.  That certain promissory note secured by a deed of trust, dated as of May 25, 2005, in the maximum aggregate principal amount of

1    approximately $30,000,000 executed by SunCal Bickford, as borrower, and payable to the order of

2    Lehman ALI.  The Bickford Second Lien Loan Agreement is allegedly secured by a second priority

3    deed of trust on the Bickford Ranch Project.  The Bickford Second Loan Agreement has an

4    asserted balance due of $56,494,059.38 as of March 30, 2009.

5           2.1.24    Bond Claim(s).  Any Claim against the Debtor(s) and a Bond Issuer under

6    various payment or performance bonds.

7           2.1.25    Bond Claimant.  Holder(s) of a Bond Claim.

8           2.1.26    Bond Indemnification Claim.  All Claims by Bond Issuers for

9    indemnification against a Bond Indemnitor for the Bond Issuer's actual payment or purchase of a

10   Bond Claim with respect to the Group I: Voluntary Debtors' Projects.

11          2.1.27    Bond Indemnitors.  The individuals and entities that are allegedly liable on

12   the Bond Indemnification Claims, including, allegedly, all of the Debtors, Acquisitions, all

13   Affiliates of Acquisitions, and Elieff.

14          2.1.28    Bond Issuer(s).  Bond Safeguard, Lexon and Arch in their capacities as

15   issuers and sureties for payment and performance bonds for the benefit of certain of the Debtors.

16          2.1.29    Bond Safeguard.  Bond Safeguard Insurance Company, a Bond Issuer.

17          2.1.30    Business Day.  Any day, other than a Saturday, a Sunday or a "legal

18   holiday," as defined in Bankruptcy Rule 9006(a).

19          2.1.31    Cases.  The Chapter 11 cases of the Group I: Voluntary Debtors pending

20   before the Bankruptcy Court.

21          2.1.32    Cash.  Currency of the United States of America and cash equivalents,

22   including, but not limited to, bank deposits, immediately available or cleared checks, drafts, wire

23   transfers and other similar forms of payment.

24          2.1.33    CFD Bonds.  Community facilities district bonds issued by a

25   governmental entity.

26          2.1.34    Chapter 11 Trustee.  Steven M. Speier, the duly appointed trustee of the

27   Trustee Debtors in their pending Chapter 11 Cases.

28

2.1.35    Claim.  This term shall have the broadest possible meaning under Section 101(5) of the Bankruptcy Code, and shall include (a) any right to payment from any of the Group I: Voluntary Debtors, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, or (b) any right to an equitable remedy for breach of performance if such breach gives rise to a right of payment from any of the Group I: Voluntary Debtors, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

2.1.36    Claims Bar Date.  For any Claim, other than the exceptions noted below, March 31, 2009, which was established by the Bankruptcy Court as the last date for creditors to file Proof of Claims with the Bankruptcy Court in all of the Group I: Voluntary Debtors' cases, except for the following: (a) Administrative Claims, for which the Administrative Claims Bar Date shall apply, (b) claims arising from rejection of executory contracts or unexpired leases pursuant to 11 U.S.C. § 365, for which the last day to file a proof of claim is (i) 30 days after the date of entry of the order authorizing the rejection, or (ii) March 31, 2009, whichever is later, (c) claims of "governmental units," as that term is defined in 11 U.S.C. § 101(27), for which proofs of claim are timely filed if filed: (i) before 180 days after the date of the Order for Relief in this case, or (ii) by March 31, 2009, whichever is later (11 U.S.C. § 502(b)(9)), and (d) claims arising from the avoidance of a transfer under chapter 5 of the Bankruptcy Code, the last day to file a proof of claim is 30 days after the entry of judgment avoiding the transfer or March 31, 2009, whichever is later.

2.1.37    Claims Objection Deadline.  The later of (i) the first business day following the one hundred and eightieth (180th) day after the Effective Date, or (ii) such greater period of limitation as may be fixed or extended by the Bankruptcy Court or by agreement between the Plan Trustee and the Holder of the Claim.

2.1.38    Claim Objection Reduction Amount. The amount of Net Sales Proceeds that is made available to the holders of Allowed Unsecured Claims due to the entry of a judgment or order on a Lehman Claim Objection that disallows, reduces, or otherwise adversely modifies the secured claims filed by the Lehman Lenders.

2.1.39    Class.  Each group of Claims or Interests classified in Article V of the Plan pursuant to Sections 1122 and 1123 of the Bankruptcy Code.

2.1.40    Confirmation Date.  The date on which the Confirmation Order is entered in the Bankruptcy Court's docket.

2.1.41    Confirmation Order.  The order entered by the Bankruptcy Court confirming the Plan in accordance with the provisions of Chapter 11 of the Bankruptcy Code.

2.1.42    Contingent Bond Claims.  Bond Indemnification Claims in which the Bond Issuer has not yet paid or purchased the underlying Bond Claim.

2.1.43    Contract Action. The action filed by certain Voluntary Debtors against Lehman ALI, Inc., and certain other defendants, in California Superior Court for the County of Orange (Case No. 30-2011-0040847-CU-BC-CJC), that was removed to the bankruptcy court as Adv.  No. 8:11-ap-01212-ES, with a reservation of rights to add the Plan Trustee and/or the Trustee Debtors (and their successors) as additional plaintiffs therein.

2.1.44    Creditor.  Any Person who is the Holder of a Claim against any Debtor that arose or accrued or is deemed to have arisen or accrued or to have matured, or otherwise become due, owing, and payable on or before the Petition Date, including, without limitation, Claims of the kind specified in Sections 502(g), 502(h) or 502(i) of the Bankruptcy Code.

2.1.45    Debtor(s).  Individually or collectively, the Voluntary Debtors and the Trustee Debtors, as specifically defined in Exhibit "1" attached hereto.

2.1.46    Debtor(s)-in-Possession.  The Voluntary Debtor(s) in their capacity as representatives of their respective Estates in their respective Chapter 11 Cases.

2.1.47    Disclosure Statement.  This document accompanying the Plan that is entitled "Third Amended Disclosure Statement Describing Third Amended Chapter 11 Plan Filed by SunCal Plan Proponents In The Chapter 11 Cases Of Palmdale Hills Property, LLC, SunCal Bickford Ranch, LLC, SunCal Emerald Meadows, LLC and Acton Estates, LLC," as amended and with all accompanying exhibits.

2.1.48    Disputed Claim(s).  All or any part of a Claim other than any Allowed Amount thereof as to which any one of the following applies: (i) no Proof of Claim has been filed

-12-

with respect to such Claim, and either (a) the Claim is not listed in the Schedules; or (b) the Claim

is listed in the Schedules as unliquidated, disputed, contingent, unknown or in a zero amount,

(ii) the Claim is the subject of (a) an unresolved Litigation Claim; (b) the Claim is subject to offset

by a Litigation Claim; (c) a timely objection to such Claim that has not been resolved by a Final

Order; or (d) a request for estimation in accordance with the Bankruptcy Code, the Bankruptcy

Rules, any applicable order of the Bankruptcy Court, or the applicable Plan(s) which is Filed on or

before the Claims Objection Deadline, which Adversary Proceeding, objection, or request for

estimation has not been dismissed, withdrawn or determined by a Final Order; or (iii) the Claim is

otherwise treated as a "Disputed Claim" pursuant to the Plan.

> 2.1.49    Disputed Lien(s).  An asserted lien(s) against Assets of the Group I

Voluntary Debtor(s) that is either subject to a Disputed Secured Claim, not duly perfected, subject

to an Avoidance Action, or subject to an action pursuant to Bankruptcy Code Sections 510(c)(2)

and/or 506(d).  However, pursuant to Section 506(d)(2), a lien is not disputed merely because it

secures a claim that "is not an allowed secured claim due only to the failure of any entity to file a

proof of such claim under section 501 of this title."

> 2.1.50    Disputed Secured Claim(s). That part of a Disputed Claim that is a

Secured Claim.

> 2.1.51    Distribution(s).  Payments to Holders of Allowed Claims provided for

under the Plan.

> 2.1.52    Distribution Agent.  The entity that is responsible for making Distributions

under the Plan, which shall be Acquisitions.

> 2.1.53    Distribution Account(s).  Separate account(s) to be established by the Plan

Trustee at an FDIC insured bank into which each Group I: Voluntary Debtor's Available Cash

shall be deposited and all Available Cash received by the Plan Trust after the Confirmation Date

that would have belonged to such Group I: Voluntary Debtor shall be deposited, other than Net

Sales Proceeds that are subject to Disputed Claims and Disputed Liens.

> 2.1.54    Distribution Date.  With respect to any Allowed Claim or Allowed

Interest, the date on which a Distribution is required to be made under the Plan.

2.1.55    Effective Date. A date selected by the applicable SunCal Plan Proponents that is not later than the ninetieth (90th) calendar day after the Confirmation Date, and provided there is no stay pending appeal of the Confirmation Order, in which case the Effective Date shall be tolled until the dissolution of such stay. However, in any case where the actions provided for in the Plan would be delayed by the automatic stay applicable in the case of any Lehman Entity operating under the protection of Chapter 11 or Chapter 7, the SunCal Plan Proponents shall have the right to extend the Effective Date for an additional sixty (60) days to obtain relief from any such stay.  The Effective Date may be further extended (beyond the above referenced initial sixty (60) day extension) by the Bankruptcy Court after notice and hearing to all parties in interest.

2.1.56    Elieff.  Bruce Elieff, the president of Acquisitions, a purported Bond Indemnitor with alleged corresponding indemnity Claims against the Debtors.

2.1.57    Emerald Compromise.  The compromise set forth and attached to the *Motion For An Order Approving Compromise of Controversies with Rubidoux 60, LLC, EMR Residential Properties LLC, Mitchell Ogron, Life Church of God in Christ, Moses Green and David Sandoval* ("Emerald Compromise Motion"), filed on or about March 14, 2011, by SunCal Emerald, as may be further amended or revised.

2.1.58    Emerald Meadows Project.  The Project owned by SunCal Emerald, located in the City of Rubidoux, California, as more particularly described herein.

2.1.59    Estates.  The bankruptcy estates of the Group I: Voluntary Debtors created pursuant to Section 541 of the Bankruptcy Code.

2.1.60    Fee Applications.  Applications of Professional Persons under Sections 330, 331 or 503 of the Bankruptcy Code for allowance of compensation and reimbursement of expenses in the Cases.

2.1.61    Fee Claim.  A Claim under Sections 330 or 503 of the Bankruptcy Code for allowance of compensation and reimbursement of expenses in the Cases.

2.1.62    Fenway Capital.  Fenway Capital Funding LLC, a Lehman Successor to Lehman's Disputed Claims and Lehman's Disputed Liens arising from (i) SunCal Communities I Loan Agreement, (ii) Ritter Ranch Loan Agreement, (iii) Bickford Second Loan Agreement,

(iv) SunCal PSV Loan Agreement, (v) SunCal Marblehead/SunCal Heartland Loan Agreement, (vi) Delta Coves Loan Agreement (vii) SunCal Northlake Loan Agreement, and (viii) SunCal Oak Valley Loan Agreement.  Such Disputed Claims and Disputed Liens were transferred back to LCPI pursuant to a compromise approved by the New York Bankruptcy Court on May 12, 2010.

2.1.63    Filed.  Delivered to, received by and entered upon the legal docket by the Clerk of the Bankruptcy Court.  "File" shall have a correlative meaning.

2.1.64    Final Order.  A judgment, order, ruling or other decree issued and entered by the Bankruptcy Court, that has not been reversed, stayed, modified or amended.

2.1.65    General Unsecured Claim.  A Claim against a Group I: Voluntary Debtor that is not (a) a Secured Claim, (b) an Administrative Claim, (c) a Tax Claim or (d) a Priority Claim.

2.1.66    Group I: Voluntary Debtors. Palmdale Hills Property, LLC, SunCal Bickford Ranch, LLC, SunCal Emerald Meadows, LLC and Acton Estates, LLC.

2.1.67    Group I: Voluntary Debtors Assets.  All assets that are property of the Group I: Voluntary Debtor(s) pursuant to Bankruptcy Code Section 541, including the Group I: Voluntary Projects, the Litigation Claims and the Net Sales Proceeds.

2.1.68    Group I: Voluntary Other Assets.  All assets of the Group I: Voluntary Debtors excluding the Group I: Voluntary Projects, Litigation Claims and Net Sales Proceeds.

2.1.69    Group I: Voluntary Projects. The Ritter Ranch Project, the Bickford Ranch Project, the Emerald Meadows Project and the Acton Project.

2.1.70    Voluntary Project Holder.  The beneficial owner of any Claim or Interest.

2.1.71    Initial Overbid. The Initial Overbid is the first Qualifying Bid after the Opening Bid that is equal to or in excess of the Initial Overbid Amount.

2.1.72    Initial Overbid Amount. In the case of the Ritter Ranch Project, the Initial Overbid Amount is a sum that is not less than the sum of the applicable Opening Bid, the Ritter Ranch Project Break-up Fee and one hundred thousand dollars ($100,000). In the case of the Bickford Ranch Project, the Initial Overbid Amount is a sum that is not less than the sum of the applicable Opening Bid, the Bickford Ranch Project Break-up Fee and seventy-five thousand

1    dollars ($75,000). In the case of the Emerald Meadow Project, the Initial Overbid Amount is a sum

2    that is not less than the sum of the applicable Opening Bid, the Emerald Meadow Project Break-up

3    Fee and seventy-five thousand dollars ($75,000). In the case of the Acton Project, the Initial

4    Overbid Amount is a sum that is not less than the sum of the applicable Opening Bid, the Acton

5    Project Break-up Fee, and one-hundred fifty-thousand dollars ($150,000).

6            2.1.73    <u>Insider</u>.  The term shall have the broadest meaning possible under

7    Section 101(31), including, but not limited to, a person in control of the Debtor, Affiliates and

8    Insiders of such Affiliates.

9            2.1.74    <u>Interest</u>.  Any equity security interest in any Group I: Voluntary Debtor

10    within the meaning, of Section 101(16) of the Bankruptcy Code, including, without limitation, any

11    equity ownership interest in any of the Group I: Voluntary Debtors, whether in the form of

12    common or preferred stock, stock options, warrants, partnership interests, or membership interests.

13            2.1.75    <u>LBHI</u>.  Lehman Brothers Holdings, Inc., a Lehman Entity, the parent

14    company of Lehman ALI and LCPI, and a Chapter 11 debtor in a bankruptcy proceeding pending

15    in the Bankruptcy Court for the Southern District of New York.

16            2.1.76    <u>LCPI</u>.  Lehman Commercial Paper, Inc., a Chapter 11 debtor in a

17    bankruptcy proceeding pending in the Bankruptcy Court for the Southern District of New York.

18            2.1.77    <u>Legal Rate</u>.  The rate of interest payable on judgments obtained in the

19    United States District Courts as set forth in 28 U.S.C. § 1961.  The rate applicable under the Plan is

20    1.44% per annum, representing the applicable rate on November 6, 2008.

21            2.1.78    <u>Lehman Adversary Proceeding</u>.  The Debtors' pending adversary

22    proceeding against the Lehman Lenders and/or the Lehman Successors asserting various causes of

23    action including equitable subordination, fraudulent conveyances and preferential transfers.

24            2.1.79    <u>Lehman ALI</u>.  Lehman ALI, Inc.

25            2.1.80    <u>Lehman Disputed Administrative Loans</u>.  The post-petition financing

26    provided by Lehman ALI to SunCal Oak Valley, SunCal Heartland, SunCal Northlake, SunCal

27    Marblehead, SunCal Century City, SunCal PSV, Delta Coves, and SunCal Oak Knoll, which

28    grants priming liens on all borrower Trustee Debtors' assets, and for super-priority administrative

status to Lehman ALI.  The aggregate amount of the Lehman Disputed Administrative Loans to all of the above reference Trustee Debtors was approximately $40 million as of March 1, 2011 and continuing to increase.  The Lehman Disputed Administrative Loans are the subject of claim objections, specifically the pending 502(d) Objection. Until these objections are resolved in the applicable Case, these Lehman Disputed Administrative Loans shall not be Allowed Claims.

2.1.81    Lehman Claim Objections. The objections filed by the Debtors to the claims filed by the Lehman Lenders that are based upon the Lehman Disputed Loans and the Lehman Disputed Administrative Loans, including, but not limited to, the Lehman Recoupment Objection and the Lehman 502(d) Objection.

2.1.82    Lehman Entities.  The Lehman Lenders, the Lehman Equity Members and LBHI.

2.1.83    Lehman Equity Members.  Lehman Entities that own direct or indirect membership Interests in all of the Trustee Debtors, except for SunCal Heartland and SunCal Marblehead.

2.1.84    Lehman Lenders.  Lehman ALI, LCPI, Northlake Holdings, and OVC Holdings.

2.1.85    Lehman Disputed Loans.  Collectively the following loans that are the purported basis for the Lehman's Disputed Claims:  (a) SunCal Communities I Loan Agreement; (b) Bickford Second Loan Agreement; (c) Ritter Ranch Loan Agreement; (d) SCC Palmdale Loan; (e) Interim Loan Agreement; (f) SunCal Oak Knoll/SunCal Torrance Loan Agreement; (g) SunCal Century City Loan Agreement; (h) SunCal PSV Loan Agreement; (i) SunCal Delta Coves Loan Agreement; (j) SunCal Marblehead/SunCal Heartland Loan Agreement; (k) Sun Cal Oak Valley Loan Agreement; (l) SunCal Northlake Loan Agreement; (m) Pacific Point First Loan Agreement; (n) Pacific Point Second Loan Agreement, and (o) the Lehman Disputed Administrative Loan.

2.1.86    Lehman Recoupment Objection. A claim objection filed with respect to certain claims filed by the Lehman Lenders that is based upon the affirmative defenses of recoupment, unjust enrichment and unclean hands.

MAINDOCS-#164803-v4-SunCal_3rd_Am_Group_I_VD_DS.DOC

1             2.1.87     <u>Lehman Representatives</u>.  The individuals that controlled the Lehman

2 Entities.

3             2.1.88     <u>Lehman Successor(s)</u>.  Entities other than the Lehman Lenders that either

4 assert to be or are determined by the Bankruptcy Court to be the beneficial owner(s) of the Lehman

5 Disputed Loan(s), including, but not limited to Fenway Capital, Lehman Re and Danske Bank.

6             2.1.89     <u>Lehman's Disputed Claim(s)</u>.  All of the Proofs of Secured Claims filed by

7 a Lehman Lender or a Lehman Successor in the Debtors' Chapter 11 Cases arising from the

8 Lehman Disputed Loans and the Lehman Disputed Administrative Loans.

9             2.1.90     <u>Lehman's Disputed Lien(s)</u>.  All of the alleged liens relating to Proofs of

10 Secured Claims filed by a Lehman Lender or a Lehman Successor in the Debtor's Chapter 11

11 Cases arising from the Lehman Disputed Loans.

12             2.1.91     <u>Lehman 502(d) Objection</u>. A claim objection filed with respect to certain

13 claims filed by the Lehman Lenders that based upon Section 502(d) of the bankruptcy code.

14             2.1.92     <u>Lexon</u>.  Lexon Insurance Co.

15             2.1.93     <u>LitCo</u> A Delaware limited liability company that will be formed for the

16 purpose of (i) purchasing the claims and Litigation Rights held by the Reliance Claimants that

17 choose to sell such Reliance Claims, (ii) funding the LitCo Plan Loan, and (iii) potentially being

18 selected as the Stalking Horse Bidder under the Group I: Voluntary Debtors' Plans.

19             2.1.94     <u>LitCo Plan Loan</u>. A loan that will be made by LitCo to the extent

20 necessary to pay Allowed Priority Claims, Allowed Administrative Claims and Post Confirmation

21 Expenses incurred by the Plan Trust, the Plan Trustee and its professionals and to the Voluntary

22 Debtors Committee and its professionals if no other source is available from the applicable Group

23 I: Voluntary Debtor's Assets.

24             2.1.95     <u>Litigation Claims</u>.   Any and all interests of the Group I: Voluntary

25 Debtors in any and all Claims, rights, causes of action, and objections or defenses to Claims, liens,

26 rights, or causes of action which have been or may be commenced by the Group I: Voluntary

27 Debtor(s), the Chapter 11 Trustee, or the Voluntary Debtors' Committee, as the case may be,

28 including, but not limited to, any (i) Avoidance Actions; (ii) for turnover of property to the Group

MAINDOCS-#164803-v4-SunCal_3rd_Am_Group_I_VD_DS.DOC

I: Voluntary Debtors' Estates and/or the Plan Trust; (iii) for the recovery of property or payment of money that belongs to the Debtors' Estates or the Plan Trust; (iv) the right to compensation in the form of damages, recoupment or setoff of the Debtors' Estates and/or the Plan Trust; (v) the Lehman Adversary Proceeding; (vi) the Contract Action, and (vii) any and all other Claims against Lehman's Disputed Claims and/or Disputed Liens referenced in the Plan or the Disclosure Statement.

2.1.96    <u>Litigation Recoveries</u>.  Any Cash or other property received by the Chapter 11 Trustee, the Group I: Voluntary Debtors, the Voluntary Debtors' Committee and/or the Plan Trust, as the case may be, from all or any portion of a Litigation Claim(s), including, but not limited to, awards of damages, attorneys' fees and expenses, interest and punitive damages, whether recovered by way of settlement, execution on judgment or otherwise.

2.1.97    <u>Litigation Rights</u>. Any Claims held by a party against the Group I: Voluntary Debtors , and if applicable, against third parties arising or relating to the Claim against the applicable Group I Voluntary Debtor, that have not been fixed in a final judgment prior to the Effective Date.

2.1.98    <u>Marblehead Project</u>.  The Project owned by SunCal Marblehead, located in the City of San Clemente, California, as more particularly described herein.

2.1.99    <u>Maximum Distribution</u>.  A Distribution to a Holder of an Allowed Unsecured Claim against a Group I: Voluntary Debtor equal to one hundred percent (100%) of the amount of the Holder's Allowed General Unsecured Claim plus interest at the Legal Rate from and as of the Group I: Voluntary Debtor's Petition Date.

2.1.100    <u>MB Firm</u>.  Miller Barondess, LLP.

2.1.101    <u>Mechanic Lien Claims</u>.  Mechanic Lien Claims arising pursuant to California Civil Code §3110, et seq. that were either allegedly perfected prepetition or otherwise allegedly satisfy the requirements of Bankruptcy Code 546(b).

2.1.102    <u>Minimum Increment</u>.  Minimum Increment applicable to the sales of the Group I: Voluntary Projects are the following: one hundred thousand dollars ($100,000) for the Ritter Ranch Project, seventy-five thousand dollars ($75,000) for the Bickford Ranch Project,

MAINDOCS-#164803-v4-SunCal_3rd_Am_Group_I_VD_DS.DOC

1   seventy-five thousand dollars ($75,000) for the Emerald Meadow Project and fifty thousand dollars

2   ($50,000) for the Acton Project.

3       2.1.103   Minimum Sale Price. The minimum gross sale price that must be paid for

4   Group I: Voluntary Project before such projects can be sold pursuant to the Plan, which prices are

5   the following: Ritter Ranch Project - $19,620,000, Bickford Ranch Project - $9,810,000, Emerald

6   Meadows Project - $5,490,000, and Acton Project - $1,500,000.

7       2.1.104   Net Litigation Recoveries.  Litigation Recoveries less associated

8   Administrative Claims and Post-Confirmation Expenses incurred in connection with such

9   Litigation Recoveries.

10      2.1.105   Net Sales Proceeds.  The Cash generated from the sale(s) or liquidation of

11  the Group I: Voluntary Debtor(s)' Assets or the Plan Trust's Assets, less payment of selling

12  expenses, taxes,  and any associated Post-Confirmation Expenses and Administrative Claims

13  incurred in furtherance of such sales or liquidation of such Assets.

14      2.1.106   Net Sales Proceeds Account(s).  Separate account(s) that will be

15  established by the Plan Trustee at an FDIC insured bank into which all Net Sale Proceeds shall be

16  deposited from the sale of Assets that were allegedly encumbered by a Disputed Secured Claim(s)

17  and/or a Disputed Lien(s).  There shall be a separate Net Sales Proceeds Account for the Net Sale

18  Proceeds allegedly subject to each Disputed Secured Claim(s) and/or Disputed Lien(s), except

19  where there are two Disputed Liens on a single Project, in which case, there shall be a single

20  account for the proceeds generated from that Project.  The Disputed Secured Claim(s) and/or

21  Disputed Lien(s) shall attach to the corresponding Net Sales Proceeds Account(s) pending any

22  Final Order(s) of the Bankruptcy Court resolving the applicable Disputed Secured Claim(s) and/or

23  applicable Disputed Lien(s).  To the extent that a particular Disputed Claim is disallowed or a

24  particular Disputed Lien is avoided (other than transferred to the Estates pursuant to Bankruptcy

25  Code Section 510(c)(2)) or otherwise invalidated, such Net Sales Proceeds allegedly subject

26  thereto shall become Available Cash and shall be transferred to the applicable Distribution

27  Account(s).  To the extent that a particular Disputed Secured Claim and a Disputed Lien are

28  allowed and deemed valid but subject to the equitable subordination causes of action in the

Lehman Adversary Proceeding, the funds shall remain in the Net Sales Accounts pending a Final

Order on the equitable subordination causes of action in the Lehman Adversary Proceeding.

2.1.107   Opening Bid.  Opening Bid means the offer for one, or both of the Group

I: Voluntary Projects, which is equal to the Minimum Sale Price(s) accepted by the Debtor for

either one, some or all of the Group I: Voluntary Projects.

2.1.108   Orders for Relief Date.  The following are dates that orders for relief were

entered for each of the Trustee Debtors:

| | |
|---|---|
| SunCal Oak Valley | January 6, 2009 |
| SunCal Heartland | January 6, 2009 |
| SunCal Northlake | January 6, 2009 |
| SunCal Marblehead | January 6, 2009 |
| SunCal Century City | January 6, 2009 |
| SunCal PSV | January 6, 2009 |
| Delta Coves | January 6, 2009 |
| SunCal Torrance | January 6, 2009 |
| SunCal Oak Knoll | January 6, 2009 |

2.1.109   Palmdale Hills.  Palmdale Hills Property LLC, a Delaware limited liability

company, a Voluntary Debtor herein, and the owner of the Ritter Ranch Project

2.1.110   Palmdale Hills CFD Bonds.  Certain CFD bonds issued by the City of

Palmdale, in the amount of approximately $33 million that are owned by Palmdale Hills.

2.1.111   Palm Springs Village Project.  The Project owned by SunCal PSV, located

in the City of Palm Springs, California, as more particularly described herein.

2.1.112   Person.  An individual, partnership, corporation, limited liability company,

business trust, joint stock company, trust, unincorporated association, joint venture, governmental

authority, governmental unit, committee or other entity of whatever nature.

2.1.113   Petition Dates.  The following are dates that each of the Voluntary Debtors

filed their Voluntary Chapter 11 petitions or Creditors filed involuntary Chapter 11 petitions

against the Trustee Debtors:

| | |
|---|---|
| Palmdale Hills | November 6, 2008 |
| SunCal Beaumont | November 6, 2008 |
| SCC Palmdale | November 7, 2008 |
| SunCal Johannson | November 7, 2008 |
| SunCal Summit Valley | November 7, 2008 |

| | |
|---|---|
| SunCal Emerald | November 7, 2008 |
| SunCal Bickford | November 7, 2008 |
| Acton Estates | November 7, 2008 |
| Seven Brothers | November 7, 2008 |
| SJD Partners. | November 7, 2008 |
| SJD Development | November 7, 2008 |
| Kirby Estates | November 7, 2008 |
| SunCal I | November 7, 2008 |
| SunCal III | November 7, 2008 |
| SCC Communities | November 19, 2008 |
| Del Rio | November 19, 2008 |
| Tesoro | November 19, 2008 |
| Delta Coves Ventures, LLC | November 14, 2008 |
| SunCal Heartland, LLC | November 12, 2008 |
| SunCal Marblehead, LLC | November 12, 2008 |
| LB-L-SunCal Northlake, LLC | November 12, 2008 |
| LB-L-SunCal Oak Valley, LLC | November 12, 2008 |
| SunCal Century City, LLC | November 14, 2008 |
| SunCal PSV, LLC | November 14, 2008 |
| SunCal Torrance Properties, LLC | November 14, 2008 |
| SunCal Oak Knoll, LLC | November 19, 2008 |

2.1.114   Plan(s).  The "Third Amended Chapter 11 Plan Filed by SunCal Plan Proponents In The Chapter 11 Cases Of Palmdale Hills Property, LLC, SunCal Bickford Ranch, LLC, SunCal Emerald Meadows, LLC and Acton Estates, LLC," together with the Exhibits thereto, as the same may be amended or modified from time to time in accordance with the Plan(s).

2.1.115   Plan Period. The period from the Effective Date to the Plan Termination Date.

2.1.116   Plan Termination Date. The fifth (5th) anniversary date of the Effective Date, unless the Plan elects and earlier date.

2.1.117   Plan Sponsor.  The entity that has committed to cause and/or arrange the funding of certain specified obligations under the Plan on or after the Effective Date.  The Plan Sponsor is Acquisitions.

2.1.118   Plan Trust.  A liquidating trust to be established prior to or on the Effective Date, with Acquisitions as the Plan Trustee and the Holders of Allowed Claims against the Debtors as the beneficiaries. The purpose of the Plan Trust will be to liquidate the Debtors'

1    Assets (other than Assets that are excluded by the Plan Trustee on the grounds that they lack value

2    or would be difficult to administer) and to otherwise consummate the Plan.

3            2.1.119    <u>Plan Trustee</u>. The Plan Trustee under the Plan Trust is Acquisitions.

4            2.1.120    <u>Plan Trust Beneficiaries</u>. The Plan Trust Beneficiaries are (i) the holders

5    of Beneficial Interests, as of any point in time, and (ii) holders of Allowed Claims that shall be

6    satisfied from Plan Trust Assets in accordance with the terms of the Plan.

7            2.1.121    <u>Plan Trust Assets</u>. Plan Trust Assets means all property within the

8    Chapter 11 estates of the Group I: Voluntary Debtors.

9            2.1.122    <u>Post-Confirmation Expenses</u>. The fees and expenses incurred by the Plan

10    Trust, the Plan Trustee and the Voluntary Debtors' Committee and their professionals following

11    the Confirmation Date (including the fees and costs of Professionals) for the purpose of

12    (i) prosecuting and liquidating the Litigation Claims; (ii) objecting to and resolving Disputed

13    Claims and Disputed Liens; (iii) selling or otherwise liquidating the Plan Trust's Assets;

14    (iv) effectuating Distributions under the Plan; and (v) otherwise consummating the Plan and

15    closing the Group I: Voluntary Debtors' Chapter 11 Cases.

16            2.1.123    <u>Priority Claim</u>. Any Claim, other than an Administrative Claim or a Tax

17    Claim, to the extent entitled to priority under Section 507(a) of the Bankruptcy Code.

18            2.1.124    <u>Pro Rata</u>. Proportionately, so that with respect to any distribution in

19    respect of any Allowed Claim, the ratio of (a)(i) the amount of property distributed on account of

20    such Allowed Claim to (ii) the amount of such Allowed Claim, is the same as the ratio of (b)(i) the

21    amount of property distributed on account of all Allowed Claims of the Class or Classes sharing in

22    such distribution to (ii) the amount of all Allowed Claims in such Class or Classes.

23            2.1.125    <u>Professional</u>. A Person or Entity (a) employed by the Group I: Voluntary

24    Debtors, the Voluntary Debtors' Committee pursuant to a Final Order in accordance with Sections

25    327 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to the

26    Effective Date, pursuant to Sections 327, 328, 329, 330 and 331 of the Bankruptcy Code, or (b) for

27    which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to

28    Section 503(b) of the Bankruptcy Code.

MAINDOCS-#164803-v4-SunCal_3rd_Am_Group_I_VD_DS.DOC

1       2.1.126   Professional Fees.  All Allowed Claims for compensation and for

2   reimbursement of expenses under Sections 328, 330 and/or 503(b) of the Bankruptcy Code

3       2.1.127   Projects.  The Debtors' residential real estate development projects and

4   other assets as separately defined herein and described in Exhibit "1" to the Disclosure Statement.

5       2.1.128   Qualifying Bid.  Qualifying Bid means, with respect to any bid on a

6   Group I: Voluntary Project, a bid made by Qualifying Bidder that is A) equal to or in excess of the

7   Initial Overbid Amount, unless it is the Initial Overbid, or B) in excess of the immediately

8   preceding Qualifying Bid by the Minimum Increment, if it is not the Initial Overbid.

9       2.1.129   Qualifying Bidder.  Qualifying Bidder means a bidder who a) has

10  deposited the sum of three hundred thousand dollars ($300,000) into an escrow designated by the

11  SunCal Plan Proponents in the case of a bid for the Ritter Ranch Project or a bid for the Bickford

12  Ranch Project, the sum of two hundred thousand dollars ($200,000) in the case of a bid for the

13  Emerald Meadows Project, and one hundred thousand dollars ($100,000) in the case of a bid for

14  the Acton Project; b) who has provided the SunCal Plan Proponents evidence confirming that such

15  bidder has the financial means to acquire the applicable Group I Assets: Voluntary Debtor(s) that

16  such bidder is seeking to acquire, and c) agreed that this sum will be forfeited as liquidated

17  damages if such bidder is the Winning Bidder and fails to perform.

18      2.1.130   Reliance Claim. An Allowed Unsecured Claim, Allowed Mechanic's

19  Lien Claim, or Allowed Bond Indemnification Claim against a Group I: Voluntary Debtor that

20  would entitle the holder thereof to be the beneficiary of any equitable subordination judgment

21  obtained against a Lehman Entity by such holder. This definition includes the holders of qualifying

22  claims that are secured by mechanics liens.  All Allowed Mechanic's Lien Claims and Bond

23  Indemnification Claims are Reliance Claims.  Moreover, all Allowed General Unsecured Claims

24  against Acton are Reliance Claims (excluding any deficiency claim arising from the Lehman

25  Disputed Claims).  Further, all Allowed General Unsecured Claim against SunCal Emerald are

26  also Reliance Claims (excluding claims address in the Emerald Compromise and excluding any

27  deficiency claim arising from the Lehman Disputed Claims).  A list of the Reliance Claims for

28  Palmdale Hills and SunCal Bickford is attached hereto as Exhibit "8."

1                2.1.131    Reliance Claimant. The holder of a Reliance Claim. A list of the Reliance

2 Claimants for Palmdale Hills and SunCal Bickford are attached hereto as Exhibit "8," and the

3 holders of mechanics lien claims.

4                2.1.132    Ritter Ranch Loan Agreement.  That certain Credit Agreement, dated as

5 of February 8, 2007, by and among Palmdale Hills, as borrower, LCPI, as administrative agent and

6 lender, pursuant to which LCPI made a loan in the maximum aggregate principal amount of

7 approximately $264,000,000.  The Ritter Ranch Loan Agreement is allegedly secured by a first-

8 priority deed of trust on all real and personal property owned by Palmdale Hills.  The Ritter Ranch

9 Loan Agreement has an asserted balance due of $287,252,096.31 as of March 30, 2009.

10              2.1.133    Ritter Ranch Project.  The Project owned by Palmdale Hills, located in

11 the City of Palmdale, California, as more particularly described herein.

12              2.1.134    Ritter Ranch Project Break-up Fee. The amount equal to 2.5% of the

13 Minimum Sales Price for the Ritter Ranch Project, plus actual amounts paid by LitCo on Allowed

14 Administrative Claims for the Palmdale Hills Case if LitCo is the Stalking Horse Bidder and is not

15 the Winning Bidder.

16              2.1.135    Sale Period.  The Sale Period is the time period during which the SunCal

17 Plan Proponents must consummate a sale or liquidation of the Group I: Voluntary Projects. The

18 Sale Period shall commence on the Confirmation Date and shall expire on the thirtieth (30th) day

19 after the Effective Date, unless extended by the Bankruptcy Court after notice and hearing.

20              2.1.136    SCC LLC.  SCC Acquisitions LLC, a limited liability company, a

21 subsidiary of Acquisitions and an indirect and/or a direct parent company of all of the Debtors.

22              2.1.137    Schedules.  The schedules of assets and liabilities and list of equity

23 security holders Filed by the Group I: Voluntary Debtors, as required by Section 521(1) of the

24 Bankruptcy Code, Bankruptcy Rules 1007(a)(3) and (b)(1), and Official Bankruptcy Form No. 6,

25 as amended from time to time.

26              2.1.138    Secured Claim.  Any Claim, including interest, fees, costs, and charges to

27 the extent allowable pursuant to Bankruptcy Code Section 506, that is secured by a valid and

28 unavoidable Lien on the Group I: Voluntary Debtor(s)' Assets.

1             2.1.139    <u>Stalking Horse Bidder</u>.  The Qualified Bidder who submits the Opening

2 Bid.

3             2.1.140    <u>SunCal</u>.  The SunCal Companies, a trade name for Acquisitions and its

4 Affiliates.

5             2.1.141    <u>SunCal Bickford</u>.  SunCal Bickford Ranch, LLC, a Delaware limited

6 liability company, a Voluntary Debtor herein, and the owner of the Bickford Ranch Project.

7             2.1.142    <u>SunCal Emerald</u>. SunCal Emerald Meadows, LLC, a Delaware limited

8 liability company, a Voluntary Debtor herein, and the owner of the Emerald Meadows Project.

9             2.1.143    <u>SunCal Emerald Meadow Project Break-up Fee</u>. The amount equal to

10 2.5% of the Minimum Sales Price for the Emerald Meadows Project, plus actual amounts paid by

11 LitCo on Allowed Administrative Claims for the SunCal Emerald Case if LitCo is the Stalking

12 Horse Bidder and is not the Winning Bidder.

13             2.1.144    <u>SunCal Management</u>.  SunCal Management, LLC, a Delaware limited

14 liability company, and the former property manager for the Projects, which has been succeeded by

15 Argent Management.

16             2.1.145    <u>SunCal Marblehead</u>. SunCal Marblehead, LLC, a Delaware limited

17 liability company, a Trustee Debtor, and the owner of the Marblehead Project.

18             2.1.146    <u>SunCal Marblehead/SunCal Heartland Loan Agreement</u>.  That certain

19 Second Amended and Restated Term Loan and Revolving Line of Credit Loan Agreement, dated

20 as of October 3, 2007, by and among SunCal Marblehead Heartland Master LLC, SunCal

21 Marblehead, and SunCal Heartland, as borrowers, and Lehman ALI, as agent and sole lender,

22 pursuant to which Lehman ALI made a loan in the maximum aggregate principal amount of

23 approximately $316,061,300.  The SunCal Marblehead/SunCal Heartland Loan Agreement is

24 allegedly secured by first-priority deeds of trust on the Marblehead and the Heartland Projects.

25 The SunCal Marblehead/SunCal Heartland Loan Agreement has an alleged balance due of

26 $354,325,126.15 as of March 30, 2009. The proofs of claim filed with respect to this loan

27 agreement are the subject of the Lehman Adversary Proceeding and the Lehman Claim Objections.

28

MAINDOCS-#164803-v4-SunCal_3rd_Am_Group_I_VD_DS.DOC

2.1.147    <u>SunCal Plan Proponents</u>.  The Group I: Voluntary Debtors, in their capacity as debtors and debtors in possession in their respective Chapter 11 cases, and Acquisitions as a creditor and party-in-interest, that are proposing the Plans.

2.1.148    <u>SunCal PSV</u>. SunCal PSV, LLC, a Delaware limited liability company, a Trustee Debtor (a Group I: Voluntary Debtor), and the owner of the Palm Springs Village Project.

2.1.149    <u>SunCal PSV Loan Agreement</u>.  That certain Term Loan and Revolving Line of Credit Loan Agreement, dated as of February 12, 2007, between SunCal PSV, as borrower, and Lehman ALI, as agent and sole lender, pursuant to which Lehman ALI made a loan in the maximum aggregate principal amount of approximately $90 million.  The SunCal PSV Loan Agreement is allegedly secured by a first-priority deed of trust on the Palm Springs Village Project. The SunCal PSV Loan Agreement has an alleged balance due of $88,257,340.20 as of March 30, 2009.

2.1.150    <u>Tax</u>.  Any tax, charge, fee, levy, impost or other assessment by any federal, state, local or foreign taxing authority, including, without limitation, income, excise, property, sales, transfer, employment, payroll, franchise, profits, license, use, ad valorem, estimated, severance, stamp, occupation and withholding tax.  "Tax" shall include any interest or additions attributable to, or imposed on or with respect to such assessments.

2.1.151    <u>Tax Claim</u>.  Any Claim for any Tax to the extent that it is entitled to priority in payment under Section 507(a)(8) of the Bankruptcy Code.

2.1.152    <u>Trustee Debtor(s)</u>. The following Debtors, individually or collectively, that are represented by the Chapter 11 Trustee: Delta Coves, SunCal Heartland, SunCal Marblehead, SunCal Northlake, SunCal Oak Valley, SunCal Century City, SunCal PSV, SunCal Torrance, and SunCal Oak Knoll.

2.1.153    <u>Unpaid Secured Real Property Tax Claims</u>.  Secured Claims held by various government entities secured by liens on the underlying real properties owned by the Debtors but that are non-recourse to the Debtors.

2.1.154    <u>Unsecured Claim</u>. An Unsecured Claim is any Claim that is not an Administrative Claim, Tax Claim, Secured Claim, or Priority Claim.

1          2.1.155    <u>Voluntary Debtor(s)</u>.  The following  Chapter 11 debtors and debtors-in-

2    possession, individually or collectively, Palmdale Hills, SunCal I, SunCal III, SCC Palmdale,

3    Acton Estates, SunCal Beaumont, SunCal Emerald, SunCal Johansson, SunCal Bickford, SunCal

4    Summit, Seven Brothers, Kirby Estates, SJD Partners, SJD Development, SCC Communities, Del

5    Rio and Tesoro.

6          2.1.156    <u>Voluntary Debtors' Committee</u>.  The Official Committee of Unsecured

7    Creditors of the Voluntary Debtors appointed in the Cases pursuant to Section 1102 of the

8    Bankruptcy Code.

9          2.1.157    <u>Winning Bid</u>. The highest Qualifying Bid received for the Ritter Ranch

10    Project, the Bickford Ranch Project, Emerald Meadows Project or the Acton Project.

11          2.1.158    <u>Winning Bidder</u>.  The party that submits the highest Qualifying Bid.

12    **2.2    Rules of Construction.**

13          For purposes of the Plan and this Disclosure Statement, unless otherwise provided herein or

14    in the Plan, (a) whenever from the context it is appropriate, each term, whether stated in the

15    singular or the plural, will include both the singular and the plural; (b) each pronoun stated in the

16    masculine, feminine or neuter includes the masculine, feminine and neuter; (c) any reference in the

17    Plan or this Disclosure Statement to an existing document or schedule filed or to be filed means

18    such document or schedule, as it may have been or may be amended, modified or supplemented

19    pursuant to the Plan; (d) any reference to an entity as a Holder of a Claim or Interest includes that

20    entity's successors and assigns; (e) except as otherwise indicated herein all references in the Plan

21    or this Disclosure Statement to Sections, Articles and Exhibits are references to Sections, Articles

22    and Exhibits of or to the Plan; (f) the words "therein," "thereunder" and "thereto" refer to the Plan

23    in its entirety rather than to a particular portion of the Plan; and (g) unless otherwise provided in

24    the Plan or this Disclosure Statement, any reference in the Plan or this Disclosure Statement to a

25    contract, instrument, release, indenture, agreement, or other document being in a particular form or

26    on particular terms and conditions means that such document shall be substantially and materially

27    in such form or substantially and materially on such terms and conditions; (h) any reference in the

28    Plan or this Disclosure Statement to a document, schedule, or exhibit to the Plan or Disclosure

1  Statement Filed or to be Filed means such document, schedule, or exhibit, as it may have been or

2  may be amended, modified, or supplemented; and (i) the rules of construction set forth in Section

3  102 of the Bankruptcy Code shall apply to the extent such rules are not inconsistent with the

4  express terms of the Plan or this Disclosure Statement or any other provision in this Section 2.2.

5      **2.3    Exhibits.**

6      All Exhibits to the Plan are incorporated into and are a part of the Plan as if set forth in full

7  therein.

8                          **III.**

9              **PLAN CONFIRMATION DEADLINES**

10     The Bankruptcy Court has not confirmed the Plan described in this Disclosure Statement.

11 Accordingly, the terms of the Plan are not binding on anyone.  However, if the Bankruptcy Court

12 confirms the Plan, then the Plan will be binding on the Debtor(s), the Plan Trustee, and on all

13 Creditors and Interest Holders in such Cases.

14     **3.1    Time and Place of the Confirmation Hearing.**

15     The hearing where the Bankruptcy Court will determine whether or not to confirm the Plan

16 will take place at 411 West Fourth Street, Santa Ana, CA 92701-4593 on October 24, 2011, at 9:30

17 a.m. in Courtroom 5A.

18     **3.2    Deadline for Voting for or Against the Plan.**

19     If you are entitled to vote, it is in your best interest to timely vote on the enclosed ballot and

20 return the ballot to:

21                Winthrop Couchot Professional Corporation
                  660 Newport Center Drive, Suite 400
22                Newport Beach, CA 92660
                  Facsimile:  (949) 720-4111
23                Attn:  P.J. Marksbury
24
25 Your ballot must be **received by** September 26, 2011**,** or it will not be counted.

    **3.3    Deadline for Objecting to the Confirmation of the Plan.**
26
27     Objections to the confirmation of the Plan must be filed with the Bankruptcy Court, and

28 served upon the following parties so that they are received by September 26, 2011:

MAINDOCS-#164803-v4-SunCal_3rd_Am_Group_I_VD_DS.DOC

| | |
|---|---|
| **Counsel to the Voluntary Debtors** | Paul J. Couchot<br>Winthrop Couchot Professional Corporation<br>660 Newport Center Drive, Suite 400,<br>Newport Beach, CA 92660 |
| **Authorized Agent for Voluntary Debtors** | Bruce V. Cook<br>General Counsel<br>2392 Morse Ave<br>Irvine, CA 92614-6234 |
| **Counsel for SunCal Management LLC and SCC Acquisitions Inc**. | Ronald Rus<br>Rus Miliband & Smith P.C.<br>2211 Michelson Drive, Seventh Floor<br>Irvine, California 92612 |
| **Authorized Agent for SunCal Management and SCC Acquisitions, Inc**. | Bruce V. Cook<br>General Counsel<br>2392 Morse Ave<br>Irvine, CA 92614-6234 |

### 3.4    Identity of Person to Contact for More Information Regarding the Plan.

Any interested party desiring further information about the Plan should contact the Voluntary Debtors' counsel, Winthrop Couchot Professional Corporation, 660 Newport Center Drive, Suite 400, Newport Beach, CA 92660, Attn:  Paul J. Couchot, (949) 720-4100; Peter W. Lianides, (949) 720-4155; Payam Khodadadi, (949) 720-4160.

### 3.5    Disclaimer.

The information contained in this Disclosure Statement is provided by the SunCal Plan Proponents.  The SunCal Plan Proponents represent that everything stated in this Disclosure Statement is true to the best of their knowledge.  The Bankruptcy Court has not yet determined whether or not the Plan is confirmable and makes no recommendation as to whether or not you should support or oppose the Plan.

The discussion in this Disclosure Statement regarding the Group I: Voluntary Debtors may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995.  Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate," or "continue," or the negative thereof or other variations thereon or comparable terminology.  The reader is cautioned that all forward looking statements are

MAINDOCS-#164803-v4-SunCal_3rd_Am_Group_I_VD_DS.DOC

necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements.  The liquidation analyses, distribution projections, projections of financial results and other information are estimates only, and the timing, amount and value of actual distributions to Creditors may be affected by many factors that cannot be predicted.  Therefore, any analyses, estimates, or projections may or may not turn out to be accurate.

The SunCal Plan Proponents and their professionals have made a diligent effort to identify in this Disclosure Statement all Litigation Claims, including claims for relief, counterclaims, and objections to claims.  However, no reliance should be placed on the fact that a particular Litigation Claim is or is not identified in this Disclosure Statement.  The Group I: Voluntary Debtors or other parties in interest may seek to investigate, file and prosecute Litigation Claims after the Confirmation Date, or the Plan Trust may seek to do so after the Effective Date of the Plan whether or not the Litigation Claims are identified in this Disclosure Statement.

## IV.

## FACTUAL BACKGROUND OF THE DEBTORS

### 4.4    The Formation of the Debtors and the Projects.

#### 4.1.1    Overview of the Debtors and their Projects.

The Group I: Voluntary Debtors are four of twenty-six entities (collectively the "Debtors") that were formed pursuant to a joint venture between Affiliates of the SunCal Companies ("SunCal") and the Lehman Entities (the "SunCal/Lehman Joint Venture"). The Debtors role in the venture was to own and develop the large residential projects that were the core assets in this joint undertaking.

At the inception of SunCal/Lehman Joint Venture, it was agreed that SunCal would be the developer/manager of the Projects and the Lehman Entities would provide the necessary capital. Attached hereto as Exhibit "1" is a general description of all of the Debtors' Projects, including the Group I: Voluntary Projects, and the Debtors' other primary Assets, excluding Cash and the Litigation Claims, and a description of the loans for the Projects that are not a part of Group I: Voluntary Projects.

1    All of the Debtors are Affiliates of Acquisitions and SCC LLC.  Some of the Debtors

2    directly own the Projects, while others serve as holding companies, owning Allowed Interests in the

3    Debtors that hold title to the Projects.  SunCal Management, LLC, a SunCal Affiliate, has

4    management contracts with respect to all of the Projects and manages the Debtors' day-to-day

5    business affairs.

6    The seventeen Debtors who are referred to herein as the "Voluntary Debtors" are wholly

7    owned by SunCal Affiliates, and consequently the SunCal Affiliates have full corporate

8    governance authority over these entities.  The Voluntary Debtors own eleven (11) of the Projects.

9    In the case of the nine Trustee Debtors, the SunCal Affiliates and the Lehman Affiliates initially

10   shared ownership equally (50% each). However, after the Petition Date, the SunCal Affiliates

11   became the owner of hundred percent (100%) of the equity in two of the nine Trustee Debtors -

12   SunCal Heartland and SunCal Marblehead.  The Trustee Debtors own nine (9) Projects.

13   Attached hereto as Exhibit "2" is a chart that sets forth the appraised value of the Group I  Projects.

14   This chart lists both the Lehman Lenders' value estimates and SunCal's valuation estimates.[1]

15   The Plan eliminates any potential value disputes by providing for the sale of the Group I:

16   Voluntary Projects through an auction that is designed to yield the highest market price for these

17   assets. Accordingly, to the extent any other party believes the Group I: Voluntary Projects have a

18   greater value than the Opening Bid offered by another Qualifying Bidder, they will have the

19   opportunity to submit a Qualifying Bid (but no credit-bids will be allowed) that exceeds the

20   Opening Bid and, if they so desire, to become the Winning Bidder by offering the highest

21   Qualifying Bid. This market sale process will insure that the rights of all stakeholders are

22   protected.

23   **4.1.2    The Group I: Voluntary Debtors' Primary Secured Creditors and Their**

24   **Disputed Claims**.

25   LCPI holds the primary secured claims against the Ritter Ranch Project and the Bickford

26   Ranch Project. LCPI's secured claim against Ritter Ranch, which is secured by a first priority deed

27   of trust against this Project, is based upon the funding provided under the terms of the Ritter Ranch

28   

---

[1] Values may have changed since these analyses were prepared.

MAINDOCS-#164803-v4-SunCal_3rd_Am_Group_I_VD_DS.DOC

Loan Agreement. The asserted balance due under the terms of this loan was $287,252,096.31 as of March 30, 2009. LCPI's secured claim against the Bickford Ranch Project, which is also secured by a first priority deed of trust, is based upon funding provided under the terms of the SunCal Communities I Loan Agreement. The asserted balance due under terms of this loan was $343,221,391.06 as of March 30, 2009. LCPI contends that this loan is also collateralized by liens against the Acton Project and the Emerald Meadow Projects. However, as more fully explained herein, this claim is clearly untenable in the case of the Acton Project, since Acton Estates never signed the loan document that purportedly conveyed a lien to LCPI.

As discussed in detail herein, during the course of the Debtors' Cases, the Debtors initiated litigation disputing the validity of Lehman's Disputed Secured Claims, and the validity, priority and extent of Lehman's Disputed Liens (which includes the liens against the Group I: Voluntary Projects).  This litigation was being pursued through the Lehman Adversary Proceeding until this matter was stayed pursuant to a ruling by the court presiding over LCPI's Chapter 11 case in New York. However, Lehman's Disputed Secured Claims are being separately contested through claims objections. In addition, a lawsuit has been filed in California Superior Court against certain Lehman Entities and their agents who are not in Chapter 11, based upon their post-petition conduct.

Attached hereto as Exhibit "3" is a chart that sets forth Lehman's Disputed Secured Claims, the alleged Holders of the Lehman Disputed Secured Claims, the collateral encumbered by the Lehman Disputed Liens, and the alleged outstanding amount based on the filed Proofs of Claim. As the chart indicates, LCPI has filed claims in the following amounts against the Group I: Voluntary Debtors:  $287,252,096 against Palmdale Hills, $343,221,391 against SunCal Bickford and $343,221,391 against Acton Estates. Lehman ALI has also filed a claim in the amount of $56,494,059 against SunCal Bickford based upon an alleged second lien held against the Bickford Ranch.

### 4.1.3    A Summary of All of the Alleged Claims Against the Group I:
### Voluntary Debtors.

Attached hereto as Exhibit "4" is a chart that sets forth the prepetition Claims that have been asserted against all of the Debtors.  In summary, the asserted Claims against the Group I: Voluntary Debtors consist of the following:

| Claims | Palmdale Hills | SunCal Emerald | SunCal Bickford | Acton Estates |
|---|---|---|---|---|
| Unpaid Secured Real Property Tax Claims | $3,008,044 | $798,256 | $9,467,165 | $463,325 |
| The Disputed Lehman Secured Claims | $287,252,096 | $343,221,391 | $343,221,391 $56,494,059 | $343,221,391 |
| Alleged Mechanic Lien Claims | $993,755 | $1,242,582 | $3,477,120 | $0 |
| Administrative and Priority Claims | $1,488,092.57 | $597,552.42 | $1,026,274.97 | $199,052.10 |
| General Unsecured Claims Including alleged Bond Claims | $34,273,437 | $7,302,777 | $3,637,402 | $1,435,314 |

The SunCal Plan Proponents believe that these balances owed to the Lehman Lenders will ultimately be reduced through the Lehman Adversary Action, the Contract Action, and the Lehman Claims Objections resulting in lower "Allowed" claims balances.

### 4.1.4    Summary of the Group I: Voluntary Debtors' Cash.

The following chart sets forth the Group I: Voluntary Debtors' cash-on-hand as of July 1, 2011.

| DEBTORS | AMOUNT |
|---|---|
| 1. Palmdale Hills - ELR Escrow | $    198,445.98 |
| 2. Palmdale Hills | 16,855,262.09 |
| 3. Palmdale Hills | 404,922.11 |
| 4. Palmdale Hills (Funds Control Account) | 2,717,486.22 |
| 5. Palmdale Hills | 343,000.00 |
| 6. SunCal Bickford | 456,499.54 |
| 7. SunCal Emerald | $3,172,67 |
| 8. Acton Estates | $0.00 |
| **Group I: Voluntary Debtors' Total** | **$20,978,788.61** |

Although the Lehman Lenders have alleged that they hold liens on the above cash, a preliminary review of the applicable lien documents indicates that most of the alleged liens were not validly perfected.  As set forth in Section 5.3.2 below, the Voluntary Debtors and the Lehman

1  Entities have entered into various stipulations which identified the "Alleged Unencumbered

2  Accounts" to include the accounts set forth above as numbers 3, 5, 6, 7 and 8.  This means that

3  these liens can be avoided, allowing the unsecured creditors recourse to these funds.  Moreover,

4  even if the liens against these accounts were properly perfected, the amount secured by these liens,

5  and their priority and their enforceability will be subject to the results of the Lehman Claim

6  Objections and the Lehman Adversary Proceeding.

7  **4.2 <u>Factual Circumstances Leading to the Filing of the Debtors' Chapter 11 Cases</u>.**

8  **4.2.1   <u>Introduction</u>.**

9  In this section of the Disclosure Statement, the SunCal Plan Proponents have provided a

10  brief description of the relationship between the Debtors and the Lehman Entities. This background

11  is relevant to the Group I: Voluntary Debtors, and in fact all of the Debtors, for the following

12  reasons. First, most of the unsecured claims asserted against the Debtors were incurred at the

13  insistence of the Lehman Lenders, and they would have been paid if the Lehman Lenders had

14  honored their obligation to pay these claims. Second, a substantial part of claims that the Lehman

15  Lenders failed to pay are being asserted against *all of the Debtors*. If the litigation against the

16  Lehman Lenders discussed herein is successful, it will, at a minimum, reduce the pool of claims

17  against the Group I: Voluntary Debtors, and thereby increase the dividend payable to the remaining

18  creditors. Third and finally, this history allows the Creditors to take the measure of the parties who

19  are now proffering the competing plan – the Lehman Lenders.  As the within discussion will

20  establish, the Lehman Lenders failed to pay the claims of Creditors prepetition, the Lehman

21  Lenders attempted to foreclose upon the Group I: Voluntary Projects post-petition in order to deny

22  the unsecured creditors any recovery on the claims they failed to pay, and finally, when this

23  foreclosure effort failed, the Lehman Lenders attempted to destroy the Debtors' reorganization and

24  sale efforts by manipulating LCPI's alleged automatic stay.

25  **4.2.2   <u>Background of the SunCal Companies</u>.**

26  SunCal is a family-owned and operated real estate business that has been successfully

27  developing properties throughout the western United States for over 70 years.  SunCal's business

28  focuses upon the "development" of residential land. A typical SunCal development begins with the

1   acquisition of one or more parcels of raw land. Thereafter, the SunCal team develops a master plan

2   for the acreage that incorporates streets, homes, parks, schools and commercial areas, and then it

3   works with the applicable municipal planning authorities (the city, county, state and federal) to

4   secure the necessary approvals or "entitlements" to gain approval of this plan. This process, which

5   requires the assistance of land planners, civil engineers, architects, lawyers, and other land

6   specialists, takes a period of years. Once the master plan is approved, SunCal provides for the

7   grading of the project and the installation of the foundational infrastructure (streets, utilities, etc.)

8   and then sells the lots or parcels within the project to merchant builders.

### 9        4.2.3   The Origins of the SunCal/Lehman Joint Venture.

10       SunCal historically financed its projects with loans and/or equity from a number of

11   different sources. However, beginning in 1997, an increasing number of SunCal's projects were

12   financed by the Lehman Entities, as Mark Walsh ("Walsh"), the head of LBHI's Global Real

13   Estate Group, began cultivating a business relationship with SunCal's principals.

14       By 2003, the Lehman Entities and SunCal had entered into joint ventures involving

15   approximately fifteen projects. By 2007, that number had grown to over forty, and the Lehman

16   Entities had become, with limited exceptions, the exclusive provider of financing for the SunCal

17   Projects pursuant to a written agreement executed in 2006. The Lehman Entities also consisted of

18   the Lehman Equity Members that either directly or indirectly owned a fifty percent (50%) equity

19   interest in all nine of the Trustee Debtors.

20       In their dealings with SunCal, the Lehman Representatives made no distinction between

21   Projects financed by Lehman ALI and Projects financed by LCPI. They also made no distinction

22   between the Debtors in which Lehman Equity Members held 50% equity memberships or the

23   Debtors in which the Lehman Entities held no equity membership interest. As agents of the

24   financial partner in the parties' joint venture, the Lehman Representatives would determine which

25   Lehman Entity would provide financing on which Projects, and would dictate the structure that the

26   financing would take, according to whatever suited the Lehman Entities' needs.

27

28

MAINDOCS-#164803-v4-SunCal_3rd_Am_Group_I_VD_DS.DOC

**4.2.4    Lehman's Effective Control over the Management of the Debtors and Promises of Ongoing Funding.**

Prior to the market downturn in the middle of 2007, Lehman Representatives afforded SunCal substantial discretion in the management and development of the Projects.  The Debtors would contract with third-party vendors to perform grading, health and safety compliance, construction, landscaping, and other necessary services on the Project sites, and they would work with the local municipalities to obtain the necessary entitlements and other authorizations necessary to proceed with development.  The Lehman Representatives, SunCal and the Debtors would discuss anticipated quarterly expenditures at periodic budget meetings, and , as expenses were incurred each month, SunCal and the Debtors would submit requests for payment to the Lehman Representatives, supported by the necessary documentation. The Lehman Representatives would then provide the funding necessary to pay these expenses.

During the third quarter of 2007, the foregoing management and payment dichotomy changed, after the real estate market experienced a sudden downturn, and many of the Projects significantly declined in value.  In response to this dramatic economic change, a series of high level discussions occurred between SunCal's representatives and the Lehman Representatives -- including Walsh, Paul Hughson ("Hughson") and Frank Gilhool ("Gilhool"), the Managing Directors of Lehman's Global Real Estate.  In these discussions, SunCal's representatives, acting on behalf of the Debtors, expressed concerns about the loans on the Projects being out of balance, and suggested shutting down the Projects, or at least slowing the pace of development.  However, Walsh specifically instructed SunCal not to slow down or stop work.  He assured SunCal that the Lehman Entities would provide the necessary funding to pay vendors and to keep the development of the Projects moving forward.

The foregoing assurances of payments were confirmed in numerous telephone conversations between Gilhool and SunCal's COO, Frank Faye ("Faye"), and/or SunCal's General Counsel, Bruce Cook ("Cook") that took place during 2007 and 2008. In each exchange, Gilhool assured SunCal that the Lehman Entities were committed to funding the debts and obligations being incurred at the Projects and they continued to insist that work proceed.

MAINDOCS-#164803-v4-SunCal_3rd_Am_Group_I_VD_DS.DOC

1    During this time frame, the Lehman Representatives became much more "hands on,"

2  scrutinizing and approving all budgets and expenses through a new control and approval structure.

3  Under the new structure, SunCal would submit budgets to the Lehman Representatives on a

4  weekly basis and explain, during period conference calls, what Project payables they believe had to

5  be paid and what work had to be performed on the Projects. The Lehman Representatives would

6  then unilaterally decide what future work would proceed, the Lehman Representatives would

7  authorize the work and the Lehman Representatives would decide what payables would be paid

8  timely by designating them as "urgent," and what other payables were not urgent and hence would

9  not be paid on a timely basis. However, even under this new Lehman controlled management and

10  payment regime, the Lehman Representatives made it clear that all payables being incurred would

11  be funded.

12    **4.2.5    The 2008 Restructuring Agreement.**

13    By the fall of 2007, both SunCal and the Lehman Representatives contemplated entering

14  into a restructuring agreement in the near term, with a closing to occur no later than January or

15  February of 2008.  However, this transaction was delayed by the Lehman Entities' extensive

16  documentation demands until May 23, 2008. On this date, SunCal and most of the Debtors finally

17  entered into an omnibus "Restructuring Agreement" with LBHI, Lehman ALI and the other

18  Lehman Entities.  The same Lehman Representative signed the Restructuring Agreement on behalf

19  of all of the Lehman Entities.

20    Pursuant to the Restructuring Agreement, Lehman ALI, "as the Lender with respect to each

21  Loan," committed, among other things, to: (1) make advances under existing loans to fund the

22  continuing costs necessary to preserve the value of the Projects; (2) move forward to resolve the

23  accrued outstanding subcontractor payables, i.e., to make sure that the Projects' creditors were paid

24  for their work; and (3) to close the transaction, whereby newly-created Lehman Entities would

25  assume the debt and obligations of the Projects.

26    As originally executed in May 2008, the Restructuring Agreement applied to twelve of the

27  twenty Projects (as well as several other projects not at issue in the Lehman Adversary

28  Proceeding):  (1) Acton Estates; (2) Beaumont Heights; (3) Bickford Ranch; (4) Emerald

-38-

1  Meadows; (5) Heartland; (6) Johannson Ranch; (7) Marblehead; (8) Northlake; (9) Oak Valley;

2  (10) Pacific Point; (11) Ritter Ranch; and (12) Summit Valley.  The Debtors that owned and/or

3  held equity interests in the entities that owned these Projects were signatories to the May 2008

4  agreement.[2]

5      Between May and August 2008, the parties agreed to add four additional projects to the

6  Restructuring Agreement: (1) Del Rio; (2) Joshua Ridge; (3) Palm Springs Village; and (4) Tesoro

7  Burnham.

8          **4.2.6    The Lehman Lenders Hire Radco.**

9      Subsequent to the execution of the Restructuring Agreement, Lehman ALI arranged for a

10  third party, Radco, to directly settle outstanding contractor payables, as its agent.  Radco was

11  provided some limited funding and authority to negotiate settlements, and did in fact reach

12  settlement with a number of creditors.  The funding for these settlements, whether the debts related

13  to Lehman ALI or LCPI funded Projects, came from the same source.  Lehman ALI and LCPI also

14  provided approval for new work on the Projects, and Lehman ALI paid for some of this work.

15  However, this funding was minimal and it soon stopped.

16      In August 2008, Lehman ALI withdrew funding and settlement authority from Radco,

17  leaving millions of dollars in outstanding contractor payables unresolved, notwithstanding the

18  contrary provisions in the Restructuring Agreement.  Leman Ali's actions also impaired the

19  Debtors' ability to resolve ongoing public health and safety issues arising at the Projects.

20  Ultimately, only a fraction of the total outstanding payables were resolved, contrary to the past

21  promises made by Lehman Representatives.

22

23

24  _____

[2] Specifically, the Restructuring Agreement was entered into by, among others, the "Borrowers," "Grantors" and
25  "Pledgors," as defined in Annex 1 thereto.  The "Borrowers" included SunCal Marblehead, SunCal Heartland, SunCal
Northlake, SunCal Oak Valley, SJD Partners, Palmdale Hills, SCC Palmdale, SunCal I, SunCal III, and SunCal
26  Bickford.

27  The "Grantors" included SunCal Marblehead, SunCal Heartland, SunCal Northlake, SunCal Oak Valley, SJD Partners,
Palmdale Hills, SunCal Bickford, SunCal Acton, SunCal Summit and SunCal Emerald, and Debtors SunCal Beaumont
and SunCal Johannson.

28  The "Pledgors" included SCC Palmdale, SunCal I, SunCal Summit and SJD Development.

### 4.2.7    The Lehman Lenders' Failure to Close on the Settlement Agreement.

Pursuant to the terms of the Restructuring Agreement, the parties agreed to enter into a Settlement Agreement, the form of which was attached to the Restructuring Agreement.  The Settlement Agreement provided for the transfer of the Projects included within the Restructuring Agreement to a series of newly formed Lehman-controlled entities (each with "SCLV" in its name, for "SunCal-Lehman Venture"). The agreement further provided that the entity taking title to the Project would assume the  Lehman Lender debt obligations associated with the Projects, assume certain bond obligations associated with the Projects, and provide indemnifications to SunCal and the Debtors for unpaid claims.

On August 25, 2008, the Settlement Agreement and a series of related documents were formally executed by SunCal and the applicable Lehman Lenders and Lehman Equity Members at a meeting held in Los Angeles on August 25, 2008.  Once these documents were signed, all that remained was the mechanical closing of the series of transactions described in the Settlement Agreement. Since all of the conditions precedent to the closings had been satisfied, or could have been satisfied at, or shortly after the meeting, this should have occurred at the August 25, 2008 meeting, or shortly after the meeting. However, the Lehman Representative asked SunCal to extend the closing date for thirty days, to September 30, 2008. According to the Lehman Representatives, this short extension would enable them to secure certain outstanding third party consents. Although SunCal knew these third party consents were readily obtainable within a few days, they agreed to this extension, believing the request was made in good faith.

### 4.2.8    The Lehman Lenders' Undisclosed Sale of Most of the Debtors' Loans.

As explained above, the Settlement Agreement was duly executed by all parties at a formal closing meeting held on August 25, 2008. When the parties signed this agreement, which was a binding contract, they both represented that they both intended and had the power and capacity to perform all of the obligations undertaken therein. However, in the case of the Lehman Entities, this representation was later discovered to be false. When the closing occurred on August 25, 2008, the Lehman Lenders had already sold the very obligations they were agreeing to assume and restructure in the Settlement Agreement to Fenway Capital pursuant to a repurchase agreement.  Accordingly,

1   as of August 25, 2008, they lacked the power to perform the most essential undertakings that they

2   agreed to perform in the Settlement Agreement. Instead of disclosing this fact at the August 25,

3   2008 meeting, the Lehman Lenders requested additional time to execute the agreed upon transfers

4   provided for under this binding agreement. The Lehman Lenders needed this delay because they

5   lacked the ability to perform the very obligations they had just agreed to perform in the Settlement

6   Agreement.

7           The Lehman Representatives also did not disclose at the August 25, 2008 closing that they

8   intended to sell the Pacific Point First Loan to Lehman Re, approximately a week later, *even though*

9   *this loan was also subject to the Settlement Agreement*. To the contrary, the Lehman

10  Representatives affirmatively concealed these facts from SunCal and the Debtors by asserting that

11  ownership still existed in the case of seven of the eight loans.

### 4.2.9    Lehman's Foreclosure Sale and Purchase of the Pacific Point Project.

13          At the time of the Restructuring Agreement and the Settlement Agreement were signed, the

14  Pacific Point Project, which was still owned by SJD Partners, was among the Projects included in

15  the Restructuring Agreement and the Settlement Agreement.  Pursuant to the Restructuring

16  Agreement, and as detailed in the Settlement Agreement attached thereto, SunCal, SJD Partners,

17  and its parent company, SJD Development, all agreed that they would not interfere with Lehman

18  ALI's (or its designee's) foreclosure on the Pacific Point Project. They further agreed that a new

19  Lehman entity, LV Pacific Point, would purchase the Pacific Point Project upon foreclosure and

20  that Lehman ALI and LV Pacific Point would (a) assume SJD Partners' and SJD Development's

21  outstanding accounts payable for Pacific Point third-party vendors, (b) assume certain bond

22  liabilities associated with the Pacific Point Project, and (c) pay for the millions of dollars worth of

23  work that Lehman ALI representatives had authorized.

24          As previously stated, the Settlement Agreement was signed on August 25, 2008 by the

25  SunCal parties, including SJD Partners and SJD Development.  It was also signed by Gilhool as

26  authorized signatory on behalf of both Lehman ALI and LV Pacific Point.  As a signatory to the

27  Settlement Agreement, LV Pacific Point was required to purchase the Pacific Point Project at the

28  foreclosure sale subject to the above obligations. Consistent with this agreement, the City of San

1    Juan Capistrano executed an estoppel certificate for the benefit of SJD Partners and Lehman ALI—

2    at Lehman ALI's request—on August 26, 2008, two days before the foreclosure sale.  This

3    certificate stated, among other things, that the "Acquiring Entity [LV Pacific Point] shall by

4    operation of law become the legal successor-in-interest to Developer [SJD Partners]" under SJD

5    Partners' agreements with the City. That certificate further provided that there existed no breaches,

6    defaults, or claims under SJD Partners' agreements with the City.

7         On August 28, 2008, Lehman ALI foreclosed on the Pacific Point Project, and title was

8    transferred to LV Pacific Point at the foreclosure sale.  However, Lehman ALI and LV Pacific

9    Point failed to assume the liabilities and obligations associated with this Project as agreed.   This

10   breach of the parties' agreement, left SJD Partners without title to the Pacific Point Project, but

11   with substantial unsecured claims relating to the Project, including certain bond claims of

12   approximately $34 million.  Moreover, since Lehman Ali and LV Pacific Point have continued to

13   breach their obligations under the above agreement, unpaid taxes, fines, and penalties have

14   continued to accrue to the detriment of the Project and these claims are being asserted against SJD

15   Partners.

16        Had SunCal, SJD Partners and SJD Development known that Lehman ALI and LV Pacific

17   Point had no intention of honoring their obligations under the foregoing agreement, they never

18   would have agreed to cooperate with the foreclosure.  Instead, SJD Partners would have filed for

19   bankruptcy earlier, thereby mitigating the damages from Lehman Ali's breach, by allowing

20   creditors recourse to the value of the Project.

21        This course of conduct is relevant to the unsecured creditors of the Group I: Voluntary

22   Debtors for the following reason. The holders of bond claims against SJD Partners are asserting

23   their massive claims against the estates of all of the Debtors, including the estates of the Group I:

24   Voluntary Debtors. Accordingly, Lehman Ali's wrongs against SJD Partners directly affect the

25   Group I: Voluntary Debtors' cases.

26

27

28

1    **4.2.10  Alvarez and Marsal Take Over Control of the Lehman Entities After**

2    **the Chapter 11 Filings of LBHI and LCPI.**

3    LBHI filed for bankruptcy in September 2008 and LCPI filed for bankruptcy in October

4    2008.  After LBHI's filing, Bryan Marsal ("Marsal") of Alvarez & Marsal ("A&M") was appointed

5    to serve as LBHI's Chief Restructuring Officer. Marsal and A&M are in charge of liquidating the

6    now defunct Lehman Entities, including Chapter 11 debtors LBHI and LCPI, and the non-bankrupt

7    Lehman Lenders (Lehman ALI, OVC, and Northlake Holdings, as well as the non-bankrupt

8    Lehman Equity Members.

9    Although A&M was not employed until after the events that occurred on August 25, 2008

10   described above, it should be noted that A&M hired the same law firm that represented the

11   Lehman Lenders in the August 25, 2008 meeting – Weil, Gotshal & Manges, LLP. Moreover, as

12   more fully explained herein, it was A&M that directed Lehman ALI not to perform its contractual

13   obligations under the Settlement Agreement after September of 2008.

14   LBHI's bankruptcy filing and the Lehman Lenders refusal, at A&M's direction, to close the

15   transactions provided for under the Settlement Agreement as agreed, were not small matters. They

16   severely damaged the Debtors. Although the Debtors were not proceeding with any new

17   construction or development, the Debtors were still required to expend significant sums on site

18   security, erosion control, property taxes and other measures in order to prevent the Projects from

19   becoming a public safety hazard, and in order to avoid the loss of valuable entitlements, and to

20   mitigate penalties and fines being incurred by the Projects.  Although SunCal and the Debtors

21   repeatedly requested that the Lehman Entities pay for critical health and safety and value

22   preservation measures on the Projects, these efforts were unavailing.

23   Between October 9 and November 4, 2008, SunCal's general counsel Cook sent Robert

24   Brusco, an authorized agent of the Lehman Entities, nearly two dozen letters requesting that the

25   Lehman Lenders provide the funding necessary to address critical needs on the Projects as

26   promised.  A summary of these health and safety notices are attached hereto as Exhibit "5".  The

27   Lehman Entities ignored these requests until November 2008, when Brusco, purportedly on behalf

28

1  of the Lehman Lenders, delivered the message that the Lehman Lenders were unwilling to fund the

2  Projects and that, instead, they intended to foreclose on all of the Projects.

3       As a result, as set forth in Exhibit "4," there are now over 240 vendors, municipalities,

4  counties and bonding companies claiming over $400 million in work, improvements and property

5  tax claims against the Projects.  Substantially all of these sums are due to work performed or

6  bonded at Lehman's request based upon Lehman's promises of payment.

7       **4.3 <u>The Group I: Voluntary Debtors' Potential Preferential Transfers</u>**.

8       Attached hereto as Exhibit "6" are charts setting forth payments made to third parties

9  during the ninety (90) day time period preceding the filing of the Debtors' Chapter 11 Cases as

10  well as payments made to the Lehman Entities and to SunCal Affiliates during the one-year time

11  period preceding the filing of the Debtors' Chapter 11 Cases. In those instances where the Group I:

12  Voluntary Debtors believe there are reasonable grounds to recover these transfers, at a reasonable

13  cost, they have filed complaints.

14       The Debtors have also filed a Fourth Amended Complaint against the Lehman Entities,

15  who were the recipients of a substantial number of these transfers. This complaint includes causes

16  of action for, among other things, the recovery of the preferential payments made to the Lehman

17  Entities referenced above. As explained herein, this action is presently stayed as to LCPI.

18       As to SunCal Affiliates, Acquisitions believes, and counsel to the Trustee has preliminarily

19  opined, that such entities either have ordinary course or new value defenses for all payments

20  received during the one-year time period preceding the Petition Dates.

21                                            **V.**

22            **<u>SIGNIFICANT EVENTS IN THE DEBTORS' CHAPTER 11 CASES</u>**

23       **5.1.    <u>Voluntary Debtors</u>.**

24            **5.1.1    <u>Joint Administration of the Voluntary Debtors and the Trustee</u>**

25                     **<u>Debtors</u>.**

26       Since their respective Petition Dates, the seventeen (17) Voluntary Debtors have continued

27  to operate as "debtors-in-possession," subject to the supervision of the Bankruptcy Court and in

28  accordance with the Bankruptcy Code.  The Voluntary Debtors are authorized to operate their

1    businesses in the ordinary course during the Chapter 11 proceedings. Transactions outside the

2    ordinary course of business must be approved by the Bankruptcy Court.

3         The Voluntary Debtors' Cases are being jointly administered pursuant to orders entered on

4    November 19, 2008 and December 9, 2008.  The Voluntary Debtors' Cases are being jointly

5    administered with the Trustee Debtors' cases pursuant to an order entered on March 11, 2009.

6         The Voluntary Debtors have employed Winthrop Couchot Professional Corporation as their

7    general insolvency counsel, and the MB Firm as their special litigation counsel.

8         ### 5.1.2    The Voluntary Debtors Court Employed Professionals.

9         The Voluntary Debtors have employed Winthrop Couchot Professional Corporation as their

10   general insolvency counsel, and the MB Firm as their special litigation counsel in the Lehman

11   Adversary Proceeding and the Contract Action.  The Voluntary Debtors' Committee has employed

12   Irell & Manella LLP as its counsel pursuant to an order entered on February 13, 2009.

13        Pursuant to the Court's Order regarding joint administration of the Voluntary Debtors, the

14   Voluntary Debtors' liability for professional fees is joint and several among the Voluntary Debtors'

15   Estates for fees incurred related to services for the benefit of all of the Voluntary Debtors.  The

16   Trustee Debtors' liability for professional fees is not joint and several.

17        Pursuant to the initial MB Firm employment application, Acquisitions was responsible for

18   the payment of their fees until December 31, 2009.  The MB Firm's application also allows for

19   payments from the Bond Companies.  The initial MB Firm employment application reserved the

20   right, should the Lehman Adversary Proceeding result in a benefit accruing to a particular Debtors'

21   Estates, to request that its fees and expenses be reimbursed by the Debtors' Estates.  The Bond

22   Companies have also agreed to jointly fund a portion of the professional fees and expenses of the

23   MB Firm with respect to the Lehman Adversary Proceeding.  The Bond Companies' funding

24   commitment can be terminated and after such a termination they will only be required to cover fees

25   and costs incurred during the period of their prior commitments.

26        The MB Firm employment application was subsequently amended.  Pursuant to an order

27   entered on April 14, 2010, (1) the Voluntary Debtors will pay up to one-half of the fees and

28   expenses incurred by the MB Firm from and after February 1, 2010 onward; and (2) the Trustee

1   Debtors do not have an obligation to pay any of the MB Firm's fees pertaining to the Trustee

2   Debtors' estates, unless and until a loan by the Voluntary Debtors to the Trustee Debtors is agreed

3   to by the Trustee and approved by the Court, or in accordance with the terms of the original

4   employment applications to the extent not superseded or modified by the amended employment

5   application.  The order does not affect the MB Firm's right to seek payment from the Bond

6   Companies without the need for an additional order of the Court.

7       The MB Firm filed an updated application seeking to further amend their employment to

8   include the right to pursue certain claims against the Lehman Entities and certain employees and

9   agents of these entities on behalf of the Voluntary Debtors.  The claims encompassed by this

10  amendment include claims that are based upon both prepetition and post-post petition actionable

11  conduct under both state law and federal law against the Lehman Entities and/or their agents.

12           ### 5.1.3   LCPI's Motions for Relief from the Automatic Stay Against Certain of

13                       the Voluntary Debtors' Projects and Related Appeals.

14      On January 23, 2009, LCPI and Lehman ALI filed various motions for relief from the

15  automatic stay against a number of the Voluntary Debtors including Group I: Voluntary Debtors

16  Palmdale Hills, SunCal Bickford and Acton Estates (the "Lehman Entities' Stay Motions").

17  Although the Debtors were able to defeat these motions, they are relevant in the following respect.

18  Had the motions filed by LCPI and Lehman ALI succeeded, it is almost certain that unsecured

19  creditors would have received nothing on their claims. Moreover, as more fully explained herein,

20  since Lehman ALI and LCPI did not even own the loans they were seeking to foreclose upon these

21  motions should never have been filed in the first instance.

22      On March 10, 2009, the Court entered orders denying the Lehman Entities' Stay Motions

23  without prejudice.  These orders included findings that the continued pursuit of the claims alleged

24  in the Lehman Adversary Proceeding would not constitute a violation of LCPI's automatic stay

25  (the "Stay Finding").  LCPI did not appeal the denial of the motions for relief from stay, but

26  instead appealed just the Stay Finding.  In a split 2-1 decision, the Bankruptcy Appellate Panel

27  reversed the Stay Finding, concluding that the equitable subordination action was subject to LCPI's

28  automatic stay.  <u>In re Palmdale Hills Property, LLC,</u> 423 B.R. 655 (9th Cir.BAP 2009).  The

1   Voluntary Debtors appealed this ruling to the Ninth Circuit.  On August 3, 2011, the Ninth Circuit

2   Court of Appeals affirmed the decision of the Bankruptcy Appellate Panel.  In re Palmdale Hills

3   Property, LLC, 2011 WL 3320429 (9th Cir. 2011).

4       **5.2.    The Debtors' Various Motions Relating to Financing for the Projects and to**

5              **Pay Professional Fees.**

6          **5.2.1    The Voluntary Debtors' Initial Motion for Surcharge and Use of Cash**

7                 **Collateral.**

8          On January 16, 2009, seven of the Debtors, including Group I: Voluntary Debtor Palmdale

9   Hills, filed a motion authorizing Palmdale Hills to use and surcharge, pursuant to 11 U.S.C.

10  § 506(c), and/or use the purported cash collateral of LCPI arising from the Ritter Ranch Loan

11  Agreement, pursuant to 11 U.S.C. § 363(c)(2), in order to pay for the reasonable and necessary

12  maintenance expenses required to preserve the value of such Debtors' Projects subject to deeds of

13  trust and other security interests held by LCPI.

14         LCPI objected to the motion and subsequently filed a motion in its own Chapter 11

15  proceeding in the Southern District of New York seeking an order barring the motion as a violation

16  of the automatic stay.  Although the Debtors believe that LCPI's stay was not violated in any way

17  by the Motion, the Motion was taken off calendar prior to any ruling by the New York Bankruptcy

18  Court, based upon the threat of sanctions made against Debtors' counsel by the presiding judge in

19  LCPI's case.

20         As explained above, LCPI did not even own an interest in the Ritter Ranch Loan

21  Agreement when it asserted the automatic stay, since the Ritter Ranch Loan Agreement, which was

22  the subject of the cash collateral motion, had already been sold pursuant to the Fenway Repurchase

23  Agreement. Yet this wrongful action prevented Palmdale Hills from using its own money to pay

24  critical bills that Lehman ALI, LCPI's parent was contractually required to fund in the first

25  instance.

26

27

28

### 5.2.2 The Voluntary Debtors' Agreements with the Lehman Entities for Use of Alleged Cash Collateral to Maintain the Properties and to Pay Professional Fees.

On September 1, 2009, with the consent of the Lehman Entities, fourteen of the Voluntary Debtors filed a motion authorizing surcharge pursuant to 11 U.S.C. § 506(c), and/or use of the purported cash collateral for the purpose of addressing critical public health and safety issues and other value preservation with respect to the Debtors Projects. On September 10, 2009, the Lehman Entities filed an opposition thereto, and on September 17, 2009, the Voluntary Debtors filed their Reply.

Subsequently, the Voluntary Debtors learned that the Lehman Entities lacked control agreements as to the majority of the depository accounts, and thus such accounts were not subject to perfected liens and therefore did not constitute "cash collateral." On October 15, 2009, the Voluntary Debtors filed a *Motion For Order Authorizing Disposition Of Certain Depository Accounts*. On or about October 22, 2009, the Lehman Entities filed an opposition, and on October 29, 2009, the Voluntary Debtors filed their Reply.

The motion was consensually resolved by way of the *Stipulation Pursuant To 11 U.S.C. §§ 362, 363, And 364: (1) Authorizing The Use Of Cash Collateral And Alleged Unencumbered Cash; (2) Approving Postpetition Financing; (3) Providing Administrative Expense Status; And (4) Modifying Automatic Stay To The Extent Necessary* filed on December 8, 2009, and the order thereon entered on December 17, 2009. The stipulation provides for a 120-day budget with expenses totaling approximately $5 million, pursuant to which any Cash in the Estates is used first and then money borrowed from the Palmdale Hills Estate is used thereafter on an administrative basis. The agreement also permitted the Voluntary Debtors to use their alleged unencumbered cash to pay its professional fees. This agreement has been renewed on several occasions.

### 5.3. The Debtors' Disputes and Claims Against the Lehman Entities.

#### 5.3.1 The Lehman Adversary Proceeding.

On January 6, 2009, the Voluntary Debtors initiated the Lehman Adversary Proceeding by filing their initial complaint against Lehman ALI for equitable subordination of Lehman ALI's

Disputed Claims and avoidance of its Disputed Liens pursuant to Bankruptcy Code Section 510(c). On February 3, 2009, the Debtors filed a First Amended Complaint, which added the Trustee Debtors as co-plaintiffs and added various other causes of action. The First Amended Complaint also named OVC Holdings, Northlake Holdings and various other entities as defendants.

Pursuant to a hearing on a motion to dismiss held on June 11, 2009, the Bankruptcy Court granted the Debtors leave to amend the second amended complaint. Thus, on July 10, 2009, the Debtors filed their Third Amended Complaint. The Third Amended Complaint addressed many of the concerns raised by the Bankruptcy Court and also included various Avoidance Actions and other causes of action against the Lehman Lenders and the Lehman Successors. The Third Amended Complaint also added Fenway Capital as a defendant based upon, the discovery of the facts relating to the sale of the loans Fenway Capital and based upon the Court ruling that the Repo was a true sale.

On September 30, 2009, the Lehman Entities filed a motion to dismiss the Third Amended Complaint (which motion was amended on October 7, 2009 and October 22, 2009), alleging that the relief requested by certain Debtors was not available as a matter of law. On September 30, 2009, Fenway also filed a motion to dismiss the Third Amended Complaint. On January 26, 2010 and January 28, 2010, the Debtors filed oppositions to the motions to dismiss the Third Amended Complaint filed by the Lehman Entities and Fenway, respectively. On February 4, 2010, the Lehman Entities and Fenway filed their respective replies. The Court entered an order granting in part and denying in part the relief requested in the motions to dismiss. Most notably, the Court denied the defendants' request for the dismissal of the equitable subordination claims and the Court permitted the Debtors to file an amended complaint. LCPI was dismissed as a defendant at this hearing, due to the fact that it did not own any interest in the loans at issue and due to potential impact of the case upon LCPI's automatic stay. On March 26, 2010, the Debtors filed their Fourth Amended Complaint. The following is a summary of the causes of action set forth in the Fourth Amended Complaint:

1

## 5.3.1.1      Equitable Subordination.

2      Based on the pre-petition inequitable conduct of the Lehman Entities, summarized in

3  Section 4.2, the Debtors have sought to subordinate the claims and avoid the liens of the Holders

4  of the Lehman Disputed Loans to the extent necessary to pay the Claims of unpaid Creditors that

5  were damaged by the inequitable conduct.

6

## 5.3.1.2      The Fraudulent Transfer Claims.

7      The fraudulent conveyance claims set forth in the Fourth Amended Complaint include the

8  following:

9      A.      Acton Estates asserts a fraudulent conveyance claim against Fenway (as a

10  non-debtor successor to LCPI) in order to avoid a lien in the amount of $342,841,322.

11      B.      SunCal Bickford asserts a fraudulent conveyance claim against Fenway (as a

12  non-debtor successor to LCPI) in order to avoid a lien in the amount of $168,651,104.

13      C.      Acton Estates asserts a fraudulent conveyance claim against Fenway (as a

14  non-debtor successor to LCPI) in order to avoid a lien in the amount of $342,841,322.

15      D.      SunCal Emerald asserts a fraudulent conveyance claim against Fenway (as a

16  non-debtor successor to LCPI) in order to avoid a lien in the amount of $298,457,533.

17      E.      SunCal Bickford asserts a fraudulent conveyance claim against LCPI (as a

18  non-debtor successor to LCPI) in order to avoid a lien in the amount of $168,651,104.

19

## 5.3.2    The Debtors' Motions to Strike the Claims and Pleadings Arising from

20

## the Sold Loans to Fenway Capital and Related Appeals.

21      Once the Debtors discovered that the Lehman Lenders had misrepresented their ownership

22  of seven loans– the loans sold to Fenway Capital back in August of 2008 - they filed motions, on

23  May 29, 2009, seeking an order striking the claims that were filed with respect to these sold (the

24  "Fenway Sold Loans").  The Fenway Sold Loans included the SunCal Communities I Loan

25  Agreement, the Ritter Ranch Loan Agreement, the SunCal PSV Loan Agreement, the SunCal

26  Marblehead/SunCal Heartland Loan Agreement, the Delta Coves Loan Agreement, the SunCal

27  Northlake Loan Agreement and SunCal Oak Valley Loan Agreement.  See Exhibit "3."

28

1    At the initial hearing on the Debtors' motion to strike the Claims held on June 30, 2009, the

2  Court held that the transfer of the Fenway Sold Loans pursuant to the MRA was a true purchase and

3  sale transaction (the "Ownership Issue") and, accordingly, the Lehman Lenders retained no right to

4  file the Proofs of claim on this basis, under Federal Rule of Bankruptcy Procedure 3001(e)(1).  The

5  Court entered an order regarding the Ownership Issue on October 2, 2009.

6    The Lehman Lenders also contended that they were entitled to file the Proofs of Claim as the

7  "Fenway's authorized agent" under Federal Rule of Bankruptcy Procedure 3001(b) (the "Agency

8  Issue").  A continued hearing on the Agency Issue was set for September 22, 2009 and the Court

9  ruled that the Lehman Lenders could file the Proofs of Claim as authorized agents.

10    The Lehman Entities appealed the Ownership Issue and the Debtors appealed the Agency

11  Issue to the Bankruptcy Appellate Panel.  These two appeals, which were consolidated, were

12  argued in September of 2010. The parties are awaiting a ruling.

13    **5.3.3    The Debtors' Motion Pursuant to Section 506(d) and the 506(d)**

14    **Valuation Stipulation.**

15    Bankruptcy Code Section 506(a) provides that an asserted Secured Claim is only an

16  Allowed Secured Claim to the extent of the value of such Creditor's interest in the Estate's interest

17  in such property.  Bankruptcy Code Section 506(d) then provides that liens against the Debtor's

18  Assets that have no such value to the Alleged Secured Creditor are void.  Finally, Bankruptcy Code

19  Section 551 provides that such liens that are void under Section 506(d) are preserved for the

20  benefit of the applicable Debtor's Estate.

21    On May 29, 2009 and June 9, 2009, the Debtors filed a motion seeking orders (i) valuing

22  certain collateral at zero dollars, (ii) voiding the corresponding liens, pursuant to 11 U.S.C. §

23  506(d), and (iii) preserving such voided liens for the benefit of the respective bankruptcy estates.

24    The Debtors and the Lehman Entities subsequently entered into a stipulation to resolve the

25  valuation of such Liens. This stipulation provided that these liens would be valued at zero for all

26  purposes, with the exception of potential equity distributions. Although the Lehman Entities

27  acknowledged the stipulation on the record before the bankruptcy court, and promised to file the

28  executed stipulation that day, counsel for the Lehman Entities subsequently refused to file the

document disclosed to the Court on the record, and the parties have subsequently entered into a modified stipulation on substantially similar terms that have been filed with both the New York and California Bankruptcy Courts.

### 5.3.4   Lehman 502(d) Objection and Objection to Lehman's Claim Against Acton.

The Voluntary Debtors and other parties-in-interest have filed a motion to disallow, pursuant to 11 U.S.C. § 502(d), a number of Disputed Claims filed by Lehman ALI and LCPI, including the following claims filed in the cases of the Group I: Voluntary Debtors:

| Disputed Proof of Claim No. | Debtor | Claim Holder | Claim Amount |
| --- | --- | --- | --- |
| 6 | SunCal Emerald Meadows | LCPI | $343,221,391 |
| 6 | Acton Estates | LCPI | $343,221,391 |
| 16 | SunCal Bickford | LCPI | $343,221,391 |

In summary, the Group I: Voluntary Debtors allege in the Lehman 502(d) Objection that the Lehman Entities received prepetition transfers that are avoidable under certain sections of the bankruptcy code.

The Lehman Entities oppose the 502(d) Objection, inter alia, on the following grounds:

(1)    SunCal Management allegedly lacks standing to object to claims in the Trustee Debtor cases.  However, Section 502 provides that any party in interest may object to claims.

(2)    Disallowance is allegedly premature because there has been no judicial determination of the avoidance liability.  However, the only "judicial determination" necessary to invoke section 502(d) is that the objecting party have established a prima facie case for avoidance.  Courts have repeatedly characterized disallowance under Section 502(d) as temporary, pending a later ultimate determination of the avoidance claims in an adversary action.

(3)    The 502(d) objection purported violated LCPI's automatic stay. However, several courts have specifically concluded that an objection under Section 502(d) does not violate the creditor's automatic stay.  See In re Metiom, 301 B.R. 634 (Bankr.S.D.N.Y. 2003); In re PRS Ins. Group, 331 B.R. 580, 584 (Bankr.D.Del. 2005).

-52-

1          (4)     The 502(d) Objection allegedly fails to establish a prim facie case for

2    avoidance.  However, applicable case law establishes that a prima facie case merely

3    requires that the underlying avoidance allegations survive a motion to dismiss.  Here, the

4    Court has already denied the Lehman Entities' Motion to dismiss the applicable avoidance

5    action.  Moreover, the 502(d) Objection further submits substantive evidence establishing

6    the merits of the avoidance claims.

7          (5)     The Lehman Entities argue that they would be entitled to retain liens in the

8    properties to the extent they gave value in good faith under Section 548(c). However, the

9    Lehman Entities failed to cite any authority to support their novel argument that Section

10    548(c) can defeat disallowance under Section 502(d).  The only authority on this point is

11    directly contrary to the Lehman Entities' argument.  See In re Interstate Cigar Co., Inc., 278 B.R.

12    8 (Bankr.E.D.N.Y. 2002).

13        This objection also explains that Acton Estates never signed a loan document, in its own

14    right, that would make Acton an obligor on the SunCal I Loan.  If these objections are sustained,

15    the above claims would be disallowed, unless the Lehman Entities repaid the avoidable transfers.

16    Moreover, in the case of Acton, a finding in favor of the Group I: Voluntary Debtors would

17    eliminate Claim 6 reference above, leaving the Acton Project free of the lien asserted by LCPI as

18    security for Claim 6 (based upon the SunCal I Loan).

19        On June 9, 2011, a hearing was held on the Lehman 502(d) Objection. At this hearing the

20    Lehman Entities disputed the merits of the Section 502(d) claim objection and LCPI alleged that

21    the filing of this objection violated its automatic stay. At the conclusion of the hearing, the Court

22    ruled that the parties could proceed with their discovery in this matter.

23        If the Lehman 502(d) Objection is successful, the claims of the Lehman Entities identified

24    in the table above will be disallowed. Although the Lehman Entities will have the right to seek

25    reconsideration of this disallowance, in order to obtain this relief they would have to repay the

26    applicable transfers.

27

28

1    ### 5.3.5    **The Lehman Recoupment Objection and the Contract Action.**

2    Pursuant to the terms of the joint ventures entered into by and among the Debtors and the

3    Lehman Entities, the Lehman Entities were responsible for paying the costs incurred in the

4    development of the Projects. These costs included the claims of the vendors who provided goods

5    and services to the Projects and the claims asserted by the Bond Claimants. Although the Lehman

6    Entities contend that they were merely "lenders," and that they did not assume any liability for

7    these claims, as the above facts and those that will be adduced prior to and at the confirmation of

8    the Plan will demonstrate, the Lehman Entities are in fact obligated to pay these claims.

9    The Debtors contend that the Lehman Entities have contractual liability on various grounds,

10    including the following. First, the Lehman Entities were either in a joint venture relationship with

11    the Debtors from the outset, or this relationship developed and became a legal fixture through the

12    Lehman Entities' course of conduct. Pursuant to this relationship, and the promises and

13    representations made therein, the Lehman Entities agreed to be responsible for all vendor and Bond

14    Claims incurred at or in connection with the Projects. The role of each of the Debtors, by mutual

15    agreement, was to provide development expertise and project management services. The Lehman

16    Entities were required to provide the capital necessary to fund the Projects.

17    Second, during the last eighteen months of the relationship between the parties, the Lehman

18    Entities assumed direct responsibility for all claims incurred during this period, by insisting that

19    work continue on the Projects and by repeatedly promising to pay for this work. Since the Lehman

20    Entities ordered this work, and promised to pay for the same, they bear this financial responsibility.

21    Third and finally, the Lehman Entities expressly agreed to pay the vendor and bond claims

22    described in the Restructuring Agreement and in the interrelated Settlement Agreement, but failed

23    to do so as contractually agreed.

24    It is the SunCal Plan Proponent's contention that the Lehman Entities' failure to pay the

25    vendor and Bond Claims associated with the Projects (as was their obligation under the terms of

26    the joint ventures, the Restructuring Agreement and the Settlement Agreement) unjustly shifted

27    responsibility for these liabilities to the Debtors in breach of the terms of joint venture, the

28    Restructuring Agreement and the Settlement Agreement. Accordingly, the SunCal Plan Proponents

1    have filed the Lehman Recoupment Objection which seeks the disallowance of certain claims filed

2    by the Lehman Lenders, including the claims filed against the Group I: Voluntary Debtors.

3            In the Lehman Recoupment Objection, the SunCal Plan Proponents seek the following

4    relief:

5                1) Disallowance of the claims asserted by the Lehman Lenders in their

6                entirety, pending compliance with the terms of the Restructuring

7                Agreement and the Settlement Agreement;

8                2) A reduction in the amount of the Lehman Entities' secured claims by

9                the amount of damages resulting from the Lehman Entities' breach of their

10               obligations under these agreements; and/or

11               3)  An order barring the Lehman Entities from enforcing their rights under

12               the Lehman Loans until they cure their breaches under the above

13               agreements.

14           The first prayer for relief above is premised upon the contention that the Lehman Entities

15   agreed to transfer ownership of the Projects described in this agreement, including the Group I:

16   Voluntary Projects, to a series of newly formed entities under the control of the Lehman Entities,

17   pursuant to the terms of the Settlement Agreement. This agreement further provided that these new

18   entities would assume the vendor payables and certain Bond Claims associated with these projects.

19   Finally, this agreement included a covenant not to sue, pursuant to which the Lehman Entities were

20   barred from seeking further recourse against the Debtors.

21           The SunCal Plan Proponents believe that the positions asserted in the Lehman Recoupment

22   Objection are well grounded in fact and in law. Had the Lehman Entities complied with their

23   contractual obligations, substantially all of the Group I: Voluntary Debtors' liabilities would have

24   been eliminated, the Group I: Voluntary Debtors would not have had to file Chapter 11, and the

25   Lehman Entities would be barred from asserting claims against the Group I: Voluntary Debtors

26   based upon the Lehman Disputed Loans. It is the SunCal Plan Proponents' position that the

27   Lehman Entities' effort to enforce claims based upon Lehman Disputed Loans is directly contrary

28

1    to the basic agreements reached in the Restructuring Agreement and in the related Settlement

2    Agreement.

3        The Lehman Entities dispute the merits of the Lehman Recoupment Objection. It the

4    Lehman Entities' position that it was within their absolute "discretion" to pay, or not to pay, the

5    vendor payables incurred during the term of the Restructuring Agreement, even where they

6    authorized the work. Accordingly, they cannot, in their assessment, be held liable for these

7    obligations. In the case of the Settlement Agreement, the Lehman Entities contend that this

8    agreement never became effective and therefore they were not bound to comply with its terms. The

9    SunCal Plan Proponents do not believe that the positions asserted by the Lehman Entities are

10   supported by the facts, or existing law.

11       In addition to the Recoupment Claim Objections, certain Voluntary Debtors, including the

12   Group I Voluntary Debtors, have also filed the Contract Action against Lehman ALI and other

13   non-debtor Lehman Entities in Orange County Superior Court. The Contract Action is based on

14   Lehman ALI's breach of contract on the Restructuring and Settlement Agreements.  On May 9,

15   2011, the Defendants in the Contract Action filed a Notice of Removal which removed the

16   Contract Action from the Orange County Superior Court to the Bankruptcy Court, as adversary no.

17   8:11-ap-01212ES.  The Voluntary Debtor-Plaintiffs moved to remand the Contract Action back to

18   the Orange County Superior Court ("Remand Motion").  The Bankruptcy Court denied the

19   Remand Motion at the hearing on July 12, 2011.

20       Although LCPI's automatic stay remains an impediment to the pursuit of the Lehman

21   Adversary Proceeding, the existence of this stay will not bar the SunCal Plan Proponents from

22   implementing the material terms of the Plan for the following reason. LCPI's automatic stay does

23   not bar the pursuit of the Lehman Claim Objections or the Contract Action.  In fact, these matters

24   are proceeding in the Bankruptcy Court. If these objections are successful, the claims of the

25   Lehman Entities will be disallowed, either in whole or in part, or the Lehman Entities will be

26   barred from pursuing these claims until they pay what they owe to the Group I: Voluntary Debtors.

27   If the Contract Action is successful, it will generate a further recovery for creditors.  In either

28

MAINDOCS-#164803-v4-SunCal_3rd_Am_Group_I_VD_DS.DOC

1  scenario, the Plan filed by the SunCal Plan Proponents is feasible and will yield a favorable return

2  for creditors.

3    **5.3.6    The Debtors' Potential Post-Petition Claims Against Lehman and Their**

4        **Agents.**

5    The Voluntary Debtors believe that the Lehman Entities and certain agents of the Lehman

6  Entities (the "Culpable Agents") engaged in a post-petition course of conduct that severely

7  damaged the Voluntary Debtors, their estates and the recovery rights of creditors. In summary, the

8  actions taken by the Lehman Entities and the Culpable Agents included, among other things, the

9  following:

10        A.    Actively concealing the prepetition sale of the Lehman Disputed Loans to

11  Fenway Capital and misrepresenting themselves as the owners of these loans during the post-

12  petition period; and

13        B.    Improperly asserting that LCPI's automatic stay barred actions in the

14  Voluntary Debtors' Chapter 11 Cases relating to two of the Lehman Disputed Loans, when in fact

15  LCPI did not own any interest in such loans and hence the stay could not apply.

16    The foregoing course of conduct inflicted millions of dollars in damages upon the Voluntary

17  Debtors in the form of additional fees and costs, and it materially delayed the progress of the

18  Voluntary Debtors' reorganization effort. The Voluntary Debtors intend to seek recourse against the

19  Culpable Agents for these wrongs.

20    **5.4.    The Lehman / Fenway Claims Transaction and Compromise Motion Filed By**

21        **the Lehman Entities.**

22    **5.4.1    Lehman Entities' and Fenway's Claims Transaction.**

23    In April of 2010, LCPI and LBHI filed that certain *Motion Pursuant To Bankruptcy Rule*

24  *9019 For Authority To Compromise Controversy In Connection With A Repurchase Transaction*

25  *With Fenway Capital, LLC And A Commercial Paper Program With Fenway Funding, LLC* (the

26  "Compromise Motion.").  In the motion, LCPI and LBHI represented that they were

27  "compromising" various issues and relationships arising out of the repurchase transaction

28

described in the LCPI – Fenway MRA (the "Repo"). However, a careful review of the transaction described therein indicated that the motion was designed to accomplish the following objectives:

    1.   To transfer title to the Lehman Disputed Loans at issue in the Lehman Adversary Proceeding from Fenway Capital to LCPI, an entity that had no interest in five of the seven loans prepetition;

    2.   To allow LCPI, as the new owner of the Lehman Disputed Loans, to re-join the Lehman Adversary Proceeding as a defendant, and once there to use its automatic stay as a "sword" to stay this action;

    3.   To enable the Lehman Entities to thwart the pursuit of the SunCal Plan Proponents' Plan;

    4.   To bestow upon the Lehman Entities' purported competing plan an unfair advantage in the plan confirmation contest by delaying the effectiveness of critical provisions in the SunCal Plan Proponents' Plan; and

    5.   To shield Fenway Capital and its principals from liability and investigation through discovery.

At the hearing on the Compromise Motion, the bankruptcy court in New York approved the Compromise Motion, and stated, consistent with the objectives of the Lehman Entities, that the continued pursuit of the Lehman Adversary Proceeding would be stayed, once LCPI obtained title to the Lehman Disputed Loans. The order reflecting this relief was entered on May 13, 2010 (the "Compromise Order").

### 5.5.    The Debtors' Motion for a Stay to Suspend Certain Lehman Actions.

On September 21, 2010, the Voluntary Debtors, Acquisitions, and SunCal Management filed a motion requesting, among other relief, for the Court to suspend the Lehman Entities competing plan and disclosure statement unless and until the Lehman Entities agree to provide the Debtors with relief from their automatic stay in the Debtors' Chapter 11 Cases (the "Suspension Motion").  The Court granted this motion and stayed all matters until March 1, 2011. The Court also ordered the parties to engage in a mediation. The Voluntary Debtors and the Lehman Entities were unable to settle their claims through this process.

1    **5.6.    The Debtors' Other Litigation with Non-Lehman Related Parties.**

2    **5.6.1    The Rubidoux 60 Litigation and Life Church Adversary Action.**

3    Rubidoux and EMR were the plaintiffs in a lawsuit against SunCal Emerald entitled

4    *Rubidoux 60, et al. v. SunCal Emerald Meadows, LLC,* which was pending before the Superior

5    Court of the State of California for the County of Riverside as Case No. RIC 503235 (the

6    "Rubidoux Action").  The Rubidoux Action asserts causes of action against SunCal Emerald for

7    breach of contract, breach of implied covenant of good faith and fair dealings, and declaratory

8    relief.  On or about December 17, 2008, Rubidoux removed the Rubidoux 60 Action to the

9    Bankruptcy Court, initiating Adv. Case No. 8:08-ap-01511-ES.  On or about May 7, 2009, the

10   Bankruptcy Court remanded the Rubidoux Action back to the Riverside County Superior Court.

11   In addition, Life Church of God in Christ ("Life Church") is the plaintiff in an adversary

12   proceeding against the Debtor entitled *Life Church of God in Christ v. Sun Cal Emerald Meadows*

13   *LLC,* which is pending before the United States Bankruptcy Court for the Central District of

14   California as Case No. 8:09-ap-01258-ES (the "Life Church Action").  The Rubidoux Action and

15   the Life Church Action are referred to herein as the "SunCal Emerald Lawsuits."

16   The SunCal Emerald Lawsuits revolved around a planned mixed-use development project

17   in Riverside County that was to include residential, commercial, church, school, and park uses on

18   an approximate 245-acre site (the "Project").  As part of the Project, Rubidoux, EMR, SunCal

19   Emerald, the Life Church, and others, entered into a series of written agreements (the "Project

20   Agreements") regarding the transfer and/or purchase of the Project properties, the recordation of a

21   necessary subdivision map (the "I-Map"), the obtaining of entitlements, and the construction of

22   certain Project-related improvements.

23   The Parties to the SunCal Emerald Lawsuits recently entered into a Settlement Agreement,

24   which *inter alia* provided for the release of certain escrowed funds (in which the Debtor has no

25   interest), and the extension of certain deadlines under the Project Agreements with respect to the

26   finalization and recordation of the I-Map, the transfer of the Project properties, and the

27   commencement and completion dates for the construction of certain subdivision improvements

28   ("Emerald Compromise").

1    On or about March 14, 2011, SunCal Emerald filed a *Motion For An Order Approving*

2    *Compromise of Controversies with Rubidoux 60, LLC, EMR Residential Properties LLC, Mitchell*

3    *Ogron, Life Church of God in Christ, Moses Green and David Sandoval* ("Emerald Compromise

4    Motion").  SunCal Emerald and LCPI are currently in informal discussions to resolve LCPI's

5    concerns with respect to the Emerald Compromise Motion.  SunCal Emerald has extended LCPI's

6    deadline to file an opposition to the Emerald Compromise Motion to August 31, 2011.

7    The Evangelical Christian Credit Union ("ECCU") holds a lien on the "Old Church Parcel"

8    securing a loan to Life Church.  The Old Church Parcel is currently held by SunCal Emerald

9    Meadows, and is further subject to a junior lien in favor of LCPI.  ECCU has recently filed a

10    motion for relief from stay in LCPI's New York bankruptcy proceeding to allow ECCU to enforce

11    its remedies against the Old Church Parcel, which has been continued pending discussions between

12    the parties.  ECCU has not yet filed a motion for relief from stay as against SunCal Emerald

13    Meadows.

14    **5.6.2    The Debtors' Failed Preliminary Injunction Motion Against the**

15    **Holders of Bond Claims.**

16    On February 20, 2009, the Debtors filed a complaint and a Motion for Preliminary

17    Injunction, pursuant to which the Debtors sought a Motion for Preliminary Injunction against the

18    Holders of Bond Claims from pursuing such Claims. On February 23, 2009, the Court denied the

19    Debtors' request for the TRO and granted the Debtors' request to require the defendants to show

20    cause why the Motion for Preliminary Injunction should not be issued.

21    On March 2, 2009, several Holders of Bond Claims objected to the Motion for the

22    Preliminary Injunction.  The objections generally alleged that the Debtors failed to show that the

23    balancing of the equities favored granting the Preliminary Injunction versus the harm to the

24    Holders of the Bond Claims.  At a hearing held on March 4, 2009, the Court denied the

25    Preliminary Injunction Motion and the underlying complaint has subsequently voluntarily been

26    dismissed without prejudice.

27

28

### 5.6.3    The Contractors' Successful Motions for Relief from Stay to Pursue the Bond Claims.

Various contractors that were hired to perform work on some of the Projects have filed motions for relief from stay with the Bankruptcy Court to pursue their purported Bond Claims. These creditors have requested that the Bankruptcy Court grant these creditors relief from the automatic stay to allow such creditors to enforce certain Claims that such creditors allege to have against some of the Debtors, including certain surety bonds that are alleged to have been issued in favor of such creditors. The Debtors opposed the motions on the grounds that the various Debtors are indispensible parties. The Court conditionally granted the motions provided that the Bond Claimants are able to sever the Debtors from their proceedings on the Bonds.

### 5.6.4    Bond Safeguard Motion.

Bond Safeguard, a surety that issued bonds to secure the performance of work on certain projects, filed a motion seeking authority to file claims against the Trustee Debtors relating to these bond claims after the bar date. The Debtors opposed this motion. This motion was granted pursuant to an order entered on January 7, 2011.

The Bond Issuers assert that surety bonds were executed on behalf of all of the SunCal Debtors and the Bond Indemnitors. However, Bond Safeguard only filed proofs of claims asserting joint and several liability ("Cross-Indemnity Claims") against the Trustee Debtors. Bond Safeguard did not file any Cross-Indemnity Claims against the Voluntary Debtors.

### 5.7.    LitCo.

As more fully explained in Article VII, pursuant to the terms of the Plan, LitCo, which shall be a Delaware limited liability company, will be making an offer to purchase the Reliance Claims held by the Reliance Claimants in Classes 6.1, 6.2, 6.3 and 6.4 pursuant to the Plan. LitCo will be capitalized by a third party capital partner with the funds necessary to fund this claims purchase. Once the Reliance Claims are purchased, LitCo will pursue these claims against the Lehman Entities. Since LitCo will be purchasing the Reliance Claims with non-estate assets, the Plan Trust will not receive any part of the recoveries obtained on these purchased claims.

### 5.8    Reliance Claims.

The Reliance Claims listed on Exhibit 8 attached to this Disclosure Statement (which consist of Allowed Unsecured Claims, Allowed Mechanic's Lien Claims, or Allowed Bond Indemnification Claims against an applicable Debtor that would entitle the Holder thereof to be the beneficiary of any equitable subordination judgment obtained against a Lehman Entity by such Holder) were determined to be Reliance Claims based on a number of factors. An analysis was made of the books and records of the applicable Debtor to determine the amounts billed to that applicable Debtor by the particular creditor and what, if any, defenses there may be to such claims. The bankruptcy schedules filed for each applicable Debtor were reviewed along with the proofs of claim filed by creditors in the respective bankruptcies, and such amounts were compared to the books and records of the applicable Debtor. An analysis was made of the list of creditors and amounts contained in the Restructuring Agreement executed with Lehman entities on May 23, 2008, and the Settlement Agreement executed with Lehman entities on August 25, 2008, with respect to amounts Lehman entities had agreed to assume in connection with such agreements. Furthermore, there was taken into account the actions of Lehman in instructing SunCal to proceed with the entitlement, development and/or maintenance of the particular projects and that SunCal did so in reliance on promises of funding, as outlined in the Litigation Claims that have been summarized in this Disclosure Statement. Taking all of these factors into consideration, Exhibit 8 was prepared based on the determination by the SunCal Plan Proponents that these claims, as listed in Exhibit 8, are Reliance Claims, as that term is defined in this Disclosure Statement. The SunCal Plan Proponents are willing to commit to the amounts listed in Exhibit 8 as allowed Reliance Claims so long as the particular creditor does not dispute the amount thereof, but if a creditor disputes the amount, the SunCal Plan Proponents reserve all rights in connection with the amount of any such claim and whether or not it would be a Reliance Claim for purposes hereof.

MAINDOCS-#164803-v4-SunCal_3rd_Am_Group_I_VD_DS.DOC

# VI.

## TREATMENT OF UNCLASSIFIED CLAIMS

### 6.1    Introduction.

As required by the Bankruptcy Code, the Plan places Claims and Interests into various Classes according to their right to priority.  However, certain types of Claims are not classified in any Classes under the Plan.  These Claims are deemed "unclassified" under the provisions of the Code.  They are not considered impaired and they do not vote on the Plan, because they are automatically entitled to specific treatment provided for them in the Code.  As such, the SunCal Plan Proponents have not placed the following Claims in a Class.  The treatment of these unclassified Claims is as provided below.

### 6.2    Treatment of Allowed Administrative Claims.

The Code requires that all Allowed Administrative Claims be paid on the later of Effective Date of the Plan(s) or the date of their allowance, unless a particular Holder agrees to a different treatment.  The treatment of Allowed Administrative Claims is as described below.  However, such Administrative Claims are continuing to be incurred.  The Allowed Administrative Claims shall be paid from the applicable Distribution Account(s) pursuant to the LitCo Plan Loan.

### 6.3    Repayment of Allowed Administrative Claims.

Except to the extent that the Holder of an Allowed Administrative Claim agrees to a different treatment and subject to the Administrative Claims Bar Date set forth herein, the Distribution Agent shall pay each Allowed Administrative Claim in full, in Cash, on the later of (i) the Effective Date, (ii) within ten (10) Business Days after the date such Administrative Claim becomes an Allowed Administrative Claim, or (iii) the date such Allowed Administrative Claim becomes due according to its terms. Notwithstanding the foregoing, any Allowed Administrative Claim representing obligations incurred in the ordinary course of post-petition business by the Debtors in Possession (including without limitation post-petition trade obligations and routine post-petition payroll obligations) shall be paid in full or performed by the Plan Trustee in the ordinary course of business, in accordance with the terms of the particular obligation.

1      **6.4**    __Administrative Claims Bar Date__.

2          All applications for final compensation of Professionals for services rendered and for

3  reimbursement of expenses incurred on or before the Effective Date and all other requests for

4  payment of Administrative Claims incurred before the Effective Date under Sections 507(a)(2)

5  or 507(b) of the Bankruptcy Code (except only for (i) post-petition, ordinary course trade

6  obligations and routine post-petition payroll obligations incurred in the ordinary course of the

7  Debtors' post-petition business, for which no bar date shall apply, and (ii) post-petition tax

8  obligations, for which no bar date shall apply) shall be Filed with the Bankruptcy Court and served

9  upon the Plan Trustee no later than the Administrative Claims Bar Date, unless such date is

10 extended by the Bankruptcy Court after notice to the Plan Trustee.  Any such request for payment

11 of an Administrative Claim that is subject to the General Administrative Claims Bar Date and that

12 is not Filed and served on or before the Administrative Claims Bar Date shall be forever barred;

13 any party that seeks payment of Administrative Claims that (i) is required to file a request for

14 payment of such Administrative Claims and (ii) does not file such a request by the deadline

15 established herein shall be forever barred from asserting such Administrative Claims against the

16 Debtors, the Plan Trust, their estates, or any of their property.

17     **6.5**    __Treatment of Unsecured Tax Claims__.

18         Tax Claims are certain unsecured income, employment and other taxes described by Code

19 Section 507(a)(8).  The Code requires that each holder of such a Section 507(a)(8) tax claim

20 receive the present value of such Claim in deferred cash payments, over a period not exceeding

21 five (5) years from the petition date and that such treatment not be less favorable than the treatment

22 accorded to non priority unsecured creditors.

23         At the election of the Plan Trustee, the Holder of each Allowed Priority Tax Claim shall be

24 entitled to receive, on account of such Claim, (i) equal cash payments on the last Business Day of

25 each three-month period following the Effective Date, during a period not to exceed five years

26 after November 6, 2008, totaling the principal amount of such Claim plus simple interest on any

27 unpaid balance from the Effective Date, calculated at the interest rate available on ninety (90) day

28 United States Treasuries on the Effective Date, (ii) such other treatment agreed to by the Holder of

MAINDOCS-#164803-v4-SunCal_3rd_Am_Group_I_VD_DS.DOC

1   the Allowed Priority Tax Claim and the Plan Trustee, provided such treatment is on more

2   favorable terms to the Debtors (or the Plan Trust after the Effective Date) than the treatment set

3   forth in clause (i) hereof, or (iii) payment of the full Allowed Priority Tax Claim in Cash.

4        **6.6**    <u>**Summary of the Group I: Voluntary Debtors Plans' Treatment of Bond**</u>

5             <u>**Indemnity Claims.**</u>

6        Allowed Bond Indemnification Claims are treated as Reliance Claims.  In the event that

7   such Bond Indemnification Claim arises from a general unsecured claim, it is classified in Class 6.

8   If the event that such Bond indemnification Claim arises from a Mechanic's Lien Claim, then it is

9   classified in Class 3.  Contingent Bond Indemnification Claims are classified separately as Class 4

10  Claims.

11       The Bond Companies assert that surety bonds were executed on behalf of all or some of the

12  Group I: Voluntary Debtors as a principal for its respective Group I: Voluntary Project ("Surety

13  Bonds").  The Surety Bond(s) will not be transferred to the Winning Bidder(s) and, if a Winning

14  Bidder(s) determines to develop the Group I: Voluntary Project(s), the Surety Bond will not apply

15  to the Winning Bidder(s)' bonding requirements with respect to such development.  If a Winning

16  Bidder(s) determines to develop all or a portion of its respective Group I: Voluntary Project(s), it

17  will be required at that time to obtain new Surety Bonds from the Bond Companies or another

18  surety, to the extent surety bonds are required by applicable state and local development

19  requirements.

20                        **VII**.

21                 <u>**CLASSIFICATION OF CLAIMS AND INTERESTS**</u>

22       As required by the Code, the Plan places Claims and Interests into various Classes

23  according to their right to priority and other relative rights.  Each of the Plan(s) specify whether

24  each Class of Claims or Interests is impaired or unimpaired, and the Plan sets forth the treatment

25  each Class will receive.  The table below lists the Classes of Claims established under the Plan and

26  states whether each particular Class is impaired or left unimpaired by the Plan.  A Class is

27  "unimpaired" if the Plan leaves unaltered the legal, equitable and contractual rights to which the

28

Holders of Claims or Interests in the Class are entitled, with certain exceptions specified in the Bankruptcy Code.

| CLASSIFICATION OF HOLDERS OF SECURED REAL PROPERTY TAX CLAIMS AGAINST THE GROUP I: VOLUNTARY PROJECTS | | |
|---|---|---|
| **Class 1** | **Claimant** | **Claim Nos.**[3] |
| **Class 1.1** | Los Angeles County as the Holder of an Unpaid Secured Real Property Tax Claim against the Ritter Ranch Project in the amount of $3,008,044.29. | Palmdale Hills 12 |
| **Class 1.2** | Placer County as the Holder of an Unpaid Secured Real Property Tax Claim against the Bickford Ranch Project in the amount of $9,467,165. | Scheduled Amount |
| **Class 1.3** | Riverside County as the Holder of an Unpaid Secured Real Property Tax Claim against the Emerald Meadows Project in the amount of $798,256. | SunCal Emerald Meadows 9 |
| **Class 1.4** | Los Angeles County as the Holder of an Unpaid Secured Real Property Tax Claim against the Acton Project in the amount of $463,325. | Acton Estates  1 |

| CLASSIFICATION OF LEHMAN'S DISPUTED CLAIMS AGAINST THE GROUP I: VOLUNTARY DEBTORS | | |
|---|---|---|
| **Class 2** | **Claims** | **Claim Nos.** |
| **Class 2.1** | The Holders of Lehman's Disputed Claims filed by LCPI against SunCal Bickford  arising from the SunCal Communities I Loan Agreement in the asserted amount of $343,221,391. | SunCal Bickford: 16 |
| **Class 2.2** | The Holder of Lehman's Disputed Claims filed by LCPI against Palmdale Hills arising from the Ritter Ranch Loan Agreement in the asserted amount of $287,252,096. | Palmdale Hills 65 |
| **Class 2.3** | The Holders of Lehman's Disputed Claims filed by LCPI against SunCal I, SunCal III, Acton Estates, SunCal Emerald, SunCal Bickford, SunCal Summit Valley arising from the SunCal Communities I Loan Agreement in the asserted amount of $343,221,391. | SunCal Emerald Meadows 7 |

---

[3] These Real Property Tax Claims have been updated to include amounts for which proofs of claim have not yet been filed.

| CLASSIFICATION OF LEHMAN'S DISPUTED CLAIMS AGAINST THE GROUP I: VOLUNTARY DEBTORS | | |
|---|---|---|
| **Class 2** | **Claims** | **Claim Nos.** |
| **Class 2.4** | The Holders of Lehman's Disputed Claims filed by LCPI against SunCal I, SunCal III, Acton Estates, SunCal Emerald, SunCal Bickford, SunCal Summit Valley arising from the SunCal Communities I Loan Agreement in the asserted amount of $343,221,391. | Acton Estates: 6 |

| CLASSIFICATION OF ASSERTED MECHANIC LIEN CLAIMS AGAINST THE GROUP I: VOLUNTARY PROJECTS | | |
|---|---|---|
| **Class 3** | **Claimant** | **Claim Nos.** |
| **Class 3.1** | The Holder of the asserted Mechanic Lien Claim held by Asphalt Professionals against the Ritter Ranch Project owned by Palmdale Hills in the amount of $38,249. | Palmdale Hills 1 and 46 |
| **Class 3.2** | The Holder of the asserted Mechanic Lien Claim held by Sierra Cascade Construction against the Ritter Ranch Project owned by Palmdale Hills in the amount of $550,677. | Palmdale Hills 33 |
| **Class 3.3** | The Holder of the asserted Mechanic Lien Claim held by Staats Construction. Inc. against the Ritter Ranch Project owned by Palmdale Hills in the amount of $166,105. | Palmdale Hills 51 |
| **Class 3.4** | The Holder of the asserted Mechanic Lien Claim held by Southland Farmers, Inc. against the Ritter Ranch Project owned by Palmdale Hills in the amount of $177,801. | Palmdale Hills 55, 67 and 68 |
| **Class 3.5** | The Holder of the asserted Mechanic Lien Claim held by Chamelon Design Inc. against the Ritter Ranch Project owned by Palmdale Hills in the amount of $60,920. | Palmdale Hills 93, 99 |
| **Class 3.6** | The Holder of the asserted Mechanic Lien Claim held by MHM Engineers against the Bickford Ranch Project in the amount of $8,916. | SunCal Bickford 5 |
| **Class 3.7** | The Holder of the asserted Mechanic Lien Claim held by Land Architecture against the Bickford Ranch Project in the amount of $100,245. | SunCal Bickford 6 |
| **Class 3.8** | The Holder of the asserted Mechanic Lien Claim held by Kiewit Pacific Co. against the Bickford Ranch Project in the amount of $1,868,357. | SunCal Bickford 10 |

| CLASSIFICATION OF ASSERTED MECHANIC LIEN CLAIMS AGAINST THE GROUP I: VOLUNTARY PROJECTS | | |
|---|---|---|
| **Class 3** | **Claimant** | **Claim Nos.** |
| **Class 3.9** | The Holder of the asserted Mechanic Lien Claim held by ARB, Inc. against the Bickford Ranch Project in the amount of $1,052,272. | SunCal Bickford 15 |
| **Class 3.10** | The Holder of the asserted Mechanic Lien Claim held by Independent Construction against the Bickford Ranch Project in the amount of $117,209. | SunCal Bickford 28 |
| **Class 3.11** | The Holder of the asserted Mechanic Lien Claim held by Marques Pipeline, Inc. against the Bickford Ranch Project in the amount of $330,118. | SunCal Bickford 29 and 30 |
| **Class 3.12** | The Holder of the asserted Mechanic Lien Claim held by Hall & Foreman, Inc. against the Emerald Meadows Project in the amount of $287,727. | SunCal Emerald 13 |
| **Class 3.13** | The Holder of the asserted Mechanic Lien Claim held by Proactive Engineering against the Emerald Meadows Project in the amount of $991,315. | SunCal Emerald 15 and 16 |
| **Class 3.14** | The Holder of the asserted Mechanic Lien Claim held by HD Supply Construction against the Emerald Meadows Project owned by SunCal Emerald in the amount of $14,893. | Palmdale Hills 15 |

| CLASSIFICATION OF CONTINGENT BOND INDEMNIFICATION CLAIMS AGAINST THE GROUP I: VOLUNTARY PROJECTS | | |
|---|---|---|
| **Class 4** | **Claimant** | **Claim Nos.** |
| **Class 4.1** | The holders of Contingent Bond Indemnification Claims that are Allowed Secured Claims arising from bonds issued with respect to the Group I: Voluntary Projects | **Various Filed and Scheduled** |

| CLASSIFICATION OF PRIORITY UNSECURED CLAIMS AGAINST THE GROUP I: VOLUNTARY DEBTORS | | |
|---|---|---|
| **Class 5** | **Claimant** | **Claim Nos.** |
| **Class 5.1** | The Holder of Priority Claims that fall within Code Sections 507(a)(2), (4), (5), (6), and (7) in the asserted amount of $10,950 against the Group I: Voluntary Debtors | Various Filed and Scheduled |

| CLASSIFICATION OF GENERAL UNSECURED CLAIMS THAT QUALIFY AS RELIANCE CLAIMS AGAINST THE GROUP I: VOLUNTARY DEBTORS [4] | | |
|---|---|---|
| **Class 6** | **Claimant** | **Claim Nos.** |
| **Class 6.1** | The holders of Allowed Unsecured Reliance Claims against Palmdale. | Various Filed and Scheduled |
| **Class 6.2** | The holders of Allowed Unsecured Reliance Claims against SunCal Bickford. | Various Filed and Scheduled |
| **Class 6.3** | The holders of Allowed Unsecured Reliance Claims against SunCal Emerald Meadows. | Various Filed and Scheduled |
| **Class 6.4** | The holders of Allowed Unsecured Reliance Claims against Acton Estates. | Various Filed and Scheduled |

| CLASSIFICATION OF GENERAL UNSECURED CLAIMS THAT DO NOT QUALIFY AS RELIANCE CLAIMS AGAINST THE GROUP I: VOLUNTARY DEBTORS [5] | | |
|---|---|---|
| **Class 7** | **Claimant** | **Claim Nos.** |
| **Class 7.1** | Claimants holding Allowed Unsecured Claims against Palmdale that are not Reliance Claims | Various Filed and Scheduled |
| **Class 7.2** | Claimants holding Allowed Unsecured Claims against SunCal Bickford that are not Reliance Claims | Various Filed and Scheduled |
| **Class 7.3** | Claimants holding Allowed Unsecured Claims against SunCal Emerald Meadows that are not Reliance Claims | Various Filed and Scheduled |

---

[4] Unsecured Claims are generally be placed within the same class and they receive the same treatment under a Plan. However, the SunCal Plan Proponents have divided Unsecured claims into two classes in the Plan – Classes 6.1, 6.2. 6.3 and 6.4, and 7.1, 7.2, 7.3 and 7.4. This separate classification has been implemented for the following reason. The Holders of Unsecured Claims in Classes 6.1, 6.2, 6.3 and 6.4, who are referred to as "Reliance Claimants," hold specific Litigation Rights that are referred to herein as "Reliance Claims." The SunCal Plan Proponents believe that the Holders of Reliance Claims are the potential beneficiaries of the equitable subordination causes of action in the Lehman Adversary Proceeding. The Unsecured Creditors in Classes 7.1, 7.2, 7.3 and 7.4 do not hold Reliance Claims. Under the Plan, the Reliance Claimants who sell their Reliance Claimants to LitCo, and who vote in favor of the Plan, which is Option A, will receive a distribution of 55 percent on their Allowed Unsecured Claims *from non-estate funds. Accordingly, the 55 percent payment is being paid from non-estate funds, for a non-estate asset.* If a Reliance Claimant elects not to sell this claim, then this claimant will receive the exact same distribution rights that the Class 7.1, 7.2, 7.3 and 7.4 claimants, respectively, will receive under the Plan, unless the Court allocates a part of any judgment granted in the Lehman Adversary Proceeding to these particular claims. In summary, the classification difference was made to provide for the purchase offer relating to the sale of the Reliance Claims. In all other respects the Holders of Unsecured Claims receive the same treatment under the Plan.

[5] This Class includes, but is not limited to, Bond Claims that are not Allowed Secured Claims within Class 4.1.

| **CLASSIFICATION OF GENERAL UNSECURED CLAIMS THAT DO NOT QUALIFY AS RELIANCE CLAIMS AGAINST THE GROUP I: VOLUNTARY DEBTORS[5]** | | |
|---|---|---|
| **Class 7** | **Claimant** | **Claim Nos.** |
| **Class 7.4** | Claimants holding Allowed Unsecured Claims against Acton Estates that are not Reliance Claims | Various Filed and Scheduled |

| **HOLDERS OF ALLOWED INTERESTS AGAINST THE GROUP I: VOLUNTARY DEBTORS** | | |
|---|---|---|
| **Class 8** | **Claimant** | **Scheduled** |
| **Class 8.1** | Allowed Interests in Palmdale held by SCC Palmdale, LLC | As scheduled |
| **Class 8.2** | Allowed Interests in SunCal Bickford held by SunCal I. | Scheduled Amount |
| **Class 8.3** | Allowed Interests in SunCal Emerald Meadows held by SunCal I | Scheduled Amount |
| **Class 8.4** | Allowed Interests in Acton Estates held by SunCal I | Scheduled Amount |

## VIII.

## THE PLAN'S TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS

**8.1.     The Plan's Treatment of Holders of Allowed Secured Real Property Tax Claims Against the Group I: Voluntary Projects (Classes 1.1 through 1.4).**

The rights of the Holder(s)' of Allowed Secured Claims in Classes 1.1 through 1.4 are impaired under the Plan and shall receive one of the following two treatments at the Plan Trustee's discretion based solely on the option of the Group I: Voluntary Debtor:

A.     Such Holders shall retain their existing lien rights and shall accrue interest as provided under applicable nonbankruptcy law pursuant to 11 U.S.C. § 506 and 511 and such Allowed Claims shall be satisfied in accordance with the provision of 11 U.S.C. § 1124(2) from the sale of the Group I: Voluntary Projects during the Sales Period; or

B.     Such Holders shall retain their existing lien rights and shall accrue interest as provided under applicable nonbankruptcy law pursuant to 11 U.S.C. § 506 and 511 and California Revenue and Taxation Code Sections 4102 and 4103, and payment on such Allowed Claims shall be satisfied over sixty-one (61) months from the applicable Group I: Voluntary Debtor's Petition Date.

**8.2.    The Plan's Treatment of Lehman's Disputed Claim(s) and Disputed Lien(s)**

**Against the Group I: Voluntary Debtors (Class 2.1 through 2.4).**

The Holder(s) of Disputed Secured Claims within Class 2.1 through 2.4 shall receive the indubitable equivalent of their claims under the Plan, pursuant to 11 U.S.C. § 1129(b)(2)(A)(iii), through the following treatment:

A.    Lien Rights. The Class 2.1 through 2.4 Holder(s) shall retain their interest in the Disputed Lien(s) against the applicable Group I: Voluntary Projects and the Group I: Voluntary Other Assets that secure the Disputed Secured Claims, pending a Final Order(s) resolving the Allowance of such Disputed Secured Claims and determining the validity, priority and extent of the applicable Disputed Liens against the applicable Group I: Voluntary Projects, which secure these claims, except as follows:

1.    The Group I: Voluntary Projects and the Group I: Voluntary Other Assets subject to the Class 2.1 through 2.4 Disputed Liens will be sought to be sold free and clear of such liens during the Sales Period, without the right to credit bid under Section 363(k) with respect to Disputed Claims and Disputed Liens. These Disputed Liens shall then attach to the Net Sales Proceeds from the sale, which shall be deposited into the Net Sales Proceeds Account, pending a resolution of such Disputed Secured Claims and Disputed Liens.  The marketing process and sales procedures for the Group I: Voluntary Projects and the Group I: Voluntary Other Assets are described in Article X hereof.

2.    To the extent that a Disputed Secured Claim held by either the Class 2.1 through 2.4 Claimants against the applicable Group I: Voluntary Projects and Group I: Voluntary Other Assets  is disallowed, and the Disputed Lien associated with this Disputed Secured Claim is consequently released to the extent of this disallowance, the Plan Trustee shall be authorized to use to the Net Sales Proceeds that are no longer subject to the Disputed Lien(s) to pay other Allowed Claims in their order of priority, in accordance with the terms of the Plan;

3.    To the extent that a Disputed Secured Claim held by either the Class 2.1 through 2.4 Claimant and the associated Disputed Lien(s) against the applicable Group I: Voluntary Projects and Group I: Voluntary Other Assets  is subordinated, the Plan Trustee shall be

1   authorized to use to the Net Sales Proceeds that are no longer subject to the Disputed Lien(s), or

2   where the priority of the Disputed Liens has been subordinated by the Court, to pay other Allowed

3   Claims in their order of priority, in accordance with the terms of the Plan, to the extent of the

4   subordination; and

5           Notwithstanding the existence of the Disputed Secured Claims and the

6   Disputed Liens, the Plan Trustee may a seek a release of the funds in the Net Sales Proceeds

7   Account subject to these claims and liens to pay the claims of other creditors in accordance with

8   the terms of the applicable Plan, if the Class 2.1 through 2.4 claimants' interests in Group I will

9   remain adequately protected after this release.

10           3.     <u>Distributions To The Class 2.1 through 2.4 Claimants</u>. If the Plan

11   Trustee consummates a sale or otherwise liquidates the particular Group I <u>Voluntary</u> Project and/or

12   Group I: Voluntary Other Assets subject to the Class 2.1 through  2.4 Disputed Secured Claim(s)

13   and/or Disputed Lien(s) during the Sales Period, as provided for above, the Holder(s) of such

14   Disputed Secured Claim shall receive a distribution to the extent of available funds from the

15   applicable Net Sale Proceeds Account(s) to the extent required by an entered Order of the Court,

16   that is not subject to a stay pending appeal, determining the allowance and priority of the Disputed

17   Secured Claims and the validity, priority and extent of the Disputed Liens in, including but not

18   limited to, the Lehman Adversary Proceeding and the Lehman Claims Objections.

19           B.     <u>Distributions To The Class 2.1 through 2.4 Claimants</u>. If the Plan Trustee

20   consummates a sale or otherwise liquidates the particular Group I Voluntary Project and/or Group

21   I: Voluntary Other Assets subject to the Class 2.1 through  2.4 Disputed Secured Claim(s) and/or

22   Disputed Lien(s) during the Sales Period, as provided for above, the Holder(s) of such Disputed

23   Secured Claim shall receive a distribution to the extent of available funds from the applicable Net

24   Sale Proceeds Account(s) to the extent required by an entered Order of the Court, that is not

25   subject to a stay pending appeal, determining the allowance and priority of the Disputed Secured

26   Claims and the validity, priority and extent of the Disputed Liens in, including but not limited to,

27   the Lehman Adversary Proceeding and the Lehman Claims Objections.

28

MAINDOCS-#164803-v4-SunCal_3rd_Am_Group_I_VD_DS.DOC

C.    Abandonment of Unsold Group I: Voluntary Projects and Group I: Voluntary Other Assets. If for any reason the Plan Trustee is unable to sell any of the Group I: Voluntary Projects and/or Group I: Voluntary Other Assets during the Sales Period, they will be abandoned as of 11:59 p.m. on the last day of the Sales Period, no payment shall be made to Holders of Class 2.1 through 2.4 Claims, as the case may be, and such Holder(s) shall be free to exercise any and all remedies that they may hold with respect to the Group I: Voluntary Projects and the Group I: Voluntary Other Assets under applicable California law.

**8.3.    The Plan's Treatment of Holders of Asserted Mechanic Lien Claims Against the Group I: Voluntary Projects (Classes 3.1 Through 3.14).**

The treatment of the Holders of Allowed Classes 3.1 through 3.14 Secured Claims under the applicable Plan shall be as follows:

A.    The Holder(s)' rights are impaired under the Plan;

B.    The Holder(s) shall retain their respective underlying liens on the applicable Group I: Voluntary Projects, but shall forebear from pursuing their rights and remedies until the expiration of the Sales Period;

C.    The Holders of Class 3.1 through 3.14 claims shall receive a distribution, to the extent of available, of Net Sale Proceeds in accordance with the priorities set forth under the Bankruptcy Code, subject to a Final Order(s) resolving the allowance and priority of the applicable Lehman's Disputed Claim(s) and the validity of the applicable Lehman Disputed Lien(s) in, including but not limited to, the Lehman Adversary Proceeding; and

D.    If for any reason the Plan Trustee is unable to sell any of the Group I: Voluntary Projects during the Sales Period, they will be abandoned as of 11:59 p.m. on the last day of the Sales Period, no payment shall be made to Holders of Classes 3.1 through 3.14 Claims, as the case may be, and such Holder(s) shall be free to exercise any and all remedies that they may hold with respect to the Group I: Voluntary Projects under applicable California law.

MAINDOCS-#164803-v4-SunCal_3rd_Am_Group_I_VD_DS.DOC

**8.4.**     **The Plan's Treatment of Holders of Contingent Bond Indemnification Claims Against the Group I: Voluntary Projects (Class 4.1).**

The Bond Companies assert that surety bonds were executed on behalf of all or some of the Group I: Voluntary Debtors as a principal for its respective Group I: Voluntary Project ("Surety Bonds"). The Surety Bond(s) will not be transferred to the Winning Bidder(s) and, if a Winning Bidder(s) determines to develop the Group I: Voluntary Project(s), the Surety Bond will not apply to the Winning Bidder(s)' bonding requirements with respect to such development. If a Winning Bidder(s) determines to develop all or a portion of its respective Group I: Voluntary Project(s), it will be require at that time to obtain new Surety Bonds from the Bond Companies or another surety, to the extent surety bonds are required by applicable state and local development requirements.

The rights of each holder of an Allowed Contingent Bond Indemnification Claim arising from a bond issued with respect to a Group I <u>Voluntary</u> Project, shall, to the extent such claim(s) are determined to be a secured claim(s), be impaired under the Plan. Such claims shall receive the following treatment:

       A.     Each such Allowed Secured Claim shall be placed in a separate class and receive a separate ballot for voting purpose;

       B.     Each Holder(s) shall retain their respective underlying liens on the applicable Group I: Voluntary Project, but shall forebear from pursuing their rights and remedies until the expiration of the Sales Period;

       C.     If the Plan Trustee is able to consummate a sale of the Group I: <u>Voluntary</u> Projects subject to the liens asserted by the Holders of Class 4.1 claimants during the Sales Period, such Holders shall receive a distribution, to the extent of available Net Sale Proceeds in accordance with the priorities set forth under the Bankruptcy Code, subject to a Final Order(s) resolving the allowance and priority of the applicable Lehman's Disputed Claim(s) and the validity of the applicable Lehman Disputed Lien(s) in, including but not limited to, the Lehman Adversary Proceeding; and

1    D.    If the Plan Trustee is unable to consummate a sale of the Group I: <u>Voluntary</u>

2    <u>Projects</u> during the Sales Period, such real property collateral shall be deemed abandoned by the

3    Plan Trustee, no payment shall be made to such Holder(s), and such Holder(s) shall be allowed to

4    pursue their respective rights against the real property collateral under applicable California law.

5    **8.5.    <u>The Plan's Treatment of Holders of Priority Claims Against the Group I:</u>**

6    **<u>Voluntary Debtors (Class 5.1)</u>.**

7    The treatment of the Holders of Allowed Priority Claims under the Plan shall be as follows**:**

8    A.    The Holder(s) are unimpaired under the Plan; and

9    B.    The Holder(s) shall be paid from the applicable Distribution Account(s) or

10    the LitCo Plan Loan (i) the full amount of such Allowed Priority Claim in Cash on the later of (x)

11    the Effective Date, (y) the date such Claim becomes an Allowed Priority Claim or (z) the date such

12    Allowed Priority Claim becomes payable in accordance with the terms governing such Allowed

13    Priority Claim, or (ii) upon such other less favorable terms as may be agreed to by such Holder and

14    the Plan Trustee.

15    **8.6.    <u>The Plan's Treatment of Holders of General Unsecured Claims that are</u>**

16    **<u>Reliance Claims Against the Group I: Voluntary Debtors (Classes 6.1, 6.2. 6.3</u>**

17    **<u>and 6.4)</u>.**

18    The rights of Holders of Allowed Class 6.1, 6.2., 6.3 and 6.4 Claims are impaired under the

19    Plan. They have the right to choose between the following treatment options:

20    A.    <u>Option A</u>: A claimant in these classes *who votes in favor of the Plan*, and

21    who chooses Option A, will have the right to sell to LitCo all of the claimant's right, title and

22    interest in all Allowed Reliance Claims and all of the claimant's Litigation Rights against the

23    applicable Debtor, SunCal Affiliates, and the Lehman Entities, for the sum of fifty-five cents

24    ($0.55) per dollar of allowed claim, payable in cash on the Effective Date, provided there is no stay

25    pending an appeal of the Confirmation Order, in full satisfaction of such claimant's Allowed

26    Reliance Claims; or

27    B.    <u>Option B</u>: A claimant in these classes who votes against the Plan, or who

28    votes in favor of the Plan, but does not choose Option A, or who does not vote on the Plan, will 1)

-75-

1   receive a minimum distribution in cash, on the Effective Date, equal to one percent (1%) of such

2   claimant's Allowed Claim, 2) retain such claimant's Reliance Claim(s) and rights against the

3   Lehman Entities and its right to receive such claimant's share, as determined by the Court, in the

4   benefits and Litigation Recoveries resulting from a judgment or order entered in the Lehman

5   Adversary Proceeding, the Contract Action, or the Lehman Claims Objections, and 3) right to

6   receive a pro-rata share of any funds payable from the applicable Distribution Account(s), after

7   payment in full of all Post Confirmation Expenses, Allowed Administrative Claims, and Allowed

8   Priority Claims.

9       **8.7.**   **The Plan's Treatment of Holders of Allowed General Unsecured Claims that**

10          **Are Not Reliance Claims Against the Group I: Voluntary Debtors (Classes 7.1.**

11          **7.2, 7.3 and 7.4).**

12        The rights of Holders of Allowed Class 7.1, 7.2, and 7.4 Claims are impaired under the

13  Plan. Under the Plan, each claimant will 1) receive a minimum distribution in cash, on the

14  Effective Date, equal to one percent (1%) of such claimant's Allowed Claim, and 2) receive a pro-

15  rata share of any funds payable from the applicable Distribution Account(s), after payment in full

16  of all Post Confirmation Expenses, Allowed Administrative Claims, and Allowed Priority Claims

17  and any sums that the Bankruptcy Court determines are payable to the Holders of Allowed Class

18  6.1, 6.2, 6.3 and 6.4 Claims from either the Claim Reduction Amounts, or on account of a

19  judgment in the Lehman Adversary Proceeding.

20        Class 7.3 consists of the claims subject to the Emerald Compromise.  The Emerald

21  Compromise, as modified or amended, shall be approved by separate order of the Court pursuant to

22  Bankruptcy Rule 9019, or as provided in the Plan and approved by the Court.

23      **8.8.**   **The Plan's Treatment of Holders of Allowed Interests Against the Group I:**

24          **Voluntary Debtors.**

25        The Interests of the Holders in Class 8.1, 8.2, 8.3 and 8.4 are impaired under the Plan. All

26  such Interests shall be cancelled as of the Effective Date and no distribution shall be made to these

27  Holders on account of such Interest(s).

28

# IX.

## ACCEPTANCE OR REJECTION OF THE PLAN

### 9.1.    Introduction.

PERSONS OR ENTITIES CONCERNED WITH CONFIRMATION OF THE PLAN SHOULD CONSULT WITH THEIR OWN ATTORNEYS BECAUSE THE LAW ON CONFIRMING A PLAN OF REORGANIZATION IS VERY COMPLEX.  The following discussion is intended solely for the purpose of alerting readers about basic confirmation issues, which they may wish to consider, as well as certain deadlines for filing Claims.  The Debtors cannot represent that the discussion contained below is a complete summary of the law on this topic.

Many requirements must be met before the Court can confirm the Plan.  Some of the requirements include that the Plan must be proposed in good faith, acceptance of the Plan, whether the Plan pays creditors at least as much as creditors would receive in a Chapter 7 liquidation, and whether the Plan is feasible.  The requirements described herein are <u>not</u> the only requirements for confirmation.

### 9.2.    Who May Object to Confirmation of the Plan.

Any party in interest may object to the confirmation of the Plan, but as explained below not everyone is entitled to vote to accept or reject the Plan.

### 9.3.    Who May Vote to Accept/Reject the Plan.

A Holder of a Claim or Interest has a right to vote for or against the Plan if that Holder of the Claim or Interest has a Claim which is both (1) Allowed or Allowed for voting purposes and (2) Classified in an impaired Class (excluding any class in which the Plan is "deemed rejected").  The votes will be tabulated on a Debtor by Debtor basis.

### 9.4.    What Is an Allowed Claim/Interest.

As noted above, a Holder of a Claim or Interest must first have an Allowed Claim or Allowed Interest to vote.

### 9.5. **What Is an Impaired Class.**

A Class is impaired if the Plan alters the legal, equitable, or contractual rights of the Claims or Interests in that Class, other than the right to accelerate the Claim upon certain kinds of defaults. In this case, the SunCal Plan Proponents believe that all Classes, except for Class 2.1, are impaired.

### 9.6. **Who Is Not Entitled to Vote.**

The following four types of Claims are not entitled to vote: (1) Claims that have been disallowed; (2) Claims in unimpaired Classes; (3) Claims entitled to priority pursuant to Bankruptcy Code Sections 507(a)(2) or (a)(3) and Claims in Classes that do not receive or retain any value under the Plan. Claims in unimpaired Classes are not entitled to vote because such Classes are deemed to have accepted the Plan. Claims entitled to priority pursuant to Bankruptcy Code Section 507(a)(8) are not entitled to vote because such Claims are not placed in Classes and they are required to receive certain treatment specified by the Bankruptcy Code. Claims in Classes that do not receive or retain any property under the Plan do not vote because such Classes are deemed to have rejected the Plan. The Debtors believe that all Classes are entitled to vote except Class 2.1. This class is not impaired under the Plan and consequently are not entitled to vote. They are conclusively deemed to have accepted the Plan. The Interests held by the Holders in Classes 8.1, 8.2, 8.3 and 8.4 are being cancelled under the Plan; accordingly these Interest Holders are deemed to have voted to reject the Plan.

EVEN IF YOUR CLAIM IS OF THE TYPE DESCRIBED ABOVE, YOU MAY STILL HAVE A RIGHT TO OBJECT TO THE CONFIRMATION OF THE PLAN.

### 9.7. **Who Can Vote in More than One Class.**

A creditor whose Claim has been Allowed in part as a Secured Claim and in part as an Unsecured Claim is entitled to accept or reject a Plan in both capacities by casting one ballot for the secured part of the Claim and another ballot for the Unsecured Claim. Also, a Creditor may otherwise hold Claims in more than one Class (such as a Holder of Senior Secured Claims and Subordinated Note Claims), and may vote the Claims held in each Class.

MAINDOCS-#164803-v4-SunCal_3rd_Am_Group_I_VD_DS.DOC

**9.8.    Votes Necessary for a Class to Accept the Plan.**

A Class of Claims is deemed to have accepted the Plan when more than one-half (1/2) in number and at least two-thirds (2/3) in dollar amount of the Claims *that actually voted*, vote to accept the Plan.  A Class of interests is deemed to have accepted the Plan when Holders of at least two-thirds (2/3) in amount of the interest-Holders of such Class which actually vote, vote to accept the Plan.

**9.9.    Treatment of Nonaccepting Classes.**

As noted above, even if there are impaired Classes that do not accept the proposed Plan, the Court may nonetheless confirm the Plan if the nonaccepting Classes are treated in the manner required by the Code and at least one impaired Class of Claims accepts the Plan. The process by which a plan may be confirmed and become binding on non-accepting Classes is commonly referred to as "cramdown."  The Bankruptcy Code allows the Plan to be "crammed down" on nonaccepting Classes of Claims or interests if it meets all statutory requirements except the voting requirements of 1129(a)(8) and if the Plan does not "discriminate unfairly" and is "fair and equitable" with respect to each impaired Class that has not voted to accept the Plan, as set forth in 11 U.S.C. § 1129(b) and applicable case law.

**9.10.    Request for Confirmation Despite Nonacceptance by Impaired Class(es).**

The SunCal Plan Proponents will ask the Court to confirm the Plan by cramdown on any impaired Class if such Class does not vote to accept the Plan.

**X.**

**MEANS OF EXECUTION AND IMPLEMENTATION OF THE PLAN**

**10.1.    Introduction.**

This section is intended to address how the SunCal Plan Proponents intend to implement the provisions of the Plan.  It addresses the marketing and the sale of the Group I: Voluntary Projects and the Group I: Voluntary Other Assets, the transfer of the Plan Trust Assets to the Plan Trust, the nature of the Plan Trust, the powers of the Plan Trust, the governance of the Plan Trust, the resolution of disputed claims, the sources of funds that will be used to pay claims and the mechanics of how claims will be paid.

**10.2**     <u>Sale Process for the Group I: Voluntary Projects and Group I: Voluntary Other Assets During the Sales Period</u>.

The core objective of the Plan is to enable all creditors holding Allowed Claims to receive the highest dividend possible by selling the estates' primary assets, the Group I: Voluntary Projects, to the highest bidder. The process of marketing the Group I: Voluntary Projects for sale will begin, pursuant to the Confirmation Order, immediately after the entry of this order. Acquisitions shall manage the marketing process initially in its capacity as a SunCal Plan Proponent and as the Plan Trustee after the Effective Date. Furthermore, the Voluntary Debtors' Committee shall be consulted and have the opportunity to object to the sales process and request a hearing with the Bankruptcy Court.

10.2.1   <u>The Group I: Voluntary Projects Marketing and Bid Procedures.</u>

The SunCal Plan Proponents and the Plan Trustee will pursue the following sale procedures culminating into a public auction for the sale of the Group I: Voluntary Projects after the Confirmation Date and during the Sales Period.

10.2.1.1     <u>Implementation of a Marketing Program</u>. Once the Plan is confirmed, the SunCal Plan Proponents will market the Group I: Voluntary Projects for sale through a comprehensive sale effort during the Sale Period. This sale effort will include 1) sending sale packages describing each Group I Voluntary Project to the real estate brokerage community; b) advertising the Group I: Voluntary Projects for sale on a website that includes links allowing direct access to all relevant information regarding the Group I: Voluntary Projects; and c) sending packages to a list of prospects nationally who are actively seeking or may have interest in these kinds of assets.

10.2.1.2     <u>Identifying a Stalking Horse Bidder</u>. On the first business day after the Effective Date, the Plan Trustee will accept, on a provisional basis, an Opening Bid for the Group I: Voluntary Projects. The bidder whose Opening Bid is accepted for each Group I Voluntary Project will become the "Stalking Horse Bidder." The Opening Bid must be equal to the Minimum Sale Price(s) fixed in the Plan for each Group I Voluntary Project. The Plan Trustee shall also select Qualified Bidders at this time.

10.2.1.3    The Sale Contract. The sale contract that will be entered into with the Stalking Horse Bidder will include the following bankruptcy-sale related provisions:

1.    Overbid Provisions. The contract will allow the Plan Trustee to seek "overbids" from other Qualified Buyers, and to accept an Initial Overbid that exceeds the Stalking Horse Bid by the Initial Overbid Amount applicable to each Group I Voluntary Project. In the case of Ritter Ranch Project, the Initial Overbid Amount is a sum that is not less than the sum of the applicable Opening Bid, the Ritter Ranch Break-up Fee and one hundred thousand dollars ($100,000). In the case of the Bickford Ranch Project, the Initial Overbid Amount is a sum that is not less than the sum of the applicable Opening Bid, the Bickford Ranch Break-up Fee and seventy-five thousand dollars ($75,000). In the case of the Emerald Meadows Project, the Initial Overbid Amount is a sum that is not less than the sum of the applicable Opening Bid, the Emerald Meadows Break-up Fee and seventy-five thousand dollars ($75,000). In the case of the Acton Project, the Initial Overbid Amount is a sum that is not less than the sum of the applicable Opening Bid, the Acton Project Break-up Fee, and fifty thousand dollars ($50,000).

2.    Break-Up Fees. The sale contract will include a "break-up fee" provision. This fee will be payable to the Stalking Horse Bidder if the Opening Bid is overbid, and another Qualified Bidder purchases the Group I Voluntary Project(s) that is the subject of the Opening Bid.

3.    Sale Free and Clear of Liens. The sale contract will provide that the Group I Voluntary Project(s) are being sold free and clear of all monetary liens and encumbrances and that no party holding a lien against the projects, including the Lehman Lenders, may submit a "credit bid" based upon the amount allegedly owing on the claims secured by the project being sold.

10.2.1.4    The Auction.  Fourteen (14) days after the date of the selection of the Stalking Horse Bidder, the Plan Trustee will conduct a public auction wherein all Qualified Bidders who have submitted Qualified Bids for the Group I: Voluntary Projects will have the opportunity to increase their bids for these Projects. The

1  Qualified Bidder that submits the highest bid for the Project will then be designated the

2  Winning Bidder. The Winning Bidder will then have fifteen (15) days pay the Winning Bid

3  amount and the closing shall occur no later than the first business day following the

4  thirtieth (30th) day after the Effective Date.

5       10.2.2  <u>The Group I: Voluntary Other Assets Marketing and Bid Procedures.</u>

6       To the extent that the SunCal Plan Proponents believe that the Group I: Voluntary Other

7  Assets have any material value, the SunCal Plan Proponents will pursue the following process for

8  the sale of the Group I: Voluntary Other Assets after the Confirmation Date and during the Sales

9  Period:

10       1.       After the Confirmation Date, the SunCal Plan Proponents will

11       implement commercially reasonable marketing efforts for the sale of the Group I:

12       Voluntary Other Assets;

13       2.       The sales procedures will be determined by the SunCal Plan

14       Proponents after consultation with the Voluntary Debtors' Committee; and

15       3.       The sale contract will provide that the Group I: Voluntary Other

16       Assets(s) are being sold free and clear of all monetary liens and encumbrances and

17       that no party holding a lien against the Group I: Voluntary Other Assets, including

18       the Lehman Lenders, may submit a "credit bid" based upon the amount allegedly

19       owing on the claims secured by the Group I: Voluntary Other Assets being sold.

20       4.       Within seven (7) days after the Effective Date, the Plan Trustee will

21       hold a public auction for the sale of the Group I: Voluntary Assets to the bidder that

22       submits the highest and best bid.  The winning bidder will then have seven (10)

23       days to close this purchase transaction by paying the winning bid amount.

24  **10.3   <u>Establishment and Operations of the Plan Trust</u>**.

25       The Plan Trust shall be established and shall become effective on the Effective Date.  The

26  Plan Trust is created pursuant to the Plan and the Confirmation Order.  The primary purpose of the

27  Plan Trust is to consummate the sales and/or the liquidation of the Group I: Voluntary Projects and

28  the Group I: Voluntary Other Assets transferred to it and the Distribution of the Net Sales Proceeds

to Creditors, with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Plan Trust. The Plan Trust shall hold title to and administer the Plan Trust Assets, including, but not limited to, any Litigation Claims, and the proceeds thereof for liquidation and distribution in accordance with the terms of the Plan.

**10.4    Preservation and Pursuit of Litigation Claims and Recovery for the Plan Trust**.

On the Effective Date, title to and possession of all property of the Group I: Voluntary Debtors shall be deemed transferred and delivered to the Plan Trust, without further act or action under any applicable agreement, law, regulation, order or rule of law.

Pursuant to Section 1123(b)(3) of the Bankruptcy Code, the Plan Trust shall retain all Litigation Claims whether or not pending on the Effective Date that are not purchased by LitCo Unless a Litigation Claim is expressly waived, relinquished, released, sold, compromised or settled in the Plan or in a Final Order, all rights with respect to such Litigation Claims are reserved and the Plan Trustee may pursue such Litigation Claims. Notwithstanding the foregoing, the Plan Trustee shall not settle or abandon a Litigation Claim valued at greater than $100,000 except upon ten (10) days' prior written notice and opportunity to object to the proposed action. Any disputes concerning the settlement or abandonment of a Litigation Claim shall be submitted to the Bankruptcy Court for resolution on no less than ten (10) days' notice to the objecting party.

All Litigation Recoveries realized or obtained by the Plan Trustee shall be promptly deposited into the applicable Distribution Account(s). Except as otherwise provided in the Plan and the Confirmation Order, the Litigation Recoveries shall be free and clear of all Claims and Liens and shall only be expended in accordance with the provisions of the Plan.

**10.5    Payment of Plan Trust Expenses**.

The expenses incurred by the Plan Trust or the Plan Trustee during the Plan Period, shall be paid, or adequate reserves shall be created for the payment of such expenses, prior to any distribution to the Plan Trust Beneficiaries.

MAINDOCS-#164803-v4-SunCal_3rd_Am_Group_I_VD_DS.DOC

**10.6     The Plan Trust Distribution System.**

The Plan Trustee shall establish a separate "Distribution Account" for each Group I: Voluntary Debtor at an FDIC insured bank. Each Group I: Voluntary Debtor's Available Cash, whether on hand as of the Effective Date or received thereafter, shall be deposited into that Group I: Voluntary Debtor's Distribution Account.  These funds will then be used to pay the claims of Creditors holding Allowed Claims in their order of priority as provided for in the Plan.  Persons dealing with the Plan Trustee, or seeking to assert Claims against the Debtors, the Estates or the Plan Trust, shall look only to property of the Debtors, the Estates or the Plan Trust to satisfy any liability to such Persons, and the Plan Trustee shall have no corporate, personal, or individual obligation to satisfy any such liability.

**10.7     The Plan Trustee**.

**10.7.1  Appointment**.  Acquisitions shall be Plan Trustee of the Plan Trust.  The appointment of the Plan Trustee shall be effective as of the Effective Date.

**10.7.2  Term**.  Unless the Plan Trustee resigns, dissolves or is removed by Court order earlier, the Plan Trustee's term shall expire upon termination of the Plan Trust pursuant to the Plan.  In the event the Plan Trustee resigns, dies or is removed by Court order prior to termination of the Plan Trust, the UST shall select and recommend to the Court a successor Plan Trustee.

**10.7.3  Powers and Duties**.  On the Effective Date, the Plan Trustee shall have the rights, powers and duties set forth in the Plan, the Confirmation Order, and Bankruptcy Code §§505, 1107 and 1108.  The Plan Trustee shall be governed in all things by the terms of the Plan and the Confirmation Order.  The Plan Trustee shall administer the Plan Trust in accordance with the Plan.  Without limitation, the Plan Trustee shall file final federal, state, foreign and, to the extent applicable, local, tax returns.  Without further Motion, notice, or order of the Court, the Plan Trustee shall be authorized, empowered and directed to take all actions necessary to comply with the Plan and exercise and fulfill the duties and obligations arising thereunder, including, without limitation to:

1            i.      employ, retain, and replace one or more attorneys, accountants,

2 auctioneers, brokers, managers, consultants, other professionals, agents, investigators, expert

3 witnesses, consultants, and advisors as necessary to discharge the duties of the Plan Trustee under

4 the Plan;

5           ii.     control and effectuate the Claims reconciliation process, including to

6 object to, seek to subordinate, compromise or settle any and all Claims against the Debtors

7 pursuant to the terms of the Plan;

8          iii.    open, maintain and administer bank accounts as necessary to

9 discharge the duties of the Plan Trustee under the Plan;

10         iv.    make Distributions to the Holders of Allowed Claims in accordance

11 with the Plan;

12         v.     retain professionals to assist in performing his or her duties under the

13 Plan;

14         vi.    pay reasonable and necessary professional fees, costs, and expenses;

15         vii.   investigate, analyze, commence, prosecute, litigate, compromise,

16 settle, dismiss, and otherwise administer all Causes of Action and Avoidance Actions for the

17 benefit of the Plan Trust and its beneficiaries, as set forth in the Plan, and to take all other

18 necessary and appropriate steps to collect, recover, settle, liquidate, or otherwise reduce to Cash all

19 Causes of Action and Avoidance Actions, as the Plan Trustee may determine is in the best interests

20 of the Plan Trust;

21         viii.   administer, sell, liquidate, or otherwise dispose of the Assets in

22 accordance with the terms of the Plan;

23         ix.    incur and pay reasonable and necessary expenses in connection with

24 the performance of the Plan Trustee's duties under the Plan;

25         x.     represent the Estates before the Court and other courts of competent

26 jurisdiction with respect to matters concerning the Plan Trust;

27         xi.    seek the examination of any entity under the subject to the provisions

28 of Bankruptcy Rule 2004;

1                xii.     comply with applicable orders of the court and any other court of

2 competent jurisdiction over the matters set forth in the Plan;

3                xiii.    comply with all applicable laws and regulations concerning the

4 matters set forth in the Plan;

5                xiv.    exercise such other powers as may be vested in the Plan Trust

6 pursuant to the Plan, the Confirmation Order, or other Final Orders of the Court.

7                xv.     execute any documents, instruments, contracts, and agreements

8 necessary and appropriate to carry out the powers and duties of the Plan Trust;

9                xvi.    (1) seek a determination of tax liability under §505 of the code, (2)

10 pay taxes, if any, related to a Debtor, (3) file, if necessary, any and all tax and information returns

11 required with the respect to the Plan Trust, including, if appropriate, treating the Plan Trust as a

12 "grantor trust" pursuant to Treas. Reg 1.671-4 or otherwise, (4) make tax elections by and on

13 behalf of the Plan Trust, and (5) pay taxes, if any, payable by the Plan Trust; and

14                xvii.    stand in the shoes of the Debtors for all purposes.

15        **10.7.4**      **Retention of Professionals and Compensation Procedure.**

16 On and after the Effective Date, the Plan Trustee may, without further application or

17 Motion, notice, hearing, or Court order, engage or employ such professionals and experts as may

18 be deemed necessary and appropriate by the Plan Trustee to assist the Plan Trustee in carrying out

19 the provisions of the Plan, including, but not limited to, the Professionals retained prior to the

20 Effective Date by either the Debtors or the Voluntary Debtors' Committee.  The Plan Trustee may

21 employ such professionals on any reasonable terms and conditions of employment to be

22 determined by the Plan Trustee.  For the services performed on and after the Effective Date, the

23 professionals engaged by the Plan Trustee (the "Plan Trustee Professionals") shall receive

24 reasonable compensation and reimbursement of expenses in a manner to be determined by the Plan

25 Trustee.

26        **10.7.5** **Fees and Expenses.**

27 Acquisitions shall not receive any compensation for the services it performs as the Plan

28 Trustee.  The Plan Trustee Professionals shall be entitled to reasonable compensation for their

1   services, and reimbursement of expenses.  The costs and expenses of the Plan Trust (including,

2   without limitation, fees and expenses of the Plan Trustee Professionals) shall be paid from the Plan

3   Trust.  The Plan Trustee shall pay, without further order, notice or application to the Court, the

4   reasonable fees and expenses of the Plan Trustee Professionals, as necessary to discharge the Plan

5   Trustee's duties under the Plan.  The Plan Trustee shall be authorized to reserve funds from the

6   Plan Trust as is reasonable to pay the expenses of the Plan Trustee and the expenses and fees of the

7   Plan Trustee Professionals before making any Distributions under the Plan.

8   **10.7.6**    **Limitation of Liability and Indemnification.**

9   None of the Group I: Voluntary Debtors, the Voluntary Debtors' Committee, the Plan

10  Sponsor, the SunCal Plan Proponents, the Plan Trustee, the Professionals, nor any of their

11  respective members, officers, directors, shareholders, employees, or agents (the "Indemnified

12  Parties") shall be liable (a) for any loss or damages by reason of any action taken or omitted by him

13  or her, except in the case of fraud, willful misconduct, bad faith, or gross negligence, (b) for any

14  act or omission made in reliance upon the Debtors' books and records or upon information or

15  advice given to the Plan Trustee by his or her professionals, or (c) for any action taken or omission

16  made in connection with or related to the negotiations, formulation, or preparation of the Plan and

17  the Disclosure Statement, the approval of the Disclosure Statement, the confirmation of the Plan,

18  the consummation of the Plan, or the administration of the Plan, the Cases, or the property to be

19  distributed under the Plan, to the fullest extent permitted by applicable statute and case law.

20  Except as otherwise provided in this Plan, the Plan Trustee shall rely and shall be protected in

21  acting upon any resolution, certificate, statement, instrument, opinion, report, notice, consent, or

22  other document believed by him or her to be genuine and to have been signed by the proper party

23  or parties.

24  The Indemnified Parties shall be indemnified and receive reimbursement from and against

25  any and all loss, liability, expense (including attorneys' fees) or damage of any kind, type or nature,

26  which the Indemnified Party may incur or sustain the exercise and performance of any of the Plan

27  Trustee's powers and duties under this Plan or the Confirmation Order, or in the rendering of

28  services by the Indemnified Party to the Plan Trustee, to the full extent permitted by applicable

law, except if such loss, liability, expense or damage is finally determined by a court of competent

jurisdiction to result from the Plan Trustee's or an Indemnified Person's fraud, willful misconduct,

bad faith, or gross negligence.  The amounts necessary for such indemnification and

reimbursement shall be paid by the Plan Trustee out of the Plan Trust Assets.  The Plan Trustee

shall not be liable for the payment of any Plan Trust expense or claim or other liability of the Plan

Trust, and no Person shall look to the Indemnified Parties for the payment of any such expense or

liability.  This indemnification shall survive the dissolution, resignation or removal, as may be

applicable, of the Plan Trustee, or the termination of the Plan Trust, and shall inure to the benefit

of the Plan Trustee's and the Indemnified Person's heirs and assigns.

### 10.7.7  **Plan Trustee as Successor.**

Pursuant to Code §1123(b), the Plan Trustee shall be the successor to the Group I

Voluntary Debtors for all purposes.

### 10.8    **The Plan Trust Beneficiaries**.

The Holders of Allowed Claims under the Plan, or any successors to such Holders'

Allowed Claims ("Beneficiary" or "Beneficiaries") shall own a beneficial interest in the Plan Trust

which shall, subject to the Plan, be entitled to a Distribution, if any, in the amounts, and at the

times, set forth in the Plan.  Ownership of a beneficial interest in the Plan Trust shall not be

evidenced by any certificate, security, or receipt or in any other form or manner whatsoever, except

as maintained on the books and records of the Plan Trust by the Plan Trustee.  The ownership of a

beneficial interest in the Plan Trust shall not entitle any Beneficiary to any title in or to the Plan

Trust assets or to any right to call for a partition or division of such assets or to require an

accounting.  The Plan Trustee shall make Distributions, if any, to Beneficiaries in the manner

provided in the Plan.

The rights of the Beneficiaries arising under the Plan Trust may be deemed "securities"

under applicable law.  However, such rights have not been defined as "securities" under the Plan

because (a) the intent of the Plan is that such rights shall not be securities, and (b) if the rights

arising under the Plan Trust are deemed to be "securities," the exemption from registration under

§1145 of the Bankruptcy code is intended to be applicable to such securities.

**10.9    No Payment of Transfer-Related Fees to the United States Trustee**.

The Plan Trust shall not be required to pay any fees to the United States Trustee based on any transfers of the Plan Trust Assets to the Plan Trust or from the Plan Trust.

**10.10    No Payment of Transfer-Related Fees to the Plan Trustee**.

The Plan Trust shall not be required to pay any fees to the Plan Trustee based on any transfers of Plan Trust Assets from the Voluntary Debtors to the Plan Trust, or from the Plan Trust.

**10.11    Books and Records of Trust**.

The Plan Trustee, and to the extent of payments and distributions by any Disbursing Agent, the Disbursing Agent, shall maintain an accounting of receipts and disbursements of the Plan Trust. The Plan Trustee shall maintain the books and records of the Plan Trust, or provide storage for such book and records, for the longer of six (6) years, or while Plan is in existence, provided that the Court may, upon application by the Plan Trustee, authorize the Plan Trust to destroy all of the Plan Trusts books and records at such time as Plan Trust has no further need for such books and records. The Plan Trust's books and records shall be open to inspection at all reasonable times, upon written request by the Voluntary Debtors' Committee.

**10.12    Federal Income Tax Treatment of the Holders of the Plan Trust Beneficial Interests**.

For all United States federal income tax purposes, the transfers by the Group I: Voluntary Debtors shall be treated by the Group I: Voluntary Debtors, their estates, the Plan Trust and the Plan Trust Beneficiaries as a transfer of the Plan Trust Assets by the Group I: Voluntary Debtors to the Plan Trust Beneficiaries followed by a transfer of the Plan Trust Assets by such the Plan Trust Beneficiaries to the Trust. The Plan Trust Beneficiaries shall be treated as the grantors and deemed owners of the Plan Trust for United States federal income tax purposes. The Plan Trust Trustee and the Plan Trust Beneficiaries are required to value their interests in the Plan Trust Assets consistently with the values placed upon the Plan Trust Assets by the Plan Trust, and to use such valuations for all purposes. The Plan Trust Agreement shall provide for consistent valuations of the Plan Trust Assets by the Plan Trust Trustee and the Plan Trust Beneficiaries, and shall provide that the Plan Trust will determine the fair market value of the Plan Trust Assets within thirty (30) days

1    after the Effective Date, and send such determination to each the Plan Trust Beneficiary. By its

2    acceptance of a the Beneficial Interest, each recipient of such an interest will be conclusively

3    deemed to agree to use such valuations for all purposes, including, without limitation, in

4    computing any gain recognized upon the exchange of such holder's claim for purposes of

5    determining any United States Federal income tax, and shall be required to include those items of

6    income, deductions and tax credits that are attributable to its the Beneficial Interest in computing

7    its taxable income.

8        **10.13    <u>Termination of the Trust</u>.**

9        The Plan Trust shall continue in effect until the earlier of: (a) the date that all the Plan Trust

10    Assets has been liquidated, all proceeds have been converted to cash or distributed in kind, all the

11    Plan Trust Expenses have been paid, all claims to be paid under the Plan for which the Plan Trust

12    Trustee is obligated to make distributions on have been paid, all distributions to be made with

13    respect to the Beneficial Interests have been made, all litigation to which the Plan Trust is a party

14    have been concluded by dismissal or an order issued by the court in which such litigation is

15    pending and such order has become "final" (consistent with the definition of Final Order in the

16    plan for orders issued by the Bankruptcy Court), and the Chapter 11 Case has been closed; and (b)

17    the expiration of five (5) years from the Effective Date; provided, however, that the Plan Trust may

18    request the Bankruptcy Court to extend the permitted life of the Plan Trust for such additional

19    period as is reasonably necessary to conclude the liquidation and distributions, not to exceed a total

20    of ten (10) years from the Effective Date, which request shall be filed so the Bankruptcy Court may

21    consider and rule on the request within six (6) months prior to the expiration of the initial five-year

22    term.

23        **10.14    <u>Exemption from Certain Transfer Taxes</u>.**

24        In accordance with Section 1146(a) of the Bankruptcy Code, the issuance, transfer or

25    exchange of a security or the making or delivery of an instrument of transfer under the plan may

26    not be taxed under any law imposing a stamp tax or similar tax. All governmental officials and

27    agents shall forego the assessment and collection of any such tax or governmental assessment and

28

1    shall accept for filing and recordation any of the foregoing instruments or other documents without

2    payment of such tax or other governmental assessment.

3    **10.15  Tax Consequence of The Plan**.

4    The implementation of the Plan may have federal, state and local tax consequences to the

5    Group I: Voluntary Debtors, Creditors and Interest Holders.  No tax opinion has been sought or will

6    be obtained with respect to any tax consequences of the Plan. This Disclosure Statement does not

7    constitute and is not intended to constitute either a tax opinion or tax advice to any person, and the

8    summary contained herein is provided for informational purposes only.

9    CREDITORS AND INTEREST HOLDERS ARE ADVISED TO CONSULT WITH THEIR

10    OWN TAX ADVISORS REGARDING THE TAX CONSEQUENCES TO THEM AND TO THE

11    DEBTOR OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING

12    FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES.

13    **10.16  The Voluntary Debtors' Committee.**

14    On the Effective Date, the Voluntary Debtors' Committee shall continue to serve their

15    applicable Debtors as Voluntary Debtors' Committee to the applicable reorganized Debtors,

16    subject to the following:

17    **10.16.1  Duties and Powers.**

18    The duties of the Voluntary Debtors' Committee after the Effective Date shall be limited to

19    monitoring the Plan's implementation, notice and opportunity to object to the sales process, notice

20    and opportunity to object to any settlement of the Lehman Adversary Proceeding, and the Contract

21    Action, standing to object to any settlement of any Litigation Claim in excess of $100,000,

22    standing to object to any proposed sales procedures on sale of the Debtors' Projects, and standing

23    and sole and exclusive right to file, prosecute and resolve potential Avoidance Actions against and

24    objections to Claims filed by (i) SunCal Affiliates, including SunCal Management, Acquisitions,

25    and SC Master Marketing, LLC and (ii) certain professionals for the SunCal Affiliates, including

26    Voss, Cook & Thel, LLP, The MB Firm, White & Case, LLP, RBF Consulting and Mayer Brown

27    LLP.  Voluntary Debtors' Committee shall receive notice of and the right to review all payments

28    and Distributions.

1    The Voluntary Debtors' Committee shall be entitled to retain, employ and compensate

2    Professionals, in order to assist with the obligations and rights of the Voluntary Debtors'

3    Committee under the terms of the Plan.  Such compensation shall be paid from the applicable

4    Distribution Account(s).

5    ### 10.16.2  Dissolution of Voluntary Debtors' Committee.

6    The Voluntary Debtors' Committee shall be dissolved upon the entry of an order

7    converting, closing or dismissing the Chapter 11 Cases or entry of a final decree in the Chapter 11

8    Cases.  On dissolution, the Voluntary Debtors' Committee shall have no other or further

9    obligations or responsibilities on behalf of the Plan Trust.

10    ### 10.17  Claims Estimation Rights.

11    On the Confirmation Date, the SunCal Plan Proponents shall be vested with standing to file

12    a motion under 11 U.S.C. § 502(c), and they shall be authorized and empowered to seek in such

13    motion the estimation, for Distribution purposes, of any Disputed Claim seeking recourse to, or

14    claiming an interest in, any asset of the Group I: Voluntary Debtors. After the Bankruptcy Court

15    estimates a Disputed Claimant's rights in, or against an asset of the Estates through this procedure,

16    the Plan Trustee shall have the right to use any funds or assets not deemed subject to the rights of

17    the Disputed Claimant, to pay the Allowed Claims under the terms of the Plan, including Allowed

18    Administrative Claims, after the Effective Date.

19    **XI.**

20    **RISK FACTORS**

21    ### 11.1  Plan Risks.

22    The Plan in this case, like any Chapter 11 reorganization plan, includes a number of risks

23    that creditors should be aware of prior to voting on the Plan. The more material of these risks are

24    summarized below.

25    ### 11.1.1  The Plan May Not Be Accepted or Confirmed.

26    While the SunCal Plan Proponents believe that the Plan is confirmable under the

27    standards set forth in 11 U.S.C. § 1129, there can be no guarantee that the Bankruptcy Court will

28    find the Plan to be confirmable. If the Plan is not confirmed, it is possible that an alternative plan

1   can be negotiated and presented to the Bankruptcy Court for approval; however, there can be no

2   assurance that any alternative plan would be confirmed, that the Chapter 11 Cases would not be

3   converted to a liquidation, or that any alternative plan of reorganization could or would be

4   formulated on terms as favorable to the Creditors and holders of Equity Interests as the terms of the

5   Plan.

6                   **11.1.2  <u>Status of LitCo Funding</u>**

7          The offer by LitCo to purchase Allowed Reliance Claims for the sum of fifty-five cents

8   ($0.55) per dollar of claim and certain other Plan funding (*e.g.*, to make required payments to

9   Creditors holding Allowed Administrative Claims, Priority Claims and Tax Claims) will not be

10  funded by the SunCal Plan Proponents.  Instead, the SunCal Plan Proponents are working with

11  proposed investors/lenders who would provide such funding.  While the SunCal Plan Proponents

12  are in discussions with third parties with respect to obtaining funding for the SunCal Plan, no

13  commitment has yet been obtained for such funding and thus SunCal Plan Proponents are not in a

14  position to disclose the terms of such funding at this time.  There is no guarantee that such funding

15  will be obtained.

16                  **11.1.3   <u>Failure to Sell The Group I: Voluntary Projects</u>**.

17         The Plan is based upon the assumption that the SunCal Plan Proponents will be able to

18  close the sale of the Group I Projects for at least the Minimum Sales Prices on the Effective Date.

19  Although the SunCal Plan Proponents are confident that they can achieve sales at these prices

20  based upon their market research and familiarity with the projects, a possibility exists that these

21  sales will not occur. If this occurs then the creditors holding liens against the Group I Projects will

22  be entitled to seek recourse against these properties, and this recourse would include foreclosure.

23                  **11.1.4  <u>Adverse Outcome of Pending Litigation</u>.**

24         The SunCal Plan Proponents have filed objections to the claims of the Lehman Lenders,

25  and they intend to pursue the Lehman Adversary Proceeding against LCPI claims and liens once

26  they obtain relief from the automatic stay in LCPI's Chapter 11 case. The SunCal Plan Proponents

27  believe that their defenses to the claims asserted by the Lehman Lender have merits and that they

28  will be sustained and that relief will also be granted in the Lehman Adversary Proceeding.

1  However, there is no assurance that this will occur. Litigation involves risks, including most

2  importantly the risk of an adverse ruling. Although the risk of an adverse ruling will not affect

3  Holders of Class 6.1, 6.2, 6.3 and 6.4 Claims that vote in favor of Option A (55 percent

4  distribution), it will affect those that vote in favor of Option B, and it will affect the future

5  distributions payable to the Class 7.1, 7.2, 7.3 and 7.4.

6  **XII.**

7  **DISTRIBUTIONS**

8  **12.1    Distribution Agent.**

9    Acquisitions shall serve as the Distribution Agent for distributions due under the Plan.  The

10  Distribution Agent may employ one or more sub agents on such terms and conditions as it may

11  agree in its discretion and pay such sub agent as a Post Confirmation Expense from the

12  Distribution Accounts.  The Distribution Agent shall not be required to provide any bond in

13  connection with the making of any Distributions pursuant to the Plan.

14    **12.2    Distributions.**

15      **12.2.1        Dates of Distributions.**

16    Any distribution required to be made on the Effective Date shall be deemed timely if made

17  as soon as practicable after such date and, in any event, within thirty (30) days after such date.  Any

18  distribution required to be made upon a Disputed Claim becoming an Allowed Claim and no

19  longer being a Disputed Claim shall be deemed timely if made as soon as practicable thereafter.

20      **12.2.2        Limitation on Liability.**

21    Neither the Plan Sponsor, the Plan Trustee, the Distribution Agent, their Affiliates, nor any

22  of their employees, members, officers, directors, agents, or professionals or Affiliates shall be

23  liable for (i) any acts or omissions (except for gross negligence or willful misconduct) in

24  connection with implementing the Distribution provisions of the Plan and the making or

25  withholding of Distributions pursuant to the Plan, or (ii) any change in the value of distributions

26  made pursuant to the Plan resulting from any delays in making such distributions in accordance

27  with the Plan's terms (including but not limited to any delays caused by the resolution of Disputed

28  Claims).

### 12.3    Old Instruments and Securities.

#### 12.3.1    Surrender and Cancellation of Instruments and Securities.

As a condition to receiving any distribution pursuant to the Plan, each Person holding any note or other instrument or security (collectively "Instruments or Securities" and individually an "Instrument or Security") evidencing an existing Claim(s) against the Debtor(s) must surrender such Instrument or Security to the Distribution Agent.

#### 12.3.2    Cancellation of Liens.

Except as otherwise provided in the Plan, any Lien securing any Secured Claim shall be deemed released and discharged, and the Person holding such Secured Claim shall be authorized and directed to release any collateral or other property of the Debtors (including, without limitation, any cash collateral) held by such Person and to take such actions as may be requested by the Plan Trustee to evidence the release of such Lien, including, without limitation, the execution, delivery and Filing or recording of such releases as may be requested by the Plan Trustee.

#### 12.3.3    De Minimis Distributions and Fractional Shares.

No Cash payment of less than ten dollars ($10) shall be made by the Plan Trust to any Holder of Claims unless a request therefore is made in writing to the Plan Trust.  Whenever payment of a fraction of a cent would otherwise be called for, the actual payment shall reflect a rounding down of such fraction to the nearest whole cent.  Any Cash or other property that is not distributed as a consequence of this section shall, after the last distribution on account of Allowed Claims in the applicable Class, be treated as "Unclaimed Property" under the Plan.

#### 12.3.4    Delivery of Distributions.

Except as provided in the Plan with respect to Unclaimed Property, distributions to Holders of Allowed Claims and Allowed Administrative Claims shall be distributed by mail as follows:  (1) with respect to each Holder of an Allowed Claim that has filed a Proof of Claim, at the address for such Holder as maintained by the official claims agent for the Debtors; (2) with respect to each Holder of an Allowed Claim that has not filed a Proof of Claim, at the address reflected on the Schedules filed by the Debtors, provided, however, that if the Debtors or the Plan Trust has received a written notice of a change of address for such Holder, the address set forth in such

MAINDOCS-#164803-v4-SunCal_3rd_Am_Group_I_VD_DS.DOC

1   notice shall be used; or (3) with respect to each Holder of an Allowed Administrative Claim, at

2   such address as the Holder may specify in writing.

3               **12.3.5      Undeliverable Distributions.**

4           If the Distribution of Cash to the Holder of any Allowed Claim is returned to the Plan

5   Trustee as undeliverable or the Distribution check is not negotiated within 90 days of mailing (any

6   such distribution being hereinafter referred to as "Unclaimed Property"), no further distribution

7   shall be made to such Holder unless and until the Plan Trustee is notified in writing of such

8   Holder's then current address.  Subject to the remainder of this Section and the following section,

9   Unclaimed Property shall remain in the possession of the Plan Trustee pursuant to this Section, and

10  shall be set aside and (in the case of Cash) held in a segregated interest bearing account (as to Cash

11  Unclaimed Property) to be maintained by the Distribution Agent until such time as the subject

12  Distribution becomes deliverable.  Nothing contained in the Plan shall require the Plan Trustee or

13  any other Person to attempt to locate such Person.

14                                   **XIII.**

15              **OBJECTIONS TO CLAIMS AND DISPUTED CLAIMS**

16          **13.1      Standing for Objections to Claims.**

17          The Plan Trustee shall have the sole and exclusive right to file, prosecute and resolve

18  objections to Claims, except as specifically provided herein.  The Voluntary Debtors Committee

19  shall have the sole and exclusive right to file, prosecute and resolve objections to Claims filed by

20  (i) SunCal Affiliates, including SunCal Management, Acquisitions, and SC Master Marketing,

21  LLC and (ii) certain professionals for the SunCal Affiliates, including Voss, Cook & Thel, LLP,

22  The MB Firm, White & Case, LLP, RBF Consulting and Mayer Brown LLP.  Any objection to a

23  Claim shall be Filed with the Bankruptcy Court and served on the Person holding such Claim on or

24  before the applicable Claims Objection Deadline.  The Plan Trustee shall have the right to petition

25  the Bankruptcy Court, without notice or a hearing, for an extension of the Claims Objection

26  Deadline if a complete review of all Claims cannot be completed by such date.

27

28

MAINDOCS-#164803-v4-SunCal_3rd_Am_Group_I_VD_DS.DOC

13.2 **Treatment of Disputed Claims and Disputed Liens**.

13.2.1 **No Distribution Pending Allowance**.

If any portion of a Claim or Lien is a Disputed Claim or Disputed Lien, no payment or distribution provided for under the Plan shall be made on account of such Claim or Lien unless and until such Claim or Lien becomes an Allowed Claim and/or Allowed Lien, and all objections thereto have been settled or withdrawn or have been determined by Final Order, and the Disputed Claim, or some portion thereof, has become an Allowed Claim; provided, however, that if the only dispute regarding a Disputed Claim is to the amount of the Disputed Claim, the Holder of a Disputed Claim shall be entitled to a Distribution on account of that portion of the Disputed Claim which the Plan Trustee does not dispute at the time and in the manner that the Plan Trustee makes Distributions to the Holders of Allowed Claims pursuant to the provisions of the Plan

13.2.2 **Distribution After Allowance**.

On the next Distribution Date following the date on which a Disputed Claim becomes an Allowed Claim and is no longer a Disputed Claim, the Distribution Agent shall distribute to the Person holding such Claim any Cash that would have been distributable to such Person if on the initial Distribution Date such Claim had been an Allowed Claim and not a Disputed Claim.

**XIV.**

**EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

14.1 **Executory Contracts to be Assumed and Assigned**.

Under the Plans, the Group I: Voluntary Projects will be sold.  As a result, the Group I: Voluntary Debtors will assume only those executory contracts and unexpired leases to be assigned to the Winning Bidder with respect to the applicable Project and the Restructuring Agreement and Settlement Agreement.

On the Effective Date, the executory contracts and unexpired leases identified on the Schedule of Assumed and Assigned Agreements attached or to be attached hereto as Exhibit "9" or filed or to be filed as Exhibit "9" to this document shall be deemed assumed and assigned to the applicable Winning Bidder, as specified in the Confirmation Order.  The SunCal Plan Proponents

intend to file the Schedule of Assumed and Assigned Agreements with the Court no later than twenty-eight (28) days prior to the Confirmation Hearing.  The Schedule of Assumed and Assigned Agreements also identifies or will identify any amounts that must be paid to cure defaults under the executory contacts and unexpired leases to be assumed and assigned under the Plan (the "Cure Amount").  If filed earlier, the SunCal Plan Proponents reserve the right to amend the Schedule of Assumed Agreements up to twenty-eight (28) days prior to the Confirmation Hearing (October 24, 2011) to: (a) add any executory contract or unexpired lease and provide for its assumption and assignment; or (b) modify the Cure Amount for any particular executory contract or unexpired lease.  The SunCal Plan Proponents further reserve the right to amend the Schedule of Assumed Agreements to delete any executory contract or unexpired lease and provide for its rejection at any time prior to the Confirmation Hearing.  The SunCal Plan Proponents will provide notice of any amendment to the Schedule of Assumed and Assigned Agreements to any party or parties to the executory contracts or unexpired leases affected by the amendment.  Absent a timely objection as provided below, the Confirmation Order will constitute a Court Order approving the assumption and assignment, on the Effective Date, of the executory contracts and unexpired leases then identified on the Schedule of Assumed and Assigned Agreements, and shall constitute a final determination of the Cure Amount and that the estate has shown adequate assurance of future performance.  Furthermore, any Cure Amount ordered by the Court, through entry of the Confirmation Order, and paid shall be deemed to satisfy any and all defaults arising from, out of or related to the executory contract of unexpired lease, including any tort claims that were or could be asserted by the non-debtor party to the contract or lease on or prior to the entry of the Confirmation Order, and all actual or pecuniary losses that have resulted from such defaults.

If you are a party to an executory contract or unexpired lease to be assumed and assigned and you object to the assumption and assignment of your lease or contract and/or you dispute the Cure Amount related to your lease or contract, then you must File and serve upon counsels for the SunCal Plan Proponents (at the address on the upper left hand corner of the caption page) a written objection by fourteen days before the Confirmation Hearing.  An objection to the Cure Amount must also set forth the amount you contend to be the correct Cure Amount and contain evidence to

1    support such amount.  Failure to timely File an objection as provided herein shall be deemed

2    consent to the proposed assumption and assignment and to the Cure Amount and a waiver of any

3    and all rights to challenge such assumption and assignment and the Cure Amount.

4           With respect to each executory contract and unexpired lease identified on the Schedule of

5    Assumed and Assigned Agreements, if no dispute arises regarding the Cure Amount, adequate

6    assurances, or some other matter related to the assumption of the executory contact or unexpired

7    lease, then the Cure Amount set forth in the schedule of Assumed and Assigned Agreements shall

8    be paid to the applicable non-debtor party in Cash on the Effective Date or as soon as reasonably

9    practicable thereafter.  If a dispute arises regarding (a) whether the proposed assignee has provided

10   adequate assurance of future performance of an executory contract or unexpired lease to be

11   assumed, or (b) any other matter pertaining to a proposed assumption and assignment, the Cure

12   Amount will be paid on the later of (1) the Effective Date or as soon as practicable thereafter, or

13   (2) within thirty (30) days after entry of a Final order resolving the dispute and approving the

14   assumption and assignment; provided, however, if a dispute arises regarding any of the foregoing,

15   the SunCal Plan Proponents reserve, for themselves and the Plan Trustee, the right to completely

16   forego assumption and assignment of and, instead, reject the subject executory contract or

17   unexpired lease.

18          If a party to an executory contract or unexpired lease identified on the Schedule of

19   Assumed and Assigned Agreements Files an objection disputing the Cure Amount, then the

20   SunCal Plan Proponents may amend the Schedule of Assumed and Assigned Agreements at any

21   time prior to the Confirmation Hearing to delete the subject executory contract or unexpired lease

22   and provide for its rejection.  Executory contracts or unexpired leases not so deleted shall be

23   conditionally assumed, subject to the SunCal Plan Proponents' and/or the Plan Trustee's right to

24   file a Motion to determine the appropriate Cure Amount up to the first (1st) Business Day that is at

25   least sixty (60) days following the Effective Date.  The SunCal Plan Proponents and/or the Plan

26   Trustee will serve any such Motion on the party to the executory contract or unexpired lease

27   affected by the Motion (or its attorneys, if any).  If the SunCal Plan Proponents and Plan Trustee

28   does not file a Motion to determine the appropriate Cure Amount, then the executory contract or

MAINDOCS-#164803-v4-SunCal_3rd_Am_Group_I_VD_DS.DOC

1  unexpired lease shall be assumed and assigned, as of the Effective Date, and the Cure Amount

2  shall be the alternative Cure Amount asserted by the non-debtor party to the subject executory

3  contract or unexpired lease in its objection to the Plan.  The Cure Amount shall be paid as soon as

4  reasonably practicable following the expiration of the 60-day deadline.

5           If the SunCal Plan Proponents or the Plan Trustee files a Motion to determine the

6  appropriate Cure Amount, then the SunCal Plan Proponents and/or Plan Trust shall have the right

7  to amend the Schedule of Assume and Assigned Agreements to completely forego assumption and

8  assignment of and, instead, reject the subject executory contract or unexpired lease up to the first

9  (1st) Business Day that is at least fifteen (15) days after the entry of an order fixing the Cure

10  Amount.  The SunCal Plan Proponents and/or Plan Trustee will provide notice of any amendment

11  to the Schedule of Assumed and Assigned Agreements to the party to the executory contract or

12  unexpired lease affected by the amendment.  If the SunCal Plan Proponents and/or Plan Trustee

13  has filed such a Motion and does not timely amend the Schedule of Assumed and Assigned

14  Agreements within fifteen (15) days after entry of an order fixing the Cure Amount, then the

15  executory contract or unexpired lease shall be assumed and assigned, as of the Effective Date, and

16  the Cure Amount shall be fixed as the Cure Amount ordered by the Court.  The Cure Amount as

17  soon as reasonably practicable following the expiration of the 15-day deadline.

18           **14.2    <u>Executory Contracts to be Rejected</u>.**

19           On the Effective Date, the estate will be deemed to have rejected any and all executory

20  contacts and unexpired leases <u>not</u> identified on the Schedule of Assumed and Assigned

21  Agreements attached or to be attached hereto as Exhibit "9," or filed or to be filed as Exhibit "9" to

22  this document.  The Confirmation Order will constitute a Court order approving the rejection, as of

23  the Effective Date, of such executory contacts and unexpired leases.  Any Claim for damages

24  arising from the rejection under the Plan of any executory contract or unexpired lease must be filed

25  with the Court and served upon the SunCal Plan Proponents and the Plan Trustee within thirty (30)

26  days of the later of (a) the Confirmation Date, and (b) the Plan Trustee's amendment of the

27  Schedule of Assumed and Assigned Agreements to eliminate the executory contract or unexpired

28  lease.  Any such damage Claims that are not timely filed and served will be forever barred and

1 unenforceable against the applicable Debtors, the Estates, the Plan Trustee, the Plan Trust, and

2 their respective property.  Persons holding these Claims who fail to timely file claims will be

3 barred from receiving any Distributions under the Plan on account of their rejection damage

4 Claims.

5       If you are a party to a lease or contract to be rejected and you object to the rejection of your

6 lease or contract, then you must file and serve your objection by fourteen days before the

7 Confirmation Hearing.

8 **XV.**

9 **BEST INTEREST OF CREDITORS TEST AND PLAN FEASIBILITY**

10     **15.1**    **Best Interests Test**.

11       Pursuant to Section 1129(a)(7) of the Bankruptcy Code, a Plan cannot be confirmed unless

12 the Bankruptcy Court determines that Distributions under the Plan to all Holders of Claims and

13 Interests who have not accepted the plan and whose Claims are classified in Classes that are

14 impaired under the plan, are not less than those which they would receive in a liquidation under

15 Chapter 7 of the Bankruptcy Code.

16       The Best Interest of Creditors Test must be satisfied even if the Plan is accepted by each

17 impaired Class of Claims and if any Holder of an Allowed Claim objects to the Plan on such basis.

18 The Best Interests Test requires the Bankruptcy Court to find either that either (i) <u>all</u> Holders of

19 Claims in an impaired Class of Claims have accepted the Plan or (ii) the Plan provides each Holder

20 of Allowed Claims of an impaired Class who has not accepted the Plan with a recovery of property

21 of a value, as of the effective date of the Plan, that is not less than the amount that such Holder

22 would receive if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code.

23       The Plan proposed by the Plan Proponents is essentially a liquidating plan. It provides for

24 the sale of all assets of the estate for their fair market value, the collection or recovery of all other

25 assets, and for the distribution of the resulting net proceeds from the sale, in accordance with the

26 priorities provided for in the bankruptcy code and under California law. A Chapter 7 trustee

27 appointed in this case would be compelled to liquidate the Debtors' assets in the same manner as

28 provided for in the Plan and to pay out the proceeds in the same manner as provided for in the

1  Plan. Accordingly, under the terms of the Plan, each individual creditor is receiving "at least as

2  much" as such creditor would receive in a Chapter 7 case, which is all that is required under the

3  Best Interests Test.

4      Although the Lehman Entities will argue that they are being denied their "credit bid" rights

5  under the Plan, and this reduces their distribution below the level that they would receive in a

6  Chapter 7 case, this argument fails.  A credit bid right does not add or reduce the value of a

7  creditor's collateral, it simply allows a creditor holding such a right to bid against other bidders

8  using its debt as "credit", rather than bidding in cash. If the creditor's collateral is sold for its "fair

9  market value," in cash, and the creditor receives what it is entitled to from the sales proceeds, then

10 the creditor is necessarily receiving exactly what it would receive in a Chapter 7. This is all that the

11 Best Interest Test Requires.  See Exhibit "7" hereto.

12      **15.2  <u>Feasibility</u>**.

13      In addition, in order to confirm the Plan, the Bankruptcy Court must find that confirmation

14 of the Plan is not likely to be followed by the liquidation or the need for further financial

15 reorganization of the Debtor(s).  This requirement is imposed by Section 1129(a)(11) of the

16 Bankruptcy Code and is generally referred to as the "feasibility" requirement. As explained above,

17 the Debtors' Plan provides for the sale of all assets of their respective estates and for the

18 distribution of the proceeds. Within the context of the plan, feasibility is limited to having

19 sufficient funds to pay administrative and priority claims on the Effective Date and sufficient funds

20 to fund the sale of the Properties.

21      Under timeline provided for in the Plan, the Group I Voluntary Project will be sold during

22 the Sale Period. The Net Sales Proceeds from these sales, plus the proceeds of the LitCo Plan

23 Loan, will provide the Debtors the means to pay all claims, including allowed administrative and

24 priority claims on this same date. All remaining claimants will then receive what they are entitled

25 under the Plan when their claims are allowed.

26

27

28

**XVI.**

**LIMITATION OF LIABILITY**

**16.1    No Liability for Solicitation or Participation.**

As specified in Section 1125(e) of the Bankruptcy Code, entities that solicit acceptances or rejections of the Plan and/or that participate in the offer, issuance, sale, or purchase of securities offered or sold under the Plan, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, shall not be liable, on account of such solicitation or participation, for violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer, issuance, sale, or purchase of securities.

**XVII.**

**CONDITIONS TO CONFIRMATION AND**

**EFFECTIVENESS OF THE PLAN**

**17.1    Conditions Precedent to Plan Confirmation.**

The only condition precedent to confirmation of the Plan is that the Bankruptcy Court shall have entered a Confirmation Order in form and substance reasonably acceptable to the SunCal Plan Proponents.

**17.2    Conditions Precedent to Plan Effectiveness.**

The conditions precedent to the effectiveness of the Plan and the occurrence of the Effective Date is that the Confirmation Order shall be a Final Order in form and substance reasonably satisfactory to the SunCal Plan Proponents.

**XVIII.**

**RETENTION OF JURISDICTION**

Notwithstanding the entry of the Confirmation Order or the occurrence of the Effective Date, the Bankruptcy Court's jurisdiction shall not be limited under the Plan and the Bankruptcy Court's jurisdiction shall apply to the fullest extent possible under applicable law.  The Court will retain exclusive jurisdiction during the Plan payout period to resolve disputes and conflicts arising from the administration of the Plan, upon request of a party-in-interest and after notice and a hearing, including, without limitation:

1        a.      The adjudication of the validity, scope, classification, allowance, and

2   disallowance of any Claim;

3        b.      The estimation of any Claim;

4        c.      The allowance or disallowance of Professional-Fee Claims, compensation,

5   or other Administrative Expense Claims;

6        d.      To hear and determine Claims concerning taxes pursuant to Bankruptcy

7   Code §§ 346, 505, 525, and 1146;

8        e.      To hear and determine any action or proceeding brought under Bankruptcy

9   Code §§108, 510, 543, 544, 545, 547, 548, 549, 550, 551 and 553;

10        f.      To hear and determine all actions and proceedings which relate to pre-

11   confirmation matters;

12        g.      To hear and determine any issue relating to the assumption or rejection of

13   executory contracts and unexpired leases;

14        h.      To hear and determine any modification to the Plan in accordance with the

15   Bankruptcy Rules and Bankruptcy Code;

16        i.      To enforce and interpret the terms of the Plan;

17        j.      To correct any defects, cure any omissions, or reconcile any inconsistency in

18   the Plan or the Confirmation Order as may be necessary to carry out the purpose and intent

19   of the Plan;

20        k.      the entry of any order, including injunctions, necessary to enforce title,

21   rights and powers of the Plan Trust, and to impose such limitations, restrictions, terms and

22   conditions on such title, rights and powers as the Court may deem necessary including,

23   without limitation, any right of the Plan Trust to recover and liquidate assets;

24        l.      To determine the validity, extent and priority of all liens and security

25   interests against property of the Estates or the Plan Trust;

26        m.      To hear and resolve any disputes regarding employment applications and

27   professional fees;

28

MAINDOCS-#164803-v4-SunCal_3rd_Am_Group_I_VD_DS.DOC

1         n.       To hear and determine such matters and make such orders as are consistent

2 with the Plan as may be necessary to carry out the provisions thereof and to adjudicate any

3 disputes arising under or relating to any order entered by the Court in these Cases;

4         o.       The entry of an order concluding and terminating these Cases; and

5         p.       To resolve any disputes as to whether there has been a default under the

6 Plan.

7 **XIX.**

8 **MODIFICATION OR WITHDRAWAL OF THE PLAN**

9       **19.1**    **Modification of Plan.**

10 At any time prior to confirmation of the Plan, the Plan Proponents may supplement, amend

11 or modify the Plan.  After confirmation of the Plan, the Plan Proponents or Plan Trustee may (x)

12 apply to the Bankruptcy Court, pursuant to Section 1127 of the Bankruptcy Code, to modify the

13 Plan; and (y) apply to the Bankruptcy Court to remedy defects or omissions in the Plan or to

14 reconcile inconsistencies in the Plan.

15       **19.2**    **Nonconsensual Confirmation.**

16 In the event that any impaired Class of Claims or Interests shall fail to accept the Plan in

17 accordance with Section 1129(a)(8) of the Bankruptcy Code, SunCal Plan Proponents (i) may

18 request that the Bankruptcy Court confirm the Plan in accordance with Section 1129(b) of the

19 Bankruptcy Code, and (ii) in accordance with Section 16.1 of the Plan, and may modify the Plan in

20 accordance with Section 1127(a) of the Bankruptcy Code.

21 **XX.**

22 **EFFECT OF CONFIRMATION**

23       **20.1**    **Discharge.**

24 Confirmation of the Plan does not discharge the Group I: Voluntary Debtors as set

25 forth in Bankruptcy Code §1141.

26       **20.2**    **Revesting of the Assets.**

27 The Assets shall not be vested in the Group I: Voluntary Debtors on or following

28 the Effective Date, but shall be vested in the Plan Trust and continue to be subject to the

-105-

1  jurisdiction of the Court following confirmation of the Plan until such Assets are distributed to the

2  Holders of Allowed Claims in accordance with the provisions of the Plan.

3  **XXI.**

4  **MISCELLANEOUS**

5  **21.1    Payment of Statutory Fees.**

6  All quarterly fees due and payable to the Office of the United States Trustee pursuant to

7  Section 1930(a)(6) of title 28 of the United States Code shall be paid in full on or before the

8  Effective Date, or, to the extent such quarterly fees are disputed, an adequate reserve shall have

9  been established and set aside for payment in full thereof, as required by Section 1129(a)(12) of the

10  Bankruptcy Code.  The Plan Trustee shall remain responsible for timely payment of quarterly fees

11  due and payable after the Effective Date and until the Debtors' Cases are closed, to the extent

12  required by Section 1930(a)(6) of title 28 of the United States Code.

13  **21.2    Changes in Rates Subject to Regulatory Commission Approval.**

14  The Group I: Voluntary Debtors are not subject to governmental regulatory commission

15  approval of their rates.

16  **21.3    Payment Dates.**

17  Whenever any payment or distribution to be made under the Plan shall be due on a day

18  other than a Business Day, such payment or distribution shall instead be made, without interest, on

19  the immediately following Business Day.

20  **21.4    Headings.**

21  The headings used in this Disclosure Statement and in the Plan are inserted for convenience

22  only and neither constitutes a portion of this Disclosure Statement or the Plan nor in any manner

23  affect the construction of the provisions of this Disclosure Statement or the Plan.

24  **21.5    Other Documents and Actions.**

25  The Plan Trustee may execute such other documents and take such other actions as may be

26  necessary or appropriate to effectuate the transactions contemplated under the Plan.

27

28

MAINDOCS-#164803-v4-SunCal_3rd_Am_Group_I_VD_DS.DOC

**21.6    Notices.**

All notices and requests in connection with this Disclosure Statement and the Plan shall be in writing and shall be hand delivered or sent by mail addressed to:

> **To the SunCal Plan Proponents**:
> Bruce V. Cook
> General Counsel
> Authorized Agent of the SunCal Plan Proponents
> 2392 Morse Ave
> Irvine, CA 92614-6234

> **With copies to:**
> Paul J. Couchot
> Winthrop & Couchot, Professional Corporation
> 660 Newport Center Drive, Suite 400
> Newport Beach, CA 92660

> Ronald Rus
> Rus Miliband & Smith P.C.
> 2211 Michelson Drive, Seventh Floor
> Irvine, California 92612

All notices and requests to any Person holding of record any Claim or Interest shall be sent to them at their last known address or to the last known address of their attorney of record. Any such Person may designate in writing any other address for purposes of this Section, which designation will be effective on receipt.

**21.7    Governing Law.**

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), the laws of the State of California (without reference to its conflict of law rules) shall govern the construction and implementation of the Plan and any agreements, documents, and instruments executed in connection with the Plan, unless otherwise specifically provided in such agreements, documents, or instruments.

**21.8    Binding Effect.**

The Plan and all rights, duties and obligations thereunder shall be binding upon and inure to the benefit of the Plan Sponsor Debtors, the Plan Trustee, Holders of Claims, Holders of Interests, and their respective successors and assigns.

MAINDOCS-#164803-v4-SunCal_3rd_Am_Group_I_VD_DS.DOC

1    **21.9    Successors and Assigns.**

2    The rights, benefits, and obligations of any entity named or referred to in the Plan shall be

3    binding on, and shall inure to the benefit of, the heirs, executors, administrators, successors, and

4    assigns of such entity.

5    **21.10    Severability of Plan Provisions.**

6    If, prior to the Confirmation Date, any term or provision of the Plan is held by the

7    Bankruptcy Court to be illegal, impermissible, invalid, void or unenforceable, or otherwise to

8    constitute grounds for denying confirmation of the Plan, the Bankruptcy Court shall, with the

9    consent of the Debtors, have the power to interpret, modify or delete such term or provision (or

10    portions thereof) to make it valid or enforceable to the maximum extent practicable, consistent

11    with the original purpose of the term or provision held to be invalid, void or unenforceable, and

12    such term or provision shall then be operative as interpreted, modified or deleted.  Notwithstanding

13    any such interpretation, modification or deletion, the remainder of the terms and provisions of the

14    Plan shall in no way be affected, impaired or invalidated by such interpretation, modification or

15    deletion.

16    **21.11    No Waiver.**

17    The failure of the Debtors or any other Person to object to any Claim for purposes of voting

18    shall not be deemed a waiver of the Voluntary Debtors' Committee', the Debtors' or the Plan

19    Trustee's right to object to or examine such Claim, in whole or in part.

20    **21.12    Inconsistencies.**

21    In the event the terms or provisions of this Disclosure Statement are inconsistent with the

22    terms and provisions of the Plan or documents executed in connection with the Plan, the terms of

23    the Plan shall control.

24    **21.13    Exemption from Certain Transfer Taxes and Recording Fees.**

25    Pursuant to Section 1146(c) of the Bankruptcy Code, any transfers from a Debtor to the

26    Plan Trust or to any other Person or entity pursuant to the Plan, or any agreement regarding the

27    transfer of title to or ownership of any of the Debtors' real or personal property or of any other

28

MAINDOCS-#164803-v4-SunCal_3rd_Am_Group_I_VD_DS.DOC

1  interest in such property (including, without limitation, a security interest) will not be subject to

2  any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax,

3  stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or

4  recording fee, or other similar tax or governmental assessment, and the Confirmation Order will

5  direct the appropriate state or local governmental officials or agents to forego the collection of any

6  such tax or governmental assessment and to accept for filing and recordation any of the foregoing

7  instruments or other documents without the payment of any such tax or governmental assessment.

8      **21.14**   **Post-Confirmation Status Report.**

9      Within 180 days following the entry of the Confirmation Order, the Plan Trustee shall file a

10  status report with the Court explaining what progress has been made toward consummation of the

11  confirmed Plan. The status report shall be served on the United States Trustee, the twenty largest

12  unsecured creditors, and those parties who have requested special notice. Unless otherwise

13  ordered, further status reports shall be filed every 180 days and served on the same entities.

14      **21.15**   **Post-Confirmation Conversion/Dismissal.**

15      A creditor or party in interest may bring a motion to convert or dismiss the case under

16  § 1112(b), after the Plan is confirmed, if there is a default in performing the Plan. The Plan

17  Trustee reserves the right to object to any motion for conversion or dismissal. In addition, as set

18  forth in the definition of the Effective Date, the Effective Date may be further extended by order of

19  the Bankruptcy Court after notice and hearing to all parties in interest. If the Court determines

20  there is no "cause" for the extension of the Effective Date, a party in interest may move to dismiss

21  or convert the Case(s).

22      If the Court orders any of the Cases converted to Chapter 7 after the Plan is confirmed, then

23  all property that had been property of the Chapter 11 Estate, and that has not been disbursed

24  pursuant to the Plan, will revest in the Chapter 7 estate. The automatic stay will be re-imposed

25  upon the revested property, but only to the extent that relief from stay was not previously

26  authorized by the Court during this case.

27

28

MAINDOCS-#164803-v4-SunCal_3rd_Am_Group_I_VD_DS.DOC

1

**21.16    Final Decree.**

2

Once an Estate has been fully administered, as referred to in Bankruptcy Rule 3022, the

3

Plan Trustee, or other party as the Court shall designate in the Confirmation Order, shall file a

4

motion with the Court to obtain a final decree to close the Case of such Debtor.

5

Date:  August 5, 2011

6

By:  /s/ Bruce Cook
7
Bruce Cook
General Counsel, Authorized Agent for the
8
Voluntary Debtors and Acquisitions

9

**Submitted By:**

10

**WINTHROP COUCHOT**                        **RUS MILIBAND & SMITH**
11
**PROFESSIONAL CORPORATION**        **A PROFESSIONAL CORPORATION**

12

13

By: /s/ *Paul J. Couchot*
Paul J. Couchot,                                 By:    /s/ *Ronald Rus*
14
General Insolvency Counsel for              Ronald Rus, Esq.
the Voluntary Debtors                          Joel S. Miliband, Esq.
15
Counselss for SCC Acquisitions, Inc.

16

17

18

19

20

21

22

23

24

25

26

27

28

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 660 Newport Center Drive, 4th Fl., Newport Beach, CA 92660.

A true and correct copy of the foregoing document described as:  **THIRD AMENDED DISCLOSURE STATEMENT DESCRIBING THIRD AMENDED CHAPTER 11 PLANS FILED BY SUNCAL PLAN PROPONENTS IN THE CHAPTER 11 CASES OF PALMDALE HILLS PROPERTY, LLC, SUNCAL BICKFORD RANCH, LLC, SUNCAL EMERALD MEADOWS, LLC AND ACTON ESTATES, LLC [GROUP I: VOLUNTARY DEBTORS]**will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

I. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On August 5 2011, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

☒  Service information continued on attached page

II.  **SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served)**:**
On _____, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be</u> completed no later than 24 hours after the document is filed.

☐  Service information continued on attached page

III.  **SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on ____, 2011 I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on the judge <u>will be</u> completed no later than 24 hours after the document is filed.
☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| August 5, 2011 | Gretchen Crumpacker | /s/ Gretchen Crumpacker |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

- **NEF SERVICE LIST**
  Selia M Acevedo    sacevedo@millerbarondess.com, mpritikin@millerbarondess.com
- Joseph M Adams    jadams@sycr.com
- Raymond H Aver    ray@averlaw.com
- James C Bastian    jbastian@shbllp.com
- Thomas Scott Belden    sbelden@kleinlaw.com, ecf@kleinlaw.com
- John A Boyd    fednotice@tclaw.net
- Mark Bradshaw    mbradshaw@shbllp.com
- Gustavo E Bravo    gbravo@smaha.com
- Jeffrey W Broker    jbroker@brokerlaw.biz
- Brendt C Butler    bbutler@mandersonllp.com
- Andrew W Caine    acaine@pszyjw.com
- Carollynn Callari    ccallari@venable.com
- Cathrine M Castaldi    ccastaldi@rusmiliband.com
- Tara Castro Narayanan    tara.narayanan@msrlegal.com, lisa.king@msrlegal.com
- Dan E Chambers    dchambers@jmbm.com
- Shirley Cho    scho@pszjlaw.com
- Vonn Christenson    vrc@paynefears.com
- Brendan P Collins    bpcollins@bhfs.com
- Vincent M Coscino    vcoscino@allenmatkins.com, emurdoch@allenmatkins.com
- Paul J Couchot    pcouchot@winthropcouchot.com,
  pj@winthropcouchot.com;gcrumpacker@winthropcouchot.com
- Jonathan S Dabbieri    dabbieri@sullivan.com,
  hill@sullivanhill.com;mcallister@sullivanhill.com;stein@sullivanhill.com;vidovich@sullivanhill.com
- Ana Damonte    ana.damonte@pillsburylaw.com
- Vanessa S Davila    vsd@amclaw.com
- Melissa Davis    mdavis@shbllp.com
- Daniel Denny    ddenny@gibsondunn.com
- Caroline Djang    crd@jmbm.com
- Donald T Dunning    ddunning@dunningLaw.com
- Meredith R Edelman    meredith.edelman@dlapiper.com
- Joseph A Eisenberg    jae@jmbm.com
- Lei Lei Wang Ekvall    lekvall@wgllp.com
- Richard W Esterkin    resterkin@morganlewis.com
- Marc C Forsythe    kmurphy@goeforlaw.com
- Alan J Friedman    afriedman@irell.com
- Steven M Garber    steve@smgarberlaw.com
- Christian J Gascou    cgascou@gascouhopkins.com
- Barry S Glaser    bglaser@swjlaw.com
- Robert P Goe    kmurphy@goeforlaw.com,
  rgoe@goeforlaw.com;mforsythe@goeforlaw.com
- Eric D Goldberg    egoldberg@stutman.com
- Richard H Golubow    rgolubow@winthropcouchot.com, pj@winthropcouchot.com
- Michael J Gomez    mgomez@frandzel.com, efiling@frandzel.com;sking@frandzel.com
- Kelly C Griffith    bkemail@harrisbeach.com
- Matthew Grimshaw    mgrimshaw@rutan.com
- Kavita Gupta    kgupta@winthropcouchot.com

|    |    |
|----|----|
| 1  | • Asa S Hami    ahami@morganlewis.com |
|    | • Michael J Hauser    michael.hauser@usdoj.gov |
| 2  | • D Edward Hays    ehays@marshackhays.com |
|    | • Michael C Heinrichs    mheinrichs@omm.com |
| 3  | • Harry D. Hochman    hhochman@pszjlaw.com, hhochman@pszjlaw.com |
| 4  | • Jonathan M Hoff    jonathan.hoff@cwt.com |
|    | • Nancy Hotchkiss    nhotchkiss@trainorfairbrook.com |
| 5  | • Michelle Hribar    mhribar@rutan.com |
|    | • John J Immordino    john.immordino@wilsonelser.com, raquel.burgess@wilsonelser.com |
| 6  | • Lawrence A Jacobson    laj@cohenandjacobson.com |
| 7  | • Michael J Joyce    mjoyce@crosslaw.com |
|    | • Stephen M Judson    sjudson@fablaw.com |
| 8  | • Kaleb L Judy    ecf@kleinlaw.com, kjudy@kleinlaw.com |
|    | • Steven J Kahn    skahn@pszyjw.com |
| 9  | • Sheri Kanesaka    sheri.kanesaka@bryancave.com |
|    | • David I Katzen    katzen@ksfirm.com |
| 10 | • Christopher W Keegan    ckeegan@kirkland.com, |
| 11 |   gdupre@kirkland.com;alevin@kirkland.com |
|    | • Payam Khodadadi    pkhodadadi@winthropcouchot.com, pj@winthropcouchot.com |
| 12 | • Irene L Kiet    ikiet@hkclaw.com |
| 13 | • Claude F Kolm    claude.kolm@acgov.org |
|    | • Mark J Krone    mk@amclaw.com, crs@amclaw.com;amc@amclaw.com |
| 14 | • David B Lally    davidlallylaw@gmail.com |
|    | • Leib M Lerner    leib.lerner@alston.com |
| 15 | • Peter W Lianides    plianides@winthropcouchot.com, pj@winthropcouchot.com |
|    | • Charles Liu    cliu@winthropcouchot.com |
| 16 | • Kerri A Lyman    klyman@irell.com |
| 17 | • Mariam S Marshall    mmarshall@marshallramoslaw.com |
|    | • Robert C Martinez    rmartinez@mclex.com |
| 18 | • Michael D May    mdmayesq@verizon.net |
| 19 | • Hutchison B Meltzer    hmeltzer@wgllp.com |
|    | • Krikor J Meshefejian    kjm@lnbrb.com |
| 20 | • Joel S. Miliband    jmiliband@rusmiliband.com |
|    | • James M Miller    jmiller@millerbarondess.com, |
| 21 |   vgunderson@millerbarondess.com;smiller@millerbarondess.com;mpritikin@millerbarond |
| 22 |   ess.com |
|    | • Louis R Miller    smiller@millerbarondess.com |
| 23 | • Craig Millet    cmillet@gibsondunn.com, |
|    |   pcrawford@gibsondunn.com;cmillet@gibsondunn.com |
| 24 | • Randall P Mroczynski    randym@cookseylaw.com |
|    | • Mike D Neue    mneue@thelobelfirm.com, |
| 25 |   jmattiace@thelobelfirm.com;pnelson@thelobelfirm.com |
|    | • Robert Nida    Rnida@castlelawoffice.com |
| 26 | • Henry H Oh    henry.oh@dlapiper.com, janet.curley@dlapiper.com |
| 27 | • Sean A Okeefe    sokeefe@okeefelc.com |
|    | • Scott H Olson    solson@seyfarth.com |
| 28 | • Robert B Orgel    rorgel@pszjlaw.com, rorgel@pszjlaw.com |
|    | • Malhar S Pagay    mpagay@pszjlaw.com, mpagay@pszjlaw.com |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

- Ernie Zachary Park    ernie.park@bewleylaw.com
- Daryl G Parker    dparker@pszjlaw.com
- Penelope Parmes    pparmes@rutan.com
- Robert J Pfister    rpfister@ktbslaw.com
- Ronald B Pierce    ronald.pierce@sdma.com
- Katherine C Piper    kpiper@steptoe.com, smcloughlin@steptoe.com
- Cassandra J Richey    cmartin@pprlaw.net
- Debra Riley    driley@allenmatkins.com
- James S Riley    tgarza@sierrafunds.com
- Todd C. Ringstad    becky@ringstadlaw.com
- R Grace Rodriguez    ecf@lorgr.com
- Martha E Romero    Romero@mromerolawfirm.com
- Ronald Rus    rrus@rusmiliband.com
- John P Schafer    jschafer@mandersonllp.com
- John E Schreiber    jschreiber@dl.com
- William D Schuster    bills@allieschuster.org
- Christopher P Simon    csimon@crosslaw.com
- Gerald N Sims    jerrys@psdslaw.com, bonniec@psdslaw.com
- Wendy W Smith    wendy@bindermalter.com
- Steven M Speier    Sspeier@Squarmilner.com, ca85@ecfcbis.com
- Steven M Speier (TR)    Sspeier@asrmanagement.com, ca85@ecfcbis.com
- Michael St James    ecf@stjames-law.com
- Michael K Sugar    msugar@irell.com
- Cathy Ta    cathy.ta@bbklaw.com,
  Arthur.Johnston@bbklaw.com;Kenneth.Burgess@bbklaw.com
- David A Tilem    davidtilem@tilemlaw.com,
  malissamurguia@tilemlaw.com;dianachau@tilemlaw.com;kmishigian@tilemlaw.com
- James E Till    jtill@thelobelfirm.com,
  jmattiace@thelobelfirm.com;pnelson@thelobelfirm.com
- United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov
- Carol G Unruh    cgunruh@sbcglobal.net
- Annie Verdries    verdries@lbbslaw.com
- Jason Wallach    jwallach@gladstonemichel.com
- Joshua D Wayser    , kim.johnson@kattenlaw.com
- Marc J Winthrop    mwinthrop@winthropcouchot.com, pj@winthropcouchot.com
- David M Wiseblood    dwiseblood@seyfarth.com
- Brett K Wiseman    bwiseman@aalaws.com
- Dean A Ziehl    dziehl@pszjlaw.com, dziehl@pszjlaw.com
- Marc A. Zimmerman    joshuasdaddy@att.net