1  PAUL J. COUCHOT -- State Bar No. 131934
   WINTHROP COUCHOT, P.C.
2  660 Newport Center Drive, Fourth Floor
   Newport Beach, CA 92660
3  Telephone: (949) 720-4100
   Facsimile: (949) 720-4111
4  General Insolvency Counsel for
   Palmdale Hills Property, LLC et. al. (the "Voluntary Debtors")

5
   RONALD RUS - State Bar No. 67369
6  JOEL S. MILIBAND - State Bar No. 77438
   RUS MILIBAND & SMITH
7  A PROFESSIONAL CORPORATION
   2211 Michelson Drive, Seventh Floor
8  Irvine, California 92612
   Telephone: (949) 752-7100
9  Facsimile:  (949) 252-1514
   Counsel for SCC Acquisitions Inc.

10
           **UNITED STATES BANKRUPTCY COURT**
11          **CENTRAL DISTRICT OF CALIFORNIA**
             **SANTA ANA DIVISION**
12
   In re                                      | Case No. 8:08-bk-17206-ES
13 PALMDALE HILLS PROPERTY, AND ITS
   RELATED DEBTORS,                           | Jointly Administered With Case Nos.
14                                              8:08-bk-17209-ES; 8:08-bk-17240-ES;
        Joint Administered Debtors and          8:08-bk-17224-ES; 8:08-bk-17242-ES;
15         Debtors-in-Possession                8:08-bk-17225-ES; 8:08-bk-17245-ES;
                                                8:08-bk-17227-ES; 8:08-bk-17246-ES;
16 Affects:                                     8:08-bk-17230-ES; 8:08-bk-17231-ES;
                                                8:08-bk-17236-ES; 8:08-bk-17248-ES;
17 ☐ All Debtors                                8:08-bk-17249-ES; 8:08-bk-17573-ES;
   ☐ Palmdale Hills Property, LLC              8:08-bk-17574 ES; 8:08-bk-17575-ES;
18 ☒ SunCal Beaumont Heights, LLC              8:08-bk-17404-ES; 8:08-bk-17407-ES;
   ☐ SCC/Palmdale, LLC                         8:08-bk-17408-ES; 8:08-bk-17409-ES;
19 ☒ SunCal Johannson Ranch, LLC               8:08-bk-17458-ES; 8:08-bk-17465-ES;
   ☐ SunCal Summit Valley, LLC                 8:08-bk-17470-ES; 8:08-bk-17472-ES;
20                                              and 8:08-bk-17588-ES
   ☐ SunCal Emerald Meadows LLC
21 ☐ SunCal Bickford Ranch, LLC               Chapter 11 Proceedings
   ☐ Acton Estates, LLC
22 ☐ Seven Brothers LLC                       **THIRD AMENDED DISCLOSURE**
   ☐ SJD Partners, Ltd.                       **STATEMENT DESCRIBING THIRD**
23                                             **AMENDED CHAPTER 11 PLANS FILED**
   ☐ SJD Development Corp.                     **BY SUNCAL PLAN PROPONENTS IN**
24 ☐ Kirby Estates, LLC                       **THE CHAPTER 11 CASES OF SUNCAL**
   ☐ SunCal Communities I, LLC                **BEAUMONT HEIGHTS, LLC AND**
25 ☐ SunCal Communities III, LLC              **SUNCAL JOHANNSON RANCH, LLC**
   ☐ SCC Communities LLC                      **[GROUP II: VOLUNTARY DEBTORS]**
26
   ☐ North Orange Del Rio Land, LLC           Date:      July 22, 2011
27 ☐ Tesoro SF LLC                            Time:      11:00 a.m.
                                              Place:     Courtroom 5A
28

*Continued from Previous Page*

- ☐ LBL-SunCal Oak Valley, LLC
- ☐ SunCal Heartland, LLC
- ☐ LBL-SunCal Northlake, LLC
- ☐ SunCal Marblehead, LLC
- ☐ SunCal Century City, LLC
- ☐ SunCal PSV, LLC
- ☐ Delta Coves Venture, LLC
- ☐ SunCal Torrance, LLC
- ☐ SunCal Oak Knoll, LLC

# **TABLE OF CONTENTS**

**PAGE**

I.      INTRODUCTION ................................................................................................    2

II.     DEFINITIONS AND RULES OF INTERPRETATION ....................................    4
        2.1   Definitions. ..............................................................................................    4
        2.2   Rules of Construction ..............................................................................    22
        2.3   Exhibits. ..................................................................................................    23

III.    PLAN CONFIRMATION DEADLINES .............................................................    23
        3.1   Time and Place of the Confirmation Hearing. ........................................    23
        3.2   Deadline for Voting for or Against the Plan. ..........................................    23
        3.3   Deadline for Objecting to the Confirmation of the Plan. ........................    23
        3.4   Identity of Person to Contact for More Information
              Regarding the Plan. ................................................................................    24
        3.5   Disclaimer. ..............................................................................................    24

IV.     FACTUAL BACKGROUND OF THE DEBTORS .............................................    25
        4.1 The Formation of the Debtors and the Projects. ......................................    25
        4.2 Factual Circumstances Leading to the Filing of the
            Debtors' Chapter 11 Cases. ....................................................................    28
        4.3 The Group II: Voluntary Debtors' Potential Preferential Transfers. ............    35

V.      SIGNIFICANT EVENTS IN THE DEBTORS' CHAPTER 11 CASES .................    35
        5.1.  Voluntary Debtors. ..................................................................................    35
        5.2.  The Debtors' Various Motions Relating to Financing for the Projects
              and to Pay Professional Fees....................................................................    37
        5.3.  The Debtors' Disputes and Claims Against the Lehman Entities.................    39
        5.4.  The Debtor's Motion for a Stay to Suspend Certain Lehman Actions ..........    42

VI.     TREATMENT OF UNCLASSIFIED CLAIMS .................................................    42
        6.1   Introduction. ..........................................................................................    42
        6.2   Treatment of Allowed Administrative Claims. ........................................    43
        6.3   Repayment of Allowed Administrative Claims .........................................    43
        6.4   Administrative Claims Bar Date ..............................................................    43
        6.5   Treatment of Unsecured Tax Claims .......................................................    44

VII.    CLASSIFICATION OF CLAIMS AND INTERESTS ...........................................    44

VIII.   THE PLAN'S TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS.......    46

        8.1   The Plan's Treatment of Holders of Allowed Secured Real
              Property Tax Claims on the Group II: Voluntary Projects
              (Classes 1.1 and 1.2). ..............................................................................    46

        8.2   The Plan's Treatment of Mechanics Lien Claims Against

Group II: Voluntary Projects (Class 2.1). ...................................................... 47
8.3   The Plan's Treatment of Holders of Priority Claims
      (Class 3.1). ..................................................................................................... 48
      8.4    The Plan's Treatment of Holders of Allowed General
      Unsecured Claims (Class 4.1). ..................................................................... 48
8.5   The Plan's Treatment of Holders of Allowed Interests. ............................. 48

IX.   ACCEPTANCE OR REJECTION OF THE PLAN ................................................ 48
9.1.    Introduction. ................................................................................................... 48
9.2.    Who May Object to Confirmation of the Plan. ............................................ 49
9.3.    Who May Vote to Accept/Reject the Plan. .................................................. 49
9.4.    What Is an Allowed Claim/Interest. ............................................................. 49
9.5.    What Is an Impaired Class. ........................................................................... 49
9.6.    Who Is Not Entitled to Vote. ........................................................................ 49
9.7.    Who Can Vote in More than One Class. ....................................................... 50
9.8.    Votes Necessary for a Class to Accept the Plan. .......................................... 50
9.9.    Treatment of Nonaccepting Classes. ............................................................ 50
9.10.   Request for Confirmation Despite Nonacceptance by
        Impaired Class(es). ........................................................................................ 51

X.    MEANS OF EXECUTION AND IMPLEMENTATION OF THE PLAN ............... 51
10.1.   Introduction. ................................................................................................... 51
10.2    Sale Process of the Group II: Voluntary Projects During the Sale Period ..... 51
10.3    Establishment and Operations of the Plan Trust ........................................... 54
10.4    Preservation and Pursuit of Litigation Claims and Recovery
        for the Plan Trust. .......................................................................................... 54
10.5    Payment of Plan Trust Expenses ................................................................... 55
10.6    The Plan Trust Distribution System. ............................................................. 55
10.7    The Plan Trustee. ........................................................................................... 55
10.8    The Plan Trust Beneficiaries ......................................................................... 59
10.9    No Payment of Transfer-Related Fees to the
        United States Trustee. .................................................................................... 60
10.10   No Payment of Transfer-Related Fees to the Plan Trustee. .......................... 60
10.11   Books and Records of Trust. ......................................................................... 60
10.12   Federal Income Tax Treatment of the Holders of the
        Plan Trust Beneficial Interests. ..................................................................... 60
10.13   Termination of the Trust. ............................................................................... 61
10.14   Exemption from Certain Transfer Taxes. ..................................................... 62
10.15   Tax Consequence of The Plan. ...................................................................... 62
10.16   The Voluntary Debtors' Committee. ............................................................. 62
10.17   Claims Estimation Rights. ............................................................................. 63

XI.   RISK FACTORS ................................................................................................... 64
11.1    Plan Risks. ...................................................................................................... 64

XII.  DISTRIBUTIONS .................................................................................................. 64
12.1    Distribution Agent. ........................................................................................ 64
12.2    Distributions. .................................................................................................. 65

MAINDOCS-#164995-v3-SunCal_3rd_Am_Group_II_VD_DS.DOC

| | | |
|---|---|---|
| 12.3 | Old Instruments and Securities. | 65 |
| **XIII.** | **OBJECTIONS TO CLAIMS AND DISPUTED CLAIMS** | 67 |
| 13.1 | Standing for Objections to Claims. | 67 |
| 13.2 | Treatment of Disputed Claims and Disputed Liens. | 67 |
| **XIV.** | **EXECUTORY CONTRACTS AND UNEXPIRED LEASES** | 68 |
| 14.1 | Executory Contracts to be Assumed and Assigned | 68 |
| 14.2 | Executory Contracts to be Rejected. | 71 |
| **XV.** | **BEST INTEREST OF CREDITORS TEST AND PLAN FEASIBILITY** | 72 |
| 15.1 | Best Interests Test. | 72 |
| 15.2 | Feasibility. | 73 |
| **XVI.** | **LIMITATION OF LIABILITY** | 73 |
| 16.1 | No Liability for Solicitation or Participation. | 73 |
| **XVII.** | **CONDITIONS TO CONFIRMATION AND EFFECTIVENESS OF THE PLAN** | 74 |
| 17.1 | Conditions Precedent to Plan Confirmation. | 74 |
| 17.2 | Conditions Precedent to Plan Effectiveness. | 74 |
| **XVIII.** | **RETENTION OF JURISDICTION** | 74 |
| **XIX.** | **MODIFICATION OR WITHDRAWAL OF THE PLAN** | 75 |
| 19.1 | Modification of Plan. | 75 |
| 19.2 | Nonconsensual Confirmation. | 76 |
| **XX.** | **EFFECT OF CONFIRMATION** | 76 |
| 20.1 | Discharge. | 76 |
| 20.2 | Revesting of the Assets. | 76 |
| 20.3 | Exculpation and Releases | 76 |
| **XXI.** | **MISCELLANEOUS** | 77 |
| 21.1 | Payment of Statutory Fees. | 77 |
| 21.2 | Changes in Rates Subject to Regulatory Commission Approval. | 77 |
| 21.3 | Payment Dates. | 77 |
| 21.4 | Headings. | 77 |
| 21.5 | Other Documents and Actions. | 77 |
| 21.6 | Notices. | 78 |
| 21.7 | Governing Law. | 78 |
| 21.8 | Binding Effect. | 78 |
| 21.9 | Successors and Assigns. | 79 |
| 21.10 | Severability of Plan Provisions. | 79 |
| 21.11 | No Waiver. | 79 |
| 21.12 | Inconsistencies. | 79 |
| 21.13 | Exemption from Certain Transfer Taxes and Recording Fees. | 79 |

MAINDOCS-#164995-v3-SunCal_3rd_Am_Group_II_VD_DS.DOC

1

21.14  Post-Confirmation Status Report.  ................................................................  80
21.15  Post-Confirmation Conversion/Dismissal.  ....................................................  80
21.16  Final Decree.  ................................................................................................  81

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MAINDOCS-#164995-v3-SunCal_3rd_Am_Group_II_VD_DS.DOC

# I.

## **INTRODUCTION**

This Disclosure Statement[1] is filed jointly by, and the accompanying Plans are proposed respectively by, SunCal Beaumont Heights, LLC and SunCal Johannson, LLC (the "Group II: Voluntary Debtors"), in their respective Chapter 11 Cases in their capacities as debtors in possession, and by Acquisitions, as the SunCal Proponents.  In addition to being one of the SunCal Plan Proponents, Acquisitions is also the Plan Sponsor, the Plan Trustee of the Plan Trust, and the Distribution Agent for each Group III: Voluntary Debtor's Plan that is confirmed.

Chapter 11 allows debtors-in-possession, Chapter 11 trustees, and under some circumstances, creditors, interest holders and others parties in interest, to propose a Chapter 11 plan.  As stated, the Group II: Voluntary Debtors are the proponents of their respective Plans sent to you in the same envelope as this Disclosure Statement.  This document summarizes the contents of the Plans, certain information relating to the Plans and the process the Bankruptcy Court follows in determining whether or not to confirm the Plans.

In summary, the Plans provide for sale of the Beaumont Heights Project and the Johannson Ranch Project (the "Group II: Voluntary Projects"), and for the liquidation of all other assets of the Group II: Voluntary Debtors. The Net Sales Proceeds from these sales will then be distributed to Creditors holding Allowed Claims in accordance with their rights and priorities under the Bankruptcy Code and under any other applicable law. Based upon the SunCal Plan Proponents' analysis of the value of the Group II: Voluntary Projects, and the amount of Allowed Claims against the estates of the respective Group II: Voluntary Debtors, there is a reasonable likelihood that all Allowed Claims will be paid in full under the Plan.

Although substantially similar Plans are being filed in the Cases of both Group II: Voluntary Debtors, confirmation of each Plan is independent of each others. In other words, the Creditors in each Case will determine, subject to Court approval, whether the applicable Plan will be approved in their Case. Accordingly, a Plan may be confirmed in one of the Group II: Voluntary Debtors Cases, but not in the other.

---

[1] All defined terms used herein have the same meanings as set forth in Article II herein and Exhibit "1" attached hereto.

1   The Lehman Lenders have filed a competing and alternative plan of reorganization in the

2   Group II Voluntary Debtors' Cases.  Accordingly, the creditors holding claims against the Group

3   II: Voluntary Debtors will have the opportunity to vote for one plan or the other, or they can vote

4   for both plans and allow the Court to decide which plan should be approved.

5   **READ THIS DISCLOSURE STATEMENT CAREFULLY IF YOU WANT TO**

6   **KNOW ABOUT**:

7   ➢   **WHO CAN VOTE OR OBJECT TO THE PLANS;**

8   ➢   **HOW YOUR CLAIM IS TREATED;**

9   ➢   **HOW THIS TREATMENT COMPARES TO WHAT YOUR CLAIM WOULD**

10      **RECEIVE IN LIQUIDATION;**

11  ➢   **A BRIEF HISTORY OF THE DEBTORS AND SIGNIFICANT EVENTS**

12      **DURING THEIR CHAPTER 11 BANKRUPTCY PROCEEDING;**

13  ➢   **WHAT FACTORS THE BANKRUPTCY COURT WILL CONSIDER TO**

14      **DECIDE WHETHER OR NOT TO CONFIRM THE PLANS;**

15  ➢   **WHAT IS THE EFFECT OF CONFIRMATION; AND**

16  ➢   **WHETHER THE PLANS ARE FEASIBLE.**

17  This Disclosure Statement cannot tell you everything about your rights.  You should

18  consider consulting your own attorney to obtain more specific advice on how the Plans will affect

19  you and your best course of action.

20  Be sure to read the applicable Plan as well as this Disclosure Statement.  If there are any

21  inconsistencies between the applicable Plan and this Disclosure Statement, the applicable Plan

22  provisions will govern.

23  **THE BANKRUPTCY CODE REQUIRES A DISCLOSURE STATEMENT TO**

24  **CONTAIN "ADEQUATE INFORMATION" CONCERNING THE PLANS.  ON**

25  **_____, 2011, THE BANKRUPTCY COURT ENTERED AN ORDER APPROVING**

26  **THIS DISCLOSURE STATEMENT, BASED UPON A FINDING THAT THIS**

27  **DOCUMENT CONTAINED "ADEQUATE INFORMATION" TO ENABLE PARTIES**

28  **AFFECTED BY THE PLANS TO MAKE AN INFORMED JUDGMENT REGARDING**

1  **THE PLAN.  ANY PARTY CAN NOW SOLICIT VOTES FOR OR AGAINST THE**

2  **PLANS.**

3  **II.**

4  **DEFINITIONS AND RULES OF INTERPRETATION**

5  **2.1    Definitions.**

6  The following defined terms are used in this Disclosure Statement.  Any capitalized term

7  that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall

8  have the meaning ascribed to that term in the Bankruptcy Code or Bankruptcy Rules.

9  2.1.1    Acquisitions.  SCC Acquisitions, Inc., a California corporation, an indirect

10  parent company of all of the Debtors, a purported Bond Indemnitor, a Creditor of all of the

11  Debtors, a SunCal Plan Proponent, the Plan Sponsor and the proposed Plan Trustee.

12  2.1.3    Acton Estates.  Acton Estates, LLC, a Delaware limited liability, and the

13  owner of the Acton Project.

14  2.1.4    Acton Project. The Project owned by Acton Estates, located in Los Angeles

15  County, California, as more particularly described herein.

16  2.1.5    Administrative Claim(s).  Any Claim against a Group II: Voluntary Debtor

17  or its Estate  incurred after the applicable Petition Date for the applicable Group II: Voluntary

18  Debtor but before the Effective Date, for any cost or expense of administration of the Case of the

19  applicable Group II: Voluntary Debtor, which Claim is entitled to priority under section 507(a)(2)

20  or (3) of the Bankruptcy Code, including, without limitation, any fee or charge assessed against an

21  Estate of a Group II: Voluntary Debtor under section 1930 of Title 28 of the United States Code.

22  2.1.6    Administrative Claims Bar Date.  The last date fixed by the Plan for the

23  filing of requests for payment of Administrative Claims.  Under the Plan, the Administrative

24  Claims Bar Date shall be the first business day after the twenty-first (21st) day after the Effective

25  Date.

26  2.1.7    Affiliate.  The term shall have the meaning set forth under Section 101(2),

27  including, but not limited to, as to any Person, any other Person that directly or indirectly owns or

28  controls, is owned or controlled by, or is under common ownership or control with, such Person.

The term "control" (including, with correlative meanings, the terms "controlled by" and "under

common control with"), as applied to any Person, means the possession, direct or indirect, of the

power to direct or cause the direction of the management and policies of such Person, whether

through the ownership of voting securities or other equity ownership interest, by contract or

otherwise.

       2.1.8    <u>Allowed</u>.  When used to describe Claim(s) or Interest(s), such Claim(s) or

Interest(s), to the extent that it or they are "Allowed Claim(s)" or "Allowed Interest(s)."

       2.1.9    <u>Allowed Amount</u> shall mean:

       A.    With respect to any Administrative Claim (i) if the Claim is based

upon a Fee Application, the amount of such Fee Application that has been approved by a Final

Order of the Bankruptcy Court; (ii) if the Claim is based upon any indebtedness or obligation

incurred in the ordinary course of business of the Group II: Voluntary Debtors and is not otherwise

subject to an Administrative Claim Bar Date, the amount of such Claim that has been agreed to by

the Group II: Voluntary Debtors and such creditor, failing which, the amount thereof as fixed by a

Final Order of the Bankruptcy Court; or (iii) if the Holder of such Claim was required to file and

has filed proof thereof with the Bankruptcy Court prior to an Administrative Claim Bar Date,

(1) the amount stated in such proof if no objection to such Proof of Claim is interposed within the

applicable period of time fixed by the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy

Court, or (2) the amount thereof as fixed by Final Order of the Bankruptcy Court if an objection to

such proof was interposed within the applicable period of time fixed by the Bankruptcy Code, the

Bankruptcy Rules or the Bankruptcy Court.  The Allowed Amount of any Administrative Claim

which is subject to an Administrative Claims Bar Date and not filed by the applicable

Administrative Claims Bar Date shall be zero, and no distribution shall be made on account of any

such Administrative Claim;

       B.    with respect to any Claim which is not an Administrative Claim

(the "Other Claim"):  (i) if the Holder of such Other Claim did not file proof thereof with the

Bankruptcy Court on or before the Claims Bar Date, the amount of such Claim as listed in the

Group II: Voluntary Debtors'' Schedules as neither disputed, contingent nor unliquidated; or (ii) if

the Holder of such Claim has filed proof thereof with the Bankruptcy Court on or before the Claims Bar Date, (a) the amount stated in such proof if no objection to such Proof of Claim was interposed within the applicable period of time fixed by the Bankruptcy Code, the Bankruptcy Rules, the Plan or the Bankruptcy Court, or (b) the amount thereof as fixed by Final Order of the Bankruptcy Court if an objection to such proof was interposed within the applicable period of time fixed by the Bankruptcy Code, the Bankruptcy Rules, the Plan or the Bankruptcy Court.  The Allowed Amount of any Other Claim which is not Filed by the applicable Claims Bar Date, is not listed on the Group II: Voluntary Debtors' Schedules or is listed as disputed, unliquidated, contingent or unknown, and is not allowed under the terms of this Plan shall be zero, and no distribution shall be made on account of any such Claim; and

     C. with respect to any Interest, (i) the amount provided by or established in the records of the Group II: Voluntary Debtors at the Confirmation Date, provided, however, that a timely filed proof of Interest shall supersede any listing of such Interest on the records of the Group II: Voluntary Debtors; or (ii) the amount stated in a proof of Interest Filed prior to the Confirmation Date if no objection to such Interest was filed prior to the Confirmation Date or such later date as the Bankruptcy Court allows; or (iii) the amount of such Interest as fixed by a Final Order of the Bankruptcy Court.

   2.1.10 <u>Allowed Claim</u>.  Except as otherwise provided in the Plan (including with respect to those Classes for which the amount of the Allowed Claims is specified by the Plan), a Claim to the extent (and only to the extent) of the Allowed Amount of such Claim.

   2.1.11 <u>Allowed Interest</u>.  Any Interest to the extent, and only to the extent, of the Allowed Amount of such Interest.

   2.1.12 <u>Allowed Secured Claims</u>.  All or  a portion of a Secured Claim that is an Allowed Claim.

   2.1.13 <u>Allowed Unsecured Claim</u>. All or a portion of an Unsecured Claim that is an Allowed Claim.

   2.1.14 <u>Assets</u>.  All assets that are property of the Debtor(s) pursuant to Bankruptcy Code Section 541.

2.1.15    Arch.  Arch Insurance Company, a Bond Issuer.

2.1.16    Available Cash.  Each Group II: Voluntary Debtors' Cash deposited into the applicable Distribution Account(s) on or after the Effective Date that is available for making Distributions under the Plan to Holders of Allowed Administrative, Priority, and Unsecured Claims.  The Available Cash shall consist of the respective Group II: Voluntary Debtors' cash on hand as of the Effective Date that is not subject to a Disputed Lien, proceeds of Net Litigation Recoveries that are not subject to a Disputed Lien, Net Sales Proceeds that become Available Cash upon the disallowance of a Disputed Claim or avoidance of a Disputed Lien purportedly encumbering such Cash, or proceeds from the LitCo Plan Loan.  All Available Cash shall be deposited into the applicable Distribution Account(s).  Available Cash shall not include Net Sale Proceeds in the Net Sales Proceeds Account where the Disputed Secured Claims are Allowed but subject to an equitable subordination judgment.

2.1.17    Avoidance Actions.  All Claims and defenses to Claims accruing to the Group II: Voluntary Debtors and their Estates under Bankruptcy Code Sections 506(d), 510(c), 541, 544, 545, 547, 548, 549, 550, or 551.

2.1.18    Bankruptcy Code.  The United States Bankruptcy Code.

2.1.19    Bankruptcy Court.  The United States Bankruptcy Court for the Central District of California, having jurisdiction over the Cases and, to the extent of any withdrawal of the reference made pursuant to Section 157 of title 28 of the United States Code, the United States District Court for the Central District of California; or, in the event such courts cease to exercise jurisdiction over the Cases, such court or unit thereof that exercises jurisdiction over the Cases in lieu thereof.

2.1.20    Bankruptcy Rules.  Collectively, as now in effect or hereafter amended and as applicable to the Cases, (i) the Federal Rules of Bankruptcy Procedure, and (ii) the Local Bankruptcy Rules and General Orders applicable to cases pending before the Bankruptcy Court.

2.1.21    Beaumont Heights Project.  The Project owned by SunCal Beaumont, located in the City of Beaumont, California, as more particularly described herein.

1          2.1.22    <u>Beaumont Heights Break-up Fee</u>. The amount equal to 2.5% of the

2    Minimum Sales Price for the Beaumont Heights Project that will be paid to the Stalking Horse

3    Bidder that submits the Opening Bid for the Beaumont Heights Project, if such Stalking Horse

4    Bidder is not the Winning Bidder.

5          2.1.23    <u>Beneficial Interests</u>. means, collectively, the interests of the holders of

6    Allowed Unsecured Claims in the Plan Trust and in all distributions to be made by the Plan Trust

7    on account of Allowed Unsecured Claims. The Beneficial Interests (a) shall be noted in the books

8    and records of the Plan Trust, (b) shall not be evidenced by a writing, and (c) may not be

9    transferred, sold, assigned or transferred by will, intestate succession or operation of law without

10   written notification to the Plan Trustee confirming and acknowledging the transfer by both the

11   holder and the transferee.

12         2.1.24    <u>Bond Claim(s)</u>.  Any Claim against the Debtor(s) and a Bond Issuer under

13   various payment or performance bonds, and/or any claims of Bond Issuer(s) against the Debtor(s)

14   under various payment or performance bonds.

15         2.1.25    <u>Bond Claimant</u>.  Holder(s) of a Bond Claim.

16         2.1.26    <u>Bond Indemnitors</u>.  The individuals and entities that are allegedly liable on

17   the Bond Indemnification Claims, including, allegedly, all of the Debtors, Acquisitions, all

18   Affiliates of Acquisitions, and Elieff.

19         2.1.27    <u>Bond Issuer(s)</u>.  Bond Safeguard, Lexon and Arch in their capacities as

20   issuers and sureties for payment and performance bonds for the benefit of certain of the Debtors.

21         2.1.28    <u>Bond Safeguard</u>.  Bond Safeguard Insurance Company, a Bond Issuer.

22         2.1.29    <u>Business Day</u>.  Any day, other than a Saturday, a Sunday or a "legal

23   holiday," as defined in Bankruptcy Rule 9006(a).

24         2.1.30    <u>Cases</u>.  The Chapter 11 cases of the Group II: Voluntary Debtors pending

25   before the Bankruptcy Court.

26         2.1.31    <u>Cash</u>.  Currency of the United States of America and cash equivalents,

27   including, but not limited to, bank deposits, immediately available or cleared checks, drafts, wire

28   transfers and other similar forms of payment.

1          2.1.32    <u>CFD Bonds</u>.  Community facilities district bonds issued by a

2   governmental entity.

3          2.1.33    <u>Claim</u>.  This term shall have the broadest possible meaning under

4   Section 101(5) of the Bankruptcy Code, and shall include (a) any right to payment from any of the

5   Group II: Voluntary Debtors, whether or not such right is reduced to judgment, liquidated,

6   unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable,

7   secured, or unsecured, or (b) any right to an equitable remedy for breach of performance if such

8   breach gives rise to a right of payment from any of the Group II: Voluntary Debtors, whether or not

9   such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured,

10  disputed, undisputed, secured, or unsecured.

11         2.1.34    <u>Claims Bar Date</u>.  For any Claim the exceptions noted below, March 31,

12  2009, which was established by the Bankruptcy Court as the last date for creditors to file Proof of

13  Claims with the Bankruptcy Court in all of the Group II: Voluntary Debtors' cases, except for the

14  following: (a) Administrative Claims, for which the Administrative Claims Bar Date shall apply,

15  (b) claims arising from rejection of executory contracts or unexpired leases pursuant to 11 U.S.C. §

16  365, for which the last day to file a proof of claim is (i) 30 days after the date of entry of the order

17  authorizing the rejection, or (ii) March 31, 2009, whichever is later, (c) claims of "governmental

18  units," as that term is defined in 11 U.S.C. § 101(27), for which proofs of claim are timely filed if

19  filed: (i) before 180 days after the date of the Order for Relief in this case, or (ii) by March 31,

20  2009, whichever is later (11 U.S.C. § 502(b)(9)), and (d) claims arising from the avoidance of a

21  transfer under chapter 5 of the Bankruptcy Code, the last day to file a proof of claim is 30 days

22  after the entry of judgment avoiding the transfer or March 31, 2009, whichever is later.

23         2.1.35    <u>Claims Objection Deadline</u>.  The later of (i) the first business day

24  following the one hundred and eightieth (180th) day after the Effective Date, or (ii) such greater

25  period of limitation as may be fixed or extended by the Bankruptcy Court or by agreement between

26  the Plan Trustee and the Holder of the Claim.

27         2.1.36    <u>Claim Objection Reduction Amount</u>. The amount of Net Sales Proceeds

28  that is made available to the holders of Allowed Unsecured Claims due to the entry of a judgment

1  or order on a Lehman Claim Objection that disallows, reduces, or otherwise adversely modifies the

2  secured claims filed by the Lehman Lenders.

3         2.1.37  <u>Class</u>.  Each group of Claims or Interests classified in Article V of the Plan

4  pursuant to Sections 1122 and 1123 of the Bankruptcy Code.

5         2.1.38  <u>Confirmation Date</u>.  The date on which the Confirmation Order is entered

6  in the Bankruptcy Court's docket.

7         2.1.39  <u>Confirmation Order</u>.  The order entered by the Bankruptcy Court

8  confirming the Plan in accordance with the provisions of Chapter 11 of the Bankruptcy Code.

9         2.1.40  <u>Contract Action</u>. The action filed by certain Voluntary Debtors against

10  Lehman ALI, Inc., and certain other defendants, in California Superior Court for the County of

11  Orange (Case No. 30-2011-0040847-CU-BC-CJC), that was removed to the bankruptcy court as

12  Adv.  No. 8:11-ap-01212-ES, with a reservation of rights to add the Plan Trustee and/or the

13  Trustee Debtors as additional plaintiffs therein.

14         2.1.41  <u>Creditor</u>.  Any Person who is the Holder of a Claim against any Debtor

15  that arose or accrued or is deemed to have arisen or accrued or to have matured, or otherwise

16  become due, owing, and payable on or before the Petition Date, including, without limitation,

17  Claims of the kind specified in Sections 502(g), 502(h) or 502(i) of the Bankruptcy Code.

18         2.1.42  <u>Debtor(s)</u>.  Individually or collectively, the Voluntary Debtors and the

19  Trustee Debtors, as specifically defined in Exhibit "1" attached hereto.

20         2.1.43  <u>Debtor(s)-in-Possession</u>.  The Voluntary Debtor(s) in their capacity as

21  representatives of their respective Estates in their respective Chapter 11 Cases.

22         2.1.44  <u>Disclosure Statement</u>.  The document accompanying the Plan that is

23  entitled "Third Amended Disclosure Statement Describing Third Amended Chapter 11 Plan Filed

24  by SunCal Plan Proponents In The Chapter 11 Cases Of SunCal Beaumont Heights, LLC and

25  SunCal Johannson Ranch, LLC [Group II: Voluntary Debtors]," as amended and with all

26  accompanying exhibits.

27         2.1.45  <u>Disputed Claim(s)</u>.  All or any part of a Claim other than any Allowed

28  Amount thereof as to which any one of the following applies: (i) no Proof of Claim has been filed

1    with respect to such Claim, and either (a) the Claim is not listed in the Schedules; or (b) the Claim

2    is listed in the Schedules as unliquidated, disputed, contingent, unknown or in a zero amount,

3    (ii) the Claim is the subject of (a) an unresolved Litigation Claim; (b) the Claim is subject to offset

4    by a Litigation Claim; (c) a timely objection to such Claim that has not been resolved by a Final

5    Order; or (d) a request for estimation in accordance with the Bankruptcy Code, the Bankruptcy

6    Rules, any applicable order of the Bankruptcy Court, or the Plan which is Filed on or before the

7    Claims Objection Deadline, which Adversary Proceeding, objection, or request for estimation has

8    not been dismissed, withdrawn or determined by a Final Order; or (iii) the Claim is otherwise

9    treated as a "Disputed Claim" pursuant to the Plan.

10            2.1.46    Disputed Lien(s).  An asserted lien(s) against Assets of the Debtor(s) that

11    is either subject to a Disputed Secured Claim, not duly perfected, subject to an Avoidance Action,

12    or subject to an action pursuant to Bankruptcy Code Sections 510(c)(2) and/or 506(d).  However,

13    pursuant to Section 506(d)(2), a lien is not disputed merely because it secures a claim that "is not

14    an allowed secured claim due only to the failure of any entity to file a proof of such claim under

15    section 501 of this title."

16            2.1.47    Disputed Secured Claim(s). That part of a Disputed Claim that is a

17    Secured Claim.

18            2.1.48    Distribution(s).  Payments to Holders of Allowed Claims provided for

19    under the Plan.

20            2.1.49    Distribution Agent.  The entity that is responsible for making Distributions

21    under the Plan, which shall be Acquisitions.

22            2.1.50    Distribution Account(s).  Separate account(s) to be established by the Plan

23    Trustee at an FDIC insured bank into which each Group II: Voluntary Debtors' Available Cash

24    shall be deposited and all Available Cash received by the Plan Trust after the Confirmation Date.

25            2.1.51    Distribution Date.  With respect to any Allowed Claim or Allowed

26    Interest, the date on which a Distribution is required to be made under the Plan.

27            2.1.52    Effective Date. A date selected by the SunCal Plan Proponents that is not

28    later than the thirtieth (30th) calendar day after the Confirmation Date of the applicable Group II:

1    Voluntary Debtor's Plan, and provided there is no stay pending appeal of the Confirmation Order,

2    in which case the Effective Date shall be tolled until the dissolution of such stay.  The Effective

3    Date may be extended by the Bankruptcy Court after notice and hearing to all parties in interest.

4            2.1.53    Elieff.  Bruce Elieff, the president of Acquisitions, a purported Bond

5    Indemnitor with alleged corresponding indemnity Claims against the Debtors.

6            2.1.54    Estates.  The bankruptcy estates of the Group II: Voluntary Debtors

7    created pursuant to Section 541 of the Bankruptcy Code.

8            2.1.55    Fee Applications.  Applications of Professional Persons under Sections

9    330, 331 or 503 of the Bankruptcy Code for allowance of compensation and reimbursement of

10    expenses in the Cases.

11            2.1.56    Fee Claim.  A Claim under Sections 330 or 503 of the Bankruptcy Code

12    for allowance of compensation and reimbursement of expenses in the Cases.

13            2.1.57    Filed.  Delivered to, received by and entered upon the legal docket by the

14    Clerk of the Bankruptcy Court.  "File" shall have a correlative meaning.

15            2.1.58    Final Order.  A judgment, order, ruling or other decree issued and entered

16    by the Bankruptcy Court that has not been reversed, stayed, modified or amended.

17            2.1.59    General Unsecured Claim.  A Claim against a Group II: Voluntary Debtor

18    that is not (a) a Secured Claim, (b) an Administrative Claim, (c) a Tax Claim or (d) a Priority

19    Claim.

20            2.1.60    Group II: Voluntary Debtors. SunCal Beaumont Heights, LLC and SunCal

21    Johannson, LLC.

22            2.1.61    Group II: Voluntary Projects. Beaumont Heights Project and Johannson

23    Ranch Project.

24            2.1.62    Holder.  The beneficial owner of any Claim or Interest.

25            2.1.63    Initial Overbid. The Initial Overbid is the first Qualifying Bid after the

26    Opening Bid that is equal to or in excess of the Initial Overbid Amount.

27            2.1.64    Initial Overbid Amount. In the case of Beaumont Heights Project, the

28    Initial Overbid Amount is a sum that is not less than the sum of the applicable Opening Bid, the

1  Beaumont Heights Project Break-up Fee and the Minimum Increment. In the case of the Johannson

2  Ranch Project, the Initial Overbid Amount is a sum that is not less than the sum of the applicable

3  Opening Bid, the Johannson Project Break-up Fee and the Minimum Increment.

4          2.1.65   Insider.  The term shall have the broadest meaning possible under

5  Section 101(31), including, but not limited to, a person in control of the Debtor, Affiliates and

6  Insiders of such Affiliates.

7          2.1.66   Interest.  Any equity security interest in any Group II: Voluntary Debtor

8  within the meaning, of Section 101(16) of the Bankruptcy Code, including, without limitation, any

9  equity ownership interest in any of the Group II: Voluntary Debtors, whether in the form of

10  common or preferred stock, stock options, warrants, partnership interests, or membership interests.

11          2.1.67   Johannson Ranch Project.  The Project owned by SunCal Johannson,

12  located in the City of Modesto, California, as more particularly described in Exhibit 1.

13          2.1.68   Johannson Ranch Break-up Fee. The amount equal to 2.5% of the

14  Minimum Sales Price for the Johannson Ranch Project that will be paid to the Stalking Horse

15  Bidder that submits the Opening Bid for the Johannson Ranch Project, if such Stalking Horse

16  Bidder is not the Winning Bidder.

17          2.1.69   LBHI.  Lehman Brothers Holdings, Inc., a Lehman Entity, the parent

18  company of Lehman ALI and LCPI, and a Chapter 11 debtor in a bankruptcy proceeding pending

19  in the Bankruptcy Court for the Southern District of New York.

20          2.1.70   LCPI.  Lehman Commercial Paper, Inc., a Chapter 11 debtor in a

21  bankruptcy proceeding pending in the Bankruptcy Court for the Southern District of New York.

22          2.1.71   Legal Rate.  The rate of interest payable on judgments obtained in the

23  United States District Courts as set forth in 28 U.S.C. § 1961.  The rate applicable under the Plan is

24  1.44% per annum, representing the applicable rate on November 6, 2008.

25          2.1.72   Lehman Adversary Proceeding.  The Debtors' pending adversary

26  proceeding against the Lehman Lenders and/or the Lehman Successors asserting various causes of

27  action including equitable subordination, fraudulent conveyances and preferential transfers.

28          2.1.73   Lehman ALI.  Lehman ALI, Inc.

2.1.74   <u>Lehman Entities</u>.  The Lehman Lenders, the Lehman Equity Members and LBHI.

2.1.75   <u>Lehman Lenders</u>.  Lehman ALI, LCPI, Northlake Holdings, and OVC Holdings.

2.1.76   <u>Lehman Representatives</u>.  The individuals that controlled the Lehman Entities.

2.1.77   <u>Lehman 502(d) Objection</u>. A claim objection filed with respect to certain claims filed by the Lehman Lenders that based upon Section 502(d) of the bankruptcy code.

2.1.78   <u>LitCo</u>  A Delaware limited liability company that will be formed for the purpose of funding the LitCo Plan Loan.

2.1.79   <u>LitCo Plan Loan</u>.  A loan that will be made by LitCo to the extent necessary to pay Allowed Priority Claims, Allowed Administrative Claims and Post Confirmation Expenses incurred by the Plan Trust, the Plan Trustee and its professionals and to the Voluntary Debtors' Committee and its professionals if no other source is available from the applicable Group II: Voluntary Debtor's Assets.

2.1.80   <u>Litigation Claims</u>.   Any and all interests of the Group II: Voluntary Debtors in any and all Claims, rights, causes of action, and objections or defenses to Claims, liens, rights, or causes of action which have been or may be commenced by the Group II: Debtor(s), or the Voluntary Debtors' Committee as the case may be, including, but not limited to, any (i) Avoidance Actions; (ii) for turnover of property to the Group II: Voluntary Debtors' Estates and/or the Plan Trust; (iii) for the recovery of property or payment of money that belongs to the Debtors' Estates or the Plan Trust; (iv) the right to compensation in the form of damages, recoupment or setoff of the Debtors' Estates and/or the Plan Trust; (v) the Lehman Adversary Proceeding; (vi) the Contract Action, and (vii) any and all other Claims against Lehman's Disputed Claims and/or Disputed Liens referenced in the Plan or the Disclosure Statement.

2.1.81   <u>Litigation Recoveries</u>.  Any Cash or other property received by the Chapter 11 Trustee, the Group II: Voluntary Debtors, the Voluntary Debtors' Committee and/or the Plan Trust, as the case may be, from all or any portion of a Litigation Claim(s), including, but not

-14-

1  limited to, awards of damages, attorneys' fees and expenses, interest and punitive damages,

2  whether recovered by way of settlement, execution on judgment or otherwise.

3        2.1.82  <u>Litigation Rights</u>. Any Claims held by a party against the Group II:

4  Voluntary Debtors, and if applicable, against third parties arising or relating to the Claim against

5  the applicable Group II Voluntary Debtor, that have not been fixed in a final judgment prior to the

6  Effective Date.

7        2.1.83  <u>Maximum Distribution</u>.  A Distribution to a Holder of an Allowed

8  Unsecured Claim against a Group II: Voluntary Debtor equal to one hundred percent (100%) of the

9  amount of the Holder's Allowed General Unsecured Claim plus interest at the Legal Rate from and

10  as of the Group II: Voluntary Debtor's Petition Date.

11        2.1.84  <u>MB Firm</u>.  Miller Barondess, LLP.

12        2.1.85  <u>Mechanic Lien Claims</u>.  Mechanic Lien Claims arising pursuant to

13  California Civil Code §3110, et seq. that were either allegedly perfected prepetition or otherwise

14  allegedly satisfy the requirements of Bankruptcy Code 546(b).

15        2.1.86  <u>Minimum Increment</u>.  Minimum Increment applicable to the sales of the

16  Group II: Voluntary Projects are the following: twenty-five thousand dollars ($25,000) for the

17  Beaumont Heights Project and fifteen thousand dollars ($15,000) for the Johannson Ranch Project.

18        2.1.87  <u>Minimum Sale Price</u>. The minimum gross sale price that must be paid for

19  each Group II Project before such projects can be sold pursuant to the Plan, which prices are the

20  following: Beaumont Height Project - $900,000, and Johannson Ranch Project - $600,000.

21        2.1.88  <u>Net Litigation Recoveries</u>.  Litigation Recoveries less associated

22  Administrative Claims and Post-Confirmation Expenses incurred in connection with such

23  Litigation Recoveries.

24        2.1.89  <u>Net Sales Proceeds</u>.  The Cash generated from the sale(s) or liquidation of

25  the Group II: Voluntary Debtor(s)' Assets or the Plan Trust's Assets, less payment of selling

26  expenses, taxes, Chapter 11 Trustee fees, and any associated Post-Confirmation Expenses and

27  Administrative Claims incurred in furtherance of such sales or liquidation of such Assets.

28

1       2.1.90 <u>Net Sales Proceeds Account(s)</u>.  Separate account(s) that will be

2    established by the Plan Trustee at an FDIC insured bank into which all Net Sale Proceeds shall be

3    deposited from the sale of Assets that were allegedly encumbered by a Disputed Secured Claim(s)

4    and/or a Disputed Lien(s).  There shall be a separate Net Sales Proceeds Account for the Net Sale

5    Proceeds allegedly subject to each Disputed Secured Claim(s) and/or Disputed Lien(s), except

6    where there are two Disputed Liens on a single Project, in which case, there shall be a single

7    account for the proceeds generated from that Project.  The Disputed Secured Claim(s) and/or

8    Disputed Lien(s) shall attach to the corresponding Net Sales Proceeds Account(s) pending any

9    Final Order(s) of the Bankruptcy Court resolving the applicable Disputed Secured Claim(s) and/or

10   applicable Disputed Lien(s).  To the extent that a particular Disputed Claim is disallowed or a

11   particular Disputed Lien is avoided (other than transferred to the Estates pursuant to Bankruptcy

12   Code Section 510(c)(2)) or otherwise invalidated, such Net Sales Proceeds allegedly subject

13   thereto shall become Available Cash and shall be transferred to the applicable Distribution

14   Account(s).  To the extent that a particular Disputed Secured Claim and a Disputed Lien are

15   allowed and deemed valid but subject to the equitable subordination causes of action in the

16   Lehman Adversary Proceeding, the funds shall remain in the Net Sales Accounts pending a Final

17   Order on the equitable subordination causes of action in the Lehman Adversary Proceeding.

18      2.1.91 <u>Opening Bid</u>.  Opening Bid means the offer by a Qualified Bidder for one,

19   or both of the Group II: Voluntary Projects, which is equal to the Minimum Sale Price(s) accepted

20   by the Debtor for either one or both of the Group II: Voluntary Projects.

21      2.1.92 <u>Orders for Relief Date</u>.  The following are dates that orders for relief were

22   entered for each of the Trustee Debtors:

| | |
|---|---|
| SunCal Oak Valley | January 6, 2009 |
| SunCal Heartland | January 6, 2009 |
| SunCal Northlake | January 6, 2009 |
| SunCal Marblehead | January 6, 2009 |
| SunCal Century City | January 6, 2009 |
| SunCal PSV | January 6, 2009 |
| Delta Coves | January 6, 2009 |
| SunCal Torrance | January 6, 2009 |
| SunCal Oak Knoll | January 6, 2009 |

2.1.93    <u>Person</u>.  An individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, governmental authority, governmental unit, committee or other entity of whatever nature.

2.1.94    <u>Petition Dates</u>.  The following are dates that each of the Voluntary Debtors filed their Voluntary Chapter 11 petitions or Creditors filed involuntary Chapter 11 petitions against the Trustee Debtors:

| | |
|---|---|
| Palmdale Hills | November 6, 2008 |
| SunCal Beaumont | November 6, 2008 |
| SCC Palmdale | November 7, 2008 |
| SunCal Johannson | November 7, 2008 |
| SunCal Summit Valley | November 7, 2008 |
| SunCal Emerald | November 7, 2008 |
| SunCal Bickford | November 7, 2008 |
| Acton Estates | November 7, 2008 |
| Seven Brothers | November 7, 2008 |
| SJD Partners. | November 7, 2008 |
| SJD Development | November 7, 2008 |
| Kirby Estates | November 7, 2008 |
| SunCal I | November 7, 2008 |
| SunCal III | November 7, 2008 |
| SCC Communities | November 19, 2008 |
| Del Rio | November 19, 2008 |
| Tesoro | November 19, 2008 |
| Delta Coves Ventures, LLC | November 14, 2008 |
| SunCal Heartland, LLC | November 12, 2008 |
| SunCal Marblehead, LLC | November 12, 2008 |
| LB-L-SunCal Northlake, LLC | November 12, 2008 |
| LB-L-SunCal Oak Valley, LLC | November 12, 2008 |
| SunCal Century City, LLC | November 14, 2008 |
| SunCal PSV, LLC | November 14, 2008 |
| SunCal Torrance Properties, LLC | November 14, 2008 |
| SunCal Oak Knoll, LLC | November 19, 2008 |

2.1.95    <u>Plan(s)</u>.  The Chapter 11 Plan for the Group II: Voluntary Debtors together with the Exhibits thereto, as the same may be amended or modified from time to time in accordance with the Plan.

2.1.96    <u>Plan Period</u>. The period from the Effective Date to the Plan Termination Date.

1        2.1.97    <u>Plan Termination Date</u>. The fifth (5th) anniversary date of the Effective

2   Date, unless the Plan elects and earlier date.

3        2.1.98    <u>Plan Sponsor</u>.  The entity that has committed to cause and/or arrange the

4   funding of certain specified obligations under the Plan on or after the Effective Date.  The Plan

5   Sponsor is Acquisitions.

6        2.1.99    <u>Plan Trust</u>.  A liquidating trust to be established prior to or on the

7   Effective Date, with Acquisitions as the Plan Trustee and the Holders of Allowed Claims against

8   the Debtors as the beneficiaries. The purpose of the Plan Trust will be to liquidate the Debtors'

9   Assets (other than Assets that are excluded by the Plan Trustee on the grounds that they lack value

10   or would be difficult to administer) and to otherwise consummate the Plan.

11        2.1.100    <u>Plan Trustee</u>. The Plan Trustee under the Plan Trust is Acquisitions.

12        2.1.101    <u>Plan Trust Beneficiaries</u>. The Plan Trust Beneficiaries are (i) the holders

13   of Beneficial Interests, as of any point in time, and (ii) holders of Allowed Claims that shall be

14   satisfied from Plan Trust Asset in accordance with the terms of the Plan.

15        2.1.102    <u>Plan Trust Asset</u>. Plan Trust Asset means all property within the Chapter

16   11 estates of the Group II: Voluntary Debtors.

17        2.1.103    <u>Post-Confirmation Expenses</u>.  The fees and expenses incurred by the Plan

18   Trust, the Plan Trustee and the Voluntary Debtors' Committee and their professionals following

19   the Confirmation Date (including the fees and costs of Professionals) for the purpose of

20   (i) prosecuting and liquidating the Litigation Claims; (ii) objecting to and resolving Disputed

21   Claims and Disputed Liens; (iii) selling or otherwise liquidating the Plan Trust's Assets;

22   (iv) effectuating Distributions under the Plan; and (v) otherwise consummating the Plan and

23   closing the Group II: Voluntary Debtors' Chapter 11 Cases.

24        2.1.104    <u>Priority Claim</u>.  Any Claim, other than an Administrative Claim or a Tax

25   Claim, to the extent entitled to priority under Section 507(a) of the Bankruptcy Code.

26        2.1.105    <u>Pro Rata</u>.  Proportionately, so that with respect to any distribution in

27   respect of any Allowed Claim, the ratio of (a)(i) the amount of property distributed on account of

28   such Allowed Claim to (ii) the amount of such Allowed Claim, is the same as the ratio of (b)(i) the

MAINDOCS-#164995-v3-SunCal_3rd_Am_Group_II_VD_DS.DOC

1    amount of property distributed on account of all Allowed Claims of the Class or Classes sharing in

2    such distribution to (ii) the amount of all Allowed Claims in such Class or Classes.

3            2.1.106    Professional.  A Person or Entity (a) employed by the Group II: Voluntary

4    Debtors, the Voluntary Debtors' Committee pursuant to a Final Order in accordance with Sections

5    327 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to the

6    Effective Date, pursuant to Sections 327, 328, 329, 330 and 331 of the Bankruptcy Code, or (b) for

7    which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to

8    Section 503(b) of the Bankruptcy Code.

9            2.1.107    Professional Fees.  All Allowed Claims for compensation and for

10   reimbursement of expenses under Sections 328, 330 and/or 503(b) of the Bankruptcy Code

11           2.1.108    Projects.  The Debtors' residential real estate development projects and

12   other assets as separately defined herein and described in Exhibit "1" to the Disclosure Statement.

13           2.1.109    Qualifying Bid.  Qualifying Bid means, with respect to any bid on a

14   Group II Voluntary Debtor Project, a bid made by Qualifying Bidder that is A) equal to or in

15   excess of the Initial Overbid Amount, unless it is the Initial Overbid, or B) in excess of the

16   immediately preceding Qualifying Bid by the Minimum Increment, if it is not the Initial Overbid.

17           2.1.110    Qualifying Bidder.  Qualifying Bidder means a bidder who a) has

18   deposited the sum of thirty thousand dollars ($30,000) into an escrow designated by the SunCal

19   Plan Proponents in the case of a bid for the Beaumont Heights Project, twenty thousand dollars or

20   ($20,000) in the case of a bid for the Johannson Ranch Project; b) agreed that this sum will be

21   forfeited as liquidated damages if such bidder fails to perform; and c) who has provided the SunCal

22   Plan Proponents evidence confirming that such bidder has the financial means to acquire the

23   applicable Group II: Voluntary Project(s) that such bidder is seeking to acquire.

24           2.1.111    Sale Period.  For each Group II: Voluntary Debtor's Plan(s), the Sale

25   Period is the time period during which the SunCal Plan Proponents must consummate a sale or

26   liquidation of the Group II: Voluntary Projects. The Sale Period shall commence on the

27   Confirmation Date and shall expire on the thirtieth (30th) day after the Effective Date, unless

28   extended by the Bankruptcy Court after notice and hearing.

1          2.1.112    <u>SCC LLC</u>.  SCC Acquisitions LLC, a limited liability company, a

2  subsidiary of Acquisitions and an indirect and/or a direct parent company of all of the Debtors.

3          2.1.113    <u>Schedules</u>.  The schedules of assets and liabilities and list of equity

4  security holders Filed by the Group II: Voluntary Debtors, as required by Section 521(1) of the

5  Bankruptcy Code, Bankruptcy Rules 1007(a)(3) and (b)(1), and Official Bankruptcy Form No. 6,

6  as amended from time to time.

7          2.1.114    <u>Secured Claim</u>.  Any Claim, including interest, fees, costs, and charges to

8  the extent allowable pursuant to Bankruptcy Code Section 506, that is secured by a valid and

9  unavoidable Lien on the Group II: Voluntary Debtor(s)' Assets.

10         2.1.115    <u>Stalking Horse Bidder</u>.  The Qualified Bidder who submits the Opening

11  Bid.

12         2.1.116    <u>SunCal</u>.  The SunCal Companies, a trade name for Acquisitions and its

13  Affiliates.

14         2.1.117    <u>SunCal I</u>. SunCal Communities I, LLC, a Delaware limited liability

15  company, a Voluntary Debtor herein, and the owner of the equity membership interests in Acton

16  Estates, SunCal Bickford, SunCal Beaumont, SunCal Summit Valley, SunCal Johannson and

17  SunCal Emerald.

18         2.1.118    <u>SunCal Communities I Loan Agreement</u>.  The loan agreement by and

19  among (i) SunCal I and SunCal III, as borrowers and (ii) LCPI, as administrative agent and lender,

20  pursuant to which LCPI made a loan to SunCal I and SunCal III, as borrowers in the maximum

21  aggregate principal amount of approximately $395,313,713.37.  The loan agreement is allegedly

22  secured by (a) alleged first-priority deeds of trust on the SunCal Bickford, the Acton Estates, and

23  the SunCal Emerald Projects, (b) an alleged pledge of SunCal I's Allowed Interest in Acton

24  Estates, SunCal Summit, SunCal Beaumont, SunCal Johannson, SunCal Emerald, and SunCal

25  Bickford; and (c) an alleged pledge of SunCal Summit's Allowed Interest in Seven Brothers and

26  Kirby.  The SunCal Communities I Loan Agreement has an alleged balance due of

27  $343,221,391.06 as of March 30, 2009.

28

1    2.1.119 <u>SunCal Management</u>.  SunCal Management, LLC, a Delaware limited

2 liability company, and the former property manager for the Projects, which has been succeeded by

3 Argent Management.

4    2.1.120 <u>SunCal Plan Proponents</u>.  The Group II: Voluntary Debtors, in their

5 capacity as debtors and debtors in possession in their respective Chapter 11 cases, and Acquisitions

6 as a creditor and party-in-interest, that are proposing the Plans.

7    2.1.121 <u>Tax</u>.  Any tax, charge, fee, levy, impost or other assessment by any

8 federal, state, local or foreign taxing authority, including, without limitation, income, excise,

9 property, sales, transfer, employment, payroll, franchise, profits, license, use, ad valorem,

10 estimated, severance, stamp, occupation and withholding tax.  "Tax" shall include any interest or

11 additions attributable to, or imposed on or with respect to such assessments.

12    2.1.122 <u>Tax Claim</u>.  Any Claim for any Tax to the extent that it is entitled to

13 priority in payment under Section 507(a)(8) of the Bankruptcy Code.

14    2.1.123 <u>Trustee Debtor(s)</u>. The following Debtors, individually or collectively,

15 that are represented by the Chapter 11 Trustee: Delta Coves, SunCal Heartland, SunCal

16 Marblehead, SunCal Northlake, SunCal Oak Valley, SunCal Century City, SunCal PSV, SunCal

17 Torrance, and SunCal Oak Knoll.

18    2.1.124 <u>Unpaid Secured Real Property Tax Claims</u>.  Secured Claims held by

19 various government entities secured by liens on the underlying real properties owned by the

20 Debtors but that are non-recourse to the Debtors.

21    2.1.125 <u>Unsecured Claim</u>. An Unsecured Claim is any Claim that is not an

22 Administrative Claim, Tax Claim, Secured Claim, or Priority Claim.

23    2.1.126 <u>Voluntary Debtor(s)</u>.  The following  Chapter 11 debtors and debtors-in-

24 possession, individually or collectively, Palmdale Hills, SunCal I, SunCal III, SCC Palmdale,

25 Acton Estates, SunCal Beaumont, SunCal Emerald, SunCal Johansson, SunCal Bickford, SunCal

26 Summit, Seven Brothers, Kirby Estates, SJD Partners, SJD Development, SCC Communities, Del

27 Rio and Tesoro.

28

1         2.1.127    <u>Voluntary Debtors' Committee</u>.  The Official Committee of Unsecured

2 Creditors of the Voluntary Debtors appointed in the Cases pursuant to Section 1102 of the

3 Bankruptcy Code.

4         2.1.128    <u>Winning Bid</u>. The highest and best Qualifying Bid received for the

5 Beaumont Heights Project and/or  the Johannson Ranch Project.

6         2.1.129    <u>Winning Bidder</u>.  The party that submits the highest Qualifying Bid that

7 is accepted by the applicable Group II: Voluntary Debtor.

8     **2.2**    **<u>Rules of Construction</u>.**

9     For purposes of the Plan and this Disclosure Statement, unless otherwise provided herein or

10 in the Plan, (a) whenever from the context it is appropriate, each term, whether stated in the

11 singular or the plural, will include both the singular and the plural; (b) each pronoun stated in the

12 masculine, feminine or neuter includes the masculine, feminine and neuter; (c) any reference in the

13 Plan or this Disclosure Statement to an existing document or schedule filed or to be filed means

14 such document or schedule, as it may have been or may be amended, modified or supplemented

15 pursuant to the Plan; (d) any reference to an entity as a Holder of a Claim or Interest includes that

16 entity's successors and assigns; (e) except as otherwise indicated herein all references in the Plan

17 or this Disclosure Statement to Sections, Articles and Exhibits are references to Sections, Articles

18 and Exhibits of or to the Plan; (f) the words "therein," "thereunder" and "thereto" refer to the Plan

19 in its entirety rather than to a particular portion of the Plan; and (g) unless otherwise provided in

20 the Plan or this Disclosure Statement, any reference in the Plan or this Disclosure Statement to a

21 contract, instrument, release, indenture, agreement, or other document being in a particular form or

22 on particular terms and conditions means that such document shall be substantially and materially

23 in such form or substantially and materially on such terms and conditions; (h) any reference in the

24 Plan or this Disclosure Statement to a document, schedule, or exhibit to the Plan or Disclosure

25 Statement Filed or to be Filed means such document, schedule, or exhibit, as it may have been or

26 may be amended, modified, or supplemented; and (i) the rules of construction set forth in Section

27 102 of the Bankruptcy Code shall apply to the extent such rules are not inconsistent with the

28 express terms of the Plan or this Disclosure Statement or any other provision in this Section 2.2.

**2.3** **Exhibits.**

All Exhibits to the Plan are incorporated into and are a part of the Plan as if set forth in full therein.

### III.

### PLAN CONFIRMATION DEADLINES

The Bankruptcy Court has not confirmed any of the Plan(s) described in this Disclosure Statement.  Accordingly, the terms of the Plan are not binding on anyone.  However, if the Bankruptcy Court confirms one or both of the Plan(s), then the Plan(s) will be binding on the applicable Debtor(s), the Plan Trustee, and on all Creditors and Interest Holders in such Cases.

**3.1** **Time and Place of the Confirmation Hearing.**

The hearing where the Bankruptcy Court will determine whether or not to confirm the Plan will take place at 411 West Fourth Street, Santa Ana, CA 92701-4593 on October 24, 2011, at 9:30 a.m. in Courtroom 5A.

**3.2** **Deadline for Voting for or Against the Plan(s).**

If you are entitled to vote, it is in your best interest to timely vote on the enclosed ballot and return the ballot to:

> Winthrop Couchot Professional Corporation
> 660 Newport Center Drive, Suite 400
> Newport Beach, CA 92660
> Facsimile:  (949) 720-4111
> Attn:  P.J. Marksbury

Your ballot must be **received by**  September 26, 2011**,** or it will not be counted.

**3.3** **Deadline for Objecting to the Confirmation of the Plan.**

Objections to the confirmation of the Plan must be filed with the Bankruptcy Court, and served upon the following parties so that they are received by September 26, 2011:

| | |
|---|---|
| **Counsel to the Group II:** **Voluntary Debtors** | Paul J. Couchot Winthrop Couchot Professional Corporation 660 Newport Center Drive, Suite 400, Newport Beach, CA 92660 |
| **Authorized Agent for the** **Group II: Voluntary** | Bruce V. Cook General Counsel |

| | | |
|---|---|---|
| **Debtors** | | 2392 Morse Ave<br>Irvine, CA 92614-6234 |
| **Counsel for SunCal<br>Management LLC and<br>SCC Acquisitions Inc**. | | Ronald Rus<br>Rus Miliband & Smith P.C.<br>2211 Michelson Drive, Seventh Floor<br>Irvine, California 92612 |
| **Authorized Agent for<br>SunCal Management and<br>SCC Acquisitions, Inc**. | | Bruce V. Cook<br>General Counsel<br>2392 Morse Ave<br>Irvine, CA 92614-6234 |

**3.4** **Identity of Person to Contact for More Information Regarding the Plan**.

Any interested party desiring further information about the Plan should contact the Voluntary Debtors' counsel, Winthrop Couchot Professional Corporation, 660 Newport Center Drive, Suite 400, Newport Beach, CA 92660, Attn:  Paul J. Couchot, (949) 720-4100; Peter W. Lianides, (949) 720-4155; Payam Khodadadi, (949) 720-4160.

**3.5** **Disclaimer**.

The information contained in this Disclosure Statement is provided by the SunCal Plan Proponents.  The SunCal Plan Proponents represent that everything stated in this Disclosure Statement is true to the best of their knowledge.  The Bankruptcy Court has not yet determined whether or not the Plan is confirmable and makes no recommendation as to whether or not you should support or oppose the Plan.

The discussion in this Disclosure Statement regarding the Group II: Voluntary Debtors may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995.  Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate," or "continue," or the negative thereof or other variations thereon or comparable terminology.  The reader is cautioned that all forward looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements.  The liquidation analyses, distribution projections, projections of financial results and other information are estimates only, and the timing, amount and value of actual distributions to Creditors may be

-24-

1   affected by many factors that cannot be predicted.  Therefore, any analyses, estimates, or

2   projections may or may not turn out to be accurate.

3       The SunCal Plan Proponents and their professionals have made a diligent effort to identify

4   in this Disclosure Statement all Litigation Claims, including claims for relief, counterclaims, and

5   objections to claims.  However, no reliance should be placed on the fact that a particular Litigation

6   Claim is or is not identified in this Disclosure Statement.  The Group II: Voluntary Debtors or other

7   parties in interest may seek to investigate, file and prosecute Litigation Claims after the

8   Confirmation Date, or the Plan Trust may seek to do so after the Effective Date of the Plan whether

9   or not the Litigation Claims are identified in this Disclosure Statement.

10                                  **IV.**

11                  **FACTUAL BACKGROUND OF THE DEBTORS**

12      **4.1    The Formation of the Debtors and the Projects.**

13          **4.1.1    Overview of the Debtors and their Projects.**

14      The Group II: Voluntary Debtors are two of twenty-six entities (collectively the "Debtors")

15   that were formed pursuant to a joint venture between Affiliates of the SunCal Companies

16   ("SunCal") and the Lehman Entities (the "SunCal/Lehman Joint Venture"). The Debtors role in the

17   venture was to own and develop the large residential projects that were the core assets in this joint

18   undertaking.

19      At the inception of SunCal/Lehman Joint Venture, it was agreed that SunCal would be the

20   developer/manager of the Projects and the Lehman Entities would provide the necessary capital.

21   Attached hereto as Exhibit "1" is a general description of the Debtors' Projects, including the

22   Group II: Voluntary Projects, and the Debtors' other primary Assets, excluding Cash and the

23   Litigation Claims, and a description of the loans for the Projects that are not a part of Group II:

24   Voluntary Projects.

25      All of the Debtors are Affiliates of Acquisitions and SCC LLC.  Some of the Debtors

26   directly own the Projects, while others serve as holding companies, owning Allowed Interests in the

27   Debtors that hold title to the Projects.

28

1    The seventeen Debtors who are referred to herein as the "Voluntary Debtors" are wholly

2    owned by SunCal Affiliates, and consequently the SunCal Affiliates have full corporate

3    governance authority over these entities.  The Voluntary Debtors own eleven (11) of the Projects.

4    In the case of the nine Trustee Debtors, the SunCal Affiliates and the Lehman Affiliates initially

5    shared ownership equally (50% each). However, after the Petition Date, the SunCal Affiliates

6    became the owner of hundred percent (100%) of the equity in two of the nine Trustee Debtors -

7    SunCal Heartland and SunCal Marblehead.  The Trustee Debtors own nine (9) Projects.

8    Attached hereto as Exhibit "2" is a chart that sets forth the appraised value of the Group II:

9    Voluntary Debtors Projects. This chart lists both the Lehman Lenders' value estimates and

10    SunCal's valuation estimates.[1]

11    The Plan eliminates any potential value disputes by providing for the sale of the Group II:

12    Voluntary Projects through an auction that is designed to yield the highest market price for these

13    assets. Accordingly, to the extent any other party believes the Group II: Voluntary Projects have a

14    greater value than the Opening Bid offered by another Qualifying Bidder, they will have the

15    opportunity to submit a Qualifying Bid (but no credit-bids will be allowed) that exceeds the

16    Opening Bid and, if they so desire, to become the Winning Bidder by offering the highest

17    Qualifying Bid. This market sale process will insure that the rights of all stakeholders are

18    protected.

19    **4.1.2    The Group II: Voluntary Debtors' Primary Secured Creditors and**

20    **Their Projects**.

21    Only Creditors holding liens against the Beaumont Heights Project and the Johannson

22    Ranch Project are Riverside County, as the Holder of an Unpaid Secured Real Property Tax

23    Claim against the Beaumont Heights Project in the approximate amount of $442,201, and

24    Stanislaus County as the Holder of an Unpaid Secured Real Property Tax Claim against the

25    Johannson Ranch Project in the amount of $434,830.

26

27

28

---

[1] Values may have changed since these analyses were prepared.

MAINDOCS-#164995-v3-SunCal_3rd_Am_Group_II_VD_DS.DOC

### 4.1.3   Lehman Disputed Claims and Liens.

As discussed in detail herein, during the course of the Debtors' Cases, the Debtors initiated litigation disputing the validity of Lehman's Disputed Secured Claims, and the validity, priority and extent of Lehman's Disputed Liens, including the Voluntary Debtors' pledge of their equity interest in the Group II: Voluntary Debtors based on the SunCal Communities I Loan.  This litigation was being pursued through the Lehman Adversary Proceeding until this matter was stayed and is now being pursued in the Lehman Claim Objections and the Contract Action.

According to LCPI, the collateral securing the outstanding balance allegedly owed on this loan ($343,221,391) includes a lien against the equity interests that SunCal I owns (100%) in SunCal Beaumont, LLC and SunCal Johannson, LLC. Since these equity level lien rights only become relevant after all allowed claims are paid in Group II: Voluntary Debtors' estates, the disallowance of the claims secured by these liens would not seems to be relevant to the Group II: Voluntary Debtors' Creditors.

However, the creditor level distribution picture in the Group II: Voluntary Debtors' cases has been complicated by the existence of the Bond Claims filed against the Group II: Voluntary Debtors' estate.

Both Arch and Bond Safeguard contend that they have the right to assert claims arising from unpaid bond obligations relating to Projects owned by other Debtors, in the estates of all of the Debtors. Accordingly, they have submitted in excess of $100,000,000 in claims against the estates of the Group II: Voluntary Debtors. Although the Group II: Voluntary Debtors do not believe these claims are valid, and that they will not be allowed, these claims must be disallowed before final distributions can be made to the Creditors holding Allowed Claims, or paid through distributions made in the other Debtors' cases. It is in this respect that the litigation over the validity and amount of the Lehman Secured Claims is relevant.

MAINDOCS-#164995-v3-SunCal_3rd_Am_Group_II_VD_DS.DOC

**4.1.4    A Summary of All of the Alleged Claims Against the Group II:**

**Voluntary Debtors.**

Attached hereto as Exhibit "4" is a chart that sets forth the prepetition Claims that have been asserted against all of the Debtors.  In summary, the asserted Claims against the Group II: Voluntary Debtors consist of the following:

| Claims | SunCal Beaumont | SunCal Johannson |
|---|---|---|
| Unpaid Secured Real Property Tax Claims | $442,201 | $434,830 |
| Alleged Mechanics Lien Claims | $ 43,355 | $0 |
| Administrative and Priority Claims | $104,616.01 | $110,151.28 |
| General Unsecured Claims | $180,713 | $41,181 |

**4.1.5.    Summary of the Group II: Voluntary Debtors' Cash.**

The following chart sets forth the Group II: Voluntary Debtors' cash on hand as of July 1, 2011.

| GROUP II: VOLUNTARY DEBTORS | AMOUNT |
|---|---|
| SunCal Beaumont Heights | $11.11 |
| SunCal Johannson | $106,087.22 |
| **Total** | $106,098.33 |

**4.2    Factual Circumstances Leading to the Filing of the Debtors' Chapter 11 Cases.**

**4.2.1    Introduction.**

In this section of the Disclosure Statement, the SunCal Plan Proponents have provided a brief description of the relationship between the Debtors and the Lehman Entities. This background is relevant to the Group II: Voluntary Debtors, and in fact all of the Debtors, for the following reasons. First, most of the unsecured claims asserted against the Debtors were incurred at the insistence of the Lehman Lenders, and they would have been paid if the Lehman Lenders had honored their obligation to pay these claims. Second, as explained above, a substantial part of claims that the Lehman Lenders failed to pay are being asserted against *all of the Debtors*. If the litigation against the Lehman Lenders discussed herein is successful, it will, at a minimum, reduce the pool of claims against the Group II: Voluntary Debtors, and thereby increase the dividend

1    payable to the remaining creditors. Third and finally, this history allows the Creditors to take the

2    measure of the parties who are now proffering the competing plan – the Lehman Lenders.  As the

3    within discussion will establish, the Lehman Lenders failed to pay the claims of Creditors

4    prepetition, the Lehman Lenders attempted to foreclose upon the Projects that were subject to their

5    liens post-petition in order to deny the unsecured creditors any recovery on the claims they failed to

6    pay, and finally, when this foreclosure effort failed, the Lehman Lenders attempted to destroy the

7    Debtors' reorganization and sale efforts to manipulating LCPI's alleged automatic stay.

8            **4.2.2    Background of the SunCal Companies**.

9            SunCal is a family-owned and operated real estate business that has been successfully

10   developing properties throughout the western United States for over 70 years.  SunCal's business

11   focuses upon the "development" of residential land. A typical SunCal development begins with the

12   acquisition of one or more parcels of raw land. Thereafter, the SunCal team develops a master plan

13   for the acreage that incorporates streets, homes, parks, schools and commercial areas, and then it

14   works with the applicable municipal planning authorities (the city, county, state and federal) to

15   secure the necessary approvals or "entitlements" to gain approval of this plan. This process, which

16   requires the assistance of land planners, civil engineers, architects, lawyers, and other land

17   specialists, takes a period of years. Once the master plan is approved, SunCal provides for the

18   grading of the project and the installation of the foundational infrastructure (streets, utilities, etc.)

19   and then sells the lots or parcels within the project to merchant builders.

20           **4.2.3    The Origins of the SunCal/Lehman Joint Venture.**

21           SunCal historically financed its projects with loans and/or equity from a number of

22   different sources.  However, beginning in 1997, an increasing number of SunCal's projects were

23   financed by the Lehman Entities, as Mark Walsh ("Walsh"), the head of LBHI's Global Real

24   Estate Group, began cultivating a business relationship with SunCal's principals.

25           By 2003, the Lehman Entities and SunCal had entered into joint ventures involving

26   approximately fifteen projects.  By 2007, that number had grown to over forty, and the Lehman

27   Entities had become, with limited exceptions, the exclusive provider of financing for the SunCal

28   Projects pursuant to a written agreement executed in 2006.  The Lehman Entities also consisted of

1  the Lehman Equity Members that either directly or indirectly owned a fifty percent (50%) equity

2  interest in all nine of the Trustee Debtors.

3       In their dealings with SunCal, the Lehman Representatives made no distinction between

4  Projects financed by Lehman ALI and Projects financed by LCPI. They also made no distinction

5  between the Debtors in which Lehman Equity Members held 50% equity memberships or the

6  Debtors in which the Lehman Entities held no equity membership interest.  As agents of the

7  financial partner in the parties' joint venture, the Lehman Representatives would determine which

8  Lehman Entity would provide financing on which Projects, and would dictate the structure that the

9  financing would take, according to whatever suited the Lehman Entities' needs.

10      **4.2.4**  **Lehman's Effective Control over the Management of the Debtors and**

11      **Promises of Ongoing Funding.**

12       Prior to the market downturn in the middle of 2007, Lehman Representatives afforded

13  SunCal substantial discretion in the management and development of the Projects.  The Debtors

14  would contract with third-party vendors to perform grading, health and safety compliance,

15  construction, landscaping, and other necessary services on the Project sites, and they would work

16  with the local municipalities to obtain the necessary entitlements and other authorizations

17  necessary to proceed with development.  The Lehman Representatives, SunCal and the Debtors

18  would discuss anticipated quarterly expenditures at periodic budget meetings, and , as expenses

19  were incurred each month, SunCal and the Debtors would submit requests for payment to the

20  Lehman Representatives, supported by the necessary documentation. The Lehman Representatives

21  would then provide the funding necessary to pay these expenses.

22       During the third quarter of 2007, the foregoing management and payment dichotomy

23  changed, after the real estate market experienced a sudden downturn, and many of the Projects

24  significantly declined in value.  In response to this dramatic economic change, a series of high

25  level discussions occurred between SunCal's representatives and the Lehman Representatives --

26  including Walsh, Paul Hughson ("Hughson") and Frank Gilhool ("Gilhool"), the Managing

27  Directors of Lehman's Global Real Estate.  In these discussions, SunCal's representatives, acting

28  on behalf of the Debtors, expressed concerns about the loans on the Projects being out of balance,

1  and suggested shutting down the Projects, or at least slowing the pace of development.  However,

2  Walsh specifically instructed SunCal not to slow down or stop work.  He assured SunCal that the

3  Lehman Entities would provide the necessary funding to pay vendors and to keep the development

4  of the Projects moving forward.

5          The foregoing assurances of payments were confirmed in numerous telephone

6  conversations between Gilhool and SunCal's COO, Frank Faye ("Faye"), and/or SunCal's General

7  Counsel, Bruce Cook ("Cook") that took place during 2007 and 2008. In each exchange, Gilhool

8  assured SunCal that the Lehman Entities were committed to funding the debts and obligations

9  being incurred at the Projects and they continued to insist that work proceed.

10          During this time frame, the Lehman Representatives became much more "hands on,"

11  scrutinizing and approving all budgets and expenses through a new control and approval structure.

12  Under the new structure, SunCal would submit budgets to the Lehman Representatives on a

13  weekly basis and explain, during period conference calls, what Project payables they believe had to

14  be paid and what work had to be performed on the Projects. The Lehman Representatives would

15  then unilaterally decide what future work would proceed, the Lehman Representatives would

16  authorize the work and the Lehman Representatives would decide what payables would be paid

17  timely by designating them as "urgent," and what other payables were not urgent and hence would

18  not be paid on a timely basis. However, even under this new Lehman controlled management and

19  payment regime, the Lehman Representatives made it clear that all payables being incurred would

20  be funded.

21                  **4.2.5    The 2008 Restructuring Agreement.**

22          By the fall of 2007, both SunCal and the Lehman Representatives contemplated entering

23  into a restructuring agreement in the near term, with a closing to occur no later than January or

24  February of 2008.  However, this transaction was delayed by the Lehman Entities' extensive

25  documentation demands until May 23, 2008. On this date, SunCal and most of the Debtors finally

26  entered into an omnibus "Restructuring Agreement" with LBHI, Lehman ALI and the other

27  Lehman Entities.  The same Lehman Representative signed the Restructuring Agreement on behalf

28  of all of the Lehman Entities.

1    Pursuant to the Restructuring Agreement, Lehman ALI, "as the Lender with respect to each

2    Loan," committed, among other things, to: (1) make advances under existing loans to fund the

3    continuing costs necessary to preserve the value of the Projects; (2) move forward to resolve the

4    accrued outstanding subcontractor payables, i.e., to make sure that the Projects' creditors were paid

5    for their work; and (3) to close the transaction, whereby newly-created Lehman Entities would

6    assume the debt and obligations of the Projects.

7    As originally executed in May 2008, the Restructuring Agreement applied to twelve of the

8    twenty Projects (as well as several other projects not at issue in the Lehman Adversary

9    Proceeding):  (1) Acton Estates; (2) Beaumont Heights; (3) Bickford Ranch; (4) Emerald

10    Meadows; (5) Heartland; (6) Johannson Ranch; (7) Marblehead; (8) Northlake; (9) Oak Valley;

11    (10) Pacific Point; (11) Ritter Ranch; and (12) Summit Valley.  The Debtors that owned and/or

12    held equity interests in the entities that owned  these Projects were signatories to the May 2008

13    agreement.[2]

14    Between May and August 2008, the parties agreed to add four additional projects to the

15    Restructuring Agreement: (1) Del Rio; (2) Joshua Ridge; (3) Palm Springs Village; and (4) Tesoro

16    Burnham, and the four Debtors associated with these Projects—SunCal Del Rio, SCC

17    Communities, SunCal PSV, and SunCal Tesoro.  Only four Projects were  not included in the

18    Restructuring Agreement: Century City, Delta Coves, Oak Knoll and Del Amo.  Accordingly, the

19    four Debtors associated with these Projects—SunCal Century City, Delta Coves, SunCal Oak

20    Knoll and SunCal Torrance—were not signatories thereto.  Lehman ALI was the lender on each of

21    these Projects and , and as with the other Projects, Lehman ALI continued to insist that these four

22

23

24    _____

[2] Specifically, the Restructuring Agreement was entered into by, among others, the "Borrowers,"
"Grantors" and "Pledgors," as defined in Annex 1 thereto.  The "Borrowers" included SunCal Marblehead,
25    SunCal Heartland, SunCal Northlake, SunCal Oak Valley, SJD Partners, Palmdale Hills, SCC Palmdale,
SunCal I, SunCal III, and SunCal Bickford.

26
The "Grantors" included SunCal Marblehead, SunCal Heartland, SunCal Northlake, SunCal Oak Valley,
27    SJD Partners, Palmdale Hills, SunCal Bickford, SunCal Acton, SunCal Summit and SunCal Emerald, and
Debtors SunCal Beaumont and SunCal Johannson.
28
The "Pledgors" included SCC Palmdale, SunCal I, SunCal Summit and SJD Development.

-32-

1    debtors  proceed with the development of the four Projects, it approved all expenses, and it

2    continually provided assurances of payment.

3           **4.2.6    <u>The Lehman Lenders Hire Radco</u>.**

4           Subsequent to the execution of the Restructuring Agreement, Lehman ALI arranged for a

5    third party, Radco, to directly settle outstanding contractor payables, as its agent.  Radco was

6    provided some limited funding and authority to negotiate settlements, and did in fact reach

7    settlement with a number of creditors.  The funding for these settlements, whether the debts related

8    to Lehman ALI or LCPI funded Projects, came from the same source.  Lehman ALI and LCPI also

9    provided approval for new work on the Projects, and Lehman ALI paid for some of this work.

10   However, this funding was minimal and it soon stopped.

11          In August 2008, Lehman ALI withdrew funding and settlement authority from Radco,

12   leaving millions of dollars in outstanding contractor payables unresolved, notwithstanding the

13   contrary provisions in the Restructuring Agreement.  Leman ALI's actions also impaired the

14   Debtors' ability to resolve ongoing public health and safety issues arising at the Projects.

15   Ultimately, only a fraction of the total outstanding payables were resolved, contrary to the  past

16   promises made by Lehman Representatives.

17          **4.2.7    <u>The Lehman Lenders' Failure to Close on the Settlement Agreement</u>.**

18          Pursuant to the terms of the Restructuring Agreement, the parties agreed to enter into a

19   Settlement Agreement, the form of which was attached to the Restructuring Agreement.  The

20   Settlement Agreement provided for the transfer of the Projects included within the Restructuring

21   Agreement to a series of newly formed Lehman-controlled entities (each with "SCLV" in its name,

22   for "SunCal-Lehman Venture"). The agreement further provided that the entity taking title to the

23   Project would assume the  Lehman Lender debt obligations associated with the Projects, assume

24   certain bond obligations associated with the Projects, and provide indemnifications to SunCal and

25   the Debtors for unpaid claims.

26          On August 25, 2008, the Settlement Agreement and a series of related documents were

27   formally executed by SunCal and the applicable Lehman Lenders and Lehman Equity Members at

28   a meeting held in Los Angeles on August 25, 2008.  Once these documents were signed, all that

1   remained was the mechanical closing of the series of transactions described in the Settlement

2   Agreement. Since all of the conditions precedent to the closings had been satisfied, or could have

3   been satisfied at, or shortly after the meeting, this should have occurred at the August 25, 2008

4   meeting, or shortly after the meeting. However, the Lehman Representative asked SunCal to

5   extend the closing date for thirty days, to September 30, 2008. According to the Lehman

6   Representatives, this short extension would enable them to secure certain outstanding third party

7   consents. Although SunCal knew these third party consents were readily obtainable within a few

8   days, they agreed to this extension, believing the request was made in good faith.

9       **4.2.8**   **Alvarez and Marsal Take Over Control of the Lehman Entities After**

10          **the Chapter 11 Filings of LBHI and LCPI.**

11        LBHI filed for bankruptcy in September 2008 and LCPI filed for bankruptcy in October

12  2008.  After LBHI's filing, Bryan Marsal ("Marsal") of Alvarez & Marsal ("A&M") was appointed

13  to serve as LBHI's Chief Restructuring Officer. Marsal and A&M are in charge of liquidating the

14  now defunct Lehman Entities, including Chapter 11 debtors LBHI and LCPI, and the non-bankrupt

15  Lehman Lenders (Lehman ALI, OVC, and Northlake Holdings, as well as the non-bankrupt

16  Lehman Equity Members.

17        Although A&M was not employed until after the events that occurred on August 25, 2008

18  described above, it should be noted that A&M hired the same law firm that represented the

19  Lehman Lenders in the August 25, 2008 meeting – Weil, Gotshal & Manges, LLP. Moreover, as

20  more fully explained herein, it was A&M that directed Lehman ALI not to perform its contractual

21  obligations under the Settlement Agreement after September of 2008.

22        LBHI's bankruptcy filing and the Lehman Lenders refusal, at A&M's direction, to close the

23  transactions provided for under the Settlement Agreement as agreed, were not small matters. They

24  severely damaged the Debtors. Although the Debtors were not proceeding with any new

25  construction or development, the Debtors were still required to expend significant sums on site

26  security, erosion control, property taxes and other measures in order to prevent the Projects from

27  becoming a public safety hazard, and in order to avoid the loss of valuable entitlements, and to

28  mitigate penalties and fines being incurred by the Projects.  Although SunCal and the Debtors

1    repeatedly requested that the Lehman Entities pay for critical health and safety and value

2    preservation measures on the Projects, these efforts were unavailing.

3         Between October 9 and November 4, 2008, SunCal's general counsel Cook sent Robert

4    Brusco, an authorized agent of the Lehman Entities, nearly two dozen letters requesting that the

5    Lehman Lenders provide the funding necessary to address critical needs on the Projects as

6    promised.  A summary of these health and safety notices are attached hereto as Exhibit "5".  The

7    Lehman Entities ignored these requests until November 2008, when Brusco, purportedly on behalf

8    of the Lehman Lenders, delivered the message that the Lehman Lenders were unwilling to fund the

9    Projects and that, instead, they intended to foreclose on all of the Projects.

10        As a result, as set forth in Exhibit "4," there are now over 240 vendors, municipalities,

11   counties and bonding companies claiming over $400 million in work, improvements and property

12   tax claims against the Projects.  Substantially all of these sums are due to work performed or

13   bonded at Lehman's request based upon Lehman's promises of payment.

14        **4.3    The Group II: Voluntary Debtors' Potential Preferential Transfers**.

15        Attached hereto as Exhibit "6" are charts setting forth payments made to third parties

16   during the ninety (90) day time period preceding the filing of the Debtors' Chapter 11 Cases as

17   well as payments made to the Lehman Entities and to SunCal Affiliates during the one-year time

18   period preceding the filing of the Debtors' Chapter 11 Cases. These total transfers total

19   approximately fifty thousand dollars ($50,000). In those instances where the Group II: Voluntary

20   Debtors believe there are reasonable grounds to recover these transfers, at a reasonable cost, they

21   have filed complaints.

22                                      **V.**

23          **SIGNIFICANT EVENTS IN THE DEBTORS' CHAPTER 11 CASES**

24        **5.1.    Voluntary Debtors.**

25             **5.1.1    Joint Administration of the Voluntary Debtors and the Trustee**

26                       **Debtors.**

27        Since their respective Petition Dates, the seventeen (17) Voluntary Debtors have continued

28   to operate as "debtors-in-possession," subject to the supervision of the Bankruptcy Court and in

1    accordance with the Bankruptcy Code.  The Voluntary Debtors are authorized to operate their

2    businesses in the ordinary course during the Chapter 11 proceedings. Transactions outside the

3    ordinary course of business must be approved by the Bankruptcy Court.

4        The Voluntary Debtors' Cases are being jointly administered pursuant to orders entered on

5    November 19, 2008 and December 9, 2008.  The Voluntary Debtors' Cases are being jointly

6    administered with the Trustee Debtors' cases pursuant to an order entered on March 11, 2009.

7        The Voluntary Debtors have employed Winthrop Couchot Professional Corporation as their

8    general insolvency counsel, and the MB Firm as their special litigation counsel.

9        **5.1.2    The Voluntary Debtors Court Employed Professionals.**

10       The Voluntary Debtors have employed Winthrop Couchot Professional Corporation as their

11   general insolvency counsel.  The Voluntary Debtors' Committee has employed Irell & Manella

12   LLP as its counsel pursuant to an order entered on February 13, 2009.

13       Pursuant to the Court's Order regarding joint administration of the Voluntary Debtors, the

14   Voluntary Debtors' liability for professional fees is joint and several among the Voluntary Debtors'

15   Estates for fees incurred related to services for the benefit of all of the Voluntary Debtors.  The

16   Trustee Debtors' liability for professional fees is not joint and several.

17       Pursuant to the initial MB Firm employment application, Acquisitions was responsible for

18   the payment of their fees until December 31, 2009.  The MB Firm's application also allows for

19   payments from the Bond Companies.  The initial MB Firm employment application reserved the

20   right, should the Lehman Adversary Proceeding result in a benefit accruing to a particular Debtors'

21   Estates, to request that its fees and expenses be reimbursed by the Debtors' Estates.  The Bond

22   Companies have also agreed to jointly fund a portion of the professional fees and expenses of the

23   MB Firm with respect to the Lehman Adversary Proceeding.  The Bond Companies' funding

24   commitment can be terminated and after such a termination they will only be required to cover fees

25   and costs incurred during the period of their prior commitments.

26       The MB Firm employment application was subsequently amended.  Pursuant to an order

27   entered on April 14, 2010, (1) the Voluntary Debtors will pay up to one-half of the fees and

28   expenses incurred by the MB Firm from and after February 1, 2010 onward; and (2) the Trustee

1    Debtors do not have an obligation to pay any of the MB Firm's fees pertaining to the Trustee

2    Debtors' estates, unless and until a loan by the Voluntary Debtors to the Trustee Debtors is agreed

3    to by the Trustee and approved by the Court, or in accordance with the terms of the original

4    employment applications to the extent not superseded or modified by the amended employment

5    application.  The order does not affect the MB Firm's right to seek payment from the Bond

6    Companies without the need for an additional order of the Court.

7          The MB Firm filed an updated application seeking to further amend their employment to

8    include the right to pursue certain claims against the Lehman Entities and certain employees and

9    agents of these entities on behalf of the Voluntary Debtors.  The claims encompassed by this

10   amendment include claims that are based upon both prepetition and post-petition actionable

11   conduct under both state law and federal law against the Lehman Entities and/or their agents.

12              **5.1.3   LCPI's Motions for Relief from the Automatic Stay Against Certain of**

13                    **the Voluntary Debtors' Projects and Related Appeals.**

14         On January 23, 2009, LCPI and Lehman ALI filed various motions for relief from the

15   automatic stay against a number of the Voluntary Debtors including Group II: Voluntary Debtors

16   Palmdale Hills, SunCal Bickford and Acton Estates (the "Lehman Entities' Stay Motions").

17   Although the Debtors, were able to defeat these motions, they are relevant in the following respect.

18   Had the motions filed by LCPI and Lehman ALI succeeded, it is almost certain that unsecured

19   creditors would have received nothing on their claims. Moreover, as more fully explained herein,

20   since Lehman ALI and LCPI did not even own the loans they were seeking to foreclose upon, these

21   motions should never have been filed in the first instance.

22         **5.2.   The Debtors' Various Motions Relating to Financing for the Projects and to**

23               **Pay Professional Fees.**

24              **5.2.1   The Voluntary Debtors' Initial Motion for Surcharge and Use of Cash**

25                    **Collateral.**

26         On January 16, 2009, seven of the Debtors, including Group II: Voluntary Debtor Palmdale

27   Hills, filed a motion authorizing Palmdale Hills to use and surcharge, pursuant to 11 U.S.C.

28   § 506(c), and/or use the purported cash collateral of LCPI arising from the Ritter Ranch Loan

1    Agreement, pursuant to 11 U.S.C. § 363(c)(2), in order to pay for the reasonable and necessary

2    maintenance expenses required to preserve the value of such Debtors' Projects subject to deeds of

3    trust and other security interests held by LCPI.

4         LCPI objected to the motion and subsequently filed a motion in its own Chapter 11

5    proceeding in the Southern District of New York seeking an order barring the motion as a violation

6    of the automatic stay.  Although the Debtors believe that LCPI's stay was not violated in any way

7    by the Motion, the Motion was taken off calendar prior to any ruling by the New York Bankruptcy

8    Court, based upon the threat of sanctions made against Debtors' counsel by the presiding judge in

9    LCPI's case.

10        As explained above, LCPI did not even own an interest in the Ritter Ranch Loan

11   Agreement when it asserted the automatic stay, since the Ritter Ranch Loan Agreement, which was

12   the subject of the cash collateral motion, had already been sold pursuant to the Fenway Repurchase

13   Agreement. Yet this wrongful action prevented Palmdale Hills from using its own money to pay

14   critical bills that Lehman ALI, LCPI's parent was contractually required to fund in the first

15   instance.

16   **5.2.2    The Voluntary Debtors' Agreements with the Lehman Entities for Use**

17   **of Alleged Cash Collateral to Maintain the Properties and to Pay**

18   **Professional Fees.**

19        On September 1, 2009, with the consent of the Lehman Entities, fourteen of the Voluntary

20   Debtors filed a motion authorizing surcharge pursuant to 11 U.S.C. § 506(c), and/or use of the

21   purported cash collateral for the purpose of addressing critical public health and safety issues and

22   other value preservation with respect to the Debtors Projects.  On September 10, 2009, the Lehman

23   Entities filed an opposition thereto, and on September 17, 2009, the Voluntary Debtors filed their

24   Reply.

25        Subsequently, the Voluntary Debtors learned that the Lehman Entities lacked control

26   agreements as to the majority of the depository accounts, and thus such accounts were not subject

27   to perfected liens and therefore did not constitute "cash collateral."  On October 15, 2009, the

28   Voluntary Debtors filed a *Motion For Order Authorizing Disposition Of Certain Depository*

-38-

1    *Accounts*.  On or about October 22, 2009, the Lehman Entities filed an opposition, and on

2    October 29, 2009, the Voluntary Debtors filed their Reply.

3        The motion was consensually resolved by way of the *Stipulation Pursuant To 11 U.S.C. §§*

4    *362, 363, And 364: (1) Authorizing The Use Of Cash Collateral And Alleged Unencumbered Cash;*

5    *(2) Approving Postpetition Financing; (3) Providing Administrative Expense Status; And (4)*

6    *Modifying Automatic Stay To The Extent Necessary* filed on December 8, 2009, and the order

7    thereon entered on December 17, 2009.  The stipulation provides for a 120-day budget with

8    expenses totaling approximately $5 million, pursuant to which any Cash in the Estates is used first

9    and then money borrowed from the Palmdale Hills Estate is used thereafter on an administrative

10    basis.  The agreement also permitted the Voluntary Debtors to use their alleged unencumbered

11    cash to pay its professional fees.  This agreement has been renewed on several occasions.

12        **5.3.    The Debtors' Disputes and Claims Against the Lehman Entities.**

13            **5.3.1    The Lehman Recoupment Objection and the Contract Action.**

14        Pursuant to the terms of the joint ventures entered into by and among the Debtors and the

15    Lehman Entities, the Lehman Entities were responsible for paying the costs incurred in the

16    development of the Projects. These costs included the claims of the vendors who provided goods

17    and services to the Projects and the claims asserted by the Bond Claimants. Although the Lehman

18    Entities contend that they were merely "lenders," and that they did not assume any liability for

19    these claims, as the above facts and those that will be adduced prior to and at the confirmation of

20    the Plan will demonstrate, the Lehman Entities are in fact obligated to pay these claims.

21        The Debtors' contend that the Lehman Entities have contractual liability on various

22    grounds, including the following. First, the Lehman Entities were either in a joint venture

23    relationship with the Debtors from the outset, or this relationship developed and became a legal

24    fixture through the Lehman Entities' course of conduct. Pursuant to this relationship, and the

25    promises and representations made therein, the Lehman Entities agreed to be responsible for all

26    vendor and Bond Claims incurred at or in connection with the Projects. The role of each of the

27    Debtors, by mutual agreement, was to provide development expertise and project management

28    services. The Lehman Entities were required to provide the capital necessary to fund the Projects.

1    Second, during the last eighteen months of the relationship between the parties, the Lehman

2   Entities assumed direct responsibility for all claims incurred during this period, by insisting that

3   work continue on the Projects and by repeatedly promising to pay for this work. Since the Lehman

4   Entities ordered this work, and promised to pay for the same, they bear this financial responsibility.

5    Third and finally, the Lehman Entities expressly agreed to pay the vendor and bond claims

6   described in the Restructuring Agreement and in the interrelated Settlement Agreement, but failed

7   to do so as contractually agreed.

8    It is the SunCal Plan Proponents' contention that the Lehman Entities' failure to pay the

9   vendor and Bond Claims associated with the Projects as (as was their obligation under the terms of

10   the joint ventures, the Restructuring Agreement and the Settlement Agreement) unjustly shifted

11   responsibility for these liabilities to the Debtors in breach of the terms of joint venture, the

12   Restructuring Agreement and the Settlement Agreement. Accordingly, the SunCal Plan Proponents

13   have filed the Lehman Recoupment Objection which seeks the disallowance of certain claims filed

14   by the Lehman Lenders, including the claims filed against the Group II: Voluntary Debtors.

15    In the Lehman Recoupment Objection, the SunCal Plan Proponents seek the following

16   relief:

17    1) Disallowance of the claims asserted by the Lehman Lenders in their

18    entirety, pending compliance with the terms of the Restructuring

19    Agreement and the Settlement Agreement;

20    2) A reduction in the amount of the Lehman Entities' secured claims by

21    the amount of damages resulting from the Lehman Entities' breach of their

22    obligations under these agreements; and/or

23    3)  An order barring the Lehman Entities from enforcing their rights under

24    the Lehman Loans until they cure their breaches under the above

25    agreements.

26   The first prayer for relief above is premised upon the contention that the Lehman Entities

27   agreed to transfer ownership of the Projects described in this agreement, including the Group II:

28   Voluntary Projects, to a series of newly formed entities under the control of the Lehman Entities,

1  pursuant to the terms of the Settlement Agreement. This agreement further provided that these new

2  entities would assume the vendor payables and certain Bond Claims associated with these projects.

3  Finally, this agreement included a covenant not to sue, pursuant to which the Lehman Entities were

4  barred from seeking further recourse against the Debtors.

5      The SunCal Plan Proponents believe that the positions asserted in the Lehman Recoupment

6  Objection are well grounded in fact and in law. Had the Lehman Entities complied with their

7  contractual obligations, substantially all of the Group II: Voluntary Debtors' liabilities would have

8  been eliminated, the Group II: Voluntary Debtors would not have had to file Chapter 11, and the

9  Lehman Entities would be barred from asserting claims against the Group II: Voluntary Debtors

10 based upon the Lehman Disputed Loans. It is the SunCal Plan Proponents' position that the

11 Lehman Entities' effort to enforce claims based upon Lehman Disputed Loans is directly contrary

12 to the basic agreements reached in the Restructuring Agreement and in the related Settlement

13 Agreement.

14     The Lehman Entities dispute the merits of the Lehman Recoupment Objection. It the

15 Lehman Entities' position that it was within their absolute "discretion" to pay, or not to pay, the

16 vendor payables incurred during the term of the Restructuring Agreement, even where they

17 authorized the work. Accordingly, they cannot, in their assessment, be held liable for these

18 obligations. In the case of the Settlement Agreement, the Lehman Entities contend that this

19 agreement never became effective and therefore they were not bound to comply with its terms. The

20 SunCal Plan Proponents do not believe that the positions asserted by the Lehman Entities are

21 supported by the facts, or existing law.

22     In addition to the Recoupment Claim Objections, certain Voluntary Debtors, including the

23 Group II Voluntary Debtors, have also filed the Contract Action against Lehman ALI and other

24 non-debtor Lehman Entities in Orange County Superior Court. The Contract Action is based on

25 Lehman ALI's breach of contract on the Restructuring and Settlement Agreements.  On May 9,

26 2011, the Defendants in the Contract Action filed a Notice of Removal which removed the

27 Contract Action from the Orange County Superior Court to the Bankruptcy Court, as adversary no.

28 8:11-ap-01212ES.  The Voluntary Debtor-Plaintiffs moved to remand the Contract Action back to

1    the Orange County Superior Court ("Remand Motion").  The Bankruptcy Court denied the

2    Remand Motion at the hearing on July 12, 2011.

3    　　　　Although LCPI's automatic stay remains an impediment to the pursuit of the Lehman

4    Adversary Proceeding, the existence of this stay will not bar the SunCal Plan Proponents from

5    implementing the material terms of the Group II: Voluntary Debtors Plans for the following reason.

6    LCPI's automatic stay does not bar the pursuit of the Lehman Claim Objections or the Contract

7    Action.  In fact, these matters are proceeding in the Bankruptcy Court. If these objections are

8    successful, the claims of the Lehman Entities will be disallowed, either in whole or in part, or the

9    Lehman Entities will be barred from pursuing these claims until they pay what they owe to the

10    Group II: Voluntary Debtors. If the Contract Action is successful, it will generate a further

11    recovery for creditors.  In either scenario, the Plan filed by the SunCal Plan Proponents is feasible

12    and will yield a favorable return for creditors.

13    　　　　**5.4.**    **The Debtors' Motion for a Stay to Suspend Certain Lehman Actions**.

14    　　　　On September 21, 2010, the Voluntary Debtors, Acquisitions, and SunCal Management

15    filed a motion requesting, among other relief, for the Court to suspend the Lehman Entities

16    competing plan and disclosure statement unless and until the Lehman Entities agree to provide the

17    Debtors with relief from their automatic stay in the Debtors' Chapter 11 Cases (the "Suspension

18    Motion").  The Court granted this motion and stayed all matters until March 1, 2011. The Court

19    also ordered the parties to engage in a mediation. The Voluntary Debtors and the Lehman Entities

20    were unable to settle their claims through this process.

21    　　　　　　　　　　　　　　　　**VI.**

22    　　　　　　　　**TREATMENT OF UNCLASSIFIED CLAIMS**

23    　　　　**6.1**    **Introduction**. As required by the Bankruptcy Code, the Plan places Claims and

24    Interests into various Classes according to their right to priority.  However, certain types of Claims

25    are not classified in any Classes under the Plan.  These Claims are deemed "unclassified" under the

26    provisions of the Code.  They are not considered impaired and they do not vote on the Plan,

27    because they are automatically entitled to specific treatment provided for them in the Code.  As

28

-42-

1    such, the SunCal Plan Proponents have not placed the following Claims in a Class.  The treatment

2    of these unclassified Claims is as provided below.

3          **6.2**     **<u>Treatment of Allowed Administrative Claims</u>.**

4          The Code requires that all Allowed Administrative Claims be paid on the later of Effective

5    Date of the Plan or the date of their allowance, unless a particular Holder agrees to a different

6    treatment.  The treatment of Allowed Administrative Claims is as described below.  However, such

7    Administrative Claims are continuing to be incurred.  The Allowed Administrative Claims shall be

8    paid from the applicable Distribution Account(s) pursuant to the LitCo Plan Loan.

9          **6.3**     **<u>Repayment of Allowed Administrative Claims</u>.**

10         Except to the extent that the Holder of an Allowed Administrative Claim agrees to a

11   different treatment and subject to the Administrative Claims Bar Date set forth herein, the

12   Distribution Agent shall pay each Allowed Administrative Claim in full, in Cash, on the later of

13   (i) the Effective Date, (ii) within ten (10) Business Days after the date such Administrative Claim

14   becomes an Allowed Administrative Claim, or (iii) the date such Allowed Administrative Claim

15   becomes due according to its terms. Notwithstanding the foregoing, any Allowed Administrative

16   Claim representing obligations incurred in the ordinary course of post-petition business by the

17   Debtors in Possession (including without limitation post-petition trade obligations and routine

18   post-petition payroll obligations) shall be paid in full or performed by the Plan Trustee in the

19   ordinary course of business, in accordance with the terms of the particular obligation.

20         **6.4**     **<u>Administrative Claims Bar Date</u>.**

21         All applications for final compensation of Professionals for services rendered and for

22   reimbursement of expenses incurred on or before the Effective Date and all other requests for

23   payment of Administrative Claims incurred before the Effective Date under Sections 507(a)(2)

24   or 507(b) of the Bankruptcy Code (except only for (i) post-petition, ordinary course trade

25   obligations and routine post-petition payroll obligations incurred in the ordinary course of the

26   Debtors' post-petition business, for which no bar date shall apply, and (ii) post-petition tax

27   obligations, for which no bar date shall apply) shall be Filed with the Bankruptcy Court and served

28   upon the Plan Trustee no later than the Administrative Claims Bar Date, unless such date is

1   extended by the Bankruptcy Court after notice to the Plan Trustee.  Any such request for payment

2   of an Administrative Claim that is subject to the General Administrative Claims Bar Date and that

3   is not Filed and served on or before the Administrative Claims Bar Date shall be forever barred;

4   any party that seeks payment of Administrative Claims that (i) is required to file a request for

5   payment of such Administrative Claims and (ii) does not file such a request by the deadline

6   established herein shall be forever barred from asserting such Administrative Claims against the

7   Debtors, the Plan Trust, their estates, or any of their property.

8          **6.5**     **Treatment of Unsecured Tax Claims.**

9          Tax Claims are certain unsecured income, employment and other taxes described by Code

10   Section 507(a)(8).  The Code requires that each holder of such a Section 507(a)(8) tax claim

11   receive the present value of such Claim in deferred cash payments, over a period not exceeding

12   five (5) years from the petition date and that such treatment not be less favorable than the treatment

13   accorded to non priority unsecured creditors.

14          At the election of the Plan Trustee, the Holder of each Allowed Priority Tax Claim shall be

15   entitled to receive, on account of such Claim, (i) equal cash payments on the last Business Day of

16   each three-month period following the Effective Date, during a period not to exceed five years

17   after November 6, 2008, totaling the principal amount of such Claim plus simple interest on any

18   unpaid balance from the Effective Date, calculated at the interest rate available on ninety (90) day

19   United States Treasuries on the Effective Date, (ii) such other treatment agreed to by the Holder of

20   the Allowed Priority Tax Claim and the Plan Trustee, provided such treatment is on more

21   favorable terms to the Debtors (or the Plan Trust after the Effective Date) than the treatment set

22   forth in clause (i) hereof, or (iii) payment of the full Allowed Priority Tax Claim in Cash.

23                                  **VII**.

24                  **CLASSIFICATION OF CLAIMS AND INTERESTS**

25          As required by the Code, the Plan places Claims and Interests into various Classes

26   according to their right to priority and other relative rights.  The Plan specifies whether each Class

27   of Claims or Interests is impaired or unimpaired, and the Plan sets forth the treatment each Class

28   will receive.  The table below lists the Classes of Claims established under the Plan and states

MAINDOCS-#164995-v3-SunCal_3rd_Am_Group_II_VD_DS.DOC

1  whether each particular Class is impaired or left unimpaired by the Plan.  A Class is "unimpaired"

2  if the Plan leaves unaltered the legal, equitable and contractual rights to which the Holders of

3  Claims or Interests in the Class are entitled, with certain exceptions specified in the Bankruptcy

4  Code.

| CLASSIFICATION OF HOLDERS OF UNPAID SECURED REAL PROPERTY TAX CLAIMS AGAINST THE GROUP II: VOLUNTARY DEBTORS | | |
|---|---|---|
| **Class 1** | **Claimant** | **Claim Nos.** |
| Class 1.1 | Riverside County as the Holder of an Unpaid Secured Real Property Tax Claim against the Beaumont Heights Project in the amount of $442,201. | SunCal Beaumont 9 |
| Class 1.2 | Stanislaus County as the Holder of an Unpaid Secured Real Property Tax Claim against the Johannson Ranch Project in the amount of $434,830. | Unknown |

| CLASSIFICATION OF ASSERTED MECHANICS LIEN CLAIMS AGAINST THE GROUP II: VOLUNTARY DEBTORS | | |
|---|---|---|
| **Class 2** | **Claimant** | **Claim Nos.** |
| Class 2.1 | The Holder of the asserted Mechanic Lien Claim held by Proactive Engineering against the Beaumont Heights Project in the amount of $43,355. | SunCal Beaumont 11 and 12 |

| CLASSIFICATION OF PRIORITY UNSECURED CLAIMS AGAINST THE GROUP II: VOLUNTARY DEBTORS | | |
|---|---|---|
| **Class 3** | **Claimant** | **Claim Nos.** |
| Class 3.1 | The Holder of Allowed Priority Claims that fall within Code Sections 507(a)(2), (4), (5), (6), and (7) against any of the Group II: Voluntary Debtors | None filed |

MAINDOCS-#164995-v3-SunCal_3rd_Am_Group_II_VD_DS.DOC

| CLASSIFICATION OF GENERAL UNSECURED CLAIMS AGAINST THE GROUP II: VOLUNTARY DEBTORS | | |
|---|---|---|
| **Class 4** | **Claimant** | **Claim Nos.** |
| Class 4.1 | Claimants holding Allowed Unsecured Claims against SunCal Beaumont in the amount of $180,713. | Various Filed and Scheduled |
| Class 4.2 | Claimants holding Allowed Unsecured Claims against SunCal Johannson Ranch in the amount of $41,181. | Various Filed and Scheduled |

| CLASSIFICATION OF INTEREST HOLDERS AGAINST THE GROUP II: VOLUNTARY DEBTORS | | |
|---|---|---|
| **Class 5** | **Claimant** | **Scheduled** |
| Class 5.1 | Allowed Interests in SunCal Beaumont held by SunCal I. | Scheduled Amount |
| Class 5.2 | Allowed Interests in SunCal Johannson Ranch held by SunCal I | Scheduled Amount |

## VIII.

## THE PLAN'S TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS

**8.1.    The Plan's Treatment of Holders of Allowed Secured Real Property Tax Claims on the Group II: Voluntary Projects (Classes 1.1 and 1.2).**

The rights of the Holder(s)' of Allowed Secured Claims in Classes 1.1 through 1.2 are impaired under the Plan and shall receive one of the following two treatments at the Plan Trustee's discretion based solely on the option of the Group II: Voluntary Debtor:

A.    Such Holders shall retain their existing lien rights and shall accrue interest as provided under applicable nonbankruptcy law pursuant to 11 U.S.C. § 506 and 511 and such Allowed Claims shall be satisfied in accordance with the provision of 11 U.S.C. § 1124(2) from the sale of the Group II: Voluntary Projects during the Sales Period; or

B.    Such Holders shall retain their existing lien rights and shall accrue interest as provided under applicable nonbankruptcy law pursuant to 11 U.S.C. § 506 and 511 and California Revenue and Taxation Code Sections 4102 and 4103, and payment on such

-46-

1    Allowed Claims shall be satisfied over sixty-one (61) months from the applicable Group II:

2    Voluntary Debtor's Petition Date.

3    **8.2.    The Plan's Treatment of Mechanics Lien Claims Against Group II: Voluntary**

4    **Projects (Class 2.1).**

5    The Holder(s) of Allowed Secured Claims within Class 2.1 shall receive the indubitable

6    equivalent of their claims under the Plan, pursuant to 11 U.S.C. § 1129(b)(2)(A)(ii),  after payment

7    of Class 1 Claims, through the following treatment:

8    A.    The sale of the Group II: Voluntary Projects shall be sold, free and clear of

9    all monetary liens and encumbrance, pursuant to the following sales procedures:

10    1.    The Group II: Voluntary Projects will be sold through a public

11    auction after a commercially reasonable marketing and advertising effort of at least sixty (60) days

12    duration;

13    2.    The SunCal Plan Proponents shall have the right to provisionally

14    accept an Opening Bid from a Stalking Horse Bidder prior to the public auction and to grant this

15    bidder the right to receive the Beaumont Heights Project Break-up Fee or the Johannson Ranch

16    Project Break-up Fee, the as the case may be, if such bidder is not the Winning Bidder;

17    3.    Other Qualified Bidders shall have the right to overbid the Opening

18    Bid by submitting a Qualifying Bid. The first round of Qualifying Bids after the Opening Bid must

19    be equal to or in excess of the Initial Overbid Amount. Thereafter, all Qualifying Bids shall be

20    increased by an amount equal to or in excess of the Minimum Increment;

21    4.    The highest Qualifying Bid received from a Qualified Bidder, shall

22    be accepted as the Winning Bid, and the submitting bidder shall be the Winning Bidder. Upon

23    payment of the Winning Bid, the Winner bidder shall receive title to the applicable Group II:

24    Voluntary Project free and clear of all monetary liens and encumbrances; and

25    5.    The Net Sales Proceeds from the sale of the Group II: Voluntary

26    Projects shall be deposited into the applicable Net Sales Proceeds Account and the liens held by

27    the holder of the Class 2.1 lien shall attach to the Net Sales Proceeds. The Class 2.1 claim shall be

28    paid from the Net Sales Proceeds within three (3) business days of the date they are Allowed.

**8.3.    The Plan's Treatment of Holders of Priority Claims (Class 3.1)**.

The treatment of the Holders of Allowed Priority Claims under the Plan shall be as follows**:**

        A.    The Holder(s) are unimpaired under the Plan; and

        B.    The Holder(s) shall be paid from the applicable Distribution Account(s) (i) the full amount of such Allowed Priority Claim in Cash on the later of (x) the Effective Date, (y) the date such Claim becomes an Allowed Priority Claim or (z) the date such Allowed Priority Claim becomes payable in accordance with the terms governing such Allowed Priority Claim, or (ii) upon such other less favorable terms as may be agreed to by such Holder and the Plan Trustee.

**8.4.    The Plan's Treatment of Holders of Allowed General Unsecured Claims (Class 4.1).**

The rights of Holders of Allowed Class 4.1 Claims are impaired under the Plan. Under the Plan, each claimant will receive a distribution of the Available Cash, if any, on or before the thirtieth (30th) day after the Effective Date, equal to the Net Sales Proceeds remaining after the payment of all Allowed Administrative, Priority and Secured Claims, including Holders of Mechanic Lien Claims, but only up to the Maximum Distribution.

**8.5.    The Plan's Treatment of Holders of Allowed Interests.**

The Interests of the Holders in Class 5.1 and 5.2 are impaired under the Plan. All such Interests shall be cancelled as of the Effective Date and no distribution shall be made to these Holders on account of such Interest(s).

## IX.

## ACCEPTANCE OR REJECTION OF THE PLAN

**9.1.    Introduction.**

PERSONS OR ENTITIES CONCERNED WITH CONFIRMATION OF THE PLAN SHOULD CONSULT WITH THEIR OWN ATTORNEYS BECAUSE THE LAW ON CONFIRMING A PLAN OF REORGANIZATION IS VERY COMPLEX.  The following discussion is intended solely for the purpose of alerting readers about basic confirmation issues, which they may wish to consider, as well as certain deadlines for filing Claims.  The Debtors

1    cannot represent that the discussion contained below is a complete summary of the law on this

2    topic.

3        Many requirements must be met before the Court can confirm the Plan.  Some of the

4    requirements include that the Plan must be proposed in good faith, acceptance of the Plan, whether

5    the Plan pays creditors at least as much as creditors would receive in a Chapter 7 liquidation, and

6    whether the Plan is feasible.  The requirements described herein are <u>not</u> the only requirements for

7    confirmation.

8        **9.2.    <u>Who May Object to Confirmation of the Plan</u>.**

9        Any party in interest may object to the confirmation of the Plan, but as explained below not

10   everyone is entitled to vote to accept or reject the Plan.

11       **9.3.    <u>Who May Vote to Accept/Reject the Plan</u>.**

12       A Holder of a Claim or Interest has a right to vote for or against the Plan if that Holder of

13   the Claim or Interest has a Claim which is both (1) Allowed or Allowed for voting purposes and

14   (2) Classified in an impaired Class (excluding any class in which the Plan is "deemed rejected").

15   The votes will be tabulated on a Debtor by Debtor basis.

16       **9.4.    <u>What Is an Allowed Claim/Interest</u>.**

17       As noted above, a Holder of Claim or Interest must first have an Allowed Claim or

18   Allowed Interest to vote.

19       **9.5.    <u>What Is an Impaired Class</u>.**

20       A Class is impaired if the Plan alters the legal, equitable, or contractual rights of the Claims

21   or Interests in that Class, other than the right to accelerate the Claim upon certain kinds of defaults.

22   In this case, the SunCal Plan Proponents believe that all Classes, except for Class 3.1 are impaired.

23       **9.6.    <u>Who Is Not Entitled to Vote</u>.**

24       The following four types of Claims are <u>not</u> entitled to vote: (1) Claims that have been

25   disallowed; (2) Claims in unimpaired Classes; (3) Claims entitled to priority pursuant to

26   Bankruptcy Code Sections 507(a)(2) or (a)(3) and Claims in Classes that do not receive or retain

27   any value under the Plan.  Claims in unimpaired Classes are not entitled to vote because such

28   Classes are deemed to have accepted the Plan.  Claims entitled to priority pursuant to Bankruptcy

1    Code Section 507(a)(8) are not entitled to vote because such Claims are not placed in Classes and

2    they are required to receive certain treatment specified by the Bankruptcy Code.  Claims in Classes

3    that do not receive or retain any property under the Plan do not vote because such Classes are

4    deemed to have rejected the Plan. The Debtors believe that all Classes, except Class 3.1, are

5    entitled to vote.

6        EVEN IF YOUR CLAIM IS OF THE TYPE DESCRIBED ABOVE, YOU MAY STILL

7    HAVE A RIGHT TO OBJECT TO THE CONFIRMATION OF THE PLAN.

8        **9.7.    Who Can Vote in More than One Class.**

9        A creditor whose Claim has been Allowed in part as a Secured Claim and in part as an

10   Unsecured Claim is entitled to accept or reject a Plan in both capacities by casting one ballot for

11   the secured part of the Claim and another ballot for the Unsecured Claim.  Also, a Creditor may

12   otherwise hold Claims in more than one Class (such as a Holder of Senior Secured Claims and

13   Subordinated Note Claims), and may vote the Claims held in each Class.

14       **9.8.    Votes Necessary for a Class to Accept the Plan.**

15       A Class of Claims is deemed to have accepted the Plan when more than one-half (1/2) in

16   number and at least two-thirds (2/3) in dollar amount of the Claims *that actually voted*, vote to

17   accept the Plan.  A Class of interests is deemed to have accepted the Plan when Holders of at least

18   two-thirds (2/3) in amount of the interest-Holders of such Class which actually vote, vote to accept

19   the Plan.

20       **9.9.    Treatment of Nonaccepting Classes.**

21       As noted above, even if there are impaired Classes that do not accept the proposed Plan, the

22   Court may nonetheless confirm the Plan if the nonaccepting Classes are treated in the manner

23   required by the Code and at least one impaired Class of Claims accepts the Plan. The process by

24   which a plan may be confirmed and become binding on non-accepting Classes is commonly

25   referred to as "cramdown."  The Bankruptcy Code allows the Plan to be "crammed down" on

26   nonaccepting Classes of Claims or interests if it meets all statutory requirements except the voting

27   requirements of 1129(a)(8) and if the Plan does not "discriminate unfairly" and is "fair and

28

1    equitable" with respect to each impaired Class that has not voted to accept the Plan, as set forth in

2    11 U.S.C. § 1129(b) and applicable case law.

3        **9.10.    Request for Confirmation Despite Nonacceptance by Impaired Class(es).**

4        The SunCal Plan Proponents will ask the Court to confirm the Plan by cramdown on any

5    impaired Class if such Class does not vote to accept the Plan.

6    **X.**

7    **MEANS OF EXECUTION AND IMPLEMENTATION OF THE PLAN**

8        **10.1.    Introduction.**

9        This section is intended to address how the SunCal Plan Proponents intend to implement

10    the provisions of the Plan.  It addresses the transfer of the Plan Trust Asset to the Plan Trust, the

11    nature of the Plan Trust, the powers of the Plan Trust, the governance of the Plan Trust, the

12    resolution of disputed claims, the sources of funds that will be used to pay claims and the

13    mechanics of how claims will be paid.

14        **10.2    Sale Process of the Group II: Voluntary Projects During the Sale Period**.

15        The core objective of the Plan is to enable all creditors holding Allowed Claims to receive

16    the highest dividend possible by selling the estates' primary assets, the Group II: Voluntary

17    Projects, to the highest bidder. The process of marketing the Group II: Voluntary Projects for sale

18    will begin, pursuant to the Confirmation Order, immediately after the entry of this order.

19    Acquisitions shall manage the marketing process initially in its capacity as a SunCal Plan

20    Proponent and as the Plan Trustee after the Effective Date.  Furthermore, the Voluntary Debtors'

21    Committee shall be consulted and have the opportunity to object to the sales process and request a

22    hearing with the Bankruptcy Court.

23        The sale of the Group II: Voluntary Projects shall be sold, free and clear of all

24    monetary liens and encumbrance, pursuant to the following sales procedures:

25        1.    The Group II: Voluntary Projects will be sold through a public

26    auction after a commercially reasonable marketing and advertising effort of at least sixty (60) days

27    duration;

28

-51-

2.    The SunCal Plan Proponents shall have the right to provisionally accept an Opening Bid from a Stalking Horse Bidder prior to the public auction and to grant this bidder the right to receive the Beaumont Heights Project Break-up Fee or the Johannson Ranch Project Break-up Fee, as the case may be, if such bidder is not the Winning Bidder;

3.    Other Qualified Bidders shall have the right to overbid the Opening Bid by submitting a Qualifying Bid. The first round of Qualifying Bids after the Opening Bid must be equal to or in excess of the Initial Overbid Amount. Thereafter, all Qualifying Bids shall be equal to or in excess or the Minimum Increment;

4.    The highest Qualifying Bid received from a Qualified Bidder, shall be accepted as the Winning Bid, and the submitting bidder shall be the Winning Bidder. Upon payment of the Winning Bid, the Winner bidder shall receive title to the applicable Group II: Voluntary Project free and clear of all monetary liens and encumbrances; and

5.    The Net Sales Proceeds from the sale of the Group II: Voluntary Projects shall be deposited into the applicable Net Sales Proceeds Account.

The SunCal Plan Proponents will pursue the following sale procedures after the Confirmation Date:

A.    <u>Implementation of a Marketing Program</u>. On or before the Confirmation Date, the SunCal Plan Proponents will market the Group II: Voluntary Projects for sale through a comprehensive sale effort during the Sale Period. This sale effort will include 1) sending sale packages describing each Group II: Voluntary Project to the real estate brokerage community; b) advertising the Group II: Voluntary Projects for sale on a website that includes links allowing direct access to all relevant information regarding the Group II: Voluntary Projects; and c) sending packages to a list of prospects nationally who are actively seeking or may have interest in these kinds of assets.

B.    <u>Identifying a Stalking Horse Bidder</u>. On the first business day after the Effective Date, the Plan Trustee will accept, on a provisional basis, an Opening Bid for one or both of the Group II: Voluntary Projects.  The bidder whose Opening Bid is accepted for each Group II: Voluntary Project will become the "Stalking Horse Bidder."  The Opening Bid must be equal to

the Minimum Sale Price(s) fixed in the Plan for each Group II: Voluntary Project. The Plan

Trustee shall also select Qualified Bidders at this time.

C.    The Sale Contract. The sale contract that will be entered into with the

Stalking Horse Bidder will include the following bankruptcy-sale related provisions:

1.    Overbid Provisions. The contract will allow the SunCal Plan

Proponents to seek "overbids" from other Qualified Buyers, and to accept an Initial Overbid that

exceeds the Stalking Horse Bid by the Initial Overbid Amount applicable to each Group II:

Voluntary Project. In the case of Beaumont Heights Project, the Initial Overbid Amount is a sum

that is not less than the sum of the applicable Opening Bid, the Beaumont Heights Ranch Break-up

Fee and Minimum Increment. In the case of the Johannson Ranch Project, the Initial Overbid

Amount is a sum that is not less than the sum of the applicable Opening Bid, the Johannson Ranch

Break-up Fee and the Minimum Increment.

2.    Break-Up Fees. The sale contract will include a "break-up fee"

provision. This fee will be payable to the Stalking Horse Bidder if the Opening Bid is overbid, and

another Qualified Bidder purchases the Group II: Voluntary Project(s) that is the subject of the

Opening Bid.

3.    Sale Free And Clear of Liens. The sale contract will provide that the

Group II: Voluntary Project(s) are being sold free and clear of all monetary liens and

encumbrances.

D.    The Auction. Fourteen (14) days after the date of the selection of the

Stalking Horse Bidder, the Plan Trustee will conduct a public auction wherein all Qualified

Bidders who have submitted Qualified Bids for the Group II: Voluntary Projects will have the

opportunity to increase their bids for these Projects. The Qualified Bidder that submits the highest

bid for the Project will then be designated the Winning Bidder. The Winning Bidder will then have

fifteen (15) days pay the Winning Bid amount and the closing shall occur no later than the first

business day following the thirtieth (30th) day after the Effective Date.

**10.3    Establishment and Operations of the Plan Trust**.

The Plan Trust shall be established and shall become effective on the Effective Date.  The Plan Trust is created pursuant to the Plan and the Confirmation Order.  The primary purpose of the Plan Trust is to consummate the sales and/or the liquidation of the Group II: Voluntary Projects transferred to it and the Distribution of the Net Sales Proceeds to Creditors, with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Plan Trust.  The Plan Trust shall hold title to and administer the Plan Trust Assets, including, but not limited to, any Litigation Claims, and the proceeds thereof for liquidation and distribution in accordance with the terms of the Plan.

**10.4    Preservation and Pursuit of Litigation Claims and Recovery for the Plan Trust**.

On the Effective Date, title to and possession of all property of the Group II: Voluntary Debtors shall be deemed transferred and delivered to the Plan Trust, without further act or action under any applicable agreement, law, regulation, order or rule of law.

Pursuant to Section 1123(b)(3) of the Bankruptcy Code, the Plan Trust shall retain all Litigation Claims whether or not pending on the Effective Date that are not purchased by LitCo Unless a Litigation Claim is expressly waived, relinquished, released, sold, compromised or settled in the Plan or in a Final Order, all rights with respect to such Litigation Claims are reserved and the Plan Trustee may pursue such Litigation Claims.  Notwithstanding the foregoing, the Plan Trustee shall not settle or abandon a Litigation Claim valued at greater than $100,000 except upon ten (10) days' prior written notice and opportunity to object to the proposed action.  Any disputes concerning the settlement or abandonment of a Litigation Claim shall be submitted to the Bankruptcy Court for resolution on no less than ten (10) days' notice to the objecting party.

All Litigation Recoveries realized or obtained by the Plan Trustee shall be promptly deposited into the applicable Distribution Account(s).  Except as otherwise provided in the Plan and the Confirmation Order, the Litigation Recoveries shall be free and clear of all Claims and Liens and shall only be expended in accordance with the provisions of the Plan.

**10.5**   **Payment of Plan Trust Expenses**.

The expenses incurred by the Plan Trust or the Plan Trustee during the Plan Period, shall be paid, or adequate reserves shall be created for the payment of such expenses, prior to any distribution to the Plan Trust Beneficiaries.

**10.6**   **The Plan Trust Distribution System.**

The Plan Trustee shall establish a separate "Distribution Account" for each Group II: Voluntary Debtor at an FDIC insured bank. Each Group II: Voluntary Debtor's Available Cash, whether on hand as of the Effective Date or received thereafter, shall be deposited into that Group II: Voluntary Debtor's Distribution Account.  These funds will then be used to pay the claims of Creditors holding Allowed Claims in their order of priority as provided for in the Plan.  Persons dealing with the Plan Trustee, or seeking to assert Claims against the Debtors, the Estates or the Plan Trust, shall look only to property of the Debtors, the Estates or the Plan Trust to satisfy any liability to such Persons, and the Plan Trustee shall have no corporate, personal, or individual obligation to satisfy any such liability.

**10.7**   **The Plan Trustee**.

**10.7.1  Appointment**.  Acquisitions shall be Plan Trustee of the Plan Trust.  The appointment of the Plan Trustee shall be effective as of the Effective Date.

**10.7.2  Term**.  Unless the Plan Trustee resigns, dissolves or is removed by Court order earlier, the Plan Trustee's term shall expire upon termination of the Plan Trust pursuant to the Plan.  In the event the Plan Trustee resigns, dies or is removed by Court order prior to termination of the Plan Trust, the UST shall select and recommend to the Court a successor Plan Trustee.

**10.7.3**   **Powers and Duties**.  On the Effective Date, the Plan Trustee shall have the rights, powers and duties set forth in the Plan, the Confirmation Order, and Bankruptcy Code §§505, 1107 and 1108.  The Plan Trustee shall be governed in all things by the terms of the Plan and the Confirmation Order.  The Plan Trustee shall administer the Plan Trust in accordance with the Plan.  Without limitation, the Plan Trustee shall file final federal, state, foreign and, to the extent applicable, local, tax returns.  Without further Motion, notice, or order of the Court, the Plan

MAINDOCS-#164995-v3-SunCal_3rd_Am_Group_II_VD_DS.DOC

Trustee shall be authorized, empowered and directed to take all actions necessary to comply with the Plan and exercise and fulfill the duties and obligations arising thereunder, including, without limitation to:

      i.     employ, retain, and replace one or more attorneys, accountants, auctioneers, brokers, managers, consultants, other professionals, agents, investigators, expert witnesses, consultants, and advisors as necessary to discharge the duties of the Plan Trustee under the Plan;

      ii.     control and effectuate the Claims reconciliation process, including to object to, seek to subordinate, compromise or settle any and all Claims against the Debtors pursuant to the terms of the Plan;

      iii.     open, maintain and administer bank accounts as necessary to discharge the duties of the Plan Trustee under the Plan;

      iv.     make Distributions to the Holders of Allowed Claims in accordance with the Plan;

      v.     retain professionals to assist in performing his or her duties under the Plan;

      vi.     pay reasonable and necessary professional fees, costs, and expenses;

      vii.     investigate, analyze, commence, prosecute, litigate, compromise, settle, dismiss, and otherwise administer all Causes of Action and Avoidance Actions for the benefit of the Plan Trust and its beneficiaries, as set forth in the Plan, and to take all other necessary and appropriate steps to collect, recover, settle, liquidate, or otherwise reduce to Cash all Causes of Action and Avoidance Actions, as the Plan Trustee may determine is in the best interests of the Plan Trust;

      viii.     administer, sell, liquidate, or otherwise dispose of the Assets in accordance with the terms of the Plan;

      ix.     incur and pay reasonable and necessary expenses in connection with the performance of the Plan Trustee's duties under the Plan;

1          x.      represent the Estates before the Court and other courts of competent

2    jurisdiction with respect to matters concerning the Plan Trust;

3          xi.     seek the examination of any entity under the subject to the provisions

4    of Bankruptcy Rule 2004;

5          xii.    comply with applicable orders of the court and any other court of

6    competent jurisdiction over the matters set forth in the Plan;

7          xiii.   comply with all applicable laws and regulations concerning the

8    matters set forth in the Plan;

9          xiv.    exercise such other powers as may be vested in the Plan Trust

10   pursuant to the Plan, the Confirmation Order, or other Final Orders of the Court.

11         xv.     execute any documents, instruments, contracts, and agreements

12   necessary and appropriate to carry out the powers and duties of the Plan Trust;

13         xvi.    (1) seek a determination of tax liability under §505 of the code, (2)

14   pay taxes, if any, related to a Debtor, (3) file, if necessary, any and all tax and information returns

15   required with the respect to the Plan Trust, including, if appropriate, treating the Plan Trust as a

16   "grantor trust" pursuant to Treas. Reg 1.671-4 or otherwise, (4) make tax elections by and on

17   behalf of the Plan Trust, and (5) pay taxes, if any, payable by the Plan Trust; and

18         xvii.   stand in the shoes of the Debtors for all purposes.

19         **10.7.4     Retention of Professionals and Compensation Procedure.**

20         On and after the Effective Date, the Plan Trustee may, without further application or

21   Motion, notice, hearing, or Court order, engage or employ such professionals and experts as may

22   be deemed necessary and appropriate by the Plan Trustee to assist the Plan Trustee in carrying out

23   the provisions of the Plan, including, but not limited to, the Professionals retained prior to the

24   Effective Date by either the Debtors or the Voluntary Debtors' Committee.  The Plan Trustee may

25   employ such professionals on any reasonable terms and conditions of employment to be

26   determined by the Plan Trustee.  For the services performed on and after the Effective Date, the

27   professionals engaged by the Plan Trustee (the "Plan Trustee Professionals") shall receive

28

1    reasonable compensation and reimbursement of expenses in a manner to be determined by the Plan

2    Trustee.

3            **10.7.5    Fees and Expenses.**

4            Acquisitions shall not receive any compensation for the services it performs as the Plan

5    Trustee.  The Plan Trustee Professionals shall be entitled to reasonable compensation for their

6    services, and reimbursement of expenses.  The costs and expenses of the Plan Trust (including,

7    without limitation, fees and expenses of the Plan Trustee Professionals) shall be paid from the Plan

8    Trust.  The Plan Trustee shall pay, without further order, notice or application to the Court, the

9    reasonable fees and expenses of the Plan Trustee Professionals, as necessary to discharge the Plan

10   Trustee's duties under the Plan.  The Plan Trustee shall be authorized to reserve funds from the

11   Plan Trust as is reasonable to pay the expenses of the Plan Trustee and the expenses and fees of the

12   Plan Trustee Professionals before making any Distributions under the Plan.

13           **10.7.6    Limitation of Liability and Indemnification.**

14           None of the Group II: Voluntary Debtors, the Voluntary Debtors' Committee, the Plan

15   Sponsor, the SunCal Plan Proponents, the Plan Trustee, the Professionals, nor any of their

16   respective members, officers, directors, shareholders, employees, or agents (the "Indemnified

17   Parties") shall be liable (a) for any loss or damages by reason of any action taken or omitted by him

18   or her, except in the case of fraud, willful misconduct, bad faith, or gross negligence, (b) for any

19   act or omission made in reliance upon the Debtors' books and records or upon information or

20   advice given to the Plan Trustee by his or her professionals, or (c) for any action taken or omission

21   made in connection with or related to the negotiations, formulation, or preparation of the Plan and

22   the Disclosure Statement, the approval of the Disclosure Statement, the confirmation of the Plan,

23   the consummation of the Plan, or the administration of the Plan, the Cases, or the property to be

24   distributed under the Plan, to the fullest extent permitted by applicable statute and case law.

25   Except as otherwise provided in this Plan, the Plan Trustee shall rely and shall be protected in

26   acting upon any resolution, certificate, statement, instrument, opinion, report, notice, consent, or

27   other document believed by him or her to be genuine and to have been signed by the proper party

28   or parties.

1    The Indemnified Parties shall be indemnified and receive reimbursement from and against

2    any and all loss, liability, expense (including attorneys' fees) or damage of any kind, type or nature,

3    which the Indemnified Party may incur or sustain the exercise and performance of any of the Plan

4    Trustee's powers and duties under this Plan or the Confirmation Order, or in the rendering of

5    services by the Indemnified Party to the Plan Trustee, to the full extent permitted by applicable

6    law, except if such loss, liability, expense or damage is finally determined by a court of competent

7    jurisdiction to result from the Plan Trustee's or an Indemnified Person's fraud, willful misconduct,

8    bad faith, or gross negligence.  The amounts necessary for such indemnification and

9    reimbursement shall be paid by the Plan Trustee out of the Plan Trust Assets.  The Plan Trustee

10   shall not be liable for the payment of any Plan Trust expense or claim or other liability of the Plan

11   Trust, and no Person shall look to the Indemnified Parties for the payment of any such expense or

12   liability.  This indemnification shall survive the dissolution, resignation or removal, as may be

13   applicable, of the Plan Trustee, or the termination of the Plan Trust, and shall inure to the benefit

14   of the Plan Trustee's and the Indemnified Person's heirs and assigns.

15           **10.7.7  Plan Trustee as Successor.**

16   Pursuant to Code §1123(b), the Plan Trustee shall be the successor to the Group II:

17   Voluntary Debtors for all purposes.

18           **10.8     The Plan Trust Beneficiaries**.

19   The Holders of Allowed Claims under the Plan, or any successors to such Holders'

20   Allowed Claims ("Beneficiary" or "Beneficiaries") shall own a beneficial interest in the Plan Trust

21   which shall, subject to the Plan, be entitled to a Distribution, if any, in the amounts, and at the

22   times, set forth in the Plan.  Ownership of a beneficial interest in the Plan Trust shall not be

23   evidenced by any certificate, security, or receipt or in any other form or manner whatsoever, except

24   as maintained on the books and records of the Plan Trust by the Plan Trustee.  The ownership of a

25   beneficial interest in the Plan Trust shall not entitle any Beneficiary to any title in or to the Plan

26   Trust assets or to any right to call for a partition or division of such assets or to require an

27   accounting.  The Plan Trustee shall make Distributions, if any, to Beneficiaries in the manner

28   provided in the Plan.

MAINDOCS-#164995-v3-SunCal_3rd_Am_Group_II_VD_DS.DOC

1    The rights of the Beneficiaries arising under the Plan Trust may be deemed "securities"

2    under applicable law.  However, such rights have not been defined as "securities" under the Plan

3    because (a) the intent of the Plan is that such rights shall not be securities, and (b) if the rights

4    arising under the Plan Trust are deemed to be "securities," the exemption from registration under

5    §1145 of the Bankruptcy code is intended to be applicable to such securities.

6    **10.9    No Payment of Transfer-Related Fees to the United States Trustee**.

7    The Plan Trust shall not be required to pay any fees to the United States Trustee based on

8    any transfers of the Plan Trust Assets to the Plan Trust or from the Plan Trust.

9    **10.10    No Payment of Transfer-Related Fees to the Plan Trustee**.

10   The Plan Trust shall not be required to pay any fees to the Plan Trustee based on any

11   transfers of Plan Trust Assets from the Group II: Voluntary Debtors to the Plan Trust, or from the

12   Plan Trust.

13   **10.11    Books and Records of Trust**.

14   The Plan Trustee, and to the extent of payments and distributions by any Disbursing Agent,

15   the Disbursing Agent, shall maintain an accounting of receipts and disbursements of the Plan

16   Trust. The Plan Trustee shall maintain the books and records of the Plan Trust, or provide storage

17   for such book and records, for the longer of six (6) years, or while Plan is in existence, provided

18   that the Court may, upon application by the Plan Trustee, authorize the Plan Trust to destroy all of

19   the Plan Trusts books and records at such time as Plan Trust has no further need for such books

20   and records. The Plan Trust's books and records shall be open to inspection at all reasonable times,

21   upon written request by the Voluntary Debtors' Committee.

22   **10.12    Federal Income Tax Treatment of the Holders of the Plan Trust Beneficial**

23   **Interests**.

24   For all United States federal income tax purposes, the transfers by the Group II: Voluntary

25   Debtors shall be treated by the Group II: Voluntary Debtors, their estates, the Plan Trust and the

26   Plan Trust Beneficiaries as a transfer of the Plan Trust Assets by the Group II: Voluntary Debtors

27   to the Plan Trust Beneficiaries followed by a transfer of the Plan Trust Assets by such the Plan

28   Trust Beneficiaries to the Trust. The Plan Trust Beneficiaries shall be treated as the grantors and

1   deemed owners of the Plan Trust for United States federal income tax purposes. The Plan Trust

2   Trustee and the Plan Trust Beneficiaries are required to value their interests in the Plan Trust

3   Assets consistently with the values placed upon the Plan Trust Assets by the Plan Trust, and to use

4   such valuations for all purposes. The Plan Trust Agreement shall provide for consistent valuations

5   of the Plan Trust Assets by the Plan Trust Trustee and the Plan Trust Beneficiaries, and shall

6   provide that the Plan Trust will determine the fair market value of the Plan Trust Assets within

7   thirty (30) days after the Effective Date, and send such determination to each the Plan Trust

8   Beneficiary. By its acceptance of a the Beneficial Interest, each recipient of such an interest will be

9   conclusively deemed to agree to use such valuations for all purposes, including, without limitation,

10  in computing any gain recognized upon the exchange of such holder's claim for purposes of

11  determining any United States Federal income tax, and shall be required to include those items of

12  income, deductions and tax credits that are attributable to its the Beneficial Interest in computing

13  its taxable income.

14       **10.13   Termination of the Trust.**

15       The Plan Trust shall continue in effect until the earlier of: (a) the date that all the Plan Trust

16  Assets has been liquidated, all proceeds have been converted to cash or distributed in kind, all the

17  Plan Trust Expenses have been paid, all claims to be paid under the Plan for which the Plan Trust

18  Trustee is obligated to make Distributions on have been paid, all distributions to be made with

19  respect to the Beneficial Interests have been made, all litigation to which the Plan Trust is a party

20  have been concluded by dismissal or an order issued by the court in which such litigation is

21  pending and such order has become "final" (consistent with the definition of Final Order in the

22  Plan for orders issued by the Bankruptcy Court), and the Chapter 11 Case has been closed; and (b)

23  the expiration of five (5) years from the Effective Date; provided, however, that the Plan Trust may

24  request the Bankruptcy Court to extend the permitted life of the Plan Trust for such additional

25  period as is reasonably necessary to conclude the liquidation and Distributions, not to exceed a

26  total of ten (10) years from the Effective Date, which request shall be filed so the Bankruptcy

27  Court may consider and rule on the request within six (6) months prior to the expiration of the

28  initial five-year term.

**10.14   Exemption from Certain Transfer Taxes**.

In accordance with Section 1146(a) of the Bankruptcy Code, the issuance, transfer or exchange of a security or the making or delivery of an instrument of transfer under the Plan may not be taxed under any law imposing a stamp tax or similar tax. All governmental officials and agents shall forego the assessment and collection of any such tax or governmental assessment and shall accept for filing and recordation any of the foregoing instruments or other documents without payment of such tax or other governmental assessment.

**10.15   Tax Consequence of The Plan**.

The implementation of the Plan may have federal, state and local tax consequences to the Group II: Voluntary Debtors, Creditors and Interest Holders.  No tax opinion has been sought or will be obtained with respect to any tax consequences of the Plan. This Disclosure Statement does not constitute and is not intended to constitute either a tax opinion or tax advice to any person, and the summary contained herein is provided for informational purposes only.

CREDITORS AND INTEREST HOLDERS ARE ADVISED TO CONSULT WITH THEIR OWN TAX ADVISORS REGARDING THE TAX CONSEQUENCES TO THEM AND TO THE DEBTOR OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES.

**10.16   The Voluntary Debtors' Committee.**

On the Effective Date, the Voluntary Debtors' Committee shall continue to serve their applicable Debtors as Voluntary Debtors' Committee to the applicable reorganized Debtors, subject to the following:

**10.16.1      Duties and Powers.**

The duties of the Voluntary Debtors' Committee after the Effective Date shall be limited to monitoring the Plan's implementation, notice and opportunity to object to the sales process, notice and opportunity to object to any settlement of the Lehman Adversary Proceeding, and the Contract Action, standing to object to any settlement of any Litigation Claim in excess of $100,000, standing to object to any proposed sales procedures on sale of the Group II: Voluntary Projects, and standing and sole and exclusive right to file, prosecute and resolve potential Avoidance

1    Actions against and objections to Claims filed by (i) SunCal Affiliates, including SunCal

2    Management, Acquisitions, and SC Master Marketing, LLC and (ii) certain professionals for the

3    SunCal Affiliates, including Voss, Cook & Thel, LLP, The MB Firm, White & Case, LLP, RBF

4    Consulting and Mayer Brown LLP.  Voluntary Debtors' Committee shall receive notice of and the

5    right to review all payments and Distributions.

6         The Voluntary Debtors' Committee shall be entitled to retain, employ and compensate

7    Professionals, in order to assist with the obligations and rights of the Voluntary Debtors'

8    Committee under the terms of the Plan.  Such compensation shall be paid from the applicable

9    Distribution Account(s).

10              **10.16.2   <u>Dissolution of Voluntary Debtors' Committee</u>.**

11        The Voluntary Debtors' Committee shall be dissolved upon the entry of an order

12   converting, closing or dismissing the Chapter 11 Cases or entry of a final decree in the Chapter 11

13   Cases.  On dissolution, the Voluntary Debtors' Committee shall have no other or further

14   obligations or responsibilities on behalf of the Plan Trust.

15        **10.17   <u>Claims Estimation Rights</u>.**

16        On the Confirmation Date, the SunCal Plan Proponents shall be vested with standing to file

17   a motion under 11 U.S.C. § 502(c), and they shall be authorized and empowered to seek in such

18   motion the estimation, for Distribution purposes, of any Disputed Claim seeking recourse to, or

19   claiming an interest in, any asset of the Group II: Voluntary Debtors. After the Bankruptcy Court

20   estimates a Disputed Claimant's rights in, or against an asset of the Estates through this procedure,

21   the Plan Trustee shall have the right to use any funds or assets not deemed subject to the rights of

22   the Disputed Claimant, to pay the Allowed Claims under the terms of the Plan, including Allowed

23   Administrative Claims, after the Effective Date.

24

25

26

27

28

# XI.

# RISK FACTORS

## 11.1    Plan Risks.

The Plan in this case, like any Chapter 11 reorganization plan, includes a number of risks that creditors should be aware of prior to voting on the Plan. The more material of these risks are summarized below.

### 11.1.1   The Plan May Not Be Accepted or Confirmed.

While the SunCal Plan Proponents believe that the Plan is confirmable under the standards set forth in 11 U.S.C. § 1129, there can be no guarantee that the Bankruptcy Court will find the Plan to be confirmable. If the Plan is not confirmed, it is possible that an alternative plan can be negotiated and presented to the Bankruptcy Court for approval; however, there can be no assurance that any alternative plan would be confirmed, that the Chapter 11 Cases would not be converted to a liquidation, or that any alternative plan of reorganization could or would be formulated on terms as favorable to the Creditors and holders of Equity Interests as the terms of the Plan.

### 11.1.2   Failure to Sell The Group II: Voluntary Projects.

The Plan is based upon the assumption that the SunCal Plan Proponents will be able to close the sale of the Group II: Voluntary Projects for at least Minimum Sales Prices during the Sale Period. Although the SunCal Plan Proponents are confident that they can achieve sales at these prices based upon their market research and familiarity with the projects, a possibility exists that these sales will not occur. If this occurs then the creditors holding liens against the Group II: Voluntary Projects will be entitled to seek recourse against these properties, and this recourse would include foreclosure.

# XII.

# DISTRIBUTIONS

## 12.1   Distribution Agent.

Acquisitions shall serve as the Distribution Agent for distributions due under the Plan. The Distribution Agent may employ one or more sub agents on such terms and conditions as it may

agree in its discretion and pay such sub agent as a Post Confirmation Expense from the

Distribution Accounts.  The Distribution Agent shall not be required to provide any bond in

connection with the making of any Distributions pursuant to the Plan.

### 12.2    Distributions.

#### 12.2.1    Dates of Distributions.

Any distribution required to be made on the Effective Date shall be deemed timely if made

as soon as practicable after such date and, in any event, within thirty (30) days after such date.  Any

distribution required to be made upon a Disputed Claim becoming an Allowed Claim and no

longer being a Disputed Claim shall be deemed timely if made as soon as practicable thereafter.

#### 12.2.2    Limitation on Liability.

Neither the Plan Sponsor, the Plan Trustee, the Distribution Agent, their Affiliates, nor any

of their employees, members, officers, directors, agents, or professionals or Affiliates shall be

liable for (i) any acts or omissions (except for gross negligence or willful misconduct) in

connection with implementing the Distribution provisions of the Plan and the making or

withholding of Distributions pursuant to the Plan, or (ii) any change in the value of distributions

made pursuant to the Plan resulting from any delays in making such distributions in accordance

with the Plan's terms (including but not limited to any delays caused by the resolution of Disputed

Claims).

### 12.3    Old Instruments and Securities.

#### 12.3.1    Surrender and Cancellation of Instruments and Securities.

As a condition to receiving any distribution pursuant to the Plan, each Person holding any

note or other instrument or security (collectively "Instruments or Securities" and individually an

"Instrument or Security") evidencing an existing Claim(s) against the Debtor(s) must surrender

such Instrument or Security to the Distribution Agent.

#### 12.3.2    Cancellation of Liens.

Except as otherwise provided in the Plan, any Lien securing any Secured Claim shall be

deemed released and discharged, and the Person holding such Secured Claim shall be authorized

and directed to release any collateral or other property of the Debtors (including, without

1    limitation, any cash collateral) held by such Person and to take such actions as may be requested by

2    the Plan Trustee to evidence the release of such Lien, including, without limitation, the execution,

3    delivery and Filing or recording of such releases as may be requested by the Plan Trustee.

4          **12.3.3**    **De Minimis Distributions and Fractional Shares**.

5          No Cash payment of less than ten dollars ($10) shall be made by the Plan Trust to any

6    Holder of Claims unless a request therefore is made in writing to the Plan Trust.  Whenever

7    payment of a fraction of a cent would otherwise be called for, the actual payment shall reflect a

8    rounding down of such fraction to the nearest whole cent.  Any Cash or other property that is not

9    distributed as a consequence of this section shall, after the last distribution on account of Allowed

10    Claims in the applicable Class, be treated as "Unclaimed Property" under the Plan.

11          **12.3.4**    **Delivery of Distributions**.

12          Except as provided in the Plan with respect to Unclaimed Property, distributions to Holders

13    of Allowed Claims and Allowed Administrative Claims shall be distributed by mail as follows:  (1)

14    with respect to each Holder of an Allowed Claim that has filed a Proof of Claim, at the address for

15    such Holder as maintained by the official claims agent for the Debtors; (2) with respect to each

16    Holder of an Allowed Claim that has not filed a Proof of Claim, at the address reflected on the

17    Schedules filed by the Debtors, provided, however, that if the Debtors or the Plan Trust has

18    received a written notice of a change of address for such Holder, the address set forth in such

19    notice shall be used; or (3) with respect to each Holder of an Allowed Administrative Claim, at

20    such address as the Holder may specify in writing.

21          **12.3.5**    **Undeliverable Distributions**.

22          If the Distribution of Cash to the Holder of any Allowed Claim is returned to the Plan

23    Trustee as undeliverable or the Distribution check is not negotiated within 90 days of mailing (any

24    such distribution being hereinafter referred to as "Unclaimed Property"), no further distribution

25    shall be made to such Holder unless and until the Plan Trustee is notified in writing of such

26    Holder's then current address.  Subject to the remainder of this Section and the following section,

27    Unclaimed Property shall remain in the possession of the Plan Trustee pursuant to this Section, and

28    shall be set aside and (in the case of Cash) held in a segregated interest bearing account (as to Cash

1    Unclaimed Property) to be maintained by the Distribution Agent until such time as the subject

2    Distribution becomes deliverable.  Nothing contained in the Plan shall require the Plan Trustee or

3    any other Person to attempt to locate such Person.

4                                              **XIII.**

5                    **OBJECTIONS TO CLAIMS AND DISPUTED CLAIMS**

6            **13.1    Standing for Objections to Claims.**

7            The Plan Trustee shall have the sole and exclusive right to file, prosecute and resolve

8    objections to Claims, except as specifically provided herein.  The Voluntary Debtors' Committee

9    shall have the sole and exclusive right to file, prosecute and resolve objections to Claims filed by

10    (i) SunCal Affiliates, including SunCal Management, Acquisitions, and SC Master Marketing,

11    LLC and (ii) certain professionals for the SunCal Affiliates, including Voss, Cook & Thel, LLP,

12    The MB Firm, White & Case, LLP, RBF Consulting and Mayer Brown LLP.  Any objection to a

13    Claim shall be Filed with the Bankruptcy Court and served on the Person holding such Claim on or

14    before the applicable Claims Objection Deadline.  The Plan Trustee shall have the right to petition

15    the Bankruptcy Court, without notice or a hearing, for an extension of the Claims Objection

16    Deadline if a complete review of all Claims cannot be completed by such date.

17            **13.2    Treatment of Disputed Claims and Disputed Liens.**

18                    **13.2.1  No Distribution Pending Allowance.**

19            If any portion of a Claim or Lien is a Disputed Claim or Disputed Lien, no payment

20    or distribution provided for under the Plan shall be made on account of such Claim or Lien unless

21    and until such Claim or Lien becomes an Allowed Claim and/or Allowed Lien.

22                    **13.2.2  Distribution After Allowance.**

23            On the next Distribution Date following the date on which a Disputed Claim

24    becomes an Allowed Claim and is no longer a Disputed Claim, the Distribution Agent shall

25    distribute to the Person holding such Claim any Cash that would have been distributable to such

26    Person if on the initial Distribution Date such Claim had been an Allowed Claim and not a

27    Disputed Claim.

28

### 13.2.3  Reserves for Disputed Claims

In the event that Disputed Claims are pending at the time of a Distribution under the Plan, the Plan Trustee shall establish and maintain a reserve for such Disputed Claims.  For purposes of establishing a reserve, Cash will be set aside equal to the amount that would have been distributed to the Holders of the Disputed Claims had the Disputed Claims been Allowed on the date a Distribution is made to the Holders of Allowed Claims in the same Class or of the same priority as the Disputed Claims.  If a Disputed Claim ultimately becomes an Allowed Claim, the amount of Cash reserved for that Disputed Claim shall be distributed on the earlier of (a) the distributed Date following the date when the Disputed Claim becomes an Allowed Claim, or (b) ninety (90) days after such Disputed Claim becomes an Allowed Claim.  Any reserved Cash not ultimately distributed to the Holder of a Disputed Claim because the Disputed Claim does not become an Allowed Claim shall become property of the Plan Trust and shall be distributed in accordance with the terms of the Plan.

## XIV.

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 14.1  Executory Contracts to be Assumed and Assigned.

Under the Plans, the Group II: Voluntary Projects will be sold.  As a result, the Group II: Voluntary Debtors will assume only those executory contracts and unexpired leases to be assigned to the Winning Bidder with respect to the applicable Group II: Voluntary Project and the Restructuring Agreement and Settlement Agreement.

On the Effective Date, the executory contracts and unexpired leases identified on the Schedule of Assumed and Assigned Agreements attached or to be attached hereto as Exhibit "9" or filed or to be filed as Exhibit "9" to this document shall be deemed assumed and assigned to the applicable Winning Bidder, as specified in the Confirmation Order.  The SunCal Plan Proponents intend to file the Schedule of Assumed and Assigned Agreements with the Court no later than twenty-eight (28) days prior to the Confirmation Hearing.  The Schedule of Assumed and Assigned Agreements also identifies or will identify any amounts that must be paid to cure defaults under the executory contacts and unexpired leases to be assumed and assigned under the Plan (the "Cure

Amount").  If filed earlier, the SunCal Plan Proponents reserve the right to amend the Schedule of Assumed Agreements up to twenty-eight (28) days prior to the Confirmation Hearing (October 24, 2011) to: (a) add any executory contract or unexpired lease and provide for its assumption and assignment; or (b) modify the Cure Amount for any particular executory contract or unexpired lease.  The SunCal Plan Proponents further reserve the right to amend the Schedule of Assumed Agreements to delete any executory contract or unexpired lease and provide for its rejection at any time prior to the Confirmation Hearing.  The SunCal Plan Proponents will provide notice of any amendment to the Schedule of Assumed and Assigned Agreements to any party or parties to the executory contracts or unexpired leases affected by the amendment.  Absent a timely objection as provided below, the Confirmation Order will constitute a Court Order approving the assumption and assignment, on the Effective Date, of the executory contracts and unexpired leases then identified on the Schedule of Assumed and Assigned Agreements, and shall constitute a final determination of the Cure Amount and that the estate has shown adequate assurance of future performance.  Furthermore, any Cure Amount ordered by the Court, through entry of the Confirmation Order, and paid shall be deemed to satisfy any and all defaults arising from, out of or related to the executory contract of unexpired lease, including any tort claims that were or could be asserted by the non-debtor party to the contract or lease on or prior to the entry of the Confirmation Order, and all actual or pecuniary losses that have resulted from such defaults.

If you are a party to an executory contract or unexpired lease to be assumed and assigned and you object to the assumption and assignment of your lease or contract and/or you dispute the Cure Amount related to your lease or contract, then you must File and serve upon counsels for the SunCal Plan Proponents (at the address on the upper left hand corner of the caption page) a written objection by fourteen days before the Confirmation Hearing.  An objection to the Cure Amount must also set forth the amount you contend to be the correct Cure Amount and contain evidence to support such amount.  Failure to timely File an objection as provided herein shall be deemed consent to the proposed assumption and assignment and to the Cure Amount and a waiver of any and all rights to challenge such assumption and assignment and the Cure Amount.

With respect to each executory contract and unexpired lease identified on the Schedule of Assumed and Assigned Agreements, if no dispute arises regarding the Cure Amount, adequate assurances, or some other matter related to the assumption of the executory contact or unexpired lease, then the Cure Amount set forth in the schedule of Assumed and Assigned Agreements shall be paid to the applicable non-debtor party in Cash on the Effective Date or as soon as reasonably practicable thereafter.  If a dispute arises regarding (a) whether the proposed assignee has provided adequate assurance of future performance of an executory contract or unexpired lease to be assumed, or (b) any other matter pertaining to a proposed assumption and assignment, the Cure Amount will be paid on the later of (1) the Effective Date or as soon as practicable thereafter, or (2) within thirty (30) days after entry of a Final order resolving the dispute and approving the assumption and assignment; provided, however, if a dispute arises regarding any of the foregoing, the SunCal Plan Proponents reserve, for themselves and the Plan Trustee, the right to completely forego assumption and assignment of and, instead, reject the subject executory contract or unexpired lease.

If a party to an executory contract or unexpired lease identified on the Schedule of Assumed and Assigned Agreements Files an objection disputing the Cure Amount, then the SunCal Plan Proponents may amend the Schedule of Assumed and Assigned Agreements at any time prior to the Confirmation Hearing to delete the subject executory contract or unexpired lease and provide for its rejection.  Executory contracts or unexpired leases not so deleted shall be conditionally assumed, subject to the SunCal Plan Proponents' and/or the Plan Trustee's right to file a Motion to determine the appropriate Cure Amount up to the first (1st) Business Day that is at least sixty (60) days following the Effective Date.  The SunCal Plan Proponents and/or the Plan Trustee will serve any such Motion on the party to the executory contract or unexpired lease affected by the Motion (or its attorneys, if any).  If the SunCal Plan Proponents and Plan Trustee does not file a Motion to determine the appropriate Cure Amount, then the executory contract or unexpired lease shall be assumed and assigned, as of the Effective Date, and the Cure Amount shall be the alternative Cure Amount asserted by the non-debtor party to the subject executory

contract or unexpired lease in its objection to the Plan.  The Cure Amount shall be paid as soon as reasonably practicable following the expiration of the 60-day deadline.

    If the SunCal Plan Proponents or the Plan Trustee files a Motion to determine the appropriate Cure Amount, then the SunCal Plan Proponents and/or Plan Trust shall have the right to amend the Schedule of Assume and Assigned Agreements to completely forego assumption and assignment of and, instead, reject the subject executory contract or unexpired lease up to the first (1st) Business Day that is at least fifteen (15) days after the entry of an order fixing the Cure Amount.  The SunCal Plan Proponents and/or Plan Trustee will provide notice of any amendment to the Schedule of Assumed and Assigned Agreements to the party to the executory contract or unexpired lease affected by the amendment.  If the SunCal Plan Proponents and/or Plan Trustee has filed such a Motion and does not timely amend the Schedule of Assumed and Assigned Agreements within fifteen (15) days after entry of an order fixing the Cure Amount, then the executory contract or unexpired lease shall be assumed and assigned, as of the Effective Date, and the Cure Amount shall be fixed as the Cure Amount ordered by the Court.  The Cure Amount as soon as reasonably practicable following the expiration of the 15-day deadline.

**14.2**  **Executory Contracts to be Rejected.**

    On the Effective Date, the estate will be deemed to have rejected any and all executory contacts and unexpired leases <u>not</u> identified on the Schedule of Assumed and Assigned Agreements attached or to be attached hereto as Exhibit "9," or filed or to be filed as Exhibit "9" to this document.  The Confirmation Order will constitute a Court order approving the rejection, as of the Effective Date, of such executory contacts and unexpired leases.  Any Claim for damages arising from the rejection under the Plan of any executory contract or unexpired lease must be filed with the Court and served upon the SunCal Plan Proponents and the Plan Trustee within thirty (30) days of the later of (a) the Confirmation Date, and (b) the Plan Trustee's amendment of the Schedule of Assumed and Assigned Agreements to eliminate the executory contract or unexpired lease.  Any such damage Claims that are not timely filed and served will be forever barred and unenforceable against the applicable Debtors, the Estates, the Plan Trustee, the Plan Trust, and their respective property.  Persons holding these Claims who fail to timely file claims will be

1 barred from receiving any Distributions under the Plan on account of their rejection damage

2 Claims.

3         If you are a party to a lease or contract to be rejected and you object to the rejection

4 of your lease or contract, then you must file and serve your objection by fourteen days before the

5 Confirmation Hearing.

6 **XV.**

7 **BEST INTEREST OF CREDITORS TEST AND PLAN FEASIBILITY**

8     **15.1**   **Best Interests Test**.

9         Pursuant to Section 1129(a)(7) of the Bankruptcy Code, a Plan cannot be confirmed unless

10 the Bankruptcy Court determines that Distributions under the Plan to all Holders of Claims and

11 Interests who have not accepted the Plan and whose Claims are classified in Classes that are

12 impaired under the Plan, are not less than those which they would receive in a liquidation under

13 Chapter 7 of the Bankruptcy Code.

14         The Best Interest of Creditors Test must be satisfied even if the Plan is accepted by each

15 impaired Class of Claims and if any Holder of an Allowed Claim objects to the Plan on such basis.

16 The Best Interests Test requires the Bankruptcy Court to find either that either (i) <u>all</u> Holders of

17 Claims in an impaired Class of Claims have accepted the Plan or (ii) the Plan provides each Holder

18 of Allowed Claims of an impaired Class who has not accepted the Plan with a recovery of property

19 of a value, as of the effective date of the Plan, that is not less than the amount that such Holder

20 would receive if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code.

21         The Plan proposed by the SunCal Plan Proponents is essentially a liquidating plan. It

22 provides for the sale of all assets of the estate for their fair market value, the collection or recovery

23 of all other assets, and for the distribution of the resulting net proceeds from the sale, in accordance

24 with the priorities provided for in the bankruptcy code and under California law. A Chapter 7

25 trustee appointed in this case would be compelled to liquidate the Debtors' assets in the same

26 manner as provided for in the Plan and to pay out the proceeds in the same manner as provided for

27 in the Plan. Accordingly, under the terms of the Plan, each individual creditor is receiving "at least

28

1  as much" as such creditor would receive in a Chapter 7 case, which is all that is required under the

2  Best Interests Test.

3      **15.2    <u>Feasibility</u>**.

4          In addition, in order to confirm the Plan, the Bankruptcy Court must find that confirmation

5  of the Plan is not likely to be followed by the liquidation or the need for further financial

6  reorganization of the Debtor(s).  This requirement is imposed by Section 1129(a)(11) of the

7  Bankruptcy Code and is generally referred to as the "feasibility" requirement. As explained above,

8  the Debtors' Plan provides for the sale of all assets of their respective estates and for the

9  distribution of the proceeds. Within the context of this Plan, feasibility is limited to having

10 sufficient funds to pay administrative and priority claims on the Effective Date and sufficient funds

11 to fund the sale of the Properties.

12         Under timeline provided for in the Plan, the Group II: Voluntary Projects will be sold

13 during the Sale Period. These LitCo Plan Loan and the sales will provide the Debtors the means to

14 pay all claims, including allowed administrative and priority claims on this same date, from

15 escrow. All remaining claimants will then receive what they are entitled under the Plan when their

16 claims are allowed.

17                                          **XVI.**

18                          **<u>LIMITATION OF LIABILITY</u>**

19     **16.1    <u>No Liability for Solicitation or Participation</u>.**

20         As specified in Section 1125(e) of the Bankruptcy Code, entities that solicit acceptances or

21 rejections of the Plan and/or that participate in the offer, issuance, sale, or purchase of securities

22 offered or sold under the Plan, in good faith and in compliance with the applicable provisions of

23 the Bankruptcy Code, shall not be liable, on account of such solicitation or participation, for

24 violation of any applicable law, rule, or regulation governing the solicitation of acceptances or

25 rejections of the Plan or the offer, issuance, sale, or purchase of securities.

26

27

28

# XVII.

## CONDITIONS TO CONFIRMATION AND

## EFFECTIVENESS OF THE PLAN

**17.1    Conditions Precedent to Plan Confirmation.**

The only condition precedent to confirmation of the Plan is that the Bankruptcy Court shall have entered a Confirmation Order in form and substance reasonably acceptable to the SunCal Plan Proponents.

**17.2    Conditions Precedent to Plan Effectiveness.**

The conditions precedent to the effectiveness of the Plan and the occurrence of the Effective Date is that the Confirmation Order shall be a Final Order in form and substance reasonably satisfactory to the SunCal Plan Proponents.

# XVIII.

## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order or the occurrence of the Effective Date, the Bankruptcy Court's jurisdiction shall not be limited under the Plan and the Bankruptcy Court's jurisdiction shall apply to the fullest extent possible under applicable law.  The Court will retain exclusive jurisdiction during the Plan payout period to resolve disputes and conflicts arising from the administration of the Plan, upon request of a party-in-interest and after notice and a hearing, including, without limitation:

a.    The adjudication of the validity, scope, classification, allowance, and disallowance of any Claim;

b.    The estimation of any Claim;

c.    The allowance or disallowance of Professional-Fee Claims, compensation, or other Administrative Expense Claims;

d.    To hear and determine Claims concerning taxes pursuant to Bankruptcy Code §§ 346, 505, 525, and 1146;

e.    To hear and determine any action or proceeding brought under Bankruptcy Code §§108, 510, 543, 544, 545, 547, 548, 549, 550, 551 and 553;

1    f.    To hear and determine all actions and proceedings which relate to pre-confirmation

2  matters;

3    g.    To hear and determine any issue relating to the assumption or rejection of executory

4  contracts and unexpired leases;

5    h.    To hear and determine any modification to the Plan in accordance with the

6  Bankruptcy Rules and Bankruptcy Code;

7    i.    To enforce and interpret the terms of the Plan;

8    j.    To correct any defects, cure any omissions, or reconcile any inconsistency in the

9  Plan or the Confirmation Order as may be necessary to carry out the purpose and intent of the Plan;

10    k.    the entry of any order, including injunctions, necessary to enforce title, rights and

11  powers of the Plan Trust, and to impose such limitations, restrictions, terms and conditions on such

12  title, rights and powers as the Court may deem necessary including, without limitation, any right of

13  the Plan Trust to recover and liquidate assets;

14    l.    To determine the validity, extent and priority of all liens and security interests

15  against property of the Estates or the Plan trust;

16    m.    To hear and resolve any disputes regarding employment applications and

17  professional fees;

18    n.    To hear and determine such matters and make such orders as are consistent with the

19  Plan as may be necessary to carry out the provisions thereof and to adjudicate any disputes arising

20  under or relating to any order entered by the Court in these Cases;

21    o.    The entry of an order concluding and terminating these Cases; and

22    p.    To resolve any disputes as to whether there has been a default under the Plan.

23  ## XIX.

24  ## MODIFICATION OR WITHDRAWAL OF THE PLAN

25  **19.1    Modification of Plan.**

26  At any time prior to the confirmation of the respective Group II: Voluntary Debtor's Plan,

27  the SunCal Plan Proponents may supplement, amend or modify the respective Group II: Voluntary

28  Debtor's Plan.  After confirmation of the respective Group II: Voluntary Debtor's Plan, SunCal

1    Plan Proponents or respective Group II: Voluntary Debtor's Plan Trustee may (x) apply to the

2    Bankruptcy Court, pursuant to Section 1127 of the Bankruptcy Code, to modify the respective

3    Group II: Voluntary Debtor's Plan; and (y) apply to the Bankruptcy Court to remedy defects or

4    omissions in the respective Group II: Voluntary Debtor's Plan or to reconcile inconsistencies in the

5    respective Group II: Voluntary Debtor's Plan.

6    **19.2    Nonconsensual Confirmation.**

7    In the event that any impaired Class of Claims or Interests shall fail to accept the Plan in

8    accordance with Section 1129(a)(8) of the Bankruptcy Code, SunCal Plan Proponents (i) may

9    request that the Bankruptcy Court confirm the Plan in accordance with Section 1129(b) of the

10    Bankruptcy Code, and (ii) in accordance with Section 16.1 of the Plan, and may modify the Plan in

11    accordance with Section 1127(a) of the Bankruptcy Code.

12    **XX.**

13    **EFFECT OF CONFIRMATION**

14    **20.1    Discharge.**

15    Confirmation of the Plan does not discharge the Group II: Voluntary Debtors as set forth in

16    Bankruptcy Code §1141.

17    **20.2    Revesting of the Assets.**

18    The Assets shall not be vested in the Group II: Voluntary Debtors on or following the

19    Effective Date, but shall be vested in the Plan Trust and continue to be subject to the jurisdiction of

20    the Court following confirmation of the Plan until such Assets are distributed to the Holders of

21    Allowed Claims in accordance with the provisions of the Plan.

22    **20.3    Exculpation and Releases**

23    Effective upon the entry of the Confirmation Order, neither the Group II: Voluntary

24    Debtors, the Voluntary Debtors' Committee, Plan Sponsor, the SunCal Plan Proponents, the

25    Professionals, nor any of their respective members, officers, directors, shareholders, employees, or

26    agents, shall have or incur any liability to any Person, including any creditors or Interest Holder of

27    the Debtors, for any act taken or omission made in connection with or related to the negotiation,

28    formulation, or preparation of the Plan and the Disclosure Statement, the approval of the

1   Disclosure Statement, the confirmation of the Plan, the consummation of the Plan, or the

2   administration of the Plan, the Cases, or the property to be distributed under the Plan, to the fullest

3   extent permitted by applicable statues and case law, except that the Plan Trust will be liable for the

4   performance of obligations assumed by it or imposed upon it under or by the Plan.

5                                          **XXI.**

6                                   **<u>MISCELLANEOUS</u>**

7        **21.1.   <u>Payment of Statutory Fees</u>.**

8        All quarterly fees due and payable to the Office of the United States Trustee pursuant to

9   Section 1930(a)(6) of title 28 of the United States Code shall be paid in full on or before the

10  Effective Date, or, to the extent such quarterly fees are disputed, an adequate reserve shall have

11  been established and set aside for payment in full thereof, as required by Section 1129(a)(12) of the

12  Bankruptcy Code.  The Plan Trustee shall remain responsible for timely payment of quarterly fees

13  due and payable after the Effective Date and until the Debtors' Cases are closed, to the extent

14  required by Section 1930(a)(6) of title 28 of the United States Code.

15       **21.2.   <u>Changes in Rates Subject to Regulatory Commission Approval</u>.**

16       The Group II: Voluntary Debtors are not subject to governmental regulatory commission

17       approval of their rates**.**

18       **21.3.   <u>Payment Dates</u>.**

19       Whenever any payment or distribution to be made under the Plan shall be due on a day

20  other than a Business Day, such payment or distribution shall instead be made, without interest, on

21  the immediately following Business Day.

22       **21.4.   <u>Headings</u>.**

23       The headings used in this Disclosure Statement and in the Plan are inserted for convenience

24  only and neither constitutes a portion of this Disclosure Statement or the Plan nor in any manner

25  affect the construction of the provisions of this Disclosure Statement or the Plan.

26       **21.5.   <u>Other Documents and Actions</u>.**

27       The Plan Trustee may execute such other documents and take such other actions as may be

28  necessary or appropriate to effectuate the transactions contemplated under the Plan.

**21.6.    Notices.**

All notices and requests in connection with this Disclosure Statement and the Plan shall be in writing and shall be hand delivered or sent by mail addressed to:

> **To the SunCal Plan Proponents**:
> Bruce V. Cook
> General Counsel
> Authorized Agent of the SunCal Plan Proponents
> 2392 Morse Ave
> Irvine, CA 92614-6234
>
> **With copies to:**
> Paul J. Couchot
> Winthrop & Couchot, Professional Corporation
> 660 Newport Center Drive, Suite 400
> Newport Beach, CA 92660
>
> Ronald Rus
> Rus Miliband & Smith P.C.
> 2211 Michelson Drive, Seventh Floor
> Irvine, California 92612

All notices and requests to any Person holding of record any Claim or Interest shall be sent to them at their last known address or to the last known address of their attorney of record.  Any such Person may designate in writing any other address for purposes of this Section 21.5, which designation will be effective on receipt.

**21.7.    Governing Law.**

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), the laws of the State of California (without reference to its conflict of law rules) shall govern the construction and implementation of the Plan and any agreements, documents, and instruments executed in connection with the Plan, unless otherwise specifically provided in such agreements, documents, or instruments.

**21.8.    Binding Effect.**

The Plan and all rights, duties and obligations thereunder shall be binding upon and inure to the benefit of the Plan Sponsor Debtors, the Plan Trustee, Holders of Claims, Holders of Interests, and their respective successors and assigns.

1    **21.9.    Successors and Assigns.**

2    The rights, benefits, and obligations of any entity named or referred to in the Plan shall be

3    binding on, and shall inure to the benefit of, the heirs, executors, administrators, successors, and

4    assigns of such entity.

5    **21.10.    Severability of Plan Provisions.**

6    If, prior to the Confirmation Date, any term or provision of the Plan is held by the

7    Bankruptcy Court to be illegal, impermissible, invalid, void or unenforceable, or otherwise to

8    constitute grounds for denying confirmation of the Plan, the Bankruptcy Court shall, with the

9    consent of the Debtors, have the power to interpret, modify or delete such term or provision (or

10    portions thereof) to make it valid or enforceable to the maximum extent practicable, consistent

11    with the original purpose of the term or provision held to be invalid, void or unenforceable, and

12    such term or provision shall then be operative as interpreted, modified or deleted.  Notwithstanding

13    any such interpretation, modification or deletion, the remainder of the terms and provisions of the

14    Plan shall in no way be affected, impaired or invalidated by such interpretation, modification or

15    deletion.

16    **21.11.    No Waiver.**

17    The failure of the respective Group II: Voluntary Debtor or any other Person to object to

18    any Claim for purposes of voting shall not be deemed a waiver of the Voluntary Debtors'

19    Committee's, the Debtors' or the Plan Trustee's right to object to or examine such Claim, in whole

20    or in part.

21    **21.12.    Inconsistencies.**

22    In the event the terms or provisions of this Disclosure Statement are inconsistent with the

23    terms and provisions of the Plan or documents executed in connection with the Plan, the terms of

24    the Plan shall control.

25    **21.13.    Exemption from Certain Transfer Taxes and Recording Fees.**

26    Pursuant to Section 1146(c) of the Bankruptcy Code, any transfers from a Debtor to the

27    Plan Trust or to any other Person or entity pursuant to the Plan, or any agreement regarding the

28    transfer of title to or ownership of any of the Debtors' real or personal property or of any other

1    interest in such property (including, without limitation, a security interest) will not be subject to

2    any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax,

3    stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or

4    recording fee, or other similar tax or governmental assessment, and the Confirmation Order will

5    direct the appropriate state or local governmental officials or agents to forego the collection of any

6    such tax or governmental assessment and to accept for filing and recordation any of the foregoing

7    instruments or other documents without the payment of any such tax or governmental assessment.

8          **21.14.  Post-Confirmation Status Report.**

9          Within 180 days following the entry of the Confirmation Order, the Plan Trustee shall file a

10   status report with the Court explaining what progress has been made toward consummation of the

11   confirmed Plan.  The status report shall be served on the United States Trustee, the twenty largest

12   unsecured creditors, and those parties who have requested special notice.  Unless otherwise

13   ordered, further status reports shall be filed every 180 days and served on the same entities.

14         **21.15.  Post-Confirmation Conversion/Dismissal.**

15         A creditor or party in interest may bring a motion to convert or dismiss the case under

16   § 1112(b), after the Plan is confirmed, if there is a default in performing the Plan.  The Plan

17   Trustee reserves the right to object to any motion for conversion or dismissal.  In addition, as set

18   forth in the definition of the Effective Date, the Effective Date may be further extended by order of

19   the Bankruptcy Court after notice and hearing to all parties in interest.  If the Court determines

20   there is no "cause" for the extension of the Effective Date, a party in interest may move to dismiss

21   or convert the case.

22         If the Court orders any of the Cases converted to Chapter 7 after the Plan is confirmed, then

23   all property that had been property of the Chapter 11 Estate, and that has not been disbursed

24   pursuant to the Plan, will revest in the Chapter 7 estate.  The automatic stay will be re-imposed

25   upon the revested property, but only to the extent that relief from stay was not previously

26   authorized by the Court during this case.

27

28

1

2    **21.16.  <u>Final Decree.</u>**

3        Once an Estate has been fully administered, as referred to in Bankruptcy Rule 3022, the

4    Plan Trustee, or other party as the Court shall designate in the Confirmation Order, shall file a

5    motion with the Court to obtain a final decree to close the Case of such Debtor.

6    Date:  August 5, 2011                    By:  ___*/s/ Bruce v. Cook*_____
                                                    Bruce Cook
7                                           General Counsel, Authorized Agent for the
                                            Voluntary Debtors and Acquisitions
8

9

10   **<u>Submitted By</u>:**

11
     **WINTHROP COUCHOT**              **RUS MILIBAND & SMITH**
12   **PROFESSIONAL CORPORATION**      **A PROFESSIONAL CORPORATION**

13

14   By: <u>/s/ *Paul J. Couchot*</u>_____    By: <u>  /s/ *Ronald Rus*</u>_____
            Paul J. Couchot,                              Ronald Rus, Esq.
15   General Insolvency Counsel for                       Joel S. Miliband, Esq.
     the Voluntary Debtors                         Counsel for SCC Acquisitions Inc.
16

17

18

19

20

21

22

23

24

25

26

27

28

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 660 Newport Center Drive, 4th Fl., Newport Beach, CA 92660.

A true and correct copy of the foregoing document described as: **THIRD AMENDED DISCLOSURE STATEMENT DESCRIBING THIRD AMENDED CHAPTER 11 PLANS FILED BY SUNCAL PLAN PROPONENTS IN THE CHAPTER 11 CASES OF SUNCAL BEAUMONT HEIGHTS, LLC AND SUNCAL JOHANNSON RANCH, LLC , [GROUP II: VOLUNTARY DEBTORS]** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

I.  **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On August 5, 2011, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

☒  Service information continued on attached page

II.  **SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served)**:** On _____, 2011, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐  Service information continued on attached page

III.  **SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on _____, 2011, I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| August 5, 2011 | Gretchen Crumpacker | /s/ Gretchen Crumpacker |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

MAINDOCS-#164995-v3-SunCal_3rd_Am_Group_II_VD_DS.DOC

- **NEF SERVICE LIST**
  Selia M Acevedo    sacevedo@millerbarondess.com, mpritikin@millerbarondess.com
- Joseph M Adams    jadams@sycr.com
- Raymond H Aver    ray@averlaw.com
- James C Bastian    jbastian@shbllp.com
- Thomas Scott Belden    sbelden@kleinlaw.com, ecf@kleinlaw.com
- John A Boyd    fednotice@tclaw.net
- Mark Bradshaw    mbradshaw@shbllp.com
- Gustavo E Bravo    gbravo@smaha.com
- Jeffrey W Broker    jbroker@brokerlaw.biz
- Brendt C Butler    bbutler@mandersonllp.com
- Andrew W Caine    acaine@pszyjw.com
- Carollynn Callari    ccallari@venable.com
- Cathrine M Castaldi    ccastaldi@rusmiliband.com
- Tara Castro Narayanan    tara.narayanan@msrlegal.com, lisa.king@msrlegal.com
- Dan E Chambers    dchambers@jmbm.com
- Shirley Cho    scho@pszjlaw.com
- Vonn Christenson    vrc@paynefears.com
- Brendan P Collins    bpcollins@bhfs.com
- Vincent M Coscino    vcoscino@allenmatkins.com, emurdoch@allenmatkins.com
- Paul J Couchot    pcouchot@winthropcouchot.com,
  pj@winthropcouchot.com;gcrumpacker@winthropcouchot.com
- Jonathan S Dabbieri    dabbieri@sullivan.com,
  hill@sullivanhill.com;mcallister@sullivanhill.com;stein@sullivanhill.com;vidovich@sullivanhill.com
- Ana Damonte    ana.damonte@pillsburylaw.com
- Vanessa S Davila    vsd@amclaw.com
- Melissa Davis    mdavis@shbllp.com
- Daniel Denny    ddenny@gibsondunn.com
- Caroline Djang    crd@jmbm.com
- Donald T Dunning    ddunning@dunningLaw.com
- Meredith R Edelman    meredith.edelman@dlapiper.com
- Joseph A Eisenberg    jae@jmbm.com
- Lei Lei Wang Ekvall    lekvall@wgllp.com
- Richard W Esterkin    resterkin@morganlewis.com
- Marc C Forsythe    kmurphy@goeforlaw.com
- Alan J Friedman    afriedman@irell.com
- Steven M Garber    steve@smgarberlaw.com
- Christian J Gascou    cgascou@gascouhopkins.com
- Barry S Glaser    bglaser@swjlaw.com
- Robert P Goe    kmurphy@goeforlaw.com,
  rgoe@goeforlaw.com;mforsythe@goeforlaw.com
- Eric D Goldberg    egoldberg@stutman.com
- Richard H Golubow    rgolubow@winthropcouchot.com, pj@winthropcouchot.com
- Michael J Gomez    mgomez@frandzel.com, efiling@frandzel.com;sking@frandzel.com
- Kelly C Griffith    bkemail@harrisbeach.com
- Matthew Grimshaw    mgrimshaw@rutan.com
- Kavita Gupta    kgupta@winthropcouchot.com

- Asa S Hami    ahami@morganlewis.com
- Michael J Hauser    michael.hauser@usdoj.gov
- D Edward Hays    ehays@marshackhays.com
- Michael C Heinrichs    mheinrichs@omm.com
- Harry D. Hochman    hhochman@pszjlaw.com, hhochman@pszjlaw.com
- Jonathan M Hoff    jonathan.hoff@cwt.com
- Nancy Hotchkiss    nhotchkiss@trainorfairbrook.com
- Michelle Hribar    mhribar@rutan.com
- John J Immordino    john.immordino@wilsonelser.com, raquel.burgess@wilsonelser.com
- Lawrence A Jacobson    laj@cohenandjacobson.com
- Michael J Joyce    mjoyce@crosslaw.com
- Stephen M Judson    sjudson@fablaw.com
- Kaleb L Judy    ecf@kleinlaw.com, kjudy@kleinlaw.com
- Steven J Kahn    skahn@pszyjw.com
- Sheri Kanesaka    sheri.kanesaka@bryancave.com
- David I Katzen    katzen@ksfirm.com
- Christopher W Keegan    ckeegan@kirkland.com, gdupre@kirkland.com;alevin@kirkland.com
- Payam Khodadadi    pkhodadadi@winthropcouchot.com, pj@winthropcouchot.com
- Irene L Kiet    ikiet@hkclaw.com
- Claude F Kolm    claude.kolm@acgov.org
- Mark J Krone    mk@amclaw.com, crs@amclaw.com;amc@amclaw.com
- David B Lally    davidlallylaw@gmail.com
- Leib M Lerner    leib.lerner@alston.com
- Peter W Lianides    plianides@winthropcouchot.com, pj@winthropcouchot.com
- Charles Liu    cliu@winthropcouchot.com
- Kerri A Lyman    klyman@irell.com
- Mariam S Marshall    mmarshall@marshallramoslaw.com
- Robert C Martinez    rmartinez@mclex.com
- Michael D May    mdmayesq@verizon.net
- Hutchison B Meltzer    hmeltzer@wgllp.com
- Krikor J Meshefejian    kjm@lnbrb.com
- Joel S. Miliband    jmiliband@rusmiliband.com
- James M Miller    jmiller@millerbarondess.com, vgunderson@millerbarondess.com;smiller@millerbarondess.com;mpritikin@millerbarondess.com
- Louis R Miller    smiller@millerbarondess.com
- Craig Millet    cmillet@gibsondunn.com, pcrawford@gibsondunn.com;cmillet@gibsondunn.com
- Randall P Mroczynski    randym@cookseylaw.com
- Mike D Neue    mneue@thelobelfirm.com, jmattiace@thelobelfirm.com;pnelson@thelobelfirm.com
- Robert Nida    Rnida@castlelawoffice.com
- Henry H Oh    henry.oh@dlapiper.com, janet.curley@dlapiper.com
- Sean A Okeefe    sokeefe@okeefelc.com
- Scott H Olson    solson@seyfarth.com
- Robert B Orgel    rorgel@pszjlaw.com, rorgel@pszjlaw.com
- Malhar S Pagay    mpagay@pszjlaw.com, mpagay@pszjlaw.com

MAINDOCS-#164995-v3-SunCal_3rd_Am_Group_II_VD_DS.DOC

1
- Ernie Zachary Park    ernie.park@bewleylaw.com
- Daryl G Parker    dparker@pszjlaw.com

2
- Penelope Parmes    pparmes@rutan.com
- Robert J Pfister    rpfister@ktbslaw.com

3
- Ronald B Pierce    ronald.pierce@sdma.com
- Katherine C Piper    kpiper@steptoe.com, smcloughlin@steptoe.com

4
- Cassandra J Richey    cmartin@pprlaw.net

5
- Debra Riley    driley@allenmatkins.com
- James S Riley    tgarza@sierrafunds.com

6
- Todd C. Ringstad    becky@ringstadlaw.com

7
- R Grace Rodriguez    ecf@lorgr.com
- Martha E Romero    Romero@mromerolawfirm.com

8
- Ronald Rus    rrus@rusmiliband.com
- John P Schafer    jschafer@mandersonllp.com

9
- John E Schreiber    jschreiber@dl.com

10
- William D Schuster    bills@allieschuster.org
- Christopher P Simon    csimon@crosslaw.com

11
- Gerald N Sims    jerrys@psdslaw.com, bonniec@psdslaw.com
- Wendy W Smith    wendy@bindermalter.com

12
- Steven M Speier    Sspeier@Squarmilner.com, ca85@ecfcbis.com
- Steven M Speier (TR)    Sspeier@asrmanagement.com, ca85@ecfcbis.com

13
- Michael St James    ecf@stjames-law.com
- Michael K Sugar    msugar@irell.com

14
- Cathy Ta    cathy.ta@bbklaw.com,

15
  Arthur.Johnston@bbklaw.com;Kenneth.Burgess@bbklaw.com
- David A Tilem    davidtilem@tilemlaw.com,

16
  malissamurguia@tilemlaw.com;dianachau@tilemlaw.com;kmishigian@tilemlaw.com
- James E Till    jtill@thelobelfirm.com,

17
  jmattiace@thelobelfirm.com;pnelson@thelobelfirm.com

18
- United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov
- Carol G Unruh    cgunruh@sbcglobal.net

19
- Annie Verdries    verdries@lbbslaw.com

20
- Jason Wallach    jwallach@gladstonemichel.com
- Joshua D Wayser    , kim.johnson@kattenlaw.com

21
- Marc J Winthrop    mwinthrop@winthropcouchot.com, pj@winthropcouchot.com
- David M Wiseblood    dwiseblood@seyfarth.com

22
- Brett K Wiseman    bwiseman@aalaws.com

23
- Dean A Ziehl    dziehl@pszjlaw.com, dziehl@pszjlaw.com
- Marc A. Zimmerman    joshuasdaddy@att.net

24

25

26

27

28