1

PAUL J. COUCHOT -- State Bar No. 131934
WINTHROP COUCHOT, P.C.
660 Newport Center Drive, Fourth Floor
Newport Beach, CA 92660
Telephone: (949) 720-4100
Facsimile: (949) 720-4111
General Insolvency Counsel for Palmdale Hills
Property, LLC et. al. (the "Voluntary Debtors")

2

3

4

5

RONALD RUS - State Bar No. 67369
JOEL S. MILIBAND - State Bar No. 77438
RUS MILIBAND & SMITH
A PROFESSIONAL CORPORATION
2211 Michelson Drive, Seventh Floor
Irvine, California 92612
Telephone: (949) 752-7100
Facsimile:  (949) 252-1514

6

7

8

9

Counsel for SCC Acquisitions Inc.

10

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**SANTA ANA DIVISION**

11

12

13

14

15

In re

PALMDALE HILLS PROPERTY, AND ITS
RELATED DEBTORS,

Joint Administered Debtors and Debtors-in-
Possession

16

Affects:

☐        All Debtors
☐        Palmdale Hills Property, LLC
☐        SunCal Beaumont Heights, LLC
☐        SCC/Palmdale, LLC
☐        SunCal Johannson Ranch, LLC
☐        SunCal Summit Valley, LLC
☐        SunCal Emerald Meadows LLC
☐        SunCal Bickford Ranch, LLC
☐        Acton Estates, LLC
☐        Seven Brothers LLC
☐        SJD Partners, Ltd.
☐        SJD Development Corp.
☐        Kirby Estates, LLC
☐        SunCal Communities I, LLC
☐        SunCal Communities III, LLC
☐        SCC Communities LLC
☐        North Orange Del Rio Land, LLC
☐        Tesoro SF LLC

17

18

19

20

21

22

23

24

25

26

27

28

Case No. 8:08-bk-17206-ES
Jointly Administered With Case Nos.
8:08-bk-17209-ES; 8:08-bk-17240-ES;
8:08-bk-17224-ES; 8:08-bk-17242-ES;
8:08-bk-17225-ES; 8:08-bk-17245-ES;
8:08-bk-17227-ES; 8:08-bk-17246-ES;
8:08-bk-17230-ES; 8:08-bk-17231-ES;
8:08-bk-17236-ES; 8:08-bk-17248-ES;
8:08-bk-17249-ES; 8:08-bk-17573-ES;
8:08-bk-17574 ES; 8:08-bk-17575-ES;
8:08-bk-17404-ES; 8:08-bk-17407-ES;
8:08-bk-17408-ES; 8:08-bk-17409-ES;
8:08-bk-17458-ES; 8:08-bk-17465-ES;
8:08-bk-17470-ES; 8:08-bk-17472-ES;
and 8:08-bk-17588-ES

Chapter 11 Proceedings

**THIRD AMENDED DISCLOSURE STATEMENT
DESCRIBING THIRD AMENDED CHAPTER 11
PLANS FILED BY SUNCAL PLAN PROPONENTS
IN THE CHAPTER 11 CASES OF SUNCAL OAK
VALLEY, LLC, SUNCAL HEARTLAND, LLC,
DELTA COVES VENTURE LLC, SUNCAL
MARBLEHEAD, LLC AND SUNCAL PSV, LLC
[GROUP I: TRUSTEE DEBTORS]**

Date:    July 22, 2011
Time:    11:00 a.m.
Place:   Courtroom 5A

*Continued from Previous Page*

- ☒ LBL-SunCal Oak Valley, LLC
- ☒ SunCal Heartland, LLC
- ☐ LBL-SunCal Northlake, LLC
- ☒ SunCal Marblehead, LLC
- ☐ SunCal Century City, LLC
- ☒ SunCal PSV, LLC
- ☒ Delta Coves Venture, LLC
- ☐ SunCal Torrance, LLC
- ☐ SunCal Oak Knoll, LLC

# **TABLE OF CONTENTS**

|  |  | **PAGE** |
|---|---|---|
| I. | INTRODUCTION......................................................................................... | 2 |
| II. | DEFINITIONS AND RULES OF INTERPRETATION ................................. | 5 |
|  | 2.1 Definitions. ................................................................................... | 5 |
|  | 2.2 Rules of Construction. ................................................................. | 28 |
|  | 2.3 Exhibits. ...................................................................................... | 28 |
| III. | PLAN CONFIRMATION DEADLINES ....................................................... | 29 |
|  | 3.1 Time and Place of the Confirmation Hearing. ........................... | 29 |
|  | 3.2 Deadline for Voting for or Against the Plan. ............................. | 29 |
|  | 3.3 Deadline for Objecting to the Confirmation of the Plan. ........... | 29 |
|  | 3.4 Idenity of Person to Contact for More Information Regarding The Plan ...... | 30 |
|  | 3.5 Disclaimer. .................................................................................. | 30 |
| IV. | FACTUAL BACKGROUND OF THE DEBTORS ....................................... | 31 |
|  | 4.1 The Formation of the Debtors and the Projects. ........................ | 31 |
|  | 4.2 Factual Circumstances Leading to the Filing of the Debtors' Chapter 11 Cases.................................................................... | 34 |
|  | 4.3 The Group I: Trustee Debtors' Potential Preferential Transfers. ................ | 43 |
| V. | SIGNIFICANT EVENTS IN THE DEBTORS' CHAPTER 11 CASES ................ | 44 |
|  | 5.1. Voluntary Debtors. ...................................................................... | 44 |
|  | 5.2. The Trustee Debtors and Their Professionals. ........................... | 46 |
|  | 5.3. The Debtors' Various Motions Relating to Financing for the Projects and to Pay Professional F§ees. ........................................ | 47 |
|  | 5.4. The Debtors' Disputes and Claims Against the Lehman Entities. ................ | 50 |
|  | 5.5. The Lehman / Fenway Claims Transaction and Compromise Motion Filed By the Lehman Entities. ........................................ | 58 |
|  | 5.6. The Debtors' Motion for a Stay to Suspend Certain Lehman Actions. ........ | 59 |
|  | 5.7. The Debtors' Other Litigation with Non-Lehman Related Parties. ............. | 59 |
|  | 5.8 LitCo. ......................................................................................... | 61 |
|  | 5.9 Reliance Claims. ......................................................................... | 61 |
| VI. | TREATMENT OF UNCLASSIFIED CLAIMS ............................................. | 62 |
|  | 6.1 Introduction. ................................................................................ | 62 |
|  | 6.2 Treatment of Allowed Administrative Claims. ........................... | 62 |
|  | 6.3 Treatment and Repayment of the Lehman Administrative Loan(s). ............ | 63 |

MAINDOCS-#164960-v3-SunCal_3rd_Am_Group_I_TD_DS.DOC

6.4   Repayment of Allowed Administrative Claims Other than
the Lehman Administrative Loans. ........................................... 63

6.5   Administrative Claims Bar Date. ............................................ 63

6.6   Treatment of Unsecured Tax Claims. ...................................... 64

6.7   Summary of the Group I: Trustee Debtors Plans' Treatment
of Bond Indemnity Claims. ..................................................... 65

VII.    CLASSIFICATION OF CLAIMS AND INTERESTS ............................................. 65

VIII.   THE PLAN'S TREATMENT OF CLASSIFIED CLAIMS
AND INTERESTS ...................................................................................... 73

8.1.   The Plan's Treatment of Holders of Allowed Secured Real
Property Tax Claims Against the Group I: Trustee Projects
(Classes 1.1 through 1.5). ..................................................... 73

8.2.   The Plan's Treatment of Lehman's Disputed Claim(s) and
Disputed Lien(s) Against the Group I: Trustee Debtors
(Classes 2.1 through 2.5 ). ..................................................... 74

8.3.   The Plan's Treatment of Holders of Asserted Mechanic Lien
Claims Against the Group I: Trustee Projects (Classes 3.1
Through 3.30). ...................................................................... 76

8.4.   The Plan's Treatment of Holders of Contingent Bond
Indemnification Claims Against the Group I: Trustee Projects
(Classes 4.1 through 4.5). ..................................................... 76

8.5.   The Plan's Treatment of Holders of Priority Claims Against the
Group I: Trustee Debtors (Classes 5.1 through 5.5). ................. 78

8.6.   The Plan's Treatment of Holders of General Unsecured Claims
That Are Reliance Claims Group I: Trustee Debtors (Classes
6.1 through 6.5). .................................................................... 78

8.7.   The Plan's Treatment of Holders of Allowed General Unsecured
Claims That Are Not Reliance Claims Group I: Trustee Debtors
(Classes 7.1 through 7.5). ..................................................... 79

8.8.   The Plan's Treatment of Holders of Allowed Interests Group I:
Trustee Debtors. .................................................................. 79

IX.    ACCEPTANCE OR REJECTION OF THE PLAN ................................................ 79

9.1.   Introduction. ....................................................................... 79
9.2.   Who May Object to Confirmation of the Plan. ......................... 80
9.3.   Who May Vote to Accept/Reject the Plan. .............................. 80
9.4.   What Is an Allowed Claim/Interest. ....................................... 80
9.5.   What Is an Impaired Class. ................................................... 80
9.6.   Who Is Not Entitled to Vote. ................................................ 80
9.7.   Who Can Vote in More than One Class. .................................. 81
9.8.   Votes Necessary for a Class to Accept the Plan. ..................... 81
9.9.   Treatment of Nonaccepting Classes. ..................................... 81

9.10.   Request for Confirmation Despite Nonacceptance by
        Impaired Class(es). ...........................................................................    82

X.      MEANS OF EXECUTION AND IMPLEMENTATION OF THE PLAN ...............    82

        10.1.   Introduction. ...............................................................................    82
        10.2    Sale Process of the Group I: Trustee Projects and the Group I:
                Trustee Other Assets During the Sales Period. .................................    82
        10.3    Establishment and Operations of the Plan Trust. ...........................    85
        10.4    Preservation and Pursuit of Litigation Claims and Recovery
                for the Plan Trust. ......................................................................    85
        10.5    Removal of Chapter 11 Trustee. .................................................    86
        10.6    Payment of Plan Trust Expenses. ................................................    86
        10.7    The Plan Trust Distribution System. ...........................................    86
        10.8    The Plan Trustee. .......................................................................    87
        10.9    The Plan Trust Beneficiaries. .....................................................    91
        10.10   No Payment of Transfer-Related Fees to the United States Trustee. ...........    91
        10.11   No Payment of Transfer-Related Fees to the Plan Trustee. ........................    91
        10.12   Books and Records of Trust. ......................................................    92
        10.13   Federal Income Tax Treatment of the Holders of the Plan Trust
                Beneficial Interests. ...................................................................    92
        10.14   Termination of the Trust. ...........................................................    93
        10.15   Exemption from Certain Transfer Taxes. .....................................    93
        10.16   Tax Consequence of The Plan. ....................................................    93
        10.17   The Trustee Debtors' Committee. ................................................    94
        10.18   Claims Estimation Rights. ..........................................................    95

XI.     RISK FACTORS .........................................................................................    95

        11.1    Plan Risks. .................................................................................    95

XII.    DISTRIBUTIONS...............................................................................................    97

        12.1    Distribution Agent.  ...................................................................    97
        12.2    Distributions. ............................................................................    97
        12.3    Old Instruments and Securities. ..................................................    98

XIII.   OBJECTIONS TO CLAIMS AND DISPUTED CLAIMS .............................    99

        13.1    Standing for Objections to Claims. .............................................    99
        13.2    Treatment of Disputed Claims and Disputed Liens. .....................    100

XIV.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES................................    101

        14.1    Executory Contracts to be Assumed and Assigned.  ....................    101
        14.2    Executory Contracts to be Rejected.  ..........................................    104

XV.     BEST INTEREST OF CREDITORS TEST AND PLAN FEASIBILITY ...............    104

-iii-

15.1    Best Interests Test. ........................................................................................ 104
15.2    Feasibility. ..................................................................................................... 105

XVI.    LIMITATION OF LIABILITY ................................................................................. 106

16.1    No Liability for Solicitation or Participation. ............................................... 106

XVII.   CONDITIONS TO CONFIRMATION AND
EFFECTIVENESS OF THE PLAN.......................................................................... 106

17.1    Conditions Precedent to Plan Confirmation. ............................................... 106
17.2    Conditions Precedent to Plan Effectiveness. ............................................... 106

XVIII.  RETENTION OF JURISDICTION ......................................................................... 107

XIX.    MODIFICATION OR WITHDRAWAL OF THE PLAN ......................................... 108

19.1    Modification of Plan. ..................................................................................... 108
19.2    Nonconsensual Confirmation. ....................................................................... 108

XX.     EFFECT OF CONFIRMATION............................................................................... 109

20.1    Discharge. ...................................................................................................... 109
20.2    Revesting of the Assets. ................................................................................ 109

XXI.    MISCELLANEOUS ................................................................................................. 109

21.1    Payment of Statutory Fees. ........................................................................... 109
21.2    Changes in Rates Subject to Regulatory Commission Approval. ............... 109
21.3    Payment Dates. .............................................................................................. 110
21.4    Headings. ....................................................................................................... 110
21.5    Other Documents and Actions. ..................................................................... 110
21.6    Notices. .......................................................................................................... 110
21.7    Governing Law. ............................................................................................. 111
21.8    Binding Effect. .............................................................................................. 111
21.9    Successors and Assigns. ................................................................................ 111
21.10   Severability of Plan Provisions. ................................................................... 111
21.11   No Waiver. ..................................................................................................... 112
21.12   Inconsistencies. ............................................................................................. 112
21.13   Exemption from Certain Transfer Taxes and Recording Fees. .................... 112
21.14   Post-Confirmation Status Report. ................................................................. 112
21.15   Post-Confirmation Conversion/Dismissal. .................................................. 112
21.16   Final Decree. ................................................................................................. 113

MAINDOCS-#164960-v3-SunCal_3rd_Am_Group_I_TD_DS.DOC

# I.

## __INTRODUCTION__

This Disclosure Statement[1] is filed jointly by, and the accompanying Plans are proposed respectively by, Acquisitions and the Voluntary Debtors, as the SunCal Plan Proponents, in the Chapter 11 Cases of SunCal Oak Valley, LLC, SunCal Heartland, LLC, Delta Coves Venture, LLC, SunCal PSV, LLC and SunCal Marblehead, LLC (the "Group I: Trustee Debtors"). In addition to being one of the SunCal Plan Proponents, Acquisitions is the Plan Sponsor, the Plan Trustee of the Plan Trust and the Distribution Agent, for each Group I: Trustee Debtor Plan that is confirmed.

Chapter 11 allows debtors-in-possession, Chapter 11 trustees, and under some circumstances, creditors, interest holders and others parties in interest, to propose a Chapter 11 plan.  As stated, Acquisitions is the SunCal Plan Proponent of the Plan sent to you in the same envelope as this Disclosure Statement.  This document summarizes the contents of the Plans, certain information relating to the Plans and the process the Bankruptcy Court follows in determining whether or not to confirm the Plans.

In summary, the Plan(s) individually provide for sale of the Oak Valley Project, the Heartland Project, the Delta Coves Project, Palms Springs Village Project and the Marblehead Project (the "Group I Projects"), free and clear of liens, claims and any purported credit bid rights of the Group I: Trustee Debtors' primary secured creditor, Lehman ALI, and for the liquidation of all other assets of the Group I: Trustee Debtors. The Net Sale Proceeds from these sales will then be distributed to Creditors holding Allowed Claims in accordance with their rights and priorities under the bankruptcy code and under any other applicable law.

**The Plans also offers the holders of a certain claims against the Group I: Trustee Debtors, which are defined herein as Reliance Claims, the right to sell these claims, along with any other Litigation Rights arising from and/or related to such Reliance Claim, to LitCo, for the sum of  fifty five cents ($0.55) per dollar of Allowed Claim.  The purchase offer**

---

[1] All defined terms used herein have the same meanings as set forth in Article II herein and Exhibit "1" attached hereto.

1    **is conditioned upon confirmation of the applicable Plan, the entry of a Final Confirmation**

2    **Order confirming such Plan, and shall occur on or before the applicable Plan's Effective**

3    **Date as defined herein.  However, this purchase offer is not contingent upon the sale of the**

4    **Group I Projects or a determination regarding any alleged automatic stay claim by LCPI**

5    **arising from LCPI's pending Chapter 11 proceeding.**

6    The offer by LitCo to purchase Allowed Reliance Claims for the sum of fifty-five cents

7    ($0.55) per dollar of claim and certain other Plan funding (*e.g.*, to make required payments to

8    Creditors holding Allowed Administrative Claims, Priority Claims and Tax Claims) will not be

9    funded by the SunCal Plan Proponents.  Instead, the SunCal Plan Proponents are working with

10   proposed investors/lenders who would provide such funding.  While the SunCal Plan Proponents

11   are in discussions with third parties with respect to obtaining funding for the SunCal Plan, no

12   commitment has yet been obtained for such funding and thus SunCal Plan Proponents are not in a

13   position to disclose the terms of such funding at this time.  There is no guarantee that such funding

14   will be obtained.

15   **EXCEPT AS PROVIDED IN THE PURCHASE OFFER TO HOLDERS OF**

16   **RELIANCE CLAIMS REFERENCED ABOVE, AS EXPLAINED IN THE DEFINITION**

17   **OF THE TERM "EFFECTIVE DATE," WHICH IS THE DATE ON WHICH THE PLAN**

18   **BECOMES EFFECTIVE, NO ACTION PROVIDED FOR IN THE PLAN SHALL BE**

19   **TAKEN AGAINST EITHER LEHMAN COMMERCIAL PAPER, INC. ("LCPI") OR**

20   **LEHMAN BROTHERS HOLDINGS, INC. ("LBHI") THAT WOULD HAVE THE**

21   **EFFECT OF VIOLATING ANY APPLICABLE AUTOMATIC STAY THAT MAY EXIST**

22   **IN THEIR CHAPTER 11 CASES. ANY SUCH ACTION WILL ONLY PROCEED AFTER**

23   **ANY APPLICABLE STAY IS EITHER LIFTED OR DEEMED INAPPLICABLE.**

24   Although substantially identical Plans are being filed in the Cases of all five Group I:

25   Trustee Debtors, confirmation of each such Plan is independent of each others.  In other words, the

26   Creditors in each Case will determine, subject to Court approval, whether the applicable Plan will

27   be approved in their Case. Accordingly, the Plan may be confirmed in the Cases of some of the

28   Group I: Trustee Debtors, but not in others.

MAINDOCS-#164960-v3-SunCal_3rd_Am_Group_I_TD_DS.DOC

The Lehman Lenders and the Chapter 11 Trustee have filed a competing and alternative plans of reorganization in the Group I: Trustee Debtors' Cases. Accordingly, the creditors holding claims against the Group I: Trustee Debtors will have the opportunity to vote for one plan or the other, or they can vote for or reject both plans and allow the Court to decide which plan should be approved. The SunCal Plan Proponents believe that the aggregate benefits offered under their Plans are superior to what is being offered to Creditors under the Lehman Lenders' competing Plans, because the consideration paid to the holders of the Reliance Claims is 55 percent under the SunCal Plans in contrast to only a potential distribution of 40 percent under the Lehman Lenders and Chapter 11 Trustee Plans for the Group I: Trustee Debtors.

**READ THIS DISCLOSURE STATEMENT CAREFULLY IF YOU WANT TO KNOW ABOUT**:

> ➢ **WHO CAN VOTE OR OBJECT TO THE PLAN;**

> ➢ **HOW YOUR CLAIM IS TREATED;**

> ➢ **HOW THIS TREATMENT COMPARES TO WHAT YOUR CLAIM WOULD RECEIVE IN LIQUIDATION;**

> ➢ **A BRIEF HISTORY OF THE DEBTORS AND SIGNIFICANT EVENTS DURING THEIR CHAPTER 11 BANKRUPTCY PROCEEDING;**

> ➢ **WHAT FACTORS THE BANKRUPTCY COURT WILL CONSIDER TO DECIDE WHETHER OR NOT TO CONFIRM THE PLAN;**

> ➢ **WHAT IS THE EFFECT OF CONFIRMATION; AND**

> ➢ **WHETHER THE PLAN IS FEASIBLE.**

This Disclosure Statement cannot tell you everything about your rights.  You should consider consulting your own attorney to obtain more specific advice on how the Plan will affect you and your best course of action.

Be sure to read the applicable Plan as well as this Disclosure Statement.  If there are any inconsistencies between the applicable Plan and this Disclosure Statement, the applicable Plan provisions will govern.

MAINDOCS-#164960-v3-SunCal_3rd_Am_Group_I_TD_DS.DOC

THE BANKRUPTCY CODE REQUIRES A DISCLOSURE STATEMENT TO CONTAIN "ADEQUATE INFORMATION" CONCERNING THE PLAN.  ON _____, 2011, THE BANKRUPTCY COURT ENTERED AN ORDER APPROVING THIS DISCLOSURE STATEMENT, BASED UPON A FINDING THAT THIS DOCUMENT CONTAINED "ADEQUATE INFORMATION" TO ENABLE PARTIES AFFECTED BY THE PLANS TO MAKE AN INFORMED JUDGMENT REGARDING THE PLANS.  ANY PARTY CAN NOW SOLICIT VOTES FOR OR AGAINST THE PLANS.

**II.**

**DEFINITIONS AND RULES OF INTERPRETATION**

**2.1    Definitions.**

The following defined terms are used in this Disclosure Statement.  Any capitalized term that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term in the Bankruptcy Code or Bankruptcy Rules.

2.1.1    Acquisitions.  SCC Acquisitions, Inc., a California corporation, an indirect parent company of all of the Debtors, a purported Bond Indemnitor, a Creditor of all of the Debtors, a SunCal Plan Proponent, the Plan Sponsor and the proposed Plan Trustee.

2.1.2    Administrative Claim(s).  Any Claim against a Group I: Trustee Debtor or its Estate  incurred after the applicable Petition Date for the applicable Group I: Trustee Debtor but before the Effective Date, for any cost or expense of administration of the Case of the applicable Group I: Trustee Debtor, which Claim is entitled to priority under section 507(a)(2) or (3) of the Bankruptcy Code, including, without limitation, any fee or charge assessed against an Estate of a Group I: Trustee Debtor under section 1930 of Title 28 of the United States Code.

2.1.3    Administrative Claims Bar Date.  The last date fixed by the Plan for the filing of requests for payment of Administrative Claims.  Under the Plan, the Administrative Claims Bar Date shall be the first business day after the twenty first (21st) day after the Effective Date.

2.1.4    Affiliate.  The term shall have the meaning set forth under Section 101(2), including, but not limited to, as to any Person, any other Person that directly or indirectly owns or

controls, is owned or controlled by, or is under common ownership or control with, such Person. The term "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as applied to any Person, means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or other equity ownership interest, by contract or otherwise.

       2.1.5   <u>Allowed</u>.  When used to describe Claim(s) or Interest(s), such Claim(s) or Interest(s), to the extent that it or they are "Allowed Claim(s)" or "Allowed Interest(s)."

       2.1.6   <u>Allowed Amount</u> shall mean:

       A.   With respect to any Administrative Claim (i) if the Claim is based upon a Fee Application, the amount of such Fee Application that has been approved by a Final Order of the Bankruptcy Court; (ii) if the Claim is based upon any indebtedness or obligation incurred in the ordinary course of business of the Group I: Trustee Debtors and is not otherwise subject to an Administrative Claim Bar Date, the amount of such Claim that has been agreed to by the Group I: Trustee Debtors and such creditor, failing which, the amount thereof as fixed by a Final Order of the Bankruptcy Court; or (iii) if the Holder of such Claim was required to file and has filed proof thereof with the Bankruptcy Court prior to an Administrative Claim Bar Date, (1) the amount stated in such proof if no objection to such Proof of Claim is interposed within the applicable period of time fixed by the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court, or (2) the amount thereof as fixed by Final Order of the Bankruptcy Court if an objection to such proof was interposed within the applicable period of time fixed by the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court.  The Allowed Amount of any Administrative Claim which is subject to an Administrative Claims Bar Date and not filed by the applicable Administrative Claims Bar Date shall be zero, and no distribution shall be made on account of any such Administrative Claim;

       B.   with respect to any Claim which is not an Administrative Claim (the "Other Claim"):  (i) if the Holder of such Other Claim did not file proof thereof with the Bankruptcy Court on or before the Claims Bar Date, the amount of such Claim as listed in the

Group I: Trustee Debtors'' Schedules as neither disputed, contingent nor unliquidated; or (ii) if the Holder of such Claim has filed proof thereof with the Bankruptcy Court on or before the Claims Bar Date, (a) the amount stated in such proof if no objection to such Proof of Claim was interposed within the applicable period of time fixed by the Bankruptcy Code, the Bankruptcy Rules, the Plan or the Bankruptcy Court, or (b) the amount thereof as fixed by Final Order of the Bankruptcy Court if an objection to such proof was interposed within the applicable period of time fixed by the Bankruptcy Code, the Bankruptcy Rules, the Plan or the Bankruptcy Court.  The Allowed Amount of any Other Claim which is not Filed by the applicable Claims Bar Date, is not listed on the Group I: Trustee Debtors' Schedules or is listed as disputed, unliquidated, contingent or unknown, and is not allowed under the terms of the plan shall be zero, and no distribution shall be made on account of any such Claim; and

C.    with respect to any Interest, (i) the amount provided by or established in the records of the Group I: Trustee Debtors at the Confirmation Date, provided, however, that a timely filed proof of Interest shall supersede any listing of such Interest on the records of the Group I: Trustee Debtors; or (ii) the amount stated in a proof of Interest Filed prior to the Confirmation Date if no objection to such Interest was filed prior to the Confirmation Date or such later date as the Bankruptcy Court allows; or (iii) the amount of such Interest as fixed by a Final Order of the Bankruptcy Court.

2.1.7    Allowed Claim.  Except as otherwise provided in the Plan(s) (including with respect to those Classes for which the amount of the Allowed Claims is specified by the Plan), a Claim to the extent (and only to the extent) of the Allowed Amount of such Claim.

2.1.8    Allowed Interest.  Any Interest to the extent, and only to the extent, of the Allowed Amount of such Interest.

2.1.9    Allowed Secured Claims.  All or  a portion of a Secured Claim that is an Allowed Claim.

2.1.10    Allowed Unsecured Claim. All or a portion of an Unsecured Claim that is an Allowed Claim.

2.1.11    Arch.  Arch Insurance Company, a Bond Issuer.

1          2.1.12    <u>Available Cash</u>.  Each Group I: Trustee Debtors' Cash deposited into the

2    applicable Distribution Account(s) on or after the Effective Date that is available for making

3    Distributions under the Plan to Holders of Allowed Administrative, Priority, and General

4    Unsecured Claims.  The Available Cash shall consist of the respective Group I: Trustee Debtors'

5    cash on hand as of the Effective Date that is not subject to a Disputed Lien, proceeds of Net

6    Litigation Recoveries that are not subject to a Disputed Lien, Net Sales Proceeds that become

7    Available Cash upon the disallowance of a Disputed Claim or avoidance of a Disputed Lien

8    purportedly encumbering such Cash, or proceeds from the LitCo Plan Loan.  All Available Cash

9    shall be deposited into the applicable Distribution Account(s).  Available Cash shall not include

10   Net Sale Proceeds in the Net Sales Proceeds Account where the Disputed Secured Claims are

11   Allowed but subject to an equitable subordination judgment.

12         2.1.13    <u>Avoidance Actions</u>.  All Claims and defenses to Claims accruing to the

13   Group I: Trustee Debtors and their Estates under Bankruptcy Code Sections 506(d), 510(c), 541,

14   544, 545, 547, 548, 549, 550, or 551.

15         2.1.14    <u>Bankruptcy Code</u>.  The United States Bankruptcy Code.

16         2.1.15    <u>Bankruptcy Court</u>.  The United States Bankruptcy Court for the Central

17   District of California, having jurisdiction over the Cases and, to the extent of any withdrawal of the

18   reference made pursuant to Section 157 of title 28 of the United States Code, the United States

19   District Court for the Central District of California; or, in the event such courts cease to exercise

20   jurisdiction over the Cases, such court or unit thereof that exercises jurisdiction over the Cases in

21   lieu thereof.

22         2.1.16    <u>Bankruptcy Rules</u>.  Collectively, as now in effect or hereafter amended

23   and as applicable to the Cases, (i) the Federal Rules of Bankruptcy Procedure, and (ii) the Local

24   Bankruptcy Rules and General Orders applicable to cases pending before the Bankruptcy Court.

25         2.1.17    <u>Beneficial Interests</u>. means, collectively, the interests of the holders of

26   Allowed Unsecured Claims in the Plan Trust and in all distributions to be made by the Plan Trust

27   on account of Allowed Unsecured Claims. The Beneficial Interests (a) shall be noted in the books

28   and records of the Plan Trust, (b) shall not be evidenced by a writing, and (c) may not be

1  transferred, sold, assigned or transferred by will, intestate succession or operation of law without

2  written notification to the Plan Trustee confirming and acknowledging the transfer by both the

3  holder and the transferee.

4          2.1.18    Bond Claim(s).  Any Claim against the Debtor(s) and a Bond Issuer under

5  various payment or performance bonds.

6          2.1.19    Bond Claimant.  Holder(s) of a Bond Claim.

7          2.1.20    Bond Indemnification Claim.  All Claims by Bond Issuers for

8  indemnification against a Bond Indemnitor for the Bond Issuer's actual payment or purchase of a

9  Bond Claim with respect to the Group I: Trustee Debtors' Projects.

10          2.1.21    Bond Indemnitors.  The individuals and entities that are allegedly liable on

11  the Bond Indemnification Claims, including, allegedly, all of the Debtors, Acquisitions, all

12  Affiliates of Acquisitions, and Elieff.

13          2.1.22    Bond Issuer(s).  Bond Safeguard, Lexon and Arch in their capacities as

14  issuers and sureties for payment and performance bonds for the benefit of certain of the Debtors.

15          2.1.23    Bond Safeguard.  Bond Safeguard Insurance Company, a Bond Issuer.

16          2.1.24    Business Day.  Any day, other than a Saturday, a Sunday or a "legal

17  holiday," as defined in Bankruptcy Rule 9006(a).

18          2.1.25    Cases.  The Chapter 11 cases of the Group I: Trustee Debtors pending

19  before the Bankruptcy Court.

20          2.1.26    Cash.  Currency of the United States of America and cash equivalents,

21  including, but not limited to, bank deposits, immediately available or cleared checks, drafts, wire

22  transfers and other similar forms of payment.

23          2.1.27    CFD Bonds.  Community facilities district bonds issued by a

24  governmental entity.

25          2.1.28    Chapter 11 Trustee.  Steven M. Speier, the duly appointed trustee of the

26  Trustee Debtors in their pending Chapter 11 Cases.

27          2.1.29    Claim.  This term shall have the broadest possible meaning under

28  Section 101(5) of the Bankruptcy Code, and shall include (a) any right to payment from any of the

1    Group I: Trustee Debtors, whether or not such right is reduced to judgment, liquidated,

2    unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable,

3    secured, or unsecured, or (b) any right to an equitable remedy for breach of performance if such

4    breach gives rise to a right of payment from any of the Group I: Trustee Debtors, whether or not

5    such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured,

6    disputed, undisputed, secured, or unsecured.

7           2.1.30    <u>Claims Bar Date</u>.  For any Claim other than the exceptions noted below,

8    March 31, 2009, which was established by the Bankruptcy Court as the last date for creditors to

9    file Proof of Claims with the Bankruptcy Court in all of the Group I: Trustee Debtors' Cases,

10   except for the following: (a) Administrative Claims, for which the Administrative Claims Bar Date

11   shall apply, (b) claims arising from rejection of executory contracts or unexpired leases pursuant to

12   11 U.S.C. § 365, for which the last day to file a proof of claim is (i) 30 days after the date of entry

13   of the order authorizing the rejection, or (ii) March 31, 2009, whichever is later, (c) claims of

14   "governmental units," as that term is defined in 11 U.S.C. § 101(27), for which proofs of claim are

15   timely filed if filed: (i) before 180 days after the date of the Order for Relief in this case, or (ii) by

16   March 31, 2009, whichever is later (11 U.S.C. § 502(b)(9)), and (d) claims arising from the

17   avoidance of a transfer under chapter 5 of the Bankruptcy Code, the last day to file a proof of claim

18   is 30 days after the entry of judgment avoiding the transfer or March 31, 2009, whichever is later.

19          2.1.31    <u>Claims Objection Deadline</u>.  The later of (i) the first business day

20   following the one hundred and eightieth (180th) day after the Effective Date, or (ii) such greater

21   period of limitation as may be fixed or extended by the Bankruptcy Court or by agreement between

22   the Plan Trustee and the Holder of the Claim.

23          2.1.32    <u>Claim Objection Reduction Amount</u>. The amount of Net Sales Proceeds

24   that is made available to the holders of Allowed Unsecured Claims due to the entry of a judgment

25   or order on a Lehman Claim Objection that disallows, reduces, or otherwise adversely modifies the

26   secured claims filed by the Lehman Lenders.

27          2.1.33    <u>Class</u>.  Each group of Claims or Interests classified in Article V of the Plan

28   pursuant to Sections 1122 and 1123 of the Bankruptcy Code.

2.1.34    Confirmation Date.  The date on which the Confirmation Order is entered in the Bankruptcy Court's docket.

2.1.35    Confirmation Order.  The order entered by the Bankruptcy Court confirming the Plan in accordance with the provisions of Chapter 11 of the Bankruptcy Code.

2.1.36    Contingent Bond Indemnification Claims.  Bond Indemnification Claims in which the Bond Issuer has not yet paid or purchased the underlying Bond Claim.

2.1.37    Contract Action. The action filed by certain Voluntary Debtors against Lehman ALI, Inc., and certain other defendants, in California Superior Court for the County of Orange (Case No. 30-2011-0040847-CU-BC-CJC), that was removed to the bankruptcy court as Adv.  No. 8:11-ap-01212-ES, with a reservation of rights to add the Plan Trustee and/or the Trustee Debtors (and their successors) as additional plaintiffs therein.

2.1.38    Creditor.  Any Person who is the Holder of a Claim against any Debtor that arose or accrued or is deemed to have arisen or accrued or to have matured, or otherwise become due, owing, and payable on or before the Petition Date, including, without limitation, Claims of the kind specified in Sections 502(g), 502(h) or 502(i) of the Bankruptcy Code.

2.1.39    Debtor(s).  Individually or collectively, the Voluntary Debtors and the Trustee Debtors, as specifically defined in Exhibit "1" attached hereto.

2.1.40    Debtor(s)-in-Possession.  The Voluntary Debtor(s) in their capacity as representatives of their respective Estates in their respective Chapter 11 Cases.

2.1.41    Delta Coves.  Delta Coves Ventures, LLC, a limited liability company, a Trustee Debtor, and the owner of the Delta Coves Project.

2.1.42    Delta Coves Project.  The Project owned by Delta Coves, located in the Contra Costa County, California, as more particularly described herein.

2.1.43    Delta Coves Project Break-up Fee. The sum equal to two and one-half  (2-1/2%) percent of the Minimum Sale Prince of the Delta Coves Project plus actual amounts paid by LitCo on Allowed Administrative Claims for the Delta Coves Case if LitCo is the Stalking Horse Bidder and is not the Winning Bidder.

1          2.1.44    <u>Delta Coves Loan Agreement</u>.  A certain Amended and Restated Loan

2 Agreement, dated as of April 20, 2007, by and between Delta Coves, as borrower, and Lehman

3 ALI as lender, pursuant to which Lehman ALI made a loan in the maximum aggregate principal

4 amount of approximately $236 million.  The Delta Coves Loan Agreement is allegedly secured by

5 a first-priority deed of trust on the Delta Coves Project.  The Delta Coves Loan Agreement has an

6 asserted balance due of $206,023,142.48 as of March 30, 2009.

7          2.1.45    <u>Disclosure Statement</u>.  The document accompanying the Plan that is

8 entitled "Third Amended Disclosure Statement Describing Third Amended Chapter 11 Plan Filed

9 by SunCal Plan Proponents In The Chapter 11 Cases Of SunCal Oak Valley, LLC, SunCal

10 Heartland, LLC, Delta Coves Venture, LLC, SunCal Marblehead, LLC and SunCal PSV, LLC," as

11 amended and with all accompanying exhibits.

12          2.1.46    <u>Disputed Claim(s)</u>.  All or any part of a Claim against a Group I: Trustee

13 Debtor as to which any one of the following applies: (i) no Proof of Claim has been filed with

14 respect to such Claim, and either (a) the Claim is not listed in the Schedules; or (b) the Claim is

15 listed in the Schedules as unliquidated, disputed, contingent, unknown or in a zero amount, (ii) the

16 Claim is the subject of (a) a unresolved Litigation Claim; (b) the Claim is subject to offset by a

17 Litigation Claim; (c) a timely objection to such Claim that has not been resolved by a Final Order;

18 or (d) a request for estimation in accordance with the Bankruptcy Code, the Bankruptcy Rules, any

19 applicable order of the Bankruptcy Court, or the applicable Plan(s) which is Filed on or before the

20 Claims Objection Deadline, which Adversary Proceeding, objection, or request for estimation has

21 not been dismissed, withdrawn or determined by a Final Order; or (iii) the Claim is otherwise

22 treated as a "Disputed Claim" pursuant to the Plan.

23          2.1.47    <u>Disputed Lien(s)</u>.  An asserted lien(s) against Assets of the Debtor(s) that

24 is either subject to a Disputed Secured Claim, not duly perfected, subject to an Avoidance Action,

25 or subject to an action pursuant to Bankruptcy Code Sections 510(c)(2) and/or 506(d).  However,

26 pursuant to Section 506(d)(2), a lien is not disputed merely because it secures a claim that "is not

27 an allowed secured claim due only to the failure of any entity to file a proof of such claim under

28 section 501 of this title."

1                2.1.48     Disputed Secured Claim(s). That part of a Disputed Claim that is a

2    Secured Claim.

3                2.1.49     Distribution(s).  Payments to Holders of Allowed Claims provided for

4    under the Plan.

5                2.1.50     Distribution Agent.  The entity that is responsible for making Distributions

6    under the Plan, which shall be Acquisitions.

7                2.1.51     Distribution Account(s).  Separate account(s) to be established by the Plan

8    Trustee at an FDIC insured bank into which each Group I: Trustee Debtors' Available Cash shall

9    be deposited and all Available Cash received by the Plan Trust after the Confirmation Date that

10    would have belonged to such Group I: Trustee Debtor shall be deposited, other than Net Sales

11    Proceeds that are subject to Disputed Claims and Disputed Liens.

12                2.1.52     Distribution Date.  With respect to any Allowed Claim or Allowed

13    Interest, the date on which a Distribution is required to be made under the Plan.

14                2.1.53     Effective Date. A date selected by the applicable SunCal Plan

15    Proponent(s) that is not later than the ninetieth (90th) calendar day after the Confirmation Date, and

16    provided there is no stay pending appeal of the Confirmation Order, in which case the Effective

17    Date shall be tolled until the dissolution of such stay.  However, in any case where the actions

18    provided for in the Plan would be delayed by the automatic stay applicable in the case of any

19    Lehman Entity operating under the protection of Chapter 11 or Chapter 7, the SunCal Plan

20    Proponents shall have the right to extend the Effective Date for an additional sixty (60) days to

21    obtain relief from any such stay.  The Effective Date may be further extended (beyond the above

22    referenced initial sixty (60) day extension) by an order of the Bankruptcy Court after notice and

23    hearing to all parties in interest.

24                2.1.54     Elieff.  Bruce Elieff, the president of Acquisitions, a purported Bond

25    Indemnitor with alleged corresponding indemnity Claims against the Debtors.

26                2.1.55     Estates.  The bankruptcy estates of the Group I: Trustee Debtors created

27    pursuant to Section 541 of the Bankruptcy Code.

28

2.1.56    <u>Fee Applications</u>.  Applications of Professional Persons under Sections 330, 331 or 503 of the Bankruptcy Code for allowance of compensation and reimbursement of expenses in the Cases.

2.1.57    <u>Fee Claim</u>.  A Claim under Sections 330 or 503 of the Bankruptcy Code for allowance of compensation and reimbursement of expenses in the Cases.

2.1.58    <u>Fenway Capital</u>.  Fenway Capital Funding LLC, a Lehman Successor to Lehman's Disputed Claims and Lehman's Disputed Liens arising from (i) SunCal Communities I Loan Agreement, (ii) Ritter Ranch Loan Agreement, (iii) Bickford Second Loan Agreement, (iv) SunCal PSV Loan Agreement, (v) SunCal Marblehead/SunCal Heartland Loan Agreement, (vi) Delta Coves Loan Agreement (vii) SunCal Northlake Loan Agreement, and (viii) SunCal Oak Valley Loan Agreement.  Such Disputed Claims and Disputed Liens were transferred back to LCPI pursuant to a compromise approved by the New York Bankruptcy Court on May 12, 2010.

2.1.59    <u>Filed</u>.  Delivered to, received by and entered upon the legal docket by the Clerk of the Bankruptcy Court.  "File" shall have a correlative meaning.

2.1.60    <u>Final Order</u>.  A judgment, order, ruling or other decree issued and entered by the Bankruptcy Court, that has not been reversed, stayed, modified or amended.

2.1.61    <u>General Unsecured Claim</u>.  A Claim against a Group I: Trustee Debtor that is not (a) a Secured Claim, (b) an Administrative Claim, (c) a Tax Claim or (d) a Priority Claim.

2.1.62    <u>Group I: Trustee Debtors</u>. SunCal Oak Valley, LLC, SunCal Heartland, LLC, Delta Coves Venture, LLC, SunCal PSV, LLC and SunCal Marblehead, LLC.

2.1.63    <u>Group I: Trustee Debtors Assets</u>.  All assets that are property of the Group I: Trustee Debtor(s) pursuant to Bankruptcy Code Section 541, including the Group I: Trustee Projects, the Litigation Claims and the Net Sales Proceeds.

2.1.64    <u>Group I: Trustee Other Assets</u>.  All assets of the Group I: Trustee Debtors excluding the Group I: Trustee Projects, Litigation Claims and Net Sales Proceeds.

2.1.65    <u>Group I: Trustee Projects</u>.  The Oak Valley Project, the Heartland Project, the Delta Coves Project, the Palm Springs Village Project and the Marblehead Project.

MAINDOCS-#164960-v3-SunCal_3rd_Am_Group_I_TD_DS.DOC

1        2.1.66    <u>Heartland Project Break-up Fee</u>. The sum equal to two and one-half (2-

2    1/2%) percent of the Minimum Sale Prince of the Heartland Project plus actual amounts paid by

3    LitCo on Allowed Administrative Claims for the SunCal Heartland Case if LitCo is the Stalking

4    Horse Bidder and is not the Winning Bidder.

5        2.1.67    <u>Heartland Project</u>.  The Project owned by SunCal Heartland, located in the

6    Riverside County, California, as more particularly described herein.

7        2.1.68    <u>Holder</u>.  The beneficial owner of any Claim or Interest.

8        2.1.69    <u>Initial Overbid</u>. The Initial Overbid is the first Qualifying Bid after the

9    Opening Bid that is equal to or in excess of the Initial Overbid Amount.

10        2.1.70    <u>Initial Overbid Amount</u>. In the case of the Oak Valley Project, the Initial

11    Overbid Amount is a sum that is not less than the sum of the Opening Bid, the Oak Valley Project

12    Break-up Fee and one hundred thousand dollars ($100,000). In the case of the  Heartland Project,

13    the Initial Overbid Amount is a sum that is not less than the sum of the Opening Bid, the Heartland

14    Project Break-up Fee and one hundred thousand dollars ($100,000).  In the case of the Delta Coves

15    Project, the Initial Overbid Amount is a sum that is not less than the sum of the Opening Bid, the

16    Delta Coves Project Break-up Fee and one hundred thousand dollars ($100,000). In the case of the

17    Marblehead Project, the Initial Overbid Amount is a sum that is not less than the sum of the

18    Opening Bid, the Marblehead Break-up Fee and one hundred thousand dollars ($100,000). In the

19    case of the Palm Springs Village Project, the Initial Overbid Amount is a sum that is not less than

20    the sum of the Opening Bid, the PSV Break-up Fee and seventy-five thousand dollars ($75,000).

21        2.1.71    <u>Insider</u>.  The term shall have the broadest meaning possible under

22    Section 101(31), including, but not limited to, a person in control of the Debtor, Affiliates and

23    Insiders of such Affiliates, and including Affiliates of Acquisitions and the Lehman Entities.

24        2.1.72    <u>Interest</u>.  Any equity security interest in any Group I: Trustee Debtor

25    within the meaning, of Section 101(16) of the Bankruptcy Code, including, without limitation, any

26    equity ownership interest in any of the Group I: Trustee Debtors, whether in the form of common

27    or preferred stock, stock options, warrants, partnership interests, or membership interests.

28

MAINDOCS-#164960-v3-SunCal_3rd_Am_Group_I_TD_DS.DOC

1          2.1.73  <u>LBHI</u>.  Lehman Brothers Holdings, Inc., a Lehman Entity, the parent

2  company of Lehman ALI and LCPI, and a Chapter 11 debtor in a bankruptcy proceeding pending

3  in the Bankruptcy Court for the Southern District of New York.

4          2.1.74  <u>LCPI</u>.  Lehman Commercial Paper, Inc., a Chapter 11 debtor in a

5  bankruptcy proceeding pending in the Bankruptcy Court for the Southern District of New York.

6          2.1.75  <u>Lehman Adversary Proceeding</u>.  The Debtors' pending adversary

7  proceeding against the Lehman Lenders and/or the Lehman Successors asserting various causes of

8  action including equitable subordination, fraudulent conveyances and preferential transfers.

9          2.1.76  <u>Lehman ALI</u>.  Lehman ALI, Inc.

10          2.1.77  <u>Lehman Disputed Administrative Loans</u>.  The post-petition financing

11  provided by Lehman ALI to SunCal Oak Valley, SunCal Heartland, SunCal Northlake, SunCal

12  Marblehead, SunCal Century City, SunCal PSV, Delta Coves, and SunCal Oak Knoll, which

13  grants priming liens on all borrower Trustee Debtors' assets, and for super-priority administrative

14  status to Lehman ALI.   The aggregate amount of the Lehman Disputed Administrative Loans to

15  all of the above reference Trustee Debtors was approximately $40 million as of March 1, 2011 and

16  continuing to increase.  The Lehman Disputed Administrative Loans are the subject of claim

17  objections, specifically the pending 502(d) Objection. Until these objections are resolved in the

18  applicable Case, these Lehman Disputed Administrative Loans shall not be Allowed Claims.

19          2.1.78  <u>Lehman Claim Objections</u>. The objections filed by the Debtors to the

20  claims filed by the Lehman Lenders that are based upon the Lehman Disputed Loans and the

21  Lehman Disputed Administrative Loans, including, but not limited to, the Lehman Recoupment

22  Objection and the Lehman 502(d) Objection.

23          2.1.79  <u>Lehman Entities</u>.  The Lehman Lenders, the Lehman Equity Members and

24  LBHI.

25          2.1.80  <u>Lehman Equity Members</u>.  Lehman Entities that own direct or indirect

26  membership Interests in all of the Trustee Debtors, except for SunCal Heartland and SunCal

27  Marblehead.

28

2.1.81    <u>Lehman Lenders</u>.  Lehman ALI, LCPI, Northlake Holdings, and OVC Holdings.

2.1.82    <u>Lehman Disputed Loans</u>.  Collectively the following loans that are the purported basis for the Lehman's Disputed Claims:  (a) SunCal Communities I Loan Agreement; (b) Bickford Second Loan Agreement; (c) Ritter Ranch Loan Agreement; (d) SCC Palmdale Loan; (e) Interim Loan Agreement; (f) SunCal Oak Knoll/SunCal Torrance Loan Agreement; (g) SunCal Century City Loan Agreement; (h) SunCal PSV Loan Agreement; (i) SunCal Delta Coves Loan Agreement; (j) SunCal Marblehead/SunCal Heartland Loan Agreement; (k) Sun Cal Oak Valley Loan Agreement; (l) SunCal Northlake Loan Agreement; (m) Pacific Point First Loan Agreement; (n) Pacific Point Second Loan Agreement, and (o) the Lehman Disputed Administrative Loan.

2.1.83    <u>Lehman Representatives</u>.  The individuals that controlled the Lehman Entities.

2.1.84    <u>Lehman Successor(s)</u>.  Entities other than the Lehman Lenders that either assert to be or are determined by the Bankruptcy Court to be the beneficial owner(s) of the Lehman Disputed Loan(s), including, but not limited to Fenway Capital, Lehman Re and Danske Bank.

2.1.85    <u>Lehman's Disputed Claim(s)</u>.  All of the Proofs of Secured Claims filed by a Lehman Lender or a Lehman Successor in the Debtors' Chapter 11 Cases arising from the Lehman Disputed Loans and the Lehman Disputed Administrative Loans.

2.1.86    <u>Lehman's Disputed Lien(s)</u>.  All of the alleged liens relating to Proofs of Secured Claims filed by a Lehman Lender or a Lehman Successor in the Debtor's Chapter 11 Cases arising from the Lehman Disputed Loans.

2.1.87    <u>Lexon</u>.  Lexon Insurance Co.

2.1.88    <u>LitCo</u> A Delaware limited liability company that will be formed for the purpose of (i) purchasing the claims and Litigation Rights held by the Reliance Claimants that choose to sell such Reliance Claims, (ii) funding the LitCo Plan Loan, and (iii) potentially being selected as the Stalking Horse Bidder under the Group I: Trustee Debtors' Plans.

2.1.89    <u>LitCo Plan Loan</u>. A loan that will be made by LitCo to the extent necessary to pay Allowed Priority Claims, Allowed Administrative Claims and Post Confirmation

Expenses incurred by the Plan Trust, the Plan Trustee and its professionals and to the Trustee Debtors Committee and its professionals if no other source is available from the applicable Group I: Trustee Debtor's Assets.

2.1.90    Litigation Claims.    Any and all interests of the Group I: Trustee Debtors in any and all Claims, rights, causes of action, and objections or defenses to Claims, liens, rights, or causes of action which have been or may be commenced by the Group I: Trustee Debtor(s), the Chapter 11 Trustee, or the Trustee Debtors' Committee, as the case may be, including, but not limited to, any (i) Avoidance Actions; (ii) for turnover of property to the Group I: Trustee Debtors' Estates and/or the Plan Trust; (iii) for the recovery of property or payment of money that belongs to the Debtors' Estates or the Plan Trust; (iv) the right to compensation in the form of damages, recoupment or setoff of the Debtors' Estates and/or the Plan Trust; (v) the Lehman Adversary Proceeding; (vi) the Contract Action, and (vii) any and all other Claims against Lehman's Disputed Claims and/or Disputed Liens referenced in the Plan or the Disclosure Statement.

2.1.91    Litigation Recoveries.    Any Cash or other property received by the Chapter 11 Trustee, the Group I: Trustee Debtors, the Trustee Debtors' Committee and/or the Plan Trust, as the case may be, from all or any portion of a Litigation Claim(s), including, but not limited to, awards of damages, attorneys' fees and expenses, interest and punitive damages, whether recovered by way of settlement, execution on judgment or otherwise.

2.1.92    Litigation Rights. Any Claims held by a party against the Group I: Trustee Debtors, and if applicable, against third parties arising or relating to the Claim against the applicable Group I: Trustee Debtor, that have not been fixed in a final judgment prior to the Effective Date.

2.1.93    Marblehead Break-up Fee. The sum equal to two and one-half  (2-1/2%) percent of the Minimum Sale Prince of the Marblehead Project plus actual amounts paid by LitCo on Allowed Administrative Claims for the Marblehead Case if LitCo is the Stalking Horse Bidder and is not the Winning Bidder.

2.1.94    Marblehead Project.  The Project owned by SunCal Marblehead, located in the City of San Clemente, California, as more particularly described herein.

MAINDOCS-#164960-v3-SunCal_3rd_Am_Group_I_TD_DS.DOC

2.1.95    Maximum Distributions.  A Distribution to a Holder of an Allowed General Unsecured Claim against a Group I: Trustee Debtor equal to one hundred percent (100%) of the amount of the Holder's Allowed General Unsecured Claim plus interest at the Legal Rate from and as of the Group I: Trustee Debtor's Order for Relief.

2.1.96    MB Firm.  Miller Barondess, LLP.

2.1.97    Mechanic Lien Claims.  Mechanic Lien Claims arising pursuant to California Civil Code §3110, et seq. that were either allegedly perfected prepetition or otherwise allegedly satisfy the requirements of Bankruptcy Code 546(b).

2.1.98    Minimum Increment.  The Minimum Increment is the additional sum that must be bid for one of the Group I: Trustee Projects in excess of a prior Qualified Bid. The Minimum Increment applicable to the sale of the Oak Valley Project and the Delta Coves Project is the sum of seventy-five thousand dollars ($75,000), until there are only two Qualified Bidders submitting bids for these Projects, then the Minimum Increment shall be fifty thousand dollars ($50,000). The Minimum Increment applicable to the sale of the Heartland Project is the sum of fifty thousand dollars ($50,000), until there are only two Qualified Bidders submitting bids for these Projects, then the Minimum Increment shall be twenty thousand dollars ($20,000). Minimum Increment applicable to the sale of the Marblehead Project and the Palm Springs Village Project is one hundred thousand dollars ($100,000), until there are only two Qualified Bidders submitting bids for a Group I: Trustee Project, then the Minimum Increment shall be fifty thousand dollars ($50,000).

2.1.99    Minimum Sale Price. The minimum gross sale price that must be paid for the Group I: Trustee Projects, respectively, before such projects can be sold pursuant to the Plan. The Minimum Sale Price for the Marblehead Project is $84,420,000, for the Palm Spring Village Project is $9,990,000, for the Oak Valley Project is $18,900,000, for the Heartland Project is $6,750,000, and for the Delta Cove Project is $18,720,000.

2.1.100    Net Litigation Recoveries.  Litigation Recoveries less associated Administrative Claims and Post-Confirmation Expenses incurred in connection with such Litigation Recoveries.

2.1.101   <u>Net Sales Proceeds</u>.  The Cash generated from the sale(s) or liquidation of the Group I: Trustee Debtor(s)' Assets or the Plan Trust's Assets, less payment of selling expenses, taxes, Chapter 11 Trustee fees, and any associated Post-Confirmation Expenses and Administrative Claims incurred in furtherance of such sales or liquidation of such Assets.

2.1.102   <u>Net Sales Proceeds Account(s)</u>.  Separate account(s) that will be established by the Plan Trustee at an FDIC insured bank into which all Net Sale Proceeds shall be deposited from the sale of Assets that were allegedly encumbered by a Disputed Secured Claim(s) and/or a Disputed Lien(s).  There shall be a separate Net Sales Proceeds Account for the Net Sale Proceeds allegedly subject to each Disputed Secured Claim(s) and/or Disputed Lien(s), except where there are two Disputed Liens on a single Project, in which case, there shall be a single account for the proceeds generated from that Project.  The Disputed Secured Claim(s) and/or Disputed Lien(s) shall attach to the corresponding Net Sales Proceeds Account(s) pending any Final Order(s) of the Bankruptcy Court resolving the applicable Disputed Secured Claim(s) and/or applicable Disputed Lien(s).  To the extent that a particular Disputed Claim is disallowed or a particular Disputed Lien is avoided (other than transferred to the Estates pursuant to Bankruptcy Code Section 510(c)(2)) or otherwise invalidated, such Net Sales Proceeds allegedly subject thereto shall become Available Cash and shall be transferred to the applicable Distribution Account(s).  To the extent that a particular Disputed Secured Claim and a Disputed Lien are allowed and deemed valid but subject to the equitable subordination causes of action in the Lehman Adversary Proceeding, the funds shall remain in the Net Sales Accounts pending a Final Order on the equitable subordination causes of action in the Lehman Adversary Proceeding.

2.1.103   <u>Oak Valley Project</u>.  The Project owned by SunCal Oak Valley, located in the Riverside County, California, as more particularly described herein.

2.1.104   <u>Oak Valley Project Break-up Fee</u>. The sum equal to two and one-half  (2-1/2%) percent of the Minimum Sale Prince of the Oak Valley Project plus actual amounts paid by LitCo on Allowed Administrative Claims for the Oak Valley Case if LitCo is the Stalking Horse Bidder and is not the Winning Bidder.

2.1.105   <u>Opening Bid</u>.  Opening Bid means the offer for one, or both of the Group I: Trustee Projects, which is equal to the Minimum Sale Price(s) accepted by the Debtor for either, some or all of the Group I: Trustee Projects.

2.1.106   <u>Orders for Relief Date</u>.  The following are dates that orders for relief were entered for each of the Trustee Debtors:

| | |
|---|---|
| SunCal Oak Valley | January 6, 2009 |
| SunCal Heartland | January 6, 2009 |
| SunCal Northlake | January 6, 2009 |
| SunCal Marblehead | January 6, 2009 |
| SunCal Century City | January 6, 2009 |
| SunCal PSV | January 6, 2009 |
| Delta Coves | January 6, 2009 |
| SunCal Torrance | January 6, 2009 |
| SunCal Oak Knoll | January 6, 2009 |

2.1.107   <u>Palmdale Hills</u>.  Palmdale Hills Property, a Delaware limited liability company, a Voluntary Debtor herein, and the owner of the Ritter Ranch Project

2.1.108   <u>Palm Springs Village Project</u>.  The Project owned by SunCal PSV, located in the City of Palm Springs, California, as more particularly described herein.

2.1.109   <u>PSV Break-up Fee</u>. The sum equal to two and one-half  (2-1/2%) percent of the Minimum Sale Prince of the Palm Springs Village Project plus actual amounts paid by LitCo on Allowed Administrative Claims for the Palm Springs Village Case if LitCo is the Stalking Horse Bidder and is not the Winning Bidder.

2.1.110   <u>Person</u>.  An individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, governmental authority, governmental unit, committee or other entity of whatever nature.

2.1.111   <u>Petition Dates</u>.  The following are dates that each of the Voluntary Debtors filed their Voluntary Chapter 11 petitions or Creditors filed involuntary Chapter 11 petitions against the Trustee Debtors:

| | |
|---|---|
| Palmdale Hills | November 6, 2008 |
| SunCal Beaumont | November 6, 2008 |
| SCC Palmdale | November 7, 2008 |
| SunCal Johannson | November 7, 2008 |
| SunCal Summit Valley | November 7, 2008 |

| | |
|---|---|
| SunCal Emerald | November 7, 2008 |
| SunCal Bickford | November 7, 2008 |
| Acton Estates | November 7, 2008 |
| Seven Brothers | November 7, 2008 |
| SJD Partners. | November 7, 2008 |
| SJD Development | November 7, 2008 |
| Kirby Estates | November 7, 2008 |
| SunCal I | November 7, 2008 |
| SunCal III | November 7, 2008 |
| SCC Communities | November 19, 2008 |
| Del Rio | November 19, 2008 |
| Tesoro | November 19, 2008 |
| Delta Coves Ventures, LLC | November 14, 2008 |
| SunCal Heartland, LLC | November 12, 2008 |
| SunCal Marblehead, LLC | November 12, 2008 |
| LB-L-SunCal Northlake, LLC | November 12, 2008 |
| LB-L-SunCal Oak Valley, LLC | November 12, 2008 |
| SunCal Century City, LLC | November 14, 2008 |
| SunCal PSV, LLC | November 14, 2008 |
| SunCal Torrance Properties, LLC | November 14, 2008 |
| SunCal Oak Knoll, LLC | November 19, 2008 |

2.1.112    Plan(s).  The "Third Amended Chapter 11 Plan Filed by SunCal Plan Proponents In The Chapter 11 Cases Of SunCal Oak Valley, LLC, SunCal Heartland, LLC, Delta Coves Venture, LLC, SunCal PSV, LLC, and SunCal Marblehead, LLC [Group I: Trustee Debtors]"together with the Exhibits thereto, as the same may be amended or modified from time to time in accordance with the Plan(s).

2.1.113    Plan Period. The period from the Effective Date to the Plan Termination Date.

2.1.114    Plan Termination Date. The fifth (5th) anniversary date of the Effective Date, unless the Plan Trustee elects an earlier date.

2.1.115    Plan Sponsor.  The entity that has committed to cause and/or arrange the funding of certain specified obligations under the Plan on or after the Effective Date.  The Plan Sponsor is Acquisitions.

2.1.116    Plan Trust.  A liquidating trust to be established prior to or on the Effective Date, with Acquisitions as the Plan Trustee and the Holders of Allowed Claims against the Debtors as the beneficiaries. The purpose of the Plan Trust will be to liquidate the Debtors'

-22-

1    Assets (other than Assets that are excluded by the Plan Trustee on the grounds that they lack value

2    or would be difficult to administer) and to otherwise consummate the Plan.

3        2.1.117    Plan Trustee. The Plan Trustee under the Plan Trust Agreement is

4    Acquisitions.

5        2.1.118    Plan Trust Beneficiaries. The Plan Trust Beneficiaries are (i) the holders

6    of Beneficial Interests, as of any point in time, and (ii) holders of Allowed Claims that shall be

7    satisfied from Plan Trust Assets in accordance with the terms of the Plan.

8        2.1.119    Plan Trust Assets. Plan Trust Assets means all property within the

9    Chapter 11 estates of the Group I: Trustee Debtors, other than property that is affirmatively

10    excluded by the Plan Trustee.

11        2.1.120    Post-Confirmation Expenses.  The fees and expenses incurred by the Plan

12    Trust, the Plan Trustee and the Trustee Debtors' Committee and their professionals following the

13    Confirmation Date (including the fees and costs of Professionals) for the purpose of (i) prosecuting

14    and liquidating the Litigation Claims; (ii) objecting to and resolving Disputed Claims and Disputed

15    Liens; (iii) selling or otherwise liquidating the Plan Trust's Assets; (iv) effectuating Distributions

16    under the Plan; and (v) otherwise consummating the Plan and closing the Group I: Trustee

17    Debtors' Chapter 11 Cases.

18        2.1.121    Priority Claim.  Any Claim, other than an Administrative Claim or a Tax

19    Claim, to the extent entitled to priority under Section 507(a) of the Bankruptcy Code.

20        2.1.122    Pro Rata.  Proportionately, so that with respect to any distribution in

21    respect of any Allowed Claim, the ratio of (a)(i) the amount of property distributed on account of

22    such Allowed Claim to (ii) the amount of such Allowed Claim, is the same as the ratio of (b)(i) the

23    amount of property distributed on account of all Allowed Claims of the Class or Classes sharing in

24    such distribution to (ii) the amount of all Allowed Claims in such Class or Classes.

25        2.1.123    Professional.  A Person or Entity (a) employed by the Group I: Trustee

26    Debtors, the Trustee Debtors' Committee pursuant to a Final Order in accordance with Sections

27    327 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to the

28    Effective Date, pursuant to Sections 327, 328, 3291 330 and 331 of the Bankruptcy Code, or (b)

MAINDOCS-#164960-v3-SunCal_3rd_Am_Group_I_TD_DS.DOC

1   for which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to

2   Section 503(b) of the Bankruptcy Code.

3          2.1.124   <u>Professional Fees</u>.  All Allowed Claims for compensation and for

4   reimbursement of expenses under Sections 328, 330 and/or 503(b) of the Bankruptcy Code

5          2.1.125   <u>Projects</u>.  The Debtors' residential real estate development projects and

6   other assets as separately defined herein and described in Exhibit "1" to the Disclosure Statement.

7          2.1.126   <u>Qualifying Bid</u>.  Qualifying Bid means, with respect to any bid on a

8   Group I: Trustee Project, a bid made by Qualifying Bidder that is A) equal to or in excess of the

9   Initial Overbid Amount, unless it is the Initial Overbid, or B) in excess of the immediately

10   preceding Qualifying Bid by the Minimum Increment, if it is not the Initial Overbid.

11          2.1.127   <u>Qualifying Bidder</u>.  Qualifying Bidder means a bidder who a) has

12   deposited the sum of five hundred thousand dollars ($500,000) in an escrow designated by the

13   SunCal Plan Proponents; b) who has provided the SunCal Plan Proponents evidence confirming

14   that such bidder has the financial means to acquire the applicable Group I: Trustee Project(s) that

15   such bidder is seeking to acquire, and c) agreed that this sum will be forfeited as liquidated

16   damages if such bidder is the Winning Bidder and fails to perform.

17          2.1.128   <u>Reliance Claim</u>. An Allowed Unsecured Claim, Allowed Mechanic's

18   Lien Claim, or Allowed Bond Indemnification Claim against a Group I: Trustee Debtor that would

19   entitle the holder thereof to be the beneficiary of any equitable subordination judgment obtained

20   against a Lehman Entity by such Group I: Trustee Debtor.  All Allowed Mechanic's Lien Claims,

21   Allowed Bond Indemnification Claims and certain Allowed General Unsecured Claims are

22   Reliance Claims.  A list of the Reliance Claims for the Group I: Trustee Debtors is attached hereto

23   as Exhibit "8."

24          2.1.129   <u>Reliance Claimant</u>. The holder of a Reliance Claim. A list of the Reliance

25   Claimants is attached hereto as Exhibit "8."

26          2.1.130   <u>Sale Period</u>.  The Sale Period is the time period during which the SunCal

27   Plan Proponents must consummate a sale or liquidation of the Group I: Trustee Projects. The Sales

28

Period shall commence on or before the Confirmation Date and shall expire on thirty (30) days

after the Effective Date, unless extended by the Bankruptcy Court after notice and hearing.

2.1.131    SCC LLC.  SCC Acquisitions LLC, a limited liability company, a

subsidiary of Acquisitions and an indirect and/or a direct parent company of all of the Debtors.

2.1.132    Schedules.  The schedules of assets and liabilities and list of equity

security holders Filed by the Group I: Trustee Debtors, as required by Section 521(1) of the

Bankruptcy Code, Bankruptcy Rules 1007(a)(3) and (b)(1), and Official Bankruptcy Form No. 6,

as amended from time to time.

2.1.133    Stalking Horse Bidder.  The Qualified Bidder who submits the Opening

Bid that is accepted by the applicable Debtor.

2.1.134    Secured Claim.  Any Claim, including interest, fees, costs, and charges to

the extent allowable pursuant to Bankruptcy Code Section 506, that is secured by a valid and

unavoidable Lien on the Group I: Trustee Debtor(s)' Assets.

2.1.135    SunCal.  The SunCal Companies, a trade name for Acquisitions and its

Affiliates.

2.1.136    SunCal Management.  SunCal Management, LLC, a Delaware limited

liability company, and the former property manager for the Projects, which has been succeed by

Argent Management.

2.1.137    SunCal Marblehead. SunCal Marblehead, LLC, a Delaware limited

liability company, a Trustee Debtor (a Group I: Trustee Debtor), and the owner of the Marblehead

Project.

2.1.138    SunCal Marblehead/SunCal Heartland Loan Agreement.  That certain

Second Amended and Restated Term Loan and Revolving Line of Credit Loan Agreement, dated

as of October 3, 2007, by and among SunCal Marblehead Heartland Master LLC, SunCal

Marblehead, and SunCal Heartland, as borrowers, and Lehman ALI, as agent and sole lender,

pursuant to which Lehman ALI made a loan in the maximum aggregate principal amount of

approximately $316,061,300.  The SunCal Marblehead/SunCal Heartland Loan Agreement is

allegedly secured by first-priority deeds of trust on the Marblehead and the Heartland Projects.

1  The SunCal Marblehead/SunCal Heartland Loan Agreement has an alleged balance due of

2  $354,325,126.15 as of March 30, 2009. The proofs of claim filed with respect to this loan

3  agreement are the subject of the Lehman Adversary Proceeding and the Lehman Claim Objections.

4         2.1.139    SunCal Oak Valley.  SunCal Oak Valley, LLC, a Delaware limited

5  liability company, a Trustee Debtor (a Group I: Trustee Debtor), and the owner of the Oak Valley

6  Project.

7         2.1.140    SunCal Oak Valley Loan Agreement.  A certain Term Loan and

8  Revolving Line of Credit Loan Agreement, dated as of May 23, 2006, by and between SunCal Oak

9  Valley, as borrower, and OVC Holdings, as successor agent and sole lender, pursuant to which

10  OVC Holdings' predecessor (Lehman ALI) made a loan in the maximum aggregate principal

11  amount of approximately $120,000,000.  The SunCal Oak Valley Loan Agreement is allegedly

12  secured by a first-priority deed of trust on the Oak Valley Project.  The SunCal Oak Valley Loan

13  Agreement has an alleged balance due of $141,630,091.63 as of March 30, 2009.

14         2.1.141    SunCal Plan Proponents.  The Voluntary Debtors, in their capacity as

15  debtors and debtors in possession in their respective Chapter 11 cases, and Acquisitions as a

16  creditor and party-in-interest, that are proposing the Plans.

17         2.1.142    SunCal PSV. SunCal PSV, LLC, a Delaware limited liability company, a

18  Trustee Debtor (a Group I: Trustee Debtor), and the owner of the Palm Springs Village Project.

19         2.1.143    SunCal PSV Loan Agreement.  That certain Term Loan and Revolving

20  Line of Credit Loan Agreement, dated as of February 12, 2007, between SunCal PSV, as borrower,

21  and Lehman ALI, as agent and sole lender, pursuant to which Lehman ALI made a loan in the

22  maximum aggregate principal amount of approximately $90 million.  The SunCal PSV Loan

23  Agreement is allegedly secured by a first-priority deed of trust on the Palm Springs Village Project.

24  The SunCal PSV Loan Agreement has an alleged balance due of $88,257,340.20 as of March 30,

25  2009.

26         2.1.144    Tax.  Any tax, charge, fee, levy, impost or other assessment by any

27  federal, state, local or foreign taxing authority, including, without limitation, income, excise,

28  property, sales, transfer, employment, payroll, franchise, profits, license, use, ad valorem,

MAINDOCS-#164960-v3-SunCal_3rd_Am_Group_I_TD_DS.DOC

1  estimated, severance, stamp, occupation and withholding tax.  "Tax" shall include any interest or

2  additions attributable to, or imposed on or with respect to such assessments.

3    2.1.145    Tax Claim.  Any Claim for any Tax to the extent that it is entitled to

4  priority in payment under Section 507(a)(8) of the Bankruptcy Code.

5    2.1.146    Trustee Debtor(s). The following Debtors, individually or collectively,

6  that are represented by the Chapter 11 Trustee: Delta Coves, SunCal Heartland, SunCal

7  Marblehead, SunCal Northlake, SunCal Oak Valley , SunCal Century City, SunCal PSV, SunCal

8  Torrance, and SunCal Oak Knoll.

9    2.1.147    Trustee Debtors' Committee.  The Official Committee of Unsecured

10  Creditors of the Trustee Debtors appointed in the Cases pursuant to Section 1102 of the

11  Bankruptcy Code.

12    2.1.148    Unpaid Secured Real Property Tax Claims.  Secured Claims held by

13  various government entities secured by liens on the underlying real properties owned by the

14  Debtors but that are non-recourse to the Debtors.

15    2.1.149    Unsecured Claim. An Unsecured Claim is any Claim that is not an

16  Administrative Claim, Tax Claim, Secured Claim, or Priority Claim.

17    2.1.150    Voluntary Debtor(s).  The following  Chapter 11 debtors and debtors-in-

18  possession, individually or collectively, Palmdale Hills, SunCal I, SunCal III, SCC Palmdale,

19  Acton Estates, SunCal Beaumont, SunCal Emerald, SunCal Johansson, SunCal Bickford, SunCal

20  Summit, Seven Brothers, Kirby Estates, SJD Partners, SJD Development, SCC Communities, Del

21  Rio and Tesoro.

22    2.1.151    Winning Bid. The highest and best Qualifying Bid received for the Oak

23  Valley Project, the Heartland Project, the Delta Coves Project, Marblehead Project or the Palm

24  Springs Village Project, respectively.

25    2.1.152    Winning Bidder.  The party that submits the highest Qualifying Bid that

26  is accepted by the applicable Debtor.

27

28

MAINDOCS-#164960-v3-SunCal_3rd_Am_Group_I_TD_DS.DOC

## 2.2    Rules of Construction.

For purposes of the Plan and this Disclosure Statement, unless otherwise provided herein or in the Plan, (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural; (b) each pronoun stated in the masculine, feminine or neuter includes the masculine, feminine and neuter; (c) any reference in the Plan or this Disclosure Statement to an existing document or schedule filed or to be filed means such document or schedule, as it may have been or may be amended, modified or supplemented pursuant to the Plan; (d) any reference to an entity as a Holder of a Claim or Interest includes that entity's successors and assigns; (e) except as otherwise indicated herein all references in the Plan or this Disclosure Statement to Sections, Articles and Exhibits are references to Sections, Articles and Exhibits of or to the Plan; (f) the words "therein," "thereunder" and "thereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; and (g) unless otherwise provided in the Plan or this Disclosure Statement, any reference in the Plan or this Disclosure Statement to a contract, instrument, release, indenture, agreement, or other document being in a particular form or on particular terms and conditions means that such document shall be substantially and materially in such form or substantially and materially on such terms and conditions; (h) any reference in the Plan or this Disclosure Statement to a document, schedule, or exhibit to the Plan or Disclosure Statement Filed or to be Filed means such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; and (i) the rules of construction set forth in Section 102 of the Bankruptcy Code shall apply to the extent such rules are not inconsistent with the express terms of the Plan or this Disclosure Statement or any other provision in this Section.

## 2.3    Exhibits.

All Exhibits to the Plan are incorporated into and are a part of the Plan as if set forth in full therein.

## III.

## PLAN CONFIRMATION DEADLINES

1    The Bankruptcy Court has not confirmed the Plan described in this Disclosure Statement.

2    Accordingly, the terms of the Plan are not binding on anyone.  However, if the Bankruptcy Court

3    confirms the Plan, then the Plan will be binding on the Debtor(s), the Plan Trustee, and on all

4    Creditors and Interest Holders in such Cases.

5    **3.1**    **Time and Place of the Confirmation Hearing.**

6    The hearing where the Bankruptcy Court will determine whether or not to confirm the Plan

7    will take place at 411 West Fourth Street, Santa Ana, CA 92701-4593 on October 24, 2011, at 9:30

8    a.m. in Courtroom 5A.

9    **3.2**    **Deadline for Voting for or Against the Plan.**

10    If you are entitled to vote, it is in your best interest to timely vote on the enclosed ballot and

11    return the ballot to:

12    
13    Winthrop Couchot Professional Corporation
     660 Newport Center Drive, Suite 400
     Newport Beach, CA 92660
14    Facsimile:  (949) 720-4111
     Attn:  P.J. Marksbury

15    
16    Your ballot must be **received by**  September 26, 2011**,** or it will not be counted.

17    **3.3**    **Deadline for Objecting to the Confirmation of the Plan.**

18    Objections to the confirmation of the Plan must be filed with the Bankruptcy Court, and

19    served upon the following parties so that they are received by September 26, 2011:

20    | **Counsel to the Voluntary Debtors** | Paul J. Couchot |
      | Winthrop Couchot Professional Corporation |
21    | | 660 Newport Center Drive, Suite 400, |
      | | Newport Beach, CA 92660 |

22    
23    | **Authorized Agent for Voluntary Debtors** | Bruce V. Cook |
      | | General Counsel |
24    | | 2392 Morse Ave |
      | | Irvine, CA 92614-6234 |

25    
26    | **Counsel for SunCal Management LLC and SCC Acquisitions Inc**. | Ronald Rus |
      | | Rus Miliband & Smith P.C. |
27    | | 2211 Michelson Drive, Seventh Floor |
      | | Irvine, California 92612 |

28    

-29-

| | |
|---|---|
| **Authorized Agent for** | Bruce V. Cook |
| **SunCal Management and** | General Counsel |
| **SCC Acquisitions, Inc**. | 2392 Morse Ave |
| | Irvine, CA 92614-6234 |

### 3.4    Identity of Person to Contact for More Information Regarding the Plan.

Any interested party desiring further information about the Plan should contact the

Voluntary Debtors' counsel, Winthrop Couchot Professional Corporation, 660 Newport Center

Drive, Suite 400, Newport Beach, CA 92660, Attn:  Paul J. Couchot, (949) 720-4100; Peter W.

Lianides, (949) 720-4155; Payam Khodadadi, (949) 720-4160.

### 3.6    Disclaimer.

The information contained in this Disclosure Statement is provided by the SunCal Plan

Proponents.  The SunCal Plan Proponents represent that everything stated in this Disclosure

Statement is true to the best of their knowledge.  The Bankruptcy Court has not yet determined

whether or not the Plan is confirmable and makes no recommendation as to whether or not you

should support or oppose the Plan.

The discussion in this Disclosure Statement regarding the Group I: Trustee Debtors may

contain "forward looking statements" within the meaning of the Private Securities Litigation

Reform Act of 1995.  Such statements consist of any statement other than a recitation of historical

fact and can be identified by the use of forward looking terminology such as "may," "expect,"

"anticipate," "estimate," or "continue," or the negative thereof or other variations thereon or

comparable terminology.  The reader is cautioned that all forward looking statements are

necessarily speculative and there are certain risks and uncertainties that could cause actual events

or results to differ materially from those referred to in such forward looking statements.  The

liquidation analyses, distribution projections, projections of financial results and other information

are estimates only, and the timing, amount and value of actual distributions to Creditors may be

affected by many factors that cannot be predicted.  Therefore, any analyses, estimates, or

projections may or may not turn out to be accurate.

The SunCal Plan Proponents and their professionals have made a diligent effort to identify

in this Disclosure Statement all Litigation Claims, including claims for relief, counterclaims, and

objections to claims.  However, no reliance should be placed on the fact that a particular Litigation

1    Claim is or is not identified in this Disclosure Statement.  The Group I: Trustee Debtors or other

2    parties in interest may seek to investigate, file and prosecute Litigation Claims after the

3    Confirmation Date, or the Plan Trust may seek to do so after the Effective Date of the Plan whether

4    or not the Litigation Claims are identified in this Disclosure Statement.

5                                              **IV.**

6                      **FACTUAL BACKGROUND OF THE DEBTORS**

7    **4.1**    **The Formation of the Debtors and the Projects.**

8           **4.1.1**    **Overview of the Debtors and Their Projects.**

9           The Group I: Trustee Debtors are two of twenty-six entities (collectively the "Debtors") that

10   were formed pursuant to a joint venture between Affiliates of the SunCal Companies ("SunCal")

11   and the Lehman Entities (the "SunCal/Lehman Joint Venture"). The Debtors role in the venture

12   was to own and develop the large residential projects that were the core assets in this joint

13   undertaking.

14          At the inception of SunCal/Lehman Joint Venture, it was agreed that SunCal would be the

15   developer/manager of the Projects and the Lehman Entities would provide the necessary capital.

16   Attached hereto as Exhibit "1" is a general description of all of the Debtors' Projects, including the

17   Group I: Trustee Projects, and the Debtors' other primary Assets, excluding Cash and the Litigation

18   Claims, and a description of the loans for the Projects that are not a part of Group I: Trustee

19   Projects.

20          All of the Debtors are Affiliates of Acquisitions and SCC LLC.  Some of the Debtors

21   directly own the Projects, while others serve as holding companies, owning Allowed Interests in the

22   Debtors that hold title to the Projects.  SunCal Management, LLC, a SunCal Affiliate, has

23   management contracts with respect to all of the Projects and manages the Debtors' day-to-day

24   business affairs.

25          The seventeen Debtors who are referred to herein as the "Voluntary Debtors" are wholly

26   owned by SunCal Affiliates, and consequently the SunCal Affiliates have full corporate

27   governance authority over these entities.  The Voluntary Debtors own eleven (11) of the Projects.

28

In the case of the nine Trustee Debtors, the SunCal Affiliates and the Lehman Affiliates initially shared ownership equally (50% each). However, after the Petition Date, the SunCal Affiliates became the owner of hundred percent (100%) of the equity in two of the nine Trustee Debtors - SunCal Heartland and SunCal Marblehead. The Trustee Debtors own nine (9) Projects. Attached hereto as Exhibit "2" is a chart that sets forth the appraised value of the Group I: Trustee Debtors' Projects. This chart lists both the Lehman Lenders' value estimates and SunCal's valuation estimates.[1]  As the chart indicates, the Lehman Lenders' valuation for the Group I: Trustee Projects is in the aggregate amount of $200,800,000, while the Debtors' valuation of the Group I: Trustee Projects is in the aggregate amount of $84,000,000.

The Plan eliminates any potential value disputes by providing for the sale of the Group I: Trustee Projects through an auction that is designed to yield the highest market price for these assets. Accordingly, to the extent any other party believes the Group I: Trustee Projects have a greater value than the Opening Bid offered by another Qualifying Bidder, they will have the opportunity to submit a Qualifying Bid (but no credit-bids will be allowed) that exceeds the Opening Bid and, if they so desire, to become the Winning Bidder by offering the highest Qualifying Bid. This market sale process will insure that the rights of all stakeholders are protected.

### 4.1.2    The Group I: Trustee Debtors' Primary Secured Creditors and Their Disputed Claims.

Lehman ALI holds the primary secured claims against the Marblehead Project and the Palm Springs Village Project. Lehman ALI's secured claim against the Marblehead Project, which is secured by a first priority deed of trust, is based upon funding provided under the terms of the SunCal Marblehead/Heartland Loan Agreement. The asserted balance due under terms of this loan was $354,325,126.15 as of March 30, 2009. This claim is also collateralized by a lien against the Heartland Project.

Lehman Ali's secured claim against the Palm Spring Village Project, which is secured by a first priority deed of trust, is based upon funding provided under the terms of the SunCal PSV Loan

---

[1] Values may have changed since these analyses were prepared.

MAINDOCS-#164960-v3-SunCal_3rd_Am_Group_I_TD_DS.DOC

1    Agreement. The asserted balance due under terms of this loan was $88,257,340.20 as of March 30,

2    2009.

### 4.1.3    Disputed Claims and Liens.

4    As discussed in detail herein, during the course of the Debtors' Cases, the Debtors initiated

5    litigation disputing the validity of Lehman's Disputed Secured Claims, and the validity, priority

6    and extent of Lehman's Disputed Liens (which includes the liens against the Group I: Trustee

7    Projects).  This litigation is being pursued through the Lehman Adversary Proceeding, various

8    contested matters, and in potential lawsuits based on the post-petition conduct of the Lehman

9    Entities and/or their agents.

10    Attached hereto as Exhibit "3" is a chart that sets forth Lehman's Disputed Secured Claims,

11    the alleged Holders of the Lehman Disputed Secured Claims, the collateral encumbered by the

12    Lehman Disputed Liens, and the alleged outstanding amount based on the filed Proofs of Claim.

13    As the chart indicates, the total of Lehman's Disputed Secured Claims (based upon the proofs of

14    claims filed in the Debtor's bankruptcy cases) with respect to the Group I: Trustee Debtors is

15    approximately $442,582,466.

### 4.1.4    A Summary of All of the Alleged Claims Against the Debtors.

17    Attached hereto as Exhibit "4" is a chart that sets forth the prepetition Claims that have

18    been asserted against all of the Debtors.  In summary, the asserted Claims against the Group I:

19    Trustee Debtors consist of the following:

| Claims | Oak Valley | Heartland | Delta Coves | Marblehead Project | Palm Springs Village Project |
|---|---|---|---|---|---|
| Unpaid Secured Real Property Tax Claims | $175,158 | $985,141 | $406,976 | $2,500,646 | $1,725,166 |
| The Disputed Lehman Secured Claims | $141,630,092 | $354,325,126 | $206,023,142 | $354,325,126 | $88,257,340 |
| Mechanics Lien Claims | $1,618,699 | $1,208,080 | $468,358 | $4,001,839 | $1,860,130 |
| Administrative and Priority Claims | $2,480,171 | $3,001,257 | $4,327,749 | $3,220,120 | $1,199,145 |
| General Unsecured Claims Including | $28,822,374 | $31,843,116 | $32,845,905 | $109,697,964 | $21,892,343 |

| alleged Bond Claims | | | | | |
|---|---|---|---|---|---|

The SunCal Plan Proponents believe that these balances owed to the Lehman Lenders will ultimately be reduced through the Lehman Adversary Action, the Contract Action and the Lehman claims objections resulting in lower "Allowed" claims balances.

### 4.1.5    Summary of the Group I: Trustee Debtors' Cash.

The following chart sets forth the Group I: Trustee Debtors' cash on hand as of July 6, 2011.

| Group I: Trustee Debtor | Amount |
|---|---|
| SunCal Oak Valley | 437,426.62 |
| SunCal Heartland | 55,730.48 |
| Delta Coves | 2,608,588.87 |
| SunCal Marblehead | $454,824.80 |
| SunCal PSV | $9,115.75 |
| **Group I: Trustee Debtors Total** | _____ |

Although the Lehman Lenders have alleged that they hold liens on the above cash, a preliminary review of the applicable lien documents indicates that most of the alleged liens were not validly perfected. This means that these liens can be avoided, allowing the unsecured creditors recourse to these funds. Moreover, even if the liens against these accounts were properly perfected, the amount secured by these liens, and their priority and their enforceability will be subject to the results of the Lehman Claim Objections and the Lehman Adversary Proceeding.

### 4.2    Factual Circumstances Leading to the Filing of the Debtors' Chapter 11 Cases.

#### 4.2.1    Introduction.

In this section of the Disclosure Statement, the SunCal Plan Proponents have provided a brief description of the relationship between the Debtors and the Lehman Entities. This background is relevant to the Group I: Trustee Debtors, and in fact all of the Debtors, for the following reasons. First, most of the unsecured claims asserted against the Debtors were incurred at the insistence of the Lehman Lenders, and they would have been paid if the Lehman Lenders had honored their obligation to pay these claims. Second, a substantial part of claims that the Lehman Lenders failed to pay are being asserted against *all of the Debtors*. If the litigation against the Lehman Lenders discussed herein is successful, it will, at a minimum, reduce the pool of claims against the Group I: Trustee Debtors, and thereby increase the dividend payable to the remaining creditors. Third and

-34-

1   finally, this history allows the Creditors to take the measure of the parties who are now proffering

2   the competing plan – the Lehman Lenders.  As the within discussion will establish, the Lehman

3   Lenders failed to pay the claims of Creditors prepetition, the Lehman Lenders attempted to

4   foreclose upon the Group I: Trustee Projects post-petition in order to deny the unsecured creditors

5   any recovery on the claims they failed to pay, and finally, when this foreclosure effort failed, the

6   Lehman Lenders attempted to destroy the Debtors' reorganization and sale efforts by manipulating

7   LCPI's alleged automatic stay.

8               **4.2.2**    **Background of the SunCal Companies**.

9          SunCal is a family-owned and operated real estate business that has been successfully

10   developing properties throughout the western United States for over 70 years.  SunCal's business

11   focuses upon the "development" of residential land. A typical SunCal development begins with the

12   acquisition of one or more parcels of raw land. Thereafter, the SunCal team develops a master plan

13   for the acreage that incorporates streets, homes, parks, schools and commercial areas, and then it

14   works with the applicable municipal planning authorities (the city, county, state and federal) to

15   secure the necessary approvals or "entitlements" to gain approval of this plan. This process, which

16   requires the assistance of land planners, civil engineers, architects, lawyers, and other land

17   specialists, takes a period of years. Once the master plan is approved, SunCal provides for the

18   grading of the project and the installation of the foundational infrastructure (streets, utilities, etc.)

19   and then sells the lots or parcels within the project to merchant builders.

20               **4.2.3**    **The Origins of the SunCal/Lehman Joint Venture**.

21          SunCal historically financed its projects with loans and/or equity from a number of

22   different sources.  However, beginning in 1997, an increasing number of SunCal's projects were

23   financed by the Lehman Entities, as Mark Walsh ("Walsh"), the head of LBHI's Global Real

24   Estate Group, began cultivating a business relationship with SunCal's principals.

25          By 2003, the Lehman Entities and SunCal had entered into joint ventures involving

26   approximately fifteen projects.  By 2007, that number had grown to over forty, and the Lehman

27   Entities had become, with limited exceptions, the exclusive provider of financing for the SunCal

28   Projects pursuant to a written agreement executed in 2006.  The Lehman Entities also consisted of

1   the Lehman Equity Members that either directly or indirectly owned a fifty percent (50%) equity

2   interest in all nine of the Trustee Debtors.

3           In their dealings with SunCal, the Lehman Representatives made no distinction between

4   Projects financed by Lehman ALI and Projects financed by LCPI. They also made no distinction

5   between the Debtors in which Lehman Equity Members held 50% equity memberships or the

6   Debtors in which the Lehman Entities held no equity membership interest.  As agents of the

7   financial partner in the parties' joint venture, the Lehman Representatives would determine which

8   Lehman Entity would provide financing on which Projects, and would dictate the structure that the

9   financing would take, according to whatever suited the Lehman Entities' needs.

10          **4.2.4    Lehman's Effective Control Over the Management of the Debtors and**

11                    **Promises of Ongoing Funding.**

12          Prior to the market downturn in the middle of 2007, Lehman Representatives afforded

13   SunCal substantial discretion in the management and development of the Projects.  The Debtors

14   would contract with third-party vendors to perform grading, health and safety compliance,

15   construction, landscaping, and other necessary services on the Project sites, and they would work

16   with the local municipalities to obtain the necessary entitlements and other authorizations

17   necessary to proceed with development.  The Lehman Representatives, SunCal and the Debtors

18   would discuss anticipated quarterly expenditures at periodic budget meetings, and , as expenses

19   were incurred each month, SunCal and the Debtors would submit requests for payment to the

20   Lehman Representatives, supported by the necessary documentation. The Lehman Representatives

21   would then provide the funding necessary to pay these expenses.

22          During the third quarter of 2007, the foregoing management and payment dichotomy

23   changed, after the real estate market experienced a sudden downturn, and many of the Projects

24   significantly declined in value.  In response to this dramatic economic change, a series of high

25   level discussions occurred between SunCal's representatives and the Lehman Representatives --

26   including Walsh, Paul Hughson ("Hughson") and Frank Gilhool ("Gilhool"), the Managing

27   Directors of Lehman's Global Real Estate.  In these discussions, SunCal's representatives, acting

28   on behalf of the Debtors, expressed concerns about the loans on the Projects being out of balance,

1    and suggested shutting down the Projects, or at least slowing the pace of development.  However,

2    Walsh specifically instructed SunCal not to slow down or stop work.  He assured SunCal that the

3    Lehman Entities would provide the necessary funding to pay vendors and to keep the development

4    of the Projects moving forward.

5          The foregoing assurances of payments were confirmed in numerous telephone

6    conversations between Gilhool and SunCal's COO, Frank Faye ("Faye"), and/or SunCal's General

7    Counsel, Bruce Cook ("Cook") that took place during 2007 and 2008. In each exchange, Gilhool

8    assured SunCal that the Lehman Entities were committed to funding the debts and obligations

9    being incurred at the Projects and they continued to insist that work proceed.

10          During this time frame, the Lehman Representatives became much more "hands on,"

11   scrutinizing and approving all budgets and expenses through a new control and approval structure.

12   Under the new structure, SunCal would submit budgets to the Lehman Representatives on a

13   weekly basis and explain, during periodic conference calls, what Project payables they believe had

14   to be paid and what work had to be performed on the Projects.  The Lehman Representatives

15   would then unilaterally decide what future work would proceed, the Lehman Representatives

16   would authorize the work and the Lehman Representatives would decide what payables would be

17   paid timely by designating them as "urgent," and what other payables were not urgent and hence

18   would not be paid on a timely basis.  However, even under this new Lehman controlled

19   management and payment regime, the Lehman Representatives made it clear that all payables

20   being incurred would be funded.

21          **4.2.5    The 2008 Restructuring Agreement.**

22          By the fall of 2007, both SunCal and the Lehman Representatives contemplated entering

23   into a restructuring agreement in the near term, with a closing to occur no later than January or

24   February of 2008.  However, this transaction was delayed by the Lehman Entities' extensive

25   documentation demands until May 23, 2008. On this date, SunCal and most of the Debtors finally

26   entered into an omnibus "Restructuring Agreement" with LBHI, Lehman ALI and the other

27   Lehman Entities.  The same Lehman Representative signed the Restructuring Agreement on behalf

28   of all of the Lehman Entities.

-37-

1    Pursuant to the Restructuring Agreement, Lehman ALI, "as the Lender with respect to each

2    Loan," committed, among other things, to: (1) make advances under existing loans to fund the

3    continuing costs necessary to preserve the value of the Projects; (2) move forward to resolve the

4    accrued outstanding subcontractor payables, i.e., to make sure that the Projects' creditors were paid

5    for their work; and (3) to close the transaction, whereby newly-created Lehman Entities would

6    assume the debt and obligations of the Projects.

7    As originally executed in May 2008, the Restructuring Agreement applied to twelve of the

8    twenty Projects (as well as several other projects not at issue in the Lehman Adversary

9    Proceeding):  (1) Acton Estates; (2) Beaumont Heights; (3) Bickford Ranch; (4) Emerald

10    Meadows; (5) Heartland; (6) Johannson Ranch; (7) Marblehead; (8) Northlake; (9) Oak Valley;

11    (10) Pacific Point; (11) Ritter Ranch; and (12) Summit Valley.  The Debtors that owned and/or

12    held equity interests in the entities that owned these Projects were signatories to the May 2008

13    agreement.[2]

14    Between May and August 2008, the parties agreed to add four additional projects to the

15    Restructuring Agreement: (1) Del Rio; (2) Joshua Ridge; (3) Palm Springs Village; and (4) Tesoro

16    Burnham, and the four Debtors associated with these Projects—SunCal Del Rio, SCC

17    Communities, SunCal PSV, and SunCal Tesoro.  Only four Projects were not included in the

18    Restructuring Agreement: Century City, Delta Coves, Oak Knoll and Del Amo.  Accordingly, the

19    four Debtors associated with these Projects—SunCal Century City, Delta Coves, SunCal Oak

20    Knoll and SunCal Torrance—were not signatories thereto.  Lehman ALI was the lender on each of

21    these Projects and , and as with the other Projects, Lehman ALI continued to insist that these four

22    debtors  proceed with the development of the four Projects, it approved all expenses, and it

23    continually provided assurances of payment.

24    _____

[2] Specifically, the Restructuring Agreement was entered into by, among others, the "Borrowers," "Grantors" and

25    "Pledgors," as defined in Annex 1 thereto.  The "Borrowers" included SunCal Marblehead, SunCal Heartland, SunCal
Northlake, SunCal Oak Valley, SJD Partners, Palmdale Hills, SCC Palmdale, SunCal I, SunCal III, and SunCal

26    Bickford.

27    The "Grantors" included SunCal Marblehead, SunCal Heartland, SunCal Northlake, SunCal Oak Valley, SJD Partners,
Palmdale Hills, SunCal Bickford, SunCal Acton, SunCal Summit and SunCal Emerald, and Debtors SunCal Beaumont
and SunCal Johannson.

28

The "Pledgors" included SCC Palmdale, SunCal I, SunCal Summit and SJD Development.

### 4.2.6    The Lehman Lenders Hire Radco.

Subsequent to the execution of the Restructuring Agreement, Lehman ALI arranged for a third party, Radco, to directly settle outstanding contractor payables, as its agent.  Radco was provided some limited funding and authority to negotiate settlements, and did in fact reach settlement with a number of creditors.  The funding for these settlements, whether the debts related to Lehman ALI or LCPI funded Projects, came from the same source.  Lehman ALI and LCPI also provided approval for new work on the Projects, and Lehman ALI paid for some of this work.  However, this funding was minimal and it soon stopped.

In August 2008, Lehman ALI withdrew funding and settlement authority from Radco, leaving millions of dollars in outstanding contractor payables unresolved, notwithstanding the contrary provisions in the Restructuring Agreement.  Leman Ali's actions also impaired the Debtors ability to resolve ongoing public health and safety issues arising at the Projects.  Ultimately,  only a fraction of the total outstanding payables were resolved, contrary to the  past promises made by Lehman Representatives.

### 4.2.7    The Lehman Lenders' Failure to Close on the Settlement Agreement.

Pursuant to the terms of the Restructuring Agreement, the parties agreed to enter into a Settlement Agreement, the form of which was attached to the Restructuring Agreement.  The Settlement Agreement provided for the transfer of the Projects included within the Restructuring Agreement to a series of newly formed Lehman-controlled entities (each with "SCLV" in its name, for "SunCal-Lehman Venture"). The agreement further provided that the entity taking title to the Project would assume the  Lehman Lender debt obligations associated with the Projects, assume certain bond obligations associated with the Projects, and provide indemnifications to SunCal and the Debtors for unpaid claims.

On August 25, 2008, the Settlement Agreement and a series of related documents were formally executed by SunCal and the applicable Lehman Lenders and Lehman Equity Members at a meeting held in Los Angeles on August 25, 2008.  Once these documents were signed, all that remained was the mechanical closing of the series of transactions described in the Settlement Agreement. Since all of the conditions precedent to the closings had been satisfied, or could have

1    been satisfied at, or shortly after the meeting, this should have occurred at the August 25, 2008

2    meeting, or shortly after the meeting. However, the Lehman Representative asked SunCal to

3    extend the closing date for thirty days, to September 30, 2008. According to the Lehman

4    Representatives, this short extension would enable them to secure certain outstanding third party

5    consents. Although SunCal knew these third party consents were readily obtainable within a few

6    days, they agreed to this extension, believing the request was made in good faith.

7        **4.2.8    The Lehman Lenders' Undisclosed Sale of Most of the Debtors' Loans.**

8          As explained above, the Settlement Agreement was duly executed by all parties at a formal

9    closing meeting held on August 25, 2008. When the parties signed this agreement, which was a

10    binding contract, they both represented that they both intended and had the power and capacity to

11    perform all of the obligations undertaken therein. However, in the case of the Lehman Entities, this

12    representation was later discovered to be false. When the closing occurred on August 25, 2008, the

13    Lehman Lenders had already sold the very obligations they were agreeing to assume and restructure

14    in the Settlement Agreement to Fenway Capital pursuant to a repurchase agreement.  Accordingly,

15    as of August 25, 2008, they lacked the power to perform the most essential undertakings that they

16    agreed to perform in the Settlement Agreement. Instead of disclosing this fact at the August 25,

17    2008 meeting, the Lehman Lenders requested additional time to execute the agreed upon transfers

18    provided for under this binding agreement. The Lehman Lenders needed this delay because they

19    lacked the ability to perform the very obligations they had just agreed to perform in the Settlement

20    Agreement.

21          The Lehman Representatives also did not disclose at the August 25, 2008 closing that they

22    intended to sell the Pacific Point First Loan to Lehman Re, approximately a week later, *even though*

23    *this loan was also subject to the Settlement Agreement*. To the contrary, the Lehman

24    Representatives affirmatively concealed these facts from SunCal and the Debtors by asserting that

25    ownership still existed in the case of seven of the eight loans.

26        **4.2.9    Lehman's Foreclosure Sale and Purchase of the Pacific Point Project.**

27          At the time the Restructuring Agreement and the Settlement Agreement were signed, the

28    Pacific Point Project, which was still owned by SJD Partners, was among the Projects included in

-40-

1   the Restructuring Agreement and the Settlement Agreement.  Pursuant to the Restructuring

2   Agreement, and as detailed in the Settlement Agreement attached thereto, SunCal, SJD Partners,

3   and its parent company, SJD Development, all agreed that they would not interfere with Lehman

4   ALI's (or its designee's) foreclosure on the Pacific Point Project. They further agreed that a new

5   Lehman entity, LV Pacific Point, would purchase the Pacific Point Project upon foreclosure and

6   that Lehman ALI and LV Pacific Point would (a) assume SJD Partners' and SJD Development's

7   outstanding accounts payable for Pacific Point third-party vendors, (b) assume certain bond

8   liability associated with the Pacific Point Project, and (c) pay for the millions of dollars worth of

9   work that Lehman ALI representatives had authorized.

10       As previously stated, the Settlement Agreement was signed on August 25, 2008 by the

11   SunCal parties, including SJD Partners and SJD Development.  It was also signed by Gilhool as

12   authorized signatory on behalf of both Lehman ALI and LV Pacific Point.  As a signatory to the

13   Settlement Agreement, LV Pacific Point was required to purchase the Pacific Point Project at the

14   foreclosure sale subject to the above obligations. Consistent with this agreement, the City of San

15   Juan Capistrano executed an estoppel certificate for the benefit of SJD Partners and Lehman ALI—

16   at Lehman ALI's request—on August 26, 2008, two days before the foreclosure sale.  This

17   certificate stated, among other things, that the "Acquiring Entity [LV Pacific Point] shall by

18   operation of law become the legal successor-in-interest to Developer [SJD Partners]" under SJD

19   Partners' agreements with the City. That certificate further provided that there existed no breaches,

20   defaults, or claims under SJD Partners' agreements with the City.

21       On August 28, 2008, Lehman ALI foreclosed on the Pacific Point Project, and title was

22   transferred to LV Pacific Point at the foreclosure sale.  However, Lehman ALI and LV Pacific

23   Point failed to assume the liabilities and obligations associated with this Project as agreed.   This

24   breach of the parties' agreement, left SJD Partners without title to the Pacific Point Project, but

25   with the potential liability for the substantial unsecured claims relating to the Project, including

26   bond claims of approximately $34 million,.  Moreover, since Lehman Ali and LV Pacific Point

27   have continued to ignore their obligations under the above agreement, unpaid taxes, fines, and

28

1    penalties have continued to accrue to the detriment of the Project and these claims are being

2    asserted against SJD Partners.

3         Had SunCal, SJD Partners and SJD Development known that Lehman ALI and LV Pacific

4    Point had no intention of honoring their obligations under the foregoing agreement, they never

5    would have agreed to cooperate with the foreclosure.  Instead, SJD Partners would have filed for

6    bankruptcy earlier, thereby mitigating the damages from Lehman Ali's breach, by allowing

7    creditors recourse to the value of the Project.

8         This course of conduct is relevant to the unsecured creditors of the Group I: Trustee

9    Debtors for the following reason. The holders of bond claims against SJD Partners are asserting

10   their massive claims against the estates of all of the Debtors, including the estates of the Group I:

11   Trustee Debtors. Accordingly, Lehman Ali's wrongs against SJD Partners directly affect the Group

12   I: Trustee Debtors' cases.

13        **4.2.10  <u>Alvarez and Marsal Take Over Control of the Lehman Entities After</u>**

14        **<u>the Chapter 11 Filings of LBHI and LCPI</u>.**

15        LBHI filed for bankruptcy in September 2008 and LCPI filed for bankruptcy in October

16   2008.  After LBHI's filing, Bryan Marsal ("Marsal") of Alvarez & Marsal ("A&M") was appointed

17   to serve as LBHI's Chief Restructuring Officer. Marsal and A&M are in charge of liquidating the

18   now defunct Lehman Entities, including Chapter 11 debtors LBHI and LCPI, and the non-bankrupt

19   Lehman Lenders (Lehman ALI, OVC, and Northlake Holdings, as well as the non-bankrupt

20   Lehman Equity Members.

21        Although A&M was not employed until after the events that occurred on August 25, 2008

22   described above, it should be noted that A&M hired the same law firm that represented the

23   Lehman Lenders in the August 25, 2008 meeting – Weil, Gotshal & Manges, LLP. Moreover, as

24   more fully explained herein, it was A&M that directed Lehman ALI not to perform its contractual

25   obligations under the Settlement Agreement after September of 2008.

26        LBHI's bankruptcy filing and the Lehman Lenders refusal, at A&M's direction, to close the

27   transactions provided for under the Settlement Agreement as agreed, were not small matters. They

28   severely damaged the Debtors. Although the Debtors were not proceeding with any new

1   construction or development, the Debtors were still required to expend significant sums on site

2   security, erosion control, property taxes and other measures in order to prevent the Projects from

3   becoming a public safety hazard, and in order to avoid the loss of valuable entitlements, and to

4   mitigate penalties and fines being incurred by the Projects.  Although SunCal and the Debtors

5   repeatedly requested that the Lehman Entities pay for critical health and safety and value

6   preservation measures on the Projects, these efforts were unavailing.

7           Between October 9 and November 4, 2008, SunCal's general counsel Cook sent Robert

8   Brusco, an authorized agent of the Lehman Entities, nearly two dozen letters requesting that the

9   Lehman Lenders provide the funding necessary to address critical needs on the Projects as

10  promised.  A summary of these health and safety notices are attached hereto as Exhibit "5".  The

11  Lehman Entities ignored these requests until November 2008, when Brusco, purportedly on behalf

12  of the Lehman Lenders, delivered the message that the Lehman Lenders were unwilling to fund the

13  Projects and that, instead, they intended to foreclose on all of the Projects.

14          As a result, as set forth in Exhibit "4," there are now over 240 vendors, municipalities,

15  counties and bonding companies claiming over $400 million in work, improvements and property

16  tax claims against the Projects.  Substantially all of these sums are due to work performed or

17  bonded at Lehman's request based upon Lehman's promises of payment.

18          **4.3      The Group I: Trustee Debtors' Potential Preferential Transfers**.

19          Attached hereto as Exhibit "6" are charts setting forth payments made to third parties

20  during the ninety (90) day time period preceding the filing of the Debtors' Chapter 11 Cases as

21  well as payments made to the Lehman Entities and to SunCal Affiliates during the one-year time

22  period preceding the filing of the Debtors' Chapter 11 Cases.

23          As the charts in Exhibit 6" indicate, Group I: Trustee Debtor's made  payments in the

24  following aggregate amounts to non-insiders within the 90 day preference period preceding the

25  Petition Date: SunCal Oak Valley: $316,534.90, SunCal Heartland: $48,896.50, Delta Coves:

26  $597,961.92, SunCal Marblehead, $1,798,895.67, and SunCal PSV, $446,772.69.  The

27  corresponding figures for payments made to "insiders" within the one year preference period

28  preceding the Petition Date were: SunCal Oak Valley: $87,293.65, SunCal Heartland:

1    $282,628.75, Delta Coves: $8,501,013.04.05, SunCal Marblehead, $945,435.78 and SunCal PSV,

2    $4,345.05.

3                                              V.

4            **SIGNIFICANT EVENTS IN THE DEBTORS' CHAPTER 11 CASES**

5        **5.1    Voluntary Debtors.**

6            **5.1.1    Joint Administration of the Voluntary Debtors and the Trustee**

7                    **Debtors.**

8            Since their respective Petition Dates, the seventeen (17) Voluntary Debtors have continued

9    to operate as "debtors-in-possession," subject to the supervision of the Bankruptcy Court and in

10   accordance with the Bankruptcy Code.  The Voluntary Debtors are authorized to operate their

11   businesses in the ordinary course during the Chapter 11 proceedings.  Transactions outside the

12   ordinary course of business must be approved by the Bankruptcy Court.

13           The Voluntary Debtors' Cases are being jointly administered pursuant to orders entered on

14   November 19, 2008 and December 9, 2008.  The Voluntary Debtors' Cases are being jointly

15   administered with the Trustee Debtors' cases pursuant to an order entered on March 11, 2009.

16           The Voluntary Debtors have employed Winthrop Couchot Professional Corporation as their

17   general insolvency counsel, and the MB Firm as their special litigation counsel.

18           **5.1.2    The Voluntary Debtors' Court Employed Professionals.**

19           The Voluntary Debtors' Committee has employed Irell & Manella LLP as its counsel

20   pursuant to an order entered on February 13, 2009.

21           Pursuant to the Court's Order regarding joint administration of the Voluntary Debtors, the

22   Voluntary Debtors' liability for professional fees is joint and several among the Voluntary Debtors'

23   Estates for fees incurred related to services for the benefit of all of the Voluntary Debtors.  The

24   Trustee Debtors' liability for professional fees is not joint and several.

25           Pursuant to the initial MB Firm employment application, Acquisitions was responsible for

26   the payment of their fees until December 31, 2009.  The MB Firm's application also allows for

27   payments from the Bond Companies.  The initial MB Firm employment application reserved the

28   right, should the Lehman Adversary Proceeding result in a benefit accruing to particular Debtors'

1    Estates, to request that its fees and expenses be reimbursed by the Debtors' Estates.  The Bond

2    Companies have also agreed to jointly fund a portion of the professional fees and expenses of the

3    MB Firm with respect to the Lehman Adversary Proceeding.  The Bond Companies' funding

4    commitment can be terminated and after such a termination they will only be required to cover fees

5    and costs incurred during the period of their prior commitments.

6          The MB Firm employment application was subsequently amended.  Pursuant to an order

7    entered on April 14, 2010, (1) the Voluntary Debtors will pay up to one-half of the fees and

8    expenses incurred by the MB Firm from and after February 1, 2010 onward; and (2) the Trustee

9    Debtors do not have an obligation to pay any of the MB Firm's fees pertaining to the Trustee

10   Debtors' estates, unless and until a loan by the Voluntary Debtors to the Trustee Debtors is agreed

11   to by the Trustee and approved by the Court, or in accordance with the terms of the original

12   employment applications to the extent not superseded or modified by the amended employment

13   application.  The order does not affect the MB Firm's right to seek payment from the Bond

14   Companies without the need for an additional order of the Court.

15         The MB Firm filed an updated application seeking to further amend their employment to

16   include the right to pursue certain claims against the Lehman Entities and certain employees and

17   agents of these entities on behalf of the Voluntary Debtors.  The claims encompassed by this

18   amendment include claims that are based upon both prepetition and post-post petition actionable

19   conduct under both state law and federal law against the Lehman Entities and/or their agents.

20       **5.1.3**    **LCPI's Motions for Relief from the Automatic Stay Against Certain of**

21              **the Voluntary Debtors' Projects and Related Appeals.**

22         On January 23, 2009, LCPI and Lehman ALI filed various motions for relief from the

23   automatic stay against Palmdale Hills, SCC Palmdale, SunCal Beaumont, SunCal Summit Valley,

24   SunCal Emerald, SunCal Bickford, Acton Estates, SunCal Johannson, and SCC Communities I

25   (the "Lehman Entities' Stay Motions").  Although the Voluntary Debtors, were able to defeat these

26   motions, they are relevant in the following respect. Had the motions filed by LCPI and Lehman

27   ALI succeeded, it is almost certain that unsecured creditors would have received nothing on their

28   claims. Moreover, as more fully explained herein, since Lehman ALI and LCPI did not even own

1   the loans they were seeking to foreclose upon, these motions should never have been filed in the

2   first instance.

3       On March 10, 2009, the Court entered orders denying the Lehman Entities' Stay Motions

4   without prejudice.  These orders included findings that the continued pursuit of the claims alleged

5   in the Lehman Adversary Proceeding would not constitute a violation of LCPI's automatic stay

6   (the "Stay Finding").  LCPI did not appeal the denial of the motions for relief from stay, but

7   instead appealed just the Stay Finding.  In a split 2-1 decision, the Bankruptcy Appellate Panel

8   reversed the Stay Finding, concluding that the equitable subordination action was subject to LCPI's

9   automatic stay.  In re Palmdale Hills Property, LLC, 423 B.R. 655 (9th Cir.BAP 2009).  The

10  Voluntary Debtors appealed this ruling to the Ninth Circuit.  On August 3, 2011, the Ninth Circuit

11  Court of Appeals affirmed the decision of the Bankruptcy Appellate Panel.  In re Palmdale Hills

12  Property, LLC, 2011 WL 3320429 (9th Cir. 2011).

13      **5.2    The Trustee Debtors and Their Professionals.**

14      Orders for Relief were entered in the involuntary cases beginning on January 6, 2009.  The

15  Trustee Debtors are represented by their duly-appointed Chapter 11 Trustee, Mr. Steven M. Speier

16  pursuant to orders of the Bankruptcy Court entered on January 15, 2009.

17      The Chapter 11 Trustee has employed the Lobel Firm as the Chapter 11 Trustee's general

18  insolvency counsel and the MB Firm, as special litigation counsel and Squar Milner, LLP as its

19  accountants.

20      The Trustee Debtors' Committee has employed Weiland, Golden, Smiley, Wang Ekvall &

21  Strok as its general insolvency counsel.

22      **5.3    The Debtors' Various Motions Relating to Financing for the Projects and to**

23      **Pay Professional Fees.**

24          **5.3.1    The Voluntary Debtors' Initial Motion for Surcharge and Use of Cash**

25          **Collateral.**

26      On January 16, 2009, seven of the Debtors filed a motion authorizing Palmdale Hills to use

27  and surcharge, pursuant to 11 U.S.C. § 506(c), and/or use the purported cash collateral of LCPI

28  arising from the Ritter Ranch Loan Agreement, pursuant to 11 U.S.C. § 363(c)(2), in order to pay

1   for the reasonable and necessary maintenance expenses required to preserve the value of such

2   Debtors' Projects subject to deeds of trust and other security interests held by LCPI.

3       LCPI objected to the motion and subsequently filed a motion in its own Chapter 11

4   proceeding in the Southern District of New York seeking an order barring the motion as a violation

5   of the automatic stay.  Although the Debtors believe that LCPI's stay was not violated in any way

6   by the Motion, the Motion was taken off calendar prior to any ruling by the New York Bankruptcy

7   Court, based upon the threat of sanctions made against Debtors' counsel by the presiding judge in

8   LCPI's case.

9       As explained above, LCPI did not even own an interest in the Ritter Ranch Loan

10  Agreement when it asserted the automatic stay, since the Ritter Ranch Loan Agreement, which was

11  the subject of the cash collateral motion, had already been sold pursuant to the Fenway Repurchase

12  Agreement. Yet this wrongful action prevented Palmdale Hills from using its own money to pay

13  critical bills that Lehman Ali, LCPI's parent, was contractually required to fund in the first

14  instance.

15              **5.3.2    The Lehman Disputed Administrative Loans.**

16      As explained above, after the Petition Dates, the Debtors collectively demanded that the

17  Lehman Lenders comply with their contractual obligations to pay for the costs of maintaining and

18  preserving the value of the Projects, including the Group I: Trustee Projects. However, the Lehman

19  Lenders not only refused to comply with their obligations, they actively attempted to bar the

20  Debtors from using their own funds to pay these critical costs, in the hope of forcing the Debtors to

21  yield the Projects without a fight.

22      In the face of the foregoing refusal and active interference, the Chapter 11 Trustee agreed to

23  enter into several stipulations with Lehman ALI for financing (in the total approximate amount of

24  $8.5 million for the Group I: Trustee Debtors) to pay for real property taxes and urgent public

25  health and safety issues on the Projects and to pay professionals under the caveat that such

26  professionals would not be paid for services performed on matters that were considered contrary to

27  the interests of the Lehman Entities. This loan was approved pursuant to an order of the Court. In

28  return for what the SunCal Plan Proponents view as a "forced loan," the Lehman Lenders insisted

that the Chapter 11 Trustee agree to withdraw a motion  providing for the sale of certain Projects free and clear of the Lehman Lenders' Disputed Liens, and the Chapter 11 Trustee agreed.

The SunCal Plan Proponents have filed a series of objections to the Lehman Lenders, including the Lehman Disputed Administrative Loans. These objections are based upon various grounds, including the following, which apply notwithstanding prior court approval.

First, the 502(d) Objection, described in more detail in Section 5.4.1.5 below, objecting *inter alia* to the following Administrative Claims:

| Debtor | Administrative Claim Holder | Alleged Administrative Claim Amount |
|--------|------------------------------|--------------------------------------|
| Delta Coves | Lehman ALI | $2,767,725 |
| Heartland | Lehman ALI | $1,935,250 |

Second, *after* the Lehman Administrative Loans were approved by the Court, the Lehman Lenders engaged in a series of wrongs that substantially damaged both the Trustee Debtors and the Voluntary Debtors. The most material of these wrongs included the misrepresentations that the Lehman Lenders made to the Debtors and the Court regarding their purported ownership of eight of the Lehman Loans that are at issue in this case. In fact, it was later discovered that these representations were false.

The eight loans that the Lehman Lenders contended they owned had, in fact, been sold to a third party – Fenway Capital – prepetition. This misrepresentation, and LCPI's improper assertion of its automatic stay as a bar to certain actions in the Debtors cases on the basis of an ownership interest *that did not exist* caused the Debtors to suffer millions in damages. These damages include, but are not limited to, millions in legal fees, the impairment of sales opportunities, and the intervening costs and damages that were incurred or suffered by the Projects that would otherwise have been eliminated through a prior sale of the Projects, but for these misrepresentations. Prior to the hearing on the confirmation of the competing reorganization plans, the SunCal Plan Proponents will be filing objections to the Lehman Administrative Loans to eliminate or reduce the claims based upon the Lehman Disputed Administrative Loans by offsetting the foregoing damage claims.

1    Finally, the Plan also provides that the Plan Trustee and the Group I: Trustee Debtors

2  reserve the right to join in the Contract Action as additional plaintiffs.  Any recovery on the

3  Contract Action may provide a further offset against the Disputed Administrative Loan.

4    **5.3.3**    **The Voluntary Debtors' Agreements with the Lehman Entities for Use**

5         **of Alleged Cash Collateral to Maintain the Properties and to Pay**

6         **Professional Fees**.

7    On September 1, 2009, with the consent of the Lehman Entities, fourteen of the Voluntary

8  Debtors filed a motion authorizing surcharge pursuant to 11 U.S.C. § 506(c), and/or use of the

9  purported cash collateral for the purpose of addressing critical public health and safety issues and

10  other value preservation with respect to the Debtors Projects.  On September 10, 2009, the Lehman

11  Entities filed an opposition thereto, and on September 17, 2009, the Voluntary Debtors filed their

12  Reply.

13    Subsequently, the Voluntary Debtors learned that the Lehman Entities lacked control

14  agreements as to the majority of the depository accounts, and thus such accounts were not subject

15  to perfected liens and therefore did not constitute "cash collateral".  On October 15, 2009, the

16  Voluntary Debtors filed a *Motion For Order Authorizing Disposition Of Certain Depository*

17  *Accounts*.  On or about October 22, 2009, the Lehman Entities filed an opposition, and on October

18  29, 2009, the Voluntary Debtors filed their Reply.

19    The motion was consensually resolved by way of the *Stipulation Pursuant To 11 U.S.C. §§*

20  *362, 363, And 364: (1) Authorizing The Use Of Cash Collateral And Alleged Unencumbered Cash;*

21  *(2) Approving Postpetition Financing; (3) Providing Administrative Expense Status; And (4)*

22  *Modifying Automatic Stay To The Extent Necessary* filed on December 8, 2009, and the order

23  thereon entered on December 17, 2009.  The stipulation provides for a 120-day budget with

24  expenses totaling approximately $5 million, pursuant to which any Cash in the Estates is used first

25  and then money borrowed from the Palmdale Hills Estate is used thereafter on an administrative

26  basis.  The agreement also permitted the Voluntary Debtors to use their alleged unencumbered

27  cash to pay its professional fees.  This agreement has been renewed on several occasions.

28    **5.4**    **The Debtors' Disputes and Claims Against the Lehman Entities.**

### 5.4.1   <u>The Lehman Adversary Proceeding</u>.

On January 6, 2009, the Voluntary Debtors initiated the Lehman Adversary Proceeding by filing their initial complaint against Lehman ALI for equitable subordination of Lehman ALI's Disputed Claims and avoidance of its Disputed Liens pursuant to Bankruptcy Code Section 510(c). On February 3, 2009, the Debtors filed a First Amended Complaint, which added the Trustee Debtors as co-plaintiffs and added various other causes of action.  The First Amended Complaint also named OVC Holdings, Northlake Holdings and various other entities as defendants.

Pursuant to a hearing on a motion to dismiss held on June 11, 2009, the Bankruptcy Court granted the Debtors leave to amend the second amended complaint.  Thus, on July 10, 2009, the Debtors filed their Third Amended Complaint.  The Third Amended Complaint addressed many of the concerns raised by the Bankruptcy Court and also included various Avoidance Actions and other causes of action against the Lehman Lenders and the Lehman Successors.  The Third Amended Complaint also added Fenway Capital as a defendant based upon the discovery of the facts relating to the sale of the loans Fenway Capital and based upon the Court ruling that the Repo was a true sale.

On September 30, 2009, the Lehman Entities filed a motion to dismiss the Third Amended Complaint (which motion was amended on October 7, 2009 and October 22, 2009), alleging that the relief requested by certain Debtors was not available as a matter of law.  On September 30, 2009, Fenway also filed a motion to dismiss the Third Amended Complaint.  On January 26, 2010 and January 28, 2010, the Debtors filed oppositions to the motions to dismiss the Third Amended Complaint filed by the Lehman Entities and Fenway, respectively.  On February 4, 2010, the Lehman Entities and Fenway filed their respective replies.  The Court entered an order granting in part and denying in part the relief requested in the motions to dismiss. Most notably, the Court denied  the defendants' request for the dismissal of  the equitable subordination claims and the Court permitted the Debtors to file an amended complaint.  LCPI was dismissed as a defendant at this hearing, due to the fact that it did not own any interest in the loans at issue and due to potential impact of the case upon LCPI's automatic stay.  On March 26, 2010, the Debtors filed their Fourth

Amended Complaint. The following is a summary of the causes of action set forth in the Fourth

Amended Complaint:

### 5.4.1.1    Equitable Subordination.

Based on the pre-petition inequitable conduct of the Lehman Entities, summarized in

Section 4.2, the Debtors have sought to subordinate the claims and avoid the liens of the Holders

of the Lehman Disputed Loans to the extent necessary to pay the Claims of unpaid Creditors that

were damaged by the inequitable conduct.

### 5.4.1.2    The Fraudulent Transfer Claims.

The fraudulent conveyance claims set forth in the Fourth Amended Complaint include the

causes of action that SunCal Marblehead and SunCal Heartland are asserting against Lehman ALI

and LCPI in order to avoid liens securing an alleged claim in the amount of $354,325,126,

respectively.

### 5.4.1.3    The Preference Claims.

The preference claims set forth in the Fourth Amended Complaint include the following:

Transfers made to a Lehman Entity by a Debtor, including a $6,195,440.46 transfer to and for the

benefit of Lehman ALI, where such Debtor was either owned by a Lehman Equity Member (50%)

or where a Lehman Equity Member of Lehman Entity controlled such Debtor at the time of the

transfer. Furthermore, according to the Lehman Lenders' appraisals submitted on the Projects of

these Debtors, all of the loans were vastly undersecured at the time of the transfers.

On April 12, 2010, the Lehman Entities filed a motion to dismiss the Fourth Amended

Complaint (as well as a related motion to strike portions of the same). On that same date, the

Lehman Entities and Fenway, respectively, also filed answers to the Complaint denying the causes

of actions set forth in the Fourth Amended Complaint and alleging certain affirmative defenses.

Furthermore, as discussed herein, the New York Bankruptcy Court has approved Fenway's sale of

all Sold Loans to LCPI. Consequently, the filing of a fifth amended complaint may be necessary.

### 5.4.1.4    The Debtors' Motions to Strike the Claims and Pleadings Arising from the Sold Loans to Fenway Capital and Related Appeals.

1       Once the Debtors discovered that the Lehman Lenders had misrepresented their ownership

2   of seven loans– the loans sold to Fenway Capital back in August of 2008 - they filed motions, on

3   May 29, 2009, seeking an order striking the claims that were filed with respect to these sold loans

4   (the "Fenway Sold Loans").  The Fenway Sold Loans included the SunCal Communities I Loan

5   Agreement, the Ritter Ranch Loan Agreement, the SunCal PSV Loan Agreement, the SunCal

6   Marblehead/SunCal Heartland Loan Agreement, the Delta Coves Loan Agreement, the SunCal

7   Northlake Loan Agreement and SunCal Oak Valley Loan Agreement.  See Exhibit "3."

8       At the initial hearing on the Debtors' motion to strike the Claims held on June 30, 2009, the

9   Court held that the transfer of the Fenway Sold Loans pursuant to the MRA was a true purchase and

10  sale transaction (the "Ownership Issue") and, accordingly, the Lehman Lenders retained no right to

11  file the Proofs of claim on this basis, under Federal Rule of Bankruptcy Procedure 3001(e)(1).  The

12  Court entered an order regarding the Ownership Issue on October 2, 2009.

13      The Lehman Lenders also contended that they were entitled to file the Proofs of Claim as the

14  "Fenway's authorized agent" under Federal Rule of Bankruptcy Procedure 3001(b) (the "Agency

15  Issue").  A continued hearing on the Agency Issue was set for September 22, 2009 and the Court

16  ruled that the Lehman Lenders could file the Proofs of Claim as authorized agents. The Lehman

17  Entities appealed the Ownership Issue and the Debtors appealed the Agency Issue to the Bankruptcy

18  Appellate Panel.  These two appeals, which were consolidated, were argued in September of 2010.

19  The parties are awaiting a ruling.

20              ### 5.4.1.5    Debtors' 502(d) Objections and Objection to Lehman's

21                          Claim Against Acton.

22      The Voluntary Debtors and other parties-in-interest have filed a motion to disallow,

23  pursuant to 11 U.S.C. § 502(d) (the "502(d) Objection"), the following Disputed Claims filed by

24  Lehman ALI and LCPI, including the following claims filed against the Group I: Trustee Debtors:

| Disputed Proof of Claim No. | Debtor | Claim Holder | Claim Amount |
|---|---|---|---|
| 21 | Delta Coves | Lehman ALI | $ 206,023,142 |
| 9 | Heartland | LCPI | $354,325,126 |
| 21 | SunCal Marblehead | LCPI | $354,325,126 |

28      The 502(d) Objection also objects *inter alia* to the following Administrative Claims:

-52-

| Debtor | Administrative Claim Holder | Alleged Administrative Claim Amount |
|---|---|---|
| Delta Coves | Lehman ALI | $2,767,725 |
| Heartland | Lehman ALI | $1,935,250 |

In summary, the Group I: Trustee Debtors allege in the Lehman 502(d) Objection that the Lehman Entities received prepetition transfers that are avoidable under certain sections of the bankruptcy code.

The Lehman Entities oppose the 502(d) Objection, inter alia, on the following grounds:

(1) SunCal Management allegedly lacks standing to object to claims in the Trustee Debtor cases. However, Section 502 provides that any party in interest may object to claims.

(2) Disallowance is allegedly premature because there has been no judicial determination of the avoidance liability. However, the only "judicial determination" necessary to invoke section 502(d) is that the objecting party have established a prima facie case for avoidance. Courts have repeatedly characterized disallowance under Section 502(d) as temporary, pending a later ultimate determination of the avoidance claims in an adversary action.

(3) The 502(d) objection purported violated LCPI's automatic stay. However, several courts have specifically concluded that an objection under Section 502(d) does not violate the creditor's automatic stay. See In re Metiom, 301 B.R. 634 (Bankr.S.D.N.Y. 2003); In re PRS Ins. Group, 331 B.R. 580, 584 (Bankr.D.Del. 2005).

(4) The 502(d) Objection allegedly fails to establish a prim facie case for avoidance. However, applicable case law establishes that a prima facie case merely requires that the underlying avoidance allegations survive a motion to dismiss. Here, the Court has already denied the Lehman Entities' Motion to dismiss the applicable avoidance action. Moreover, the 502(d) Objection further submits substantive evidence establishing the merits of the avoidance claims.

(5) The Lehman Entities argue that they would be entitled to retain liens in the properties to the extent they gave value in good faith under Section 548(c). However, the Lehman Entities failed to cite any authority to support their novel argument that Section

-53-

1    548(c) can defeat disallowance under Section 502(d).  The only authority on this point is

2    directly contrary to the Lehman Entities' argument.  See In re Interstate Cigar Co., Inc., 278 B.R.

3    8 (Bankr.E.D.N.Y. 2002).

4        On June 9, 2011, a hearing was held on the Section 502(d) claim objection. At this hearing

5    the Lehman Entities disputed the merits of the Section 502(d) claim objection and LCPI alleged

6    that the filing of this objection violated its automatic stay. At the conclusion of the hearing, the

7    Court ruled that the parties could proceed with their discovery in this matter.

8        If the Section 502(d) claim objection is successful, the claims of the Lehman Entities

9    identified in the table above will be disallowed. Although the Lehman Entities will have the right

10   to seek reconsideration of this disallowance, in order to obtain this relief they would have to repay

11   the applicable transfers.

12        **5.4.1.6    The Lehman Recoupment Claim Objections and the Contract**

13        **Action.**

14        Pursuant to the terms of the joint ventures entered into by and among the Debtors and the

15   Lehman Entities, the Lehman Entities were responsible for paying the costs incurred in the

16   development of the Projects. These costs included the claims of the vendors who provided goods

17   and services to the Projects and the claims asserted by the Bond Claimants. Although the Lehman

18   Entities contend that they were merely "lenders," and that they did not assume any liability for

19   these claims, as the above facts and those that will be adduced prior to and at the confirmation of

20   the Plan will demonstrate, the Lehman Entities are in fact obligated to pay these claims.

21        The Debtors contend that direct liability can be imposed on the Lehman Entities on various

22   grounds, including the following. First, the Lehman Entities were either in a joint venture

23   relationship with the Debtors from the outset, or this relationship developed and became a legal

24   fixture through the Lehman Entities' course of conduct. Pursuant to this relationship, and the

25   promises and representations made therein, the Lehman Entities agreed to be responsible for all

26   vendor and Bond Claims incurred at or in connection with the Projects. The role of each of the

27   Debtors, by mutual agreement, was to provide development expertise and project management

28   services. The Lehman Entities were required to provide the capital necessary to fund the Projects.

1    Second, during the last eighteen months of the relationship between the parties, the Lehman

2  Entities assumed direct responsibility for all claims incurred during this period, by insisting that

3  work continue on the Projects and by repeatedly promising to pay for this work. Since the Lehman

4  Entities ordered this work, and promised to pay for the same, they bear this financial responsibility.

5    Third and finally, the Lehman Entities expressly agreed to pay the vendor and bond claims

6  described in the Restructuring Agreement and in the interrelated Settlement Agreement, but failed

7  to do so as contractually agreed.

8    It is the SunCal Proponent's contention that the Lehman Entities' failure to pay the vendor

9  and Bond Claims associated with the Projects (as was their obligation under the terms of the joint

10  ventures, the Restructuring Agreement and the Settlement Agreement) unjustly shifted

11  responsibility for these liabilities to the Debtors in breach of the terms of joint venture, the

12  Restructuring Agreement and the Settlement Agreement.  Accordingly, the SunCal Plan

13  Proponents have filed objections to seven of the Secured Claims asserted by the Lehman Entities

14  based upon the affirmative defenses of recoupment, unjust enrichment and unclean hands (the

15  "Lehman Recoupment Claim Objections").

16    In the Lehman Recoupment Claim Objections, the SunCal Proponents seek the following

17  relief:

18        1) Disallowance of the claims asserted by the Lehman Lenders in their

19        entirety, pending compliance with the terms of the Restructuring

20        Agreement and the Settlement Agreement;

21        2) A reduction in the amount of the Lehman Entities' secured claims by

22        the amount of damages resulting from the Lehman Entities' breach of their

23        obligations under these agreements; and/or

24        3)  An order barring the Lehman Entities from enforcing their rights under

25        the Lehman Loans until they cure their breaches under the above

26        agreements.

27    The first prayer for relief above is premised upon the contention that the Lehman Entities

28  agreed to transfer ownership of the Group I: Trustee Projects to a series of newly formed entities

MAINDOCS-#164960-v3-SunCal_3rd_Am_Group_I_TD_DS.DOC

1    under the control of the Lehman Entities, pursuant to the terms of the Settlement Agreement. This

2    agreement further provided that these new entities would assume the vendor payables and certain

3    Bond Claims associated with these projects. Finally, this agreement included a covenant not to sue,

4    pursuant to which the Lehman Entities were barred from seeking further recourse against the

5    Debtors.

6        The SunCal Plan Proponents believe that the positions asserted in the Lehman Recoupment

7    Claim Objections are well grounded in fact and in law. Had the Lehman Entities complied with

8    their contractual obligations, substantially all of the Group I: Trustee Debtor's liabilities would

9    have been eliminated, the Group I: Trustee Debtors would not have had to file Chapter 11, and the

10   Lehman Entities would be barred from asserting claims against the Group I: Trustee Debtors based

11   upon the Lehman Disputed Loans. It is the SunCal Plan Proponents position that the Lehman

12   Entities effort to enforce claims based upon Lehman Disputed Loans is directly contrary to the

13   basic agreements reached in the Restructuring Agreement and in the related Settlement Agreement.

14       The Lehman Entities dispute the merits of the Lehman Recoupment Claim Objections. It is

15   the Lehman Entities' position that it was within their absolute "discretion" to pay, or not to pay, the

16   vendor payables incurred during the term of the Restructuring Agreement. Accordingly, they

17   cannot, in their assessment, be held liable for these obligations. In the case of the Settlement

18   Agreement, the Lehman Entities contend that this agreement never became effective and therefore

19   they were not bound to comply with its terms. The SunCal Plan Proponents do not believe that the

20   positions asserted by the Lehman Entities are supported by the facts, or existing law.

21       In addition to the Recoupment Claim Objections, certain Voluntary Debtors have also filed

22   the Contract Action against Lehman ALI and other non-debtor Lehman Entities in Orange County

23   Superior Court. The Contract Action is based on Lehman ALI's breach of contract on the

24   Restructuring and Settlement Agreements.  On May 9, 2011, the Defendants in the Contract Action

25   filed a Notice of Removal which removed the Contract Action from the Orange County Superior

26   Court to the Bankruptcy Court, as adversary no. 8:11-ap-01212ES.  The Voluntary Debtor-

27   Plaintiffs moved to remand the Contract Action back to the Orange County Superior Court

28

1    ("Remand Motion").  The Bankruptcy Court denied the Remand Motion at the hearing on July 12,

2    2011.

3    The Group I: Trustee Debtors are potential plaintiffs in the Contract Action, and such

4    claims constitute property of their estates.  The Trustee refused to authorize the Group I: Trustee

5    Debtors to become additional plaintiffs in the Contract Action.  If the Plan is Confirmed, the Plan

6    Trustee and/or the Group I: Trustee Debtors reserve the right to join the Contract Action as

7    additional plaintiffs.

8    Although LCPI's automatic stay remains an impediment to the pursuit of the Lehman

9    Adversary Proceeding, the existence of this stay will not bar the SunCal Plan Proponents from

10   implementing the material terms of the Plan for the following reason. LCPI's automatic stay does

11   not bar the pursuit of the Lehman Claim Objections or the Contract Action.  In fact, these matters

12   are proceeding in the Bankruptcy Court. If these objections are successful, the claims of the

13   Lehman Entities will be disallowed, either in whole or in part, or the Lehman Entities will be

14   barred from pursuing these claims until they pay what they owe to the Group I: Trustee Debtors.  If

15   the Plan Trustee and/or the Group I: Trustee Debtors join the Contract Action and the Contract

16   Action is successful, it will generate a further recovery for creditors.  In either scenario, the Plan

17   filed by the SunCal Plan Proponents is feasible and will yield a favorable return for creditors.

18   **5.5**    **The Lehman / Fenway Claims Transaction and Compromise Motion Filed By**

19           **the Lehman Entities.**

20           **5.5.1**    **Lehman Entities' and Fenway's Claims Transaction.**

21           In April of 2010, LCPI and LBHI filed that certain *Motion Pursuant To Bankruptcy Rule*

22   *9019 For Authority To Compromise Controversy In Connection With A Repurchase Transaction*

23   *With Fenway Capital, LLC And A Commercial Paper Program With Fenway Funding, LLC* (the

24   "Compromise Motion.")  In the motion, LCPI and LBHI represented that they were

25   "compromising" various issues and relationships arising out of the repurchase transaction

26   described in the LCPI – Fenway MRA (the "Repo").  However, a careful review of the transaction

27   described therein indicated that the motion was designed to accomplish the following objectives:

28

1       1.   To transfer title to the Lehman Disputed Loans at issue in the Lehman

2           Adversary Proceeding from Fenway Capital to LCPI, an entity that had no

3           interest in five of the seven loans prepetition;

4       2.   To allow LCPI, as the new owner of the Lehman Disputed Loans, to re-

5           join the Lehman Adversary Proceeding as a defendant, and once there to

6           use its automatic stay as a "sword" to stay this action;

7       3.   To enable the Lehman Entities to thwart the pursuit of the SunCal Plan

8           Proponents' Plan;

9       4.   To bestow upon the Lehman Entities' purported competing plan an unfair

10          advantage in the plan confirmation contest by delaying the effectiveness of

11          critical provisions in the SunCal Plan Proponents' Plan; and

12      5.   To shield Fenway Capital and its principals from liability and investigation

13          through discovery.

14      At the hearing on the Compromise Motion, the bankruptcy court in New York approved the

15  Compromise Motion, and stated, consistent with the objectives of the Lehman Entities, that the

16  continued pursuit of the Lehman Adversary Proceeding would be stayed, once LCPI obtained title

17  to the Lehman Disputed Loans. The order reflecting this relief was entered on May 13, 2010 (the

18  "Compromise Order").

19     **5.6**    **The Debtors' Motion for a Stay to Suspend Certain Lehman Actions**.

20      On September 21, 2010, the Voluntary Debtors, Acquisitions, and SunCal Management

21  filed a motion requesting, among other relief, for the Court to suspend the Lehman Entities

22  competing plan and disclosure statement unless and until the Lehman Entities agree to provide the

23  Debtors with relief from their automatic stay in the Debtors' Chapter 11 Cases (the "Suspension

24  Motion").  The Court granted this motion and stayed all matters until March 1, 2011. The Court

25  also ordered the parties to engage in a mediation. The Voluntary Debtors and the Lehman Entities

26  were unable to settle their claims through this process.

27

28

**5.7    The Debtors' Other Litigation with Non-Lehman Related Parties.**

**5.7.1    The Debtors' Failed Preliminary Injunction Motion Against the Holders of Bond Claims.**

On February 20, 2009, the Debtors filed a complaint and a Motion for Preliminary Injunction, pursuant to which the Debtors sought a Motion for Preliminary Injunction against the Holders of Bond Claims from pursuing such Claims. On February 23, 2009, the Court denied the Debtors' request for the TRO and granted the Debtors' request to require the defendants to show cause why the Motion for Preliminary Injunction should not be issued.

On March 2, 2009, several Holders of Bond Claims objected to the Motion for the Preliminary Injunction.  The objections generally alleged that the Debtors failed to show that the balancing of the equities favored granting the Preliminary Injunction versus the harm to the Holders of the Bond Claims.  At a hearing held on March 4, 2009, the Court denied the Preliminary Injunction Motion and the underlying complaint has subsequently voluntarily been dismissed without prejudice.

**5.7.2    The Contractors' Successful Motions for Relief from Stay to Pursue the Bond Claims.**

Various contractors that were hired to perform work on some of the Projects have filed motions for relief from stay with the Bankruptcy Court to pursue their purported Bond Claims. These creditors have requested that the Bankruptcy Court grant these creditors relief from the automatic stay to allow such creditors to enforce certain Claims that such creditors allege to have against some of the Debtors, including certain surety bonds that are alleged to have been issued in favor of such creditors.  The Debtors opposed the motions on the grounds that the various Debtors are indispensible parties.  The Court conditionally granted the motions provided that the Bond Claimants are able to sever the Debtors from their proceedings on the Bonds.

**5.7.3    Arch's Motion for Relief from Stay.**

On March 10, 2010, Arch and the City of San Clemente jointly filed a motion for relief from stay.  The motion requested an order granting the following relief: (1) allowing such parties to obtain authorization from the Trustee for a right of entry to allow Arch, as subdivision

1  performance bond surety for Group I: Trustee Debtor SunCal Marblehead, and the City (and their

2  respective contractors and consultants), to enter onto land located entirely, or in part, on the

3  Property owned by Group I: Trustee Debtor SunCal Marblehead to complete works of

4  improvement which, if left unfinished, pose a health and safety risk to the general public; (2) to the

5  extent such improvements are located entirely, or in part, on the Project owned by SunCal

6  Marblehead authorizing the City to accept SunCal Marblehead's offer of dedication for such

7  improvements and the rights-of-way pertaining thereto upon completion; and (3) to the extent

8  SunCal Marblehead may have custody of any equipment, materials, and supplies that are needed to

9  complete the works of improvement, Arch and City request that such equipment, materials, and

10  supplies be released to Arch and its completion contractors so that the applicable portion(s) of the

11  Project can timely proceed.  There was no opposition to this motion.  On April 6, 2010, the Court

12  granted this motion.

13              **5.7.4    Shea's Successful Motion for Relief from Stay.**

14              On April 7, 2010, Shea Construction, Inc. filed a motion for relief from stay to pursue a

15  state court for foreclosure of liens on property previously owned by the Debtors and no longer

16  property of the Debtors' estate.  On May 14, 2010, the Court granted this motion.

17              **5.7.5    Bond Safeguard Motion.**

18              Bond Safeguard, a surety that issued bonds to secure the performance of work on certain

19  projects, filed a motion seeking authority to file claims against the Trustee Debtors relating to these

20  bond claims after the bar date. The Debtors opposed this motion. This motion was granted

21  pursuant to an order entered on January 7, 2011.

22              The Bond Issuers assert that surety bonds were executed on behalf of all of the SunCal

23  Debtors and the Bond Indemnitors.  However, Bond Safeguard only filed proofs of claims

24  asserting joint and several liability ("Cross-Indemnity Claims") against the Trustee Debtors.  Bond

25  Safeguard did not file any Cross-Indemnity Claims against the Voluntary Debtors.  The Cross-

26  Indemnity Claims are disputed, as the Group I: Trustee Debtor and the Plan Trustee reserve the

27  right to object to the Cross-Indemnity Claims and/or to seek to avoid such obligations as a

28  fraudulent transfer.

**5.8**    **LitCo.**

As more fully explained in Article VII, pursuant to the terms of the Plan, LitCo, which shall be a Delaware limited liability company, will be making an offer to purchase the Reliance Claims held by the Reliance Claimants in Classes 6.1 and 6.2 pursuant to the Plan. LitCo will be capitalized by a third party capital partner with the funds necessary to fund this claims purchase. Once the Reliance Claims are purchased, LitCo will pursue these claims against the Lehman Entities. Since LitCo will be purchasing the Reliance Claims with non-estate assets, the Plan Trust will not receive any part of the recoveries obtained on these purchased claims.

**5.9**    **Reliance Claims.**

The Reliance Claims listed on Exhibit 8 attached to this Disclosure Statement (which consist of Allowed Unsecured Claims, Allowed Mechanic's Lien Claims, or Allowed Bond Indemnification Claims against an applicable Debtor that would entitle the Holder thereof to be the beneficiary of any equitable subordination judgment obtained against a Lehman Entity by such Holder) were determined to be Reliance Claims based on a number of factors. An analysis was made of the books and records of the applicable Debtor to determine the amounts billed to that applicable Debtor by the particular creditor and what, if any, defenses there may be to such claims. The bankruptcy schedules filed for each applicable Debtor were reviewed along with the proofs of claim filed by creditors in the respective bankruptcies, and such amounts were compared to the books and records of the applicable Debtor. An analysis was made of the list of creditors and amounts contained in the Restructuring Agreement executed with Lehman entities on May 23, 2008, and the Settlement Agreement executed with Lehman entities on August 25, 2008, with respect to amounts Lehman entities had agreed to assume in connection with such agreements. Furthermore, there was taken into account the actions of Lehman in instructing SunCal to proceed with the entitlement, development and/or maintenance of the particular projects and that SunCal did so in reliance on promises of funding, as outlined in the Litigation Claims that have been summarized in this Disclosure Statement. Taking all of these factors into consideration, Exhibit 8 was prepared based on the determination by the SunCal Plan Proponents that these claims, as listed in Exhibit 8, are Reliance Claims, as that term is defined in this Disclosure Statement. The SunCal

Plan Proponents are willing to commit to the amounts listed in Exhibit 8 as allowed Reliance

Claims so long as the particular creditor does not dispute the amount thereof, but if a creditor

disputes the amount, the SunCal Plan Proponents reserve all rights in connection with the amount

of any such claim and whether or not it would be a Reliance Claim for purposes hereof.

**VI.**

**TREATMENT OF UNCLASSIFIED CLAIMS**

**6.1    Introduction**.

As required by the Bankruptcy Code, the Plan places Claims and Interests into various

Classes according to their right to priority.  However, certain types of Claims are not classified in

any Classes under the Plan.  These Claims are deemed "unclassified" under the provisions of the

Code.  They are not considered impaired and they do not vote on the Plan, because they are

automatically entitled to specific treatment provided for them in the Code.  As such, the SunCal

Plan Proponents have not placed the following Claims in a Class.  The treatment of these

unclassified Claims is as provided below.

**6.2    Treatment of Allowed Administrative Claims**.

The Code requires that all Allowed Administrative Claims be paid on the later of Effective

Date of the Plan or the date of their allowance, unless a particular Holder agrees to a different

treatment.  The treatment of Allowed Administrative Claims is as described below.  However, such

Administrative Claims are continuing to be incurred.  The Allowed Administrative Claims shall be

paid from the applicable Distribution Account(s) pursuant to the LitCo Plan Loan.

**6.3    Treatment and Repayment of the Lehman Administrative Loan(s)**.

The Lehman Disputed Administrative Loans shall be paid in full on the later of the

Effective Date, or the date any objections to the same are overruled by the Court leaving them

Allowed claims. Prior to payment, or until disallowed, these claims shall continue to be secured by

their existing liens against the respective Assets of the Trustee Debtors.

The Lehman Disputed Administrative Loans shall be paid in full, on the date referenced

above, from either 1) funds loaned to the Plan Trust by LitCo or another designated third party, or

2) from the funds in the applicable Net Sale Proceeds Account.

**6.4**     **Repayment of Allowed Administrative Claims Other than the Lehman Administrative Loans.**

Except to the extent that the Holder of an Allowed Administrative Claim agrees to a different treatment and subject to the Administrative Claims Bar Date set forth herein, the Distribution Agent shall pay each Allowed Administrative Claim in full, in Cash, on the later of (i) the Effective Date, (ii) within ten (10) Business Days after the date such Administrative Claim becomes an Allowed Administrative Claim, or (iii) the date such Allowed Administrative Claim becomes due according to its terms. Notwithstanding the foregoing, any Allowed Administrative Claim representing obligations incurred in the ordinary course of post-petition business by the estate (including without limitation post-petition trade obligations and routine post-petition payroll obligations) shall be paid in full or performed by the Plan Trustee in the ordinary course of business, in accordance with the terms of the particular obligation.

**6.5**     **Administrative Claims Bar Date.**

All applications for final compensation of Professionals for services rendered and for reimbursement of expenses incurred on or before the Effective Date and all other requests for payment of Administrative Claims incurred before the Effective Date under Sections 507(a)(2) or 507(b) of the Bankruptcy Code (except only for (i) post-petition, ordinary course trade obligations and routine post-petition payroll obligations incurred in the ordinary course of the Debtors' post-petition business, for which no bar date shall apply, and (ii) post-petition tax obligations, for which no bar date shall apply) shall be Filed with the Bankruptcy Court and served upon the Plan Trustee no later than the Administrative Claims Bar Date, unless such date is extended by the Bankruptcy Court after notice to the Plan Trustee.  Any such request for payment of an Administrative Claim that is subject to the General Administrative Claims Bar Date and that is not Filed and served on or before the Administrative Claims Bar Date shall be forever barred; any party that seeks payment of Administrative Claims that (i) is required to file a request for payment of such Administrative Claims and (ii) does not file such a request by the deadline established herein shall be forever barred from asserting such Administrative Claims against the Debtors, the Plan Trust, their estates, or any of their property.

**6.6**    **Treatment of Unsecured Tax Claims.**

Tax Claims are certain unsecured income, employment and other taxes described by Code Section 507(a)(8). The Code requires that each holder of such a Section 507(a)(8) tax claim receive the present value of such Claim in deferred cash payments, over a period not exceeding five (5) years from the petition date and that such treatment not be less favorable than the treatment accorded to non priority unsecured creditors.

At the election of the Plan Trustee, the Holder of each Allowed Priority Tax Claim shall be entitled to receive, on account of such Claim, (i) equal cash payments on the last Business Day of each three-month period following the Effective Date, during a period not to exceed five years after November 6, 2008, totaling the principal amount of such Claim plus simple interest on any unpaid balance from the Effective Date, calculated at the interest rate applicable pursuant to 11 U.S.C. §511, (ii) such other treatment agreed to by the Holder of the Allowed Priority Tax Claim and the Plan Trustee, provided such treatment is on more favorable terms to the Debtors (or the Plan Trust after the Effective Date) than the treatment set forth in clause (i) hereof, or (iii) payment of the full Allowed Priority Tax Claim in Cash.

**6.7**    **Summary of the Group I: Trustee Debtors Plans' Treatment of Bond Indemnity Claims.**

Bond Indemnification Claims are treated as Reliance Claims. In the event that such Bond Indemnification Claim arises from a general unsecured claim, it is classified in Class 6. If the event that such Bond indemnification Claim arises from a Mechanic's Lien Claim, then it is classified in Class 3. Contingent Bond Indemnification Claims are classified separately as Class 4 Claims.

The Bond Companies assert that surety bonds were executed on behalf of all or some of the Group I: Trustee Debtors as a principal for its respective Group I: Trustee Project ("Surety Bonds"). The Surety Bond(s) will not be transferred to the Winning Bidder(s) and, if a Winning Bidder(s) determines to develop the Group I: Trustee Project(s), the Surety Bond will not apply to

1    the Winning Bidder(s)' bonding requirements with respect to such development.  If a Winning

2    Bidder(s) determines to develop all or a portion of its respective s(s), it will be required at that time

3    to obtain new Surety Bonds from the Bond Companies or another surety, to the extent surety bonds

4    are required by applicable state and local development requirements.

5                                                   **VII**.

6                      **CLASSIFICATION OF CLAIMS AND INTERESTS**

7              As required by the Code, the Plan places Claims and Interests into various Classes

8    according to their right to priority and other relative rights.  The Plan specifies whether each Class

9    of Claims or Interests is impaired or unimpaired, and the Plan sets forth the treatment each Class

10   will receive.  The table below lists the Classes of Claims established under the Plan and states

11   whether each particular Class is impaired or left unimpaired by the Plan.  A Class is "unimpaired"

12   if the Plan leaves unaltered the legal, equitable and contractual rights to which the Holders of

13   Claims or Interests in the Class are entitled, with certain exceptions specified in the Bankruptcy

14   Code.

| CLASSIFICATION OF HOLDERS OF SECURED REAL PROPERTY TAX CLAIMS AGAINST THE GROUP I: TRUSTEE PROJECTS | | |
|---|---|---|
| **Class 1** | **Claimant** | **Claim Nos.[3]** |
| **Class 1.1** | Contra Costa County as the Holder of an Unpaid Secured Real Property Tax Claim against the Delta Coves Project in alleged  the amount of $406,976. | **Delta Coves 16** |
| **Class 1.2** | Riverside County as the Holder of an Unpaid Secured Real Property Tax Claim against the Heartland Project in the alleged amount of $985,141. | **SunCal Heartland 5** |
| **Class 1.3** | Riverside County as the Holder of an Unpaid Secured Real Property Tax Claim against the Oak Valley Project in the alleged amount of $175,158. | **SunCal Oak Valley 9** |
| **Class 1.4** | Orange County as the Holder of an Unpaid Secured Real Property Tax Claim against the Marblehead Project in the amount of $2,500,646. | **SunCal Marblehead 49 and 57** |

---

[3] These Real Property Tax Claims have been updated to include amounts for which proofs of claim have not yet been filed.

| CLASSIFICATION OF HOLDERS OF SECURED REAL PROPERTY TAX CLAIMS AGAINST THE GROUP I: TRUSTEE PROJECTS | | |
|---|---|---|
| **Class 1** | **Claimant** | **Claim Nos.**[3] |
| **Class 1.5** | San Bernardino County as the Holder of an Unpaid Secured Real Property Tax Claim against the Palm Springs Village Project in the amount of $1,725,166. | **SunCal PSV 22** |

| CLASSIFICATION OF LEHMAN'S DISPUTED CLAIMS AGAINST THE GROUP I: TRUSTEE DEBTORS | | |
|---|---|---|
| **Class 2** | **Claims** | **Claim Nos.** |
| **Class 2.1** | The Holder of Lehman's Disputed Claims filed by Lehman ALI against Delta Coves arising from the Delta Coves Loan Agreement in the asserted amount of $206,023,142. | **Delta Coves 21** |
| **Class 2.2** | The Holder of the Disputed Secured Claim that is secured by a Disputed Lien against SunCal Marblehead and SunCal Heartland, which claim is based upon funds allegedly advanced pursuant to the SunCal Marblehead/SunCal Heartland Loan Agreement. | **SunCal Heartland 9** |
| **Class 2.3** | The Holder of Lehman's Disputed Claims filed by OVC Holdings against SunCal Oak Valley arising from the SunCal Oak Valley Loan Agreement in the asserted amount of $141,630,091. | **SunCal Oak Valley 16** |
| **Class 2.4** | The Holder of the Disputed Secured Claim that is secured by a Disputed Lien against SunCal Marblehead and SunCal Heartland, which claim is based upon funds allegedly advanced pursuant to the SunCal Marblehead/SunCal Heartland Loan Agreement. | **SunCal Marblehead: 21** |
| **Class 2.5** | The Holder of the Disputed Secured Claim that is secured by a Disputed Lien against the Palm Springs Village Project, which claim is based upon funds allegedly advanced pursuant to the SunCal PSV Loan Agreement in the asserted amount of $88,257,340. | **SunCal PSV 12** |

| CLASSIFICATION OF ASSERTED MECHANIC LIEN CLAIMS AGAINST THE GROUP I: TRUSTEE PROJECTS | | |
|---|---|---|
| **Class 3** | **Claimant** | **Claim Nos.** |

| CLASSIFICATION OF ASSERTED MECHANIC LIEN CLAIMS AGAINST THE GROUP I: TRUSTEE PROJECTS | | |
|---|---|---|
| **Class 3** | **Claimant** | **Claim Nos.** |
| **Class 3.1** | The Holder of the disputed asserted Mechanic Lien Claim held by Hertz Equipment Rental Corporation against the Delta Coves Project in the amount of $25,444. | **Delta Coves 2** |
| **Class 3.2** | The Holder of the asserted Mechanic Lien Claim held by MBH Architects against the Delta Coves Project in the amount of $97,091. | **Delta Coves 8** |
| **Class 3.3** | The Holder of the asserted Mechanic Lien Claim held by Top Grade Construction, Inc. against the Delta Coves Project in the amount of $250,000. | **Delta Coves 3** |
| **Class 3.4** | The Holder of the asserted Mechanic Lien Claim held by HD Supply Construction against the Heartland Project in the amount of $47,675. | **SunCal Heartland 2** |
| **Class 3.5** | The Holder of the asserted Mechanic Lien Claim held by Pinnik, Inc. against the Heartland Project in the amount of $522,238,. | **SunCal Heartland 8** |
| **Class 3.6** | The Holder of the asserted Mechanic Lien Claim held by Dennis M. McCoy & Sons against the Heartland Project in the amount of $638,167. | **SunCal Heartland 16** |
| **Class 3.7** | The Holder of the asserted Mechanic Lien Claim held by HD Supply Construction against the Oak Valley Project in the amount of $52,806. | **SunCal Oak Valley 3** |
| **Class 3.8** | The Holder of the asserted Mechanic Lien Claim held by Pinnik Inc. against the Oak Valley Project in the amount of $966,987. | **SunCal Oak Valley 12 and 14** |
| **Class 3.9** | The Holder of the asserted Mechanic Lien Claim held by Hillcrest Contracting Inc. against the Oak Valley Project in the amount of $136,567. | **SunCal Oak Valley 23** |
| **Class 3.10** | The Holder of the asserted Mechanic Lien Claim held by MacKenzie Landscape against the Oak Valley Project in the amount of $121,297. | **SunCal Oak Valley 25** |

| CLASSIFICATION OF ASSERTED MECHANIC LIEN CLAIMS AGAINST THE GROUP I: TRUSTEE PROJECTS | | |
|---|---|---|
| **Class 3** | **Claimant** | **Claim Nos.** |
| **Class 3.11** | The Holder of the asserted Mechanic Lien Claim held by All American Asphalt against the Oak Valley Project in the amount of $60,355. | **SunCal Oak Valley 26** |
| **Class 3.12** | The Holder of the asserted Mechanic Lien Claim held by Proactive Engineering against the Oak Valley Project in the amount of $280,685. | **SunCal Oak Valley 35 and 36** |
| **Class 3.13** | The Holder of the asserted Mechanic Lien Claim held by The Jasper Companies against the Marblehead Project in the amount of $146,657. | **SunCal Marblehead 29** |
| **Class 3.14** | The Holder of the asserted Mechanic Lien Claim held by Kirk Negrete, Inc. dba United Steel Placers against the Marblehead Project in the amount of $270,056. | **SunCal Marblehead 38** |
| **Class 3.15** | The Holder of the asserted Mechanic Lien Claim held by RBF Consulting against the Marblehead Project in the amount of $125,093. | **SunCal Marblehead 39** |
| **Class 3.16** | The Holder of the asserted Mechanic Lien Claim held by RJ Noble Co. against the Marblehead Project in the amount of $175,030. | **SunCal Marblehead 42, 50 and 58** |
| **Class 3.17** | The Holder of the asserted Mechanic Lien Claim held by Orange County Stripping Services against the Marblehead Project in the amount of $11,752. | **SunCal Marblehead 46 and 54** |
| **Class 3.18** | The Holder of the asserted Mechanic Lien Claim held by Savala Equipment Co. Inc. against the Marblehead Project in the amount of $34,440. | **SunCal Marblehead 48 and 56** |
| **Class 3.19** | The Holder of the asserted Mechanic Lien Claim held by All American Asphalt against the Marblehead Project in the amount of $1,344,445. | **SunCal Marblehead 63** |
| **Class 3.20** | The Holder of the asserted Mechanic Lien Claim held by Rockey Murata Landscaping against the Marblehead Project in the amount of $285,643. | **SunCal Marblehead 60** |

| CLASSIFICATION OF ASSERTED MECHANIC LIEN CLAIMS AGAINST THE GROUP I: TRUSTEE PROJECTS | | |
|---|---|---|
| **Class 3** | **Claimant** | **Claim Nos.** |
| **Class 3.21** | The Holder of the asserted Mechanic Lien Claim held by BNB Engineering, Inc. against the Marblehead Project in the amount of $1,608,723. | **SunCal Marblehead 37** |
| **Class 3.22** | The Holder of the asserted Mechanic Lien Claim held by Brudvik Inc. against the Palm Springs Village Project in the amount of $43,365. | **SunCal PSV 4** |
| **Class 3.23** | The Holder of the asserted Mechanic Lien Claim held by Larry Jacinto Construction Inc. against the Palm Springs Village Project in the amount of $212,663. | **SunCal PSV 5 and 24** |
| **Class 3.24** | The Holder of the asserted Mechanic Lien Claim held by William + Paddon Architects + Planners Inc. against the Palm Springs Village Project in the amount of $73,798. | **SunCal PSV 9 and 10** |
| **Class 3.25** | The Holder of the asserted Mechanic Lien Claim held by Southern California Edison against the Palm Springs Village Project in the amount of $23,861. | **SunCal PSV 26** |
| **Class 3.26** | The Holder of the asserted Mechanic Lien Claim held by Pacific Masonry Walls, Inc. against the Palm Springs Village Project in the amount of $314,061. | **SunCal PSV 33 and 39** |
| **Class 3.27** | The Holder of the asserted Mechanic Lien Claim held by J.R. Simplot Company against the Palm Springs Village Project in the amount of $3,467. | **SunCal PSV 34 and 40** |
| **Class 3.28** | The Holder of the asserted Mechanic Lien Claim held by Desert Pipeline Inc. against the Palm Springs Village Project in the amount of $469,784. | **SunCal PSV 36, 42 and 47** |
| **Class 3.29** | The Holder of the asserted Mechanic Lien Claim held by MSA Consulting against the Palm Springs Village Project in the amount of $666,897. | **SunCal PSV 43** |
| **Class 3.30** | The Holder of the asserted Mechanic Lien Claim held by Jackson DeMarco against the Palm Springs Village Project in the amount of $52,234. | **SunCal PSV 45** |

| CLASSIFICATION OF CONTINGENT BOND INDEMNIFICATION CLAIMS AGAINST THE GROUP I: TRUSTEE PROJECTS | | |
|---|---|---|
| **Class 4** | **Claimant** | **Claim Nos.** |
| **Class 4.1** | The holders of Contingent Bond Indemnification Claims arising from bonds issued with respect to the Del Coves Project. | **Various Filed** |
| **Class 4.2** | The holders of Contingent Bond Indemnification Claims arising from bonds issued with respect the Heartland Project. | **Various Filed** |
| **Class 4.3** | The holders of Contingent Bond Indemnification Claims arising from bonds issued with respect to the Oak Valley Project. | **Various Filed** |
| **Class 4.4** | The holders of Contingent Bond Indemnification Claims arising from bonds issued with respect to the Marblehead Project | **Various Filed** |
| **Class 4.5** | The holders of Contingent Bond Indemnification Claims arising from bonds issued with respect to the Palm Springs Village Project | **Various Filed** |

| CLASSIFICATION OF PRIORITY UNSECURED CLAIMS AGAINST THE GROUP I: TRUSTEE DEBTORS | | |
|---|---|---|
| **Class 5** | **Claimant** | **Claim Nos.** |
| Class 5.1 | The Holder of Priority Claims that fall within Code Sections 507(a)(2), (4), (5), (6), and (7) against Delta Coves. | **Various Filed and Scheduled** |
| Class 5.2 | The Holder of Priority Claims that fall within Code Sections 507(a)(2), (4), (5), (6), and (7) against SunCal Heartland. | **Various Filed and Scheduled** |
| Class 5.3 | The Holder of Priority Claims that fall within Code Sections 507(a)(2), (4), (5), (6), and (7) against Oak Valley. | **Various Filed and Scheduled** |

MAINDOCS-#164960-v3-SunCal_3rd_Am_Group_I_TD_DS.DOC

| CLASSIFICATION OF PRIORITY UNSECURED CLAIMS AGAINST THE GROUP I: TRUSTEE DEBTORS | | |
|---|---|---|
| **Class 5** | **Claimant** | **Claim Nos.** |
| **Class 5.4** | The Holder of Priority Claims that fall within Code Sections 507(a)(2), (4), (5), (6), and (7) in the asserted amount of $10,950 against SunCal Marblehead. | **Scheduled Amount and SunCal Marblehead 45** |
| Class 5.5 | The Holder of Priority Claims that fall within Code Sections 507(a)(2), (4), (5), (6), and (7) against SunCal PSV | **Various Filed and Scheduled** |

| CLASSIFICATION OF GENERAL UNSECURED CLAIMS THAT QUALIFY AS RELIANCE CLAIMS[4] | | |
|---|---|---|
| **Class 6** | **Claimant** | **Claim Nos.** |
| **Class 6.1** | The holders of Allowed Unsecured Reliance Claims against Delta Coves. | **Various Filed and Scheduled** |
| **Class 6.2** | The holders of Allowed Unsecured Reliance Claims against SunCal Heartland. | **Various Filed and Scheduled** |
| **Class 6.3** | The holders of Allowed Unsecured Reliance Claims against SunCal Oak Valley. | **Various Filed and Scheduled** |
| **Class 6.4** | The holders of Allowed Unsecured Reliance Claims against SunCal Marblehead. | **Various Filed and Scheduled** |
| **Class 6.5** | The holders of Allowed Unsecured Reliance Claims against SunCal PSV. | **Various Filed and Scheduled** |

---

[4] Unsecured Claims are generally placed within the same class and they receive the same treatment under a Plan. However, the SunCal Plan Proponents have divided Unsecured claims into two classes in the Plan – Classes 6.1 through 6.5, and 7.1 through 7.5. This separate classification has been implemented for the following reason. The Holders of Unsecured Claims in Classes 6.1 through 6.5, who are referred to as "Reliance Claimants," hold specific Litigation Rights that are referred to herein as "Reliance Claims." The SunCal Plan Proponents believe that the Holders of Reliance Claims are the potential beneficiaries of the equitable subordination causes of action in the Lehman Adversary Proceeding. The Unsecured Creditors in Classes 7.1 through 7.5 do not hold Reliance Claims. Under the Plan, the Reliance Claimants who sell their Reliance Claimants to LitCo, and who vote in favor of the Plan, which is Option A, will receive a distribution of 55 percent on their Allowed Unsecured Claims *from non-estate funds. Accordingly, the 55 percent payment is being paid from non-estate funds, for a non-estate asset.* If a Reliance Claimant elects not to sell this claim, then this claimant will receive the exact same distribution rights that the Class 7.1 through 7.5 claimants, respectively, will receive under the Plan, unless the Court allocates a part of any judgment granted in the Lehman Adversary Proceeding to these particular claims. In summary, the classification difference was made to provide for the purchase offer relating to the sale of the Reliance Claims. In all other respects the Holders of Unsecured Claims receive the same treatment under the Plan.

| CLASSIFICATION OF GENERAL UNSECURED CLAIMS THAT DO NOT QUALIFY AS RELIANCE CLAIMS[5] | | |
|---|---|---|
| **Class 7** | **Claimant** | **Claim Nos.** |
| **Class 7.1** | Claimants holding Allowed Unsecured Claims against Delta Coves that are not Reliance Claims. | **Various Filed and Scheduled** |
| **Class 7.2** | Claimants holding Allowed Unsecured Claims against SunCal Heartland that are not Reliance Claims. | **Various Filed and Scheduled** |
| **Class 7.3** | Claimants holding Allowed Unsecured Claims against Oak Valley that are not Reliance Claims. | **Various Filed and Scheduled** |
| **Class 7.4** | Claimants  holding Allowed Unsecured Claims against SunCal Marblehead that are not Reliance Claims | Various Filed and Scheduled |
| **Class 7.5** | Claimants  holding Allowed Unsecured Claims against SunCal PSV that are not Reliance Claims | Various Filed and Scheduled |

| **Class 8** | **Claimant** | **Scheduled** |
|---|---|---|
| **Class 8.1** | Allowed Interests in Delta Coves held by Delta Coves Master JV LLC and LB/L-DUC III Master LLC. | Scheduled Amount |
| **Class 8.2** | Allowed Interests in SunCal Heartland held by SunCal Marblehead Heartland Master LLC. | Scheduled Amount |
| **Class 8.3** | Allowed Interests in SunCal Oak Valley held by SCLV Oak Valley, LLC and SCC/Oak Valley, LLC. | Scheduled Amount |
| **Class 8.4** | Allowed Interests in SunCal Marblehead held by SunCal Marblehead Heartland Master LLC. | Scheduled Amount |
| **Class 8.5** | Allowed Interests in SunCal PSV, LLC held by Lehman SunCal Real Estate Fund LLC | Scheduled Amount |

## VIII.

## THE PLAN'S TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS

8.1    **The Plan's Treatment of Holders of Allowed Secured Real Property Tax Claims Against the Group I: Trustee Projects (Classes 1.1 through 1.5).**

---

[5] This Class includes, but it is not limited to, Bond Claims that are not Allowed Secured Claims within Class 4.1.

1    The rights of the Holder(s)' of Allowed Secured Claims in Classes 1.1 through 1.5 are

2    impaired under the Plan and shall receive one of the following two treatments at the Plan Trustee's

3    discretion based solely on the option of the Group I: Trustee Debtor:

4        A.    Such Holders shall retain their existing lien rights and shall accrue interest

5    as provided under applicable nonbankruptcy law pursuant to 11 U.S.C. § 506 and 511 and

6    such Allowed Claims shall be satisfied in accordance with the provision of 11 U.S.C. §

7    1124(2) from the sale of the Group I: Trustee Projects during the Sales Period; or

8        B.    Such Holders shall retain their existing lien rights and shall accrue interest

9    as provided under applicable nonbankruptcy law pursuant to 11 U.S.C. § 506 and 511 and

10    California Revenue and Taxation Code Sections 4102 and 4103, and payment on such

11    Allowed Claims shall be satisfied over sixty-one (61) months from the applicable Group I:

12    Trustee Debtor's Petition Date.

13

14    **8.2**    **The Plan's Treatment of Lehman's Disputed Claim(s) and Disputed Lien(s)**

15        **Against the Group I: Trustee Debtors (Classes 2.1 through 2.5 ).**

16    The Holder(s) of Disputed Secured Claims within Class 2.1 through  2.5 shall receive the

17    indubitable equivalent of their disputed claims under the Plan, pursuant to 11 U.S.C.

18    § 1129(b)(2)(A)(iii), through the following treatment:

19        A.    <u>Lien Rights</u>. The Class 2.1 through 2.5 Holder(s) shall retain their interest in

20    the Disputed Lien(s) against the applicable Group I: Trustee Projects and the Group I: Trustee

21    Other Assets that secure the Disputed Secured Claims, pending a Final Order(s) resolving the

22    Allowance of such Disputed Secured Claims and determining the validity, priority and extent of

23    the applicable Disputed Liens against the applicable Group I: Trustee Projects, which secure these

24    claims, except as follows:

25        1.    The Group I: Trustee Projects and the Group I: Trustee Other Assets subject

26    to the Class 2.1 through 2.5 Disputed Liens will be sought to be sold free and clear of such liens

27    during the Sales Period, without the right to credit bid under Section 363(k) with respect to

28    Disputed Claims and Disputed Liens. These Disputed Liens shall then attach to the Net Sales

1    Proceeds from the sale, which shall be deposited into the Net Sales Proceeds Account, pending a

2    resolution of such Disputed Secured Claims and Disputed Liens.  The marketing process and sales

3    procedures for the Group I: Trustee Projects and the Group I: Trustee Other Assets are described in

4    Article X hereof.

5            2.      To the extent that a Disputed Secured Claim held by either the Class 2.1

6    through 2.5 Claimants against the applicable Group I: Trustee Projects and Group I: Trustee Other

7    Assets  is disallowed, and the Disputed Lien associated with this Disputed Secured Claim is

8    consequently released to the extent of this disallowance, the Plan Trustee shall be authorized to use

9    to the Net Sales Proceeds that are no longer subject to the Disputed Lien(s) to pay other Allowed

10    Claims in their order of priority, in accordance with the terms of the Plan;

11            3.      To the extent that a Disputed Secured Claim held by either the Class 2.1

12    through 2.5 Claimant and the associated Disputed Lien(s) against the applicable Group I: Trustee

13    Projects and Group I: Trustee Other Assets  is subordinated, the Plan Trustee shall be authorized to

14    use to the Net Sales Proceeds that are no longer subject to the Disputed Lien(s), or where the

15    priority of the Disputed Liens has been subordinated by the Court, to pay other Allowed Claims in

16    their order of priority, in accordance with the terms of the Plan, to the extent of the subordination;

17    and

18            Notwithstanding the existence of the Disputed Secured Claims and the

19    Disputed Liens, the Plan Trustee may a seek a release of the funds in the Net Sales Proceeds

20    Account subject to these claims and liens to pay the claims of other creditors in accordance with

21    the terms of the applicable Plan, if the Class 2.1 through 2.5 claimants' interests in Group I will

22    remain adequately protected after this release.

23            4.      <u>Distributions To The Class 2.1 through 2.5 Claimants</u>. If the Plan Trustee

24    consummates a sale or otherwise liquidates the particular Group I Trustee Project and/or Group I:

25    Trustee Other Assets subject to the Class 2.1 through 2.5 Disputed Secured Claim(s) and/or

26    Disputed Lien(s) during the Sales Period, as provided for above, the Holder(s) of such Disputed

27    Secured Claim shall receive a distribution to the extent of available funds from the applicable Net

28    Sale Proceeds Account(s) to the extent required by an entered Order of the Court, that is not

1    subject to a stay pending appeal, determining the allowance and priority of the Disputed Secured

2    Claims and the validity, priority and extent of the Disputed Liens in, including but not limited to,

3    the Lehman Adversary Proceeding and the Lehman Claims Objections.

4           5.     <u>Abandonment of Unsold Group I: Trustee Projects and Group I: Trustee

5    Other Assets</u>. If for any reason the Plan Trustee is unable to sell any of the Group I: Trustee

6    Projects and/or Group I: Trustee Other Assets during the Sales Period, they will be abandoned as

7    of 11:59 p.m. on the last day of the Sales Period, no payment shall be made to Holders of Class 2.1

8    through 2.5 Claims, as the case may be, and such Holder(s) shall be free to exercise any and all

9    remedies that they may hold with respect to the Group I: Trustee Projects and the Group I: Trustee

10    Assets under applicable California law.

11    **8.3**    **<u>The Plan's Treatment of Holders of Asserted Mechanic Lien Claims Against**

12    **the Group I: Trustee Projects (Classes 3.1 Through 3.30).</u>**

13        The treatment of the Holders of Allowed Classes 3.1 through 3.30 Secured Claims under

14    the Plan shall be as follows:

15           A.     The Holder(s)' rights are impaired under the Plan;

16           B.     The Holder(s) shall retain their respective underlying liens on the applicable

17    Group I: Trustee Project(s), but shall forebear from pursuing their rights and remedies until the

18    expiration of the Sales Period;

19           C.     If the Plan Trustee is able to consummate a sale of the Group I: Trustee

20    Projects subject to the liens asserted by the Holders of Class 3.1 through 3.30 claims  during the

21    Sales Period, such Holders shall receive a distribution, to the extent of available, of Net Sale

22    Proceeds in accordance with the priorities set forth under the Bankruptcy Code, subject to a Final

23    Order(s) resolving the allowance and priority of the applicable Lehman's Disputed Claim(s) and

24    the validity of the applicable Lehman Disputed Lien(s) in, including but not limited to, the Lehman

25    Adversary Proceeding; and

26           D.     If for any reason the Plan Trustee is unable to sell any of the Group I:

27    Trustee Projects during the Sales Period, they will be abandoned as of 11:59 p.m. on the last day of

28    the Sales Period, no payment shall be made to Holders of Classes 3.1 through 3.30 Claims, as the

1   case may be, and such Holder(s) shall be free to exercise any and all remedies that they may hold

2   with respect to the Group I: Trustee Projects under applicable California law.

3   **8.4      The Plan's Treatment of Holders of Contingent Bond Indemnification Claims**

4   **Against the Group I: Trustee Projects (Classes 4.1 through 4.5).**

5   The Bond Companies assert that surety bonds were executed on behalf of all or some of the

6   Group I: Trustee Debtors as a principal for its respective Group I: Trustee Project ("Surety

7   Bonds").  The Surety Bond(s) will not be transferred to the Winning Bidder(s) and, if a Winning

8   Bidder(s) determines to develop the Group I: Trustee Project(s), the Surety Bond will not apply to

9   the Winning Bidder(s)' bonding requirements with respect to such development.  If a Winning

10  Bidder(s) determines to develop all or a portion of its respective Group I: Trustee Project(s), it will

11  be require at that time to obtain new Surety Bonds from the Bond Companies or another surety, to

12  the extent surety bonds are required by applicable state and local development requirements.

13  The rights of each holder of an Allowed Contingent Bond Indemnification Claim arising

14  from a bond issued with respect to a Group I: Trustee Project, shall, to the extent such claim(s) are

15  determined to be a secured claim(s), be impaired under the Plan. Such claims shall receive the

16  following treatment:

17  A.  Each such Allowed Secured Claim shall be placed in a separate class and receive a

18  separate ballot for voting purpose

19  B.  Each Holder(s) shall retain their respective underlying liens on the applicable Group

20  I: Trustee Project(s), but shall forebear from pursuing their rights and remedies until the expiration

21  of the Sales Period;

22  C.  If the Plan Trustee is able to consummate a sale of the Group I: Trustee Projects

23  subject to the liens asserted by the Holders of Classes 4.1 through 4.5 claimants  during the Sales

24  Period, such Holders shall receive a distribution, to the extent of available Net Sale Proceeds in

25  accordance with the priorities set forth under the Bankruptcy Code, subject to a Final Order(s)

26  resolving the allowance and priority of the applicable Lehman's Disputed Claim(s) and the validity

27  of the applicable Lehman Disputed Lien(s) in, including but not limited to, the Lehman Adversary

28  Proceeding; and

1      D.  If the Plan Trustee is unable to consummate a sale of the Group I: Trustee Projects

2  during the Sales Period, such real property collateral shall be deemed abandoned by the Plan

3  Trustee, no payment shall be made to such Holder(s), and such Holder(s) shall be allowed to

4  pursue their respective rights against the real property collateral under applicable California law.

5

6

7      **8.5**    **The Plan's Treatment of Holders of Priority Claims Against the Group I:**

8            **Trustee Debtors (Classes 5.1 through 5.5)**.

9      The treatment of the Holders of Allowed Priority Claims under the applicable Plan(s) shall

10  be as follows**:**

11            A.      The Holder(s) are unimpaired under the Plan; and

12            B.      The Holder(s) shall be paid from either the applicable Distribution

13  Account(s) (i) the full amount of such Allowed Priority Claim in Cash on the later of (x) the

14  Effective Date, (y) the date such Claim becomes an Allowed Priority Claim or (z) the date such

15  Allowed Priority Claim becomes payable in accordance with the terms governing such Allowed

16  Priority Claim, or (ii) upon such other less favorable terms as may be agreed to by such Holder and

17  the Plan Trustee.

18      **8.6**    **The Plan's Treatment of Holders of General Unsecured Claims That Are**

19            **Reliance Claims Group I: Trustee Debtors (Classes 6.1 through 6.5).**

20      The rights of Holders of Allowed Classes 6.1 through 6.5 Claims are impaired under the

21  applicable Plan(s). They have the right to choose between the following treatment options:

22            A.      Option A: A claimant in these classes *who votes in favor of the Plan*, and

23  who chooses Option A, will have the right to sell to LitCo all of the claimant's right, title and

24  interest in all Allowed Reliance Claims and all of the claimant's Litigation Rights against the

25  applicable Debtor, SunCal Affiliates, and the Lehman Entities, for the sum of fifty five cents

26  ($0.55) per dollar of allowed claim, payable in cash on the Effective Date, provided there is no stay

27  pending an appeal of the Confirmation Order, in full satisfaction of such claimant's Allowed

28  Reliance Claims; or

B.      Option B: A claimant in these classes who votes against the Plan, or who votes in favor of the Plan, but does not choose Option A, or who does not vote on the Plan, will 1) receive a minimum distribution in cash, on the Effective Date, equal to one percent (1%) of such claimant's Allowed Claim, 2) retain such claimant's Reliance Claim(s) and rights against the Lehman Entities and its right to receive such claimant's share, as determined by the Court, in the benefits and recoveries resulting from a judgment or order entered in the Lehman Adversary Proceeding, the Contract Action, or the Lehman Claims Objections,  and 3) right to receive a pro-rata share of any funds payable from the applicable Distribution Account(s), after payment in full of all Post Confirmation Expenses, Allowed Administrative Claims, and Allowed Priority Claims.

**8.7**      **The Plan's Treatment of Holders of Allowed General Unsecured Claims That Are Not Reliance Claims Group I: Trustee Debtors (Classes 7.1 through 7.5).**

The rights of Holders of Allowed Class 7.1 through 7.5 Claims are impaired under the Plan(s). Under the Plan(s), each claimant will 1) receive a minimum distribution in cash, on the Effective Date, equal to one percent (1%) of such claimant's Allowed Claim, and 2) receive a pro-rata share of any funds payable from the applicable Distribution Account(s), after payment in full of all Post Confirmation Expenses, Allowed Administrative Claims, and Allowed Priority Claims and any sums that the Bankruptcy Court determines are payable to the Holders of Allowed Class 6.1 through 6.5 Claims from either the Claim Reduction Amounts or on account of a judgment in the Lehman Adversary Proceeding.

**8.8**      **The Plan's Treatment of Holders of Allowed Interests Group I: Trustee Debtors.**

The Interests of the Holders in Class 8.1 and 8.5 are impaired under the Plan. All such Interests shall be cancelled as of the Effective Date and no distribution shall be made to these Holders on account of such Interest(s).

**IX.**

**ACCEPTANCE OR REJECTION OF THE PLAN**

**9.1**      **Introduction.**

1    PERSONS OR ENTITIES CONCERNED WITH CONFIRMATION OF THE PLAN

2    SHOULD CONSULT WITH THEIR OWN ATTORNEYS BECAUSE THE LAW ON

3    CONFIRMING A PLAN OF REORGANIZATION IS VERY COMPLEX.  The following

4    discussion is intended solely for the purpose of alerting readers about basic confirmation issues,

5    which they may wish to consider, as well as certain deadlines for filing Claims.  The Debtors

6    cannot represent that the discussion contained below is a complete summary of the law on this

7    topic.

8    Many requirements must be met before the Court can confirm the Plan.  Some of the

9    requirements include that the Plan must be proposed in good faith, acceptance of the Plan, whether

10    the Plan pays creditors at least as much as creditors would receive in a Chapter 7 liquidation, and

11    whether the Plan is feasible.  The requirements described herein are <u>not</u> the only requirements for

12    confirmation.

13    **9.2    <u>Who May Object to Confirmation of the Plan</u>.**

14    Any party in interest may object to the confirmation of the Plan, but as explained below not

15    everyone is entitled to vote to accept or reject the Plan.

16    **9.3    <u>Who May Vote to Accept/Reject the Plan</u>.**

17    A Holder of a Claim or Interest has a right to vote for or against the Plan if that Holder of

18    the Claim or Interest has a Claim which is both (1) Allowed or Allowed for voting purposes and

19    (2) Classified in an impaired Class (excluding any class in which the Plan is "deemed rejected").

20    The votes will be tabulated on a Debtor by Debtor basis.

21    **9.4    <u>What Is an Allowed Claim/Interest</u>.**

22    As noted above, a Holder of a Claim or Interest must first have an Allowed Claim or

23    Allowed Interest to vote.

24    **9.5    <u>What Is an Impaired Class</u>.**

25    A Class is impaired if the Plan alters the legal, equitable, or contractual rights of the Claims

26    or Interests in that Class, other than the right to accelerate the Claim upon certain kinds of defaults.

27    In this case, the SunCal Plan Proponents believe that all Classes, except for Classes 5.1 through

28    5.5, are impaired.

### 9.6 <u>Who Is Not Entitled to Vote</u>.

The following four types of Claims are <u>not</u> entitled to vote: (1) Claims that have been disallowed; (2) Claims in unimpaired Classes; (3) Claims entitled to priority pursuant to Bankruptcy Code Sections 507(a)(2) or (a)(3) and Claims in Classes that do not receive or retain any value under the Plan.  Claims in unimpaired Classes are not entitled to vote because such Classes are deemed to have accepted the Plan.  Claims entitled to priority pursuant to Bankruptcy Code Section 507(a)(8) are not entitled to vote because such Claims are not placed in Classes and they are required to receive certain treatment specified by the Bankruptcy Code.  Claims in Classes that do not receive or retain any property under the Plan do not vote because such Classes are deemed to have rejected the Plan.  The SunCal Plan Proponents believe that all Classes are entitled to vote except Classes 5.1 through 5.5. These classes are not impaired under the Plan and consequently are not entitled to vote. They are conclusively deemed to have accepted the Plan. The Interests held by the Holders in Classes 8.1 through 8.5 are being cancelled under the Plan; accordingly these Interest Holders are deemed to have voted to reject the Plan.

EVEN IF YOUR CLAIM IS OF THE TYPE DESCRIBED ABOVE, YOU MAY STILL HAVE A RIGHT TO OBJECT TO THE CONFIRMATION OF THE PLAN.

### 9.7 <u>Who Can Vote in More than One Class</u>.

A creditor whose Claim has been Allowed in part as a Secured Claim and in part as an Unsecured Claim is entitled to accept or reject a Plan in both capacities by casting one ballot for the secured part of the Claim and another ballot for the Unsecured Claim.  Also, a Creditor may otherwise hold Claims in more than one Class (such as a Holder of Senior Secured Claims and Subordinated Note Claims), and may vote the Claims held in each Class.

### 9.8 <u>Votes Necessary for a Class to Accept the Plan</u>.

A Class of Claims is deemed to have accepted the Plan when more than one-half (1/2) in number and at least two-thirds (2/3) in dollar amount of the Claims *that actually voted*, vote to accept the Plan.  A Class of interests is deemed to have accepted the Plan when Holders of at least two-thirds (2/3) in amount of the interest-Holders of such Class which actually vote, vote to accept the Plan.

**9.9**     **Treatment of Nonaccepting Classes.**

As noted above, even if there are impaired Classes that do not accept the proposed Plan, the Court may nonetheless confirm the Plan if the nonaccepting Classes are treated in the manner required by the Code and at least one impaired Class of Claims accepts the Plan. The process by which a plan may be confirmed and become binding on non-accepting Classes is commonly referred to as "cramdown." The Bankruptcy Code allows the Plan to be "crammed down" on nonaccepting Classes of Claims or interests if it meets all statutory requirements except the voting requirements of 1129(a)(8) and if the Plan does not "discriminate unfairly" and is "fair and equitable" with respect to each impaired Class that has not voted to accept the Plan, as set forth in 11 U.S.C. § 1129(b) and applicable case law.

**9.10**     **Request for Confirmation Despite Nonacceptance by Impaired Class(es).**

The SunCal Plan Proponents will ask the Court to confirm the Plan by cramdown on any impaired Class if such Class does not vote to accept the Plan.

**X.**

**MEANS OF EXECUTION AND IMPLEMENTATION OF THE PLAN**

**10.1**     **Introduction.**

This section is intended to address how the SunCal Plan Proponents intend to implement the provisions of the Plan. It addresses the marketing and the sale of the Group I: Trustee Projects and the Group I: Trustee Other Assets, the transfer of the Plan Trust Assets to the Plan Trust, the nature of the Plan Trust, the powers of the Plan Trust, the governance of the Plan Trust, the resolution of disputed claims, the sources of funds that will be used to pay claims and the mechanics of how claims will be paid.

**10.2**     **Sale Process of the Group I: Trustee Projects and the Group I: Trustee Other Assets During the Sales Period.**

The core objective of the Plan is to enable all creditors holding Allowed Claims to receive the highest dividend possible by selling the estates' primary assets, the Group I: Trustee Projects, to the highest bidder. The process of marketing the Group I: Trustee Projects for sale will begin, pursuant to the Confirmation Order, immediately after the entry of this order. Acquisitions shall

manage the marketing process initially in its capacity as a SunCal Plan Proponent and as the Plan

Trustee after the Effective Date.  Furthermore, the Trustee Debtors' Committee shall be consulted

and have the opportunity to object to the sales process and request a hearing with the Bankruptcy

Court.

10.2.1. The Group I: Trustee Projects Marketing and Bid Procedures.  The SunCal

Plan Proponents and the Plan Trustee will pursue the following sale procedures culminating into a

public auction for the sale of the Group I: Trustee Projects after the Confirmation Date and during

the Sales Period.

10.2.1.1      Implementation of a Marketing Program. Once the Plan is

confirmed, the SunCal Plan Proponents will market the Group I: Trustee Projects for sale through a

comprehensive sale effort during the Sale Period. This sale effort will include 1) sending sale

packages describing each Group I: Trustee Project to the real estate brokerage community; b)

advertising the Group I: Trustee Projects for sale on a website that includes links allowing direct

access to all relevant information regarding the Group I: Trustee Projects; and c) sending packages

to a list of prospects nationally who are actively seeking or may have interest in these kinds of

assets.

10.2.1.2      Identifying a Stalking Horse Bidder. On the first business day

after the Effective Date, the Plan Trustee will accept, on a provisional basis, an Opening Bid for

the Group I: Trustee Projects.  The bidder whose Opening Bid is accepted for each Group I Trustee

Project will become the "Stalking Horse Bidder."  The Opening Bid must be equal to the

Minimum Sale Price(s) fixed in the Plan for each Group I Trustee Project.  The Plan Trustee shall

also select Qualified Bidders at this time.

10.2.1.3      The Sale Contract. The sale contract that will be entered into

with the Stalking Horse Bidder will include the following bankruptcy-sale related provisions:

1.      Overbid Provisions. The contract will allow the Plan Trustee

to seek "overbids" from other Qualified Buyers, and to accept an Initial Overbid that exceeds the

Stalking Horse Bid by the Initial Overbid Amount applicable to each Group I: Trustee Project.  In

the case of the Heartland Project, the Initial Overbid Amount is a sum that is not less than the sum

-82-

of the Opening Bid, the Heartland Project Break-up Fee and one hundred thousand dollars ($100,000).  In the case of the Delta Coves Project, the Initial Overbid Amount is a sum that is not less than the sum of the Opening Bid, the Delta Coves Project Break-up Fee and one hundred thousand dollars ($100,000).  In the case of the Oak Valley Project, the Initial Overbid Amount is a sum that is not less than the sum of the Opening Bid, the Oak Valley Project Break-up Fee and one hundred thousand dollars ($100,000).  In the case of the Marblehead Project, the Initial Overbid Amount is a sum that is not less than $84,420,000, plus the Marblehead Break-up Fee, plus one hundred thousand dollars ($100,000).  In the case of the Palm Springs Village Project, the Initial Overbid Amount is $9,990,000, plus the PSV Break-up Fee, plus seventy-five thousand dollars ($75,000).

     2. <u>A Break-Up Fee</u>. The sale contract will include a "break-up fee" provision. This fee will be payable to the Stalking Horse Bidder if the Opening Bid is overbid, and another Qualified Bidder purchases the Group I: Trustee Project(s) that is the subject of the Opening Bid.

     3. <u>Sale Free And Clear of Liens</u>. The sale contract will provide that the Group I: Trustee Project(s) are being sold free and clear of all monetary liens and encumbrances and that no party holding a lien against the Assets, including the Lehman Lenders, may submit a "credit bid" based upon the amount allegedly owing on the claims secured by the project being sold.

    10.2.1.4 <u>The Auction</u>.  Fourteen (14) days after the date of the selection of the Stalking Horse Bidder, the Plan Trustee will conduct a public auction wherein all Qualified Bidders who have submitted Qualified Bids for the Group I: Trustee Projects will have the opportunity to increase their bids for these Projects. The Qualified Bidder that submits the highest bid for the Project will then be designated the Winning Bidder. The Winning Bidder will then have fifteen (15) days pay the Winning Bid amount and the closing shall occur no later than the first business day following the thirtieth (30th) day after the Effective Date.

    10.2.2 <u>The Group I: Trustee Other Assets Marketing and Bid Procedures.</u>  To the extent that the SunCal Plan Proponents believe that the Group I: Trustee Other Assets have any

material value, the SunCal Plan Proponents will pursue the following process for the sale of the Group I: Trustee Other Assets after the Confirmation Date and during the Sales Period:

      1.     After the Confirmation Date, the SunCal Plan Proponents will implement commercially reasonable marketing efforts for the sale of the Group I: Trustee Other Assets;

      2.     The sales procedures will be decided by the SunCal Plan Proponents after consultation with the Trustee Debtors' Committee; and

      3.     The sale contract will provide that the Group I: Trustee Other Assets(s) are being sold free and clear of all monetary liens and encumbrances and that no party holding a lien against the Group I: Trustee Other Assets, including the Lehman Lenders, may submit a "credit bid" based upon the amount allegedly owing on the claims secured by the Group I: Trustee Other Assets being sold.

      4.     Within seven (7) days after the Effective Date, the Plan Trustee will hold a public auction for the sale of the Group I: Trustee Assets to the bidder that submits the highest and best bid.  The winning bidder will then have seven (10) days to close this purchase transaction by paying the winning bid amount.

### 10.3  Establishment and Operations of the Plan Trust.

The Plan Trust shall be established and shall become effective on the Effective Date.  The Plan Trust is created pursuant to the Plan and the Confirmation Order.  The primary purpose of the Plan Trust is to consummate the sales and/or the liquidation of the Group I: Trustee Projects and the Group I: Trustee Other Assets transferred to it and the Distribution of the Net Sales Proceeds to Creditors, with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Plan Trust. The Plan Trust shall hold title to and administer the Plan Trust Property, including, but not limited to, any Litigation Claims, and the proceeds thereof for liquidation and distribution in accordance with the terms of the Plan.

### 10.4  Preservation and Pursuit of Litigation Claims and Recovery for the Plan Trust.

MAINDOCS-#164960-v3-SunCal_3rd_Am_Group_I_TD_DS.DOC

On the Effective Date, title to and possession of all property of the Group I: Trustee Debtors shall be deemed transferred and delivered to the Plan Trust, without further act or action under any applicable agreement, law, regulation, order or rule of law.

Pursuant to Section 1123(b)(3) of the Bankruptcy Code, the Plan Trust shall retain all Litigation Claims whether or not pending on the Effective Date that are not purchased by LitCo Unless a Litigation Claim is expressly waived, relinquished, released, sold, compromised or settled in the Plan or in a Final Order, all rights with respect to such Litigation Claims are reserved and the Plan Trustee may pursue such Litigation Claims.  Notwithstanding the foregoing, the Plan Trustee shall not settle or abandon a Litigation Claim valued at greater than $100,000 except upon ten (10) days' prior written notice and opportunity to object to the proposed action.  Any disputes concerning the settlement or abandonment of a Litigation Claim shall be submitted to the Bankruptcy Court for resolution on no less than ten (10) days' notice to the objecting party.

All Litigation Recoveries realized or obtained by the Plan Trustee shall be promptly deposited into the applicable Distribution Account(s).  Except as otherwise provided in the Plan and the Confirmation Order, the Litigation Recoveries shall be free and clear of all Claims and Liens and shall only be expended in accordance with the provisions of the Plan.

**10.5     Removal of Chapter 11 Trustee**.

As of the Effective Date, the appointment of the Chapter 11 Trustee for SunCal Oak Valley, SunCal Heartland and Delta Coves Cases, SunCal Marblehead, and SunCal PSV shall terminate, and possession and control over all property within these estates shall pass to the Plan Trust.

**10.6     Payment of Plan Trust Expenses**.

The expenses incurred by the Plan Trust or the Plan Trustee during the Plan Period, shall be paid, or adequate reserves shall be created for the payment of such expenses, prior to any distribution to the Plan Trust Beneficiaries.

**10.7     The Plan Trust Distribution System.**

The Plan Trustee shall establish a separate "Distribution Account" for each Group I: Trustee Debtor at an FDIC insured bank. Each Group I: Trustee Debtor's Available Cash, whether

1    on hand as of the Effective Date or received thereafter, shall be deposited into that Group I: Trustee

2    Debtor's Distribution Account.  These funds will then be used to pay the claims of Creditors

3    holding Allowed Claims in their order of priority as provided for in the Plan.  Persons dealing with

4    the Plan Trustee, or seeking to assert Claims against the Debtors, the Estates or the Plan Trust,

5    shall look only to property of the Debtors, the Estates or the Plan Trust to satisfy any liability to

6    such Persons, and the Plan Trustee shall have no corporate, personal, or individual obligation to

7    satisfy any such liability.

8        **10.8    The Plan Trustee**.

9        **10.8.1    Appointment**.  Acquisitions shall be Plan Trustee of the Plan Trust.  The

10    appointment of the Plan Trustee shall be effective as of the Effective Date.

11        **10.8.2    Term**.  Unless the Plan Trustee resigns, dissolves or is removed by Court

12    order earlier, the Plan Trustee's term shall expire upon termination of the Plan Trust pursuant to

13    the Plan.  In the event the Plan Trustee resigns, dies or is removed by Court order prior to

14    termination of the Plan Trust, the UST shall select and recommend to the Court a successor Plan

15    Trustee.

16        **10.8.3    Powers and Duties**.  On the Effective Date, the Plan Trustee shall have the

17    rights, powers and duties set forth in the Plan, the Confirmation Order, and Bankruptcy Code

18    §§505, 1107 and 1108.  The Plan Trustee shall be governed in all things by the terms of the Plan

19    and the Confirmation Order.  The Plan Trustee shall administer the Plan Trust in accordance with

20    the Plan.  Without limitation, the Plan Trustee shall file final federal, state, foreign and, to the

21    extent applicable, local, tax returns.  Without further Motion, notice, or order of the Court, the Plan

22    Trustee shall be authorized, empowered and directed to take all actions necessary to comply with

23    the Plan and exercise and fulfill the duties and obligations arising thereunder, including, without

24    limitation to:

25        i.    employ, retain, and replace one or more attorneys, accountants, auctioneers,

26    brokers, managers, consultants, other professionals, agents, investigators, expert witnesses,

27    consultants, and advisors as necessary to discharge the duties of the Plan Trustee under the Plan;

28

ii.    control and effectuate the Claims reconciliation process, including to object to, seek to subordinate, compromise or settle any and all Claims against the Debtors pursuant to the terms of the Plan;

iii.    open, maintain and administer bank accounts as necessary to discharge the duties of the Plan Trustee under the Plan;

iv.    make Distributions to the Holders of Allowed Claims in accordance with the Plan;

v.    retain professionals to assist in performing his or her duties under the Plan;

vi.    pay reasonable and necessary professional fees, costs, and expenses;

vii.    investigate, analyze, commence, prosecute, litigate, compromise, settle, dismiss, and otherwise administer all Causes of Action and Avoidance Actions for the benefit of the Plan Trust and its beneficiaries, as set forth in the Plan, and to take all other necessary and appropriate steps to collect, recover, settle, liquidate, or otherwise reduce to Cash all Causes of Action and Avoidance Actions, as the Plan Trustee may determine is in the best interests of the Plan Trust;

viii.    administer, sell, liquidate, or otherwise dispose of the Assets in accordance with the terms of the Plan;

ix.    incur and pay reasonable and necessary expenses in connection with the performance of the Plan Trustee's duties under the Plan;

x.    represent the Estates before the Court and other courts of competent jurisdiction with respect to matters concerning the Plan Trust;

xi.    seek the examination of any entity under the subject to the provisions of Bankruptcy Rule 2004;

xii.    comply with applicable orders of the court and any other court of competent jurisdiction over the matters set forth in the Plan;

xiii.    comply with all applicable laws and regulations concerning the matters set forth in the Plan;

1       xiv. exercise such other powers as may be vested in the Plan Trust pursuant to

2    the Plan, the Confirmation Order, or other Final Orders of the Court.

3        xv. execute any documents, instruments, contracts, and agreements necessary

4    and appropriate to carry out the powers and duties of the Plan Trust;

5        xvi. (1) seek a determination of tax liability under §505 of the code, (2) pay

6    taxes, if any, related to a Debtor, (3) file, if necessary, any and all tax and information returns

7    r3equired with the respect to the Plan Trust, including, if appropriate, treating the Plan Trust as a

8    "grantor trust" pursuant to Treas. Reg 1.671-4 or otherwise, (4) make tax elections by and on

9    behalf of the Plan Trust, and (5) pay taxes, if any, payable by the Plan Trust; and

10        xvii. stand in the shoes of the Debtors for all purposes.

11        **10.8.4 <u>Retention of Professionals and Compensation Procedure</u>.**

12       On and after the Effective Date, the Plan Trustee may, without further application or

13    Motion, notice, hearing, or Court order, engage or employ such professionals and experts as may

14    be deemed necessary and appropriate by the Plan Trustee to assist the Plan Trustee in carrying out

15    the provisions of the Plan, including, but not limited to, the Professionals retained prior to the

16    Effective Date by either the Debtors or the Trustee Debtors' Committee.  The Plan Trustee may

17    employ such professionals on any reasonable terms and conditions of employment to be

18    determined by the Plan Trustee.  For the services performed on and after the Effective Date, the

19    professionals engaged by the Plan Trustee (the "Plan Trustee Professionals") shall receive

20    reasonable compensation and reimbursement of expenses in a manner to be determined by the Plan

21    Trustee.

22        **10.8.5 <u>Fees and Expenses</u>.**

23       Acquisitions shall not receive any compensation for the services it performs as the Plan

24    Trustee.  The Plan Trustee Professionals shall be entitled to reasonable compensation for their

25    services, and reimbursement of expenses.  The costs and expenses of the Plan Trust (including,

26    without limitation, fees and expenses of the Plan Trustee Professionals) shall be paid from the Plan

27    Trust.  The Plan Trustee shall pay, without further order, notice or application to the Court, the

28    reasonable fees and expenses of the Plan Trustee Professionals, as necessary to discharge the Plan

MAINDOCS-#164960-v3-SunCal_3rd_Am_Group_I_TD_DS.DOC

1  Trustee's duties under the Plan.  The Plan Trustee shall be authorized to reserve funds from the

2  Plan Trust as is reasonable to pay the expenses of the Plan Trustee and the expenses and fees of the

3  Plan Trustee Professionals before making any Distributions under the Plan.

4  **10.8.6  <u>Limitation of Liability and Indemnification</u>.**

5        None of the Group I: Trustee Debtors, the Trustee Debtors' Committee, the Plan Sponsor,

6  the SunCal Plan Proponents, the Plan Trustee, the Professionals, nor any of their respective

7  members, officers, directors, shareholders, employees, or agents (the "Indemnified Parties") shall

8  be liable (a) for any loss or damages by reason of any action taken or omitted by him or her, except

9  in the case of fraud, willful misconduct, bad faith, or gross negligence, (b) for any act or omission

10  made in reliance upon the Debtors' books and records or upon information or advice given to the

11  Plan Trustee by his or her professionals, or (c) for any action taken or omission made in connection

12  with or related to the negotiations, formulation, or preparation of the Plan and the Disclosure

13  Statement, the approval of the Disclosure Statement, the confirmation of the Plan, the

14  consummation of the Plan, or the administration of the Plan, the Cases, or the property to be

15  distributed under the Plan, to the fullest extent permitted by applicable statute and case law.

16  Except as otherwise provided in this Plan, the Plan Trustee shall rely and shall be protected in

17  acting upon any resolution, certificate, statement, instrument, opinion, report, notice, consent, or

18  other document believed by him or her to be genuine and to have been signed by the proper party

19  or parties.

20        The Indemnified Parties shall be indemnified and receive reimbursement from and against

21  any and all loss, liability, expense (including attorneys' fees) or damage of any kind, type or nature,

22  which the Indemnified Party may incur or sustain the exercise and performance of any of the Plan

23  Trustee's powers and duties under this Plan or the Confirmation Order, or in the rendering of

24  services by the Indemnified Party to the Plan Trustee, to the full extent permitted by applicable

25  law, except if such loss, liability, expense or damage is finally determined by a court of competent

26  jurisdiction to result from the Plan Trustee's or an Indemnified Person's fraud, willful misconduct,

27  bad faith, or gross negligence.  The amounts necessary for such indemnification and

28  reimbursement shall be paid by the Plan Trustee out of the Plan Trust Property.  The Plan Trustee

MAINDOCS-#164960-v3-SunCal_3rd_Am_Group_I_TD_DS.DOC

1    shall not be liable for the payment of any Plan Trust expense or claim or other liability of the Plan

2    Trust, and no Person shall look to the Indemnified Parties for the payment of any such expense or

3    liability.  This indemnification shall survive the dissolution, resignation or removal, as may be

4    applicable, of the Plan Trustee, or the termination of the Plan Trust, and shall inure to the benefit

5    of the Plan Trustee's and the Indemnified Person's heirs and assigns.

6

7                    **10.8.7  Plan Trustee as Successor.**

8             Pursuant to Code §1123(b), the Plan Trustee shall be the successor to the Group I

9    Voluntary Debtors for all purposes.

10            **10.9      The Plan Trust Beneficiaries**.

11            The Holders of Allowed Claims under the Plan, or any successors to such Holders'

12   Allowed Claims ("Beneficiary" or "Beneficiaries") shall own a beneficial interest in the Plan Trust

13   which shall, subject to the Plan, be entitled to a Distribution, if any, in the amounts, and at the

14   times, set forth in the Plan.  Ownership of a beneficial interest in the Plan Trust shall not be

15   evidenced by any certificate, security, or receipt or in any other form or manner whatsoever, except

16   as maintained on the books and records of the Plan Trust by the Plan Trustee.  The ownership of a

17   beneficial interest in the Plan Trust shall not entitle any Beneficiary to any title in or to the Plan

18   Trust assets or to any right to call for a partition or division of such assets or to require an

19   accounting.  The Plan Trustee shall make Distributions, if any, to Beneficiaries in the manner

20   provided in the Plan.

21            The rights of the Beneficiaries arising under the Plan Trust may be deemed "securities"

22   under applicable law.  However, such rights have not been defined as "securities" under the Plan

23   because (a) the intent of the Plan is that such rights shall not be securities, and (b) if the rights

24   arising under the Plan Trust are deemed to be "securities," the exemption from registration under

25   §1145 of the Bankruptcy code is intended to be applicable to such securities.

26            **10.10   No Payment of Transfer-Related Fees to the United States Trustee**.

27            The Plan Trust shall not be required to pay any fees to the United States Trustee based on

28   any transfers of the Plan Trust Assets to the Plan Trust or from the Plan Trust.

**10.11   No Payment of Transfer-Related Fees to the Plan Trustee**.

The Plan Trust shall not be required to pay any fees to the Plan Trustee based on any transfers of Plan Trust Assets from the Group I: Trustee Debtors to the Plan Trust, or from the Plan Trust.

**10.12   Books and Records of Trust**.

The Plan Trustee, and to the extent of payments and distributions by any Disbursing Agent, the Disbursing Agent, shall maintain an accounting of receipts and disbursements of the Plan Trust. The Plan Trustee shall maintain the books and records of the Plan Trust, or provide storage for such book and records, for the longer of six (6) years, or while Plan is in existence, provided that the Court may, upon application by the Plan Trustee, authorize the Plan Trust to destroy all of the Plan Trusts books and records at such time as Plan Trust has no further need for such books and records. The Plan Trust's books and records shall be open to inspection at all reasonable times, upon written request by the Trustee Debtors' Committee.

**10.13   Federal Income Tax Treatment of the Holders of the Plan Trust Beneficial Interests**.

For all United States federal income tax purposes, the transfers by the Group I: Trustee Debtors shall be treated by the Group I: Trustee Debtors, their estates, the Plan Trust and the Plan Trust Beneficiaries as a transfer of the Plan Trust Assets by the Group I: Trustee Debtors to the Plan Trust Beneficiaries followed by a transfer of the Plan Trust Assets by such the Plan Trust Beneficiaries to the Trust. The Plan Trust Beneficiaries shall be treated as the grantors and deemed owners of the Plan Trust for United States federal income tax purposes. The Plan Trust Trustee and the Plan Trust Beneficiaries are required to value their interests in the Plan Trust Assets consistently with the values placed upon the Plan Trust Assets by the Plan Trust, and to use such valuations for all purposes. The Plan Trust Agreement shall provide for consistent valuations of the Plan Trust Assets by the Plan Trust Trustee and the Plan Trust Beneficiaries, and shall provide that the Plan Trust will determine the fair market value of the Plan Trust Assets within thirty (30) days

1  after the Effective Date, and send such determination to each the Plan Trust Beneficiary. By its

2  acceptance of a the Beneficial Interest, each recipient of such an interest will be conclusively

3  deemed to agree to use such valuations for all purposes, including, without limitation, in

4  computing any gain recognized upon the exchange of such holder's claim for purposes of

5  determining any United States Federal income tax, and shall be required to include those items of

6  income, deductions and tax credits that are attributable to its the Beneficial Interest in computing

7  its taxable income.

8       **10.14  Termination of the Trust.**

9       The Plan Trust shall continue in effect until the earlier of: (a) the date that all the Plan Trust

10  Assets has been liquidated, all proceeds have been converted to cash or distributed in kind, all the

11  Plan Trust Expenses have been paid, all claims to be paid under the Plan for which the Plan Trust

12  Trustee is obligated to make distributions on have been paid, all distributions to be made with

13  respect to the Beneficial Interests have been made, all litigation to which the Plan Trust is a party

14  have been concluded by dismissal or an order issued by the court in which such litigation is

15  pending and such order has become "final" (consistent with the definition of Final Order in the

16  plan for orders issued by the Bankruptcy Court), and the Chapter 11 Case has been closed; and (b)

17  the expiration of five (5) years from the Effective Date; provided, however, that the Plan Trust may

18  request the Bankruptcy Court to extend the permitted life of the Plan Trust for such additional

19  period as is reasonably necessary to conclude the liquidation and distributions, not to exceed a total

20  of ten (10) years from the Effective Date, which request shall be filed so the Bankruptcy Court may

21  consider and rule on the request within six (6) months prior to the expiration of the initial five-year

22  term.

23       **10.15  Exemption from Certain Transfer Taxes**.

24       In accordance with Section 1146(a) of the Bankruptcy Code, the issuance, transfer or

25  exchange of a security or the making or delivery of an instrument of transfer under the plan may

26  not be taxed under any law imposing a stamp tax or similar tax. All governmental officials and

27  agents shall forego the assessment and collection of any such tax or governmental assessment and

28  shall accept for filing and recordation any of the foregoing instruments or other documents without

1  payment of such tax or other governmental assessment.

2  **10.16  Tax Consequence of The Plan**.

3  The implementation of the Plan may have federal, state and local tax consequences to the

4  Group I: Trustee Debtors, Creditors and Interest Holders.  No tax opinion has been sought or will be

5  obtained with respect to any tax consequences of the Plan. This Disclosure Statement does not

6  constitute and is not intended to constitute either a tax opinion or tax advice to any person, and the

7  summary contained herein is provided for informational purposes only.

8  CREDITORS AND INTEREST HOLDERS ARE ADVISED TO CONSULT WITH THEIR

9  OWN TAX ADVISORS REGARDING THE TAX CONSEQUENCES TO THEM AND TO THE

10  DEBTOR OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING

11  FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES.

12  **10.17  The Trustee Debtors' Committee.**

13  On the Effective Date, the Trustee Debtors' Committee shall continue to serve their

14  applicable Debtors as Trustee Debtors' Committee to the applicable reorganized Debtors, subject

15  to the following:

16  **10.17.1  Duties and Powers.**

17  The duties of the Trustee Debtors' Committee after the Effective Date shall be

18  limited to monitoring the Plan's implementation, notice and opportunity to object to the sales

19  process, notice and opportunity to object to any settlement of the Lehman Adversary Proceeding,

20  and the Contract Action, standing to object to any settlement of any Litigation Claim in excess of

21  $100,000, standing to object to any proposed sales procedures on sale of the Debtors' Projects and

22  standing to file, prosecute and resolve objections to Claims filed by Insiders that are SunCal

23  Affiliates and their professionals.  The Trustee Debtors' Committee shall receive notice of and the

24  right to review all payments and Distributions.

25  The Trustee Debtors' Committee shall be entitled to retain, employ and

26  compensate Professionals, in order to assist with the obligations and rights of the Trustee Debtors'

27  Committee under the terms of the Plan.  Such compensation shall be paid from the applicable

28  Distribution Account(s).

### 10.17.2 <u>Dissolution of Trustee Debtors' Committee.</u>

The Trustee Debtors' Committee shall be dissolved upon the entry of an order converting, closing or dismissing the Chapter 11 Cases or entry of a final decree in the Chapter 11 Cases.  On dissolution, the Trustee Debtors' Committee shall have no other or further obligations or responsibilities on behalf of the Plan Trust.

### 10.18 <u>Claims Estimation Rights.</u>

On the Confirmation Date, the SunCal Plan Proponents shall be vested with standing to file a motion under 11 U.S.C. § 502(c), and they shall be authorized and empowered to seek in such motion the estimation, for Distribution purposes, of any Disputed Claim seeking recourse to, or claiming an interest in, any asset of the Group I: Trustee Debtors. After the Bankruptcy Court estimates a Disputed Claimant's rights in, or against an asset of the Estates through this procedure, the Plan Trustee shall have the right to use any funds or assets not deemed subject to the rights of the Disputed Claimant, to pay the Allowed Claims under the terms of the Plan, including Allowed Administrative Claims, after the Effective Date.

**XI.**

**<u>RISK FACTORS</u>**

### 11.1 <u>Plan Risks</u>.

The Plan in this case, like any Chapter 11 reorganization plan, includes a number of risks that creditors should be aware of prior to voting on the Plan. The more material of these risks are summarized below.

### 11.1.1 <u>The Plan May Not Be Accepted or Confirmed.</u>

While the SunCal Plan Proponents believe that the Plan is confirmable under the standards set forth in 11 U.S.C. § 1129, there can be no guarantee that the Bankruptcy Court will find the Plan to be confirmable. If the Plan is not confirmed, it is possible that an alternative plan can be negotiated and presented to the Bankruptcy Court for approval; however, there can be no assurance that any alternative plan would be confirmed, that the Chapter 11 Cases would not be converted to a liquidation, or that any alternative plan of reorganization could or would be

formulated on terms as favorable to the Creditors and holders of Equity Interests as the terms of the Plan.

### 11.1.2    Status of LitCo Funding

The offer by LitCo to purchase Allowed Reliance Claims for the sum of fifty-five cents ($0.55) per dollar of claim and certain other Plan funding (*e.g.*, to make required payments to Creditors holding Allowed Administrative Claims, Priority Claims and Tax Claims) will not be funded by the SunCal Plan Proponents.  Instead, the SunCal Plan Proponents are working with proposed investors/lenders who would provide such funding.  While the SunCal Plan Proponents are in discussions with third parties with respect to obtaining funding for the SunCal Plan, no commitment has yet been obtained for such funding and thus SunCal Plan Proponents are not in a position to disclose the terms of such funding at this time.  There is no guarantee that such funding will be obtained.

### 11.1.3    Failure to Sell the Group I Projects.

The Plan is based upon the assumption that the SunCal Plan Proponents will be able to close the sale of the Group I Projects for at least the Minimum Sales Prices on the Effective Date. Although the SunCal Plan Proponents are confident that they can achieve sales at these prices based upon their market research and familiarity with the projects, a possibility exists that these sales will not occur. If this occurs then the creditors holding liens against the Group I Projects will be entitled to seek recourse against these properties, and this recourse would include foreclosure.

### 11.1.4    Adverse Outcome of Pending Litigation.

The SunCal Plan Proponents have filed objections to the claims of the Lehman Lenders, and they intend to pursue the Lehman Adversary Proceeding against LCPI claims and liens once they obtain relief from the automatic stay in LCPI's Chapter 11 case.  The SunCal Plan Proponents believe that their defenses to the claims asserted by the Lehman Lender have merits and that they will be sustained and that relief will also be granted in the Lehman Adversary Proceeding. However, there is no assurance that this will occur. Litigation involves risks, including most importantly the risk of an adverse ruling. Although the risk of an adverse ruling will not

-95-

1   affect Holders of Class 6.1 through 6.5 Claims that vote in favor of Option A (55 percent

2   distribution), it will affect those that vote in favor of Option B, and it will affect the future

3   distributions payable to the Class 7.1 through 7.5.

4       **11.1.5  Risks Associated with Lehman Disputed Administrative Loans.**

5           The SunCal Plan Proponents will be filing objections to the Lehman Disputed

6   Administrative Loans. Since these loans were approved by an order of the Court, the SunCal Plan

7   Proponents ability to object to these claims may be limited to damages arising from wrongs that

8   occurred after these loans were approved. If these objections are not successful, the sums owed on

9   account of the Lehman Disputed Administrative Loans will have to be paid on the Effective Date

10  of the Plan, or on the date that they are allowed. If the SunCal Plan Proponents are not allowed to

11  use the Net Proceeds from the sale of the Group I Projects to pay these obligations and they are

12  unable to pay these claims from their own resources, or through funding or financing provided by

13  third parties, the Plan will fail.

14                              **XII.**

15                        **DISTRIBUTIONS**

16      **12.1      Distribution Agent.**

17          Acquisitions shall serve as the Distribution Agent for distributions due under the Plan.  The

18  Distribution Agent may employ one or more sub agents on such terms and conditions as it may

19  agree in its discretion and pay such sub agent as a Post Confirmation Expense from the

20  Distribution Accounts.  The Distribution Agent shall not be required to provide any bond in

21  connection with the making of any Distributions pursuant to the Plan.

22      **12.2      Distributions.**

23          **12.2.1      Dates of Distributions.**

24          Any distribution required to be made on the Effective Date shall be deemed timely if made

25  as soon as practicable after such date and, in any event, within thirty (30) days after such date.  Any

26  distribution required to be made upon a Disputed Claim becoming an Allowed Claim and no

27  longer being a Disputed Claim shall be deemed timely if made as soon as practicable thereafter.

28          **12.2.2      Limitation on Liability.**

Neither the Plan Sponsor, the Plan Trustee, the Distribution Agent, their Affiliates, nor any of their employees, members, officers, directors, agents, or professionals or Affiliates shall be liable for (i) any acts or omissions (except for gross negligence or willful misconduct) in connection with implementing the Distribution provisions of the Plan and the making or withholding of Distributions pursuant to the Plan, or (ii) any change in the value of distributions made pursuant to the Plan resulting from any delays in making such distributions in accordance with the Plan's terms (including but not limited to any delays caused by the resolution of Disputed Claims).

**12.3    Old Instruments and Securities.**

**12.3.1    Surrender and Cancellation of Instruments and Securities.**

As a condition to receiving any distribution pursuant to the Plan, each Person holding any note or other instrument or security (collectively "Instruments or Securities" and individually an "Instrument or Security") evidencing an existing Claim(s) against the Debtor(s) must surrender such Instrument or Security to the Distribution Agent.

**12.3.2    Cancellation of Liens.**

Except as otherwise provided in the Plan, any Lien securing any Secured Claim shall be deemed released and discharged, and the Person holding such Secured Claim shall be authorized and directed to release any collateral or other property of the Debtors (including, without limitation, any cash collateral) held by such Person and to take such actions as may be requested by the Plan Trustee to evidence the release of such Lien, including, without limitation, the execution, delivery and Filing or recording of such releases as may be requested by the Plan Trustee.

**12.3.3    De Minimis Distributions and Fractional Shares.**

No Cash payment of less than ten dollars ($10) shall be made by the Plan Trust to any Holder of Claims unless a request therefore is made in writing to the Plan Trust.  Whenever payment of a fraction of a cent would otherwise be called for, the actual payment shall reflect a rounding down of such fraction to the nearest whole cent.  Any Cash or other property that is not distributed as a consequence of this section shall, after the last distribution on account of Allowed Claims in the applicable Class, be treated as "Unclaimed Property" under the Plan.

### 12.3.4 Delivery of Distributions.

Except as provided in the Plan with respect to Unclaimed Property, distributions to Holders of Allowed Claims and Allowed Administrative Claims shall be distributed by mail as follows: (1) with respect to each Holder of an Allowed Claim that has filed a Proof of Claim, at the address for such Holder as maintained by the official claims agent for the Debtors; (2) with respect to each Holder of an Allowed Claim that has not filed a Proof of Claim, at the address reflected on the Schedules filed by the Debtors, provided, however, that if the Debtors or the Plan Trust has received a written notice of a change of address for such Holder, the address set forth in such notice shall be used; or (3) with respect to each Holder of an Allowed Administrative Claim, at such address as the Holder may specify in writing.

### 12.3.5 Undeliverable Distributions.

If the Distribution of Cash to the Holder of any Allowed Claim is returned to the Plan Trustee as undeliverable or the Distribution check is not negotiated within 90 days of mailing (any such distribution being hereinafter referred to as "Unclaimed Property"), no further distribution shall be made to such Holder unless and until the Plan Trustee is notified in writing of such Holder's then current address. Subject to the remainder of this Section and the following section, Unclaimed Property shall remain in the possession of the Plan Trustee pursuant to this Section, and shall be set aside and (in the case of Cash) held in a segregated interest bearing account (as to Cash Unclaimed Property) to be maintained by the Distribution Agent until such time as the subject Distribution becomes deliverable. Nothing contained in the Plan shall require the Plan Trustee or any other Person to attempt to locate such Person.

### XIII.

### OBJECTIONS TO CLAIMS AND DISPUTED CLAIMS

### 13.1 Standing for Objections to Claims.

The Plan Trustee shall have the sole and exclusive right to file, prosecute and resolve objections to Claims, excluding Claims filed that are SunCal Affiliates including SunCal Management. The Trustee Debtors' Committee shall have the sole and exclusive right to file, prosecute and resolve potential Avoidance Actions against and objections to Claims filed by

MAINDOCS-#164960-v3-SunCal_3rd_Am_Group_I_TD_DS.DOC

(i) SunCal Affiliates, including SunCal Management, Acquisitions, and SC Master Marketing, LLC and (ii) certain professionals for the SunCal Affiliates, including Voss, Cook & Thel, LLP, The MB Firm, White & Case, LLP, RBF Consulting and Mayer Brown LLP.

Any objection to a Claim shall be Filed with the Bankruptcy Court and served on the Person holding such Claim on or before the applicable Claims Objection Deadline.  The Plan Trustee shall have the right to petition the Bankruptcy Court, without notice or a hearing, for an extension of the Claims Objection Deadline if a complete review of all Claims cannot be completed by such date.

### 13.2     Treatment of Disputed Claims and Disputed Liens.

#### 13.2.1  No Distribution Pending Allowance.

If any portion of a Claim or Lien is a Disputed Claim or Disputed Lien, no payment or distribution provided for under the Plan shall be made on account of such Claim or Lien unless and until such Claim or Lien becomes an Allowed Claim and/or Allowed Lien.

#### 13.2.2  Distribution After Allowance.

On the next Distribution Date following the date on which a Disputed Claim becomes an Allowed Claim and is no longer a Disputed Claim, the Distribution Agent shall distribute to the Person holding such Claim any Cash that would have been distributable to such Person if on the initial Distribution Date such Claim had been an Allowed Claim and not a Disputed Claim.

#### 13.2.3  Reserves for Disputed Claims

In the event that Disputed Claims are pending at the time of a Distribution under the Plan, the Plan Trustee shall establish and maintain a reserve for such Disputed Claims.  For purposes of establishing a reserve, Cash will be set aside equal to the amount that would have been distributed to the Holders of the Disputed Claims had the Disputed Claims been Allowed on the date a Distribution is made to the Holders of Allowed Claims in the same Class or of the same priority as the Disputed Claims.  If a Disputed Claim ultimately becomes an Allowed Claim, the amount of Cash reserved for that Disputed Claim shall be distributed on the earlier of (a) the distributed Date following the date when the Disputed Claim becomes an Allowed Claim, or (b) ninety (90) days after such Disputed Claim becomes an Allowed Claim.  Any reserved Cash not ultimately

distributed to the Holder of a Disputed Claim because the Disputed Claim does not become an

Allowed Claim shall become property of the Plan Trust and shall be distributed in accordance with

the terms of the Plan.

## XIV.

### EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**14.1    Executory Contracts to be Assumed and Assigned.**

Under the Plans, the Group I: Trustee Debtors Projects will be sold.  As a result, the Group

I: Trustee Debtors will assume only those executory contracts and unexpired leases to be assigned

to the Winning Bidder with respect to the applicable Project and the Restructuring Agreement and

Settlement Agreement.

On the Effective Date, the executory contracts and unexpired leases identified on the

Schedule of Assumed and Assigned Agreements attached or to be attached hereto as Exhibit "9" or

filed or to be filed as Exhibit "9" to this document shall be deemed assumed and assigned to the

applicable Winning Bidder, as specified in the Confirmation Order.  The SunCal Plan Proponents

intend to file the Schedule of Assumed and Assigned Agreements with the Court no later than

twenty-eight (28) days prior to the Confirmation Hearing.  The Schedule of Assumed and Assigned

Agreements also identifies or will identify any amounts that must be paid to cure defaults under the

executory contacts and unexpired leases to be assumed and assigned under the Plan (the "Cure

Amount").  If filed earlier, the SunCal Plan Proponents reserve the right to amend the Schedule of

Assumed Agreements up to twenty-eight (28) days prior to the Confirmation Hearing (October 24,

2011) to: (a) add any executory contract or unexpired lease and provide for its assumption and

assignment; or (b) modify the Cure Amount for any particular executory contract or unexpired

lease.  The SunCal Plan Proponents further reserve the right to amend the Schedule of Assumed

Agreements to delete any executory contract or unexpired lease and provide for its rejection at any

time prior to the Confirmation Hearing.  The SunCal Plan Proponents will provide notice of any

amendment to the Schedule of Assumed and Assigned Agreements to any party or parties to the

1  executory contracts or unexpired leases affected by the amendment.  Absent a timely objection as

2  provided below, the Confirmation Order will constitute a Court Order approving the assumption

3  and assignment, on the Effective Date, of the executory contracts and unexpired leases then

4  identified on the Schedule of Assumed and Assigned Agreements, and shall constitute a final

5  determination of the Cure Amount and that the estate has shown adequate assurance of future

6  performance.  Furthermore, any Cure Amount ordered by the Court, through entry of the

7  Confirmation Order, and paid shall be deemed to satisfy any and all defaults arising from, out of or

8  related to the executory contract of unexpired lease, including any tort claims that were or could be

9  asserted by the non-debtor party to the contract or lease on or prior to the entry of the Confirmation

10  Order, and all actual or pecuniary losses that have resulted from such defaults.

11         If you are a party to an executory contract or unexpired lease to be assumed and assigned

12  and you object to the assumption and assignment of your lease or contract and/or you dispute the

13  Cure Amount related to your lease or contract, then you must File and serve upon counsels for the

14  SunCal Plan Proponents (at the address on the upper left hand corner of the caption page) a written

15  objection by fourteen days before the Confirmation Hearing.  An objection to the Cure Amount

16  must also set forth the amount you contend to be the correct Cure Amount and contain evidence to

17  support such amount.  Failure to timely File an objection as provided herein shall be deemed

18  consent to the proposed assumption and assignment and to the Cure Amount and a waiver of any

19  and all rights to challenge such assumption and assignment and the Cure Amount.

20         With respect to each executory contract and unexpired lease identified on the Schedule of

21  Assumed and Assigned Agreements, if no dispute arises regarding the Cure Amount, adequate

22  assurances, or some other matter related to the assumption of the executory contact or unexpired

23  lease, then the Cure Amount set forth in the schedule of Assumed and Assigned Agreements shall

24  be paid to the applicable non-debtor party in Cash on the Effective Date or as soon as reasonably

25  practicable thereafter.  If a dispute arises regarding (a) whether the proposed assignee has provided

26  adequate assurance of future performance of an executory contract or unexpired lease to be

27  assumed, or (b) any other matter pertaining to a proposed assumption and assignment, the Cure

28  Amount will be paid on the later of (1) the Effective Date or as soon as practicable thereafter, or

(2) within thirty (30) days after entry of a Final order resolving the dispute and approving the assumption and assignment; provided, however, if a dispute arises regarding any of the foregoing, the SunCal Plan Proponents reserve, for themselves and the Plan Trustee, the right to completely forego assumption and assignment of and, instead, reject the subject executory contract or unexpired lease.

If a party to an executory contract or unexpired lease identified on the Schedule of Assumed and Assigned Agreements Files an objection disputing the Cure Amount, then the SunCal Plan Proponents may amend the Schedule of Assumed and Assigned Agreements at any time prior to the Confirmation Hearing to delete the subject executory contract or unexpired lease and provide for its rejection.  Executory contracts or unexpired leases not so deleted shall be conditionally assumed, subject to the SunCal Plan Proponents' and/or the Plan Trustee's right to file a Motion to determine the appropriate Cure Amount up to the first (1st) Business Day that is at least sixty (60) days following the Effective Date.  The SunCal Plan Proponents and/or the Plan Trustee will serve any such Motion on the party to the executory contract or unexpired lease affected by the Motion (or its attorneys, if any).  If the SunCal Plan Proponents and Plan Trustee does not file a Motion to determine the appropriate Cure Amount, then the executory contract or unexpired lease shall be assumed and assigned, as of the Effective Date, and the Cure Amount shall be the alternative Cure Amount asserted by the non-debtor party to the subject executory contract or unexpired lease in its objection to the Plan.  The Cure Amount shall be paid as soon as reasonably practicable following the expiration of the 60-day deadline.

If the SunCal Plan Proponents or the Plan Trustee files a Motion to determine the appropriate Cure Amount, then the SunCal Plan Proponents and/or Plan Trust shall have the right to amend the Schedule of Assume and Assigned Agreements to completely forego assumption and assignment of and, instead, reject the subject executory contract or unexpired lease up to the first (1st) Business Day that is at least fifteen (15) days after the entry of an order fixing the Cure Amount.  The SunCal Plan Proponents and/or Plan Trustee will provide notice of any amendment to the Schedule of Assumed and Assigned Agreements to the party to the executory contract or unexpired lease affected by the amendment.  If the SunCal Plan Proponents and/or Plan Trustee

1    has filed such a Motion and does not timely amend the Schedule of Assumed and Assigned

2    Agreements within fifteen (15) days after entry of an order fixing the Cure Amount, then the

3    executory contract or unexpired lease shall be assumed and assigned, as of the Effective Date, and

4    the Cure Amount shall be fixed as the Cure Amount ordered by the Court.  The Cure Amount as

5    soon as reasonably practicable following the expiration of the 15-day deadline.

6         **14.2**   **Executory Contracts to be Rejected.**

7         On the Effective Date, the estate will be deemed to have rejected any and all executory

8    contacts and unexpired leases <u>not</u> identified on the Schedule of Assumed and Assigned

9    Agreements attached or to be attached hereto as Exhibit "9," or filed or to be filed as Exhibit "9" to

10   this document.  The Confirmation Order will constitute a Court order approving the rejection, as of

11   the Effective Date, of such executory contacts and unexpired leases.  Any Claim for damages

12   arising from the rejection under the Plan of any executory contract or unexpired lease must be filed

13   with the Court and served upon the SunCal Plan Proponents and the Plan Trustee within thirty (30)

14   days of the later of (a) the Confirmation Date, and (b) the Plan Trustee's amendment of the

15   Schedule of Assumed and Assigned Agreements to eliminate the executory contract or unexpired

16   lease.  Any such damage Claims that are not timely filed and served will be forever barred and

17   unenforceable against the applicable Debtors, the Estates, the Plan Trustee, the Plan Trust, and

18   their respective property.  Persons holding these Claims who fail to timely file claims will be

19   barred from receiving any Distributions under the Plan on account of their rejection damage

20   Claims.

21        If you are a party to a lease or contract to be rejected and you object to the rejection of your

22   lease or contract, then you must file and serve your objection by fourteen days before the

23   Confirmation Hearing.

24   **XV.**

25   **BEST INTEREST OF CREDITORS TEST AND PLAN FEASIBILITY**

26        **15.1**   **Best Interests Test**.

27        Pursuant to Section 1129(a)(7) of the Bankruptcy Code, a Plan cannot be confirmed unless

28   the Bankruptcy Court determines that Distributions under the Plan to all Holders of Claims and

1    Interests who have not accepted the plan and whose Claims are classified in Classes that are

2    impaired under the plan, are not less than those which they would receive in a liquidation under

3    Chapter 7 of the Bankruptcy Code.

4        The Best Interest of Creditors Test must be satisfied even if the Plan is accepted by each

5    impaired Class of Claims and if any Holder of an Allowed Claim objects to the Plan on such basis.

6    The Best Interests Test requires the Bankruptcy Court to find either that either (i) <u>all</u> Holders of

7    Claims in an impaired Class of Claims have accepted the Plan or (ii) the Plan provides each Holder

8    of Allowed Claims of an impaired Class who has not accepted the Plan with a recovery of property

9    of a value, as of the effective date of the Plan, that is not less than the amount that such Holder

10   would receive if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code.

11       The Plan proposed by the Plan Proponents is essentially a liquidating plan. It provides for

12   the sale of all assets of the estate for their fair market value, the collection or recovery of all other

13   assets, and for the distribution of the resulting net proceeds from the sale, in accordance with the

14   priorities provided for in the Bankruptcy Code and under California law. A Chapter 7 trustee

15   appointed in this case would be compelled to liquidate the Debtors' assets in the same manner as

16   provided for in the Plan and to pay out the proceeds in the same manner as provided for in the

17   Plan. Accordingly, under the terms of the Plan, each individual creditor is receiving "at least as

18   much" as such creditor would receive in a Chapter 7 case, which is all that is required under the

19   Best Interests Test.

20       Although the Lehman Entities will argue that they are being denied their "credit bid" rights

21   under the Plan, and this reduces their distribution below the level that they would receive in a

22   Chapter 7 case, this argument fails.  A credit bid right does not add or reduce the value of a

23   creditor's collateral, it simply allows a creditor holding such a right to bid against other bidders

24   using its debt as "credit", rather than bidding in cash. If the creditor's collateral is sold for its "fair

25   market value," in cash, and the creditor receives what it is entitled to from the sales proceeds, then

26   the creditor is necessarily receiving exactly what it would receive in a Chapter 7. This is all that the

27   Best Interest Test Requires.  See Exhibit "7" hereto.

28       **15.2    <u>Feasibility</u>**.

In addition, in order to confirm the Plan, the Bankruptcy Court must find that confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor(s).  This requirement is imposed by Section 1129(a)(11) of the Bankruptcy Code and is generally referred to as the "feasibility" requirement. As explained above, the Debtors' Plan provides for the sale of all assets of their respective estates and for the distribution of the proceeds. Within the context of the plan, feasibility is limited to having sufficient funds to pay administrative and priority claims on the Effective Date and sufficient funds to fund the sale of the Properties.

Under timeline provided for in the Plan, the Group I: Trustee Project will be sold during the Sale Period. The Net Sale Proceeds from these sales, plus the proceeds of the LitCo Plan Loan, will provide the Debtors the means to pay all claims, including allowed administrative and priority claims on this same date. All remaining claimants will then receive what they are entitled under the Plan when their claims are allowed.

## XVI.

## LIMITATION OF LIABILITY

### 16.1    No Liability for Solicitation or Participation.

As specified in Section 1125(e) of the Bankruptcy Code, entities that solicit acceptances or rejections of the Plan and/or that participate in the offer, issuance, sale, or purchase of securities offered or sold under the Plan, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, shall not be liable, on account of such solicitation or participation, for violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer, issuance, sale, or purchase of securities.

## XVII.

## CONDITIONS TO CONFIRMATION AND

## EFFECTIVENESS OF THE PLAN

### 17.1    Conditions Precedent to Plan Confirmation.

MAINDOCS-#164960-v3-SunCal_3rd_Am_Group_I_TD_DS.DOC

1    The only condition precedent to confirmation of the Plan is that the Bankruptcy Court shall

2    have entered a Confirmation Order in form and substance reasonably acceptable to the SunCal Plan

3    Proponents.

4    **17.2    Conditions Precedent to Plan Effectiveness.**

5    The conditions precedent to the effectiveness of the Plan and the occurrence of the

6    Effective Date is that the Confirmation Order shall be a Final Order in form and substance

7    reasonably satisfactory to the SunCal Plan Proponents, and the resolutions of any material

8    impairment of the Plan terms caused by the automatic stays applicable in the Lehman Entities

9    cases. The automatic stay in the Debtors' cases shall continue to be applicable until the Effective

10    Date.

11    **XVIII.**

12    **RETENTION OF JURISDICTION**

13    Notwithstanding the entry of the Confirmation Order or the occurrence of the Effective

14    Date, the Bankruptcy Court's jurisdiction shall not be limited under the Plan and the Bankruptcy

15    Court's jurisdiction shall apply to the fullest extent possible under applicable law.  The Court will

16    retain exclusive jurisdiction during the Plan payout period to resolve disputes and conflicts arising

17    from the administration of the Plan, upon request of a party-in-interest and after notice and a

18    hearing, including, without limitation:

19    a.    The adjudication of the validity, scope, classification, allowance, and disallowance

20    of any Claim;

21    b.    The estimation of any Claim;

22    c.    The allowance or disallowance of Professional-Fee Claims, compensation, or other

23    Administrative Expense Claims;

24    d.    To hear and determine Claims concerning taxes pursuant to Bankruptcy Code §§

25    346, 505, 525, and 1146;

26    e.    To hear and determine any action or proceeding brought under Bankruptcy Code

27    §§108, 510, 543, 544, 545, 547, 548, 549, 550, 551 and 553;

28

1   f.  To hear and determine all actions and proceedings which relate to pre-confirmation

2 matters;

3   g.  To hear and determine any issue relating to the assumption or rejection of executory

4 contracts and unexpired leases;

5   h.  To hear and determine any modification to the Plan in accordance with the

6 Bankruptcy Rules and Bankruptcy Code;

7   i.  To enforce and interpret the terms of the Plan;

8   j.  To correct any defects, cure any omissions, or reconcile any inconsistency in the

9 Plan or the Confirmation Order as may be necessary to carry out the purpose and intent of the Plan;

10   k.  the entry of any order, including injunctions, necessary to enforce title, rights and

11 powers of the Plan Trust, and to impose such limitations, restrictions, terms and conditions on such

12 title, rights and powers as the Court may deem necessary including, without limitation, any right of

13 the Plan Trust to recover and liquidate assets;

14   l.  To determine the validity, extent and priority of all liens and security interests

15 against property of the Estates or the Plan Trust;

16   m.  To hear and resolve any disputes regarding employment applications and

17 professional fees;

18   n.  To hear and determine such matters and make such orders as are consistent with the

19 Plan as may be necessary to carry out the provisions thereof and to adjudicate any disputes arising

20 under or relating to any order entered by the Court in these Cases;

21   o.  The entry of an order concluding and terminating these Cases; and

22   p.  To resolve any disputes as to whether there has been a default under the Plan.

23        **XIX.**

24   **MODIFICATION OR WITHDRAWAL OF THE PLAN**

25   **19.1  Modification of Plan.**

26   At any time prior to confirmation of the Plan, the Plan Proponent may supplement, amend

27 or modify the Plan.  After confirmation of the Plan, the Plan Proponent or Plan Trustee may (x)

28 apply to the Bankruptcy Court, pursuant to Section 1127 of the Bankruptcy Code, to modify the

1  Plan; and (y) apply to the Bankruptcy Court to remedy defects or omissions in the Plan or to

2  reconcile inconsistencies in the Plan.

3      **19.2    Nonconsensual Confirmation.**

4      In the event that any impaired Class of Claims or Interests shall fail to accept the Plan in

5  accordance with Section 1129(a)(8) of the Bankruptcy Code, SunCal Plan Proponents (i) may

6  request that the Bankruptcy Court confirm the Plan in accordance with Section 1129(b) of the

7  Bankruptcy Code, and (ii) in accordance with Section 16.1 of the Plan, and may modify the Plan in

8  accordance with Section 1127(a) of the Bankruptcy Code.

9                                       **XX.**

10                          **EFFECT OF CONFIRMATION**

11      **20.1    Discharge.**

12      Confirmation of the Plan does not discharge the Group I: Trustee Debtors as set forth in

13  Bankruptcy Code §1141.

14      **20.2    Revesting of the Assets.**

15      The Assets shall not be vested in the Group I: Trustee Debtors on or following the Effective

16  Date, but shall be vested in the Plan Trust and continue to be subject to the jurisdiction of the

17  Court following confirmation of the Plan until such Assets are distributed to the Holders of

18  Allowed Claims in accordance with the provisions of the Plan.

19                                       **XXI.**

20                              **MISCELLANEOUS**

21      **21.1    Payment of Statutory Fees.**

22      All quarterly fees due and payable to the Office of the United States Trustee pursuant to

23  Section 1930(a)(6) of title 28 of the United States Code shall be paid in full on or before the

24  Effective Date, or, to the extent such quarterly fees are disputed, an adequate reserve shall have

25  been established and set aside for payment in full thereof, as required by Section 1129(a)(12) of the

26  Bankruptcy Code.  The Plan Trustee shall remain responsible for timely payment of quarterly fees

27  due and payable after the Effective Date and until the Debtors' Cases are closed, to the extent

28  required by Section 1930(a)(6) of title 28 of the United States Code.

**21.2    Changes in Rates Subject to Regulatory Commission Approval.**

The Group I: Trustee Debtors are not subject to governmental regulatory commission approval of their rates.

**21.3    Payment Dates.**

Whenever any payment or distribution to be made under the Plan shall be due on a day other than a Business Day, such payment or distribution shall instead be made, without interest, on the immediately following Business Day.

**21.4    Headings.**

The headings used in this Disclosure Statement and in the Plan are inserted for convenience only and neither constitutes a portion of this Disclosure Statement or the Plan nor in any manner affect the construction of the provisions of this Disclosure Statement or the Plan.

**21.5    Other Documents and Actions.**

The Plan Trustee may execute such other documents and take such other actions as may be necessary or appropriate to effectuate the transactions contemplated under the Plan.

**21.6    Notices.**

All notices and requests in connection with this Disclosure Statement and the Plan shall be in writing and shall be hand delivered or sent by mail addressed to:

> **To the SunCal Plan Proponents**:
> Bruce V. Cook
> General Counsel
> Authorized Agent of the SunCal Plan Proponents
> 2392 Morse Ave
> Irvine, CA 92614-6234
>
> **With copies to:**
> Paul J. Couchot
> Winthrop & Couchot, Professional Corporation
> 660 Newport Center Drive, Suite 400
> Newport Beach, CA 92660
>
> Ronald Rus
> Rus Miliband & Smith P.C.
> 2211 Michelson Drive, Seventh Floor
> Irvine, California 92612

1   All notices and requests to any Person holding of record any Claim or Interest shall be sent

2   to them at their last known address or to the last known address of their attorney of record.  Any

3   such Person may designate in writing any other address for purposes of this Section, which

4   designation will be effective on receipt.

5   **21.7    Governing Law.**

6   Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy

7   Code and Bankruptcy Rules), the laws of the State of California (without reference to its conflict of

8   law rules) shall govern the construction and implementation of the Plan and any agreements,

9   documents, and instruments executed in connection with the Plan, unless otherwise specifically

10  provided in such agreements, documents, or instruments.

11  **21.8    Binding Effect.**

12  The Plan and all rights, duties and obligations thereunder shall be binding upon and inure to

13  the benefit of the Plan Sponsor Debtors, the Plan Trustee, Holders of Claims, Holders of Interests,

14  and their respective successors and assigns.

15  **21.9    Successors and Assigns.**

16  The rights, benefits, and obligations of any entity named or referred to in the Plan shall be

17  binding on, and shall inure to the benefit of, the heirs, executors, administrators, successors, and

18  assigns of such entity.

19  **21.10    Severability of Plan Provisions.**

20  If, prior to the Confirmation Date, any term or provision of the Plan is held by the

21  Bankruptcy Court to be illegal, impermissible, invalid, void or unenforceable, or otherwise to

22  constitute grounds for denying confirmation of the Plan, the Bankruptcy Court shall, with the

23  consent of the Debtors, have the power to interpret, modify or delete such term or provision (or

24  portions thereof) to make it valid or enforceable to the maximum extent practicable, consistent

25  with the original purpose of the term or provision held to be invalid, void or unenforceable, and

26  such term or provision shall then be operative as interpreted, modified or deleted.  Notwithstanding

27  any such interpretation, modification or deletion, the remainder of the terms and provisions of the

28

-110-

1    Plan shall in no way be affected, impaired or invalidated by such interpretation, modification or

2    deletion.

3

4        **21.11    No Waiver.**

5        The failure of the Debtors or any other Person to object to any Claim for purposes of voting

6    shall not be deemed a waiver of the Trustee Debtors' Committee(s)', the Debtors' or the Plan

7    Trustee's right to object to or examine such Claim, in whole or in part.

8        **21.12    Inconsistencies.**

9        In the event the terms or provisions of this Disclosure Statement are inconsistent with the

10   terms and provisions of the Plan or documents executed in connection with the Plan, the terms of

11   the Plan shall control.

12       **21.13    Exemption from Certain Transfer Taxes and Recording Fees.**

13       Pursuant to Section 1146(a) of the Bankruptcy Code, any transfers from a Debtor to the

14   Plan Trust or to any other Person or entity pursuant to the Plan, or any agreement regarding the

15   transfer of title to or ownership of any of the Debtors' real or personal property or of any other

16   interest in such property (including, without limitation, a security interest) will not be subject to

17   any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax,

18   stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or

19   recording fee, or other similar tax or governmental assessment, and the Confirmation Order will

20   direct the appropriate state or local governmental officials or agents to forego the collection of any

21   such tax or governmental assessment and to accept for filing and recordation any of the foregoing

22   instruments or other documents without the payment of any such tax or governmental assessment.

23       **21.14    Post-Confirmation Status Report.**

24       Within 180 days following the entry of the Confirmation Order, the Plan Trustee shall file a

25   status report with the Court explaining what progress has been made toward consummation of the

26   confirmed Plan.  The status report shall be served on the United States Trustee, the twenty largest

27   unsecured creditors, and those parties who have requested special notice.  Unless otherwise

28   ordered, further status reports shall be filed every 180 days and served on the same entities.

**21.15   Post-Confirmation Conversion/Dismissal.**

A creditor or party in interest may bring a motion to convert or dismiss the case under § 1112(b), after the Plan is confirmed, if there is a default in performing the Plan.  The Plan Trustee reserves the right to object to any motion for conversion or dismissal.  In addition, as set forth in the definition of the Effective Date, the Effective Date may be further extended by order of the Bankruptcy Court after notice and hearing to all parties in interest.  If the Court determines there is no "cause" for the extension of the Effective Date, a party in interest may move to dismiss or convert the Case(s).

If the Court orders any of the Cases converted to Chapter 7 after the Plan is confirmed, then all property that had been property of the Chapter 11 Estate, and that has not been disbursed pursuant to the Plan, will revest in the Chapter 7 estate.  The automatic stay will be reimposed upon the revested property, but only to the extent that relief from stay was not previously authorized by the Court during this case.

**21.16   Final Decree.**

Once an Estate has been fully administered, as referred to in Bankruptcy Rule 3022, the Plan Trustee, or other party as the Court shall designate in the Confirmation Order, shall file a motion with the Court to obtain a final decree to close the Case of such Debtor.

Date:  August 5, 2011                By: _____
                                         Bruce Cook, General Counsel
                                         Authorized Agent for the Voluntary Debtors and
                                         Acquisitions

Submitted By:

**WINTHROP COUCHOT**                  **RUS MILIBAND & SMITH**
**PROFESSIONAL CORPORATION**          **A Professional Corporation**


By: /s/ Paul J. Couchot_____      By:____ /s/ Ronald Rus_____
    Paul J. Couchot,                          Ronald Rus, Esq.
General Insolvency Counsel for                Joel S. Miliband, Esq.
the Voluntary Debtors                     Counsel for SCC Acquisitions Inc.

MAINDOCS-#164960-v3-SunCal_3rd_Am_Group_I_TD_DS.DOC

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 660 Newport Center Drive, 4th Fl., Newport Beach, CA 92660.

A true and correct copy of the foregoing document described as: **THIRD AMENDED DISCLOSURE STATEMENT DESCRIBING THIRD AMENDED CHAPTER 11 PLANS FILED BY SUNCAL PLAN PROPONENTS IN THE CHAPTER 11 CASES OF SUNCAL OAK VALLEY, LLC, SUNCAL HEARTLAND, LLC, DELTA COVES VENTURE LLC, SUNCAL MARBLEHEAD, LLC AND SUNCAL PSV, LLC [GROUP I: TRUSTEE DEBTORS]** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

I. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On August 5, 2011, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

☒ Service information continued on attached page

II. **SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served)**:**
On _____, 2011, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be</u> completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

III. **SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on _____, 2011, I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on the judge <u>will be</u> completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| August 5, 2011 | Gretchen Crumpacker | /s/ Gretchen Crumpacker |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

MAINDOCS-#164960-v3-SunCal_3rd_Am_Group_I_TD_DS.DOC

- **NEF SERVICE LIST**
  Selia M Acevedo    sacevedo@millerbarondess.com, mpritikin@millerbarondess.com
- Joseph M Adams    jadams@sycr.com
- Raymond H Aver    ray@averlaw.com
- James C Bastian    jbastian@shbllp.com
- Thomas Scott Belden    sbelden@kleinlaw.com, ecf@kleinlaw.com
- John A Boyd    fednotice@tclaw.net
- Mark Bradshaw    mbradshaw@shbllp.com
- Gustavo E Bravo    gbravo@smaha.com
- Jeffrey W Broker    jbroker@brokerlaw.biz
- Brendt C Butler    bbutler@mandersonllp.com
- Andrew W Caine    acaine@pszyjw.com
- Carollynn Callari    ccallari@venable.com
- Cathrine M Castaldi    ccastaldi@rusmiliband.com
- Tara Castro Narayanan    tara.narayanan@msrlegal.com, lisa.king@msrlegal.com
- Dan E Chambers    dchambers@jmbm.com
- Shirley Cho    scho@pszjlaw.com
- Vonn Christenson    vrc@paynefears.com
- Brendan P Collins    bpcollins@bhfs.com
- Vincent M Coscino    vcoscino@allenmatkins.com, emurdoch@allenmatkins.com
- Paul J Couchot    pcouchot@winthropcouchot.com,
  pj@winthropcouchot.com;gcrumpacker@winthropcouchot.com
- Jonathan S Dabbieri    dabbieri@sullivan.com,
  hill@sullivanhill.com;mcallister@sullivanhill.com;stein@sullivanhill.com;vidovich@sullivanhill.com
- Ana Damonte    ana.damonte@pillsburylaw.com
- Vanessa S Davila    vsd@amclaw.com
- Melissa Davis    mdavis@shbllp.com
- Daniel Denny    ddenny@gibsondunn.com
- Caroline Djang    crd@jmbm.com
- Donald T Dunning    ddunning@dunningLaw.com
- Meredith R Edelman    meredith.edelman@dlapiper.com
- Joseph A Eisenberg    jae@jmbm.com
- Lei Lei Wang Ekvall    lekvall@wgllp.com
- Richard W Esterkin    resterkin@morganlewis.com
- Marc C Forsythe    kmurphy@goeforlaw.com
- Alan J Friedman    afriedman@irell.com
- Steven M Garber    steve@smgarberlaw.com
- Christian J Gascou    cgascou@gascouhopkins.com
- Barry S Glaser    bglaser@swjlaw.com
- Robert P Goe    kmurphy@goeforlaw.com,
  rgoe@goeforlaw.com;mforsythe@goeforlaw.com
- Eric D Goldberg    egoldberg@stutman.com
- Richard H Golubow    rgolubow@winthropcouchot.com, pj@winthropcouchot.com
- Michael J Gomez    mgomez@frandzel.com, efiling@frandzel.com;sking@frandzel.com
- Kelly C Griffith    bkemail@harrisbeach.com
- Matthew Grimshaw    mgrimshaw@rutan.com
- Kavita Gupta    kgupta@winthropcouchot.com

MAINDOCS-#164960-v3-SunCal_3rd_Am_Group_I_TD_DS.DOC

1
- Asa S Hami    ahami@morganlewis.com
2
- Michael J Hauser    michael.hauser@usdoj.gov
- D Edward Hays    ehays@marshackhays.com
3
- Michael C Heinrichs    mheinrichs@omm.com
- Harry D. Hochman    hhochman@pszjlaw.com, hhochman@pszjlaw.com
4
- Jonathan M Hoff    jonathan.hoff@cwt.com
- Nancy Hotchkiss    nhotchkiss@trainorfairbrook.com
5
- Michelle Hribar    mhribar@rutan.com
- John J Immordino    john.immordino@wilsonelser.com, raquel.burgess@wilsonelser.com
6
- Lawrence A Jacobson    laj@cohenandjacobson.com
7
- Michael J Joyce    mjoyce@crosslaw.com
- Stephen M Judson    sjudson@fablaw.com
8
- Kaleb L Judy    ecf@kleinlaw.com, kjudy@kleinlaw.com
- Steven J Kahn    skahn@pszyjw.com
9
- Sheri Kanesaka    sheri.kanesaka@bryancave.com
- David I Katzen    katzen@ksfirm.com
10
- Christopher W Keegan    ckeegan@kirkland.com,
11
  gdupre@kirkland.com;alevin@kirkland.com
- Payam Khodadadi    pkhodadadi@winthropcouchot.com, pj@winthropcouchot.com
12
- Irene L Kiet    ikiet@hkclaw.com
13
- Claude F Kolm    claude.kolm@acgov.org
- Mark J Krone    mk@amclaw.com, crs@amclaw.com;amc@amclaw.com
14
- David B Lally    davidlallylaw@gmail.com
- Leib M Lerner    leib.lerner@alston.com
15
- Peter W Lianides    plianides@winthropcouchot.com, pj@winthropcouchot.com
16
- Charles Liu    cliu@winthropcouchot.com
- Kerri A Lyman    klyman@irell.com
17
- Mariam S Marshall    mmarshall@marshallramoslaw.com
- Robert C Martinez    rmartinez@mclex.com
18
- Michael D May    mdmayesq@verizon.net
19
- Hutchison B Meltzer    hmeltzer@wgllp.com
- Krikor J Meshefejian    kjm@lnbrb.com
20
- Joel S. Miliband    jmiliband@rusmiliband.com
- James M Miller    jmiller@millerbarondess.com,
21
  vgunderson@millerbarondess.com;smiller@millerbarondess.com;mpritikin@millerbarond
  ess.com
22
- Louis R Miller    smiller@millerbarondess.com
- Craig Millet    cmillet@gibsondunn.com,
23
  pcrawford@gibsondunn.com;cmillet@gibsondunn.com
24
- Randall P Mroczynski    randym@cookseylaw.com
- Mike D Neue    mneue@thelobelfirm.com,
25
  jmattiace@thelobelfirm.com;pnelson@thelobelfirm.com
26
- Robert Nida    Rnida@castlelawoffice.com
- Henry H Oh    henry.oh@dlapiper.com, janet.curley@dlapiper.com
27
- Sean A Okeefe    sokeefe@okeefelc.com
- Scott H Olson    solson@seyfarth.com
28
- Robert B Orgel    rorgel@pszjlaw.com, rorgel@pszjlaw.com
- Malhar S Pagay    mpagay@pszjlaw.com, mpagay@pszjlaw.com

MAINDOCS-#164960-v3-SunCal_3rd_Am_Group_I_TD_DS.DOC

- Ernie Zachary Park    ernie.park@bewleylaw.com
- Daryl G Parker    dparker@pszjlaw.com
- Penelope Parmes    pparmes@rutan.com
- Robert J Pfister    rpfister@ktbslaw.com
- Ronald B Pierce    ronald.pierce@sdma.com
- Katherine C Piper    kpiper@steptoe.com, smcloughlin@steptoe.com
- Cassandra J Richey    cmartin@pprlaw.net
- Debra Riley    driley@allenmatkins.com
- James S Riley    tgarza@sierrafunds.com
- Todd C. Ringstad    becky@ringstadlaw.com
- R Grace Rodriguez    ecf@lorgr.com
- Martha E Romero    Romero@mromerolawfirm.com
- Ronald Rus    rrus@rusmiliband.com
- John P Schafer    jschafer@mandersonllp.com
- John E Schreiber    jschreiber@dl.com
- William D Schuster    bills@allieschuster.org
- Christopher P Simon    csimon@crosslaw.com
- Gerald N Sims    jerrys@psdslaw.com, bonniec@psdslaw.com
- Wendy W Smith    wendy@bindermalter.com
- Steven M Speier    Sspeier@Squarmilner.com, ca85@ecfcbis.com
- Steven M Speier (TR)    Sspeier@asrmanagement.com, ca85@ecfcbis.com
- Michael St James    ecf@stjames-law.com
- Michael K Sugar    msugar@irell.com
- Cathy Ta    cathy.ta@bbklaw.com,
  Arthur.Johnston@bbklaw.com;Kenneth.Burgess@bbklaw.com
- David A Tilem    davidtilem@tilemlaw.com,
  malissamurguia@tilemlaw.com;dianachau@tilemlaw.com;kmishigian@tilemlaw.com
- James E Till    jtill@thelobelfirm.com,
  jmattiace@thelobelfirm.com;pnelson@thelobelfirm.com
- United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov
- Carol G Unruh    cgunruh@sbcglobal.net
- Annie Verdries    verdries@lbbslaw.com
- Jason Wallach    jwallach@gladstonemichel.com
- Joshua D Wayser    , kim.johnson@kattenlaw.com
- Marc J Winthrop    mwinthrop@winthropcouchot.com, pj@winthropcouchot.com
- David M Wiseblood    dwiseblood@seyfarth.com
- Brett K Wiseman    bwiseman@aalaws.com
- Dean A Ziehl    dziehl@pszjlaw.com, dziehl@pszjlaw.com
- Marc A. Zimmerman    joshuasdaddy@att.net

MAINDOCS-#164960-v3-SunCal_3rd_Am_Group_I_TD_DS.DOC