1
2
3
4

PAUL J. COUCHOT -- State Bar No. 131934
WINTHROP COUCHOT, P.C.
660 Newport Center Drive, Fourth Floor
Newport Beach, CA 92660
Telephone: (949) 720-4100
Facsimile: (949) 720-4111
General Insolvency Counsel for Palmdale Hills
Property, LLC et. al. (the "Voluntary Debtors")

5
6
7
8
9

RONALD RUS - State Bar No. 67369
JOEL S. MILIBAND - State Bar No. 77438
RUS MILIBAND & SMITH
A PROFESSIONAL CORPORATION
2211 Michelson Drive, Seventh Floor
Irvine, California 92612
Telephone: (949) 752-7100
Facsimile:  (949) 252-1514

Counsel for SCC Acquisitions Inc.

10
11

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**SANTA ANA DIVISION**

12
13
14
15

In re

PALMDALE HILLS PROPERTY, AND ITS
RELATED DEBTORS,

Joint Administered Debtors and
Debtors-in-Possession

Case No. 8:08-bk-17206-ES

Jointly Administered With Case Nos.
8:08-bk-17209-ES; 8:08-bk-17240-ES;
8:08-bk-17224-ES; 8:08-bk-17242-ES;
8:08-bk-17225-ES; 8:08-bk-17245-ES;
8:08-bk-17227-ES; 8:08-bk-17246-ES;
8:08-bk-17230-ES; 8:08-bk-17231-ES;
8:08-bk-17236-ES; 8:08-bk-17248-ES;
8:08-bk-17249-ES; 8:08-bk-17573-ES;
8:08-bk-17574 ES; 8:08-bk-17575-ES;
8:08-bk-17404-ES; 8:08-bk-17407-ES;
8:08-bk-17408-ES; 8:08-bk-17409-ES;
8:08-bk-17458-ES; 8:08-bk-17465-ES;
8:08-bk-17470-ES; 8:08-bk-17472-ES;
and 8:08-bk-17588-ES

Chapter 11 Proceedings

16
17
18
19
20
21
22
23
24
25
26
27
28

Affects:

☐ All Debtors
☐ Palmdale Hills Property, LLC
☐ SunCal Beaumont Heights, LLC
☐ SCC/Palmdale, LLC
☐ SunCal Johannson Ranch, LLC
☐ SunCal Summit Valley, LLC
☐ SunCal Emerald Meadows LLC
☐ SunCal Bickford Ranch, LLC
☐ Acton Estates, LLC
☐ Seven Brothers LLC
☐ SJD Partners, Ltd.
☐ SJD Development Corp.
☐ Kirby Estates, LLC
☐ SunCal Communities I, LLC
☐ SunCal Communities III, LLC
☐ SCC Communities LLC
☐ North Orange Del Rio Land, LLC
☐ Tesoro SF LLC

**THIRD AMENDED DISCLOSURE
STATEMENT DESCRIBING THIRD
AMENDED CHAPTER 11 PLANS FILED
BY SUNCAL PLAN PROPONENTS IN THE
CHAPTER 11 CASES OF SUNCAL OAK
KNOLL, LLC AND SUNCAL TORRANCE,
LLC [GROUP II: TRUSTEE DEBTORS]**

Date:       July 22, 2011
Time:       11:00 a.m.
Place:      Courtroom 5A

1

*Continued from Previous Page*

☐ LBL-SunCal Oak Valley, LLC

2

☐ SunCal Heartland, LLC

3

☐ LBL-SunCal Northlake, LLC

☐ SunCal Marblehead, LLC

4

☐ SunCal Century City, LLC

5

☐ SunCal PSV, LLC

☐ Delta Coves Venture, LLC

6

☒ SunCal Torrance, LLC

7

☒ SunCal Oak Knoll, LLC

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**PAGE**

I.      INTRODUCTION ........................................................................................................    2

II.     DEFINITIONS AND RULES OF INTERPRETATION ............................................    5
        2.1     Definitions.  ....................................................................................................    5
        2.2     Rules of Construction.  .................................................................................    25
        2.3     Exhibits.  .........................................................................................................    26

III.    PLAN CONFIRMATION DEADLINES .....................................................................    26
        3.1     Time and Place of the Confirmation Hearing.  ...........................................    26
        3.2     Deadline for Voting for or Against the Plan.  .............................................    26
        3.3     Deadline for Objecting to the Confirmation of the Plan.  ...........................    26
        3.4     Identity of Person to Contact for More Information Regarding the Plan.  ....    27
        3.5     Disclaimer.  ....................................................................................................    27

IV.     FACTUAL BACKGROUND OF THE DEBTORS .......................................................    28
        4.1     The Formation of the Debtors and Their Projects........................................    28
        4.2     Factual Circumstances Leading to the Filing of the Debtors' Chapter 11 Cases    31
        4.3     The Group II: Trustee Debtors' Potential Preferential Transfers...................    40

V.      SIGNIFICANT EVENTS IN THE DEBTORS' CHAPTER 11 CASES ..................    41
        5.1     Voluntary Debtors.  .......................................................................................    41
        5.2     The Trustee Debtors and Their Professionals ...............................................    43
        5.3     The Debtors' Various Motions Relating to Financing for the
                Projects and to Pay Professional Fees...........................................................    43
        5.4     The Debtors' Disputes and Claims Against the Lehman Entities..................    46
        5.5     The Debtors' Motion for a Stay to Suspend Certain Lehman Actions. .........    53
        5.6     The Debtors' Other Litigation with Non-Lehman Related Parties. ...............    54
        5.7     LitCo   ...........................................................................................................    55
        5.8     Reliance Claims ............................................................................................    55

VI.     TREATMENT OF UNCLASSIFIED CLAIMS ...........................................................    56
        6.1     Introduction.  .................................................................................................    56
        6.2     Treatment of Allowed Administrative Claims.  ...........................................    56
        6.3     Treatment and Repayment of Lehman's Administrative Loans.  .................    57
        6.4     Repayment of Allowed Administrative Claims Other than the
                Lehman Administrative Loans........................................................................    57
        6.5     Administrative Claims Bar Date ....................................................................    57
        6.6     Treatment of Unsecured Tax Claims .............................................................    58
        6.7     Summary of the Group II: Trustee Debtors Plans' Treatment
                of Bond Indemnity Claims. ...........................................................................    59

VII.    CLASSIFICATION OF CLAIMS AND INTERESTS............................................    59

MAINDOCS-#164959-v3-SunCal_3rd_Am_Group_II_TD_DS.DOC

VIII.  THE PLAN'S TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS.......  62

    8.1.  The Plan's Treatment of Holders of Allowed Secured Real
        Property Tax Claims Against the Group II: Trustee Projects
        (Classes 1.1 and 1.2). .......................................................................  62

    8.2.  The Plan's Treatment of Lehman's Disputed Claim(s) and
        Disputed Lien(s) Against the Group II: Trustee Debtors
        (Class 2.1 and 2.2). .....................................................................  63

    8.3.  The Plan's Treatment of Holders of Asserted Mechanic Lien
        Claims Against the Group II: Trustee Projects (Classes 3.1
        Through 3.4). ...............................................................................  65

    8.4.  The Plan's Treatment of Holders of Contingent Bond Indemnification
        Claims Against the Group II: Trustee Projects (Class 4.1). ...........  65

    8.5.  The Plan's Treatment of Holders of Priority Claims
        Group II: Trustee Debtors (Class 5.1). ........................................  66

    8.6.  The Plan's Treatment of Holders of General Unsecured Claims
        that are Reliance Claims Group II: Trustee Debtors
        (Classes 6.1 and 6.2). ..................................................................  67

    8.7.  The Plan's Treatment of Holders of Allowed General Unsecured
        Claims that Are Not Reliance Claims Group II:
        Trustee Debtors (Classes 7.1. and 7.2)........................................  68

    8.8.  The Plan's Treatment of Holders of Allowed Interests Group II:
        Trustee Debtors. ..........................................................................  68

IX.  ACCEPTANCE OR REJECTION OF THE PLAN ................................  68

    9.1.  Introduction.  ...............................................................................  68
    9.2.  Who May Object to Confirmation of the Plan.  ...........................  69
    9.3.  Who May Vote to Accept/Reject the Plan.  .................................  69
    9.4.  What Is an Allowed Claim/Interest.  ...........................................  69
    9.5.  What Is an Impaired Class.  .........................................................  69
    9.6.  Who Is Not Entitled to Vote.  .....................................................  69
    9.7.  Who Can Vote in More than One Class.  ......................................  70
    9.8.  Votes Necessary for a Class to Accept the Plan.  ........................  70
    9.9.  Treatment of Nonaccepting Classes.  ..........................................  70
    9.10.  Request for Confirmation Despite Nonacceptance by
        Impaired Class(es)........................................................................  71

X.  MEANS OF EXECUTION AND IMPLEMENTATION OF THE PLAN ..............  71

    10.1.  Introduction.  ...............................................................................  71
    10.2  Sale Process for the Group II: Trustee Projects and Group II:
        Trustee Other Assets During the Sales Period. ............................  71
    10.3  Establishment and Operations of the Plan Trust. ........................  74
    10.4  Preservation and Pursuit of Litigation Claims and Recovery for
        the Plan Trust. .............................................................................  74
    10.5  Removal of Chapter 11 Trustee .................................................  75
    10.6  Payment of Plan Trust Expenses. ...............................................  75
    10.7  The Plan Trust Distribution System. ...........................................  75
    10.8  The Plan Trustee.  .......................................................................  75
    10.9  The Plan Trust Beneficiaries. .....................................................  79

MAINDOCS-#164959-v3-SunCal_3rd_Am_Group_II_TD_DS.DOC

10.10   No Payment of Transfer-Related Fees to the United States Trustee. ............   80
10.11   No Payment of Transfer-Related Fees to the Plan Trustee. ........................   80
10.12   Books and Records of Trust. ...................................................................   80
10.13   Federal Income Tax Treatment of the Holders of the Plan Trust
        Beneficial Interests. ...............................................................................   80
10.14   Termination of the Trust. ........................................................................   81
10.15   Exemption from Certain Transfer Taxes. .................................................   82
10.16   Tax Consequence of The Plan. ...............................................................   82
10.17   The Trustee Debtors' Committee. ...........................................................   82
10.18   Claims Estimation Rights. .....................................................................   83

XI.    RISK FACTORS ...............................................................................................   83
11.1    Plan Risks. ............................................................................................   83

XII.   DISTRIBUTIONS...............................................................................................   85
12.1    Distribution Agent.   ..............................................................................   85
12.2    Distributions. ........................................................................................   86
12.3    Old Instruments and Securities.  ............................................................   86
12.4    De Minimis Distributions and Fractional Shares........................................   87
12.5    Delivery of Distributions ........................................................................   87
12.6    Undeliverable Distributions ....................................................................   87

XIII.  OBJECTIONS TO CLAIMS AND DISPUTED CLAIMS .......................................   88
13.1    Standing for Objections to Claims.   .......................................................   88
13.2    Treatment of Disputed Claims and Disputed Liens.  ...................................   88

XIV.   EXECUTORY CONTRACTS AND UNEXPIRED LEASES..................................   89
14.1    Executory Contracts to be Assumed and Assigned.  ...................................   89
14.2    Executory Contracts to be Rejected.  ......................................................   92

XV.    BEST INTEREST OF CREDITORS TEST AND PLAN FEASIBILITY ................   93
15.1    Best Interests Test. ................................................................................   93
15.2    Feasibility. ............................................................................................   94

XVI.   LIMITATION OF LIABILITY ..........................................................................   95
16.1    No Liability for Solicitation or Participation.  ..........................................   95

XVII.  CONDITIONS TO CONFIRMATION AND
       EFFECTIVENESS OF THE PLAN..................................................................   95
17.1    Conditions Precedent to Plan Confirmation.   ..........................................   95
17.2    Conditions Precedent to Plan Effectiveness.  ...........................................   95

XVIII. RETENTION OF JURISDICTION .....................................................................   95

XIX.   MODIFICATION OR WITHDRAWAL OF THE PLAN.....................................   97
19.1    Modification of Plan.   ...........................................................................   97
19.2    Nonconsensual Confirmation. .................................................................   97

XX.    EFFECT OF CONFIRMATION ................................................................................    97
       20.1    Discharge. .............................................................................................    97
       20.2    Revesting of the Assets. .......................................................................    98

XXI.   MISCELLANEOUS .............................................................................................    98
       21.1    Payment of Statutory Fees.  ................................................................    98
       21.2    Changes in Rates Subject to Regulatory Commission Approval.  ..............    98
       21.3    Payment Dates. ....................................................................................    98
       21.4    Headings.  ............................................................................................    98
       21.5    Other Documents and Actions.  ...........................................................    99
       21.6    Notices.  ...............................................................................................    99
       21.7    Governing Law.  ...................................................................................    99
       21.8    Binding Effect. ....................................................................................    100
       21.9    Successors and Assigns.  ......................................................................    100
       21.10   Severability of Plan Provisions.  .........................................................    100
       21.11   No Waiver.  ..........................................................................................    100
       21.12   Inconsistencies.  ..................................................................................    100
       21.13   Exemption from Certain Transfer Taxes and Recording Fees.  ..................    101
       21.14   Post-Confirmation Status Report.  .......................................................    101
       21.15   Post-Confirmation Conversion/Dismissal.  ..........................................    101
       21.16   Final Decree.  ......................................................................................    101

MAINDOCS-#164959-v3-SunCal_3rd_Am_Group_II_TD_DS.DOC

# I.

## __INTRODUCTION__

This Disclosure Statement[1] is filed jointly by, and the accompanying Plans are proposed respectively by, Acquisitions and the Voluntary Debtors, as the SunCal Plan Proponents, in the Chapter 11 Cases of SunCal Torrance, LLC and SunCal Oak Knoll, LLC (the "Group II: Trustee Debtors"). In addition to being one of the SunCal Plan Proponents, Acquisitions is the Plan Sponsor, the Plan Trustee of the Plan Trust and the Distribution Agent, for each Group II: Trustee Debtor Plan that is confirmed.

Chapter 11 allows debtors-in-possession, Chapter 11 trustees, and under some circumstances, creditors, interest holders and others parties in interest, to propose a Chapter 11 plan.  As stated, Acquisitions is the SunCal Plan Proponent of the Plans sent to you in the same envelope as this Disclosure Statement.  This document summarizes the contents of the Plans, certain information relating to the Plan and the process the Bankruptcy Court follows in determining whether or not to confirm the Plans.

In summary, the Plan(s) individually provide for sale of the Oak Knoll Project and the Del Amo Project (the "Group II: Trustee Debtors Projects"), free and clear of liens, claims and any purported credit bid rights of the Group II: Trustee Debtors' primary secured creditor, Lehman ALI, and for the liquidation of all other assets of the Group II: Trustee Debtors. The Net Sales Proceeds from these sales will then be distributed to Creditors holding Allowed Claims in accordance with their rights and priorities under the bankruptcy code and under any other applicable law.

**The Plans also offers the holders of a certain claims against the Group II: Trustee Debtors, which are defined herein as Reliance Claims, the right to sell these claims, along with  any other Litigation Rights arising from and/or related to such Reliance Claim, to LitCo, for the sum of fifty five cents ($0.55) per dollar of Allowed Claim.  The purchase offer is conditioned upon confirmation of the applicable Plan, the entry of a Final Confirmation**

---

[1] All defined terms used herein have the same meanings as set forth in Article II herein and Exhibit "1" attached hereto.

**Order confirming such Plan, and shall occur on or before the applicable Plan's Effective Date as defined herein.  However, this purchase offer is <u>not</u> contingent upon the sale of the Group II: Trustee Debtor Projects or a determination regarding any alleged automatic stay claim by LCPI arising from LCPI's pending Chapter 11 proceeding.**

The offer by LitCo to purchase Allowed Reliance Claims for the sum of fifty-five cents ($0.55) per dollar of claim and certain other Plan funding (*e.g.*, to make required payments to Creditors holding Allowed Administrative Claims, Priority Claims and Tax Claims) will not be funded by the SunCal Plan Proponents.  Instead, the SunCal Plan Proponents are working with proposed investors/lenders who would provide such funding.  While the SunCal Plan Proponents are in discussions with third parties with respect to obtaining funding for the SunCal Plan, no commitment has yet been obtained for such funding and thus SunCal Plan Proponents are not in a position to disclose the terms of such funding at this time.  There is no guarantee that such funding will be obtained.

Although the substantially identical Plans are being filed in the Cases of all Group II: Trustee Debtors, confirmation of each Plan is independent of the other. In other words, the Creditors in each Case will determine, subject to Court approval, whether the applicable Plan will be approved in their Case. Accordingly, the Plan may be confirmed in the Cases of one of the Group II: Trustee Debtors, but not in the other.

The Lehman Lenders and the Chapter 11 Trustee have filed a competing and alternative plans of reorganization in the Group II: Trustee Debtors' Cases. Accordingly, the creditors holding claims against the Debtors will have the opportunity to vote for one plan or the other, or they can vote for or reject both plans and allow the Court to decide which plan should be approved. The SunCal Plan Proponents believe that the aggregate benefits offered under their Plan are superior to what is being offered to Creditors under the Lehman Lenders' competing Plans, because the consideration paid to the holders of the Reliance Claims is 55 percent under the SunCal Plans, in contrast to only a potential distribution of 40 percent under the Lehman Lenders and Chapter 11 Trustee Plans for the Group II: Trustee Debtors.

1 **READ THIS DISCLOSURE STATEMENT CAREFULLY IF YOU WANT TO**

2 **KNOW ABOUT**:

3   ➢ **WHO CAN VOTE OR OBJECT TO THE PLAN;**

4   ➢ **HOW YOUR CLAIM IS TREATED;**

5   ➢ **HOW THIS TREATMENT COMPARES TO WHAT YOUR CLAIM WOULD**

6     **RECEIVE IN LIQUIDATION;**

7   ➢ **A BRIEF HISTORY OF THE DEBTORS AND SIGNIFICANT EVENTS**

8     **DURING THEIR CHAPTER 11 BANKRUPTCY PROCEEDING;**

9   ➢ **WHAT FACTORS THE BANKRUPTCY COURT WILL CONSIDER TO**

10     **DECIDE WHETHER OR NOT TO CONFIRM THE PLAN;**

11   ➢ **WHAT IS THE EFFECT OF CONFIRMATION; AND**

12   ➢ **WHETHER THE PLAN IS FEASIBLE.**

13    This Disclosure Statement cannot tell you everything about your rights.  You should

14 consider consulting your own attorney to obtain more specific advice on how the Plan will affect

15 you and your best course of action.

16    Be sure to read the applicable Plan as well as this Disclosure Statement.  If there are any

17 inconsistencies between the applicable Plan and this Disclosure Statement, the applicable Plan

18 provisions will govern.

19    **THE BANKRUPTCY CODE REQUIRES A DISCLOSURE STATEMENT TO**

20 **CONTAIN "ADEQUATE INFORMATION" CONCERNING THE PLAN.  ON _____,**

21 **2011, THE BANKRUPTCY COURT ENTERED AN ORDER APPROVING THIS**

22 **DISCLOSURE STATEMENT, BASED UPON A FINDING THAT THIS DOCUMENT**

23 **CONTAINED "ADEQUATE INFORMATION" TO ENABLE PARTIES AFFECTED BY**

24 **THE PLANS TO MAKE AN INFORMED JUDGMENT REGARDING THE PLANS.  ANY**

25 **PARTY CAN NOW SOLICIT VOTES FOR OR AGAINST THE PLANS.**

26

27

28

1

2

3                                  II.

4            **DEFINITIONS AND RULES OF INTERPRETATION**

5        **2.1    Definitions.**

6            The following defined terms are used in this Disclosure Statement.  Any capitalized term

7    that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall

8    have the meaning ascribed to that term in the Bankruptcy Code or Bankruptcy Rules.

9            2.1.1    <u>Acquisitions</u>.  SCC Acquisitions, Inc., a California corporation, an indirect

10   parent company of all of the Debtors, a purported Bond Indemnitor, a Creditor of all of the

11   Debtors, a SunCal Plan Proponent, the Plan Sponsor and the proposed Plan Trustee.

12           2.1.2    <u>Administrative Claim(s)</u>.  Any Claim against a Group II: Trustee Debtor or

13   its Estate incurred after the applicable Petition Date for the applicable Group II: Trustee Debtor but

14   before the Effective Date, for any cost or expense of administration of the Case of the applicable

15   Group II: Trustee Debtor, which Claim is entitled to priority under section 507(a)(2) or (3) of the

16   Bankruptcy Code, including, without limitation, any fee or charge assessed against an Estate of a

17   Group II: Trustee Debtor under section 2030 of Title 28 of the United States Code.

18           2.1.3    <u>Administrative Claims Bar Date</u>.  The last date fixed by the Plan for the

19   filing of requests for payment of Administrative Claims.  Under the Plan, the Administrative

20   Claims Bar Date shall be the first business day after the twenty-first (21st) day after the Effective

21   Date.

22           2.1.4    <u>Affiliate</u>.  The term shall have the meaning set forth under Section 101(2),

23   including, but not limited to, as to any Person, any other Person that directly or indirectly owns or

24   controls, is owned or controlled by, or is under common ownership or control with, such Person.

25   The term "control" (including, with correlative meanings, the terms "controlled by" and "under

26   common control with"), as applied to any Person, means the possession, direct or indirect, of the

27   power to direct or cause the direction of the management and policies of such Person, whether

28

MAINDOCS-#164959-v3-SunCal_3rd_Am_Group_II_TD_DS.DOC

1   through the ownership of voting securities or other equity ownership interest, by contract or

2   otherwise.

3            2.1.5   Allowed.  When used to describe Claim(s) or Interest(s), such Claim(s) or

4   Interest(s), to the extent that it or they are "Allowed Claim(s)" or "Allowed Interest(s)."

5            2.1.6     Allowed Amount shall mean:

6                A.     With respect to any Administrative Claim (i) if the Claim is based

7   upon a Fee Application, the amount of such Fee Application that has been approved by a Final

8   Order of the Bankruptcy Court; (ii) if the Claim is based upon any indebtedness or obligation

9   incurred in the ordinary course of business of the Group II: Trustee Debtors and is not otherwise

10   subject to an Administrative Claim Bar Date, the amount of such Claim that has been agreed to by

11   the Group II: Trustee Debtors and such creditor, failing which, the amount thereof as fixed by a

12   Final Order of the Bankruptcy Court; or (iii) if the Holder of such Claim was required to file and

13   has filed proof thereof with the Bankruptcy Court prior to an Administrative Claim Bar Date,

14   (1) the amount stated in such proof if no objection to such Proof of Claim is interposed within the

15   applicable period of time fixed by the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy

16   Court, or (2) the amount thereof as fixed by Final Order of the Bankruptcy Court if an objection to

17   such proof was interposed within the applicable period of time fixed by the Bankruptcy Code, the

18   Bankruptcy Rules or the Bankruptcy Court.  The Allowed Amount of any Administrative Claim

19   which is subject to an Administrative Claims Bar Date and not filed by the applicable

20   Administrative Claims Bar Date shall be zero, and no distribution shall be made on account of any

21   such Administrative Claim;

22                B.     with respect to any Claim which is not an Administrative Claim

23   (the "Other Claim"):  (i) if the Holder of such Other Claim did not file proof thereof with the

24   Bankruptcy Court on or before the Claims Bar Date, the amount of such Claim as listed in the

25   Group II: Trustee Debtors'' Schedules as neither disputed, contingent nor unliquidated; or (ii) if

26   the Holder of such Claim has filed proof thereof with the Bankruptcy Court on or before the

27   Claims Bar Date, (a) the amount stated in such proof if no objection to such Proof of Claim was

28   interposed within the applicable period of time fixed by the Bankruptcy Code, the Bankruptcy

Rules, the Plan or the Bankruptcy Court, or (b) the amount thereof as fixed by Final Order of the Bankruptcy Court if an objection to such proof was interposed within the applicable period of time fixed by the Bankruptcy Code, the Bankruptcy Rules, the Plan or the Bankruptcy Court.  The Allowed Amount of any Other Claim which is not Filed by the applicable Claims Bar Date, is not listed on the Group II: Trustee Debtors' Schedules or is listed as disputed, unliquidated, contingent or unknown, and is not allowed under the terms of the Plan shall be zero, and no distribution shall be made on account of any such Claim; and

C.    with respect to any Interest, (i) the amount provided by or established in the records of the Group II: Trustee Debtors at the Confirmation Date, provided, however, that a timely filed proof of Interest shall supersede any listing of such Interest on the records of the Group II: Trustee Debtors; or (ii) the amount stated in a proof of Interest Filed prior to the Confirmation Date if no objection to such Interest was filed prior to the Confirmation Date or such later date as the Bankruptcy Court allows; or (iii) the amount of such Interest as fixed by a Final Order of the Bankruptcy Court.

2.1.7    <u>Allowed Claim</u>.  Except as otherwise provided in the Plan(s) (including with respect to those Classes for which the amount of the Allowed Claims is specified by the Plan), a Claim to the extent (and only to the extent) of the Allowed Amount of such Claim.

2.1.8    <u>Allowed Interest</u>.  Any Interest to the extent, and only to the extent, of the Allowed Amount of such Interest.

2.1.9    <u>Allowed Secured Claims</u>.  All or a portion of a Secured Claim that is an Allowed Claim.

2.1.10    <u>Allowed Unsecured Claim</u>. All or a portion of an Unsecured Claim that is an Allowed Claim.

2.1.11    <u>Arch</u>.  Arch Insurance Company, a Bond Issuer.

2.1.12    <u>Available Cash</u>.  Each Group II: Trustee Debtors' Cash deposited into the applicable Distribution Account(s) on or after the Effective Date that is available for making Distributions under the Plan to Holders of Allowed Administrative, Priority, and General Unsecured Claims.  The Available Cash shall consist of the respective Group II: Trustee Debtors'

1    cash on hand as of the Effective Date that is not subject to a Disputed Lien, proceeds of Net

2    Litigation Recoveries that are not subject to a Disputed Lien, Net Sales Proceeds that become

3    Available Cash upon the disallowance of a Disputed Claim or avoidance of a Disputed Lien

4    purportedly encumbering such Cash, or proceeds from the LitCo Plan Loan.  All Available Cash

5    shall be deposited into the applicable Distribution Account(s).  Available Cash shall not include

6    Net Sale Proceeds in the Net Sales Proceeds Account where the Disputed Secured Claims are

7    Allowed but subject to an equitable subordination judgment.

8              2.1.13    <u>Avoidance Actions</u>.  All Claims and defenses to Claims accruing to the

9    Group II: Trustee Debtors and their Estates under Bankruptcy Code Sections 506(d), 510(c), 541,

10   544, 545, 547, 548, 549, 550, or 551.

11             2.1.14    <u>Bankruptcy Code</u>.  The United States Bankruptcy Code.

12             2.1.15    <u>Bankruptcy Court</u>.  The United States Bankruptcy Court for the Central

13   District of California, having jurisdiction over the Cases and, to the extent of any withdrawal of the

14   reference made pursuant to Section 157 of title 28 of the United States Code, the United States

15   District Court for the Central District of California; or, in the event such courts cease to exercise

16   jurisdiction over the Cases, such court or unit thereof that exercises jurisdiction over the Cases in

17   lieu thereof.

18             2.1.16    <u>Bankruptcy Rules</u>.  Collectively, as now in effect or hereafter amended

19   and as applicable to the Cases, (i) the Federal Rules of Bankruptcy Procedure, and (ii) the Local

20   Bankruptcy Rules and General Orders applicable to cases pending before the Bankruptcy Court.

21             2.1.17    <u>Beneficial Interests</u>. means, collectively, the interests of the holders of

22   Allowed Unsecured Claims in the Plan Trust and in all distributions to be made by the Plan Trust

23   on account of Allowed Unsecured Claims. The Beneficial Interests (a) shall be noted in the books

24   and records of the Plan Trust, (b) shall not be evidenced by a writing, and (c) may not be

25   transferred, sold, assigned or transferred by will, intestate succession or operation of law without

26   written notification to the Plan Trustee confirming and acknowledging the transfer by both the

27   holder and the transferee.

28

MAINDOCS-#164959-v3-SunCal_3rd_Am_Group_II_TD_DS.DOC

1                2.1.18    <u>Bond Claim(s)</u>.  Any Claim against the Debtor(s) and a Bond Issuer under

2 various payment or performance bonds.

3                2.1.19    <u>Bond Claimant</u>.  Holder(s) of a Bond Claim.

4                2.1.20    <u>Bond Indemnification Claim</u>.  All Claims by Bond Issuers for

5 indemnification against a Bond Indemnitor for the Bond Issuer's actual payment or purchase of a

6 Bond Claim with respect to the Group II: Trustee Debtors' Projects.

7                2.1.21    <u>Bond Indemnitors</u>.  The individuals and entities that are allegedly liable on

8 the Bond Indemnification Claims, including, allegedly, all of the Debtors, Acquisitions, all

9 Affiliates of Acquisitions, and Elieff.

10               2.1.22    <u>Bond Issuer(s)</u>.  Bond Safeguard, Lexon and Arch in their capacities as

11 issuers and sureties for payment and performance bonds for the benefit of certain of the Debtors.

12               2.1.23    <u>Bond Safeguard</u>.  Bond Safeguard Insurance Company, a Bond Issuer.

13               2.1.24    <u>Business Day</u>.  Any day, other than a Saturday, a Sunday or a "legal

14 holiday," as defined in Bankruptcy Rule 9006(a).

15               2.1.25    <u>Cases</u>.  The Chapter 11 cases of the Group II: Trustee Debtors pending

16 before the Bankruptcy Court.

17               2.1.26    <u>Cash</u>.  Currency of the United States of America and cash equivalents,

18 including, but not limited to, bank deposits, immediately available or cleared checks, drafts, wire

19 transfers and other similar forms of payment.

20               2.1.27    <u>CFD Bonds</u>.  Community facilities district bonds issued by a

21 governmental entity.

22               2.1.28    <u>Chapter 11 Trustee</u>.  Steven M. Speier, the duly appointed trustee of the

23 Trustee Debtors in their pending Chapter 11 Cases.

24               2.1.29    <u>Claim</u>.  This term shall have the broadest possible meaning under

25 Section 101(5) of the Bankruptcy Code, and shall include (a) any right to payment from any of the

26 Group II: Trustee Debtors, whether or not such right is reduced to judgment, liquidated,

27 unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable,

28 secured, or unsecured, or (b) any right to an equitable remedy for breach of performance if such

1    breach gives rise to a right of payment from any of the Group II: Trustee Debtors, whether or not

2    such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured,

3    disputed, undisputed, secured, or unsecured.

4        2.1.30    Claims Bar Date.  For any Claim other than the exceptions noted below ,

5    March 31, 2009, which was established by the Bankruptcy Court as the last date for creditors to

6    file Proof of Claims with the Bankruptcy Court in all of the Group II: Trustee Debtors' cases,

7    except for the following: (a) Administrative Claims, for which the Administrative Claims Bar Date

8    shall apply, (b) claims arising from rejection of executory contracts or unexpired leases pursuant to

9    11 U.S.C. § 365, for which the last day to file a proof of claim is (i) 30 days after the date of entry

10   of the order authorizing the rejection, or (ii) March 31, 2009, whichever is later, (c) claims of

11   "governmental units," as that term is defined in 11 U.S.C. § 101(27), for which proofs of claim are

12   timely filed if filed: (i) before 180 days after the date of the Order for Relief in this case, or (ii) by

13   March 31, 2009, whichever is later (11 U.S.C. § 502(b)(9)), and (d) claims arising from the

14   avoidance of a transfer under chapter 5 of the Bankruptcy Code, the last day to file a proof of claim

15   is 30 days after the entry of judgment avoiding the transfer or March 31, 2009, whichever is later.

16       2.1.31    Claims Objection Deadline.  The later of (i) the first business day

17   following the one hundred and eightieth (180th) day after the Effective Date, or (ii) such greater

18   period of limitation as may be fixed or extended by the Bankruptcy Court or by agreement between

19   the Plan Trustee and the Holder of the Claim.

20       2.1.32    Claim Objection Reduction Amount. The amount of Net Sales Proceeds

21   that is made available to the holders of Allowed Unsecured Claims due to the entry of a judgment

22   or order on a Lehman Claim Objection that disallows, reduces, or otherwise adversely modifies the

23   secured claims filed by the Lehman Lenders.

24       2.1.33    Class.  Each group of Claims or Interests classified in Article V of the Plan

25   pursuant to Sections 1122 and 1123 of the Bankruptcy Code.

26       2.1.34    Confirmation Date.  The date on which the Confirmation Order is entered

27   in the Bankruptcy Court's docket.

28

1          2.1.35    Confirmation Order.  The order entered by the Bankruptcy Court

2    confirming the Plan in accordance with the provisions of Chapter 11 of the Bankruptcy Code.

3          2.1.36    Contingent Bond Claims.  Bond Indemnification Claims in which the

4    Bond Issuer has not yet paid or purchased the underlying Bond Claim.

5          2.1.37    Contract Action. The action filed by certain Voluntary Debtors against

6    Lehman ALI, Inc., and certain other defendants, in California Superior Court for the County of

7    Orange (Case No. 30-2011-0040847-CU-BC-CJC), that was removed to the bankruptcy court as

8    Adv.  No. 8:11-ap-01212-ES, with a reservation of rights to add the Plan Trustee and/or the

9    Trustee Debtors as additional plaintiffs therein.

10         2.1.38    Creditor.  Any Person who is the Holder of a Claim against any Debtor

11   that arose or accrued or is deemed to have arisen or accrued or to have matured, or otherwise

12   become due, owing, and payable on or before the Petition Date, including, without limitation,

13   Claims of the kind specified in Sections 502(g), 502(h) or 502(i) of the Bankruptcy Code.

14         2.1.39    Debtor(s).  Individually or collectively, the Voluntary Debtors and the

15   Trustee Debtors, as specifically defined in Exhibit "1" attached hereto

16         2.1.40    Debtor(s)-in-Possession.  The Voluntary Debtor(s) in their capacity as

17   representatives of their respective Estates in their respective Chapter 11 Cases.

18         2.1.41    Del Amo Project.  The Project owned by SunCal Torrance, located in the

19   City of Torrance, California, as more particularly described herein.

20         2.1.42    Del Amo Project Value. The value of $13,500,000, which is the SunCal

21   Plan Proponent's conclusion regarding the fair market value of the Del Amo Project based upon

22   their underwriting teams' knowledge of the Project and present market conditions.

23         2.1.43    Disclosure Statement.  The document accompanying the Plan that is

24   entitled "Third Amended Disclosure Statement Describing Third Amended Chapter 11 Plan Filed

25   by SunCal Plan Proponents In The Chapter 11 Cases Of SunCal Oak Knoll, LLC and SunCal

26   Torrance, LLC," as amended and with all accompanying exhibits.

27         2.1.44    Disputed Claim(s).  All or any part of a Claim against a Group II: Trustee

28   Debtor as to which any one of the following applies: (i) no Proof of Claim has been filed with

respect to such Claim, and either (a) the Claim is not listed in the Schedules; or (b) the Claim is listed in the Schedules as unliquidated, disputed, contingent, unknown or in a zero amount, (ii) the Claim is the subject of (a) an unresolved Litigation Claim; (b) the Claim is subject to offset by a Litigation Claim; (c) a timely objection to such Claim that has not been resolved by a Final Order; or (d) a request for estimation in accordance with the Bankruptcy Code, the Bankruptcy Rules, any applicable order of the Bankruptcy Court, or the applicable Plan(s) which is Filed on or before the Claims Objection Deadline, which Adversary Proceeding, objection, or request for estimation has not been dismissed, withdrawn or determined by a Final Order; or (iii) the Claim is otherwise treated as a "Disputed Claim" pursuant to the Plan.

2.1.45    Disputed Lien(s).  An asserted lien(s) against Assets of the Debtor(s) that is either subject to a Disputed Secured Claim, not duly perfected, subject to an Avoidance Action, or subject to an action pursuant to Bankruptcy Code Sections 510(c)(2) and/or 506(d).  However, pursuant to Section 506(d)(2), a lien is not disputed merely because it secures a claim that "is not an allowed secured claim due only to the failure of any entity to file a proof of such claim under section 501 of this title."

2.1.46    Disputed Secured Claim(s). That part of a Disputed Claim that is a Secured Claim.

2.1.47    Distribution(s).  Payments to Holders of Allowed Claims provided for under the Plan.

2.1.48    Distribution Agent.  The entity that is responsible for making Distributions under the Plan, which shall be Acquisitions.

2.1.49    Distribution Account(s).  Separate account(s) to be established by the Plan Trustee at an FDIC insured bank into which each Group II: Trustee Debtors' Available Cash shall be deposited and all Available Cash received by the Plan Trust after the Confirmation Date that would have belonged to such Group II: Trustee Debtor shall be deposited, other than Net Sales Proceeds that are subject to Disputed Claims and Disputed Liens.

2.1.50    Distribution Date.  With respect to any Allowed Claim or Allowed Interest, the date on which a Distribution is required to be made under the Plan.

1    2.1.51    Effective Date. A date selected by the applicable SunCal Plan

2 Proponent(s) that is not later than the thirtieth (30th) calendar day after the Confirmation Date, and

3 provided there is no stay pending appeal of the Confirmation Order, in which case the Effective

4 Date shall be tolled until the dissolution of such stay.  The Effective Date may be extended by an

5 order of the Bankruptcy Court after notice and hearing to all parties in interest.

6    2.1.52    Elieff.  Bruce Elieff, the president of Acquisitions, a purported Bond

7 Indemnitor with alleged corresponding indemnity Claims against the Debtors.

8    2.1.53    Estates.  The bankruptcy estates of the Group II: Trustee Debtors created

9 pursuant to Section 541 of the Bankruptcy Code.

10    2.1.54    Fee Applications.  Applications of Professional Persons under Sections

11 330, 331 or 503 of the Bankruptcy Code for allowance of compensation and reimbursement of

12 expenses in the Cases.

13    2.1.55    Fee Claim.  A Claim under Sections 330 or 503 of the Bankruptcy Code

14 for allowance of compensation and reimbursement of expenses in the Cases.

15    2.1.56    Filed.  Delivered to, received by and entered upon the legal docket by the

16 Clerk of the Bankruptcy Court.  "File" shall have a correlative meaning.

17    2.1.57    Final Order.  A judgment, order, ruling or other decree issued and entered

18 by the Bankruptcy Court, that has not been reversed, stayed, modified or amended.

19    2.1.58    General Unsecured Claim.  A Claim against a Group II: Trustee Debtor

20 that is not (a) a Secured Claim, (b) an Administrative Claim, (c) a Tax Claim or (d) a Priority

21 Claim.

22    2.1.59    Group II: Trustee Debtors. SunCal Torrance, LLC and SunCal Oak Knoll,

23 LLC.

24    2.1.60    Group II: Trustee Debtors Assets.  All assets that are property of the

25 Group II: Trustee Debtor(s) pursuant to Bankruptcy Code Section 541, including the Group II:

26 Trustee Projects, the Litigation Claims and the Net Sales Proceeds.

27    2.1.61    Group II: Trustee Other Assets.  All assets of the Group II: Trustee

28 Debtors excluding the Group II: Trustee Projects, Litigation Claims and Net Sales Proceeds.

2.1.62    Group II: Trustee Projects. The Del Amo Project and the Oak Knoll Project.

2.1.63    Holder.  The beneficial owner of any Claim or Interest.

2.1.64    Initial Overbid. The Initial Overbid is the first Qualifying Bid after the Opening Bid that is equal to or in excess of the Initial Overbid Amount.

2.1.65    Initial Overbid Amount. In the case of the Oak Knoll Project, the Initial Overbid Amount is a sum that is not less than the sum of the Opening Bid, the Oak Knoll Break-up Fee and seventy five thousand dollars ($75,000). In the case of the Del Amo Project, the Initial Overbid Amount is a sum that is not less than the sum of the Opening Bid, the Torrance Break-up Fee and seventy-five thousand dollars ($75,000).

2.1.66    Insider.  The term shall have the broadest meaning possible under Section 101(31), including, but not limited to, a person in control of the Debtor, Affiliates and Insiders of such Affiliates, and including Affiliates of Acquisitions and the Lehman Entities.

2.1.67    Interest.  Any equity security interest in any Group II: Trustee Debtor within the meaning, of Section 101(16) of the Bankruptcy Code, including, without limitation, any equity ownership interest in any of the Group II: Trustee Debtors, whether in the form of common or preferred stock, stock options, warrants, partnership interests, or membership interests.

2.1.68    LBHI.  Lehman Brothers Holdings, Inc., a Lehman Entity, the parent company of Lehman ALI and LCPI, and a Chapter 11 debtor in a bankruptcy proceeding pending in the Bankruptcy Court for the Southern District of New York.

2.1.69    LCPI.  Lehman Commercial Paper, Inc., a Chapter 11 debtor in a bankruptcy proceeding pending in the Bankruptcy Court for the Southern District of New York.

2.1.70    Lehman Adversary Proceeding.  The Debtors' pending adversary proceeding against the Lehman Lenders and/or the Lehman Successors asserting various causes of action including equitable subordination, fraudulent conveyances and preferential transfers.

2.1.71    Lehman ALI.  Lehman ALI, Inc.

2.1.72    Lehman Disputed Administrative Loans.  The post-petition financing provided by Lehman ALI to SunCal Oak Valley, SunCal Heartland, SunCal Northlake, SunCal

Marblehead, SunCal Century City, SunCal PSV, Delta Coves, and SunCal Oak Knoll, which

grants priming liens on all borrower Trustee Debtors' assets, and for super-priority administrative

status to Lehman ALI.  The aggregate amount of the Lehman Disputed Administrative Loans to all

of the Trustee Debtors was approximately $40 million as of March 1, 2011 and continuing to

increase.  The Lehman Disputed Administrative Loans are the subject of claim objections,

specifically the pending 502(d) Objection.  Until these objections are resolved in the applicable

Case, these Lehman Disputed Administrative Loans shall not be Allowed Claims.

 2.1.73     <u>Lehman Claim Objections</u>. The objections filed by the Debtors to the

claims filed by the Lehman Lenders that are based upon the Lehman Disputed Loans and the

Lehman Disputed Administrative Loans, including, but not limited to, the Lehman Recoupment

Objection and the Lehman 502(d) Objection.

 2.1.74     <u>Lehman Entities</u>.  The Lehman Lenders, the Lehman Equity Members and

LBHI.

 2.1.75     <u>Lehman Equity Members</u>.  Lehman Entities that own direct or indirect

membership Interests in all of the Trustee Debtors, except for SunCal Heartland and SunCal

Marblehead.

 2.1.76     <u>Lehman Lenders</u>.  Lehman ALI, LCPI, Northlake Holdings, and OVC

Holdings.

 2.1.77     <u>Lehman Disputed Loans</u>.  Collectively the following loans that are the

purported basis for the Lehman's Disputed Claims:  (a) SunCal Communities I Loan Agreement;

(b) Bickford Second Loan Agreement; (c) Ritter Ranch Loan Agreement; (d) SCC Palmdale Loan;

(e) Interim Loan Agreement; (f) SunCal Oak Knoll/SunCal Torrance Loan Agreement; (g) SunCal

Century City Loan Agreement; (h) SunCal PSV Loan Agreement; (i) SunCal Delta Coves Loan

Agreement; (j) SunCal Marblehead/SunCal Heartland Loan Agreement; (k) Sun Cal Oak Valley

Loan Agreement; (l) SunCal Northlake Loan Agreement; (m) Pacific Point First Loan Agreement;

(n) Pacific Point Second Loan Agreement, and (o) the Lehman Disputed Administrative Loan.

 2.1.78     <u>Lehman Representatives</u>.  The individuals that controlled the Lehman

Entities.

2.1.79    Lehman Successor(s).  Entities other than the Lehman Lenders that either assert to be or are determined by the Bankruptcy Court to be the beneficial owner(s) of the Lehman Disputed Loan(s), including, but not limited to Fenway Capital, Lehman Re and Danske Bank.

2.1.80    Lehman's Disputed Claim(s).  All of the Proofs of Secured Claims filed by a Lehman Lender or a Lehman Successor in the Debtors' Chapter 11 Cases arising from the Lehman Disputed Loans and the Lehman Disputed Administrative Loans.

2.1.81    Lehman's Disputed Lien(s).  All of the alleged liens relating to Proofs of Secured Claims filed by a Lehman Lender or a Lehman Successor in the Debtor's Chapter 11 Cases arising from the Lehman Disputed Loans.

2.1.82    Lexon.  Lexon Insurance Co.

2.1.83    LitCo  A Delaware limited liability company that will be formed for the purpose of (i) purchasing the claims and Litigation Rights held by the Reliance Claimants that choose  to sell such Reliance Claims, (ii) funding the LitCo Plan Loan, and (iii) potentially being selected as the Stalking Horse Bidder under the Group II: Trustee Debtors' Plans.

2.1.84    LitCo Plan Loan.  A loan that will be made by LitCo to the extent necessary to pay Allowed Priority Claims, Allowed Administrative Claims and Post Confirmation Expenses incurred by the Plan Trust, the Plan Trustee and its professionals and to the Trustee Debtors Committee and its professionals if no other source is available from the applicable Group II: Trustee Debtor's Assets.

2.1.85    Litigation Claims.   Any and all interests of the Group II: Trustee Debtors in any and all Claims, rights, causes of action, and objections or defenses to Claims, liens, rights, or causes of action which have been or may be commenced by the Group II: Trustee Debtor(s), the Chapter 11 Trustee, or the Trustee Debtors' Committee, as the case may be, including, but not limited to, any (i) Avoidance Actions; (ii) for turnover of property to the Group II: Trustee Debtors' Estates and/or the Plan Trust; (iii) for the recovery of property or payment of money that belongs to the Debtors' Estates or the Plan Trust; (iv) the right to compensation in the form of damages, recoupment or setoff of the Debtors' Estates and/or the Plan Trust; (v) the Lehman Adversary Proceeding; (vi) the Contract Action, and (vii) any and all other Claims against

1    Lehman's Disputed Claims and/or Disputed Liens referenced in the Plan or the Disclosure

2    Statement.

3        2.1.86    <u>Litigation Recoveries</u>.  Any Cash or other property received by the

4    Chapter 11 Trustee, the Group II: Trustee Debtors, the Trustee Debtors' Committee and/or the Plan

5    Trust, as the case may be, from all or any portion of a Litigation Claim(s), including, but not

6    limited to, awards of damages, attorneys' fees and expenses, interest and punitive damages,

7    whether recovered by way of settlement, execution on judgment or otherwise.

8        2.1.87    <u>Litigation Rights</u>. Any Claims held by a party against the Group II: Trustee

9    Debtors, and if applicable, against third parties arising or relating to the Claim against the

10   applicable Group II: Trustee Debtor, that have not been fixed in a final judgment prior to the

11   Effective Date.

12       2.1.88    <u>Maximum Distributions</u>.  A Distribution to a Holder of an Allowed

13   General Unsecured Claim against a Group II: Trustee Debtor equal to one hundred percent (100%)

14   of the amount of the Holder's Allowed General Unsecured Claim plus interest at the Legal Rate

15   from and as of the Group II: Trustee Debtor's Order for Relief.

16       2.1.89    <u>MB Firm</u>.  Miller Barondess, LLP.

17       2.1.90    <u>Mechanic Lien Claims</u>.  Mechanic Lien Claims arising pursuant to

18   California Civil Code §3110, et seq. that were either allegedly perfected prepetition or otherwise

19   allegedly satisfy the requirements of Bankruptcy Code 546(b).

20       2.1.91    <u>Minimum Increment</u>.  Minimum Increment applicable to the sales of the

21   Group II: Trustee Projects is one hundred thousand dollars ($100,000), until there are only two

22   Qualified Bidders submitting bids for a Group II: Trustee Project, then the Minimum Increment

23   shall be fifty thousand dollars ($50,000).

24       2.1.92    <u>Minimum Sale Price</u>. The minimum gross sale price that must be paid for

25   either the Oak Knoll Project or the Del Amo Project before such project can be sold pursuant to the

26   Plan. Such prices are $22,860,000 and $12,150,000 respectively.

27

28

1     2.1.93  <u>Net Litigation Recoveries</u>.  Litigation Recoveries less associated

2 Administrative Claims and Post-Confirmation Expenses incurred in connection with such

3 Litigation Recoveries.

4     2.1.94  <u>Net Sales Proceeds</u>.  The Cash generated from the sale(s) or liquidation of

5 the Group II: Trustee Debtor(s)' Assets or the Plan Trust's Assets, less payment of selling

6 expenses, taxes, Chapter 11 Trustee fees, and any associated Post-Confirmation Expenses and

7 Administrative Claims incurred in furtherance of such sales or liquidation of such Assets.

8     2.1.95  <u>Net Sales Proceeds Account(s)</u>.  Separate account(s) that will be

9 established by the Plan Trustee at an FDIC insured bank into which all Net Sale Proceeds shall be

10 deposited from the sale of Assets that were allegedly encumbered by a Disputed Secured Claim(s)

11 and/or a Disputed Lien(s).  There shall be a separate Net Sales Proceeds Account for the Net Sale

12 Proceeds allegedly subject to each Disputed Secured Claim(s) and/or Disputed Lien(s), except

13 where there are two Disputed Liens on a single Project, in which case, there shall be a single

14 account for the proceeds generated from that Project.  The Disputed Secured Claim(s) and/or

15 Disputed Lien(s) shall attach to the corresponding Net Sales Proceeds Account(s) pending any

16 Final Order(s) of the Bankruptcy Court resolving the applicable Disputed Secured Claim(s) and/or

17 applicable Disputed Lien(s).  To the extent that a particular Disputed Claim is disallowed or a

18 particular Disputed Lien is avoided (other than transferred to the Estates pursuant to Bankruptcy

19 Code Section 510(c)(2)) or otherwise invalidated, such Net Sales Proceeds allegedly subject

20 thereto shall become Available Cash and shall be transferred to the applicable Distribution

21 Account(s).  To the extent that a particular Disputed Secured Claim and a Disputed Lien are

22 allowed and deemed valid but subject to the equitable subordination causes of action in the

23 Lehman Adversary Proceeding, the funds shall remain in the Net Sales Accounts pending a Final

24 Order on the equitable subordination causes of action in the Lehman Adversary Proceeding.

25     2.1.96  <u>Oak Knoll Break-up Fee</u>. The sum equal to two and one-half (2-1/2%)

26 percent of the Minimum Sale Prince of the Oak Knoll Project plus actual amounts paid by LitCo

27 on Allowed Administrative Claims for the Oak Knoll Case if LitCo is the Stalking Horse Bidder

28 and is not the Winning Bidder.

2.1.97    <u>Oak Knoll Project</u>.  The Project owned by SunCal Marblehead, located in the City of San Clemente, California, as more particularly described herein.

2.1.98    <u>Opening Bid</u>.  Opening Bid means the offer for one, or both of the Group II: Trustee Projects, which is equal to the Minimum Sale Price(s) accepted by the Debtor for either one or both of the Group II: Trustee Projects.

2.1.99    <u>Orders for Relief Date</u>.  The following are dates that orders for relief were entered for each of the Trustee Debtors:

| | |
|---|---|
| SunCal Oak Valley | January 6, 2009 |
| SunCal Heartland | January 6, 2009 |
| SunCal Northlake | January 6, 2009 |
| SunCal Marblehead | January 6, 2009 |
| SunCal Century City | January 6, 2009 |
| SunCal PSV | January 6, 2009 |
| Delta Coves | January 6, 2009 |
| SunCal Torrance | January 6, 2009 |
| SunCal Oak Knoll | January 6, 2009 |

2.1.100   <u>Palmdale Hills</u>.  Palmdale Hills Property, a Delaware limited liability company, a Voluntary Debtor herein, and the owner of the Ritter Ranch Project.

2.1.101   <u>Person</u>.  An individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, governmental authority, governmental unit, committee or other entity of whatever nature.

2.1.102   <u>Petition Dates</u>.  The following are dates that each of the Voluntary Debtors filed their Voluntary Chapter 11 petitions or Creditors filed involuntary Chapter 11 petitions against the Trustee Debtors:

| | |
|---|---|
| Palmdale Hills | November 6, 2008 |
| SunCal Beaumont | November 6, 2008 |
| SCC Palmdale | November 7, 2008 |
| SunCal Johannson | November 7, 2008 |
| SunCal Summit Valley | November 7, 2008 |
| SunCal Emerald | November 7, 2008 |
| SunCal Bickford | November 7, 2008 |
| Acton Estates | November 7, 2008 |
| Seven Brothers | November 7, 2008 |
| SJD Partners. | November 7, 2008 |
| SJD Development | November 7, 2008 |
| Kirby Estates | November 7, 2008 |

| SunCal I | November 7, 2008 |
| SunCal III | November 7, 2008 |
| SCC Communities | November 20, 2008 |
| Del Rio | November 20, 2008 |
| Tesoro | November 20, 2008 |
| Delta Coves Ventures, LLC | November 14, 2008 |
| SunCal Heartland, LLC | November 12, 2008 |
| SunCal Marblehead, LLC | November 12, 2008 |
| LB-L-SunCal Northlake, LLC | November 12, 2008 |
| LB-L-SunCal Oak Valley, LLC | November 12, 2008 |
| SunCal Century City, LLC | November 14, 2008 |
| SunCal PSV, LLC | November 14, 2008 |
| SunCal Torrance Properties, LLC | November 14, 2008 |
| SunCal Oak Knoll, LLC | November 20, 2008 |

2.1.103   Plan(s).  The "Third Amended Chapter 11 Plan(s) Filed by SunCal Plan Proponents In The Chapter 11 Cases Of SunCal Oak Knoll, LLC and SunCal Torrance, LLC," together with the Exhibits thereto, as the same may be amended or modified from time to time in accordance with the Plan.

2.1.104   Plan Period. The period from the Effective Date to the Plan Termination Date.

2.1.105   Plan Termination Date. The fifth (5th) anniversary date of the Effective Date, unless the Plan Trustee elects an earlier date.

2.1.106   Plan Sponsor.  The entity that has committed to cause and/or arrange the funding of certain specified obligations under the Plan on or after the Effective Date.  The Plan Sponsor is Acquisitions..

2.1.107   Plan Trust.  A liquidating trust to be established prior to or on the Effective Date, with Acquisitions as the Plan Trustee and the Holders of Allowed Claims against the Debtors as the beneficiaries. The purpose of the Plan Trust will be to liquidate the Debtors' Assets (other than Assets that are excluded by the Plan Trustee on the grounds that they lack value or would be difficult to administer) and to otherwise consummate the Plan.

2.1.108   Plan Trustee. The Plan Trustee under the Plan Trust Agreement is Acquisitions.

MAINDOCS-#164959-v3-SunCal_3rd_Am_Group_II_TD_DS.DOC

1             2.1.109   Plan Trust Beneficiaries. The Plan Trust Beneficiaries are (i) the holders of

2    Beneficial Interests, as of any point in time, and (ii) holders of Allowed Claims that shall be

3    satisfied from Plan Trust Assets in accordance with the terms of the Plan.

4             2.1.110   Plan Trust Assets. Plan Trust Assets means all property within the Chapter

5    11 estates of the Group II: Trustee Debtors, other than property that is affirmatively excluded by

6    the Plan Trustee.

7             2.1.111   Post-Confirmation Expenses.  The fees and expenses incurred by the Plan

8    Sponsor, the Plan Trustee and the Trustee Debtors' Committee and their professionals following

9    the Confirmation Date (including the fees and costs of Professionals) for the purpose of

10    (i) prosecuting and liquidating the Litigation Claims; (ii) objecting to and resolving Disputed

11    Claims and Disputed Liens; (iii) selling or otherwise liquidating the Plan Trust's Assets;

12    (iv) effectuating Distributions under the Plan; and (v) otherwise consummating the Plan and

13    closing the Group II: Trustee Debtors' Chapter 11 Cases.

14            2.1.112   Priority Claim.  Any Claim, other than an Administrative Claim or a Tax

15    Claim, to the extent entitled to priority under Section 507(a) of the Bankruptcy Code.

16            2.1.113   Pro Rata.  Proportionately, so that with respect to any distribution in

17    respect of any Allowed Claim, the ratio of (a)(i) the amount of property distributed on account of

18    such Allowed Claim to (ii) the amount of such Allowed Claim, is the same as the ratio of (b)(i) the

19    amount of property distributed on account of all Allowed Claims of the Class or Classes sharing in

20    such distribution to (ii) the amount of all Allowed Claims in such Class or Classes.

21            2.1.114   Professional.  A Person or Entity (a) employed by the Group II: Trustee

22    Debtors, the Trustee Debtors' Committee pursuant to a Final Order in accordance with Sections

23    327 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to the

24    Effective Date, pursuant to Sections 327, 328, 3291 330 and 331 of the Bankruptcy Code, or (b)

25    for which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to

26    Section 503(b) of the Bankruptcy Code.

27            2.1.115   Professional Fees.  All Allowed Claims for compensation and for

28    reimbursement of expenses under Sections 328, 330 and/or 503(b) of the Bankruptcy Code

MAINDOCS-#164959-v3-SunCal_3rd_Am_Group_II_TD_DS.DOC

2.1.116  <u>Projects</u>.  The Debtors' residential real estate development projects and other assets as separately defined herein and described in Exhibit "1" to the Disclosure Statement.

2.1.117  <u>Qualifying Bid</u>.  Qualifying Bid means, with respect to any bid on a Group II: Trustee Project, a bid made by Qualifying Bidder that is A) equal to or in excess of the Initial Overbid Amount, unless it is the Initial Overbid, or B) in excess of the immediately preceding Qualifying Bid by the Minimum Increment, if it is not the Initial Overbid.

2.1.118  <u>Qualifying Bidder</u>.  Qualifying Bidder means a bidder who a) has deposited the sum of five hundred thousand dollars ($500,000) in an escrow designated by the SunCal Plan Proponents; b) who has provided the SunCal Plan Proponents evidence confirming that such bidder has the financial means to acquire the applicable Group II: Trustee Project(s) that such bidder is seeking to acquire, and c) agreed that this sum will be forfeited as liquidated damages if such bidder is the Winning Bidder and fails to perform.

2.1.119  <u>Reliance Claim</u>. An Allowed Unsecured Claim, Allowed Mechanic's Lien Claim, or Allowed Bond Indemnification Claim against a Group II: Trustee Debtor that would entitle the holder thereof to be the beneficiary of any equitable subordination judgment obtained against a Lehman Entity by such Group II: Trustee Debtor.  All Allowed Mechanic's Lien Claims, Allowed Bond Indemnification Claims and certain Allowed General Unsecured Claims are Reliance Claims.  A list of the Reliance Claims for the Group II: Trustee Debtors is attached hereto as Exhibit "8."

2.1.120  <u>Reliance Claimant</u>. The holder of a Reliance Claim. A list of the Reliance Claimants for the Group II: Trustee Debtors is attached hereto as Exhibit "8."

2.1.121  <u>Sale Period</u>.  The Sale Period is the time period during which the SunCal Plan Proponents must consummate a sale or liquidation of the Group II: Trustee Projects. The Sales Period shall commence on or before the Confirmation Date and shall expire thirty days after the Effective Date, unless extended by the Bankruptcy Court after notice and hearing.

2.1.122  <u>SCC LLC</u>.  SCC Acquisitions LLC, a limited liability company, a subsidiary of Acquisitions and an indirect and/or a direct parent company of all of the Debtors.

1           2.1.123   Schedules.  The schedules of assets and liabilities and list of equity

2  security holders Filed by the Group II: Trustee Debtors, as required by Section 521(1) of the

3  Bankruptcy Code, Bankruptcy Rules 1007(a)(3) and (b)(1), and Official Bankruptcy Form No. 6,

4  as amended from time to time.

5           2.1.124   Stalking Horse Bidder.  The Qualified Bidder who submits the Opening

6  Bid that is accepted by the applicable Debtor.

7           2.1.125   SunCal.  The SunCal Companies, a trade name for Acquisitions and its

8  Affiliates.

9           2.1.126   SunCal Management.  SunCal Management, LLC, a Delaware limited

10  liability company, and the former property manager for the Projects, which has been succeed by

11  Argent Management.

12           2.1.127   SunCal Oak Knoll. SunCal Oak Knoll, LLC, a Delaware limited liability

13  company, a Trustee Debtor (a Group II: Trustee Debtor), and the owner of the Oak Knoll Project.

14           2.1.128   SunCal Oak Knoll/SunCal Torrance Loan Agreement.  That certain Loan

15  Agreement, dated as of November 30, 2006, between SunCal Torrance and SunCal Oak Knoll, as

16  borrowers, and Lehman ALI, as agent and sole lender, pursuant to which Lehman ALI made a loan

17  in the maximum aggregate principal amount of approximately $167.7 million.  The SunCal Oak

18  Knoll/SunCal Torrance Loan Agreement is allegedly secured by first-priority deeds of trust on the

19  Oak Knoll and the Del Amo Projects.  The SunCal Oak Knoll/SunCal Torrance Loan Agreement

20  has an alleged balance due of $158,141,364.64 as of March 30, 2009.  . The proofs of claim filed

21  with respect to this loan agreement are the subject of the Lehman Adversary Proceeding and the

22  Lehman Claim Objections.

23           2.1.129   SunCal Plan Proponents.  The Voluntary Debtors, in their capacity as

24  debtors and debtors in possession in their respective Chapter 11 cases, and Acquisitions as a

25  creditor and party-in-interest, that are proposing the Plans.

26           2.1.130   SunCal Torrance. SunCal Torrance, LLC, a Delaware limited liability

27  company, a Trustee Debtor (a Group II: Trustee Debtor), and the owner of the Del Amo Project.

28

MAINDOCS-#164959-v3-SunCal_3rd_Am_Group_II_TD_DS.DOC

1              2.1.131   Tax.  Any tax, charge, fee, levy, impost or other assessment by any federal,

2 state, local or foreign taxing authority, including, without limitation, income, excise, property,

3 sales, transfer, employment, payroll, franchise, profits, license, use, ad valorem, estimated,

4 severance, stamp, occupation and withholding tax.  "Tax" shall include any interest or additions

5 attributable to, or imposed on or with respect to such assessments.

6              2.1.132   Tax Claim.  Any Claim for any Tax to the extent that it is entitled to

7 priority in payment under Section 507(a)(8) of the Bankruptcy Code.

8              2.1.133   Torrance Break-up Fee. The sum equal to two and one-half (2-1/2%)

9 percent of the Minimum Sale Prince of the Oak Knoll Project plus actual amounts paid by LitCo

10 on Allowed Administrative Claims for the Torrance Case if LitCo is the Stalking Horse Bidder and

11 is not the Winning Bidder.

12            2.1.134   Trustee Debtor(s). The following Debtors, individually or collectively, that

13 are represented by the Chapter 11 Trustee: Delta Coves, SunCal Heartland, SunCal Marblehead,

14 SunCal Northlake, SunCal Oak Valley , SunCal Century City, SunCal PSV, SunCal Torrance, and

15 SunCal Oak Knoll.

16            2.1.135   Trustee Debtors' Committee.  The Official Committee of Unsecured

17 Creditors of the Trustee Debtors appointed in the Cases pursuant to Section 1102 of the

18 Bankruptcy Code.

19            2.1.136   Unpaid Secured Real Property Tax Claims.  Secured Claims held by

20 various government entities secured by liens on the underlying real properties owned by the

21 Debtors but that are non-recourse to the Debtors.

22            2.1.137   Unsecured Claim. An Unsecured Claim is any Claim that is not an

23 Administrative Claim, Tax Claim, Secured Claim, or Priority Claim.

24            2.1.138   Voluntary Debtor(s).  The following  Chapter 11 debtors and debtors-in-

25 possession, individually or collectively, Palmdale Hills, SunCal I, SunCal III, SCC Palmdale,

26 Acton Estates, SunCal Beaumont, SunCal Emerald, SunCal Johansson, SunCal Bickford, SunCal

27 Summit, Seven Brothers, Kirby Estates, SJD Partners, SJD Development, SCC Communities, Del

28 Rio and Tesoro.

1    2.1.139   <u>Winning Bid</u>. The highest and best Qualifying Bid received for the Oak

2    Knoll Project or the Del Amo Project.

3    2.1.140   <u>Winning Bidder</u>.  The party that submits the highest Qualifying Bid that is

4    accepted by the applicable Debtor.

5    **2.2    <u>Rules of Construction</u>.**

6    For purposes of the Plan and this Disclosure Statement, unless otherwise provided herein or

7    in the Plan, (a) whenever from the context it is appropriate, each term, whether stated in the

8    singular or the plural, will include both the singular and the plural; (b) each pronoun stated in the

9    masculine, feminine or neuter includes the masculine, feminine and neuter; (c) any reference in the

10    Plan or this Disclosure Statement to an existing document or schedule filed or to be filed means

11    such document or schedule, as it may have been or may be amended, modified or supplemented

12    pursuant to the Plan; (d) any reference to an entity as a Holder of a Claim or Interest includes that

13    entity's successors and assigns; (e) except as otherwise indicated herein all references in the Plan

14    or this Disclosure Statement to Sections, Articles and Exhibits are references to Sections, Articles

15    and Exhibits of or to the Plan; (f) the words "therein," "thereunder" and "thereto" refer to the Plan

16    in its entirety rather than to a particular portion of the Plan; and (g) unless otherwise provided in

17    the Plan or this Disclosure Statement, any reference in the Plan or this Disclosure Statement to a

18    contract, instrument, release, indenture, agreement, or other document being in a particular form or

19    on particular terms and conditions means that such document shall be substantially and materially

20    in such form or substantially and materially on such terms and conditions; (h) any reference in the

21    Plan or this Disclosure Statement to a document, schedule, or exhibit to the Plan or Disclosure

22    Statement Filed or to be Filed means such document, schedule, or exhibit, as it may have been or

23    may be amended, modified, or supplemented; and (i) the rules of construction set forth in Section

24    102 of the Bankruptcy Code shall apply to the extent such rules are not inconsistent with the

25    express terms of the Plan or this Disclosure Statement or any other provision in this Section.

26    **2.3    <u>Exhibits</u>.**

27    All Exhibits to the Plan are incorporated into and are a part of the Plan as if set forth in full

28    therein.

MAINDOCS-#164959-v3-SunCal_3rd_Am_Group_II_TD_DS.DOC

# III.

## PLAN CONFIRMATION DEADLINES

The Bankruptcy Court has not confirmed the Plan described in this Disclosure Statement. Accordingly, the terms of the Plan are not binding on anyone.  However, if the Bankruptcy Court confirms the Plan, then the Plan will be binding on the Debtor(s), the Plan Trustee, and on all Creditors and Interest Holders in such Cases.

**3.1**     **Time and Place of the Confirmation Hearing.**

The hearing where the Bankruptcy Court will determine whether or not to confirm the Plan will take place at 411 West Fourth Street, Santa Ana, CA 92701-4593 on October 24, 2011, at 9:30 a.m. in Courtroom 5A.

**3.2**     **Deadline for Voting for or Against the Plan.**

If you are entitled to vote, it is in your best interest to timely vote on the enclosed ballot and return the ballot to:

> Winthrop Couchot Professional Corporation
> 660 Newport Center Drive, Suite 400
> Newport Beach, CA 92660
> Facsimile:  (949) 720-4111
> Attn:  P.J. Marksbury

Your ballot must be **received by** September 26, 2011**,** or it will not be counted.

**3.3**     **Deadline for Objecting to the Confirmation of the Plan(s).**

Objections to the confirmation of the Plan must be filed with the Bankruptcy Court, and served upon the following parties so that they are received by September 26, 2011:

| **Counsel to the Voluntary Debtors** | Paul J. Couchot<br>Winthrop Couchot Professional Corporation<br>660 Newport Center Drive, Suite 400,<br>Newport Beach, CA 92660 |
| --- | --- |
| **Authorized Agent for Voluntary Debtors** | Bruce V. Cook<br>General Counsel<br>2392 Morse Ave<br>Irvine, CA 92614-6234 |
| **Counsel for SunCal Management LLC and SCC Acquisitions Inc.** | Ronald Rus<br>Rus Miliband & Smith P.C. |

-26-

2211 Michelson Drive, Seventh Floor
Irvine, California 92612

**Authorized Agent for**
**SunCal Management and**
**SCC Acquisitions, Inc**.

Bruce V. Cook
General Counsel
2392 Morse Ave
Irvine, CA 92614-6234

### 3.4    Identity of Person to Contact for More Information Regarding the Plan.

Any interested party desiring further information about the Plan should contact the

Voluntary Debtors' counsel, Winthrop Couchot Professional Corporation, 660 Newport Center

Drive, Suite 400, Newport Beach, CA 92660, Attn:  Paul J. Couchot, (949) 720-4100; Peter W.

Lianides, (949) 720-4155; Payam Khodadadi, (949) 720-4160.

### 3.5    Disclaimer.

The information contained in this Disclosure Statement is provided by the SunCal Plan

Proponents.  The SunCal Plan Proponents represent that everything stated in this Disclosure

Statement is true to the best of their knowledge.  The Bankruptcy Court has not yet determined

whether or not the Plan is confirmable and makes no recommendation as to whether or not you

should support or oppose the Plan.

The discussion in this Disclosure Statement regarding the Group II: Trustee Debtors may

contain "forward looking statements" within the meaning of the Private Securities Litigation

Reform Act of 2095.  Such statements consist of any statement other than a recitation of historical

fact and can be identified by the use of forward looking terminology such as "may," "expect,"

"anticipate," "estimate," or "continue," or the negative thereof or other variations thereon or

comparable terminology.  The reader is cautioned that all forward looking statements are

necessarily speculative and there are certain risks and uncertainties that could cause actual events

or results to differ materially from those referred to in such forward looking statements.  The

liquidation analyses, distribution projections, projections of financial results and other information

are estimates only, and the timing, amount and value of actual distributions to Creditors may be

affected by many factors that cannot be predicted.  Therefore, any analyses, estimates, or

projections may or may not turn out to be accurate.

1    The SunCal Plan Proponents and their professionals have made a diligent effort to identify

2 in this Disclosure Statement all Litigation Claims, including claims for relief, counterclaims, and

3 objections to claims.  However, no reliance should be placed on the fact that a particular Litigation

4 Claim is or is not identified in this Disclosure Statement.  The Group II: Trustee Debtors or other

5 parties in interest may seek to investigate, file and prosecute Litigation Claims after the

6 Confirmation Date, or the Plan Trust may seek to do so after the Effective Date of the Plan whether

7 or not the Litigation Claims are identified in this Disclosure Statement.

8    **IV.**

9    **FACTUAL BACKGROUND OF THE DEBTORS**

10    **4.1    The Formation of the Debtors and the Projects.**

11        **4.1.1    Overview of the Debtors and Their Projects.**

12    The Group II: Trustee Debtors are two of twenty-six entities (collectively the "Debtors")

13 that were formed pursuant to a joint venture between Affiliates of the SunCal Companies

14 ("SunCal") and the Lehman Entities (the "SunCal/Lehman Joint Venture"). The Debtors' role in

15 the venture was to own and develop the large residential projects that were the core assets in this

16 joint undertaking.

17    At the inception of SunCal/Lehman Joint Venture, it was agreed that SunCal would be the

18 developer/manager of the Projects and the Lehman Entities would provide the necessary capital.

19 Attached hereto as Exhibit "1" is a general description of all of the Debtors' Projects, including the

20 Group II: Trustee Projects, and the Debtors' other primary Assets, excluding Cash and the

21 Litigation Claims, and a description of the loans for the Projects that are not a part of Group II:

22 Trustee Projects.

23    All of the Debtors are Affiliates of Acquisitions and SCC LLC.  Some of the Debtors

24 directly own the Projects, while others serve as holding companies, owning Allowed Interests in the

25 Debtors that hold title to the Projects.  SunCal Management, LLC, a SunCal Affiliate, has

26 management contracts with respect to all of the Projects and manages the Debtors' day-to-day

27 business affairs.

28

1    The seventeen Debtors who are referred to herein as the "Voluntary Debtors" are wholly

2    owned by SunCal Affiliates, and consequently the SunCal Affiliates have full corporate

3    governance authority over these entities.  The Voluntary Debtors own eleven (11) of the Projects.

4    In the case of the nine Trustee Debtors, the SunCal Affiliates and the Lehman Affiliates initially

5    shared ownership equally (50% each). However, after the Petition Date, the SunCal Affiliates

6    became the owner of hundred percent (100%) of the equity in two of the nine Trustee Debtors -

7    SunCal Heartland and SunCal Marblehead.  The Trustee Debtors own nine (9) Projects.

8    Attached hereto as Exhibit "2" is a chart that sets forth the appraised value of the Group II: Trustee

9    Debtors' Projects. This chart lists both the Lehman Lenders' value estimates and SunCal's

10   valuation estimates.[2]  As the chart indicates, the Lehman Lenders' valuation for the Group II:

11   Trustee Projects is in the aggregate amount of $73,000,000, while the Debtors' valuation of the

12   Group II: Trustee Projects is in the aggregate amount of $38,900,000.

13   The Plan eliminates any potential value disputes by providing for the sale of the Group II:

14   Trustee Projects through an auction that is designed to yield the highest market price for these

15   assets. Accordingly, to the extent any other party believes the Group II: Trustee Projects have a

16   greater value than the Opening Bid offered by another Qualifying Bidder, they will have the

17   opportunity to submit a Qualifying Bid (but no credit-bids will be allowed) that exceeds the

18   Opening Bid and, if they so desire, to become the Winning Bidder by offering the highest

19   Qualifying Bid. This market sale process will insure that the rights of all stakeholders are

20   protected.

21   ### 4.1.2    The Debtors' Primary Secured Creditors and Their Disputed Claims.

22   Lehman ALI holds the primary secured claims against the Oak Knoll Project and the Del

23   Amo Project. Lehman ALI's secured claim against the Oak Knoll Project and the Del Amo Project,

24   which are secured by a first priority deed of trust, is based upon funding provided under the terms

25   of the SunCal Oak Knoll/SunCal Torrance Loan Agreement. The asserted balance due under terms

26   of this loan was $158,141,365 as of March 30, 2009.

27

28

---

[2] Values may have changed since these analyses were prepared.

-29-

### 4.1.3    Disputed Claims and Liens.

As discussed in detail herein, during the course of the Debtors' Cases, the Debtors initiated litigation disputing the validity of Lehman's Disputed Secured Claims, and the validity, priority and extent of Lehman's Disputed Liens (which includes the liens against the Group II: Trustee Projects). This litigation is being pursued through the Lehman Adversary Proceeding, various contested matters, and in potential lawsuits based on the post-petition conduct of the Lehman Entities and/or their agents.

Attached hereto as Exhibit "3" is a chart that sets forth Lehman's Disputed Secured Claims, the alleged Holders of the Lehman Disputed Secured Claims, the collateral encumbered by the Lehman Disputed Liens, and the alleged outstanding amount based on the filed Proofs of Claim. As the chart indicates, the total of Lehman's Disputed Secured Claims (based upon the proofs of claims filed in the Debtor's bankruptcy cases) with respect to the Group II: Trustee Debtors is approximately $158,141,364.64 as of March 30, 2009.

### 4.1.4    A Summary of All of the Alleged Claims Against the Debtors.

Attached hereto as Exhibit "4" is a chart that sets forth the prepetition Claims that have been asserted against all of the Debtors. In summary, the asserted Claims against the Group II: Trustee Debtors consist of the following:

| Claims | Oak Knoll Project | Del Amo Project |
|---|---|---|
| Unpaid Secured Real Property Tax Claims | $4,156,073 | $773,211 |
| The Disputed Lehman Secured Claims | $158,141,365 | $158,141,365 |
| Mechanics Lien Claims | $4,687,891 | $0 |
| Administrative and Priority Claims | $18,022,329 | $2,064,158 |
| General Unsecured Claims Including alleged Bond Claims | $938,074 | $203,838 |

The SunCal Plan Proponents believe that these balances owed to the Lehman Lenders will ultimately be reduced through the Lehman Adversary Action, the Contract Action and the Lehman claims objections resulting in lower "Allowed" claims balances.

### 4.1.5    Summary of the Group II:  Trustee Debtors' Cash.

The following chart sets forth the Group II: Trustee Debtors' cash on hand as of July 6, 2011.

-30-

| Group II: Trustee Debtors | Amount |
|---|---|
| SunCal Oak Knoll | $502,124.84 |
| SunCal Torrance | $150,116.20 |
| **Group II: Trustee Debtors' Total** | $652,241.04 |

Although the Lehman Lenders may allege that they hold liens on the above cash, a review of the applicable lien documents indicates that any purported liens on the cash were not validly perfected. This means that these liens can be avoided, allowing the unsecured creditors recourse to these funds. Moreover, even if the liens against these accounts were properly perfected, the amount secured by these liens, and their priority and their enforceability will be subject to the results of the Lehman Claim Objections and the Lehman Adversary Proceeding.

**4.2** **Factual Circumstances Leading to the Filing of the Debtors' Chapter 11 Cases.**

**4.2.1** **Introduction.**

In this section of the Disclosure Statement, the SunCal Plan Proponents have provided a brief description of the relationship between the Debtors and the Lehman Entities. This background is relevant to the Group II: Trustee Debtors, and in fact all of the Debtors, for the following reasons. First, most of the unsecured claims asserted against the Debtors were incurred at the insistence of the Lehman Lenders, and they would have been paid if the Lehman Lenders had honored their obligation to pay these claims. Second, a substantial part of claims that the Lehman Lenders failed to pay are being asserted against *all of the Debtors*. If the litigation against the Lehman Lenders discussed herein is successful, it will, at a minimum, reduce the pool of claims against the Group II: Trustee Debtors, and thereby increase the dividend payable to the remaining creditors. Third and finally, this history allows the Creditors to take the measure of the parties who are now proffering the competing plan – the Lehman Lenders.  As the within discussion will establish, the Lehman Lenders failed to pay the claims of Creditors prepetition, the Lehman Lenders attempted to foreclose upon the Group II: Trustee Projects post-petition in order to deny the unsecured creditors any recovery on the claims they failed to pay, and finally, when this foreclosure effort failed, the Lehman Lenders attempted to destroy the Debtors' reorganization and sale efforts by manipulating LCPI's alleged automatic stay.

MAINDOCS-#164959-v3-SunCal_3rd_Am_Group_II_TD_DS.DOC

### 4.2.2    Background of the SunCal Companies.

SunCal is a family-owned and operated real estate business that has been successfully developing properties throughout the western United States for over 70 years.  SunCal's business focuses upon the "development" of residential land. A typical SunCal development begins with the acquisition of one or more parcels of raw land. Thereafter, the SunCal team develops a master plan for the acreage that incorporates streets, homes, parks, schools and commercial areas, and then it works with the applicable municipal planning authorities (the city, county, state and federal) to secure the necessary approvals or "entitlements" to gain approval of this plan. This process, which requires the assistance of land planners, civil engineers, architects, lawyers, and other land specialists, takes a period of years. Once the master plan is approved, SunCal provides for the grading of the project and the installation of the foundational infrastructure (streets, utilities, etc.) and then sells the lots or parcels within the project to merchant builders.

### 4.2.3    The Origins of the SunCal/Lehman Joint Venture.

SunCal historically financed its projects with loans and/or equity from a number of different sources.  However, beginning in 2007, an increasing number of SunCal's projects were financed by the Lehman Entities, as Mark Walsh ("Walsh"), the head of LBHI's Global Real Estate Group, began cultivating a business relationship with SunCal's principals.

By 2003, the Lehman Entities and SunCal had entered into joint ventures involving approximately fifteen projects.  By 2007, that number had grown to over forty, and the Lehman Entities had become, with limited exceptions, the exclusive provider of financing for the SunCal Projects pursuant to a written agreement executed in 2006.  The Lehman Entities also consisted of the Lehman Equity Members that either directly or indirectly owned a fifty percent (50%) equity interest in all nine of the Trustee Debtors.

In their dealings with SunCal, the Lehman Representatives made no distinction between Projects financed by Lehman ALI and Projects financed by LCPI. They also made no distinction between the Debtors in which Lehman Equity Members held 50% equity memberships or the Debtors in which the Lehman Entities held no equity membership interest.  As agents of the financial partner in the parties' joint venture, the Lehman Representatives would determine which

1    Lehman Entity would provide financing on which Projects, and would dictate the structure that the

2    financing would take, according to whatever suited the Lehman Entities' needs.

3    **4.2.4    Lehman's Effective Control over the Management of the Debtors and**

4    **Promises of Ongoing Funding.**

5    Prior to the market downturn in the middle of 2007, Lehman Representatives afforded

6    SunCal substantial discretion in the management and development of the Projects.  The Debtors

7    would contract with third-party vendors to perform grading, health and safety compliance,

8    construction, landscaping, and other necessary services on the Project sites, and they would work

9    with the local municipalities to obtain the necessary entitlements and other authorizations

10    necessary to proceed with development.  The Lehman Representatives, SunCal and the Debtors

11    would discuss anticipated quarterly expenditures at periodic budget meetings, and, as expenses

12    were incurred each month, SunCal and the Debtors would submit requests for payment to the

13    Lehman Representatives, supported by the necessary documentation. The Lehman Representatives

14    would then provide the funding necessary to pay these expenses.

15    During the third quarter of 2007, the foregoing management and payment dichotomy

16    changed, after the real estate market experienced a sudden downturn, and many of the Projects

17    significantly declined in value.  In response to this dramatic economic change, a series of high

18    level discussions occurred between SunCal's representatives and the Lehman Representatives --

19    including Walsh, Paul Hughson ("Hughson") and Frank Gilhool ("Gilhool"), the Managing

20    Directors of Lehman's Global Real Estate.  In these discussions, SunCal's representatives, acting

21    on behalf of the Debtors, expressed concerns about the loans on the Projects being out of balance,

22    and suggested shutting down the Projects, or at least slowing the pace of development.  However,

23    Walsh specifically instructed SunCal not to slow down or stop work.  He assured SunCal that the

24    Lehman Entities would provide the necessary funding to pay vendors and to keep the development

25    of the Projects moving forward.

26    The foregoing assurances of payments were confirmed in numerous telephone

27    conversations between Gilhool and SunCal's COO, Frank Faye ("Faye"), SunCal's General

28    Counsel, Bruce Cook ("Cook"), Steve Elieff and/or Bruce Elieff that took place during 2007 and

1   2008. In each exchange, Gilhool assured SunCal that the Lehman Entities were committed to

2   funding the debts and obligations being incurred at the Projects and they continued to insist that

3   work proceed.

4        During this time frame, the Lehman Representatives became much more "hands on,"

5   scrutinizing and approving all budgets and expenses through a new control and approval structure.

6   Under the new structure, SunCal would submit budgets to the Lehman Representatives on a

7   weekly basis and explain, during periodic conference calls, what Project payables they believe had

8   to be paid and what work had to be performed on the Projects.  The Lehman Representatives

9   would then unilaterally decide what future work would proceed, the Lehman Representatives

10  would authorize the work and the Lehman Representatives would decide what payables would be

11  paid timely by designating them as "urgent," and what other payables were not urgent and hence

12  would not be paid on a timely basis.  However, even under this new Lehman controlled

13  management and payment regime, the Lehman Representatives made it clear that all payables

14  being incurred would be funded.

15          **4.2.5    The 2008 Restructuring Agreement.**

16       By the fall of 2007, both SunCal and the Lehman Representatives contemplated entering

17  into a restructuring agreement in the near term, with a closing to occur no later than January or

18  February of 2008.  However, this transaction was delayed by the Lehman Entities' extensive

19  documentation demands until May 23, 2008. On this date, SunCal and most of the Debtors finally

20  entered into an omnibus "Restructuring Agreement" with LBHI, Lehman ALI and the other

21  Lehman Entities.  The same Lehman Representative signed the Restructuring Agreement on behalf

22  of all of the Lehman Entities.

23       Pursuant to the Restructuring Agreement, Lehman ALI, "as the Lender with respect to each

24  Loan," committed, among other things, to: (1) make advances under existing loans to fund the

25  continuing costs necessary to preserve the value of the Projects; (2) move forward to resolve the

26  accrued outstanding subcontractor payables, i.e., to make sure that the Projects' creditors were paid

27  for their work; and (3) to close the transaction, whereby newly-created Lehman Entities would

28  assume the debt and obligations of the Projects.

MAINDOCS-#164959-v3-SunCal_3rd_Am_Group_II_TD_DS.DOC

1    As originally executed in May 2008, the Restructuring Agreement applied to twelve of the

2    twenty Projects (as well as several other projects not at issue in the Lehman Adversary

3    Proceeding): (1) Acton Estates; (2) Beaumont Heights; (3) Bickford Ranch; (4) Emerald

4    Meadows; (5) Heartland; (6) Johannson Ranch; (7) Marblehead; (8) Northlake; (9) Oak Valley;

5    (10) Pacific Point; (11) Ritter Ranch; and (12) Summit Valley. The Debtors that owned and/or

6    held equity interests in the entities that owned these Projects were signatories to the May 2008

7    agreement.[3]

8    Between May and August 2008, the parties agreed to add four additional projects to the

9    Restructuring Agreement: (1) Del Rio; (2) Joshua Ridge; (3) Palm Springs Village; and (4) Tesoro

10    Burnham, and the four Debtors associated with these Projects—SunCal Del Rio, SCC

11    Communities, SunCal PSV, and SunCal Tesoro. Only four Projects were not included in the

12    Restructuring Agreement: Century City, Delta Coves, Oak Knoll and Del Amo. Accordingly, the

13    four Debtors associated with these Projects—SunCal Century City, Delta Coves, SunCal Oak

14    Knoll and SunCal Torrance—were not signatories thereto. Lehman ALI was the lender on each of

15    these Projects and, as with the other Projects, Lehman ALI continued to insist that these four

16    debtors proceed with the development of the four Projects, it approved all expenses, and it

17    continually provided assurances of payment.

### 4.2.6    The Lehman Lenders Hire Radco.

19    Subsequent to the execution of the Restructuring Agreement, Lehman ALI arranged for a

20    third party, Radco, to directly settle outstanding contractor payables, as its agent. Radco was

21    provided some limited funding and authority to negotiate settlements, and did in fact reach

22    settlement with a number of creditors. The funding for these settlements, whether the debts related

23    to Lehman ALI or LCPI funded Projects, came from the same source. Lehman ALI and LCPI also

24

---

25    [3] Specifically, the Restructuring Agreement was entered into by, among others, the "Borrowers,"
"Grantors" and "Pledgors," as defined in Annex 1 thereto. The "Borrowers" included SunCal Marblehead,
26    SunCal Heartland, SunCal Northlake, SunCal Oak Valley, SJD Partners, Palmdale Hills, SCC Palmdale,
SunCal I, SunCal III, and SunCal Bickford.
27    The "Grantors" included SunCal Marblehead, SunCal Heartland, SunCal Northlake, SunCal Oak Valley,
SJD Partners, Palmdale Hills, SunCal Bickford, SunCal Acton, SunCal Summit and SunCal Emerald, and
28    Debtors SunCal Beaumont and SunCal Johannson.
    The "Pledgors" included SCC Palmdale, SunCal I, SunCal Summit and SJD Development.

MAINDOCS-#164959-v3-SunCal_3rd_Am_Group_II_TD_DS.DOC

1    provided approval for new work on the Projects, and Lehman ALI paid for some of this work.

2    However, this funding was minimal and it soon stopped.

3         In August 2008, Lehman ALI withdrew funding and settlement authority from Radco,

4    leaving millions of dollars in outstanding contractor payables unresolved, notwithstanding the

5    contrary provisions in the Restructuring Agreement.  Leman ALI's actions also impaired the

6    Debtors' ability to resolve ongoing public health and safety issues arising at the Projects.

7    Ultimately, only a fraction of the total outstanding payables were resolved, contrary to the  past

8    promises made by Lehman Representatives.

9        **4.2.7**   **The Lehman Lenders' Failure to Close on the Settlement Agreement.**

10         Pursuant to the terms of the Restructuring Agreement, the parties agreed to enter into a

11    Settlement Agreement, the form of which was attached to the Restructuring Agreement.  The

12    Settlement Agreement provided for the transfer of the Projects included within the Restructuring

13    Agreement to a series of newly formed Lehman-controlled entities (each with "SCLV" in its name,

14    for "SunCal-Lehman Venture"). The agreement further provided that the entity taking title to the

15    Project would assume the  Lehman Lender debt obligations associated with the Projects, assume

16    certain bond obligations associated with the Projects, and provide indemnifications to SunCal and

17    the Debtors for unpaid claims.

18         On August 25, 2008, the Settlement Agreement and a series of related documents were

19    formally executed by SunCal and the applicable Lehman Lenders and Lehman Equity Members at

20    a meeting held in Los Angeles on August 25, 2008.  Once these documents were signed, all that

21    remained was the mechanical closing of the series of transactions described in the Settlement

22    Agreement. Since all of the conditions precedent to the closings had been satisfied, or could have

23    been satisfied shortly after the meeting, this should have occurred on or shortly after the August 25,

24    2008 meeting.  However, the Lehman Representative asked SunCal to extend the closing date for

25    thirty days, to September 30, 2008. According to the Lehman Representatives, this short extension

26    would enable them to secure certain outstanding third party consents. Although SunCal knew these

27    third party consents were readily obtainable within a few days, they agreed to this extension,

28    believing the request was made in good faith.

-36-

**4.2.8**   **The Lehman Lenders' Undisclosed Sale of Most of the Debtors' Loans**.

As explained above, the Settlement Agreement was duly executed by all parties at a formal

closing meeting held on August 25, 2008. When the parties signed this agreement, which was a

binding contract, they both represented that they both intended and had the power and capacity to

perform all of the obligations undertaken therein. However, in the case of the Lehman Entities, this

representation was later discovered to be false. When the closing occurred on August 25, 2008, the

Lehman Lenders had already sold the very obligations they were agreeing to assume and restructure

in the Settlement Agreement to Fenway Capital pursuant to a repurchase agreement (the "Fenway

Repurchase Agreement").  Accordingly, as of August 25, 2008, they lacked the power to perform

the most essential undertakings that they agreed to perform in the Settlement Agreement. Instead of

disclosing this fact at the August 25, 2008 meeting, the Lehman Lenders requested additional time

to execute the agreed upon transfers provided for under this binding agreement. The Lehman

Lenders needed this because they lacked the ability to perform the very obligations they had just

agreed to perform in the Settlement Agreement.

The Lehman Representatives also did not disclose at the August 25, 2008 closing that they

intended to sell the Pacific Point First Loan to Lehman Re, approximately a week later, *even though

this loan was also subject to the Settlement Agreement*. To the contrary, the Lehman

Representatives affirmatively concealed these facts from SunCal and the Debtors by asserting that

ownership still existed in the case of seven of the eight loans.

**4.2.9**   **Lehman's Foreclosure Sale and Purchase of the Pacific Point Project**.

At the time the Restructuring Agreement and the Settlement Agreement were signed, the

Pacific Point Project, which was still owned by SJD Partners, was among the Projects included in

the Restructuring Agreement and the Settlement Agreement.  Pursuant to the Restructuring

Agreement, and as detailed in the Settlement Agreement attached thereto, SunCal, SJD Partners,

and its parent company, SJD Development, all agreed that they would not interfere with Lehman

ALI's (or its designee's) foreclosure on the Pacific Point Project. They further agreed that a new

Lehman entity, LV Pacific Point, would purchase the Pacific Point Project upon foreclosure and

that Lehman ALI and LV Pacific Point would (a) assume SJD Partners' and SJD Development's

1  outstanding accounts payable for Pacific Point third-party vendors, (b) assume certain bond

2  liability associated with the Pacific Point Project, and (c) pay for the millions of dollars worth of

3  work that Lehman ALI representatives had authorized.

4        As previously stated, the Settlement Agreement was signed on August 25, 2008 by the

5  SunCal parties, including SJD Partners and SJD Development.  It was also signed by Gilhool as

6  authorized signatory on behalf of both Lehman ALI and LV Pacific Point.  As a signatory to the

7  Settlement Agreement, LV Pacific Point was required to purchase the Pacific Point Project at the

8  foreclosure sale subject to the above obligations. Consistent with this agreement, the City of San

9  Juan Capistrano executed an estoppel certificate for the benefit of SJD Partners and Lehman ALI—

10  at Lehman ALI's request—on August 26, 2008, two days before the foreclosure sale.  This

11  certificate stated, among other things, that the "Acquiring Entity [LV Pacific Point] shall by

12  operation of law become the legal successor-in-interest to Developer [SJD Partners]" under SJD

13  Partners' agreements with the City. That certificate further provided that there existed no breaches,

14  defaults, or claims under SJD Partners' agreements with the City.

15        On August 28, 2008, Lehman ALI foreclosed on the Pacific Point Project, and title was

16  transferred to LV Pacific Point at the foreclosure sale.  However, Lehman ALI and LV Pacific

17  Point failed to assume the liabilities and obligations associated with this Project as agreed.   This

18  breach of the parties' agreement, left SJD Partners without title to the Pacific Point Project, but

19  with the potential liability for the substantial unsecured claims relating to the Project, including

20  bond claims of approximately $34 million.  Moreover, since Lehman ALI and LV Pacific Point

21  have continued to breach their obligations under the above agreement, unpaid taxes, fines, and

22  penalties have continued to accrue to the detriment of the Project and these claims are being

23  asserted against SJD Partners.

24        Had SunCal, SJD Partners and SJD Development known that Lehman ALI and LV Pacific

25  Point had no intention of honoring their obligations under the foregoing agreement, they never

26  would have agreed to cooperate with the foreclosure.  Instead, SJD Partners would have filed for

27  bankruptcy earlier, thereby mitigating the damages from Lehman Ali's breach, by allowing

28  creditors recourse to the value of the Project.

1    This course of conduct is relevant to the unsecured creditors of the Group II: Trustee

2    Debtors for the following reason. The holders of bond claims against SJD Partners are asserting

3    their massive claims against the estates of all of the Debtors, including the estates of the Group II:

4    Trustee Debtors. Accordingly, Lehman ALI's wrongs against SJD Partners directly affect the

5    Group II: Trustee Debtors' cases.

6    **4.2.10  Alvarez and Marsal Take over Control of the Lehman Entities After the**

7    **Chapter 11 Filings of LBHI and LCPI.**

8    LBHI filed for bankruptcy in September 2008 and LCPI filed for bankruptcy in October

9    2008.  After LBHI's filing, Bryan Marsal ("Marsal") of Alvarez & Marsal ("A&M") was appointed

10    to serve as LBHI's Chief Restructuring Officer. Marsal and A&M are in charge of liquidating the

11    now defunct Lehman Entities, including Chapter 11 debtors LBHI and LCPI, and the non-bankrupt

12    Lehman Lenders (Lehman ALI, OVC, and Northlake Holdings, as well as the non-bankrupt

13    Lehman Equity Members.

14    Although A&M was not employed until after the events that occurred on August 25, 2008

15    described above, it should be noted that A&M hired the same law firm that represented the

16    Lehman Lenders in the August 25, 2008 meeting – Weil, Gotshal & Manges, LLP. Moreover, as

17    more fully explained herein, it was A&M that directed Lehman ALI not to perform its contractual

18    obligations under the Settlement Agreement after September of 2008.

19    LBHI's bankruptcy filing and the Lehman Lenders refusal, at A&M's direction, to close the

20    transactions provided for under the Settlement Agreement as agreed, were not small matters. They

21    severely damaged the Debtors. Although the Debtors were not proceeding with any new

22    construction or development, the Debtors were still required to expend significant sums on site

23    security, erosion control, property taxes and other measures in order to prevent the Projects from

24    becoming a public safety hazard, and in order to avoid the loss of valuable entitlements, and to

25    mitigate penalties and fines being incurred by the Projects.  Although SunCal and the Debtors

26    repeatedly requested that the Lehman Entities pay for critical health and safety and value

27    preservation measures on the Projects, these efforts were unavailing.

28

MAINDOCS-#164959-v3-SunCal_3rd_Am_Group_II_TD_DS.DOC

1    Between October 9 and November 4, 2008, SunCal's general counsel Bruce Cook sent

2    Robert Brusco, an authorized agent of the Lehman Entities, nearly two dozen letters requesting that

3    the Lehman Lenders provide the funding necessary to address critical needs on the Projects as

4    promised.  A summary of these health and safety notices are attached hereto as Exhibit "5".  The

5    Lehman Entities ignored these requests until November 2008, when Brusco, purportedly on behalf

6    of the Lehman Lenders, delivered the message that the Lehman Lenders were unwilling to fund the

7    Projects and that, instead, they intended to foreclose on all of the Projects.

8    As a result, as set forth in Exhibit "4," there are now over 240 vendors, municipalities,

9    counties and bonding companies claiming over $400 million in work, improvements and property

10    tax claims against the Projects.  Substantially all of these sums are due to work performed or

11    bonded at Lehman's request based upon Lehman's promises of payment.

12    **4.3**    **The Group II: Trustee Debtors' Potential Preferential Transfers**.

13    Attached hereto as Exhibit "6" are charts setting forth payments made to third parties

14    during the ninety (90) day time period preceding the filing of the Debtors' Chapter 11 Cases as

15    well as payments made to the Lehman Entities and to SunCal Affiliates during the one-year time

16    period preceding the filing of the Debtors' Chapter 11 Cases.

17    As the charts in Exhibit 6" indicate, Group II: Trustee Debtor's made  payments in the

18    following aggregate amounts to non-insiders within the 90 day preference period preceding the

19    Petition Date: SunCal Oak Knoll, $2,324,630.92, and SunCal Torrance, $18,618.50.  The

20    corresponding figures for payments made to "insiders" within the one year preference period

21    preceding the Petition Date were: SunCal Oak Knoll, $2,914,645.70 and SunCal Torrance,

22    $310,181.43.

23    / / /

24    / / /

25    / / /

26    / / /

27    / / /

28    / / /

MAINDOCS-#164959-v3-SunCal_3rd_Am_Group_II_TD_DS.DOC

## V.

## SIGNIFICANT EVENTS IN THE DEBTORS' CHAPTER 11 CASES

### 5.1.    Voluntary Debtors.

#### 5.1.1    Joint Administration of the Voluntary Debtors and the Trustee Debtors.

Since their respective Petition Dates, the seventeen (17) Voluntary Debtors have continued to operate as "debtors-in-possession," subject to the supervision of the Bankruptcy Court and in accordance with the Bankruptcy Code.  The Voluntary Debtors are authorized to operate their businesses in the ordinary course during the Chapter 11 proceedings.  Transactions outside the ordinary course of business must be approved by the Bankruptcy Court.

The Voluntary Debtors' Cases are being jointly administered pursuant to orders entered on November 20, 2008 and December 9, 2008.  The Voluntary Debtors' Cases are being jointly administered with the Trustee Debtors' cases pursuant to an order entered on March 11, 2009.

The Voluntary Debtors have employed Winthrop Couchot Professional Corporation as their general insolvency counsel, and the MB Firm as their special litigation counsel.

#### 5.1.2    The Voluntary Debtors Court Employed Professionals.

The Voluntary Debtors' Committee has employed Irell & Manella LLP as its counsel pursuant to an order entered on February 13, 2009.

Pursuant to the Court's Order regarding joint administration of the Voluntary Debtors, the Voluntary Debtors' liability for professional fees is joint and several among the Voluntary Debtors' Estates for fees incurred related to services for the benefit of all of the Voluntary Debtors.  The Trustee Debtors' liability for professional fees is not joint and several.

Pursuant to the initial MB Firm employment application, Acquisitions was responsible for the payment of their fees until December 31, 2009.  The MB Firm's application also allows for payments from the Bond Companies.  The initial MB Firm employment application reserved the right, should the Lehman Adversary Proceeding result in a benefit accruing to particular Debtors' Estates, to request that its fees and expenses be reimbursed by the Debtors' Estates.  The Bond Companies have also agreed to jointly fund a portion of the professional fees and expenses of the

-41-

MB Firm with respect to the Lehman Adversary Proceeding.  The Bond Companies' funding commitment can be terminated and after such a termination they will only be required to cover fees and costs incurred during the period of their prior commitments.

The MB Firm employment application was subsequently amended.  Pursuant to an order entered on April 14, 2010, (1) the Voluntary Debtors will pay up to one-half of the fees and expenses incurred by the MB Firm from and after February 1, 2010 onward; and (2) the Trustee Debtors do not have an obligation to pay any of the MB Firm's fees pertaining to the Trustee Debtors' estates, unless and until a loan by the Voluntary Debtors to the Trustee Debtors is agreed to by the Trustee and approved by the Court, or in accordance with the terms of the original employment applications to the extent not superseded or modified by the amended employment application.  The order does not affect the MB Firm's right to seek payment from the Bond Companies without the need for an additional order of the Court.

The MB Firm filed an updated application seeking to further amend their employment to include the right to pursue certain claims against the Lehman Entities and certain employees and agents of these entities on behalf of the Voluntary Debtors.  The claims encompassed by this amendment include claims that are based upon both prepetition and post-post petition actionable conduct under both state law and federal law against the Lehman Entities and/or their agents.

### 5.1.3    LCPI's Motions for Relief from the Automatic Stay Against Certain of the Voluntary Debtors' Projects and Related Appeals.

On January 23, 2009, LCPI and Lehman ALI filed various motions for relief from the automatic stay against Palmdale Hills, SCC Palmdale, SunCal Beaumont, SunCal Summit Valley, SunCal Emerald, SunCal Bickford, Acton Estates, SunCal Johannson, and SCC Communities I (the "Lehman Entities' Stay Motions").  Although the Debtors were able to defeat the Lehman Entities' Stay Motions, they are relevant in the following respect. Had the motions filed by LCPI and Lehman Ali succeeded, it is almost certain that unsecured creditors would have received nothing on their claims. Moreover, as more fully explained herein, since Lehman ALI and LCPI did not even own the loans they were seeking to foreclose upon, these motions should never have been filed in the first instance.

1  **5.2.**    **The Trustee Debtors and Their Professionals.**

2  Orders for Relief were entered in the involuntary cases beginning on January 6, 2009.  The

3  Trustee Debtors are represented by their duly-appointed Chapter 11 Trustee, Mr. Steven M. Speier,

4  pursuant to orders of the Bankruptcy Court entered on January 15, 2009.

5  The Chapter 11 Trustee has employed the Lobel Firm as the Chapter 11 Trustee's general

6  insolvency counsel, the MB Firm as special litigation counsel, and Squar Milner, LLP as its

7  accountants.

8  The Trustee Debtors' Committee has employed Weiland, Golden, Smiley, Wang Ekvall &

9  Strok as its general insolvency counsel.

10  **5.3.**    **The Debtors' Various Motions Relating to Financing for the Projects and to**

11  **Pay Professional Fees.**

12  **5.3.1**    **The Voluntary Debtors' Initial Motion for Surcharge and Use of Cash**

13  **Collateral.**

14  On January 16, 2009, seven of the Debtors filed a motion authorizing Palmdale Hills to use

15  and surcharge, pursuant to 11 U.S.C. § 506(c), and/or use the purported cash collateral of LCPI

16  arising from the Ritter Ranch Loan Agreement, pursuant to 11 U.S.C. § 363(c)(2), in order to pay

17  for the reasonable and necessary maintenance expenses required to preserve the value of such

18  Debtors' Projects subject to deeds of trust and other security interests held by LCPI.

19  LCPI objected to the motion and subsequently filed a motion in its own Chapter 11

20  proceeding in the Southern District of New York seeking an order barring the motion as a violation

21  of LCPI's automatic stay.  Although the Debtors believe that LCPI's stay was not violated in any

22  way by the Motion, the Motion was taken off calendar prior to any ruling by the New York

23  Bankruptcy Court, based upon the threat of sanctions made against Debtors' counsel by the

24  presiding judge in LCPI's case.

25  As explained above, LCPI did not even own an interest in the Ritter Ranch Loan

26  Agreement when it asserted the automatic stay, since the Ritter Ranch Loan Agreement, which was

27  the subject of the cash collateral motion, had already been sold pursuant to the Fenway Repurchase

28  Agreement. Yet this wrongful action prevented Palmdale Hills from using its own money to pay

1    critical bills that Lehman ALI, LCPI's parent, was contractually required to fund in the first

2    instance.

### 5.3.2    The Lehman Disputed Administrative Loans.

4        As explained above, after the Petition Dates, the Debtors collectively demanded that the

5    Lehman Lenders comply with their contractual obligations to pay for the costs of maintaining and

6    preserving the value of the Projects, including the Group II: Trustee Projects. However, the

7    Lehman Lenders not only refused to comply with their obligations, they actively attempted to bar

8    the Debtors from using their own funds to pay these critical costs, in the hope of forcing the

9    Debtors to yield the Projects without a fight.

10        In the face of the foregoing refusal and active interference, the Chapter 11 Trustee agreed to

11    enter into several stipulations with Lehman ALI for financing (in the total approximate amount of

12    $17,680,316 for the Group II: Trustee Debtors) to pay for real property taxes and urgent public

13    health and safety issues on the Projects and to pay professionals under the caveat that such

14    professionals would not be paid for services performed on matters that were considered contrary to

15    the interests of the Lehman Entities. This loan was approved pursuant to an order of the Court. In

16    return for what the SunCal Plan Proponents view as a "forced loan," the Lehman Lenders insisted

17    that the Chapter 11 Trustee agree to withdraw a motion  providing for the sale of certain Projects

18    free and clear of the Lehman Lenders' Disputed Liens, including the Projects of the Group II:

19    Trustee Debtors, and the Chapter 11 Trustee agreed.

20        The SunCal Plan Proponents have filed a series of objections to the Lehman Lenders'

21    claims, including the Lehman Disputed Administrative Loans. These objections are based upon

22    various grounds, including the following, which apply notwithstanding prior court approval:

23        First, the 502(d) Objection, described in more detail in Section 5.4.1.5 below, objecting

24    *inter alia* to the following Administrative Claims:

| Debtor | Administrative Claim Holder | Alleged Administrative Claim Amount |
|---|---|---|
| Oak Knoll | Lehman ALI | $13,002,451 |
| Torrance | Lehman ALI | $1,346,711 |

MAINDOCS-#164959-v3-SunCal_3rd_Am_Group_II_TD_DS.DOC

1        Second, because there is no Lehman automatic stay enjoining the Group II: Trustee

2  Debtors, the Group II; Trustee Debtors may assert offset rights as set forth in the Recoupment

3  Objection as against Lehman ALI.

4        Third, the Plan also provides that the Plan Trustee and the Group II: Trustee Debtors

5  reserve the right to join in the Contract Action as additional plaintiffs.  Any recovery on the

6  Contract Action may provide a further offset against the Lehman Disputed Administrative Loan.

7            **5.3.3**    **The Voluntary Debtors' Agreements with the Lehman Entities for Use**

8                  **of Alleged Cash Collateral to Maintain the Properties and to Pay**

9                  **Professional Fees.**

10        On September 1, 2009, with the consent of the Lehman Entities, fourteen of the Voluntary

11  Debtors filed a motion authorizing surcharge pursuant to 11 U.S.C. § 506(c), and/or use of the

12  purported cash collateral for the purpose of addressing critical public health and safety issues and

13  other value preservation with respect to the Debtors Projects.  On September 10, 2009, the Lehman

14  Entities filed an opposition thereto, and on September 17, 2009, the Voluntary Debtors filed their

15  Reply.

16        Subsequently, the Voluntary Debtors learned that the Lehman Entities lacked control

17  agreements as to the majority of the depository accounts, and thus such accounts were not subject

18  to perfected liens and therefore did not constitute "cash collateral".  On October 15, 2009, the

19  Voluntary Debtors filed a *Motion For Order Authorizing Disposition Of Certain Depository*

20  *Accounts*.  On or about October 22, 2009, the Lehman Entities filed an opposition, and on October

21  29, 2009, the Voluntary Debtors filed their Reply.

22        The motion was consensually resolved by way of the *Stipulation Pursuant To 11 U.S.C.*

23  *§§362, 363, And 364: (1) Authorizing The Use Of Cash Collateral And Alleged Unencumbered*

24  *Cash; (2) Approving Postpetition Financing; (3) Providing Administrative Expense Status; And (4)*

25  *Modifying Automatic Stay To The Extent Necessary* filed on December 8, 2009, and the order

26  thereon entered on December 17, 2009.  The stipulation provided for a 120-day budget with

27  expenses totaling approximately $5 million, pursuant to which any Cash in the Estates is used first

28  and then money borrowed from the Palmdale Hills Estate is used thereafter on an administrative

1  basis.  The agreement also permitted the Voluntary Debtors to use their alleged unencumbered

2  cash to pay its professional fees.  This agreement has been renewed on several occasions.  The

3  Parties have subsequently entered into stipulations authorizing the Voluntary Debtors' use of the

4  alleged unencumbered cash.

5       **5.4.    The Debtors' Disputes and Claims Against the Lehman Entities.**

6            **5.4.1    The Lehman Adversary Proceeding.**

7            On January 6, 2009, the Voluntary Debtors initiated the Lehman Adversary Proceeding by

8  filing their initial complaint against Lehman ALI for equitable subordination of Lehman ALI's

9  Disputed Claims and avoidance of its Disputed Liens pursuant to Bankruptcy Code Section 510(c).

10  On February 3, 2009, the Debtors filed a First Amended Complaint, which added the Trustee

11  Debtors as co-plaintiffs and added various other causes of action.  The First Amended Complaint

12  also named OVC Holdings, Northlake Holdings and various other entities as defendants.

13            Pursuant to a hearing on a motion to dismiss held on June 11, 2009, the Bankruptcy Court

14  granted the Debtors leave to amend the second amended complaint.  Thus, on July 10, 2009, the

15  Debtors filed their Third Amended Complaint.  The Third Amended Complaint addressed many of

16  the concerns raised by the Bankruptcy Court and also included various Avoidance Actions and

17  other causes of action against the Lehman Lenders and the Lehman Successors.  The Third

18  Amended Complaint also added Fenway Capital as a defendant based upon the discovery of the

19  facts relating to the sale of the loans Fenway Capital and based upon the Court ruling that the Repo

20  was a true sale.

21            On September 30, 2009, the Lehman Entities filed a motion to dismiss the Third Amended

22  Complaint (which motion was amended on October 7, 2009 and October 22, 2009), alleging that

23  the relief requested by certain Debtors was not available as a matter of law.  On September 30,

24  2009, Fenway also filed a motion to dismiss the Third Amended Complaint.  On January 26, 2010

25  and January 28, 2010, the Debtors filed oppositions to the motions to dismiss the Third Amended

26  Complaint filed by the Lehman Entities and Fenway, respectively.  On February 4, 2010, the

27  Lehman Entities and Fenway filed their respective replies.  The Court entered an order granting in

28  part and denying in part the relief requested in the motions to dismiss. Most notably, the Court

1  denied the defendants request for the dismissal of the equitable subordination claims and the

2  Court permitted the Debtors to file an amended complaint. LCPI was dismissed as a defendant at

3  this hearing, due to the fact that it did not own any interest in the loans at issue and due to potential

4  impact of the case upon LCPI's automatic stay. On March 26, 2010, the Debtors filed their Fourth

5  Amended Complaint. The following is a summary of the causes of action set forth in the Fourth

6  Amended Complaint:

7  ### 5.4.1.1    Equitable Subordination.

8  Based on the pre-petition inequitable conduct of the Lehman Entities, summarized in

9  Section 4.2, the Debtors have sought to subordinate the claims and avoid the liens of the Holders

10  of the Lehman Disputed Loans to the extent necessary to pay the Claims of unpaid Creditors that

11  were damaged by the inequitable conduct.

12  ### 5.4.1.2    The Fraudulent Transfer Claims.

13  The fraudulent conveyance claims set forth in the Fourth Amended Complaint include the

14  cause of action that SunCal Oak Knoll and SunCal Torrance are asserting against Lehman ALI in

15  order to avoid liens securing the alleged claims in the amount of $158,141,365.

16  ### 5.4.1.3    The Preference Claims.

17  The preference claims set forth in the Fourth Amended Complaint include the following:

18  Transfers made to a Lehman Entity by a Debtor, where such Debtor was either owned by a Lehman

19  Equity Member (50%) or where a Lehman Equity Member of Lehman Entity controlled such

20  Debtor at the time of the transfer. Furthermore, according to the Lehman Lenders' appraisals

21  submitted on the Projects of these Debtors, all of the loans were vastly undersecured at the time of

22  the transfers.

23  On April 12, 2010, the Lehman Entities filed a motion to dismiss the Fourth Amended

24  Complaint (as well as a related motion to strike portions of the same). On that same date, the

25  Lehman Entities and Fenway, respectively, also filed answers to the Complaint denying the causes

26  of actions set forth in the Fourth Amended Complaint and alleging certain affirmative defenses.

27  Furthermore, as discussed herein, the New York Bankruptcy Court has approved Fenway's sale of

28  all Sold Loans to LCPI. Consequently, the filing of a fifth amended complaint may be necessary.

### 5.4.1.4 <u>Debtors' 502(d) Objections and Objection to Lehman's Claim Against Acton.</u>

The Voluntary Debtors and other parties-in-interest have filed a motion to disallow, pursuant to 11 U.S.C. § 502(d) (the "502(d) Objection"), the following Disputed Claims filed by Lehman ALI and LCPI, including the following claims filed against the Group II: Trustee Debtors:

| Disputed Proof of Claim No. | Debtor | Claim Holder | Claim Amount |
|---|---|---|---|
| 12 | SunCal Oak Knoll | Lehman ALI | $158,141,365 |
| 4 | SunCal Torrance | Lehman ALI | $158,141,365 |

The 502(d) Objection also objects inter alia to the following Administrative Claims:

| Debtor | Administrative Claim Holder | Alleged Administrative Claim Amount |
|---|---|---|
| Oak Knoll | Lehman ALI | $13,002,451 |
| Torrance | Lehman ALI | $1,346,711 |

In summary, the Group II: Trustee Debtors allege in the Lehman 502(d) Objection that the Lehman Entities received prepetition transfers that are avoidable under certain sections of the bankruptcy code.

The Lehman Entities oppose the 502(d) Objection, inter alia, on the following grounds:

(1)     SunCal Management allegedly lacks standing to object to claims in the Trustee Debtor cases.  However, Section 502 provides that any party in interest may object to claims.

(2)     Disallowance is allegedly premature because there has been no judicial determination of the avoidance liability.  However, the only "judicial determination" necessary to invoke section 502(d) is that the objecting party have established a prima facie case for avoidance.  Courts have repeatedly characterized disallowance under Section 502(d) as temporary, pending a later ultimate determination of the avoidance claims in an adversary action.

(3)     The 502(d) objection purported violated LCPI's automatic stay. However, several courts have specifically concluded that an objection under Section 502(d) does not violate the creditor's automatic stay.  See In re Metiom, 301 B.R. 634 (Bankr.S.D.N.Y. 2003); In re PRS Ins. Group, 331 B.R. 580, 584 (Bankr.D.Del. 2005).

(4)    The 502(d) Objection allegedly fails to establish a prima facie case for
avoidance.  However, applicable case law establishes that a prima facie case merely
requires that the underlying avoidance allegations survive a motion to dismiss.  Here, the
Court has already denied the Lehman Entities' Motion to dismiss the applicable avoidance
action.  Moreover, the 502(d) Objection further submits substantive evidence establishing
the merits of the avoidance claims.

(5)    The Lehman Entities argue that they would be entitled to retain liens in the
properties to the extent they gave value in good faith under Section 548(c). However, the
Lehman Entities failed to cite any authority to support their novel argument that Section
548(c) can defeat disallowance under Section 502(d).  The only authority on this point is
directly contrary to the Lehman Entities' argument.  See <u>In re Interstate Cigar Co., Inc.</u>,
278 B.R. 8 (Bankr.E.D.N.Y. 2002).s

On June 9, 2011, a hearing was held on the Section 502(d) claim objection. At this hearing
the Lehman Entities disputed the merits of the Section 502(d) claim objection and LCPI alleged
that the filing of this objection violated its automatic stay. At the conclusion of the hearing, the
Court ruled that the parties could proceed with their discovery in this matter.

If the Section 502(d) claim objection is successful, the claims of the Lehman Entities
identified in the table above will be disallowed. Although the Lehman Entities will have the right
to seek reconsideration of this disallowance, in order to obtain this relief they would have to repay
the applicable transfers.

### 5.4.1.5    <u>The Lehman Recoupment Claim Objections and the Contract Action.</u>

Pursuant to the terms of the joint ventures entered into by and among the Debtors and the
Lehman Entities, the Lehman Entities were responsible for paying the costs incurred in the
development of the Projects. These costs included the claims of the vendors who provided goods
and services to the Projects and the claims asserted by the Bond Claimants. Although the Lehman
Entities contend that they were merely "lenders," and that they did not assume any liability for

1  these claims, as the above facts and those that will be adduced prior to and at the confirmation of

2  the Plan will demonstrate, the Lehman Entities are in fact obligated to pay these claims.

3  The Debtors' contend that direct liability can be imposed on the Lehman Entities on various

4  grounds, including the following.  First, the Lehman Entities were either in a joint venture

5  relationship with the Debtors from the outset, or this relationship developed and became a legal

6  fixture through the Lehman Entities' course of conduct. Pursuant to this relationship, and the

7  promises and representations made therein, the Lehman Entities agreed to be responsible for all

8  vendor and Bond Claims incurred at or in connection with the Projects. The role of each of the

9  Debtors, by mutual agreement, was to provide development expertise and project management

10 services. The Lehman Entities were required to provide the capital necessary to fund the Projects.

11 Second, during the last eighteen months of the relationship between the parties, the Lehman

12 Entities assumed direct responsibility for all claims incurred during this period, by insisting that

13 work continue on the Projects and by repeatedly promising to pay for this work. Since the Lehman

14 Entities ordered this work, and promised to pay for the same, they bear this financial responsibility.

15 Third and finally, the Lehman Entities expressly agreed to pay the vendor and bond claims

16 described in the Restructuring Agreement and in the interrelated Settlement Agreement, but failed

17 to do so as contractually agreed.

18 It is the SunCal Plan Proponent's contention that the Lehman Entities' failure to pay the

19 vendor and Bond Claims associated with the Projects as was their obligation under the terms of the

20 joint ventures, the Restructuring Agreement and the Settlement Agreement) unjustly shifted

21 responsibility for these liabilities to the Debtors in breach of the terms of joint venture, the

22 Restructuring Agreement and the Settlement Agreement. Accordingly, the SunCal Plan Proponents

23 have filed objections to seven of the Secured Claims asserted by the Lehman Entities based upon

24 the affirmative defenses of recoupment, unjust enrichment and unclean hands (the "Lehman

25 Recoupment Claim Objections").

26 In the Lehman Recoupment Claim Objections, the SunCal Plan Proponents seek the

27 following relief:

28

MAINDOCS-#164959-v3-SunCal_3rd_Am_Group_II_TD_DS.DOC

1    1) Disallowance of the claims asserted by the Lehman Lenders in their

2    entirety, pending compliance with the terms of the Restructuring

3    Agreement and the Settlement Agreement;

4    2) A reduction in the amount of the Lehman Entities' secured claims by

5    the amount of damages resulting from the Lehman Entities' breach of their

6    obligations under these agreements; and/or

7    3) An order barring the Lehman Entities from enforcing their rights under

8    the Lehman Loans until they cure their breaches under the above

9    agreements.

10    The first prayer for relief above is premised upon the contention that the Lehman Entities

11    agreed to transfer ownership of the Projects to a series of newly formed entities under the control

12    of the Lehman Entities, pursuant to the terms of the Settlement Agreement.  This agreement further

13    provided that these new entities would assume the vendor payables and certain Bond Claims

14    associated with these projects.  Finally, this agreement included a covenant not to sue, pursuant to

15    which the Lehman Entities were barred from seeking further recourse against the Debtors.

16    The SunCal Plan Proponents believe that the positions asserted in the Lehman Recoupment

17    Claim Objections are well grounded in fact and in law. Had the Lehman Entities complied with

18    their contractual obligations, substantially all of the these Debtor's liabilities would have been

19    eliminated, these Debtors would not have had to file Chapter 11, and the Lehman Entities would be

20    barred from asserting claims against these  Debtors based upon the Lehman Disputed Loans. It is

21    the SunCal Plan Proponents position that the Lehman Entities effort to enforce claims based upon

22    Lehman Disputed Loans is directly contrary to the basic agreements reached in the Restructuring

23    Agreement and in the related Settlement Agreement.

24    The Lehman Entities dispute the merits of the Lehman Recoupment Claim Objections. It is

25    the Lehman Entities' position that it was within their absolute "discretion" to pay, or not to pay, the

26    vendor payables incurred during the term of the Restructuring Agreement. Accordingly, they

27    cannot, in their assessment, be held liable for these obligations. In the case of the Settlement

28    Agreement, the Lehman Entities contend that this agreement never became effective and therefore

-51-

1    they were not bound to comply with its terms. The SunCal Plan Proponents do not believe that the

2    positions asserted by the Lehman Entities are supported by the facts, or existing law.

3         Moreover, because there is no automatic stay enjoining the Group II: Trustee Debtors as to

4    Lehman ALI, the Group II; Trustee Debtors may assert offset rights as set forth in the Recoupment

5    Objection as against the Claims of Lehman ALI.

6         In addition to the Recoupment Claim Objections, certain Voluntary Debtors also filed the

7    Contract Action against Lehman ALI and other non-debtor Lehman Entities in Orange County

8    Superior Court. The Contract Action is based on Lehman ALI's breach of contract on the

9    Restructuring and Settlement Agreements.  On May 9, 2011, the Defendants in the Contract Action

10   filed a Notice of Removal which removed the Contract Action from the Orange County Superior

11   Court to the Bankruptcy Court, as adversary no. 8:11-ap-01212ES.  The Voluntary Debtor-

12   Plaintiffs moved to remand the Contract Action back to the Orange County Superior Court

13   ("Remand Motion").  The Bankruptcy Court denied the Remand Motion at the hearing on July 12,

14   2011.

15        The Group II: Trustee Debtors are potential plaintiffs in the Contract Action, and such

16   claims constitute property of the Group II: Trustee Debtors' estate.  The Trustee refused to

17   authorize the Group II: Trustee Debtors to become additional plaintiffs in the Contract Action.  If

18   the Plan is Confirmed, the Plan Trustee and/or the Group II: Trustee Debtors reserve the right to

19   join the Contract Action as additional plaintiffs.  Although LCPI's automatic stay remains an

20   impediment to the pursuit of the Lehman Adversary Proceeding, the existence of this stay will not

21   bar the SunCal Plan Proponents from implementing the material terms of the Plan for the

22   following reason. LCPI's automatic stay does not bar the pursuit of the Lehman Claim Objections

23   or the Contract Action.  In fact, these matters are proceeding in the Bankruptcy Court.  If these

24   objections are successful, the claims of the Lehman Entities will be disallowed, either in whole or

25   in part, or the Lehman Entities will be barred from pursuing these claims until they pay what they

26   owe to these Debtors. If the Plan Trustee and/or the Group II: Trustee Debtors join the Contract

27   Action and the Contract Action is successful, it will generate a further recovery for creditors.  In

28

1    either scenario, the Plan filed by the SunCal Plan Proponents is feasible and will yield a favorable

2    return for creditors.

3        As set forth above, only four Projects were not included in the Restructuring Agreement:

4    Century City, Delta Coves, Oak Knoll and Del Amo.  Accordingly, the four Debtors associated

5    with these Projects—SunCal Century City, Delta Coves, SunCal Oak Knoll and SunCal

6    Torrance—were not signatories thereto.  Lehman ALI was the lender on each of these Projects and,

7    as with the other Projects, Lehman ALI continued to insist that these four debtors proceed with the

8    development of the four Projects, it approved all expenses, and it continually provided assurances

9    of payment.

10        The Recoupment Claim Objections are relevant to the SunCal Oak Knoll and SunCal

11    Torrance estate because both Arch and Bond Safeguard contend that they have the right to assert

12    claims arising from unpaid bond obligations relating to Projects owned by other Debtors, in the

13    estates of all of the Debtors. Accordingly, they have submitted in excess of $100,000,000 in claims

14    against the estates of the Group II: Trustee Debtors. Although the Group II: Trustee Debtors do not

15    believe these claims are valid, and that they will not be allowed, these claims must be disallowed

16    before final distributions can be made to the Creditors holding Allowed Claims, or paid through

17    distributions made in the other Debtors' cases. It is in this respect that the litigation over the

18    validity and amount of the Lehman Secured Claims is relevant.

19        If the Lehman Recoupment Objection and the Lehman 502(d) Objection discussed herein

20    are successful, or if the Lehman Adversary Proceeding is successful, then the claims filed by Arch

21    and Bond Safeguard may be paid through distributions payable from the estates of the other

22    Debtors' cases where these claims may have right to payment. For this reason, the SunCal Plan

23    Proponents have described the background and status of this litigation at some length in this

24    Disclosure Statement

25        **5.5.    The Debtors' Motion for a Stay to Suspend Certain Lehman Actions.**

26        On September 21, 2010, the Voluntary Debtors, Acquisitions, and SunCal Management

27    filed a motion requesting, among other relief, for the Court to suspend the Lehman Entities

28    competing plan and disclosure statement unless and until the Lehman Entities agree to provide the

1   Debtors with relief from their automatic stay in the Debtors' Chapter 11 Cases (the "Suspension

2   Motion").  The Court granted this motion and stayed all matters until March 1, 2011. The Court

3   also ordered the parties to engage in a mediation. The Voluntary Debtors and the Lehman Entities

4   were unable to settle their claims through this process.

5           **5.6.      The Debtors' Other Litigation with Non-Lehman Related Parties.**

6                   **5.6.1    The Debtors' Failed Preliminary Injunction Motion Against the**

7                             **Holders of Bond Claims.**

8           On February 20, 2009, the Debtors filed a complaint and a Motion for Preliminary

9   Injunction, pursuant to which the Debtors sought a Motion for Preliminary Injunction against the

10  Holders of Bond Claims from pursuing such Claims. On February 23, 2009, the Court denied the

11  Debtors' request for the TRO and granted the Debtors' request to require the defendants to show

12  cause why the Motion for Preliminary Injunction should not be issued.

13          On March 2, 2009, several Holders of Bond Claims objected to the Motion for the

14  Preliminary Injunction.  The objections generally alleged that the Debtors failed to show that the

15  balancing of the equities favored granting the Preliminary Injunction versus the harm to the

16  Holders of the Bond Claims.  At a hearing held on March 4, 2009, the Court denied the

17  Preliminary Injunction Motion and the underlying complaint has subsequently voluntarily been

18  dismissed without prejudice.

19                  **5.6.2    The Contractors' Successful Motions for Relief from Stay to Pursue the**

20                            **Bond Claims.**

21          Various contractors that were hired to perform work on some of the Projects have filed

22  motions for relief from stay with the Bankruptcy Court to pursue their purported Bond Claims.

23  These creditors have requested that the Bankruptcy Court grant these creditors relief from the

24  automatic stay to allow such creditors to enforce certain Claims that such creditors allege to have

25  against some of the Debtors, including certain surety bonds that are alleged to have been issued in

26  favor of such creditors.  The Debtors opposed the motions on the grounds that the various Debtors

27  are indispensible parties.  The Court conditionally granted the motions provided that the Bond

28  Claimants are able to sever the Debtors from their proceedings on the Bonds.

### 5.6.3    Bond Safeguard Motion.

Bond Safeguard, a surety that issued bonds to secure the performance of work on certain projects, filed a motion against the Trustee Debtors seeking authority to file  claims against the Trustee Debtors relating to these bond claims after the bar date. The Debtors opposed this motion. This motion was granted pursuant to an order entered on January 7, 2011.

The Bond Issuers assert that surety bonds were executed on behalf of all of the SunCal Debtors and the Bond Indemnitors.  However, Bond Safeguard only filed proofs of claims asserting joint and several liability ("Cross-Indemnity Claims") against the Trustee Debtors.  Bond Safeguard did not file any Cross-Indemnity Claims against the Voluntary Debtors.  The Cross-Indemnity Claims are disputed, as the Group II: Trustee Debtor and the Plan Trustee reserve the right to object to the Cross-Indemnity Claims and/or to seek to avoid such obligations as a fraudulent transfer.

### 5.7    LitCo

As more fully explained in Article VII, pursuant to the terms of the Plan, LitCo, which shall be a Delaware limited liability company, will be making an offer to purchase the Reliance Claims held by the Reliance Claimants in Classes 6.1 and 6.2 pursuant to the Plan.  LitCo will be capitalized by a third party capital partner with funds necessary to fund this claims purchase.  Once the Reliance Claims are purchased, LitCo will pursue these claims against the Lehman Entities. Since LitCo will be purchasing the Reliance Claims with non-estate assets, the Plan Trust will not receive any part of the recoveries obtained on these purchased claims.

### 5.8    Reliance Claims.

The Reliance Claims listed on Exhibit 8 attached to this Disclosure Statement (which consist of Allowed Unsecured Claims, Allowed Mechanic's Lien Claims, or Allowed Bond Indemnification Claims against an applicable Debtor that would entitle the Holder thereof to be the beneficiary of any equitable subordination judgment obtained against a Lehman Entity by such Holder) were determined to be Reliance Claims based on a number of factors. An analysis was made of the books and records of the applicable Debtor to determine the amounts billed to that applicable Debtor by the particular creditor and what, if any, defenses there may be to such claims.

MAINDOCS-#164959-v3-SunCal_3rd_Am_Group_II_TD_DS.DOC

1   The bankruptcy schedules filed for each applicable Debtor were reviewed along with the proofs of

2   claim filed by creditors in the respective bankruptcies, and such amounts were compared to the

3   books and records of the applicable Debtor. An analysis was made of the list of creditors and

4   amounts contained in the Restructuring Agreement executed with Lehman entities on May 23,

5   2008, and the Settlement Agreement executed with Lehman entities on August 25, 2008, with

6   respect to amounts Lehman entities had agreed to assume in connection with such agreements.

7   Furthermore, there was taken into account the actions of Lehman in instructing SunCal to proceed

8   with the entitlement, development and/or maintenance of the particular projects and that SunCal

9   did so in reliance on promises of funding, as outlined in the Litigation Claims that have been

10  summarized in this Disclosure Statement. Taking all of these factors into consideration, Exhibit 8

11  was prepared based on the determination by the SunCal Plan Proponents that these claims, as listed

12  in Exhibit 8, are Reliance Claims, as that term is defined in this Disclosure Statement. The SunCal

13  Plan Proponents are willing to commit to the amounts listed in Exhibit 8 as allowed Reliance

14  Claims so long as the particular creditor does not dispute the amount thereof, but if a creditor

15  disputes the amount, the SunCal Plan Proponents reserve all rights in connection with the amount

16  of any such claim and whether or not it would be a Reliance Claim for purposes hereof.

17  **VI.**

18  **<u>TREATMENT OF UNCLASSIFIED CLAIMS</u>**

19       **6.1**    **<u>Introduction</u>**. As required by the Bankruptcy Code, the Plan places Claims and

20  Interests into various Classes according to their right to priority.  However, certain types of Claims

21  are not classified in any Classes under the Plan.  These Claims are deemed "unclassified" under the

22  provisions of the Code.  They are not considered impaired and they do not vote on the Plan,

23  because they are automatically entitled to specific treatment provided for them in the Code.  As

24  such, the SunCal Plan Proponents have not placed the following Claims in a Class.  The treatment

25  of these unclassified Claims is as provided below.

26       **6.2**    **<u>Treatment of Allowed Administrative Claims</u>.**

27         The Code requires that all Allowed Administrative Claims be paid on the later of Effective

28  Date of the Plan or the date of their allowance, unless a particular Holder agrees to a different

MAINDOCS-#164959-v3-SunCal_3rd_Am_Group_II_TD_DS.DOC

treatment.  The treatment of Allowed Administrative Claims is as described below.  However, such Administrative Claims are continuing to be incurred.  The Allowed Administrative Claims shall be paid from the applicable Distribution Account(s) pursuant to the LitCo Plan Loan.

**6.3    Treatment and Repayment of the Lehman's Administrative Loan(s).**

The Lehman Disputed Administrative Loans shall be paid in full on the later of the Effective Date, or the date any objections to the same are overruled by the Court leaving them Allowed claims. Prior to payment, or until disallowed, these claims shall continue to be secured by their existing liens against the respective Assets of the Trustee Debtors.

The Lehman Disputed Administrative Loans shall be paid in full, on the date referenced above, from either 1) funds loaned to the Plan Trust by LitCo or another designated third party, or 2) from the funds in the applicable Net Sale Proceeds Account.

**6.4    Repayment of Allowed Administrative Claims Other than the Lehman Administrative Loans.**

Except to the extent that the Holder of an Allowed Administrative Claim agrees to a different treatment and subject to the Administrative Claims Bar Date set forth herein, the Distribution Agent shall pay each Allowed Administrative Claim in full, in Cash, on the later of (i) the Effective Date, (ii) within ten (10) Business Days after the date such Administrative Claim becomes an Allowed Administrative Claim, or (iii) the date such Allowed Administrative Claim becomes due according to its terms. Notwithstanding the foregoing, any Allowed Administrative Claim representing obligations incurred in the ordinary course of post-petition business by the Debtors in Possession (including without limitation post-petition trade obligations and routine post-petition payroll obligations) shall be paid in full or performed by the Plan Trustee in the ordinary course of business, in accordance with the terms of the particular obligation.

**6.5    Administrative Claims Bar Date.**

All applications for final compensation of Professionals for services rendered and for reimbursement of expenses incurred on or before the Effective Date and all other requests for payment of Administrative Claims incurred before the Effective Date under Sections 507(a)(2) or 507(b) of the Bankruptcy Code (except only for (i) post-petition, ordinary course trade

1    obligations and routine post-petition payroll obligations incurred in the ordinary course of the

2    Debtors' post-petition business, for which no bar date shall apply, and (ii) post-petition tax

3    obligations, for which no bar date shall apply) shall be Filed with the Bankruptcy Court and served

4    upon the Plan Trustee no later than the Administrative Claims Bar Date, unless such date is

5    extended by the Bankruptcy Court after notice to the Plan Trustee.  Any such request for payment

6    of an Administrative Claim that is subject to the General Administrative Claims Bar Date and that

7    is not Filed and served on or before the Administrative Claims Bar Date shall be forever barred;

8    any party that seeks payment of Administrative Claims that (i) is required to file a request for

9    payment of such Administrative Claims and (ii) does not file such a request by the deadline

10    established herein shall be forever barred from asserting such Administrative Claims against the

11    Debtors, the Plan Trust, their estates, or any of their property.

12          **6.6**      **Treatment of Unsecured Tax Claims.**

13          Tax Claims are certain unsecured income, employment and other taxes described by Code

14    Section 507(a)(8).  The Code requires that each holder of such a Section 507(a)(8) tax claim

15    receive the present value of such Claim in deferred cash payments, over a period not exceeding

16    five (5) years from the petition date and that such treatment not be less favorable than the treatment

17    accorded to non priority unsecured creditors.

18          At the election of the Plan Trustee, the Holder of each Allowed Priority Tax Claim shall be

19    entitled to receive, on account of such Claim, (i) equal cash payments on the last Business Day of

20    each three-month period following the Effective Date, during a period not to exceed five years

21    after November 6, 2008, totaling the principal amount of such Claim plus simple interest on any

22    unpaid balance from the Effective Date, calculated at the interest rate available on ninety (90) day

23    United States Treasuries on the Effective Date, (ii) such other treatment agreed to by the Holder of

24    the Allowed Priority Tax Claim and the Plan Trustee, provided such treatment is on more

25    favorable terms to the Debtors (or the Plan Trust after the Effective Date) than the treatment set

26    forth in clause (i) hereof, or (iii) payment of the full Allowed Priority Tax Claim in Cash.

27        / / /

28        / / /

MAINDOCS-#164959-v3-SunCal_3rd_Am_Group_II_TD_DS.DOC

## 6.7 **Summary of the Group II: Trustee Debtors Plans' Treatment of Bond Indemnity Claims.**

Bond Indemnification Claims are treated as Reliance Claims.  In the event that such Bond Indemnification Claim arises from a general unsecured claim, it is classified in Class 6.  If the event that such Bond indemnification Claim arises from a Mechanic's Lien Claim, then it is classified in Class 3.  Contingent Bond Indemnification Claims are classified separately as Class 4 Claims.

The Bond Companies assert that surety bonds were executed on behalf of all or some of the Group II: Trustee Debtors as a principal for its respective Group II: Trustee Project ("Surety Bonds").  The Surety Bond(s) will not be transferred to the Winning Bidder(s) and, if a Winning Bidder(s) determines to develop the Group II: Trustee Project(s), the Surety Bond will not apply to the Winning Bidder(s)' bonding requirements with respect to such development.  If a Winning Bidder(s) determines to develop all or a portion of its respective Group II: Trustee Project(s), it will be required at that time to obtain new Surety Bonds from the Bond Companies or another surety, to the extent surety bonds are required by applicable state and local development requirements.

## VII.

## CLASSIFICATION OF CLAIMS AND INTERESTS

As required by the Code, the Plan places Claims and Interests into various Classes according to their right to priority and other relative rights.  The Plan specifies whether each Class of Claims or Interests is impaired or unimpaired, and the Plan sets forth the treatment each Class will receive.  The table below lists the Classes of Claims established under the Plan and states whether each particular Class is impaired or left unimpaired by the Plan.  A Class is "unimpaired" if the Plan leaves unaltered the legal, equitable and contractual rights to which the Holders of Claims or Interests in the Class are entitled, with certain exceptions specified in the Bankruptcy Code.

MAINDOCS-#164959-v3-SunCal_3rd_Am_Group_II_TD_DS.DOC

| CLASSIFICATION OF HOLDERS OF SECURED REAL PROPERTY TAX CLAIMS AGAINST THE GROUP II: TRUSTEE PROJECTS | | |
|---|---|---|
| **Class 1** | **Claimant** | **Claim Nos.[4]** |
| **Class 1.1** | Alameda County as the Holder of an Unpaid Secured Real Property Tax Claim against the Oak Knoll Project in the amount of $4,156,073. | SunCal Oak Knoll 22, 23 and 24 |
| **Class 1.2** | Los Angeles County as the Holder of an Unpaid Secured Real Property Tax Claim against the Torrance Project in the amount of $773,211. | SunCal Torrance 10 |

| CLASSIFICATION OF LEHMAN'S DISPUTED CLAIMS AGAINST THE GROUP II: TRUSTEE DEBTORS | | |
|---|---|---|
| **Class 2** | **Claims** | **Claim Nos.** |
| **Class 2.1** | The Holder of Lehman's Disputed Claims filed by Lehman ALI against SunCal Oak Knoll and SunCal Torrance arising from the SunCal Oak Knoll/SunCal Torrance Loan Agreement in the asserted amount of $158,141,364. | SunCal Oak Knoll: 12 SunCal Torrance: 4 |

| CLASSIFICATION OF ASSERTED MECHANIC LIEN CLAIMS AGAINST THE GROUP II: TRUSTEE PROJECTS | | |
|---|---|---|
| Class 3 | **Claimant** | Claim Nos. |
| **Class 3.1** | The Holder of the asserted Mechanic Lien Claim held by Oliphant Golf, Inc. against the Oak Knoll Project in the amount of $456,476. | SunCal Oak Knoll 46 |
| **Class 3.2** | The Holder of the asserted Mechanic Lien Claim held by RGA Environmental, Inc. against the Oak Knoll Project in the amount of $62,904. | SunCal Oak Knoll 1 |
| **Class 3.3** | The Holder of the asserted Mechanic Lien Claim held by BKF Engineers against the Oak Knoll Project in the amount of $308,817. | **SunCal Oak Knoll 2 and 20** |
| **Class 3.4** | The Holder of the asserted Mechanic Lien Claim held by CST Environmental Inc. against the Oak Knoll Project in the amount of $4,316,169. | **SunCal Oak Knoll 4 and 9** |

| CLASSIFICATION OF CONTINGENT BOND INDEMNIFICATION CLAIMS AGAINST THE GROUP II: TRUSTEE PROJECTS | | |
|---|---|---|
| **Class 4** | **Claimant** | **Claim Nos.** |

---

[4] These Real Property Tax Claims have been updated to include amounts for which proofs of claim have not yet been filed.

| CLASSIFICATION OF CONTINGENT BOND INDEMNIFICATION CLAIMS AGAINST THE GROUP II: TRUSTEE PROJECTS | | |
|---|---|---|
| **Class 4** | **Claimant** | **Claim Nos.** |
| **Class 4.1** | The holders of Contingent Bond Indemnification Claims arising from bonds issued with respect to the Group II: Trustee Projects | |

| CLASSIFICATION OF PRIORITY UNSECURED CLAIMS AGAINST THE GROUP II: TRUSTEE DEBTORS | | |
|---|---|---|
| **Class 5** | **Claimant** | **Claim Nos.** |
| **Class 5.1** | The Holder of Priority Claims that fall within Code Sections 507(a)(2), (4), (5), (6), and (7) in the asserted amount of $235 against SunCal Oak Knoll. | SunCal Oak Knoll 26 |

| CLASSIFICATION OF GENERAL UNSECURED CLAIMS THAT QUALIFY AS RELIANCE CLAIMS[5] AGAINST THE GROUP II: TRUSTEE DEBTORS | | |
|---|---|---|
| **Class 6** | **Claimant** | **Claim Nos.** |
| **Class 6.1** | The holders of Allowed Unsecured Reliance Claims against SunCal Oak Knoll. | Various Filed and Scheduled |
| **Class 6. 2** | The holders of Allowed Unsecured Reliance Claims against SunCal Torrance. | Various Filed and Scheduled |

---

[5] Unsecured Claims are generally placed within the same class and they receive the same treatment under a Plan. However, the SunCal Plan Proponents have divided Unsecured claims into two classes in the Plan – Classes 6.1 and 6.2, and 7.1 and 7.2. This separate classification has been implemented for the following reason. The Holders of Unsecured Claims in Classes 6.1 and 6.2, who are referred to as "Reliance Claimants," hold specific Litigation Rights that are referred to herein as "Reliance Claims." The SunCal Plan Proponents believe that the Holders of Reliance Claims are the potential beneficiaries of the equitable subordination causes of action in the Lehman Adversary Proceeding. The Unsecured Creditors in Classes 7.1 and 7.2 do not hold Reliance Claims. Under the Plan, the Reliance Claimants who sell their Reliance Claimants to LitCo, and who vote in favor of the Plan, which is Option A, will receive a distribution of 55 percent on their Allowed Unsecured Claims *from non-estate funds. Accordingly, the 55 percent payment is being paid from non-estate funds, for a non-estate asset.* If a Reliance Claimant elects not to sell this claim, then this claimant will receive the exact same distribution rights that the Class 7.1 and 7.2 claimants will receive under the Plan. In summary, the classification difference was made to provide for the purchase offer relating to the sale of the Reliance Claims. In all other respects the Holders of Unsecured Claims receive the same treatment under the Plan.

MAINDOCS-#164959-v3-SunCal_3rd_Am_Group_II_TD_DS.DOC

| CLASSIFICATION OF GENERAL UNSECURED CLAIMS THAT DO NOT QUALIFY AS RELIANCE CLAIMS[6] AGAINST THE GROUP II: TRUSTEE DEBTORS | | |
|---|---|---|
| **Class 7** | **Claimant** | **Claim Nos.** |
| **Class 7.1** | Claimants holding Allowed Unsecured Claims against SunCal Oak Knoll that are not Reliance Claims | Various Filed and Scheduled |
| **Class 7.2** | Claimants holding Allowed Unsecured Claims against SunCal Torrance that are not Reliance Claims | Various Filed and Scheduled |

| **Class 8** | **CLAIMANT/INTEREST HOLDER AGAINST THE GROUP II: TRUSTEE DEBTORS** | **Scheduled** |
|---|---|---|
| **Class 8.1** | Allowed Interests in SunCal Oak Knoll held by Lehman SunCal Real Estate Fund LLC and LBREP II/SunCal Land Fund Member LLC. | Scheduled Amount |
| **Class 8.2** | Allowed Interests in SunCal Torrance held by Lehman SunCal Real Estate Fund LLC and LBREP II/SunCal Land Fund Member LLC. | Scheduled Amount |

# VIII.

## THE PLAN'S TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS

### 8.1.    The Plan's Treatment of Holders of Allowed Secured Real Property Tax Claims Against the Group II: Trustee Projects (Classes 1.1 and 1.2).

The rights of the Holder(s)' of Allowed Secured Claims in Classes 1.1 and 1.2 are impaired under the Plan and shall receive one of the following two treatments at the Plan Trustee's discretion based solely on the option of the Group II: Trustee Debtor:

A.    Such Holders shall retain their existing lien rights and shall accrue interest as provided under applicable nonbankruptcy law pursuant to 11 U.S.C. § 506 and 511 and such Allowed Claims shall be satisfied in accordance with the provision of 11 U.S.C. § 1124(2) from the sale of the Group II: Trustee Projects during the Sales Period; or

B.    Such Holders shall retain their existing lien rights and shall accrue interest as provided under applicable nonbankruptcy law pursuant to 11 U.S.C. § 506 and 511 and California Revenue and Taxation Code Sections 4102 and 4103, and payment on such

---

[6] This Class includes, but it is not limited to, Bond Claims that are not Allowed Secured Claims within Class 4.1.

1    Allowed Claims shall be satisfied over sixty-one (61) months from the applicable Group II:

2    Trustee Debtor's Petition Date.

3    **8.2.    The Plan's Treatment of Lehman's Disputed Claim(s) and Disputed Lien(s)**

4    **Against the Group II: Trustee Debtors (Classes 2.1 and 2.2).**

5    The Holder(s) of Disputed Secured Claims within Class 2.1 and Class 2.2 shall receive the

6    indubitable equivalent of their disputed claims under the Plan, pursuant to 11 U.S.C. §

7    1129(b)(2)(A)(iii), through the following treatment:

8    A.    Lien Rights. The Class 2.1 and 2.2 Holder(s) shall retain their interest in the

9    Disputed Lien(s) against the applicable Group II: Trustee Projects and the Group II: Trustee Other

10    Assets that secure the Disputed Secured Claims, pending a Final Order(s) resolving the Allowance

11    of such Disputed Secured Claims and determining the validity, priority and extent of the applicable

12    Disputed Liens against the applicable Group II: Trustee Projects, which secure these claims, except

13    as follows:

14    1.    The Group II: Trustee Projects and the Group II: Trustee Other Assets

15    subject to the Class 2.1 through 2.2 Disputed Liens will be sought to be sold free and clear of such

16    liens during the Sales Period, without the right to credit bid under Section 363(k) with respect to

17    Disputed Claims and Disputed Liens. These Disputed Liens shall then attach to the Net Sales

18    Proceeds from the sale, which shall be deposited into the Net Sales Proceeds Account, pending a

19    resolution of such Disputed Secured Claims and Disputed Liens.  The marketing process and sales

20    procedures for the Group II: Trustee Projects and the Group II: Trustee Other Assets are described

21    in Article X hereof.

22    2.    To the extent that a Disputed Secured Claim held by either the Class 2.1

23    through 2.2 Claimants against the applicable Group II: Trustee Projects and Group II: Trustee

24    Other Assets  is disallowed, and the Disputed Lien associated with this Disputed Secured Claim is

25    consequently released to the extent of this disallowance, the Plan Trustee shall be authorized to use

26    to the Net Sales Proceeds that are no longer subject to the Disputed Lien(s) to pay other Allowed

27    Claims in their order of priority, in accordance with the terms of the Plan;

28

MAINDOCS-#164959-v3-SunCal_3rd_Am_Group_II_TD_DS.DOC

3.      To the extent that a Disputed Secured Claim held by either the Class 2.1 through 2.2 Claimant and the associated Disputed Lien(s) against the applicable Group II: Trustee Projects and Group II: Trustee Other Assets is subordinated, the Plan Trustee shall be authorized to use to the Net Sales Proceeds that are no longer subject to the Disputed Lien(s), or where the priority of the Disputed Liens has been subordinated by the Court, to pay other Allowed Claims in their order of priority, in accordance with the terms of the Plan, to the extent of the subordination; and

Notwithstanding the existence of the Disputed Secured Claims and the Disputed Liens, the Plan Trustee may a seek a release of the funds in the Net Sales Proceeds Account subject to these claims and liens to pay the claims of other creditors in accordance with the terms of the applicable Plan, if the Class 2.1 through 2.2 claimants' interests in Group II will remain adequately protected after this release.

3.      Distributions To The Class 2.1 and 2.2 Claimants. If the Plan Trustee consummates a sale or otherwise liquidates the particular Group II Trustee Project and/or Group II: Trustee Other Assets subject to the Class 2.1 and 2.2 Disputed Secured Claim(s) and/or Disputed Lien(s) during the Sales Period, as provided for above, the Holder(s) of such Disputed Secured Claim shall receive a distribution to the extent of available funds from the applicable Net Sale Proceeds Account(s) to the extent required by an entered Order of the Court, that is not subject to a stay pending appeal, determining the allowance and priority of the Disputed Secured Claims and the validity, priority and extent of the Disputed Liens in, including but not limited to, the Lehman Adversary Proceeding and the Lehman Claims Objections.

4.      Abandonment of Unsold Group II: Trustee Projects and Group II: Trustee Other Assets. If for any reason the Plan Trustee is unable to sell any of the Group II: Trustee Projects and/or Group II: Trustee Other Assets during the Sales Period, they will be abandoned as of 11:59 p.m. on the last day of the Sales Period, no payment shall be made to Holders of Class 2.1 and 2.2 Claims, as the case may be, and such Holder(s) shall be free to exercise any and all remedies that they may hold with respect to the Group II: Trustee Projects and the Group II: Trustee Assets under applicable California law.

MAINDOCS-#164959-v3-SunCal_3rd_Am_Group_II_TD_DS.DOC

**8.3.    The Plan's Treatment of Holders of Asserted Mechanic Lien Claims Against the Group II: Trustee Projects (Classes 3.1 Through 3.4).**

The treatment of the Holders of Allowed Classes 3.1 through 3.4 Secured Claims under the Plan shall be as follows:

A.    The Holder(s)' rights are impaired under the Plan;

B.    The Holder(s) shall retain their respective underlying liens on the applicable Group II: Trustee Project(s), but shall forebear from pursuing their rights and remedies until the expiration of the Sales Period;

C.    If the Plan Trustee is able to consummate a sale of the Group II: Trustee Projects subject to the liens asserted by the Holders of Class 3.1 through 3.4 claims during the Sales Period, such Holders shall receive a distribution of, to the extent available, Net Sale Proceeds in accordance with the priorities set forth under the Bankruptcy Code, subject to a Final Order(s) resolving the allowance and priority of the applicable Lehman's Disputed Claim(s) and the validity of the applicable Lehman Disputed Lien(s) in, including but not limited to, the Lehman Adversary Proceeding; and

D.    If for any reason the Plan Trustee is unable to sell any of the Group II: Trustee Projects during the Sales Period, they will be abandoned as of 11:59 p.m. on the last day of the Sales Period, no payment shall be made to Holders of Classes 3.1 through 3.4 Claims, as the case may be, and such Holder(s) shall be free to exercise any and all remedies that they may hold with respect to the Group II: Trustee Projects under applicable California law.

**8.4.    The Plan's Treatment of Holders of Contingent Bond Indemnification Claims Against the Group II: Trustee Projects (Class 4.1).**

The Bond Companies assert that surety bonds were executed on behalf of all or some of the Group II: Trustee Debtors as a principal for its respective Group II: Trustee Project ("Surety Bonds"). The Surety Bond(s) will not be transferred to the Winning Bidder(s) and, if a Winning Bidder(s) determines to develop the Group II: Trustee Project(s), the Surety Bond will not apply to the Winning Bidder(s)' bonding requirements with respect to such development. If a Winning Bidder(s) determines to develop all or a portion of its respective Group II: Trustee Project(s), it

1  will be require at that time to obtain new Surety Bonds from the Bond Companies or another

2  surety, to the extent surety bonds are required by applicable state and local development

3  requirements.

4        The rights of each holder of an Allowed Contingent Bond Indemnification Claim arising

5  from a bond issued with respect to a Group II: Trustee Project, shall, to the extent such claim(s) are

6  determined to be a secured claim(s), be impaired under the Plan. Such claims shall receive the

7  following treatment:

8        A.      Each such Allowed Secured Claim shall be placed in a separate class and

9  receive a separate ballot for voting purpose;

10        B.      Each Holder(s) shall retain their respective underlying liens on the

11  applicable Group II: Trustee Project(s), but shall forebear from pursuing their rights and remedies

12  until the expiration of the Sales Period;

13        C.      If the Plan Trustee is able to consummate a sale of the Group II: Trustee

14  Projects subject to the liens asserted by the Holders of Class 4.1 claimants during the Sales Period,

15  such Holders shall receive a distribution, to the extent of available Net Sale Proceeds in accordance

16  with the priorities set forth under the Bankruptcy Code, subject to a Final Order(s) resolving the

17  allowance and priority of the applicable Lehman's Disputed Claim(s) and the validity of the

18  applicable Lehman Disputed Lien(s) in, including but not limited to, the Lehman Adversary

19  Proceeding; and

20        D.      If the Plan Trustee is unable to consummate a sale of the applicable Group

21  II: Trustee Project(s) during the Sales Period, such projects shall be deemed abandoned by the Plan

22  Trustee, no payment shall be made to such Holder(s), and such Holder(s) shall be allowed to

23  pursue their respective rights against these project(s) under applicable California law.

24        **8.5.**    **The Plan's Treatment of Holders of Priority Claims Group II: Trustee Debtors**

25        **(Class 5.1)**.

26  The treatment of the Holders of Allowed Priority Claims under the Plan shall be as follows**:**

27        A.      The Holder(s) are unimpaired under the Plan; and

28

MAINDOCS-#164959-v3-SunCal_3rd_Am_Group_II_TD_DS.DOC

1        B.        The Holder(s) shall be paid either from the applicable Distribution

2  Account(s) (i) the full amount of such Allowed Priority Claim in Cash on the later of (x) the

3  Effective Date, (y) the date such Claim becomes an Allowed Priority Claim or (z) the date such

4  Allowed Priority Claim becomes payable in accordance with the terms governing such Allowed

5  Priority Claim, or (ii) upon such other less favorable terms as may be agreed to by such Holder and

6  the Plan Trustee.

7        **8.6.    The Plan's Treatment of Holders of General Unsecured Claims that are**

8              **Reliance Claims Group II: Trustee Debtors (Classes 6.1 and 6.2).**

9        The rights of Holders of Allowed Class 6.1 and 6.2 Claims are impaired under the Plan.

10  They have the right to choose between the following treatment options:

11        A.        Option A:  A claimant in these classes *who votes in favor of the Plan*, and

12  who chooses Option A, will have the right to sell to LitCo all of the claimant's right, title and

13  interest in all Allowed Reliance Claims and all of the claimant's Litigation Rights against the

14  applicable Debtor, SunCal Affiliates, and the Lehman Entities, for the sum of fifty five cents

15  ($0.55) per dollar of Allowed Reliance Claim, payable in cash on the Effective Date, provided

16  there is no stay pending an appeal of the Confirmation Order, in full satisfaction of such claimant's

17  Allowed Reliance Claims; or

18        B.        Option B:  A claimant in these classes who votes against the Plan, or who

19  votes in favor of the Plan, but does not choose Option A, or who does not vote on the Plan, will 1)

20  receive a minimum distribution in cash, on the Effective Date, equal to one percent (1%) of such

21  claimant's Allowed Claim, 2) retain such claimant's Reliance Claim(s) and rights against the

22  Lehman Entities and its right to receive such claimant's share, as determined by the Court, in the

23  benefits and recoveries resulting from a judgment or order entered in the Lehman Adversary

24  Proceeding, the Contract Action, or the Lehman Claims Objections,  and 3) right to receive a pro-

25  rata share of any funds payable from the applicable Distribution Account(s), after payment in full

26  of all Post Confirmation Expenses, Allowed Administrative Claims, and Allowed Priority Claims.

27

28

**8.7.** **The Plan's Treatment of Holders of Allowed General Unsecured Claims that Are Not Reliance Claims Group II: Trustee Debtors (Classes 7.1 and 7.2).**

The rights of Holders of Allowed Class 7.1 and 7.2 Claims are impaired under the Plan. Under the Plan, each claimant will 1) receive a minimum distribution in cash, on the Effective Date, equal to one percent (1%) of such claimant's Allowed Claim, and 2) receive a pro-rata share of any funds payable from the applicable Distribution Account(s), after payment in full of all Post Confirmation Expenses, Allowed Administrative Claims, and Allowed Priority Claims and any sums that the Bankruptcy Court determines are payable to the Holders of Allowed Class 6.1 and 6.2 Claims from either the Claim Reduction Amounts or on account of a judgment in the Lehman Adversary Proceeding.

**8.8.** **The Plan's Treatment of Holders of Allowed Interests Group II: Trustee Debtors.**

The Interests of the Holders in Class 8.1 and 8.2 are impaired under the Plan. All such Interests shall be cancelled as of the Effective Date and no distribution shall be made to these Holders on account of such Interest(s).

## IX.

## ACCEPTANCE OR REJECTION OF THE PLAN

**9.1.** **Introduction.**

PERSONS OR ENTITIES CONCERNED WITH CONFIRMATION OF THE PLAN SHOULD CONSULT WITH THEIR OWN ATTORNEYS BECAUSE THE LAW ON CONFIRMING A PLAN OF REORGANIZATION IS VERY COMPLEX.  The following discussion is intended solely for the purpose of alerting readers about basic confirmation issues, which they may wish to consider, as well as certain deadlines for filing Claims.  The Debtors cannot represent that the discussion contained below is a complete summary of the law on this topic.

Many requirements must be met before the Court can confirm the Plan.  Some of the requirements include that the Plan must be proposed in good faith, acceptance of the Plan, whether the Plan pays creditors at least as much as creditors would receive in a Chapter 7 liquidation, and

MAINDOCS-#164959-v3-SunCal_3rd_Am_Group_II_TD_DS.DOC

1  whether the Plan is feasible.  The requirements described herein are <u>not</u> the only requirements for

2  confirmation.

3       **9.2.**    <u>**Who May Object to Confirmation of the Plan**</u>.

4       Any party in interest may object to the confirmation of the Plan, but as explained below not

5  everyone is entitled to vote to accept or reject the Plan.

6       **9.3.**    <u>**Who May Vote to Accept/Reject the Plan**</u>.

7       A Holder of a Claim or Interest has a right to vote for or against the Plan if that Holder of

8  the Claim or Interest has a Claim which is both (1) Allowed or Allowed for voting purposes and

9  (2) Classified in an impaired Class (excluding any class in which the Plan is "deemed rejected").

10  The votes will be tabulated on a Debtor by Debtor basis.

11       **9.4.**    <u>**What Is an Allowed Claim/Interest**</u>.

12       As noted above, a Holder of a Claim or an Interest must first have an Allowed Claim or

13  Allowed Interest to vote.

14       **9.5.**    <u>**What Is an Impaired Class**</u>.

15       A Class is impaired if the Plan alters the legal, equitable, or contractual rights of the Claims

16  or Interests in that Class, other than the right to accelerate the Claim upon certain kinds of defaults.

17  In this case, the SunCal Plan Proponents believe that all Classes, except for Class 5.1, are

18  impaired.

19       **9.6.**    <u>**Who Is Not Entitled to Vote**</u>.

20       The following four types of Claims are <u>not</u> entitled to vote: (1) Claims that have been

21  disallowed; (2) Claims in unimpaired Classes; (3) Claims entitled to priority pursuant to

22  Bankruptcy Code Sections 507(a)(2) or (a)(3) and Claims in Classes that do not receive or retain

23  any value under the Plan.  Claims in unimpaired Classes are not entitled to vote because such

24  Classes are deemed to have accepted the Plan.  Claims entitled to priority pursuant to Bankruptcy

25  Code Section 507(a)(8) are not entitled to vote because such Claims are not placed in Classes and

26  they are required to receive certain treatment specified by the Bankruptcy Code.  Claims in Classes

27  that do not receive or retain any property under the Plan do not vote because such Classes are

28  deemed to have rejected the Plan.  The SunCal Plan Proponents believe that all Classes are entitled

1   to vote except Class 5.1.  These classes are not impaired under the Plan and consequently are not

2   entitled to vote. They are conclusively deemed to have accepted the Plan.  The Interests held by the

3   Holders in Classes 8.1 and 8.2 are being cancelled under the Plan; accordingly these Interest

4   Holders are deemed to have voted to reject the Plan.

5        EVEN IF YOUR CLAIM IS OF THE TYPE DESCRIBED ABOVE, YOU MAY STILL

6   HAVE A RIGHT TO OBJECT TO THE CONFIRMATION OF THE PLAN.

7       **9.7.**   **Who Can Vote in More than One Class.**

8        A creditor whose Claim has been Allowed in part as a Secured Claim and in part as an

9   Unsecured Claim is entitled to accept or reject a Plan in both capacities by casting one ballot for

10  the secured part of the Claim and another ballot for the Unsecured Claim.  Also, a Creditor may

11  otherwise hold Claims in more than one Class (such as a Holder of Senior Secured Claims and

12  Subordinated Note Claims), and may vote the Claims held in each Class.

13      **9.8.**   **Votes Necessary for a Class to Accept the Plan.**

14       A Class of Claims is deemed to have accepted the Plan when more than one-half (1/2) in

15  number and at least two-thirds (2/3) in dollar amount of the Claims *that actually voted*, vote to

16  accept the Plan.  A Class of interests is deemed to have accepted the Plan when Holders of at least

17  two-thirds (2/3) in amount of the interest-Holders of such Class which actually vote, vote to accept

18  the Plan.

19      **9.9.**   **Treatment of Nonaccepting Classes.**

20       As noted above, even if there are impaired Classes that do not accept the proposed Plan, the

21  Court may nonetheless confirm the Plan if the nonaccepting Classes are treated in the manner

22  required by the Code and at least one impaired Class of Claims accepts the Plan.  The process by

23  which a plan may be confirmed and become binding on non-accepting Classes is commonly

24  referred to as "cramdown."  The Bankruptcy Code allows the Plan to be "crammed down" on

25  nonaccepting Classes of Claims or interests if it meets all statutory requirements except the voting

26  requirements of 1129(a)(8) and if the Plan does not "discriminate unfairly" and is "fair and

27  equitable" with respect to each impaired Class that has not voted to accept the Plan, as set forth in

28  11 U.S.C. § 1129(b) and applicable case law.

**9.10.    Request for Confirmation Despite Nonacceptance by Impaired Class(es).**

The SunCal Plan Proponents will ask the Court to confirm the Plan by cramdown on any impaired Class if such Class does not vote to accept the Plan.

**X.**

**MEANS OF EXECUTION AND IMPLEMENTATION OF THE PLAN**

**10.1.    Introduction.**

This section is intended to address how the SunCal Plan Proponents intend to implement the provisions of the Plan.  It addresses the marketing and the sale of the Group II: Trustee Projects and the Group II: Trustee Other Assets, the transfer of the Plan Trust Assets to the Plan Trust, the nature of the Plan Trust, the powers of the Plan Trust, the governance of the Plan Trust, the resolution of disputed claims, the sources of funds that will be used to pay claims and the mechanics of how claims will be paid.

**10.2    Sale Process of the Group II: Trustee Projects and the Group II: Trustee Other Assets During the Sales Period**.

The core objective of the Plan is to enable all creditors holding Allowed Claims to receive the highest dividend possible by selling the estates' primary assets, the Group II: Trustee Projects, to the highest bidder. The process of marketing the Group II: Trustee Projects for sale will begin, pursuant to the Confirmation Order, immediately after the entry of this order.  Acquisitions shall manage the marketing process initially in its capacity as a SunCal Plan Proponent and as the Plan Trustee after the Effective Date.  Furthermore, the Trustee Debtors' Committee shall be consulted and have the opportunity to object to the sales process and request a hearing with the Bankruptcy Court.

The SunCal Plan Proponents and the Plan Trustee will pursue the following sale procedures culminating into a public auction for the sale of the Group II: Trustee Projects after the Confirmation Date and during the Sales Period.

10.2.1  Implementation of a Marketing Program. Once the Plan is confirmed, the SunCal Plan Proponents will market the Group II: Trustee Projects for sale through a comprehensive sale effort during the Sale Period. This sale effort will include 1) sending sale

-71-

packages describing each Group II: Trustee Project to the real estate brokerage community; b) advertising the Group II: Trustee Projects for sale on a website that includes links allowing direct access to all relevant information regarding the Group II: Trustee Projects; and c) sending packages to a list of prospects nationally who are actively seeking or may have interest in these kinds of assets.

10.2.2 <u>Identifying a Stalking Horse Bidder</u>. On the first business day after the Effective Date, the Plan Trustee will accept, on a provisional basis, an Opening Bid for the Group II: Trustee Projects.  The bidder whose Opening Bid is accepted for each Group II Trustee Project will become the "Stalking Horse Bidder."  The Opening Bid must be equal to the Minimum Sale Price(s) fixed in the Plan for each Group II Trustee Project.  The Plan Trustee shall also select Qualified Bidders at this time.

10.2.3 <u>The Sale Contract</u>. The sale contract that will be entered into with the Stalking Horse Bidder will include the following bankruptcy-sale related provisions:

1. <u>Overbid Provisions</u>. The contract will allow the Plan Trustee to seek "overbids" from other Qualified Buyers, and to accept an Initial Overbid that exceeds the Stalking Horse Bid by the Initial Overbid Amount applicable to each Group II: Trustee Project. In the case of the Oak Knoll Project, the Initial Overbid Amount is a sum that is not less than $22,860,000, plus the Oak Knoll Break-up Fee, plus seventy five thousand dollars ($75,000). In the case of the Del Amo Project, the Initial Overbid Amount is $12,150,000, plus the Torrance Break-up Fee, plus seventy-five thousand dollars ($75,000).

2. <u>A Break-Up Fee</u>. The sale contract will include a "break-up fee" provision.  This fee will be payable to the Stalking Horse Bidder if the Opening Bid is overbid, and another Qualified Bidder purchases the Group II: Trustee Project(s) that is the subject of the Opening Bid. The Del Amo Break-up Fee is $540,000 and the Oak Knoll Break-up Fee is $1,016,000.

3. <u>Sale Free and Clear of Liens</u>. The sale contract will provide that the Group II: Trustee Project(s) are being sold free and clear of all monetary liens and encumbrances and that no party holding a lien against the projects, including the Lehman Lenders, may submit a

-72-

1    "credit bid" based upon the amount allegedly owing on the claims secured by the project being

2    sold.

3       10.2.4 <u>The Auction</u>. Fourteen (14) days after the date of the selection of the

4    Stalking Horse Bidder, the Plan Trustee will conduct a public auction wherein all Qualified

5    Bidders who have submitted Qualified Bids for the Group II: Trustee Projects will have the

6    opportunity to increase their bids for these Projects. The Qualified Bidder that submits the highest

7    bid for the Project will then be designated the Winning Bidder. The Winning Bidder will then have

8    fifteen (15) days pay the Winning Bid amount and the closing shall occur no later than the first

9    business day following the thirtieth (30th) day after the Effective Date.

10       10.2.5 <u>The Group II: Trustee Other Assets Marketing and Bid Procedures.</u>

11      To the extent that the SunCal Plan Proponents believe that the Group II: Trustee Other

12    Assets have any material value, the SunCal Plan Proponents will pursue the following process for

13    the sale of the Group II: Trustee Other Assets after the Confirmation Date and during the Sales

14    Period:

15       1. After the Confirmation Date, the SunCal Plan Proponents will

16       implement commercially reasonable marketing efforts for the sale of the Group II:

17       Trustee Other Assets;

18       2. The sales procedures will be decided by the SunCal Plan Proponents

19       after consultation with the Trustee Debtors' Committee; and

20       3. The sale contract will provide that the Group II: Trustee Other

21       Assets(s) are being sold free and clear of all monetary liens and encumbrances and

22       that no party holding a lien against the Group II: Trustee Other Assets, including the

23       Lehman Lenders, may submit a "credit bid" based upon the amount allegedly owing

24       on the claims secured by the Group II: Trustee Other Assets being sold.

25       4. Within seven (7) days after the Effective Date, the Plan Trustee will

26       hold a public auction for the sale of the Group II: Trustee Assets to the bidder that

27       submits the highest and best bid.  The winning bidder will then have seven (10)

28       days to close this purchase transaction by paying the winning bid amount.

### 10.3    Establishment and Operations of the Plan Trust.

The Plan Trust shall be established and shall become effective on the Effective Date.  The Plan Trust is created pursuant to the Plan and the Confirmation Order.  The primary purpose of the Plan Trust is to consummate the sales and/or the liquidation of the Group II: Trustee Projects and the Group II: Trustee Other Assets transferred to it and the Distribution of the Net Sales Proceeds to Creditors, with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Plan Trust.  The Plan Trust shall hold title to and administer the Plan Trust Property, including, but not limited to, any Litigation Claims, and the proceeds thereof for liquidation and distribution in accordance with the terms of the Plan.

### 10.4    Preservation and Pursuit of Litigation Claims and Recovery for the Plan Trust.

On the Effective Date, title to and possession of all property of the Group II: Trustee Debtors shall be deemed transferred and delivered to the Plan Trust, without further act or action under any applicable agreement, law, regulation, order or rule of law.

Pursuant to Section 1123(b)(3) of the Bankruptcy Code, the Plan Trust shall retain all Litigation Claims whether or not pending on the Effective Date that are not purchased by LitCo Unless a Litigation Claim is expressly waived, relinquished, released, sold, compromised or settled in the Plan or in a Final Order, all rights with respect to such Litigation Claims are reserved and the Plan Trustee may pursue such Litigation Claims.  Notwithstanding the foregoing, the Plan Trustee shall not settle or abandon a Litigation Claim valued at greater than $100,000 except upon ten (10) days' prior written notice and opportunity to object to the proposed action.  Any disputes concerning the settlement or abandonment of a Litigation Claim shall be submitted to the Bankruptcy Court for resolution on no less than ten (10) days' notice to the objecting party.

All Litigation Recoveries realized or obtained by the Plan Trustee shall be promptly deposited into the applicable Distribution Account(s).  Except as otherwise provided in the Plan and the Confirmation Order, the Litigation Recoveries shall be free and clear of all Claims and Liens and shall only be expended in accordance with the provisions of the Plan.

MAINDOCS-#164959-v3-SunCal_3rd_Am_Group_II_TD_DS.DOC

1    **10.5    Removal of Chapter 11 Trustee**.

2         As of the Effective Date, the appointment of the Chapter 11 Trustee in the SunCal Oak

3    Knoll, LLC and SunCal Torrance, LLC shall terminate, and possession and control over all

4    property within these estates shall pass to the Plan Trust.

5         **10.6    Payment of Plan Trust Expenses**.

6         The expenses incurred by the Plan Trust or the Plan Trustee during the Plan Period, shall be

7    paid, or adequate reserves shall be created for the payment of such expenses, prior to any

8    distribution to the Plan Trust Beneficiaries.

9         **10.7    The Plan Trust Distribution System.**

10        The Plan Trustee shall establish a separate "Distribution Account" for each Group II:

11   Trustee Debtor at an FDIC insured bank. Each Group II: Trustee Debtor's Available Cash, whether

12   on hand as of the Effective Date or received thereafter, shall be deposited into that Group II:

13   Trustee Debtor's Distribution Account.  These funds will then be used to pay the claims of

14   Creditors holding Allowed Claims in their order of priority as provided for in the Plan.  Persons

15   dealing with the Plan Trustee, or seeking to assert Claims against the Debtors, the Estates or the

16   Plan Trust, shall look only to property of the Debtors, the Estates or the Plan Trust to satisfy any

17   liability to such Persons, and the Plan Trustee shall have no corporate, personal, or individual

18   obligation to satisfy any such liability.

19        **10.8    The Plan Trustee**.

20        **10.8.1  Appointment**.  Acquisitions shall be Plan Trustee of the Plan Trust.  The

21   appointment of the Plan Trustee shall be effective as of the Effective Date.

22        **10.8.2  Term**.  Unless the Plan Trustee resigns, dissolves or is removed by Court

23   order earlier, the Plan Trustee's term shall expire upon termination of the Plan Trust pursuant to

24   the Plan.  In the event the Plan Trustee resigns, dies or is removed by Court order prior to

25   termination of the Plan Trust, the UST shall select and recommend to the Court a successor Plan

26   Trustee.

27        **10.8.3    Powers and Duties**.  On the Effective Date, the Plan Trustee shall have

28   the rights, powers and duties set forth in the Plan, the Confirmation Order, and Bankruptcy Code

§§505, 1107 and 1108.  The Plan Trustee shall be governed in all things by the terms of the Plan and the Confirmation Order.  The Plan Trustee shall administer the Plan Trust in accordance with the Plan.  Without limitation, the Plan Trustee shall file final federal, state, foreign and, to the extent applicable, local, tax returns.  Without further Motion, notice, or order of the Court, the Plan Trustee shall be authorized, empowered and directed to take all actions necessary to comply with the Plan and exercise and fulfill the duties and obligations arising thereunder, including, without limitation to:

       i.     employ, retain, and replace one or more attorneys, accountants, auctioneers, brokers, managers, consultants, other professionals, agents, investigators, expert witnesses, consultants, and advisors as necessary to discharge the duties of the Plan Trustee under the Plan;

       ii.    control and effectuate the Claims reconciliation process, including to object to, seek to subordinate, compromise or settle any and all Claims against the Debtors pursuant to the terms of the Plan;

       iii.   open, maintain and administer bank accounts as necessary to discharge the duties of the Plan Trustee under the Plan;

       iv.   make Distributions to the Holders of Allowed Claims in accordance with the Plan;

       v.    retain professionals to assist in performing his or her duties under the Plan;

       vi.   pay reasonable and necessary professional fees, costs, and expenses;

       vii.   investigate, analyze, commence, prosecute, litigate, compromise, settle, dismiss, and otherwise administer all Causes of Action and Avoidance Actions for the benefit of the Plan Trust and its beneficiaries, as set forth in the Plan, and to take all other necessary and appropriate steps to collect, recover, settle, liquidate, or otherwise reduce to Cash all Causes of Action and Avoidance Actions, as the Plan Trustee may determine is in the best interests of the Plan Trust;

       viii.  administer, sell, liquidate, or otherwise dispose of the Assets in accordance with the terms of the Plan;

MAINDOCS-#164959-v3-SunCal_3rd_Am_Group_II_TD_DS.DOC

1     ix. incur and pay reasonable and necessary expenses in connection with the

2 performance of the Plan Trustee's duties under the Plan;

3     x. represent the Estates before the Court and other courts of competent

4 jurisdiction with respect to matters concerning the Plan Trust;

5     xi. seek the examination of any entity under the subject to the provisions of

6 Bankruptcy Rule 2004;

7     xii. comply with applicable orders of the court and any other court of competent

8 jurisdiction over the matters set forth in the Plan;

9     xiii. comply with all applicable laws and regulations concerning the matters set

10 forth in the Plan;

11     xiv. exercise such other powers as may be vested in the Plan Trust pursuant to

12 the Plan, the Confirmation Order, or other Final Orders of the Court.

13     xv. execute any documents, instruments, contracts, and agreements necessary

14 and appropriate to carry out the powers and duties of the Plan Trust;

15     xvi. (1) seek a determination of tax liability under §505 of the code, (2) pay

16 taxes, if any, related to a Debtor, (3) file, if necessary, any and all tax and information returns

17 r3equired with the respect to the Plan Trust, including, if appropriate, treating the Plan Trust as a

18 "grantor trust" pursuant to Treas. Reg 1.671-4 or otherwise, (4) make tax elections by and on

19 behalf of the Plan Trust, and (5) pay taxes, if any, payable by the Plan Trust; and

20     xvii. stand in the shoes of the Debtors for all purposes.

21    **10.8.4**  **Retention of Professionals and Compensation Procedure.**

22   On and after the Effective Date, the Plan Trustee may, without further application or

23 Motion, notice, hearing, or Court order, engage or employ such professionals and experts as may

24 be deemed necessary and appropriate by the Plan Trustee to assist the Plan Trustee in carrying out

25 the provisions of the Plan, including, but not limited to, the Professionals retained prior to the

26 Effective Date by either the Debtors or the Trustee Debtors' Committee.  The Plan Trustee may

27 employ such professionals on any reasonable terms and conditions of employment to be

28 determined by the Plan Trustee.  For the services performed on and after the Effective Date, the

MAINDOCS-#164959-v3-SunCal_3rd_Am_Group_II_TD_DS.DOC

1    professionals engaged by the Plan Trustee (the "Plan Trustee Professionals") shall receive

2    reasonable compensation and reimbursement of expenses in a manner to be determined by the Plan

3    Trustee.

4              **10.8.5  <u>Fees and Expenses</u>.**

5              Acquisitions shall not receive any compensation for the services it performs as the Plan

6    Trustee.  The Plan Trustee Professionals shall be entitled to reasonable compensation for their

7    services, and reimbursement of expenses.  The costs and expenses of the Plan Trust (including,

8    without limitation, fees and expenses of the Plan Trustee Professionals) shall be paid from the Plan

9    Trust.  The Plan Trustee shall pay, without further order, notice or application to the Court, the

10   reasonable fees and expenses of the Plan Trustee Professionals, as necessary to discharge the Plan

11   Trustee's duties under the Plan.  The Plan Trustee shall be authorized to reserve funds from the

12   Plan Trust as is reasonable to pay the expenses of the Plan Trustee and the expenses and fees of the

13   Plan Trustee Professionals before making any Distributions under the Plan.

14             **10.8.6      <u>Limitation of Liability and Indemnification</u>.**

15             None of the Group II: Trustee Debtors, the Trustee Debtors' Committee, the Plan Sponsor,

16   the SunCal Plan Proponents, the Plan Trustee, the Professionals, nor any of their respective

17   members, officers, directors, shareholders, employees, or agents (the "Indemnified Parties") shall

18   be liable (a) for any loss or damages by reason of any action taken or omitted by him or her, except

19   in the case of fraud, willful misconduct, bad faith, or gross negligence, (b) for any act or omission

20   made in reliance upon the Debtors' books and records or upon information or advice given to the

21   Plan Trustee by his or her professionals, or (c) for any action taken or omission made in connection

22   with or related to the negotiations, formulation, or preparation of the Plan and the Disclosure

23   Statement, the approval of the Disclosure Statement, the confirmation of the Plan, the

24   consummation of the Plan, or the administration of the Plan, the Cases, or the property to be

25   distributed under the Plan, to the fullest extent permitted by applicable statute and case law.

26   Except as otherwise provided in this Plan, the Plan Trustee shall rely and shall be protected in

27   acting upon any resolution, certificate, statement, instrument, opinion, report, notice, consent, or

28

1    other document believed by him or her to be genuine and to have been signed by the proper party

2    or parties.

3         The Indemnified Parties shall be indemnified and receive reimbursement from and against

4    any and all loss, liability, expense (including attorneys' fees) or damage of any kind, type or nature,

5    which the Indemnified Party may incur or sustain the exercise and performance of any of the Plan

6    Trustee's powers and duties under this Plan or the Confirmation Order, or in the rendering of

7    services by the Indemnified Party to the Plan Trustee, to the full extent permitted by applicable

8    law, except if such loss, liability, expense or damage is finally determined by a court of competent

9    jurisdiction to result from the Plan Trustee's or an Indemnified Person's fraud, willful misconduct,

10   bad faith, or gross negligence.  The amounts necessary for such indemnification and

11   reimbursement shall be paid by the Plan Trustee out of the Plan Trust Property.  The Plan Trustee

12   shall not be liable for the payment of any Plan Trust expense or claim or other liability of the Plan

13   Trust, and no Person shall look to the Indemnified Parties for the payment of any such expense or

14   liability.  This indemnification shall survive the dissolution, resignation or removal, as may be

15   applicable, of the Plan Trustee, or the termination of the Plan Trust, and shall inure to the benefit

16   of the Plan Trustee's and the Indemnified Person's heirs and assigns.

17         **10.8.7  Plan Trustee as Successor.**

18         Pursuant to Code §1123(b), the Plan Trustee shall be the successor to the Group II

19   Voluntary Debtors for all purposes.

20         **10.9    The Plan Trust Beneficiaries**.

21         The Holders of Allowed Claims under the Plan, or any successors to such Holders'

22   Allowed Claims ("Beneficiary" or "Beneficiaries") shall own a beneficial interest in the Plan Trust

23   which shall, subject to the Plan, be entitled to a Distribution, if any, in the amounts, and at the

24   times, set forth in the Plan.  Ownership of a beneficial interest in the Plan Trust shall not be

25   evidenced by any certificate, security, or receipt or in any other form or manner whatsoever, except

26   as maintained on the books and records of the Plan Trust by the Plan Trustee.  The ownership of a

27   beneficial interest in the Plan Trust shall not entitle any Beneficiary to any title in or to the Plan

28   Trust assets or to any right to call for a partition or division of such assets or to require an

1  accounting.  The Plan Trustee shall make Distributions, if any, to Beneficiaries in the manner

2  provided in the Plan.

3       The rights of the Beneficiaries arising under the Plan Trust may be deemed "securities"

4  under applicable law.  However, such rights have not been defined as "securities" under the Plan

5  because (a) the intent of the Plan is that such rights shall not be securities, and (b) if the rights

6  arising under the Plan Trust are deemed to be "securities," the exemption from registration under

7  §1145 of the Bankruptcy code is intended to be applicable to such securities.

8       **10.10    No Payment of Transfer-Related Fees to the United States Trustee**.

9       The Plan Trust shall not be required to pay any fees to the United States Trustee based on

10  any transfers of the Plan Trust Assets to the Plan Trust or from the Plan Trust.

11       **10.11    No Payment of Transfer-Related Fees to the Plan Trustee**.

12       The Plan Trust shall not be required to pay any fees to the Plan Trustee based on any

13  transfers of Plan Trust Assets from the Group II: Trustee Debtors to the Plan Trust, or from the

14  Plan Trust.

15       **10.12    Books and Records of Trust**.

16       The Plan Trustee, and to the extent of payments and distributions by any Disbursing Agent,

17  the Disbursing Agent, shall maintain an accounting of receipts and disbursements of the Plan

18  Trust. The Plan Trustee shall maintain the books and records of the Plan Trust, or provide storage

19  for such book and records, for the longer of six (6) years, or while Plan is in existence, provided

20  that the Court may, upon application by the Plan Trustee, authorize the Plan Trust to destroy all of

21  the Plan Trusts books and records at such time as Plan Trust has no further need for such books

22  and records. The Plan Trust's books and records shall be open to inspection at all reasonable times,

23  upon written request by the Trustee Debtors' Committee.

24       **10.13    Federal Income Tax Treatment of the Holders of the Plan Trust Beneficial**

25  **Interests**.

26       For all United States federal income tax purposes, the transfers by the Group II: Trustee

27  Debtors shall be treated by the Group II: Trustee Debtors, their estates, the Plan Trust and the Plan

28  Trust Beneficiaries as a transfer of the Plan Trust Assets by the Group II: Trustee Debtors to the

MAINDOCS-#164959-v3-SunCal_3rd_Am_Group_II_TD_DS.DOC

1    Plan Trust Beneficiaries followed by a transfer of the Plan Trust Assets by such the Plan Trust

2    Beneficiaries to the Trust. The Plan Trust Beneficiaries shall be treated as the grantors and deemed

3    owners of the Plan Trust for United States federal income tax purposes. The Plan Trust Trustee and

4    the Plan Trust Beneficiaries are required to value their interests in the Plan Trust Assets

5    consistently with the values placed upon the Plan Trust Assets by the Plan Trust, and to use such

6    valuations for all purposes. The Plan Trust Agreement shall provide for consistent valuations of the

7    Plan Trust Assets by the Plan Trust Trustee and the Plan Trust Beneficiaries, and shall provide that

8    the Plan Trust will determine the fair market value of the Plan Trust Assets within thirty (30) days

9    after the Effective Date, and send such determination to each the Plan Trust Beneficiary. By its

10   acceptance of a the Beneficial Interest, each recipient of such an interest will be conclusively

11   deemed to agree to use such valuations for all purposes, including, without limitation, in

12   computing any gain recognized upon the exchange of such holder's claim for purposes of

13   determining any United States Federal income tax, and shall be required to include those items of

14   income, deductions and tax credits that are attributable to its the Beneficial Interest in computing

15   its taxable income.

16   **10.14   Termination of the Trust.**

17          The Plan Trust shall continue in effect until the earlier of: (a) the date that all the Plan Trust

18   Assets has been liquidated, all proceeds have been converted to cash or distributed in kind, all the

19   Plan Trust Expenses have been paid, all claims to be paid under the Plan for which the Plan Trust

20   Trustee is obligated to make distributions on have been paid, all distributions to be made with

21   respect to the Beneficial Interests have been made, all litigation to which the Plan Trust is a party

22   have been concluded by dismissal or an order issued by the court in which such litigation is

23   pending and such order has become "final" (consistent with the definition of Final Order in the

24   plan for orders issued by the Bankruptcy Court), and the Chapter 11 Case has been closed; and (b)

25   the expiration of five (5) years from the Effective Date; provided, however, that the Plan Trust may

26   request the Bankruptcy Court to extend the permitted life of the Plan Trust for such additional

27   period as is reasonably necessary to conclude the liquidation and distributions, not to exceed a total

28   of ten (10) years from the Effective Date, which request shall be filed so the Bankruptcy Court may

1    consider and rule on the request within six (6) months prior to the expiration of the initial five-year

2    term.

3       **10.15**    <u>**Exemption from Certain Transfer Taxes**</u>.

4       In accordance with Section 1146(a) of the Bankruptcy Code, the issuance, transfer or

5    exchange of a security or the making or delivery of an instrument of transfer under the plan may

6    not be taxed under any law imposing a stamp tax or similar tax. All governmental officials and

7    agents shall forego the assessment and collection of any such tax or governmental assessment and

8    shall accept for filing and recordation any of the foregoing instruments or other documents without

9    payment of such tax or other governmental assessment.

10       **10.16**    <u>**Tax Consequence of The Plan**</u>.

11       The implementation of the Plan may have federal, state and local tax consequences to the

12    Group II: Trustee Debtors, Creditors and Interest Holders.  No tax opinion has been sought or will

13    be obtained with respect to any tax consequences of the Plan. This Disclosure Statement does not

14    constitute and is not intended to constitute either a tax opinion or tax advice to any person, and the

15    summary contained herein is provided for informational purposes only.

16       CREDITORS AND INTEREST HOLDERS ARE ADVISED TO CONSULT WITH THEIR

17    OWN TAX ADVISORS REGARDING THE TAX CONSEQUENCES TO THEM AND TO THE

18    DEBTOR OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING

19    FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES.

20       **10.17**    <u>**The Trustee Debtors' Committee.**</u>

21       On the Effective Date, the Trustee Debtors' Committee shall continue to serve their

22    applicable Debtors as Trustee Debtors' Committee to the applicable reorganized Debtors, subject

23    to the following:

24       **10.17.1**    <u>**Duties and Powers.**</u>

25       The duties of the Trustee Debtors' Committee after the Effective Date shall be limited to

26    monitoring the Plan's implementation, notice and opportunity to object to the sales process, notice

27    and opportunity to object to any settlement of the Lehman Adversary Proceeding, and the Contract

28    Action, standing to object to any settlement of any Litigation Claim in excess of $100,000,

MAINDOCS-#164959-v3-SunCal_3rd_Am_Group_II_TD_DS.DOC

1 standing to object to any proposed sales procedures on sale of the Debtors' Projects and standing to

2 file, prosecute and resolve objections to Claims filed by Insiders that are SunCal Affiliates and

3 their professionals.  The Trustee Debtors' Committee shall receive notice of and the right to review

4 all payments and Distributions.

5       The Trustee Debtors' Committee shall be entitled to retain, employ and compensate

6 Professionals, in order to assist with the obligations and rights of the Trustee Debtors' Committee

7 under the terms of the Plan.  Such compensation shall be paid from the applicable Distribution

8 Account(s).

9 **10.17.2   Dissolution of Trustee Debtors' Committee.**

10       The Trustee Debtors' Committee shall be dissolved upon the entry of an order converting,

11 closing or dismissing the Chapter 11 Cases or entry of a final decree in the Chapter 11 Cases.  On

12 dissolution, the Trustee Debtors' Committee shall have no other or further obligations or

13 responsibilities on behalf of the Plan Trust.

14    **10.18    Claims Estimation Rights.**

15       On the Confirmation Date, the SunCal Plan Proponents shall be vested with standing to file

16 a motion under 11 U.S.C. § 502(c), and they shall be authorized and empowered to seek in such

17 motion the estimation, for Distribution purposes, of any Disputed Claim seeking recourse to, or

18 claiming an interest in, any asset of the Group II: Trustee Debtors. After the Bankruptcy Court

19 estimates a Disputed Claimant's rights in, or against an asset of the Estates through this procedure,

20 the Plan Trustee shall have the right to use any funds or assets not deemed subject to the rights of

21 the Disputed Claimant, to pay the Allowed Claims under the terms of the Plan, including Allowed

22 Administrative Claims, after the Effective Date.

23 **XI.**

24 **RISK FACTORS**

25    **11.1    Plan Risks**.

26       The Plan in this case, like any Chapter 11 reorganization plan, includes a number of risks

27 that creditors should be aware of prior to voting on the Plan. The more material of these risks are

28 summarized below.

### 11.1.1  **The Plan May Not Be Accepted or Confirmed**.

While the SunCal Plan Proponents believe that the Plan is confirmable under the standards set forth in 11 U.S.C. § 1129, there can be no guarantee that the Bankruptcy Court will find the Plan to be confirmable. If the Plan is not confirmed, it is possible that an alternative plan can be negotiated and presented to the Bankruptcy Court for approval; however, there can be no assurance that any alternative plan would be confirmed, that the Chapter 11 Cases would not be converted to a liquidation, or that any alternative plan of reorganization could or would be formulated on terms as favorable to the Creditors and holders of Equity Interests as the terms of the Plan.

### 11.1.2  **Status of LitCo Funding**

The offer by LitCo to purchase Allowed Reliance Claims for the sum of fifty-five cents ($0.55) per dollar of claim and certain other Plan funding (*e.g.*, to make required payments to Creditors holding Allowed Administrative Claims, Priority Claims and Tax Claims) will not be funded by the SunCal Plan Proponents.  Instead, the SunCal Plan Proponents are working with proposed investors/lenders who would provide such funding.  While the SunCal Plan Proponents are in discussions with third parties with respect to obtaining funding for the SunCal Plan, no commitment has yet been obtained for such funding and thus SunCal Plan Proponents are not in a position to disclose the terms of such funding at this time.  There is no guarantee that such funding will be obtained.

### 11.1.3  **Failure to Sell The Group II: Trustee Debtor Projects**.

The Plan is based upon the assumption that the SunCal Plan Proponents will be able to close the sale of the Group II: Trustee Debtor Projects for at least the Minimum Sales Prices on the Effective Date. Although the SunCal Plan Proponents are confident that they can achieve sales at these prices based upon their market research and familiarity with the projects, a possibility exists that these sales will not occur. If this occurs then the creditors holding liens against the Group II: Trustee Debtor Projects will be entitled to seek recourse against these properties, and this recourse would include foreclosure.

///

///

### 11.1.4 <u>Adverse Outcome of Pending Litigation</u>.

The SunCal Plan Proponents have filed objections to the claims of the Lehman Lenders, and they intend to pursue the Lehman Adversary Proceeding against LCPI claims and liens once they obtain relief from the automatic stay in LCPI's Chapter 11 case. The SunCal Plan Proponents believe that their defenses to the claims asserted by the Lehman Lender have merits and that they will be sustained and that relief will also be granted in the Lehman Adversary Proceeding. However, there is no assurance that this will occur. Litigation involves risks, including most importantly the risk of an adverse ruling. Although the risk of an adverse ruling will not affect Holders of Class 6.1 and 6.2 Claims that vote in favor of Option A ($.55 cent distribution), it will affect those that vote in favor of Option B, and it will affect the future distributions payable to the Class 7.1 and 7.2.

### 11.1.5 <u>Risks Associated With Lehman Disputed Administrative Loans</u>.

The SunCal Plan Proponents will be filing objections to the Lehman Disputed Administrative Loans. Since these loans were approved by an order of the Court, the SunCal Plan Proponents ability to object to these claims may be limited to damages arising from wrongs that occurred after these loans were approved. If these objections are not successful, the sums owed on account of the Lehman Disputed Administrative Loans will have to be paid on the Effective Date of the Plan, or on the date that they are allowed. If the SunCal Plan Proponents are not allowed to use the Net Sales Proceeds from the sale of the Group II: Trustee Debtor Projects to pay these obligations and they are unable to pay these claims from their own resources, or through funding or financing provided by third parties, the Plan will fail.

<h2 style="text-align:center;">XI.</h2>

<h2 style="text-align:center;"><u>DISTRIBUTIONS</u></h2>

### 12.1 <u>Distribution Agent</u>.

Acquisitions shall serve as the Distribution Agent for distributions due under the Plan. The Distribution Agent may employ one or more sub agents on such terms and conditions as it may agree in its discretion and pay such sub agent as a Post Confirmation Expense from the

1    Distribution Accounts.  The Distribution Agent shall not be required to provide any bond in

2    connection with the making of any Distributions pursuant to the Plan.

3        **12.2    Distributions.**

4            **12.2.1    Dates of Distributions.**

5        Any distribution required to be made on the Effective Date shall be deemed timely if made

6    as soon as practicable after such date and, in any event, within thirty (30) days after such date.  Any

7    distribution required to be made upon a Disputed Claim becoming an Allowed Claim and no

8    longer being a Disputed Claim shall be deemed timely if made as soon as practicable thereafter.

9            **12.2.2    Limitation on Liability.**

10       Neither the Plan Sponsor, the Plan Trustee, the Distribution Agent, their Affiliates, nor any

11   of their employees, members, officers, directors, agents, or professionals or Affiliates shall be

12   liable for (i) any acts or omissions (except for gross negligence or willful misconduct) in

13   connection with implementing the Distribution provisions of the Plan and the making or

14   withholding of Distributions pursuant to the Plan, or (ii) any change in the value of distributions

15   made pursuant to the Plan resulting from any delays in making such distributions in accordance

16   with the Plan's terms (including but not limited to any delays caused by the resolution of Disputed

17   Claims).

18       **12.3    Old Instruments and Securities.**

19           **12.3.1    Surrender and Cancellation of Instruments and Securities.**

20       As a condition to receiving any distribution pursuant to the Plan, each Person holding any

21   note or other instrument or security (collectively "Instruments or Securities" and individually an

22   "Instrument or Security") evidencing an existing Claim(s) against the Debtor(s) must surrender

23   such Instrument or Security to the Distribution Agent.

24           **12.3.2    Cancellation of Liens.**

25       Except as otherwise provided in the Plan, any Lien securing any Secured Claim shall be

26   deemed released and discharged, and the Person holding such Secured Claim shall be authorized

27   and directed to release any collateral or other property of the Debtors (including, without

28   limitation, any cash collateral) held by such Person and to take such actions as may be requested by

the Plan Trustee to evidence the release of such Lien, including, without limitation, the execution, delivery and Filing or recording of such releases as may be requested by the Plan Trustee.

### 12.4    De Minimis Distributions and Fractional Shares.

No Cash payment of less than ten dollars ($10) shall be made by the Plan Trust to any Holder of Claims unless a request therefore is made in writing to the Plan Trust.  Whenever payment of a fraction of a cent would otherwise be called for, the actual payment shall reflect a rounding down of such fraction to the nearest whole cent.  Any Cash or other property that is not distributed as a consequence of this section shall, after the last distribution on account of Allowed Claims in the applicable Class, be treated as "Unclaimed Property" under the Plan.

### 12.5    Delivery of Distributions.

Except as provided in the Plan with respect to Unclaimed Property, distributions to Holders of Allowed Claims and Allowed Administrative Claims shall be distributed by mail as follows:  (1) with respect to each Holder of an Allowed Claim that has filed a Proof of Claim, at the address for such Holder as maintained by the official claims agent for the Debtors; (2) with respect to each Holder of an Allowed Claim that has not filed a Proof of Claim, at the address reflected on the Schedules filed by the Debtors, provided, however, that if the Debtors or the Plan Trust has received a written notice of a change of address for such Holder, the address set forth in such notice shall be used; or (3) with respect to each Holder of an Allowed Administrative Claim, at such address as the Holder may specify in writing.

### 12.6    Undeliverable Distributions.

If the Distribution of Cash to the Holder of any Allowed Claim is returned to the Plan Trustee as undeliverable or the Distribution check is not negotiated within 90 days of mailing (any such distribution being hereinafter referred to as "Unclaimed Property"), no further distribution shall be made to such Holder unless and until the Plan Trustee is notified in writing of such Holder's then current address.  Subject to the remainder of this Section and the following section, Unclaimed Property shall remain in the possession of the Plan Trustee pursuant to this Section, and shall be set aside and (in the case of Cash) held in a segregated interest bearing account (as to Cash Unclaimed Property) to be maintained by the Distribution Agent until such time as the subject

Distribution becomes deliverable.  Nothing contained in the Plan shall require the Plan Trustee or any other Person to attempt to locate such Person.

### XIII.

### OBJECTIONS TO CLAIMS AND DISPUTED CLAIMS

**13.1**    **Standing for Objections to Claims.**

The Plan Trustee shall have the sole and exclusive right to file, prosecute and resolve objections to Claims, excluding Claims filed that are SunCal Affiliates including SunCal Management.  The Trustee Debtors' Committee shall have the sole and exclusive right to file, prosecute and resolve potential Avoidance Actions against and objections to Claims filed by (i) SunCal Affiliates, including SunCal Management, Acquisitions, and SC Master Marketing, LLC and (ii) certain professionals for the SunCal Affiliates, including Voss, Cook & Thel, LLP, The MB Firm, White & Case, LLP, RBF Consulting and Mayer Brown LLP.

Any objection to a Claim shall be Filed with the Bankruptcy Court and served on the Person holding such Claim on or before the applicable Claims Objection Deadline.  The Plan Trustee shall have the right to petition the Bankruptcy Court, without notice or a hearing, for an extension of the Claims Objection Deadline if a complete review of all Claims cannot be completed by such date.

**13.2**    **Treatment of Disputed Claims and Disputed Liens.**

**13.2.1  No Distribution Pending Allowance.**

If any portion of a Claim or Lien is a Disputed Claim or Disputed Lien, no payment or distribution provided for under the Plan shall be made on account of such Claim or Lien unless and until such Claim or Lien becomes an Allowed Claim and/or Allowed Lien.

**13.2.2  Distribution After Allowance.**

On the next Distribution Date following the date on which a Disputed Claim becomes an Allowed Claim and is no longer a Disputed Claim, the Distribution Agent shall distribute to the Person holding such Claim any Cash that would have been distributable to such Person if on the initial Distribution Date such Claim had been an Allowed Claim and not a Disputed Claim.

MAINDOCS-#164959-v3-SunCal_3rd_Am_Group_II_TD_DS.DOC

### 13.2.3  Reserves for Disputed Claims

In the event that Disputed Claims are pending at the time of a Distribution under the Plan, the Plan Trustee shall establish and maintain a reserve for such Disputed Claims.  For purposes of establishing a reserve, Cash will be set aside equal to the amount that would have been distributed to the Holders of the Disputed Claims had the Disputed Claims been Allowed on the date a Distribution is made to the Holders of Allowed Claims in the same Class or of the same priority as the Disputed Claims.  If a Disputed Claim ultimately becomes an Allowed Claim, the amount of Cash reserved for that Disputed Claim shall be distributed on the earlier of (a) the distributed Date following the date when the Disputed Claim becomes an Allowed Claim, or (b) ninety (90) days after such Disputed Claim becomes an Allowed Claim.  Any reserved Cash not ultimately distributed to the Holder of a Disputed Claim because the Disputed Claim does not become an Allowed Claim shall become property of the Plan Trust and shall be distributed in accordance with the terms of the Plan.

## XIV.

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 14.1  Executory Contracts to be Assumed and Assigned.

Under the Plans, the Group II: Trustee Projects will be sold.  As a result, the Group II: Trustee Debtors will assume only those executory contracts and unexpired leases to be assigned to the Winning Bidder with respect to the applicable Project and the Restructuring Agreement and Settlement Agreement.

On the Effective Date, the executory contracts and unexpired leases identified on the Schedule of Assumed and Assigned Agreements attached or to be attached hereto as Exhibit "9" or filed or to be filed as Exhibit "9" to this document shall be deemed assumed and assigned to the applicable Winning Bidder, as specified in the Confirmation Order.  The SunCal Plan Proponents intend to file the Schedule of Assumed and Assigned Agreements with the Court no later than twenty-eight (28) days prior to the Confirmation Hearing.  The Schedule of Assumed and Assigned Agreements also identifies or will identify any amounts that must be paid to cure defaults under the executory contacts and unexpired leases to be assumed and assigned under the Plan (the "Cure

Amount").  If filed earlier, the SunCal Plan Proponents reserve the right to amend the Schedule of Assumed Agreements up to twenty-eight (28) days prior to the Confirmation Hearing (October 24, 2011) to: (a) add any executory contract or unexpired lease and provide for its assumption and assignment; or (b) modify the Cure Amount for any particular executory contract or unexpired lease.  The SunCal Plan Proponents further reserve the right to amend the Schedule of Assumed Agreements to delete any executory contract or unexpired lease and provide for its rejection at any time prior to the Confirmation Hearing.  The SunCal Plan Proponents will provide notice of any amendment to the Schedule of Assumed and Assigned Agreements to any party or parties to the executory contracts or unexpired leases affected by the amendment.  Absent a timely objection as provided below, the Confirmation Order will constitute a Court Order approving the assumption and assignment, on the Effective Date, of the executory contracts and unexpired leases then identified on the Schedule of Assumed and Assigned Agreements, and shall constitute a final determination of the Cure Amount and that the estate has shown adequate assurance of future performance.  Furthermore, any Cure Amount ordered by the Court, through entry of the Confirmation Order, and paid shall be deemed to satisfy any and all defaults arising from, out of or related to the executory contract of unexpired lease, including any tort claims that were or could be asserted by the non-debtor party to the contract or lease on or prior to the entry of the Confirmation Order, and all actual or pecuniary losses that have resulted from such defaults.

If you are a party to an executory contract or unexpired lease to be assumed and assigned and you object to the assumption and assignment of your lease or contract and/or you dispute the Cure Amount related to your lease or contract, then you must File and serve upon counsels for the SunCal Plan Proponents (at the address on the upper left hand corner of the caption page) a written objection by fourteen days before the Confirmation Hearing.  An objection to the Cure Amount must also set forth the amount you contend to be the correct Cure Amount and contain evidence to support such amount.  Failure to timely File an objection as provided herein shall be deemed consent to the proposed assumption and assignment and to the Cure Amount and a waiver of any and all rights to challenge such assumption and assignment and the Cure Amount.

With respect to each executory contract and unexpired lease identified on the Schedule of Assumed and Assigned Agreements, if no dispute arises regarding the Cure Amount, adequate assurances, or some other matter related to the assumption of the executory contact or unexpired lease, then the Cure Amount set forth in the schedule of Assumed and Assigned Agreements shall be paid to the applicable non-debtor party in Cash on the Effective Date or as soon as reasonably practicable thereafter.  If a dispute arises regarding (a) whether the proposed assignee has provided adequate assurance of future performance of an executory contract or unexpired lease to be assumed, or (b) any other matter pertaining to a proposed assumption and assignment, the Cure Amount will be paid on the later of (1) the Effective Date or as soon as practicable thereafter, or (2) within thirty (30) days after entry of a Final order resolving the dispute and approving the assumption and assignment; provided, however, if a dispute arises regarding any of the foregoing, the SunCal Plan Proponents reserve, for themselves and the Plan Trustee, the right to completely forego assumption and assignment of and, instead, reject the subject executory contract or unexpired lease.

If a party to an executory contract or unexpired lease identified on the Schedule of Assumed and Assigned Agreements Files an objection disputing the Cure Amount, then the SunCal Plan Proponents may amend the Schedule of Assumed and Assigned Agreements at any time prior to the Confirmation Hearing to delete the subject executory contract or unexpired lease and provide for its rejection.  Executory contracts or unexpired leases not so deleted shall be conditionally assumed, subject to the SunCal Plan Proponents' and/or the Plan Trustee's right to file a Motion to determine the appropriate Cure Amount up to the first (1st) Business Day that is at least sixty (60) days following the Effective Date.  The SunCal Plan Proponents and/or the Plan Trustee will serve any such Motion on the party to the executory contract or unexpired lease affected by the Motion (or its attorneys, if any).  If the SunCal Plan Proponents and Plan Trustee does not file a Motion to determine the appropriate Cure Amount, then the executory contract or unexpired lease shall be assumed and assigned, as of the Effective Date, and the Cure Amount shall be the alternative Cure Amount asserted by the non-debtor party to the subject executory

1    contract or unexpired lease in its objection to the Plan.  The Cure Amount shall be paid as soon as

2    reasonably practicable following the expiration of the 60-day deadline.

3         If the SunCal Plan Proponents or the Plan Trustee files a Motion to determine the

4    appropriate Cure Amount, then the SunCal Plan Proponents and/or Plan Trust shall have the right

5    to amend the Schedule of Assume and Assigned Agreements to completely forego assumption and

6    assignment of and, instead, reject the subject executory contract or unexpired lease up to the first

7    (1st) Business Day that is at least fifteen (15) days after the entry of an order fixing the Cure

8    Amount.  The SunCal Plan Proponents and/or Plan Trustee will provide notice of any amendment

9    to the Schedule of Assumed and Assigned Agreements to the party to the executory contract or

10   unexpired lease affected by the amendment.  If the SunCal Plan Proponents and/or Plan Trustee

11   has filed such a Motion and does not timely amend the Schedule of Assumed and Assigned

12   Agreements within fifteen (15) days after entry of an order fixing the Cure Amount, then the

13   executory contract or unexpired lease shall be assumed and assigned, as of the Effective Date, and

14   the Cure Amount shall be fixed as the Cure Amount ordered by the Court.  The Cure Amount as

15   soon as reasonably practicable following the expiration of the 15-day deadline.

16       **14.2    <u>Executory Contracts to be Rejected</u>.**

17       On the Effective Date, the estate will be deemed to have rejected any and all executory

18   contacts and unexpired leases <u>not</u> identified on the Schedule of Assumed and Assigned

19   Agreements attached or to be attached hereto as Exhibit "9," or filed or to be filed as Exhibit "9" to

20   this document.  The Confirmation Order will constitute a Court order approving the rejection, as of

21   the Effective Date, of such executory contacts and unexpired leases.  Any Claim for damages

22   arising from the rejection under the Plan of any executory contract or unexpired lease must be filed

23   with the Court and served upon the SunCal Plan Proponents and the Plan Trustee within thirty (30)

24   days of the later of (a) the Confirmation Date, and (b) the Plan Trustee's amendment of the

25   Schedule of Assumed and Assigned Agreements to eliminate the executory contract or unexpired

26   lease.  Any such damage Claims that are not timely filed and served will be forever barred and

27   unenforceable against the applicable Debtors, the Estates, the Plan Trustee, the Plan Trust, and

28   their respective property.  Persons holding these Claims who fail to timely file claims will be

1    barred from receiving any Distributions under the Plan on account of their rejection damage

2    Claims.

3         If you are a party to a lease or contract to be rejected and you object to the rejection of your

4    lease or contract, then you must file and serve your objection by fourteen days before the

5    Confirmation Hearing.

6                                            **XV.**

7              **BEST INTEREST OF CREDITORS TEST AND PLAN FEASIBILITY**

8         **15.1    Best Interests Test**.

9         Pursuant to Section 1129(a)(7) of the Bankruptcy Code, a Plan cannot be confirmed unless

10   the Bankruptcy Court determines that Distributions under the Plan to all Holders of Claims and

11   Interests who have not accepted the plan and whose Claims are classified in Classes that are

12   impaired under the plan, are not less than those which they would receive in a liquidation under

13   Chapter 7 of the Bankruptcy Code.

14        The Best Interest of Creditors Test must be satisfied even if the Plan is accepted by each

15   impaired Class of Claims and if any Holder of an Allowed Claim objects to the Plan on such basis.

16   The Best Interests Test requires the Bankruptcy Court to find either that either (i) _all_ Holders of

17   Claims in an impaired Class of Claims have accepted the Plan or (ii) the Plan provides each Holder

18   of Allowed Claims of an impaired Class who has not accepted the Plan with a recovery of property

19   of a value, as of the effective date of the Plan, that is not less than the amount that such Holder

20   would receive if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code.

21        The Plan proposed by the Plan Proponents is essentially a liquidating plan. It provides for

22   the sale of all assets of the estate for their fair market value, the collection or recovery of all other

23   assets, and for the distribution of the resulting net proceeds from the sale, in accordance with the

24   priorities provided for in the Bankruptcy Code and under California law. A Chapter 7 trustee

25   appointed in this case would be compelled to liquidate the Debtors' assets in the same manner as

26   provided for in the Plan and to pay out the proceeds in the same manner as provided for in the

27   Plan. Accordingly, under the terms of the Plan, each individual creditor is receiving "at least as

28

1    much" as such creditor would receive in a Chapter 7 case, which is all that is required under the

2    Best Interests Test.

3        Although the Lehman Entities will argue that they are being denied their "credit bid" rights

4    under the Plan, and this reduces their distribution below the level that they would receive in a

5    Chapter 7 case, this argument fails.  A credit bid right does not add or reduce the value of a

6    creditor's collateral, it simply allows a creditor holding such a right to bid against other bidders

7    using its debt as "credit", rather than bidding in cash. If the creditor's collateral is sold for its "fair

8    market value," in cash, and the creditor receives what it is entitled to from the sales proceeds, then

9    the creditor is necessarily receiving exactly what it would receive in a Chapter 7. This is all that the

10   Best Interest Test Requires.  See Exhibit "7" hereto.

11       **15.2**    **Feasibility**.

12       In addition, in order to confirm the Plan, the Bankruptcy Court must find that confirmation

13   of the Plan is not likely to be followed by the liquidation or the need for further financial

14   reorganization of the Debtor(s).  This requirement is imposed by Section 1129(a)(11) of the

15   Bankruptcy Code and is generally referred to as the "feasibility" requirement. As explained above,

16   the Debtors' Plan provides for the sale of all assets of their respective estates and for the

17   distribution of the proceeds. Within the context of the Plan, feasibility is limited to having

18   sufficient funds to pay administrative and priority claims on the Effective Date and sufficient funds

19   to fund the sale of the Properties.

20       Under timeline provided for in the Plan, the Group II: Trustee Projects will be sold during

21   the Sale Period. The Net Sales Proceeds from these sales, plus the proceeds of the LitCo Plan

22   Loan, will provide the Debtors the means to pay all claims, including allowed administrative and

23   priority claims on this same date. All remaining claimants will then receive what they are entitled

24   under the Plan when their claims are allowed.

25       / / /

26       / / /

27       / / /

28       / / /

# XVI.

## LIMITATION OF LIABILITY

### 16.1    No Liability for Solicitation or Participation.

As specified in Section 1125(e) of the Bankruptcy Code, entities that solicit acceptances or rejections of the Plan and/or that participate in the offer, issuance, sale, or purchase of securities offered or sold under the Plan, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, shall not be liable, on account of such solicitation or participation, for violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer, issuance, sale, or purchase of securities.

# XVII.

## CONDITIONS TO CONFIRMATION AND

## EFFECTIVENESS OF THE PLAN

### 17.1    Conditions Precedent to Plan Confirmation.

The only condition precedent to confirmation of the Plan is that the Bankruptcy Court shall have entered a Confirmation Order in form and substance reasonably acceptable to the SunCal Plan Proponents.

### 17.2    Conditions Precedent to Plan Effectiveness.

The conditions precedent to the effectiveness of the Plan and the occurrence of the Effective Date is that the Confirmation Order shall be a Final Order in form and substance reasonably satisfactory to the SunCal Plan Proponents, and the resolutions of any material impairment of the Plan terms caused by the automatic stays applicable in the Lehman Entities cases. The automatic stay in the Debtors' cases shall continue to be applicable until the Effective Date.

# XVIII.

## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order or the occurrence of the Effective Date, the Bankruptcy Court's jurisdiction shall not be limited under the Plan and the Bankruptcy Court's jurisdiction shall apply to the fullest extent possible under applicable law.  The Court will

retain exclusive jurisdiction during the Plan payout period to resolve disputes and conflicts arising from the administration of the Plan, upon request of a party-in-interest and after notice and a hearing, including, without limitation:

a.    The adjudication of the validity, scope, classification, allowance, and disallowance of any Claim;

b.    The estimation of any Claim;

c.    The allowance or disallowance of Professional-Fee Claims, compensation, or other Administrative Expense Claims;

d.    To her and determine Claims concerning taxes pursuant to Bankruptcy Code §§ 346, 505, 525, and 1146;

e.    To hear and determine any action or proceeding brought under Bankruptcy Code §§108, 510, 543, 544, 545, 547, 548, 549, 550, 551 and 553;

f.    To hear and determine all actions and proceedings which relate to pre-confirmation matters;

g.    To hear and determine any issue relating to the assumption or rejection of executory contracts and unexpired leases;

h.    To hear and determine any modification to the Plan in accordance with the Bankruptcy Rules and Bankruptcy Code;

i.    To enforce and interpret the terms of the Plan;

j.    To correct any defects, cure any omissions, or reconcile any inconsistency in the Plan or the Confirmation Order as may be necessary to carry out the purpose and intent of the Plan;

k.    the entry of any order, including injunctions, necessary to enforce title, rights and powers of the Plan Trust, and to impose such limitations, restrictions, terms and conditions on such title, rights and powers as the Court may deem necessary including, without limitation, any right of the Plan Trust to recover and liquidate assets;

l.    To determine the validity, extent and priority of all liens and security interests against property of the Estates or the Plan Trust;

MAINDOCS-#164959-v3-SunCal_3rd_Am_Group_II_TD_DS.DOC

m.       To hear and resolve any disputes regarding employment applications and professional fees;

n.       To her and determine such matters and make such orders as are consistent with the Plan as may be necessary to carry out the provisions thereof and to adjudicate any disputes arising under or relating to any order entered by the Court in these Cases;

o.       The entry of an order concluding and terminating these Cases; and

p.       To resolve any disputes as to whether there has been a default under the Plan.

**XIX.**

**MODIFICATION OR WITHDRAWAL OF THE PLAN**

**19.1    Modification of Plan.**

At any time prior to confirmation of the Plan, the Plan Proponent may supplement, amend or modify the Plan.  After confirmation of the Plan, the Plan Proponent or Plan Trustee may (x) apply to the Bankruptcy Court, pursuant to Section 1127 of the Bankruptcy Code, to modify the Plan; and (y) apply to the Bankruptcy Court to remedy defects or omissions in the Plan or to reconcile inconsistencies in the Plan.

**19.2    Nonconsensual Confirmation.**

In the event that any impaired Class of Claims or Interests shall fail to accept the Plan in accordance with Section 1129(a)(8) of the Bankruptcy Code, SunCal Plan Proponents (i) may request that the Bankruptcy Court confirm the Plan in accordance with Section 1129(b) of the Bankruptcy Code, and (ii) in accordance with Section 16.1 of the Plan, and may modify the Plan in accordance with Section 1127(a) of the Bankruptcy Code.

**XX.**

**EFFECT OF CONFIRMATION**

**20.1    Discharge.**

Confirmation of the Plan does not discharge the Group II: Trustee Debtors as set forth in Bankruptcy Code §1141.

/ / /

/ / /

**20.2   Revesting of the Assets.**

The Assets shall not be vested in the Group II: Trustee Debtors on or following the Effective Date, but shall be vested in the Plan Trust and continue to be subject to the jurisdiction of the Court following confirmation of the Plan until such Assets are distributed to the Holders of Allowed Claims in accordance with the provisions of the Plan.

**XXI.**

**MISCELLANEOUS**

**21.1.   Payment of Statutory Fees.**

All quarterly fees due and payable to the Office of the United States Trustee pursuant to Section 2030(a)(6) of title 28 of the United States Code shall be paid in full on or before the Effective Date, or, to the extent such quarterly fees are disputed, an adequate reserve shall have been established and set aside for payment in full thereof, as required by Section 1129(a)(12) of the Bankruptcy Code.  The Plan Trustee shall remain responsible for timely payment of quarterly fees due and payable after the Effective Date and until the Debtors' Cases are closed, to the extent required by Section 2030(a)(6) of title 28 of the United States Code.

**21.2.   Changes in Rates Subject to Regulatory Commission Approval.**

The Group II: Trustee Debtors are not subject to governmental regulatory commission approval of their rates**.**

**21.3.   Payment Dates.**

Whenever any payment or distribution to be made under the Plan shall be due on a day other than a Business Day, such payment or distribution shall instead be made, without interest, on the immediately following Business Day.

**21.4.   Headings.**

The headings used in this Disclosure Statement and in the Plan are inserted for convenience only and neither constitutes a portion of this Disclosure Statement or the Plan nor in any manner affect the construction of the provisions of this Disclosure Statement or the Plan.

/ / /

/ / /

MAINDOCS-#164959-v3-SunCal_3rd_Am_Group_II_TD_DS.DOC

**21.5.   Other Documents and Actions.**

The Plan Trustee may execute such other documents and take such other actions as may be necessary or appropriate to effectuate the transactions contemplated under the Plan.

**21.6.   Notices.**

All notices and requests in connection with this Disclosure Statement and the Plan shall be in writing and shall be hand delivered or sent by mail addressed to:

> **To the SunCal Plan Proponents**:
> Bruce V. Cook
> General Counsel
> Authorized Agent of the SunCal Plan Proponents
> 2392 Morse Ave
> Irvine, CA 92614-6234
>
> **With copies to:**
> Paul J. Couchot
> Winthrop & Couchot, Professional Corporation
> 660 Newport Center Drive, Suite 400
> Newport Beach, CA 92660
>
> Ronald Rus
> Rus Miliband & Smith P.C.
> 2211 Michelson Drive, Seventh Floor
> Irvine, California 92612

All notices and requests to any Person holding of record any Claim or Interest shall be sent to them at their last known address or to the last known address of their attorney of record.  Any such Person may designate in writing any other address for purposes of this Section, which designation will be effective on receipt.

**21.7.   Governing Law.**

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), the laws of the State of California (without reference to its conflict of law rules) shall govern the construction and implementation of the Plan and any agreements, documents, and instruments executed in connection with the Plan, unless otherwise specifically provided in such agreements, documents, or instruments.

### 21.8. __Binding Effect.__

The Plan and all rights, duties and obligations thereunder shall be binding upon and inure to the benefit of the Plan Sponsor Debtors, the Plan Trustee, Holders of Claims, Holders of Interests, and their respective successors and assigns.

### 21.9. __Successors and Assigns.__

The rights, benefits, and obligations of any entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, the heirs, executors, administrators, successors, and assigns of such entity.

### 21.10. __Severability of Plan Provisions.__

If, prior to the Confirmation Date, any term or provision of the Plan is held by the Bankruptcy Court to be illegal, impermissible, invalid, void or unenforceable, or otherwise to constitute grounds for denying confirmation of the Plan, the Bankruptcy Court shall, with the consent of the Debtors, have the power to interpret, modify or delete such term or provision (or portions thereof) to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be operative as interpreted, modified or deleted. Notwithstanding any such interpretation, modification or deletion, the remainder of the terms and provisions of the Plan shall in no way be affected, impaired or invalidated by such interpretation, modification or deletion.

### 21.11. __No Waiver.__

The failure of the Debtors or any other Person to object to any Claim for purposes of voting shall not be deemed a waiver of the Trustee Debtors' Committee's, the Debtors' or the Plan Trustee's right to object to or examine such Claim, in whole or in part.

### 21.12. __Inconsistencies.__

In the event the terms or provisions of this Disclosure Statement are inconsistent with the terms and provisions of the Plan or documents executed in connection with the Plan, the terms of the Plan shall control.

1        **21.13.  Exemption from Certain Transfer Taxes and Recording Fees.**

2        Pursuant to Section 1146(a) of the Bankruptcy Code, any transfers from a Debtor to the

3 Plan Trust or to any other Person or entity pursuant to the Plan, or any agreement regarding the

4 transfer of title to or ownership of any of the Debtors' real or personal property or of any other

5 interest in such property (including, without limitation, a security interest) will not be subject to

6 any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax,

7 stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or

8 recording fee, or other similar tax or governmental assessment, and the Confirmation Order will

9 direct the appropriate state or local governmental officials or agents to forego the collection of any

10 such tax or governmental assessment and to accept for filing and recordation any of the foregoing

11 instruments or other documents without the payment of any such tax or governmental assessment.

12        **21.14.  Post-Confirmation Status Report.**

13        Within 180 days following the entry of the Confirmation Order, the Plan Trustee shall file a

14 status report with the Court explaining what progress has been made toward consummation of the

15 confirmed Plan.  The status report shall be served on the United States Trustee, the twenty largest

16 unsecured creditors, and those parties who have requested special notice.  Unless otherwise

17 ordered, further status reports shall be filed every 180 days and served on the same entities.

18        **21.15.  Post-Confirmation Conversion/Dismissal.**

19        A creditor or party in interest may bring a motion to convert or dismiss the case under

20 § 1112(b), after the Plan is confirmed, if there is a default in performing the Plan.  The Plan

21 Trustee reserves the right to object to any motion for conversion or dismissal.  In addition, as set

22 forth in the definition of the Effective Date, the Effective Date may be further extended by order of

23 the Bankruptcy Court after notice and hearing to all parties in interest.  If the Court determines

24 there is no "cause" for the extension of the Effective Date, a party in interest may move to dismiss

25 or convert the Case(s).

26        If the Court orders any of the Cases converted to Chapter 7 after the Plan is confirmed, then

27 all property that had been property of the Chapter 11 Estate, and that has not been disbursed

28 pursuant to the Plan, will revest in the Chapter 7 estate.  The automatic stay will be reimposed

1    upon the revested property, but only to the extent that relief from stay was not previously

2    authorized by the Court during this case.

3        **21.16.  Final Decree.**

4        Once an Estate has been fully administered, as referred to in Bankruptcy Rule 3022, the

5    Plan Trustee, or other party as the Court shall designate in the Confirmation Order, shall file a

6    motion with the Court to obtain a final decree to close the Case of such Debtor.

7

8    Date:  August 5, 2011            By: _____

9                                        Bruce Cook
                                       General Counsel, Authorized Agent for the Voluntary
                                       Debtors and Acquisitions
10

11   **Submitted By:**
     **WINTHROP COUCHOT**                **RUS MILIBAND & SMITH**
12   **PROFESSIONAL CORPORATION**        **A PROFESSIONAL CORPORATION**

13   By: /s/ *Paul J. Couchot*_____    By:  /s/ *Ronald Rus*_____
            Paul J. Couchot, Esq.                   Ronald Rus, Esq.
14   General Insolvency Counsel for the            Joel S. Miliband, Esq.
     Voluntary Debtors                             Cathrine Castaldi, Esq.
15                                                 Counsel for SCC Acquisitions Inc.

16

17

18

19

20

21

22

23

24

25

26

27

28

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 660 Newport Center Drive, 4th Fl., Newport Beach, CA 92660.

A true and correct copy of the foregoing document described as: **THIRD AMENDED DISCLOSURE STATEMENT DESCRIBING THIRD AMENDED CHAPTER 11 PLANS FILED BY SUNCAL PLAN PROPONENTS IN THE CHAPTER 11 CASES OF SUNCAL OAK KNOLL, LLC AND SUNCAL TORRANCE, LLC [GROUP II: TRUSTEE DEBTORS]** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

I. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On August 5, 2011, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

☒ Service information continued on attached page

II. **SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served)**:**
On _____, 2011, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

III. **SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on _____, 2011, I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| August 5, 2011 | Gretchen Crumpacker | /s/ Gretchen Crumpacker |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

MAINDOCS-#164959-v3-SunCal_3rd_Am_Group_II_TD_DS.DOC

- **NEF SERVICE LIST**
  Selia M Acevedo      sacevedo@millerbarondess.com, mpritikin@millerbarondess.com
- Joseph M Adams      jadams@sycr.com
- Raymond H Aver      ray@averlaw.com
- James C Bastian      jbastian@shbllp.com
- Thomas Scott Belden      sbelden@kleinlaw.com, ecf@kleinlaw.com
- John A Boyd      fednotice@tclaw.net
- Mark Bradshaw      mbradshaw@shbllp.com
- Gustavo E Bravo      gbravo@smaha.com
- Jeffrey W Broker      jbroker@brokerlaw.biz
- Brendt C Butler      bbutler@mandersonllp.com
- Andrew W Caine      acaine@pszyjw.com
- Carollynn Callari      ccallari@venable.com
- Cathrine M Castaldi      ccastaldi@rusmiliband.com
- Tara Castro Narayanan      tara.narayanan@msrlegal.com, lisa.king@msrlegal.com
- Dan E Chambers      dchambers@jmbm.com
- Shirley Cho      scho@pszjlaw.com
- Vonn Christenson      vrc@paynefears.com
- Brendan P Collins      bpcollins@bhfs.com
- Vincent M Coscino      vcoscino@allenmatkins.com, emurdoch@allenmatkins.com
- Paul J Couchot      pcouchot@winthropcouchot.com,
  pj@winthropcouchot.com;gcrumpacker@winthropcouchot.com
- Jonathan S Dabbieri      dabbieri@sullivan.com,
  hill@sullivanhill.com;mcallister@sullivanhill.com;stein@sullivanhill.com;vidovich@sulli
  vanhill.com
- Ana Damonte      ana.damonte@pillsburylaw.com
- Vanessa S Davila      vsd@amclaw.com
- Melissa Davis      mdavis@shbllp.com
- Daniel Denny      ddenny@gibsondunn.com
- Caroline Djang      crd@jmbm.com
- Donald T Dunning      ddunning@dunningLaw.com
- Meredith R Edelman      meredith.edelman@dlapiper.com
- Joseph A Eisenberg      jae@jmbm.com
- Lei Lei Wang Ekvall      lekvall@wgllp.com
- Richard W Esterkin      resterkin@morganlewis.com
- Marc C Forsythe      kmurphy@goeforlaw.com
- Alan J Friedman      afriedman@irell.com
- Steven M Garber      steve@smgarberlaw.com
- Christian J Gascou      cgascou@gascouhopkins.com
- Barry S Glaser      bglaser@swjlaw.com
- Robert P Goe      kmurphy@goeforlaw.com,
  rgoe@goeforlaw.com;mforsythe@goeforlaw.com
- Eric D Goldberg      egoldberg@stutman.com
- Richard H Golubow      rgolubow@winthropcouchot.com, pj@winthropcouchot.com
- Michael J Gomez      mgomez@frandzel.com, efiling@frandzel.com;sking@frandzel.com
- Kelly C Griffith      bkemail@harrisbeach.com
- Matthew Grimshaw      mgrimshaw@rutan.com
- Kavita Gupta      kgupta@winthropcouchot.com

- Asa S Hami    ahami@morganlewis.com
- Michael J Hauser    michael.hauser@usdoj.gov
- D Edward Hays    ehays@marshackhays.com
- Michael C Heinrichs    mheinrichs@omm.com
- Harry D. Hochman    hhochman@pszjlaw.com, hhochman@pszjlaw.com
- Jonathan M Hoff    jonathan.hoff@cwt.com
- Nancy Hotchkiss    nhotchkiss@trainorfairbrook.com
- Michelle Hribar    mhribar@rutan.com
- John J Immordino    john.immordino@wilsonelser.com, raquel.burgess@wilsonelser.com
- Lawrence A Jacobson    laj@cohenandjacobson.com
- Michael J Joyce    mjoyce@crosslaw.com
- Stephen M Judson    sjudson@fablaw.com
- Kaleb L Judy    ecf@kleinlaw.com, kjudy@kleinlaw.com
- Steven J Kahn    skahn@pszyjw.com
- Sheri Kanesaka    sheri.kanesaka@bryancave.com
- David I Katzen    katzen@ksfirm.com
- Christopher W Keegan    ckeegan@kirkland.com, gdupre@kirkland.com;alevin@kirkland.com
- Payam Khodadadi    pkhodadadi@winthropcouchot.com, pj@winthropcouchot.com
- Irene L Kiet    ikiet@hkclaw.com
- Claude F Kolm    claude.kolm@acgov.org
- Mark J Krone    mk@amclaw.com, crs@amclaw.com;amc@amclaw.com
- David B Lally    davidlallylaw@gmail.com
- Leib M Lerner    leib.lerner@alston.com
- Peter W Lianides    plianides@winthropcouchot.com, pj@winthropcouchot.com
- Charles Liu    cliu@winthropcouchot.com
- Kerri A Lyman    klyman@irell.com
- Mariam S Marshall    mmarshall@marshallramoslaw.com
- Robert C Martinez    rmartinez@mclex.com
- Michael D May    mdmayesq@verizon.net
- Hutchison B Meltzer    hmeltzer@wgllp.com
- Krikor J Meshefejian    kjm@lnbrb.com
- Joel S. Miliband    jmiliband@rusmiliband.com
- James M Miller    jmiller@millerbarondess.com, vgunderson@millerbarondess.com;smiller@millerbarondess.com;mpritikin@millerbarondess.com
- Louis R Miller    smiller@millerbarondess.com
- Craig Millet    cmillet@gibsondunn.com, pcrawford@gibsondunn.com;cmillet@gibsondunn.com
- Randall P Mroczynski    randym@cookseylaw.com
- Mike D Neue    mneue@thelobelfirm.com, jmattiace@thelobelfirm.com;pnelson@thelobelfirm.com
- Robert Nida    Rnida@castlelawoffice.com
- Henry H Oh    henry.oh@dlapiper.com, janet.curley@dlapiper.com
- Sean A Okeefe    sokeefe@okeefelc.com
- Scott H Olson    solson@seyfarth.com
- Robert B Orgel    rorgel@pszjlaw.com, rorgel@pszjlaw.com
- Malhar S Pagay    mpagay@pszjlaw.com, mpagay@pszjlaw.com

- Ernie Zachary Park    ernie.park@bewleylaw.com
- Daryl G Parker    dparker@pszjlaw.com
- Penelope Parmes    pparmes@rutan.com
- Robert J Pfister    rpfister@ktbslaw.com
- Ronald B Pierce    ronald.pierce@sdma.com
- Katherine C Piper    kpiper@steptoe.com, smcloughlin@steptoe.com
- Cassandra J Richey    cmartin@pprlaw.net
- Debra Riley    driley@allenmatkins.com
- James S Riley    tgarza@sierrafunds.com
- Todd C. Ringstad    becky@ringstadlaw.com
- R Grace Rodriguez    ecf@lorgr.com
- Martha E Romero    Romero@mromerolawfirm.com
- Ronald Rus    rrus@rusmiliband.com
- John P Schafer    jschafer@mandersonllp.com
- John E Schreiber    jschreiber@dl.com
- William D Schuster    bills@allieschuster.org
- Christopher P Simon    csimon@crosslaw.com
- Gerald N Sims    jerrys@psdslaw.com, bonniec@psdslaw.com
- Wendy W Smith    wendy@bindermalter.com
- Steven M Speier    Sspeier@Squarmilner.com, ca85@ecfcbis.com
- Steven M Speier (TR)    Sspeier@asrmanagement.com, ca85@ecfcbis.com
- Michael St James    ecf@stjames-law.com
- Michael K Sugar    msugar@irell.com
- Cathy Ta    cathy.ta@bbklaw.com,
  Arthur.Johnston@bbklaw.com;Kenneth.Burgess@bbklaw.com
- David A Tilem    davidtilem@tilemlaw.com,
  malissamurguia@tilemlaw.com;dianachau@tilemlaw.com;kmishigian@tilemlaw.com
- James E Till    jtill@thelobelfirm.com,
  jmattiace@thelobelfirm.com;pnelson@thelobelfirm.com
- United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov
- Carol G Unruh    cgunruh@sbcglobal.net
- Annie Verdries    verdries@lbbslaw.com
- Jason Wallach    jwallach@gladstonemichel.com
- Joshua D Wayser    , kim.johnson@kattenlaw.com
- Marc J Winthrop    mwinthrop@winthropcouchot.com, pj@winthropcouchot.com
- David M Wiseblood    dwiseblood@seyfarth.com
- Brett K Wiseman    bwiseman@aalaws.com
- Dean A Ziehl    dziehl@pszjlaw.com, dziehl@pszjlaw.com
- Marc A. Zimmerman    joshuasdaddy@att.net