1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PAUL J. COUCHOT -- State Bar No. 131934
WINTHROP COUCHOT, P.C.
660 Newport Center Drive, Fourth Floor
Newport Beach, CA 92660
Telephone: (949) 720-4100
Facsimile: (949) 720-4111
General Insolvency Counsel for
Palmdale Hills Property, LLC et. al. (the "Voluntary Debtors")

RONALD RUS - State Bar No. 67369
JOEL S. MILIBAND - State Bar No. 77438
RUS MILIBAND & SMITH
A PROFESSIONAL CORPORATION
2211 Michelson Drive, Seventh Floor
Irvine, California 92612
Telephone: (949) 752-7100
Facsimile:  (949) 252-1514
Counsel for ~~SunCal Management LLC and~~ SCC Acquisitions Inc.

### UNITED STATES BANKRUPTCY COURT
### CENTRAL DISTRICT OF CALIFORNIA
### SANTA ANA DIVISION

In re

PALMDALE HILLS PROPERTY, AND ITS
RELATED DEBTORS,

    Joint Administered Debtors and
    Debtors-in-Possession

Affects:

☐ All Debtors
☐ Palmdale Hills Property, LLC
☐ SunCal Beaumont Heights, LLC
☐ SCC/Palmdale, LLC
☐ SunCal Johannson Ranch, LLC
☐ SunCal Summit Valley, LLC
☐ SunCal Emerald Meadows LLC
☐ SunCal Bickford Ranch, LLC
☐ Acton Estates, LLC
☐ Seven Brothers LLC
☒ SJD Partners, Ltd.
☒ SJD Development Corp.
☐ Kirby Estates, LLC
☐ SunCal Communities I, LLC
☐ SunCal Communities III, LLC
☐ SCC Communities LLC
☐ North Orange Del Rio Land, LLC
☐ Tesoro SF LLC

Case No. 8:08-bk-17206-ES

Jointly Administered With Case Nos.
8:08-bk-17209-ES; 8:08-bk-17240-ES;
8:08-bk-17224-ES; 8:08-bk-17242-ES;
8:08-bk-17225-ES; 8:08-bk-17245-ES;
8:08-bk-17227-ES; 8:08-bk-17246-ES;
8:08-bk-17230-ES; 8:08-bk-17231-ES;
8:08-bk-17236-ES; 8:08-bk-17248-ES;
8:08-bk-17249-ES; 8:08-bk-17573-ES;
8:08-bk-17574 ES; 8:08-bk-17575-ES;
8:08-bk-17404-ES; 8:08-bk-17407-ES;
8:08-bk-17408-ES; 8:08-bk-17409-ES;
8:08-bk-17458-ES; 8:08-bk-17465-ES;
8:08-bk-17470-ES; 8:08-bk-17472-ES;
and 8:08-bk-17588-ES

Chapter 11 Proceedings

**~~[REDLINED] SECOND~~THIRD AMENDED
DISCLOSURE STATEMENT
DESCRIBING ~~SECOND~~THIRD AMENDED
JOINT CHAPTER 11 PLAN FILED BY SJD
PARTNERS, LTD. AND SJD
DEVELOPMENT CORP. [GROUP IV:
VOLUNTARY DEBTORS]**

Date:     July 22, 2011
Time:    11:00 a.m.
Place:   Courtroom 5A

1

*Continued from Previous Page*

2   ☐  LBL-SunCal Oak Valley, LLC

3   ☐  SunCal Heartland, LLC

    ☐  LBL-SunCal Northlake, LLC

4   ☐  SunCal Marblehead, LLC

5   ☐  SunCal Century City, LLC

    ☐  SunCal PSV, LLC

6   ☐  Delta Coves Venture, LLC

7   ☐  SunCal Torrance, LLC

    ☐  SunCal Oak Knoll, LLC

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**PAGE**

I.    INTRODUCTION ................................................................... 2

II.    DEFINITIONS AND RULES OF INTERPRETATION ........................ 4

2.1    ~~2.1~~ ~~Definitions.~~ ........................................................... 4

2.2    ~~2.2.~~ ...............................................................................Rules of Construction    ........................................................... ~~25~~22

2.3    ~~2.3.~~ ...............................................................................Exhibits. ~~26~~22

III.    PLAN CONFIRMATION DEADLINES ........................................ ~~26~~23

3.1    ~~3.1~~ ..............................................................................Time and Place of the Confirmation Hearing. ........................... ~~26~~23

3.2    ~~3.2.~~ ..............................................................................Deadline for Voting for or Against the Plan. ........................... ~~27~~23

3.3    ~~3.3.~~ ..............................................................................Deadline for Objecting to the Confirmation of the Plan. ............ ~~27~~23

3.4    ~~3.4.~~ ..............................................................................Identity of Person to Contact for More Information
        Regarding the Plan. .................................................. ~~27~~24

3.5    ~~3.5~~ ~~Disclaimer.~~ ........................................................... ~~28~~24

IV.    FACTUAL BACKGROUND OF THE DEBTORS ......................... ~~29~~25

4.1    ~~4.1.~~ ..............................................................................The Formation of the Debtors and the Projects ~~29~~ ........................ 25

4.2    ~~4.1.1    Overview of the Debtors and Their Projects~~................. ~~29~~
4.3    ~~4.1.2    The Debtors' Primary Secured Creditors and~~
4.4    ~~Their Disputed Claims~~ .............................................. ~~30~~
4.5    ~~4.1.3    A Summary of All of the Alleged Claims Against~~
4.6    ~~the Group IV:  Voluntary Debtors~~ .............................. ~~31~~
4.7    ~~4.1.4    Summary of the Group IV:  Voluntary Debtors' Cash~~
4.8    ~~4.2.~~ ..............................................................................Factual Circumstances Leading to the Filing of the
        Debtors' Chapter 11 Cases ~~32~~ .................................... 29
4.9    ~~4.2.1    Introduction~~ ................................................... ~~32~~
4.10    ~~4.2.2    Background on the SunCal Companies~~ ..................... ~~33~~
4.11    ~~4.2.3    The Origins of the SunCal/Lehman Joint Venture~~........... ~~33~~
4.12    ~~4.2.4    Lehman's Effective Control over the Management~~
4.13    ~~of the Debtors and Promises of Ongoing Funding~~................. ~~34~~
4.14    ~~4.2.5    The 2008 Restructuring Agreement~~ ........................ ~~35~~
4.15    ~~4.2.6    The Lehman Lenders Hire Radco~~ ........................... ~~36~~
4.16    ~~4.2.7    The Lehman Lenders' Failure to Close on the~~
4.17    ~~Settlement Agreement~~................................................ ~~37~~

4.18    4.2.8    The Lehman Lenders' Undisclosed Sale of Most
4.19    of the Debtors' Loans.................................................... 38
4.20    4.2.9    Lehman's Foreclosure Sale and Purchase of the
4.21    Pacific Point Project........................................................ 38
4.22    4.2.10    Alvarez and Marsal Take Over Control of the
4.23    Lehman Entities After the Chapter 11 Filing of
4.24    LBHI and LCPI......................................................... 40
4.25    4.3 The
Debtors' Potential Preferential Transfers 41 ................................ 38
4.26

# TABLE OF CONTENTS

## (Continued)

PAGE

V.      SIGNIFICANT EVENTS IN THE DEBTORS' CHAPTER 11 CASES ................. 4238

5.1.           5.1   Voluntary Debtors 42. ......................................................... 38

5.2.           5.1.1   Joint Administration of the Voluntary Debtors

5.3.           and the Trustee Debtors ................................................. 42

5.4.           5.1.2   The Voluntary Debtors Court Employed Professionals ................. 42

5.5.           5.2

5.6.           The Debtors' Motion for a Stay to Suspend Certain

5.7.   Lehman Actions  Disputes and Claims Against the

Lehman Entities.          40

5.8.           5.3 ....................................................... The

Debtors' Other Litigation with Non-Lehman Related Parties .......................................

5.9.           5.3.1   The Debtors' Failed Preliminary Injunction Motion

5.10.          Against the Holders of Bond Claims

5.11.          5.3.2   The Contractors' Successful Motions for Relief from

5.12.          Stay to Pursue the Bond Claims .................................

Related Parties .............................................. 45

5.13.   LitCo. ............................................................. 46

5.14.   Reliance Claims ............................................... 46

VI.     TREATMENT OF UNCLASSIFIED CLAIMS ......................................... 5347

6.1           6.1   Introduction. ............................................................ 5347

6.2           6.2   Treatment of Allowed Administrative Claims. ........................................... 5447

6.3           6.3   Administrative Claims Bar Date ............................................................ 5548

6.4           6.4   Treatment of Unsecured Tax Claims .................................................. 5549

6.5     Summary of the Plans' Treatment
        of Bond Indemnity Claims. .......................................... 49

VII.    CLASSIFICATION OF CLAIMS AND INTERESTS ........................................ 5649

VIII.   THE PLAN'S TREATMENT OF CLASSIFIED CLAIMS ...................................AND
INTERESTS          5751

8.1.           8.1 .................................................................... The
        Plan's Treatment of Lehman's Disputed Secured Claim(s)
        and Disputed Lien(s) Against Group IV:  Voluntary Debtors
        (Classes 1.1 and 1.2) 57 ................................................... 51

8.2     The Plan's Treatment of Holders of Bond Indemnification
        Claims Against Group IV:  Voluntary Debtors (Class 2.1) ........................... 57

8.2.        8.3.        The Plan's Treatment of Holders of Priority Claims Against Group IV:  Voluntary Debtors (Class 3.12.1) ..................................... 5952

8.3.        8.4.        The Plan's Treatment of Holders of General Unsecured ................................................. Claims Against Group IV:  Voluntary Debtors that Areare ................................................. Reliance Claims (See Exhibit 8 to Disclosure Statement) ................................................ (Class 4.1), 6052

8.4.        8.5.        The Plan's Treatment of Holders of Allowed General Unsecured Claims Against Group IV:  Voluntary Debtors that Are Not ....................... Reliance Claims (Class 5.1), ................................................ 53

8.5.        8.6.        The Plan's Treatment of Holders of Allowed Interests ................................................. Against Group IV:  Voluntary Debtors ................................................ 6053

IX.        ACCEPTANCE OR REJECTION OF THE PLAN ............................................. 6054

9.1.        9.1        Introduction. ............................................................ 6054

9.2.        9.2.        Who May Object to Confirmation of the Plan. ................................................ 6054

9.3.        9.3.        Who May Vote to Accept/Reject the Plan. ................................................ 6154

9.4.        9.4.        What Is an Allowed Claim/Interest. ................................................ 6154

9.5.        9.5.        What Is an Impaired Class. ................................................ 6155

9.6.        9.6.        Who Is Not Entitled to Vote. ................................................ 6155

9.7.        9.7.        Who Can Vote in More than One Class. ................................................ 6255

9.8.        9.8.        Votes Necessary for a Class to Accept the Plan. ................................................ 6256

9.9.        9.9        Treatment of Nonaccepting Classes. ................................................ 6256

9.10.        9.10.        Request for Confirmation Despite Nonacceptance by Impaired Class(es). ................................................ 6256

X.        MEANS OF EXECUTION AND IMPLEMENTATION OF THE PLAN ............. 6356

10.1.        10.1        Introduction 63. ................................................ 56

10.2        Transfer of Property To The Plan Trust ................................................ 65

10.3        Purposes of the Plan Trust ................................................ 65

10.4        Trust Agreement ................................................ 66

10.2        10.5 Establishment and Operations of the Plan Trust ................................................ 6657

10.3        10.6        The

10.3     Preservation and Pursuit of Litigation Claims and Recovery
         for the Plan ~~Trustee~~..................................................66Trust.
         57

~~10.7~~10.4     Payment of Plan Trust Expenses..........................................~~66~~58
~~10.8~~10.5     The ~~Plan~~Trust Distribution System ~~67~~.................................58
~~10.9     Claims Estimation Rights~~.................................................~~67~~
10.6     The Plan Trustee..............................................................58
10.7     The Plan Trust Beneficiaries...............................................62
~~10.10~~10.8     No Payment of Transfer-Related Fees to the
         United States Trustee......................................................~~67~~63
10.9     No Payment of Transfer-Related Fees to the Plan Trustee. .......63
~~10.11~~10.10     Books and Records of Trust ~~68~~..................................63
~~10.12     Limitations on Liability~~...............................................~~68~~
~~10.13~~10.11     Federal Income Tax Treatment of the Holders of the
         Plan
         Trust Beneficial Interests. ...........................................~~69~~63
~~10.14~~10.12     Termination of the Trust...............................................~~69~~64
~~10.15~~10.13     Exemption from Certain Transfer Taxes. .........................~~70~~65
~~10.16~~10.14     Tax ~~Consequences~~Consequence of ~~the~~The Plan. ...................~~70~~65
~~10.17~~10.15     The Plan Sponsor........................................................~~71~~65
~~10.18~~10.16     The Voluntary Debtors' Committee ~~71~~...........................65
         ~~10.18.1     Duties and Powers~~...........................................~~71~~
         ~~10.18.2     Dissolution of Voluntary Debtors' Committees~~...........~~71~~
~~10.19     Litigation Claims~~.....................................................~~72~~10.17
Claims Estimation Rights...................................................66
~~10.20     Collection of Litigation Recoveries~~.................................~~72~~


XI.     RISK FACTORS...............................................................~~72~~67
         11.1     Plan Risks............................................................~~72~~67
         11.2     The Plan May Not ~~Be~~be Accepted or Confirmed...........~~72~~67
         11.3     Status of LitCo Funding......................................67
11.4     Adverse Outcome of Pending Litigation..............................~~73~~68

XII.    DISTRIBUTIONS.............................................................~~73~~68
12.1     ~~12.1~~
         Distribution Agent. ..............................................~~73~~68
12.2     ~~12.2~~
         Distributions ~~73~~..............................................68
12.3     ~~12.2.1~~..........................................................~~Dates of
Distributions          73~~
12.4     ~~12.2.2~~
         ~~Limitation on Liability~~........................................~~74~~
12.3     ~~12.3~~............................................................Old
Instruments and Securities ~~74~~.....................................69
12.4     ~~12.3.1~~
         ~~Surrender and Cancellation of Instruments and Securities~~.........~~74~~

12.5   12.3.2
Cancellation of Liens ................................................................. 74
12.3.3  De Minimis Distributions and Fractional Shares ................ 74
12.3.4  Delivery of Distributions ................................................. 75
12.3.5  Undeliverable Distributions ............................................. 75
12.3.6  Disposition of Unclaimed Property .................................. 75

XIII.   OBJECTIONOBJECTIONS TO CLAIMS AND DISPUTEDISPUTED CLAIMS . 7671
13.1   13.1 .............................................Standing
for Objections to Claims. ................................................ 7671
13.2   13.2
Treatment of Disputed Claims and Disputed Liens 76. ................ 71
13.2.1  No Distribution Pending Allowance ................................. 76
13.2.2  Distribution After Allowance .......................................... 76

XIV.   EXECUTORY CONTRACTS AND UNEXPIRED LEASES ................................. 7772
14.1   14.1
Executory Contracts Potentially Beingto be Assumed ................................. 7772
14.2   14.2
Executory Contracts Beingto be Rejected ................................. 75
14.3   14.3   Bar Date for Rejection Damages. .................................. 77
14.4   14.4   Changes in Rates Subject to Regulatory Commission Approval ....... 77

XV.   BEST INTEREST OF CREDITORS TEST AND
PLAN FEASIBILITY ................................................. 7775
15.1   Best Interests Test. ................................................. 7775
15.2   Feasibility. ................................................. 7876

XVI.   LIMITATION OF LIABILITY ................................................. 7977
16.1   16.1 No Liability for Solicitation or Participation. ................................. 7977

XVII.   CONDITIONS TO CONFIRMATION AND
EFFECTIVENESS   OF THE PLAN ................................................. 7977
17.1   17.1
Conditions Precedent to Plan Confirmation. ................................................. 7977
17.2   17.2
Conditions Precedent to Plan Effectiveness. ................................................. 7977

XVIII. RETENTION OF JURISDICTION ................................................. 8077

XIX.   MODIFICATION OR WITHDRAWAL OF THE PLAN ....................................... 8079
19.1   18.1
Modification of Plan. ................................................. 8079
19.2   18.2
Nonconsensual Confirmation. ................................................. 8079

XX.   EFFECT OF CONFIRMATION ................................................. 79
20.1   Discharge. ................................................. 79

20.2    Revesting of the Assets. ......................................................................    80

XXI.    MISCELLANEOUS ...........................................................................    80

21.1    20.1 Payment of Statutory Fees. ...........................................................    80

21.2    Changes in Rates Subject to Regulatory Commission Approval.  ...............    80

21.3    20.2 Payment Dates. ...........................................................    8180

21.4    20.3 Headings. ...........................................................    8280

21.5    20.4 Other Documents and Actions. ...........................................    8281

21.6    20.5 Notices. ...........................................................    8281

21.7    20.6 Governing Law. ...........................................................    8381

21.8    20.7 Binding Effect. ...........................................................    8382

21.9    20.8 Successors and Assigns. ...........................................    8382

21.10    20.9 Severability of Plan Provisions. ...........................................    8382

21.11    20.10 No Waiver. ...........................................................    8482

21.12    20.11 Inconsistencies. ...........................................................    8482

21.13    20.12 Exemption from Certain Transfer Taxes and Recording Fees. ...................    8483

21.14    20.13 Post-Confirmation Status Report. ...........................................    8483

21.15    20.14 Post-Confirmation Conversion/Dismissal. ...............................    8583

21.16    20.15 Final Decree. ...........................................................    8584

MAINDOCS-#163418-v9-SCC164968-v3-SunCal_3rd_Am_Group_IV_VD_DS.DOC

**I.**

**INTRODUCTION**

This Disclosure Statement[1] is filed by, and the accompanying Plan is proposed by, SJD Partners and SJD Development (the "Group IV: Voluntary Debtors"), ~~as the SunCal Plan Proponents,~~ in their respective Chapter 11 Cases ~~of the Group IV: Voluntary Debtors~~ in their capacities as debtors in possession, and by Acquisitions, as the SunCal Proponents.  In addition to being one of the SunCal Plan ~~Proponent in the Trustee Debtors' Cases~~ Proponents, Acquisitions ~~shall be~~ is also the Plan Sponsor, the Plan Trustee of the Plan Trust, and the Distribution Agent for ~~all of the Debtors' Cases in which the SunCal Plan Proponents' Plan(s) are confirmed.~~ the Plan.

SJD Development is the sole equity owner of SJD Partners.  SJD Partners is the former owner of the Pacific Point Project.  This Disclosure Statement and the Plan assume that all claims filed against SJD Development were inadvertent and should have been filed against SJD Partners as the project-owning entity that incurred such debt.  Consequently, a joint Plan is filed in the cases of the Group IV:  Voluntary Debtors.

SJD Development is the 100% equity holder of SJD Partners.  SJD Partners formerly owned the Pacific Point Project.  The Pacific Point Project was lost through a non-judicial foreclosure sale by Lehman ALI, which caused a Lehman Affiliate, LV Pacific Point LLC, a Delaware limited liability company, a Lehman Entity, a Delaware Limited Liability Company, to purchase the Pacific Point Project at a foreclosure sale conducted on August 28, 2008.  The Group IV: Voluntary Debtors have initiated litigation regarding the foregoing as described herein.

Chapter 11 allows debtors-in-possession, Chapter 11 trustees, and under some circumstances, creditors, interest holders and others parties in interest, to propose a Chapter 11 plan.  As stated, the SunCal Plan Proponents are the proponents of the Plan sent to you in the same envelope as this Disclosure Statement.  This document summarizes the contents of the Plan, certain information relating to the Plan and the process the Bankruptcy Court follows in determining whether or not to confirm the Plan.

---

[1] All defined terms used herein have the same meanings as set forth in Article II herein and Exhibit "1" attached hereto.

29    In summary, the Plan provides for the recovery of the Pacific Point Project and/or liquidation

30  of Litigation Recoveries of Group IV: Voluntary Debtors.  The ~~Net Sales Proceeds~~net proceeds will

31  then be distributed to Creditors holding Allowed Claims in accordance with their rights and

32  priorities under the Bankruptcy Code and under other applicable law.  In addition, holders of

33  Allowed Reliance Claims will receive an initial distribution equal to 1% of such holder's Allowed

34  Claim, and, potentially, an additional distribution of up to 49% thereof from LitCo in the event that

35  such newly formed entity obtains free and clear title to the Pacific Point Project (the "LitCo

36  Enhancement").

37    Plan funding (*e.g.*, to make required payments to Creditors holding Allowed Administrative

38  Claims, Priority Claims, Tax Claims and Reliance Claims) (the "Effective Date Payments"), to the

39  extent estate assets are not available, is not contemplated to be provided by the SunCal Plan

40  Proponents.  Instead, the SunCal Plan Proponents are working with proposed investors/lenders to

41  make the Effective Date Payments (including the 1% Distribution to Holders of Reliance Claims, for

42  which estate assets cannot be used).  While the SunCal Plan Proponents are in discussions with third

43  parties with respect to obtaining funding for these payments, no commitment has yet been obtained

44  for such funding and thus SunCal Plan Proponents are not in a position to disclose the terms of such

45  funding at this time.  There is no guarantee that such funding will be obtained.

46    The SunCal Plan Proponents do not believe that a third party financing source is material to

47  the feasibility of the Plan, because the Effective Date Payments are relatively minimal such that

48  Acquisitions or an Affiliate of Acquisitions will fund such payments. The LitCo Enhancement to

49  Holders of Reliance Claims, is only a Plan obligation in the event LitCo or its designee acquires the

50  PacPoint Project free and clear of all claims and liens during the five-year Plan term, and financing

51  for the LitCo Enhancement will be obtained in connection with that acquisition.  At the present time,

52  free and clear title to the PacPoint Project cannot be obtained absent the consent of Lehman ALI, and

1  it is uncertain whether such consent will be obtained.

2    **READ THIS DISCLOSURE STATEMENT CAREFULLY IF YOU WANT TO**

3  **KNOW ABOUT**:

4    ➢  **WHO CAN VOTE OR OBJECT TO THE PLAN;**

29    ➢    **HOW YOUR CLAIM IS TREATED;**

30    ➢    **HOW THIS TREATMENT COMPARES TO WHAT YOUR CLAIM WOULD**

31         **RECEIVE IN LIQUIDATION;**

32    ➢    **A BRIEF HISTORY OF THE DEBTORS AND SIGNIFICANT EVENTS**

33         **DURING THEIR CHAPTER 11 BANKRUPTCY PROCEEDING;**

34    ➢    **WHAT FACTORS THE BANKRUPTCY COURT WILL CONSIDER TO**

35         **DECIDE WHETHER OR NOT TO CONFIRM THE PLAN;**

36    ➢    **WHAT IS THE EFFECT OF CONFIRMATION; AND**

37    ➢    **WHETHER THE PLAN IS FEASIBLE.**

38    This Disclosure Statement cannot tell you everything about your rights.  You should consider

39 consulting your own attorney to obtain more specific advice on how the Plan will affect you and your

40 best course of action.

41    Be sure to read the applicable Plan as well as this Disclosure Statement.  If there are any

42 inconsistencies between the applicable Plan and this Disclosure Statement, the applicable Plan

43 provisions will govern.

44    ~~The Bankruptcy Code requires a Disclosure Statement to contain "adequate information"~~

45 ~~concerning the Plans.  On _____, 2011, the Bankruptcy Court entered an order approving this~~

46 ~~Disclosure Statement, based upon a finding that this document contained "adequate information" to~~

47 ~~enable parties affected by the Plans to make an informed judgment regarding the Plan.  Any party can~~

48 ~~now solicit votes for or against the Plans~~

49    **THE BANKRUPTCY CODE REQUIRES A DISCLOSURE STATEMENT TO**

50 **CONTAIN "ADEQUATE INFORMATION" CONCERNING THE PLANS.  ON**

51 **_____, 2011, THE BANKRUPTCY COURT ENTERED AN ORDER APPROVING**

52 **THIS DISCLOSURE STATEMENT, BASED UPON A FINDING THAT THIS DOCUMENT**

1 **CONTAINED "ADEQUATE INFORMATION" TO ENABLE PARTIES AFFECTED BY**

2 **THE PLANS TO MAKE AN INFORMED JUDGMENT REGARDING THE PLAN.  ANY**

3 **PARTY CAN NOW SOLICIT VOTES FOR OR AGAINST THE PLANS.**

4    **II.**

## DEFINITIONS AND RULES OF INTERPRETATION

### 2.1    Definitions.

The following defined terms are used in this Disclosure Statement.  Any capitalized term that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term in the Bankruptcy Code or Bankruptcy Rules.

2.1.1    Acquisitions.  SCC Acquisitions, Inc., a California corporation, an indirect parent company of all of the Debtors, a purported Bond Indemnitor, a Creditor of all of the Debtors, a SunCal Plan Proponent, the Plan Sponsor and the proposed Plan Trustee.

2.1.2    Administrative Claim(s).  Any Claim against a Group IV: Voluntary Debtor or such Group IV: Voluntary Debtor's Estate incurred after the applicable Petition Date for the applicable Group IV: Voluntary Debtor but before the Effective Date, for any cost or expense of administration of the Case of the applicable Group IV: Voluntary Debtor, which Claim is entitled to priority under section 507(a)(2) or (3) of the Bankruptcy Code, including, without limitation, any fee or charge assessed against an Estate of a Group IV: Voluntary Debtor under section 1930 of Title 28 of the United States Code.

2.1.3    Administrative Claims Bar Date.  The last date fixed by the Group IV: Voluntary Debtors Plan for the filing of requests for payment of Administrative Claims.  Under the Group IV: Voluntary Debtors Plan, the Administrative Claims Bar Date shall be the first business day after the twenty-first (21st) day after the Effective Date.

2.1.4    Affiliate.  The term shall have the meaning set forth under Section 101(2), including, but not limited to, as to any Person, any other Person that directly or indirectly owns or controls, is owned or controlled by, or is under common ownership or control with, such Person. The term "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as applied to any Person, means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or other equity ownership interest, by contract or otherwise.

2.1.5    <u>Allowed</u>.  When used to describe Claim(s) or Interest(s) against the applicable Group IV: Voluntary Debtor, such Claim(s) or Interest(s), to the extent that it or they are "Allowed Claim(s)" or "Allowed Interest(s)."

2.1.6    <u>Allowed Amount</u> shall mean:

A.    With respect to any Administrative Claim (i) if the Claim is based upon a Fee Application, the amount of such Fee Application that has been approved by a Final Order of the Bankruptcy Court; (ii) if the Claim is based upon any indebtedness or obligation incurred in the ordinary course of business of the Group IV: Voluntary Debtors and is not otherwise subject to an Administrative Claim Bar Date, the amount of such Claim that has been agreed to by the Group IV: Voluntary Debtors and such creditor, failing which, the amount thereof as fixed by a Final Order of the Bankruptcy Court; or (iii) if the Holder of such Claim was required to file and has filed proof thereof with the Bankruptcy Court prior to an Administrative Claim Bar Date, (1) the amount stated in such proof if no objection to such Proof of Claim is interposed within the applicable period of time fixed by the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court, or (2) the amount thereof as fixed by Final Order of the Bankruptcy Court if an objection to such proof was interposed within the applicable period of time fixed by the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court.  The Allowed Amount of any Administrative Claim which is subject to an Administrative Claims Bar Date and not filed by the applicable Administrative Claims Bar Date shall be zero, and no Distribution shall be made on account of any such Administrative Claim;

B.    with respect to any Claim which is not an Administrative Claim (the "Other Claim"):  (i) if the Holder of such Other Claim did not file proof thereof with the Bankruptcy Court on or before the Claims Bar Date, the amount of such Claim as listed in the Group IV: Voluntary Debtors'' Schedules as neither disputed, contingent nor unliquidated; or (ii) if the Holder of such Claim has filed proof thereof with the Bankruptcy Court on or before the Claims Bar Date, (a) the amount stated in such proof if no objection to such Proof of Claim was interposed within the applicable period of time fixed by the Bankruptcy Code, the Bankruptcy Rules, the Plan or the Bankruptcy Court, or (b) the amount thereof as fixed by Final Order of the Bankruptcy Court if an objection to such proof was interposed within the applicable period of time fixed by the Bankruptcy

Code, the Bankruptcy Rules, the Plan or the Bankruptcy Court.  The Allowed Amount of any Other Claim which is not Filed by the applicable Claims Bar Date, is not listed on the Group IV: Voluntary Debtors' Schedules or is listed as disputed, unliquidated, contingent or unknown, and is not allowed under the terms of the Plan shall be zero, and no Distribution shall be made on account of any such Claim; and

C.    with respect to any Interest, (i) the amount provided by or established in the records of the Group IV: Voluntary Debtors at the Confirmation Date, provided, however, that a timely filed proof of Interest shall supersede any listing of such Interest on the records of the Group IV: Voluntary Debtors; or (ii) the amount stated in a proof of Interest Filed prior to the Confirmation Date if no objection to such Interest was filed prior to the Confirmation Date or such later date as the Bankruptcy Court allows; or (iii) the amount of such Interest as fixed by a Final Order of the Bankruptcy Court.

2.1.7    <u>Allowed Claim</u>.  Except as otherwise provided in the Plan(s) (including with respect to those Classes for which the amount of the Allowed Claims is specified by the Plan), a Claim to the extent (and only to the extent) of the Allowed Amount of such Claim.

2.1.8    <u>Allowed Interest</u>.  Any Interest to the extent, and only to the extent, of the Allowed Amount of such Interest.

2.1.9    <u>Allowed Secured Claims</u>.  All or a portion of a Secured Claim that is an Allowed Claim against the applicable Group IV: Voluntary Debtor.

2.1.10    <u>Allowed Unsecured Claim</u>. All or a portion of an Unsecured Claim that is an Allowed Claim against the applicable Group IV: Voluntary Debtor.

2.1.11    <u>Assets</u>.  All assets that are property of the Group IV: Voluntary Debtor(s) pursuant to Bankruptcy Code Section 541, which include the Group IV: Voluntary Debtor(s)' Assets described in Exhibit "1" hereto, the Group IV: Voluntary Debtors' Cash, and the Group IV: Voluntary Debtor(s)' Litigation Claims.

2.1.11    2.1.12    <u>Arch</u>.  Arch Insurance Company, a Bond Issuer.

2.1.12    2.1.13    <u>Available Cash</u>.  Each Group IV: Voluntary Debtors' Cash deposited into the applicable Distribution Account(s) on or after the Effective Date that is available

for making Distributions under the Plan to Holders of Allowed Administrative, Priority, and General Unsecured Claims. The Available Cash shall consist of the respective Group IV: Voluntary Debtors' cash on hand as of the Effective Date that is not subject to a Disputed Lien, proceeds of Net Litigation Recoveries that are not subject to a Disputed Lien, ~~Net Sales Proceeds~~proceeds that become Available Cash upon the disallowance of a Disputed Claim or avoidance of a Disputed Lien purportedly encumbering such Cash. All Available Cash shall be deposited into the applicable Distribution Account(s). ~~Available Cash shall not include Net Sale Proceeds in the Net Sales Proceeds Account where the Disputed Secured Claims are Allowed but subject to an equitable subordination judgment.~~

2.1.13   ~~2.1.14~~  Avoidance Actions. All Claims and defenses to Claims accruing to the Group IV: Voluntary Debtors and their Estates under Bankruptcy Code Sections 506(d), 510(c), 541, 544, 545, 547, 548, 549, 550, or 551.

2.1.14   ~~2.1.15~~  Bankruptcy Code. The United States Bankruptcy Code.

2.1.15   ~~2.1.16~~  Bankruptcy Court. The United States Bankruptcy Court for the Central District of California, having jurisdiction over the Cases and, to the extent of any withdrawal of the reference made pursuant to Section 157 of title 28 of the United States Code, the United States District Court for the Central District of California; or, in the event such courts cease to exercise jurisdiction over the Cases, such court or unit thereof that exercises jurisdiction over the Cases in lieu thereof.

2.1.16   ~~2.1.17~~  Bankruptcy Rules. Collectively, as now in effect or hereafter amended and as applicable to the Cases, (i) the Federal Rules of Bankruptcy Procedure, and (ii) the Local Bankruptcy Rules and General Orders applicable to cases pending before the Bankruptcy Court.

2.1.17   ~~2.1.18~~  Beneficial Interests. Collectively, the interests of the holders of Allowed Unsecured Claims in the Plan Trust and in all Distributions to be made by the Plan Trust on account of Allowed Unsecured Claims with respect to the Group IV: Voluntary Debtors. The Beneficial Interests (a) shall be noted in the books and records of the Plan Trust, (b) shall not be evidenced by a writing, and (c) may not be transferred, sold, assigned or transferred by will, intestate

29 | succession or operation of law without written notification to the Plan Trustee confirming and

30 | acknowledging the transfer by both the holder and the transferee.

31 |       2.1.18  2.1.19 Bond Claim(s).  Any Claim against the Group IV: Voluntary

32 | Debtor(s) and a Bond Issuer under various payment or performance bonds.

33 |       2.1.19  2.1.20 Bond Claimant.  Holder(s) of a Bond Claim.

34 |       2.1.20  2.1.21 Bond Indemnification Claim.  All Claims by Bond Issuers for

35 | indemnification against a Bond Indemnitor for the Bond Issuer's actual payment or purchase of a

36 | Bond Claim with respect to the Pacific Point Project.

37 |       2.1.21  2.1.22 Bond Indemnitors.  The individuals and entities that are allegedly

38 | liable on the Bond Indemnification Claims, including, allegedly, all of the Debtors, Acquisitions, all

39 | Affiliates of Acquisitions, and Elieff.

40 |       2.1.22  2.1.23 Bond Issuer(s).  Bond Safeguard, Lexon and Arch in their capacities

41 | as issuers and sureties for payment and performance bonds for the benefit of certain of the Debtors.

42 |       2.1.23  2.1.24 Bond Safeguard.  Bond Safeguard Insurance Company, a Bond

43 | Issuer.

44 |       2.1.24  2.1.25 Business Day.  Any day, other than a Saturday, a Sunday or a "legal

45 | holiday," as defined in Bankruptcy Rule 9006(a).

46 |       2.1.25  2.1.26 Cases.  The Chapter 11 cases of the Group IV: Voluntary Debtors

47 | pending before the Bankruptcy Court.

48 |       2.1.26  2.1.27 Cash.  Currency of the United States of America and cash

49 | equivalents, including, but not limited to, bank deposits, immediately available or cleared checks,

50 | drafts, wire transfers and other similar forms of payment.

51 |       2.1.27  2.1.28 Claim.  This term shall have the broadest possible meaning under

52 | Section 101(5) of the Bankruptcy Code, and shall include (a) any right to payment from any of the

1 | Group IV: Voluntary Debtors, whether or not such right is reduced to judgment, liquidated,

2 | unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured,

3 | or unsecured, or (b) any right to an equitable remedy for breach of performance if such breach gives

4 | rise to a right of payment from any of the Group IV: Voluntary Debtors, whether or not such right to

29  an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed,

30  undisputed, secured, or unsecured.

31         2.1.28 ~~2.1.29~~ Claims Bar Date.  For any Claim other than the exceptions noted

32  below, March 31, 2009, which was established by the Bankruptcy Court as the last date for creditors

33  to file Proof of Claims with the Bankruptcy Court in all of the Group IV: Voluntary Debtors' Cases,

34  except for the following: (a) Administrative Claims, for which the Administrative Claims Bar Date

35  shall apply, (b) claims arising from rejection of executory contracts or unexpired leases pursuant to

36  11 U.S.C. § 365, for which the last day to file a proof of claim is (i) 30 days after the date of entry of

37  the order authorizing the rejection, or (ii) March 31, 2009, whichever is later, (c) claims of

38  "governmental units," as that term is defined in 11 U.S.C. § 101(27), for which proofs of claim are

39  timely filed if filed: (i) before 180 days after the date of the Order for Relief in this case, or (ii) by

40  March 31, 2009, whichever is later (11 U.S.C. § 502(b)(9)), and (d) claims arising from the

41  avoidance of a transfer under chapter 5 of the Bankruptcy Code, the last day to file a proof of claim is

42  30 days after the entry of judgment avoiding the transfer or March 31, 2009, whichever is later.

43         2.1.29 ~~2.1.30~~ Claims Objection Deadline.  The later of (i) the first business day

44  following the one hundred and eightieth (180th) day after the Effective Date, or (ii) such greater

45  period of limitation as may be fixed or extended by the Bankruptcy Court or by agreement between

46  the Plan Trustee and the Holder of the Claim.

47         ~~2.1.31    Claim Objection Reduction Amount. The amount of Net Sales Proceeds~~

48  ~~that is made available to the holders of Allowed Unsecured Claims due to the entry of a judgment or~~

49  ~~order on a Lehman Claim Objection that disallows, reduces, or otherwise adversely modifies the~~

50  ~~secured claims filed by the Lehman Lenders.~~

51         2.1.30 ~~2.1.32~~ Class.  Each group of Claims or Interests classified in Article IV of

52  the Group IV: Voluntary Debtor's Plan pursuant to Sections 1122 and 1123 of the Bankruptcy Code.

1         ~~2.1.33    Committee.  The Voluntary Debtors' Committee, both before and after the~~

2  ~~Confirmation Date.~~

3         2.1.31 ~~2.1.34~~ Confirmation Date.  The date on which the Confirmation Order is

4  entered in the Bankruptcy Court's docket.

2.1.32   2.1.35   Confirmation Order.  The order entered by the Bankruptcy Court confirming the Plan in accordance with the provisions of Chapter 11 of the Bankruptcy Code with respect to the Group IV Voluntary Debtor's Plan.

2.1.33   2.1.36   Contingent Bond Claims.  Bond Indemnification Claims in which the Bond Issuer has not yet paid or purchased the underlying Bond Claim.

2.1.34   2.1.37   Contract Action. The action filed by certain Voluntary Debtors against Lehman Ali, Inc., and certain other defendants, in California Superior Court for the County of Orange (Case No. 30-2011-0040847-CU-BC-CJC), that was removed to the Bankruptcy Court as Adv. No. 8:11-ap-01212-ES, and with a reservation of rights to add the Plan Trustee and/or the Trustee Debtors (or their sucessors successors) as additional plaintiffs therein.

2.1.35   2.1.38   Creditor.  Any Person who is the Holder of a Claim against any Group IV: Voluntary Debtor that arose or accrued or is deemed to have arisen or accrued or to have matured, or otherwise become due, owing, and payable on or before the Petition Date, including, without limitation, Claims of the kind specified in Sections 502(g), 502(h) or 502(i) of the Bankruptcy Code.

2.1.36   2.1.39   Debtor(s).  Individually or collectively, the Voluntary Debtors and the Trustee Debtors, as specifically defined in Exhibit "1" attached to the Disclosure Statement.

2.1.37   2.1.40   Debtor(s)-in-Possession.  The Voluntary Debtor(s) when acting in their capacity as representatives of their respective Estates in their respective Chapter 11 Cases.

2.1.38   2.1.41   Disclosure Statement.  The document accompanying the applicable Group IV: Voluntary Debtors' Plan that is entitled "Second Third Amended Disclosure Statement Describing Second Third Amended Joint Chapter 11 Plan Filed by SJD Partners, Ltd. and SJD Development Corp." and with all accompanying exhibits.

2.1.39   2.1.42   Disputed Claim(s).  All or any part of a Group IV: Voluntary Debtors' Claim other than any Allowed Amount thereof as to which any one of the following applies: (i) no Proof of Claim has been filed with respect to such Claim, and either (a) the Claim is not listed in the Schedules; or (b) the Claim is listed in the Schedules as unliquidated, disputed, contingent, unknown or in a zero amount, (ii) the Claim is the subject of (a) an unresolved  Litigation

29  Claim; (b) the Claim is subject to offset by a Litigation Claim; (c) a timely objection to such Claim

30  that has not been resolved by a Final Order; or (d) a request for estimation in accordance with the

31  Bankruptcy Code, the Bankruptcy Rules, any applicable order of the Bankruptcy Court, or the

32  applicable Plan which is Filed on or before the Claims Objection Deadline, which Adversary

33  Proceeding, objection, or request for estimation has not been dismissed, withdrawn or determined by

34  a Final Order; or (iii) the Claim is otherwise treated as a "Disputed Claim" pursuant to the Plan.

35              2.1.40   ~~2.1.43~~ Disputed Lien(s).  An asserted lien(s) against Group IV: Voluntary

36  Assets of the Group IV: Voluntary Debtor(s) that is either subject to a Disputed Secured Claim, not

37  duly perfected, subject to an Avoidance Action, or subject to an action pursuant to Bankruptcy Code

38  Sections 510(c)(2) and/or 506(d).  However, pursuant to Section 506(d)(2), a lien is not disputed

39  merely because it secures a claim that "is not an allowed secured claim due only to the failure of any

40  entity to file a proof of such claim under section 501 of this title."

41              2.1.41   ~~2.1.44~~ Disputed Secured Claim(s). That part of a Disputed Claim against

42  the Group IV: Voluntary Debtors that is a Secured Claim.

43              2.1.42   ~~2.1.45~~ Distribution(s).  Payments to Holders of Allowed Claims provided

44  for under the Plan.

45              2.1.43   ~~2.1.46~~ Distribution Agent.  The entity that is responsible for making

46  Distributions under the Group IV: Voluntary Debtors' Plan, which shall be Acquisitions.

47              2.1.44   ~~2.1.47~~ Distribution Account(s).  Separate account(s) to be established by

48  the Plan Trustee at an FDIC insured bank into which each Group IV: Voluntary Debtors' Available

49  Cash shall be deposited and all Available Cash received by the Plan Trust after the Confirmation

50  Date that would have belonged to such Group IV: Voluntary Debtor shall be deposited, ~~other than~~

51  ~~Net Sales Proceeds that are subject to Disputed Claims and Disputed Liens~~.

52              2.1.45   ~~2.1.48~~ Distribution Date.  With respect to any Allowed Claim or Allowed

1  Interest, the date on which a Distribution is required to be made under the Group IV: Voluntary

2  Debtors' Plan.

3              2.1.46   ~~2.1.49~~ Effective Date. A date selected by the SunCal Plan Proponents that

4  is not later than the thirteenth (30th) calendar day after the Confirmation Date of the Group IV:

Voluntary Debtors' Plan, provided there is ~~not~~no stay pending appeal of the Confirmation Order, in which case the ~~deadline for the~~Effective Date ~~will~~shall be tolled until the dissolution of such stay ~~pending appeal has expired.~~.  The Effective Date may be further extended by the Bankruptcy Court after notice and hearing to all parties in interest.

2.1.47    ~~2.1.50~~ Elieff.  Bruce Elieff, the president of Acquisitions, a purported Bond Indemnitor Claims with alleged corresponding indemnity Claims against the Debtors.

2.1.48    ~~2.1.51~~ Estates.  The bankruptcy estates of the Group IV: Voluntary Debtors created pursuant to Section 541 of the Bankruptcy Code.

2.1.49    ~~2.1.52~~ Fee Applications.  Applications of Professional Persons under Sections 330, 331 or 503 of the Bankruptcy Code for allowance of compensation and reimbursement of expenses in the Group IV: Voluntary Debtors' Cases.

2.1.50    ~~2.1.53~~ Fee Claim.  A Claim under Sections 330 or 503 of the Bankruptcy Code for allowance of compensation and reimbursement of expenses in the Group IV Voluntary Debtors' Cases.

2.1.51    ~~2.1.54~~ Filed.  Delivered to, received by and entered upon the legal docket by the Clerk of the Bankruptcy Court.  "File" shall have a correlative meaning.

2.1.52    ~~2.1.55~~ Final Order.  A judgment, order, ruling or other decree issued and entered by the Bankruptcy Court that has not been reversed, stayed, modified or amended.

2.1.53    ~~2.1.56~~ General Unsecured Claim.  A Claim against a Group IV: Voluntary Debtor that is not (a) a Secured Claim, (b) an Administrative Claim, (c) a Tax Claim (d) a Priority Claim or (e) a Bond Indemnification Claim.

2.1.54    Group IV: Voluntary Assets.  All assets that are property of the Group IV: Voluntary Debtor(s) pursuant to Bankruptcy Code Section 541, which include the Assets described in Exhibit "1" hereto, the Group IV: Voluntary Debtors' Cash, and the Group IV: Voluntary Debtor(s)' Litigation Claims.

2.1.55    ~~2.1.57~~ Group IV: Voluntary Debtors.  SJD Partners, Ltd. and SJD Development Corp.~~.~~

29   2.1.56   2.1.58  Holder.  The beneficial owner of any Claim or Interest against the

30   Group IV: Voluntary Debtors.

31   2.1.57   2.1.59  Insider.  The term shall have the broadest meaning possible under

32   Section 101(31), including, but not limited to, a person in control of the Group IV: Voluntary

33   Debtors, Affiliates and Insiders of such Affiliates, including the Lehman Entities.

34   2.1.58   2.1.60  Interest.  Any equity security interest in any Group IV: Voluntary

35   Debtor within the meaning, of Section 101(16) of the Bankruptcy Code, including, without

36   limitation, any equity ownership interest in any of the Group IV: Voluntary Debtors, whether in the

37   form of common or preferred stock, stock options, warrants, partnership interests, or membership

38   interests.

39   2.1.59   2.1.61  LBHI.  Lehman Brothers Holdings, Inc., a Lehman Entity, the

40   parent company of Lehman ALI and LCPI, and a Chapter 11 debtor in a bankruptcy proceeding

41   pending in the Bankruptcy Court for the Southern District of New York.

42   2.1.60   2.1.62  LCPI.  Lehman Commercial Paper, Inc., a Chapter 11 debtor in a

43   bankruptcy proceeding pending in the Bankruptcy Court for the Southern District of New York.

44   2.1.61   2.1.63  Lehman Adversary Proceeding.  The Debtors' (including the Group

45   IV: Voluntary Debtors) pending adversary proceeding against the Lehman Lenders and/or the

46   Lehman Successors asserting various causes of action including equitable subordination, fraudulent

47   inducement, fraudulent conveyances and preferential transfers.

48   2.1.62   2.1.64  Lehman ALI.  Lehman ALI, Inc.

49   2.1.63   2.1.65  Lehman Re.  Lehman Re LTD., an Affiliate of the Lehman Entities

50   and a Lehman Successor to Lehman's Disputed Claim and Disputed Liens arising from the Pacific

51   Point First Loan Agreement.

52   2.1.64   2.1.66  Lehman Claim Objections. The objections filed by the Debtors to

1    the claims filed by the Lehman Lenders that are based upon the Lehman Disputed Loans and the

2    Lehman Disputed Administrative Loans, including, but not limited to, the Lehman Recoupment

3    Objection and the Lehman 502(d) Objection.

4

2.1.65  2.1.67  Lehman's Disputed Claim(s).  All of the Proofs of Secured Claims filed by a Lehman Lender or a Lehman Successor in the Debtors' Chapter 11 Cases, including in the Group IV: Voluntary Debtors' Cases, arising from the Lehman Disputed Loans and the Lehman Disputed Administrative Loans.

2.1.66  2.1.68  Lehman's Disputed Lien(s).  All of the alleged liens relating to Proofs of Secured Claims filed by a Lehman Lender or a Lehman Successor in the Debtor's Chapter 11 Cases arising from the Lehman Disputed Loans.

2.1.67  2.1.69  Lehman Disputed Loans.  Collectively the following loans that are the purported basis for the Lehman's Disputed Claims:  (a) SunCal Communities I Loan Agreement; (b) Bickford Second Loan Agreement; (c) Ritter Ranch Loan Agreement; (d) SCC Palmdale Loan; (e) Interim Loan Agreement; (f) SunCal Oak Knoll/SunCal Torrance Loan Agreement; (g) SunCal Century City Loan Agreement; (h) SunCal PSV Loan Agreement; (i) SunCal Delta Coves Loan Agreement; (j) SunCal Marblehead/SunCal Heartland Loan Agreement; (k) Sun Cal Oak Valley Loan Agreement; (l) SunCal Northlake Loan Agreement; (m) Pacific Point First Loan Agreement; (n) Pacific Point Second Loan Agreement , and (o) the Lehman Disputed Administrative Loan.

2.1.68  2.1.70  Lehman Entities.  The Lehman Lenders, the Lehman Equity Members and LBHI.

2.1.69  2.1.71  Lehman Equity Members.  Lehman Entities that own direct or indirect membership Interests in all of the Trustee Debtors, except for SunCal Heartland and SunCal Marblehead.

2.1.70  2.1.72  Lehman Lenders.  Lehman ALI, LCPI, Northlake Holdings, and OVC Holdings.

2.1.71  2.1.73  Lehman Representatives.  The individuals that controlled the Lehman Entities.

2.1.72  2.1.74  Lehman Successor(s).  Entities other than the Lehman Lenders that either assert to be or are determined by the Bankruptcy Court to be the beneficial owner(s) of the Lehman Disputed Loan(s), including, but not limited to Fenway Capital, Lehman Re and Danske Bank.

2.1.73   2.1.75 Lexon.  Lexon Insurance Co.

2.1.74   2.1.76 LitCo. A newly formed Delaware limited liability company that will be purchasing the claims and litigation rights held by the Reliance Claimants that choose Option A provided for informed for the Plan, and purpose of funding certain distributions the LitCo Plan Loan.

2.1.75    LitCo Plan Loan. A loan that will be made by LitCo to the extent necessary to pay Allowed Priority Claims, Allowed Administrative Claims and Post Confirmation Expenses incurred by the Plan Trust, the Plan Trustee and its professionals and to the Voluntary Debtors' Committee and its professionals if no other source is available from the Group IV: Voluntary Assets, and to make the 1% Distribution to Holders of Allowed Reliance Claims.

2.1.76   2.1.77 Litigation Claims.  Any and all interests of the Group IV: Voluntary Debtors in any and all Claims, rights, causes of action, and objections or defenses to Claims, liens, rights, or causes of action which have been or may be commenced by the Group IV: Voluntary Debtor(s), the Voluntary Debtors and/or the Plan Trust, as the case may be, including, but not limited to, any (i) Avoidance Actions; (ii) for turnover of property to the Group IV: Voluntary Debtors' Estates and/or the Plan Trust; (iii) for the recovery of property or payment of money that belongs to the Debtors' Estates or the Plan Trust; (iv) the right to compensation in the form of damages, recoupment or setoff of the Debtors' Estates and/or the Plan Trust; (v) the Lehman Adversary Proceeding; (vi) the Contract Action, (vii) Lehman Claim Objections (and related Claim Objection Reduction Amount) and (viii) any and all other Claims against Lehman's Disputed Claims and/or Disputed Liens referenced in the Plan or the Disclosure Statement.

2.1.77   2.1.78 Litigation Recoveries.  Any Cash or other property received by the Chapter 11 Trustee, the Group IV: Voluntary Debtors, the Voluntary Debtors' Committee and/or the Plan Trust, as the case may be, from all or any portion of a Litigation Claim(s), including, but not limited to, awards of damages, attorneys' fees and expenses, interest and punitive damages, whether recovered by way of settlement, execution on judgment or otherwise.

2.1.78   2.1.79 Litigation Rights. Any Claims held by a party against the Group IV: Voluntary Debtors, and if applicable, against third parties arising or relating to the Claim against the

applicable Group IV Voluntary Debtor, that have not been fixed in a final judgment prior to the Effective Date.

2.1.79  2.1.80  Maximum Distributions.  A Distribution to a Holder of an Allowed General Unsecured Claim against a Group IV: Voluntary Debtor equal to one hundred percent (100%) of the amount of the Holder's Allowed General Unsecured Claim plus interest at the Legal Rate from and as of the Group IV: Voluntary Debtor's Petition Date.

2.1.80  2.1.81  MB Firm.  Miller Barondess, LLP.

2.1.81  2.1.82  Mechanic Lien Claims.  Mechanic Lien Claims arising pursuant to California Civil Code §3110, et seq. that were either allegedly perfected prepetition or otherwise allegedly satisfy the requirements of Bankruptcy Code 546(b).

2.1.82  2.1.83  Net Litigation Recoveries.  Litigation Recoveries less associated Administrative Claims and Post-Confirmation Expenses incurred in connection with such Litigation Recoveries.

2.1.84    Net Sales Proceeds.  The Cash generated from the sale(s) or liquidation of the Group IV: Voluntary Debtor(s)' Assets or the Plan Trust's Assets, less payment of selling expenses, taxes, and any associated Post-Confirmation Expenses and Administrative Claims incurred in furtherance of such sales or liquidation of such Assets.

2.1.85    Net Sales Proceeds Account(s).  Separate account(s) that will be established by the Plan Trustee at an FDIC insured bank into which all Net Sales Proceeds shall be deposited from the sale of Assets that were allegedly encumbered by a Disputed Secured Claim(s) and/or a Disputed Lien(s).  There shall be a separate Net Sales Proceeds Account for the Net Sale Proceeds allegedly subject to each Disputed Secured Claim(s) and/or Disputed Lien(s), except where there are two Disputed Liens on a single Project, in which case, there shall be a single account for the proceeds generated from that Project.  The Disputed Secured Claim(s) and/or Disputed Lien(s) shall attach to the corresponding Net Sales Proceeds Account(s) pending any Final Order(s) of the Bankruptcy Court resolving the applicable Disputed Secured Claim(s) and/or applicable Disputed Lien(s).  To the extent that a particular Disputed Claim is disallowed or a particular Disputed Lien is avoided (other than transferred to the Estates pursuant to Bankruptcy Code Section 510(c)(2)) or otherwise

29    ~~invalidated, such Net Sales Proceeds allegedly subject thereto shall become Available Cash and shall~~

30    ~~be transferred to the applicable Distribution Account(s).  To the extent that a particular Disputed~~

31    ~~Secured Claim and a Disputed Lien are allowed and deemed valid but subject to the equitable~~

32    ~~subordination causes of action in the Lehman Adversary Proceeding, the funds shall remain in the~~

33    ~~Net Sales Accounts pending a Final Order on the equitable subordination causes of action in the~~

34    ~~Lehman Adversary Proceeding.~~

35          2.1.83    ~~2.1.86~~  Orders for Relief Date.  The following are dates that orders for relief

36    were entered for each of the Trustee Debtors:

| | |
|---|---|
| SunCal Oak Valley | January 6, 2009 |
| SunCal Heartland | January 6, 2009 |
| SunCal Northlake | January 6, 2009 |
| SunCal Marblehead | January 6, 2009 |
| SunCal Century City | January 6, 2009 |
| SunCal PSV | January 6, 2009 |
| Delta Coves | January 6, 2009 |
| SunCal Torrance | January 6, 2009 |
| SunCal Oak Knoll | January 6, 2009 |

43          2.1.84    ~~2.1.87~~  Pacific Point First Loan Agreement.  A certain loan agreement,

44    dated February 16, 2006, by and among Lehman ALI, SJD Development and SJD Partners, pursuant

45    to which Lehman ALI made a loan in the maximum aggregate principal amount of approximately

46    $125,000,000. The Pacific Point First Loan Agreement is allegedly secured by a first-priority deed of

47    trust on the Pacific Point Project.  The Pacific Point First Loan Agreement had an asserted balance

48    due of $120,110,237 as of March 30, 2009.  The ownership of the term loan portion of the Pacific

49    Point First Loan Agreement is now allegedly held by Lehman Re, a Bermuda business entity and the

50    ownership of the revolving portion of this loan is allegedly held by Lehman ALI.

51          2.1.85    ~~2.1.88~~  Pacific Point Second Loan Agreement. A certain loan agreement,

52    dated May 1997, by and between Lehman ALI and SJD Partners, pursuant to which Lehman ALI

1    initially made a loan in the maximum aggregate principal amount of approximately $20,000,000.

2    The Pacific Point Second Loan Agreement was secured by a second-priority deed of trust on the

3    Pacific Point Project, which was foreclosed upon on August 28, 2008 by LV Pacific Point, as

4    assignee of Lehman ALI.

2.1.86    2.1.89  Pacific Point Project.  The Project formerly owned by SJD Partners, located in the San Juan Capistrano, California, as more particularly described herein.

2.1.87    2.1.90  Person.  An individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, governmental authority, governmental unit, committee or other entity of whatever nature.

2.1.88    2.1.91  Petition Dates.  The following are dates that each of the Voluntary Debtors filed their Voluntary Chapter 11 petitions or Creditors filed involuntary Chapter 11 petitions against the Trustee Debtors:

| | |
|---|---|
| Palmdale Hills | November 6, 2008 |
| SunCal Beaumont | November 6, 2008 |
| SCC Palmdale | November 7, 2008 |
| SunCal Johannson | November 7, 2008 |
| SunCal Summit Valley | November 7, 2008 |
| SunCal Emerald | November 7, 2008 |
| SunCal Bickford | November 7, 2008 |
| Acton Estates | November 7, 2008 |
| Seven Brothers | November 7, 2008 |
| SJD Partners. | November 7, 2008 |
| SJD Development | November 7, 2008 |
| Kirby Estates | November 7, 2008 |
| SunCal I | November 7, 2008 |
| SunCal III | November 7, 2008 |
| SCC Communities | November 19, 2008 |
| Del Rio | November 19, 2008 |
| Tesoro | November 19, 2008 |
| Delta Coves Ventures, LLC | November 14, 2008 |
| SunCal Heartland, LLC | November 12, 2008 |
| SunCal Marblehead, LLC | November 12, 2008 |
| LB-L-SunCal Northlake, LLC | November 12, 2008 |
| LB-L-SunCal Oak Valley, LLC | November 12, 2008 |
| SunCal Century City, LLC | November 14, 2008 |
| SunCal PSV, LLC | November 14, 2008 |
| SunCal Torrance Properties, LLC | November 14, 2008 |
| SunCal Oak Knoll, LLC | November 19, 2008 |

2.1.89    2.1.92  Plan.  The SecondThird Amended Joint Chapter 11 Plan Filed by SJD Partners, Ltd. and SJD Development Corp. in their capacities as debtors and debtors in possession, together with the Exhibits thereto, as the same may be amended or modified from time to time in accordance with the Plan.

2.1.90   ~~2.1.93~~ Plan Period. The period from the Effective Date to the Group IV: Voluntary Debtors Plan Termination Date.

2.1.91   ~~2.1.94~~ Plan Termination Date. The fifth (5th) anniversary date of the Effective Date for the Group IV: Voluntary Debtors, unless the Group IV: Voluntary Debtors Plan elects an earlier date.

2.1.92   ~~2.1.95~~ Plan Sponsor.  The entity that has committed to cause and/or arrange the funding of certain specified obligations under the Plan on or after the Effective Date. The Group IV: Voluntary Debtors Plan Sponsor is Acquisitions.

2.1.93   ~~2.1.96~~ Plan Trust.  A liquidating trust to be established prior to or on the Effective Date, with Acquisitions as the Group IV: Voluntary Debtors Plan Trustee and the Holders of Allowed Claims against the Group IV: Voluntary Debtors as the ~~beneficiaries~~Plan Trust Beneficiaries. The purpose of the ~~Group IV: Voluntary Debtors~~ Plan Trust will be to liquidate the Group IV: Voluntary ~~Debtors'~~ Assets (other than Group IV: Voluntary Assets that are excluded by the Group IV: Voluntary Debtors Plan Trustee on the grounds that they lack value or would be difficult to administer) and to otherwise consummate the Group IV: Voluntary Debtors Plan.

2.1.94   Plan Trust Assets. All property within the Chapter 11 estates of the Group IV: Voluntary Debtors.

2.1.95   Plan Trust Beneficiaries. The Group IV: Voluntary Debtors Plan Trust Beneficiaries are (i) the holders of Beneficial Interests, as of any point in time, and (ii) holders of Allowed Claims that shall be satisfied from the Group IV: Voluntary Debtors Plan Trust Assets in accordance with the terms of the Group IV: Voluntary Debtors Plan.

2.1.96   ~~2.1.97~~ Plan Trustee. The Group IV: Voluntary Debtors Plan Trustee under the Group IV: Voluntary Debtors Plan Trust is Acquisitions.

~~2.1.98   Plan Trust Beneficiaries. The Group IV: Voluntary Debtors Plan Trust Beneficiaries are (i) the holders of Beneficial Interests, as of any point in time, and (ii) holders of Allowed Claims that shall be satisfied from the Group IV: Voluntary Debtors Plan Trust Property in accordance with the terms of the Group IV: Voluntary Debtors Plan.~~

~~2.1.99      Plan Trust Property. All property within the Chapter 11 estates of the Group IV: Voluntary Debtors, other than property that is affirmatively excluded by the Group IV: Voluntary Debtors Plan Trustee.~~

2.1.97      ~~2.1.100~~ Post-Confirmation Expenses.  The fees and expenses incurred by the Group IV: Voluntary Debtors Plan Trust, the Group IV: Voluntary Debtors Plan Trustee and the Voluntary Debtors' Committee and their professionals following the Confirmation Date (including the fees and costs of Professionals) for the purpose of (i) prosecuting and liquidating the Litigation Claims; (ii) objecting to and resolving Disputed Claims and Disputed Liens; (iii) selling or otherwise liquidating the Plan Trust's Assets; (iv) effectuating Distributions under the Plan; and (v) otherwise consummating the Plan and closing the Group IV: Voluntary Debtors' Chapter 11 Cases.

2.1.98      ~~2.1.101~~ Priority Claim.  Any Claim, other than an Administrative Claim or a Tax Claim, to the extent entitled to priority under Section 507(a) of the Bankruptcy Code.

2.1.99      ~~2.1.102~~ Pro Rata.  Proportionately, so that with respect to any Distribution in respect of any Allowed Claim, the ratio of (a)(i) the amount of property distributed on account of such Allowed Claim to (ii) the amount of such Allowed Claim, is the same as the ratio of (b)(i) the amount of property distributed on account of all Allowed Claims of the Class or Classes sharing in such Distribution to (ii) the amount of all Allowed Claims in such Class or Classes.

2.1.100      ~~2.1.103~~ Professional.  A Person or Entity (a) employed by the Group IV: Voluntary Debtors, the Voluntary Debtors' Committee pursuant to a Final Order in accordance with Sections 327 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to the Effective Date, pursuant to Sections 327, 328, 3291 330 and 331 of the Bankruptcy Code, or (b) for which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to Section 503(b) of the Bankruptcy Code.

2.1.101      ~~2.1.104~~ Professional Fees.  All Allowed Claims for compensation and for reimbursement of expenses under Sections 328, 330 and/or 503(b) of the Bankruptcy Code

2.1.102      ~~2.1.105~~ Projects.  The Debtors' residential real estate development projects and other assets as separately defined herein and described in Exhibit "1" to the Disclosure Statement.

2.1.103   2.1.106  Reliance Claim(s). An Allowed Unsecured Claim, Allowed Mechanic's Lien Claim, or Allowed Bond Indemnification Claim against a Group IV: Voluntary Debtor that would entitle the holder thereof to be the beneficiary of any judgment obtained in the Lehman Adversary Action against a Lehman Entity by such Group IV: Voluntary Debtor.  All Allowed Mechanic's Lien Claims and, Allowed Bond Indemnification Claims and certain Allowed General Unsecured Claims are Reliance Claims.  A list of the Reliance Claims for the Group IV: Voluntary Debtors is attached hereto as Exhibit "8."

2.1.104   2.1.107  Reliance Claimant. The holder of a Reliance Claim against a Group IV: Voluntary Debtor.  A list of the Reliance Claimants against the Group IV: Voluntary Debtors is attached to the Disclosure Statement as Exhibit "8."

2.1.105   2.1.108  SCC LLC.  SCC Acquisitions LLC, a limited liability company, a subsidiary of Acquisitions and an indirect and/or a direct parent company of all of the Debtors.

2.1.106   2.1.109  Schedules.  The schedules of assets and liabilities and list of equity security holders Filed by the Group IV: Voluntary Debtors, as required by Section 521(1) of the Bankruptcy Code, Bankruptcy Rules 1007(a)(3) and (b)(1), and Official Bankruptcy Form No. 6, as amended from time to time.

2.1.110   Secured Claim.  A Claim secured by a lien on any property of any of the Group IV: Voluntary Debtors' Estates, but only to the extent of the value of the interest of the holder of such Allowed Claim in the interest of the Estate in such property.

2.1.107   2.1.111  Secured Claim.  Any Claim, including interest, fees, costs, and charges to the extent allowable pursuant to Bankruptcy Code Section 506, that is secured by a valid and unavoidable Lien on the Group IV: Voluntary Debtor(s)' Assets.

2.1.108   2.1.112  SJD Development. SJD Development Corp., a California corporation, a Voluntary Debtor, a Group IV: Voluntary Debtor, and the parent of SJD Partners.

2.1.109   2.1.113  SJD Partners. SJD Partners, Ltd., a Group IV: Voluntary Debtor, and the owner of the former owner of the Pacific Point Project.

2.1.110   2.1.114  SunCal.  The SunCal Companies, a trade name for Acquisitions and its Affiliates.

2.1.111  2.1.115  SunCal Management.  SunCal Management, LLC, a Delaware limited liability company, and the former property manager for the Projects, which has been succeed succeeded by Argent Management.

2.1.112  2.1.116  SunCal Plan Proponent(s)Proponents.  The Voluntary Debtors, in their capacity as debtors and debtors- in possession in their respective Chapter 11 Cases, and Acquisitions as the partiesa creditor and party-in-interest, that are proposing the Plans in the applicable Trustee Debtors' Cases. .

2.1.113  2.1.117  Tax.  Any tax, charge, fee, levy, impost or other assessment by any federal, state, local or foreign taxing authority, including, without limitation, income, excise, property, sales, transfer, employment, payroll, franchise, profits, license, use, ad valorem, estimated, severance, stamp, occupation and withholding tax.  "Tax" shall include any interest or additions attributable to, or imposed on or with respect to such assessments.

2.1.114  2.1.118  Tax Claim.  Any Claim for any Tax to the extent that it is entitled to priority in payment under Section 507(a)(8) of the Bankruptcy Code.

2.1.115  2.1.119  Trustee Debtor(s).  The following Debtors, individually or collectively, that are represented by the Chapter 11 Trustee: Delta Coves, SunCal Heartland, SunCal Marblehead, SunCal Northlake, SunCal Oak Valley , SunCal Century City, SunCal PSV, SunCal Torrance, and SunCal Oak Knoll.

2.1.116  2.1.120  Unsecured Claim. An Unsecured Claim is any Claim that is not an Administrative Claim, Tax Claim, Secured Claim, or Priority Claim.

2.1.117  2.1.121  Voluntary Debtor(s).  The following  Chapter 11 debtors and debtors-in-possession, individually or collectively, Palmdale Hills, SunCal I, SunCal III, SCC Palmdale, Acton Estates, SunCal Beaumont, SunCal Emerald, SunCal Johansson, SunCal Bickford, SunCal Summit, Seven Brothers, Kirby Estates, SJD Partners, SJD Development, SCC Communities, Del Rio and Tesoro.

2.1.118  2.1.122  Voluntary Debtors' Committee.  The Official Committee of Unsecured Creditors of the Voluntary Debtors appointed in the Cases pursuant to Section 1102 of the Bankruptcy Code.

## 2.2    Rules of Construction.

For purposes of the Plan and this Disclosure Statement, unless otherwise provided herein or in the Plan, (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural; (b) each pronoun stated in the masculine, feminine or neuter includes the masculine, feminine and neuter; (c) any reference in the Plan or this Disclosure Statement to an existing document or schedule filed or to be filed means such document or schedule, as it may have been or may be amended, modified or supplemented pursuant to the Plan; (d) any reference to an entity as a Holder of a Claim or Interest includes that entity's successors and assigns; (e) except as otherwise indicated herein all references in the Plan or this Disclosure Statement to Sections, Articles and Exhibits are references to Sections, Articles and Exhibits of or to the Plan; (f) the words "therein," "thereunder" and "thereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; and (g) unless otherwise provided in the Plan or this Disclosure Statement, any reference in the Plan or this Disclosure Statement to a contract, instrument, release, indenture, agreement, or other document being in a particular form or on particular terms and conditions means that such document shall be substantially and materially in such form or substantially and materially on such terms and conditions; (h) any reference in the Plan or this Disclosure Statement to a document, schedule, or exhibit to the Plan or Disclosure Statement Filed or to be Filed means such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; and (i) the rules of construction set forth in Section 102 of the Bankruptcy Code shall apply to the extent such rules are not inconsistent with the express terms of the Plan or this Disclosure Statement or any other provision in this Section 2.2.

## 2.3    Exhibits.

All Exhibits to the Plan are incorporated into and are a part of the Plan as if set forth in full therein.

## III.

## PLAN CONFIRMATION DEADLINES

29    The Bankruptcy Court has not confirmed the Plan described in this Disclosure Statement.

30  Accordingly, the terms of the Plan are not binding on anyone.  However, if the Bankruptcy Court

31  confirms the Plan, then the Plan will be binding on the Debtor(s), the Plan Trustee, and on all

32  Creditors and Interest Holders in such Cases.

33    **3.1    Time and Place of the Confirmation Hearing.**

34    The hearing where the Bankruptcy Court will determine whether or not to confirm the Plan

35  will take place at 411 West Fourth Street, Santa Ana, CA 92701-4593 on October 24, 2011, at 9:30

36  a.m. in Courtroom 5A.

37    **3.2    Deadline for Voting for or Against the Plan.**

38    If you are entitled to vote, it is in your best interest to timely vote on the enclosed ballot and

39  return the ballot to:

40                Winthrop Couchot Professional Corporation
41                660 Newport Center Drive, Suite 400
                  Newport Beach, CA 92660
42                Facsimile:  (949) 720-4111
                  Attn:  P.J. Marksbury
43
44  Your ballot must be **received by**  September 26, 2011**,** or it will not be counted.

45    **3.3    Deadline for Objecting to the Confirmation of the Plan.**

46    Objections to the confirmation of the Plan must be filed with the Bankruptcy Court, and

47  served upon the following parties so that they are received by September 26, 2011:

48  | **Counsel to the Voluntary Debtors** | Paul J. Couchot |
49  | | Winthrop Couchot Professional Corporation |
    | | 660 Newport Center Drive, Suite 400, |
50  | | Newport Beach, CA 92660 |

51  | **Authorized Agent for Voluntary Debtors** | Bruce V. Cook |
    | | General Counsel |
52  | | 2392 Morse Ave |
    | | Irvine, CA 92614-6234 |

1

2  | **Counsel for SunCal Management LLC and SCC Acquisitions Inc.** | Ronald Rus |
    | | Rus Miliband & Smith A |
3  | | Professional Corporation |
    | | 2211 Michelson Drive, Seventh Floor |
4  | | Irvine, California 92612 |

-25-

**Authorized Agent for**     Bruce V. Cook
**SunCal Management and**     General Counsel
**SCC Acquisitions, Inc**.     2392 Morse Ave
                              Irvine, CA 92614-6234

### 3.4    Identity of Person to Contact for More Information Regarding the Plan.

Any interested party desiring further information about the Plan should contact the Voluntary Debtors' counsel, Winthrop Couchot Professional Corporation, 660 Newport Center Drive, Suite 400, Newport Beach, CA 92660, Attn:  Paul J. Couchot, (949) 720-4100; Peter W. Lianides, (949) 720-4155; Payam Khodadadi, (949) 720-4160.

### 3.5    Disclaimer.

The information contained in this Disclosure Statement is provided by the SunCal Plan Proponents.  The SunCal Plan Proponents represent that everything stated in this Disclosure Statement is true to the best of their knowledge.  The Bankruptcy Court has not yet determined whether or not the Plan is confirmable and makes no recommendation as to whether or not you should support or oppose the Plan.

The discussion in this Disclosure Statement regarding the Group IV: Voluntary Debtors may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995.  Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate," or "continue," or the negative thereof or other variations thereon or comparable terminology.  The reader is cautioned that all forward looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements.  The liquidation analyses, ~~distribution~~Distribution projections, projections of financial results and other information are estimates only, and the timing, amount and value of actual ~~distributions~~Distributions to Creditors may be affected by many factors that cannot be predicted.  Therefore, any analyses, estimates, or projections may or may not turn out to be accurate.

The SunCal Plan Proponents and their professionals have made a diligent effort to identify in this Disclosure Statement all Litigation Claims, including claims for relief, counterclaims, and objections to claims.  However, no reliance should be placed on the fact that a particular Litigation

-26-

29  Claim is or is not identified in this Disclosure Statement.  The Group IV: Voluntary Debtors or other

30  parties in interest may seek to investigate, file and prosecute Litigation Claims after the Confirmation

31  Date, or the Plan Trust may seek to do so after the Effective Date of the Plan whether or not the

32  Litigation Claims are identified in this Disclosure Statement.

33                                          **IV.**

34                      **FACTUAL BACKGROUND OF THE DEBTORS**

35      4.1     **The Formation of the Debtors and the Projects.**

36              4.1.1    **Overview of the Debtors and their Projects.**

37          The Group IV: Voluntary Debtors are two of twenty-six entities (collectively the "Debtors")

38  that were formed pursuant to a joint venture between Affiliates of the SunCal Companies ("SunCal")

39  and the Lehman Entities (the "SunCal/Lehman Joint Venture"). The Debtors role in the venture was

40  to own and develop the large residential projects that were the core assets in this joint undertaking. At

41  the inception of SunCal/Lehman Joint Venture, it was agreed that SunCal would be the

42  developer/manager of the Projects and the Lehman Entities would provide the necessary capital.

43  Attached hereto as Exhibit "1" is a general description of the Debtors' Projects, including the

44  Debtors' other primary Group IV: Voluntary Assets, excluding Cash and the Litigation Claims, and a

45  description of the loans for the Projects.

46          All of the Debtors are Affiliates of Acquisitions and SCC LLC.  Some of the Debtors directly

47  own the Projects, while others serve as holding companies, owning Allowed Interests in the Debtors

48  that hold title to the Projects.  SunCal Management, LLC, a SunCal Affiliate, has management

49  contracts with respect to all of the Projects and manages the Debtors' day-to-day business affairs.

50          The seventeen Debtors who are referred to herein as the "Voluntary Debtors" are wholly

51  owned by SunCal Affiliates, and consequently the SunCal Affiliates have full corporate governance

52  authority over these entities.  The Voluntary Debtors own eleven (11) of the Projects.  As described

1   herein, SJD Partners formerly owned the Pacific Point Project.  In the case of the nine Trustee

2   Debtors, the SunCal Affiliates and the Lehman Affiliates initially shared ownership equally (50%

3   each). However, after the Petition Date, the SunCal Affiliates became the owner of hundred percent

4

29  (100%) of the equity in two of the nine Trustee Debtors - SunCal Heartland and SunCal Marblehead.

30  The Trustee Debtors own nine (9) Projects.

31          Attached hereto as Exhibit "2" is a chart that sets forth the appraised value of the Debtors'

32  Projects.[2]  The Group IV: Voluntary Debtors value the Pacific Point Project at $16,000,000, which is

33  the subject of litigation described herein.  The $16,000,000 value reflects the estimate made by

34  SunCal's underwriting team.

35          **4.1.2    The Group IV: Voluntary Debtors' Primary Secured Creditors and**

36  **Their Disputed Claims**.

37          SJD Partners is a party to a certain loan agreement, dated February 16, 2006, by and among

38  Lehman ALI, SJD Development and SJD Partners, pursuant to which Lehman ALI made a loan in

39  the maximum aggregate principal amount of approximately $125,000,000 (the "Pacific Point First

40  Loan Agreement"). The Pacific Point First Loan Agreement is allegedly secured by a first-priority

41  deed of trust on the Pacific Point Project.  The Pacific Point First Loan Agreement had an asserted

42  balance due of $120,110,237 as of March 30, 2009.,  The ownership of the term loan portion of the

43  Pacific Point First Loan Agreement is allegedly held by Lehman Re, a Bermuda business entity and

44  the ownership of the revolving portion of this loan is allegedly held by Lehman ALI.  For more

45  detail, see Exhibit "3".

46          SJD Partners was also a party to a certain loan agreement, dated May 1997, by and between

47  Lehman ALI and SJD Partners, pursuant to which Lehman ALI initially made a loan in the maximum

48  aggregate principal amount of approximately $20,000,000 (the "Pacific Point Second Loan

49  Agreement").  The Pacific Point Second Loan Agreement was secured by a second-priority deed of

50  trust on the Pacific Point Project, which was foreclosed upon on August 28, 2008 by LV Pacific

51  Point, as assignee of Lehman ALI ("LV Pacific Point")

52          As stated, SJD Partners no longer owns the Pacific Point Project, ~~allegedly~~ due to the

1   foreclosure of the Pacific Point Project.  Pursuant to the Lehman Adversary Proceeding and the

2   Contract Action, the litigation over the Pacific Point Project is based on the following facts:

3

4

_____

[2] Values may have changed since these analyses were prepared.

29      Pursuant to the Restructuring Agreement and Settlement Agreement, the SunCal parties

30    agreed not to interfere with the foreclosure of the Pacific Point Project, in consideration for the

31    assumption and payment of the specified payables and other obligations.  Although LV Pacific Point,

32    Lehman ALI's designee, took title to the Pacific Point Project, it has failed and refused to pay any of

33    payables or obligations for which it is liable pursuant to the parties' agreements.  In other words, the

34    SunCal parties have done, vis-à-vis Pacific Point, everything they could do under the agreement.  Yet

35    the Lehman Entities, despite having gotten all of the benefits of the agreement in connection

36    therewith, have still refused to pay.

37      The Sixth Claim for Relief in the Contract Action for breach of contract is brought by SJD

38    Partners, Ltd. (the owner of the Pacific Point Project prior to the foreclosure) against Lehman ALI,

39    LV Pacific Point, PAMI LLC, and PAM Inc.(PAMI LLC's parent) for failure to pay urgent payables,

40    assumed Pacific Point obligations and lender authorized work.  This claim seeks damages in excess

41    of ten million dollars.

42      The Seventh Claim for Relief in the Contract Action for breach of contract is brought by

43    Elieff and SCC Acquisitions, Inc., against the same defendants for the same Pacific Point-related

44    obligations, seeking recovery of damages to the extent that these plaintiffs face exposure for these

45    amounts.  These plaintiffs also join with all other plaintiffs in the Eighth Claim for Relief in the

46    Contract Action against Lehman ALI for breach of the covenant of good faith and fair dealing, which

47    seeks damages in excess of $100 million.

48      Moreover, pursuant to the Lehman Adversary Proceeding, SJD Partners has a fraudulent

49    inducement action against LV Pacific Point and Lehmand Lehman ALI seeking rescission and/or

50    damages.

51      On June 17, 2011, Lehman Re filed a Motion For Judgment On The Pleadings And To

52    Expunge Lis Pendens Relating To The Pacific Point Property ("JOP Motion") in the Lehman

1    Adversary Proceeding.  In the JOP Motion, Lehman Re alleges that the SJD Partners'

2    requests request to undo rescind the foreclosure sale on the Pacific Point Project are is improper and

3    not available as a matter of law.  Based on the foregoing, Lehman Re further alleges that SJD's

4

efforts to reclaim the Pacific Point Project may be subject to dismissal in the near future by the Bankruptcy Court.

In particular, Lehman Re alleges that the foreclosure of the Pacific Point Project was based on a default on over $50 million worth of loans secured by the Pacific Point Project, which loans, according to Lehman Re were issued before the Restructuring Agreement was signed.  Lehman Re further alleges that SunCal received substantial benefits from the Lehman Entities' partial performance of the Restructuring Agreement, which according to Lehman Re would need to be returned in order to rescind the Restructuring Agreement.  Finally, Lehman Re asserts that the Debtors cannot rescind part~~, but not all,~~ of the Restructuring Agreement without rescinding all of it.

As set forth above, the SunCal Plan Proponents disagrees with these allegations and will continue the prosecution of the Lehman Adversary Proceeding and the Contract Action.  In fact, in a recent status conference, SJD Partners agreed, and Lehman Re declined, to set a hearing date on the JOP Motion.

### 4.1.3   A Summary of All of the Alleged Claims Against the Group IV: Voluntary Debtors.

Attached hereto as Exhibit "4" is a chart that sets forth the prepetition Claims that have been asserted against all of the Debtors.  In summary, the asserted Claims against the Group IV: Voluntary Debtors consist of the following:

| Claims | SJD Partners |
| --- | --- |
| Unpaid Secured Real Property Tax Claims | $0 |
| The Disputed Lehman Secured Claims | $120,110,237 |
| Mechanics Lien Claims | $0 |
| Administrative and Priority Claims | $550,693 |
| General Unsecured Claims Including alleged Bond Claims | $56,206,409 |

The SunCal Plan Proponents believe that these balances will ultimately be reduced through claims objections resulting in lower "Allowed" claims balances.

### 4.1.4   Summary of the Group IV: Voluntary Debtors' Cash.

The following chart sets forth the Group IV: Voluntary Debtors' cash on hand as of July 1, 2011.

| Group IV: Voluntary Debtors | Amount |
|---|---|
| SJD Partners | 19,622.94 |
| SJD Development | 205.99 |

The Group IV: Voluntary Debtors' review of the applicable loan and lien document indicates that any purported liens on the cash were not validly perfected because the accounts lack control agreements and therefore do not constitute "cash collateral."

**4.2    Factual Circumstances Leading to the Filing of the Debtors' Chapter 11 Cases.**

**4.2.1    Introduction.**

In this section of the Disclosure Statement, the SunCal Plan Proponents have provided a brief description of the relationship between the Debtors and the Lehman Entities. This background is relevant to the Group IV: Voluntary Debtors, and in fact all of the Debtors, for the following reasons. First, most of the unsecured claims asserted against the Debtors were incurred at the insistence of the Lehman Lenders, and they would have been paid if the Lehman Lenders had honored their obligation to pay these claims. Second, a substantial part of claims that the Lehman Lenders failed to pay are being asserted against *all of the Debtors*. If the litigation against the Lehman Lenders discussed herein is successful, it will, at a minimum, reduce the pool of claims against the Group IV: Voluntary Debtors, and thereby increase the dividend payable to the remaining creditors. Third and finally, this history allows the Creditors to take the measure of the parties who are now proffering the competing plan – the Lehman Lenders.  As the within discussion will establish, the Lehman Lenders failed to pay the claims of Creditors prepetition, and the Lehman Lenders attempted to destroy the Debtors' reorganization and sale efforts by manipulating LCPI's alleged automatic stay. s

**4.2.2    Background of the SunCal Companies.**

SunCal is a family-owned and operated real estate business that has been successfully developing properties throughout the western United States for over 70 years.  SunCal's business focuses upon the "development" of residential land. A typical SunCal development begins with the acquisition of one or more parcels of raw land. Thereafter, the SunCal team develops a master plan for the acreage that incorporates streets, homes, parks, schools and commercial areas, and then it works with the applicable municipal planning authorities (the city, county, state and federal) to

29  secure the necessary approvals or "entitlements" to gain approval of the Plan. This process, which

30  requires the assistance of land planners, civil engineers, architects, lawyers, and other land

31  specialists, takes a period of years. Once the master plan is approved, SunCal provides for the grading

32  of the project and the installation of the foundational infrastructure (streets, utilities, etc.) and then

33  sells the lots or parcels within the project to merchant builders.

34  **4.2.3    The Origins of the SunCal/Lehman Joint Venture.**

35  SunCal historically financed its projects with loans and/or equity from a number of different

36  sources.  However, beginning in 1997, an increasing number of SunCal's projects were financed by

37  the Lehman Entities, as Mark Walsh ("Walsh"), the head of LBHI's Global Real Estate Group,

38  began cultivating a business relationship with SunCal's principals.

39  By 2003, the Lehman Entities and SunCal had entered into joint ventures involving

40  approximately fifteen projects.  By 2007, that number had grown to over forty, and the Lehman

41  Entities had become, with limited exceptions, the exclusive provider of financing for the SunCal

42  Projects pursuant to a written agreement executed in 2006.  The Lehman Entities also consisted of

43  the Lehman Equity Members that either directly or indirectly owned a fifty percent (50%) equity

44  interest in all nine of the Trustee Debtors.

45  In their dealings with SunCal, the Lehman Representatives made no distinction between

46  Projects financed by Lehman ALI and Projects financed by LCPI. They also made no distinction

47  between the Debtors in which Lehman Equity Members held 50% equity memberships or the

48  Debtors in which the Lehman Entities held no equity membership interest.  As agents of the financial

49  partner in the parties' joint venture, the Lehman Representatives would determine which Lehman

50  Entity would provide financing on which Projects, and would dictate the structure that the financing

51  would take, according to whatever suited the Lehman Entities' needs.

52  **4.2.4    Lehman's Effective Control over the Management of the Debtors and**
1  **Promises of Ongoing Funding.**

2  Prior to the market downturn in the middle of 2007, Lehman Representatives afforded

3  SunCal substantial discretion in the management and development of the Projects.  The Debtors

4  would contract with third-party vendors to perform grading, health and safety compliance,

29  construction, landscaping, and other necessary services on the Project sites, and they would work

30  with the local municipalities to obtain the necessary entitlements and other authorizations necessary

31  to proceed with development.  The Lehman Representatives, SunCal and the Debtors would discuss

32  anticipated quarterly expenditures at periodic budget meetings, and , as expenses were incurred each

33  month, SunCal and the Debtors would submit requests for payment to the Lehman Representatives,

34  supported by the necessary documentation. The Lehman Representatives would then provide the

35  funding necessary to pay these expenses.

36  During the third quarter of 2007, the foregoing management and payment dichotomy

37  changed, after the real estate market experienced a sudden downturn, and many of the Projects

38  significantly declined in value.  In response to this dramatic economic change, a series of high level

39  discussions occurred between SunCal's representatives and the Lehman Representatives -- including

40  Walsh, Paul Hughson ("Hughson") and Frank Gilhool ("Gilhool"), the Managing Directors of

41  Lehman's Global Real Estate.  In these discussions, SunCal's representatives, acting on behalf of the

42  Debtors, expressed concerns about the loans on the Projects being out of balance, and suggested

43  shutting down the Projects, or at least slowing the pace of development.  However, Walsh

44  specifically instructed SunCal not to slow down or stop work.  He assured SunCal that the Lehman

45  Entities would provide the necessary funding to pay vendors and to keep the development of the

46  Projects moving forward.

47  The foregoing assurances of payments were confirmed in numerous telephone conversations

48  between Gilhool and SunCal's COO, Frank Faye ("Faye"), SunCal's General Counsel, Bruce Cook

49  ("Cook"), Steve Elieff and/or Bruce Elieff that took place during 2007 and 2008. In each exchange,

50  Gilhool assured SunCal that the Lehman Entities were committed to funding the debts and

51  obligations being incurred at the Projects and they continued to insist that work proceed.

52  During this time frame, the Lehman Representatives became much more "hands on,"

1  scrutinizing and approving all budgets and expenses through a new control and approval structure.

2  Under the new structure, SunCal would submit budgets to the Lehman Representatives on a weekly

3  basis and explain, during period conference calls, what Project payables they believe had to be paid

4  and what work had to be performed on the Projects.  The Lehman Representatives would then

29  unilaterally decide what future work would proceed, the Lehman Representatives would authorize

30  the work and the Lehman Representatives would decide what payables would be paid timely by

31  designating them as "urgent," and what other payables were not urgent and hence would not be paid

32  on a timely basis.  However, even under this new Lehman controlled management and payment

33  regime, the Lehman Representatives made it clear that all payables being incurred would be funded.

34              **4.2.5    The 2008 Restructuring Agreement.**

35              By the fall of 2007, both SunCal and the Lehman Representatives contemplated entering into

36  restructuring agreement in the near term, with a closing to occur no later than January or February of

37  2008.  However, this transaction was delayed by the Lehman Entities' extensive documentation

38  demands until May 23, 2008. On this date, SunCal and most of the Debtors finally entered into an

39  omnibus "Restructuring Agreement" with LBHI, Lehman ALI and the other Lehman Entities.  The

40  same Lehman Representative signed the Restructuring Agreement on behalf of all of the Lehman

41  Entities.

42              Pursuant to the Restructuring Agreement, Lehman ALI, "as the Lender with respect to each

43  Loan," committed, among other things, to: (1) make advances under existing loans to fund the

44  continuing costs necessary to preserve the value of the Projects; (2) move forward to resolve the

45  accrued outstanding subcontractor payables, i.e., to make sure that the Projects' creditors were paid

46  for their work; and (3) to close the transaction, whereby newly-created Lehman Entities would

47  assume the debt and obligations of the Projects.

48              As originally executed in May 2008, the Restructuring Agreement applied to twelve of the

49  twenty Projects (as well as several other projects not at issue in the Lehman Adversary Proceeding):

50  (1) Acton Estates; (2) Beaumont Heights; (3) Bickford Ranch; (4) Emerald Meadows; (5) Heartland;

51  (6) Johansson Ranch; (7) Marblehead; (8) Northlake; (9) Oak Valley; (10) Pacific Point; (11) Ritter

52  Ranch; and (12) Summit Valley.  The Debtors that owned and/or held equity interests in the entities

1   that owned these Projects were signatories to the May 2008 agreement.[3]

2   _____
3   [3] Specifically, the Restructuring Agreement was entered into by, among others, the "Borrowers," "Grantors" and
    "Pledgors," as defined in Annex 1 thereto.  The "Borrowers" included SunCal Marblehead, SunCal Heartland, SunCal
    Northlake, SunCal Oak Valley, SJD Partners, Palmdale Hills, SCC Palmdale, SunCal I, SunCal III, and SunCal Bickford.

4   The "Grantors" included SunCal Marblehead, SunCal Heartland, SunCal Northlake, SunCal Oak Valley, SJD Partners,
    Palmdale Hills, SunCal Bickford, SunCal Acton, SunCal Summit and SunCal Emerald, and Debtors SunCal Beaumont

29  Between May and August 2008, the parties agreed to add four additional projects to the

30  Restructuring Agreement: (1) Del Rio; (2) Joshua Ridge; (3) Palm Springs Village; and (4) Tesoro

31  Burnham, and the four Debtors associated with these Projects and other assets.

32  ### 4.2.6    The Lehman Lenders Hire Radco.

33  Subsequent to the execution of the Restructuring Agreement, Lehman ALI arranged for a

34  third party, Radco, to directly settle outstanding contractor payables, as its agent.  Radco was

35  provided some limited funding and authority to negotiate settlements, and did in fact reach settlement

36  with a number of creditors.  The funding for these settlements, whether the debts related to Lehman

37  ALI or LCPI funded Projects, came from the same source.  Lehman ALI and LCPI also provided

38  approval for new work on the Projects, and Lehman ALI paid for some of this work.  However, this

39  funding was minimal and it soon stopped.

40  In August 2008, Lehman ALI withdrew funding and settlement authority from Radco, leaving

41  millions of dollars in outstanding contractor payables unresolved, notwithstanding the contrary

42  provisions in the Restructuring Agreement.  ~~Leman~~Lehman ALI's actions also impaired the Debtors'

43  ability to resolve ongoing public health and safety issues arising at the Projects.  Ultimately,  only a

44  fraction of the total outstanding payables were resolved, contrary to the  past promises made by

45  Lehman Representatives.

46  ### 4.2.7    The Lehman Lenders' Failure to Close on the Settlement Agreement.

47  Pursuant to the terms of the Restructuring Agreement, the parties agreed to enter into a

48  Settlement Agreement, the form of which was attached to the Restructuring Agreement.  The

49  Settlement Agreement provided for the transfer of the Projects included within the Restructuring

50  Agreement to a series of  newly formed Lehman-controlled entities (each with "SCLV" in its name,

51  for "SunCal-Lehman Venture"). The agreement further provided that the entity taking title to the

52  Project would assume the  Lehman Lender debt obligations associated with the Projects, assume

1  certain bond obligations associated with the Projects, and provide indemnifications to SunCal and

2  the Debtors for unpaid claims.

3

4  and SunCal Johannson.

The "Pledgors" included SCC Palmdale, SunCal I, SunCal Summit and SJD Development.

On August 25, 2008, the Settlement Agreement and a series of related documents were formally executed by SunCal and the applicable Lehman Lenders and Lehman Equity Members at a meeting held in Los Angeles on August 25, 2008.  Once these documents were signed, all that remained was the mechanical closing of the series of transactions described in the Settlement Agreement. Since all of the conditions precedent to the closings had been satisfied, or could have been satisfied at the meeting, this should have occurred at the August 25, 2008 meeting. However, the Lehman Representative asked SunCal to extend the closing date for thirty days, to September 30, 2008. Accordingly to the Lehman Representatives, this short extension would enable them to secure certain outstanding third party consents. Although SunCal knew these third party consents were readily available, within a few days they agreed to this extension, believing the request was made in good faith. ~~In fact, as more fully explained blow, it was not.~~

### 4.2.8    The Lehman Lenders' Undisclosed Sale of Most of the Debtors' Loans.

As explained above, the Settlement Agreement was duly executed by all parties at a formal closing meeting held on August 25, 2008. When the parties signed this agreement, which was a binding contract, they both represented that they both intended and had the power and capacity to perform all of the obligations undertaken therein. However, in the case of the Lehman Entities, this representation was later discovered to be false. When the closing occurred on August 25, 2008, the Lehman Lenders had already sold the very obligations they were agreeing to assume and restructure in the Settlement Agreement to Fenway Capital pursuant to a repurchase agreement.  Accordingly, as of August 25, 2008, they lacked the power to perform the most essential undertakings that they agreed to perform in the Settlement Agreement. Instead of disclosing this fact at the August 25, 2008 meeting, the Lehman Lenders requested additional time to execute the agreed upon transfers provided for under this binding agreement. The Lehman Lenders needed this delay ~~for an obvious, but undisclosed reason: They~~ because they lacked the ability to perform the very obligations they had just agreed to perform in the Settlement Agreement.

The Lehman Representatives also did not disclose at the August 25, 2008 closing that they intended to sell the Pacific Point First Loan to Lehman Re, approximately a week later, *even though this loan was also subject to the Settlement Agreement*. To the contrary, the Lehman Representatives

29  affirmatively concealed these facts from SunCal and the Debtors by asserting that ownership still

30  existed in the case of seven of the eight loans.

### 4.2.9    Lehman's Foreclosure Sale and Purchase of the Pacific Point Project.

32        At the time the Restructuring Agreement and the Settlement Agreement were signed, the

33  Pacific Point Project, which was still owned by SJD Partners, was among the Projects included in the

34  Restructuring Agreement and the Settlement Agreement.  Pursuant to the Restructuring Agreement,

35  and as detailed in the Settlement Agreement attached thereto, SunCal, SJD Partners, and its parent

36  company, SJD Development, all agreed that they would not interfere with Lehman ALI's (or its

37  designee's) foreclosure on the Pacific Point Project. They further agreed that a new Lehman entity,

38  LV Pacific Point, would purchase the Pacific Point Project upon foreclosure and that Lehman ALI

39  and LV Pacific Point would (a) assume SJD Partners' and SJD Development's outstanding accounts

40  payable for Pacific Point third-party vendors, (b) assume certain bond liability associated with the

41  Pacific Point Project, and (c) pay for the millions of dollars worth of work that Lehman ALI

42  representatives had authorized.

43        As previously stated, the Settlement Agreement was signed on August 25, 2008 by the

44  SunCal parties, including SJD Partners and SJD Development.  It was also signed by Gilhool as

45  authorized signatory on behalf of both Lehman ALI and LV Pacific Point.  As a signatory to the

46  Settlement Agreement, LV Pacific Point was required to purchase the Pacific Point Project at the

47  foreclosure sale subject to the above obligations. Consistent with this agreement, the City of San

48  Juan Capistrano executed an estoppel certificate for the benefit of SJD Partners and Lehman

49  ALI—at Lehman ALI's request—on August 26, 2008, two days before the foreclosure sale.  This

50  certificate stated, among other things, that the "Acquiring Entity [LV Pacific Point] shall by

51  operation of law become the legal successor-in-interest to Developer [SJD Partners]" under SJD

52  Partners' agreements with the City. That certificate further provided that there existed no breaches,

1   defaults, or claims under SJD Partners' agreements with the City.

2         On August 28, 2008, Lehman ALI foreclosed on the Pacific Point Project, and title was

3   transferred to LV Pacific Point at the foreclosure sale.  However, Lehman ALI and LV Pacific Point

4   failed to assume the liabilities and obligations associated with this Project as agreed.   This breach of

29  the parties' agreement, left SJD Partners without title to the Pacific Point Project, but with the

30  potential liability for the unsecured claims relating to the Project, including bond claims of

31  approximately $34 million,.  Moreover, since Lehman ALI and LV Pacific Point have continued to

32  ignore their obligations under the above agreement, unpaid taxes, fines, and penalties have continued

33  to accrue to the detriment of the Project and these claims are being asserted against SJD Partners.

34      Had SunCal, SJD Partners and SJD Development known that Lehman ALI and LV Pacific

35  Point had no intention of honoring their obligations under the foregoing agreement, they never

36  would have agreed to cooperate with the foreclosure.  Instead, SJD Partners would have filed for

37  bankruptcy earlier, thereby mitigating the damages from Lehman ALI's breach, by allowing creditors

38  recourse to the value of the Project.

39      This course of conduct is relevant to the unsecured creditors of the Group IV: Voluntary

40  Debtors for the following reason. The holders of bond claims against SJD Partners are asserting their

41  massive claims against the estates of all of the Debtors, including the estates of the Group IV:

42  Voluntary Debtors. Accordingly, Lehman ALI's wrongs against SJD Partners directly affect the

43  Group IV: Voluntary Debtors' cases.

44      **4.2.10  <u>Alvarez and Marsal Take Over Control of the Lehman Entities After the</u>**

45      **<u>Chapter 11 Filings of LBHI and LCPI.</u>**

46      LBHI filed for bankruptcy in September 2008 and LCPI filed for bankruptcy in October

47  2008.  After LBHI's filing, Bryan Marsal ("Marsal") of Alvarez & Marsal ("A&M") was appointed

48  to serve as LBHI's Chief Restructuring Officer. Marsal and A&M are in charge of liquidating the

49  now defunct Lehman Entities, including Chapter 11 debtors LBHI and LCPI, and the non-bankrupt

50  Lehman Lenders (Lehman ALI, OVC, and Northlake Holdings, as well as the non-bankrupt Lehman

51  Equity Members.

52      Although A&M was not employed until after the events that occurred on August 25, 2008

1  described above, it should be noted that A&M hired the same law firm that represented the Lehman

2  Lenders in the August 25, 2008 meeting – Weil, Gotshal & Manges, LLP. Moreover, as more fully

3  explained herein, it was A&M that directed Lehman ALI not to perform its contractual obligations

4  under the Settlement Agreement after September of 2008. <span style="color:red">Accordingly, the same individuals that</span>

29 ~~caused the damages to unsecured creditors by insisting upon the breach of the Settlement~~

30 ~~Agreement, are now asking for their vote in the competing plan filed by the Lehman Lenders.~~

31       LBHI's bankruptcy filing and the Lehman Lenders refusal, at A&M's direction, to close the

32 transactions provided for under the Settlement Agreement as agreed, were not small matters. They

33 severely damaged the Debtors. Although the Debtors were not proceeding with any new construction

34 or development, the Debtors were still required to expend significant sums on site security, erosion

35 control, property taxes and other measures in order to prevent the Projects from becoming a public

36 safety hazard, and in order to avoid the loss of valuable entitlements, and to mitigate penalties and

37 fines being incurred by the Projects.  Although SunCal and the Debtors repeatedly requested that the

38 Lehman Entities pay for critical health and safety and value preservation measures on the Projects,

39 these efforts were unavailing.

40       Between October 9 and November 4, 2008, SunCal's general counsel Cook sent Robert

41 Brusco, an authorized agent of the Lehman Entities, nearly two dozen letters requesting that the

42 Lehman Lenders provide the funding necessary to address critical needs on the Projects as promised.

43 A summary of these health and safety notices are attached hereto as Exhibit "5".  The Lehman

44 Entities ignored these requests until November 2008, when Brusco, purportedly on behalf of the

45 Lehman Lenders, delivered the message that the Lehman Lenders were unwilling to fund the

46 Projects and that, instead, they intended to foreclose on all of the Projects.

47       As a result, as set forth in Exhibit "4," there are now over 240 vendors, municipalities,

48 counties and bonding companies claiming over $400 million in work, improvements and property

49 tax claims against the Projects.  Substantially all of these sums are due to work performed or bonded

50 at Lehman's request based upon Lehman's promises of payment.

51

52     **4.3**    **The Debtors' Potential Preferential Transfers**.

1 Attached hereto as Exhibit "6" are charts setting forth payments made to third parties during the

2 ninety (90) day time period preceding the filing of the Debtors' Chapter 11 Cases as well as

3 payments made to the Lehman Entities and to SunCal Affiliates during the one-year time period

4 preceding the filing of the Debtors' Chapter 11 Cases.

29   As the charts in Exhibit 6" indicate, Group IV: Voluntary Debtors made payments in the following

30   aggregate amounts to non-insiders within the 90 day preference period preceding the Petition Date:

31   SJD Partners: $748,926.28, SJD Development: $25.00.  The corresponding figures for payments

32   made to "insiders" within the one year preference period preceding the Petition Date were: SJD

33   Partners: $498,351.39, SJD Development: $0.00.

34                                              **V.**

35                **SIGNIFICANT EVENTS IN THE DEBTORS' CHAPTER 11 CASES**

36       **5.1.    Voluntary Debtors.**

37           **5.1.1    Joint Administration of the Voluntary Debtors and the Trustee Debtors.**

38           Since their respective Petition Dates, the seventeen (17) Voluntary Debtors have continued to

39   operate as "debtors-in-possession," subject to the supervision of the Bankruptcy Court and in

40   accordance with the Bankruptcy Code.  The Voluntary Debtors are authorized to operate their

41   businesses in the ordinary course during the Chapter 11 proceedings.  Transactions outside the

42   ordinary course of business must be approved by the Bankruptcy Court.

43           The Voluntary Debtors' Cases are being jointly administered pursuant to orders entered on

44   November 19, 2008 and December 9, 2008.  The Voluntary Debtors' Cases are being jointly

45   administered with the Trustee Debtors' cases pursuant to an order entered on March 11, 2009.

46           **5.1.2    The Voluntary Debtors Court Employed Professionals.**

47           The Voluntary Debtors have employed Winthrop Couchot Professional Corporation as their

48   general insolvency counsel, and the MB Firm as their special litigation counsel in the Lehman

49   Adversary Proceeding and the Contract Action.  The Voluntary Debtors' Committee has employed

50   Irell & Manella LLP as its counsel pursuant to an order entered on February 13, 2009.

51           Pursuant to the Court's Order regarding joint administration of the Voluntary Debtors, the

52   Voluntary Debtors' liability for professional fees is joint and several among the Voluntary Debtors'

1    Estates for fees incurred related to services for the benefit of all of the Voluntary Debtors.  The

2    Trustee Debtors' liability for professional fees is not joint and several.

3    Pursuant to the initial MB Firm employment application, Acquisitions was responsible for the

4    payment of their fees until December 31, 2009. The MB Firm's application also allows for payments

29  from the Bond Companies.  The initial MB Firm employment application reserved the right, should

30  the Lehman Adversary Proceeding result in a benefit accruing to particular Debtors' Estates, to

31  request that its fees and expenses be reimbursed by the Debtors' Estates.  The Bond Companies have

32  also agreed to jointly fund a portion of the professional fees and expenses of the MB Firm with

33  respect to the Lehman Adversary Proceeding.  The Bond Companies' funding commitment can be

34  terminated and after such a termination they will only be required to cover fees and costs incurred

35  during the period of their prior commitments.

36          The MB Firm employment application was subsequently amended.  Pursuant to an order

37  entered on April 14, 2010, (1) the Voluntary Debtors will pay up to one-half of the fees and expenses

38  incurred by the MB Firm from and after February 1, 2010 onward; and (2) the Trustee Debtors do not

39  have an obligation to pay any of the MB Firm's fees pertaining to the Trustee Debtors' estates, unless

40  and until a loan by the Voluntary Debtors to the Trustee Debtors is agreed to by the Trustee and

41  approved by the Court, or in accordance with the terms of the original employment applications to

42  the extent not superseded or modified by the amended employment application.  The order does not

43  affect the MB Firm's right to seek payment from the Bond Companies without the need for an

44  additional order of the Court.

45          The MB Firm filed an updated application seeking to further amend their employment to

46  include the right to pursue certain claims against the Lehman Entities and certain employees and

47  agents of these entities on behalf of the Voluntary Debtors.  The claims encompassed by this

48  amendment include claims that are based upon both prepetition and post-post petition actionable

49  conduct under both state law and federal law against the Lehman Entities and/or their agents.

50

51          **5.2.    <u>The Debtors' Disputes and Claims Against the Lehman Entities</u>.**

52          ~~**5.2.1.    The Lehman Adversary Proceeding.**~~

1           On January 6, 2009, the Voluntary Debtors initiated the Lehman Adversary Proceeding by

2   filing their initial complaint against Lehman ALI for equitable subordination of Lehman ALI's

3   Disputed Claims and avoidance of its Disputed Liens pursuant to Bankruptcy Code Section 510(c).

4   On February 3, 2009, the Debtors filed a First Amended Complaint, which added the Trustee

29  Debtors as co-plaintiffs and added various other causes of action.  The First Amended Complaint

30  also named OVC Holdings, Northlake Holdings and various other entities as defendants.

31  On March 11, 2009, the Debtors filed the Second Amended Complaint.  Pursuant to a

32  hearing on a motion to dismiss held on June 11, 2009, the Bankruptcy Court granted the Debtors

33  leave to amend the second amended complaint Second Amended Complaint.  Thus, on July 10, 2009,

34  the Debtors filed their Third Amended Complaint.  The Third Amended Complaint addressed many

35  of the concerns raised by the Bankruptcy Court and also included various Avoidance Actions and

36  other causes of action against the Lehman Lenders and the Lehman Successors.  The Third Amended

37  Complaint also added Fenway Capital as a defendant based upon, the discovery of the facts relating

38  to the sale of the loans Fenway Capital and based upon the Court ruling that the Repo was a true sale.

39  On September 30, 2009, the Lehman Entities filed a motion to dismiss the Third Amended

40  Complaint (which motion was amended on October 7, 2009 and October 22, 2009), alleging that the

41  relief requested by certain Debtors was not available as a matter of law.  On September 30, 2009,

42  Fenway also filed a motion to dismiss the Third Amended Complaint.  On January 26, 2010 and

43  January 28, 2010, the Debtors filed oppositions to the motions to dismiss the Third Amended

44  Complaint filed by the Lehman Entities and Fenway, respectively.  On February 4, 2010, the Lehman

45  Entities and Fenway filed their respective replies.  The Court entered an order granting in part and

46  denying in part the relief requested in the motions to dismiss. Most notably, the Court denied  the

47  defendants' request for the dismissal of  the equitable subordination claims and the Court permitted

48  the Debtors to file an amended complaint.  LCPI was dismissed as a defendant at this hearing, due to

49  the fact that it did not own any interest in the loans at issue and due to potential impact of the case

50  upon LCPI's automatic stay.  On March 26, 2010, the Debtors filed their Fourth Amended

51  Complaint. The following is a summary of the causes of action set forth in the Fourth Amended

52  Complaint: relating to the Group IV: Voluntary Debtors.

1  **5.2.1**  5.2.2  **Equitable Subordination.**

2  Based on the pre-petition inequitable conduct of the Lehman Entities, the Debtors have

3  sought to subordinate the claims and avoid the liens of the Holders of the Lehman Disputed Loans to

4

29    the extent necessary to pay the Claims of unpaid Creditors that were damaged by the inequitable

30    conduct.

### 5.2.2    Fraudulent Inducement.

31

32    The second claim for relief in the Lehman Adversary Proceeding asserts that Lehman ALI

33    and LV Pacific Point represented under the terms of the Restructuring Agreement and under the

34    Settlement Agreement that Lehman ALI and/or LV Pacific Point would assume the millions of

35    dollars in outstanding accounts payable for the Pacific Point Project third-party vendors and millions

36    of dollars in bond obligations, as well as pay for work authorized by Lehman ALI to be performed in

37    order to induce the Group IV: Voluntary Debtors, then the owner of the Pacific Point Project, to

38    consent to LV Pacific Point foreclosing upon the property.  According to this claim for relief, these

39    representations were in fact false and induced the Group IV: Voluntary Debtors' consent.  As a result

40    of these representations and the foreclosure, LV Pacific Point and Lehman ALI have left millions of

41    dollars in outstanding payables and bond liabilities on which the Group IV: Voluntary Debtors

42    remain exposed.

43    ### 5.2.3. 5.2.3 The Lehman Recoupment Objection and the Contract Action.

44    Pursuant to the terms of the joint ventures entered into by and among the Debtors and the

45    Lehman Entities, the Lehman Entities were responsible for paying the costs incurred in the

46    development of the Projects. These costs included the claims of the vendors who provided goods and

47    services to the Projects and the claims asserted by the Bond Claimants. Although the Lehman

48    Entities contend that they were merely "lenders," and that they did not assume any liability for these

49    claims, as the above facts and those that will be adduced prior to and at the confirmation of the Plan

50    will demonstrate, the Lehman Entities are in fact obligated to pay these claims.

51    The Debtors contend that the Lehman Entities have contractual liability on various grounds,

52    including the following. First, the Lehman Entities were either in a joint venture relationship with the

1    Debtors from the outset, or this relationship developed and became a legal fixture through the

2    Lehman Entities' course of conduct. Pursuant to this relationship, and the promises and

3    representations made therein, the Lehman Entities agreed to be responsible for all vendor and Bond

4    Claims incurred at or in connection with the Projects. The role of each of the Debtors, by mutual

29   agreement, was to provide development expertise and project management services. The Lehman

30   Entities were required to provide the capital necessary to fund the Projects.

31       Second, during the last eighteen months of the relationship between the parties, the Lehman

32   Entities assumed direct responsibility for all claims incurred during this period, by insisting that

33   work continue on the Projects and by repeatedly promising to pay for this work. Since the Lehman

34   Entities ordered this work, and promised to pay for the same, they bear this financial responsibility.

35       Third and finally, the Lehman Entities expressly agreed to pay the vendor and bond claims

36   described in the Restructuring Agreement and in the ~~interrelated~~related Settlement Agreement, but

37   failed to do so as contractually agreed.

38       It is the SunCal Plan ~~Proponent's~~Proponents' contention that the Lehman Entities' failure to

39   pay the vendor and Bond Claims associated with the Projects (as was their obligation under the terms

40   of the joint ventures, the Restructuring Agreement and the Settlement Agreement) unjustly shifted

41   responsibility for these liabilities to the Debtors in breach of the terms of joint venture, the

42   Restructuring Agreement and the Settlement Agreement.  Accordingly, the SunCal Plan Proponents

43   have filed the Lehman Recoupment Objection which seeks the disallowance of certain claims filed

44   by the Lehman ALI, including inter alia the claim filed against SJD Partners:

| Claim No. | Relevant SunCal Debtors | Current Claim Holder | Claim Amount |
|-----------|-------------------------|----------------------|--------------|
| 23        | SJD Partners            | Lehman ALI           | $120,110,237 |

47   In the Lehman Recoupment Objection, the SunCal Plan Proponents seek the following relief:

48       1) Disallowance of the claims asserted by the Lehman Lenders in their

49       entirety, pending compliance with the terms of the Restructuring Agreement

50       and the Settlement Agreement;

51       2) A reduction in the amount of the Lehman Entities' secured claims by the

52       amount of damages resulting from the Lehman Entities' breach of their

1        obligations under these agreements; and/or

2        3)  An order barring the Lehman Entities from enforcing their rights under

3        the Lehman Loans until they cure their breaches under the above

4        agreements.

29    The first prayer for relief above is premised upon the contention that the Lehman Entities

30    agreed to transfer ownership of the Projects described in this agreement to a series of newly formed

31    entities under the control of the Lehman Entities, pursuant to the terms of the Settlement Agreement.

32    This agreement further provided that these new entities would assume the vendor payables and

33    certain Bond Claims associated with these projects.  Finally, this agreement included a covenant not

34    to sue, pursuant to which the Lehman Entities were barred from seeking further recourse against the

35    Debtors.

36    The SunCal Plan Proponents believe that the positions asserted in the Lehman Recoupment

37    Objection are well grounded in fact and in law. Had the Lehman Entities complied with their

38    contractual obligations, substantially all of the Group IV: Voluntary Debtor's liabilities would have

39    been eliminated, SJD ~~Parnters~~Partners would not have had to file Chapter 11, and the Lehman

40    Entities would be barred from asserting claims against SJD Partners based upon the Lehman

41    Disputed Loans. It is the SunCal Plan Proponents' position that the Lehman Entities' effort to

42    enforce claims based upon Lehman Disputed Loans is directly contrary to the basic agreements

43    reached in the Restructuring Agreement and in the related Settlement Agreement.

44    The Lehman Entities dispute the merits of the Lehman Recoupment Objection. It the Lehman

45    Entities' position that it was within their absolute "discretion" to pay, or not to pay, the vendor

46    payables incurred during the term of the Restructuring Agreement, even where they authorized the

47    work. Accordingly, they cannot, in their assessment, be held liable for these obligations. In the case

48    of the Settlement Agreement, the Lehman Entities contend that this agreement never became

49    effective and therefore they were not bound to comply with its terms. The SunCal Plan Proponents

50    do not believe that the positions asserted by the Lehman Entities are supported by the facts, or

51    existing law.

52    In addition to the Recoupment Claim Objections, certain Voluntary Debtors, including SJD

1    Partners, have also filed the Contract Action against Lehman ALI and other non-debtor Lehman

2    Entities in Orange County Superior Court. The Contract Action is based on Lehman ALI's breach of

3    contract on the Restructuring and Settlement Agreements.  On May 9, 2011, the Defendants in the

4    Contract Action filed a Notice of Removal which removed the Contract Action from the Orange

29  County Superior Court to the Bankruptcy Court, as adversary no. 8:11-ap-01212ES.  The Voluntary

30  Debtor-Plaintiffs moved to remand the Contract Action back to the Orange County Superior Court

31  ("Remand Motion").  The Bankruptcy Court denied the Remand Motion at the hearing on July 12,

32  2011.

33          Although LCPI's automatic stay remains an impediment to the pursuit of many of the causes

34  of action in the Lehman Adversary Proceeding, the existence of this stay will not bar the SunCal Plan

35  Proponents from implementing the material terms of the Plan for the Group IV Voluntary Debtors

36  for the following reason. LCPI is not a creditor of the Group IV Voluntary Debtors.  LCPI's

37  automatic stay does not bar the pursuit of the Lehman Claim Objections or the Contract Action.  If

38  these objections are successful, the claims of the Lehman Entities will be disallowed, either in whole

39  or in part, or the Lehman Entities will be barred from pursuing these claims until they pay what they

40  owe to the Group IV Voluntary Debtors.  If the Contract Action is successful, it will generate a

41  further recovery for creditors of the Group IV Voluntary Debtors.  In either scenario, the Plan filed by

42  the SunCal Plan Proponents is feasible and will yield a favorable return for creditors.

43          **5.2.4    The Debtors' Motion for a Stay to Suspend Certain Lehman Actions**.

44          On September 21, 2010, the Voluntary Debtors, Acquisitions, and SunCal Management filed

45  a motion requesting, among other relief, for the Court to suspend the Lehman Entities competing

46  plan and disclosure statement unless and until the Lehman Entities agree to provide the Debtors with

47  relief from their automatic stay in the Debtors' Chapter 11 Cases (the "Suspension Motion").  The

48  Court granted this motion and stayed all matters until March 1, 2011. The Court also ordered the

49  parties to engage in a mediation. The Voluntary Debtors and the Lehman Entities were unable to

50  settle their claims through this process.

51          **5.3**    ~~5.3.~~ **The Debtors' Other Litigation with Non-Lehman Related Parties**.

52          **5.3.1    The Debtors' Failed Preliminary Injunction Motion Against the Holders**

1                          **of Bond Claims**.

2          On February 20, 2009, the Debtors filed a complaint and a Motion for Preliminary

3  Injunction, pursuant to which the Debtors sought a Motion for Preliminary Injunction against the

4  Holders of Bond Claims from pursuing such Claims. On February 23, 2009, the Court denied the

29  Debtors' request for the TRO and granted the Debtors' request to require the defendants to show

30  cause why the Motion for Preliminary Injunction should not be issued.

31        On March 2, 2009, several Holders of Bond Claims objected to the Motion for the

32  Preliminary Injunction.  The objections generally alleged that the Debtors failed to show that the

33  balancing of the equities favored granting the Preliminary Injunction versus the harm to the Holders

34  of the Bond Claims.  At a hearing held on March 4, 2009, the Court denied the Preliminary

35  Injunction Motion and the underlying complaint has subsequently voluntarily been dismissed

36  without prejudice.

37        ### 5.3.2    The Contractors' Successful Motions for Relief from Stay to Pursue the

38                    Bond Claims.

39  Various contractors that were hired to perform work on some of the Projects have filed motions for

40  relief from stay with the Bankruptcy Court to pursue their purported Bond Claims.  These creditors

41  have requested that the Bankruptcy Court grant these creditors relief from the automatic stay to allow

42  such creditors to enforce certain Claims that such creditors allege to have against some of the

43  Debtors, including certain surety bonds that are alleged to have been issued in favor of such

44  creditors.  The Debtors opposed the motions on the grounds that the various Debtors are

45  indispensible parties.  The Court conditionally granted the motions provided that the Bond

46  Claimants are able to sever the Debtors from their proceedings on the Bonds.

47        ### 5.3.3    Bond Safeguard Motion and Claims.

48        Bond Safeguard, a surety that issued bonds to secure the performance of work on certain

49  projects, filed a motion seeking authority to file claims against the Trustee Debtors relating to these

50  bond claims after the bar date. The Debtors opposed this motion. This motion was granted pursuant

51  to an order entered on January 7, 2011.

52  The Bond Issuers assert that surety bonds were executed on behalf of all of the SunCal Debtors and

1  the Bond Indemnitors.  However, Bond Safeguard only filed proofs of claims asserting joint and

2  several liability ("Cross-Indemnity Claims") against the Trustee Debtors.  Bond Safeguard did not

3  file any Cross-Indemnity Claims against the Voluntary Debtors.

4        ### 5.4    LitCo

As more fully explained in Article VII, pursuant to the terms of the Plan, LitCo, which shall be a Delaware limited liability company, will be making an offer to purchase the Reliance Claims held by the Reliance Claimants in Class 3.1 pursuant to the Plan. LitCo will be capitalized by a third party capital partner with the funds necessary to fund this claims purchase. Once the Reliance Claims are purchased, LitCo will pursue these claims against the Lehman Entities. Since LitCo will be purchasing the Reliance Claims with non-estate assets, the Plan Trust will not receive any part of the recoveries obtained on these purchased claims.

**5.5     Reliance Claims.**

The Reliance Claims listed on Exhibit 8 attached to this Disclosure Statement (which consist of Allowed Unsecured Claims, Allowed Mechanic's Lien Claims, or Allowed Bond Indemnification Claims against the applicable Debtor that would entitle the Holder thereof to be the beneficiary of any equitable subordination judgment obtained against a Lehman Entity by such Holder) were determined to be Reliance Claims based on a number of factors. An analysis was made of the books and records of the applicable Debtor to determine the amounts billed to the applicable Debtor by the particular creditor and what, if any, defenses there may be to such claims. The bankruptcy schedules filed for the applicable Debtors were reviewed along with the proofs of claim filed by creditors in the respective bankruptcies, and such amounts were compared to the books and records of the applicable Debtor. An analysis was made of the list of creditors and amounts contained in the Restructuring Agreement executed with Lehman entities on May 23, 2008, and the Settlement Agreement executed with Lehman entities on August 25, 2008, with respect to amounts Lehman entities had agreed to assume in connection with such agreements. Furthermore, there was taken into account the actions of Lehman in instructing SunCal to proceed with the entitlement, development and/or maintenance of the particular projects and that SunCal did so in reliance on promises of funding, as outlined in the Litigation Claims that have been summarized in this Disclosure Statement. Taking all of these factors into consideration, Exhibit 8 was prepared based on the determination by the SunCal Plan Proponents that these claims, as listed in Exhibit 8, are Reliance Claims, as that term is defined in this Disclosure Statement. The SunCal Plan Proponents are willing to commit to the amounts listed in Exhibit 8 as allowed Reliance Claims so long as the particular creditor does not dispute the

29   amount thereof, but if a creditor disputes the amount, the SunCal Plan Proponents reserve all rights

30   in connection with the amount of any such claim and whether or not it would be a Reliance Claim for

31   purposes hereof.

32                                          **VI.**

33                      <u>**TREATMENT OF UNCLASSIFIED CLAIMS**</u>

34          **6.1     <u>Introduction</u>**. As required by the Bankruptcy Code, the Group IV: Voluntary

35   Debtors Plan places Claims and Interests into various Classes according to their right to priority.

36   However, certain types of Claims are not classified in any Classes under the Group IV: Voluntary

37   Debtors Plan.  These Claims are deemed "unclassified" under the provisions of the Code.  They are

38   not considered impaired and they do not vote on the Group IV: Voluntary Debtors Plan, because they

39   are automatically entitled to specific treatment provided for them in the Code.  As such, the SunCal

40   Plan Proponents have not placed the following Claims in a Class.  The treatment of these

41   unclassified Claims is as provided below.

42          **6.2     <u>Treatment of Allowed Administrative Claims</u>.**

43          The Code requires that all Allowed Administrative Claims be paid on the later of Effective

44   Date of the Group IV: Voluntary Debtors Plan or the date of their allowance, unless a particular

45   Holder agrees to a different treatment.  The treatment of Allowed Administrative Claims is as

46   described below.  However, such Administrative Claims are continuing to be incurred.  The Allowed

47   Administrative Claims shall be paid from the applicable Distribution Account(s).

48          Except to the extent that the Holder of an Allowed Administrative Claim agrees to a different

49   treatment and subject to the Administrative Claims Bar Date set forth herein, the Distribution Agent

50   shall pay each Allowed Administrative Claim in full, in Cash, on the later of (i) the Effective Date,

51   (ii) within ten (10) Business Days after the date such Administrative Claim becomes an Allowed

52   Administrative Claim, or (iii) the date such Allowed Administrative Claim becomes due according

1    to its terms. Notwithstanding the foregoing, any Allowed Administrative Claim representing

2    obligations incurred in the ordinary course of post-petition business by the Debtors in Possession

3    (including without limitation post-petition trade obligations and routine post-petition payroll

4

29   obligations) shall be paid in full or performed by the Plan Trustee in the ordinary course of business,

30   in accordance with the terms of the particular obligation.

31   **6.3**        **Administrative Claims Bar Date.**

32   All applications for final compensation of Professionals for services rendered and for

33   reimbursement of expenses incurred on or before the Effective Date and all other requests for

34   payment of Administrative Claims incurred before the Effective Date under Sections 507(a)(2) or

35   507(b) of the Bankruptcy Code (except only for (i) post-petition, ordinary course trade obligations

36   and routine post-petition payroll obligations incurred in the ordinary course of the Group IV:

37   Voluntary Debtors' post-petition business, for which no bar date shall apply, and (ii) post-petition

38   tax obligations, for which no bar date shall apply) shall be Filed with the Bankruptcy Court and

39   served upon the Plan Trustee no later than the Administrative Claims Bar Date, unless such date is

40   extended by the Bankruptcy Court after notice to the Plan Trustee.  Any such request for payment of

41   an Administrative Claim that is subject to the General Administrative Claims Bar Date and that is

42   not Filed and served on or before the Administrative Claims Bar Date shall be forever barred; any

43   party that seeks payment of Administrative Claims that (i) is required to file a request for payment of

44   such Administrative Claims and (ii) does not file such a request by the deadline established herein

45   shall be forever barred from asserting such Administrative Claims against the Group IV: Voluntary

46   Debtors, the Plan Trust, their estates, or any of their property.

47   **6.4**        **Treatment of Unsecured Tax Claims.**

48   Tax Claims are certain unsecured income, employment and other taxes described by Code

49   Section 507(a)(8).  The Code requires that each holder of such a Section 507(a)(8) tax claim receive

50   the present value of such Claim in deferred cash payments, over a period not exceeding five (5) years

51   from the petition date and that such treatment not be less favorable than the treatment accorded to

52   non priority unsecured creditors.

1    At the election of the Plan Trustee, the Holder of each Allowed Priority Tax Claim shall be

2    entitled to receive, on account of such Claim, (i) equal cash payments on the last Business Day of

3    each three-month period following the Effective Date, during a period not to exceed five years after

4    November 6, 2008, totaling the principal amount of such Claim plus simple interest on any unpaid

balance from the Effective Date, calculated at the interest rate available on ninety (90) day United States Treasuries on the Effective Date, (ii) such other treatment agreed to by the Holder of the Allowed Priority Tax Claim and the Plan Trustee, provided such treatment is on more favorable terms to the Group IV: Voluntary Debtors (or the Plan Trust after the Effective Date) than the treatment set forth in clause (i) hereof, or (iii) payment of the full Allowed Priority Tax Claim in Cash.

**6.5    Summary of the Plan's Treatment of Bond Indemnity Claims.**

Allowed Bond Indemnification Claims are treated as Reliance Claims.  In the event that such Bond Indemnification Claim arises from a general unsecured claim, it is classified in Class 3.

## VII.

## CLASSIFICATION OF CLAIMS AND INTERESTS

As required by the Code, the Group IV: Voluntary Debtors Plan places Claims and Interests into various Classes according to their right to priority and other relative rights.  The Group IV: Voluntary Debtors Plan specifies whether each Class of Claims or Interests is impaired or unimpaired, and the Group IV: Voluntary Debtors Plan sets forth the treatment each Class will receive.  The table below lists the Classes of Claims established under the Group IV: Voluntary Debtors Plan and states whether each particular Class is impaired or left unimpaired by the Group IV: Voluntary Debtors Plan.  A Class is "unimpaired" if the Group IV: Voluntary Debtors Plan leaves unaltered the legal, equitable and contractual rights to which the Holders of Claims or Interests in the Class are entitled, with certain exceptions specified in the Bankruptcy Code.

| CLASSIFICATION OF LEHMAN'S DISPUTED CLAIMS AGAINST THE GROUP IV: VOLUNTARY DEBTORS | | |
|---|---|---|
| **Class 1** | **Claims** | **Claim Nos.** |
| Class 1.1 | The Holder of the Disputed Claim filed by Lehman ALI on behalf of Lehman Re and Lehman ALI against SJD Partners arising from the Pacific Point First Loan Agreement in the asserted amount of $120,110,237. | SJD Partners No. 23; SJD Development No. 2<br><br>Disputed in the Amount of $120,110,237 |
| Class 1.2 | The Holder of Lehman's Disputed (Contingent) Claim | SJD Partners No. |

| CLASSIFICATION OF LEHMAN'S DISPUTED CLAIMS AGAINST THE GROUP IV: VOLUNTARY DEBTORS | | |
|---|---|---|
| **Class 1** | **Claims** | **Claim Nos.** |
| | filed by Lehman ALI against SJD Partners arising from the Pacific Point Second Loan Agreement. | 24 <br><br> Disputed |

| CLASSIFICATION OF PRIORITY UNSECURED CLAIMS AGAINST THE GROUP IV: VOLUNTARY DEBTORS | | |
|---|---|---|
| **Class 2** | **Claimant** | **Claim Nos.** |
| Class 2.1 | The Holder of Priority Claims that fall within Code Sections 507(a)(4), (5), (6), and (7). | Schedule Amount and SJD Partners No. 12 in the Estimated Amount of $4,188 |

| CLASSIFICATION OF GENERAL UNSECURED CLAIMS THAT QUALIFY AS RELIANCE CLAIMS[4] AGAINST THE GROUP IV: VOLUNTARY DEBTORS AS SET FORTH IN EXHIBIT "8" | | |
|---|---|---|
| **Class 3** | **Claimant** | **Claim Nos.** |
| Class 3.1 | The holders of Reliance Claims against SJD Partners. | Various Filed and Scheduled Claims in the Estimated Amount of $6,419,915 |

| CLASSIFICATION OF GENERAL UNSECURED CLAIMS THAT DO NOT QUALIFY AS RELIANCE CLAIMS AGAINST THE GROUP IV: VOLUNTARY DEBTORS | | |
|---|---|---|
| **Class 4** | **Claimant** | **Claim Nos.** |
| Class 4.1 | Claimants holding Allowed Unsecured Claims against SJD Partners that are not Reliance Claims, including any Allowed deficiency claim arising from the Pacific Point First Loan and/or the Pacific Point Second Loan. | Various Filed and Scheduled Claims in the Estimated Amount of $49,786,494 |

---

[4] Unsecured Claims are generally placed within the same class and they receive the same treatment under the Group IV: Voluntary Debtors Plan. However, the SunCal Plan Proponents have divided Unsecured claims into two classes in the Group IV: Voluntary Debtors Plan. This separate classification has been implemented for the following reason. The Holders of Unsecured Claims who are referred to as "Reliance Claimants," hold specific Litigation Rights that are referred to herein as "Reliance Claims." The other Unsecured Creditors do not hold Reliance Claims.

| CLASSIFICATION OF INTEREST HOLDERS AGAINST THE GROUP IV: VOLUNTARY DEBTORS | | |
|---|---|---|
| **Class 5** | **Claimant** | **Amount** |
| Class 5.1 | Allowed Interests in SJD Partners held by SJD Development. | 100% |
| Class 5.2 | Allowed Interests in SJD Development held by Elieff. | 100% |

## VIII.

## THE PLAN'S TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS

**8.1.**    **The Plan's Treatment of Lehman's Disputed Secured Claim(s) and Disputed Lien(s) Against Group IV: Voluntary Debtors (Classes 1.1 and 1.2).**

The Disputed Secured Claims within Classes 1.1 and 1.2 shall be disallowed pursuant to Bankruptcy Code Sections 506(a) and 506(d) because there is no collateral to support such alleged Claims and the liens shall be declared null and void.   Therefore, the Holders of such Disputed Secured Claims shall not receive a Distribution under the Plan.  To the extent that any Allowed deficiency Claim arises under Classes 1.1 and 1.2 Claims, such Claims shall be treated as Class 4.1 General Unsecured Claims.

**8.2.**    **The Plan's Treatment of Holders of Priority Claims Against Group IV: Voluntary Debtors (Class 2.1)**.

The treatment of the Holders of Allowed Priority Claims under the Group IV: Voluntary Debtors Plan shall be as follows**:**

A.    The Holder(s) are unimpaired under the Group IV: Voluntary Debtors Plan; and

B.    The Holder(s) shall be paid ~~either~~ from the applicable Distribution Account(s) ~~or Litco Plan Loan~~ (i) the full amount of such Allowed Priority Claim in Cash on the later of (x) the Effective Date, (y) the date such Claim becomes an Allowed Priority Claim or (z) the date such Allowed Priority Claim becomes payable in accordance with the terms governing such Allowed Priority Claim, or (ii) upon such other less favorable terms as may be agreed to by such Holder and the Plan Trustee.

**8.3.    The Plan's Treatment of Holders of General Unsecured Claims Against Group IV: Voluntary Debtors that are Reliance Claims  (See Exhibit 8 to Disclosure Statement) (Class 4.1).**

The rights of Holders of Allowed Class 4.1 Claims are impaired under the Group IV: Voluntary Debtors Plan and shall be treated as follows:

A.    On the Distribution Date, such Holders shall receive a Distribution in cash, on the Effective Date, equal to one percent (1%) of such claimant's Allowed Claim from the LitCo Plan Loan.

B.    On or after the Distribution Date, such Holders shall receive a pro-rata share of any funds payable from the applicable Distribution Account(s), including the Litigation Recoveries (inclusive of applicable Litigation Recoveries from the Lehman Adversary Proceeding), after payment in full of all Post Confirmation Expenses, Allowed Administrative Claims, Allowed Priority Claims, if and when such funds become available for Distribution.

C.    If ~~Litco.~~during the Plan term, LitCo, and/or its designee, acquires the Pacific Point Project free and clear of all claims and liens (with the exception of Allowed Contingent Bond Indemnification Claims), and to the extent the ~~Distribution~~Distributions to date made to such Holders is less than 50% on account of such Allowed Claims, such Holders shall receive an additional Distribution equal to the difference between the ~~Distribution~~Distributions previously provided to such Holders and a 50% Distribution on account of such Holders' Allowed Claims in full satisfaction of such Allowed Claims.  Currently, the Pacific Point Project is owned by LV Pacific Point, a Lehman ALI Affiliate.  Consequently, at the present time, free and clear title to the Pacific Point Project cannot be obtained absent the consent of Lehman ALI, and it is uncertain whether such consent will be obtained.

**8.4.    The Plan's Treatment of Holders of Allowed General Unsecured Claims Against Group IV: Voluntary Debtors that Are Not Reliance Claims (Class 5.1).**

29   The rights of Holders of Allowed Class 5.1 Claims are impaired under the Group IV:

30   Voluntary Debtors Plan.  Under the Group IV: Voluntary Debtors Plan, each claimant shall receive

31   their pro-rata share of any funds payable from the applicable Distribution Account(s) arising from

32   Litigation Claims (excluding recoveries from the Lehman Adversary Proceeding), after payment in

33   full of all Post Confirmation Expenses, Allowed Administrative Claims, and Allowed Priority

34   Claims.

35   **8.5.    The Plan's Treatment of Holders of Allowed Interests Against Group IV:**

36   **Voluntary Debtors.**

37   The Interests of the Holders in Class 6.1 to 6.3 are impaired under the Group IV: Voluntary

38   Debtors Plan. All such Interests shall be cancelled as of the Effective Date and no Distribution shall

39   be made to these Holders on account of such Interest(s).

40

41

42

43   **IX.**

44   **ACCEPTANCE OR REJECTION OF THE PLAN**

45   **9.1.    Introduction.**

46   PERSONS OR ENTITIES CONCERNED WITH CONFIRMATION OF THE PLAN

47   SHOULD CONSULT WITH THEIR OWN ATTORNEYS BECAUSE THE LAW ON

48   CONFIRMING A PLAN OF REORGANIZATION IS VERY COMPLEX.  The following

49   discussion is intended solely for the purpose of alerting readers about basic confirmation issues,

50   which they may wish to consider, as well as certain deadlines for filing Claims.  The Group IV:

51   Voluntary Debtors cannot represent that the discussion contained below is a complete summary of

52   the law on this topic.

1   Many requirements must be met before the Court can confirm the Plan.  Some of the

2   requirements include that the Plan must be proposed in good faith, acceptance of the Plan, whether

3   the Plan pays creditors at least as much as creditors would receive in a Chapter 7 liquidation, and

4

29 | whether the Plan is feasible.  The requirements described herein are <u>not</u> the only requirements for

30 | confirmation.

31 | **9.2.    <u>Who May Object to Confirmation of the Plan</u>.**

32 | Any party in interest may object to the confirmation of the Plan, but as explained below not

33 | everyone is entitled to vote to accept or reject the Plan.

34 | **9.3.    <u>Who May Vote to Accept/Reject the Plan</u>.**

35 | A Holder of a Claim or Interest has a right to vote for or against the Plan if that Holder of the

36 | Claim or Interest has a Claim which is both (1) Allowed or Allowed for voting purposes and (2)

37 | Classified in an impaired Class (excluding any class in which the Plan is "deemed rejected").  The

38 | votes will be tabulated on a Debtor by Debtor basis.

39 | **9.4.    <u>What Is an Allowed Claim/Interest</u>.**

40 | As noted above, a Holder of Claim or Interest must first have an Allowed Claim or Allowed

41 | Interest to vote.

42 | **9.5.    <u>What Is an Impaired Class</u>.**

43 | A Class is impaired if the Plan alters the legal, equitable, or contractual rights of the Claims

44 | or Interests in that Class, other than the right to accelerate the Claim upon certain kinds of defaults.

45 | In this case, the ~~Group IV: Voluntary Debtors~~<u>SunCal Plan Proponents</u> believe that all Classes,

46 | except for Class 3.1 are impaired.

47 | **9.6.    <u>Who Is Not Entitled to Vote</u>.**

48 | The following four types of Claims are <u>not</u> entitled to vote: (1) Claims that have been

49 | disallowed; (2) Claims in unimpaired Classes; (3) Claims entitled to priority pursuant to Bankruptcy

50 | Code Sections 507(a)(2) or (a)(3) and Claims in Classes that do not receive or retain any value under

51 | the Plan.  Claims in unimpaired Classes are not entitled to vote because such Classes are deemed to

52 | have accepted the Plan.  Claims entitled to priority pursuant to Bankruptcy Code Section 507(a)(8)

1 | are not entitled to vote because such Claims are not placed in Classes and they are required to receive

2 | certain treatment specified by the Bankruptcy Code.  Claims in Classes that do not receive or retain

3 | any property under the Plan do not vote because such Classes are deemed to have rejected the Plan.

4 | The Group IV: Voluntary Debtors believe that all Classes are entitled to vote except Class ~~5.1. These~~

29    classes are3.1. This Class is not impaired under the Plan and consequently areis not entitled to vote.

30    They are conclusively deemed to have accepted the Plan.  The Interests held by the Holders in

31    Classes 6.15.1 and 6.25.2 are being cancelled under the Plan; accordingly these Interest Holders are

32    deemed to have voted to reject the Plan.

33         EVEN IF YOUR CLAIM IS OF THE TYPE DESCRIBED ABOVE, YOU MAY STILL

34    HAVE A RIGHT TO OBJECT TO THE CONFIRMATION OF THE PLAN.

35         **9.7.    Who Can Vote in More than One Class.**

36         A creditor whose Claim has been Allowed in part as a Secured Claim and in part as an

37    Unsecured Claim is entitled to accept or reject a Plan in both capacities by casting one ballot for the

38    secured part of the Claim and another ballot for the Unsecured Claim.  Also, a Creditor may

39    otherwise hold Claims in more than one Class (such as a Holder of Senior Secured Claims and

40    Subordinated Note Claims), and may vote the Claims held in each Class.

41         **9.8.    Votes Necessary for a Class to Accept the Plan.**

42         A Class of Claims is deemed to have accepted the Plan when more than one-half (1/2) in

43    number and at least two-thirds (2/3) in dollar amount of the Claims *that actually voted*, vote to accept

44    the Plan.  A Class of interests is deemed to have accepted the Plan when Holders of at least

45    two-thirds (2/3) in amount of the interest-Holders of such Class which actually vote, vote to accept

46    the Plan.

47         **9.9.    Treatment of Nonaccepting Classes.**

48         As noted above, even if there are impaired Classes that do not accept the proposed Plan, the

49    Court may nonetheless confirm the Plan if the nonaccepting Classes are treated in the manner

50    required by the Code and at least one impaired Class of Claims accepts the Plan.  The process by

51    which a plan may be confirmed and become binding on non-accepting Classes is commonly referred

52    to as "cramdown."  The Bankruptcy Code allows the Plan to be "crammed down" on nonaccepting

1    Classes of Claims or interests if it meets all statutory requirements except the voting requirements of

2    1129(a)(8) and if the Plan does not "discriminate unfairly" and is "fair and equitable" with respect to

3    each impaired Class that has not voted to accept the Plan, as set forth in 11 U.S.C. § 1129(b) and

4    applicable case law.

**9.10.    Request for Confirmation Despite Nonacceptance by Impaired Class(es).**

The SunCal Plan Proponents will ask the Court to confirm the Plan by cramdown on any impaired Class if such Class does not vote to accept the Plan.

**X.**

**MEANS OF EXECUTION AND IMPLEMENTATION OF THE PLAN**

**10.1    10.3. Introduction.**

This section is intended to address how the SunCal Plan Proponents intend to implement the provisions of the Plan.  It addresses the transfer of the Plan Trust PropertyAssets to the Plan Trust, the nature of the Plan Trust, the powers of the Plan Trust, the governance of the Plan Trust, the resolution of disputed claims, the sources of funds that will be used to pay claims and the mechanics of how claims will be paid.

**10.4.    Transfer of Property To The Plan Trust.**

On the Effective Date, title to and possession of all property of the Group IV: Voluntary Group IV: Voluntary Debtors, excepting those items of property that the Plan Trustee affirmatively elects not to transfer to the Plan Trust, shall be deemed transferred and delivered to the Plan Trust, without further act or action under any applicable agreement, law, regulation, order or rule of law.

**10.5.    Purposes of The Plan Trust.**

The Plan Trust's purposes, powers and objectives include, but are not limited to the following: (i) to take control over, manage and over time sell or otherwise dispose of all Plan Trust Property for the highest return reasonably obtainable; (ii) to pursue all Litigation Claims through collection efforts, including through litigation in any court of competent jurisdiction, and to obtain the most favorable recovery on the same, with due consideration of all relevant factors, including cost; (iii) to cause all Available Cash to be deposited into the applicable Distribution Accounts; (iii) to initiate actions to resolve any remaining issues regarding the allowance and payment of Claims including, as necessary, initiation and/or participation in proceedings before the Bankruptcy Court; (iv) to take such other actions as are necessary or useful to maximize the value of all property received by the Plan Trust; (v) to make the payments and Distributions to creditors and holders of Beneficial Interests as required by the Plan; and (vi) to enforce all rights with respect to the Plan

29  Trust Property; and (vii) to take all actions reasonable and necessary to implement the terms of the

30  Plan.

31          It is intended that the Plan Trust will be classified for U.S. federal income tax purposes as a

32  "liquidating trust," with the primary objective of liquidating the Plan Trust Property and distributing

33  the net proceeds thereof, with no objective to continue or engage in the conduct or a trade or business

34  in accordance with Treasury Regulation 301.7701-4(d), and, notwithstanding anything to the

35  contrary in the Plan, all actions taken by the Plan Trust or any person acting on behalf of the Plan

36  Trust shall be consistent with such primary objective.

37          **10.6.    Preservation of Litigation Claims for the Plan Trust.**

38          The Plan Trustee reserves for the Estates and the Plan Trust all rights to commence and

39  pursue, as appropriate, any and all Litigation Claims, whether arising prior to or after the petition

40  Date, in any court or other tribunal, including without limitation, any adversary proceeding filed

41  and/or pending in the Court.  On the Effective Date, the Plan Trustee will be vested with authority to

42  enforce, file, litigate, prosecute, settle and collect with respect to the Litigation Claims, although it

43  will not be required to do so and the determination of whether to so will be made solely by the Plan

44  Trustee in his absolute discretion.  With respect to any Litigation Claims commenced prior to the

45  Effective Date to which any or all of the Group IV: Voluntary Debtors is a party, the Plan Trustee

46  shall replace and stand in the shoes of such Debtors as the real party in interest.

47          While the SunCal Plan Proponents have attempted to identify all Litigation Claims in the

48  Disclosure Statement which may be pursued, and hereby incorporates by reference those disclosures

49  and provisions, the failure to list any potential Litigation Claims, generally or specifically, is not

50  intended to limit the rights of the Plan Trustee to pursue such Litigation Claims.  Unless a Litigation

51  Claims against any Person is expressly waived, relinquished, released, compromised or settled as

52  provided or identified in the Plan, any Confirmation Order or prior order of the Court, the Plan

1   Trustee expressly reserves any Litigation Claims for later adjudication.  Therefore, no preclusion

2   doctrine, including, without limitation, the doctrine of res judicata, collateral estoppel, issue

3   preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches shall apply to such

4   Litigation Claims upon or after Confirmation or consummation of the Plan.  All Litigation Claims

29  are preserved under the Plan for the benefit of the Estates and the Plan Trust.  Any recoveries from

30  Litigation Claims will be paid to the Plan Trust.

31          ANY CREDITORS THAT BELIEVE THEY RECEIVED A TRANSFER OR

32  SETOFF THAT IS AVOIDABLE UNDER THE CODE OR THAT HOLDS A CLAIM AGAINST

33  THE ESTATES THAT COULD BE SUBJECT TO AN OBJECTION BASED UPON FAILURE

34  TO RETURN AN AVOIDABLE TRANSFER OR SETOFF, ARE DIRECTED TO REVIEW

35  THEIR RECORDS AND/OR THE DEBTORS' SCHEDULES FOR FURTHER INFORMATION.

36  HOWEVER, ALL RIGHTS OF THE DEBTORS AND THE ESTATES ARE RESERVED WITH

37  RESPECT TO ANY AND ALL TRANSFERS OR SETOFFS WHICH MAY BE AVOIDABLE

38  UNDER THE BANKRUPTCY CODE.

39          **10.7. 10.2 Establishment and Operations of the Plan Trust**.

40          The Plan Trust shall be established and shall become effective on the Effective Date.  The

41  Plan Trust is created pursuant to the Plan and the Confirmation Order.  The primary purpose of the

42  Plan Trust is the liquidation and distribution the Group IV: Voluntary Assets and the Distribution of

43  the Plan Trust Property transferred to it proceeds to Creditors, with no objective to continue or

44  engage in the conduct of a trade or business, except to the extent reasonably necessary to, and

45  consistent with, the liquidating purpose of the Plan Trust.  The Plan Trust shall hold title to and

46  administer the Plan Trust Property Assets, including, but not limited to, any Litigation Claims, and

47  the proceeds thereof for liquidation and distribution Distribution in accordance with the terms of the

48  Plan.

49          From and after the Effective Date, the Plan Trust may use, acquire and dispose of the Plan

50  Trust Property held in the Plan Trust, and take any of the actions set forth in this Article, without the

51  approval of the Bankruptcy Court and free of the restrictions of the Bankruptcy Code, the

52  Bankruptcy Rules or the prior orders of the Bankruptcy Court, other than restrictions expressly

1  imposed by the Plan, the Confirmation Order, provided that the Plan Trust is administered so that it

2  qualifies as a liquidating trust under Treasury Regulation § 301.7701-4(d).

3          **10.3    Preservation and Pursuit of Litigation Claims and Recovery for the Plan Trust.**

4

On the Effective Date, title to and possession of all property of the Group IV: Voluntary Debtors shall be deemed transferred and delivered to the Plan Trust, without further act or action under any applicable agreement, law, regulation, order or rule of law.

Pursuant to Section 1123(b)(3) of the Bankruptcy Code, the Plan Trust shall retain all Litigation Claims whether or not pending on the Effective Date.  Unless a Litigation Claim is expressly waived, relinquished, released, sold, compromised or settled in the Plan or in a Final Order, all rights with respect to such Litigation Claims are reserved and the Plan Trustee may pursue such Litigation Claims.  Notwithstanding the foregoing, the Plan Trustee shall not settle or abandon a Litigation Claim valued at greater than $100,000 except upon ten (10) days' prior written notice and opportunity to object to the proposed action.  Any disputes concerning the settlement or abandonment of a Litigation Claim shall be submitted to the Bankruptcy Court for resolution on no less than ten (10) days' notice to the objecting party.

All Litigation Recoveries realized or obtained by the Plan Trustee shall be promptly deposited into the applicable Distribution Account(s).  Except as otherwise provided in the Plan and the Confirmation Order, the Litigation Recoveries shall be free and clear of all Claims and Liens and shall only be expended in accordance with the provisions of the Plan.

**10.8. 10.4 Payment of Plan Trust Expenses**.

The expenses incurred by the Plan Trust or the Plan Trustee during the Plan Period, shall be paid, or adequate reserves shall be created for the payment of such expenses, prior to any distribution Distribution to the Plan Trust Beneficiaries.

**10.9. 10.5 The Plan Trust Distribution System.**

The Plan Trustee shall establish a separate "Distribution Account" for each Group IV: Voluntary Debtor at an FDIC insured bank. Each Group IV: Voluntary Debtor's Available Cash, whether on hand as of the Effective Date or received thereafter, shall be deposited into that Group IV: Voluntary Debtor's Distribution Account.  These funds will then be used to pay the claims of Creditors holding Allowed Claims in their order of priority as provided for in the Plan.  Persons dealing with the Plan Trustee, or seeking to assert Claims against the Debtors, the Estates or the Plan Trust, shall look only to property of the Debtors, the Estates or the Plan Trust to satisfy any liability

29    to such Persons, and the Plan Trustee shall have no corporate, personal, or individual obligation to

30    satisfy any such liability.

31    **~~10.10.~~10.6 The Plan Trustee**.

32         ~~10.10.1.~~**10.6.1 Appointment**.  Acquisitions shall be Plan Trustee of the Plan Trust.

33    The appointment of the Plan Trustee shall be effective as of the Effective Date.

34         ~~10.10.2.~~**10.6.2 Term**.  Unless the Plan Trustee resigns, dissolves or is removed by

35    Court order earlier, the Plan Trustee's term shall expire upon termination of the Plan Trust pursuant

36    to the Plan.  In the event the Plan Trustee resigns, dies or is removed by Court order prior to

37    termination of the Plan Trust, the UST shall select and recommend to the Court a successor Plan

38    Trustee.

39         ~~10.10.3.~~**10.6.3 Powers and Duties**.  On the Effective Date, the Plan Trustee shall

40    have the rights, powers and duties set forth in the Plan, the Confirmation Order, and Bankruptcy

41    Code §§505, 1107 and 1108.  The Plan Trustee shall be governed in all things by the terms of the

42    Plan and the Confirmation Order.  The Plan Trustee shall administer the Plan Trust in accordance

43    with the Plan.  Without limitation, the Plan Trustee shall file final federal, state, foreign and, to the

44    extent applicable, local, tax returns.  Without further Motion, notice, or order of the Court, the Plan

45    Trustee shall be authorized, empowered and directed to take all actions necessary to comply with the

46    Plan and exercise and fulfill the duties and obligations arising thereunder, including, without

47    limitation to:

48         i.      employ, retain, and replace one or more attorneys, accountants,

49    auctioneers, brokers, managers, consultants, other professionals, agents, investigators, expert

50    witnesses, consultants, and advisors as necessary to discharge the duties of the Plan Trustee under

51    the Plan;

52         ii.      control and effectuate the Claims reconciliation process, including to

1    object to, seek to subordinate, compromise or settle any and all Claims against the Debtors pursuant

2    to the terms of the Plan;

3         iii.      open, maintain and administer bank accounts as necessary to

4    discharge the duties of the Plan Trustee under the Plan;

iv.     make Distributions to the Holders of Allowed Claims in accordance with the Plan;

v.     retain professionals to assist in performing his or her duties under the Plan;

vi.     pay reasonable and necessary professional fees, costs, and expenses;

vii.     investigate, analyze, commence, prosecute, litigate, compromise, settle, dismiss, and otherwise administer all Causes of Action and Avoidance Actions for the benefit of the Plan Trust and its beneficiaries, as set forth in the Plan, and to take all other necessary and appropriate steps to collect, recover, settle, liquidate, or otherwise reduce to Cash all Causes of Action and Avoidance Actions, as the Plan Trustee may determine is in the best interests of the Plan Trust;

viii.     administer, sell, liquidate, or otherwise dispose of the Assets in accordance with the terms of the Plan;

ix.     incur and pay reasonable and necessary expenses in connection with the performance of the Plan Trustee's duties under the Plan;

x.     represent the Estates before the Court and other courts of competent jurisdiction with respect to ~~mattes~~matters concerning the Plan Trust;

xi.     seek the examination of any entity under the subject to the provisions of Bankruptcy Rule 2004;

xii.     comply with applicable orders of the court and any other court of competent jurisdiction over the matters set forth in the Plan;

xiii.     comply with all applicable laws and regulations concerning the matters set forth in the Plan;

xiv.     exercise such other powers as may be vested in the Plan Trust pursuant to the Plan, the Confirmation Order, or other Final Orders of the Court.

xv.     execute any documents, instruments, contracts, and agreements necessary and appropriate to carry out the powers and duties of the Plan Trust;

-63-
MAINDOCS-#163418-v9-SCC164968-v3-SunCal_3rd_Am_Group_IV_VD_DS.DOC

29    xvi.    (1) seek a determination of tax liability under §505 of the code, (2) pay

30  taxes, if any, related to a Debtor, (3) file, if necessary, any and all tax and information returns

31  r3equired required with the respect to the Plan Trust, including, if appropriate, treating the Plan Trust

32  as a "grantor trust" pursuant to Treas. Reg 1.671-4 or otherwise, (4) make tax elections by and on

33  behalf of the Plan Trust, and 95(5) pay taxes, if any, payable by the Plan Trust; and

34    xvii.    stand in the shoes of the Debtors for all purposes.

35    **10.10.4. 10.6.4 Retention of Professionals and Compensation Procedure.**

36    On and after the Effective Date, the Plan Trustee may, without further application or Motion,

37  notice, hearing, or Court order, engage or employ such professionals and experts as may be deemed

38  necessary and appropriate by the Plan Trustee to assist the Plan Trustee in carrying out the provisions

39  of the Plan, including, but not limited to, the Professionals retained prior to the Effective Date by

40  either the Debtors or the Voluntary Debtors' Committee.  The Plan Trustee may employ such

41  professionals on any reasonable terms and conditions of employment to be determined by the Plan

42  Trustee.  For the services performed on and after the Effective Date, the professionals engaged by the

43  Plan Trustee (the "Plan Trustee Professionals") shall receive reasonable compensation and

44  reimbursement of expenses in a manner to be determined by the Plan Trustee.

45    **10.10.5. 10.6.5 Fees and Expenses.**

46    Acquisitions shall not receive any compensation for the services it performs as the Plan

47  Trustee, other than the release provided for in the Plan, but shall be entitled to reimbursement of

48  reasonable expenses.  The Plan Trustee Professionals shall be entitled to reasonable compensation

49  for their services, and reimbursement of expenses.  The costs and expenses of the Plan trust Trust

50  (including, without limitation, fees and expenses of the Plan Trustee Professionals) shall be paid

51  from the Plan Trust.  The Plan Trustee shall pay, without further order, notice or application to the

52  Court, the reasonable fees and expenses of the Plan Trustee Professionals, as necessary to discharge

1   the Plan Trustee's duties under the Plan.  The Plan Trustee shall be authorized to reserve funds from

2   the Plan Trust as is reasonable to pay the expenses of the Plan Trustee and the expenses and fees of

3   the Plan Trustee Professionals before making any Distributions under the Plan.

4     **10.10.6. 10.6.6 Limitation of Liability and Indemnification.**

~~Neither the Plan Trustee nor its~~None of the Group IV: Voluntary Debtors, the Voluntary Debtors' Committee, the Plan Sponsor, the SunCal Plan Proponents, the Plan Trustee, the Professionals, nor any of their respective members, officers, directors, shareholders, employees, ~~Plan Trustee Professionals~~ or agents (the "Indemnified Parties") shall be liable (a) for any loss or damages by reason of any action taken or omitted by him or her, except in the case of fraud, willful misconduct, bad faith, or gross negligence, ~~or~~ (b) for any act or omission made in reliance upon the Debtors' books and records or upon information or advice given to the Plan Trustee by his or her professionals, or (c) for any action taken or omission made in connection with or related to the negotiations, formulation, or preparation of the Plan and the Disclosure Statement, the approval of the Disclosure Statement, the confirmation of the Plan, the consummation of the Plan, or the administration of the Plan, the Cases, or the property to be distributed under the Plan, to the fullest extent permitted by applicable statute and case law.  Except as otherwise provided in this Plan, the Plan Trustee shall rely and shall be protected in acting upon any resolution, certificate, statement, instrument, opinion, report, notice, consent, or other document believed by him or her to be genuine and to have been signed by the proper party or parties.

The ~~Plan Trustee and its employees, Plan Trustee Professionals or agents (collectively, the~~ "Indemnified Parties~~" and each, an "Indemnified Party")~~ shall be indemnified and receive reimbursement from and against any and all loss, liability, expense (including attorneys' fees) or damage of any kind, type or nature, which the Indemnified Party may incur or sustain the exercise and performance of any of the Plan Trustee's powers and duties under this Plan or the Confirmation Order, or in the rendering of services by the Indemnified Party to the Plan Trustee, to the full extent permitted by applicable law, except if such loss, liability, expense or damage is finally determined by a court of competent jurisdiction to result from the Plan Trustee's or an Indemnified Person's fraud, willful misconduct, bad faith, or gross negligence.  The amounts necessary for such indemnification and reimbursement shall be paid by the Plan Trustee out of the Plan Trust ~~Property~~Assets.  The Plan Trustee shall not be liable for the payment of any Plan Trust expense or claim or other liability of the Plan Trust, and no Person shall look to the Indemnified Parties ~~personally~~ for the payment of any such expense or liability.  This indemnification shall survive the dissolution, resignation or removal,

as may be applicable, of the Plan Trustee, or the termination of the Plan Trust, and shall inure to the benefit of the Plan Trustee's and the Indemnified Person's heirs and assigns.

### 10.10.7.  10.6.7 Plan Trustee as Successor.

Pursuant to Code §1123(b), the Plan Trustee shall be the successor to the Group IV Voluntary Debtors for all purposes.

### 10.11.  10.7     The Plan Trust Beneficiaries.

The Holders of Allowed Claims under the Plan, or any successors to such Holders' Allowed Claims ("Beneficiary" or "Beneficiaries") shall own a beneficial interest in the Plan Trust which shall, subject to the Plan, be entitled to a Distribution, if any, in the amounts, and at the times, set forth in the Plan.  Ownership of a beneficial interest in the Plan Trust shall not be evidenced by any certificate, security, or receipt or in any other form or manner whatsoever, except as maintained on the books and records of the Plan Trust by the Plan Trustee.  The ownership of a beneficial interest in the Plan Trust shall not entitle any Beneficiary to any title in or to the Plan Trust assets or to any right to call for a partition or division of such assets or to require an accounting.  The Plan Trustee shall make Distributions, if any, to Beneficiaries in the manner provided in the Plan.

The rights of the Beneficiaries arising under the Plan Trust may be deemed "securities" under applicable law.  However, such rights have not been defined as "securities" under the Plan because (a) the intent of the Plan is that such rights shall not be securities, and (b) if the rights arising under the Plan Trust are deemed to be "securities," the exemption from registration under §1145 of the Bankruptcy code is intended to be applicable to such securities.

### 10.12.  Claims Estimation Rights.

On the Confirmation Date, the SunCal Plan Proponents shall be vested with standing to file a motion under 11 U.S.C. § 502(c), and they shall be authorized and empowered to seek in such motion the estimation, for Distribution purposes, of any Disputed Claim seeking recourse to, or claiming an interest in, any asset of the Group IV Voluntary Debtors. After the Bankruptcy Court estimates a Disputed Claimant's rights in, or against an asset of the Estates through this procedure, the Plan Trustee shall have the right to use any funds or assets not deemed subject to the rights of the

29    Disputed Claimant, to pay the Allowed Claims under the terms of the Plan, including Allowed

30    Administrative Claims, after the Effective Date.

31    **10.13. 10.8 No Payment of Transfer-Related Fees to the United States Trustee**.

32    The Plan Trust shall not be required to pay any fees to the United States Trustee based on any

33    transfers of the Plan Trust Property Assets to the Plan Trust or from the Plan Trust.

34    **10.9    No Payment of Transfer-Related Fees to the Plan Trustee.**

35    The Plan Trust shall not be required to pay any fees to the Plan Trustee based on any transfers

36    of Plan Trust Assets from the Voluntary Debtors to the Plan Trust, or from the Plan Trust.

37    **10.14. 10.10 Books and Records of Trust**.

38    The Plan Trustee, and to the extent of payments and Distributions by any Disbursing Agent,

39    the Disbursing Agent, shall maintain an accounting of receipts and disbursements of the Plan Trust.

40    The Plan Trustee shall maintain the books and records of the Plan Trust, or provide storage for such

41    book and records, for the longer of six (6) years, or while Plan is in existence, provided that the Court

42    may, upon application by the Plan Trustee, authorize the Plan Trust to destroy all of the Plan Trusts

43    books and records at such time as Plan Trust has no further need for such books and records. The

44    Plan Trust's books and records shall be open to inspection at all reasonable times, upon written

45    request by the Voluntary Debtors' Committee.

46    **10.15. 10.11 Federal Income Tax Treatment of the Holders of the Plan Trust Beneficial**

47    **Interests**.

48    For all United States federal income tax purposes, the transfers by the Group IV: Voluntary

49    Debtors shall be treated by the Group IV: Voluntary Debtors, their estates, the Plan Trust and the

50    Plan Trust Beneficiaries as a transfer of the Plan Trust Property Assets by the Group IV: Voluntary

51    Debtors to the Plan Trust Beneficiaries followed by a transfer of the Plan Trust Property Assets by

52    such the Plan Trust Beneficiaries to the Trust. The Plan Trust Beneficiaries shall be treated as the

1    grantors and deemed owners of the Plan Trust for United States federal income tax purposes. The

2    Plan Trust Trustee and the Plan Trust Beneficiaries are required to value their interests in the Plan

3    Trust Property Assets consistently with the values placed upon the Plan Trust Property Assets by the

4    Plan Trust, and to use such valuations for all purposes. The Plan Trust Agreement shall provide for

consistent valuations of the Plan Trust ~~Property~~Assets by the Plan Trust Trustee and the Plan Trust Beneficiaries, and shall provide that the Plan Trust will determine the fair market value of the Plan Trust ~~Property~~Assets within thirty (30) days after the Effective Date, and send such determination to each the Plan Trust Beneficiary. By its acceptance of a the Beneficial Interest, each recipient of such an interest will be conclusively deemed to agree to use such valuations for all purposes, including, without limitation, in computing any gain recognized upon the exchange of such holder's claim for purposes of determining any United States Federal income tax, and shall be required to include those items of income, deductions and tax credits that are attributable to its the Beneficial Interest in computing its taxable income.

### ~~10.16.~~ 10.12 Termination of the Trust.

The Plan Trust shall continue in effect until the earlier of: (a) the date that all the Plan Trust ~~Property has~~Assets have been liquidated, all proceeds have been converted to cash or distributed in kind, all the Plan Trust Expenses have been paid, all claims to be paid under the Plan for which the Plan Trust Trustee is obligated to make Distributions on have been paid, all Distributions to be made with respect to the Beneficial Interests have been made, all litigation to which the Plan Trust is a party have been concluded by dismissal or an order issued by the court in which such litigation is pending and such order has become "final" (consistent with the definition of Final Order in the Plan for orders issued by the Bankruptcy Court), and the Chapter 11 Case has been closed; and (b) the expiration of five (5) years from the Effective Date; provided, however, that the Plan Trust may request the Bankruptcy Court to extend the permitted life of the Plan Trust for such additional period as is reasonably necessary to conclude the liquidation and Distributions, not to exceed a total of ten (10) years from the Effective Date, which request shall be filed so the Bankruptcy Court may consider and rule on the request within six (6) months prior to the expiration of the initial five-year term.

### ~~10.17.~~ 10.13 Exemption from Certain Transfer Taxes.

In accordance with Section 1146(a) of the Bankruptcy Code, the issuance, transfer or exchange of a security or the making or delivery of an instrument of transfer under the ~~Plan~~plan may not be taxed under any law imposing a stamp tax or similar tax. All governmental officials and

29    agents shall forego the assessment and collection of any such tax or governmental assessment and

30    shall accept for filing and recordation any of the foregoing instruments or other documents without

31    payment of such tax or other governmental assessment.

32          **10.18. 10.14 Tax Consequence of The Plan**.

33          The implementation of the Plan may have federal, state and local tax consequences to the

34    Group IV: Voluntary Debtors, Creditors and Interest Holders.  No tax opinion has been sought or will

35    be obtained with respect to any tax consequences of the Plan. This Disclosure Statement does not

36    constitute and is not intended to constitute either a tax opinion or tax advice to any person, and the

37    summary contained herein is provided for informational purposes only.

38          CREDITORS AND INTEREST HOLDERS ARE ADVISED TO CONSULT WITH THEIR

39    OWN TAX ADVISORS REGARDING THE TAX CONSEQUENCES TO THEM AND TO THE

40    DEBTOR OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING

41    FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES.

42          **10.19. 10.15  The Plan Sponsor**.

43    The Plan Sponsor shall be Acquisitions.

44          **10.20. 10.16 The Voluntary Debtors' Committee**.

45          On the Effective Date, the Voluntary Debtors' Committee shall continue to serve its

46    applicable Group IV: Voluntary Debtors as Voluntary Debtors' Committee to the applicable

47    reorganized Group IV: Voluntary Debtors, subject to the following:

48          **10.20.1. 10.16.1 Duties and Powers**.

49          The duties of the Voluntary Debtors' Committee after the Effective Date shall be limited to

50    monitoring the Plan's implementation, notice and opportunity to object to any settlement of the

51    Lehman Adversary Proceeding, and the Contract Action, standing to object to any settlement of any

52    Litigation Claim in excess of $100,000 100,000, and standing and sole and exclusive right to file,

1     prosecute and resolve potential Avoidance Actions against and objections to Claims filed by Insiders

2     that are SunCal Affiliates.  The (i) SunCal Affiliates, including SunCal Management, Acquisitions,

3     and SC Master Marketing, LLC and (ii) certain professionals for the SunCal Affiliates, including

4     Voss, Cook & Thel, LLP, The MB Firm, White & Case, LLP, RBF Consulting and Mayer Brown

29  LLP. Voluntary Debtors' Committee shall receive notice of and the right to review all payments and

30  Distributions.

31      The Voluntary Debtors' Committee shall be entitled to retain, employ and compensate

32  Professionals, in order to assist with the obligations and rights of the Voluntary Debtors' Committee

33  under the terms of the Plan.  Such compensation shall be paid from the applicable Distribution

34  Account(s).

35                  10.20.2. **10.16.2 Dissolution of Voluntary Debtors' Committee.**

36      The Voluntary Debtors' Committee shall be dissolved upon the entry of an order converting,

37  closing or dismissing the Chapter 11 Cases or entry of a final decree in the Chapter 11 Cases.  On

38  dissolution, the Voluntary Debtors' Committee shall have no other or further obligations or

39  responsibilities on behalf of the Plan Trust.

40      **10.21.  Litigation Claims.**

41      Pursuant to Section 1123(b)(3) of the Bankruptcy Code, the Plan Trust shall retain all

42  Litigation Claims whether or not pending on the Effective Date.  Unless a Litigation Claim is

43  expressly waived, relinquished, released, compromised, settled or sold in the Plan or in a Final

44  Order, all rights with respect to such Litigation Claims are reserved and the Plan Trustee (in the case

45  of Avoidance Actions) may pursue such Litigation Claims.   Notwithstanding the foregoing, the

46  Plan Trustee shall not settle or abandon a Litigation Claim valued at greater than $100,000 except

47  upon ten (10) days' prior written notice and opportunity to object to the Voluntary Debtors'

48  Committee.  Any disputes concerning the settlement or abandonment of a Litigation Claim shall be

49  submitted to the Bankruptcy Court for resolution on no less than ten (10) days' notice to the

50  objecting party.

51      **10.22.  Collection of Litigation Recoveries.**

52      All Litigation Recoveries realized or obtained by the Plan Trustee shall be promptly

1   deposited into the applicable Distribution Account(s).  Except as otherwise provided in the Plan and

2   the Confirmation Order, the Litigation Recoveries shall be free and clear of all Claims and Liens and

3   shall only be expended in accordance with the provisions of the Plan.

4       **10.23.  Dissolution of the Group IV Debtors**

29  ~~On the Effective Date, each of the Group IV: Voluntary Debtors shall be deemed dissolved~~
30  ~~for all purposes without the necessity for any other further actions to be taken by or on behalf of such~~
31  ~~Debtors or payments to be made in connection therewith.~~

32  **10.17   Claims Estimation Rights.**

33  On the Confirmation Date, the SunCal Plan Proponents shall be vested with standing to file a
34  motion under 11 U.S.C. § 502(c), and they shall be authorized and empowered to seek in such
35  motion the estimation, for Distribution purposes, of any Disputed Claim seeking recourse to, or
36  claiming an interest in, any asset of the Group IV: Voluntary Debtors. After the Bankruptcy Court
37  estimates a Disputed Claimant's rights in, or against an asset of the Estates through this procedure,
38  the Plan Trustee shall have the right to use any funds or assets not deemed subject to the rights of the
39  Disputed Claimant, to pay the Allowed Claims under the terms of the Plan, including Allowed
40  Administrative Claims, after the Effective Date.

41  **XI.**

42  **RISK FACTORS**

43  **11.1     Plan Risks.**

44  The Plan in this case, like any Chapter 11 reorganization plan, includes a number of risks that
45  creditors should be aware of prior to voting on the Plan. The more material of these risks are
46  summarized below.

47  **11.2.     The Plan May Not Be Accepted or Confirmed.**

48  While the SunCal Plan Proponents believe that the Plan is confirmable under the standards
49  set forth in 11 U.S.C. § 1129, there can be no guarantee that the Bankruptcy Court will find the Plan
50  to be confirmable. If the Plan is not confirmed, it is possible that an alternative plan can be negotiated
51  and presented to the Bankruptcy Court for approval; however, there can be no assurance that any
52  alternative plan would be confirmed, that the Chapter 11 Cases would not be converted to a
1   liquidation, or that any alternative plan of reorganization could or would be formulated on terms as
2   favorable to the Creditors and holders of Equity Interests as the terms of the Plan.

3   **11.3   Status of LitCo Funding**

4

Plan funding for the Effective Date Payments, to the extent estate assets are not available, is not contemplated to be provided by the SunCal Plan Proponents.  Instead, the SunCal Plan Proponents are working with proposed investors/lenders to make the Effective Date Payments (including the 1% Distribution to Holders of Reliance Claim, for which estate assets cannot be used).  While the SunCal Plan Proponents are in discussions with third parties with respect to obtaining funding for these payments, no commitment has yet been obtained for such funding and thus SunCal Plan Proponents are not in a position to disclose the terms of such funding at this time.  There is no guarantee that such funding will be obtained.

The SunCal Plan Proponents do not believe that a third party financing source is material to the feasibility of the Plan, because the Effective Date are relatively minimal such that Acquisitions or an Affiliate of Acquisitions will fund such payments. The LitCo Enhancement  is only a Plan obligation in the event LitCo or its designee acquires the PacPoint Project free and clear of all claims and liens during the five-year Plan term, and financing for the LitCo Enhancement will be obtained in connection with that acquisition.  At the present time, free and clear title to the PacPoint Project cannot be obtained absent the consent of Lehman ALI, and it is uncertain whether such consent will be obtained.

**11.4**    **Adverse Outcome of Pending Litigation.**

The Group IV: Voluntary Debtors are plaintiffs in the Lehman Adversary Proceeding and the Contract Action.  The Group IV: Voluntary Debtors believe that their causes of action in the Lehman Adversary Proceeding and the Contract Action are meritorious.  However, there is no assurance that they will prevail in either action.

**XII.**

**DISTRIBUTIONS**

**12.1**    **Distribution Agent.**

Acquisitions shall serve as the Distribution Agent for Distributions due under the Plan.  The Distribution Agent may employ one or more sub agents on such terms and conditions as it may agree in its discretion and pay such sub agent as a Post Confirmation Expense from the Distribution

29   Accounts.  The Distribution Agent shall not be required to provide any bond in connection with the

30   making of any Distributions pursuant to the Plan.

31   **12.2**      **Distributions.**

32   **12.2.1**      **Dates of Distributions.**

33   Any Distribution required to be made on the Effective Date shall be deemed timely if made

34   as soon as practicable after such date and, in any event, within thirty (30) days after such date.  Any

35   Distribution required to be made upon a Disputed Claim becoming an Allowed Claim and no longer

36   being a Disputed Claim shall be deemed timely if made as soon as practicable thereafter.

37   **12.2.2**      **Limitation on Liability.**

38   Neither the Plan Sponsor, the Plan Trustee, the Distribution Agent, their Affiliates, nor any of

39   their employees, members, officers, directors, agents, or professionals or Affiliates shall be liable for

40   (i) any acts or omissions (except for gross negligence or willful misconduct) in connection with

41   implementing the Distribution provisions of the Plan and the making or withholding of Distributions

42   pursuant to the Plan, or (ii) any change in the value of Distributions made pursuant to the Plan

43   resulting from any delays in making such Distributions in accordance with the Plan's terms

44   (including but not limited to any delays caused by the resolution of Disputed Claims).

45   **12.3**   **Old Instruments and Securities.**

46   **12.3.1**      **Surrender and Cancellation of Instruments and Securities.**

47   As a condition to receiving any Distribution pursuant to the Plan, each Person holding any

48   note or other instrument or security (collectively "Instruments or Securities" and individually an

49   "Instrument or Security") evidencing, an existing Claim(s) against the Group IV: Voluntary Debtors

50   must surrender such Instrument or Security to the Distribution Agent.

51   **12.3.2**      **Cancellation of Liens.**

52   Except as otherwise provided in the Plan, any Lien securing any Secured Claim shall be

1   deemed released and discharged, and the Person holding such Secured Claim shall be authorized and

2   directed to release any collateral or other property of the Group IV: Voluntary Debtors (including,

3   without limitation, any cash collateral) held by such Person and to take such actions as may be

4

29  requested by the Plan Trustee to evidence the release of such Lien, including, without limitation, the

30  execution, delivery and Filing or recording of such releases as may be requested by the Plan Trustee.

### 12.3.3    De Minimis Distributions and Fractional Shares.

32  No Cash payment of less than ten dollars ($10) shall be made by the Plan Trust to any Holder

33  of Claims unless a request therefore is made in writing to the Plan Trust.  Whenever payment of a

34  fraction of a cent would otherwise be called for, the actual payment shall reflect a rounding down of

35  such fraction to the nearest whole cent.  Any Cash or other property that is not distributed as a

36  consequence of this section shall, after the last Distribution on account of Allowed Claims in the

37  applicable Class, be treated as "Unclaimed Property" under the Plan.

### 12.3.4    Delivery of Distributions.

39  Except as provided in the Plan with respect to Unclaimed Property, Distributions to Holders

40  of Allowed Claims and Allowed Administrative Claims shall be distributed by mail as follows:  (1)

41  with respect to each Holder of an Allowed Claim that has filed a Proof of Claim, at the address for

42  such Holder as set forth in the Proof of Claim; (2) with respect to each Holder of an Allowed Claim

43  that has not filed a Proof of Claim, at the address reflected on the Schedules filed by the Group IV:

44  Voluntary Debtors, provided, however, that if the Group IV: Voluntary Debtors or the Plan Trust has

45  received a written notice of a change of address for such Holder, the address set forth in such notice

46  shall be used; or (3) with respect to each Holder of an Allowed Administrative Claim, at such

47  address as the Holder may specify in writing.

### 12.3.5    Undeliverable Distributions.

49  If the Distribution of Cash to the Holder of any Allowed Claim is returned to the Plan Trustee

50  as undeliverable or the Distribution check is not negotiated within 90 days of mailing (any such

51  Distribution being hereinafter referred to as "Unclaimed Property"), no further Distribution shall be

52  made to such Holder unless and until the Plan Trustee is notified in writing of such Holder's then

1  current address.  Subject to the remainder of this Section and the following section, Unclaimed

2  Property shall remain in the possession of the Plan Trustee pursuant to this Section, and shall be set

3  aside and (in the case of Cash) held in a segregated interest bearing account (as to Cash Unclaimed

4  Property) to be maintained by the Distribution Agent until such time as the subject Distribution

becomes deliverable.  Nothing contained in the Plan shall require the Plan Trustee or any other Person to attempt to locate such Person.

### 12.3.6    Disposition of Unclaimed Property.

If the Person entitled thereto notifies the Plan Trustee of such Person's Claim to a Distribution of Unclaimed Property within ninety (90) days following such Person's initial Distribution Date, Effective Date, the Unclaimed Property distributable to such Person, together with any interest or dividends earned thereon, shall be paid or distributed to such Person as soon as practicable.  Any Holder of an Allowed Claim that does not assert a Claim in writing for Unclaimed Property held by the Plan Trustee within ninety (90) days after the Holder's initial Distribution Date shall no longer have any Claim to or Interest in such Unclaimed Property, and shall be forever barred from receiving any Distributions under the Plan or otherwise from the Plan Trustee.  In such cases, any property held for Distribution on account of such Claims shall become Available Cash and deposited into the Distribution Account.

## XIII.

## OBJECTIONS TO CLAIMS AND DISPUTED CLAIMS

### 13.1    Standing for Objections to Claims.

The Plan Trustee shall have the sole and exclusive right to file, prosecute and resolve objections to Claims, ~~excluding Claims filed by Insiders that are SunCal Affiliates~~except as specifically provided herein.  The Voluntary Debtors Committee shall have the sole and exclusive right to file, prosecute and resolve objections to Claims filed by ~~Insiders that are SunCal Affiliates~~(i) SunCal Affiliates, including SunCal Management, Acquisitions, and SC Master Marketing, LLC and (ii) certain professionals for the SunCal Affiliates, including Voss, Cook & Thel, LLP, The MB Firm, White & Case, LLP, RBF Consulting and Mayer Brown LLP.  Any objection to a Claim shall be Filed with the Bankruptcy Court and served on the Person holding such Claim on or before the applicable Claims Objection Deadline.  The Plan Trustee shall have the right to petition the Bankruptcy Court, without notice or a hearing, for an extension of the Claims Objection Deadline if a complete review of all Claims cannot be completed by such date.

### 13.2    Treatment of Disputed Claims and Disputed Liens.

29    **13.2.1  No Distribution Pending Allowance.**

30        If any portion of a Claim or Lien is a Disputed Claim or Disputed Lien, no payment or

31    Distribution provided for under the Plan shall be made on account of such Claim or Lien unless and

32    until such Claim or Lien becomes an Allowed Claim and/or Allowed Lien.

33    **13.2.2  Distribution After Allowance.**

34        On the next Distribution Date following the date on which a Disputed Claim becomes

35    an Allowed Claim and is no longer a Disputed Claim, the Distribution Agent shall distribute to the

36    Person holding such Claim any Cash that would have been distributable to such Person if on the

37    initial Distribution Date such Claim had been an Allowed Claim and not a Disputed Claim.

38    **13.2.3  Reserves for Disputed Claims**

39        In the event that Disputed Claims are pending at the time of a Distribution under the Plan, the

40    Plan Trustee shall establish and maintain a reserve for such Disputed Claims.  For purposes of

41    establishing a reserve, Cash will be set aside equal to the amount that would have been distributed to

42    the Holders of the Disputed Claims had the Disputed Claims been Allowed on the date a Distribution

43    is made to the Holders of Allowed Claims in the same Class or of the same priority as the Disputed

44    Claims.  If a Disputed Claim ultimately becomes an Allowed Claim, the amount of Cash reserved for

45    that Disputed Claim shall be distributed on the earlier of (a) the distributed Date following the date

46    when the Disputed Claim becomes an Allowed Claim, or (b) ninety (90) days after such Disputed

47    Claim becomes an Allowed Claim.  Any reserved Cash not ultimately distributed to the Holder of a

48    Disputed Claim because the Disputed Claim does not become an Allowed Claim shall become

49    property of the Plan Trust and shall be distributed in accordance with the terms of the Plan.

50                                **XIV.**

51              **EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

52    **14.1    Executory Contracts to be Assumed ~~and Assigned~~.**

1        ~~Under the Plans, the Group IV: Voluntary Debtors Projects will be sold.  As a result, the~~

2    ~~Group IV: Voluntary Debtors will assume only those executory contracts and unexpired leases to be~~

3    ~~assigned to the Winning Bidder with respect to the applicable Project.~~

4

On the Effective Date, the executory contracts and unexpired leases identified on the Schedule of Assumed and Assigned Agreements attached or to be attached hereto as Exhibit "9" or filed or to be filed as Exhibit "9" to this document shall be deemed assumed and assigned to the applicable Winning Bidder by the Plan Trust, as specified in the Confirmation Order.  The SunCal Plan Proponents intend to file the Schedule of Assumed and Assigned Agreements with the Court no later than _____ (_____ twenty-eight (28) days prior to the Confirmation Hearing.  The Schedule of Assumed and Assigned Agreements also identifies or will identify any amounts that must be paid to cure defaults under the executory contacts and unexpired leases to be assumed and assigned under the Plan (the "Cure Amount").  If filed earlier, the SunCal Plan Proponents reserve the right to amend the Schedule of Assumed Agreements up to _____ (_____ twenty-eight (28) days prior to the Confirmation Hearing (_____, October 24, 2011) to: (a) add any executory contract or unexpired lease and provide for its assumption and assignment; or (b) modify the Cure Amount for any particular executory contract or unexpired lease.  The SunCal Plan Proponents further reserve the right to amend the Schedule of Assumed Agreements to delete any executory contract or unexpired lease and provide for its rejection at any time prior to the Confirmation Hearing.  The SunCal Plan Proponents will provide notice of any amendment to the Schedule of Assumed and Assigned Agreements to any party or parties to the executory contracts or unexpired leases affected by the amendment.  Absent a timely objection as provided below, the Confirmation Order will constitute a Court Order approving the assumption and assignment, on the Effective Date, of the executory contracts and unexpired leases then identified on the Schedule of Assumed and Assigned Agreements, and shall constitute a final determination of the Cure Amount and that the estate has shown adequate assurance of future performance.  Furthermore, any Cure Amount ordered by the Court, through entry of the Confirmation Order, and paid shall be deemed to satisfy any and all defaults arising from, out of or related to the executory contract of unexpired lease, including any tort claims that were or could be asserted by the non-debtor party to the contract or lease on or prior to the entry of the Confirmation Order, and all actual or pecuniary losses that have resulted from such defaults.

29    If you are a party to an executory contract or unexpired lease to be assumed ~~and assigned~~ and

30  you object to the assumption ~~and assignment~~ of your lease or contract and/or you dispute the Cure

31  Amount related to your lease or contract, then you must File and serve upon counsels for the SunCal

32  Plan Proponents (at the address on the upper left hand corner of the caption page) a written objection

33  by ~~____, 2011.~~ fourteen days before the Confirmation Hearing.   An objection to the Cure Amount

34  must also set forth the amount you contend to be the correct Cure Amount and contain evidence to

35  support such amount.  Failure to timely File an objection as provided herein shall be deemed consent

36  to the proposed assumption ~~and assignment~~ and to the Cure Amount and a waiver of any and all

37  rights to challenge such assumption ~~and assignment~~ and the Cure Amount.

38    With respect to each executory contract and unexpired lease identified on the Schedule of

39  Assumed ~~and Assigned~~ Agreements, if no dispute arises regarding the Cure Amount, adequate

40  assurances, or some other matter related to the assumption of the executory contact or unexpired

41  lease, then the Cure Amount set forth in the schedule of Assumed ~~and Assigned~~ Agreements shall be

42  paid to the applicable non-debtor party in Cash on the Effective Date or as soon as reasonably

43  practicable thereafter.  If a dispute arises regarding ~~(a) whether the proposed assignee has provided~~

44  ~~adequate assurance of future performance of an executory contract or unexpired lease to be assumed,~~

45  ~~or (b) any other~~any matter pertaining to a proposed assumption ~~and assignment~~, the Cure Amount

46  will be paid on the later of (1) the Effective Date or as soon as practicable thereafter, or (2) within

47  thirty (30) days after entry of a Final order resolving the dispute and approving the assumption ~~and~~

48  ~~assignment~~; provided, however, if a dispute arises regarding any of the foregoing, the SunCal Plan

49  Proponents reserve, for themselves and the Plan Trustee, the right to completely forego assumption

50  ~~and assignment~~ of and, instead, reject the subject executory contract or unexpired lease.

51    If a party to an executory contract or unexpired lease identified on the Schedule of Assumed

52  ~~and Assigned~~ Agreements Files an objection disputing the Cure Amount, then the SunCal Plan

1   Proponents may amend the Schedule of Assumed ~~and Assigned~~ Agreements at any time prior to the

2   Confirmation Hearing to delete the subject executory contract or unexpired lease and provide for its

3   rejection.  Executory contracts or unexpired leases not so deleted shall be conditionally assumed,

4   subject to the SunCal Plan Proponents' and/or the Plan Trustee's right to file a Motion to determine

the appropriate Cure Amount up to the first (1st) Business Day that is at least sixty (60) days following the Effective Date.  The SunCal Plan Proponents and/or the Plan Trustee will serve any such Motion on the party to the executory contract or unexpired lease affected by the Motion (or its attorneys, if any).  If the SunCal Plan Proponents and Plan Trustee does not file a Motion to determine the appropriate Cure Amount, then the executory contract or unexpired lease shall be assumed ~~and assigned~~, as of the Effective Date, and the Cure Amount shall be the alternative Cure Amount asserted by the non-debtor party to the subject executory contract or unexpired lease in its objection to the Plan.  The Cure Amount shall be paid as soon as reasonably practicable following the expiration of the 60-day deadline.

If the SunCal Plan Proponents or the Plan Trustee files a Motion to determine the appropriate Cure Amount, then the SunCal Plan Proponents and/or Plan Trust shall have the right to amend the Schedule of ~~Assume and Assigned~~Assumed Agreements to completely forego assumption ~~and assignment~~ of and, instead, reject the subject executory contract or unexpired lease up to the first (1st) Business Day that is at least fifteen (15) days after the entry of an order fixing the Cure Amount.  The SunCal Plan Proponents and/or Plan Trustee will provide notice of any amendment to the Schedule of Assumed ~~and Assigned~~ Agreements to the party to the executory contract or unexpired lease affected by the amendment.  If the SunCal Plan Proponents and/or Plan Trustee has filed such a Motion and does not timely amend the Schedule of Assumed ~~and Assigned~~ Agreements within fifteen (15) days after entry of an order fixing the Cure Amount, then the executory contract or unexpired lease shall be assumed ~~and assigned~~, as of the Effective Date, and the Cure Amount shall be fixed as the Cure Amount ordered by the Court.  The Cure Amount as soon as reasonably practicable following the expiration of the 15-day deadline.

**14.2    Executory Contracts to be Rejected.**

On the Effective Date, the estate will be deemed to have rejected any and all executory contacts and unexpired leases <u>not</u> identified on the Schedule of Assumed ~~and Assigned~~ Agreements attached or to be attached hereto as Exhibit "9," or filed or to be filed as Exhibit "9" to this document.  The Confirmation Order will constitute a Court order approving the rejection, as of the Effective Date, of such executory contacts and unexpired leases.  Any Claim for damages arising

29 from the rejection under the Plan of any executory contract or unexpired lease must be filed with the

30 Court and served upon the SunCal Plan Proponents and the Plan Trustee within thirty (30) days of

31 the later of (a) the Confirmation Date, and (b) the Plan Trustee's amendment of the Schedule of

32 Assumed and Assigned Agreements to eliminate the executory contract or unexpired lease.  Any

33 such damage Claims that are not timely filed and served will be forever barred and unenforceable

34 against the applicable Debtors, the Estates, the Plan Trustee, the Plan Trust, and their respective

35 property.  Persons holding these Claims who fail to timely file claims will be barred from receiving

36 any Distributions under the Plan on account of their rejection damage Claims.

37         If you are a party to a lease or contract to be rejected and you object to the rejection of

38 your lease or contract, then you must file and serve your objection by ⸺⸺⸺.fourteen days

39 before the Confirmation Hearing.

40 **XV.**

41 **BEST INTEREST OF CREDITORS TEST AND PLAN FEASIBILITY**

42      **15.1     Best Interests Test**.

43         Pursuant to Section 1129(a)(7) of the Bankruptcy Code, a Plan cannot be confirmed unless

44 the Bankruptcy Court determines that Distributions under the Plan to all Holders of Claims and

45 Interests who have not accepted the plan and whose Claims are classified in Classes that are impaired

46 under the plan, are not less than those which they would receive in a liquidation under Chapter 7 of

47 the Bankruptcy Code.

48         The Best Interest of Creditors Test must be satisfied even if the Plan is accepted by each

49 impaired Class of Claims and if any Holder of an Allowed Claim objects to the Plan on such basis.

50 The Best Interests Test requires the Bankruptcy Court to find either that either (i) all Holders of

51 Claims in an impaired Class of Claims have accepted the Plan or (ii) the Plan provides each Holder

52 of Allowed Claims of an impaired Class who has not accepted the Plan with a recovery of property of

1 a value, as of the effective date of the Plan, that is not less than the amount that such Holder would

2 receive if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code.

3         The Plan proposed by the Group IV: Voluntary Debtors is essentially a litigation and

4 liquidation plan. It provides for the recovery of the Pacific Point Project and/or damages through the

29 Lehman Adversary Proceeding or the Contract Action and for the ~~distribution~~Distribution of the

30 resulting net proceeds, in accordance with the priorities provided for in the Bankruptcy Code and

31 under California law.

32   If a Chapter 7 trustee were appointed in this case and had sufficient financing to pursue the

33 causes of action in the Lehman Adversary Proceeding and the Contract Action, it would be

34 compelled to liquidate the Group IV: Voluntary Debtors' assets in the same manner as provided for

35 in the Plan and to pay out the proceeds in the same manner as provided for in the Plan. Accordingly,

36 under the terms of the Plan, each individual creditor is receiving "at least as much" as such creditor

37 would receive in a Chapter 7 case, which is all that is required under the Best Interests Test.

38   **15.2**  ~~15.2~~ **Feasibility**.

39   In addition, in order to confirm the Plan, the Bankruptcy Court must find that confirmation of

40 the Plan is not likely to be followed by the liquidation or the need for further financial reorganization

41 of the Debtor(s).  This requirement is imposed by Section 1129(a)(11) of the Bankruptcy Code and is

42 generally referred to as the "feasibility" requirement. As explained above, the Group IV: Voluntary

43 Debtors' Plan provides for pursuing the Group IV: Voluntary Debtors' litigation rights, the

44 liquidation of any recoveries, and for the ~~distribution of the proceeds.~~ Distribution of the proceeds.

45 The Plan also provides that on the Distribution Date, Holders of Reliance Claims shall receive a

46 Distribution in cash, on the Effective Date, equal to one percent (1%) of such claimant's Allowed

47 Claim.  Within the context of the Plan and the proceeds of the LitCo Plan Loan, feasibility is limited

48 to having sufficient funds to pay administrative and priority claims on the Effective Date and

49 sufficient funds to finance the litigation.

50          **XVI.**

51       **LIMITATION OF LIABILITY**

52   **16.1**  **No Liability for Solicitation or Participation**.

1   As specified in Section 1125(e) of the Bankruptcy Code, entities that solicit acceptances or

2 rejections of the Plan and/or that participate in the offer, issuance, sale, or purchase of securities

3 offered or sold under the Plan, in good faith and in compliance with the applicable provisions of the

4 Bankruptcy Code, shall not be liable, on account of such solicitation or participation, for violation of

29    any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the

30    Plan or the offer, issuance, sale, or purchase of securities.

31                                     **XVII.**

32                 **CONDITIONS TO CONFIRMATION AND**

33                     **EFFECTIVENESS OF THE PLAN**

34        **17.1    Conditions Precedent to Plan Confirmation.**

35        The only condition precedent to confirmation of the Plan is that the Bankruptcy Court shall

36    have entered a Confirmation Order in form and substance reasonably acceptable to the SunCal Plan

37    Proponents.

38        **17.2    Conditions Precedent to Plan Effectiveness.**

39        The conditions precedent to the effectiveness of the Plan and the occurrence of the Effective

40    Date is that the Confirmation Order shall be a Final Order in form and substance reasonably

41    satisfactory to the SunCal Plan Proponents~~, and the resolutions of any material impairment of the~~

42    ~~Plan terms caused by the automatic stays applicable in the Lehman Entities cases~~. The automatic stay

43    in the Group IV: Voluntary Debtors cases shall continue to be applicable until the Effective Date.

44                                     **XVIII.**

45                     **RETENTION OF JURISDICTION**

46        Notwithstanding the entry of the Confirmation Order or the occurrence of the Effective Date,

47    the Bankruptcy Court's jurisdiction shall not be limited under the Plan and the Bankruptcy Court's

48    jurisdiction shall apply to the fullest extent possible under applicable law.  The Court will retain

49    exclusive jurisdiction during the Plan payout period to resolve disputes and conflicts arising from the

50    administration of the Plan, upon request of a party-in-interest and after notice and a hearing,

51    including, without limitation:

52        a.    The adjudication of the validity, scope, classification, allowance, and disallowance of

1    any Claim;

2        b.    The estimation of any Claim;

3        c.    The allowance or disallowance of Professional-Fee Claims, compensation, or other

4    Administrative Expense Claims;

29    d.    To ~~her~~hear and determine Claims concerning taxes pursuant to Bankruptcy Code §§

30    346, 505, 525, and 1146;

31    e.    To hear and determine any action or proceeding brought under Bankruptcy Code

32    §§108, 510, 543, 544, 545, 547, 548, 549, 550, 551 and 553;

33    f.    To hear and determine all actions and proceedings which relate to pre-confirmation

34    matters;

35    g.    To hear and determine any issue relating to the assumption or rejection of executory

36    contracts and unexpired leases;

37    h.    To hear and determine any modification to the plan in accordance with the

38    Bankruptcy Rules and Bankruptcy Code;

39    i.    To enforce and interpret the terms of the Plan;

40    j.    To correct any defects, cure any omissions, or reconcile any inconsistency in the Plan

41    or the Confirmation Order as may be necessary to carry out the purpose and intent of the Plan;

42    k.    the entry of any order, including injunctions, necessary to enforce title, rights and

43    powers of the Plan Trust, and to impose such limitations, restrictions, terms and conditions on such

44    title, rights and powers as the Court may deem necessary including, without limitation, any right of

45    the Plan Trust to recover and liquidate assets;

46    l.    To determine the validity, extent and priority of all liens and security interests against

47    property of the Estates or the Plan trust;

48    m.    To hear and resolve any disputes regarding employment applications and

49    professional fees;

50    n.    To ~~her~~hear and determine such matters and make such orders as are consistent with

51    the Plan as may be necessary to carry out the provisions thereof and to adjudicate any disputes arising

52    under or relating to any order entered by the Court in these Cases;

1    o.    The entry of an order concluding and terminating these Cases; and

2    p.    To resolve any disputes as to whether there has been a default under the Plan.

3    **XIX.**

4    **MODIFICATION OR WITHDRAWAL OF THE PLAN**

29    **19.1    Modification of Plan**.

30          At any time prior to confirmation of the Plan, the SunCal Plan Proponents may supplement,

31    amend or modify the Plan.  After confirmation of the Plan, the SunCal Plan Proponents or Plan

32    Trustee may (x) apply to the Bankruptcy Court, pursuant to Section 1127 of the Bankruptcy Code, to

33    modify the Plan; and (y) apply to the Bankruptcy Court to remedy defects or omissions in the Plan or

34    to reconcile inconsistencies in the Plan.

35    **19.2    Nonconsensual Confirmation**.

36          In the event that any impaired Class of Claims or Interests shall fail to accept the Plan in

37    accordance with Section 1129(a)(8) of the Bankruptcy Code, SunCal Plan Proponents (i) may

38    request that the Bankruptcy Court confirm the Plan in accordance with Section 1129(b) of the

39    Bankruptcy Code, and (ii) in accordance with Section 16.1 of the Plan, and may modify the Plan in

40    accordance with Section 1127(a) of the Bankruptcy Code.

41                                   **XX.**

42                       **EFFECT OF CONFIRMATION**

43    **20.1    Discharge**.

44          Confirmation of the Plan does not discharge the Group IV: Voluntary Debtors as set

45    forth in Bankruptcy Code §1141.

46    **20.2    Revesting of the Group IV: Voluntary Assets**.

47          The Group IV: Voluntary Assets shall not be vested in the Group IV: Voluntary

48    Debtors on or following the Effective Date, but shall be vested in the Plan Trust and continue to be

49    subject to the jurisdiction of the Court following confirmation of the Plan until such Group IV:

50    Voluntary Assets are distributed to the Holders of Allowed Claims in accordance with the provisions

51    of the Plan.

52    **20.3    Exculpation and Releases**

1          Effective upon the entry of the Confirmation Order, neither the Group IV: Voluntary

2    Debtors, the Committees, Plan Sponsor, the SunCal Plan Proponents, the Professionals, nor any of

3    their respective members, officers, directors, shareholders, employees, or agents, shall have or incur

4    any liability to any Person, including any creditors or Interest Holder of the Debtors, for any act taken

29 ~~or omission made in connection with or related to the~~ ~~negotiation~~, ~~formulation, or preparation of the~~
30 ~~Plan and the Disclosure Statement, the approval of the Disclosure Statement, the confirmation of the~~
31 ~~Plan, the consummation of the Plan, or the administration of the Plan, the Cases, or the property to be~~
32 ~~distributed under the Plan, to the fullest extent permitted by applicable~~ ~~statues and case law, except~~
33 ~~that the Plan Trust will be liable for the performance of obligations assumed by it or imposed upon it~~
34 ~~under or by the Plan.~~

35 **XXI.**

36 **MISCELLANEOUS**

37 **21.1    Payment of Statutory Fees.**

38 All quarterly fees due and payable to the Office of the United States Trustee pursuant to

39 Section 1930(a)(6) of title 28 of the United States Code shall be paid in full on or before the Effective

40 Date, or, to the extent such quarterly fees are disputed, an adequate reserve shall have been

41 established and set aside for payment in full thereof, as required by Section 1129(a)(12) of the

42 Bankruptcy Code.  The Plan Trustee shall remain responsible for timely payment of quarterly fees

43 due and payable after the Effective Date and until the Group IV: Voluntary Debtors' Cases are

44 closed, to the extent required by Section 1930(a)(6) of title 28 of the United States Code.

45 **21.2    Changes in Rates Subject to Regulatory Commission Approval.**

46 The Group IV: Voluntary Debtors are not subject to governmental regulatory commission

47 approval of their rates.

48 **21.3** ~~21.2~~ **Payment Dates.**

49 Whenever any payment or Distribution to be made under the Plan shall be due on a day other

50 than a Business Day, such payment or Distribution shall instead be made, without interest, on the

51 immediately following Business Day.

52 **21.4** ~~21.3~~ **Headings.**

1 The headings used in the Disclosure Statement and in the Plan are inserted for convenience

2 only and neither constitutes a portion of the Disclosure Statement or the Plan nor in any manner

3 affect the construction of the provisions of the Disclosure Statement or the Plan.

4

29    **21.5**    ~~21.4~~   **Other Documents and Actions**.

30          The Plan Trustee may execute such other documents and take such other actions as may be

31    necessary or appropriate to effectuate the transactions contemplated under the Plan.

32    **21.6**    ~~21.5~~   **Notices**.

33          All notices and requests in connection with the Disclosure Statement and the Plan shall be in

34    writing and shall be hand delivered or sent by mail addressed to:

35                    **To the SunCal Plan Proponents**:
36                    Bruce V. Cook
                      General Counsel
37                    Authorized Agent of the SunCal Plan Proponents
                      2392 Morse Ave
38                    Irvine, CA 92614-6234

39                    **With copies to:**
40                    Paul J. Couchot
                      Winthrop & Couchot, Professional Corporation
41                    660 Newport Center Drive, Suite 400
                      Newport Beach, CA 92660

42
                      Ronald Rus
43                    Rus Miliband & Smith A Professional Corporation
                      2211 Michelson Drive, Seventh Floor
44                    Irvine, California 92612

45          All notices and requests to any Person holding of record any Claim or Interest shall be sent to

46    them at their last known address or to the last known address of their attorney of record.  Any such

47    Person may designate in writing any other address for purposes of this Section 16.5, which

48    designation will be effective on receipt.

49    **21.7**    ~~21.6~~   **Governing Law**.

50          Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code

51    and Bankruptcy Rules), the laws of the State of California (without reference to its conflict of law

52    rules) shall govern the construction and implementation of the Plan and any agreements, documents,

1    and instruments executed in connection with the Plan, unless otherwise specifically provided in such

2    agreements, documents, or instruments.

3

4

**21.8**  21.7  **Binding Effect.**

The Plan and all rights, duties and obligations thereunder shall be binding upon and inure to the benefit of the Plan Sponsor, the Plan Trustee, Holders of Claims, Holders of Interests, and their respective successors and assigns.

**21.9**  21.8  **Successors and Assigns.**

The rights, benefits, and obligations of any entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, the heirs, executors, administrators, successors, and assigns of such entity.

**21.10**  21.9  **Severability of Plan Provisions.**

If, prior to the Confirmation Date, any term or provision of the Plan is held by the Bankruptcy Court to be illegal, impermissible, invalid, void or unenforceable, or otherwise to constitute grounds for denying confirmation of the Plan, the Bankruptcy Court shall, with the consent of the Group IV: Voluntary Debtors, have the power to interpret, modify or delete such term or provision (or portions thereof) to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be operative as interpreted, modified or deleted.  Notwithstanding any such interpretation, modification or deletion, the remainder of the terms and provisions of the Plan shall in no way be affected, impaired or invalidated by such interpretation, modification or deletion.

**21.11**  21.10  **No Waiver.**

The failure of the Group IV: Voluntary Debtors or any other Person to object to any Claim for purposes of voting shall not be deemed a waiver of the Voluntary Debtors' Committee, the Group IV: Voluntary Debtors' or the Plan Trustee's right to object to or examine such Claim, in whole or in part.

**21.12**  21.11  **Inconsistencies.**

In the event the terms or provisions of the Disclosure Statement are inconsistent with the terms and provisions of the Plan or documents executed in connection with the Plan, the terms of the Plan shall control.

**21.13**  21.12  **Exemption from Certain Transfer Taxes and Recording Fees.**

MAINDOCS-#163418-v9-SCC164968-v3-SunCal_3rd_Am_Group_IV_VD_DS.DOC

Pursuant to Section 1146(c) of the Bankruptcy Code, any transfers from a Group IV: Voluntary Debtor to the Plan Trust or to any other Person or entity pursuant to the Plan, or any agreement regarding the transfer of title to or ownership of any of the Group IV: Voluntary Debtors' real or personal property or of any other interest in such property (including, without limitation, a security interest) will not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax,

stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, and the Confirmation Order will direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### 21.14  21.13  Post-Confirmation Status Report.

Within 180 days following the entry of the Confirmation Order, the Plan Trustee shall file a status report with the Court explaining what progress has been made toward consummation of the confirmed Plan.  The status report shall be served on the United States Trustee, the twenty largest unsecured creditors, and those parties who have requested special notice.  Unless otherwise ordered, further status reports shall be filed every 180 days and served on the same entities.

### 21.15  21.14  Post-Confirmation Conversion/Dismissal.

A creditor or party in interest may bring a motion to convert or dismiss the case under § 1112(b), after the Plan is confirmed, if there is a default in performing the Plan.  The Plan Trustee reserves the right to object to any motion for conversion or dismissal.  In addition, as set forth in the definition of the Effective Date, the Effective Date may be further extended by order of the Bankruptcy Court after notice and hearing to all parties in interest.  If the Court determines there is no "cause" for the extension of the Effective Date, a party in interest may move to dismiss or convert the case.

If the Court orders any of the Cases converted to Chapter 7 after the Plan is confirmed, then all property that had been property of the Chapter 11 Estate, and that has not been disbursed pursuant to the Plan, will revest in the Chapter 7 estate.  The automatic stay will be reimposed upon the

29 revested property, but only to the extent that relief from stay was not previously authorized by the

30 Court during this case.

31    **21.16** 21.15  **Final Decree.**

32    Once an Estate has been fully administered, as referred to in Bankruptcy Rule 3022, the Plan

33 Trustee, or other party as the Court shall designate in the Confirmation Order, shall file a motion

34 with the Court to obtain a final decree to close the Case of such Group IV: Voluntary Debtor.

35 Date:  July 18,August 5, 2011                                      By:  ___/s/ Bruce

36 v. Cook_____

37                                                Bruce Cook
                                                 General Counsel, Authorized Agent for the
                                                 Voluntary Debtors and Acquisitions

38

39 **Submitted By:**

40 **WINTHROP COUCHOT**              **RUS MILIBAND & SMITH**
   **PROFESSIONAL CORPORATION**      **A PROFESSIONAL CORPORATION**

41

42 By:  /s/ Paul J. Couchot_____      By: _/s/ Ronald Rus_____

43     Paul J. Couchot, Esq.                    Ronald Rus, Esq.
   General Insolvency Counsel for               Joel S. Miliband, Esq.
44 the Voluntary Debtors                    Counsel for SCC Acquisitions Inc.

45 **RUS MILIBAND & SMITH**
   **A PROFESSIONAL CORPORATION**

46

47 By:  /s/ Ronald Rus_____
       Ronald Rus, Esq.
48     Joel S. Miliband, Esq.
   Attorneys for SunCal Management, LLC and
49 SCC Acquisitions Inc.

50

51

52

1

2

3

4

| In re: | CHAPTER  11 |
|--------|-------------|
| Debtor(s). | CASE NUMBER |

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 660 Newport Center Drive, 4th Fl., Newport Beach, CA 92660.

A true and correct copy of the foregoing document described as:  ~~SECOND~~THIRD **AMENDED DISCLOSURE STATEMENT DESCRIBING** ~~SECOND~~THIRD **AMENDED JOINT CHAPTER 11 PLAN FILED BY SJD PARTNERS, LTD. AND SJD DEVELOPMENT CORP. [GROUP IV: VOLUNTARY DEBTORS]**  will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

I.  **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document.  On ~~July 18,~~August 5, 2011, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

☒  Service information continued on attached page

II.  **SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served)**:**
On _____, 2011, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐  Service information continued on attached page

III.  **SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on _____, 2011, I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| ~~July 18,~~August 5, 2011 | Gretchen Crumpacker | /s/ Gretchen Crumpacker |
|---------------------------|---------------------|--------------------------|
| *Date* | *Type Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*

**F 9013-3.1**

| In re: | CHAPTER 11 |
|--------|------------|
| Debtor(s). | CASE NUMBER |

- **NEF SERVICE LIST**

- Selia M Acevedo     sacevedo@millerbarondess.com, mpritikin@millerbarondess.com
- Joseph M Adams     jadams@sycr.com
- Raymond H Aver     ray@averlaw.com
- James C Bastian     jbastian@shbllp.com
- Thomas Scott Belden     sbelden@kleinlaw.com, ecf@kleinlaw.com
- John A Boyd     fednotice@tclaw.net
- Mark Bradshaw     mbradshaw@shbllp.com
- Gustavo E Bravo     gbravo@smaha.com
- Jeffrey W Broker     jbroker@brokerlaw.biz
- Brendt C Butler     bbutler@mandersonllp.com
- Andrew W Caine     acaine@pszyjw.com
- Carollynn Callari     ccallari@venable.com
- Cathrine M Castaldi     ccastaldi@rusmiliband.com
- Tara Castro Narayanan     tara.narayanan@msrlegal.com, lisa.king@msrlegal.com
- Dan E Chambers     dchambers@jmbm.com
- Shirley Cho     scho@pszjlaw.com
- Vonn Christenson     vrc@paynefears.com
- Brendan P Collins     bpcollins@bhfs.com
- Vincent M Coscino     vcoscino@allenmatkins.com, emurdoch@allenmatkins.com
- Paul J Couchot     pcouchot@winthropcouchot.com,
  pj@winthropcouchot.com;sconnor gcrumpacker@winthropcouchot.com
- Jonathan S Dabbieri     dabbieri@sullivan.com,
  hill@sullivanhill.com;mcallister@sullivanhill.com;stein@sullivanhill.com;vidovich@sullivanhill.com
- Ana Damonte     ana.damonte@pillsburylaw.com
- Vanessa S Davila     vsd@amclaw.com
- Melissa Davis     mdavis@shbllp.com
- Daniel Denny     ddenny@gibsondunn.com
- Caroline Djang     crd@jmbm.com
- Donald T Dunning     ddunning@dunningLaw.com
- Meredith R Edelman     meredith.edelman@dlapiper.com
- Joseph A Eisenberg     jae@jmbm.com
- Lei Lei Wang Ekvall     lekvall@wgllp.com
- Richard W Esterkin     resterkin@morganlewis.com
- Marc C Forsythe     kmurphy@goeforlaw.com
- Alan J Friedman     afriedman@irell.com
- Steven M Garber     steve@smgarberlaw.com
- Christian J Gascou     cgascou@gascouhopkins.com
- Barry S Glaser     bglaser@swjlaw.com
- Robert P Goe     kmurphy@goeforlaw.com, rgoe@goeforlaw.com;mforsythe@goeforlaw.com
- Eric D Goldberg     egoldberg@stutman.com
- Richard H Golubow     rgolubow@winthropcouchot.com, pj@winthropcouchot.com
- Michael J Gomez     mgomez@frandzel.com, efiling@frandzel.com;sking@frandzel.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*                                                                                    **F 9013-3.1**

| | |
|---|---|
| In re: | CHAPTER  11 |
| Debtor(s). | CASE NUMBER |

- Kelly C Griffith    bkemail@harrisbeach.com
- Matthew Grimshaw    mgrimshaw@rutan.com
- Kavita Gupta    kgupta@winthropcouchot.com
- Asa S Hami    ahami@morganlewis.com
- Michael J Hauser    michael.hauser@usdoj.gov
- D Edward Hays    ehays@marshackhays.com
- Michael C Heinrichs    mheinrichs@omm.com
- Harry D. Hochman    hhochman@pszjlaw.com, hhochman@pszjlaw.com
- Jonathan M Hoff    jonathan.hoff@cwt.com
- Nancy Hotchkiss    nhotchkiss@trainorfairbrook.com
- Michelle Hribar    mhribar@rutan.com
- John J Immordino    john.immordino@wilsonelser.com, raquel.burgess@wilsonelser.com
- Lawrence A Jacobson    laj@cohenandjacobson.com
- Michael J Joyce    mjoyce@crosslaw.com
- Stephen M Judson    sjudson@fablaw.com
- Kaleb L Judy    ecf@kleinlaw.com, kjudy@kleinlaw.com
- Steven J Kahn    skahn@pszyjw.com
- Sheri Kanesaka    sheri.kanesaka@bryancave.com
- David I Katzen    katzen@ksfirm.com
- Christopher W Keegan    ckeegan@kirkland.com, gdupre@kirkland.com;alevin@kirkland.com
- Payam Khodadadi    pkhodadadi@winthropcouchot.com, pj@winthropcouchot.com
- Irene L Kiet    ikiet@hkclaw.com
- Claude F Kolm    claude.kolm@acgov.org
- Mark J Krone    mk@amclaw.com, crs@amclaw.com;amc@amclaw.com
- David B Lally    davidlallylaw@gmail.com
- Leib M Lerner    leib.lerner@alston.com
- Peter W Lianides    plianides@winthropcouchot.com, pj@winthropcouchot.com
- Charles Liu    cliu@winthropcouchot.com
- Kerri A Lyman    klyman@irell.com
- Mariam S Marshall    mmarshall@marshallramoslaw.com
- Robert C Martinez    rmartinez@mclex.com
- Michael D May    mdmayesq@verizon.net
- Hutchison B Meltzer    hmeltzer@wgllp.com
- Krikor J Meshefejian    kjm@lnbrb.com
- Joel S. Miliband    jmiliband@rusmiliband.com
- James M Miller    jmiller@millerbarondess.com,
  vgunderson@millerbarondess.com;smiller@millerbarondess.com;mpritikin@millerbarondess.com
- Louis R Miller    smiller@millerbarondess.com
- Craig Millet    cmillet@gibsondunn.com, pcrawford@gibsondunn.com;cmillet@gibsondunn.com
- Randall P Mroczynski    randym@cookseylaw.com
- Mike D Neue    mneue@thelobelfirm.com, jmattiace@thelobelfirm.com;pnelson@thelobelfirm.com
- Robert Nida    Rnida@castlelawoffice.com
- Henry H Oh    henry.oh@dlapiper.com, janet.curley@dlapiper.com
- Sean A Okeefe    sokeefe@okeefelc.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*                                                                                                    **F 9013-3.1**

| In re: | CHAPTER  11 |
|---|---|
| Debtor(s). | CASE NUMBER |

- Scott H Olson    solson@seyfarth.com
- Robert B Orgel    rorgel@pszjlaw.com, rorgel@pszjlaw.com
- Malhar S Pagay    mpagay@pszjlaw.com, mpagay@pszjlaw.com
- Ernie Zachary Park    ernie.park@bewleylaw.com
- Daryl G Parker    dparker@pszjlaw.com
- Penelope Parmes    pparmes@rutan.com
- Robert J Pfister    rpfister@ktbslaw.com
- Ronald B Pierce    ronald.pierce@sdma.com
- Katherine C Piper    kpiper@steptoe.com, smcloughlin@steptoe.com
- Cassandra J Richey    cmartin@pprlaw.net
- Debra Riley    driley@allenmatkins.com
- James S Riley    tgarza@sierrafunds.com
- Todd C. Ringstad    becky@ringstadlaw.com
- R Grace Rodriguez    ecf@lorgr.com
- Martha E Romero    Romero@mromerolawfirm.com
- Ronald Rus    rrus@rusmiliband.com
- John P Schafer    jschafer@mandersonllp.com
- John E Schreiber    jschreiber@dl.com
- William D Schuster    bills@allieschuster.org
- Christopher P Simon    csimon@crosslaw.com
- Gerald N Sims    jerrys@psdslaw.com, bonniec@psdslaw.com
- Wendy W Smith    wendy@bindermalter.com
- Steven M Speier    Sspeier@Squarmilner.com, ca85@ecfcbis.com
- Steven M Speier (TR)    Sspeier@asrmanagement.com, ca85@ecfcbis.com
- Michael St James    ecf@stjames-law.com
- Michael K Sugar    msugar@irell.com
- Cathy Ta    cathy.ta@bbklaw.com, Arthur.Johnston@bbklaw.com;Kenneth.Burgess@bbklaw.com
- David A Tilem    davidtilem@tilemlaw.com,
  malissamurguia@tilemlaw.com;dianachau@tilemlaw.com;kmishigian@tilemlaw.com
- James E Till    jtill@thelobelfirm.com, jmattiace@thelobelfirm.com;pnelson@thelobelfirm.com
- United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov
- Carol G Unruh    cgunruh@sbcglobal.net
- Annie Verdries    verdries@lbbslaw.com
- Jason Wallach    jwallach@gladstonemichel.com
- Joshua D Wayser    , kim.johnson@kattenlaw.com
- Marc J Winthrop    mwinthrop@winthropcouchot.com, pj@winthropcouchot.com
- David M Wiseblood    dwiseblood@seyfarth.com
- Brett K Wiseman    bwiseman@aalaws.com
- Dean A Ziehl    dziehl@pszjlaw.com, dziehl@pszjlaw.com
- Marc A. Zimmerman    joshuasdaddy@att.net

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*                                                                              **F 9013-3.1**

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 660 Newport Center Drive, 4th Fl., Newport Beach, CA 92660.

A true and correct copy of the foregoing document described as:  REDLINED DISCLOSURE STATEMENT will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

**I.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On August 8, 2011, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

☒  Service information continued on attached page

**II.  SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served)**:**
On _____, 2011, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐  Service information continued on attached page

**III.  SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on August 8, 2011, I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.

Robert Orgel:  Rorgel@pszjlaw.com
Richard Pachulaki:  rpachulski@pszjlaw.com
John W. Lucas: jlucas@pszjlaw.co,

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| August 8, 2011 | Gretchen Crumpacker | /s/ Gretchen Crumpacker |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

NEF SERVICE LIST
- Selia M Acevedo     sacevedo@millerbarondess.com, mpritikin@millerbarondess.com
- Joseph M Adams     jadams@sycr.com
- Raymond H Aver     ray@averlaw.com
- James C Bastian     jbastian@shbllp.com
- Thomas Scott Belden     sbelden@kleinlaw.com, ecf@kleinlaw.com
- John A Boyd     fednotice@tclaw.net
- Mark Bradshaw     mbradshaw@shbllp.com
- Gustavo E Bravo     gbravo@smaha.com
- Jeffrey W Broker     jbroker@brokerlaw.biz
- Brendt C Butler     bbutler@mandersonllp.com
- Andrew W Caine     acaine@pszyjw.com
- Carollynn Callari     ccallari@venable.com
- Cathrine M Castaldi     ccastaldi@rusmiliband.com
- Tara Castro Narayanan     tara.narayanan@msrlegal.com, lisa.king@msrlegal.com
- Dan E Chambers     dchambers@jmbm.com
- Shirley Cho     scho@pszjlaw.com
- Vonn Christenson     vrc@paynefears.com
- Brendan P Collins     bpcollins@bhfs.com
- Vincent M Coscino     vcoscino@allenmatkins.com, emurdoch@allenmatkins.com
- Paul J Couchot     pcouchot@winthropcouchot.com,
  pj@winthropcouchot.com;gcrumpacker@winthropcouchot.com
- Jonathan S Dabbieri     dabbieri@sullivan.com,
  hill@sullivanhill.com;mcallister@sullivanhill.com;stein@sullivanhill.com;vidovich@sullivanhill.com
- Ana Damonte     ana.damonte@pillsburylaw.com
- Vanessa S Davila     vsd@amclaw.com
- Melissa Davis     mdavis@shbllp.com
- Daniel Denny     ddenny@gibsondunn.com
- Caroline Djang     crd@jmbm.com
- Donald T Dunning     ddunning@dunningLaw.com
- Meredith R Edelman     meredith.edelman@dlapiper.com
- Joseph A Eisenberg     jae@jmbm.com
- Lei Lei Wang Ekvall     lekvall@wgllp.com
- Richard W Esterkin     resterkin@morganlewis.com
- Marc C Forsythe     kmurphy@goeforlaw.com
- Alan J Friedman     afriedman@irell.com
- Steven M Garber     steve@smgarberlaw.com
- Christian J Gascou     cgascou@gascouhopkins.com
- Barry S Glaser     bglaser@swjlaw.com
- Robert P Goe     kmurphy@goeforlaw.com, rgoe@goeforlaw.com;mforsythe@goeforlaw.com
- Eric D Goldberg     egoldberg@stutman.com
- Richard H Golubow     rgolubow@winthropcouchot.com, pj@winthropcouchot.com
- Michael J Gomez     mgomez@frandzel.com, efiling@frandzel.com;sking@frandzel.com
- Kelly C Griffith     bkemail@harrisbeach.com
- Matthew Grimshaw     mgrimshaw@rutan.com
- Kavita Gupta     kgupta@winthropcouchot.com
- Asa S Hami     ahami@morganlewis.com
- Michael J Hauser     michael.hauser@usdoj.gov
- D Edward Hays     ehays@marshackhays.com
- Michael C Heinrichs     mheinrichs@omm.com
- Harry D. Hochman     hhochman@pszjlaw.com, hhochman@pszjlaw.com
- Jonathan M Hoff     jonathan.hoff@cwt.com
- Nancy Hotchkiss     nhotchkiss@trainorfairbrook.com
- Michelle Hribar     mhribar@rutan.com

- John J Immordino    john.immordino@wilsonelser.com, raquel.burgess@wilsonelser.com
- Lawrence A Jacobson    laj@cohenandjacobson.com
- Michael J Joyce    mjoyce@crosslaw.com
- Stephen M Judson    sjudson@fablaw.com
- Kaleb L Judy    ecf@kleinlaw.com, kjudy@kleinlaw.com
- Steven J Kahn    skahn@pszyjw.com
- Sheri Kanesaka    sheri.kanesaka@bryancave.com
- David I Katzen    katzen@ksfirm.com
- Christopher W Keegan    ckeegan@kirkland.com, gdupre@kirkland.com;alevin@kirkland.com
- Payam Khodadadi    pkhodadadi@winthropcouchot.com, pj@winthropcouchot.com
- Irene L Kiet    ikiet@hkclaw.com
- Claude F Kolm    claude.kolm@acgov.org
- Mark J Krone    mk@amclaw.com, crs@amclaw.com;amc@amclaw.com
- David B Lally    davidlallylaw@gmail.com
- Leib M Lerner    leib.lerner@alston.com
- Peter W Lianides    plianides@winthropcouchot.com, pj@winthropcouchot.com
- Charles Liu    cliu@winthropcouchot.com
- Kerri A Lyman    klyman@irell.com
- Mariam S Marshall    mmarshall@marshallramoslaw.com
- Robert C Martinez    rmartinez@mclex.com
- Michael D May    mdmayesq@verizon.net
- Hutchison B Meltzer    hmeltzer@wgllp.com
- Krikor J Meshefejian    kjm@lnbrb.com
- Joel S. Miliband    jmiliband@rusmiliband.com
- James M Miller    jmiller@millerbarondess.com,
  vgunderson@millerbarondess.com;smiller@millerbarondess.com;mpritikin@millerbarondess.com
- Louis R Miller    smiller@millerbarondess.com
- Craig Millet    cmillet@gibsondunn.com, pcrawford@gibsondunn.com;cmillet@gibsondunn.com
- Randall P Mroczynski    randym@cookseylaw.com
- Mike D Neue    mneue@thelobelfirm.com,
  jmattiace@thelobelfirm.com;pnelson@thelobelfirm.com
- Robert Nida    Rnida@castlelawoffice.com
- Henry H Oh    henry.oh@dlapiper.com, janet.curley@dlapiper.com
- Sean A Okeefe    sokeefe@okeefelc.com
- Scott H Olson    solson@seyfarth.com
- Robert B Orgel    rorgel@pszjlaw.com, rorgel@pszjlaw.com
- Malhar S Pagay    mpagay@pszjlaw.com, mpagay@pszjlaw.com
- Ernie Zachary Park    ernie.park@bewleylaw.com
- Daryl G Parker    dparker@pszjlaw.com
- Penelope Parmes    pparmes@rutan.com
- Robert J Pfister    rpfister@ktbslaw.com
- Ronald B Pierce    ronald.pierce@sdma.com
- Katherine C Piper    kpiper@steptoe.com, smcloughlin@steptoe.com
- Cassandra J Richey    cmartin@pprlaw.net
- Debra Riley    driley@allenmatkins.com
- James S Riley    tgarza@sierrafunds.com
- Todd C. Ringstad    becky@ringstadlaw.com
- R Grace Rodriguez    ecf@lorgr.com
- Martha E Romero    Romero@mromerolawfirm.com
- Ronald Rus    rrus@rusmiliband.com
- John P Schafer    jschafer@mandersonllp.com
- John E Schreiber    jschreiber@dl.com
- William D Schuster    bills@allieschuster.org
- Christopher P Simon    csimon@crosslaw.com
- Gerald N Sims    jerrys@psdslaw.com, bonniec@psdslaw.com

- Wendy W Smith     wendy@bindermalter.com
- Steven M Speier     Sspeier@Squarmilner.com, ca85@ecfcbis.com
- Steven M Speier (TR)     Sspeier@asrmanagement.com, ca85@ecfcbis.com
- Michael St James     ecf@stjames-law.com
- Michael K Sugar     msugar@irell.com
- Cathy Ta     cathy.ta@bbklaw.com, Arthur.Johnston@bbklaw.com;Kenneth.Burgess@bbklaw.com
- David A Tilem     davidtilem@tilemlaw.com,
  malissamurguia@tilemlaw.com;dianachau@tilemlaw.com;kmishigian@tilemlaw.com
- James E Till     jtill@thelobelfirm.com, jmattiace@thelobelfirm.com;pnelson@thelobelfirm.com
- United States Trustee (SA)     ustpregion16.sa.ecf@usdoj.gov
- Carol G Unruh     cgunruh@sbcglobal.net
- Annie Verdries     verdries@lbbslaw.com
- Jason Wallach     jwallach@gladstonemichel.com
- Joshua D Wayser     , kim.johnson@kattenlaw.com
- Benjamin M Weiss     bweiss@lansingcompanies.com
- Marc J Winthrop     mwinthrop@winthropcouchot.com, pj@winthropcouchot.com
- David M Wiseblood     dwiseblood@seyfarth.com
- Brett K Wiseman     bwiseman@aalaws.com
- Dean A Ziehl     dziehl@pszjlaw.com, dziehl@pszjlaw.com
- Marc A. Zimmerman     joshuasdaddy@att.net