PAUL J. COUCHOT -- State Bar No. 131934
WINTHROP COUCHOT, P.C.
660 Newport Center Drive, Fourth Floor
Newport Beach, CA 92660
Telephone: (949) 720-4100
Facsimile: (949) 720-4111
General Insolvency Counsel for Palmdale Hills
Property, LLC et. al. (the "Voluntary Debtors")

RONALD RUS - State Bar No. 67369
JOEL S. MILIBAND - State Bar No. 77438
RUS MILIBAND & SMITH
A PROFESSIONAL CORPORATION
2211 Michelson Drive, Seventh Floor
Irvine, California 92612
Telephone: (949) 752-7100
Facsimile:  (949) 252-1514

Counsel for ~~SunCal Management LLC and~~ SCC
Acquisitions Inc.

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
~~Santa Ana Division~~
**<u>SANTA ANA DIVISION</u>**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

In re

PALMDALE HILLS PROPERTY, AND ITS
RELATED DEBTORS,

> Joint Administered Debtors and
> Debtors-in-Possession

Affects:

☐ All Debtors
☐ Palmdale Hills Property, LLC
☐ SunCal Beaumont Heights, LLC
☐ SCC/Palmdale, LLC
☐ SunCal Johannson Ranch, LLC
☐ SunCal Summit Valley, LLC
☐ SunCal Emerald Meadows LLC
☐ SunCal Bickford Ranch, LLC
☐ Acton Estates, LLC
☐ Seven Brothers LLC
☐ SJD Partners, Ltd.
☐ SJD Development Corp.
☐ Kirby Estates, LLC
☐ SunCal Communities I, LLC
☐ SunCal Communities III, LLC
☐ SCC Communities LLC
☐ North Orange Del Rio Land, LLC
☐ Tesoro SF LLC

*Continued from Previous Page*

☐ LBL-SunCal Oak Valley, LLC
☐ SunCal Heartland, LLC
☐ LBL-SunCal Northlake, LLC
☐ SunCal Marblehead, LLC
☐ SunCal Century City, LLC
☐ SunCal PSV, LLC
☐ Delta Coves Venture, LLC
☒ SunCal Torrance, LLC
☒ SunCal Oak Knoll, LLC

Case No. 8:08-bk-17206-ES

Jointly Administered With Case Nos.
8:08-bk-17209-ES; 8:08-bk-17240-ES;
8:08-bk-17224-ES; 8:08-bk-17242-ES;
8:08-bk-17225-ES; 8:08-bk-17245-ES;
8:08-bk-17227-ES; 8:08-bk-17246-ES;
8:08-bk-17230-ES; 8:08-bk-17231-ES;
8:08-bk-17236-ES; 8:08-bk-17248-ES;
8:08-bk-17249-ES; 8:08-bk-17573-ES;
8:08-bk-17574-ES; 8:08-bk-17575-ES;
8:08-bk-17404-ES; 8:08-bk-17407-ES;
8:08-bk-17408-ES; 8:08-bk-17409-ES;
8:08-bk-17458-ES; 8:08-bk-17465-ES;
8:08-bk-17470-ES; 8:08-bk-17472-ES;
and 8:08-bk-17588-ES

Chapter 11 Proceedings

**[REDLINED] SECONDTHIRD AMENDED
DISCLOSURE STATEMENT
DESCRIBING SECONDTHIRD AMENDED
CHAPTER 11 PLANS FILED BY SUNCAL
PLAN PROPONENTS IN THE CHAPTER
11 CASES OF SUNCAL OAK KNOLL, LLC
AND SUNCAL TORRANCE, LLC [GROUP
II: TRUSTEE DEBTORS]**

Date:      July 22, 2011
Time:     11:00 a.m.
Place:     Courtroom 5A

# TABLE OF CONTENTS

**PAGE**

I.      INTRODUCTION.......................................................................    2

II.     DEFINITIONS AND RULES OF INTERPRETATION.........................    45
        2.1        2.1      Definitions.................................................    45
        2.2        2.2      ..........................................................Rules of
        Construction.................................................    2325
        2.3        2.3      ..........................................................Exhibits.
                   2426

III.    PLAN CONFIRMATION DEADLINES ........................................    2426
        3.1        3.1      ..........................................................Time and
        Place of the Confirmation Hearing.................................    2426
        3.2        3.2      ..........................................................Deadline
        for Voting for or Against the Plan.................................    2426
        3.3        3.3      ..........................................................Deadline
        for Objecting to the Confirmation of the Plan.................................    2526
        3.4        3.4      ..........................................................Identity of
        Person to Contact for More Information.................................
        Regarding the Plan.................................    2527
        3.5        3.5      ..........................................................
                   Disclaimer.................................    2527

IV.     FACTUAL BACKGROUND OF THE DEBTORS .............................    2628
        4.1        4.1      ..........................................................The
        Formation of the Debtors and theTheir Projects.................................    2628
4.2        4.1.1
        Overview of the Debtors and Their Projects.................................    26
4.3        4.1.2      ..........................................................The
Debtors' Primary Secured Creditors and
4.4        ..........................................................Their
Disputed Claims        28
4.5        4.1.3      ..........................................................Disputed
Claims and Liens        28
4.6        4.1.4      ..........................................................A
Summary of All of the Alleged Claims
4.7        ..........................................................Against
the Debtors        29
4.8        4.1.5
        Summary of the Group II: Trustee Debtors' Cash .......................    29
        4.9        4.2      ..........................................................Factual
        Circumstances Leading to the Filing of the .......................
        Debtors' Chapter 11 Cases.................................    2931

4.10      4.2.1    Introduction ................................................... 29

4.11      4.2.2    Background on the SunCal Companies ................. 30

4.12      4.2.3 ...................................................... The Origins of the SunCal/Lehman Joint Venture ........................................... 31

4.13      4.2.4    Lehman's Effective Control over the Management

4.14 ...................................................... of the Debtors and Promises of Ongoing Funding ........................... 31

4.15      4.2.5 ...................................................... The 2008 Restructuring Agreement ................................................. 33

4.16      4.2.6 ...................................................... The Lehman Lenders Hire Radco ....................................................... 34

4.17      4.2.7 ...................................................... The Lehman Lenders' Failure to Close on the

4.18

            Settlement Agreement ................................................. 34

4.19      4.2.8 ...................................................... The Lehman Lenders' Undisclosed Sale of Most

4.20 ...................................................... of the Debtors' Loans ...................................................... 35

4.21      4.2.9    Lehman's Foreclosure Sale and Purchase of the

4.22 ...................................................... Pacific Point Project ........ 36

4.23      4.2.10 ...................................................... Alvarez and Marsal Take Over Control of the

4.24 ...................................................... Lehman Entities After the Chapter 11 Filing of

4.25 ...................................................... LBHI and LCPI .......... 37

4.26    4.3    The Debtors' Potential Preferential Transfers ..................................... 39

4.27

# TABLE OF CONTENTS

## (Continued)

**PAGE**

4.28    The Group II: Trustee Debtors' Potential Preferential Transfers..................    40

V.    SIGNIFICANT EVENTS IN THE DEBTORS' CHAPTER 11 CASES ...............    ~~39~~41
    5.1    Voluntary Debtors..................................................    ~~39~~
        5.1.1    Joint Administration of the Voluntary Debtors
            and the Trustee Debtors ...........................    ~~39~~
        5.1.2    The Voluntary Debtors Court Employed Professionals................    ~~40~~
        5.1.3    LCPI's Motions for Relief from the Automatic Stay
            Against Certain of the Voluntary Debtors' Projects   and Related Appeals.
            41
    5.2    The Trustee Debtors and Their Professionals ...............................    ~~41~~43
    5.3    The Debtors' Various Motions Relating to Financing for the
        Projects and to Pay Professional Fees ...............................    ~~42~~43
        5.3.1    The Voluntary Debtors' Initial Motion for Surcharge
            and Use of Cash Collateral ...........................    ~~42~~
        5.3.2    The Lehman Disputed Administrative Loans ....................    ~~42~~
        5.3.3    The Voluntary Debtors' Agreements with the Lehman
            Entities for Use of Alleged Cash Collateral to Maintain
            the Properties and to Pay Professional Fees ....................    ~~44~~
    5.4    The Debtors' Disputes and Claims Against the Lehman Entities......    45
        5.4.1    The Lehman Adversary Proceeding .........................    45
            5.4.1.1   Equitable Subordination......................    46
            5.4.1.2   The Fraudulent Transfer Claims ..............    46
            5.4.1.3   The Preference Claims .......................    46
            5.4.1.4   The Debtors' Motions to Strike the Claims and
                Pleadings Arising from the Sold Loans to Fenway
                Capital and Related Appeals ..................    46
            5.4.1.5   Debtors' 502(d) Objections and Lehman's
                Claim Against Acton .........................    47
            5.4.1.6   The Lehman Recoupment Claim Objections
                and the Contract Action .....................    48
            5.4.1.7   The Debtors' Potential Post-Petition Claims
                Against Lehman and Their Agents ...............    52
    5.5    The ~~Lehman Fenway Claims Transaction, Compromise
        Motion Filed by the Lehman Entities.~~...............    ~~52~~
        5.5.1    Lehman Entities' and Fenway's Proposed Claims
            Transaction ...............................    ~~52~~
    5.6    The Debtors' Motion for a Stay to Suspend Certain...................... Lehman
        Actions.    53
        ~~5.7~~5.6   The Debtors' Other Litigation with Non-Lehman Related Parties. ..............    54
        5.7.1    The Debtors' Failed Preliminary Injunction Motion
            Against the Holders of Bond Claims .......................    54

**TABLE OF CONTENTS**

**(Continued)**

**PAGE**

5.7.2   The Contractors' Successful Motions for Relief from
Stay to Pursue the Bond Claims ..................................................... 54

5.7.3   Bond Safeguard Motion ......................................................... 54

5.7.4 5.7   LitCo. 55 ......................................................................................

5.8   Reliance Claims ......................................................................... 55

VI.   TREATMENT OF UNCLASSIFIED CLAIMS ........................................... 55 56

6.1     6.1   Introduction. ........................................................... 55 56

6.2     6.2   Treatment of Allowed Administrative Claims. ............................................ 55 56

6.3     6.3   Treatment and Repayment of the Lehman's Administrative Loan(s)............ 55 Loans. 57

6.4     6.4   Repayment of Allowed Administrative Claims ............................ Other than the Lehman Administrative Loans. ................................................................ 56 57

6.5     6.5   Administrative Claims Bar Date .................................................... 56 57

6.6     6.6   Treatment of Unsecured Tax Claims ............................................ 57 58

6.7   Summary of the Group II: Trustee Debtors Plans' Treatment of Bond Indemnity Claims. .............................................................. 59

VII.   CLASSIFICATION OF CLAIMS AND INTERESTS ......................................... 57 59

VIII.   THE PLAN'S TREATMENT OF CLASSIFIED CLAIMS ...................................AND INTERESTS   60 62

8.1.     8.1.   The Plan's Treatment of Holders of Allowed Secured   Real Property Tax Claims on Real Properties Subject to Against the Group II: Trustee Projects Deeds of Trust Arising from Lehman's Disputed Secured ............................ Claims and Disputed Liens (Classes 1.1 Through and 1.2). .............................................. 60 62

8.2.     8.2.   The Plan's Treatment of Holders of Lehman's Disputed ................................Claim(s) and Disputed Lien(s) (Classes 2.1 Through 2.2) ........................................................ 61

A.   Lien Rights ......................................................................... 61

B.   Sale of Group II:  Trustee Debtor Projects........................... 62

C.   Abandonment of Unsold Group II:  Trustee Debtor Project(s) ...................................................................... 62

D.      Sale of Other Plan Trust Assets Subject to Liens
of Class 2.1 and Class 2.2 Claimants ................................................ 63
E.      Abandonment of Assets Other Than Group II:
Trustee Debtor Projects....................................................................... 63
F.      Distributions to the Class 2.1 and Class 2.2 .................................
Claimants                  63Against the Group II: Trustee Debtors
(Class 2.1 and 2.2).      ...........................................................................63

8.3.          8.3. ...................................The
Plan's Treatment of Holders of Asserted ...............................................
Mechanic Lien
Claims Against the Group II: Trustee DEBTOR
Projects SUBJECT TO LEHMAN'S DISPUTED CLAIMS...............................(Classes
3.1
Through 3.4). ....................................................................6465

8.4.          8.4. ...................................The
Plan's Treatment of Holders of Contingent Bond Indemnification
Claims Against the Group II: Trustee Projects (Class 4.1) 64..................... 65

MAINDOCS #163137-v6-SCC164959-v3-SunCal_3rd_Am_Group_II_TD_DS.DOC

# ~~TABLE OF CONTENTS~~

### ~~(Continued)~~

~~PAGE~~

8.5.          ~~8.5.~~ ...................................................The Plan's Treatment of Holders of Priority Claims
Group II: Trustee Debtors (Class 5.1)..................................... 66

~~(Class 5.1) ................................................... 65~~

~~8.6.      THE PLAN'S TREATMENT OF HOLDERS OF GENERAL~~
~~UNSECURED CLAIMS THAT ARE RELIANCE CLAIMS~~
~~(CLASSES 6.1 AND 6.2)................................................. 66~~
~~A.      OPTION A................................................. 66~~
~~B.      OPTION B................................................. 66~~

8.6.      The Plan's Treatment of Holders of General Unsecured Claims that ~~Are Not~~are Reliance Claims Group II: Trustee Debtors (Classes 6.1 ~~Through 6.4) ................................................... 66~~and 6.2).      67

8.7.          ~~8.7.~~ ...................................................The Plan's Treatment of Holders of Allowed ...................................................General Unsecured Claims that Are Not Reliance ...................................................Claims Group II: Trustee Debtors (Classes ~~7.1~~7.1. and 7.2)..................................... ~~66~~68

8.8.          ~~88~~ ...................................................The Plan's Treatment of Holders of Allowed Interests ~~67~~ Group II: Trustee Debtors. ..................................... 68

IX.      ACCEPTANCE OR REJECTION OF THE PLAN ..................................... ~~67~~68

9.1.          ~~9.1~~ Introduction. ..................................... ~~67~~68

9.2.          ~~9.2.~~ Who May Object to Confirmation of the Plan. ..................................... ~~67~~69

9.3.          ~~9.3.~~ Who May Vote to Accept/Reject the Plan. ..................................... ~~68~~69

9.4.          ~~9.4.~~ What Is an Allowed Claim/Interest. ..................................... ~~68~~69

9.5.          ~~9.5.~~ What Is an Impaired Class. ..................................... ~~68~~69

9.6.          ~~9.6.~~ Who Is Not Entitled to Vote. ..................................... ~~68~~69

9.7.          ~~9.7.~~ Who Can Vote in More than One Class. ..................................... ~~69~~70

9.8.          ~~9.8.~~ Votes Necessary for a Class to Accept the Plan. ..................................... ~~69~~70

9.9.          ~~9.9~~ Treatment of Nonaccepting Classes. ..................................... ~~69~~70

9.10.          9.10.....................................................................................Request
for Confirmation Despite Nonacceptance by
           Impaired Class(es).............................................................6971

X.      MEANS OF EXECUTION AND IMPLEMENTATION OF THE PLAN ...............7071

10.1.          10.1
           Introduction..............................................................7071

10.2    Sale Process After Confirmation Date but prior to
        Effective Date .....................................................................70

        A.      Implementation of a Marketing Program ........................70

        B.      Indentifying a Stalking Horse Bidder............................71

        C.      The Sale Contract....................................................71

                1.      Overbid Provisions..............................71

                2.      A Break-Up Fee ................................71

                3.      Sale Free and Clear of Liens ...................71

        D.      The Auction .........................................................71

10.2    Sale Process for the Group II: Trustee Projects and Group II:
        Trustee Other Assets During the Sales Period. ........................71

        10.3    Establishment and Operations of the Plan Trust. .............74

10.4    Preservation and Pursuit of Litigation Claims and Recovery for
        the Plan Trust. ...................................................................74

10.5    Removal of Chapter 11 Trustee ...........................................7275

10.4    Transfer of Property to the Plan Trust....................................72

MAINDOCS-#163137-v6-SCC164959-v3-SunCal_3rd_Am_Group_II_TD_DS.DOC

# TABLE OF CONTENTS

## (Continued)

PAGE

10.5    Closing of Group II:  Trustee Debtor Project Sales ................................. 72

10.6    Purpose of the Plan Trust Assets ................................................. 72

10.7    Trust Agreement ................................................................. 73

10.8    Operations of the Plan Trust .................................................... 73

10.9    The Plan Trustee ................................................................ 74

10.10    Payment of Plan Trust Expenses. ............................................... 74 75

10.11 10.7    The Plan Trust Distribution System 74. ...................................... 75

10.12    Claims Estimation Rights ....................................................... 74

10.8    The Plan Trustee. ................................................................ 75

10.9    The Plan Trust Beneficiaries. .................................................... 79

10.13 10.10    No Payment of Transfer-Related Fees to the United States Trustee. ......... 75 80

10.14 10.11    No Payment of Transfer-Related Fees to the Plan Trustee. ................ 75 80

10.15 10.12    Books and Records of Trust 75. .............................................. 80

10.16    Limitations on Liability ......................................................... 75

10.17 10.13    Federal Income Tax Treatment of the Holders of the Plan Trust Beneficial Interests. ................................................................... 76 80

10.18 10.14    Termination of the Trust. ........................................................ 77 81

10.19 10.15    Exemption from Certain Transfer Taxes. ...................................... 77 82

10.20 10.16    Tax Consequence of The Plan 77. .............................................. 82

10.21    The Plan Sponsor ............................................................... 78

10.22    Acquisitions' Obligations ....................................................... 78

10.23 10.17    The Trustee Debtors' committee ............................................. 78

10.23.1    Duties and Powers ...................................................... 78

10.23.2    Dissolution of Committee 80. ............................................. 82

10.24    Litigation Claims ........................................................... 80 10.18    Claims Estimation Rights. ....................................................... 83

10.25    Collection of Litigation Recoveries .............................................. 80

XI.    RISK FACTORS .................................................................. 80 83

11.1    Plan Risks 80. .................................................................. 83

11.1.1    The Plan May Not Be Accepted or Confirmed ............................. 80

11.1.2    Failure to Sell the Group II:  Trustee Debtor Projects ...................... 80

11.1.3    Adverse Outcome of Pending Litigation ................................... 81

11.1.4    Risks Associated with Lehman Disputed Administrative Loans ............ 81

XII.    DISTRIBUTIONS ................................................................ 81 85

12.1    12.1    Distribution Agent. ................................................ 81 85

12.2    12.2    Distributions 82. ................................................... 86

12.3    12.2.1 Dates of Distributions    82

12.4    12.2.2 Limitation on Liability    82

12.3    12.3. Old Instruments and Securities 82    86

12.4    12.3.1 Surrender and Cancellation of Instruments and Securities    82

12.5    12.3.2) Cancellation of Liens    82

MAINDOCS-#163137-v6-SCC164959-v3-SunCal_3rd_Am_Group_II_TD_DS.DOC

**TABLE OF CONTENTS**

**(Continued)**

**PAGE**

12.6 ~~12.4~~ De Minimis Distributions and Fractional Shares ........................... ~~83~~87

12.7 ~~12.5~~ Delivery of Distributions .......................................... ~~83~~87

12.8 ~~12.6~~ Undeliverable Distributions ......................................... ~~83~~87

12.9 ~~12.7   Disposition of Unclaimed Property.......................................... 84~~

XIII. ~~OBJECTION~~OBJECTIONS TO CLAIMS AND ~~DISPUTE~~DISPUTED CLAIMS . ~~84~~88

13.1 ~~13.1~~ Standing for Objections to Claims._ .................................... ~~84~~88

13.2 ~~13.2~~ Treatment of Disputed Claims and Disputed Liens ~~85~~. ................... 88

~~13.2.1   No Distribution Pending Allowance ..................................... 85~~

~~13.2.2   Distribution After Allowance .......................................... 85~~

XIV. EXECUTORY CONTRACTS AND UNEXPIRED LEASES ................................ ~~85~~89

14.1 ~~14.1~~ Executory Contracts ~~Being~~to be Assumed ~~85~~ and Assigned. ................. 89

14.2 ~~14.2   Bar Date for Rejection Damages.................................... 85~~

14.3 ~~14.3   Changes in Rates Subject to Regulatory Commission Approval...... 85~~

14.2 Executory Contracts to be Rejected. ................................ 92

XV. BEST INTEREST OF CREDITORS TEST AND PLAN FEASIBILITY ............... ~~86~~93

15.1 Best Interests Test._ ............................................... ~~86~~93

15.2 Feasibility._ ...................................................... ~~87~~94

XVI. LIMITATION OF LIABILITY ................................................ ~~87~~95

16.1 ~~16.1~~ No Liability for Solicitation or Participation._ ........................ ~~87~~95

XVII. CONDITIONS TO CONFIRMATION AND EFFECTIVENESS   OF THE PLAN ............... ~~88~~95

17.1 ~~17.1~~ Conditions Precedent to Plan Confirmation._ ......................... ~~88~~95

17.2 ~~17.2~~ Conditions Precedent to Plan Effectiveness._ ....................... ~~88~~95

XVIII. RETENTION OF JURISDICTION ........................................... ~~88~~95

XIX. MODIFICATION OR WITHDRAWAL OF THE PLAN ................................ ~~88~~97

19.1 ~~19.1~~ Modification of Plan._ ............................................ ~~88~~97

19.2 ~~19.2~~ Nonconsensual Confirmation. ................................................................. ~~89~~97

XX. EFFECT OF CONFIRMATION. ....................................................................... 97
20.1 Discharge. ..................................................................................................... 97
20.2 Revesting of the Assets. .............................................................................. 98

XXI. MISCELLANEOUS ............................................................................................ ~~89~~98
21.1 ~~20.1~~ Payment of Statutory Fees. ........................................................... ~~89~~98
21.2 Changes in Rates Subject to Regulatory Commission Approval. ............... 98
21.3 ~~20.2~~ Payment Dates. ....................................................................................... ~~89~~98
21.4 ~~20.3~~ Headings. ........................................................................................ ~~89~~98
21.5 ~~20.4~~ Other Documents and Actions. .................................................... ~~89~~99
21.6 ~~20.5~~ Notices. ~~90~~99
21.7 ~~20.6~~ Governing Law ~~90~~. ....................................................................... 99

MAINDOCS-#~~163137-v6-SCC~~164959-v3-SunCal_3rd_Am_Group_II_TD_DS.DOC

# TABLE OF CONTENTS

## (Continued)

PAGE

21.8    20.7...................................................................................Binding Effect. .........................................................................90100

21.9    20.8    Successors and Assigns. ...................................................... 91100

21.10    20.9    Severability of Plan Provisions. ........................................... 91100

21.11    20.10...........................................................................No Waiver. .....................................................................91100

21.12    20.11    Inconsistencies. ........................................................... 91100

21.13    20.12    Exemption from Certain Transfer Taxes and Recording Fees. .................... 91101

21.14    20.13    Post-Confirmation Status Report. ................................... 92101

21.15    20.14    Post-Confirmation Conversion/Dismissal. ............................... 92101

21.16    20.15...................................................................................Final Decree. ..............................................................93101

# I.

## **INTRODUCTION**

This Disclosure Statement[1] is filed ~~by~~jointly by, and the accompanying Plans are proposed respectively by, Acquisitions and the Voluntary Debtors, as the SunCal Plan Proponents, in the Chapter 11 Cases of ~~the following Debtors:~~SunCal Torrance, LLC and SunCal Oak Knoll, LLC (the "Group II: Trustee Debtors"). In addition to being one of the ~~proponents of the~~SunCal Plan Proponents, Acquisitions is the Plan Sponsor, the Plan Trustee of the Plan Trust and the Distribution Agent, for each Group II~~:~~ Trustee Debtor Plan that is confirmed.

Chapter 11 allows debtors-in-possession, Chapter 11 trustees, and under some circumstances, creditors, interest holders and others parties in interest, to propose a Chapter 11 plan. As stated, Acquisitions is the SunCal Plan Proponent of the Plans sent to you in the same envelope as this Disclosure Statement.  This document summarizes the contents of the Plans, certain information relating to the Plan and the process the Bankruptcy Court follows in determining whether or not to confirm the Plans.

In summary, the Plan(s) individually provide for sale of the Oak Knoll Project and the Del Amo Project (the "Group II: Trustee Debtors Projects"), free and clear of liens, claims and any purported credit bid rights of the Group II: Trustee Debtors' primary secured creditor, Lehman ALI, and for the liquidation of all other assets of the Group II: Trustee Debtors. The Net Sales Proceeds from these sales will then be distributed to Creditors holding Allowed Claims in accordance with their rights and priorities under the bankruptcy code and under any other applicable law.

**The Plans also offers the holders of a certain claims against the Group II: Trustee Debtors, which are defined herein as Reliance Claims, the right to sell these claims, along with any other Litigation Rights ~~arisng~~arising from and/or related to such Reliance Claim, to LitCo, for the sum of fifty five cents ($0.55) per dollar of Allowed Claim.  The purchase offer is conditioned upon confirmation of the applicable Plan, the entry of a Final Confirmation Order confirming such Plan, and shall occur on or before the applicable Plan's Effective Date**

---

[1] All defined terms used herein have the same meanings as set forth in Article II herein and Exhibit "1" attached hereto.

29  **as defined herein.  However, this purchase offer is <u>not</u> contingent upon the sale of the Group**

30  **II: Trustee Debtor Projects or a determination regarding any alleged automatic stay claim by**

31  **LCPI arising from LCPI's pending Chapter 11 proceeding.**

32  The offer by LitCo to purchase Allowed Reliance Claims for the sum of fifty-five cents

33  ($0.55) per dollar of claim and certain other Plan funding (*e.g.*, to make required payments to

34  Creditors holding Allowed Administrative Claims, Priority Claims and Tax Claims) will not be

35  funded by the SunCal Plan Proponents.  Instead, the SunCal Plan Proponents are working with

36  proposed investors/lenders who would provide such funding.  While the SunCal Plan Proponents are

37  in discussions with third parties with respect to obtaining funding for the SunCal Plan, no

38  commitment has yet been obtained for such funding and thus SunCal Plan Proponents are not in a

39  position to disclose the terms of such funding at this time.  There is no guarantee that such funding

40  will be obtained.

41  Although the substantially identical Plans are being filed in the Cases of all Group II: Trustee

42  Debtors, confirmation of each Plan is independent of the other. In other words, the Creditors in each

43  Case will determine, subject to Court approval, whether the applicable Plan will be approved in their

44  Case. Accordingly, the Plan may be confirmed in the Cases of one of the Group II: Trustee Debtors,

45  but not in the other.

46  The Lehman Lenders and the Chapter 11 Trustee have filed a competing and alternative plans

47  of reorganization in the Group II: Trustee Debtors' Cases. Accordingly, the creditors holding claims

48  against the Debtors will have the opportunity to vote for one plan or the other, or they can vote for or

49  reject both plans and allow the Court to decide which plan should be approved. The SunCal Plan

50  Proponents believe that the aggregate benefits offered under their Plan are superior to what is being

51  offered to Creditors under the Lehman Lenders' competing Plans, because the consideration paid to

52  the holders of the Reliance Claims is 55 percent under the SunCal Plans, ~~incontrast~~in contrast to only

1  a potential distribution of 40 percent under the Lehman Lenders and Chapter 11 Trustee Plans for the

2  Group II: Trustee Debtors.

3  **<u>READ THIS DISCLOSURE STATEMENT CAREFULLY IF YOU WANT TO</u>**

4  **<u>KNOW ABOUT</u>:**

> ➢ **WHO CAN VOTE OR OBJECT TO THE PLAN;**

> ➢ **HOW YOUR CLAIM IS TREATED;**

> ➢ **HOW THIS TREATMENT COMPARES TO WHAT YOUR CLAIM WOULD RECEIVE IN LIQUIDATION;**

> ➢ **A BRIEF HISTORY OF THE DEBTORS AND SIGNIFICANT EVENTS DURING THEIR CHAPTER 11 BANKRUPTCY PROCEEDING;**

> ➢ **WHAT FACTORS THE BANKRUPTCY COURT WILL CONSIDER TO DECIDE WHETHER OR NOT TO CONFIRM THE PLAN;**

> ➢ **WHAT IS THE EFFECT OF CONFIRMATION; AND**

> ➢ **WHETHER THE PLAN IS FEASIBLE.**

This Disclosure Statement cannot tell you everything about your rights.  You should consider consulting your own attorney to obtain more specific advice on how the Plan will affect you and your best course of action.

Be sure to read the applicable Plan as well as this Disclosure Statement.  If there are any inconsistencies between the applicable Plan and this Disclosure Statement, the applicable Plan provisions will govern.

~~The Bankruptcy Code requires a Disclosure Statement to contain "adequate information" concerning the Plan.  On _____, 2011, the Bankruptcy Court entered an order approving this Disclosure Statement, based upon a finding that this document contained "adequate information" to enable parties affected by the Plans to make an informed judgment regarding the Plans.  Any party can now solicit votes for or against the Plans.~~

**THE BANKRUPTCY CODE REQUIRES A DISCLOSURE STATEMENT TO CONTAIN "ADEQUATE INFORMATION" CONCERNING THE PLAN.  ON _____, 2011, THE BANKRUPTCY COURT ENTERED AN ORDER APPROVING THIS DISCLOSURE STATEMENT, BASED UPON A FINDING THAT THIS DOCUMENT CONTAINED "ADEQUATE INFORMATION" TO ENABLE PARTIES AFFECTED BY THE PLANS TO MAKE AN INFORMED JUDGMENT REGARDING THE PLANS.  ANY PARTY CAN NOW SOLICIT VOTES FOR OR AGAINST THE PLANS.**

29

30

31

32

33

34

**II.**

35

**DEFINITIONS AND RULES OF INTERPRETATION**

36

**2.1    Definitions.**

37

The following defined terms are used in this Disclosure Statement.  Any capitalized term that

38

is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the

39

meaning ascribed to that term in the Bankruptcy Code or Bankruptcy Rules.

40

2.1.1    <u>Acquisitions</u>.  SCC Acquisitions, Inc., a California corporation, an indirect

41

parent company of all of the Debtors, a purported Bond Indemnitor, a Creditor of all of the Debtors,

42

a SunCal Plan Proponent, the Plan Sponsor and the proposed Plan Trustee.

43

2.1.2    <u>Administrative Claim(s)</u>.  Any Claim against a Group II: Trustee Debtor or its

44

Estate incurred after the applicable Petition Date for the applicable Group II: Trustee Debtor but

45

before the Effective Date, for any cost or expense of administration of the Case of the applicable

46

Group II: Trustee Debtor, which Claim is entitled to priority under section 507(a)(2) or (3) of the

47

Bankruptcy Code, including, without limitation, any fee or charge assessed against an Estate of a

48

Group II: Trustee Debtor under section 2030 of Title 28 of the United States Code.

49

2.1.3    <u>Administrative Claims Bar Date</u>.  The last date fixed by the Plan for the filing

50

of requests for payment of Administrative Claims.  Under the Plan, the Administrative Claims Bar

51

Date shall be the first business day after the twenty-first (21st) day after the Effective Date.

52

2.1.4    <u>Affiliate</u>.  The term shall have the meaning set forth under Section 101(2),

1

including, but not limited to, as to any Person, any other Person that directly or indirectly owns or

2

controls, is owned or controlled by, or is under common ownership or control with, such Person.

3

The term "control" (including, with correlative meanings, the terms "controlled by" and "under

4

common control with"), as applied to any Person, means the possession, direct or indirect, of the

power to direct or cause the direction of the management and policies of such Person, whether

through the ownership of voting securities or other equity ownership interest, by contract or

otherwise.

       2.1.5   <u>Allowed</u>.  When used to describe Claim(s) or Interest(s), such Claim(s) or

Interest(s), to the extent that it or they are "Allowed Claim(s)" or "Allowed Interest(s)."

       2.1.6   <u>Allowed Amount</u> shall mean:

       A.    With respect to any Administrative Claim (i) if the Claim is based

upon a Fee Application, the amount of such Fee Application that has been approved by a Final Order

of the Bankruptcy Court; (ii) if the Claim is based upon any indebtedness or obligation incurred in

the ordinary course of business of the Group II: Trustee Debtors and is not otherwise subject to an

Administrative Claim Bar Date, the amount of such Claim that has been agreed to by the Group II:

Trustee Debtors and such creditor, failing which, the amount thereof as fixed by a Final Order of the

Bankruptcy Court; or (iii) if the Holder of such Claim was required to file and has filed proof thereof

with the Bankruptcy Court prior to an Administrative Claim Bar Date, (1) the amount stated in such

proof if no objection to such Proof of Claim is interposed within the applicable period of time fixed

by the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court, or (2) the amount thereof as

fixed by Final Order of the Bankruptcy Court if an objection to such proof was interposed within the

applicable period of time fixed by the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy

Court.  The Allowed Amount of any Administrative Claim which is subject to an Administrative

Claims Bar Date and not filed by the applicable Administrative Claims Bar Date shall be zero, and

no distribution shall be made on account of any such Administrative Claim;

       B.    with respect to any Claim which is not an Administrative Claim (the

"Other Claim"):  (i) if the Holder of such Other Claim did not file proof thereof with the Bankruptcy

Court on or before the Claims Bar Date, the amount of such Claim as listed in the Group II: Trustee

Debtors'' Schedules as neither disputed, contingent nor unliquidated; or (ii) if the Holder of such

Claim has filed proof thereof with the Bankruptcy Court on or before the Claims Bar Date, (a) the

amount stated in such proof if no objection to such Proof of Claim was interposed within the

applicable period of time fixed by the Bankruptcy Code, the Bankruptcy Rules, the Plan or the

MAINDOCS-#163137-v6-SCC164959-v3-SunCal_3rd_Am_Group_II_TD_DS.DOC

29    Bankruptcy Court, or (b) the amount thereof as fixed by Final Order of the Bankruptcy Court if an

30    objection to such proof was interposed within the applicable period of time fixed by the Bankruptcy

31    Code, the Bankruptcy Rules, the Plan or the Bankruptcy Court.  The Allowed Amount of any Other

32    Claim which is not Filed by the applicable Claims Bar Date, is not listed on the Group II: Trustee

33    Debtors' Schedules or is listed as disputed, unliquidated, contingent or unknown, and is not allowed

34    under the terms of the Plan shall be zero, and no distribution shall be made on account of any such

35    Claim; and

36                    C.      with respect to any Interest, (i) the amount provided by or

37    established in the records of the Group II: Trustee Debtors at the Confirmation Date, provided,

38    however, that a timely filed proof of Interest shall supersede any listing of such Interest on the

39    records of the Group II: Trustee Debtors; or (ii) the amount stated in a proof of Interest Filed prior to

40    the Confirmation Date if no objection to such Interest was filed prior to the Confirmation Date or

41    such later date as the Bankruptcy Court allows; or (iii) the amount of such Interest as fixed by a Final

42    Order of the Bankruptcy Court.

43             2.1.7    <u>Allowed Claim</u>.  Except as otherwise provided in the Plan(s) (including

44    with respect to those Classes for which the amount of the Allowed Claims is specified by the Plan), a

45    Claim to the extent (and only to the extent) of the Allowed Amount of such Claim.

46             2.1.8    <u>Allowed Interest</u>.  Any Interest to the extent, and only to the extent, of the

47    Allowed Amount of such Interest.

48             2.1.9    <u>Allowed Secured Claims</u>.  All or a portion of a Secured Claim that is an

49    Allowed Claim.

50             2.1.10    <u>Allowed Unsecured Claim</u>. All or a portion of an Unsecured Claim that is

51    an Allowed Claim.

52             2.1.11    Assets.  All assets that are property of the Debtor(s) pursuant to Bankruptcy

1     Code Section 541.

2             2.1.11    2.1.12   <u>Arch</u>.  Arch Insurance Company, a Bond Issuer.

3             2.1.12    2.1.13   <u>Available Cash</u>.  Each Group II: Trustee Debtors' Cash deposited

4     into the applicable Distribution Account(s) on or after the Effective Date that is available for making

29  Distributions under the Plan to Holders of Allowed Administrative, Priority, and General Unsecured

30  Claims.  The Available Cash shall consist of the respective Group II: Trustee Debtors' cash on hand

31  as of the Effective Date that is not subject to a Disputed Lien, proceeds of Net Litigation Recoveries

32  that are not subject to a Disputed Lien, Net Sales Proceeds that become Available Cash upon the

33  disallowance of a Disputed Claim or avoidance of a Disputed Lien purportedly encumbering such

34  Cash, or proceeds from the ~~Litco.~~LitCo Plan Loan.  All Available Cash shall be deposited into the

35  applicable Distribution Account(s).  Available Cash shall not include Net Sale Proceeds in the Net

36  Sales Proceeds Account where the Disputed Secured Claims are Allowed but subject to an equitable

37  subordination judgment.

38          2.1.13   ~~2.1.14~~ Avoidance Actions.  All Claims and defenses to Claims accruing to

39  the Group II: Trustee Debtors and their Estates under Bankruptcy Code Sections 506(d), 510(c), 541,

40  544, 545, 547, 548, 549, 550, or 551.

41          2.1.14   ~~2.1.15~~ Bankruptcy Code.  The United States Bankruptcy Code.

42          2.1.15   ~~2.1.16~~ Bankruptcy Court.  The United States Bankruptcy Court for the

43  Central District of California, having jurisdiction over the Cases and, to the extent of any withdrawal

44  of the reference made pursuant to Section 157 of title 28 of the United States Code, the United States

45  District Court for the Central District of California; or, in the event such courts cease to exercise

46  jurisdiction over the Cases, such court or unit thereof that exercises jurisdiction over the Cases in

47  lieu thereof.

48          2.1.16   ~~2.1.17~~ Bankruptcy Rules.  Collectively, as now in effect or hereafter

49  amended and as applicable to the Cases, (i) the Federal Rules of Bankruptcy Procedure, and (ii) the

50  Local Bankruptcy Rules and General Orders applicable to cases pending before the Bankruptcy

51  Court.

52          2.1.17   ~~2.1.18~~ Beneficial Interests. means, collectively, the interests of the holders

1   of Allowed Unsecured Claims in the Plan Trust and in all distributions to be made by the Plan Trust

2   on account of Allowed Unsecured Claims. The Beneficial Interests (a) shall be noted in the books

3   and records of the Plan Trust, (b) shall not be evidenced by a writing, and (c) may not be transferred,

4   sold, assigned or transferred by will, intestate succession or operation of law without written

notification to the Plan Trustee confirming and acknowledging the transfer by both the holder and the transferee.

2.1.18  2.1.19  Bond Claim(s).  Any Claim against the Debtor(s) and a Bond Issuer under various payment or performance bonds.

2.1.19  2.1.20  Bond Claimant.  Holder(s) of a Bond Claim.

2.1.20  2.1.21  Bond Indemnification Claim.  All Claims by Bond Issuers for indemnification against a Bond Indemnitor for the Bond Issuer's actual payment or purchase of a Bond Claim with respect to the Group II: Trustee Debtors' Projects.

2.1.21  2.1.22  Bond Indemnitors.  The individuals and entities that are allegedly liable on the Bond Indemnification Claims, including, allegedly, all of the Debtors, Acquisitions, all Affiliates of Acquisitions, and Elieff.

2.1.22  2.1.23  Bond Issuer(s).  Bond Safeguard, Lexon and Arch in their capacities as issuers and sureties for payment and performance bonds for the benefit of certain of the Debtors.

2.1.23  2.1.24  Bond Safeguard.  Bond Safeguard Insurance Company, a Bond Issuer.

2.1.24  2.1.25  Business Day.  Any day, other than a Saturday, a Sunday or a "legal holiday," as defined in Bankruptcy Rule 9006(a).

2.1.25  2.1.26  Cases.  The Chapter 11 cases of the Group II: Trustee Debtors pending before the Bankruptcy Court.

2.1.26  2.1.27  Cash.  Currency of the United States of America and cash equivalents, including, but not limited to, bank deposits, immediately available or cleared checks, drafts, wire transfers and other similar forms of payment.

2.1.27  2.1.28  CFD Bonds.  Community facilities district bonds issued by a governmental entity.

2.1.28  2.1.29  Chapter 11 Trustee.  Steven M. Speier, the duly appointed trustee of the Trustee Debtors in their pending Chapter 11 Cases.

2.1.29  2.1.30  Claim.  This term shall have the broadest possible meaning under Section 101(5) of the Bankruptcy Code, and shall include (a) any right to payment from any of the

Group II: Trustee Debtors, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, or (b) any right to an equitable remedy for breach of performance if such breach gives rise to a right of payment from any of the Group II: Trustee Debtors, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

2.1.30   2.1.31   Claims Bar Date.  For any Claimother Claim other than the exceptions noted below , March 31, 2009, which was established by the Bankruptcy Court as the last date for creditors to file Proof of Claims with the Bankruptcy Court in all of the Group II: Trustee Debtors' cases, except for the following: (a) Administrative Claims, for which the Administrative Claims Bar Date shall apply, (b) claims arising from rejection of executory contracts or unexpired leases pursuant to 11 U.S.C. § 365, for which the last day to file a proof of claim is (i) 30 days after the date of entry of the order authorizing the rejection, or (ii) March 31, 2009, whichever is later, (c) claims of "governmental units," as that term is defined in 11 U.S.C. § 101(27), for which proofs of claim are timely filed if filed: (i) before 180 days after the date of the Order for Relief in this case, or (ii) by March 31, 2009, whichever is later (11 U.S.C. § 502(b)(9)), and (d) claims arising from the avoidance of a transfer under chapter 5 of the Bankruptcy Code, the last day to file a proof of claim is 30 days after the entry of judgment avoiding the transfer or March 31, 2009, whichever is later.

2.1.31   2.1.32   Claims Objection Deadline.  The later of (i) the first business day following the one hundred and eightieth (180th) day after the Effective Date, or (ii) such greater period of limitation as may be fixed or extended by the Bankruptcy Court or by agreement between the Plan Trustee and the Holder of the Claim.

2.1.32   2.1.33   Claim Objection Reduction Amount. The amount of Net Sales Proceeds that is made available to the holders of Allowed Unsecured Claims due to the entry of a judgment or order on a Lehman Claim Objection that disallows, reduces, or otherwise adversely modifies the secured claims filed by the Lehman Lenders.

2.1.33   2.1.34   Class.  Each group of Claims or Interests classified in Article V of the Plan pursuant to Sections 1122 and 1123 of the Bankruptcy Code.

~~2.1.35    Committee.  The Official Committee of Unsecured Creditors of the Trustee Debtors appointed in the Cases pursuant to Section 1102 of the Bankruptcy Code.~~

2.1.34    ~~2.1.36~~  Confirmation Date.  The date on which the Confirmation Order is entered in the Bankruptcy Court's docket.

2.1.35    ~~2.1.37~~  Confirmation Order.  The order entered by the Bankruptcy Court confirming the Plan in accordance with the provisions of Chapter 11 of the Bankruptcy Code.

2.1.36    ~~2.1.38~~  Contingent Bond Claims.  Bond Indemnification Claims in which the Bond Issuer has not yet paid or purchased the underlying Bond Claim.

2.1.37    ~~2.1.39~~  Contract Action. The action filed by certain Voluntary Debtors against Lehman ALI, Inc., and certain other defendants, in California Superior Court for the County of Orange (Case No. 30-2011-0040847-CU-BC-CJC), that was removed to the bankruptcy court as Adv.  No. 8:11-ap-01212-ES, ~~and~~with a reservation of rights to add the Plan Trustee and/or the Trustee Debtors as additional plaintiffs therein.

2.1.38    ~~2.1.40~~  Creditor.  Any Person who is the Holder of a Claim against any Debtor that arose or accrued or is deemed to have arisen or accrued or to have matured, or otherwise become due, owing, and payable on or before the Petition Date, including, without limitation, Claims of the kind specified in Sections 502(g), 502(h) or 502(i) of the Bankruptcy Code.

2.1.39    ~~2.1.41~~  Debtor(s).  Individually or collectively, the Voluntary Debtors and the Trustee Debtors, as specifically defined in Exhibit "1" attached hereto

2.1.40    ~~2.1.42~~  Debtor(s)-in-Possession.  The Voluntary Debtor(s) ~~when acting~~ in their capacity as representatives of their respective Estates in their respective Chapter 11 Cases.

2.1.41    ~~2.1.43~~  Del **A**mo Project.  The Project owned by SunCal Torrance, located in the City of Torrance, California, as more particularly described herein.

2.1.42    ~~2.1.44~~  Del Amo Project Value. The value of $13,500,000, which is the SunCal Plan Proponent's conclusion regarding the fair market value of the Del Amo Project based upon their underwriting teams' knowledge of the Project and present market conditions.

2.1.43    ~~2.1.45~~  Disclosure Statement.  The document accompanying the Plan that is entitled "~~Second amended~~Third Amended Disclosure Statement Describing ~~Second amended~~Third

29  Amended Chapter 11 Plan Filed by SunCal Plan Proponents In The Chapter 11 Cases Of SunCal

30  Oak Knoll, LLC and SunCal Torrance, LLC," as amended and with all accompanying exhibits.

31            2.1.44  2.1.46 Disputed Claim(s).  All or any part of a Claim against a Group II:

32  Trustee Debtor as to which any one of the following applies: (i) no Proof of Claim has been filed

33  with respect to such Claim, and either (a) the Claim is not listed in the Schedules; or (b) the Claim

34  listed in the Schedules as unliquidated, disputed, contingent, unknown or in a zero amount, (ii) the

35  Claim is the subject of (a) an unresolved Litigation Claim; (b) the Claim is subject to offset by a

36  Litigation Claim; (c) a timely objection to such Claim that has not been resolved by a Final Order; or

37  (d) a request for estimation in accordance with the Bankruptcy Code, the Bankruptcy Rules, any

38  applicable order of the Bankruptcy Court, or the applicable Plan(s) which is Filed on or before the

39  Claims Objection Deadline, which Adversary Proceeding, objection, or request for estimation has

40  not been dismissed, withdrawn or determined by a Final Order; or (iii) the Claim is otherwise treated

41  as a "Disputed Claim" pursuant to the Plan.

42            2.1.45  2.1.47 Disputed Lien(s).  An asserted lien(s) against Assets of the

43  Debtor(s) that is either subject to a Disputed Secured Claim, not duly perfected, subject to an

44  Avoidance Action, or subject to an action pursuant to Bankruptcy Code Sections 510(c)(2) and/or

45  506(d).  However, pursuant to Section 506(d)(2), a lien is not disputed merely because it secures a

46  claim that "is not an allowed secured claim due only to the failure of any entity to file a proof of such

47  claim under section 501 of this title."

48            2.1.46  2.1.48 Disputed Secured Claim(s). That part of a Disputed Claim that is a

49  Secured Claim.

50            2.1.47  2.1.49 Distribution(s).  Payments to Holders of Allowed Claims provided

51  for under the Plan.

52            2.1.48  2.1.50 Distribution Agent.  The entity that is responsible for making

1  Distributions under the Plan, which shall be Acquisitions.

2            2.1.49  2.1.51 Distribution Account(s).  Separate account(s) to be established by

3  the Plan Trustee at an FDIC insured bank into which each Group II: Trustee Debtors' Available Cash

4  shall be deposited and all Available Cash received by the Plan Trust after the Confirmation Date that

would have belonged to such Group II: Trustee Debtor shall be deposited, other than Net Sales

Proceeds that are subject to Disputed Claims and Disputed Liens.

2.1.50   2.1.52 Distribution Date.  With respect to any Allowed Claim or Allowed

Interest, the date on which a Distribution is required to be made under the Plan.

2.1.51   2.1.53 Effective Date. A date selected by the applicable SunCal Plan

Proponent(s) that is not later than the ninetieth (90 thirtieth (30th) calendar day after the Confirmation

Date, and provided there is no stay pending appeal of the Confirmation Order, in which case the

Effective Date shall be tolled until the dissolution of such stay.  The Effective Date may be extended

by an order of the Bankruptcy Court after notice and hearing to all parties in interest.

2.1.52   2.1.54 Elieff.  Bruce Elieff, the president of Acquisitions, a purported

Bond Indemnitor with alleged corresponding indemnity Claims against the Debtors.

2.1.53   2.1.55 Estates.  The bankruptcy estates of the Group II: Trustee Debtors

created pursuant to Section 541 of the Bankruptcy Code.

2.1.54   2.1.56 Fee Applications.  Applications of Professional Persons under

Sections 330, 331 or 503 of the Bankruptcy Code for allowance of compensation and reimbursement

of expenses in the Cases.

2.1.55   2.1.57 Fee Claim.  A Claim under Sections 330 or 503 of the Bankruptcy

Code for allowance of compensation and reimbursement of expenses in the Cases.

2.1.56   2.1.58 Filed.  Delivered to, received by and entered upon the legal docket

by the Clerk of the Bankruptcy Court.  "File" shall have a correlative meaning.

2.1.57   2.1.59 Final Order.  A judgment, order, ruling or other decree issued and

entered by the Bankruptcy Court, that has not been reversed, stayed, modified or amended.

2.1.58   2.1.60 General Unsecured Claim.  A Claim against a Group II: Trustee

Debtor that is not (a) a Secured Claim, (b) an Administrative Claim, (c) a Tax Claim or (d) a Priority

Claim.

2.1.59   2.1.61 Group II: Trustee Debtors. SunCal Torrance, LLC and SunCal Oak

Knoll, LLC.

29          2.1.60    Group II: Trustee Debtors Assets.  All assets that are property of the Group

30   II: Trustee Debtor(s) pursuant to Bankruptcy Code Section 541, including the Group II: Trustee

31   Projects, the Litigation Claims and the Net Sales Proceeds.

32          2.1.61    Group II: Trustee Other Assets.  All assets of the Group II: Trustee Debtors

33   excluding the Group II: Trustee Projects, Litigation Claims and Net Sales Proceeds.

34          2.1.62    Group II: Trustee ~~Debtor~~ Projects. The Del Amo Project and the Oak Knoll

35   Project.

36          2.1.63    Holder.  The beneficial owner of any Claim or Interest.

37          2.1.64    Initial Overbid. The Initial Overbid is the first Qualifying Bid after the

38   Opening Bid that is equal to or in excess of the Initial Overbid Amount.

39          2.1.65    Initial Overbid Amount. In the case of the Oak Knoll Project, the Initial

40   Overbid Amount is a sum that is not less than the sum of the Opening Bid, the Oak Knoll Break-up

41   Fee and seventy five thousand dollars ($75,000). In the case of the Del Amo Project, the Initial

42   Overbid Amount is a sum that is not less than the sum of the Opening Bid, the Torrance Break-up

43   Fee and seventy-five thousand dollars ($75,000).

44          2.1.66    Insider.  The term shall have the broadest meaning possible under Section

45   101(31), including, but not limited to, a person in control of the Debtor, Affiliates and Insiders of

46   such Affiliates, and including Affiliates of Acquisitions and the Lehman Entities.

47          2.1.67    Interest.  Any equity security interest in any Group II: Trustee Debtor within

48   the meaning, of Section 101(16) of the Bankruptcy Code, including, without limitation, any equity

49   ownership interest in any of the Group II: Trustee Debtors, whether in the form of common or

50   preferred stock, stock options, warrants, partnership interests, or membership interests.

51          2.1.68    LBHI.  Lehman Brothers Holdings, Inc., a Lehman Entity, the parent

52   company of Lehman ALI and LCPI, and a Chapter 11 debtor in a bankruptcy proceeding pending in

1    the Bankruptcy Court for the Southern District of New York.

2           2.1.69    LCPI.  Lehman Commercial Paper, Inc., a Chapter 11 debtor in a

3    bankruptcy proceeding pending in the Bankruptcy Court for the Southern District of New York.

4

29               2.1.70    Lehman Adversary Proceeding.  The Debtors' pending adversary

30 proceeding against the Lehman Lenders and/or the Lehman Successors asserting various causes of

31 action including equitable subordination, fraudulent conveyances and preferential transfers.

32             2.1.71    Lehman ALI.  Lehman ALI, Inc.

33             2.1.72    Lehman Disputed Administrative Loans.  The post-petition financing

34 provided by Lehman ALI to SunCal Oak Valley, SunCal Heartland, SunCal Northlake, SunCal

35 Marblehead, SunCal Century City, SunCal PSV, Delta Coves, and SunCal Oak Knoll, which grants

36 priming liens on all borrower Trustee Debtors' assets, and for super-priority administrative status to

37 Lehman ALI.  The aggregate amount of the Lehman Disputed Administrative Loans to all of the

38 Trustee Debtors was approximately $40 million as of March 1, 2011 and continuing to increase.  The

39 Lehman Disputed Administrative Loans are the subject of claim objections, specifically the pending

40 502(d) Objection.  Until these objections are resolved in the applicable Case, these Lehman Disputed

41 Administrative Loans shall not be Allowed Claims.

42             2.1.73    Lehman Claim Objections. The objections filed by the Debtors to the claims

43 filed by the Lehman Lenders that are based upon the Lehman Disputed Loans and the Lehman

44 Disputed Administrative Loans, including, but not limited to, the Lehman Recoupment Objection

45 and the Lehman 502(d) Objection.

46             2.1.74    Lehman Entities.  The Lehman Lenders, the Lehman Equity Members and

47 LBHI.

48             2.1.75    Lehman Equity Members.  Lehman Entities that own direct or indirect

49 membership Interests in all of the Trustee Debtors, except for SunCal Heartland and SunCal

50 Marblehead.

51             2.1.76    Lehman Lenders.  Lehman ALI, LCPI, Northlake Holdings, and OVC

52 Holdings.

1             2.1.77    Lehman Disputed Loans.  Collectively the following loans that are the

2 purported basis for the Lehman's Disputed Claims:  (a) SunCal Communities I Loan Agreement; (b)

3 Bickford Second Loan Agreement; (c) Ritter Ranch Loan Agreement; (d) SCC Palmdale Loan; (e)

4 Interim Loan Agreement; (f) SunCal Oak Knoll/SunCal Torrance Loan Agreement; (g) SunCal

29  Century City Loan Agreement; (h) SunCal PSV Loan Agreement; (i) SunCal Delta Coves Loan

30  Agreement; (j) SunCal Marblehead/SunCal Heartland Loan Agreement; (k) Sun Cal Oak Valley

31  Loan Agreement; (l) SunCal Northlake Loan Agreement; (m) Pacific Point First Loan Agreement;

32  (n) Pacific Point Second Loan Agreement, and (o) the Lehman Disputed Administrative Loan.

33          2.1.78    <u>Lehman Representatives</u>.  The individuals that controlled the Lehman

34  Entities.

35          2.1.79    <u>Lehman Successor(s)</u>.  Entities other than the Lehman Lenders that either

36  assert to be or are determined by the Bankruptcy Court to be the beneficial owner(s) of the Lehman

37  Disputed Loan(s), including, but not limited to Fenway Capital, Lehman Re and Danske Bank.

38          2.1.80    <u>Lehman's Disputed Claim(s)</u>.  All of the Proofs of Secured Claims filed by

39  a Lehman Lender or a Lehman Successor in the Debtors' Chapter 11 Cases arising from the Lehman

40  Disputed Loans and the Lehman Disputed Administrative Loans.

41          2.1.81    <u>Lehman's Disputed Lien(s)</u>.  All of the alleged liens relating to Proofs of

42  Secured Claims filed by a Lehman Lender or a Lehman Successor in the Debtor's Chapter 11 Cases

43  arising from the Lehman Disputed Loans.

44          2.1.82    <u>Lexon</u>.  Lexon Insurance Co.

45          2.1.83    <u>LitCo</u>. A ~~newly formed~~ Delaware limited liability company that will be

46  formed for the purpose of (i) purchasing the claims and ~~litigation rights~~Litigation Rights held by the

47  Reliance Claimants that choose ~~Option A provided for in the Plan~~ to sell such Reliance Claims, (ii)

48  funding the LitCo Plan Loan, and (iii) potentially being selected as the Stalking Horse Bidder under

49  the Group II: Trustee Debtors' Plans.

50          2.1.84    <u>LitCo Plan Loan</u>. A loan that will be made by LitCo~~,~~ to the extent necessary

51  to pay Allowed Priority Claims, Allowed Administrative Claims~~,~~ and ~~post~~Post Confirmation ~~Date~~

52  ~~costs incurred by the SunCal Plan Proponents in connection with the sale process, and to pay post~~

1  ~~Effective Date costs~~Expenses incurred by the Plan Trust, ~~including litigation expenses where~~

2  ~~applicable,~~the Plan Trustee and its professionals and to the Trustee Debtors Committee and its

3  professionals if no other source is available ~~to pay these obligations. LitCo will be capitalized with~~

4  ~~funds provided by a third party.~~from the applicable Group II: Trustee Debtor's Assets.

2.1.85    <u>Litigation Claims</u>.   Any and all interests of the Group II: Trustee Debtors in any and all Claims, rights, causes of action, and objections or defenses to Claims, liens, rights, or causes of action which have been or may be commenced by the Group II: Trustee Debtor(s), the Chapter 11 Trustee, or the <u>Trustee Debtors'</u> Committee, as the case may be, including, but not limited to, any (i) Avoidance Actions; (ii) for turnover of property to the Group II: Trustee Debtors' Estates and/or the Plan Trust; (iii) for the recovery of property or payment of money that belongs to the Debtors' Estates or the Plan Trust; (iv) the right to compensation in the form of damages, recoupment or setoff of the Debtors' Estates and/or the Plan Trust; (v) the Lehman Adversary Proceeding; (vi) the Contract Action, and (vii) any and all other Claims against Lehman's Disputed Claims and/or Disputed Liens referenced in the Plan or the Disclosure Statement.

2.1.86    <u>Litigation Recoveries</u>.   Any Cash or other property received by the Chapter 11 Trustee, the Group II: Trustee Debtors, the <u>Trustee Debtors'</u> Committee and/or the Plan Trust, as the case may be, from all or any portion of a Litigation Claim(s), including, but not limited to, awards of damages, attorneys' fees and expenses, interest and punitive damages, whether recovered by way of settlement, execution on judgment or otherwise.

2.1.87    <u>Litigation Rights</u>. Any Claims held by a party against the Group II: Trustee Debtors, and if applicable, against third parties arising or relating to the Claim against the applicable Group II: Trustee Debtor, that have not been fixed in a final judgment prior to the Effective Date.

2.1.88    <u>Maximum Distributions</u>.  A Distribution to a Holder of an Allowed General Unsecured Claim against a Group II: Trustee Debtor equal to one hundred percent (100%) of the amount of the Holder's Allowed General Unsecured Claim plus interest at the Legal Rate from and as of the Group II: Trustee Debtor's Order for Relief.

2.1.89    <u>MB Firm</u>.  Miller Barondess, LLP.

2.1.90    <u>Mechanic Lien Claims</u>.  Mechanic Lien Claims arising pursuant to California Civil Code §3110, et seq. that were either allegedly perfected prepetition or otherwise allegedly satisfy the requirements of Bankruptcy Code 546(b).

2.1.91    <u>Minimum Increment</u>.  Minimum Increment applicable to the sales of the Group II: Trustee ~~Debtor~~ Projects is one hundred thousand dollars ($100,000), until there are only

29    two Qualified Bidders submitting bids for a Group II: Trustee ~~Debtor~~ Project, then the Minimum

30    Increment shall be fifty thousand dollars ($50,000).

31        2.1.92    <u>Minimum Sale Price</u>. The minimum gross sale price that must be paid for

32    either the Oak Knoll Project or the Del Amo Project before such project can be sold pursuant to the

33    Plan. Such prices are $22,860,000 and $12,150,000 respectively.

34        2.1.93    <u>Net Litigation Recoveries</u>.  Litigation Recoveries less associated

35    Administrative Claims and Post-Confirmation Expenses incurred in connection with such Litigation

36    Recoveries.

37        2.1.94    <u>Net Sales Proceeds</u>.  The Cash generated from the sale(s) or liquidation of

38    the Group II: Trustee Debtor(s)' Assets or the Plan Trust's Assets, less payment of selling expenses,

39    taxes, Chapter 11 Trustee fees, and any associated Post-Confirmation Expenses and Administrative

40    Claims incurred in furtherance of such sales or liquidation of such Assets.

41        2.1.95    <u>Net Sales Proceeds Account(s)</u>.  Separate account(s) that will be established

42    by the Plan Trustee at an FDIC insured bank into which all Net Sale Proceeds shall be deposited from

43    the sale of Assets that were allegedly encumbered by a Disputed Secured Claim(s) and/or a Disputed

44    Lien(s).  There shall be a separate Net Sales Proceeds Account for the Net Sale Proceeds allegedly

45    subject to each Disputed Secured Claim(s) and/or Disputed Lien(s), except where there are two

46    Disputed Liens on a single Project, in which case, there shall be a single account for the proceeds

47    generated from that Project.  The Disputed Secured Claim(s) and/or Disputed Lien(s) shall attach to

48    the corresponding Net Sales Proceeds Account(s) pending any Final Order(s) of the Bankruptcy

49    Court resolving the applicable Disputed Secured Claim(s) and/or applicable Disputed Lien(s).  To

50    the extent that a particular Disputed Claim is disallowed or a particular Disputed Lien is avoided

51    (other than transferred to the Estates pursuant to Bankruptcy Code Section 510(c)(2)) or otherwise

52    invalidated, such Net Sales Proceeds allegedly subject thereto shall become Available Cash and shall

1    be transferred to the applicable Distribution Account(s).  To the extent that a particular Disputed

2    Secured Claim and a Disputed Lien are allowed and deemed valid but subject to the equitable

3    subordination causes of action in the Lehman Adversary Proceeding, the funds shall remain in the

4

Net Sales Accounts pending a Final Order on the equitable subordination causes of action in the

Lehman Adversary Proceeding.

2.1.96    Oak Knoll Break-up Fee. The sum equal to two and one-half  (2-1/2%)

percent of the Minimum Sale Prince of the Oak Knoll Project plus the actual amounts paid to by

LitCo on Allowed Administrative Claims in for the Oak Knoll Case, that will be paid to the Stalking

Horse Bidder that submits the Opening Bid for the Oak Knoll Project, if such if LitCo is the Stalking

Horse Bidder and is not the Winning Bidder.

2.1.97    Oak Knoll Project.  The Project owned by SunCal Marblehead, located in

the City of San Clemente, California, as more particularly described herein.

2.1.98    Opening Bid.  Opening Bid means the offer for one, or both of the Group II:

Trustee Debtor Projects, which is equal to the Minimum Sale Price(s) accepted by the Debtor for

either one or both of the Group II: Trustee Debtor Projects.

2.1.99    Orders for Relief Date.  The following are dates that orders for relief were

entered for each of the Trustee Debtors:

| | |
|---|---|
| SunCal Oak Valley | January 6, 2009 |
| SunCal Heartland | January 6, 2009 |
| SunCal Northlake | January 6, 2009 |
| SunCal Marblehead | January 6, 2009 |
| SunCal Century City | January 6, 2009 |
| SunCal PSV | January 6, 2009 |
| Delta Coves | January 6, 2009 |
| SunCal Torrance | January 6, 2009 |
| SunCal Oak Knoll | January 6, 2009 |

2.1.100   Palmdale Hills.  Palmdale Hills Property, a Delaware limited liability

company, a Voluntary Debtor herein, and the owner of the Ritter Ranch Project.

2.1.101   Torrance Break-up Fee. The sum equal to two and one-half (2-1/2%)

percent of the Minimum Sale Prince of the Oak Knoll Project plus the actual amounts paid to

Allowed Administrative Claims in the Torrance Case, that will be paid to the Stalking Horse Bidder

that submits the Opening Bid for the Del Amo Project, if such Stalking Horse Bidder is not the

Winning Bidder.

2.1.101 ~~2.1.102~~ Person.  An individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, governmental authority, governmental unit, committee or other entity of whatever nature.

2.1.102 ~~2.1.103~~ Petition Dates.  The following are dates that each of the Voluntary Debtors filed their Voluntary Chapter 11 petitions or Creditors filed involuntary Chapter 11 petitions against the Trustee Debtors:

| Palmdale Hills | November 6, 2008 |
|---|---|
| SunCal Beaumont | November 6, 2008 |
| SCC Palmdale | November 7, 2008 |
| SunCal Johannson | November 7, 2008 |
| SunCal Summit Valley | November 7, 2008 |
| SunCal Emerald | November 7, 2008 |
| SunCal Bickford | November 7, 2008 |
| Acton Estates | November 7, 2008 |
| Seven Brothers | November 7, 2008 |
| SJD Partners. | November 7, 2008 |
| SJD Development | November 7, 2008 |
| Kirby Estates | November 7, 2008 |
| SunCal I | November 7, 2008 |
| SunCal III | November 7, 2008 |
| SCC Communities | November 20, 2008 |
| Del Rio | November 20, 2008 |
| Tesoro | November 20, 2008 |
| Delta Coves Ventures, LLC | November 14, 2008 |
| SunCal Heartland, LLC | November 12, 2008 |
| SunCal Marblehead, LLC | November 12, 2008 |
| LB-L-SunCal Northlake, LLC | November 12, 2008 |
| LB-L-SunCal Oak Valley, LLC | November 12, 2008 |
| SunCal Century City, LLC | November 14, 2008 |
| SunCal PSV, LLC | November 14, 2008 |
| SunCal Torrance Properties, LLC | November 14, 2008 |
| SunCal Oak Knoll, LLC | November 20, 2008 |

2.1.103 ~~2.1.104~~ Plan(s).  The "~~Second amended~~Third Amended Chapter 11 Plan(s) Filed by SunCal Plan Proponents In The Chapter 11 Cases Of SunCal Oak Knoll, LLC and SunCal Torrance, LLC," together with the Exhibits thereto, as the same may be amended or modified from time to time in accordance with the Plan.

2.1.104 ~~2.1.105~~ Plan Period. The period from the Effective Date to the Plan Termination Date.

29    2.1.106

30    2.1.105 2.1.107 Plan Termination Date. The fifth (5th) anniversary date of the

31    Effective Date, unless the Plan Trustee elects an earlier date.

32    2.1.106 2.1.108 Plan Sponsor.  The entity that has committed to cause and/or

33    arrange the funding of certain specified obligations under the Plan on or after the Effective Date.

34    The Plan Sponsor is Acquisitions..

35    2.1.107 2.1.109 Plan Trust.  A liquidating trust to be established prior to or on the

36    Effective Date, with Acquisitions as the Plan Trustee and the Holders of Allowed Claims against the

37    Debtors as the beneficiaries. The purpose of the Plan Trust will be to liquidate the Debtors' Assets

38    (other than Assets that are excluded by the Plan Trustee on the grounds that they lack value or would

39    be difficult to administer) and to otherwise consummate the Plan.

40    2.1.108 2.1.110 Plan Trustee. The Plan Trustee under the Plan Trust Agreement is

41    Acquisitions.

42    2.1.109 2.1.111 Plan Trust Beneficiaries. The Plan Trust Beneficiaries are (i) the

43    holders of Beneficial Interests, as of any point in time, and (ii) holders of Allowed Claims that shall

44    be satisfied from Plan Trust Assets in accordance with the terms of the Plan.

45    2.1.110 2.1.112 Plan Trust Assets. Plan Trust Assets means all property within the

46    Chapter 11 estates of the Group II: Trustee Debtors, other than property that is affirmatively

47    excluded by the Plan Trustee.

48    2.1.111 2.1.113 Post-Confirmation Expenses.  The fees and expenses incurred by

49    the Plan Sponsor, the Plan Trustee and the Trustee Debtors' Committee and their professionals

50    following the Confirmation Date (including the fees and costs of Professionals) for the purpose of (i)

51    prosecuting and liquidating the Litigation Claims; (ii) objecting to and resolving Disputed Claims

52    and Disputed Liens; (iii) selling or otherwise liquidating the Plan Trust's Assets; (iv) effectuating

1    Distributions under the Plan; and (v) otherwise consummating the Plan and closing the Group II:

2    Trustee Debtors' Chapter 11 Cases.

3    2.1.112 2.1.114 Priority Claim.  Any Claim, other than an Administrative Claim or

4    a Tax Claim, to the extent entitled to priority under Section 507(a) of the Bankruptcy Code.

2.1.113 2.1.115 Pro Rata.  Proportionately, so that with respect to any distribution in respect of any Allowed Claim, the ratio of (a)(i) the amount of property distributed on account of such Allowed Claim to (ii) the amount of such Allowed Claim, is the same as the ratio of (b)(i) the amount of property distributed on account of all Allowed Claims of the Class or Classes sharing in such distribution to (ii) the amount of all Allowed Claims in such Class or Classes.

2.1.114 2.1.116 Professional.  A Person or Entity (a) employed by the Group II: Trustee Debtors, the Trustee Debtors' Committee pursuant to a Final Order in accordance with Sections 327 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to the Effective Date, pursuant to Sections 327, 328, 3291 330 and 331 of the Bankruptcy Code, or (b) for which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to Section 503(b) of the Bankruptcy Code.

2.1.115 2.1.117 Professional Fees.  All Allowed Claims for compensation and for reimbursement of expenses under Sections 328, 330 and/or 503(b) of the Bankruptcy Code

2.1.116 2.1.118 Projects.  The Debtors' residential real estate development projects and other assets as separately defined herein and described in Exhibit "1" to the Disclosure Statement.

2.1.117 2.1.119 Qualifying Bid.  Qualifying Bid means, with respect to any bid on a Group II: Trustee Project, a bid made by Qualifying Bidder that is A) equal to or in excess of the Initial Overbid Amount, unless it is the Initial Overbid, or B) in excess of the immediately preceding Qualifying Bid by the Minimum Increment, if it is not the Initial Overbid.

2.1.118 2.1.120 Qualifying Bidder.  Qualifying Bidder means a bidder who a) has deposited the sum of five hundred thousand dollars ($500,000) in an escrow designated by the SunCal Plan Proponents; b) who has provided the SunCal Plan Proponents evidence confirming that such bidder has the financial means to acquire the applicable Group II: Trustee Project(s) that such bidder is seeking to acquire, and c) agreed that this sum will be forfeited as liquidated damages if such bidder is the Winning Bidder and fails to perform.

2.1.119 2.1.121 Reliance Claim. An Allowed Unsecured Claim, Allowed Mechanic's Lien Claim, or Allowed Bond Indemnification Claim against a Group II: Trustee Debtor

that would entitle the holder thereof to be the beneficiary of any equitable subordination judgment obtained against a Lehman Entity by such Group II: Trustee Debtor.  All Allowed Mechanic's Lien Claims and, Allowed Bond Indemnification Claims and certain Allowed General Unsecured Claims are Reliance Claims.  A list of the Reliance Claims for the Group II: Trustee Debtors is attached hereto as Exhibit "8."

2.1.120  2.1.122  Reliance Claimant. The holder of a Reliance Claim. A list of the Reliance Claimants for the Group II: Trustee Debtors is attached hereto as Exhibit "8."

2.1.121  2.1.123  Sale Period.  The Sale Period is the time period during which the SunCal Plan Proponents must consummate a sale or liquidation of the Group II: Trustee Projects. The Sales Period shall commence on or before the Confirmation Date and shall expire thirty days after the Effective Date, unless extended by the Bankruptcy Court after notice and hearing.

2.1.122  2.1.124  SCC LLC.  SCC Acquisitions LLC, a limited liability company, a subsidiary of Acquisitions and an indirect and/or a direct parent company of all of the Debtors.

2.1.123  2.1.125  Schedules.  The schedules of assets and liabilities and list of equity security holders Filed by the Group II: Trustee Debtors, as required by Section 521(1) of the Bankruptcy Code, Bankruptcy Rules 1007(a)(3) and (b)(1), and Official Bankruptcy Form No. 6, as amended from time to time.

2.1.124  2.1.126  Stalking Horse Bidder.  The Qualified Bidder who submits the Opening Bid that is accepted by the applicable Debtor.

2.1.125  2.1.127  SunCal.  The SunCal Companies, a trade name for Acquisitions and its Affiliates.

2.1.126  2.1.128  SunCal Management.  SunCal Management, LLC, a Delaware limited liability company, and the former property manager for the Projects, which has been succeed by Argent Management.

2.1.127  2.1.129  SunCal Oak Knoll. SunCal Oak Knoll, LLC, a Delaware limited liability company, a Trustee Debtor (a Group II: Trustee Debtor), and the owner of the Oak Knoll Project.

2.1.128  2.1.130  SunCal Oak Knoll/SunCal Torrance Loan Agreement.  That certain Loan Agreement, dated as of November 30, 2006, between SunCal Torrance and SunCal Oak Knoll, as borrowers, and Lehman ALI, as agent and sole lender, pursuant to which Lehman ALI made a loan in the maximum aggregate principal amount of approximately $167.7 million.  The SunCal Oak Knoll/SunCal Torrance Loan Agreement is allegedly secured by first-priority deeds of trust on the Oak Knoll and the Del Amo Projects.  The SunCal Oak Knoll/SunCal Torrance Loan Agreement has an alleged balance due of $158,141,364.64 as of March 30, 2009.  . The proofs of claim filed with respect to this loan agreement are the subject of the Lehman Adversary Proceeding and the Lehman Claim Objections.

2.1.129  2.1.131  SunCal Plan Proponent(s)Proponents.  The Voluntary Debtors, in their capacity as debtors and debtors in possession in their respective Chapter 11 cases, and Acquisitions as thea creditor and party-in-interest, that isare proposing the Plans in the applicable Trustee Debtors' Cases.

2.1.130  2.1.132  SunCal Torrance. SunCal Torrance, LLC, a Delaware limited liability company, a Trustee Debtor (a Group II: Trustee Debtor), and the owner of the Del Amo Project.

2.1.131  2.1.133  Tax.  Any tax, charge, fee, levy, impost or other assessment by any federal, state, local or foreign taxing authority, including, without limitation, income, excise, property, sales, transfer, employment, payroll, franchise, profits, license, use, ad valorem, estimated, severance, stamp, occupation and withholding tax.  "Tax" shall include any interest or additions attributable to, or imposed on or with respect to such assessments.

2.1.132  2.1.134  Tax Claim.  Any Claim for any Tax to the extent that it is entitled to priority in payment under Section 507(a)(8) of the Bankruptcy Code.

2.1.133   Torrance Break-up Fee. The sum equal to two and one-half (2-1/2%) percent of the Minimum Sale Prince of the Oak Knoll Project plus actual amounts paid by LitCo on Allowed Administrative Claims for the Torrance Case if LitCo is the Stalking Horse Bidder and is not the Winning Bidder.

2.1.134 ~~2.1.135~~ Trustee Debtor(s). The following Debtors, individually or collectively, that are represented by the Chapter 11 Trustee: Delta Coves, SunCal Heartland, SunCal Marblehead, SunCal Northlake, SunCal Oak Valley , SunCal Century City, SunCal PSV, SunCal Torrance, and SunCal Oak Knoll.

2.1.135 ~~2.1.136~~ Trustee Debtors' Committee.  The Official Committee of Unsecured Creditors of the Trustee Debtors appointed in the Cases pursuant to Section 1102 of the Bankruptcy Code.

2.1.136 ~~2.1.137~~ Unpaid Secured Real Property Tax Claims.  Secured Claims held by various government entities secured by liens on the underlying real properties owned by the Debtors but that are non-recourse to the Debtors.

2.1.137 ~~2.1.138~~ Unsecured Claim. An Unsecured Claim is any Claim that is not an Administrative Claim, Tax Claim, Secured Claim, or Priority Claim.

2.1.138 ~~2.1.139~~ Voluntary Debtor(s).  The following  Chapter 11 debtors and debtors-in-possession, individually or collectively, Palmdale Hills, SunCal I, SunCal III, SCC Palmdale, Acton Estates, SunCal Beaumont, SunCal Emerald, SunCal Johansson, SunCal Bickford, SunCal Summit, Seven Brothers, Kirby Estates, SJD Partners, SJD Development, SCC Communities, Del Rio and Tesoro.

~~2.1.140   Voluntary Debtors' Committee.  The Official Committee of Unsecured Creditors of the Voluntary Debtors appointed in the Cases pursuant to Section 1102 of the Bankruptcy Code.~~

2.1.139 ~~2.1.141~~ Winning Bid. The highest and best Qualifying Bid received for the Oak Knoll Project or the Del Amo Project.

2.1.140 ~~2.1.142~~ Winning Bidder.  The party that submits the highest Qualifying Bid that is accepted by the applicable Debtor.

## 2.2    Rules of Construction.

For purposes of the Plan and this Disclosure Statement, unless otherwise provided herein or in the Plan, (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural; (b) each pronoun stated in the masculine,

feminine or neuter includes the masculine, feminine and neuter; (c) any reference in the Plan or this Disclosure Statement to an existing document or schedule filed or to be filed means such document or schedule, as it may have been or may be amended, modified or supplemented pursuant to the Plan; (d) any reference to an entity as a Holder of a Claim or Interest includes that entity's successors and assigns; (e) except as otherwise indicated herein all references in the Plan or this Disclosure Statement to Sections, Articles and Exhibits are references to Sections, Articles and Exhibits of or to the Plan; (f) the words "therein," "thereunder" and "thereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; and (g) unless otherwise provided in the Plan or this Disclosure Statement, any reference in the Plan or this Disclosure Statement to a contract, instrument, release, indenture, agreement, or other document being in a particular form or on particular terms and conditions means that such document shall be substantially and materially in such form or substantially and materially on such terms and conditions; (h) any reference in the Plan or this Disclosure Statement to a document, schedule, or exhibit to the Plan or Disclosure Statement Filed or to be Filed means such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; and (i) the rules of construction set forth in Section 102 of the Bankruptcy Code shall apply to the extent such rules are not inconsistent with the express terms of the Plan or this Disclosure Statement or any other provision in this Section.

## 2.3    Exhibits.

All Exhibits to the Plan are incorporated into and are a part of the Plan as if set forth in full therein.

## III.

## PLAN CONFIRMATION DEADLINES

The Bankruptcy Court has not confirmed the Plan described in this Disclosure Statement. Accordingly, the terms of the Plan are not binding on anyone.  However, if the Bankruptcy Court confirms the Plan, then the Plan will be binding on the Debtor(s), the Plan Trustee, and on all Creditors and Interest Holders in such Cases.

## 3.1    Time and Place of the Confirmation Hearing.

29    The hearing where the Bankruptcy Court will determine whether or not to confirm the Plan

30 will take place at 411 West Fourth Street, Santa Ana, CA 92701-4593 on October 24, 2011, at 9:30

31 a.m. in Courtroom 5A.

32    **3.2    Deadline for Voting for or Against the Plan.**

33    If you are entitled to vote, it is in your best interest to timely vote on the enclosed ballot and

34 return the ballot to:

35

36
> Winthrop Couchot Professional Corporation
> 660 Newport Center Drive, Suite 400
> Newport Beach, CA 92660
37
> Facsimile:  (949) 720-4111
> Attn:  P.J. Marksbury
38

39    Your ballot must be **received by** September 26, 2011**,** or it will not be counted.

40    **3.3    Deadline for Objecting to the Confirmation of the Plan(s).**

41    Objections to the confirmation of the Plan must be filed with the Bankruptcy Court, and

42 served upon the following parties so that they are received by September 26, 2011:

| | |
|---|---|
| **Counsel to the Voluntary Debtors** | Paul J. Couchot<br>Winthrop Couchot Professional Corporation<br>660 Newport Center Drive, Suite 400,<br>Newport Beach, CA 92660 |
| **Authorized Agent for Voluntary Debtors** | Bruce V. Cook<br>General Counsel<br>2392 Morse Ave<br>Irvine, CA 92614-6234 |
| **Counsel for SunCal Management LLC and SCC Acquisitions Inc**. | Ronald Rus<br>Rus Miliband & Smith P.C.<br>2211 Michelson Drive, Seventh Floor<br>Irvine, California 92612 |
| **Authorized Agent for SunCal Management and SCC Acquisitions, Inc**. | Bruce V. Cook<br>General Counsel<br>2392 Morse Ave<br>Irvine, CA 92614-6234 |

43
44
45
46
47
48
49
50
51
52
1
2

3    **3.4    Identity of Person to Contact for More Information Regarding the Plan.**

4    Any interested party desiring further information about the Plan should contact the Voluntary

Debtors' counsel, Winthrop Couchot Professional Corporation, 660 Newport Center Drive, Suite

29  400, Newport Beach, CA 92660, Attn:  Paul J. Couchot, (949) 720-4100; Peter W. Lianides, (949)

30  720-4155; Payam Khodadadi, (949) 720-4160.

31      **3.5**    **Disclaimer**.

32      The information contained in this Disclosure Statement is provided by the SunCal Plan

33  Proponents.  The SunCal Plan Proponents represent that everything stated in this Disclosure

34  Statement is true to the best of their knowledge.  The Bankruptcy Court has not yet determined

35  whether or not the Plan is confirmable and makes no recommendation as to whether or not you should

36  support or oppose the Plan.

37      The discussion in this Disclosure Statement regarding the Group II: Trustee Debtors may

38  contain "forward looking statements" within the meaning of the Private Securities Litigation Reform

39  Act of 2095.  Such statements consist of any statement other than a recitation of historical fact and

40  can be identified by the use of forward looking terminology such as "may," "expect," "anticipate,"

41  "estimate," or "continue," or the negative thereof or other variations thereon or comparable

42  terminology.  The reader is cautioned that all forward looking statements are necessarily speculative

43  and there are certain risks and uncertainties that could cause actual events or results to differ

44  materially from those referred to in such forward looking statements.  The liquidation analyses,

45  distribution projections, projections of financial results and other information are estimates only, and

46  the timing, amount and value of actual distributions to Creditors may be affected by many factors

47  that cannot be predicted.  Therefore, any analyses, estimates, or projections may or may not turn out

48  to be accurate.

49      The SunCal Plan Proponents and their professionals have made a diligent effort to identify in

50  this Disclosure Statement all Litigation Claims, including claims for relief, counterclaims, and

51  objections to claims.  However, no reliance should be placed on the fact that a particular Litigation

52  Claim is or is not identified in this Disclosure Statement.  The Group II: Trustee Debtors or other

1  parties in interest may seek to investigate, file and prosecute Litigation Claims after the Confirmation

2  Date, or the Plan Trust may seek to do so after the Effective Date of the Plan whether or not the

3  Litigation Claims are identified in this Disclosure Statement.

4

# IV.

## FACTUAL BACKGROUND OF THE DEBTORS

### 4.1    The Formation of the Debtors and the Projects.

#### 4.1.1    Overview of the Debtors and Their Projects.

The Group II: Trustee Debtors are two of twenty-six entities (collectively the "Debtors") that were formed pursuant to a joint venture between Affiliates of the SunCal Companies ("SunCal") and the Lehman Entities (the "SunCal/Lehman Joint Venture"). The Debtors' role in the venture was to own and develop the large residential projects that were the core assets in this joint undertaking.

At the inception of SunCal/Lehman Joint Venture, it was agreed that SunCal would be the developer/manager of the Projects and the Lehman Entities would provide the necessary capital. Attached hereto as Exhibit "1" is a general description of all of the Debtors' Projects, including the Group II: Trustee Debtor Projects, and the Debtors' other primary Assets, excluding Cash and the Litigation Claims, and a description of the loans for the Projects that are not a part of Group II: Trustee Debtor Projects.

All of the Debtors are Affiliates of Acquisitions and SCC LLC.  Some of the Debtors directly own the Projects, while others serve as holding companies, owning Allowed Interests in the Debtors that hold title to the Projects.  SunCal Management, LLC, a SunCal Affiliate, has management contracts with respect to all of the Projects and manages the Debtors' day-to-day business affairs.

The seventeen Debtors who are referred to herein as the "Voluntary Debtors" are wholly owned by SunCal Affiliates, and consequently the SunCal Affiliates have full corporate governance authority over these entities.  The Voluntary Debtors own eleven (11) of the Projects. In the case of the nine Trustee Debtors, the SunCal Affiliates and the Lehman Affiliates initially shared ownership equally (50% each). However, after the Petition Date, the SunCal Affiliates became the owner of hundred percent (100%) of the equity in two of the nine Trustee Debtors - SunCal Heartland and SunCal Marblehead.  The Trustee Debtors own nine (9) Projects. Attached hereto as Exhibit "2" is a chart that sets forth the appraised value of the Group II: Trustee Debtors' Projects. This chart lists both the Lehman Lenders' value estimates and SunCal's valuation

estimates.[2]  As the chart indicates, the Lehman Lenders' valuation for the Group II: Trustee~~Debtor~~ Projects is in the aggregate amount of $73,000,000, while the Debtors' valuation of the Group II: Trustee~~Debtor~~ Projects is in the aggregate amount of $38,900,000.

The Plan eliminates any potential value disputes by providing for the sale of the Group II: Trustee~~Debtor~~ Projects through an auction that is designed to yield the highest market price for these assets. Accordingly, to the extent any other party believes the Group II: Trustee~~Debtor~~ Projects have a greater value than the Opening Bid offered by another Qualifying Bidder, they will have the opportunity to submit a Qualifying Bid (but no credit-bids will be allowed) that exceeds the Opening Bid and, if they so desire, to become the Winning Bidder by offering the highest Qualifying Bid. This market sale process will insure that the rights of all stakeholders are protected.

### 4.1.2    The Debtors' Primary Secured Creditors and Their Disputed Claims.

Lehman ALI holds the primary secured claims against the Oak Knoll Project and the Del Amo Project. Lehman ALI's secured claim against the Oak Knoll Project and the Del Amo Project, which are secured by a first priority deed of trust, is based upon funding provided under the terms of the SunCal Oak Knoll/SunCal Torrance Loan Agreement. The asserted balance due under terms of this loan was $158,141,365 as of March 30, 2009.

### 4.1.3    Disputed Claims and Liens.

As discussed in detail herein, during the course of the Debtors' Cases, the Debtors initiated litigation disputing the validity of Lehman's Disputed Secured Claims, and the validity, priority and extent of Lehman's Disputed Liens (which includes the liens against the Group II: Trustee~~Debtor~~ Projects).  This litigation is being pursued through the Lehman Adversary Proceeding, various contested matters, and in potential lawsuits based on the post-petition conduct of the Lehman Entities and/or their agents.

Attached hereto as Exhibit "3" is a chart that sets forth Lehman's Disputed Secured Claims, the alleged Holders of the Lehman Disputed Secured Claims, the collateral encumbered by the Lehman Disputed Liens, and the alleged outstanding amount based on the filed Proofs of Claim.  As

---

[2] Values may have changed since these analyses were prepared.

the chart indicates, the total of Lehman's Disputed Secured Claims (based upon the proofs of claims filed in the Debtor's bankruptcy cases) with respect to the Group II: Trustee Debtors is approximately $158,141,364.64 as of March 30, 2009.

### 4.1.4    A Summary of All of the Alleged Claims Against the Debtors.

Attached hereto as Exhibit "4" is a chart that sets forth the prepetition Claims that have been asserted against all of the Debtors.  In summary, the asserted Claims against the Group II: Trustee Debtors consist of the following:

| Claims | Oak Knoll Project | Del Amo Project |
|---|---|---|
| Unpaid Secured Real Property Tax Claims | $4,156,073 | $773,211 |
| The Disputed Lehman Secured Claims | $158,141,365 | $158,141,365 |
| Mechanics Lien Claims | $4,687,891 | $0 |
| Administrative and Priority Claims | $18,022,329 | $2,064,158 |
| General Unsecured Claims Including alleged Bond Claims | $938,074 | $203,838 |

The SunCal Plan Proponents believe that these balances owed to the Lehman Lenders will ultimately be reduced through the Lehman Adversary Action, the Contract Action and the Lehman claims objections resulting in lower "Allowed" claims balances.

### 4.1.5    Summary of the Group II:  Trustee Debtors' Cash.

The following chart sets forth the Group II: Trustee Debtors' cash on hand as of July 6, 2011.

| Group II: Trustee Debtors | Amount |
|---|---|
| SunCal Oak Knoll | $502,124.84 |
| SunCal Torrance | $150,116.20 |
| **Group II: Trustee Debtors' Total** | $652,241.04 |

Although the Lehman Lenders may allege that they hold liens on the above cash, a review of the applicable lien documents indicates that any purported liens on the cash were not validly perfected. This means that these liens can be avoided, allowing the unsecured creditors recourse to these funds. Moreover, even if the liens against these accounts were properly perfected, the amount secured by these liens, and their priority and their enforceability will be subject to the results of the Lehman Claim Objections and the Lehman Adversary Proceeding.

29  **4.2**    **Factual Circumstances Leading to the Filing of the Debtors' Chapter 11 Cases.**

30      **4.2.1**    **Introduction.**

31      In this section of the Disclosure Statement, the SunCal Plan Proponents have provided a brief

32  description of the relationship between the Debtors and the Lehman Entities. This background is

33  relevant to the Group II: Trustee Debtors, and in fact all of the Debtors, for the following reasons.

34  First, most of the unsecured claims asserted against the Debtors were incurred at the insistence of the

35  Lehman Lenders, and they would have been paid if the Lehman Lenders had honored their obligation

36  to pay these claims. Second, a substantial part of claims that the Lehman Lenders failed to pay are

37  being asserted against *all of the Debtors*. If the litigation against the Lehman Lenders discussed

38  herein is successful, it will, at a minimum, reduce the pool of claims against the Group II: Trustee

39  Debtors, and thereby increase the dividend payable to the remaining creditors. Third and finally, this

40  history allows the Creditors to take the measure of the parties who are now proffering the competing

41  plan – the Lehman Lenders.  As the within discussion will establish, the Lehman Lenders failed to

42  pay the claims of Creditors prepetition, the Lehman Lenders attempted to foreclose upon the Group

43  II: Trustee ~~Debtor~~ Projects post-petition in order to deny the unsecured creditors any recovery on the

44  claims they failed to pay, and finally, when this foreclosure effort failed, the Lehman Lenders

45  attempted to destroy the Debtors' reorganization and sale efforts by manipulating LCPI's alleged

46  automatic stay.

47      **4.2.2**    **Background of the SunCal Companies.**

48      SunCal is a family-owned and operated real estate business that has been successfully

49  developing properties throughout the western United States for over 70 years.  SunCal's business

50  focuses upon the "development" of residential land. A typical SunCal development begins with the

51  acquisition of one or more parcels of raw land. Thereafter, the SunCal team develops a master plan

52  for the acreage that incorporates streets, homes, parks, schools and commercial areas, and then it

1   works with the applicable municipal planning authorities (the city, county, state and federal) to

2   secure the necessary approvals or "entitlements" to gain approval of this plan. This process, which

3   requires the assistance of land planners, civil engineers, architects, lawyers, and other land

4   specialists, takes a period of years. Once the master plan is approved, SunCal provides for the grading

29  of the project and the installation of the foundational infrastructure (streets, utilities, etc.) and then

30  sells the lots or parcels within the project to merchant builders.

### 4.2.3    The Origins of the SunCal/Lehman Joint Venture.

32  SunCal historically financed its projects with loans and/or equity from a number of different

33  sources.  However, beginning in 2007, an increasing number of SunCal's projects were financed by

34  the Lehman Entities, as Mark Walsh ("Walsh"), the head of LBHI's Global Real Estate Group,

35  began cultivating a business relationship with SunCal's principals.

36  By 2003, the Lehman Entities and SunCal had entered into joint ventures involving

37  approximately fifteen projects.  By 2007, that number had grown to over forty, and the Lehman

38  Entities had become, with limited exceptions, the exclusive provider of financing for the SunCal

39  Projects pursuant to a written agreement executed in 2006.  The Lehman Entities also consisted of

40  the Lehman Equity Members that either directly or indirectly owned a fifty percent (50%) equity

41  interest in all nine of the Trustee Debtors.

42  In their dealings with SunCal, the Lehman Representatives made no distinction between

43  Projects financed by Lehman ALI and Projects financed by LCPI. They also made no distinction

44  between the Debtors in which Lehman Equity Members held 50% equity memberships or the

45  Debtors in which the Lehman Entities held no equity membership interest.  As agents of the financial

46  partner in the parties' joint venture, the Lehman Representatives would determine which Lehman

47  Entity would provide financing on which Projects, and would dictate the structure that the financing

48  would take, according to whatever suited the Lehman Entities' needs.

### 4.2.4    Lehman's Effective Control over the Management of the Debtors and Promises of Ongoing Funding.

51  Prior to the market downturn in the middle of 2007, Lehman Representatives afforded

52  SunCal substantial discretion in the management and development of the Projects.  The Debtors

1  would contract with third-party vendors to perform grading, health and safety compliance,

2  construction, landscaping, and other necessary services on the Project sites, and they would work

3  with the local municipalities to obtain the necessary entitlements and other authorizations necessary

4  to proceed with development.  The Lehman Representatives, SunCal and the Debtors would discuss

29    anticipated quarterly expenditures at periodic budget meetings, and, as expenses were incurred each

30    month, SunCal and the Debtors would submit requests for payment to the Lehman Representatives,

31    supported by the necessary documentation. The Lehman Representatives would then provide the

32    funding necessary to pay these expenses.

33         During the third quarter of 2007, the foregoing management and payment dichotomy

34    changed, after the real estate market experienced a sudden downturn, and many of the Projects

35    significantly declined in value.  In response to this dramatic economic change, a series of high level

36    discussions occurred between SunCal's representatives and the Lehman Representatives -- including

37    Walsh, Paul Hughson ("Hughson") and Frank Gilhool ("Gilhool"), the Managing Directors of

38    Lehman's Global Real Estate.  In these discussions, SunCal's representatives, acting on behalf of the

39    Debtors, expressed concerns about the loans on the Projects being out of balance, and suggested

40    shutting down the Projects, or at least slowing the pace of development.  However, Walsh

41    specifically instructed SunCal not to slow down or stop work.  He assured SunCal that the Lehman

42    Entities would provide the necessary funding to pay vendors and to keep the development of the

43    Projects moving forward.

44         The foregoing assurances of payments were confirmed in numerous telephone conversations

45    between Gilhool and SunCal's COO, Frank Faye ("Faye"), SunCal's General Counsel, Bruce Cook

46    ("Cook"), Steve Elieff and/or Bruce Elieff that took place during 2007 and 2008. In each exchange,

47    Gilhool assured SunCal that the Lehman Entities were committed to funding the debts and

48    obligations being incurred at the Projects and they continued to insist that work proceed.

49         During this time frame, the Lehman Representatives became much more "hands on,"

50    scrutinizing and approving all budgets and expenses through a new control and approval structure.

51    Under the new structure, SunCal would submit budgets to the Lehman Representatives on a weekly

52    basis and explain, during periodic conference calls, what Project payables they believe had to be paid

1     and what work had to be performed on the Projects.  The Lehman Representatives would then

2     unilaterally decide what future work would proceed, the Lehman Representatives would authorize

3     the work and the Lehman Representatives would decide what payables would be paid timely by

4     designating them as "urgent," and what other payables were not urgent and hence would not be paid

29    on a timely basis.  However, even under this new Lehman controlled management and payment

30    regime, the Lehman Representatives made it clear that all payables being incurred would be funded.

### 4.2.5    The 2008 Restructuring Agreement.

32    By the fall of 2007, both SunCal and the Lehman Representatives contemplated entering into

33    a restructuring agreement in the near term, with a closing to occur no later than January or February

34    of 2008.  However, this transaction was delayed by the Lehman Entities' extensive documentation

35    demands until May 23, 2008. On this date, SunCal and most of the Debtors finally entered into an

36    omnibus "Restructuring Agreement" with LBHI, Lehman ALI and the other Lehman Entities.  The

37    same Lehman Representative signed the Restructuring Agreement on behalf of all of the Lehman

38    Entities.

39    Pursuant to the Restructuring Agreement, Lehman ALI, "as the Lender with respect to each

40    Loan," committed, among other things, to: (1) make advances under existing loans to fund the

41    continuing costs necessary to preserve the value of the Projects; (2) move forward to resolve the

42    accrued outstanding subcontractor payables, i.e., to make sure that the Projects' creditors were paid

43    for their work; and (3) to close the transaction, whereby newly-created Lehman Entities would

44    assume the debt and obligations of the Projects.

45    As originally executed in May 2008, the Restructuring Agreement applied to twelve of the

46    twenty Projects (as well as several other projects not at issue in the Lehman Adversary Proceeding):

47    (1) Acton Estates; (2) Beaumont Heights; (3) Bickford Ranch; (4) Emerald Meadows; (5) Heartland;

48    (6) Johannson Ranch; (7) Marblehead; (8) Northlake; (9) Oak Valley; (10) Pacific Point; (11) Ritter

49    Ranch; and (12) Summit Valley.  The Debtors that owned and/or held equity interests in the entities

50    that owned these Projects were signatories to the May 2008 agreement.[3]

---

[3] Specifically, the Restructuring Agreement was entered into by, among others, the "Borrowers," "Grantors" and "Pledgors," as defined in Annex 1 thereto.  The "Borrowers" included SunCal Marblehead, SunCal Heartland, SunCal Northlake, SunCal Oak Valley, SJD Partners, Palmdale Hills, SCC Palmdale, SunCal I, SunCal III, and SunCal Bickford.
The "Grantors" included SunCal Marblehead, SunCal Heartland, SunCal Northlake, SunCal Oak Valley, SJD Partners, Palmdale Hills, SunCal Bickford, SunCal Acton, SunCal Summit and SunCal Emerald, and Debtors SunCal Beaumont and SunCal Johannson.
The "Pledgors" included SCC Palmdale, SunCal I, SunCal Summit and SJD Development.

-35-

29        Between May and August 2008, the parties agreed to add four additional projects to the

30 Restructuring Agreement: (1) Del Rio; (2) Joshua Ridge; (3) Palm Springs Village; and (4) Tesoro

31 Burnham, and the four Debtors associated with these Projects—SunCal Del Rio, SCC Communities,

32 SunCal PSV, and SunCal Tesoro.  Only four Projects were not included in the Restructuring

33 Agreement: Century City, Delta Coves, Oak Knoll and Del Amo.  Accordingly, the four Debtors

34 associated with these Projects—SunCal Century City, Delta Coves, SunCal Oak Knoll and SunCal

35 Torrance—were not signatories thereto.  Lehman ALI was the lender on each of these Projects and,

36 as with the other Projects, Lehman ALI continued to insist that these four debtors proceed with the

37 development of the four Projects, it approved all expenses, and it continually provided assurances of

38 payment.

### 4.2.6    The Lehman Lenders Hire Radco.

40        Subsequent to the execution of the Restructuring Agreement, Lehman ALI arranged for a

41 third party, Radco, to directly settle outstanding contractor payables, as its agent.  Radco was

42 provided some limited funding and authority to negotiate settlements, and did in fact reach settlement

43 with a number of creditors.  The funding for these settlements, whether the debts related to Lehman

44 ALI or LCPI funded Projects, came from the same source.  Lehman ALI and LCPI also provided

45 approval for new work on the Projects, and Lehman ALI paid for some of this work.  However, this

46 funding was minimal and it soon stopped.

47        In August 2008, Lehman ALI withdrew funding and settlement authority from Radco, leaving

48 millions of dollars in outstanding contractor payables unresolved, notwithstanding the contrary

49 provisions in the Restructuring Agreement.  Leman ALI's actions also impaired the Debtors' ability

50 to resolve ongoing public health and safety issues arising at the Projects.  Ultimately, only a fraction

51 of the total outstanding payables were resolved, contrary to the  past promises made by Lehman

52 Representatives.

### 4.2.7    The Lehman Lenders' Failure to Close on the Settlement Agreement.

2        Pursuant to the terms of the Restructuring Agreement, the parties agreed to enter into a

3 Settlement Agreement, the form of which was attached to the Restructuring Agreement.  The

4 Settlement Agreement provided for the transfer of the Projects included within the Restructuring

29    Agreement to a series of newly formed Lehman-controlled entities (each with "SCLV" in its name,

30    for "SunCal-Lehman Venture"). The agreement further provided that the entity taking title to the

31    Project would assume the  Lehman Lender debt obligations associated with the Projects, assume

32    certain bond obligations associated with the Projects, and provide indemnifications to SunCal and

33    the Debtors for unpaid claims.

34         On August 25, 2008, the Settlement Agreement and a series of related documents were

35    formally executed by SunCal and the applicable Lehman Lenders and Lehman Equity Members at a

36    meeting held in Los Angeles on August 25, 2008.  Once these documents were signed, all that

37    remained was the mechanical closing of the series of transactions described in the Settlement

38    Agreement. Since all of the conditions precedent to the closings had been satisfied, or could have

39    been satisfied shortly after the meeting, this should have occurred on or shortly after the August 25,

40    2008 meeting.  However, the Lehman Representative asked SunCal to extend the closing date for

41    thirty days, to September 30, 2008. According to the Lehman Representatives, this short extension

42    would enable them to secure certain outstanding third party consents. Although SunCal knew these

43    third party consents were readily obtainable within a few days, they agreed to this extension,

44    believing the request was made in good faith. ~~In fact, as more fully explained blow, it was not~~.

45         **4.2.8    The Lehman Lenders' Undisclosed Sale of Most of the Debtors' Loans.**

46         As explained above, the Settlement Agreement was duly executed by all parties at a formal

47    closing meeting held on August 25, 2008. When the parties signed this agreement, which was a

48    binding contract, they both represented that they both intended and had the power and capacity to

49    perform all of the obligations undertaken therein. However, in the case of the Lehman Entities, this

50    representation was later discovered to be false. When the closing occurred on August 25, 2008, the

51    Lehman Lenders had already sold the very obligations they were agreeing to assume and restructure

52    in the Settlement Agreement to Fenway Capital pursuant to a repurchase agreement (the "Fenway

1    Repurchase Agreement").  Accordingly, as of August 25, 2008, they lacked the power to perform the

2    most essential undertakings that they agreed to perform in the Settlement Agreement. Instead of

3    disclosing this fact at the August 25, 2008 meeting, the Lehman Lenders requested additional time to

4    execute the agreed upon transfers provided for under this binding agreement. The Lehman Lenders

29  needed this ~~delay for an obvious, but undisclosed reason: They~~because they lacked the ability to

30  perform the very obligations they had just agreed to perform in the Settlement Agreement.

31      The Lehman Representatives also did not disclose at the August 25, 2008 closing that they

32  intended to sell the Pacific Point First Loan to Lehman Re, approximately a week later, *even though*

33  *this loan was also subject to the Settlement Agreement*. To the contrary, the Lehman Representatives

34  affirmatively concealed these facts from SunCal and the Debtors by asserting that ownership still

35  existed in the case of seven of the eight loans.

36      **4.2.9    Lehman's Foreclosure Sale and Purchase of the Pacific Point Project.**

37      At the time the Restructuring Agreement and the Settlement Agreement were signed, the

38  Pacific Point Project, which was still owned by SJD Partners, was among the Projects included in the

39  Restructuring Agreement and the Settlement Agreement.  Pursuant to the Restructuring Agreement,

40  and as detailed in the Settlement Agreement attached thereto, SunCal, SJD Partners, and its parent

41  company, SJD Development, all agreed that they would not interfere with Lehman ALI's (or its

42  designee's) foreclosure on the Pacific Point Project. They further agreed that a new Lehman entity,

43  LV Pacific Point, would purchase the Pacific Point Project upon foreclosure and that Lehman ALI

44  and LV Pacific Point would (a) assume SJD Partners' and SJD Development's outstanding accounts

45  payable for Pacific Point third-party vendors, (b) assume certain bond liability associated with the

46  Pacific Point Project, and (c) pay for the millions of dollars worth of work that Lehman ALI

47  representatives had authorized.

48      As previously stated, the Settlement Agreement was signed on August 25, 2008 by the

49  SunCal parties, including SJD Partners and SJD Development.  It was also signed by Gilhool as

50  authorized signatory on behalf of both Lehman ALI and LV Pacific Point.  As a signatory to the

51  Settlement Agreement, LV Pacific Point was required to purchase the Pacific Point Project at the

52  foreclosure sale subject to the above obligations. Consistent with this agreement, the City of San

1   Juan Capistrano executed an estoppel certificate for the benefit of SJD Partners and Lehman

2   ALI—at Lehman ALI's request—on August 26, 2008, two days before the foreclosure sale.  This

3   certificate stated, among other things, that the "Acquiring Entity [LV Pacific Point] shall by

4   operation of law become the legal successor-in-interest to Developer [SJD Partners]" under SJD

29  Partners' agreements with the City. That certificate further provided that there existed no breaches,

30  defaults, or claims under SJD Partners' agreements with the City.

31      On August 28, 2008, Lehman ALI foreclosed on the Pacific Point Project, and title was

32  transferred to LV Pacific Point at the foreclosure sale.  However, Lehman ALI and LV Pacific Point

33  failed to assume the liabilities and obligations associated with this Project as agreed.   This breach of

34  the parties' agreement, left SJD Partners without title to the Pacific Point Project, but with the

35  potential liability for the substantial unsecured claims relating to the Project, including bond claims

36  of approximately $34 million.  Moreover, since Lehman ALI and LV Pacific Point have continued to

37  ~~ignore~~breach their obligations under the above agreement, unpaid taxes, fines, and penalties have

38  continued to accrue to the detriment of the Project and these claims are being asserted against SJD

39  Partners.

40      Had SunCal, SJD Partners and SJD Development known that Lehman ALI and LV Pacific

41  Point had no intention of honoring their obligations under the foregoing agreement, they never

42  would have agreed to cooperate with the foreclosure.  Instead, SJD Partners would have filed for

43  bankruptcy earlier, thereby mitigating the damages from Lehman Ali's breach, by allowing creditors

44  recourse to the value of the Project.

45      This course of conduct is relevant to the unsecured creditors of the Group II: Trustee Debtors

46  for the following reason. The holders of bond claims against SJD Partners are asserting their massive

47  claims against the estates of all of the Debtors, including the estates of the Group II: Trustee Debtors.

48  Accordingly, Lehman ALI's wrongs against SJD Partners directly affect the Group II: Trustee

49  Debtors' cases.

50      **4.2.10  Alvarez and Marsal Take over Control of the Lehman Entities After the**

51          **Chapter 11 Filings of LBHI and LCPI.**

52      LBHI filed for bankruptcy in September 2008 and LCPI filed for bankruptcy in October

1   2008.  After LBHI's filing, Bryan Marsal ("Marsal") of Alvarez & Marsal ("A&M") was appointed

2   to serve as LBHI's Chief Restructuring Officer. Marsal and A&M are in charge of liquidating the

3   now defunct Lehman Entities, including Chapter 11 debtors LBHI and LCPI, and the non-bankrupt

4

29   Lehman Lenders (Lehman ALI, OVC, and Northlake Holdings, as well as the non-bankrupt Lehman

30   Equity Members.

31         Although A&M was not employed until after the events that occurred on August 25, 2008

32   described above, it should be noted that A&M hired the same law firm that represented the Lehman

33   Lenders in the August 25, 2008 meeting – Weil, Gotshal & Manges, LLP. Moreover, as more fully

34   explained herein, it was A&M that directed Lehman ALI not to perform its contractual obligations

35   under the Settlement Agreement after September of 2008. ~~Accordingly, the same individuals that~~

36   ~~caused the damages to unsecured creditors by insisting upon the breach of the Settlement~~

37   ~~Agreement, are now asking for their vote in the competing plan filed by the Lehman Lenders.~~

38         LBHI's bankruptcy filing and the Lehman Lenders refusal, at A&M's direction, to close the

39   transactions provided for under the Settlement Agreement as agreed, were not small matters. They

40   severely damaged the Debtors. Although the Debtors were not proceeding with any new construction

41   or development, the Debtors were still required to expend significant sums on site security, erosion

42   control, property taxes and other measures in order to prevent the Projects from becoming a public

43   safety hazard, and in order to avoid the loss of valuable entitlements, and to mitigate penalties and

44   fines being incurred by the Projects.  Although SunCal and the Debtors repeatedly requested that the

45   Lehman Entities pay for critical health and safety and value preservation measures on the Projects,

46   these efforts were unavailing.

47         Between October 9 and November 4, 2008, SunCal's general counsel Bruce Cook sent

48   Robert Brusco, an authorized agent of the Lehman Entities, nearly two dozen letters requesting that

49   the Lehman Lenders provide the funding necessary to address critical needs on the Projects as

50   promised.  A summary of these health and safety notices are attached hereto as Exhibit "5".  The

51   Lehman Entities ignored these requests until November 2008, when Brusco, purportedly on behalf

52   of the Lehman Lenders, delivered the message that the Lehman Lenders were unwilling to fund the

1    Projects and that, instead, they intended to foreclose on all of the Projects.

2          As a result, as set forth in Exhibit "4," there are now over 240 vendors, municipalities,

3    counties and bonding companies claiming over $400 million in work, improvements and property

4

29    tax claims against the Projects.  Substantially all of these sums are due to work performed or bonded

30    at Lehman's request based upon Lehman's promises of payment.

31    **4.3    The Group II: Trustee Debtors' Potential Preferential Transfers**.

32    Attached hereto as Exhibit "6" are charts setting forth payments made to third parties during

33    the ninety (90) day time period preceding the filing of the Debtors' Chapter 11 Cases as well as

34    payments made to the Lehman Entities and to SunCal Affiliates during the one-year time period

35    preceding the filing of the Debtors' Chapter 11 Cases.

36    As the charts in Exhibit 6" indicate, Group II: Trustee Debtor's made  payments in the

37    following aggregate amounts to non-insiders within the 90 day preference period preceding the

38    Petition Date: SunCal Oak Knoll, $2,324,630.92, and SunCal Torrance, $18,618.50.  The

39    corresponding figures for payments made to "insiders" within the one year preference period

40    preceding the Petition Date were: SunCal Oak Knoll, $2,914,645.70 and SunCal Torrance,

41    $310,181.43.

42    / / /

43    / / /

44    / / /

45    / / /

46    / / /

47    / / /

48    **V.**

49    **SIGNIFICANT EVENTS IN THE DEBTORS' CHAPTER 11 CASES**

50    **5.1.    Voluntary Debtors.**

51    **5.1.1    Joint Administration of the Voluntary Debtors and the Trustee Debtors.**

52    Since their respective Petition Dates, the seventeen (17) Voluntary Debtors have continued to

1    operate as "debtors-in-possession," subject to the supervision of the Bankruptcy Court and in

2    accordance with the Bankruptcy Code.  The Voluntary Debtors are authorized to operate their

3    businesses in the ordinary course during the Chapter 11 proceedings.  Transactions outside the

4    ordinary course of business must be approved by the Bankruptcy Court.

29        The Voluntary Debtors' Cases are being jointly administered pursuant to orders entered on

30  November 20, 2008 and December 9, 2008.  The Voluntary Debtors' Cases are being jointly

31  administered with the Trustee Debtors' cases pursuant to an order entered on March 11, 2009.

32        The Voluntary Debtors have employed Winthrop Couchot Professional Corporation as their

33  general insolvency counsel, and the MB Firm as their special litigation counsel.

34          **5.1.2**   **The Voluntary Debtors Court Employed Professionals**.

35        The Voluntary Debtors' Committee has employed Irell & Manella LLP as its counsel

36  pursuant to an order entered on February 13, 2009.

37        Pursuant to the Court's Order regarding joint administration of the Voluntary Debtors, the

38  Voluntary Debtors' liability for professional fees is joint and several among the Voluntary Debtors'

39  Estates for fees incurred related to services for the benefit of all of the Voluntary Debtors.  The

40  Trustee Debtors' liability for professional fees is not joint and several.

41        Pursuant to the initial MB Firm employment application, Acquisitions was responsible for

42  the payment of their fees until December 31, 2009.  The MB Firm's application also allows for

43  payments from the Bond Companies.  The initial MB Firm employment application reserved the

44  right, should the Lehman Adversary Proceeding result in a benefit accruing to particular Debtors'

45  Estates, to request that its fees and expenses be reimbursed by the Debtors' Estates.  The Bond

46  Companies have also agreed to jointly fund a portion of the professional fees and expenses of the

47  MB Firm with respect to the Lehman Adversary Proceeding.  The Bond Companies' funding

48  commitment can be terminated and after such a termination they will only be required to cover fees

49  and costs incurred during the period of their prior commitments.

50        The MB Firm employment application was subsequently amended.  Pursuant to an order

51  entered on April 14, 2010, (1) the Voluntary Debtors will pay up to one-half of the fees and expenses

52  incurred by the MB Firm from and after February 1, 2010 onward; and (2) the Trustee Debtors do not

1  have an obligation to pay any of the MB Firm's fees pertaining to the Trustee Debtors' estates, unless

2  and until a loan by the Voluntary Debtors to the Trustee Debtors is agreed to by the Trustee and

3  approved by the Court, or in accordance with the terms of the original employment applications to

4  the extent not superseded or modified by the amended employment application.  The order does not

29   affect the MB Firm's right to seek payment from the Bond Companies without the need for an

30   additional order of the Court.

31   The MB Firm filed an updated application seeking to further amend their employment to

32   include the right to pursue certain claims against the Lehman Entities and certain employees and

33   agents of these entities on behalf of the Voluntary Debtors.  The claims encompassed by this

34   amendment include claims that are based upon both prepetition and post-post petition actionable

35   conduct under both state law and federal law against the Lehman Entities and/or their agents.

36   ### 5.1.3   LCPI's Motions for Relief from the Automatic Stay Against Certain of

37   ### the Voluntary Debtors' Projects and Related Appeals.

38   On January 23, 2009, LCPI and Lehman ALI filed various motions for relief from the

39   automatic stay against Palmdale Hills, SCC Palmdale, SunCal Beaumont, SunCal Summit Valley,

40   SunCal Emerald, SunCal Bickford, Acton Estates, SunCal Johannson, and SCC Communities I (the

41   "Lehman Entities' Stay Motions").  Although the Debtors were able to defeat the Lehman Entities'

42   Stay Motions, they are relevant in the following respect. Had the motions filed by LCPI and Lehman

43   Ali succeeded, it is almost certain that unsecured creditors would have received nothing on their

44   claims. Moreover, as more fully explained herein, since Lehman ALI and LCPI did not even own the

45   loans they were seeking to foreclose upon, these motions should never have been filed in the first

46   instance. ~~Yet now, these same parties  Lehman ALI and LCPI   are asking these same creditors to~~

47   ~~vote on their plan and to "trust" them.~~

48   ### 5.2.   The Trustee Debtors and Their Professionals.

49   Orders for Relief were entered in the involuntary cases beginning on January 6, 2009.  The

50   Trustee Debtors are represented by their duly-appointed Chapter 11 Trustee, Mr. Steven M. Speier,

51   pursuant to orders of the Bankruptcy Court entered on January 15, 2009.

52   The Chapter 11 Trustee has employed the Lobel Firm as the Chapter 11 Trustee's general

1   insolvency counsel, the MB Firm as special litigation counsel, and Squar Milner, LLP as its

2   accountants.

3   The Trustee Debtors' Committee has employed Weiland, Golden, Smiley, Wang Ekvall &

4   Strok as its general insolvency counsel.

### 5.3.    The Debtors' Various Motions Relating to Financing for the Projects and to Pay Professional Fees.

#### 5.3.1    The Voluntary Debtors' Initial Motion for Surcharge and Use of Cash Collateral.

On January 16, 2009, seven of the Debtors filed a motion authorizing Palmdale Hills to use and surcharge, pursuant to 11 U.S.C. § 506(c), and/or use the purported cash collateral of LCPI arising from the Ritter Ranch Loan Agreement, pursuant to 11 U.S.C. § 363(c)(2), in order to pay for the reasonable and necessary maintenance expenses required to preserve the value of such Debtors' Projects subject to deeds of trust and other security interests held by LCPI.

LCPI objected to the motion and subsequently filed a motion in its own Chapter 11 proceeding in the Southern District of New York seeking an order barring the motion as a violation of LCPI's automatic stay. Although the Debtors believe that LCPI's stay was not violated in any way by the Motion, the Motion was taken off calendar prior to any ruling by the New York Bankruptcy Court, based upon the threat of sanctions made against Debtors' counsel by the presiding judge in LCPI's case.

As explained above, LCPI did not even own an interest in the Ritter Ranch Loan Agreement when it asserted the automatic stay, since the Ritter Ranch Loan Agreement, which was the subject of the cash collateral motion, had already been sold pursuant to the Fenway Repurchase Agreement. Yet this wrongful action prevented Palmdale Hills from using its own money to pay critical bills that Lehman ALI, LCPI's parent, was contractually required to fund in the first instance.

#### 5.3.2    The Lehman Disputed Administrative Loans.

As explained above, after the Petition Dates, the Debtors collectively demanded that the Lehman Lenders comply with their contractual obligations to pay for the costs of maintaining and preserving the value of the Projects, including the Group II: Trustee ~~Debtor~~ Projects. However, the Lehman Lenders not only refused to comply with their obligations, they actively attempted to bar the Debtors from using their own funds to pay these critical costs, in the hope of forcing the Debtors to yield the Projects without a fight.

29  In the face of the foregoing refusal and active interference, the Chapter 11 Trustee agreed to

30  enter into several stipulations with Lehman ALI for financing (in the total approximate amount of

31  $17,680,316 for the Group II: Trustee Debtors) to pay for real property taxes and urgent public health

32  and safety issues on the Projects and to pay professionals under the caveat that such professionals

33  would not be paid for services performed on matters that were considered contrary to the interests of

34  the Lehman Entities. This loan was approved pursuant to an order of the Court. In return for what the

35  SunCal Plan Proponents view as a "forced loan," the Lehman Lenders insisted that the Chapter 11

36  Trustee agree to withdraw a motion  providing for the sale of certain Projects free and clear of the

37  Lehman Lenders' Disputed Liens, including the Projects of the Group II: Trustee Debtors, and the

38  Chapter 11 Trustee agreed.

39  The SunCal Plan Proponents have filed a series of objections to the Lehman Lenders' claims,

40  including the Lehman Disputed Administrative Loans. These objections are based upon various

41  grounds, including the following, which apply notwithstanding prior court approval:

42  First, the 502(d) Objection, described in more detail in Section 5.4.1.5 below, objecting *inter*

43  *alia* to the following Administrative Claims:

| Debtor | ~~Adminstrative~~Administrative Claim Holder | Alleged Administrative Claim Amount |
|--------|--------------------------------------|-------------------------------------|
| Oak Knoll | Lehman ALI | $13,002,451 |
| Torrance | Lehman ALI | $1,346,711 |

47  Second, because there is no Lehman automatic stay enjoining the Group II: Trustee Debtors,

48  the Group II; Trustee Debtors may assert offset rights as set forth in the Recoupment Objection as

49  against Lehman ALI.

50  Third, the Plan also provides that the Plan Trustee and the Group II: Trustee Debtors reserve

51  the right to join in the Contract Action as additional plaintiffs.  Any recovery on the Contract Action

52  may provide a further offset against the Lehman Disputed Administrative Loan.

1  **5.3.3**  **The Voluntary Debtors' Agreements with the Lehman Entities for Use of**

2  **Alleged Cash Collateral to Maintain the Properties and to Pay**

3  **Professional Fees.**

4

29      On September 1, 2009, with the consent of the Lehman Entities, fourteen of the Voluntary

30      Debtors filed a motion authorizing surcharge pursuant to 11 U.S.C. § 506(c), and/or use of the

31      purported cash collateral for the purpose of addressing critical public health and safety issues and

32      other value preservation with respect to the Debtors Projects.  On September 10, 2009, the Lehman

33      Entities filed an opposition thereto, and on September 17, 2009, the Voluntary Debtors filed their

34      Reply.

35      Subsequently, the Voluntary Debtors learned that the Lehman Entities lacked control

36      agreements as to the majority of the depository accounts, and thus such accounts were not subject to

37      perfected liens and therefore did not constitute "cash collateral".  On October 15, 2009, the

38      Voluntary Debtors filed a *Motion For Order Authorizing Disposition Of Certain Depository*

39      *Accounts*.  On or about October 22, 2009, the Lehman Entities filed an opposition, and on October

40      29, 2009, the Voluntary Debtors filed their Reply.

41      The motion was consensually resolved by way of the *Stipulation Pursuant To 11 U.S.C. §§*

42      *362, 363, And 364: (1) Authorizing The Use Of Cash Collateral And Alleged Unencumbered Cash;*

43      *(2) Approving Postpetition Financing; (3) Providing Administrative Expense Status; And (4)*

44      *Modifying Automatic Stay To The Extent Necessary* filed on December 8, 2009, and the order

45      thereon entered on December 17, 2009.  The stipulation provided for a 120-day budget with

46      expenses totaling approximately $5 million, pursuant to which any Cash in the Estates is used first

47      and then money borrowed from the Palmdale Hills Estate is used thereafter on an administrative

48      basis.  The agreement also permitted the Voluntary Debtors to use their alleged unencumbered cash

49      to pay its professional fees.  This agreement has been renewed on several occasions.  The Parties

50      have subsequently entered into stipulations authorizing the Voluntary Debtors' use of the alleged

51      unencumbered cash.

52      **5.4.**    **The Debtors' Disputes and Claims Against the Lehman Entities.**

1      **5.4.1**    **The Lehman Adversary Proceeding.**

2      On January 6, 2009, the Voluntary Debtors initiated the Lehman Adversary Proceeding by

3      filing their initial complaint against Lehman ALI for equitable subordination of Lehman ALI's

4      Disputed Claims and avoidance of its Disputed Liens pursuant to Bankruptcy Code Section 510(c).

29    On February 3, 2009, the Debtors filed a First Amended Complaint, which added the Trustee

30    Debtors as co-plaintiffs and added various other causes of action.  The First Amended Complaint

31    also named OVC Holdings, Northlake Holdings and various other entities as defendants.

32    Pursuant to a hearing on a motion to dismiss held on June 11, 2009, the Bankruptcy Court

33    granted the Debtors leave to amend the second amended complaint.  Thus, on July 10, 2009, the

34    Debtors filed their Third Amended Complaint.  The Third Amended Complaint addressed many of

35    the concerns raised by the Bankruptcy Court and also included various Avoidance Actions and other

36    causes of action against the Lehman Lenders and the Lehman Successors.  The Third Amended

37    Complaint also added Fenway Capital as a defendant based upon the discovery of the facts relating to

38    the sale of the loans Fenway Capital and based upon the Court ruling that the Repo was a true sale.

39    On September 30, 2009, the Lehman Entities filed a motion to dismiss the Third Amended

40    Complaint (which motion was amended on October 7, 2009 and October 22, 2009), alleging that the

41    relief requested by certain Debtors was not available as a matter of law.  On September 30, 2009,

42    Fenway also filed a motion to dismiss the Third Amended Complaint.  On January 26, 2010 and

43    January 28, 2010, the Debtors filed oppositions to the motions to dismiss the Third Amended

44    Complaint filed by the Lehman Entities and Fenway, respectively.  On February 4, 2010, the Lehman

45    Entities and Fenway filed their respective replies.  The Court entered an order granting in part and

46    denying in part the relief requested in the motions to dismiss. Most notably, the Court denied  the

47    defendants request for the dismissal of  the equitable subordination claims and the Court permitted

48    the Debtors to file an amended complaint.  LCPI was dismissed as a defendant at this hearing, due to

49    the fact that it did not own any interest in the loans at issue and due to potential impact of the case

50    upon LCPI's automatic stay.  On March 26, 2010, the Debtors filed their Fourth Amended

51    Complaint. The following is a summary of the causes of action set forth in the Fourth Amended

52    Complaint:

### 5.4.1.1    Equitable Subordination.

2    Based on the pre-petition inequitable conduct of the Lehman Entities, summarized in Section

3    4.2, the Debtors have sought to subordinate the claims and avoid the liens of the Holders of the

4

29   Lehman Disputed Loans to the extent necessary to pay the Claims of unpaid Creditors that were

30   damaged by the inequitable conduct.

**5.4.1.2    The Fraudulent Transfer Claims.**

32        The fraudulent conveyance claims set forth in the Fourth Amended Complaint include the

33   cause of action that SunCal Oak Knoll  and SunCal Torrance are asserting against Lehman ALI in

34   order to avoid liens securing the alleged claims in the amount of $158,141,365.

**5.4.1.3    The Preference Claims.**

36        The preference claims set forth in the Fourth Amended Complaint include the following:

37   Transfers made to a Lehman Entity by a Debtor, where such Debtor was either owned by a Lehman

38   Equity Member (50%) or where a Lehman Equity Member of Lehman Entity controlled such Debtor

39   at the time of the transfer.  Furthermore, according to the Lehman Lenders' appraisals submitted on

40   the Projects of these Debtors, all of the loans were vastly undersecured at the time of the transfers.

41        On April 12, 2010, the Lehman Entities filed a motion to dismiss the Fourth Amended

42   Complaint (as well as a related motion to strike portions of the same).  On that same date, the Lehman

43   Entities and Fenway, respectively, also filed answers to the Complaint denying the causes of actions

44   set forth in the Fourth Amended Complaint and alleging certain affirmative defenses.  Furthermore,

45   as discussed herein, the New York Bankruptcy Court has approved Fenway's sale of all Sold Loans

46   to LCPI.  Consequently, the filing of a fifth amended complaint may be necessary.

**5.4.1.4    Debtors' 502(d) Objections and Objection to Lehman's Claim
Against Acton.**

49        The Voluntary Debtors and other parties-in-interest have filed a motion to disallow, pursuant

50   to 11 U.S.C. § 502(d) (the "502(d) Objection"), the following Disputed Claims filed by Lehman ALI

51   and LCPI, including the following claims filed against the Group II: Trustee Debtors:

| Disputed Proof of Claim No. | Debtor | Claim Holder | Claim Amount |
|---|---|---|---|
| 12 | SunCal Oak Knoll | Lehman ALI | $158,141,365 |
| 4 | SunCal Torrance | Lehman ALI | $158,141,365 |

The 502(d) Objection also objects inter alia to the following Administrative Claims:

| Debtor | ~~Adminstrative~~Administrative Claim Holder | Alleged Administrative Claim Amount |
|---|---|---|

-48-

| Oak Knoll | Lehman ALI | $13,002,451 |
| Torrance | Lehman ALI | $1,346,711 |

In summary, the Group III: Trustee Debtors allege in the Lehman 502(d) Objection that the Lehman Entities received prepetition transfers that are avoidable under certain sections of the bankruptcy code.

The Lehman Entities oppose the 502(d) Objection, inter alia, on the following grounds:

(1)    SunCal Management allegedly lacks standing to object to claims in the Trustee Debtor cases.  However, Section 502 provides that any party in interest may object to claims.

(2)    Disallowance is allegedly premature because there has been no judicial determination of the avoidance liability.  However, the only "judicial determination" necessary to invoke section 502(d) is that the objecting party have established a prima facie case for avoidance.  Courts have repeatedly characterized disallowance under Section 502(d) as temporary, pending a later ultimate determination of the avoidance claims in an adversary action.

(3)    The 502(d) objection purported violated LCPI's automatic stay. However, several courts have specifically concluded that an objection under Section 502(d) does not violate the creditor's automatic stay.  See In re Metiom, 301 B.R. 634 (Bankr.S.D.N.Y. 2003); In re PRS Ins. Group, 331 B.R. 580, 584 (Bankr.D.Del. 2005).

(4)    The 502(d) Objection allegedly fails to establish a ~~prim~~prima facie case for avoidance.  However, applicable case law establishes that a prima facie case merely requires that the underlying avoidance allegations survive a motion to dismiss.  Here, the Court has already denied the Lehman Entities' Motion to dismiss the applicable avoidance action.  Moreover, the 502(d) Objection further submits substantive evidence establishing the merits of the avoidance claims.

(5)    The Lehman Entities argue that they would be entitled to retain liens in the properties to the extent they gave value in good faith under Section 548(c). However, the Lehman Entities failed to cite any authority to support their novel argument that Section 548(c) can defeat disallowance under Section 502(d).  The only authority on this point is

-49-

29    directly contrary to the Lehman Entities' argument.  See <u>In re Interstate Cigar Co., Inc.</u>,  278

30    B.R. 8 (Bankr.E.D.N.Y. 2002).s

31    On June 9, 2011, a hearing was held on the Section 502(d) claim objection. At this hearing

32    the Lehman Entities disputed the merits of the Section 502(d) claim objection and LCPI alleged that

33    the filing of this objection violated its automatic stay. At the conclusion of the hearing, the Court

34    ruled that the parties could proceed with their discovery in this matter.

35    If the Section 502(d) claim objection is successful, the claims of the Lehman Entities

36    identified in the table above will be disallowed. Although the Lehman Entities will have the right to

37    seek reconsideration of this disallowance, in order to obtain this relief they would have to repay the

38    applicable transfers.

39    ### 5.4.1.5    <u>The Lehman Recoupment Claim Objections and the Contract</u>

40    <u>Action</u>.

41    Pursuant to the terms of the joint ventures entered into by and among the Debtors and the

42    Lehman Entities, the Lehman Entities were responsible for paying the costs incurred in the

43    development of the Projects. These costs included the claims of the vendors who provided goods and

44    services to the Projects and the claims asserted by the Bond Claimants. Although the Lehman

45    Entities contend that they were merely "lenders," and that they did not assume any liability for these

46    claims, as the above facts and those that will be adduced prior to and at the confirmation of the Plan

47    will demonstrate, the Lehman Entities are in fact obligated to pay these claims.

48    The Debtors' contend that direct liability can be imposed on the Lehman Entities on various

49    grounds, including the following.  First, the Lehman Entities were either in a joint venture

50    relationship with the Debtors from the outset, or this relationship developed and became a legal

51    fixture through the Lehman Entities' course of conduct. Pursuant to this relationship, and the

52    promises and representations made therein, the Lehman Entities agreed to be responsible for all

1    vendor and Bond Claims incurred at or in connection with the Projects. The role of each of the

2    Debtors, by mutual agreement, was to provide development expertise and project management

3    services. The Lehman Entities were required to provide the capital necessary to fund the Projects.

4

29    Second, during the last eighteen months of the relationship between the parties, the Lehman

30  Entities assumed direct responsibility for all claims incurred during this period, by insisting that

31  work continue on the Projects and by repeatedly promising to pay for this work. Since the Lehman

32  Entities ordered this work, and promised to pay for the same, they bear this financial responsibility.

33    Third and finally, the Lehman Entities expressly agreed to pay the vendor and bond claims

34  described in the Restructuring Agreement and in the interrelated Settlement Agreement, but failed to

35  do so as contractually agreed.

36    It is the SunCal Plan Proponent's contention that the Lehman Entities' failure to pay the

37  vendor and Bond Claims associated with the Projects as was their obligation under the terms of the

38  joint ventures, the Restructuring Agreement and the Settlement Agreement) unjustly shifted

39  responsibility for these liabilities to the Debtors in breach of the terms of joint venture, the

40  Restructuring Agreement and the Settlement Agreement. Accordingly, the SunCal Plan Proponents

41  have filed objections to seven of the Secured Claims asserted by the Lehman Entities based upon the

42  affirmative defenses of recoupment, unjust enrichment and unclean hands (the "Lehman

43  Recoupment Claim Objections").

44    In the Lehman Recoupment Claim Objections, the SunCal Plan Proponents seek the

45  following relief:

46        1) Disallowance of the claims asserted by the Lehman Lenders in their

47        entirety, pending compliance with the terms of the Restructuring Agreement

48        and the Settlement Agreement;

49        2) A reduction in the amount of the Lehman Entities' secured claims by the

50        amount of damages resulting from the Lehman Entities' breach of their

51        obligations under these agreements; and/or

52        3)  An order barring the Lehman Entities from enforcing their rights under

1        the Lehman Loans until they cure their breaches under the above

2        agreements.

3    The first prayer for relief above is premised upon the contention that the Lehman Entities

4  agreed to transfer ownership of ~~certain of these Debtors'~~the Projects to a series of newly formed

29   entities under the control of the Lehman Entities, pursuant to the terms of the Settlement Agreement.

30   This agreement further provided that these new entities would assume the vendor payables and

31   certain Bond Claims associated with these projects.  Finally, this agreement included a covenant not

32   to sue, pursuant to which the Lehman Entities were barred from seeking further recourse against the

33   Debtors.

34        The SunCal Plan Proponents believe that the positions asserted in the Lehman Recoupment

35   Claim Objections are well grounded in fact and in law. Had the Lehman Entities complied with their

36   contractual obligations, substantially all of the these Debtor's liabilities would have been eliminated,

37   these Debtors would not have had to file Chapter 11, and the Lehman Entities would be barred from

38   asserting claims against these  Debtors based upon the Lehman Disputed Loans. It is the SunCal Plan

39   Proponents position that the Lehman Entities effort to enforce claims based upon Lehman Disputed

40   Loans is directly contrary to the basic agreements reached in the Restructuring Agreement and in the

41   related Settlement Agreement.

42        The Lehman Entities dispute the merits of the Lehman Recoupment Claim Objections. It is

43   the Lehman Entities' position that it was within their absolute "discretion" to pay, or not to pay, the

44   vendor payables incurred during the term of the Restructuring Agreement. Accordingly, they cannot,

45   in their assessment, be held liable for these obligations. In the case of the Settlement Agreement, the

46   Lehman Entities contend that this agreement never became effective and therefore they were not

47   bound to comply with its terms. The SunCal Plan Proponents do not believe that the positions

48   asserted by the Lehman Entities are supported by the facts, or existing law.

49        Moreover, because there is no automatic stay enjoining the Group II; Trustee Debtors as to

50   Lehman ALI, the Group II; Trustee Debtors may assert offset rights as set forth in the Recoupment

51   Objection as against the Claims of Lehman ALI.

52        In addition to the Recoupment Claim Objections, certain Voluntary Debtors also filed the

1    Contract Action against Lehman ALI and other non-debtor Lehman Entities in Orange County

2    Superior Court. The Contract Action is based on Lehman ALI's breach of contract on the

3    Restructuring and Settlement Agreements.  On May 9, 2011, the Defendants in the Contract Action

4    filed a Notice of Removal which removed the Contract Action from the Orange County Superior

29    Court to the Bankruptcy Court, as adversary no. 8:11-ap-01212ES.  The Voluntary Debtor-Plaintiffs

30    moved to remand the Contract Action back to the Orange County Superior Court ("Remand

31    Motion").  The Bankruptcy Court denied the Remand Motion at the hearing on July 12, 2011.

32         The Group II: Trustee Debtors are potential plaintiffs in the Contract Action, and such claims

33    constitute property of the Group II: Trustee Debtors' estate.  The Trustee refused to authorize the

34    Group II: Trustee Debtors to become additional plaintiffs in the Contract Action.  If the Plan is

35    Confirmed, the Plan Trustee and/or the Group II: Trustee Debtors reserve the right to join the

36    Contract Action as additional plaintiffs.  Although LCPI's automatic stay remains an impediment to

37    the pursuit of the Lehman Adversary Proceeding, the existence of this stay will not bar the SunCal

38    Plan Proponents from implementing the material terms of the Plan for the following reason. LCPI's

39    automatic stay does not bar the pursuit of the Lehman Claim Objections or the Contract Action.  In

40    fact, these matters are proceeding in the Bankruptcy Court. If these objections are successful, the

41    claims of the Lehman Entities will be disallowed, either in whole or in part, or the Lehman Entities

42    will be barred from pursuing these claims until they pay what they owe to these Debtors. If the Plan

43    Trustee and/or the Group II: Trustee Debtors join the Contract Action and the Contract Action is

44    successful, it will generate a further recovery for creditors.  In either scenario, the Plan filed by the

45    SunCal Plan Proponents is feasible and will yield a favorable return for creditors.

46         As set forth above, only four Projects were not included in the Restructuring Agreement:

47    Century City, Delta Coves, Oak Knoll and Del Amo.  Accordingly, the four Debtors associated with

48    these Projects—SunCal Century City, Delta Coves, SunCal Oak Knoll and SunCal Torrance—were

49    not signatories thereto.  Lehman ALI was the lender on each of these Projects and, as with the other

50    Projects, Lehman ALI continued to insist that these four debtors proceed with the development of the

51    four Projects, it approved all expenses, and it continually provided assurances of payment.

52         The Recoupment Claim Objections are relevant to the SunCal Oak Knoll and SunCal

1    Torrance estate because both Arch and Bond Safeguard contend that they have the right to assert

2    claims arising from unpaid bond obligations relating to Projects owned by other Debtors, in the

3    estates of all of the Debtors. Accordingly, they have submitted in excess of $100,000,000 in claims

4    against the estates of the Group II: Trustee Debtors. Although the Group II: Trustee Debtors do not

29  believe these claims are valid, and that they will not be allowed, these claims must be disallowed

30  before final distributions can be made to the Creditors holding Allowed Claims, or paid through

31  distributions made in the other Debtors' cases. It is in this respect that the litigation over the validity

32  and amount of the Lehman Secured Claims is relevant.

33        If the Lehman Recoupment Objection and the Lehman 502(d) Objection discussed herein are

34  successful, or if the Lehman Adversary Proceeding is successful, then the claims filed by Arch and

35  Bond Safeguard may be paid through distributions payable from the estates of the other Debtors'

36  cases where these claims may have right to payment. For this reason, the SunCal Plan Proponents

37  have described the background and status of this litigation at some length in this Disclosure

38  Statement

39        **5.5.**    **The Debtors' Motion for a Stay to Suspend Certain Lehman Actions.**

40        On September 21, 2010, the Voluntary Debtors, Acquisitions, and SunCal Management filed

41  a motion requesting, among other relief, for the Court to suspend the Lehman Entities competing

42  plan and disclosure statement unless and until the Lehman Entities agree to provide the Debtors with

43  relief from their automatic stay in the Debtors' Chapter 11 Cases (the "Suspension Motion").  The

44  Court granted this motion and stayed all matters until March 1, 2011. The Court also ordered the

45  parties to engage in a mediation. The Voluntary Debtors and the Lehman Entities were unable to

46  settle their claims through this process.

47        **5.6.**    **The Debtors' Other Litigation with Non-Lehman Related Parties.**

48        ~~5.7.1~~ **5.6.1 The Debtors' Failed Preliminary Injunction Motion Against the**

49        **Holders of Bond Claims.**

50        On February 20, 2009, the Debtors filed a complaint and a Motion for Preliminary

51  Injunction, pursuant to which the Debtors sought a Motion for Preliminary Injunction against the

52  Holders of Bond Claims from pursuing such Claims. On February 23, 2009, the Court denied the

1  Debtors' request for the TRO and granted the Debtors' request to require the defendants to show

2  cause why the Motion for Preliminary Injunction should not be issued.

3        On March 2, 2009, several Holders of Bond Claims objected to the Motion for the

4  Preliminary Injunction.  The objections generally alleged that the Debtors failed to show that the

balancing of the equities favored granting the Preliminary Injunction versus the harm to the Holders of the Bond Claims.  At a hearing held on March 4, 2009, the Court denied the Preliminary Injunction Motion and the underlying complaint has subsequently voluntarily been dismissed without prejudice.

### 5.7.2   5.6.2 The Contractors' Successful Motions for Relief from Stay to Pursue the Bond Claims.

Various contractors that were hired to perform work on some of the Projects have filed motions for relief from stay with the Bankruptcy Court to pursue their purported Bond Claims. These creditors have requested that the Bankruptcy Court grant these creditors relief from the automatic stay to allow such creditors to enforce certain Claims that such creditors allege to have against some of the Debtors, including certain surety bonds that are alleged to have been issued in favor of such creditors.  The Debtors opposed the motions on the grounds that the various Debtors are indispensible parties.  The Court conditionally granted the motions provided that the Bond Claimants are able to sever the Debtors from their proceedings on the Bonds.

### 5.7.3   5.6.3 Bond Safeguard Motion.

Bond Safeguard, a surety that issued bonds to secure the performance of work on certain projects, filed a motion against the Trustee Debtors seeking authority to file  claims against the Trustee Debtors relating to these bond claims after the bar date. The Debtors opposed this motion. This motion was granted pursuant to an order entered on January 7, 2011.

The Bond Issuers assert that surety bonds were executed on behalf of all of the SunCal Debtors and the Bond Indemnitors.  However, Bond Safeguard only filed proofs of claims asserting joint and several liability ("Cross-Indemnity Claims") against the Trustee Debtors.  Bond Safeguard did not file any Cross-Indemnity Claims against the Voluntary Debtors.  The Cross-Indemnity Claims are disputed, as the Group II: Trustee Debtor and the Plan Trustee reserve the right to object to the Cross-Indemnity Claims and/or to seek to avoid such obligations as a fraudulent transfer.

### 5.7.4

### 5.8 5.7 LitCo.

As more fully explained in Article VII, pursuant to the terms of the Plan, LitCo, which ~~is a newly formed~~shall be a Delaware limited liability company, will be making an offer to purchase the Reliance Claims held by the Reliance Claimants in Classes 6.1 and 6.2 pursuant to the Plan.  LitCo will be capitalized by a third party capital partner with funds necessary to fund this claims purchase. Once the Reliance Claims are purchased, LitCo will pursue these claims against the Lehman Entities. Since LitCo will be purchasing the Reliance Claims with non-estate assets, the Plan Trust will not receive any part of the recoveries obtained on these purchased claims.

**5.8     Reliance Claims.**

The Reliance Claims listed on Exhibit 8 attached to this Disclosure Statement (which consist of Allowed Unsecured Claims, Allowed Mechanic's Lien Claims, or Allowed Bond Indemnification Claims against an applicable Debtor that would entitle the Holder thereof to be the beneficiary of any equitable subordination judgment obtained against a Lehman Entity by such Holder) were determined to be Reliance Claims based on a number of factors. An analysis was made of the books and records of the applicable Debtor to determine the amounts billed to that applicable Debtor by the particular creditor and what, if any, defenses there may be to such claims. The bankruptcy schedules filed for each applicable Debtor were reviewed along with the proofs of claim filed by creditors in the respective bankruptcies, and such amounts were compared to the books and records of the applicable Debtor. An analysis was made of the list of creditors and amounts contained in the Restructuring Agreement executed with Lehman entities on May 23, 2008, and the Settlement Agreement executed with Lehman entities on August 25, 2008, with respect to amounts Lehman entities had agreed to assume in connection with such agreements. Furthermore, there was taken into account the actions of Lehman in instructing SunCal to proceed with the entitlement, development and/or maintenance of the particular projects and that SunCal did so in reliance on promises of funding, as outlined in the Litigation Claims that have been summarized in this Disclosure Statement. Taking all of these factors into consideration, Exhibit 8 was prepared based on the determination by the SunCal Plan Proponents that these claims, as listed in Exhibit 8, are Reliance Claims, as that term is defined in this Disclosure Statement. The SunCal Plan Proponents are willing to commit to the amounts listed in Exhibit 8 as allowed Reliance Claims so long as the particular

29    creditor does not dispute the amount thereof, but if a creditor disputes the amount, the SunCal Plan

30    Proponents reserve all rights in connection with the amount of any such claim and whether or not it

31    would be a Reliance Claim for purposes hereof.

32                                                   **VI.**

33                        **TREATMENT OF UNCLASSIFIED CLAIMS**

34        **6.1    Introduction**. As required by the Bankruptcy Code, the Plan places Claims and

35    Interests into various Classes according to their right to priority.  However, certain types of Claims

36    are not classified in any Classes under the Plan.  These Claims are deemed "unclassified" under the

37    provisions of the Code.  They are not considered impaired and they do not vote on the Plan, because

38    they are automatically entitled to specific treatment provided for them in the Code.  As such, the

39    SunCal Plan Proponents have not placed the following Claims in a Class.  The treatment of these

40    unclassified Claims is as provided below.

41        **6.2    Treatment of Allowed Administrative Claims.**

42            The Code requires that all Allowed Administrative Claims be paid on the later of Effective

43    Date of the Plan or the date of their allowance, unless a particular Holder agrees to a different

44    treatment.  The treatment of Allowed Administrative Claims is as described below.  However, such

45    Administrative Claims are continuing to be incurred.  The Allowed Administrative Claims shall be

46    paid from the applicable Distribution Account(s) pursuant to the ~~Litco.~~LitCo Plan Loan.

47        **6.3    Treatment and Repayment of the Lehman's Administrative Loan(s).**

48            The Lehman Disputed Administrative Loans shall be paid in full on the later of the Effective

49    Date, or the date any objections to the same are overruled by the Court leaving them Allowed claims.

50    Prior to payment, or until disallowed, these claims shall continue to be secured by their existing liens

51    against the respective Assets of the Trustee Debtors.

52            The Lehman Disputed Administrative Loans shall be paid in full, on the date referenced

1    above, from either 1) funds loaned to the Plan Trust by ~~Litco~~LitCo or another designated third party,

2    or 2) from the funds in the applicable Net Sale Proceeds Account.

3        **6.4    Repayment of Allowed Administrative Claims Other than the Lehman**

4                **Administrative Loans.**

Except to the extent that the Holder of an Allowed Administrative Claim agrees to a different treatment and subject to the Administrative Claims Bar Date set forth herein, the Distribution Agent shall pay each Allowed Administrative Claim in full, in Cash, on the later of (i) the Effective Date, (ii) within ten (10) Business Days after the date such Administrative Claim becomes an Allowed Administrative Claim, or (iii) the date such Allowed Administrative Claim becomes due according to its terms. Notwithstanding the foregoing, any Allowed Administrative Claim representing obligations incurred in the ordinary course of post-petition business by the Debtors in Possession (including without limitation post-petition trade obligations and routine post-petition payroll obligations) shall be paid in full or performed by the Plan Trustee in the ordinary course of business, in accordance with the terms of the particular obligation.

### 6.5    Administrative Claims Bar Date.

All applications for final compensation of Professionals for services rendered and for reimbursement of expenses incurred on or before the Effective Date and all other requests for payment of Administrative Claims incurred before the Effective Date under Sections 507(a)(2) or 507(b) of the Bankruptcy Code (except only for (i) post-petition, ordinary course trade obligations and routine post-petition payroll obligations incurred in the ordinary course of the Debtors' post-petition business, for which no bar date shall apply, and (ii) post-petition tax obligations, for which no bar date shall apply) shall be Filed with the Bankruptcy Court and served upon the Plan Trustee no later than the Administrative Claims Bar Date, unless such date is extended by the Bankruptcy Court after notice to the Plan Trustee.  Any such request for payment of an Administrative Claim that is subject to the General Administrative Claims Bar Date and that is not Filed and served on or before the Administrative Claims Bar Date shall be forever barred; any party that seeks payment of Administrative Claims that (i) is required to file a request for payment of such Administrative Claims and (ii) does not file such a request by the deadline established herein shall be forever barred from asserting such Administrative Claims against the Debtors, the Plan Trust, their estates, or any of their property.

### 6.6    Treatment of Unsecured Tax Claims.

Tax Claims are certain unsecured income, employment and other taxes described by Code Section 507(a)(8). The Code requires that each holder of such a Section 507(a)(8) tax claim receive the present value of such Claim in deferred cash payments, over a period not exceeding five (5) years from the petition date and that such treatment not be less favorable than the treatment accorded to non priority unsecured creditors.

At the election of the Plan Trustee, the Holder of each Allowed Priority Tax Claim shall be entitled to receive, on account of such Claim, (i) equal cash payments on the last Business Day of each three-month period following the Effective Date, during a period not to exceed five years after November 6, 2008, totaling the principal amount of such Claim plus simple interest on any unpaid balance from the Effective Date, calculated at the interest rate available on ninety (90) day United States Treasuries on the Effective Date, (ii) such other treatment agreed to by the Holder of the Allowed Priority Tax Claim and the Plan Trustee, provided such treatment is on more favorable terms to the Debtors (or the Plan Trust after the Effective Date) than the treatment set forth in clause (i) hereof, or (iii) payment of the full Allowed Priority Tax Claim in Cash.

///
///

### 6.7    Summary of the Group II: Trustee Debtors Plans' Treatment of Various Bond Indemnity Claims.

Bond Indemnification Claims are treated as Reliance Claims. In the event that such Bond Indemnification Claim arises from a general unsecured claim, it is classified in Class 6. If the event that such Bond indemnification Claim arises from a Mechanic's Lien Claim, then it is classified in Class 3. Contingent Bond Indemnification Claims are classified separately as Class 4 Claims.

The Bond Companies assert that surety bonds were executed on behalf of all or some of the Group II: Trustee Debtors as a principal for its respective Group II: Trustee Project ("Surety Bonds"). The Surety Bond(s) will not be transferred to the Winning Bidder(s) and, if a Winning Bidder(s) determines to develop the Group II: Trustee Debtor Project(s), the Surety Bond will not apply to the Winning Bidder(s)' bonding requirements with respect to such development. If a Winning Bidder(s) determines to develop all or a portion of tisits respective Group II: Trustee Debtor

29  Project(s), it will be ~~require~~ required at that time to obtain new Surety Bonds from the Bond

30  Companies or another surety, to the extent surety bonds are required by applicable state and local

31  development requirements.

**VII**.

**CLASSIFICATION OF CLAIMS AND INTERESTS**

34          As required by the Code, the Plan places Claims and Interests into various Classes according

35  to their right to priority and other relative rights.  The Plan specifies whether each Class of Claims or

36  Interests is impaired or unimpaired, and the Plan sets forth the treatment each Class will receive.  The

37  table below lists the Classes of Claims established under the Plan and states whether each particular

38  Class is impaired or left unimpaired by the Plan.  A Class is "unimpaired" if the Plan leaves unaltered

39  the legal, equitable and contractual rights to which the Holders of Claims or Interests in the Class are

40  entitled, with certain exceptions specified in the Bankruptcy Code.

| CLASSIFICATION OF HOLDERS OF SECURED REAL PROPERTY TAX CLAIMS AGAINST THE GROUP II: TRUSTEE ~~DEBTORS~~ PROJECTS | | |
|---|---|---|
| **Class 1** | **Claimant** | **Claim Nos.**[4] |
| **Class 1.1** | Alameda County as the Holder of an Unpaid Secured Real Property Tax Claim against the Oak Knoll Project in the amount of $4,156,073. | SunCal Oak Knoll 22, 23 and 24 |
| **Class 1.2** | Los Angeles County as the Holder of an Unpaid Secured Real Property Tax Claim against the Torrance Project in the amount of $773,211. | SunCal Torrance 10 |

| CLASSIFICATION OF LEHMAN'S DISPUTED CLAIMS AGAINST THE GROUP II: TRUSTEE DEBTORS | | |
|---|---|---|
| **Class 2** | **Claims** | **Claim Nos.** |
| **Class 2.1** | The Holder of Lehman's Disputed Claims filed by Lehman ALI against SunCal Oak Knoll and SunCal Torrance arising from the SunCal Oak Knoll/SunCal Torrance Loan Agreement in the asserted amount of $158,141,364. | SunCal Oak Knoll: 12 SunCal Torrance: 4 |

[4] These Real Property Tax Claims have been updated to include amounts for which proofs of claim have not yet been filed.

| CLASSIFICATION OF LEHMAN'S DISPUTED CLAIMS AGAINST THE GROUP II: TRUSTEE DEBTORS | | |
|---|---|---|
| **Class 2** | **Claims** | **Claim Nos.** |
| | | |

| CLASSIFICATION OF ASSERTED MECHANIC LIEN CLAIMS ~~ON THE OAK KNOLL PROJECT AND THE DEL AMO PROJECT~~ AGAINST THE GROUP II: TRUSTEE ~~DEBTORS~~PROJECTS | | |
|---|---|---|
| Class 3 | **Claimant** | Claim Nos. |
| **Class 3.1** | The Holder of the asserted Mechanic Lien Claim held by Oliphant Golf, Inc. against the Oak Knoll Project in the amount of $456,476. | SunCal Oak Knoll 46 |
| **Class 3.2** | The Holder of the asserted Mechanic Lien Claim held by RGA Environmental, Inc. against the Oak Knoll Project in the amount of $62,904. | SunCal Oak Knoll 1 |
| **Class 3.3** | The Holder of the asserted Mechanic Lien Claim held by BKF Engineers against the Oak Knoll Project in the amount of $308,817. | **SunCal Oak Knoll 2 and 20** |
| **Class 3.4** | The Holder of the asserted Mechanic Lien Claim held by CST Environmental Inc. against the Oak Knoll Project in the amount of $4,316,169. | **SunCal Oak Knoll 4 and 9** |

| CLASSIFICATION OF CONTINGENT BOND INDEMNIFICATION CLAIMS AGAINST THE GROUP II: TRUSTEE ~~DEBTORS~~PROJECTS | | |
|---|---|---|
| **Class 4** | **Claimant** | **Claim Nos.** |
| **Class 4.1** | The holders of Contingent Bond Indemnification Claims arising from bonds issued with respect to the Group II: Trustee ~~Debtor~~ Projects | |

| CLASSIFICATION OF PRIORITY UNSECURED CLAIMS AGAINST THE GROUP II: TRUSTEE DEBTORS | | |
|---|---|---|
| **Class 5** | **Claimant** | **Claim Nos.** |
| **Class 5.1** | The Holder of Priority Claims that fall within Code Sections 507(a)(2), (4), (5), (6), and (7) in the asserted amount of $235 against SunCal Oak Knoll. | SunCal Oak Knoll 26 |

MAINDOCS ~~#163137-v6-SCC~~164959-v3-SunCal_3rd_Am_Group_II_TD_DS.DOC

| CLASSIFICATION OF GENERAL UNSECURED CLAIMS THAT QUALIFY AS RELIANCE CLAIMS[5] AGAINST THE GROUP II: TRUSTEE DEBTORS | | |
|---|---|---|
| **Class 6** | **Claimant** | **Claim Nos.** |
| **Class 6.1** | The holders of Allowed Unsecured Reliance Claims against SunCal Oak Knoll. | Various Filed and Scheduled |
| **Class 6. 2** | The holders of Allowed Unsecured Reliance Claims against SunCal Torrance. | Various Filed and Scheduled |

| CLASSIFICATION OF GENERAL UNSECURED CLAIMS THAT DO NOT QUALIFY AS RELIANCE CLAIMS[6] AGAINST THE GROUP II: TRUSTEE DEBTORS | | |
|---|---|---|
| **Class 7** | **Claimant** | **Claim Nos.** |
| **Class 7.1** | Claimants  holding Allowed Unsecured Claims against SunCal Oak Knoll that are not Reliance Claims | Various Filed and Scheduled |
| **Class 7.2** | Claimants  holding Allowed Unsecured Claims against SunCal Torrance that are not Reliance Claims | Various Filed and Scheduled |

---

[5] Unsecured Claims are generally placed within the same class and they receive the same treatment under a Plan. However, the SunCal Plan Proponents have divided Unsecured claims into two classes in the Plan – Classes 6.1 and 6.2, and 7.1 and 7.2. This separate classification has been implemented for the following reason. The Holders of Unsecured Claims in Classes 6.1 and 6.2, who are referred to as "Reliance Claimants," hold specific Litigation Rights that are referred to herein as "Reliance Claims." The SunCal Plan Proponents believe that the Holders of Reliance Claims are the potential beneficiaries of the equitable subordination causes of action in the Lehman Adversary Proceeding. The Unsecured Creditors in Classes 7.1 and 7.2 do not hold Reliance Claims. Under the Plan, the Reliance Claimants who sell their Reliance Claimants to LitCo, and who vote in favor of the Plan, which is Option A, will receive a distribution of 55 percent on their Allowed Unsecured Claims *from non-estate funds. Accordingly, the 55 percent payment is being paid from non-estate funds, for a non-estate asset*. If a Reliance Claimant elects not to sell this claim, then this claimant will receive the exact same distribution rights that the Class 7.1 and 7.2 claimants will receive under the Plan. In summary, the classification difference was made to provide for the purchase offer relating to the sale of the Reliance Claims. In all other respects the Holders of Unsecured Claims receive the same treatment under the Plan.
[6] **This Class includes, but it is not limited to, Bond Claims that are not Allowed Secured Claims within Class 4.1.**

| Class 8 | CLAIMANT/INTEREST HOLDER AGAINST THE GROUP II: TRUSTEE DEBTORS | Scheduled |
|---|---|---|
| Class 8.1 | Allowed Interests in SunCal Oak Knoll held by Lehman SunCal Real Estate Fund LLC and LBREP II/SunCal Land Fund Member LLC. | Scheduled Amount |
| Class 8.2 | Allowed Interests in SunCal Torrance held by Lehman SunCal Real Estate Fund LLC and LBREP II/SunCal Land Fund Member LLC. | Scheduled Amount |

# VIII.

## THE PLAN'S TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS

**8.1.    The Plan's Treatment of Holders of Allowed Secured Real Property Tax Claims** ~~on Real Properties Subject to Deeds of Trust Arising from Lehman's Disputed Secured Claims and Disputed Liens~~ **Against the Group II: Trustee Projects (Classes 1.1 and 1.2).**

The rights of the Holder(s)' of Allowed Secured Claims in Classes 1.1 and 1.2 are ~~not~~ impaired under the Plan and shall receive one of the following two treatments at the Plan Trustee's discretion based solely on the option of the Group II: Trustee Debtor:

A.    Such ~~claimants~~Holders shall retain their existing lien rights~~,~~ and shall accrue interest as provided under applicable nonbankruptcy law pursuant to 11 U.S.C. § ~~511, and one of the following two non-impairment options shall apply, at the election of the Plan Trustee: 1) On the Effective Date, such claims~~506 and 511 and such Allowed Claims shall be satisfied in accordance with the provision of 11 U.S.C. § 1124(2)~~, or 2) on the Effective Date, or the Holder(s) shall be free to pursue~~ from the sale of the Group II: Trustee Projects during the Sales Period; or

B.    Such Holders shall retain their ~~respective~~existing lien rights and ~~remedies against the underlying real property collateral under applicable California law~~shall accrue interest as provided under applicable nonbankruptcy law pursuant to 11 U.S.C. § 506 and 511 and California Revenue and Taxation Code Sections 4102 and 4103, and payment on

29    such Allowed Claims shall be satisfied over sixty-one (61) months from the applicable

30    Group II: Trustee Debtor's Petition Date.

31    **8.2.    The Plan's Treatment of Lehman's Disputed Claim(s) and Disputed Lien(s)**

32    **Against the Group II: Trustee Debtors (Classes 2.1 and 2.2).**

33    The Holder(s) of Disputed Secured Claims within Class 2.1 and Class 2.2  shall receive the

34    indubitable equivalent of their disputed claims under the Plan, pursuant to 11 U.S.C. §

35    1129(b)(2)(A)(iii), through the following treatment:

36    A.    Lien Rights. The Class 2.1 and ~~Class~~ 2.2 Holder(s) shall retain their interest in

37    the Disputed Lien(s) against ~~Plan Trust~~the applicable Group II: Trustee Projects and the Group II:

38    Trustee Other Assets that secure the Disputed Secured Claims, pending a Final Order(s) resolving

39    the Allowance of such Disputed Secured Claims and determining the validity, priority and extent of

40    the applicable Disputed Liens against the applicable ~~Plan Trust Assets~~Group II: Trustee Projects,

41    which secure these claims, except as follows:

42    1.    The ~~Plan Trust~~Group II: Trustee Projects and the Group II: Trustee Other

43    Assets subject to the Class 2.1 ~~and 2.1~~through 2.2 Disputed Liens ~~may~~will be sought to be sold free

44    and clear of such liens ~~on~~during the ~~Effective Date~~Sales Period, without the right to credit bid under

45    Section 363(k) with respect to Disputed Claims and Disputed Liens. These Disputed Liens shall then

46    attach to the Net Sales Proceeds from the sale, which shall be deposited into the Net Sales Proceeds

47    Account, pending a resolution of such Disputed Secured Claims and Disputed Liens~~;~~.  The

48    marketing process and sales procedures for the Group II: Trustee Projects and the Group II: Trustee

49    Other Assets are described in Article X hereof.

50    ~~2.~~2.  To the extent that a Disputed Secured Claim held by either the Class 2.1

51    ~~or~~through 2.2 Claimants against ~~either~~the applicable Group II: Trustee ~~Debtor Project~~Projects and

52    Group II: Trustee Other Assets  is disallowed, and the Disputed Lien associated with this Disputed

1    Secured Claim is consequently released to the extent of this disallowance, the Plan Trustee shall be

2    authorized to use to the Net Sales Proceeds that are no longer subject to the Disputed Lien(s) ~~or~~

3    ~~entitled to priority over the Disputed Lien(s)~~to pay other Allowed Claims in their order of priority, in

4    accordance with the terms of the Plan;

~~3.~~ 3. To the extent that a Disputed Secured Claim held by either the Class 2.1 ~~or~~through 2.2 Claimant and the associated Disputed Lien(s) against ~~either~~the applicable Group II: Trustee ~~Debtor Project are~~Projects and Group II: Trustee Other Assets is subordinated, the Plan Trustee shall be authorized to use to the Net Sales Proceeds that are no longer subject to the Disputed Lien(s), or where the priority of the Disputed Liens has been subordinated by the Court, to pay other Allowed Claims in their order of priority, in accordance with the terms of the Plan, to the extent of the subordination; and

Notwithstanding the existence of the Disputed Secured Claims and the Disputed Liens, the Plan Trustee may a seek a release of the funds in the Net Sales Proceeds Account subject to these claims and liens to pay the claims of other creditors in accordance with the terms of the applicable Plan, if the Class 2.1 ~~and~~through 2.2 claimants' interests in ~~this property~~Group II will remain adequately protected after this release.

~~B.      Sale of Group II: Trustee Debtor Assets. The Plan Trustee shall complete the sale of Group II: Trustee Debtor Assets on the Effective Date that are subject to the Holder(s)' Disputed Secured Claims and Disputed Liens, free and clear of such claims and liens, through a sale that satisfies the following conditions:~~

~~1.      The Group II: Trustee Debtor Assets will be sold through a public auction after a commercially reasonable marketing and advertising effort of at least sixty (60) days duration;~~

~~2.      The SunCal Plan Proponents shall have the right to provisionally accept an Opening Bid from a Stalking Horse Bidder prior to the public auction and to grant this bidder either the Oak Knoll Break-Up Fee or the Torrance Break-up Fee as the case may be;~~

~~3.      Other Qualified Bidders shall have the right to overbid the Opening Bid by submitting a Qualifying Bid. The first round of Qualifying Bids after the Opening Bid must be equal to or in excess of the Initial Overbid Amount. Thereafter, all Qualifying Bids shall be equal to or in excess or the Minimum Increment;~~

~~4.      The highest and best Qualifying Bid received from a Qualified Bidder, shall be accepted as the Winning Bid, and the submitting bidder shall be the Winning Bidder. Upon~~

29   ~~payment of the Winning Bid, the Winning Bidder shall receive title to the applicable Group II:~~

30   ~~Trustee Debtor Asset free and clear of all monetary liens and encumbrances; and~~

31   ~~5.      No bidder shall be allowed to submit or demand the acceptance of a~~

32   ~~"credit bid" based upon an existing claim or lien.~~

33   3.      Distributions ~~to the~~To The Class 2.1 and ~~Class~~ 2.2 Claimants.  If the Plan

34   Trustee consummates a sale or otherwise liquidates the particular ~~Asset(s)~~Group II Trustee Project

35   and/or Group II: Trustee Other Assets subject to the Class 2.1 and 2.2 Disputed Secured Claim(s)

36   and/or Disputed Lien(s) during the Sales Period, as provided for above, the Holder(s) of such

37   Disputed Secured Claim shall receive a distribution to the extent of available funds from the

38   applicable Net Sale Proceeds Account(s) to the extent required by an entered Order of the Court, that

39   is not subject to a stay pending appeal, determining the allowance and priority of the Disputed

40   Secured Claims and the validity, priority and extent of the Disputed Liens in, including but not

41   limited to, the Lehman Adversary Proceeding and the Lehman Claims Objections.

42   4.      Abandonment of Unsold Group II: Trustee Projects and Group II: Trustee

43   Other Assets. If for any reason the Plan Trustee is unable to sell any of the Group II: Trustee Projects

44   and/or Group II: Trustee Other Assets during the Sales Period, they will be abandoned as of 11:59

45   p.m. on the last day of the Sales Period, no payment shall be made to Holders of Class 2.1 and 2.2

46   Claims, as the case may be, and such Holder(s) shall be free to exercise any and all remedies that they

47   may hold with respect to the Group II: Trustee Projects and the Group II: Trustee Assets under

48   applicable California law.

49   **8.3.    The Plan's Treatment of Holders of Asserted Mechanic Lien Claims Against the**

50   **Group II: Trustee ~~Debtor~~ Projects ~~Subject to Lehman's Disputed Claims~~**

51   **(Classes 3.1 Through 3.4).**

52   The treatment of the Holders of Allowed Classes 3.1 through 3.4 Secured Claims under the

1   Plan shall be as follows:

2   A.      The Holder(s)' rights are impaired under the Plan;

3

4

B.    The Holder(s) shall retain their respective underlying liens on the applicable Group II: Trustee ~~Debtor~~ Project(s), but shall forebear from pursuing their rights and remedies until the expiration of the Sales Period;

C.    If the Plan Trustee is able to consummate a sale of the Group II: Trustee ~~Debtor~~ Projects subject to the liens asserted by the Holders of Class 3.1 through 3.4 claims  during the Sales Period, such Holders shall receive a distribution of, to the extent available, Net Sale Proceeds in accordance with the priorities set forth under the Bankruptcy Code, subject to a Final Order(s) resolving the allowance and priority of the applicable Lehman's Disputed Claim(s) and the validity of the applicable Lehman Disputed Lien(s) in, including but not limited to, the Lehman Adversary Proceeding; and

D.    If for any reason the Plan Trustee is unable to ~~consummate a sale~~sell any of the ~~applicable~~ Group II: Trustee ~~Debtor Project(s)~~Projects during the Sales Period, ~~such projects shall be deemed~~they will be abandoned ~~by the Plan Trustee~~as of 11:59 p.m. on the last day of the Sales Period, no payment shall be made to ~~such Holder(s)~~Holders of Classes 3.1 through 3.4 Claims, as the case may be, and such Holder(s) shall be ~~allowed to pursue their respective rights against these project(s)~~free to exercise any and all remedies that they may hold with respect to the Group II: Trustee Projects under applicable California law.

### 8.4.    The Plan's Treatment of Holders of Contingent Bond Indemnification Claims Against the Group II: Trustee Projects (Class 4.1).

The Bond Companies assert that surety bonds were executed on behalf of all or some of the Group II: Trustee Debtors as a principal for its respective Group II: Trustee Project ("Surety Bonds").  The Surety Bond(s) will not be transferred to the Winning Bidder(s) and, if a Winning Bidder(s) determines to develop the Group II: Trustee ~~Debtor~~ Project(s), the Surety Bond will not apply to the Winning Bidder(s)' bonding requirements with respect to such development.  If a Winning Bidder(s) determines to develop all or a portion of ~~tis~~its respective Group II: Trustee ~~Debtor~~ Project(s), it will be require at that time to obtain new Surety Bonds from the Bond Companies or another surety, to the extent surety bonds are required by applicable state and local development requirements.

-67-

The rights of each holder of an Allowed Contingent Bond Indemnification Claim arising from a bond issued with respect to a Group II: Trustee ~~Debtor~~ Project, shall, to the extent such claim(s) are determined to be a secured claim(s), be impaired under the Plan. Such claims shall receive the following treatment:

A.    Each such Allowed Secured Claim shall be placed in a separate class and receive a separate ballot for voting purpose;

B.    Each Holder(s) shall retain their respective underlying liens on the applicable Group II: Trustee ~~Debtor~~ Project(s), but shall forebear from pursuing their rights and remedies until the expiration of the Sales Period;

C.    If the Plan Trustee is able to consummate a sale of the Group II: Trustee ~~Debtor~~ Projects subject to the liens asserted by the Holders of Class 4.1 claimants during the Sales Period, such Holders shall receive a distribution, to the extent of available~~, of~~ Net Sale Proceeds in accordance with the priorities set forth under the Bankruptcy Code, subject to a Final Order(s) resolving the allowance and priority of the applicable Lehman's Disputed Claim(s) and the validity of the applicable Lehman Disputed Lien(s) in, including but not limited to, the Lehman Adversary Proceeding; and

D.    If the Plan Trustee is unable to consummate a sale of the applicable Group II: Trustee ~~Debtor~~ Project(s) during the Sales Period, such projects shall be deemed abandoned by the Plan Trustee, no payment shall be made to such Holder(s), and such Holder(s) shall be allowed to pursue their respective rights against these project(s) under applicable California law.

**8.5.    The Plan's Treatment of Holders of Priority Claims Group II: Trustee Debtors (Class 5.1)**.

The treatment of the Holders of Allowed Priority Claims under the Plan shall be as follows**:**

A.    The Holder(s) are unimpaired under the Plan; and

B.    The Holder(s) shall be paid either from the applicable Distribution Account(s) (i) the full amount of such Allowed Priority Claim in Cash on the later of (x) the Effective Date, (y) the date such Claim becomes an Allowed Priority Claim or (z) the date such Allowed Priority Claim

29   becomes payable in accordance with the terms governing such Allowed Priority Claim, or (ii) upon

30   such other less favorable terms as may be agreed to by such Holder and the Plan Trustee.

31   **8.6.    The Plan's Treatment of Holders of General Unsecured Claims that are**

32   **Reliance Claims Group II: Trustee Debtors (Classes 6.1 and 6.2).**

33   The rights of Holders of Allowed Class 6.1 and 6.2 Claims are impaired under the Plan. They

34   have the right to choose between the following treatment options:

35   A.    Option A:  A claimant in these classes *who votes in favor of the Plan*, and who

36   chooses Option A, will have the right to sell to LitCo all of the claimant's right, title and interest in

37   all Allowed Reliance Claims and all of the claimant's Litigation Rights against the applicable

38   Debtor, SunCal Affiliates, and the Lehman Entities, for the sum of fifty five cents ($0.55) per dollar

39   of Allowed Reliance Claim, payable in cash on the Effective Date, provided there is no stay pending

40   an appeal of the Confirmation Order, in full satisfaction of such claimant's Allowed Reliance

41   Claims; or

42   B.    Option B:  A claimant in these classes who votes against the Plan, or who

43   votes in favor of the Plan, but does not choose Option A, or who does not vote on the Plan, will 1)

44   receive a minimum distribution in cash, on the Effective Date, equal to one percent (1%) of such

45   claimant's Allowed Claim, 2) retain such claimant's Reliance Claim(s) and rights against the

46   Lehman Entities and its right to receive such claimant's share, as determined by the Court, in the

47   benefits and recoveries resulting from a judgment or order entered in the Lehman Adversary

48   Proceeding, the Contract Action, or the Lehman Claims Objections,  and 3) right to receive a pro-rata

49   share of any funds payable from the applicable Distribution Account(s), after payment in full of all

50   Post Confirmation Expenses, Allowed Administrative Claims, and Allowed Priority Claims.

51

52   **8.7.    The Plan's Treatment of Holders of Allowed General Unsecured Claims that**

1   **Are Not Reliance Claims Group II: Trustee Debtors (Classes 7.1 and 7.2).**

2   The rights of Holders of Allowed Class 7.1 and 7.2 Claims are impaired under the Plan.

3   Under the Plan, each claimant will 1) receive a minimum distribution in cash, on the Effective Date,

4   equal to one percent (1%) of such claimant's Allowed Claim, and 2) receive a pro-rata share of any

29    funds payable from the applicable Distribution Account(s), after payment in full of all Post

30    Confirmation Expenses, Allowed Administrative Claims, and Allowed Priority Claims and any

31    sums that the Bankruptcy Court determines are payable to the Holders of Allowed Class 6.1 and 6.2

32    Claims from either the Claim Reduction Amounts or on account of a judgment in the Lehman

33    Adversary Proceeding.

34    **8.8.    The Plan's Treatment of Holders of Allowed Interests Group II: Trustee**

35    **Debtors.**

36    The Interests of the Holders in Class 8.1 and 8.2 are impaired under the Plan. All such

37    Interests shall be cancelled as of the Effective Date and no distribution shall be made to these

38    Holders on account of such Interest(s).

39    **IX.**

40    **ACCEPTANCE OR REJECTION OF THE PLAN**

41    **9.1.    Introduction.**

42    PERSONS OR ENTITIES CONCERNED WITH CONFIRMATION OF THE PLAN

43    SHOULD CONSULT WITH THEIR OWN ATTORNEYS BECAUSE THE LAW ON

44    CONFIRMING A PLAN OF REORGANIZATION IS VERY COMPLEX.  The following

45    discussion is intended solely for the purpose of alerting readers about basic confirmation issues,

46    which they may wish to consider, as well as certain deadlines for filing Claims.  The Debtors cannot

47    represent that the discussion contained below is a complete summary of the law on this topic.

48    Many requirements must be met before the Court can confirm the Plan.  Some of the

49    requirements include that the Plan must be proposed in good faith, acceptance of the Plan, whether

50    the Plan pays creditors at least as much as creditors would receive in a Chapter 7 liquidation, and

51    whether the Plan is feasible.  The requirements described herein are <u>not</u> the only requirements for

52    confirmation.

1    **9.2.    Who May Object to Confirmation of the Plan.**

2    Any party in interest may object to the confirmation of the Plan, but as explained below not

3    everyone is entitled to vote to accept or reject the Plan.

4    ///

### 9.3.    Who May Vote to Accept/Reject the Plan.

A Holder of a Claim or Interest has a right to vote for or against the Plan if that Holder of the Claim or Interest has a Claim which is both (1) Allowed or Allowed for voting purposes and (2) Classified in an impaired Class (excluding any class in which the Plan is "deemed rejected"). The votes will be tabulated on a Debtor by Debtor basis.

### 9.4.    What Is an Allowed Claim/Interest.

As noted above, a Holder of a Claim or an Interest must first have an Allowed Claim or Allowed Interest to vote.

### 9.5.    What Is an Impaired Class.

A Class is impaired if the Plan alters the legal, equitable, or contractual rights of the Claims or Interests in that Class, other than the right to accelerate the Claim upon certain kinds of defaults. In this case, the ~~Debtors~~SunCal Plan Proponents believe that all Classes, except for ~~Classes 4.1 through 4.2,~~Class 5.1, are impaired.

### 9.6.    Who Is Not Entitled to Vote.

The following four types of Claims are not entitled to vote: (1) Claims that have been disallowed; (2) Claims in unimpaired Classes; (3) Claims entitled to priority pursuant to Bankruptcy Code Sections 507(a)(2) or (a)(3) and Claims in Classes that do not receive or retain any value under the Plan. Claims in unimpaired Classes are not entitled to vote because such Classes are deemed to have accepted the Plan. Claims entitled to priority pursuant to Bankruptcy Code Section 507(a)(8) are not entitled to vote because such Claims are not placed in Classes and they are required to receive certain treatment specified by the Bankruptcy Code. Claims in Classes that do not receive or retain any property under the Plan do not vote because such Classes are deemed to have rejected the Plan. The ~~Debtors~~SunCal Plan Proponents believe that all Classes are entitled to vote except Class 5.1. These classes are not impaired under the Plan and consequently are not entitled to vote. They are conclusively deemed to have accepted the Plan. The Interests held by the Holders in Classes 8.1 and 8.2 are being cancelled under the Plan; accordingly these Interest Holders are deemed to have voted to reject the Plan.

29    EVEN IF YOUR CLAIM IS OF THE TYPE DESCRIBED ABOVE, YOU MAY STILL

30    HAVE A RIGHT TO OBJECT TO THE CONFIRMATION OF THE PLAN.

31       **9.7.    Who Can Vote in More than One Class.**

32    A creditor whose Claim has been Allowed in part as a Secured Claim and in part as an

33    Unsecured Claim is entitled to accept or reject a Plan in both capacities by casting one ballot for the

34    secured part of the Claim and another ballot for the Unsecured Claim.  Also, a Creditor may

35    otherwise hold Claims in more than one Class (such as a Holder of Senior Secured Claims and

36    Subordinated Note Claims), and may vote the Claims held in each Class.

37       **9.8.    Votes Necessary for a Class to Accept the Plan.**

38    A Class of Claims is deemed to have accepted the Plan when more than one-half (1/2) in

39    number and at least two-thirds (2/3) in dollar amount of the Claims *that actually voted*, vote to accept

40    the Plan.  A Class of interests is deemed to have accepted the Plan when Holders of at least

41    two-thirds (2/3) in amount of the interest-Holders of such Class which actually vote, vote to accept

42    the Plan.

43       **9.9.    Treatment of Nonaccepting Classes.**

44    As noted above, even if there are impaired Classes that do not accept the proposed Plan, the

45    Court may nonetheless confirm the Plan if the nonaccepting Classes are treated in the manner

46    required by the Code and at least one impaired Class of Claims accepts the Plan.  The process by

47    which a plan may be confirmed and become binding on non-accepting Classes is commonly referred

48    to as "cramdown."  The Bankruptcy Code allows the Plan to be "crammed down" on nonaccepting

49    Classes of Claims or interests if it meets all statutory requirements except the voting requirements of

50    1129(a)(8) and if the Plan does not "discriminate unfairly" and is "fair and equitable" with respect to

51    each impaired Class that has not voted to accept the Plan, as set forth in 11 U.S.C. § 1129(b) and

52    applicable case law.

1       **9.10.    Request for Confirmation Despite Nonacceptance by Impaired Class(es).**

2    The SunCal Plan Proponents will ask the Court to confirm the Plan by cramdown on any

3    impaired Class if such Class does not vote to accept the Plan.

4

# X.

## MEANS OF EXECUTION AND IMPLEMENTATION OF THE PLAN

### 10.1.    Introduction.

This section is intended to address how the SunCal Plan Proponents intend to implement the provisions of the Plan.  It addresses the marketing and the sale of the Group II: Trustee Projects and the Group II: Trustee Other Assets, the transfer of the Plan Trust Assets to the Plan Trust, the nature of the Plan Trust, the powers of the Plan Trust, the governance of the Plan Trust, the resolution of disputed claims, the sources of funds that will be used to pay claims and the mechanics of how claims will be paid.

### 10.2    Sale Process After Confirmation Date but Prior to Effective Date of the Group II: Trustee Projects and the Group II: Trustee Other Assets During the Sales Period.

The core objective of the Plan is to enable all creditors holding Allowed Claims to receive the highest dividend possible by selling the estates' primary assets, the Group II: Trustee Debtor Projects, to the highest bidder. The process of marketing the Group II: Trustee Debtor Projects for sale will begin, pursuant to the Confirmation Order, immediately after the entry of this order. Although the Chapter 11 Trustee will not be formally removed under the Plan until the Effective Date, he will be required to work with the SunCal Plan Proponents after the Confirmation Date to promote and facilitate the sale of the Group II: Trustee Debtor Projects in accordance with the Plan terms.  Acquisitions shall manage the marketing process initially in its capacity as a SunCal Plan Proponent and as the Plan Trustee after the Effective Date.  Furthermore, the Trustee Debtors' Committee shall be consulted and have the opportunity to object to the sales process and request a hearing with the Bankruptcy Court.

The Plan Trustee shall complete the sale of Group II: Trustee Debtor Assets on the Effective Date that are subject to the Holder(s)' Disputed Secured Claims and Disputed Liens, free and clear of such claims and liens, through a sale that satisfies the following conditions:

29          1.      The Group II: Trustee Debtor Assets will be sold through a public

30   auction after a commercially reasonable marketing and advertising effort of at least sixty (60) days

31   duration;

32          2.      The SunCal Plan Proponents shall have the right to provisionally

33   accept an Opening Bid from a Stalking Horse Bidder prior to the public auction and to grant this

34   bidder either the Oak Knoll Break-Up Fee or the Torrance Break-up Fee as the case may be;

35          3.      Other Qualified Bidders shall have the right to overbid the Opening

36   Bid by submitting a Qualifying Bid. The first round of Qualifying Bids after the Opening Bid must

37   be equal to or in excess of the Initial Overbid Amount. Thereafter, all Qualifying Bids shall be equal

38   to or in excess or the Minimum Increment;

39          4.      The highest Qualifying Bid received from a Qualified Bidder, shall be

40   accepted as the Winning Bid, and the submitting bidder shall be the Winning Bidder. Upon payment

41   of the Winning Bid, the Winning Bidder shall receive title to the applicable Group II: Trustee Debtor

42   Asset free and clear of all monetary liens and encumbrances; and

43          5.      No bidder shall be allowed to submit or demand the acceptance of a

44   "credit bid" based upon an existing claim or lien.

45      The SunCal Plan Proponents and the Plan Trustee will pursue the following sale procedures

46   culminating into a public auction for the sale of the Group II: Trustee Projects after the Confirmation

47   Date: and during the Sales Period.

48          A. 10.2.1 Implementation of a Marketing Program. On or beforeOnce the applicable

49   Plan is confirmed, the SunCal Plan Proponents will market the Group II: Trustee Debtor Projects for

50   sale through a comprehensive sale effort during the Sale Period. This sale effort will include 1)

51   sending sale packages describing each Group II: Trustee Debtor Project to the real estate brokerage

52   community; b) advertising the Group II: Trustee Debtor Projects for sale on a website that includes

1    links allowing direct access to all relevant information regarding the Group II: Trustee Debtor

2    Projects; and c) sending packages to a list of prospects nationally who are actively seeking or may

3    have interest in these kinds of assets.

4

**B.** 10.2.2 Identifying a Stalking Horse Bidder. On ~~or before the commencement of the Sale Period, the SunCal Parties~~ the first business day after the Effective Date, the Plan Trustee will accept, on a provisional basis, an Opening Bid for ~~one or both of~~ the Group II: Trustee ~~Debtor~~ Projects. The bidder whose Opening Bid is accepted for each Group II Trustee Project will become the "Stalking Horse Bidder." The Opening Bid must be equal to the Minimum Sale Price(s) fixed in the Plan for each Group II: Trustee ~~Debtor Project: $22,860,000 for the Oak Knoll Project and $12,150,000 for the Torrance Project.~~ Project. The Plan Trustee shall also select Qualified Bidders at this time.

**C.** 10.2.3 The Sale Contract. The sale contract that will be entered into with the Stalking Horse Bidder will include the following bankruptcy-sale related provisions:

1.    Overbid Provisions. The contract will allow the ~~SunCal~~ Plan ~~Proponents~~ Trustee to seek "overbids" from other Qualified Buyers, and to accept an Initial Overbid that exceeds the Stalking Horse Bid by the Initial Overbid Amount applicable to each Group II: Trustee ~~Debtor~~ Project. In the case of the Oak Knoll Project, the Initial Overbid Amount is a sum that is not less than $22,860,000, plus the Oak Knoll Break-up Fee, plus seventy five thousand dollars ($75,000). In the case of the Del Amo Project, the Initial Overbid Amount is $12,150,000, plus the Torrance Break-up Fee, plus seventy-five thousand dollars ($75,000).

2.    A Break-Up Fee. The sale contract will include a "break-up fee" provision. This fee will be payable to the Stalking Horse Bidder if the Opening Bid is overbid, and another Qualified Bidder purchases the Group II: Trustee ~~Debtor~~ Project(s) that is the subject of the Opening Bid. The Del Amo Break-up Fee is $540,000 and the Oak Knoll Break-up Fee is $1,016,000.

3.    Sale Free and Clear of Liens. The sale contract will provide that the Group II: Trustee ~~Debtor~~ Project(s) are being sold free and clear of all monetary liens and encumbrances and that no party holding a lien against the projects, including the Lehman Lenders, may submit a "credit bid" based upon the amount allegedly owing on the claims secured by the project being sold.

D.    The Auction. At least thirty (30) days prior to the Effective Date, the SunCal Plan Proponents 10.2.4    The Auction.  Fourteen (14) days after the date of the selection of the Stalking Horse Bidder, the Plan Trustee will conduct an a public auction wherein all Qualified Bidders who have submitted Qualified Bids for the Group II: Trustee Debtor Projects will have the opportunity to increase their bids for these Projects. The Qualified Bidder that submits the highest bid for the Project will then be designated the Winning Bidder. The Winning Bidder will then have thirty (30) days to prepare to close this purchase transaction by paying the Winning Bid amount. Once the Winning Bidder advises fifteen (15) days pay the Winning Bid amount and the closing shall occur no later than the first business day following the thirtieth (30th) day after the Effective Date.

10.2.5  The Group II: Trustee Other Assets Marketing and Bid Procedures.

To the extent that the SunCal Plan Proponents that they are ready to close, the sequence of events described in paragraphs 10.3 through 10.5 shall be implemented. believe that the Group II: Trustee Other Assets have any material value, the SunCal Plan Proponents will pursue the following process for the sale of the Group II: Trustee Other Assets after the Confirmation Date and during the Sales Period:

1.    After the Confirmation Date, the SunCal Plan Proponents will implement commercially reasonable marketing efforts for the sale of the Group II: Trustee Other Assets;

2.    The sales procedures will be decided by the SunCal Plan Proponents after consultation with the Trustee Debtors' Committee; and

3.    The sale contract will provide that the Group II: Trustee Other Assets(s) are being sold free and clear of all monetary liens and encumbrances and that no party holding a lien against the Group II: Trustee Other Assets, including the Lehman Lenders, may submit a "credit bid" based upon the amount allegedly owing on the claims secured by the Group II: Trustee Other Assets being sold.

4.    Within seven (7) days after the Effective Date, the Plan Trustee will hold a public auction for the sale of the Group II: Trustee Assets to the bidder that

submits the highest and best bid.  The winning bidder will then have seven (10) days to close this purchase transaction by paying the winning bid amount.

~~The entire process of marketing and selling the Group II: Trustee Debtor Projects will be overseen by an independent real estate professional with experience managing sales of this kind. This professional will participate in every material aspect of the sale effort, and he or she shall have the right to file an objection to the sale effort with the Court if the process is not proceeding in a fair and effective manner.~~

**10.3    Establishment and Operations of the Plan Trust.**

The Plan Trust shall be established and shall become effective on the Effective Date.  The Plan Trust is created pursuant to the Plan and the Confirmation Order.  The primary purpose of the Plan Trust is to consummate the sales and/or the liquidation of the Group II: Trustee Projects and the Group II: Trustee Other Assets transferred to it and the Distribution of the Net Sales Proceeds to Creditors, with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Plan Trust.  The Plan Trust shall hold title to and administer the Plan Trust Property, including, but not limited to, any Litigation Claims, and the proceeds thereof for liquidation and distribution in accordance with the terms of the Plan.

**10.4    Preservation and Pursuit of Litigation Claims and Recovery for the Plan Trust.**

On the Effective Date, title to and possession of all property of the Group II: Trustee Debtors shall be deemed transferred and delivered to the Plan Trust, without further act or action under any applicable agreement, law, regulation, order or rule of law.

Pursuant to Section 1123(b)(3) of the Bankruptcy Code, the Plan Trust shall retain all Litigation Claims whether or not pending on the Effective Date that are not purchased by LitCo Unless a Litigation Claim is expressly waived, relinquished, released, sold, compromised or settled in the Plan or in a Final Order, all rights with respect to such Litigation Claims are reserved and the Plan Trustee may pursue such Litigation Claims.  Notwithstanding the foregoing, the Plan Trustee shall not settle or abandon a Litigation Claim valued at greater than $100,000 except upon ten (10) days' prior written notice and opportunity to object to the proposed action.  Any disputes concerning

29   the settlement or abandonment of a Litigation Claim shall be submitted to the Bankruptcy Court for

30   resolution on no less than ten (10) days' notice to the objecting party.

31       All Litigation Recoveries realized or obtained by the Plan Trustee shall be promptly

32   deposited into the applicable Distribution Account(s).  Except as otherwise provided in the Plan and

33   the Confirmation Order, the Litigation Recoveries shall be free and clear of all Claims and Liens and

34   shall only be expended in accordance with the provisions of the Plan.

35       **10.5**   10.3. **Removal of Chapter 11 Trustee**.

36       As of the Effective Date, the appointment of the Chapter 11 Trustee in the SunCal Oak Knoll,

37   LLC and SunCal Torrance, LLC shall terminate, and possession and control over all property within

38   these estates shall pass to the Plan Trust.

39       10.4.   **Transfer of Property to the Plan Trust**.

40       On the Effective Date, title to and possession of all property of the Group II: Trustee Debtors,

41   excepting those items of property that the Plan Trustee affirmatively elects not to transfer to the Plan

42   Trust, shall be deemed transferred and delivered to the Plan Trust, without further act or action under

43   any applicable agreement, law, regulation, order or rule of law.

44       10.5.   **Closing of Group II: Trustee Debtor Project Sales**. On the Effective Date, the

45   Group II: Trustee Debtor Project(s) shall be sold free and clear of liens to the Winning Bidder, at the

46   Winning Bid.

47       10.6.   **Purposes of The Plan Trust**.

48       The Plan Trust's purposes, powers and objectives include, but are not limited to the

49   following: (i) to take control over, manage and over time sell or otherwise dispose of all Plan Trust

50   Assets for the highest return reasonably obtainable; (ii) to pursue all Litigation Claims through

51   collection efforts, including through litigation in any court of competent jurisdiction, and to obtain

52   the most favorable recovery on the same, with due consideration of all relevant factors, including

1   cost; (iii) to cause all Available Cash to be deposited into the applicable Distribution Accounts; (iii)

2   to initiate actions to resolve any remaining issues regarding the allowance and payment of Claims

3   including, as necessary, initiation and/or participation in proceedings before the Bankruptcy Court;

4   (iv) to take such other actions as are necessary or useful to maximize the value of all property

29 received by the Plan Trust; (v) to make the payments and distributions to creditors and holders of

30 Beneficial Interests as required by the Plan; and (vi) to enforce all rights with respect to the Plan

31 Trust Assets; and (vii) to take all actions reasonable and necessary to implement the terms of the

32 Plan, including but not limited to selling the Group II: Trustee Debtor Projects and the Assets. A

33 more complete statement of the Plan Trust's powers and limitations is set forth in the Plan Trust

34 Agreement, which is a part of the Plan Supplement.

35      It is intended that the Plan Trust will be classified for U.S. federal income tax purposes as a

36 "liquidating trust," with the primary objective of liquidating the Plan Trust Assets and distributing

37 the net proceeds thereof, with no objective to continue or engage in the conduct or a trade or business

38 in accordance with Treasury Regulation 301.7701-4(d), and, notwithstanding anything to the

39 contrary in the Plan, all actions taken by the Plan Trust or any person acting on behalf of the Plan

40 Trust shall be consistent with such primary objective.

41      10.7.  **Preservation of Litigation Claims for the Plan Trust**.

42

43      The Plan Trustee reserves for Estates and the Plan Trust all rights to commence and pursue,

44 as appropriate, any and all Litigation Claims, whether arising prior to or after the petition Date, in

45 any court or other tribunal, including without limitation, in an adversary proceeding filed in the

46 Court.  On the Effective Date, the Plan Trustee will be vested with authority to enforce, file, litigate,

47 prosecute, settle and collect with respect to the Litigation Claims, although he will not be required to

48 do so and the determination of whether to so will be made solely by the Plan Trustee in his absolute

49 discretion.  With respect to any Litigation Claims commenced prior to the Effective Date to which

50 any or all of the Group II: Trustee Debtors is a party, the Plan Trustee shall replace and stand in the

51 shoes of such Debtor(s) as the real party in interest.

52      While the SunCal Plan Proponents have attempted to identify all Litigation Claims in the

1 Disclosure Statement which may be pursued, and hereby incorporates by reference those disclosures

2 and provisions, the failure to list any potential Litigation Claims, generally or specifically, is not

3 intended to limit the rights of the Plan Trustee to pursue such Litigation Claims.  Unless a Litigation

4 Claims against any Person is expressly waived, relinquished, released, compromised or settled as

29  provided or identified in the Plan, any Confirmation Order or prior order of the Court, the Plan

30  Trustee expressly reserves any Litigation Claims for later adjudication.  Therefore, no preclusion

31  doctrine, including, without limitation, the doctrine of res judicata, collateral estoppel, issue

32  preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches shall apply to such

33  Litigation Claims upon or after Confirmation or consummation of the Plan.  All Litigation Claims

34  are preserved under the Plan for the benefit of the Estates and the Plan Trust.  Any recoveries from

35  Litigation Claims will be paid to the Plan Trust.

36        ANY CREDITORS THAT BELIEVE THEY RECEIVED A TRANSFER OR SETOFF

37  THAT IS AVOIDABLE UNDER THE CODE OR THAT HOLDS A CLAIM AGAINST THE

38  ESTATES THAT COULD BE SUBJECT TO AN OBJECTION BASED UPON FAILURE TO

39  RETURN AN AVOIDABLE TRANSFER OR SETOFF, ARE DIRECTED TO REVIEW THEIR

40  RECORDS AND/OR THE DEBTORS' SCHEDULES FOR FURTHER INFORMATION.

41  HOWEVER, ALL RIGHTS OF THE DEBTORS AND THE ESTATES ARE RESERVED WITH

42  RESPECT TO ANY AND ALL TRANSFERS OR SETOFFS WHICH MAY BE AVOIDABLE

43  UNDER THE BANKRUPTCY CODE.

44        10.8.   **Establishment and Operations of the Plan Trust**.

45  The Plan Trust shall be established and shall become effective on the Effective Date.  The Plan Trust

46  is created pursuant to the Plan and the Confirmation Order.  The primary purpose of the Plan Trust is

47  the liquidation and distribution of the Plan Trust Assets transferred to it, with no objective to

48  continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to,

49  and consistent with, the liquidating purpose of the Plan Trust.  The Plan Trust shall hold and

50  administer the Plan Trust Assets, including, but not limited to, any Litigation Claims, and the

51  proceeds thereof for liquidation and distribution in accordance with the terms of the Plan.

52        From and after the Effective Date, the Plan Trust may use, acquire and dispose of the Plan

1   Trust Assets held in the Plan Trust, and take any of the actions set forth in this Article or in the Plan

2   Trust Agreement, without the approval of the Bankruptcy Court and free of the restrictions of the

3   Bankruptcy Code, the Bankruptcy Rules or the prior orders of the Bankruptcy Court, other than

4   restrictions expressly imposed by the Plan, the Confirmation Order or the Plan Trust Agreement,

29    provided that the Plan Trust is administered so that it qualifies as a liquidating trust under Treasury

30    Regulation § 301.7701-4(d).

31        10.9.  **10.6 Payment of Plan Trust Expenses**.

32        The expenses incurred by the respective Group II: Trustee Debtor's Plan Trust or the Plan

33    Trust during the respective Group II: Trustee Debtor's Plan Period, which shall include the

34    compensation payable to the Acquisitions, shall be paid, or adequate reserves shall be created for the

35    payment of such expenses, prior to any Distributiondistribution to the respective Group II: Trustee

36    Debtor's Plan Trust Beneficiaries..

37        10.10.  **10.7 The Plan Trust Distribution System**.

38        The Plan Trustee shall establish a separate "Distribution Account" for each Group II: Trustee

39    Debtor at an FDIC insured bank. Each Group II: Trustee Debtor's Available Cash, whether on hand

40    as of the Effective Date or received thereafter, shall be deposited into that Group II: Trustee Debtor's

41    Distribution Account. The only exception to this provision shall be in the case of Net Sales Proceeds

42    that are subject to disputed liens. Such proceeds shall remain in the applicable Net Sales Proceeds

43    Accounts established to receive the proceeds from the sale of a particular property. Once all disputes

44    regarding entitlement to the funds in the Net Sales Proceeds Accounts have been resolved, the

45    proceeds remaining (after the payment of the Allowed Claims secured by liens on these proceeds)

46    shall be transferred to the Distribution Account. These funds will then be used to pay the claims of

47    Creditors holding Allowed Claims in their order of priority as provided for in the Plan.  Persons

48    dealing with the Plan Trustee, or seeking to assert Claims against the Debtors, the Estates or the Plan

49    Trust, shall look only to property of the Debtors, the Estates or the Plan Trust to satisfy any liability

50    to such Persons, and the Plan Trustee shall have no corporate, personal, or individual obligation to

51    satisfy any such liability..

52        10.11.  **10.8 The Plan Trustee**.

1        10.11.1  **10.8.1**        **Appointment**.  Acquisitions shall be Plan Trustee of the Plan

2    Trust.  The appointment of the Plan Trustee shall be effective as of the Effective Date.

3        10.11.2  **10.8.2**        **Term**.  Unless the Plan Trustee resigns, dissolves or is

4    removed by Court order earlier, the Plan Trustee's term shall expire upon termination of the Plan

Trust pursuant to the Plan.  In the event the Plan Trustee resigns, dies or is removed by Court order prior to termination of the Plan Trust, the UST shall select and recommend to the Court a successor Plan Trustee.

~~10.11.3~~ **10.8.3**        **Powers and Duties**.  On the Effective Date, the Plan Trustee shall have the rights, powers and duties set forth in the Plan, the Confirmation Order, and Bankruptcy Code §§505, 1107 and 1108.  The Plan Trustee shall be governed in all things by the terms of the Plan and the Confirmation Order.  The Plan Trustee shall administer the Plan Trust in accordance with the Plan.  Without limitation, the Plan Trustee shall file final federal, state, foreign and, to the extent applicable, local, tax returns.  Without further Motion, notice, or order of the Court, the Plan Trustee shall be authorized, empowered and directed to take all actions necessary to comply with the Plan and exercise and fulfill the duties and obligations arising thereunder, including, without limitation to:

i.        employ, retain, and replace one or more attorneys, accountants, auctioneers, brokers, managers, consultants, other professionals, agents, investigators, expert witnesses, consultants, and advisors as necessary to discharge the duties of the Plan Trustee under the Plan;

ii.        control and effectuate the Claims reconciliation process, including to object to, seek to subordinate, compromise or settle any and all Claims against the Debtors pursuant to the terms of the Plan;

iii.        open, maintain and administer bank accounts as necessary to discharge the duties of the Plan Trustee under the Plan;

iv.        make Distributions to the Holders of Allowed Claims in accordance with the Plan;

v.        retain professionals to assist in performing ~~its~~his or her duties under the Plan;

vi.        pay reasonable and necessary professional fees, costs, and expenses;

vii.        investigate, analyze, commence, prosecute, litigate, compromise, settle, dismiss, and otherwise administer all Causes of Action and Avoidance Actions for the benefit of the Plan Trust and its beneficiaries, as set forth in the Plan, and to take all other necessary and appropriate steps to collect, recover, settle, liquidate, or otherwise reduce to Cash all Causes of

29 Action and Avoidance Actions, as the Plan Trustee may determine is in the best interests of the Plan

30 Trust;

31        viii.  administer, sell, liquidate, or otherwise dispose of the Assets in accordance

32 with the terms of the Plan;

33        ix.  incur and pay reasonable and necessary expenses in connection with the

34 performance of the Plan Trustee's duties under the Plan;

35        x.  represent the Estates before the Court and other courts of competent

36 jurisdiction with respect to ~~mattes~~<u>matters</u> concerning the Plan Trust;

37        xi.  seek the examination of any entity under the subject to the provisions of

38 Bankruptcy Rule 2004;

39        xii.  comply with applicable orders of the court and any other court of competent

40 jurisdiction over the matters set forth in the Plan;

41        xiii.  comply with all applicable laws and regulations concerning the matters set

42 forth in the Plan;

43        xiv.  exercise such other powers as may be vested in the Plan Trust pursuant to the

44 Plan, the Confirmation Order, or other Final Orders of the Court.

45        xv.  execute any documents, instruments, contracts, and agreements necessary and

46 appropriate to carry out the powers and duties of the Plan Trust;

47        xvi.  (1) seek a determination of tax liability under §505 of the code, (2) pay taxes,

48 if any, related to a Debtor, (3) file, if necessary, any and all tax and information returns r3equired

49 with the respect to the Plan Trust, including, if appropriate, treating the Plan Trust as a "grantor

50 trust" pursuant to Treas. Reg 1.671-4 or otherwise, (4) make tax elections by and on behalf of the

51 Plan Trust, and ~~95~~<u>(5)</u> pay taxes, if any, payable by the Plan Trust; and

52        xvii.  stand in the shoes of the Debtors for all purposes.

1        **~~10.11.4~~<u>10.8.4</u>** **Retention of Professionals and Compensation Procedure.**

2        On and after the Effective Date, the Plan Trustee may, without further

3 application or Motion, notice, hearing, or Court order, engage or employ such professionals and

4 experts as may be deemed necessary and appropriate by the Plan Trustee to assist the Plan Trustee in

29   carrying out the provisions of the Plan, including, but not limited to, the Professionals retained prior

30   to the Effective Date by either the Debtors or the Trustee Debtors' Committee.  The Plan Trustee

31   may employ such professionals on any reasonable terms and conditions of employment to be

32   determined by the Plan Trustee.  For the services performed on and after the Effective Date, the

33   professionals engaged by the Plan Trustee (the "Plan Trustee Professionals") shall receive

34   reasonable compensation and reimbursement of expenses in a manner to be determined by the Plan

35   Trustee.

36             ~~10.11.5~~10.8.5        **Fees and Expenses.**

37          Acquisitions shall not receive any compensation for the services it performs as the

38   Plan Trustee, ~~other than the release provided for in the Plan, but shall be entitled to reimbursement of~~

39   ~~reasonable expenses~~.  The Plan Trustee Professionals shall be entitled to reasonable compensation

40   for their services, and reimbursement of expenses.  The costs and expenses of the Plan ~~trust~~Trust

41   (including, without limitation, fees and expenses of the Plan Trustee Professionals) shall be paid

42   from the Plan Trust.  The Plan Trustee shall pay, without further order, notice or application to the

43   Court, the reasonable fees and expenses of the Plan Trustee Professionals, as necessary to discharge

44   the Plan Trustee's duties under the Plan.  The Plan Trustee shall be authorized to reserve funds from

45   the Plan Trust as is reasonable to pay the expenses of the Plan Trustee and the expenses and fees of

46   the Plan Trustee Professionals before making any Distributions under the Plan.

47             ~~10.11.6~~10.8.6        **Limitation of Liability and Indemnification.**

48          ~~Neither the Plan Trustee nor its~~None of the Group II: Trustee Debtors, the Trustee

49   Debtors' Committee, the Plan Sponsor, the SunCal Plan Proponents, the Plan Trustee, the

50   Professionals, nor any of their respective members, officers, directors, shareholders, employees, ~~Plan~~

51   ~~Trustee Professionals~~or agents (the "Indemnified Parties") shall be liable (a) for any loss or damages

52   by reason of any action taken or omitted by him or her, except in the case of fraud, willful

1   misconduct, bad faith, or gross negligence, ~~or~~(b) for any act or omission made in reliance upon the

2   Debtors' books and records or upon information or advice given to the Plan Trustee by ~~its~~

3   ~~professionals~~his or her professionals, or (c) for any action taken or omission made in connection with

4   or related to the negotiations, formulation, or preparation of the Plan and the Disclosure Statement,

29  the approval of the Disclosure Statement, the confirmation of the Plan, the consummation of the

30  Plan, or the administration of the Plan, the Cases, or the property to be distributed under the Plan, to

31  the fullest extent permitted by applicable statute and case law.  Except as otherwise provided in this

32  Plan, the Plan Trustee shall rely and shall be protected in acting upon any resolution, certificate,

33  statement, instrument, opinion, report, notice, consent, or other document believed by him or her to

34  be genuine and to have been signed by the proper party or parties.

35  ————The Plan Trustee and its employees, Plan Trustee Professionals or agents

36  (collectively, the "The Indemnified Parties" and each, an "Indemnified Party") shall be indemnified

37  and receive reimbursement from and against any and all loss, liability, expense (including attorneys'

38  fees) or damage of any kind, type or nature, which the Indemnified Party may incur or sustain the

39  exercise and performance of any of the Plan Trustee's powers and duties under this Plan or the

40  Confirmation Order, or in the rendering of services by the Indemnified Party to the Plan Trustee, to

41  the full extent permitted by applicable law, except if such loss, liability, expense or damage is finally

42  determined by a court of competent jurisdiction to result from the Plan Trustee's or an Indemnified

43  Person's fraud, willful misconduct, bad faith, or gross negligence.  The amounts necessary for such

44  indemnification and reimbursement shall be paid by the Plan Trustee out of the Plan Trust

45  AssetsProperty.  The Plan Trustee shall not be liable for the payment of any Plan Trust expense or

46  claim or other liability of the Plan Trust, and no Person shall look to the Indemnified Parties

47  personally for the payment of any such expense or liability.  This indemnification shall survive the

48  dissolution, resignation or removal, as may be applicable, of the Plan Trustee, or the termination of

49  the Plan Trust, and shall inure to the benefit of the Plan Trustee's and the Indemnified Person's heirs

50  and assigns.

51  10.11.710.8.7    **Plan Trustee as Successor.**

52  Pursuant to Code §1123(b), the Plan Trustee shall be the successor to the Group II Trustee

1  Voluntary Debtors for all purposes.

2  10.1210.9    **The Plan TrusteeTrust Beneficiaries**.

3  The Holders of Allowed Claims under the Plan, or any successors to such Holders' Allowed

4  Claims ("Beneficiary" or "Beneficiaries") shall own a beneficial interest in the Plan Trust which

shall, subject to the Plan, be entitled to a Distribution, if any, in the amounts, and at the times, set

forth in the Plan.  Ownership of a beneficial interest in the Plan Trust shall not be evidenced by any

certificate, security, or receipt or in any other form or manner whatsoever, except as maintained on

the books and records of the Plan Trust by the Plan Trustee.  The ownership of a beneficial interest in

the Plan Trust shall not entitle any Beneficiary to any title in or to the Plan Trust assets or to any right

to call for a partition or division of such assets or to require an accounting.  The Plan Trustee shall

make Distributions, if any, to Beneficiaries in the manner provided in the Plan.

The rights of the Beneficiaries arising under the Plan Trust may be deemed "securities" under

applicable law.  However, such rights have not been defined as "securities" under the Plan because

(a) the intent of the Plan is that such rights shall not be securities, and (b) if the rights arising under

the Plan Trust are deemed to be "securities," the exemption from registration under §1145 of the

Bankruptcy code is intended to be applicable to such securities.

**10.13.   Claims Estimation Rights**.

On the Confirmation Date, the SunCal Plan Proponents shall be vested with standing to file a

motion under 11 U.S.C. § 502(c), and they shall be authorized and empowered to seek in such

motion the estimation, for distribution purposes, of any Disputed Claim seeking recourse to, or

claiming an interest in, any asset of the Group II: Trustee Debtors. After the Bankruptcy Court

estimates a Disputed Claimant's rights in, or against an asset of the Estates through this procedure,

the Plan Trustee shall have the right to use any funds or assets not deemed subject to the rights of the

Disputed Claimant, to pay the Allowed Claims under the terms of the Plan, including Allowed

Administrative Claims, after the Effective Date.

**10.14. 10.10 No Payment of Transfer-Related Fees to the United States Trustee**.

The Plan Trust shall not be required to pay any fees to the United States Trustee based on any

transfers of the Plan Trust Assets to the Plan Trust or from the Plan Trust.

**10.15. 10.11 No Payment of Transfer-Related Fees to the Plan Trustee**.

The Plan Trust shall not be required to pay any fees to the Plan Trustee based on any transfers

of Plan Trust Assets from the Group II: Trustee Debtors to the Plan Trust, or from the Plan Trust.

**10.16. 10.12 Books and Records of Trust**.

The Plan Trustee, and to the extent of payments and distributions by any Disbursing Agent, the Disbursing Agent, shall maintain an accounting of receipts and disbursements of the Plan Trust. The Plan Trustee shall maintain the books and records of the Plan Trust, or provide storage for such book and records, for the longer of six (6) years, or while Plan is in existence, provided that the Court may, upon application by the Plan Trustee, authorize the Plan Trust to destroy all of the Plan Trusts books and records at such time as Plan Trust has no further need for such books and records. The Plan Trust's books and records shall be open to inspection at all reasonable times, upon written request by the Trustee Debtors' Committee.

### 10.17. 10.13 Federal Income Tax Treatment of the Holders of the Plan Trust Beneficial Interests.

For all United States federal income tax purposes, the transfers by the Group II: Trustee Debtor Debtors shall be treated by the Group II: Trustee Debtor Debtors, their estates, the Plan Trust and the Plan Trust Beneficiaries as a transfer of the Plan Trust Assets by the Group II: Trustee Debtor Debtors to the Plan Trust Beneficiaries followed by a transfer of the Plan Trust Assets by such the Plan Trust Beneficiaries to the Trust. The Plan Trust Beneficiaries shall be treated as the grantors and deemed owners of the Plan Trust for United States federal income tax purposes. The Plan Trust Trustee and the Plan Trust Beneficiaries are required to value their interests in the Plan Trust Assets consistently with the values placed upon the Plan Trust Assets by the Plan Trust, and to use such valuations for all purposes. The Plan Trust Agreement shall provide for consistent valuations of the Plan Trust Assets by the Plan Trust Trustee and the Plan Trust Beneficiaries, and shall provide that the Plan Trust will determine the fair market value of the Plan Trust Assets within thirty (30) days after the Effective Date, and send such determination to each the Plan Trust Beneficiary. By its acceptance of a Beneficial Interest, each recipient of such an interest will be conclusively deemed to agree to use such valuations for all purposes, including, without limitation, in computing any gain recognized upon the exchange of such holder's claim for purposes of determining any United States Federal income tax, and shall be required to include those items of income, deductions and tax credits that are attributable to its the Beneficial Interest in computing its taxable income.

### 10.18. 10.14 Termination of the Trust.

MAINDOCS-#163137-v6-SCC164959-v3-SunCal_3rd_Am_Group_II_TD_DS.DOC

The Plan Trust shall continue in effect until the earlier of: (a) the date that all the Plan Trust Assets has been liquidated, all proceeds have been converted to cash or distributed in kind, all the Plan Trust Expenses have been paid, all claims to be paid under the Plan for which the Plan Trust Trustee is obligated to make distributions on have been paid, all distributions to be made with respect to the Beneficial Interests have been made, all litigation to which the Plan Trust is a party have been concluded by dismissal or an order issued by the court in which such litigation is pending and such order has become "final" (consistent with the definition of Final Order in the ~~Plan~~plan for orders issued by the Bankruptcy Court), and the Chapter 11 Case has been closed; and (b) the expiration of five (5) years from the Effective Date; provided, however, that the Plan Trust may request the Bankruptcy Court to extend the permitted life of the Plan Trust for such additional period as is reasonably necessary to conclude the liquidation and distributions, not to exceed a total of ten (10) years from the Effective Date, which request shall be filed so the Bankruptcy Court may consider and rule on the request within six (6) months prior to the expiration of the initial five-year term.

**~~10.19.~~ 10.15 Exemption from Certain Transfer Taxes**.

In accordance with Section 1146(a) of the Bankruptcy Code, the issuance, transfer or exchange of a security or the making or delivery of an instrument of transfer under the ~~Plan~~plan may not be taxed under any law imposing a stamp tax or similar tax. All governmental officials and agents shall forego the assessment and collection of any such tax or governmental assessment and shall accept for filing and recordation any of the foregoing instruments or other documents without payment of such tax or other governmental assessment.

**~~10.20.~~ 10.16 Tax Consequence of ~~the~~The Plan**.

The implementation of the Plan may have federal, state and local tax consequences to the Group II: Trustee Debtors, Creditors and Interest Holders.  No tax opinion has been sought or will be obtained with respect to any tax consequences of the Plan. This Disclosure Statement does not constitute and is not intended to constitute either a tax opinion or tax advice to any person, and the summary contained herein is provided for informational purposes only.

CREDITORS AND INTEREST HOLDERS ARE ADVISED TO CONSULT WITH THEIR

OWN TAX ADVISORS REGARDING THE TAX CONSEQUENCES TO THEM AND TO THE DEBTOR OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES.

10.21   **The Plan Sponsor.**

The Plan Sponsor shall be Acquisitions.

10.22   **Acquisitions' Obligations** .

As part of its obligations as the Plan Sponsor, Acquisitions will manage the affairs of the Plan Trust and manage the payment of the following amounts required under the Plan:

(a)   All Allowed Administrative Claims;

(b)   Allowed Priority Claims; and

(c)   Continuing Professional fees for the prosecution of the Litigation Claims and other post-confirmation expenses

The actual source of the funding for these obligations will either be funds obtained from the New Sales Proceeds, or from the LitCo Plan Loan.

10.23 **10.17 The Trustee Debtors' Committee.**

On the Effective Date, the Trustee Debtors' Committee shall continue to serve their applicable Group II: Trustee Debtors as Trustee Debtors' Committee to the applicable reorganized Group II: Trustee Debtors, subject to the following:

10.23.1  **10.17.1 Duties and Powers.**

The duties of the Trustee Debtors' Committee after the Effective Date shall be limited to monitoring the Plan's implementation, notice and opportunity to object to the sales process, notice and opportunity to object to any settlement of the Lehman Adversary Proceeding, and the Contract Action, standing to object to any settlement of any Litigation Claim in excess of $100,000, standing to object to any proposed sales procedures on sale of the Debtors' Projects and standing to file, prosecute and resolve objections to Claims filed by Insiders that are SunCal Affiliates and their professionals.  The Trustee Debtors' Committee shall receive notice of and the right to review all payments and Distributions.

The Trustee Debtors' Committee shall be entitled to retain, employ and compensate Professionals, in order to assist with the obligations and rights of the Trustee Debtors' Committee under the terms of the Plan. Such compensation shall be paid from the applicable Distribution Account(s).

**10.23.210.17.2        Dissolution of Trustee Debtors' Committee.**

The Trustee Debtors' Committee shall be dissolved upon the entry of an order converting, closing or dismissing the Chapter 11 Cases or entry of a final decree in the Chapter 11 Cases. On dissolution, the Trustee Debtors' Committee shall have no other or further obligations or responsibilities on behalf of the Plan Trust.

**10.24   Litigation Claims.**

Pursuant to Section 1123(b)(3) of the Bankruptcy Code, the Plan Trust shall retain all Litigation Claims whether or not pending on the Effective Date that are not purchased by LitCo. Unless a Litigation Claim is expressly waived, relinquished, released, compromised or settled in the Plan or in a Final Order, all rights with respect to such Litigation Claims are reserved and the Plan Trustee may pursue such Litigation Claims.

The Group II: Trustee Debtors are potential plaintiffs in the Contract Action, and such claims constitute property of the Group II: Trustee Debtors' estates. If the Plan is Confirmed, the Plan Trustee and/or the Group II: Trustee Debtors reserve the right to join the Contract Action as additional plaintiffs.

Notwithstanding the foregoing, the Plan Trustee shall not settle or abandon a Litigation Claim valued at greater than $100,000 except upon ten (10) days' prior written notice and opportunity to object to one or another. Any disputes concerning the settlement or abandonment of a Litigation Claim shall be submitted to the Bankruptcy Court for resolution on no less than ten (10) days' notice to the objecting party.

**10.25   Collection of Litigation Recoveries.**

All Litigation Recoveries realized or obtained by the Plan Trustee and/or the Committee shall be promptly deposited into the applicable Distribution Account(s). Except as otherwise

29    provided in the Plan and the Confirmation Order, the Litigation Recoveries shall be free and clear of

30    all Claims and Liens and shall only be expended in accordance with the provisions of the Plan.

31    **10.26    Dissolution of the Group II: Trustee Debtors**

32    On the Effective Date, each of the Group II: Trustee Debtors shall be deemed dissolved for

33    all purposes without the necessity for any other further actions to be taken by or on behalf of such

34    Debtors or payments to be made in connection therewith.

35    **10.18    Claims Estimation Rights.**

36    On the Confirmation Date, the SunCal Plan Proponents shall be vested with standing to file a

37    motion under 11 U.S.C. § 502(c), and they shall be authorized and empowered to seek in such

38    motion the estimation, for Distribution purposes, of any Disputed Claim seeking recourse to, or

39    claiming an interest in, any asset of the Group II: Trustee Debtors. After the Bankruptcy Court

40    estimates a Disputed Claimant's rights in, or against an asset of the Estates through this procedure,

41    the Plan Trustee shall have the right to use any funds or assets not deemed subject to the rights of the

42    Disputed Claimant, to pay the Allowed Claims under the terms of the Plan, including Allowed

43    Administrative Claims, after the Effective Date.

44                                    **XI.**

45                            **RISK FACTORS**

46    **11.1    Plan Risks**.

47    The Plan in this case, like any Chapter 11 reorganization plan, includes a number of risks that

48    creditors should be aware of prior to voting on the Plan. The more material of these risks are

49    summarized below.

50

51

52    **11.1.1  The Plan May Not Be Accepted or Confirmed.**

1    While the SunCal Plan Proponents believe that the Plan is confirmable under the standards

2    set forth in 11 U.S.C. § 1129, there can be no guarantee that the Bankruptcy Court will find the Plan

3    to be confirmable. If the Plan is not confirmed, it is possible that an alternative plan can be negotiated

4    and presented to the Bankruptcy Court for approval; however, there can be no assurance that any

29  alternative plan would be confirmed, that the Chapter 11 Cases would not be converted to a

30  liquidation, or that any alternative plan of reorganization could or would be formulated on terms as

31  favorable to the Creditors and holders of Equity Interests as the terms of the Plan.

32  **11.1.2  Status of LitCo Funding**

33  The offer by LitCo to purchase Allowed Reliance Claims for the sum of fifty-five cents

34  ($0.55) per dollar of claim and certain other Plan funding (*e.g.*, to make required payments to

35  Creditors holding Allowed Administrative Claims, Priority Claims and Tax Claims) will not be

36  funded by the SunCal Plan Proponents.  Instead, the SunCal Plan Proponents are working with

37  proposed investors/lenders who would provide such funding.  While the SunCal Plan Proponents are

38  in discussions with third parties with respect to obtaining funding for the SunCal Plan, no

39  commitment has yet been obtained for such funding and thus SunCal Plan Proponents are not in a

40  position to disclose the terms of such funding at this time.  There is no guarantee that such funding

41  will be obtained.

42  **11.1.3    Failure to Sell The Group II: Trustee Debtor Projects**.

43  The Plan is based upon the assumption that the SunCal Plan Proponents will be able to close

44  the sale of the Group II: Trustee Debtor Projects for at least the Minimum Sales Prices on the

45  Effective Date. Although the SunCal Plan Proponents are confident that they can achieve sales at

46  these prices based upon their market research and familiarity with the projects, a possibility exists

47  that these sales will not occur. If this occurs then the creditors holding liens against the Group II:

48  Trustee Debtor Projects will be entitled to seek recourse against these properties, and this recourse

49  would include foreclosure.

50  / / /

51  / / /

52  ~~11.1.3~~**11.1.4    Adverse Outcome of Pending Litigation.**

1  The SunCal Plan Proponents have filed objections to the claims of the Lehman Lenders, and

2  they intend to pursue the Lehman Adversary Proceeding against LCPI claims and liens once they

3  obtain relief from the automatic stay in LCPI's Chapter 11 case. The SunCal Plan Proponents believe

4  that their defenses to the claims asserted by the Lehman Lender have merits and that they will be

29  sustained and that relief will also be granted in the Lehman Adversary Proceeding. However, there is

30  no assurance that this will occur. Litigation involves risks, including most importantly the risk of an

31  adverse ruling. Although the risk of an adverse ruling will not affect Holders of Class 6.1 and 6.2

32  Claims that vote in favor of Option A ($.55 cent distribution), it will affect those that vote in favor of

33  Option B, and it will affect the future distributions payable to the Class 7.1 and 7.2.

34        **~~11.1.4~~11.1.5**    **Risks Associated With Lehman Disputed Administrative Loans**.

35        The SunCal Plan Proponents will be filing objections to the Lehman Disputed

36  Administrative Loans. Since these loans were approved by an order of the Court, the SunCal Plan

37  Proponents ability to object to these claims may be limited to damages arising from wrongs that

38  occurred after these loans were approved. If these objections are not successful, the sums owed on

39  account of the Lehman Disputed Administrative Loans will have to be paid on the Effective Date of

40  the Plan, or on the date that they are allowed. If the SunCal Plan Proponents are not allowed to use

41  the Net Sales Proceeds from the sale of the Group II: Trustee Debtor Projects to pay these obligations

42  and they are unable to pay these claims from their own resources, or through funding or financing

43  provided by third parties, the Plan will fail.

44  **XI.**

45  **DISTRIBUTIONS**

46      **12.1**   **Distribution Agent**.

47        Acquisitions shall serve as the Distribution Agent for distributions due under the Plan.  The

48  Distribution Agent may employ one or more sub agents on such terms and conditions as it may agree

49  in its discretion and pay such sub agent as a Post Confirmation Expense from the Distribution

50  Accounts.  The Distribution Agent shall not be required to provide any bond in connection with the

51  making of any Distributions pursuant to the Plan.

52      **12.2**   **Distributions**.

1        **12.2.1**   **Dates of Distributions**.

2        Any distribution required to be made on the Effective Date shall be deemed timely if made as

3  soon as practicable after such date and, in any event, within thirty (30) days after such date.  Any

4

distribution required to be made upon a Disputed Claim becoming an Allowed Claim and no longer being a Disputed Claim shall be deemed timely if made as soon as practicable thereafter.

### 12.2.2    Limitation on Liability.

Neither the Plan Sponsor, the Plan Trustee, the Distribution Agent, their Affiliates, nor any of their employees, members, officers, directors, agents, or professionals or Affiliates shall be liable for (i) any acts or omissions (except for gross negligence or willful misconduct) in connection with implementing the Distribution provisions of the Plan and the making or withholding of Distributions pursuant to the Plan, or (ii) any change in the value of distributions made pursuant to the Plan resulting from any delays in making such distributions in accordance with the Plan's terms (including but not limited to any delays caused by the resolution of Disputed Claims).

### 12.3    Old Instruments and Securities.

### 12.3.1    Surrender and Cancellation of Instruments and Securities.

As a condition to receiving any distribution pursuant to the Plan, each Person holding any note or other instrument or security (collectively "Instruments or Securities" and individually an "Instrument or Security") evidencing an existing Claim(s) against the Debtor(s) must surrender such Instrument or Security to the Distribution Agent.

### 12.3.2    Cancellation of Liens.

Except as otherwise provided in the Plan, any Lien securing any Secured Claim shall be deemed released and discharged, and the Person holding such Secured Claim shall be authorized and directed to release any collateral or other property of the Debtors (including, without limitation, any cash collateral) held by such Person and to take such actions as may be requested by the Plan Trustee to evidence the release of such Lien, including, without limitation, the execution, delivery and Filing or recording of such releases as may be requested by the Plan Trustee.

### 12.4    De Minimis Distributions and Fractional Shares.

No Cash payment of less than ten dollars ($10) shall be made by the Plan Trust to any Holder of Claims unless a request therefore is made in writing to the Plan Trust.  Whenever payment of a fraction of a cent would otherwise be called for, the actual payment shall reflect a rounding down of such fraction to the nearest whole cent.  Any Cash or other property that is not distributed as a

29    consequence of this section shall, after the last distribution on account of Allowed Claims in the

30    applicable Class, be treated as "Unclaimed Property" under the Plan.

31        **12.5    Delivery of Distributions.**

32        Except as provided in the Plan with respect to Unclaimed Property, distributions to Holders

33    of Allowed Claims and Allowed Administrative Claims shall be distributed by mail as follows:  (1)

34    with respect to each Holder of an Allowed Claim that has filed a Proof of Claim, at the address for

35    such Holder as maintained by the official claims agent for the Debtors; (2) with respect to each

36    Holder of an Allowed Claim that has not filed a Proof of Claim, at the address reflected on the

37    Schedules filed by the Debtors, provided, however, that if the Debtors or the Plan Trust has received

38    a written notice of a change of address for such Holder, the address set forth in such notice shall be

39    used; or (3) with respect to each Holder of an Allowed Administrative Claim, at such address as the

40    Holder may specify in writing.

41        **12.6    Undeliverable Distributions.**

42        If the Distribution of Cash to the Holder of any Allowed Claim is returned to the Plan Trustee

43    as undeliverable or the Distribution check is not negotiated within 90 days of mailing (any such

44    distribution being hereinafter referred to as "Unclaimed Property"), no further distribution shall be

45    made to such Holder unless and until the Plan Trustee is notified in writing of such Holder's then

46    current address.  Subject to the remainder of this Section and the following section, Unclaimed

47    Property shall remain in the possession of the Plan Trustee pursuant to this Section, and shall be set

48    aside and (in the case of Cash) held in a segregated interest bearing account (as to Cash Unclaimed

49    Property) to be maintained by the Distribution Agent until such time as the subject Distribution

50    becomes deliverable.  Nothing contained in the Plan shall require the Plan Trustee or any other

51    Person to attempt to locate such Person.

52        ~~12.7    **Disposition of Unclaimed Property.**~~

1        ~~If the Person entitled thereto notifies the Plan Trustee of such Person's Claim to a~~

2    ~~Distribution of Unclaimed Property within ninety (90) days following such Person's initial~~

3    ~~Distribution Date, Effective Date, the Unclaimed Property distributable to such Person, together~~

4    ~~with any interest or dividends earned thereon, shall be paid or distributed to such Person as soon as~~

-95-

29  practicable. Any Holder of an Allowed Claim that does not assert a Claim in writing for Unclaimed

30  Property held by the Plan Trustee within ninety (90) days after the Holder's initial Distribution Date

31  shall no longer have any Claim to or Interest in such Unclaimed Property, and shall be forever barred

32  from receiving any distributions under the Plan or otherwise from the Plan Trustee. In such cases,

33  any property held for Distribution on account of such Claims shall become Available Cash and

34  deposited into the Distribution Account.

35                                              **XIII.**

36                      **OBJECTIONS TO CLAIMS AND DISPUTED CLAIMS**

37          **13.1    Standing for Objections to Claims.**

38          The Plan Trustee shall have the sole and exclusive right to file, prosecute and resolve

39  objections to Claims, excluding Claims filed by Insiders that are SunCal Affiliates including SunCal

40  Management. The Trustee Debtors' Committee shall have the sole and exclusive right to file,

41  prosecute and resolve potential Avoidance Actions against and objections to Claims filed by Insiders

42  that are SunCal Affiliates (i) SunCal Affiliates, including SunCal Management, Acquisitions, and SC

43  Master Marketing, LLC and (ii) certain professionals for the SunCal Affiliates, including Voss,

44  Cook & Thel, LLP, The MB Firm, White & Case, LLP, RBF Consulting and Mayer Brown LLP.

45          Any objection to a Claim shall be Filed with the Bankruptcy Court and served on the Person

46  holding such Claim on or before the applicable Claims Objection Deadline. The Plan Trustee shall

47  have the right to petition the Bankruptcy Court, without notice or a hearing, for an extension of the

48  Claims Objection Deadline if a complete review of all Claims cannot be completed by such date.

49          **13.2    Treatment of Disputed Claims and Disputed Liens.**

50                  **13.2.1  No Distribution Pending Allowance.**

51          If any portion of a Claim or Lien is a Disputed Claim or Disputed Lien, no payment or

52  distribution provided for under the Plan shall be made on account of such Claim or Lien unless and

1   until such Claim or Lien becomes an Allowed Claim and/or Allowed Lien.

2                   **13.2.2  Distribution After Allowance.**

3           On the next Distribution Date following the date on which a Disputed Claim becomes

4   an Allowed Claim and is no longer a Disputed Claim, the Distribution Agent shall distribute to the

Person holding such Claim any Cash that would have been distributable to such Person if on the

initial Distribution Date such Claim had been an Allowed Claim and not a Disputed Claim.

### 13.2.3  Reserves for Disputed Claims

In the event that Disputed Claims are pending at the time of a Distribution under the Plan, the

Plan Trustee shall establish and maintain a reserve for such Disputed Claims.  For purposes of

establishing a reserve, Cash will be set aside equal to the amount that would have been distributed to

the Holders of the Disputed Claims had the Disputed Claims been Allowed on the date a Distribution

is made to the Holders of Allowed Claims in the same Class or of the same priority as the Disputed

Claims.  If a Disputed Claim ultimately becomes an Allowed Claim, the amount of Cash reserved for

that Disputed Claim shall be distributed on the earlier of (a) the distributed Date following the date

when the Disputed Claim becomes an Allowed Claim, or (b) ninety (90) days after such Disputed

Claim becomes an Allowed Claim.  Any reserved Cash not ultimately distributed to the Holder of a

Disputed Claim because the Disputed Claim does not become an Allowed Claim shall become

property of the Plan Trust and shall be distributed in accordance with the terms of the Plan.

## XIV.

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 14.1    Executory Contracts to be Assumed and Assigned.

Under the Plans, the Group II: Trustee ~~Debtors~~ Projects will be sold.  As a result, the Group

II: Trustee Debtors will assume only those executory contracts and unexpired leases to be assigned to

the Winning Bidder with respect to the applicable Project and the Restructuring Agreement and

Settlement Agreement.

On the Effective Date, the executory contracts and unexpired leases identified on the

Schedule of Assumed and Assigned Agreements attached or to be attached hereto as Exhibit "9" or

filed or to be filed as Exhibit "9" to this document shall be deemed assumed and assigned to the

applicable Winning Bidder, as specified in the Confirmation Order.  The SunCal Plan Proponents

intend to file the Schedule of Assumed and Assigned Agreements with the Court no later than

~~twenty-eight~~ (~~28~~) days prior to the Confirmation Hearing.  The Schedule of Assumed and

-97-

29    Assigned Agreements also identifies or will identify any amounts that must be paid to cure defaults

30    under the executory contacts and unexpired leases to be assumed and assigned under the Plan (the

31    "Cure Amount"). If filed earlier, the SunCal Plan Proponents reserve the right to amend the

32    Schedule of Assumed Agreements up to ~~(~~ twenty-eight (28) days prior to the Confirmation

33    Hearing (~~,~~October 24, 2011) to: (a) add any executory contract or unexpired lease and

34    provide for its assumption and assignment; or (b) modify the Cure Amount for any particular

35    executory contract or unexpired lease. The SunCal Plan Proponents further reserve the right to

36    amend the Schedule of Assumed Agreements to delete any executory contract or unexpired lease and

37    provide for its rejection at any time prior to the Confirmation Hearing. The SunCal Plan Proponents

38    will provide notice of any amendment to the Schedule of Assumed and Assigned Agreements to any

39    party or parties to the executory contracts or unexpired leases affected by the amendment. Absent a

40    timely objection as provided below, the Confirmation Order will constitute a Court Order approving

41    the assumption and assignment, on the Effective Date, of the executory contracts and unexpired

42    leases then identified on the Schedule of Assumed and Assigned Agreements, and shall constitute a

43    final determination of the Cure Amount and that the estate has shown adequate assurance of future

44    performance. Furthermore, any Cure Amount ordered by the Court, through entry of the

45    Confirmation Order, and paid shall be deemed to satisfy any and all defaults arising from, out of or

46    related to the executory contract of unexpired lease, including any tort claims that were or could be

47    asserted by the non-debtor party to the contract or lease on or prior to the entry of the Confirmation

48    Order, and all actual or pecuniary losses that have resulted from such defaults.

49       If you are a party to an executory contract or unexpired lease to be assumed and assigned and

50    you object to the assumption and assignment of your lease or contract and/or you dispute the Cure

51    Amount related to your lease or contract, then you must File and serve upon counsels for the SunCal

52    Plan Proponents (at the address on the upper left hand corner of the caption page) a written objection

1    by ~~, 2011~~fourteen days before the Confirmation Hearing. An objection to the Cure Amount

2    must also set forth the amount you contend to be the correct Cure Amount and contain evidence to

3    support such amount. Failure to timely File an objection as provided herein shall be deemed consent

4

to the proposed assumption and assignment and to the Cure Amount and a waiver of any and all rights to challenge such assumption and assignment and the Cure Amount.

With respect to each executory contract and unexpired lease identified on the Schedule of Assumed and Assigned Agreements, if no dispute arises regarding the Cure Amount, adequate assurances, or some other matter related to the assumption of the executory contact or unexpired lease, then the Cure Amount set forth in the schedule of Assumed and Assigned Agreements shall be paid to the applicable non-debtor party in Cash on the Effective Date or as soon as reasonably practicable thereafter.  If a dispute arises regarding (a) whether the proposed assignee has provided adequate assurance of future performance of an executory contract or unexpired lease to be assumed, or (b) any other matter pertaining to a proposed assumption and assignment, the Cure Amount will be paid on the later of (1) the Effective Date or as soon as practicable thereafter, or (2) within thirty (30) days after entry of a Final order resolving the dispute and approving the assumption and assignment; provided, however, if a dispute arises regarding any of the foregoing, the SunCal Plan Proponents reserve, for themselves and the Plan Trustee, the right to completely forego assumption and assignment of and, instead, reject the subject executory contract or unexpired lease.

If a party to an executory contract or unexpired lease identified on the Schedule of Assumed and Assigned Agreements Files an objection disputing the Cure Amount, then the SunCal Plan Proponents may amend the Schedule of Assumed and Assigned Agreements at any time prior to the Confirmation Hearing to delete the subject executory contract or unexpired lease and provide for its rejection.  Executory contracts or unexpired leases not so deleted shall be conditionally assumed, subject to the SunCal Plan Proponents' and/or the Plan Trustee's right to file a Motion to determine the appropriate Cure Amount up to the first (1st) Business Day that is at least sixty (60) days following the Effective Date.  The SunCal Plan Proponents and/or the Plan Trustee will serve any such Motion on the party to the executory contract or unexpired lease affected by the Motion (or its attorneys, if any).  If the SunCal Plan Proponents and Plan Trustee does not file a Motion to determine the appropriate Cure Amount, then the executory contract or unexpired lease shall be assumed and assigned, as of the Effective Date, and the Cure Amount shall be the alternative Cure Amount asserted by the non-debtor party to the subject executory contract or unexpired lease in its

29  objection to the Plan.  The Cure Amount shall be paid as soon as reasonably practicable following

30  the expiration of the 60-day deadline.

31      If the SunCal Plan Proponents or the Plan Trustee files a Motion to determine the appropriate

32  Cure Amount, then the SunCal Plan Proponents and/or Plan Trust shall have the right to amend the

33  Schedule of Assume and Assigned Agreements to completely forego assumption and assignment of

34  and, instead, reject the subject executory contract or unexpired lease up to the first (1st) Business

35  Day that is at least fifteen (15) days after the entry of an order fixing the Cure Amount.  The SunCal

36  Plan Proponents and/or Plan Trustee will provide notice of any amendment to the Schedule of

37  Assumed and Assigned Agreements to the party to the executory contract or unexpired lease affected

38  by the amendment.  If the SunCal Plan Proponents and/or Plan Trustee has filed such a Motion and

39  does not timely amend the Schedule of Assumed and Assigned Agreements within fifteen (15) days

40  after entry of an order fixing the Cure Amount, then the executory contract or unexpired lease shall

41  be assumed and assigned, as of the Effective Date, and the Cure Amount shall be fixed as the Cure

42  Amount ordered by the Court.  The Cure Amount as soon as reasonably practicable following the

43  expiration of the 15-day deadline.

44

45      **14.2**   <u>**Executory Contracts to be Rejected**</u>.

46      On the Effective Date, the estate will be deemed to have rejected any and all executory

47  contacts and unexpired leases <u>not</u> identified on the Schedule of Assumed and Assigned Agreements

48  attached or to be attached hereto as Exhibit "9," or filed or to be filed as Exhibit "9" to this

49  document.  The Confirmation Order will constitute a Court order approving the rejection, as of the

50  Effective Date, of such executory contacts and unexpired leases.  Any Claim for damages arising

51  from the rejection under the Plan of any executory contract or unexpired lease must be filed with the

52  Court and served upon the SunCal Plan Proponents and the Plan Trustee within thirty (30) days of

1   the later of (a) the Confirmation Date, and (b) the Plan Trustee's amendment of the Schedule of

2   Assumed and Assigned Agreements to eliminate the executory contract or unexpired lease.  Any

3   such damage Claims that are not timely filed and served will be forever barred and unenforceable

4   against the applicable Debtors, the Estates, the Plan Trustee, the Plan Trust, and their respective

property.  Persons holding these Claims who fail to timely file claims will be barred from receiving any Distributions under the Plan on account of their rejection damage Claims.

If you are a party to a lease or contract to be rejected and you object to the rejection of your lease or contract, then you must file and serve your objection by ~~_____~~ fourteen days before the Confirmation Hearing.

~~**14.3    Changes in Rates Subject to Regulatory Commission Approval.**~~

~~The Debtors are not subject to governmental regulatory commission approval of their rates.~~

### XV.

### **BEST INTEREST OF CREDITORS TEST AND PLAN FEASIBILITY**

**15.1    Best Interests Test**.

Pursuant to Section 1129(a)(7) of the Bankruptcy Code, a Plan cannot be confirmed unless the Bankruptcy Court determines that Distributions under the Plan to all Holders of Claims and Interests who have not accepted the plan and whose Claims are classified in Classes that are impaired under the plan, are not less than those which they would receive in a liquidation under Chapter 7 of the Bankruptcy Code.

The Best Interest of Creditors Test must be satisfied even if the Plan is accepted by each impaired Class of Claims and if any Holder of an Allowed Claim objects to the Plan on such basis. The Best Interests Test requires the Bankruptcy Court to find either that either (i) all Holders of Claims in an impaired Class of Claims have accepted the Plan or (ii) the Plan provides each Holder of Allowed Claims of an impaired Class who has not accepted the Plan with a recovery of property of a value, as of the effective date of the Plan, that is not less than the amount that such Holder would receive if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code.

The Plan proposed by the Plan Proponents is essentially a liquidating plan. It provides for the sale of all assets of the estate for their fair market value, the collection or recovery of all other assets, and for the distribution of the resulting net proceeds from the sale, in accordance with the priorities provided for in the Bankruptcy Code and under California law. A Chapter 7 trustee appointed in this case would be compelled to liquidate the Debtors' assets in the same manner as provided for in the Plan and to pay out the proceeds in the same manner as provided for in the Plan. Accordingly, under

29    the terms of the Plan, each individual creditor is receiving "at least as much" as such creditor would

30    receive in a Chapter 7 case, which is all that is required under the Best Interests Test.

31       Although the Lehman Entities will argue that they are being denied their "credit bid" rights

32    under the Plan, and this reduces their distribution below the level that they would receive in a

33    Chapter 7 case, this argument fails. A credit bid right does not add or reduce the value of a creditor's

34    collateral, it simply allows a creditor holding such a right to bid against other bidders using its debt as

35    "credit", rather than bidding in cash. If the creditor's collateral is sold for its "fair market value," in

36    cash, and the creditor receives what it is entitled to from the sales proceeds, then the creditor is

37    necessarily receiving exactly what it would receive in a Chapter 7. This is all that the Best Interest

38    Test Requires. See Exhibit "7" hereto.

39       **15.2**    **Feasibility**.

40       In addition, in order to confirm the Plan, the Bankruptcy Court must find that confirmation of

41    the Plan is not likely to be followed by the liquidation or the need for further financial reorganization

42    of the Debtor(s). This requirement is imposed by Section 1129(a)(11) of the Bankruptcy Code and is

43    generally referred to as the "feasibility" requirement. As explained above, the Debtors' Plan provides

44    for the sale of all assets of their respective estates and for the distribution of the proceeds. Within the

45    context of the Plan, feasibility is limited to having sufficient funds to pay administrative and priority

46    claims on the Effective Date and sufficient funds to fund the sale of the Properties.

47       Under timeline provided for in the Plan, the Group II: Trustee ~~Debtor~~ Projects will be sold

48    ~~on~~during the ~~Effective Date~~Sale Period. The Net Sales Proceeds from these sales, plus the proceeds

49    of the LitCo Plan Loan, will provide the Debtors the means to pay all claims, including allowed

50    administrative and priority claims on this same date~~, from escrow~~. All remaining claimants will then

51    receive what they are entitled under the Plan when their claims are allowed.

52       / / /

1       / / /

2       / / /

3       / / /

4

# XVI.

## LIMITATION OF LIABILITY

### 16.1    No Liability for Solicitation or Participation.

As specified in Section 1125(e) of the Bankruptcy Code, entities that solicit acceptances or rejections of the Plan and/or that participate in the offer, issuance, sale, or purchase of securities offered or sold under the Plan, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, shall not be liable, on account of such solicitation or participation, for violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer, issuance, sale, or purchase of securities.

# XVII.

## CONDITIONS TO CONFIRMATION AND

## EFFECTIVENESS OF THE PLAN

### 17.1    Conditions Precedent to Plan Confirmation.

The only condition precedent to confirmation of the Plan is that the Bankruptcy Court shall have entered a Confirmation Order in form and substance reasonably acceptable to the SunCal Plan Proponents.

### 17.2    Conditions Precedent to Plan Effectiveness.

The conditions precedent to the effectiveness of the Plan and the occurrence of the Effective Date is that the Confirmation Order shall be a Final Order in form and substance reasonably satisfactory to the SunCal Plan Proponents, and the resolutions of any material impairment of the Plan terms caused by the automatic stays applicable in the Lehman Entities cases. The automatic stay in the Debtors' cases shall continue to be applicable until the Effective Date.

# XVIII.

## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order or the occurrence of the Effective Date, the Bankruptcy Court's jurisdiction shall not be limited under the Plan and the Bankruptcy Court's jurisdiction shall apply to the fullest extent possible under applicable law.  The Court will retain exclusive jurisdiction during the Plan payout period to resolve disputes and conflicts arising from the

administration of the Plan, upon request of a party-in-interest and after notice and a hearing, including, without limitation:

a.    The adjudication of the validity, scope, classification, allowance, and disallowance of any Claim;

b.    The estimation of any Claim;

c.    The allowance or disallowance of Professional-Fee Claims, compensation, or other Administrative Expense Claims;

d.    To her and determine Claims concerning taxes pursuant to Bankruptcy Code §§ 346, 505, 525, and 1146;

e.    To hear and determine any action or proceeding brought under Bankruptcy Code §§108, 510, 543, 544, 545, 547, 548, 549, 550, 551 and 553;

f.    To hear and determine all actions and proceedings which relate to pre-confirmation matters;

g.    To hear and determine any issue relating to the assumption or rejection of executory contracts and unexpired leases;

h.    To hear and determine any modification to the ~~plan~~Plan in accordance with the Bankruptcy Rules and Bankruptcy Code;

i.    To enforce and interpret the terms of the Plan;

j.    To correct any defects, cure any omissions, or reconcile any inconsistency in the Plan or the Confirmation Order as may be necessary to carry out the purpose and intent of the Plan;

k.    the entry of any order, including injunctions, necessary to enforce title, rights and powers of the Plan Trust, and to impose such limitations, restrictions, terms and conditions on such title, rights and powers as the Court may deem necessary including, without limitation, any right of the Plan Trust to recover and liquidate assets;

l.    To determine the validity, extent and priority of all liens and security interests against property of the Estates or the Plan ~~trust~~Trust;

m.    To hear and resolve any disputes regarding employment applications and professional fees;

29    n.    To her and determine such matters and make such orders as are consistent with the

30   Plan as may be necessary to carry out the provisions thereof and to adjudicate any disputes arising

31   under or relating to any order entered by the Court in these Cases;

32    o.    The entry of an order concluding and terminating these Cases; and

33    p.    To resolve any disputes as to whether there has been a default under the Plan.

## XIX.

## MODIFICATION OR WITHDRAWAL OF THE PLAN

### 19.1    Modification of Plan.

At any time prior to confirmation of the Plan, the ~~former Debtor(s)~~Plan Proponent may

supplement, amend or modify the Plan.  After confirmation of the Plan,  the ~~Debtors~~Plan Proponent

or Plan Trustee may (x) apply to the Bankruptcy Court, pursuant to Section 1127 of the Bankruptcy

Code, to modify the Plan; and (y) apply to the Bankruptcy Court to remedy defects or omissions in

the Plan or to reconcile inconsistencies in the Plan.

### 19.2    Nonconsensual Confirmation.

In the event that any impaired Class of Claims or Interests shall fail to accept the Plan in

accordance with Section 1129(a)(8) of the Bankruptcy Code, SunCal Plan Proponents (i) may

request that the Bankruptcy Court confirm the Plan in accordance with Section 1129(b) of the

Bankruptcy Code, and (ii) in accordance with Section 16.1 of the Plan, and may modify the Plan in

accordance with Section 1127(a) of the Bankruptcy Code.

## XX.

## EFFECT OF CONFIRMATION

### 20.1    Discharge.

Confirmation of the Plan does not discharge the Group II: Trustee Debtors as set forth in

Bankruptcy Code §1141.

///

///

### 20.2    Revesting of the Assets.

29    The Assets shall not be vested in the Group II: Trustee Debtors on or following the Effective

30    Date, but shall be vested in the Plan Trust and continue to be subject to the jurisdiction of the Court

31    following confirmation of the Plan until such Assets are distributed to the Holders of Allowed

32    Claims in accordance with the provisions of the Plan.

33    **20.3    Exculpation and Releases**

34    Effective upon the entry of the Confirmation Order, neither the Group II: Trustee Debtors,

35    the Committees, Plan Sponsor, the SunCal Plan Proponents, the Professionals, nor any of their

36    respective members, officers, directors, shareholders, employees, or agents, shall have or incur any

37    liability to any Person, including any creditors or Interest Holder of the Debtors, for any act taken or

38    omission made in connection with or related to the negotiation, formulation, or preparation of the

39    Plan and the Disclosure Statement, the approval of the Disclosure Statement, the confirmation of the

40    Plan, the consummation of the Plan, or the administration of the Plan, the Cases, or the property to be

41    distributed under the Plan, to the fullest extent permitted by applicable statues and case law, except

42    that the Plan Trust will be liable for the performance of obligations assumed by it or imposed upon it

43    under or by the Plan.

44    **XXI.**

45    **MISCELLANEOUS**

46    **21.1.    Payment of Statutory Fees.**

47    All quarterly fees due and payable to the Office of the United States Trustee pursuant to

48    Section 2030(a)(6) of title 28 of the United States Code shall be paid in full on or before the Effective

49    Date, or, to the extent such quarterly fees are disputed, an adequate reserve shall have been

50    established and set aside for payment in full thereof, as required by Section 1129(a)(12) of the

51    Bankruptcy Code.  The Plan Trustee shall remain responsible for timely payment of quarterly fees

52    due and payable after the Effective Date and until the Debtors' Cases are closed, to the extent

1    required by Section 2030(a)(6) of title 28 of the United States Code.

2    **21.2.    Changes in Rates Subject to Regulatory Commission Approval.**

3    The Group II: Trustee Debtors are not subject to governmental regulatory commission

4    approval of their rates.

**21.3.** ~~21.2.~~ **Payment Dates.**

Whenever any payment or distribution to be made under the Plan shall be due on a day other than a Business Day, such payment or distribution shall instead be made, without interest, on the immediately following Business Day.

**21.4.** ~~21.3.~~ **Headings.**

The headings used in this Disclosure Statement and in the Plan are inserted for convenience only and neither constitutes a portion of this Disclosure Statement or the Plan nor in any manner affect the construction of the provisions of this Disclosure Statement or the Plan.

_____ / / /

_____ / / /

**21.5.** ~~21.4.~~ **Other Documents and Actions.**

The Plan Trustee may execute such other documents and take such other actions as may be necessary or appropriate to effectuate the transactions contemplated under the Plan.

**21.6.** ~~21.5.~~ **Notices.**

All notices and requests in connection with this Disclosure Statement and the Plan shall be in writing and shall be hand delivered or sent by mail addressed to:

> **To the SunCal Plan Proponents**:
> Bruce V. Cook
> General Counsel
> Authorized Agent of the SunCal Plan Proponents
> 2392 Morse Ave
> Irvine, CA 92614-6234
>
> **With copies to:**
> Paul J. Couchot
> Winthrop & Couchot, Professional Corporation
> 660 Newport Center Drive, Suite 400
> Newport Beach, CA 92660
>
> Ronald Rus
> Rus Miliband & Smith P.C.
> 2211 Michelson Drive, Seventh Floor
> Irvine, California 92612

All notices and requests to any Person holding of record any Claim or Interest shall be sent to them at their last known address or to the last known address of their attorney of record.  Any such

MAINDOCS #~~163137-v6-SCC~~164959-v3-SunCal_3rd_Am_Group_II_TD_DS.DOC

Person may designate in writing any other address for purposes of this Section, which designation will be effective on receipt.

### **21.7.** ~~21.6.~~ **Governing Law.**

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), the laws of the State of California (without reference to its conflict of law rules) shall govern the construction and implementation of the Plan and any agreements, documents, and instruments executed in connection with the Plan, unless otherwise specifically provided in such agreements, documents, or instruments.

### **21.8.** ~~21.7.~~ **Binding Effect.**

The Plan and all rights, duties and obligations thereunder shall be binding upon and inure to the benefit of the Plan Sponsor Debtors, the Plan Trustee, Holders of Claims, Holders of Interests, and their respective successors and assigns.

### **21.9.** ~~21.8.~~ **Successors and Assigns.**

The rights, benefits, and obligations of any entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, the heirs, executors, administrators, successors, and assigns of such entity.

### **21.10.** ~~21.9.~~ **Severability of Plan Provisions.**

If, prior to the Confirmation Date, any term or provision of the Plan is held by the Bankruptcy Court to be illegal, impermissible, invalid, void or unenforceable, or otherwise to constitute grounds for denying confirmation of the Plan, the Bankruptcy Court shall, with the consent of the Debtors, have the power to interpret, modify or delete such term or provision (or portions thereof) to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be operative as interpreted, modified or deleted.  Notwithstanding any such interpretation, modification or deletion, the remainder of the terms and provisions of the Plan shall in no way be affected, impaired or invalidated by such interpretation, modification or deletion.

### **21.11.** ~~21.10.~~ **No Waiver.**

The failure of the Debtors or any other Person to object to any Claim for purposes of voting shall not be deemed a waiver of the Trustee Debtors' Committee's, the Debtors' or the Plan Trustee's right to object to or examine such Claim, in whole or in part.

**21.12.** 21.11. **Inconsistencies.**

In the event the terms or provisions of this Disclosure Statement are inconsistent with the terms and provisions of the Plan or documents executed in connection with the Plan, the terms of the Plan shall control.

**21.13.** 21.12. **Exemption from Certain Transfer Taxes and Recording Fees.**

Pursuant to Section 1146(a) of the Bankruptcy Code, any transfers from a Debtor to the Plan Trust or to any other Person or entity pursuant to the Plan, or any agreement regarding the transfer of title to or ownership of any of the Debtors' real or personal property or of any other interest in such property (including, without limitation, a security interest) will not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, and the Confirmation Order will direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**21.14.** 21.13. **Post-Confirmation Status Report.**

Within 180 days following the entry of the Confirmation Order, the Plan Trustee shall file a status report with the Court explaining what progress has been made toward consummation of the confirmed Plan.  The status report shall be served on the United States Trustee, the twenty largest unsecured creditors, and those parties who have requested special notice.  Unless otherwise ordered, further status reports shall be filed every 180 days and served on the same entities.

**21.15.** 21.14. **Post-Confirmation Conversion/Dismissal.**

A creditor or party in interest may bring a motion to convert or dismiss the case under § 1112(b), after the Plan is confirmed, if there is a default in performing the Plan.  The Plan Trustee

29  reserves the right to object to any motion for conversion or dismissal.  In addition, as set forth in the

30  definition of the Effective Date, the Effective Date may be further extended by order of the

31  Bankruptcy Court after notice and hearing to all parties in interest.  If the Court determines there is

32  no "cause" for the extension of the Effective Date, a party in interest may move to dismiss or convert

33  the ~~case~~Case(s).

34       If the Court orders any of the Cases converted to Chapter 7 after the Plan is confirmed, then

35  all property that had been property of the Chapter 11 Estate, and that has not been disbursed pursuant

36  to the Plan, will revest in the Chapter 7 estate.  The automatic stay will be reimposed upon the

37  revested property, but only to the extent that relief from stay was not previously authorized by the

38  Court during this case.

39  ~~///~~

40       **21.16.**  ~~21.15.~~

29 **Final Decree.**

30       Once an Estate has been fully administered, as referred to in Bankruptcy Rule 3022, the Plan

31 Trustee, or other party as the Court shall designate in the Confirmation Order, shall file a motion

32 with the Court to obtain a final decree to close the Case of such Debtor.

33

34 Date: ~~July 18,~~ August 5, 2011      By: _____
           Bruce Cook

35            General Counsel, Authorized Agent for the Voluntary
           Debtors and Acquisitions

36

37 **Submitted By:**
**WINTHROP COUCHOT**       **RUS MILIBAND & SMITH**

38 **PROFESSIONAL CORPORATION**     **A PROFESSIONAL CORPORATION**

39 By: /s/ Paul J. Couchot_____    By: _/s/ Ronald Rus_____

40     Paul J. Couchot, Esq.         Ronald Rus, Esq.
General Insolvency Counsel for the      Joel S. Miliband, Esq.

41 Voluntary Debtors           Cathrine Castaldi, Esq.
          Counsel for SCC Acquisitions Inc.

42            ~~RUS MILIBAND & SMITH~~

43 ~~A PROFESSIONAL CORPORATION~~

44 ~~By: _/s/ Ronald Rus_____~~

45     ~~Ronald Rus, Esq.~~
    ~~Joel S. Miliband, Esq.~~

46     ~~Cathrine Castaldi, Esq.~~
~~Attorneys for SunCal Management, LLC and~~

47 ~~SCC Acquisitions Inc.~~

48

49

50

51

52

1

2

3

4

29  **NOTE:** When using this form to indicate service of a
proposed order, **DO NOT** list any person or entity in
Category I.

30  Proposed orders do not generate an NEF because only
orders that have been entered are placed on the

31  CM/ECF docket.**PROOF OF SERVICE OF**

32  **DOCUMENT**

33  I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 660 Newport Center Drive, 4th Fl., Newport Beach, CA 92660.

34  A true and correct copy of the foregoing document described as:  **SECONDTHIRD AMENDED DISCLOSURE**

35  **STATEMENT DESCRIBING SECONDTHIRD AMENDED CHAPTER 11 PLANS FILED BY SUNCAL PLAN PROPONENTS IN THE CHAPTER 11 CASES OF SUNCAL OAK KNOLL, LLC AND SUNCAL TORRANCE,**

36  **LLC [GROUP II: TRUSTEE DEBTORS]** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

37  **I.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to

38  controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On July 18,August 5, 2011, I checked the CM/ECF docket for this bankruptcy

39  case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

40  ☒  Service information continued on attached page

41  **II.  SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served)**:**

42  On _____, 2011, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United

43  States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be</u> completed no later than 24 hours after the document is filed.

44

45

46  ☐  Service information continued on attached page

47  **III.  SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for

48  each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on _____, 2011, I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service

49  method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on the judge <u>will be</u> completed no later than 24 hours after the document is filed.

50

51  ☐  Service information continued on attached page

52  I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

1   July 18,August 5, 2011        Gretchen Crumpacker              /s/ Gretchen Crumpacker

2   *Date*                       *Type Name*                     *Signature*

3

4

MAINDOCS-#163137-v6-SCC164959-v3-SunCal_3rd_Am_Group_II_TD_DS.DOC

- **NEF SERVICE LIST**

- Selia M Acevedo      sacevedo@millerbarondess.com, mpritikin@millerbarondess.com
- Joseph M Adams      jadams@sycr.com
- Raymond H Aver      ray@averlaw.com
- James C Bastian      jbastian@shbllp.com
- Thomas Scott Belden      sbelden@kleinlaw.com, ecf@kleinlaw.com
- John A Boyd      fednotice@tclaw.net
- Mark Bradshaw      mbradshaw@shbllp.com
- Gustavo E Bravo      gbravo@smaha.com
- Jeffrey W Broker      jbroker@brokerlaw.biz
- Brendt C Butler      bbutler@mandersonllp.com
- Andrew W Caine      acaine@pszyjw.com
- Carollynn Callari      ccallari@venable.com
- Cathrine M Castaldi      ccastaldi@rusmiliband.com
- Tara Castro Narayanan      tara.narayanan@msrlegal.com, lisa.king@msrlegal.com
- Dan E Chambers      dchambers@jmbm.com
- Shirley Cho      scho@pszjlaw.com
- Vonn Christenson      vrc@paynefears.com
- Brendan P Collins      bpcollins@bhfs.com
- Vincent M Coscino      vcoscino@allenmatkins.com, emurdoch@allenmatkins.com
- Paul J Couchot      pcouchot@winthropcouchot.com, pj@winthropcouchot.com; ~~sconnor~~gcrumpacker@winthropcouchot.com
- Jonathan S Dabbieri      dabbieri@sullivan.com, hill@sullivanhill.com;mcallister@sullivanhill.com;stein@sullivanhill.com;vidovich@sullivanhill.com
- Ana Damonte      ana.damonte@pillsburylaw.com
- Vanessa S Davila      vsd@amclaw.com
- Melissa Davis      mdavis@shbllp.com
- Daniel Denny      ddenny@gibsondunn.com
- Caroline Djang      crd@jmbm.com
- Donald T Dunning      ddunning@dunningLaw.com
- Meredith R Edelman      meredith.edelman@dlapiper.com
- Joseph A Eisenberg      jae@jmbm.com
- Lei Lei Wang Ekvall      lekvall@wgllp.com
- Richard W Esterkin      resterkin@morganlewis.com
- Marc C Forsythe      kmurphy@goeforlaw.com
- Alan J Friedman      afriedman@irell.com
- Steven M Garber      steve@smgarberlaw.com
- Christian J Gascou      cgascou@gascouhopkins.com
- Barry S Glaser      bglaser@swjlaw.com
- Robert P Goe      kmurphy@goeforlaw.com, rgoe@goeforlaw.com;mforsythe@goeforlaw.com
- Eric D Goldberg      egoldberg@stutman.com
- Richard H Golubow      rgolubow@winthropcouchot.com, pj@winthropcouchot.com
- Michael J Gomez      mgomez@frandzel.com, efiling@frandzel.com;sking@frandzel.com
- Kelly C Griffith      bkemail@harrisbeach.com
- Matthew Grimshaw      mgrimshaw@rutan.com

- Kavita Gupta     kgupta@winthropcouchot.com
- Asa S Hami     ahami@morganlewis.com
- Michael J Hauser     michael.hauser@usdoj.gov
- D Edward Hays     ehays@marshackhays.com
- Michael C Heinrichs     mheinrichs@omm.com
- Harry D. Hochman     hhochman@pszjlaw.com, hhochman@pszjlaw.com
- Jonathan M Hoff     jonathan.hoff@cwt.com
- Nancy Hotchkiss     nhotchkiss@trainorfairbrook.com
- Michelle Hribar     mhribar@rutan.com
- John J Immordino     john.immordino@wilsonelser.com, raquel.burgess@wilsonelser.com
- Lawrence A Jacobson     laj@cohenandjacobson.com
- Michael J Joyce     mjoyce@crosslaw.com
- Stephen M Judson     sjudson@fablaw.com
- Kaleb L Judy     ecf@kleinlaw.com, kjudy@kleinlaw.com
- Steven J Kahn     skahn@pszyjw.com
- Sheri Kanesaka     sheri.kanesaka@bryancave.com
- David I Katzen     katzen@ksfirm.com
- Christopher W Keegan     ckeegan@kirkland.com,
  gdupre@kirkland.com;alevin@kirkland.com
- Payam Khodadadi     pkhodadadi@winthropcouchot.com, pj@winthropcouchot.com
- Irene L Kiet     ikiet@hkclaw.com
- Claude F Kolm     claude.kolm@acgov.org
- Mark J Krone     mk@amclaw.com, crs@amclaw.com;amc@amclaw.com
- David B Lally     davidlallylaw@gmail.com
- Leib M Lerner     leib.lerner@alston.com
- Peter W Lianides     plianides@winthropcouchot.com, pj@winthropcouchot.com
- Charles Liu     cliu@winthropcouchot.com
- Kerri A Lyman     klyman@irell.com
- Mariam S Marshall     mmarshall@marshallramoslaw.com
- Robert C Martinez     rmartinez@mclex.com
- Michael D May     mdmayesq@verizon.net
- Hutchison B Meltzer     hmeltzer@wgllp.com
- Krikor J Meshefejian     kjm@lnbrb.com
- Joel S. Miliband     jmiliband@rusmiliband.com
- James M Miller     jmiller@millerbarondess.com,
  vgunderson@millerbarondess.com;smiller@millerbarondess.com;mpritikin@millerbarond
  ess.com
- Louis R Miller     smiller@millerbarondess.com
- Craig Millet     cmillet@gibsondunn.com,
  pcrawford@gibsondunn.com;cmillet@gibsondunn.com
- Randall P Mroczynski     randym@cookseylaw.com
- Mike D Neue     mneue@thelobelfirm.com,
  jmattiace@thelobelfirm.com;pnelson@thelobelfirm.com
- Robert Nida     Rnida@castlelawoffice.com
- Henry H Oh     henry.oh@dlapiper.com, janet.curley@dlapiper.com
- Sean A Okeefe     sokeefe@okeefelc.com
- Scott H Olson     solson@seyfarth.com
- Robert B Orgel     rorgel@pszjlaw.com, rorgel@pszjlaw.com

29
- Malhar S Pagay    mpagay@pszjlaw.com, mpagay@pszjlaw.com
- Ernie Zachary Park    ernie.park@bewleylaw.com

30
- Daryl G Parker    dparker@pszjlaw.com
- Penelope Parmes    pparmes@rutan.com

31
- Robert J Pfister    rpfister@ktbslaw.com
- Ronald B Pierce    ronald.pierce@sdma.com

32
- Katherine C Piper    kpiper@steptoe.com, smcloughlin@steptoe.com
- Cassandra J Richey    cmartin@pprlaw.net

33
- Debra Riley    driley@allenmatkins.com
- James S Riley    tgarza@sierrafunds.com

34
- Todd C. Ringstad    becky@ringstadlaw.com
- R Grace Rodriguez    ecf@lorgr.com

35
- Martha E Romero    Romero@mromerolawfirm.com
- Ronald Rus    rrus@rusmiliband.com

36
- John P Schafer    jschafer@mandersonllp.com

37
- John E Schreiber    jschreiber@dl.com
- William D Schuster    bills@allieschuster.org

38
- Christopher P Simon    csimon@crosslaw.com
- Gerald N Sims    jerrys@psdslaw.com, bonniec@psdslaw.com

39
- Wendy W Smith    wendy@bindermalter.com

40
- Steven M Speier    Sspeier@Squarmilner.com, ca85@ecfcbis.com
- Steven M Speier (TR)    Sspeier@asrmanagement.com, ca85@ecfcbis.com

41
- Michael St James    ecf@stjames-law.com
- Michael K Sugar    msugar@irell.com

42
- Cathy Ta    cathy.ta@bbklaw.com,
  Arthur.Johnston@bbklaw.com;Kenneth.Burgess@bbklaw.com

43
- David A Tilem    davidtilem@tilemlaw.com,
  malissamurguia@tilemlaw.com;dianachau@tilemlaw.com;kmishigian@tilemlaw.com

44
- James E Till    jtill@thelobelfirm.com,
  jmattiace@thelobelfirm.com;pnelson@thelobelfirm.com

45
- United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov

46
- Carol G Unruh    cgunruh@sbcglobal.net

47
- Annie Verdries    verdries@lbbslaw.com
- Jason Wallach    jwallach@gladstonemichel.com

48
- Joshua D Wayser    , kim.johnson@kattenlaw.com

49
- Marc J Winthrop    mwinthrop@winthropcouchot.com, pj@winthropcouchot.com

50
- David M Wiseblood    dwiseblood@seyfarth.com
- Brett K Wiseman    bwiseman@aalaws.com

51
- Dean A Ziehl    dziehl@pszjlaw.com, dziehl@pszjlaw.com

52
- Marc A. Zimmerman    joshuasdaddy@att.net

1

2

3

4

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 660 Newport Center Drive, 4th Fl., Newport Beach, CA 92660.

A true and correct copy of the foregoing document described as:  REDLINED DISCLOSURE STATEMENT will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

I.  **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On August 8, 2011, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

☒  Service information continued on attached page

II.  **SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served)**:**
On _____, 2011, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐  Service information continued on attached page

III.  **SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on August 8, 2011, I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.

Robert Orgel:  Rorgel@pszjlaw.com
Richard Pachulaki:  rpachulski@pszjlaw.com
John W. Lucas: jlucas@pszjlaw.co,

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| August 8, 2011 | Gretchen Crumpacker | /s/ Gretchen Crumpacker |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

NEF SERVICE LIST

- Selia M Acevedo    sacevedo@millerbarondess.com, mpritikin@millerbarondess.com
- Joseph M Adams    jadams@sycr.com
- Raymond H Aver    ray@averlaw.com
- James C Bastian    jbastian@shbllp.com
- Thomas Scott Belden    sbelden@kleinlaw.com, ecf@kleinlaw.com
- John A Boyd    fednotice@tclaw.net
- Mark Bradshaw    mbradshaw@shbllp.com
- Gustavo E Bravo    gbravo@smaha.com
- Jeffrey W Broker    jbroker@brokerlaw.biz
- Brendt C Butler    bbutler@mandersonllp.com
- Andrew W Caine    acaine@pszyjw.com
- Carollynn Callari    ccallari@venable.com
- Cathrine M Castaldi    ccastaldi@rusmiliband.com
- Tara Castro Narayanan    tara.narayanan@msrlegal.com, lisa.king@msrlegal.com
- Dan E Chambers    dchambers@jmbm.com
- Shirley Cho    scho@pszjlaw.com
- Vonn Christenson    vrc@paynefears.com
- Brendan P Collins    bpcollins@bhfs.com
- Vincent M Coscino    vcoscino@allenmatkins.com, emurdoch@allenmatkins.com
- Paul J Couchot    pcouchot@winthropcouchot.com,
  pj@winthropcouchot.com;gcrumpacker@winthropcouchot.com
- Jonathan S Dabbieri    dabbieri@sullivan.com,
  hill@sullivanhill.com;mcallister@sullivanhill.com;stein@sullivanhill.com;vidovich@sullivanhill.com
- Ana Damonte    ana.damonte@pillsburylaw.com
- Vanessa S Davila    vsd@amclaw.com
- Melissa Davis    mdavis@shbllp.com
- Daniel Denny    ddenny@gibsondunn.com
- Caroline Djang    crd@jmbm.com
- Donald T Dunning    ddunning@dunningLaw.com
- Meredith R Edelman    meredith.edelman@dlapiper.com
- Joseph A Eisenberg    jae@jmbm.com
- Lei Lei Wang Ekvall    lekvall@wgllp.com
- Richard W Esterkin    resterkin@morganlewis.com
- Marc C Forsythe    kmurphy@goeforlaw.com
- Alan J Friedman    afriedman@irell.com
- Steven M Garber    steve@smgarberlaw.com
- Christian J Gascou    cgascou@gascouhopkins.com
- Barry S Glaser    bglaser@swjlaw.com
- Robert P Goe    kmurphy@goeforlaw.com, rgoe@goeforlaw.com;mforsythe@goeforlaw.com
- Eric D Goldberg    egoldberg@stutman.com
- Richard H Golubow    rgolubow@winthropcouchot.com, pj@winthropcouchot.com
- Michael J Gomez    mgomez@frandzel.com, efiling@frandzel.com;sking@frandzel.com
- Kelly C Griffith    bkemail@harrisbeach.com
- Matthew Grimshaw    mgrimshaw@rutan.com
- Kavita Gupta    kgupta@winthropcouchot.com
- Asa S Hami    ahami@morganlewis.com
- Michael J Hauser    michael.hauser@usdoj.gov
- D Edward Hays    ehays@marshackhays.com
- Michael C Heinrichs    mheinrichs@omm.com
- Harry D. Hochman    hhochman@pszjlaw.com, hhochman@pszjlaw.com
- Jonathan M Hoff    jonathan.hoff@cwt.com
- Nancy Hotchkiss    nhotchkiss@trainorfairbrook.com
- Michelle Hribar    mhribar@rutan.com

- John J Immordino    john.immordino@wilsonelser.com, raquel.burgess@wilsonelser.com
- Lawrence A Jacobson    laj@cohenandjacobson.com
- Michael J Joyce    mjoyce@crosslaw.com
- Stephen M Judson    sjudson@fablaw.com
- Kaleb L Judy    ecf@kleinlaw.com, kjudy@kleinlaw.com
- Steven J Kahn    skahn@pszyjw.com
- Sheri Kanesaka    sheri.kanesaka@bryancave.com
- David I Katzen    katzen@ksfirm.com
- Christopher W Keegan    ckeegan@kirkland.com, gdupre@kirkland.com;alevin@kirkland.com
- Payam Khodadadi    pkhodadadi@winthropcouchot.com, pj@winthropcouchot.com
- Irene L Kiet    ikiet@hkclaw.com
- Claude F Kolm    claude.kolm@acgov.org
- Mark J Krone    mk@amclaw.com, crs@amclaw.com;amc@amclaw.com
- David B Lally    davidlallylaw@gmail.com
- Leib M Lerner    leib.lerner@alston.com
- Peter W Lianides    plianides@winthropcouchot.com, pj@winthropcouchot.com
- Charles Liu    cliu@winthropcouchot.com
- Kerri A Lyman    klyman@irell.com
- Mariam S Marshall    mmarshall@marshallramoslaw.com
- Robert C Martinez    rmartinez@mclex.com
- Michael D May    mdmayesq@verizon.net
- Hutchison B Meltzer    hmeltzer@wgllp.com
- Krikor J Meshefejian    kjm@lnbrb.com
- Joel S. Miliband    jmiliband@rusmiliband.com
- James M Miller    jmiller@millerbarondess.com,
  vgunderson@millerbarondess.com;smiller@millerbarondess.com;mpritikin@millerbarondess.com
- Louis R Miller    smiller@millerbarondess.com
- Craig Millet    cmillet@gibsondunn.com, pcrawford@gibsondunn.com;cmillet@gibsondunn.com
- Randall P Mroczynski    randym@cookseylaw.com
- Mike D Neue    mneue@thelobelfirm.com,
  jmattiace@thelobelfirm.com;pnelson@thelobelfirm.com
- Robert Nida    Rnida@castlelawoffice.com
- Henry H Oh    henry.oh@dlapiper.com, janet.curley@dlapiper.com
- Sean A Okeefe    sokeefe@okeefelc.com
- Scott H Olson    solson@seyfarth.com
- Robert B Orgel    rorgel@pszjlaw.com, rorgel@pszjlaw.com
- Malhar S Pagay    mpagay@pszjlaw.com, mpagay@pszjlaw.com
- Ernie Zachary Park    ernie.park@bewleylaw.com
- Daryl G Parker    dparker@pszjlaw.com
- Penelope Parmes    pparmes@rutan.com
- Robert J Pfister    rpfister@ktbslaw.com
- Ronald B Pierce    ronald.pierce@sdma.com
- Katherine C Piper    kpiper@steptoe.com, smcloughlin@steptoe.com
- Cassandra J Richey    cmartin@pprlaw.net
- Debra Riley    driley@allenmatkins.com
- James S Riley    tgarza@sierrafunds.com
- Todd C. Ringstad    becky@ringstadlaw.com
- R Grace Rodriguez    ecf@lorgr.com
- Martha E Romero    Romero@mromerolawfirm.com
- Ronald Rus    rrus@rusmiliband.com
- John P Schafer    jschafer@mandersonllp.com
- John E Schreiber    jschreiber@dl.com
- William D Schuster    bills@allieschuster.org
- Christopher P Simon    csimon@crosslaw.com
- Gerald N Sims    jerrys@psdslaw.com, bonniec@psdslaw.com

- Wendy W Smith    wendy@bindermalter.com
- Steven M Speier    Sspeier@Squarmilner.com, ca85@ecfcbis.com
- Steven M Speier (TR)    Sspeier@asrmanagement.com, ca85@ecfcbis.com
- Michael St James    ecf@stjames-law.com
- Michael K Sugar    msugar@irell.com
- Cathy Ta    cathy.ta@bbklaw.com, Arthur.Johnston@bbklaw.com;Kenneth.Burgess@bbklaw.com
- David A Tilem    davidtilem@tilemlaw.com, malissamurguia@tilemlaw.com;dianachau@tilemlaw.com;kmishigian@tilemlaw.com
- James E Till    jtill@thelobelfirm.com, jmattiace@thelobelfirm.com;pnelson@thelobelfirm.com
- United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov
- Carol G Unruh    cgunruh@sbcglobal.net
- Annie Verdries    verdries@lbbslaw.com
- Jason Wallach    jwallach@gladstonemichel.com
- Joshua D Wayser    , kim.johnson@kattenlaw.com
- Benjamin M Weiss    bweiss@lansingcompanies.com
- Marc J Winthrop    mwinthrop@winthropcouchot.com, pj@winthropcouchot.com
- David M Wiseblood    dwiseblood@seyfarth.com
- Brett K Wiseman    bwiseman@aalaws.com
- Dean A Ziehl    dziehl@pszjlaw.com, dziehl@pszjlaw.com
- Marc A. Zimmerman    joshuasdaddy@att.net