| | |
|---|---|
| Attorney or Party Name, Address, Telephone & FAX Numbers, and California State Bar Number | FOR COURT USE ONLY |
| D. EDWARD HAYS, #162507 / CHARLES LIU, #190513<br>ehays@marshackhays.com / cliu@marshackhays.com<br>MARSHACK HAYS LLP<br>870 Roosevelt Avenue<br>Irvine, CA 92620<br>(949) 333-7777 / (949) 333-7778 - Fax<br><br>☐ Individual appearing without counsel<br>☒ Attorney for: VILLA SAN CLEMENTE, LLC | |

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| In re<br>  PALMDALE HILLS PROPERTY, LLC, and Its Related Debtors | CHAPTER: 11 |
| | CASE NO.: 8:08-bk-17206-ES |
| Debtor(s). | DATE:   9/15/11<br>TIME:   10:30 a.m.<br>CTRM:   5A<br>FLOOR: |

## NOTICE OF MOTION AND MOTION FOR RELIEF FROM THE AUTOMATIC STAY
### UNDER 11 U.S.C. § 362 (with supporting declarations)
### (MOVANT:  VILLA SAN CLEMENTE, LLC                )
### (Personal Property)

1. NOTICE IS HEREBY GIVEN to the Debtor(s) and Trustee (if any)("Responding Parties"), their attorneys (if any), and other interested parties that on the above date and time and in the indicated courtroom, Movant in the above-captioned matter will move this Court for an Order granting relief from the automatic stay as to Debtor(s) and Debtor's(s') bankruptcy estate on the grounds set forth in the attached Motion.

2. **Hearing Location:** ☐ **255 East Temple Street, Los Angeles**     ☒ **411 West Fourth Street, Santa Ana**
   ☐ **21041 Burbank Boulevard, Woodland Hills**     ☐ **1415 State Street, Santa Barbara**
   ☐ **3420 Twelfth Street, Riverside**

3. a. ☒ This Motion is being heard on REGULAR NOTICE pursuant to Local Bankruptcy Rule 9013-1. If you wish to oppose this Motion, you must file a written response to this Motion with the Bankruptcy Court and serve a copy of it upon the Movant's attorney (or upon Movant, if the Motion was filed by an unrepresented individual) at the address set forth above no less than 14 days before the above hearing and appear at the hearing of this Motion.

   b. ☐ This Motion is being heard on SHORTENED TIME. If you wish to oppose this Motion, you must appear at the hearing. Any written response or evidence must be filed and served:

      ☐ at the hearing     ☐ at least _____ court days before the hearing.

   (1) ☐ A Motion for Order Shortening Time was not required (according to the calendaring procedures of the assigned judge).

   (2) ☐ A Motion for Order Shortening Time was filed per Local Bankruptcy Rule 9075-1(b) and was granted by the Court.

   (3) ☐ A Motion for Order Shortening Time has been filed and remains pending. Once the Court has ruled on that Motion, you will be served with another notice or an order that will specify the date, time and place of the hearing on the attached Motion and the deadline for filing and serving a written opposition to the Motion.

4. You may contact the Bankruptcy Clerk's Office to obtain a copy of an approved court form for use in preparing your response (Optional Court Form F 4001-1M.RES), or you may prepare your response using the format required by Local Bankruptcy Rule 9004-1 and the Court Manual

(Continued on next page)

This form is mandatory by Order of the United States Bankruptcy Court for the Central District of California.

Motion for Relief from Stay (Personal Property) - *Page 2 of* __17__      **F 4001-1M.PP**

| In re                                           (SHORT TITLE) | CHAPTER:   11 |
|---|---|
| PALMDALE HILLS PROPERTY, LLC, and Its Related Debtors                    Debtor(s). | CASE NO.:  8:08-bk-17206-ES |

5.  If you fail to file a written response to the Motion or fail to appear at the hearing, the Court may treat such failure as a waiver of your right to oppose the Motion and may grant the requested relief.

Dated: August 25, 2011

MARSHACK HAYS LLP
_____
*Print Law Firm Name (if applicable)*

CHARLES LIU
_____
*Print Name of Individual Movant or Attorney for Movant*

*/s/ Charles Liu*
_____
*Signature of Individual Movant or Attorney for Movant*

---

This form is mandatory by Order of the United States Bankruptcy Court for the Central District of California.

*December 2009*                                                                **F 4001-1M.PP**

| In re                (SHORT TITLE) | CHAPTER:   11 |
|---|---|
| PALMDALE HILLS PROPERTY, LLC, and Its Related Debtors        Debtor(s). | CASE NO.: 8:08-bk-17206-ES |

# MOTION FOR RELIEF FROM STAY
## (MOVANT: VILLA SAN CLEMENTE, LLC                    )

1. **The Property at Issue:** Movant moves for relief from the automatic stay with respect to the following personal property (the "Property"):

   ☐ Vehicle *(describe year, manufacturer, type, and model)*:

      *Vehicle Identification Number:*
      *Location of vehicle (if known):*

   ☐ Equipment *(describe manufacturer, type, and characteristics)*:

      *Serial number(s):*
      *Location (if known):*

   ☒ Other Personal Property *(describe type, identifying information, and location)*:
   Chicago Title Insurance Company Escrow Account Number 6016409.

2. **Case History:**
   a. ☒ A voluntary  ☐ An involuntary   petition under Chapter   ☐ 7  ☒ 11  ☐ 12  ☐ 13
      was filed on *(specify date)*: 11/12/08
   b. ☐ An Order of Conversion to Chapter   ☐ 7  ☐ 11  ☐ 12  ☐ 13
      was entered on *(specify date)*:
   c. ☐ Plan was confirmed on *(specify date)*:
   d. ☐ Other bankruptcy cases affecting this Property have been pending within the past two years.  See attached Declaration.

3. **Grounds for Relief from Stay:**
   a. ☒ Pursuant to 11 U.S.C. § 362(d)(1), cause exists to grant Movant the requested relief from stay as follows:
      (1) ☐ Movant's interest in the Property is not adequately protected.
         (a) ☐ Movant's interest in the collateral is not protected by an adequate equity cushion.
         (b) ☐ The fair market value of the Property is declining and payments are not being made to Movant sufficient to protect Movant's interest against that decline.
         (c) ☐ No proof of insurance re Movant's collateral has been provided to Movant, despite borrower(s)'s obligation to insure the collateral under the terms of Movant's contract with Debtor(s).
         (d) ☐ Payments have not been made as required by an Adequate Protection Order previously granted in this case.
      (2) ☐ The bankruptcy case was filed in bad faith to delay, hinder or defraud Movant.
         (a) ☐ Movant is the only creditor or one of very few creditors listed on the master mailing matrix.
         (b) ☐ The Property was transferred to Debtor(s) either just before the bankruptcy filing or since the filing.
         (c) ☐ Non-individual entity was created just prior to bankruptcy filing for the sole purpose of filing bankruptcy.
         (d) ☐ Other bankruptcy cases have been filed asserting an interest in the same Property.
         (e) ☐ The Debtor(s) filed what is commonly referred to as a "face sheet" filing of only a few pages consisting of the Petition and a few other documents.  No Schedules or Statement of Affairs (or Chapter 13 Plan, if appropriate) has been filed.

*(Continued on next page)*

---

This form is mandatory by Order of the United States Bankruptcy Court for the Central District of California.

*December 2009*                                                    **F 4001-1M.PP**

Motion for Relief from Stay (Personal Property) - *Page 4 of* __17__    **F 4001-1M.PP**

| In re                               (SHORT TITLE)  |                        | CHAPTER: 11 |
|---|---|---|
| PALMDALE HILLS PROPERTY, LLC, and Its Related Debtors | Debtor(s). | CASE NO.: 8:08-bk-17206-ES |

(3) ☐ *(Chapter 12 or 13 cases only)*

    (a) ☐ Postconfirmation plan payments have not been made to the standing trustee.

    (b) ☐ Postconfirmation payments required by the confirmed plan have not been made to Movant.

(4) ☐ The lease has been rejected or deemed rejected by operation of law.

(5) ☒ For other cause for relief from stay, see attached continuation page.

    b. ☐ Pursuant to 11 U.S.C. § 362(d)(2)(A), Debtor(s) has/have no equity in the Property; and pursuant to § 362(d)(2)(B), the Property is not necessary for an effective reorganization.

4. ☐ Movant also seeks annulment of the stay so that the filing of the bankruptcy petition does not affect postpetition acts, as specified in the attached Declaration(s).

5. **Evidence in Support of Motion:** *(Important Note: Declaration(s) in support of the Motion MUST be attached hereto.)*

    a. ☐ Movant submits the attached Declaration(s) on the Court's approved forms (if applicable) to provide evidence in support of this Motion pursuant to Local Bankruptcy Rules.

    b. ☒ Movant submits the attached supplemental Declaration(s) under penalty of perjury, to provide additional admissible evidence in support of this Motion.

    c. ☐ Movant requests that the Court consider as admissions the statements made by Debtor(s) under penalty of perjury concerning Movant's claims and the Property set forth in Debtor's(s') Schedules. Authenticated copies of the relevant portions of the Schedules are attached as Exhibit _____.

    d. ☐ Other evidence *(specify)*:

6. ☒ **An optional Memorandum of Points and Authorities is attached to this Motion.**

**WHEREFORE, Movant prays that this Court issue an Order terminating or modifying the stay and granting the following *(specify forms of relief requested)*:**

1. ☐ Relief from the stay allowing Movant (and any successors or assigns) to proceed under applicable non-bankruptcy law to enforce its remedies to repossess and sell the Property.

2. ☐ Annulment of the stay so that the filing of the bankruptcy petition does not affect postpetition acts, as specified in the attached Declaration(s).

3. Additional provisions requested:

    a. ☐ That the Order be binding and effective despite any conversion of this bankruptcy case to a case under any other chapter of Title 11 of the United States Code.

    b. ☐ That the 14-day stay prescribed by Bankruptcy Rule 4001(a)(3) be waived.

    c. ☐ That Extraordinary Relief be granted as set forth in the Attachment *(attach Optional Court Form F 4001-1M.ER)*.

    d. ☒ For other relief requested, see attached continuation page.

*(Continued on next page)*

---

This form is mandatory by Order of the United States Bankruptcy Court for the Central District of California.

*December 2009*                                                                 **F 4001-1M.PP**

Motion for Relief from Stay (Personal Property) - *Page 5 of* __17__    **F 4001-1M.PP**

| In re                          (SHORT TITLE) | CHAPTER: 11 |
|---|---|
| PALMDALE HILLS PROPERTY, LLC, and Its Related Debtors | |
| Debtor(s). | CASE NO.:    8:08-bk-17206-ES |

4.  If relief from stay is not granted, Movant respectfully requests the Court to order adequate protection.


Dated:  August 25, 2011

Respectfully submitted,

VILLA SAN CLEMENTE, LLC
_____
*Movant Name*

MARSHACK HAYS LLP
_____
*Firm Name of Attorney for Movant (if applicable)*

By:    */s/ Charles Liu*
_____
*Signature*

Name:    CHARLES LIU
_____
*Typed Name of Individual Movant or Attorney for Movant*

---

This form is mandatory by Order of the United States Bankruptcy Court for the Central District of California.

*December 2009*                                                                 **F 4001-1M.PP**

1  D. EDWARD HAYS, #162507
   ehays@marshackhays.com
2  CHARLES LIU, #190513
   cliu@marshackhays.com
3  **MARSHACK HAYS LLP**
   870 Roosevelt Avenue
4  Irvine, California 92620-5749
   Telephone:  (949) 333-7777
5  Facsimile:  (949) 333-7778

6  Attorneys for Movant,
   VILLA SAN CLEMENTE, LLC

7

8              UNITED STATES BANKRUPTCY COURT

9          CENTRAL DISTRICT OF CALIFORNIA - SANTA ANA DIVISION

10

11 | In re: | Case No.: 8:08-bk-17206-ES
   PALMDALE HILLS PROPERTY, LLC, and Its | Jointly Administered With Case Nos.:
12 Related Debtors, | 8:08-bk-17209-ES; 8:08-bk-17140-ES;
                  Jointly Administered Debtors and | 8:08-bk-17224-ES; 8:08-bk-17242-ES;
13               Debtors-In-Possession. | 8:08-bk-17225-ES; 8:08-bk-17245-ES;
                                          | 8:08-bk-17227-ES; 8:08-bk-17246-ES;
14 Affects: | 8:08-bk-17230-ES; 8:08-bk-17231-ES;
   ☐ All Debtors | 8:08-bk-17236-ES; 8:08-bk-17248-ES;
15 ☐ Palmdale Hills Property, LLC | 8:08-bk-17249-ES; 8:08-bk-17573-ES;
   ☐ SunCal Beaumont Heights, LLC | 8:08-bk-17574-ES; 8:08-bk-17575-ES;
16 ☐ SCC/Palmdale, LLC | 8:08-bk-17404-ES; 8:08-bk-17407-ES;
   ☐ SunCal Johannson Ranch, LLC | 8:08-bk-17408-ES; 8:08-bk-17409-ES;
17 ☐ SunCal Summit Valley, LLC | 8:08-bk-17458-ES; 8:08-bk-17465-ES;
   ☐ SunCal Emerald Meadows, LLC | 8:08-bk-17470-ES; 8:08-bk-17472-ES;
18 ☐ SunCal Bickford Ranch, LLC | and 8:08-bk-17588-ES
   ☐ Action Estates, LLC |
19 ☐ Seven Brothers, LLC |
   ☐ SJD Partners, Ltd. | Chapter 11
20 ☐ SJD Development Corp. |
   ☐ Kirby Estates, LLC | MEMORANDUM OF POINTS AND
21 ☐ SunCal Communities I, LLC | AUTHORITIES IN SUPPORT OF
   ☐ SunCal Communitities III, LLC | MOTION FOR TO MODIFY STAY TO
22 ☐ SCC Communities, LLC | ALLOW MOVANT TO  MAKE ELECTION
   ☐ North Orange Del Rio Land, LLC | TO TAKE OVER CONSTRUCTION
23 ☐ Tesoro SF, LLC | ACTIVITIES; MEMORANDUM OF POINTS
   ☐ LB-1 SunCal Oak Valley, LLC | AND AUTHORITIES; DECLARATION OF
24 ☐ SunCal Heartland, LLC | DAVID SANNER IN SUPPORT
   ☐ LB-L-SunCal Northlake, LLC |
25 ☒ SunCal Marblehead, LLC | Date:      September 15, 2011
   ☐ SunCal Century City, LLC | Time:      10:30 a.m.
26 ☐ SunCal PSV, LLC | Ctrm:      5A
   ☐ Delta Coves Venture, LLC |
27 ☐ SunCal Torrance, LLC |
   ☐ SunCal Oak Knoll, LLC |

28

                                    6

1  TO THE HONORABLE ERITHE A. SMITH UNITED STATES BANKRUPTCY COURT

2  JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE AND ALL INTERESTED

3  PARTIES:

**MEMORANDUM OF POINTS AND AUTHORITIES**

4

5  1.    INTRODUCTION

6          SunCal Marblehead, LLC ("Debtor" or "SunCal") is the master developer of the

7  Marblehead Coastal Development consisting of 248 acres of raw land in the City of San Clemente.

8  Pursuant to written agreement, Movant, Villa San Clemente, LLC ("Movant" or "VSC") purchased

9  59 acres of the Marblehead Coastal Property (the "Commercial Property") from SunCal in 2006 for

10  a purchase price of $20,500,000.  The agreement obligates SunCal to timely construct certain onsite

11  and offsite improvements ("Development Work") for the benefit of VSC.  In accordance with the

12  agreement, a portion of the purchase price was deposited into an escrow account to be used to fund

13  construction of the Development Work. If SunCal fails to timely complete the Development Work,

14  VSC is entitled to make an election to assume construction of any item of the Development Work

15  after notice to SunCal.

16          VSC wishes to begin construction of its shopping center, restaurants and other

17  improvements on the Commercial Property but certain items of unfinished Development Work either

18  must be completed before VSC can begin its construction or constitute critical path items that must

19  be constructed now.  The City of San Clemente has also stated that the unfinished Development

20  Work also constitutes a potential physical threat to public health and safety.

21          Therefore, VSC seeks entry of an order modifying the automatic stay pursuant to 11

22  U.S.C. § 362(d) to permit VSC to give notice to SunCal pursuant to the Agreement that the

23  Development Work is not proceeding so as to be timely completed and thereafter give any notices of

24  VSC's election to take over construction of one or more items of the Development Work.

25          Modification of the automatic stay should be granted because "cause" exists to

26  modify the stay under 11 U.S.C. § 362(d)(1): the Debtor has no beneficial interest in the Commercial

27  Property, has ceased all Development Work, has no ability to complete the Development Work, and

28  based on its recently filed plan of reorganization, has no intention of completing any part of its

1  Marblehead Development, including work related to the Commercial Property.  Additionally, any

2  further delay in completion of certain items of the Development Work will delay VSC's construction

3  thereby causing a threat to public safety and severe financial hardship to VSC.

4  2.    <u>BACKGROUND FACTS</u>

5          On June 29, 1999, VSC and SunCal's predecessor-in-interest MT NO. 1, LLC entered

6  into an Amended and Restated Purchase and Sale Agreement and Joint Escrow Instructions (the

7  "Original Agreement") whereby VSC agreed to purchase certain unimproved real property in the

8  City of San Clemente for the purpose of building an outlet shopping center with retail stores,

9  theaters, restaurants, and a hotel (the "Commercial Property") as part of the Marblehead Coastal

10  Project in San Clemente, California.  The Original Agreement was subsequently amended and

11  SunCal assumed the obligations of its predecessor.  True and correct copies of the Original

12  Agreement, First Amendment, Fourth Amendment, and Sixth Amendment are collectively attached

13  to the Declaration of David Sanner as Exhibit 1 and are referred to as the "Agreement." On May 11,

14  2006, escrow closed and VSC acquired title to the Commercial Property from SunCal for a purchase

15  price of $20,500,000 (see Declaration of David L. Sanner, p. 1, ¶ 2).

16          Pursuant to the terms of the Agreement, SunCal agreed to timely complete certain

17  Development Work as described in the Fourth Amendment at p. 9-10 § 11.1. The Development

18  Work includes, but is not limited to, i) rough grading of VSC's Commercial Property, ii) installation

19  of utility mains (gas, electric, telephone, cable, etc.) to the boundary of VSC's property and

20  relocation of utility lines on VSC's property. The parties agreed that $9 million of the purchase price

21  paid by VSC would be deposited into a "Cash Withhold Account" for the purpose of providing a

22  funding source to complete the Development Work.  In May 2006, $9 million was deposited with

23  Chicago Title Insurance Company as Disbursing Agent, creating account No. 6016409 (see Sanner

24  Declar., p. 1-2, ¶'s 3-4).

25  / / /

26  / / /

27  / / /

28  / / /

8

Between May 2006 and March 2008 and pursuant to the procedure described in Section 3.3.2 of the Agreement[1], SunCal submitted a total of ten draw requests on the Cash Withhold Account. The disbursing agent would then disburse the amounts requested directly to SunCal's contractors and subcontractors to pay for Development Work leaving a current balance of approximately $1.2 million in the Cash Withhold Account at Chicago Title (see Sanner Declar., p. 2, ¶ 5).

All Development Work was to be completed by SunCal no later than August 11, 2007.  In September 2007, SunCal ceased performing the on-site Development Work for VSC due to its financial difficulties.  By SunCal's own estimate, the Development Work is 68.23% complete and the cost of completion was $5,508,851.52 as of March 19, 2008 (see Sanner Declar., p. 2, ¶ 6 and SunCal's 10th Draw Request attached thereto as Exhibit 2).

Prior to the petition date of November 12, 2008, VSC commenced an action in the Superior Court for the State of California, County of Orange seeking to recover, *inter alia*, damages resulting from the substantial delays caused by SunCal's non-performance (the "State Court Action").  Before the State Court Action could proceed to trial, the Debtor filed a voluntary petition under Chapter 11 of Title 11 of the United States Code.  Steven M. Speier is the duly appointed and acting Chapter 11 Trustee (the "Trustee").

Movant previously filed a motion seeking to compel the Trustee to assume or reject the Agreement because performance of work remains due by both parties.  The Debtor is required to complete construction before the funds can be released for payment.  After a contested hearing, the

---

[1] Section 3.3.2 of the Agreement provides in part: The Cash Withhold shall be disbursed monthly by the Disbursing Agent directly to the applicable contractors or subcontractors, to pay the actual cost of the Development Work as incurred in accordance with the Completion Estimate by Seller's written demand for such funds to Disbursing Agent within ten (10) days following the end of each month, with a copy to Buyer, which demands shall include copies of the invoices/billings received during the previous month for which payment is sought and the amounts due ("Monthly Draw Request") …Within two (2) business days following its receipt of each Monthly Draw Request from Seller, the Disbursing Agent shall disburse the amount requested to Seller's contractors and subcontractors. Each Monthly Draw Request shall pay for the Development Work in accordance with the line items on the Completion Estimate; … Immediately after Seller's completion of the Development Work under Section 11.1 hereof, the entire remaining balance of the Cash Withhold, if any, and the interest earned thereon, shall be disbursed to Seller upon the Disbursing Agents receipt of Seller's written request for same, which request has also been approved by Buyer in writing.

1    Court denied the motion without prejudice on the grounds that no notice of VSC's intent to assume

2    control of the project with the remaining costs to be paid from the Cash Withhold Account.

3    3.    LEGAL AUTHORITIES

4         A.    Cause Exists to Modify the Stay

5              While the filing of a bankruptcy petition creates an automatic stay as to the debtor,

6    subsection 362(d)(1) of the Bankruptcy Code provides, in relevant part, that "the court shall grant

7    relief from the stay ... for cause, including the lack of adequate protection of an interest in property

8    of such party in interest." 11 U.S.C. § 362(d)(l).  As a general matter, there is no clear definition of

9    what constitutes "cause" within the meaning of section 362(d)(l) of the Bankruptcy Code, so relief

10   from stay on this basis is discretionary and must be determined on a case-by-case basis. See

11   *MacDonald v. MacDonald (In re MacDonald)*, 755 F.2d 715, 717 (9th Cir. 1985).  It is well

12   established, however, that subsection 362(d)(1) is broad and is not limited to a lack of adequate

13   protection.  3 *Collier on Bankruptcy* §362.07[3][a] (l5th ed. rev. 2002).

14              SunCal does not have the intent or ability to complete the Development Work that is

15   necessary for VSC's development of its commercial project. Therefore, VSC seeks entry of an order

16   modifying the automatic stay to allow VSC to give notice to Debtor that the Development Work is

17   not timely proceeding then give further notice of VSC's election to take over construction of one or

18   more items of the Development Work pursuant to the notice provisions contained in Section

19   11.1.3(B) of the Agreement.[2]

20              VSC is constructing a 400,000 square-foot manufacturer's outlet shopping center and

21   additional improvements on its Commercial Property. VSC's civil documents are 100% approved

22

23   _____

     [2] Section 11.1.3(B) If Buyer determines in its reasonable judgment and in good faith that the performance of the
     Development Work is not proceeding so as to be completed within the time limits set forth in 11.1.3(A) (it being

24   understood that time is of the essence), Buyer may give notice of such fact to Seller. If Seller does not present to Buyer
     reasonable evidence, within ten (10) days of receipt of such notice, either that the Development Work will be completed

25   as required or that an extension of a completion date therefor is permitted because of Force Majeure, Buyer shall have
     the right but not the obligation to assume control of the construction activities and upon such election Buyer agrees to

26   proceed to complete the same with all reasonable dispatch. Upon Buyer's election to assume the construction of any item
     of the Development Work, Buyer shall have the right to receive payment for the cost of same from the Cash Withhold

27   under the procedure described in Section 3.3.2 of the Original Agreement in the same fashion as Seller is to receive
     payment for Development Work. (emphasis added)

28

                                                    10

and a $53 million construction contract was awarded in April 2011 for Phase 1 construction consisting of 250,000 square feet.  Over 60% of the first phase available space has been leased or is in lease documentation. When completed VSC"s commercial development is expected to generate annual sales tax revenue in excess of $20 million with $2.25 million going to the City of San Clemente. (Sanner Decl., p. 2, ¶ 7) It is imperative that the three categories of Development Work (i.e., rough grading, dry utilities and relocation of AT&T fiber optic lines) be completed as soon as possible so that VSC can begin construction of its commercial development without further delay. (Sanner Decl, p. 3, ¶ 8)

Delays in completion of the Development Work have caused and will continue to cause severe financial and other hardships to VSC. VSC's "carrying costs" including property taxes and interest on its $30 million acquisition loan are over $210,000 per month. VSC has no income and must continuously borrow funds to pay for these carrying costs. In addition to financial hardship, VSC faces significant financial risks if there is further delay because a majority of the tenants who have signed leases are now entitled to exercise their cancellation rights due to the delay in construction and VSC's inability to deliver possession of the premises when promised. Additionally, VSC has been advised by the San Clemente Building Department that they are very reluctant to continue to extend VSC's Building Permit Applications without specific timeframes for resumption of the Development Work and the start of VSC's construction. A refusal by the City to extend will result in significant damages to VSC because the lengthy permit process will have to be started over again and newly enacted building code provisions will result in more expensive design and construction. (See Sanner decl., p. 3 – 4, ¶ 9)

Because SunCal asserts no beneficial interest in the Commercial Property, has ceased performing the Development Work and does not have the ability to complete the Development Work, VSC should be allowed to give notice of its intent to take over construction of certain items of the Development Work which will allow VSC to begin construction of its commercial development and avoid the continuing substantial damages and financial exposure it has as a result of SunCal's failure to complete the Development Work.

/ / /

11

4.    <u>CONCLUSION</u>

For all of the foregoing reasons, VSC respectfully requests that the Court enter an order modifying the automatic stay to permit VSC to elect to take over the Development Work, and for such other and further relief as the Court deems necessary and appropriate.

Respectfully submitted,

DATED:  August 25, 2011    **MARSHACK HAYS LLP**

By:    */s/ Charles Liu*
_____
D. EDWARD HAYS
CHARLES LIU
Attorneys for Movant
VILLA SAN CLEMENTE, LLC

12

1

## DECLARATION OF DAVID SANNER

2

3        I, DAVID SANNER, declare as follows:

4        1.     I am an individual over eighteen years of age and General Counsel to Villa

5 San Clemente, LLC ("VSC") in the above-entitled action.   The facts set forth herein are true of my

6 own personal knowledge, and if called upon to testify thereto, I could and would competently testify

7 thereto.

8

### VSC's ACQUISITION OF THE MARBLEHEAD COMMERCIAL SITE

9        2.     On June 29, 1999, VSC and SunCal's predecessor-in-interest MT NO. 1, LLC

10 entered into an Amended and Restated Purchase and Sale Agreement and Joint Escrow Instructions

11 (the "Original Agreement") whereby VSC agreed to purchase certain unimproved real property in

12 the City of San Clemente for the purpose of building an outlet shopping center with retail stores,

13 theaters, restaurants, and a hotel (the "Commercial Property") as part of the Marblehead Coastal

14 Project in San Clemente, California.  The Original Agreement was subsequently amended and

15 SunCal assumed the obligations of its predecessor.  True and correct copies of the Original

16 Agreement, First Amendment, Fourth Amendment, and Sixth Amendment are collectively attached

17 to the Declaration of David Sanner as Exhibit 1 and are referred to as the "Agreement." On May 11,

18 2006 and VSC acquired the Commercial Property from SunCal for a purchase price of $20.5 million.

19

### DEVELOPMENT WORK TO BE PERFORMED BY SUNCAL

20        3.     Section 11.1 of the Agreement (Fourth Amendment, p. 9) obligates SunCal to

21 timely commence, diligently perform and timely complete certain onsite and offsite improvements

22 (Development Work) for VSC and pay the governmentally-required fees and all other costs and

23 expenses to complete the Development Work. The Development Work includes, but is not limited

24 to, rough grading of VSC's Commercial Property, installation of utility mains (gas, electric,

25 telephone, cable, etc.) to the boundary of VSC's property and relocation of utility lines on VSC's

26 property. All Development Work was to be completed by SunCal no later than August 11, 2007.

27 / / /

28 / / /

<u>FUND CONTROL ACCOUNT AT CHICAGO TITLE</u>

4.      In order to provide a funding source to guarantee the completion of the Development Work to be performed by SunCal, the parties agreed that $9 million of the $20.5 million purchase price would be withheld from SunCal and deposited into a "Cash Withhold Account" (Agreement, see Exh. 1, p. 2, Section 3.3.2). Pursuant to the terms of the Agreement, VSC and SunCal employed Chicago Title Insurance Company as the Disbursing Agent. In May 2006, the funds ($9 million) were tendered to Chicago Title Insurance Company creating account number 6016409. SunCal is entitled to submit monthly draw requests to the Disbursing Agent pursuant to the disbursement procedures set forth in Section 3.3.2 of the Agreement. (See Points and Authorities, p. 4, footnote 1).

5.      Between May 2006 and March 2008, SunCal submitted a total of ten draw requests on the Cash Withhold Account totaling $7,931,564.09. SunCal's submittals would include copies of invoices/billings SunCal received from its contractors for Development Work completed on the Commercial Site along with certifications that the work being paid for had been completed pursuant to the plans and specifications for such work. The disbursing agent would then disburse the amounts requested directly to SunCal's contractors and subcontractors within two business days. 6.

6.      All Development Work was to be completed by SunCal no later than August 2007. In September 2007, SunCal ceased performing the onsite Development Work for VSC due to its financial difficulties. SunCal's tenth and last draw request was made on March 21, 2008, leaving a current balance of approximately $1.2 million in the Cash Withhold Account. A true copy of relevant portions of SunCal's tenth draw request is attached hereto as Exhibit 2. In its tenth draw request SunCal represents that the Development Work is now 68.23% complete and the remaining cost to complete the Development Work is $5,508,851.52.

<u>VSC'S COMMERCIAL DEVELOPMENT HAS BEEN DELAYED BY</u>
<u>SUNCAL'S FAILURE TO COMPLETE THE DEVELOPMENT WORK</u>

7.      VSC is constructing a 400,000 square-foot manufacturer's outlet shopping center and additional improvements on its Commercial Property. VSC's civil documents are 100% approved and a $53 million construction contract was awarded in April 2011 for Phase 1

1  construction consisting of 250,000 square feet.  Over 60% of the available space in Phase 1 has been

2  leased or is in lease documentation. When completed VSC"s commercial development is expected to

3  generate annual sales tax revenue in excess of $20 million with $2.25 million going to the City of

4  San Clemente.

5          8.    VSC intends to begin construction of Phase 1 in the very near future.

6  However, there are at least three items of Development Work that SunCal failed to complete and that

7  need to be finished as follows:

8          A.    Rough grading on the commercial site – Although building permits are

9                ready to be issued by the City of San Clemente for VSC's Phase 1 construction, the

10               rough grading on the Commercial Site needs to be completed and certified before

11               VSC's construction can start. The estimated cost to complete rough grading on the

12               Commercial Site is $400,000.

13         B.    Installation of dry utilities – The Development Work consisting of the

14               installation of utility mains (gas, electric, telephone, cable, etc.) to the boundary of

15               VSC's Commercial Property has not been completed. The estimated cost to complete

16               these items is $650,000. VSC is working with San Diego Gas and Electric and the

17               City of San Clemente on engineering plans for the dry utilities.

18         C.    Relocation of utility lines – Underground relocation of the AT&T fiber

19               optic lines along the east edge of VSC's Commercial Property must be completed

20               before rough grading and vertical construction can be accomplished. The cost of

21               finalizing the design for the relocation, preparing a construction phasing plan,

22               installing the required substructures and conduit is estimated to be $550,000. VSC is

23               currently working with AT&T engineers on finalizing the design for the relocation.

24  DELAYS IN COMPLETION OF THE DEVELOPMENT WORK

25  ARE CAUSING SEVERE FINANCIAL AND OTHER HARDSHIPS TO VSC

26         9.    Delays caused by SunCal's failure to timely complete the Development Work

27  have placed great financial hardships on VSC. VSC's "carrying costs" including property taxes and

28  interest on its $30 million acquisition loan are over $210,000 per month. VSC has no income and

15

must continuously borrow funds to pay for these carrying costs. It is imperative that the three categories of Development Work (i.e., rough grading, dry utilities and relocation of AT&T fiber optic lines) be completed as soon as possible so that VSC can begin construction of its commercial development without further delay. In addition to financial hardship, VSC faces significant financial risks if there is further delay because a majority of the tenants who have signed leases are now entitled to exercise their cancellation rights due to the delay in construction and VSC's inability to deliver possession of the premises when promised. Additionally, VSC has been advised by the San Clemente Building Department that they are very reluctant to continue to extend VSC's Building Permit Applications without specific timeframes for resumption of the Development Work and the start of VSC's construction. A refusal by the City to extend will result in significant damages to VSC because the lengthy permit process will have to be started over again and newly enacted building code provisions will result in more expensive design and construction.

10.     Tom Bonigut, Assistant City Engineer for the City of San Clemente has identified numerous physical threats to public health and safety which exist due to the unfinished rough grading of the Commercial Property. They include drainage and erosion safety issues, fire hazards and potential danger to site visitors. These threats to public health and safety can be substantially reduced or eliminated if VSC proceeds to complete the rough grading component of the Development Work. Additionally, the City is under severe budget constraints and every month that the Commercial Project is delayed due to the failure to complete rough grading and other Development Work results in losses of approximately $250,000 per month in tax revenue to the City of San Clemente.

11.     If the present motion for relief from stay is granted, VSC intends to give notice to SunCal in accordance with the notice procedures in the Agreement that the Development Work is not timely proceeding and that VSC is electing to assume construction of certain items of

/ / /

/ / /

/ / /

/ / /

16

1  the Development Work. It is VSC's intent to perform this Development Work at its earliest

2  opportunity so that construction of Phase 1 can begin.

3         I declare under penalty of perjury under the laws of the United States of America that

4  the foregoing is true and correct, and that this declaration is executed on August 25, 2011, at

5  Newport Beach, California.

6                                 */s/ David Sanner*

7                                DAVID SANNER

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

51457v1/1079-001

Exhibit "1"

## AMENDED AND RESTATED PURCHASE AND SALE
## AGREEMENT AND JOINT ESCROW INSTRUCTIONS

This **AMENDED AND RESTATED PURCHASE AND SALE AGREEMENT AND JOINT ESCROW INSTRUCTIONS** ("Agreement") dated ⟶June 29⟵, 1999, effective as of the 5th day of February, 1999 ("Effective Date"), is made by and between MT NO. 1, LLC, a California limited liability company ("Seller"), and VILLA SAN CLEMENTE, LLC, a California limited liability company ("Buyer"). Buyer and Seller are sometimes referred to herein collectively as the "Parties."

### RECITALS

**WHEREAS**, Seller is the owner of certain unimproved land comprising approximately two hundred fifty (250) acres, located in the City of San Clemente, County of Orange, State of California, legally described in **Exhibit "A"** attached hereto ("Marblehead Coastal Project").

**WHEREAS**, a portion of the Marblehead Coastal Project consists of approximately 74.529 gross acres of unimproved land containing approximately sixty (60) Net Usable acres, or Two Million Six Hundred Thirteen Thousand (2,613,600) Net Useable square feet ("Retail Site"), and is legally described as follows:

Parcel 1 of Lot Line Adjustment LL 98-103, recorded on December 16, 1998, as Instrument Number 19980869560 of the Official Records of Orange County, California.

The balance of the Marblehead Coastal Project (approximately one hundred seventy-five [175] gross acres) is hereinafter referred to as the "Residential Site."

**WHEREAS**, Seller, SDC Partners, Ltd., a California corporation ("SDC"), and Dayton Hudson Corporation, a Minnesota corporation ("Dayton") have entered into that certain written Purchase and Sale Agreement and Joint Escrow Instructions dated February 5, 1996 ("Prior Purchase Agreement") and in connection therewith, have opened an escrow at Chicago Title Company, 16969 Von Karman, Irvine, California  92606 ("Escrow Holder"); Escrow Number 006016409M23 ("Escrow").

**WHEREAS**, Dayton has withdrawn from the Prior Purchase Agreement pursuant to that certain written Termination Agreement and General Release dated June 16, 1999 executed by Seller and Dayton and consented to by SDC ("Dayton Termination Agreement"), the terms of which are incorporated herein by this reference.

**WHEREAS**, concurrently herewith, SDC has assigned all of its right, title and interest in and to the Retail Site, the Prior Purchase Agreement, and the Escrow to Buyer by written assignment dated as of February 5, 1999.

**WHEREAS**, Seller desires to sell the Retail Site to Buyer, and Buyer desires to purchase the Retail Site from Seller, on the terms and conditions set forth in this Agreement.

**NOW THEREFORE**, in consideration of the covenants and agreements contained herein, the Parties hereto agree as follows:

161857.7

-1-

## TERMS AND CONDITIONS

### 1. AMENDMENT AND COMPLETE RESTATEMENT OF PRIOR PURCHASE AGREEMENT

This Agreement amends, and completely restates the Prior Purchase Agreement in its entirety. From and after the Effective Date, the sale and purchase of the Retail Site by Seller and Buyer, as well as the Escrow shall be governed solely by this Agreement and the Prior Purchase Agreement shall be completely superceded hereby and of no further force or effect.

### 2. PURCHASE AND SALE

Seller agrees to sell the Retail Site to Buyer, and Buyer agrees to purchase the Retail Site from Seller, on the terms and conditions, and subject to the contingencies, set forth in this Agreement.

### 3. PURCHASE PRICE

3.1    Purchase Price. Subject to adjustment pursuant to Section 3.2 below, the total purchase price for the Retail Site shall be Twenty-Seven Million Four Hundred Forty-Two Thousand Eight Hundred And 00/100 Dollars ($27,442,800.00) plus Two Hundred Thousand And 00/100 Dollars ($200,000.00) for a total of Twenty-Seven Million Six Hundred Forty-Two Thousand Eight Hundred And 00/100 Dollars ($27,642,800.00) ("Purchase Price").

3.2    Adjustment of Purchase Price. If the Net Useable Area (defined and determined in accordance with Section 7.2 below) is more or less than Two Million Six Hundred Thirteen Thousand Six Hundred (2,613,600) square feet, then the Purchase Price shall be adjusted by multiplying such difference by the amount of Ten Dollars And Fifty Cents ($10.50) for each square foot that the Net Useable Area differs from 2,613,600 square feet and the product shall be added or subtracted from the Purchase Price set forth in Subsection 3.1 above so that the Purchase Price is based upon the product of $10.50 multiplied by the square footage of the Net Usable Area, plus Two Hundred Thousand And 00/100 Dollars ($200,000.00).

3.3    Terms of Payment.

3.3.1    Buyer shall deposit with Escrow Holder at least 24 hours prior to the close of Escrow, the entire Purchase Price which, subject to the Cash Withhold described in Subsection 3.3.2, below, shall be paid to Seller at the Closing (as defined in Section 12.2).

3.3.2    Buyer's and Seller's Completion Estimate: Cash Withhold. By no later than twenty (20) days prior to the Closing, Seller shall prepare, deliver to Buyer and deposit into Escrow a written estimate of the total cost to complete the Development Work required to be completed by Seller pursuant to Section 11.1 below ("Completion Estimate"). The Completion Estimate shall contain in reasonable detail (i) separate line items for each category of work required under Section 11.1 that has not then been completed by Seller, and (ii) a dollar estimate of the total cost to complete each such line item. If Buyer does not, within said ten (10) day period, object in writing to any particular line items, Seller's Completion Estimate as to those line items to which Buyer has not objected shall be deemed approved.    If Buyer objects to

Seller's estimate of the cost of any line items, Buyer shall also, within said ten (10) day period, state in writing the basis for Buyer's objection to specific line items and Buyer's proposed estimated amount to be applicable to such line items.. Such statement shall be signed by both a member of Seller and a California licensed civil engineer. If there is a disagreement between Seller and Buyer as to the cost estimate of any particular line item, the amount to be retained in Escrow in respect of such line item shall be an amount equal to the lesser of (i) the average of (a) Buyer's estimated cost for such line item and (b) Seller's estimated cost for such line item; or (ii) an amount equal to 110% of Seller's estimated cost for such line item. Subject to the foregoing in this Section 3.3.2, Escrow Holder shall deposit with the "Disbursing Agent" (defined below) in Escrow at the Closing an amount equal to the cost to complete the Development Work based on the Completion Estimate, but in no event to exceed Nine Million And 00/100 Dollars ($9,000,000.00) ("Cash Withhold"). The remainder of the Purchase Price shall be disbursed to Seller at Closing. The Cash Withhold shall be held in an interest-bearing account at a Disbursing Agent, with all interest payable to remain in the account. Buyer shall have no right, title or interest in the Cash Withhold or the interest earned thereon, and all monies constituting the Cash Withhold and the interest earned thereon, shall belong to Seller subject to Seller's lien-free completion of the Development Work in accordance with Section 11.1 below. The term "Disbursing Agent" shall mean the Bank of America, or any other independent, third party lender or construction disbursement company mutually satisfactory to both Seller and Buyer.

The Cash Withhold shall be disbursed monthly by the Disbursing Agent directly to the applicable contractors or subcontractors, to pay the actual cost of the Development Work as incurred in accordance with the Completion Estimate, by Seller's written demand for such funds to Disbursing Agent within ten (10) days following the end of each month, with a copy to Buyer, which demand shall include copies of the invoices/billings received during the previous month for which payment is sought, and the amounts due ("Monthly Draw Request"). Each Monthly Draw Request shall be certified by Seller's civil and/or soil engineer (for the benefit of Seller and Buyer) that the work being paid for in respect of the subject Monthly Draw Request has been completed pursuant to the plans and specifications for such work in accordance with the specifications prepared by Seller's soils engineer; and such certification shall also state the approximate percentage of work completed to the date of such Monthly Draw Request. Buyer shall be provided with a copy of each Monthly Draw Request. The Monthly Draw Request will include only those payments for which applicable conditional lien releases have been furnished. Seller shall inform Buyer in writing of any changes in the contract price of the contracts entered into by Seller pursuant to Section 11.1 of this Agreement.

Within two (2) business days following its receipt of each Monthly Draw Request from Seller, the Disbursing Agent shall disburse the amount requested to Seller's contractors and subcontractors. Each Monthly Draw Request shall pay for the Development Work in accordance with the line items on the Completion Estimate; provided, however, that any savings by Seller in any line item may be applied on a dollar-by-dollar basis, to increasing the amount estimated for any other line item. (All such savings shall be allocated to increasing the estimated amount of other line items in Seller's sole and absolute discretion.) Any monies allocable to a line item labeled "contingency" (or comparable designation) may be used for any other line item in Seller's sole and absolute discretion. If any line item in a Monthly Draw Request exceeds the amount set forth in the Completion Estimate (as such line item may be increased by reason of any savings in any other line item, as provided aforesaid), the Disbursing Agent shall disburse

-3-

the amount set forth in the Completion Estimate (as it may be adjusted as provided aforesaid) and Seller shall pay (outside of Escrow) any such excess in respect of such line item. However, the Disbursing Agent shall not withhold payment of the amount allocated in the Completion Estimate (as it may be adjusted as provided aforesaid) as a result of such increased cost. Disbursing Agent is not to be concerned with application of each Monthly Draw Request to the line items shown in the Completion Estimate but only that the cumulative total of the Monthly Draw Requests does not exceed the amount of the Cash Withhold, exclusive of interest earned thereon. Each Monthly Draw Request will show the percentage of Development Work (defined in Section 11 this Agreement) which has been completed to the date of such Monthly Draw Request. Buyer shall have no right to approve or disapprove of any Monthly Draw Request and the Disbursing Agent shall not be required, nor shall the Disbursing Agent seek, to obtain Buyer's consent to any Monthly Draw Request, or the disbursement of monies therefor. Immediately after Seller's completion of the Development Work under Section 11.1 hereof, the entire remaining balance of the Cash Withhold, if any, and the interest earned thereon, shall be disbursed to Seller upon the Disbursing Agent's receipt of Seller's written request for same, which request has also been approved by Buyer in writing.

3.4     Deposit.  Upon the full execution of this Agreement, Buyer shall deposit with Escrow Holder the sum of Fifty Thousand And 00/100 Dollars ($50,000.00), to be placed in a separate interest bearing account, with all interest accruing to the benefit of Buyer ("Deposit"). The Deposit shall be fully refundable until such time as Buyer's "Contingencies" as set forth in Article 5 have been either satisfied or waived by the deadline for satisfaction or waiver of such Contingencies, at which time the Deposit, plus all accrued interest thereon, shall be non-refundable and released to Seller. The Deposit, plus all accrued interest thereon, shall be applied to the Purchase Price at the Close of Escrow.

3.5     Rebate of Portion of Purchase Price.  Buyer shall be entitled to a rebate of a portion of the Purchase Price in an amount not to exceed Three Hundred Seventy Five Thousand And 00/100 Dollars ($375,000.00) if, and to the extent, provided in this Section 3.5.  If (i) Buyer is required, by a Governing Agency (defined in Section 5.1.1, below) to develop (or caused to be developed) a hotel or separate community center on the Retail Site as a condition to any Governing Agency's approval of Buyer's Site Plan for the Retail Site; and (ii) if a hotel, Buyer enters into a binding written agreement with a hotel owner to own and operate a hotel on the Retail Site within thirty-six (36) months after the Closing; or, if a separate community center, Buyer has entered into a binding written commitment to build a community center within thirty-six (36) months after the Closing;  Buyer shall be entitled to a rebate of a portion of the Purchase Price ("Rebate") in an amount determined by the following calculation: (a) the number of acres covered by the Hotel or Community Area (defined below); multiplied by (b) $125,000.00 per acre (prorated for any portion of an acre).  The term "Hotel or Community Area" as used in this Section 3.5 shall mean the area on which the hotel (or community center) is located, including parking which is legally required and dedicated solely therefore.  Notwithstanding anything above in this Agreement, the Rebate shall not, under any circumstance, exceed $375,000.00. The parties good faith estimate of the Rebate shall remain in escrow until thirty-six (36) months after the Closing, at which time the Rebate will thereupon either (1) be disbursed to Buyer (if Buyer is thereupon entitled to any Rebate pursuant to this Section 3.5); or (2) immediately thereupon returned to Seller (if Buyer is not entitled to a Rebate pursuant to this Section 3.5). To the extent the estimated Rebate held in escrow exceeds the actual Rebate to which Buyer is

Exhibit "1"
Page 21

entitled, the excess shall, at the end of the thirty-six (36) month after the Closing, be returned to Seller.

## 4.    CONDITION OF TITLE TO RETAIL SITE

4.1    <u>Conveyance of Retail Site</u>. Title to the Retail Site shall be conveyed to Buyer at the Closing.

4.2    <u>Permitted Exceptions</u>. Title to the Retail Site shall be conveyed to Buyer by Grant Deed in the form attached hereto as **Exhibit "B"** free and clear of all liens except: (A) liens securing real property taxes and assessments (which are not delinquent); and (B) such other exceptions and reservations (other than the deed of trust reflected as Item No. 16 in Schedule B) shown on the preliminary title report dated December 18, 1998 (Order Number 6016409A-U54) ("Title Report") issued by Chicago Title Company ("Title Company") a copy of which is attached hereto as **Exhibit "C"** and incorporated herein by this reference, and such additional exceptions as are approved in writing by Buyer. All exceptions to title set forth in the Title Report together with those Additional Exceptions approved in writing by Buyer (as provided in Section 4.2.1, below) are hereinafter collectively referred to as the "Permitted Exceptions."

4.2.1    Seller has furnished Buyer with a current preliminary title report, together with copies of all recorded exceptions to title and the plotted easements. An ALTA survey of the Retail Site ("ALTA Survey") has been approved by Buyer and has been deposited with the Title Company.  Buyer and Seller acknowledge and agree that, during the course of Seller's development and pre-development activities prior to Closing, certain additional title exceptions ("Additional Exceptions") may be recorded against the Retail Site, which Additional Exceptions shall be subject to Buyer's approval as follows:

(a)    Seller shall give Buyer written notice of such Additional Exception(s), which notice shall include a statement that Buyer shall have ten (10) days following receipt of such notice to notify Seller in writing that Buyer has reasonably determined that such Additional Exception(s) have (i) caused the creation of an additional financial obligation other than as provided herein, including, but not limited to Mello-Roos districts, or (ii) caused the Net Useable Area (determined pursuant to Section 7.2) to decrease below 2,613,600 square feet, or (iii) caused the total square footage of the improvements permitted to be built within the Retail Site to decrease below 700,000 square feet ("Buildable Area"), or (iv) resulted in a material change to Buyer's proposed development of the Retail Site (and the reasons therefor). If Buyer does not notify Seller of its disapproval within said ten (10) day period, then such Additional Exceptions shall be deemed to be Permitted Exceptions.

(b)    In the event Buyer gives Seller timely written notice of its disapproval of any Additional Exceptions ("Buyer's Notice Of Additional Exceptions"), Seller shall have ten (10) days following receipt of Buyer's Notice of Additional Exception to agree, (by giving written notice to Buyer), to cure or remove such Additional Exception prior to the Closing. Failure by Seller to give the aforesaid notice to Buyer within said ten (10) day period shall constitute Seller's election to cure or remove such Additional Exceptions. The removal or cure of any such objection which effects title shall be evidenced by Seller providing, or causing

to be provided, to Buyer an updated Preliminary Title Report showing the deletion of the Additional Exception disapproved by Buyer and/or a revised ALTA Survey.

(c)     If any of Buyer's objections to Additional Exceptions are not cured or removed as provided herein and the item objected to is a monetary lien, Buyer may elect to (i) accept title to the Retail Site as it is, or (ii) terminate this Agreement. Notwithstanding anything set forth above in this Section 4.2 or elsewhere in this Agreement, Seller shall pay (or otherwise cause to be removed from the Title Policy) at Closing, all monetary liens encumbering the Retail Site which arose by reason of either (1) judgment liens or mechanic's liens; or (2) liens secured by a mortgage or deed of trust. However, any Additional Exception which constitutes a property tax or assessment against the Retail Site shall be prorated at closing pursuant to Section 13, below. If any of Buyer's objections to Additional Exceptions are not cured or removed as provided herein and the item objected to is a non-monetary lien, Buyer may elect either to (i) accept title to the Retail Site as it is, or (ii) terminate this Agreement.

In the event this Agreement is terminated as provided herein, each party shall be released from all duties or obligations contained herein and all sums, less disbursements authorized by this Agreement, and documents deposited in Escrow shall be returned to the Parties who respectively deposited the same, and Seller shall pay the Escrow costs.

4.3     Form of Policy. Title to the Retail Site shall be evidenced by Title Company's issuance at Closing of an American Land Title Association Extended Coverage Policy of Title Insurance ("Extended Coverage Policy"), with liability in the amount of the Purchase Price showing title to the Retail Site vested in Buyer subject only to the Permitted Exceptions. If Buyer so desires, Buyer may obtain any title insurance endorsements provided that Buyer shall pay all additional costs associated with any endorsements desired by Buyer together with the increased cost of an Extended Coverage Policy over the cost of a CLTA policy of title insurance ("Standard Coverage Policy"). The title policy to be issued to Buyer, as provided above, shall be referred to as the "Title Policy". Notwithstanding the foregoing, any title insurance endorsements desired by Buyer shall, under no circumstance, delay or extend the date for the Closing, as provided in this Agreement.

## 5.     BUYER'S CONTINGENCIES

Buyer's obligations under this Agreement are contingent upon the satisfaction or waiver of the contingencies described in Sections 5.1 through 5.3 below (individually, a "Contingency" and collectively, the "Contingencies").

5.1     Approvals for Retail Site.

5.1.1   Buyer's obligations under this Agreement and its obligations to close Escrow are contingent upon Seller obtaining, on or before November 30, 2000, the necessary, discretionary governmental zoning and land use entitlements from the governing authorities having jurisdiction over the Retail Site (collectively, "Governing Agencies" and, individually, "Governing Agency") including, but not limited to the City of San Clemente, the California Coastal Commission, the Army Corps of Engineers, the U.S. Fish and Wildlife Service and the California Department of Fish and Game, for a retail/commercial project on the Retail Site

consistent with the site plan SPP99-16, the Conditional Use Permit application numbered CUP99-17 and the Sign Exception Permit numbered SEP99-18 (all more particularly described in Section 6.1, below), satisfying the following: (i) the Net Useable Area of the Retail Site (as determined pursuant to Section 7.2, below) containing a minimum of 2,613,600 square feet; (ii) the building-to-land ratio (calculated by dividing the Buildable Area by the Net Useable Area) is no less than twenty-six percent (26%); and (iii) the Buildable Area is not less than 700,000 square feet. No representation, whether express or implied, is made by Seller as to Seller's ability to obtain the said necessary discretionary governmental zoning and land use entitlements from any Governing Agency.

5.1.2   If, at any time, any Governing Agency conditions or reduces (i) the Net Useable Area of the Retail Site to less than 2,613,600 square feet; (ii) the building-to-land ratio to less than 26%; or (iii) the Buildable Area to less than 700,000 square feet, then, within ten (10) days thereafter, Buyer must elect, by giving written notice to Seller, to either (a) accept such conditions or reductions and continue to proceed with seeking approvals from other Governing Agencies for zoning and land use entitlements; or (b) terminate this Agreement. If Buyer elects (a), aforesaid (that is, to accept such conditions or reductions and continue to proceed with seeking approvals from other Governing Agencies), Buyer shall not thereafter have the right to terminate this Agreement unless, thereafter, a Governing Agency further conditions or reduces the Net Useable Area of the Retail Site, the building-to-land ratio or the Buildable Area. If a Governing Agency subsequently further conditions or reduces the Net Useable Area of the Retail Site, the building-to-land ratio or the Buildable Area, Buyer must elect, by giving written notice to Seller within ten (10) days thereafter, either (a) or (b), aforesaid, in this Section 5.1.2

5.1.3   If a government moratorium results in the inability of Buyer to develop the Retail Site as contemplated by this Agreement, Buyer shall have the right, to be exercised by written notice to Seller within thirty (30) days after such action to either (i) waive the Contingency in this Section 5.1.3; or (ii) elect to terminate this Agreement. In addition, and notwithstanding the provisions of Section 5.4, below, if, at the time the aforesaid moratorium occurs, all other Contingencies have been satisfied or waived pursuant to this Agreement (other than the Contingency provided in Section 5.4. below), then the deadline for the satisfaction (or waiver) of the Contingency set forth in Section 5.4, below, (that is, Seller obtaining a bulk grading permit for the Retail Site and Residential Site) shall be advanced from November 30, 2000, to the deadline for the satisfaction (or waiver) of the Contingency set forth in this Section 5.1.3 (to wit; thirty (30) days after the moratorium occurs). It is therefore the intent of the Parties that if a moratorium precludes the issuance of a bulk grading permit (and if at such time all other Contingencies have then been satisfied or waived pursuant to this Agreement), the Contingency regarding Seller's obtaining a bulk grading permit shall, notwithstanding the provisions of Section 5.4, expire thirty (30) days after the moratorium.

5.1.4   If any lawsuit is filed which results in the issuance of an injunction enjoining the development of the Retail Site as contemplated by this Agreement, Buyer shall have until the earlier to occur of (a) the lifting of such injunction or (b) November 30, 2000 (or, if Buyer has elected to extend the Closing pursuant to Section 12.2.2, Buyer shall have until November 30, 2001) to elect, by giving Seller written notice prior to such time, to either (i) waive the Contingency in this Section 5.1.4 or (ii) elect to terminate this Agreement. However, if Buyer elects to waive the Contingency and close the purchase and sale contemplated

by this Agreement notwithstanding any such injunction, Seller shall not be deemed to be in breach of this Agreement if it is unable to perform the Development Work (defined below), provided that Seller opposes the continuation of such injunction.

5.1.5   Notwithstanding anything set forth above in this Section 5.1 or elsewhere in this Agreement, the date for the Closing shall be no later than the Outside Closing Date (defined in Section 12.2.1, below), subject to extension as provided in Section 12.2.1 and 12.2.2, below.

5.2    Entitlement Fees.

5.2.1   Following the Close of Escrow, Buyer agrees to pay the fees attributable to its development of the Retail Site including, without limitation, those fees described in that certain Memorandum dated February 24, 1994 and recorded on to Cliff Russell from Mike Burke attached hereto as **Exhibit "D"** (collectively the "Buyer's Entitlement Fees"). Buyer reserves the right, but shall not be obligated, to reduce any of Buyer's Entitlement Fees through negotiations with the City of San Clemente. Notwithstanding the foregoing, Buyer's obligations under this Agreement are not contingent upon such reduction and shall not, under any circumstance, delay the date for the Closing as otherwise contemplated in this Agreement.

(i)     Buyer agrees to pay all fees, charges and payments applicable to the "Commercial Area" as contained in that certain written Development Agreement for Marblehead Coastal Property dated October 2, 1998 and recorded on October 2, 1998 as Instrument No. 19980667761 of the Official Records ("Development Agreement") except those obligations set forth in Sections 3.5, 3.6, 4.2, 4.3, 4.4, 4.5, and 4.7 of the Development Agreement and except for fees for the Development Work to be completed by Seller pursuant to Paragraph 11, below, in this Agreement.

(ii)    Buyer's Entitlement Fees shall not include fees, charges and payments for the design, planning, approval and construction of the Avenida Vista Hermosa Interchange as described in Section 11, below.

5.2.2   In the event the City San Clemente and/or any other Governing Agency shall adopt further entitlement fees following the Effective Date ("Further Entitlement Fees"), and upon Seller receiving written notice thereof, Seller shall give prompt written notice thereof to Buyer, Buyer shall have twenty (20) days from receipt of notice of such Further Entitlement Fees to review and approve, or waive any objection to, such Further Entitlement Fees. Failure of Buyer to provide Seller with notice in writing of Buyer's disapproval of any such Further Entitlement Fees ("Buyer's Disapproval Notice of Further Entitlement Fees") within such twenty (20) day time period shall be deemed approval of the Further Entitlement Fees and, therefore, the waiver by Buyer of the Contingency in this Section 5.2.2 as to any such Further Entitlement Fees. If Buyer disapproves in writing any of the Further Entitlement Fees Seller shall, within ten (10) days of receipt of Buyer's Disapproval Notice of Further Entitlement Fees, notify Buyer in writing, of any action Seller is willing to undertake, if any, to cause Buyer to waive Buyer's disapproval of such Further Entitlement Fees. In the event Seller fails to so notify Buyer of Seller's decision in this matter within ten (10) days after receipt of Buyer's disapproval of such Further Entitlement Fees, or Seller declines to take action to remedy Buyer's

disapproval within said ten (10) day period, Buyer must elect, in its absolute discretion within five (5) days after expiration of the aforesaid ten (10) day period, to either (i) waive the Contingency set forth in this Section 5.2.2 or (ii) terminate this Agreement by giving written notice to Seller and Escrow Holder, in which case all sums, less disbursements authorized by this Agreement, and documents deposited in Escrow shall be returned to the Parties who respectively deposited the same, and Seller shall pay the Escrow costs. If Buyer fails to make its election within five (5) days after the expiration of the aforesaid ten (10) day period, Buyer shall be deemed to have elected to waive the contingency set forth in this Section 5.2.2.    No representation or warranty, whether express or implied, is made by Seller as to whether or not there will, or will not, be Further Entitlement Fees.

5.3    Approvals, Funding and Completion of Avenida Vista Hermosa Interchange.

5.3.1  Buyer's obligations under this Agreement and its obligation to close Escrow are contingent upon: (A) the governmental approvals and funding (as defined below) for the completion of the Avenida Vista Hermosa Interchange being in place by no later than November 30, 2000; (B) construction of the Avenida Vista Hermosa Interchange having commenced by no later than November 30, 2000; and (C) Buyer having determined, in Buyer's reasonable discretion, by the earlier to occur of (i) thirty (30) days after construction of the Avenida Vista Hermosa Interchange has commenced; or (ii) November 30, 2000; that completion of the northbound and southbound on and off ramps for the Avenida Vista Hermosa Interchange will occur (a) in the case of (i), aforesaid, within twelve (12) months after commencement of construction of the Avenida Vista Hermosa Interchange; or, (b) in the case of (ii), aforesaid, by November 30, 2001. By no later than the respective deadlines provided in (A), (B) and (C), aforesaid, Buyer shall give Seller written notice of its election to either (i) waive the Contingencies set forth in (A), (B) and (C) aforesaid, respectively, or (ii) elect to terminate this Agreement by reason by failure of any of such Contingencies. Failure by Buyer to give Seller written notice by the deadlines as aforesaid shall be deemed to be an election by Buyer to waive the Contingencies in this Section 5.3.1. No representation or warranty, whether express or implied, is made by Seller as to whether (A), (B) or (C), aforesaid can be satisfied. For the purpose of this Section 5.3, the term "funding" shall mean that commitment(s) have been obtained from a financial institution, and/or a governmental agency, and/or a third party that will provide reasonably sufficient capital for completion of the Avenida Vista Hermosa Interchange, or alternatively, that evidence reasonably satisfactory to Buyer exists to establish that funds will be available to finance such project from other sources. In addition, for the purpose of this Section 5.3 only, the term "commencement" shall mean the beginning of any physical construction, grading or other physical work with respect to the Avenida Vista Hermosa Interchange, under a contract issued by the appropriate authority for the completion of the Avenida Vista Hermosa Interchange.

5.4    Bulk Grading Permit. Subject to the provisions of Section 5.3.1, above, Buyer's obligations under this Agreement and its obligation to close Escrow are contingent upon Seller obtaining, on or before November 30, 2000, a bulk grading permit for the Retail Site and Residential Site. If, by November 30, 2000, Seller has not obtained the aforesaid bulk grading permit, Buyer must elect, in its absolute discretion by no later than November 30, 2000, to either (i) waive the Contingency set forth in this Section 5.4; or (ii) terminate this Agreement by giving written notice to Seller and Escrow Holder, in which case, all sums, less disbursements

Exhibit "1"
Page 26

authorized by this Agreement, and documents deposited in Escrow shall be returned to the Parties who respectively deposited the same, and Seller shall pay the Escrow Costs. No representations or warranty, whether express or implied, is made by Seller as to whether a bulk grading permit will or will not be obtained.

     5.5   <u>Remedy For Failure of Contingencies</u>. If Buyer fails to elect to terminate this Agreement by reason of the failure of any Contingency by the applicable deadline therefor, Buyer shall be deemed to have elected to waive the subject Contingency. In the event of the failure of any of the Contingencies set forth in this Article 5 and provided Seller is not in default under the terms of this Article 5, the sole remedy of Buyer shall be to terminate this Agreement, whereupon all sums, less disbursements authorized by this Agreement, and documents deposited in Escrow shall be returned to the Parties who respectively deposited the same, Seller shall pay the Escrow costs, and neither Party shall have any further obligations under this Agreement.

## 6.    BUYER'S SPECIFIC SITE PLANS

     6.1    Buyer has prepared a site plan with elevations for the Retail Site, which was submitted to the City of San Clemente for approval on February 8, 1999, and is identified as SPP99-16. In response to comments by the staff of the City of San Clemente, Buyer has revised the site plan. (The site plan for the Retail Site, together with the accompanying exhibits thereto, are hereinafter referred to as "Buyer's Specific Site Plans."). Buyer also prepared a Conditional Use Permit application, numbered CUP99-17 and a Sign Exception Permit numbered SEP99-18. The CUP application and the Sign Exception Permit application were both submitted to the City of San Clemente on March 4, 1999. These applications are being processed by the Buyer. Seller acknowledges receiving and approving Buyer's Specific Site Plans. Buyer's Specific Site Plans includes the following:

     (A)    the proposed configuration of Buyer's improvements to the Retail Site;

     (B)    the proposed vehicular access points to and from the Retail Site from the adjoining public streets;

     (C)    the proposed specific layout of the access between the Retail Site and the Avenida Vista Hermosa ramp/interchange to the I-5 Freeway ("Avenida Vista Hermosa Interchange") to be constructed adjacent to the Retail Site.

     6.2    Buyer has previously provided Seller with grading information, elevations and the location of utilities for the Retail Site on plans prepared in conjunction with Tentative Tract Map #8817, which Tentative Tract Map was approved by the City of San Clemente on August 5, 1998. The aforesaid plans which specify the grading information, elevations and location of utilities for the Retail Site which are attached hereto as **Exhibit "H."** If, upon final approval by the Governing Agencies of Buyer's Site Plan SPP99-16 (or any subsequent Site Plan for the Retail Site), there is additional work required for the Retail Site which is otherwise not consistent with the work to be performed pursuant to Exhibit "H," then the net increase in costs shall be paid by Buyer. In addition, Buyer shall pay for any and all costs incurred as a result of berming or other screening (if any) required to reduce visual site impacts from the Retail Site. As soon as practicable after the Closing, Seller shall prepare its good faith written estimate ("Estimate") of