JONATHAN M. HOFF (Bar No. 099787)
GREGORY M. PETRICK (Admitted *pro hac vice*)
**CADWALADER, WICKERSHAM & TAFT LLP**
One World Financial Center
New York, NY  10281
Tel:  212.504.6000
Fax:  212.504.6666
E-mail:  jonathan.hoff@cwt.com
          gregory.petrick@cwt.com

BETTY M. SHUMENER (Bar No. 137220)
HENRY H. OH (Bar No. 187127)
**DLA PIPER LLP (US)**
550 South Hope Street, Suite 2300
Los Angeles, CA  90071-2678
Tel:  213.330.7700
Fax:  213.330.7701
E-mail:  henry.oh@dlapiper.com

Attorneys for the Joint Provisional Liquidators of
LEHMAN RE LTD.

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**SANTA ANA DIVISION**

| | |
|---|---|
| In re<br><br>PALMDALE HILLS PROPERTY, LLC,<br>AND ITS RELATED DEBTORS,<br><br>      Jointly Administered Debtor<br>      and Debtors-in-Possession | **Case No.  8:08-bk-17206-ES**<br><br>Jointly Administered With Case Nos.<br>8:08-bk-17209-ES; 8:08-bk-17224-ES;<br>8:08-bk-17225-ES; 8:08-bk-17227-ES<br>8:08-bk-17230-ES; 8:08-bk-17231-ES<br>8:08-bk-17236-ES; 8:08-bk-17240-ES<br>8:08-bk-17242-ES; 8:08-bk-17245-ES<br>8:08-bk-17246-ES; 8:08-bk-17248-ES<br>8:08-bk-17249-ES; 8:08-bk-17404-ES<br>8:08-bk-17407-ES; 8:08-bk-17408-ES<br>8:08-bk-17409-ES; 8:08-bk-17458-ES<br>8:08-bk-17465-ES; 8:08-bk-17470-ES<br>8:08-bk-17472-ES; 8:08-bk-17473-ES<br>8:08-bk-17474-ES; 8:08-bk-17475-ES<br>8:08-bk-17588-ES |
| Affects:<br><br>☐ All Debtors<br>☐ Palmdale Hills Property, LLC,<br>☐ SunCal Beaumont Heights, LLC<br>☐ SCC/Palmdale, LLC<br>☐ SunCal Johannson Ranch, LLC<br>☐ SunCal Summit Valley, LLC<br>☐ SunCal Emerald Meadows LLC<br>☐ SunCal Bickford Ranch, LLC<br>☐ Acton Estates, LLC<br>☐ Seven Brothers LLC<br>☒ SJD Partners, Ltd.<br>☒ SJD Development Corp.<br>☐ Kirby Estates, LLC<br>☐ SunCal Communities I, LLC<br>☐ SunCal Communities II, LLC<br>☐ SCC Communities LLC<br>☐ North Orange Del Rio Land, LLC | **OBJECTION OF LEHMAN RE LTD. TO CONFIRMATION OF FOURTH AMENDED JOINT CHAPTER 11 PLAN FILED BY SJD PARTNERS, LTD. AND SJD DEVELOPMENT CORP. [GROUP IV VOLUNTARY DEBTORS]**<br><br>Date:  October 24-28, 2011<br>Time: 9:30 A.M.<br>Place: Courtroom 5A<br>     411 West Fourth Street<br>     Santa Ana, CA 92701 |

☐   Tesoro SF, LLC
☐ LB-L-SunCal Oak Valley, LLC
☐ SunCal Heartland, LLC
☐ LB-L-SunCal Northlake, LLC
☐ SunCal Marblehead, LLC
☐ SunCal Century City, LLC
☐ SunCal PSV, LLC
☐ Delta Coves Venture, LLC
☐ SunCal Torrance, LLC
☐ SunCal Oak Knoll, LLC

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

**I.**    PRELIMINARY STATEMENT ................................................................ 1

**II.**    BACKGROUND ................................................................................ 4

    **A.**    Pacific Point .......................................................................... 4

    **B.**    The Lehman Adversary Proceeding ......................................... 5

    **C.**    The Acton Adversary Proceeding ........................................... 6

    **D.**    The Disallowance Motion ...................................................... 7

    **E.**    The Group IV Voluntary Debtors' Disclosure Statement and Plan ...................... 8

**III.**    OBJECTION ................................................................................... 8

    **A.**    The Plan Is Improperly Based On The Recovery of Pacific Point ........................ 8

        1.    There Is No Basis For Partial Rescission Of The Restructuring Agreement. .................................................. 9

        a.    Indivisible Contracts Cannot Be Partially Rescinded ................................. 9

        b.    Rescission Requires That Contract Benefits Be Returned .......................... 12

        c.    Rescission Is Improper Because All The Necessary Parties Have Not Been Joined ........................................ 15

        2.    There Is No Basis To Invalidate The Foreclosure Sale ........................... 16

        3.    There Is No Basis For Imposition Of A Constructive Trust On The Pacific Point Project. ................................... 17

    **B.**    The Plan Does Not Satisfy Bankruptcy Code Section 1129 ............................. 18

        1.    The Plan is Not Proposed in Good Faith ....................................... 19

        2.    The Plan Does Not Satisfy the Best Interest of Creditors Test ................. 22

        3.    The Plan Cannot Satisfy the Section 1129(a)(11)'s Feasibility Requirement .................................................... 25

        4.    The Plan is Unfairly Discriminatory ........................................... 27

**IV.**    CONCLUSION ................................................................................ 29

<u>Exhibit A</u> – Unreported Decisions Cited in Objection

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

## FEDERAL CASES

Adrian Family Partners I, L.P. v. Exxonmobil Corp., No. 19344/01, 2007 WL 6370971
(Sup. Ct. June 11, 2007), aff'd, 878 N.Y.S.2d 140 (App. Div. 2009) .................................... 12

Aetna Realty Investors, Inc. v. Monarch Beach Venture, Ltd. (In re Monarch Beach
Venture, Ltd.), 166 B.R. 428 (C.D. Cal. 1993) ........................................................................ 27

Barden & Robeson Corp. v. Timmerman, 497 N.Y.S.2d 196 (App. Div. 1986) ........................... 9

Behdjou v. US Bancorp, No. CV 09-2314 AHM (RCx), 2009 WL 2048124 (C.D. Cal.
July 13, 2009) .............................................................................................................................. 16

In re Bosque Power Co., No. 10-60348-rbk, 2010 Bankr. LEXIS 6064 (Bankr. W.D. Tex.
Sept. 1, 2010) .............................................................................................................................. 22

Campbell v. Superior Court, 132 Cal. App. 4th 904, 34 Cal. Rptr. 3d 68 (2005) ....................... 17

Denker v. Twentieth Century-Fox Film Corp., 10 N.Y.2d 339, 179 N.E.2d 336 (1961) ............. 15

Dresdner Bank AG (N.Y. Branch) v. Morse/Diesel, Inc., 499 N.Y.S.2d 703 (App. Div.
1986) ............................................................................................................................................ 9

Ellsworth v. Lifescape Med. Assocs., P.C. (In re Ellsworth), BAP No. AZ-10-1253-
MkMaD, 2011 Bankr. LEXIS 3010 (B.A.P. 9th Cir. July 29, 2011) ...................................... 18

In re Emergency Monitoring Techs., 366 B.R. 476 (Bankr. W.D. Pa. 2007) ........................ 18, 21

Feder v. Lazar (In re Lazar), 83 F.3d 306 (9th Cir. 1996) ........................................................... 21

First Sav. & Loan Ass'n of Jersey City, N.J. v. Am. Home Assurance Co., 29 N.Y.2d 297,
277 N.E.2d 638 (1971) ................................................................................................................. 9

Galbraith v. Guida, 554 N.Y.S.2d 592 (App. Div. 1990) ............................................................. 15

Goldman v. Sontag, 15 N.Y.S.2d 407 (App. Div. 1939), amended on other grounds, 29
N.Y.S.2d 910 (App. Div. 1941), aff'd, 289 N.Y. 556, 43 N.E.2d 532 (1942) .......................... 9

Gregory v. Garrett Corp., 589 F. Supp. 296 (S.D.N.Y. 1984) ..................................................... 12

In re Griswold Bldg. LLC, 420 B.R. 666 (Bankr. E.D. Mich. 2009) ........................................... 26

Jorgensen v. Fed. Land Bank (In re Jorgensen), 66 B.R. 104 (B.A.P. 9th Cir. 1986) ................. 19

Karlsen v. Am. Sav. & Loan Ass'n, 15 Cal. App. 3d 112, 92 Cal. Rptr. 851 (1971) .................. 16

Liberty Nat'l Enters. v. Ambanc La Mesa, Ltd. P'ship (In re Ambanc La Mesa, Ltd.
  P'ship), 115 F.3d 650 (9th Cir. 1996) ........................................................................ 18

In re Lifschultz Fast Freight, 132 F.3d 339 (7th Cir. 1997) .......................................... 21

Merryman v. Gottlieb, 472 N.Y.S.2d 488 (3rd Dep't 1984) ........................................ 10

In re Pac. First Bank ex rel. RT Capital Corp. v. Boulders on the River, Inc. (In re
  Boulders on the River, Inc.), 164 B.R. 99 (9th Cir. 1994) ....................................... 19

In re Made in Detroit, Inc., 299 B.R. 170 (Bankr. E.D. Mich. 2003), aff'd, 414 F.3d 576
  (6th Cir. 2005) ............................................................................................................ 26

Max Sugarman Funeral Home, Inc. v. A.D.B. Investors, 926 F.2d 1248 (1st Cir. 1991) ........... 21

Rand v. Porsche Fin. Servs. (In re Rand), BAP No. AZ-10-1160-BaPaJu, 2010 Bankr.
  LEXIS 5076 (B.A.P. 9th Cir. Dec. 7, 2010) ....................................................... 19, 26

Reaves v. Comerica Bank-Cal. (In re GTI Capital Holdings, LLC), No. 07-00031, 2007
  Bankr. LEXIS 3005 (Bankr. D. Ariz. Aug. 30, 2007) ............................................ 21

Rudman v. Cowles Commc'ns, Inc., 30 N.Y.2d 1, 280 N.E.2d 867 (1972) ................... 12

Ryan v. Loui (In re Corey), 892 F.2d 829 (9th Cir. 1989) ............................................. 19

In re Sagewood Manor Assocs. Ltd. P'shp, 223 B.R. 756 (Bankr. D. Nev. 1998) ....... 25

Slater v. Slater, 204 N.Y.S.  112 (App. Div. 1924), aff'd, 240 N.Y. 557, 148 N.E. 703
  (1925) .......................................................................................................................... 9

Sokolow, Dunaud, Mercadier & Carreras LLP v. Lacher, 747 N.Y.S.2d 441 (App. Div.
  2002) ............................................................................................................................ 12

Tarleton Bldg. Corp. v. Spider Staging Sales Co., 274 N.Y.S.2d 43 (App. Div. 1966) .............. 12

In re Trans Max Techs., Inc., 349 B.R. 80 (Bankr. D. Nev. 2006) ................................ 26

Tudor v. Riposanu, 461 N.Y.S.2d 6, 7 (App. Div. 1983) .............................................. 15

**STATUTES**

11 U.S.C. § 1129(a)(3) .................................................................................................... 18

11 U.S.C. 1129(a)(7) ....................................................................................................... 22

11 U.S.C. § 1129(a)(11) .................................................................................................. 25

11 U.S.C. § 1129(b)(1) .................................................................................................... 26

**TREATISES**

4-506 <u>Collier on Bankruptcy</u> ¶ 506.03[2][a] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2010) .................................................................................................................... 28

**<u>TO THE HONORABLE ERITHE A. SMITH, UNITED STATES BANKRUPTCY JUDGE,
AND ALL CREDITORS AND OTHER PARTIES IN INTEREST HEREIN:</u>**

Dan Schwarzmann and Garth Calow, in their capacity as joint provisional liquidators of

Lehman Re Ltd. ("<u>Lehman Re</u>"), by and through their counsel, respectfully submit this objection

(the "<u>Objection</u>")[1] to the *Fourth Amended Joint Chapter 11 Plan Filed By SJD Partners, Ltd.,
and SJD Development Corp. [Group IV Voluntary Debtors]* (the "<u>Plan</u>"), dated August 12, 2011.

In support of the Objection, Lehman Re respectfully submits as follows:[2]

## I.    <u>PRELIMINARY STATEMENT</u>[3]

For a plan of reorganization to be confirmed, it must meet the requirements of section

1129(a) of the Bankruptcy Code.  SCC Acquisitions, Inc. ("<u>SCC Acquistions</u>") and the Group IV

Voluntary Debtors, as SunCal Plan Proponents, bear the burden of showing that the Plan

complies with the applicable Bankruptcy Code provisions.  Here, SCC Acquisitions and the

Group IV Voluntary Debtors plainly failed to meet their burden.

The protection afforded by chapter 11 is meant to facilitate the successful reorganization

of a debtor, pursuant to which the debtor's constituents are able to realize appropriate value on

their claims and interests.  The Plan proposed by the Group IV Voluntary Debtors has no chance

of achieving such a result and should therefore be denied.  The Group IV Voluntary Debtors seek

confirmation of a Plan that is premised on an unrealistic best-case scenario – success in the

adversary proceeding (the "<u>Lehman Adversary Proceeding</u>") brought by certain of the SunCal

debtors (the "<u>SunCal Debtors</u>") against, among others, Lehman Brothers Holdings, Inc.

---

[1] The Declaration of Jonathan M. Hoff, in support of the Objection, is being filed concurrently herewith
("<u>Hoff Decl.</u>")

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan.
Pleadings and other court filings herein are referred to by docket number ("AP" for the Lehman Adversary
Proceeding, case number 8:09-ap-01005-ES, and "BK" for the main SunCal bankruptcy case, case number 8:08-bk-
17206-ES).

[3] Capitalized terms used but not otherwise defined in the Preliminary Statement shall have the meanings ascribed to
them below.

("LBHI"), Lehman ALI, Inc. ("Lehman ALI"), LV Pacific Point, LLC ("LV Pacific Point", together with LBHI and Lehman ALI, the "Lehman Entities"), and Lehman Re.  The proposed Plan precariously hinges the recoveries of the Group IV Voluntary Debtors' unsecured creditors that qualify as Reliance Claimants on an improbable outcome in the Lehman Adversary Proceeding:  the unwinding of a legal and consensual foreclosure sale and the recovery of the Pacific Point project ("Pacific Point") by the SunCal Debtors, and the subsequent equitable subordination of Lehman Re's first-priority lien on Pacific Point.[4]  However, the relief requested by the SunCal Debtors in the Lehman Adversary Proceeding is unsupported by the evidence and improper as a matter of law.  Given the significant litigation contingencies that the SunCal Debtors face in the Lehman Adversary Proceeding, it is all but certain that the Group IV Voluntary Debtors will not acquire title to Pacific Point and, in turn, that the SunCal Debtors will not be able to generate the requisite free cash needed to make any meaningful distributions under the Plan to their preferred unsecured creditors.  Notwithstanding such hurdles, in seeking confirmation of the Plan, the Group IV Voluntary Debtors curiously ignore the improbable nature of their claims in the Lehman Adversary Proceeding and the significant legal infirmities they face therein.  As a result of this willful ignorance, the recoveries projected by the Group IV Voluntary Debtors' proposed Plan are nothing more than empty promises bound to mislead innocent unsecured creditors.  Absent a remote victory by the SunCal Debtors in the Lehman Adversary Proceeding and on the Litigation Claims, the unsecured creditors of these estates have no chance of obtaining any meaningful recovery under the proposed Plan.  It is not even clear that the Group IV Voluntary Debtors have the financial wherewithal to continue prosecuting the Lehman

---

[4] Notably, the prospect for the Group IV Voluntary Debtors' unsecured creditors that do not qualify as Reliance Claimants to obtain any recoveries under the Plan is equally remote because recoveries for such creditors are also entirely hinged upon the Group IV Voluntary Debtors' successful prosecution of the Litigation Claims (excluding recoveries from the Lehman Adversary Proceeding).

Adversary Proceeding or any of the other Litigation Claims upon which recoveries under the Plan are contingent.  Likewise, even *assuming arguendo* the unlikely circumstance that the SunCal Debtors succeed in acquiring Pacific Point through litigation, it is also not clear that the Group IV Voluntary Debtors even have the necessary funding to maintain the project pending sale (assuming they can even procure a buyer) to ensure the value of the property is not placed at risk. And if the Group IV Voluntary Debtors are not able to procure a buyer for Pacific Point, it is unclear what the implications of the lack of any such sale will be on the Plan and the distributions promised thereunder.  These uncertainties are fatal to confirmation, as the proposed Plan consists of nothing more than speculative and misleading pipedreams.

The inequity of the Group IV Voluntary Debtors' proposed Plan is further compounded by the Plan's failure to satisfy the feasibility requirement under section 1129(a)(11) of the Bankruptcy Code.  Fatally, the Plan fails to explain how LitCo, the shell entity the Group IV Voluntary Debtors charge with the responsibility to purchase the Reliance Claims under the Plan, currently has or plans to obtain the necessary funding to carry out its Plan obligations.  Further, the Plan provides no explanation as to how LitCo will secure funds to pay the LitCo Plan Loan, which in turn will be used to prosecute the Lehman Adversary Proceeding (and other Litigation Claims) and fund Post-Confirmation Expenses (including payment of priority and administrative claims).  While LitCo's funding source is unknown and uncertain, it remains entirely premature for the Group IV Voluntary Debtors to seek confirmation of a Plan for which they *still* cannot make a realistic representation of feasibility to creditors and this Court.

Furthermore, notwithstanding the proscriptions in section 1129(b) of the Bankruptcy Code, the Group IV Voluntary Debtors have formulated a Plan under which two classes of similarly situated general unsecured creditors are treated differently.  The Plan classifies certain unsecured creditors as Reliance Claims, without a legal justification, and provides for

discriminatory treatment of similarly situated unsecured claims not arbitrarily given such a title. Moreover, the Plan's proposed treatment of claims in Classes 1.1 and 1.2, which includes the disputed claims filed on account of Pacific Point, is also entirely baseless.  The Plan relies upon sections 506(a) and (d) of the Bankruptcy Code, which speak to the amount of a secured claim, in an attempt to disallow the secured claims arising from the Pacific Point First Loan Agreement. This purported treatment lacks any foundation in law or reason and hobbles the Plan with yet another legal infirmity.

These, and other material and disabling deficiencies described below, reveal the abject failure of the Group IV Voluntary Debtors and SCC Acquisitions, as SunCal Plan Proponents, to comply with the requirements of sections 1129(a) and (b) of the Code, and render the Plan unconfirmable as a matter of law.  Accordingly, Lehman Re respectfully requests that the Court enter an order denying confirmation of the Plan.

## II.    BACKGROUND

### A.    Pacific Point

Lehman Re is a Bermuda registered reinsurance company and a wholly-owned subsidiary of LBHI.   Lehman Re is currently subject to a winding-up proceeding (the "Bermuda Proceeding") in the Supreme Court of Bermuda, that was commenced on September 23, 2008. On September 24, 2009, the Bermuda Proceeding was recognized by the United States Bankruptcy Court for the Southern District of New York as a foreign main proceeding under chapter 15 of the Bankruptcy Code.

Lehman Re is the current owner of the $100 million term loan portion (the "Term Loan") of that certain loan agreement, dated February 16, 2006 (the "Pacific Point First Loan Agreement"), entered into by SJD Partners Ltd. ("SJD Partners") on February 16, 2006, pursuant to which Lehman ALI made a loan of approximately $125,000,000 to SJD Development Corp.

("SJD Development") and SJD Partners, in connection with a construction project involving Pacific Point. Hoff Decl., Ex. 4, ¶¶ 62, 216, 223. The Term Loan has been in default since at least July 10, 2007. Lehman Re has succeeded to Lehman ALI's interest in the Term Loan, as well as to Lehman ALI's interest in the Construction Deed of Trust and Fixture Filing (the "Deed of Trust"), dated February 16, 2006, which secures the Term Loan by a first-priority lien on Pacific Point. Hoff Decl., Ex. 4, ¶¶ 62, 216, 223. As a result of the Term Loan, Lehman Re enjoys a first priority security interest in Pacific Point. Id.

Pacific Point is currently owned by LV Pacific Point LLC ("LV Pacific Point") – a non-debtor company that is not affiliated with, owned or controlled by any of the SunCal Debtors. Hoff Decl., Ex. 4, ¶ 212. LV Pacific Point, took title to Pacific Point pursuant to a pre-petition foreclosure sale on August 28, 2008 ("Foreclosure Sale"). Id. Prior to the Foreclosure Sale, Pacific Point was owned by SJD Partners. The Foreclosure Sale took place following SJD Partners' defaults on a series of construction loans issued by Lehman ALI. Although their consent was not required for the Foreclosure Sale, SJD Partners and other SunCal affiliates consented to the Foreclosure Sale by the terms of an Omnibus Restructuring Agreement (the "Restructuring Agreement"), entered into by the Lehman Entities and certain of the SunCal Debtors on May 23, 2008. Hoff Decl., Ex. 1, Ex. B, § 4(a).

**B.    The Lehman Adversary Proceeding**

On January 6, 2009, SJD Partners and a number of other bankrupt SunCal affiliates commenced the Lehman Adversary Proceeding. The complaint (the "Complaint"), as amended on March 26, 2010, makes the baseless allegation that the SunCal Debtors and their affiliates were fraudulently induced to enter into the Restructuring Agreement and that the Lehman Entities breached their obligations under the Restructuring Agreement.[5] The SunCal Debtors in turn

---

[5] Complaint, ¶¶ 247-257.

attempt to argue that because the Restructuring Agreement was fraudulently induced, their

consent to the Foreclosure Sale was fraudulently obtained.    Based on these allegations, the

SunCal Debtors seek the unwinding of the Foreclosure Sale on Pacific Point for purposes of

clawing back what is currently non-debtor property into SJD Partners' estate (Second Claim For

Relief – Fraudulent Inducement).    The SunCal Debtors assert three grounds to unwind the

Foreclosure Sale:    (1) the SunCal Debtors claim that the Restructuring Agreement should be

rescinded, but only "to the extent that SJD Partners consented to the foreclosure and sale of the

Pacific Point property";    (2) the SunCal Debtors claim that the Foreclosure Sale should be

"invalidated"; and (3) the SunCal Debtors claim that the Bankruptcy Court should "impose a

constructive trust upon the Pacific Point property" and direct LV Pacific Point to transfer title

back to SJD Partners.[6]

## C.    The Acton Adversary Proceeding

On March 24, 2011, certain SunCal Debtors, including SJD Partners, filed a complaint in

the Superior Court of California against Lehman ALI, LV Pacific Point and certain other Lehman

entities[7] seeking, among other things, damages for breach of contract ("Acton Adversary

Proceeding").[8]    The Acton Adversary Proceeding alleges that Lehman ALI and certain of its

affiliates breached the Restructuring Agreement by failing to provide funding and other benefits

required by the Restructuring Agreement and seeks damages caused by the alleged breaches.[9]

Plaintiffs in the Acton Adversary Proceeding, including SJD Partners, specifically allege that the

---

[6] Complaint ¶ 256.

[7] Lehman Re is *not* a named party to the Acton Adversary Proceeding.

[8] See Complaint, Acton Estates, LLC, et al., v. Lehman ALI, Inc., et al., Adv. Pro. No. 11-1212-ES (BK 2074, Ex A). On May 9, 2011, certain defendants in the State Court Action, including Lehman ALI and LV Pacific Point filed a notice of removal of the State Court Action from the Superior Court of California, County of Orange, to the United States Bankruptcy Court for the Central District of California.  See BK 2074.  On May 26, 2011, the SunCal Debtors' filed a Motion for Remand [AP 10], which was denied at a hearing on July 12, 2011.

[9] See BK 2074, Exhibit A.

Foreclosure Sale triggered the Lehman Entities' obligations under the Restructuring Agreement with respect to the overall SunCal-Lehman relationship.[10]  Significantly, the allegations in the Acton Adversary Proceeding are premised on the theory that the Restructuring Agreement is an *integrated*, comprehensive agreement between SunCal and the Lehman Entities.  Ironically, unlike in the Lehman Adversary Proceeding, in the Acton Adversary Proceeding the respective SunCal Debtors seek to affirm the entire Restructuring Agreement, and the allegations by the SunCal Debtors, including SJD Partners, make clear that all of the obligations contained in the contract arose from the same agreement.[11]

### D.    The Disallowance Motion

On May 10, 2011, certain SunCal Debtors, including SJD Partners, took another step in their multiple front approach against the Lehman Entities and filed a motion seeking to enforce the Restructuring Agreement by disallowing certain claims held by the Lehman Entities, on the basis of their alleged breaches of the Restructuring Agreement ("Disallowance Motion").[12] Lehman Re objected to the Disallowance Motion on May 26, 2011.[13]  Rather than seeking rescission of the respective SunCal Debtors' consent to the Foreclosure Sale, the Disallowance Motion seeks to enforce the Restructuring Agreement in its entirety, even relying on the Foreclosure Sale as a basis for enforcement of the various rights and obligations arising out of the contract as a whole.[14]  The Disallowance Motion also argues that all of the obligations under the

---

[10] See BK 2074, Exhibit A ¶ 187.

[11] See BK 2074, Exhibit A ¶¶ 134-205.

[12] See BK 2082, Notice of Amended Motion and Amended Motion for Order Disallowing Certain Claims Held By Lehman ALI Inc. and Lehman Commercial Paper Inc.

[13] See BK 2125, Joinder to Lehman Entities' Opposition to Amended Motion for Order Disallowing Certain Claims Held by Lehman ALI Inc. and Lehman Commercial Paper, Inc.

[14] See BK 2082, at 22-24.

Restructuring Agreement and all of the parties' efforts to perform under the Restructuring

Agreement were part of the "same transaction."[15]

**E.      The Group IV Voluntary Debtors' Disclosure Statement and Plan**

On August 12, 2011, the Group IV Voluntary Debtors filed their most recent version of

the Plan and disclosure statement (the "Disclosure Statement") with respect to SJD Partners and

SJD Development.[16]  As was the case with all prior iterations of the disclosure statements and

plans filed by the Group IV Voluntary Debtors, the current Plan is speculative, replete with

infirmities, and describes a proposed chapter 11 plan that is patently unconfirmable under section

1129 of the Bankruptcy Code.

## III.      OBJECTION

**A.      The Plan Is Improperly Based On The Recovery of Pacific Point**

Although Lehman Re is not herein seeking that the Court resolve the merits of the claims

asserted in the Lehman Adversary Proceeding, it is important to note the weaknesses and

speculative nature of such claims because they are the source of any meaningful distributions to

Reliance Claimants, the preferred unsecured creditors under the proposed Plan.  Indeed, the

estimated recoveries and distributions for Reliance Claimants described in Section V of the Plan

are premised entirely upon SJD Partners' ability to obtain title, free and clear, to Pacific Point in

the Lehman Adversary Proceeding – a highly unlikely feat.  Interestingly, the Group IV

Voluntary Debtors have already conceded that neither SJD Partners nor SJD Development

currently own any real property.[17]  Thus, the only potential means for Reliance Claimants to

actually realize any meaningful distributions under the Plan is if SJD Partners first acquires

---

[15] See BK 2082, at 26.

[16] See BK 2554, Fourth Amended Disclosure Statement Describing Fourth Amended Joint Chapter 11 Plan Filed by SJD Partners Ltd. and SJD Development Corp. (Group IV: Voluntary Debtors).

[17] See Disclosure Statement at Exhibit "1". ("SJD Partners . . . currently owns no real property", and "SJD Development . . . does not own any real property.").

Pacific Point free and clear of any liens as a remedy for its fraudulent inducement claim in the Lehman Adversary Proceeding. As set forth herein, this cannot be accomplished because each of the three grounds asserted by the SunCal Debtors in the Lehman Adversary Proceeding as a basis to unwind the Foreclosure Sale fail as a matter of law.

1.    **There Is No Basis For Partial Rescission Of The Restructuring Agreement.**

a.    **Indivisible Contracts Cannot Be Partially Rescinded**

The first ground asserted by the SunCal Debtors for unwinding the Foreclosure Sale is rescission of the Restructuring Agreement, but only "to the extent that SJD Partners consented to the foreclosure and sale of the Pacific Point property."[18] However, the Restructuring Agreement, which is governed by New York law, is an indivisible contract that is not subject to partial rescission. See Goldman v. Sontag, 15 N.Y.S.2d 407, 411 (App. Div. 1939) (an indivisible contract cannot be affirmed in part and rescinded in part, and if it cannot be rescinded in its entirety, it cannot be rescinded at all), amended on other grounds, 29 N.Y.S.2d 910 (App. Div. 1941), aff'd, 289 N.Y. 556, 43 N.E.2d 532 (1942).

Specifically, a contract is indivisible when by its terms, nature, and purpose, it contemplates and intends that each and all of its parts and the consideration therefor shall be common each to the other and interdependent. See First Sav. & Loan Ass'n of Jersey City, N.J. v. Am. Home Assurance Co., 29 N.Y.2d 297, 299, 277 N.E.2d 638, 639 (1971); Dresdner Bank AG (N.Y. Branch) v. Morse/Diesel, Inc., 499 N.Y.S.2d 703, 706 (App. Div. 1986). Where the parties contemplate fulfillment of the entire contract, the contract is treated as indivisible. See Barden & Robeson Corp. v. Timmerman, 497 N.Y.S.2d 196, 197 (App. Div. 1986). An indivisible contract can only be rescinded in its entirety, leaving the parties in the same position

---

[18] Complaint ¶ 256.

they would occupy if there had been no agreement.  See Goldman, 15 N.Y.S.2d at 411; Slater v. Slater, 204 N.Y.S. 112, 117 (App. Div. 1924), aff'd, 240 N.Y. 557, 148 N.E. 703 (1925); see also Merryman v. Gottlieb, 472 N.Y.S.2d 488, 490 (App. Div. 1984) (if a particular contract is subject to rescission, it should be rescinded completely and not partially).

The Restructuring Agreement is an indivisible contract and may not be partially rescinded. The Restructuring Agreement embodies an overall workout of the SunCal Debtors' primary debt obligations to the Lehman Entities with respect to all of the real estate development projects at issue in the Complaint.  The Restructuring Agreement itself is replete with examples of interrelated and overlapping consideration provisions, and the Restructuring Agreement does not contain a severability clause.  See Hoff Decl., Ex. 1.

Recital G of the form Settlement Agreement, which is incorporated into the Restructuring Agreement and is attached as Exhibit B to the Restructuring Agreement, describes the mutual promises being exchanged in consideration for the entire agreement.  Rather than separating various agreements by project, Recital G provides that:

- "the Manager shall enter into the Management Agreements with the respective Venture Grantees"

- "the Existing Interim Loan shall be extended as provided herein"

- "Lender shall make the New Interim Loan to the New Interim Loan Borrower as provided herein"

- "Elieff shall execute and deliver the Elieff Note to Lehman ALI"; and

- "the Mortgage Loans shall be modified and amended pursuant to the Loan Modification Documents"

Hoff Decl., Ex. 1, Ex. B, Recital G.  Listed along with these and other benefits is the following regarding the Pacific Point foreclosure: "with respect to the Pacific Point Property, the Pacific Point Lender shall proceed with the Pac Point Foreclosure Proceeding and the Pac Point Borrower Parties and Elieff shall cooperate with respect thereto, all in accordance with the terms

of this Agreement." Hoff Decl., Ex. 1, Ex. B, Recital G (emphasis added). Recital G further

states that:

> The Conveyance Property Transfers, the Equity Interest Transfers, all of the other transactions described above and all of the other transactions contemplated under this Agreement or any of the other Settlement documents (collectively, the "Settlement Transactions") shall be entered into and consummated pursuant to the terms, covenants and conditions set forth in this Agreement **and shall be subject to the performance of all of the obligations of the parties set forth herein**. (emphasis added).

Hoff Decl., Ex. 1, Ex. B, Recital G.

In addition to the terms of the Restructuring Agreement itself, which makes clear that the

contract is indivisible and not subject to partial rescission, the testimony of Bruce Elieff, SunCal's

principal owner, and Bruce Cook, SunCal's general counsel and one of SunCal's primary

negotiators of the Restructuring Agreement, makes clear that the SunCal Debtors' requests for

rescission of only those portions of the Restructuring Agreement dealing with consent to the

Foreclosure Sale are improper. As Bruce Elieff testified at his deposition, rather than treating

Pacific Point as an independent transaction, the parties to the Restructuring Agreement intended

to treat Pacific Point as part of the overall transaction set forth in the agreement. Hoff Decl., Ex.

2, 98-99. In fact, Elieff testified that, other than the form (foreclosure, deed in lieu of foreclosure

or other form of transfer) by which Pacific Point would be transferred to its new owner, Pacific

Point was intended to be treated like all the other properties as contemplated by the entire

Restructuring Agreement. Hoff Decl., Ex. 2, 98-99. Cook testified that the Restructuring

Agreement was an "omnibus" agreement, intended to address a large number of projects, as part

of a single transaction. Hoff Decl., Ex. 3, 163-164. Cook further testified that Recital G

accurately reflected the intention of the parties entering into the Restructuring Agreement. Hoff

Decl., Ex. 3, 178-179.

### b.    Rescission Requires That Contract Benefits Be Returned

Rescission requires that the parties to the agreement be returned to the status quo that existed prior to the contract, meaning that any benefits received by the party requesting rescission must be returned.  See Rudman v. Cowles Commc'ns, Inc., 30 N.Y.2d 1, 13, 280 N.E.2d 867, 873-74 (1972); see also Gregory v. Garrett Corp., 589 F. Supp. 296, 300 (S.D.N.Y. 1984).  When it is clear that the party seeking rescission has no ability or willingness to return the contract benefits and restore the status quo, a court will enter judgment in favor of the party against whom rescission is sought.  Adrian Family Partners I, L.P. v. Exxonmobil Corp., No. 19344/01, 2007 WL 6370971, *14 (Sup. Ct. June 11, 2007) (seller of a parcel of land sought rescission of the sale; court held that rescission was not available because seller had no ability to restore the purchase price and return the defendant to the status quo), aff'd, 878 N.Y.S.2d 140 (App. Div. 2009); see also Gregory, 589 F. Supp. at 300 (party required to repay cash received in exchange for release or face dismissal of action for rescission).  Rescission is also inappropriate where restoration of the status quo ante is impractical because of a substantial change in the position of the parties.  Sokolow, Dunaud, Mercadier & Carreras LLP v. Lacher, 747 N.Y.S.2d 441, 446 (App. Div. 2002); see also Rudman, 30 N.Y.2d at 13-14, 280 N.E.2d at 873-74 (plaintiff not entitled to rescission of a merger agreement where the assimilation of plaintiff's company was already complete); Tarleton Bldg. Corp. v. Spider Staging Sales Co., 274 N.Y.S.2d 43, 44 (App. Div. 1966) (plaintiff not entitled to rescission of a construction contract because "the installation of facilities integrated into and designed for a particular building, does not lend itself to a substantial restoration to the status quo ante of the breaching contractor.")

The Complaint's request for rescission of the Restructuring Agreement is improper because the status quo that existed prior to the Restructuring Agreement cannot be restored.  The SunCal Debtors seek to rescind one part of the Restructuring Agreement while simultaneously retaining all the benefits of the contract that they have received or to which they are otherwise

entitled.  <u>See, e.g.</u>, Hoff Decl., Ex. 4, ¶¶ 102, 106, 108, 256.  The SunCal Debtors have already received the benefits of partial performance of the Restructuring Agreement, yet they do not offer to return those benefits, nor do they allege any basis upon which restoration of the status quo is feasible.

The SunCal Debtors who were parties to the Restructuring Agreement received the benefit of millions of dollars in value, and other substantial benefits, as a result of the Lehman Entities' performance under the Restructuring Agreement, prior to its termination by Lehman.  Among other things, the Restructuring Agreement provided that, under certain conditions, Lehman would provide funding for certain approved "Urgent Payables" to vendors who were creditors of the SunCal Debtors, and that Lehman would pay management fees to SunCal Management, LLC in respect of the projects subject to the Restructuring Agreement.  Hoff Decl., Ex. 1, §§ 1(h)-(i).  In fact, the Lehman Entities provided millions of dollars to the SunCal Debtors in accordance with the terms of the Restructuring Agreement.

As the SunCal Debtors' have admitted in their own allegations in the Lehman Adversary Proceeding, Lehman ALI arranged for a third party, Radco, to settle outstanding contractor payables on the SunCal Debtors' projects.  At the deposition of Norman Radow, the CEO of Radco, a document was introduced, showing that as of October 2, 2008, Radco had paid over $17 million for payables on certain SunCal projects with funds provided by Lehman ALI, with the Lehman Entities paying another $1.7 million directly.  Hoff Decl., Ex. 5.  Mr. Radow also confirmed the accuracy of these figures in his deposition testimony.  Hoff Decl., Ex. 6, 218-219.  In addition, one of the SunCal Debtors' chief negotiators for the Restructuring Agreement, Bruce Cook, admitted that the $17 million figure was accurate.  Hoff Decl., Ex. 3, 210-211 (Q: "Do you have any basis to contend that this -- the payments that are identified there totaling $17 million were not in fact made -- paid by RADCO?" A: "I think that's about right").

The $17 million figure reflected in the Radco documentation and confirmed by the testimony of Bruce Cook and Norman Radow is also consistent with the testimony of Robert Brusco, of Lehman.  Hoff Decl., Ex. 7, 326-327.  Mr. Brusco testified that, between the date of the Restructuring Agreement and the date of LBHI's bankruptcy filing, Lehman provided between $10 million and $20 million worth of funding for Radco payments on the SunCal Debtors' outstanding payables.  Hoff Decl., Ex. 7, 326-327.

The payments made by Lehman for the SunCal Debtors' payables were memorialized by certain "Protective Disbursement Agreements" signed by Lehman and SunCal.  <u>See</u> Hoff Decl., Ex. 8.  Mr. Brusco has executed a declaration in opposition to the Disallowance Motion in which he stated that the amounts contained in twelve sample Protective Disbursement Agreements were paid by Lehman.   Hoff Decl., Ex. 9, ¶ 6 ("Each of the lenders under the respective Loan Documents funded the amounts set forth in their respective Protective Disbursement Agreements to the applicable Borrower Debtors").   The amount of money provided under these twelve Protective Disbursement Agreements alone is approximately $3.8 million.  When confronted with copies of these Protective Disbursement Agreements at his deposition, Mr. Cook, of SunCal, admitted that some, if not all, of these amounts had been paid.  Hoff Decl., Ex. 3, 204-205 (Q: "Okay. Do you know whether these – the protective advances that were -- that are set forth in this exhibit were in fact paid?" A: "Some of them were paid. I don't know if all of them were paid").  Mr. Cook also confirmed that the protective advances were paid by Lehman, and were made pursuant to the Restructuring Agreement.  Hoff Decl., Ex. 3, 202-205 (Q: "Okay. Do you know -- and the -- and these protective advance payments by or on behalf of Lehman were made pursuant to the restructuring agreement?" A: "Yes").

Yet, the SunCal Debtors have expressed no intention and have shown no ability to make the Lehman Entities whole for the millions of dollars in value that they received pursuant to the

Restructuring Agreement.  There are no allegations in the Complaint that the SunCal Debtors have the intention or ability to divest themselves of the contractual benefits they have received, including to repay the money that the Lehman Entities paid under the Restructuring Agreement, or to forego any other non-monetary benefits.

As Bruce Elieff's testimony makes clear, the SunCal Debtors are not prepared to return the substantial benefits they received under the Restructuring Agreement.  When directly asked whether the SunCal Debtors are prepared to forego and return the benefits of the Restructuring Agreement, Elieff became evasive and refused to commit to returning the Lehman Entities to the status quo that existed prior to the Restructuring Agreement.  Hoff Decl., Ex. 2, 119-123.

**c.    Rescission Is Improper Because All The Necessary Parties Have Not Been Joined.**

The SunCal Debtors also have failed to join all the parties necessary for rescission of the Restructuring Agreement.  In an action for rescission, all parties to the agreement must be joined as necessary parties.  See Tudor v. Riposanu, 461 N.Y.S.2d 6, 7 (App. Div. 1983).  Fundamental due process requires that all parties with rights arising from an agreement be joined in an action seeking to rescind that agreement.  See Galbraith v. Guida, 554 N.Y.S.2d 592, 593 (App. Div. 1990).  When a party is entitled to benefits under the contract, and that party does not request rescission and is not named as a defendant in the action, another party's claim for rescission of the contract must be dismissed.  See Denker v. Twentieth Century-Fox Film Corp., 10 N.Y.2d 339, 345-46, 179 N.E.2d 336, 337-38 (1961) (plaintiff's claims for rescission and partial rescission dismissed where another party receiving benefits refused to request rescission).

SCC Acquistions and Bruce Elieff are parties to the Restructuring Agreement, but are not plaintiffs in the Lehman Adversary Proceeding.  SCC Acquisitions and Bruce Elieff have not appeared in the Lehman Adversary Proceeding and have expressed no intention or desire to return the benefits to which they are entitled under the Restructuring Agreement.  To the contrary, SCC

Acquisitions and Elieff are plaintiffs in the Acton Adversary Proceeding, which seeks to enforce the Restructuring Agreement, in its entirety. The Restructuring Agreement confers substantial benefits on SCC Acquistions and Elieff, including relief from millions of dollars worth of liability for bond indemnities signed by Bruce Elieff and his wife Kathy Elieff, and millions in guaranty liability that SCC Acquisitions undertook in connection with the issuance of the loans subject to the Restructuring Agreement. Bruce Elieff testified that he and SCC Acquisitions are not prepared to agree to simply forego these benefits by rescinding the contract that confers them. See Hoff Decl., Ex. 2, 119-123.

SCC Acquisitions and Elieff have not joined in the request for rescission of the Restructuring Agreement, nor have they been named as parties in the Lehman Adversary Proceeding. Both in terms of the absence of necessary parties and, as a result, the inability to restore the status quo, the Complaint's request for rescission is improper.

**2.    There Is No Basis To Invalidate The Foreclosure Sale.**

The second argument made by the SunCal Debtors in an attempt to obtain title to Pacific Point is that the Foreclosure Sale should be "invalidated." Complaint ¶ 256. However, the law is clear that a plaintiff must pay or offer to pay the debt secured by a property before filing an action to set aside a foreclosure sale. See Behdjou v. US Bancorp, No. CV 09-2314 AHM (RCx), 2009 WL 2048124, *3 (C.D. Cal. July 13, 2009) (citation omitted); see also Karlsen v. Am. Sav. & Loan Ass'n, 15 Cal. App. 3d 112, 117, 92 Cal. Rptr. 851, 854 (1971) ("A valid and viable tender of payment of the indebtedness owing is essential to an action to cancel a voidable sale under a deed of trust."). Here, the SunCal Debtors cannot maintain an action to "invalidate" the Foreclosure Sale because they have not fulfilled this essential pre-condition. Indeed, the SunCal Debtors have failed to pay, and have no intent to pay, the delinquent debt secured by Pacific

Point.  To the contrary, the Lehman Adversary Proceeding actually seeks to *avoid payment* on that secured debt.

**3.    There Is No Basis For Imposition Of A Constructive Trust On The Pacific Point Project.**

The third claim made by the SunCal Debtors in an attempt to obtain title to Pacific Point is that the Bankruptcy Court should "impose a constructive trust upon the Pacific Point property" and direct LV Pacific Point to transfer title back to SJD Partners.[19]  Fatally, however, the SunCal Debtors are not entitled to a constructive trust because (1) SJD Partners has no right to possess Pacific Point and (2) Pacific Point was not wrongfully acquired by LV Pacific Point.  See Campbell v. Superior Court, 132 Cal. App. 4th 904, 920,34 Cal. Rptr. 3d 68, 79-80 (2005).  In fact, the Foreclosure Sale was justified by SJD Partners' default on the secured debt and was conducted in accordance with California law.

SJD Partners' consent was not required for the Foreclosure Sale to proceed.  As the SunCal Debtors, including SJD Partners, have repeatedly admitted, the loans secured by Pacific Point were in default at the time of the Foreclosure Sale.  See, e.g., Hoff Decl., Ex. 8, Ex. 10.  The Trustee's Deed Upon Sale, recorded on September 9, 2008, shows that at the time of the Foreclosure Sale, SJD Partners owed $58,169,825.74 on the loan underlying the foreclosure.  Hoff Decl., Ex. 11.  Additionally, this Court has already ruled that the SunCal Debtors' allegations do not support a claim that the Foreclosure Sale was irregular or otherwise unlawful or invalid.  Hoff Decl., Ex. 12, p. 8:20-24 ("There was nothing in the complaint that alleged or included facts sufficient to support a claim that the foreclosure sale was anything other than regularly conducted and – within the meaning of applicable state and federal law").

---

[19] See Complaint ¶ 256.

Moreover, the SunCal Debtors' remaining claims against Lehman Re, for equitable subordination and transfer of claims and liens, are premised on the faulty assumption that Pacific Point is transferred from LV Pacific Point into the SJD Partners' estate as a result of the SunCal Debtors' claims to unwind the Foreclosure Sale. Because Pacific Point is not the property of SJD Partners' estate and cannot be transferred under any of the theories the SunCal Debtors have asserted in the Lehman Adversary Proceeding, the SunCal Debtors' equitable subordination and lien transfer claims are invalid as a matter of law. See In re Emergency Monitoring Techs., 366 B.R. 476, 504 n.22 (Bankr. W.D. Pa. 2007).

The law and the facts are plainly against the SunCal Debtors' efforts to partially rescind the Restructuring Agreement. Therefore, SJD Partners' attempts to unwind the Foreclosure Sale are meritless and will not succeed. As a result, any real recoveries set forth in the Group IV Voluntary Debtors' proposed Plan that are premised upon the SunCal Debtors' success in the Lehman Adversary Proceeding are nothing more than empty promises that the Group IV Voluntary Debtors will not be able to fulfill.

**B.**     **The Plan Does Not Satisfy Bankruptcy Code Section 1129**

In addition to improper reliance on the legally infirm Lehman Adversary Proceeding, the Plan does not meet the requirements of the Bankruptcy Code. The SunCal Plan Proponents bear the burden of proving that each condition to confirmation set forth in section 1129 of the Bankruptcy Code is satisfied. See Ellsworth v. Lifescape Med. Assocs., P.C. (In re Ellsworth), BAP No. AZ-10-1253-MkMaD, 2011 Bankr. LEXIS 3010, *30 (B.A.P. 9th Cir. July 29, 2011); Liberty Nat'l Enters. v. Ambanc La Mesa, Ltd. P'ship (In re Ambanc La Mesa, Ltd. P'ship), 115 F.3d 650, 653 (9th Cir. 1996). As shown herein, the Plan is riddled with material failures and illegal provisions that preclude its confirmation. SCC Acquisitions and the Group IV Voluntary Debtors cannot sustain their burden of proof and confirmation must be denied.

1    **1.    The Plan is Not Proposed in Good Faith**

2    Section 1129(a)(3) of the Bankruptcy Code requires that the plan proponent propose the

3    plan "in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). A plan of

4    reorganization must be consistent with the objectives and purposes of the Bankruptcy Code,

5    including a sense that the debtor is trying to maximize the return to its creditors within the

6    confines of the rules. See Ryan v. Loui (In re Corey), 892 F.2d 829, 835 (9th Cir. 1989); Rand v.

7    Porsche Fin. Servs. (In re Rand), BAP No. AZ-10-1160-BaPaJu, 2010 Bankr. LEXIS 5076, *25

8    (B.A.P. 9th Cir. Dec. 7, 2010).

9

10    As a prerequisite to confirmation, the good faith requirement of section 1129(a)(3)

11    requires that the proposed plan achieve a result consistent with the Bankruptcy Code. A plan

12    proposed in good faith exhibits both a fundamental fairness in dealing with creditors and is

13    consistent with the objectives and purposes of the Bankruptcy Code. See Jorgensen v. Fed. Land

14    Bank (In re Jorgensen), 66 B.R. 104, 109 (B.A.P. 9th Cir. 1986); see also In re Corey, 892 F.2d at

15    835 (a plan is proposed in good faith if there is a likelihood that the plan will achieve a result

16    consistent with the standards prescribed under the Bankruptcy Code). The proposed plan must be

17    viewed in light of the totality of the circumstances and the bankruptcy judge must assess the good

18    faith nature of the respective parties' proposals. See In re Pac. First Bank ex rel. RT Capital

19

20    Corp. v. Boulders on the River, Inc. (In re Boulders on the River, Inc.), 164 B.R. 99, 104 (9th Cir.

21    1994).

22    Here, the Group IV Voluntary Debtors' proposed Plan raises serious questions of good

23    faith because it is based upon unfounded and unrealistic funding expectations, and willful

24    ignorance as to the outcomes likely imposed upon the Group IV Voluntary Debtors' creditors. In

25    fact, it is not even clear that the Group IV Voluntary Debtors have the financial wherewithal to

26    consummate and effectuate the Plan. To date no commitment has been obtained to (i) fund

27

28    LitCo's obligation to purchase Reliance Claims under the Plan, or (ii) make the LitCo Plan Loan

which, in turn, must fund Post-Confirmation Expenses, including any prosecution or settlement of the Litigation Claims (including the Lehman Adversary Proceeding and the Acton Adversary Proceeding).[20]  Accordingly, the financing required to prosecute the very litigations that allegedly will fund distributions under the Plan does not yet even exist.[21]  Without any firm commitment by a financially sound third party to fund Litco, the Plan's proposed distributions are nothing more than pure speculative hope on the part of the Group IV Voluntary Debtors.  In light of these numerous hindrances to any material creditor recovery, the distribution scheme proposed under the Plan can not have been formulated with the honest goal of maximizing creditor recoveries.

While the Plan wishfully estimates that holders of Allowed Reliance Claims will receive an initial 1% distribution on their Allowed Claims from the LitCo Plan Loan, with a potential additional distribution of up to approximately 49% from LitCo in the unlikely event that LitCo obtains free and clear title to Pacific Point though litigation, the fact of the matter is that, for the reasons stated above, LitCo will not be able to obtain free and clear title to Pacific Point, which is currently owned by non-debtor LV Pacific Point and remains subject to Lehman Re's first priority lien.  Yet, instead of conceding this point, the Plan makes conspicuous and baseless representations that creditors may actually receive up to 50% of the value of their claim.[22]  This scenario is so remote that there is no basis to conclude that the Plan protects the interests of

---

[20] See Disclosure Statement § 11.3.

[21] The Group IV Voluntary Debtors' Plan also fails to account for how recoveries, if any, on account of the Litigation Claims will be allocated amongst the different SunCal entities that have interests therein, including, for instance, insiders such as other SunCal Debtors, Bruce Elieff and SCC Acquisitions.  For example, the Acton Adversary Proceeding was brought by numerous SunCal Debtors other than SJD Partners (as well as Bruce Elieff and SCC Acquisitions) and the Plan fails to account for the fact that recoveries awarded in that action would presumably have to be allocated amongst the numerous plaintiffs thereto in addition to SJD Partners.  As such, the creditors of the Group IV Voluntary Debtors would essentially be sharing any recoveries on account of the Litigation Claims with creditors of the other SunCal Debtors, as well as insiders Bruce Elieff and SCC Acquisitions.  It is not clear in the Plan what the Group IV Voluntary Debtors' stakes are with respect to the Litigation Claims vis-à-vis the other plaintiffs that have interests therein.  The Plan fails to address this material contingency.

[22] See Plan § 1.

innocent creditors and furthers the objectives of the Bankruptcy Code.  In reality, the Plan is simply hinging creditor recoveries on nothing more than the SunCal Debtors' speculative litigation tactics – including the gamble for Pacific Point.

Moreover, even *assuming arguendo* that the far-fetched remedies the SunCal Debtors seek with respect to unwinding a consensual and legal foreclosure sale are actually available at law, the best-case-scenario still leaves the SunCal Debtors and Lehman Re in the same positions held before the Pacific Point foreclosure absent any subordination:[23] with Lehman Re, as successor lender, enjoying the benefit of a valid first-priority Deed of Trust securing the Term Loan and the Pacific Point First Loan Agreement, and the SunCal Debtors holding an encumbered Pacific Point, having failed to pay over $100 million worth of debt secured by liens on the property. Even if the SunCal Debtors are successful in recovering Pacific Point in the Lehman Adversary Proceeding, an unlikely result which Lehman Re does not concede, Pacific Point and any proceeds from its post-confirmation sale, will still be encumbered by Lehman Re's first priority lien of nearly $100 million.  Nevertheless, the Plan seemingly attempts to placate innocent

---

[23] It is well established that "equitable subordination is an unusual remedy which should be applied only in limited circumstances." Feder v. Lazar (In re Lazar), 83 F.3d 306, 309 (9th Cir. 1996). "Equitable subordination means that a court has chosen to disregard an otherwise legally valid transaction." See In re Lifschultz Fast Freight, 132 F.3d 339, 347 (7th Cir. 1997); See also Reaves v. Comerica Bank-Cal. (In re GTI Capital Holdings, LLC), No. 07-00031, 2007 Bankr. LEXIS 3005, *43 (Bankr. D. Ariz. Aug. 30, 2007) ("Equitable subordination is a dramatic remedy, and one that is rarely granted."). Bankruptcy Courts only apply section 510(c)(2) to the liens of secured creditors, meaning creditors with claims against a debtor that are secured by property of the estate. See In re Emergency Monitoring Techs., 366 B.R. 476, 504 n.22 (Bankr. W.D. Pa. 2007) ("510(c), which provides for the recapture by the bankruptcy estate of any security interest – i.e., any lien – that secures a subordinated claim, operates to aid in the equitable subordination of a secured claim from unsecured claims."). Section 510(c) is used to subordinate creditor claims and cannot be used to enlarge a debtor's estate. The addition of property to a debtor's estate is only to be achieved by the Bankruptcy Code's avoidance provisions. See Max Sugarman Funeral Home, Inc. v. A.D.B. Investors, 926 F.2d 1248, 1254 (1st Cir. 1991) ("Although subsection 510(c)(2) permits the bankruptcy court to 'order that any lien securing *such a subordinated claim* [i.e., an allowed claim subordinated under subsection 510(c)(1)] be transferred to the estate,' neither subsection 510(c)(1) nor (2) empowers *avoidance* of the lien. . . .") (emphasis in original). Thus, Section 510(c) only applies to liens against property of the estate. It is undisputed that Pacific Point is not property of any of the SunCal Debtors' bankruptcy estates and, as demonstrated herein, even in the remote chance that the SunCal Debtors succeed on the merits of their fraudulent inducement claim, Pacific Point cannot be transferred into their bankruptcy estates under any of the theories advanced in the Complaint. Therefore, no action for equitable subordination of that lien may be maintained against Lehman Re. See Emergency Monitoring Techs., 366 B.R. at 504 n.22.

creditors by offering wide-eyed and unrealistic recoveries hinged upon dubious litigation theories. The misleading nature of the Plan, and its inability to be effectuated, render it unconfirmable.

### 2.    The Plan Does Not Satisfy the Best Interest of Creditors Test

Bankruptcy Code § 1129(a)(7) provides: "with respect to each impaired class of claims or interests – (A) each holder of a claim or interest of such class . . . (ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date." 11 U.S.C. 1129(a)(7).  Section 1129(a)(7) guarantees that unless otherwise agreed to, each creditor or interest holder will receive at least as much under the plan as it would in a liquidation of the debtor in a chapter 7 case.  In determining whether the best interests test has been met, it is necessary to determine the dollar amount that would be generated from a hypothetical liquidation of the debtors' assets in chapter 7 as of the effective date.  In re Bosque Power Co., No. 10-60348-rbk, 2010 Bankr. LEXIS 6064, *181 (Bankr. W.D. Tex. Sept. 1, 2010) ("to calculate the probable distribution to an impaired class of claims and interests if the debtor were liquidated under chapter 7,  a bankruptcy court must first determine the aggregate dollar amount that would be generated from the debtor's assets if it's chapter 11 case were converted to a chapter 7 under the Bankruptcy Code").  Here, the Plan does not satisfy the best interest analysis of section 1129 because the Group IV Voluntary Debtors have not provided any analysis whatsoever of what recoveries the creditors would receive in a chapter 7 liquidation.  Therefore, the Plan is unconfirmable for utterly failing to satisfy section 1129(a)(7).

While the Group IV Voluntary Debtors' Disclosure Statement provides a mere chart illustrating the potential results if they are not successful in the Lehman Adversary Proceeding, the Group IV Voluntary Debtors have failed to set forth any concrete estimate of what creditors

would receive in a chapter 7 liquidation, and instead have rested their case solely upon the naked assertion in the Disclosure Statement that creditors are receiving "at least as much" as they would receive in chapter 7 because a chapter 7 trustee allegedly would be compelled to liquidate the Group IV Voluntary Debtors' assets in the same manner as provided for in the Plan.[24]    In fact, however, in a chapter 7 liquidation it is very well likely that an objective trustee would not pursue the meritless Litigation Claims that are to be pursued under the Plan.  With less costs and expenses being expended in hopeless pursuit of the Litigation Claims (including the unnecessary expenditure of professional fees associated therewith), it is feasible that creditors may be receiving less under the Plan than in a chapter 7.

The Group IV Voluntary Debtors' misleadingly labeled "best interest analysis" assumed (i) a recovery of approximately $16,000,000 for the fraudulent inducement claims in the Lehman Adversary Proceeding, and (ii) that SJD Partners would be successful in its fraudulent inducement claim and that the Pacific Point Project would thereafter be sold to a buyer that would assume the un-matured bond liabilities.[25]    Despite Lehman Re's repeated prior requests for further disclosure regarding the alleged $16,000,000 value of Pacific Point that is presumed in the Disclosure Statement -- including requests for appraisal estimates, valuation opinions, explanations as to the type of valuation methodology employed by the Group IV Voluntary Debtors and the date such value was measured -- the Group IV Voluntary Debtors have failed to provided any such information and have merely stated that the valuation was based upon internal estimates.  See SunCal Plan Proponents' Omnibus Reply to Objections to First Amended Disclosure Statements § VII(E).[26]    Because the Group IV Voluntary Debtors have based their

---

[24] See Disclosure Statement § 15.1.

[25] See Disclosure Statement, Exhibit "7".

[26] Lehman Re again requested information from the SunCal Debtors regarding the $16,000,000 valuation of Pacific Point during formal discovery, and as of the date hereof is still awaiting such information.  In light of the ongoing

alleged best interest analysis on such unsubstantiated value, the Plan, in turn, reflects speculative and potentially inflated distribution projections. Consequently, it is impossible to assess whether creditors are in fact recovering at least as much under the Plan as they would recover in a chapter 7 liquidation.

The Group IV Voluntary Debtors' putative best interest analysis is also defective because it fails to consider and make any adjustments on account of how recoveries may be affected if no purchaser is secured for the unmatured bond liabilities, the analysis of which is required for a creditor to fully understand the differences between recovery under the Plan and recovery in a hypothetical chapter 7 liquidation.[27]    Rather, the Group IV Voluntary Debtors put forward recovery amounts for Bond Claimants based on success in the Lehman Adversary Proceeding and a subsequent sale of the Bond Claims.  This limited analysis relies on yet another unsubstantiated and speculative assumption -- that the Group IV Voluntary Debtors will be able to procure a buyer for the Bond Claims and consummate a sale thereof.  As presented in the Disclosure Statement Objection, while Exhibit "7" includes a column titled "Available Distribution Assuming Sale," there is no corresponding column that sets forth available distributions assuming a sale is not consummated notwithstanding success in the Lehman Adversary Proceeding.  Also absent from the Plan's best interest analysis is any consideration as to how recoveries would be impacted if Pacific Point were recovered but the Group IV Voluntary Debtors lacked the requisite funds to maintain the property pending sale in order to ensure that its value will not be eroded.

---

discovery process, Lehman Re reserves all rights to make further submissions on this point upon receipt of any production by the SunCal Debtors.

[27] Bond Claimants are defined under the Plan as holders of claims on account of various payment or performance bonds.  See Plan § 2.1.19.  These claimants include sureties that issued bonds to secure performance of work on certain projects and contractors hired to perform work on certain projects.  See Disclosure Statement § 5.3.  A comprehensive understanding of potential recoveries under the Plan versus a chapter 7 liquidation must account for contingencies related to the resolution of the Bond Claims.

In the absence of a proper and substantive best interest analysis that is not based on random and unsubstantiated values, section 1129(a)(7) has not been satisfied.  Accordingly, the Plan is unconfirmable as a matter of law.

**3.    The Plan Cannot Satisfy the Section 1129(a)(11)'s Feasibility Requirement**

The Plan also is unconfirmable because it cannot satisfy the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code.  Section 1129(a)(11) provides that a court may confirm a plan only if  "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11).  Courts are thus required to scrutinize a proposed plan carefully to determine whether it offers a reasonable prospect of success.  See In re Sagewood Manor Assocs. Ltd. P'shp, 223 B.R. 756, 762 (Bankr. D. Nev. 1998).  The goal is to determine whether there is a reasonable probability that the plan can be performed, and to weed out plans that are too tentative and visionary.  Id. at 763 ("[t]he purpose of section 1129(a)(11) is to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation") (quoting In re Pizza of Hawaii, Inc., 671 F.2d 1374, 1382 (9th Cir. 1985)).

The Plan proposed here and the promises made by the Group IV Voluntary Debtors thereunder are precisely what section 1129(a)(11) is intended to prevent.  Under the Plan, the Group IV Voluntary Debtors' assert that Post-Confirmation Expenses, including administrative expenses and priority claims, will be paid by SCC Acquisitions, as Plan Trustee for the Plan Trust, which will be financed by LitCo via the LitCo Plan Loan.  Notably, the definition of the LitCo Plan Loan explains that the obligations of LitCo under the Plan arise to the extent necessary -- meaning if there is no other source available from the "Group IV: Voluntary Assets"

(a category that includes the assets listed in Exhibit "1" to the Disclosure Statement, cash and Litigation Claims held by the Group IV Voluntary Debtors).[28]  Thus, before they secure the LitCo Plan Loan, the Group IV Voluntary Debtors may have to expend estate funds to implement the Plan.  But, as the Disclosure Statement makes clear: "SJD Partners . . . currently owns no real property", and "SJD Development . . . does not own any real property."[29]  In light of the lack of any Group IV: Voluntary Assets, it is clear that the LitCo Plan Loan will be needed to fund Post-Confirmation Expenses, including prosecution of the Lehman Adversary Proceeding.  However, because capitalization of LitCo remains a mystery, LitCo's ability and obligation to extend the LitCo Plan Loan is likewise illusory.[30]  As a result of this insufficient funding, there is real doubt that the Group IV Voluntary Debtors even have or can obtain the requisite funding for the required Effective Date payments under the Plan in order for confirmation to be authorized.  See Rand v. Porsche Fin. Servs. (In re Rand); 2010 Bankr. LEXIS 5076, *21 (9th Cir. Oct. 22, 2010); In re Trans Max Techs., Inc., 349 B.R. 80, 92 (Bankr. D. Nev. 2006) ("the debtor must offer more than speculation about the source of funding for the plan) (quoting In re Walker, 165 B.R. 994, 1003 (E.D. Va. 1994)); In re Made in Detroit, Inc., 299 B.R. 170, 179 (Bankr. E.D. Mich. 2003) (plan not confirmed when proponent made inadequate showing of ability to obtain financing), aff'd, 414 F.3d 576 (6th Cir. 2005); In re Griswold Bldg. LLC, 420 B.R. 666, 697 (Bankr. E.D. Mich. 2009) (denying confirmation because debtor did not have sufficient funds to pay administrative claims).

---

[28] See Plan § 2.1.75.

[29] See Disclosure Statement, Exhibit "1".

[30] See Disclosure Statement § 1 ("There is no guarantee that such funding will be obtained.").

### 4.    The Plan is Unfairly Discriminatory

Section 1129(b)(1) of the Bankruptcy Code provides that "the Court . . . shall confirm the plan . . . if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." 11 U.S.C. § 1129(b)(1).    The statutory proscription against unfair discrimination compensates for the complex priorities among classes and requires that a plan allocate value to a dissenting class in a manner consistent with the value allocated to other classes whose claims against the debtor are of a similar legal nature.    See Aetna Realty Investors, Inc. v. Monarch Beach Venture, Ltd. (In re Monarch Beach Venture. Ltd.), 166 B.R. 428, 437 (C.D. Cal. 1993).    Under the requirement that a plan not unfairly discriminate, the bankruptcy court must make findings and conclusions as to the existence of unfair discrimination in a plan, whether there is a reasonable basis for any discrimination, and the importance to the plan of such discrimination.    Id.

Here, there is no purported legal justification for the Plan's differing treatment between General Unsecured Claims (Class 4.1) and General Unsecured Claims classified as Reliance Claims (Class 3.1), all of which are similarly-situated and should be afforded similar treatment under the Plan.    Instead, however, the Plan entitles holders of Reliance Claims (i) an initial distribution equal to 1% of such claimant's Allowed Claim from the Litco Plan Loan, (ii) a pro-rata share of any funds payable from the applicable Distribution Account(s) after payment in full of all Post Confirmation Expenses, Allowed Administrative Claims and Allowed Priority Claims if and when such funds become available for distribution, and (iii) then the potential for an additional distribution equal to the difference between the distributions previously provided to such claim holders and a 50% distribution on account of such holders' Allowed Claims if Pacific Point is acquired free and clear of all claims and liens.[31]    In stark contrast, Holders of General

---

[31] See Plan at § 5.3.

Unsecured Claims that are not classified as Reliance Claims are only due to receive their *pro rata* share of any funds payable from the applicable Distribution Account(s) after payment in full of all Post-Confirmation Expenses, Allowed Administrative Claims and Allowed Priority Claims.[32]  In response to prior requests for further clarity as to the legal justification for the preferred treatment of Reliance Claimants,[33] the Debtors have merely disclosed that the separate classification has been implemented because Reliance Claimants hold specific Litigation Rights which are not held by other Unsecured Creditors.[34]  No sufficient legal justification has been put forth regarding the standards, methodology and criteria used for determining why some similarly situated unsecured creditors qualify as Reliance Claimants (including, conveniently, insiders such as SCC Acquisitions - an indirect parent company of the Group IV Voluntary Debtors, and SunCal Management, LLC – the former property manager for the Projects, as well as Miller Barondess, LLP and Voss, Cook & Thelp LP – counsel to the SunCal Debtors), while others do not.  In the absence of any apparent rationale to justify why some unsecured creditors qualify as Reliance Claimants entitled to preferred treatment, the Plan violates section 1129(b)(1).  Furthermore, the proposed treatment of claims within Classes 1.1 and 1.2 (which cover the disputed claims asserted against SJD Partners on account of the Pacific Point First Loan Agreement) is based upon unsupported and unexplained invocations of sections 506(a) and 506(d) of the Bankruptcy Code.  While section 506 may determine the amount of a secured claim, it does not govern the actual allowance or disallowance of a claim.  See, e.g., 4-506 Collier on Bankruptcy ¶ 506.03[2][a] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2010) (noting that section 506 does not speak to allowance and instead defers to the claims allowance process of section 502).  Therefore, the

---

[32] See Plan at § 5.4.

[33] See Disclosure Statement Objection ¶ 15.

[34] See Plan at 24 n.2.

1
2

Group IV Voluntary Debtors' attempt to disallow under the Plan claims related to the Pacific

3

Point First Loan Agreement is not legally supportable. The Court should deny confirmation.

4

### CONCLUSION

5

      **WHEREFORE,** for the reasons stated herein, Lehman Re respectfully requests

6

that confirmation of the Plan be denied.

7

8

Dated:  September 19, 2011          CADWALADER, WICKERSHAM & TAFT LLP

9

10

          By: */s/ Johnathan M. Hoff*

11

          JONATHAN M. HOFF (Bar No. 099787)
          Gregory M. Petrick (Admitted *pro hac vice*)

12

          **CADWALADER, WICKERSHAM & TAFT LLP**
          One World Financial Center

13

          New York, NY  10281

14

          Tel:  212.504-6000
          Fax:  212.504-6666

15

          E-mail:  jonathan.hoff@cwt.com
                  gregory.petrick@cwt.com

16

          BETTY M. SHUMENER (Bar No. 137220)

17

          HENRY H. OH (Bar No. 187127)

18

          **DLA PIPER LLP (US)**
          550 South Hope Street, Suite 2300

19

          Los Angeles, CA  90071-2678
          Tel:  213.330.7700

20

          Fax:  213.330.7701
          E-mail:  henry.oh@dlapiper.com

21

22

          Attorneys for the Joint Provisional Liquidators of
          LEHMAN RE LTD.

23

24

25

26

27

28