1 PAUL J. COUCHOT - State Bar No. 131934
  pcouchot@winthropcouchot.com
2 **WINTHROP COUCHOT**
  **PROFESSIONAL CORPORATION**
3 660 Newport Center Drive, Suite 400
  Newport Beach, CA 92660
4 Telephone: (949) 720-4100
  Facsimile: (949) 720-4111
5 General Insolvency Counsel for Administratively
  Consolidated Debtors-in-Possession
6
  RONALD RUS State Bar No. 67369
7 rrus@rusmiliband.com
  JOEL S. MILIBAND - State Bar No. 77438
8 jmiliband@rusmiliband.com
  **RUS MILIBAND & SMITH P.C.**
9 2211 Michelson Drive, Seventh Floor
  Irvine, California 92612
10 Telephone: (949) 752-7100
   Facsimile: (949) 252-1514
11 Counsel for SCC Acquisitions, Inc.

12           **UNITED STATES BANKRUPTCY COURT**
13           **CENTRAL DISTRICT OF CALIFORNIA**
                 **SANTA ANA DIVISION**
14
15 In re | Case No. 8:08-bk-17206-ES

Palmdale Hills Property, LLC, and its
16 Related Debtors.
           Jointly Administered Debtors
17         and Debtors-in-Possession

18 Affects:
   ☐ All Debtors
19 ☒ Palmdale Hills Property, LLC,
   ☒ SunCal Beaumont Heights, LLC
20 ☐ SCC/Palmdale, LLC
   ☒ SunCal Johannson Ranch, LLC
21 ☒ SunCal Summit Valley, LLC
   ☒ SunCal Emerald Meadows LLC
22 ☒ SunCal Bickford Ranch, LLC
   ☒ Acton Estates, LLC
23 ☒ Seven Brothers LLC
   ☒ SJD Partners, Ltd.
24 ☐ SJD Development Corp.
   ☒ Kirby Estates, LLC
25 ☒ SunCal Communities I, LLC
   ☐ SunCal Communities III, LLC
26 ☒ SCC Communities LLC
27 ☒ North Orange Del Rio Land, LLC
   ***Caption Continued on Next Page***
28

Jointly Administered With Case Nos. 8:08-bk-17209-ES;
8:08-bk-17240-ES; 8:08-bk-17224-ES; 8:08-bk-17242-ES;
8:08-bk-17225-ES; 8:08-bk-17245-ES; 8:08-bk-17227-ES;
8:08-bk-17246-ES; 8:08-bk-17230-ES; 8:08-bk-17231-ES;
8:08-bk-17236-ES; 8:08-bk-17248-ES; 8:08-bk-17249-ES;
8:08-bk-17573-ES; 8:08-bk-17574-ES; 8:08-bk-17575-ES;
8:08-bk-17404-ES; 8:08-bk-17407-ES; 8:08-bk-17408-ES;
8:08-bk-17409-ES; 8:08-bk-17458-ES; 8:08-bk-17465-ES;
8:08-bk-17470-ES; 8:08-bk-17472-ES; and 8:08-17588-ES.

Chapter 11 Cases

**SUNCAL PLAN PROPONENTS' OBJECTIONS TO:
(A)   THIRD AMENDED JOINT CHAPTER 11 PLAN
FOR ELEVEN VOLUNTARY DEBTORS PROPOSED
BY THE LEHMAN VD LENDERS; AND
(B)   THIRD AMENDED JOINT CHAPTER 11 PLAN
FOR EIGHT TRUSTEE DEBTORS PROPOSED BY
THE TRUSTEE AND SUBJECT LEHMAN
CREDITORS
[DECLARATIONS OF BRUCE V. COOK AND SEAN
A. O'KEEFE IN SUPPORT THEREOF AND
REQUEST FOR JUDICIAL NOTICE FILED
CONCURRENTLY HEREWITH]**

DATE:      October 24, 2011
TIME:      10:00 a.m.
PLACE:    Courtroom 5A

1

*Caption Continued from Previous Page*

2

☒ Tesoro SF, LLC

☒ SunCal Heartland, LLC

3

☒ LBL-SunCal Northlake, LLC

☒ SunCal Marblehead, LLC

4

☐ SunCal Century City, LLC

☒ SunCal PSV, LLC

5

☒ Delta Coves Venture, LLC

6

☒ SunCal Torrance, LLC

☒ SunCal Oak Knoll, LLC

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## TABLE OF CONTENTS

| | | |
|---|---|---|
| I. | PRELIMINARY STATEMENT | 1 |
| II. | MATERIAL BACKGROUND FACTS | 8 |
| III. | THE LEHMAN ENTITIES' DISPUTED CLAIMS SHOULD BE SUBSTANTIALLY REDUCED OR COMPLETELY DISALLOWED | 21 |
| IV. | THE LEHMAN PLANS FAIL TO COMPLY WITH 11 U.S.C. § 1129(a)(2) | 27 |
| V. | THE LEHMAN PLANS FAIL TO SATISFY 11 U.S.C. § 1129(a)(3) BY CREATING DEFICIENCY CLAIMS IN VIOLATION OF CALIFORNIA STATE LAW | 30 |
| VI. | THE LEHMAN PLANS WERE NOT PROPOSED IN GOOD FAITH IN VIOLATION OF 11 U.S.C. § 1129(a)(3) | 32 |
| VII. | THE LEHMAN PLANS FAIL TO SATISFY SECTION 1129(a)(7) | 32 |
| VIII. | THE TD PLAN DOES NOT COMPLY WITH SECTION 1129(a)(9) | 33 |
| IX. | THE LEHMAN PLANS FAIL TO SATISFY 11 U.S.C. § 1129(a)(11) | 34 |
| X. | THE LEHMAN PLANS DO NOT COMPLY WITH SECTION 1129(B)(2)(C) | 40 |
| XI. | THE LEHMAN PLANS IMPROPERLY CLASSIFY THE CLAIMS OF INSIDERS IN CONTRAVENTION OF SECTION 1123 | 40 |
| XII. | THE LEHMAN PLANS FAIL TO SATISFY SECTION 1123(a)(4) | 41 |
| XIII. | RESERVATION OF RIGHTS | 41 |
| XIV. | CONCLUSION | 42 |

# TABLE OF AUTHORITIES

***Statutes***

11 U.S.C. § 524 ........................................................................................................32

11 U.S.C. § 1123 ............................................................................................6, 40, 41

11 U.S.C. § 1129 ..........................................................5, 6, 7, 22, 27-34, 4

28 U.S.C. § 959 ........................................................................................................31


***Cases***

*In re Acequia*
    787 F.2d 1352 ...............................................................................................34

*In re Ambanc La Mesa Ltd. Partnership*
    115 F.3d 650 .................................................................................................32

*American Hardwoods, Inc. v. Deutsche Credit Corp. (In re American Hardwoods)*
    885 F.2d 621 .................................................................................................28

*American List Corp. v. U.S. News and World Report*
    75 N.Y.2d 38 .................................................................................................18

*Butner v. United States*
    440 U.S. 48 ...................................................................................................31

*In re Chateaugay Corp.*
    155 B.R. 625 .................................................................................................34

*In re Clinton Care Center, LLC*
    436 B.R. 390 .................................................................................................34

*In re Corey*
    892 F.2d 829 .................................................................................................32

*In re Harbon*
    4876 F.3d 510 ...............................................................................................34

*In re Jorgensen*
    66 B.R. 104 ...................................................................................................32

*Long Is. R.R. Co. v. Northville Indus. Corp.*
    41 N.Y.2d 455 ................................................................................................... 18

*Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp.*
    92 N.Y.2d 458 ................................................................................................... 19

*In re Pizza of Hawaii*
    761 F.2d 1374 ................................................................................................... 34

*Seaport Automotive Warehouse, Inc. v. Rohnert Park Auto Parts*
    113 B.R. 610 ..................................................................................................... 28

*In re Stolrow's Inc.*
    84 B.R. 167 ....................................................................................................... 32

*Stratosphere Litigation L.L.C. v. Grand Casinos, Inc.*
    298 F.3d 1137 ................................................................................................... 28

*Sun Valley Newspapers, Inc. v. Sun World Corp.*
    171 B.R. 71 ....................................................................................................... 28

*Underhill v. Royal*
    69 F.2d 1426 ..................................................................................................... 28

*In re Wingspread Corp.*
    145 B.R. 784 ..................................................................................................... 34

1   The Voluntary Debtors[1] and SCC Acquisitions, Inc. in their capacity as co-plan proponents

2   in certain of these jointly administered Chapter 11 cases (collectively the "SunCal Proponents"),[2]

3   hereby submit the following objections (the "Objections")[3] to the: (A) *Third Amended Joint*

4   *Chapter 11 Plan for Eleven Voluntary Debtors* (the "VD Plan") proposed by Lehman VD Lenders

5   ("LCPI"); and (B) *Third Amended Joint Chapter 11 Plan for Eight Trustee Debtors* (the "TD

6   Plan") proposed by the Chapter 11 Trustee for the Trustee Debtors[4] and subject Lehman creditors

7   (collectively, the "Lehman Entities").[5]  The VD Plan and the TD Plan are collectively referred to

8   as the "Lehman Plans."

9                                                        I

10                                    **PRELIMINARY STATEMENT**

11   The Lehman Plans seek to:

12   1) obtain title to the Projects owned by the Voluntary Debtors and Trustee Debtors

13   (together the "Debtors") through a Lehman-designed and controlled  foreclosure sale that bars

14   third party bidding;

15   2)  unilaterally create hundreds of millions in "deficiency claims" through this sale that are

16   expressly barred under California law[6] and that are not authorized under 11 U.S.C. § 1111;

17   3)  vote these artificial and unlawful claims with the intent of gerrymandering an impaired

18   consenting class in violation of § 1123(a)(3) and 11 U.S.C. § 1123(a)(4); and

19

20   ---
[1] The Voluntary Debtors are Palmdale Hills, LLC, a Delaware corporation ("Palmdale Hills"), SunCal Communities I

21   ("Communities I"), Acton Estates, LLC ("Acton"), SunCal Beaumont, LLC ("Beaumont"), SunCal Emerald
Meadows, LLC ("Emerald Meadows"), SunCal Johansson Ranch, LLC ("Johannson Ranch"), SunCal Bickford

22   Ranch, LLC ("Bickford Ranch"), SunCal Summit Valley, LLC ("Summit Valley"), Seven Brothers, LLC ("Seven
Brothers"), Kirby Estates, LLC ("Kirby Estates"), SCC Communities, LLC ("SCC Communities"), North Orange Del

23   Rio Land, LLC ("Del Rio"), and Tesoro SF LLC ("Tesoro").

[2] All capitalized terms shall have the meaning set forth in the Lehman Plans.
24   [3] Unless otherwise defined herein, all capitalized terms have the meaning set forth in the definition sections of the
SunCal Plan Proponents' disclosure statement and plan.

25   [4] The Trustee Debtors are: LB/L-SunCal Oak Valley, LLC ("Oak Valley"), SunCal Heartland, LLC ("Heartland"),
LB/L-SunCal Northlake, LLC ("Northlake"), SunCal Marblehead, LLC ("Marblehead"), SunCal PSV, LLC ("PSV"),
26   Delta Coves Venture, LLC ("Delta Coves"), SunCal Torrance Properties, LLC ("Torrance") and SunCal Oak Knoll,
LLC ("Oak Knoll").  The Voluntary Debtors and Trustee Debtors are collectively referred to as the "Debtors."
27
[5] The Lehman Plans are virtually identical in structure and materially only vary in the proposed distributions.
28   [6] These deficiency claims are based solely *upon the Lehman Entities' view* of their loan balances and the Project
values.

-1-

1    4) unlawfully effect a release of claims held by non-debtor third parties against the

2  Lehman Entities. In return for this impermissible "taking" and releases, the Lehman Plans

3  purport to "guarantee" the holders of "allowed" unsecured claims a one percent (1%) distribution.

4  This distribution is paid, in the first instance, from the very cash that the Lehman Entities'

5  propose to seize from the Debtors under the Lehman Plans. To the extent this cash is insufficient,

6  which it will be as proven herein, the Lehman Entities represent that they will fund the

7  differential, but only up to their overall funding caps, which are vastly exceeded by the purported

8  distributions under the Lehman Plans.

9    As more fully explained herein, the Lehman Plans are also premised upon the following

10  fallacious assumption: the validity of the Lehman Entities' secured claims. Although the

11  Lehman Entities managed to bar any objection to these claims for almost three years, through a

12  series of questionable legal maneuvers and judicially determined misrepresentations, this

13  stratagem ultimately failed. As of this writing, every claim submitted by the Lehman Entities is

14  the subject of a well-grounded and supported claim objection or a pending adversary claim that is

15  not subject to the automatic stay arising from certain Lehman Entities' Chapter 11 proceedings

16  pending in the Southern District of New York. These objections and counter-claims have

17  eliminated the prima facie validity that would otherwise have been accorded the Lehman Entities'

18  claims, thereby leaving the Lehman Entities with the burden of establishing their entitlement to

19  payment by a preponderance of the evidence. Until the Lehman Entities meet this burden, which

20  the SunCal Proponents do not believe is possible given the weight of the evidence, the assumption

21  in the confirmation process should be that the claims of all other holders of allowed claims will be

22  paid in full from the assets in the Debtors' cases due to the presently disallowed status of the

23  Lehman Entities' claims.

24    Although the Lehman Entities will insist, as they have in the past, that they do not have to

25  "prove" the validity, priority and amount their claims, and that this Court can simply step-over

26  this issue on one basis or another, this is not the law. Pursuant to Section 1129(a)(7), to the extent

27  there is a single creditor voting against each of the Lehman Plans, this Court must independently

28  find that all creditors will receive at least as much as they would receive in a Chapter 7 case under

1   the Lehman Plans. To make this finding, the Court must take evidence and reach a conclusion

2   regarding what the Lehman Entities are owed, if anything, after due consideration of the pending

3   claim objections. Without this quantification of the liability side of the Debtors' balance sheets, a

4   ruling on the ultimate distributions that would be available to creditors is impossible.

5          Since the SunCal Proponents have extensively briefed their objections and their other

6   defenses to the Lehman Entities' claims in separately pending claim objections and adversary

7   proceeding, they will not repeat, but only summarize these arguments herein in their totality. In

8   addition, they will instead file these pleadings as attachments to the accompanying the SunCal

9   Proponents *Request for Judicial Notice* ("RJN"). These pleadings include:

| Title | Docket No. |
|---|---|
| • Debtors' Objections to and Motion for Order Striking Claims Filed by the Lehman Entities | 351 |
| • Amended Motion and Amended Motion For Order Disallowing Certain Claims Held By Lehman Ali Inc. and Lehman Commercial Paper Inc. ("Amended Claim Objection") | 2082 |
| • Declaration Re: Declaration of Bruce V. Cook in Support Of Motion for Order Disallowing Certain Claims Filed by Lehman Ali Inc. and Lehman Commercial Paper Inc. Filed By Debtor Palmdale Hills Property, LLC Re: Related Document(s) | 1903 |
| • Request for Judicial Notice in Support of Motion for Order Disallowing Certain Claims Held by Lehman Ali Inc. and Lehman Commercial Paper Inc. Filed by Debtor Palmdale Hills Property, LLC | 1905-1913 |
| • Notice of Motion and Motion for Order Disallowing Claims of Lehman Ali, Inc. and Lehman Commercial Paper, Inc. Pursuant to 11 U.S.C. Section 502(D) | 1978 |
| • Declarations Re: Declaration of Bruce V. Cook and Dale Strickland in Support of Moving Voluntary Debtors and SunCal Management LLC's Motion for Order Disallowing Claims of Lehman Ali, Inc. and Lehman Commercial Paper, Inc. Pursuant to 11 U.S.C. Section 502(D) | 1977 |
| • Declaration of Tom Rollins in Support of Moving Voluntary Debtors and SunCal Management LLC's Motion for Order Disallowing Claims of Lehman Ali, Inc. And Lehman Commercial Paper, Inc. Pursuant to 11 U.S.C. Section 502(D) | 1976 |

- Plaintiffs' Notice of Motion and Motion for Partial              28
  Summary Judgment Against Defendant Lehman ALI, Inc.
  (Adv 11-ap-01212)

- Notice of Motion and Motion by SCC Communities LLC,             337
  North Orange Del Rio Land LLC and Tesoro SF LLC, for
  Summary Judgment, or , In the Alternative, Partial
  Summary Adjudication, on 3rd Claims for Relief
  (Fraudulent Transfer)(Adv. 09-ap-1005)

- Reply re: Motion by SCC Communities LLC, North Orange
  Del Rio Land LLC and Tesoro SF LLC, for Summary             383
  Judgment, or , In the Alternative, Partial Summary
  Adjudication, on 3rd Claims for Relief (Fraudulent Transfer)
  (Adv. 09-ap-1005)

- Motion for Order Disallowing Disputed Claim No. 6-3
  Filed by Lehman Commercial Paper, Inc.                          2676

- Voluntary Debtors' and SunCal Management LLC's Notice
  of Motion and Motion for Order Disallowing Claims of       [To Be Filed]
  Arch Insurance Company

- Voluntary Debtors' and SunCal Management LLC's Notice
  of Motion and Motion for Order Disallowing Claims of       [To Be Filed]
  Bond Safeguard Insurance Co. and Lexon Insurance Co.

The foregoing pleadings and the supporting evidence, and the additional evidence

submitted in support of this Objection, establish that 1) the purported secured and unsecured

deficiency claims of the Lehman Entities should be disallowed pursuant to 11 U.S.C. § 502(d); 2)

the Lehman Entities' secured claims should be reduced by $89,021.729, by virtue the recoupment

and setoff damage claims detailed in Exhibit "1" to the *Declaration of Bruce V. Cook* filed

concurrently herewith (the "Cook Decl."); 3) the claims asserted by Lehman ALI against the

estates of Tesoro and SCC Communities should be disallowed and the associated liens avoided;

and 4) LCPI's secured claim against the Acton estate in the amount of $343,221,391 should be

disallowed. When these claim reductions and disallowances are taken into account, the dividend

payable on the allowed claims of the unsecured creditors in a liquidation approaches 100%, which

is substantially higher than the dividend percentage offered under the Lehman Plans. In sum, the

Lehman Plans fail to satisfy the requirement in 11 U.S.C. § 1129(a)(7).

1        In addition to the foregoing fatal deficiency, the Lehman Plans fails to comply with the

2   following additional subsections of Section 1129:

3             **A)**    **The Lehman Plans Fail to Comply with the applicable**

4                   **provisions of Section 524(e) and Section 105 in contravention**

5                   **of Section 1129(a)(2).**

6        Under Section 1129(a)(2), the Lehman Entities are statutorily required to comply with the

7   applicable provisions of Title 11 of the United States Code. The Lehman Plans contravene this

8   requirement by improperly seeking to release claims held by the Debtors' affiliates against the

9   Lehman Entities, in violation Section 524(e) and by seeking de facto substantive consolidation of

10  the Debtors' cases without court approval.

11            **B)**    **The Lehman Plans fail to satisfy Section § 1129(a)(3).**

12       Pursuant to Section 1129(a)(3), a plan cannot include provisions "forbidden by law." The

13  Lehman Plans clearly violate this provision. The State of California has an integrated anti-

14  deficiency scheme that governs real property foreclosures. This statutory scheme is set forth in

15  four interrelated sections of the Code of Civil Procedure (the "C.C.P.). Together these statutes

16  circumscribe a creditor's [9] rights to a deficiency judgment.

17       Section 726 of the C.C.P., known as the 'one-action rule, compels a creditor to foreclose

18  on the underlying the real-property security interest *before taking action on the note*. Sections

19  580a and 726(b) require a fair-value hearing after both nonjudicial and judicial foreclosure sales.

20  Both sections limit the permissible deficiency to the difference between the fair value of the

21  property and the remaining indebtedness, thus providing protection against a creditor's inadequate

22  bid. Section 580d bars a creditor that acquires title through a non-judicial foreclosure sale from

23  obtaining a deficiency.

24       The Lehman Plans attempt to sweep away the California statutes that govern their rights

25  and put in their stead a scheme that is directly contrary to the intent of these statutes. In essence,

26  the Lehman Entities seek to import *into their claim* the right to foreclose on the Projects, in a

27  private sale with no bidding allowed, and to thereafter retain a fixed deficiency claim. No fair

28  value hearing is provided for, and no redemptions rights are allowed. Contrary to the Lehman

1  Entities' belief, nothing in the Bankruptcy Code, or in case law interpreting the Supremacy

2  Clause, allows *a creditor* to incorporate into its claim rights that are specifically barred under

3  California law. *Butner v. United States*, 440 U.S. 48, 55 (1979) ("Unless some federal interest

4  requires a different result, there is no reason why such interests should be analyzed differently

5  simply because an interested party is involved in a bankruptcy proceeding.").

6  **C)  The Lehman Entities' Plans Attempt to Create and Vote**

7  **Illegal Deficiency Claims Violates Section 1129(a)(3).**

8  The Lehman Entities have admitted that the purported "deficiency claims" created under

9  the Lehman Plans, again in violation of California law, were created for one purpose – to provide

10  the Lehman Entities a block of claims for voting purposes.[7] Creating a block of claims that are

11  both artificial and unlawful claims for the sole purpose of gerrymandering an acceptance of the

12  Lehman Plans (by Class 7 Non-Reliance Claims) violates Section 1123(a)(4), which requires all

13  Chapter 11 plans to be filed in good faith.

14  **D)  The Lehman Plans Fail To Satisfy Section 1123(a)(4).**

15  The Lehman Entities acknowledge in the Lehman Plans that they are appropriating all cash

16  held by the Debtors, whether or not this cash is in fact subject to a perfected lien in their favor, and

17  sweeping these funds into what is referred to as the "Lehman Creditor Distribution Funding." The

18  Lehman Entities then propose to use this cash to fund, in part, the payment of a 40% dividend to

19  one class of unsecured creditors, Class 6 ("Reliance Claimants"), while paying a second similarly

20  situated class of creditors, Class 7 (Non-Reliance Claimants) 1% (or up to 5%). Although the

21  Lehman Entities *may* be able to convince the Court that they have the right to use *their own cash* to

22  buy the individual claims held against them by the Class 6 claimants, and on this basis to pay such

23  class a higher dividend, they cannot, directly or indirectly use one penny of estate cash to fund this

24  increment. Yet, this is exactly what they propose to do in the Lehman Plans. This arbitrary

25  classification and arbitrary discrimination treatment fails under applicable Ninth Circuit law

26

27  _____

28  [7] See, O'Keefe Decl., Ex. "   P       "

-6-

1 | holding that such efforts to gerrymander an impaired consenting class violates the good faith

2 | requirement of Bankruptcy Code Section 1123(a)(4) (citations).

3 |     The Lehman Plans' arbitrary effort to exclude the claims held by one claimant, SunCal

4 | Management, from Class 6, notwithstanding the fact that such claims clearly fall within Class 6,

5 | also violates Section 1123(a)(4). The fact that the Lehman Entities are in litigation with SunCal

6 | Management deprives the claims asserted by this claimant of prima facie validity, but it does not

7 | provide any basis for treatment discrimination.

8 |         **E)**    **The Lehman Plans Fail To Satisfy Section 1129(a)(11).**

9 |     A plan cannot be approved unless the Court finds that it is feasible[8]. The Lehman Plans fail

10 | to satisfy this benchmark for the following reasons the:

11 |     1)    "funding caps" built into the Lehman Plans have been vastly exceeded;

12 |     2)    Lehman Plans are contingent upon settlements with the Bond Companies, which

13 | do not exist, and upon approval by the New York Bankruptcy Court, which has not been granted.

14 | *See* TD Plan, §14.1; VD Plan, §14.1[9];

15 |     3)    Lehman Entities are not obligated to implement the TD Plan unless it is confirmed

16 | as to all of the TD Debtors (TD Plan, §14.3(b)). A similar provision appears in the VD Plan. VD

17 | Plan, §14.3(b). This provision renders both plans aleatory and hence unconfirmable under Section

18 | 1129(a)(11). This provision also places the Trustee in the TD Debtors' cases in a conflict position.

19 | In those cases where the plan offered by the SunCal Proponents is more favorable to particular TD

20 | Debtor, he is barred from supporting it, since this would prejudice the rights of all other TD

21 | Debtors under the TD Plan due to the above provision; and

22 |     4)    confirmation of the competing non-debtor Chapter 11 plans in the bankruptcy

23 | cases of LBHI and certain affiliates including LCPI, both of which require the termination and

24 | replacement of the existing Lehman Board of Directors with a new Board of Directors, could

25 |

---

[8] Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

[9] The Bond Companies have asserted future Bond Claims of $157.5 million against the Trustee Debtors and $68.7 million against the Voluntary Debtors. However, these claims are subject to complete disallowance pursuant to the SunCal Proponents pending objections to such claims. *See* RJN, Exhibits "___" and "___". Thus, even if the settlements are finalized, the disallowance of such bond claims would render such settlements moot.

1 | likely result in the new management's withdrawal of support of the Lehman Plans, or otherwise

2 | adversely affect the Lehman Entities' ability to fund the Lehman Plan.

3 | **II**

4 | **MATERIAL BACKGROUND FACTS**

5 |     **A)**    **The SunCal Debtors.**

6 |       SunCal (which is an affiliated group of corporate entities under common control) is one of

7 | the largest private land developers in the United States.

8 |     **B)**    **The SunCal/Lehman Venture.**

9 |       In the late 1990s, SunCal and certain affiliates of Lehman Brothers Holdings, Inc.

10 | ("LBHI"), including, most importantly, LCPI and Lehman ALI entered into a business relationship

11 | (the "Venture"). The objective of the Venture was to acquire, develop and sell a series of

12 | residential development projects in California (the "Projects").

13 |       The ownership, control and funding structure that the employed Venture followed a

14 | common template. Each project would be acquired by a newly formed limited liability company.

15 | The Lehman Entities provide most of the funding for this acquisition and SunCal would provide

16 | the balance. SunCal would be responsible for managing the day-to-day affairs of the new entity,

17 | and developing the Project, and the Lehman Entities were responsible for funding the

18 | development costs.

19 |       The following single purpose entities, all of whom are Voluntary Debtors, were formed

20 | pursuant to this business model: SJD Partners, Palmdale, SunCal I, SunCal III, Bickford, Acton,

21 | Summit Valley, Kirby, Beaumont, Emerald Meadows, Johannson, SJD Development, SunCal II,

22 | Del Rio and Tesoro. The following single purpose entities, all of which are Trustee Debtors, were

23 | also formed to the same business models except that Lehman affiliates were also 50% equity

24 | partners: Oak Valley, Heartland, Northlake, Marblehead, Century City, PSV, Delta Coves,

25 | Torrance and Oak Knoll.

26 |       The relationship that existed between the Debtors and the Lehman Entities was a lending

27 | relationship, and, in the cases of the Trustee Debtors, also a fifty percent (50%) equity partnership.

28 | One of the Lehman Entities was the lender in each relationship and one or more of the Voluntary

1    or Trustee Debtors were the borrower. These lender/borrower and equity partnership relationships,

2    which are summarized in Section C below, are relevant for the following reason: In the

3    *Restructuring Agreement* entered into by and among most of the Projects holding Voluntary

4    Debtors and Trustee Debtors and the Lehman Entities on May 23, 2008, the Lehman Entities

5    agreed to fundamentally restructure this lending and equity partnership relationship by modifying,

6    restating and exonerating each of the loan relationship between the parties and diluting the Trustee

7    Debtors equity interests.

8        **C)**    **The Restructuring Agreement.**

9        On May 23, 2008, defendant Lehman ALI and other Lehman affiliates, on the one hand,

10    and certain Debtors, on the other, entered into an agreement ("Restructuring Agreement").[10]   The

11    Restructuring Agreement provided, among other things, that if certain "Closing Conditions"

12    were met by August 31, 2008 (later extended by mutual agreement to September 30, 2008), the

13    parties were obligated to proceed to execute and deliver a more comprehensive and final

14    "Settlement Agreement" and to proceed to a "Closing" of the "Settlement Transactions."   The

15    Settlement Agreement is attached as an exhibit to the Restructuring Agreement.

16        Section 1(b) of the Restructuring Agreement provides, in pertinent part:

17        Unless the Agreement shall have been terminated pursuant to the terms hereof, the obligations of the Parties to execute and deliver (or to have their affiliates execute

18        and deliver) the Settlement Agreement and other Settlement Documents shall be unconditional and irrevocable provided that the following conditions are satisfied

19        (collectively, the "Closing Conditions")....[11]

20        By letter agreement dated August 27, 2008, the parties extended the date for satisfaction

21    of the Closing Conditions from August 31, 2008 to September 30, 2008.[12]   In the Restructuring

22    Agreement, Lehman ALI represented that it was the "Lender with respect to each Loan," and as

23

24

25

26    [10] May 23, 2008 Restructuring Agreement (Pritikin Decl., Exh. 1).

27    [11] *Id.*, § 1(b) (Pritikin Decl., Exh. 1); *see also id.* § 1(a) ("[E]ach of the Parties will execute, deliver and enter into and will cause the other SunCal Proponents and Lehman Parties, respectively, and any other Affiliates thereof, as applicable, to execute, deliver and enter into, the Settlement Agreement [and other "Settlement Documents"]).

28    [12] *See Id.*, § 1(d) 2008 (Pritikin Decl., Exh. 1); E-mail from Nellie Camerik dated August 26, at 2 (letter agreement dated August 27, 2008) (Pritikin Decl., Exh. 2); Brusco Tr., 94:23-95:4 (Pritikin Decl., Exh. 3).

1    such, committed to pay certain "Urgent Payables" and management fees in connection with the

2    Projects.[13]

3         As originally drafted, the Restructuring Agreement applied to, among others, the

4    following Loans: The SunCal Communities I Loan; The Marblehead/Heartland Loan; The Oak

5    Valley Loan; the Northlake Loan; and the Ritter Ranch Loan.[14] The Restructuring Agreement

6    was thereafter amended as of August 27, 2008 to add several other Projects, including the

7    Projects owned by the SunCal PSV, SunCal Marblehead, SunCal Hartford, SunCal Century City,

8    SunCal Oak Valley and SunCal NorthLake.[15] The twelve loans subject to the Restructuring

9    Agreements are collectively referred to herein as the "Restructured Loans." The twelve Projects

10    encumbered by these loans are referred to herein as the "Restructured Projects."

11         The following table summarizes the twelve loans that were modified by the terms of the

12    Restructuring Agreement (the "Restructured Loans"):

| Loan | Claimant | Alleged Amount Owed |
|---|---|---|
| SunCal Communities I Loan | Lehman Commercial | $343,221,391 |
| Ritter Ranch Loan | Lehman Commercial | $287,252,096 |
| SCC Palmdale Loan | Lehman Commercial | $119,664,305 |
| Bickford Second Loan | Lehman ALI | $56,494,059 |
| Interim Loan | Lehman ALI | $23,795,013 |
| SunCal Oak Knoll / SunCal Torrance Loan | Lehman ALI | $158,141,365 |
| SunCal Century City Loan | Danske Bank (assignee of Lehman ALI) | $120,000,000 |
| SunCal PSV Loan | Lehman ALI | $88,257,340 |
| SunCal Delta Coves Loan | Lehman ALI | $206,023,142 |
| SunCal Marblehead/ Heartland Loan | Lehman ALI | $354,325,126 |
| Sun Cal Oak Valley Loan | OVC Holdings, LLC | $141,630,092 |
| SunCal Northlake Loan | Northlake Holdings, LLC | $123,654,777 |

20         In the Restructuring Agreement and the attached Settlement Agreement, the parties

21    agreed to fundamentally restructure the lending relationship set forth in the Restructured Loans.

22    Upon the Closing provided for in the Restructuring Agreement, the Restructured Loans would be

23    modified as follows:

25        1.   Title to the Restructured Projects would be transferred from the SunCal Debtors to new "Venture Grantee" entities, in which the Lehman parties would have a primary equity interest and the SunCal Proponents would have a

27    [13] Restructuring Agreement, §§ 1(h), (i) (Pritikin Decl., Exh. 1).

28    [14] *Id.*, Exhibit B ("Form of Settlement Agreement"), at Annex 2 thereto (Pritikin Decl., Exh.1).

[15] Email from Nellie Camerik dated August 26, at 2 (Pritikin Decl., Exh. 2).

substantially diluted interest;[16]

2. The interest rate on the Loans would have been modified:[17]

3. The Lenders would sign "Covenants Not to Sue" the "Borrower Parties" under the Loans.[18]

4. The Venture Grantees agreed to assume and pay certain obligations of the Borrowers, Guarantors, and/or other SunCal Affiliates, including certain bonded obligations.[19] In exchange, such payments would result in an increase in the Lehman parties' rights to equity payments in connection with the Restructuring Projects Loans.[20]

In order to make the fundamental changes to the lending and equity relationship set forth in the Restructuring Agreement, Lehman Ali had to own, or at least control the Restructured Loans, during the performance period provided for the agreement. [21] As more fully explained

---

[16] *See* Settlement Agreement, § 2 (Pritikin Decl., Exh. 4); *see also* Restructuring Agreement, Exhibit A ("Term Sheet"), at pp. 2-3 (Pritikin Decl., Exh. 1) (summarizing transaction and new equity structure)

[17] Section 11 of the Settlement Agreement provided: <u>Mortgage Loans</u>. The Borrower Parties hereby acknowledge and agree that each Mortgage Loan is currently accruing interest at the applicable default rate provided under the applicable Loan Documents and shall continue to accrue interest at such default rate (provided, that such default rate shall not exceed 15% per annum; provided, however, that the foregoing limitation shall not be applicable to the Pac Point Loans) following the Closing until such Mortgage Loan has been repaid in full.

Settlement Agreement, § 11 (Pritikin Decl., Exh. 4).

[18] Section 21 of the Settlement Agreement provides:

(b) At Closing, the Lehman Parties shall deliver to Grantors, and/or the other SunCal Proponents, as applicable, the following documents, duly executed by the appropriate parties: (1) The Lenders and LBHI shall deliver, with respect to each Loan (other than the Existing Interim Loan) and any Related Mezzanine Loan thereto, a Covenant Not To Sue executed by the applicable Lender(s) and LBHI in favor of the applicable Borrower Parties in the form attached hereto as <u>Exhibit I</u> (each, a "<u>Covenant Not to Sue</u>" and collectively, the "<u>Covenants Not to Sue</u>"); Settlement Agreement § 21(b)(1) (Pritikin Decl., Exh. 4); *id.* § 4(c), (d) (Pritikin Decl., Exh. 4); *see* August 26, 2008 Form of Covenant Not to Sue (Exhibit I) (Pritikin Decl., Exh. 5); signature pages to Covenants Not to Sue (Pritikin Decl., Exh. 6). "Borrower Parties" were defined in the Settlement Agreement to include, with limited exception, "the Borrowers, the Grantors, the Guarantors, the Pledgors," i.e., Plaintiffs, among others. Settlement Agreement, Exhibit A ("Definitions") at A-2 (Pritikin Decl., Exh. 1); *see* Restructuring Agreement, Annex 1 (identifying Borrowers, Grantors, Guarantors, and Pledgors) (Pritikin Decl., Exh. 1); *see also* Settlement Agreement. § 4(d) (Pritikin Decl., Exh. 4); (Pacific Point covenant not to sue was to include Elieff).

[19] *See* Settlement Agreement § 14(a) (Pritikin Decl., Exh. 4) ("At Closing and to the extent the same have not been paid or satisfied as of the Closing Date, each of the Venture Grantees shall assume and be responsible for the payment of ... the "<u>Venture Grantee Assumed Obligations</u>"); *id* § 14(b) ("[A]t Closing, the Pac Point Transferee shall assume and be responsible for the payment of ... the "<u>Pac Point Payable Obligations</u>"); *id* § 16 ("Assumed Bond Obligations"). The identity and amount of the obligations which were to be assumed at Closing are not material for purposes of the instant Motion, which seeks only partial summary judgment on the issue of liability. The extent of damages is an issue to be proven at trial.

[20] *See* Settlement Agreement § 14(d) (Pritikin Decl., Exh. 4) ("[T]o the extent that the aggregate amount actually paid...with respect to Scheduled Assumed Obligations....exceeds... the "Excess Vendor Payments," the Lehman Preferred Amount...shall be increased by the amount of such Excess Vendor Payments....").

[21] Settlement Agreement, § 15(h) (Pritikin Decl., Exh. 4).

herein, this obligatory predicate was not extant during the performance period, and in fact

Lehman Ali engaged in a course of conduct that affirmatively made performance impossible.

**D)   The Lehman-Fenway Repo Agreement.**

On August 22, 2008, LCPI, as "Seller," and Fenway Capital, Inc. ("Fenway"), as

"Buyer," entered into a "Master Repurchase Agreement" ("MRA") that provided in relevant

part:

> From time to time the parties hereto may enter into transactions in which one party
> ("Seller") agrees to transfer to the other ("Buyer") securities or other assets
> ("Securities") against the transfer of funds by Buyer, with a simultaneous agreement
> by Buyer to transfer to Seller such Securities at a date certain or on demand, against
> the transfer of funds by Seller.  Each such transaction shall be referred to herein as a
> "Transaction"....[22]

The MRA further defined "Purchased Securities" as "the Securities transferred by Seller to

Buyer in a Transaction hereunder...."[23]  The MRA provided that "[a]ll of Seller's interest in the

Purchased Securities shall pass to Buyer on the Purchase Date," and that "the parties intend that

all Transactions hereunder be sales and purchases and not loans."[24] *Thus, once Purchased*

*Securities were transferred to the Buyer (Fenway), LCPI, and hence Lehman Ali, had no*

*ownership rights in such Purchased Securities,* and no capacity to modify these loans as required

under the terms of the Restructuring Agreement.

**E)   The Default Provisions In The MRA.**

Annex 1, Part I to the Repo Agreement enumerated the events that would constitute an

"Event of Default."  Included among such events was where "Seller fails ... to pay the Repurchase

Price on the Repurchase Date," or where "an Act of Insolvency occurs with respect to Seller, the

Guarantor or Buyer."[25]  LBHI was the "Guarantor" under the Repo Agreement.[26]  That same

Annex amended Section 11(a) of the Repo Agreement to provide that, although a written "Notice

of Default" would ordinarily be required, "no such notice shall be required in regards to an Act of

---

[22] MRA § 1 (Pritikin Decl., Exh. 7).

[23] *Id.* § 2(p) (Pritikin Decl., Exh. 7).

[24] *Id.* §§ 8, 6 (Pritikin Decl., Exh. 7).

[25] MRA Annex 1, Part 1, § 2(d)(i), subparts (iii) and (vi) (Pritikin Decl., Exh. 7); *see also* MRA § 11 (Pritikin Decl., Exh. 7).

[26] MRA, Annex 1, Part 2 ("List of Additional Defined Terms") (Pritikin Decl., Exh. 7) at p.14.

-12-

Insolvency and an Event of Default shall automatically be deemed to have occurred in such event."[27]

The Annex further provided that upon an Event of Default, LCPI was obligated to immediately pay the Repurchase Price for the Purchased Securities, and immediately deliver to Fenway the Purchased Securities:

> In all Transactions in which the defaulting party is acting as Seller, if the nondefaulting party exercises or is deemed to have exercised the option referred to in subparagraph (a) of this Paragraph, (i) the defaulting party's obligations in such Transactions to repurchase all Purchased Securities, at the Repurchase Price therefor on the Repurchase Date…shall thereupon become immediately due and payable, and…(iii) the defaulting party shall immediately deliver to the nondefaulting party any Purchased Securities subject to such Transactions then in the defaulting party's possession or control."[28]

Thus, although LCPI enjoyed a right of substitution prior to an Event of Default,[29] upon such default that right was cut off; LCPI had to deliver the Purchased Securities or buy them back, but could not otherwise deal with them.

Annex III to the MRA, titled "Hold-in-Custody Transaction Annex," provided that LCPI, in addition to being the "Seller" would serve as the "hold-in-custody" agent ("Agent" or "HIC Agent") for Buyer, retaining possession of the Purchased Securities even after title had passed to Fenway and before repurchase has occurred.[30]

As HIC Agent, LCPI was obligated to keep the Purchased Securities in a segregated account for Buyer.[31]  Annex III placed other limits on LCPI's rights as Agent.  Among other things:

> Agent shall not subject the Purchased Securities to any other right, charge, security interest, lien, claim or encumbrance in favor of any party of any person claiming through Agent.[32]

---

[27] MRA, Annex 1, Part 1 § 2(d)(ii) (Pritikin Decl., Exh. 7); see also MRA § 11 (Pritikin Decl., Exh. 7).

[28] MRA, Annex 1, Part 1 § 2(d)(iii) (Pritikin Decl., Exh. 7); see MRA § 11 (Pritikin Decl., Exh. 7).

[29] MRA § 9 (Pritikin Decl., Exh. 7).

[30] MRA, Annex III at §§ 1, 2-3 Pritikin Decl., Exh. 7).

[31] MRA, Annex III at § 1(a) (Pritikin Decl., Exh. 7).

[32] MRA, Annex III at § 1(b) (Pritikin Decl., Exh. 7) (emphasis added).

-13-

1   Further, LCPI, in its capacity as Agent, "shall not take *any action* (aside from actions in

2   accordance with instructions from Buyer) in respect of the Purchased Securities or Additional

3   Purchased Securities," unless the Repo Agreement permitted otherwise.[33] Upon an Event of

4   Default, LCPI as Agent could do nothing more than what the Repo Agreement required in such

5   circumstances:

> Following the occurrence of an Event of Default in respect of the Seller, or, if the
> Guarantor's rating is put on watch for possible downgrade by S&P or by Moody's
> or is withdrawn or reduced below A-i by S&P or P-i by Moody's, Agent will
> upon demand of the Buyer, deliver .... all Purchased Securities and Additional
> Purchased Securities....[34]

Thus, the fact that LCPI served as "Agent" restricted LCPI's power to deal with the

Purchased Securities, especially upon an Event of Default.

Prior to the time for the closing of the Settlement Agreement, Lehman ALI transferred

seven (7) of the Loans subject to the Restructuring Agreement to LCPI.[35] Lehman's ALI's

designated person most knowledgeable on the issue of the transfers of the Loans testified that

this transfer was effectuated pursuant to an intra-Lehman repurchase agreement between Lehman

ALI and LCPI.[36]

---

[33] MRA, Annex III, § 1(e) (Pritikin, Decl., Exh. 7) (emphasis added).

[34] MRA, Annex III, § 1(d) (Pritikin, Decl., Exh. 7).

[35] *Compare* May 23, 2008 Restructuring Agreement § 1(h) (Pritikin Decl., Exh. 1) ("Lehman ALI, as the Lender with respect to each Loan...hereby agrees to make protective advances under the applicable Loans(s)...."), *with* June 25, 2008 Radco Retainer Agreement, at 2 (Pritikin Decl., Exh. 8) ("Pursuant to the terms of Section 1(h) of the Restructuring Agreement, Lehman ALI and [LCPI] (as successor to Lehman ALI with respect to certain of the Loans), each in its capacity as agent and sole lender with respect to certain of the Loans (in such capacity, a 'Lender') have agreed to make protective advances under the applicable Loan(s)...."). Feibus Tr. at 74:24-75:7, 75:13-18, 87:5-13, 88:3-13 (Pritikin Decl., Exh. 10).

[36] *See* Notice of Deposition of Person Most Knowledgeable re Repurchase Transaction Issue Designated by Lehman ALI, Inc. (Exh. 1 to Feibus Tr.) (Pritikin Decl., Exh. 9); Feibus Tr. at 11:14-24, 13:13-20, 74:24-75:7, 75:13-18, 87:5-13, 88:3-13 (Pritikin Decl., Exh. 10).

Over two years ago, the Voluntary Debtors and the other plaintiffs in the related adversary proceeding for equitable subordination, Case No. 8:09-ap-01005-ES, propounded document requests on Lehman ALI and LCPI, seeking all document relating to the transfer of any of the Loans between or among them. *See, e.g.,* Plaintiffs' First Set of Requests for Production of Documents Propounded on Defendant Lehman ALI, Inc. dated April 23, 2009 (Pritikin Decl., Exh. 11), at Request No. 28 (seeking production of "All AGREEMENTS between YOU, LCPI, OVC or NORTHLAKE HOLDINGS, on the one hand, and any counterparty to a repurchase agreement, on the other, PERTAINING TO any of the PROJECTS."). No repo agreement between Lehman ALI and LCPI was produced. At a hearing before this Court on September 22, 2009, counsel for the Lehman Entities stated: "And yes, there is an internal document transferring those documents [*sic*] to the entity that transferred them in the repurchase agreement [i.e., to LCPI]. And we will find that document and supply it to the Court as soon as we get it." Sep. 22, 2009

1    According to the confirmations (or "confirms") provided by LCPI to Fenway, the

2   following seven Loans made to the SunCal Debtors were "Purchased Securities" in which

3   LCPI's interest was transferred to Fenway prior to the time for a Closing of the restructuring:[37]

4

| Repo Loan | Original Lender |
|---|---|
| SunCal Communities I Loan | LCPI |
| Ritter Ranch Loan | LCPI |
| PSV Loan | Lehman ALI |
| Delta Coves Loan | Lehman ALI |
| Marblehead/ Heartland Loan | Lehman ALI |
| Oak Valley Loan | Lehman ALI |
| Northlake Loan | Lehman ALI |

10    As this Court found in Findings entered October 2, 2009, and as was affirmed by the

11   Bankruptcy Appellate Pane for the Ninth Circuit Court of Appeals on August 10, 2011, the

12   language of the Repo Agreement unambiguously provided that transactions entered into pursuant

13   to its terms were *true sales*, and not loans, whereby title to the Repo Loans passed to Fenway:

14    In examining the four corners of the MRA, we construe it to be unambiguous and

15   conclude that the Lehman Entities and Fenway intended the transaction to be a sale.[38]

16    **F)    LCPI's Default Under the Repo Agreement.**

17    On August 20, 2008, two days before the Repo Agreement was executed, LBHI signed a

18   Guaranty of LCPI's obligations under the Repo Agreement.[39]  On September 15, 2008, LBHI

19   filed a voluntary Chapter 11 bankruptcy petition.[40]  Pursuant to the Repo Agreement, LBHI's

20   bankruptcy filing constituted an "Event of Default," in which case the Buyer (Fenway) was

21   automatically deemed to demand a return or repurchase of the Purchased Securities then in

22

---

23   Hearing Tr. at 68:15-19 (Pritikin Decl., Exh. 28).  They never did so.  Yet on August 12, 2011, Lehman ALI's PMK
testified that his counsel had *showed him* such a document in the weeks before his deposition. Feibus Tr., at 75:13-18,
24   87:24-88:13 (Pritikin Decl., Exh. 10).  The Lehman Entities' withholding of this document from Plaintiffs may be the
subject of a future motion for discovery abuses.

25   [37] Feibus Depo., Exh. 6 (Repo Confirms), JPM-Palmdale0006-0012 (Pritikin Decl., Exh. 12); Feibus Tr., at 132:25-
134:2, 135:22-136:4, 136:17-138:2, 138:14-18 (Pritikin Decl., Exh. 10).

26   [38] BAP Opinion, at 27 (Pritikin Decl., Exh. 14); *see id.* at 28 ("[E]ven if we considered the MRA ambiguous, and we
reviewed the extrinsic evidence in this case, we would still conclude that the MRA was a sale"); October 2, 2009
27   Findings, at ¶¶ 2.3-2.4 (Pritikin Decl., Exh. 13).

28   [39] LBHI Guarantee (Pritikin Decl., Exh. 15).

[40] Feibus Tr., 95:6-12 (Pritikin Decl., Exh. 10).

1  LCPI's custody or control.[41] LCPI's only rights with regard to the Repo Loans, as Agent under

2  the Hold-in-Custody Annex, was to comply with Fenway's actual or constructive demand and

3  deliver the Purchased Securities to Fenway.[42]

4        On September 14, 2008, in the hours before LBHI's bankruptcy filing, LCPI and Fenway

5  attempted to "unwind" the Repo transaction and return the Purchased Securities, including the

6  Repo Loans, to LCPI.[43]  However, they were unable to do so, because at the same time that LCPI

7  and Fenway entered the Repo Agreement, Fenway issued a Series 2008-2 Variable Funding Note

8  ("VFN") to its affiliate, Fenway Funding, LLC ("Fenway Funding"), which was secured by the

9  Purchased Securities under the Repo transaction (including the Repo Loans).[44]  Fenway Funding,

10  in turn, issued commercial paper notes ("CP Notes") secured by the proceeds of the Series 2008-

11  2 note (i.e., the Repo Loans), which CP Notes were acquired by LBHI.[45]  LBHI then pledged the

12  CP Notes to JPMorgan Chase, N.A. ("JPM") as collateral for certain liquidity that JPM had

13  provided to LBHI.[46]

14        The September 14 attempted "unwind" required that LBHI return the CP Notes to

15  Fenway Funding, in exchange for Fenway returning the Repo Loans to LCPI.[47]  However, this

16  was not an option. LBHI had pledged the CP Notes as collateral to JPM and JPM would not

17  release this collateral unless it received collateral of equal value – collateral not already subject

18  to JPM lien.[48]

19

---

20  [41] MRA, Annex I, Part 1, § 2(e)(i)-(iii) (Pritikin Decl., Exh. 7); Feibus Tr., at 89:8-13, 94:15-25 (Pritikin Decl., Exh. 10).

21  [42] MRA Annex III, § 1 (Pritikin Decl., Exh. 7).

22  [43] Sep. 14, 2008 Letter Agreement (Pritikin Decl., Exh. 16).

23  [44] Compromise Motion ¶¶ 10-11 (Pritikin Decl., Exh. 17); Feibus Tr., at 77:17-78:12, 83:25-84:20 (Pritikin Decl., Exh. 10).

24  [45] Compromise Motion ¶ 10 (Pritikin Decl., Exh. 17); Feibus Tr., at 78:13-79:2, 83:25-84:20 (Pritikin Decl., Exh. 10).

25  [46] Compromise Motion at p.4 n.1 (Pritikin Decl., Exh. 17); Feibus Tr., at 78:13-79:2, 83:25-84:20 (Pritikin Decl., Exh. 10).

26  [47] Sep. 14, 2008 Letter Agreement (Pritikin Decl., Exh.16).

27  [48] Carne Tr., 128:9-21 (Pritikin Decl., Exh. 18); Feibus Tr., 90:9-11, 90:24-91:3 (Pritikin Decl., Exh. 10).

LBHI had pledged the $3 billion in Fenway CP Notes to JP Morgan at least by September 12, 2008, the last business
28  day before LBHI's bankruptcy.  Feibus Tr., 139:25-140:10, 161:14-18, 166:10-16 (Pritikin Decl., Exh. 10).  As of
September 12, 2008, "only $2.4 billion of Lehman's $32.5 billion liquidity pool was readily convertible to cash."
Lehman Examiner's Report, at 1452-53 (Pritikin Decl., Exh. 29).  Given that the CP Notes could not be returned,

1    Notably, LBHI itself has admitted that it took Lehman over a year to obtain the release of

2    JPM lien against the CP Notes, which was a necessary predicate to return of the Restructured

3    Loans. In the final purported "settlement" with JPM, JPM conditioned its release of the CP

4    Notes (among other collateral) upon, *inter alia*, a $557 million payment in cash.[49]  This

5    settlement was not approved by the bankruptcy court in New York until *March 24, 2010*.[50]  It

6    was only at this point that the repo with Fenway was "unwound"[51]—*over 19 months after the*

7    *date set by Lehman and SunCal Proponents to consummate a Closing of the Settlement*

8    *Transactions.*

9        **G)    SunCal's Demand For Performance Under the Restructuring Agreement and**

10           **the Settlement Agreement.**

11    On September 29, 2008, Matt Wyman of Cox, Castle & Nicholson, LLP, counsel for the

12    SunCal Proponents, sent a letter to Lehman demanding that they proceed to a Closing of the

13    restructuring contemplated by the Restructuring Agreement and the Settlement Agreement.[52]  On

14    November 13, 2008, Gerald Pietroforte, on behalf of the Lehman lenders, sent a letter purporting

15    to "terminate" the Restructuring Agreement and the Settlement Agreement pursuant to Section

16    1(d) of the Restructuring Agreement. In this letter, Mr. Pietroforte alleged that "among other

17    Conditions," the requisite number of "Required Consents" had ostensibly not been obtained.[53]

18    No other grounds for refusing to close were cited.[54]

19

20    LCPI lacked the financial wherewithal to repurchase the $3 billion in Repo assets (including the SunCal Repo Loans) as of September 12, 2008. Feibus Tr., 160:24-161:6, 170:13-19, 172:3-17 (Pritikin Decl., Exh. 10).

21    [49] LBHI-JPMorgan Motion to Approve Agreement, Feb. 24, 2010 at ¶ 6 (Pritikin Decl., Exh. 19); LBHI-
22    JPM Notice of Filing of Executed Agreement, at Exhibit A thereto (Pritikin Decl., Exh. 30).

      [50] Order Approving Collateral Disposition Agreement (Pritikin Decl., Exh. 20).
23
      [51] Order approving compromise motion (Pritikin Decl., Exh. 21).
24
      [52] Sep. 29, 2008 Wyman letter (Pritikin Decl., Exh. 22).

25    [53] Nov. 13, 2008 Pietroforte letter (Pritikin Decl., Exh. 23). Mr. Pietroforte purported to be terminating the
      Restructuring Agreement only as to "all SunCal Proponents which are not currently debtors in Chapter 11
26    cases pending in the United States Bankruptcy Court for the Central District of California." *Id.* All but two
      of the Voluntary Debtor Plaintiffs (SCC Communities LLC and Tesoro SF, LLC) had filed for bankruptcy
27    protection by the time of Mr. Pietroforte's letter (on November 6 or 7, 2008). It is does not appear that the
      Lehman parties ever purported to formally terminate the Restructuring Agreement as to the other Debtors.
28    In any event, as discussed herein, Lehman ALI undoubtedly *breached* that agreement as to *all* Plaintiffs no
      later than September 15, 2008, when it put it out of its own power to perform prior to the time for

-17-

1    In their respective depositions, neither Mr. Pietroforte nor Mr. Brusco could identify a

2    single "Required Consent" that was missing as of the date of Mr. Wyman's letter.  Frank

3    Gilhool, who was the Lehman agent most familiar with this transaction, also could not cite a

4    single missing Required Consent when he was asked to do so in his deposition.[55] They simply

5    stated that they *believed* this to be the case. Although Messrs. Pietroforte, Brusco and Gilhool are

6    welcome to what they acknowledged under oath were their wholly unsubstantiated opinions,

7    their speculation as to the facts is not relevant evidence.

8        Finally, as more fully explained below, the letter from Mr. Pietroforte purporting to

9    "terminate" the Restructuring Agreement was a nullity for an additional reason. By September 7,

10   2008, Lehman Ali had voluntarily deprived itself of the ability to perform under the terms of the

11   Restructuring Agreement within the performance period. This act repudiated the agreement,

12   leaving nothing to "terminate."

13   **H)**      **The Repo Repudiated The Restructuring Agreement and Settlement**

14            **Agreement.**

15       Where a party puts itself in a position where it will be unable to perform its obligations

16   under a contract, prior to the time for performance, this constitutes a breach of contract.  "If one

17   party to a contract repudiates his duties thereunder prior to the time designated for performance

18   and before he has received all of the consideration due him thereunder, such repudiation entitles

19   the nonrepudiating party to claim damages for total breach," and the nonrepudiating party need not

20   continue to perform under the contract in order to do so.  *Long Is. R.R. Co. v. Northville Indus.*

21   *Corp.*, 41 N.Y.2d 455, 463, 393 N.Y.S.2d 925, 362 N.E.2d 558 (N.Y. 1977); *see also American*

22   *List Corp. v. U.S. News and World Report, Inc.*, 75 N.Y.2d 38, 44, 549 N.E.2d 1161, 1165, 550

23   N.Y.S.2d 590, 594 (N.Y. 1989).

24

25

---

26   performance.  Moreover, an attempt to terminate based on SunCal bankruptcies would itself be void under
the Bankruptcy Code as an *ipso facto* clause. *See* 11 U.S.C. § 365(e)(1).

27   [54] This purported termination violated the automatic stay of most of the Debtors since they had already filed
voluntary Chapter 11 protection or had been involuntarily placed under Chapter 11 bankruptcy protection

28   by certain creditors.

[55] Ex. "P. , O'Keefe Decl.

1    A repudiation can be either "a statement by the obligor to the obligee indicating that the

2    obligor will commit a breach that would of itself give the obligee a claim for damages for total

3    breach" or "*a voluntary affirmative act which renders the obligor unable or apparently unable to*

4    *perform without such a breach.*" *Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp.,*

5    92 N.Y.2d 458, 463, 705 N.E.2d 656, 659, 682 N.Y.S.2d 664, 667 (N.Y. 1998) (citing

6    Restatement 2nd of Contracts § 250)) (emphasis added).

7    In New York, "it has long been the law that a party repudiates a contract where that party,

8    before the time of performance arrives, puts it out of his power to keep his contract," or

9    "voluntarily disables itself from complying with its contractual obligations." *CPU*, 301 A.D.2d at

10    77, 747 N.Y.S.2d at 475 (citations omitted).

11    Here, a Closing of the Settlement Transactions would have involved, among other things:

12    converting certain debt positions to equity; modifying the interest rate on the Loans; executing

13    covenants not to sue under the Loans and releasing the borrowers and guarantors thereunder

14    from certain liability in connection with the Loans; and assuming and paying for certain

15    obligations of the Borrowers and Guarantors under the Loans. Lehman ALI's transfer of the

16    Repo Loans to LCPI, and LCPI's transfer of them to Fenway pursuant to the Repo Agreement

17    breached this contract for the following reasons:

18    1.    It is now established that the Repo Transaction was a true sale in which

19    title to Repo Loans passed to Fenway.[56] Once LCPI, as Lehman ALI's successor under

20    the Repo Loans, entered into the Repo Agreement with Fenway on August 22, 2008, and

21    included the Repo Loans in the Repo transaction on August 27, 2008 and September 10,

22    2008, neither Lehman ALI nor LCPI retained any ownership interest in the Repo Loans

23    at that point. *They were no longer the lenders under the Repo Loans, and so lacked the*

24    *authority to restructure them;*

25    2.    The Repo Agreement barred LCPI from subjecting the Repo Loans to any

26    "right, charge, security interest, lien, claim or encumbrance in favor of any party or any

27

28

---

[56] October 2, 2009 Findings, ¶¶ 2.3-2.4 (Pritikin Decl., Exh. 13); BAP Opinion at 27-28 (Pritikin Decl., Exh. 14).

1   person claiming through Agent."[57]  Thus, Lehman ALI could not have consummated a

2   Closing under the terms of the Settlement Agreement, since this Closing would have

3   subject to the Repo Loans to the rights of the new entities acquiring title to the Projects

4   secured by these loans;

5           3.      The Event of Default under the Repo Agreement precluded Lehman ALI's

6   performance under the Restructuring Agreement.  Lehman ALI may argue that LCPI had

7   the right of substitution under the Repo Agreement, such that it could have replaced the

8   SunCal Repo Loans with other collateral.[58]  However, Lehman ALI's PMK conceded that

9   as to the seven Repo Loans at issue, once they were made part of the Repo Transaction,

10  LCPI *never exercised that right of substitution.*[59]

11          It should also be noted that once guarantor LBHI filed for bankruptcy on

12  September 15, 2008, which constituted an Event of Default, LCPI *lost* the right of

13  substitution.[60]  LCPI could "not take any action (aside from instructions in accordance

14  with instructions from the Buyer) in respect of the Purchased Securities" that was

15  inconsistent with Fenway's rights upon the Event of Default.[61]  Its only power as HIC

16  Agent at that point was to comply with Fenway's actual or constructive request to deliver

17  the Repo Loans;[62] and

18          4.      The Repo Transactions and the Event of Default in connection therewith

19  constituted a breach of the representations and warranties in the Restructuring

20  Agreement.  Lehman ALI represented in the Restructuring Agreement that it was the

21  "Lender with respect to each Loan," and Lehman ALI (and any successor Lenders)

22  represented and warranted in the Settlement Agreement that had the authority to enter

23  _____

24  [57] MRA, Annex III at § 1(b) (emphasis added) (Pritikin Decl., Exh. 7).

25  [58] MRA § 9 (Pritikin Decl., Exh. 7).

    [59] Feibus Tr., at 132:25-133:22, 136:17-138:2 (Pritikin Decl., Exh. 10).

26  [60] MRA, Annex 1, Part 1 § 2(d)(iii) (Pritikin Decl., Exh.7), *see also* MRA § 11 (Pritikin Decl., Exh. 7).  Such a
27  provision in a repo agreement is not an *ipso facto* clause prohibited by the Bankruptcy Code. *See* 11 U.S.C. §§
    362(b)(6)-(7), 555, 556, 559.

28  [61] MRA, Annex III, § 1(e) (Pritikin Decl., Exh. 7).

    [62] MRA, Annex 1, Part 1 § 2(d)(iii) (Pritikin Decl., Exh. 7); MRA, Annex III, §§ 1(d), (e) (Pritikin Decl., Exh. 7).

1   into the Settlement Transactions, had obtained the necessary consents to do so, and that

2   doing so did not violate their agreements with any other parties.[63]  Obviously, these

3   representations and warranties were false and could not be satisfied by September 30,

4   2008.

5   In summary, after the Repo Transaction, neither LCPI, Lehman ALI, [Note should LBHI

6   be included here?] nor any other successor, predecessor, affiliate, or other person or entity acting

7   on their behalf, could have restructured the Repo Loans or otherwise fulfilled their obligations,

8   representations and warranties by the September 30, 2008 deadline.[64]

9   ## III

10  ## THE LEHMAN ENTITIES' DISPUTED CLAIMS SHOULD BE

11  ## SUBSTANTIALLY REDUCED OR COMPLETELY DISALLOWED

12  **A)  The SunCal Parties' Pending Recoupment Claim Objection and the Voluntary**

13  **Debtors' Pending Contract Action Will  Create Value for the Debtors'**

14  **Unsecured Creditors  and Should Substantially Reduce the Lehman Entities'**

15  **Secured Claims.**

16  As discussed above, pursuant to the terms of the Restructuring Agreement and the

17  Settlement Agreement, Lehman ALI, which is the parent entity of LCPI, was contractually bound

18  to pay the "urgent payables" and Management Fees, and to effectuate a closing of the Settlement

19  Agreement, thereby transferring the Projects to new Lehman entities (Venture Grantees), which

20  ------

21  [63] Restructuring Agreement, §§ 1(h), (i) (Pritikin Decl., Exh. 1); Settlement Agreement, § 15.h. (Pritikin Decl., Exh. 4).

22  Like the Settlement Agreement, itself, the Covenants Not to Sue contained a warranty by the Lehman Lenders that
23  they had the authority to provide the released contained therein, and had not sold or transferred the right to enforce the Loans.  *See* Settlement Agreement, Exhibit I at § 5 (Pritikin Decl., Exh. 5) ("The Lender Parties further expressly
    warrant and represent that the Lender Parties have not sold, granted, transferred or assigned or caused to be sold,
24  granted, transferred or assigned or purported to sell, grant, transfer or assign to any other person, entity, firm or
    corporation any Claims or any portion thereof or any part of any recovery thereon which the Lender Parties may have
25  or become entitled to against the Borrower Beneficiaries in connection with, or in any way related to or arising out of the Claims.").

26  [64] Lehman ALI has disputed that the Closing Conditions were met by September 30, 2008.  Although Plaintiffs
27  vigorously disagree - the Lehman parties were obligated to proceed to a Closing even before LBHI's September 15,
    2008 bankruptcy, let alone by the September 30, 2008 deadline - the Court need not resolve that issue for purposes of
28  this Motion.  The fact that Lehman ALI was *unable* to perform its obligations under the Restructuring Agreement and
    Settlement Agreement *prior* to the deadline for satisfying the Closing Conditions is an anticipatory breach as a matter of law.

1   would assume the unpaid vendor claims incurred at Projects, assume the bond liabilities associated

2   with that Project.  Had Lehman ALI performed these contractual obligations, the relevant

3   Voluntary and Trustee Debtors would have had little or no debt, and the instant Chapter 11 cases

4   would have been unnecessary. However, instead, Lehman ALI breached the  agreement. It did not

5   pay the "urgent payables" or the bond obligations. Moreover, three days before signing the

6   Settlement Agreement, Lehman ALI, and its subsidiary, LCPI, sold all of their right, title and

7   interest in the Sold Loans to Fenway Capital. Yet, when the Lehman Parties signed the Settlement

8   Agreement, they represented that they still owned these loans and had authority to consummate

9   the Settlement Agreement. These representations were false and this transfer rendered

10  performance under the terms of the Restructuring Agreement and the Settlement Agreement

11  impossible.

12       As detailed in the Cook Declaration, the Lehman Entities' breach of the Restructuring

13  Agreement and the Settlement Agreement caused the Voluntary and Trustee Debtors to suffer

14  approximately $90 million in damages.  Under established law, the secured portions of the

15  Lehman Claims should be reduced by this sum and the resulting equity should be available for

16  unsecured creditors of the respective estates. *See* 11 U.S.C. 1129(b).

17       Similarly, the Voluntary Debtors' Contract Action against Lehman ALI seeks affirmative

18  damages against Lehman ALI and other non-debtor Lehman Defendants caused by the Lehman

19  Defendants breach of the Restructuring Agreement and the Settlement Agreement.  Because the

20  Chapter 11 Trustee refused to allow the Trustee Debtors to be included as plaintiffs in the Contract

21  Action against Lehman ALI and other non-debtor Lehman Affiliates, of the Debtors, only the

22  Voluntary Debtors are plaintiffs along with certain other SunCal affiliates. However, both the

23  SunCal Proponents Plans and the underlying complaint in the Contract Action reserved the right to

24  add the Trustee Debtors as Plaintiffs in the Contract Action if the SunCal Proponents Plans are

25  confirmed in such Trustee Debtors' cases.  The SunCal Plan Proponents Plans also seek to assume

26  the Restructuring Agreement and the Settlement Agreement.

27

28

-22-

**B)**    **The Debtors' 502(d) Objections to Several Lehman Claims.**

On April 26, 2011, the Voluntary Debtors and SunCal Management LLC, on behalf of the

Trustee Debtors, filed a motion to disallow, pursuant to 11 U.S.C. § 502(d), the following

Disputed Claims filed by Lehman ALI and LCPI ("Lehman 502(d) Objection").

| Disputed Proof of Claim No. | Debtor | Claim Holder | Claim Amount |
|---|---|---|---|
| 1 | SunCal I | LCPI | $343,221,391 |
| 2 | SunCal III | LCPI | $343,221,391 |
| 6 | Acton Estates | LCPI | $343,221,391 |
| 6 | Emerald Meadows | LCPI | $343,221,391 |
| 16 | Bickford Ranch | LCPI | $343,221,391 |
| 12 | Summit Valley | LCPI | $343,221,391 |
| 1 | SCC/Palmdale | LCPI | $119,664,305 |
| 12 | Oak Knoll | Lehman ALI | $158,141,365 |
| 4 | Torrance | Lehman ALI | $158,141,365 |
| 9 | Heartland | LCPI | $354,325,126 |
| 21 | Marblehead | LCPI | $354,325,126 |
| 9 | SCC Communities | Lehman ALI | $ 23,795,013 |
| 7 | Tesoro | Lehman ALI | $ 23,795,013 |
| 14 | Del Rio | Lehman ALI | $ 23,795,013 |
| 21 | Delta Coves | Lehman ALI | $ 206,023,142 |

In the pending Lehman Adversary Proceeding, the Trustee and the Voluntary Debtors

allege that Lehman ALI and LCPI are recipients of certain fraudulent transfers and preferential

transfers from the Debtors that are avoidable pursuant to Sections 544, 547, 548, 550 and 551.

These avoidable transfers have not been returned by Lehman ALI and/or LCPI to the applicable

Debtor's estate, despite the fact that the underlying avoidance causes of action have survived the

Lehman Entities' motions to dismiss the Debtors' Third Amended Complaint against the Lehman

Entities and Fenway (the "Dismissal Motions") and the same causes of action are currently set

forth in the Debtors' Fourth Amended Complaint ("FAC") against Lehman ALI but not LCPI due

to LCPI's automatic stay arising from its Chapter 11 proceeding in New York 8:09-ap-01005-ES.

At the June 9, 2011 scheduled hearing, on the 502(d) Objection, the Lehman Entities' core

defense was that the 502(d) Objection also violated LCPI's its automatic stay. However, at the

conclusion of the hearing, the Court ruled that LCPI's automatic stay was inapplicable to the

502(d) motion and that the parties could proceed with their discovery in this matter.  If granted,

1  the 502(d) Objection would result in complete disallowance of the Lehman Lenders' claims

2  subject thereto in an amount exceeding $1.2 billion.

3      **C)    Lehman ALI's Claims and Liens Against Tesoro and SCC Communities**

4      **Should be Disallowed and Avoided as Fraudulent Conveyances.**

5      Although most of the claims asserted by the Debtors in the Lehman Adversary Proceeding

6  are currently subject to LCPI's automatic stay, a number fall outside the stay. For example, SCC

7  Communities, Tesoro and Del Rio have asserted fraudulent transfer claims against Lehman Ali in

8  the Fourth Amended Complaint that seek a judgment disallowing approximately $23 million of

9  secured claims that Lehman ALI filed against each of these Voluntary Debtors based upon the $20

10  million Interim Loan. As more fully detailed in the FAC, the Voluntary Debtors received only a

11  small fraction of the proceeds from this loan, yet they have been subjected to claims and liens

12  seeking payment of the entire loan balance.

13      On April 1, 2011, SCC Communities, Del Rio, and Tesoro filed a motion seeking

14  summary judgment on the foregoing fraudulent conveyance claims. This matter is now fully

15  briefed and scheduled for hearing on September 23, 2011. The Voluntary Debtors believe that the

16  evidence presented in this motion warrants a judgment in their favor and would create an

17  aggregate value totaling approximately $930,000 for these estates based on the pending purchase

18  offer from Diamond Valley, LLC ("Diamond Valley").

19      **D)    LCPI's Secured Claim Against Acton in the Amount of $343,221,391 Should**

20      **be Completely Disallowed.**

21      Acton has filed an objection to LCPI's secured claim against Acton in the amount of

22  $343,221,391 that is based on a purported guaranty referred to as an "Assumption Agreement."

23  However, Acton never signed any agreement that would make Acton an obligor on the underlying

24  loan. In the absence of a valid executed agreement, LCPI's Claim No. 6 against Acton must be

25  disallowed in its entirety. Thus, on September 2, 2011, Acton filed a *Motion for Order*

26  *Disallowing LCPI's Disputed Claim No. 6-3* against Acton. This matter is currently set for hearing

27  on October 3, 2011. If the Acton claim objection is sustained, it will be create value in the

28

1  minimum amount of $1,600,000, subject to overbid based on the pending offer from Diamond

2  Valley.

3       E)      **The Debtors' Equitable Subordination Causes of Action Against Lehman ALI**

4               **and LCPI.**

5       The Debtors are asserting a broad range of claims in the Lehman Adversary. However, the

6  core claim in the action seeks a judgment equitably subordinating the claims and liens of the

7  Lehman Entities. Although LCPI has been dismissed as a defendant in this action pending either

8  relief from LCPI's automatic stay, or the expiration of LCPI's stay, if one or more of the SunCal

9  Plan Proponents Plans are confirmed in cases where LCPI has asserted a claim, the SunCal Plan

10 Proponents will move swiftly to seek relief from stay LCPI's stay in New York. Given the

11 advance state of LCPI's Chapter 11 case, the SunCal Plan Proponents believe that this relief will

12 be granted.

13      F)      **The Voluntary Debtors Action For Damages For LCPI's False Stay Assertions.**

14      Prior to the disclosure of the Fenway Repo, and this Court's ruling on the ownership of the

15 Sold Loans, the Lehman Entities continuously and falsely represented to this Court, and to the

16 Bankruptcy Court in New York ("New York Bankruptcy Court"), that LCPI owned certain of the

17 Sold Loans. On the basis of this alleged but non-existent ownership status, the Lehman Entities

18 asserted that LCPI's automatic stay precluded any action that affected the Sold Loans that it

19 purported to own. Over a period of nine months both the Lehman Entities' used this false stay

20 allegation to interfere with an severely damages the Debtors' ongoing reorganization efforts. This

21 wrongful course of conduct and the damages resulting therefrom are described in the complaint

22 filed adversary proceeding 8:11-ap-01212, a copy of which is attached as Exhibit " " to the RJN.

23 These facts are material to the pending confirmation since these damages would also directly

24 reduce the secured claims alleged by Lehman Ali [Check with Sean -- should this be LCPI?].

25      G)      **The Delta Coves Preference Action.**

26 The Lehman Adversary Proceeding states a claim for avoidance of preferential transfer against

27 Lehman ALI as to Delta Coves in the amount of $6,195,440.46. On July 10, 2009, the Voluntary

28 Debtors and the Trustee filed their Third Amended Complaint (the "TAC") in the Lehman

-25-

1  Adversary Proceeding.  On April 12, 2010, the Court entered the *Order re Lehman Entities'*

2  *Amended Motion to Dismiss the Third Amended Complaint* (the "Order Denying The Dismissal

3  Motions") which *denied* the Lehman ALI's Motion to dismiss inter alia as to the sixth claim for

4  relief (Avoid and Recover Preferential Transfers) as to the claims brought by Delta Coves.   On

5  March 26, 2010, the Debtors filed the FAC, which retained the causes of action upheld by the

6  Court, including the preferential transfer claims (renumbered as the fourth claim for relief) as to

7  Delta Coves.

8  As stated, the Trustee withdrew his opposition to the Claims Transaction and withdrew as a

9  movant in the RFS Motion in New York.  Consequently, the New York Bankruptcy Court denied

10  the RFS Motion expressly based in material part on the Trustee's withdrawal of its opposition to

11  the RFS Motion.  As a result, the Fenway Disputed Loans were transferred to LCPI and thus,

12  subject to LCPI's automatic stay.  Accordingly, the prosecution of the Lehman Adversary

13  Proceeding has been stayed even as to the Trustee Debtors.  The Lehman Adversary Proceeding

14  will be pursued post-confirmation after obtaining or the expiration of LCPI's stay.  Such

15  preference action is pending in the FAC but has not been pursued by the Trustee.

16      **H)    The Debtors' Pending Objection to the Bond Claims.**

17          The SunCal Parties have filed objections to all of the claims filed or held by Arch

18  Insurance Company ("Arch"). These objections are made on the following grounds:

19          (1) Twenty (20) of the Debtors have absolutely no contractual relationship with

20  Arch, they never executed any indemnity agreements in favor of Arch, Arch never issued bonds

21  on the Projects owned by these Debtors and Arch never provided any consideration to these

22  Debtors. Accordingly, Arch's has no valid claims against these Debtors;

23          (2) Arch has asserted that all twenty five (25) Debtors have joint and several

24  indemnity liability to Arch for all debts asserted against Arch by third party entities. Since the

25  Debtors subjected to these claims did not reasonably equivalent value in exchange for incurring

26  this purported liability, Arch's claims are subject to disallowance under Section 502(d);

27          (3) Arch asserts contingent claims for indemnity against each of the Debtors that

28  should be disallowed under Section 502(e)(1)(B).

1    If granted, these objections shall disallow claims against the Debtors in the aggregate

2    amount of $155 million in contingent claims and $131,000 in liquidated claims.

3    The SunCal Parties have also filed objections to the claims filed or held by Bond

4    Safeguard Insurance Company and Lexon Insurance Company ("Bond Safeguard") based upon

5    the following grounds:

6    (1) Bond Safeguard filed forty-nine (49) contingent claim for indemnification that

7    are subject to disallowance under Section 502(e)(1)(B);

8    (2) Bond Safeguard filed nine (9) claims against all of the Trustee Debtors asserting

9    cross-indemnification liability based upon a General Agreement of Indemnity. Since this contract

10    was not executed by any of the Trustee Debtors, it is not enforceable against them; and

11    (3) None of the Trustee Debtors received consideration, let alone reasonably

12    equivalent value, in exchange for these cross indemnity claims asserted by Bond Safeguard.

13    Accordingly, these claims are subject to disallowance under Section 502(d).

14    If granted, these objections shall disallow claims against the Debtors in excess of the

15    aggregate amount of $174 million in contingent claims and $11 million in non-contingent claims.

16                                              **IV**

17    **THE LEHMAN PLANS FAIL TO COMPLY WITH 11 U.S.C. § 1129(a)(2)**

18    Section 1129(a)(2) provides that a plan proponent must comply with applicable provisions

19    of this title. 11 U.S.C § 1129(a)(2). The Lehman Plans, by seeking to obtain improper third party

20    releases of claim held by the Debtors' affiliates in contravention of Section 524(e) and de facto

21    substantive consolidation of the Debtors' cases without any showing or court approval, fail to

22    satisfy this requirement.

23    **A)    Section 524(e).**

24    The Lehman Plans provide for the third-party releases of any claims held by the Debtors'

25    affiliates against the various Lehman Entities (i.e., the "Lehman Released Parties" which is

26    broadly defined in exhibit E) in violation of Section 524(e). Section 8.9.2 provides as follows:

27    "The Estate of each VD Plan Debtor, *on behalf of itself and its Affiliates* exclusive
of other Debtors in these Cases, automatically upon the occurrence of the
28    Effective Date, shall be deemed to unconditionally, irrevocably and generally

-27-

1  release, acquit and forever discharge, waive and relinquish any and all Lehman
Released Claims against each and every Lehman Released Party.

2  VD Plan, Section 8.9.2 (emphasis added). *See also,* TD Plan, Section 8.8.2.[65]

3  Exhibit E of the VD Plan and TD Plan defines "affiliate" as follows:

4
5  Affiliate.  As to any Person, any other Person that directly or indirectly owns or
controls, is owned or controlled by, or is under common ownership or control with,
such Person. The term "control" (including, with correlative meanings, the terms
6  "controlled by" and "under common control with"), as applied to any Person,
means the possession, direct or indirect, of the power to direct or cause the
7  direction of the management and policies of such Person, whether through the
ownership of voting securities or other equity ownership interest, by contract or
8  otherwise; provided that as to any Lehman Related Party, the term "Affiliate" does
9  not include any Debtor.

10  Thus, the Lehman Entities are seeking to surreptitiously include a release by the Debtors'

11  affiliates of the Lehman Released Parties.  Section 524(e) specifically states that "discharge of a

12  debt of the debtor does not affect the liability of any other entity on, or the property of any other

13  entity for, such debt." 11 U.S.C. § 524(e).  The Ninth Circuit has repeatedly held that § 524(e)

14  precludes a Chapter 11 plan from discharging the liabilities of non-debtors. See *In re*

15  *Lowenschuss*, 67 F.3d 1394, 1401-1402 (9th Cir. 1995) ("The bankruptcy court lacks the power to

16  confirm plans of reorganization which do not comply with applicable provisions of the

17  Bankruptcy Code. ... This court has repeatedly held, without exception, that § 524(e) precludes

18  bankruptcy courts from discharging the liabilities of non-debtors."); *Stratosphere Litigation L.L.C.*

19  *v. Grand Casinos, Inc.,* 298 F.3d 1137, 1143 (9th Cir. 2002) ("a bankruptcy court cannot confirm a

20  reorganization plan that discharges the liabilities of a third party"); *American Hardwoods, Inc. v.*

21  *Deutsche Credit Corp. (In re American Hardwoods, Inc.),* 885 F.2d 621, 626 (9th Cir.1989);

22  *Underhill v. Royal,* 769 F.2d 1426, 1432 (9th Cir.1985); *Sun Valley Newspapers, Inc. v. Sun*

23  *World Corp. (In re Sun Valley Newspapers, Inc.),* 171 B.R. 71, 77 (9th Cir. BAP 1994) (holding

24  reorganization plans which proposed to release non-debtor guarantors violated § 524(e) and were

25  therefore unconfirmable); *Seaport Automotive Warehouse, Inc. v. Rohnert Park Auto Parts, Inc.*

26  *(In re Rohnert Park Auto Parts, Inc.),* 113 B.R. 610, 614-17 (9th Cir. BAP 1990) (finding that a

27

28  [65] Robert Brusco, who testified as the Lehman Entities' designated "person most knowledgeable" regarding the
Lehman Plans admitted that the Lehman Entities are in fact seeking to release third party claims held against the
Lehman Entities through the Lehman Plans. See, Ex. " ", P. O'Keefe Decl.

-28-

1  reorganization plan provision which enjoined creditors from proceeding against co-debtors

2  violated § 524(e)).  Accordingly, the proposed release violates Section 524(e) and therefore the

3  Lehman Plans can not be confirmed.

4  **B)   The Lehman Plans Provide For De Facto Substantive Consolidation Without**

5  **Having to Prove the Requisite Elements.**

6  Although the Lehman Plans expressly state that they are not conditioned upon substantive

7  consolidation,[66] the mechanics of these plans appear to be unworkable without at least partial

8  substantive consolidation.  For instance, the VD Plan provides, without differentiation between

9  estates, that:

10  "If permitted by the applicable Lehman VD Lender, on the Effective Date, the
   Liquidating Trustee will use the Cash Collateral for a Lehman Secured Claim to
11  pay the Lehman Creditor Distribution Funding (in the order set forth in
   definition thereof, unless otherwise specified by the applicable Lehman VD
12  Lender) and then to pay the applicable Lehman VD Lender, unless it agrees that
   the Liquidating Trustee, instead, may hold such Cash Collateral in the Plan
13  Reserve for potential use of payment of Post-Confirmation Expenses."

14  VD Plan, Section 8.4(c), 64:16-22.  *See also*, TD Plan, 8.4(c), 59:25-28, 1-2. Since much of this

15  purported "Cash Collateral" is in fact cash that is not subject to a perfected lien, this is in effect

16  free and clear estate cash and yet it is being used to fund cross-estate obligations.

17  In addition, to the extent that a Voluntary Debtor's available cash or assets are exhausted, the

18  Liquidating Trustee may pay its post-confirmation expenses with the cash and assets of the other

19  Voluntary Debtors and book a receivable for the advancing Voluntary Debtor and a payable for the

20  borrowing Voluntary Debtor.   VD Plan, Section 8.5(d), 66:22.  *See also*, TD Plan, 8.4(g), 61-61,

21  28:1-7. Given the fact that these cases are liquidating cases and the Debtors will cease operating,

22  the creation of accounts payable is a meaningless act that is intended to hide the fact that the

23  _____

24  [66] *See* TD Plan, Section V, 19:6-10 ("The Plan does not intend to and does not provide for substantive
   consolidation of any of the TD Plan Debtors for any purpose, *e.g.*, for voting, for classification, for the
25  testing of compliance of the Plan with applicable provisions of the Bankruptcy Code, for treatment of
   Claims and Interests, including calculations of Distributions among creditors, or for the obligations created
26  under the Plan with respect to Distributions for Creditors.").  *See also*, VD Plan, Section V, 21:14-18 ("The
   Plan does not intend to and does not provide for substantive consolidation of any of the VD Plan Debtors
27  for any purpose, *e.g.*, for voting, for classification, for the testing of compliance of the Plan with applicable
   provisions of the Bankruptcy Code, for treatment of Claims and Interests, including calculations of
28  Distributions among creditors, or for the obligations created under the Plan with respect to Distributions for
   Creditors.")

1    Debtors are co-mingling funds, which is de facto consolidation. Finally, the Lehman Plans state

2    that the confirmation of their plans is contingent on confirmation of all Plans in both sets of cases,

3    which is again consistent with de facto substantive consolidation.

4         Since the Lehman Entities have expressly stated in the Lehman Plans that they are not

5    seeking substantive consolidation, and they have made no showing that consolidation is

6    appropriate under *In re Bonham*, 229 F. 3d 750 (9th Cir. 2000), this Court should, at a minimum,

7    strike the provisions in the Lehman Plans that attempt to effectuate a de facto substantive

8    consolidation of these cases.

9                                      **V**

10        **THE LEHMAN PLANS FAIL TO SATISFY 11 U.S.C. § 1129(a)(3) BY CREATING**

11        **DEFICIENCY CLAIMS IN VIOLATION OF CALIFORNIA STATE LAW**

12        Pursuant to Section 1129(a)(3), a plan cannot include proposed provisions that are

13   "forbidden by law." The Lehman Plans clearly violates this provision. The State of California has

14   an integrated anti-deficiency scheme that governs real property foreclosures. This statutory

15   scheme is set forth in four interrelated sections of the Code of Civil Procedure (the "C.C.P.).

16   Together these statutes circumscribe a creditor's[9] rights to a deficiency judgment.

17        Section 726 of the C.C.P., known as the 'one-action rule, compels a creditor to foreclose

18   on the underlying the real-property security interest *before taking action on the note*. Sections

19   580a and 726(b) require a fair-value hearing after both nonjudicial and judicial foreclosure sales.

20   Both sections limit the permissible deficiency to the difference between the fair value of the

21   property and the remaining indebtedness, thus providing protection against a creditor's inadequate

22   bid. Section 580d bars a creditor that acquires title through a non-judicial foreclosure sale from

23   obtaining a deficiency.

24        The State of California has a regulatory interest in the policies underlying section 580d and

25   the fair-value statutes. This statutory scheme establishes what the California legislature has

26   concluded are fair foreclosure remedies. These statutes were designed to protect the

27   owners/hypothecators of California real property, regardless of domicile.

28

-30-

1    In the Lehman Plans, the Lehman Entities attempt to sweep away the California statutes

2    that govern their rights and put in their stead a scheme that is directly contrary to the intent of

3    these statutes. In essence, the Lehman Entities seek to import *into their claim* the right to foreclose

4    on the Projects, in a private sale with no bidding allowed, and to thereafter retain a fixed

5    deficiency claim. No fair value hearing is provided for, and no redemptions rights are allowed.

6    This the Lehman Entities cannot do.

7    In *Butner v. United States*, the Supreme Court made it clear that lender who comes into

8    bankruptcy court retains only those rights available under state law:

9    
10    
11    
12    
13

> Property interests are created and defined by state law. Unless some federal interest
> requires a different result, there is no reason why such interests should be analyzed
> differently simply because an interested party is involved in a bankruptcy
> proceeding. Uniform treatment of property interests by both state and federal courts
> within a State serves to reduce uncertainty, to discourage forum shopping, and to
> prevent a party from receiving "a windfall merely by reason of the happenstance of
> bankruptcy."

14    440 U.S. 48, 55 (1979).

15    A creditor filing a plan cannot "gross up" its claim by adding rights and remedies that are

16    specifically barred by state law. Although the Lehman Entities will make a vague bankruptcy

17    preemption argument in favor of their wholesale derogation of California's foreclosure laws, this

18    argument fails. The Supreme Court has been particularly respectful of state foreclosure laws when

19    applying the Supremacy Clause, holding that preemption will only apply *where Congress has*

20    *clearly authorized it*. Here, nothing in the bankruptcy Code authorizes a NON-DEBTOR lender-

21    plan proponent to convey upon itself rights that are specifically bared by California law. Certainly

22    no provision in 11 U.S.C. 1123 or 1129 includes such an authorization. To the contrary, 28 U.S.C.

23    § 959[67] makes it clear that a trustee must comply with existing state law in the operation of a

24

25    _____

[67] Pursuant to 28 U.S.C. § 959:

26    
27    
28

> a trustee, receiver or manager appointed in any case pending in any court of the United States,
> including a debtor in possession, shall manage and operate the property in his possession as such
> trustee, receiver or manager according to the requirements of the valid laws of the State in which
> such property is located, in the same manner that the owner or possessor thereof would be bound
> to do if in possession thereof.

28 U.S.C. § 959.

1  property.  The scheme concocted by the Lehman Entities would clearly violate this statutory

2  restriction.

3                                                VI

4          **THE LEHMAN PLANS WERE NOT PROPOSED IN GOOD FAITH**

5                      **IN VIOLATION OF U.S.C. § 1129(a)(3)**

6          Under Section 1129(a)(3), a plan must be proposed in "good faith" where there is a

7  reasonable likelihood the plan will "achieve a result consistent with the objectives and purposes of

8  the Code.  *In re Corey,* 892 F.2d 829, 835 (9th Cir. 1989); *In re Stolrow's Inc.,* 84 B.R. 167, 172

9  (9th Cir. BAP 1988).   Good faith also requires that the plan demonstrates a fundamental fairness in

10  dealing with one's creditors.  *In re Jorgensen,* 66 B.R. 104, 109 (9th Cir. BAP 1986).

11          The Lehman Plans clearly violate this provision by, *inter alia,*: 1) attempting to assert

12  deficiency claims in excess of $1 billion in contravention of California state laws in order to

13  control (gerrymander) the voting of the classes of unsecured creditors in the Lehman Plans; 2)

14  improperly seeking to obtain third party releases of claim held by the Debtors' affiliates in

15  contravention of Section 524(e); and 3) obtaining to obtain de facto substantive consolidation of

16  the Debtors' cases without court approval.  Since the SunCal Proponents have timely objected to

17  the Lehman Plans under Section 1129(a)(3), the presumption of good faith under Fed. R. Bankr. P.

18  3020 has been defeated and the Lehman Entities must provide evidence that the Lehman Plans

19  were filed in good faith.

20                                              VII

21          **THE LEHMAN PLANS FAIL TO SATISFY SECTION 1129(a)(7)**

22          The Lehman Entities have failed to meet their burden of proving that an unsecured creditor

23  will receive as much under the Lehman Plans that it would receive in a hypothetical Chapter 7

24  proceeding as required by Section 1129(a)(7).   *In re Ambanc La Mesa Ltd. Partnership,* 115 F.3d

25  650, 657 (9th Cir. 1997).

26          The Lehman Plans provide for a one percent (1%) guaranteed distribution to unsecured

27  creditors holding allowed claims, which the Lehman Entities contend is more than the zero percent

28  distribution that creditors would receive in a hypothetical Chapter 7 proceedings.  Although the

1   Lehman Entities' did not provide any substantive bases for the liquidation analysis in their

2   Disclosure Statements, it appears that their analysis is premised on the fallacy that their purported

3   claims – secured and unsecured - will be deemed allowed in these cases.

4         The Lehman Entities' position ignores the fact that the Debtors have filed numerous

5   objections to substantially all of these claims. These objections and the related motions include the

6   Recoupment Claim Objection, the MSJ on the Contract Action, the 502(d) Objections, the MSJ on

7   the Tesoro and SCC Communities claims and liens, the Acton Claim Objection, the Delta Coves

8   Preference Action, and the claims in the Equitable Subordination Action. *See* RJN. The foregoing

9   objections and defenses are well grounded and supported. The damages that the Debtors suffered

10  on account of the wrongs described in these matters total not less than $90 million.. These

11  damages can and should be applied against, and should serve to reduce the secured part of the

12  Lehman Entities claims.

13        Although the Lehman Entities will insist that the Court can simply step over the objections

14  to their claims and confirm the Lehman Plans, the SunCal Proponents would respectfully submit

15  that this is not the law. Until the amount of the Lehman Entities' claims – both secured and

16  unsecured – have been quantified, *after due consideration of these objections*, the Lehman Entities

17  cannot meet their burden of proving best interest of creditors test under Section 1129(a)(7) and

18  consequently, the Lehman Plans cannot be confirmed.

19        The Lehman Entities argument also ignores the burden structure that applies to claim

20  objections. Once a well-supported objection to a claim is filed, the claimant must then submit

21  evidence proving its claim by a preponderance, in light of the evidence submitted in support of

22  the objection. The Lehman Entities cannot meet this burden, since their own witnesses have

23  testified that they simply do not recall the facts that bear upon the issues addressed in the pending

24  objections. In short, they have no competent evidence to present.

25        As more fully detained in the table below, when the reductions and disallowances prayed

26  for in the pending objections are taken into consideration, the resulting dividend to creditors

27  substantially exceeds what is being offered to creditors under the Lehman Plans:

28

| | FMV of Projects[68] | Lehman Entities Alleged Secured Claim | Recoupment Damages Reducing Secured Claim | Secured After Potential Claim Disallowance under Section 502(d) *et al.* | Net Equity for Distribution to Unsecured Creditors | Resulting Distribution Percentage[69] |
|---|---|---|---|---|---|---|
| Palmdale Hills | $21,800,000 | $42,99,000 | | | | |
| Beaumont | $1,020,000 | $1,020,000 | | | | |
| Johannson | $540,000 | $4,000,000 | | | | |
| Summit | $2,200,000 | $0 | | 0 | | |
| Bickford | $10,900,000 | $29,500,000 | | 0 | | |
| Acton | $1,600,000 | | | 0 | | |
| Seven Brothers | $200,000 | $0 | | 0 | | |
| Kirby Estates | $2,800,000 | $0 | | 0 | | |
| SunCal Communities | $1,200,000 | | | 0 | | |
| Tesoro | $740,000 | | | 0 | | |
| | | | | | | |
| Oak Valley | $21,000,000 | $29,900,000 | | | | |
| Heartland | $7,500,000 | $7,900,000 | | 0 | | |
| Northlake | $4,100,000 | $23,000,000 | | | | |
| Marblehead | $93,800,000 | $187,500,000 | | 0 | | |
| PSV | $18,000,000 | $13,800,000 | | | | |
| Delta Coves | $20,800,000 | $25,200,000 | | 0 | | |
| Torrance | $13,500,000 | $25,000,000 | | 0 | | |
| Oak Knoll | $25,400,000 | $48,000,000 | | 0 | | |
| TOTAL | | | | | | |

## VIII

### THE TD PLAN DOES NOT COMPLY WITH SECTION 1129(a)(9)

Section 1129(a)(9) provides that all allowed administrative expenses must be paid in full on the effective date unless the holder of such a claim agrees to a different treatment. Here, the amount of administrative claims in the Trustee Debtor cases is approximately $65,795,425, *exclusive of cure claims and rejection damages.* The TD Plan provides for the executory contracts and leases listed on Exhibit "A" will be assumed or assumed or assigned on the Effective Date. TD Plan, 11.2, 85:10-21. However, Exhibit "A" is blank and the Lehman Entities have not updated that exhibit to date nor have they attempted to quantify the amount of the cure claims or rejection damages. Since cure claims are administrative claims, they must be paid on the Effective Date under Section 1129(a)(9). *In re Wingspread Corp.*, 145 B.R. 784, 787 (S.D.N.Y. 1992) affirmed 992 F.2d 319 (2d Cir. 1993) ("Courts have held that a right to immediate cure,

---

[68] The SunCal Plan Proponents' valuation opinions were conducted in April 2011 and relect the value estimates by the SunCal Plan Proponents' underwriting team. SunCal Plan Proponents.

[69] At a maximum, if all assumptions are correct, the Lehman Entities will offer between $.40 to $.50 under the Lehman Plans, with the exception of Beaumont and Johannson where there is value for equity, which is impermissibly cancelled.

1  such as that provided for in § 365, gives rise to a priority administrative expense under §

2  507(a)(2)."); *In re Clinton Care Center, LLC*, 436 B.R. 390, 395 (Bankr.N.D.Miss. 2010) ("Had

3  the debtor assumed the lease, it would have had to timely cure any existing defaults in the lease

4  provisions. See, § 365(b)(1)(A) of the Bankruptcy Code. The failure to subsequently cure these

5  defaults could have elevated a claim related thereto to an administrative expense priority. See,

6  § 503(b)(7) of the Bankruptcy Code."); *In re Chateaugay Corp.*, 155 B.R. 625, 634

7  (Bankr.S.D.N.Y. 1993) ("After assuming the leases, the debtor attempted to cure the defaults on

8  the remaining leases, under § 365(b)(1), which would give rise to a § 507(a)(2) administrative

9  expense priority.").

10      The Lehman Entities imposed an overall funding cap of $55 million for the Trustee

11  Debtors, which has already been exceeded by the $65,795,425 administrative claims, exclusive of

12  any cure claims for unexpired lease and executory contracts that may be assumed.  Therefore,

13  unless the Lehman Entities agree to affirmative waive the funding thresholds for the Trustee

14  Debtors at the confirmation hearing on the Lehman Plans, they will not have sufficient funds to

15  even pay the administrative claims on the Effective Date as mandated by Section 1129(a)(9).

16                                             **IX**

17            **THE LEHMAN PLANS FAIL TO SATISFY 11 U.S.C. § 1129(a)(11)**

18      The Lehman Plans are not feasible.  The feasibility test set forth in Section 1129(a)(11)

19  requires the Court to determine whether a plan is feasible and has a reasonable likelihood of

20  success. *See In re Acequia*, 787 F.2d 1352, 1364 (9th Cir. 1986); *In re Harbon*, 486 F.3d 510, 517

21  (9th Cir. 2007).  The key element of feasibility is whether there exists a reasonable probability that

22  the provisions of the plan can be performed.  The purpose of the feasibility test is to protect

23  against visionary or speculative plans that promise creditors more than they can possibly obtain

24  post-confirmation. *In re Pizza of Hawaii*, 761 F.2d 1374 (9th Cir. 1985), *quoting 5 Collier on*

25  *Bankruptcy*, ¶ 1129.02[11] at 1129-34 (15th ed. 1984).

26      The Lehman Plans fail under this standard for the following reasons:

27            1.      The Lehman Entities have the right to withdraw the TD Plan post-

28  confirmation, but prior to the effective date, if "[t]he Lehman Creditors' good faith estimate of the

1    likely Classes 6/7 Claims Amount exceeds $30 million" or "[t]he Lehman Creditors' good faith

2    estimate of the likely maximum amount for the Lehman Plan Funding exceeds $55 million (plus

3    the amount of any new Lehman Administrative Loans made after August 10, 2010)." TD Plan,

4    §14.3.

5    　　　　2.    As evidenced by the following chart, which uses the records of the Classes

6    6/7 claims of the Lehman Entities set forth in Exhibit "D" of the TD Plan and the SunCal

7    Proponents, which arbitrarily excludes the asserted Reliance Claims of the SunCal Affiliates,[70] the

8    amount of Classes 6/7 is between approximately $32 million to $64 million, which clearly

9    establishes that the $30 million threshold has already been exceeded.

| | Oak Valley | Heartland | Northlake | Marblehead | PSV | Delta Coves | Torrance | Oak Knoll |
|---|---|---|---|---|---|---|---|---|
| Class 6 Reliance Claims[71] | $3,698,831 | $2,584,879 | $982,660 | $11,861,430 | $4,924,902 | $4,716,540 | $198,722 | $913,367 |
| Class 7 Claims General Unsecured Claims (using Lehman Entities Ex. D)[72] | $1,076,081 | $1,051,465 | $0 | $58,323,666 | $2,366,094 | $1,219,715 | $0 | $0 |
| Class 7 General Unsecured Claims (Using SunCal Plan Proponents Ex. "4") | $955,264 | $310,797 | $850,420 | $0 | $0 | $582,624 | $5,116 | $24,707 |

[70] The Lehman Entities have filed an objection to the SunCal Affiliates' claims but the SunCal Plan Proponents' understanding that the SunCal Affiliates will be heard on October 24, 2011. The SunCal affiliates have submitted ballots rejecting the Lehman Plans that indicate the same.

[71] The Reliance Claims listed on Exhibit D of the TD Plan does not include the $6,536,496 Reliance Claims asserted by the SunCal Management ("SCM") and SCC Acquisitions ("SCC"): (1) Oak Valley – SCM: $1,163,688; SCC: $5,300; (2) Heartland – SCM: $397,455; SCC: $24,065; (3) Northlake - $896,008; SCC: $6,617; (4) Marblehead – SCM: $1,799,805; SCC: $4,000; (5) PSV – SCM: $520,753; SCC: $22,977; (6) Delta Coves – SCM:$1,084,858; (7) Torrance – SCM: $148,578; and (8) Oak Knoll – SCM: $462,392. *See* Cook Decl., Ex. "__."

[72] The amount of the Class 7 Claims was calculated by taking the amount of Class 7 claims and subtracting the amount of the Class 6 Claims.

In addition, as illustrated below, the maximum funding for the TD Plan is excess of approximately $97 million, which clearly exceeds the $55 million funding cap.

| Trustee Debtors | | Percentage Distribution on the Effective Date of the TD Plan | Amount of Distribution on the Effective Date of the TD Plan |
|---|---|---|---|
| Administrative Claims | $65,795,425[73] | 100% | $65,795,425 |
| Unpaid Real Property Taxes | $17,642,376[74] | 100% | $17,642,376 |
| Secured Mechanic's Lien Claims[75] | $12,104,977 | 40%[76] | $4,841,990 |
| Other Secured Claims | $0.00 | N/A | $0 |
| Priority Claims | $11,185 | 100% | $11,185 |
| Reliance Claims Voting Option 1 | $23,344,835 | 40% | $9,337,934 |
| Reliance Claims Voting Option 2 | $6,536,496 | 1% | $65,364 |
| General Unsecured Claims Using the Lehman Entities Ex. D | $34,155,689 | 5% | $1,707,784 |
| General Unsecured Claims Using the SunCal Plan Proponents Ex. 4 | $2,728,928 | 5% | $136,446 |
| TOTAL (using the Lehman Entities' Ex. D) | $159,590,983 | N/A | $99,402,058 |
| TOTAL (using the SunCal Plan Proponents Ex. 4) | $128,164,222 | N/A | $97,830,720 |

Currently, the reliance/general unsecured claims in the Trustee Debtors' cases are between approximately $32-$64 million, without taking into account potential unsecured rejection claims and bond claims. In addition, the Trustee Debtors' estates currently have approximately $17 million of unpaid real property taxes that are to be paid in full, approximately $65 million of administrative and priority claims that are to be paid in full, and, as stated above, approximately

---

[73] The amount of the administrative claims for the Trustee Debtors listed on Exhibit "4" of the Debtors' plans was approximately $56,545,425. This exhibit was based on an ongoing monitoring of the claim docket by attorneys at Winthrop Couchot PC. These claims were increased by $9,250,000, which amount includes: (1) $2,250,000 based on a substantial contribution claim asserted to the Trustee Debtors (excluding Century City); and (2) $7,000,000 by virtue of a financing order entered on July 19, 2011 [Docket No. 2410].

[74] This is the SunCal Management's estimation of the real property taxes that will be due in December 2011.

[75] The amount of the Secured Mechanic's Lien Claim was calculated from the TD Plan. TD Plan: pages 23-26. The SunCal Plan Proponents assume that the holders of mechanic's liens' claims will elect to waive their secured claim and assert their claims as Class 6 Reliance Claims, largely, in part, because all of the asserted mechanic's lien claims are treated as Reliance Claims in the Debtors' plans. However, under the TD Plan, such unsecured claims are expressly excluded from the $30 million cap for unsecured claims.

[76] Assuming that the Lehman Entities waive the $30 million claims cap, the SunCal Plan Proponents believe that the Class 6 Reliance Claims and the holders of mechanic's lien claims will receive a 40% distribution.

-37-

1  $32- $64 million of reliance/general unsecured claims, exclusive of potential cure claims, rejection

2  claims and bond claims even after several rounds of claim objections.

3            3.       The VD Plan provides as a condition to entry of the confirmation order, that

4  as to Group I Debtors,[77] the Lehman VD Lenders good faith estimate of the Lehman Plan Funding

5  does not exceed $22 million and as to the Group II Debtors,[78] the Allowed Senior Claims does not

6  exceed $3 million. VD Plan, §14.3.

7            As evidenced by the following chart, the $22 Lehman Plan Funding caps have been

8  vastly exceeded.

|  | Group I Debtors | Percentage Distribution on the Effective Date of the TD Plan | Amount of Distribution on the Effective Date of the TD Plan |
|---|---|---|---|
| **Administrative Claims** | $18,926,726[79] | 100% | $18,926,726 |
| **Unpaid Real Property Taxes** | $20,586,110[80] | 100% | $20,586,110 |
| **Secured Mechanic's Lien Claims** [81] | $6,056,212 | 40%[82] | $2,422,484 |
| **Other Secured Claims** | $0 | N/A | $0 |
| **Priority Claims** | $10,950 | 100% | $10,950 |
| **Reliance Claims Voting Option 1** | $6,951,400[83] | 40% | $2,780,560 |

[77] Group I Debtors include: Acton, Palmdale, SCC, Bickford, Communities I, Summit and Tesoro.

[78] Group II Debtors include: Kirby, Seven Brothers, Beaumont and Johannson.

[79] The amount of the administrative claims for the Group I Debtors listed in Exhibit "4" of the Debtors' plans was approximately $3,186,602. This exhibit was based on an ongoing monitoring of the claim docket by attorneys at Winthrop Couchot PC. This amount increased by $15,740,154 based on the following: (1) $4,652,730, which is 90% of the pro-rated approximate aggregate outstanding fees owed to the following professionals in addition to estimates for September 2011 and October 2011. Winthrop Couchot PC ($1,780,000), Irell & Manella, LLP ($1,761,518), and Miller Barondess, LLP ($1,111,212); (2) $1,555,462 administrative claim asserted by the City of Palmdale for Fiscal Year 2010/2011 Mello-Roos Special Tax Levy for payments due December 10, 2010 and April 10, 2010 [Docket No. 2120]; and (3) $9,295,906 and $236,056 claim owed by the 17 Voluntary Debtors to Palmdale and Bickford, respectively, for administrative loans used to pay professional fees during the pendency of these cases pursuant to those certain stipulations between the Voluntary Debtors and the Lehman Entities authorizing use of unencumbered cash, granting administrative expense claims and modifying the automatic stay. [Docket Nos. 1154, 1566, 2102].

[80] This is SunCal Management's estimation of the taxes due in December 2011.

[81] The SunCal Plan Proponents assume that the holders of mechanic's liens claims will elect to waive their secured claim and assert their claims as Class 6 Reliance Claims, largely, in part, because all of the asserted mechanic's lien claims are treated as Reliance Claims in the Debtors' plans. However, under the TD Plan, such unsecured claims are expressly excluded from the $30 million cap for unsecured claims.

[82] Assuming that the Lehman Entities waive the $30 million claims cap, the SunCal Plan Proponents believe that the Class 6 Reliance Claims and the holders of mechanic's lien claims will receive a 40% distribution.

[83] The amount of the Reliance Claims was calculated by Irell and Manella, LLP, counsel to the Official Committee for the Voluntary Debtors.

| Reliance Claims Voting Option 2 | $1,896,398[84] | 1% | $18,963 |
|---|---|---|---|
| General Unsecured Claims[85] | $0 | 5% | $0 |
| TOTAL | | | $44,745,793 |

The aggregate amount of general unsecured claims, unpaid real property taxes, priority claims and administrative claims in the Group I Debtors' cases are in excess of approximately $44 million, exclusive of potential cure claims, rejection claims and bond claims. In addition, the SunCal Proponents believe that the amount of the Allowed Senior Claims in the Group II Debtor's cases are at least approximately $2.6 million.

4.    The Lehman Plans are also contingent upon nonexistent settlements with the Bond Companies and their approval by the New York Bankruptcy Court. See TD Plan, §14.1; VD Plan, §14.1. The Bond Companies have asserted future Bond Claims of $157.5 million against the Trustee Debtors and $68.7 million against the Voluntary Debtors. As mentioned, the Bond Claims are subject to pending objections requesting complete disallowance of these claims.

5.    The Lehman Entities may withdraw the Lehman Plans if one of the eight Trustee Debtor plans is not confirmed (TD Plan, §14.3(b)) or one of the eleven Voluntary Debtors' plan is not confirmed.  VD Plan, §14.3(b).

6.    LBHI and certain affiliates including LCPI (the "Lehman Debtors"), are subject to a jointly administered Chapter 11 proceeding in the Southern District of New York, Case No. 08-13555 JMP ("Lehman NY Bankruptcy Proceeding").  On April 25, 2011, the *Non-Consolidation Plan Proponents*[86] filed a competing Chapter 11 plan in the Lehman NY

---

[84] The Reliance Claims listed on the VD Plan do not include the following Reliance Claims of SCM and SCC:1) Acton- SCM $44,173; $3,000; 2) Palmdale – SCM:$1,379,367; SCC:$3,000; 3) SCC Communities-- SCM: $21,804; SCC: $1,000; (4) Bickford – SCM:$321,103; SCC:$3,000; (5) Summit – SCM:$7,436; SCC:$2,500; and (6) Tesoro -- SCM:$104,510;SCC: $5,505.

[85] The amount of the general unsecured claims was calculated by taking the amount of Class 7 claims and subtracting the amount of the Class 6 Claims.

[86] The members of the *Non-Consolidation Plan Proponents* include Deutsche Bank AG, State Street Bank and Trust Company, Cyrus Capital Partners, LP, Silver Point Capital, L.P., York Capital Management Global Advisors, LLC, Morgan Stanley & Co. International PLC, Morgan Stanley Capital Services Inc., D. E. Shaw Composite Portfolios, L.L.C., D.E. Shaw Oculus Portfolios, L.L.C., Goldman Sachs Bank USA, Goldman Sachs International, Credit Agricole CIB, Credit Suisse International, The Royal Bank of Scotland PLC, Oaktree Capital Management, L.P., solely in its capacity as agent on behalf of certain funds advised by it or their respective subsidiaries, and Silver Point Capital, L.P. on behalf of its affiliated investment funds, and certain funds managed by and/or affiliated with: Angelo, Gordon & Co., L.P., Contrarian Capital Management, LLC, Goldentree Asset Management, LP, Hayman Capital Management, LP, Knighthead Capital Management, LLC, Mason Capital Management LLC, Mount Kellett Capital Management, Oaktree Capital Management, L.P., and Serengeti Asset Management LP.

1  Bankruptcy Proceeding ("Deutsche Bank Competing Plan" and "Deutsche Bank Disclosure

2  Statement"). On April 27, 2011, the *Ad Hoc Group of Lehman Brothers Creditors*[87] filed a

3  competing Chapter 11 plan and disclosure statement in the Lehman NY Bankruptcy Proceeding

4  ("Ad Hoc Competing Plan" and "Ad Hoc Disclosure Statement"). Both of these competing plans

5  provide that the existing Lehman Board of Directors shall be terminated and replaced by a new

6  Board of Directors. The new Board of Directors will have full discretion to terminate any existing

7  managers or advisors to the Lehman Debtors. *See* Deutsche Bank Disclosure Statement, pgs. 90-

8  91; Ad Hoc Disclosure Statement, pgs. 90-91.

9           Substantially all of the proponents of both the Ad Hoc Competing Plan and the

10  Deutsche Bank Competing Plan have decided to support the Lehman Debtors' Plan subject to the

11  terms of their Plan Support Agreements. Accordingly, the Lehman Debtors, the Ad Hoc Group

12  and substantially all of the Deutsche Bank Plan Proponents have entered into a stipulation and

13  order, subject to court approval, pursuant to which they have agreed not to prosecute their plans or

14  seek approval of their disclosure statements unless: (1) a requisite of members of the Ad Hoc

15  Group and the Deutsche Bank Plan Proponents terminate their Plan Support Agreements or (2) the

16  Effective Date of the Plan has not occurred on or before March 31, 2012. Therefore, the Ad Hoc

17  Competing Plan and the Deutsche Bank Competing Plan have not been withdrawn and they may

18  still be prosecuted. If either of these competing plans is ultimately confirmed in the Lehman NY

19  bankruptcy proceeding, resulting in the wholesale replacement of the existing management for all

20  of the Lehman Entities, there is a very real possibility that such new management will withdraw

21  their support of the Lehman Plans.

22           Consequently, there are major and perhaps insurmountable contingencies under the

23  Lehman Plans that render them infeasible.

24                                              **X.**

25           **THE LEHMAN PLANS DO NOT COMPLY WITH SECTION 1129(B)(2)(C)**

26  _____

27  [87] Members of the Ad Hoc Group of Lehman Brothers Creditors are: 1. California Public Employees' Retirement
System, 2. County of San Mateo, 3. Fiduciary Counselors Inc., 4. Fir Tree, Inc., 5. Gruss Asset Management, L.P., 6.

28  Owl Creek Asset Management, L.P., 7. Paulson & Co. Inc., 8. Perry Capital LLC on behalf of one or more
investment funds for which it or an affiliate acts as investment advisor or general partner, 9. Taconic Capital Advisors
L.P., 10. Western Asset Management Company.

The Lehman Plans provide that the equity for Beaumont, Johannson, Tesoro, SCC Communities and Action will be cancelled in contravention of Section 1129(b)(2)(C). The minimum fair market value of the Beaumont Project ($1,020,000) and the Johannson Project ($650,000) pursuant to the Diamond Valley Term Sheet, subject to overbid, exceeds the amount of the claims that are asserted against those projects. In addition, if the MSJ on the Tesoro and SCC causes of action in the FAC, and Acton Claim Objection are resolved in the Debtors' favor, the equity holders for these Debtors would also be entitled to a distribution of $750,000, $180,000, and $1,600,000, respectively.

**XI**

## THE LEHMAN PLANS IMPROPERLY CLASSIFIES THE CLAIMS
## OF INSIDERS IN CONTRAVENTION OF SECTION 1123

In the Lehman Plans, the Lehman Entities specifically exclude from Class 6 Reliance Claims held by an "insider[88]" that would otherwise fall within this class. This treatment essentially separately classifies insider Reliance Claims in a class (Class 6) that is different from another substantially similar claims (by default Class 7), without any justification other than these claimants' "insider" status. This manipulative classification is not allowed. The mere fact that a claim is held by insider is not a sufficient basis for separate classification. *In re United Marine, Inc.*, 197 B.R. 942, 949 (Bankr. S.D. Fla. 1996); *In re Martin's Point Ltd. Partnership*, 12 B.R. 721, 727 (Bankr. N.D. Ga.1981) (allowing insider claims to be classified with other unsecured claims and noting that claims of equity holders are generally treated equally with those of other creditors); *In re Holywell Corp.*, 913 F.2d 873, 880 (11th Cir.1990) (applying the rule of *Martin's Point* to prohibit separate classification of insider claims).

**XII**

---

[88] The term "insider" is defined in the TD Plan as "(1) A Person other than a Lehman Related Party that is an "insider" as to any TD Plan Debtor as defined in Bankruptcy Code section 101, (2) an Affiliate of such a Person of (3) without limiting the foregoing, as to all TD Plan Debtors, *inter alia,* each other TD Plan Debtor, SunCal Management, LLC, Acquisitions, Elieff, Voss, Cook & Thel, LLP, Greenfield Communications, and SunCal Master Venture Member, LLC." TD Plan, Ex. E, page 15:1-5. Similarly, the term "insider" is defined in the VD Plan as ""(1) A Person other than a Lehman Related Party that is an "insider" as to any VD Plan Debtor as defined in Bankruptcy Code section 101, (2) an Affiliate of such a Person of (3) without limiting the foregoing, as to all VD Plan Debtors, *inter alia,* each other VD Plan Debtor, SunCal Management, LLC, Acquisitions, Elieff, Voss, Cook & Thel, LLP, Greenfield Communications, and SunCal Master Venture Member, LLC." VD Plan, Ex. E, page 15:11-15.

1

## THE LEHMAN PLANS FAILS TO SATISFY SECTION 1123(a)(4)

2   The Lehman Entities acknowledge in the Lehman Plan that they are appropriating all cash

3   held by the Voluntary Debtors, whether or not this cash is in fact "cash collateral," and sweeping

4   these funds into the misnamed "Lehman Creditor Distribution Funding." The Lehman Entities then

5   propose to use this cash to fund a 40% dividend to one class of unsecured creditors, Class 6

6   ("Reliance Claimants") while paying a second similarly situated class of creditors, Class 7 (Non-

7   Reliance Claimants) only a 1% (or up to 5%) dividend. The Lehman Entities apparently believe

8   this blatant discrimination is justified, because the Class 6 claimants are assigning to Lehman

9   Entities the claims they hold against these entities. This justification fails. Although the Lehman

10  Entities may have the right to pay certain unsecured creditors more than others, if such claimants

11  are selling individually held assets, they can only do this if they use 100% non-estate assets. They

12  cannot fund a discriminatory scheme with estate funds that would otherwise be payable to all

13  unsecured creditors. This clearly violates 11 U.S.C. § 1123(a)(4). Notably, the SunCal Proponents'

14  Plans avoid this problem by using *non-estate funds* to buy these claims.

15

### XIII

16

### RESERVATION OF RIGHTS

17  As discovery is ongoing, the SunCal Proponents expressly reserve their rights to

18  supplement and amend the Objection, and introduce any newly produced evidence that was made

19  available after the date of this Opposition at any hearing to consider the Lehman Plans.

20

### XIV

21

### CONCLUSION

22  For all of these reasons set forth in detail throughout the Objection, the SunCal Proponents

23  request the Court to deny confirmation of the Lehman Plans.

24  DATED:  September 19, 2011                    **WINTHROP COUCHOT**
                                                **PROFESSIONAL CORPORATION**
25

26                                              By:___/s/ *Paul J. Couchot*_____
                                                      Paul J. Couchot, Esq.
27                                              General Insolvency Counsel for Administratively
                                                Consolidated Debtors-in-Possession
28
                                                **RUS, MILIBAND & SMITH P.C.**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

By:___ /s/ *Ron Rus*  ____
      Ronald Rus, Esq.
      Joel S. Miliband, Esq.
      Catherine Castaldi, Esq.
Attorneys for SunCal Management, LLC, and SCC
Acquisitions Inc.

**PROOF OF SERVICE OF DOCUMENT**

1

2   I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 660 Newport Center Drive, 4ᵗʰ Fl., Newport Beach, CA 92660.

3   A true and correct copy of the foregoing document described as: **SUNCAL PLAN PROPONENTS'
4   OBJECTIONS TO: (A) THIRD AMENDED JOINT CHAPTER 11 PLAN FOR ELEVEN VOLUNTARY
    DEBTORS PROPOSED BY THE LEHMAN VD LENDERS; AND (B) THIRD AMENDED JOINT CHAPTER
    11 PLAN FOR EIGHT TRUSTEE DEBTORS PROPOSED BY THE TRUSTEE AND SUBJECT LEHMAN
5   CREDITORS - [DECLARATIONS OF BRUCE V. COOK AND SEAN A. O'KEEFE IN SUPPORT
    THEREOF AND REQUEST FOR JUDICIAL NOTICE FILED CONCURRENTLY HEREWITH]** was served
6   in the manner indicated below:

7   I. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to
    controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served
8   by the court via NEF and hyperlink to the document. On September 20, 2011, I checked the CM/ECF
    docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on
9   the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

10   ☒ Service information continued on attached page

11   II. **SERVED BY U.S. MAIL OR OVERNIGHT MAIL** (indicate method for each person or entity served):
    On _____, 2011, I served the following person(s) and/or entity(ies) at the last known
12   address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a
    sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail
13   service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will
    be completed no later than 24 hours after the document is filed.
14

15

16   III. **SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for
    each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on _____, 2011,
17   I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in
    writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here
18   constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after
    the document is filed.
19
    ☐ Service information continued on attached page
20

21   I declare under penalty of perjury under the laws of the United States of America that the foregoing is true
    and correct.
22
    September 20, 2011     Gretchen Crumpacker          /s/ Gretchen Crumpacker
23   _Date_                _Type Name_                  _Signature_

24

25

26

27

28

-44-

## E-MAIL SERVICE LIST

- Selia M Acevedo    sacevedo@millerbarondess.com, mpritikin@millerbarondess.com
- Joseph M Adams    jadams@sycr.com
- Raymond H Aver    ray@averlaw.com
- James C Bastian    jbastian@shbllp.com
- Thomas Scott Belden    sbelden@kleinlaw.com, ecf@kleinlaw.com
- John A Boyd    fcdnotice@tclaw.net
- Mark Bradshaw    mbradshaw@shbllp.com
- Gustavo E Bravo    gbravo@smaha.com
- Jeffrey W Broker    jbroker@brokerlaw.biz
- Brendt C Butler    bbutler@mandersonllp.com
- Andrew W Caine    acaine@pszyjw.com
- Carollynn Callari    ccallari@venable.com
- Cathrine M Castaldi    ccastaldi@rusmiliband.com
- Tara Castro Narayanan    tara.narayanan@msrlegal.com, lisa.king@msrlegal.com
- Dan E Chambers    dchambers@jmbm.com
- Shirley Cho    scho@pszjlaw.com
- Vonn Christenson    vrc@paynefears.com
- Brendan P Collins    bpcollins@bhfs.com
- Vincent M Coscino    vcoscino@allenmatkins.com, emurdoch@allenmatkins.com
- Paul J Couchot    pcouchot@winthropcouchot.com,
  pj@winthropcouchot.com;gcrumpacker@winthropcouchot.com
- Geoffrey Crisp    geoffrey@smgarberlaw.com, michelle@smgarberlaw.com
- Jonathan S Dabbieri    dabbieri@sullivan.com,
  hill@sullivanhill.com;mcallister@sullivanhill.com;stein@sullivanhill.com;vidovich@sullivanhill.com
- Ana Damonte    ana.damonte@pillsburylaw.com
- Vanessa S Davila    vsd@amclaw.com
- Melissa Davis    mdavis@shblp.com
- Daniel Denny    ddenny@gibsondunn.com
- Caroline Djang    crd@jmbm.com
- Caroline Djang    cdjang@rutan.com
- Donald T Dunning    ddunning@dunningLaw.com
- Lynsey M Eaton    leaton@gglts.com
- Meredith R Edelman    meredith.edelman@dlapiper.com
- Joseph A Eisenberg    jae@jmbm.com
- Lei Lei Wang Ekvall    lekvall@wgllp.com
- Richard W Esterkin    resterkin@morganlewis.com
- Don Fisher    dfisher@ptwww.com
- Marc C Forsythe    kmurphy@goeforlaw.com
- Alan J Friedman    afriedman@irell.com
- Steven M Garber    steve@smgarberlaw.com
- Christian J Gascou    cgascou@gascouhopkins.com
- Barry S Glaser    bglaser@swjlaw.com
- Robert P Goe    kmurphy@goeforlaw.com, rgoe@goeforlaw.com;mforsythe@goeforlaw.com
- Eric D Goldberg    egoldberg@stutman.com
- Richard H Golubow    rgolubow@winthropcouchot.com, pj@winthropcouchot.com
- Michael J Gomez    mgomez@frandzel.com, cfiling@frandzel.com;sking@frandzel.com
- Kelly C Griffith    bkemail@harrisbeach.com
- Matthew Grimshaw    mgrimshaw@rutan.com
- Kavita Gupta    kgupta@winthropcouchot.com
- Asa S Hami    ahami@morganlewis.com
- Michael J Hauser    michael.hauser@usdoj.gov

- D Edward Hays    ehays@marshackhays.com
- Michael C Heinrichs    mheinrichs@omm.com
- Harry D. Hochman    hhochman@pszjlaw.com, hhochman@pszjlaw.com
- Jonathan M Hoff    jonathan.hoff@cwt.com
- Nancy Hotchkiss    nhotchkiss@trainorfairbrook.com
- Michelle Hribar    mhribar@rutan.com
- John J Immordino    john.immordino@wilsonelser.com, raquel.burgess@wilsonelser.com
- Lawrence A Jacobson    laj@cohenandjacobson.com
- Michael J Joyce    mjoyce@crosslaw.com
- Stephen M Judson    sjudson@fablaw.com
- Kaleb L Judy    ecf@kleinlaw.com, kjudy@kleinlaw.com
- Steven J Kahn    skahn@pszyjw.com
- Sheri Kanesaka    sheri.kanesaka@bryancave.com, theresa.macaulay@bryancave.com
- David I Katzen    katzen@ksfirm.com
- Christopher W Keegan    ckeegan@kirkland.com,
  shalimar.caltagirone@kirkland.com;alevin@kirkland.com
- Irene L Kiet    ikiet@hkclaw.com
- Claude F Kolm    claude.kolm@acgov.org
- Mark J Krone    mk@amclaw.com, crs@amclaw.com;amc@amclaw.com
- David B Lally    davidlallylaw@gmail.com
- Leib M Lerner    leib.lerner@alston.com
- Peter W Lianides    plianides@winthropcouchot.com, pj@winthropcouchot.com
- Charles Liu    cliu@marshackhays.com
- Charles Liu    cliu@winthropcouchot.com
- John W Lucas    jlucas@pszjlaw.com
- Kerri A Lyman    klyman@irell.com
- Mariam S Marshall    mmarshall@marshallramoslaw.com
- Robert C Martinez    rmartinez@mclex.com
- Michael D May    mdmayesq@verizon.net
- Hutchison B Meltzer    hmeltzer@wgllp.com
- Krikor J Meshefejian    kjm@lnbrb.com
- Joel S. Miliband    jmiliband@rusmiliband.com
- James M Miller    jmiller@millerbarondess.com,
  vgunderson@millerbarondess.com;smiller@millerbarondess.com;mpritikin@millerbarondess.com
- Louis R Miller    smiller@millerbarondess.com
- Craig Millet    cmillet@gibsondunn.com, pcrawford@gibsondunn.com;cmillct@gibsondunn.com
- Randall P Mroczynski    randym@cookseylaw.com
- Mike D Neue    mneue@thelobelfirm.com,
  jmattiace@thelobelfirm.com;pnelson@thelobelfirm.com
- Robert Nida    Rnida@castlelawoffice.com
- Henry H Oh    henry.oh@dlapiper.com, janet.curley@dlapiper.com
- Sean A Okeefe    sokeefe@okeefelc.com
- Scott H Olson    solson@seyfarth.com
- Robert B Orgel    rorgel@pszjlaw.com, rorgel@pszjlaw.com
- Malhar S Pagay    mpagay@pszjlaw.com, mpagay@pszjlaw.com
- Ernie Zachary Park    ernie.park@bewleylaw.com
- Daryl G Parker    dparker@pszjlaw.com
- Penelope Parmes    pparmes@rutan.com
- Robert J Pfister    rpfister@ktbslaw.com
- Ronald B Pierce    ronald.pierce@sdma.com
- Katherine C Piper    kpiper@steptoe.com, smcloughlin@steptoe.com
- Cassandra J Richey    cmartin@pprlaw.net
- Debra Riley    driley@allenmatkins.com
- James S Riley    tgarza@sierrafunds.com

- Todd C. Ringstad    becky@ringstadlaw.com
- R Grace Rodriguez    ecf@lorgr.com
- Martha E Romero    Romero@mromerolawfirm.com
- Ronald Rus    rrus@rusmiliband.com
- John P Schafer    jschafer@mandersonllp.com
- John E Schreiber    jschreiber@dl.com
- William D Schuster    bills@allieschuster.org
- Christopher P Simon    csimon@crosslaw.com
- Gerald N Sims    jerrys@psdslaw.com, bonniec@psdslaw.com
- Wendy W Smith    wendy@bindermalter.com
- Steven M Speier    Sspeier@Squarmilner.com, ca85@ecfcbis.com
- Steven M Speier (TR)    Sspeier@asrmanagement.com, ca85@ecfcbis.com
- Michael St James    ecf@stjames-law.com
- Michael K Sugar    msugar@irell.com
- Cathy Ta    cathy.ta@bbklaw.com, Arthur.Johnston@bbklaw.com;Kenneth.Burgess@bbklaw.com
- David A Tilem    davidtilem@tilemlaw.com,
  malissamurguia@tilemlaw.com;dianachau@tilemlaw.com;kmishigian@tilemlaw.com
- James E Till    jtill@thelobelfirm.com, jmattiace@thelobelfirm.com;pnelson@thelobelfirm.com
- United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov
- Carol G Unruh    cgunruh@sbcglobal.net
- Annie Verdries    verdries@lbbslaw.com
- Jason Wallach    jwallach@gladstonemichel.com
- Joshua D Wayser    , kim.johnson@kattenlaw.com
- Marc J Winthrop    mwinthrop@winthropcouchot.com, pj@winthropcouchot.com
- David M Wiseblood    dwiseblood@seyfarth.com
- Brett K Wiseman    bwiseman@aalaws.com
- Dean A Ziehl    dziehl@pszjlaw.com, dziehl@pszjlaw.com
- Marc A. Zimmerman    joshuasdaddy@att.net

1 | ROBERT E. OPERA – State Bar No. 101182
ropera@winthropcouchot.com
2 | WINTHROP COUCHOT
PROFESSIONAL CORPORATION
3 | 660 Newport Center Drive, Suite 400
Newport Beach, CA 92660
4 | Telephone: (949) 720-4100
Facsimile: (949) 720-4111
5 |
Proposed General Insolvency Counsel for
6 | Official Unsecured Creditors Committee

7

8

9 | UNITED STATES BANKRUPTCY COURT

10 | CENTRAL DISTRICT OF CALIFORNIA

11 | RIVERSIDE DIVISION

12

13 | In re:                                              Case No. 6:11-bk-13071-DS

14 | TRADE UNION INTERNATIONAL INC., a          Jointly Administered with
Case No. 6:11-bk-13072-DS
15 | California corporation,
Chapter 11 Proceeding
16 |                    Debtor.
APPLICATION OF OFFICIAL
17 | _____                    UNSECURED CREDITORS
In re:                                          COMMITTEE FOR AUTHORITY TO
18 |                                                 EMPLOY WINTHROP COUCHOT
DUCK HOUSE, INC., a California corporation,     PROFESSIONAL CORPORATION AS ITS
19 |                                                 GENERAL INSOLVENCY COUNSEL;
MEMORANDUM OF POINTS AND
20 |                    Debtor.                      AUTHORITIES AND DECLARATION OF
ROBERT E. OPERA IN SUPPORT
21 |                                                 THEREOF

22 | [11 U.S.C. §§327, 328]

23 | [No Hearing Set]

24 | _____

25

26

27

28

MAINDOCS-#165334-v1-TradeUnion-AppEmployWC.DOC

1    The Official Unsecured Creditors Committee ("Committee") hereby applies to this Court

2    for an order authorizing it to employ Winthrop Couchot Professional Corporation as the

3    Committee's general insolvency counsel. In support of this Application, the Committee

4    respectfully represents and alleges as follows:

5        1.    On January 31, 2011 ("Petition Date"), Debtors Trade Union International, Inc. and

6    Duck House, Inc. filed in this Court their respective petitions for relief under Chapter 11 of the

7    Bankruptcy Code. Since the Petition Date, the Debtors have acted as debtors-in-possession

8    pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

9        2.    On February 10, 2011, the Court entered an order jointly administering the Debtors'

10   cases [Docket No. 22].

11       3.    On June 22, 2011, the Office of the United States Trustee ("U.S. Trustee") gave

12   notice of the appointment of the Committee to serve as the duly authorized committee of creditors

13   holding unsecured claims with respect to the Debtors' cases [Docket No. 132].

14       4.    The Committee desires to employ Winthrop Couchot Professional Corporation

15   ("Firm") as the Committee's counsel for the purposes described herein.

16       5.    The Firm is comprised of attorneys who specialize in insolvency, bankruptcy and

17   corporate reorganization and is well qualified to represent the Committee in proceedings of this

18   nature. All attorneys comprising or associated with the Firm who will appear in this case are duly

19   admitted to practice law in the courts of the State of California and in the United States District

20   Court for the Central District of California. A copy of the Firm's résumé is attached as Exhibit "1"

21   to the Declaration of Robert E. Opera attached hereto ("Opera Declaration").

22       6.    The Committee requires the services of the Firm for the following purposes:

23           a.    To provide to the Committee legal advice with respect to the Committee's

24   duties, responsibilities and powers in the Debtors' bankruptcy cases;

25           b.    To assist the Committee in investigating the acts, conduct, assets, liabilities

26   and financial condition of the Debtors and their insiders and affiliates;

27           c.    To provide to the Committee legal advice and representation with respect to

28   the negotiation, confirmation and implementation of a Chapter 11 plan;

-2-

d. To provide to the Committee legal advice with respect to the administration of the Debtors' cases, the distribution of the Debtors' assets, the prosecution of claims against third parties, and any other matters relevant to the Debtors' cases;

e. To provide to the Committee legal advice and representation, if appropriate, with respect to the appointment of a trustee or examiner; and

f. To provide to the Committee legal advice and representation in any legal proceeding, whether adversary or otherwise, involving the interests represented by the Committee, and the performance of such other legal services as may be required by the Committee in furtherance of the interests of general unsecured creditors in the Debtors' cases.

7. The Firm has not received any retainer for its services in these cases. The Firm will render services to the Committee at the Firm's regular hourly billing rates, which may be subject to adjustment in the future. A list of the Firm's hourly billing rates is set forth in the Opera Declaration.

8. The Firm requests that it be authorized to obtain from the Debtors payment of the Firm's accruing fees and costs on a monthly basis. On March 30, 2011, the Court entered an order authorizing the Debtors' counsel to obtain, after its retainer is exhausted in the Debtors' cases, monthly payment of 80% of its accruing fees and 100% of its accruing expenses in the cases provided that the Debtors' counsel complies with the monthly payment procedure set forth in its employment application [Docket No. 82] ("Debtors' Counsel Employment Order"). By this Application, the Firm requests that the Court authorize the Firm to obtain monthly compensation in accordance with terms and conditions materially the same as those approved by the Court pursuant to the Debtors' Counsel Employment Order.

a. In accordance with the U.S. Trustee's Guide to Applications for Retainers and Professional and Insider Compensation, the Firm will file monthly professional fee statements ("Professional Fee Statement") together with documentation supporting the charges for professional services rendered and expenses incurred in the form required for professional fee applications by applicable law. A copy of the Professional Fee Statement

-3-

1    will be served on the following creditors and parties-in-interest: the U.S. Trustee; counsel

2    for the Debtors; counsel for the primary secured creditors in the Debtors' cases, Cathay

3    Bank and China Trust Bank (together, "Bank Group"); the Committee members; and on

4    parties who have requested special notice in the cases.

5          b.    Any creditor or party-in-interest will have the right to oppose the payment of

6    the fees and expenses requested in the Professional Fee Statement. If no objection to the

7    Professional Fee Statement is filed within ten days after the service of the Professional Fee

8    Statement, the Firm will be entitled to be paid, and the Debtors will forthwith pay to the

9    Firm, 80% of the Firm's fees and 100% of the Firm's expenses requested in the

10    Professional Fee Statement. If an objection is filed with respect to the Professional Fee

11    Statement, the Firm will not be paid the disputed amount of the Firm's fees and/or costs

12    unless and until the objection is withdrawn or the Court has resolved the objection.

13          c.    Any compensation paid to the Firm pursuant to the proposed monthly

14    payment procedure will not be allowed by the Court, but will remain subject to Court

15    approval pursuant to subsequently filed fee applications under Sections 330 or 331 of the

16    Bankruptcy Code.

17          d.    No compensation will be paid to the Firm pursuant to the proposed monthly

18    compensation procedure, from funds that constitute the Bank Group's "cash collateral" (as

19    such term is defined in Section 363(a) of the Bankruptcy Code), unless the use of cash

20    collateral for such purpose is authorized by order the Court.

21    9.    The Firm respectfully submits that the proposed monthly compensation procedure

22    is justified on the grounds that the Debtors' cases are complicated, fairly contentious cases that are

23    proceeding at an extremely rapid pace.[1] Since the Committee's engagement of the Firm, the Firm

24    has been required to devote significant time to evaluating the Debtors' business and financial

25    affairs, the proceedings filed by the Debtors in these cases, the disclosure statement and the

26    Chapter 11 plan and amendments thereto filed by the Debtors, and the prospects for recovery by

27

28

[1] The Court has scheduled a hearing on the confirmation of the Debtors' Chapter 11 plan for September 2, 2011.

-4-

1  general unsecured creditors in these cases. The Firm also has been required to devote significant

2  time to addressing deficiencies in the Debtors' disclosure statement and Chapter 11 plan, to

3  preparing an extensive objection to the Debtors' disclosure statement and to engaging in

4  negotiations with the Debtors and the Bank Group with respect to the terms of the Debtors'

5  Chapter 11 plan and, specifically, with respect to the treatment of general unsecured claims under

6  the plan. The Firm anticipates that it will be required to continue to devote a significant amount of

7  time to representing the interests of general unsecured creditors in the Debtors' cases with respect

8  to the pending plan confirmation proceedings and matters pertaining thereto. In effect, by reason

9  of the fast track on which these cases are proceeding, the Firm has been and will continue to be

10  required to devote to these cases a significant amount of time during an approximately three-month

11  period, a very "compressed" period of time relative to most Chapter 11 cases. Based upon the

12  foregoing, requiring that the Committee's counsel wait for an extended period of time to obtain

13  any compensation in these cases would be imposing a severe and unnecessary hardship on the

14  Committee's counsel. Under such circumstances, the Committee's counsel effectively would be

15  required to finance the administration of the Debtors' cases, at its financial risk. The Committee

16  respectfully submits that approving for the Firm a monthly payment procedure, on terms

17  comparable to those already approved by the Court pursuant to the Debtors' Counsel Employment

18  Order, is necessary to ameliorate the financial hardship that otherwise would be imposed upon the

19  Firm as the Committee's counsel in these cases.

20        10.    The Firm understands that its compensation in the Debtors' cases will be subject to

21  the approval of the Court. No funds paid to the Firm pursuant to the proposed monthly payment

22  procedure will be deemed to be allowed by the Court. All funds paid to the Firm pursuant to the

23  proposed monthly payment procedure will be subject to allowance by the Court, upon appropriate

24  application and noticed hearing.

25        11.    At the conclusion of these cases, the Firm will file an appropriate application

26  seeking final allowance of all of its fees and costs, regardless of whether interim compensation has

27  been paid to the Firm. The Committee requests that the Court order that, upon allowance of such

28

1    fees and costs by the Court, the Debtors pay to the Firm the difference between the amounts

2    allowed to the Firm and any interim compensation paid to the Firm.

3        12.    No portion of the funds paid to the Firm pursuant to the proposed monthly payment

4    procedure will be deemed to have been allowed by the Court unless and until such time as the

5    Court enters an order expressly allowing such fees and costs in accordance with the requirements

6    of Sections 330 and 331 of the Bankruptcy Code. The Firm understands and agrees that any

7    compensation to be received hereafter by the Firm is subject to approval by this Court, upon

8    appropriate application and hearing in conformity with Sections 330 and 331 of the Bankruptcy

9    Code.

10       13.    As disclosed in the Opera Declaration, to the best of the Firm's knowledge, neither

11   the Firm nor any of the attorneys comprising or employed by it, have any other connection with the

12   Debtors, nor does the Firm have any other connection with the Debtors' creditors, or any party-in-

13   interest, or their respective attorneys or accountants. As of the time of the Committee's

14   engagement of the Firm, the Firm was not owed any funds by the Debtors. The Firm is a

15   disinterested person within the meaning of Section 101(14) of the Bankruptcy Code. Furthermore,

16   the Firm does not have an interest adverse to the Debtors' estates in accordance with the

17   provisions of Section 327 of the Bankruptcy Code.

18       14.    As set forth in the Opera Declaration, none of the attorneys comprising or employed

19   by the Firm is related to any judge of the United States Bankruptcy Court for the Central District of

20   California, the U.S. Trustee, or to any person employed by the U.S. Trustee. The Honorable Erithe

21   A. Smith, United States Bankruptcy Judge for the Central District of California, however, was a

22   member of Lobel, Winthrop & Broker, a former law partnership which included some of the

23   current shareholders of the Firm. The Firm is not a creditor, an equity security holder or an insider

24   of the Debtors. The Firm is not and was not, within two years before the date of the filing of the

25   Debtors' petitions, a director, officer or employee of the Debtors. To the best of my knowledge,

26   the Firm has no direct or indirect relationship to, connection with, or interest in, the Debtors.

27       15.    To the best of the Firm's knowledge, the Firm has never represented Cathay Bank,

28   China Trust Bank, the members of the Committee, or any other creditor holding one of the 20

1    largest general unsecured claims against the Debtors, or any equity holder in the Debtors' cases.

2    To the best of the Firm's knowledge, the Firm has no interest adverse to the Debtors' estates.

3        16.      The Firm has not agreed to share with any person or entity any compensation

4    received by the Firm in the Debtors' cases, except as among the members of the Firm.

5        This Application is made and based upon the foregoing allegations and representations, the

6    Memorandum of Points and Authorities and the Opera Declaration attached hereto, the papers,

7    pleadings and other documents on file in these cases, and upon such other information, both oral

8    and documentary, as may be presented to the Court at or before the time of the hearing on this

9    Application.

10       **WHEREFORE**, the Committee prays that the Court enter an order as follows:

11       1.      Authorizing the Committee, based upon the foregoing and pursuant to 11 U.S.C.

12    §§ 328(a), 330 and 1103 and Rule 2014(a) of the Federal Rules of Bankruptcy Procedure, to

13    employ the Firm as its counsel, effective as of the Committee's engagement of the Firm on

14    June 27, 2011, for the purposes set forth herein;

15       2.      Authorizing the Firm to receive payment on a monthly basis from the Debtors'

16    estates, in accordance with the terms and conditions set forth herein; and

17       3.      Granting to the Firm such other and further relief as the Court deems just and

18    appropriate.

19

20    **[SIGNATURES ON NEXT PAGE]**

21

22

23

24

25

26

27

28

DATED: August ___, 2011

OFFICIAL UNSECURED
CREDITORS COMMITTEE

BY:   MONTEREY LIGHTING SOLUTIONS,
INC.

By: _____
Clark Longhurst

Its: _COMMITTEE CHAIR_____
Committee Chairperson

PRESENTED BY:
WINTHROP COUCHOT
PROFESSIONAL CORPORATION

By: _/s/ Robert E. Opera_____
Robert E. Opera
[Proposed] General Insolvency Counsel for
Official Unsecured Creditors Committee

-8-

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

**I.**

3

## THE BANKRUPTCY CODE AUTHORIZES THE COMMITTEE TO EMPLOY

4

## PROFESSIONALS AT THE EXPENSE OF THE DEBTORS' ESTATES

5      Section 1102 of the Bankruptcy Code, which governs the appointment of committees,

6    provides, in pertinent part, as follows:

7
8      (a)(1). . . as soon as practicable after the order for relief under chapter 11 of
       this title, the United States trustee shall appoint a committee of creditors
       holding unsecured claims...
9
       On June 22, 2011, the U.S. Trustee gave notice of the appointment of the Committee in the
10
     Debtors' cases.
11
       Section 1103 of the Bankruptcy Code, which governs the powers and duties of
12
     committees, provides, in pertinent part, as follows:
13

14     (a)  At a scheduled meeting of a committee appointed under section 1102 of
       this title, at which a majority of the members of such committee are present,
15     and with the court's approval, such committee may select and authorize the
       employment by such committee of one or more attorneys, accountants, or
16     other agents, to represent or perform services for such committee.

17     At a meeting of the Committee held on June 27, 2011, the Committee selected the Firm to

18   serve as the Committee's counsel in these cases, subject to the approval of this Court.

19     Counsel for a duly appointed and acting committee in a Chapter 11 case may receive

20   compensation at the expense of the debtor's estate.  In this regard, Section 328(a) of the

21   Bankruptcy Code, provides, in pertinent part, as follows:

22     The trustee, or a committee appointed under section 1102 of this title, with the
       court's approval, may employ or authorize the employment of a professional
23     person under sections 327 or 1103 of this title, as the case may be, on any
       reasonable terms and conditions of employment, including . . . on an hourly
24     basis...
25
       Section 328(c) of the Bankruptcy Code provides that, in order for a professional employed
26
     under Section 1103 to be compensated in a debtor's case, such professional must be disinterested
27
     and must not hold an interest adverse to the interests of the estate with respect to the matter on
28
     which such professional is employed.  11 U.S.C. § 328(c).

-9-

1    Rule 2014 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules") mandates

2    that a professional seeking approval of its employment by the bankruptcy estate disclose "any

3    proposed arrangement for compensation" and "all of the person's connections with the debtor,

4    creditors, any other party in interest, their respective attorneys and accountants, [and] the United

5    States trustee."

6    Here, the Firm has complied fully with the disclosure requirements set forth in the

7    Bankruptcy Code and the Bankruptcy Rules.  By the Opera Declaration, the Firm provides full and

8    complete disclosure in order to demonstrate that it satisfies all requirements imposed by the

9    Bankruptcy Code and the Bankruptcy Rules for employment in the Debtors' cases.  Neither the

10   Firm nor any attorney who is a member of the Firm holds any interest materially adverse to the

11   interests of the Debtors' estates.  Moreover, the Firm is a "disinterested person," as that term is

12   defined in Section 101(14) of the Bankruptcy Code.  Therefore, this Court may authorize the

13   proposed employment of the Firm as general insolvency counsel to the Committee pursuant to

14   Section 1103 of the Bankruptcy Code.

15                                    II.

16   ## THE PROPOSED MONTHLY PAYMENT PROCEDURE IS APPROPRIATE AND

17   ## SHOULD BE APPROVED BY THIS COURT

18   Professionals can be compensated in accordance with monthly payment procedures

19   without a bankruptcy court's prior allowance of the professional's fees and costs.  In re Knudsen,

20   84 B.R. 668 (Bankr. 9th Cir. 1988).[2]  In Knudsen, the Ninth Circuit Bankruptcy Appellate Panel

21   ("BAP") reasoned that, since Section 328(a) of the Bankruptcy Code allows a bankruptcy court to

22   authorize professionals to receive as compensation a retainer, which contemplates payment of a

23   lump sum at the beginning of a case or periodically thereafter, "[i]t makes little sense that the

24   court could allow payment of a lump sum or periodic retainer before fees are earned, but not

25   after."  Id. at 671.

26

27   [2] See also, In re Lotus Properties L.P., 200 B.R. 388 (Bankr. C.D. Cal. 1996); In re Kaiser Steel Corp., 74 B.R. 885
28   (Bankr.D.Colo. 1987); In re Frontier Airlines, Inc., 74 B.R. 973 (Bankr.D.Colo. 1987); In re Printcrafters, Inc.,
208 B.R. 968 (Bankr.D.Colo. 1997); In re Jefferson Business Center Associates, 135 B.R. 676 (Bankr.D.Colo. 1992);
In re Cottrell Intern., LLC, 2000 WL 1180282 (Bankr.D.Colo. 2000).

1    In In re Lotus Properties LP, 200 B.R. 388 (Bankr. C.D. Cal. 1996), the bankruptcy court

2    examined the principles set forth in Knudsen and found that the establishment of monthly

3    payment procedures can be authorized even if the circumstances of a particular case do not meet

4    all of the specific factual criteria articulated by the BAP in Knudsen. Lotus Properties, 200 B.R.

5    at 398. In Lotus Properties, counsel for the debtor agreed to represent the debtor with a relatively

6    small retainer in reliance upon the debtor's agreement to pay counsel's fees and costs on a

7    monthly basis after the retainer were exhausted. Counsel for the debtor applied to the bankruptcy

8    court for approval of such monthly payment procedure, and the Office of the United States Trustee

9    objected to the establishment of the proposed monthly payment procedure. The Lotus Properties

10    court found that the establishment of the monthly payment procedure was appropriate in that case

11    since counsel for the debtor had taken a reduced retainer in exchange for obtaining payment of its

12    fees and costs on a monthly basis. Id. at 396-99.

13    Here, the Committee requests that the Court approve for the Firm, monthly payment

14    procedures comparable to the procedures already approved for the Debtors' counsel pursuant to

15    the Debtors' Counsel Employment Order. As set forth in the Opera Declaration, the Firm believes

16    that such monthly payment procedures are appropriate.

17    A.    **Requiring The Firm To Wait An Extended Period Of Time For Payment Of**

18    **Its Fees In The Debtors' Cases May Cause Undue Hardship To The Firm.**

19    As set forth in the Opera Declaration, the Firm anticipates that it will be required to devote

20    significant time to assisting the Committee regarding the Debtors' Chapter 11 cases. The Firm

21    anticipates that two (2) of the eight (8) attorneys of the Firm and the sole paralegal of the Firm will

22    be required to devote billing time to the representation of the Committee. As a result, a significant

23    amount of the Firm's resources will be devoted to these cases.

24    As set forth in the Opera Declaration, the Firm believes that the proposed monthly payment

25    procedure is fair and is appropriate given the nature of the Debtors' cases, the required

26    commitment of the Firm's resources to the Debtors' cases, and the risks inherent in these cases.

27    Requiring the Firm to wait for an extended period of time to obtain payment of its fees pursuant to

28    Section 331 of the Bankruptcy Code may place undue hardship on the Firm. It would be

1  burdensome for the Firm if it were effectively required to "finance" the Debtors' reorganization

2  efforts in these cases.

3       B.     **The Firm Will Be Able To Respond To Any Reassessment Of Fees Ordered**

4              **By This Court.**

5       As set forth in the Opera Declaration, the Firm will be able to respond to any order entered

6  by this Court reassessing fees paid to the Firm pursuant to the requested monthly payment

7  procedure.  First, the Firm requests payment of only 80% of its accruing fees.  The 20% of the

8  Firm's fees "held back" from payment to the Firm will help to ensure that the Firm will not be paid

9  monthly fees in excess of the amount of fees ultimately awarded to the Firm, and, hence, that the

10 Firm will not be required to disgorge any fees paid to the Firm in these cases.  Second, the Firm

11 and the shareholders of the Firm have the ability to respond to any such reassessment of fees paid

12 to the Firm.  The Firm is one of the preeminent bankruptcy law firms in Southern California, and

13 has operated continuously since March 1, 1995.  Marc J. Winthrop has more than 36 years of

14 experience in the Southern California bankruptcy community, and Robert E. Opera has more than

15 29 years of experience in the Southern California bankruptcy community.  The Firm has never

16 been unable to respond to any court-ordered reassessments of its fees.  The Firm understands that

17 its ultimate compensation in this case is subject to the provisions of Sections 330 and 331 of the

18 Bankruptcy Code, and is prepared to respond to any such reassessment  In summary, the Firm's

19 longevity and financial stability attest to the fact that it will be able to respond to any Court-

20 ordered reassessment of fees in these cases.

21       C.     **The Proposed Payment Procedure Has Been The Subject Of Notice to**

22              **Creditors.**

23       As is evidenced by the proof of service attached to this Application, notice of the relief

24 requested by this Application has been provided to the U.S. Trustee, counsel for the Debtors, the

25 Committee members, counsel for the Bank Group and all creditors and parties-in-interest who

26 have requested special notice in the Debtors' cases.  Such parties have been provided with an

27 opportunity to obtain a hearing on this Application should they object to the relief requested

28 hereby.

-12-

1    The monthly payment procedure provided by this Application is fair and satisfies all due

2    process requirements under the Bankruptcy Code and the Bankruptcy Rules. First, the

3    compensation procedure allows for ample scrutiny of the Firm's fees and costs by the Debtors, the

4    Bank Group, the U.S. Trustee, creditors and by this Court. The fees and costs for which the Firm

5    applies on a monthly basis are not deemed allowed by this Court. Instead, the Firm is required to

6    apply for allowance of its fees and costs in accordance with the requirements of Sections 330 or

7    331 of the Bankruptcy Code. The scrutiny of the Firm's fees by the Debtors, the Bank Group, the

8    U.S. Trustee, creditors and this Court, therefore, remains undiminished by the monthly payment

9    procedure proposed herein. Second, in the event that any fees and costs paid on a monthly basis

10    to the Firm are not ultimately allowed by this Court, the Firm can and will repay to the Debtors the

11    amount thereof. See, the Opera Declaration. Third, compensation will be paid to the Firm from

12    any cash collateral of the Bank Group only to the extent that such cash collateral use is authorized

13    by order of the Court.

14    By virtue of the foregoing, the Committee believes that the monthly payment procedure

15    provided for by this Application should be authorized by this Court.

16                                    III.

17                                **CONCLUSION**

18    Based upon the foregoing, the Firm respectfully submits that good cause exists for this

19    Court to authorize the Committee to employ the Firm as its general insolvency counsel in these

20    Chapter 11 cases on the terms and conditions set forth herein.

21    DATED: August 5, 2011                **WINTHROP COUCHOT**

22                                         **PROFESSIONAL CORPORATION**

23

24                                         By:    /s/ Robert E. Opera
                                                  Robert E. Opera
25                                         [Proposed] General Insolvency Counsel for
                                           Official Unsecured Creditors Committee
26

27

28

-13-

## DECLARATION OF ROBERT E. OPERA

I, Robert E. Opera, declare and state as follows:

1. The matters stated herein are true and correct and within my own personal knowledge. If called as a witness, I could and would competently testify thereto.

2. I am a shareholder with Winthrop Couchot Professional Corporation (the "Firm") and am authorized to make this declaration on behalf of the Firm. This declaration is offered in support of the Application of Official Unsecured Creditors Committee for Authority to Employ Winthrop Couchot Professional Corporation as its General Insolvency Counsel ("Application") filed by the Committee in the Debtors' cases.[1]

3. I have reviewed the Application. To the best of my knowledge, the factual representations concerning the Firm's proposed representation of the Committee set forth in the Application are materially correct.

4. The Committee desires to employ the Firm as the Committee's counsel for the purposes described in the Application.

5. The Firm is comprised of attorneys who specialize in insolvency, bankruptcy and corporate reorganization and is well qualified to represent the Committee in proceedings of this nature. All attorneys comprising or associated with the Firm who will appear in this case are duly admitted to practice law in the courts of the State of California and in the United States District Court for the Central District of California. A copy of the Firm's résumé is attached as Exhibit "1" hereto and is incorporated herein by this reference.

6. The Committee requires the services of the Firm for the following purposes:

    a.  To provide to the Committee legal advice with respect to the Committee's duties, responsibilities and powers in the Debtors' bankruptcy cases;

    b.  To assist the Committee in investigating the acts, conduct, assets, liabilities and financial condition of the Debtors and their insiders and affiliates;

---

[1] Unless otherwise defined herein, the definitions of the capitalized terms contained herein are as set forth in the Application.

c.      To provide to the Committee legal advice and representation with respect to the negotiation, confirmation and implementation of a Chapter 11 plan;

d.      To provide to the Committee legal advice with respect to the administration of the Debtors' cases, the distribution of the Debtors' assets, the prosecution of claims against third parties, and any other matters relevant to the Debtors' cases;

e.      To provide to the Committee legal advice and representation, if appropriate, with respect to the appointment of a trustee or examiner; and

f.      To provide to the Committee legal advice and representation in any legal proceeding, whether adversary or otherwise, involving the interests represented by the Committee, and the performance of such other legal services as may be required by the Committee in furtherance of the interests of general unsecured creditors in the Debtors' cases.

7.      The Firm has not received any retainer for its services in these cases. The Firm will render services to the Committee at the Firm's regular hourly billing rates, which may be subject to adjustment in the future. A following is a list of the Firm's hourly billing rates:

| Attorneys | Hourly Rates |
|---|---|
| Marc J. Winthrop | $725.00 |
| Robert E. Opera | $725.00 |
| Sean A. O'Keefe, *Of Counsel* | $725.00 |
| Paul J. Couchot | $725.00 |
| Richard H. Golubow | $575.00 |
| Peter W. Lianides | $575.00 |
| Garrick A. Hollander | $575.00 |
| Kavita Gupta | $495.00 |
| Payam Khodadadi | $395.00 |
| **Legal Assistants** | |
| P.J. Marksbury | $250.00 |
| Legal Assistant Associates | $135.00 |

1    8.    The Firm requests that it be authorized to obtain from the Debtors payment of the

2    Firm's accruing fees and costs on a monthly basis.  On March 30, 2011, the Court entered an

3    order authorizing the Debtors' counsel to obtain, after its retainer is exhausted in the Debtors'

4    cases, monthly payment of 80% of its accruing fees and 100% of its accruing expenses in the

5    cases provided that the Debtors' counsel complies with the monthly payment procedure set forth

6    by its employment application [Docket No. 82] ("Debtors' Counsel Employment Order").  As set

7    forth in the Application, the Firm requests that the Court authorize the Firm to obtain monthly

8    compensation in accordance with terms and conditions materially the same as those approved by

9    the Court pursuant to the Debtors' Counsel Employment Order.

10    9.    The Firm respectfully believes that the proposed monthly compensation

11    procedure is justified, in part, on the grounds that the Debtors' cases are complicated, fairly

12    contentious cases that are proceeding at a rapid pace.  The Committee engaged the Firm on June

13    27, 2011.  Since the Committee's engagement of the Firm, the Firm has been required to rapidly

14    "get up to speed" regarding the Debtors' cases.  The Firm has devoted significant time to

15    evaluating the Debtors' businesses and financial affairs, the proceedings filed by the Debtors in

16    these cases, the disclosure statement and the Chapter 11 plan and amendments thereto filed by

17    the Debtors, and the prospects for recovery by general unsecured creditors in these cases.  The

18    Firm also has been required to devote significant time to addressing deficiencies in the Debtors'

19    disclosure statement and Chapter 11 plan, to preparing an extensive objection to the Debtors'

20    disclosure statement and to engaging in negotiations with the Debtors and with the Bank Group

21    with respect to the terms of the Debtors' Chapter 11 plan and, specifically, with respect to the

22    treatment of general unsecured claims under the plan.  I anticipate that the Firm will be required

23    to continue to devote a significant amount of time to representing the interests of general

24    unsecured creditors in the Debtors' cases with respect to the pending plan confirmation

25    proceedings and matters pertaining thereto.  In effect, by reason of the fast track on which these

26    cases are proceeding, the Firm has been, and will continue to be, required to devote to these

27    cases a significant amount of time during an approximately three-month period, a very

28    "compressed" period of time relative to most Chapter 11 cases.  Based upon the foregoing,

-16-

1    requiring that the Firm wait for an extended period of time to obtain any compensation in these

2    cases would be imposing a severe and unnecessary hardship on the Firm. Under such

3    circumstances, the Firm effectively would be required to finance the administration of the

4    Debtors' cases, at its financial risk. Approving for the Firm a monthly payment procedure, on

5    terms comparable to those already approved by the Court pursuant to the Debtors' Counsel

6    Employment Order, will ameliorate the financial hardship that otherwise would be imposed upon

7    the Firm as the Committee's counsel in these cases.

8          10.      The Firm understands that its compensation in the Debtors' cases will be subject

9    to the approval of the Court. No funds paid to the Firm pursuant to the proposed monthly

10   payment procedure will be deemed to be allowed by the Court. All funds paid to the Firm

11   pursuant to the proposed monthly payment procedure will be subject to allowance by the Court,

12   upon appropriate application and noticed hearing.

13         11.      At the conclusion of these cases, the Firm will file an appropriate application

14   seeking final allowance of all of its fees and costs, regardless of whether interim compensation

15   has been paid to the Firm.

16         12.      No portion of the funds paid to the Firm pursuant to the proposed monthly

17   payment procedure will be deemed to have been allowed by the Court unless and until such time

18   as the Court enters an order expressly allowing such fees and costs in accordance with the

19   requirements of Sections 330 and 331 of the Bankruptcy Code. The Firm understands and

20   agrees that any compensation to be received hereafter by the Firm is subject to approval by this

21   Court, upon appropriate application and hearing in conformity with Sections 330 and 331 of the

22   Bankruptcy Code.

23         13.      To the best of the Firm's knowledge, neither the Firm nor any of the attorneys

24   comprising or employed by it, have any other connection with the Debtors, nor does the Firm

25   have any other connection with the Debtors' creditors, or any party-in-interest, or their respective

26   attorneys or accountants. The Firm has represented parties in unrelated matters in which counsel

27   for the Debtors or counsel for the Bank Group was involved. The Firm also has worked with the

28   Committee's proposed business and financial advisors, Corporate Recovery Associates

-17-

1  ("CRA"), in a case pending in the United States Bankruptcy Court for the Central District of

2  California, MTI Technology Corp. ("MTI"), Case No. 8:07-13347-ES, and currently served as

3  counsel representing CRA as the "Plan Agent" appointed pursuant to a Chapter 11 plan

4  confirmed in the MTI case.

5      14.    As of the time of the Committee's engagement of the Firm, the Firm was not

6  owed any funds by the Debtors. The Firm is a disinterested person within the meaning of

7  Section 101(14) of the Bankruptcy Code. The Firm is not a creditor, an equity security holder or

8  an insider of the Debtors. The Firm is not and was not, within two years before the date of the

9  filing of the Debtors' petitions, a director, officer or employee of the Debtors. To the best of my

10 knowledge, the Firm has no direct or indirect relationship to, connection with, or interest in, the

11 Debtors.

12      15.    To the best of the Firm's knowledge, the Firm has never represented Cathay

13 Bank, China Trust Bank, the members of the Committee, or any other creditor holding one of the

14 20 largest general unsecured claims against the Debtors, or any equity holder in the Debtors'

15 cases. To the best of the Firm's knowledge, the Firm has no interest adverse to the Debtors'

16 estates.

17      16.    To the best of the Firm's knowledge, none of the attorneys comprising or

18 employed by the Firm is related to any judge of the United States Bankruptcy Court for the

19 Central District of California, the U.S. Trustee, or to any person employed by the U.S. Trustee.

20 The Honorable Erithe A. Smith, United States Bankruptcy Judge for the Central District of

21 California, however, was a member of Lobel, Winthrop & Broker, a former law partnership

22 which included some of the current shareholders of the Firm.

23

24

25

26

27

28

-18-

1

2    17.    The Firm has not agreed to share with any person or entity any compensation

3    received by the Firm in the Debtors' cases, except as among the members of the Firm.

4        I declare under penalty of perjury under the laws of the State of California that the

5    foregoing is true and correct.

6        EXECUTED this 5th day of August 2011 at Newport Beach, California.

7

8                                    /s/ Robert E. Opera
                                     Robert E. Opera
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**WINTHROP COUCHOT
PROFESSIONAL CORPORATION**
660 Newport Center Drive, Fourth Floor
Newport Beach, California 92660
www.WinthropCouchot.com

Telephone: (949) 720-4100
Facsimile: (949) 720-4111


    The Firm limits its practice exclusively to the field of bankruptcy,
insolvency, corporate reorganization, workouts and related commercial litigation
and transactional matters. By restricting its practice to this field, the Firm is able
to keep abreast of the rapid advances and the frequent changes in bankruptcy
jurisprudence. The Firm has extensive experience representing debtors,
creditors, bankruptcy trustees, creditors committees and asset purchasers. The
Firm's clients include publicly and closely held companies as well as partnerships
and individuals.

## MEMBERS OF FIRM

**MARC J. WINTHROP**, born Philadelphia, Pennsylvania, May 24,1948;
admitted to State Bar of California, 1974. U.S. District Court, Central District of
California, 1974; Northern, Southern and Eastern Districts of California, 1974.
**Education:** University of California at Los Angeles (A.B., with honors 1969; J.D.,
1974). Order of the Coif. Member, University of California at Los Angeles Law
Review, 1972-1974. **Lecturer:** "Practice Under the Bankruptcy Code," California
Continuing Education of the Bar, 1983; "Enforcement of Judgments," California
Continuing Education of the Bar, 1984; Fundamentals of Bankruptcy, California
Continuing Education of the Bar, 1986. **Moderator/Panelist:** Panelist, "The D.I.P. –
The Director's Cut," Orange County Bankruptcy Forum, 2003; Panelist, National
Conference of Bankruptcy Judges (ABA Business Bankruptcy Committee), 2003.
"Topics in Executory Contracts," Orange County Bankruptcy Forum, 2003. Panelist,
Problem Loan Seminar, 2002; Panelist, "Expert Witnessess in Bankruptcy
Trials,"California CPA Education Foundation, 2002. Moderator/Panelist, "Current
Developments in Commercial Law," California Continuing Education of the Bar, 1999.
Panelist, "Bailing Out the Sinking Partnership," Financial Lawyers Conference, 1992.
Moderator/Panelist, "Current Developments in Bankruptcy," California Continuing
Education of the Bar, 1992 through 1998. Panelist, "Bankruptcy Appeals," Orange
County Bankruptcy Forum, 1990. Panelist, "The Chapter 11 Plan Confirmation
Process," Orange County Bankruptcy Forum, 1990, Co-Moderator, "Selected Issues
in Bankruptcy and Reorganization" (Advanced Course), California Continuing
Education of the Bar, 1989 and 1991. Co-Moderator, "Selected Issues in Bankruptcy
Practice," California Continuing Education of the Bar, 1989. Panelist "Counseling
Creditors of Distressed Business Before and During Bankruptcy; Loan Workouts and
Chapter 11 Proceedings," California Continuing Education of the Bar, 1988.
Moderator, Introduction to Bankruptcy Practice, California Continuing Education of the
Bar, 1987. "Bankruptcy Practice After the 1984 Code Amendments," California
Continuing Education of the Bar, 1985. **Author:** Co-Author: "How Not to Get
Clobbered by Catapult! Ride Through the Unassumed Executory Contract," ABA
Business Bankruptcy Committee, 2003. "Insolvency and the Boardwoom," Orange
County Bueinsss Journal, 2002.  Chapter 11 Plan Confirmation, Orange County
Bankruptcy Forum, 1995. "Recent Developments in Bankruptcy (Chapter 11), Cal.
C.E.B. 1992 – 1998. "Toward a Less than Absolute Priority Rule for Small Business
Reorganizations; Reforming the New Value Exception," 18 California Bankruptcy
Journal 59, January 1990. "Post Confirmation Issues: When A Confirmed Plan
Doesn't Go According to Plan," Financial Lawyers Conference, 1989. "Debtor in
Possession Financing and Cash Collateral," Continuing Education of the Bar, 1988.
"Marshalling Under the Bankruptcy Code," Financial Lawyers Conference, 1987.
**Member:** Turnaround Management Association; Board of Governors, Financial
Lawyers Conference, ABA (Business Bankruptcy Committee); American Bankruptcy
Institute; Orange County Bankruptcy Forum; Federal Bar Association.
**Awards/Honors:** Recipient of the 2006 Peter M. Elliott Award; Inducted as a Fellow

-2-

of The American College of Bankrutpcy in 2005; Named as a "Southern California
Super Lawyer" for 2005 (Bankruptcy & Workout) by *Law & Politics Magazine* and *Los
Angeles Magazine.* Listed in *Best Lawyers in America,* 1994-present.

PAUL J. COUCHOT, born Fremont, California, December 25,
1961; admitted to State Bar of California, 1987; U.S. District Court, Southern and
Central Districts of California, 1987. **Education:** U.C. Santa Barbara (B.A.
1984), U.C. Davis School of Law (J.D. 1987). **Speaker:** "Rents in Bankruptcy -
New Frontier; Hot Topics in Insolvency," 1997; "Plan Confirmation as a Defense
to General Liability Notwithstanding Bankruptcy Code Section 524(c)," 1998,
"Substantive Consolidation," 1998; "Subordination of Creditors Under §510(b) of
the Bankruptcy Code," 1998; "Section 707(a) and (b) Motions to Dismiss," 1998.
**Member:** Orange County Bankruptcy Forum, Third Thursday Knights.

RICHARD H. GOLUBOW, born Brooklyn, New York, March 3,
1964; admitted to State Bar of California, 1992; U.S. District Court, Central
District of California, 1992; Northern, Southern and Eastern Districts of
California, 1994, California Real Estate Broker. **Education:** State University of
New York at Albany (B.S., cum laude, 1985), Southwestern University School of
Law (J.D., 1992); American Jurisprudence Award in Civil Procedure; Judicial
Extern Law Clerk to the Honorable John J. Wilson, United States Bankruptcy
Court, Central District of . California, 1992. **Judicial Law Clerk** to the Honorable
John J. Wilson, United States Bankruptcy Court, Central District of California,
1992-1994. **Publications:** "Bankruptcy's Effect on Environmental Claims: Should
Involuntary Environmental Creditors be Entitled to Non-Dischargeable
SuperPriority Creditor Status," 3 Univ. Miami L. Rev. 100 (1993). **Member:** State
Bar of California, American Bankruptcy Institute, Financial Lawyers Conference,
Orange County Bar Association, Orange County Bankruptcy Forum.

ROBERT E. OPERA, born Long Beach, New York, 1956; Licenses:
State of California and United States District Court, 1981. **Education:**
University of Pennsylvania (B.A., summa cum laude, 1978), University of
California at Los Angeles (J.D., 1981). **Lecturer:** "California Chapter 11 Plan
Confirmation Issues," Orange County Bar Association, Bankruptcy Section;
"Current Issues in Bankruptcy," Annual Orange County Bar Association Seminar,
1996; "Fundamentals of Bankruptcy," California Continuing Education of the Bar,
1988-1989, 1991. **Member:** Phi Beta Kappa. Moot Court Executive Board at
University of California at Los Angeles. Judicial Liaison Committee on Revision
of Local Bankruptcy Rules. Editorial Board, California Bankruptcy Journal, 1989-
1990. Los Angeles County and Orange County Bar Associations (Commercial
Law and Bankruptcy Section); Orange County Bankruptcy Forum.

PETER W. LIANIDES, born San Francisco, California, August 11, 1965; admitted to California Bar, 1992 and U.S. District Court, Central District of California, 1992. "Southern California Super Lawyer" in the category "Bankruptcy & Workout" for 2005, 2006 and 2007 issued by *Law & Politics Magazine* and *Los Angeles Magazine*. Certified Specialist in "Personal and Small Business Bankruptcy Law" by the State Bar of California, Board of Legal Specialization. **Education:** University of California at Santa Cruz (B.A., Highest Honors, 1987). University of California at Santa Barbara (M.A., Economics, 1988); University of Hong Kong Institute for Comparative and International Law (Certificate, 1989); Santa Clara University School of Business (M.B.A., 1992 - Beta Gama Sigma - Top 20th percentile); Santa Clara University School of Law (J.D., 1992, Dean's List -Top 11th percentile). **Judicial Law Clerk** to the Honorable John J. Wilson, United States Bankruptcy Court, Central District of California, 1994-1995; Judicial Extern Law Clerk to the Honorable John J. Wilson, United States Bankruptcy Court, Central District of California, 1992-1993. **Publications:** Co-Author, "Debtor's Perspective - Subtraction Cases Must Be Followed," Orange County Bankruptcy Forum, June 1997. Best Respondent Brief, law school Legal Writing Section, 1989. **Member:** State Bar of California; Orange County Bankruptcy Forum, Asian and Pacific American Law Students Association: Treasurer, 1991-1992.

GARRICK A. HOLLANDER, born Los Angeles, California, July 30, 1966; admitted to California Bar, 1993; U.S. District Court, Central District of California, 1993; U.S. Court of Appeals, Ninth circuit, 1993; **Education:** Loyola Law School, JD, 1993; Judicial Extern to Barry Russell, U.S. Bankruptcy Judge, 9th Circuit Bankruptcy Appellate Panel, Summer 1991; California State University, Northridge, 1988 (B.S. Business Admin – Cum Laude, Dean's List, Special Honors, Beta Gamma Sigma, Beta Alpha Psi). Certified Public Accountant. **Publications:** "Safeguarding Against Corporate Financial Difficulty," Orange County Lawyer, January 2005; "Following the Money," California Lawyer, December 2005; "Protecting Your Company's Assets"; "Defining Unreasonably Small Capital in Fraudulent Conveyance Cases: Ratio Analysis May Provide an Answer," 49 The Business Lawyer, May 1994; Editorial Advisory Board for California Causes of Action, 1999 Ed. **Lecturer/Trainer:** Defining Unreasonably Small Capital; National Trial Advocacy Trial program.

-4-

## ASSOCIATES

**KAVITA GUPTA**, born New Delhi, India, December 23, 1960; admitted to California Bar, 1988 and U.S. District Court, Central District of California, 1992. **Education:** University of Southern California (B.A., 1983); University of Southern California Gould School of Law (J.D., 1988). **Judicial Law Clerk** to the Honorable James N. Barr, United States Bankruptcy Court, 1991-2006.

**PAYAM KHODADADI,** born Tehran, Iran, September 2, 1980; Admitted to the State Bar of California and U.S. District Court Central District of California 2005, Southern District of California 2010, Eastern District of California 2011; Education: University of California, Los Angeles (B.A., 2002; *cum laude*); Loyola Law School (J.D., 2005; *order of the coif* and *cum laude*); Member of the Loyola of Los Angeles Entertainment Law Review Highest Grade Award Recipient in Bankruptcy and Commercial Law; Judicial Extern to the Honorable Thomas B. Donovan, United States Bankruptcy Court, Central District of California; **Publications**: Co-Author: Chapter 15 -- Dealing with Transnational and Cross-Border Insolvencies (2006); Co-Author: Implications of Sarbanes-Oxley on the Bankruptcy Practice (2006); Contributor: How Far Will Good Faith Get you in the Ninth Circuit After Clear Channel? (2009).

## OF COUNSEL

**SEAN A. O'KEEFE**, born Providence, Rhode Island, July 9, 1958; Licenses: State Bar of New York, 1984, State Bar of California, 1986; U.S. District Court, Central, Eastern and Southern Districts of California 1987; California Real Estate Broker. **Education**: Dartmouth College (B.A., 1980), Fordham University (J.D., 1983). **Publications:** "Adequate Protection After United Savings v. Timbers of Inwood Forest," 16 Cal. Bankr. J. 8 (1988); "Post-Petition Perfection of Assignment of Rent Clauses Under 11 U.S.C. § 546(b): A Creative Illusion," 17 Cal. Bankr. J. 123 (1989). **Speaker:** 1990 Annual Conference of the California Bankruptcy Forum, "Converting Rents, Rates and Revenues Into Cash Collateral: New Challenges to an Old Alchemy;" Orange County Bankruptcy Forum, "What Price Justice: Is There an Exception to the Absolute Priority Rule?" February, 1993; National Business Institute Seminar: "How to Protect Secured Interests in Bankruptcy of California," August 1993; "Post-Petition Financing," April 1, 1997; "Securitized Loans in Bankruptcy," October, 1998; "Annual Commercial Law Update," February, 1999. **Member:** Orange County (Member, Commercial Law and Bankruptcy Section; Program Chairman, 1990; Chairman, 1991; Member, Board of Directors 1994); Orange County Bankruptcy Forum.

*Exhibit "1", Page 24*

### SUMMER INTERNS

The firm employs second year law students to serve as summer associates. Summer associates work under the direct supervision of the attorneys. The duties of the summer associates include, but are not limited to, the following:

> Research and analyze legal issues; draft pleadings, memoranda and other necessary legal documentation; assist attorneys in preparing for court appearances; attend and participate in strategy meetings and client meetings, when and if appropriate; attend and monitor court hearings, 341 (a) meetings; meetings of creditors and any other appearances which the supervising attorney deems in the interest of economy to the Firm's clients; and, such other and further tasks that may appropriately be assigned to the summer associate.

### DESCRIPTION OF RESPONSIBILITIES OF LEGAL ASSISTANTS

The Firm currently employs one full-time Legal Assistant whose duties include, but are not limited to, the following:

Attendance at initial attorney/client meetings, preparation of petitions, schedules, statement of affairs, and rendering assistance to client in meeting the requirements of the United States Trustee.

After filing of the petition, the Legal Assistants, under the supervision of the attorneys, prepare drafts of motions, applications and other documents, including, but not limited to the following:

> Applications for authorization to employ professional persons; applications for compensation of attorneys' fees; motions to compromise controversies; stipulations; motions for extension of time for the debtor to file schedules; motions for extension of exclusivity periods [Bankruptcy Code §1121]; motions for extension of the time in which the debtor may assume or reject nonresidential real property leases; motions for authorization to sell assets of the debtor's estate; applications for orders shortening time for serving notices to creditors; motions for authorization to incur debt; applications for removal of civil actions; amendments to schedules; final reports and account [Bankruptcy Rule 1019(6)]; notices as required by the

Bankruptcy Rules; orders; judgments-, findings of fact and conclusions of law; applications for final decrees closing Chapter 11 cases; final decrees; statements of indebtedness and declarations in adversary proceedings; collection complaints; notices of appeal; and any other documents which may appropriately be drafted at the legal assistant level.

Moreover, the Legal Assistants assist the attorneys when necessary in trial preparation. Duties performed in this regard include preparing deposition digests, indexing documents, preparing files for trial, overseeing service of subpoenas, contacting witnesses, and any and all other duties which the attorneys deem appropriate.

The Legal Assistants are trained and have the responsibility for calendaring all relevant statutory dates, hearing dates, and filing deadlines. They work closely with the attorneys in this regard to ensure that all of the Firm's requirements are met.

The Firm also represents various creditor clients in regard to relief from stay litigation. In this regard, Legal Assistants are responsible for reviewing and analyzing the creditor client's case files and, with the attorneys, making appropriate strategy recommendations. The Legal Assistants review the debtor's court file, contact title companies, contact other lienholders, order and review lot book reports or trustee's sale guarantees, prepare requests for beneficiary statements to any senior lienholders, and perform any other assignment that the attorneys deem appropriate. Under the supervision of the attorneys, -the Legal Assistants prepare necessary pleadings, including, but not limited to, motions to obtain relief from the stay, stipulations, objections to Chapter 13 plans, declarations and proposed orders. Responsibilities also include preparing matters for trial and/or interfacing with trustees, and opposing counsel with respect to settlement negotiations. When written stipulations have been reached with debtors, the Legal Assistants continue to monitor the case under the terms of the stipulations.

At all times, Legal Assistants are expected to conduct themselves in a professional manner. While the Legal Assistants are trained not to make statements which may be construed as legal advice, at the same time the Firm expects that its clients will be able to rely on the expertise and judgment of the Legal Assistants and that the Legal Assistants will be able to diligently meet the legal needs of the firm's clients.

Immediately following is a description of the experience and qualifications of the Legal Assistant employed at the Firm.

-7-

### P.J. MARKSBURY

Ms. Marksbury received her Bachelor of Arts degree in Speech (Special Education) in 1972 from California State University at Northridge. Ms. Marksbury has been a Legal Assistant since June, 1984, and is assigned primarily to those cases where the firm represents operating and real estate debtors in possession. Prior to becoming a legal assistant, Ms. Marksbury was legal secretary to Marc J. Winthrop. Ms. Marksbury was also employed for 7-1/2 years as a legal secretary to Richard F. Broude, a contributing author to Collier On Bankruptcy, 14th and 15th editions. During that time, Ms. Marksbury participated in the management of many large Chapter 11 cases from inception through consummation of the plan and filing of the final decree which closed the case. As a result of having been deeply involved with operating Chapter 11 cases, Ms. Marksbury has gained extensive "hands on" experience in managing Chapter 11 cases and in adversary proceedings arising thereunder, including collection actions, objections to claims, and the numerous matters which accompany such proceedings. For example, Ms. Marksbury was the Legal Assistant assigned to the Sambo's Restaurant, Inc. Chapter 11 case, where her duties included assisting in the preparation of several hundred objections to claims. Ms. Marksbury's substantial experience in representing debtors in possession also enables her to provide training and assistance to other legal assistants working on such cases.

Ms. Marksbury has attended various paralegal seminars given in the Orange County area, and when a program is deemed to be of particular importance to paralegals, the Commercial Law and Bankruptcy Section meetings of the Orange County Bar Association.

Ms. Marksbury was a member of the Steering Committee for the University of California, Irvine, with respect to the University's Advanced Legal Assistant Certificate Program and is a member of the Orange County Bankruptcy Forum.

*Exhibit "1", Page 27*

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 660 Newport Center Drive, 4th Fl., Newport Beach, CA 92660.

A true and correct copy of the foregoing document described as: **APPLICATION OF OFFICIAL UNSECURED CREDITORS COMMITTEE FOR AUTHORITY TO EMPLOY WINTHROP COUCHOT PROFESSIONAL CORPORATION AS ITS GENERAL INSOLVENCY COUNSEL; MEMORANDUM OF POINTS AND AUTHORITIES AND DECLARATION OF ROBERT E. OPERA IN SUPPORT THEREOF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

I. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On August 5, 2011, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

☒ Service information continued on attached page

II. **SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served): On August 5, 2011, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

    Trade Union International Inc.                    **Debtor**
    4651 State Street
    Montclair, CA 91763

☐ Service information continued on attached page

III. **SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on _____, 2011, I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| August 5, 2011 | Gretchen Crumpacker | /s/ Gretchen Crumpacker |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

-20-

NEF SERVICE LIST

- James C Bastian    jbastian@shbllp.com

- Michael G Fletcher    mfletcher@frandzel.com,
  efiling@frandzel.com;shom@frandzel.com – counsel for secured creditor

- Barry V Freeman    bvf@jmbm.com, bvf@jmbm.com –counsel to secured creditor

- Allan P Leguay    leguay@pacbell.net

- Elizabeth A Lossing    elizabeth.lossing@usdoj.gov

- Nicholas A Merkin    nmerkin@frandzel.com,
  efiling@frandzel.com;bwilson@frandzel.com

- Robert E Opera    ropera@winthropcouchot.com,
  sconnor@winthropcouchot.com;pj@winthropcouchot.com

- Ramesh Singh    claims@recoverycorp.com

- James M Sullivan    jsullivan@mosessinger.com,
  ccaruso@mosessinger.com;dkick@mosessinger.com

- United States Trustee (RS)    ustpregion16.rs.ecf@usdoj.gov

- Andrew F Whatnall    awhatnall@daca4.com

-21-