1    PAUL J. COUCHOT -- State Bar No. 131934
     SEAN A. O'KEEFE -- State Bar No. 122417
2    **WINTHROP COUCHOT**
     **PROFESSIONAL CORPORATION**
3    660 Newport Center Drive, Fourth Floor
     Newport Beach, CA 92660
4    Telephone: (949) 720-4100
     Facsimile: (949) 720-4111
5    General Insolvency Counsel for Administratively
     Consolidated Debtors-in-Possession
6
7    RONALD RUS - State Bar No. 67369
     JOEL S. MILIBAND - State Bar No. 77438
8    **RUS MILIBAND & SMITH P.C.**
     2211 Michelson Drive, Seventh Floor
9    Irvine, California 92612
     Telephone: (949) 752-7100
10   Facsimile: (949) 252-1514

11   Counsel for SunCal Management LLC and
     SCC Acquisitions Inc.

12                **UNITED STATES BANKRUPTCY COURT**
                  **CENTRAL DISTRICT OF CALIFORNIA**
13                      **SANTA ANA DIVISION**

14   In re                                    | Case No. 8:08-bk-17206-ES

15   Palmdale Hills Property, LLC, and its    | Jointly Administered With Case Nos.
16   Related Debtors.                         | 8:08-bk-17209ES; 8:08-bk-17240ES; 8:08-bk-17224ES;
                                              | 8:08-bk-17242ES; 8:08-bk-17225ES; 8:08-bk-17245ES;
                  Jointly Administered        | 8:08-bk-17227ES; 8:08-bk-17246ES; 8:08-bk-17230ES;
17                Debtors and Debtors-in-     | 8:08-bk-17231ES; 8:08-bk-17236ES; 8:08-bk-17248ES;
                  Possession                  | 8:08-bk-17249ES; 8:08-bk-17573ES; 8:08-bk-17574ES;
18                                            | 8:08-bk-17575ES; 8:08-bk-17404ES; 8:08-bk-17407ES;
     Affects:                                 | 8:08-bk-17408ES; 8:08-bk-17409ES; 8:08-bk-17458ES;
19   ☐ All Debtors                            | 8:08-bk-17465ES; 8:08-bk-17470ES; 8:08-bk-17472ES;
20   ☒ Palmdale Hills Property, LLC,          | and 8:08-17588ES.
     ☒ SunCal Beaumont Heights, LLC           | Chapter 11 Cases
21   ☐ SCC/Palmdale, LLC
22   ☒ SunCal Johannson Ranch, LLC            | **REQUEST FOR JUDICIAL NOTICE IN**
     ☒ SunCal Summit Valley, LLC              | **SUPPORT OF SUNCAL PARTIES**
23   ☒ SunCal Emerald Meadows LLC             | **OBJECTIONS TO 1)** *THIRD AMENDED*
     ☒ SunCal Bickford Ranch, LLC             | *JOINT CHAPTER 11 PLAN FOR ELEVEN*
24   ☒ Acton Estates, LLC                     | **VOLUNTARY DEBTORS PROPOSED BY THE**
     ☒ Seven Brothers LLC                     | **LEHMAN VD LENDERS AND 2)** *THIRD*
25   ☐ SJD Partners, Ltd.                     | *AMENDED* **JOINT CHAPTER 11 PLAN FOR**
26   ☐ SJD Development Corp.                  | **EIGHT TRUSTEE DEBTORS PROPOSED BY**
     ☐ Kirby Estates, LLC                     | **THE LEHMAN TD LENDERS; AND**
27   ☒ SunCal Communities I, LLC              | **DECLARATION OF SEAN A. OKEEFE IN**
     ☐ SunCal Communities III, LLC            | **SUPPORT THEREOF**
28           *Continued on Next Page*

MAINDOCS-#166775-v2-RJN-Objection_to_Plan.DOC

*Continued from Previous Page*

1  ☒ SCC Communities LLC
   ☐ North Orange Del Rio Land, LLC
2  ☒ Tesoro SF, LLC
3  ☒ LBL-SunCal Oak Valley, LLC
   ☒ SunCal Heartland, LLC
4  ☒ LBL-SunCal Northlake, LLC
   ☒ SunCal Marblehead, LLC
5  ☐ SunCal Century City, LLC
6  ☒ SunCal PSV, LLC
   ☒ Delta Coves Venture, LLC
7  ☒ SunCal Torrance, LLC
   ☒ SunCal Oak Knoll, LLC
8

DATE:     October 24, 2011
TIME:     10:00 a.m.
PLACE:    Courtroom 5A

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1    The Voluntary Debtors[1] and SunCal Management, LLC (collectively the "SunCal Parties")

2  hereby request that the Court take judicial notice of *the entirety* of documents referenced herein, as

3  they appear on the cited dockets in connection with the SunCal Parties' concurrently filed

4  Objections to the *Third Amended Joint Chapter 11 Plan for Eleven Voluntary Debtors* (the "VD

5  Plan") and the *Third Amended Joint Chapter 11 Plan for Eight Trustee Debtors* (the "TD Plan")

6  (together the "Lehman Plans") filed by Lehman Ali, Inc. ("Lehman Ali") and Lehman

7  Commercial Paper, Inc. ("LCPI") (together the "Lehman Entities"). Partial copies of these prior

8  filings are attached hereto.

9    The primary documents referenced in this Request for Judicial Notice are three motions,

10  and the evidence filed in support thereof, that are pending before the Court. Two of these motions

11  (the "Claim Objections") are pending in the main bankruptcy case. They seek the disallowance of

12  the claims that the Lehman Entities have filed in the cases of the Voluntary Debtors and the

13  Trustee Debtors (the "Lehman Claims"). The third motion is a motion for summary judgment

14  pending in related Adversary Case No. 8:11-ap-01212-ES (the "MSJ"). The MSJ addresses and

15  resolves certain issues that are integral to the Claim Objections. As more fully explained in the

16  Objections, if the Lehman Claims are disallowed, in whole or in part, as prayed in the Claim

17  Objections, the Lehman Plans fail.

18    The foregoing documents, which again have already been filed in the Voluntary Debtors'

19  cases and in the adversary proceeding, exceed *eight thousand pages*. In order to avoid incurring

20  the substantial cost and expense and burden on the Court associated with filing these documents a

21  second time in support of the Objections, the SunCal Parties are only attaching hereto the primary

22  pleadings without exhibits, except in limited instances. However, the SunCal Parties reserve the

23  right to use the *entirety* of these prior filings in support of the Objections. In order to insure that

24  they have this right, the SunCal Parties are filing herewith a motion seeking confirmation that they

25

26  [1] The following objecting Voluntary Debtors are Palmdale Hills, LLC, a Delaware corporation ("Palmdale Hills"),
SunCal Communities I ("Communities I"), Acton Estates, LLC ("Acton"), SunCal Beaumont, LLC ("Beaumont"),
27  SunCal Emerald Meadows, LLC ("Emerald Meadows"), SunCal Johannson Ranch, LLC ("Johannson Ranch"),
SunCal Bickford Ranch, LLC ("Bickford Ranch"), SunCal Summit Valley, LLC ("Summit Valley"), Seven Brothers,
28  LLC ("Seven Brothers"), Kirby Estates, LLC ("Kirby Estates"), SCC Communities, LLC ("SCC Communities"),
North Orange Del Rio Land, LLC ("Del Rio"), and Tesoro SF LLC ("Tesoro").

1   will have this right at the confirmation trial on the Lehman Plans, as long as copies of all

2   previously filed documents are included within the Exhibit Binders that will be provided to the

3   Court and opposing counsel prior to this trial in accordance with the Local Rules.

| Pleading | Dkt. No. | Exhibit |
|---|---|---|
| Notice Of Amended Motion And Amended Motion For Order Disallowing Certain Claims Held By Lehman Ali Inc. And Lehman Commercial Paper Inc. | 2082 | 1 |
| Declaration Of Bruce V. Cook In Support Of Motion For Order Disallowing Certain Claims Filed By Lehman Ali Inc. And Lehman Commercial Paper Inc. | 1903 | 2 |
| A partial copy of Amended Claim No. 6-3 filed by LCPI on September 21, 2009 filed in Palmdale Hills Property, LLC | 6-3 | 3 |
| A partial copy of Amended Claim No. 16-3 filed by LCPI on September 21, 2009 filed in SunCal Bickford Ranch LLC | 16-3 | 4 |
| A partial copy of Amended Claim No. 7-2 filed by LCPI on September 21, 2009 filed in SunCal Emerald Meadows LLC | 7-2 | 5 |
| A partial copy of Amended Claim No. 23-2 filed on March 30, 2009 filed in SJD Partners, Ltd. | 23-2 | 6 |
| A partial copy of Amended Claim No. 12-2 filed by LCPI on September 21, 2009 filed in SunCal Summit Valley LLC | 12-2 | 7 |
| A partial copy of Amended Claim No. 9-2 filed by Lehman ALI Inc. on September 21, 2009 filed in SunCal Heartland, LLC | 9-2 | 8 |
| A partial copy of Amended Claim No. 7-1 filed by Lehman ALI Inc. on March 30, 2009 filed in SunCal Emerald Meadows, LLC | 7-1 | 9 |
| A partial copy of Amended Claim No.16-2 filed by OVC Holdings, LLC on March 30, 2009 filed in LBL-Sun Cal Heartland Oak Valley, LLC | 16-2 | 10 |
| A partial copy of Amended Claim No. 6-2 filed by Northlake Holdings LLC on March 30, 2009 filed in LBL- SunCal Northlake, LLC | 6-2 | 11 |
| A partial copy of Amended Claim No. 12-2 filed by Lehman ALI Inc. on September 21, 2009 filed in SunCal PSV, LLC | 12-2 | 12 |
| A partial copy of Amended Claim No. 21-2 filed by Lehman ALI, Inc., on September 21, 2009 filed in SunCal Marblehead, LLC | 21-2 | 13 |
| Order On Objections To And Motion For Order Striking Claims Filed By The Lehman Entities entered by the Court on October 2, 2010. | 653 | 14 |
| Findings of Fact and Conclusions of Law in Support of Order on Objections to Claims entered by the Court on October 2, 2010. | 652 | 15 |

| Pleading | Dkt. No. | Exhibit |
|---|---|---|
| Plaintiffs' Notice Of Motion And Motion For Partial Summary Judgment Against Defendant Lehman Ali, Inc. | 28[2] | 16 |
| Plaintiffs' Statement Of Uncontroverted Facts And Conclusions Of Law In Support Of Motion For Partial Summary Judgment Against Defendant Lehman Ali, Inc. | 29 | 17 |
| Declaration Of Martin Pritikin In Support Of Plaintiffs' Motion Form Partial Summary Judgment Against Defendant Lehman Ali, Inc. | 30 | 18 |
| The Moving Voluntary Debtors' And Suncal Management LLC's Notice Of Motion And Motion For Order Disallowing Claims Of Lehman Ali, Inc. And Lehman Commercial Paper, Inc. Pursuant To 11 U.S.C. § 502(d). | 1976 | 19 |
| Declaration Of Tom Rollins In Support Of Moving Voluntary Debtors' And Suncal Management LLCs Motion For Order Disallowing Claims Of Lehman Ali, Inc. And Lehman Commercial Paper, Inc. Pursuant To 11 U.S.C. § 502(d). | 1978 | 20 |
| Declaration Of Bruce V. Cook In Support Of Moving Voluntary Debtors' And Suncal Management LLC's Motion For Order Disallowing Claims Of Lehman Ali, Inc. And Lehman Commercial Paper, Inc. Pursuant To 11 U.S.C. § 502(d). | 1977 | 21 |
| Declaration Of Dale Strickland In Support Of Moving Voluntary Debtors' And Suncal Management LLC's Motion For Order Disallowing Claims Of Lehman Ali, Inc. And Lehman Commercial Paper, Inc. Pursuant To 11 U.S.C. § 502(d) (Partial). | 1980 | 22 |
| Debtors' Objections to and Motion for Order Striking Claims Filed by the Lehman Entities | 351 | 23 |
| Request for Judicial Notice in Support of Motion for Order Disallowing Certain Claims Held by Lehman Ali Inc. and Lehman Commercial Paper Inc. Filed by Debtor Palmdale Hills Property, LLC | 1905-1913 | 24 |
| Notice of Motion and Motion by SCC Communities LLC, North Orange Del Rio Land LLC and Tesoro SF LLC, for Summary Judgment, or , In the Alternative, Partial Summary Adjudication, on 3rd Claims for Relief (Fraudulent Transfer) Adv. 09-ap-1005) | 337 | 25 |
| Reply re: Motion by SCC Communities LLC, North Orange Del Rio Land LLC and Tesoro SF LLC, for Summary Judgment, or , In the Alternative, Partial Summary Adjudication, on 3rd Claims for Relief (Fraudulent Transfer) (Adv. 09-ap-1005) | 383 | 26 |

[2] Case No. 8:11-08-ap-01212

-4-

| Pleading | Dkt. No. | Exhibit |
|---|---|---|
| Motion for Order Disallowing Disputed Claim No. 6-3 Filed by Lehman Commercial Paper, Inc. | 2676 | 27 |
| Voluntary Debtors' and SunCal Management LLC's Notice of Motion and Motion for Order Disallowing Claims of Arch Insurance Company | [To Be Filed] | |
| Voluntary Debtors' and SunCal Management LLC's Notice of Motion and Motion for Order Disallowing Claims of Bond Safeguard Insurance Co. and Lexon Insurance Co. | [To Be Filed] | |

DATED: September 19, 2011

**WINTHROP COUCHOT**
**PROFESSIONAL CORPORATION**

By:     /s/ *Paul J. Couchot*
        Paul J. Couchot
        Attorney for the Voluntary Debtors

MAINDOCS-#166775-v2-RJN-Objection_to_Plan.DOC

## DECLARATION OF SEAN A. O'KEEFE

I, Sean A. O'Keefe, hereby declare and state as follows:

1.      I am over the age of eighteen years. The facts stated herein are within my personal knowledge and if called upon to testify to the same I could and would testify to the same under the penalty of perjury.

2.      I am a member of the bar of the State of California and I have been working on the above-referenced cases since 2009.

3.      All of the documents attached hereto are either partial or complete copies of the corresponding documents that have already been filed in either the main bankruptcy case (8:08-bk-17206-ES) or in Adversary Case No. 8:11-ap-01212-ES.

I declare that the foregoing is true and correct under the penalty of perjury.

Executed this 19th day of September 2011, in Orange County, California.



Sean A. O'Keefe

-6-

**EXHIBIT "1"**

PAUL J. COUCHOT -- State Bar No. 131934
SEAN A. O'KEEFE -- State Bar No. 122417
**WINTHROP COUCHOT**
**PROFESSIONAL CORPORATION**
660 Newport Center Drive, Fourth Floor
Newport Beach, CA 92660
Telephone: (949) 720-4100
Facsimile: (949) 720-4111
General Insolvency Counsel for Administratively
Consolidated Debtors-in-Possession

RONALD RUS - State Bar No. 67369
JOEL S. MILIBAND - State Bar No. 77438
**RUS MILIBAND & SMITH P.C.**
2211 Michelson Drive, Seventh Floor
Irvine, California 92612
Telephone: (949) 752-7100
Facsimile: (949) 252-1514

Counsel for SunCal Management LLC and
SCC Acquisitions Inc.

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**SANTA ANA DIVISION**

| | |
|---|---|
| In re<br><br>Palmdale Hills Property, LLC, and its Related Debtors.<br><br>       Jointly Administered Debtors and Debtors-in-Possession | Case No. 8:08-bk-17206-ES<br><br>Jointly Administered With Case Nos.<br><br>8:08-bk-17209ES; 8:08-bk-17240ES; 8:08-bk-17224ES; 8:08-bk-17242ES; 8:08-bk-17225ES; 8:08-bk-17245ES; 8:08-bk-17227ES; 8:08-bk-17246ES; 8:08-bk-17230ES; 8:08-bk-17231ES; 8:08-bk-17236ES; 8:08-bk-17248ES; 8:08-bk-17249ES; 8:08-bk-17573ES; 8:08-bk-17574ES; 8:08-bk-17575ES; 8:08-bk-17404ES; 8:08-bk-17407ES; 8:08-bk-17408ES; 8:08-bk-17409ES; 8:08-bk-17458ES; 8:08-bk-17465ES; 8:08-bk-17470ES; 8:08-bk-17472ES; and 8:08-17588ES. |
| Affects:<br>☐ All Debtors<br>☒ Palmdale Hills Property, LLC,<br>☐ SunCal Beaumont Heights, LLC<br>☐ SCC/Palmdale, LLC<br>☐ SunCal Johannson Ranch, LLC<br>☒ SunCal Summit Valley, LLC<br>☒ SunCal Emerald Meadows LLC<br>☒ SunCal Bickford Ranch, LLC<br>☒ Acton Estates, LLC<br>☐ Seven Brothers LLC<br>☒ SJD Partners, Ltd.<br>☐ SJD Development Corp.<br>☐ Kirby Estates, LLC<br>☐ SunCal Communities I, LLC<br>☐ SunCal Communities III, LLC<br>    ***Continued on Next Page*** | Chapter 11 Cases<br><br>**NOTICE OF AMENDED MOTION AND AMENDED MOTION FOR ORDER DISALLOWING CERTAIN CLAIMS HELD BY LEHMAN ALI INC. AND LEHMAN COMMERCIAL PAPER INC.**<br><br>DATE:    June 9, 2011<br>TIME:    10:30 a.m.<br>PLACE:    Courtroom 5A |

MAINDOCS-#161367-v1-SCC_MtnReDisallowRecoupment.DOC

**EXHIBIT 1**

*Continued from Previous Page*

☒ SCC Communities LLC
☐ North Orange Del Rio Land, LLC
☒ Tesoro SF, LLC
☒ LBL-SunCal Oak Valley, LLC
☒ SunCal Heartland, LLC
☒ LBL-SunCal Northlake, LLC
☒ SunCal Marblehead, LLC
☐ SunCal Century City, LLC
☒ SunCal PSV, LLC
☐ Delta Coves Venture, LLC
☐ SunCal Torrance, LLC
☐ SunCal Oak Knoll, LLC

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT 1**

**TABLE OF CONTENTS**

|  |  |  | PAGE |
|---|---|---|---|
| I. | INTRODUCTION | | 1 |
| II. | MATERIAL BACKGROUND FACTS | | 2 |
| | A. | The SunCal Debtors | 2 |
| | B. | Acton Estates | 2 |
| | C. | Bickford Ranch | 2 |
| | D. | Emerald Meadows | 3 |
| | E. | Palmdale Hills | 3 |
| | F. | SCC Communities | 3 |
| | G. | SJD Partners | 4 |
| | H. | Summit Valley | 4 |
| | I. | Tesoro | 4 |
| | J. | Heartland | 4 |
| | K. | Marblehead | 5 |
| | L. | Oak Valley | 5 |
| | M. | Northlake | 5 |
| | N. | PSV | 5 |
| | O. | The Economic Downturn In 2007 and Promises of Funding | 6 |
| | P. | The Restructuring Agreement | 6 |
| | | 1. The Parties To The Restructuring Agreement | 7 |
| | | 2. Lehman ALI's Obligation to Fund "Urgent Payables." | 8 |
| | | 3. Lehman ALI's Obligation to Close | 9 |
| | Q. | The Breach of The Restructuring Agreement | 10 |
| | | 1. Failure to Pay Urgent Payables | 10 |
| | | 2. Failure To Proceed With A Closing Under The Settlement Agreement | 11 |
| | | 3. The Sale of Seven Sold Loans to Fenway Breached The Terms of The Restructuring Agreement. | 12 |
| | R. | The Settlement Agreement | 12 |
| | | 1. The Obligations to Pay Assumed and Authorized Amounts. | 13 |
| | | a. Scheduled Assumed Obligations | 14 |
| | | b. Lender Authorized Work | 16 |
| | | 2. The Obligations to Assume Bond Obligations and to Replace or Release Bonds | 16 |
| | | 3. Pacific Point Obligations | 19 |
| | S. | The Breaches of The Settlement Agreement | 20 |
| | | 1. Lehman ALI Attempted To Repudiate The Settlement Agreement | 20 |
| | | 2. The Sale of The Sold Loans Repudiated The Settlement Agreement | 21 |
| | | 3. Covenant Not To Sue | 22 |
| | | 4. Lehman Parties Acquire the Pacific Point Project Without Payment | 22 |
| | T. | Damages From the Breach of the Settlement Agreement | 23 |

-i-

***EXHIBIT 1***

**TABLE OF CONTENTS**

**(Continued)**

| | | PAGE |
|---|---|---|
| III. | ARGUMENT | 24 |
| | A. Lehman ALI Breached The Terms of the Restructuring Agreement | 24 |
| | B. The Debtor is Entitled to Recoup its Damages Against the Secured Portion of the Lehman Claims. | 24 |
| | C. LCPI, as Assignee, Has No Immunity from Palmdale Hill's Defenses | 27 |
| | D. The SunCal Debtors Are Entitled To Offset Their Damages - Against Lehman Ali's Claims Only | 29 |
| | E. Allowing The Lehman Claims Would Unjustly Enrich The Lehman Entities | 30 |
| | F. The Lehman Entities Cannot Profit From Their own Wrongs (Unclean\ Hands) | 31 |
| | G. The Imposition Of A Constructive Trust Is Justified - Against Lehman Ali Only | 32 |
| | H. The Imposition Of An Equitable Lien Is Justified - Against Lehman Ali Only | 33 |
| | I. LCPI's Automatic Stay Does Not Apply to an Objection to Claim. | 33 |
| | J. Any Party in Interest Has Standing to Object to Claims. | 35 |
| IV. | CONCLUSION | 36 |

-ii-

*EXHIBIT 1*

1

## TABLE OF AUTHORITIES

2                                                                                    **PAGE**

3    **CASES**

4

5    *Albright v. Gates,*
         362 F.2d 928 (9th Cir.1966) ..................................................................26

6    *Campbell v. Superior Court,*
         132 Cal. App. 4th 904 (2005) ..............................................................32

7

8    *Coffman v. Cobra Mfg. Co.,*
         242 F.2d 754 (9th Cir. 1954) ..............................................................30

9    *Communist Party v. Valencia, Inc.*
         35 Cal.App.4th 980 (1995) ...................................................................32

10

11   *Del Charro Properties, L.P. v. Heron,*
         H025571, 2004 WL 1616016 (2004) ...................................................29

12   *Destro v. Stuhley,*
         675 F.2d 1037 (9th Cir.1981) ..............................................................33

13

14   *Estate of Pitts,*
         218 Cal. 184 (1933) .............................................................................33

15   *FDIC v. Union Entities (In re Be-Mac Transp.),*
         83 F.3d 1020 (8th Cir.1996) ................................................................35

16

17   *Feature Realty, Inc. v. City of Spokane,*
         331 F.3d 1082 (9th Cir. 2003) .............................................................31

18   *Fiberchem, Inc. v. General Plastics Corp.,*
         495 F.2d 737 (9th Cir.1974) ................................................................28

19

20   *Gaudiosi v. Mellon,*
         269 F.2d 873 (3d Cir.1959) .................................................................31

21   *Gold Mining & Water Co. v. Swinerton,*
         23 Cal. 2d 19, 142 P.2d 22 (1943) ......................................................24

22

23   *Granberry v. Islay Investments*
         9 Cal.4th 738 (1995) ............................................................................29

24   *Hammelburger v. Foursome Inn Corp.,*
         54 N.Y.2d 580, 431 N.E.2d 278 (1981) ..............................................28

25

26   *Harrison v. Adams,*
         20 Cal. 2d 646, 128 P.2d 9 (1942) ......................................................30

27   *Highland Tank & Mfg. Co. v. PS Intern. Inc.,*
         393 F.Supp.2d 348 (W.D.Pa.2005) .....................................................31

28

-iii-

**EXHIBIT 1**

1
## TABLE OF AUTHORITIES

2
### (Continued)

3
**PAGE**

4
*In re Anderson,*
5
    382 B.R. 496 (Bankr.D.Or. 2008) ............................................................35

6
*In re Bousa, Inc.,*
    2005 WL 1176108, *4 (S.D.N.Y. 2005) ...............................................34

7
*In re Brannan,*
8
    40 B.R. 20 (Bankr. N.D. Ga. 1984), ....................................................28

9
*In re Financial News Network,*
    158 B.R. 570 (S.D.N.Y. 1993) ..............................................................34

10
*In re McMahon,*
11
    129 F.3d 93 (2d Cir. 1997) ....................................................................35

12
*In re Meade,*
    1999 WL 33496001, *1 (E.D.Pa. 1999). ..............................................34

13
*In re Metiom,*
14
    301 B.R. 634 (Bankr.S.D.N.Y. 2003); ...........................................27, 34

15
*In re Palmdale Hills Property, LLC,*
    423 B.R. 655, n.9 (9th Cir. BAP 2009) ...........................................34, 35

16
*In re Parker,*
17
    80 B.R. 729 (Bankr. E.D. Pa. 1987) ...............................................30, 34

18
*In re Petersen,*
    2010 WL 3842157, *13 (D.Ariz. 2010) ...............................................35

19
*In re QMect, Inc.,*
20
    349 B.R. 620 (Bankr. N.D.Cal. 2006) ..................................................36

21
*In re Snyder,*
    436 B.R. 81 (Bankr.C.D.Ill. 2010) ......................................................28

22
*In re Thompson,*
23
    350 B.R. 842 (Bankr.E.D.Wis. 2006) ..................................................26

24
*In re TLC Hospitals, Inc.,*
    224 F.3d 1008 (9th Cir. 2000) .........................................................26, 34

25
*In re Wheatfield Business Park,*
    308 B.R. 463 (9th Cir. BAP 2004) .......................................................34

26
*IRS v. Taylor (In re Taylor),*
27
    132 F.3d 256 (5th Cir.1998) .................................................................35

28
*Jones v. Sacramento Sav. & Loan Ass'n,*
    248 Cal. App. 2d 522 (1967) ...............................................................33

-iv-

**EXHIBIT 1**

<u>**TABLE OF AUTHORITIES**</u>

**(Continued)**

<u>**PAGE**</u>

*Lawrence v. Steinford Holding B.V. ( In re Dominelli),*
    820 F.2d 313 (9th Cir.1987) ................................................................35

*Lewis Pub. Co. v. Henderson*
    103 Cal. App. 425 (1930) ................................................................31

*Margott v. Gem Properties, Inc.,*
    34 Cal. App. 3d 849 (1973) ................................................................30

*McColgan v. Bank of California Assn.,*
    208 Cal. 329 (1929) ................................................................33

*Minidoka Irrigation Dist. v. Dep't of the Interior,*
    154 F.3d 924 (9th Cir.1998) ................................................................24

*Moore v. New York Cotton Exchange,*
    270 U.S. 593, 46 S.Ct. 367, 70 L.Ed. 750 (1926). ................................................................26

*Newbery Corp. v. Fireman's Fund Ins. Co.,*
    95 F.3d 1392 (9th Cir. 1996),................................................................24, 25, 26, 34

*Olick v. Parker & Parsley Petroleum Co.,*
    145 F.3d 513 (2d Cir. 1998); ................................................................34

*Peterson v. Cellco P'ship,*
    164 Cal.App.4th 1583, 80 Cal.Rptr.3d 316 (2008) ................................................................30

*Q Mgmt. v. Snake River Equip. Co.,*
    CV 05-322-E-MHW, 2008 WL 219173 (D. Idaho Jan. 24, 2008)................................................24

*Rathbun v. Sec. Mfg. Co.,*
    82 Cal. App. 793 (1927) ................................................................31

*Robinson, on behalf of C. & R. Transfer, v. Boulevard Express,*
    17 Cal. App. 2d 492 (1936) ................................................................31

*Shum v. Intel Corp.,*
    630 F. Supp. 2d 1063 (N.D. Cal. 2009) *aff'd,* 633 F.3d 1067 (Fed. Cir. 2010) ................................30

*Siegel v. Federal Home Loan Mortg. Corp.,*
    143 F.3d 525 (9th Cir. 1998). ................................................................35

*Smith v. Anglo-California Trust Co.,*
    205 Cal. 496 (1928) ................................................................33

*Vasile v. Dean Witter Reynolds Inc.,*
    20 F.Supp.2d 465 (E.D.N.Y. 1998) ................................................................34

-v-

**EXHIBIT 1**

1

## TABLE OF AUTHORITIES

2

### (Continued)

3                                                                                                    PAGE

4    **STATUTES**

5
     11 U.S.C. § 362 .................................................................................................35
6    11 U.S.C. § 502(a). ...........................................................................................35
     Cal. Code Civ. Proc. § 431.70. .........................................................................29
7    Cal Civ. Code § 2224 ........................................................................................32
8    **OTHER AUTHORITIES**

9
     3 Pomeroy's Equity Jurisprudence (5th ed.) s 390, p. 67 ...............................33
     4 Pomeroy's Equity Jurisprudence (5th ed.) s 1235, pp. 696—699 ...............33
10   3A Corbin, Contracts § 767, at 540 (1960)......................................................31
     Advisory Committee Notes to Bankruptcy Rule 3007 .....................................35
11   *Restatement of Restitution* § 3 (1937) ............................................................31
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*EXHIBIT 1*

1  Acton Estates LLC ("Acton"), SunCal Bickford Ranch LLC ("Bickford"), SunCal Emerald

2  Meadows LLC ("Emerald Meadows"), Palmdale Hills Property, LLC ("Palmdale Hills"), SJD

3  Partners, Ltd. ("SJD Partners"), SunCal Summit Valley LLC ("Summit Valley"), SCC

4  Communities LLC ("SCC Communities"), Tesoro SF LLC ("Tesoro"), and SunCal Management,

5  LLC ("SunCal Management") (collectively, the "SunCal Moving Parties"), hereby move (the

6  "Motion") the Court, in both the Voluntary Debtors' cases[1] and the Trustee Debtors' cases[2], for an

7  order granting the following relief:[3]

8      (A)    Disallowing the following Proofs of Claim filed by Lehman ALI, Inc. ("Lehman

9  ALI") and Lehman Commercial Paper, Inc. ("LCPI", and together with Lehman ALI, the

10  "Lehman Entities") on the grounds that the debt obligation therein was eliminated by the

11  Settlement Agreement, as that term is defined herein:

| Claim No. | Relevant SunCal Debtors | Current Claim Holder[4] | Claim Amount | RJN Exhibit No. |
|-----------|-------------------------|-------------------------|--------------|-----------------|
| 6         | Acton Estates           | LCPI                    | $343,221,391 | 1.              |
| 16        | Bickford Ranch          | LCPI                    | $343,221,391 | 2.              |
| 7         | Emerald Meadows         | LCPI                    | $343,221,391 | 3.              |
| 65        | Palmdale Hills          | LCPI                    | $287,252,096 | 4.              |
| 23        | SJD Partners            | Lehman ALI              | $120,110,237 | 5.              |
| 12        | Summit Valley           | LCPI                    | $343,221,391 | 6.              |
| 9         | SCC Communities         | Lehman ALI              | $ 23,795,013 | 7.              |

---

[1] The Voluntary Debtors are defined as Acton, SunCal Beaumont Heights, LLC ("Beaumont"), Bickford, Emerald Meadows, SunCal Johannson Ranch, LLC ("Johannson"), SCC Palmdale, Palmdale Hills, SJD Partners, SJD Development Corp. ("SJD Development"), Summit Valley, SCC Communities, Seven Brothers LLC ("Seven Brothers"), Kirby Estates, LLC ("Kirby"), SunCal Communities I LLC ("SunCal I"), SunCal Communities III LLC ("SunCal III"), North Orange Del Rio Land LLC ("Del Rio"), and Tesoro.
[2] The Trustee Debtors are defined as LB/L-SunCal Oak Valley LLC ("Oak Valley"), LB/L-SunCal Northlake LLC ("Northlake"), SunCal Heartland LLC ("Heartland"), SunCal Marblehead LLC ("Marblehead"), SunCal Century City LLC ("Century City"), SunCal PSV LLC ("PSV"), Delta Coves Venture LLC ("Delta Coves"), SunCal Torrance LLC ("Torrance"), and SunCal Oak Knoll LLC ("Oak Knoll") (collectively "Trustee Debtors"). The Trustee Debtors and Voluntary Debtors are referred to collectively herein as the "Debtors."
[3] The respective Voluntary Debtors are the moving parties with respect to the objections to claims in their respective Voluntary Debtors' cases, and SunCal Management is the moving party in the objections to claims in the specified Trustee Debtors' cases in its capacity as a creditor and party in interest in such Trustee Debtors' cases.
[4] As set forth in more detail below, several of the underlying loans have been subject to multiple transfers before and after the petition date. Accordingly, the "current claim holder" is not necessarily the original claim holder or the entity which initially filed the proof of claim. To the extent that other Lehman affiliated entities are the holders of any of these claims, for the purposes of this Motion, such entities are included in the definition of the "Lehman Entities" and such to this Motion.

*EXHIBIT 1*

| Claim No. | Relevant SunCal Debtors | Current Claim Holder[4] | Claim Amount | RJN Exhibit No. |
|-----------|------------------------|------------------------|--------------|-----------------|
| 7 | Tesoro | Lehman ALI | $ 23,795,013 | 8. |
| 16 | Oak Valley | LCPI | $141,630,092 | 9. |
| 6 | Northlake | LCPI | $123,654,777 | 10. |
| 12 | PSV | LCPI | $88,257,340 | 11. |
| 9 | Heartland | LCPI | $354,325,126 | 12. |
| 21 | Marblehead | LCPI | $354,325,126 | 13. |

(the above referenced proofs of claim are collectively referred to as the "Lehman Claims");

(B)    Recouping from the secured portion of the Lehman Claims, all damages suffered by the Relevant SunCal Debtors on account of the breach of Restructuring Agreement by Lehman ALI, Inc. ("Lehman ALI"), LCPI's predecessor-in-interest;

(C)    Offsetting from the secured portion of the Lehman ALI's claims all damages suffered by the Relevant SunCal Debtors on account of the breach of Restructuring Agreement by Lehman ALI;

(D)    Denying the Lehman Entities any relief or recovery on the Lehman Claims on the grounds that they have failed to establish their burden under applicable law;

(E)    Imposing a constructive trust on any recovery obtained by Lehman ALI from property of the relevant SunCal Debtors in that amount necessary to enable the such Debtors to recover the damages owed to them by Lehman ALI, or imposing an equitable lien on any such recovery to accomplish this purpose;

(F)    Barring the Lehman Claims on the grounds of unclean hands and unjust enrichment; and

(G)    Such further relief as the Court deems just and proper.

This Motion is made on the basis of the concurrently filed Declaration of Bruce Cook (the "Cook Declaration"), and Request for Judicial Notice, the within points and authorities, and upon such other evidence as the Court elects to consider prior to or at the hearing on this matter.

IF YOU DO NOT OPPOSE THE MOTION, YOU NEED TAKE NO FURTHER ACTION. HOWEVER, IF YOU OPPOSE THE MOTION, OPPOSITIONS MUST BE FILED WITH THE COURT NO LATER THAN FOURTEEN (14) DAYS PRIOR TO THE HEARING ON THE MOTION. YOU MUST FILE YOUR OPPOSITION WITH THE CLERK OF THE UNITED

-viii-

***EXHIBIT 1***

1   STATES BANKRUPTCY COURT LOCATED AT 411 WEST FOURTH STREET, SUITE 2030,

2   SANTA ANA, CALIFORNIA 92701.  YOU MUST ALSO SERVE A COPY OF YOUR

3   OPPOSITION TO THE MOTION UPON COUNSELS FOR THE VOLUNTARY DEBTORS

4   AND SUNCAL MANAGEMENT AT THE MAILING ADDRESSES INDICATED IN THE

5   UPPER LEFT CORNER OF THE FIRST PAGE OF THIS MOTION.  THE VOLUNTARY

6   DEBTORS' COUNSEL WILL ACCEPT E-MAIL SERVE AT THE FOLLOWING

7   ADDRESSES:  PCOUCHOT@WINTHROPCOUCHOT.COM, WITH A COPY TO

8   PJ@WINTHROPCOUCHOT.COM.  ANY FAILURE TO TIMELY FILE AND SERVE AN

9   OPPOSITION MAY RESULT IN ANY SUCH OPPOSITION BEING WAIVED, AND THE

10  COURT MAY ENTER AN ORDER GRANTING THE MOTION WITHOUT FURTHER

11  NOTICE.

12  DATED: May 10, 2011                     **WINTHROP COUCHOT**
                                            **PROFESSIONAL CORPORATION**
13

14
                                            By:___/s/ *Paul J. Couchot*_____
15                                               Paul J. Couchot, Esq.
                                                 Sean Okeefe, Esq.
16                                               Peter Lianides, Esq.
                                            General Insolvency Counsel for Administratively
17                                          Consolidated Debtors-in-Possession

18
                                            **RUS MILIBAND & SMITH P.C.**
19

20
                                            By:__/s/ *Ronald Rus*_____
21                                               Ronald Rus, Esq.
                                                 Joel S. Miliband, Esq.
22                                               Catherine Castaldi, Esq.
                                            Attorneys for SunCal Management, LLC, and
23                                          SCC Acquisitions Inc.

24

25

26

27

28

-ix-

***EXHIBIT 1***

1

### MEMORANDUM OF POINTS AND AUTHORITIES

2

### I.

3

### INTRODUCTION

4     In May of 2008, the SunCal Parties (as defined herein), on the one hand, and Lehman ALI,

5 Inc. ("Lehman ALI") and its related affiliates, on the other (together, the "Lehman Parties"),

6 entered into that certain "Restructuring Agreement." See Cook Declaration, Exhibit 1. Pursuant

7 to the terms of the Restructuring Agreement, Lehman ALI agreed (1) to pay the certain "urgent

8 payables" (defined below), and management fees, according to a contractual schedule, (2) to the

9 transfer the Relevant SunCal Debtors' projects to newly created Lehman entities (referred to as the

10 Venture Grantees), who would assume the unpaid vendor claims incurred at the respective

11 projects, including but not limited to the "lender authorized work" and assume the bond liabilities

12 associated with that project, and (3) to make a number of material modification to the loans that

13 were secured by liens against these projects.  In August of 2008, the SunCal Parties and the

14 Lehman Parties executed a second agreement, the Settlement Agreement (Cook Declaration,

15 Exhibit 2), and further included additional Projects and their respective Debtors as parties to the

16 Restructuring Agreement.  The applicable Debtors who were the parties to the Restructuring

17 Agreement, and set forth in the chart above, are referred to herein as the "Relevant SunCal

18 Debtors".

19     As more fully detailed herein, Lehman ALI and the other Lehman Parties breached the

20 terms of the Restructuring Agreement and the Settlement Agreement by failing to pay the vendor

21 claims and bond obligations as promised and they later repudiated the entirety of these

22 agreements.  The Lehman Parties' actions have caused the Relevant SunCal Debtors to suffer tens

23 of millions, if not in excess of one hundred million dollars in damages, which will need to be

24 quantified through discovery.  The secured portion of the Lehman Claims should be reduced by

25 this sum and the resulting equity should be available for unsecured creditors of the respective

26 estates.

27

28

-1-

### EXHIBIT 1

## II.

## MATERIAL BACKGROUND FACTS

**A)**    **The SunCal Debtors**. Beginning in the late 1990s, a group of affiliated companies owned directly or indirectly by or affiliated with SCC Acquisitions, Inc. (collectively "SunCal"), entered into a joint venture (the "Venture") with certain affiliates of LBHI, including most importantly LCPI and Lehman ALI.  The objective of the Venture was to acquire, develop and sell a series of residential development projects in California (the "Projects").

Under the parties' Venture, SunCal, which is one of the largest private land developers in the United States, served as the developer/manager of the Projects, and the Lehman Parties served as the capital source.  The SunCal Debtors (the debtors listed on the face page of this pleading) were either formed to own the Projects being developed by the Venture, or they were formed to serve as the parent entities of the entities that owned the Projects.  The Relevant SunCal Debtors and their Projects are set forth below:

**B)**    **Acton Estates**.  Acton Estates owns the Acton Project consisting of a 175-acre site situated in Los Angeles County, California.  LCPI entered into a loan agreement dated November 17, 2005 ("SunCal Communities I Loan") with SunCal I, as borrower.  The Acton Estates Project is encumbered by a first priority deed of trust securing the SunCal Communities I Loan.  Acton was not an original borrower under the SunCal Communities I Loan, but rather LCPI purports that Acton subsequently executed an "Assumption Agreement" whereby it purported to become an additional grantor under the Guarantee and Collateral Agreement relating to the SunCal Communities I Loan.  However, LCPI's relevant proof of claim (Claim 2-2) fails to attach or establish the existence of an Assumption Agreement as to Acton.  On or about September 21, 2009, LCPI filed Claim 2-2 in the amount of $343,221,391 against Acton.[5]

**C)**    **Bickford Ranch**.  SunCal Bickford owns the Bickford Ranch Project, consisting of a 1,940-acre site situated in the City of Penryn, in Placer County, California.  The Bickford Ranch

---

[5] Claim 2 against Acton is based upon the SunCal Communities I Loan which was one of the "Sold Loans" (defined below) which was transferred to Fenway prior to the petition date (see RJN Exhibits 13 and 14).  On or about June 22, 2010, Fenway transferred the Sold Loans, and therefore the corresponding claims, to LCPI.  See Docket Nos. 1179 through 1191.

-2-

*EXHIBIT 1*                                                              Page 000020

1  Project is encumbered by a first priority deed of trust recorded on August 25, 2006 securing the

2  SunCal Communities I Loan.  Bickford Ranch was also not an original borrower under the SunCal

3  Communities I Loan, but rather subsequently executed an "Assumption Agreement" whereby it

4  purported to become an additional grantor under the Guarantee and Collateral Agreement relating

5  to the SunCal Communities I Loan.  On September 21, 2009, LCPI filed Claim 16-3, in the amount

6  of $343,221,391 against Bickford Ranch.

7      **D)**    **Emerald Meadows**.  Emerald Meadows owns the Emerald Meadows Project,

8  consisting of a 178-acre site situated in the City of Rubidoux, in Riverside County, California.  The

9  Emerald Meadows Project is encumbered by a first priority deed of trust recorded on July 19, 2007

10  securing the SunCal Communities I Loan.  Emerald Meadows was also not a borrower under the

11  SunCal Communities I Loan, but rather subsequently executed an "Assumption Agreement".  On

12  September 21, 2009, LCPI filed Claim 7-2 in the amount of $343,221,391 against Emerald

13  Meadows.

14      **E)**    **Palmdale Hills**. Palmdale Hills's primary asset is the Ritter Ranch Project, a 10,000

15  acre residential development located in Antelope Valley, California. The Ritter Ranch Project is

16  encumbered by a first priority deed of trust that was originally granted to LCPI in February of

17  2007. LCPI contend that this deed of trust secures, inter alia, all obligations arising under that

18  certain *Credit Agreement* dated as of February 8, 2007 (the "Ritter Ranch Loan" ), entered into by

19  and between LCPI and the Debtor.  On or about September 23, 2009, LCPI filed Claim 65-4 in the

20  amount of $287,252,096.31 against Palmdale Hills.

21      **F)**    **SCC Communities**. SCC Communities owns the Joshua Ridge Project, consisting

22  of an 80-acre site situated in the City of Victorville in San Bernardino County, California.  The

23  Joshua Ridge Project is encumbered by a first priority deed of trust recorded on November 2, 2007

24  securing that certain Loan Agreement, dated as of October 31, 2007, by and between SCC

25  Acquisitions LLC ("Acquisitions"), as borrower and Lehman ALI, as lender (the "Interim Loan

26  Agreement").  SCC Communities was not a borrower under the Interim Loan Agreement, but did

27  sign a "subsidiary guaranty."  On March 30, 2009, Lehman ALI filed Claim 9 against SCC

28  Communities in the amount of $23,795,013 arising from Interim Loan.

-3-

***EXHIBIT 1***

**G)    SJD Partners**. SJD Partners currently owns no real property. SJD Partners

formerly owned a project located in San Juan Capistrano known as the "Pacific Point Project".

The Pacific Point Project was lost through a non-judicial foreclosure sale by Lehman ALI, on the

second priority deed of trust, which caused a Lehman Affiliate, LV Pacific Point LLC ("LV

PacPoint"), a Delaware Limited Liability Company, to purchase the Pacific Point Project at a

foreclosure sale conducted on August 28, 2008. The Pacific Point Project is encumbered by a first

priority deed of trust securing that certain loan agreement, dated February 16, 2006, by and among

Lehman ALI, SJD Development and SJD Partners, pursuant to which Lehman ALI made a loan in

the maximum aggregate principal amount of approximately $125,000,000 (the "Pacific Point First

Loan Agreement"). On March 30, 2009, Lehman ALI filed Claim 23 in the amount of

$120,110,237 against SJD Partners.

**H)    Summit Valley.** Summit Valley owns most of the Summit Valley Project that

originally consisted of a 2,500-acre site situated in the City of Hesperia, in San Bernardino County,

California. Summit Valley was also not a borrower under the SunCal Communities I Loan, but

rather subsequently executed an "Assumption Agreement" whereby it purported to become an

additional grantor under the Guarantee and Collateral Agreement relating to the SunCal

Communities I Loan. Claim 12-2 was filed by LCPI on September 21, 2009 in the amount of

$343,221,391.

**I)    Tesoro**. Tesoro owns the Tesoro Project consisting of a 185-acre site situated in the

City of Santa Clarita in Los Angeles County, California. The Tesoro Project is encumbered by a

first priority deed of trust recorded on November 2, 2007 securing the Interim Loan Agreement.

Tesoro was not a borrower under the Interim Loan Agreement, but did sign a "subsidiary

guaranty." On March 30, 2009, Lehman ALI filed Claim 7 against Tesoro in the amount of

$23,795,013

**J)    Heartland**. Heartland owns the Heartland Project consisting of a 417 acre site

located in Riverside County, California. The Heartland Project is encumbered by a first priority

deed of trust recorded on October 3, 2007 securing that certain Second Amended and Restated

Term Loan and Revolving Line of Credit Loan Agreement, dated as of October 3, 2007, by and

-4-

***EXHIBIT 1***

1    among SunCal Marblehead Heartland Master LLC, Marblehead, and Heartland, as borrowers, and

2    Lehman ALI, as agent and sole lender (the "Marblehead/Heartland Loan Agreement"). On

3    September 21, 2009, Lehman ALI filed Claim 9-2 against Heartland in the amount of

4    $354,325,126.

5        **K)    Marblehead.** Marblehead owns the Marblehead Project, consisting of a 247-acre

6    site and is expected to consist of 308 units in San Clemente, California. The Marblehead Project is

7    encumbered by a first priority deed of trust recorded on October 3, 2007 securing the

8    Marblehead/Heartland Loan Agreement. On September 21, 2009, Lehman ALI filed Claim 21-2

9    in the amount of $354,325,126.

10       **L)    Oak Valley**. Oak Valley owns the Oak Valley Project consisting of a 985-acre site

11   which is located in Riverside County, California. The Oak Valley Project is encumbered by a first

12   priority deed of trust securing that certain Term Loan and Revolving Line of Credit Loan

13   Agreement, dated as of May 23, 2006, by and between SunCal Oak Valley, as borrower, and OVC

14   Holdings, as successor agent and sole lender, pursuant to which OVC Holdings' predecessor

15   (Lehman ALI) made a loan in the maximum aggregate principal amount of approximately

16   $120,000,000 ("Oak Valley Loan Agreement"). On or about September 21, 2009, OVC Holdings

17   filed Claim 16-3 against Oak Valley in the amount of $141,630,092.

18       **M)    Northlake.** Northlake owns the Northlake Project, consisting of a 1,564-acre site

19   which is located in Castaic, California, north of Valencia, approximately 45 miles north of

20   downtown Los Angeles and 10 miles north of the San Fernando Valley. The Northlake Project is

21   encumbered by a first priority deed of trust securing that certain Term Loan and Revolving Line of

22   Credit Loan Agreement, dated as of September 5, 2009, between SunCal Northlake, as borrower,

23   and Northlake Holdings, as successor agent and sole lender, pursuant to which Northlake

24   Holdings' predecessor (Lehman ALI) made a loan in the maximum aggregate principal amount of

25   approximately $100,000,000 (the "Northlake Loan Agreement"). On September 21, 2009,

26   Northlake Holdings filed Claim 6-2 against Northlake in the amount of $158,141,365.

27       **N)    PSV**. PSV owns the Palm Springs Village Project, consisting of a 309-acre site

28   which is located in the City of Palm Springs, California. The PSV Project is encumbered by a

-5-

***EXHIBIT 1***

first priority deed of trust securing that certain Term Loan and Revolving Line of Credit Loan Agreement, dated as of February 12, 2007, between SunCal PSV, as borrower, and Lehman ALI, as agent and sole lender, pursuant to which Lehman ALI made a loan in the maximum aggregate principal amount of approximately $90 million (the "PSV Loan Agreement"). On or about September 21, 2009, Lehman ALI filed Claim 12-2 against PSV in the amount of $88,257,340.

     **O)**    <u>**The Economic Downturn In 2007 and Promises of Funding**</u>. Prior to 2007, the Venture thrived, generating favorable returns for both parties. However, beginning in 2007, the real estate market experienced a downturn. This downturn substantially reduced the value of the Projects and negatively impacted potential sales. In an effort to mitigate the cash drain at the Projects caused by the slowdown, SunCal proposed closing certain Projects and slowing the pace of development at others. The Lehman Entities rejected these proposals and insisted that development proceed. In 2007 and 2008, Lehman ALI and LCPI repeatedly assured SunCal that Lehman ALI and LCPI were committed to funding the debts and obligations of the Projects and the work they directed to be performed; that funding would be forthcoming; and that SunCal and the Relevant SunCal Debtors should continue to have contractors undertake work to develop and preserve the value in the Projects. In reliance on these representations, SunCal and the Relevant SunCal Debtors continued to move forward with the Projects and incurred substantial expenses in hiring contractors to maintain and/or develop them and to deal with public health and safety issues.

     Substantially all of the unsecured creditor claims and mechanic's lien claims that have been filed against each of the Debtors' estates are obligations that Lehman ALI or LCPI authorized the Debtors to incur and promised to provide funding for and/or promised to assume. A list of the unsecured creditors that have filed proofs of claims against each of the Debtors, and the amounts of their claims, is included in Exhibit 19 to the Cook Declaration. A list of mechanic lien claims filed against each of the Debtors, and the amounts of their claims, is included in Exhibit 20 attached to the Cook Declaration.

     **P)**    <u>**The Restructuring Agreement**</u>. It was contemplated as of the October 2007 Interim Loan that a restructuring agreement would be entered into shortly, by no later than January or February of 2008. However, implementation was dragged out due in large part to Lehman's

1   extensive documentation.  In the meantime, until a restructuring agreement was entered into,

2   Lehman ALI and LCPI stopped paying vendor payables, nor would they pay any management fees

3   of SunCal Management LLC, which was managing and continued to manage each of the Relevant

4   SunCal Debtors' Projects.  As the restructuring was pushed further and further out and Lehman

5   ALI and LCPI continued to refuse to provide funding—despite their prior assurances—SunCal

6   was effectively drained of liquidity, and so the Relevant SunCal Debtors became even more

7   desperate and more dependent on Lehman ALI and LCPI financing.  Lehman ALI and LCPI used

8   the Relevant SunCal Debtors' vulnerability to their advantage in negotiating a restructuring

9   agreement that was tipped heavily in Lehman's favor.

10              1)      The Parties To The Restructuring Agreement. On May 23, 2008, SCC

11  Acquisitions, Inc. ("Acquisitions Inc."), and certain affiliated SunCal entities, [6] on the one hand,

12  and the Lehman Parties on the other, entered into the Restructuring Agreement ("Restructuring

13  Agreement").  See Cook Dec., Exhibit 1.  As originally executed in May 2008, the Restructuring

14  Agreement applied to twelve Projects relevant herein (as well as several other projects not at issue

15  in these bankruptcies):  (1) Acton Estates; (2) Beaumont Heights; (3) Bickford Ranch; (4) Emerald

16  Meadows; (5) Heartland; (6) Johannson Ranch; (7) Marblehead; (8) Northlake; (9) Oak Valley;

17  (10) Pacific Point; (11) Ritter Ranch; and (12) Summit Valley.  The Debtors that owned and/or

18  held equity interests in the owners of these Projects were signatories to the May 2008 agreement.

19  The Restructuring Agreement was entered into by, among others, the "Borrowers," "Grantors" and

20  "Pledgors," as defined in Annex 1 thereto.[7]

21

22  [6] The original signatories to the Restructuring Agreement include SunCal Marblehead Heartland
    Master LLC, Marblehead, Heartland, Oak Valley, SJD Partners, Palmdale Hills, SunCal
23  Communities I, LLC ("SunCal I"), SunCal Communities III, LLC ("SunCal III"), Bickford Ranch,
    Acton, Summit Valley, Kirby Estates LLC ("Kirby"), SunCal Beaumont Heights, LLC
24  ("Beaumont"), Emerald Meadows, SunCal Johannson Ranch, LLC ("Johannson"), Acquisitions
    Inc., Acquisitions, SunCal Master JV, LLC, SJD Development Corp ("SJD Development"),
25  SCC/Indio Land LLC, SCC Master IV Communities LLC, SCC/West Creek LLC, SunCal
    Communities II LLC, SunCal Management LLC, and Northlake.
26
    [7]   The "Borrowers" included Marblehead, Heartland, Northlake, Oak Valley, SJD Partners,
27  Palmdale Hills, SCC Palmdale, SunCal I, SunCal III, and Bickford.  The "Grantors" included
    Marblehead, Heartland, Northlake, Oak Valley, SJD Partners, Palmdale Hills, Bickford, Acton,
28  Summit Valley, Emerald Meadows, Beaumont and Johannson.  The "Pledgors" included SCC
    Palmdale, SunCal I, Summit Valley and SJD Development.

-7-

**EXHIBIT 1**                                                   Page 000025

1        Between May and August 2008, four additional projects were added to the

2   Restructuring Agreement by agreement of the parties: (1) Del Rio; (2) Joshua Ridge; (3) Palm

3   Springs Village; and (4) Tesoro.  Accordingly, the Debtors associated with these Projects—Del

4   Rio, SCC Communities, PSV, and Tesoro—became parties to the Restructuring Agreement as

5   amended.  These Debtors were signatories to the August 25, 2008 Settlement Agreement, along

6   with the Debtors associated with the original twelve Projects, as "Borrowers" and/or "Grantors."

7   (The SunCal parties to the agreements are collectively referred to herein as the "SunCal Parties").[8]

8        2)    Lehman ALI's Obligation to Fund "Urgent Payables." Pursuant to

9   Section 1(h) of the Restructuring Agreement, Lehman ALI agreed to pay certain urgent expenses

10  that were either owed, or being incurred at the Relevant SunCal Debtors' Projects that were

11  subject to the Restructuring Agreement.  Specifically, Section 1(h) provided, in pertinent part:

12       During the term of this Agreement, Lehman ALI, as the Lender with respect to
         each Loan, . . . hereby agrees to make protective advances under the applicable
13       Loan(s) to reimburse or otherwise provide funds to the applicable Borrowers for
         the payment of any such Urgent Payables which are approved by Lehman ALI….
14

15  Cook Declaration, Exhibit 1, Section 1(h).  "Urgent Payables" were defined in Section 1(h) as:

16       work or other services (including, without limitation, litigation defense costs) that
         need to be performed or provided with respect to each Property and any accounts
17       payable arising from work previously authorized by Lehman ALI which need to be
         paid with respect to each Property.
18

19  Cook Declaration, Exhibit 1, Section 1(h).

20       Pursuant to Section 1(i) of the Restructuring Agreement, Lehman ALI also agreed to

21  pay monthly management fees for the management of each of the Projects, from May 15, 2008

22

23  [8] Thus, four Projects were not formally added to the Restructuring Agreement—Century City,
    Delta Coves, Oak Knoll and Del Amo; and the four Debtors associated with these Projects—
24  Century City, Delta Coves, Oak Knoll and Torrance—were not signatories to the Settlement
    Agreement.  Lehman ALI was the lender on each of these Projects, three of which were part of the
25  Lehman SunCal Real Estate Fund LLC (the "Lehman SunCal Fund").  However, even as to these
    four Projects, Lehman ALI engaged in the same course of conduct that it had regarding the other
26  Projects regarding representations of funding.  Lehman ALI encouraged SunCal and these four
    Debtors to continue developing these Projects, and made assurances of payment.  Later, Lehman
27  ALI approved all expenses, told these Debtors what work to move forward with, and promised it
    would pay for such work.  These Debtors performed substantial work and incurred millions in
28  third-party debt in reliance on Lehman ALI's promises of payment.

-8-

*EXHIBIT 1*                                              Page 000026

1   forward, unless and until either (a) it provided thirty (30) 5 days' written notice, or (b) the

2   Restructuring Agreement was terminated ("Management Fees").

3                3)     <u>Lehman ALI's Obligation to Close</u>. The Restructuring Agreement was

4   designed to culminate in a closing ("Closing") with the execution of a Settlement Agreement (and

5   related settlement transaction documents), discussed in more detail below, whereby, among other

6   things:

7          (1)     the Grantors would convey title to, and the Borrowers, Pledgors, and
Guarantors would transfer all interests in, the Projects to new Lehman entities

8          ("Venture Grantees"), which entities would then be responsible for repayment of
the loans previously made to the Borrowers (and which were guaranteed by the

9          Guarantors and/or secured by pledges of interests by the Pledgors), as well as
payment of management fees to SunCal Management;

10

11          (2)     the Venture Grantees and/or other Lehman entities would pay for all
payables arising from "Lender Authorized Work"—work that Lehman ALI had

12          previously approved;

13          (3)     the Venture Grantees and/or other Lehman entities would pay for tens of
millions of dollars in outstanding payables which the Grantors, Borrowers,

14          Pledgors and/or Guarantors owed to third-party vendors that had provided goods or
services on the Projects (at Lehman ALI's instruction);

15

16          (4)     the Venture Grantees and/or other Lehman entities would indemnify
Plaintiffs for up to at least $15 million in existing bond obligations, and also agreed

17          to indemnify the SunCal Parties for certain bond liability going forward if the
Lehman parties failed to release and/or replace the existing performance bonds; and

18

19          (5)     PAMI, LLC ("PAMI") an ostensibly creditworthy indemnitor, was the
entity designated to be the "Lehman Indemnitor" under the parties' Settlement

20          Agreement would be jointly and severally liable for the above payment and
indemnification obligations.

21

22       Section 1(a) of the Restructuring Agreement delineated the parties' obligation, upon

23   satisfaction of the Closing Conditions, to execute, and to cause their respective affiliated parties to

24   execute, the Settlement Agreement and related settlement documents. Section 1(c) of the

25   Restructuring Agreement further provided, in pertinent part, that "[u]pon satisfaction of the

26   Closing Conditions, the Parties shall proceed to Closing…."The Closing Conditions also included

27   certain consents and approvals of governmental authorities and other parties which are referred to

28   in Section 2(a) of the Restructuring Agreement as "Required Consents." Section 2(a) further

1  provided a mechanism for partial Closing if Required Consents had been obtained for fewer than

2  all of the Projects by the Closing date.  Although the formula was complex, essentially, so long as

3  Required Consents had been obtained for eight of the subject Projects plus the Pacific Point

4  Project, an "Initial Closing" would occur as to those Projects for which consents had been

5  obtained, and a "Subsequent Closing" could occur for Projects for which all consents were

6  subsequently obtained, and the parties were to use commercially reasonable effort to obtain the

7  Required Consents for a Subsequent Closing.

8      Under Section 1(d)(i), the Restructuring Agreement could be terminated (a "Termination

9  Event") if neither the Closing Conditions for an Initial Closing nor complete Closing were

10  satisfied on or prior to the Closing Date.   However, Section 1(d)(i) further provided that neither

11  party could terminate the Restructuring Agreement "if the failure of any Closing Conditions shall

12  have been due to such Party's (or such Party's Affiliate's) willful misconduct, gross negligence or

13  failure to pursue the satisfaction [of] the Closing Conditions in good faith."  Under Section 1(e) of

14  the Restructuring Agreement, unless the agreement otherwise specified, the obligations of the

15  Parties under the Agreement would terminate "upon termination of this Agreement."  Thus,

16  Lehman ALI's obligation under Section 1(h) to make protective advances to cover Urgent

17  Payables on the Projects, its obligation under Section 1(i) to pay Management Fees, and its

18  obligation under Section 1(c) to consummate the Closing did not terminate unless there was a

19  valid Termination Event.

20      **Q)**    **The Breach of The Restructuring Agreement**. Lehman ALI breached the terms

21  of the Restructuring Agreement through the following actions or inactions:

22      1.    Failure to Pay Urgent Payables. After the Restructuring Agreement was

23  executed, the Lehman Parties insisted that the Relevant SunCal Debtors continue work at the

24  Projects.  In reliance upon the Lehman ALI's promise to pay urgent payables, and to have the

25  projects transferred to the Lehman created "Venture Grantees" who would be liable for the

26  "assumed obligations," the Relevant SunCal Debtors continued authorize work on their respective

27  Projects.  However, when it came time to pay these expenses, as required under the terms of the

28  Restructuring Agreement, Lehman ALI refused to so, despite written demands by SunCal. An

1  expanded list of total account payables as of the Closing Date for the relevant Projects is set forth

2  in section (G)(1)(a) below.

3       Moreover, Lehman ALI never provided thirty days' written notice of intent to cease

4  payment of the monthly Management Fees. Lehman ALI did purport to terminate the Restructuring

5  Agreement on November 13, 2008. However, as discussed below, the Restructuring Agreement

6  imposed certain requirements for a termination to be valid. Because Lehman ALI's purported

7  termination was invalid, its obligation to pay the monthly Management Fees continued past

8  November 13, 2008, and continues through the present date. SunCal Management and the other

9  SunCal Parties have continued to manage the Projects. All conditions precedent to Lehman ALT

10 paying SunCal Management the monthly Management Fee from May 15, 2008 through at least

11 November 12, 2008, and beyond, were satisfied.

12      "Exhibit D" to the Restructuring Agreement, referenced in Section 1(h) above, listed a

13 total of $580,352 in Monthly Management Fees for ten of the twelve Projects." Subsequent

14 documentation listed a total of $683,383 in Monthly Management Fees for the fifteen Properties at

15 issue that were ultimately subject to the agreement. By Project, the monthly management fees listed in

16 Exhibit D to the Restructuring Agreement were: (1) Acton Estates ($31,396); (2) Beaumont Heights

17 ($53,862); (3) Bickford Ranch ($81,982); (4) Emerald Meadows ($43,593); (5) Heartland ($38,151);

18 (6) Johannson Ranch ($35,868); (7) Marblehead ($111,137); (8) Oak Valley ($42,574); (9) Ritter

19 Ranch ($110,772); and (10) Summit Valley ($31,017). See Exh. 1, at Exh. D.

20      2.   Failure To Proceed With A Closing Under The Settlement Agreement. The

21 Restructuring Agreement was designed to serve as a financial bridge to the implementation –

22 closing – of the transactions described in the Settlement Agreement. One of Lehman ALI's

23 obligations under the Restructuring Agreement was to proceed with the closing of the Settlement

24 Agreement. As more fully explained in the following sections, by failing and refusing to proceed

25 with a closing under the terms of the Settlement Agreement, Lehman ALI-- breached the terms of

26 the Restructuring Agreement. As a result of Lehman ALI's breach, the Projects were never

27 transferred to the Lehman "Venture Grantees" who would be liable for the "assumed obligations"

28 and the "Lender Authorized Work."

-11-

**EXHIBIT 1**

1        3.   <u>The Sale of Seven Sold Loans to Fenway Breached The Terms of The</u>

2  <u>Restructuring Agreement</u>.  In order to perform its obligations under the terms of the Restructuring

3  Agreement, and to implement the transactions described in the Settlement Agreement, Lehman

4  ALI had to remain the "Lender with respect to each Loan" as represented in the Restructuring

5  Agreement.  *See* Restructuring Agreement, Section 1(h).  However, as more fully explained below,

6  on August 22, 2008, Fenway Capital, as "Buyer," and LCPI, as "Seller," entered into that certain

7  *Master Repurchase Agreement* (the "Repo"), whereby Fenway Capital purchased all of LCPI's

8  right, title and interest in the following loans:

9

| Loan | Claimant | Alleged Balance |
|------|----------|-----------------|
| SunCal Communities I Loan | LCPI | $343,221,391 |
| Ritter Ranch Loan | LCPI | $287,252,096 |
| SunCal PSV Loan | Lehman ALI | $88,257,340 |
| SunCal Delta Coves Loan | Lehman ALI | $206,023,142 |
| SunCal Marblehead/ Heartland Loan | Lehman ALI | $354,325,126 |
| Sun Cal Oak Valley Loan | OVC Holdings, LLC | $141,630,092 |
| SunCal Northlake Loan | Northlake Holdings, LLC | $123,654,777 |

10

11

12

13

14  (together the "Sold Loans").

15        When Lehman ALI and LCPI concocted the sale of the Sold Loans under the Repo, which

16  were also governed by the terms of the Restructuring Agreement, they were intentionally

17  breaching their performance obligations under the terms of the Restructuring Agreement.[9]

18  Lehman ALI violated the covenant of good faith and fair dealing by failing to pursue its express

19  obligations in good faith, and by taking action or inaction so as to deprive the Relevant SunCal

20  Debtors of the expected benefits of the agreement.

21        **R)   <u>The Settlement Agreement</u>**.  One of the exhibits to the Restructuring Agreement is

22  the form of "Settlement Agreement."  The Restructuring Agreement was intended to serve as a

23  bridge to the Settlement Agreement, by providing the SunCal Parties the funds necessary to

24  support themselves until the closing of the Settlement Agreement, on which date the Projects

25  would be transferred to the new Lehman-controlled "Venture Grantees."[10]  The language in the

26  Settlement Agreement makes it clear that this transfer is the final step in the contractual process:

27  [9] On or about June 22, 2010, Fenway Capital transferred the Sold Loans, and therefore the
corresponding claims, to LCPI.  See Docket Nos. 1179 through 1191.

28  [10] "Venture Grantees" are defined in Recital G of the Settlement Agreement, which itself cross-
references Annex 1 of the Settlement Agreement.  The version of Annex 1 appended to the May

-12-

**EXHIBIT 1**

1

2

> [E]ach Grantor hereby agrees to convey, assign, and transfer to the applicable Venture Grantee (and each other Borrower Party agrees to convey, assign and transfer to the applicable Venture Grantee all of its respective right, title and interest, if any, in and to any of the property described below), and the applicable Venture Grantee agrees to accept a conveyance of, on the Closing Date, all of such Grantor's (and/or such other Borrower Party's) respective right, title and interest in and to [the Conveyance Properties].

3

4

5

Cook Declaration, Exhibit 2, Settlement Agreement, pg. 3, ¶2.

6

7    Section 9 of the Settlement Agreement provides, in relevant part: "The closing of the

8    transactions contemplated by this Agreement (the 'Closing') shall take place on the date on which

9    this Agreement is executed (the 'Closing Date')." *The Settlement Agreement and related*

10   *settlement documents were each executed by all applicable parties on August 25, 2008.* See

11   Cook Declaration, ¶ 41.  Although the SunCal parties acquiesced in the Lehman Parties' extension

12   of the closing date to September 30, 2008, this extension did not modify the Lehman Parties'

13   obligation to consummate the Closing upon satisfaction of the Closing Conditions, including the

14   obtaining of the Required Consents.  This extension also did not affect Lehman ALI's obligation

15   to pursue in good faith any remaining Required Consents.

16   In exchange for the Grantors and Borrowers conveying the Projects, the respective Venture

17   Grantees—and LV Pac Point, the Lehman entity designated to by Lehman ALI to be the transferee

18   with respect to the Pacific Point Project—were to assume tens of millions of dollars in certain

19   payment and bond obligations, as described below.

20         1.    The Obligations to Pay Assumed and Authorized Amounts.  Under

21   Section 14.a of the Settlement Agreement, each of the Venture Grantees were to assume

22   responsibility for (1) Scheduled Assumed Obligations and (2) Lender Authorized Work.

23   Section 14.a. provides, in pertinent part:

24   2008 Restructuring Agreement had placeholders for the name of each Venture Grantee in boldface brackets, e.g., "Acton Estates Venture Grantee," "Beaumont Heights Venture Grantee," etc.  In the signature blocks for the Settlement Agreement that were ultimately signed on August 25, 2008, under the heading for "Venture Grantees," for each property (except for Pacific Point, which was treated slightly differently, as discussed below), there was listed a limited liability company with the acronym "SCLV" (for "SunCal-Lehman Venture") followed by the name of the property. Thus, the Venture Grantee for the Acton property was "SCLV Acton Ranch LLC"; for Beaumont Heights, "SCLV Beaumont Heights LLC," etc.  Each of these signature blocks was signed by an authorized Lehman representative on behalf of each SCLV entity.

25

26

27

28

-13-

**EXHIBIT 1**

1
2
3
4
5

> At Closing…, each of the Venture Grantees shall assume and be responsible for the payment of (i) those payables and other obligations of the Grantors as described on <u>Schedule 5</u> that relate to such Venture Grantee's Conveyance Property… (collectively, the "Scheduled Assumed Obligations"), and (ii) all payables arising from any Lender Authorized Work ("Authorized Assumed Obligations" and together with the Scheduled Assumed Obligations, the "Venture Grantee Assumed Obligations").

6

Cook Declaration, Exhibit 2, Settlement Agreement, pg. 12.

7
8
9
10
11
12

        a.      <u>Scheduled Assumed Obligations</u>. Pursuant to Section 14.a, the "Scheduled Assumed Obligations" are described in Schedule 5 to the Settlement Agreement. The version of Schedule 5 attached to the May 2008 Restructuring Agreement (Cook Declaration, Exhibit 3) listed the following amounts of total accounts payables ("Total AP") for each of the relevant Voluntary Debtors' Projects (along with a description of the amounts owed to each vendor on each Project), totaling over $18 million:

| Project | Total AP |
|---|---|
| Acton | $141,521 |
| Beaumont Heights | $189,052 |
| Bickford | $3,319,114 |
| Emerald Meadows | $2,910,825 |
| Johannson | $69,062 |
| Ritter Ranch | $11,464,998 |
| Summit Valley | $430,669 |
| **TOTAL** | **$18,525,241.00** |

13
14
15
16
17
18
19
20

When the Scheduled Assumed Obligations for the other Projects are taken into account, the total amount of Scheduled Assumed Obligations was $46,907,019. The additional $28.4 million was comprised as follows:

21
22
23
24
25

| Project | Total AP |
|---|---|
| Marblehead—Scheduled Assumed Obligations | $16,835,573 |
| Marblehead—Lender Authorized Work | $1,985,289 |
| Heartland | $3,247,620 |
| Oak Valley | $5,582,297 |
| Northlake | $730,999 |
| **TOTAL** | **$28,381,778.00** |

26
27
28

*See* Scheduled 5 to the Settlement Agreement, May 2008 (Cook Declaration, Exhibit 3). Because the Schedules, Annexes, and Exhibits to the Settlement Agreement are voluminous, totaling many hundreds of pages, only the most pertinent Schedules are attached hereto.

-14-

*EXHIBIT 1*

1       The August 2008 version of Schedule 5[11] (which reflects adjustments for the

2 settlements that were made after May 2008, as well as the addition of several projects (among

3 other adjustments)) was the most current version as of the time of the execution of the Settlement

4 Agreement.  It lists the following amounts of total account payables as of the Closing Date for the

5 relevant Projects (other than Pacific Point) that were to be Assumed Obligations. This figure totals

6 over $9 million after adjustments:

| Project | Total AP |
| --- | --- |
| Acton | $94,062 |
| Beaumont Heights | $163,709 |
| Bickford | $3,011,191 |
| Del Rio | $1,797,401 |
| Emerald Meadows | $1,451,711 |
| Johannson | $30,526 |
| Joshua Ridge II | $6,156 |
| Ritter Ranch | $2,179,082 |
| Summit Valley | $308,777 |
| Tesoro Burnham | $51,918 |
| **TOTAL** | **$9,094,533.00** |

      When the Scheduled Assumed Obligations for the other Projects are taken into account,

the Scheduled Assumed Obligations on the updated schedule totals $36,918,153.  The additional

$27.8 million was comprised as follows:

| Project | Total AP |
| --- | --- |
| Marblehead—Scheduled Assumed Obligations | $12,334,033 |
| Marblehead—Lender Authorized Work | $224,031 |
| Heartland | $2,910,825 |
| Oak Valley | $4,667,191 |
| Northlake | $346,749 |
| Palm Springs Village | $7,340,791 |
| **TOTAL** | **$27,823,620.00** |

*See* Scheduled 5 to the Settlement Agreement, August 2008 (Cook Declaration, Exhibit 4).

      However, this sum understates the actual figure. The Scheduled Assumed Obligations

reflected on the updated Schedule 5 take into consideration reductions resulting from certain

settlements that were not paid in some instances. See Cook Declaration.

---

[11] Cook Declaration, Exhibit 4.

1                       b.      Lender Authorized Work. As noted above, under Section 14.a of the

2   Settlement Agreement, the "Venture Grantee Assumed Obligations" to be assumed at Closing

3   included not only the Scheduled Assumed Obligations, but also "all payables arising from any

4   Lender Authorized Work ("Authorized Assumed Obligations"). According to the definition in

5   Exhibit A to the Settlement Agreement (at p.5), "Lender Authorized Work" means "work which,

6   as of the Closing Date, has been performed with respect to or for the benefit of any of the

7   Conveyance Properties at the specific direction of or with the authorization of the Lenders and

8   which work is more specifically described on Schedule 17." (Cook Declaration, Exhibit 2,

9   pg. A-5.

10           Schedule 17 did not list particular creditors or dollar amounts owed, as did

11   Schedule 5.  Cook Declaration, Exhibit 5 (Schedule 17 to the Settlement Agreement, May 2008),

12   and Exhibit 6 (Schedule 17 to the Settlement Agreement, August2008).  Rather, Schedule 17

13   described categories of work that Lehman ALI authorized at the Projects and for which it was

14   bound to pay.  For example, in the case of Bickford Ranch, the two categories of Lender

15   Authorized Work listed were: "Construction of the off-site waterline and pump station" and

16   "Mitigation Management and Monitoring of the project, including Oak Tree Mitigation,

17   SWPPP/RWQCB compliance, VELB Habitat, Bat Habitat, and Raptor Nesting."[12]  The applicable

18   Lehman parties thus obligated themselves to pay for goods or services that fell within these

19   categories.

20           Schedule 17 was modified between the time of the execution of the Restructuring

21   Agreement in May 2008 and the execution of the Settlement Agreement in August 2008, to

22   account for the Projects that were added to the agreement in the interim, as well as additional

23   categories of work that were authorized.[13]  The total value of the Lender Authorized Work which

24   was performed and which the Lehman Parties were obligated to pay for pursuant to Schedule 17 is

25   well into the millions of dollars.

26           2.      The Obligations to Assume Bond Obligations and to Replace or Release

27   Bonds. In addition to assuming the Venture Grantee Assumed Obligations, the Venture Grantees

28

---

[12] *See* Scheduled 17 to the Settlement Agreement, May 2008 (Cook Declaration, Exhibit 5).
[13] *See* Scheduled 17 to the Settlement Agreement, August 2008 (Cook Declaration, Exhibit 6).

*EXHIBIT 1*

1  were also to assume certain bond obligations in connection with certain of the Projects.

2  Schedule 12-C to the Settlement Agreement describes the "Payment and Performance Bonds"[14]

3  associated with the Projects subject to the Agreement.  For each such Bond, Schedule 12-C

4  delineates:  the Project, Bond Number, Carrier, Obligee, Bond Amount, Date of Issue, Tract

5  Number, Description of work covered, and Bond Obligors.[15] Schedule 13 to the Settlement

6  Agreement described the Payment Performance Bonds for which a "Bond Payment Demand" had

7  been made (the "Pre-Closing Designated Payment and Performance Bonds").  For each such Bond

8  for which a Bond Payment Demand had been made, Schedule 13 delineated the Project; Vendor;

9  Date Filed (if applicable); Claim Amount; Case Number (if applicable); Bond Number; and

10 comments regarding case status.

11        The version of Schedule 13 attached to the May 2008 Restructuring Agreement

12 listed $12,622,374.36 in such Bond Payment Demands.[16]  These can be grouped by Project, as

13 follows:

| Project | Aggregate Value of Bond Payment Demands on May 2008 Schedule 13 |
| --- | --- |
| Acton | $    11,312.37 |
| Marblehead | $5,686,937.59 |
| Pacific Point | $4,246,595.48 |
| Ritter Ranch | $2,677,528.92 |
| **TOTAL** | **$12,622,374,36** |

18        A subsequent version of Schedule 13 listed Bond Payment Demands as of at least

19 August 2008, which reflected not only new claims, but also claims against Projects that were

20 added to the Restructuring and Settlement Agreement after May 2008.[17]  The subsequent

21 documentation shows aggregate Bond Payment Demands totaling at least $22,183,424.22, as

22 follows:

| Project | Aggregate Value of Bond Payment Demands on Updated Schedule 13 |
| --- | --- |
| Bickford | $330,118.00 |
| Del Rio | $627,227.39 |
| Marblehead | $9,547,608.61 |

---

[14] This term is defined in Section 15.a.(22) to the Settlement Agreement.
[15] *See* Scheduled 12-C to the Settlement Agreement, May 2008 (Cook Declaration, Exhibit 7).
[16] *See* Scheduled 13 to the Settlement Agreement, May 2008 (Exhibit 9).
[17] *See* Scheduled 13 to the Settlement Agreement, August 2008 (Exhibit 10).

-17-

**EXHIBIT 1**

| Project | Aggregate Value of Bond Payment Demands on Updated **Schedule 13** |
|---|---|
| Oak Valley | $196,922.91 |
| Pacific Point | $4,742,040.39 |
| Palm Springs Village | $3,524,406.54 |
| Ritter Ranch | $3,215,100.38 |
| **TOTAL** | **$22,183,424.22** |

The amounts of bond payment demands on the Marblehead, Ritter Ranch and Pacific Point Projects have increased further beyond these figures because of additional work performed on these Projects by reason of called bonds. The Settlement Agreement contemplated that additional Bond Payment Demands could be made on Payment Performance Bonds post-closing, and referred to Bonds where such demands were made as "Post-Closing Designated Payment and Performance Bonds." (See Cook Declaration, Exhibit 2, Settlement Agreement § 16.b). The Venture Grantees (and the Pac Point Transferee, discussed below) would attempt to litigate and/or resolve the Bond Payment Demands. *See id.*

Section 16.c of the Settlement Agreement provided that the Venture Grantees and Pac Point Transferee (i.e., LV Pacific Point), collectively, would be obligated to pay up to $12,622,374.36 with respect to the payment of claims arising under Pre-Closing Designated Payment and Performance Bonds, and up to $2,377,625.64 with respect to the payment of claims arising under Post-Closing Designated Payment and Performance Bonds (collectively, the "Assumed Bond Obligations"). (Cook Declaration, Exhibit 2, Settlement Agreement § 16.b). Thus, the Venture Grantees and Pac Point Transferee agreed to pay up to a total of at least $15 million in connection with payments under Bond Payment Demands.

Further, Section 14.g. provided that if a Venture Grantee (or LV Pac Point, the transferee of the Pacific Point Project) decides to proceed with development of a Project post-closing, it shall use commercially reasonable efforts to replace and cause to be released existing bonds issued in connection with such Project for such development work, and shall indemnify and hold harmless the applicable Bond Obligor for claims or losses prior to such release. (PAMI also had an indemnification obligation if claims arose when such release was not obtained). Pending such work, the Venture Grantees and LV Pac Point were obligated to pay the premiums on all Payment and Performance Bonds.

-18-

***EXHIBIT 1***

1          Specifically, Section 14.g. of the Settlement Agreement provided, in pertinent part:

2          If, and to the extent that, any Venture Grantee or the Pac Point Transferee
3          desires, at its sole option and in its sole and absolute discretion, to proceed with
           the development of its Property in a material manner after the date of this
4          Agreement ("Material Development Work"), such Venture Grantee or Pac
           Point Transferee, as applicable, shall use commercially reasonable efforts to
5          replace and cause to be released each existing Payment and Performance Bond
           issued with respect to such Property that relates to or secures the Material
6          Development Work to be undertaken and shall indemnify and hold the
           applicable Bond Obligor thereunder harmless from and against any claims or
7          losses incurred by such Bond Obligor in respect of such Payment and
           Performance Bond until such time as such Payment and Performance Bond has
8          been replaced and released.  To the extent that a Venture Grantee or the Pac
9          Point Transferee, undertakes or causes work to be performed on its Property
           after the date of this Agreement and as a result of such work, liability is created
10         or arises under any existing Payment and Performance Bond, such Venture
           Grantee or Pac Point Transferee, as applicable, and PAMI LLC shall, jointly
11         and severally, indemnify and hold harmless any applicable Bond Obligor from
           any liability with respect to, and to the extent of, the work so undertaken.
12         Unless and until Material Development Work is undertaken with respect to a
13         Property, … the applicable Venture Grantee or Pac Point Transferee, as
           applicable, shall pay the premiums for the maintenance of such Payment and
14         Performance Bonds… .

15    Cook Declaration, Exhibit 2, pg. 16, Section 14.g.

16         3.    Pacific Point Obligations.   The transactions contemplated by the

17    Restructuring and Settlement Agreement were configured differently for the Pacific Point project

18    than they were for the remaining Projects.  For Pacific Point, however, title would be transferred

19    to Lehman ALI (or its designated transferee, LV Pac Point) pursuant to a nonjudicial foreclosure

20    process. However, the Lehman parties' obligation to cover the payables and bond obligations was

21    similarly structured.

22         Under Section 14.b of the Settlement Agreement, the "Pac Point Transferee," i.e.,

23    LV Pac Point, was to assume (1) approximately $4 million in "Bonded Pac Point Payable

24    Obligations" and (2) approximately $3.7 million in "Other Pac Point Payable Obligations."

25         Schedules 4-A and 4-B provided detailed information about the bonded and other

26    obligations to be assumed in connection with Pacific Point. Schedule 4-A to the Settlement

27    Agreement delineates, by individual vendor and claim amount, the Bonded Pac Point Payable

28    Obligations totaling $3,956,693.30.25 Schedule 4-B to the Settlement Agreement delineates, by

-19-

**EXHIBIT 1**

1  individual vendor and claim amount, the Other Pac Point Payable Obligations totaling $3,688,011.

2  See Cook Declaration, Exhibits 11 through 14.

3          Moreover, as discussed above, pursuant to Section 14.a. of the Settlement

4  Agreement, the entities taking title to the properties at closing were also to pay for "all payables

5  arising from any Lender Authorized Work" on the respective properties. Schedule 17 to the

6  agreement lists various categories of "Lender Authorized Work" relating to, among other Projects,

7  the Pacific Point Project for which the Pac Point Transferee would be liable.

8          In negotiating the Settlement Agreement, the parties agreed that the Lehman Parties

9  would provide a creditworthy indemnitor that would back the Lehman Parties' payment

10  obligations thereunder. Under Section 17.h. of the Settlement Agreement, the Venture Grantees

11  and the "Lehman Indemnitor"—i.e., PAMI - to be jointly and severally liable to indemnify the

12  applicable Debtor for, among other things, the failure of any Venture Grantee or other Lehman

13  Party to pay or otherwise satisfy or settle any of the Assumed Obligations, which include each of

14  the payment obligations under the Settlement Agreement discussed above.

15          Thus, to the extent that the Venture Grantees failed to pay any of the bonded or

16  non-bonded assumed obligations, and to the extent that LV Pac Point, as the Pacific Point

17  Transferee, failed to cover the bonded or non-bonded Pac Point Payables, PAMI is liable to pay

18  those amounts.  Section 14.g. provided that if a Venture Grantee or LV Pac Point, the transferee of

19  the Pacific Point Project, decides to proceed with development of a Project post-closing, they shall

20  replace and cause to be released existing payment and performance bonds, and shall indemnify

21  and hold harmless the Bond Obligors for claims or losses prior to such release.

22      **S.**    **The Breaches of The Settlement Agreement.**  In addition to the breaches of the

23  Restructuring Agreement discussed above, Lehman ALI breached the Settlement Agreement

24  through the following actions and failure to perform.

25          1)    Lehman ALI Attempted  To Repudiate The Settlement Agreement. As the

26  Declaration of Bruce Cook confirms, Lehman ALI not only failed to perform under the terms of

27  the Settlement Agreement, it affirmatively repudiated the same on November 13, 2008, after

28  written demands for performance.  Lehman ALI's affirmative repudiation occurred after the

*EXHIBIT 1*

1    Relevant SunCal Debtors began filing for bankruptcy, which were precipitated by the Lehman

2    Parties' failure to fulfill their funding obligations (Cook Decl., ¶¶ 59 ). As to the Relevant SunCal

3    Debtors who had already filed for bankruptcy, the attempted repudiation was ineffective as a

4    violation of the automatic stay. As to the Relevant SunCal Debtors who had not yet filed their

5    bankruptcies, the purported repudiation was also ineffective, as Lehman ALI had already

6    defaulted, and such Debtors were ready to perform and thus were not in default.

7              2)    The Sale of The Sold Loans Repudiated The Settlement Agreement. At

8    some point on or before August 22, 2008, Lehman ALI transferred all of its right, title and interest

9    in the Sold Loans (i.e., the PSV Loan, the Delta Coves Loan and the Marblehead/Heartland Loan)

10    to LCPI. Similarly other Lehman affiliates (OVC Holdings and Northlake Holdings) transferred

11    their right, title and interest in the other Sold Loan to LCPI. LCPI originally held title to the

12    SunCal Communities I Loan and the Ritter Ranch Loan. Thus, as a result of the transfers from

13    Lehman ALI, OVC Holdings and Northlake Holdings, LCPI held title to all seven Sold Loans.

14    Pursuant to the Repo, LCPI transferred all of its right, title and interest in all of the Sold Loans to

15    Fenway Capital on August 22, 2008. See RJN, Exhibits 13 and 14.

16              After the Sold Loans were transferred, LCPI and Lehman ALI lacked the power to

17    make the agreed upon changes to this loan that were specifically provided for and mandated by the

18    terms of the Settlement Agreement. Although LCPI was not a signatory to the May Restructuring

19    Agreement, LCPI was a signatory (along with Lehman ALI, OVC Holdings, and Northlake

20    Holdings) to the Settlement Agreement. Accordingly, when the Lehman Parties executed the

21    Settlement Agreement on August 25, 2008, three days after the foregoing sale of the Sold Loans

22    they knew that they could not perform its obligations thereunder.

23              In Recital B to the Settlement Agreement, which the Lehman Parties executed on

24    August 25, 2008, the Lehman Parties states:

25              Each of the respective entities identified as "Lenders" on Annex 2 attached hereto
              (each, a "Lender" and collectively, the "Lenders") is the owner and holder, or
26              arranger, of the respective loan or loans more particularly described on Annex 2
              (each, a "Loan" and collectively, the "Loans").
27

28

-21-

***EXHIBIT 1***

1    Cook Declaration, Exhibit 2, Settlement Agreement, pg. 1, Recital B.  The Lehman Parties

2    represented that they were the owners and holders of the Sold Loans, which in fact was a false

3    statement, since these loans were transferred to LCPI and then re-sold to Fenway Capital, no later

4    than August 22, 2008, three days earlier.

5            In sum, when Lehman ALI executed the Settlement Agreement on August 25, 2008,

6    Lehman ALI did not own any of the Sold Loans referenced therein and it knew that this sale

7    deprived it of the ability to perform the obligations thereunder. Performance was an objective

8    impossibility.[18]

9            3)    Covenant Not To Sue.  The exhibits to the Settlement Agreement included a

10   Covenant Not to Sue, which provided that the lenders would not seek to enforce the rights against

11   the SunCal Borrowers, Guarantors and Pledgors, with respect to: "amounts owing pursuant to the

12   Note, the Loan Agreement or the Loan or obligations or liabilities arising under the Deed of Trust,

13   Pledge Agreement, Completion Guaranty, Limited Guaranty or the other Loan" if the Relevant

14   SunCal Parties performed their obligations under the Settlement Agreement.  See Cook

15   Declaration, Exhibit 15.  If the Lehman Parties had not prevented the closing and consummation of

16   the Settlement Agreement, the Relevant SunCal Debtors would have been wholly exonerated from

17   their obligations under the applicable Lehman Claims.

18           4)    Lehman Parties Acquire the Pacific Point Project Without Payment.  LV Pac

19   Point foreclosed on Pacific Point on August 28, 2008—three days after the Settlement Agreement

20   was signed—and acquired the property pursuant to a non-judicial foreclosure sale. Title was thus

21   transferred from SJD Partners to LV Pac Point, and so the Lehman parties obtained the property as

22   contemplated.

23           Lehman ALI, SJD Partners and the City of San Juan Capistrano even entered into

24   an estoppel certificate—at Lehman ALI's request—on August 26, 2008, two days before the

─────────────────────

25   [18] To the extent that any of the Lehman Parties contends that they had the ability to comply with

26   their obligations under the terms of the Settlement Agreement on August 25, 2008, this
     representation is demonstrably false. A party cannot modify the terms of loan that it does not own

27   and unwinding the sale prior to the extended closing date was not a viable prospect.  To the
     contrary, the Lehman Parties affirmatively represented to the New York Bankruptcy that it took

28   them over a year to persuade JP Morgan to release its lien on the commercial paper issuance,
     which was necessary to secure the release of the collateral securing this issuance – the Sold Loans.

-22-

***EXHIBIT 1***

1    foreclosure. That certificate stated, among other things, that the "Acquiring Entity [LV Pac Point]

2    shall by operation of law become the legal successor-in-interest to Developer [SJD Partners]"

3    under SJD Partners' agreements with the City. That certificate further provided that there existed

4    no breaches, defaults or claims under SJD Partners' agreements with the City. Yet demands have

5    been made by the City and/or other creditors—even after the estoppel was signed—against SJD

6    Partners, and its bond companies, because of LV Pac Point's failure to fulfill its assumption and

7    payment obligations.

8         Nevertheless, LV Pac Point has not performed any of its Pacific Point obligations.

9    Nor has PAMI performed any of its Pacific Point indemnity obligations.  The SunCal Parties

10    related to the project, SJD Partners and its parent, SJD Development, filed for bankruptcy in

11    November 2008 as a result of the Lehman parties' failure to perform. These Debtors remain

12    exposed to millions of dollars in bond and non-bonded liability to third parties due to LV Pac

13    Point's failure to fulfill its payment obligations and PAMI's failure to fulfill its indemnity

14    obligations.

15         **T.    Damages From the Breach of the Settlement Agreement**. As of September 30,

16    2008, Lehman ALI was bound to pay the "urgent payables" and monthly Management Fees, as

17    well as to cause the closing transferring the Projects to new Lehman entities (Venture Grantees),

18    who would assume the unpaid vendor claims incurred at respective Projects, assume the bond

19    liabilities associated with each respective Projects.  Had the Lehman Parties performed these

20    contractual obligations, the Relevant SunCal Debtors would have had little or no debt, and the

21    instant Chapter 11 cases would have been unnecessary.

22         As a result of the Lehman Parties' failure to pay urgent payables, failure to proceed and

23    cause its affiliates to proceed to closing, and repudiation of the agreements, the Relevant SunCal

24    Debtors had no choice but to file their respective petitions for protection under Chapter 11 of the

25    Bankruptcy Code.  This was the very result sought to be avoided by the Restructuring Agreement

26    and Settlement Agreement.  Thus, the breaches of the Lehman Parties not only resulted in non-

27    payment of all obligations to be assumed, but they caused the bankruptcies themselves.  Thus, the

28    damages incurred by the Relevant SunCal Debtors from the breaches of the Settlement Agreement

-23-

*EXHIBIT 1*

1    are all claims and costs incurred relating to their Projects since September 30, 2008. This would

2    include all costs associated with the maintenance and preservation of the Projects since this date,

3    and all costs incurred in this Chapter 11 effort, which was compelled by the Lehman Parties'

4    breach of both the Restructuring Agreement and the Settlement Agreement.

**III.**

**ARGUMENT**

7    **A.**    **Lehman ALI Breached The Terms of the Restructuring Agreement.**

8         Lehman ALI breached the terms of the Restructuring Agreement by failing and then

9    refusing to pay the Urgent Payables and by repudiating the Settlement Agreement. *See Q Mgmt. v.*

10    *Snake River Equip. Co.*, CV 05-322-E-MHW, 2008 WL 219173 (D. Idaho Jan. 24, 2008) ("A

11    breach of contract is non-performance of any contractual duty of immediate performance.");

12    *Minidoka Irrigation Dist. v. Dep't of the Interior,* 154 F.3d 924, 927 (9th Cir.1998) (anticipatory

13    repudiation occurs when "the act make[s] the promisor's performance impossible") (internal

14    quotations and citation omitted); *Gold Mining & Water Co. v. Swinerton,* 23 Cal. 2d 19, 29, 142

15    P.2d 22, 27 (1943) ("It follows that where there has been a partial breach by the promisor

16    accompanied or followed by a repudiation of the contract by the promisor, the breach is total.").

17         The Voluntary Debtors, Acquisition Inc., Acquisitions, SunCal Management and Bruce

18    Elieff filed a complaint with the Orange County Superior Court on March 24, 2011, against

19    Lehman ALI, LV Pacific Point, PAMI, and other Lehman Parties (none of whom are parties in the

20    instant proceedings) for breach of contract and breach of the covenant of good faith and fair

21    dealing. See RJN, Exhibit 16.

22    **B.**    **The Debtor is Entitled to Recoup its Damages Against the Secured Portion of**

23    **the Lehman Claims.**

24         In *Newbery Corp. v. Fireman's Fund Ins. Co.*, 95 F.3d 1392 (9th Cir. 1996), the Ninth

25    Circuit explained the right of recoupment, which is an affirmative defense under California law, as

26    follows:

27

28

> [R]recoupment "is the setting up of a demand arising from the *same transaction* as
> the plaintiff's claim or cause of action, strictly for the purpose of abatement or
> reduction of such claim." *Collier* ¶ 553.03, at 553-15 (emphasis in original). Under

-24-

***EXHIBIT 1***

recoupment, a defendant is able to meet a plaintiff's claim "with a countervailing claim that arose 'out of the same transaction.' " *Ashland Petroleum Co. v. Appel (In re B & L Oil Co.)*, 782 F.2d 155, 157 (10th Cir.1986) (citations omitted). For this reason, recoupment has been analogized to both compulsory counterclaims and affirmative defenses. *See, e.g., In re California Canners and Growers*, 62 B.R. 18, 22 (9th Cir. BAP 1986) (Elliott, Bankruptcy J., concurring) (citation omitted).

*Newbury*, 95 F. 3d at 1399. Here, the Debtor is setting up a demand or counter-demand in response to Claim 65 "strictly for the purpose of abatement or reduction of such claim." *Id.* This is also a case where the demand being set up arises from the "same transaction or occurrence." *Id.*

The *Newbery* case provided dispositive guidance on the "same transaction and occurrence" issue. In *Newbery*, Newbery, an electrical contractor, failed to complete a series of projects that were the subject of completion bonds issued by Firemans Fund Insurance ("Firemans"). Pursuant to this bonding arrangement, Newbery had executed an indemnity agreement indemnifying Firemans from any damages resulting from a failure to complete the projects.

After Newbery's default and Chapter 11 filing, Newbery, Firemans and Citibank, a secured creditor holding a lien on the unfinished projects, entered into a settlement agreement. This agreement allowed Firemans to takeover and complete the projects, using a new contractor, and it allowed the new contractor to use the Newbery equipment at the project sites. As part of this agreement, Firemans was required to pay rent for its use of Newbery's equipment to Citibank. Pursuant to the foregoing settlement, Firemans and the new contractor completed the projects. However, Firemans failed to pay the agreed upon rent for the use of Newbery equipment to Citibank.

Later, Citibank and Newbery engaged in litigation over Citibank's claim in Newbery's Chapter 11 case. This litigation resulted in a settlement pursuant to which Citibank assigned to Newbery the claim that it held against Firemans for the unpaid rent. Newbery (as the debtor) then asserted this rent claim against Firemans in the Chapter 11 proceeding. In response to the Newbury's claim, Firemans asserted the damages that it had incurred under the bond indemnity agreement against Newbery debtor, relying upon recoupment and offset theories. The District Court granted summary judgment in favor of Firemans on both defenses.

Newbery and Citibank then appealed this ruling, arguing that the claim for unpaid rent assigned by Citibank to Newbery did not arise from the same transaction or occurrence as the

-25-

*EXHIBIT 1*                                                    Page 000043

1  damages recoverable by Firemans under the indemnity agreement with Newbery. The Ninth

2  Circuit rejected this argument:

> In deciding whether the relevant claims arose from the same transaction, the
> district court applied the "logical relationship" test outlined by the Supreme Court
> in *Moore v. New York Cotton Exchange,* 270 U.S. 593, 46 S.Ct. 367, 70 L.Ed. 750
> (1926). In *Moore,* the Court stated that "'[t]ransaction' is a word of flexible
> meaning. It may comprehend a series of many occurrences, depending not so
> much upon the immediateness of their connection as upon their logical
> relationship." *Id.,* 270 U.S. at 610, 46 S.Ct. at 371; *see also Albright v. Gates,* 362
> F.2d 928, 929 (9th Cir.1966) ("In deciding what is a transaction, we take note that
> the term gets an increasingly liberal construction."). Applying this test, the district
> court accepted Fireman's Fund's argument that, because of the incorporation of
> the General Indemnity Agreement into the June 4, 1987 Agreement, both claims
> arose from the latter agreement.

95 F. 3d at 1402; *see also, In re TLC Hospitals, Inc.*, 224 F.3d 1008, 1012 (9th Cir. 2000) ("We

have held that the crucial factor in determining whether two events are part of the same

transaction is the "logical relationship" between the two. *Newbery Corp. v. Fireman's Fund Ins.

Co.,* 95 F.3d 1392, 1403 (9th Cir.1996) (resolving a dispute between a contractor and its surety).

Thus, a "transaction" may include "a series of many occurrences, depending not so much upon

the immediateness of their connection as upon their logical relationship." *Moore v. New York

Cotton Exch.,* 270 U.S. 593, 610, 46 S.Ct. 367, 70 L.Ed. 750 (1926).").

Here, the claims and the bases for the objections thereto clearly arise out of the "same

transaction." The Lehman Claims are all purported secured claims based on Loan Agreements

and related guaranty agreements and/or security agreements involving the Projects as collateral.

The Restructuring Agreement and the Settlement Agreement, on which the current objections are

based, contemplated "friendly" foreclosures whereby Lehman ALI or its designee (the Venture

Grantees) would take title to the Projects and pay the claims of the applicable creditors, and

would agree not to sue on the very obligations that form the basis of their Claims. The respective

Loan Agreements, Restructuring Agreement and the Settlement Agreement all arise out of a

common series of transactions that clearly bear a "logical relationship" for the purposes of

recoupment. See e.g., *In re Thompson,* 350 B.R. 842 (Bankr.E.D.Wis. 2006) (debtor's claims

originated out of mortgage loan satisfied "same transaction" requirement of recoupment doctrine

against lender).

-26-

*EXHIBIT 1*                                    Page 000044

C.    **LCPI, as Assignee, Has No Immunity from Palmdale Hill's Defenses**.

LCPI acquired title to the Sold Loans with full knowledge of the defenses held by the Relevant SunCal Debtors. In fact, LCPI's desire to stay the pursuit of these and other defenses in the form of the equitable subordination adversary action was one of the reasons why it repurchased this loan.[19]

As this Court is aware, on October 2, 2009, the Court entered formal findings that the transfer of Sold Loans by LCPI to Fenway Capital to pursuant to the Repo was a true sale, rather than a security device. *See* Docket Nos. 652 and 653 attached to the RJN, Exhibits 14 and 15. Thereafter, under the guise of a "compromise," LCPI and Fenway agreed that Fenway would sell the loans to LCPI--even those loans previously held by Lehman ALI. LCPI filed a motion with the New York Bankruptcy Court seeking approval of this transaction, characterized as a "Compromise Motion". LBHI Docket No. 7831. The Debtors filed a limited opposition to the extent the transaction would impose LCPI's stay against the pending adversary action, Adversary No. 8:09-ap-01005-ES ("Lehman Adversary Proceeding"). LBHI Docket No. 8105. In its Reply, LCPI was clear that the transaction would result in the Sold Loans being subject to its automatic stay. *See* LBHI Docket No. 8260 at p.13 ¶ 25 ("LCPI's automatic stay will attach to the property it receives as part of the Transaction as a matter of law, regardless of LCPI's intent."). The Debtors also filed a motion for relief from the automatic stay as to both LCPI and LBHI. LBHI Docket No. 8539. Immediately after the New York Bankruptcy Court's approved the "compromise", LCPI's counsel filed a Supplement to Unilateral Status Report ("Lehman Status Report") representing that the Lehman Adversary Proceeding has been affirmatively stayed by the approval of the compromise. Adv. Docket No. 290. As set forth above, on or about June 22, 2010, Fenway transferred the Sold Loans, and therefore the corresponding claims, to LCPI,[20] even though most of

---

[19] The affirmative defenses raised herein are being raised through a claim objection. This does not violate LCPI's stay. See *In re Wheatfield Business Park*, 308 B.R. 463, 466 (9th Cir. BAP 2004); *In re Financial News Network*, 158 B.R. 570 (S.D.N.Y. 1993); *In re Metiom*, 301 B.R. 634, 638-639 (Bankr.S.D.N.Y. 2003).
[20] See *Notices and Evidence of Transfer by Fenway Capital, LLC of Claim* filed on June 22, 2010 as Docket Nos. 1179 through 1191.

-27-

**EXHIBIT 1**

1  the Sold Loans were not originally held by LCPI, but rather by non-bankrupt Lehman Parties, such

2  as Lehman ALI, OVC Holdings and Northlake Holdings.

3      Accordingly, at the time of its acquisition, LCPI was not only aware of the Relevant

4  SunCal Debtors' defenses to the Sold Loans, LCPI's affirmatively acquired the loans in order to

5  invoke its stay over the Sold Loans and the Lehman Adversary Proceeding.  A debtor's post-

6  petition acquisition of a distressed asset, for the purpose of invoking its automatic stay, is an abuse

7  of process, and therefore is not in good faith.  In *In re Brannan*, 40 B.R. 20 (Bankr. N.D. Ga.

8  1984), 14 months prior to the petition date, the debtor transferred certain real property to a third

9  party.  Subsequently, the property was subject to a foreclosure proceeding.  The debtor filed for

10 bankruptcy, and less than two months later, the third party transferred the real property to the

11 debtor.  The debtor contended that the pending foreclosure was stayed, since the real property had

12 become property of the estate.  The court disagreed, and observed that an attempt to "shield a

13 property interest under the automatic stay by conveying the property interest to" the debtor's estate

14 during the pendency of the bankruptcy "*would be an abuse of the bankruptcy process*." *Brannan*,

15 40 B.R. at 24-25 (emphasis added).  Accordingly, LCPI's post-petition acquisition of the Sold

16 Loans for the purposes of invoking its automatic stay over the Sold Loans and the Lehman

17 Adversary Proceeding, was an abuse of process.

18     Under these facts, Lehman Claims are subject to any and all defenses held by the Relevant

19 SunCal Debtors, including the affirmative defenses raised herein. *See Fiberchem, Inc. v. General*

20 *Plastics Corp.*, 495 F.2d 737 (9th Cir.1974) (an assignee with knowledge of the equities of a third

21 party against the assigned right takes his claim subject to those equities); *Hammelburger v.*

22 *Foursome Inn Corp.*, 54 N.Y.2d 580, 588, 431 N.E.2d 278, 283 (1981) ("An assignee who takes

23 with knowledge can no more enforce the mortgage, whether as to principal or interest, than could

24 the usurer. Knowledge by the assignee of the usurious nature of the transaction will, therefore,

25 defeat an estoppel claim. See also *In re Snyder*, 436 B.R. 81, 90 (Bankr.C.D.Ill. 2010) ("As a

26 general rule, the purchaser of a claim against a debtor in bankruptcy steps into the shoes of the

27 claim seller, enjoying the same benefits, but suffering the same limitations of the claim, as a

28 successor in interest to the seller's position. An assignee of a claim may not receive more than the

-28-

*EXHIBIT 1*

1   assignor would have been entitled to without the assignment since an assignment operates to

2   transfer no greater right or interest than was possessed by the assignor.")

3   **D.    The SunCal Debtors Are Entitled To Offset Their Damages - Against Lehman**

4   **ALI's Claims Only.**

5          The relevant SunCal Debtors have the right offset their claims against Lehman ALI,

6   against any claims asserted by Lehman ALI against their assets. Section 431.70 of the California

7   Code of Civil Procedure provides in relevant part:

8          Where cross-demands for money have existed between persons at any point in
9          time when neither demand was barred by the statute of limitations, and an action
           is thereafter commenced by one such person, the other person may assert in the
10         answer the defense of payment in that the two demands are compensated so far
           as they equal each other, notwithstanding that an independent action asserting the
11         person's claim would at the time of filing the answer be barred by the statute of
           limitations. If the cross-demand would otherwise be barred by the statute of
12         limitations, the relief accorded under this section shall not exceed the value of
           the relief granted to the other party. The defense provided by this section is not
13         available if the cross-demand is barred for failure to assert it in a prior action
           under Section 426.30. Neither person can be deprived of the benefits of this
14         section by the assignment or death of the other. For the purposes of this section, a
           money judgment is a "demand for money" and, as applied to a money judgment,
15         the demand is barred by the statute of limitations when enforcement of the
           judgment is barred under Chapter 3 (commencing with Section 683.010) of
16         Division 1 of Title 9.
17

18   Cal. Code of Civ. Proc. 431.70.

19          Although Section 431.70 sets forth California's current statutory setoff provision, this

20   source of authority is not exclusive. The defense of setoff under California law "emanates from

21   'the established principle *in equity* that either party to a transaction involving mutual debts and

22   credits can strike a balance, holding himself owing or entitled only to the net difference... .'" *Del*

23   *Charro Properties, L.P. v. Heron*, H025571, 2004 WL 1616016 (Cal.App. July 20, 2004).  Code

24   of Civil Procedure section 431.70 "does not create a substantive right to raise setoff as a defense to

25   a claim for monetary relief, but merely describes the procedures to be followed in raising this

26   defense. [Citations.]" *Granberry v. Islay Investments* 9 Cal.4th 738, 744 (1995). Setoff is allowed

27   under California law where the parties have mutual debts and they are due to each party in the

28

-29-

*EXHIBIT 1*                                                    Page 000047

1  same capacity. *See Coffman v. Cobra Mfg. Co.*, 242 F.2d 754 (9th Cir. 1954). On the facts these

2  elements are clearly satisfied.

3      California law also allows the debtor the right to decide what claims to offset against a

4  where the debtor faces a range of claims asserted by the creditor party. *Margott v. Gem Properties,*

5  *Inc.*, 34 Cal. App. 3d 849, 855 (1973) ("Precedential expression of general rules, however,

6  strongly indicates that it is the judgment debtor and not the judgment creditor who has the right to

7  choose which of several claims possessed by the judgment debtor against the judgment creditor

8  should be offset. Offset is expressed as a right of the judgment debtor."); *see also Harrison v.*

9  *Adams*, 20 Cal. 2d 646, 648-49 (1942) ("Concerning the rights of the appellant to the money on

10  deposit as against the assignee of the judgment for a valuable consideration, it is well settled that a

11  court of equity will compel a set-off when mutual demands are held under such circumstances that

12  one of them should be applied against the other and only the balance recovered. The insolvency of

13  the party against whom the relief is sought affords sufficient ground for invoking this equitable

14  principle."); *In re Parker*, 80 B.R. 729, 732 (Bankr. E.D. Pa. 1987) ("Thus, we will reduce the

15  Mortgagee's "claim" for arrearages to $6,888.53 and the secured portion of its total debt to

16  $19,350.00.).

17      **E.    Allowing The Lehman Claims Would Unjustly Enrich The Lehman Entities**.

18      Under California law, the elements of unjust enrichment are: (1) receipt of a benefit; and

19  (2) the unjust retention of the benefit at the expense of another. *Shum v. Intel Corp.*, 630 F. Supp.

20  2d 1063, 1073 (N.D. Cal. 2009) *aff'd*, 633 F.3d 1067 (Fed. Cir. 2010); *Peterson v. Cellco P'ship*,

21  164 Cal.App.4th 1583, 1593, 80 Cal.Rptr.3d 316 (2008). In this case, the Lehman Entities

22  induced the SunCal Debtors to incur debt solely for the benefit of the Lehman Entities, via

23  promises of paying for certain obligations, and then the Lehman Entities refused to pay these

24  obligations. However, the Lehman Entities now come to this Court seeking 1) to have their claims

25  validated in the full amount, and 2) the right to use these claims as basis for foreclosing on the

26  very projects that were improved by the debts that they failed to pay in the first instance.

27  Validating the Lehman Claims would clearly convey an unjust windfall on these claimants.

28  Accordingly, these claims should not be allowed.

-30-

*EXHIBIT 1*

**F.** **The Lehman Entities Cannot Profit From Their Own Wrongs (Unclean Hands).**

"It is elementary that one party cannot compel another to perform while he himself is in default under the contract." *Rathbun v. Sec. Mfg. Co.*, 82 Cal. App. 793, 796 (1927); see also, *Robinson, on behalf of C. & R. Transfer, v. Boulevard Express*, 17 Cal. App. 2d 492, 495 (1936) ("A party cannot recover damages for the breach of an entire contract if he himself has failed, without lawful cause, to perform the covenants, upon compliance with which the obligations of the defendant were dependent."); *Lewis Pub. Co. v. Henderson* 103 Cal. App. 425, 429 (1930) ("Therefore, in the present case, plaintiff having failed to prove, as alleged in its complaint, that it had performed its part of the contract, was not entitled to enforce its terms against the other party thereto"). It is also well established that "[o]ne who unjustly prevents the performance or the happening of a condition of his own promissory duty thereby eliminates it as such a condition. He will not be permitted to take advantage of his own wrong, and to escape from liability for not rendering his promised performance by preventing the happening of the condition on which it was promised." 3A Corbin, Contracts § 767, at 540 (1960). Stated more succinctly, a claimant will not be allowed to profit from his or her own wrongdoing. *See Restatement of Restitution* § 3 (1937) ("A person is not permitted to profit by his own wrong at the expense of another."); *Feature Realty, Inc. v. City of Spokane*, 331 F.3d 1082, 1092 (9th Cir. 2003) ("A court of equity will not permit a person to profit by his own breach of contract and to benefit by his own wrong.").

Here, the Lehman Entities, *inter alia*, breached the terms of the Restructuring Agreement and Settlement Agreement, which are an integral part of the loan contracts that they are now seeking to enforce. These breaches left the SunCal Debtors owing millions in unpaid liabilities, which ultimately drove them into Chapter 11. Now, the Lehman Entities – the parties that participated in this breach as primary wrongdoers - come to this court seeking to profit from Lehman ALI's wrongs. This position is untenable. *Id. see also Highland Tank & Mfg. Co. v. PS Intern. Inc.*, 393 F.Supp.2d 348, 361 (W.D.Pa.2005) ("No Court will lend its aid to a man who founds his cause of action upon an immoral or an illegal act."); *see also Gaudiosi v. Mellon*, 269 F.2d 873, 882 (3d Cir.1959) ("The doctrine (of unclean hands) is confessedly derived from the

1    unwillingness of a court, originally and still nominally one of conscience, to give its peculiar relief

2    to a suitor who in the very controversy has so conducted himself as to shock the moral sensibilities

3    of the judge. It has nothing to do with the rights or liabilities of the parties; indeed the defendant

4    who invokes it need not be damaged, and the court may even raise it sua sponte."). The Lehman

5    Entities should be barred from seeking any relief against the Voluntary Debtors with respect to the

6    Lehman Claims until they have cured the taint of unclean hands by remedying their wrongs.

7    **G.    The Imposition Of A Constructive Trust Is Justified – Against Lehman ALI**

8    **Only.**

9        Section 2224 of the California Civil Code states that '[o]ne who gains a thing by fraud,

10    accident, mistake, undue influence, the violation of a trust, or other wrongful act, is, unless he or

11    she has some other and better right thereto, an involuntary trustee of the thing gained, for the

12    benefit of the person who would otherwise have had it." A constructive trust may be imposed

13    pursuant to this section if the following three conditions are satisfied: (1) the existence of a *res*

14    (property or some interest in property); (2) the *right* of a complaining party to that res; and (3)

15    some *wrongful* acquisition or detention of the res by another party who is not entitled to it.

16    [Citations.]" *Communist Party v. Valencia, Inc.* 35 Cal.App.4th 980, 990 (1995); *Campbell v.*

17    *Superior Court*, 132 Cal. App. 4th 904, 920 (2005).

18        In this case, Lehman ALI directed the Voluntary Debtors to continue to employ vendors to

19    improve the Projects prior to their transfer to the Lehman controlled entities. The Voluntary

20    Debtors incurred these debts, and Projects were improved by the services and materials provided

21    by the various vendors, in reliance on this promise. Now, Lehman ALI seeks to foreclose upon the

22    Projects and to retain the benefits of the work and services provided to the Projects, without

23    paying for the same. A constructive trust should be imposed upon the proceeds generated from the

24    sale of the Projects to the extent of the damages incurred by the relevant SunCal Debtors through

25    Lehman ALI's breach of its obligations under the terms of the Restructuring Agreement and the

26    Settlement Agreement.

27

28

-32-

*EXHIBIT 1*                                    Page 000050

**H.    The Imposition Of An Equitable Lien Is Justified – Against Lehman ALI Only.**

Equity permits imposition of an equitable lien where the claimant's expenditure has benefited another's property under circumstances entitling the claimant to restitution. *Jones v. Sacramento Sav. & Loan Ass'n*, 248 Cal. App. 2d 522, 530 (1967); *McColgan v. Bank of California Assn.*, 208 Cal. 329, 338 (1929); 4 Pomeroy's Equity Jurisprudence (5th ed.) § 1235, pp. 696—699; 3 Pomeroy's Equity Jurisprudence (5th ed.) s 390, p. 67. Such relief has been granted where a lender advances money which benefits the land of another in mistaken reliance upon an imperfect mortgage or lien upon that land. *Estate of Pitts*, 218 Cal. 184, 189 (1933); *Smith v. Anglo-California Trust Co.*, 205 Cal. 496, 502-504 (1928). It is particularly likely that an equitable lien will be recognized when "money has been borrowed or other obligation incurred on the faith of it." *Destro v. Stuhley,* 675 F.2d 1037, 1039 (9th Cir.1981).

In this case, Lehman ALI induced the SunCal Debtors to continue to incur debts in the form of vendor obligations for improvements to the Projects. The SunCal Debtors incurred these debts, and the Projects were improved thereby, in express reliance upon Lehman ALI's promises of payment. Thereafter, Lehman ALI's failed to honor these promises, which left the SunCal Debtors owing tens of millions to the unpaid vendors. Notwithstanding this conduct, Lehman ALI seeks to enforce the very contracts that it breached, by foreclosing on the improved Projects. This injustice should not be allowed to occur. The Court should impose an equitable lien on all of the Projects subject to Lehman ALI's liens that is senior to Lehman ALI's liens. This equitable lien will then secure the damages incurred through Lehman ALI's breach of the Restructuring Agreement and the Settlement Agreement.

**I.    LCPI's Automatic Stay Does Not Apply to an Objection to Claim.**

While the parties have previously litigated as to whether LCPI's automatic stay is applicable to the equitable subordination cause of action in the Lehman Adversary Action, it is well established in both the Ninth Circuit and Second Circuit that a creditor's stay is not applicable to a claim objection proceeding. Where there are two independent bankruptcy estates in which one estate asserts a claim against the other, an objection to claim does not violate the claimant's

-33-

*EXHIBIT 1*

1   automatic stay. See *In re Wheatfield Business Park*, 308 B.R. 463, 466 (9th Cir. BAP 2004); *In re*

2   *Financial News Network*, 158 B.R. 570 (S.D.N.Y. 1993); *In re Metiom*, 301 B.R. 634, 638-639

3   (Bankr.S.D.N.Y. 2003); *In re Meade*, 1999 WL 33496001, *1 (E.D.Pa. 1999).

4        In *Wheatfield Business Park*, 308 B.R. 463 (9th Cir. BAP 2004), the Bankruptcy

5   Appellate Panel held that the creditor's automatic stay did not apply to an objection to its claim,

6   as the creditor was effectively acting in the capacity of a plaintiff, to whom the stay does not

7   apply.  The subsequent BAP decision in *In re Palmdale Hills Property, LLC*, 423 B.R. 655, 665

8   (9th Cir.BAP 2009), cited the *Wheatfield Business Park* and *Financial News Network* decisions

9   with approval for the proposition that claim objections do not violate the stay of a debtor-

10  claimant.

11       The law in the Second Circuit is substantially identical.  In *In re Financial News Network*,

12  158 B.R. 570 (S.D.N.Y. 1993), a debtor (Kaypro) whose Chapter 11 case was pending in the

13  Southern District of California, filed a claim in Financial News Network's Chapter 11 case in the

14  Southern District of New York.  When Kaypro's claim was disallowed by the bankruptcy court in

15  New York, Kaypro appealed contending that this relief was barred by its automatic stay in

16  California. The District Court rejected this position, stating "both the language and purpose of

17  section 362 indicate that the automatic stay in effect in the Bankruptcy Court for the Southern

18  District of California did not preclude the New York Bankruptcy Court from sustaining [NY

19  debtor's] objection to [California debtor's] proof of claim filed in New York Bankruptcy Court."

20  *Financial News*, 158 B.R. at 573.  See also *Olick v. Parker & Parsley Petroleum Co.*, 145 F.3d

21  513, 516 (2d Cir. 1998); *Vasile v. Dean Witter Reynolds Inc.*, 20 F.Supp.2d 465, 499 (E.D.N.Y.

22  1998) ("the primary claims raised by [debtor] are claims asserted by, and not against, the debtor,

23  and are therefore not subject to the stay and can be immediately adjudicated."); *In re Bousa, Inc.*,

24  2005 WL 1176108, *4 (S.D.N.Y. 2005) ("To the extent that the debtor has itself brought the

25  claim, the automatic stay provision does not preclude adjudication.").

26       Further, it is well established in this Circuit that the automatic stay does not apply to the

27  assertion of recoupment.  See *Newbery Corp. v. Fireman's Fund Ins. Co.*, 95 F.3d 1392, 1400 (9th

28  Cir. 1996); *In re TLC Hospitals, Inc.*, 224 F.3d 1008, 1014 (9th Cir. 2000); *In re Palmdale Hills*

-34-

*EXHIBIT 1*

1  *Property, LLC*, 423 B.R. 655, 667 n.9 (9th Cir. BAP 2009) ("[Recoupment] is an equitable

2  common law doctrine to net out debts and allow the defendant to recoup payments made against

3  the claim and is not limited to pre-petition claims. It is not subject to the automatic stay."); *In re*

4  *Petersen*, 2010 WL 3842157, *13 (D.Ariz. 2010) ("because 'recoupment is neither a claim nor a

5  debt, it is unaffected by either the automatic stay or the debtor's discharge.'"); *In re McMahon*,

6  129 F.3d 93, 98 (2d Cir. 1997) ("a recoupment not subject to the automatic stay of 11 U.S.C.

7  § 362").

8       Here, the within Motion does not seek any affirmative recovery against LCPI. Rather,

9  SunCal Moving Parties are merely acting defensively to disallow the Lehman Claims.

10  Accordingly, LCPl's automatic stay is not applicable.

11       **J.    Any Party in Interest Has Standing to Object to Claims.**

12       As set forth above, SunCal Management is the moving party in this objection to claims in

13  the specified Trustee Debtors' cases in its capacity as a creditor and party in interest in such

14  Trustee Debtors' cases. Any party in interest has standing to objection to claims. 11 U.S.C.

15  §502(a) ("a claim…is deemed allowed, unless a party in interest…objects"). *See also* Advisory

16  Committee Notes to Bankruptcy Rule 3007 ("any party in interest may object to a claim").

17       The Ninth Circuit has similarly held that "any party in interest" can object to a claim

18  pursuant to Section 502(a):

19       Again, any party in interest can object. *See* 11 U.S.C. § 502(a). Although the
         trustee in Siegel's bankruptcy could have objected to Freddie Mac's proofs of
20       claim, Siegel could have objected as well. *See Lawrence v. Steinford Holding
         B.V. ( In re Dominelli)*, 820 F.2d 313, 316 (9th Cir.1987) (stating that under 11
21       U.S.C. § 502(a) a party in interest, including the trustee, can object to a proof of
         claim); *see also IRS v. Taylor (In re Taylor)*, 132 F.3d 256, 261 (5th Cir.1998)
22       ("Once a proof of claim is filed, the debt is considered allowed unless the debtor
         or another party in interest files an objection to the proof of claim."); *FDIC v.
23       Union Entities (In re Be-Mac Transp.)*, 83 F.3d 1020, 1025 (8th Cir.1996) ("In
         order to disallow the claim, the debtor or another party in interest must object
24       and request a determination of the lien's validity.")
25
     *Siegel v. Federal Home Loan Mortg. Corp.*, 143 F.3d 525, 531 (9th Cir. 1998). See also In re
26
     *Anderson*, 382 B.R. 496, 506 (Bankr.D.Or. 2008) ("To the extent [the plan] limits the parties who
27
     may file claims objections to the Debtors and the trustee, it is inappropriate as any party in interest
28
     has standing to object to claims. § 502(a)."); *In re QMect, Inc.*, 349 B.R. 620, 625 (Bankr.

1  N.D.Cal. 2006) ("A creditor or creditors' committee has standing independent of the trustee or

2  debtor-in-possession to object to another creditor's claim as long as it has something to gain if it

3  prevails.").

4  **IV.**

5  **CONCLUSION**

6      Pursuant to the terms of the Restructuring Agreement and the Settlement Agreement,

7  Lehman ALI, which is the parent entity of LCPI, Lehman ALI was bound to pay the "urgent

8  payables" and Management Fees, as well as to cause to closing transferring the Projects to new

9  Lehman entities (Venture Grantees), who would assume the unpaid vendor claims incurred at

10  Projects, assume the bond liabilities associated with that Project. Had Lehman ALI performed

11  these contractual obligations, the Relevant SunCal Debtors would have had little or no debt, and

12  the instant Chapter 11 cases would have been unnecessary. Lehman ALI did not comply with the

13  terms of this agreement. It did not pay the Urgent Payables or the bond obligations. Moreover,

14  three days before signing the Settlement Agreement, Lehman ALI, and its subsidiary, LCPI, sold

15  all of their right, title and interest in the Sold Loans to Fenway Capital. Yet, when the Lehman

16  Parties signed the Settlement Agreement, they represented that they still owned these loans. These

17  representations were false and this transfer rendered performance under the terms of the

18  Restructuring Agreement and the Settlement Agreement impossible.

19      The foregoing breaches caused the Relevant SunCal Debtors to suffer millions of dollars in

20  damages, which will need to be quantified through discovery. These damages can and should be

21  recouped from the secured portion of the Lehman Claims, and the Lehman Entities should be

22  denied the right to seek any relief on the basis of Lehman Claims until the Relevant SunCal

23  Debtors are made whole.

24  DATED: May 10, 2011          **WINTHROP COUCHOT
                PROFESSIONAL CORPORATION**

25            By:   _/s/ Paul J. Couchot_

26               Paul J. Couchot, Esq.
                   Sean Okeefe, Esq.

27               Peter Lianides, Esq.
                General Insolvency Counsel for Administratively

28            Consolidated Debtors-in-Possession

*[SIGNATURES CONTINUED ON NEXT PAGE]*

-36-

*EXHIBIT 1*

1

2

**RUS MILIBAND & SMITH P.C.**

3

4

By: _/s/ Ronald Rus_____

Ronald Rus, Esq.

Joel S. Miliband, Esq.

Cathrine Castaldi, Esq.

Attorneys for SunCal Management, LLC, and SCC
Acquisitions Inc.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-37-

*EXHIBIT 1*

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 660 Newport Center Drive, 4th Fl., Newport Beach, CA 92660.

A true and correct copy of the foregoing document described as: **NOTICE OF AMENDED MOTION AND AMENDED MOTION FOR ORDER DISALLOWING CERTAIN CLAIMS HELD BY LEHMAN ALI INC. AND LEHMAN COMMERCIAL PAPER INC.** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

I. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On May 10, 2011, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

☒  Service information continued on attached page

II. **SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served)**:**
On May 10, 2011, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☒  Service information continued on attached page

III. **SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on _____, 2011 I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| May 10, 2011 | Susan Connor | |
|---|---|---|
| Date | Type Name | Signature |

-38-

*EXHIBIT 1*

Page 000056

## NEF SERVICE LIST

- Selia M Acevedo    sacevedo@millerbarondess.com, mpritikin@millerbarondess.com
- Joseph M Adams    jadams@sycr.com
- Raymond H Aver    ray@averlaw.com
- James C Bastian    jbastian@shbllp.com
- Thomas Scott Belden    sbelden@kleinlaw.com, ccf@kleinlaw.com
- John A Boyd    fednotice@tclaw.net
- Mark Bradshaw    mbradshaw@shbllp.com
- Gustavo E Bravo    gbravo@smaha.com
- Jeffrey W Broker    jbroker@brokerlaw.biz
- Brendt C Butler    bbutler@mandersonllp.com
- Andrew W Caine    acaine@pszyjw.com
- Carollynn Callari    ccallari@venable.com
- Cathrine M Castaldi    ccastaldi@rusmiliband.com
- Tara Castro Narayanan    tara.narayanan@msrlegal.com, lisa.king@msrlegal.com
- Dan E Chambers    dchambers@jmbm.com
- Shirley Cho    scho@pszjlaw.com
- Vonn Christenson    vrc@paynefears.com
- Brendan P Collins    bpcollins@bhfs.com
- Vincent M Coscino    vcoscino@allenmatkins.com, emurdoch@allenmatkins.com
- Paul J Couchot    pcouchot@winthropcouchot.com, pj@winthropcouchot.com;sconnor@winthropcouchot.com
- Jonathan S Dabbieri    dabbieri@sullivan.com, hill@sullivanhill.com;mcallister@sullivanhill.com;stein@sullivanhill.com;vidovich@sullivanhill.com
- Ana Damonte    ana.damonte@pillsburylaw.com
- Vanessa S Davila    vsd@amclaw.com
- Melissa Davis    mdavis@shbllp.com
- Daniel Denny    ddenny@gibsondunn.com
- Caroline Djang    crd@jmbm.com
- Donald T Dunning    ddunning@dunningLaw.com
- Joseph A Eisenberg    jae@jmbm.com
- Lei Lei Wang Ekvall    lekvall@wgllp.com
- Richard W Esterkin    resterkin@morganlewis.com
- Marc C Forsythe    kmurphy@goeforlaw.com
- Alan J Friedman    afriedman@irell.com
- Steven M Garber    steve@smgarberlaw.com
- Christian J Gascou    cgascou@gascouhopkins.com
- Barry S Glaser    bglaser@swjlaw.com
- Robert P Goe    kmurphy@goeforlaw.com, rgoe@goeforlaw.com;mforsythe@goeforlaw.com
- Eric D Goldberg    egoldberg@stutman.com
- Richard H Golubow    rgolubow@winthropcouchot.com, pj@winthropcouchot.com
- Michael J Gomez    mgomez@frandzel.com, efiling@frandzel.com;sking@frandzel.com
- Kelly C Griffith    bkemail@harrisbeach.com
- Matthew Grimshaw    mgrimshaw@rutan.com
- Kavita Gupta    kgupta@winthropcouchot.com
- Asa S Hami    ahami@morganlewis.com
- Michael J Hauser    michael.hauser@usdoj.gov
- D Edward Hays    ehays@marshackhays.com
- Michael C Heinrichs    mheinrichs@omm.com
- Harry D. Hochman    hhochman@pszjlaw.com, hhochman@pszjlaw.com
- Jonathan M Hoff    jonathan.hoff@cwt.com
- Nancy Hotchkiss    nhotchkiss@trainorfairbrook.com
- Michelle Hribar    mhribar@rutan.com
- John J Immordino    john.immordino@wilsonelser.com, raquel.burgess@wilsonelser.com
- Lawrence A Jacobson    laj@cohenandjacobson.com

*EXHIBIT 1*

|   |   |
|---|---|
| 1 | • Michael J Joyce   mjoyce@crosslaw.com |
|   | • Stephen M Judson   sjudson@fablaw.com |
| 2 | • Kaleb L Judy   ecf@kleinlaw.com, kjudy@kleinlaw.com |
|   | • Steven J Kahn   skahn@pszyjw.com |
| 3 | • Sheri Kanesaka   sheri.kanesaka@bryancave.com |
|   | • David I Katzen   katzen@ksfirm.com |
| 4 | • Christopher W Keegan   ckeegan@kirkland.com, gdupre@kirkland.com;alevin@kirkland.com |
|   | • Payam Khodadadi   pkhodadadi@winthropcouchot.com, pj@winthropcouchot.com |
| 5 | • Irene L Kiet   ikiet@hkclaw.com |
|   | • Claude F Kolm   claude.kolm@acgov.org |
| 6 | • Mark J Krone   mk@amclaw.com, crs@amclaw.com;amc@amclaw.com |
|   | • David B Lally   davidlallylaw@gmail.com |
| 7 | • Leib M Lerner   leib.lerner@alston.com |
|   | • Peter W Lianides   plianides@winthropcouchot.com, pj@winthropcouchot.com |
| 8 | • Charles Liu   cliu@winthropcouchot.com |
|   | • Kerri A Lyman   klyman@irell.com |
| 9 | • Mariam S Marshall   mmarshall@marshallramoslaw.com |
|   | • Robert C Martinez   rmartinez@mclex.com |
| 10 | • Michael D May   mdmayesq@verizon.net |
|   | • Hutchison B Meltzer   hmeltzer@wgllp.com |
| 11 | • Krikor J Meshefejian   kjm@lnbrb.com |
|   | • Joel S. Miliband   jmiliband@rusmiliband.com |
| 12 | • James M Miller   jmiller@millerbarondess.com, vgunderson@millerbarondess.com |
|   | • Louis R Miller   smiller@millerbarondess.com |
| 13 | • Randall P Mroczynski   randym@cookseylaw.com |
|   | • Mike D Neue   mneue@thelobelfirm.com, jmattiace@thelobelfirm.com;pnelson@thelobelfirm.com |
| 14 | • Robert Nida   Rnida@castlelawoffice.com |
|   | • Henry H Oh   henry.oh@dlapiper.com, janet.curley@dlapiper.com |
| 15 | • Sean A Okeefe   sokeefe@okeefelc.com |
|   | • Robert B Orgel   rorgel@pszjlaw.com, rorgel@pszjlaw.com |
| 16 | • Malhar S Pagay   mpagay@pszjlaw.com, mpagay@pszjlaw.com |
|   | • Penelope Parmes   pparmes@rutan.com |
| 17 | • Ronald B Pierce   ronald.pierce@sdma.com |
|   | • Katherine C Piper   kpiper@steptoe.com |
| 18 | • Cassandra J Richey   cmartin@pprlaw.net |
|   | • Debra Riley   driley@allenmatkins.com |
| 19 | • James S Riley   tgarza@sierrafunds.com |
|   | • Todd C. Ringstad   becky@ringstadlaw.com |
| 20 | • R Grace Rodriguez   ecf@lorgr.com |
|   | • Martha E Romero   Romero@mromerolawfirm.com |
| 21 | • Ronald Rus   rrus@rusmiliband.com |
|   | • John P Schafer   jschafer@mandersonllp.com |
| 22 | • John E Schreiber   jschreiber@dl.com |
|   | • William D Schuster   bills@allieschuster.org |
| 23 | • Christopher P Simon   csimon@crosslaw.com |
|   | • Wendy W Smith   wendy@bindermalter.com |
| 24 | • Steven M Speier   Sspeier@Squarmilner.com, ca85@ecfcbis.com |
|   | • Steven M Speier (TR)   Sspeier@asrmanagement.com, ca85@ecfcbis.com |
| 25 | • Michael St James   ecf@stjames-law.com |
|   | • Michael K Sugar   msugar@irell.com |
| 26 | • Cathy Ta   cathy.ta@bbklaw.com, Arthur.Johnston@bbklaw.com;Kenneth.Burgess@bbklaw.com |
|   | • David A Tilem   davidtilem@tilemlaw.com, |
| 27 |   malissamurguia@tilemlaw.com;dianachau@tilemlaw.com;kmishigian@tilemlaw.com |
|   | • James E Till   jtill@thelobelfirm.com, jmattiace@thelobelfirm.com;pnelson@thelobelfirm.com |
| 28 | • United States Trustee (SA)   ustpregion16.sa.ecf@usdoj.gov |
|   | • Carol G Unruh   cgunruh@sbcglobal.net |

-40-

*EXHIBIT 1*

1
- Annie Verdries    verdries@lbbslaw.com
- Jason Wallach    jwallach@gladstonemichel.com
2
- Joshua D Wayser    , kim.johnson@kattenlaw.com
- Christopher T Williams    ctwilliams@venable.com, jcontreras@venable.com
3
- Marc J Winthrop    mwinthrop@winthropcouchot.com, pj@winthropcouchot.com
- David M Wiseblood    dwiseblood@seyfarth.com
4
- Brett K Wiseman    bwiseman@aalaws.com
- Dean A Ziehl    dziehl@pszjlaw.com, dziehl@pszjlaw.com
5
- Marc A. Zimmerman    joshuasdaddy@att.net
-
6

### SERVICE VIA FIRST CLASS MAIL

7

| Bickford 16, SJDPartners23 Comm9, Tesoro7 | Heartland9, Marblehead21, PSV12 Acton6Emerald 7, SunValley17, PalmdaleHills65 SummitValley12, Northlake6, OakValley |
|---|---|
| Lehman Commercial Paper Inc. Lehman ALI, Inc. Attn: Gerald Pietroforte 1271 Sixth Ave., 46th Fl. New York, NY 10020 | Lehman ALI, Inc. OVC Holdings, LLC Northlake Holdings LLC Lehman Commercial Paper Inc. Attn: Jeff Fitts 1271 Sixth Ave., 46th Fl. New York, NY 10020 |
| All | |
| Weil, Gotshal & Manges LLP Attn: Shai Y. Waisman 767 Fifth Ave. New York, NY 10153 | |

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-41-

*EXHIBIT 1*

**EXHIBIT "2"**

1   PAUL J. COUCHOT -- State Bar No. 131934
    SEAN A. O'KEEFE -- State Bar No. 122417
2   PETER W. LIANIDES – State Bar No. 160517
    **WINTHROP COUCHOT**
3   **PROFESSIONAL CORPORATION**
    660 Newport Center Drive, Fourth Floor
4   Newport Beach, CA 92660
    Telephone: (949) 720-4100
5   Facsimile: (949) 720-4111
    General Insolvency Counsel for Administratively Consolidated
6   Debtors-in-Possession

7   RONALD RUS - State Bar No. 67369
    JOEL S. MILIBAND - State Bar No. 77438
8   **RUS MILIBAND & SMITH P.C.**
    2211 Michelson Drive, Seventh Floor
9   Irvine, California 92612
    Telephone: (949) 752-7100
10  Facsimile:  (949) 252-1514

11  Counsel for SunCal Management LLC and
    SCC Acquisitions Inc.

12          **UNITED STATES BANKRUPTCY COURT**
               **CENTRAL DISTRICT OF CALIFORNIA**
13                 **SANTA ANA DIVISION**

    In re
14
    PALMDALE HILLS PROPERTY, LLC, AND      Case No. 8:08-bk-17206-ES
15  ITS RELATED DEBTORS,                    Jointly Administered With Case Nos.
                                            8:08-17209-ES; 8:08-17240-ES; 8:08-17224-ES;
         Jointly Administered Debtors       8:08-17242-ES; 8:08-17225-ES; 8:08-17245-ES;
16       and Debtors-in-Possession          8:08-17227-ES; 8:08-17246-ES; 8:08-17230-ES;
                                            8:08-17231-ES; 8:08-17236-ES; 8:08-17248-ES;
17  ─────────────────────────────────      8:08-17249-ES; 8:08-17573-ES; 8:08-17574 ES;
    Affects:                                8:08-17575-ES; 8:08-17404-ES; 8:08-17407-ES;
18  ☐ All Debtors                           8:08-17408-ES; 8:08-17409-ES; 8:08-17458-ES;
    ☒ Palmdale Hills Property, LLC,         8:08-17465-ES; 8:08-17470-ES; 8:08-17472-ES; and
19  ☐ SunCal Beaumont Heights, LLC          8:08-17588-ES

20  ☐ SCC/Palmdale, LLC                     Chapter 11 Proceedings
    ☐ SunCal Johannson Ranch, LLC
21  ☒ SunCal Summit Valley, LLC             **DECLARATION OF BRUCE V. COOK IN**
                                            **SUPPORT OF MOTION FOR ORDER**
22  ☒ SunCal Emerald Meadows LLC            **DISALLOWING  CERTAIN CLAIMS FILED**
    ☒ SunCal Bickford Ranch, LLC            **BY LEHMAN ALI INC. AND LEHMAN**
23  ☒ Acton Estates, LLC ·                  **COMMERCIAL PAPER INC.**
    ☐ Seven Brothers LLC
24                                          DATE:     June 9, 2011
    ☒ SJD Partners, Ltd.                    TIME:     10:30 a.m.
25  ☐ SJD Development Corp.                   PLACE: Courtroom 5A
    ☐ Kirby Estates, LLC
26  ☐ SunCal Communities I, LLC
    ☐ SunCal Communities III, LLC
27
28       ***Caption Continued on Next Page***

                              –1–

                      ***EXHIBIT 2***

1
2
3
4
5
6
7
8
9

*Continued from Previous Page*
☒ SCC Communities LLC
☐ North Orange Del Rio Land, LLC
☒ Tesoro SF, LLC
☒ LBL-SunCal Oak Valley, LLC
☒ SunCal Heartland, LLC
☒ LBL-SunCal Northlake, LLC
☒ SunCal Marblehead, LLC
☐ SunCal Century City, LLC
☒ SunCal PSV, LLC
☐ Delta Coves Venture, LLC
☐ SunCal Torrance, LLC
☐ SunCal Oak Knoll, LLC

10    I, Bruce V. Cook, hereby declare and state as follows:

11    1.    I submit this declaration in support of the MOTION FOR ORDER DISALLOWING

12 CERTAIN CLAIMS FILED BY LEHMAN ALI INC. AND LEHMAN COMMERCIAL PAPER

13 INC. (the "Motion"). Unless stated otherwise, the terms used herein are as defined in the Motion. I

14 have personal knowledge of the following facts and, if called as a witness, I could and would

15 competently testify thereto.

16    2.    I am the General Counsel for SunCal Management, LLC ("SunCal Management")

17 and SCC Acquisitions, Inc. ("SCC"). SCC is either a direct or indirect equity holder of the nine

18 Trustee Debtors.[1] I am and have been the General Counsel for the seventeen Voluntary Debtors[2],

19 in most cases since the formation of such entities. The thirteen (13) above identified debtors

20

21 [1]    They are: LB/L-SunCal Oak Valley LLC ("Oak Valley"), LB/L-SunCal Northlake LLC
("Northlake"), SunCal Heartland LLC ("Heartland"), SunCal Marblehead LLC ("SunCal
22 Marblehead"), SunCal Century City LLC ("Century City"), SunCal PSV LLC ("PSV"), Delta Coves
Venture LLC ("Delta Coves"), SunCal Torrance LLC ("Torrance"), and SunCal Oak Knoll LLC
23 ("Oak Knoll").
[2]    They are: Acton Estates LLC ("Acton"), SunCal Beaumont Heights, LLC ("Beaumont"), SunCal
24 Bickford Ranch LLC ("Bickford"), SunCal Emerald Meadows LLC ("Emerald Meadows"), SunCal
25 Johannson Ranch, LLC ("Johannson"), SCC Palmdale LLC ("SCC Palmdale"), Palmdale Hills
Property LLC ("Palmdale Hills"), SJD Partners, Ltd. ("SJD Partners"), SJD Development Corp.
26 ("SJD Development"), SunCal Summit Valley LLC ("Summit Valley"), Seven Brothers LLC
("Seven Brothers"), Kirby Estates, LLC ("Kirby"), SCC Communities LLC ("SCC Communities"),
27 SunCal Communities I LLC ("SunCal I"), SunCal Communities III LLC ("SunCal III"), North
28 Orange Del Rio Land LLC ("Del Rio"), and Tesoro SF LLC ("Tesoro").
    The Trustee Debtors and Voluntary Debtors are referred to collectively herein as the "Debtors."

-2-

***EXHIBIT 2***

Page 000062

1   relevant to the Motion, i.e., Palmdale Hills, Summit Valley, Emerald Meadows, Bickford, Acton,

2   SJD Partners, SCC Communities, Tesoro, Oak Valley, Northlake, Heartland, Marblehead and PSV

3   are referred to herein as the "Relevant SunCal Debtors".

4       3.   I have knowledge of the Debtors' books and records, and I am familiar with the

5   Debtors' projects and their operational affairs.  As to the following facts, I know them to be true of

6   my own knowledge, and, if called as a witness, I could and would competently testify thereto; or I

7   have gained such knowledge from the business records of the Debtors which were made at or near

8   the time of the acts, conditions or events to which they relate.  Any such document or record was

9   prepared in the ordinary course of business by a person who had personal knowledge of the event

10  being recorded and had a business duty to accurately record such event.

11      4.   The Debtors are part of an integrated network of companies that operate under the

12  common dba "the SunCal Companies" or "SunCal."  SunCal is a family-owned business; SunCal

13  and its related parties and affiliates have been in the land development business for over seventy

14  years.  The Debtors were formed as part of a joint venture to develop a series of residential real

15  estate Projects with the Global Real Estate Group within Lehman Brothers Holdings, Inc. ("LBHI"),

16  through various affiliates that it wholly-owned and/or controlled (collectively, "Lehman").  These

17  entities included Lehman ALI, Inc. ("Lehman ALI") (and eventually, its apparent successors, OVC

18  Holdings, LLC ("OVC") and Northlake Holdings LLC ("Northlake Holdings") and Lehman

19  Commercial Paper, Inc. ("LCPI"), as well as the "Lehman Equity Members" described below.

20  **Lehman Entities' Representations**

21      5.   Frank Gilhool ("Gilhool") was, at least prior to late 2008, a Managing Director of

22  Global Real Estate at Lehman.  I understood based on his representations and conduct that he had

23  authority to act and make representations on behalf of both Lehman ALI, in its capacity as lender to

24  the nine Trustee Debtors and SunCal Bickford, SJD Partners, SJD Development, SunCal Del Rio,

25  SCC Communities, and SunCal Tesoro; and LCPI, in its capacity as the lender to SunCal Bickford

26  and the remaining Voluntary Debtors.

27      6.   In numerous telephone conversations between Gilhool and myself in 2007 and 2008,

28  Gilhool assured me that Lehman ALI and LCPI were committed to funding debts and obligations of

−3−

***EXHIBIT 2***

1  the Projects and the work they directed to be performed; that funding would be forthcoming; and that

2  SunCal and the Relevant SunCal Debtors should continue to have contractors undertake work to

3  develop, maintain and preserve the value in the Projects.

4       7.    In reliance on these representations, SunCal and the Relevant SunCal Debtors

5  continued to move forward with the Projects and incurred substantial expenses in hiring contractors

6  to maintain and/or develop them and to deal with public health and safety issues and value

7  preservation.

8       8.    Substantially all of the unsecured creditor claims and mechanic's lien claims that

9  have been filed against each of the Debtors' estates are obligations that Lehman ALI or LCPI

10  authorized the Debtors to incur and promised to provide funding for and/or promised to assume.  A

11  list of the unsecured creditors that have filed proofs of claims against each of the Debtors, and the

12  amounts of their claims, is included in Exhibit 19 hereto.  A list of mechanic lien claims filed against

13  each of the Debtors, and the amounts of their claims, is included in Exhibit 20 attached hereto.

14  **Lehman Entities' Control and Exercise Thereof**

15       9.    Prior to the market downturn, Lehman afforded its partner SunCal substantial

16  discretion to use its expertise to manage development of the Projects.  However, beginning in or

17  about 2007, Lehman ALI and LCPI became much more "hands on" in scrutinizing—and

18  approving—budgets and expenses.  Lehman ALI and LCPI had not only input on, but importantly,

19  veto power over budgets delineating expenditures undertaken on the Projects.

20       10.    Lehman ALI and LCPI used their control to impose onerous financing terms that did

21  not benefit the Relevant SunCal Debtors.

22       11.    For example, when SunCal initially approached Lehman ALI and LCPI about the

23  Projects' financial difficulties, I was made aware that they assured SunCal of immediate financing to

24  cover operating expenses, starting out at the $20 to $25 million range per month, and increasing

25  from there.  However, only one such loan of $20 million (the October 2007 Interim Loan from

26  Lehman ALI) was made, as what was supposed to be "quick" financing got bogged down in Lehman

27  ALI's extensive documentation.

28

–4–

*EXHIBIT 2*

12.     Moreover, Lehman ALI insisted that SunCal put up security, previously unencumbered, to secure that financing, although that was not originally contemplated. In that connection, SunCal put up the interests of SunCal Del Rio, SCC Communities, and SunCal Tesoro in the Del Rio, Joshua Ridge and Tesoro Projects, respectively, as security for the Interim Loan.

13.     In addition, at the last minute, Lehman ALI decided to specify exactly what the $20 million could be used for, whereas all the way through the discussions, the money was simply to assist SunCal in meeting its operating expenses, as SunCal determined. Ultimately, Lehman ALI kept the funds and only disbursed them after it had approved the disbursements, most of which went to pay expenses of the Ritter Ranch Project, not any of SunCal Del Rio's, SCC Communities', or SunCal Tesoro's encumbered Projects.

14.     SunCal and the Relevant SunCal Debtors continued to work with the contractors in connection with the development, maintenance and preservation of the Projects in reliance on a promised overall "work out" or restructuring of the Projects and of the Loans and/or liens held by Lehman ALI and LCPI, as well as an assumption of SCC's and Elieff's indemnity liability on surety bonds covering work that had been done and was being done on the Projects.

15.     It was contemplated as of the October 2007 Interim Loan that a restructuring agreement would be entered into shortly, by no later than January or February of 2008. However, implementation was again dragged out due in large part to Lehman's extensive documentation.

16.     In the meantime, until a restructuring agreement was entered into, Lehman ALI and LCPI stopped paying vendor payables, nor would they pay any management fees of SunCal Management LLC, which was managing and continued to manage each of the Relevant SunCal Debtors' Projects.

17.     As the restructuring was pushed further and further out and Lehman ALI and LCPI continued to refuse to provide funding—despite their prior assurances—SunCal was effectively drained of liquidity, and so the Relevant SunCal Debtors became even more desperate and more dependent on Lehman ALI and LCPI financing.

18.     Lehman ALI and LCPI used the Relevant SunCal Debtors' vulnerability to their advantage in negotiating a restructuring agreement that was tipped heavily in Lehman's favor.

−5−

***EXHIBIT 2***

1      19.     For example, Lehman had indicated that it was open to suggestions from SunCal
2  regarding the terms of a restructuring agreement. SunCal proposed that, particularly given the long
3  and profitable history of the parties' venture together, the restructuring should take into account a
4  reasonable view of the values of the properties, so that Lehman ALI and LCPI would at least in part
5  share the burden of the market downturn.

6      20.     In response, Lehman became irate and countered with what was essentially a take-it-
7  or-leave-it offer. Under the counter-proposal, (1) Lehman ALI and LCPI would be paid in full for
8  every dollar that they had invested with SunCal that had not been returned, including interest on
9  those amounts, default interest, and penalty fees; (2) Lehman would recoup all money that it had put
10  in as equity in certain projects; and (3) Lehman would receive a 15% return on all funds contributed
11  (both debt and equity) until they were returned—all without regard to the value of the properties.
12  For the most part, this is how the restructuring agreement was ultimately structured.

13      21.     Similarly, when the restructuring agreement was finally entered into in late May
14  2008, SunCal sought to have its management fees reimbursed as of February 1, 2008, the date by
15  which the restructuring agreement should have and would have been entered into but for Lehman's
16  delays. Lehman ALI and LCPI refused, and in fact insisted upon a waiver of all past management
17  fees, with only management fees from May 15, 2008 onward being payable, at reduced rates.

18      22.     Lehman ALI and LCPI also required that SunCal pledge $33 million of its equity
19  interest in the four Lehman SunCal Fund projects (Century City, Del Amo, Oak Knoll and PSV) as
20  partial consideration for Lehman ALI and LCPI's satisfaction of existing debt on the other Projects
21  subject to the restructuring agreement. SunCal did not believe these Projects (and PSV in particular)
22  should have to be included as collateral to secure the restructuring of the other Projects. Instead,
23  SunCal felt that LBREP II/SCLFM, the Lehman equity member in the Lehman SunCal Fund, should
24  cover the Fund Projects' expenses, as there was plenty of capital yet to be called to fund the existing
25  debts and other needs of these Projects, per the terms of the Fund's Operating Agreement. (Lehman
26  had committed to contributing up to $600 million in equity through the Fund, but had contributed
27  only a fraction of that amount.) But Lehman ALI and LCPI insisted, and SunCal had no choice but
28  to acquiesce.

-6-

*EXHIBIT 2*

1    **The Parties' Restructuring Agreement**

2         23.     Finally, on May 23, 2008, SunCal and certain of the Relevant SunCal Debtors entered

3    into an omnibus "Restructuring Agreement" with LBHI, Lehman ALI and other Lehman-controlled

4    entities. (LCPI, for reasons known to Lehman ALI and LCPI, was not a signatory to the

5    Restructuring Agreement, although it was a signatory to the subsequent "Settlement Agreement"

6    signed in August 2008.) Lehman's Gilhool signed the Restructuring Agreement on behalf of each of

7    these entities. A true and correct copy of the May 23, 2008 Restructuring Agreement (without its

8    exhibits, which are voluminous) is attached here to as Exhibit 1, and incorporated herein by this

9    reference.

10        24.     The Restructuring Agreement was designed to culminate in a closing ("Closing")

11   with the parties entering into a Settlement Agreement, the form of which was attached to the

12   Restructuring Agreement. Under the Settlement Agreement, new Lehman-controlled entities

13   (referred to as the "Venture Grantees" each with "SCLV" in its name, for "SunCal-Lehman

14   Venture") would take title to the properties, assume the Relevant SunCal Debtors' debt obligations

15   to Lehman ALI and LCPI and assume bond obligations and other accounts payable owed by the

16   Relevant SunCal Debtors, and with respect to which bond obligations SunCal and Elieff had signed

17   indemnifications. These SCLV entities—along with what was purported by Lehman ALI and LCPI

18   to be a substantial-net-worth Lehman-related entity—were also to provide indemnifications to

19   SunCal and the Relevant SunCal Debtors with respect to existing accounts payable, including bond

20   obligations. The Settlement Agreement was signed by the SunCal and Lehman parties on August

21   25, 2008. But as explained below, the Lehman parties did not close.

22        25.     As originally executed in May 2008, the Restructuring Agreement applied to twelve

23   Projects relevant herein (as well as several other projects not at issue in these bankruptcies):

24   (1) Acton Estates; (2) Beaumont Heights; (3) Bickford Ranch; (4) Emerald Meadows; (5) Heartland;

25   (6) Johannson Ranch; (7) Marblehead; (8) Northlake; (9) Oak Valley; (10) Pacific Point; (11) Ritter

26

27

28

–7–

**EXHIBIT 2**