1  Richard M. Pachulski (CA Bar No. 90073)
   Dean A. Ziehl (CA Bar No. 84529)
2  Robert B. Orgel (CA Bar No. 101875)
   John W. Lucas (CA Bar No. 271038)
3  PACHULSKI STANG ZIEHL & JONES LLP
   10100 Santa Monica Boulevard, 13th Floor
4  Los Angeles, California 90067
   Telephone: (310) 277-6910 / Facsimile: (310) 201-0760
5
   Edward Soto (admitted *pro hac vice*)
6  Alfredo R. Perez (admitted *pro hac vice*)
   WEIL, GOTSHAL & MANGES LLP
7  1395 Brickell Avenue
   Suite 1200
8  Miami, Florida 33131
   Telephone: (305) 577-3100 / Facsimile: (305) 374-7159
9
   Attorneys for Lehman ALI, Inc., Lehman Commercial Paper Inc.,
   Northlake Holdings, LLC and OVC Holdings, LLC

10           UNITED STATES BANKRUPTCY COURT
             CENTRAL DISTRICT OF CALIFORNIA
11                 SANTA ANA DIVISION

12 In re:                                          Case No.: 8:08-bk-17206-ES
   Palmdale Hills Property, LLC, and Its Related Debtors,   Jointly Administered With Case Nos.
13           Jointly Administered Debtors and Debtors-      8:08-bk-17209-ES; 8:08-bk-17240-ES;
             In-Possession.                                 8:08-bk-17224-ES; 8:08-bk-17242-ES;
14 _____         8:08-bk-17225-ES; 8:08-bk-17245-ES;
   Affects:                                          8:08-bk-17227-ES; 8:08-bk-17246-ES;
15 ☐ All Debtors                                     8:08-bk-17230-ES; 8:08-bk-17231-ES;
   ☒ Palmdale Hills Property, LLC                    8:08-bk-17236-ES; 8:08-bk-17248-ES;
16 ☒ SunCal Beaumont Heights, LLC                    8:08-bk-17249-ES; 8:08-bk-17573-ES;
   ☐ SCC/Palmdale, LLC                               8:08-bk-17574-ES; 8:08-bk-17575-ES;
17 ☒ SunCal Johannson Ranch, LLC                     8:08-bk-17404-ES; 8:08-bk-17407-ES;
   ☐ SunCal Summit Valley, LLC                       8:08-bk-17408-ES; 8:08-bk-17409-ES;
18 ☒ SunCal Emerald Meadows, LLC                     8:08-bk-17458-ES; 8:08-bk-17465-ES;
   ☒ SunCal Bickford Ranch, LLC                      8:08-bk-17470-ES; 8:08-bk-17472-ES;
19 ☒ Acton Estates, LLC                              and 8:08-bk-17588-ES
   ☐ Seven Brothers, LLC
20 ☒ SJD Partners, Ltd.                              Chapter 11
   ☒ SJD Development Corp.
21 ☒ Kirby Estates, LLC                              OBJECTION OF THE LEHMAN CREDITORS
   ☐ SunCal Communities I, LLC                       TO THE CONFIRMATION OF THE SEVEN
22 ☐ SunCal Communities III, LLC                     PROPOSED SUNCAL PLANS FILED BY THE
   ☒ SCC Communities, LLC                            SUNCAL PLAN PROPONENTS
23 ☒ North Orange Del Rio Land, LLC
   ☒ Tesoro SF, LLC                                  **Confirmation Hearing**:
24 ☒ LB-L-SunCal Oak Valley, LLC                     Date:  October 24, 2011
   ☒ SunCal Heartland, LLC                           Time:  9:30 a.m.
25 ☐ LB-L-SunCal Northlake, LLC                      Place: Courtroom 5A
   ☒ SunCal Marblehead, LLC
26 ☒ SunCal Century City, LLC
   ☒ SunCal PSV, LLC
27 ☒ Delta Coves Venture, LLC
   ☒ SunCal Torrance, LLC
28 ☒ SunCal Oak Knoll, LLC

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

DOCS_LA:244816.4 52063-001

# TABLE OF CONTENTS

**Page**

I. PRELIMINARY STATEMENT ....................................................................................... 2

II. STATEMENT OF RELEVANT FACTS .................................................................. 4

III. DISCUSSION ........................................................................................................... 6

    A.    The SunCal Plans Fail to Provide the Lehman Creditors with Required Credit Bid Rights or Even with the Indubitable Equivalent of Their Claims ..................... 6

        1.    The Proposed Sales and Bidding Procedures Applicable to Five of the SunCal Plans Do Not Comply With the Bankruptcy Code and Are Not Designed to Ensure the Lehman Creditors Receive the Indubitable Equivalent of Their Claims ...................................................................... 8

            a.    The Break-Up Fees Chill the Bidding Process and Are Designed to Shift the Burden of Funding Administrative Claims Away from the SunCal Plan Proponents to a Surcharge of the Lehman Creditors' Collateral ................................................................................ 9

            b.    The SunCal Plan Proponents' Marketing Process Will Not Yield the Greatest Value ........................................................................ 12

            c.    Inadequate Disclosure of the Bid Procedures Renders the SunCal Plans Unconfirmable .......................................................... 15

        2.    Prohibiting Credit Bidding Is Contrary to the Express Provisions of the Bankruptcy Code and Deprives the Lehman Creditors of the Indubitable Equivalent of their Claims .......................................................... 16

        3.    By Defining Net Sales Proceeds to Allow Use of Sale Proceeds to Pay Expenses Not Reasonably Required for Project Sales, the SunCal Plans Impermissibly Surcharge the Lehman Creditors' Secured Claims and Collateral and Deny them Indubitable Equivalent ......................... 21

        4.    The SunCal Plans' Failure to Provide that the Projects will be Maintained and Taxes Paid after Confirmation and Pending Sale or Abandonment Is a Denial of Adequate Protection and Deprives the Lehman Creditors of the Indubitable Equivalent of their Claims .......................................... 23

    B.    The SunCal Plans' Treatment of Reliance Claims Violates the Same Treatment Requirement of 11 U.S.C. § 1123(a)(4) ..................................................... 23

    C.    Holders of Real Property Tax Claims Are Classified and Deemed Impaired in Violation of 11 U.S.C. § 1123(a)(1) .......................................................... 24

    D.    Assumption of Contracts or Leases ................................................................ 25

    E.    The Treatment of the Class of Contingent Bond Indemnification Claims Is Impermissible, Unfairly Discriminatory and/or Exceeds the Court's Jurisdiction ...................................................................................................... 25

    F.    The SunCal Plans Are Not Feasible ............................................................... 26

        1.    The SunCal Plans Are Not Feasible Because The SunCal Plan Proponents Do Not Have The Necessary Funds To Pay Administrative Claims Or Other Allowed Claims ................................................................... 27

            a.    LitCo is a Shell that Lacks the Financial Wherewithal to Fund Distributions Under the SunCal Plans ............................................. 27

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

i

|  |  | b. | Prevailing in the Claim Objection Will Not Provide the Funds Necessary to Pay Administrative Claims and Other Distributions Under the SunCal Plans | 28 |
|  |  | c. | Speculative Litigation Prospects is No Substitute for Adequate Protection | 29 |
|  | 2. | | The SunCal Plans are Not Feasible Because Marketing and Securing Project Bids Has Not Yet Occurred. | 30 |
|  | 3. | | The SunCal Plans are Not Feasible and are Proposed in Bad Faith Because They Fail To Fund the Continuing Creditors' Committees | 30 |
|  | 4. | | The VD Group I SunCal Plan Is not Feasible Because it Lacks a Disputed Claim Reserve | 30 |
|  | 5. | | The VD Group I Plan is not confirmable as to SunCal Emerald Meadows Because the Failure to Address the $6 Million Lien of ECCU Precludes Feasibility | 31 |
| G. | | | The SunCal Plans Violate the Absolute Priority Rule and Reflect a Lack of Good Faith With Respect to the Benefits Afforded Equity | 31 |
| H. | | | Having Acquisitions As Plan Trustee Represents a Conflict Of Interest That Prevents Confirmation Of The SunCal Plans | 33 |
| I. | | | The VD Group IV SunCal Plan Is Unconfirmable | 34 |
|  | 1. | | The Plan Itself Impermissibly Disallows the Claims of the Lehman Creditors | 34 |
|  | 2. | | The Plan Unfairly Discriminates in Favor of the Class of Reliance Claims | 35 |
|  | 3. | | The Plan Fails to Include Safeguards Assuring a Project Sale that would Afford the Lehman Creditors at least as much as in a Chapter 7 Case or the Indubitable Equivalent of Its Claims | 36 |
| J. | | | The Lehman Creditors Reserve the Right to Designate Votes | 36 |
| K. | | | Reservation of Rights | 36 |
| IV. CONCLUSION | | | | 37 |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

ii

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Aetna Realty Inv., Inc. v. Monarch Beach Venture, Ltd.*
   *(In re Monarch Beach Venture, Ltd.),*
   166 B.R. 428 (C.D. Cal. 1993) .................................................................. 17

*Bank of New York Trust Co., et al. v. Official Unsecured Creditors' Committee, et al.*
   *(In re The Pacific Lumber Co., et al.),*
   584 F.3d 229 (5th Cir. 2009) .................................................................. 18

*Bank of Nova Scotia v. St. Croix Hotel Corp.*
   *(In re St. Croix Hotel Corp.),*
   44 B.R. 277 (D.V.I. 1984) ...................................................................... 20

*Bonner Mall P'ship v. U.S. Bancorp Mortgage Co.*
   *(In re Bonner Mall P'ship),*
   2 F.3d 899 (9th Cir. 1993) ...................................................................... 32

*Brutoco Eng'g & Constr. Co. v. Dennis Ponte, Inc.*
   *(In re Dennis Ponte, Inc.),*
   61 B.R. 296 (9th Cir. B.A.P. 1986) ....................................................... 26

*Calpine Corp. v. O'Brien Env't Energy, Inc.*
   *(In re O'Brien Env't Energy, Inc.),*
   181 F.3d 527 (3d Cir. 1999) ................................................................... 11

*Cohen v. KB Mezzanine Fund II, LP*
   *(In re SubMicron Systems Corp.),*
   432 F.3d 448 (3d Cir. 2006) ................................................................... 19

*Dewsnup v. Timm,*
   502 U.S. 410 (1992).................................................................................. 35

*Gey Assocs. G.P. v. 310 Assocs., L.P.,*
   2002 WL 31426344 (S.D.N.Y. Oct. 29, 2002) .................................... 11

*Great Western Bank v. Sierra Woods Group,*
   953 F.2d 1174 (9th Cir. 1992) ................................................................ 23

*In re 4 C Solutions, Inc.,*
   302 B.R. 592 (Bankr. C.D. Ill. 2003)..................................................... 31

*In re Adelphia Communications Corp.,*
   361 B.R. 337 (S.D.N.Y. 2007)................................................................ 24

*In re America West Airlines, Inc.,*
   166 B.R. 908 (Bankr. D. Ariz. 1994)...................................................... 10

*In re American Appliance,*
   272 B.R. 587 (Bankr. D. N.J. 2002) ...................................................... 11

*In re Brotby,*
   303 B.R. 177 (9th Cir. B.A.P. 2003) ..................................................... 24

*In re Cascade Hydraulics and Utility Service, Inc.,*
   815 F.2d 546 (9th Cir. 1987) ................................................................. 21

*In re Commercial Western Finance Corp.,*
   761 F.2d 1329 (9th Cir. 1985). .............................................................. 35

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

i

*In re Compton Impressions, Ltd.*,
217 F.3d 1256 (9th Cir. 2000) .................................................................. 21

*In re Drexel Burnham Lambert Group, Inc.*,
113 B.R. 830 (Bankr. S.D.N.Y. 1990) ..................................................... 28

*In re EQK Bridgeview Plaza, Inc.*,
2011 WL 2458068 (Bankr. N.D. Tex. June 16, 2011) ......................... 24

*In re Freymiller Trucking, Inc.*,
190 B.R. 913 (Bankr. W.D. Okla. 1996) .................................................. 7

*In re Global Ocean Carriers, Ltd .*,
251 B.R. 31 (Bankr. D. Del. 2000) ........................................................... 32

*In re Golden Plan of California, Inc.*,
829 F.2d 705 (9th Cir. 1986) ..................................................................... 34

*In re Harbin*,
486 F.3d 510 (9th Cir. 2007) ..................................................................... 26

*In re Hupp Industries, Inc.*,
140 B.R. 191 (Bankr. N.D. Ohio 1992) .................................................. 10

*In re Integrated Resources, Inc.*,
147 B.R. 650 (S.D.N.Y. 1992) .................................................................. 11

*In re Kings Terrance Nursing Home and Health Related Facility*,
184 B.R. 200 (S.D.N.Y. 1995) .................................................................. 28

*In re Lionel Corp.*,
722 F.2d 1063 (2d Cir. 1983) ................................................................... 10

*In re Los Gatos Lodge Inc.*,
278 F.3d 890 (9th Cir. 2002) ..................................................................... 22

*In re Mesa Air Group, Inc.*,
2011 WL 182450 (Jan. 20, 2011) ............................................................ 25

*In re Miami General Hospital, Inc.*,
81 B.R. 682 (S.D. Fla. 1988) .................................................................... 20

*In re Murel Holdings Corp.*,
75 F.2d 941 (2d Cir. 1935) .......................................................................... 7

*In re Octagon Roofing*,
123 B.R. 583 (Bankr. N.D. Ill. 1991) ...................................................... 20

*In re Philadelphia Newspapers, LLC*,
599 F.3d 298 (3d Cir. 2010) ...................................................................... 17

*In Re River Road Hotel Partners, LLC*,
__ F.3d __, 2011 WL 2547615 (7th Cir. June 28, 2011) ................... 18

*In re Smith*,
123 B.R. 863 (Bankr. C.D. Cal. 1991) .................................................... 24

*In re South Canaan Cellular Investments, Inc.*,
427 B.R. 44 (Bankr. E.D. Pa. 2010) ....................................................... 30

*In re SunCruz Casinos, LLC*,
298 B.R. 833 (Bankr. S.D. Fla. 2003) ..................................................... 17

*John Hancock Mutual Life Insurance Co. v. California Hancock, Inc.*
*(In re California Hancock, Inc.)*,
88 B.R. 226 (B.A.P. 9th Cir. 1988) .......................................................... 17

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

ii

*Liberty Nat'l Enters. v. Ambanc La Mesa Ltd. P'ship*
   *(In re Ambanc La Mesa Ltd. P'ship),*
   115 F.3d 650 (9th Cir. 1997) ...................................................... 32

*Norwest Bank Worthington v. Ahlers,*
   485 U.S. 197 (1988) .................................................................... 32

*Pizza of Hawaii, Inc. v. Shakey's, Inc.*
   *(In re Pizza of Hawaii, Inc.),*
   761 F.2d 1374 (9th Cir. 1985) .................................................... 26

*Sheldon H. Solow, d/b/a Solow Building Company v. PPI Enterprises (U.S.), Inc., et al.*
   *(In re PPI Enterprises (U.S.), Inc.),*
   324 F.3d 197 (3d Cir. 2003) ...................................................... 24

*United States, on behalf of the United States Farmers Home Administration v. Arnold and Baker Farms*
   *(In re Arnold and Baker Farms),*
   85 F.3d 1415 (9th Cir. 1996) ...................................................... 7

**Statutes**

11 U.S.C. § 1123 ......................................................................... 24

11 U.S.C. § 1129 ............................................................... 7, 26, 33

11 U.S.C. § 506 ........................................................................... 21

**Rules**

LBR 6004-1 ................................................................................ 10

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

iii

Lehman Commercial Paper Inc. ("LCPI"), Lehman ALI, Inc. ("Lehman ALI"), Northlake

Holdings LLC ("Northlake"), and OVC Holdings LLC ("OVC") (collectively, the "Lehman

Creditors") hereby submit this objection to the confirmation of the following seven (7) proposed

plans (the "SunCal Plans") filed by the SunCal Plan Proponents:[1]

| **Full Plan Name** | **Docket No.** | **Short Plan Name Used Below** |
|---|---|---|
| The Third Amended Chapter 11 Plans Filed by SunCal Plan Proponents in the Chapter 11 Cases of SunCal Oak Valley, LLC, SunCal Heartland, LLC, Delta Coves Venture, LLC, SunCal Marblehead, LLC and SunCal PSV, LLC [Group I: Trustee Debtors] | 2488 | TD Group I SunCal Plan |
| The Third Amended Chapter 11 Plans Filed by SunCal Plan Proponents in the Chapter 11 Cases of SunCal Oak Knoll, LLC and SunCal Torrance, LLC [Group II: Trustee Debtors] | 2489 | TD Group II SunCal Plan |
| The Third Amended Chapter 11 Plan Filed by SunCal Plan Proponents in the Chapter 11 Case of SunCal Century City, LLC [Docket No.] (the ""). | 2490 | CC SunCal Plan |
| The Third Amended Chapter 11 Plans Filed by Palmdale Hills Property, LLC, SunCal Bickford Ranch, LLC, SunCal Emerald Meadows, LLC and Acton Estates, LLC [Group I: Voluntary Debtors] | 2484 | VD Group I SunCal Plan |
| The Third Amended Chapter 11 Plans Filed by SunCal Plan Proponents in the Chapter 11 Cases of SunCal Beaumont Heights, LLC and SunCal Johannson Ranch, LLC [Group II: Voluntary Debtors] | 2485 | VD Group II SunCal Plan |
| The Third Amended Chapter 11 Plans Filed by SCC Communities, LLC, North Orange Del Rio Land, LLC and Tesoro SF, LLC [Group III: Voluntary Debtors] | 2486 | VD Group III SunCal Plan |
| The Fourth Amended Joint Chapter 11 Plan Filed by SJD Partners, Ltd. and SJD Development Corp. [Group IV: Voluntary Debtors] | 2555 | VD Group IV SunCal Plan |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

---

[1] Capitalized terms not defined herein shall have the meanings used in the SunCal Plans.

DOCS_LA:244816.4 52063-001

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

# I.

## **PRELIMINARY STATEMENT**

The SunCal Plans all are liquidation plans and espouse the laudable goal of maximizing distributions to creditors:

> The core objective of the Plan is to enable all creditors holding Allowed Claims to receive the highest dividend possible by selling the estates' primary assets . . . to the highest bidder.[2]

Yet, the SunCal Plans are replete with insidious provisions that preclude returns to the Lehman Creditor and other creditors of at least as much as they would receive in a chapter 7 case or, for the Lehman Creditors, deny them treatment that is fair and equitable and the indubitable equivalent of their secured claims and liens.  In addition, the SunCal Plans lack funding and contain a multitude other failings that require denial of confirmation.

Four of the seven SunCal Plans similarly provide for the sale of Projects against which the Lehman Creditors hold disputed liens and claims, which Lehman Creditor liens and claims are undisputedly claimed in amounts ($1.8 billion) far in excess of the collateral's value.[3]  These SunCal Plans, while all contemplating a truncated marketing period and including bid-chilling provisions, also would deny the Lehman Creditors the protection against low bidding afforded by credit bid rights and thereby fail to comply with either the requirements for credit bidding of sections 363(k) and 1129(b)(2)(A)(ii) of the Bankruptcy Code or, even if applicable, the indubitable equivalent requirements of section 1129(b)(2)(A)(iii) of the Bankruptcy Code.

Most egregiously, three of the SunCal Plans provide that Administrative Claims are payable from the sale proceeds, instead of requiring that all of the sale proceeds be escrowed pending resolution of the disputed claims and liens of the Lehman Creditors.[4]  This not only is an impermissible surcharge of the Lehman Creditors' collateral, inconsistent with section 506(c) of the Bankruptcy Code and, thus, section 1129(a)(1) of the Bankruptcy Code, but the mechanism used to

---

[2] *See* TD Group I SunCal Plan, § 7.2, p. 46; TD Group II SunCal Plan, § 7.2, p. 39; VD Group I SunCal Plan, § 7.2, p. 44; VD Group II SunCal Plan, § 7.2, p. 30; and VD Group III SunCal Plan, § 7.2, p. 35.

[3] TD Group I SunCal Plan, TD Group II SunCal Plan, VD Group I SunCal Plan, and VD Group III SunCal Plan.

[4] TD Group I SunCal § 2.1.43, TD Group I SunCal § 2.1.66, TD Group I SunCal § 2.1.93, TD Group II SunCal § 2.1.133, TD Group II SunCal § 2.1.96, TD Group I SunCal § 2.1.104, TD Group I SunCal § 2.1.109, VD Group I SunCal § 2.1.4, VD Group I SunCal § 2.1.22, VD Group I SunCal § 2.1.134, and VD Group I SunCal § 2.1.143.

2

1    accomplish this illegal surcharge - enabling the insiders to require any stalking horse bidder to

2    advance these sums prior to the Project sale – is a bid-chilling procedure that limits which bidders

3    would be interested in participating in the auction and thereby deprives any creditor who might

4    benefit from the estate achieving the highest and best price for the Project the opportunity to receive

5    under the SunCal Plans at least as much as it would were the sale conducted by a chapter 7 trustee.

6    These three SunCal Plans and the two other SunCal Plans[5] that also provide for Project sales include

7    other sale procedures that are unfair, improper, and improperly deprive the Lehman Creditors of

8    their rights.

9          For the CC SunCal Plan, problems include that the creditors do not fare as well as in a

10    chapter 7 case because, in a chapter 7 case, the fiduciary trustee objecting to the largest disputed

11    claims (held by the insiders) and pursuing preferences against them is free to make a cost-benefit

12    decision at any point as to how much to spend in prosecution of these claims whereas under the CC

13    SunCal Plan, the insiders are afforded the high litigation advantage of having capped the

14    expenditures possible in respect of the objections to claims and preference action against them.

15          For the VD Group IV SunCal Plan, confirmation is not possible because the Plan itself

16    impermissibly disallows the Lehman Creditors' claims (and those of Lehman Re), through a

17    proposed plan treatment provision and it unfairly discriminates in favor of Reliance Claims – who

18    receive a unique promise of an up to a 50% distribution – without affording anything more to

19    similarly situated creditors holding other general unsecured claims, including the unsecured

20    deficiency claims of the Lehman Creditors.

21          Further, as the Court is well aware, the SunCal Plan Proponents have yet to demonstrate to

22    anyone that they have the funding to make any of the SunCal Plans feasible.  While the key

23    objections to the SunCal Plans are highlighted and discussed below, a more exhaustive listing of the

24    numerous confirmation infirmities and errors in the SunCal Plans is set forth in the chart attached

25    hereto as **Exhibit A**.

26

27

28

---

[5] VD Group II SunCal Plan and VD Group III SunCal Plan.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

# II.

## STATEMENT OF RELEVANT FACTS

The Lehman Creditors are these estates' largest prepetition and postpetition creditors.  They hold prepetition claims aggregating approximately $1.8 billion without taking into consideration the guarantee claims (collectively, the "Lehman Loans") against most Debtors subject to the SunCal Plans, secured by liens against the Projects and Other Assets of most Debtors (collectively, the "Lehman Collateral").[6]  The Lehman Creditors also hold over $38 million in secured, superpriority administrative claims, primarily against the eight Trustee Debtors[7] other than SunCal Century City, based on postpetition financing loans that were approved by this Court and allowed.

After the commencement of these cases, the Voluntary Debtors[8] commenced a variety of actions and proceedings against the Lehman Creditors (collectively, the "SunCal/Lehman Litigation").[9]

The SunCal Plans are liquidation plans premised upon continuation of the SunCal/Lehman Litigation.  Under the SunCal Plans, Acquisitions, an indirect parent of each of the Debtors, whose principal is Bruce Elieff ("Elieff") (a) is the proposed Plan Trustee[10] with control over the SunCal Lehman Litigation,[11] (b) is the sole entity authorized to object to Claims and prosecute Claim objections, including against the Lehman Creditors (other than Claims held by Acquisitions and its

---

[6] As to the Debtors subject to the VD Group IV SunCal Plan, the Lehman Creditors' Claims are contingent upon the Project's foreclosure by the Lehman Creditors being set aside.  As to SunCal Century City, the Lehman Creditors' claim is unsecured and is contingent on a successful prosecution of what the Lehman Creditors believe is a baseless preference claim.  Also, as to the Debtors subject to the VD Group II SunCal Plan, the Lehman Creditors hold claims against SunCal Communities I, secured by its interests in such Debtors.

[7] The Trustee Debtors are the last nine Debtors named in the list of 26 Debtors in the caption on page 1 hereof.

[8] The Voluntary Debtors are the first seventeen Debtors named in the list of 26 Debtors in the caption on page 1 hereof.

[9] These actions or claims include:  (a) an adversary proceeding in this Court, seeking, *inter alia*, to equitably subordinate the claims of the Lehman Creditors to the claims of all of the Debtors' unsecured creditors and to transfer the liens securing the Lehman Creditors' claims to the Debtors' Estates (the "Lehman Adversary Proceeding"), from which action LCPI was dropped as a defendant due to its automatic stay and as to which the Lehman Creditors have currently pending before this Court their partial motion to dismiss and a motion to strike the most recent complaint; (b) motions to disallow certain Claims held By Lehman ALI and LCPI [Docket Nos. 1901 & 2082] (together, the "Claim Objection"), advancing similar theories as those in the Lehman Adversary Proceeding, and seek to reduce, by way of recoupment and other purported defensive remedies; (c) certain of the Voluntary Debtors and SunCal Management also commenced a state court action, removed to the Bankruptcy Court,  against Lehman ALI and certain affiliates based upon facts identical to those in the Claim Objection. *See Acton Estates, LLC et al. v. Lehman ALI Inc., et al.*, Adv. Pro. No. 11-1212-ES (the "Acton Action"); and (d) a motion to disallow claims of Lehman ALI and LCPI pursuant to 11 U.S.C. 502(d) [Docket No. 1976] (the "502(d) Motion").

[10] *See, e.g.*, TD Group I SunCal Plan, § 2.1.117, p. 21.

[11] *See, e.g.*, TD Group I SunCal Plan, § 7.4, p. 49.

4

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

affiliates),[12] (c) is given control over the sales of the Projects[13] and other Assets during the Sale Period, subject to whatever conditions that the Court may impose, including selection of the Stalking Horse Bidder, determination of the terms of any sale agreements, and the qualifications for overbidding, and (d) is the Plan Sponsor,[14] alleged in certain places to be responsible for funding "certain obligations under the Plan" (Notwithstanding this assertion, the SunCal Plan Proponents have not provided any support to show that Acquisitions has the financial wherewithal to perform such function.).

Under six of the SunCal Plans, a new entity, LitCo,[15] is purported to be the funding source for Allowed Priority Claims, Allowed Administrative Claims and Post-Confirmation Expenses and, in five of the Plans it is indicated it may be the Stalking Horse Bidder.[16]  Under five of the SunCal Plans, LitCo is to be repaid for its advance for at least Administrative Claims from Project sale proceeds through a break-up fee.[17]  Thus, through control of the selection of the Stalking Horse Bidder, the SunCal Plan Proponents can attempt to secure financing to fund necessary payments for their SunCal Plans by trading off higher purchase price offers for the Projects for lower offers that include plan funding.

The Lehman Creditors also are proponents of pending plans in these cases:  a plan for the eight Trustee Debtors other than SunCal Century City, co-sponsored by the chapter 11 trustee (the "Trustee/Lehman TD Plan") and a plan for eleven Voluntary Debtors proposed by two of the Lehman Creditors (the "Lehman VD Plan" and together with the Trustee/Lehman TD Plan, the "Trustee/Lehman Plans").  The Lehman Creditors' plans are designed to resolve the SunCal/Lehman Litigation.

Additional relevant facts are described below.

---

[12] *See, e.g.,* TD Group I SunCal Plan, § 9.1, p. 61.

[13] *See, e.g.,* TD Group I SunCal Plan, § 7.2.1, p. 46.

[14] Under each of the SunCal Plans, "Plan Sponsor" is defined as "The entity that has committed to cause and/or arrange the funding of certain specified obligations under the Plan on or after the Effective Date.  The Plan Sponsor is Acquisitions."  Any objection herein to the Plan Sponsor will generally refer to such but is intended to apply to this provision in each SunCal Plan.

[15] TD Group I § 2.1.88, TD Group II § 2.1.83, VD Group I § 2.1.94, VD Group II § 2.1.78, VD Group III § 2.1.82, and VD Group IV § 2.1.74.

[16] *See, e.g.*, TD Group I SunCal Plan §§ 2.1.88 & 2.1.89, p. 16.

[17] *See, e.g.*, TD Group I SunCal Plan § 2.1.43, p. 10.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

5

# III.

## DISCUSSION[18]

**A.    The SunCal Plans Fail to Provide the Lehman Creditors with Required Credit Bid Rights or Even with the Indubitable Equivalent of Their Claims**

Four relevant SunCal Plans[19] purport that the sales of the Projects and Other Assets provide the secured Lehman Creditors with the "indubitable equivalent" of the Lehman Claims, as allegedly permitted by section 1129(b)(2)(A)(iii) of the Bankruptcy Code.  These plans are deficient and fail, however, because the Lehman Creditors must be afforded credit bid rights under section 1129(b)(2)(A)(ii) of the Bankruptcy Code and because the terms of such plans, in any event, fail to afford the Lehman Creditors the indubitable equivalent of their secured claims and liens as required by section 1129(b)(2)(A)(iii) of the Bankruptcy Code.

Section 1129(b) of the Bankruptcy Code provides, in relevant part:

(b)(1) Notwithstanding section 510(a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

(2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:  (A) With respect to a class of secured claims, the plan provides--

(i)(I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and(II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

(ii) for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the

---

[18] The Lehman Creditors do not always cite to the problematic provisions contained in each SunCal Plan because many of the provisions in the SunCal Plans are substantially similar.  Thus, any objection to a particular provision in one SunCal Plan that also occurs in other SunCal Plans is intended as an objection to such provisions even if it is not expressly cited herein or the attached objection chart.

[19] TD Group I SunCal Plan, TD Group II SunCal Plan, VD Group I SunCal Plan, and VD Group III SunCal Plan.

DOCS_LA:244816.4 52063-001

treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or

(iii) for the realization by such holders of the indubitable equivalent of such claims.

11 U.S.C. § 1129(b)(1) and (2)(A).

The phrase "indubitable equivalent" was first used by Judge Learned Hand in which he held that to deprive a secured party of its interest in property the debtor must provide in exchange the "indubitable equivalence" of the same. *In re Murel Holdings Corp.*, 75 F.2d 941, 942 (2d Cir. 1935). As the words so aptly convey, this is not just a requirement, like "best interests" that the secured creditor receive what it would receive in a liquidation, but instead represents a higher standard that requires greater certainty by the Court that there be no doubt the secured creditor will receive something equivalent in exchange for its lien. This extremely high standard of indubitable equivalence has been articulately described as follows:

> Something is dubitable if it is open to doubt or question and, conversely, is indubitable if it is not open to any doubt. One might say, therefore, that the evidence of the requisite indubitable equivalent is present if, under the treatment proposed in the plan, there is no reasonable doubt but that the bank will receive the full value of what it bargained for when it made the contract with the debtor. In other words, is there any real doubt but that, as a matter of fact, the bank will be paid in full? It goes without saying that, since we are operating in a court of law, the interrogatory can be answered only by an examination of the evidence in the record.

*In re Freymiller Trucking, Inc.*, 190 B.R. 913, 915-16 (Bankr. W.D. Okla. 1996) (emphasis added and internal citations omitted).

This higher standard is a recognition of the uncertainty surrounding attempts by courts to approximate values. The United States Court of Appeals of the Ninth Circuit (the "Ninth Circuit") has held that when ascertaining value

> [e]xperience has taught us that determining the value of real property at any given time is not an exact science. Because each parcel of real property is unique, the precise value of land is difficult, if not impossible, to determine until it is actually sold.

*United States, on behalf of the United States Farmers Home Administration v. Arnold and Baker Farms* (*In re Arnold and Baker Farms*), 85 F.3d 1415, 1421 (9th Cir. 1996). This higher standard of

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

7

section 1129(b)(2)(A)(iii) of the Bankruptcy Code requires something more certain for the secured creditor.

### 1. The Proposed Sales and Bidding Procedures Applicable to Five of the SunCal Plans Do Not Comply With the Bankruptcy Code and Are Not Designed to Ensure the Lehman Creditors Receive the Indubitable Equivalent of Their Claims

The SunCal Plans' bidding and sale procedures run afoul of the standards set forth by sections 363(e), 1129(a)(1)-(3) & (7), and 1129(b)(2)(A)(iii) of the Bankruptcy Code.

Each of the SunCal Plans provide for a sale of the Projects and Other Assets free and clear of disputed clams and disputed liens through sales to be conducted during the Sale Period, which commences upon entry of the order of confirmation and ends under each of the SunCal Plans thirty (30) days after the Effective Date of each such plan,[20] pursuant to the following terms:

(i)     Sixty-day "commercially reasonable marketing and advertising effort";

(ii)    Public auction;

(iii)   SunCal Plan Proponents shall have the right to provisionally accept an Opening Bid from a Stalking Horse Bidder prior to the public auction and grant such bidder a Break-Up Fee of up to 2.5% of the Opening Bid for a Project plus the amounts paid by LitCo in administrative claims if LitCo is the Stalking Horse Bidder;

(iv)    Other Qualifying Bidders shall have the right to overbid the Opening Bid by submitting a Qualifying Bid first equal to or in excess the Initial Overbid Amount, and any subsequent bids equal to the Minimum Increment;

(v)     No bidder may submit a credit bid; and

(vi)    Qualifying Bidders that submit the *highest* Qualifying Bid shall obtain title to the applicable Project(s) free and clear of all Disputed Claims and Disputed Liens.

Bankruptcy courts encourage competitive bidding of assets to facilitate an open and fair public sale designed to maximize value for the estate. Here, the SunCal Plan Proponents are requesting the very opposite. They are offering a sale process with truncated marketing and sales period on terms that are not disclosed other than the bid-chilling ability of the SunCal Plan Proponents to (a) relieve the SunCal Plan Proponents of the obligation to fund senior claim

---

[20] *See,* TD Group I SunCal Plan § 2.1.30, TD Group II SunCal Plan § 2.1.121, VD Group I SunCal Plan § 2.1.135, VD Group II SunCal Plan § 2.1.111, and VD Group III SunCal Plan § 2.1.114.

8

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

distributions by requiring prospective buyers to fund the LitCo Plan Loan and the associated

Debtor's Administrative Claims at the expense and detriment of holders of secured claims,

(b) require the prospective buyer to assume or arrange for elimination of Elieff's Contingent Bond

Indemnification Claims, and (c) require the prospective buyer to use and/or partner with Elieff or his

affiliates to develop and/or manage the Projects after the sale.  Elieff and the SunCal Plan

Proponents are afforded too much discretion in the sales process, particularly in light of their

conflicting economic interests.  The control over the sales process provided to Acquisitions is

improper due to its conflicting interests and is among the reasons that the Lehman Creditors are not

afforded the treatment to which they are entitled under section 1129(b)(2)(A) of the Bankruptcy

Code with respect to their claims.

Also, the SunCal Plans contain no provisions with respect to who will receive notice, or the

contents of such notice, of the proposed bidding procedures or sales.  The SunCal Plan Proponents

must comply with Bankruptcy Rule 2002 and the Local Rule 6004-1 by providing the appropriate

notice to the required parties.

Additionally, notably absent from the marketing of the Projects and Other Assets is the

involvement of an independent professional with real estate expertise in marketing of projects of this

type and the absence of any requirement that the auction and subsequent sale of the Projects take

place publicly in this Court (so that the Court can determine whether the terms do indeed yield the

indubitable equivalent of the Lehman Creditors' claims) also contribute to these plans' failure to

comply with section 1129(b)(2)(A) of the Bankruptcy Code.

> **a.**    **The Break-Up Fees Chill the Bidding Process
> and Are Designed to Shift the Burden of Funding
> Administrative Claims Away from the SunCal Plan
> Proponents to a Surcharge of the Lehman Creditors' Collateral**

The apparent conflict of interest between Acquisitions controlling the sale process and

obtaining the highest and best offers for the Projects is highlighted by the applicable definitions for

the proposed break-up fees and overbid increments under three of the SunCal Plans.[21]  The definition

---

[21] TD Group I SunCal Plan, TD Group II SunCal Plan, and VD Group I SunCal Plan.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

DOCS_LA:244816.4 52063-001

of the break-up fee for the Ritter Ranch Project under the VD Group I SunCal Plan provides that

such fee is

> [t]he amount equal to 2.5% of the Minimum Sales Price for the Ritter Ranch Project, **plus actual amounts paid by LitCo on Allowed Administrative Claims** for the Palmdale Hills Case if LitCo is the Stalking Horse Bidder and is not the Winning Bidder.[22]

Similar definitions apply as to each Project to be sold under the three above-indicated plans.

Local Bankruptcy Rule 6004-1 provides as follows with respect to requests for break-up fees:

> <u>Break-up Fees</u>:  If a break-up fee or other form of overbid protection is requested in the Sale Procedure Motion, the request must be supported by evidence establishing:
>
> (A) That such a fee is likely to enhance the ultimate sale price; and
>
> (B) The reasonableness of the fee.

LBR 6004-1 (b)(2); (6).

Break-up fees only should be permitted where they assist in achieving the highest and best price.  *See In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983) (a proposed break-up fee must be carefully scrutinized to insure that the Debtor's estate is not unduly burdened and that the relative rights of the parties in interest are protected); *In re Hupp Industries, Inc.*, 140 B.R. 191, 196 (Bankr. N.D. Ohio 1992).  (The analysis conducted by the Court must include a determination that "all aspects of the transaction are in the best interests of all concerned.").  In the bankruptcy context, "bidding incentives such as break-up fees and bid increment limitations are carefully scrutinized in § 363(b) asset sales to insure that the debtor's estate is not unduly burdened and that the relative rights of the parties in interest are protected."  *Id.*

Where a court concluded that the proposed break-up fee would not induce further bidding or bidding generally, the court refused to approve a break-up fee.  *See In re America West Airlines, Inc.*, 166 B.R. 908, 912 (Bankr. D. Ariz. 1994); *accord In re S.N.A. Nut Co.*, 186 B.R. at 104 (following *America West*; additionally noting that no particular deference should be given to

---

[22] *See, e.g.*, VD Group I SunCal Plan § 2.1.134 (emphasis added); see, also the other definitions of break-up fees that contain this same impermissible component, TD Group I SunCal § 2.1.43, TD Group I SunCal § 2.1.66, TD Group I SunCal § 2.1.93, TD Group II SunCal § 2.1.133, TD Group II SunCal § 2.1.96, TD Group I SunCal § 2.1.104, TD Group I SunCal § 2.1.109, VD Group I SunCal § 2.1.4, VD Group I SunCal § 2.1.22, VD Group I SunCal § 2.1.134, and VD Group I SunCal § 2.1.143.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

debtor's business judgment where debtor was liquidating rather than reorganizing).  The standard is not whether the break-up fee is within the business judgment of the debtor, but whether the transaction will further the diverse interests of the debtor, creditor and equity holders, alike. *America West*, 166 B.R. at 912.  As *America West* concluded, the analysis conducted by the court must therefore include a determination that "*all* aspects of the transaction are in the best interests of all concerned."  *Id.* (emphasis in original).

Even courts that apply the business judgment standard to break-up fees have held that the protection of the business judgment rule should be removed when a sale transaction process is tainted by self-dealing.  *See, e.g., In re Integrated Resources, Inc.*, 147 B.R. 650 (S.D.N.Y. 1992).  Moreover, even in the section 363 sale context, courts have generally held that break-up fees are appropriate only if they are intended to induce bidding.  *See America West*, 166 B.R., at 912 (held that the payment of the contemplated break-up fee was not in the best interests of the estate, the creditors, or the equity security holders because it would not induce bidding); *accord Gey Assocs. G.P. v. 310 Assocs., L.P.*, 2002 WL 31426344, at *2, at * 5 (S.D.N.Y. Oct. 29, 2002) (break-up fee inappropriate where there were "two buyers drooling to make this purchase"), *aff'd* 345 F.3d 31 (2d Cir. 2003); *Calpine Corp. v. O'Brien Env't Energy, Inc. (In re O'Brien Env't Energy, Inc.)*, 181 F.3d 527, 537 (3d Cir. 1999) (where bidder "had strong financial incentives to undertake the cost of submitting a bid," a break-up fee is not warranted); *In re American Appliance*, 272 B.R. 587, 601 (Bankr. D. N.J. 2002) ("Where a potential purchaser would bid whether or not break-up fees are offered, the award of a break-up fee cannot be characterized as necessary to preserve the value of the estate.").

Here, the definition of the applicable break-up fees indicate that any Stalking Horse Bidder may be required as a condition of becoming the Stalking Horse Bidder to fund the LitCo Plan Loan and, thus, may be required to fund the payment of Administrative Claims (in addition to agreeing to pay the Minimum Sales Price).  Thus, sales proceeds that should be paid to or held for the Lehman Creditors will instead be used to pay Administrative Claims thereby surcharging the Lehman Collateral and secured claims of the Lehman Creditors.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

11

Further, if the SunCal Plan Proponents are permitted to allow a Stalking Horse Bidder to fund the LitCo Plan Loan and Administrative Claims as a condition of being the opening bidder, such requirements may limit the number of persons willing to bid and thereby chill even the overall amount being offered for the Project inclusive of the amount for the LitCo Plan Loan.  Moreover, requiring a subsequent bidder to add the amount of the LitCo Plan Loan for Administrative Claims to the Initial Overbid Amount when making its bid, also will chill further bidding.

No evidence has been – or could at this point be – submitted in support of the break-up fee.  This so-called break-up fee does not enhance the price to be achieved but diminishes it.  Allocating a portion of the purchase price to the payment of Administrative Expenses is not "in the best interest of" the Lehman Creditors who at the very least are entitled to as much as they would get in a sale by a chapter 7 trustee.  Moreover, even the SunCal Plan Proponents acknowledge that the Lehman Creditors are entitled to the indubitable equivalent of their claims.  There is no doubt that by providing LitCo with a fee that covers the payment of Administrative Claims, the Projects are not being sold for the highest and best price thereby depriving the Lehman Creditors of the indubitable equivalent of their claims. (This sale procedure diminishes the value of the proceeds to be deposited in the Net Sale Proceeds account for the Lehman Creditors and is exactly why preservation of their right to credit bid is essential, as discussed below.) Thus, by impermissibly surcharging the Lehman Collateral of the Lehman Creditors in this manner, the subject plans fail the "best interests" test – in that a chapter 7 sale would not have this diversion of value - and thereby also fail to meet the higher standard for treatment of secured creditors mandated by section 1129(b)(2)(A) of the Bankruptcy Code.

### b.  The SunCal Plan Proponents' Marketing Process Will Not Yield the Greatest Value

The SunCal Plans fail to show how the marketing process is designed to yield the greatest value in exchange for the sale of the Projects and Other Assets.[23]

---

[23] The marketing process and the sale procedures for each of the Projects and Other Assets is described in section 7.2 of the TD Group I SunCal Plan, TD Group II SunCal Plan, VD Group I SunCal Plan, VD Group II SunCal Plan, and VD Group III SunCal Plan,.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

DOCS_LA:244816.4 52063-001

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

The SunCal Plans provide that after the confirmation hearing, Acquisitions (the Debtors indirect parent/equity holder of all Debtors that is not entitled to receive any distributions under the SunCal Plans on account of such equity interests), as opposed to an independent professional with expertise in marketing the Projects, will commence the marketing of the Projects by (i) sending sale packages to the real estate brokerage community describing the projects, (ii) advertising the Projects on a website that include all relevant information regarding such Projects, and (iii) sending packages on a national level to a list of potential prospects.

Nothing more is said or has been submitted by the SunCal Plan Proponents to show that this marketing process will ensure that the Lehman Creditors and any other secured creditors will receive the indubitable equivalent of their claims.  Moreover, the Court has recently indicated that "the failure to employ a professional to market the properties is of concern to the court – particularly where the stalking horse bidder is an insider."[24]

The marketing process is crucial to a determination with respect to whether any bidder's offer represents the best price for a Project.  The SunCal Plan Proponents propose a marketing and advertising effort to be conducted in a matter of sixty (60) days.  The proposed marketing timing and process for these unique groupings of entitled, California raw land cannot be shown to be adequate, which is the burden of the SunCal Plan Proponents.

The SunCal Plan Proponents could have been marketing many of the Projects for months.  At this point, the SunCal Plan Proponents have wasted that time and for competitive purposes attempt to propose a speedy process to pay creditors, cannot show that their time for marketing or the marketing process itself is adequate and, certainly, cannot show that a stalking horse bidder will enhance prospects of securing maximum prices for these Projects.  It is simply too late to begin marketing now given the timeline to which the five subject SunCal Plans are committed.

Even without first setting a Stalking Horse Bidder, sixty days does not provide sufficient time for marketing, the negotiation and execution of confidentiality agreements, and due diligence

---

[24] *See* the Court's September 1, 2011 tentative ruling regarding *Debtors' Motion for Order: (1) Approving Sale Procedures in Connection with Proposed Sales of Substantially All Assets of the Moving Voluntary Debtors' Estates; and (2) Setting Preliminary and Final Hearing in Connection with the Approval of the Sales of the Moving Voluntary Debtors' Assets.*  [Docket No. 2617] (the "Sale Motion").

13

by potential bidders, including site tours, and the negotiation and finalization of definitive terms of an asset purchase agreement. An important element of ensuring that market value is achieved for a real estate sale is to assure that a reasonable time is allowed for exposure of the property to be sold in the open market. The marketing process here simply is inadequate.

The SunCal Plan Proponents do not even attach a proposed form of asset purchase agreement that potential bidders could use as a baseline to submit their offers.

Ordinarily, when a debtor in chapter 11 seeks to sell its assets it (i) discloses the marketing efforts that is has undertaken to locate prospective buyers or an actual offer to purchase, (ii) sets forth a format for submitting qualified bids (*i.e.*, more details than just a purchase price), (iii) sets bid deadlines, (iv) criteria to be used to identify and the justification for a stalking horse bidder (as opposed to presuming one is necessary), and (v) an auction date and time. The above is of course a non-exclusive list but the SunCal Plan Proponents' marketing and sale process has been non-existent and thus fails.

Yet, the SunCal Plan Proponents are asking the Court to determine that the marketing process will provide the Lehman Creditors with the indubitable equivalent of their claims when the sale price for each of the Projects will not be determined until **after** the confirmation hearing. The only thing definitive about the marketing process proposed by the SunCal Plan Proponents is that Acquisitions will manage the process and only the Voluntary Debtors' Committee and Trustee Debtors' Committee (together, the "Committees") will have the opportunity to object to such process and request a hearing if any dispute is not resolved.[25] This is also inappropriate and separate grounds for denying confirmation of the SunCal Plans. For many of the Projects, price matters most to the Lehman Creditors. If their claims and liens are not subordinated, they receive 100% of all Net Sale Proceeds. If their claims and liens are subordinated, they receive the balance after payment of other creditors. Most of the Projects (although not all) appear to be worth substantially more than the non-Lehman Creditor claims against the applicable Debtor. Thus, a diminished price in many instances only has bearing on the Lehman Creditors. They must have notice and an opportunity to be heard on all matters concerning the disposition of the Projects and Other Assets in order to assure

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

---

[25] *See, e.g.,* TD Group I SunCal Plan, § 7.2, p. 46.

them the indubitable equivalent of their claims and/or even that they are getting as much as they would in a chapter 7 case.

### c.    Inadequate Disclosure of the Bid Procedures Renders the SunCal Plans Unconfirmable

Generally, a seller markets first, enables inspection and diligence to be undertaken, explores potential terms with potential buyers and, then, seeks to turn one of those potential buyers into a stalking horse who will execute an asset purchase agreement that will set out not only the terms of the sale but also the procedures the debtor will ask the court to approve to govern the auction process. Here, the SunCal Plans, which must be found to offer creditors at least as much as they would get in a chapter 7 case and must offer the Lehman Creditors, as well, the indubitable equivalent of their secured claims, each contain provisions permitting the SunCal Plan Proponents wide latitude in the sale process after confirmation.

The procedures enable the SunCal Plan Proponents to accept an Opening Bid and designate such bidder as a Stalking Horse Bidder, who will be entitled to a break-up fee in the event a subsequent bidder submits a higher offer. The criteria for selecting a stalking horse bidder are non-existent. A "Stalking Horse Bidder" is defined only as "the Qualifying Bidder who submits the Opening Bid." The SunCal Plan Proponents propose a Sale Period until closing of up to approximately 120 days, but no timeline with respect to the deadline for submission of bids and financial information to support the bidder's ability to consummate a sale, the form of bids, the location of the auction(s), the rights of other parties in interest to participate in the process, and other related information.

Under the SunCal Plans, it is impossible for a potential bidder or anyone to determine what terms might be acceptable for an Opening Bid (and it will surely contain more terms than the Minimum Sale Price alone). An "Opening Bid" means an offer equal to the Minimum Sale Price that is accepted. A Qualified Bidder is a party that has deposited the sum applicable to the subject Project, provided evidence of its financial wherewithal to consummate the sale to the satisfaction of only the SunCal Plan Proponents, and agreed to forfeit the deposit if it fails to perform. No other terms are specified. A bidder making a deposit is not assured it will be held in trust nor of the

15

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1  financial net worth of the seller to assure the bidder that its deposit will be returned if it is not the

2  successful bidder.

3      The SunCal Plans provide barebones sales procedures that will govern an insider's selection

4  of a stalking horse bidder and payment of a break-up fee without prior disclosure of the selection

5  process.  The SunCal Plans simply provide that the SunCal Plan Proponents may select a stalking

6  horse bidder.  Elsewhere it provides that the Plan Trustee (*i.e.*, Acquisitions) shall sell the Projects.

7      The "procedures" set forth in the SunCal Plans fail to satisfy the sales procedures

8  requirements set forth in Local Bankruptcy Rule 6004-1, which provide the following, among other,

9  requirements:

> <u>Contents of Notice</u>:  The notice must describe the proposed bidding
> procedures and include a copy of the proposed purchase agreement.  If
> the purchase agreement is not available, the moving party must
> describe the terms of the sale proposed, when a copy of the actual
> agreement will be filed with the court, and from whom it may be
> obtained.  The notice must describe the marketing efforts undertaken
> and the anticipated marketing plan, or explain why no marketing is
> required.

15  LBR 6004-1 (b)(2).  As noted above, the SunCal Plans and the relevant disclosure statements (the

16  "<u>SunCal Disclosure Statements</u>") are entirely devoid of such information.

17      It appears that the sale procedures are designed for Acquisitions' and Elieff's benefit to

18  enable them to choose in their discretion a stalking horse such as LitCo that will use SunCal

19  Management/Acquisitions as the developer/manager on the sold Projects and/or agree to assume or

20  eliminate Elieff's and Acquisitions' bond issuer indemnity obligations, and to get LitCo repaid on

21  the amounts it funds to pay Administrative Claims.  Absent disclosure immediately of the stalking

22  horse bidder and that bidder being proper (*e.g.,* not an insider, affiliate of an insider or a party

23  engaged in self-dealing with an insider or the Debtors), the SunCal Plans should not be confirmed

24  due to this failure.

25      **2.    Prohibiting Credit Bidding Is Contrary to the
26          Express Provisions of the Bankruptcy Code and Deprives the
          <u>Lehman Creditors of the Indubitable Equivalent of their Claims</u>**

27      The five relevant SunCal Plans that seek to sell Projects or Other Assets subject to the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

16

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Lehman Creditors' liens prohibit credit bidding.[26]  Without credit bidding, the proposed sale of the Lehman Creditors' collateral is patently unfair and fails to satisfy the sale of assets requirements under section 1129(b)(2)(A)(ii) of the Bankruptcy Code and, even if applicable, the indubitable equivalent standard under section 1129(b)(2)(A)(iii) of the Bankruptcy Code.

The SunCal Plan Proponents contend that fair market value can be obtained without credit bidding, but provide absolutely no explanation to support a need for the blanket prohibition against credit bidding[27] and utterly fail by their plans' terms to establish a process **certain** to achieve the highest and best price for the Projects.  The SunCal Proponents ignore that credit bidding balances the competing needs of a debtor, who receives the benefit of the automatic stay to shield the collateral from foreclosure, against a secured creditor's interest in the collateral.  In the end, credit bidding prevents a debtor from accepting an unreasonably low purchase price. *Aetna Realty Inv., Inc. v. Monarch Beach Venture, Ltd. (In re Monarch Beach Venture, Ltd.)*, 166 B.R. 428, 433 (C.D. Cal. 1993) (chapter 11 plan purporting to take away secured creditor's right to credit bid could not be confirmed under cram down section allowing fulfillment of "fair and equitable" requirement by permitting debtor to pay proceeds of sale of collateral to creditor or to retain proceeds subject to lien); *John Hancock Mutual Life Insurance Co. v. California Hancock, Inc. (In re California Hancock, Inc.)*, 88 B.R. 226, 231 (B.A.P. 9th Cir. 1988) (upholding bankruptcy court's rejection of a reorganization plan that did not permit a nonrecourse creditor the right to credit bid, given the Congressional intent to allow a non-recourse creditor the right to credit bid in a proposed sale of the property pursuant to a plan of reorganization); *In re SunCruz Casinos, LLC*, 298 B.R. 833, 838-39 (Bankr. S.D. Fla. 2003) (denying confirmation of a plan that prohibited the secured creditor from credit bidding its claim and holding that the secured creditor may credit bid the full amount of its claim including the unsecured deficiency portion).

The SunCal Plan Proponents have asserted that the Lehman Creditors' treatment is being offered under section 1129(b)(2)(A)(iii) of the Bankruptcy Code (indubitable equivalence).  *See In re Philadelphia Newspapers, LLC*, 599 F.3d 298, 317-18 (3d Cir. 2010) (holding that the cramdown

---

[26] The prohibition against credit bidding occurs in Section 5.2 of the TD Group I SunCal Plan, TD Group II SunCal Plan, VD Group I SunCal Plan, VD Group II SunCal Plan, and VD Group III SunCal Plan.

[27] *See, e.g.*, Disclosure Statement VD Group I § 10.2, pp. 80-81.

provisions under section 1129(b)(2)(A) provide a debtor with a set of options and subsection (iii) permits sales without credit bidding so long as the secured creditor receives the indubitable equivalent of its secured claim); *Bank of New York Trust Co., et al. v. Official Unsecured Creditors' Committee, et al. (In re The Pacific Lumber Co., et al.)*, 584 F.3d 229 (5th Cir. 2009) (same). The decision in *Pacific Lumber* is not persuasive due to material factual distinctions. There, the parties litigated over the value of the collateral and the bankruptcy court had made findings <u>prior to the confirmation hearing</u>. *Pacific Lumber*, 584 F.3d at 248 and 249. As a result, the debtors in *Pacific Lumber* were permitted to sell their assets pursuant to section 1129(b)(2)(A)(iii) and prohibit credit bidding because the value of the collateral was known at the time of confirmation thereby ensuring that any cash payment equal to such value was the indubitable equivalent of the secured claims. *Id.*

The dissenting opinion in *Philadelphia Newspapers* of Judge Ambro recognized that the analyses in both the majority's opinion and the Fifth Circuit's *Pacific Lumber* are deficient because their reliance on the disjunctive nature of section 1129(b)(2)(A) renders an anomalous interpretation of the secured creditor cramdown section. In his persuasive dissent, Judge Ambro explains that by interpreting section 1129(b)(2)(A)(iii) to permit a sale of a secured creditor's collateral without credit bidding undoubtedly places the two clauses in conflict: "It seems Pickwickian to believe that Congress would expend the ink and energy detailing procedures in clause (ii) that specifically deal with plan sales of property free of liens, only to leave general language in clause (iii) that could sidestep entirely those very procedures. Unlike the majority, I do not read the language to signal such a result; I read the text to show congressional intent to limit clause (iii) to those situations not already addressed in prior, specifically worded clauses." *Philadelphia Newspapers*, 599 F.3d at 329.

More importantly, since the entry of the decision in *Philadelphia Newspapers*, the United States Court of Appeals of the Seventh Circuit (the "<u>Seventh Circuit</u>") recently followed the rational in Judge Ambro's dissent. *In Re River Road Hotel Partners, LLC*, __ F.3d __, 2011 WL 2547615 (7th Cir. June 28, 2011). In this decision, the Seventh Circuit held that

> Because the Debtors' proposed auctions would deny secured lenders the ability to credit bid, they lack a crucial check against undervaluation. Consequently, there is an increased risk that the winning bids in these auctions would not provide the Lenders with the current market value of the encumbered assets. Nothing in the text of

18

> Section 1129(b)(2)(A) indicates that plans that might provide secured
> lenders with the indubitable equivalent of their claims can be
> confirmed under Subsection (iii).  Hence, we find that a plain-meaning
> reading of Subsection (iii)'s text does not establish that it can be used
> to confirm plans that propose auctioning off a debtor's encumbered
> assets free and clear of liens without allowing credit bidding.

*Id.* at *7.  The Seventh Circuit also found that the interpretation of section 1129(b)(2)(A) by the

court in *Philadelphia Newspapers*

> violates a cardinal rule of statutory construction.  One of the basic
> tenets that courts follow when interpreting ambiguous text states that
> "a statute ought . . . to be so construed that, if it can be prevented, no
> clause, sentence, or word shall be superfluous, void, or insignificant."

*River Road,* 2011 WL 2547615, *8 (citing *Duncan v. Walker*, 533 U.S. 167, 174 (2001)).

The proposed SunCal Plans make the same error found in the plans in both *River Road* and

*Philadelphia Newspaper*.  The SunCal Plan Proponents' efforts to exclude the Lehman Creditors

from the confirmation process is contrary to the best means to determine the value of a secured

creditor's collateral, i.e., credit bidding.  *Cohen v. KB Mezzanine Fund II, LP* (*In re SubMicron

Systems Corp.*), 432 F.3d 448, 460 (3d Cir. 2006) (permitting a secured creditor to credit bid the full

amount of its claims (even the presumably undersecured portion) and recognizing that this is the best

way to determine the value of the collateral).

Here, the SunCal Plan Proponents have not offered any evidence to support the fair market

values of the Projects or Other Assets.  Instead, they are seeking the Court's approval of an ill-

defined sale process that places control of the "marketing" of assets in the hands of an insider with

differing interests from other creditors and who are depending upon the sale proceeds for

distributions on their claims.  More importantly, the past several months, when marketing of the

Projects could have occurred, were wasted and, thus, no proposed sale prices for the Projects or any

terms for such sales have been disclosed.  Consequently, it is impossible for the Court to determine

that a sale without the right to credit bid provides the Lehman Creditors with the indubitable

equivalent of their claims, even if such substituted treatment were permissible.

A summary elimination of the rights of the Lehman Creditors to credit bid for the collateral is

without any basis or justification.  The pendency of the SunCal/Lehman Litigation should not

foreclose the Lehman Creditors' rights to credit bid.  The case law is full of examples permitting

19

secured creditors holding disputed claims to credit bid. *Bank of Nova Scotia v. St. Croix Hotel Corp.* (*In re St. Croix Hotel Corp.*), 44 B.R. 277, (D.V.I. 1984); *In re Miami General Hospital, Inc.*, 81 B.R. 682, 687-88 (S.D. Fla. 1988); *In re Octagon Roofing,* 123 B.R. 583, 592 (Bankr. N.D. Ill. 1991).  Although the Voluntary Debtors' and SunCal Management's claim objections appear to seek to offset against the Lehman Creditors' claims an aggregate amount under $100 million, the remaining Lehman claims, even after a successful reduction by $100 million, still would greatly exceed the estimated value of the Projects, and the alleged ability to recoup, after bifurcation of the claim, under section 506(a) of the Bankruptcy Code, from its secured portion is simply without basis.  As to subordination, the Court could itself determine whether an alternative remedy could be fashioned and even the SunCal Plan Proponents must concede that the Lehman Creditors, even if their claims are subordinated, would have secured claims if any Project were worth more than the allowed claims against its owner Debtor.

Only the Lehman Creditors have a strong incentive to see Project values maximized.  If equitable subordination is denied, as the Lehman Creditors expect, no other creditor gets anything from the sales proceeds.  If equitable subordination to any Claim ultimately is granted, because each Project likely is worth more than any Debtor's allowed Reliance Claims against such Debtor, again, only the Lehman Creditors' claims (even if subordinated) would be benefitted or harmed by a higher or lower Project sale price.  Thus, without the ability to credit bid, the Lehman Creditors, who are the only party with a compelling interest in ensuring that a fair price is achieved, would have no tool to ensure that result.  If the Lehman Creditors are prohibited from credit bidding, the SunCal Plan Proponents' discretion over the sales process would be enhanced and no substitute mechanism would be in place to assure the Lehman Creditors the indubitable equivalent of their credit bidding protection or foreclosure rights.  Accordingly, due to the prohibition on credit bidding, the SunCal Plans and the sale procedures therein are at odds with the statutory scheme prescribed by Congress because without credit bidding they fail to show how the Lehman Creditors will receive the indubitable equivalent of their secured claims.

DOCS_LA:244816.4 52063-001

**3. By Defining Net Sales Proceeds to Allow Use of Sale Proceeds to Pay Expenses Not Reasonably Required for Project Sales, the SunCal Plans Impermissibly Surcharge the Lehman Creditors' Secured Claims and Collateral and Deny them Indubitable Equivalent**

The SunCal Plans define "Net Sales Proceeds" as

> The Cash generated from the sale(s) or liquidation of the Group I: Voluntary Debtor(s)' Assets or the Plan Trust's Assets, less payment of selling expenses, taxes, Chapter 11 Trustee fees, and any associated Post-Confirmation Expenses and Administrative Claims incurred in furtherance of such sales or liquidation of such Assets.[28]

The proposed definition has numerous problems that have the material defect of permitting the SunCal Plan Proponents to surcharge the sale proceeds to fund expenses that are not junior in priority to the Lehman Creditors' liens and not necessary for the sale under state law to which the proposed sale must be indubitably equivalent.

Section 506(c) of the Bankruptcy Code provides

> The trustee may recover from property securing <u>an allowed secured claim</u> the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim, including the payment of all ad valorem property taxes with respect to the property.

11 U.S.C. § 506(c) (emphasis added).

The standard under section 506(c) of the Bankruptcy Code is very strict and the debtor has the burden to show that the expenses were (a) reasonable, (b) necessary, and (c) beneficial to the lender. *In re Cascade Hydraulics and Utility Service, Inc.*, 815 F.2d 546, 548 (9th Cir. 1987). More importantly, the expenses incurred <u>must relate directly to the preservation of the lender's collateral</u>. *Id.* In *In re Compton Impressions, Ltd.*, 217 F.3d 1256, 1260-1 (9th Cir. 2000), the Ninth Circuit held that the Debtor was not entitled to surcharge its expenses incurred in completing and selling units in a residential development, as such services were not necessary and did not benefit the secured creditor, as the secured creditor would have been better off had it been allowed to foreclose on its collateral at the beginning of the case. Thus, recovery under this section of the Bankruptcy Code is narrow and subject to great scrutiny.

---

[28] VD Group I SunCal Plan § 2.1.105. A substantially similar definition appears in each of the SunCal Plans wherein the only difference relates to the applicable Debtors and their assets. While the objection above only focuses on the definition in the VD Group I SunCal Plan, the objection is meant to apply to each of the definitions in the SunCal Plans.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

DOCS_LA:244816.4 52063-001

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Certainly, general administrative expenses are not chargeable against collateral subject to a lien.  Yet, the SunCal Plans inappropriately provide that "Chapter 11 Trustee fees" and other amounts are to be deducted from the sales proceeds in determining the Net Sale Proceeds to be held.  Worse yet, the SunCal Plan Proponents seek to charge Post-Confirmation Expenses against sale proceeds.  Post-Confirmation Expenses are defined as,

> The fees and expenses incurred by the Plan Trust, the Trustee and the Voluntary Debtors' Committee and their Professionals following the Confirmation Date (including the fees and costs of professionals) for the purpose of (i) prosecuting and liquidating the Litigation Claims; (ii) objecting to and resolving Disputed Claims and Disputed Liens; (iii) selling or otherwise liquidating Plan Trust's Assets; (iv) effectuating Distributions under the Plan; and (v) otherwise consummating the Plan and closing the Group I: Voluntary Debtor Chapter 11 Cases.[29]

As shown by this definition, other than subsection (iii) (which is subject to other limitations), Post-Confirmation Expenses have no relationship to the preservation and disposition of the Projects or Other Assets, nor do such expenses benefit the Lehman Creditors in any manner.

In addition, the expenses incurred under subsection (iii) (selling or otherwise liquidating Plan Trust's Assets) are also not chargeable against the Sale Proceeds because to "recover under § 506(c), a trustee must establish that the claim associated with the relevant collateral is both 'allowed' and 'secured.'"  *In re Los Gatos Lodge Inc.*, 278 F.3d 890, 893-94 (9th Cir. 2002).  In *Los Gatos Lodge*, when the trustee sought reimbursement pursuant to section 506(c), the related claims were not allowed.  *Id.* at 893-94.  The Ninth Circuit goes on to hold that

> In short, in order to be eligible for a § 506(c) surcharge, the claim must be an "allowed secured claim" at the time the § 506(c) action is filed.  Because it was not in this instance, the trustee cannot recover under § 506(c) as a matter of law.

*Id.* at 894.  Clearly, the SunCal Plan Proponents contest the validity of the Lehman Creditors' claims.  Thus, the express terms of controlling authority do not permit surcharge because the claims have not been determined to be allowed and secured.

---

[29] VD Group I SunCal Plan § 2.1.122.  A substantially similar definition appears in each of the SunCal Plans wherein the only difference relates to the applicable Debtors and their assets.  While the objection above only focuses on the definition in the VD Group I SunCal Plan, the objection is meant to apply to each of the definitions in the SunCal Plans.

**4.    The SunCal Plans' Failure to Provide that the Projects will be Maintained and Taxes Paid after Confirmation and Pending Sale or Abandonment Is a Denial of Adequate Protection and Deprives the Lehman Creditors of the Indubitable Equivalent of their Claims**

The SunCal Plan's proposed treatment of Secured Claims is unconfirmable over the objection of secured creditors, such as the Lehman Creditors and holders of Mechanic Liens and Bond Claims, because the SunCal Plans arguably deprive secured creditors of all remedies until the applicable period **after** Effective Date.[30]

The Plan Trustee is under no express obligation to properly maintain or preserve the Projects and Other Assets and, yet, the Lehman Creditors request, and are entitled to, adequate protection.[31] Also, the mandatory forbearance, without any adequate protection, cannot constitute "fair and equitable" or indubitably equivalent treatment pursuant to section 1129(b) of the Bankruptcy Code. Proposing no payments to a secured creditor while imposing an extended period of forbearance equates to extreme negative amortization of the secured claims while giving the Debtors a no-risk cost-free option. That treatment could not remotely pass muster under the standards for negative amortization set forth in *Great Western Bank v. Sierra Woods Group*, 953 F.2d 1174, 1177 (9th Cir. 1992).

**B.    The SunCal Plans' Treatment of Reliance Claims Violates the Same Treatment Requirement of 11 U.S.C. § 1123(a)(4)**

The LitCo Offers in three of the SunCal Plans[32] include a contingency that creditors must vote in favor of the applicable SunCal Plans. Inclusion of this voting contingency represents a blatant effort to acquire votes in support of the SunCal Plans. Because this contingency is unnecessary and results in the unequal treatment of Reliance Claimants, the treatment violates

---

[30] *See, e.g.*, TD Group I §§ 5.2(C) (Lehman Creditors), 5.3(D) (Mechanic Liens), 5.4(D) (Bond Claims), TD Group II §§ 5.2(A.4) (Lehman Creditors), 5.3(D) (Mechanic Liens), 5.4(D) (Bond Claims), VD Group I §§ 5.2(C) (Lehman Creditors), 5.3(D) (Mechanic Liens), 5.4(D) (Bond Claims), VD Group II § 5.2(C) (Mechanic Liens) (no right to exercise rights against collateral at any time), and VD Group III § 5.2(C) (Lehman Creditors),.

[31] By example only, the SunCal Plan Proponents should be obligated to assure Project maintenance and preservation, including paying real property taxes. In addition, cash collateral and sales proceeds should be held unused and segregated, and remedies for creditors should be specified in the applicable SunCal Plans. Please note, that the Lehman Creditors are not conceding that such assurance would supply the necessary adequate protection but would be one of the necessary conditions or terms.

[32] TD Group I SunCal Plan § 5.6, TD Group II SunCal Plan § 5.6, and VD Group I SunCal Plan § 5.6.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

23

sections 1123(a)(4) and 1129(a)(1) of the Bankruptcy Code, which requires a plan to "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." 11 U.S.C. § 1123(a)(4); *In re Adelphia Communications Corp.*, 361 B.R. 337, 361 (S.D.N.Y. 2007) (granting releases only to creditors that accepted plan was not equal treatment); *see also In re Brotby*, 303 B.R. 177, 185-86 (9th Cir. B.A.P. 2003) (reversing plan approval where single creditor in class would not receive distribution at same time as others); *In re Smith*, 123 B.R. 863, 865 (Bankr. C.D. Cal. 1991) (denying confirmation where all creditors in class paid except one creditor forced to litigate outside of bankruptcy case).

**C.    Holders of Real Property Tax Claims Are Classified and
Deemed Impaired in Violation of 11 U.S.C. § 1123(a)(1)**

A class of Real Property Tax Claims cannot be an impaired consenting class for a plan.  The SunCal Plans improperly classify the holders of Real Property Tax Claims in violation of section 1123(a)(1) of the Bankruptcy Code and treat such claims as being impaired when their treatment is determined by the Bankruptcy Code, not the applicable SunCal Plan provisions.[33]

When a provision under the Bankruptcy Code determines the treatment of a claim or class of claims, such claims are not impaired even if the Bankruptcy Code's treatment alters the rights of the claim.  *Sheldon H. Solow, d/b/a Solow Building Company v. PPI Enterprises (U.S.), Inc., et al. (In re PPI Enterprises (U.S.), Inc.)*, 324 F.3d 197, (3d Cir. 2003) (holding that a landlord's claim that is capped by section 502(b)(6) is statutorily impaired, not impaired by specific treatment under the plan).

Similarly, the treatment of tax claims that are covered under section 507(a)(8) of the Bankruptcy Code (whether they are secured or priority) is determined by the confirmation provision under section 1129(a)(9)(C) and (D).  Because the treatment for such tax claims is determined by the Bankruptcy Code, the majority of any such "class" cannot bind the minority because 1129(a)(9)(C) and (D) determines the treatment.  *See, e.g., In re EQK Bridgeview Plaza, Inc.*, 2011 WL 2458068, *2 (Bankr. N.D. Tex. June 16, 2011) (recognizing that the treatment under section 1129(a)(9)(D)

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

---

[33] TD Group I SunCal Plan § 5.1, TD Group II SunCal Plan § 5.1, VD Group I SunCal Plan § 5.1, VD Group II SunCal Plan § 5.1, and VD Group III SunCal Plan § 5.1.

DOCS_LA:244816.4 52063-001

1    likely prevents secured tax from being classified and an impaired accepting class); *In re Mesa Air*

2    *Group, Inc.*, 2011 WL 182450, *3 (Jan. 20, 2011) (holding that secured tax claims and priority tax

3    claims are not subject to classification as provided by section 1123(a)(1)).

4        Accordingly, each of the SunCal Plans cited above having tax claims that are classified are

5    not confirmable and nor should any votes for such "classes" be counted for any purpose, including

6    whether an impaired class of claims has accepted the applicable SunCal Plans as required by section

7    1129(b)(1) of the Bankruptcy Code.

8    **D.    Assumption of Contracts or Leases**

9        To the extent that the SunCal Plan Proponents intend to move to assume any of the contracts

10   they may believe any Debtor has with the Lehman Creditors, the Lehman Creditors withhold consent

11   thereto, reserve all rights to respond after appropriate notice and note that financial accommodation

12   contracts may never be assumed.

13   **E.    The Treatment of the Class of Contingent Bond
        Indemnification Claims Is Impermissible,**
14   **Unfairly Discriminatory and/or Exceeds the Court's Jurisdiction**

15       The Contingent Bond Indemnification Claims are claims of Elieff and others for indemnity

16   for any amounts to be paid in the future by Elieff and other to the Bond Issuers, which may include

17   future reimbursements by Elieff for amounts paid by Bond Issuers to other creditors in these cases –

18   some of which creditors may be holders of Mechanics Lien Claims.  Various of the SunCal Plans

19   provide that to the extent the Contingent Bond Indemnification Claims are secured claims, they are

20   separately classified from the Mechanic Lien Claims to which they are subrogated and receive

21   additional consideration beyond what other holders of Mechanic's Lien Claims receive, which

22   consideration is beyond the jurisdiction of the Court to afford.[34]  This treatment is impermissible in

23   two respects and makes the SunCal Plans unconfirmable:  (a) first, treatment of any "contingent"

24   claim must deal with the fact that it cannot be allowed until it is not contingent – and the plan

25   treatment simply ignores this; and (b) the treatment includes language, which if taken literally,

26   appears to ask the Court to unnecessarily exceed its jurisdiction by dictating the effect of continuing

27   bond obligations of the Bond Issuers (which cannot be eliminated under the SunCal Plans) to

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

---

[34] *See, e.g.,* TD Group I SunCal Plan, §§ 3.7 & 5.4, pp. 29-30 & 40.

1    municipalities, cities and utilities on the rights and obligations of future owners of the Projects.  Such

2    language includes:  "the Surety Bond will not apply to the Winning Bidder(s) bonding requirements

3    with respect to the development" and that for a new owner to develop the Project "it will be required

4    at that time to obtain new Surety Bonds."  If the purpose of this language is to make clear that the

5    SunCal Plans and any bond obligations of the Bond Issuers do not continue following the transfers to

6    the buyers, the language should have said just that.

7    **F.    The SunCal Plans Are Not Feasible**

8         Section 1129(a)(11) of the Bankruptcy Code requires as a condition of confirmation that the

9    bankruptcy court make an independent finding that:

10         Confirmation of the plan is not likely to be followed by the liquidation,
      or the need for further financial reorganization, of the debtor or any
11         successor to the debtor under the plan, unless such liquidation or
      reorganization is proposed in the plan.
12

13    11 U.S.C. § 1129(a)(11).  The Ninth Circuit has interpreted the purpose of section 1129(a)(11) to

14    "prevent confirmation of visionary schemes which promise creditors and equity security holders

15    more under a proposed plan than the debtor can possibly attain after confirmation."  *Pizza of Hawaii,*

16    *Inc. v. Shakey's, Inc. (In re Pizza of Hawaii, Inc.)*, 761 F.2d 1374, 1382 (9th Cir. 1985).  Thus, a

17    bankruptcy court has an obligation to scrutinize a plan to determine whether "it offers a reasonable

18    prospect of success and is workable."  The Ninth Circuit has interpreted *Pizza of Hawaii* to mean

19    that a bankruptcy court cannot have adequately determined whether a plan is feasible "without

20    evaluating whether a potential future judgment may affect the debtor's ability to implement its plan."

21    *In re Harbin*, 486 F.3d 510, 518 (9th Cir. 2007).  Thus, a bankruptcy court's "failure to consider

22    such a possibility in discharging its duties under section 1129(a)(11) is clear error."  *Id.*; (citing

23    *Brutoco Eng'g & Constr. Co. v. Dennis Ponte, Inc. (In re Dennis Ponte, Inc.)*, 61 B.R. 296, 300 (9th

24    Cir. B.A.P. 1986).

25         In *Harbin*, a creditor's claim was conditionally disallowed on the basis that the state court

26    entered a judgment in favor of the debtor and against the creditor.  *Id.* at 514.  At the time the

27    creditor's claim was conditionally disallowed, the bankruptcy court noted that such claim could be

28    reinstated if the creditor succeeded on appeal.  *Id.*  The bankruptcy court found that the debtor's plan

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

26

1   was feasible because it proposed to pay all creditors in full even though such plan did not take into

2   account the potential payment of the conditionally disallowed claim. *Id.* at 514-15. The Ninth

3   Circuit reversed and held that the bankruptcy court's approval of the plan was clearly erroneous

4   because it did not take into account the debtor's inability to satisfy the obligations under the plan if

5   the creditor prevailed on appeal. *Id.* at 518.

6        Similarly in *Pizza of Hawaii*, the Ninth Circuit reversed the bankruptcy court by holding that

7   the bankruptcy court's approval of the plan was clearly erroneous because it did not take into

8   account the debtor's inability to satisfy its obligations under the plan if objecting creditor prevailed

9   in its trademark litigation against the debtor. *Pizza of Hawaii*, 761 F.2d at 1382.

10       **1.   The SunCal Plans Are Not Feasible Because
             The SunCal Plan Proponents Do Not Have The Necessary
             Funds To Pay Administrative Claims Or Other Allowed Claims**

12           **a.   LitCo is a Shell that Lacks the Financial
                   Wherewithal to Fund Distributions Under the SunCal Plans**

14   In the SunCal Disclosure Statements, the SunCal Plan Proponents admit that

15           The offer by LitCo to purchase Allowed Reliance Claims for the sum
             of fifty-five cents ($0.55) per dollar of claim and certain other Plan
16           funding (e.g., to make required payments to Creditors holding Allowed
             Administrative Claims, Priority Claims and Tax Claims) will not be
17           funded by the SunCal Plan Proponents. Instead, the SunCal Plan
             Proponents are working with proposed investors/lenders who would
18           provide such funding. While the SunCal Plan Proponents are in
             discussions with third parties with respect to obtaining funding for the
19           SunCal Plan, **no commitment has yet been obtained for such
             funding and thus SunCal Plan Proponents are not in a position to
20           disclose the terms of such funding at this time. There is no
             guarantee that such funding will be obtained**.[35]

21   On the date hereof, the SunCal Plan Proponents have not disclosed any information with

22   respect to LitCo, including its beneficial owner, its financial wherewithal, or if such entity has

23   actually committed to purchase the Reliance Claims as proposed under the SunCal Plans. The

24   SunCal Plan Proponents have made it impossible for the Court and the Lehman Creditors to evaluate

25   the feasibility of virtually all funding provisions under the SunCal Plans. Without any support, the

---

[35] Disclosure Statement to VD Group I SunCal Plan, p. 3 (emphasis added). Identical or substantially similar provisions appear in the Disclosure Statements for the VD Group IV SunCal Plan, TD Group I SunCal Plan, and TD Group II SunCal Plan.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    confirmation of the SunCal Plans must be denied.

2              **b.    Prevailing in the Claim Objection Will Not Provide the Funds
                       Necessary to <u>Pay Administrative Claims and Other Distributions</u>**
3                      **<u>Under the SunCal Plans</u>**

4          The SunCal Plan Proponents' believe that by prevailing on the Claim Objection dispute they

5    will be entitled to a recovery that they will use to fund Administrative Claims and other distributions

6    to the holders of Allowed Claims.  While at numerous hearings the SunCal Plan Proponents

7    vehemently denied they are seeking anything more than recoupment by the Claim Objections, their

8    assertions are to the contrary.  For example, in a reply pleading filed with respect to a hearing on the

9    SunCal Disclosure Statements, the SunCal Plan Proponents asserted:

10
11              [w]hen these sixteen Projects are sold, which sales shall occur on the
                Effective Date, the SunCal Proponents will immediately "recoup"
12              from these sales proceeds the damages owed and immediately pay any
                allowed administrative claims.[36]

13          However, under applicable New York law,[37] "[r]ecoupment . . . is an equitable remedy that,

14   of itself, gives no right to actual payment."  *In re Kings Terrance Nursing Home and Health Related*

15   *Facility*, 184 B.R. 200, 202 (S.D.N.Y. 1995); *In re Drexel Burnham Lambert Group, Inc.*, 113 B.R.

16   830, 854 (Bankr. S.D.N.Y. 1990) (holding and quoting *Wright & Miller*, recoupment is "purely

17   defensive in character and could be used only to defeat or diminish plaintiff's recovery; recoupment

18   could not be the basis for affirmative relief.").  On the other hand, section 510(c) of the Bankruptcy

19   Code governs equitable subordination "of all or part of an allowed claim to all or part of another

20   allowed claim."  <u>Section 510(c) of the Bankruptcy Code clearly reflects that subordination can occur</u>

21   <u>only as to "allowed claims."</u>  *See* COLLIER ON BANKRUPTCY at ¶510.02[3] (16th Ed. 2010)

22   ("subordination changes the priority among valid claims").  <u>Yet, once the claim is allowed, section</u>

23   <u>502 of the Bankruptcy Code, including recoupment and setoff, is irrelevant.</u> *Id.* ("[s]ubordination is a

---

[36] *SunCal Plan Proponents' Omnibus Reply to Objections to First Amended Disclosure Statements* [Docket No. 2390]
(the "<u>Disclosure Statement Reply</u>"), p. 4.

[37] Both the Ninth Circuit and the Second Circuit are in agreement that any recoupment defense is governed by state law.
*Newbery Corp. v. Fireman's Fund Ins.*, 95 F.3d 1392, 1398 n.9 (9th Cir. 1996); *In re Madigan*, 270 B.R. 749, 758
(B.A.P. 9th Cir. 2001); *New York State Elec. And Gas Corp. v. McMahon (In re McMahon)*, 129 F.3d 93, 96 (2d Cir.
1997).  Where, as here, the controlling documents (the various loan agreements pursuant to which the loans were
made, the Restructuring Agreement and the purported Settlement Agreement) have New York choice of law
provisions, it is New York law that governs the analysis. *Westinghouse Credit Corp. v. D'Urso*, 278 F.3d 138, 146 n.3
(2d Cir. 2002).

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

28

1    remedy in which the order of payment rather than the existence of the debt is in issue"). The SunCal

2    Plan Proponents attempt to conflate these two statutory processes in an attempt to use collateral that

3    that is subject to the liens of the Lehman Creditors. Because the SunCal Plan Proponents are relying

4    on an affirmative recovery to fund payments under the SunCal Plans, such plans are not feasible and

5    thus unconfirmable.

6          c.    **Speculative Litigation Prospects is No Substitute for Adequate
              Protection**

7

8          The SunCal Plan Proponents contend that they will be permitted to use the Net Sale Proceeds

9    as of the Effective Date but <u>before</u> the various disputes are resolved regarding the Lehman Creditors'

10   claims without having to provide adequate protection based on the "quantum of evidence" of the

11   merits of the Debtors' litigation.[38]

12         Section 361 and 363(e) of the Bankruptcy Code provides that a secured creditor is entitled to

13   adequate protection if a debtor uses such creditor's collateral without consent. Section 361 of the

14   Bankruptcy Code provides examples of adequate protection (cash payments, replacement lien, or the

15   indubitable equivalent of the secured party's collateral). 11 U.S.C. 361. Notably, the SunCal Plan

16   Proponents have not offered any adequate substitute that would provide sufficient adequate

17   protection of the Net Sale Proceeds. Instead, the SunCal Plan Proponents believe that their litigation

18   prospects will be sufficient to justify their use of the Lehman Creditors' collateral over their

19   objection. For these reasons, the SunCal Plans are not feasible because the SunCal Plan Proponents

20   are depending on the availability of the Net Sale Proceeds to fund distributions when they cannot

21   provide the Lehman Creditors with adequate protection.

22         The SunCal Plans also provide that if the Lehman Claims are "disallowed," then the Plan

23   Trustee is authorized to use the Net Sale Proceeds to pay other Allowed Claims, apparently even if

24   there is a stay pending appeal.[39] In contrast, the SunCal Plans provide that if the Debtors fail to get

25   an order from the Bankruptcy Court disallowing such claims, the Plan Trustee will make a

26

27   [38] Disclosure Statement Reply, p. 5 ("By that point in time, the quantum of evidence before the Court confirming the
     merits of their defenses to the Lehman Claims will all but assure future disallowance of the claims in an amount that
     exceeds the proposed usage. Under these circumstances, use of Net Proceeds in the anticipated amount of this
28   disallowance should be allowed.")

[39] *See, e.g.*, TD Group I SunCal Plan, section 5.2 A.2

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

distribution to the Lehman Creditors only "to the extent required by an entered Order of the Court that is not subject to a stay pending appeal . . . ."[40]  The Plans cannot be used to override the Lehman Creditors' rights to obtain a stay pending appeal, especially while expressly reserving the Debtors' rights to obtain a stay.

### 2. The SunCal Plans are Not Feasible Because Marketing and Securing Project Bids Has Not Yet Occurred.

"[A] party proposing a chapter 11 plan that calls for the sale of an asset typically will need to present some evidence of a bona fide offer or competent marketing efforts to establish feasibility." *In re South Canaan Cellular Investments, Inc.*, 427 B.R. 44, 63 (Bankr. E.D. Pa. 2010) (emphasis added).  It is the SunCal Plan Proponents' burden to establish this essential requirement and no information or other support has been submitted.  Accordingly, the SunCal Plans are not feasible.

### 3. The SunCal Plans are Not Feasible and are Proposed in Bad Faith Because They Fail To Fund the Continuing Creditors' Committees

The committee professionals are to be paid post-confirmation from "Distribution Account(s)."  This means there is no funding for paying the committee professionals or its members expenses unless the Lehman Creditors are defeated or there is some unencumbered asset discovered or recovered.  Yet, the committees and their professionals are the entities that are tasked with investigating and prosecuting insider claims. For the insiders to fail to fund only the investigation of the claims against them does not reflect the good faith necessary for confirmation.

### 4. The VD Group I SunCal Plan Is not Feasible Because it Lacks a Disputed Claim Reserve

The VD Group I SunCal Plan fails to include adequate means for its implementation, and thus is not feasible, because it fails to reserve assets for distribution pending reconciliation of all disputed claims.[41]  The VD Group I SunCal Plan contemplates claims objections after confirmation (as they must since the Court will not hear them prior to confirmation).  In that regard, such plan lacks any mechanic for delaying payment for potentially disputed claims or reserving payment on initially disputed claims.  In these liquidating plans, (a) if payments to holders of Disputed Claims

---

[40] *See, e.g.*, TD Group I SunCal Plan, section 5.2 B

[41] *See, e.g.*, VD Group I SunCal Plan Art. IX.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

DOCS_LA:244816.4 52063-001

1   are not delayed, holders of Allowed Claims would be diluted by improper payments and receive too

2   little; and (b) if delayed payments for Disputed Claims are not put in a reserve, there may be nothing

3   to pay them when their claims are allowed.  Either circumstance demonstrates that the VD Group I

4   SunCal Plan fails to include adequate means for its implementation in addition to failing the best

5   interests test in a liquidating case and result in disparate treatment that violates the absolute priority

6   rule.  Without the amendment of a disputed claim reserve, the VD Group I SunCal Plan fails to

7   satisfy section 1129(a)(11) of the Bankruptcy Code.

8        **5.**     **The VD Group I Plan is not confirmable as to SunCal**
                   **Emerald Meadows Because the Failure to Address**
9                  **the $6 Million Lien of ECCU Precludes Feasibility**

10        The SunCal Plan Proponents estimate the worth of the Project of SunCal Emerald Meadows

11  at approximately $6 million.  The Evangelical Christian Credit Union ("ECCU") has asserted a lien

12  of just over that amount against a major parcel of that Project. This lien is unaddressed by the Plan.

13  Without dealing with the lien of ECCU, the Project could not be sold as contemplated by the SunCal

14  Plan or the applicable SunCal Disclosure Statement.

15  **G.**     **The SunCal Plans Violate the Absolute Priority Rule and**
            **Reflect a Lack of Good Faith With Respect to the Benefits Afforded Equity**
16

17        The SunCal Plans violate the absolute priority rule because Acquisitions, an indirect parent

18  of each of the Debtors, and its principal Elieff, receive under the SunCal Plans, among other things,

19  control Project sales, the SunCal/Lehman Litigation and claims objections, all as Plan Trustee.

20  Those rights have substantial value to Acquisitions and its direct and indirect owners.

21        Under the absolute priority rule, equity holders are not allowed to receive any distribution

22  under a plan on account of their equity interests unless non-consenting senior classes of claims are

23  paid in full.  11 U.S.C. § 1129(b)(2)(B).  Under the SunCal Plans, pre-petition equity interests are

24  cancelled, and no new equity is to be issued to anyone.  Rather, instead of the issuance of new

25  equity, the assets are transferred to a trust and Acquisitions will be the Plan Trustee with full

26  authority and control over the assets, the litigation with the Lehman Creditors, and the sale process.

27  Thus, for all intensive purposes, Acquisitions effectively owns the new equity of the reorganized

28  debtors, and has not given any value for that ownership.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

31

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1   Although Acquisitions is not a direct shareholder of the Debtors, it is a holder of an "interest"

2   by way of its indirect controlling interest in the Debtors.  In *In re 4 C Solutions, Inc.*, 302 B.R. 592,

3   597-98 (Bankr. C.D. Ill. 2003), a plan provided that the old shares would be cancelled, and new

4   shares issued for no consideration to an individual that did not directly own shares of the debtors, but

5   was an indirect owner with control through a holding company.  The bankruptcy court held that such

6   individual was effectively the holder of an "interest" within the meaning of the absolute priority rule

7   because of such control, and thus the absolute priority rule was violated.  *Id.*  In reaching its

8   conclusion, the bankruptcy court partially relied upon the Supreme Court's decision in *Norwest Bank*

9   *Worthington v. Ahlers*, 485 U.S. 197, 208 (1988), where the bankruptcy court noted that the

10   "Supreme Court has recognized that the power to control a corporation, through its board of

11   directors, that a majority shareholder has, is a separate property interest, distinct from the value of

12   the shares themselves."  *Id.*  Similarly, in *In re Global Ocean Carriers, Ltd*., 251 B.R. 31, 46-47

13   (Bankr. D. Del. 2000), the bankruptcy court was faced with the issue as to whether the debtors' plan,

14   which provided for the purchase of the reorganized debtors' stock to a company owned by the

15   daughter of the controlling shareholder of the debtor, violated the absolute priority rule.  *Id.* at 47-49.

16   The Court held that with respect to the controlling interest of the debtors' shareholder, "[t]his control

17   of Global Ocean is a right which he holds 'on account of' his current position as a controlling

18   shareholder of Global Ocean," and the designation of a company owned by his daughter to purchase

19   the new stock implicated the absolute priority rule, and the new value exception.  *Id.* at 52.  In the

20   SunCal Plans, the problem is even more exacerbated, as Acquisition, the controlling equity holder of

21   the Debtors, is designating and essentially gifting control of the reorganized Debtors to itself for no

22   value whatsoever.

23   There is, however, the "new value" exception, which allows junior interest holders (*e.g.*,

24   equity holders in a corporate debtor) to receive a distribution of property under a plan if they offer

25   "value" to the reorganized debtor that is: (1) new; (2) substantial; (3) money or money's worth; (4)

26   necessary for a successful reorganization; and (5) reasonably equivalent to the value or interest

27   received.  *See Liberty Nat'l Enters. v. Ambanc La Mesa Ltd. P'ship (In re Ambanc La Mesa Ltd.*

28   *P'ship)*, 115 F.3d 650, 654 (9th Cir. 1997), *cert. denied*, 522 U.S. 1110 (1998); *Bonner Mall P'ship*

32

*v. U.S. Bancorp Mortgage Co. (In re Bonner Mall P'ship)*, 2 F.3d 899, 906-07 (9th Cir. 1993).  Only those contributions that will actually be paid on the effective date of the plan may be considered as "money or money's worth" under the new value exception.  *See, e.g.*, *Ambanc*, 115 F.3d at 654-55 ("The relevant amount for the substantiality analysis is the partners' up-front contribution").  In determining whether the new value contribution is "reasonably equivalent to the value being received," courts have required that the new value be substantial in comparison to such things as (1) the total unsecured claims against the debtor, (2) the claims being discharged, or (3) the dividend being paid on unsecured claims by virtue of the contribution.  *Id.* at 656.

Literally none of the requirements to satisfy the "new value exception" have been shown.

Additionally, although the insider Plan Trustee does not take a "fee," there is no disclosure of the extent it can pass through expenses of paying affiliates for services.  With Liquidating Trusts being formed, there should be transparency and the provision for the filing of periodic financial reporting and disclosure of all payments of expenses to the Plan Trustee or payments to its affiliates, all of which should be subject to Court approval.  Post-confirmation jurisdiction should include the Court's ability to monitor payments to insiders and its affiliates.

Moreover, the limitation on the insiders' liability[42] needs a carveout noting that the Plan Trustee can be liable for damages from gross negligence or intentional misconduct and should be liable for mere negligence as to all of the specific obligations imposed on it under the Plan.  As to the need for this accountability, by example, section 7.13 of the TD Group I SunCal Plan permits the Plan Trustee select the Project and asset values on which creditors pay taxes, which could cost creditors if not done with care.

## H.    Having Acquisitions As Plan Trustee Represents a Conflict Of Interest That Prevents Confirmation Of The SunCal Plans

For the SunCal Plans to be confirmed, the appointment of Acquisitions as the Plan Trustee must be "consistent with the interest of creditors and equity security holders and with public policy."  11 U.S.C. §1129(a)(5)(A)(ii).  Under the SunCal Plans, the Plan Trustee will control the sales of Projects and Other Assets, prosecute the Lehman Adversary Proceeding, and be the sole party

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

---

[42] *See, e.g.*, section 7.7 of TD Group I SunCal Plan.

DOCS_LA:244816.4 52063-001

responsible for objecting to Claims, with limited exceptions.  However, Acquisitions has irreconcilable conflicts in carrying out these responsibilities, because (a) Elieff benefits from trading off a lower purchase price in Project sales for either or both (i) assumption or elimination of Elieff's and Acquisitions' Bond Issuer indemnity obligations by the Acquisitions' selected buyer, or (ii) the selection of SunCal Management or Acquisitions by the buyer to develop/manage the subject Project(s); and (b) as to the Lehman Adversary Proceeding, if LitCo is tied in any fashion to any of Elieff's affiliates (there is no disclosure on this point), then Elieff or his affiliates, as assignee of claims under the "offer" by LitCo to purchase Reliance Claims, may utilize Acquisitions' control of the Lehman Adversary Proceeding to afford their own claims better treatment.  The SunCal Plan Proponents' proposal to use an independent professional fails to address the conflict issues and adds an unnecessary layer of expenses.

## I.    The VD Group IV SunCal Plan Is Unconfirmable

The VD Group IV SunCal Plan is premised on the SunCal Plan Proponents' ability to reacquire the property (Pacific Point Project) formerly owned by Debtor SJD Partners and SJD Development as equity owner of such Debtor.  The Lehman Creditors filed contingent claims against these estates in the event that the SunCal Plan Proponents prevail in reacquiring the Pacific Point Project.  Thus, at this juncture, the Lehman Creditors' claims are contingent and not subject to resolution or judicial adjudication unless and until it is finally determined whether the SunCal Plan Proponents can reacquire the Project.  Presumably, if the Project were reacquired and the Lehman Creditors claims were not disallowed, the claims would be secured or unsecured.

### 1.    The Plan Itself Impermissibly Disallows
the Claims of the Lehman Creditors

As to the potential secured claims of the Lehman Creditors, section 5.1 of the VD Group IV SunCal Plan purports to disallow all of such claims (and those of Lehman Re) pursuant to sections 506(a) and 506(d) of the Bankruptcy Code "because there is no collateral to support such alleged Claims and the liens shall be declared null and void."[43]  Section 5.1 of the VD Group IV SunCal Plan is fatally flawed because a plan proponent may not seek to avoid an interest in property through

---

[43] VD Group IV SunCal Plan § 5.1.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

a provision in a chapter 11 plan. *In re Golden Plan of California, Inc.*, 829 F.2d 705, 711 and 712 (9th Cir. 1986). Bankruptcy Rule 7001 requires a trustee or debtor to commence an adversary proceeding to "determine the validity, priority, or extent of a lien or other interest in property. Bankruptcy Rule 7001(2). A chapter 11 plan that seeks to avoid a lien or other interest in property contravenes the express requirements under Bankruptcy Rule 7001. *Golden Plan*, 829 F.2d at 711-12. In a prior decision, the Ninth Circuit address how a plan proponent should object to or contest the validity of a creditor's interest in property of the estate:

> More importantly, in trying to avoid the investors' property interests by the court's approval of the plan, the Trustee sought to place on the investors the burden of challenging the Trustee's ability to avoid their interests by requiring them to object to the plan. Normally, when a creditor files a proof of claim, it becomes prima facie evidence of the claims' validity and amount. Fed. R. Bankr. P. 301. The burden is then on the Trustee to produce evidence and facts to defeat the claim through an adversary proceeding under Rule 701. The Trustee's attempt to avoid the investors' interests by confirmation of a plan, if successful, would have circumvented the Trustee's duty to prove that he was entitled to such relief.

*In re Commercial Western Finance Corp.*, 761 F.2d 1329, 1337 (9th Cir. 1985). In further support of this result, the United States Supreme Court has held that section 506(d) of the Bankruptcy Code does not void liens on the basis of whether they are secured under section 506(a) of the Bankruptcy Code, rather, such liens are avoided on the basis of whether the underlying claims are allowed or disallowed under section 502 of the Bankruptcy Code. *Dewsnup v. Timm*, 502 U.S. 410, 415-16 (1992). Because the proposed treatment of the Lehman Creditors' claims under the VD Group IV SunCal Plan violates section 506(d), Bankruptcy Rule 7001(2), and 1129(a)(1), confirmation should be denied.

### 2. The Plan Unfairly Discriminates in Favor of the Class of Reliance Claims

In the VD Group IV SunCal Plan, the definition and treatment of Reliance Claims discriminates unfairly against all non-Reliance Claimants holding non-priority unsecured claims: In the VD Group IV SunCal Plan, Reliance Claimants get 50% if LitCo purchases the Project, but the holders of such claims give up nothing different than any other estate creditor. While Reliance Claims are defined as claims that would be beneficiaries of a judgment against the Lehman

DOCS_LA:244816.4 52063-001

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1   Creditors, this SunCal Plan offers no rationale for why the creditors on Exhibit 8 identified as

2   Reliance Claimants were selected as the creditors who would be beneficiaries of judgment against

3   the Lehman Creditors.  Other of the SunCal Plans make clear that the only justification for Reliance

4   Claims' class under those SunCal Plans is the third party purchase offer for non-estate assets. *See*

5   *e.g.*, Group I TD Plan, p. 35, n. 3.  (In three other SunCal Plans, Reliance Claimants sell their own

6   litigation rights to a third party.)

7       **3.     The Plan Fails to Include Safeguards Assuring a Project Sale
            that would Afford the Lehman Creditors at least as much
8            as in a Chapter 7 Case or the Indubitable Equivalent of Its Claims**

9       The VD Group IV SunCal Plan provides for the liquidation of the Pacific Point Project in the

10  event such project is "reacquired" by the Plan Trustee or LitCo; however, no procedures or any

11  disclosure whatsoever is provided with respect to how such liquidation or other disposition will

12  proceed, will it be subject to a separate motion and Court approval, etc.[44]  Because the VD Group IV

13  SunCal Plan cannot eliminate the Lehman Creditor's lien in the event the Project is required, the

14  Lehman Creditors will still hold a secured claim against such Project.  Therefore, any sale or other

15  disposition of the Project under the VD Group IV SunCal Plan must afford the Lehman Creditors

16  treatment that conforms with the requirements of section 1129(b)(2)(A) of the Bankruptcy Code.

17  Even if the Lehman Claims were subordinated, they would be entitled to assurance of a sale process

18  that achieves the highest and best price to assure they would receive as much under the SunCal Plan

19  as they would receive in a chapter 7 case as required by section 1129(a)(7) of the Bankruptcy Code.

20  **J.     The Lehman Creditors Reserve the Right to Designate Votes**

21      The Lehman Creditors reserve the right to designate any entity whose acceptance or rejection

22  of the Plans was not in good faith, or was not solicited or procured in good faith pursuant to section

23  1126(e) of the Bankruptcy Code.

24  **K.     Reservation of Rights**

25      The Lehman Creditors reserve all rights to supplement this objection and in response to any

26  issues raised or not raised in the brief to be filed by the SunCal Plan Proponents in support of

27  confirmation of the SunCal Plans.

28  ---
[44] VD Group IV SunCal Plan § 7.2.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

36

1

## IV.

## <u>CONCLUSION</u>

WHEREFORE the Lehman Creditors respectfully request that the Court deny confirmation of the SunCal Plans as they fail to satisfy the requirements under section 1129 of the Bankruptcy Code.

Dated:    September 19, 2011                PACHULSKI STANG ZIEHL & JONES LLP


                                           */s/ Robert B. Orgel*
                                           Richard M. Pachulski (CA Bar No. 90073)
                                           Dean A. Ziehl (CA Bar No. 84529)
                                           Robert B. Orgel (CA Bar No. 101875)
                                           John W. Lucas (CA Bar No. 271038)
                                           PACHULSKI STANG ZIEHL & JONES LLP
                                           10100 Santa Monica Boulevard, 13th Floor
                                           Los Angeles, California  90067
                                           Telephone:  (310) 277-6910
                                           Facsimile:  (310) 201-0760

                                           Edward Soto (admitted *pro hac vice*)
                                           Alfredo R. Perez (admitted *pro hac vice*)
                                           WEIL, GOTSHAL & MANGES LLP
                                           1395 Brickell Avenue
                                           Suite 1200
                                           Miami, Florida 33131
                                           Telephone:  (305) 577-3100
                                           Facsimile:  (305) 374-7159

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

37

# <u>EXHIBIT A</u>

EXHIBIT A

Lehman Creditors' Objection to the SunCal Plans

| Obj. No. | Applicable SunCal Plan Provision(s) | Description of Objection(s) |
|---|---|---|
| 1. | VD Group I § 2.1.4 | **Acton Project Break-Up Fee:**<br><br>The proposed break-up fee for this project is not necessary and impermissibly allocates a substantial portion of the purchase price to pay the Administrative Claims against the Debtor that owns the Project.<br><br>For example, if LitCo is the Stalking Horse Bidder, the amount of Administrative Claims against the Debtors automatically becomes a component of the break-up fee because the Initial Overbid Amount must include (i) 2.5% of the Minimum Sale Price and (ii) the amount of Administrative Claims against the Debtor.  While a prospective purchaser of a Project might not care how the sale proceeds are allocated after it receives the Project, the SunCal Plan Proponents cannot surcharge the sale proceeds from the Project to satisfy the obligations of the applicable Debtor because they would be using collateral that is subject to the liens of secured creditors.  Thus, by diverting sale proceeds to satisfy Administrative Claims, the SunCal Plan Proponents are not ensuring that the Lehman Creditors will receive the indubitable equivalent of their claims.<br><br>The proposed break-up fee is not reasonable because it is designed to be substantially greater than 2.5% of the Minimum Sale Price because it also includes millions of dollars in Administrative Claims.<br><br>In any of event, the break-up fee should not be payable to an insider, especially when an insider is slated to be the party that will determine whether a bid is qualified or not. |
| 2. | TD Group I § 2.1.2<br>TD Group II § 2.1.2<br>VD Group I § 2.1.5<br>VD Group II § 2.1.5<br>VD Group III §§ 2.1.2 & 3.2<br>VD Group IV § 2.1.2 & 3.2<br>CC § 2.1.3 & 3.2 | **Administrative Claim(s):** This definition is flawed because it purports to include "any fees or charges assessed against an" applicable Debtors' estate that are subject to the requirements under section 506(c) of the Bankruptcy Code.<br><br>Certain of the SunCal Plans also fail to specify the source of payment of allowed Administrative Claims (*e.g.*, VD Group III Plan, VD Group IV Plan, and CC Plan).  Each such plan fails to satisfy the requirements under sections 1129(a)(9) and (a)(11) of the Bankruptcy Code they have no funding or a commitment from an entity party that has the financial wherewith to perform. |
| 3. | TD Group I §§ 2.1.5-.7<br>TD Group II §§ 2.1.5-.7<br>VD Group I §§ 2.1.8-.10<br>VD Group II §§ 2.1.8-.10<br>VD Group III §§ 2.1.5-.7<br>VD Group IV §§ 2.1.5-.7<br>CC § 2.1.6-.8 | **"Allowed" and Related Definitions:**  The relating definitions are unclear as to whether any objections are permissible to the status of claims, (e.g., administrative, priority or secured), as opposed to their amount, or whether objections are permitted to claims scheduled as undisputed, unliquidated and contingent.  Such objections must be permitted and the definitions should be clear on this. |
| 4. | VD Group II § 2.1.22 | **Beaumont Heights Break-Up:**  The SunCal Plan Proponents have failed to justify the need and benefit of a break-up fee for this project.  Thus, without <u>first</u> demonstrating the necessity and benefit of a stalking horse bidder, it is impossible to determine whether the economic terms of the proposed break-up fee are reasonable.  The SunCal Plan Proponents have not provided any information to show that a stalking horse bidder is necessary to attract bidders because there might already be sufficient interest in the Project or whether such a fee will benefit the estate.  In addition, the fact that the SunCal Plan Proponents have lowered |

| Obj. No. | Applicable SunCal Plan Provision(s) | Description of Objection(s) |
|---|---|---|
| | | the proposed break-up fee to 2.5% of the Minimum Sale Price for this Project does not show that such fee is reasonable in relation to the actual sale price for this project. |
| 5. | VD Group I § 2.1.22 | **Bickford Ranch Project Break-Up Fee:** *See* Objection No. 1 above. |
| 6. | VD Group III § 2.1.42 | **Del Rio Break-Up Fee:** *See* Objection No.4 above. |
| 7. | TD Group I § 2.1.43 | **Delta Coves Project Break-Up Fee:** *See* Objection No. 1 above. |
| 8. | TD Group I § 2.1.47 TD Group II § 2.1.45 VD Group I § 2.1.49 VD Group II § 2.1.46 VD Group III § 2.1.47 VD Group IV § 2.1.40 CC § 2.1. | **Disputed Lien(s):** This definition is flawed because it attempts to define liens in such a way that they may be eliminated solely by sections 506(a) and (d). However, a party may not seek to invoke the lien stripping mechanism under section 506(d) of the Bankruptcy Code until the lien and claim are challenged pursuant to section 502 of the Bankruptcy Code and Bankruptcy Rules 3007 and 7001. Further, in defining the Liens held by the Lehman Creditors the term "Disputed" should not be added as a character of the definition. It is unclear what happens to the Lehman Creditors' Lien when it is Allowed. Note: Section 8.4.2 of the SunCal Plans cancels all Liens that are not otherwise preserved and a Lien for the benefit of the Lehman Creditors' allowed claims is not accounted for. |
| 9. | VD Group I § 2.1.48 & Article IX | **Disputed Claims Reserve:** The VD Group I Plan fails to include adequate means for its implementation because such plan contemplates claims objections post-confirmation and after the Effective Date, but lacks any mechanic for delaying payment for potentially Disputed Claims or reserving payment on initially Disputed Claims. In this liquidating plan, (a) if payments to holders of Disputed Claims are not delayed, holders of Allowed Claims would be diluted by improper payments and receive too little; and (b) if delayed payments for Disputed Claims are not put in a reserve, there may be nothing to pay them when their claims are allowed. Either circumstance causes a failure of the best interests test, ultimately violates the absolute priority rule because some junior creditors could receive more than senior creditors, and results in disparate treatment within a class. |
| 10. | VD Group I § 2.1.57 | **Emerald Compromise:** The compromiser makes no sense. The Debtor and any successor owners of the Project would be bound to covenants running with the land that require them to perform obligations that they may not be able to legally perform and that are untethered from a marketable and economically-viable development plan for the Project. Moreover, the settlement unnecessarily and unfairly has the effect of converting alleged prepetition unsecured claims into postpetition obligations and/or administrative claims. By imposing obligations on the Debtor and any successor in title to the Project that may be impossible to perform (as well as serve no rational purpose), and for which the settling parties will have whole dollar claims for breach against the Debtor or its successor, the settlement will make the Project less valuable and mean that less value will be available for the Debtor's creditors (other than, perhaps, the settling creditors). |
| 11. | TD Group I § 2.1.60 TD Group II § 2.1.59 TD Group III § 2.1.57 VD Group I § 2.1.64 VD Group II § 2.1.58 VD Group III § 2.1.59 VD Group IV § 2.1.52 CC § 2.1.46 | **Final Order:** The definition of Final Order appears defective – it is written to include interlocutory orders that may yet be subject to appeal and this does not appear intended or to make sense. |

2

| Obj. No. | Applicable SunCal Plan Provision(s) | Description of Objection(s) |
|---|---|---|
| 12. | TD Group I § 2.1.66 | **Heartland Project Break-Up Fee:** *See* Objection No. 1 above. |
| 13. | TD Group I § 2.1.70<br>TD Group II § 2.1.65<br>VD Group I § 2.1.72 | **Initial Overbid Amount:** The definition of "Initial Overbid Amount" in TD Group I Plan, TD Group II Plan, and VD Group I Plan reflects that any Qualified Bidder that submits an Initial Overbid must pay the Administrative Claims associated with the applicable Debtor as part of this Initial Overbid Amount.<br><br>In addition, by having the Initial Overbid Amount include the amount of Administrative Claims, it chills the bidding process because the initial bid increment will be so large that no bidder will be likely to bid an amount that does not relate to the fair market value of the Project.<br><br>Based on the foregoing, this definition contributes to making the SunCal Plans deprive the secured creditors of the indubitable equivalent of their claims and receipt of as much s they would get in a chapter 7 case. |
| 14. | VD Group II § 2.1.68 | **Johannson Ranch Project Break-Up Fee:** *See* Objection No.4 above. |
| 15. | TD Group I § 2.1.95<br>TD Group II § 2.1.88<br>VD Group III § 2.1.86<br>VD Group IV § 2.1.79<br>CC § 2.1.63 | **Legal Rate**: In some SunCal Plans, this term is not used, but it is defined. In others, this term is used and <u>not</u> defined. The applicable SunCal Plans should be revised to either remove the definition, if the term is not used, or add a definition, if the defined term is used. |
| 16. | TD Group I § 2.1.77 & 3.3<br>TD Group II §§ 2.1.72 & 3.3<br>VD Group I § 2.1.77<br>VD Group IV § 2.1.67 | **Lehman Disputed Administrative Loans:** The definition and related treatment provisions should be removed entirely. On August 24, 2011, the Bankruptcy Court entered an order reflecting that the Administrative Claims of the Lehman Creditors that were being disputed by the SunCal Plan Proponents are, pursuant to *In re MicroAge, Inc.*, 291 B.R. 503 (B.A.P. 9th Cir. 2002), allowed and not subject to dispute. *See* [Docket No. 2604]. For these reasons, the Lehman Creditors' Administrative Claims should be treated and paid on the Effective Date at the same time as other holders of allowed Administrative Claims, otherwise the SunCal Plans are not confirmable because the applicable provisions of such plans violate section 1129(a)(9) of the Bankruptcy Code. If the SunCal Plan Proponents do not have sufficient funds to make distributions on account of the Lehman Administrative Loans, the applicable SunCal Plans are not feasible and violate section 1129(a)(11) of the Bankruptcy Code. |
| 17. | TD Group I § 2.1.82<br>TD Group II § 2.1.77<br>VD Group I § 2.1.85<br>VD Group III § 2.1.76<br>VD Group IV § 2.1.67 | **Lehman Disputed Loans:** This definition should be revised to reflect that there are no "Lehman Disputed Administrative Loans" for the reasons stated in Objection No. 16 above. |
| 18. | TD Group I § 2.1.84<br>TD Group II § 2.1.79<br>VD Group I § 2.1.88<br>VD Group III § 2.1.81<br>VD Group IV § 2.1.72<br>CC §§ 2.1.60 | **Lehman Successor(s):** This definition was drafted at a time when it was still disputed who are the beneficial owners of the Lehman Loans. Consequently, the definition should be revised to reflect that the applicable Lehman Creditors are the beneficial owners of the Disputed Loans for the reasons set forth in *In re Lehman Brothers Holdings Inc.*, 435 B.R. 122 (S.D.N.Y. 2010), *aff'd*, 402 Fed. Appx. 634 (2d Cir.). |

DOCS_SF:78202.4 52063-001

| Obj. No. | Applicable SunCal Plan Provision(s) | Description of Objection(s) |
|---|---|---|
| 19. | TD Group I § 2.1.85<br>TD Group II § 2.1.80<br>VD Group I § 2.1.89<br>VD Group III § 2.1.74<br>VD Group IV § 2.1.65 | **Lehman's Disputed Claims:** This definition should be revised to reflect that there are no "Lehman Disputed Administrative Loans" for the reasons stated in the objection above in Objection No. 16 above. |
| 20. | TD Group I § 2.1.88<br>TD Group II § 2.1.83<br>VD Group I § 2.1.94<br>VD Group II § 2.1.78<br>VD Group III § 2.1.82<br>VD Group IV § 2.1.74 | **LitCo:** As discussed in greater detail in the narrative portion of the Lehman Creditors' Objection, the definition is inadequate because there SunCal Plan Proponents have failed to demonstrate this entity has the financial wherewithal to fund and commit to make distributions under the SunCal Plans. Further, the SunCal Plans fail because they do not describe who are the principals of this company, their relationship to the SunCal Plan Proponents or the Debtors, or the terms under which LitCo will lend funds to the SunCal Plan Proponents for the purpose of funding Administrative Claims, Priority Claims, and purchase Reliance Claims. In addition, this definition should be removed for the SunCal Plans in which LitCo does not have a proposed role (*e.g.*, VD Group III Plan, VD Group IV Plan), or if it does apply to such plans then these plans, such plans are fatally flawed because they fail to show the source of funds to pay the applicable claims or that such entity has the financial wherewithal to fund and commit to make distributions under these SunCal Plans. |
| 21. | TD Group I §§ 2.1.95<br>TD Group II §§ 2.1.84<br>VD Group I §§ 2.1.94<br>VD Group II § 2.1.79<br>VD Group III § 2.1.83<br>VD Group IV § 2.1.75 | **LitCo Plan Loan**: *See* Objection No. 20. In addition, unless the SunCal Plan Proponents disclose the identity of the third party and any commitment letter or other agreement binding such third party to loan the funds, the terms of the loan, and such party's financial wherewithal to fund LitCo with what will necessarily be substantial amounts necessary to pay the expenses set forth in the definition, the SunCal Plans are not feasible and violate section 1129(a)(11) of the Bankruptcy Code. |
| 22. | TD Group I § 2.1.93 | **Marblehead Break-Up Fee:** *See* Objection No. 1 above. |
| 23. | TD Group I § 2.1.90<br>TD Group II § 2.1.88<br>VD Group I § 2.1.99<br>VD Group IV § 2.1.79 | **Maximum Distribution:** This term is not used. If not applicable, should be removed to avoid confusion. |
| 24. | TD Group I § 2.1.94<br>TD Group II § 2.1.92<br>VD Group I § 2.1.103<br>VD Group II § 2.1.87<br>VD Group III § 2.1.89 | **Minimum Sale Price:** The definition and its relationship to the sale procedures contained in Article VII of the applicable SunCal Plan fail to obtain the highest and best price for the applicable Projects and deprive the Lehman Creditors and other secured creditors of the highest and best sale price for each of the Projects. First, these minimum prices are artificially low and make an overbid (and loss of value to pay a break-up fee) that much more likely. Second, the low initial prices and insider control of who can overbid is especially improper in the event that the Stalking Horse Bidder itself is an insider who can purchase the Projects cheap and chill overbidding against itself. Additionally:<br><br>TD Group I Plan: The Minimum Sale Price for the Marblehead Project, Palm Springs Village Project, Oak Valley Project, Heartland Project, and Delta Cove Project are each artificially low. They are lower than the values ascribed to these projects in the Disclosure Statement for the VD Group III Plan. For example, the values used in the TD Group I Plan are lower by the following amounts when compared to the amounts used in the Disclosure Statement: Marblehead Project (**$9,380,000**), Palm Springs Village Project (**$8,010,000**), Oak Valley Project (**$2,100,000**), Heartland Project (**$750,000**), and Delta Cove Project (**$2,080,000**). These values are also substantially lower than the values ascribed to these projects by the Lehman Creditors by |

4

| Obj. No. | Applicable SunCal Plan Provision(s) | Description of Objection(s) |
|---|---|---|
| | | the following amounts:  Marblehead Project (**$103,430,000**), Palm Springs Village Project (**$3,810,000**), Oak Valley Project (**$2,000,000**), Heartland Project (**$1,150,000**), and Delta Cove Project (**$6,480,000**). |
| | | TD Group II Plan:  The Minimum Sale Price for the Oak Knoll Project and Del Amo Project are each artificially low. They are lower than the values ascribed to these projects in the Disclosure Statement for the VD Group III Plan.  For example, the values used in the TD Group II Plan are lower by the following amounts when compared to the amounts used in the Disclosure Statement:  Oak Knoll Project (**$2,540,000**) and Del Amo Project (**$1,350,000**).  These values are also substantially lower than the values ascribed to these projects by the Lehman Creditors by the following amounts:  Oak Knoll Project (**$25,140,000**) and Del Amo Project (**$21,850,000**). |
| | | VD Group I Plan:  The Minimum Sale Price for the Ritter Ranch Project, Bickford Ranch Project, and Acton Project are each artificially low.  They are lower than the values ascribed by the SunCal Plan Proponents to these Projects in the Disclosure Statement for the VD Group I Plan.  To the extent this lower "sales price" is so that a buyer can divert sale consideration to pay Administrative Claims, this is improper and prevents a fair sale process.  For example, the values used in the VD Group I Plan are lower by the following amounts when compared to the amounts used in the Disclosure Statement:  Ritter Ranch Project (**$2.1 million**), Bickford Ranch Project (**$1.1 million**), and Acton Project (**$100,000**).  (These values are also substantially lower than the values ascribed to these Projects by the Lehman Creditors by the following amounts:  Ritter Ranch Project (**$21,100,000**) and Bickford Ranch Project (**$18,500,000**).) |
| | | VD Group II Plan:  The Minimum Sale Price for the Beaumont Height Project and Johannson Ranch Project are each artificially low.  They are lower than the values ascribed to these projects in the Disclosure Statement for the VD Group II Plan.  For example, the values used in the VD Group II Plan are lower by the following amounts when compared to the amounts used in the Disclosure Statement:  Beaumont Height Project (**$120,000**).  These values are also substantially lower than the values ascribed to these projects by the Lehman Creditors by the following amounts:  Beaumont Height Project (**$900,000**) and Johannson Ranch Project (**$3,400,000**). |
| | | VD Group III Plan:  The Minimum Sale Price for the SCC Communities Assets and Tesoro Assets are each artificially low.  They are lower than the values ascribed to these projects in the Disclosure Statement for the VD Group III Plan.  For example, the values used in the VD Group II Plan are lower by the following amounts when compared to the amounts used in the Disclosure Statement:  SCC Communities Assets (**$850,000**) and Tesoro Assets (**$850,000**).  These values are also substantially lower than the values ascribed to these projects by the Lehman Creditors by the following amounts:  SCC Communities Assets (**$1,050,000**) and Tesoro Assets (**$1,150,000**). |
| 25. | TD Group I § 2.1.101<br>TD Group II § 2.1.94<br>VD Group I § 2.1.105<br>VD Group II § 2.1.89<br>VD Group III § 2.1.92 | **Net Sales Proceeds:**  By this definition, the SunCal Plan Proponents wrongfully exclude from Net Sale Proceeds amounts for expenses other than those permissibly chargeable against secured creditors' collateral.  The definition thereby contributes to the SunCal Plans failing the "best interests" test and failing to afford the Lehman Creditors and secured creditors the indubitable equivalent of their claims.<br><br>First, the reference to "Chapter 11 Trustee Fees" wrongfully allocates secured proceeds to satisfy fees that are general administrative expenses.  Similarly, "Post-Confirmation Expenses" have no relationship to the preservation and disposition of the Projects or Other Assets, nor do such expenses benefit the Lehman Creditors in any manner.  Accordingly, this term permits the use of sale proceeds in which secured creditors hold an interest without their consent and, thus, represents an impermissible surcharge that prevents secured creditors from obtaining the indubitable equivalent of their claims or as much as they would receive in a chapter 7 case.<br><br>Section 506(c) of the Bankruptcy Code imposes a very strict standard for surcharge that requires a debtor/trustee to show (i) reasonableness, (ii) necessity, and (iii) a direct benefit to the lender.  Further, even if such conditions are satisfied, under |

| Obj. No. | Applicable SunCal Plan Provision(s) | Description of Objection(s) |
|---|---|---|
| | | controlling Ninth Circuit authority, as cited in the narrative, section 506(c) only permits a surcharge against a lender's collateral if the claims associated with the collateral are both secured and allowed. Here, the Lehman Creditors' claims have not yet been allowed. |
| 26. | TD Group I § 2.1.101<br>TD Group II § 2.1.94<br>VD Group I § 2.1.106<br>VD Group II § 2.1.89<br>VD Group III § 2.1.92 | **Net Sales Proceeds Account(s):** The accounts selected by the SunCal Plan Proponents should be located a banks that are on the U.S. Trustee's list of approved depositories. In addition, the accounts should be interest bearing and all dispositions from the accounts subject to court authorization. |
| 27. | TD Group II § 2.1.96 | **Oak Knoll Break-Up Fee:** *See* Objection No. 1 above. |
| 28. | TD Group I § 2.1.104 | **Oak Valley Project Break-Up Fee:** *See* Objection No. 1 above. |
| 29. | TD Group I § 2.1.105<br>TD Group II § 2.1.98<br>VD Group I § 2.1.107<br>VD Group II § 2.1.91<br>VD Group III § 2.1.94 | **Opening Bid:** This component of the bidding and sale procedures fails to satisfy the "best interests" and indubitable equivalent requirements under section 1129 of the Bankruptcy Code as to the Lehman Creditors. The process is flawed because its efficacy cannot be gauged. No support has been afforded regarding (i) the criteria to be used to select a Stalking Horse Bidder or (ii) why the Minimum Sales Price is reasonable. This definition, along with the balance of the bidding and sale procedures cannot be approved as they permit the SunCal Plan Proponents to select insiders or any other party as a Stalking Horse Bidder without any standard that ensures the highest and best price will be obtained. As drafted, the SunCal Plan Proponents are effectively ensuring that the Stalking Horse Bidder will be paid a break-up fee. |
| 30. | TD Group I §§ 2.1.116 & .117<br>TD Group II §§ 2.1.107 & .108<br>VD Group I §§ 2.1.118 & .119<br>VD Group II §§ 2.1.99 & .100<br>VD Group III §§ 2.1.102 & .103<br>VD Group IV §§ 2.1.93 & .96<br>CC §§ 2.1.74 & .77 | **Plan Trust** and **Plan Trustee:** As discussed in greater detail in the narrative portion of this Objection, there is an inherent conflict of interest to have Acquisitions serve as Plan Trustee given that this entity is the indirect parent of the Debtors. The SunCal Plan Proponents' proposal to use an independent professional does not address the conflict and adds an unnecessary layer of administrative expenses. The proposal to have Acquisitions serve as Plan Trustee is a direct violation of section 1129(a)(5)(A)(ii) of the Bankruptcy Code because Acquisitions has irreconcilable conflicts in carrying out these responsibilities, because (a) Elieff benefits from trading off a lower purchase price in Project sales for either or both (i) assumption or elimination of Elieff's and Acquisitions' Bond Issuer indemnity obligations by the Acquisitions' selected buyer, or (ii) the selection of SunCal Management or Acquisitions by the buyer to develop/manage the subject Project(s); and (b) as to the Lehman Adversary Proceeding, if LitCo is tied in any fashion to any of Elieff's affiliates (there is no disclosure on this point), then Elieff or his affiliates, as assignee of claims under the "offer" by LitCo to purchase Reliance Claims, may utilize Acquisitions' control of the Lehman Adversary Proceeding to afford their own claims better treatment.. |
| 31. | | **Plan Trust Agreement:** It is unclear why this definition was omitted from the SunCal Plans when the SunCal Plans still use the term in places and the plans still contemplate the creation of the a plan trust administered by a plan trustee. Because the SunCal Plan Proponents propose transferring the assets of each Debtor to a trust, it is essential that the terms of the Plan Trust be governed by a plan trust agreement. The failure to include a plan trust agreement demonstrates that the SunCal Plans are not feasible and violate section 1129(a)(11) of the Bankruptcy Code. |
| 32. | TD Group I § 2.1.109 | **PSV Break-Up Fee:** *See* Objection No.1 above. |

6

| Obj. No. | Applicable SunCal Plan Provision(s) | Description of Objection(s) |
|---|---|---|
| 33. | TD Group I § 2.1.127<br>TD Group II § 2.1.118<br>VD Group I § 2.1.129<br>VD Group II § 2.1.110<br>VD Group III § 2.1.113 | **Qualifying Bidder:**  *See* Objection No. 29. |
| 34. | TD Group I §§ 2.1.128 & 2.1.129<br>TD Group II §§ 2.1.119 & 2.1.120<br>VD Group I §§  2.1.130 & 2.1.131<br>VD Group IV § 2.1.103 & 2.1.104 | **Reliance Claim** and **Reliance Claimants:**  This definition is ambiguous and prevents the applicable SunCal Plans from containing adequate means for their implementation as required by section 1123 of the Bankruptcy Code.  While the definitions incorporate by reference the list of Reliance Claimants on Exhibit 8 of the applicable Disclosure Statements, it is not clear whether Exhibit 8 is the exclusive list of all Reliance Claimants or whether a creditor may request or seek to be designation as such upon a showing of necessary information presented to the Bankruptcy Court.  Also, it is unclear whether the SunCal Plan Proponents intend to file a motion to conform the applicable SunCal Plans to their disclosure statement, which matters when LitCo attempts to establish it has sufficient cash to fund the LitCo Offer.  As these SunCal Plans are drafted, the LitCo Offer must pay 55% of any allowed amount of a Reliance Claim, no matter how high.  According to the disclosure statement, the LitCo Offer is capped at 55% of the amounts on Exhibit 8, but creditors who voted assuming they could get 55% of a higher amount that would be allowed will have been mislead.<br><br>The proposed classification fails to satisfy section 1123(a)(1) and (3) of the Bankruptcy Code.  The holders Reliance Claims are classified in their own class under the VD Group I Plan, VD Group IV Plan, TD Group I Plan, TD Group II Plan.  However, the definition of "Reliance Claim" also incorporates the holders of Mechanic's Lien Claims and Bond Indemnification Claims, who each have separate classes.  It is a violation of sections 1122 and 1123(a)(1) and (3) of the Bankruptcy Code by having the holders of Mechanic's Lien Claims and Bond Indemnification Claims in two separate classes<br><br>Further, Bond Indemnification Claims are set forth in one place (e.g., TD Group I, section 5.4) as being Reliance Claims, but are not listed on Exhibit 8, which the definition of Reliance Claims seems to indicate is the sole place to find such claims. |
| 35. | VD Group I § 2.1.134 | **Ritter Ranch Project Break-Up Fee:**  *See* Objection No. 1 above. |
| 36. | TD Group I § 2.1.30<br>TD Group II § 2.1.121<br>VD Group I § 2.1.135<br>VD Group II § 2.1.111<br>VD Group III § 2.1.114 | **Sale Period:**  As part of the bidding and sale procedures, the SunCal Plans fails to provide adequate protection of any kind for any secured claim holders prior to the Effective Date, which for the Lehman Creditors may be at least 150 days after Confirmation.  Section 361 and 363(e) of the Bankruptcy Code provides that a secured creditor is entitled to adequate protection if a debtor uses such creditor's collateral without consent.  Section 361 of the Bankruptcy Code provides examples of adequate protection (cash payments, replacement lien, or the indubitable equivalent of the secured party's collateral).  11 U.S.C. 361.  Notably, the SunCal Plan Proponents have not offered any adequate substitute that would provide sufficient adequate protection of the secured creditors' interests in the assets subject to the sale process.  Instead, the SunCal Plan Proponents believe that their litigation prospects will be sufficient to justify their use of the Lehman Creditors' collateral over their objection.  For these reasons, the SunCal Plans are not feasible because the SunCal Plan Proponents are depending the availability of the Net Sale Proceeds to fund distributions when cannot provide the Lehman Creditors with adequate protection. |
| 37. | VD Group III § 2.1.117 | **SCC Communities Assets Break-Up Fee:**  *See* Objection No. 4 above. |
| 38. | VD Group I § 2.1.143 | **SunCal Emerald Meadow Break-Up Fee:**  *See* Objection No. 1 above. |

7

| Obj. No. | Applicable SunCal Plan Provision(s) | Description of Objection(s) |
|---|---|---|
| 39. | TD Group I § 2.1.133<br>TD Group II § 2.1.124<br>VD Group I § 2.1.139<br>VD Group II § 2.1.115<br>VD Group III § 2.1.121 | **Stalking Horse Bidder:** *See* Objection No. 29. |
| 40. | VD Group III § 2.1.130 | **Tesoro Break-Up Fee:** *See* Objection No. 4 above. |
| 41. | TD Group II § 2.1.133 | **Torrance Break-Up Fee:** *See* Objection No. 1 above. |
| 42. | TD Group I § 3.2<br>TD Group II § 3.2<br>VD Group I § 3.2<br>VD Group II § 3.2<br>VD Group III § 3.2<br>VD Group IV § 3.2<br>CC § 3.2 | **Funding for Unclassified Claims:** As described in greater detail below and in the narrative portion of this Objection, the SunCal Plan Proponents have not provided any evidence to show that they have the funds necessary to make distributions to holders of senior, unclassified claims. With respect to the Trustee Debtors, these claims exceed $55 million, and with respect to the Voluntary Debtors these claims exceed $17.5 million. Because there is no supporting evidence, the SunCal Plans are not feasible and cannot be confirmed because they fail to satisfy the requirements under sections 1129(a)(9) and (a)(11) of the Bankruptcy Code. |
| 43. | TD Group I § 3.2<br>TD Group II § 3.2<br>VD Group I § 3.2<br>VD Group II § 3.2<br>VD Group III § 3.2<br>VD Group IV § 3.2<br>CC § 3.2 | **Treatment of Allowed Administrative Claims:** Funding not shown. There is no supporting evidence to show that the Allowed Administrative Claims can be paid in full on the Effective Date by LitCo through the LitCo Plan Loan.<br><br>Certain SunCal Plans (VD Group III § 3.2, VD Group IV § 3.2, and SCC § 3.2) fail to describe the source from which Allowed Administrative Claims will be paid. The failure of the SunCal Plan Proponents to show and support the source of funding causes the applicable SunCal Plans to be in violation of 1129(a)(9) and not feasible under 1129(a)(11). |
| 44. | TD Group I § 3.3<br>TD Group II § 3.3 | **Treatment and Repayment of the Lehman Administrative Loan(s):** This treatment provision should be removed entirely. On August 24, 2011, the Bankruptcy Court entered an order reflecting that the Administrative Claims of the Lehman Creditors that were being disputed by the SunCal Plan Proponents are, pursuant to *In re MicroAge, Inc.*, 291 B.R. 503 (B.A.P. 9th Cir. 2002), allowed and not subject to dispute. *See* [Docket No. 2604]. For these reasons, the Lehman Creditors' Administrative Claims should be treated and paid on the Effective Date at the same time as other holders of Allowed Administrative Claims, otherwise the SunCal Plans are not confirmable because the applicable provisions of such plans violate section 1129(a)(9) of the Bankruptcy Code. |
| 45. | TD Group I § 3.6<br>TD Group II § 3.6<br>VD Group I § 3.5<br>VD Group II § 3.5<br>VD Group III § 3.4<br>VD Group IV § 3.4<br>CC § 3.4 | **Treatment of Unsecured Tax Claims:** Funding not shown. There is no supporting evidence to show that Allowed Unsecured Tax Claims can be paid in accordance with the proposed treatment under the SunCal Plans. |

| Obj. No. | Applicable SunCal Plan Provision(s) | Description of Objection(s) |
|---|---|---|
| 46. | TD Group I § 5.1<br>TD Group II § 5.1<br>VD Group I § 5.1<br>VD Group II § 5.1<br>VD Group III § 5.1 | **Allowed Secured Real Property Tax Claims:**  The SunCal Plans improperly classify the holders of Real Property Tax Claims in violation of section 1123(a)(1) of the Bankruptcy Code and improperly treat such claims as being impaired (section 1123(a)(3)) when their treatment is determined by section 1129(a)(9) of the Bankruptcy Code, not the SunCal Plans.  When a provision under the Bankruptcy Code determines the treatment of a claim or class of claims, such claims are not impaired even if the Bankruptcy Code's treatment alters the claimants' rights.  The treatment of tax claims that are covered under section 507(a)(8) of the Bankruptcy Code (whether they are secured or priority) is determined by the confirmation provisions under section 1129(a)(9)(C) and (D).  Because the treatment for such tax claims is determined by the Bankruptcy Code, the majority of any such class cannot bind the minority.<br><br>Thus, the applicable SunCal Plans are not confirmable because they fail to satisfy sections 1123(a)(1) and (3) and 1129(a)(1) of the Bankruptcy Code.  Because these creditors are not impaired and as such not entitled to vote, such purported class cannot serve as an impaired accepting class for purposes of section 1129(b)(1) of the Bankruptcy Code. |
| 47. | TD Group I § 5.2<br>TD Group II § 5.2<br>VD Group I § 5.2<br>VD Group III § 5.2<br>VD Group IV § 5.1 | **Treatment of Lehman's Disputed Claims and Disputed Liens:**<br><br>If the claims of the Lehman Creditors are disallowed, the SunCal Plan Proponents intend to use of the Net Sale Proceeds to fund distributions to the extent of such disallowance.  However, this provision should be revised to include that such use shall not be permitted if the order disallowing the claims of the Lehman Creditors is stayed or otherwise unenforceable.<br><br>Further, any request to use the Net Sale Proceeds prior to the final resolution of the Lehman Creditors' claims should be subject to further notice and hearing to determine whether the proposed substituted collateral is adequate and satisfies the requirements under sections, 361, 363(e), and 1129(b) of the Bankruptcy Code.<br><br>The applicable SunCal Plans prevent the Lehman Creditors from enforcing their rights against the collateral during the applicable Sales Period without any adequate protection.  Thus, the treatment violates section 363(e), is not fair and equitable, nor does it provide such holders with the indubitable equivalent of their claims.<br><br>In their current form, the SunCal Plans fail to provide that the claims of the Lehman Creditors will be paid when allowed.  Thus, the applicable treatment provisions for the claims of the Lehman Creditors' should be revised to expressly state that such claims will be paid when allowed by a Final Order of a court of competent jurisdiction.<br><br>The proposed treatment of the Lehman Creditors' claims under the VD Group IV Plan violates section 506(d), Bankruptcy Rule 7001(2), and 1129(a)(1).  The SunCal Plan Proponents may not seek to avoid an interest in property through a provision in a chapter 11 plan.  Bankruptcy Rule 7001 requires the SunCal Plan Proponents to commence an adversary proceeding to "determine the validity, priority, or extent of a lien or other interest in property."  In *re Golden Plan of California, Inc.*, 829 F.2d 705, 711 and 712 (9th Cir. 1986).  Thus, the SunCal Plans seek to avoid a lien or other interest in property in direct contravention of the express requirements under Bankruptcy Rule 7001.  Furthermore, the lien stripping provision under section 506(d) of the Bankruptcy Code are dependent upon first determining that the underlying secured claims are allowed or disallowed under section 502 of the Bankruptcy Code and Bankruptcy rule 7001.  *Dewsnup v. Timm*, 502 U.S. 410, 415-16 (1992).<br><br>The balance of the Lehman Creditors' objections to the treatment of their claims is located in the narrative portion of this Objection, and otherwise reserved in response to the confirmation brief the SunCal Plan Proponents file on September 26, 2011. |
| 48. | TD Group I § 5.3<br>TD Group II § 5.3<br>VD Group I § 5.3 | **Treatment of Mechanic Lien Claims:**  To the extent such claims are valid, the applicable SunCal Plans prevent the holders from enforcing their rights against the collateral during the applicable Sales Period without any adequate protection.  Thus, the treatment violates section 363(e), is not fair and equitable, nor does it provide such holders with the indubitable equivalent of |

| Obj. No. | Applicable SunCal Plan Provision(s) | Description of Objection(s) |
|---|---|---|
| | VD Group II § 5.2 | their claims. |
| 49. | TD Group I §§ 3.7 & 5.4<br>TD Group II §§ 3.7 & 5.4<br>VD Group I §§ 3.6 & 5.4 | **Treatment of Contingent Bond Indemnification Claims:** The SunCal Plan Proponents' treatment of contingent indemnification claims is in direct violation of section 502(e) of the Bankruptcy Code. The SunCal Plan Proponents may not create a class of claims for the purpose of providing the holders certain protections when the Bankruptcy Code prohibits the distributions to the holders of such claims.<br><br>In addition, the initial paragraph of Section 5.4 of the applicable SunCal Plans is not a treatment provision. Instead, it appears to be part of the proposed procedures relating to the sale of the Projects and Others Assets. Further adding to the confusion of the "treatment" provision, the SunCal Plan Proponents in one breathe state that such claims are "contingent" then in the next breathe describe them as being secured. The SunCal Plan Proponents have never explained or supported with evidence to show that these claims are secured and entitled to separate classification. This is reinforced by the definition of "Reliance Claim," which includes the Contingent Bond Indemnification Claims as a subset of such claims. If the Contingent Bond Indemnification Claims are not secured in any manner, then the ballots cast by the purported holders of such claims should not be counted in this separate class.<br><br>These provision also include language that appears to have the Bankruptcy Court rule that municipalities and successor owners of the Projects may not agree to go forward with development of the Projects without putting new bonds on the Projects ("Surety Bonds will not apply to Winning Bidder(s)' bonding requirements with respect to such development" and [Winning Bidder(s) who elect to develop "will be required at that time to obtain new Surety Bonds.") If the intent only was to say that the old bonds are not being assigned, the applicable SunCal Plan is not preventing the cities or municipalities from requiring new bonds, and that buyers should be aware that cities / municipalities may require new bonds, the language should be amended to reflect just that.<br><br>Contingent Bond Indemnification Claims as Reliance Claims also have a separate problem because they do not appear on the list of Reliance Claims annexed to the applicable Disclosure Statements as Exhibit 8. Thus, if Contingent Indemnification Bond Claims are Reliance Claims, it is unclear why these claims are not listed on Exhibit 8. |
| 50. | TD Group I § 5.6<br>TD Group II § 5.6<br>VD Group I § 5.6 | **Treatment of Reliance Claims:** The treatment of Reliance Claims violates section 1123(a)(4) of the Bankruptcy Code because the SunCal Plan Proponents condition certain distributions (*i.e.*, the right to sell the Reliance Claim) on the holders' acceptance of the applicable SunCal Plan. Thus, if a holder of a Reliance Claim votes to reject the applicable SunCal Plan and such class receive sufficient votes and weight in claims, the rejecting holder is not entitled to sell its Reliance Claim. In addition, to this fatal classification and treatment flaw, there are feasibility issues that question the commitment to fund the distributions to the class of Reliance Claims because there is no evidence to support that LitCo is a viable entity that has the financial wherewithal to fund the LitCo Plan Loan. These issues are discussed in greater detail in the narrative portion of this Objection.<br><br>The alleged "Right to Sell" to LitCo is not tied to an obligation or commitment of LitCo to purchase the claims. Thus, assuming LitCo obtains the funds needed to purchase Reliance Claims, it is necessary to show the "commitment" to fund and purchase, not just the ability. |
| 51. | VD Group IV §§ 5.3 & 5.4 | **Treatment of Reliance Claims and Unsecured Claims (VD Group IV):** In this plan, the definition and treatment of Reliance Claims discriminates unfairly against all non-Reliance Claimants holding non-priority unsecured claims. For example, Reliance Claimants receive 50% of the value of their claims if the Project is recovered and LitCo purchases the project, but the holders of Reliance Claims do not release or provide anything in exchange that is different than the holders of non-priority unsecured claims. Further, the VD Group IV Plan offers no rationale why the holders of Reliance Claims on Exhibit 8 were selected as the creditors who would be beneficiaries of judgment against the Lehman Lenders. The classification fails because there is not a rational basis to support the settlement offer being made for non-Estate assets and the discrimination between classes. The |

| Obj. No. | Applicable SunCal Plan Provision(s) | Description of Objection(s) |
|---|---|---|
| | | other SunCal Plans make clear that only justification for separately classifying Reliance Claims is the third party purchase offer for non-estate assets (which has its own problems).  Thus, these provisions in the VD Group IV Plan violate section 1123(a)(1) and (4) of the Bankruptcy Code because creditors holding claims that are substantially similar are classified in separate classes and treated differently when there is difference in the claims that justifies separate classification and discriminatory treatment. |
| 52. | TD Group I § 5.7<br>TD Group II § 5.7<br>VD Group I § 5.7<br>VD Group II § 5.4<br>VD Group III § 5.4<br>VD Group IV § 5.4 | **Treatment of General Unsecured Claims:**  The SunCal Plan Proponents have not provided any evidence to show they will have the funds necessary to pay the 1% of allowed non-priority, general unsecured claims.  While 1% might not appear to be a substantial amount, it is quite large when the Lehman Creditors' deficiency claims are included.  For TD Group I Plan alone, which totals approximately $1.1 billion, the SunCal Plan Proponents must have at least $11 million to satisfy only the Lehman Creditors' unsecured claims.  Because there is no evidence showing they have the funds to make these distributions, the SunCal Plans are not feasible and violate section 1129(a)(11) of the Bankruptcy Code. |
| 53. | VD Group II § 5.5 | **Treatment of Holders of Allowed Interests:**  Under the VD Group II Plan, equity interests of the Debtors held by Debtor SunCal Communities I, LLC (which equity interests were pledged to the Lehman Creditors) are being terminated and no distribution will be made in respect of them.  However, if creditors' claims are paid in full, the SunCal Plan Proponents do not explain what they will do with the surplus funds or why they are not being paid to or for the benefit of SunCal Communities I or the Lehman Creditors..  (Note: The plans of the Lehman Lenders include a plan for SunCal Communities I and direct that the value due to equity for these Debtors would go to the Lehman Creditors.  If there are surplus funds after all creditors are paid, such funds should be paid to SunCal Communities I or the Lehman Creditors.  Any other distribution would violate the absolute priority rule. |
| 54. | TD Group I Art. VII<br>TD Group II Art. VII<br>VD Group I Art. VII<br>VD Group II Art. VII<br>VD Group III Art. VII | **Sales Procedures:**<br><br>The SunCal Plan Proponents fail to describe any of the terms of the proposed sale contracts for the Projects.  While the Minimum Purchase Price, Initial Overbid Amount, and other related provisions have their own issues, it is not sufficient to state that the sale contract will have minimum sale price and a liquidated damage clause but not describe any of the other material terms that could affect whether the proposed sale is reasonable, fair and equitable, and provides the Lehman Creditors with the indubitable equivalent of their claims.<br><br>• In light of potential interest of Lehman Creditors in bidding and in accordance with customary practice for real estate sales in bankruptcy, this provision is not fair and equitable because it does not prevent the SunCal Plan Proponents from inserting restrictive terms in the sales contracts, such as might limit bidding to a single contract that includes terms not necessary to maximize the value of the Projects.<br><br>• Having an insider that is not entitled to any distributions under the SunCal Plans as Plan Trustee (a) is a violation of the absolute priority rule since an equity holder that controls the sale process without providing new, necessary and adequate value stands to gain substantial benefits on account of interest that are not entitled to a distribution, (b) prevents the Lehman Lenders from being adequately protected and receiving the highest and best price for the asset because the insider is not expressly precluded from selecting a lower paying bidder who will commit to use the insider for development of the project, and (c) is in bad faith.<br><br>• The Auction should occur in Bankruptcy Court to ensure fairness and thus the highest and best price and at least some mechanism to address any practices that arguably would reduce the likelihood of achieving the highest and best price.<br><br>• The Lehman Creditors must be included on the list of notice parties for all purposes of the sale procedures.<br><br>• The propose sale contract is not adequate because the sale of assets free and clear sale because it does not include a provision |

11

| Obj. No. | Applicable SunCal Plan Provision(s) | Description of Objection(s) |
|---|---|---|
| | | that enables getting a separate recordable order for that purpose.  Moreover, there must be certain limitations on the "free and clear" nature of the sale and those should be more clearly identified (*e.g.*, (a) statutory liens for secured real property tax claims to the extent securing amounts required to be paid under the Plan; (b) certain easements, covenants, conditions, restrictions and other matters of record affecting real property, leasehold estates or personalty or any interest therein (to be particularly described with reference to appropriate preliminary title reports), (c) the effect of any building and zoning regulations, now existing or hereafter in effect with respect to the relevant Project that are not violated by the current use of the Project, (e) oil, mineral and/or water rights, and claims of title thereto, shown by the public records, (f) discrepancies, conflicts in boundary lines, shortages in area or encroachments which an inspection or survey of the subject Project would disclose, and (g) other liens to which the transferee of the property, in connection with such transfer, agrees to take subject). |
| | | • There is no reason to deny the Lehman Creditors credit bid rights because after taking into account the asserted Reliance Claims, the claims of the Lehman Creditors are still enormous and they should at least be entitled to credit the remainder.  However, the Lehman Creditors believe they should be permitted to credit bid the entire amount because they have the financial wherewith to pay cash if their claims are disallowed.  The policies governing credit bidding under the Bankruptcy Code ensure that the Projects and Other Assets will receive a fair price.  Further, because the Lehman Creditors will reject the SunCal Plans and because the SunCal Proponents propose to deny credit bid rights to the Lehman Creditors (which the Lehman Creditors dispute), even if such denial is approved, cram down will require that the treatment of the Lehman Creditors' claims is fair and equitable and results in the indubitable equivalent of such secured claims.  This means that any disposition of the Projects or Other Assets that yields less than fair market value is insufficient to meet either test.  Because the sales procedures put control of the sales process in the hands of an insider with economic interests in conflict with achieving the highest and best price – that is, the insider would like to develop the projects and might be incentivized to take a lower bid, the SunCal Plans can never result in the Lehman Creditors being assured of fair and equitable treatment or receiving the indubitable equivalent of their secured claims. |
| | | • The Lehman Creditors stand to lose the most if the SunCal Plan Proponents are permitted to market and sell the Projects and Other Asset with inadequate procedures.  Consequently, the Lehman Creditors and any other party with in interest in the Projects should be permitted to participate in and object to the proposed marketing and sale procedures to be implemented after the Confirmation Date.  Anything less is not fair and equitable and will not provide the Lehman Creditors with the indubitable equivalent of their claims. |
| | | • Notably, there is nothing in Section 7.2 of the SunCal Plans that requires the SunCal Plan Proponents to deposit all of the proceeds from the Winning Bid into the Net Sale Proceeds Account(s) and that such proceeds will not be used until the final adjudication of the claims of the Lehman Creditors.  The account must be interest bearing with the disputed lien attaching thereto as well, and located at an U.S. Trustee approved depository. |
| | | • There also must be provisions to provide adequate protection to the holders of disputed secured claims through the later of (i) the Sale Period or (ii) the date they receive a distribution on their claims. |
| 55. | TD Group I § 7.3<br>TD Group II § 7.3<br>VD Group I § 7.3<br>VD Group II § 7.3<br>VD Group III § 7.3<br>VD Group IV § 7.2<br>CC § 7.2 | **Plan Trust:** The SunCal Plan Proponents state that the Plan Trust will be used to hold the proceeds from the sale of the Projects and Other Assets.  The creation of the Plan Trust has several problems.  As with any trust, the Plan Trust must be governed by an agreement that sets forth the terms and conditions of its purpose, administration, disposition of assets, payment of fees and expenses and the source of funds to pay such fees and expenses.  Without a plan trust agreement, the Plan Trustee would be free to use the "Plan Trust Assets" as it sees fit even if such use is contrary to the rights of creditors holding secured claims against such assets.  The definition of "Plan Trust Agreement" was removed from the current version of the SunCal Plans without explanation.  The SunCal Plan Proponents should be required to prepare a proposed "Plan Trust Agreement" as part of a supplement to the SunCal Plans so that all parties in interest have the chance to review, comment, and object if |

12

| Obj. No. | Applicable SunCal Plan Provision(s) | Description of Objection(s) |
|---|---|---|
| | | necessary. |
| | | Under TD Group I and TD Group II, Section 7.3 refers to "Plan Trust Property" when there is no such definition.  Presumably the SunCal Plan Proponents meant to use "Plan Trust Assets," in which case the provisions should be revised to reflect this correction. |
| 56. | TD Group I § 7.4<br>TD Group II § 7.4<br>VD Group I § 7.4<br>VD Group II § 7.4<br>VD Group III § 7.4<br>VD Group IV § 7.3<br>CC § 7.3 | **Preservation and Pursuit of Litigation Claims and Recovery:**  The SunCal Plans provide that the Plan Trustee shall hold title to all Litigation Claims and Litigation Recoveries.  In this provision that SunCal Plan Proponents state that "[e]xcept as otherwise provided in the Plan and Confirmation Order, the Litigation Recoveries shall be free and clear of all Claims and Liens and shall only be expended in accordance with the Plan."  This provision must be removed so that the status of any Litigation Recoveries is determined by Court or else this provision would have the effect of stripping claims and liens from such recoveries in the event the Bankruptcy Court determined that such property was in fact subject to the rights, claims, liens, or interest of parties other than the Plan Trustee. |
| 57. | TD Group I § 7.6<br>TD Group II § 7.6<br>VD Group I § 7.5<br>VD Group II § 7.5<br>VD Group III § 7.5<br>VD Group IV § 7.4<br>CC § 7.4 | **Payment of Plan Trust Expenses:**  This provision attempt to mandate the absolute payment of the expenses incurred by the Plan Trustee and Plan Trust.  However, the provision is vague and fails to describe the property to be used to pay these expenses.  Any property that is subject to the liens, claims, or other interest of creditors shall not be used to pay the expenses of the Plan Trustee or Plan Trust without first providing protection of such interest that is determined to be adequate by the Bankruptcy Court.<br><br>While the Plan Trustee will not receive any compensation, there is no disclosure of the extent it can pass through expenses of paying affiliates for services.  Any liquidating trust should be transparent and is another reason why there should be a "plan trust agreement."  In that regard, the Plan Trustee should be required to file periodic financial reporting and disclose all payments of expenses of the Plan Trustee and Plan Trust.  Because the SunCal Plan Proponents are attempting to sur-charge the collateral of the Lehman Creditors to fund these expenses, the Court should monitor all expenses and payments of the Plan Trustee and Plan Trust. |
| 58. | TD Group I § 7.7<br>TD Group II § 7.7<br>VD Group I § 7.6<br>VD Group II § 7.6<br>VD Group III § 7.6<br>VD Group IV § 7.5<br>CC § 7.5 | **Plan Trust Distribution System:**  The SunCal Plans violate sections 1129(a)(9) and (11) of the Bankruptcy Code because they purport to limit recovery of Administrative Claims and other senior claims to the funds in the Plan Trust.  If under the SunCal Plans and the Bankruptcy Code, the SunCal Plan Proponents are required to pay certain claims in full (*e.g.*, Administrative Claims) then such claims shall be paid in full notwithstanding the SunCal Plan Proponents' attempt to limit all recoveries to the property located in these accounts.  If the SunCal Plan Proponents do not have sufficient funds to satisfy Claims that are required to be paid in full, then the SunCal Plans should not be confirmed.<br><br>The limitation of liability provision in this section should be revised to clarify that the Plan Trustee is not liable in its capacity as trustee for the claims of creditors subject to its fiduciary duties to administer the Plan Trust.  However, the Plan Trustee shall not receive a discharge for any liability that such Plan Trustee may have on a personal or individual basis or excused from failing to carry out its performance obligations under the Plan.<br><br>The Distribution Account should be located at banks on the U.S. Trustee's approved depository list and should be interest bearing. |
| 59. | TD Group I § 7.8.1<br>TD Group II § 7.8.1<br>VD Group I § 7.7.1 | **Appointment of Plan Trustee:**  For the SunCal Plans to be confirmed, the appointment of Acquisitions as the Plan Trustee must be "consistent with the interest of creditors and equity security holders and with public policy."  11 U.S.C. §1129(a)(5)(A)(ii).  Under the SunCal Plans, the Plan Trustee will control the sales of Projects and Assets, prosecute the Lehman Adversary Proceeding, and be the sole party responsible for objecting to Claims, with limited exceptions.  However, |

DOCS_SF:78202.4 52063-001

| Obj. No. | Applicable SunCal Plan Provision(s) | Description of Objection(s) |
|---|---|---|
| | VD Group II § 7.7.1<br>VD Group III § 7.7.1<br>VD Group IV § 7.6.1<br>CC § 7.6.1 | Acquisitions has irreconcilable conflicts in carrying out these responsibilities, because (a) Elieff benefits from trading off a lower purchase price in Project sales for either or both (i) assumption or elimination of Elieff's and Acquisitions' Bond Issuer indemnity obligations by the Acquisitions' selected buyer, or (ii) the selection of SunCal Management or Acquisitions by the buyer to develop/manage the subject Project(s); and (b) as to the Lehman Adversary Proceeding, if LitCo is tied in any fashion to any of Elieff's affiliates (there is no disclosure on this point), then Elieff or his affiliates, as assignee of claims under the "offer" by LitCo to purchase Reliance Claims, may utilize Acquisitions' control of the Lehman Adversary Proceeding to afford their own claims better treatment.  The SunCal Plan Proponents' proposal to use an independent professional fails to address the conflict issues and adds an unnecessary layer of expenses. |
| 60. | TD Group I § 7.8.2<br>TD Group II § 7.8.2<br>VD Group I § 7.7.2<br>VD Group II § 7.7.2<br>VD Group III § 7.7.2<br>VD Group IV § 7.6.2<br>CC § 7.6.2 | **Term of Plan Trustee:**  If the Plan Trustee resigns or removed for any reason, the replacement of such trustee should be subject to notice and hearing to ensure that the Plan Trust Assets are being adequately protected and administered for the benefit of the beneficiaries of such trust. |
| 61. | TD Group I § 7.8.3<br>TD Group II § 7.8.3<br>VD Group I § 7.7.3<br>VD Group II § 7.7.3<br>VD Group III § 7.7.3<br>VD Group IV § 7.6.3<br>CC § 7.6.3 | **Powers and Duties of Plan Trustee:**  For the reasons set forth in Objection No. 59 above, the following powers of the Plan Trustee create a conflict of interest if Acquisitions will serve as such trustee.<br><br>• To permit Acquisitions the power to "control and effectuate the Claims reconciliation process, including to object to, seek to subordinate, compromise or settle any and all Claims against the Debtors pursuant to the terms of the Plan" provides an equity holder with valuable control over the Debtors' assets when Acquisition's interests are not aligned with creditors and other parties in interests.  (7.7.3(ii) & (vii)).<br>• To empower the Plan Trustee to pay reasonable fees and expenses to its professionals, the SunCal Plans must also explain how and from what property the Plan Trustee will pay such fees and expenses to ensure that such property is not subject to the liens or other interest of creditors. (7.7.3(vi), (ix), & (xvi)).<br>• Acquisitions or any other party should not be empowered to dispose of assets when the SunCal Plans fails to describe in a sufficient manner how the assets will be sold.  Without such information, the SunCal Plans fail to be fair and equitable and do not provide the indubitable equivalent to the holders of secured claims. (7.7.3(viii)). |
| 62. | TD Group I § 7.8.4<br>TD Group II § 7.8.4<br>VD Group I § 7.7.4<br>VD Group II § 7.7.4<br>VD Group III § 7.7.4<br>VD Group IV § 7.6.4<br>CC § 7.6.4 | **Retention of Professionals and Compensation Procedure:**  The SunCal Plans cannot be implemented and thereby violate section 1129(a)(11) because they empower the Plan Trustee to pay reasonable fees and expenses to its professionals but fail to show how and from what property the Plan Trustee will pay such fees and expenses. |

14

| Obj. No. | Applicable SunCal Plan Provision(s) | Description of Objection(s) |
|---|---|---|
| 63. | TD Group I § 7.8.5<br>TD Group II § 7.8.5<br>VD Group I § 7.7.5<br>VD Group II § 7.7.5<br>VD Group III § 7.7.5<br>VD Group IV § 7.6.5<br>CC § 7.6.5 | **Fee and Expenses:** *See* Objection No. 62. |
| 64. | TD Group I § 7.8.6<br>TD Group II § 7.8.6<br>VD Group I § 7.7.6<br>VD Group II § 7.7.6<br>VD Group III § 7.7.6<br>VD Group IV § 7.6.6<br>CC § 7.6.6 | **Limitation of Liability:** This provision is vague and purports to release non-Debtors from any and all liability. For example, subpart (a) provides that "None of the . . . Plan Sponsor, the SunCal Plan Proponents, the Plan Trustee, Professionals, nor any of their respective members, officers, directors, shareholders, employees, or agents (the "Indemnified Parties") shall be liable (a) for any loss or damages by reason of any action taken or omitted by him or her . . .." This provision does not appear to be limited to the context of prosecution of the SunCal Plans because that provision appears under subject (c). As a result, subsection (a) appears to provide these non-Debtor parties with a release in violation of section 524 of the Bankruptcy Code. *See, also In re Lowenschuss*, 67 F.3d 1394 (9th Cir. 1995).<br><br>Further, the Plan Trustee should not be immune from liability for breach of duties imposed by him/her under the SunCal Plans. Thus a Plan Trustee should be liable for damages arising from his/her negligence to carry out the duties under the SunCal Plans. The various reliance provisions in this section should be qualified in its entirety by a standard of reasonableness. For example, the SunCal Plan Proponents propose that the Plan Trustee shall not be liable "for any act or omission made in reliance upon the Debtors' books and records or upon information and advice given to the Plan Trustee by his or her professionals." The Plan Trustee should not be able to blindly rely on the books and records if upon reasonable inspection such book and records could not be relied upon by a reasonable person. This change should be made throughout with respect to all reliance provisions.<br><br>The reimbursement for indemnification claims suffers from the same problems and the provisions described above regarding the payment of fees and expenses incurred by the Plan Trustee and Plan Trust. To empower the Plan Trustee to pay reasonable fees and expenses to its professionals, the SunCal Plans must also explain how and from what property the Plan Trustee will pay such fees and expenses to ensure that such property is not subject to the liens or other interest of creditors. |
| 65. | TD Group I § 7.18<br>TD Group II § 7.17<br>VD Group I § 7.16<br>VD Group II § 7.16<br>VD Group III § 7.16<br>VD Group IV § 7.16<br>CC § 7.15 | **Duties and Powers of Committees:** As noted elsewhere with respect to the Lehman Creditors' objection to the payment and funding of fees and expenses, there is no funding for paying the Committee professionals or its members expenses unless the Lehman Creditors are defeated or there is some unencumbered asset discovered or recovered. Yet, the Committees are slated to investigate and prosecute insider claims. Without adequate funding, the SunCal Plan Proponents are effectively ensuring that the claims are not investigated and released without any benefit in return. Thus, the SunCal Plans violate sections 1123(a)(5), 1129(a)(3) and (a)(7). |

DOCS_SF:78202.4 52063-001

| Obj. No. | Applicable SunCal Plan Provision(s) | Description of Objection(s) |
|---|---|---|
| 66. | TD Group I § 7.20<br>TD Group II § 7.20<br>VD Group I § 7.17<br>VD Group II § 7.17<br>VD Group III § 7.17<br>VD Group IV § 7.17 | **Claims Estimation Rights:** This provision is contrary to the purpose of section 502(c) of the Bankruptcy Code and must be removed for the following reasons. Estimation is required only if liquidation would unduly delay administration of the bankruptcy estate and confirmation of the plan. *In re Corey*, 892 F.2d 829, 834 (9th Cir. 1989). If the SunCal Plans are confirmed, estimation will not serve any purpose because all that is left to do under the SunCal Plans is to liquidate disputed claims. The SunCal Plan Proponents and SunCal Management have commenced a numerous objections and other proceedings against the Lehman Creditors, all of which are still pending. The Lehman Creditors have expended enormous fees and expenses defending these actions. The SunCal Plan Proponents should not be permitted to abandon the objection and other proceedings and try to relitigate all of the pending issues in a new proceeding/motion. |
| 67. | TD Group I § 8.1<br>TD Group II § 8.1<br>VD Group I § 8.1<br>VD Group II § 8.1<br>VD Group III § 8.1<br>VD Group IV § 8.1<br>CC § 8.1 | **Distribution Agent:** Acquisitions, or any other Plan Trustee, should not be excused from providing a fiduciary bond as to money for which it is a fiduciary. |
| 68. | TD Group I § 8.4.2<br>TD Group II § 8.4.2<br>VD Group I § 8.4.2<br>VD Group II § 8.4.2<br>VD Group III § 8.4.2<br>VD Group IV § 8.4.2<br>CC § 8.4.2 | **Cancellation of Liens:** This provision should be revised because it fails to provide when (*e.g.*, Confirmation Date, Effective Date, some other date?) Liens are released. The Lehman Creditors believe that the transfer, sale, or other disposition of the Projects or Other Assets does not occur until the Effective Date. As a result, the release or discharge of any Lien should not occur until the Effective Date of the applicable SunCal Plan. Further, this provision should cross-reference the sections in the SunCal Plans that provide otherwise. For example, the sale of the Projects and Other Assets subject to the Liens of the Lehman Creditors attach to the sale proceeds as under Article V of the SunCal Plans. Thus, it should be made clear that the Lien of the Lehman Creditors shall not be affected by this provision. The definition of "Disputed Lien" should also be revised to describe the Liens of the Lehman Creditors as "liens" because if they are allowed, then attachment of the Lehman Creditors' Liens will not survive since Section 5.2 of the SunCal Plans only provide that "Disputed Liens" attach to the sale proceeds. |
| 69. | TD Group I § 9.1<br>TD Group II § 8.1<br>VD Group I § 9.1<br>VD Group II § 9.1<br>VD Group III § 9.1<br>VD Group IV § 9.1<br>CC § 9.1 | **Standing for Objections to Claims:** For the reasons set forth in Objection No. 59 and 61 above, Acquisitions as Plan Trustee should not be permitted to control the claim reconciliation process as its interest and the interests of creditors are not aligned.<br><br>Only Acquisitions is given standing to object to claims (other than the applicable Committee objecting to the claims of insiders). If the Trustee's and Lehman Creditors' plans are not confirmed and the Lehman Creditors' claims are subordinated, the Lehman Creditors receive the residual after payment of other Claims and thus would be the only party to have an interest in the amount of other claims. Thus, the Lehman Creditors should have standing to object to claims because they stand to lose the most by not allowing inflated or unsubstantiated claims. In a chapter 7 case, the chapter 7 trustee would have full fiduciary duties to the Lehman Creditors. Here, the Plan Trustee's duties are more limited. Thus, Lehman Creditors are receiving less under the Plans than in a chapter 7 case if the party controlling whether to object to claims potentially senior to the Lehman Creditors' claims has no firm duty to object, where appropriate. |
| 70. | VD Group I Article IX | **Reserve for Disputed Claims:** The VD Group I SunCal Plan fails to include adequate means for its implementation because it does not reserve assets for distribution pending reconciliation of all disputed claims. Article IX of the VD Group I SunCal Plan contemplates claims objections after confirmation (as they must since the Court will not hear them prior to confirmation). In that regard, such plan lacks any mechanic for delaying payment for potentially disputed claims or reserving payment on initially disputed claims. In these liquidating plans, (a) if payments to holders of Disputed Claims are not delayed, holders of Allowed |

16

| Obj. No. | Applicable SunCal Plan Provision(s) | Description of Objection(s) |
|---|---|---|
| | | Claims would be diluted by improper payments and receive too little; and (b) if delayed payments for disputed claims are not put in a reserve, there may be nothing to pay them when their claims are allowed.  Either circumstance demonstrates that the VD Group I Plan fails to include adequate means for its implementation in addition to failing the best interests test in a liquidating case and result in disparate treatment that violates the absolute priority rule.  Thus, the VD Group I Plan fails to satisfy section 1129(a)(11) of the Bankruptcy Code. |
| 71. | TD Group I § 10.1<br>TD Group II § 10.1<br>VD Group I § 10.1<br>VD Group II § 10.1<br>VD Group III § 10.1<br>VD Group IV § 10.1<br>CC § 10.1 | **Executory Contracts to be Assumed and Assigned:**  The Lehman Creditors reserve all rights to object to any contract or lease with them proposed to be assumed. |
| 72. | TD Group I § 14.1<br>TD Group II § 14.1<br>VD Group I § 14.1<br>VD Group II § 14.1<br>VD Group III § 14.1<br>VD Group IV § 14.1<br>CC § 14.1 | **Modification of Plan:**  This provision should be revised so that all such modifications are subject to the requirements of section 1127 of the Bankruptcy Code.  In its current form, the SunCal Plan Proponents seek authority to apply "to the Bankruptcy Court to remedy defects or omissions in the Plan or to reconcile inconsistencies in the Plan." but such changes do not appear to be subject to the requirements of section 1127 of the Bankruptcy Code. |
| 73. | TD Group I § 16.13<br>VD Group I § 16.13<br>VD Group II § 16.13<br>VD Group III § 16.13<br>VD Group IV § 16.13 | **Exemption from Certain Transfer Taxes and Recording Fees:**  This provision contains an incorrect reference to section "1146(c)," which no longer exists and should be corrected to reference section 1146(a). |

17

In re: Case 8:08-bk-17206-ES    Doc 2820    Filed 09/19/11    Entered 09/19/11 21:03:50    Desc
PALMDALE HILLS PROPERTY, LLC. AND ITS RELATED DEBTORS    Main Document    Page 62 of 64
CASE NUMBER 08-17206-ES

Debtor(s).

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:

10100 Santa Monica Blvd., 13th Floor, Los Angeles, CA 90067

A true and correct copy of the foregoing document described as *OBJECTION OF THE LEHMAN CREDITORS TO THE CONFIRMATION OF THE SEVEN PROPOSED SUNCAL PLANS FILED BY THE SUNCAL PLAN PROPONENTS* will be served or was served **(a)** on the **judge in chambers** in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

**I. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On ____September 19, 2011____ I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

☒ Service information continued on attached page

**II. SERVED BY U.S. MAIL OR OVERNIGHT MAIL** (indicate method for each person or entity served)**:**
On _____September 19, 2011_____ I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. *Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.*
JUDGE'S COPY [Overnight Delivery]
The Honorable Erithe A. Smith
United States Bankruptcy Court - Central District of California
411 West Fourth Street, Suite 5041
Santa Ana, CA 92701-4593

☐ Service information continued on attached page

**III. SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on _____September 19, 2011_____ I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. *Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.*

(1) Gen'l Counsel for Voluntary Debtors:
Paul Couchot - pcouchot@winthropcouchot.com
Marc J. Winthrop – pj@winthropcouchot.com
Paul Lianides - plianides@winthropcouchot.com
(2) Special Counsel for Jt. Admin. Debtors & Trustee Speier:
Louis Miller - smiller@millerbarondess.com; jmiller@millerbarondess.com
Martin Pritikin – mpritikin@millerbarondess.com
(3) Gen'l Counsel for Ch. 11 Trustee (Speier):
William Lobel - wlobel@thelobelfirm.com
Mike Neue – mneue@thelobelfirm.com
(4) Ch. 11 Trustee:
Steven N. Speier - sspeier@asrmanagement.com; ca85@ecfcbis.com
(5) Office of the United States Trustee:
Michael Hauser - michael.hauser@usdoj.gov
(6) Counsel for Voluntary Debtors' Committee:
Alan Friedman - afriedman@irell.com
Kerri A. Lyman - klyman@irell.com
(7) Counsel for Trustee Debtors' Committee:
Lei Lei Wang Ekvall - lekvall@wgllp.com
Hutchison B. Meltzer - hmeltzer@wgllp.com

(8) Counsel for Joint Provisional Liquidators of Lehman RE Ltd
Chauncey Cole – chauncey.cole@cwt.com
Betty Shumener - betty.shumener@dlapiper.com
(9) Counsel for Bond Safeguard & Lexon
Mark E. Aronson – mea@amclaw.com
Mark J. Krone - mk@amclaw.com, crs@amclaw.com; amc@amclaw.com
(10) Counsel for Fenway Capital LLC
John E Schreiber - jschreiber@dl.com
Richard Reinthaler - rreinthaler@dl.com;
(11) Counsel for SunCal Management:
Ronald Rus – rrus@rusmiliband.com
(12) Debtors (Palmdale Hills Property, LLC and related entities):
Bruce Cook - bcook@suncal.com

Edward Soto - Edward.soto@weil.com; odalys.smith@weil.com; lori.seavey@weil.com
Allen Blaustein - Allen.Blaustein@weil.com
Alfredo R. Perez - alfredo.perez@weil.com
Lauren Zerbinopoulos– lauren.zerbinopoulos@weil.com
Erica Rutner – erica.rutner@weil.com
Mark McKane - mark.mckane@kirkland.com

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| September 19, 2011 | Myra Kulick | /s/ Myra Kulick |
| --- | --- | --- |
| Date | Type Name | Signature |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

August 2010                                                                                    F 9013-3.1.PROOF.SERVICE

## I. SERVED BY NEF

**8:08-bk-17206-ES Notice will be electronically mailed to:**

1. Selia M Acevedo for Atty Miller Barondess LLP
   sacevedo@millerbarondess.com, mpritikin@millerbarondess.com
2. Joseph M Adams for Def The City of San Juan Capistrano
   jadams@sycr.com
3. Raymond H Aver for Debtor Palmdale Hills Property, LLC
   ray@averlaw.com
4. James C Bastian for Cred ARB, Inc.
   jbastian@shbllp.com
5. Thomas Scott Belden for Def Zim Ind., Inc. dba Bakersfield Well
   sbelden@kleinlaw.com, ecf@kleinlaw.com
6. John A Boyd for Int Pty Oliphant Golf Inc
   fednotice@tclaw.net
7. Mark Bradshaw for Int Pty Courtesy NEF
   mbradshaw@shbllp.com
8. Gustavo E Bravo for Cred Oliphant Golf, Inc.
   gbravo@smaha.com
9. Jeffrey W Broker for Cred Bond Safeguard Ins Co
   jbroker@brokerlaw.biz
10. Brendt C Butler for Cred EMR Residential Properties LLC
    bbutler@mandersonllp.com
11. Andrew W Caine for Cred Lehman ALI, Inc.
    acaine@pszyjw.com
12. Carollynn Callari for Cred Danske Bank A/S London Branch
    ccallari@venable.com
13. Cathrine M Castaldi for Cred SunCal Management, LLC
    ccastaldi@rusmiliband.com
14. Tara Castro Narayanan for Int Pty Courtesy NEF
    tara.narayanan@msrlegal.com, lisa.king@msrlegal.com
15. Dan E Chambers for Cred EMR Residential Properties LLC
    dchambers@jmbm.com
16. Shirley Cho for Cred Lehman ALI, Inc.
    scho@pszjlaw.com
17. Vonn Christenson for Int Pty Courtesy NEF
    vrc@paynefears.com
18. Brendan P Collins for Cred Gray1 CPB, LLC
    bpcollins@bhfs.com
19. Vincent M Coscino for Pet Cred CST Environmental Inc
    vcoscino@allenmatkins.com, emurdoch@allenmatkins.com
20. Paul J Couchot for Cred SCC Acquisitions, Inc.
    pcouchot@winthropcouchot.com,
    pj@winthropcouchot.com;gcrumpacker@winthropcouchot.com
21. Geoffrey Crisp for Int Pty Courtesy NEF
    geoffrey@smgarberlaw.com, michelle@smgarberlaw.com
22. Jonathan S Dabbieri for Int Pty Courtesy NEF
    dabbieri@sullivan.com,
    hill@sullivanhill.com;mcallister@sullivanhill.com;stein@sullivanhill.
    com;vidovich@sullivanhill.com
23. Ana Damonte for Cred Top Grade Construction, Inc.
    ana.damonte@pillsburylaw.com
24. Vanessa S Davila for Cred Bond Safeguard Ins Co
    vsd@amclaw.com
25. Melissa Davis for Cred City of Orange
    mdavis@shbllp.com
26. Daniel Denny for Int Pty Courtesy NEF
    ddenny@gibsondunn.com
27. Caroline Djang for Cred City of San Clemente
    cdjang@rutan.com
28. Caroline Djang for Cred Lehman ALI, Inc.
    crd@jmbm.com
29. Donald T Dunning for Cred Hertz Equipment Rental Corp
    ddunning@dunningLaw.com
30. Meredith R Edelman for Int Pty Courtesy NEF
    meredith.edelman@dlapiper.com
31. Joseph A Eisenberg for Cred Lehman ALI, Inc.
    jae@jmbm.com

32. Lei Lei Wang Ekvall for Atty Weiland Golden
    lekvall@wgllp.com
33. Richard W Esterkin for Debtor Palmdale Hills Property, LLC
    resterkin@morganlewis.com
34. Don Fisher for Cred Warmington Homes California
    dfisher@ptwww.com
35. Marc C Forsythe for Atty Robert Goe
    kmurphy@goeforlaw.com
36. Alan J Friedman for Atty Irell & Manella LLP
    afriedman@irell.com
37. Steven M Garber for Cred Park West Landscape, Inc
    steve@smgarberlaw.com
38. Christian J Gascou for 3rd Pty Pltf Arch Ins Co
    cgascou@gascouhopkins.com
39. Barry S Glaser for Cred County of Los Angeles
    bglaser@swjlaw.com
40. Robert P Goe for Atty Robert Goe
    kmurphy@goeforlaw.com,
    rgoe@goeforlaw.com;mforsythe@goeforlaw.com
41. Eric D Goldberg for Int Pty Courtesy NEF
    egoldberg@stutman.com
42. Richard H Golubow for Debtor Palmdale Hills Property, LLC
    rgolubow@winthropcouchot.com, pj@winthropcouchot.com
43. Michael J Gomez for Int Pty Central Pacific Bank
    mgomez@frandzel.com, efiling@frandzel.com;sking@frandzel.com
44. Kelly C Griffith for Cred Bond Safeguard Ins Co
    bkemail@harrisbeach.com
45. Matthew Grimshaw for Int Pty City Of Torrance
    mgrimshaw@rutan.com
46. Kavita Gupta for Debtor Palmdale Hills Property, LLC
    kgupta@winthropcouchot.com
47. Asa S Hami for Debtor Palmdale Hills Property, LLC
    ahami@morganlewis.com
48. Michael J Hauser for UST (SA)
    michael.hauser@usdoj.gov
49. D Edward Hays for Cred Lehman ALI, Inc.
    ehays@marshackhays.com
50. Michael C Heinrichs for Int Pty Courtesy NEF
    mheinrichs@omm.com
51. Harry D. Hochman for Cred Lehman ALI, Inc.
    hhochman@pszjlaw.com, hhochman@pszjlaw.com
52. Jonathan M Hoff for 3rd Pty Pltf Jt Prov of Lehman RE
    jonathan.hoff@cwt.com
53. Nancy Hotchkiss for Cred Murray Smith & Associates Engineering
    nhotchkiss@trainorfairbrook.com
54. Michelle Hribar for Pltf EMR Residential Properties LLC
    mhribar@rutan.com
55. John J Immordino for Cred Arch Ins Co.
    john.immordino@wilsonelser.com, raquel.burgess@wilsonelser.com
56. Lawrence A Jacobson for Cred BKF Engineers
    laj@cohenandjacobson.com
57. Michael J Joyce for Int Pty Courtesy NEF
    mjoyce@crosslaw.com
58. Stephen M Judson for Pet Cred The Professional Tree Care Co
    sjudson@fablaw.com
59. Kaleb L Judy for Def Zim Ind., Inc. dba Bakersfield Well
    ecf@kleinlaw.com, kjudy@kleinlaw.com
60. Steven J Kahn for Cred Lehman ALI, Inc.
    skahn@pszyjw.com
61. Sheri Kanesaka for Cred California Bank & Trust
    sheri.kanesaka@bryancave.com, theresa.macaulay@bryancave.com
62. David I Katzen for Int Pty Bethel Isl Muni Improve District
    katzen@ksfirm.com
63. Christopher W Keegan for Cred SC Master Holdings II LLC
    ckeegan@kirkland.com,
    shalimar.caltagirone@kirkland.com;alevin@kirkland.com
64. Irene L Kiet for Cred BNB Engineering, Inc.
    ikiet@hkclaw.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

August 2010                                                                                      **F 9013-3.1.PROOF.SERVICE**

65. *Claude F Kolm for Cred County of Alameda Tax Collector*
claude.kolm@acgov.org

66. *Mark J Krone for Cred Bond Safeguard Ins Co*
mk@amclaw.com, crs@amclaw.com;amc@amclaw.com

67. *David B Lally for Def Contracting Engineers, Inc.*
davidlallylaw@gmail.com

68. *Leib M Lerner for Cred Steiny and Co, Inc.*
leib.lerner@alston.com

69. *Peter W Lianides for Debtor Palmdale Hills Property, LLC*
plianides@winthropcouchot.com, pj@winthropcouchot.com

70. *Charles Liu for Cred Villa San Clemente, LLC*
cliu@marshackhays.com

71. *Charles Liu for Debtor Palmdale Hills Property, LLC*
cliu@winthropcouchot.com

72. *John W Lucas for Cred Lehman ALI, Inc., Lehman Commercial Paper Inc., OVC Holdings, LLC and Northlake Holdings, LLC*
jlucas@pszjlaw.com

73. *Kerri A Lyman for Atty Irell & Manella LLP*
klyman@irell.com

74. *Mariam S Marshall for Cred RGA Environmental, Inc.*
mmarshall@marshallramoslaw.com

75. *Robert C Martinez for Cred TC Construction Co, Inc*
rmartinez@mclex.com

76. *Michael D May for Cred R.J. Noble Co.*
mdmayesq@verizon.net

77. *Hutchison B Meltzer for Jt Unsec Cred Com*
hmeltzer@wgllp.com

78. *Krikor J Meshefejian for Int Pty Courtesy NEF*
kjm@lnbrb.com

79. *Joel S. Miliband for Cred RBF CONSULTING*
jmiliband@rusmiliband.com

80. *James M Miller for Atty Miller Barondess LLP*
jmiller@millerbarondess.com, vgunderson@millerbarondess.com;
smiller@millerbarondess.com;
mpritikin@millerbarondess.com

81. *Louis R Miller for Pltf Palmdale Hills Property, LLC*
smiller@millerbarondess.com

82. *Craig Millet for Int Pty Doug Champion*
cmillet@gibsondunn.com,
pcrawford@gibsondunn.com;cmillet@gibsondunn.com

83. *Randall P Mroczynski for Def Bob McGrann Construction, Inc.*
randym@cookseylaw.com

84. *Mike D Neue for Atty The Lobel Firm, LLP*
mneue@thelobelfirm.com,
jmattiace@thelobelfirm.com;pnelson@thelobelfirm.com

85. *Robert Nida for Cred Kirk Negrete, Inc*
Rnida@castlelawoffice.com

86. *Henry H Oh for 3rd Pty Pltf Jt Prov of Lehman RE*
henry.oh@dlapiper.com, janet.curley@dlapiper.com

87. *Sean A Okeefe for Debtor Palmdale Hills Property, LLC*
sokeefe@okeefelc.com

88. *Scott H Olson for Cred Bethel Isl Muni Improve District*
solson@seyfarth.com

89. *Robert B Orgel for Cred CA Verhagen Holdings*
rorgel@pszjlaw.com, rorgel@pszjlaw.com

90. *Malhar S Pagay for Cred Lehman ALI, Inc.*
mpagay@pszjlaw.com, mpagay@pszjlaw.com

91. *Ernie Zachary Park for Int Pty Newcomm*
ernie.park@bewleylaw.com

92. *Daryl G Parker for Cred Lehman ALI, Inc.*
dparker@pszjlaw.com

93. *Penelope Parmes for Cred EMR Residential Properties LLC*
pparmes@rutan.com

94. *Robert J Pfister for Int Pty Courtesy NEF*
rpfister@ktbslaw.com

95. *Ronald B Pierce for Cred Griffith Co*
ronald.pierce@sdma.com

96. *Katherine C Piper for Int Pty New Anaverde LLC*
kpiper@steptoe.com, smcloughlin@steptoe.com

97. *Cassandra J Richey for Cred Patricia I Volkerts, as Trstee, et al*
cmartin@pprlaw.net

98. *James S Riley for Cred Sierra Liquidity Fund, LLC*
tgarza@sierrafunds.com

99. *Debra Riley for Int Pty City of Palmdale*
driley@allenmatkins.com

100. *Todd C. Ringstad for Int Pty Courtesy NEF*
becky@ringstadlaw.com

101. *R Grace Rodriguez for Def O&B Equipment, Inc.*
ecf@lorgr.com

102. *Martha E Romero for Cred California Taxing Authorities*
Romero@mromerolawfirm.com

103. *Ronald Rus for Cred SCC Acquisitions, Inc.*
rrus@rusmiliband.com

104. *John P Schafer for Cred LB/L-DUC III Bethel Island, LLC*
jschafer@mandersonllp.com

105. *John E Schreiber for Def Fenway Capital, LLC*
jschreiber@dl.com

106. *William D Schuster for Cred HD Supply Construction Supply LTD*
bills@allieschuster.org

107. *Christopher P Simon for Int Pty Courtesy NEF*
csimon@crosslaw.com

108. *Gerald N Sims for Cred Chicago Title Ins Co*
jerrys@psdslaw.com, bonniec@psdslaw.com

109. *Wendy W Smith for Cred Castaic Union School District*
wendy@bindermalter.com

110. *Steven M Speier (TR)*
Sspeier@asrmanagement.com, ca85@ecfcbis.com

111. *Steven M Speier for Trstee Steven Speier (TR)*
Sspeier@Squarmilner.com, ca85@ecfcbis.com

112. *Michael St James for Cred MBH Architects, Inc.*
ecf@stjames-law.com

113. *Michael K Sugar for OCUC*
msugar@irell.com

114. *Cathy Ta for Def Hi-Grade Material Co.*
cathy.ta@bbklaw.com,
Arthur.Johnston@bbklaw.com;Kenneth.Burgess@bbklaw.com

115. *David A Tilem for Def Southland Pipe Corp*
davidtilem@tilemlaw.com, malissamurguia@tilemlaw.com;
dianachau@tilemlaw.com;
kmishigian@tilemlaw.com

116. *James E Till for Trstee Steven Speier (TR)*
jtill@thelobelfirm.com, jmattiace@thelobelfirm.com;
pnelson@thelobelfirm.com

117. *United States Trstee (SA)*
ustpregion16.sa.ecf@usdoj.gov

118. *Carol G Unruh for Cred Scott E. McDaniel*
cgunruh@sbcglobal.net

119. *Annie Verdries for Cred WEC Corp*
verdries@lbbslaw.com

120. *Jason Wallach for Def Professional Pipeline Contractors, Inc.*
jwallach@gladstonemichel.com

121. *Joshua D Wayser for Other Professional D. E. Shaw & Co., L.P.*
 kim.johnson@kattenlaw.com

122. *Marc J Winthrop for Debtor Palmdale Hills Property, LLC*
mwinthrop@winthropcouchot.com, pj@winthropcouchot.com

123. *David M Wiseblood for Cred Bethel Isl Muni Improve District*
dwiseblood@seyfarth.com

124. *Brett K Wiseman for Cred JF Shea Construction Inc*
bwiseman@aalaws.com

125. *Dean A Ziehl for Counter-Def LV Pacific Point LLC*
dziehl@pszjlaw.com, dziehl@pszjlaw.com

126. *Marc A. Zimmerman for Cred Life Church of God in Christ*
joshuasdaddy@att.net

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*August 2010*    **F 9013-3.1.PROOF.SERVICE**