1  PAUL J. COUCHOT - State Bar No. 131934
   pcouchot@winthropcouchot.com
2  **WINTHROP COUCHOT**
   **PROFESSIONAL CORPORATION**
3  660 Newport Center Drive, Suite 400
   Newport Beach, CA 92660
4  Telephone: (949) 720-4100
   Facsimile: (949) 720-4111
5  General Insolvency Counsel for Administratively
   Consolidated Debtors-in-Possession
6
   RONALD RUS State Bar No. 67369
7  rrus@rusmiliband.com
   JOEL S. MILIBAND - State Bar No. 77438
8  jmiliband@rusmiliband.com
   **RUS MILIBAND & SMITH P.C.**
9  2211 Michelson Drive, Seventh Floor
   Irvine, California 92612
10 Telephone: (949) 752-7100
   Facsimile:  (949) 252-1514
11 Counsel for SCC Acquisitions, Inc.

12         **UNITED STATES BANKRUPTCY COURT**
            **CENTRAL DISTRICT OF CALIFORNIA**
13             **SANTA ANA DIVISION**

14

15 In re                                         Case No. 8:08-bk-17206-ES
                                                 Jointly Administered With Case Nos.
16 Palmdale Hills Property, LLC, and its Related 8:08-bk-17209-ES; 8:08-bk-17240-ES;
   Debtors.                                      8:08-bk-17224-ES; 8:08-bk-17242-ES;
17        Jointly Administered Debtors           8:08-bk-17225-ES; 8:08-bk-17245-ES;
          and Debtors-in-Possession              8:08-bk-17227-ES; 8:08-bk-17246-ES;
18                                               8:08-bk-17230-ES; 8:08-bk-17231-ES;
                                                 8:08-bk-17236-ES; 8:08-bk-17248-ES;
19 Affects:                                      8:08-bk-17249-ES; 8:08-bk-17573-ES;
20 ☐ All Debtors                                 8:08-bk-17574 ES; 8:08-bk-17575-ES;
   ☒ Palmdale Hills Property, LLC,               8:08-bk-17404-ES; 8:08-bk-17407-ES;
21 ☒ SunCal Beaumont Heights, LLC                8:08-bk-17408-ES; 8:08-bk-17409-ES;
   ☐ SCC/Palmdale, LLC                           8:08-bk-17458-ES; 8:08-bk-17465-ES;
22 ☒ SunCal Johannson Ranch, LLC                 8:08-bk-17470-ES; 8:08-bk-17472-ES;
   ☐ SunCal Summit Valley, LLC                   and 8:08-bk-17588-ES
23 ☒ SunCal Emerald Meadows LLC
   ☒ SunCal Bickford Ranch, LLC                  Chapter 11 Proceedings
24 ☒ Acton Estates, LLC
   ☐ Seven Brothers LLC                          **SUNCAL PLAN PROPONENTS' OMNIBUS**
25 ☒ SJD Partners, Ltd.                          **BRIEF IN SUPPORT OF CONFIRMATION**
   ☒ SJD Development Corp.                        **OF THE GROUP I VD PLANS, GROUP II**
26 ☐ Kirby Estates, LLC                          **VD PLANS, GROUP III VD PLANS,**
   ☐ SunCal Communities I, LLC                   **GROUP IV VD PLANS, GROUP I TD**
27                                               **PLANS AND GROUP II TD PLANS;**
   ☐ SunCal Communities III, LLC                 **MEMORANDUM OF POINTS AND**
28    ***Caption Continued on Next Page***

1

*Caption Continued from Previous Page*

2

☒ SCC Communities LLC

☒ North Orange Del Rio Land, LLC

3

☒ Tesoro SF, LLC

4

☒ SunCal Heartland, LLC

☐ LBL-SunCal Northlake, LLC

5

☒ SunCal Marblehead, LLC

☒ SunCal Century City, LLC

6

☒ SunCal PSV, LLC

7

☒ Delta Coves Venture, LLC

☒ SunCal Torrance, LLC

8

☒ SunCal Oak Knoll, LLC

9

**AUTHORITIES**

**[DECLARATIONS OF BRUCE V. COOK AND GARRICK A. HOLLANDER IN SUPPORT THEREOF FILED CONCURRENTLY HEREWITH]**

<u>**Confirmation Hearing:**</u>

DATE:    October 24, 2010
TIME:    9:00 a.m.
PLACE:    Courtroom. 5A

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

**PAGE**

I.      BACKGROUND FACTS ........................................................................................    3

    1.1      The Debtors......................................................................................................    3

    1.2      SunCal Proponents..........................................................................................    3

    1.3      The SunCal Plans Generally ............................................................................    3

    1.4      Modifications to the SunCal Plans...................................................................    4

        1.4.1      Definition of LitCo and LitCo Plan Loans .........................................    4

        1.4.2      Modifications to Treatment of Allowed Claims for
                Secured Real Property Taxes..............................................................    5

        1.4.3      Treatment of Holders of Allowed Interests Against the
                Acton Plan Set Forth in the Group I:  Voluntary Debtors ................    5

        1.4.4      Treatment of Holders of Allowed Interests Against the
                Group II:  Voluntary Debtors.............................................................    6

        1.4.5      Treatment of Holders of Allowed Interests Against the
                Group III:  Voluntary Debtors ...........................................................    6

        1.4.6      Incorporation of the Diamond Valley Term Sheet ............................    7

    1.5      The SunCal Plan Proponents' Retention of a Third Party Real
        Estate Professional to Run the Sale Process ....................................................    9

    1.6      Classification and Voting Results for Each Class of Claims in
        SunCal Plans ...................................................................................................    9

        1.6.1      All SunCal Plans - Unclassified Classes.............................................    10

        1.6.2      Group I VD Plan Classes of Claims and Voting Results....................    10

        1.6.3      Group II VD Plan Classes of Claims and Voting Results ...................    12

        1.6.4      Group III VD Plan Classes of Claims and Voting Results ..................    12

        1.6.5      Group IV VD Plan Classes of Claims and Voting Results..................    13

        1.6.6      Group I TD Plan Classes of Claims and Voting Results ....................    14

        1.6.7      Group II TD Plan Classes of Claims and Voting Results...................    16

II.     THE SUNCAL PLANS COMPLY WITH THE REQUIREMENTS
    FOR CONFIRMATION SET FORTH IN SECTION 1129 ....................................    17

    2.1      11 U.S.C. § 1129(a)(1)....................................................................................    17

        2.1.1      Classification (11 U.S.C. § 1122).......................................................    17

        2.1.2      Mandatory Contents of the Plan (11 U.S.C. § 1123(a)) ....................    18

        2.1.3      Conclusion Regarding 11 U.S.C. § 1129(a)(1)...................................    20

    2.2      11 U.S.C. § 1129(a)(2)....................................................................................    20

    2.3      11 U.S.C. § 1129(a)(3)....................................................................................    20

    2.4      11 U.S.C. § 1129(a)(4)....................................................................................    21

    2.5      11 U.S.C. § 1129(a)(5)....................................................................................    21

    2.6      11 U.S.C. § 1129(a)(6)....................................................................................    22

    2.7      11 U.S.C. § 1129(a)(7)....................................................................................    22

    2.8      11 U.S.C. § 1129(a)(8)....................................................................................    24

    2.9      11 U.S.C. § 1129(a)(9)....................................................................................    26

    2.10    11 U.S.C. § 1129(a)(10)..................................................................................    27

# TABLE OF CONTENTS

## (Continued)

|  |  |  | PAGE |
|---|---|---|---|
| 2.11 | 11 U.S.C. § 1129(a)(11)...................................................................... | | 28 |
| | 2.11.1 Group I VD Plan ..................................................................... | | 29 |
| | A. | Creditor Distribution Obligations ......................................... | 29 |
| | | 1. Administrative Claims ............................................. | 29 |
| | | 2. Class 1.1 through 1.4 Claims (Property Taxes)...................................................... | 30 |
| | | 3. Class 2.1 through 2.4 Claims (Lehman) .................. | 30 |
| | | 4. Class 3.1 through 3.14 Claims (Mechanics Lienors)...................................................... | 30 |
| | | 5. Class 4.1 (Contingent Bond Claims) ........................ | 30 |
| | | 6. Class 5.1 (Priority Claims)........................................ | 30 |
| | | 7. Class 6.1 through 6.4 (Unsecured Claims That Are Reliance Claims) ................................ | 31 |
| | | 8. Class 7.1 through 7.4 (Unsecured Claims That Are Not Reliance Claims) ................................ | 31 |
| | B. | Plan Administrative Administration Costs ........................... | 31 |
| | | 1. Marketing Costs ...................................................... | 32 |
| | | 2. Plan Trust Costs ...................................................... | 32 |
| | | 3. Litigation Costs ....................................................... | 32 |
| | 2.11.2 Group II VD Plan ................................................................... | | 32 |
| | A. | Creditor Distribution Obligations ......................................... | 32 |
| | | 1. Administrative Claims ............................................. | 32 |
| | | 2. Class 1.1 Through 1.2 Claims (Property Taxes)...................................................... | 33 |
| | | 3. Class 2.1 (Mechanics Lienor) .................................. | 33 |
| | | 4. Class 3.1 (Priority Claims)........................................ | 33 |
| | | 5. Class 4.1 Through 4.2 (Unsecured Claims).............. | 33 |
| | | 6. Class 5.1 Through 5.2 (Interests Held by SunCal Communities I, LLC) ................................ | 33 |
| | B. | Plan Administrative Administration Costs ........................... | 34 |
| | | 1. Marking Costs ......................................................... | 34 |
| | | 2. Plan Trust Costs ...................................................... | 34 |
| | | 3. Litigation Costs ....................................................... | 34 |
| | 2.11.3 Group III VD Plan .................................................................. | | 34 |
| | A. | Creditor Distribution Obligations ......................................... | 35 |
| | | 1. Administrative Claims ............................................. | 35 |
| | | 2. Class 1.1 Through 1.2 Claims (Property Taxes)...................................................... | 35 |
| | | 3. Class 2.1 Through 2.3 Claims (Lehman) .................. | 35 |
| | | 4. Class 3.1 Through 3.2 (Priority Claims).................... | 35 |
| | | 5. Class 4.1 Through 4.3 (Unsecured Claims).............. | 36 |
| | | 6. Class 5.1 Through 5.3 (Interests).............................. | 36 |

# TABLE OF CONTENTS

## (Continued)

**PAGE**

|  |  |  |  |  |
|---|---|---|---|---|
| B. | Plan Administrative Administration Costs | | | 36 |
| | 1. | Marking Costs | | 36 |
| | 2. | Plan Trust Costs | | 36 |
| | 3. | Litigation Costs | | 36 |
| 2.11.4 | Group IV VD Plan | | | 37 |
| A. | Creditor Distribution Obligations | | | 37 |
| | 1. | Administrative Claims | | 37 |
| | 2. | Class 1.1 Through 1.2 Claims (Lehman) | | 37 |
| | 3. | Class 2.1 (Priority Claims) | | 37 |
| | 4. | Class 3.1 (Unsecured Claims That Are Reliance Claims) | | 38 |
| | 6. | Class 4.1 (Unsecured Claims That Are Not Reliance Claims) | | 38 |
| B. | Plan Administrative Administration Costs | | | 38 |
| | 1. | Plan Trust Costs | | 38 |
| | 2. | Litigation Costs | | 38 |
| 2.11.5 | Group I TD Plan | | | 38 |
| A. | Creditor Distribution Obligations | | | 39 |
| | 1. | Administrative Claims | | 39 |
| | 2. | Class 1.1 Through 1.5 Claims (Property Taxes) | | 39 |
| | 3. | Class 2.1 Through 2.5 Claims (Lehman) | | 39 |
| | 4. | Class 3.1 Through 3.30 Claims (Mechanics Lienors) | | 39 |
| | 5. | Class 4.1 Through 4.5 (Contingent Bond Claims) | | 40 |
| | 6. | Class 5.1 Through 5.5 (Priority Claims) | | 40 |
| | 7. | Class 6.1 Through 6.5 (Unsecured Claims That Are Reliance Claims) | | 40 |
| | 8. | Class 7.1 Through 7.5 (Unsecured Claims That Are Not Reliance Claims) | | 41 |
| B. | Plan Administrative Administration Costs | | | 41 |
| | 1. | Marketing Costs | | 41 |
| | 2. | Plan Trust Costs | | 41 |
| | 3. | Litigation Costs | | 41 |
| 2.11.6 | Group II TD Plan | | | 41 |
| A. | Creditor Distribution Obligations | | | 42 |
| | 1. | Administrative Claims | | 42 |
| | 2. | Class 1.1 Through 1.2 Claims (Property Taxes) | | 42 |
| | 3. | Class 2.1 Claims (Lehman) | | 42 |

## TABLE OF CONTENTS

### (Continued)

| | | | | PAGE |
|---|---|---|---|---|
| | | 4. | Class 3.1 Through 3.4 Claims (Mechanics Lienors) | 43 |
| | | 5. | Class 4.1 (Contingent Bond Claims) | 43 |
| | | 6. | Class 5.1 (Priority Claims) | 43 |
| | | 7. | Class 6.1 Through 6.2 (Unsecured Claims That Are Reliance Claims) | 43 |
| | | 8. | Class 7.1 Through 7.2 (Unsecured Claims That Are Not Reliance Claims) | 44 |
| | B. | Plan Administrative Administration Costs | | 44 |
| | | 1. | Marketing Costs | 44 |
| | | 1. | Plan Trust Costs | 44 |
| | | 2. | Litigation Costs | 44 |
| | 2.11.7 | Conclusion | | 44 |
| 2.12 | 11 U.S.C. § 1129(a)(12) | | | 45 |
| 2.13 | 11 U.S.C. § 1129(a)(13) | | | 45 |
| 2.14 | 11 U.S.C. § 1129(a)(14) | | | 45 |
| 2.15 | 11 U.S.C. § 1129(a)(15) | | | 45 |
| III. | THE PLAN COMPLIES WITH ALL OF THE REQUIREMENTS FOR CONFIRMATION SET FORTH IN SECTION 1129(b) OF THE BANKRUPTCY CODE | | | 46 |
| | 3.1 | No Unfair Discrimination | | 46 |
| | 3.2 | The Plan Is Fair and Equitable | | 47 |
| | | 3.2.1 | Secured Claims | 48 |
| | | 3.2.2 | Unsecured Claims | 49 |
| IV. | CONCLUSION | | | 50 |

# TABLE OF AUTHORITIES

**PAGE**

**CASES**

Acquia Inc. v. Clinton,
    787 F. 2d 1352 (9th Cir. 1986) ................................................28

Bonner Mall Partnership v. U.S. Bancorp Mortgage Co. (In re Bonner Mall Partnership),
    2 F.3d 899 (9th Cir. 1993) cert. denied, 315 U.S. 19 (1995) ....................................21

Brite v. Sun Country Development, Inc. (In re Sun Country Development, Inc.),
    764 F.2d 406 (5th Cir. 1985) ................................................21

Citizens Bank of Pennsylvania v. Philadelphia Newspapers, LLC
    (In re Philadelphia Newspapers, LLC),
    599 F.3d 298 (3d Cir. Mar. 22, 2010) ................................................49

Clarkson v. Cooke Sales and Service Co.,
    767 F. 2d 417 (8th Cir. 1985) ................................................28

In re Acequia, Inc.,
    787 F.2d 1352 (9th Cir. 1986) ................................................47

In re Brown,
    108 B.R. 738 (Bankr. C.D.Cal. 1989) ................................................25

In re Caldwell,
    76 B.R. 643 (Bankr. E.D. Tenn. 1987) ................................................47

In re Campbell,
    89 B.R. 187 (Bankr. N.D.Fla. 1988) ................................................25

In re Drexel Burnham Lambert Group, Inc.,
    138 B.R. 723 (Bankr. S.D.N.Y. 1992) ................................................28, 29

In re Eagle Bus. Mfg., Inc.,
    134 B.R. 584 (Bankr. S.D. Tex. 1991),
    order aff'd. 158 B.R. 421 (S.D. Tex. 1993) ................................................19

In re Johns-Manville Corp.,
    68 B.R. 618 (Bankr. S.D.N.Y. 1986),
    aff'd, 78 B.R. 407 (S.D.N.Y. 1987),
    aff'd, 843 F.2d 636 (2d Cir. 1988) ................................................47

In re M. Long Arabians,
    103 B.R. 211 (9th Cir. BAP 1989) ................................................25

1

## <u>TABLE OF AUTHORITIES</u>

2

### (Continued)

3

<u>PAGE</u>

4

<u>In re Mullberry Phosphates Inc.</u>,
5
    149 B.R. 702 (Bankr. M.D. Fla. 1993)...................................................................28, 29

6

<u>In re Neff</u>,
7
    60 B.R. 448 (Bankr. N.D.Tex. 1985)
    affirmed 785 F.2d 1033 (5th Cir. 1986) ......................................................................25

8

<u>In re Pardee</u>,
9
    218 B.R. 916 (9th Cir. BAP 1998) ..............................................................................25

10

<u>In re Pine Lake Village Apartment Co.</u>,
    19 B.R. 819 (Bankr. S.D.N.Y. 1982) ..........................................................................47
11

<u>In re Ruti-Sweetwater</u>,
12
    57 B.R. 748 (D.Utah 1985)
13
    affirmed 836 F.2d 1263 (10th Cir. 1988) ....................................................................25

14
<u>In re Szostek</u>,
    886 F.2d 1405 (10th Cir. 1989)...................................................................................25
15

<u>In re Toy & Sports Warehouse, Inc.</u>,
16
    37 B.R. 141 (Bankr. S.D.N.Y. 1984) ..........................................................................46

17

<u>In re Tucson Self-Storage</u>,
18
    166 B.R. 892 (9th Cir. BAP 1994) ..............................................................................46

19

<u>Prudential Ins. Co. of America v. Monnier Bros.</u>,
    755 F. 2d 1336 (8th Cir. 1985)....................................................................................28
20

<u>Scotia Pacific Co., LLC v. Official Unsecured Creditors' Committee</u>
21
    <u>(In re Pacific Lumber Co.)</u>,
22
    584 F.3d 229 (5th Cir. 2009)........................................................................................49

23
<u>United Savings v. Timbers of Inwood Forest, L.P.</u>,
    484 U.S. 365 (1989) .....................................................................................................49

24

<u>Wright v. Union Cent. Life Ins. Co.</u>,
25
    311 U.S. 273 (1940) .....................................................................................................49

26

27

28

# TABLE OF AUTHORITIES

### (Continued)

**PAGE**

**STATUTES**

11 U.S.C. § 301 .................................................................................................. 26
11 U.S.C. § 302 .................................................................................................. 26
11 U.S.C. § 303 .................................................................................................. 26
11 U.S.C. § 363(k) ............................................................................................. 47
11 U.S.C. § 502(b)(1) .......................................................................................... 8
11 U.S.C. § 506 .................................................................................................. 27
11 U.S.C. § 507(a)(1) ......................................................................................... 13
11 U.S.C. § 507(a)(2) .................................................................................... 13, 26
11 U.S.C. § 507(a)(4) .................................................................................... 13, 26
11 U.S.C. § 507(a)(5) .................................................................................... 13, 26
11 U.S.C. § 507(a)(6) .................................................................................... 13, 26
11 U.S.C. § 507(a)(7) .................................................................................... 13, 26
11 U.S.C. § 507(a)(8) ......................................................................................... 26
11 U.S.C. § 511 .................................................................................................. 27
11 U.S.C. § 1111(b)(2) ........................................................................................ 22
11 U.S.C. § 1114 ................................................................................................ 45
11 U.S.C. § 1114(e)(1)(B) or (g) ........................................................................ 45
11 U.S.C. § 1115 ................................................................................................ 48
11 U.S.C. § 1122 .......................................................................................... 18, 20
11 U.S.C. § 1122(a) ............................................................................................ 18
11 U.S.C. § 1122(b) ............................................................................................ 26
11 U.S.C. § 1123 .......................................................................................... 18, 20
11 U.S.C. § 1123(a) ............................................................................................ 18
11 U.S.C. § 1123(a)(1) ........................................................................................ 18
11 U.S.C. § 1123(a)(2) ........................................................................................ 18
11 U.S.C. § 1123(a)(3) ........................................................................................ 18
11 U.S.C. § 1123(a)(4) ........................................................................................ 18
11 U.S.C. § 1123(a)(5) ........................................................................................ 19
11 U.S.C. § 1123(a)(6) ........................................................................................ 19
11 U.S.C. § 1123(a)(7) ........................................................................................ 19
11 U.S.C. § 1123(a)(8) ........................................................................................ 20
11 U.S.C. § 1124(2) ............................................................................................ 27
11 U.S.C. § 1125 ................................................................................................ 20
11 U.S.C. § 1125 ................................................................................................ 20
11 U.S.C. § 1127 .................................................................................................. 9
11 U.S.C. § 1129 .............................................................................. 17, 25, 48, 50
11 U.S.C. § 1129(a) ...................................................................................... 17, 46
11 U.S.C. § 1129(a)(1) ............................................................................ 17, 18, 20
11 U.S.C. § 1129(a)(2) ........................................................................................ 20
11 U.S.C. § 1129(a)(3) ................................................................................... 20, 21

1

# TABLE OF AUTHORITIES

2

### (Continued)

3

**PAGE**

4

11 U.S.C. § 1129(a)(4)...................................................................................................21

5

11 U.S.C. § 1129(a)(5)...............................................................................................21, 22

11 U.S.C. § 1129(a)(6)...................................................................................................22

6

11 U.S.C. § 1129(a)(7)...............................................................................................22, 24

7

11 U.S.C. § 1129(a)(8)............................................................17, 24, 25, 26, 46

11 U.S.C. § 1129(a)(9)...............................................................................................26, 27

8

11 U.S.C. § 1129(a)(9)(A)...............................................................................................26

11 U.S.C. § 1129(a)(9)(B)...............................................................................................27

9

11 U.S.C. § 1129(a)(9)(C)...............................................................................................27

11 U.S.C. § 1129(a)(9)(D)...............................................................................................27

10

11 U.S.C. § 1129(a)(10)...........................................................................................27, 28

11

11 U.S.C. § 1129(a)(11)...................................................................................................28

11 U.S.C. § 1129(a)(12)...................................................................................................45

12

11 U.S.C. § 1129(a)(13)...................................................................................................45

13

11 U.S.C. § 1129(a)(14)...................................................................................................45

11 U.S.C. § 1129(a)(15)...................................................................................................45

11 U.S.C. § 1129(a)(16)...................................................................................................45

14

11 U.S.C. § 1129(b)...............................................................17, 25, 26, 46, 47

15

11 U.S.C. § 1129(b)(2)(A)...........................................................................................48, 49

11 U.S.C. § 1129(b)(2)(A)(iii).......................................................................................48, 49

16

28 U.S.C. § 1930 of title 28...............................................................................................45

Cal. Rev. Tax. Code § 4102...............................................................................................27

17

Cal. Rev. Tax. Code § 4103...............................................................................................27

18

**OTHER AUTHORITIES**

19

H.R. Rep. No. 595, 95th Cong., 1st Sess. 412 (1977).....................................................20

20

S. Rep. No. 989, 95th Cong., 2d Sess. 126 (1978).........................................................20

Sponsors' Remarks, 124 Cong. Rec. H11, 104 (daily ed. Sep. 28, 1978)

21

    (statement of Rep. Edwards; 124 Cong. Rec. S17, 420 (daily ed. Oct. 6, 1978)

    (statement of Sen. De Concini)...............................................................................46

22

**TREATISES**

23

5 Collier on Bankruptcy, ¶ 1129.03, at 1129-50 (15th ed. 1993)...............................47

24

7 Collier on Bankruptcy at ¶ 1123.01[6] (15th ed. Revised 2009)...............................19

7 Collier on Bankruptcy at ¶ 1129.02[2] (15th ed. 2009).............................................20

25

26

27

28

1   The Voluntary Debtors[1] and SCC Acquisitions, Inc. ("SCC Acquisitions"), in their capacity

2   as co-plan proponents in certain of these jointly administered Chapter 11 cases (collectively the

3   "SunCal Proponents"),[2] hereby submit the following brief ("Confirmation Brief") in support of the

4   following proposed Chapter 11 plans:

5          A. Third Amended Chapter 11 Plans filed by the SunCal Proponents in the

6              Chapter 11 cases of Palmdale Hills Property, LLC, SunCal Bickford Ranch,

7              LLP, SunCal Emerald Meadows, LLC and Acton Estates, LLC [Group I:

8              Voluntary Debtors] ("Group I VD Plans");

9          B. Third Amended Chapter 11 Plans filed by SunCal Plan Proponents in the

10             Chapter 11 Cases of SunCal Beaumont Heights, LLC and SunCal Johannson

11             Ranch, LLC [Group II: Voluntary Debtors] ("Group II VD Plans");

12         C. Third Amended Chapter 11 Plans filed by SunCal Plan Proponents in the

13             Chapter 11 Cases of SCC Communities, LLC, North Orange Del Rio Land,

14             LLC and Tesoro SF, LLC [Group III: Voluntary Debtors] ("Group III VD

15             Plans");

16         D. Fourth Amended Joint Chapter 11 Plan filed by the SunCal Proponents in the

17             Chapter 11 cases of SJD Partners, Ltd. and SJD Development Corp. [Group IV

18             Voluntary Debtors] ("Group IV VD Plans");

19         E. Third Amended Chapter 11 Plans filed by SunCal Plan Proponents in the

20             Chapter 11 Cases of SunCal Oak Valley, LLC, SunCal Heartland, LLC, Delta

21             Coves Venture, LLC, SunCal Marblehead, LLC and SunCal PSV, LLC [Group

22             I: Trustee Debtors] ("Group I TD Plans");

23

24  [1] The Voluntary Debtors are Palmdale Hills, LLC, a Delaware corporation ("Palmdale Hills"), SunCal Communities
    I ("Communities I"), Acton Estates, LLC ("Acton"), SunCal Beaumont, LLC ("Beaumont"), SunCal Emerald

25  Meadows, LLC ("Emerald Meadows"), SunCal Johannson Ranch, LLC ("Johannson Ranch"), SunCal Bickford
    Ranch, LLC ("Bickford Ranch"), SunCal Summit Valley, LLC ("Summit Valley"), Seven Brothers, LLC ("Seven

26  Brothers"), Kirby Estates, LLC ("Kirby Estates"), SCC Communities, LLC ("SCC Communities"), North Orange
    Del Rio Land, LLC ("Del Rio"), and Tesoro SF LLC ("Tesoro").  The Trustee Debtors are: LB/L-SunCal Oak

27  Valley, LLC ("Oak Valley"), SunCal Heartland, LLC ("Heartland"), LB/L-SunCal Northlake, LLC ("Northlake"),
    SunCal Marblehead, LLC ("Marblehead"), SunCal PSV, LLC ("PSV"), Delta Coves Venture, LLC ("Delta

28  Coves"), SunCal Torrance Properties, LLC ("Torrance") and SunCal Oak Knoll, LLC ("Oak Knoll").  The
    Voluntary Debtors and Trustee Debtors are collectively referred to as the "Debtors."
    [2] All capitalized terms shall have the meaning set forth in the SunCal Plans.

F. Third Amended Chapter 11 Plans filed by SunCal Plan Proponents in the Chapter 11 Cases of SunCal Oak Knoll, LLC and SunCal Torrance, LLC [Group II: Trustee Debtors] ("Group II TD Plans"); and

G. The modifications to such Plans pursuant to that certain *Motion for Order Approving Nonmaterial Modifications to the SunCal Plan Proponents' Third Amended Chapter 11 Plans*, docket no. 2632 (the "Plan Modification Motion") set for hearing on October 24, 2011. A supplement to the Plan Modification Motion and redline versions to the Plans reflecting the proposed modifications shall be filed by October 3, 2011, which shall comply with regular notice for such means.

(collectively, the "SunCal Plans"). This brief is supported and supplemented by the concurrently filed Declarations of Bruce V. Cook (the "Cook Declaration") and Garrick H. Hollander (the "Hollander Declaration"), and the pleadings listed in Exhibit "1" to the Hollander Declaration. Unless otherwise indicated herein, capitalized terms have the same definitions as the corresponding terms used in the SunCal Plans.

## I.

## BACKGROUND FACTS

### 1.1    The Debtors.

The Debtors are twenty-six affiliated entities that are owned, directly or indirectly, by SCC Acquisitions. They are part of a larger family of companies that is generically referred to as the SunCal Companies ("SunCal"). Prior to the Debtors' Chapter 11 filings, SunCal was one of the largest private real estate developers in the United States. Most of the Debtors were formed to own, develop and ultimately to sell residential development projects in California. Several of the Debtors are holding companies for other Debtors that directly hold title to the Projects (the "Project Debtors"). More detailed facts regarding the Debtors' history, and their individual assets and liabilities, are set forth in the Disclosure Statements filed in support of the SunCal Plans.

## 1.2 **SunCal Proponents**.

As stated above, the Voluntary Debtors (as defined in footnote 1 herein) and SCC Acquisitions are SunCal Plan Proponents for the five SunCal Plans presented to the Court for confirmation. This Confirmation Brief is submitted in support of all of the above SunCal Plans.

## 1.3 **The SunCal Plans Generally.**

The SunCal Plans provide, in summary, for the sale of the individual real estate Projects owned by the Debtors, through an auction process, with the objective being to generate the highest price possible. These sales would be made free and clear of all Disputed Secured Claims and any purported credit bid rights of the Disputed Secured Creditors. After payment of closings costs and Allowed Administrative Claims, the Net Sale Sales Proceeds would then be set aside in Net Sales Proceeds Accounts. The Disputed Liens will then attach to these proceeds in their preexisting order of priority. Once all disputes regarding the applicable Secured Claims are resolved, the Net Sales Proceeds will then be distributed to creditors in accordance with their rights under the Bankruptcy Code. Distributions prior to the resolution of an affected Secured Claims will only occur in those instances where the Court concludes that the rights of the Secured Creditors holding potential, but disputed Secured Claims, will remain adequately protected, notwithstanding these distributions.

As more fully explained in the Disclosure Statements, the Lehman Disputed Liens and Lehman Disputed Claims are the subject of a series of pending contested matters and adversary proceedings. The merits of the objections and defenses raised by the SunCal Proponents in these litigation matters are directly relevant to the merits of the SunCal Plans and the Lehman Plans. If, as the SunCal Proponents contend, the Lehman Disputed Claims are disallowed in their entirety, or reduced as prayed in the pending litigation matters, then the resulting dividend payable to all other creditors under the SunCal Plans will range between 80% and 100%, instead of the 1% dividend purportedly "guaranteed" under the competing Lehman Plans. This would not only make the SunCal Plans the preferred option for creditors, it would render the Lehman Plans unconfirmable, since the Lehman Plans would offering creditors less than they would receive in a Chapter 7 case.

### 1.4    Modifications To The SunCal Plans.

In order to address the objections of certain creditors and to take into consideration a recent purchase offer received for several of the Voluntary Projects that will improve the distribution available to creditors and to respond to objections to the Plans filed on September 19, 2011, the SunCal Proponents propose to make certain non-material changes to the SunCal Plans. These proposed changes, which are reflected in redlined version of the SunCal Plans as part of the Plan Modification Motion, are summarized below:

#### 1.4.1    Definition of LitCo and LitCo Plan Loans.

The modifications relating to the Group I VD Plans, the Group III VD Plans, the Group I TD Plans, Group II TD Plans expand the definition of the term "LitCo Loans" to encompass credit support arrangements (letters of credit, collateral, etc.) provided to secure funding for the Effective Date Payments and Post-Confirmation expenses.  The modifications to the Group I VD Plan relating to Acton describe a purchase submitted by buyer Diamond Valley, LLC for the Acton Project. Based upon this offer, the SunCal Proponents seek to identify Diamond Valley as the Stalking Horse Bidder for the Acton Project in the Group I Plan.

The purchase offer from Diamond Valley also seeks to purchase Beaumont Heights and Johannson Ranch Projects. Accordingly, the SunCal Proponents seek to make the corresponding modification to the Group II VD and Group III VD Plans, which apply to these two Debtors.

#### 1.4.2    Modifications to Treatment of Allowed Claims for Secured Real Property Taxes.

In response to objections asserted by certain taxing authorities, the SunCal Plan Proponents have included a provision in the SunCal Plans stating that any installment payments payable on account of an Allowed Real Property Tax Claims shall not be paid later any later than the date that payments are made to the holders of Allowed Claims in the applicable unsecured classes.  The Plan treatment has further been clarified that payments shall be made in "regular installments" over a period not later than sixty (60) months after the date of the order for relief, in compliance with 11 U.S.C. § 1129(a)(9)(C) & (D).

**1.4.3    Treatment of Holders of Allowed Interests Against the Acton Plan Set**

**Forth in the Group I: Voluntary Debtors.**

The Plan as to the Group I: Voluntary Debtors currently provides, in summary, that interest

holders are impaired as follows:

> The Interests of the Holders in Class 8.1, 8.2, 8.3 and 8.4 are impaired under
> the Plan. All such Interests shall be cancelled as of the Effective Date and no
> distribution shall be made to these Holders on account of such Interest(s).

Plan, Group I: Voluntary Debtors, Section 5.8.

In the Acton case, there is a pending objection to LCPI's proof of claim no. 6-3, docket

no. 2676 ("Acton Claim Objection").  If the Acton Claim Objection is successful, it will create a

surplus estate.  Accordingly, the Group I Plan provision relating to the treatment of equity

interests in Acton must provide for a distribution of excess funds to such interest holders in the

event all Allowed Unsecured Claims are paid in full.  The following modification addresses this

issue:

> The Interests of the Holders in Class 8.1, 8.2, 8.3 and 8.4 are impaired under the
> Plan. All such Interests shall be cancelled as of the Effective Date and no
> distribution shall be made to these Holders on account of such Interest(s) with the
> following exception for potential Distributions to the Interest holders of class 8.4
> Interest Holders of the Acton Estate which shall be treated as follows:  Any
> potential Distribution to Holders of Class 8.4 Allowed Interest against the Acton
> Estate shall first, to pay pro-rata any unpaid Professional Fees in the Voluntary
> Debtors' cases pursuant to orders authorizing joint and several liability of the
> estate for post-petition professional fees and expenses [Docket No. 12], and to
> repay Palmdale Hills for the individual loans made from "Alleged Unencumbered
> Cash" to the Subject Voluntary Debtors pursuant to paragraph 2 of the Stipulations
> entered as docket nos. 854, 1154, 1566, and 2102; second, to repay the LitCo Plan
> Loan; and third, pro-rata to the Holders of Allowed Interests in the Acton Estate.

**1.4.4    Treatment of Holders of Allowed Interests Against the**

**Group II: Voluntary Debtors.**

The Plan as to the Group II: Voluntary Debtors currently provides that interest holders are

impaired and cancelled.  *See* Plan, Group II: Voluntary Debtors, Section 5.5.

The Lehman Entities do not hold any liens against the Projects owned by the Group II

Voluntary Debtors, which means that one or more surplus estates could result in these cases.  In

order to accommodate this possibility, the Group II: Voluntary Debtors' Plans must provide for a

distribution of any additional funds to equity after the Allowed Claims of unsecured creditors have been paid in full.  The following modified treatment for the Class 5.1 to 5.3 Allowed Interests in the Group II: Voluntary Debtors' cases addresses this issue:

> The Interests of the Holders in Class 5.1 to 5.3 are impaired under the Plan(s). Any potential Distribution to Holders of Allowed Interest against the Group II: Voluntary Debtors shall first be used to pay pro-rata any unpaid Professional Fees in the Voluntary Debtors' cases pursuant to orders authorizing joint and several liability of the estate for post-petition professional fees and expenses [Docket No. 12], and to repay Palmdale Hills for the individual loans made from "Alleged Unencumbered Cash" to the Subject Voluntary Debtors pursuant to paragraph 2 of the Stipulations entered as docket nos. 854, 1154, 1566, and 2102; second, to repay the LitCo Plan Loan, and third, any remaining funds thereafter shall be paid pro-rata to Allowed Interests of the respective the Group II: Voluntary Debtors.

### 1.4.5    Treatment of Holders of Allowed Interests Against the Group III: Voluntary Debtors.

The Group III: VD Plans currently provide that interest holders are impaired and cancelled.  See Plan, Group III: Voluntary Debtors, Section 5.5.

The Group III: Voluntary Debtors' estates propose treatment for the holders of allowed interests that is consistent with the treatment described in Section 1.4.4.  This modified treatment is set forth below:

> The Interests of the Holders in Class 5.1 to 5.3 are impaired under the Plan(s). Any potential Distribution to Holders of Allowed Interest against the Group III: Voluntary Debtors shall first be used to pay pro-rata any unpaid Professional Fees in the Voluntary Debtors' cases pursuant to orders[3] authorizing joint and several liability of the estate for post-petition professional fees and expenses, and to repay Palmdale Hills for the individual loans made from "Alleged Unencumbered Cash" to the Subject Voluntary Debtors pursuant to paragraph 2 of the Stipulations entered as docket nos. 854, 1154, 1566, and 2102; second, to repay the LitCo Plan Loan, and third, any remaining funds thereafter shall be paid pro-rata to Allowed Interests of the respective the Group III: Voluntary Debtors.

### 1.4.6    Incorporation of the Diamond Valley Term Sheet.

The SunCal Parties further propose to modify the Group I VD Plan, Group II VD Plan and the Group III VD Plan to make Diamond Valley Land LLC ("Diamond Valley") the stalking horse

---

[3] See Docket Nos. 12 (lead case), 14 (Tesoro), 14 (SCC Communities), and 15 (Del Rio).

bidder for the following projects in the cases of Beaumont, Johannson, SCC Communities, Tesoro, Acton and Torrance. A summary of the terms in the Diamond Valley offer are set forth below:

| Proposed Projects to Be Sold | Diamond Valley Purchase Offer | Deposit Amount | Minimum and Subsequent Overbid Increments | Comments |
|---|---|---|---|---|
| Beaumont Heights Project | $1,020,000 | $25,000 | $25,000 | No liens |
| Johannson Ranch Project | $650,000 | $15,000 | $15,000 | No liens |
| SCC Communities Project | $180,000 | $5,000 | $5,000 | See below |
| Tesoro Project | $750,000 | $20,000 | $20,000 | See below |
| Acton Project | $1,600,000 | $50,000 | $50,000 | See below |
| Del Amo Project/ Torrance | $10,935,000 | 300,000 | $300,000 | See below |

A. The above purchase offers from Diamond Valley Land LLC ("Diamond Valley") (the "Purchase Offer(s)") provide for all cash upon closing.

B. The Purchase Offers are conditioned upon appropriate findings of the Court establishing: (i) the good faith of each debtor and Diamond Valley in connection with the negotiation, execution, delivery, and consummation of the sales; and (ii) the arms-length nature of such negotiations and transactions, together with such other findings as are necessary to ensure that each debtor and Diamond Valley are each entitled to the protection afforded by Bankruptcy Code Section 363(m).

C. Diamond Valley shall be required to place deposits in the same amounts as the Qualified Competing Bidder referenced above. The deposits shall be held in a segregated account with Winthrop Couchot Professional Corporation and deposited within five business days of the service of the Sale Motion. The deposits shall be non-refundable only if Diamond Valley is approved by the Bankruptcy Court as to the Winning Bidder and fails to close within the time period prescribed.

1    D.  The Diamond Valley Purchase Offer does not require a break-up

2 fee. Further, Diamond Valley is only offering to purchase the subject Debtor's

3 Projects and no other assets of such Debtors estates.

4    E.  The sale of the SCC Communities Project (Joshua Ridge Project)

5 and the Tesoro Project are conditioned upon the disallowance of Lehman ALI's

6 credit bid rights, which is already provided for in the applicable Plans;.

7    F.  The sale of the Acton Project is conditioned upon the disallowance

8 of LCPI's disputed claim against the Acton Debtor under Acton Debtor's pending

9 objection to LCPI's claim pursuant to Section 502(b)(1).

10    G.  The sale of the Del Amo Project (Torrance) is conditioned upon

11 the disallowance of Lehman ALI's disputed credit bid rights, which is already

12 provided for in the application Plan.

13  The SunCal Parties are filing redlined versions of the respective Plans incorporating the

14 modifications set forth above by October 3, 2011.

15  The foregoing modifications to the SunCal Plans take into account events that either

16 occurred, or may occur after the date the SunCal Plans were filed. Since these modifications will

17 merely *improve* the distributions to creditors under the SunCal Plans, within the existing

18 distributional structures, they are beneficial and non-material and accordingly should be improved

19 under 11 U.S.C. § 1127.

20    **1.5**  **The SunCal Plan Proponents' Retention of a Third Party Real Estate**

21      **Professional to Run the Sale Process**.

22  The SunCal Proponents are employing Park Place Partners, Inc., dba Land Advisors

23 Organization ("Land Advisors), to manage the marketing, advertising and auctions provided for in

24 the SunCal Plans. Land Advisors is a nationally recognized brokerage firm that recently sold the

25 Pool-1 properties in the related SunCal bankruptcy cases being managed by Chapter 11 trustee

26 Alfred Siegel. Using the services of this firm to conduct marketing, advertising and/or auctions

27 will eliminate any allegations of insider bias, or insufficient marketing.

28    **1.6**  **Classification and Voting Results For Each Class of Claims In SunCal Plans**.

The SunCal Plans place claims and interests into various classes according to their respective priority rights, as required by the Bankruptcy Code.  The SunCal Plans also state whether or not a class of claims or interests is impaired or unimpaired, and they describe in detail the treatment being accorded to each class under the Plans.  In the following subparagraphs the SunCal Proponents list the various classes of creditors and the results of the plan solicitation effort.

### 1.6.1   All SunCal Plans  - Unclassified Classes.

All of the SunCal Plans have the same Article III. This section describes certain categories of claims that are not classified for voting purposes, because their treatment, which is specified in the Bankruptcy Code, is mandatory. The treatment accorded these claims is summarized below.

| Type of Claim | Treatment |
| --- | --- |
| Allowed Administrative Claims | Unless each Holder of an Allowed Administrative Claim agrees to a different treatment and subject to the Administrative Claims Bar Date, each holder will receive payment in full on the later of: (i) the Effective Date; (ii) within ten Business Days after the date the Administrative Claim becomes an Allowed Administrative Claim; or (iii) the date such Allowed Administrative Claim becomes due according to its terms. |
| Allowed Unsecured Tax Claims | At the election of the Plan Trustee, the holder of each Allowed Priority Tax Claim shall be entitled to receive: (i) equal cash payments on the last business day of each three-month period following the Effective Date, during a period not to exceed five years after November 6, 2008 from the Effective Date calculated at the interest rate available on ninety (90) day United States Treasuries on the Effective Date, (ii) such other treatment agreed to by the holder of such claim and the Plan Trustee, provided that such treatment is on more favorable terms to the Debtor or the Plan Trust than the treatment set forth in section (i); or (iii) payment of the full Allowed Priority Claim in Cash. |

### 1.6.2.   Group I VD Plan Classes of Claims and Voting Results.

The table below summarizes the classes of claims in the Group I VD Plan and recites the voting results for each class of claims. The reference to an "S" or "L" in the column, with an accompanying number, is the "plan preference" voting result[4]:

| Class 1 | Claimant | Voting Results |
|---|---|---|
| Class 1.1 | Los Angeles County | No acceptance |
| Class 1.2 | Placer County | No acceptance |
| Class 1.3 | Riverside County | No ballot |
| Class 1.4 | Los Angeles County | No ballot |

| Class 2 | Claims | Voting Results |
|---|---|---|
| Class 2.1 | LCPI | N/A – claims subject to objection |
| Class 2.2 | LCPI | N/A – claims subject to objection |
| Class 2.3 | LCPI | N/A – claims subject to objection |
| Class 2.4 | LCPI | N/A – claims subject to objection; also no ballot |

| Class 3 | Claimant | Voting Results |
|---|---|---|
| **Class 3.1** | Asphalt Professionals | No ballot |
| **Class 3.2** | Sierra Cascade Construction | No ballot |
| **Class 3.3** | Staats Construction. Inc. | No ballot |
| **Class 3.4** | Southland Farmers, Inc. | No ballot |
| **Class 3.5** | Chamelon Design Inc. | Accept |
| **Class 3.6** | MHM Engineers | Accept (S-1) |
| **Class 3.7** | Land Architecture | No ballot |
| **Class 3.8** | Kiewit Pacific Co. | Invalid ballot |
| **Class 3.9** | ARB, Inc. | Accept (S-1) (L-0) |
| **Class 3.10** | Independent Construction | Accept (S-1) (L-0) |
| **Class 3.11** | Marques Pipeline, Inc. | Accept (S-1) (L-0) |
| **Class 3.12** | Hall & Foreman, Inc. | Accept (S-1) (L-0) |
| **Class 3.13** | Proactive Engineering | Accept |
| **Class 3.14** | HD Supply Construction | No ballot |

| Class 4 | Claimant | Voting Results |
|---|---|---|
| Class 4.1 | Contingent Bond Indemnification Claims that are Allowed Secured Claims arising from bonds issued with respect to the Group I: Voluntary Projects | N/A – claims subject to objection; also no ballot |

| Class 5 | Claimant | Voting Results |
|---|---|---|

---

[4] For example the references (S-1) (L-0) means that one vote was submitted indicating a preference for the SunCal Plan and zero votes were submitted indicating a preference for the Lehman Plan.

-11-

| Class 5 | Claimant | Voting Results |
|---|---|---|
| Class 5.1 | Priority Claims against the Group I: Voluntary Debtors. | No ballots |

| Class 6 | Claimant | Voting Results |
|---|---|---|
| Class 6.1 | Allowed Unsecured Reliance Claims - Palmdale. | Accept (S-28) (L-1) |
| Class 6.2 | Allowed Unsecured Reliance Claims -Bickford. | Accept (S-6) (L-3) |
| Class 6.3 | Allowed Unsecured Reliance Claims - Emerald Meadows. | Accept (S-7) (L-1) |
| Class 6.4 | Allowed Unsecured Reliance Claims - Acton Estates. | Accept (S-5) (L-1) |

| Class 7 | Claimant | Voting Results |
|---|---|---|
| Class 7.1 | Allowed Unsecured Claims - Palmdale | No ballots |
| Class 7.2 | Allowed Unsecured Claims - Bickford | No ballots |
| Class 7.3 | Allowed Unsecured Claims – Emerald Meadows | No ballots |
| Class 7.4 | Allowed Unsecured Claims - Acton | No vote |

In summary, all classes of unsecured creditors that voted on the Group I VD Plan, voted in favor of the Plan, and their plan preference was overwhelmingly in favor of the SunCal Plan. (See, Ex. "5," Hollander Declaration).

### 1.6.3 **Group II VD Plan Classes of Claims and Voting Results.**

The table below summarizes the classes of claims in the Group II VD Plan and recites the voting results for each class of claims. The reference to an "S" or "L" in the column, with an accompanying number, is the "plan preference" voting result:

| Class 1 | Claimant | Voting Results |
|---|---|---|
| Class 1.1 | Riverside County | No acceptance |
| Class 1.2 | Stanislaus County | No ballot |

| Class 2 | Claimant | Voting Results |
|---|---|---|
| Class 2.1 | Proactive Engineering | No ballot |

| Class 3 | Claimant | Voting Results |
|---|---|---|
| Class 3.1 | Allowed Priority Claims against any of the Group II: Voluntary Debtors | No ballot |

| Class 4 | Claimant | Voting Results |
|---|---|---|
| Class 4.1 | Allowed Unsecured Claims - SunCal Beaumont | Accept (S-2) (L-0) |
| Class 4.2 | Claimants holding Allowed Unsecured - Johannson Ranch | Accept (S-2) (L-0) |

| Class 5 | Claimant | Voting Results |
|---|---|---|
| Class 5.1 | Allowed Interests - Beaumont held by SunCal I. | No ballot |
| Class 5.2 | Allowed Interests in - Johannson Ranch held by SunCal I | No ballot |

In summary, all classes of unsecured creditors that voted on the Group II VD Plan, voted in favor of the Plan, and their plan preference was overwhelmingly in favor of the SunCal Plan. (See, Ex. "5," Hollander Declaration).

### 1.6.4  Group III VD Plan Classes of Claims and Voting Results.

The table below summarizes the classes of claims in the Group III VD Plan and recites the voting results for each class of claims. The reference to an "S" or "L" in the column, with an accompanying number, is the "plan preference" voting result:

| Class 1 | Claimant | Voting Results |
|---|---|---|
| Class 1.1 | Los Angeles County | No ballot |
| Class 1.2 | San Bernardino | No acceptance |

| Class 2 | Claims | Voting Results |
|---|---|---|
| Class 2.1 | The Holder of Lehman's Disputed Claims filed by Lehman ALI against SCC Communities | N/A – claims subject to objection |
| Class 2.2 | The Holder of Lehman's Disputed Claims filed by Lehman ALI against Tesoro | N/A – claims subject to objection |
| Class 2.3 | The Holder of Lehman's Disputed Claims filed by Lehman ALI against Del Rio | N/A – claims subject to objection |

| Class 3 | Claimant | Voting Results |
|---|---|---|
| Class 3.1 | The Holder of Priority Claims that fall within Code Sections 507(a)(2), (4), (5), (6), and (7) asserted against SCC Communities. | No ballot |
| Class 3.2 | The Holder of Priority Claims that fall within Code Sections 507(a)(4), (5), (6), and (7) asserted against Tesoro. | No ballot |

| Class 4 | Claimant | Voting Results |
|---|---|---|
| Class 4.1 | Claimants holding Allowed Unsecured Claims against SCC Communities. | Accept (S-2) (L-0) |
| Class 4.2 | Claimants holding Allowed Unsecured Claims against Del Rio. | Accept (S-3) (L-1) |
| Class 4.3 | Claimants holding Allowed Unsecured Claims against Tesoro. | Accept (S-2) (L-0) |

-13-

In summary, all classes of unsecured creditors that voted on the Group III VD Plan, voted in favor of the Plan, and their plan preference was overwhelmingly in favor of the SunCal Plan. (See, Ex. "5," Hollander Declaration).

### 1.6.5  Group IV VD Plan Classes of Claims and Voting Results.

The tables below summarize the classes of claims in the Group IV VD Plan and recites the voting results for each class of claims:

| Class 1 | Claims | Voting Results |
|---|---|---|
| Class 1.1 | Lehman Ali/Lehman Re | N/A – claims subject to objection |
| Class 1.2 | Lehman Ali | N/A – claims subject to objection |

| Class 2 | Claimant | Voting Result |
|---|---|---|
| Class 2.1 | Priority Claims | No ballots |

| Class 3 | Claimant | Voting Result |
|---|---|---|
| Class 3.1 | Unsecured Reliance Claims against SJD Partners. | Accept (S-22) (L-1) |

| Class 4 | Claimant | Voting Result |
|---|---|---|
| Class 4.1 | Allowed Unsecured Claims - SJD Partners | Accept |

| Class 5 | Claimant | Voting Result |
|---|---|---|
| Class 5.1 | Allowed Interests in SJD Partners held by SJD Development. | No ballots |
| Class 5.2 | Allowed Interests in SJD Development held by Elieff. | No ballots |

In summary, all classes of unsecured creditors that voted on the Group IV VD Plan, voted in favor of the Plan. (See, Ex. "5," Hollander Declaration).

### 1.6.6  Group I TD Plan Classes of Claims and Voting Results.

The table below summarizes the classes of claims in the Group I TD Plan and recites the voting results for each class of claims. The reference to an "S" or "L" in the column, with an accompanying number, is the "plan preference" voting result:

| Class 1 | Claimant | Voting Results |
|---|---|---|
| Class 1.1 | Contra Costa County | No acceptance |
| Class 1.2 | Riverside County. | No ballot |
| Class 1.3 | Riverside County | No acceptance |
| Class 1.4 | Orange County | No ballot |

| Class 1 | Claimant | Voting Results |
|---|---|---|
| Class 1.5 | San Bernardino County | No acceptance |

| Class 2 | Claims | Voting Results |
|---|---|---|
| Class 2.1 | The Holder of Lehman's Disputed Claims filed by Lehman ALI against Delta Coves | N/A – claims subject to objection |
| Class 2.2 | The Holder of the Disputed Secured Claim that is secured by a Disputed Lien against SunCal Marblehead and SunCal Heartland | N/A – claims subject to objection |
| Class 2.3 | The Holder of Lehman's Disputed Claims filed by OVC Holdings against SunCal Oak Valley | N/A – claims subject to objection |
| Class 2.4 | The Holder of the Disputed Secured Claim that is secured by a Disputed Lien against SunCal Marblehead and SunCal Heartland | N/A – claims subject to objection |
| Class 2.5 | The Holder of the Disputed Secured Claim that is secured by a Disputed Lien against the Palm Springs Village Project | N/A – claims subject to objection |

| Class 3 | Claimant | Voting Results |
|---|---|---|
| Class 3.1 | Hertz Equipment Rental Corporation | Accept (L-1) (S-0) |
| Class 3.2 | MBH Architects | No ballot |
| Class 3.3 | Top Grade Construction, Inc. | Accept (L-1) (S-0) |
| Class 3.4 | HD Supply Construction | No ballot |
| Class 3.5 | Pinnik, Inc. | Accept (L-1) (S-0) |
| Class 3.6 | Dennis M. McCoy & Sons | Accept (S-1) (L-0) |
| Class 3.7 | HD Supply Construction | No ballot |
| Class 3.8 | Pinnik Inc. | Invalid ballot (S-1) (L-0) |
| Class 3.9 | Hillcrest Contracting Inc. | Accept (S-1) (L-0) |
| Class 3.10 | MacKenzie Landscape | No ballot |
| Class 3.11 | All American Asphalt | No ballot |
| Class 3.12 | Proactive Engineering. | Accept |
| Class 3.13 | Jasper Companies | No ballot |
| Class 3.14 | Kirk Negrete, Inc. dba United Steel Placers | No ballot |
| Class 3.15 | RBF Consulting | Accept |
| Class 3.16 | RJ Noble Co. | No ballot |
| Class 3.17 | Orange County Stripping Services | No ballot |
| Class 3.18 | Savala Equipment Co. Inc. | No ballot |
| Class 3.19 | All American Asphalt | No ballot |
| Class 3.20 | Rockey Murata Landscaping | Accept (S-1) (L-0) |
| Class 3.21 | BNB Engineering, Inc. | No ballot |
| Class 3.22 | Brudvik Inc. | Accept (S-1) (L-0) |
| Class 3.23 | Larry Jacinto Construction Inc. | No ballot |
| Class 3.24 | William+ Paddon Architects + Planners Inc. | Accept (S-1) (L-0) |
| Class 3.25 | Southern California Edison | No ballot |
| Class 3.26 | Pacific Masonry Walls, Inc. | Accept (L-1) (S-0) |
| Class 3.27 | J.R. Simplot Company | Accept |
| Class 3.28 | Desert Pipeline Inc. | No ballot |

MAINDOCS-#167174-v3-FINAL_-_SunCal_Confirmation_Brief.DOC

| Class 3 | Claimant | Voting Results |
|---|---|---|
| Class 3.29 | MSA Consulting. | Accept (S-1) (L-0) |
| Class 3.30 | Jackson DeMarco | Accept |

| Class 4 | Claimant | Voting Results |
|---|---|---|
| Class 4.1 | Contingent Bond Indemnification Claims - Delta Coves Project. | N/A – claims subject to objection; also no ballot |
| Class 4.2 | Contingent Bond Indemnification Claims - Heartland Project. | N/A – claims subject to objection; also no ballot |
| Class 4.3 | Contingent Bond Indemnification Claims - Oak Valley Project. | N/A – claims subject to objection; also no ballot |
| Class 4.4 | Contingent Bond Indemnification Claims - Marblehead Project | N/A – claims subject to objection; also no ballot |
| Class 4.5 | Contingent Bond Indemnification Claims - Palm Springs Village Project | N/A – claims subject to objection; also no ballot |

| Class 5 | Claimant | Voting Results |
|---|---|---|
| Class 5.1 | Priority Claims - Delta Coves. | No ballot |
| Class 5.2 | Priority Claims - Heartland. | No ballot |
| Class 5.3 | Priority Claims - Oak Valley. | No ballot |
| Class 5.4 | Priority Claims - Marblehead. | No ballot |
| Class 5.5 | Priority Claims - PSV | No ballot |

| Class 6 | Claimant | Voting Results |
|---|---|---|
| Class 6.1 | Allowed Unsecured Reliance Claims - Delta Coves. | No acceptance (S-16) (L-2) |
| Class 6.2 | Allowed Unsecured Reliance Claims - Heartland. | Accept (S-13) (L3) |
| Class 6.3 | Allowed Unsecured Reliance Claims - Oak Valley. | Accept (S-28) (l-5) |
| Class 6.4 | Allowed Unsecured Reliance Claims - Marblehead. | Accept (S-27) (L-1) |
| Class 6.5 | Allowed Unsecured Reliance Claims - PSV. | No acceptance (S-19) (L-5) |

| Class 7 | Claimant | Voting Results |
|---|---|---|
| Class 7.1 | Allowed Unsecured Claims - Delta Coves | No ballots |
| Class 7.2 | Allowed Unsecured Claims - Heartland | Accept (S-1) (L-2) |
| Class 7.3 | Allowed Unsecured Claims - Oak Valley | No ballot |
| Class 7.4 | Allowed Unsecured Claims - Marblehead | Accept (S-1) (L-1) |
| Class 7.5 | Allowed Unsecured Claims - PSV | No acceptance |

Five of the ten classes of unsecured claims voted in favor of the Group I TD Plan. The votes submitted by three unsecured classes did not exceed the voting threshold, resulting in non-acceptance, and two unsecured classes did not vote. The plan preference vote was decidedly in favor of the SunCal Plan. However, this is a preliminary conclusion that does not take into account

-16-

1    the potential Class 7 claims of SunCal Management subject to a pending estimation motion.

2    Because SunCal Management voted in favor of the Plans, the numbers can only be increased.

3    (See, Ex. "5," Hollander Declaration).

4    **1.6.7  Group II TD Plan Classes of Claims and Voting Results.**

5    The table below summarizes the classes of claims in the Group II TD Plan and recites the

6    voting results for each class of claims. The reference to an "S" or "L" in the column, with an

7    accompanying number, is the "plan preference" voting result:

8

| Class 1 | Claimant | Voting Results |
|---|---|---|
| Class 1.1 | Alameda County | Accept |
| Class 1.2 | Los Angeles County | No ballot |

| Class 2 | Claims | Voting Results |
|---|---|---|
| Class 2.1 | The Holder of Lehman's Disputed Claims filed by Lehman ALI against SunCal Oak Knoll and SunCal Torrance | No ballot |

| Class 3 | Claimant | Voting Results |
|---|---|---|
| Class 3.1 | The Holder of the asserted Mechanic Lien Claim held by Oliphant Golf, Inc. against the Oak Knoll | No ballot |
| Class 3.2 | The Holder of the asserted Mechanic Lien Claim held by RGA Environmental, Inc. against the Oak Knoll Project | No ballot |
| Class 3.3 | The Holder of the asserted Mechanic Lien Claim held by BKF Engineers against the Oak Knoll Project | Accept (S-1) (L-0) |
| Class 3.4 | The Holder of the asserted Mechanic Lien Claim held by CST Environmental Inc. against the Oak Knoll Project | No ballot |

| Class 4 | Claimant | Voting Results |
|---|---|---|
| Class 4.1 | Contingent Bond Indemnification Claims - Group II: Trustee Projects | N/A – claims subject to objection; also no ballot |

| Class 5 | Claimant | Voting Results |
|---|---|---|
| Class 5.1 | Priority Claims - Oak Knoll. | No ballot |

| Class 6 | Claimant | Voting Results |
|---|---|---|
| Class 6.1 | Allowed Unsecured Reliance Claims - Oak Knoll. | Accept (S-11) (L-2) |
| Class 6. 2 | Allowed Unsecured Reliance Claims - Torrance. | Accept (S-4) (L-4) |

| Class 7 | Claimant | Voting Results |
|---|---|---|

| Class 7 | Claimant | Voting Results |
|---------|----------|----------------|
| Class 7.1 | Allowed Unsecured Claims - Oak Knoll | No ballots |
| Class 7.2 | Allowed Unsecured Claims - Torrance | No ballots |

In summary, all classes of unsecured creditors that voted on the Group II: TD Plan voted in favor of the Plan, and in both cases their preference was the SunCal Plan. (See, Ex. "5," Hollander Declaration).

**II.**

**THE SUNCAL PLANS COMPLY WITH THE REQUIREMENTS FOR**

**CONFIRMATION SET FORTH IN SECTION 1129**

As demonstrated herein, the SunCal Plans meet all of the requirements for confirmation set forth in Section 1129(a), with the exception of Section 1129(a)(8), and all requirements for "cram down" under Section 1129(b).  Consequently, the SunCal Plans should be confirmed.  11 U.S.C. § 1129 (providing that, where the requirements of Section 1129 are met, a court "shall confirm the plan.").

**2.1**    **11 U.S.C. § 1129(a)(1).**

Section 1129(a)(1) requires that "the plan complies with the applicable provisions of [Chapter 11]."  The most important of these provisions are set forth in Sections 1122 and 1123(a).

**2.1.1.   Classification (11 U.S.C. § 1122).**

Section 1122(a)  permits a plan to place a claim in a particular class only if such claim is substantially similar to the other claims in such class.  Here, the SunCal Plans clearly satisfy this requirement. Article V of the each of the SunCal Plans divides substantially similar claims into a series of classes, and provides separate treatment for each class, satisfying the requirements in Section 1122.

**2.1.2.   Mandatory Contents of the Plan (11 U.S.C. § 1123(a)).**

A plan must comply with the requirements of Section 1123.  This section sets forth seven provisions that must be contained in a plan. Section 1123(a)(1) requires a plan to designate classes of claims and interests.  Article V of each of the SunCal Plans designates the classification of the classes of claims and interests in accordance with this requirement. Section 1123(a)(2) requires a plan to specify any class of claims or interest that is not impaired under the plan.

Article V of the Plan specifies the class of claims and interests under the Plan that are not "impaired." Specifically, the following Classes are not impaired:

| Plan | Impaired Class |
|------|----------------|
| Group I VD Plan | Class 5.1 |
| Group II VD Plan | Class 3.1 |
| Group III VD Plan | Class 3.1 |
| Group IV VD Plan | Class 4.1 |
| Group I TD Plan | Class 5.1 |
| Group II TD Plan | Class 5.1 |
| CC Plan | Class 1.1 |

Section 1123(a)(3) requires a plan to specify the treatment of any classes of claims or interests that are impaired by the plan. Article V of each of the SunCal Plans specifies the treatment of classes of claims that are impaired by the Plan. This article also specifies the treatment of the class of interests under each of the SunCal Plans; all of the classes of interests are impaired under the SunCal Plans.

Section 1123(a)(4) requires that a plan provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such claim or interest. Section V of each of the SunCal Plans satisfies this requirement by treating the allowed claims or interests of all members of each class equally.

Section 1123(a)(5) requires that a plan provide adequate means for its implementation. Each of the SunCal Plans describes the means through which the provisions of the plans will be implemented in Article VII in accordance with this requirement. Other parts of the SunCal Plans include additional information similar to what is set forth in Section 1123(a)(5). For example, Article III describes the proposed sale of the Debtors' assets, and Article V describes how claims and interests will be treated under the SunCal Plans.

Section 1123(a)(6) requires that certain provisions be included in the charter of a corporate debtor. According to the noted treatise on bankruptcy law, *Collier on Bankruptcy*, Section 1123(a)(6) is designed to ensure that "creditors who are forced to take stock in the new company, or whose rights as creditors are modified or altered so that they assume some risk of the success of the reorganized corporation, are entitled to an allocation of voting power and a voice in the selection of management that will protect their interests." *7 Collier on Bankruptcy,*

1  at ¶ 1123.01[6] (15th ed. Revised 2009).  In these cases, no creditor is being forced to take stock

2  in the reorganized Debtors.

3         Section 1123(a)(7)  requires that the provisions of a plan providing for selection of any

4  officer, director or trustee under the plan be consistent with the interests of creditors and equity

5  security holders, and with public policy.  In construing this requirement, courts have determined

6  that a debtor's plan complies with this requirement where the plan provides for the selection of

7  officers, directors or trustees in accordance with applicable corporate law.  *See e.g., In re Eagle*

8  *Bus. Mfg., Inc.*, 134 B.R. 584, 597 (Bankr. S.D. Tex. 1991), *order aff'd*, 158 B.R. 421 (Bankr.

9  S.D. Tex. 1993) (finding compliance with Section 1123(a)(7) where "selection of the officers of

10  the reorganized debtors will be in accordance with applicable corporate law").

11         In these cases, Article VII of each of the SunCal Plans provides that SCC Acquisitions,

12  Inc., a California corporation, shall be the Plan Trustee.  The Plan Trustee's appointment shall be

13  effective as of the Effective Date and this term will expire upon the termination of the Plan Trust.

14  This article further describes the rights and powers the Plan Trustee shall have under the SunCal

15  Plans, and this section specifically authorizes the Debtors to employ or contract with other

16  persons or entities to perform the obligations created under the Plan.  The foregoing is consistent

17  with the interests of creditors and equity security holders.  Accordingly, this requirement is

18  satisfied.

19         Section 1123(a)(8)  relates to individual debtors and is therefore inapplicable here.

20         **2.1.3.   Conclusion Regarding 11 U.S.C. § 1129(a)(1).**

21         As demonstrated by the foregoing analysis, the Plan satisfies the requirements of

22  Sections 1122 and 1123 .  Hence, the Plan complies with the provisions of Section 1129(a)(1) .

23    **2.2    11 U.S.C. § 1129(a)(2).**

24         Section 1129(a)(2) provides that the proponent of a plan shall comply "with the applicable

25  provisions of [Chapter 11]."  The legislative history of this section "indicates that Congress was

26  primarily concerned 'that the proponent of the plan comply with the applicable provisions of

27  title 11, such as section 1125 regarding disclosure.'"  7 Collier on Bankruptcy at ¶ 1129.02[2]

28

1    (15th Ed. 2009) (quoting H.R. Rep. No. 595, 95th Cong., 1st Sess. 412 (1977); S. Rep. No. 989,

2    95th Cong., 2d Sess. 126 (1978)).

3        Here, the SunCal Proponents have complied with the applicable provisions of Chapter 11.

4    The most important of these provisions are set forth in Section 1125.  The Debtors fully complied

5    with the requirements of Section 1125  by soliciting the votes of creditors through court-approved

6    disclosure statements containing adequate information in accordance with the requirements of

7    Section 1125.

8        The SunCal Proponents have also complied with all other applicable statutory provisions

9    in formulating and proposing their Plan.  Accordingly, the requirements of Section 1129(a)(2) are

10   satisfied.

11       **2.3    11 U.S.C. § 1129(a)(3).**

12       Section 1129(a)(3) provides that "the plan has to be proposed in good faith and not by any

13   means forbidden by law."  The primary purpose of Chapter 11 is to reorganize a debtor and to

14   maximize the value of the debtor's Chapter 11 estate.  *See Bonner Mall Partnership v. U.S.*

15   *Bancorp Mortgage Co. (In re Bonner Mall Partnership)*, 2 F.3d 899, 915-916 (9th Cir. 1993) *cert.*

16   *denied*, 315 U.S. 19 (1995).  Accordingly, a plan satisfies Section 1129(a)(3) when it "is proposed

17   with the legitimate and honest purpose to reorganize and has a reasonable hope of success."  *Brite*

18   *v. Sun Country Development, Inc. (In re Sun Country Development, Inc.),* 764 F.2d 406, 408 (5th

19   Cir. 1985).

20       In these cases, it is clear that the SunCal Plans have been proposed in good faith.  As set

21   forth in the Cook Declaration, the SunCal Plans were designed to generate the highest value for

22   creditors though the sale of the Projects. In furtherance of this goal, the SunCal Proponents met

23   with counsel for the Official Committee representing the VD Debtors to obtain their input on the

24   plans. Based upon the Committees comments changes were made to the SunCal Plans, and they

25   were supported by a "yes" letter from the Committee. If the SunCal Plans are confirmed, and the

26   SunCal Proponents' litigation effort is successful, then the claims of substantially all creditors

27   should be paid in full. In contrast, the dividend "guaranteed" under the Lehman Plans is only 1%.

28   In sum, the Plans satisfy the "good faith" requirement of Section 1129(a)(3).

## 2.4    **11 U.S.C. § 1129(a)(4)**.

Section 1129(a)(4) provides:

Any payment made or to be made by the proponent, by the Debtor, or by a
person issuing securities or acquiring property under the plan, for services or for
costs and expenses in connection with the case, or in connection with the plan
and incident to the case, has been approved by, or is subject to the approval of,
the court as reasonable.

In this case, Section 4.1 of the Plan allows for payment in full of administrative claims
(which includes compensation awarded by the Bankruptcy Court to professional persons), upon
allowance of such expenses by the Bankruptcy Court following the filing of applications for final
compensation.  Consequently, this requirement is satisfied.

## 2.5    **11 U.S.C. § 1129(a)(5)**.

Section 1129(a)(5) provides:

(A)(i) The proponent of the plan has disclosed the identity and affiliations of any
individual proposed to serve, after confirmation of the plan, as a director, officer,
or voting trustee of the debtor, an affiliate of the debtor participating in a joint
plan with the debtor, or a successor to the debtor under the plan; and
    (ii) the appointment to, or continuance in, such office of such individual, is
 consistent with the interests of creditors and equity security holders and with
 public policy; and
(B) the proponent of the plan has disclosed the identity of any insider that will be
employed or retained by the reorganized debtor, and the nature of any
compensation for such insider.

Here, Section 7.75 in the SunCal Plan discloses the fact that Acquisitions will not receive
any compensation under the SunCal Plans, but will have the right to employ and compensate
professionals as needed to implement the terms of the plans:

> Acquisitions shall not receive any compensation for the services it
> performs as the Plan Trustee.  The Plan Trustee Professionals shall be
> entitled to reasonable compensation for their services, and reimbursement
> of expenses.  The costs and expenses of the Plan Trust (including, without
> limitation, fees and expenses of the Plan Trustee Professionals) shall be
> paid from the Plan Trust.  The Plan Trustee shall pay, without further
> order, notice or application to the Court, the reasonable fees and expenses
> of the Plan Trustee Professionals, as necessary to discharge the Plan
> Trustee's duties under the Plan.  The Plan Trustee shall be authorized to
> reserve funds from the Plan Trust as is reasonable to pay the expenses of
> the Plan Trustee and the expenses and fees of the Plan Trustee
> Professionals before making any Distributions under the Plan.

(Section 7.7.5, SunCal Plans). In summary, the provisions of Section 1129(a)(5) are satisfied.

## 2.6    11 U.S.C. § 1129(a)(6).

Section 1129(a)(6) requires that any governmental regulatory commission with jurisdiction over the rates of the debtor approve any rate change provided for by the plan.  Section 1129(a)(6) is inapplicable in these cases in that no such regulatory approval is required in these cases.

## 2.7    11 U.S.C. § 1129(a)(7).

Section 1129(a)(7) provides:

With respect to each impaired class of claims or interests --
    (A)    each holder of a claim or interest of such class --
        (i)    has accepted the plan; or
        (ii)    will receive or retain under the plan on account of such
claim or interest property of a value, as of the effective date of the plan, that is
not less than the amount that such holder would so receive or retain if the debtor
were liquidated under Chapter 7 of this title on such date; or
    (B)    if Section 1111(b)(2) of this title applies to the claims of such
class, each holder of a claim of such class will receive or retain under the plan on
account of such claim property of a value, as of the effective date of the plan, that
is not less than the value of such holder's interest in the estate's interest in the
property that secures such claims.

This requirement is known as the "best interest" test.  To satisfy the "best interest" test, the Bankruptcy Court must reach a conclusion regarding the probable distribution to the holders in each impaired class of claims and interests, assuming the applicable debtor was liquidated in a Chapter 7 proceeding.

The first step in this process is to determine the "liquidation value" that would be generated from a forced sale of each debtor's assets.  The second step requires the application of the projected liquidation proceeds in accordance with the various rights of creditors holding liens on the property.  For example, if Creditor "A" holds a lien on real property of the debtor that secures a valid claim, the proceeds of the liquidations derived from this asset would have to be applied against this claimant's secured claim.  If the proceeds were sufficient to retire the creditor's secured claim, then the claim would be paid in full.  If the liquidation proceeds were not sufficient, then that portion of the claim that was not satisfied from the sale proceeds would be treated as an unsecured claim and this claim would share pro rata at this distribution level.  This process is then repeated as to each collateral category.

MAINDOCS-#167174-v3-FINAL_-_SunCal_Confirmation_Brief.DOC

1    Once all of the claims secured by liens on the estates' assets are deducted from the

2    projected liquidation proceeds, then the costs and expenses associated with the liquidation of the

3    estate incurred by the Chapter 7 trustee are deducted, as well as other costs associated with the

4    Chapter 7 process, which are entitled to priority.  These costs would include the compensation of a

5    trustee and his or her professionals, asset disposition expenses, all unpaid administrative expenses

6    incurred by the debtor in its Chapter 11 case (such as compensation of attorneys, financial

7    advisors, and restructuring consultants) that are allowed in the Chapter 7 case, litigation costs, and

8    unpaid claims arising from the operations of the debtor during the pendency of the Chapter 11

9    case. Thereafter, the administrative costs and expenses incurred in the Chapter 11 case must be

10    paid from the net proceeds.

11    After the payment of administrative expenses, the remaining liquidation proceeds would be

12    used to pay priority claims, such as tax and wage claims that are entitled to priority under the

13    Bankruptcy Code.  Thereafter the remaining liquidation proceeds would be made available to pay

14    general unsecured claims.  Finally, to the extent that any proceeds remained after paying all

15    allowed claims, they would be distributed to equity holders in accordance with their liquidation

16    priorities.

17    In the case of the SunCal Plans, the structure of the plans insures compliance with this

18    requirement. Pursuant to the plans, all assets of the subject SunCal Debtors will be sold, free and

19    clear of liens and encumbrances, through an auction that will preceded by a commercially

20    reasonable marketing effort. The winner of the auction will be the buyer that offers the highest

21    Qualifying Bid for the asset being sold – necessarily its fair market value at that point in time. The

22    Net Proceeds from this sale will then be deposited into a segregated account until all disputed

23    secured claim amounts are resolved. Once this occurs, distributions will be made to creditors

24    holding allowed claims in accordance with the dictates of the Bankruptcy Code.

25    Although the Lehman Entities have alleged that the mechanics of the sale process

26    proposed in the SunCal Plans will not, in fact, yield the fair market value of the asset, and that

27    certain other aspects of the proposed sales will deny them their rights under the bankruptcy code,

28    these objections are not well taken. As more fully explained in Article III, Section 3.2 hereof,

1    where these objections are addressed, in summary, in fact the sales procedures proposed in the

2    SunCal Plans, which as modified, require that an independent real estate firm oversee the process,

3    will yield the highest fair market value for the Projects and the distribution scheme, which

4    distributes to creditors what they are entitled to receive under the bankruptcy code, fully satisfies

5    Section 1129(a)(7).

6        Exhibit "1" to the Cook Declaration details the sale and distribution results that the SunCal

7    Debtors project would occur in a Chapter 7 proceeding, if the presiding Chapter 7  trustee pursued

8    the equitable subordination action to a conclusion, which is exactly what is provided for in the

9    SunCal Plans. Accordingly, the Plan meets the "best interests" test, and therefore complies with

10    the provisions of Section 1129(a)(7).

11        **2.8**    **11 U.S.C. § 1129(a)(8).**

12        Section 1129(a)(8) provides:

13            "With respect to each class of claims or interests --
            (A)    such class has accepted the Plan; or
14            (B)    such class is not impaired under the Plan."

15    The charts presented in Article I, Section 1.6 above detail the results of voting on the SunCal

16    Plans. A comprehensive analysis of the data underlying the class voting conclusions in Section

17    1.6 is attached to the Hollander Declaration as Exhibit "5." In summary, every class *that actually*

18    *voted* on the SunCal Plans voted in favor except for Delta Coves, which should prove to be the

19    same when the claims estimation hearing is ruled upon. These voting results properly exclude

20    claims that are the subject of pending claim objections, such as the Lehman Claims, the Bond

21    Company claims, and, as stated, the claims of SunCal Management in certain of the Trustee

22    Debtor cases.

23        A number of classes did not elect to vote on the SunCal Plans. There is case law

24    supporting the proposition that a non-voting and non-objecting class is deemed to have accepted a

25    Chapter 11 plan for the purposes of Section 1129, see, In re Ruti-Sweetwater, 57 B.R. 748, 750

26    (D.Utah 1985) affirmed 836 F.2d 1263 (10th Cir. 1988) ("Accordingly, the court concludes as a

27    matter of law that a non-voting, non-objecting creditor who is a member of a class that casts no

28    votes is deemed to have accepted the plan of reorganization for the purposes of section 1129(a)(8)

-25-

and 1129(b).”); In re Limited Gaming of America, Inc., 228 B.R. 275, 290 (Bankr. N.D.Okla.

1998) (“Classes 4 through 8 did not cast any votes with respect to the Third Amended Plan; they

are therefore deemed to have accepted the Third Amended Plan.”); In re Szostek, 886 F.2d 1405,

1413 (10th Cir. 1989) (“failure to make a timely objection constitutes acceptance of the plan.”); In

re Campbell, 89 B.R. 187, 188 (Bankr. N.D.Fla. 1988) (“those impaired classes which failed to

vote and did not object to confirmation of the plan are deemed to have accepted the plan for

purposes of meeting the requirements of § 1129(a)(8)”); In re Neff, 60 B.R. 448, 457-458 (Bankr.

N.D.Tex. 1985) affirmed 785 F.2d 1033 (5th Cir. 1986) (classes of claims whose ballots had not

been received prior to the confirmation hearing "were deemed to have accepted the plan by the

failure to vote").  Cf. In re Pardee, 218 B.R. 916, 926 (9th Cir. BAP 1998) (“a creditor's failure to

object to the chapter 13 plan at the plan confirmation hearing constitutes an implied acceptance of

the plan.”); In re Brown, 108 B.R. 738, 740 (Bankr. C.D.Cal. 1989) (“I have determined that

creditors who do not object to confirmation of a Chapter 13 plan, have accepted it”). However, the

Ninth Circuit BAP has ruled that a non-voting class *which objects to the confirmation of a plan* is

not deemed to have accepted the plan.  In re M. Long Arabians, 103 B.R. 211, 215 (9th Cir. BAP

1989).  Since certain classes of creditors have not voted on the SunCal Plans, but they have

objected to these plans, they will not be deemed to have voted in favor of these plans, which

means that Section 1129(a)(8) is not satisfied as to these creditors.  Notwithstanding that fact, the

Debtors’ Plan can and should still be confirmed pursuant to the “cram down” provisions of

Section 1129(b).

### 2.9    11 U.S.C. § 1129(a)(9).

Section 1129(a)(9) provides:

Except to the extent that the holder of a particular claim has agreed to a different
treatment of such claim, the plan provides that—
(A) with respect to a claim of a kind specified in section 507(a)(2) or 507(a)(3)
of this title, on the effective date of the plan, the holder of such claim will receive
on account of such claim cash equal to the allowed amount of such claim;
(B) with respect to a class of claims of a kind specified in section 507(a)(1),
507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7) of this title, each holder of a claim
of such class will receive—

(i) if such class has accepted the plan, deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

(ii) if such class has not accepted the plan, cash on the effective date of the plan equal to the allowed amount of such claim;

(C) with respect to a claim of a kind specified in section 507(a)(8) of this title, the holder of such claim will receive on account of such claim regular installment payments in cash—

(i) of a total value, as of the effective date of the plan, equal to the allowed amount of such claim;

(ii) over a period ending not later than 5 years after the date of the order for relief under section 301, 302, or 303; and

(iii) in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the plan (other than cash payments made to a class of creditors under section 1122 (b)); and

(D) with respect to a secured claim which would otherwise meet the description of an unsecured claim of a governmental unit under section 507(a)(8), but for the secured status of that claim, the holder of that claim will receive on account of that claim, cash payments, in the same manner and over the same period, as prescribed in subparagraph (C).

In this case, Article III of the SunCal Plans requires that administrative claims be paid in full in cash on the later of (i) the effective date, (ii) within ten business days after the date such administrative Claim becomes an allowed administrative claim, or (iii) the date such allowed administrative claim becomes due according to its terms.  Accordingly, Section 1129(a)(9)(A) is satisfied.

Article III of the SunCal Plans also requires that allowed priority claims be paid until a full distribution is made to such holders during the sales period.  Accordingly, Section 1129(a)(9)(B) is also satisfied. Section 3.4 of these Plans provides that at the election of the Debtors, the holder of each allowed priority tax claim shall be entitled to receive, on account of such claim, (i) equal cash payments on the last business day of each three-month period following the effective date, during a period not to exceed five years after the Petition Date, totaling the principal amount of such claim plus simple interest on any unpaid balance from the effective date, calculated at the interest rate available on ninety (90) day United States Treasuries on the effective date, (ii) such other treatment agreed to by the holder of the allowed priority tax claim and the Debtors, provided such treatment is on more favorable terms to the Debtors than the treatment set forth in clause (i)

hereof, or (iii) payment of the full allowed priority tax claim in cash.  Accordingly, the requirements of Section 1129(a)(9)(C) are satisfied.

Finally, Article V of the applicable Plans provides the following in satisfaction of Section 1129(a)(9)(D) with respect to the secured real property tax claims asserted by the various county taxing authorities:

> The rights of the Holder(s)' of Allowed Secured Claims in Classes ___ through ___ are impaired under the Plan and shall receive one of the following two treatments at the Plan Trustee's discretion based solely on the option of the Group ____ Debtor:
>
> A.    Such Holders shall retain their existing lien rights and shall accrue interest as provided under applicable nonbankruptcy law pursuant to 11 U.S.C. § 506 and 511 and such Allowed Claims shall be satisfied in accordance with the provision of 11 U.S.C. § 1124(2) from the sale of the applicable Debtors Projects during the Sales Period; or
>
> B.    Such Holders shall retain their existing lien rights and shall accrue interest as provided under applicable nonbankruptcy law pursuant to 11 U.S.C. § 506 and 511 and California Revenue and Taxation Code Sections 4102 and 4103, and payment on such Allowed Claims shall be satisfied over sixty-one (61) months from the applicable Debtor's Petition Date.

The Plan Modification Motion will further provide that in no case shall payment be made to Class 1 Allow Real Property Tax Claims later than the payment of non-priority unsecured claims.  The Plan treatment has further been clarified that payments shall be made in "regular installments" over a period not later than sixty (60) months after the date of the order for relief, in compliance with 11 U.S.C. § 1129(a)(9)(C) & (D).  Accordingly, the requirements of Section 1129(a)(9) are satisfied.

### 2.10    11 U.S.C. § 1129(a)(10).

Section 1129(a)(10) requires that "if a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider."  As the tables in Section 1.6 above confirm, the requirements of Section 1129(a)(10) are satisfied as to every SunCal Debtor addressed in the SunCal Plans.

### 2.11    11 U.S.C. § 1129(a)(11).

Section 1129(a)(11) requires that "confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan."

Section 1129(a)(11) contains a feasibility standard.  More than any other Section of the Bankruptcy Code, Section 1129(a)(11) conveys Congress' belief that the overall economic good would ultimately be served through the confirmation of the Chapter 11 plans, as opposed to the destruction of businesses.  Congress states in this subsection that a plan shall be confirmed as long as it is "not likely to be followed by ... further financial reorganization."  11 U.S.C. § 1129(a)(11).  **In other words, the test is satisfied if the Bankruptcy Court finds that the reorganization is not likely to fail**.  Congress intentionally made this a very lenient standard, because it wanted Chapter 11 plans to succeed, as long as a <u>reasonable opportunity</u> for success existed.  <u>See Acquia Inc. v. Clinton</u>, 787 F. 2d 1352, 1364 (9th Cir. 1986), ("The Debtor has presented ample evidence to demonstrate that the Plan has a **reasonable probability of success"**); <u>Prudential Ins. Co. of America v. Monnier Bros.</u>, 755 F. 2d 1336, 1341 (8th Cir. 1985), ("..reasonable prospect of success and is workable."); <u>Clarkson v. Cooke Sales and Service Co.</u>, 767 F. 2d 417, 420 (8th Cir. 1985), ("The test is whether the things which are to be done after confirmation can be done as a practical matter..."); <u>In re Mullberry Phosphates Inc.</u>, 149 B.R 702, 708 (Bankr. M.D. Fla. 1993), ("A plan meets the § 1129(a)(ii) feasibility standard if the court determines that the plan offers a reasonable prospect of success and is workable.").

In <u>In re Drexel Burnham Lambert Group, Inc.</u>, 138 B.R. 723 (Bankr. S.D.N.Y. 1992) the court confirmed Congressional intent regarding Section 1129(a)(11):

> The feasibility test set forth in § 1129(a)(11) requires us to determine independently whether the Plan is workable and has a reasonable likelihood of success.... As noted in Collier on Bankruptcy, a guarantee of success is not required.

*Id.* at 762.

The <u>Drexel</u> Court went on to make a statement that is uniquely applicable in the instant case:

-29-

**The mere prospect of financial uncertainty cannot defeat confirmation on feasibility grounds since a guaranteed of the future is not required.**

Id.; See also, Mullberry, 142 B.R. at 709.  In summary, the case law on the issue of feasibility is clear.  If the Bankruptcy Court finds that a reasonable prospect for success exists, the test is satisfied.

The evidence that the Debtors have filed in support of their feasibility is summarized in the following subparagraphs for each of the SunCal Plans.

### 2.11.1  Group I VD Plan.

The Group I VD Plan provides, in summary, for the sale of the four Projects owned by the Group I VD Debtors free and clear of liens.  The Net Proceeds from these sales shall then be segregated, unless disbursement is authorized by Court order, until all objections to the validity, priority and amount of the Secured Claims seeking recourse to these funds are resolved or settled. As more fully explained in the Group I VD Disclosure Statement, the SunCal Proponents believe that the primary secured claims seeking recourse from these funds will either be subordinated  or disallowed in an amount necessary to enable all other creditors Allowed Claims to be paid in full.

The costs that the SunCal Proponents need to fund to implement the plan fall into two basic categories: Creditor distribution obligations and plan administration/implementation obligations. These obligations and the projected funding sources are detailed in Exhibit "2" to the Cook Declaration and they are summarized below.

### A.    Creditor Distribution Obligations.

### 1.    Administrative Claims.

The Group I VD Debtors' administrative claims are primarily comprised of professional fees, management fees and intercompany post-petition borrowings pursuant to a court approved stipulation (the "Inter-Company Borrowings"). The SunCal Proponents believe that these claims will be paid from closings of sales on the Project and cash on hand in the estates of the Group I VD Debtors prior to the Effective. (Ex. "1", Cook Declaration). The administrative claims against the Group I VD Debtors' estates (other than the Palmdale estate) that are owed to Palmdale for funds advanced to pay administrative fees, will be repaid on the Effective Date and simultaneously loaned back to these Debtors by Palmdale, through a book entry transaction.

**2.  Class 1.1 through 1.4 Claims (Property Taxes).**

The Allowed Secured Claims of the Class 1.1 through 1.4 claims shall be paid in full through the Net Proceeds generated from the sale of the Projects.

**3.  Class 2.1 through 2.4 Claims (Lehman).**

Any Allowed Secured Claim arising from the disputed secured claims asserted by the Lehman Entities against the four Projects owned by the Group I VD Debtors will be paid from the Net Sales Proceeds generated from the sale of the Projects. As more fully explained in the Group I VD Plan Disclosure Statement, the SunCal Proponents expect these claims to be either completely disallowed, in the case of the claims against Acton Estates, or to subordinated or disallowed to the extent necessary to pay the allowed claims of all other creditors in full.

**4.  Class 3.1 through 3.14 Claims (Mechanics Lienors).**

Although these claims are technically secured by liens recorded against the Projects. No value will exist to "secure" these claims unless the Lehman Claims asserted against the Projects are reduced or eliminated through the pending claims objections, or subordinated through the Lehman Adversary Proceeding. If this occurs, then these claims will be paid in accordance with their respective priorities through the Net Proceeds from the sale of the Projects.  These claims are also considered Reliance Claims, and the holders of such claims to be Reliance Claimants.  As such, such reliance Claimants were offered the right to sell their claims to LitCo for .55¢ of their Allowed Claim in Class 6.

**5.  Class 4.1 (Contingent Bond Claims).**

All contingent bond claims are disputed and they will be eliminated upon the sale of the Project, when the buyers replace these bonds.  However, if allowed, the treatment is based upon the exact language requested by Bond Safeguard.

**6.  Class 5.1 (Priority Claims).**

Priority claims against the estates of the Group I VD Debtors are nominal and they will be paid from cash on hand, or alternatively from (i) the LitCo Loan, which the SunCal Proponents expect to be made available from a third party prior to the Confirmation Date, or (ii) from the

1   release of funds from the Net Sale Proceeds, upon a sufficient adequate protection showing by the

2   SunCal Proponents.

3                **7.**   **Class 6.1 through 6.4 (Unsecured Claims that are Reliance**

4                **Claims).**

5        These classes have the right to sell their Reliance Claims to LitCo for 55 cents per dollar of

6   claim (Option A), or await whatever recovery is generated from the equitable subordination action

7   and other litigation initiated by the Debtors against Lehman. In the projection attached as Exhibit

8   "2" to the Cook Declaration, the SunCal Proponents have assumed that all eligible reliance

9   claimants accept the Option A offer. The calculation of the actual figure based upon the ballots is

10   still in process. The funds required to fund this claims purchase will be provided to LitCo by a

11   third party capital source. As more fully explained in the Cook Declaration this financing is in the

12   process of being obtained and the SunCal Proponents have an executed letter of intent that would

13   accomplish this objective subject to twenty days due diligence. Those claimants within this class

14   that did not elect Option A will not receive any distribution unless and until the Lehman

15   Adversary Proceeding and other Litigation Claims are completed. Then they will receive their pro

16   rata share of the recovery from such litigation.

17                **8.**   **Class 7.1 through 7.4 (Unsecured Claims that are not**

18                **Reliance Claims).**

19        The claimants holding allowed claims within this class will receive a 1% distribution and a

20   pro rata share of any recovery or Net Sales Proceeds remaining after the conclusion of claims

21   objections and other litigation recoveries except for the equitable subordination causes of action in

22   the Lehman Adversary Proceeding. From a feasibility perspective, the SunCal Proponents' burden

23   is to show that they can pay the 1% distribution, and this figure is accounted for in the Exhibit "2"

24   projections. This sum will be paid by the LitCo loan.

25               **B.**   **Plan Administrative Administration Costs**.

26        The costs within this category include the following: 1) costs that will be incurred in

27   selling the Projects; 2) costs that will be incurred in administering the Plan Trust; and 3) costs that

28

will be incurred in pursuing the claim objections and equitable subordination action. Each of these costs and the applicable funding source are discussed below:

### 1. **Marketing Costs**.

All internal costs associated with this marketing effort will be borne by the SunCal Plan Proponents. Third party sales costs will be paid from the Net Sales Proceeds, as they would as an ordinary and necessary sale cost in any property sale transaction.

### 2. **Plan Trust Costs**.

The second category of costs will be nominal since Acquisitions, which is serving as the Trustee of the Plan Trust will be serving without compensation. Any costs incurred in this administrative effort will be paid from the Plan Trust, which means they will be paid from the proceeds generated from the litigation, from the Net Sales Proceeds released from the liens of the Lehman Entities on account of litigation determinations or the LitCo Loan.

### 3. **Litigation Costs**.

The last category of costs will be paid from the Plan Trust, which is expected to have available the proceeds generated from litigation recoveries and, if necessary, the LitCo Loan.

### 2.11.2 **Group II VD Plan**.

The Group II VD Plan provided, in summary, for the sale of two Projects owned by the Group II VD Debtors free and clear of liens. Notably, these Projects are not subject to the liens asserted by the Lehman Entities and Diamond Valley has made a Stalking Horse purchase offer that approaches and may exceed a 100% distribution to creditors.

The Net Proceeds from these sales shall then be segregated, unless disbursement is authorized by Court order, until all the validity, priority and amount of the Secured Claims seeking recourse to these funds are resolved by the Court or through settlement.

The costs that the SunCal Proponents need to fund to implement the plan fall into two basic categories: Creditor distribution obligations and plan administration/implementation obligations. Each of these cost categories and the anticipated funding sources are discussed and explained in following subparagraphs.

A.  **Creditor Distribution Obligations**.

1.  **Administrative Claims**.

The Group II VD Debtors administrative claims are primarily comprised of professional fees, management fees and Inter-Company Loans pursuant to a court approved stipulation. The SunCal Proponents believe that these claims will be paid from the closings of the sale of the applicable Projects, cash on hand in the estates of the Group II VD Debtors, or through cash provided by Palmdale, prior to the Effective. (Ex. "1", Cook Declaration). The administrative claims existing in the Group II VD Debtors' estates that are owed to Palmdale for funds advanced to pay administrative fees, will be repaid on the Effective Date, and simultaneously loaned back to these Debtors by Palmdale, through a book entry transaction.

2.  **Class 1.1 Through 1.2 Claims (Property Taxes)**.

The Allowed Secured Claims of the Class 1.1 through 1.2 claims shall be paid in full through the Net Proceeds generated from the sale of the Projects.

3.  **Class 2.1 (Mechanics Lienor)**.

This single claim ($43,355) will be paid in through the Net Proceeds from the sale of the Projects.

4.  **Class 3.1 (Priority Claims)**.

Priority claims against the estates of the Group I VD Debtors are nominal and they will be paid from cash on hand, or alternatively from (i) the LitCo Loan, which the SunCal Proponents expect to be made available from a third party prior to the Confirmation Date, or (ii) from the release of funds from the Net Sale Proceeds, upon a sufficient adequate protection showing by the SunCal Proponents.

5.  **Class 4.1 Through 4.2 (Unsecured Claims)**.

These claims will be paid in full from the Net Sales Proceeds.

6.  **Class 5.1 Through 5.2 (Interests held by SunCal Communities I, LLC)**

These interests shall be preserved under the Group II VD Plan. They shall receive a distribution of any excess funds remaining in the estate after the payment of all senior priority

1  claims, including the claims relating to the funds advanced by Palmdale Hills pursuant to

2  Stipulations entered as docket nos. 854, 1154, 1566, and 2102, the Inter-Company Loan

3  Stipulation, unpaid professional fees of the Voluntary Debtors and pursuant to the Litco Loan, if

4  any.

5  **B.    Plan Administrative Administration Costs**.

6  The costs within this category include the following: 1) costs that will be incurred in

7  selling the Projects; 2) costs that will be incurred in administering the Plan Trust; and 3) costs that

8  will be incurred in pursuing the claim objections and equitable subordination action. Each of these

9  costs and the applicable funding source are discussed below:

10  **1.    Marketing Costs**.

11  All internal costs associated with this marketing effort will be borne by SunCal

12  Management, LLC. Third party sales costs will be paid from the Net Sales Proceeds, as they

13  would as an ordinary and necessary sale cost in any property sale transaction.

14  **2.    Plan Trust Costs**.

15  The second category of costs will be nominal since Acquisitions, which is serving as the

16  Trustee of the Plan Trust will be serving without compensation. Any costs incurred in this

17  administrative effort will be paid from the Plan Trust, which means they will be paid from the

18  proceeds generated from the litigation, or from the Net Sales Proceeds.

19  **3.    Litigation Costs**.

20  The last category of costs will be paid from the Plan Trust, which is expected to have

21  available the proceeds generated from litigation recoveries

22  **2.11.3  Group III VD Plan**.

23  The Group III VD Plan provides, in summary, for the sale of the three Projects owned by

24  the Group III VD Debtors free and clear of liens and without creditor bid rights of the disputed

25  secured creditor Lehman ALI.  The Net Proceeds from these sales shall then be segregated, unless

26  disbursement is authorized by Court order, until all the validity, priority and amount of the

27  Secured Claims seeking recourse to these funds are resolved by the Court or through settlement.

28  As more fully explained in the Group III VD Disclosure Statement, the SunCal Proponents

1    believes the primary secured claims seeking recourse from these funds will either be subordinated

2    to disallowed in amount necessary to enable all other creditors Allowed Claims to be paid in full.

3        The costs that the SunCal Proponents need to fund to implement the plan fall into two

4    basic categories: Creditor distribution obligations and plan administration/implementation

5    obligations. Each of these cost categories and the anticipated funding sources are discussed and

6    explained in following subparagraphs.

7                    **A.    Creditor Distribution Obligations**.

8                        **1.    Administrative Claims**.

9        The Group III VD Debtors' administrative claims are primarily comprised of professional

10   fees, management fees and the Inter-Company Loans. The SunCal Proponents believe that these

11   claims will be paid from the closing of the sales, the cash on hand in the estates of the Group III

12   VD Debtors, or through cash provided by Palmdale, prior to the Effective. (Ex. "1", Cook

13   Declaration). If necessary, and the SunCal Proponents Plan for Palmdale is confirmed, the

14   administrative claims existing in the Group III VD Debtors' estates that are owed to Palmdale for

15   funds advanced to pay administrative fees, will be repaid on the Effective Date, and

16   simultaneously loaned back to these Debtors by Palmdale, through a book entry transaction.

17                **2.    Class 1.1 Through 1.2 Claims (Property Taxes)**.

18       The Allowed Secured Claims of the Class 1.1 through 1.2 claims shall be paid in full

19   through the Net Proceeds generated from the sale of the Projects.

20                **3.    Class 2.1 Through 2.3 Claims (Lehman)**.

21       The disputed secured claims asserted by the Lehman Entities against the two Projects

22   owned by the Group III VD Debtors will be paid from the Net Sales Proceeds generated from the

23   sale of the Projects. As more fully explained in the Group III VD Plan Disclosure Statement, the

24   SunCal Proponents expect these claims to be either subordinated or disallowed to the extent

25   necessary to pay the allowed claims of all other creditors in full.

26                **4.    Class 3.1 Through 3.2 (Priority Claims)**.

27       Priority claims against the estates of the Group I VD Debtors are nominal and they will be

28   paid from cash on hand, or alternatively from (i) the LitCo Loan, which the SunCal Proponents

1    expect to be made available from a third party prior to the Confirmation Date, or (ii) from the

2    release of funds from the Net Sale Proceeds, upon a sufficient adequate protection showing by the

3    SunCal Proponents.

4         **5.   Class 4.1 Through 4.3 (Unsecured Claims).**

5         Under the SunCal Plans this class of claims will receive their share of the Net Sale

6    Proceeds after the payment of all senior claims.

7         **6.   Class 5.1 through 5.3 (Interests)**

8         These interests shall be preserved under the Group III VD Plan. They shall receive a

9    distribution of any excess funds remaining in the estate after the payment of all senior priority

10   claims, including the claims relating to the funds advanced by Palmdale Hills pursuant to

11   Stipulations entered as docket nos. 854, 1154, 1566, and 2102, and pursuant to the Litco Loan if

12   any.

13        **B.   Plan Administrative Administration Costs.**

14        The costs within this category include the following: 1) costs that will be incurred in

15   selling the Projects; 2) costs that will be incurred in administering the Plan Trust; and 3) costs that

16   will be incurred in pursuing the claim objections and equitable subordination action. Each of these

17   costs and the applicable funding source are discussed below:

18        **1.   Marketing Costs.**

19        All internal costs associated with this marketing effort will be borne by SunCal

20   Management, LLC. Third party sales costs will be paid from the Net Sales Proceeds, as they

21   would as an ordinary and necessary sale cost in any property sale transaction.

22        **2.   Plan Trust Costs.**

23        The second category of costs will be nominal since Acquisitions, which is serving as the

24   Trustee of the Plan Trust will be serving without compensation. Any costs incurred in this

25   administrative effort will be paid from the Plan Trust, which means they will be paid from the

26   proceeds generated from the litigation, or from the Net Sales Proceeds released from the liens of

27   the Lehman Entities on account of litigation determinations.

28

**3.  Litigation Costs**.

The last category of costs will be paid from the Plan Trust, which is expected to have

available the proceeds generated from litigation recoveries

**2.11.4  Group IV VD Plan**.

The Group IV VD Plan provides, in summary, for either the recovery of the Pacific Point

Project, or through a damage recovery that compensates the Group IV Debtors for Lehman Ali's

failure to comply with its obligations under the Restructuring Agreement and Settlement

Agreement relating to this Project, through the Lehman Adversary Proceeding.  The costs that the

SunCal Proponents need to fund to implement the plan fall into two basic categories: Creditor

distribution obligations and plan administration/implementation obligations. Each of these cost

categories and the anticipated funding sources are discussed and explained in following

subparagraphs.

**A.    Creditor Distribution Obligations**.

**1.    Administrative Claims**.

The Group IV VD Debtors administrative claims are primarily comprised of professional

fees, management fees and the Inter-Company Loan. The SunCal Proponents believe that these

claims will be from the LitCo Loan, or through cash provided by Palmdale, prior to the Effective.

(Ex. "1", Cook Declaration). Specifically, the administrative claims existing in the Group IV VD

Debtors' estates that are owed to Palmdale for funds advanced to pay administrative fees, will be

repaid on the Effective Date, and simultaneously loaned back to these Debtors by Palmdale,

through a book entry transaction, if the SunCal Plan for Palmdale is confirmed.

**2.    Class 1.1 through 1.2 (Lehman)**.

If allowed, the disputed secured claims asserted by the Lehman Entities against the Pacific

Point Project will be paid from the Net Sales Proceeds generated from the sale of this Project.

Alternatively, they will allow to retain their interest in this Project, but be required pay a damage

judgment resulting from the successful prosecuting of the Lehman Adversary Proceeding.

1         **3.    Class 2.1 (Priority Claims).**

2         Priority claims against the estates of the Group I VD Debtors are nominal and they will be

3    paid from the LitCo Loan.

4         **4.    Class 3.1 (Unsecured Claims That Are Reliance Claims).**

5         This class will receive (1) a one (1%) percent distribution of their Allowed Claims on the

6    Effective Date; (2) their pro rata share of any allocated distribution from the Lehman Adversary

7    Proceeding and other Litigation Recoveries and (3) a forty nine (49%) distribution if the Pacific

8    Point Project is purchased by LitCo or its designee free and clear of all claims during the Plan

9    Term, after the payment of senior claims.

10        **5.    Class 4.1 (Unsecured Claims That Are Not Reliance Claims)**

11        This class will receive their pro rata share of all funds in the estate after the payment of

12   senior claims of Litigation Recoveries other than the Lehman Adversary Proceeding.

13        **B.    Plan Administrative Administration Costs.**

14        The costs within this category include (1) costs that will be incurred in administering the

15   Plan Trust; and (2) the costs that will be incurred in pursuing the Litigation Recoveries and will

16   come from the LitCo Loan.

17        **1.    Plan Trust Costs.**

18        The second category of costs will be nominal since Acquisitions, which is serving as the

19   Trustee of the Plan Trust will be serving without compensation. Any costs incurred in this

20   administrative effort will be paid from the Plan Trust, which means they will be paid from the

21   proceeds generated from the litigation, or from the Net Sales Proceeds released from the liens of

22   the Lehman Entities on account of litigation determinations.

23        **2.    Litigation Costs.**

24        The last category of costs will be paid from the LitCo Loan.

25        **2.11.5    Group I TD Plan.**

26        The Group I TD Plan provided, in summary, for the sale of the five Projects owned by the

27   Group I TD Debtors free and clear of liens.  The Net Proceeds from these sales shall then be

28   segregated, unless disbursement is authorized by Court order, until all the validity, priority and

1   amount of the Secured Claims seeking recourse to these funds are resolved by the Court or

2   through settlement. As more fully explained in the Group I TD Disclosure Statement, the SunCal

3   Proponents believe the primary secured claims seeking recourse from these funds will either be

4   subordinated to disallowed in an amount necessary to enable all other creditors Allowed Claims to

5   be paid in full.

6        The costs that the SunCal Proponents need to fund to implement the plan fall into two

7   basic categories: Creditor distribution obligations and plan administration/implementation

8   obligations. Each of these cost categories and the anticipated funding sources are discussed and

9   explained in following subparagraphs.

10                      **A.    Creditor Distribution Obligations**.

11                              **1.    Administrative Claims**.

12       Effective Date administrative claims for the Group I TD Debtors, which are primarily

13  attributable to the Lehman Administrative Loans, are projected to total approximately

14  $55,000,000. These claims will paid from one or more of the following three sources of cash: (i)

15  proceeds from the sale of the Projects that are authorized to be released pursuant to the

16  Confirmation order of the Court; (ii) cash on hand in the estates, if any,; and/or (iv) funding from

17  the LitCo Loan.

18                  **2.    Class 1.1 Through 1.5 Claims (Property Taxes)**.

19       The Allowed Secured Claims of the Class 1.1 through 1.5 claims shall be paid in full

20  through the Net Proceeds generated from the sale of the Projects.

21                      **3.    Class 2.1 Through 2.5 Claims (Lehman)**.

22       The disputed secured claims asserted by the Lehman Entities against the Projects owned

23  by the Group I TD Debtors will be paid from the Net Sales Proceeds generated from the sale of the

24  Projects. As more fully explained in the Group I TD Plan Disclosure Statement, the SunCal

25  Proponents expect these claims to be either subordinated or disallowed to the extent necessary to

26  pay the allowed claims of all other creditors in full.

27

28

1

**4.    <u>Class 3.1 Through 3.30 Claims (Mechanics Lienors).</u>**

2    Although these claims are technically secured by liens recorded against the Projects. No

3    value will exist to "secure" these claims unless the Lehman Claims asserted against the Projects

4    are reduced or eliminated through the pending claims objections, or subordinated through the

5    Lehman Adversary Proceeding. If this occurs, then these claims will be paid in accordance with

6    their respective priorities through the Net Proceeds from the sale of the Projects.  These claims are

7    also considered Reliance Claims, and the holders of such claims to be Reliance Claimants.  As

8    such, such reliance Claimants were offered the right to sell their claims to LitCo for .55¢ of their

9    Allowed Claim in Class 6. .

10

**5.    <u>Class 4.1 Through 4.5 (Contingent Bond Claims).</u>**

11    To the extent these claims are allowed claims, they will be paid according to their

12    treatment under the Plan as required by Bond Safeguard.

13

**6.    <u>Class 5.1 Through 5.5 (Priority Claims).</u>**

14    Priority claims against the estates of the Group I TD Debtors are nominal and they will be

15    paid from (i) the cash on hand, if any, (ii) the LitCo Loan, which the SunCal Proponents, or (iii)

16    from the release of funds from the Net Sale Proceeds, upon a sufficient adequate protection

17    showing by the SunCal Proponents.

18

**7.    <u>Class 6.1 through 6.5 (Unsecured Claims That Are Reliance</u>**

19    **<u>Claims).</u>**

20    These classes have the right to sell their Reliance Claims to LitCo for 55 cents per dollar of

21    claim (Option A), or await whatever recovery is generated from the equitable subordination action

22    and other litigation initiated by the Debtors against Lehman. In the projection attached as Exhibit

23    "2" to the Cook Declaration, the SunCal Proponents have assumed that all eligible reliance

24    claimants accept the Option A offer. The calculation of the actual figure based upon the ballots is

25    still in process. The funds required to fund this claims purchase will be provided to LitCo by a

26    third party capital source. As more fully explained in the Cook Declaration, this financing is in the

27    process of being obtained. Those claimants within this class that did not elect Option A will not

28

1    receive any distribution unless and until the Lehman Adversary Proceeding and other Litigation

2    Recoveries are obtained. Then they will receive their pro rata share of the recovery.

3              **8.    Class 7.1 through 7.5 (Unsecured Claims That Are Not**

4                   **Reliance Claims)**

5         The claimants holding allowed claims within this class will receive a 1% distribution and a

6    pro rata share of any Litigation Recoveries, excluding the equitable subordination claims. From a

7    feasibility perspective, the SunCal Proponents' burden is to show that they can pay the 1%

8    distribution, and this figure is accounted for in the Exhibit "2" projections. This sum will be paid

9    by the LitCo loan.

10             **B.    Plan Administrative Administration Costs**.

11        The costs within this category include the following: 1) costs that will be incurred in

12   selling the Projects; 2) costs that will be incurred in administering the Plan Trust; and 3) costs that

13   will be incurred in pursuing the claim objections and equitable subordination action. Each of these

14   costs and the applicable funding source are discussed below:

15             **1.    Marketing Costs**.

16        All internal costs associated with this marketing effort will be borne by SunCal

17   Management, LLC. Third party sales costs will be paid from the Net Sales Proceeds, as they

18   would as an ordinary and necessary sale cost in any property sale transaction.

19             **2.    Plan Trust Costs**.

20        The second category of costs will be nominal since Acquisitions, which is serving as the

21   Trustee of the Plan Trust will be serving without compensation. Any costs incurred in this

22   administrative effort will be paid from the Plan Trust, which means they will be paid from the

23   proceeds generated from the litigation, or from the Net Sales Proceeds released from the liens of

24   the Lehman Entities on account of litigation determinations.

25             **3.    Litigation Costs**.

26        The last category of costs will be paid from the Plan Trust, which is expected to have

27   available funds from the LitCo Loan and the proceeds generated from Litigation Recoveries.

28

### 2.11.6  Group II TD Plan.

The Group II TD Plan provided, in summary, for the sale of the two Projects owned by the Group II TD Debtors free and clear of liens.  The Net Proceeds from these sales shall then be segregated, unless disbursement is authorized by Court order, until all the validity, priority and amount of the Secured Claims seeking recourse to these funds are resolved by the Court or through settlement. As more fully explained in the Group II TD Disclosure Statement, the SunCal Proponents believes the primary secured claims seeking recourse from these funds will either be subordinated to disallowed in amount necessary to enable all other creditors Allowed Claims to be paid in full.

The costs that the SunCal Proponents need to fund to implement the plan fall into two basic categories: Creditor distribution obligations and plan administration/implementation obligations. Each of these cost categories and the anticipated funding sources are discussed and explained in following subparagraphs.

### A.    Creditor Distribution Obligations.

#### 1.    Administrative Claims.

Effective Date administrative claims for the Group I TD Debtors, which are primarily attributable to the Lehman Administrative Loans, are projected to total approximately $22,000,000. These claims will paid from one or more of the following three sources of cash: (i) proceeds from the sale of the Projects that are released pursuant to the Confirmation Order; (ii) cash on hand in the estates, if any,; and (iii) funding from a third party capital source secured prior to the Confirmation Date.

#### 2.    Class 1.1 through 1.2 Claims (Property Taxes).

The Allowed Secured Claims of the Class 1.1 through 1.2 claims shall be paid in full through the Net Proceeds generated from the sale of the Projects.

#### 3.    Class 2.1 Claims (Lehman).

The disputed secured claims asserted  by the Lehman Entities against the Projects owned by the Group II TD Debtors will be paid from the Net Sales Proceeds generated from the sale of the Projects. As more fully explained in the Group II TD Plan Disclosure Statement, the SunCal

1    Proponents expect these claims to be either subordinated or disallowed to the extent necessary to

2    pay the allowed claims of all other creditors in full.

3                    **4.    Class 3.1 through 3.4 Claims (Mechanics Lienors).**

4           Although these claims are technically secured by liens recorded against the Projects. No

5    value will exist to "secure" these claims unless the Lehman Claims asserted against the Projects

6    are reduced or eliminated through the pending claims objections, or subordinated through the

7    Lehman Adversary Proceeding. If this occurs, then these claims will be paid in accordance with

8    their respective priorities through the Net Proceeds from the sale of the Projects.  These claims are

9    also considered Reliance Claims, and the holders of such claims to be Reliance Claimants.  As

10    such, such reliance Claimants were offered the right to sell their claims to LitCo for .55¢ of their

11    Allowed Claim in Class 6.

12                    **5.    Class 4.1 (Contingent Bond Claims).**

13           To the extent these claims are secured claims, they will be paid from the Net Sales

14    Proceeds generated from the sale of the Projects. If they are no secured they will fall into Class 6

15    and be treated along with the claims in that class.

16                    **6.    Class 5.1 (Priority Claims).**

17           Priority claims against the estates of the Group II TD Debtors are nominal and they will be

18    paid from cash on hand, or alternatively from (i) the LitCo Loan, or (ii) from the release of funds

19    from the Net Sale Proceeds, upon a sufficient adequate protection showing by the SunCal

20    Proponents authorized by the Confirmation Order.

21                    **7.    Class 6.1 through 6.2 (Unsecured Claims that are Reliance**

22                            **Claims).**

23           These classes have the right to sell their Reliance Claims to LitCo for 55 cents per dollar of

24    claim (Option A), or await whatever recovery is generated from the equitable subordination action

25    and other Litigation Recoveries from litigation initiated by the Debtors against the Lehman

26    Entities. In the projection attached as Exhibit "2" to the Cook Declaration, the SunCal Proponents

27    have assumed that all eligible reliance claimants accept the Option A offer. The calculation of the

28    actual figure based upon the ballots is still in process. The funds required to fund this claims

1    purchase will be provided to LitCo by a third party capital source. As more fully explained in the

2    Cook Declaration this financing is in the process of being obtained. Those claimants within this

3    class that did not elect Option A will not receive any distribution unless and until the Lehman

4    Adversary Proceeding and other Litigation Claims are completed. Then they will receive their pro

5    rata share of the recovery.

6            **8.    Class 7.1 through 7.2 (Unsecured Claims that are not**

7                    **Reliance Claims)**

8            The claimants holding allowed claims within this class will receive a 1% distribution and a

9    pro rata share of any Litigation Recoveries other than the Equitable Subordination claims. From a

10   feasibility perspective, the SunCal Proponents' burden is to show that they can pay the 1%

11   distribution, and this figure is accounted for in the Exhibit "2" projections. This sum will be paid

12   by the LitCo loan.

13           **B.    Plan Administrative Administration Costs**.

14           The costs within this category include the following: 1) costs that will be incurred in

15   selling the Projects; 2) costs that will be incurred in administering the Plan Trust; and 3) costs that

16   will be incurred in pursuing the claim objections and equitable subordination action. Each of these

17   costs and the applicable funding source are discussed below:

18           **1.    Marketing Costs**.

19           All internal costs associated with this marketing effort will be borne by SunCal

20   Management, LLC. Third party sales costs will be paid from the Net Sales Proceeds, as they

21   would as an ordinary and necessary sale cost in any property sale transaction.

22           **2.    Plan Trust Costs**.

23           The second category of costs will be nominal since Acquisitions, which is serving as the

24   Trustee of the Plan Trust will be serving without compensation. Any costs incurred in this

25   administrative effort will be paid from the Plan Trust, which means they will be paid from the

26   proceeds generated from the litigation, or from the Net Sales Proceeds released from the liens of

27   the Lehman Entities on account of litigation determinations.

28

### 3. **Litigation Costs**.

The last category of costs will be paid from the Plan Trust, which is expected to have available LitCo Loan another the proceeds generated from Litigation Recoveries.

**2.117. Conclusion**. As explained above, the Group II VD and Group III VD Plans contemplated sales of the Project, without any acquisition of claims. The source funding for the obligations in these plans is simply the Net Sales Proceeds derived from the sale of the Projects. In the cases of the Group I VD Plan, Group IV VD Plan, the Group I TD Plan and the Group II TD Plan, a funding contingency continues to exist. The SunCal Proponents have a third party with the ability to fund the claims purchase offer in these cases, and the substantial administrative claims is dependent upon third party funding. Although the process of securing this funding is in process, it is not yet a reality.

### 2.12 **11 U.S.C. § 1129(a)(12).**

Section 1129(a)(12) requires that "all fees payable under section 1930 of title 28, as determined by the court at the hearing on confirmation of the plan, have been paid or the plan provides for the payment of all such fees on the effective date of the plan." Section 16.1 of the SunCal Plans states that these fees will be paid in full as required. Accordingly, the requirements of Section 1129(a)(12) are satisfied.

### 2.13 **11 U.S.C. § 1129(a)(13).**

Section 1129(a)(13) requires the following:

The plan provides for the continuation after its effective date of payment of all retiree benefits, as that term is defined in section 1114 of this title, at the level established pursuant to subsection (e)(1)(B) or (g) of section 1114 of this title, at any time prior to confirmation of the plan, for the duration of the period the debtor has obligated itself to provide such benefits.

The requirements of Section 1129(a)(13) are not applicable here, in that the SunCal Proponents are not obligated to make any payments for retiree benefits.

### 2.14 **11 U.S.C. § 1129(a)(14) and (15).**

The requirements set forth in Sections 1129(a)(14) and (15) are not applicable here because the Debtors are not individuals.

**2.15**   **11 U.S.C. § 1129(a)(16).**

Section 1129(a)(16) requires the following:

> All transfers of property of the plan shall be made in accordance with any
> applicable provisions of nonbankruptcy law that govern the transfer of property
> by a corporation or trust that is not a moneyed, business, or commercial
> corporation or trust.

All transfers of property under the Plan will be made in accordance with any applicable

California law.  Accordingly, this requirement is also satisfied.

**III.**

**THE PLAN COMPLIES WITH ALL OF THE**

**REQUIREMENTS FOR CONFIRMATION SET FORTH**

**IN SECTION 1129(b) OF THE BANKRUPTCY CODE**

The SunCal Plans satisfy each of the requirements for confirmation set forth in

Section 1129(a), except only for the requirement of Section 1129(a)(8) that each class

established by the Plan accept or be deemed to accept the Plan.  The Plan can still be confirmed

notwithstanding the SunCal Plan Proponents inability to comply with the requirements of

Section 1129(a)(8) for such Debtors.  In this regard, Section 1129(b) provides, in pertinent part,

as follows:

> (1)     if all of the applicable requirements of subsection (a) of this section other
> than paragraph (8) are met with respect to a plan, the court, on request of the
> proponent of the plan, shall confirm the plan notwithstanding the requirements of
> such paragraph if the plan does not discriminate unfairly, and is fair and
> equitable, with respect to each class of claims or interests that is impaired under,
> and has not accepted, the plan.

Section 1129(b) makes clear that, if a plan does not discriminate unfairly, and is fair and

equitable with respect to each class of claims or interests impaired under the plan that has not

accepted the plan, the bankruptcy court is <u>required</u> to confirm the plan.

**3.1**   **No Unfair Discrimination.**

The reference in Section 1129(b) to the requirement that a plan not "discriminate

unfairly" has been held to mean that a plan cannot provide unequal treatment of similar claims or

similar interests.  <u>See</u>, Sponsors' Remarks, 124 Cong. Rec. H11, 104 (daily ed. Sep. 28, 1978)

(statement of Rep. Edwards; 124 Cong. Rec. S17, 420 (daily ed. Oct. 6, 1978) (statement of Sen.

-47-

1  De Concini); In re Tucson Self-Storage, 166 B.R. 892, 898 (9th Cir. BAP 1994) (citing In re Toy

2  & Sports Warehouse, Inc., 37 B.R. 141, 15-52 (Bankr. S.D.N.Y. 1984)).  Only in situations

3  proposing "widely disparate" treatment of "similarly situated" claims will courts deny

4  confirmation of Chapter 11 plans for being unfairly discriminatory.  See Id.; In re Caldwell, 76

5  B.R. 643, 646 (Bankr. E.D. Tenn. 1987) (denying confirmation of Chapter 11 plan where plan

6  proposed to pay class of unsecured credit card claims 100%, but proposed to pay class of all

7  other unsecured claims only 22.7%); In re Johns-Manville Corp., 68 B.R. 618, 636 (Bankr.

8  S.D.N.Y. 1986), aff'd, 78 B.R. 407 (S.D.N.Y. 1987), aff'd, 843 F.2d 636 (2d Cir. 1988) ("[A]

9  plan proponent may not segregate two similar claims or groups of claims into separate classes

10  and provide disparate treatment for those classes."); In re Pine Lake Village Apartment Co., 19

11  B.R. 819, 831 (Bankr. S.D.N.Y. 1982) (plan cannot place a secured creditor's deficiency claim in

12  separate class receiving different treatment from other unsecured claims).  In re Acequia, Inc.,

13  787 F.2d 1352, 1364 (9th Cir. 1986), citing 5 Collier on Bankruptcy, ¶ 1129.03, at 1129-50 (15th

14  ed. 1993) ("Collier on Bankruptcy states that this provision requires that a plan 'allocate[] value

15  to [a] class in a manner consistent with the treatment afforded to other classes with similar legal

16  claims against the debtor.'").

17        Here, creditors and interest holders with similar legal claims or interests have been

18  treated the same in the classes established by the Plan.  Specifically, there is no "widely

19  disparate" treatment of "similarly situated" creditors or interest holders.

20        **3.2**    **The Plan Is Fair and Equitable.**

21  Section 1129(b) of the Bankruptcy Cod provides, in pertinent part, as follows:

22  (2)     For the purpose of this subsection, the condition that a plan be fair and
   equitable with respect to a class includes the following requirements:

23  (A)     With respect to a class of secured claims, the plan provides—

24  (i)

25  (I)     that the holders of such claims retain the liens
   securing such claims, whether the property subject to such

26  liens is retained by the debtor or transferred to another
   entity, to the extent of the allowed amount of such claims;

27  and

28

-48-

1

2

3

       (II)     that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

4

5

6

       (ii)     for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or

7

8

       (iii)    for the realization by such holders of the indubitable equivalent of such claims.

9

10

11

   (B)     With respect to a class of unsecured claims—

       (i)     the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

12

13

       (ii)    the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property, except that

14

15

in a case in which the debtor is an individual, the debtor may retain property included in the estate under section 1115, subject to the requirements of subsection (a)(14) of this section.

16

11 U.S.C. § 1129(b)(2).

17

### 3.2.1  **Secured Claims.**

18

     The requirements of Section 1129(b)(2)(A) clearly been met as to all secured claims.  In

19

each of the SunCal Plans, Article V provides that the holders of liens against property of the

20

estate will maintain their liens or receive replacement liens on the proceeds of the sold collateral

21

in accordance with their rights under the Bankruptcy Code.  Furthermore, all of the SunCal Plans

22

provide for payment in full to these holders on account of their *allowed* claims, less potential

23

reductions as a result of a favorable judgment in the Lehman Adversary Proceeding.

24

     The Lehman Entities' contention that the treatment accorded their claims pursuant to 11

25

U.S.C. § 1129(b)(2)(A)(iii) does not convey upon their claims the required indubitable equivalent

26

is in error. According to their argument, a sale free and clear of liens and without credit bid rights,

27

as provided in the SunCal Plans, necessarily fails the "indubitable equivalent" standard. This

28

argument ignores dispositive case law to the contrary. The Supreme Court has consistently held

-49-

1    that such a sale necessarily conveys upon a secured creditor all that it is entitled to under the law.

2    Wright v. Union Cent. Life Ins. Co., 311 U.S. 273, 278-79 (1940)[5]; United Savings v. Timbers of

3    Inwood Forest, L.P., 484 U.S. 365, 377 (1989) (Confirming that "indubitable equivalent" means

4    no more than the present value of the secured creditor's collateral). The Lehman Entities' related

5    contention that barring credit bids is not allowed under the bankruptcy code in also contrary to the

6    weight of authority. Two of the three circuits that have addressed this issue have concluded that

7    11 U.S.C. § 1129(b)(2)(A)(iii) does indeed authorize the sale of properties free and clear of liens.

8    See Citizens Bank of Pennsylvania v. Philadelphia Newspapers, LLC (In re Philadelphia

9    Newspapers, LLC), 599 F.3d 298 (3d Cir. Mar. 22, 2010); Scotia Pacific Co., LLC v. Official

10   Unsecured Creditors' Committee (In re Pacific Lumber Co., 584 F.3d 229 (5th Cir. 2009). The

11   reasoning underlying these decisions is compelling for a simple reason – the court's applied the

12   statutory language as written.

13        The Lehman Entities' argument also ignores a critical fact: All of the Lehman Entities

14   claims are the subject of pending objections. Until the Lehman Entities overcome these

15   objections, they do not have a right to payment that is entitled to protection.

16        The Lehman Entities' attacks on the mechanics of the sale process have already been

17   addressed through the Proposed Plan Modification. Specifically, one of the proposed

18   modifications is the employment of Land Advisors, an independent auction firm to orchestrate the

19   sale of the Projects – the same auction firm that successfully orchestrated the auction of the

20   properties in the SunCal Pool-1 cases for Chapter 11 trustee Al Siegel. The remainder of the

21   Lehman Entities' objections are based upon an erroneous characterization of the facts or the law,

22   *and they continue to ignore the fact that the Lehman Entities' claims are presently not allowed*.

23   Accordingly, the requirements of Section 1129(b)(2)(A) are satisfied.

24        ### 3.2.2   Unsecured Claims.

25        Pursuant to the terms of the SunCal Plans, the holders of unsecured claims, in every case,

26   will receive a pro rata share of all distributions after the claims of all senior claimants have been

27

28   _____

[5] 311 U.S. 273, 278-79 (1940) ("Safeguards were provided to protect the rights of secured creditors, throughout the proceedings, to the extent of the value of the property. … There is no constitutional claim of the creditor to more than that.")

1    paid with the exception of those all unsecured claims that may be beneficiaries of an Equitable

2    Subordination Judgment. In those cases where Reliance Claims are offered, the LitCo purchase

3    offer, the consideration for the purchase is not property of the estates.  Moreover, payments will

4    be made to equity until such claims are paid in full. Accordingly, the requirements of

5    Section 1129(b)(2)(B) are satisfied.

6                                          **IV.**

7                                    **<u>CONCLUSION</u>**

8            Section 1129 provides that a bankruptcy court must confirm a Chapter 11 plan if the plan

9    complies with the requirements of Section 1129.  As established above, the SunCal Plans comply

10   fully with the requirements for confirmation set forth in Section 1129.  Accordingly,

11   confirmation of the SunCal Plan is appropriate.

12   DATED:  September 26, 2011              **WINTHROP COUCHOT**
                                            **PROFESSIONAL CORPORATION**
13

14                                          By:___*/s/ Paul J. Couchot*_____
                                                    Paul J. Couchot
15                                          General Insolvency Counsel for Administratively
                                            Consolidated Debtors-in-Possession
16

17                                          **RUS, MILIBAND & SMITH P.C.**

18                                          By:___*/s/ Ron Rus*_____
                                                    Ronald Rus, Esq.
19                                                  Joel S. Miliband, Esq.
                                                    Catherine Castaldi, Esq.
20                                          Attorneys for SunCal Management, LLC, and SCC
21                                          Acquisitions Inc.

22

23

24

25

26

27

28

                                                       MAINDOCS-#167174-v3-FINAL_-_SunCal_Confirmation_Brief.DOC

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 660 Newport Center Drive, 4th Fl., Newport Beach, CA 92660.

A true and correct copy of the foregoing document described as:  **SUNCAL PLAN PROPONENTS' OMNIBUS  BRIEF IN SUPPORT OF CONFIRMATION OF THE GROUP I VD PLANS, GROUP II VD PLANS, GROUP III VD PLANS, GROUP IV VD PLANS, GROUP I TD PLANS AND GROUP II TD PLANS; MEMORANDUM OF POINTS AND AUTHORITIES** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

**I.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On September 26, 2011, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

☒   Service information continued on attached page

**II.  SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served)**:**
On September 26, 2011, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be</u> completed no later than 24 hours after the document is filed.

☐   Service information continued on attached page

**III.  SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on September 26, 2011, I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on the judge <u>will be</u> completed no later than 24 hours after the document is filed.

**Via Attorney Service**
Honorable Erithe Smith
Ronald Reagan Federal Bldg.
411 W. Fourth St., Suite 5041
Santa Ana, CA 92701

☐   Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| | | |
|---|---|---|
| September 26, 2011 | Viann Corbin | /s/ Viann Corbin |
| *Date* | *Type Name* | *Signature* |

MAINDOCS-#167174-v3-FINAL_-_SunCal_Confirmation_Brief.DOC

NEF SERVICE LIST

- Selia M Acevedo    sacevedo@millerbaronedess.com, mpritikin@millerbaronedess.com
- Joseph M Adams    jadams@sycr.com
- Raymond H Aver    ray@averlaw.com
- James C Bastian    jbastian@shbllp.com
- Thomas Scott Belden    sbelden@kleinlaw.com, ecf@kleinlaw.com
- John A Boyd    fednotice@tclaw.net
- Mark Bradshaw    mbradshaw@shbllp.com
- Gustavo E Bravo    gbravo@smaha.com
- Jeffrey W Broker    jbroker@brokerlaw.biz
- Richard W Brunette    rbrunette@sheppardmullin.com
- Brendt C Butler    bbutler@mandersonllp.com
- Andrew W Caine    acaine@pszyjw.com
- Carollynn Callari    ccallari@venable.com
- Cathrine M Castaldi    ccastaldi@rusmiliband.com
- Tara Castro Narayanan    tara.narayanan@msrlegal.com, lisa.king@msrlegal.com
- Dan E Chambers    dchambers@jmbm.com
- Shirley Cho    scho@pszjlaw.com
- Vonn Christenson    vrc@paynefears.com
- Brendan P Collins    bpcollins@bhfs.com
- Vincent M Coscino    vcoscino@allenmatkins.com, emurdoch@allenmatkins.com
- Paul J Couchot    pcouchot@winthropcouchot.com,
  pj@winthropcouchot.com;gcrumpacker@winthropcouchot.com
- Geoffrey Crisp    geoffrey@smgarberlaw.com, michelle@smgarberlaw.com
- Jonathan S Dabbieri    dabbieri@sullivan.com,
  hill@sullivanhill.com;mcallister@sullivanhill.com;stein@sullivanhill.com;vidovich@sullivanhill.com
- Ana Damonte    ana.damonte@pillsburylaw.com
- Vanessa S Davila    vsd@amclaw.com
- Melissa Davis    mdavis@shbllp.com
- Daniel Denny    ddenny@gibsondunn.com
- Caroline Djang    crd@jmbm.com
- Caroline Djang    cdjang@rutan.com
- Donald T Dunning    ddunning@dunningLaw.com
- Lynsey M Eaton    leaton@gglts.com
- Meredith R Edelman    meredith.edelman@dlapiper.com
- Joseph A Eisenberg    jae@jmbm.com
- Lei Lei Wang Ekvall    lekvall@wgllp.com
- Richard W Esterkin    resterkin@morganlewis.com
- Don Fisher    dfisher@ptwww.com
- Marc C Forsythe    kmurphy@goeforlaw.com
- Alan J Friedman    afriedman@irell.com
- Steven M Garber    steve@smgarberlaw.com
- Christian J Gascou    cgascou@gascouhopkins.com
- Barry S Glaser    bglaser@swjlaw.com
- Robert P Goe    kmurphy@goeforlaw.com, rgoe@goeforlaw.com;mforsythe@goeforlaw.com
- Eric D Goldberg    egoldberg@stutman.com
- Richard H Golubow    rgolubow@winthropcouchot.com, pj@winthropcouchot.com
- Michael J Gomez    mgomez@frandzel.com, efiling@frandzel.com;sking@frandzel.com
- Kelly C Griffith    bkemail@harrisbeach.com
- Matthew Grimshaw    mgrimshaw@rutan.com
- Kavita Gupta    kgupta@winthropcouchot.com
- Asa S Hami    ahami@morganlewis.com

- Michael J Hauser    michael.hauser@usdoj.gov
- D Edward Hays    ehays@marshackhays.com
- Michael C Heinrichs    mheinrichs@omm.com
- Harry D. Hochman    hhochman@pszjlaw.com, hhochman@pszjlaw.com
- Jonathan M Hoff    jonathan.hoff@cwt.com
- Nancy Hotchkiss    nhotchkiss@trainorfairbrook.com
- Michelle Hribar    mhribar@rutan.com
- John J Immordino    john.immordino@wilsonelser.com, raquel.burgess@wilsonelser.com
- Lawrence A Jacobson    laj@cohenandjacobson.com
- Michael J Joyce    mjoyce@crosslaw.com
- Stephen M Judson    sjudson@fablaw.com
- Kaleb L Judy    ecf@kleinlaw.com, kjudy@kleinlaw.com
- Steven J Kahn    skahn@pszyjw.com
- Sheri Kanesaka    sheri.kanesaka@bryancave.com, theresa.macaulay@bryancave.com
- David I Katzen    katzen@ksfirm.com
- Christopher W Keegan    ckeegan@kirkland.com,
  shalimar.caltagirone@kirkland.com;alevin@kirkland.com
- Irene L Kiet    ikiet@hkclaw.com
- Claude F Kolm    claude.kolm@acgov.org
- Mark J Krone    mk@amclaw.com, crs@amclaw.com;amc@amclaw.com
- David B Lally    davidlallylaw@gmail.com
- Leib M Lerner    leib.lerner@alston.com
- Peter W Lianides    plianides@winthropcouchot.com, pj@winthropcouchot.com
- Charles Liu    cliu@marshackhays.com
- Charles Liu    cliu@winthropcouchot.com
- Ben H Logan    blogan@omm.com
- John W Lucas    jlucas@pszjlaw.com
- Kerri A Lyman    klyman@irell.com
- Mariam S Marshall    mmarshall@marshallramoslaw.com
- Robert C Martinez    rmartinez@mclex.com
- Michael D May    mdmayesq@verizon.net
- Hutchison B Meltzer    hmeltzer@wgllp.com
- Krikor J Meshefejian    kjm@lnbrb.com
- Joel S. Miliband    jmiliband@rusmiliband.com
- James M Miller    jmiller@millerbarondess.com,
  vgunderson@millerbarondess.com;smiller@millerbarondess.com;mpritikin@millerbarondess.com
- Louis R Miller    smiller@millerbarondess.com
- Craig Millet    cmillet@gibsondunn.com, pcrawford@gibsondunn.com;cmillet@gibsondunn.com
- Randall P Mroczynski    randym@cookseylaw.com
- Mike D Neue    mneue@thelobelfirm.com,
  jmattiace@thelobelfirm.com;pnelson@thelobelfirm.com
- Robert Nida    Rnida@castlelawoffice.com
- Henry H Oh    henry.oh@dlapiper.com, janet.curley@dlapiper.com
- Sean A Okeefe    sokeefe@okeefelc.com
- Robert B Orgel    rorgel@pszjlaw.com, rorgel@pszjlaw.com
- Malhar S Pagay    mpagay@pszjlaw.com, mpagay@pszjlaw.com
- Ernie Zachary Park    ernie.park@bewleylaw.com
- Daryl G Parker    dparker@pszjlaw.com
- Penelope Parmes    pparmes@rutan.com
- Robert J Pfister    rpfister@ktbslaw.com
- Ronald B Pierce    ronald.pierce@sdma.com
- Katherine C Piper    kpiper@steptoe.com, smcloughlin@steptoe.com
- Cassandra J Richey    cmartin@pprlaw.net

- Debra Riley    driley@allenmatkins.com
- James S Riley    tgarza@sierrafunds.com
- Todd C. Ringstad    becky@ringstadlaw.com
- R Grace Rodriguez    ecf@lorgr.com
- Martha E Romero    Romero@mromerolawfirm.com
- Ronald Rus    rrus@rusmiliband.com
- John P Schafer    jschafer@mandersonllp.com
- John E Schreiber    jschreiber@dl.com
- William D Schuster    bills@allieschuster.org
- Christopher P Simon    csimon@crosslaw.com
- Gerald N Sims    jerrys@psdslaw.com, bonniec@psdslaw.com
- Wendy W Smith    wendy@bindermalter.com
- Steven M Speier    Sspeier@Squarmilner.com, ca85@ecfcbis.com
- Steven M Speier (TR)    Sspeier@asrmanagement.com, ca85@ecfcbis.com
- Michael St James    ecf@stjames-law.com
- Michael K Sugar    msugar@irell.com
- Cathy Ta    cathy.ta@bbklaw.com, Arthur.Johnston@bbklaw.com;Kenneth.Burgess@bbklaw.com
- David A Tilem    davidtilem@tilemlaw.com, malissamurguia@tilemlaw.com;dianachau@tilemlaw.com;kmishigian@tilemlaw.com
- James E Till    jtill@thelobelfirm.com, jmattiace@thelobelfirm.com;pnelson@thelobelfirm.com
- United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov
- Carol G Unruh    cgunruh@sbcglobal.net
- Annie Verdries    verdries@lbbslaw.com
- Jason Wallach    jwallach@gladstonemichel.com
- Joshua D Wayser    , kim.johnson@kattenlaw.com
- Marc J Winthrop    mwinthrop@winthropcouchot.com, pj@winthropcouchot.com
- CDavid M Wiseblood    dwiseblood@seyfarth.com
- Brett K Wiseman    bwiseman@aalaws.com
- Laurel R Zaeske    lzaeske@rusmiliband.com
- Dean A Ziehl    dziehl@pszjlaw.com, dziehl@pszjlaw.com
- Marc A. Zimmerman    joshuasdaddy@att.net

E-MAIL SERVICE OF PARTIES OBJECTING TO PLANS

Attorneys for New Anaverde, LLC – Filiberto Agusti and Joshua Taylor – fagusti@steptoe.com; jrtaylor@step.com

Attorneys for County of Alameda Treasurer-Tax Collector – Claude F. Kolm – claude.kolm.acgov.org