PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1  Richard M. Pachulski (CA Bar No. 90073)
   Dean A. Ziehl (CA Bar No. 84529)
2  Robert B. Orgel (CA Bar No. 101875)
   John W. Lucas (CA Bar No. 271038)
3  PACHULSKI STANG ZIEHL & JONES LLP
   10100 Santa Monica Blvd., 13th Floor
4  Los Angeles, California  90067-4100
   Telephone: (310) 277-6910 / Facsimile: (310) 201-0760
5
   Edward Soto (admitted *pro hac vice*)
6  Alfredo R. Perez (admitted *pro hac vice*)
   WEIL, GOTSHAL & MANGES LLP
7  767 Fifth Avenue
   New York, NY  10153-0119
8  Telephone:  (212) 310-8000 / Facsimile:  (212) 310-8007

9  Attorneys for Lehman Commercial Paper Inc., Lehman ALI,
   Inc., Northlake Holdings LLC and OVC Holdings LLC
10
   William N. Lobel (CA Bar No. 93202)
11 Mike D. Neue (CA Bar No. 179303)
   THE LOBEL FIRM, LLP
12 840 Newport Center Drive, Suite 750
   Newport Beach, California  92660
13 Telephone: (949) 999-2860 / Facsimile: (949) 999-2870

14 General Insolvency Counsel for Steven M. Speier,
   the Chapter 11 Trustee for the Trustee Debtors
15
16          **UNITED STATES BANKRUPTCY COURT**
            **CENTRAL DISTRICT OF CALIFORNIA**
17               **SANTA ANA DIVISION**

18 In re:                                          Case No.: 8:08-bk-17206-ES
   Palmdale Hills Property, LLC, and its Related
19 Debtors,                                        Chapter 11
                      Jointly Administered Debtors
20                 and Debtors-In-Possession       Jointly Administered Case Nos.
                                                   8:08-bk-17209-ES; 8:08-bk-17240-ES;
21 Affects:                                        8:08-bk-17224-ES; 8:08-bk-17242-ES;
   ☐  All Debtors                                  8:08-bk-17225-ES; 8:08-bk-17245-ES;
22 ☑  Palmdale Hills Property, LLC                 8:08-bk-17227-ES; 8:08-bk-17246-ES;
   ☑  SunCal Beaumont Heights, LLC                 8:08-bk-17230-ES; 8:08-bk-17231-ES;
23 ☐  SCC/Palmdale, LLC                            8:08-bk-17236-ES; 8:08-bk-17248-ES;
   ☑  SunCal Johannson Ranch, LLC                  8:08-bk-17249-ES; 8:08-bk-17573-ES;
24 ☑  SunCal Summit Valley, LLC                    8:08-bk-17574-ES; 8:08-bk-17575-ES
   ☐  SunCal Emerald Meadows, LLC                  8:08-bk-17404-ES; 8:08-bk-17407-ES;
25 ☑  SunCal Bickford Ranch, LLC                   8:08-bk-17408-ES; 8:08-bk-17409-ES;
   ☑  Acton Estates, LLC                           8:08-bk-17458-ES; 8:08-bk-17465-ES;
26 ☑  Seven Brothers, LLC                          8:08-bk-17470-ES; 8:08-bk-17472-ES;
   ☐  SJD Partners, Ltd.                           and 8:08-bk-17588-ES
27 ☐  SJD Development Corp.
   ☑  Kirby Estates, LLC                           **MEMORANDUM OF POINTS AND**
28 ☑  SunCal Communities I, LLC                    **AUTHORITIES SUBMITTED BY:**
   ☑  SCC Communities LLC

1

☐  SunCal Communities III, LLC
☐  North Orange Del Rio Land, LLC

2

☑  Tesoro SF, LLC
☑  LB/L-SunCal Oak Valley, LLC

3

☑  SunCal Heartland, LLC
☑  LB/L-SunCal Northlake, LLC

4

☑  SunCal Marblehead, LLC
☐  SunCal Century City, LLC

5

☑  SunCal PSV, LLC
☑  Delta Coves Venture, LLC

6

☑  SunCal Torrance Properties, LLC
☑  SunCal Oak Knoll, LLC

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**(I) TRUSTEE AND LEHMAN
CREDITORS IN SUPPORT OF
CONFIRMATION OF THE *THIRD
AMENDED* JOINT CHAPTER 11
PLAN FOR EIGHT TRUSTEE
DEBTORS PROPOSED BY THE
TRUSTEE AND SUBJECT
LEHMAN CREDITORS; AND**

**(II) LEHMAN VD LENDERS IN
SUPPORT OF CONFIRMATION OF
THE *THIRD AMENDED* JOINT
CHAPTER 11 PLAN FOR ELEVEN
VOLUNTARY DEBTORS
PROPOSED BY THE LEHMAN VD
LENDERS**

**Hearing:**

Confirmation Hearing:
Date:        October 24, 2011
Time:        9:30 a.m.

Place:       Courtroom 5A
             411 West Fourth Street
             Santa Ana, CA  92701

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

# **TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ...................................................................................................... 1

II. THE PLANS COMPLY WITH ALL  OF THE APPLICABLE PROVISIONS OF 11
U.S.C. § 1129(A) AND (D) .......................................................................................... 4

    A.    The Plans Comply With Section 1129(a)(1) of the Bankruptcy Code ................... 4

        1.The Plans Properly Classify Claims and Interests – Section 1122 .................... 4

        2.The Plans Include Mandatory and Permissive Provisions Consistent with
        Section 1123(a) and (b) of the Bankruptcy Code ........................................... 7

    B.    The Plan Proponents Have Complied With the Applicable Provisions of
    Section 1129(a)(2) of the Bankruptcy Code ........................................................ 13

    C.    The Plans are Proposed in Good Faith and not by Means Forbidden by Law–
    Section 1123(a)(3) of the Bankruptcy Code ........................................................ 14

        1.The Plans are not an Attempt to Circumvent California's Anti-Deficiency
        Laws................................................................................................................ 15

        2.The Plan Releases are Consistent With the Bankruptcy Code ....................... 17

        3.Funding of Distributions Does Not Effectuate a De Facto Substantive
        Consolidation ................................................................................................. 17

    D.    Any and all Compensation of Professionals will be Made Pursuant to
    Bankruptcy Court Supervision as Required by Section 1129(a)(4) of the
    Bankruptcy Code ................................................................................................ 18

    E.    Post-Confirmation Management is Fully Disclosed and Satisfies Section
    1129(a)(5) of the Bankruptcy Code ..................................................................... 18

    F.    Plans do not Require Approval of any Regulatory Commission – Section
    1129(a)(6) of the Bankruptcy Code ..................................................................... 19

    G.    Plans Meet the "Best Interest of Creditors" Test – Section 1129(a)(7) of the
    Bankruptcy Code ................................................................................................ 19

        1.Best Interests Test – Trustee/Lehman Plan...................................................... 20

    H.    Acceptance of the Plan – Section 1129(a)(8) of the Bankruptcy Code ................. 27

    I.    Administrative Claims and Priority Claimants are Treated Appropriately
    Under the Plans – Section 1129(a)(9) of the Bankruptcy Code............................ 30

        1.Allowed Administrative Claims ...................................................................... 31

        2.Treatment of Priority Tax Claims. .................................................................. 32

        3.Treatment of Secured Real Property Tax Claims ........................................... 32

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

J.    Each of the Plans Have Been Accepted by at Least One Impaired Class –
Section 1129(a)(10) of the Bankruptcy Code ....................................................... 34

K.    The Plans are Feasible – Section 1129(a)(11) of the Bankruptcy Code ................ 34

    1. The Plan are Feasible ....................................................................... 35

    2. The Lehman Creditors Have the Necessary Cash to Satisfy the Lehman
    Plan Funding Obligations ................................................................ 35

    3. Conditions to Effectiveness of the Plans Do Not Raise Feasibility Issues ....... 35

L.    Bankruptcy Fees will Have Been Paid by the Effective Date – Section
1129(a)(12) of the Bankruptcy Code ...................................................... 36

M.    Sections 1129(a)(13), (14), (15), And (16) of the Bankruptcy Code are not
Applicable ....................................................................................... 36

N.    The Principal Purpose of the Plans are not Avoidance of Tax or Securities Act
Obligations – Section 1129(d) of the Bankruptcy Code ........................................ 37

III. SETTLEMENTS, INCLUDING OF THE SUNCAL ACTIONS, MAY BE
EFFECTUATED THROUGH THE PLANS .................................................................. 37

A.    Sections 1123 and 1129 of the Bankruptcy Code Permit Plans to Include
Settlements ....................................................................................... 37

B.    Standard for Permissible Settlements ................................................... 38

C.    The Consideration from the Lehman Creditors to the Estates and Other
Creditors to be Provided Under the Plans is Substantial ....................................... 39

IV. THE SUNCAL ACTIONS LACK MERIT .......................................................... 40

A.    SunCal Arguments – a Moving Target Over Time ................................. 41

    1. SunCal Actions .................................................................... 41

    2. SunCal Allegations ................................................................ 41

B.    The Courts Have Already Held That The LCPI Automatic Stay *Does* Apply In
the SunCal Bankruptcy Proceedings .................................................... 44

C.    There Was No Obligation to Close the Proposed Settlement Transactions
Because SunCal Failed To Satisfy The Conditions Precedent ............................... 45

    1. The Restructuring Agreement Establishes The Standard For Closing The
    Proposed Settlement Transactions ............................................... 45

    2. The Parties Agree To An Extension Of The Closing Conditions Deadline ..... 48

    3. The Parties Did Not Execute And Close The Proposed Settlement
    Transactions In August 2008 .......................................................... 50

    4. SunCal's Failure To Satisfy The Closing Conditions .................................... 53

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

5. SunCal's Attempted Initial Closing Was Improper Under the Terms of the Restructuring Agreement ........................................................ 62

6. The Lehman Entities Properly Terminated the Restructuring Agreement ....... 65

D. The Lehman Entities Funded Urgent Payables ....................................... 66

E. SunCal's Claims for Management Fees Cannot Succeed .................................... 71

F. No Lehman Entity Representative Involved in a SunCal Transaction Or Proposed Transaction Knew in August 2008 That There Would Be A Lehman Bankruptcy ........................................................................................ 71

G. The Repo Transaction is Authorized By the Operative Documents ..................... 72

1. The Repo Transaction ........................................................................ 72

2. The Repo Transaction Is Not A "Breach" Of Contract ................................. 73

3. LCPI Had the Ability to Consummate the Proposed Settlement Transactions ........................................................................................ 76

4. The Repo Transaction Could Have Been Unwound If The Closing Conditions Were Satisfied .............................................................. 78

H. The Claim to Avoid the Liens Securing the Guaranty of the Interim Loan Cannot Succeed .................................................................................. 81

I. The Motion to Disallow the Lehman Entities' Claims Under Section 502(d) is Meritless ........................................................................................ 85

V. THE PLANS SATISFY THE "CRAM DOWN" REQUIREMENTS OF SECTION 1129(B) OF THE BANKRUPTCY CODE WITH RESPECT TO REJECTING CLASSES OF THE APPLICABLE PLANS ...................................................... 88

A. The Plans Do Not Discriminate Unfairly ................................................... 89

1. The Plans Do Not Discriminate Unfairly ............................................... 90

B. The Plans are Fair and Equitable ........................................................... 92

1. The Plans are Fair and Equitable to Impaired General Unsecured Claims ....... 92

2. The Plans are Fair and Equitable to Impaired Interests .............................. 92

VI. THE PLANS SHOULD BE CONFIRMED OVER ALL OBJECTIONS ............. 93

VII. CONCLUSION ..................................................................................... 94

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*A & V 425 LLC Contracting Co. v. RFD 55th Street LLC*
830 N.Y.S.2d 637 (Sup.Ct. 2007) ........................................................................ 73

*Acequia, Inc. v. Clinton (In re Acequia, Inc.)*
787 F.2d 1352, 1358 (9th Cir. 1986) ............................................................... 15, 34

*Andrew v. Coopersmith (In re Downtown Inv. Club III)*
89 B.R. 59 (B.A.P. 9th Cir. 1988) ....................................................................... 13

*Atwood-Larson Co. v. Hasvold (In re Richmond Equity Exchange)*
280 F. 385 (8th Cir. 1922) .................................................................................. 86

*Beautiful Jewelers Private Limited, Mittal Court "A" Wing, 10th Floor, Nariman*
*Point, Mumbai, India 400021 v. Tiffany & Co. 727 Fifth Avenue*
2011 WL 4337108 (2d Cir. Sept. 16, 2011) ..................................................... 45, 74

*Black Car and Livery Ins., Inc. v. H & W Brokerage, Inc.*
813 N.Y.S.2d 751 (N.Y. App. Div. 2006) ............................................................ 73

*Cook Family Foods, Ltd. v. Voss*
781 F. Supp. 1458 (C.D. Cal. 1991) .................................................................... 73

*Cruden v. Bank of New York*
957 F.2d 961 (2d Cir. 1992) ............................................................................... 84

*Edge Group WAICCS LLC v. Sapir Group LLC*
705 F. Supp. 2d 304 (S.D.N.Y. 2010) ................................................................. 62

*Feder v. Lazar (In re Lazar)*
83 F.3d 306 (9th Cir. 1996) ............................................................................... 44

*First Invs. Corp. v. Liberty Mut. Ins. Co.*
152 F.3d 162 (2d Cir. 1998)) ............................................................................. 45

*Friedman v. Sheila Plotsky Brokers, Inc. (In re Friedman)*
126 B.R. 63 (BAP 9th Cir. 1991) ....................................................................... 44

*Henneberry v. Sumitomo Corp. of Am.*
No. 04 Civ. 2128, 2005 WL 991772 .................................................................. 73

*Henry v. Lehman Commercial Paper, Inc. (In re First Alliance Mortgage Co.)*
471 F.3d 977 (9th Cir. 2006) ............................................................................. 44

*Idaho Dep't of Lands v. Arnold (In re Arnold)*
806 F.2d 937 (9th Cir. 1986) ............................................................................. 27

*In re 11,111, Inc.*
117 B.R. 471 (Bankr. D. Minn. 1990) ................................................................ 89

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

*In re Ambanc La Mesa Ltd. P'ship*
115 F.3d 650 (9th Cir. 1997) ............................................................................. 19

*In re Arnold*
806 F.2d 937 (9th Cir. 1986) ............................................................................. 34

*In re Butler*
42 B.R. 777 (Bankr. E.D. Ark. 1984) ................................................................ 13

*In re Buttonwood Partners, Ltd.*
111 B.R. 57 (Bankr. S.D.N.Y. 1990) ................................................................. 90

*In re Consol. Capital Equities Corp.*
143 B.R. 80 (Bankr. N.D. Tex. 1992) ................................................................ 84

*In re DSBC Investments, L.L.C.*
2009 Bankr. LEXIS 2954 (Bankr. D. Ariz. Sept. 11, 2009) .............................. 88

*In re Entz-White Lumber & Supply, Inc.*
850 F.2d 1338 (9th Cir. 1988) ..................................................................... 33, 88

*In re Hoff*
54 B.R. 746 (Bankr. D.N.D. 1985) .................................................................... 13

*In re Jacks*
266 B.R. 728 (9th Cir. B.A.P. 2001) ................................................................. 82

*In re Jeffrey Bigelow Design Group, Inc.*
956 F.2d 479 (4th Cir. 1992)) ........................................................................... 84

*In re Johns-Manville Corp.*
68 B.R. 618 (Bankr. S.D.N.Y. 1986) ................................................................. 90

*In re Kemp*
134 B.R. 413 (E.D. Cal. 1991) .......................................................................... 34

*In re Koelbl*
751 F.2d 137 (2d Cir. 1984) .............................................................................. 15

*In re M. Long Arabians*
103 B.R. 211 (B.A.P. 9th Cir. 1989) ................................................................. 19

*In re Magnolia Gas Company, L.L.C.,*
255 B.R. 900 (Bankr. W.D. Okla. 2000) ........................................................... 86

*In re Martin Paint Stores*
199 B.R. 258 (Bankr. S.D.N.Y. 1996) ............................................................... 62

*In re Mcorp Fin., Inc.*
137 B.R. 219 (Bankr. S.D. Tex. 1992) .............................................................. 89

*In re MGS Marketing*
111 B.R. 264 (B.A.P. 9th Cir. 1990) ................................................................. 39

*In re N. Merch., Inc.*
371 F.3d 1056 (9th Cir. 2004) ........................................................................... 84

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

*In re Odom Antennas Inc.*,
   340 F.3d 705 (8th Cir. 2003) ................................................................. 86

*In re Ollag Constr. Equip. Corp.*
   578 F.2d 904 (2d Cir. 1978)............................................................... 83, 84

*In re Pajaro Dunes Rental Agency*
   174 B.R. 557 (Bankr. N.D. Cal. 1994). ................................................. 84

*In re Palmdale Hills Property*
   2011 Bankr. Lexis 3535 (BAP 9th Cir. August 10, 2011)...................... 73

*In re Palmdale Hills Property, LLC*
   --- F.3d --- at *4 (9th Cir. Aug. 3, 2011)....................................42, 45, 72

*In re Prime Motor Inns, Inc.*,
   135 B.R. 917 (Bankr. S.D. Fla. 1992) ................................................... 86

*In re Ruti-Sweetwater, Inc.*
   836 F.2d 1263 (10th Cir. 1988) ............................................................ 88

*In re Sierra Steel, Inc.*
   96 B.R. 275 (9th Cir. B.A.P. 1989)....................................................... 82

*In re Texaco, Inc.*
   84 B.R. 893 (Bankr. S.D.N.Y 1988) ..................................................... 13

*In re Toy & Sports Warehouse, Inc.*
   37 B.R. 141 (Bankr. S.D.N.Y. 1984) ...................................................... 4

*In re Trigem Am. Corp.*
   431 B.R. 855 (Bankr. C.D. Cal. 2010) .................................................. 84

*In re Tucson Self-Storage, Inc.*
   166 B.R. 892 (B.A.P. 9th Cir. 1994).................................................. 7, 89

*In re Victory Constr. Co., Inc.*
   42 B.R. 145 (Bankr. C.D. Cal. 1984) .................................................... 19

*In re Westgate California Corp.*
   642 F.2d 1174 (9th Cir. 1981) .............................................................. 66

*In re Xonics Photochemical, Inc.*
   841 F.2d 198 (7th Cir. 1988) ................................................................ 82

*Jasik v. Conrad (In re Jasik)*
   727 F.2d 1379 (5th Cir. 1984) .............................................................. 15

*Kane v. Johns-Manville Corp.*
   843 F.2d 636 (2d Cir. 1988).......................................................4, 15, 34

*Lehman Commercial Paper Inc. v. Palmdale Hills Property, LLC*
   *(In re Palmdale Hills Property, LLC)*
   423 B.R. 655 (B.A.P. 9th Cir. 2009)..................................................... 44

*Liberty National Enters. v. Ambanc La Mesa Ltd. P'ship*

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

*(In re Ambanc La Mesa Ltd. P'ship)*
115 F.3d 650 (9th Cir. 1997) ............................................................................. 92

*Martin v. Kane (In re A&C Properties)*
784 F.2d 1377 (9th Cir.) ..................................................................................... 38

*Martin v. Robinson*
479 U.S. 854 (1986) ............................................................................................ 38

*Mellon Bank, N.A. v. Metro Communications, Inc.*
945 F.2d 635 (3d Cir. 1991)t 649 ...................................................................... 83

*Mokava Corp. v. Dolan*
147 F.2d 340 (2d Cir. 1945) ................................................................................. 5

*Paloian v. LaSalle Bank, N.A.*
619 F.3d 688 (7th Cir. 2010) ............................................................................. 83

*Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*
390 U.S. 414, *reh'g denied*, 391 U.S. 909 (1968) .......................................... 38

*R.G. Group, Inc. v. Horn & Hadart Co.*
751 F.2d 69 (2d Cir. 1984) ................................................................................ 50

*Reprosystem, B.V. v. SCM Corp.*
727 F.2d 257 (2d Cir. 1984) .............................................................................. 50

*Ryan v. Louis (In re Corey)*
892 F.2d 829 (9th Cir. 1989) ............................................................................. 15

*Saccurato v. Masters, Inc. (In re Masters, Inc.)*
149 B.R. 289 (E.D.N.Y. 1992) .......................................................................... 61

*Sloan v. Kubitsky*
712 A.2d 966 (Conn. App. Ct. 1998) ................................................................ 74

*Smith v. Fitzsimmons*
584 N.Y.S.2d 692 (App. Div., 4th Dept. 1992)) ............................................... 73

*Steelcase v. Johnston (In re Johnston)*
21 F.3d 323 (9th Cir. 1994) ................................................................................. 6

*Stolrow v. Stolrow's, Inc. (In re Stolrow's Inc.)*
84 B.R. 167, (B.A.P. 9th Cir. 1988) .................................................................. 15

*Stoombus v. Kilimark*
988 F.2d 949 (9th Cir. 1993) ............................................................................. 66

*Travelers Ins. Co. v. Pikes Peak Water Co. (In re Pikes Peak Water Co.)*
779 F.2d 1456 (10th Cir. 1985) ......................................................................... 19

*United States v. Alaska National Bank (In re Walsh Construction, Inc.)*
669 F.2d 1325 (9th Cir. 1982) ........................................................................... 39

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

*Woodson v. Fireman's Fund Insur. Co. (In re Woodson)*
    839 F.2d 610 (9th Cir. 1988) .................................................................................. 39


## <u>STATUTES</u>

California Civil Code § 3439.08(d) ........................................................................... 87

11 U.S.C. § 301(b) ................................................................................................... 61

11 U.S.C. § 363(b)(1) ............................................................................................... 61

11 U.S.C. § 507 .......................................................................................................... 5

11 U.S.C. § 507(a)(2) ............................................................................................... 36

11 U.S.C. § 507(a)(8) ........................................................................................... 7, 31

11 U.S.C. § 511 ........................................................................................................ 33

11 U.S.C. § 1122 ................................................................................................. 4, 13

11 U.S.C. § 1123 ................................................................................................. 4, 13

11 U.S.C. § 1123(a) ................................................................................................... 7

11 U.S. C. § 1123(a)(1) ..................................................................................... 7, 31

11 U.S.C. § 1123(a)(3) ............................................................................................... 8

11 U.S.C. § 1123(a)(3)(A) ...................................................................................... 38

11 U.S.C. § 1123(a)(6) ............................................................................................ 10

11 U.S.C. § 1123(b) ................................................................................................. 10

11 U.S.C. § 1123(b)(6) ............................................................................................. 8

11 U.S.C. § 1124(2) ................................................................................................. 33

11 U.S.C. § 1125 ..................................................................................................... 14

11 U.S.C. § 1125(b) ................................................................................................. 13

11 U.S.C. § 1126 ............................................................................................... 28, 30

11 U.S.C. § 1126(a) ................................................................................................. 27

11 U.S.C. § 1126(c) ................................................................................................. 27

11 U.S.C. § 1128(a)(8) ............................................................................................ 88

11 U.S.C. § 1129 ....................................................................................................... 4

11 U.S.C. § 1129(a) ................................................................................................... 4

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

11 U.S.C. § 1129(a)(1)..............................................................................................4, 13, 37

11 U.S.C. § 1129(a)(3) .................................................................................................14, 18

11 U.S.C. § 1129(a)(7)..................................................................................................19, 27

11 U.S.C. §1129(a)(8)...................................................................................27, 28, 30, 34

11 U.S.C. § 1129(a)(9) ........................................................................................................30

11 U.S.C. §  1129(a)(9)(A) .................................................................................................32

11 U.S.C. § 1129(a)(9)(B) ....................................................................................................5

11 U.S.C. §  1129(a)(9)(C) .................................................................................................32

11 U.S.C. § 1129(a)(9)(D) ..............................................................................7, 31, 33, 34

11 U.S.C. §1129(a)(10)........................................................................................................34

11 U.S.C. § 1129(a)(11) ................................................................................................34, 36

11 U.S.C. § 1129(a)(12) .......................................................................................................36

11 U.S.C. § 1129(a)(13) ................................................................................................36, 37

11 U.S.C. § 1129(a)(14) .......................................................................................................37

11 U.S.C. § 1129(a)(15) .......................................................................................................37

11 U.S.C. § 1129(a)(16) .......................................................................................................37

11 U.S.C. § 1129(b) ...............................................................................................88, 89, 92

11 U.S.C. § 1129(b)(1) .........................................................................................................89

11 U.S.C. § 1129(b)(2)(B)(ii) .............................................................................................92

11 U.S.C. § 1129(d) .............................................................................................................37

## OTHER AUTHORITIES

5 *Collier on Bankruptcy* ¶ 1129.03 [1129-111]............................................................89

5 *Collier on Bankruptcy* ¶ 1129.03 [1129-79]...............................................................89

7 *Collier on Bankruptcy*, ¶1129.03[1] (15th ed. rev.)....................................................4

7 *Collier on Bankruptcy*, ¶1129.03[2] (15th ed. rev.)..................................................13

H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 412 (1977) ........................................4, 13

S. Rep. No. 95-989, 95th Cong. 2d Sess. 126 (1978) .......................................................13

S. Rep. No. 95-989, 9th Cong., 2d Sess. 126 (1978) ....................................................................... 4

Section 1122(a) of the Bankruptcy Code ....................................................................................... 4

**<u>RULES</u>**

Bankruptcy Rule 3020(b)(2) .......................................................................................................... 14

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1   This memorandum is submitted: (I) by Steven M. Speier, Chapter 11 Trustee (the "Trustee")

2   and Lehman Commercial Paper Inc. ("LCPI"), Lehman ALI, Inc. ("Lehman ALI"), Northlake

3   Holdings LLC ("Northlake"), and OVC Holdings LLC ("OVC" and, together with LCPI, Lehman

4   ALI and Northlake, the "Lehman Creditors" and, together with the Trustee, the "TD Plan

5   Proponents") in support of confirmation of the *Third Amended Joint Plan for Eight Trustee Debtors*

6   *Proposed by the Trustee and Subject Lehman Creditors* (the "Trustee/Lehman Plan"),[1] and (II) by

7   LCPI and Lehman ALI (the "Lehman VD Lenders" and, together with the TD Plan Proponents, the

8   "Plan Proponents") in support of confirmation of the *Third Amended Joint Chapter 11 Plan for*

9   *Eleven Voluntary Debtors Proposed by the Lehman VD Lenders* (the "Lehman VD Plan"[2] and

10  together with the Trustee/Lehman Plan, the "Plans").[3]

# I.

# **INTRODUCTION**

The Lehman Creditors, in various capacities, are owed approximately $1.8 billion, secured

primarily by deeds of trust on the real property assets (which are the Plan Projects) of debtors subject

to the Plans (the "Plan Debtors") and secured by pledges of the equity interests of the Group II

Debtors subject to the Lehman VD Plan.  By far, the Lehman Creditors are these estates' largest

Creditors.  Unfortunately for all concerned, the Lehman Creditors' collateral is worth substantially

less than their Claims.  Because the Lehman Creditors appreciate that, for the foreseeable future, the

Trustee and Plan Debtors have no and will have no ability either to pay the full amount of the debt

owed to the Lehman Creditors giving rise to the Lehman Secured Claims or, without additional

funding, to develop or even maintain the Plan Projects, the Lehman Creditors want ownership of all

---

[1]  The Trustee debtors are:  SunCal Heartland LLC; LB/L-SunCal Northlake LLC; SunCal Marblehead LLC; SunCal Century City, LLC; SunCal PSV, LLC; Delta Coves Venture LLC; SunCal Torrance Properties LLC; LB/L SunCal Oak Valley LLC; and SunCal Oak Knoll, LLC (collectively, the "Trustee Debtors").

[2]  The voluntary debtors are:  Palmdale Hills Property, LLC, Acton Estates, LLC; Kirby Estates, LLC; North Orange Del Rio Land, LLC; SCC Communities LLC; SCC/Palmdale, LLC; Seven Brothers LLC; SJD Development Corp.; SJD Partners, Ltd.; SunCal Beaumont Heights, LLC; SunCal Bickford Ranch LLC; SunCal Communities I, LLC; SunCal Communities III, LLC; SunCal Emerald Meadows LLC; SunCal Johannson Ranch LLC; SunCal Summit Valley LLC; and Tesoro SF LLC (collectively, the "Voluntary Debtors" and together with the Trustee Debtors, the "Debtors").

[3]  Capitalized terms not otherwise defined herein shall have the meaning ascribed in the applicable Plan and Disclosure Statement.

1  Plan Projects.  Thus, upon Confirmation of the Plans, among other things, ownership of the Plan

2  Projects will be conveyed to the designees of the Lehman Creditors (the Lehman Nominees).  In

3  exchange, the Lehman Creditors will pay substantial sums for the benefit of other Creditors through

4  the Lehman Plan Funding under the Plans, as and to the extent provided under the Plans.

5  Under the Plans, as part of the consideration for the conveyance of the Plan Projects to the

6  Lehman Nominees, the Lehman Creditors will provide the Lehman Plan Funding, which has been

7  estimated to approximate almost $92 million, not including the payments to be made under the

8  Settling Bond Issuer Agreements.  The Lehman Plan Funding includes the Lehman Post-

9  Confirmation Expense Funding (*i.e.*, to fund up to an aggregate of $1,000,000 of Post-Confirmation

10  Expenses incurred during the 2 years following each Plans' Effective Date) and amounts to fund

11  payments to creditors (the Lehman Creditor Distribution Funding), including to the Lehman

12  Creditors (for repayment of approximately $38 million in post-petition loans to Estates of Trustee

13  Debtors).

14  After the Lehman Creditors, the next largest Creditors of these estates are the Bond Issuers,

15  Arch and Bond Safeguard.  The Bond Issuers hold liquidated current Claims and contingent Claims

16  for indemnification relating to Future Work that they bonded and that municipalities or utilities

17  could require to be performed, *e.g.*, under bonded subdivision improvement agreements, collectively

18  in the tens of millions of dollars.  In addition to committing to the Lehman Creditor Distribution

19  Funding for other Creditors, the Lehman Creditors are on track to finalize, before confirmation of

20  the Plans, Settling Bond Issuer Agreements with and for the Bond Issuers, as described in the Plans,

21  under which, among other things, the large, contingent Claims of the Bond Issuers relating to Future

22  Work would not have any dilutive effect on recoveries for other Creditors.  Under these agreements,

23  the Lehman Creditors would arrange for the Lehman Nominees, taking title to Plan Projects for

24  which Project Bond were issued, to pay expected amounts of at least several millions of dollars

25  (based upon presently unliquidated, contingent amounts, essentially capped by the aggregate face

26  amount of the outstanding Project Bonds totaling in excess of one hundred million dollars).

27  The Plans are designed to enable a reasonable resolution of the financial distress of the Plan

28  Debtors and of the delay and cost attendant to the continuation of the Plan Debtors' Cases absent

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1   Confirmation of a plan as to them.  In all, under the Plans, the Plan Proponents believe that other

2   Creditors will receive as much or more than they would if the Cases were converted to cases under

3   chapter 7 of the Bankruptcy Code.  As importantly, however, the Plan Proponents believe that, under

4   the Plans, Creditors will receive payment much sooner than if the Plans were not confirmed.

5       Simultaneously with the solicitation of votes in respect of the Plans, SCC Acquisitions, Inc.

6   and the Voluntary Debtors (the "SunCal Plan Proponents") were soliciting acceptances to seven

7   plans (the "SunCal Plans") with respect certain of the above-captioned Debtors.  The Trustee and

8   Lehman Creditors do not believe that the SunCal Plans are confirmable. In any event, unlike the Plan

9   Proponents' Plans, the SunCal Plans do nothing to promptly resolve SunCal's pending Claim

10  objections and lawsuits, including, particularly, subordination claims against the Lehman Creditors

11  (the "SunCal Actions").

12      For all pending plans, September 19, 2011 was the deadline for voting.

13      **For the Trustee/Lehman Plan, all of the voting classes (Trustee/Lehman Plan Classes 2,**

14  **6, 7, and 8) voted to accept the Trustee/Lehman Plan.**  *See Declaration of Maria A. Bove with*

15  *Respect to the Tabulation of Votes on the Third Amended Joint Chapter 11 Plan for Eight Trustee*

16  *Debtors Proposed by the Trustee and Lehman Creditors*, filed concurrently herewith, which includes

17  a tabulation of the ballots cast in favor of and in opposition to the Trustee/Lehman Plan (the

18  "Trustee/Lehman Ballot Summary Certification").

19      **For the Lehman VD Plan, all of the voting classes (Lehman VD Plan Classes 2, 6, 7, 8**

20  **and 9), to the extent that they are believed to contain Claims, voted to accept the Lehman VD**

21  **Plan for all of the Plan Debtors, except as follows:  SCC Communities Class 7.4 rejected the**

22  **Lehman VD Plan.**  The Lehman VD Lenders request that the Court confirm the Lehman VD Plan

23  as to SCC Communities notwithstanding the non-acceptance of Class 7 therein.  *See Declaration of*

24  *Maria A. Bove with Respect to the Tabulation of Votes on the Third Amended Joint Chapter 11 Plan*

25  *for Eleven Voluntary Debtors Proposed by the Lehman VD Lenders*, filed concurrently herewith,

26  which includes a tabulation of the ballots cast in favor of and in opposition to the Lehman VD Plan

27  (the "Lehman VD Ballot Summary Certification" and together with the Trustee/Lehman Ballot

28  Summary Certification, the "Ballot Certifications").

1    This Memorandum presents a comprehensive analysis of the grounds for confirmation of the

2    Plans.  Together with the Ballot Certifications and certain declarations filed contemporaneously

3    herewith, this Memorandum demonstrates that the Plans comply with the applicable provisions of

4    the Bankruptcy Code and Bankruptcy Rules, and provides the legal and evidentiary basis necessary

5    for the Bankruptcy Court to confirm the Plans pursuant to section 1129 of the Bankruptcy Code.

**II.**

**THE PLANS COMPLY WITH ALL**

**OF THE APPLICABLE PROVISIONS OF 11 U.S.C. § 1129(A) AND (D)**

As set forth more fully below, all of the applicable requirements of section 1129(a) and (d) of

the Bankruptcy Code are satisfied.

**A.    The Plans Comply With Section 1129(a)(1) of the Bankruptcy Code**

Section 1129(a) of the Bankruptcy Code provides that a court may confirm a plan only if all

requirements of section 1129 are satisfied, including that "[t]he plan complies with the applicable

provisions of this title."  11 U.S.C. § 1129(a)(1).  The legislative history of section 1129(a)(1)

explains that this provision incorporates the requirements of sections 1122 and 1123 of the

Bankruptcy Code, which govern classifications of claims and interests and the contents of a plan of

reorganization.  H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 412 (1977); S. Rep. No. 95-989, 9th

Cong., 2d Sess. 126 (1978).  *See Kane v. Johns-Manville Corp.*, 843 F.2d 636, 648-49 (2d Cir.

1988); *In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 149 (Bankr. S.D.N.Y. 1984); 7 *Collier on*

*Bankruptcy*, ¶1129.03[1] (15th ed. rev.).  For the reasons set forth below, the Plans satisfy these

requirements.

1.    The Plans Properly Classify Claims and Interests – Section 1122

Section 1122(a) of the Bankruptcy Code requires that a plan "place a claim or an interest in a

particular class only if such claim or interest is substantially similar to other claims or interests of

such class."  The Trustee/Lehman Plan contains eight (8) classes of Claims and one (1) class of

Interests with respect to the TD Plan Debtors and each class is broken into subclasses that

correspond to each TD Plan Debtor.  The VD Lender Plan contains nine (9) classes of Claims and

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

one (1) class of Interests with respect to the VD Plan Debtors and each class is broken into subclasses that correspond to each VD Plan Debtor.  Solely for purposes of convenience, the Plan Proponents will refer to the classes collectively (*e.g.*, Class 1 will generally refer to Classes 1.1 through 1.8).  However, the Plan Proponents will only refer to the subclasses as necessary.

As discussed below, the Plan Proponents, as applicable, submit that the Plans' classification of Claims and Interests is appropriate under the Bankruptcy Code.

i.    Classes 1 through 4 of each Plan consists of Secured Claims.  For purposes of distributions under these classes of the Plans, each holder of an Allowed Secured Claim is considered to be in its own separate subclass within the identified larger class.  Each subclass is deemed to be a separate Class for all purposes under the applicable Plan.  The Allowed Secured Claims in such classes are separately classified because the different collateral or priority for each Claim results in different rights for each holder and, based on such unique collateral, such Claims are not similar to any other type of Claim and are therefore appropriately separately classified.  *See Mokava Corp. v. Dolan*, 147 F.2d 340 (2d Cir. 1945).

ii.    Class 5 of each Plan consists of Priority Claims.  For purposes of distributions under the Plans, the Allowed Priority Claims against each Debtor are in a separate subclass of Priority Claims.  Each such subclass is deemed to be a separate Class for all purposes under the Plans.  The Priority Claims in Class 5 must be separately classified because, by virtue of the mandatory treatment of such Claims under sections 507 and 1129(a)(9)(B) of the Bankruptcy Code, these claims are not substantially similar to general unsecured claims and must be paid in full on the Effective Date or in accordance with section 1129(a)(9)(B) of the Bankruptcy Code.

iii.    Class 6 of the Trustee/Lehman Plan and as to Group I Debtors of the Lehman VD Plan consists of Reliance Claims.  For purposes of distributions, the Allowed Reliance Claims against each Debtor are in a separate subclass of Reliance Claims.  Each such subclass is deemed to be a separate Class for all purposes under the Plans.  Reliance Claims are certain non-priority, unsecured Claims that meet what the Lehman Creditors view as the threshold characteristics for at least their potential exposure for such Claims and are offered a 40-50% recovery through the Lehman Distribution Enhancement for execution of a Creditor's Assignment/Release for Lehman.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1   The features distinguishing General Unsecured Claims from Reliance Claims, as more fully reflected

2   in the definitions of each, are set forth in greater detail in the Disclosure Statements in support of the

3   Plans.  For those reasons, the Reliance Claims in Class 6 are appropriately separately classified.

4   *Steelcase v. Johnston* (*In re Johnston*), 21 F.3d 323, 328 (9th Cir. 1994).

5                  iv.      Class 7 of the Trustee/Lehman Plan and as to Group I Debtors of the

6   Lehman VD Plan consists of General Unsecured Claims.  For purposes of distributions, the Allowed

7   General Unsecured Claims against each Debtor are in a separate subclass of General Unsecured

8   Claims.  Each such subclass is deemed to be a separate Class for all purposes under the Plans.  The

9   General Unsecured Claims in Class 7 are appropriately separately classified because they are certain

10  non-priority, unsecured Claims that lack what the Lehman Creditors view as the threshold

11  characteristics for their potential litigation exposure and, thus, are offered 5% through the Lehman

12  Distribution Enhancement for execution of a Creditor's Assignment/Release for Lehman. For those

13  reasons, the General Unsecured Claims are appropriately separately classified.

14                 v.       Class 8 of the Trustee/Lehman Plan and Class 9 of the Lehman VD

15  Plan consist of Settling Bond Issuer-Related Future Work Claims.  For purposes of distributions, the

16  Allowed Settling Bond Issuer-Related Future Work Claim in Class 8 of the Trustee/Lehman Plan

17  against each TD Plan Debtor and Allowed Settling Bond Issuer-Related Future Work Claim in Class

18  9 of the Lehman VD Plan against each VD Plan Debtor are in a separate subclass of Settling Bond

19  Issuer-Related Future Work Claims.  Each such subclass is deemed to be a separate Class for all

20  purposes under the Plans.  The Settling Bond Issuer-Related Future Work Claims are appropriately

21  separately classified because they are certain non-priority, unsecured, bonded Claims of bond

22  beneficiaries (or Bond Issuer indemnity claims) for Future Work (*i.e.*, work that was <u>not</u> performed

23  or otherwise provided as of the applicable Plan's Effective Date) and the Plans offer them treatment

24  tailored to their non-current nature and in light of the fact that the Claims are bonded.

25                 vi.      Class 8 of the Lehman VD Plan consists of General Unsecured Claims

26  against the Group II Debtors.  For purposes of distributions under the Lehman VD Plan, Allowed

27  General Unsecured Claims against each Group II Debtor is considered to be in a separate subclass of

28  General Unsecured Claims.  Each such subclass is deemed to be a separate Class for all purposes

1    under the Lehman VD Plan.  The General Unsecured Claims against Group II Debtors in Class 8 are

2    the only class of non-priority, unsecured Claims against Group II Debtors and must be separately

3    classified because they lack any contract or statutory rights entitling them to priority or security in or

4    against the applicable VD Plan Debtors or their property.

5                    vii.    Class 9 of the Trustee/Lehman Plan and Class 10 of the Lehman VD

6    Plan consists of Interests.  Allowed Interests in Class 9 of the Trustee/Lehman Plan against each TD

7    Plan Debtor and Allowed Interests in Class 10 of the Lehman VD Plan against each VD Plan Debtor

8    are considered to be in a separate subclass of Interests.  Each such subclass is deemed to be a

9    separate Class for all purposes under the Plans.  The Interests must be separately classified because

10   distributions to holders of Interests are not permitted unless and until all Creditors are paid in full.

11   *See In re Tucson Self-Storage, Inc.*, 166 B.R. 892, 899 (B.A.P. 9th Cir.1994).

12

13           2.      The Plans Include Mandatory and Permissive Provisions

14                   Consistent with Section 1123(a) and (b) of the Bankruptcy Code

15               a.      The Plans Comply with the Mandatory

16                       Provisions of Section 1123(a) of the Bankruptcy Code

17           Section 1123(a) of the Bankruptcy Code sets forth certain provisions that a debtor's plan

18   must contain, as set forth below:

19                   i.      Paragraph (1) of section 1123(a) requires that a plan designate classes

20   of claims other than claims of a priority specified in subparagraphs 2, 3, and 8 of section 507(a) of

21   the Bankruptcy Code.  Article V of the Plans satisfy this requirement by designating all classes of

22   Claims and Interests other than the specified claims, which are identified in the Plans as

23   Administrative Claims and Priority Tax Claims in Article IV.[4]

24

25

26

27   [4]  The Plan Proponents classified Secured Real Property Tax Claims for administrative convenience.  The holders of
     Secured Real Property Tax Claims are unimpaired because their treatment is determined by sections 507(a)(8),
     1123(a)(1), and 1129(a)(9)(D) of the Bankruptcy Code.  The holders of such claims are not entitled to vote and the
28   classification does not have any legal significance, consequently, it is consistent with the requirements prescribed by
     section 1123(a)(1) of the Bankruptcy Code.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1      ii.  Paragraph (2) of section 1123(a) requires that a plan specify those

2 classes of claims or interests that are not impaired.  Article V of the Plans specifies the treatment of

3 Classes 1, 3, 4, and 5 as being unimpaired.

4      iii.  Paragraph (3) of section 1123(a) requires that a plan specify the

5 treatment of any class of claims or interests that is impaired under the plan.  Article V of the

6 Lehman/Trustee Plan specifies the treatment of Classes 2, 5, 7, 8, and 9 as being impaired.  Article V

7 of the Lehman VD Plan specifies the treatment of Classes 2, 5, 7, 8, 9, and 10 as being impaired.

8      iv.  Paragraph (4) of section 1123(a) requires that a plan provide the same

9 treatment for each claim or interest of a particular class, unless the holder agrees to a less favorable

10 treatment of such particular claim or interest.  As shown by Article V, the Plans provide for the same

11 treatment of claims and interests within each Class, unless the holder has agreed to a less favorable

12 treatment.  All holders of Allowed Claims in Class 6 of the Plans were afforded the opportunity to

13 elect to resolve certain claims such holders may have against the Lehman Released Parties (some

14 jointly with the applicable Plan Debtor's estate) by providing a voluntary release to such parties in

15 exchange for the Lehman Distribution Enhancement, thereby increasing their recovery from 1% to

16 40-50% of their Allowed Claims.  This treatment is consistent with sections 1123(a)(3) and

17 1123(b)(6) of the Bankruptcy Code.

18      v.  Paragraph (5) of section 1123(a) requires that a plan provide adequate

19 means for its implementation.  Article VIII of the Plans describe the means for the execution and

20 implementation of the Plan's provisions.  Among other things, the Trustee/Lehman Plan provides for

21 (a) the appointment of the Liquidating Trustee to oversee distributions to creditors (Section 8.2),

22 (b) funding of distribution to creditors, post-confirmation expenses, and reserves (Section 8.4),

23 (c) vesting of assets (Section 8.5), (d) disposition and value of assets (Section 8.6), (e) settlement of

24 Bond Issuer Claims (Section 8.7), (e) voluntary and Plan releases (Section 8.8), and (f) dissolution of

25 the Trustee Committee and entry of final decree (Section 8.9 & 8.10).  Among other things, Article

26 VIII of the Lehman VD Plan provides for (1) the appointment of the Liquidating Trustee to oversee

27 distributions to creditors (Section 8.2), (2) funding of distribution to creditors and reserves (Section

28 8.4), (3) post-confirmation expenses (Section 8.5), (4) vesting of assets (Section 8.6), (5) disposition

and value of assets (Section 8.7), (6) settlement of Bond Issuer claims (Section 8.8), (7) voluntary and Plan releases (Section 8.9), and (8) dissolution of Voluntary Committee and entry of final decree (Section 8.10 & 8.11).

vi.     Paragraph (6) of section 1123(a) requires that a plan provide for the inclusion in the charter of a corporate debtor a provision prohibiting the issuance of nonvoting equity securities, and providing, as to the several classes of securities possessing voting power, an appropriate distribution of such power among such classes.  The inclusion of a provision in the charters of each of the Debtors is not necessary because the Plan Debtors' assets are being liquidated to pay creditors holding Allowed Claims (Article VIII of the Plans).

vii.     Paragraph (7) of section 1123(a) requires that a plan contain only provisions that are consistent with the interests of creditors, equity security holders and public policy with respect to the manner of selection of any officer, director or trustee under the plan and any successor thereto.  The Plans fulfills this requirement because the Trustee has agreed to be the Liquidating Trustee under the Plans.

viii.     Paragraph (8) of section 1123(a) applies to cases involving individuals and, therefore, is not applicable to the Plans.

        b.     The Plans Contain Permissive Provisions

               Consistent With Section 1123(b) of the Bankruptcy Code

Section 1123(b) of the Bankruptcy Code specifies certain permissive provisions that may appear in a plan:

i.     Paragraph (1) of section 1123(b) provides that a plan may impair or leave unimpaired any class of claims, whether secured or unsecured.  Article V of the Plans specify the treatment of each Class under the Plans.

ii.     Paragraph (2) of section 1123(b) specifies that, subject to section 365 of the Bankruptcy Code, a plan may provide for the assumption, rejection or assignment of any executory contract or unexpired lease not previously rejected.  Article XI of the Plans contain such provisions including (a) the identification of executory contracts and unexpired leases to be assumed

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

or rejected, (b) cure rights, and (c) the establishment of a bar date to file claims arising from

rejection damages.

    iii.  Paragraph (3) of section 1123(b) specifies that a plan may provide for

"the settlement or adjustment of any claim or interest belonging to the debtor or to the estate" or "the

retention and enforcement by the debtor, by the trustee, or by a representative of the estate appointed

for such purpose, of any such claim or interest."  Article VII of the Plans (Section 8.8 of

Trustee/Lehman Plan and Section 8.9 of Lehman VD Plan), provides that in exchange for the

Lehman Plan Funding, the Estate of each Plan Debtor releases the Lehman Released Claims against

the Lehman Released Parties.  The basis for and reasonableness of this settlement is discussed in

greater detail in Articles III and IV.

    iv.  Paragraph (4) of section 1123(b) specifies that a plan may provide for

the sale of all or substantially all of the property of the estates, and the distribution of the proceeds of

such sale among holders of claims or interests.  Pursuant to Section 8.2 of the Plans, the Liquidating

Trustee will be empowered to sell and otherwise liquidate Remaining Other Assets as necessary to

effectuate distributions under the Plans.  Also, conveyances of the Plan Projects also are provided

under the Plans as part of the treatment of the Lehman Secured Claims and overall compromise set

forth in the Plans in accordance with Bankruptcy Code § 1123(a)(6).

    v.  Paragraph (5) of section 1123(b) allows a plan to "modify the rights of

holders of secured claims, other than a claim secured only by a security interest in real property that

is the debtor's principal residence, or of holders of unsecured claims, or leave unaffected the rights

of holders of any class of claims."  Article V of the Plans contains provisions that permissibly

modify the rights of certain classes of Secured Claims.

    vi.  Paragraph (6) of section 1123(b) specifies that a plan may include any

other provisions not inconsistent with the applicable provisions of the Bankruptcy Code.  The Plans

contain many such provisions that are standard in chapter 11 plans or otherwise consistent with the

purposes of the Bankruptcy Code.  The Plan Proponents believe that all such provisions are

permissible under section 1123(b)(6) of the Bankruptcy Code. Specifically, by example:

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

a)      Articles VI & VIII of the Plans (*e.g.*, Sections 6.6 & 6.7 of the Plans, Section 8.8 of Trustee/Lehman Plan & Section 8.9 of Lehman VD Plan), provide that in exchange for the Lehman Distribution Enhancement, whether or not the Creditor votes in favor of the Plans, each Creditor who holds a Reliance Claim or General Unsecured Claim and checks the appropriate box on its Ballot (and / or timely executes and delivers a separate, written assignment and/or release), assigns to a Lehman Creditor and/or releases all rights of the assigning Holder with respect to each of such Holder's Reliance Claims, General Unsecured Claims, and, if any, Lehman Released Claims (except as specified) in exchange for the Lehman Distribution Enhancement, which increases its Distribution from 1% to 5% (General Unsecured Claims) or 40-50% (Reliance Claims). The basis for and reasonableness of this settlement is discussed in greater detail in Articles III and IV.

b)      Section 6.2 of the Plans provides for a conveyance and transfer of the Plan Projects and other collateral to the Lehman Nominees as part of the overall resolution of issues proposed by the Plans, including the SunCal Actions, *e.g.*, partially for (1) the Lehman Secured Claims, to the extent modified by the Plans, (2) the Lehman Plan Funding, and (3) the other obligations under the Plans of the Lehman Creditors.

c)      Article VIII of the Plans (Sections 8.4 of the Plans, Section 8.7 of Trustee/Lehman Plan, & Section 8.8 of Lehman VD Plan), reflect that the Lehman Creditors anticipate arranging for execution with the Bond Issuers of a Settling Bond Issuer Agreement related to Claims under the Plans and that this is part of the Lehman Plan Funding. Absent the Plans and/or a settlement with each of the Bond Issuers, the Plan Proponents believe that their Claims would be dilutive, non-priority, unsecured Claims. Because of their potential size, reserves for them could delay meaningful distributions to other Creditors and payment to them could substantially affect *pro rata* payments. One or both Bond Issuers have contended, instead, that: (i) should a Bond Issuer be required to pay or perform under a Project Bond because of a demand from a municipality that is the beneficiary of the Project Bond, the costs for improving the subject Plan Project can be recovered upon sale or transfer of the Plan Project from its subsequent owner; and (ii) absent consent of the applicable Bond Issuer, the Project Bonds must be replaced on sale or transfer of each applicable

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Plan Project. The Plan Proponents dispute that the Bond Issuers are entitled to full 100% payment

for all of their Claims. Certainly, such Claims are not secured by the Plan Projects, such that, absent

the Lehman Creditors' consent, the Plan Projects must be sold under terms that would not trade off a

reduction in purchase price for some accommodation as to the Bond Issuers' Claims. Yet, to the

benefit of other Creditors, in connection with the conveyance of the Plan Projects under the Plans,

the Lehman Creditors, to facilitate Confirmation of the Plans, are arranging, under each Settling

Bond Issuer Agreement and as part of the Lehman Plan Funding and through the structure of the

Plans, that there will be little or no dilutive effect to other Creditors from the large Claims of the

Bond Issuers.

Specifically, the Lehman Nominee that takes title to a Plan Project for which Future Work

Bonds were issued and remain outstanding as of the Effective Date, *inter alia*, will reimburse and or

commit to reimburse such Settling Bond Issuer for all or a portion of the Settling Bond Issuer-

Incurred Future Work Obligations arising in connection with the satisfaction of such Settling Bond

Issuer's obligations to Bond-Backed Claimants under Future Work Bonds issued by such Settling

Bond Issuer and related to such Allowed Claims as will be provided in the Settling Bond Issuer

Agreements and may agree to other terms, including with respect to bond premiums, replacement of

bonds and others. In turn, the applicable Settling Bond Issuer will agree that such Settling Bond

Issuer, itself, will not receive the full amount otherwise due under the applicable Plan from the

applicable Debtor's Estates with respect to the Settling Bond Issuer-Owned Claims or any other

Claims it may have (provided that, with respect to Settling Bond Issuer-Owned Future Work

Claims, it will receive the applicable cooperation and reimbursement from the applicable Lehman

Nominees and the applicable Future Work Obligation Collateral). Moreover, the Lehman Creditors

have absorbed the risk to Creditors from the Bond Issuer's Claims by agreeing to the Guaranteed

Minimum Distribution and Lehman Distribution Enhancement as percentage payouts that are subject

to limited dilution (*e.g.*, the payment to Reliance Claims only drops from 50% to as low as 40%

under specified conditions).

1    Thus, the Plan Proponents believe that the overall resolution of the Claims held by the Bond

2    Issuers against the applicable Plan Debtors is fair and reasonable and in the best interests of the

3    Estates and the Plan Debtors' creditors.

4    Based upon the foregoing, the Plan Proponents respectfully submit that the Plans comply

5    with the provisions of sections 1122 and 1123 of the Bankruptcy Code and, therefore, comply with

6    section 1129(a)(1) of the Bankruptcy Code.

7    **B.      The Plan Proponents Have Complied With the**
     **          Applicable Provisions of Section 1129(a)(2) of the Bankruptcy Code**

8    Section 1129(a)(2) of the Bankruptcy Code provides that a court may confirm a plan only if

9    "[t]he proponent of the plan complies with the applicable provisions of this title."  The principal

10   purpose of this subsection is to assure that the plan proponent has complied with the requirements of

11   section 1125 of the Bankruptcy Code in the solicitation of acceptances to the plan.  *In re Texaco,*

12   *Inc.*, 84 B.R. 893, 906-07 (Bankr. S.D.N.Y 1988); *In re Hoff*, 54 B.R. 746, 750-51 (Bankr. D.N.D.

13   1985); *In re Butler*, 42 B.R. 777, 782 (Bankr. E.D. Ark. 1984); *see also*, H.R. Rep. No. 95-595, 95th

14   Cong., 1st Sess. 412 (1977); S. Rep. No. 95-989, 95th Cong. 2d Sess. 126 (1978); 7 *Collier on*

15   *Bankruptcy*, ¶1129.03[2] (15th ed. rev.); *Andrew v. Coopersmith (In re Downtown Inv. Club III)*, 89

16   B.R. 59, 65 (B.A.P. 9th Cir. 1988).  Bankruptcy Code section 1125(b) provides, in relevant part,

17   that:

18   > An acceptance or rejection of a plan may not be solicited after the
     > commencement of the case under this title from a holder of a claim or
19   > interest with respect to such claim or interest, unless, at that time of or
     > before such solicitation, there is transmitted to such holder the plan or
20   > a summary of the plan, and a written disclosure statement approved,
     > after notice and hearing, by the court as containing adequate
21   > information.

22   11 U.S.C. § 1125(b).

23   On August 1, 2011, the Bankruptcy Court entered its *Order (A) Approving Plan Solicitation,*

24   *Notice, and Voting Procedures and (B) Establishing Deadlines in Connection with Solicitation and*

25   *Confirmation with Respect to All Pleadings Plans* [Docket No. 2453] (the "Solicitation Procedures

26   Order"), pursuant to which the Bankruptcy Court (a) established notice, balloting, and voting

27   procedures in connection with soliciting votes on the Plans, (b) fixed objection deadlines to

28   confirmation of the Plans, and (c) scheduled a hearing to consider confirmation of the Plans.

*PACHULSKI STANG ZIEHL & JONES LLP*
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

On August 1, 2011 the Bankruptcy Court entered (i) *Order Approving First Amended Disclosure Statement with Respect To Third Amended Joint Chapter 11 Plan For Eight Trustee Debtors Proposed by The Trustee and Lehman Creditors* [Docket No. 2454] (the "Trustee/Lehman Disclosure Statement Order") and (ii) *Order Approving First Amended Disclosure Statement with Respect To Third Amended Joint Chapter 11 Plan For Eleven Voluntary Debtors Proposed by The Lehman VD Lenders* [Docket No. 2455] (the "Lehman VD Lender Disclosure Statement Order" and together with the Solicitation Procedures Order and Trustee/Lehman Disclosure Statement Order, the "Disclosure Statement Orders"), pursuant to which the Bankruptcy Court approved the adequacy of information contained in the Disclosure Statements in support of the Plans as required by section 1125 of the Bankruptcy Code.

In accordance with the Solicitation Procedures Order, on August 25, 2011, the Plan Proponents solicited all known holders of claims against or interests in the Plan Debtors as of the Voting Record Date.[5]  On September 1, 2011, the Plan Proponents served the Plan Proponents' recommendation letters with respect to the Plans and the SunCal Plans upon, among other parties, all known holders of claims against or interests in the Debtors as of the Voting Record Date.[6]  No solicitation of acceptances and rejections of the Plans occurred before the Plan Proponents mailed the Disclosure Statements.  Therefore, any and all solicitations by the Plan Proponents of acceptances of the Plans were in accordance with the provisions of section 1125 of the Bankruptcy Code.

**C.    The Plans are Proposed in Good Faith and
       not by Means Forbidden by Law– Section 1123(a)(3) of the Bankruptcy Code**

Section 1129(a)(3) of the Bankruptcy Code requires that a plan be proposed "in good faith and not by any means forbidden by law."  Bankruptcy Rule 3020(b)(2) provides that a court need not require evidence that a plan has been proposed in good faith if no objection has been filed challenging the proponent's good faith.

The good faith standard requires that there be a reasonable likelihood that a plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code.  *Ryan v. Louis (In re*

---

[5]  *See Certificates of Service of Patricia Jeffries* [Docket Nos. 2706 and 2707].
[6]  See *Certificates of Service of Patricia Jeffries* [Docket Nos. 2718 and 2719].

1  *Corey)*, 892 F.2d 829, 835 (9th Cir. 1989); *Stolrow v. Stolrow's, Inc. (In re Stolrow's Inc.)*, 84 B.R.

2  167, 172 (B.A.P. 9th Cir. 1988).  The good faith standard requires a showing that the plan was

3  proposed with "honesty and good intentions."  *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d

4  Cir. 1988).  A chapter 11 plan is filed in good faith if the plan proponent has exhibited "a

5  fundamental fairness in dealing with one's creditors."  *Stolrow's,* 84 B.R. at 172.  Good faith is

6  viewed under the totality of the circumstances.  *Jasik v. Conrad (In re Jasik)*, 727 F.2d 1379, 1383

7  (5th Cir. 1984).  The reference to law in the phrase "not by means forbidden by law" is construed to

8  apply to applicable non-bankruptcy law.  *Acequia, Inc. v. Clinton* (*In re Acequia, Inc.*), 787 F.2d

9  1352, 1358 (9th Cir. 1986) (citing *In re Koelbl*, 751 F.2d 137, 139 (2d Cir. 1984) and finding that

10  plan complied with state law and therefore did not violate 1129(a)(3)).

11  In this case, the circumstances show that the Plan Proponents have proposed the Plans in

12  good faith.  The Plan Proponents have worked diligently to formulate and propose Plans that include

13  guaranteed minimum distributions to Creditors holding Allowed Claims, settlements that provide for

14  the Lehman Distribution Enhancement, the Bond Issuer Agreements, and a resolution of the Claims

15  held by the Plan Debtors against the Lehman Creditors.  The Plan Proponents believe that the terms

16  and conditions of the Plans are fair and provide Creditors the best opportunity to receive a fair

17  distribution promptly.  All negotiations regarding the provisions of the Plans and the treatment of

18  Creditors were at arms' length and the Plans' provisions reflect the result of those negotiations.

19

20  1.      The Plans are not an Attempt to Circumvent California's Anti-Deficiency Laws

21  The SunCal Plan Proponents appear to allege that the Plans are not proposed in good faith

22  due to the California anti-deficiency laws (although the Court rejected this view when SunCal

23  repeatedly raised it in objecting to the Disclosure Statements).

24  As part of the overall resolution of issues proposed by the Plans, including the SunCal

25  Actions, Section 6.2 of the Plans provides for a conveyance and transfer of the Plan Projects and

26  other collateral to the Lehman Nominees, *e.g.*, partially for (1) the Lehman Secured Claims, to the

27  extent modified by the Plans, (2) the Lehman Plan Funding, and (3) the other obligations under the

28  Plans of the Lehman Creditors. The fairness of this exchange is discussed elsewhere herein (*see, e.g.*,

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1   Articles III and IV).  Specifically as to the Claims' treatment, for their Claims arising from the

2   Lehman Loans, under the Plans, the Lehman Creditors are allowed both Secured Claims at the

3   indicated collateral values and General Unsecured Claims (deficiency claims) for the balance for all

4   loans that were recourse prepetition, which constitute each and every Lehman Loan except the

5   Interim Loan Guarantee by Tesoro and SCC Communities (as to which Plan Debtors no deficiency

6   claim is proposed for the Lehman VD Lenders).  Plans, § 5.2.  Under the Plans, the Lehman

7   Creditors have agreed with respect to virtually all of their Claims to take less favorable treatment

8   than that to which they believe their Claims entitle them. For their Secured Claims, they do get the

9   Plan Projects worth a fraction of the $1.8 billion they are owed, <u>but, at the same time, are paying</u>

10  <u>millions and millions of dollars for the privilege</u>. *See* Disclosure Statements, § 5.4.4.  For any Senior

11  Secured Mechanic's Liens or Reliance Claims that they obtain (such as from taking assignment of

12  such claims held by Bond Issuers), they have agreed only to share in "Available Cash" and receive

13  no other consideration.  *See, e.g.,* Lehman VD Lender Disclosure Statement, §§ 5.3.3(d), 5.3.6(d), &

14  5.3.7(e).  <u>For the deficiency claims, these are all classified in the classes of General Unsecured</u>

15  <u>Claims and the Lehman Creditors have agreed  to forego payment altogether on these Claims</u>. *See,*

16  *e.g.,* Lehman VD Lender Disclosure Statement, § 5.3.7(e).

17       The California anti-deficiency laws are irrelevant to good faith, irrelevant to these Plans and

18  irrelevant to the deficiency claims afforded to the Lehman Creditors under the Plans.  First, even

19  under California law, the Lehman Creditors could judicially foreclose and obtain deficiency

20  judgments.

21       Second, the conditions that trigger California's limitations on deficiency judgments after a

22  non-judicial foreclosure have no application here:  (a) the Lehman Creditors are not "foreclosing" on

23  the Plan Projects, they are paying millions and millions of dollars through, *inter alia*, the Lehman

24  Plan Funding to obtain title to the Plan Projects; and (b) these Plans, being that they are Bankruptcy

25  Court approved, are not non-judicial foreclosures. The plan confirmation process is an alternative,

26  federal, statutory, court process through which creditors may be paid or treated, but it is not a non-

27  judicial foreclosure.  This confirmation process involves high costs and close court supervision.  In

28  short, section 580(d) of California Code of Civil Procedure is completely irrelevant to the instant

matter, and accordingly, the Lehman Creditors are entitled, under the applicable federal statutory law, to deficiency claims (although they take no distributions as to them under the Plans).

Third, Section 1111(b)(1)(A)(ii) of the Bankruptcy Code expressly provides that recourse is denied to a creditor only when "such holder does not have such recourse and such property is . . . to be sold under the plan." The Lehman Creditors have reviewed their loans. All of the Lehman Creditors' Claims for loans are recourse loans other than the as to SCC Communities (the owner of the Joshua Ridge Project) and Tesoro (the owner of the Tesoro Project). For those two debtors, the Lehman VD Plan signifies that no deficiency claim is allowed for the Lehman Creditors as General Unsecured Claims against such two Debtors. Lehman VD Lender Disclosure Statement, §§ 4.2.4 & 5.2. For all other Plan Debtors against which the Lehman Creditors have asserted Secured Claims, their claims are recourse and allowance of deficiency claims is appropriate.

Further, the SunCal Plan Proponents have not provided any case law in support of their position.

### 2.    The Plan Releases are Consistent With the Bankruptcy Code

The intent of the Plan releases are to afford the Lehman Creditors, in exchange for the consideration they are providing under the Plans, peace with respect to the claims against them relating to the Claims which are being asserted against a Plan Debtor or the Plan Projects or these Cases. The fairness of this exchange is discussed elsewhere herein (see, e.g., Articles III and IV).

### 3.    Funding of Distributions Does Not Effectuate a De Facto Substantive Consolidation

Cash from one Estate is not proposed to be used to pay Claims of another Estate under the Plans. Cash of the Debtors also may be applied to pay Claims under the Plans. (See Section 8.4(c) of the Plans.) All of such cash is alleged cash collateral of the Lehman Creditors. Although the liens thereupon have been disputed, at least as to certain cash of Palmdale Hills, it is not disputed that the Lehman Creditors' lien was perfected by a control agreement. Excluding such cash and excluding cash subject to other Creditors' claims or that is escrowed, each Plan Debtor's cash, as set forth on pages 38 and 39 of the Disclosure Statement for the Trustee/Lehman Plan and Lehman VD

Plan, respectively, is less than the secured, administrative or priority claims of that particular Plan

Debtor as set forth on pages 41 and 61 of the Disclosure Statement for the Trustee/Lehman Plan and

pages 43 and 66 of the Disclosure Statement for the Lehman VD Plan.  Thus, while it would be

irrelevant in any event due to the overall compromise with the Lehman Creditors, in fact, no cash

from one Plan Debtor is proposed to be used to pay the Claims of another Plan Debtor.

Thus, the Plans do not contain provisions forbidden by law and therefore the Plan Proponents

have exhibited the "fundamental fairness in dealing with creditors" required by section 1129(a)(3) of

the Bankruptcy Code.  The essential bargain contained in the Plans is the result of an arms' length

negotiations between the Trustee and Lehman Creditors and, as to specific provisions, between the

Lehman Creditors and the Committees and other parties have ensured that the Plans "will achieve a

result consistent with the objectives and purposes of the Code."  Accordingly, the requirements of

section 1129(a)(3) of the Bankruptcy Code have been satisfied.

**D.     Any and all Compensation of Professionals will be Made Pursuant to Bankruptcy
        Court Supervision as Required by Section 1129(a)(4) of the Bankruptcy Code**

Section 1129(a)(4) of the Bankruptcy Code provides that a court shall confirm a plan only if

"[a]ny payment made or to be made by the proponent, by the debtor, or by a person issuing securities

or acquiring property under the plan, for services or for costs and expenses in or in connection with

the case, or in connection with the plan and incident to the case, has been approved by, or is subject

to the approval of, the court as reasonable."  As provided in Section 4.1(b)(i) of the Plans, claims of

all Professionals are subject to the review and approval of the Bankruptcy Court.  Accordingly, the

Plans comply with the requirements of section 1129(a)(4) of the Bankruptcy Code.

**E.     Post-Confirmation Management is Fully Disclosed
        and Satisfies Section 1129(a)(5) of the Bankruptcy Code**

Section 1129(a)(5)(A)(i) of the Bankruptcy Code provides that a court may confirm a plan

only if the plan proponent discloses "the identity and affiliations of any individual proposed to serve,

after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the

debtor participating in a joint plan with the debtor, or a successor to the debtor under the plan."

Section 1129(a)(5)(A)(ii) of the Bankruptcy Code requires that the appointment to or continuance in

such office of such party be "consistent with the interests of creditors and equity security holders and

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1  with public policy." Similarly, section 1129(a)(5)(B) of the Bankruptcy Code requires that a plan

2  disclose the identity of any "insider" to be employed or retained by the reorganized debtor and the

3  "nature of any compensation" for such insider.

4      The requirements of these sections are satisfied by the Plan because Steven M. Speier, the

5  duly Bankruptcy Court appointed chapter 11 trustee of the Trustee Debtors, will manage the Estates

6  of the Plan Debtors after the Effective Date of the Plans as the Liquidating Trustee. *See* Section 8.2

7  of the Plans.

8  **F.    Plans do not Require Approval of any**
   **Regulatory Commission – Section 1129(a)(6) of the Bankruptcy Code**

9      Section 1129(a)(6) of the Bankruptcy Code requires that, after confirmation of a plan, any

10  governmental regulatory commission with jurisdiction "over the rates of the debtor has approved any

11  rate change provided for in the plan." As set forth in Section 17.1 of the Plans, this section is

12  inapplicable because no regulatory commission consents are necessary.

13  **G.    Plans Meet the "Best Interest of**
14  **Creditors" Test – Section 1129(a)(7) of the Bankruptcy Code**

15      Bankruptcy Code section 1129(a)(7) provides that a court may confirm a plan only if the plan

16  meets the "best interest of creditors" test. Under the "best interest of creditors" test, each holder of a

17  claim or interest in an impaired class must either accept the plan or receive or retain property of a

18  value, as of the effective date of the plan, that is not less than the amount such holder would receive

19  or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code on such date. *See In*

20  *re Ambanc La Mesa Ltd. P'ship*, 115 F.3d 650, 657 (9th Cir. 1997); *In re M. Long Arabians*, 103

21  B.R. 211 (B.A.P. 9th Cir. 1989) (remanding plan to bankruptcy court because "the court did not have

22  a proper factual basis to make an informed decision" under section 1129(a)(7); *Travelers Ins. Co. v.*

23  *Pikes Peak Water Co. (In re Pikes Peak Water Co.)*, 779 F.2d 1456, 1460 (10th Cir. 1985); *In re*

24  *Crowthers McCall Pattern, Inc.*, 120 B.R. 279, 297 (Bankr. S.D.N.Y. 1990); *In re Victory Constr.*

25  *Co., Inc.*, 42 B.R. 145, 151 (Bankr. C.D. Cal. 1984).

26      The Best Interest Test is met in these cases. Article VI of the Disclosure Statements discuss

27  the liquidation analysis of the Plan Debtors in a chapter 7 case. The Best Interests Test must be

28  satisfied even if the Plans are accepted by each impaired Class of Claims and Interests if any Holder

of an Allowed Claim or Allowed Interest objects to the applicable Plan on such basis.  The Best Interests Test requires the Bankruptcy Court to find either that (i) all Holders of Claims and Interests in an Impaired Class for a particular Plan have accepted the applicable Plan, or (ii) the Plan for such Plan Debtor provides each Holder of Allowed Claim or Interest in an Impaired Class who has not accepted the applicable Plan with a recovery of property of a value, as of the effective date of the applicable Plan, that is not less than the amount that such Holder would receive if the applicable Debtor were liquidated under chapter 7 of the Bankruptcy Code.

Excluding the Secured Claims of the Lehman Creditors (who, as Plan Proponents, will vote in favor of the Plans) and ignoring the Claims of Settling Bond Issuers based on the settlement embodied in the applicable Settling Bond Issuer Agreement, Allowed Claims and interests classified as Impaired include:

- Allowed Reliance Claims in Class 6;
- Allowed General Unsecured Claims in Class 7 (Trustee/Lehman Plan);
- Allowed General Unsecured Claims in Class 7 (Lehman VD Plan – Group I Debtors)
- Allowed General Unsecured Claims in Class 8 (Lehman VD Plan – Group II Debtors);
- Allowed Settling Bond Issuer-Related Future Work Claims in Class 8 (Trustee/Lehman Plan);
- Allowed Settling Bond Issuer-Related Future Work Claims in Class 9 (Lehman VD Plan);
- Allowed Interests in Class 9 (Trustee/Lehman Plan);
- Allowed Interests in Class 10 (Lehman VD Plan).

1.    Best Interests Test – Trustee/Lehman Plan

Because each of the Plan Projects of the Trustee Plan Debtors and the Group I Debtors (other than SunCal Summit Valley) is subject to a Lehman Claim Lien and the amount owed under the applicable Lehman Loan exceeds the value of the applicable Plan Project, unless the SunCal Actions were successful, Claims in Impaired Classes 6, 7 and 8 under the Trustee/Lehman Plan and Claims in Impaired Classes 6, 7 and 9 as to the Group I Debtors under the Lehman VD Plan would receive

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

no recovery in chapter 7 liquidation cases from the Plan Projects.  The key contentions in the SunCal

Actions of SCC Acquisitions, Inc. and its affiliates against the Lehman Creditors are false

contentions that the equitable subordination claims asserted in the ES Action have merit. If the

litigation with respect to equitable subordination actually could be adequately funded in a chapter 7

liquidation (or under an alternative plan), the Lehman Creditors, as more fully set forth in Articles III

and IV, estimate the outcome as follows: [7]

| Trustee/Lehman Plan:  TD Plan Proponents' Estimated Distributions from Chapter 7 Liquidation for Creditors Other Than Lehman Creditors | | | | | | |
|---|---|---|---|---|---|---|
| **DEBTOR** | **ADMIN-ISTRATIVE, PRIORITY TAX & PRIORITY CLAIMS (CLASS 5)** | **OTHER SECURED (CLASS 4) & SECURED REAL PROPERTY TAX CLAIMS (CLASS 1)** | **ALLOWED SR. SECURED MECHANIC'S LIEN CLAIMS (CLASS 3) IF ANY** | **RELIANCE CLAIMS – (CLASS 6)** | **GENERAL UN-SECURED CLAIMS - CLASS 7** | **SETTLING BOND ISSUER RELATED FUTURE WORK CLAIMS - CLASS 8** |
| SunCal Heart-land | Unknown | 100% | 100% | 0% | 0% | 0% |
| SunCal Marble-head | Unknown | 100% | 100% | 0% | 0% | 0% |
| SunCal Oak Knoll | Unknown | 100% | 100% | 0% | 0% | 0% |
| SunCal Torrance | Unknown | 100% | 100% | 0% | 0% | 0% |
| Delta Coves | Unknown | 100% | 100% | 0% | 0% | 0% |
| SunCal North-lake | Unknown | 100% | 100% | 0% | 0% | 0% |
| SunCal Oak Valley | Unknown | 100% | 100% | 0% | 0% | 0% |
| SunCal PSV | Unknown | 100% | 100% | 0% | 0% | 0% |

---

[7] In any event, for net recoveries from Litigation Claims to result in distributions to Holders of Claims in Classes 6, 7 or 8 of the Trustee/Lehman Plan or Claims in Classes 6, 7 or 9 against Group I Debtors of the Lehman VD Plan, (a) the Litigation Claims or their proceeds would have to be unencumbered by any Liens and (b) the net recoveries would need to exceed the amount of Administrative Claims and Priority Claims.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| Lehman VD Plan: Group I Debtors:  Lehman VD Lenders' Estimated Distributions from Chapter 7 Liquidation for Creditors Other Than Lehman Creditors | | | | | | |
|---|---|---|---|---|---|---|
| **Group I Voluntary Debtors** | | | | | | |
| **DEBTOR** | **ADMIN-ISTRATIVE, PRIORITY TAX, PRIORITY (CLASS 5) & OTHER SECURED (CLASS 4) CLAIMS** | **SECURED REAL PROPERTY TAX CLAIMS (CLASS 1)** | **ALLOWED SR. SECURED MECHANIC'S LIEN CLAIMS (CLASS 3) IF ANY** | **RELIANCE CLAIMS (CLASS 6)** | **GENERAL UNSECURED CLAIMS (CLASS 7)** | **SETTLING BOND ISSUER RELATED FUTURE WORK CLAIMS - CLASS 9** |
| Acton Estates | Unknown | 100% | 100% | 0% | 0% | 0% |
| Palmdale Hills | Unknown | 100% | 100% | 0% | 0% | 0% |
| SunCal Bickford | Unknown | 100% | 100% | 0% | 0% | 0% |
| SCC Communities | Unknown | 100% | 100% | 0% | 0% | 0% |
| SunCal I | Unknown | 100% | 100% | 0% | 0% | 0% |
| SunCal Summit Valley | 100% | 100% | 100% | 0% | 0% | 0% |
| Tesoro | Unknown | 100% | 100% | 0% | 0% | 0% |

| Lehman VD Plan: Group II Debtors:  Lehman VD Lenders' Estimated Distributions from Chapter 7 Liquidation for Creditors Other Than Lehman Creditors | | | | | |
|---|---|---|---|---|---|
| **DEBTOR** | **ADMIN-ISTRATIVE, PRIORITY TAX, PRIORITY (CLASS 5) & OTHER SECURED (CLASS 4) CLAIMS[8]** | **SECURED REAL PROPERTY TAX CLAIMS (CLASS 1)** | **ALLOWED SR. SECURED MECHANIC'S LIEN CLAIMS (CLASS 3) IF ANY** | **GENERAL UNSECURED CLAIMS (CLASS 8)** | **SETTLING BOND ISSUER RELATED FUTURE WORK CLAIMS - CLASS 9** |
| Kirby Estates | 100% | 100% | Not applicable | Not applicable | Not applicable |
| Seven Brothers | 100% | 100% | Not applicable | Not applicable | Not applicable |

---

[8]  For purposes of the analyses in this chart and section, Seller Financing Secured Claims are not considered. In a chapter 7 liquidation and under the Plan it is expected that they either will be paid in full or the collateral supporting them will be abandoned to their holders or they will be allowed to retain their liens and pursue their remedies.

| DEBTOR | ADMIN-ISTRATIVE, PRIORITY TAX, PRIORITY (CLASS 5) & OTHER SECURED (CLASS 4) CLAIMS[8] | SECURED REAL PROPERTY TAX CLAIMS (CLASS 1) | ALLOWED SR. SECURED MECHANIC'S LIEN CLAIMS (CLASS 3) IF ANY | GENERAL UNSECURED CLAIMS (CLASS 8) | SETTLING BOND ISSUER RELATED FUTURE WORK CLAIMS - CLASS 9 |
|---|---|---|---|---|---|
| SunCal Beaumont[9] | 0% | 93% | 0% | 0% | Not applicable |
| SunCal Johannson | 100% | 100% | Not applicable | 100% | Not applicable |

*(table title, above the header:)* **Lehman VD Plan: Group II Debtors:  Lehman VD Lenders' Estimated Distributions from Chapter 7 Liquidation for Creditors Other Than Lehman Creditors**

In contrast, under the Plans, Holders of Allowed Claims in Classes 6, 7 and 8 of the Trustee/Lehman Plan and Allowed Claims in Class 6, 7 and 9 of the Lehman VD Plan all receive meaningful Distributions or performance (and the Plan Proponents believe that any Distribution with respect to such Classes would be more than a Creditor would receive through a chapter 7 liquidation by depending on success with respect to the ES Action).  Allowed Claims in Class 8 against Group II Debtors are projected to receive the same treatment (Creditors of Kirby Estates, Seven Brothers and SunCal Johannson) or better treatment (Creditors of SunCal Beaumont) as in a liquidation, but in all cases sooner.

Under the Plans, Distributions and performance proposed for Creditors other than the Lehman Creditors and other than the Settling Bond Issuers are as set forth in the following charts (with shaded boxes reflecting projected improved treatment from that projected in a chapter 7 case and unshaded boxes reflecting the same projected treatment).  Based on the Lehman VD Lenders' estimates of Claims set forth in the Disclosure Statement as of June 1, 2011, wherever ranges are possible, the highest percentage in the range is estimated to be payable:

---

[9]  For purposes of this chapter 7 liquidation recovery estimate, the actual 2009 appraised value of $1.4 million for the Beaumont Heights Project obtained by the Lehman VD Lenders is utilized.  This figure remains higher than the 2011 SunCal opinion of value of $1.02 million, but is less than the $1.8 million amount that, to the benefit of the SunCal Beaumont Creditors, the Lehman VD Lenders have elected to use for the value of this Project in calculating, under the Plan, Distributions to SunCal Beaumont Creditors (and the Lehman VD Lenders' deficiency claim against SunCal Communities I, LLC arising from their Lien on its ownership interests in SunCal Beaumont).  Because estimated real property tax obligations alone exceed $1.5 million, in a chapter 7 liquidation, no other Creditors of SunCal Beaumont other than the taxing authorities are projected to receive a recovery.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| Distributions Under Lehman/Trustee Plans | | | | | | |
|---|---|---|---|---|---|---|
| **DEBTOR** | **ADMIN-ISTRATIVE, PRIORITY TAX, PRIORITY (CLASS 5) & OTHER SECURED (CLASS 4) CLAIMS** | **SECURED REAL PROPERTY TAX CLAIMS (CLASS 1)** | **ALLOWED SR. SECURED MECHANIC'S LIEN CLAIMS (CLASS 3) IF ANY** | **RELI-ANCE CLAIMS (CLASS 6) (Sign Creditor's Assignment/ Release for Lehman? % if Yes / % if No)** | **GENERAL UNSECURED CLAIMS (CLASS 7) (Sign Creditor's Assignment/ Release for Lehman? % if Yes / % if No)** | **SETTLING BOND ISSUER-BACKED FUTURE WORK CLAIMS - CLASS 8** |
| SunCal Heart-land | 100% | 100% | 100% | 40-50% / 1% | 5% / 1% | 100% |
| SunCal Marble-head | 100% | 100% | 100% | 40-50% / 1% | 5% / 1% | 100% |
| SunCal Oak Knoll | 100% | 100% | 100% | 40-50% / 1% | 5% / 1% | 100% |
| SunCal Torrance | 100% | 100% | 100% | 40-50% / 1% | 5% / 1% | 100% |
| Delta Coves | 100% | 100% | 100% | 40-50% / 1% | 5% / 1% | 100% |
| SunCal North-lake | 100% | 100% | 100% | 40-50% / 1% | 5% / 1% | 100% |
| SunCal Oak Valley | 100% | 100% | 100% | 40-50% / 1% | 5% / 1% | 100% |
| SunCal PSV | 100% | 100% | 100% | 40-50% / 1% | 5% / 1% | 100% |

| Distributions Under Lehman VD Plan - Group I Voluntary Debtors | | | | | | |
|---|---|---|---|---|---|---|
| **DEBTOR** | **ADMIN-ISTRATIVE, PRIORITY TAX, PRIORITY (CLASS 5) & OTHER SECURED (CLASS 4) CLAIMS** | **SECURED REAL PROPERTY TAX CLAIMS (CLASS 1)** | **ALLOWED SR. SECURED MECHANIC'S LIEN CLAIMS (CLASS 3) IF ANY** | **RELIANCE CLAIMS (CLASS 6) (Sign Creditor's Assignment/ Release for Lehman? % if Yes / % if No)** | **GENERAL UNSECURED CLAIMS (CLASS 7) (Sign Creditor's Assignment/ Release for Lehman? % if Yes / % if No)** | **SETTLING BOND ISSUER-BACKED FUTURE WORK CLAIMS - CLASS 9** |
| Acton Estates | 100% | 100% | 100% | 40%-50% / 1% | 5% / 1% | 100% |
| Palmdale Hills | 100% | 100% | 100% | 40%-50% / 1% | 5% / 1% | 100% |

| Distributions Under Lehman VD Plan - Group I Voluntary Debtors | | | | | | |
|---|---|---|---|---|---|---|
| **DEBTOR** | **ADMIN-ISTRATIVE, PRIORITY TAX, PRIORITY (CLASS 5) & OTHER SECURED (CLASS 4) CLAIMS** | **SECURED REAL PROPERTY TAX CLAIMS (CLASS 1)** | **ALLOWED SR. SECURED MECHANIC'S LIEN CLAIMS (CLASS 3) IF ANY** | **RELIANCE CLAIMS (CLASS 6) (Sign Creditor's Assignment/ Release for Lehman? % if Yes / % if No)** | **GENERAL UNSECURED CLAIMS (CLASS 7) (Sign Creditor's Assignment/ Release for Lehman? % if Yes / % if No)** | **SETTLING BOND ISSUER-BACKED FUTURE WORK CLAIMS - CLASS 9** |
| SCC Communities | 100% | 100% | 100% | 40%-50% / 1% | 5% / 1% | 100% |
| SunCal Bickford | 100% | 100% | 100% | 40%-50% / 1% | 5% / 1% | 100% |
| SunCal I | 100% | 100% | 100% | 40%-50% / 1% | 5% / 1% | 100% |
| SunCal Summit Valley | 100% | 100% | 100% | 40%-50% / 1% | 5% / 1% | 100% |
| Tesoro | 100% | 100% | 100% | 40%-50% / 1% | 5% / 1% | 100% |

| Distributions Under Lehman VD Plan - Group II Voluntary Debtors | | | | | |
|---|---|---|---|---|---|
| **DEBTOR** | **ADMIN-ISTRATIVE, PRIORITY TAX, PRIORITY (CLASS 5) & OTHER SECURED (CLASS 4) CLAIMS** | **SECURED REAL PROPERTY TAX CLAIMS (CLASS 1)** | **ALLOWED SR. SECURED MECHANIC'S LIEN CLAIMS (CLASS 3) IF ANY** | **GENERAL UNSECURED CLAIMS (CLASS 8)** | **SETTLING BOND ISSUER-BACKED FUTURE WORK CLAIMS - CLASS 9** |
| Kirby Estates | 100% | 100% | Not applicable | Not applicable | Not applicable |
| Seven Brothers | 100% | 100% | Not applicable | Not applicable | Not applicable |
| SunCal Beaumont | 100% | 100% | 100% | 100% | Not applicable |
| SunCal Johannson | 100% | 100% | Not applicable | 100% | Not applicable |

For Holders of Allowed Class 6 Reliance Claims under the Plans, they receive not only their proportional share of Residual Cash, but also the Guaranteed Minimum Distribution of 1% of the Allowed Claims and, if they elect it, the Lehman Distribution Enhancement of another 39% to 49% of their Allowed Claims. As to the fairness of the Distributions for Allowed Reliance Claims with respect to the equitable subordination claims, the Plan Proponents believe the Lehman Plan Funding results in fair value for the Plan Debtors' Assets based on the complexities of the ES Action with

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

respect to the equitable subordination claims, the lack of definitive funding for the prosecution thereof and for the maintenance of the Plan Projects and Estates pending resolution of the ES Action, the delay attendant to prosecution of the ES Action as to at least Lehman Commercial due to the automatic stay in its bankruptcy case and the high evidentiary hurdles for either recovery for an individual Creditor or to substantively consolidate multiple Plan Debtors to enable recoveries for a broader group of Creditors.

For Holders of Allowed Class 7 General Unsecured Claims under the Plans, they receive not only their proportional share of Residual Cash, but also the Guaranteed Minimum Distribution of 1% of their Allowed Claims and, if they elect it, the Lehman Distribution Enhancement of up to another 4% of their Allowed Claims.

For Holders of Allowed Class 8 Settling Bond Issuer-Backed Future Work Claims under the Trustee/Lehman Plan and Class 9 Settling Bond Issuer-Backed Future Work Claims under the Lehman VD Plan, based on the recommitment from the Settling Bond Issuers, they are to receive essentially the full benefit of their bargains. As described in the Plans and Disclosure Statements, however, Settling Bond Issuers are waiving payment on all or some of their Allowed Claims in Classes 3, 6 and/or 7 of the Plans and Class 8 of the Lehman VD Plan as to the Group II Debtors.

For Holders of Allowed Class 8 General Unsecured Claims against Group II Debtors of the Lehman VD Plan, they receive 100% of their Claims unless Residual Cash and Project Values are insufficient to pay all Claims. In that event, Holders of Allowed Class 8 General Unsecured Claims against Group II Debtors receive their Pro Rata share of Project Values and Residual Cash after payment of Allowed Senior Claims, but no less than 1% of each Allowed Class 8 Claim.

For Holders of Allowed Class 9 Interests under the Trustee/Lehman Plan and Class 10 Interests under the Lehman VD Plan of Group I Debtors, because (i) all of the Trustee Plan Debtors and Group I Debtors are insolvent  (ii) in the case of the Group II Debtors, Lehman VD Lenders hold Secured Claims in the Interests in the Group II Debtors (entitling them to any Distributions therefor), in a chapter 7 liquidation, nothing would be available for Holders of Interests and nothing is payable to them under the Plans.  Thus, they do no worse.

In sum, the Plan Proponents believe that the Plans will result in a greater distribution to creditors than a liquidation under chapter 7. Based on the foregoing, the Plans comply with the Best Interest Test set forth in section 1129(a)(7) of the Bankruptcy Code.

**H.**    **Acceptance of the Plan – Section 1129(a)(8) of the Bankruptcy Code**

Section 1129(a)(8) of the Bankruptcy Code provides that a court may confirm a plan only if, with respect to each class of claims and interests, such class has accepted the plan or such class is not impaired under the plan. *See Idaho Dep't of Lands v. Arnold (In re Arnold)*, 806 F.2d 937, 940 (9th Cir. 1986). Section 1126(a) of the Bankruptcy Code states "[t]he holder of a claim or interest allowed under section 502 of this title may accept or reject a plan." Section 1126(c) of the Bankruptcy Code provides that:

> [a] class of claims has accepted a plan if such plan has been accepted by creditors . . . that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors . . . that have accepted or rejected such plan.

As set forth more fully in the Ballot Certifications, the following is a summary of how holders of Claims voted on the Plans:

| Debtor | Accepting Classes | Rejecting Classes | Non-Accepting Classes (in which either no Ballots were cast or in which Ballots were cast but none tabulated) | Classes Without Any Claims |
|---|---|---|---|---|
| LB-L-SunCal Oak Valley, LLC | Class 2.1 Class 6.1 Class 7.1 Class 8.1 | | | |
| SunCal Heartland, LLC | Class 2.2 Class 6.2 Class 7.2 Class 8.2 | | | |
| LB-L-SunCal Northlake, LLC | Class 2.3 Class 6.3 Class 7.3 Class 8.3 | | | |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| Debtor | Accepting Classes | Rejecting Classes | Non-Accepting Classes (in which either no Ballots were cast or in which Ballots were cast but none tabulated) | Classes Without Any Claims |
|---|---|---|---|---|
| SunCal Marblehead, LLC | Class 2.4<br>Class 6.4<br>Class 7.4<br>Class 8.4 | | | |
| SunCal PSV, LLC | Class 2.5<br>Class 6.5<br>Class 7.5<br>Class 8.5 | | | |
| Delta Coves Venture, LLC | Class 2.6<br>Class 6.6<br>Class 7.6<br>Class 8.6 | | | |
| SunCal Torrance, LLC | Class 2.7<br>Class 6.7<br>Class 7.7<br>Class 8.7 | | | |
| SunCal Oak Knoll, LLC | Class 2.8<br>Class 6.8<br>Class 7.8<br>Class 8.8 | | | |

As reflected above, the classes listed under the column "Accepting Classes" above have accepted the Trustee/Lehman Plan in accordance with section 1126 of the Bankruptcy Code. In addition, it establishes that at least one Impaired Class in each Case has accepted the Trustee/Lehman Plan. Impaired accepting Classes consist of all votes to accept the Trustee/Lehman Plan as set forth in the Trustee/Lehman Ballot Summary Certification that were counted by the Plan Proponents. As set forth below, Ballots cast by the Lehman Creditors were included in the tabulation of acceptances of Class 2 and Class 7 for each Trustee Plan Debtor. The Lehman Creditors believe that they should not be considered insiders for purposes of voting on the Trustee/Lehman Plan.

Accordingly, section 1129(a)(8) of the Bankruptcy Code is satisfied.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| Debtor | Accepting Classes | Rejecting Classes | Non-Accepting Classes (in which either no Ballots were cast or in which Ballots were cast but none tabulated) | Classes Without Any Claims |
|---|---|---|---|---|
| Palmdale Hills Property, LLC | Class 2.1 Class 6.1 Class 7.1 Class 9.1 | | | |
| SunCal Bickford, LLC | Class 2.2 Class 6.2 Class 7.2 Class 9.2 | | | |
| Acton Estates, LLC | Class 2.3 Class 6.3 Class 7.3 Class 9.3 | | | |
| SCC Communities, LLC | Class 2.4 Class 6.4 Class 9.4 | Class 7.4 | | |
| SunCal Communities I, LLC | Class 2.5 Class 7.5 Class 9.5 | | | Class 6.5 |
| SunCal Summit Valley, LLC | Class 2.6 Class 6.6 Class 7.6 Class 9.6 | | | |
| Tesoro SF, LLC | Class 2.7 Class 6.7 Class 7.7 Class 9.7 | | | |
| Kirby Estates, LLC | Class 8.8 Class 9.8 | | | |
| Seven Brothers, LLC | Class 8.9 Class 9.9 | | | |
| SunCal Beaumont Heights, LLC | Class 8.10 Class 9.10 | | | |
| SunCal Johannson Ranch, LLC | Class 8.11 Class 9.11 | | | |

As reflected above, the classes listed under the column "Accepting Classes" above have accepted the Lehman VD Plan in accordance with section 1126 of the Bankruptcy Code. In addition, it establishes that at least one Impaired Class in each Case has accepted the Lehman VD Plan. The Lehman VD Ballot Summary Certification also demonstrates that Class 7.4 (General Unsecured Claims Against SCC Communities) has rejected the Lehman VD Plan. Lastly, Class 6.5 (Reliance Claims Against SunCal Communities I) has no Claims. The Lehman VD Lenders do not believe that any Claims against SunCal Communities I are Reliance Claims and did not include any such claims for SunCal Communities I in Exhibit 2 to the Lehman VD Plan. As set forth in Exhibit 2 to the Lehman VD Plan, Creditors that disagreed with the Lehman VD Lenders and believe either that they hold Reliance Claims or that they hold Reliance Claims in amounts higher than those stated on the Reliance Claim Exhibit were permitted to vote those claims as such, subject to the terms and conditions set forth therein. However, under Section 6.6 of the Lehman VD Plan, the only opportunity to assert a Reliance Claim, and vote as such, was by submitting a Class 7/Class 7 Ballot voting a Class 6 Reliance Claim. No Creditor submitted such a Ballot with respect to Class 6.5. Accordingly, this Class contains no Claims.

Accordingly, section 1129(a)(8) of the Bankruptcy Code is satisfied to the extent provided therein, otherwise the Plan Proponents seek to confirm those Plans that do not satisfy section 1129(a)(8) by satisfying the requirements in section 1129(b) of the Bankruptcy, as set forth in greater detail in section V below..

**I.    Administrative Claims and Priority Claimants are Treated
Appropriately Under the Plans – Section 1129(a)(9) of the Bankruptcy Code**

As required by the Bankruptcy Code, the Plans place Claims and Interests into various Classes according to their right to priority. However, in accordance with section 1123(a)(1) of the Bankruptcy Code, certain types of Claims are not classified in any Classes under the Plans and the Plan Proponents have not placed such Claims in a Class. These Claims are "unclassified." As to Allowed Administrative Claims, Allowed Priority Tax Claims, and Secured Real Property Tax

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Claims,[10] these Claims are not considered Impaired, and they do not vote on the Plans because they are automatically entitled to the specific treatment prescribed by the Bankruptcy Code. The treatment of these unclassified Claims is as provided below.

       1.     Allowed Administrative Claims

Section 4.1 of the Plans provide that except to the extent that the Holder of an Allowed Administrative Claim agrees to a different treatment, and subject to the Administrative Claim Bar Date set forth in the Plans, the Liquidating Trustee shall pay each Allowed Administrative Claim in full, in Cash, by the later of (i) the Effective Date, (ii) within ten (10) Business Days after the date such Administrative Claim becomes an Allowed Administrative Claim, or (iii) the date such Allowed Administrative Claim becomes due according to its terms. Notwithstanding the foregoing, any Allowed Administrative Claim representing obligations incurred prior to the Effective Date in the ordinary course of post-petition business by the applicable Plan Debtors (including, without limitation, post-petition trade obligations and routine post-petition payroll obligations) shall be paid in full or performed by the Liquidating Trustee in the ordinary course of business, in accordance with the terms of the particular obligation.

       a.     Treatment and Repayment of the Lehman Administrative Loan(s)

Section 4.1(a) of the Plans provide for the treatment of the Lehman Administrative Loans (certain post-petition and pre-Confirmation financing provided by Lehman ALI and/or other Lehman Related Parties pursuant to order(s) of the Bankruptcy Court, as more fully defined above). The Lehman Administrative Loans are Allowed in the amounts loaned or advanced by Lehman ALI and/or other applicable Lehman Related Parties after the commencement of the Cases net of any repayment thereof and are to be paid in Cash in full on the Effective Date of each Plan from the Lehman Creditor Distribution Funding or from the Lehman Creditor Distribution Funding at such later time and on such other terms as the Lehman Creditors may agree. Pending any such payment or during a period of voluntary deferral by Lehman ALI and/or Lehman Related Parties, the Lehman

---

[10] The Plan Proponents classified Secured Real Property Tax Claims for administrative convenience. The holders of Secured Real Property Tax Claims are unimpaired because their treatment is determined by sections 507(a)(8), 1123(a)(1), and 1129(a)(9)(D) of the Bankruptcy Code. The holders of such claims are not entitled to vote and the classification does not have any legal significance, consequently, it is consistent with the requirements prescribed by section 1123(a)(1) of the Bankruptcy Code.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Administrative Loans shall continue to have a first priority Lien against the respective Assets securing such loans as of the moment prior to the Effective Date, including any Cash of the applicable Plan Debtors, such as may be deposited in the Plan Reserve or Post-Confirmation Accounts, and any proceeds thereof.

Accordingly, the Plans satisfy section 1129(a)(9)(A) of the Bankruptcy Code.

2.      Treatment of Priority Tax Claims.

Priority Tax Claims are certain unsecured income, employment and other Taxes described by section 507(a)(8) of the Bankruptcy Code. The Bankruptcy Code requires that each Holder of such a Priority Tax Claim receive the present value of such Claim in deferred Cash payments over a period not exceeding five (5) years from the applicable Petition Date and that such treatment not be less favorable than the treatment accorded to non-priority unsecured creditors.

Section 4.2 of the Plans provides that Holders of Allowed Priority Tax Claims, if any, shall receive from the Liquidating Trustee (i) equal Cash payments to be made on the last Business Day of each third full-calendar month following the Effective Date, *provided that* the first payment need not be made any sooner than thirty (30) days following the Effective Date and *provided that* such periodic payments are to be payable until November 6, 2013, on which date the final payment shall be due, with all such payments totaling 100% of the principal amount of such Claim, plus interest on any unpaid balance from the Effective Date, calculated at the nonbankruptcy interest rate applicable on the Effective Date, if any, or (ii) such other treatment agreed to by the Holder of the Allowed Priority Tax Claim and the Liquidating Trustee, provided such treatment is on more favorable terms to the applicable Plan Debtor's Estate than the treatment set forth in clause (i) hereof; provided that, prepayments shall be made and permitted with the consent or at the direction of a Plan Proponents, including payment in full any time on or after the Effective Date.

Accordingly, the Plans satisfy section 1129(a)(9)(C) of the Bankruptcy Code.

3.      Treatment of Secured Real Property Tax Claims

Section 6.1 of the Plans provides for the treatment of Secured Real Property Tax Claims and affords holders of such Claims, at the Lehman Creditors' option, certain alternative treatments. For the Trustee/Lehman Plan, the two alternative treatments are either: (1) a lump sum cure payment to

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

be made in accordance with section 1124(2) of the Bankruptcy Code, that would cure, pay interest, but avoid penalties or (2) equal quarterly payments over time, with penalty amounts, in accordance with section 1129(a)(9)(D) of the Bankruptcy Code.  The same two treatments are included in the Lehman VD Plan, plus a provision for simple unimpairment (whereby the taxing authorities would be left their rights to foreclose, such as where the collateral is to be abandoned).

The Plan Proponents contend that, consistent with sections 1124(2) and 1129(a)(9)(D) of the Bankruptcy Code,  controlling Ninth Circuit authority permits the Plans to cure defaults through a lump sum payment of a fully matured obligation and avoid penalties so long as the taxing authority is compensated for "any damages incurred as a result of any reasonable reliance by such holder on . . . applicable law."  *See In re Entz-White Lumber & Supply, Inc.*, 850 F.2d 1338 (9th Cir. 1988).  The taxing authorities contend, *inter alia*, that section 511 of the Bankruptcy Code, which addresses the rate of interest chargeable when interest is due, precludes this treatment.  (Some taxing authorities also may errantly contend that this is Impairment.  Even being unimpaired does not entitle a Creditor to more than it is owed; this is not Impairment but a determination of what is owing.)

This issue is complicated, may involve factual matters and is best addressed when fully and separately briefed and considered by the parties. Thus, to address contentions of the taxing authorities that cure and reinstatement under section 1124(2) of the Bankruptcy Code cannot avoid penalties, the Plans previously were modified (*see* Sections 6.1 and 10.2.4 of the Plans) and now provide that, if the Lehman Creditors select to make the curative lump sum payment, besides paying on the Effective Date all of the amounts that the Lehman Creditors believe are owing, without holdback – which includes principal and interest and charges, but not penalties, if the taxing authorities timely file a statement as to the additional penalty amounts or other amounts that they contend are owing, the Lehman Creditors will pay those amounts too into the Plan Reserve to be held by the Liquidating Trustee.  Upon the taxing authorities motion, a separate hearing will be held to address this issue and, if the taxing authorities prevail, the additional disputed amounts claimed payable would be released to them.

As set forth above, the Lehman Creditors are proposing to fund on the Effective Date all amounts that the taxing authorities contend are owing with only disputed penalty amounts to be

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

placed in the Plan Reserve pending Court determination. This treatment is in accordance with

section 1129(a)(9)(D) of the Bankruptcy Code, which permits payments over time of these amounts.

**J.      Each of the Plans Have Been Accepted by at
        Least One Impaired Class – Section 1129(a)(10) of the Bankruptcy Code**

Section 1129(a)(10) of the Bankruptcy Code provides that a Court may confirm a plan only if

"at least one class of claims that is impaired under the plan has accepted the plan, determined

without including any acceptance of the plan by any insider."  *See In re Arnold*, 806 F.2d 937, 940

n.2 (9th Cir. 1986) (holding that at least one class of impaired claimants must accept plan).  As

discussed above with respect to the requirements under section 1129(a)(8) of the Bankruptcy Code,

at least one Class of Claims under each Plan for each Plan Debtor has accepted the Plan applicable to

such Debtor's Estate.  The Lehman Creditors contend that they are not insiders for purposes of this

section.  The charts and the related discussion above in Section II.H that describes the Impaired

accepting Classes of each Plan.

As reflected in the charts and related discussion in Section II.H, each of the Plans comply

with the provisions of section 1129(a)(10) of the Bankruptcy Code.

**K.      The Plans are Feasible – Section 1129(a)(11) of the Bankruptcy Code**

Section 1129(a)(11) of the Bankruptcy Code provides that a Court may confirm a plan only

if:

> [c]onfirmation of the plan is not likely to be followed by the
> liquidation, or the need for further financial reorganization, of the
> debtor or any successor to the debtor under the plan, unless such
> liquidation or reorganization is proposed in the plan.

To demonstrate that a plan is feasible, it is not necessary that success be guaranteed; only a

reasonable assurance of success is required.  *See, e.g., Acequia, Inc. v. Clinton (In re Acequia, Inc.)*,

787 F.2d 1352, 1364 (9th Cir. 1986) (holding that feasibility requirement is satisfied by showing of

"reasonable probability of success."); *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir.

1988); *In re Kemp*, 134 B.R. 413, 416 (E.D. Cal. 1991) (all that is required is reasonable assurance

of commercial viability).  In these Cases, the Plans are feasible.

1.    The Plan are Feasible

The Plans are liquidating plans under which, essentially, (a) the Lehman Creditors receive conveyance of the Plan Debtors' primary assets, the Plan Projects, as well as certain other collateral, (b) most Creditors are paid cash on the Effective Date or relatively promptly thereafter, and (c) the Liquidating Trustee is to (i) sell or liquidate Remaining Other Assets, (ii) address Claims with the Lehman Creditors and (iii) make Distributions.  For these Plans, all that is needed for feasibility is an adequate structure for their implementation and sufficient cash.

The terms of the Plans as to implementation are adequate and provide for the appointment of the Trustee as Liquidating Trustee under both Plans, something to which the Trustee has agreed. The Liquidating Trustee has the benefit under each Plan of the Lehman Post-Confirmation Expense Funding (aggregating $1,000,000 for both Plans) for Post-Confirmation Expenses.  Under the Plans, the Lehman Creditors also have agreed to provide the Lehman Creditor Distribution Funding, which represents the payments due to Creditors.

2.    The Lehman Creditors Have the Necessary Cash

to Satisfy the Lehman Plan Funding Obligations

The Monthly Operating Report August 2011 filed on September 21, 2011 in the New York Bankruptcy Court [Docket No. 20182] (the "Lehman August 2011 MOR") reflects ending unrestricted cash and investments that includes cash in demand-deposit accounts, money market funds, treasury bills and other investments held by Lehman Commercial of approximately $3.893 billion and, together with LBHI, a combined total of $6.017 billion.[11]

3.    Conditions to Effectiveness of the

Plans Do Not Raise Feasibility Issues

Presently unsatisfied conditions to confirmation or effectiveness of the Plans, that may be waived by the Lehman Creditors, include that certain monetary caps, set forth in Section 14.3 of the Plans. not be exceeded and that the Settling Bond Issuer Agreements, as summarized in Section 8.7

---

[11] See, Request for Judicial Notice No. 1 in Support of Memorandum of Points and Authorities Submitted by: Trustee and Lehman Creditors in Support of Confirmation of the Third Amended Joint Chapter 11 Plan for Eight Trustee Debtors Proposed by the Trustee and Subject Lehman Creditors; and Lehman VD Lenders in Support of Confirmation of the Third Amended Joint Chapter 11 Plan for Eleven Voluntary Debtors Proposed by the Lehman VD Lenders, filed contemporaneously herewith.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1   of the Plans, be executed and be approved by the New York Bankruptcy Court, due to its having

2   jurisdiction over the New York Bankruptcy Cases of LCPI and LBHI, which may be parties to the

3   Settling Bond Issuer Agreements and may be sources of funding of the Lehman Plan Funding.

4   Feasibility, as reflected above, however, requires that the Court find that the Plans are unlikely to

5   fail, not that the Court find that they are likely to be confirmed or become effective.  The Lehman

6   Creditors continue to assess the Claims and payments required under the Plans, but presently are

7   unaware of a change in circumstance that they have determined would cause them to change their

8   previously formed belief that the monetary caps will not be exceeded.  Moreover, as to the Bond

9   Issuers, the Lehman Creditors and Arch were successful in bridging remaining issues, the Lehman

10  Creditors and Bond Safeguard have executed a term sheet and the Lehman Creditors expect to

11  execute both Settling Bond Issuer Agreements promptly.

12         For all the foregoing reasons, the Plan satisfies section 1129(a)(11) of the Bankruptcy Code.

13
**L.    Bankruptcy Fees will Have Been Paid by**
14     **the Effective Date – Section 1129(a)(12) of the Bankruptcy Code**

15         Section 1129(a)(12) provides that a court may confirm a plan only if "[a]ll fees payable

16  under section 1930 of title 28, as determined by the court at the Confirmation Hearing, have been

17  paid or the plan provides for the payment of all such fees on the effective date of the plan."  Section

18  507 of the Bankruptcy Code provides that "any fees and charges assessed against the estate under

19  [section 1930,] chapter 123 of title 28" are afforded priority as administrative expenses.  11 U.S.C. §

20  507(a)(2).

21         The Lehman Plan Funding includes payment of Administrative Claims such that funding is

22  adequate. The Liquidating Trustee is empowered and tasked under the Plans with making payment

23  of Administrative Claims such that adequate means exist for fulfillment of this obligation.

24  Accordingly, the Plans satisfy the requirements of section 1129(a)(12) of the Bankruptcy Code..

25
**M.    Sections 1129(a)(13), (14), (15), And (16) of the Bankruptcy Code are not Applicable**
26

27         Section 1129(a)(13) of the Bankruptcy Code provides that a court may confirm a plan only if

28  "[t]he plan provides for the continuation after its effective date of payment of all retiree benefits, as

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

that term is defined in section 1114 of this title, at the level established pursuant to subsection (e)(1)(B) or (g) of section 1114 of this title, at any time prior to confirmation of the plan, for the duration of the period the debtor has obligated itself to provide such benefits." 11 U.S.C. § 1129(a)(13). The Plan Proponents do not believe that the Plan Debtors have any "retirees" entitled to benefits. Accordingly, this requirement is inapplicable.

Moreover, the Plan Proponents do not believe that the Debtors are required by a judicial or administrative order, or by statute, to pay a domestic support obligation. Accordingly, section 1129(a)(14) of the Bankruptcy Code is inapplicable in these Cases. Likewise, section 1129(a)(15) of the Bankruptcy Code is inapplicable in these Cases because the Plan Debtors are not individuals. Lastly, the Plan Debtors are not corporations or trusts that are not moneyed, business or commercial corporations or trusts. Therefore, section 1129(a)(16) of the Bankruptcy Code is inapplicable to these Cases.

**N.    The Principal Purpose of the Plans are not Avoidance of
Tax or Securities Act Obligations – Section 1129(d) of the Bankruptcy Code**

Section 1129(d) provides that:

> [O]n request of a party in interest that is a governmental unit, the court may not confirm a plan if the principal purpose of the plan is the avoidance of taxes or the avoidance of section 5 of the Securities Act of 1933 . . .

No governmental party in interest has requested the denial of confirmation on any of the foregoing grounds, and they are not applicable here. As shown above in the "good faith" analysis, the principal purpose of the Plans are to pay creditor claims -- the paramount chapter 11 goal. Consequently, this requirement has been satisfied.

**III.
SETTLEMENTS, INCLUDING OF THE
SUNCAL ACTIONS, MAY BE EFFECTUATED THROUGH THE PLANS**

**A.    Sections 1123 and 1129 of the Bankruptcy Code Permit Plans to Include Settlements**

Section 1129(a)(1) of the Bankruptcy Code requires that the Plans comply with applicable provisions of the Bankruptcy Code.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    Sections 1123(a)(3)(A) and (6) of the Bankruptcy Code permit the Plans to include

2    settlements of estate claims or of third party claims, respectively.

3    Section 6.2 of the Plans provides for a conveyance and transfer of the Plan Projects and other

4    collateral to the Lehman Nominees as part of the overall resolution of issues proposed by the Plans,

5    including the SunCal Actions, *e.g.*, partially for (1) the Lehman Secured Claims, to the extent

6    modified by the Plans, (2) the Lehman Plan Funding, and (3) the other obligations under the Plans of

7    the Lehman Creditors.

8    **B.    Standard for Permissible Settlements**

9    The standard for approval of a compromise was addressed by the United States Supreme

10   Court in *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*,

11   390 U.S. 414, *reh'g denied*, 391 U.S. 909 (1968).  There the court held that a bankruptcy court in

12   considering whether to approve a compromise, should inform itself regarding

13            all facts necessary for an intelligent and objective opinion of the
         probabilities of ultimate success should the claim be litigated.  Further,
14       the judge should form an educated estimate of the complexity,
         expense, and likely duration of such litigation, the possible difficulties
15       of collecting on any judgment which might be obtained, and all other
         factors relevant to a full and fair assessment of the wisdom of the
16       proposed compromise.

17   *Id.*  The Supreme Court further held in *TMT Trailer* that compromises reached during the course of

18   insolvency proceedings must be "fair and reasonable."  390 U.S. at 424.  Significantly, the court

19   stated that "[b]asic to this process in every instance, of course, is the need to compare the terms of

20   the compromise with the likely rewards of litigation." *Id.*

21   The United States Court of Appeals of the Ninth Circuit (the "<u>Ninth Circuit</u>") has held that

22   the determination of whether a proposed settlement agreement meets the requisite standards of

23   fairness, equity and reasonableness, is a function of several factors:  (a) the probability of success in

24   the litigation; (b)  the difficulties, if any, to be encountered in the matter of collection; (c) complexity

25   of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (d)

26   the paramount interest of creditors and a proper deference to their reasonable views.  *See Martin v.*

27   *Kane (In re A&C Properties)*, 784 F.2d 1377, 1381 (9th Cir.), *cert. denied sub nom., Martin v.*

28   *Robinson*, 479 U.S. 854 (1986); *accord Woodson v. Fireman's Fund Insur. Co. (In re Woodson)*,

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

839 F.2d 610, 620 (9th Cir. 1988); *In re MGS Marketing*, 111 B.R. 264, 267 (B.A.P. 9th Cir. 1990).

Finally, a bankruptcy court has wide latitude and discretion in evaluating a proposed compromise because the judge is "uniquely situated to consider the equities and reasonableness." *United States v. Alaska National Bank (In re Walsh Construction, Inc.)*, 669 F.2d 1325, 1328 (9th Cir. 1982). In that vein, the Ninth Circuit has further stated:

> A compromise agreement allows the trustee and the creditor to avoid the expenses and burdens associated with litigating "sharply contested and dubious" claims. The bankruptcy court need not conduct an exhaustive investigation into the validity of the asserted claim. It is sufficient that, after appraising itself of all facts necessary for an intelligent and objective opinion concerning the claim's validity, the court determines that either (1) the claim has "substantial foundation" and is not "clearly invalid as a matter of law," or (2) the outcome of the claim's litigation is "doubtful."

*Id.* at 1328 (citations omitted). In light of the consideration offered by the Lehman Creditors under the Plans and the lack of merit of the SunCal Actions, the overall settlement with the Lehman Creditors embodied in the Plans is well within the range of reasonableness.

**C.    The Consideration from the Lehman Creditors to the
Estates and Other Creditors to be Provided Under the Plans is Substantial**

As set forth above, under the Plans, as part of the consideration for the conveyance of the Plan Projects to the Lehman Nominees, the Lehman Creditors will provide the Lehman Plan Funding, which has been estimated to approximate almost $92 million, not including the payments to be made under the Settling Bond Issuer Agreements. The Lehman Plan Funding includes the Lehman Post-Confirmation Expense Funding (*i.e.*, an obligation to fund up to an aggregate of $1,000,000 of Post-Confirmation Expenses incurred during the 2 years following each Plans' Effective Date) and obligations to fund payments to creditors (the Lehman Creditor Distribution Funding), including to the Lehman Creditors for repayment of post-petition loans. The obligations to Bond Issuers being arranged by the Lehman Creditors under the Settling Bond Issuer Agreements are expected to be at additional potential cost to the Lehman Nominees taking title to those Plan Projects for which Project Bond were issued of at least several millions of dollars (and based upon presently unliquidated, contingent amounts, essentially capped by the aggregate face amount of the outstanding Project Bonds totaling in excess of one hundred million dollars).

Moreover, as to the treatment of the Lehman Creditors' Claims, for their over $1.8 billion in Claims arising from the Lehman Loans, under the Plans, the Lehman Creditors are allowed both Secured Claims at the indicated collateral values and General Unsecured Claims (deficiency claims) for the balance.  Plans, § 5.2.  Under the Plans, the Lehman Creditors have agreed with respect to virtually all of their Claims to take less favorable treatment than that to which they believe their Claims entitle them. For their Secured Claims, the Lehman Creditors do get the Plan Projects worth a fraction of the nearly $1.8 billion they are owed, <u>but, at the same time, are paying millions and millions of dollars for the privilege, as noted above.</u>  For any Senior Secured Mechanic's Liens or Reliance Claims that they obtain (such as from taking assignment of such claims held by Bond Issuers), they have agreed only to share in "Available Cash" and receive no other consideration. *See, e.g.,* Lehman VD Lenders Disclosure Statement, §§ 5.3.3(d), 5.3.6(d), and 5.3.7(e).  <u>For the deficiency claims, these are all classified in the classes of General Unsecured Claims and the Lehman Creditors have agreed  to forego payment altogether on these Claims</u>. *See, e.g.,* Lehman VD Lenders Disclosure Statement, §§ 5.3.7(e).

## IV.

## <u>THE SUNCAL ACTIONS LACK MERIT</u>

The Plan Proponents believe that the overall resolution of the SunCal Action and the Claims of the Lehman Creditors and other Creditors represented by the Plans is fair and reasonable and in the best interests of the Estates and the Debtors' creditors both because the consideration being provided by the Lehman Creditors is very, very substantial, as noted above, and because the SunCal Actions lack merit, as noted below.

The SunCal Debtors used the money they borrowed pursuant to the <u>Lehman Loans</u> to develop certain properties located in the State of California (collectively, the "<u>Projects</u>").  The Projects are the Lehman Entities' collateral for the Lehman Loans, either directly or through pledges of equity interests in entities which own certain of the Projects.  Approximately $1.8 billion is owed with respect to the Lehman Loans, and prior to the commencement of the SunCal Debtors' chapter 11 cases, each of the Lehman Loans had matured.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1

**A.      SunCal Arguments – a Moving Target Over Time**

2

1.      SunCal Actions

3

After receiving billions of dollars from the Lehman Entities' in the form of secured loans, the

4

SunCal Debtors subsequently failed to repay the Lehman Loans in accordance with their terms.

5

Instead, certain SunCal Debtors and their principals and/or affiliates ("SunCal") have filed several

6

adversary proceedings and contested matters against certain Lehman Entities (collectively, the

7

"SunCal Actions").

8

In 2009, the SunCal Debtors filed a complaint, which was amended numerous times, seeking

9

to equitably subordinate Lehman ALI, OVC, and Northlake's secured claims that were filed against

10

the applicable SunCal Debtors.  *See* Fourth Amended Adversary Proceeding Complaint, Adv. No.

11

8:09-ap-01005-ES [ECF No. 237] (the "Equitable Subordination Action" or "ES Action").  The

12

Trustee has suspended any participation in or prosecution of the Equitable Subordination Action

13

claims.  Those claims will be fully resolved and dismissed upon plan confirmation.

14

In 2011, certain Voluntary Debtors and others filed a second complaint against Lehman ALI

15

and additional entities for breach of contract.  *See* Complaint for Breach of Contract and Breach of

16

Covenant of Good Faith and Fair Dealing, Adv. No. 8:00-ap-01212-ES [ECF No. 1] (the "Contract

17

Action").

18

Finally, shortly after the Contract Action was filed, certain Voluntary Debtors and SunCal

19

Management, LLC filed a motion seeking to disallow certain Lehman Entities' secured claims that

20

were filed against the applicable SunCal Debtors' estates.  *See* Notice of Amended Motion and

21

Amended Motion for Order Disallowing Certain Claims Held by Lehman ALI, Inc. and Lehman

22

Commercial Paper Inc., [ECF No. 2082] (the "Disallowance Action").

23

2.      SunCal Allegations

24

The allegations in the Equitable Subordination Action, the Contract Action, and the

25

Disallowance Action substantially overlap.

26

a.      SunCal's Allegation That LCPI's Automatic Stay "Does Not

27

Apply" In The SunCal Bankruptcy Proceedings

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    LCPI filed for bankruptcy protection on October 5, 2008.  An automatic stay imposed by 11

2  U.S.C. § 362(a) "bars actions that would diminish the estate of a debtor in bankruptcy."  *In re*

3  *Palmdale Hills Property, LLC*, 2011 WL 3320429, at *1 (9th Cir. Aug. 3, 2011).  The SunCal

4  Debtors argue in connection with the Equitable Subordination Action that LCPI's automatic stay

5  "was not and ha[s] never been applicable" and there was "repeated false invocation" of LCPI's

6  automatic stay (even though the United States Court of Appeals for the Ninth Circuit and the United

7  States Bankruptcy Appellate Panel of the Ninth Circuit have both held the LCPI automatic stay

8  applies and LCPI properly enforced the stay).

9              b.      SunCal's Allegation That The Lehman Entities Should Have,

10                     But *Did Not*, Close The Proposed Settlement Transactions

11    A restructuring agreement, dated May 23, 2008, by and between, among others, Lehman

12  Brothers Holdings Inc. ("LBHI"), Lehman ALI, certain SunCal Debtors, SCC Acquisitions, Inc.,

13  SCC Acquisitions, LLC, SunCal Management, LLC, and Bruce Elieff (the "Restructuring

14  Agreement"), set forth the processes and conditions for a possible settlement agreement (the

15  "Proposed Settlement Agreement"), which included proposed settlement transactions (the "Proposed

16  Settlement Transactions") with respect to certain of the Projects.[12]  In the Equitable Subordination

17  Action, the Contract Action, and the Disallowance Action, SunCal argues that the Lehman Entities

18  were required to close the Proposed Settlement Transactions (even though the conditions precedent

19  to closing the Proposed Settlement Transactions were not satisfied).

20              c.      SunCal's Allegation That The Lehman Entities *Did* Execute

21                     And Close The Proposed Settlement Transactions

22    Both the Contract Action and the Disallowance Action allege that not only did the Lehman

23  Entities fail to close the Proposed Settlement Transactions, but that the Proposed Settlement

24  Agreement was actually *executed* by the parties and *closed* in August 2008 (even though SunCal's

25  own counsel admitted that the Proposed Settlement Transactions did not close in August 2008 and

26  both parties testified that all that the parties signed were signature pages to be held in escrow until a

27  final agreement was reached (which never happened)).

28  _____
[12] *See* Declaration of Douglas Champion, filed contemporaneously herewith as Exhibit A ("Champion Decl.")
at Ex. A (Restructuring Agreement).

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

d.    SunCal's Allegation That The Lehman Entities Did Not Fund

"Urgent Payables."

Pursuant to the Restructuring Agreement, Lehman ALI agreed to make certain protective advances to SunCal under SunCal's relevant existing loans to enable SunCal to pay "such Urgent Payables which are approved by Lehman ALI (pursuant to such invoices and other documentation substantiating the same to Lehman ALI's reasonable satisfaction)."[13]  In the Equitable Subordination Action, the Contract Action, and the Disallowance Action, SunCal argue that the Lehman Entities did not fund Urgent Payables (even though the Lehman Entities funded more than $60 million in "Protective Disbursement Agreements" and "Project Cash" (as defined below), approximately 99% of the Urgent Payables that were approved by the Lehman Entities at the time LBHI filed for bankruptcy protection).

e.    SunCal's Allegation That The Lehman Entities Knew In

August 2008 That There Would Be A Lehman Bankruptcy

The SunCal Debtors allege in the Equitable Subordination Action that the Lehman Entities took certain alleged actions in August 2008 because they knew that an LBHI bankruptcy filing was imminent (even though every witness testified to the contrary).

f.    SunCal's Allegation That The Lehman Entities Breached The

Restructuring Agreement

In the Disallowance Motion, SunCal alleges that LCPI and Lehman ALI breached the Restructuring Agreement because LCPI entered into a "Repo Transaction" (defined below) pursuant to a Master Repurchase Agreement with a third party (even though LCPI is not a party to the Restructuring Agreement, Lehman ALI is not a party to the Master Repurchase Agreement, and the operative documents expressly permit the Repo Transaction).

***

For numerous reasons, *all* of SunCal's arguments necessarily fail because they overlook fundamental contract principles, fail to meet the requirements of equitable subordination and breach

---

[13] Champion Decl., Ex. A (Restructuring Agreement) § 1(h).

1   of contract under the law, and are directly contrary to the established facts and testimony in this case.

2   As shown below, SunCal cannot succeed on its claims against the Lehman Entities.

3

**B.      The Courts Have Already Held That The LCPI Automatic**
4   **Stay _Does_ Apply In the SunCal Bankruptcy Proceedings**

5          It is well established that "equitable subordination is an unusual remedy which should be

6   applied only in limited circumstances." _Feder v. Lazar (In re Lazar)_, 83 F.3d 306, 309 (9th Cir.

7   1996). The Ninth Circuit has instructed that the "subordination of claims based on equitable

8   considerations generally requires three findings: '(1) that the claimant engaged in some type of

9   inequitable conduct, (2) that the misconduct injured creditors or conferred unfair advantage on the

10  claimant, and (3) that subordination would not be inconsistent with the Bankruptcy Code.'" _Henry_

11  _v. Lehman Commercial Paper, Inc. (In re First Alliance Mortgage Co.)_, 471 F.3d 977, 1006 (9th Cir.

12  2006)) (quoting _In re Lazar_, 83 F.3d at 309); s_ee also Spacek v. Thomen (In re Universal Farming_

13  _Indus.)_, 873 F.2d 1334, 1337 (9th Cir. 1989) (same). For a court "to justify equitable

14  subordination," it must "make specific findings and conclusions with respect to each of the

15  requirements." _In re Lazar_, 83 F.3d at 309. The "burden of establishing all the elements of

16  subordination by a preponderance of the evidence is on the objecting party." _Friedman v. Sheila_

17  _Plotsky Brokers, Inc. (In re Friedman)_, 126 B.R. 63, 71 (BAP 9th Cir. 1991).

18         As a result of two decisions regarding the LCPI automatic stay, the SunCal Debtors'

19  argument in the Equitable Subordination Action that LCPI's automatic stay "was not and ha[s] never

20  been applicable" and there was "repeated false invocation" of LCPI's automatic stay is

21  unsustainable. On December 15, 2009, the Ninth Circuit Bankruptcy Appellate Panel (the "BAP")

22  held the SunCal Debtors' Equitable Subordination Action against LCPI "violates [LCPI's] automatic

23  stay." _Lehman Commercial Paper Inc. v. Palmdale Hills Property, LLC (In re Palmdale Hills_

24  _Property, LLC)_, 423 B.R. 655, 659 (B.A.P. 9th Cir. 2009). The BAP found that the protection of the

25  LCPI automatic stay "did not evaporate when it filed a proof of claim in [the SunCal] Debtors'

26  bankruptcy case." _Id_. at 667. The BAP further held the SunCal Debtors "may not initiate an action

27  or proceeding against [LCPI] that seeks affirmative relief, such as a counterclaim without violating

28  the automatic stay." _Id_. Finally, the BAP recognized that LCPI "has a right to protect its estate from

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1  diminishment of its assets by others, which here includes Debtors' proposed modification of its

2  rights, including its lien rights." *Id.* at 666 n.8.

3       On August 3, 2011, the Ninth Circuit affirmed the BAP's Opinion.  It held "[t]he BAP

4  correctly determined that [LCPI's] automatic stay prevented [LCPI's] claims from being

5  subordinated." *In re Palmdale Hills Property, LLC*, --- F.3d ----, 2011 WL 3320429, at *4 (9th Cir.

6  Aug. 3, 2011).  Accordingly, LCPI clearly did not engage in any "inequitable conduct" by enforcing

7  its automatic stay.

8

9  **C.    There Was No Obligation to Close the Proposed Settlement
         Transactions Because SunCal Failed To Satisfy The Conditions Precedent**

10      Under New York law, "the elements of a cause of action for breach of contract are (1) the

11  existence of a contract, (2) performance of the contract by one party, (3) breach by the other party,

12  and (4) damages suffered as a result of the breach." *Beautiful Jewelers Private Limited, Mittal Court*

13  *"A" Wing, 10th Floor, Nariman Point, Mumbai, India 400021 v. Tiffany & Co.*, 727 Fifth Avenue,

14  No. 10–3039–cv, 2011 WL 4337108, at *1 (2d Cir. Sept. 16, 2011) (citing *First Invs. Corp. v.*

15  *Liberty Mut. Ins. Co.*, 152 F.3d 162, 168 (2d Cir. 1998)).  The evidence is clear that a) Lehman ALI

16  did not breach the Restructuring Agreement; b) LCPI could not have breached the Restructuring

17  Agreement because it is not a party to the Restructuring Agreement; and c) a final, operative

18  Proposed Settlement Agreement does not exist and therefore cannot be "breached" as a matter of

19  law.

20

21      1.    The Restructuring Agreement Establishes The Standard For Closing

22            The Proposed Settlement Transactions

23            a.    The Restructuring Agreement:  The Agreement That Actually Existed

24      Although the Lehman Entities could have foreclosed on the Projects after the Lehman Loans

25  went into default, certain Lehman Entities instead engaged in negotiations with SunCal.  Those

26  negotiations eventually lead to the execution of the Restructuring Agreement.  The Restructuring

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1   Agreement set forth the processes and conditions for a Proposed Settlement Agreement, which

2   included Proposed Settlement Transactions with respect to certain of the Projects.[14]

3       While the Voluntary Debtors and others assert in their <u>Objections</u>[15] that "[t]he Settlement

4   Agreement is attached as an exhibit to the Restructuring Agreement," in fact, as the Restructuring

5   Agreement clearly states, all that was attached was "the *form* of the Settlement Agreement to be

6   executed and delivered at the closing of the restructuring transactions contemplated in the Term

7   Sheet" (the "<u>Form Settlement Agreement</u>").[16]  That "form" included numerous blanks, incomplete

8   provisions, and undrafted exhibits.  It was not a finalized document and, contrary to the Voluntary

9   Debtors' assertions, not only did it not take effect when the Restructuring Agreement was executed,

10  but it was revised numerous times in subsequent drafts exchanged by the parties.  As the extensive

11  deposition testimony on this issue clearly indicates, the Restructuring Agreement was intended to

12  "provide[] the parameters under which the parties would proceed to execute the settlement

13  agreement and close the settlement transaction. . . . It was a very detailed description of what it was

14  going to take to close."[17]

15          b.      The Restructuring Agreement Lists The Conditions Precedent

16                  <u>For Closing The Proposed Settlement Transactions</u>

17      Pursuant to the Restructuring Agreement, certain conditions precedent had to be satisfied

18  prior to closing the Proposed Settlement Transactions, including a set of conditions entitled the

19  "<u>Closing Conditions</u>."[18]  Foremost among these was the requirement that the parties obtain "all

---

[14] The properties subject to the terms of the Restructuring Agreement (the "<u>Eligible Conveyance Properties</u>") are Acton Estate, Beaumont Heights, Bickford Ranch, Emerald Meadows, Heartland, Johannson Ranch, Marblehead, Northlake, Oak Valley, Ritter Ranch, Summit Valley, and Pacific Point.  Declaration of Nellie Camerik, attached hereto filed contemporaneously herewith as Exhibit B ("<u>Camerik Decl.</u>"), Ex. B (Form Settlement Agreement Annex 1).  Since the Proposed Settlement Agreement was never completed and never closed, no other properties were added to the Restructuring Agreement.

[15] "<u>Objections</u>" or "<u>Obj.</u>" refers to certain Voluntary Debtors and SCC Acquisitions, Inc.'s Objections the Lehman/Trustee Plan for the Trustee Debtors and the Lehman Creditor Plan for the Voluntary Debtors [ECF No. 2815].

[16] Champion Decl., Ex. A (Restructuring Agreement) at 1 (emphasis added).

[17] Declaration of Dean Ziehl, filed contemporaneously herewith as Exhibit C ("<u>Ziehl Decl.</u>"), Ex. B (excerpts of August 26, 2011 deposition transcript of Nellie Camerik) (the "<u>Camerik Depo.</u>") at 20:1-5.  The parties could not consummate the Proposed Settlement Transactions at the time the Restructuring Agreement was executed because, among other things, there were a "myriad number of consents" that SunCal needed to obtain which "was going to take time."  *Id.* at 19:10-14.  Ms. Camerik is counsel for the Lehman Entities and was involved in drafting the Restructuring Agreement as well as the Proposed Settlement Agreement and related documents.

[18] *See* Champion Decl., Ex. A (Restructuring Agreement) § 1(b).

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

consents and approvals" of third parties "to any agreements to which [SunCal] or [the Lehman Entities] . . . are parties or to which they may be bound that are required to be obtained with respect to or as a result of any of the [Proposed Settlement Transactions]" (the "<u>Required Consents</u>").[19]  The Required Consents involved obtaining the consent of a third party to the assignment of certain agreements from the original SunCal project owner to the new entity that would take title to the various projects under the Proposed Settlement Transactions.[20]  The Restructuring Agreement required that *all* consents and approvals be obtained with respect to all the Eligible Conveyance Properties, or at least with respect to eight of the Eligible Conveyance Properties and the Pacific Point Project (in which case, certain of the Eligible Conveyance Properties were required to close together).[21]

Another Closing Condition under the Restructuring Agreement required the parties to "have negotiated and agreed upon the form" of the documents necessary to close the Proposed Settlement Transactions, including, among others, "any other schedules, exhibits and annexes" to the Proposed Settlement Agreement.[22]  This was a critical step in closing the Proposed Settlement Transactions because the "devil is in the details" and final form settlement documents were needed to formalize any agreement between the parties.[23]  Another Closing Condition under the Restructuring Agreement required that the Title Insurer be "prepared to issue the Title Policies as contemplated under the terms of the [Proposed] Settlement Agreement."[24]  The Closing Conditions also required that no governmental authority or court had issued an order or taken other action "materially restraining, enjoining, or otherwise prohibiting any of the [Proposed] Settlement Transactions."[25]

---

[19] Champion Decl., Ex. A (Restructuring Agreement) § 1(b)(ii)

[20] Champion Decl. ¶ 1.  The new entities were proposed as single purpose entities, formed to hold the individual projects, which themselves were to be owned by a joint venture between a SunCal related entity and a Lehman related entity.  *See*  Ziehl Decl., Ex B (Camerik Depo.) at 52: 14-16 ("the transferee was a joint venture between Lehman and SunCal").

[21] Champion Decl., Ex. A (Restructuring Agreement) § 1(b)(ii), 2(a).  Marblehead and Heartland were required to close together and Bickford Ranch, Emerald Meadows, Acton, Beaumont Heights, Summit Valley, and Johannson Ranch were required to close together.  Camerik Decl., Ex C (Restructuring Agreement Annex 2).

[22] Champion Decl., Ex. A (Restructuring Agreement) § 1(b)(iii).

[23] Ziehl Decl., Ex. D (excerpts of August 1, 2011 deposition transcript of Robert Brusco) ("Brusco Depo.") at 131: 15-25 – 132: 1-16.

[24] Champion Decl., Ex. A (Restructuring Agreement) § 1(b)(iv)(b).

[25] Champion Decl., Ex. A (Restructuring Agreement) § 1(b)(vi).

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    In addition to these and other specified Closing Conditions, the Restructuring Agreement

2    imposed additional conditions precedent necessary for the closing of the Proposed Settlement

3    Transactions (together with the Closing Conditions, the "Conditions Precedent").  Among the

4    Conditions Precedent was the satisfaction and performance of all requirements, conditions, and

5    obligations set forth in the Form Settlement Agreement and supporting documents as well as the

6    delivery of the necessary documents contemplated in the Form Settlement Documents and the

7    Preliminary Closing Checklist.  The Preliminary Closing Checklist described a myriad of documents

8    that needed to be negotiated, finalized, and delivered prior to the consummation of the Proposed

9    Settlement Transactions, including a number of documents for which SunCal was expressly

10   responsible. [26]  In addition, the Form Settlement Agreement specifically required that on the

11   Proposed Closing Date, *SunCal* deliver the settlement documents to the Lehman Entities.[27]

12   Pursuant to sections 1(b) and (c) of the Restructuring Agreement, the parties were under no

13   obligation to consummate the Proposed Settlement Transactions if any of the Conditions Precedent

14   remained outstanding.[28]  In addition, section 1(d) of the Restructuring Agreement required that the

15   Closing Conditions be satisfied by a date certain (the "Closing Conditions Deadline").[29]  To the

16   extent the Closing Conditions remained outstanding as of that date, the parties were permanently

17   relieved of the obligation to consummate the Proposed Settlement Transaction.[30]

18

19         2.     The Parties Agree To An Extension Of The Closing Conditions Deadline

20   In the summer of 2008, the parties worked towards a closing of the Proposed Settlement

21   Transactions, which had an original Closing Conditions Deadline of August 31, 2008.  In early

22

23

24   _____

25   [26] Champion Decl., Ex. A (Restructuring Agreement) § 1(c).  The "Preliminary Closing Checklist" is
     appended to the Restructuring Agreement as Exhibit C.  Camerik Decl., Ex. E.
     [27] Camerik Decl., Ex. A (Form Settlement Agreement) §21.
26   [28] *See* Champion Decl., Ex. A (Restructuring Agreement) §§ 1(b), (c).
     [29] *See* Champion Decl., Ex. A (Restructuring Agreement) §1(d).  The Restructuring Agreement contemplated
27   that if the Closing Conditions were in fact satisfied by the Closing Conditions Deadline, the parties were to
     execute the Proposed Settlement Agreement within three business days of the satisfaction of the Closing
28   Conditions (the "Proposed Closing Date").  *Id.* at §1(a).
     [30] Champion Decl., Ex. A (Restructuring Agreement) §1(d).

1    August, both parties were aware that there was a large amount of work to be done to complete the

2    entitlements, loan agreements, title, deliverables and other closing items.[31]

3         By August 22, 2008 – at the latest – it became apparent to both the Lehman Entities and to

4    SunCal that the Closing Conditions would not be met on or prior to August 31, 2008.[32]  This

5    conclusion was based on the parties' recognition of "the amount of work and conditions that

6    need[ed] to be satisfied in order to consummate the closing" and "that it wasn't going to get done in

7    that short period, by [August] 31st."[33]  It was then decided that the parties would meet in Los

8    Angeles, California at the end of August (the "August 2008 Meeting"), not to close the Proposed

9    Settlement Transactions, but to "iron out what remained of a few material open issues and what was

10   left of open issues. . . . While everybody's in the room, everybody's who is anybody in this

11   transaction is going to be present, let's take advantage of that opportunity and try to get as many

12   documents signed as possible."[34]  The timing of this meeting was dictated largely by the availability

13   of SunCal's outside general counsel, Bruce Cook, who was planning to be on vacation from August

14   26 through September 10, 2008.  The parties had agreed that in light of Mr. Cook's impending

15   absence, it would be productive to have the parties sign the various signature pages in advance of the

16   actual closing in order to expedite the ultimate closing.[35]  At the August 2008 Meeting, the parties

17   decided to push the Closing Conditions Deadline to September 30, 2008 based on the "mountain of

18   work that remained to get to the finish line."[36]

19

20

21

22

---

[31] *See* Ziehl Decl., Ex G (excerpts of September 12, 2011 deposition transcript of Francis Gilhool) ("Gilhool
Depo.") at 84:1 – 85:16.  During the summer of 2008, Mr. Gilhool was the primary Lehman representative
involved with negotiating the Restructuring Agreement and Proposed Settlement Transactions.  *See also* Ex.
D (Brusco Depo.) at 102: 17 – 24 ("Q: So is your understanding that at least as of August 11, 2008, Frank
Gilhool was proposing that the transaction would close August 27? A: Yes.  I think we were all – we wanted
to close – I think all parties wanted to close the transaction by the 31st.").

[32] *See* Ziehl Decl., Ex B (Camerik Depo.) at 92: 1-8 (discussing August 22, 2008 call between the parties
where it was decided that the Required Consents could not be obtained until September 2008); *see also*
Champion Decl. ¶ 5.

[33] Ziehl Decl., Ex D (Brusco Depo.) at 95: 2 – 96:2.

[34] *Id*. at 92: 6-12; *see also* Champion Decl. at ¶ 6.

[35] *See* May 26, 2011 Declaration of Nellie Camerik [ECF No. 2124] ¶ 3.

[36] *See* Ziehl Decl., Ex. D (Brusco Depo.) at 98: 23 – 101: 2; *see also* Champion Decl. ¶ 7.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

3.    The Parties Did Not Execute And Close The Proposed Settlement

Transactions In August 2008

Although SunCal has repeatedly represented to the Court that the Proposed Settlement

Agreement was executed in August, the evidence (and SunCal's own arguments in some instances)

clearly shows that is not the case. Indeed, SunCal has taken inconsistent positions with respect to

the alleged closing of the Proposed Settlement Agreement, asserting one argument and then a

contrary argument where convenient. In multiple filings, SunCal persists in claiming that the

"Settlement Agreement and related settlement documents were each executed by all applicable

parties on August 25, 2008."[37] Yet, SunCal also takes the paradoxical position – *in the very same*

*filings* – that the Lehman Entities "prevented the closing and consummation of the Settlement

Agreement."[38]

There is no doubt that the Proposed Settlement Agreement was never executed. New York

law provides that "if parties do not intend to be bound by an agreement until it is in writing and

signed, then there is no contract until that event occurs." *R.G. Group, Inc. v. Horn & Hadart Co.*,

751 F.2d 69, 74 (2d Cir. 1984) (citation omitted). In fact, "[t]he point of these rules is to give parties

the power to contract as they please, so that they may . . . maintain 'complete immunity from all

obligation' until a written agreement is executed." *Id.* (citation omitted). In *Reprosystem, B.V. v.*

*SCM Corp.*, 727 F.2d 257, 262 (2d Cir. 1984), the court found that language in a draft proposed

contract that stated that the agreement would be valid and binding "when executed and delivered"

established a mutual intent not to be bound prior to execution of the documents. Here, the Lehman

Entities clearly intended to execute, deliver, and be bound by the Proposed Settlement Agreement

only *after*, among other things, all the Proposed Settlement Documents were finalized, all the

---

[37] Disallowance Action at 16; Contract Action at 17 ("The Settlement Agreement and related settlement documents were each executed by all applicable parties on August 25, 2008."); Equitable Subordination Action at 22 (the SunCal Agreement was signed by the SunCal and Lehman parties on August 25, 2008"); Obj. at 22 ("the Lehman Parties signed the Settlement Agreement").

[38] Disallowance Action at 24; Contract Action at 34 ("Lehman ALI was contractually required to proceed, and to cause its affiliates to proceed, with a consummation of the closing of the Settlement Agreement. Without excuse for nonperformance, Lehman ALI refused and failed to do so or to cause its affiliates to do so."); Obj. at 20 ("Lehman ALI could not have consummated a Closing under the terms of the Settlement Agreement . . .").

1    Conditions Precedent were satisfied, and all the signature pages were delivered to the parties.  As

2    discussed below, none of this occurred.

3                  a.        The Parties Signed Only Signature Pages To Be Held In Escrow

4                            Pending A Closing Of The Proposed Settlement Transactions

5           The record is clear that during the August 2008 Meeting, the parties signed only signature

6    pages to be held in escrow pending a closing of the Proposed Settlement Transactions.  Erica Bose,

7    counsel for the SunCal parties at the August 2008 Meeting, testified:

8                  A. It was my understanding that those documents were being executed
                   in anticipation of an upcoming closing and that Nellie was going to be
9                  holding those documents or those signatures in trust, so to speak, until
                   the parties agreed that the conditions precedent to closing were
10                 satisfied, at which point she would distribute the signatures attached to
                   the correct closing documents.
11
                   Q. Did she ever distribute those signatures?
12
                   A. She did not, to the best of my knowledge.
13
                   Q. And your understanding was that Nellie [Camerik], an attorney at
14                 Weil    Gotshal, was going to hold the signatures in trust, correct?

15                 A. Yes.[39]

16          Frank Gilhool, the signatory for certain Lehman Entities on certain signature pages at the

17    August 2008 Meeting, testified:

18                 Q. And when you were signing those documents, what was your
                   understanding of what you were doing?
19
                   A. We were signing documents in escrow subject to all of the work
20                 that we've been talking about getting completed.  So once all the -- we
                   had the Restructuring Agreement, we had some version of a
21                 Settlement Agreement and those -- we were signing documents pre-
                   close and having those signature pages held in escrow subject to
22                 completing all the work that was required based upon, you know,
                   where we stood at that point in time.[40]
23
            Nellie Camerik, counsel for certain Lehman Entities at the August 2008 Meeting, testified:
24
                   Q. And what were you supposed to do with those signatures?
25
                   A. Hold them until we were ready to close.[41]
26

27                 . . .
      _____
28    [39] Ziehl Decl., Ex. H (excerpts of July 28, 2011 Deposition of Erica Bose) (the "Bose Depo.") at 37:4-21.
      [40] Ziehl Decl., Ex. G (Gilhool Depo.) at 86:12-24.
      [41] Ziehl Decl., Ex. B (Camerik Depo.) at 197:8-14.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Q. And there wasn't a set of signature pages that footed to the latest form of the settlement agreement?

A. No. The signature pages were stand-alones and they were going to be      appended to whatever the parties ultimately agreed was the final, fully approved   agreement.[42]

Michael Bond, counsel for certain Lehman Entities at the August 2008 Meeting, testified: "there were various signature pages that were signed and put in escrow."[43]

Robert Brusco, who attended the August 2008 Meeting on behalf of certain Lehman Entities, testified:

Q. You understand that signature pages to the settlement agreement, whether attached to the settlement agreement or not, those signature pages were signed at that August meeting, right?

A. There were signature pages only executed and delivered into escrow at the August 25 meeting.  Yes.

Q. In fact, there were signature pages not just to the settlement agreement, but to numerous documents signed at that August meeting, correct?

A. Signature pages only that were not attached to final documents.[44]

. . .

A. I'll tell you that Nellie Camerik did make it clear, I believe, on more than one occasion that the signature pages that were being delivered by both parties were delivered -- were being delivered and asked to be held in escrow pending satisfaction of conditions, you know, finalization of document, and all those good things that come with, you know, not, in essence, effectuating a closing.[45]

In addition to the signature pages held in escrow by Ms. Camerik, Douglas Champion, another attorney for the Lehman Entities, testified that following the August 2008 Meeting, he received in his office at Gibson, Dunn & Crutcher LLP additional signature pages that were to be held in trust pending the closing of the Proposed Settlement Transactions.  No documents in final form existed for those signature pages.[46]  Subsequent to the August 2008 Meeting, Mr. Champion communicated with Amy Freilich of SunCal, Lauren Dalessio of SunCal, and Scott Campbell of Cox, Castle & Nicholson LLP, the law firm that represented SunCal in connection with the Proposed

---

[42] Ziehl Decl., Ex. B (Camerik Depo.) at 218:13-18.
[43] Ziehl Decl., Ex. I (excerpts of September 8, 2011 deposition of Mike Bond) at 29:21-22.
[44] Ziehl Decl., Ex. D (Brusco Depo.) at 118:8-21.
[45] *Id.* at 256:13-23.
[46] Champion Decl. ¶ 10.

Settlement Transactions, regarding holding the signature pages in trust pending the closing of the Proposed Settlement Transactions and the parties' authorization to attach the signature pages to the final forms of documents to be circulated upon closing.[47]

All original signature pages continue to be held by Gibson, Dunn & Crutcher LLP because the Proposed Settlement Transactions never closed. Mr. Champion never received the Lehman Entities' or SunCal's "e-mail authorization to attach signature pages to the final forms of the documents to be circulated electronically at closing," because, among other things, there was never a closing for the Proposed Settlement Transactions.[48]

### b.    There Was No "Closing" In August 2008

Additional evidence also demonstrates that there was no "closing" of the Proposed Settlement Transactions in August 2008. For instance, an agreement between the parties dated August 27, 2008 provides: "Section 1(d)(1) [setting closing date] of the Restructuring Agreement is hereby amended to delete the reference to 'August 31, 2008' and substitute 'September 30, 2008' in lieu thereof."[49] If the Proposed Settlement Transactions had "closed" in August 2008, there would have been no need to extend the Closing Conditions Deadline to September 2008.

The fact that there was no closing in August 2008 was further confirmed by SunCal's counsel, Ms. Bose:

Q. So on August 26th there was not a closing; is that correct?

A. There was not an actual closing, that is correct.[50]

Similarly, the Lehman Entities' counsel, Ms. Camerik, testified "the settlement transactions never closed."[51]

### 4.    SunCal's Failure To Satisfy The Closing Conditions

SunCal argues that Lehman ALI breached the Restructuring Agreement by failing to close the Proposed Settlement Transactions, including failing to assume the obligations under the

---

[47] Champion Decl. ¶ 11.
[48] Champion Decl. ¶ 12.
[49] Camerik Decl., Ex. E (August 27, 2008 Letter Agreement).
[50] Ziehl Decl., Ex. H (Bose Depo.) at 19:10-13.
[51] Ziehl Decl., Ex. B (Camerik Depo.) at 65:15-16.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    Proposed Settlement Agreement.[52]  Inexplicably, SunCal also argues that Lehman ALI breached the

2    terms of the Proposed Settlement Agreement, even though SunCal acknowledges that such Proposed

3    Settlement Agreement and related Proposed Settlement Transactions *never closed*.[53]  Regardless, the

4    Lehman Entities were not under an obligation to close the Proposed Settlement Transactions

5    because, as discussed below, SunCal failed to satisfy the Closing Conditions pursuant to the terms of

6    the Restructuring Agreement on or before the Closing Conditions Deadline.  The Lehman Entities,

7    therefore, properly terminated the Restructuring Agreement and any claim for breach of that

8    agreement must necessarily fail.

9               a.    SunCal Failed to Satisfy the Closing Conditions Prior to the

10                   Closing Conditions Deadline

11          While the original Closing Conditions deadline was August 31, 2008,[54] the parties agreed to

12   extend the Closing Conditions Deadline to September 30, 2008[55] because it became clear that the

13   Closing Conditions could not be satisfied by the end of August.[56]  SunCal buries in a footnote in its

14   Objections its unsubstantiated contention that "the Lehman parties were obligated to proceed to a

15   Closing even before LBHI's September 15, 2008 bankruptcy."[57]  Not surprisingly, SunCal offers no

16   evidence for its contention.  The actual facts establish that, despite the extension, SunCal failed to

17   satisfy the Closing Conditions necessary to effectuate the Proposed Settlement Transactions.

18               b.    SunCal Failed to Obtain the Required Consents

19          Without the Required Consents, the parties were unable to close the Proposed Settlement

20   Transactions.

21               i.    SunCal and the Lehman Entities Agreed to the List of

22                   Required Consents

23          The Required Consents were not initially defined in the Restructuring Agreement.  Instead,

24   both SunCal and certain Lehman Entities, along with their counsel, actively negotiated the consents

---

[52] *See* Disallowance Action at 16; Contract Action at 34.
[53] *See* Disallowance Action at 24; Contract Action at 34; Obj. at 20.
[54] Champion Decl. ¶ 4.
[55] *Id*. at ¶ 6.
[56] *Id*. at ¶ 5.
[57] Obj. at 21 n. 64.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    that were to be included as Required Consents under the Restructuring Agreement.[58]  As a result of

2    these negotiations, the consents that the parties considered material to the goals of the Proposed

3    Settlement Transactions were included under the Restructuring Agreement as Required Consents.[59]

4    As multiple representatives of the Lehman Entities testified, the Lehman Entities were clear that they

5    would not close the Proposed Settlement Transactions without receiving all of the Required

6    Consents pursuant to the terms of the Restructuring Agreement.[60]  The Restructuring Agreement is

7    clear:  *all* Required Consents needed to be obtained prior to closing the Proposed Settlement

8    Transactions.[61]

9                    ii.      SunCal Was Responsible for Obtaining the Required Consents

10            SunCal was tasked with the responsibility of obtaining the Required Consents.[62]  In fact, in

11   most instances, SunCal insisted that the Lehman Entities not contact third parties or become

12   involved in the consent process in order to avoid confusion with the third parties as to the current

13   ownership of the Projects, as well as to avoid sending potentially negative messages into the

14

15

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

16   [58] Champion Decl. ¶ 2.  *See also* Ziehl Decl., Ex B (Camerik Depo.) at 48: 23-25 – 49:1-6 ("In the beginning
     of the summer of '08 we came up with a mutually agreed upon list of everything both parties thought was

17   critical, important, and left off the list things that just either could be easily obtained after title transfer, never
     needed to be obtained, didn't matter, were obsolete . . . . But we came up with a list project by project,

18   excruciatingly detailed, and everybody decided who was going to be the SunCal point person to go get
     them."); Ziehl Decl., Ex. K (excerpts of the August 31, 2011 transcript of Amy Freilich) ("Freilich Depo.") at

19   47: 2-6 ("I don't believe the restructuring agreement was clear about what consents were required so the first
     thing that we did was attempt to develop a list of what consents were required.").  Amy Freilich was counsel

20   for the SunCal entities and was primarily responsible for negotiating and obtaining the Required Consents on
     behalf of SunCal.

21   [59] Champion Decl. ¶ 2.
     [60] *See* Ziehl Decl., Ex. D (Brusco Depo.) at 150: 17-23 ("I think our view was we needed – we needed

22   everything.  If there was a particular consent agreement permit, what it was that attached to the property and
     that property had the benefit of, those items needed to flow with the asset to us when we took title.").  Robert

23   Brusco is a managing director at LAMCO, LLC, a wholly-owned subsidiary of LBHI.  Mr. Brusco was
     involved with, among other things, the Restructuring Agreement and the Proposed Settlement Transactions.

24   *See also* Ziehl  Decl., Ex G (Gilhool Depo.) at 130: 16-21 ("I knew at the time through September that there
     was various issues that were need to be obtained and the marching orders that I gave at that time is live by

25   the document, get everything that needs to be done and we should be able to close.").
     [61] Champion Decl. ¶ 2; Ex. A (Restructuring Agreement) § 1(b)(ii).

26   [62] Champion Decl. ¶ 3.  *See also* Ziehl Decl., Ex B (Camerik Depo.) at 51: 6-16 (" SunCal ran the show.
     They didn't want Lehman to get terribly in the face of these municipalities.  This was SunCal's expertise.

27   They had the relationships, they knew these people personally. . . . And because of these relationships,
     SunCal insisted that they were going to take care of this.  And we monitored."); Ziehl Decl., Ex K (Freilich

28   Depo.) at 49: 8-11 (Q: Which party was responsible for obtaining the consents that were on the list? A: We
     divvied up the consents.  But typically it was SunCal or a SunCal employee.").

1   market.[63]  Thus, it was SunCal's responsibility to obtain the Required Consents from the various

2   third parties and then transmit such consents to the Lehman Entities.

3        Throughout late August and early September 2008, counsel for the Lehman Entities

4   circulated numerous e-mails to SunCal and their counsel, Amy Freilich, detailing the outstanding

5   items that the Lehman Entities needed from SunCal with regard to the Required Consents.[64]

6   Additionally, counsel for the Lehman Entities encouraged daily calls with Ms. Freilich and other

7   SunCal representatives in order to keep the process of obtaining the Required Consents on track to

8   meet the Closing Conditions Deadline.[65]

9                    iii.      SunCal Failed to Obtain the Required Consents by the

10                            Closing Conditions Deadline

11       Despite the Lehman Entities' efforts, SunCal failed to obtain the Required Consents.[66]  At

12  least four Required Consents were never obtained by SunCal and transmitted to the Lehman Entities,

13  as required by the express terms of the Restructuring Agreement.  These outstanding consents relate

14  to the Marblehead, Pacific Point, Ritter Ranch, and Del Rio Projects.[67]

15                    a)      Marblehead and Pacific Point

16       SunCal failed to obtain the consent of San Diego Gas & Electric to (i) the Assignment and

17  Assumption of the utility agreements by and between SunCal Marblehead LLC, as assignor, and

18  SCLV Marblehead LLC, as assignee, for the Marblehead project (the "Marblehead SDG&E

19  Consent") and (ii) the Assignment and Assumption of the utility agreements by and between SJD

20  Partners Ltd., as assignor, and LV Pacific Point LLC, as assignee, for the Pacific Point project (the

21  "Pacific Point SDG&E Consent").[68]  The Marblehead SDG&E Consent and the Pacific Point

22

23

24  _____
    [63] Champion Decl. ¶ 3.
    [64] Champion Decl. ¶ 15, Exs. C-D.
25  [65] Champion Decl. ¶ 15, Exs. C-D.
    [66] Champion Decl. ¶ 16.  *See also* Ziehl Decl., Ex K (Freilich Depo.) at 52: 17-19 (Q: Did SunCal obtain all
26  the consents that were on the list? A: No.).
    [67] Champion Decl. ¶ 16.
27  [68] Champion Decl. ¶ 16(b).  *See also* Ziehl  Decl., Ex K (Freilich Depo.) at 96:1-12 ("Q: But you believe that
    the consents for Marblehead were not all obtained as of November 18, 2008, is that right? A: I believe that
28  that utility consent may not have been obtained.  Q: Was the utility consent for Pac Point obtained for
    November 18, 2008?  A: Not to my knowledge").

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

SDG&E Consent were two of the consents that the parties agreed to include as Required Consents under the terms of the Restructuring Agreement.[69]

SunCal's inability to obtain the Marblehead SDG&E Consent and the Pacific Point SDG&E Consent is not attributable to the Lehman Entities.[70]  In early September 2008, SunCal informed the Lehman Entities that SDG&E required certain information from certain Lehman entities, as part owner of SCLV Marblehead LLC and as owner of LV Pacific Point, the entities that were to assume the utility agreements.[71]  The requested information included: (1) the certificate of formation of SCLV Marblehead LLC and LV Pacific Point LLC; (ii) the limited liability company agreement of SCLV Marblehead LLC and LV Pacific Point LLC; (iii) the certificate of registration for SCLV Marblehead LLC and LV Pacific Point LLC; (iv) an organizational chart for SCLV Marblehead LLC and LV Pacific Point LLC; (v) the name of the authorized signatory for SCLV Marblehead LLC and LV Pacific Point LLC; and (vi) financial statements for SCLV Marblehead LLC and LV Pacific Point LLC.[72]

The Lehman Entities provided SDG&E with all of the requested information, with the exception of the financial statements for SCLV Marblehead LLC and LV Pacific Point LLC because such financial statements did not exist at the time.[73]  In lieu of the non-existent financial statements, the Lehman Entities provided SDG&E with a description of the SCLV Marblehead LLC entity and the LV Pacific Point LLC entity and offered to provide financial statements when they were available.[74]  The certain Lehman entities even suggested to SunCal that they provide the financial statements for LBHI, but were directed by SunCal not to send such financial information to SDG&E.[75]  The Lehman Entities never received any other requests for additional information from either SunCal or SDG&E regarding the SDG&E Marblehead Consent or the SDG&E Pacific Point Consent.[76]

---

[69] Champion Decl. ¶ 17.

[70] Champion Decl. ¶ 18.

[71] *See* Ziehl Decl., Ex. L (September 3, 2008 email from A. Freilich to R. Brusco).

[72] *See* Champion Decl., Ex. G (September 4, 2008 letter from R. Brusco to SDG&E)

[73] *Id.*

[74] *Id.*

[75] Ziehl Decl., Ex. L (September 3, 2008 E-mail from A. Freilich to R. Brusco) ("No need to add the Lehman financials (Dave think it will overwhelm), but please do mention that there is no financial statement as this is an SPE and its sole asset is the property.").

[76] Champion Decl. ¶ 20.

1    On September 12, 2008, counsel for the Lehman Entities circulated a list of outstanding

2  items for the Required Consents to counsel for SunCal.[77]  This list indicated that the Lehman Entities

3  were still waiting for the Marblehead SDG&E Consent and the Pacific Point SDG&E Consent,

4  among others, and that, per SunCal, such consents were expected by late September.[78]  Counsel for

5  SunCal responded to this e-mail, but never indicated that SunCal or SDG&E was waiting for

6  additional information from the Lehman Entities in order to obtain the consents.[79]

7    Despite the Lehman Entities' efforts to provide the required information to SDG&E, SunCal

8  failed to obtain the Marblehead SDG&E Consent and the Pacific Point SDG&E consent.  Indeed,

9  SDG&E informed the Lehman Entities that as of August 27, 2009 – almost one year after the

10  Closing Conditions Deadline – the Marblehead SDG&E Consent was unexecuted by SDG&E

11  because "David Placek of SunCal notified [SDG&E] in late September 2008 not to proceed with the

12  assignments.  At that time the request for the assignment was cancelled."[80]  SunCal's failure to

13  obtain the Marblehead SDG&E Consent and the Pacific Point SDG&E Consent, and its affirmative

14  directive <u>not</u> to proceed with the consents, constituted a failure of a Closing Condition under the

15  Restructuring Agreement.

16           b)      Ritter Ranch

17    SunCal failed to obtain the consent of the Los Angeles Waterworks District to the

18  Assignment and Assumption of the Settlement Agreement and Amended and Restated Water System

19  Agreement by and between Palmdale Hills Property LLC, as assignor, and SCLV Ritter Ranch LLC,

20  as assignee, for the Ritter Ranch project (the "<u>Ritter Ranch Consent</u>").[81]  The Ritter Ranch Consent

21  was one of the consents that the parties agreed to include as a Required Consent under the terms of

22  the Restructuring Agreement.[82]

23    The fact that SunCal was responsible for, and unable to obtain, the Ritter Ranch Consent is

24  not disputed by SunCal.  In fact, in a letter from SunCal's general counsel dated November 18, 2008,

25  ───────────────
   [77] Champion Decl. ¶ 21, Ex D.
   [78] *Id.*

26  [79] Champion Decl. ¶ 21, Ex H.
   [80] Ziehl Decl., Ex. N (August 27, 2009 letter from SDG&E to Lehman ALI).

27  [81] Champion Decl. ¶ 16(c).  *See also* Ziehl Decl., Ex. O (October 3, 2008 e-mail from F. Pfaeffle of Los
   Angeles County to E. Casey of SunCal); (Freilich Depo.) at 91: 24-25 – 92: 1-12 ("Q: What consents had not

28  been obtained with respect to the Ritter Ranch project as of September 30, 2008? A: The water assignment.").
   [82] Champion Decl. ¶ 17.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1  SunCal admitted that the Ritter Ranch consent was still outstanding as of the Closing Conditions

2  Deadline.[83]  Attempting to shift the blame to the Lehman Entities, SunCal's former counsel, Amy

3  Freilich, testified that the inability to obtain the Ritter Ranch Consent was due to Lehman's failure to

4  provide information necessary to obtain the consent.[84]  However, SunCal has been unable to point to

5  any specific request by either SunCal or any third party regarding information necessary for the

6  Ritter Ranch Consent.  That is because there was no such request.  Any information that may have

7  been requested from the Lehman Entities was promptly provided to either SunCal or the requesting

8  party.[85]  In fact, SunCal was still negotiating with Los Angeles County regarding the form of the

9  assignment and assumption for the Ritter Ranch Consent as of, and following, the Closing

10  Conditions Deadline.[86]  SunCal's failure to obtain the Ritter Ranch Consent constituted a failure of a

11  Closing Condition under the Restructuring Agreement.

12                                        c)      Del Rio

13          SunCal failed to obtain the consent of the City of Orange to the Amendment of the

14  Development Agreement by and between the City of Orange and North Orange Del Rio LLC for the

15  Del Rio project (the "Del Rio Consent").[87]  Although Del Rio was never added to the Restructuring

16  Agreement as an Eligible Conveyance Property, the parties contemplated that if it would ultimately

17  be part of the Proposed Settlement Transactions, this consent would be a Required Consent for

18  purposes of closing.[88]

19          As described above, on September 12, 2008, counsel for the Lehman Entities circulated a list

20  of open issues for the Required Consents to counsel for SunCal, among others.[89]  The Del Rio

21  Consent was noted on this list as outstanding and, per SunCal, the Del Rio Consent would not be

22  [83] Camerik Decl., Ex. F (November 18, 2008 letter from Bruce Cook on behalf of SunCal to the Lehman
     Entities)

23  [84] Ziehl Decl., Ex. K (Freilich Depo.) at 91: 24-25 – 92: 1-12 ("Q: What consents had not been obtained with
     respect to the Ritter Ranch project as of September 30, 2008? A: The water assignment.  Q: Who was

24  responsible for obtaining that consent?  . . . A: Well, it was SunCal and SunCal had an outside counsel who
     was working on it but we stopped working on it when we couldn't get any feedback with respect to it. Q:

25  Who didn't provide the feedback? A: Lehman.").
     [85] Champion Decl. ¶ 18.

26  [86] Declaration of Erica Rutner Exhibit D, Ex. O (E-mail from LA County to SunCal, dated October 3, 2008,
     attaching "a redlined version of the draft Assignment Agreement" which shows LA County's "proposed

27  changes").
     [87] Champion Decl. ¶ 16(d).

28  [88] Champion Decl. ¶17.
     [89] Champion Decl. ¶ 21, Ex. D.

1   heard by the City of Orange until October 14, 2008 – well after the Closing Conditions Deadline.[90]

2   Indeed, the City of Orange heard the Del Rio Consent issue on October 14, 2008 and the

3   Amendment to the Development Agreement became effective on November 26, 2008, almost two

4   months after the Closing Conditions Deadline.[91]  SunCal's failure to obtain the Del Rio Consent on

5   or prior to the Closing Conditions Deadline constituted a failure of a Closing Condition under the

6   Restructuring Agreement to the extent this property would have become part of the Proposed

7   Settlement Transactions.

8              iv.      The Parties Did Not Agree To and Finalize the Proposed

9                       Settlement Documents

10          As of the Closing Conditions Deadline, many of the documents necessary for the Proposed

11  Settlement Transactions were only in draft form and certain documents had not been drafted at all

12  (the "Proposed Settlement Documents").[92]  For example, the parties discussed drafting and executing

13  an amended restructuring agreement, but that document was never drafted and circulated to the

14  parties prior to the Closing Conditions Deadline.[93]  Also, SunCal failed to deliver numerous other

15  documents they were specifically tasked with completing, including, among others, the legal

16  descriptions for the various projects and missing documents for Schedule 3 to the Proposed

17  Settlement Agreement.[94]  In addition, while both SunCal and the Lehman Entities took an active role

18  in negotiating the Proposed Settlement Documents, it was SunCal's ultimate responsibility to deliver

19  all of the documents to the Lehman Entities in order for the Proposed Settlement Transactions to

20  close.[95]  The failure to negotiate, agree upon, and deliver the final form of the Proposed Settlement

21

22  ─────────────────
    [90] *Id.*

23  [91] Ziehl Decl., Ex. Q (City of Orange Records).
    [92] Ziehl Decl., Ex. B (Camerik Depo.) at 106:15-24 ("Q:  Other than the required consents . . . were there any

24  other conditions to closing on the settlement agreement that were not satisfied as of September 2008?  A: Yes
    . . . categorically some documents had never been finalized, some documents have never been drafted, some

25  documents had never been agreed upon, some deliverables, many deliverables had not been provided.").
    [93] *Id*. at 106: 25 – 107:1-3 ("Q: But as you sit here today can you tell me specifically what [documents were]

26  missing? A: As I said the amended and restated restructuring agreement.").
    [94] *See* Camerik Decl., Ex. D (Preliminary Closing Checklist) (identifying SunCal as the party tasked with

27  completing this and other documents prior to closing).
    [95] Camerik Decl., Ex. A (Form Settlement Agreement) § 21 ("On the Closing Date, the SunCal Parties shall

28  deliver, or cause to be delivered, to the Venture Grantees, Pac Point Transferee, Lenders or other Lehman
    Parties, as the case may be, each of the following documents, duly executed by the appropriate parties . . .
    .").

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1 Documents on or prior to the Closing Conditions Deadline constituted a failure of a Closing

2 Condition under the Restructuring Agreement.

3                              v.       The Title Insurer Was Not Prepared to Issue Title

4          As of the Closing Conditions Deadline, the title company – Fidelity – had yet to put the title

5 policies for the various projects into final form.[96]  The finalization of the title policies required

6 SunCal's completion of the owner's affidavits, a task that was never completed.[97]  Because the title

7 company was not prepared to issue the Title Policies under the terms of the Proposed Settlement

8 Transactions, the Closing Conditions under the Restructuring Agreement were not satisfied.

9                              vi.      The Proposed Settlement Transactions Were Materially Restrained

10         LBHI filed for bankruptcy protection on September 15, 2008, fifteen days prior to the

11 Closing Conditions Deadline.  The order for relief in LBHI's chapter 11 case was issued on

12 September 15, 2008,[98] which triggered the restrictions under Section 363(b) of the Bankruptcy

13 Code[99] and "materially restrained" LBHI's ability to enter into the Proposed Settlement Agreement

14 and consummate the Proposed Settlement Transactions.

15         Because LBHI was unable to consummate the Proposed Settlement Transactions, Lehman

16 ALI was likewise unable to do so.  Section 1(a) of the Restructuring Agreement requires that "each

17 of the Parties will execute, deliver and enter into and will cause the other SunCal Parties and

18 Lehman Parties, respectively . . . to execute, deliver and enter into, the Settlement Agreement."[100]  It

---

19 [96] Ziehl Decl., Ex. B (Camerik Depo.) at 106: 8-12, 19-22 ("Q: Other than the required consents . . . were
there any other conditions to closing on the settlement agreement that were not satisfied as of September
20 2008? A: Title commitments were not in final form acceptable to Lehman as they were required to be.  There
were outstanding issues with the title company that hadn't been resolved.").

21 [97] Ziehl Decl., Ex. B (Camerik Depo.) at 151: 7-20 ("Q: The title issues, whose responsibility was that to
resolve the title issues before closing? A:  Both parties, SunCal owned the properly and some things they had
22 to us resolve with the title case.  Case in point, owners affidavits.  I absolutely recall that that was a very
deeply negotiated document with the title company.  And I'm not sure we ever reached a final agreement on
23 that document.  That was a document that SunCal needed to sign, and they were the ones making the
representations in that document.  So of course they would have to bless and approve whatever the form
24 looked like.").

[98] Pursuant to 11 U.S.C. §301(b), "[t]he commencement of a voluntary case under a chapter of this title
25 constitutes an order for relief under such chapter."

[99] 11 U.S.C. 363(b)(1) requires that a chapter 11 debtor's transactions, other than those in the ordinary course
26 of business, be authorized by the court.  11 U.S.C. §363(b)(1) ("The trustee, after notice and a hearing, may
use, sell, or lease, other than in the ordinary course of business, property of the estate . . ."); *see also* Fed. R.
27 Bankr. P. 9019(a) ("On Motion by the trustee and after notice and a hearing, the court may approve a
compromise or settlement."); *Saccurato v. Masters, Inc. (In re Masters, Inc.)*, 149 B.R. 289, 291 (E.D.N.Y.
28 1992) ("In general, debtors cannot bind their estates to compromise absent bankruptcy court approval.").
[100] *See* Champion Decl., Ex. A (Restructuring Agreement) §1(a).

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    was impossible for Lehman ALI to cause LBHI to "execute, deliver and enter into" the Proposed

2    Settlement Agreement once LBHI became the principal debtor in the largest bankruptcy case in

3    American history.  Neither Lehman ALI, nor any other parties to the Restructuring Agreement,

4    would for example have standing to bring a motion in the LBHI bankruptcy case to compel LBHI to

5    do so.  Any such obligation under the Restructuring Agreement was excused as legally

6    impossible.[101]

7

8          5.      SunCal's Attempted Initial Closing Was Improper Under the Terms of

9                  the Restructuring Agreement

10          Prior to the Closing Conditions Deadline, SunCal indicated to the Lehman Entities that it had

11    eight properties that were ready to close in an "Initial Closing" pursuant to the terms of the

12    Restructuring Agreement.[102]  However, SunCal's attempted initial closing failed for two reasons: (i)

13    the properties that SunCal attempted to close were not eligible Conveyance Properties under the

14    terms of the Restructuring Agreement, and (ii) SunCal had not obtained the Required Consents for

15    Pacific Point.

16

17          a.      SunCal's Attempted Initial Closing Included
                    Non-Eligible Conveyance Properties

18          Under the Restructuring Agreement, only certain of the SunCal projects were eligible to

19    close in the Proposed Settlement Transactions.  The Eligible Conveyance Properties include: Acton

20    Estates, Beaumont Heights, Bickford Ranch, Emerald Meadows, Heartland, Marblehead, Johannson

21    Ranch, Northlake, Oak Valley, Ritter Ranch, and Summit Valley.[103]  The Restructuring Agreement

22    further provides for the concept of an Initial Closing wherein (i) if all Closing Conditions have been

23    satisfied except that the Required Consents have not been obtained for all of the Eligible

24    Conveyance Properties, (ii) the Required Consents have been obtained for eight of the Eligible

25    ─────────────────────
26    [101] *See In re Martin Paint Stores*, 199 B.R. 258 (Bankr. S.D.N.Y. 1996) ("[T]he entry of a judicial order that
      renders performance legally impossible excuses the party who must perform."); *Edge Group WAICCS LLC v.
      Sapir Group LLC*, 705 F. Supp. 2d 304, 318 (S.D.N.Y. 2010) ("impossibility [or impracticability] of
27    performance . . . may excuse enforcement of a contract if the impossibility . . . [was] not caused by the
      party.").
28    [102] Camerik Decl., Ex. G (Sept. 10, 2008 e-mail from E. Bose to N. Camerik).
      [103] Camerik Decl., Ex. A (Form Settlement Agreement Annex 1).

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Conveyance Properties and for Pacific Point and, (iii) those eight properties are within the same group of "Related Conveyance Properties,"[104] then the parties shall close as to those Eligible Conveyance Properties for which the Required Consents have been obtained.[105]  The purpose of the Related Conveyance Properties was to ensure that the collateral for a single loan was transferred as a group to the new owner.[106]

On September 10, 2008, counsel for SunCal indicated that SunCal may be ready to proceed with an Initial Closing as to eight properties:  "Bickford Ranch, Acton, Johannson Ranch, Joshua Ridge II, Emerald Meadows, Summit Valley, Beaumont Heights, and Tesoro Burnham."[107] However, whether the eight properties designated by SunCal may have been ready to close – which they were not – is irrelevant because only Bickford Ranch, Acton Estates, Johannson Ranch, Emerald Meadows, Summit Valley, and Beaumont Heights were eligible to close in an Initial Closing as Eligible Conveyance Properties under the terms of the Restructuring Agreement.[108] Joshua Ridge and Tesoro Burnham were not included as Eligible Conveyance Properties under the terms of the Restructuring Agreement and thus did not qualify as one of the eight properties eligible for an Initial Closing.[109]

SunCal's argument that Joshua Ridge and Tesoro Burnham, along with Del Rio and Palm Springs Village, were added to the Restructuring Agreement as properties eligible for an Initial Closing is belied by the documents themselves.[110]  Moreover, Ms. Camerik – who, among others, took the lead on drafting the Restructuring Agreement and Proposed Settlement Agreement – testified that the annex that listed the Related Conveyance Properties was never amended to include any additional properties that were eligible for an Initial Closing.[111]  In fact, SunCal's former

---

[104] Camerik Decl., Ex. C (Restructuring Agreement Annex 2).
[105] Champion Decl., Ex. A (Restructuring Agreement) § 2(a).
[106] Ziehl Decl., Ex. B (Camerik Depo.) at 141:13-20 ("The idea here was we were never going to close title transfer on one without the other.  You don't convey part of the collateral because then it was too hard to understand then what do we do with that loan?  One single loan secured by multiple mortgages or in this case deeds of trust or other collateral.  So all the collateral for a single loan had to stay together is the bottom line.").
[107] Camerik Decl., Ex. G (Sept. 10, 2008 e-mail from E. Bose to N. Camerik).
[108] Champion Decl., Ex. A (Restructuring Agreement) § 2(a).
[109] Camerik Decl., Ex. B (Form Settlement Agreement Annex 1).
[110] See Camerik Decl., Ex. C (Restructuring Agreement Annex 2) (listing Related Conveyance Properties); Camerik Decl., Ex. B (Form Settlement Agreement Annex 1) (listing Eligible Conveyance Properties).
[111] See Ziehl Decl., Ex. B (Camerik Depo.) at 143: 2-7.

counsel also testified that she was unaware of an amendment to the Restructuring Agreement to add additional properties.[112]  Moreover, even if these properties were added to the terms of the Restructuring Agreement (which they clearly were not), the parties would have required that they close together with Del Rio, consistent with the requirement that the collateral for a single loan be transferred as a group to the new owner.[113]  There is no question that the Del Rio Consent was never obtained.  Thus, even if SunCal had satisfied the Closing Conditions for these eight proposed properties and Pacific Point, the Initial Closing was nevertheless improper under the terms of the Restructuring Agreement.

> b.    SunCal Had Not Satisfied the Conditions Precedent for an Initial Closing

The Restructuring Agreement permits an Initial Closing *only* if the Required Consents for eight Conveyance Properties *and* Pacific Point have been obtained *and* all other Closing Conditions have been satisfied.[114]  As stated above and as admitted by SunCal's former counsel, the Pacific Point SDG&E Consent was never obtained by SunCal.[115]  Therefore, the attempted Initial Closing by SunCal would necessarily fail.

Moreover, as stated above, many of the Conditions Precedent, including the Closing Conditions, had not been satisfied: numerous documents remained to be drafted, finalized, and delivered and the title insurer was not prepared to issue title policies.[116]  Thus, the Conditions

---

[112] *See* Ziehl Decl., Ex. K (Freilich Depo.) at 71: 2-11 ("Q: Well, if I understood your testimony, you didn't see any amendments of the restructuring agreement adding properties to Annex 2, did you?  A: Not that I can recall.  Q:  And you also didn't see any amendment to the restructuring agreement adding parties to the restructuring agreement, did you?  A: I may have, I don't recall.").

[113] The Del Rio, Tesoro, and Joshua Ridge Projects were all collateral for the Interim Loan Agreement, dated October 31, 2008, by and between SCC Acquisitions, LLC, as borrower, and Lehman ALI Inc., as agent and sole Lender.  *See* Deed of Trust, Security Agreement, Assignment of Rents and Leases and Fixture Filing for the benefit of Lehman dated October 31, 2007, § 2.1.  Deed of Trust, Security Agreement, Assignment of Rents and Leases and Fixture Filing for the benefit of Lehman dated October 31, 2007, § 2.1.  Assignment of CFD Proceeds for the benefit of Lehman dated October 31, 2007 , Recital G (attached as Exhibits 3-5 to the Motion by SCC Communities LC, North Orange Del Rio Land LLC, and Tesoro SF, LLC for Summary Judgment on the Third Claim for Relief [E.C.F. 337]).

[114] Champion Decl., Ex. A (Restructuring Agreement) § 2(a).

[115] *See supra* Section III.C.4.b.iii; *see also* Ziehl Decl., Ex K (Freilich Depo.) at 96:1-12 ("Q: But you believe that the consents for Marblehead were not all obtained as of November 18, 2008, is that right? A: I believe that that utility consent may not have been obtained.  Q: Was the utility consent for Pac Point obtained for November 18, 2008?  A: Not to my knowledge").

[116] *See supra* Section III.C.1.b.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Precedent were not otherwise satisfied as required for an Initial Closing.  Simply stated, SunCal's

attempted "fire drill"[117] Initial Closing was improper and rightfully rejected by the Lehman Entities.

6.    The Lehman Entities Properly Terminated the Restructuring Agreement

The parties could terminate the Restructuring Agreement if, among other things, the Closing

Conditions were not satisfied by the Closing Conditions Deadline.[118]  The record is clear that SunCal

failed to satisfy numerous Closing Conditions by the Closing Conditions Deadlines because, among

other things, (i) they failed to obtain the Required Consents; (ii) they failed to agree upon and

finalize the settlement documents, (iii) they failed to complete the necessary steps for the title insurer

to issue the title policies,[119] and (iv) because LBHI was materially restrained from entering into the

Proposed Settlement Agreement.  The Lehman Entities' November 13, 2008 termination of the

Restructuring Agreement was therefore proper under the terms of the Restructuring Agreement.[120]

The failure to satisfy the Closing Conditions – or any of the Conditions Precedent – cannot

be attributed to the Lehman Entities, as it was ultimately SunCal's responsibility to obtain the

Required Consents and deliver the required documents in order to close the Proposed Settlement

Transactions.  Contrary to SunCal's undocumented assertions, the Lehman Entities pursued the

Closing Conditions in good faith.  As Mr. Gilhool testified, "as of [September 15, 2008, the date of

LBHI's bankruptcy filing], I was still pushing to get the deal closed . . . ."[121]  Mr. Brusco also

testified that after September 15, 2008 "the team that was responsible for [the SunCal] portfolio

continued to do anything that was dramatically less than they would otherwise have been doing pre-

bankruptcy."[122]  In fact, following the bankruptcy of LBHI, SunCal provided virtually no

communication to counsel for the Lehman Entities regarding the status of the Required Consents.[123]

Because the Closing Conditions were not satisfied by the Closing Conditions Deadline –

notwithstanding the fact that the Lehman Entities pursued them in good faith – the termination of the

---

[117] Camerik Decl., Ex. H (Sept. 10, 2008 e-mail from Erica Bose).
[118] *See* Champion Decl., Ex A (Restructuring Agreement) §1(d).
[119] *See supra* Section III.C.1.b and III.C.4.b.
[120] Camerik Decl., Ex. I (November 13, 2008 letter from Lehman ALI to SunCal).
[121] Ziehl Decl., Ex. G (Gilhool Depo.) at 134: 23-24.
[122] Ziehl Decl., Ex. D (Brusco Depo.) at 214: 6-10.
[123] Champion Decl. ¶ 22.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1   Restructuring Agreement was proper.[124]  It is abundantly clear that the Lehman Entities did not

2   engage in any "inequitable conduct," one of the prerequisites for equitable subordination.  It is also

3   clear that Lehman ALI did not breach the Restructuring Agreement, a necessary element of the

4   Contract Action and Disallowance Action.

5   **D.      The Lehman Entities Funded Urgent Payables**

6          It is well established that equitable subordination is a fact-specific, creditor-specific remedy,

7   "applied only to the extent necessary to offset the specific harm caused by the inequitable conduct."

8   *In re Westgate California Corp.*, 642 F.2d 1174, 1178 (9th Cir. 1981).  A claim "will be [equitably]

9   subordinated only to the claims of creditors whom the inequitable conduct has disadvantaged."

10  *Stoombus v. Kilimark*, 988 F.2d 949, 960 (9th Cir. 1993).  The SunCal Debtors seek to equitably

11  subordinate the secured claims of Lehman ALI, OVC, and Northlake to the other creditors of the

12  SunCal Debtors' estates.  Thus, the SunCal Debtors must prove, among other things, on a creditor-

13  by-creditor basis, that the applicable Lehman Entities disadvantaged those creditors.  However, the

14  record is clear that those Lehman Entities did not disadvantage any creditors, let alone all of them.

15         SunCal contends, without evidentiary support, that Lehman ALI did not fund certain

16  unspecific "Urgent Payables."  Obj. at 22.  That contention is demonstrably false.

17         SunCal and its affiliates managed and controlled the Projects for which SunCal sought

18  protective advances.  The Lehman Entities did not manage or control SunCal or the Projects.  Any

19  contention that the Lehman Entities managed or controlled the Projects is inaccurate.  As the

20  managers and parties in control of the Projects, during the parties' conferences, it was SunCal that

21  would suggest the vendors and amounts for which it sought funding.[125]

22         In or about February 2008, SunCal began requesting that the Lehman Entities advance funds

23  for the payment of expenses relating to the Projects.  At that time, (i) SunCal had failed to repay the

24  Lehman Loans in accordance with the terms of the Lehman Loans, (ii) each of the Lehman Loans

25  was due and payable in full and remained outstanding and in default and, (iii) the "Events of

26  Default" (as defined in the respective Lehman Loans) had occurred and had not been cured.[126]

27  _____

28  [124] *Id.*
    [125] Declaration of Andrew Wilson, filed contemporaneously herewith as Exhibit E ("Wilson Decl.") ¶ 4.
    [126] Wilson Decl. ¶ 5.

1    Between February 2008 and May 23, 2008, upon mutual agreement between the applicable

2    Lehman Entities and SunCal, the Lehman Entities would fund certain protective advance loans and

3    document the payments in a "Protective Disbursement Agreement" or authorize payment from

4    "Project Cash," as discussed below.  During that period of time, the Lehman Entities funded

5    approximately $41.5 million through Protective Disbursement Agreements and approximately

6    $976,000 in Project Cash.[127]

7    On or around May 23, 2008, LBHI, Lehman ALI and various SunCal entities entered into the

8    Restructuring Agreement.  Under the Restructuring Agreement, Lehman ALI agreed to make "such

9    Urgent Payables which are approved by Lehman ALI (pursuant to such invoices and other

10    documentation substantiating the same to Lehman ALI's reasonable satisfaction)."[128]

11    After the Restructuring Agreement was entered into, the parties conferred regularly to

12    discuss SunCal's funding requests.  Conferences took place weekly at first, and subsequently as

13    needed.  All such conferences occurred only after the Lehman Loans went into default.  The

14    conferences were generally conducted by telephone, but were occasionally held in person.[129]

15    The parties' conferences and activities were undertaken at arms-length, in the normal course

16    of business, without any contemplation of the SunCal bankruptcies.  The parties would confer to

17    discuss potential Urgent Payables for work that was performed before the Restructuring Agreement

18    was entered into and potential Urgent Payables for work that might be performed at a future date.[130]

19    The great majority of the work that was performed on the Projects was done before the

20    Lehman Entities became involved in the protective advance funding process.  With respect to the

21    work that was done prior to the protective advance funding process, the parties would discuss

22    SunCal's various requests to pay those aged payables and would jointly decide which requests to

23    fund.  A company named RADCO would then negotiate the funding amount on behalf of the

24    applicable Lehman Entity and SunCal and attempt to settle the aged payables with the respective

25

26

27    [127] Wilson Decl. ¶ 6.
[128] Champion Decl., Ex. A (Restructuring Agreement) §1(h).
28    [129] Wilson Decl. ¶ 8.
[130] Wilson Decl. ¶ 9.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1  vendors.  The applicable Lehman Entities would place funds into a payables account that RADCO

2  used to pay SunCal's vendors.[131]

3  　　　With respect to potential work that would be performed after the Restructuring Agreement

4  was entered into, the parties would discuss SunCal's proposals and jointly decide which requests to

5  fund, and when and how they would be funded.[132]

6  　　　The approval for the payment of expenses came only after the parties jointly agreed. Andrew

7  Wilson, who has been personally involved in the real estate operations of the Lehman Entities since

8  2006, testified:  "I am not aware of any instance prior to LBHI's bankruptcy filing in which SunCal

9  complained that an expense should have been approved for payment because a Lehman Entity

10  representative had made a promise that it would be paid, or that a payment should be made because a

11  contractor or vendor had provided goods or services in reliance on a promise by a Lehman Entity

12  representative that it would be paid."[133]

13  　　　Upon mutual agreement, the Lehman Entities would document the payments in a Protective

14  Disbursement Agreement or authorize payment from Project Cash, as discussed below.  No other

15  Urgent Payables were approved.[134]

16  　　　The protective advance fundings were made by the Lehman Entities relevant to a particular

17  Project.  The applicable Lehman Entities and SunCal entered into at least 134 Protective

18  Disbursement Agreements.  In connection with the Projects included in the Restructuring Agreement

19  (among other Projects), the Lehman Entities funded approximately $21.5 million in protective

20  advances between around May 23, 2008 and September 15, 2008 (the date that LBHI filed for

21  bankruptcy protection).[135]

22  　　　The Protective Disbursement Agreements provided, among other things, that the parties to

23  the Protective Disbursement Agreement "acknowledge and agree":

24  　　　　　　(i) "that prior Events of Default have occurred and are continuing
　　　　　　under the Loan Documents, and that the Loan has been and remains
25  　　　　　　accelerated and/or matured    and is  due and payable in full";

26

27  [131] Wilson Decl. ¶ 10.
[132] Wilson Decl. ¶ 11.
[133] Wilson Decl. ¶ 12.
28  [134] Wilson Decl. ¶ 13.
[135] Wilson Decl. ¶ 14.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

(ii) "that the Lenders are not under any obligation to make the Protective Disbursement or any future protective disbursement or Protective Advance";

(iii) "that the making of the Protective Disbursement is not and shall not be  construed as a waiver of any defaults or Events of Default which heretofore have occurred and continue to exist under the Loan Documents";

(iv) "that the Loan Documents to which each of the Loan Parties is a party   constitute the valid and legally binding obligations of such Loan Parties, enforceable against such Loan Parties in accordance with their respective terms";

(v) "that interest at the Default Rate is accruing on all amounts currently outstanding  under the Loan Documents and shall accrue on the Protective Disbursement from and after the disbursement thereof by Agent";

(vi) "that the Protective Disbursement shall be secured by the Deed of Trust and each of the other Loan Documents";

(vii) "that the Loan Parties have no defenses, set-offs or claims under the Loan Documents, and that the Loan Parties hereby waive and release any and all such defenses, set-offs or claims, if any, under the Loan and the Loan Documents";

(viii) "that the Loan Parties hereby release Agent and each Lender, and any      predecessor in interest to Agent and each Lender, from any and all claims, counterclaims, actions, set-offs, and causes of action of any kind or nature  whatsoever in any manner relating to the Loan, the Loan Documents, or the Project"; and

(ix) "that funds used to make the Protective Disbursement were derived from the Lenders' own funds which have not been applied to reduce the Loan, and that as requested by the Loan Parties, the Protective Disbursement will not be applied to reduce the Loan, but shall be used by Borrower to pay the Project Expenses."[136]

Through the date that LBHI filed for bankruptcy protection, the Lehman Entities made protective advances to SunCal for approximately 99% of the Urgent Payables that were approved. SunCal has failed to repay the Protective Disbursement Agreements.  Any contention that the Lehman Entities breached the Restructuring Agreement by failing to fund Urgent Payables is inaccurate.  If SunCal chose to authorize additional work outside of the agreed upon Urgent Payables, it was not done at the Lehman Entities' request or pursuant to the Lehman Entities' approval.  Any contention to the contrary is inaccurate.[137]

---

[136] *See, e.g.*, Wilson Decl. Ex. 23.
[137] Wilson Decl. ¶ 16.

1  Protective Disbursement Agreements were used where there was not sufficient asset level

2  cash available to pay a particular expense.  If there was sufficient Project Cash — cash collateral of a

3  Lehman Entity that was held in a Project's bank account — a Lehman Entity in a particular Project

4  and SunCal would in some instances agree to use Project Cash to pay a vendor.  Approximately $2.2

5  million in Project Cash was used to fund vendor payables between May 23, 2008 and LBHI's

6  bankruptcy filing.[138]

7  On or around June 2008, LCPI released approximately $4.2 million into the Elizabeth Lake

8  Road escrow account in connection with the Ritter Ranch Project.  LCPI and SunCal would agree on

9  the release of funds from the escrow account to pay vendors in connection with the Elizabeth Lake

10  Road work.[139]

11  The loans from the applicable Lehman Entities to SunCal were subject to being "immediately

12  due and payable in full" by SunCal.[140]  SunCal has failed to repay the loans.[141]

13  Finally, if SunCal attempts to cling to the notion that there were certain "oral agreements"

14  regarding funding, that allegation is expressly contradicted by the Restructuring Agreement, which

15  provides:  "The terms and provisions of this Agreement cannot be waived or modified except in

16  writing and signed by all Parties."[142]  The Restructuring Agreement further provides:  "This

17  Agreement, together with the attachments hereto and the documents referred to herein, contain the

18  entire agreement among the Parties with respect to the subject matter hereof, and any other

19  agreements shall be deemed to have merged herewith."[143]

20  Thus, the evidence is clear that the Lehman Entities did not disadvantage any creditors, let

21  alone all of them. It is also clear that Lehman ALI did not breach the Restructuring Agreement (but

22  that SunCal breached more than 100 contracts by failing to repay loans).  In light of the foregoing,

23  the claims in the Equitable Subordination Action have no merit.

24

25

26  [138] Wilson Decl. ¶ 17.

27  [139] Wilson Decl. ¶ 18.
    [140] Champion Decl. Ex. A (Restructuring Agreement) § 1(j)).
    [141] Wilson Decl. ¶ 19.

28  [142] Champion Decl., Ex. A (Restructuring Agreement) § 6
    [143] Champion Decl., Ex. A (Restructuring Agreement) § 6

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

E.    **SunCal's Claims for Management Fees Cannot Succeed**

The SunCal Debtors have asserted claims for "unpaid management fees" as one of the alleged reasons that the Lehman Entities' claims should be disallowed or that Lehman ALI breached the Restructuring Agreement.[144]  However, to the extent that any management fees were owed by Lehman ALI, they were owed to SunCal Management,[145] a non-debtor party to the Restructuring Agreement.  The SunCal Debtors cannot object to Lehman ALI's claims or assert independent claims on the basis of fees that are not owed to them.

In any event, Lehman ALI did pay the management fees owed to SunCal Management up until the time such fees were owed.[146]  Pursuant to section 1(i) of the Restructuring Agreement, Lehman ALI was only required to pay the management fees "until the termination of this Agreement."[147]  The Lehman Entities terminated the Restructuring Agreement on November 13, 2008[148] and as such any obligation to pay the management fees ceased at that time.  Again, it is clear that Lehman ALI did not breach the Restructuring Agreement, and the claims asserted in both the Contract Action and Disallowance Action lack merit.

F.    **No Lehman Entity Representative Involved in a SunCal Transaction Or Proposed Transaction Knew in August 2008 That There Would Be A Lehman Bankruptcy**

The testimony on this point is crystal clear.  Mr. Brusco testified:

> Q. What do you recall hearing on September 14, 2008 about that?
>
> A. I recall watching the Giants game with my son and watching the ticker come across the bottom of the screen that indicated Lehman's deal with B of A had fallen through and Lehman was seeking -- would most likely file bankruptcy in the morning.
>
> Q. You hadn't heard anything about Lehman's bankruptcy prior to seeing it on the ticker?
>
> A. No, I had not.

---

[144] Disallowance Action at 13-14; Contract Action at 12; Obj. at 21-22.

[145] Champion Decl., Ex. A (Restructuring Agreement) §1(i) (Lehman ALI . . . shall pay to the Manager, in advance, a management fee . . ."); Camerik Decl., Ex. A (Form Settlement Agreement) at 1 (defining SunCal Management as the "Manager").

[146] Ziehl Decl., Ex. U (e-mail from Tom Rollins to Rob Starkman, Bruce Cook, and Frank Faye, dated September 15, 2008: "We have been paid management fees through September 30 other than Delta Coves, Oak Knoll, and Century City" [projects which were not part of the Restructuring Agreement]).

[147] Champion Decl., Ex. A (Restructuring Agreement) §1(i).

[148] Camerik Decl., Ex. I (November 13, 2008 letter from Lehman ALI to SunCal).

1

Q. Did you have any discussions with people at Lehman prior to September 14 where people speculated about the possibility that Lehman might file for bankruptcy?

2

3

A. No, I did not.149

4

Similarly, Mr. Gilhool testified:

5

Q. At the time you attended the 8/25 meeting, did you have any understanding that Lehman Brothers was contemplating or may have been contemplating a bankruptcy filing?

6

7

A. I had no idea at that point that Lehman would file for bankruptcy.

8

Q. When did you come to that understanding?

9

A. My understanding of that came through -- that a bankruptcy was likely to happen came on the Friday prior to the bankruptcy.150

10

Thus, once again, there is no evidentiary basis for the SunCal Debtors' allegations in the

11

Equitable Subordination Action.

12

**G.    The Repo Transaction is Authorized By the Operative Documents**

13

14

1.    The Repo Transaction

15

On August 22, 2008, LCPI and Fenway Capital, LLC ("Fenway") entered into a Master

16

Repurchase Agreement (the "MRA"),151 pursuant to which LCPI subsequently transferred certain

17

assets to Fenway (the "Repo Assets"), subject to the Repo Assets being transferred back to LCPI in

18

the future (the "Repo Transaction").152  Attempting to aggrandize a transaction which never

19

interfered with the Lehman Entities' access to the applicable Lehman Loans, SunCal claims that the

20

Repo Transaction constituted a repudiation of the Restructuring Agreement and Proposed Settlement

21

Agreement because it prevented the Lehman Entities from performing their obligations

22

23

---

149 Ziehl Decl., Ex. D (Brusco Depo.) at 52:10-53:4.

24

150 Ziehl Decl., Ex. G (Gilhool Depo.) at 91:15-25.

25

151 *See* Lehman Entities' Supplemental Memorandum of Lehman Lenders' Status as Authorized Agents of Fenway, Ex. A [ECF 533] (MRA).

26

152 The MRA did not by itself operate to transfer particular loans but instead created the framework by which loans would be transferred in the future pursuant to written confirmations, otherwise known as "Repo Confirmations."  MRA § 3.  On September 12, 2008, LCPI provided Fenway with three Repo Confirmations

27

which transferred certain Lehman Loans to Fenway (the "September 12, 2008 Repo Confirmations").  With respect to those certain Lehman Loans that were included among the Repo Assets, only the term loans and not

28

the revolver loans were transferred.  *See In re Palmdale Hills Property, LLC*, --- F.3d ----, at *4 (9th Cir. Aug. 3, 2011).

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    thereunder.[153]  Notwithstanding SunCal's wholly contrary arguments that the Proposed Settlement

2    Agreement was executed on the one hand but that the Repo Transaction prevented the

3    consummation of the Proposed Settlement Agreement on the other, the fact of the matter is that the

4    Repo Transaction had no impact whatsoever on either the Restructuring Agreement or the Proposed

5    Settlement Agreement.  As with SunCal's other arguments, this argument cannot succeed.[154]

6           2.      The Repo Transaction Is Not A "Breach" Of Contract
                    a.      LCPI Could Not Have "Breached" The Restructuring Agreement
7                            Because It Is Not A Party To The Restructuring Agreement

8           SunCal asserts that the Repo Transaction was a "breach" of the Restructuring Agreement and

9    Proposed Settlement Agreement.[155]  LCPI cannot be said to have "breached" the Restructuring

10   Agreement because LCPI is not a party to the Restructuring Agreement.  *See Black Car and Livery*

11   *Ins., Inc. v. H & W Brokerage, Inc.*, 813 N.Y.S.2d 751, 752 (N.Y. App. Div. 2006) ("the breach of

12   contract cause of action was properly dismissed as to the respondent, since he was not a party to the

13   agreement in question"); *Henneberry v. Sumitomo Corp. of Am.*, No. 04 Civ. 2128, 2005 WL

14   991772, at *12 (S.D.N.Y. Apr. 27, 2005) ("defendants rightly point out that, in order to sue for

15   breach of contract, plaintiff must be a party to the contract"); *A & V 425 LLC Contracting Co. v.*

16   *RFD 55th Street LLC*, 830 N.Y.S.2d 637, 643 (Sup.Ct. 2007) ("in order for someone to be liable for

17   a breach of contract, that person must be a party to the contract") (citing *Smith v. Fitzsimmons*, 584

18   N.Y.S.2d 692 (App. Div., 4th Dept. 1992)).

19           b.      A Final, Operative "Settlement Agreement" Does Not Exist,
                     So There Could Be No "Breach" As A Matter Of Law
20

---

21   [153] *See* Disallowance Action at 15, 23-25; Obj. at 18-21; Plaintiffs' Motion for Partial Summary Judgment
Against Lehman ALI (the "Fenway Summary Judgment Motion") at 13-16 [Contract Action ECF No. 28].
22   While SunCal filed the Fenway Summary Judgment Motion in which it raised allegations with respect to the
Repo Transaction, SunCal never asserted these allegations – or even mentioned them – in the underlying
23   complaint.  *See* Contract Action.  As such, any claim for relief SunCal seeks pursuant to that motion would
undoubtedly fail.  *See, e.g., Cook Family Foods, Ltd. v. Voss*, 781 F. Supp. 1458, 1472 (C.D. Cal. 1991)
24   ("summary judgment is not the proper vehicle to pursue" a claim not raised in the complaint).
[154] SunCal has also alleged that the Lehman Entities acted in bad faith by filing the proofs of claim because it
25   did not have the right to do so in light of the Repo Transaction.  Equitable Subordination Action at 46-47.
However, this Court and the BAP both held that the Lehman Entities were acting as agents for Fenway and
26   therefore had full authority to file the proofs of claim.  *In re Palmdale Hills Property*, 2011 Bankr. Lexis
3535, at *52 (BAP 9th Cir. August 10, 2011); Order Regarding Lehman Lenders' Authority to File Proofs of
27   Claims as Agents of Fenway Capital, LLC, dated Dec. 21, 2009 [ECF 841] at 1.  As such, SunCal's bad faith
arguments premised on the Lehman Entities' alleged lack of authority must also fail.  Additionally, as
28   discussed, the Lehman Entities never transferred the revolver loans to Fenway.
[155] Disallowance Action at 15, 23-25; Obj. at 21 n.64; Fenway Summary Judgment Motion at 13-16.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

With respect to the Proposed Settlement Agreement, SunCal's argument, of course, is premised on its paradoxical contention that the Proposed Settlement Agreement was executed and therefore constitutes a "contract" under New York law. [156]  However, it is bedrock law that in order for there to be a breach of contract, there must be, among other things, "the existence of a contract." *Beautiful Jewelers*, 2011 WL 4337108, at *1.[157]  As discussed, SunCal failed to satisfy the Closing Conditions and there is no final, operative settlement agreement.  Incredibly, SunCal contends that "the Court need not resolve that issue."[158]  But that argument misses the mark because, in light of the absence of a final, operative settlement agreement, there cannot be a breach of contract.

c.    The Repo Transaction Was Expressly Authorized
By The Operative Documents

The Repo Transaction was expressly authorized by the applicable Lehman Loans.[159]  Each of these Lehman Loans provide that the lender may, in its sole discretion, sell, assign, or grant its interests in the loan.  For example, Section 10.3.1 of the Marblehead/Heartland Loan Agreement provides that "[a]ny Lender may elect, at any time, to sell, assign or grant participations in all or any portions of its rights and obligations under the Loan Documents, and that any such sale, assignment or participation may be to one or more financial institutions, private investors, and/or other entities, at Agent's or Lender's sole discretion."[160]  The other Lehman Loans each contain similar

---

[156] Ironically, on the very same page in which SunCal alleges that the Lehman Entities executed the Proposed Settlement Agreement and thereby breached the agreement as a result of the Repo Transaction, SunCal also states that the Lehman Entities "prevented the closing and consummation of the Settlement Agreement." Disallowance Action at 25.  Apparently acknowledging the frivolity of this position, SunCal wholly omits the argument that the Proposed Settlement Agreement was breached in its Fenway Summary Judgment Motion.
[157] *See also Sloan v. Kubitsky*, 712 A.2d 966, 839 (Conn. App. Ct. 1998) ("for a valid contract defense such as recoupment to be asserted, however, there first me be an enforceable contract between the parties").
[158] Obj. at 21 n.64.
[159] *See* Camerik Decl., Ex. J (Form Settlement Agreement Annex 2) (listing the Lehman Loans that are part of the Restructuring Agreement).
[160] Lehman Entities' Supplemental Memorandum of Lehman Lenders' Status as Authorized Agents of Fenway, Ex. J (Second Amended and Restated Term Loan and Revolving Line of Credit Loan Agreement (as amended and/or supplemented from time to time), dated as of October 3, 2007, by and between SunCal Marblehead Master LLC, SunCal Marblehead, LLC and SunCal Heartland, LLC as borrowers, and Lehman ALI, as agent and sole lender).

1  provisions.[161]  The Lehman Lenders clearly had the right to transfer the Repo Assets under the terms

2  of the governing Lehman Loans.

3      Contrary to SunCal's suppositions, there are absolutely no provisions in the Restructuring

4  Agreement amending or modifying that right in any way.[162]  In fact, the Restructuring Agreement

5  expressly provides that "nothing contained herein shall restrict, limit or prevent any of the Lenders

6  from: (A) taking any action that any such Lender may take under the applicable Loan Documents."

7  The Restructuring Agreement further provides that "the Borrower Parties further acknowledge and

8  agree that this Agreement is not intended to be and shall not be deemed to be a . . . modification,

9  amendment or waiver of any of the Loans or the Loan Documents or *any provision* thereof."[163]

10  Thus, the Repo Transaction simply could not have constituted a breach of the Restructuring

11  Agreement.

12      Separately, in order for there to be a breach of contract, there must be, among other things,

13  "breach by the other party." *Beautiful Jewelers*, 2011 WL 4337108, at *1.  Lehman ALI cannot be

14  held to have breached the Restructuring Agreement as a result of the Repo Transaction because

15  Lehman ALI is not a party to the Repo Transaction (and, as discussed, the Repo Transaction would

16  not be a breach of the Restructuring Agreement).

17

18  [161] *See* Lehman Entities' Supplemental Memorandum of Lehman Lenders' Status as Authorized Agents of
Fenway, Ex. K (Oak Valley Term Loan and Revolving Line of Credit Loan Agreement (as amended and/or

19  supplemented from time to time), dated May 23, 2006, by and between LB/L – SunCal Oak Valley LLC, as
borrower, and OVC Holdings (as Lehman ALI's assignee), as agent and sole lender, §10.3.1); Ex. L

20  (Northlake Term Loan and Revolving Line of Credit Loan Agreement (as amended and/or supplemented from
time to time) by and between LB/L – SunCal Northlake LLC, as borrower, and Northlake Holdings (as ALI's

21  assignee), as agent and sole lender, §10.3.1); Ex. M (Ritter Ranch Credit Agreement (as amended and/or
supplemented from time to time), dated February 8, 2007, by and between Palmdale Hills Property, LLC, as

22  borrower, Lehman Brothers, Inc., as advisor, sole lead arranger and sole bookrunner, and LCPI as syndication
and administrative agent, § 10.6(b)); Ex. O (SunCal Communities I Credit Agreement (as amended and/or

23  supplemented from time to time), dated November 17, 2005, by and between SunCal Communities I, LLC, as
borrower, and Lehman Brothers, Inc., as advisor, sole lead arranger and sole bookrunner, and LCPI, as

24  syndication agent and administrative agent, § 9.6(b)).
[162] Champion Decl., Ex. A (Restructuring Agreement) § 1(j). SunCal cites §§ 1(h) and (j) of the Restructuring

25  Agreement to argue that Lehman ALI represented in the Restructuring Agreement that it was the "Lender
with respect to each Loan." Obj. at 20; Fenway Summary Judgment Motion at 15. However, §§1(h) and (j)

26  simply provide that Lehman ALI, *in relation to Urgent Payables and Management Fees*, is the "Lender with
respect to the Loan." As discussed herein, Urgent Payables were funded and Management Fees were paid.

27  None of the applicable Lehman Entities represented generally – or even specifically with respect to the
consummation of the Proposed Settlement Transactions – that they would remain, at all times, the "Lender

28  with respect to each Loan."
[163] Champion Decl., Ex. A (Restructuring Agreement) § 1(j) (emphasis added).

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

3.      LCPI Had the Ability to Consummate the Proposed Settlement Transactions

a.      LCPI Always Maintained the Right to Substitute the Repo Assets

Ignoring the terms of the MRA, SunCal contends that the Repo Transaction prevented LCPI from closing the Proposed Settlement Agreement.[164]  Certainly, this argument is directly contrary to SunCal's steadfast position that the Settlement Agreement was in fact executed and thereby breached as a result of the Repo Transaction.[165]  In any event, the Repo Transaction would never have prevented the Lehman Entities from entering into the Proposed Settlement Agreement and consummating the Proposed Settlement Transactions if SunCal had actually satisfied the Closing Conditions.  Section 9 of the MRA grants LCPI the unrestricted right to substitute the Repo Assets with other assets:

> In Transactions in Which Seller Retains Custody of Purchased Securities, the Parties Expressly Agree that Buyer shall be deemed, for purposes of subparagraph (a) of this Paragraph, to have agreed to and accepted in this Agreement substitution by Seller of other Securities for Purchased Securities; provided however, that such other Securities shall have a Market Value at least equal to the Market Value of the Purchased Securities for which they are substituted.[166]

Under the Hold-in-Custody Agreement appended to the MRA, LCPI also retained possession of the Repo Assets.[167]

Pursuant to these contractual terms, LCPI had complete control over the segregation and substitution of the Repo Assets.  Adam Carne, the Senior Vice President of Hudson Castle at the time of the Repo Transaction,[168] confirmed that "LCPI *always* had – had the standing right to substitute collateral" and that as the hold-in-custody agent, LCPI also had the "standing right to allow collateral in and out of the segregated account, per the terms of the repo agreement."[169]  Mr. Carne also testified that because of the right of substitution, the September 12, 2008 Repo Confirmations reflected "the collateral that Lehman was *currently* pledging under the repo" and that

---

[164] *See* Obj. at 19-21; Disallowance Action at 15, 23-25; Fenway Summary Judgment Motion at 14-16.
[165] *See* Disallowance Action at 23-25.
[166] MRA ¶ 9(b).
[167] MRA Annex III § 2 (providing that "[t]he Buyer appoints Agent [Lehman Commercial Paper Inc.] to act as its hold in custody agent as described in this HIC Annex.").
[168] Hudson Castle was the program manager for Fenway and provided assistance in sourcing assets for Fenway.  Ziehl Decl., Ex. W (excerpts of August 11, 2011 Deposition Transcript of Adam Carne (the "Carne Depo.") at 44:5-12.
[169] Ziehl Decl., Ex. W (Carne Depo.) at 176:9-14.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    on a different date "there was probably a daily collateral report that may have shown different

2    collateral here. . . . each day is probably the potential for a different collateral report."[170]  Cliff

3    Feibus, the Lehman Entities' 30(b)(6) witness on Fenway-related issues, similarly confirmed that if

4    LCPI was "looking to substitute a position within the Fenway Repo, then we would have had the

5    right to do that."[171]  Because LCPI had the right to substitute the Repo Assets, the Repo Transaction

6    would not have posed any impediment to the consummation of the Proposed Settlement

7    Transactions.

8         While SunCal contends that LCPI never actually exercised its right of substitution, that

9    argument is a red-herring.[172]  As Mr. Feibus testified, if the Lehman Loans transferred to Fenway

10   were "position[s] in the Repo that you wanted to pull out of there because you had to something else

11   with [sic] that position," then LCPI "*would have done that*."[173]  Of course, there was no need to

12   substitute the Lehman Loans because the Conditions Precedent, including the Closing Conditions,

13   were never satisfied.  It is no wonder that SunCal does not want this Court to "resolve that issue."[174]

14

15

16

17

18   _____

[170] Ziehl Decl., Ex. W (Carne Depo.) at 148:13-21.

19   [171] Ziehl Decl., Ex. X (excerpts of August 12, 2011 Deposition Transcript of Cliff Feibus (the "Feibus Depo.")
     at 205:17-206:6.  Mr. Feibus also indicated that LCPI retained this right notwithstanding whether any

20   accommodation was reached with JP Morgan Chase ("JP Morgan").  *Id.*  As explained in section *infra*, LBHI
     pledged the commercial paper notes to JP Morgan, but as Mr. Feibus confirmed, that pledge had absolutely no

21   impact on LCPI's unfettered right to substitute the Repo Assets at any time.
     [172] Obj. at 20; Fenway Summary Judgment Motion at 15.

22   [173] Ziehl Decl., Ex. X (Feibus Depo.) at 171:8-11.

     [174] Acknowledging LCPI's substitution rights under the MRA, SunCal next argues that LCPI "lost" those

23   rights when LBHI filed for bankruptcy protection on September 15, 2008, which SunCal contends was an
     "Event of Default" under the MRA.  Obj. at 20.  However, SunCal misreads the MRA.  The restrictions and

24   obligations imposed on the "Seller" in an event of default arise only if "the defaulting party is acting as
     Seller."  *See* MRA Annex 1 §§ 2(e)(iii)-(iv).  LCPI did not file for bankruptcy protection until October 5,

25   2008 – several days after the Proposed Closing Date.  Thus, there were no restrictions or obligations imposed
     on LCPI as a defaulting party – including any alleged loss of the right of substitution – prior to the Proposed

26   Closing Date because LCPI was not a defaulting party at that time.  SunCal fails to cite a single provision that
     supports its interpretation of the MRA, and in fact attempts to "cite" a contract provision that simply does not

27   exist (SunCal cites the MRA, Annex 1, Part 1 § 2(d)(iii).  However, Annex 1 only contains §§ 2(d)(i) and (ii).
     § 2(d)(iii) simply does not exist.  In addition, § 11 of the MRA, which SunCal also cites generally, never

28   mentions the right of substitution and in fact specifically provides that the rights and obligations of LCPI with
     respect to the Repo Assets are affected only where they are the defaulting party).

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    Because LCPI always had the right of substitution under the MRA, it always had the ability

2    to consummate the Proposed Settlement Transactions.[175]  For this reason (among the others

3    discussed), SunCal's fixation on the Repo Transaction is without merit and any litigation premised

4    on the existence of this transaction would not succeed.

5

6        4.    The Repo Transaction Could Have Been Unwound If The Closing

7              Conditions Were Satisfied

8            a.    The MRA Obligated Fenway To Retransfer The Repo Assets To

9                  LCPI Prior To The Proposed Closing Date

10    Even if LCPI did not have the unrestricted right of substitution under the MRA (which it

11    clearly did), the Lehman Entities could have also consummated the Proposed Settlement

12    Transactions because the Repo Transaction would have been unwound prior to the Proposed Closing

13    Date.  Pursuant to the MRA, the Repo Confirmations are to set forth the "Repurchase Date,"[176]

14    which is the "date on which Seller is to repurchase the Purchased Securities from Buyer."[177]  The

15    Repo Confirmations, together with the MRA, constitute "conclusive evidence of the terms agreed to

16    between Buyer and Seller with respect to the Transaction to which the Confirmation relates."[178]  The

17    three Repo Confirmations that LCPI provided to Fenway on September 12, 2008 specify that the

18    "Repurchase Date" is September 23, 2008, September 24, 2008, and September 25, 2008 for the

19    three confirmations, respectively.[179]  Thus, pursuant to the MRA and the governing Repo

20

21    _____

22    [175] Even if LCPI had defaulted prior to the Proposed Closing Date, which it clearly did not, it would still have
retained its right of substitution under the MRA.  The default provision of the MRA, Section 11, simply states
the result of an Event of Default.  *See* MRA Annex 1 § 2(e)(iii) ("the defaulting party's obligations in such

23    Transactions [in which the defaulting party is acting as Seller] to repurchase all Purchased Securities, at the
Repurchase Price therefore on the Repurchase Date determined in accordance with subparagraph (a) of this

24    Paragraph plus Breakage thereon and other amounts owing hereunder, shall thereupon become immediately
due and payable.").  It does not provide that the right of substitution disappears in an Event of Default.

25    Moreover, Section 14 of the MRA provides that "[e]ach provision and agreement herein shall be treated as
separate and independent from any other provision or agreement herein."  *See* MRA § 14.  Because Section

26    11 does not explicitly limit Section 9's right of substitution, Section 9 is treated as separate and independent
from section 11 and remains in effect notwithstanding any Event of Default.

27    [176] MRA § 3(b).
[177] MRA § 2(q).

28    [178] MRA § 3(b).
[179] Dedyo Decl., Ex., 1 (September 12, 2008 Repo Confirmations).

1    Confirmations, Fenway was obligated to retransfer the Repo Assets to LCPI *prior to* the Proposed

2    Closing Date.[180]

3                    b.    LBHI had the Ultimate Economic Interest in the Repo Assets

4            The transfers of the Repo Assets from LCPI to Fenway were not isolated transactions, but

5    were part of a larger series of transactions.  Using the Repo Assets and other loans transferred to it

6    by LCPI as security, Fenway issued a note (known as the 2008-2 Note) to Fenway Funding.  In turn

7    Fenway Funding issued commercial paper notes to LBHI backed by the Series 2008-2 Note as

8    collateral (the "Fenway Commercial Paper Notes").  As a result, LBHI, an affiliate of LCPI, retained

9    the ultimate economic interest in the Repo Assets.[181]

10           Because LBHI owned the Fenway Commercial Paper Notes, the unwinding of the Repo

11   Transaction would never have resulted in any cash changing hands.  As Mr. Feibus testified:

12                LCPI and LBHI were part of the consolidated group, so meaning
                  LBHI owned LCPI through its investment in Lehman ALI, and to the
13                extent that the commercial paper was owned by a Lehman entity and
                  the repurchase agreement was effectively collateralizing that
14                commercial paper, that I would say to you that you could have
                  unwound the transaction and there would have been *no impact* to the
15                liquidity of Lehman Brothers.[182]

16           Adam Carne also explained that the Repo Transaction "could be unwound, repaid without a

17   cash movement" because

18                Lehman was the sole noteholder of the – of the Fenway notes, and
                  Lehman – you know, LCPI was the repo counterparty under the repo
19                agreement, you had two Lehman entities; and in order – and if
                  Lehman, under the repo, was to repay Fenway the cash – the
20                repurchase price, and Fenway turns around and hands it to another

21   _____
     [180] The parties had amended the Closing Conditions Deadline – and thus the Proposed Closing Date – before
22   LCPI entered into the the September 12, 2008 Repo Confirmations.  *See Supra* III.C.2.
     [181] *See* Declaration of Irena Goldstein in Support of Consolidated Opposition of the Lehman Entities to (1)
23   Debtors' Objection to and Motion for Order Striking Claims and (2) Motion for Order Striking Pleadings, ¶¶
     3-4 ("it is not true that the Lehman Entities relinquished all right, title and interest in the loans.  As set forth in
24   my May 12 email, the loans serve as the ultimate collateral for the CP Notes issued by Fenway Funding to
     LBHI. . . . LBHI has the beneficial interest. . . . if loan proceeds are paid to Fenway Capital, those same
25   proceeds will be transferred ultimately to LBHI"); Ziehl Decl., Ex. X (Feibus Depo.) at 77:20-79:2 (testifying
     that "various positions were repo'd from LCPI to Fenway [Capital,]" that Fenway Capital then issued variable
26   funding notes to its affiliate Fenway Funding which were secured by the repo'd assets, and that Fenway
     Funding then issued commercial paper secured by the proceeds of the variable funding notes to LBHI); Ziehl
27   Decl., Ex. W (Carne Depo.) at 94:21-95:11 (answering in the affirmative when asked if it was his
     understanding "that LCPI was going to be entering into a repo with Fenway Capital . . . . And then Fenway
28   Capital was going to be issuing a series 2008-2 variable funding note to Fenway Funding . . . . And then
     Fenway Funding was going to be issuing commercial paper.").
     [182] Ziehl Decl., Ex. X (Feibus Depo.) at 165:23-166:9.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1 | Lehman entity, that cash movement wasn't necessary, because it
2 | would just be Lehman paying, through the conduit, another Lehman entity.[183]

3 | Simply put, the Repo Assets could have been easily retransferred to LCPI in the event that became

4 | necessary to consummate the Proposed Settlement Transactions.

5 |           c.      JP Morgan Would Have Consented to the Repo Unwind In the Event the

6 |                 Proposed Settlement Transactions Were Consummated

7 |       SunCal argues that, because LBHI had pledged the Fenway Commercial Paper Notes to JP

8 | Morgan, JP Morgan's consent would have been needed to effectuate the unwind and JP Morgan did

9 | not give their consent until months after the parties were to consummate the Proposed Settlement

10 | Transactions.[184]  However, as Ms. Camerik testified, JP Morgan frequently and easily consented to

11 | the unwinding of other repo transactions involving Fenway where the parties ultimately proceeded to

12 | a loan restructuring or modification – something which never occurred in this case.[185]  Ms. Camerik

13 | explained that "on a number of other Fenway assets that I was specifically involved in, loans, where

14 | Lehman wanted to do something, modify, restructure, whatever it may be, we received JP Morgan's

15 | consent to do that."[186]  Ms. Camerik further reiterated that the Lehman Entities "got [JP Morgan's]

16 | consent fairly easily to do those transactions"[187] and that the consent was given "at various points

17 | along the way[,]" including "early on after the bankruptcy occurred."[188]

18 |       JP Morgan did ultimately consent to the unwinding of the Repo Transaction and clearly

19 | would have done so prior to the Proposed Closing Date if the Conditions Precedent had been

20 | satisfied such that the Proposed Settlement Transactions could be consummated.  As Ms. Camerik

21 | testified with respect to the pledge of the Fenway Commercial Paper: "I didn't see that as an

22 | impediment in any way" to the consummation of the Proposed Settlement Transactions.[189]  Thus,

23 | notwithstanding LCPI's right of substitution, because the Repo Transaction could have – and would

---

[183] Ziehl Decl., Ex. W (Carne Depo.) at 118:2-11.
[184] Obj. at 17; Fenway Summary Judgment Motion at 10-11.  Notwithstanding the pledge of the Fenway Commercial Paper Notes, JP Morgan did not own or have a lien on any of the SunCal loans.  *See* July 14, 2009 Declaration of Lawrence Chanen [ECF 440], ¶ 3.
[185] Ziehl Decl., Ex. B (Camerik Depo.) at 125:4-126:11.
[186] *Id.* at 125:4-8.
[187] *Id.* at 125:14-15.
[188] *Id.* at 126:14-19.
[189] *Id.* at 126:8-11.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1  have – been unwound prior to the consummation of the Proposed Settlement Transactions, SunCal's

2  claims against the Lehman Entities premised on the existence of the Repo Transaction cannot

3  succeed.

4  **H.    The Claim to Avoid the Liens Securing the Guaranty of the Interim Loan Cannot**

5  **Succeed.**

6  Three of the Voluntary Debtors (SCC Communities LLC ("SCC Communities"), North

7  Orange Del Rio Land LLC ("Del Rio") and Tesoro SF, LLC ("Tesoro") (collectively, the

8  "Guarantors") assert that they can avoid as a fraudulent transfer their Guaranty[190] of the

9  approximately $20 million Interim Loan[191] from Lehman ALI to their parent, SCC Acquisitions LLC

10  ("SCC LLC").

11  To secure their obligations under the Guaranty:  (1) SCC Communities and Tesoro entered

12  into deeds of trust encumbering their respective real property, and Del Rio assigned to ALI all of Del

13  Rio's interest in the proceeds of the City of Orange, Community Facilities District No. 06-1 (Del Rio

14  Public Improvements) 2007 Special Tax Bonds.[192]

15  The Guarantors' theory of liability is simple:

16  A.    each Guarantor incurred a $20 million liability when it executed the Guaranty;

17  B.    each Guarantor had less than $20 million in assets at the time; and

18  C.    each Guarantor received less than $20 million in Interim Loan proceeds.

19  Specifically, they contend that at the time of the Interim Loan, Tesoro's property was worth

20  between $8.6 and $10.8 million, Joshua Ridge's property was worth approximately $2.3 million, and

21  the Del Rio bond proceeds were worth approximately $14.2 million.  Mot. at 9.  Therefore, they

22  [190] The Guarantors filed a *Motion by SCC Communities LLC, North Orange Del Rio Land LLC and Tesoro SF, LLC for Summary Judgment, or, in the Alternative, Partial Summary Adjudication, on 3rd Claim for Relief (Fraudulent Transfer)* ("Mot" or "MSJ") in the Equitable Subordination Action.  [08-ap-1005 D.E. 337].  The Subsidiary Guaranty, dated Oct. 31, 2007, between SCC Communities LLC, Tesoro SF LLC, and North Orange Del Rio Land, LLC, in favor of Lehman ALI, Inc. (the "Guaranty"), attached as Ex. 2 to Decl. of Bruce Cook in Support of MSJ [08-ap-1005 D.E. 341] (the "Cook Declaration").

25  [191] The "Interim Loan" was made pursuant to the Loan Agreement, dated Oct. 31, 2007, by and between SCC Acquisitions, LLC, as borrower, and Lehman ALI Inc., as agent and sole Lender (the "Loan Agreement"), attached as Ex. 1 to the Cook Declaration, as amended by the First Amendment to Loan Agreement and Other Loan Documents, dated June 10, 2008, a copy of which is attached as Ex. A to the Decl. of Dean Ziehl in Support of Opp'n to MSJ (the "Ziehl MSJ Declaration") [08-ap-1005 D.E. 377].

28  [192] Assignment of CFD Proceeds for the benefit of Lehman dated October 31, 2007, attached as Exhibit 5 to Cook Declaration (the "Del Rio Assignment"), Recital G.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1  argue, each Guarantor was rendered insolvent by the Guaranty, and received less than reasonably

2  equivalent value in exchange.

3      The Guarantors' motion for summary judgment on this claim was denied on September 23,

4  2011 and, for the same reasons that their motion was denied, they will ultimately be unable to meet

5  their burden to prove their claim.  This simplistic theory of liability is riddled with legal and factual

6  defects, starting with the fact that it triple-counts the liability represented by the Guaranty by valuing

7  it as a $20 million liability against each of the three entities.

8      The Guarantors cannot prove the Guaranty rendered them insolvent, because it didn't.  In

9  denying summary judgment, the Court ruled that under § 101(32)'s definition of "insolvent," a

10 contingent liability such as the Guaranty must be discounted by the probability of its occurrence.

11 Overwhelming authority confirms this.[193]  *In re Sierra Steel, Inc.*, 96 B.R. 275, 279 (9th Cir. B.A.P.

12 1989), *In re Jacks*, 266 B.R. 728 (9th Cir. B.A.P. 2001); *In re Xonics Photochemical, Inc.*, 841 F.2d

13 198, 200 (7th Cir. 1988).  The Court rejected the Guarantors' argument that their obligations under

14 the Guaranty were primary, not contingent:  there is no provision in the Guaranty that would enable

15 Lehman ALI to seek any relief under the Guaranty without a failure by the Borrower, SCC LLC, to

16 make "punctual payment" of the obligations under the Loan Agreement.

17     Thus the Court ruled that it would be necessary to assess SCC LLC's ability to repay the

18 Interim Loan.  The evidence demonstrates this was a low probability.  SCC LLC had "net equity of

19 approximately $232 million as of October 31, 2007, making it unlikely that the Guaranty would

20 become actual liabilities" of the Guarantors.[194]  Rollins and others testified that, even as of

21 December 31, 2007, there was no reason to believe that the Guarantors would be called upon to

22 perform their obligations under the Guaranty.[195]  This is consistent with the representations and

23 warranties in § 3.20 of the Loan Agreement that the Guarantors were solvent as of the date of the

24 Guaranty (and thereafter), which their witnesses do not dispute.

25     The Guarantors themselves did not book their contingent obligation under the Guaranty as a

26

---

27 [193] It is also consistent with GAAP, which requires contingent liabilities need to be "probability-weighted."  Declaration
of R. Bruce Den Uyl ("Den Uyl Decl.") [08-ap-1005 D.E. 380] at ¶ 10.

[194] Declaration of J. Duross O'Bryan ("O'Bryan Decl.") [08-ap-1005 D.E. 379] at ¶¶ 9-10.

28 [195] Ziehl MSJ Dec., Ex. N (Rollins Dep.) at 160:5-8, 161:2-10, 164:18-24, 165:1-8; Ex. L (Cook Dep.) at 61:19-25, 62:2-
7, 62:14-19, 116:1-22.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1  liability,[196] but only on the financial statement of the Borrower, SCC LLC.[197]  That was consistent

2  with GAAP, since there was no probable event that would have the contingency to mature into an

3  actual liability.  O'Bryan Decl. ¶¶ 6-7.  To book the Interim Loan as a liability four times (once for

4  the Borrower and three more times for each of the Guarantors) would have been inconsistent with

5  GAAP, as the Guarantors conceded.  Den Uyl Dec., ¶ 14; O'Bryan Dec., ¶ 15; Ziehl MSJ Decl., Ex.

6  N (Rollins Dep.) at 130:15-20.

7       *Even assuming that SSC LLC had no assets, and assuming the Guarantors' own proffered*

8  *property asset values,* the collateral pledged by the Guarantors was between $23-$24.7 million

9  dollars, *greater* than the $20 million Interim Loan.  Furthermore, an outside valuation company

10  valued Tesoro's real estate asset at between $16.2-18 million, more than double Strickland's value of

11  $7-9 million.[198]  Either way, the Guarantors' insolvency theory only works by triple-counting the full

12  value of the liability represented by the Guaranty.  In fact, since the Interim Loan was already

13  booked as a liability of SCC LLC, the same $20 million is effectively counted four times.  This

14  analysis is flawed as it neither takes into account the probability that the Guaranty would be called,

15  nor does it take into account the apportionment of liability between the (collectively solvent)

16  Guarantors if it was called.[199]  As a matter of GAAP accounting, it would not be proper to record the

17  $20 million liability four times; rather it would only be booked as a liability on SCC LLC's financial

18  statement, and that is exactly how SunCal accounted for it.[200]

19       Furthermore, equitable rights of contribution, reimbursement, indemnity, subrogation, and

20  exoneration constitute contingent assets of a debtor's estate that must be taken into account in any

21  insolvency analysis.  *Paloian v. LaSalle Bank, N.A.*, 619 F.3d 688, 695 (7th Cir. 2010); *In re Ollag*

22  *Constr. Equip. Corp.*, 578 F.2d 904, 908 (2d Cir. 1978); *Mellon Bank*, 945 F.2d at 649 (with "no

23  proof of the value of [debtor]'s rights to contribution, one cannot determine on this record whether

24  the guaranty of the 1.85 million dollar loan and the accompanying security interest rendered the

25  ---
[196] Ziehl MSJ Decl., Ex. O (Strickland Dep.): 182:21-25, 184:3-187-3; Ex. N (Rollins Dep.) at 107:10-19, 124:11-125:5, 129:14-19 (Del Rio), 140:12-141:5 (SCC Communities), 141:20-142:2 (Tesoro).

26  [197] Ziehl MSJ Decl., Ex. N (Rollins Dep.) at 130:15-20.

27  [198] Ziehl MSJ Decl., Ex. O (Strickland Dep.) at 150:24-151:6 and Ex. 12 thereto.  In addition, a broker opinion valued SCC Communities' property at between $2.8-$3M, in contrast with Strickland's appraisal of appx. $2.3M.  Ziehl MSJ Decl., Ex. O (Strickland Dep.) 155:11-17, 156:6-15 and Ex. 13 thereto.

28  [199] Den Uyl Decl. ¶¶ 14-15.
[200] O'Bryan Decl., ¶ 15; Ziehl MSJ Decl., Ex. N (Rollins Dep.) at 130:15-20.

1  corporation insolvent"). Here, given that there was over $200 million of equity in SCC LLC, that

2  the collateral posted by the Guarantors was at least $3-4 million greater than the total liability, and

3  that the Interim Loan was also guaranteed by both Bruce Elieff and Stephen Elieff, it is clear that

4  each Guarantor accrued contingent assets that would leave it far from insolvent even if the Guaranty

5  were enforced solely against that Guarantor.

6      Still further, the Guaranty has a Savings Clause that (a) calculates an allocation among the

7  Guarantors that is based upon the maximum amount that could be recovered from a Guarantor

8  without rendering the Guaranty avoidable as a fraudulent transfer under the Bankruptcy Code or

9  state law; (b) provides for rights of contribution and indemnification against the co-Guarantors to the

10  extent such allocable amount is exceeded.  Guaranty §§ 1, 4.  The Guaranty by its own terms could

11  not be a fraudulent transfer.  The failure to give effect to all parts of the contract is inconsistent with

12  New York law.  *Cruden v. Bank of New York*, 957 F.2d 961, 976 (2d Cir. 1992).

13      The Court also ruled that in determining whether the Guarantors received reasonably

14  equivalent value, they must take into account more than just the amount of loan proceeds they

15  received, but also indirect benefits.[201]  This includes the value of each Guarantor's equitable rights of

16  indemnity and contribution against its co-obligors if its Guaranty was called.  *Mellon Bank*, 945 F.2d

17  at 648; *In re Consol. Capital Equities Corp.*, 143 B.R. 80, 88 (Bankr. N.D. Tex. 1992); *In re Ollag*,

18  578 F.2d at 908.  Where the guarantor cannot show that the principal cannot repay the loan, those

19  equitable rights constitute reasonably equivalent value.  *Alexander Dispos-Haul*, 36 B.R. at 615-16.

20      Even where a transferring debtor does not receive a direct or indirect benefit, reasonably

21  equivalent value may be found where the party receiving such benefit and the debtor "are so related

22  or situated" that "what benefits one will, in such case benefit the other to some degree."  *In re Tousa*,

23  444 B.R. at 654 n.43 (citations omitted).  The "identity of interests" doctrine recognizes that a

24  corporate group may purposely avail itself of the benefits of an enterprise and, thus,  should be

25  treated as one borrowing unit even though each member of the enterprise is a separate entity."  *Id.*

26  *In re Marquis Prods., Inc.*, 150 B.R. 487, 491 (Bankr. D. Me. 1993).  Such a strong identity of

---

[201]  *In re N. Merch., Inc.*, 371 F.3d 1056, 1058 (9th Cir. 2004) (quoting *In re Jeffrey Bigelow Design Group, Inc.*, 956
F.2d 479, 485 (4th Cir. 1992)) (discussing indirect benefits in reasonably equivalent value analysis); *In re Trigem Am.
Corp.*, 431 B.R. 855, 868 (Bankr. C.D. Cal. 2010) (considering direct and indirect benefits); *In re Pajaro Dunes Rental
Agency*, 174 B.R. 557 (Bankr. N.D. Cal. 1994).

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    interests existed between the Guarantors and SCC LLC, which was a holding company.[202]

2         In short, under the controlling law adopted by the Court, rather than the facile theory asserted

3    by the Guarantors, the Guarantors will be unable to avoid the Guaranty as a fraudulent transfer

4    where the primary obligation for the $20 million Interim Loan lay with a borrower, SCC LLC, with

5    over $200 million in equity, and was co-guaranteed by Guarantors with collective equity of at least

6    $23 million, and by both of the Elieffs.

7    **I.       The Motion to Disallow the Lehman Entities' Claims Under Section 502(d) is Meritless**

8         SunCal has moved to disallow the Lehman Entities' claims under section 502(d).  There is no

9    likelihood it will prevail.  Section 502(d) of the Bankruptcy Code provides:

> (d)     Notwithstanding subsections (a) and (b) of this section, the
> court shall disallow any claim of any entity from which property is
> recoverable under section 542, 543, 550, or 553 of this title or that is a
> transferee of a transfer avoidable under section 522(f), 522(h), 544,
> 545, 547, 548, 549, or 724(a) of this title, unless such entity or
> transferee has paid the amount, or turned over any such property, for
> which such entity or transferee is liable under section 522(i), 542,
> 543, 550, or 553 of this title.

11 U.S.C. § 502(d).

15        First, the entire objection fails because claim disallowance under § 502(d) is premised on a

16   creditor's non-compliance with a judgment avoiding a transfer, something that cannot occur here.

17   The purpose of section 502(d) is to ensure compliance with judicial orders.  *In re Davis*, 889 F.2d

18   658, 661 (5th Cir. 1989).  But in this case, the only transfers at issue in SunCal's avoidance claims

19   are transfers of liens, not cash, and any judgment avoiding a lien is self-executing.  Thus there is no

20   way that the Lehman Entities could fail to comply with such a judgment avoiding a lien, even if they

21   had the inclination.  Accordingly, there will and can be no final disallowance of the Lehman Entities'

22   claims under § 502(d).

24        Second, the § 502(d) objection is brought in the Trustee Debtor cases by SunCal

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

---

[202] Ziehl MSJ Decl., Ex. L (Cook Dep.) at 133:19-134:13; Ziehl MSJ Decl., Ex. N (Rollins Dep.) at 39:14-16.

Pachulski Stang Ziehl & Jones LLP
Attorneys At Law
Los Angeles, California

Management, as a purported creditor.[203]  Yet disallowance under § 502(d) is premised on a final

avoidance judgment; as SunCal acknowledged, pleading an avoidance claim results only in

temporary disallowance.  But the Trustee has exclusive standing to prosecute avoidance claims to

their conclusion  Thus only a trustee has standing to prosecute a § 502(d) objection.  *In re Odom

Antennas Inc.*, 340 F.3d 705, 709 (8th Cir. 2003) (junior lienholders cannot "accomplish indirectly

what they could not accomplish directly"); *In re Prime Motor Inns, Inc.*, 135 B.R. 917, 920 (Bankr.

S.D. Fla. 1992) (creditor cannot "avoid the 'standing' issue by disguising its …avoidance action as

an objection to claims."); *In re Magnolia Gas Company, L.L.C.*, 255 B.R. 900, 915 (Bankr. W.D.

Okla. 2000) (following *Prime Motor Inns*).

> Although UJB has cited several cases for the proposition an objection
> to claim based on avoidance grounds under § 502(d) of the Bankruptcy
> Code is somehow fundamentally different from a pure avoidance
> action, in all the cases cited by UJB, the party objecting to claims was
> a bankruptcy trustee or debtor-in-possession, parties expressly vested
> with standing under § 547 to bring avoidance actions. [citations
> omitted]  Thus, the issue is not whether a creditor may object to
> another creditor's claim . . . but whether a creditor has standing to raise
> § 547 as a basis for such objection.  The narrow issue presented here is
> who may assert a claim to avoid a preference under § 547, whether
> offensively or defensively.  It is clear that the statutory language of §
> 547, which specifically vests standing to bring avoidance actions in a
> trustee, cannot be circumvented merely by asserting § 547 defensively.

*Prime Motor Inns*, 135 B.R. at 920-921 (emphasis added).  The only authority cited by

SunCal Management was a 1922 case from the Eighth Circuit[204] that was effectively overruled by

the Eighth Circuit in 2003 in *Odom*.  While SunCal Management was permitted to obtain temporary

disallowance under § 502(d) on the basis of pleading an avoidance claim, it acknowledged final

disallowance would require a final avoidance judgment, something that ultimately only the Trustee

can pursue.

---

[203] The claims objected to under § 502(d) in the Trustee Debtor cases are: Oak Knoll: Claim 12 for $158,141,365 and
$13,002,451 in administrative expenses; Torrance: Claim No. 4 for $158,141,365 and $1,346,711 in administrative
expenses; Heartland: Claim No. 9 for $354,325,126 and $1,935,250 in administrative expenses; Marblehead: Claim No.
21 for $354,325,126 and $5,634,270 in administrative expenses; Delta Coves: Claim No. 21-2 for $2,060,231 and
$2,767,725 in administrative expenses; and all other administrative claims of the Lehman Creditors against the above
Debtors.

[204] *Atwood-Larson Co. v. Hasvold (In re Richmond Equity Exchange)*, 280 F. 385 (8th Cir. 1922).

Third, the Court has rejected SunCal's attempt to object to the Lehman Entities' administrative financing claims under § 502(d).[205]

Fourth, the avoidance claims brought by the Voluntary Debtors are futile.  Under § 548(c) and Cal.Civ. Code § 3439.08(d), a good faith transferee retains a lien to the extent it gave value.  In this case, with respect to the claims asserted by the Voluntary Debtors, in every case except Acton the alleged current value of the property is less than the amount of proceeds that each Voluntary Debtor alleges it received.

| Loans | Debtor | Amount Allegedly Received | Alleged Value |
|---|---|---|---|
| **Lehman ALI (Heartland/Marblehead Loan)** | SunCal Heartland | $45,594,848 | $7,900,000 (12/7/08) |
| | SunCal Marblehead | $258,843,352 | $187,500,000 (12/20/08) |
| **Lehman ALI (Del Amo Loan)** | Oak Knoll | $103,575,426 | $48,000,000 (12/5/08) |
| | Torrance | 45,185,350 | $25,000,000 (11/28/08) |
| **LCPI (SunCal Communities I Loan)** Loan proceeds also alleged to have been received by: Beaumont: $42,030925 Johannson: $14,636,674 | Bickford Ranch | $174,570,287 | $237,500,00 (12/12/06) |
| | Emerald Meadows | $4,763,858 | $12,000,000 (9/16/06) |
| | Acton Estates | $380,069 | $13,500,000 |
| | Summit Valley | $9,925,373 | $5,200,000 (12/1/08) |
| | SunCal I | 0 | 0* (per Mot. to Disallow at 20 n.9) |

Fifth, the avoidance claims simply lack merit.  They rely on the same flawed analysis of insolvency and reasonably equivalent value that the Court rejected in denying SunCal's motion for summary judgment in respect of the Interim Loan, *i.e.*, SunCal simply compares the gross amount of each loan to the amount of loan proceeds received by an individual borrower. If such allegations

---

[205] *Order Granting Joint Motion of Lehman Creditors and Chapter 11 Trustee for: (A) Approval of Stipulation of July 2011 by and between Lehman Ali, Inc and Chapter 11 Trustee, Pursuant to 11 USC Sections 362, 363, 364, and 507, (1) Approving Senior Secured Superpriority Postpetition Financing, (2) Granting Liens and Providing Superpriority Administrative Expense Status, and (3) Modifying Automatic Stay to the Extent Necessary; and (B) Clarification of Prior Financing Orders*, entered August 24, 2011 [D.E. 2604].

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1   stated a case, every joint loan would potentially constitute a fraudulent transfer, since each co-

2   borrower receives less than 100% of the loan proceeds.  Not surprisingly, the law requires SunCal to

3   prove more than it has attempted to do thus far.

### V.
### THE PLANS SATISFY THE "CRAM DOWN"
### REQUIREMENTS OF SECTION 1129(B) OF THE BANKRUPTCY
### CODE WITH RESPECT TO REJECTING CLASSES OF THE APPLICABLE PLANS

Section 1129(b) of the Bankruptcy Code provides a mechanism for confirmation of a plan in

circumstances where the plan is not accepted by all impaired classes of claims and equity interests.

11 U.S.C. § 1129 (b).  When all requirements of section 1129(a) have been satisfied, except that the

plan does not satisfy section 1128(a)(8) as to one or more impaired classes, the "cram down"

requirements section 1129(b) of the Bankruptcy Code may be invoked with respect to each impaired,

non-consenting class.  *In re Ruti-Sweetwater, Inc.*, 836 F.2d 1263 (10th Cir. 1988).

Here, the provisions of section 1129(b) are applicable to certain Debtors as to the Classes of

impaired Claims against such Debtors that have or are deemed to have rejected the applicable Plans

with respect to each of those Debtors, as summarized in section II.H above and in the Ballot

Certifications.  Class 9 of the Trustee/Lehman Plan and Class 10 of the Lehman VD Plan are not

entitled to any distributions under such Plans and deemed to reject the applicable Plans.[206]

The Plan Proponents request that the Court conduct a cram down hearing as to dissenting

Classes.

To confirm a plan over the dissent of a class, or cram down the plan, it must be shown that

the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the impaired

classes of claims and interests rejecting the Plan.  As noted by one commentator:

> Reducing "discrimination" to its bear essentials, a dissident class must
> not only receive "fair and equitable" treatment, but the class must also
> receive treatment which allocates value to the class in a manner

---

[206] No Classes of Secured Claims are Impaired under the Plans and, thus, no such Class can or did reject either Plan and no cram down is necessary of any Class of Secured Claims. As noted above, although the real property taxing authorities may equate elimination of penalties through cure as impairment, payment of the statutory cure amount constitutes full payment of the Claim.  *See In re Entz-White Lumber & Supply, Inc.*, 850 F.2d 1338, 1342 (9th Cir. 1988) ("It is clear that the power to cure under the Bankruptcy Code [section 1124(2)] authorizes a plan to nullify all consequences of a default, including avoidance of default penalties such as higher interest."); *In re DSBC Investments, L.L.C.*, 2009 Bankr. LEXIS 2954 (Bankr. D. Ariz. Sept. 11, 2009).

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

consistent with the treatment afforded to other classes with similar
legal claims against the debtor.

5 *Collier on Bankruptcy* ¶ 1129.03 [1129-79].  Each Class consists of distinct legal claims against

the Debtors such that there can be no unfair discrimination.

Emanating from the "fair and equitable" language of the statute is the additional requirement

for cram down that no class senior to the dissenting class receive more than one hundred percent of

their claims.  5 *Collier on Bankruptcy* ¶ 1129.03 [1129-111].  Because the Plans do not provide more

than full payment for any Class, this element of cramdown is satisfied as to all Classes.

Additional elements of cramdown, specified in the statute, are specific to the type of claims

in the dissenting class, *i.e.*, secured claims, unsecured claims, or interests.  As the following reflects,

despite the deemed rejecting Classes of Interests and the other Classes that rejected the Plans, each

as set forth in the Ballot Certifications, the Plan Proponents respectfully submit that the Plans should

be confirmed notwithstanding such deemed rejections, non-acceptances, and/or rejections because

the Plans do not discriminate unfairly and are fair and equitable with respect to all Classes.

## A.      The Plans Do Not Discriminate Unfairly

Section 1129 (b)(1) of the Bankruptcy Code does not prohibit discrimination between

classes; it prohibits only discrimination that is unfair.  *In re 11,111, Inc.*, 117 B.R. 471, 478 (Bankr.

D. Minn. 1990).  The weight of judicial authority holds that a plan unfairly discriminates in violation

of section 1129(b) of the Bankruptcy Code only if similar classes are treated differently without a

reasonable basis for the disparate treatment.  *See, e.g.*, *In re Tucson Self-Storage, Inc.*, 166 B.R. 892,

898 (B.A.P. 9th Cir. 1994) (explaining that "[a] plan discriminates unfairly if it singles out the holder

of some claim or interest for particular treatment," and denying confirmation of a plan that proposed

to pay unsecured deficiency claims less that other unsecured claims in full); *In re Mcorp Fin., Inc.*,

137 B.R. 219, 234 (Bankr. S.D. Tex. 1992), *dismissed on other grounds*, 139 B.R. 820 (S.D. Tex.

1992) (explaining that section 1129(b)(1) requires that a dissenting class receive "treatment which

allocates value to the [dissenting] class in a manner consistent with the treatment afforded to other

classes with similar legal claims against the debtor").

Accordingly, as between two classes of claims or two classes of equity interests, there is no

unfair discrimination if (i) the classes are composed of dissimilar claims or interests, or (ii) taking

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    into account the particular facts and circumstances of the case, there is a reasonable basis for such

2    disparate treatment.  *See, e.g., In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986)

3    (classes comprised of dissimilar claims and interests); *In re Buttonwood Partners, Ltd.*, 111 B.R. 57,

4    63 (Bankr. S.D.N.Y. 1990) (providing disparate treatment but on a reasonable basis).

5        1.    <u>The Plans Do Not Discriminate Unfairly</u>

6        The treatment provisions for the various Classes are not unfairly discriminatory.  The various

7    Classes of Secured Claims are offered similar treatment for any Allowed Claims in the Class –

8    essentially full payment or access to their collateral or unimpairment.  (Class 2, in which the Lehman

9    Secured Claims are placed, receives less favorable treatment by agreement of the Lehman Creditors.

10    Class 5 in each Plan is comprised of Priority Claims.  The preferred treatment for the Claims

11    in these Classes is mandated by statute and the nature of these Claims and is not discriminatory.

12        Class 6 in each Plan is comprised of Reliance Claims.  Reliance Claims are certain non-

13    priority, unsecured Claims that, absent success in the SunCal Actions, would receive nothing in a

14    chapter 7 case due to the Lehman Creditors' liens on the Plan Projects.  Yet, these Claims meet what

15    the Lehman Creditors and Trustee view as the threshold characteristics for at least their potential

16    exposure for such Claims.  Thus, Holders of Reliance Claims that properly grant the

17    assignment/release for the Lehman Released Parties receive a higher Lehman Distribution

18    Enhancement than holders of General Unsecured Claims providing such assignment/release.  The

19    features distinguishing General Unsecured Claims from Reliance Claims, making the Lehman

20    Creditors' belief that they face more potential exposure from the latter Claims than the former

21    rational and reasonable and justifying this differing, but not discriminatory, treatment are more fully

22    reflected in the definitions in the Plans for each term and described in some detail in discussing the

23    settlement embodied in the Plans in Article IV. By example, the Debtors executed at least 134

24    Protective Disbursement Agreements that each provide, among other things, "that the Lenders are

25    not under any obligation to make the Protective Disbursement or any future protective disbursement

26    or Protective Advance." *See* Wilson Declaration, ¶¶ 15 - 17.  Thus, the Lehman Creditors' belief that

27    insiders do not hold Claims as to which the Lehman Creditors' potential exposure is as high as

28    others' Claims is rationally based and reasonable. Therefore, there is no unfair discrimination

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

between the Classes of Reliance Claims in Class 6 and the Classes of General Unsecured Claims in Class 7.

Class 7 in the Trustee/Lehman Plan and Class 7 in the Lehman VD Plan as to Group I Debtors are comprised of General Unsecured Claims. These General Unsecured Claims in Class 7 are certain non-priority, unsecured Claims that, absent success in the SunCal Actions, would receive nothing in a chapter 7 case due to the Lehman Creditors' liens on the Plan Projects. Unlike the Reliance Claims, however, these Claims lack the threshold characteristics for the Lehman Creditors' potential litigation exposure for these Claims as set forth above and explained in Article IV above. Therefore, the difference in treatment for Classes of Reliance Claims and Classes of General Unsecured Claims against the TD Plan Debtors and Group I Debtors under the Lehman VD Plan is not discriminatory and these Claims are appropriately separately classified.

Class 8 in the Lehman VD Plan for Group II Debtors is comprised of General Unsecured Claims. For each Group II Debtor, this is the only Class of non-priority, unsecured claims and, thus, no discrimination is possible.

Class 8 in the Trustee/Lehman Plan and Class 9 in the Lehman VD Plan are comprised of Settling Bond Issuer Related Future Work Claims and are clearly different than all Claims in the remaining Classes. The Claims in these Classes either (1) are held by municipalities and utilities as to which certain performance by a Plan Debtor was backed or secured by a bond or (2) are held by the Bond Issuers. The municipalities and utilities Claims are bonded. And, as noted above, one or both Bond Issuers have contended that: (i) should a Bond Issuer be required to pay or perform under a Project Bond because of a demand from a municipality that is the beneficiary of the Project Bond, the costs for improving the subject Plan Project can be recovered upon sale or transfer of the Plan Project from its subsequent owner; and (ii) absent consent of the applicable Bond Issuer, the Project Bonds must be replaced on sale or transfer of each applicable Plan Project. All of these Claims are contingent. The Claims in these classes receive future treatment under the Plans unique to their nature. This treatment, because tailored to the Claims' nature, is not discriminatory.

Class 9 in the Trustee/Lehman Plan and Class 10 in the Lehman VD Plans are comprised of Interests and are clearly different than all Claims in the remaining Classes. Interests are different

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

than the Claims in other Classes because they represent a certain share of equity ownership in the applicable Plan Debtor.  There are no other Classes against each applicable Plan Debtor containing claims with similar attributes and, thus, no discrimination is possible.

Accordingly, the Plans do not unfairly discriminate.

**B.      The Plans are Fair and Equitable**

What constitutes "fair and equitable" treatment for the purposes of section 1129 (b)(1) of the Bankruptcy Code is set forth in detail in section 1129 (b)(2) of the Bankruptcy Code.

  1.      The Plans are Fair and Equitable to Impaired General Unsecured Claims

A preliminary review of the Ballot Certifications indicates that a Class of General Unsecured Claims has voted to reject the Lehman VD Lender Plan.  *See* the chart in Section II.H above.

Section 1129(b)(2)(B)(ii) provides that a plan is "fair and equitable" with respect to class of unsecured claims where, "the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property." 11 U.S.C. § 1129(b)(2)(B)(ii).

The applicable Plans satisfy the requirement set forth in section 1129(b)(2)(B)(ii) as to these Classes because the only Classes that are junior to these Classes of non-priority, unsecured Claims (the Interests in Class 9 under the Trustee/Lehman Plan and Classes 10 under Lehman VD Plan) are not receiving any distribution under the applicable Plans.  *See Liberty National Enters. v. Ambanc La Mesa Ltd. P'ship* (*In re Ambanc La Mesa Ltd. P'ship*), 115 F.3d 650, 654 (9th Cir. 1997).

  2.      The Plans are Fair and Equitable to Impaired Interests

The Classes of Interests under the Plans all are deemed to reject (Class 9 in the Trustee/Lehman Plan and Class 10 in the Lehman VD Plan).

Section 1129(b)(2)(C) requires for confirmation over the dissent of an equity class that a junior interest "will not receive or retain under the plan on account of such junior interest any property." Here, no holders of interests are getting anything on account of their interests.

Based on the foregoing, the Plan Proponents request confirmation of the Plans pursuant to section 1129 (b) of the Bankruptcy Code.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1

## VI.

2

### THE PLANS SHOULD BE

3

### <u>CONFIRMED OVER ALL OBJECTIONS</u>

4

Objections or other responses to the Plans were filed on or prior to September 19, 2011 (the

5

"<u>Confirmation Responses</u>").  Absent consensual resolutions and to the extent that the Confirmation

6

Responses are not addressed by this Brief, the Plan Proponents will address the Confirmation

7

Responses in detail in the omnibus reply to objections to the Plans and this Brief, which reply is to

8

be filed on October 14, 2011.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1

2

**VII.**

3

**CONCLUSION**

4

  Based on the foregoing, the Plans meet each and every requirement for confirmation pursuant

5

to section 1129 of the Bankruptcy Code.  Accordingly, the Plan Proponents request that the

6

Bankruptcy Court enter order confirming the Plans and granting such other and further relief as is

7

just and proper under the circumstances.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Dated:    September 26, 2011

PACHULSKI STANG ZIEHL & JONES LLP

*/s/ Robert B. Orgel*

Richard M. Pachulski (CA Bar No. 90073)
Dean A. Ziehl (CA Bar No. 84529)
Robert B. Orgel (CA Bar No. 101875)
John W. Lucas (CA Bar No. 271038)

-and-

WEIL, GOTSHAL & MANGES LLP
Edward Soto (admitted *pro hac vice*)
Alfredo R. Perez (admitted *pro hac vice*)

Counsel for Lehman Commercial Paper Inc.,
Lehman ALI, Inc., Northlake Holdings, LLC and
OVC Holdings, LLC

Dated:    September 26, 2011

THE LOBEL FIRM, LLP

William N. Lobel (CA Bar No. 93202)
Mike D. Neue (CA Bar No. 179303)

General Insolvency Counsel for Steven M. Speier,
the Chapter 11 Trustee for the Trustee Debtors